UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED

2005 MAR -8  P 3:10

U.S. DISTRICT COURT
DISTRICT OF MASS.

------------------------------------------------x

ERNESTO DARQUEA,

Plaintiff,

–against–

VIISAGE TECHNOLOGY, INC.,
BERNARD BAILEY, WILLIAM K. AULET,
and DENIS K. BERUBE,

Defendants.

------------------------------------------------x

**COMPLAINT**

| RECEIPT # | 62506 |
|---|---|
| AMOUNT $ | 250 ⁰⁰ |
| SUMMONS ISSUED | 1-4 |
| LOCAL RULE 4.1 | |
| WAIVER FORM | |
| MCF ISSUED | |
| BY DPTY. CLK. | ⁄ʰ |
| DATE | 3·8·05 |

**JURY TRIAL DEMANDED**

**05    10438 MLW**

**MAGISTRATE JUDGE** Collings

Plaintiff Ernesto Darquea ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and on information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Viisage Technology, Inc., Inc. ("Viisage" or the "Company") and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE CASE

1.    This securities fraud class action is brought to recover damages for all persons

who purchased Viisage securities from October 25, 2004 through March 2, 2005 (the "Class Period").

2.      Viisage is a Billerica, Massachusetts company which specializes in providing state governments and others with secure means for issuing drivers' licenses, authenticating documents, and preventing identity theft.

3.      For many years, Viisage has not been able to run its business profitably. After a loss of $17.7 million in 2003, the Company found itself in dire financial straits in the first half of 2004. Its credit line with Commerce Bank had proved inadequate to its needs, and controlling shareholder Lau Acquisition Corp. ("Lau") had been forced during 2003 to bail out Viisage by making loans totaling approximately $5 million pursuant to a $7 million credit facility entered into between Lau and Viisage in May 2003. Lau is controlled by the family of defendant Denis Berube ("Berube"), the Chairman of the Company's Board of Directors.

4.      Viisage knew that its liquidity problems would be eased, and Lau relieved of its uncomfortable role as lender of last resort to a struggling enterprise, if Viisage could obtain a large and flexible credit line from a reputable bank. To do this, Viisage would have to present itself as a Company that was not constantly teetering on the edge of business failure, but rather as one which had turned the corner to profitability. The defendants thus hatched a scheme to create an artificial profit in the third quarter of 2004, which ended on September 26, 2004. Such a profit would allow Viisage to accomplish its crucial goal of replacing its old inadequate credit line with a newer, more generous credit line.

5.      On October 26, 2004, the beginning of the Class Period, Viisage reported a net

2

profit for the third quarter of 2004, its first corporate profit in three years. Turning the corner to apparent profitability had allowed Viisage to obtain and announce a new $25 million credit line, as to which defendant Aulet, the CFO, boasted: "This new arrangement will not only give us valuable flexibility but will also reduce our rates of borrowing, significantly simplify our covenants, and increase yields on our money in the bank...." Viisage also announced that it was increasing its projections for EBITDA to $11.5 to $12.5 million for the 2004 year. (EBITDA is a key financial measure signifying earnings before deducting interest, taxes, depreciation and amortization).

6.      Unbeknownst to shareholders, this third quarter profit had been artificially engineered by improperly recognizing corporate benefits, and deferring recognition of corporate expenses from the third quarter into the fourth quarter. The artificially rosy third quarter report was followed almost immediately by unusual and suspicious selling by insiders, including Lau.

7.      On February 7, 2005 Viisage stunned investors by reporting that in its fourth quarter it had returned to serious unprofitability. It reported unusual and disproportionate fourth quarter charges, many of which had plainly been improperly deferred from the third quarter or earlier periods. One such charge, in the amount of $2 million, related to a settlement payment in a case in which Viisage had been accused of misconduct in the procurement of a contract with the State of Georgia. During the third quarter of 2004, Georgia had been enjoined from making this payment, and in the fourth quarter the payment was adjudged unlawful due to fraud by Viisage. This prospective payment, given the circumstances, should have the subject of a reserve against earnings by the beginning of the Class Period, and should have been deemed impaired no later than December 27, 2004, the date of the final court ruling. Nonetheless, Viisage remained

3

silent regarding the financial impact of this matter until Feb. 7, 2005. Other peculiar fourth

quarter charges include large write-offs for legal fees, and SEC compliance costs. Due to these

events, Viisage said EBITDA for 2004 would be $8-9 million, not the $11.5-12.5 million

previously forecast, and that its loss for the year would be $7-8 million. On this news, Viisage

stock dropped 20% on extraordinary trading volume of 4.6 million shares.

