**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **In re VIISAGE TECHNOLOGY, INC. SECURITIES LITIGATION** | **Civil Action No. 05-cv-10438-MLW** |
| | **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |
| **This Pleading Applies to: All Actions** | **JURY TRIAL DEMANDED** |

Lead Plaintiffs allege the following based upon the investigation of Lead Plaintiffs' counsel, which included inspection of United States Securities and Exchange Commission ("SEC") filings by Viisage Technology, Inc. ("Viisage" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company, and pleadings and judicial orders relating to the Company. Lead Plaintiffs believe that additional substantial evidentiary support exists for the allegations set forth herein after a reasonable opportunity for discovery

**<u>NATURE OF THE ACTION</u>**

1. This is a federal securities class action on behalf of purchasers of the Company's publicly traded securities during the period from May 12, 2004 through March 2, 2005 (the "Class Period").

2. Viisage claims to be a leading provider of advanced technology identity solutions that enable governments, law enforcement agencies and businesses to enhance security, reduce identity theft and protect personal privacy. Viisage purportedly combines its proprietary biometric and secure credential software with complementary industry standard products to create turnkey solutions for its customers that integrate secure document technologies, image and data capture, relational databases and multiple biometrics, improving the customer's ability to

process and manage identity information.

3.     Viisage's operations began in 1993 and, except for fiscal years 1996 and 2000, when it experienced only modest profits, the Company incurred losses in each fiscal year. Nevertheless, Viisage represented itself to be a growth company with increasing revenues, driven significantly by obtaining publicly bid contracts with governmental entities for secure credentials such as drivers' licenses. For the quarter ended March 28, 2004, the "Secure Credentials Segment" of Viisage's business accounted for 85.8 percent of revenues. Viisage's revenue growth was also driven by a string of acquisitions funded principally with newly issued Viisage stock. In early 2004 alone, Viisage completed two acquisitions for an aggregate purchase price of $84.9 million. Continued acquisitions were a significant part of Viisage's business plan going forward and in October 2004, Viisage completed a $34.1 million acquisition using principally $26.2 million worth of newly issued shares of its stock. The ability of the Company to grow its business in the publicly bid secure credential sector and to maintain a healthy stock price to fuel acquisitions was highly dependent on Viisage's reputation and product offerings. Toward that end, during the Class Period, Viisage emphasized the purported quality of its product offerings and that it was "extremely well-positioned to compete successfully for emerging opportunities both domestically and internationally."

4.     Before and during the Class Period, Viisage repeatedly issued press releases to the public and discussed with securities analysts who covered Viisage, a major $19.5 million contract it had obtained with the Georgia Department of Motor Vehicle Safety ("DMVS") to provide secure drivers' licenses for the State. Unknown to the investing public, however, Viisage had engaged in highly improper conduct in bidding for that contract. Viisage's misconduct was the specific focus of a lawsuit brought by Digimarc ID Systems ("Digimarc"), a competitor in bidding on the DMVS contract, contesting the award of the Georgia DMVS contract to Viisage. Among other things, despite Viisage's efforts to avoid discovery of the tactics underlying its winning bid, the Superior Court of Fulton County, Georgia ("the Georgia court") ultimately found "that there were significant instances of misconduct and

misrepresentations by Defendant Viisage."

5.    The disclosure of Viisage's misconduct with respect to the Georgia contract could adversely impact, *inter alia*, Viisage's ability to successfully bid for other public secure credential contracts and Viisage's planned August 2004 offering of 7.5 million shares by which it hoped to raise over $60 million. Thus, Viisage falsely represented during the Class Period that the litigation commenced by Digimarc solely involved alleged wrongdoing by the DMVS, and that it was not even a party to the litigation. Viisage thereby concealed its own wrongful conduct in connection with its bid for the DMVS contract including that:

- Viisage had submitted samples cards as its "production quality" cards that were in fact produced by a competitor for which it had no authority to produce and which were not cards Viisage had the ability to produce; and

- Viisage had falsely stated to the DMVS that it had secured a back-up card production facility to take over license production in the event the central permanent card production facility is compromised, as was required by the operative Request for Proposal.

6.    On July 21, 2004, Viisage announced that it had entered into a settlement with the DMVS by which the DMVS would: (i) pay Viisage $2.5 million for work it ostensibly completed for the DMVS since the bid award; (ii) terminate the contract awarded to Viisage; and (iii) issue a new request for proposal. Viisage touted this settlement as being a result of its initiative to help resolve the dispute on a contract "appropriately awarded to Viisage." In reality, however, the contract was not appropriately awarded to Viisage and, at the time of the settlement, Viisage had been refusing to comply with orders of the Georgia court presiding over the litigation requiring Viisage to make witnesses available for deposition by Digimarc and to produce documents to Digimarc concerning Viisage's lack of a product to actually provide to Georgia if it were ultimately successful in winning the Georgia contract. The settlement was, therefore, a subterfuge on the part of Viisage aimed at preventing these facts from coming to light.

7.      On August 19, 2004, the Georgia court entered a TRO enjoining the settlement, and on September 2, 2004 enjoined it as violative of the Court's July 2003 order preliminarily enjoining any 'activities related to implementation of or performance under the contract [awarded to Viisage by the DMVS].''  Viisage, however, made no public disclosure of the August TRO until late October and no public disclosure of the September injunction until mid-November.  During the period it concealed these rulings, Viisage secured State drivers license contracts with other States and when it finally disclosed the Georgia court's injunction in mid-November 2004, still publicly maintained that the Georgia litigation was focused solely on alleged wrongdoing by the DMVS.  Moreover, in late October 2004, Viisage increased its guidance for 2004 initially provided on May 3, 2004, stating that annual revenue was then anticipated to be between $66-68 million, an increase from the prior guidance of $60-63 million, and Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") was then anticipated to be between $11.5-12.5 million, an increase from Viisage's previous guidance of $11-12 million.  Viisage represented in its SEC filings that it "reports EBITDA as a financial performance measure and as an indicator of future performance."

8.      On December 22, 2004, the Georgia court found, based upon an extensive evidentiary record developed after Viisage finally cooperated with the Georgia court's discovery orders, "that there were significant instances of misconduct and misrepresentations by Defendant Viisage."  As a result, the Georgia court disallowed the $2 million in payments Viisage claimed it was owed for services it purportedly performed under the contract, and directed a re-bid of the DMVS contract.  Viisage did not issue a press release regarding this ruling until December 27, 2004 and that press release omitted any information concerning the Georgia court's finding of Viisage's misconduct.

9.      On February 7, 2005, Viisage also belatedly revealed that EBITDA for 2004 was expected to fall below the increased guidance it had provided in late October 2004, the principal reason being the $2 million disallowed by the Georgia Court on December 22, 2004.  As noted above, however, the Georgia Court had preliminarily enjoined the payment on September 2 --

over one month prior to when Viisage increased EBITDA guidance without disclosure that the increase was premised on receipt of the enjoined funds.

10.     On March 2, 2005, investors were again shocked by news concerning Viisage. In announcing fourth quarter financial results, Viisage revealed that its internal accounting controls were so flawed that they qualified as a "material weakness" under Public Company Accounting Oversight Board's Accounting Standard No. 2 and, as such, violated the provisions Sarbanes-Oxley relating to the Company's ability to file accurate financial statements. In each of Viisage's Form 10Q filings during the Class Period, however, Viisage had represented and its principal officers had certified that "There were no changes in our internal controls over financial reporting that occurred during our most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting." These internal control failures were so serious that Viisage announced on March 17, 2005 that it was unable to file its Form 10-K for its 2004 fiscal year on time. Viisage did not do so until more than three months later on filing its amended Form 10-K on July 5, 2005. Viisage acknowledged that "during the fourth quarter of 2004 and the first quarter of 2005," the Company had made "significant changes" to its internal controls over financial reporting designed to remediate the material weaknesses identified on March 2, 2005.

11.     As a result of the defendants' false and misleading statements, Viisage's stock price traded at artificially inflated levels throughout the Class Period. Viisage took advantage of this artificial inflation by acquiring Imaging Automation ("iA") for $34.1 million, including $26.2 million of Viisage stock, and completing a secondary offering of 7.5 million shares on July 22, 2004 for proceeds to Viisage of over $37 million (the "Secondary Offering") -- which was used to pay off a $ 30.3 million in indebtedness owed by the Company to, among others, defendant Beck and a company controlled by defendant Berube. In addition, certain of the Individual Defendants (as noted below) sold over 1,163,000 shares of Viisage stock during the Class Period for collective proceeds of approximately $8,673,000.

12.     During the Class Period, the Company's stock traded as high as $10.34 per share

on May 26, 2004.  Prior to the late December 2004 public revelation of Viisage's wrongful

conduct in connection with its bid for the DMVS conduct, Viisage's stock was trading at almost

$10 per share.  Following the revelations in late December, 2004, and subsequent revelations

concerning Viisage's preliminary 2004 results on February 7, 2005, and lack of adequate internal

financial controls on March 2, 2005, Viisage's stock was trading at $4.50 per share and traded in

the ninety day period after the close of the Class Period at an average price of $ 3.53.  Indeed,

just between the close of trading on March 2, 2005 and the close of trading on March 3, 2005,

the stock closed down almost 18% on heavy trading volume.

## JURISDICTION AND VENUE

13.    This action arises under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933

(the "Securities Act"), [15 U.S.C. §§ 77k, 77l(a)(2), and 77(o)]; and Sections 10(b) and 20(a) of

the Securities Exchange Act of 1934 (the "Exchange Act"), [15 U.S.C. §§ 78j(b) and 78t(a), and

the rules and regulations promulgated thereunder, including SEC Rule 10b-5, [17 C.F.R.

240.10b-5].

14.    This Court has jurisdiction over the subject matter of this action pursuant to

Section 22 of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77v], Section 27(a) of

the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78aa] and 28 U.S.C. §§

1331 and 1337.

15.    Venue is proper in this District pursuant to the provisions of Section 22 of the

Securities Act [15 U.S.C. § 77v], Section 27 of the Exchange Act [15 U.S.C. § 78aa] and 28

U.S.C. § 1391(b).  The Company has its principal place of business at 296 Concord Road, Third

Floor, Billerica, MA 01821 and many of the acts and transactions giving rise to the violations of

law complained of herein, including the preparation and dissemination to the investing public of false and misleading information, occurred in this District.

16.    In connection with the acts, conduct and other wrongs complained of herein, the defendants used the means and instrumentalities of interstate commerce.

## THE PARTIES

17.    Lead Plaintiff Turnberry Asset Management ("Turnberry") purchased the Company's publicly traded securities as detailed in the attached Certification and was damaged thereby.  Turnberry also purchased Viisage common shares in the Company's Secondary Offering (defined below) from JP Morgan, one of the underwriters of the offering, and was damaged thereby.

18.    Lead Plaintiff Electronic Trading Group ("ETG") purchased the Company's publicly traded securities as detailed in the attached Certification and was damaged thereby.

19.    Lead Plaintiff Ronald Sauer ("Sauer") purchased the Company's publicly traded securities as detailed in the attached Certification and was damaged thereby.

20.    Lead Plaintiff David Hancock ("D. Hancock") purchased the Company's publicly traded securities as detailed in the attached Certification and was damaged thereby.

21.    Lead Plaintiff Lance Hancock ("L. Hancock") purchased the Company's publicly traded securities as detailed in the attached Certification and was damaged thereby.

22.    Walter Cohutt is an additional plaintiff in this litigation.  During the Class Period, Mr. Cohutt purchased the Company's publicly traded securities as detailed in the attached Certification and was damaged thereby.

23.    Defendant Viisage is a provider of identity solutions that enable governments, law enforcement agencies and businesses to enhance security, reduce identity theft and protect

personal privacy in the business of designing, developing and marketing educational products, including hardware and software.  Viisage is a publicly traded company whose common stock is traded on the NASDAQ National Market System under the ticker "VISG."

24.     Defendant Bernard C. Bailey ("Bailey"), at all relevant times, served as President and Chief Executive Officer of Viisage.  Bailey joined Viisage in August 2002 as Chief Executive Officer and was appointed a Director of Viisage in April 2004.  Bailey signed Viisage's Form 10-Qs for its quarters ended March 28, 2004, June 27, 2004 and September 26, 2004, certified that each of those Form 10-Qs "did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading," and that any change in Viisage's internal control over financial reporting was disclosed in the Form 10-Q.  In addition, Bailey signed Viisage's Registration Statement on Form S-3 filed with the SEC on June 21, 2004, and the Amended Registration Statement on Form S-3/A filed with the SEC on July 22, 2004 for the Secondary Offering of 7.5 million shares of common stock.

25.     Defendant William K. Aulet ("Aulet"), at all relevant times, served as the Chief Financial Officer of Viisage.  Aulet joined Viisage in February 2003 as Chief Financial Officer. Aulet signed Viisage's Form 10-Qs for its quarters ended March 28, 2004, June 27, 2004 and September 26, 2004, certified that each of those Form 10-Qs "did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading," and that any change in Viisage's internal control over financial reporting was disclosed in the Form 10-Q. In addition, Aulet signed Viisage's Registration Statement on Form S-3 filed with the SEC on June 21, 2004, and the Amended Registration Statement on Form S-3/A filed with the SEC on

July 22, 2004 for the Secondary Offering of 7.5 million shares of common stock.  Mr. Aulet resigned his position in the fall of 2005.

26.    Defendant Denis K. Berube ("Berube"), at all relevant times, served as Chairman of the Board of Viisage, and has served in that capacity since the Company's incorporation in 1996.  Mr. Berube is Executive Vice President and Chief Operating Officer of Lau Technologies ("Lau"). Lau is the largest holder of Viisage common stock, directly owning approximately 17% of its issued and outstanding common stock prior to the Class Period and had provided financing to the Company.  During the Class Period, Lau sold 380,602 shares of Viisage common stock on the open market, realizing proceeds of $2,946,685.20.  In addition, Lau realized proceeds of $779,779.00 from the sale of 141,778 shares of Viisage common stock that were included in Viisage's Secondary Offering of 7.5 million shares of common stock.  Berube signed Viisage's Registration Statement on Form S-3 filed with the SEC on June 21, 2004, and the Amended Registration Statement on Form S-3/A filed with the SEC on July 22, 2004 for the Secondary Offering of 7.5 million shares of common stock.  Viisage repaid in full its $4.3 million debt obligation to Lau from the proceeds of the Secondary Offering.  Berube left his position as Chairman in late 2005.

27.    Defendant Marcel Yon ("Yon"), since June 2004, and at all relevant times, has served as a Director of Viisage.  Yon was CEO of ZN Vision Technologies, a company acquired by Viisage in 2003.  Yon is the Chief Executive Officer of Odeon Venture Capital AG, which, prior to the Class Period, owned 949,325 shares of Viisage common stock.  Yon has sole voting and dispositive power over the shares beneficially owned by Odeon.  During the Class Period, Odeon sold 770,473 shares of Viisage common stock on the open market realizing proceeds of $6,127,489.69.  In addition, Odeon realized proceeds of $743,363.50 from the sale of 135,157

shares of Viisage common stock that were included in Viisage's Secondary Offering of 7.5 million shares of common stock. Yon signed Viisage's Registration Statement on Form S-3 filed with the SEC on June 21, 2004, and the Amended Registration Statement on Form S-3/A filed with the SEC on July 22, 2004 for the Secondary Offering of 7.5 million shares of common stock.

28.    Defendant Buddy G. Beck ("Beck"), at all relevant times, has served as a Director of, and consultant to, Viisage as well as its Vice Chairman of the Viisage's Board of Directors. Beck was the President and Chief Executive Officer of Trans Digital Technologies Corporation from 1998 until its acquisition by Viisage in February 2004. In connection with that acquisition, the Company assumed a $15.3 million debt to Beck. Prior to the Class Period, Beck owned 5,869,651 shares, representing 16.4 percent of Viisage's issued and outstanding common stock. During the Class Period, Beck realized proceeds of $779,779 from the sale of 141,778 shares of Viisage common stock that were included in Viisage's Secondary Offering of 7.5 million shares of common stock. Beck signed Viisage's Registration Statement on Form S-3 filed with the SEC on June 21, 2004, and the Amended Registration Statement on Form S-3/A filed with the SEC on July 22, 2004 for the Secondary Offering of 7.5 million shares of common stock. Viisage repaid in full its $15.3 million debt obligation to Beck from the proceeds of the Secondary Offering.

29.    Defendant Charles A. Levine ("Levine"), at all relevant times, has served as a Director and member of the Audit Committee of the Board, charged with responsibility for overseeing the Company's accounting, financial reporting, data processing, regulatory and internal control environments. The Audit Committee meets at least quarterly to review the Company's quarterly financial releases. Levine sold 9,000 shares of Viisage common stock during the Class Period and realized proceeds of $63,000. Levine signed Viisage's Registration

Statement on Form S-3 filed with the SEC on June 21, 2004, and the Amended Registration Statement on Form S-3/A filed with the SEC on July 22, 2004 for the Secondary Offering of 7.5 million shares of common stock.

30.     Defendant Thomas J. Reilly ("Reilly"), at all relevant times, has served as a Director and member of the Audit Committee of the Board. Reilly sold 10,000 shares of Viisage common stock during the Class Period and realized proceeds of $87,000. Reilly signed Viisage's Registration Statement on Form S-3 filed with the SEC on June 21, 2004, and the Amended Registration Statement on Form S-3/A filed with the SEC on July 22, 2004 for the Secondary Offering of 7.5 million shares of common stock.

31.     Defendant Harriet Mouchly-Weiss ("Mouchly-Weiss"), at all relevant times, has served as Director and signed Viisage's Registration Statement on Form S-3 filed with the SEC on June 21, 2004, and the Amended Registration Statement on Form S-3/A filed with the SEC on July 22, 2004 for the Secondary Offering of 7.5 million shares of common stock.

32.     Defendant Paul T. Principato ("Principato") was a Director of the Company and is Chief Financial Officer of Lau. Principato signed Viisage's Registration Statement on Form S-3 filed with the SEC on June 21, 2004, and the Amended Registration Statement on Form S-3/A filed with the SEC on July 22, 2004 for the Secondary Offering of 7.5 million shares of common stock.

33.     Defendant Peter Nessen ("Nessen") was a Director of the Company at all relevant times and signed Viisage's Registration Statement on Form S-3 filed with the SEC on June 21, 2004, and the Amended Registration Statement on Form S-3/A filed with the SEC on July 22, 2004 for the Secondary Offering of 7.5 million shares of common stock.

34.     Each of the defendants named in ¶¶ 24-33 above are collectively referred to

herein as the "Individual Defendants."

**CLASS ACTION ALLEGATIONS**

35.    Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased the Company's publicly traded securities (the "Class") during the Class Period.  Excluded from the Class are the defendants herein, the directors, officers and employees of the Company, the members of each Individual Defendants' immediate families, any entity in which any defendant has a controlling interest, and the legal affiliates, representatives, heirs, controlling persons, successors and predecessors in interest or assigns of any such excluded party.

36.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  During the Class Period, Viisage had outstanding at least 47 million shares of common stock, owned by thousands of persons.

37.    Lead Plaintiffs' claims are typical of the claims of the members of the Class because Lead Plaintiffs and all of the Class members sustained damages arising out of the same wrongful conduct complained of herein.

38.    Lead Plaintiffs will fairly and adequately protect the interests of Class members and have retained counsel who are experienced and competent in class and securities litigation. Lead Plaintiffs have no interests that are contrary to or in conflict with the members of the Class Lead Plaintiffs seek to represent.

39.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense

12

and burden of individual litigation make it impossible for the members of the Class individually

to redress the wrongs done to them.  There will be no difficulty in the management of this action

as a class action.

40.    Questions of law and fact common to the members of the Class which

predominate over questions which may affect individual Class members include: (a) whether

defendants violated the federal securities laws; (b) whether defendants omitted and/or

misrepresented material facts; (c) whether defendants' statements omitted material facts

necessary to make the statements made, in light of the circumstances under which they were

made, not misleading; (d) whether defendants knew or should have known or recklessly

disregarded that their statements were false and misleading; (e) whether Viisage shares were

artificially inflated during the Class Period; and (f) whether the members of the Class have

sustained damages proximately caused by the alleged misrepresentations and omissions, and, if

so, what is the appropriate measure of damages.

## SUBSTANTIVE ALLEGATIONS

41.    On May 24, 2002, the Georgia Technology Authority ("GTA") issued RFP No.

GTA 000051 ("RFP") on behalf of the Georgia Department of Motor Vehicle Safety ("DMVS")

seeking proposals to provide a digitized license system for the DMVS.  Sealed proposals were

due by July 19, 2002 and were submitted by Viisage, Digimarc (the incumbent provider of such

services to the DMVS) and a third bidder.

42.    Although the contract was awarded to Viisage on November 12, 2002, Digimarc

challenged the award and, after exhausting administrative remedies, filed an action in the

Superior Court of Fulton County, Georgia against the GTA and DMVS on March 5, 2003.

43.    After a brief period of expedited discovery, on May 20, 2003, Digimarc filed a

motion seeking to preliminarily enjoin further implementation of and performance under the contract awarded to Viisage. By order dated July 31, 2003, the Georgia court granted Digimarc's motion and entered the injunction until further order of the court finding, *inter alia*, that "[t]he Plaintiff has made a compelling case that irregularities occurred during the procurement process, and if the case proceeds to a full trial on the merits, there is a substantial likelihood that the Plaintiff will prevail." These "irregularities" referred to by the Georgia court included substantial wrongdoing by Viisage. Accordingly, by consent of the parties, the Georgia court entered an order on November 7, 2003 directing that Viisage be added to the action as "a necessary party." Digimarc filed its First Amended Complaint adding Viisage as a defendant on November 12, 2003.

44.     As was subsequently confirmed by Digimarc with the benefit of discovery, there existed substantial evidentiary support for Digimarc's contentions that Viisage had made material misrepresentations to the GTA and DMVS in connection with its bid.

45.     For example, a requirement of the RFP was for sample drivers' licenses to be submitted for review by GTA's Technical Evaluation Team to insure the samples meet the specifications identified in the RFP. In an e-mail dated August 2, 2002 from Barry Shepard, Contracting Officer for the GTA, to Mohammed Siddiqui, Marketing Director of Viisage's 3SI Division (and person in charge of Viisage's RFP proposal), the GTA informed Viisage that although Viisage had submitted an independent lab report with its proposal attesting that Viisage's samples met the RFP requirements, GTA's Technical Evaluation Team concluded that they failed "durability standards." In the e-mail, Mr. Shepard explained that the sample of the temporary document provided by Viisage "tore easily" and with respect to the sample of the permanent document:

> Lamination easily removed, information left intact on card face; information easily altered; OVD [optical variable device] remained intact on removed lament and showed no signs of fracture.

This meant that the printed information on the permanent card samples submitted by Viisage could be altered and the cards then reassembled without detection.  Mr. Shepard requested confirmation from Viisage that the actual cards to be produced would, in fact, meet the RFP specifications and requested 18 new samples of each of the temporary and permanent cards and that such samples be "actual production cards."  Viisage, however, could not make that representation.  As confirmed by Viisage's Senior Director of ID Services, Ifti Ahmed during his deposition, Viisage believed it could not resubmit additional samples of the same permanent cards as they would have failed the requirements of the RFP.

46.    Accordingly, on August 26, 2002, Viisage submitted a "Temporary and Permanent Card Re-Submission," which included two entirely new proposed permanent card solutions, which it claimed were "production quality samples" as required by the GTA and DMVS.  Viisage referred to the first in its submission as the "Georgia Design Sample 3M Confirm Laminate" (the "Georgia Design Card").  It referred to the second as "Production Quality Card 3M Confirm Laminate" (the "New York Design Card").  The latter, however, was a drivers' license containing artwork and graphics from New York State.  As confirmed by testimony contained in Digimarc's submissions to the Georgia Court, a Viisage *competitor*, De La Rue, manufactured the New York Card Design Card.  As they used a 3M laminate, De La Rue had provided samples of their finished cards to 3M as a courtesy for 3M's own use; not, as 3M's account representative in charge of the De La Rue account testified, to be provided to a competitor -- Viisage -- to help it win a bid.

47.    Moreover, as Ifti Ahmed testified, Viisage did not know how the New York

Design Cards it submitted -- as its own "production quality" cards -- were made or what materials were used to make them. He testified: "I do not know how [a] New York card is made. I know it uses a 3M Confirm material which is the issue that we were trying to address, but I do not know exactly how the New York card is made." Another Viisage witness, Craig Vosseteig, testified as follows:

> Q.    As far as you know, Mr. Vosseteig, were the New York driver's license samples that were given to Viisage by 3M made using the same production method, means, equipment and construction as the Georgia design samples that you got made with 3M's assistance?
>
> A.    I don't know that. I don't know what were those New York samples came from.[sic] Or how they were produced.

Therefore, to avoid being precluded from further consideration on the bid, Viisage deceptively submitted to the DMVS and GTA sample cards that were not its own, that it did not have authority to submit, and as to which it did not even know the method of production.

48.    On August 28, 2002, Charles Nixon, Contracting Officer for GTA, advised Mohammed Siddiqui by e-mail that the submitted samples "do not appear to be production quality, as the lamination is removed intact with very little effort." Mr. Nixon further asked Mr. Siddiqui in his e-mail to either confirm that the Georgia Design Card, which had not been labeled "production quality" was in fact "production quality" or to submit additional samples of the New York Design Card, as Viisage had submitted only one sample of it. In Mr. Nixon's e-mail, he emphasized that "production quality" cards "should be produced using the same methods, materials, equipment and specifications as what is being proposed for Georgia."

49.    In an August 28, 2002 letter by Mohammed Siddiqui to Charles Nixon, Viisage conceded that the samples of the Georgia Design Card it provided were not "production quality" samples, but that it was delivering "17 additional production quality samples" of the New York

Design Card. This representation was also false and misleading, as these were simply additional samples made by De La Rue that were improperly provided by Viisage. None of these additional samples were "production quality."

50. The RFP also required each bidder to describe its plan to produce permanent cards in the event that a disaster disrupted the ability to issue cards from the primary issuance facility in Georgia. Viisage stated in its response to the RFP that it "had made arrangements with Arthur Blank and Company to use their card printing facility as a backup, in case of disaster at the permanent facility in Georgia." As Craig Voesseteig testified, however, Arthur Blank and Company did not have experience in printing the types of cards being proposed by Viisage nor did it have the equipment necessary to laminate or die-cut the individual cards. Moreover, Viisage had no binding agreement with Arthur Blank and Company to produce the cards even if Arthur Blank had the ability to produce the cards. Indeed, none of the witnesses put forward by Viisage as knowledgeable about the arrangement with Arthur Blank and Company, could confirm that Viisage had in fact a binding arrangement with Arthur Blank and Company as represented in Viisage's RFP response. Craig Vosseteig testified that he had no idea why Viisage had stated that Arthur Blank and Company would serve as the necessary back-up as he knew that it did not have the equipment necessary to do so.

