## UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re VIISAGE TECHNOLOGY, INC. SECURITIES LITIGATION | ) ) ) ) ) ) ) |

CIVIL ACTION NO. 05-cv-10438-MLW

This Pleading Applies to:  All Actions

## DEFENDANTS' MOTION FOR LEAVE TO FILE OVER-LENGTH MEMORANDUM IN SUPPORT OF MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Defendants Viisage Technology, Inc., Bernard C. Bailey, William Aulet, Denis K. Berube, Marcel Yon, Buddy G. Beck, Charles A. Levine, Thomas J. Reilly, Harriet Mouchly-Weiss, Paul T. Principato and Peter Nessen move, pursuant to Local Rule 7.1(4), for leave to file a 45-page memorandum in support of their motion to dismiss plaintiffs' Consolidated Amended Class Action Complaint, attached hereto as *Exhibit A*.  In support of their motion, defendants state as follows:

1.      This is a securities fraud class action.  Plaintiffs' Consolidated Amended Class Action Complaint is 154 paragraphs and 62 pages long, alleging four separate causes of action against 11 different defendants.  All 11 defendants are submitting one joint memorandum. Defendants believe that the additional pages are necessary to fully address plaintiffs' allegations and claims and that the memorandum will substantially aid the Court in deciding the motion.

2.      If successful, defendants' motion will dispose of the entire case.

WHEREFORE, defendants respectfully request that the Court grant them leave to file a 45-page memorandum in support of their motion to dismiss and grant plaintiffs leave to file a 45-page opposition thereto.

VIISAGE TECHNOLOGY, INC.

By its attorneys,

/s/ Aloknanda S. Bose
Mitchell H. Kaplan (BBO #258940)
John R. Baraniak, Jr. (BBO #552259)
Aloknanda S. Bose (BBO #658108)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA 02110
(617) 248-5000

Dated:  April 3, 2006

4065420_1.DOC

# Exhibit A
# (Part 1 of 2)

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In re VIISAGE TECHNOLOGY, INC.    )
SECURITIES LITIGATION            )      CIVIL ACTION NO. 05-cv-10438-MLW
                              )
                              )
This Pleading Applies to:  All Actions    )

DEFENDANTS' MEMORANDUM
IN SUPPORT OF THEIR MOTION TO DISMISS THE
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Mitchell H. Kaplan (BBO #258940)
John R. Baraniak, Jr. (BBO#552259)
Aloknanda S. Bose (BBO#658108)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA  02110
Tel.: (617) 248-5000

## Table of Contents

Introduction ...................................................................................................................vi

Procedural History .........................................................................................................3

The Counts and the Parties ............................................................................................3

I.     The Facts.................................................................................................................4

       A.      Relevant Background Facts. ................................................................4

       B.      The Georgia RFP. ...............................................................................6

       C.      The Georgia Litigation. .......................................................................7

       D.      The Public Disclosures Addressing the Georgia Litigation. ..............12

       E.      Disclosures Pertaining to Sarbanes-Oxley Sections 302 and 404. ........18

II.    Argument ................................................................................................................20

       A.      Plaintiffs' Section 10(b) Claim Must Be Dismissed Under Rule
              12(b)(6) and Rule 9(b). .......................................................................21

            1.      The Georgia Litigation ...........................................................21

                  a.      Defendants had no duty to accuse Viisage of
                      wrongdoing or to predict the outcome of the
                      litigation.......................................................................21

                  b.      Viisage was under no duty to disclose the Court's
                      interlocutory orders on discovery motions or other
                      matters. .......................................................................24

                  c.      Defendants had no duty to disclose more about the
                      Georgia litigation because that information was
                      already publicly available...............................................26

                  d.      Plaintiffs' contention that Viisage entered into the
                      settlement with Georgia to avoid having to provide
                      discovery concerning its own wrongdoing is flatly
                      contradicted by the court documents on which
                      plaintiffs rely for their claim...........................................28

e.   Viisage's EBITDA was unaffected by the $2 million impairment charge taken as a result of the Summary Judgment Decision. ........................ 29

2.   Viisage's Internal Controls ........................................................ 31

3.   Plaintiffs' General Allegations of Scienter are Inadequate. ....................... 34

B.   Plaintiffs' Section 20(a) Control Person Claim Should Be Dismissed. ................................................................................................. 36

C.   Plaintiffs' Section 11 Claim Must Be Dismissed Under Rules 12(b)(6) and 9(b). ..................................................................... 38

D.   Plaintiff's Section 15 Control Person Claim Should Be Dismissed. ..................... 43

III.   Conclusion ........................................................................................... 43

## Table of Authorities

**Cases**                                                                                               **Page**

*Acito v. Imcera Group, Inc.*, 47 F.3d 47 (2d Cir. 1995) ................................................................35

*Ackermann v. Doyle*, 43 F. Supp. 2d 265 (E.D.N.Y. 1999)..........................................................28

*Aldridge v. A.T. Cross Corp.*, 284 F.3d 72 (1st Cir. 2002) ................................................34, 36, 37

*Alternative Energy, Inc. v. St. Paul Fire and Marine Ins. Co.*, 267 F.3d 30 (1st Cir. 2001) ...........5

*Amalgamated Clothing and Textile Workers Union v. J.P. Stevens & Co., Inc.*,
    475 F. Supp. 328 (S.D.N.Y. 1979), *vacated on other grounds*, 638 F.2d 7 (2nd Cir. 1980)......24

*Arruda v. Sears Roebuck & Co.*, 310 F.3d 13 (1st Cir. 2002).........................................................32

*Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990). ............................................................20

*Brody v. Homestore, Inc.*, 2003 U.S. Dist. LEXIS 17267 (C.D. Cal. August 8, 2003)................42

*E.I. Dupont Nemours & Co., Inc. v. Cullen*, 791 F.2d 5 (1st Cir. 1986)....................................5, 27

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185, (1976), *reh'g denied*, 425 U.S. 986 (1976). ............33

*Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1996) ...................................................20, 35

*Hackett v. Storey*, No. 3:03-CV-395(JBA), 2003 WL 23100328 (D. Conn. Dec. 30, 2003)........28

*HAS Residential Mortgage Servs. Of Texas v. Casuccia*, 350 F. Supp. 2d 352
    (E.D.N.Y. 2003) .......................................................................................................................28

*Higginbotham v. Baxter Int'l, Inc.*, No. 04 C 4909, 2005 U.S. Dist. LEXIS 12006
    (N.D. Ill. May 25, 2005 ............................................................................................................33

*IBM Corp. v. Evans*, 265 Ga. 215 (1955)......................................................................................7

*Ieradi v. Mylan Labs., Inc.,* 230 F.3d 594 (3d Cir. 2000).............................................................5

*In re American Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424
    (S.D.N.Y. 2000)........................................................................................................................42

*In re Apple Computer Sec. Litig.*, 886 F.2d 1109 (9th Cir. 1989)......................................26, 27, 35

*In re Biogen Sec. Litig.*, 179 F.R.D. 25 (D. Mass. 1997) ........................................................26, 27

*In re Cabletron Sys., Inc.*, 311 F.3d 11 (1st Cir. 2002) ..............................................20, 33

*In re Computervision Corp. Sec. Litig.*, 869 F. Supp. 56 (D. Mass. 1994) ....................................40

*In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006 (9th Cir. 2005),
cert. denied, 126 S.Ct. 1335 (2006).......................................................................41

*In re Focus Enhancements, Inc. Sec. Litig.*, 309 F. Supp. 2d 134 (D. Mass. 2001)......................33

*In re Hypercom Corp. Sec. Litig.*, No. CV-05-0455-PHX-NVW, 2006
U.S. Dist. LEXIS 2669 (D. Ariz. January 4, 2006) ....................................................33

*In re Interpublic Sec. Litig.*, No. 02 CIV. 6527 (DLC), 2003 U.S. Dist. LEXIS 8844
(S.D.N.Y. May 30, 2003..................................................................................34

*In re Metricom Sec. Litig.*, No. C 01-4085 PJH, 2004 WL 966291 (N.D. Cal. 2004) ..................42

*In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309 (8th Cir. 1997).......................................40

*In re Seachange Int'l, Inc. Sec. Litig.*, No. 02-12116, 2004 U.S. Dist. LEXIS 1687
(D. Mass. February 6, 2004)....................................................................22, 23, 24, 28

*In re Stac Electronics Sec. Litig.*, 89 F.3d 1399 ......................................................40, 42

*In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187 (1st Cir. 2005) ..........................................20

*In re Stratosphere Corp. Sec. Litig.*, No. CV-S-96-708-PMP,
1997 U.S. Dist. LEXIS 14621 (D. Nev. May 20, 1997)................................41, 42, 43

*In re Tyco Ltd. Sec. Litig.*, No. 03-CV-1352-PB, 2005 U.S. Dist. LEXIS 19154
(D.N.H. September 2, 2005) ...............................................................................42

*In re Tyco Int'l, Ltd. Sec. Litig.*, 185 F. Supp. 2d 102, 104 (D.N.H. 2002) ....................................5

*In re Tyco Intl Multidistrict Litig.*, No. 02-266-B, 2004 U.S. Dist. LEXIS 20733
(D.N.H. September 2, 2005) .................................................................................37

*In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678 (S.D.N.Y. 2000)............................................42

*In re Wade*, 969 Fed. 241 (7th Cir. 1992)..................................................................32

*In re White Elec. Designs Corp. Sec. Litig.*, No. CV04-1499PHX-SRB,
2006 U.S. Dist. LEXIS 6961 (D.Ariz. Feb. 14, 2006); ................................................40

*Kalmit v. Eichler*, 264 F.2d 131 (2d Cir. 2001)............................................................35

*Kaplan v. Kahn*, C-93-020015 RPA, 1994 WL 618473 (N.D. Cal. Oct. 25, 1994).....................24

*Klein v. General Nutrition Cos., Inc.*, 186 F.3d 338 (3d Cir. 1999)................................28

*Kramer v. Time Warner, Inc.*, 937 F.2d 767 (2d Cir. 1991).......................................5, 27

*Lernout & Hauspie Sec. Litig.*, 286 B.R. 33 (D. Mass. 2002)........................................37

*Lirette v. Shiva Corp.*, 27 F. Supp. 2d 268 (D. Mass. 1998) ......................................35

*Lone Star Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363 (5th Cir. 2001) ...................40, 41

*Neer v. Pellino*, 389 F.Supp.2d 648 (E.D. Penn. 2005)..............................................34

*Pacheco v. Cambridge Tech. Partners, Inc.*, 85 F. Supp. 2d 69 (D. Mass. 2000) ......................28

*Rand v. Cullinet Software, Inc.*, 847 F. Supp. 200 (D. Mass. 1994) ..............................26, 27

*Roeder v. Alpha Indus., Inc.*, 814 F.2d 22 (1st Cir. 1987)......................................23, 25

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004)....................................................40

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000) ...................................................35

*Securities and Exchange Comm'n v. Texas Int'l Co.*, 498 F. Supp. 1231 (N.D. Ill. 1980)...........24

*Shapiro v. UJB Fin. Corp.*, 964 F.2d 272 (3d Cir. 1992).........................................40

*Shaw v. Digital Equip. Corp.*, 82 F.3d 1194 (1st Cir. 1996)......................................5, 40

*Suna v. Bailey Corp.*, 107 F.3d 64 (1st Cir. 1997) .............................................36

*Taam Assocs., Inc. v. Housecall Medical Res., Inc.*, No. 1:96CV2214 A JEC,
    1998 U.S. Dist. LEXIS 22372 (N.D. Ga. March 31, 1998)........................................40

*Watterson v. Page*, 987 F.2d 1 (1st Cir. 1993) ...................................................5

*Websecure, Inc. Sec. Litig.*, 182 F.R.D. 364 (D. Mass. 1998).....................................40

*White v. H&R Block, Inc.*, No. 02-CV-8965, 2004 WL 1698628,
    (S.D.N.Y. July 28, 2004).....................................................................24

*Wieglos v. Commonwealth Edison Co.*, 892 F.2d 509 (7th Cir. 1989)..............................23

**Regulations**

17 C.F.R. § 229.10(a)(1)..................................................................................22
17 C.F.R.§ 229.103..........................................................................................22
17 C.F.R.§ 240.12b-2..................................................................................33, 37

**Statutes**

1995 PSLRA Safe Harbor § 102(b)...................................................................30
Sarbanes-Oxley Act of 2002........................2, 18, 19, 31, 32, 33, 34, 39
15 U.S.C. § 72k................................................................................................4
15 U.S.C. § 77k...............................................................................................38
15 U.S.C. § 77o..........................................................................................4, 43
15 U.S.C. § 78j(b)............................................................................................4
15 U.S.C. § 78t...........................................................................................4, 36
15 U.S.C. § 78u-4(b)(2)..................................................................................33
15 U.S.C. §§ 78u-4(b)(1) and (2) ...................................................................20

**Rules**

Fed. R. Civ. P. 9(b) ..............................................................20, 29, 40, 41, 42, 43

## Introduction

The Defendants: Viisage Technology, Inc. ("Viisage"); Bernard C. Bailey and William Aulet (the "Officer Defendants") and Denis K. Berube, Marcel Yon, Buddy G. Beck, Charles A. Levine, Thomas J. Reilly, Harriet Mouchly-Weiss, Paul T. Principato and Peter Nessen (the "Director Defendants") respectfully submit this memorandum in support of their motion to dismiss the Consolidated Amended Class Action Complaint (the "Complaint").