8.    On March 2, 2005, Viisage announced more bad news. Its loss for the fourth

quarter of 2004 was an astounding $5.2 million. In addition, Viisage stunned investors with the

following announcement:

> In connection with the preparation of the Company's consolidated financial statements for
> the year ended December 31, 2004, the Company determined that it had an internal
> control deficiency that constitutes a "material weakness" as defined by the Public
> Company Accounting Oversight Board's Accounting Standard No. 2. The Company has
> concluded that it had insufficient personnel resources and technical accounting expertise
> within the accounting function to resolve non-routine or complex accounting matters. **As
> a result, management will be unable to conclude that the Company's internal
> controls over financial reporting are effective as of December 31, 2004. Therefore,
> BDO Seidman LLP, the Company's external accounting firm, will issue an adverse
> opinion with respect to the effectiveness of the Company's internal controls over
> financial reporting.** In addition, as part of the Sarbanes-Oxley Section 404 compliance
> review, the Company is in the process of reviewing all of its other key internal control
> processes as well. While the evaluation is ongoing, management believes that it will
> likely conclude that the Company had significant deficiencies, which could constitute a
> material weakness, in the control processes around information technology systems as
> well.

9.    In reaction to this news, Viisage stock dropped another 20%, on trading volume of

1.6 million shares.

## JURISDICTION AND VENUE

10.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

11.    This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

12.    Venue is proper in this judicial district pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this judicial district, and the Company has its principal offices in this District.

13.    In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

14.    Plaintiff Ernesto Darquea , as set forth in the accompanying certification, incorporated by reference herein, purchased Viisage stock at artificially inflated prices during the Class Period and has been damaged thereby.

15.    Defendant Viisage delivers technology identity solutions for governments, law enforcement agencies and businesses concerned with enhancing security, reducing identity theft,

providing access control and protecting personal privacy. The Company's business involves two related segments: secure credentials and biometrics. The secure credentials solutions segment involves the design, development, marketing and implementation of integrated software and hardware solutions that produce identification credentials utilizing face recognition and other biometric technologies. The focus of the biometric technology solutions segment is primarily on applications designed to deter criminal and terrorist activities, including government research and development contracts.

16.    Defendant Bernard C. Bailey is the Company's President, Chief Executive Officer and a director.

17.    Defendant William K. Aulet is a Senior Vice-President and Chief Financial Officer.

18.    Non-party Lau Acquisition Corp. ("Lau"), d/b/a Lau Technologies, beneficially owns approximately 13.8 percent of the Company's stock. The Company has significant relationships with Lau. The Company had previously acquired Lau Security Systems from Lau. Prior to the offering described below, Lau provided the Company with a credit facility in an aggregate principal amount of $7.3 million, which was secured by some of the Company's assets.

19.    Defendant Denis K. Berube, is the Company's Chairman. He and his spouse own a majority of Lau's voting stock. Berube is sued as a controlling person of Viisage. Both Lau and Berube exercised actual control over the Company, and its operations and public announcements. The Company's public filings made during the Class Period assert that Lau exercises a "strong influence on matters requiring approval by our stockholders, including the election of directors and most corporate actions, including mergers and acquisitions." (Form S-3,

filed Dec. 13, 2004, p.8). Berube, as a director and Lau's Board designee, signed and approved all or most of the Company's key S.E.C. filings.

20.     During the Class Period, defendants Bailey and Aulet as senior executive officers and Berube as controlling persons were privy to non-public information concerning the Company's business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, these defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being misrepresented to, the investing public.

21.     As officers and controlling persons of a publicly-held company whose securities were and are registered with the SEC pursuant to the Exchange Act, and which were publicly traded and governed by the provisions of the federal securities laws, Bailey and Aulet had a duty to disseminate accurate and truthful information promptly with respect to the Company's financial condition and performance, and product development, and to correct any previously-issued statements which had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. Bailey's and Aulet's misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of Viisage from October 25, 2004, through March 2, 2005, (the "Class Period"), and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

23.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively publicly traded. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

24.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

25.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

26.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

8

a.    whether the federal securities laws were violated by defendants' acts as alleged herein;

b.    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and products of the Company; and

c.    to what extent the members of the Class have sustained damages and the proper measure of damages.

27.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

28.    Prior to the commencement of the class period, Viisage had expanded its operations and had incurred high interest rate loans to finance its operations and acquisitions, including loans from Lau, which became the Company's lender of last resort.

29.    On February 14, 2004, the Company acquired Trans Digital Technologies from B.G. Beck.  In connection with the acquisition, Viisage issued a promissory note to Beck in the amount of $15.3 million.