51. In an attempt to conceal these facts, Viisage engaged in a determined effort to stymie Digimarc's discovery efforts while at the same time concealing from the investing public its own wrongdoing in connection with responding to the RFP. Therefore, when Digimarc sought full discovery from the defendants concerning its contentions that Viisage as well as the GTA and DMVS had engaged in significant improprieties, Viisage was recalcitrant. This necessitated the filing of a motion to compel by Digimarc on April 20, 2004.

**FALSE AND MISLEADING**
**STATEMENTS DURING THE CLASS PERIOD**

52.    Notwithstanding this evidence of Viisage's own wrongdoing and the fact that it

was integral to Digimarc's claims, Viisage characterized the litigation brought by Digimarc, in

its Form 10-Q for the period ending March 28, 2004, filed with the SEC on May 12, 2004, as one

***solely concerned*** with allegations that the DMVS failed to Comply with its own bid process.

Specifically, Viisage represented in the 10-Q that:

> On July 31, 2003 the superior court for Fulton County, Georgia issued a
> preliminary injunction prohibiting Georgia's Department of Motor Vehicle Safety
> from continuing to work with us to install a new drivers' license system for the
> State of Georgia. This injunction is the result of a lawsuit filed in March 2003 by
> one of our competitors, Digimarc ID Systems, LLC. The suit claims that the
> Department of Motor Vehicle Safety did not comply with its own bid process
> when selecting a vendor for the digital drivers' license program. The merits of
> Digimarc Corporation's claims against the Department of Motor Vehicle Safety
> are to be addressed in further court proceedings. The Department of Motor
> Vehicle Safety has confirmed that our contract with them remains in place.
> However, if the lawsuit is successful and we lose the contract, we could lose up to
> $19.7 million in revenue that we expected to recognize over the next five and one-
> half years. In addition, although we expect that the Department of Motor Vehicle
> Safety would be required to reimburse us for our costs incurred under the
> contract, if we are unable to obtain reimbursement of those costs, we could be
> required to recognize a loss of up to approximately $5 million for costs incurred
> to date on the Georgia contract.

53.    Viisage further stated in its Form 10-Q under Item 4 - Controls And Procedures:

> (a) Evaluation of disclosure controls and procedures. Our management, with the
> participation of our Chief Executive Officer, or CEO, and Chief Financial officer,
> or CFO, evaluated the effectiveness of our disclosure controls and procedures (as
> defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act) as
> of March 28, 2004.

> * * *

> Based on this evaluation, our CEO and CFO concluded that, as of March 28,
> 2004, our disclosure controls and procedures were (1) designed to ensure that
> material information relating to us, including our consolidated subsidiaries, is
> made known to our CEO and CFO by others within those entities, particularly
> during the period in which this report was being prepared and (2) effective, in that
> they provide reasonable assurance that information required to be disclosed by us

18

in the reports that we file or submit under the Securities Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the Securities Exchange Commission's rules and forms.

54.        In Exhibits 31.1 – 31.2 to the Form 10-Q, defendants Bailey and Aulet each

certified pursuant to Section 302 of the Sarbanes-Oxley Act 0f 2002, *inter alia* that:

- Based upon each of their respective knowledge, "this quarterly report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report."

- The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15 (e) and 15d-15(e)) for the registrant and have:

    a)        Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)        Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    c)        Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

- The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

    a)        All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

55.    Only ten days later, on May 21, 2004, Viisage filed an Amendment to a Form S-3 Registration Statement to register for resale 5,221,454 Viisage shares held by six beneficial owners of Viisage stock including 1,054,798 shares held by Odeon Venture Capital AG for which defendant Yon had sole voting and dispositive power and 1,054,798 shares held by Dr. Christoph v.d. Malsburg, a member of Viisage's board of directors.  Defendants Bailey, Aulet, Berube, Levine, Mouchley-Weiss, Principato, Nessen and Reilly signed this Registration Statement.  At the time this Registration Statement was filed, Viisage stock was trading at $8.51 per share.  This Form S-3/A contained the same material misrepresentations and omitted the same material information concerning the Georgia litigation, as is the case with the aforementioned Form 10-Q and indeed incorporated that Form 10-Q by reference.

56.    On June 3, 2004, the Georgia court granted Digimarc's motion to compel Viisage to produce certain witnesses for deposition pursuant to Rule 30(b)(6) and for Viisage to produce, *inter alia*, the following categories of documents:

- documents relating to post-November 12, 2002 changes in Viisage's technical proposal with respect to Viisage's proposed back-up card production facility;

- documents reflecting changes to Viisage's proposed vendor costs in connection with the change in POS vendor;

- documents reflecting how Viisage came to submit New York State drivers' licenses to the DMVS as being production samples of Viisage;

Viisage was also directed to certify to the Georgia court by affidavit that "a thorough and diligent search has been completed and any responsive documents produced."

57.    On June 21, 2004, Viisage filed a Form 10-Q/A for the quarterly period ending

March 28, 2004 to include certain pro forma information with respect to its previous acquisitions of ZN Vision Technologies AG and Trans Digital Technologies Corporation.  No change, however, was made in its disclosures concerning the Georgia litigation or concerning the Company's internal financial controls.

58.    Also on June 21, 2004, the Company filed a Form S-3 Registration Statement containing a preliminary prospectus for a Secondary Offering of 7.2 million shares of newly issued common stock by Viisage and for the sale of 300,000 shares by Lau, Yon, and Beck.  The June 21, 2004 Registration Statement was signed by defendants Bailey, Aulet, Berube, Mouchly-Weiss, Principato, Levine, Nessen, Reilly, Beck, and Yon.  The Registration Statement incorporated by reference, *inter alia*, Viisage's Form 10-Q and amended 10-Q for the quarterly period ended March 28, 2004.

59.    The Secondary Offering was essential for Viisage.  Viisage had not reported a profit in 2001, 2002, or 2003 and had reported a net loss in the first quarter of 2004 as well.  As of March 28, 2004, Viisage had total debt of $31,423,000, of which $15.3 million was owed to defendant Beck and approximately $5 million was owed to Lau.  The interest expense on the debt was substantially hampering its ability to report a profit.  The principal stated purpose of the Secondary Offering was to repay approximately $30.3 million of indebtedness, which would virtually eliminate interest expense from Viisage's balance sheet.  Disclosure of the true state of affairs concerning Viisage's bid for the Georgia DMVS could have jeopardized the offering or the ability to raise sufficient funds to extinguish the debt.  Accordingly, the Registration Statement merely continued the same disclosures contained in its 10-Q and 10-Q/A for the quarter ended March 28, 2004, and in its May 21, 2004 Form S-3/A without any mention of the wrongdoing with which it was charged.

60.    Substantial efforts were made to ensure the success of the Secondary Offering. Viisage representatives appeared at numerous conferences in May 2004 to generate interest in the Company's Secondary Offering.  On May 5, 2004, defendant Aulet presented the Company and its prospects at the JP Morgan 32nd Annual Tech and Telecom Conference in San Francisco. On May 18, 2004, defendant Bailey presented again at the American Electronics Association Micro Cap Financial Conference in Monterey, California.  On May 19, 2004, defendant Aulet presented for the second time that month at the Piper Jaffray Technology Conference in New York City.

61.    On July 1, 2004, Digimarc moved the Georgia court to compel Viisage to comply with the Georgia court's June 3, 2004 discovery order and for sanctions against Viisage due to its abject failure to produce the ordered documents—documents Digimarc reasonably maintained were necessary before the directed depositions could go forward.

62.    In the face of this motion and with the planned Secondary Offering only weeks away, Viisage sought to prevent the requested documents or depositions from ever occurring by agreeing with the DMVS to terminate the contract Digimarc was challenging.  Thus, on July 21, 2004, Viisage issued a press release relating to the Georgia litigation.  In that press release entitled "Viisage Takes Initiative to Help End Stalemate in Georgia Drivers' License Contract Dispute: Viisage to receive $2.5 million payment; New request for proposals to be issued by Georgia Department of Motor Vehicle Safety", Viisage stated that:

> the Company has taken decisive action to resolve the continuing stalemate over the implementation of the State of Georgia drivers' license contract. Under the terms of the agreement with the Georgia Department of Motor Vehicle Safety (DMVS), Viisage will receive a settlement of $2.5 million as reimbursement for work completed on the drivers' license contract awarded to Viisage in November 2002. This settlement terminates the current Georgia DMVS contract with Viisage. The agency has confirmed that it intends to file a motion to dismiss the lawsuit initiated by a Viisage competitor contesting the contract award. The

Georgia DMVS also has confirmed that it plans to issue a new request for proposals for a new drivers' license system as soon as possible and no later than the end of October 2004.

In addition, defendant Bailey stated in that press release that:

The State of Georgia Department of Motor Vehicle Safety has a responsibility to protect its citizens from identity-related crimes. Recognizing that the State has been unable to fulfill this responsibility for the past year due to the litigation, we chose to take a proactive step to help resolve this issue. Viisage and the State agreed that for the benefit of both our constituents, it was best to terminate our contract, settle final payments and enable the State to issue a request for proposals for a new contract.

This is an amicable agreement with a valued customer on a contract that we believe was appropriately awarded to Viisage. We fully intend to compete for the new contract and are confident that, if re-awarded the contract, our advanced technology identity solutions would successfully fulfill the Georgia DMVS's needs for a state-of-the art solution.

63.     On the same day, July 21, 2004, Viisage also issued a press release announcing its financial results for its second quarter ended June 27, 2004, in which defendant Aulet reaffirmed that Viisage expects "revenue between $60-63 million and EBITDA of $10-11 million" for 2004.

64.     In a conference call with analysts held the following day on July 22, 2004, Defendant Bailey elaborated further on the termination of the Georgia DMVS contract stating:

*Viisage was never a party to this lawsuit, which has dragged on and on for a year and a half, nor were any allegations of impropriety ever lodged against our company.* Still and all, with more than $1m spent already in legal fees as a related party and no prospect of a breakthrough in the logjam within the foreseeable future, we decided it was time to act.

Let me put this in context. Almost two years ago, when I joined Viisage, I said that we would build this company from the customer end. Central to that was a core value that states that we are committed to the success of our customers. That means making sure that they are successful in all they do, not just implementing on our contracts. *As a result, we had to make sure that we lived by our core values.* So rather than continue to let the State waste money and continue to deprive their customer of the advantages of Advanced Identity Solutions documents, we took action.

*We offered an approach that allowed the State to move this procurement from the courts to the marketplace where we believe it belongs.* The terms of this settlement are spelled out in the press release we issued. What's most important are two facts. First, this step will enable the State to end the ongoing legal battle with its enormous costs for all parties.

23

> Second, the State will be reissuing an RFP for this contract before the end of
> 2004, allowing its citizens to finally get the secure identity document that they
> require for their protection. (emphasis added.)

65.     Defendant Aulet stated further on that conference call that "[t]he cash total will be increased by the payment we are receiving from the State of Georgia of $2.5 million, which will be recorded in the third quarter of this year."

66.     On July 22, 2004, Viisage filed an Amended Registration Statement with the SEC with respect to Viisage's Secondary Offering.  In the Amended Registration Statement, Viisage stated:

> In July 2003, a Georgia court issued a preliminary injunction prohibiting
> Georgia's Department of Motor Vehicle Safety from continuing to work with us
> to install the State's new drivers' license system. The injunction is the result of a
> lawsuit filed in March 2003 by one of our competitors alleging that the
> Department of Motor Vehicle Safety did not comply with its own bid process
> when it selected a vendor for its new digital drivers' license program. In July
> 2004, we reached a settlement agreement with the State pursuant to which the
> Department of Motor Vehicle Safety terminated the contract for convenience and
> agreed to pay us $2.0 million in cash and the State agreed to purchase certain
> equipment from us for $500,000. The Department of Motor Vehicle Safety has
> filed a motion with the Georgia court to dismiss the case based upon the
> termination of the contract. The agency also has filed an affidavit stating that it
> intends to issue a new request for proposals for a digital drivers' license system
> before the end of October 2004. As a result of the termination of the contract, we
> will lose up to $19.7 million in revenue that we expected to recognize over the
> next five and one-half years, which was included in our $176 million of backlog
> at March 28, 2004, unless we are able to win the new contract for the digital
> drivers' license system and the revenues from such new contract are substantially
> similar to the terminated contract.

Thus, Viisage asserted that the Georgia DMVS had "terminated the contract for convenience" in a further effort to avoid any disclosure of its own wrongdoing, and to maintain the fiction that it was not even a defendant in the action, Viisage reported that *the DMVS* had filed a motion to dismiss the Georgia litigation based upon termination of the contract.  In reality, *Viisage* also filed a motion to dismiss Digimarc's complaint on the same day the DMVS' motion was filed – July 21, 2004.  The Amended Registration Statement incorporated by reference, *inter alia*, Viisage's Form 10-Q and amended 10-Q for the quarterly period ended March 28, 2004, and

Viisage's July 21, 2004 Press Release that was included in a Form 8-K filing by Viisage with the SEC on that date.

67.     On July 23, 2004, Digimarc filed a motion for the entry of a temporary restraining order preventing the DMVS and Viisage from consummating the announced settlement on the grounds that the termination of the contract awarded to Viisage and payment of $2.5 million would violate the Georgia court's injunction issued on July 31, 2003.  Specifically, Digimarc contended that settlement payment of $2.5 million Viisage characterized in its Press Release dated July 21, 2004 "as reimbursement for work completed on the driver's license contract awarded to Viisage in November 2002" constituted "activity related to … performance under the contract" which was prohibited by the July 31, 2003 injunction order.

68.     On or about August 4, 2004, the Amended Registration Statement for the Secondary Offering became effective and on August 5, 2004, Viisage filed with the SEC a prospectus (the "Prospectus") for the Secondary Offering stating that the shares were being offered at $5.50 per share.  In the Prospectus, defendants repeated virtually verbatim the misleading and incomplete disclosure it made in the Amended Registration Statement concerning the Georgia litigation again falsely asserted that the Georgia DMVS had merely "terminated the contract for convenience" and falsely implying that it was not a party to the litigation.  Viisage added only one sentence to the Prospectus concerning the Georgia litigation that was not contained in the S-3/A, indicating that Digimarc sought to enjoin the payment of $2.5 million.  The Prospectus incorporated by reference the same documents as the Amended Registration Statement.  The Secondary Offering raised approximately $37.1 million for Viisage, of which $30.3 million was used to repay indebtedness principally to Beck and Lau, and approximately $2.3 million for Defendants Berube, Beck, and Yon for their sales of Viisage stock.

69.     On August 11, 2004, Viisage filed its Form 10-Q for the quarter ended June 30, 2004.  In that Form 10-Q, with regard to the Georgia litigation, Viisage merely repeated the false and misleading disclosure it had provided in the Prospectus.  It further stated under Item 4 -

Controls And Procedures:

> (a) Evaluation of disclosure controls and procedures. Our management, with the participation of our Chief Executive Officer, or CEO, and Chief Financial officer, or CFO, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act) as of June 27, 2004.
>
> * * *
>
> Based on this evaluation, our CEO and CFO concluded that, as of June 27, 2004, our disclosure controls and procedures were (1) designed to ensure that material information relating to us, including our consolidated subsidiaries, is made known to our CEO and CFO by others within those entities, particularly during the period in which this report was being prepared and (2) effective, in that they provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the Securities Exchange Commission's rules and forms.

70.    It also contained the same Section 302 Certifications by defendants Bailey and Aulet as they provided in Viisage's 10-Q for the prior quarterly period, but with respect to the second quarter.

71.    On August 19, 2004, the Georgia court granted Digimarc's motion for a TRO enjoining consummation of the settlement announced by Viisage on July 21, 2004 just before its completion of the Secondary Offering.  The Georgia court held that the TRO would be in place until September 2, 2004 – the day after the Georgia court was going to hold a hearing on whether to enter a preliminary injunction regarding Viisage's settlement with the DMVS.

72.    On August 23, 2004, Digimarc filed it Second Amended Complaint against the GTA, DMVS and Viisage.  Based in part upon the discovery obtained by Digimarc described above, the Second Amended Complaint spelled out in detail the highly improper conduct by Viisage including the fact that Viisage did not have the ability to manufacture the cards it had submitted to the Georgia DMVS and had submitted another manufacturer's card as its "production quality" samples without disclosing that fact.

73.    On August 23, 2004, Digimarc also filed its motion to preliminarily enjoin

consummation of the settlement agreement.  In that motion, Digimarc detailed much of the evidence supporting its allegations of Viisage's improper conduct described above in paragraphs 41-51.

74.     The Georgia court held a hearing on Digimarc's motion on September 1, 2004 and by order dated September 2, 2004:

Enjoined the proposed settlement between GTA and DMVS and Viisage of $2.5 million and transfer of certain goods and equipment by Viisage to the State finding the settlement "constitutes 'activities related to implementation of or performance under the contract dated November 12, 2002' which is prohibited under the July 31, 2003 Injunction Order."

Granted Digimarc's second motion to compel finding that Viisage had "not yet completed its discovery obligations under this Court's previously issued Order dated June 3, 2004"

Granted Digimarc's motion for attorneys' fees of $5,761.50; and

Denied the motions to dismiss filed by Viisage as well as the GTA and DMVS.

Viisage made no disclosure of this ruling at or about this date.

75.     On October 5, 2004, Viisage issued a press release announcing that it had acquired Imaging Automation (iA) ("Imaging Automation") for approximately $5 million in cash, 3.9 newly issued shares of Viisage common stock, and the assumption of $2.9 million in debt.  The press release further indicated that the number of shares necessary to acquire Imaging Automation was "based upon the 20 day market closing price average of Viisage common stock as of two days prior to the completion of the transaction, which is $6.74."  Viisage still made no disclosure of the Georgia court's rulings in the press release.

76.     On October 11, 2004, the parties in the Georgia litigation filed cross motions for summary judgment – one by Viisage, one by the GTA and DMVS, and a partial summary judgment motion by Digimarc.  Responses to those motions were filed on October 20, 2004.  In its response, Digimarc provided an even fuller factual record of Viisage's wrongdoing in connection with its RFP proposals, as Viisage had finally provided the discovery Digimarc had been seeking all year.

27

77.    On October 21, 2004, Viisage announced that it has been awarded four contracts within the drivers' license market, including a $7 million contract to provide digital drivers licenses to the Wisconsin Department of Motor Vehicles and a $2 million contract through Hewlett-Packard to produce secure drivers' licenses and IDs for the Maryland Department of Motor Vehicles.  Viisage did not provide the names of the other two public entities that had awarded Viisage contracts totaling $1.91 million.

78.    After the close of the market on October 25, 2004, Viisage announced "record" results for the third quarter ended September 30, 2004 -- Viisage's first profitable quarter in three years -- and increased Viisage's revenues and earnings guidance for 2004. Specifically, Viisage stated in a press release:

> On the basis of its results for the nine months, Viisage is increasing its guidance for 2004, with annual revenue now anticipated to be between $66-68 million, increased from $60-63 million, and EBITDA anticipated to be between $11.5-12.5 million, increased from EBITDA of $11-12 million.

In that press release, Defendant Bailey also stated that "The Company's performance for the third quarter, combined with our accomplishments so far this quarter, give us the confidence to increase both our revenue and EBITDA guidance for 2004."  Defendant Aulet added that

> Viisage continued to significantly improve its financial performance and strengthen its balance sheet in the past quarter while maintaining the necessary financial flexibility. Our strong revenue performance coupled with careful expense management enabled us to produce our first profitable quarter on a GAAP basis in several years. At the same time, our focus on growing EBITDA (earnings before interest, taxes, depreciation and amortization) proved successful as it increased to $3.4 million this past quarter, from $1.5 million in the same quarter last year.

Again, Viisage made no disclosure of the Georgia court's September 2, 2004 rulings in the press release.  In addition, even though by that ruling, the Georgia court had preliminarily enjoined payment of the $2.5 million to Viisage, Viisage *included the $2.5 million payment* in its increased EBITDA guidance for 2004.

79.    On October 26, 2004, Viisage held a conference call with analysts, during which it made similar representations regarding Viisage's increased guidance for 2004. In addition, defendant Aulet highlighted the significant benefits achieved from the Company's August 5, 2004 offering and that Viisage had obtained a commitment for a new $25 million line of credit to replace its prior credit line, stating:

> At the end of the third quarter of 2004 we had a cash position of approximately $37.36m compared to $12.6m at the end of the second quarter, reflecting the addition of net proceeds of approximately $37.9m from our follow-on offering, offset by the initial repayment of related party debt of approximately $10m. Of our cash position only approximately $3m or less than 10 percent is encumbered.

> As Bernard mentioned, we're pleased to announce as well today that we have received a commitment letter from a major bank for a $25m line of credit to replace our existing bank facilities. This new arrangement will not only give us valuable flexibility but will also reduce our rates of borrowing, significantly simplify our covenants, and increase yields on our money in the bank, all while making our G&A operations more productive by providing services locally and worldwide to meet our rapidly evolving needs.

> In the fourth quarter we will be able, if we so choose, to reduce our outstanding debt quite significantly, and after paying off early prepayment fees save approximately $600,000 a year in interest expense. We will be monitoring this closely, and our actions will be affected directly by our M&A program. But in any case, we have new financial flexibility that will be very valuable to support our growth, as well as being highly cost effective.

80.    With the new State contracts and new line of credit secured, defendant Bailey, for the first time, revealed on the October 26, 2004 call the existence of the August 19, 2004 TRO over the settlement it had announced on July 21, 2004. However, Viisage continued to conceal the Georgia court's September 2, 2004 injunction, the order sanctioning Viisage, or the order compelling Viisage to comply with the Georgia court's prior discovery orders, or one order denying the motions to dismiss filed by the GTA, DMVS, and Viisage. Moreover, as had been the case since the Georgia litigation had been commenced, Viisage made no disclosure that Viisage's own wrongdoing was a material subject of the litigation, or that Viisage was even a defendant in the litigation.

81.    On November 10, 2004, Viisage filed its Form 10-Q for the third quarter ended September 30, 2004. In that Form 10Q, Viisage repeated the revenue and earnings figures announced on October 25, 2004. With regard to the Georgia litigation, the 10-Q stated:

> In July 2003, a Georgia court issued a preliminary injunction prohibiting Georgia's Department of Motor Vehicle Safety from continuing to work with us to install the State's new drivers' license system. The injunction is the result of a lawsuit filed in March 2003 by one of our competitors alleging that the Department of Motor Vehicle Safety did not comply with its own bid process when it selected a vendor for its new digital drivers' license program. In July 2004, we reached a settlement agreement with the State pursuant to which the Department of Motor Vehicle Safety terminated the contract for convenience and agreed to pay us $2.0 million in cash and the State agreed to purchase certain equipment from us for $500,000. The Department of Motor Vehicle Safety has filed a motion with the Georgia court to dismiss the case based upon the termination of the contract. The agency has informed the court that it intends to issue a new request for proposals for a digital drivers' license system before the end of 2004. In response to a motion filed by the competitor, the Georgia court has issued a preliminary injunction prohibiting the Department of Motor Vehicle Safety and the State from making any payments to us under the settlement agreement. As a result of the termination of the contract, we will lose up to $19.7 million in revenue that we expected to recognize over the next five and one-half years, unless we are able to win the new contract for the digital drivers' license system and the revenues from such new contract are substantially similar to the terminated contract. While we believe we can utilize the remaining $2.8 million in assets being retained by us from the Georgia contract either in Georgia, if we win the contract based on the new request for proposals, or on alternative projects, to the extent that we are unable to utilize these assets or realize value through a sale of these assets, we would be required to take a charge to earnings.

This November 10, 2004 marked Viisage's first public acknowledgement that the Georgia court had preliminary enjoined the settlement with the GTA and DMVS -- more than two months earlier -- while at the same time Viisage continued to, *inter alia*, falsely represent to the public that Viisage was entitled to the $2.5 million payment from the Greorgia DMVS discussed above. In addition, Viisage made no disclosure of the Georgia court's September 2, 2004 order sanctioning Viisage, compelling Viisage to comply with the Georgia court's prior discovery orders, or denying the motions to

dismiss filed by the GTA, DMVS, and Viisage. Indeed, the disclosure indicated that the

motion to dismiss was still pending. Moreover, as had been the case since the Georgia

litigation had been commenced, Viisage continued to conceal the fact that Viisage's own

wrongdoing was a material subject of the litigation, and that Viisage was even a

defendant in the litigation.

82.     Viisage again stated under Item 4 - Controls And Procedures:

(a) Evaluation of disclosure controls and procedures. Our management, with the
participation of our Chief Executive Officer, or CEO, and Chief Financial officer,
or CFO, evaluated the effectiveness of our disclosure controls and procedures (as
defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act) as
of September 26, 2004.

* * *

Based on this evaluation, our CEO and CFO concluded that, as of September 26,
2004, our disclosure controls and procedures were (1) designed to ensure that
material information relating to us, including our consolidated subsidiaries, is
made known to our CEO and CFO by others within those entities, particularly
during the period in which this
report was being prepared and (2) effective, in that they provide reasonable
assurance that information required to be disclosed by us in the reports that we
file or submit under the Securities Exchange Act is recorded, processed,
summarized, and reported within the time periods specified in the Securities
Exchange Commission's rules and forms.

83.     It also contained the same Section 302 Certifications by defendants Bailey and

Aulet as they provided in Viisage's 10-Q for the prior quarterly periods, but with respect to the

third quarter.

84.     On December 14, 2004, Viisage issued a press release announcing that it had

entered into a loan agreement with Citizens Bank of Massachusetts permitting Viisage the right

to borrow up to $25 million, subject to certain financial covenants.

85.     On December 15, 2004, Viisage issued a press release stating that the Florida

Department of Highway Safety and Motor Vehicles had awarded a $1.1 million contract to

Viisage to provide automatic document authentication technology to detect falsified documents

and ensure that state driver licenses are issued only to the rightful owners.

86.     On December 22, 2004, the Georgia Court in which Digimarc's lawsuit was pending ruled on the cross-motions for summary judgment and concluded, based upon a substantial evidentiary record, "that there were significant instances of misconduct and misrepresentations by Defendant Viisage."  As a result, the Georgia Court permanently disallowed the $2.5 million in payments Viisage claimed it was owed for services it purportedly performed under the then terminated contract.

87.     In its ruling, the Georgia court found, *inter alia*, the following facts concerning Viisage's misconduct and misrepresentations to be *undisputed*:

- "On August 26, 2002, Defendant Viisage submitted two entirely new proposed permanent card solutions – both made with 3M products [without authorization from the manufacturer of the cards].  Defendant Viisage submitted a sample called the "Georgia Design Sample 3M Confirm Laminate" and a single card sample called the "Production Quality Card 3M Confirm Laminate," which was a driver's license card containing artwork and graphics from New York State.  Defendant Viisage failed to label the Georgia Design Sample as "production quality" even though these cards met the specifications of production quality cards as defined by DVMS.  There cards were discovered to be defective because the laminate was easily removed, leaving the underlying information on the card intact and subject to alteration; thus, the Evaluation Team concluded they were not production quality."