In November 2002, after evaluating bids submitted in response to a request for proposal, the State of Georgia awarded Viisage a contract to design, develop and implement a new digital driver's license program. The disappointed incumbent driver's license contractor, Digimarc ID Systems LLC ("Digimarc"), filed an administrative challenge to the state's award of that contract to Viisage with the Georgia Technology Authority ("GTA"). On February 17, 2003, a "Protest Decisionmaker" denied Digimarc's challenge, finding that there "are no merits to any of [Digimarc's] allegations." On March 5, 2003, Digimarc filed suit against GTA and the Georgia Department of Motor Vehicle Safety (the "DMVS", the GTA and DMVS are collectively referred to as "GTA/DMVS") in a Georgia superior court seeking to enjoin these state agencies from implementing Georgia's contract with Viisage. Digimarc alleged that GTA/DMVS had "acted arbitrarily and unfairly by their failure to follow Georgia law governing procurement to the benefit of Viisage." Throughout the lengthy and vitriolic Georgia litigation, GTA/DMVS filed pleadings in which they expressed satisfaction with Viisage and advised the Court that they and Viisage had completed the vast majority of the work on the new license system and were ready to begin the transition to the new system.[1] Although Viisage was not originally even a

---

[1]   *See, e.g.*, Response to Motion for Interlocutory Injunction by GTA/DMVS, pp. 1-3.  Bose Ex. 2.  This memorandum will cite to a number of pleadings filed in the *Digimarc ID Systems v. Georgia Technology Department and Georgia Department of Motor Vehicle Safety*, Fulton County Superior Court, case no. 2003CV66498.  Citations will be to Exhibits to the Affidavit of Aloknanda Bose, which include the Civil Docket

nominal party to this litigation and no relief was ever requested from it, both before and during the putative class period Viisage fully disclosed the existence of this action and its potential financial impact on it.

Stripped of its prolix and misleading allegations purportedly drawn from the voluminous record of the Georgia proceedings in the Fulton County Superior Court (the "Georgia litigation"), the Complaint is principally based on nothing more than Viisage's putative failure (i) expressly to disclose matters alleged by Digimarc in publicly filed pleadings or contained in well publicized Court orders or (ii) to predict the Georgia Court's ultimate decision on cross-motions for summary judgment issued nearly two years after the Georgia action was filed -- a ruling with which both the Georgia state agencies and Viisage disagreed and which Viisage appealed. It is well established that the federal securities laws do not require a company either to publicize pleadings or to predict the outcome of contested litigation, but rather require only that a company fairly disclose the existence of litigation that may adversely affect its prospects and the financial risks that this litigation poses. Viisage did both.

The only other allegation of material misrepresentation or omission contained in the Complaint is equally unusual and equally lacking in substance. Plaintiff asserts that Viisage misrepresented a material fact by failing to predict that it would be among the more than five hundred companies that found itself unable to meet the internal control standards imposed by Section 404 of the Sarbanes-Oxley Act in the first reporting period in which they applied to the Company, and therefore was required to report material weaknesses in internal controls in its 2004 Form 10-K. The Complaint does not allege, nor could it, that Viisage's financial statements actually misrepresented Viisage's financial condition.

---

and selected pleadings from that litigation, SEC filings and press releases. Defendants will be pleased to provide copies of any additional pleadings from that case that the Court may request.

This putative securities fraud Complaint appears to exalt bulk over clarity in its 62 pages and 154 paragraphs. Indeed, the Complaint never alleges that Viisage failed fairly to inform the investing public of the pendency of the Georgia litigation or advise it of the economic effect of an adverse outcome. It also does not allege that Viisage ever predicted what the outcome of that litigation would be. It does not allege that any of Viisage's financial statements contained errors or ever required restatement. While it touts Viisage's alleged failure to disclose purported wrongdoing in its response to the RFP, Viisage has always disputed that it engaged in any wrongdoing. Moreover, such wrongdoing was allegedly directed at the State of Georgia, which consistently expressed confidence in its decision to select Viisage as its contract partner.

## Procedural History

The plaintiffs allege that the putative class period runs from May 12, 2004 (the date Viisage filed its Form 10-Q for the quarter ending March 28, 2004) to March 2, 2005 (the date Viisage issued a press release that disclosed, among other things, that its 2004 Form 10-K would report material weaknesses in internal controls). Between March 8 and April 12, 2005, eight class action complaints were filed.[2] By order entered January 13, 2006, the so-called Turnberry Asset Group ("Turnberry") was approved as lead plaintiff. Turnberry filed the consolidated Complaint on February 27, 2006.

## The Counts and the Parties

Turnberry actually consists of five separate plaintiffs, the first two of which -- Turnberry Asset Management and Electronic Trading Group L.L.C. -- appear to be day traders as they collectively engaged in more than a thousand buy or sell transactions in Viisage's stock during

---

[2] One of the Complaints: *Broder v. Viisage, et al.*, C.A. No. 05-10475 MLW, was voluntarily dismissed.

the class period. <u>See</u>, Compl. certification. Turnberry seeks to bring its claims as a class action on behalf of all purchasers of Viisage stock during the class period.

The Complaint alleges four causes of action. In Count I, Turnberry Asset Management alleges that it bought Viisage shares "pursuant to or traceable to the Amended Registration Statement and Prospectus" associated with an August 5, 2005 secondary public offering of Viisage stock, and asserts claims for violation of Section 11 of the Securities Act, 15 U.S.C. § 72k, against Viisage and the individual defendants, each of whom signed the Amended Registration Statement. Compl., ¶¶ 107-108 and 111-112. In Count II, Turnberry Asset Management asserts that defendants Bailey, Aulet, Berube, Beck and Yon are liable as control persons of Viisage, pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, by reason of its violation of Section 11.

Count III is brought by all plaintiffs against Viisage and individual defendants Bailey, Aulet, Berube and Beck for violation of Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder. Count IV alleges control person liability under Section 20 of the Securities Exchange Act, 15 U.S.C. § 78t, on account of this 10b-5 violation, also against Bailey, Aulet, Berube, Beck and Yon.

## I.   THE FACTS

### A.   <u>Relevant Background Facts.</u>

Viisage delivers advanced technology identity solutions that enable governments, law enforcement agencies and businesses to enhance security, reduce identity theft and protect personal privacy. Viisage combines its proprietary biometric and secure credential software with complementary industry standard products to create turnkey solutions for its customers that integrate secure document technologies, image and data capture, relational databases and multiple biometrics, improving the customer's ability to process and manage identity

information. Compl., ¶ 2. Viisage was formed as a division of Lau Technologies in 1992 and spun out into a separate public company in 1996. *Id.* and Ex. 3, p. 3.[3, 4] Viisage grew substantially during 2004, in large measure as a result of three strategic acquisitions. In January, Viisage acquired ZN Vision Technologies ("ZN"), a company with advanced face recognition technology. In February, it acquired Trans Digital Technologies Corporation ("TDT"), which had a significant presence in U.S. federal government credential production. Finally, in October 2004, Viisage acquired Imaging Automation, Inc. ("IA") which focused on document authentication products and had a strong presence in international markets. Compl., ¶ 3 and Ex. 3, p. 3.

In August 2004, Viisage sold approximately 7.3 million shares in an underwritten follow-on public offering, raising net proceeds of $37.4 million.[5] Compl., ¶ 68 and Ex. 3, p. 19. These funds were used, among other things, to repay a $15.3 million promissory note to defendant Beck who had been the principal shareholder of TDT, $4.3 million of debt to Lau Technologies and $7.7 million of bank debt. Ex. 3, p. 19; Compl., ¶ 68.

---

[3] The factual description here and elsewhere in this memorandum draws from the Complaint, from documents referenced in the complaint, e.g., pleadings filed in the Georgia litigation, and from other matters of public record, such as SEC filings, press releases and newspaper articles. *See Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996) (holding that court may "consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint, without converting the motion into one for summary judgment"); *Alternative Energy, Inc. v. St. Paul Fire and Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001)("When the complaint relies upon a document, whose authenticity is not challenged, such a document 'merges into the pleadings' and the court may properly consider it under a Rule 12(b)(6) motion to dismiss.")(citations omitted); *Watterson v. Page*, 987 F.2d 1, 3-4 (1st Cir. 1993) (noting that "court may properly look beyond the complaint to matters of public record" in ruling on motion to dismiss) (quotation omitted); *E.I. Dupont DeNemours & Co., Inc. v. Cullen*, 791 F.2d 5, 7 (1st Cir. 1986). (Court may consider pleadings from separate but related proceedings); *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773-74 (2d Cir. 1991) (holding that district court did not err when it relied on documents filed with SEC and press releases to justify dismissal of plaintiff's complaint); *Ieradi v. Mylan Labs., Inc.*, 230 F.3d 594, 598 n.2, 600 n.3 (3d Cir. 2000) (taking judicial notice of newspaper article and stock price data); *In re Tyco Int'l, Ltd Sec. Litig.*, 185 F. Supp. 2d 102, 104 (D.N.H. 2002) (referring to press releases).

[4] Bose Ex. 3: Viisage Form 10-K for the year ended December 31, 2004.

[5] Lau, Beck and Yon (a principal shareholder in ZN) were each permitted to sell shares in this follow-on offering. See, Bose Ex. 4: Viisage Prospectus filed August 5, 2004, p. 55.

**B.    The Georgia RFP.**

On May 24, 2002, GTA issued a request for proposal ("RFP") on behalf of the DMVS, seeking proposals for a new digitized drivers license system. Compl., ¶ 41, Ex. 2, p. 6-7. The procurement was a "negotiated, solution-based solicitation" which gave "the vendors flexibility to propose innovative technology to achieve the 'desired state'." *Id.* at 6. GTA/DMVS received three proposals from: Viisage, Digimarc, and a third vendor. Under the RFP, the technical and cost proposals were to be submitted separately. This third vendor was soon eliminated from consideration and a four month evaluation process ensued in which Viisage and Digimarc were permitted to make additional submissions and the State tested their products. Ultimately, Viisage was selected as the successful bidder on November 12, 2002. *Id.* at 17-18, and Compl., ¶ 42.