30.    In addition to the funds owed to Beck and Lau, the Company also had loans outstanding to Commerce Bank.  The outstanding debt included:

9

| Lender | Due Date | Interest Rate | | Amount (000's) |
|--------|----------|:---:|---|---|
| B.G. Beck | 12/1/2005 | 8.50 | % | $ 15,300 |
| Commerce | 3/11/2006 | 6.25 | % | 1,612 |
| Commerce | 6/20/2006 | 8.00 | % | 2,053 |
| Commerce | 2/27/2007 | 7.30 | % | 2,924 |
| Commerce | 6/24/2007 | 5.25 | % | 901 |
| Commerce | 12/31/2007 | 5.25 | % | 1,394 |
| Commerce | 4/24/2008 | 5.25 | % | 1,191 |
| Lau | 8/30/2005 | 8.50 | % | 1,014 |
| Lau | 5/30/2008 | 8.50 | % | 2,249 |
| Lau | 6/30/2009 | 8.50 | % | 1,673 |
| | | | | $ 30,311 |

31.    In a follow-on public offering on August 5, 2004, the Company sold 7.2 million shares at $5.50 a share and raised approximately $37.4 million. Approximately $30.3 million of these proceeds were used to repay debt, including debt owed to Lau and Beck. This offering, while easing the Company's immediate liquidity issues, did not solve all of its problems. For one thing, as a result of the offering share price, the offering markedly depressed the market price of Viisage shares. In addition, the Company still lacked adequate working capital or credit facilities; the credit agreement with Commerce Bank was too restrictive for Viisage's needs, and it did not provide for all of its credit requirements. As a result, Lau and Berube had become the lenders of last resort for Viisage. These defendants did not want to continue in their role as lenders of last resort, and thus the defendants hatched a scheme to portray the Company as very successful, and profitable, so as to secure a credit line from another lender, and relieve Lau and Berube of any concerns that they would be forced to fund what was, in truth, a struggling company.

32.    Thereafter, the defendants launched a scheme to flood the market with highly positive information concerning Viisage, in order to pump up the Company's depressed stock

10

price. Thus, in a conference with analysts on October 25, 2004, the defendants portrayed Viisage as on track, and profitable. They represented that the Company's costs were under control, and that the Company's future performance would be even better than in the third Quarter of 2004. There was no disclosure of material negatives, including the true facts and costs concerning the Georgia license litigation, discussed below, material accounting deficiencies which plagued the Company, of which the defendants must have been aware, and the failure to disclose the nature and extent of compliance costs associated with the Sarbanes-Oxley Act of 2002, which had imposed new corporate governance responsibilities upon public companies. Defendants omitted to disclose a real likelihood that very material contracts expected to be finalized in the fourth quarter of 2004 would not be; that the Company's legal fees would skyrocket by $500,000 in the fourth quarter; or that the Company's increased overseas business would likely result in a loss of a like amount due to weakness in the dollar. On October 25, 2004, the Company announced financial results for the Third Quarter of 2004. Revenues for the third quarter of 2004 totaled $19.91 million, marking the fifth consecutive quarter in which revenues set a Company record, up 97% from $10.11 million in the comparable period last year, as reported in accordance with the change in accounting principle described below. **The Company also reported news certain to impress shareholders and lenders: Viisage had returned to profitability, reporting its first profitable quarter in years.** The net income for the third quarter of 2004 was $198,000, or $0.00 on a basic and diluted share basis, compared to a net loss of $389,000, or $0.02 per basic and diluted share, for the third quarter of 2003.

33.     In an Analysts' Conference that day, defendant Bailey stated in relevant part:

> We are certainly exceedingly pleased with our results for this
> quarter. For the fifth straight quarter we are reporting record

11

quarterly revenues. At $19.9m our revenues are up 97 percent on a year-over-year basis. I am also pleased to report that we produced a profitable quarter with earnings of almost $200,000. At the same time, we have generated a record level of EBITDA. At $3.4m this quarter our EBITDA was up more than 110 percent from the previous year's quarter.

These financial results are certainly a testament to our continued focus on delivering profitable revenue growth for our shareholders, while effectively managing our cost structure. I also think these results speak very well to the momentum we are building, both for the rest of this year, as well as leading us into 2005.

The results we have already produced and the opportunities ahead of us provide us with the confidence today to increase our 2004 annual revenue and EBITDA guidance.

Defendant Bailey touted the Company's new credit line:

This past quarter we also put a great deal of effort into improving the long-term financial health of our Company. Our follow-on offering allowed us to increase our cash position from $12.6m to more than $37m, while at the same time reducing our outstanding debt from $29.8m to $19.2m. *This improved financial health has allowed us to secure a $25m line of credit with the leading financial institution, Citizens Bank, which will give us even greater financial flexibility to build our Company going forward.*

Defendant Aulet was reported to have said:

As Bernard mentioned, for the third quarter of 2004 we experienced robust revenue growth. Revenues for the recently completed quarter were $19.91m, a fifth consecutive record quarter.