- "Defendant GTA subsequently asked Defendant Viisage to submit 17 samples of the New York cards, *which Defendant Viisage had already falsely represented were production quality*.  Defendant Viisage then arranged for 3M to send 17 additional samples of the New York cards, indicating that they were its "production quality cards."  The New York card samples were actually made by De La Rue and not Defendant Viisage and De La Rue never gave 3M or Defendant Viisage permission to use the New York card samples and they were only given to Defendant Viisage for marketing purposes.  *In short, Defendant Viisage submitted another vendors' sample cards, which it had no permission to use, in an attempt to submit acceptable permanent card samples*." (emphasis added)

- "In a further attempt to secure the contract with Defendants GTA and DMVS, Defendant Viisage misrepresented the existence of a back-up card production facility.  The RFP required that each bidder describe what plans it had to produce permanent cards on a central issuance basis in the event that a disaster disrupted the ability to issue cards from the primary central issuance facility in Georgia.

Prior to its July 19, 2002, initial proposal, Defendant Viisage had no alternative central issuance production facility in service for another state. Instead, it asked permission of Arthur Blank & Company to include them in the Georgia proposal as a back-up card printing facility in case of disaster at the permanent facility in Georgia. *In fact, Arthur Blank & Company did not have the capacity to provide back-up card production facilities, and Defendant Viisage had no binding contract with Arthur Blank & Company that could serve as a basis for Defendant Viisage's assertion in its proposal that it had secured this company as its back-up card production facility. In fact, Defendant Viisage had not procured specific pricing information from Arthur Blank & Company regarding how much money it would require from Defendant Viisage in order to prepare itself to serve as a back-up card production facility.*" (emphasis added)

88.    However, the Georgia court found that Digimarc had not convinced it that "but for the alleged acts of Defendants Viisage, GTA and DMVS Plaintiff Digimarc would have been awarded the contract at issue," and ordered that the GTA and DMVS be permitted to re-bid the RFP allowing both Viisage and Digimarc to participate.

89.    Viisage made no disclosure of this ruling on December 22, 2004. Rather it waited until after wire reports of the Georgia court's rulings began circulating on December 27, 2004 that were causing Viisage's stock price to drop. As reported by the Comtex News Network, "VISG is seeing sharp sell pressure this morning following wire reports that Digimarc received a favorable court ruling in Georgia related to a drivers license contract awarded to VISG"

90.    On December 27, 2004, Digimarc issued a press release stating:

the Fulton County Superior Court in Georgia has disallowed the State's 2002 driver license contract award to Viisage**,** finding that 'there were significant instances of misconduct and misrepresentation by Defendant Viisage**.**' The Court's ruling clears the way for the State to re-bid the contract and for Digimarc to compete to retain the State of Georgia's driver license business.

Digimarc further disclosed details of the Georgia court's ruling, as follows:

The Court found, among other things, that:

-- that Viisage's 'temporary card sample tore easily' and its 'permanent card samples easily delaminated and that the information on the card could be easily altered';

-- Viisage submitted another vendor's sample cards, which it did not have permission to use, in an attempt to submit acceptable permanent card samples;

-- 'key representatives of Defendant Viisage did not know how these card samples were made or whether Defendant Viisage was, in fact, capable of making the cards it proposed ...;' and that

-- Viisage 'misrepresented the existence of a back-up card production facility' in its bid submission.

This marked the first public recitation of Viisage's wrongdoing regarding the DMVS contract.

91.     Finally, following Digimarc's press release, on December 27, 2004, Viisage issued its press release regarding the Georgia court's ruling.  Attempting to put a false positive spin on that ruling, Viisage omitted any information concerning the Georgia Court's finding of Viisage's misconduct.  Rather, Defendant Bailey stated:

> Viisage learned today that the Georgia court has issued a summary judgment ruling permitting the state to move forward in its rebid of the state's drivers' license contract and permitting Viisage to compete to retain its contract with the state. We are pleased that the state will finally be permitted to begin the rebid process and *that the judge has agreed with us and the state on virtually all aspects of the summary judgment motions*.

92.     In addition, Viisage admitted without explanation that the Georgia court had ruled that $2 million of the purported $2.5 million settlement discussed above could not be paid to Viisage.

93.     In spite of Viisage's attempt to put a positive spin on the Georgia Court's ruling -- and omit material information regarding Viisage's improper conduct with respect to that contract -- as this news seeped into the market during the holidays, Viisage's stock price began to immediately decline following this announcement -- from a Class Period high of $9.64 per share on December 23, 2004 (the previous trading day) to a low of $8.38 on December 27, 2004, or a 15% drop, closing at $8.82 on high volume.

94.     On February 7, 2005, Viisage announced that it would meet its previously stated revenue guidance for 2004 and report $66-$67 million in revenues for 2004.  However, the Company also stated that it would not meet its previously issued earnings guidance of $11.5 -

$12.5 million in EBITDA and would instead report only $8-9 million in EBITDA. In addition, rather than report a $1.5 loss as previously projected, Viisage anticipated a loss of approximately $7-8 million.  The Company claimed that the earnings shortfall was "primarily due to several non-recurring factors, including a non-cash impairment charge of $2 million in connection" with the Digimarc litigation relating to the Georgia DMVS contract.  Thus, Viisage had continued to include the settlement payment from the DMVS in its public projections even though the Georgia court had enjoined it on August 19, 2004.  Further, Viisage blamed a tax election taken in the fourth quarter but which it stated was related to it acquisition of TDT on February 14, 2004 i.e. the first quarter of 2004.  Viisage also blamed "Sarbanes-Oxley Section 404 Compliance" claiming that "despite work undertaken in prior quarters, Viisage experienced higher than anticipated costs related to its Sarbanes-Oxley compliance efforts" totaling $550,000 in the fourth quarter.

95.     That day, defendants Bailey and Aulet held a conference call with analysts in which they attempted to downplay the significance of the earnings shortfall and, at the same time, highlight defendants' claim that Viisage had met its revenue guidance for 2004.  Defendant Bailey also discussed the $2 million asset write down due to the court's December 22, 2004 ruling in the Digimarc litigation, stating:

> I think many of you saw our press release on the conclusion of this legal matter last month. We have now had the opportunity to assess the situation more thoroughly in light of the most recent judge's decision to reduce our compensation-related to terminating our contract with the State of Georgia, and we were able to discuss with our lawyers and our auditors what prudent measures we should take. As a result, we are taking a one-time, noncash, $2m write-down during the fourth quarter of 2004 for an impairment charge to assets currently on our balance sheet. This, we believe, is taking an appropriately conservative approach to the situation. As you'll recall, the December summary judgment ruling, in essence, sent the dispute in contract back to the Department of Motor Vehicle Safety in Georgia for a rebid -- exactly what we had asked for.

96.     Defendant Bailey further explained in response to a question posed during the call: "this was just that $2 million portion that we had agreed with the state was unique to their

specific situation, and we should have been reimbursed for those expenses." Contrary to Defendant Bailey's belief, the Georgia court concluded otherwise.

97.     The market's reaction was immediate. On February 8, 2005, Viisage's shares plunged as much as 24.3% -- from $7.27 to a low of $5.85 -- on extraordinarily high volume of over 4.6 million shares. The market, therefore, considered the $2 million impairment charge to be material.

98.     On March 2, 2005, Viisage again shocked the market announcing that a "material weakness" existed in Viisage's internal accounting controls. Specifically, Viisage stated:

> In connection with the preparation of the Company's consolidated financial statements for the year ended December 31, 2004, the Company determined that it had an internal control deficiency that constitutes a 'material weakness' as defined by the Public Company Accounting Oversight Board's Accounting Standard No. 2. The Company has concluded that it had insufficient personnel resources and technical accounting expertise within the accounting function to resolve non-routine or complex accounting matters. As a result, management will be unable to conclude that the Company's internal controls over financial reporting are effective as of December 31, 2004. Therefore, BDO Seidman LLP, the Company's external accounting firm, will issue an adverse opinion with respect to the effectiveness of the Company's internal controls over financial reporting. In addition, as part of the Sarbanes-Oxley Section 404 compliance review, the Company is in the process of reviewing all of its other key internal control processes as well. While the evaluation is ongoing, management believes that it will likely conclude that the Company had significant deficiencies, which could constitute a material weakness, in the control processes around information technology systems as well.

In addition, Viisage announced that revenues for the first quarter 2005 would be $15-$17 million.

99.     The Company held a conference call before the market opened on March 3, 2005 to discuss its press release. During that conference call, Defendant Aulet admitted that the Company recognized it had internal control deficiencies "months ago" had been "working to remedy the issues for some time." Aulet further acknowledged "for the last *six to eight months*,

we have been working hard on our internal controls *with the goal* of full compliance rating for the year 2004 in our Sarbanes-Oxley 404 review." In response to a question, Defendant Bailey also admitted that the Company's internal control deficiencies were well known throughout 2004. He stated "[w]e have been going through an exhaustive, detailed analysis of our entire control system in this company for the entire year."

100.    The market's reaction to these latest revelations was again immediate. On March 3, 2005, Viisage's shares plunged as much as 27.2% -- from the close of $5.47 the previous day to a low of $4.30 on March 3, 2005 on extraordinarily high volume of over 6.2 million shares.

101.    On March 17, 2005, Viisage filed a Notification of Late Filing of its Form 10-K for 2004 with the SEC. The reasons it noted for its inability to file a timely Form 10-K were that: "Financial and other information for the filing of a complete and accurate Annual Report on Form 10-K for the period ended December 31, 2004, particularly with respect to the valuation of goodwill with respect to acquisitions completed by the Company in 2004 and completion of a review of pending litigation involving the Company could not be provided within the prescribed time period without unreasonable effort and expense." The effect of Viisage's Notification of Late Filing was to give Viisage a 15-day extension until March 31, 2005 in which to file its Form 10-K.

102.    On March 31, 2005, however, Viisage did not file its Form 10-K for 2004. Rather, Viisage issued a press release advising that it did not know when it would be able to file it's Form 10-K and that, as a result, it expects to receive a notice from the Nasdaq National Market that it is not in compliance with the filing requirements for continued listing on Nasdaq and that its securities may be subject to delisting from the Nasdaq National Market.

103.    On April 8, 2005, Viisage issued a press release announcing that it had received a

notice from the staff of The Nasdaq Stock Market indicating that the Company is subject to potential delisting from The Nasdaq National Market as a result of Viisage's failure to file its Form 10-K for the fiscal year ended December 31, 2004 in a timely fashion, as required under Nasdaq Marketplace Rule 4310(c) (14). Viisage further announced that it intended to appeal the Nasdaq Staff determination.

104.    Viisage did not file its Form 10-K and 10-Q for the first quarter until June 30, 2005, which it then amended to provide further information about its internal controls on July 7, 2005. Viisage's Form 10-K filings included the report of its auditors, BDO Seidman, LLP, on the identified material weaknesses in Viisage's internal financial controls. In that report, BDO Seidman, LLP explained that: "A material weakness is a control deficiency, or combination of control deficiencies, that results in *more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected.*"

105.    Significantly, the Company stated in the 10-Q that its internal controls had still not been fully remedied by April 3, 2005:

> In connection with the preparation of this Quarterly Report on Form 10-Q, an evaluation was performed under the supervision and with the participation of our management, including the CEO and CFO, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act) as of April 3, 2005. In performing this evaluation, management reviewed our internal controls over financial reporting, noting that there were two that had significant deficiencies that constituted material weaknesses in our control processes. The first of these is with regard to insufficient personnel resources and technical accounting expertise within the accounting function to effect timely financial close process and to effectively evaluate and resolve non-routine and/or complex accounting transactions. The second is with regard to inadequate or ineffective control processes around information technology systems, including inadequate security, inadequate restricted access to systems, inadequate segregation of duties within systems, lack of appropriate system documentation, ineffective change management processes and insufficient disaster recovery plans. Based on that evaluation, our CEO and CFO concluded that our disclosure controls and procedures were not effective as of April 3, 2005.

Nor were they effective as of July 3, 2005, according to Viisage's Form 10-Q filed with the SEC on August 12, 2005. Indeed, Viisage has not yet disclosed that they have been fully remedied.

## COUNT I
### For Violations of Section 11 of the Securities Act

106.    Lead Plaintiff Turnberry repeats and realleges the allegations set forth in paragraph 1-105 as though fully set forth herein.

107.    This Count is brought by Lead Plaintiff Turnberry pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of those members of the Class who purchased Viisage common stock issued pursuant to or traceable to the Amended Registration Statement and Prospectus filed by Viisage with the SEC and declared effective by the SEC on or about August 4, 2004, against all defendants. This claim is not based on and does not sound in fraud and expressly excludes any element of any paragraph that alleges that defendants' misconduct was done intentionally, knowingly or with reckless disregard for the truth and any element of a paragraph that otherwise sounds in fraud.

108.    Lead Plaintiff Turnberry acquired Viisage common stock pursuant to or traceable to the Amended Registration Statement and Prospectus.

109.    The Amended Registration Statement and Prospectus for Viisage's Secondary Offering were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed adequately to disclose material facts, as follows:

a.       The Amended Registration Statement and Prospectus falsely represented that the Georgia litigation solely involved claims that the DVMS "did not comply with its own bid process when it selected a vendor for its new digital drivers' license program," and failed to disclose that Viisage had been added as a defendant to the suit on November 12, 2003, that Viisage had also filed a motion to dismiss Digimarc's complaint on the same day the DMVS' motion was filed – July 21, 2004, and that Viisage's own wrongful conduct was a significant part of the litigation.

b.       The Amended Registration Statement and Prospectus further falsely stated that the settlement with the DMVS was reached for "convenience" when in fact it was initiated by Viisage in an attempt to avoid having to comply with the discovery demands of Digimarc which were directed at Viisage's wrongful conduct.

c.       Viisage failed to disclose that there was a substantial risk that the settlement violated the Georgia court's July 2003 injunction order and the substantial risk that it was not entitled to the $2.5 million payment because it violated the injunction and because of its own wrongdoing.

d.       In incorporating its Form 10-Q for its first quarter of 2004 in the Amended Registration Statement and Prospectus, Viisage also falsely represented that Viisage's "disclosure controls and procedures were . . . effective, in that they provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the Securities Exchange Commission's rules and forms."  In addition, the Section 302 Certifications of defendants Bailey and Aulet falsely represented that the above disclosure "presented in this report our conclusions about the effectiveness of the disclosure

controls and procedures, as of the end of the period covered by this report based on such evaluation" and that this Form 10-Q disclosed "any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter . . . that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting." To the contrary, as acknowledged by Defendants Bailey and Aulet on a conference call with the investment community on March 3, 2005, the Company's internal control deficiencies were well known throughout 2004. Further by their Section 302 Certifications, Defendants Bailey and Aulet falsely represented that based upon each of their respective knowledge that each "quarterly report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report." For the reasons set forth above, this Form 10-Q was materially false and misleading.

110.    Viisage is the registrant for the Secondary Offering and filed the Amended Registration Statement and Prospectus as the issuer of Viisage common stock, as defined in Section 11(a)(5) of the Securities Act.

111.    As the issuer, Viisage is strictly liable to Lead Plaintiff Turnberry and the members of the Class who purchased Viisage common stock issued pursuant to or traceable to the Amended Registration Statement and Prospectus for the misstatements in, and the omissions from, the Amended Registration Statement and Prospectus.

112.    Each Individual Defendant signed the Amended Registration Statement, and/or was a Director of the Board of Viisage at the time of the filing of the Amended Registration Statement with the SEC.

113.    None of the Individual Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Amended Registration Statement and Prospectus were true and without omissions of any material facts and were not misleading.  The Individual Defendants in the exercise of reasonable care should have known of the material misstatements and omissions contained in the Amended Registration Statement and Prospectus as set forth herein.

114.    Lead Plaintiff Turnberry and the members of the Class who purchased Viisage common stock issued pursuant to or traceable to the Amended Registration Statement and Prospectus have sustained damages.  The value of Viisage stock has declined substantially subsequent to the Secondary Offering due to defendants' violations.

115.    At the times they purchased Viisage common stock, neither Lead Plaintiff Turnberry nor any member of the Class knew, or by the reasonable exercise of care could have known, of the facts concerning the inaccurate and misleading statements and omissions alleged herein.  Less than one year has elapsed from the time that Lead Plaintiff Turnberry discovered or reasonably could have discovered the facts upon which this Amended Complaint is based to the time that Lead Plaintiff Turnberry filed its initial complaint in this action.  Less than three years have elapsed between the time that the securities upon which this claim is brought were offered to the public and the time Lead Plaintiff Turnberry filed its initial complaint.

116.    In connection with the Secondary Offering and sale of Viisage common stock, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce and the United States Mails.

117.    By reason of the foregoing, the defendants have violated Section 11 of the Securities Act and are liable to Lead Plaintiff Turnberry and the members of the Class who

purchased Viisage common stock pursuant to and/or traceable to the Secondary Offering, each of whom has been damaged by reason of such violations.

## COUNT II

### For Violations of Section 15 of the Securities Act

118.    Lead Plaintiff Turnberry repeats and realleges the allegations set forth in paragraphs 1-117 as though fully set forth herein.

119.    This Claim is brought by Lead Plaintiff Turnberry pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of those members of the Class who purchased Viisage common stock issued pursuant to or traceable to the Amended Registration Statement filed by Viisage with the SEC and declared effective by the SEC on August 5, 2004, against defendants Bailey, Aulet, Berube, Beck and Yon.  This claim is not based on and does not sound in fraud and expressly excludes any element of any paragraph that alleges that defendants' misconduct was done intentionally, knowingly or with reckless disregard for the truth and any element of a paragraph that otherwise sounds in fraud.

120.    Each of the defendants named in this Count were control persons of Viisage by virtue of the following facts:

      a.    Bailey and Aulet, at all relevant times, were the CEO and CFO of Viisage, its most senior officers.  In addition, Bailey and Aulet were in direct control of the public statements made by Viisage having either signed them or made the statements on conference calls held by Viisage with the investment community.

      b.    Berube controlled and had the ability to control Viisage due to his positions as Chairman of the Board of Viisage and as Executive Vice President and Chief

Operating Officer of Lau, the largest holder of Viisage common stock, directly owning approximately 17% of its issued and outstanding common stock prior to the Class Period. In addition, Viisage was significantly indebted to Lau, as Lau loaned Viisage $7.3 million in May 2003. That loan was not paid off until September 2004, with proceeds of the Secondary Offering.

c.   Beck controlled and had the ability to control Viisage due to his positions as a Director of, and consultant to, Viisage, as well as his serving as Vice Chairman of the Viisage's Board of Directors. Viisage was also indebted to Beck in the amount of $15.3 million, a debt Viisage assumed in connection with the acquisition of Trans Digital Technologies Corporation in February 2004. This debt was not repaid until October 19, 2004 with proceeds of the Secondary Offering. In addition, prior to the Class Period, Beck owned 5,869,651 shares, representing 16.4 percent of Viisage's issued and outstanding common stock.

d.   Viisage has admitted in its Form 10-Q and S-3 filings that "as a result of their ownership, both Lau and Mr. Beck have a strong influence on matters requiring approval by our stockholders, including the election of directors and most corporate actions, including mergers and acquisitions."

e.   Yon controlled and had the ability to control Viisage due to his position as a Director of Viisage, and as the Chief Executive Officer of Odeon Venture Capital AG, which, prior to the Class Period, owned 1,054,798 shares of Viisage common stock, over which Yon has sole voting and dispositive power.

121.    None of the Individual Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Amended Registration Statement and Prospectus for the Secondary Offering were true and devoid of any omissions of material fact.  Therefore, by reason of their positions of control over the Company, as alleged herein, pursuant to Section 15 of the Securities Act, each of the Individual Defendants is liable jointly and severally with and to the same extent that Viisage is liable to Lead Plaintiff Turnberry and the members of the Class who purchased Viisage common stock on the Secondary Offering pursuant to or traceable to the Amended Registration Statement and Prospectus as a result of the wrongful conduct alleged herein.

## COUNT III

### For Violations of Section 10(b) of the
### Exchange Act And Rule 10b-5 Promulgated Thereunder

122.    Lead Plaintiffs repeat and realleges the allegations set forth in paragraphs 1-105 above as though fully set forth herein.

123.    This Claim is brought by Lead Plaintiffs pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, against defendants Viisage, Bailey, and Aulet with respect to each of the material false and misleading statements described in this Count, and against defendants Berube and Beck with respect to the June 21, 2004 and July 22, 2004 registration statements filed with the SEC for the Secondary Offering, which they each signed, and also against defendant Berube with respect Viisage's Form S-3/A registration statement filed with the SEC on May 21, 2004, which he signed,  .

124.    Throughout the Class Period, defendants Viisage, Bailey, Aulet, Berube, and Beck, individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company,

including its true state of operations and financial health, as specified herein.

125.    These defendants employed devices, schemes, and artifices to defraud while in possession of material, adverse non-public information and engaged in acts, practices, and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about the Company not misleading; and engaged in acts, practices and a course of business which operated as a fraud and deceit upon Lead Plaintiffs and the members of the Class in an effort to maintain artificially high market prices for Viisage shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**False and Misleading Statements**

126.    Viisage's filings with the SEC on May 12, 2004, May 21, 2004, June 21, 2004, July 22, 2004, August 5, 2004, August 11, 2004 and November 10, 2004, Viisage's Press Releases issued July 21, 2004, October 5, 2004, October 25, 2004 and December 27, 2004, and Viisage's conference calls with the investment community on July 22, 2004 and October 26, 2004, referenced above at ¶¶ 52-55, 57-59, 62-66, 68-70, 75, 78-83, 91 were materially false and misleading for the following reasons:

> a.    Each misrepresented the nature of the Georgia litigation initiated by Digimarc by falsely portraying the litigation as solely alleging that the DMVS "did not comply with its own bid process when it selected a vendor for its new digital drivers' license program."  In reality, as set forth above, Viisage had been added as a party to the litigation on November 12, 2003 and the litigation was also focused on materially false and misleading information provided by Viisage to the GTA and DMVS in an effort to secure the contract, as described in detail above;

b.      Viisage's Press Release of July 21, 2004, defendant Bailey's comments on

the Viisage's July 22, 2004 conference call, Viisage's S-3/A filing with

the SEC on July 22, 2004, Viisage's August 5, 2004 filing of the

Prospectus, and Viisage's August 11, 2004 and November 10, 2004 Form

10-Q filings each also: (i) falsely represented the reason for the settlement

it had initiated with the DMVS in that they falsely stated that the

settlement with the DMVS was reached for "convenience" when it was

initiated by Viisage in an attempt to avoid having to comply with the

discovery demands of Digimarc which were directed at Viisage's

wrongful conduct; (ii) falsely represented that only the DMVS had filed a

motion to dismiss the Georgia litigation due to the settlement in an effort

to avoid any indication that Viisage was a party to the action and that its

wrongful conduct was a significant subject of the action.  To the contrary,

as a party to the lawsuit, *Viisage* had also filed a motion to dismiss

Digimarc's complaint on the same day the DMVS' motion was filed –

July 21, 2004; and (iii) with respect to the aforementioned disclosures in

this subparagraph prior to November 10, 2004, Viisage failed to disclose

that there was a substantial risk that the settlement violated the Georgia

court's July 2003 injunction order and the substantial risk that it was not

entitled to the $2.5 million payment because it violated the injunction and

because of its own wrongdoing described at ¶¶ 43-50, 87, including, *inter

alia*, that Viisage had submitted another manufacturer's cards to the

Georgia DMVS as if they were Viisage's "production cards" without any

authorization.

c.    The Amended Registration Statement and Prospectus for Viisage's

Secondary Offering were also inaccurate and misleading, contained untrue

statements of material facts, omitted to state other facts necessary to make

the statements made not misleading, and concealed and failed adequately

to disclose material facts for the reasons set forth in paragraph 109, above.

d.    During Viisage's July 22, 2004 conference call, Defendant Bailey falsely

stated that "*Viisage was never a party to this lawsuit, which has dragged*

*on and on for a year and a half, nor were any allegations of impropriety*

*ever lodged against our company.*"  Bailey further falsely stated on the

call that the settlement was a product of Viisage living up to its "core

values."  To the contrary, as detailed above, Viisage initiated the

settlement in an effort to avoid having to comply with the Georgia court's

discovery orders which required Viisage to provide full discovery of its

own wrongdoing.

e.    Viisage's October 25, 2004 Press Release and October 26, 2004

conference call also omitted any disclosure of the Georgia court's

September 2, 2004 ruling preliminary enjoining the proposed settlement

between GTA and DMVS and Viisage of $2.5 million and transfer of

certain goods and equipment by Viisage to the State as violating the

Georgia court's July 31, 2003 Injunction Order; imposition of sanctions

against Viisage for its repeated failure to comply with the court's

discovery orders; and denying the motions to dismiss filed by Viisage as

48

well as the GTA and DMVS.

f.    Viisage's November 10, 2004 Form 10-Q also failed to disclose any of the

Georgia court's rulings other than the entry of the preliminary injunction.

Thus, in it, Viisage still falsely represented that the motion to dismiss filed

solely by the DMVS was still pending, when it, as well as its own motion

to dismiss had been denied on September 2, 2004.

g.    Viisage's Form 10-Qs filed with the SEC on May 12, 2004, June 21, 2004,

August 11, 2004 and November 10, 2004, and the Amended Registration

Statement and Prospectus (each of which incorporated by reference

Viisage's May 12, 2004 10-Q) also falsely represented that Viisage's

"disclosure controls and procedures were . . . effective, in that they

provide reasonable assurance that information required to be disclosed by

us in the reports that we file or submit under the Securities Exchange Act

is recorded, processed, summarized, and reported within the time periods

specified in the Securities Exchange Commission's rules and forms."  In

addition, the Section 302 Certifications of defendants Bailey and Aulet

falsely represented that the above disclosure "presented in this report our

conclusions about the effectiveness of the disclosure controls and

procedures, as of the end of the period covered by this report based on

such evaluation" and that each Form 10-Q disclosed "any change in the

registrant's internal control over financial reporting that occurred during

the registrant's most recent fiscal quarter . . . that has materially affected,

or is reasonably likely to materially affect, the registrant's internal control

over financial reporting." To the contrary, as acknowledged by Defendants Bailey and Aulet on a conference call with the investment community on March 3, 2005, the Company's internal control deficiencies were well known throughout 2004. Further by their Section 302 Certifications, Defendants Bailey and Aulet falsely represented that based upon each of their respective knowledge that each "quarterly report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report." The costs of remedying its deficient internal controls were significant. On February 7, 2005, Viisage stated that, "in the fourth quarter alone, compliance-related costs totaled $550,000." In addition, although Viisage represented in its March 2, 2005 press release that it expected "to reach profitability during 2005," in its July 5, 2005, press release, it stated that "ongoing higher compliance expenses" were a principal reason why the Company no longer anticipated "reaching GAAP profitability in 2005 and may not increase its cash generation compared to 2004 as previously expected." For the reasons set forth above, each of Viisage's Form 10-Qs filed with the SEC during the Class Period was materially false and misleading.

h.     The EBITDA guidance for 2004 provided by defendants Viisage, Bailey and Aulet on July 21 and 22, 2004 of $10-11 million and their increase in EBITDA guidance to $11.25 - $12.5 million on October 25 and 26, 2004

lacked a reasonable basis in that, as these defendants knew, it was predicated on receipt of the $2.5 million settlement with the DMVS. The receipt of this settlement amount was materially in doubt as the settlement violated the terms of the Georgia court's July 2003 Injunction Order and required the DMVS – a public entity – to compensate Viisage for Viisage's own deception of the DMVS. Even after it had been enjoined by Georgia court on September 2, 2004, these defendants increased their guidance without any disclosure of this injunction. On February 7, 2005, Viisage revealed that it anticipated reporting EBITDA for 2004 of only $8-9 million due in significant part to the Georgia court's determination in December 2004 that to pay Viisage $2 million of the $2.5 million would unjustly enrich Viisage for its own wrongdoing.