Early in the evaluation process, GTA/DMVS opened the cost proposals. *Id.* at 10. The Viisage "price per card was quoted at a substantially lower rate than [Digimarc's]." Ex. 5, p. 12.[6] The opening of the cost proposals became the central issue in the Georgia litigation. Digimarc maintained that Georgia law required GTA/DMVS to complete the technical evaluation before opening the price proposal. It alleged that after opening the price proposal and finding that Viisage had substantially underbid Digimarc, GTA/DMVS acted with favoritism toward Viisage in the technical evaluation process. Ex. 6, p. 9;[7] Ex. 5, p. 12. GTA/DMVS countered that the RFP and Georgia law authorized it to open the cost proposals after an initial technical evaluation and that thereafter both Viisage and Digimarc were permitted to amend their technical proposals to attempt to meet the State's requirements. Ex. 2, pp. 40-41; Ex. 5, p. 12.

---

[6] Bose Ex. 5: December 22, 2004, Order on Cross-Motions for Summary Judgment.

[7] Bose Ex. 6: *Digimarc v. GTA/DMVS* Complaint.

C.    **The Georgia Litigation.**

On November 17, 2002, Digimarc filed a protest of the contract award with the GTA. On February 17, 2003, a Protest Decisionmaker issued a lengthy Decision denying the Protest and finding, *inter alia*: "[t]here are no merits to any of the Protest's allegations." Ex. 7, p. 7.[8] On March 3, 2003, Digimarc filed a Verified Complaint For Temporary Restraining Order, Interlocutory and Permanent Injunctive Relief in the Fulton County Superior Court, although it did not then seek a hearing on its request for interim injunctive relief. Ex. 6; Ex. 1.[9] The Complaint named GTA and DMVS as defendants and stated that it was "an action for *de novo* judicial review of GTA's and DMVS' procurement process." Ex. 6, p. 2. Digimarc asserted that GTA/DMVS: (i) violated the terms of their RFP; (ii) violated "numerous rules governing GTA procurements;" (iii) violated "provisions of the Official Code of Georgia;" and (iv) "deprived Digimarc of its property without due process of law." As relief, Digimarc requested that GTA/DMVS be enjoined from proceeding with the implementation and performance of the Viisage contract and that they be directed to award the contract to Digimarc, or, alternatively, required to rebid the contract. Ex. 6, pp. 43-50.

On May 20, 2003, Digimarc moved for a preliminary injunction. Ex. 1. GTA/DMVS vigorously opposed the motion: "[d]espite Plaintiff's rhetoric, its sole goal as the incumbent provider is to stop the final transition of this lucrative contract to a competitor, with complete disregard for the impact an eleventh hour injunction will have on Georgia's citizens, from both a fiscal and security perspective." Ex. 2, p. 1. Georgia defended the propriety of its conduct in lengthy submissions and argued that Digimarc had not met "the heavy burden of challenging an administrative decision of a state agency. *IBM Corp. v. Evans*, 265 Ga. 215, 217 (1955)." *Id.*,

---

[8] Bose Ex. 7: February 17, 2003 Decision of the Protest Decisionmaker.

[9] Bose Ex 1: Georgia *litigation* Docket Sheet.

p. 38. The Georgia Court disagreed and issued an order on July 31, 2003 enjoining GTA and DMVS "from all further activities related to the implementation of or performance under the contract" with Viisage. The order went on to call for a "full trial on the merits as expeditiously as possible." Ex. 8,[10] p. 4. Thereafter, the parties began additional discovery activity.

On October 1, 2003, the Georgia defendants filed a motion to dismiss Digimarc's Complaint or in the alternative add Viisage as an indispensable party. GTA/DMVS argued that Viisage had an obvious interest in the outcome of the litigation as a permanent injunction would clearly effect its rights, as well as an interest in protecting its pricing structure and other confidential business information from its competitor, Digimarc. Ex. 9; Ex. 1.[11]

On November 7, 2003, the Georgia court entered a Consent Order on this motion in which GTA/DMVS and Digimarc agreed that Viisage was a "necessary party." The Order directed Digimarc to ask Viisage to join the Georgia Action as a plaintiff, but if Viisage refused, to add Viisage "as an interested party" defendant. Digimarc made this request. Ex. 10.[12] Viisage filed a response noting that no party had asserted a claim against Viisage, and Viisage did not then have a claim that it wished to assert against any party; although, it believed that it would have a claim for damages if it was prevented from performing its contract. Viisage went on to state that its interests were more closely aligned with GTA/DMVS and therefore it believed it more appropriate that it be added as a party defendant. Ex. 11.[13]

On November 12, 2003, Digimarc amended its Complaint to add Viisage as a so-called "Necessary Party-Defendant." The prayers for relief remained the same as in Digimarc's

---

[10] Bose Ex. 8: July 31, *2003* Order on Plaintiff's Motion for Interlocutory Injunction.

[11] Bose Ex. 9: Brief in Support of Defendants' Motion to Dismiss or in the Alternative Add an Indispensable Party.

[12] Bose Ex. 10: *Consent* Order on Defendants' Motion to Dismiss or in the Alternative Add an Indispensable Party.

[13] Bose Ex. 11: *Response* of Viisage to Consent Order.

original complaint, except that Digimarc added a claim for damages against GTA/DMVS to recover its bid costs. No relief was sought from Viisage. Ex. 12,[14] pp. 45-53.

The docket of the Georgia litigation suggests concerted discovery-related activity, including multiple motions to compel filed by both plaintiffs and defendants, over the next eight months. On February 13, 2004, GTA/DMVS and Viisage moved to expedite trial. Ex. 13.[15] On June 9, 2004, the Court issued a scheduling order which addressed discovery, set dates for filing any motions for summary judgment, and stated that trial would begin in September. Ex. 14.[16] On July 1, 2004, Digimarc filed another motion to compel discovery that incorporated a request that the trial be rescheduled to December. Ex. 15.[17]

On July 21, 2004, GTA/DMVS filed a motion to dismiss on the grounds "that the matter was moot" because DMVS had terminated its contract with Viisage. Ex. 16, p. 2.[18] An affidavit of the Georgia Commissioner of the DMVS explained the reasons for the contract termination. The Commissioner stated that he learned that DMVS's current contract with Digimarc to provide driver's licenses was to expire on June 30, 2004. He instructed his staff to negotiate a day-to-day extension of that contract pending transition to a new system. In a meeting, Digimarc's representative expressed the view that the Georgia litigation might take three or more years to resolve. Digimarc proposed that it enter into a new contract with DMVS to provide a license vastly superior to the one then in use, at a cost less than Digimarc had proposed in response to

---

[14] Bose Ex. 12: First *Amended* Complaint for Interlocutory and Permanent Injunctive Relief.

[15] Bose Ex. 13: GTA/*DMVS* and Viisage's Motion to Expedite Trial and for a Special Trial Setting or Transfer of the Case.

[16] Bose Ex. 14: June 9, *2004* Scheduling Order.

[17] Bose Ex. 15: *Plaintiff* Digimarc's Motion to Compel Compliance with Discovery Order, Revise Scheduling Order and for Sanctions Against Viisage.

[18] Bose Ex. 16: State Defendant's Motion to Dismiss. Viisage also filed a motion to dismiss relying on Georgia's termination of the contract and further arguing that even if some residual controversy existed between Digimarc and the Georgia agencies, since *Viisage* had been added as a necessary party only because it was a party to the contract, it should be dismissed in any event. Bose Ex. 17: Viisage Motion to Dismiss.

the RFP. The Commissioner concluded that accepting this proposal would violate Georgia's competitive bidding laws. He proposed to Digimarc a settlement in which the November 12, 2002 contract would be terminated and a panel of experts appointed to choose between new contract proposals submitted by Digimarc and Viisage. Digimarc rejected that proposal. Ex. 18, pp. 3-4[19]; Ex. 5, p. 9.

The Commissioner then decided to notify Viisage that it was "terminating [Viisage's] contract for convenience. Viisage made demand for a termination payment of $8.2 million under GTA Rule 665-2-11-09." Ex. 18, p. 4. Thereafter, Viisage and DMVS negotiated a settlement pursuant to which Viisage would receive a $2 million termination payment and DMVS would purchase certain equipment from Viisage for $500,000. Ex. 5, p. 9-10.

Digimarc, opposed the motion to dismiss and filed three separate motions seeking to enjoin implementation of the settlement and a Second Amended Complaint. Ex. 1 and Ex. 5, p. 10. On September 2, 2004, the Court issued an order in which it held that consummating the settlement between GTA/DMVS and Viisage would constitute activities prohibited by the Court's prior July 31, 2003 order which had enjoined implementation or performance of the contract.[20] Among other things, the Court ordered Viisage to provide support for the cost of the equipment it proposed to sell to DMVS and an accounting of the direct costs it had incurred in connection with its work under the contract. It set new dates for filing dispositive motions and a date to hear them. It also determined that Viisage had not fully complied with its prior discovery order, compelled it to do so, and sanctioned Viisage $5,761.50 for its failure to provide

---

[19] Bose Ex. 18: Second Affidavit of James R. Davis.

[20] On August 18, 2004, the "Presiding Judge" entered a temporary restraining order preserving the status quo until Judge Moore, the judge assigned this case, could hear the matter. Bose Ex. 19: Order on Plaintiffs' Motion For Temporary Restraining Order.

discovery. Ex. 20, pp. 4-7.[21] Both GTA/DMVS and Viisage filed appeals from the Court's

September 2, 2004 Order to the Georgia Supreme Court. Ex. 21.[22]

On October 11, 2004, all parties filed cross-motions for summary (or partial summary)

judgment. In Digimarc's motion it asked the Court to declare that the November 12, 2004

contract was *void ab initio*, to award it the contract, or, alternatively, enjoin Georgia from

awarding a rebid contract to Viisage. Ex. 22, pp. 1-2.[23] GTA/DMVS described its position as

follows:

> On July 20, 2004, GTA and DMVS determined that, lacking cooperation
> from Digimarc and having been threatened by Digimarc that this litigation
> could continue for years, it was appropriate to terminate the contract
> awarded to Viisage for convenience and to enter into settlement with
> Viisage of its potential claims arising from the costs it had incurred prior to
> the issuance of the preliminary injunction for system implementation.

Ex. 23, p. 2.[24] Viisage's position was consistent with that of GTA/DMVS.

On December 22, 2004, the Georgia Court issued its decision on the cross-motions for

summary judgment. The Court concluded that GTA/DMVS had violated state law by opening

Digimarc's and Viisage's cost proposals, after concluding that neither bidder had submitted

technically acceptable proposals. The Court concluded that after seeing Viisage's substantially

lower bid, the evaluation team was "biased" toward Viisage. Ex. 5, pp. 11-12

The Court also found that Viisage had committed instances of misconduct by submitting

sample New York licenses that were produced by a different vendor, which it did not know if it

could produce, and claiming that it had secured a backup card production facility for

---

[21] Bose Ex. 20: September 2, 2004 Order.

[22] Bose Ex. 21: Notices of Appeal.

[23] Bose Ex. 22: Plaintiff's Motion for Partial Summary Judgment.

[24] Bose Ex. 23: Brief in Support Motion for Summary Judgment of Defendants GTA/DMVS.

emergencies when it had not. Viisage disagreed with these factual findings, as did the Georgia defendants. See Exs. 24 and 25, ¶¶ 58, 59 and 164.[25, 26]

The Court, however, found that the question of whether the contract was *void ab initio* was moot because the contract had been terminated for convenience "to prevent a long and lengthy delay of these proceedings and . . . critical additional delay in meeting the homeland security concerns . . . ." Ex. 5 at 14. It further held that Digimarc had not presented any concrete evidence that it would have been awarded the contract but for defendants' wrongful acts. It denied all Digimarc's requested relief, ruling that the contract could be rebid and Viisage and Digimarc both participate in the rebid process. The Court permitted Georgia to purchase equipment from Viisage for $500,000 in accordance with the parties' settlement, but ordered that Georgia not make the $2 million termination payment -- although neither Georgia nor Digimarc had requested that relief in their summary judgment motions. *Id.* at 5, 16.