In addition, these systems will provide the foundation for ongoing higher margin revenue streams in the future, specifically in the area of consumables. The gross margin percentage on these production systems was within the mid-teens range and, therefore, are adding to the absolute gross margin they did go down the overall gross margin percentage for the Company in the quarter.

12

Of the 97 percent year-to-year growth rate, organic growth represented approximately one-third demonstrating that not only are our acquisitions already contributing significantly to our top line growth but we are experiencing healthy organic growth in our core business, as well.

Equally as important to our top line growth is our net income. We are proud to announce the first GAAP profit in three years with $198,000 of net income, or essentially breakeven on a basic and diluted share basis, demonstrating our commitment to attaining this important long-term goal.   We've been steadily improving our performance in the bottom line, and in the first quarter we had a loss of slightly over $1m.  Last quarter this has been reduced to a loss of $17,000.  This quarter we crossed the breakeven line to be net income positive. For a year-to-year comparison purposes in the last year's third quarter the Company recorded a loss of $390,000 or 2 cents per share on a basic and diluted basis  We are pleased with our progress here.

Defendant Aulet further stated:

The gross profit margins we indicated on the last conference call that they would decrease due to the Department of Defense, our production systems, anticipated in this quarter.  As projected, this became a reality this quarter as our gross margins decreased to 28 percent from 31 percent in this year's second quarter, and down from a record 33 percent in last year's third quarter.  This is a reflection of product mix.  We anticipate a substantial number of tax reductions to shift in the fourth quarter, as well, albeit at a slightly lower total volume.

Even so, we see that investments we have made in improving our product offerings and efficiencies in delivery should make this just completed quarter a temporary depression in gross margin percentage.  We are confident that these efforts to increase gross margin going forward will pay dividends in the near term.  In fact, as we look forward to our pipeline for the next quarter and the productivity improvements we have made even with the significant component of common access card production systems in the quarter's revenue we believe we are poised for significant overall gross margin improvement that will not only return us to the margins we saw earlier this year but allow us to potentially exceed them.

13

Defendant Aulet stressed the importance of the new credit facility:

> As Bernard mentioned, we're pleased to announce as well today that we have received a commitment letter from a major bank for a $25m line of credit to replace our existing bank facilities. This new arrangement will not only give us valuable flexibility but will also reduce our rates of borrowing, significantly simplify our covenants, and increase yields on our money in the bank, all while making our G&A operations more productive by providing services locally and worldwide to meet our rapidly evolving needs.
>
> In the fourth quarter we will be able, if we so choose, to reduce our outstanding debt quite significantly, and after paying off early prepayment fees save approximately $600,000 a year in interest expense. We will be monitoring this closely, and our actions will be affected directly by our M&A program. But in any case, we have new financial flexibility that will be very valuable to support our growth, as well as being highly cost effective.

Significantly, defendant Aulet raised the Company's guidance for Fiscal 2004:

> Now, I'd like to discuss our annual guidance for 2004. In early May, based upon the strength of our pipeline business we raised annual guidance to 60m to 63m, and our EBITDA guidance for 2004 to 11m to 12m. **At this time, we are comfortable raising this guidance *yet again* to revenue of $66m to $68m for 2004, up approximately 10 percent, and EBITDA of 11.5m to 12.5m for the year.**

34.    On December 27, 2004, the Company issued a press release concerning the

dispute over the award of the Georgia state drivers license contract, which stated:

> "Viisage learned today that the Georgia court has issued a summary judgment ruling permitting the state to move forward in its rebid of the state's drivers' license contract and permitting Viisage to compete to retain its contract with the state. We are pleased that the state will finally be permitted to begin the rebid process and that the judge has agreed with us and the state on virtually all aspects of the summary judgment motions," said Bernard Bailey, president and CEO, Viisage. Contrary to statements made by our competitor in an earlier press release, the court did not disallow the 2002 award of the contract to Viisage. The court merely

14

acknowledged that the state and Viisage had entered into a settlement agreement under which the state terminated the drivers' license contract with Viisage for convenience and was to pay Viisage a $2.5 million settlement payment, all as previously announced by Viisage. However, the court has ruled that the state cannot pay $2 million of that settlement payment. Without this payment, Viisage believes that either the settlement agreement with the state is not effective and that Viisage's contract with the state remains in place or that Viisage's initial claim for an $8.2 million settlement payment is revived. While we are very pleased with the overall result, we are disappointed and strongly disagree with this and certain other elements of the court's ruling, including statements of disputed fact which we believe are not appropriate in a summary judgment ruling, and intend to appeal.