127.    In addition to the duties of full disclosure imposed on the defendants named in this Court as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, these defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in Regulation S-X, S-K, Form S-3 and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

128.    Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities

analysts to be disclosed and is known by corporate officials and their legal and financial advisors

to be the type of information which is expected to be and must be disclosed.

129.    The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false statements pleaded in this complaint.

The statements alleged to be false and materially misleading herein relate to then-existing facts

and conditions.  To the extent there were any forward-looking statements, there were no

meaningful cautionary statements identifying the important then-present factors that could and

did cause actual results to differ materially from those in the purportedly forward-looking

statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-

looking statements pleaded herein, liability may be established for those false forward-looking

statements because at the time each of those forward-looking statements was made, the particular

speaker knew that the particular forward-looking statement was false or misleading, and/or the

forward-looking statement was made, authorized and/or approved by an executive officer of

Viisage who knew that those statements were false when made.  Any warnings contained in the

press releases and the financial statements quoted herein were generic statements of the kind of

risks that affect any high profile company and misleadingly contained no specific factual

disclosure that Viisage had made material misrepresentations to the DMVS and GTA in

connection with bidding for its contract, which put the Company's prospects at risk.

130.    Defendants Bailey, Aulet, Berube, and Beck, as the directors and/or top executive

officers of the Company, are liable as direct participants in the wrongs complained of herein.

Through their positions of control and authority as officers and/or directors of the Company,

and/or through their extensive stock ownership in Viisage, these defendants were able to and did

control the content of the false and misleading public statements disseminated by the Company

described herein with which they are charged.  With knowledge of the falsity and/or misleading nature of the statements contained therein or in reckless disregard of the true facts detailed herein, these defendants caused the heretofore complained of public statements to contain misstatements and omissions of material facts as alleged herein.  The false and misleading statements contained in the Company's SEC filings and press releases constituted "group published information," which Bailey and Aulet (and other individual defendants depending on the disclosure) were responsible for creating.

<u>**Defendants Acted with Scienter**</u>

131.    The defendants named in this Count acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were readily available to them based upon the following facts.

132.    With respect to the material misrepresentations and omissions concerning the DVMS RFP described at ¶ 126, the litigation was identified in the SEC filings signed by each of the individual defendants named in this Count.  In addition, on several conference calls with the investment community, Defendants Bailey and Aulet held themselves out to be knowledgeable about that litigation, providing updates (although misleading and incomplete ones) on almost every conference call.  The size of the potential contract with the DMVS -- $19.5 million -- made it one of the most significant potential contracts in the Company's history.  In addition to the significance of this business to Viisage: (i) the litigation had been continuing since 2003; Viisage had been added as a defendant in November 2003; (ii) Viisage's conduct was a principal subject of the litigation; (iii) the litigation had been escalating during the Class Period; (iv) Viisage had

been subjected to sanctions for flouting the Georgia court's discovery orders; and (v) Viisage

announced the settlement with the DMVS only a few weeks after Digimarc had filed its second

motion to compel and for sanctions against Viisage for failing to comply with the Georgia

court's discovery orders directed specifically at Viisage's deceptive conduct.

133.    A strong inference of scienter is also provided by Bailey's blatant lie during the

July 22, 2004 conference call -- on the eve of the Company's completion of the Secondary

Offering – that "*Viisage was never a party to this lawsuit, which has dragged on and on for a

year and a half, nor were any allegations of impropriety ever lodged against our company.*"

There was utterly no basis for Bailey, the CEO of Viisage, to have believed that statement was

accurate.

134.    Further, Vissage's pattern of delaying disclosures of adverse rulings in the

Georgia litigation further supports scienter.  Although the Georgia court issued a TRO enjoining

the $2.5 million settlement on August 19, 2004, defendants made no disclosure of that fact until

the Company's October 26, 2004 conference call.  Significantly, this was after Viisage had

announced, on October 5, 2004, that it had completed its stock for stock acquisition of Imaging

Automation, Inc. and after, as it announced on October 21, 2004, it had been awarded four new

secure identity contracts.  Even then, defendants Bailey and Aulet, the principal spokesmen on

the call, made no disclosure of the Georgia court's September 2, 2004 order issuing a

preliminary injunction, imposing sanctions on Viisage, and denying the motions to dismiss

including its own.  The fact of the injunction was not revealed until November 10, 2004—over

two months after the fact - by the addition of only one sentence, in its From 10-Q for its third

quarter, to its standard disclosure regarding the Georgia litigation – after it had publicly

announced its first quarterly profit in some time on October 25, 2004.  It is reasonable to infer

that these defendants did not want Viisage's increasing litigation problems -- which, *inter alia*, defendant Bailey had falsely stated Viisage was not even a defendant  -- to overshadow its financial results.  Even then, Viisage, in the Form 10-Q, inexplicably, maintained the fiction that only the DMVS had filed a motion to dismiss while omitting that it, as well as Viisage's own motion to dismiss, had been denied two months earlier.

135.    Defendants Berube and Beck, Chairman and Vice-Chairman of Viisage's Board, had a significant interest in the affairs of Viisage, beneficially owning prior to the Secondary Offering approximately 16.8% and 16.4%, respectively of Viisage's outstanding stock.  In addition, prior to the Secondary Offering, Viisage was indebted to Lau (which Berube and his wife control) and Beck in the amounts of $4.3 million and $15.3 million, respectively.  As a result, the Company repeatedly advised investors in its SEC filings that "both Lau and Mr. Beck have a strong influence on matters requiring approval by our stockholders, including the election of directors and *most corporate actions* . . . ."  Even after their sales on Secondary Offering, Lau and Beck retained 13.8% and 13.4%, respective ownership of Viisage, remaining its two largest shareholders, and Viisage continued to advise investors in its SEC filings that these affiliated shareholders "could result in us taking actions that are not supported by unaffiliated stockholders."  Given their respective interests and involvement with the Company, and that the Secondary Offering was going to provide the funds to repay the Company's indebtedness to them in full, a strong inference can be made that both defendants Berube and Beck each knew or recklessly disregarded the material misrepresentations in and omissions from the Registration Statement and Amended Registration for the Secondary Offering which they each signed.

136.    Further, due to the improprieties by Viisage in the bidding process described at ¶¶ 43-50, 87 and the terms of the Georgia court's July 2003 injunction order, defendants had no

basis for Viisage's public assertions that it had secured a $2.5 million in settlement funds from the DMVS, which it expected to be paid in the third quarter.

137.    In addition, as a result of the forgoing misrepresentations and omissions, defendants Bailey and Aulet knowingly or recklessly lacked a reasonable basis for their adherence, on July 21 and 22, 2004, to Viisage's prior EBITDA guidance of $10-11 million. That guidance was provided at the same time Viisage announced its settlement with the DMVS, which it announced was expected to be paid in the third quarter, and included that payment in the projection.  Furthermore, defendants Bailey and Audet *increased* their EBITDA guidance on October 25 and 26, 2004 to $11.25-12.5 million even though, as they acknowledged in Viisage's Form 10-Q for the third quarter, that payment had been enjoined.  The receipt of this settlement amount in 2004 or ever was materially in doubt as the settlement violated the terms of the Georgia court's July 2003 Injunction Order and required the DMVS – a public entity – to compensate Viisage for Viisage's own deception of the DMVS.  On February 7, 2005, Viisage revealed that it anticipated reporting EBITDA for 2004 of only $8-9 million due, in significant part, to the Georgia court's determination in December 2004 that to pay Viisage $2 million of the $2.5 million would unjustly enrich Viisage for its own wrongdoing.

138.    With regard to the alleged misrepresentations regarding Viisage's internal financial controls, no significant event occurred during the third or fourth quarter that could have led to a massive deterioration in the Company's internal controls as of year-end 2004 that were identified by Viisage on March 2, 2005.  Indeed, Bailey and Aulet acknowledged during the Company's March 3, 2005 conference call with the investment community that the Company's internal control deficiencies were well known throughout 2004, as detailed in paragraph 99 above.  Nevertheless, each signed Form 10-Qs that made no mention of these internal control

deficiencies and executed false and misleading Certifications on the subject. Further, given that substantial efforts were being expended to address Viisage's internal control deficiencies so that Viisage could report compliance with Sarbanes-Oxley at year-end, Defendants Berube and Beck, due to their positions ad Chairman and Vice Chairman of the Board, respectively, and to their substantial involvement in the affairs of the Company, knew or recklessly disregarded that the representations in the Form 10-Qs that were incorporated by reference in the registration statements they signed were false and lacked any reasonable basis.

139.    Viisage is properly charged with knowledge of its own wrongdoing which was a significant focus of the Georgia litigation, the content of the depositions of its own officers and/or employees in the Georgia litigation, and of the Georgia court's orders as set forth herein. At all times relevant to this action, Viisage's officers and employees involved in the bid for the Georgia contract were acting within the scope of their employment in furtherance of their responsibilities to the Company. As such, their scienter is imputable to Viisage.

140.    Scienter is also supported by the motive and opportunity of these defendants to engage in the fraudulent practices detailed in this Count.

141.    The misrepresentations of the defendants named in this Count: (i) enabled Viisage to complete, in August 2004, the Secondary Offering of approximately 7.5 million shares by which it sold approximately 7.2 million shares and received net proceeds of approximately $37.4 million at a time when it was struggling to report a profit; (ii) Lau, controlled by Defendant Berube, realized proceeds of $779,779.00 from the sale of 141,778 shares of Viisage common stock on the Secondary Offering, Beck realized proceeds of $779,779 from the sale of 141,778 shares of Viisage common stock on the Secondary Offering, and Odeon, controlled by Defendant Yon, realized proceeds of $743,363.50 from the sale of 135,157 shares of Viisage common stock

on the Secondary Offering.  Significantly, the proceeds of the Secondary Offering to Viisage were used, in substantial part, to repay in full a $15.3 million promissory note issued to Defendant Beck and to repay in full a $4.3 million remaining debt obligation to Lau.  As represented in Viisage's SEC filings, "as a result of their ownership, both Lau and Mr. Beck have a strong influence on matters requiring approval by our stockholders, including the election of directors and most corporate actions, including mergers and acquisitions.

142.    Although the Georgia Court issued its preliminary injunction on September 2, 2004, Viisage concealed that fact until the announcement of its third quarter results on October 25, 2004 -- after it had completed its acquisition of Imaging Automation, Inc. on or about October 5, 2004.  Viisage utilized 3.9 million shares of its common stock for 77 percent of the $34 million purchase price.

143.    In addition, at the end of Viisage's first quarter, Viisage had incurred indebtedness to Commerce Bank and Trust Company in the amount of $10,075,000.  The financial covenants in effect at the time, which had been recently renegotiated, included, *inter alia*, that Viisage **not** report a net loss for 2004 greater than $2.0 million.  Through the first two quarters of 2004, however, Viisage had reported a net loss of $1,949,000 -- or a mere $51,000 away from violating the covenant.  Each of the defendants named in this Count therefore knew that it was essential for Viisage to complete the Secondary Offering so that it could repay the debt and avoid the risk of violating the covenant.

144.    In addition to $2,302,921.50 in proceeds from sales on the Secondary offering, Defendants reaped proceeds from open market sales of Viisage stock, in the aggregate, of $8,990,315.02, as follows:

a.    Lau, controlled by Defendant Berube sold the following shares of Viisage:

| NAME | DATE | SHARES SOLD | PROCEEDS |
|------|------|-------------|----------|
| Lau Acq. Corp. | 5/26/2004 | 8,000 | $14,040.00 |
| Lau Acq. Corp. | 6/17/2004 | 17,000 | $44,200.00 |
| Lau Acq. Corp. | 7/15/2004 | 6,602 | $17,165.00 |
| Lau Acq. Corp. | 11/30/2004 | 50,000 | $395,000.00 |
| Lau Acq. Corp. | 12/1/2004 | 25,000 | $200,000.00 |
| Lau Acq. Corp. | 12/2/2004 | 75,000 | $604,000.00 |
| Lau Acq. Corp. | 12/7/2004 | 100,000 | $839,000.00 |
| Lau Acq. Corp. | 12/13/2004 | 77,000 | $627,030.00 |
| Lau Acq. Corp. | 12/15/2004 | 25,000 | $206,250.00 |
| **TOTALS** | | 380,602 | $2,946,685.20 |

145.    As a result of these deceptive practices and false and misleading statements and/or omissions, the market price of Viisage shares was artificially inflated during the Class Period and due to the declines in the price of Viisage stock due to the revelations of defendants' misrepresentations and omissions detailed herein, Lead Plaintiffs and the members of the Class suffered significant damage.  Lead Plaintiffs and the members of the Class purchased Viisage stock in ignorance of the false and misleading nature of the representations and/or omissions described above and the deceptive and manipulative devices employed by the defendants named in this Count.  Lead Plaintiffs and the other members of the Class, purchased Viisage stock

during the Class Period in reliance on either the integrity of the market and/or directly on the statements and reports of the defendants named in this Count.

146.    Had Lead Plaintiffs and the other members of the Class known of the material adverse information not disclosed by the defendants named in this Count, or been aware of the truth behind these defendants' material misstatements, they would not have purchased or acquired Viisage shares, or, if they had purchased or acquired such shares, they would not have done so at the artificially inflated prices which they paid.

147.    As a direct and proximate result of the wrongful conduct by the defendants named in this Count, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Viisage shares during the Class Period.

By virtue of the foregoing, defendants named in this Count have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**Applicability of Presumption of Reliance:**
**Fraud-On-The-Market Doctrine**

148.    At all relevant times, the market for Viisage common stock was an efficient market for the following reasons, among others:

a.    Throughout the Class Period, Viisage shares met the requirements for listing, and were listed and actively traded on the NASDAQ National Market, a highly efficient market.  The average weekly volume during the Class Period for Viisage stock on the NASDAQ was 1,738,244,381 million shares;

b.    As a regulated issuer subject to the reporting requirements of the securities laws, Viisage filed public reports with the SEC;

c.    Viisage shares were followed by securities analysts employed by major brokerage firms, including JP Morgan, Needham, Roth Capital Partners, C.F. Unterberg Towbin,

who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace; and

        d.     Viisage regularly issued press releases that were carried by national and international newswires.  Each of these releases was publicly available and entered the public marketplace.  In addition, Viisage regularly held conference calls with the investment community concerning its operations and financial results.

149.   As a result, the market for Viisage securities promptly digested current information with respect to Viisage from all publicly-available sources and reflected such information in Viisage's stock price.  Under these circumstances, all purchasers of Viisage shares during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices and a presumption of reliance applies.

## COUNT IV

### For Violations of Section 20 of the Exchange Act

150.   Lead Plaintiffs repeat and reallege the allegations set forth above in paragraphs 1-105, 123-149, as though fully set forth herein.

151.   This Claim is brought by Lead Plaintiffs pursuant to Section 20 of the Exchange Act, 15 U.S.C. § 78t, on behalf of the Class against defendants Bailey, Aulet, Berube, Beck and Yon.

152.   Each of the defendants named in this Count were control persons of Viisage for the reasons set forth in paragraph 120, above within the meaning of Section 20 of the Exchange Act during the Class Period.

153.   These defendants were therefore each in a position to control or influence the

contents of, or otherwise cause corrective disclosures to have been made in the Company's SEC

filings, along with the Company's other public statements that contained materially false and

misleading statements that were disseminated during the Class Period.

154.    By reason of the wrongful conduct alleged herein, the defendants named in this

Count are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result

of their wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages

in connection with their purchases of Viisage shares during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs, on their own behalf and on behalf of the Class, pray for

relief and judgment, as follows:

A.    Declaring this action to be a proper class action pursuant to Rule 23(a) and (b) (3)

of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.    Awarding Lead Plaintiffs and the other members of the Class damages in an

amount that may be proven at trial, together with interest thereon;

C.    Awarding Lead Plaintiffs and the members of the Class pre-judgment and post-

judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

D.    Awarding such other relief as this Court may deem just and proper.

## JURY DEMAND

Lead Plaintiffs demand a trial by jury.

|                |                      | /s/Jeffrey C. Block, Esq. |
|----------------|----------------------|---------------------------|
| DATED:         | February 27, 2006    | Jeffrey C. Block, Esq.  (BBO# 6007470 |

Leslie R. Stern, Esq. (BBO# 631201)
BERMAN DEVALERIO PEASE
    TABACCO BURT & PUCILLO
One Liberty Square, 8th Floor
Boston, MA 02109
(617) 542-8300

**Plaintiffs' Liaison Counsel**

Jeffrey A. Klafter, Esq.
KLAFTER & OLSEN LLP
1311 Mamaroneck Ave., Suite 220
White Plains, NY 10605
(914) 997-5656

Kurt B. Olsen, Esq.
KLAFTER & OLSEN LLP
2121 K Street, N.W.
Suite 800
Washington, D.C.  20037
(202) 261-3553

Stephen D. Oestreich, Esq.
Robert Cappucci, Esq.
William W. Wickersham, Esq.
**ENTWISTLE & CAPPUCCI LLP**
280 Park Avenue
26th Floor West
New York, NY 10017
(212) 894-7200

**Lead Counsel for Lead Plaintiffs**

Roy L. Jacobs, Esq.
**ROY JACOBS & ASSOCIATES**
60 East 42nd Street
46th Floor
New York, NY 10165
212-867-1156

Laurence D. Paskowitz, Esq.
**PASKOWITZ & ASSOCIATES**
60 East  42nd Street
46th Floor
New York, NY 10165
(212) 685-0969

**Counsel for Additional
Plaintiff Walter Cohutt**

## VIISAGE TECHNOLOGIES, INC.
## CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAWS

*David Hancock* ("Plaintiff") duly swears and says, as to the claims asserted under the federal securities laws, that:

1.    I have retained Klafter & Olsen LLP as my counsel, reviewed the complaint, and authorized the filing of a substantially similar complaint on my behalf.

2.    The security that is the subject of this action was not purchased at the direction of plaintiff's counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    The transactions in the security that is the subject of this action during the Class Period are as follows:

| Date | Number of Shares Purchased | Price Per Share |
|------|----------------------------|-----------------|
| 2/4/05 | 3,000 | 7.55 |
| 2/8/05 | 1,000 | 6.14 |
| 2/8/05 | 1,900 | 6.16 |
| 2/8/05 | 100 | 6.20 |

| Date | Number of Shares Sold | Price Per Share |
|------|-----------------------|-----------------|
| 3/9/05 | 3,000 | 4.51 |
| 3/9/05 | 3,000 | 4.51 |

5.    Plaintiff has not sought to serve as a class representative in more than five securities fraud class actions in the last three (3) years.

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except as ordered or approved by the court for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury under the laws of United States that the foregoing is true and correct.  Executed this 29th day of March 2005, at 4:00 PM    .

**VIISAGE TECHNOLOGIES, INC.**
**CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAWS**

_Lance Hancock_ ("Plaintiff") duly swears
and says, as to the claims asserted under the federal securities
laws, that:

     1.   I have retained Klafter & Olsen LLP as my counsel,
reviewed the complaint, and authorized the filing of a
substantially similar complaint on my behalf.

     2.   The security that is the subject of this action
was not purchased at the direction of plaintiff's counsel or in
order to participate in this private action.

     3.   Plaintiff is willing to serve as a representative
party on behalf of the class, including providing testimony at
deposition and trial, if necessary.

     4.   The transactions in the security that is the
subject of this action during the Class Period are as follows:

| Date | Number of Shares Purchased | Price Per Share |
|------|----------------------------|-----------------|
| 2/4/05 | 5,000 | 7.5 |
| 2/8/05 | 3,000 | 5.98 |
| 3/3/05 | 20,000 | 4.83 |
| 3/7/05 | 4,000 | 4.85 |
| 3/16/05 | 4,000 | 4.45 |

| Date | Number of Shares Sold | Price Per Share |
|------|------------------------|-----------------|
| 2/9/05 | 5,000 | 5.82 |
| 2/9/05 | 3,000 | 5.95 |
| 3/4/05 | 1,700 | 4.61 |
| 3/4/05 | 3,300 | 4.612 |
| 3/4/05 | 5,000 | 4.69 |
| 3/4/05 | 10,000 | 4.82 |
| 3/4/05 | 4,000 | 4.18 |
| 3/4/05 | 4,000 | 4.47 |

5.  Plaintiff has not sought to serve as a class representative in more than five securities fraud class actions in the last three (3) years.

6.  Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except as ordered or approved by the court for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.


I declare under penalty of perjury under the laws of United States that the foregoing is true and correct. Executed this 24th day of March 2005, at  8:30 Am  .

## PLAINTIFF'S CERTIFICATE

*Walter D. Cohott* ("Plaintiff"), declares, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the complaint against Viisage Technology, Inc. and certain other defendants.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as approved by the court.

5.    Plaintiff made the following transactions during the Class Period (October 25, 2004 through March 2, 2005) in the common shares of Viisage:

| Purchases | | | | Sales | | |
|---|---|---|---|---|---|---|
| Date(s) | Number of Shares | Price | | Date(s) | Number of Shares | Price |
| 1/27/2005 | 5000 | 7.31 | | | | |
| 1/28/2005 | 5000 | 7.19 | | | | |
| 1/31/2005 | 5000 | 7.18 | | | | |
| 2/8/2005 | 5000 | 6.01 | | | | |
| 2/9/2005 | 5000 | 6.06 | | | | |
| 2/14/2005 | 5000 | 5.88 | | | | |
| 2/22/2005 | 5000 | 6.13 | | | | |
| 2/23/2005 | 5000 | 6.08 | | | | |
| TOTAL | 40000 | AVG 6.48 | | | | |

6.    During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws.

7.    I declare under penalty of perjury, this __11__ day of March, 2005 that the information above is accurate.

*Walter D. Cohott*

## VIISAGE TECHNOLOGIES, INC.
## CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAWS

_RONALD SAUER_ ("Plaintiff") duly swears and says, as to the claims asserted under the federal securities laws, that:

1.    I have retained Klafter & Olsen LLP as my counsel, reviewed the complaint, and authorized the filing of a substantially similar complaint on my behalf.

2.    The security that is the subject of this action was not purchased at the direction of plaintiff's counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    The transactions in the security that is the subject of this action during the Class Period are as follows:

| Date | Number of Shares Purchased | Price Per Share |
|------|---------------------------|-----------------|
| 12-17-04 | 2,000 | 9.00 |
| 1-5-05 | 2,000 | 8.39 |
| 1-5-05 | 1,500 | 8.73 |
| 1-5-05 | 500 | 8.63 |
| 1-11-05 | 2,000 | 8.00 |
| 2-4-05 | 2,000 | 7.60 |

| Date | Number of Shares Sold | Price Per Share |
|------|----------------------|-----------------|
| 3-16-05 | 2,000 | 4.37 |
| 3-16-05 | 1,633 | 4.32 |
| 3-15-05 | 367 | 4.16 |
| 3-15-05 | 2,000 | 4.18 |
| 3-14-05 | 2,000 | 4.15 |
| 3-14-05 | 2,000 | 4.16 |

5.    Plaintiff has not sought to serve as a class representative in more than five securities fraud class actions in the last three (3) years.

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except as ordered or approved by the court for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.


I declare under penalty of perjury under the laws of United States that the foregoing is true and correct. Executed this __21__ day of March 2005, at WILMINGTON NC.

Ronald Sauer

## CERTIFICATION

Gregg Giaquinto declares the following as to the claims asserted, or to be asserted, under the federal securities laws:

1. My name is Gregg Giaquinto and I am the Chief Operating Officer and General Counsel of Electronic Trading Group, L.L.C. ("ETG").

2. I have reviewed a copy of the complaint filed in the action, captioned *Darquea v. Viisage Technology, Inc., et. al.*, Civil Action No. 05-cv-10438 (U.S. Dist. Ct., D. Mass.).

3. ETG did not acquire any of the relevant securities at the direction of plaintiff's counsel or in order to participate in any private action under the federal securities laws.

4. I am duly authorized to pursue appointment of ETG as a representative party in this matter and to seek approval of ETG's selection of lead and liaison counsel. ETG is willing to serve as a representative party in this action and it recognizes its duties as such, including monitoring and directing the litigation, and providing testimony at deposition and trial, if necessary.

5. ETG will not accept any payment for serving as a representative party beyond its *pro rata* share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the court pursuant to law.

6. ETG has not sought to serve or served as a representative party for a class in any action under the federal securities laws within the past three years, except *PLA, LLC v. Advanced Neuromodulation Systems, Inc., et al.*, Civil Action No. 05-cv-78 (U.S. Dist. Ct., E.D. Tex.); *Williams v. Elan Corporation, plc, et. al.*, Civil Action No. 05-cv-10413 (U.S. Dist. Ct., D. Mass.); and *Heywood v. Cell Therapeutics Inc., et. al.*, Civil Action No. 05-cv-00396 (U.S. Dist. Ct., W. Wash.).