Viisage appealed the December 22, 2004 order and requested that this appeal be consolidated with the defendants' prior appeal of the Court's September 2, 2004 order. Ex. 26, pp. 1-2.[27]

**D.    The Public Disclosures Addressing the Georgia Litigation.**

On August 1, 2003, the day following the issuance of the Georgia Court's order preliminarily enjoining performance of the November 12, 2002 contract, Viisage issued a press release notifying the public of the injunction. Ex. 27.[28] So did Digimarc, noting that Viisage had

---

[25] Bose Exs. 24 and 25:  Viisage's Answers to First Amended Complaint and DMVS Answer to Complaint, respectively.

[26] Indeed GTA/DMVS acknowledged that it was common knowledge that the New York cards were produced by a different vendor.  DMVS found that irrelevant.  Rather, it understood that Viisage was proposing to produce that type of card in Georgia.  The New York card was laminated by 3M, Viisage's subcontractor in the Georgia contract. Ex. 2, pp. 21-22; Ex. 5, p. 6.

[27] Bose Ex. 26: January 3, 2005 Notice of Appeal.

[28] Bose Ex. 27: August 1, 2003 *Viisage* Press Release.

been scheduled to begin producing licenses in August, but now Digimarc would continue to

provide services to Georgia under its existing contract. Ex. 28.[29]

On August 13, 2003, Viisage filed its Form 10-Q for the quarter ended June 29, 2003.[30]

Ex. 29, p. 11.  It disclosed the injunction as a subsequent event, describing it as follows:

> On July 31, 2003 the superior court for Fulton County, Georgia issued a
> preliminary injunction stopping Georgia's Department of Motor Vehicle
> Safety from continuing to work with us to install a new drivers' license
> system for the state of Georgia.  This injunction is the result of a law suit
> filed in March 2003 by one of our competitors, Digimarc Corporation.  The
> suit claims that the Department of Motor Vehicle Safety did not comply
> with its own bid process when selecting a vendor for the digital drivers'
> license program.  The merits of Digimarc Corporation's claims against the
> Department of Motor Vehicle Safety are to be addressed in further court
> proceedings.  The Department of Motor Vehicle Safety has confirmed that
> our contract with them remains in place.

In Viisage's Form 10-Q for the third quarter of 2003 the foregoing description of the

Georgia litigation was included in the "Legal Proceedings" item, with the following additional

two sentences:

> However, if the lawsuit is successful and we lose the contract, we could lose
> up to $15.9 million in revenue that we expected to recognize over the next
> five and one-half years.   In addition, although we expect that the
> Department of Motor Vehicle Safety would be required to reimburse us for
> our costs incurred under the contract, if we are unable to obtain
> reimbursement of those costs, we could be required to recognize a loss of
> up to approximately $5 million on the Georgia contract.

The litigation was again disclosed in Viisage's 2003 Form 10-K, filed with the SEC on

March 30, 2004, both in the section requiring a description of Legal Proceedings and as a Risk

Factor.  The Legal Proceeding description is identical to that contained in the third quarter

---

[29] Bose Ex. 28:  August 1, 2003 *Digimarc* Press Release.

[30] Bose Ex. 29:  Form 10-Q for period ended June 29, 2003.

Form 10-Q, except the amount of potential revenue loss, if Digimarc's suit were successful, was increased to $19.7 million.[31]  Ex. 30, pp. 15, 36.

Plaintiffs allege that the class period begins on May 12, 2004, when Viisage filed its Form 10-Q for the first quarter of 2004.  Compl., ¶¶ 1, 52 and 126.  However, the description of the Georgia litigation set out in that filing is in all material aspects exactly the same as that first provided by Viisage in 2003, and the Complaint does not allege that any event had occurred by May 12, 2004 that made the prior disclosures inaccurate.  The amendment that Viisage filed to its Form S-3 on May 21, 2004, registering for sale shares obtained by certain shareholders as a result of Viisage's acquisitions, includes as a Risk Factor a disclosure of the Georgia litigation also identical to that set out in the third quarter Form 10-Q; as does the Form S-3 filed in June 21, 2004, in preparation for the secondary stock offering in August.  Compl., ¶¶ 55-57.

On July 21, 2004, Viisage issued a press release announcing its settlement with DMVS and the termination of the November 12, 2002 contract.  Compl., ¶ 62; Ex. 31.[32]  The press release described the $2 million termination payment and $500,000 equipment purchase which it expected to receive from the State in the third quarter as a part of the settlement.  It also disclosed that, as a result of the contract termination, Viisage had reduced its backlog from $171 million to $151 million.  Viisage expressed an expectation that the contract termination would end the substantial legal costs that it had incurred with respect to the Georgia litigation over the past year.  *Id.*  As explained above, this expectation may then have been warranted, but it was unfortunately mistaken.

On July 22, 2004, Viisage filed an amended Registration Statement with the SEC in connection with its planned public offering.  Compl., ¶ 66.  The Risk Factor section included an

---

[31] Bose Ex. 30: Form 10-K for the period ended December 31, 2003.
[32] Bose Ex. 31: July 21, 2004 Viisage Press Release.

item with the bold-faced heading: "**Termination of our contract with Georgia could cause us to lose $19.7 million in projected revenues over the next five and one-half years and could negatively affect our earnings.**" It described the termination as follows:

> In July 2004, we reached a settlement agreement with the State pursuant to which the Department of Motor Vehicle Safety terminated the contract for convenience and agreed to pay us $2.0 million in cash and the State agreed to purchase certain equipment from us for $500,000. The Department of Motor Vehicle Safety has filed a motion with the Georgia court to dismiss the case based upon the termination of the contract. The agency also has filed an affidavit stating that it intends to issue a new request for proposals for a digital drivers' license system before the end of October 2004. As a result of the termination of the contract, we will lose up to $19.7 million in revenue that we expected to recognize over the next five and one-half years, which was included in our $176 million of backlog at March 28, 2004, unless we are able to win the new contract for the digital drivers' license system and the revenues from such new contract are substantially similar to the terminated contract. While we believe we can utilize the remaining $2.8 million in assets being retained by us from the Georgia contract either in Georgia, if we win the contract based on the new request proposals, or on alternative projects, to the extent that we are unable to utilize these assets or realize value through a sale of these assets, we would be required to take a charge to earnings.

Ex. 32, pp. 8-9.[33] On August 5, 2005, Viisage filed the final prospectus for its public offering of stock. Compl., ¶ 68. By then Digimarc had filed the first of its several motions to enjoin the contract termination and implementation of the settlement. Ex. 1. Accordingly, Viisage added the following sentence to its description of the Georgia litigation: "[Digimarc] has filed a motion with the Georgia Court to enjoin the DMVS and the State from making any payments to us under the settlement agreement." The very same description of the Georgia litigation and settlement appeared in Viisage's second quarter Form 10-Q filed on August 11, 2004. Compl., ¶ 69.

---

[33] Bose Ex. 32: *Viisage* Form S-3 filed July 22, 2004.

On September 14, 2004, Digimarc issued a press release describing in detail the Georgia Court's September Order enjoining Viisage's settlement with the DMVS. Digimarc's website included a "link" to the full text of the Order. Ex. 33.[34]

On October 25, 2004, Viisage issued a press release announcing its results for the quarter ended September 26, 2004. Compl., ¶ 78; Ex. 34.[35] Viisage reported record revenues and a modest profit on a GAAP basis, its first in several years, and reviewed its achievements for the first nine months of 2004. The Complaint does not allege any misstatement with respect to any historic information set out in the press release. Viisage also announced that it was "increasing its guidance on annual revenue . . . and EBITDA [Earnings Before Interest, Taxes, Depreciation and Amortization] to be between $11.5 - $12.5 million, increased from EBITDA of $11.12 million." The press release did not report on the Georgia litigation or any other litigation confronting Viisage. *Id.*

On October 26, 2004, the day following the earnings release, Viisage held its quarterly telephone call with analysts. Compl., ¶ 79. In his remarks, CEO Bailey commented that "someone always asks for an update on Georgia." He briefly described the previously announced settlement, but then added:

> Unfortunately, that settlement was the subject of a temporary restraining order by our competitor. Right now, we expect a hearing on a series of summary judgment motions to occur shortly, with a decision probably coming out in the next few weeks. We'll certainly let you know once we hear more information.

Ex. 35, p. 3.[36] In response to a question, Bailey noted that the $2.5 million had not been booked as revenue, and never would be, because with driver's license contracts Viisage only recognized

---

[34] Bose Ex. 33: *Digimarc* September 14, 2004 Press Release.

[35] Bose Ex. 34: *Viisage* October 25, 2004 Press Release.

[36] Bose Ex. 35: *Transcripts* of October 26, 2004 Analysts' Conference Call.

16

revenue as it produced a license. *Id.* at 9. Viisage's 10-Q for the third quarter, filed on November 10, 2004, included a similar representation regarding the status of the $2.5 million of settlement payments: "[i]n response to a motion filed by the competitor, the Georgia court has issued a preliminary injunction prohibiting the [DMVS] and the State from making any payments to us under the settlement agreement." Ex. 36, p. 31.[37]

As noted above, the Georgia Court's Summary Judgment Decision was dated December 22, 2004, the Wednesday before Christmas. On Monday, December 27, 2004, a number of wire services reported about the Decision. Ex. 37.[38] That day Digimarc issued a press release describing (and seemingly distorting) the Decision and providing a link to it on its website. Ex. 38.[39] Viisage also issued a press release. Compl., ¶ 89, Ex. 39.[40] Viisage stated that it had learned of the Decision that day. It took issue with some of the content of Digimarc's release. Viisage stated that it was pleased that Georgia would be permitted to rebid the contract and that Viisage could compete for it. It went on to note that because the State had been prohibited from making the $2 million termination payment, Viisage believed that:

> . . . Viisage's initial claim for an $8.2 million settlement payment is revived. While we are very pleased with the overall result, we are disappointed and strongly disagree with this and certain other elements of the court's ruling, including statements of disputed fact which we believe are not appropriate in a summary judgment ruling, and intend to appeal.

On December 28, 2004, the *Atlantic Journal Constitution* reported on the Decision. Among other things, it quoted a GTA official who stated that the GTA also believed that the "bids were handled appropriately under the procurement rules." Ex. 40.[41]

---

[37] Bose Ex. 36: Form *10*-Q for the period ended September 26, 2004.

[38] Bose Ex. 37: Assorted Wire Reports dated December 27, 2004.

[39] Bose Ex. 38: *December* 27, 2004 Digimarc Press Release.

[40] Bose Ex. 39: *December* 27, 2004 Viisage Press Release.

[41] Bose Ex. 40: December 28, 2004 Atlanta Journal Constitution Article.

On February 7, 2005, Viisage issued a press release that disclosed that while the Company expected that revenues for 2004 would meet the guidance that the Company had previously announced, EBITDA and net income were expected to fall short. The press release attributed this to a number of non-recurring expenses and charges, including a $2 million "non-cash write-down" of certain assets associated with the Georgia contract. It stated that this impairment charge was the result of the Summary Judgment Decision that had been appealed and that the $2 million write-down affected net income, but not EBITDA. The Complaint does not allege any misrepresentation or error with respect to any aspect of this press release. Ex. 41.[42], [43]

**E.    Disclosures Pertaining to Sarbanes-Oxley Sections 302 and 404.**

In each of the Forms 10-Q issued during the class period, Bailey, as CEO, and Aulet, as CFO, provided the standard certification required of them, and all other officers of public companies, by Section 302 of the Sarbanes-Oxley Act of 2002. Compl., ¶¶ 53, 64 and 82. It is set forth in full in the appendix (e.g. Ex. 36, p. 31). Generally stated, in relevant part, this certification requires that the CEO and CFO certify that they had evaluated the company's internal controls and procedures and concluded that internal controls (i) were designed to insure that all material information relating to Viisage was made known to them and (ii) are effective in providing reasonable assurance that the information required to be reported to the SEC is properly recorded on the company's books. The CEO and CFO must also certify that any weaknesses in internal controls or fraud known to them have been reported to Viisage's audit committee and outside auditors. Compl., ¶ 54. There is no allegation that they failed to do so.