35.    On February 7, 2005, the Company began to admit the truth: its stellar

performance was overstated, and that there were significant negatives which the defendants had

failed to reveal. In a press release it revised its previous guidance on fiscal 2004 financial

performance, stating in relevant part:

Earnings before interest, taxes, depreciation and amortization (EBITDA) and net income are expected to fall below guidance. The expected shortfall is primarily due to several non-recurring factors, including a non-cash impairment charge of $2 million in connection with a settlement involving the Company's previous drivers' license contract with the Georgia Department of Motor Vehicle Safety, which had been litigated. This charge was a result of a judge's ruling in the fourth quarter, which the Company is currently appealing.

In issuing its results for the third quarter of 2004 on October 25, 2004, the Company had increased its guidance for 2004, anticipating revenues for the full year in the range of $66-68 million, with EBITDA between $11.5-12.5 million, while maintaining net income guidance as a loss of $1.5 million for the year.

Based upon the preliminary review of its financial results for the year, Viisage now expects revenues of approximately $66-67

15

million, and EBITDA of approximately $8-9 million. Net income, which includes the $2 million impairment charge related to the terminated Georgia contract, is anticipated to be a loss of approximately $7-8 million. The primary drivers of the shortfall in operating performance are related to non-recurring charges, timing associated with contracts and a temporary increase in certain operating expenses. Viisage believes that these results do not reflect a change in the underlying fundamentals of the business. Specifically, fourth quarter results were impacted by the following:

> -- Georgia - the non-cash write-down of certain assets related to the terminated Georgia contract reduced pre-tax income by $2 million in the fourth quarter but did not affect EBITDA.

> -- Tax Liability - in the fourth quarter, the Company filed an election under Internal Revenue Tax Code Section 338(h)10 to treat its acquisition of TDT as an asset transaction for tax purposes. This election may generate approximately $8.5 million of future tax benefits. In connection with this election, an initial deferred tax asset of approximately $900,000 was created. Based on Viisage's history of tax losses, the Company had to provide approximately $900,000 for a valuation reserve against the deferred tax asset in the fourth quarter. This provision did not affect EBITDA.

> -- Timing - deliveries on several substantial, high margin contracts, including a State of Florida Department of Highway Safety document authentication contract and a major European border management project, slipped from the fourth quarter of 2004 into the first half of 2005. This resulted in revenue and an overall lower margin revenue mix for the quarter. Viisage estimates that these contracts would contribute more than $1 million of gross profit directly affecting EBITDA and net income in the fourth quarter.

> -- Sarbanes-Oxley Section 404 Compliance - despite work undertaken in prior quarters, Viisage experienced higher than anticipated costs related to its Sarbanes-Oxley compliance efforts. In the fourth

16

quarter alone, compliance-related costs totaled
$550,000. These expenses are expected to decrease
dramatically going forward.

-- Currency - Viisage experienced a significant
negative impact from the weak dollar, resulting in
an approximately $500,000 decrease in EBITDA
and net income in the fourth quarter. In light of the
continued growth in its overseas revenue, the
Company is considering various ways of mitigating
future currency risks.

-- Legal and Other Charges - there were a number
of charges in the fourth quarter related to specific
legal matters that are now completed or winding
down, as well as severance payments, that together
totaled approximately $500,000.

The Georgia drivers' license contract litigation has concluded with
the state planning to conduct a new procurement for its drivers'
license program. However, the status of Viisage's previously-
awarded $2.5 million settlement from the state in connection with
the termination of the contract has not been resolved. While the
state has agreed to pay the amount to Viisage, the presiding judge
reduced that payment by $2 million in her December summary
judgment ruling. Viisage believes that it is appropriate to take a
non-cash write-down of $2 million in the fourth quarter of 2004 for
an impairment charge to assets currently on its balance sheet,
although the Company continues to maintain the validity of its
position in terms of the settlement and is appealing the judge's
ruling.

36.    On March 2, 2004, the Company reported financial results for the Fourth Quarter

and Fiscal 2004. The press release confirmed the Company's failure to meet previous guidance.

The release stated in relevant part:

Viisage a leading provider of advanced technology identity
solutions, today reported final results for its fourth quarter and year
ended December 31, 2004. For the fourth quarter, revenues were
$19.0 million, an 84 percent increase over $10.3 million in the

same period last year. ***The net loss for the fourth quarter of 2004 was $5.2 million,*** or $0.11 per fully diluted share, which includes the impact of the previously disclosed $2 million impairment charge of contract assets related to the terminated State of Georgia drivers' license contract, and a $900,000 non-cash deferred tax expense. In the 2003 fourth quarter, the Company reported a net loss of $1.4 million or $0.06 per fully diluted share. The 2004 fourth quarter results include the contribution from the acquisition of Imaging Automation, Inc. (iA), which was completed on October 5, 2004.