7. ETG's transactions during the proposed class period in Viisage Technology, Inc. securities, that are the subject of this litigation, are described in the chart attached hereto as Schedule A.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 2nd day of May 2005

By: _____
    Gregg Giaquinto
    Chief Operating Officer and
    General Counsel
    Electronic Trading Group, L.L.C.

| CLIENT | SYMBOL | TDATE | QUANTITY | PRICE | COMMISSIONS | NET_AMT |
|---|---|---|---|---|---|---|
| Electronic Trading Group, LLC | VISG | 05/03/2004 | 100 | 8.7400 | 0.5000 | -874.5000 |
| Electronic Trading Group, LLC | VISG | 05/03/2004 | 100 | 8.6200 | 0.5000 | -862.5000 |
| Electronic Trading Group, LLC | VISG | 05/03/2004 | 100 | 8.4600 | 0.5000 | -846.5000 |
| Electronic Trading Group, LLC | VISG | 05/03/2004 | 50 | 8.7400 | 0.2500 | -437.2500 |
| Electronic Trading Group, LLC | VISG | 05/03/2004 | 50 | 8.5000 | 0.2500 | -425.2500 |
| Electronic Trading Group, LLC | VISG | 05/03/2004 | -100 | 8.4700 | 6.4200 | 840.5800 |
| Electronic Trading Group, LLC | VISG | 05/03/2004 | -100 | 8.4400 | 0.5200 | 843.4800 |
| Electronic Trading Group, LLC | VISG | 05/03/2004 | -300 | 8.4000 | 0.0600 | 2,519.9400 |
| Electronic Trading Group, LLC | VISG | 05/03/2004 | -300 | 8.4000 | 1.5600 | 2,518.4400 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | 1,000 | 10.0500 | 6 | -10,056 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | 1,000 | 9.7600 | 1 | -9,761 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | 1,000 | 9.9100 | 1 | -9,911 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | 939 | 9.6000 | 5.6400 | -9,020.0400 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | 900 | 10.0500 | 5.7300 | -9,050.7300 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | 900 | 10.0500 | 5.4000 | -9,050.4000 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | 800 | 10.0100 | 5.1100 | -8,013.1100 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | 700 | 10.0200 | 8.5000 | -7,022.5000 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | 600 | 9.7600 | 0.6000 | -5,856.6000 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | 500 | 10.1300 | 3.5000 | -5,068.5000 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | 400 | 10.1400 | 2.4000 | -4,058.4000 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | 400 | 9.7600 | 0.4000 | -3,904.4000 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | 200 | 10.0900 | 2.4300 | -2,020.4300 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | 200 | 10.0100 | 1.3600 | -2,003.3600 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | 200 | 10.0200 | 2.4300 | -2,006.4300 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | 100 | 10.1400 | 0.7000 | -1,014.7000 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | 100 | 10.0800 | 0.6200 | -1,008.6200 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | 100 | 10.0800 | 0.6200 | -1,008.6200 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | 100 | 10.0500 | 0.7300 | -1,005.7300 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | 100 | 10.0500 | 0.6200 | -1,005.6200 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | 100 | 10.0300 | 0.7300 | -1,003.7300 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | 100 | 10.0200 | 0.6200 | -1,002.6200 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | 100 | 10.0100 | 0.6200 | -1,001.6200 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | 100 | 10.0100 | 0.6200 | -1,001.6200 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | 100 | 10.0200 | 1.3200 | -1,003.3200 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | 100 | 10.0300 | 0.6200 | -1,003.6200 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | 100 | 10.0500 | 0.6200 | -1,005.6200 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | 100 | 10.0500 | 1.2100 | -1,006.2100 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | 61 | 9.5700 | 0.0600 | -583.8300 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -25 | 10.3800 | 0.0400 | 259.4600 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -100 | 10.3800 | 0.1300 | 1,037.8700 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -100 | 10.3800 | 0.1300 | 1,037.8700 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -100 | 10.3800 | 0.1300 | 1,037.8700 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -100 | 9.4300 | 0.6300 | 942.3700 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -100 | 9.7600 | 0.1300 | 975.8700 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -100 | 9.8600 | 0.1300 | 985.8700 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -100 | 9.8900 | 0.1300 | 988.8700 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -100 | 10.0700 | 0.7600 | 1,006.2400 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -100 | 10.0800 | 0.1300 | 1,007.8700 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -100 | 10.1300 | 0.6500 | 1,012.3500 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -100 | 10.1300 | 0.7600 | 1,012.2400 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -100 | 10.1500 | 0.6300 | 1,014.3700 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -100 | 10.3600 | 0.1300 | 1,035.8700 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -100 | 10.3800 | 0.1300 | 1,037.8700 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -100 | 10.3800 | 0.1300 | 1,037.8700 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -100 | 10.3800 | 0.1300 | 1,037.8700 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -171 | 9.9300 | 0.2100 | 1,697.8200 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -200 | 10.3500 | 0.2500 | 2,069.7500 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -200 | 10.2500 | 1.2500 | 2,048.7500 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -200 | 9.9000 | 0.2500 | 1,979.7500 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -200 | 9.9300 | 0.2500 | 1,985.7500 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -300 | 10.2200 | 1.8800 | 3,064.1200 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -300 | 9.8900 | 0.3700 | 2,966.6300 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -375 | 10.3800 | 0.4800 | 3,892.0200 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -400 | 10.2300 | 2.5000 | 4,089.5000 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -400 | 9.7600 | 0.5000 | 3,903.5000 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -400 | 9.4100 | 0.4900 | 3,763.5100 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -400 | 9.4100 | 0.4900 | 3,763.5100 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -500 | 10.1400 | 5.7400 | 5,064.2600 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -500 | 9.7600 | 3.1200 | 4,876.8800 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -500 | 9.4200 | 3.1200 | 4,706.8800 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -500 | 9.7600 | 3.1200 | 4,876.8800 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -500 | 9.9000 | 0.6200 | 4,949.3800 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -500 | 9.7600 | 3.1200 | 4,876.8800 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -500 | 9.8900 | 0.6200 | 4,944.3800 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -600 | 9.4000 | 0.7400 | 5,639.2600 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -629 | 9.9300 | 3.9300 | 6,242.0400 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -700 | 9.9200 | 0.8700 | 6,943.1300 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -700 | 9.9200 | 0.8700 | 6,943.1300 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -900 | 10.2000 | 1.1200 | 9,178.8800 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -900 | 9.8600 | 1.1100 | 8,872.8900 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -1,000 | 9.8600 | 1.2400 | 9,858.7600 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -1,000 | 9.4000 | 1.2200 | 9,398.7800 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -1,000 | 9.3900 | 1.2200 | 9,388.7800 |
| Electronic Trading Group, LLC | VISG | 05/04/2004 | -1,000 | 9.7600 | 6.2300 | 9,753.7700 |
| Electronic Trading Group, LLC | VISG | 05/05/2004 | 800 | 10.3400 | 4.8000 | -8,276.8000 |
| Electronic Trading Group, LLC | VISG | 05/05/2004 | 600 | 10.1100 | 4.2000 | -6,070.2000 |
| Electronic Trading Group, LLC | VISG | 05/05/2004 | 500 | 10.2500 | 3.5000 | -5,128.5000 |
| Electronic Trading Group, LLC | VISG | 05/05/2004 | 500 | 10.2500 | 0.5000 | -5,125.5000 |
| Electronic Trading Group, LLC | VISG | 05/05/2004 | 500 | 10.2800 | 0.5000 | -5,140.5000 |
| Electronic Trading Group, LLC | VISG | 05/05/2004 | 500 | 10.4200 | 3 | -5,213 |
| Electronic Trading Group, LLC | VISG | 05/05/2004 | 500 | 10.1300 | 3 | -5,068 |
| Electronic Trading Group, LLC | VISG | 05/05/2004 | 400 | 10.2800 | 0.4000 | -4,112.4000 |
| Electronic Trading Group, LLC | VISG | 05/05/2004 | 200 | 10.1100 | 1.4000 | -2,023.4000 |
| Electronic Trading Group, LLC | VISG | 05/05/2004 | 100 | 10.3400 | 0.1000 | -1,034.1000 |
| Electronic Trading Group, LLC | VISG | 05/05/2004 | 100 | 10.3400 | 0.1000 | -1,034.1000 |
| Electronic Trading Group, LLC | VISG | 05/05/2004 | 100 | 10.1100 | 0.7000 | -1,011.7000 |
| Electronic Trading Group, LLC | VISG | 05/05/2004 | 100 | 10.2800 | 0.1000 | -1,028.1000 |
| Electronic Trading Group, LLC | VISG | 05/05/2004 | 100 | 10.1100 | 0.7000 | -1,011.7000 |
| Electronic Trading Group, LLC | VISG | 05/05/2004 | -26 | 10.0800 | 0.1900 | 261.8900 |
| Electronic Trading Group, LLC | VISG | 05/05/2004 | -47 | 10.1500 | 0.3500 | 476.7000 |
| Electronic Trading Group, LLC | VISG | 05/05/2004 | -100 | 10.2000 | 0.7300 | 1,019.2700 |
| Electronic Trading Group, LLC | VISG | 05/05/2004 | -300 | 10.0800 | 2.1800 | 3,021.8200 |
| Electronic Trading Group, LLC | VISG | 05/05/2004 | -674 | 10.0600 | 4.8800 | 6,775.5600 |