---

[42]  Bose Ex. 41: *February* 7, 2005 Viisage Press Release.

[43]  In an analyst's conference call, also held on February 7, 2005, Bailey elaborated on this impairment charge explaining that Viisage had written off $2 million of assets on Viisage's balance sheet that were "uniquely attributable to the Georgia contract" and could not be used by Viisage to generate revenue except in fulfillment of a contract with Georgia. Bose Ex. 42: Transcript of February 7, 2005 Analysts' Conference Call, p. 11.

In Viisage's October 26, 2004 third quarter analysts' conference call, Peter Faubert, Viisage's Vice President of Finance and Corporate Controller, reported that expenses incurred during 2004 in connection with the Sarbanes-Oxley Section 404 compliance project were approximately $400,000 to date, and the costs would continue to be incurred in the fourth quarter "as we go through the final testing stages." Ex. 35, p. 5.

On March 2, 2005, Viisage reported its financial results for 2004. The press release provided limited guidance for forecast financial performance for 2005. Viisage went on to state that: "[i]n connection with the preparation of the Company's consolidated financial statements for the year ended December 31, 2004, the Company determined that it had an internal control deficiency that constitutes a 'material weakness' as defined by the Public Company Accounting Oversight Board Standard No. 2." Viisage reported that it had insufficient personnel resources and technical accounting expertise to resolve non-routine or complex accounting matters and its outside auditors were likely to render an adverse opinion regarding Viisage's internal controls. In a conference call with analysts the following day CFO Aulet provided a further explanation:

> [D]espite strong internal controls in most areas, there were enough adjustments in our close process to make clear that the Company was short on technical accounting resources to support Viisage's significantly more complex business . . . [W]e did not catch all the accounting adjustments with our internal staff that we should have.

Ex. 43,[44] p. 6. Aulet went on to state that "this does not mean that our financial statements are misstated." He noted that he expected BDO Seidman to issue an unqualified opinion on the 2004 financials, which it did. He expressed disappointment that notwithstanding "six to eight months" of hard work undertaken "with the goal of full compliance rating for the year 2004" this would not be achieved, but noted that the prior day the *Wall Street Journal* had reported that over

---

[44] Bose Ex. 43: Transcript of March 3, 2005 Analysts' Conference Call.

500 companies had reported internal control deficiencies. *Id.* at 7; Ex. 44.[45]  Plaintiffs do not allege that any aspect of the March 2nd Press Release or March 3rd conference call were false or misleading.  Although Viisage filed its 2004 Form-10K late, it was consistent in all respects with the information provided in the March 2, 2005 press release and conference call.  Ex. 3.

## II.    ARGUMENT

Courts in this Circuit  apply "strict and rigorous" pleading standards to complaints alleging securities fraud. *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 193 (1ˢᵗ Cir. 1996).  To survive a motion to dismiss:  (1) the complaint must specify each alleged misstatement and the reason why the statement is misleading; (2) the alleged misstatements must be misleading to a material degree; and (3) the complaint must state with particularity facts that give rise to a "strong inference," rather than just a reasonable inference, of scienter.  *See, e.g., In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187, 194 (1ˢᵗ Cir. 2005); *In re Cabletron Sys., Inc.*, 311 F.3d 11, 27 (1ˢᵗ Cir. 2002) and 15 U.S.C. §§ 78u-4(b)(1) and (2).  A securities complaint must further satisfy Fed. R. Civ. P. 9(b) by stating the "circumstances constituting fraud" with "particularity." *In re Stone & Webster Sec. Litig.*, 414 F.3d at 194.  Finally, the complaint, when basing its claims on an omission, rather than on an affirmative misstatement, must allege circumstances under which the defendant(s) charged with the omission had a duty to speak.  *Backman v. Polaroid Corp.*, 910 F.2d 10, 16 (1st Cir. 1990).

As explained below, plaintiffs' Complaint satisfies none of these standards.

---

[45]  Bose Ex. 44:  March 2, 2005 *Wall Street Journal* article entitled: "Accounting Rule Exposes Problems But Draws Complaints About Costs."

**A.    Plaintiffs' Section 10(b) Claim Must Be Dismissed Under Rule 12(b)(6) and Rule 9(b).**

Plaintiffs' Section 10(b) claim rests on: (1) alleged misstatements/omissions concerning the litigation over the State of Georgia driver's license contract, and (2) alleged misstatements/omissions concerning Viisage's internal controls.

**1.    The Georgia Litigation**

**a.    Defendants had no duty to accuse Viisage of wrongdoing or to predict the outcome of the litigation.**

Though plaintiffs attempt to disguise it, the gravamen of their Section 10(b) claim is that defendants failed to predict the outcome of the Georgia litigation and publicly to disclose that prediction to shareholders. Plaintiffs allege that defendants "concealed [Viisage's] wrongful conduct in connection with its bid for the DMVS contract" as found by the Georgia Court. Compl. ¶¶ 4, 5, 87. Specifically, plaintiffs allege that defendants failed to disclose that "Viisage had submitted sample cards as its 'production quality' cards that were in fact produced by a competitor for which it had no authority to produce and which were not cards Viisage had the ability to produce." *Id.* at. ¶¶ 5, 46, 87. Plaintiffs further allege that defendants failed to disclose that "Viisage had falsely stated to the DMVS that it had secured a back-up card production facility to take over license production in the event the central permanent card production facility is compromised, as was required by the operative Request for Proposal." *Id.* at ¶¶ 5, 50, 87. Throughout the litigation, both Viisage and the Georgia GTA/DMVS consistently denied these allegations and any wrongdoing by Viisage. Thus, plaintiffs' real complaint is that defendants failed to predict that the Georgia Court would disagree with Visage and the Georgia GTA/DMVS; and, more particularly, to predict that DMVS would eventually terminate

21

# Exhibit A
# (Part 2 of 2)

Viisage's contract for convenience and the Court would rely on its finding of "wrongdoing" to disallow part of the termination payment that Georgia had agreed to make to Viisage.

The law in this area is clear. A company and its officers and directors need only disclose the existence of the litigation and need not handicap its outcome. Item 103 of Regulation S-K, which governs litigation disclosures in Forms 10-K and prospectuses (Forms S), requires only that registrants "[d]escribe briefly any material pending legal proceedings, other than ordinary routine litigation incidental to the business" along with the name of the court or agency in which the proceeding is pending, the date instituted, the principal parties, the factual basis underlying the action, and the relief sought. *See* 17 C.F.R. § 229.10(a)(1) and § 229.103. Viisage's public disclosures, both before and during the putative class period, fully complied with these requirements. *See* pages 12-17, *supra*, for a complete description of the five Viisage press releases, eight Viisage SEC filings, and Viisage analyst conference calls which disclose required information about the Georgia litigation.

The duty to disclose litigation goes no further. As the court explained in *In re Seachange Int'l, Inc. Sec. Litig.*, No. 02-12116, 2004 U.S. Dist. LEXIS 1687, at *31 (D. Mass. February 6, 2004), "[t]he disclosure required by Item 103 is meant to put potential investors on notice of pending litigation, not to force companies to predict a particular outcome in the litigation." "[T]he SEC has deliberately chosen not to impose the type of duty of disclosure that plaintiffs contend defendants breached." *Id.*

In *Seachange*, the company was charged by a competitor with willfully infringing on the competitor's patent. During the course of the trial, the company disclosed in a prospectus and Registration Statement for a secondary offering the existence of the litigation and denied any wrongdoing. *Id.* at *22-*23. After the offering was completed, a jury returned a verdict of

willful infringement by Seachange and the court awarded the plaintiff competitor its attorneys' fees. The plaintiff there argued, and the court agreed, that at the time of the Registration Statement Seachange knew it was infringing on the competitor's patent and that Seachange was likely to lose the litigation. *Id.* at 24. Nonetheless, the court dismissed the plaintiffs' securities claims under Rule 12(b)(6), finding the disclosures describing the litigation in broad terms to be true and finding no duty by Seachange or its officers or directors to disclose more. The court explained that "[w]hile a company that chooses to reveal material information, even though it had no duty to do so, 'must disclose the whole truth," it need not disclose everything it knows; rather, the company is required only to make additional disclosures to keep the information from being materially misleading." *Id.* at 25. "Given that at the time of the Offering the jury had not yet returned a verdict, Seachange was not obligated to predict the outcome or estimate the impact of the . . . litigation." *Id.* at 27 (citations omitted).

Not only did the court in *Seachange* find nothing misleading in the litigation disclosure that was made, but also it found no independent affirmative duty, separate and apart from any statement made, for Seachange to disclose its patent infringing conduct. Tracing its reasoning back to *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22 (1st Cir. 1987), the *Seachange* court explained that "a duty to disclose does not arise from the mere possession of nonpublic market information," and that "there is no affirmative duty of disclosure in cases where there is no insider trading, no statute or regulation requiring disclosure, and no inaccurate, incomplete, or misleading prior disclosures." *Id.* at 34 (quotations and citations omitted).

*Seachange* is by no means alone in holding that a company need not disclose its view of its chances in litigation. *See, e.g., Wieglos v. Commonwealth Edison Co.*, 892 F.2d 509, 518 (7th Cir. 1989)(company not required to disclose probability that tribunal will deliver a particular

decision); *White v. H&R Block, Inc.*, No. 02-CV-8965, 2004 WL 1698628, at *10 (S.D.N.Y. July 28, 2004); *Kaplan v. Kahn*, No. C-93-020015 RPA, 1994 WL 618473, at *8 (N.D. Cal. Oct. 25, 1994)(company "need not admit fault or accuse itself of copyright violation in it is own disclosures when describing the nature of adverse litigation."); *Securities and Exchange Comm'n v. Texas Int'l Co.*, 498 F. Supp. 1231, 1249-50 (N.D. Ill. 1980)(company not required to speculate on potential outcomes); and *Amalgamated Clothing and Textile Workers Union v. J.P. Stevens & Co., Inc.*, 475 F. Supp. 328, 331-32 (S.D.N.Y. 1979), *vacated on other grounds*, 638 F.2d 7 (2d Cir) (proxy rules do not require management to accuse itself of antisocial or illegal policies).

The instant case is no different. Here, plaintiffs allege that defendants had a duty to disclose alleged Viisage's wrongful conduct with respect to the "production quality" samples and the back-up production facility, that it was likely to lose the litigation, and that its settlement with GTA/DMSV would be invalidated. *See, e.g.,* Compl. ¶¶ 46, 50, 81  This is precisely what *Seachange* and the other cases cited above held need not be disclosed as a matter of law.  Indeed, a different rule requiring the types of disclosures plaintiffs urge would produce anomalous results.  A company intent on defending itself against allegations of wrongdoing cannot be required to admit those allegations in public documents for fear that a loss in that litigation will subject it to Section 10(b) liability.  Such a rule would be particularly inappropriate in the present case where Viisage and the Georgia state agencies believed the Superior Court's ruling to have been in error.

          **b.**     **Viisage was under no duty to disclose the Court's interlocutory orders on discovery motions or other matters.**

As to the claims that Viisage was required to disclose the Court's rulings on discovery motions or other interlocutory orders, not surprisingly, Item 103 does not require that.  Nor is a

24

public company under any obligation to issue a press release every time it receives an adverse order or ruling on an interlocutory matter. *See*, *Roeder*, 814 F.2d at 34. Between August 11, 2004 (the date it filed its third quarter Form 10-Q) and its October 26, 2004 analysts' conference call, Viisage made no public statements about the Georgia litigation. As a matter of law, it had no obligation to do so.