For the full year 2004, revenues were $67.5 million, an 81 percent increase over revenues of $37.4 million in 2003. ***The Company's net loss for 2004 was $7.0 million,*** or $0.18 per basic and diluted share, compared to a net loss of $17.7 million, or $0.82 per fully diluted share, in the prior year, which includes the impact of the one-time charge of $12.1 million or $0.56 per share that the Company recorded in connection with a change in accounting principle. On December 30, 2003, Viisage adopted new accounting rule EITF 00-21, "Accounting for Revenue Arrangements with Multiple Deliverables," which pertains to revenue recognition for certain long-term contracts, such as Viisage's state drivers' licenses contracts, retroactive to January 1, 2003.

On February 7, 2005, Viisage announced preliminary results for the fourth quarter of 2004, indicating that while the Company achieved its revenue guidance, its net income and EBITDA fell short of expectations reflecting a number of primarily non-recurring factors.

The Company issued guidance for Fiscal 2005:

Financial Outlook for 2005

On an annual basis, Viisage expects to increase total revenues by approximately 8-19 percent over 2004, resulting in revenues in a range of $73-80 million. For the first quarter of 2005, the Company is anticipating revenues between $15-17 million, reflecting transitions on several large contracts. The Company is not sharing specific EBITDA targets, although it anticipates remaining cash flow positive and continuing to increase its cash generation in 2005, compared to 2004. The Company also expects

18

to reach profitability during 2005, excluding the impact of stock
option expensing which will commence as of July 1, 2005.

The Company revealed material accounting deficiencies:

> Sarbanes-Oxley Compliance
>
> In connection with the preparation of the Company's consolidated
> financial statements for the year ended December 31, 2004, the
> Company determined that it had an internal control deficiency that
> constitutes a 'material weakness' as defined by the Public Company
> Accounting Oversight Board's Accounting Standard No. 2. The
> Company has concluded that it had insufficient personnel resources
> and technical accounting expertise within the accounting function
> to resolve non-routine or complex accounting matters. As a result,
> management will be unable to conclude that the Company's
> internal controls over financial reporting are effective as of
> December 31, 2004. Therefore, BDO Seidman LLP, the
> Company's external accounting firm, will issue an adverse opinion
> with respect to the effectiveness of the Company's internal controls
> over financial reporting. In addition, as part of the Sarbanes-Oxley
> Section 404 compliance review, the Company is in the process of
> reviewing all of its other key internal control processes as well.
> While the evaluation is ongoing, management believes that it will
> likely conclude that the Company had significant deficiencies,
> which could constitute a material weakness, in the control
> processes around information technology systems as well. The
> Company is in the process of remediating the material weakness
> and significant deficiencies, and has devoted substantial resources
> to assess and take concrete steps to strengthen these internal
> controls. Management believes that the indicated control
> deficiencies do not affect the Company's financial strength or
> business prospects.

37.     As a result of the Company's announcement on February 7, 2005 which shocked

the market, the Company's stock dropped from $7.27 on February 7, 2005 to $5.91 on February

8, 2004, on greatly increased trading of 4.6 million shares. In reaction to the press release on

March 3, 2005, which also shocked the market, the Company's stock dropped from $5.47 to

$4.50 on greatly increased trading of 6.2 million shares. The declines in the Company's stock price as a result of the revelations of the true facts concerning the Company's performance resulted a 38.10 percent decline of shareholder value. As a result the market value of Viisage declined by approximately $131 million upon the full revelation of the fraud.

38.    The statements set forth above in paragraph 32 to 34 were materially false and misleading, because defendants were aware of substantial negatives concerning the Company, as set forth above.

39.    Defendants' representations concerning the court decision on the Georgia state license dispute were materially false and misleading, in that defendants knew that the disputed $2 million payment would likely never be paid. In addition, the defendants failed to reveal that the court held that Viisage had engaged in misconduct in order to procure this key contract. For one thing, it was found that there was no issue of material fact that Viisage had committed acts of misrepresentation, including representing to the State of Georgia that it had a back-up card production facility, which representation was knowingly false when made. It was also found that Viisage engaged in inappropriate and unauthorized communications with certain Georgia State employees after a premature reading of the price proposals regarding the license contract bid. Further it was clear from the Court's opinion that there could have been no reasonable expectation that the $2 million which Viisage claimed it was owed under the settlement agreement with Georgia would ever be paid.