| Electronic Trading Group, LLC | VISG | 05/05/2004 | -1,000 | 10.1800 | 7.2400 | 10,172.7600 |
|---|---|---|---|---|---|---|
| Electronic Trading Group, LLC | VISG | 05/05/2004 | -1,000 | 10.1000 | 6.6000 | 10,093.4000 |
| Electronic Trading Group, LLC | VISG | 05/05/2004 | -1,853 | 10.1500 | 13.4200 | 18,794.5300 |
| Electronic Trading Group, LLC | VISG | 05/06/2004 | 1,880 | 9.2000 | 1.8800 | -17,297.8800 |
| Electronic Trading Group, LLC | VISG | 05/06/2004 | 1,000 | 9.2000 | 1 | -9,201 |
| Electronic Trading Group, LLC | VISG | 05/06/2004 | 120 | 9.2000 | 0.1200 | -1,104.1200 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | 1,000 | 11.1000 | 6.3600 | -11,106.3600 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | 1,000 | 11.1000 | 6.3600 | -11,106.3600 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | 1,000 | 11.2000 | 6 | -11,206 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | 1,000 | 11.1000 | 6.3600 | -11,106.3600 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | 1,000 | 11.1000 | 6.3600 | -11,106.3600 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | 983 | 11.1200 | 12.5300 | -10,943.4900 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | 712 | 11.2000 | 4.2800 | -7,978.6800 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | 610 | 10.3500 | 3.6600 | -6,317.1600 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | 500 | 11.0800 | 6.0700 | -5,546.0700 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | 500 | 11.0700 | 3.2300 | -5,538.2300 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | 500 | 11.0900 | 6.3800 | -5,551.3800 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | 500 | 11.0800 | 6.3800 | -5,546.3800 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | 500 | 10.4400 | 0.3800 | -5,220.3800 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | 400 | 11.1700 | 0.4000 | -4,468.4000 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | 390 | 10.3500 | 2.3400 | -4,038.8400 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | 390 | 10.3500 | 2.3400 | -4,038.8400 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | 390 | 10.3500 | 0.3900 | -4,036.8900 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | 300 | 11.1700 | 0.3000 | -3,351.3000 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | 200 | 11.1700 | 0.2000 | -2,234.2000 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | 200 | 10.4000 | 0.1500 | -2,080.1500 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | 188 | 11.2000 | 1.1200 | -2,106.7200 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | 125 | 10.4100 | 0.7200 | -1,301.9700 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | 100 | 11.2000 | 0.6000 | -1,120.6000 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | 100 | 11.1700 | 0.1000 | -1,117.1000 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | 100 | 11.0300 | 1.2800 | -1,104.2800 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | 100 | 11.2200 | 1.2800 | -1,123.2800 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | 100 | 10.4900 | 0.7100 | -1,049.7100 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | 100 | 10.4000 | 0.5800 | -1,040.5800 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | 75 | 10.4100 | 0.4400 | -781.1900 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | 17 | 11.1200 | 0.2200 | -189.2600 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | 10 | 10.5100 | 0.0600 | -105.1600 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | 10 | 10.9700 | 0.0600 | -109.7600 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | -4 | 10.4300 | 0.0300 | 41.6900 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | -6 | 10.3200 | 0.0500 | 61.8700 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | -10 | 10.4200 | 0.0200 | 104.1800 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | -10 | 10.4700 | 0.1800 | 104.5200 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | -80 | 10.4000 | 0.1000 | 831.9000 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | -100 | 10.7900 | 0.6500 | 1,078.3500 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | -100 | 10.9900 | 1.3100 | 1,097.6900 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | -100 | 10.9100 | 1.3100 | 1,089.6900 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | -100 | 11.0600 | 1.3100 | 1,104.6900 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | -147 | 10.3600 | 0.8800 | 1,522.0400 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | -153 | 10.4200 | 0.9200 | 1,593.3400 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | -190 | 10.4100 | 0.2400 | 1,977.6600 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | -200 | 10.4100 | 0.2500 | 2,081.7500 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | -233 | 10.8000 | 2.9900 | 2,513.4100 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Electronic Trading Group, LLC | VISG | 05/07/2004 | -300 | 11.1300 | 0.3800 | 3,338.6200 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | -300 | 10.8000 | 3.9100 | 3,236.0900 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | -300 | 10.4200 | 1.8100 | 3,124.1900 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | -400 | 10.9100 | 5.2100 | 4,358.7900 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | -470 | 11.1500 | 0.6000 | 5,239.9000 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | -500 | 10.3700 | 3.0100 | 5,181.9900 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | -500 | 10.9000 | 6.5100 | 5,443.4900 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | -530 | 11.1500 | 0.6700 | 5,908.8300 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | -600 | 10.4100 | 0.7500 | 6,245.2500 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | -667 | 10.7900 | 8.2800 | 7,188.6500 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | -700 | 11.1300 | 0.8900 | 7,790.1100 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | -700 | 10.8100 | 9.1100 | 7,557.8900 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | -700 | 10.4000 | 0.8800 | 7,279.1200 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | -1,000 | 10.8100 | 6.2600 | 10,803.7400 |
| Electronic Trading Group, LLC | VISG | 05/07/2004 | -1,000 | 10.8000 | 6.2600 | 10,793.7400 |
| Electronic Trading Group, LLC | VISG | 05/10/2004 | 100 | 9.8900 | 3.3100 | -992.3100 |
| Electronic Trading Group, LLC | VISG | 05/10/2004 | 100 | 9.8900 | 3.2000 | -992.2000 |
| Electronic Trading Group, LLC | VISG | 05/10/2004 | 100 | 9.8900 | 3.7000 | -992.7000 |
| Electronic Trading Group, LLC | VISG | 05/10/2004 | 100 | 9.8900 | 3.7000 | -992.7000 |
| Electronic Trading Group, LLC | VISG | 05/10/2004 | -100 | 9.8400 | 3.3100 | 980.6900 |
| Electronic Trading Group, LLC | VISG | 05/10/2004 | -300 | 9.8100 | 9.9000 | 2,933.1000 |
| Electronic Trading Group, LLC | VISG | 05/12/2004 | 500 | 9.1800 | 0.5000 | -4,590.5000 |
| Electronic Trading Group, LLC | VISG | 05/12/2004 | 500 | 9.1600 | 0.5000 | -4,580.5000 |
| Electronic Trading Group, LLC | VISG | 05/12/2004 | 500 | 9.1600 | 0.5000 | -4,580.5000 |
| Electronic Trading Group, LLC | VISG | 05/12/2004 | 257 | 9.1700 | 1.8000 | -2,358.4900 |
| Electronic Trading Group, LLC | VISG | 05/12/2004 | 200 | 9.1800 | 0.2000 | -1,836.2000 |
| Electronic Trading Group, LLC | VISG | 05/12/2004 | 43 | 9.1700 | 0.3000 | -394.6100 |
| Electronic Trading Group, LLC | VISG | 05/12/2004 | -300 | 9.1600 | 2.1700 | 2,745.8300 |
| Electronic Trading Group, LLC | VISG | 05/12/2004 | -300 | 9.1400 | 1.8700 | 2,740.1300 |
| Electronic Trading Group, LLC | VISG | 05/12/2004 | -1,400 | 9.1400 | 8.7000 | 12,787.3000 |
| Electronic Trading Group, LLC | VISG | 05/17/2004 | 600 | 8.9500 | 6 | -5,376 |
| Electronic Trading Group, LLC | VISG | 05/17/2004 | 500 | 8.9500 | 14.2300 | -4,489.2300 |
| Electronic Trading Group, LLC | VISG | 05/17/2004 | 100 | 8.9500 | 0.5000 | -895.5000 |
| Electronic Trading Group, LLC | VISG | 05/17/2004 | 100 | 8.9500 | 0.5000 | -895.5000 |
| Electronic Trading Group, LLC | VISG | 05/17/2004 | 100 | 8.8600 | 0.5000 | -886.5000 |
| Electronic Trading Group, LLC | VISG | 05/17/2004 | 100 | 8.9400 | 0.5000 | -894.5000 |
| Electronic Trading Group, LLC | VISG | 05/17/2004 | -500 | 9.0300 | 11.6100 | 4,503.3900 |
| Electronic Trading Group, LLC | VISG | 05/18/2004 | 500 | 8.6600 | 7.7500 | -4,337.7500 |
| Electronic Trading Group, LLC | VISG | 05/18/2004 | 500 | 8.6600 | 7.2500 | -4,337.2500 |
| Electronic Trading Group, LLC | VISG | 05/18/2004 | 100 | 8.9300 | 0.5000 | -893.5000 |
| Electronic Trading Group, LLC | VISG | 05/18/2004 | 100 | 8.9000 | 0.5000 | -890.5000 |
| Electronic Trading Group, LLC | VISG | 05/18/2004 | 100 | 8.6600 | 0.5000 | -866.5000 |
| Electronic Trading Group, LLC | VISG | 05/18/2004 | 100 | 8.6600 | 0.5000 | -866.5000 |
| Electronic Trading Group, LLC | VISG | 05/18/2004 | -100 | 9.0200 | 0.5300 | 901.4700 |
| Electronic Trading Group, LLC | VISG | 05/18/2004 | -100 | 8.9600 | 0.5300 | 895.4700 |
| Electronic Trading Group, LLC | VISG | 05/18/2004 | -100 | 8.9700 | 0.5300 | 896.4700 |
| Electronic Trading Group, LLC | VISG | 05/18/2004 | -300 | 8.7800 | 1.5700 | 2,632.4300 |
| Electronic Trading Group, LLC | VISG | 05/18/2004 | -600 | 8.7100 | 6.1300 | 5,219.8700 |
| Electronic Trading Group, LLC | VISG | 05/19/2004 | -100 | 8.7400 | 1.5800 | 872.4200 |
| Electronic Trading Group, LLC | VISG | 05/19/2004 | -100 | 8.7800 | 0.5300 | 877.4700 |
| Electronic Trading Group, LLC | VISG | 05/19/2004 | -100 | 8.7300 | 0.5300 | 872.4700 |
| Electronic Trading Group, LLC | VISG | 05/19/2004 | -200 | 8.7400 | 2.1500 | 1,745.8500 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Electronic Trading Group, LLC | VISG | 05/19/2004 | -700 | 8.7400 | 11 | 6,107 |
| Electronic Trading Group, LLC | VISG | 05/21/2004 | 1,500 | 8.7200 | 18.7500 | -13,098.7500 |
| Electronic Trading Group, LLC | VISG | 05/21/2004 | 1,500 | 8.6500 | 0 | -12,975 |
| Electronic Trading Group, LLC | VISG | 05/21/2004 | 900 | 8.7400 | 0 | -7,866 |
| Electronic Trading Group, LLC | VISG | 05/21/2004 | 500 | 8.6800 | 0 | -4,340 |
| Electronic Trading Group, LLC | VISG | 05/21/2004 | 236 | 8.5400 | 2.7200 | -2,018.1600 |
| Electronic Trading Group, LLC | VISG | 05/21/2004 | 200 | 8.5400 | 2.3000 | -1,710.3000 |
| Electronic Trading Group, LLC | VISG | 05/21/2004 | 200 | 8.5100 | 2.3000 | -1,704.3000 |
| Electronic Trading Group, LLC | VISG | 05/21/2004 | 100 | 8.5500 | 1.1500 | -856.1500 |
| Electronic Trading Group, LLC | VISG | 05/21/2004 | 100 | 8.5400 | 1.1500 | -855.1500 |
| Electronic Trading Group, LLC | VISG | 05/21/2004 | 100 | 8.6000 | 1.1500 | -861.1500 |
| Electronic Trading Group, LLC | VISG | 05/21/2004 | 100 | 8.7400 | 0 | -874 |
| Electronic Trading Group, LLC | VISG | 05/21/2004 | 100 | 8.5800 | 1.1500 | -859.1500 |
| Electronic Trading Group, LLC | VISG | 05/21/2004 | 64 | 8.5400 | 0.7300 | -547.2900 |
| Electronic Trading Group, LLC | VISG | 05/21/2004 | -100 | 8.6400 | 1.1900 | 862.8100 |
| Electronic Trading Group, LLC | VISG | 05/21/2004 | -100 | 8.7600 | 1.1900 | 874.8100 |
| Electronic Trading Group, LLC | VISG | 05/21/2004 | -400 | 8.6800 | 4.7300 | 3,467.2700 |
| Electronic Trading Group, LLC | VISG | 05/21/2004 | -500 | 8.6800 | 5.9100 | 4,334.0900 |
| Electronic Trading Group, LLC | VISG | 05/21/2004 | -500 | 8.5700 | 0 | 4,285 |
| Electronic Trading Group, LLC | VISG | 05/21/2004 | -500 | 8.6800 | 0 | 4,340 |
| Electronic Trading Group, LLC | VISG | 05/21/2004 | -500 | 8.7000 | 0 | 4,350 |
| Electronic Trading Group, LLC | VISG | 05/21/2004 | -1,500 | 8.6500 | 19.0600 | 12,955.9400 |
| Electronic Trading Group, LLC | VISG | 05/21/2004 | -1,500 | 8.7200 | 0 | 13,080 |
| Electronic Trading Group, LLC | VISG | 05/24/2004 | 600 | 9.1700 | 3.6000 | -5,505.6000 |
| Electronic Trading Group, LLC | VISG | 05/24/2004 | 500 | 9.1300 | 2.5000 | -4,567.5000 |
| Electronic Trading Group, LLC | VISG | 05/24/2004 | 500 | 9.1300 | 2.5000 | -4,567.5000 |
| Electronic Trading Group, LLC | VISG | 05/24/2004 | 400 | 9.3300 | 1.5600 | -3,733.5600 |
| Electronic Trading Group, LLC | VISG | 05/24/2004 | 400 | 9.2000 | 1.6700 | -3,681.6700 |
| Electronic Trading Group, LLC | VISG | 05/24/2004 | 325 | 9.1300 | 1.2700 | -2,968.5200 |
| Electronic Trading Group, LLC | VISG | 05/24/2004 | 300 | 9.2300 | 1.5000 | -2,770.5000 |
| Electronic Trading Group, LLC | VISG | 05/24/2004 | 200 | 9.1400 | 1 | -1,829 |
| Electronic Trading Group, LLC | VISG | 05/24/2004 | 75 | 9.1300 | 0.3000 | -685.0500 |
| Electronic Trading Group, LLC | VISG | 05/24/2004 | -100 | 9.1400 | 0.4200 | 913.5800 |
| Electronic Trading Group, LLC | VISG | 05/24/2004 | -100 | 9.5200 | 0.0700 | 951.9300 |
| Electronic Trading Group, LLC | VISG | 05/24/2004 | -100 | 9.8700 | 0.4200 | 986.5800 |
| Electronic Trading Group, LLC | VISG | 05/24/2004 | -100 | 9.5000 | 0.5300 | 949.4700 |
| Electronic Trading Group, LLC | VISG | 05/24/2004 | -100 | 9.7500 | 0.8300 | 974.1700 |
| Electronic Trading Group, LLC | VISG | 05/24/2004 | -100 | 9.7200 | 0.4200 | 971.5800 |
| Electronic Trading Group, LLC | VISG | 05/24/2004 | -200 | 9.5100 | 0.9400 | 1,901.0600 |
| Electronic Trading Group, LLC | VISG | 05/24/2004 | -200 | 9.5200 | 0.1300 | 1,903.8700 |
| Electronic Trading Group, LLC | VISG | 05/24/2004 | -200 | 9.3300 | 1.0500 | 1,864.9500 |
| Electronic Trading Group, LLC | VISG | 05/24/2004 | -300 | 9.1400 | 1.2400 | 2,740.7600 |
| Electronic Trading Group, LLC | VISG | 05/24/2004 | -500 | 9.3100 | 2.6100 | 4,652.3900 |
| Electronic Trading Group, LLC | VISG | 05/24/2004 | -600 | 9.1600 | 3.7300 | 5,492.2700 |
| Electronic Trading Group, LLC | VISG | 05/24/2004 | -800 | 9.3100 | 4.1800 | 7,443.8200 |
| Electronic Trading Group, LLC | VISG | 05/25/2004 | -100 | 9.9300 | 0.8300 | 992.1700 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | 1,000 | 10.4900 | 11.3600 | -10,501.3600 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | 1,000 | 10.3800 | 6 | -10,386 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | 1,000 | 10.4800 | 6 | -10,486 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | 1,000 | 10.4900 | 8 | -10,498 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | 977 | 10.3000 | 5.8600 | -10,068.9600 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | 977 | 10.3000 | 5.8600 | -10,068.9600 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Electronic Trading Group, LLC | VISG | 05/26/2004 | 900 | 10.4800 | 5.4000 | -9,437.4000 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | 800 | 10.4900 | 6.4000 | -8,398.4000 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | 800 | 10.3400 | 4.8000 | -8,276.8000 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | 500 | 10.3000 | 3 | -5,153 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | 500 | 9.8800 | 2.5000 | -4,942.5000 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | 500 | 10.3800 | 2.5000 | -5,192.5000 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | 500 | 9.8500 | 2.5000 | -4,927.5000 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | 313 | 10.3000 | 1.8800 | -3,225.7800 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | 200 | 10.4900 | 1.6000 | -2,099.6000 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | 200 | 10.3100 | 1 | -2,063 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | 200 | 10.3300 | 1.2000 | -2,067.2000 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | 150 | 10.5100 | 0.7500 | -1,577.2500 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | 133 | 10.4000 | 0.6600 | -1,383.8600 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | 100 | 10.4800 | 0.6000 | -1,048.6000 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | 100 | 10.4000 | 0.5000 | -1,040.5000 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | 100 | 10.3800 | 0.5000 | -1,038.5000 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | 100 | 10.2200 | 0.5000 | -1,022.5000 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | 100 | 10.3100 | 0.5000 | -1,031.5000 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | 100 | 10.3100 | 0.5000 | -1,031.5000 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | 100 | 10.3300 | 0.5000 | -1,033.5000 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | 100 | 10.3900 | 0.5000 | -1,039.5000 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | 100 | 10.4700 | 0.5000 | -1,047.5000 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | 100 | 10.3000 | 0.6000 | -1,030.6000 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | 100 | 10.3100 | 0.5000 | -1,031.5000 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | 100 | 10.4700 | 0.5000 | -1,047.5000 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | 100 | 10.5000 | 0.5000 | -1,050.5000 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | 87 | 10.3300 | 0.6500 | -899.3600 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | 67 | 10.3900 | 0.3300 | -696.4600 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | 50 | 10.3300 | 0.2500 | -516.7500 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | 23 | 10.3000 | 0.1400 | -237.0400 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | 23 | 10.3000 | 0.1400 | -237.0400 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | -21 | 9.9400 | 0.1800 | 208.5600 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | -25 | 10.4400 | 0.0400 | 260.9600 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | -45 | 10.0800 | 0.5400 | 453.0600 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | -75 | 10.4400 | 0.1000 | 782.9000 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | -79 | 9.9400 | 0.6500 | 784.6100 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | -100 | 10.4400 | 0.1300 | 1,043.8700 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | -100 | 10.4400 | 0.1300 | 1,043.8700 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | -100 | 10.4400 | 0.1300 | 1,043.8700 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | -100 | 10.4400 | 0.1300 | 1,043.8700 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | -100 | 10.1000 | 0.7600 | 1,009.2400 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | -100 | 10.4900 | 0.8300 | 1,048.1700 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | -100 | 9.8200 | 0.8300 | 981.1700 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | -100 | 10.0800 | 0.6500 | 1,007.3500 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | -100 | 10.1000 | 0.6500 | 1,009.3500 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | -100 | 10.1400 | 0.6300 | 1,013.3700 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | -100 | 10.4400 | 0.1300 | 1,043.8700 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | -200 | 9.9900 | 1.0500 | 1,996.9500 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | -200 | 10.4400 | 1.0500 | 2,086.9500 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | -200 | 9.9400 | 1.0500 | 1,986.9500 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | -200 | 10.0700 | 1.0500 | 2,012.9500 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | -255 | 10.0800 | 2.9500 | 2,567.4500 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Electronic Trading Group, LLC | VISG | 05/26/2004 | -400 | 10.1400 | 2.5000 | 4,053.5000 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | -400 | 10.0900 | 2.6000 | 4,033.4000 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | -400 | 10.0300 | 2.1000 | 4,009.9000 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | -500 | 10.4400 | 0.6300 | 5,219.3700 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | -500 | 10.4800 | 2.6300 | 5,237.3700 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | -500 | 10.4800 | 2.6300 | 5,237.3700 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | -500 | 10.1500 | 3.1200 | 5,071.8800 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | -500 | 10.1800 | 4.1200 | 5,085.8800 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | -500 | 10.1800 | 3.1200 | 5,086.8800 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | -900 | 10.4400 | 1.1200 | 9,394.8800 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | -1,000 | 10.2000 | 6.6000 | 10,193.4000 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | -1,000 | 10.1500 | 8.2400 | 10,141.7600 |
| Electronic Trading Group, LLC | VISG | 05/26/2004 | -2,000 | 10.4400 | 2.4900 | 20,877.5100 |
| Electronic Trading Group, LLC | VISG | 05/27/2004 | 1,000 | 10.5300 | 5 | -10,535 |
| Electronic Trading Group, LLC | VISG | 05/27/2004 | 500 | 10.3500 | 2.5000 | -5,177.5000 |
| Electronic Trading Group, LLC | VISG | 05/27/2004 | 300 | 10.5500 | 1.5000 | -3,166.5000 |
| Electronic Trading Group, LLC | VISG | 05/27/2004 | 200 | 10.5200 | 1 | -2,105 |
| Electronic Trading Group, LLC | VISG | 05/27/2004 | -200 | 10.1500 | 1.2700 | 2,028.7300 |
| Electronic Trading Group, LLC | VISG | 05/27/2004 | -300 | 10.1500 | 1.9100 | 3,043.0900 |
| Electronic Trading Group, LLC | VISG | 05/27/2004 | -500 | 10.7100 | 2.6300 | 5,352.3700 |
| Electronic Trading Group, LLC | VISG | 05/27/2004 | -500 | 10.5900 | 2.6300 | 5,292.3700 |
| Electronic Trading Group, LLC | VISG | 05/27/2004 | -1,000 | 10.5000 | 5.2500 | 10,494.7500 |
| Electronic Trading Group, LLC | VISG | 05/27/2004 | -1,000 | 10.4200 | 5.2500 | 10,414.7500 |
| Electronic Trading Group, LLC | VISG | 06/01/2004 | 500 | 10.3200 | 2.5000 | -5,162.5000 |
| Electronic Trading Group, LLC | VISG | 06/01/2004 | 500 | 10.2800 | 2.5000 | -5,142.5000 |
| Electronic Trading Group, LLC | VISG | 06/01/2004 | 500 | 10.2800 | 2.5000 | -5,142.5000 |
| Electronic Trading Group, LLC | VISG | 06/01/2004 | 482 | 10.2500 | 2.4100 | -4,942.9100 |
| Electronic Trading Group, LLC | VISG | 06/01/2004 | 300 | 10.2600 | 1.5000 | -3,079.5000 |
| Electronic Trading Group, LLC | VISG | 06/01/2004 | 200 | 10.2100 | 1 | -2,043 |
| Electronic Trading Group, LLC | VISG | 06/01/2004 | 18 | 10.2700 | 0.0900 | -184.9500 |
| Electronic Trading Group, LLC | VISG | 06/02/2004 | 500 | 9.8400 | 2.5000 | -4,922.5000 |
| Electronic Trading Group, LLC | VISG | 06/02/2004 | 500 | 10.0200 | 2.5000 | -5,012.5000 |
| Electronic Trading Group, LLC | VISG | 06/02/2004 | 200 | 9.8500 | 1 | -1,971 |
| Electronic Trading Group, LLC | VISG | 06/02/2004 | 100 | 9.8500 | 0.5000 | -985.5000 |
| Electronic Trading Group, LLC | VISG | 06/02/2004 | -300 | 9.7200 | 10.0700 | 2,905.9300 |
| Electronic Trading Group, LLC | VISG | 06/02/2004 | -300 | 9.7000 | 0.0700 | 2,909.9300 |
| Electronic Trading Group, LLC | VISG | 06/02/2004 | -800 | 9.7800 | 4.1900 | 7,819.8100 |
| Electronic Trading Group, LLC | VISG | 06/02/2004 | -1,000 | 9.7800 | 5.2300 | 9,774.7700 |
| Electronic Trading Group, LLC | VISG | 06/02/2004 | -1,400 | 9.7100 | 0.3200 | 13,593.6800 |
| Electronic Trading Group, LLC | VISG | 06/03/2004 | 1,500 | 9.9700 | 9 | -14,964 |
| Electronic Trading Group, LLC | VISG | 06/03/2004 | 200 | 10 | 1.2000 | -2,001.2000 |
| Electronic Trading Group, LLC | VISG | 06/03/2004 | 200 | 9.9800 | 1.2000 | -1,997.2000 |
| Electronic Trading Group, LLC | VISG | 06/03/2004 | 100 | 9.9900 | 0.6000 | -999.6000 |
| Electronic Trading Group, LLC | VISG | 06/03/2004 | -11 | 9.7800 | 0.1200 | 107.4600 |
| Electronic Trading Group, LLC | VISG | 06/03/2004 | -89 | 9.8000 | 0.5700 | 871.6300 |
| Electronic Trading Group, LLC | VISG | 06/03/2004 | -100 | 9.7900 | 0.6400 | 978.3600 |
| Electronic Trading Group, LLC | VISG | 06/03/2004 | -100 | 9.8000 | 0.6300 | 979.3700 |
| Electronic Trading Group, LLC | VISG | 06/03/2004 | -300 | 9.8000 | 1.8700 | 2,938.1300 |
| Electronic Trading Group, LLC | VISG | 06/03/2004 | -500 | 9.8000 | 3.1600 | 4,896.8400 |
| Electronic Trading Group, LLC | VISG | 06/03/2004 | -500 | 9.8000 | 3.1600 | 4,896.8400 |
| Electronic Trading Group, LLC | VISG | 06/03/2004 | -900 | 9.7800 | 5.6100 | 8,796.3900 |
| Electronic Trading Group, LLC | VISG | 06/04/2004 | 600 | 9.5400 | 6 | -5,730 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Electronic Trading Group, LLC | VISG | 06/07/2004 | 590 | 9.1500 | 0 | -5,398.5000 |
| Electronic Trading Group, LLC | VISG | 06/07/2004 | 10 | 9.1400 | 6 | -97.4000 |
| Electronic Trading Group, LLC | VISG | 06/07/2004 | -600 | 8.9700 | 6.1300 | 5,375.8700 |
| Electronic Trading Group, LLC | VISG | 06/08/2004 | 500 | 10.4000 | 10.3300 | -5,210.3300 |
| Electronic Trading Group, LLC | VISG | 06/08/2004 | 500 | 10.0700 | 6.3800 | -5,041.3800 |
| Electronic Trading Group, LLC | VISG | 06/08/2004 | 400 | 10.2100 | 7.9700 | -4,091.9700 |
| Electronic Trading Group, LLC | VISG | 06/08/2004 | 200 | 10.1200 | 3.9800 | -2,027.9800 |
| Electronic Trading Group, LLC | VISG | 06/08/2004 | 200 | 10.1600 | 1.7800 | -2,033.7800 |
| Electronic Trading Group, LLC | VISG | 06/08/2004 | 200 | 10.1200 | 4.9800 | -2,028.9800 |
| Electronic Trading Group, LLC | VISG | 06/08/2004 | 100 | 10.1200 | 2.1000 | -1,014.1000 |
| Electronic Trading Group, LLC | VISG | 06/08/2004 | 100 | 9.9200 | 1 | -993 |
| Electronic Trading Group, LLC | VISG | 06/08/2004 | 100 | 10.0100 | 1 | -1,002 |
| Electronic Trading Group, LLC | VISG | 06/08/2004 | 100 | 10.0100 | 1 | -1,002 |
| Electronic Trading Group, LLC | VISG | 06/08/2004 | 100 | 9.9200 | 1 | -993 |
| Electronic Trading Group, LLC | VISG | 06/08/2004 | 100 | 10.3800 | 9.5000 | -1,047.5000 |
| Electronic Trading Group, LLC | VISG | 06/08/2004 | 100 | 10.4000 | 0.7300 | -1,040.7300 |
| Electronic Trading Group, LLC | VISG | 06/08/2004 | 100 | 10.3200 | 0.6000 | -1,032.6000 |
| Electronic Trading Group, LLC | VISG | 06/08/2004 | 100 | 10.2500 | 0.7300 | -1,025.7300 |
| Electronic Trading Group, LLC | VISG | 06/08/2004 | 100 | 10.2100 | 0.7300 | -1,021.7300 |
| Electronic Trading Group, LLC | VISG | 06/08/2004 | 100 | 10.4000 | 0.6200 | -1,040.6200 |
| Electronic Trading Group, LLC | VISG | 06/08/2004 | 100 | 10.2100 | 2.1000 | -1,023.1000 |
| Electronic Trading Group, LLC | VISG | 06/08/2004 | -100 | 10.0800 | 1.5000 | 1,006.5000 |
| Electronic Trading Group, LLC | VISG | 06/08/2004 | -100 | 10 | 1.0300 | 998.9700 |
| Electronic Trading Group, LLC | VISG | 06/08/2004 | -100 | 10.1600 | 1.1500 | 1,014.8500 |
| Electronic Trading Group, LLC | VISG | 06/08/2004 | -100 | 10.1600 | 1.2600 | 1,014.7400 |
| Electronic Trading Group, LLC | VISG | 06/08/2004 | -100 | 10.1700 | 0.7600 | 1,016.2400 |
| Electronic Trading Group, LLC | VISG | 06/08/2004 | -100 | 10.3600 | 0.1300 | 1,035.8700 |
| Electronic Trading Group, LLC | VISG | 06/08/2004 | -100 | 10.1600 | 0.6500 | 1,015.3500 |
| Electronic Trading Group, LLC | VISG | 06/08/2004 | -100 | 10.0800 | 1.5000 | 1,006.5000 |
| Electronic Trading Group, LLC | VISG | 06/08/2004 | -100 | 10.0800 | 1.5000 | 1,006.5000 |
| Electronic Trading Group, LLC | VISG | 06/08/2004 | -100 | 10.0800 | 1.5000 | 1,006.5000 |
| Electronic Trading Group, LLC | VISG | 06/08/2004 | -100 | 10.0800 | 1.5000 | 1,006.5000 |
| Electronic Trading Group, LLC | VISG | 06/08/2004 | -200 | 10.2000 | 1.2500 | 2,038.7500 |
| Electronic Trading Group, LLC | VISG | 06/08/2004 | -200 | 10.0100 | 2.0500 | 1,999.9500 |
| Electronic Trading Group, LLC | VISG | 06/08/2004 | -300 | 9.8700 | 3.0700 | 2,957.9300 |
| Electronic Trading Group, LLC | VISG | 06/08/2004 | -500 | 10.3500 | 10.4600 | 5,164.5400 |
| Electronic Trading Group, LLC | VISG | 06/08/2004 | -500 | 9.9600 | 6.5000 | 4,973.5000 |
| Electronic Trading Group, LLC | VISG | 06/08/2004 | -500 | 10.0600 | 9.9500 | 5,020.0500 |
| Electronic Trading Group, LLC | VISG | 06/09/2004 | 2,500 | 9.6100 | 12.5000 | -24,037.5000 |
| Electronic Trading Group, LLC | VISG | 06/09/2004 | 500 | 9.6500 | 2.5000 | -4,827.5000 |
| Electronic Trading Group, LLC | VISG | 06/09/2004 | -100 | 9.6500 | 2.5300 | 962.4700 |
| Electronic Trading Group, LLC | VISG | 06/09/2004 | -200 | 9.6400 | 1.0500 | 1,926.9500 |
| Electronic Trading Group, LLC | VISG | 06/09/2004 | -300 | 9.6500 | 1.5700 | 2,893.4300 |
| Electronic Trading Group, LLC | VISG | 06/09/2004 | -400 | 9.6400 | 0.1000 | 3,855.9000 |
| Electronic Trading Group, LLC | VISG | 06/09/2004 | -500 | 9.6900 | 2.6200 | 4,842.3800 |
| Electronic Trading Group, LLC | VISG | 06/09/2004 | -500 | 9.6900 | 2.6200 | 4,842.3800 |
| Electronic Trading Group, LLC | VISG | 06/09/2004 | -500 | 9.6800 | 2.6200 | 4,837.3800 |
| Electronic Trading Group, LLC | VISG | 06/09/2004 | -500 | 9.6400 | 2.6200 | 4,817.3800 |
| Electronic Trading Group, LLC | VISG | 06/16/2004 | 300 | 9.4100 | 3 | -2,826 |
| Electronic Trading Group, LLC | VISG | 06/16/2004 | -300 | 9.2800 | 3.0700 | 2,780.9300 |
| Electronic Trading Group, LLC | VISG | 06/17/2004 | 10,000 | 9.3137 | 0 | -93,137 |
| Electronic Trading Group, LLC | VISG | 06/17/2004 | -100 | 9.3100 | 0 | 931 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Electronic Trading Group, LLC | VISG | 06/17/2004 | -100 | 9.2900 | 0 | 929 |
| Electronic Trading Group, LLC | VISG | 06/17/2004 | -127 | 9.2900 | 0 | 1,179.8300 |
| Electronic Trading Group, LLC | VISG | 06/17/2004 | -500 | 9.3000 | 0 | 4,650 |
| Electronic Trading Group, LLC | VISG | 06/17/2004 | -600 | 9.3100 | 0 | 5,586 |
| Electronic Trading Group, LLC | VISG | 06/17/2004 | -873 | 9.3000 | 0 | 8,118.9000 |
| Electronic Trading Group, LLC | VISG | 06/17/2004 | -900 | 9.2900 | 0 | 8,361 |
| Electronic Trading Group, LLC | VISG | 06/17/2004 | -900 | 9.3000 | 0 | 8,370 |
| Electronic Trading Group, LLC | VISG | 06/17/2004 | -1,000 | 9.3400 | 0 | 9,340 |
| Electronic Trading Group, LLC | VISG | 06/17/2004 | -1,000 | 9.3200 | 0 | 9,320 |
| Electronic Trading Group, LLC | VISG | 06/17/2004 | -1,000 | 9.3800 | 0 | 9,380 |
| Electronic Trading Group, LLC | VISG | 06/17/2004 | -1,000 | 9.3200 | 0 | 9,320 |
| Electronic Trading Group, LLC | VISG | 06/17/2004 | -1,900 | 9.2900 | 0 | 17,651 |
| Electronic Trading Group, LLC | VISG | 06/17/2004 | -10,000 | 9.3137 | 132.1800 | 93,004.8200 |
| Electronic Trading Group, LLC | VISG | 06/18/2004 | 2,300 | 9.1804 | 29.9000 | -21,144.8200 |
| Electronic Trading Group, LLC | VISG | 06/18/2004 | 2,300 | 9.3100 | 0 | -21,413 |
| Electronic Trading Group, LLC | VISG | 06/18/2004 | 1,200 | 9.1900 | 0 | -11,028 |
| Electronic Trading Group, LLC | VISG | 06/18/2004 | 1,100 | 9.1700 | 0 | -10,087 |
| Electronic Trading Group, LLC | VISG | 06/18/2004 | 300 | 9.3800 | 3 | -2,817 |
| Electronic Trading Group, LLC | VISG | 06/18/2004 | -300 | 9.2600 | 3.0700 | 2,774.9300 |
| Electronic Trading Group, LLC | VISG | 06/18/2004 | -2,300 | 9.3100 | 30.4100 | 21,382.5900 |
| Electronic Trading Group, LLC | VISG | 06/18/2004 | -2,300 | 9.1804 | 0 | 21,114.9200 |
| Electronic Trading Group, LLC | VISG | 06/18/2004 | -2,300 | 9.3100 | 0 | 21,413 |
| Electronic Trading Group, LLC | VISG | 06/22/2004 | 17,000 | 9.1852 | 221 | -156,369.4000 |
| Electronic Trading Group, LLC | VISG | 06/22/2004 | 2,000 | 9.2600 | 0 | -18,520 |
| Electronic Trading Group, LLC | VISG | 06/22/2004 | 1,000 | 9.1700 | 0 | -9,170 |
| Electronic Trading Group, LLC | VISG | 06/22/2004 | 1,000 | 9.1100 | 0 | -9,110 |
| Electronic Trading Group, LLC | VISG | 06/22/2004 | 1,000 | 9.2100 | 0 | -9,210 |
| Electronic Trading Group, LLC | VISG | 06/22/2004 | 1,000 | 9.2000 | 0 | -9,200 |
| Electronic Trading Group, LLC | VISG | 06/22/2004 | 1,000 | 9.2000 | 0 | -9,200 |
| Electronic Trading Group, LLC | VISG | 06/22/2004 | 1,000 | 9.1100 | 0 | -9,110 |
| Electronic Trading Group, LLC | VISG | 06/22/2004 | 1,000 | 9.1700 | 0 | -9,170 |
| Electronic Trading Group, LLC | VISG | 06/22/2004 | 1,000 | 9.1900 | 0 | -9,190 |
| Electronic Trading Group, LLC | VISG | 06/22/2004 | 1,000 | 9.1800 | 0 | -9,180 |
| Electronic Trading Group, LLC | VISG | 06/22/2004 | 1,000 | 9.2000 | 0 | -9,200 |
| Electronic Trading Group, LLC | VISG | 06/22/2004 | 1,000 | 9.1700 | 0 | -9,170 |
| Electronic Trading Group, LLC | VISG | 06/22/2004 | 1,000 | 9.2000 | 0 | -9,200 |
| Electronic Trading Group, LLC | VISG | 06/22/2004 | 1,000 | 9.2100 | 0 | -9,210 |
| Electronic Trading Group, LLC | VISG | 06/22/2004 | 770 | 9.1500 | 0 | -7,045.5000 |
| Electronic Trading Group, LLC | VISG | 06/22/2004 | 770 | 9.1700 | 0 | -7,060.9000 |
| Electronic Trading Group, LLC | VISG | 06/22/2004 | 230 | 9.1200 | 0 | -2,097.6000 |
| Electronic Trading Group, LLC | VISG | 06/22/2004 | 230 | 9.1500 | 0 | -2,104.5000 |
| Electronic Trading Group, LLC | VISG | 06/22/2004 | -36 | 8.7600 | 0.3800 | 314.9800 |
| Electronic Trading Group, LLC | VISG | 06/22/2004 | -164 | 8.7600 | 1.7000 | 1,434.9400 |
| Electronic Trading Group, LLC | VISG | 06/22/2004 | -200 | 8.7600 | 2.0700 | 1,749.9300 |
| Electronic Trading Group, LLC | VISG | 06/22/2004 | -17,000 | 9.1852 | 0 | 156,148.4000 |
| Electronic Trading Group, LLC | VISG | 06/28/2004 | 500 | 9.0100 | 5.7500 | -4,510.7500 |
| Electronic Trading Group, LLC | VISG | 06/28/2004 | 500 | 9.3300 | 5.7500 | -4,670.7500 |
| Electronic Trading Group, LLC | VISG | 06/28/2004 | 200 | 9.0700 | 2.3000 | -1,816.3000 |
| Electronic Trading Group, LLC | VISG | 06/28/2004 | 200 | 9.0500 | 2 | -1,812 |
| Electronic Trading Group, LLC | VISG | 06/28/2004 | 100 | 9.0700 | 1 | -908 |
| Electronic Trading Group, LLC | VISG | 06/28/2004 | -10 | 8.9600 | 1.0100 | 88.5900 |
| Electronic Trading Group, LLC | VISG | 06/28/2004 | -90 | 8.9600 | 0.0200 | 806.3800 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Electronic Trading Group, LLC | VISG | 06/28/2004 | -100 | 9.0800 | 1.0300 | 906.9700 |
| Electronic Trading Group, LLC | VISG | 06/28/2004 | -100 | 8.9300 | 1.0300 | 891.9700 |
| Electronic Trading Group, LLC | VISG | 06/28/2004 | -200 | 8.9900 | 2.3800 | 1,795.6200 |
| Electronic Trading Group, LLC | VISG | 06/28/2004 | -500 | 8.9900 | 5.9000 | 4,489.1000 |
| Electronic Trading Group, LLC | VISG | 06/28/2004 | -500 | 8.9800 | 5.9100 | 4,484.0900 |
| Electronic Trading Group, LLC | VISG | 07/07/2004 | 500 | 8.0200 | 6.3800 | -4,016.3800 |
| Electronic Trading Group, LLC | VISG | 07/07/2004 | 305 | 8.0200 | 3.8900 | -2,449.9900 |
| Electronic Trading Group, LLC | VISG | 07/07/2004 | 195 | 8.0200 | 2.4900 | -1,566.3900 |
| Electronic Trading Group, LLC | VISG | 07/07/2004 | -1,000 | 8.1500 | 12.9500 | 8,137.0500 |
| Electronic Trading Group, LLC | VISG | 07/13/2004 | 6,000 | 7.2682 | 265 | -43,874.2000 |
| Electronic Trading Group, LLC | VISG | 07/13/2004 | 4,000 | 7.2682 | 185 | -29,257.8000 |
| Electronic Trading Group, LLC | VISG | 07/16/2004 | -200 | 6.5300 | 1.7000 | 1,304.3000 |
| Electronic Trading Group, LLC | VISG | 07/19/2004 | 6,000 | 6.4186 | 265 | -38,776.6000 |
| Electronic Trading Group, LLC | VISG | 07/19/2004 | 4,000 | 6.4186 | 185 | -25,859.4000 |
| Electronic Trading Group, LLC | VISG | 07/19/2004 | 200 | 6.7300 | 1.8600 | -1,347.8600 |
| Electronic Trading Group, LLC | VISG | 07/21/2004 | 200 | 7.0200 | 1.7000 | -1,405.7000 |
| Electronic Trading Group, LLC | VISG | 07/21/2004 | 200 | 6.9800 | 2.3800 | -1,398.3800 |
| Electronic Trading Group, LLC | VISG | 07/21/2004 | 200 | 6.9800 | 2.3800 | -1,398.3800 |
| Electronic Trading Group, LLC | VISG | 07/21/2004 | 150 | 7 | 1.6600 | -1,051.6600 |
| Electronic Trading Group, LLC | VISG | 07/21/2004 | 100 | 6.9800 | 1.1900 | -699.1900 |
| Electronic Trading Group, LLC | VISG | 07/21/2004 | 50 | 7 | 0.5600 | -350.5600 |
| Electronic Trading Group, LLC | VISG | 07/21/2004 | -100 | 7 | 0.8700 | 699.1300 |
| Electronic Trading Group, LLC | VISG | 07/21/2004 | -100 | 6.8700 | 0.8700 | 686.1300 |
| Electronic Trading Group, LLC | VISG | 07/21/2004 | -100 | 6.8700 | 0.8700 | 686.1300 |
| Electronic Trading Group, LLC | VISG | 07/21/2004 | -100 | 7 | 0.8700 | 699.1300 |
| Electronic Trading Group, LLC | VISG | 07/21/2004 | -100 | 7 | 0.8700 | 699.1300 |
| Electronic Trading Group, LLC | VISG | 07/21/2004 | -100 | 6.9100 | 0.8700 | 690.1300 |
| Electronic Trading Group, LLC | VISG | 07/21/2004 | -100 | 6.9200 | 0.8700 | 691.1300 |
| Electronic Trading Group, LLC | VISG | 07/21/2004 | -200 | 7.0100 | 1.7400 | 1,400.2600 |
| Electronic Trading Group, LLC | VISG | 07/23/2004 | 200 | 6.6400 | 1.7000 | -1,329.7000 |
| Electronic Trading Group, LLC | VISG | 07/23/2004 | -200 | 6.5500 | 1.9400 | 1,308.0600 |
| Electronic Trading Group, LLC | VISG | 08/03/2004 | 300 | 6.9200 | 3 | -2,079 |
| Electronic Trading Group, LLC | VISG | 08/03/2004 | 100 | 7.2400 | 0 | -724 |
| Electronic Trading Group, LLC | VISG | 08/03/2004 | 100 | 7.2400 | 1.8000 | -725.8000 |
| Electronic Trading Group, LLC | VISG | 08/03/2004 | 100 | 7.2400 | 0 | -724 |
| Electronic Trading Group, LLC | VISG | 08/03/2004 | -80 | 7.1400 | 0.0200 | 571.1800 |
| Electronic Trading Group, LLC | VISG | 08/03/2004 | -100 | 6.7900 | 3.0200 | 675.9800 |
| Electronic Trading Group, LLC | VISG | 08/03/2004 | -100 | 6.7900 | 0.0200 | 678.9800 |
| Electronic Trading Group, LLC | VISG | 08/03/2004 | -100 | 6.7900 | 0.0200 | 678.9800 |
| Electronic Trading Group, LLC | VISG | 08/03/2004 | -220 | 7.1100 | 1.8400 | 1,562.3600 |
| Electronic Trading Group, LLC | VISG | 08/04/2004 | 1,500 | 6.2500 | 15 | -9,390 |
| Electronic Trading Group, LLC | VISG | 08/04/2004 | 600 | 6.3100 | 6 | -3,792 |
| Electronic Trading Group, LLC | VISG | 08/04/2004 | 500 | 6.2500 | 2.5000 | -3,127.5000 |
| Electronic Trading Group, LLC | VISG | 08/04/2004 | 500 | 6.3100 | 5 | -3,160 |
| Electronic Trading Group, LLC | VISG | 08/04/2004 | 500 | 6.3400 | 4.9900 | -3,174.9900 |
| Electronic Trading Group, LLC | VISG | 08/04/2004 | 500 | 6.2400 | 2.5000 | -3,122.5000 |
| Electronic Trading Group, LLC | VISG | 08/04/2004 | 200 | 6.3100 | 2 | -1,264 |
| Electronic Trading Group, LLC | VISG | 08/04/2004 | 200 | 6.3300 | 2 | -1,268 |
| Electronic Trading Group, LLC | VISG | 08/04/2004 | 200 | 6.3100 | 2 | -1,264 |
| Electronic Trading Group, LLC | VISG | 08/04/2004 | 200 | 6.3100 | 2 | -1,264 |
| Electronic Trading Group, LLC | VISG | 08/04/2004 | 100 | 6.3400 | 0.9900 | -634.9900 |
| Electronic Trading Group, LLC | VISG | 08/04/2004 | 100 | 6.3400 | 1.0200 | -635.0200 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Electronic Trading Group, LLC | VISG | 08/04/2004 | 100 | 6.3100 | 1 | -632 |
| Electronic Trading Group, LLC | VISG | 08/04/2004 | 100 | 6.3100 | 1 | -632 |
| Electronic Trading Group, LLC | VISG | 08/04/2004 | 100 | 6.3100 | 1 | -632 |
| Electronic Trading Group, LLC | VISG | 08/04/2004 | 100 | 6.3300 | 1 | -634 |
| Electronic Trading Group, LLC | VISG | 08/04/2004 | 100 | 6.3100 | 1 | -632 |
| Electronic Trading Group, LLC | VISG | 08/04/2004 | 100 | 6.3100 | 1 | -632 |
| Electronic Trading Group, LLC | VISG | 08/04/2004 | 100 | 6.3100 | 1 | -632 |
| Electronic Trading Group, LLC | VISG | 08/04/2004 | 100 | 6.3100 | 1 | -632 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | 6,000 | 5.6000 | 259 | -33,859 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | 6,000 | 5.6000 | 259 | -33,859 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | 6,000 | 5.6000 | 259 | -33,859 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | 5,000 | 5.6400 | 315 | -28,515 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | 4,000 | 5.6000 | 179 | -22,579 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | 4,000 | 5.6000 | 179 | -22,579 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | 4,000 | 5.6000 | 179 | -22,579 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | 2,000 | 5.7900 | 0 | -11,580 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | 1,000 | 5.7900 | 15 | -5,805 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | 1,000 | 5.7000 | 0 | -5,700 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | 1,000 | 5.8000 | 5 | -5,805 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | 1,000 | 5.8300 | 5 | -5,835 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | 800 | 5.7000 | 0 | -4,560 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | 700 | 5.7900 | 0 | -4,053 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | 500 | 5.8300 | 5 | -2,920 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | 500 | 5.7900 | 0 | -2,895 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | 500 | 5.7800 | 5 | -2,895 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | 500 | 5.7900 | 0 | -2,895 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | 500 | 5.8300 | 0 | -2,915 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | 500 | 5.7900 | 0 | -2,895 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | 500 | 5.7000 | 15 | -2,865 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | 400 | 5.7000 | 0 | -2,280 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | 300 | 5.7900 | 3 | -1,740 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | 300 | 5.7900 | 0 | -1,737 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | 300 | 5.7000 | 0 | -1,710 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | 270 | 5.8300 | 0 | -1,574.1000 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | 200 | 5.7900 | 15 | -1,173 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | 130 | 5.8300 | 0 | -757.9000 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | 100 | 5.8300 | 5 | -588 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | 100 | 5.7900 | 0 | -579 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | 100 | 5.7900 | 0 | -579 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | 100 | 5.7900 | 0 | -579 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | -100 | 5.7500 | 0.0200 | 574.9800 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | -100 | 5.7500 | 0.0200 | 574.9800 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | -100 | 5.7500 | 0.0200 | 574.9800 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | -100 | 5.7500 | 0.0200 | 574.9800 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | -100 | 5.7500 | 0.0200 | 574.9800 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | -100 | 5.7600 | 0.0200 | 575.9800 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | -100 | 5.7600 | 0.0200 | 575.9800 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | -100 | 5.7600 | 15.0200 | 560.9800 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | -100 | 5.7600 | 0.0200 | 575.9800 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | -100 | 5.7600 | 0.0200 | 575.9800 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Electronic Trading Group, LLC | VISG | 08/05/2004 | -100 | 5.7500 | 0.0200 | 574.9800 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | -100 | 5.7500 | 0.0200 | 574.9800 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | -100 | 5.7500 | 0.0200 | 574.9800 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | -100 | 5.7500 | 0.0200 | 574.9800 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | -100 | 5.7500 | 0.0200 | 574.9800 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | -100 | 5.7500 | 15.0200 | 559.9800 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | -100 | 5.7500 | 0.0200 | 574.9800 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | -100 | 5.7500 | 0.0200 | 574.9800 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | -200 | 5.7500 | 0.0300 | 1,149.9700 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | -300 | 5.7500 | 0.0500 | 1,724.9500 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | -400 | 5.7500 | 0.0600 | 2,299.9400 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | -500 | 5.7600 | 0.0700 | 2,879.9300 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | -500 | 5.7500 | 0.0700 | 2,874.9300 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | -500 | 5.7700 | 15.0700 | 2,869.9300 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | -500 | 5.7800 | 5.1200 | 2,884.8800 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | -500 | 5.7600 | 0.0700 | 2,879.9300 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | -500 | 5.7500 | 0.0700 | 2,874.9300 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | -500 | 5.7500 | 0.0700 | 2,874.9300 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | -500 | 5.6000 | 15.0700 | 2,784.9300 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | -1,000 | 5.6500 | 5.1400 | 5,644.8600 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | -1,000 | 5.7800 | 10.2400 | 5,769.7600 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | -1,000 | 5.6000 | 0.1400 | 5,599.8600 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | -1,200 | 5.7500 | 0.1700 | 6,899.8300 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | -1,300 | 5.7000 | 13.1800 | 7,396.8200 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | -1,500 | 5.6000 | 0.2000 | 8,399.8000 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | -1,500 | 5.7800 | 15.3600 | 8,654.6400 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | -2,000 | 5.7500 | 0.2700 | 11,499.7300 |
| Electronic Trading Group, LLC | VISG | 08/05/2004 | -2,000 | 5.7800 | 20.4800 | 11,539.5200 |
| Electronic Trading Group, LLC | VISG | 08/09/2004 | 2,500 | 5.6200 | 15 | -14,065 |
| Electronic Trading Group, LLC | VISG | 08/11/2004 | -7,500 | 5.3000 | 87.1900 | 39,662.8100 |
| Electronic Trading Group, LLC | VISG | 08/26/2004 | -600 | 6.3900 | 6.0900 | 3,827.9100 |
| Electronic Trading Group, LLC | VISG | 08/30/2004 | 600 | 6.5600 | 6 | -3,942 |
| Electronic Trading Group, LLC | VISG | 08/31/2004 | 3,000 | 6.5500 | 180 | -19,830 |
| Electronic Trading Group, LLC | VISG | 09/15/2004 | 1,000 | 7.3000 | 5 | -7,305 |
| Electronic Trading Group, LLC | VISG | 09/15/2004 | 1,000 | 7.4400 | 5 | -7,445 |
| Electronic Trading Group, LLC | VISG | 09/15/2004 | 1,000 | 7.4500 | 5 | -7,455 |
| Electronic Trading Group, LLC | VISG | 09/15/2004 | 1,000 | 7.3300 | 5 | -7,335 |
| Electronic Trading Group, LLC | VISG | 09/15/2004 | 1,000 | 7.3000 | 5 | -7,305 |
| Electronic Trading Group, LLC | VISG | 09/15/2004 | 600 | 7.4500 | 5 | -4,475 |
| Electronic Trading Group, LLC | VISG | 09/15/2004 | 590 | 7.3800 | 0 | -4,354.2000 |
| Electronic Trading Group, LLC | VISG | 09/15/2004 | 500 | 7.3100 | 5 | -3,660 |
| Electronic Trading Group, LLC | VISG | 09/15/2004 | 500 | 7.3800 | 0 | -3,690 |
| Electronic Trading Group, LLC | VISG | 09/15/2004 | 500 | 7.3100 | 0 | -3,655 |
| Electronic Trading Group, LLC | VISG | 09/15/2004 | 500 | 7.2500 | 0 | -3,625 |
| Electronic Trading Group, LLC | VISG | 09/15/2004 | 500 | 7.2700 | 5 | -3,640 |
| Electronic Trading Group, LLC | VISG | 09/15/2004 | 410 | 7.3800 | 5 | -3,030.8000 |
| Electronic Trading Group, LLC | VISG | 09/15/2004 | 410 | 7.3800 | 5 | -3,030.8000 |
| Electronic Trading Group, LLC | VISG | 09/15/2004 | 400 | 7.3100 | 0 | -2,924 |
| Electronic Trading Group, LLC | VISG | 09/15/2004 | 300 | 7.3100 | 0 | -2,193 |
| Electronic Trading Group, LLC | VISG | 09/15/2004 | 200 | 7.3100 | 0 | -1,462 |
| Electronic Trading Group, LLC | VISG | 09/15/2004 | 200 | 7.4600 | 0 | -1,492 |
| Electronic Trading Group, LLC | VISG | 09/15/2004 | 100 | 7.4500 | 0 | -745 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Electronic Trading Group, LLC | VISG | 09/15/2004 | 100 | 7.3100 | 5 | -736 |
| Electronic Trading Group, LLC | VISG | 09/15/2004 | 100 | 7.4600 | 0 | -746 |
| Electronic Trading Group, LLC | VISG | 09/15/2004 | 90 | 7.3800 | 0 | -664.2000 |
| Electronic Trading Group, LLC | VISG | 09/15/2004 | -100 | 7.2500 | 0.0200 | 724.9800 |
| Electronic Trading Group, LLC | VISG | 09/15/2004 | -200 | 7.2500 | 0.0400 | 1,449.9600 |
| Electronic Trading Group, LLC | VISG | 09/15/2004 | -300 | 7.3200 | 0.0600 | 2,195.9400 |
| Electronic Trading Group, LLC | VISG | 09/15/2004 | -300 | 7.2500 | 20.0600 | 2,154.9400 |
| Electronic Trading Group, LLC | VISG | 09/15/2004 | -302 | 7.3000 | 0.0600 | 2,204.5400 |
| Electronic Trading Group, LLC | VISG | 09/15/2004 | -500 | 7.3100 | 25.0900 | 3,629.9100 |
| Electronic Trading Group, LLC | VISG | 09/15/2004 | -1,271 | 7.3000 | 0.2200 | 9,278.0800 |
| Electronic Trading Group, LLC | VISG | 09/15/2004 | -1,398 | 7.3300 | 10.2400 | 10,237.1000 |
| Electronic Trading Group, LLC | VISG | 09/15/2004 | -3,229 | 7.3000 | 0.5600 | 23,571.1400 |
| Electronic Trading Group, LLC | VISG | 09/15/2004 | -3,400 | 7.2500 | 0.5800 | 24,649.4200 |
| Electronic Trading Group, LLC | VISG | 09/27/2004 | -100 | 6.6300 | 1.1800 | 661.8200 |
| Electronic Trading Group, LLC | VISG | 09/27/2004 | -357 | 6.6300 | 4.2100 | 2,362.7000 |
| Electronic Trading Group, LLC | VISG | 09/27/2004 | -400 | 6.6300 | 4.7100 | 2,647.2900 |
| Electronic Trading Group, LLC | VISG | 09/27/2004 | -400 | 6.6300 | 4.7100 | 2,647.2900 |
| Electronic Trading Group, LLC | VISG | 09/27/2004 | -500 | 6.6400 | 5.8800 | 3,314.1200 |
| Electronic Trading Group, LLC | VISG | 09/27/2004 | -500 | 6.6400 | 5.8800 | 3,314.1200 |
| Electronic Trading Group, LLC | VISG | 09/27/2004 | -500 | 6.6500 | 5.8800 | 3,319.1200 |
| Electronic Trading Group, LLC | VISG | 09/27/2004 | -1,000 | 6.6400 | 11.7600 | 6,628.2400 |
| Electronic Trading Group, LLC | VISG | 09/27/2004 | -1,711 | 6.6400 | 20.1200 | 11,340.9200 |
| Electronic Trading Group, LLC | VISG | 09/28/2004 | -2,000 | 6.7500 | 23.5200 | 13,476.4800 |
| Electronic Trading Group, LLC | VISG | 09/28/2004 | -3,000 | 6.7500 | 35.2800 | 20,214.7200 |
| Electronic Trading Group, LLC | VISG | 10/08/2004 | -100 | 6.5900 | 1.1700 | 657.8300 |
| Electronic Trading Group, LLC | VISG | 10/08/2004 | -200 | 6.5900 | 2.3500 | 1,315.6500 |
| Electronic Trading Group, LLC | VISG | 10/08/2004 | -300 | 6.5900 | 3.5500 | 1,973.4500 |
| Electronic Trading Group, LLC | VISG | 10/08/2004 | -2,000 | 6.5900 | 23.5100 | 13,156.4900 |
| Electronic Trading Group, LLC | VISG | 10/08/2004 | -2,400 | 6.5900 | 28.2200 | 15,787.7800 |
| Electronic Trading Group, LLC | VISG | 10/13/2004 | -30 | 6.5700 | 0.3600 | 196.7400 |
| Electronic Trading Group, LLC | VISG | 10/13/2004 | -100 | 6.5700 | 1.1700 | 655.8300 |
| Electronic Trading Group, LLC | VISG | 10/13/2004 | -100 | 6.5700 | 1.1700 | 655.8300 |
| Electronic Trading Group, LLC | VISG | 10/13/2004 | -100 | 6.5700 | 1.1700 | 655.8300 |
| Electronic Trading Group, LLC | VISG | 10/13/2004 | -130 | 6.5700 | 1.5200 | 852.5800 |
| Electronic Trading Group, LLC | VISG | 10/13/2004 | -179 | 6.5700 | 2.1000 | 1,173.9300 |
| Electronic Trading Group, LLC | VISG | 10/13/2004 | -200 | 6.5700 | 2.4700 | 1,311.5300 |
| Electronic Trading Group, LLC | VISG | 10/13/2004 | -200 | 6.5700 | 2.3500 | 1,311.6500 |
| Electronic Trading Group, LLC | VISG | 10/13/2004 | -200 | 6.5700 | 2.3500 | 1,311.6500 |
| Electronic Trading Group, LLC | VISG | 10/13/2004 | -270 | 6.5700 | 3.1800 | 1,770.7200 |
| Electronic Trading Group, LLC | VISG | 10/13/2004 | -291 | 6.5400 | 3.4300 | 1,899.7100 |
| Electronic Trading Group, LLC | VISG | 10/13/2004 | -300 | 6.5700 | 3.5200 | 1,967.4800 |
| Electronic Trading Group, LLC | VISG | 10/13/2004 | -300 | 6.5700 | 3.5200 | 1,967.4800 |
| Electronic Trading Group, LLC | VISG | 10/13/2004 | -500 | 6.5700 | 5.8700 | 3,279.1300 |
| Electronic Trading Group, LLC | VISG | 10/13/2004 | -2,000 | 6.5600 | 23.5100 | 13,096.4900 |
| Electronic Trading Group, LLC | VISG | 10/14/2004 | -100 | 6.4400 | 1.1700 | 642.8300 |
| Electronic Trading Group, LLC | VISG | 10/14/2004 | -100 | 6.5100 | 1.1800 | 649.8200 |
| Electronic Trading Group, LLC | VISG | 10/14/2004 | -100 | 6.5000 | 1.1700 | 648.8300 |
| Electronic Trading Group, LLC | VISG | 10/14/2004 | -100 | 6.5000 | 1.1700 | 648.8300 |
| Electronic Trading Group, LLC | VISG | 10/14/2004 | -100 | 6.5000 | 1.1700 | 648.8300 |
| Electronic Trading Group, LLC | VISG | 10/14/2004 | -200 | 6.4400 | 2.3800 | 1,285.6200 |
| Electronic Trading Group, LLC | VISG | 10/14/2004 | -200 | 6.5000 | 2.3500 | 1,297.6500 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Electronic Trading Group, LLC | VISG | 10/14/2004 | -447 | 6.4400 | 5.2500 | 2,873.4300 |
| Electronic Trading Group, LLC | VISG | 10/14/2004 | -500 | 6.4400 | 5.8700 | 3,214.1300 |
| Electronic Trading Group, LLC | VISG | 10/14/2004 | -500 | 6.5000 | 5.8700 | 3,244.1300 |
| Electronic Trading Group, LLC | VISG | 10/14/2004 | -500 | 6.5000 | 5.8700 | 3,244.1300 |
| Electronic Trading Group, LLC | VISG | 10/14/2004 | -1,496 | 6.5000 | 17.5800 | 9,706.4200 |
| Electronic Trading Group, LLC | VISG | 10/14/2004 | -1,604 | 6.5000 | 18.8500 | 10,407.1500 |
| Electronic Trading Group, LLC | VISG | 10/14/2004 | -1,685 | 6.5000 | 19.8000 | 10,932.7000 |
| Electronic Trading Group, LLC | VISG | 10/14/2004 | -1,900 | 6.5000 | 22.4000 | 12,327.6000 |