More particularly, Plaintiffs complain that Viisage failed to disclose that on September 2, 2004, the Court ordered it to pay Digimarc $5,761.50 for attorneys' fees as a consequence of Digimarc's filing a successful motion to compel additional discovery from Viisage. (Compl. ¶ 74). Leaving aside the question of whether such information would ever be material to a reasonable investor, Viisage had no duty to disclose it. Plaintiffs further complain that Viisage did not disclose sufficiently promptly that, in that same order, the Georgia Court preliminarily enjoined GTA/DMVS from paying the $2.5 million termination payment. Once again, plaintiffs fail to identify why Viisage was obligated to say anything about the Georgia litigation, at least until it filed its Form 10-Q on November 10, 2004. In fact, plaintiffs' allegation that Viisage failed to disclose the injunction in its October 26, 2004 conference call is simply wrong. (Compl. ¶ 126e). During that call, CEO Bailey expressly explained that the $2.5 million was subject to a "restraining order" and he expected "a hearing on a series of summary judgment motions shortly." A description of the injunction was fully set out in Viisage's third quarter Form 10-Q. *See supra* at 15.

Finally, plaintiffs complain that Viisage waited until December 27, 2004 to disclose the Georgia Court's Summary Judgment Decision dated December 22, 2004. (Compl. ¶ 89). Aside from the fact that Viisage had no obligation to disclose sooner, the Court may take judicial notice of the fact that December 22, 2004 was the Wednesday before Christmas, and only one business

day passed between the date on the Decision and the day Viisage issued a press release regarding it. Moreover that release states that Viisage learned of the Decision "today." Plaintiffs do not allege that statement to be false. December 27, 2004 was also the day that the wire services reported the Decision and Digimarc issued its own press release describing it . *See supra* at 17.

**c.    Defendants had no duty to disclose more about the Georgia litigation because that information was already publicly available.**

Plaintiffs' contention that Viisage committed security fraud by not disclosing that: Viisage was a party to the Georgia litigation (Compl. ¶ 64); Viisage "was a material subject of the litigation"(*Id.* ¶ 80); Viisage had been ordered to pay Digimarc $5,761.50 for attorneys' fees in connection with a motion to compel (*Id.* ¶ 74) -- or not disclosing quickly enough the September 2, 2004 injunction or the December 22, 2004 Summary Judgment Decision -- founders for an even more obvious reason. To the extent material, each of these alleged omissions concerns information that *was* publicly available and in the marketplace. The pleadings filed in, and orders issued by, the Georgia court were available to all and frequently touted by Digimarc. The risks to Viisage posed by the Georgia litigation were clearly and frequently disclosed. To the extent that the market was concerned about the litigation, there was simply no way it (and the shareholders who were relying on the integrity of the share price instantaneously to reflect all publicly available information) could have been misled.

The "truth on the market" defense has been adopted by courts in this Circuit and elsewhere. *See, e.g., Rand v. Cullinet Software, Inc.*, 847 F. Supp. 200, 206-07 (D. Mass. 1994) and cases cited therein. *See also In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1111-12 (9th Cir. 1989) . As the court explained in *In re Biogen Sec. Litig.*, 179 F.R.D. 25, 36-37 (D. Mass. 1997), the defense – that the market already knew the allegedly misstated or omitted information on which a securities plaintiff bases his or her claim – is intended to counter plaintiffs pleading

26

reliance by alleging fraud on the market, that is, that the market efficiently and immediately incorporated the misinformation into the company's market price causing it to be artificially inflated. "If corrective information 'credibly entered the market and dissipated the effects of the misstatements, those who traded [defendant's] shares after the corrective statements would have no direct or indirect connection with the fraud.'" *Id.* at 37, quoting *Rand*, 847 F. Supp. at 205. To prevail, therefore, on this defense, a defendant must establish that "the corrective information has been made credibly available to the market by other sources, *Apple Computer*, 886 F.2d at 115-16, and that the nature and proportion of the corrective information has yielded a "sufficiently curative effect." *Id.* at 116.

That Viisage had been added as an interested party to the litigation,[46] that Viisage's response to GTA's RFP was an issue in the case, that Viisage had been taxed attorneys' fees for failing to comply with the court's discovery order, and that the court issued a preliminary injunction enjoining the settlement payment, all were immediately disclosed for anyone to see on the court's docket and in the court's orders and the parties' court filings. And Digimarc was quick to advise the public of each litigation success, issuing press releases with website links to the Court's orders.

It is beyond question that the Court can consider the Georgia court's docket, orders and the parties' court filings on a motion to dismiss. *See E.I. Dupont Nemours & Co., Inc. v. Cullen*, 791 F.2d at 7, and cases collected therein (holding that court can take judicial notice of pleadings in other court case); *Kramer*, 937 F.2d at 774 ("courts routinely take judicial notice of documents

---

[46] Plaintiffs' make much of CEO's Bailey's comment during a July 22, 2004 analysts' conference call that Viisage "was never a party to this lawsuit, which has dragged on for a year and a half, nor were any allegations of impropriety ever lodged against our company." July 22 Transcript, pp. 3-4. Viisage was added only as an interested party defendant in November 2003 when it declined Digimarc's invitation to join the litigation as a plaintiff. However, no relief was sought by Digimarc against Viisage, and its addition as an interested party did not change the risks posed to it by the litigation, nor the central issue in the case, at least until DMVS terminated the contract, *i.e.*, did GTA/DMVS follow their own procurement rules in awarding the contract to Viisage? *See, supra* at 7-9.

filed in other courts . . . not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.") (citation omitted). *See also Hackett v. Storey*, No. 3:03-CV-395(JBA), 2003 WL 23100328, at *2 (D. Conn. Dec. 30, 2003); *Ackermann v. Doyle*, 43 F. Supp. 2d 265, 268 (E.D.N.Y. 1999); *HAS Residential Mortgage Servs. of Texas v. Casuccio*, 350 F. Supp. 2d 352, 361 (E.D.N.Y. 2003). Indeed, in *Seachange*, discussed above at pages 22-24, the court examined, in the context of a motion to dismiss, the docket of a patent litigation which the plaintiffs claimed had been misrepresented by the defendant. *Seachange,* 2004 U.S. Dist. LEXIS 1687, at *23-*24. Defendants offer these pleadings and orders not to prove the truth of the matters asserted therein, but to demonstrate that the information plaintiffs claim defendants concealed was, in fact, out in the marketplace and available to plaintiffs and to the other shareholders. For this reason, the Court should find that the truth on the market defense precludes plaintiffs from pressing their claims based on supposedly inaccurate and/or incomplete disclosures concerning the Georgia litigation. *See Klein v. General Nutrition Cos., Inc.*, 186 F.3d 338, 343 (3d Cir. 1999)(dismissing claim based on alleged misrepresentation that did not concern "private, internal [corporate] information"), and *Pacheco v. Cambridge Tech. Partners, Inc.*, 85 F. Supp. 2d 69, 78-79 (D. Mass. 2000)(alleged undisclosed information perceived by market immaterial as a matter of law).

        **d.      Plaintiffs' contention that Viisage entered into the settlement with Georgia to avoid having to provide discovery concerning its own wrongdoing is flatly contradicted by the court documents on which plaintiffs rely for their claim.**

In its Summary Judgment Decision the Georgia court expressly found that Georgia "approached Viisage about a termination of the 2002 contract and a rebid;" (Ex. 5, p. 9) and that it "terminated the contract for convenience; to prevent a long and lengthy delay of these

proceedings and imposing significant and unnecessary additional cost to all parties, not to mention critical additional delay in meeting the homeland security concerns ... [for] the State of Georgia." *Id.* at 14. These findings are based on an affidavit from the Georgia Commissioner of the DMVS quoted at length, *supra* at 9. Nonetheless, plaintiffs allege that Viisage committed fraud when it stated that the settlement with Georgia was reached for "convenience," because "Viisage initiated the settlement in an effort to avoid having to comply with the Georgia court's discovery order which required Viisage to provide full discovery of its own wrongdoing." Compl. ¶¶ 126b and d.

Plaintiffs fail to allege a single fact to support their contention that it was Viisage that sought to terminate the contract to protect itself from having to disclose "wrongdoing." Plaintiffs do not even identify the nefarious facts that Viisage was then attempting to shield from discovery. Surely more is required under Fed. Rule Civ. P. 9(b) before an allegation of fraud is asserted against defendants – especially an allegation that has imbedded within it a claim that the Commissioner of the Georgia DMVS committed a fraud on the Georgia Superior Court when he submitted his affidavit.

> e.    **Viisage's EBITDA was unaffected by the $2 million impairment charge taken as a result of the Summary Judgment Decision.**

Plaintiffs contend that the guidance that Bailey and Aulet provided regarding the EBITDA that Viisage hoped to achieve in 2004 constituted fraud. Specifically, they allege that the $10-$11 million 2004 EBITDA forecast that was provided on June 21 and 22, 2004 in a press release and conference call, increased to $11.25-$12.5 million in the third quarter October 25th press release, "lacked a reasonable basis in that, as these defendants knew, it was predicated on the receipt of the $2.5 million settlement with the DMVS." Compl. ¶ 126h. Leaving aside the fact that these forward looking statements are precisely the kind of statements that fall within the

1995 PSLRA Safe Harbor provisions (§ 102(b)), plaintiffs' allegations express a profound lack of understanding of basic accounting concepts.

The $2.5 million termination payment which GTA/DMVS had agreed to make would never be income to Viisage, but rather was repayment of costs incurred in preparing to perform the Georgia contract. *See, supra* at 11. CEO Bailey expressly explained this during the October 26, 2004 conference call, pointing out that Viisage recorded income only when driver's licenses were delivered. *See, supra* at 17. Rather, the $2 million write down of Viisage's assets was a non-cash impairment charge taken because Viisage concluded after reviewing the Summary Judgment Decision that it had $2 million of assets on its books related to the Georgia contract that it was now concerned might never produce revenue for Viisage.[47]   Bailey also expressly explained this point in the February 7, 2005 analysts' conference call. *See, supra* at 18 n.43. The $2 million impairment charge was a non-cash item, and accordingly had no affect whatever on EBITDA. This was expressly noted in the February 7, 2005 press release: "the non-cash write down of certain assets related to the terminated Georgia contract . . . did not affect EBITDA." Ex. 41, p. 1.

Simply stated, the Georgia Court's Summary Judgment Decision enjoining DMVS from paying $2 million of the $2.5 million settlement had no affect whatsoever on Viisage's 2004 EBITDA and the related allegation of fraud makes no sense whatsoever. Additionally, it may be noted that all of Viisage's disclosures regarding the Georgia litigation advised that if the 2002 contract was terminated and Viisage could not recover its costs from Georgia, it might have to recognize a loss of up to $5 million. *See, supra* at 13.

---

[47]  Under Generally Accepted Accounting Principles, an asset intended to be held and used is impaired when its carrying amount exceeds the sum of the cash flows expected to result from its use and eventual disposition, and should then be written down.  FASB Statement of Financial Accounting Standards No. 144 "Accounting for Impairment or Disposal of Long-Lived Assets," ¶ 7.

### 2.    Viisage's Internal Controls

Plaintiffs' other basis for their Section 10(b) claim is that Viisage's SEC filings during the putative class period falsely represented that its "disclosure controls and procedures were effective, in that they provide reasonable assurance that information required to be disclosed by us in the reports we file or submit under the Securities Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the Securities Exchange Commission's rules and forms." Compl. ¶ 126(g). According to plaintiffs, the falsity of that statement was revealed when Viisage announced on March 2, 2005, that a "'material weakness' existed in Viisage's internal controls." Id. ¶ 98. Plaintiffs rely on a purported admission by defendant Aulet during a conference call with analysts the following day, that "the Company recognized it had internal control deficiencies 'months ago,'" and that for 6-8 months the Company had been working toward full compliance for the year 2004 in its Sarbanes-Oxley 404 review, to supply the factual allegation to support this fraud claim. Id. at 99.