40.    Viisage knew it had committed wrongdoing in connection with the State of Georgia bid. It should have reserved for the $2 million payment at least by the start of the Class Period, if not long before that. Following the Court's ruling, there was no excuse for Viisage's

20

prolonged failure to announce a $2 million impairment charge, especially as its financial statements were rendered plainly wrong and misleading by the court's ruling. During the period between the summary judgment opinion, and the write-down announcement, millions of Viisage shares changed hands at inflated prices. Viisage obscured the import of the Court's ruling by issuing a press release placing a false positive spin on that ruling.

41.     It may be reasonably inferred that the court's finding that Viisage had engaged in improper conduct in connection with the Georgia bidding process impaired the Company's ability to close new contracts, and indeed Viisage was having difficulty closing contracts in the fourth quarter of 2004. This, too, was not revealed in a timely fashion. Moreover, the various charges that seem suddenly to have cropped up in the fourth quarter were, in truth and in fact, largely deferred from previous quarters in order to create a false impression that Viisage had returned to profitability. Indeed, once Viisage had achieved its goals, including securing the crucial $25 million credit line, Viisage returned to its usual course--**unprofitability.** The fourth quarter loss alone was an astounding $5.2 million, compared with losses of only $1.8 million in the first three quarters of the year. The artificially rosy third quarter report was followed almost immediately by unusual and suspicious selling by insiders, including Lau.

## SCIENTER ALLEGATIONS

42.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced

in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

43.    The scheme was designed to portray the Company as very successful so as to obtain a new credit line for the Company, which would be sufficient in amount to relieve Lau and Berube of their role as lenders of last resort. The obtaining of the new credit line in the amount of $25 million was one of the prime motives for the fraud. Unless the defendants demonstrated that the Company had turned the corner and was successful and profitable, it would have been impossible to obtain the new credit line, as no bank would have extended such credit terms if the Company's financial prospects were tenuous.

44.    On December 2, 2004, Lau sold 150,000 shares at $8.01 for proceeds of $1.2 million; on December 7, 2004, Lau sold 100,000 shares at $8.39 for proceeds of $839,000; on December 15, 2004, Lau sold 95,000 shares at $8.46 for proceeds of $803,700. This insider selling was far in excess of Lau's normal insider sales, and thus constitutes further evidence that the conduct complained of herein was fraudulent.

45.    At all relevant times, the market for Viisage securities was an efficient market for the following reasons, among others:

(a)    Viisage stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Viisage filed periodic public reports with the SEC and the NASDAQ;

(c)    Viisage regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases

22

on the national circuits of major news wire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

> (d)    Viisage was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

46.    As a result of the foregoing, the market for Viisage securities promptly digested current information regarding Viisage from all publicly-available sources and reflected such information in the Viisage stock price. Under these circumstances, all purchasers of Viisage securities during the Class Period suffered similar injury through their purchase of Viisage securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

47.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-

looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Viisage who knew that those statements were false when made.

## FIRST CLAIM
### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against Defendants Viisage, Bailey and Aulet

48.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

49.     During the Class Period, defendants Viisage, Bailey and Aulet carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Viisage securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, these defendants, and each of them, took the actions set forth herein.

50.     These defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Viisage securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. These defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

51.     These defendants, individually and in concert, directly and indirectly, by the use,

24

means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Viisage as specified herein.

52.    These defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Viisage value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Viisage and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Viisage securities during the Class Period.

53.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Viisage operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.

54.    As a result of the dissemination of the materially false and misleading

25

information and failure to disclose material facts, as set forth above, the market price of Viisage securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Viisage publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired Viisage securities during the Class Period at artificially high prices and were damaged thereby.

55.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Viisage was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Viisage securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

56.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

57.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

26

**SECOND CLAIM**
**Violation Of Section 20(a) Of**
**The Exchange Act Against all of the Individual Defendants**

58.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

59.     The individual defendants acted as a controlling persons of Viisage within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and knowledge of the Company's operations and/or insider status, and knowledge of the false statements disseminated to the investing public, the individual defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The individual defendants  had unlimited access to copies to the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

60.     As set forth above, defendants Viisage, Bailey and Aulet each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, all of the individual defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

27

A.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: Boston, Massachusetts
       March 8, 2005

**SHAPIRO HABER & URMY LLP**

By: _Theodore M. Hess-Mahan_

Thomas G. Shapiro (BBO#454680)
Theodore M. Hess-Mahan (BBO#57109)
53 State Street
Boston, MA 02109
617-439-3939
**Attorneys for Plaintiff**