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

Jeffrey Schnipper declares the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.      My name is Jeffrey Schnipper and I am Sole Proprietor of Turnberry Asset Management ("Turnberry").

2.      I am duly authorized to designate Entwistle & Cappucci LLP as counsel for Turnberry in this action for all purposes, to pursue appointment Turnberry as lead plaintiff in this matter, and to seek approval of Turnberry's selection of Entwistle & Cappucci LLP as lead counsel and Berman DeValerio Pease Tabacco Burt & Pucillo as liaison counsel.

3.      I have reviewed a copy of the complaint filed in the action and have been advised that additional complaints based on the same operative facts have been filed.

4.      Turnberry did not acquire any of the relevant securities at the direction of plaintiff's counsel or in order to participate in any private action under the federal securities laws.

5.      Turnberry is willing to serve as a lead plaintiff in this action and it recognizes its duties as lead plaintiff to act on behalf of other class members in monitoring and directing the action, and, if necessary, testifying at deposition and trial.

6.      Turnberry will not accept any payment for serving as a representative party beyond its *pro rata* share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the court pursuant to law.

7.      Turnberry has not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

8.    Turnberry's transactions during the proposed Class Period, May 3, 2005 to March 2, 2005, inclusive, in Viisage Technology, Inc. securities, which are the subject of this litigation, are described in the chart attached hereto as Schedule A.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this _12th_ day of April 2005

By: _____
Jeffrey Schnipper

## SCHEDULE A  FOR TURNBERRY ASSET MANAGEMENT

| Trade Date | Symbol | Activity | Quantity | USD Price | Net Amt/Net Notional Value |
|---|---|---|---|---|---|
| 6/23/2004 | VISG | Buy | 1,900 | $8.73 | $16,587.00 |
| 6/23/2004 | VISG | Buy | 100 | $8.73 | $873.00 |
| 6/23/2004 | VISG | Buy | 200 | $8.73 | $1,746.00 |
| 6/23/2004 | VISG | Buy | 100 | $8.73 | $873.00 |
| 6/23/2004 | VISG | Buy | 100 | $8.73 | $873.00 |
| 6/23/2004 | VISG | Buy | 600 | $8.73 | $5,238.00 |
| 7/1/2004 | VISG | Buy | 100 | $8.31 | $831.00 |
| 7/1/2004 | VISG | Buy | 300 | $8.31 | $2,493.00 |
| 7/1/2004 | VISG | Buy | 400 | $8.31 | $3,324.00 |
| 7/1/2004 | VISG | Buy | 100 | $8.31 | $831.00 |
| 7/1/2004 | VISG | Buy | 100 | $8.31 | $831.00 |
| 7/1/2004 | VISG | Buy | 500 | $8.35 | $4,175.00 |
| 7/1/2004 | VISG | Buy | 500 | $8.35 | $4,175.00 |
| 7/1/2004 | VISG | Buy | 200 | $8.35 | $1,670.00 |
| 7/1/2004 | VISG | Buy | 200 | $8.35 | $1,670.00 |
| 7/1/2004 | VISG | Buy | 100 | $8.35 | $835.00 |
| 7/1/2004 | VISG | Buy | 100 | $8.35 | $835.00 |
| 7/1/2004 | VISG | Buy | 400 | $8.34 | $3,336.00 |
| 7/8/2004 | VISG | Buy | 100 | $7.63 | $763.00 |
| 7/8/2004 | VISG | Buy | 100 | $7.63 | $763.00 |
| 7/8/2004 | VISG | Buy | 100 | $7.63 | $763.00 |
| 7/8/2004 | VISG | Buy | 400 | $7.63 | $3,052.00 |
| 7/8/2004 | VISG | Buy | 900 | $7.63 | $6,867.00 |
| 7/8/2004 | VISG | Buy | 100 | $7.63 | $763.00 |
| 7/8/2004 | VISG | Buy | 100 | $7.63 | $763.00 |
| 7/8/2004 | VISG | Buy | 200 | $7.62 | $1,524.00 |
| 7/28/2004 | VISG | Buy | 100 | $6.30 | $630.00 |
| 7/28/2004 | VISG | Buy | 700 | $6.30 | $4,410.00 |
| 7/28/2004 | VISG | Buy | 100 | $6.30 | $630.00 |
| 7/28/2004 | VISG | Buy | 500 | $6.30 | $3,150.00 |
| 7/28/2004 | VISG | Buy | 100 | $6.30 | $630.00 |
| 7/28/2004 | VISG | Buy | 100 | $6.30 | $630.00 |
| 8/5/2004 | VISG | Buy | 5,000 | $5.50 | $27,500.00 |
| 8/5/2004 | VISG | Buy | 20,000 | $5.50 | $110,000.00 |
| 8/6/2004 | VISG | Buy | 500 | $5.55 | $2,775.00 |
| 8/6/2004 | VISG | Buy | 500 | $5.55 | $2,775.00 |
| 8/6/2004 | VISG | Buy | 500 | $5.55 | $2,775.00 |
| 8/6/2004 | VISG | Buy | 1,500 | $5.43 | $8,145.00 |
| 8/6/2004 | VISG | Buy | 350 | $5.57 | $1,949.50 |
| 8/9/2004 | VISG | Buy | 10,000 | $5.59 | $55,850.00 |
| 8/12/2004 | VISG | Buy | 700 | $5.34 | $3,738.00 |
| 8/12/2004 | VISG | Buy | 300 | $5.34 | $1,602.00 |
| 8/12/2004 | VISG | Buy | 500 | $5.35 | $2,675.00 |
| 8/12/2004 | VISG | Buy | 100 | $5.35 | $535.00 |
| 8/12/2004 | VISG | Buy | 100 | $5.35 | $535.00 |
| 8/12/2004 | VISG | Buy | 300 | $5.32 | $1,596.00 |
| 8/25/2004 | VISG | Buy | 800 | $6.53 | $5,224.00 |

| | | | | | |
|---|---|---|---|---|---|
| 8/25/2004 | VISG | Buy | 1,000 | $6.53 | $6,530.00 |
| 8/25/2004 | VISG | Buy | 700 | $6.54 | $4,578.00 |
| 8/26/2004 | VISG | Buy | 311 | $6.36 | $1,977.96 |
| 8/26/2004 | VISG | Buy | 100 | $6.36 | $636.00 |
| 8/26/2004 | VISG | Buy | 100 | $6.36 | $636.00 |
| 8/26/2004 | VISG | Buy | 400 | $6.36 | $2,544.00 |
| 8/26/2004 | VISG | Buy | 566 | $6.36 | $3,599.76 |
| 8/26/2004 | VISG | Buy | 23 | $6.36 | $146.28 |
| 8/26/2004 | VISG | Buy | 1,000 | $6.38 | $6,380.00 |
| 8/30/2004 | VISG | Buy | 100 | $6.48 | $648.00 |
| 8/30/2004 | VISG | Buy | 200 | $6.48 | $1,296.00 |
| 8/30/2004 | VISG | Buy | 200 | $6.48 | $1,296.00 |
| 8/30/2004 | VISG | Buy | 500 | $6.48 | $3,240.00 |
| 8/30/2004 | VISG | Buy | 1,000 | $6.47 | $6,470.00 |
| 8/31/2004 | VISG | Buy | 100 | $6.36 | $636.00 |
| 8/31/2004 | VISG | Buy | 500 | $6.36 | $3,180.00 |
| 8/31/2004 | VISG | Buy | 400 | $6.36 | $2,544.00 |
| 9/9/2004 | VISG | Buy | 100 | $6.77 | $677.00 |
| 9/29/2004 | VISG | Buy | 300 | $6.02 | $1,806.00 |
| 9/29/2004 | VISG | Buy | 700 | $6.03 | $4,221.00 |
| 9/29/2004 | VISG | Buy | 1,000 | $6.05 | $6,050.00 |
| 9/29/2004 | VISG | Buy | 2,000 | $6.08 | $12,160.00 |
| 9/29/2004 | VISG | Buy | 900 | $6.09 | $5,481.00 |
| 9/29/2004 | VISG | Buy | 2,000 | $6.17 | $12,340.00 |
| 10/6/2004 | VISG | Buy | 400 | $6.34 | $2,536.00 |
| 10/6/2004 | VISG | Buy | 100 | $6.34 | $634.00 |
| 10/6/2004 | VISG | Buy | 500 | $6.34 | $3,170.00 |
| 10/6/2004 | VISG | Buy | 1,000 | $6.36 | $6,360.00 |
| 10/6/2004 | VISG | Buy | 700 | $6.41 | $4,487.00 |
| 10/6/2004 | VISG | Buy | 200 | $6.42 | $1,284.00 |
| 10/6/2004 | VISG | Buy | 100 | $6.54 | $654.00 |
| 10/8/2004 | VISG | Buy | 1,000 | $6.64 | $6,640.00 |
| 10/12/2004 | VISG | Buy | 400 | $6.70 | $2,680.00 |
| 10/12/2004 | VISG | Buy | 500 | $6.70 | $3,350.00 |
| 10/12/2004 | VISG | Buy | 100 | $6.70 | $670.00 |
| 10/13/2004 | VISG | Buy | 100 | $6.51 | $651.00 |
| 10/13/2004 | VISG | Buy | 900 | $6.54 | $5,886.00 |
| 10/19/2004 | VISG | Buy | 100 | $6.72 | $672.00 |
| 10/22/2004 | VISG | Buy | 100 | $6.86 | $686.00 |
| 11/5/2004 | VISG | Buy | 34 | $7.28 | $247.52 |
| 11/5/2004 | VISG | Buy | 100 | $7.28 | $728.00 |
| 11/5/2004 | VISG | Buy | 466 | $7.28 | $3,392.48 |
| 11/5/2004 | VISG | Buy | 300 | $7.28 | $2,184.00 |
| 11/5/2004 | VISG | Buy | 100 | $7.26 | $726.00 |
| 11/5/2004 | VISG | Buy | 100 | $7.45 | $745.00 |
| 11/15/2004 | VISG | Buy | 100 | $6.84 | $684.00 |
| 11/16/2004 | VISG | Buy | 800 | $6.98 | $5,584.00 |
| 11/22/2004 | VISG | Buy | 500 | $6.70 | $3,350.00 |
| 11/22/2004 | VISG | Buy | 400 | $6.70 | $2,680.00 |
| 11/22/2004 | VISG | Buy | 100 | $6.70 | $670.00 |
| 11/22/2004 | VISG | Buy | 1,000 | $6.69 | $6,690.00 |
| 11/24/2004 | VISG | Buy | 2,000 | $6.86 | $13,720.00 |