Plaintiffs distort Aulet's statements. He did not say that the Company recognized that it had internal control deficiencies months ago. What he did say was that the Company "recognized [internal controls over financial reporting] as an area for improvement months ago" and that they have "been working diligently to remedy these issues for some time." See Ex. 43, p. 7. To go from "areas for improvement" to "internal control deficiencies" to "'material weakness' in Viisage's internal controls," as defined by the PCAOB, is a series of significant leaps wholly lacking support in the Complaint. Indeed, as Aulet explained in that same analyst conference call, the material weaknesses in controls came to light in the process of the Company's year end audit, which occurred just before the March 2, 2005 announcement:

> [W]e discovered in the process of our Sarbanes-Oxley [404] compliance
> work and our year-end audit, that despite strong internal controls in most
> areas, there were enough adjustments in our close process to make clear that

> the Company was short on technical accounting resources to support
> Viisage's significantly more complex business. . . . More specifically, this
> means that we did not catch all the accounting adjustments with our internal
> staff that we should have .... [and that they] had to be picked up by our
> independent public auditors.

Ex. 43, p. 6. Thus, plaintiffs' contention that Aulet's statement during the March 3, 2005

conference call contains factual support for the claim that he knew that there existed material

weakness in internal controls within the meaning of Sarbanes-Oxley Section 404 eight months

earlier, when Viisage filed its first quarter Form 10-Q, is demonstrably inconsistent with what

Aulet actually said. What Aulet actually stated was that it was not until the 2004 audit that

Viisage identified these "material weaknesses," and learned that it would receive an adverse

opinion from its auditors under Section 404(b) regarding them.[48] Plaintiffs' allegations prove to

be the undoing of their claim. *See Arruda v. Sears Roebuck & Co.,* 310 F.3d 13, 18-19 (1st Cir.

2002)(in considering a motion to dismiss, when the complaint "incorporates by reference a

written instrument, any inconsistencies between the complaint and the instrument must be

resolved in favor of the latter"); and *In re Wade,* 969 Fed. 241, 249 (7th Cir. 1992)(a plaintiff

"may plead himself out of court" by incorporating by reference a document showing he is not

entitled to relief).

Moreover, the Court should not lose sight of the fact that nowhere do plaintiffs allege that

these material internal control weaknesses led to the restatement of any of Viisage's reported

financial results. Rather, they were, as Aulet described, part and parcel of the Company's efforts

to come into compliance with Section 404 of the Sarbanes-Oxley Act which mandated new

requirements for management assessment of internal control structures and procedures for

---

[48] This is also consistent with Viisage's corporate controller's statement in October 2004 that the Sarbanes-Oxley
compliance project would continue through the fourth quarter "as we go through final testing stages." *See supra*
p. 19.

financial reporting beginning with fiscal years ending after November 15, 2004, for companies of Viisage's market capitalization. *See*, SEC Release No. 34-49313, 69 Fed. Reg. 9722 (March 1, 2004); 17 C.F.R. § 240 12b-2. As Aulet mentioned, this was a huge undertaking, not only for Viisage which, like other public companies of similar size, spent hundreds of thousands of dollars and months of effort to come into compliance . *See* Ex. 43, p. 7 and 44. Also like over 500 hundred other public companies, Viisage was unable to report timely compliance. *Id.*

Defendants are not aware of a single case involving a Section 10(b) claim based on a company's inability to meet Section 404 control standards by the first annual report in which they applied. The case law discussing financial reporting errors generally supports dismissal of plaintiffs' claim. Under Section 10(b), there can be no liability without scienter, "a mental state embracing intent to deceive, manipulate, or defraud." *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976), *reh'g denied*, 425 U.S. 986 (1976). A Section 10(b) claim fails unless a plaintiff alleges" with particularity facts giving rise to a strong inference" that the defendants acted with scienter. *See* 15 U.S.C. § 78u-4(b)(2). The inference must be both reasonable and strong. *See In re Cabletron Sys., Inc.*, 311 F.3d 11, 28 (1st Cir. 2002). *Afortiori*, if alleging fraud simply based on the restatement of a company's financial results constitutes "fraud-by-hindsight" fails to provide the requisite strong inference of scienter, *see In re Focus Enhancements, Inc. Sec. Litig.*, 309 F. Supp. 2d 134, 160 (D. Mass. 2001), plaintiffs cannot allege fraud based on the fact that the Company announced that it had material weaknesses in its internal controls in its initial attempt to meet Sarbanes-Oxley Section 404 standards for financial reporting.[49] The Complaint lacks any factual allegations which could give rise to an inference

---

[49] *See also In re Hypercom Corp. Sec. Litig.*, No. CV-05-0455-PHX-NVW, 2006 U.S. Dist. LEXIS 2669, at *13 (D. Ariz. January 4, 2006)(restatement of income did not support a strong inference of scienter); *Higginbotham v. Baxter Int'l, Inc.*, No. 04 C 4909, 2005 U.S. Dist. LEXIS 12006, at *16 (N.D. Ill. May 25, 2005)(dismissing Section 10(b) claim because restatement was small and complaint lacked specific allegations of defendants' awareness of

(let alone a strong inference) that defendants knew of these material weaknesses any earlier than the Company announced them.

Indeed, in this regard the Complaint may be viewed as an attempt to state a private cause of action for failing to meet Section 404 standards even in the absence of any material misstatement in a company's financial reports. Clearly, this was not the intent of Congress in enacting Section 404. *Compare, Neer v. Pellino,* 389 F.Supp.2d 648, 652-657 (E.D. Penn. 2005)(finding no private right of action under Section 304 of Sarbanes-Oxley Act). For this additional reason, plaintiffs' Section 10(b) claim must be dismissed.

### 3. Plaintiffs' General Allegations of Scienter are Inadequate.

Plaintiffs attempt generally to allege defendants' scienter by alleging defendants' motive and opportunity to commit fraud. In this Circuit, allegations of motive ("concrete benefits that could be realized by . . . the false statements and wrongful nondisclosures") and opportunity ("the means and likely prospect of achieving concrete benefits by the means alleged"), combined with other allegations, can supply the necessary allegations of scienter required to state a claim. *See Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 82 (1ˢᵗ Cir. 2002).

Here, plaintiffs attempt to allege motive and opportunity by alleging that defendants Viisage, Bailey, Aulet and Beck all sold Viisage shares during the putative class period *See* Compl. ¶¶ 141, 144. Plaintiffs allege that Viisage sold 7.5 million shares in its August, 2004 Secondary Offering, a portion of which went to repay outstanding debts to defendant Beck and to Lau Corporation, allegedly controlled by defendant Berube, and that defendants Berube and

---

control deficiencies); *In re Interpublic Sec. Litig.*, No. 02 CIV. 6527 (DLC), 2003 U.S. Dist. LEXIS 8844, at *37 (S.D.N.Y. May 30, 2003)(dismissing Section 10(b) claim based on alleged false statements regarding internal controls due to lack of sufficient allegations of defendants' knowledge).

Beck received upwards of $700,000 from stock sales in that same offering. *Id.* Further undercutting any inference plaintiffs hope to draw, plaintiffs allege that Lau and Beck retained significant holdings in Viisage (13.8% and 13.4%, respectively) after the secondary offering. Compl. ¶ 135.

Plaintiffs' allegations, however, are incomplete. Allegations of stock sales, without more, do not give rise to or even contribute meaningfully to the required strong inference. *See Greebel v. FTP Software, Inc.*, 194 F.3d 185, 197-198 (1st Cir. 1999)(trading by insiders must be "unusual" or "at suspicious times or in suspicious amounts."). Entirely missing from the Complaint are any allegations concerning past sales by these defendants, the amounts of Viisage stock they retained at the end of the putative class period, or any other facts which would make it clear that the stock sales plaintiffs do allege are unusual in amount or timing. Plaintiffs bear the burden of showing, by their allegations, that the sales by insiders were in fact unusual or suspicious in timing. To do so, plaintiffs' Complaint must "set forth the amount of trading [defendants] conducted before or after the class period or . . . any other fact which might support a finding of unusualness." *Lirette v. Shiva Corp.*, 27 F. Supp. 2d 268, 283 (D. Mass. 1998)(rejecting plaintiff's attempt to plead scienter by alleging insider stock sales). Because plaintiffs have not done this, their allegations of insider sales cannot support or even contribute to the strong inference of scienter necessary to plead a Section 10(b) claim. *See, e.g. Rothman v. Gregor*, 220 F.3d 81, 94-95 (2d Cir. 2000); *Acito v. Imcera Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995); *In re Apple Computer Sec. Litig.*, 886 F.2d at 1117-1118. For this additional reason, plaintiffs Section 10(b) claim should be dismissed.[50]

---

[50] Plaintiffs also seemingly allege that defendants acted with scienter because they had a motive to inflate Viisage's stock price to make it easier for Viisage to acquire other companies. *See* Compl. ¶ 3. This contention has been found insufficient as a matter of law. *See Kalmit v. Eichler*, 264 F.2d 131, 140 (2d Cir. 2001) ("Achieving a superior agreement with [another company] does not demonstrate defendants' intent to benefit themselves at the

**B.    Plaintiffs' Section 20(a) Control Person Claim Should Be Dismissed.**

Plaintiff assert a claim for "control person" liability under Section 20(a) of the Exchange

Act against defendants Bailey, Aulet, Berube, Beck, and Yon.  Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under
> any provision of this chapter or of any rule or regulation thereunder shall
> also be liable jointly and severally with and to the same extent as such
> controlled person . . . unless the controlling person acted in good faith and
> did not directly or indirectly induce the act or acts constituting the violation
> or cause of action.

15 U.S.C. § 78t(a) (2000).  At a minimum, therefore, plaintiffs must allege (1) an underlying

primary violation by a controlled person or entity; and (2) the defendant's control of the violator.

*See Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 84-85 (1st Cir. 2002).[51]

Plaintiffs' Section 20(a) claim should be dismissed against all of the individual

defendants named above because, as shown above, plaintiffs have not alleged a primary violation

under Section 10(b).  *See Suna v. Bailey Corp.*, 107 F.3d 64 (1st Cir. 1997).

Moreover, plaintiffs' Section 20(a) claim fails against defendants Berube, Beck, and Yon

for the additional reason that plaintiff has not alleged sufficient facts showing that they

controlled Viisage.  Paragraph 120 of the Complaint sets forth plaintiffs' allegations of control.

For defendant Berube, plaintiffs allege that he controlled Viisage by virtue of his positions as

Chairman of the Viisage's board and as Executive Vice President and Chief Operating Officer of

Lau Corporation, Viisage's largest single shareholder (with 17% of the outstanding issued

common stock) and to which Viisage was indebted for $7.3 million.  Compl. ¶ 120(b).  Plaintiffs

---

expense of the shareholders because the shareholders would benefit from a superior transaction.")   More
importantly, in this case it is absurd to think that a company willing to be acquired by Viisage in return for Viisage
stock would not diligently review the pleadings of cases disclosed in Viisage's SEC filings.

[51] The First Circuit has recognized a split among the other circuits as to whether to allege control person liability a
plaintiff must allege that the defendants are in a meaningful sense culpable participants in the fraud in question. *See
Aldridge*, 284 F.3d at 85.  It has, however, declined to reach that question, and defendants do not ask this Court to
dismiss plaintiffs' Section 20(a) claim on that basis, there being two other bases available for dismissal.

rely on the allegations that defendant Beck was Vice Chairman of Viisage's board, a consultant to the Company, owner of 16.4 % of Vissage's shares *before the putative class period*, and that Viisage was indebted to him for $15.3 million. *Id.* at ¶ 120(c). Finally, plaintiffs claim that defendant Yon controlled Viisage due to his positions as a member of Viisage's board and as CEO of Odeon Venture Capital AG, which, *prior to the putative class period*, owned over a million Viisage shares. *Id* at ¶ 120(e). Elsewhere plaintiffs cite to the Company's statement in SEC filings that "both Lau and Mr. Beck have a strong influence on matters requiring approval by our stockholders, including the election of directors and most corporate actions." *Id.* at ¶ 135.