**Of Counsel:**

Laurence D. Paskowitz
**PASKOWITZ & ASSOCIATES**
60 East 42nd Street
46th Floor
New York, NY 10165
(212) 685-0969

28

**ROY JACOBS & ASSOCIATES**
Roy L. Jacobs
60 East 42nd Street
46th Floor
New York, NY 10165
212-867-1156

## PLAINTIFF'S CERTIFICATE

The undersigned ("Plaintiff") declares, as to the claims asserted under the Federal Securities laws, that:

1.    Plaintiff has reviewed the complaint against Viisage Technology, Inc. (VISG"), and certain other defendants, and authorizes its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff represents and warrants that he is fully authorized to enter into and execute this certification.

5.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as approved by the court.

6.    Plaintiff has made no transaction(s) during the Class Period in VISG common stock, except those set forth below (attach extra paper if needed):

| Purchases | | | | Sales | | |
|---|---|---|---|---|---|---|
| Date(s) | Number of Shares | Price | | Date(s) | Number of Shares | Price |
| 12/8/04 | 800 | 8.18 | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

7.    During the three years prior to the date of this Certification, Plaintiff has not moved to serve as a representative party for a class in an action filed under the federal securities laws.

I declare under penalty of perjury, under the laws of the United States, this 4 day of March, 2005 that the information above is accurate.

_(Signature)_

Ernesto Darquea

%JS 44 (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

FILED
IN CLERKS OFFICE

2005 MAR -8 P 3:10

U.S. DISTRICT COURT
DISTRICT OF MASS.

## I. (a) PLAINTIFFS
ERNESTO DARQUEA

**DEFENDANTS**
VISAGE TECHNOLOGY, INC., BERNARD BAILEY, WILLIAM K. AULET and DENIS K. BERUBE

(b) County of Residence of First Listed Plaintiff   OUT OF STATE
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Theodore M. Hess-Mahan   Tel: (617) 439-3939
Shapiro Haber & Urmy LLP   Fax: (617) 439-0134
53 State Street
Boston, MA 02109

Attorneys (If Known)

# 05 10438 MLW

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff

X 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PLF | DEF | | PLF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury— | of Property 21 USC 881 | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | ☐ 840 Trademark | X 850 Securities/Commodities/ |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | Exchange |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | **SOCIAL SECURITY** | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | ☐ 861 HIA (1395ff) | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | & Disclosure Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 740 Railway Labor Act | | ☐ 900 Appeal of Fee Determination Under |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | | ☐ 870 Taxes (U.S. Plaintiff | Equal Access to Justice |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | or Defendant) | ☐ 950 Constitutionality of |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party | State Statutes |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. | 26 USC 7609 | ☐ 890 Other Statutory Actions |
| | | ☐ 550 Civil Rights | Security Act | | |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

X 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
(Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

15 USC §§78j(b) and 78t(a) and 17 CFR 240.10b-5

## VII. REQUESTED IN COMPLAINT:
X CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ 0

CHECK YES only if demanded in complaint:
JURY DEMAND: X Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions): JUDGE _____ DOCKET NUMBER _____

DATE 3/8/2005

SIGNATURE OF ATTORNEY OF RECORD
Theodore Hess-Mahan

FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1.  Title of case (name of first party on each side) Ernesto Darquea v. Viisage Technology, Inc., et al.

2.  Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local rule 40.1(a)(1)).

    ___   I.    160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

    _X_   II.   195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730, *Also complete AO 120 or AO 121
                740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.      for patent, trademark or copyright cases

    ___   III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
                315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
                380, 385, 450, 891.

    ___   IV.   220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
                690, 810, 861-865, 870, 871, 875, 900.

    ___   V.    150, 152, 153.

3.  Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court. _____

4.  Has a prior action between the same parties and based on the same claim ever been filed in this court?

                                                         YES ☐       NO ☒

5.  Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)

                                                         YES ☐       NO ☒

    If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

                                                         YES ☐       NO ☒

6.  Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

                                                         YES ☐       NO ☒

7.  Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

                                                         YES ☒       NO ☐

    A.  If yes, in which division do all of the non-governmental parties reside?

        Eastern Division  ☒        Central Division ☐        Western Division ☐

    B.  If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

        Eastern Division  ☐        Central Division ☐        Western Division ☐

8.  If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

                                                         YES ☐       NO ☐

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME Theodore M. Hess-Mahan _____

ADDRESS Shapiro Haber & Urmy LLP, 53 State Street, Boston, MA 02109 _____

TELEPHONE NO. (617) 439-3939 _____

                                        (Viisage Category Form (Darquea).wpd - 10/17/02)