| 11/26/2004 | VISG | Buy | 500 | $7.03 | $3,515.00 |
| 11/26/2004 | VISG | Buy | 100 | $7.03 | $703.00 |
| 11/26/2004 | VISG | Buy | 121 | $7.03 | $850.63 |
| 11/26/2004 | VISG | Buy | 100 | $7.03 | $703.00 |
| 11/26/2004 | VISG | Buy | 500 | $7.03 | $3,515.00 |
| 11/26/2004 | VISG | Buy | 100 | $7.03 | $703.00 |
| 11/26/2004 | VISG | Buy | 100 | $7.03 | $703.00 |
| 11/26/2004 | VISG | Buy | 100 | $7.03 | $703.00 |
| 11/26/2004 | VISG | Buy | 300 | $7.03 | $2,109.00 |
| 11/26/2004 | VISG | Buy | 79 | $7.03 | $555.37 |
| 12/1/2004 | VISG | Buy | 500 | $8.02 | $4,010.00 |
| 12/1/2004 | VISG | Buy | 400 | $8.02 | $3,208.00 |
| 12/1/2004 | VISG | Buy | 300 | $8.02 | $2,406.00 |
| 12/1/2004 | VISG | Buy | 200 | $8.02 | $1,604.00 |
| 12/1/2004 | VISG | Buy | 100 | $8.02 | $802.00 |
| 12/1/2004 | VISG | Buy | 100 | $8.02 | $802.00 |
| 12/1/2004 | VISG | Buy | 500 | $8.02 | $4,010.00 |
| 12/1/2004 | VISG | Buy | 500 | $8.02 | $4,010.00 |
| 12/1/2004 | VISG | Buy | 200 | $8.00 | $1,600.00 |
| 12/1/2004 | VISG | Buy | 50 | $8.03 | $401.50 |
| 12/3/2004 | VISG | Buy | 200 | $8.04 | $1,608.00 |
| 12/6/2004 | VISG | Buy | 1,900 | $8.08 | $15,352.00 |
| 12/6/2004 | VISG | Buy | 100 | $8.13 | $813.00 |
| 12/7/2004 | VISG | Buy | 900 | $8.07 | $7,263.00 |
| 12/8/2004 | VISG | Buy | 500 | $8.10 | $4,050.00 |
| 12/8/2004 | VISG | Buy | 500 | $8.10 | $4,050.00 |
| 12/8/2004 | VISG | Buy | 1,000 | $7.86 | $7,860.00 |
| 12/8/2004 | VISG | Buy | 1,000 | $8.06 | $8,060.00 |
| 12/14/2004 | VISG | Buy | 50 | $8.16 | $408.00 |
| 12/14/2004 | VISG | Buy | 500 | $8.16 | $4,080.00 |
| 12/14/2004 | VISG | Buy | 200 | $8.16 | $1,632.00 |
| 12/14/2004 | VISG | Buy | 200 | $8.16 | $1,632.00 |
| 12/14/2004 | VISG | Buy | 50 | $8.14 | $407.00 |
| 12/14/2004 | VISG | Buy | 1,000 | $8.40 | $8,400.00 |
| 12/14/2004 | VISG | Buy | 1,000 | $8.45 | $8,450.00 |
| 12/27/2004 | VISG | Buy | 5,000 | $8.52 | $42,600.00 |
| 1/4/2005 | VISG | Buy | 500 | $8.83 | $4,415.00 |
| 1/4/2005 | VISG | Buy | 100 | $8.83 | $883.00 |
| 1/4/2005 | VISG | Buy | 280 | $8.83 | $2,472.40 |
| 1/4/2005 | VISG | Buy | 200 | $8.83 | $1,766.00 |
| 1/4/2005 | VISG | Buy | 1,000 | $8.78 | $8,780.00 |
| 1/4/2005 | VISG | Buy | 120 | $8.80 | $1,056.00 |
| 1/5/2005 | VISG | Buy | 1,000 | $8.38 | $8,380.00 |
| 1/5/2005 | VISG | Buy | 1,000 | $8.56 | $8,560.00 |
| 1/5/2005 | VISG | Buy | 500 | $8.61 | $4,305.00 |
| 1/5/2005 | VISG | Buy | 1,000 | $8.62 | $8,620.00 |
| 1/5/2005 | VISG | Buy | 1,000 | $8.66 | $8,660.00 |
| 1/5/2005 | VISG | Buy | 500 | $8.69 | $4,345.00 |
| 1/5/2005 | VISG | Buy | 5,000 | $8.55 | $42,750.00 |
| 1/12/2005 | VISG | Buy | 1,000 | $7.78 | $7,780.00 |
| 1/14/2005 | VISG | Buy | 148 | $7.84 | $1,160.32 |
| 1/14/2005 | VISG | Buy | 86 | $7.84 | $674.24 |

| | | | | | |
|---|---|---|---|---|---|
| 1/14/2005 | VISG | Buy | 100 | $7.84 | $784.00 |
| 1/14/2005 | VISG | Buy | 366 | $7.84 | $2,869.44 |
| 1/14/2005 | VISG | Buy | 100 | $7.84 | $784.00 |
| 1/14/2005 | VISG | Buy | 100 | $7.98 | $798.00 |
| 1/14/2005 | VISG | Buy | 100 | $8.01 | $801.00 |
| 1/14/2005 | VISG | Buy | 100 | $8.05 | $805.00 |
| 1/18/2005 | VISG | Buy | 300 | $7.59 | $2,277.00 |
| 1/18/2005 | VISG | Buy | 100 | $7.59 | $759.00 |
| 1/18/2005 | VISG | Buy | 100 | $7.59 | $759.00 |
| 1/18/2005 | VISG | Buy | 100 | $7.59 | $759.00 |
| 1/18/2005 | VISG | Buy | 300 | $7.59 | $2,277.00 |
| 1/19/2005 | VISG | Buy | 900 | $7.54 | $6,786.00 |
| 1/19/2005 | VISG | Buy | 100 | $7.54 | $754.00 |
| 1/19/2005 | VISG | Buy | 500 | $7.54 | $3,770.00 |
| 1/19/2005 | VISG | Buy | 300 | $7.54 | $2,262.00 |
| 1/19/2005 | VISG | Buy | 200 | $7.54 | $1,508.00 |
| 1/20/2005 | VISG | Buy | 100 | $7.42 | $742.00 |
| 1/20/2005 | VISG | Buy | 100 | $7.46 | $746.00 |
| 1/20/2005 | VISG | Buy | 500 | $7.47 | $3,735.00 |
| 1/20/2005 | VISG | Buy | 200 | $7.53 | $1,506.00 |
| 1/20/2005 | VISG | Buy | 300 | $7.54 | $2,262.00 |
| 1/24/2005 | VISG | Buy | 100 | $7.44 | $744.00 |
| 1/25/2005 | VISG | Buy | 1,000 | $7.13 | $7,130.00 |
| 1/25/2005 | VISG | Buy | 100 | $7.19 | $719.00 |
| 1/25/2005 | VISG | Buy | 100 | $7.19 | $719.00 |
| 1/25/2005 | VISG | Buy | 300 | $7.19 | $2,157.00 |
| 1/25/2005 | VISG | Buy | 500 | $7.19 | $3,595.00 |
| 1/25/2005 | VISG | Buy | 100 | $7.22 | $722.00 |
| 1/25/2005 | VISG | Buy | 900 | $7.22 | $6,498.00 |
| 1/26/2005 | VISG | Buy | 1,000 | $6.96 | $6,960.00 |
| 2/4/2005 | VISG | Buy | 100 | $7.41 | $741.00 |
| 2/4/2005 | VISG | Buy | 100 | $7.46 | $746.00 |
| 2/7/2005 | VISG | Buy | 100 | $7.47 | $747.00 |
| 2/8/2005 | VISG | Buy | 400 | $6.19 | $2,476.00 |
| 2/8/2005 | VISG | Buy | 500 | $6.20 | $3,100.00 |
| 2/8/2005 | VISG | Buy | 1,000 | $6.08 | $6,080.00 |
| 2/8/2005 | VISG | Buy | 400 | $6.00 | $2,400.00 |
| 2/8/2005 | VISG | Buy | 255 | $6.00 | $1,530.00 |
| 2/8/2005 | VISG | Buy | 200 | $6.00 | $1,200.00 |
| 2/8/2005 | VISG | Buy | 100 | $6.00 | $600.00 |
| 2/8/2005 | VISG | Buy | 37 | $6.00 | $222.00 |
| 2/8/2005 | VISG | Buy | 8 | $6.00 | $48.00 |
| 2/8/2005 | VISG | Buy | 100 | $5.97 | $597.00 |
| 2/8/2005 | VISG | Buy | 500 | $5.97 | $2,985.00 |
| 2/8/2005 | VISG | Buy | 200 | $5.97 | $1,194.00 |
| 2/9/2005 | VISG | Buy | 1,000 | $5.84 | $5,840.00 |
| 2/11/2005 | VISG | Buy | 300 | $5.83 | $1,749.00 |
| 2/11/2005 | VISG | Buy | 200 | $5.83 | $1,166.00 |
| 2/11/2005 | VISG | Buy | 100 | $5.83 | $583.00 |
| 2/11/2005 | VISG | Buy | 400 | $5.83 | $2,332.00 |
| 2/15/2005 | VISG | Buy | 400 | $5.76 | $2,304.00 |
| 2/15/2005 | VISG | Buy | 600 | $5.76 | $3,456.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2/16/2005 | VISG | Buy | 2,000 | $5.77 | $11,540.00 |
| 2/16/2005 | VISG | Buy | 1,500 | $5.76 | $8,640.00 |
| 2/16/2005 | VISG | Buy | 712 | $5.76 | $4,101.12 |
| 2/16/2005 | VISG | Buy | 288 | $5.76 | $1,658.88 |
| 2/17/2005 | VISG | Buy | 100 | $5.77 | $577.00 |
| 2/17/2005 | VISG | Buy | 100 | $5.79 | $579.00 |
| 2/17/2005 | VISG | Buy | 2,040 | $5.66 | $11,546.40 |
| 2/18/2005 | VISG | Buy | 2 | $5.79 | $11.58 |
| 2/18/2005 | VISG | Buy | 500 | $5.81 | $2,905.00 |
| 2/18/2005 | VISG | Buy | 300 | $5.81 | $1,743.00 |
| 2/18/2005 | VISG | Buy | 200 | $5.81 | $1,162.00 |
| 2/23/2005 | VISG | Buy | 100 | $6.02 | $602.00 |
| 2/24/2005 | VISG | Buy | 200 | $5.73 | $1,146.00 |
| 2/24/2005 | VISG | Buy | 500 | $5.73 | $2,865.00 |
| 2/24/2005 | VISG | Buy | 200 | $5.73 | $1,146.00 |
| 2/28/2005 | VISG | Buy | 1,000 | $5.87 | $5,870.00 |
| 2/28/2005 | VISG | Buy | 200 | $5.87 | $1,174.00 |
| 2/28/2005 | VISG | Buy | 500 | $5.87 | $2,935.00 |
| 2/28/2005 | VISG | Buy | 200 | $5.87 | $1,174.00 |
| 2/28/2005 | VISG | Buy | 100 | $5.87 | $587.00 |
| 2/28/2005 | VISG | Buy | 100 | $5.81 | $581.00 |
| 2/28/2005 | VISG | Buy | 500 | $5.81 | $2,905.00 |
| 2/28/2005 | VISG | Buy | 100 | $5.81 | $581.00 |
| 2/28/2005 | VISG | Buy | 226 | $5.81 | $1,313.06 |
| 2/28/2005 | VISG | Buy | 74 | $5.81 | $429.94 |
| 2/28/2005 | VISG | Buy | 87 | $5.80 | $504.60 |
| 2/28/2005 | VISG | Buy | 73 | $5.80 | $423.40 |
| 2/28/2005 | VISG | Buy | 100 | $5.80 | $580.00 |
| 3/1/2005 | VISG | Buy | 540 | $5.88 | $3,175.20 |
| 3/1/2005 | VISG | Buy | 100 | $5.88 | $588.00 |
| 3/2/2005 | VISG | Buy | 100 | $5.62 | $562.00 |
| 3/2/2005 | VISG | Buy | 200 | $5.62 | $1,124.00 |
| 3/2/2005 | VISG | Buy | 100 | $5.62 | $562.00 |
| 3/2/2005 | VISG | Buy | 100 | $5.62 | $562.00 |
| 3/2/2005 | VISG | Buy | 87 | $5.62 | $488.94 |
| 3/2/2005 | VISG | Buy | 100 | $5.62 | $562.00 |
| 3/2/2005 | VISG | Buy | 313 | $5.62 | $1,759.06 |
| 3/2/2005 | VISG | Buy | 400 | $5.48 | $2,192.00 |
| 3/2/2005 | VISG | Buy | 600 | $5.48 | $3,288.00 |
| | | | | | |
| | | | | | |
| 6/25/2004 | VISG | Sell | 3,000 | $9.15 | $27,450.00 |
| 7/27/2004 | VISG | Sell | 1,500 | $6.75 | $10,125.00 |
| 7/27/2004 | VISG | Sell | 466 | $6.85 | $3,192.10 |
| 8/2/2004 | VISG | Sell | 100 | $6.83 | $683.00 |
| 8/2/2004 | VISG | Sell | 300 | $6.83 | $2,049.00 |
| 8/2/2004 | VISG | Sell | 857 | $6.85 | $5,870.45 |
| 8/2/2004 | VISG | Sell | 43 | $6.85 | $294.55 |
| 8/2/2004 | VISG | Sell | 100 | $6.85 | $685.00 |
| 8/2/2004 | VISG | Sell | 300 | $6.86 | $2,058.00 |
| 8/2/2004 | VISG | Sell | 300 | $6.86 | $2,058.00 |

| 8/2/2004 | VISG | Sell | 1,000 | $6.80 | $6,800.00 |
|---|---|---|---|---|---|
| 8/3/2004 | VISG | Sell | 1,500 | $6.86 | $10,290.00 |
| 8/3/2004 | VISG | Sell | 500 | $6.87 | $3,435.00 |
| 8/3/2004 | VISG | Sell | 400 | $7.20 | $2,880.00 |
| 8/3/2004 | VISG | Sell | 165 | $7.21 | $1,189.65 |
| 8/3/2004 | VISG | Sell | 1,489 | $7.23 | $10,765.47 |
| 8/4/2004 | VISG | Sell | 118 | $6.27 | $739.86 |
| 8/4/2004 | VISG | Sell | 100 | $6.27 | $627.00 |
| 8/4/2004 | VISG | Sell | 800 | $6.27 | $5,016.00 |
| 8/4/2004 | VISG | Sell | 382 | $6.27 | $2,395.14 |
| 8/4/2004 | VISG | Sell | 100 | $6.27 | $627.00 |
| 8/4/2004 | VISG | Sell | 500 | $6.27 | $3,135.00 |
| 8/4/2004 | VISG | Sell | 234 | $6.50 | $1,521.00 |
| 8/4/2004 | VISG | Sell | 1,400 | $6.50 | $9,100.00 |
| 8/4/2004 | VISG | Sell | 200 | $6.50 | $1,300.00 |
| 8/4/2004 | VISG | Sell | 166 | $6.50 | $1,079.00 |
| 8/4/2004 | VISG | Sell | 1,700 | $6.59 | $11,203.00 |
| 8/4/2004 | VISG | Sell | 100 | $6.60 | $660.00 |
| 8/4/2004 | VISG | Sell | 100 | $6.61 | $661.00 |
| 8/4/2004 | VISG | Sell | 100 | $6.63 | $663.00 |
| 8/4/2004 | VISG | Sell | 300 | $6.06 | $1,818.00 |
| 8/4/2004 | VISG | Sell | 50 | $6.09 | $304.50 |
| 8/5/2004 | VISG | Sell | 4,500 | $5.70 | $25,650.00 |
| 8/5/2004 | VISG | Sell | 500 | $5.71 | $2,855.00 |
| 8/10/2004 | VISG | Sell | 3,000 | $5.67 | $17,010.00 |
| 8/16/2004 | VISG | Sell | 2,000 | $5.50 | $11,000.00 |
| 8/17/2004 | VISG | Sell | 500 | $5.82 | $2,910.00 |
| 8/17/2004 | VISG | Sell | 500 | $5.82 | $2,910.00 |
| 8/17/2004 | VISG | Sell | 100 | $5.89 | $589.00 |
| 8/17/2004 | VISG | Sell | 300 | $5.89 | $1,767.00 |
| 8/17/2004 | VISG | Sell | 100 | $5.89 | $589.00 |
| 8/17/2004 | VISG | Sell | 500 | $5.89 | $2,945.00 |
| 8/18/2004 | VISG | Sell | 2,000 | $6.05 | $12,100.00 |
| 8/23/2004 | VISG | Sell | 2,000 | $6.28 | $12,560.00 |
| 9/1/2004 | VISG | Sell | 1,000 | $6.71 | $6,710.00 |
| 9/1/2004 | VISG | Sell | 1,000 | $6.81 | $6,810.00 |
| 9/7/2004 | VISG | Sell | 500 | $6.61 | $3,305.00 |
| 9/7/2004 | VISG | Sell | 500 | $6.61 | $3,305.00 |
| 9/7/2004 | VISG | Sell | 500 | $6.61 | $3,305.00 |
| 9/7/2004 | VISG | Sell | 500 | $6.61 | $3,305.00 |
| 9/28/2004 | VISG | Sell | 2,000 | $6.78 | $13,560.00 |
| 10/4/2004 | VISG | Sell | 1,500 | $6.13 | $9,195.00 |
| 10/5/2004 | VISG | Sell | 1,500 | $6.19 | $9,285.00 |
| 10/5/2004 | VISG | Sell | 2,000 | $6.38 | $12,760.00 |
| 10/7/2004 | VISG | Sell | 1,000 | $6.72 | $6,720.00 |
| 10/21/2004 | VISG | Sell | 100 | $6.92 | $692.00 |
| 10/21/2004 | VISG | Sell | 500 | $6.92 | $3,460.00 |
| 10/21/2004 | VISG | Sell | 500 | $6.92 | $3,460.00 |
| 10/21/2004 | VISG | Sell | 216 | $6.93 | $1,496.88 |
| 10/21/2004 | VISG | Sell | 100 | $6.93 | $693.00 |
| 10/21/2004 | VISG | Sell | 500 | $6.93 | $3,465.00 |
| 10/21/2004 | VISG | Sell | 484 | $6.93 | $3,354.12 |

| | | | | | |
|---|---|---|---|---|---|
| 10/21/2004 | VISG | Sell | 100 | $6.93 | $693.00 |
| 10/21/2004 | VISG | Sell | 200 | $6.93 | $1,386.00 |
| 10/21/2004 | VISG | Sell | 400 | $6.93 | $2,772.00 |
| 10/21/2004 | VISG | Sell | 500 | $6.93 | $3,465.00 |
| 10/25/2004 | VISG | Sell | 2,500 | $7.05 | $17,625.00 |
| 10/26/2004 | VISG | Sell | 2,500 | $7.20 | $18,000.00 |
| 10/27/2004 | VISG | Sell | 500 | $7.35 | $3,675.00 |
| 10/27/2004 | VISG | Sell | 100 | $7.35 | $735.00 |
| 10/27/2004 | VISG | Sell | 500 | $7.35 | $3,675.00 |
| 10/27/2004 | VISG | Sell | 200 | $7.42 | $1,484.00 |
| 10/27/2004 | VISG | Sell | 100 | $7.42 | $742.00 |
| 10/27/2004 | VISG | Sell | 100 | $7.42 | $742.00 |
| 10/27/2004 | VISG | Sell | 100 | $7.42 | $742.00 |
| 11/4/2004 | VISG | Sell | 1,000 | $7.49 | $7,490.00 |
| 11/30/2004 | VISG | Sell | 350 | $8.05 | $2,817.50 |
| 11/30/2004 | VISG | Sell | 500 | $8.05 | $4,025.00 |
| 11/30/2004 | VISG | Sell | 1,000 | $8.06 | $8,060.00 |
| 12/2/2004 | VISG | Sell | 100 | $8.24 | $824.00 |
| 12/7/2004 | VISG | Sell | 500 | $8.40 | $4,200.00 |
| 12/7/2004 | VISG | Sell | 500 | $8.40 | $4,200.00 |
| 12/7/2004 | VISG | Sell | 400 | $8.40 | $3,360.00 |
| 12/7/2004 | VISG | Sell | 100 | $8.40 | $840.00 |
| 12/7/2004 | VISG | Sell | 500 | $8.40 | $4,200.00 |
| 12/7/2004 | VISG | Sell | 1,000 | $8.65 | $8,650.00 |
| 12/9/2004 | VISG | Sell | 1,000 | $8.05 | $8,050.00 |
| 12/13/2004 | VISG | Sell | 900 | $8.42 | $7,578.00 |
| 12/13/2004 | VISG | Sell | 100 | $8.42 | $842.00 |
| 12/13/2004 | VISG | Sell | 1,200 | $8.19 | $9,828.00 |
| 12/13/2004 | VISG | Sell | 300 | $8.20 | $2,460.00 |
| 12/13/2004 | VISG | Sell | 1,500 | $8.30 | $12,450.00 |
| 12/13/2004 | VISG | Sell | 1,000 | $8.55 | $8,550.00 |
| 12/13/2004 | VISG | Sell | 1,500 | $8.73 | $13,095.00 |
| 12/13/2004 | VISG | Sell | 1,500 | $8.85 | $13,275.00 |
| 12/14/2004 | VISG | Sell | 200 | $8.27 | $1,654.00 |
| 12/14/2004 | VISG | Sell | 500 | $8.27 | $4,135.00 |
| 12/14/2004 | VISG | Sell | 300 | $8.31 | $2,493.00 |
| 12/15/2004 | VISG | Sell | 200 | $8.50 | $1,700.00 |
| 12/22/2004 | VISG | Sell | 2,000 | $8.75 | $17,500.00 |
| 12/28/2004 | VISG | Sell | 5,000 | $9.30 | $46,490.50 |
| 1/13/2005 | VISG | Sell | 1,000 | $8.08 | $8,080.00 |
| 1/20/2005 | VISG | Sell | 1,250 | $7.70 | $9,625.00 |
| 1/21/2005 | VISG | Sell | 100 | $7.63 | $763.00 |
| 1/21/2005 | VISG | Sell | 400 | $7.63 | $3,052.00 |
| 1/21/2005 | VISG | Sell | 500 | $7.63 | $3,815.00 |
| 1/21/2005 | VISG | Sell | 1,050 | $7.53 | $7,906.50 |
| 1/21/2005 | VISG | Sell | 1,000 | $7.56 | $7,560.00 |
| 1/28/2005 | VISG | Sell | 100 | $7.40 | $740.00 |
| 1/28/2005 | VISG | Sell | 100 | $7.40 | $740.00 |
| 1/28/2005 | VISG | Sell | 800 | $7.40 | $5,920.00 |
| 2/3/2005 | VISG | Sell | 1,000 | $7.42 | $7,420.00 |
| 2/9/2005 | VISG | Sell | 1,000 | $6.10 | $6,100.00 |
| 2/10/2005 | VISG | Sell | 200 | $6.00 | $1,200.00 |

| 2/10/2005 | VISG | Sell | 500 | $6.00 | $3,000.00 |
|-----------|------|------|-----|-------|-----------|
| 2/10/2005 | VISG | Sell | 300 | $6.00 | $1,800.00 |
| 2/16/2005 | VISG | Sell | 500 | $5.79 | $2,895.00 |
| 2/16/2005 | VISG | Sell | 300 | $5.79 | $1,737.00 |
| 2/16/2005 | VISG | Sell | 300 | $5.79 | $1,737.00 |
| 2/16/2005 | VISG | Sell | 100 | $5.79 | $579.00 |
| 2/16/2005 | VISG | Sell | 100 | $5.79 | $579.00 |
| 2/16/2005 | VISG | Sell | 100 | $5.79 | $579.00 |
| 2/16/2005 | VISG | Sell | 100 | $5.79 | $579.00 |
| 2/16/2005 | VISG | Sell | 73 | $5.79 | $422.67 |
| 2/16/2005 | VISG | Sell | 27 | $5.79 | $156.33 |
| 2/16/2005 | VISG | Sell | 100 | $5.79 | $579.00 |
| 2/16/2005 | VISG | Sell | 500 | $5.79 | $2,895.00 |
| 2/16/2005 | VISG | Sell | 300 | $5.79 | $1,737.00 |
| 2/16/2005 | VISG | Sell | 500 | $5.79 | $2,895.00 |
| 2/16/2005 | VISG | Sell | 500 | $5.79 | $2,895.00 |
| 2/16/2005 | VISG | Sell | 100 | $5.79 | $579.00 |
| 2/16/2005 | VISG | Sell | 42 | $5.79 | $243.18 |
| 2/16/2005 | VISG | Sell | 100 | $5.79 | $579.00 |
| 2/25/2005 | VISG | Sell | 13 | $5.95 | $77.35 |
| 2/25/2005 | VISG | Sell | 87 | $5.95 | $517.65 |
| 2/25/2005 | VISG | Sell | 300 | $5.95 | $1,785.00 |
| 2/25/2005 | VISG | Sell | 600 | $5.95 | $3,570.00 |
| 2/25/2005 | VISG | Sell | 900 | $6.05 | $5,445.00 |
| 2/25/2005 | VISG | Sell | 100 | $6.05 | $605.00 |
| 3/1/2005 | VISG | Sell | 300 | $5.93 | $1,779.00 |
| 3/1/2005 | VISG | Sell | 400 | $5.93 | $2,372.00 |
| 3/1/2005 | VISG | Sell | 100 | $5.93 | $593.00 |
| 3/1/2005 | VISG | Sell | 100 | $5.93 | $593.00 |
| 3/1/2005 | VISG | Sell | 100 | $5.90 | $590.00 |
| 3/1/2005 | VISG | Sell | 300 | $5.90 | $1,770.00 |
| 3/1/2005 | VISG | Sell | 100 | $5.90 | $590.00 |
| 3/1/2005 | VISG | Sell | 500 | $5.90 | $2,950.00 |
| 3/1/2005 | VISG | Sell | 800 | $5.96 | $4,768.00 |
| 3/1/2005 | VISG | Sell | 500 | $5.97 | $2,985.00 |
| 3/1/2005 | VISG | Sell | 100 | $5.98 | $598.00 |
| 3/1/2005 | VISG | Sell | 500 | $5.99 | $2,995.00 |
| 3/1/2005 | VISG | Sell | 100 | $5.99 | $599.00 |