None of these allegations come close to alleging control. "To meet the control element, the alleged controlling person must not only have the general power to control the company, but also must actually exercise control over the company." *Aldridge*, 284 F.3d at 85. Control means "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person." 17 C.F.R. § 240.12b-2. The control must be over the day-to-day operations of the company. *See In re Tyco Int'l Multidistrict Litig.*, No. 02-266-B, 2004 U.S. Dist. LEXIS 20733, at *52 (D.N.H. October 14, 2004). Neither director status, nor membership on the firm's audit committee, without more, establish control. *In re Lernout & Hauspie Sec. Litig.*, 286 B.R. 33, 39 (D. Mass. 2002). Even allegations of majority or controlling shareholder status (not alleged here), do not suffice. *See Aldridge*, 284 F.3d at 85. "Unless there are facts that indicate that the controlling shareholders were actively participating in the decision making processes of the corporation, no controlling person liability can be imposed" *Id. See also, In re Tyco Int'l*, 2004 U.S. Dist. LEXIS 20733, at *52 (allegation that individual was a major shareholder was not sufficient to allege control).

37

These cases make clear that plaintiffs' control allegations fall short of the mark. Nowhere in the Complaint do plaintiffs allege that defendants Berube, Beck, or Yon used their positions -- either inside or outside of the Company – to direct the Company's decisions generally, and definitely not specifically as it relates to the fraud alleged. For this additional reason, plaintiffs' Section 20(a) claim must be dismissed as against these individual defendants.

**C.    Plaintiffs' Section 11 Claim Must Be Dismissed Under Rules 12(b)(6) and 9(b).**

Plaintiffs also bring a claim under Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, which provides a private cause of action based on untrue statements of material fact or material omissions in registration statements against, among others, those who signed the registration statement.    Plaintiffs claim that Viisage's Prospectus and Amended Registration Statement (the "Prospectus") filed with the SEC in connection with the Company's August, 2004 secondary offering were inaccurate and misleading with respect to the Georgia litigation and the internal control situation – the exact same bases as for plaintiffs' Section 10(b) claim.  *See* Compl. ¶109.

As to the Georgia litigation, Plaintiffs assert a subset of the Georgia litigation claims alleged in support of its Rule 10b-5 violation.  Plaintiffs assert that the Prospectus:  (i) falsely represented that the Georgia litigation solely involved claims that DMVS failed to follow its own bid process, and failed to state that Viisage had been added as a defendant and its own misconduct was a significant part of the litigation; (ii) falsely stated that the settlement with DMVS had been reached for convenience when it was initiated by Viisage to avoid having to comply with Digimarc's discovery demands; and (iii) failed to disclose risk that the settlement violated the Georgia Court's July 2003 Order and that it would not receive the $2.5 million payment.

As noted above, Item 103 of Regulation S-K defines the information a registrant must disclose concerning pending litigation in a prospectus as well as Form 10-K. Simply stated, none of the aforementioned information was required to be disclosed. *See, supra* at ____. The Georgia litigation was fairly described. The grounds on which Digimarc sought to void the 2002 contract awarded Viisage was expressly that GTA/DMVS had not followed its own rules and procedures. Presumably, Georgia could have attempted to void its contract with Viisage by asserting that Viisage misled it in the RFP process; however, Georgia consistently denied that it was ever misled by Viisage and fought to implement the contract until July 2004. As described above, the allegation that Viisage initiated the settlement with Georgia to prevent discovery concerning its wrongdoing is devoid of any supporting factual allegations -- and quite frankly outrageous. Finally, the suggestion that either Viisage or GTA/DMVS could have foreseen the Court's response to Georgia's decision to terminate the contract for convenience, settle the termination payment due Viisage and rebid, is simply disingenuous. In any event, the Prospectus fairly disclosed that by August 5, 2004, Digimarc had filed its first motion to enjoin the payment.

As for that part of plaintiffs' claim resting on plaintiffs' allegations concerning the internal control weaknesses, it, too, should must be dismissed for the reasons described above. The Sarbanes-Oxley Section 302 certifications contained in the Forms 10-Q state, in relevant part, that the CEO and CFO have evaluated the internal controls and they have concluded that, in their opinion, the internal controls were effective in that they provided "reasonable assurance" that information required to be disclosed in SEC filings was properly recorded. *See* Ex. 36, p. 31. There are no allegations that either Bailey or Aulet did not believe that conclusion when they signed the certification. The prospectus contains no prediction that Viisage would be able to meet its Section 404 standards, and the investing public was well aware that Viisage, like

39

every other public company, would be hard at work on its 404 compliance project through year end. *See, supra* at 31-32.

Even if the Court were to disagree and find adequate allegations of false statements concerning internal controls incorporated in the Prospectus by reference to the Forms 10-Q, plaintiffs' Section 11 claim still should be dismissed. Ordinarily, fraud is not part of a Section 11 claim and for that reason Rule 9(b) does not apply. *In re Websecure, Inc. Sec. Litig.*, 182 F.R.D. 364, 367 (D. Mass. 1998). The First Circuit, and the great majority of other circuits who have addressed the issue, however, have held that the pleading requirements of Fed. R. Civ. P. 9(b) will apply to a § 11 claim when "fraud might be said to lie at the core of the action." *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1223 (1st Cir. 1996).[52] These courts, and courts within this district, state that a Complaint should be examined to see whether it "sounds in fraud." If it does, then the plaintiff must allege that fraud, including claims under Section 11 must be alleged, with particularity. *See, e.g., In re Computervision Corp. Sec. Litig.*, 869 F. Supp. 56, 63 (D. Mass. 1994). As one court explained:

> A mere allegation, or "averment," of [fraud] could still serve to injure a defendant's reputation, regardless of whether such allegation is necessary to establish liability under a cause of action. As such, Rule 9(b)'s requirement that a claimant be able to factually support his claim should be imposed not only if fraud is an element of the cause of action in question, but also if the claim sounds in fraud and could thus operate to injure the defendant's reputation.

*Taam Assocs., Inc. v. Housecall Medical Res., Inc.*, No. 1:96CV2214 A JEC, 1998 U.S. Dist. LEXIS 22372 at *40 (N.D. Ga. March 31, 1998). *See In re White Elec. Designs Corp. Sec. Litig.*, No. CV04-1499PHX-SRB, 2006 U.S. Dist. LEXIS 6961, at *26 (D.Ariz. Feb. 14, 2006);

---

[52] *See Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004); *Lone Star Ladies Inv. Club v. Schlotzsky's, Inc.*, 238 F.3d 363, 368 (5th Cir. 2001); *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1404-05 (9th Cir. 1996); *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 287-88 (3d Cir. 1992). *But see In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 314 (8th Cir. 1997).

*In re Stratosphere Corp. Sec. Litig.*, No. CV-S-96-708-PMP, 1997 U.S. Dist. LEXIS 14621 at
\*20 (D. Nev. May 20, 1997) (recognizing that although § 11 permits recovery for negligent, non-
fraudulent conduct, plaintiff did not allege negligent, non-fraudulent conduct, and therefore
subjecting plaintiff's § 11 claim to the rigors of Rule 9(b)).

Here, the Complaint's allegations concerning internal controls sound in fraud. They
describe an alleged scheme by Viisage actively and purposefully to conceal and misrepresent the
true facts with respect to its internal controls. *See* Compl. ¶¶ 10, 99. The Section 302
certification requires the CEO and CFO to certify that *they* have evaluated internal controls and
*they* have concluded that they are adequate to provide reasonable assurance of proper financial
reporting. Plaintiffs claim that Bailey and Aulet were lying when they signed the certification.

In the Complaint's 62 pages and 154 paragraphs, there are only two short sentences that
speak, in conclusory fashion, of defendants' lack of "reasonable investigation" or "reasonable
ground for belief." *See* Compl. ¶ 113. In conclusory fashion, plaintiffs allege "[t]he Individual
Defendants in the exercise of reasonable care should have known of the material misstatements
and omissions contained in the Amended Registration Statement and Prospectus. *Id.* The
certification, however, expressly states that they made the necessary investigation and reached
the required conclusion. A plaintiff may not ignore the clear import of its own allegations and
withstand dismissal of its Section 11 claim simply by adding a few words to a 62-page
Complaint. This Court need not "sift through allegations of fraud in search of some lesser
included claim of strict liability." *Lone Star Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 368 (5th
Cir. 2001). If the Court were to follow the directive of *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d
1006, 1028 (9th Cir. 2005), *cert. denied*, 126 S.Ct. 1335 (2006), and "strip away" the allegations

of fraud, then it would find absolutely nothing left. Plaintiff's Complaint alleges a unified course of fraudulent conduct. Indeed, it is impossible to read the Complaint any other way.

In a transparent effort to sidestep the application of Rule 9(b) to its § 11 claim, plaintiff alleges "[t]his claim is not based on and does not sound in fraud and expressly excludes any element of any paragraph that alleges that defendants' misconduct was done intentionally, knowingly or with reckless disregard for the truth and any element of a paragraph that otherwise sounds in fraud." Compl. ¶ 107. This stratagem repeatedly has been held to be ineffective. "Plaintiffs cannot avoid the more stringent requirements of Rule 9(b) by merely inserting boilerplate language into their Complaint stating that the claims are based on negligence, not fraud, or try to plead both fraud and negligence by stating Defendants 'knew or should have known' of the alleged falsity." *In re Stratosphere Corp. Sec. Litig.*, 1997 U.S. Dist. LEXIS 14621, at *20-21 (D. Nev. May 20, 1997). *Accord, In re Stac Elec. Sec. Litig.*, 89 F.3d 1399, 1405 n.2 (9th Cir. 1996); *In re Tyco Ltd. Sec. Litig.*, No. 03-CV-1352-PB, 2005 U.S. Dist. LEXIS 19154, at *60 (D.N.H. September 2, 2005); *Brody v. Homestore, Inc.*, 2003 U.S. Dist. LEXIS 17267 at *13 (C.D. Cal. August 8, 2003) (holding that such disclaimers should not be taken "at face value"). *See also In re Metricom Sec. Litig.*, No. C 01-4085 PJH, 2004 WL 966291, at *24 (N.D. Cal. 2004) (plaintiff cannot "scissor out a non-fraud claim from the center of that unified course of conduct in order to evade the Rule 9(b) requirement"); *In re American Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 440 (S.D.N.Y. 2000) (rejecting "boilerplate disclaimer of fraud"); *In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 691 (S.D.N.Y. 2000) (same). Form should not be exalted over substance. The gravamen of the Complaint is fraud. The plaintiff's extensive allegations of fraud cannot be put aside by *ipsi dixit*.

Disregarding plaintiff's disclaimer and applying Rule 9(b), plaintiff's § 11 internal control claim fails. As described above, the Complaint lacks particularized allegations of defendants' knowledge of any material weaknesses in internal controls. Therefore, plaintiff's § 11 claim should be dismissed. *In re Stratosphere Corp. Sec. Litig.*, 1997 U.S. Dist. LEXIS 14621, at *20-21 (dismissing § 11 claim under Rule 9(b) because, among other reasons, complaint did not include particularized allegations of knowledge of falsity).

> **D.     Plaintiff's Section 15 Control Person Claim Should Be Dismissed.**

Section 15 of the Securities Act of 1933, 15 U.S.C. § 77o, is the control person analog to Section 20(a) of the Exchange Act . The analysis is identical. For the reasons given at pages 36-37, *supra,* this claim should be dismissed. Plaintiffs have not alleged a Section 11 violation, nor have they sufficiently alleged that defendants Berube, Beck, or Yon controlled Viisage.

**III.     CONCLUSION**

For the foregoing reasons, the Court should dismiss plaintiffs' Complaint in its entirety as against all defendants and with prejudice.

> VIISAGE TECHNOLOGY, INC.
>
> By its attorneys,
>
>
> /s/ Aloknanda S. Bose
> Mitchell H. Kaplan (BBO #258940)
> John R. Baraniak, Jr. (BBO#552259)
> Aloknanda S. Bose (BBO#658108)
> CHOATE, HALL & STEWART LLP
> Two International Place
> Boston, MA  02110
> Tel.: (617) 248-5000

Dated:  April 3, 2006

4054822_1.DOC