UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re VIISAGE TECHNOLOGY, INC. SECURITIES LITIGATION ) ) ) ) ) ) ) | CIVIL ACTION NO. 05-cv-10438-MLW |
| This Pleading Applies to:  All Actions | |

TRANSMITTAL AFFIDAVIT OF ALOKNANDA S. BOSE
IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

I, Aloknanda S. Bose, depose and state the following:

I am an associate with the law firm Choate, Hall & Stewart LLP, Two International Place, Boston, Massachusetts.  I am a member in good standing of the Bar of the Commonwealth of Massachusetts.   I am counsel for Defendants Viisage Technology, Inc. ("Viisage"); Bernard C. Bailey, William Aulet, Denis K. Berube, Marcel Yon, Buddy G. Beck, Charles A. Levine, Thomas J. Reilly, Harriet Mouchly-Weiss, Paul T. Principato and Peter Nessen.

I submit this affidavit on behalf of all the Defendants and in support of Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint in the above-captioned matter.

I have attached true and accurate copies of the following documents hereto:

1.  Attached hereto as Exhibit 1, Docket Sheet, *Digimarc ID Systems v. Georgia Technology Department and Georgia Department of Motor Vehicle Safety*, Fulton County Superior Court, Case No. 2003CV66498;

2.  Attached hereto as Exhibit 2, Response to Motion for Interlocutory Injunction by the Georgia Technology Authority ("GTA") and the Georgia Department of

Motor Vehicle Safety (the "DMVS"), including the Contract between Viisage and GTA/DMVS (Exhibit 17 to the Response);

3.      Attached hereto as Exhibit 3, Viisage Form 10-K for the year ended December 31, 2004;

4.      Attached hereto as Exhibit 4, Viisage Prospectus filed August 5, 2004;

5.      Attached hereto as Exhibit 5, Order on Cross-Motions for Summary Judgment, dated December 22, 2004;

6.      Attached hereto as Exhibit 6, *Digimarc v. GTA/DMVS* Complaint;

7.      Attached hereto as Exhibit 7, Decision of the Protest Decisionmaker, dated February 17, 2003;

8.      Attached hereto as Exhibit 8, Order on Plaintiff's Motion for Interlocutory Injunction, dated July 31, 2003;

9.      Attached hereto as Exhibit 9, Brief in Support of Defendants' Motion to Dismiss or in the Alternative Add an Indispensable Party;

10.     Attached hereto as Exhibit 10, Consent Order on Defendants' Motion to Dismiss or in the Alternative Add an Indispensable Party;

11.     Attached hereto as Exhibit 11, Response of Viisage to Consent Order;

12.     Attached hereto as Exhibit 12, First Amended Complaint for Interlocutory and Permanent Injunctive Relief;

13.     Attached hereto as Exhibit 13, GTA/DMVS and Viisage's Motion to Expedite Trial and for a Special Trial Setting or Transfer of the Case;

14.     Attached hereto as Exhibit 14, Scheduling Order, dated June 9, 2004;

15.     Attached hereto as Exhibit 15, Plaintiff Digimarc's Motion to Compel Compliance with Discovery Order, Revise Scheduling Order and for Sanctions Against Viisage;

16.     Attached hereto as Exhibit 16, State Defendants' Motion to Dismiss;

17.     Attached hereto as Exhibit 17, Viisage Motion to Dismiss;

18.     Attached hereto as Exhibit 18, Second Affidavit of James R. Davis;

19.     Attached hereto as Exhibit 19, Order on Plaintiffs' Motion For Temporary Restraining Order, dated August 18, 2004;

20.     Attached hereto as Exhibit 20, Order, dated September 2, 2004;

21.   Attached hereto as <u>Exhibit 21</u>, Notices of Appeal by Viisage and GTA/DMVS;

22.   Attached hereto as <u>Exhibit 22</u>, Plaintiff's Motion for Partial Summary Judgment;

23.   Attached hereto as <u>Exhibit 23</u>, Brief in Support Motion for Summary Judgment of Defendants GTA/DMVS, including the Release and Settlement Agreement between Viisage and GTA/DMVS (Exhibit B to Brief);

24.   Attached hereto as <u>Exhibit 24</u>, Viisage's Answers to First Amended Complaint;

25.   Attached hereto as <u>Exhibit 25</u>, DMVS Answer to Complaint;

26.   Attached hereto as <u>Exhibit 26</u>, Notice of Appeal, dated January 3, 2005;

27.   Attached hereto as <u>Exhibit 27</u>, Viisage Press Release, dated August 1, 2003;

28.   Attached hereto as <u>Exhibit 28</u>, Digimarc Press Release, dated August 1, 2003;

29.   Attached hereto as <u>Exhibit 29</u>, Form 10-Q for period ended June 29, 2003;

30.   Attached hereto as <u>Exhibit 30</u>, Form 10-K for the period ended December 31, 2003;

31.   Attached hereto as <u>Exhibit 31</u>, Viisage Press Release, dated July 21, 2004;

32.   Attached hereto as <u>Exhibit 32</u>, Viisage Form S-3 filed July 22, 2004;

33.   Attached hereto as <u>Exhibit 33</u>, Digimarc Press Release, dated September 14, 2004;

34.   Attached hereto as <u>Exhibit 34</u>, Viisage Press Release, dated October 25, 2004;

35.   Attached hereto as <u>Exhibit 35</u>, Transcripts of October 26, 2004 Analysts' Conference Call;

36.   Attached hereto as <u>Exhibit 36</u>, Form 10-Q for the period ended September 26, 2004;

37.   Attached hereto as <u>Exhibit 37</u>, Assorted Wire Reports, dated December 27, 2004;

38.   Attached hereto as <u>Exhibit 38</u>, Digimarc Press Release, dated December 27, 2004;

39.   Attached hereto as <u>Exhibit 39</u>, Viisage Press Release, dated December 27, 2004;

40.   Attached hereto as <u>Exhibit 40</u>, Atlanta Journal Constitution Article, dated December 28, 2004;

41.   Attached hereto as <u>Exhibit 41</u>, Viisage Press Release, dated February 7, 2005;

42.    Attached hereto as <u>Exhibit 42</u>, Transcript of February 7, 2005 Analysts' Conference Call;

43.    Attached hereto as <u>Exhibit 43</u>, Transcript of March 3, 2005 Analysts' Conference Call; and

44.    Attached hereto as <u>Exhibit 44</u>, Wall Street Journal article entitled: "Accounting Rule Exposes Problems But Draws Complaints About Costs," dated March 2, 2005.

Subscribed and sworn to under the pains and penalties of perjury this 3rd day of April, 2006.

/s/ Aloknanda S. Bose
Aloknanda S. Bose, Esq.

4066042v1

# Exhibit 1
# (Part 1 of 2)

## Civil Docket

Fulton County Superior Court
Juanita Hicks, Clerk

Case No. 2003CV66498
Fulton County

March 3rd, 2006
4:08pm

DIGIMARC ID SYSTEMS vs. GERORGIA
TECHNOLOGY AUTHORITY AND GEORGIA
DEPARTMENT OF MOTOR VEICHLE SAFETY

Filed : 03/05/2003
Status: Disposed
Type: OTHER CIVIL

Judge
THELMA WYATT CUMMINGS MO

Court Reporter

| Date | | Volume | Page |
|---|---|---|---|

### Defendant Information

| DEFENDANT NAME | ATTORNEY NAME |
|---|---|
| GEORGIA TECHNOLOGY AUTHORITY | Hitchcock, Emily P. |
| | Fears, Oscar Baldwi |
| | Gallagher, John P. |
| GEORGIA DEPARTMENT OF MOTOR VEHICLE | Hitchcock, Emily P. |
| | Fears, Oscar Baldwi |
| | Gallagher, John P. |

### Plaintiff Information

| PLAINTIFF NAME | ATTORNEY NAME |
|---|---|
| DIGIMARC ID SYSTEMS | Balser, David |
| | Hutchins, John P. |

### Disposition Information

06/06/05 | Global Disposition: FINAL ORDER

### Events & Orders of the Court

04/04/06 | CIVIL MOTION HEARING

Page 1

## Civil Docket

Fulton County Superior Court
Juanita Hicks, Clerk

Case No. 2003CV66498
Fulton County

March 3rd, 2006
4:08pm

| Date | Events & Orders of the Court (cont.) | Volume | Page |
|---|---|---|---|
| | Re-set of Hearing on Atty's Fees and Expenses | | |
| 02/16/06 | CIVIL MOTION HEARING | | |
| | Continuation of Hearing on Motion for Atty's Fees | | |
| 01/24/06 | TRANSCRIPT (E396) | | |
| | WW-PROCEEDINGS AND EVIDENCE BEFORE THE HON. THELMA MOORE ON 12/22/05, 1 COPY | | |
| 12/22/05 | CIVIL MOTION HEARING | | |
| | Plaintiff's Motion for Attorneys' Fees and Costs | | |
| 12/09/05 | NOTICE (E395) | | |
| | RAB-NOTICE OF SUBSTITUTION OF COUNSEL: WILLIAM M. RAGLAND, JR. FOR DEFENDANT, VISSAGE | | |
| 11/17/05 | CERTIFICATE OF SERVICE (E393) | | |
| | RAB-DEFENDANT COGNISA SECURITY, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS | | |
| 11/17/05 | NOTICE (E394) | | |
| | RAB-NOTICE OF HEARING: 12/22/05 AT 9:30 a.m. | | |
| 10/06/05 | CIVIL MOTION HEARING | | |
| | Motion for Attorney's Fees and Litigation Costs | | |
| 07/25/05 | AFFIDAVIT (E392) | | |
| | RAB-SUPPLEMENTAL AFFIDAVIT OF JOHN P. HUTCCHINS IN SUPPORT OF PLAINTIFF'S MOTION FOR REASONABLE ATTORNEYS' FEES AND EXPENSES OF LITIGATION FROM DEFENDANT VIISAGE TECHNOLOGY, INC. UNDER OCGA 9-15-14 | | |
| 06/06/05 | ORDER (E391) | | |
| | WAB: SUPREME COURT ORDER ADJUDGED AND DISMISSED | | |
| 05/06/05 | OTHER (E390) | | |
| | SU-WITHDRAWAL OF JOHN P. GALLAGHER AND NOTICE OF CONTINUATION OF CO-COUNSEL | | |
| 04/21/05 | RESPONSE (E389) | | |
| | SU-SUR REPLY TO PLAINTIFF DIGIMARC ID SYSTEMS, LLC'S MOTION FOR REASONABLE ATTORNEYS' FEES AND EXPENSES OF LITIGATION IN THE REASONABLE ATTORNEY'S FEES AND EXPENSES OF LITIGATION IN THE AMOUNT OF $106,034.65 FROM DEFENDANT VIISAGE TECHNOLOGY, INC. | | |
| 03/24/05 | BRIEF (E388) | | |
| | RAB-REPLY BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR REASONABLE ATTORNEYS' FEES AND EXPENSES OF LITIGATION | | |
| 03/09/05 | RESPONSE (E387) | | |
| | RAB-RESPONSE TO PLAINTIFF DIGIMARC ID SYSTEMS, LLC'S MOTION FOR REASONABLE ATTORNEYS' FEES AND EXPENSES OF LITIGATION IN THE AMOUNT OF $106,034.65 FROM DEFENDANT VIISAGE TECHNOLOGY, INC. UNDER O.C.G.A. 9-15-14 | | |
| 02/28/05 | NOTICE OF DOCKETING (E386) | | |
| | RAB-SUPREME COURT OF GEORGIA CASE NUMBER S05A0936 | | |
| 02/22/05 | RECORD TRANSMITTED TO SUPREME COURT (E385) | | |

# Civil Docket

Fulton County Superior Court
Juanita Hicks, Clerk

Case No. 2003CV66498
Fulton County

March 3rd, 2006
4:08pm

| Date | | Volume | Page |
|------|--|--------|------|

## Events & Orders of the Court (cont.)

| Date | | | |
|------|--|--|--|
| 02/21/05 | APPELLATE INDEX (E357) | | |
| | RAB-VOLUME XXI OF XXVI, PAGES 10,000-10,500 | | |
| 02/21/05 | APPELLATE INDEX (E358) | | |
| | RAB-VOLUME XXII OF XXVI, PAGES 10,501-11,000 | | |
| 02/21/05 | APPELLATE INDEX (E359) | | |
| | RAB-VOLUME XXIII OF XXVI, PAGES 11,001-11,500 | | |
| 02/21/05 | APPELLATE INDEX (E360) | | |
| | RAB-VOLUME XXIV OF XXVI, PAGES 11,501-12,000 | | |
| 02/21/05 | APPELLATE INDEX (E361) | | |
| | RAB-VOLUME XXV OF XXVI, PAGES 12,001-12,500 | | |
| 02/21/05 | APPELLATE INDEX (E362) | | |
| | RAB-VOLUME XXVI OF XXVI, PAGES 12,501-12,717 | | |
| 02/21/05 | APPELLATE INDEX (E363) | | |
| | RAB-VOLUME XXVI OF XXVI, PAGES 7,501-8,000 | | |
| 02/21/05 | APPELLATE INDEX (E364) | | |
| | RAB-VOLUME XVII OF XXVI, PAGES 8,001-8,500 | | |
| 02/21/05 | APPELLATE INDEX (E365) | | |
| | RAB-VOLUME XXIV OF XVIII, PAGES 8,501-9,000 | | |
| 02/21/05 | APPELLATE INDEX (E366) | | |
| | RAB-VOLUME XIX OF XXVI, PAGES 9,001-9,500 | | |
| 02/21/05 | APPELLATE INDEX (E367) | | |
| | RAB-VOLUME XX OF XXVI, PAGES 9,501-10,000 | | |
| 02/21/05 | APPELLATE INDEX (E368) | | |
| | RAB-VOLUME XI OF XXVI, PAGES 5,001-5,500 | | |
| 02/21/05 | APPELLATE INDEX (E369) | | |
| | RAB-VOLUME XXII OF XXVI, PAGES 5,501-6,000 | | |
| 02/21/05 | APPELLATE INDEX (E370) | | |
| | RAB-VOLUME XIII OF XXVI, PAGES 6,001-6,500 | | |
| 02/21/05 | APPELLATE INDEX (E371) | | |
| | RAB-VOLUME XIV OF XXVI, PAGES 6,501-7,000 | | |
| 02/21/05 | APPELLATE INDEX (E372) | | |
| | RAB-VOLUME XIV OF XXVI, PAGES 7,001-7,500 | | |
| 02/21/05 | APPELLATE INDEX (E373) | | |
| | RAB-VOLUME XV OF XXVI, PAGES 7,001-7,500 | | |
| 02/21/05 | APPELLATE INDEX (E374) | | |
| | RAB-VOLUME XV OF XXVI, PAGES 7,001-7,500 | | |
| 02/21/05 | APPELLATE INDEX (E375) | | |
| | RAB-VOLUME I OF XXVI, PAGES 1-500 | | |
| 02/21/05 | APPELLATE INDEX (E376) | | |
| | RAB-VOLUME II OF XXVI, PAGES 501-1000 | | |
| 02/21/05 | APPELLATE INDEX (E377) | | |
| | RAB-VOLUME III OF XXVI, PAGES 1001-1500 | | |
| 02/21/05 | APPELLATE INDEX (E378) | | |
| | RAB-VOLUME IV OF XXVI, PAGES 1501-2000 | | |
| 02/21/05 | APPELLATE INDEX (E379) | | |

# Civil Docket

Fulton County Superior Court
Juanita Hicks, Clerk

Case No. 2003CV66498
Fulton County

March 3rd, 2006
4:08pm

| Date | | Volume | Page |
|------|---|--------|------|

## Events & Orders of the Court (cont.)

|  |  |  |  |
|------|---|---|---|
| | RAB-VOLUME V OF XXVI, PAGES 2001-2500 | | |
| 02/21/05 | APPELLATE INDEX (E380) | | |
| | RAB-VOLUME VI OF XXVI, PAGES 2501-3000 | | |
| 02/21/05 | APPELLATE INDEX (E381) | | |
| | RAB-VOLUME VII OF XXVI, PAGES 3001-3500 | | |
| 02/21/05 | APPELLATE INDEX (E382) | | |
| | RAB-VOLUME VIII OF XXVI, PAGES 3501-4000 | | |
| 02/21/05 | APPELLATE INDEX (E383) | | |
| | RAB-VOLUME IX OF XXVI, PAGES 4001-4500 | | |
| 02/21/05 | APPELLATE INDEX (E384) | | |
| | RAB-VOLUME X OF XXVI, PAGES 4501-5000 | | |
| 02/15/05 | NOTICE (E356) | | |
| | TLB-NOTICE OF WITHDRAWAL OF APPEAL | | |
| 02/07/05 | BRIEF (E353) | | |
| | SH- BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR REASONABLE ATTORNEYS' FEES AND EXPENSES OF LITIGATION IN THE AMOUNT OF $106,034.65 FROM DEFENDANT VIISAGE TECHNOLOGY, INC. | | |
| 02/07/05 | AFFIDAVIT (E354) | | |
| | SH- AFFIDAVIT OF JOHN P. HUTCHINS IN SUPPORT OF PLAINTIFF'S MOTION FOR MOTION FOR REASONABLE ATTORNEYS' FEES AND EXPENSES OF LITIGATION IN THE AMOUNT OF $106,034.65 FROM DEFENDANT VIISAGE TECHNOLOGY, INC. | | |
| 02/07/05 | MOTION (E355) | | |
| | SH- MOTION FOR REASONABLE ATTORNEYS' FEES AND EXPENSES OF LITIGATION IN THE AMOUNT OF $106,034.65 FROM DEFENDANT DIISAGE TECHNOLOGY, INC. | | |
| 01/27/05 | COST BILL PAID (E352) | | |
| | 33,665.50 PAID FOR AN APPEAL BY VIISAGE TECHNOLGY/CT/01/27/05. | | |
| 01/21/05 | COST BILL PAID (E351) | | |
| | 27.50 PAID FOR AN APPEAL BY STATE OF GEORGIA DEPARTMENT OF LAW/CT/01/21/05. | | |
| 01/14/05 | APPEALS RECEIPT (GREEN CARD) (E349) | | |
| | LR - COST BILL DELIVERED TO KING & SPALDING LLP ON 1/11/05 | | |
| 01/14/05 | APPEALS RECEIPT (GREEN CARD) (E350) | | |
| | LR - COST BILL DELIVERED TO OSCAR B. FEARS ON 1/12/05 | | |
| 01/06/05 | COST BILL (E347) | | |
| | LR - COST BILL FOR NOTICE OF APPEAL FILED 10/1/04 IN THE AMOUNT OF $27.50 MAILED TO OSCAR B. FEARSS | | |
| 01/06/05 | COST BILL (E348) | | |
| | LR - COST BILL FOR NOTICE OF APPEAL FILED 10/1/04 IN THE AMOUNT OF $33,665.50 MAILED TO KING & SPALDING LLP | | |
| 01/03/05 | APPEAL (E346) | | |
| | CO- VIISAGE TECHNOLOGY INC APPEAL TO THE SUPREME COURT OF THE STATE OF GEORGIA | | |
| 12/22/04 | ORDER (E345) | | |

# Civil Docket

Fulton County Superior Court
Juanita Hicks, Clerk

Case No. 2003CV66498
Fulton County

March 3rd, 2006
4:08pm

| Date | | Volume | Page |
|---|---|---|---|

### Events & Orders of the Court (cont.)

| | |
|---|---|
| | IJ-ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT |
| 12/21/04 | TRANSCRIPT (E344) |
| | RAB-TRANSCRIPT OF MOTION PROCEEDINGS HEARD BEFORE THE HONORABLE THELMA WYATT CUMMINGS MOORE JUDGE, ATLANTA JUDICIAL CIRCUIT, COMMENCING ON 27th DAY OF OCTOBER 2004 (ONE ORIGINAL AND ONE COPY) |
| 12/15/04 | OTHER (E342) |
| | RAB-JOINT STIPULATION FOR REPLACEMENT OF MISPLACED RECORD DOCUMENTS: CERTIFIDE COPY OF THE RECORD OF PROCEEDINGS IN THEMATTER OF: PROTEST OF DIGIMARC ID SYSTEMS, OF THE CONTRACTAWARD FOR REQUEST FOR PROPOSAL NO.GTA000051, DIGITIZEDLICENSE SYSTEM FOR THE GEORGIA DEPT. OF MOTOR VEHICLESAFETY (2 VOLUMES) ORGINALLY FILED 5/1/03 AS AN OTHER |
| 12/15/04 | OTHER (E343) |
| | RAB-CERTIFIDE COPY OF THE RECORD OF PROCEEDINGS IN THE MATTER OF: PROTEST OF DIGIMARC ID SYSTEMS, OF THE CONTRACTAWARD FOR REQUEST FOR PROPOSAL NO.GTA000051, DIGITIZEDLICENSE SYSTEM FOR THE GEORGIA DEPT. OF MOTOR VEHICLESAFETY (2 VOLUMES): ORIGINAL FILED 5/1/03; REPLACED PER STIPULATION OF 12/15/04 |
| 12/09/04 | SCHEDULING ORDER (E341) |
| | JJL |
| 11/12/04 | OTHER (E340) |
| | RAB-VIISAGE TECHNOLOGY, INC.'S REPLY IN SUPPORT OF ITS MOTION TO REVOKE PRO HAC VICE APPEARANCE OF ROGER FRENCH |
| 11/01/04 | NOTICE (E337) |
| | RAB-DEFENDANTS' NOTICE OF FILING ORIGINAL DISCOVERY: ORIGINAL DEPOSITION TRANSCRIPT OF BRIAN LaBREC, TAKEN ON 1/22/04 |
| 11/01/04 | CERTIFICATE OF SERVICE (E338) |
| | RAB-RULE 5.2 CERTIFICATE OF SERVICE OF DISCOVERY: DEFENDANTS' NOTICE OF FILING ORIGINAL DISCOVERY |
| 11/01/04 | TRANSCRIPT (E339) |
| | RAB-TRANSCRIPT OF THE TESTIMONY OF: BRIAN LaBRECK, 1/22/04 |
| 10/28/04 | ORDER (E336) |
| | RAB-ORDER: RE: PRESENTATGION OF EXHIBIT IN LEGIBLE FORMAT |
| 10/26/04 | ORDER (E323) |
| | RAB-RE: SUMMARY JUDGMENT HEARING SCHEDULED FOR OCTOBER 27, 2004, BEGINNING AT 9:30 AM, IN COURTROOM 4E. |
| 10/26/04 | MOTION (E324) |
| | RAB-MOTION BY PLAINTIFF DIGIMARC ID SYSTEMS, LLC TO ALLOW MULTIMEDIA COURTROOM PRESENTATION AT SUMMARY JUDGMENT HEARING |
| 10/26/04 | ORDER (E325) |
| | RAB-ORDER: RE: MULTIMEDIA EQUIPMENT IN THE COURTROOM |
| 10/26/04 | MOTION (E326) |
| | RAB-PLAINTIFF'S FOURTH MOTION TO COMPEL DISCOVERY FROM VIISAGE TECHNOLOGY, INC. AND FOR CONTEMPT |

# Civil Docket

Fulton County Superior Court
Juanita Hicks, Clerk

Case No. 2003CV66498
Fulton County

March 3rd, 2006
4:08pm

| Date | | Volume | Page |
|------|---|--------|------|

### Events & Orders of the Court (cont.)

10/26/04  OTHER (E327)
RAB-REQUEST FOR FILING ORIGINAL DISCOVERY: DEPOSITION OF BRIAN
LaBRECK, WHICH WAS TAKEN ON JANUARY 22, 2004

10/26/04  BRIEF (E328)
RAB-BRIEF IN SUPPORT OF PLAINTIFF'S FOURTH MOTION TO COMPEL
DISCOVERY FROM VIISAGE TECHNOLOGY, INC. AND FOR CONTEMPT

10/26/04  DEPOSITION (E329)
RAB-VIDEOTAPED DEPOSITION OF CRAIG VOSSETEIG, ON SEPTEMBER
28, 2004, COMMENCING AT 4:15 PM

10/26/04  NOTICE (E330)
RAB-NOTICE OF FILING DISCOVERY: 1.ORIGINAL DEPOSITION OF
MOHAMMAD SIDDIGUI (MINUS ERRATA SHEET); 2.ORIGINAL
30 (B) (6) DEPOSITION OF CRAIG VOSSETEIG (VOLS I&II) (MINUS ERRATA
SHEET; 3.ORIGINAL 30 (B) (6) DEPOSITION OF BARRY ERHARDT (MINUS
ERRATA SHEET); AND 4.ORIGINAL DEPOSITION OF EDWARD B. COLE

10/26/04  DEPOSITION (E331)
RAB-DEPOSITION OF KEVIN CURRY; 10/5/04 COMMENCING AT 3:10PM

10/26/04  DEPOSITION (E332)
RAB-VIDEOTAPED DEPOSITION OF MOHAMMED SIDDIGUI; 10/7/04
COMMENCING AT 10:07 AM

10/26/04  DEPOSITION (E333)
RAB-DEPOSITION OF EDWARD B. COLE 10/5/04 AT 12:08 PM

10/26/04  DEPOSITION (E334)
RAB-VIDEOTAPED DEPOSITION OF CRAIG VOSSETEIG 10/8/04 AT 10:08
AM

10/26/04  DEPOSITION (E335)
RAB-VIDEOTAPED DEPOSITION OF BARRY ERHARDT   9/29/04 AT 8:45 AM

10/25/04  RESPONSE (E319)
RAB-PLAINTIFF'S RESPONSE TO VIISAGE TECHNOLOGY, INC.'S MOTION
TO REVOKE PRO HAC VICE APPEARANCE OF ROGER FRENCH

10/25/04  AFFIDAVIT (E320)
RAB-AFIDAVIT OF JOHN P. HUTCHINS

10/25/04  OTHER (E321)
RAB-GEORGIA TECHNOLOGY AUTHORITY AND THE GEORGIA DEPARTMENT OF
MOTOR VEHICLE SAFETY'S REPLY TO PLAINTIFF'S BRIEF IN OPOSITION
TO THESE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

10/25/04  OTHER (E322)
RAB-REPLY OF VIISAGE TECHNOLOGY, INC. TO PLAINTIFF'S BRIEF IN
OPPOSITION TO VIISAGE'S MOTION FOR SUMMARY JUDGMENT

10/20/04  RESPONSE (E308)
RAB-DIGIMARC'S RULE 6.5 STATEMENT IN RESPONSE TO THE MOTION FOR
SUMMARY JODGMENT BY GTA AND DMVS

10/20/04  RESPONSE (E309)
RAB-DIGIMARC'S RULE 6.5 STATEMENT IN RESPONSE TO VIISAGE'S
MOTION FOR SUMMARY JUDGMENT

# Civil Docket

Fulton County Superior Court
Juanita Hicks, Clerk

Case No. 2003CV66498                                    March 3rd, 2006
Fulton County                                               4:08pm

| Date | Events & Orders of the Court (cont.) | Volume | Page |
|------|-------------------------------------|--------|------|
| 10/20/04 | BRIEF (E310)<br>RAB-PLAINTIFF'S BRIEF IN OPPOSITION TO MOTION FOR SUMMARY<br>JUDGMENT BY VIISAGE TECHNOLOGY, INC. | | |
| 10/20/04 | BRIEF (E311)<br>RAB-PLAINTIFF'AS BRIEF IN OPPOSITION TO MOTION FOR SUMMARY<br>JUDGMENT BY GEORGIA TECHNOLOGY AUTHORITY AND GEORGIA DEPARTMENT<br>OF MOTOR VEHICLE SAFETY | | |
| 10/20/04 | AFFIDAVIT (E312)<br>RAB-AFFIDAVIT OF JOSEPH SANDERS | | |
| 10/20/04 | AFFIDAVIT (E313)<br>RAB-AFFIDAVIT OF JOHN DUNCAN | | |
| 10/20/04 | CERTIFICATE OF SERVICE (E314)<br>RAB-CERTIFICATE OF SERVICE: 1.PLAINTIFF'S BRIEF IN OPPOSITION TO<br>MOTION FOR SUMMARY JUDGMENT BY VIISAGE TECHNOLOGY, INC.;<br>2.DIGIMARC'S RULE 6.5 STATEMENT IN RESPONSE TO VIISAGE'S MOTION<br>FOR SUMMARY JUDGMENT; 3.PLAINTIFF'S BRIEF IN OPPOSITION TO<br>MOTION FOR SUMMARY JUDGMENT BY GEORGIA AUTHORITY AND DEPARTMENT<br>OF MOTOR VEHICLE SAFETY;4. DIGIMARC'S RULE 6.5 STATEMENT IN<br>RESPONSE TO THE MOTION FOR SUMMARY BY GTA AND DMVS;5.AFFIDAVIT<br>OF JOHN DUNCAN; AND 6.AFFIDAVIT OF JOSSEPH SANDERS | | |
| 10/20/04 | RESPONSE (E315)<br>RAB-VIISAGE'S RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL<br>FACTS AS TO WHICH NO GENUINE DISPUTE EXISTS | | |
| 10/20/04 | OTHER (E316)<br>RAB-VIISAGE TECHNOLOGY, INC.'S OPOSITION TO DIGIMARC ID SYSTEMS<br>LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT | | |
| 10/20/04 | RESPONSE (E317)<br>RAB-GEORGIA TECHNOLOGY AUTHORITY AND THE GEORGIA DEPARTMENT OF<br>MOTOR VEHICLE SAFETY'S RESPONSE TO PLAINTIFF'S MOTION FOR<br>PARTIAL SUMMARY JUDGMENT | | |
| 10/20/04 | RESPONSE (E318)<br>RAB-GEORGIA TECHNOLOGY AUTHORITY AND THE GEORGIA DEPARTMENTOF<br>MOTOR VEHICLE SAFETY'S RESPONSE TO PLAINTIFF'S STATEMEENT OF<br>MATERIAL FACTS AS TO WHICH NO GENUINE ISSUES EXISTS | | |
| 10/14/04 | STIPULATION EXTENDING TIME (E307)<br>JJL - WITHIN WHICH PLAINTIFF MAY RESPOND | | |
| 10/13/04 | NOTICE OF CHANGE OF ADDRESS (E306)<br>RAB-JOHN HUTCHINS; ATTORNEY FOR DIGIMARC | | |
| 10/12/04 | BRIEF (E303)<br>JJL - IN SUPPORT OF A MOTION FOR SUMMARY JUDGMENT | | |
| 10/12/04 | MOTION (E304)<br>JJL-STATE DEFENDANTS' GEORGIA TECHNOLOGY AUTHORITY AND THE<br>GEORGIA DEPARTMENT OF MOTOR VEHICLE SAFETY'S MOTION FOR SUMMARY<br>JUDGMENT | | |
| 10/12/04 | STATEMENT OF UNDISPUTED MATERIAL FACTS (E305) | | |

# Civil Docket

Fulton County Superior Court
Juanita Hicks, Clerk

Case No. 2003CV66498
Fulton County

March 3rd, 2006
4:08pm

| Date | | Volume | Page |
|------|--|--------|------|

## Events & Orders of the Court (cont.)

|  | JJL-GEORGIA TECHNOLOGY AUTHORITY AND THE GEORGIA DEPARTMENT OF MOTOR VEHICLE SAFETY'S STATEMENT OF UNDISPUTED MATERIAL FACTS |
| 10/11/04 | NOTICE (E296) |
|  | RAB-NOTICE OF FILING ORIGINAL AFFIDAVIT OF IFTIKHAR A. AHMAD |
| 10/11/04 | MOTION (E297) |
|  | RAB-VIISAGE TECHNOLOGY, INC.'S MOTION FOR SUMMARY JUDGMENT |
| 10/11/04 | STATEMENT OF UNDISPUTED MATERIAL FACTS (E298) |
|  | RAB-VIISAGE TECHNOLOGY, INC.'S STATEMENT OF UNDISPUTED MATERIAL FACTS |
| 10/11/04 | MEMORANDUM (E299) |
|  | RAB-VIISAGE TECHNOLOGY, INC.'S MEMOANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT |
| 10/11/04 | MOTION (E300) |
|  | RAB-PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT |
| 10/11/04 | BRIEF (E301) |
|  | RAB-PAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT |
| 10/11/04 | STATEMENT OF UNDISPUTED MATERIAL FACTS (E302) |
|  | RAB- PLAINTIFF'S STATEMENT OF MATERIAL FACTS AS TO WHICH NO GENUINE DISPUTE EXIST |
| 10/01/04 | APPEAL (E294) |
|  | CO- VIISAGE TECHNOLOGY INC NOTICE OF APPEAL TO THE SUPREME COURT OF GEORGIA |
| 10/01/04 | APPEAL (E295) |
|  | CO- GEORGIA TECHNOLOGY AUTHORITY AND GEORGIA DEPARTMENT OF MOTOR VEHICLE SAFETY APPEAL TO THE SUPREME COURT |
| 09/28/04 | ENTRY/NOTICE OF APPEARANCE (E293) |
|  | RAB-OSCAR B. FEARS, III FOR GEORGIA TECHNOLOGY AUTHORITY AND THE GEORGIA DEPARTMENT OF MOTOR VEHICLE SAFETY |
| 09/27/04 | RESPONSE (E286) |
|  | RAB-STATE DEFENDANTS' RESPONSE TO PLAINTIFF DIGIMARC ID SYSEMS, LLC'S REQUEST FOR PRELIMINARY INJUNCTION |
| 09/27/04 | AMENDMENT (E287) |
|  | RAB-AMENDED NOTICE OF DEPOSITION: ED COLE, 10/5/04 AT 12:00PM |
| 09/27/04 | AMENDMENT (E288) |
|  | RAB-AMENDED NOTICE OF DEPOSITION: ED COLE, OCTOBER 5, 2004 BEGINNING AT 12:00 p.m. |
| 09/27/04 | AMENDMENT (E289) |
|  | RAB-SECOND AMENDED NOTICE OF DEPOSITION: MOHAMMAD A. SIDDIQUI, OCTOBER 7, 2004 BEGINNING AT 10:00 a.m. |
| 09/27/04 | AMENDMENT (E290) |
|  | RAB-AMENDED NOTICE OF DEPOSITION: KEVIN J. CURRY, OCTOBER 5, 2004 BEGINNING  AT 3:00p.m. |
| 09/27/04 | RESPONSE (E291) |
|  | RAB-VIISAGE TECHNOLOGY, INC.'S RESPONSES TO PLAINTIFF'S MOTION |

## Civil Docket

Fulton County Superior Court
Juanita Hicks, Clerk

Case No. 2003CV66498
Fulton County

March 3rd, 2006
4:08pm

| Date | | Volume | Page |
|------|---|--------|------|

### Events & Orders of the Court (cont.)

FOR PRELIMIARY INJUNCTION

| 09/27/04 | ORDER (E292)<br>EL-ORDER GRANTING MOTION FOR TEMPORARY RESTRAINING ORDER AND IT IS ORDERED ROGER L. FRENCH BE PROHIBITED FROM CONDUCTING DISCOVERY OR OTHERWISE APPEARING AS AN ATTORNEY ON BEHALF OF PLAINTIFF DIGIMARC ID SYSTEM, LLS IN THIS CASE UNTIL SUCH TIME AS VIISAGE'S PENDING MOTION TO REVOKE THE PRO HAC VICE STATUS OF ROGER L. FRENCH IS RULED UPON |
| 09/24/04 | MOTION (E285)<br>RAB-VIISAGE TECHNOLOGY, INC.'S MOTION FOR TEMPORARY RESTRAINING ORDER AND MEMORANDUM OF LAW IN SUPPORT |
| 09/22/04 | CERTIFICATE OF SERVICE (E282)<br>RAB-SUBPOENA FOR ED COLE |
| 09/22/04 | AMENDMENT (E283)<br>RAB-AMENDED NOTICE OF DEPOSITION: MOHAMMED A. SIDDIQUI; ON OCTOBER 4, 2004 BEGINNING AT 10:00a.m. |
| 09/22/04 | CERTIFICATE OF SERVICE (E284)<br>RAB-SUBPOENA FOR KEVIN J. CURRY |
| 09/20/04 | STIPULATION EXTENDING TIME (E281)<br>RAB-STIPULATION EXTENDING TIME WITHIN WHICH PLAINTIFF MAY RESPOND TO VIISAGE TECHNOLOGY, INC.'S MOTION TO REVOKE PRO HAC VICE APPEARANCE OF ROGER FRENCH AND MEMORANDUM OF LAW IN SUPPORT |
| 09/14/04 | NOTICE OF DEPOSITION (E279)<br>RAB-ED COLE: ON OCTOBER 1, 2004 BEGINNING AT 12:00 p.m. |
| 09/14/04 | NOTICE OF DEPOSITION (E280)<br>RAB-AS TO KEVIN J. CURRY, ON OCTOBER 1, 2004 BEGINNING AT 3:00p.m. |
| 09/10/04 | NOTICE OF DEPOSITION (E277)<br>RAB-NOTICE OF DEPOSITION (MOHAMMED A. SADDIQUI) ON SEPTEMBER 30, 2004 BEGINNING AT 10:00 a.m. |
| 09/10/04 | NOTICE OF DEPOSITION (E278)<br>RAB-NOTICE OF DEPOSITION (CRAIG VOSSETEIG AND BEARRY ERHARDT, ON SEPTEMBER 28, 2004 BEGINNING AT 9:00 a.m. |
| 09/02/04 | MOTION (E275)<br>RAB-MOTION TO REVOKE PRO HAC VICE APPEARANCE OG ROGER FRENCH AND MEMORANDUM OF LAW IN SUPPORT |
| 09/02/04 | ORDER (E276)<br>RAB-ORDER RE:MOTION FOR TEMPORARY RESTRAINING ORDER, JULY 28, 2004; MOTIONS TO DISMISS, JULY 21, 2004; AND MOTION TO COMPEL COMPLIANCE WIT DISCOVERY ORDER, REVISE SCHEDULING ORDER AND FOR SANCTIONS AGAINST DEFENDANT VIISAGE TECHNOLOGY, INC., FILED JULY 1, 2004 |
| 09/01/04 | BRIEF (E274)<br>RAB-VIISAGE TECHNOLOGY, INC.'S REPLY BRIEF IN SUPPORT OF ITS |

# Civil Docket

Fulton County Superior Court
Juanita Hicks, Clerk

Case No. 2003CV66498
Fulton County

March 3rd, 2006
4:08pm

| Date | | Volume | Page |
|------|---|--------|------|

### Events & Orders of the Court (cont.)

| | |
|---|---|
| | MOTION TO DISMISS |
| 08/31/04 | OTHER (E271) |
| | RAB-PLAINTIFF'S REPLY TO STATE DEFENDANTS' RESPOSE TO PLAINTIFF DIGIMARC ID SYSTEMS, LLC'S MOTION FOR TEMPORARY RESTRAINING ORDER AND VIISAGE TECHNOLOGY, INC.'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER |
| 08/31/04 | TRANSCRIPT (E272) |
| | RAB-TRANSCRIPT OF MOTIONS HEARING BEFORE THE HONORABLE THELMA WYATT CUMMINGS MOORE, ATLANTA JUDICIAL CIRCUIT, ON JULTY 21, 2004 (ONE ORIGINAL AND ONE COPY) |
| 08/31/04 | TRANSCRIPT (E273) |
| | RAB-TRANSCRIPT OF MOTIONS HEARING AND EVIDENCE BEFORE THE HONORABLE THELMA WYATTCUMMINGS MOORE, ATLANTA JUDICIAL CIRCUIT, ON MAY 25, 2004 (ONE ORIGINAL AND ONE COPY) |
| 08/25/04 | RESPONSE (E269) |
| | RAB-STATE DEFENDANTS' RESPONSE TO PLAINTIFF DIGIMARC ID SYSTEMS, LLC'S MOTION FOR TEMPORARY RESTRAINING ORDER |
| 08/25/04 | RESPONSE (E270) |
| | RAB-VIISAGE TECHNOLOGY, INC.'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER |
| 08/23/04 | MOTION (E265) |
| | RAB-PLAINTIFF DIGIMARC ID SYSTEMS, LLC'S MOTION FOR PRELIMINARY INJUNCTION |
| 08/23/04 | BRIEF (E266) |
| | RAB-PLAINTIFF DIGIMARC ID SYSTEMS, LLC'S BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION |
| 08/23/04 | RESPONSE (E267) |
| | RAB-PLAINTIFF'S RESPONSE TO STATE DEFENDANTS' MOTION TO DISMISS AND BRIEF IN SUPPORT THEREOF AND VIISAGE TECHNOLOGY, INC.'S MOTION TO DISMISS AND SUPPORTING MEMORANDUM |
| 08/23/04 | AMENDED COMPLAINT (E268) |
| | RAB-SECOND AMENDED CCOMPLAINT |
| 08/19/04 | ORDER (E263) |
| | RAB-ORDER ON PLAINTIFF DIGIMARC ID SYSTEMS, LLC'S MOTION FOR TEMPORARY RESTRAINING ORDER SEEKING PRESERVATION OF STATUS QUO AND SUPPORTING MEMORANDUM OF LAW |
| 08/19/04 | STIPULATION EXTENDING TIME (E264) |
| | RAB-STIPULATION EXTENDING TIME WITHIN WHICH PLAINTIFF MAY RESPOND TO DEFENDANTS' MOTION TO DISMISS AND WITHIN WHICH DEFENDANTS MAY RESPOND TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER |
| 08/18/04 | RULE NISI (E259) |
| | RAB-AUGUST 18, 2004 AT 3:00 p.m. |
| 08/18/04 | AFFIDAVIT (E260) |
| | RAB-FOURTH AFFIDAVIT OF EMILY P. HITCHCOCK |

## Civil Docket

Fulton County Superior Court
Juanita Hicks, Clerk

Case No. 2003CV66498
Fulton County

March 3rd, 2006
4:08pm

| Date | | Volume | Page |
|---|---|---|---|

### Events & Orders of the Court (cont.)

| Date | | | |
|---|---|---|---|
| 08/18/04 | AFFIDAVIT (E261)<br>RAB-SECOND AFFIDAVIT OF JAMES R. DAVIS | | |
| 08/18/04 | RESPONSE (E262)<br>RAB-VIISAGE TECHNOLOGY, INC.'S RESPONSE IN OPPOSITION TO MOTION<br>FOR TEMPORARY RESTRAINING ORDER | | |
| 08/17/04 | MOTION (E258)<br>RAB-PLAINTIFF DIGIMARC ID SYSTEMMS, LLC'S MOTION FOR TEMPORARY<br>RESTRAINING ORDER SEEKING PRESERVATION OF STATUS QUO AND<br>SUPPORTING MEMORANNDUM OF LAW | | |
| 08/13/04 | AMENDMENT (E257)<br>RAB-AMENDED SCHEDULING ORDER | | |
| 08/03/04 | AFFIDAVIT (E256)<br>JJL - OF ELLIOTT J. MARK | | |
| 08/02/04 | MOTION (E255)<br>JJL - VISAGE RESPONSE TO MOTION TO COMPEL COMPLIANCE WITH COURT<br>ORDER AND FOR SANCTIONS2 | | |
| 07/23/04 | MOTION (E253)<br>RAB-PLAINTIFF DIGIMARC ID SYSTEMS, LLC'S MOTION FOR TEMPORARY<br>RESTRAINING ORDER AND SUPPORTING MEMORANDUM OF LAW | | |
| 07/23/04 | AFFIDAVIT (E254)<br>RAB-AFFIDAVIT OF J. ANTHONY MAST IN SUPPORT OF MOTION FOR<br>TEMPORARY RESTRAINING ORDER AND SUPPORTING MEMORANDUM OF LAW | | |
| 07/21/04 | AFFIDAVIT (E250)<br>RAB-AFFIDAVIT OF JOHN P. HUTCHINS IN SUPPORT OF MOTION FOR<br>SANCTIONS | | |
| 07/21/04 | MOTION (E251)<br>RAB-VIISAGE TECHNOLOGY, INC.'S MOTION TO DISMISS AND SUPPORTING<br>MEMORANDUM | | |
| 07/21/04 | MOTION (E252)<br>RAB-STATE DEFENDANTS' MOTION TO DISMISS AND BRIEF IN SUPPORT<br>THEREOF | | |
| 07/14/04 | RESPONSE (E249)<br>RAB-RESPONSE OF GEORGIA TECHNOLOGY AUTHORITY AND THE GEORGIA<br>DEPARTMENT OF MOTOR VEHICLE SAFETY TO PLAINTIFF DIGIMARC ID<br>SYSTEMS, LLC'S MOTION TO COMPEL COMPLIANCE WITH DISCOVERY<br>ORDER, REVISE SCHEDULING ORDER AND FOR SANCTIONS AGAINST<br>DEFENDANT VIISAGE TECHNOLOGY, INC. | | |
| 07/01/04 | MOTION (E246)<br>RAB-MOTION AND SUPPORTING MEMORANDUM OF LAW REQUESTING<br>EXPEDITED TREATMENT OF PLAINTIFF DIGIMARC ID SYSTEMS, LLC',<br>MOTION TO COMPEL COMPLIANCE WITH DISCOVERY ORDER, REVISE<br>SCHEDULING ORDER AND FOR SANCTIONS AGAINST DEFENDANT VIISAGE<br>TECHNOLOGY, INC. | | |
| 07/01/04 | BRIEF (E247)<br>RAB-PLAINTIFF DIGIMARC ID SYSTEMS, LLC'S BRIEF IN SUPPORT OF ITS | | |

# Civil Docket

Fulton County Superior Court
Juanita Hicks, Clerk

Case No. 2003CV66498
Fulton County

March 3rd, 2006
4:08pm

| Date | | Volume | Page |
|---|---|---|---|

### Events & Orders of the Court (cont.)

|  |  |
|---|---|
|  | MOTION TO COMPEL COMPLIANCE WITH DISCOVERY ORDER, REVISE SCHEDULING ORDER AND FOR SANCTIONS AGAINST DEFENDANT VIISAGE TECHNOLOGY, INC. |
| 07/01/04 | MOTION (E248) |
|  | RAB-PLAINTIFF DIGIMARC ID SYSTEMS, LLC'S MOTION TO COMPEL COMPLIANCE WITH DISCOVERY ORDER AND FOR SANCTIONS AGAINST DEFENDANT VIISAGE TECHNOLOGY, INC. |
| 06/30/04 | CERTIFICATE OF SERVICE (E245) |
|  | RAB-CEERTIFICATE OF SERVICE: AFFIDAVIT OF ROGER L. FRENCH IN REGARDS TO DOCUMENT PRODUCTION BY DIGIMARC ID SYSTEMS, LLC |
| 06/21/04 | AFFIDAVIT (E244) |
|  | HAB-AFFIDAVIT OF ROGER L. FRENCH IN REGARDS TO DOCUMENT PRODUCTIONS BY DIGIMARC ID SYSTEMS, LLC |
| 06/09/04 | ORDER (E243) |
|  | RAB-SCHEDULING ORDER |
| 06/03/04 | ORDER (E242) |
|  | RAB-RE:MOTIONS TO EXPEDITE TRIAL, COMPEL FULL AND COMPLETE DOCUMENTS AND DISCOVERY RESPONSES, COMPEL COMPETION OF VIISAGE'S DEPOSITION, AND MOTION TO COMPEL PRODUCTION OF DOCUMENTS FROM VIISAGE |
| 06/02/04 | OTHER (E239) |
|  | RAB-COMMISSION TO TAKE DEPOSITION OF KEVIN J. CURRY |
| 06/02/04 | OTHER (E240) |
|  | RAB-COMMISSION TO TAKE DEPOSITION OF ED COLE |
| 06/02/04 | OTHER (E241) |
|  | RAB-COMMISSION TO TAKE DEPOSITION OF VIISAGE TECHNOLOGY, INC. |
| 05/26/04 | ORDER (E236) |
|  | RAB-ORDER FOR ISSUANCE OF COMMISSION FOR TAKING DEPOSITION OUT OF STATE OF (MOHAMMED A. SIDDIQUI) |
| 05/26/04 | ORDER (E237) |
|  | RAB-ORDER FOR ISSUANCE OF COMMISSION FOR TAKING DEPOSITION OUT OF STATE OF (ED COLE) |
| 05/26/04 | ORDER (E238) |
|  | RAB-ORDER FOR ISSUANCE OF COMMISSION FOR TAKING DEPOSITION OUT OF STATE OF (KEVIN J. CURRY) |
| 05/25/04 | NOTICE (E231) |
|  | RAB-DEFENDANTS' NOTICE OF FILING ORIGINAL DISCOVERY: (1)DEFENDANTS' FIRST INTERROGATORIES AND FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO PLAINTIFF; (2)DEPOSITION OF ROBERT L. JONES, TAKEN JANUARY 19, 2004, WITH EXHIBITS 422 AND 423(MARKED COPIES); (3)DEPOSITION OF STEPHEN MALONE, TAKEN DECEMBER 15, 2003, WITH EXHIBITS 106-112(EXHIBITS 113-117 ARE NOTED ON THE DEPOSITION TRANSCRIPTS AS "NOT APPLICABLE" AND DO NOT EXIST); AND (4)DEPOSITION OF NEAL WYNNE, TAKEN DECEMBER 16, 2003, WITH EXHIBITS 118-121(MARKED COPIES) |

# Civil Docket

Fulton County Superior Court
Juanita Hicks, Clerk

Case No. 2003CV66498
Fulton County

March 3rd, 2006
4:08pm

| Date | | Volume | Page |
|---|---|---|---|

## Events & Orders of the Court (cont.)

| Date | |
|---|---|
| 05/25/04 | INTERROGATORY (E232) |
| | RAB-DEFENDANTS' FIRST INTERROGATORIES AND FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO PLAINTIFF |
| 05/25/04 | TRANSCRIPT (E233) |
| | RAB-TRANSCRIPT OF THE TESTIMONY OF : DR. ROBERT L. JONES, JANUARY 19, 2004 |
| 05/25/04 | DEPOSITION (E234) |
| | RAB-STEPHEN MALONE, DECEMBER 15, 2003 AT 9:30 AM |
| 05/25/04 | DEPOSITION (E235) |
| | RAB-NEAL WYNNE: DECEMBER 16, 2003 AT 11:00 AM |
| 05/24/04 | RESPONSE (E230) |
| | RAB-VIISAGE TECHNOLOGY, INC.'S RESPONSE TO PLAINTII'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS FROM VIISAGE TECHNOLOGY, INC. |
| 05/19/04 | RESPONSE (E229) |
| | RAB-PLAINTIFF'S RESPONSE TO VIISAGE TECHNOLOGY, INC.'S MOTION FOR PROTECTIVE ORDER |
| 05/17/04 | OTHER (E228) |
| | RAB-REQUEST FOR FILING ORIGINAL DISCOVERY: (1) DEPOSITION OF ROBERT L. JONES, TAKEN JANUARY 19, 2004, WITH EXHIBITS 422 AND 423; (2) DEPOSITION OF STEPHEN MALONE, TAKEN DECEMBER 15, 2003, WITH EXHIBITS 106-117; AND (3) DEPOSITION OF NEAL WYNNEW, TAKEN DECEMBER 16, 2003, WITH EXHIBITS 118-121 |
| 05/06/04 | NOTICE (E226) |
| | RAB-NOTICE OF HEARING: 5/25/04 AT 9:30AM |
| 05/06/04 | TRANSCRIPT (E227) |
| | RAB-PROCEEDINGS BEFORE JUDGE MOORE ON 7/28/03 WITH COPY |
| 04/26/04 | RESPONSE (E211) |
| | SH- PLAINTIFF'S RESPONSE TO DEFENDANT VIISAGE TECHNOLOGY, INC.'S FIRST REQUESTS FOR PRODUCTION |
| 04/26/04 | NOTICE (E212) |
| | SH- NOTICE OF FILING ORIGINAL DISCOVERY |
| 04/26/04 | DEPOSITION (E213) |
| | RAB-VIDEOTAPED 30(B)(6) DEPOSITION OF GEORGIA TECHNOLOGY AUTHORITY THROUGH MIKE MCCLEARN 1/28/04 |
| 04/26/04 | DEPOSITION (E214) |
| | RAB-VIDEOTAPED 30(B)(6) DEPOSITION OF GEORGIA TECHNOLOGY AUTHORITY THROUGH CHRISTOPHER TOMLINSON 1/28/04 |
| 04/26/04 | DEPOSITION (E215) |
| | RAB-VIDEOTAPED 30(B)(6) DEPOSITION OF GEORGIA TECHNOLOGYAUTHORITY THROUGH CHARLES NIXON 1/28/04 |
| 04/26/04 | DEPOSITION (E216) |
| | RAB-VIDEOTAPED DEPOSITION OF CHAREMON GRANT 12/18/03 AT 1:44PM |
| 04/26/04 | DEPOSITION (E217) |
| | RAB-VIDEOTAPED 30(B)(6) DEPOSITION OF GEORGIA TECHNOLOGY AUTHORITY THROUGH LISA URICH 1/16/04 |

# Exhibit 1
# (Part 2 of 2)

## Civil Docket

Fulton County Superior Court
Juanita Hicks, Clerk

Case No. 2003CV66498
Fulton County

March 3rd, 2006
4:08pm

| Date | | Volume | Page |
|------|---|--------|------|

### Events & Orders of the Court (cont.)

| Date | |
|------|---|
| 04/26/04 | DEPOSITION (E218)<br>RAB-VIDEOTAPED 30 (B) (6) DEPOSITION OF GEORGIA TECHNOLOGY AUTHORITY THROUGH CHRISTINEE CLAY 2/12/04 |
| 04/26/04 | DEPOSITION (E219)<br>RAB-VIDEOTAPED DEPOSITION OF RONNY JOHNSON, 1/5/04 AT 9:14AM |
| 04/26/04 | DEPOSITION (E220)<br>RAB-VIDEOTAPED DEPOSITION OF OF CHRISTOPHER TOMLINSON, 12/18/03 AT 9:10AM |
| 04/26/04 | DEPOSITION (E221)<br>RAB-VIDEOTAPED DEPOSITION OF BARRY SHEPARD, 12/23/03 AT 9:07AM |
| 04/26/04 | DEPOSITION (E222)<br>RAB-VIDEOTAPED DEPOSITION OF CHARLES NIXON, 12/22/03 AT 9:08AM |
| 04/26/04 | DEPOSITION (E223)<br>RAB-VIDEOTAPED 30 (B) (6) DEPOSITION OF GEORGIA TECHNOLOGY AUTHORITY THROUGH CHUCK FREEDMAN 1/27/04 |
| 04/26/04 | DEPOSITION (E224)<br>RAB-VIDEOTAPED 30 (B) (6) DEPOSITION OF GEORGIA TECHNOLOGY AUTHORITY THROUGH JENNIFER AMMONS 1/23/04 AT 9:18AM |
| 04/26/04 | DEPOSITION (E225)<br>RAB-VIDEOTAPED 30 (B) (6) DEPOSITION OF GEORGIA TECHNOLOGY AUTHORITY THROUGH GEORGE THEOBALD 2/12/04 |
| 04/20/04 | OTHER (E205)<br>RAB-(1)REQUEST FOR FILING ORIGINAL DISCOVERY: DEFENDANTS' FIRST INTERROGATORIES AND FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO PLAINTIFF (1)DEFENDANT VIISAGE TECHNOLOGY, INC.'S FIRST REQUESTS FOR PRODUCTION; (2)EXHIBITS 526, 529-A AND 529-B TO THE 30 (B) (6) DEPOSITION OF VIISAGE TECHNOLOGY, INC. (IFTI AHMAD) TAKEN ON 2/10/04 |
| 04/20/04 | AFFIDAVIT (E206)<br>RAB-AFFIDAVIT OF ROGER L. FRENCH IN SUPPORT OF PLASINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS FROM VIISAGE TECHNOLOGY, INC. |
| 04/20/04 | AFFIDAVIT (E207)<br>RAB-AFFIDAVIT OF JOHN P. HUTCHINS IN SUPPORT OF PLASINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS FROM VIISAGE TECHNOLOGY, INC. |
| 04/20/04 | RESPONSE (E208)<br>RAB-VIISAGE TECHNOLOGY, INC.'S RESPONSE TO PLAINTIFF'S MOTION TO COMPEL THE COMPLETION OF VIISAGE'S 30 (B) (6) DEPOSITION AND MOTION FOR PROTECTIVE ORDER AND MEMORANDUM OF LAW IN SUPPORT MOTION (E209) |
| 04/20/04 | RAB-MOTION TO COMPEL PRODUCTION OF DOCUMENTS FROM VIISAGE TECHNOLOGY, INC. |
| 04/20/04 | BRIEF (E210)<br>RAB-BRIEF IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL PRODUCTION |

## Civil Docket

Fulton County Superior Court
Juanita Hicks, Clerk

Case No. 2003CV66498
Fulton County

March 3rd, 2006
4:08pm

| Date | | Volume | Page |
|------|---|--------|------|

### Events & Orders of the Court (cont.)

OF DOCUMENTS FROM VIISAGE TECHNOLOGY, INC.

04/01/04  LEAVE OF ABSENCE (E204)
RAB-JOHN P. HUTCHINS: 11/8/04 THROUGH 11/12/04

03/31/04  NOTICE (E192)
RAB-VIISAGE TECHNOLOGY, INC.'S NOTICE OF ILING ORIGINAL
DEPOSITION (THOMAS REGAN, TAKEN ON DECEMBER 29, 2003, AND
ORIGINAL EXHIBIT 170, WHICH WAS MARKED DURING THE
DEPOSITION) DEPOSITION ATTACHED

03/31/04  NOTICE (E193)
RAB-VIISAGE TECHNOLOGY, INC'S NOTICE OF FILING ORIGINAL
DEPOSITION OF (ROGER FRENCH TAKEN ON 1/2/04, AND EXHIBIT
300) DEPOSITION ATTACHED

03/31/04  NOTICE (E194)
RAB-VIISAGE TECHNOLOGY, INC.'S NOTICE OF FILING ORIGINAL
DEPOSTION (OF ROGER FRENCH TAKEN ON 1/22/04) DEPOSITION ATTACHED

03/31/04  NOTICE (E195)
RAB-VIISAGE TECHNOLOGY, INC.'S NOTICE OF FILING ORIGINAL
DEPOSITION (OF ROBERT L. JONES TAKEN ON 12/30/03, AND EXHIBITS
172-178, WHICH WERE MARKED DURING DEPOSITION) DEPOSITION ATTACHED

03/31/04  NOTICE (E196)
RAB-VIISGE TECHNOLOGY, INC.'S NOTICE OF FILING ORIGINAL
DEPOSITION (OF INDRANEEL PAUL, TAKEN 12/30/03, EXHIBITS 171,
WHICH WAS MARKED DURING THE DEPOSITION, AND THE SIGNED ERATA
SHEET) DEPOSITION ATTACHED

03/31/04  NOTICE (E197)
RAB-VIISAGE TECHNOLOGY, INC.'S NOTICE OF FILING ORIGINAL
DEPOSIITION (OF BRIAN BRESNHAN TAKEN ON 1/13/04) DEPOSITION
ATTACHED

03/31/04  NOTICE (E198)
RAB-VIISAGE TECHNOLOGY INC.'S NOTICE OF FILING ORIGINAL
DEPOSITION (OF ROGER FRENCH, TAKEN ON 1/14/04, AND ORIGINAL
EXHIBITS 350-355, WHICH WERE MARKED DURING
DEPOSITION) DEPOSITION ATTACHED

03/31/04  NOTICE (E199)
RAB-VIISAGE TECHNOLOGY, INC.'S NOTICE OF FILIING ORIGINAL
DEPOSITION (OF ARTHUR GRIFFIN, TAKEN ON 1/24/04)

03/31/04  NOTICE (E200)
RAB-VIISAGE TECHNOLOGY, INC.'S NOTICE OF FILING ORIGINAL
DEPOSITION (OF BRIAN BRESNAHAN TAKEN ON 1/21/04, AND EXHIBITS
439-442, WHICH WERE MARKED DURING DEPOSITION) DEPOSITION ATTACHED

03/31/04  NOTICE (E201)
RAB-VIISAGE TECHNOLOGY, INC.'S NOTICE OF FILING ORIGINAL
DEPOSITION (OF LEEVI RAASSINA TAKEN ON 1/2/04) DEPOSITION
ATTACHED

03/31/04  NOTICE (E202)

# Civil Docket

Fulton County Superior Court
Juanita Hicks, Clerk

Case No. 2003CV66498
Fulton County

March 3rd, 2006
4:08pm

| Date | | Volume | Page |
|---|---|---|---|

## Events & Orders of the Court (cont.)

| Date | |
|---|---|
| 03/31/04 | RAB-VIISAGE TECHNOLOGY, INC.'S NOTICE OF FILING ORIGINAL DEPOSITION(OF ROGER FRENCH TAKEN ON 1/15/04, AND EXHIBITS 356-362, WHICH WERE MARKED DURING DEPOSITION)DEPOSITION ATTACHED NOTICE (E203) |
| | RAB-VIISAGE TECHNOLOGY, INC.'S NOTICE OF FILING ORIGINALDEPOSITION (OF STEPHEN MALONE TAKEN ON 1/23/04, AND EXHIBITS 450-473, WHICH WERE MARKED DURING DEPOSITION)DEPOSITION ATTACHED |
| 03/29/04 | RESPONSE (E190) |
| | RAB-PLAINTIFF'S RESPONSE TO VIISAGE'S MOTION TO COMPEL FULL AND COMPLETE PRODUCTION OF DOCUMENTS AND DISCOVERY RESPONSES, AND FOR SANCTIONS AND MEMORANDUM OF LAW IN SUPPORT |
| 03/29/04 | AFFIDAVIT (E191) |
| | RAB-AFFIDAVIT OF JOHN P. HUTCHINS IN SUPPORT OF PLAINTIFF'S RREAPONSE TO VIISAGE'S MOTION TO COMPEL |
| 03/23/04 | DEPOSITION (E182) |
| | RAB-VIDEOTAPED DEPOSITION OF (KEVIN KEIPER) 1/6/04 AT 10:05 |
| 03/23/04 | DEPOSITION (E183) |
| | RAB-VIDEOTAPED DEPOSITION OF (SANDRA VILLENEUVE) 1/7/04 AT 10:08AM |
| 03/23/04 | DEPOSITION (E184) |
| | RAB-VIDEOTAPED DEPOSITION OF (DAVID GAWTHROP) 1/8/04 AT 10:00 AM |
| 03/23/04 | NOTICE (E185) |
| | RAB-VIISAGE TECHNOLOGY, INC.'S NOTICE OF FILING ORIGINAL DEPOSITION OF (SANDRA VILLENEUVE) TAKEN 1/7/04 |
| 03/23/04 | NOTICE (E186) |
| | RAB-VIISAGE TECHNOLOGY, INC.'S NOTICE OF FILING ORIGINAL DEPOSITION OF (DAVID GAWTHROP) TAKEN 1/8/04 INCLUDES ORIGINAL EXHIBITS 320 THROUGH 324; ORIGINAL SIGNED CERTIFICATE AND ORIGINAL ERATA SHEET |
| 03/23/04 | NOTICE (E187) |
| | RAB-VIISAGE TECHNOLOGY, INC.'S NOTICE OF FILING ORIGINAL DEPOSITION OF (JOHN DUNCAN) TAKEN 1/9/04: INCLUDES ORIGINAL MASTER VIDEO TAPES 1-2, ORIGINAL EXHIBITS 330-335, ORIGINAL SIGNED CERTIFICATE AND ORIGINAL SIGNED AMENDMENT TO DEPOSITION |
| 03/23/04 | LETTER (E188) |
| | RAB-RE:FILING OF ORIGINAL DEPOSITION AND EXHIBIT (S) |
| 03/23/04 | NOTICE (E189) |
| | RAB-VIISAGE TECHNOLOGY, INC.'S NOTICE OF FILING ORIGINAL DEPOSITION OF (KEVIN KEIPPER) TAKEN 1/6/04 |
| 03/17/04 | LEAVE OF ABSENCE (E181) |
| | RAB-JOHN P. HUTCHINS: 4/2/04 THROUGH 4/9/04 |
| 03/16/04 | AMENDMENT (E178) |
| | RAB-COPY OF THE 30(B)(6) DEPOSITION OF DMVS(GEORGE THEOBALD) |

# Civil Docket

Fulton County Superior Court
Juanita Hicks, Clerk

Case No. 2003CV66498
Fulton County

March 3rd, 2006
4:08pm

| Date | | Volume | Page |
|---|---|---|---|

### Events & Orders of the Court (cont.)

| Date | Description |
|---|---|
| | VOLUME TWO TAKEN ON 2/12/04 |
| 03/16/04 | NOTICE (E179) |
| | RAB-NOTICE OF FILG DISCOVERY: COPY OF 30(B)(6) DEPOSITION OF DMVS (CHRISTINE CLAY) TAKEN ON 2/12/04 |
| 03/16/04 | AMENDMENT (E180) |
| | RAB-AMENDED CERTIFICATE OF SERVICE: PLAINTIFF'S MOTION TO COMPEL THE COMPLETION OF VIISAGE'S 30(B)(6) DEPOSITION AND (2) BRIEF IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL THE COMPLETIONOF VIISAGE'S 30(B)(6) DEPOSITION |
| 03/15/04 | OTHER (E166) |
| | RAB-PLAINTIFF'S REPLY TO VIISAGE'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTIONS FOR ISSUANCE OF COMMISSION |
| 03/15/04 | AFFIDAVIT (E167) |
| | RAB-AFFIDAVIT OF JOHN P. HUTCHINS |
| 03/15/04 | BRIEF (E168) |
| | RAB-BRIEF IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL THE COMPLETION OF VIISAGE'S 30(B)(6) DEPOSITION |
| 03/15/04 | MOTION (E169) |
| | RAB-PLAINTIFF'S MOTION TO COMPEL THE COMPLETION OF VIISAGE'S 30(B)(6) DEPOSITION |
| 03/15/04 | RESPONSE (E170) |
| | RAB-PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO EXPEDITE TRIAL AND FOR A SPECIAL TRIAL SETTING OR TRANSFER OF THE CASE |
| 03/15/04 | NOTICE (E171) |
| | RAB-NOTICE OF FILING DISCOVERY: ORIGINAL 30(B)(6) DEPOSITIONS OF DMVS (GEORGE THEOBALD) VOL I ON 1/16/04 WITH ORIGINAL EXHIBITS; GEORGE THEOBALD VOL II ON 2/12/04 TO BE FILED WHEN RECEIVED FROM COURT REPORTER: VIISAGE (IFTIKHAR A. AHMAD) VOL I ON 1/20/04 WITH ORIGINAL EXHIBITS TO FOLLOW; IFTIKHAR A. AHMAD VOL II ON 2/10/04 WITH ORIGINAL EXHIBITS TO FOLLOW; IFTIKHAR A. AHMAD VOL III WITH ORIGINAL EXHIBITS TO FOLLOW; AND IFTKHAR A. AHMAD VOL IV WITH ORIGINAL EXHIBITS TO FOLLOW |
| 03/15/04 | CERTIFICATE (E172) |
| | RAB-CERTIFICATE OF GOOD FAITH DISCOVERY CONFERENCE |
| 03/15/04 | DEPOSITION (E173) |
| | RAB-VIDEOTAPED 30(B)(6) DEPOSSITION OF GEORGIA DEPARRTMENT OF MOTOR VEHICLE SAFETY THROUGH GFEORGE THEOBALD 1/16/04 |
| 03/15/04 | TRANSCRIPT (E174) |
| | RAB-IFTI AHMAD 2/18/04 |
| 03/15/04 | TRANSCRIPT (E175) |
| | RAB-IFTIKHAR A. AHMAD 2/19/04 |
| 03/15/04 | TRANSCRIPT (E176) |
| | IFTIKHAR A. AHMAD 1/20/04 |
| 03/15/04 | TRANSCRIPT (E177) |
| | RAB-VIISAGE TECHNOLOGY 2/10/04 |

# Civil Docket

Fulton County Superior Court
Juanita Hicks, Clerk

Case No. 2003CV66498
Fulton County

March 3rd, 2006
4:08pm

| Date | | Volume | Page |
|------|------|--------|------|

### Events & Orders of the Court (cont.)

| | |
|------|------|
| 03/01/04 | RESPONSE (E165)<br>JW-VIISAGE TECHNOLOGY INC'S RESPONSE IN OPPOSITION TO<br>PLAINTIFF'S MOTIONS FOR ISSUANCE OF COMMISSIONS |
| 02/27/04 | MOTION (E164)<br>RAB-REFILING OF VIISAGE TECHNOLOGY INC.'S MOTION TO COMPEL FULL<br>AND COMPLETE PRODUCTION OF DOCUMENTS AND DISCOVERY RESPONSES,<br>AND FOR SANCTIONS AND MEMORANDUM OF LAW IN SUPPORT |
| 02/24/04 | OTHER (E163)<br>RAB-WITHDRAWAL OF VIISAGE TECHNOLOGY INC.'S MOTION TO COMPEL<br>FULL AND COMPLETE PRODUCTION OF DOCUMENTS AND DISCOVERY<br>RESPONSES, AND FOR SANCTIONS AND MEMORANDUM OF LAW IN SUPPORT |
| 02/18/04 | MOTION (E159)<br>RAB-MOTION FOR ISSUANCE OF COMMISSION TO AUTHORIZE DEPOSITION<br>OF (MOHAMMAD A. SIDDIQUI) |
| 02/18/04 | MOTION (E160)<br>RAB-MOTION FOR ISSUANCE OF COMMISSION TO AUTHORIZE DEPOSITION<br>OF (ED COLE, ACCOUNT REPRESENTATIVE) |
| 02/18/04 | MOTION (E161)<br>RAB-MOTION FOR ISSUANCE OF COMMISSION TO AUTHORIZE DEPOSITION<br>OF (KEVIN J. CURRY, BUSSINESS DEVELOPMENT MANAGER) |
| 02/18/04 | RESPONSE (E162)<br>RAB-RESPONSE TO MOTION TO SHORTEN DIGIMARC'S RESPONSE TIME TO<br>SEVEN DAYS |
| 02/16/04 | MOTION (E158)<br>RAB-MOTION TO COMPEL FULL AND COMPLETE PRODUCTION OF DOCUMENTS<br>AND DISCOVERY RESPONSES, AND FOR SANCTIONS AND MEMORANDUM OF<br>LAW IN SUPPORT |
| 02/13/04 | MEMORANDUM (E156)<br>RAB-MEMORANDUM OF LAW IN SUPPORT OF GA. TECHNOLOGY AUTHORITY,<br>GA.DMVS, AND VIISAGE TECHNOLOGY, INC.'S MOTION TO EPEDITE TRIAL<br>AND FOR SPECIAL TRIAL SETTING OR TRANSFER OF CASE |
| 02/13/04 | MOTION (E157)<br>RAB-GA. TECHNOLOGY AUTHORITY, GA.DMVS, AND VIISAGE TECHNOLOGY,<br>INC'S MOTION TO EXPEDITE TRIAL AND FOR A SPECIAL TRIAL SETTING<br>OR TRANSFER OF THE CASE |
| 02/09/04 | RESPONSE (E155)<br>RAB-RESPONSE TO OBJECTION TO NOTICE FOR LEAVE OF ABSENCE |
| 02/06/04 | OBJECTIONS (E154)<br>RAB-OBJECTION TO NOTICE FOR LEAVE OF ABSENCE |
| 02/05/04 | OBJECTIONS (E153)<br>RAB-OBJECTION TO NOTICE OF LEAVE OF ABSENCE |
| 01/13/04 | CERTIFICATE OF SERVICE (E149)<br>RAB-PLA'S RESPONSE TO DEFS' 3RD INTERROGATORIES AND 3RD REQUEST<br>FOR PRODUCTION OF DOCUMENTS |
| 01/13/04 | CERTIFICATE OF SERVICE (E150) |

## Civil Docket

Fulton County Superior Court
Juanita Hicks, Clerk

Case No. 2003CV66498
Fulton County

March 3rd, 2006
4:08pm

| Date | | Volume | Page |
|------|--|--------|------|

### Events & Orders of the Court (cont.)

|  | |
|--|--|
| | RAB-PLA'S RESPONSE TO DEF VIISAGE TECHNOLOGY, INC.'S 1ST REQUEST for PRODUCTION |
| 01/13/04 | CERTIFICATE OF SERVICE (E151) |
| | RAB-PLA'S RESPONSE TO DEF VIISAGE TECHNOLOGY, INC.'S 1ST INTERROGATORIES |
| 01/13/04 | CERTIFICATE OF SERVICE (E152) |
| | RAB-GA. DMVS'S SUPPLEMENTAL RESPONSE TO PLA'S 1ST INTERROGATORIES |
| 01/12/04 | CERTIFICATE OF SERVICE (E148) |
| | RAB-RESPONSE OF GA. TECHNOLOGY AUTHORITY TO PLA'S 1ST INTERROGATORIES AND 1ST REQUEST FOR PRODUCTION OF DOCUMENTS |
| 01/09/04 | CERTIFICATE OF SERVICE (E145) |
| | RAB-RULE 5.2: DISCOVERY: RESPONSE OF THE GA. TECHNOLOGY AUTHORITY AND THE GA. DMVS TO PLA'S 6TH REQUEST FOR PRODUCTION OF DOCUMENTS |
| 01/09/04 | CERTIFICATE OF SERVICE (E146) |
| | RAB-DEF VIISAGE TECHNOLOGY, INC.'S OBJECTIONS AND RESPONSES TO PLA'S 1ST INTERROGATORIES |
| 01/09/04 | ORDER (E147) |
| | RAB-ORDER ON DEFS' JOINT EMERGENCY MOTION TO COMPEL: ROGER L. FRENCH TO APPEAR FOR A DEPOSITION |
| 01/08/04 | LEAVE OF ABSENCE (E144) |
| | RAB-EMILY P. HITCHCOCK: 2/13/04 THROUGH AND INCLUDING 3/1/04 |
| 01/06/04 | NOTICE OF DEPOSITION (E142) |
| | RAB-GA. TECHNOLOGY AUTHORITY BEGINNING AT 9.00AM ON 1/19/04 |
| 01/06/04 | NOTICE OF DEPOSITION (E143) |
| | RAB-GA. DMVS BEGINNING AT 9:00AM ON 1/16/04 |
| 01/05/04 | MOTION (E141) |
| | RAB-JOINT EMERGENCY MOTION TO COMPEL ATTENDANCE AT DEPOSITION, FOR COSTS, AND FOR SANCTIONS AND MEMORANDUM OF LAW IN SUPPORT (FILED WITH DEPOSITION OF ROGER FRENCH AS EXHIBIT H) |
| 01/02/04 | CERTIFICATE OF SERVICE (E135) |
| | RAB-DISCOVERY: GA. DMVS'S SUPPLEMENTAL RESPONSES TO PLA'S 2ND INTERROGATORIES |
| 01/02/04 | CERTIFICATE OF SERVICE (E136) |
| | RAB-DISCOVERY:RESPONSES OF GA. DMVS'S DIGIMARC'S 4TH INTERROGATORIES AND 5TH REQUEST FOR PRODUCTION |
| 01/02/04 | CERTIFICATE OF SERVICE (E137) |
| | RAB-RESPONSE OF GA. DMVS'S TO PLA 'S 3RD INTERROGATORIES AND 5TH REQUEST FOR PRODUCTION OF DOCUMENTS |
| 01/02/04 | CERTIFICATE OF SERVICE (E138) |
| | RAB-GA. TECHNOLOGY AUTH.'S SUPPLEMENTAL RESPONSE TO PLA'S 1ST INTERROGATORIES |
| 01/02/04 | CERTIFICATE OF SERVICE (E139) |
| | RAB-GA. TECHNOLOGY AUTH.'S SUPPLEMENTAL RESPONSE TO PLA'S 2ND |

## Civil Docket

Fulton County Superior Court
Juanita Hicks, Clerk

Case No. 2003CV66498
Fulton County

March 3rd, 2006
4:08pm

| Date | | Volume | Page |
|---|---|---|---|

### Events & Orders of the Court (cont.)

| | |
|---|---|
| | INTERROGATORIES |
| 01/02/04 | CERTIFICATE OF SERVICE (E140) |
| | RAB-DEFS' SUPPLEMENTAL RESPONSE TO PLA'S 1ST REQUEST FOR ADMISSIONS |
| 12/31/03 | AMENDMENT (E134) |
| | RAB-AMENDED NOTICE OF 30(B)(6) DEPOSITION OF VIISAGE TECHNOLOGY, INC. |
| 12/24/03 | NOTICE OF DEPOSITION (E133) |
| | RAB-VIISAGE TECHNOLOGY, INC. AT 9:00AM ON 1/15/04 |
| 12/22/03 | CERTIFICATE OF SERVICE (E130) |
| | RAB-DISCOVERY: GA. DMV'S RESPONSE TO PLA DIGIMARC'S 3RD INTERROGAETORIES |
| 12/22/03 | CERTIFICATE OF SERVICE (E131) |
| | RAB-DISCOVERY: RESPONSE OF GA. DMV AND GA. TECHNOLOGY AUTH. TO PLA DIGIMARC |
| 12/22/03 | CERTIFICATE OF SERVICE (E132) |
| | RAB-DISCOVERY: RESPONSE OF THE DMV AND THE GA. TECHNOLOGY AUTHORITY TO PLA'S 4TH REQUEST FOR PRODUCTION OF DOCUMENTS |
| 12/19/03 | NOTICE OF DEPOSITION (E129) |
| | RAB-RONNIE JOHNSON ON 1/5/04 AT 9:30 AM |
| 12/15/03 | ANSWER (E128) |
| | RAB-VIISAGE TECHNOLOGY, INC.'S ANSWER TO PLA'S 1ST AMENDED COMPLAINT FOR INTERLOCUTORY AND PERMANENT INJUNCTIVE RELIEF AND DEMAND FOR TRIAL BY STRUCK JURY |
| 12/12/03 | NOTICE (E127) |
| | RAB-DEF VISAGE TECHNOLOGY, INC.'S RULE 5.2 NOTICE OF SERVICE OF DISCOVERY |
| 12/11/03 | CERTIFICATE OF SERVICE (E124) |
| | RAB-PLA'S 6TH REQUEST FOR PRODUCTION OF DOCUMENTS TO DMV AND TO GA. TECHNOLOGY AUTHORITY; PLA'S 1ST INTERROGATORIES TO VIISAGE TECHNOLOGY, INC.; AND PLA'S 1ST REQUEST FOR PRODUCTION OF DOCUMENTS TO VIISAGE TECHNOLOGY, INC. |
| 12/11/03 | CERTIFICATE OF SERVICE (E125) |
| | RAB-DISCOVERY: DEF'S' 3RD INTERROGATORIES AND 3RD REQUEST FOR PRODUCTION OF DOCUMENTS TO PLA DIGIMARC |
| 12/11/03 | CERTIFICATE (E126) |
| | RAB-RULE 5.2: PLA'S 4TH INTERROGATORIES AND 5TH REQUEST FOR PRODUCTION OF DOCUMENTS TO DEF GA. DMV AND 3RDINTERROGATORIES AND 5TH REQUEST FOR PRODUCTION OF DOCUMENTS TO DEF GA. TECHNOLOGY AUTHORITY |
| 12/10/03 | CONSENT ORDER (E123) |
| | RAB-EXTENDING DISCOVERY UNTIL 1/9/04 |
| 12/01/03 | NOTICE OF DEPOSITION (E118) |
| | RAB-CHRISTOPHER TOMLINSON ON 12/18/03 AT 9:00AM TO CONTINUE FROM DAY TO DAY UNTIL COMPLETED |

# Civil Docket

Fulton County Superior Court
Juanita Hicks, Clerk

Case No. 2003CV66498
Fulton County

March 3rd, 2006
4:08pm

| Date | | Volume | Page |
|------|--|--------|------|

## Events & Orders of the Court (cont.)

| | |
|---|---|
| 12/01/03 | NOTICE OF DEPOSITION (E119)<br>RAB-CHAREMON SCOTT ON 12/18/03 AT 1:30 PM AND CONTINUE FROM DAY<br>TODAY UNTIL COMPLETE |
| 12/01/03 | NOTICE OF DEPOSITION (E120)<br>RAB-CHARLES NIXON ON 12.22.03 AT 9:00 AND CONTINUE FROM DAY TO<br>DAY UNTIL COMPLETE |
| 12/01/03 | NOTICE OF DEPOSITION (E121)<br>RAB-RONNIE JOHNSON ON 12/30/03 AT 9:00AM AND DAY TO DAY TO<br>COMPLETION |
| 12/01/03 | NOTICE OF DEPOSITION (E122)<br>RAB-BARRY SHEPERD ON 12.23.03 AT 9:00 AM AND CONTINUE DAY BY<br>DAY TO COMPLETION |
| 11/21/03 | CERTIFICATE OF SERVICE (E115)<br>RAB-PLA DIGIMARC ID SSYSTEMS, LLC'S 3RD INTERROGATORIES TO DEF<br>GA. DEPT. OF MOTOR VEHICLE SAFETY |
| 11/21/03 | CERTIFICATE OF SERVICE (E116)<br>RAB-PLA DIGIMARC ID SYSTEMS, LLC'S 2ND REQUEST FOR ADMISSIONS<br>TO DEFS |
| 11/21/03 | CERTIFICATE OF SERVICE (E117)<br>RAB-DIGIMARC'S 4TH REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFS |
| 11/20/03 | ACKNOWLEDGMENT OF SERVICE (E114)<br>RAB-VIISAGE TECHNOLOGY 11.13.03 |
| 11/12/03 | DEPOSITION (E110)<br>RAB-GEORGE THEOBALD VOL 1: COMMENCING 6/17/03 AT 9:23 AM<br>(VIDEOTAPED) |
| 11/12/03 | DEPOSITION (E111)<br>RAB-CONTINUATION OF THE VIDEOTAPED DEPOSITION OF (GEORGE<br>THEOBALD) COMMENCING 7/24/03, AT 9:31 AM |
| 11/12/03 | NOTICE (E112)<br>RAB-NOTICE OF FILINF ORIGINAL DISCOVERY: DEPOSITION OF GEORGE<br>THEOBALD VOL I TAKEN ON 6/17/03; AND VOLUME II TAKEN ON 7/24/03 |
| 11/12/03 | AMENDED COMPLAINT (E113)<br>RAB-1ST AMENDED COMPLAINT FOR INTERLOCUTORY AND PERMANENT<br>INJUNCTIVE RELIEF |
| 11/10/03 | NOTICE (E109)<br>RAB-NOTICE OF OBJECTION |
| 11/07/03 | CONSENT ORDER (E107)<br>RAB-CONSENT ORDER ON DEFS' MOTION TO DISMISS OR IN THE<br>ALTERNATIVE TO ADD AN INDISPENSABLE PARTY |
| 11/07/03 | OTHER (E108)<br>RAB-RESPONSE OF VIISAGE TECHNOLOGY, INC. TO CONSENT ORDER ON<br>DEFS' MOTION TO DISMISS OR IN THE ALTERNATIVE TO ADD AN<br>INDISPENSABLE PARTY |
| 10/29/03 | ENTRY/NOTICE OF APPEARANCE (E95)<br>RAB-FOR DEFS (GA. TECHNOLOGY AUTHORITY AND GA. DEPT. OF MOTOOR |

# Civil Docket

Fulton County Superior Court
Juanita Hicks, Clerk

Case No. 2003CV66498
Fulton County

March 3rd, 2006
4:08pm

| Date | Events & Orders of the Court (cont.) | Volume | Page |
|------|---------------------------------------|--------|------|
| | VEHICLE SAFETY)  JOHN P. GALLAGHER | | |
| 10/29/03 | NOTICE OF DEPOSITION (E96) | | |
| | RAB-BRIAN BRESNAHAN: COMMENCING 12.5.03 AT 3:00 PM | | |
| 10/29/03 | NOTICE OF DEPOSITION (E97) | | |
| | RAB-NEAL WYNNE: COMMENCING 12.2.03 AT 9:00 AM | | |
| 10/29/03 | NOTICE OF DEPOSITION (E98) | | |
| | RAB-STEPHEN MALONE: COMMENCING 11.25.03 AT 9:00 AM | | |
| 10/29/03 | NOTICE OF DEPOSITION (E99) | | |
| | RAB-JOHN MUNDAY: COMMENCING 11.24.03 AT 1:00 PM | | |
| 10/29/03 | NOTICE OF DEPOSITION (E100) | | |
| | RAB-JOHN DUNCAN: COMMENCING 12.1.03 AT 4:00 PM | | |
| 10/29/03 | NOTICE OF DEPOSITION (E101) | | |
| | RAB-DR. ROBERT JONES: COMMENCING 12.4.03 AT 9:00AM | | |
| 10/29/03 | NOTICE OF DEPOSITION (E102) | | |
| | RAB-KEVIN KEIPPER: COMMENCING 12.5.03 AT 1:00PM | | |
| 10/29/03 | NOTICE OF DEPOSITION (E103) | | |
| | RAB-DAVID GAWTHROP: COMMENCING 12.4.03 AT 4:00 PM | | |
| 10/29/03 | NOTICE OF DEPOSITION (E104) | | |
| | RAB-INDRA PAUL: COMMENCING 12.3.03 AT 2:00 PM | | |
| 10/29/03 | NOTICE OF DEPOSITION (E105) | | |
| | RAB-SAL KEENEY: COMMENCING 12.5.03 AT 9:00 AM | | |
| 10/29/03 | NOTICE OF DEPOSITION (E106) | | |
| | RAB-SANDRA VILLENEUVE: COMMENCING 12.1.03 AT 1:00 PM | | |
| 10/01/03 | MOTION (E92) | | |
| | IJ-MOTION FOR EXPEDITED DECISION | | |
| 10/01/03 | MOTION (E93) | | |
| | IJ-DEFENDANTS' MOTION TO DISMISS | | |
| 10/01/03 | BRIEF (E94) | | |
| | IJ-BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS | | |
| 09/25/03 | CERTIFICATE OF SERVICE (E89) | | |
| | IJ-RULE 5.2 CERTIFICATE OF SERVICE OF DISCOVERY, SECOND INTERROGATORIES AND THIRD REQUEST FOR PRODUCTION | | |
| 09/25/03 | CERTIFICATE OF SERVICE (E90) | | |
| | IJ-RULE 5.2 CERTIFICATE OF SERVICE OF DISCOVERY, FIRST REQUEST FOR ADMISSIONS | | |
| 09/25/03 | CERTIFICATE OF SERVICE (E91) | | |
| | IJ-RULE 5.2 CERTIFICATE OF SERVICE OF DISCOVERY | | |
| 09/16/03 | ORDER (COO) | | |
| | TT | | |
| 09/04/03 | ORDER (E87) | | |
| | IJ-ORDER GRANTED FOR ADMISSION PRO HAC VICE OF SPECIAL ASSISTANT ATTORNEY GENERAL ALVIN O. SABO ON BEHALF OF DEFENDANTS | | |
| 08/29/03 | OTHER (E86) | | |
| | IJ-WITHDRAWAL OF STATEMENTS MADE DURING ORAL ARGUMENT | | |

## Civil Docket

Fulton County Superior Court
Juanita Hicks, Clerk

Case No. 2003CV66498
Fulton County

March 3rd, 2006
4:08pm

| Date | | Volume | Page |
|------|--|--------|------|

### Events & Orders of the Court (cont.)

| Date | Description |
|------|-------------|
| 08/27/03 | CERTIFICATE OF SERVICE (E83)<br>IJ-PLAINTIFF DIGIMARC ID SYSTEMS, LLC'S SECOND INTERROGATORIES & THIRD REQUEST FOR PRODUCTION OF DOCUMENTS, TO DEFENDANT GEORGIA TECHNOLOGY AUTHORITY |
| 08/27/03 | CERTIFICATE OF SERVICE (E84)<br>IJ-PLAINTIFF DIGIMARC ID SYSTEMS, LLC'S SECOND INTERROGATORIES & THIRD REQUEST FOR PRODUCTION OF DOCUMENTS, TO DEFENDANT GEORGIA DEPT OF MOTOR VEHICLE SAFETY |
| 08/27/03 | CERTIFICATE OF SERVICE (E85)<br>JW-CERTIFICATE OF SERVICE SERVED A COPY OF PLAINTIFF DIGIMARE ID SYSTEMS LLC'S FIRST REQUEST FOR ADMISSIONS TO DEFENDANTS BY HAND DELIVERY TO JOHN P BALLARD JR AND EMILY P HITCHCOCK |
| 08/20/03 | AMENDED ANSWER (E81)<br>IJ-SECOND AMENDED ANSWER & DEFENSES OF THE GEORGIA TECHNOLOGY AUTHORITY |
| 08/20/03 | AMENDED ANSWER (E82)<br>IJ-FIRST AMENDED ANSWER & DEFENSES OF THE DEPARTMENT OF MOTOR VEHICLE SAFETY |
| 08/19/03 | CONSENT ORDER (E80)<br>IJ-CONSENT ORDER EXTENDING DISCOVERY PERIOD |
| 08/18/03 | NOTICE OF DEPOSITION (E79)<br>IJ-TO: VIISAGE TECHNOLOGY INC. |
| 08/07/03 | ORDER (E78)<br>IJ-ORDER ON DEFENDANTS' MOTION FOR FINDINGS OF FACT & CONCLUSIONS OF LAW |
| 08/06/03 | OTHER (E77)<br>IJ-APPLICATION FOR ADMISSION PRO HAC VICE |
| 07/31/03 | ORDER (E76)<br>IJ-ORDER ON PLAINTIFF'S MOTION FOR INTERLOCUTORY INJUNCTION |
| 07/30/03 | RESPONSE (E75)<br>IJ-DIGIMARC'S RESPONSE TO DEFENDANTS' MOTION FOR FINDINGS OF FACT & CONCLUSIONS OF LAW |
| 07/29/03 | MOTION (E74)<br>IJ-MOTION FOR FINDING OF FACT & CONCLUSIONS OF LAW |
| 07/28/03 | NOTICE (E73)<br>IJ-NOTICE OF FILING DISCOVERY |
| 07/24/03 | NOTICE (E71)<br>IJ-NOTICE OF FILING DISCOVERY |
| 07/24/03 | ORDER (E72)<br>IJ-ORDER GRANTING MOTION TO QUASH |
| 07/23/03 | MOTION (E70)<br>IJ-MOTION TO QUASH NOTICE OF DEPOSITION & SUBPOENA FOR DEPOSITION & BRIEF IN SUPPORT THEREOF |
| 07/22/03 | NOTICE (E69)<br>IJ-NOTICE OF DEPOSITION OF DE LA RUE IDENTITY SYSTEMS |

## Civil Docket

Fulton County Superior Court
Juanita Hicks, Clerk

Case No. 2003CV66498
Fulton County

March 3rd, 2006
4:08pm

| Date | | Volume | Page |
|------|--|--------|------|

### Events & Orders of the Court (cont.)

| Date | Event |
|------|-------|
| 07/09/03 | NOTICE OF DEPOSITION (E68)<br>RAB-GEORGE THEOBALD ON 7.24.03 AT 9:00AM |
| 07/02/03 | VERIFICATION (E64)<br>RAB-DIRECTOR OF LEGAL SERVICES FOR THE DMVS (CHAREMON<br>SCOTT)DMVS'S PARTIAL RESPONSE TO POLA'S 1ST INTERRS |
| 07/02/03 | VERIFICATION (E65)<br>RAB-ASSISTANT GENERAL COUNSEL FOR TH GTA (CHRISTOPHER<br>TOMLINSON) GTA'S EXPEDITED PARTIAL RESPONSE TO PLA'S 1ST INTERRS |
| 07/02/03 | VERIFICATION (E66)<br>RAB-ASST. GEN. COUNSEL FOR THE GTA (CHRISTOPHER<br>TOMLINSON) ANSWER AND DEFENSES OF THE GTA |
| 07/02/03 | VERIFICATION (E67)<br>RAB-CLAREMONT SCOTT (ANSWER AND DEFENSES OF THE DMVS) |
| 07/01/03 | ORDER (E63)<br>RAB-ORDER ON MOTION FOR TRANSFER, JUDICIAL ASSISTANCE OR, IN<br>THE ALTERNATIVE, LEAVE TO SEEK A HEARING WITH THE PRESIDING<br>JUDGE |
| 06/25/03 | ORDER (E60)<br>RAB-ORDER FOR ISSUANCE OF COMMISSION TO TAKE DEPOSITION OUT OF<br>STATE OF VISAGE TECHNOLOGY, INC. |
| 06/25/03 | BRIEF (E61)<br>RAB-BRIEF IN SUPPORT OF MOTION FOR TRANSFER, JUDICIAL<br>ASSISTANCE OR, IN THE ALTERNATIVE, LEAVE TO SEEK A HEARING WITH<br>THE PRESIDING JUDGE |
| 06/25/03 | MOTION (E62)<br>RAB-MOTIONFOR TRANSFER, JUDICIAL ASSISTANCE OR, IN THE<br>ALTERNATIVE, LEAVE TO SEEK A HEARING WITH THE PRESIDING JUDGE |
| 06/23/03 | ORDER (E59)<br>RAB-ROGER L. FRENCH IS ADDED AS COUNSEL FOR DIGIMARC PRO HAC<br>VICE |
| 06/19/03 | RESPONSE (E58)<br>RAB-RESPONSE TO MOTION FOR INTERLOCUORY INJUNCTION BY THE GA.<br>TECHNOLOGY AUTHORITY AND THE DEPT. OF MOTOR VEHICLE SAFETY |
| 06/18/03 | NOTICE OF DEPOSITION (E57)<br>RAB-GEORGE THEOBALD ON 6.16.03 FROM 8:30 AM UNTIL 2:00PM AND<br>WIL CONTINUE ON 6.17.03 AT 8:30 AM |
| 06/17/03 | OTHER (E55)<br>RAB-STIPULATION RE (CERTIFIE COPY OF THE REQUEST PROPOSAL NO.<br>GTA 000051) |
| 06/17/03 | OTHER (E56)<br>RAB-CERTIFIDE COPY OF THE REQUEST FOR PROPOSAL NO. GTA 000051<br>DIGITIZED LICENSE SYSTEM FOR THE GA. DEPT. OF MOTOR VEHICLE<br>SAFETY |
| 06/09/03 | BRIEF (E54)<br>RAB-BRIEF OF THE GA. TECHNOLOGY AUTHORITY AND THE DEPT. OF |

# Civil Docket

Fulton County Superior Court
Juanita Hicks, Clerk

Case No. 2003CV66498
Fulton County

March 3rd, 2006
4:08pm

| Date | | Volume | Page |
|------|--|--------|------|

### Events & Orders of the Court (cont.)

| | |
|---|---|
| | MOTOR VEHICLE SAFETY IN RESPONSE TO PLA'S MPOTION FOR EMERGENCY HEARING ON ITS MOTTION FOR INTERLOCUTORY INJUNCTION |
| 06/06/03 | MOTION (E53) |
| | RAB-MOTION FOR ISSUANCE OF COMMISSION TO TAKE DEPOSITION OUT OF ATATE OF VIISAGE TECHNOLOGY, INC. |
| 06/05/03 | MOTION (E50) |
| | RAB-MOTION FOR EMERGENCY HEARING ON DIGIMARC'S MOTION FOR INTERLOCUTORY INJUNCTION |
| 06/05/03 | AFFIDAVIT (E51) |
| | RAB-AFFIDAVIT OF VALERIE D. BARTON |
| 06/05/03 | BRIEF (E52) |
| | RAB-BRIEF IN SUPPORT OF MOTION FOR EMERGENCY HEARING ON DIGIMARC'S MOTION FOR INTERLOCUTORY INJUNCTION |
| 06/04/03 | CERTIFICATE OF SERVICE (E49) |
| | RAB-PLA'S RESPONSE TO DEFS' 2ND INTERRS AND PDO TO PLA |
| 06/02/03 | RESPONSE (E46) |
| | RAB-GA. TECHNOLOGY AURHORITY'S EXPEDITED PARTIAL RESPONSE TO PLA DIGIMARC ID SYSTEMS, LLC'C 1ST INTERRS |
| 06/02/03 | RESPONSE (E47) |
| | RAB-GA. DEPT. OF MOTOR VEHICLE SAFETY'S EXPEDITED PARTIAL RESPONSE TO PLA DIGIMARC ID SYSTEMS, LLC'S 1ST INTERRS |
| 06/02/03 | NOTICE (E48) |
| | RAB-NOTICE OF FILING OF ORIGINAL DISCOVERY MATERIAL |
| 05/29/03 | MOTION (E45) |
| | RAB-MOTION FOR LEAVE TO APPEAR AS COUNSEL PHO HAC VICE FOR PLA DIGIMARC ID SYSTEMS, LLC |
| 05/22/03 | OTHER (E43) |
| | RAB-REQUEST FOR FILING ORIGINAL DISCOVERY |
| 05/22/03 | MOTION (E44) |
| | RAB-MOTION FOR HEARING ON PLA DIGIMARC'S MOTION FOR INTERLOCUTORY INJUNCTION |
| 05/20/03 | BRIEF (E39) |
| | RAB-BRIEF IN SUPPORT OF PLA DIGIMARC'S MOTION FOR INTERLOCUTORY INJUNCTION |
| 05/20/03 | CERTIFICATE OF SERVICE (E40) |
| | RAB-1) DIGIMARC'S MOTION FOR INTERLOCUTORY INJUNCTION; 2) BRIEF IN SUPPORT OF DIGIMARC'S MOTION FOR INTERLOCUTORY INJUNCTION; AND 3) EVIDENTIARY APPENDIX IN SUPPORT OF DIGIMARC'S MOTION FOR INTERLOCUTORY INJUNCTION |
| 05/20/03 | OTHER (E41) |
| | RAB-EVIDENTIARY APPENDIX IN SUPPORT OF DIGIMARC'S MOTION FOR INTERLOCUTORY INJUNCTION |
| 05/20/03 | MOTION (E42) |
| | RAB-DIGIMARC'S ID SYSTEMS, LLC'S MOTION FOR INTERLOCUTORY INJUNCTION |

# Civil Docket

Fulton County Superior Court
Juanita Hicks, Clerk

Case No. 2003CV66498
Fulton County

March 3rd, 2006
4:08pm

| Date | | Volume | Page |
|---|---|---|---|

### Events & Orders of the Court (cont.)

| Date | |
|---|---|
| 05/05/03 | CERTIFICATE OF SERVICE (E38)<br>RAB-DISCOVERY: GA. TECHNOLOGY AUTHORITY'S RESPONSE TO PLA'S 2ND PDO AND MATERIAL THINGS; DEPT. OF MOTOR VEHICLE SAFETY'S RESPONSE TO PLA'S 2ND PDO AND MATERIAL THINGS; GA. TECHNOLOGY AUTHORITY'S SUPPLEMENTAL NON-EXPEDITED RESPONSE TO PLA'S 1ST INTERRS; AND DEPT. OF MOTOR VEHICLE SAFETY'S SUPPLEMENTAL NON-EXPEDITED RESPONSE TO PLA'S 1ST INTERRS |
| 05/01/03 | CERTIFICATE OF SERVICE (E35)<br>RAB-PLA'S RESPONSE TO DEFS' 1ST INTERRS AND PDO |
| 05/01/03 | OTHER (E36)<br>RAB-STIPULATION THAT THE COURT OR ANY PARTY MAY REFER TO THE RECORD FOR THE PURPOSE OF ANY MOTION, AND MAY TENDER EVIDENCE AT TRIAL, WITHOUT NEED OF FURTHER ETC. |
| 05/01/03 | OTHER (E37)<br>RAB-CERTIFIED COPY OF THE RECORD OF PROCEEDINGS IN THE MATTER OF: PROTEST OF DIGIMARC ID SYSTEMS, OF THE CONTRACT AWARD FOR REQUEST FOR PROPOSAL NO.GTA000051, DIGITIZED LICENSE SYSTEM FOR THE GEORGIA DEPT. OF MOTOR VEHICLE SAFETY (2 VOLUMES) |
| 04/29/03 | ORDER (E34)<br>RAB-APPLICATION OF EMILY P. HITCHCOCK FOR LEAVE OF ABSENE IS GRANTED FOR 6.20.03 THROUGH AND INCLUDING 7.21.03 |
| 04/24/03 | CERTIFICATE OF SERVICE (E33)<br>RAB-DISCOVERY: DEPT. OF MOTOR VEHICLE SAFETY'S EXPEDITED PARTIAL RESPONSE TO PLA'S 1ST INTERRS |
| 04/22/03 | CONSENT ORDER (E31)<br>RAB-CONCERNING CONFIDENTIALITY |
| 04/22/03 | CERTIFICATE OF SERVICE (E32)<br>RAB-DEFS' 2ND INTERRS AND PDO TO PLA |
| 04/18/03 | CERTIFICATE OF SERVICE (E29)<br>RAB-DISCOVERY: GA. DEPT. OF MOTOR VEHICLE SAFETY'S EXPEDITED PARTIAL RESPONSE TO PLA'S 1ST PDO AND MATERIAL THINGS |
| 04/18/03 | CERTIFICATE OF SERVICE (E30)<br>RAB-DISCOVERY: GA. TECCHNOLOGY AUTHORITY'S EXPEDITED PARTIAL RESPONSE TO PLA'S 1ST INTERRS |
| 04/16/03 | CERTIFICATE OF SERVICE (E27)<br>RAB-DISCOVERY: GA. TECHNOLOGY AUTHORITY'S RESPONSE TO PLA'S 1ST PDO |
| 04/16/03 | CERTIFICATE OF SERVICE (E28)<br>RAB-DISCOVERY: GA. DEPT. OF MOTOR VEHICLE SAFETY'S RESPONSE TO PLA'S 1ST PDO AND MATERIAL THINGS |
| 04/10/03 | CERTIFICATE OF SERVICE (E26)<br>RAB-DEFS' 1ST INTERRS AND 1ST PDO TO PLA |
| 04/09/03 | CERTIFICATE OF SERVICE (E22)<br>RAB-PLA DIGIMARC ID SYSTEMS, LLC'S 1ST INTERRS TO DEF GA. DEPT. OF MOTOR VEHICLE SAFETY |

# Civil Docket

Fulton County Superior Court
Juanita Hicks, Clerk

Case No. 2003CV66498
Fulton County

March 3rd, 2006
4:08pm

| Date | | Volume | Page |
|------|--|--------|------|

## Events & Orders of the Court (cont.)

| Date | |
|------|--|
| 04/09/03 | CERTIFICATE OF SERVICE (E23) |
| | RAB-PLA DIGIMARC'S 1ST INTERRS TO DEF GA. TECHNOLOGY AUTHORITY |
| 04/09/03 | CERTIFICATE OF SERVICE (E24) |
| | RAB-DIGIMARC'S 2ND PDO AND MATERIAL THINGS TO DEF GA. TECHNOLOGY AUTHORITY |
| 04/09/03 | CERTIFICATE OF SERVICE (E25) |
| | RAB-DIGIMARC'S 2ND PDO AND MASTERIAL THINGS TO DEF GA. DEPT OF MOTOR VEHICLE SAFETY |
| 04/08/03 | AMENDMENT (E21) |
| | RAB-AMENDMENT TO ANSWER AND DEFENSES OF THE GA. TECHNOLOGY AUTHORITY |
| 04/07/03 | ORDER (E19) |
| | RAB-GRANTING EXPEDITED DISCOVERY |
| 04/07/03 | ANSWER (E20) |
| | RAB-ANSWER AND DEFENSES OF THE DEPT. OF MOTOR VEHICLE SAFETY |
| 04/04/03 | ANSWER (E18) |
| | RAB-GA. TECHNOLOGY AUTHORITY |
| 04/01/03 | LEAVE OF ABSENCE (E17) |
| | RAB-EMILY P. HITCHCOCK: APLLICTION FOR LEAVE OF ABSENCE FOR MORE THAN 30 DAYS; JUDGE'S ORDER PENDING |
| 03/31/03 | RESPONSE (E14) |
| | RAB-DEFS' SUPPLEMENTAL RESPONSE TO PLA'S MOTION FOR EXPEDITED DISCOVERY |
| 03/31/03 | CERTIFICATE OF SERVICE (E15) |
| | RAB-PLA DIGIMARC ID SYSTEMS, LLC.'S 1ST PDO AND MATERIAL THINGS TO DEF GA. DEPT. OF MOTOR VEHICLE SAFETY |
| 03/31/03 | CERTIFICATE OF SERVICE (E16) |
| | RAB-PLA DIGIMARC ID SYSTEMS, LLC.'S 1ST PDO AND MATERIAL THINGS TO DEF GA. TECHNOLOGY AUTHORITY |
| 03/26/03 | BRIEF (E13) |
| | RAB-REPLY BRIEF OF PLA TO DEFS' RESPONSE TO PLA'S MOTION FOR RECONSIDERATION OF PLA'S REQUEST FOR ORAL HEARING OR, IN THE ALTERNATIVE, RESPONSE TO MOTION FOR EXPEDITED DISCOVERY |
| 03/25/03 | RESPONSE (E12) |
| | RAB-RESPONSE TO PLA'S MOTION FOR RECONSIDERATION OF PLA'S REQUEST FOR ORAL HEARING OR, IN THE ALTERNATIVE, RESPONSE TO MOTION FOR EXPEDITED DISCOVERY |
| 03/21/03 | NOTICE (E11) |
| | RAB-NOTICE OF HEARING ON PLA DIGIMARC'S MOTION FOR EXPEDITED DISCOVERY |
| 03/20/03 | MOTION (E9) |
| | RAB-MOTION FOR RECONSIDERATION OF PLA'S REQUEST FOR ORAL HEARING |
| 03/20/03 | BRIEF (E10) |
| | RAB-BRIEF IN SUPPORT OF MOTION FOR RECONSIDERATION OF PLA'S |

# Civil Docket

Fulton County Superior Court
Juanita Hicks, Clerk

Case No. 2003CV66498
Fulton County

March 3rd, 2006
4:08pm

| Date | | Volume | Page |
|---|---|---|---|

### Events & Orders of the Court (cont.)

| | |
|---|---|
| | REQUEST FOR ORAL HEARING AND REPLY BRIEF TO OBJECTION TO HEARING |
| 03/17/03 | OBJECTIONS (E8) |
| | RAB-OBJECTION TO HEARING ON MOTION FOR EXPEDITED DISCOVERY BY THE GA. TECHNOLOGY AUTHORITY AND THE DEPT. OF MOTOR VEHICLES |
| 03/12/03 | ENTRY/NOTICE OF APPEARANCE (E7) |
| | KJN-ENTRY OF APPEARANCE ON BEHALF OF DEFENDANTS (EMILY P. HITCHCOCK) |
| 03/11/03 | AFFIDAVIT (E5) |
| | RAB-GA. TECHNOLOGY AUTHORITY C/O BRENDA GREENWAY 2.5.03 |
| 03/11/03 | AFFIDAVIT (E6) |
| | RAB-GA. DEPT. OF MOTOR VEHICLE SAFETY C/O KAREN MARTIN 3.6.03 |
| 03/07/03 | CERTIFICATE OF SERVICE (E4) |
| | RAB-MOTION AND BRIEF FOR EXPEDITED DISCOVERY |
| 03/06/03 | MOTION (E3) |
| | RAB-MOTION AND BRIEF FOR EXPEDITED DISCOVERY |
| 03/05/03 | PLAINTIFF'S ORIGINAL PETITION (E1) |
| | KA: VERIFIED COMPLAINT FOR TEMPORARY RESTRAINIG ORDER INTERLOCUTORY AND PERMANENT INJUNCTIVE RELIEF |
| 03/05/03 | CASE INITIATION FORM (E2) |
| | KA: |

### Fee Payment Information

Total Payments: 1
Total Charged : $73.00
Total Paid   : $73.00

| | | | |
|---|---|---|---|
| 03/05/03 | Check | Rcpt # 60937 | $73.00 |

### Fee Information

| Fee Code | Plaintiff | Defendant |
|---|---|---|
| SUP.SN | $1.00 | $0.00 |
| SUP.LL | $3.00 | $0.00 |
| SUP.CR | $1.00 | $0.00 |
| SUP.CF | $55.00 | $0.00 |
| SUP.ADR | $5.00 | $0.00 |
| AP | $8.00 | $0.00 |
| Less Deposits | $73.00 | $0.00 |

# Exhibit 2
# (Part 1 of 2)

IN THE SUPERIOR COURT OF FULTON COUNTY

STATE OF GEORGIA

| | | |
|---|---|---|
| DIGIMARC ID SYSTEMS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Civil Action No. 2003CV66498 |
| GEORGIA TECHNOLOGY | ) | |
| AUTHORITY and the GEORGIA | ) | |
| DEPARTMENT OF MOTOR VEHICLE | ) | |
| SAFETY, | ) | |
| | ) | |
| Defendants. | ) | |

## RESPONSE TO MOTION FOR INTERLOCUTORY INJUNCTION BY THE GEORGIA TECHNOLOGY AUTHORITY AND THE DEPARTMENT OF MOTOR VEHICLE SAFETY

Plaintiff, a frustrated bidder which submitted a price more than twice that of the successful bidder's price, seeks to enjoin the final transition of Georgia's existing drivers' license system to a new, improved, and vastly more secure system. Plaintiff filed its Motion for Interlocutory Injunction over seven months after the underlying contract was executed and almost three months after it filed its Complaint. Despite Plaintiff's rhetoric, its sole goal as the incumbent provider is to stop the final transition of this lucrative contract to a competitor, with complete disregard for the impact an eleventh hour injunction will have on Georgia's citizens, from both from a fiscal and security perspective. The timing of the Motion could not be better calculated to expose the successful bidder (Plaintiff's competitor), the Department of Motor Vehicle Safety, and the Georgia Technology Authority to the maximum out-of-pocket-expense for creating a system that would then sit idle and unused if this Court enjoins the implementation of Georgia's new digitized drivers' license and identification card system.

Defendants, the Georgia Technology Authority ("GTA") and the Department of Motor Vehicle Safety ("DMVS") vigorously oppose this attempt to foist Plaintiff's more costly proposal upon the DMVS and the citizens of Georgia and respectfully ask this Court not to block the implementation of the Georgia's new digitized drivers' license system. In support of their opposition to Plaintiff's Motion for Interlocutory Injunction ("Motion"), the GTA and the DMVS rely on the record and Exhibits 1 through 21 attached hereto and incorporated herein by reference.[1]

## I. BACKGROUND

Georgia's new Digitized License System (the "DLS") will provide photograph, signature, and fingerprint capture, storage, and retrieval, as well as document production based upon a firm, fixed price for each driver's license, identification card, or special identification card produced. Record of the Proceedings (hereinafter cited as "R."), Tab 3, Protest Decision p. 2.[2] It includes a Central Image System ("CIS") for the storage and retrieval of digital photographs, signatures, and fingerprints. Id. The vendor also will provide installation and ongoing support for stationary and portable workstations and printers statewide, which includes an integrated end user interface with the existing DMVS drivers' licensing system and the offline application, as well as the vendor's DLS. Id. This allows the DMVS staff to enter and retrieve applicant information and capture, store, and retrieve a photograph, signature, and two fingerprints. Id.

---

[1] Plaintiff also requested the hearing be scheduled prior to June 27, 2003. Motion p. 2. Plaintiff subsequently filed a Motion for Emergency Hearing. The parties have reached a joint stipulation under which they have requested oral argument be scheduled on or before August 8, 2003, unless the Court decides the issue on the briefs prior thereto.
[2] Georgia's existing drivers' license system and the new DLS both issue identification cards and special identification cards. References to drivers' licenses, drivers' license system or the DLS herein include identification cards and special identification cards, as the text requires.

The DLS will include the issuance of secure temporary drivers' licenses on site with the secure permanent drivers' licenses being mailed subsequently. RFP § 2.7.3, item 3. The DLS is an innovative project and will be a substantial improvement over the existing ten- year- old system. Exh. 1, Burgess Aff. ¶ 5, RFP § 2.7.

## A.  Status of Implementation of the Digitized License System ("DLS")

The defendant entities and Viisage Technology, Inc. ("Viisage") have completed the vast majority of the work required to create Georgia's brand new drivers' license system. It currently appears that the phased transition to the DLS will begin on or about August 11, 2003, with the final transition occurring approximately seven weeks later.[3] Exh. 2, Clay Aff. ¶ 11. The original Request for Proposal indicated that full implementation or "cutover" should occur on or about June 27, 2003. RFP § 3.22. Because the evaluation of the proposals took substantially longer than the DMVS and the GTA anticipated,[4] and due to the delays in receiving extracted information from Plaintiff, the DMVS rescheduled both the phased and the full implementation dates for the DLS. Exh. 2, Clay Aff. ¶ 11. No delays in the implementation schedule were caused by Viisage. Id. ¶ 12. Implementation of the DLS required the DMVS to invest substantial time and tax dollars to assure that it integrates with the DMVS' technology, including the following:

> (a)    Rewriting a custom off-line program written by DMVS' in-house technology personnel;

---

[3] By stipulated agreement of the parties, the phased implementation date was postponed until August 11, 2003 from the original date of July 14, 2003.
[4] By early August 2002, the DMVS was aware that the extended evaluation period could affect the full implementation or cutover date for the DLS. Therefore, the DMVS and Plaintiff executed an Eleventh Amendment to its contract on August 9, 2002. Exh. 4. The contract is a non-exclusive, no minimum contract. Therefore, the DMVS may discontinue using the Plaintiff's service at any time during the contract or it may terminate the contract on 90 days notice. Id. § 22.

    (b)    Modifying a custom on-line program written by DMVS' in-house technology
           personnel;

    (c)    Writing new code to support items new to the DLS, for example, the point of sale
           feature and the biometric log-in; and

    (d)    Working with Viisage to design the final version of both the cosmetic and
           security features of the new drivers' licenses.

<u>Id</u>. Aff. ¶ 6.  The DMVS expended other resources on project management, including extensive

involvement in the design, testing, and approval of the various components of the system, as well

as site surveys.  <u>Id</u>.  DMVS' personnel spent over 8,439 hours on the DLS' implementation

between November 12, 2002 and May 31, 2003, 2003, with the vast majority of the work

occurring after February 17, 2003.  <u>Id</u>. ¶ 1.  The DMVS also purchased Plaintiff's services for

the exportation of sample image records and the exportation of the entire historical image

database at a cost of one hundred twelve thousand five hundred and eighty-three dollars

($112,583.00).  <u>Id</u>.

       The GTA also expended considerable resources on the implementation of the DLS.  GTA

purchased consulting services to modify its Internet portal infrastructure and upgrade the

WebMethods software.  Exh. 3, Stewart Aff. ¶ 5.  The WebMethods messaging service is a

secure method of sending messages from the GTA's mainframe to an agency's computers.  The

modifications will ultimately be used by a number of state agencies; however, the GTA would

not have upgraded the WebMethods software and made the modifications to it's infrastructure at

this time but for the implementation of the digitized license system.  <u>Id</u>.  The professional

services GTA purchased from WebMethods cost fifty-six thousand dollars ($56,000.00).

Furthermore, approximately eight GTA employees worked on the project a total of

approximately 950 hours.  <u>Id</u>, ¶ 6.  In addition, the Secretary of State's Office expended

resources coordinating the transition of the motor voter services.  Exh. 2, Clay Aff. ¶ 8.

Of course, the greatest expenditures have been made by the successful Offeror, Viisage.

Viisage's expenditures to date include, but are not limited to, the following:

(a)   Leased space, purchased and installed equipment, wrote custom programs to import the data, and purchased off the shelf administrative software tools to support the central repository for the DLS, known as the central imaging system ("CIS"), which will house all images for all Georgia drivers' licenses;

(b)   Leased space, purchased, installed and customized equipment, including specialized environmental controls and utilities, purchased and received the initial shipment of consumables, hired and trained personnel, and successfully set up and produced a drivers' license card;

(c)   Purchased over 400 work stations, along with related equipment (printers, monitors, etc.) and necessary consumable supplies (which will be deployed state wide at DMVS drivers' license facilities);

(d)   Developed and tested customized software to be used on the workstations;

(e)   Established a training program for DMVS personnel;

(f)   Developed an interface with GTA's mainframe;

(g)   Developed educational brochures for the general public and law enforcement regarding the new cards;

(h)   Purchased network connectivity between the CIS and DMVS;

(i)   Purchased and custom tailored point of sale integration software for the DMVS system;

(j)   Wrote custom software to support the Secretary of State's motor voter program; and

(k)   Worked with DMVS to design the final version of both the cosmetic and security features of the new drivers' licenses.

Exh. 2, Clay Aff. ¶ 5.

Pursuant to its contract with the DMVS, Plaintiff, as the incumbent vendor, is required to cooperate with other vendors. Ex. 4, Contract with Polaroid Corporation, predecessor to Plaintiff, with the associated Eleventh Amended Contract (hereinafter collectively referred to as "Digimarc Contract"). Plaintiff's first notification of its transition responsibilities under its current contract occurred on or about December 29, 2002. Exh. 2, Clay Aff. ¶ 9. Pursuant to its transition obligations, Plaintiff has been extracting drivers' license information contained in its system and providing the information to the DMVS. The porting *i.e.*, extraction and transfer of information, of the data is labor intensive. Once certain technology problems were resolved and

testing completed, approximately one to three million images were ported weekly beginning on or about March 25, 2003. Subject to a two to three week delay to input new drivers' license and identification card information into Plaintiff's system and then port it to the DLS, all existing images have been transferred to the DMVS and are being converted and ported into Viisage's system. Id. ¶ 9. In addition, approximately 2.3 million fingerprint images (approximately 25% of the fingerprint images) have been sent for enrollment in the new fingerprint search engine, which will provide the DMVS with the ability to conduct one to many searches of the attributes of the fingerprints to eliminate inadvertently issuing multiple credentials to the same person. Id.

### B. The Request for Proposal and Evaluation Process

Georgia's DLS is a highly innovative system that does not currently exist in the United States. Exh. 1, Burgess Aff. ¶ 7. The DMVS sought and obtained state of the art technology. This required that the DMVS and the GTA design a proposal that set forth the "desired state" and gave the vendors flexibility to propose innovative technology to achieve the "desired state." RFP § 2.7. Consequently, the procurement was "a *negotiated*, solution-based solicitation." RFP § 1.2 (emphasis added). A solution-based solicitation establishes performance standards and imposes the duty of determining the required specifications to meet those performance standards on the Offerors. See generally, RFP. A solution-based solicitation is necessarily a fluid process.

On May 24, 2002, the GTA[5], on behalf of the DMVS, issued Request for Proposal GTA000051 ("RFP"),[6] the purpose of which was to engage the services of a qualified vendor to

---

[5] The GTA issued the RFP pursuant to O.C.G.A. § 50-15-7.3 and Ga. Comp. R. & Regs. ch. 665 (the "GTA Rules"). The GTA Rules are available online at either gta.georgia.gov (click on Procurement icon, then Procurement Policies icon, then Official Procurement Rules icon) or http://gta.georgia.gov/vgn/images/portal/cit_1210/1267043procurement_rules.pdf.
[6] Addenda to the RFP were issued on June 18 and July 12, 2002. As used herein, the term "RFP" means the May 24, 2002 RFP as amended by the two addenda. A certified copy of the RFP is being filed simultaneously herewith pursuant to the stipulation of the parties.

6

provide the new digitized drivers' license system for the DMVS. R., Tab 3, Protest Decision p.

1. In the RFP, the DMVS sought a qualified vendor to provide the DLS, to assist in minimizing

costs, to improve the level of performance, and to furnish new technology. Id. The RFP

requested several optional features be proposed. Id. pp. 1 & 2. All interested vendors were to

submit separate technical and cost proposals. RFP § 4.2. The GTA received technical and cost

proposals from three vendors (hereinafter referred to as "Offeror(s)") on July 19, 2002: one from

the Plaintiff, the incumbent vendor; one from Viisage, the successful Offeror; and one from

SoftLEAD, Inc. (the "July 19 Proposals"). R., Tab 3, Protest Decision p. 2. The SoftLEAD, Inc.

proposal is not an issue in this case. Plaintiff's Brief at n.1.

        Immediately after receipt of the July 19 Proposals, an Evaluation Team consisting

of employees of the DMVS, the GTA, and the Secretary of State's office[7] was convened,

R., Tab 3, Protest Decision p. 2, and the long and arduous task of evaluating the

proposals began. RFP § 5.5. It took over four months to complete, not the originally

anticipated two to three weeks. Exh. 8, Childers Aff. ¶ 5. Because the Evaluation Team

included personnel from both the DMVS and the GTA, the GTA was a an active

participant in making all decisions throughout the process. Mr. George Theobald, the

Procurement Project Manager for the DLS and a member of the Evaluation Team, was

assigned the ministerial task of reducing the Evaluation Team's findings to written form

_____

[7] The Office of the Secretary of State's participation in the evaluation of the proposals was
limited to the portions addressing the motor voter provisions. E.g., RFP § 3.4.6; RFP Addendum
2 § 3.14.11. The Secretary of State's team met separately to address those portions of the
proposals and communicated their findings to GTA and to Mr. Theobald. Exh. 5, Theobald Aff.
¶ 5.

7

after the group reached consensus.[8] Exh. 5, Theobald Aff. ¶ 6.

The evaluation process included reviewing the Offerors' responses to the RFP specifications, testing the temporary and permanent drivers' license and identification card samples (the "card samples"), and evaluating each Offeror's corporate and individual experience. R., Tab 3, Protest Decision p. 2. The evaluation tool provided for an "adjectival" basis for evaluating the proposals whereby each factor or specification was classified as either "Excellent," "Good," "Satisfactory," or "Unsatisfactory." Id.; RFP §§ 5.5.1 & 5.5.1.1. As required by GTA Rule 665-2-4-.02(b)2, the RFP set forth the importance or weight to be given each evaluation factor. Section 5.3 of the RFP provided that all factors or specifications, including price, were to be given the same weight, i.e., "Very Important." The RFP further stated that the Evaluation Team was permitted to, but was not required, to trade off between price and non-price factors. Id. (relative overall ranking MAY be adjusted up or down); GTA Rule 665-2-4-.02(c). The trade off method is designed to permit the purchasing agency to select a more expensive but superior product if the agency determines that the more expensive product is the best value. It does not require the purchase of the more expensive product, whether that product is superior to, equal to, or inferior to the lowest priced product. The purchasing agency, in this case the GTA on behalf of the DMVS, is required to exercise its discretion and judgment in "trading off" the non-price factors against the price. Id. GTA Rule and Sections 5.5.1 and 5.6 of the RFP authorized waivers.

---

[8] It is apparent that Plaintiff does not understand the procedure as it repeatedly emphasizes that the DMVS transmitted documents to the GTA after an action was taken, thereby implying that said actions were taken prematurely. E.g., Plaintiff's Brief pp. 15, 19, & 32. In each instance the document was merely a written memorialization of the prior decision.

The Evaluation Team was also authorized to determine if and when clarifications, as permitted by GTA Rule 665-2-4-.02, would occur.  GTA Rule 665-2-4-.02 defines a clarification as "limited exchanges between the state and offerors that may occur after receipt of offer."  It provides that clarifications may include, but does not limit a clarification to, the resolution of clerical errors.  Id.  Furthermore, GTA Rule 665-2-4-.07 provides that

> [w]hen the agency or GTA determines that an offer appears to contain an obvious error or otherwise where an error is suspected, the agency or GTA may investigate or act upon the circumstances.  Any action taken shall not prejudice the rights of the public or other offering companies.  <u>Where offers are submitted substantially in accordance with the solicitation document but are not entirely clear as to intent or to some particular fact or where there are other ambiguities, the agency or GTA may seek and accept clarifications or may open communications.</u>

(emphasis added).  RFP § 5.4 provided that

> DMVS reserves the right to, and may, request clarifications from a [sic] Offeror in DMVS' sole discretion.  All requests for clarifications issued by the GTA Contracting Officer, and all responses thereto submitted by the Offeror, shall be in writing.  The Evaluation Committee will be the arbiter of whether Offeror's responses are accurate and meet the evaluation criteria in this Request.  **Each Offeror's Proposal will be evaluated based on the information submitted therein, plus any clarifications.**

(emphasis in original).  The Evaluation Team engaged in clarifications with all Offerors at various times throughout the evaluation periods.  See e.g., R., Tab 3, Protest Decision p. 3; Exh. 6, Selected Examples of Clarification Requests.  Consequently, the evaluation process was lengthy and the Offerors' final evaluations reflected the Evaluation Team's best judgment of the final proposal, including all clarifications as permitted by the GTA Rules and the RFP.  Exh. 7, Digimarc and Viisage Evaluation Narratives and Matrix.

## C.  The Initial Evaluation Period

After conducting individualized reviews of all technical proposals, the Evaluation Team met between July 29, 2002 and August 1, 2002 at Unicoi State Park in White County, Georgia

for a joint evaluation of all technical proposals. Exh. 8, Childers Aff. ¶ 6. The July 19 Proposals were reviewed and discussed to identify their strengths and weaknesses. Exh. 7, Viisage & Digimarc Eval. Narratives pp. 1. The Evaluation Team completed the initial evaluation of the technical proposals on or about Wednesday, July 31, 2002 and, to its dismay, determined that no technical proposal was minimally acceptable. R., Tab 3, Protest Decision p. 2. Among other deficiencies, no Offerors' temporary or permanent card samples were acceptable; they all failed the tests administered by the DMVS personnel. Id. p. 2. In analyzing the results of the evaluations, the Evaluation Team concluded that all Offerors were unclear as to intent or some particular fact. Exh. 8, Childers Aff. ¶ 6. For example, the Evaluation Team questioned whether either Plaintiff or Viisage submitted production quality permanent card samples. Id. ¶ 5. In spite of this, the Evaluation Team was pleased to note that the technical proposals submitted by both Plaintiff and Viisage were similarly rated and deemed to be very close to the minimally acceptable requirements. R., Tab 3, Protest Decision p. 2.

Although the July 19 Proposals did not meet the minimum requirements of the RFP, the Evaluation Team determined that the proposals were submitted substantially in accordance with the RFP and that the Offerors were responsible Offerors whose proposals had a reasonable chance of being selected for award. Exh. 8, Childers Aff. ¶ 6. Accordingly, the Evaluation Team exercised its discretion, and instead of eliminating all Offerors, waived the provision that the price proposals of Offerors that did not receive at least an overall satisfactory rating in Phase I would not be considered, see RFP § 5.1, and opened the price proposals on or about August 1, 2002, after having completed the first phase of the initial evaluation. Exh. 8, Childers Aff. ¶ 6. GTA Rule 665-2-5-.02 was promulgated to facilitate timely purchases in unusual and unique circumstances, such as existed here.

Section 5.6 of the RFP provides in pertinent part that

Subsequent to the opening of the sealed Cost Proposal, discussions, consisting of Communications and Clarifications as defined in GTA Rule 665-2-1-.02, may be conducted by GTA with responsible Offerors whose submitted proposals are determined to have a reasonable chance of being selected for award. In conducting any such discussions, there shall be no disclosure of any information derived from proposals submitted by competing Offerors. The GTA Contracting Officer shall conduct all such discussions.

The Evaluation Team members agreed that additional clarifications with the Offerors were necessary. Id. Upon its return to Atlanta, the Evaluation Team recommended to the Commissioner that the project proceed as designed after clarifications with the Offerors. Exh. 1, Burgess Aff. ¶ 9.

The results of the evaluations were memorialized in writing (both narrative and matrix format) during and following the conclusion of the initial evaluation. Exh. 7. On August 6, 2002, the DMVS formally requested the Contracting Officer assist the Evaluation Team with obtaining clarifications from the Offerors. Plaintiff's Brief, Tab Q.

**D.  The August 14, 2002 Clarification Meeting**

The DMVS Commissioner, in conjunction with the Contracting Officer and the other members of the Evaluation Team, met jointly with all Offerors to clarify the RFP requirements on August 14, 2002, during which meeting he discussed problems with both the temporary and permanent sample cards. Exh. 7, Digimarc & Viisage Eval. Narratives pp. 2. During the clarification meeting, the Commissioner discussed in broad terms the requirements and specifications of the RFP, particularly as they related to the card samples. Id. Subsequent to the clarification meeting, all Offerors were asked to submit revised technical and cost proposals,

11

including the submission of revised temporary and permanent card samples.[9] R., Tab 3, Protest

Decision p. 3. All Offerors submitted revised proposals and permanent and temporary card

samples on August 26, 2002 ("August 26 Proposals"). Id.

**E. The Second Evaluation Period**

    The second evaluation period began upon receipt of the revised August 26 Proposals.

Both Plaintiff and Viisage submitted multiple permanent card solutions as a part of the August

26 Proposals. Viisage's August 26 Proposal changed the structure of one of its proposed

permanent cards from a "10 mil security laminated/10 mil teslin substrate/10 mil clear back

laminate" card to a "6 mil Confirm laminate/14 mil Teslin Substrate/ 10 mil clear back laminate"

card. Exh. 9, Viisage Aug. 26 Proposal p. 2. Both Plaintiff and Viisage had at least one

permanent card sample meeting the minimum testing requirements of the RFP. Exh. 7, compare

Digimarc Eval. Narrative p. 4 with Viisage Eval. Narrative p. 3; see I. Background, § I, infra. p.

21. However, no Offerors' temporary card sample was compliant with the requirements of the

RFP. Exh. 7, compare Digimarc Eval. Narrative pp. 3 & 4 with Viisage Eval. Narrative p. 3.

    After completing the evaluation of the technical proposals, the Evaluation Team opened

the revised cost proposals. Exh. 5, Theobald Aff. ¶ 10. All Offerors' price proposals were

changed, some increasing in price and some decreasing in price. R., Tab 3, Protest Decision p. 3.


*September 2002 Demonstrations*

    The Evaluation Team exercised its discretionary authority under RFP § 5.5.2 and requested

---

[9] GTA employee Barry Shepard requested that Viisage resubmit permanent and temporary card
samples on or about August 1, 2002. Plaintiff's Brief, App., Tab P. Some time thereafter in
early August 2002, Mr. Shepard gave Mr. Theobald temporary card samples, but no permanent
card samples. Mr. Theobald did not inform the remaining Evaluation Team members of the

the Offerors demonstrate their products. All Offerors were given an opportunity to demonstrate the production of temporary card samples at a DMVS site. E.g., Exh. 10, Plaintiff's Notice of Clarification Meeting. In an effort to clarify further the RFP's requirements for the Offerors, all Offerors were provided a description of the ten tests to be independently performed by the DMVS personnel and were given their individual results of the tests performed on the August 26 card samples prior to the demonstrations. Exh. 10. The demonstrations occurred on September 26 and 27, 2002. R., Tab 3, Protest Decision p. 3.

All Offerors produced temporary card samples during their respective demonstration. R., Tab 3, Protest Decision pp. 3 & 4. Plaintiff produced two temporary card samples. Both failed multiple tests. Exh. 7, Digimarc Eval. Narrative pp. 4 & 5. Plaintiff was informed of the results. Exh. 5, Theobald Aff. ¶ 11. Viisage also produced two temporary card samples. One temporary card sample was treated to withstand nine of the ten tests while the other was treated to withstand the remaining test. Both temporary card samples passed the tests for which they were treated. Exh. 7, Viisage Eval. Narrative p. 4. Thus, Viisage, but not Plaintiff, had a compliant temporary card sample at the close of the September 2002 demonstration. In an abundance of caution, the Evaluation Team requested Viisage submit a single card treated to withstand all ten tests. See I. Background, § I, infra p. 22.

At the conclusion of the second evaluation period, both Offerors had submitted an acceptable permanent card sample and Viisage had submitted an acceptable temporary card sample. The Evaluation Team determined that both Plaintiff and Viisage were responsible Offerors who could be awarded the contract and that the remaining issues could be addressed during the best and final offer stage. Thereafter, results of the evaluations were memorialized in

---

receipt of these temporary card samples and they were never tested. Exh. 5, Theobald Aff. ¶ 7.

writing by updating the evaluation report for each Offeror. Exh. 7, <u>compare</u> Viisage Eval. Narrative pp. 3 & 4 <u>with</u> Digimarc Eval. Narrative pp. 3-5.

## F. Evaluation of Best and Final Offers ("BAFO Proposals")

On or about October 8, 2002, Plaintiff and Viisage were given instructions to submit best and final Offers pursuant to RFP § 5.6 and GTA Rule 665-2-4-.02(a)6. R., Tab 3, Protest Decision p. 4. The instructions requested a revised price and responses to clarifications on Offeror specific issues. Exh. 7, <u>compare</u> Viisage Eval. Narrative pp. 4 & 5 <u>with</u> Digimarc Eval. Narrative pp. 5 & 6. Only Plaintiff's clarification request included a request for temporary card samples. <u>Id</u>.

Both Offerors submitted BAFO Proposals in a timely manner. R., Tab 3, Protest Decision p. 4. During the BAFO evaluation, Plaintiff was eliminated from further consideration first on its technical proposal and then on its price proposal. R., Tab 3, Protest Decision pp. 4 & 5; Exh. 7, Digimarc Eval. Narrative pp. 6 & 7.

Plaintiff's BAFO technical proposal did not satisfactorily respond to the following items:

1. Plaintiff continued to take exception to the ownership rights requirement in RFP § 3.9.1, item 22 stating that transfer of ownership would cost the State if all contract renewals were not exercised.
2. Plaintiff did not provide exact terms and conditions for working with future vendors.
3. Plaintiff asked DMVS to consider applying a urethane lamination the temporary licenses and identification cards but indicated that that the lamination was not included in the base price and, therefore, subsequent negotiations would be necessary. The Evaluation Team also had concerns about the accounting and inventory of the lamination stock and the additional manual steps and processes for applying the lamination.
4. Plaintiff's response for restating the additional security features was incomplete.

---

Since they were not a part of the evaluation process, their existence is irrelevant to this litigation.

Id. The Evaluation Team further noted that Plaintiff's response did not revise its response to an early clarification indicating it could not provide UV printing. Exh. 11, August 2, 2002 Response to Clarification Request.

Viisage's BAFO technical proposal answered all clarification questions satisfactorily. Exh. 7, Viisage Eval. Narrative p. 5. Viisage also proposed an additional security feature the Evaluation Team found highly desirable, variable UV printing, but which would require negotiation since it was not a mandatory feature included in the base price. Id. The Evaluation Team concluded that the Viisage proposal was better than Plaintiff's proposal because it was both compliant with the DMVS' envisioned business practices and was technically superior to Plaintiff's proposal. Viisage received five more "Excellent" and two more "Good" ratings than did Plaintiff. Id. pp. 5-6.

Plaintiff's price was two and one-half times greater than the price submitted by Viisage. R., Tab 3, Protest Decision p. 5. The Evaluation Team noted that the price proposals for both Plaintiff and Viisage failed to acknowledge that one or more required mandatory features were included in the base price. Exh. 7, compare Viisage Eval. Narrative p. 5 with Digimarc Eval. Narrative p. 6. With respect to both Offerors, the Evaluation Team noted that, if necessary, "[f]urther clarification must be obtained to ensure [Offeror] understands and agrees to this request," id., thus indicating that the selected Offeror, regardless of which one it might be, would have to confirm the base price included the omitted features prior to the award of the contract.

Because Plaintiff's technical proposal was less desirable and more expensive than the Viisage proposal, the Evaluation Team properly exercised its discretion and did not "trade off" price against non-price factors. The lowest priced technically acceptable offer was, in this case, the best value offer. Therefore, the Evaluation Team recommended to the Commissioner that the

procurement be awarded to Viisage. Exh. 1, Burgess Aff. ¶ 11. Once again, Mr. Theobald

reduced the Evaluation Team's findings into written form. Exh. 7, Digimarc Viisage

Evaluations.

### G. Viisage's Final Demonstration

At the conclusion of the BAFO evaluation, no Offeror had demonstrated all components

of the proposed DLS to the Evaluation Team in one demonstration. Exh. 5, Theobald Aff. ¶ 14.

Therefore, the GTA recommended that Viisage make a final demonstration of its entire process.

R., Tab 3, Protest Decision p. 5. On October 28, 2002, the Commissioner formally transmitted

the evaluation reports to the GTA with the judgment that, "Viisage is the apparent winner," and

requested the GTA "move expeditiously" to award the contract to Viisage. Id. The

Commissioner also officially conveyed his request that, based on the recommendation of the

GTA members of the Evaluation Team, the Contracting Officer ask Viisage to demonstrate its

complete system and, assuming a successful demonstration, begin contract negotiations. Id. On

October 29, 2002, the GTA sent an e-mail to Viisage directing it perform a final demonstration

during which it should be prepared to discuss the implementation considerations of the

mainframe and CIS interaction and real-time synchronization. Id.

*(i) The Point of Sale ("POS") Optional Component*

The POS was one of several optional components in the RFP. Because the DMVS was

concerned about the cost of the DLS, it choose to present certain features that were desirable but

not mandatory as options. Exh. 1, Burgess Aff. ¶ 8. Each Offeror's technical and price

proposals were to include a proposed solution for each optional component. RFP § 1.1.

The DMVS elected to purchase the optional POS system. E.g., Exh. 20, Plaintiff's Best

and Final Offer p. 7. The POS system is a turnkey solution that will interface with the DMVS'

technology as well as the DLS. Viisage is responsible for acquiring, installing, and supporting all necessary hardware and software to fulfill the requirements of the POS. The POS cashiering functionality will exist at each Workstation. It will provide the platform for tracking and processing payments and other revenue transactions across all distribution channels used by the DMVS. RFP § 3.14.4 et seq.

Prior to the final demonstration, on November 7, 2002, Viisage requested it be allowed to substitute a new subcontractor for the POS. R., Tab 3, Protest Decision p. 5. The DMVS agreed to consider the substitution and requested an amended proposal describing the proposed substitute subcontractor's POS system. Id. Viisage delivered the revised POS proposal on the day of the final demonstration. Exh. 5, Theobold Aff. ¶ 11; R., Tab 3, Protest Decision p. 5. The Evaluation Team evaluated the revised POS proposal prior to engaging in any discussions with Viisage. It was found to be compliant with the RFP requirements and at least as satisfactory as the initial proposal. Exh. 5, Theobald Aff. ¶ 12.

*(ii) November 12, 2002 Demonstration*

The final demonstration occurred on November 12, 2002 as scheduled. R., Tab 3, Protest Decision p. 6. As noted above, the Evaluation Team first evaluated the proposed new subcontractor for the POS and found it to be acceptable. Thereafter, the Evaluation Team clarified the outstanding issues with Viisage. For example, the Evaluation Team confirmed that the omitted features were included in the base price. Exh. 5, Theobald Aff. ¶ 13. All questions were answered satisfactorily at the demonstration. Id. Thereafter, Viisage reduced its oral responses to writing at the request of the GTA. R., Tab 3, Protest Decision p. 6.

In addition to the demographics, image capture, and temporary card production components demonstrated at the September demonstration, the final demonstration required

Viisage to include the POS, document scanning, biometric log-in, facial recognition, and one to one fingerprint. Exh. 5, Theobald Aff. ¶ 14. No changes were made to Viisage's adjectival ratings as a result of the final November 12, 2002 demonstration. R., Tab 3, Protest Decision p. 6.

**H.  Contract Execution**

After the evaluation and demonstration were completed, the DMVS issued the Notice of Award to Viisage. Exh. 8, Childers Aff. ¶ 12; Exh. 12, Notice of Award. The Notice of Award was contingent on five items, at least one of which was actually fulfilled prior to the Notice being issued and at least one of which could not be fulfilled until the contract was well under way. Exh. 12. For example, the financial capability/profile was substantiated prior to November 12, 2002. See I. Background, § J, infra pp. 23-26. At the same time, the software escrow agreement could not be executed until the contract was well under way and the code was written. Exh. 13, Escrow Agreement. Other items, such as the performance bond, are by practice to be delivered in a timely manner after the execution of the contract. Exh. 8, Digimarc Contract, Special Notes. Viisage subsequently provided evidence of a performance bond. Exh. 21, Viisage's Performance Bond. Later that afternoon, the contract between the DMVS and Viisage was executed. Exh. 8, Childers Aff. ¶ 12.

**I.  Temporary and Permanent Cards**

During the extended evaluation process, the Evaluation Committee repeatedly reviewed the temporary and permanent card solutions submitted by both Plaintiff and Viisage. Both Offerors initially submitted unsatisfactory reports from a certified laboratory for the proposed permanent card solution and both ultimately had the requirement waived. Both Offerors' permanent and temporary card samples were submitted to independent testing by the DMVS. At

18

the conclusion of the evaluation, both were deemed to have permanent and temporary card

solutions compliant with the requirements of the RFP.

   *(i)  The Certified Laboratory Reports*

        The RFP required Offerors submit a report from a certified testing laboratory verifying

that the durability of the permanent card samples met the testing standards established by the

American Association of Motor Vehicle Administrators (AAMVA).  RFP § 3.5.2, item 1.  At the

initial evaluation, DMVS determined that the reports from a certified laboratory submitted by

both Plaintiff and Viisage were unsatisfactory.  The independent lab report submitted by Plaintiff

did not indicate that the laboratory had subjected Plaintiff's proposed solution to all of the

required tests in either the first or second area.  Exh. 7, Digimarc Eval. Narrative p. 2 and Matrix

pp. 4 & 5.  Although the independent lab report submitted by Viisage indicated all required tests

had been conducted, it also indicated that the proposed solution did not meet all of the durability

tests in both the first and second areas.  Id.  Therefore, the permanent card samples submitted by

both Plaintiff and Viisage were non-compliant with RFP § 3.5.2, item 1 at the conclusion of the

initial evaluation.

        Both Offerors were asked to submit revised permanent card samples with their

August 26 Proposals.  R., Tab 3, Protest Decision p. 3.  Although neither Offeror was asked

to submit a report from a certified laboratory with the revised card samples, Viisage

submitted what DMVS believed to be associated certified laboratory reports for both its

alternative revised permanent card solutions.  Exh. 5, Theobald Aff. ¶ 8.  Plaintiff submitted

several alternative revised permanent card proposals, none of which were accompanied by a

report from a certified laboratory.  Id.

The Evaluation Team selected, for both Offerors, the proposed permanent card solution that it considered to be the best performing solution. Exh. 7, compare Digimarc Eval. Narrative p. 4 with Viisage Eval. Narrative p. 3. Prior to notifying both Offerors that a report from a certified laboratory would be required for their respective best performing permanent card solution, Mr. Theobald contacted AAMVA for information about the length of time required to obtain such a report. Exh. 5, Theobald Aff. ¶ 8. He was informed it would require approximately eight weeks to secure such a report. Id. Because of the lengthy time required to obtain a report from a certified laboratory and the State's compelling security concerns, the Evaluation Team elected to exercise its discretionary authority to waive the requirement that the Offerors provide a report from an certified laboratory. Id. As a result, neither Offeror was asked to submit an independent lab report for its best performing permanent card solution as a part of its BAFO Proposal. Id. The Evaluation Team did not consider Viisage's unsolicited report submitted with its August 26 Proposal. Thus, neither Plaintiff nor Viisage were compliant with the requirement that a report from a certified laboratory be submitted. The requirement was waived for both Plaintiff and Viisage and, accordingly, the final evaluation reports for both Offerors reflect an "Unsatisfactory" for the "Permanent DL/ID Specifications (AAMVA Standards)" and the "Permanent DL/ID Durability" factors. Exh. 7, compare Viisage Eval. Matrix pp. 4 & 5 with Digimarc Eval. Matrix pp. 4 & 5.

*(ii) Independent Testing of Sample Cards by the Evaluation Team*

Under the RFP, the Evaluation Team conducted its own test of the card samples. See e.g., RFP § 3.5.4, item 1. During the initial evaluation period, neither Offerors' temporary or permanent card samples were acceptable; they all failed the tests administered by the Evaluation Team personnel. Exh. 7, Digimarc & Viisage Eval. Narratives p. 2. After the August 14, 2002

20

clarification meeting, the Offerors were asked to submit revised proposals, including revised temporary and permanent card samples. Id. pp. 3. Both Offerors submitted multiple solutions from which the Evaluation Team could choose the solution it considered to be the best performing solution. Exh. 7, compare Digimarc Eval. Narrative pp. 3 & 4 with Viisage Eval. Narrative p. 3.

Plaintiff retained its original permanent card solution and proposed five new optional solutions. One of Plaintiff's permanent card samples passed all tests administered by the Evaluation Team. Plaintiff's permanent card sample passing all the administered tests was deemed the best performing solution and, therefore, Plaintiff was not required to submit additional permanent card samples. Exh. 7, Digimarc Eval. Narrative p.4. Viisage submitted two optional permanent card solutions. Option 2 passed all tests administered by the Evaluation Team. Viisage only submitted one production quality card sample for Option 1 so the Evaluation Team exercised its discretion to request an additional 17 production quality Option 1 permanent card samples for testing purposes. Exh. 14, Aug. 28, 2002 Letter. Viisage's Option 1 permanent card samples passed all the administered tests. The Evaluation Team concluded that Viisage's Option 1 was its best performing permanent card solution. Exh. 7, Viisage Eval. Narrative p. 3. Thus, both Offerors' permanent card were acceptable at this time.

Plaintiff contends that Viisage's permanent card samples were fatally flawed because they were from New York although Viisage does not have a contract to produce New York's drivers' licenses. Plaintiff's Brief pp. 12-13. The GTA and the DMVS do not dispute that Viisage does not have a current contract to produce drivers' licenses for the State of New York. It is immaterial whether the cards were produced under a different contract, were produced as a part of another procurement proposal, were produced by a subcontractor, or were produced for

21

some other reason unknown to the defendant entities. Nothing in the RFP required any Offeror to propose only a solution that they were currently making. The Evaluation Team simply required the permanent card samples be produced using the same methods, materials, equipment and specifications proposed for the DLS. Exh. 14.

No Offerors' temporary card samples passed the independent tests performed by the Evaluation Team on August 26, 2002. Exh. 7, compare Viisage Eval. Narrative p. 3 with Digimarc Eval. Narrative pp. 3-4.[10] Therefore, all Offerors were asked to produce temporary card samples during their respective September demonstration, which were independently tested by the Evaluation Team onsite, with the exception of the Viisage Diet Coke test, which was performed during the demonstration. Exh. 7, Viisage Eval. Narrative pp. 3 & 4. Plaintiff produced two temporary card samples. Both failed multiple tests. Exh. 7, Digimarc Eval. Narrative pp. 4 & 5. Plaintiff was informed of the results. R., Tab 3, Protest Decision pp. 3 & 4. Viisage also produced two temporary card samples. One temporary card sample was treated to withstand nine of the ten tests while the other was treated to withstand the remaining test. Both temporary card samples passed the tests for which they were treated. Exh. 7, Viisage Eval. Narrative p. 4. Viisage was informed of the results. R., Tab 3, Protest Decision pp. 3 & 4. Thus, Viisage, but not Plaintiff, met the temporary card sample requirement of the RFP at the close of the September 2002 demonstration. Nonetheless, in an abundance of caution, the Evaluation Team exercised its discretion to require Viisage submit a single temporary card sample to be submitted to all ten tests by the Evaluation Team. Thereafter, Viisage submitted a

---

[10] Viisage's temporary card samples were blank and, because the Evaluation Team required card samples with content for testing, it requested card samples with content. The card samples with content were the ones that were tested. Exh. 5, Theobald Aff. ¶ 9.

single temporary card sample that passed all independently administered tests on October 7,

2002. Id.

Because Plaintiff did not have a compliant temporary card sample prior to the BAFO

stage of the procurement, its BAFO request included the submission of a revised temporary card

sample. Plaintiff's BAFO Proposal included the required revised temporary card solution with

the relevant card samples attached. Viisage's BAFO request did not seek the submission of a

temporary card sample; Viisage had an acceptable temporary card solution prior to BAFO.

Neither Offeror was asked to submit a permanent card sample, as each had previously submitted

an acceptable permanent card sample. Exh. 7 compare Viisage Eval. Narrative p. 5 with

Digimarc Eval. Narrative p. 6. Plaintiff's technical proposal was otherwise inferior to Viisage's

technical proposal and, therefore, in the interest of moving forward expeditiously, the Evaluation

Team elected not to test Plaintiff's BAFO temporary card sample but deemed it to be compliant

for the purpose of the cost evaluation. Exh. 7, Digimarc Eval. Narrative p. 6. Had the Plaintiff's

BAFO price proposal been priced substantially lower than Viisage's price proposal, the

Evaluation Team would have performed its independent testing on Plaintiff's BAFO temporary

card sample and, if it passed the tests, proceeded to use the trade off method to award the

contract. However, as noted above, the Evaluation Team concluded the Viisage technical

proposal was superior regardless of the compliance of Plaintiff's BAFO temporary card sample.

Exh. 7, compare Digimarc Eval. Narrative p. 7 with Viisage Eval. Narrative p. 6.

**J. Offerors' Responsibility Evaluations**

Another ongoing component of the evaluation process was the assessment of the

Offerors' responsibility. All Offerors were required to submit business background information,

general business information, an executive summary, financial information, and information

23

about the company's legal status and previous contract terminations. RFP §§ 4.2.1.2 through 4.2.1.3.4. Viisage submitted all financial information required by the RFP, which was reviewed by members of the Evaluation Team. See e.g., Exh. 8, Childers Aff. ¶ 7.

During the evaluation process, DMVS members of the Evaluation Team researched the American Association of Motor Vehicle Administrators ("AAMVA") database and found that Viisage was reported as servicing multiple states with the issuance and production of drivers' licenses. Exh. 5, Theobald Aff. ¶¶ 15 & 16; Exh. 8; Childers Aff. ¶ 7. DMVS personnel contacted at least five (5) other states to validate the AAMVA report findings and to solicit additional information about Viisage's performance. Other steps taken to assess Viisage's responsibility included reviewing press releases listed on the NASDAQ website for both Plaintiff and Viisage and reviewing press releases listed on both the Viisage and Digimarc web sites about once a week during the months of August, September, and October 2002 beginning on or about August 12, 2002. Id.

A Dun and Bradstreet report regarding Viisage was obtained and reviewed by members of the Evaluation Team. Id.; Exh. 19, McClearn Aff. ¶ 4. GTA members of the Evaluation Team first sought to obtain Dun and Bradstreet reports on both Offerors on August 26, 2002. For unknown reasons, Dun and Bradstreet reported that neither company could be located. Exh. 15, Brooks Aff. ¶ 4. A Dun and Bradstreet report on Viisage was subsequently obtained. R., Tab 3, Protest Decision p. 8. Although the Dun and Bradstreet report did ascribe some financial risk to the Viisage position, the Evaluation Team did not consider the position alarming. Id.

Information that would lead to a determination that an Offeror is not responsible includes, but is not necessarily limited to, evidence that an Offeror has: (i) committed fraud or willfully misstated its financial condition; (ii) been in or is currently in bankruptcy; and/or (iii) defaulted

on other relevant contracts. Exh. 8, Childers Aff. ¶ 8; R., Tab 3, Protest Decision p. 8; Exh. 19,

McClearn Aff. ¶ 3. Neither the documentation reviewed nor the results of the reference checks

reported these or other conditions of similar severity with respect to Viisage that would lead to a

reasonable conclusion that Viisage was not responsible. Id. Since the Evaluation Team's due

diligence review did not reveal any information that under Georgia law or the GTA Rules would

have led to a determination that Viisage was not a responsible Offeror; Viisage was, in fact,

determined to be a responsible Offeror.

The Protest Decisionmaker found that the GTA appropriately exercised its discretion in

determining the amount of information required to evaluate the Offerors' financial responsibility.

R., Tab 3, Protest Decision p. 8. He also found that Viisage demonstrated its ability to perform

through the ability to purchase a $3 million dollar performance bond. Id.

In order to evaluate Plaintiff's protest allegation that Viisage was not financially

responsible, the Protest Decisionmaker conducted an independent investigation. During his

deliberations, he confirmed that both Viisage and Plaintiff were publicly traded companies. Exh.

16, Freedman Aff. ¶ 7. In assessing the allegation that Viisage lacked the necessary financial

ability to perform due to its deteriorating cash position resulting from operating losses, he also

assessed Plaintiff's financial ability to perform using the same criteria. Accordingly, in addition

to Viisage's filings with the Security and Exchange Commission (SEC) attached to the protest,

he examined Plaintiff's corresponding filings with the SEC, Plaintiff's 2001 annual report, and

Viisage's 2001 annual report. Id. From these reviews, he noted that Plaintiff's financial position

appeared to be at least as risky as that of Viisage. Id. He reached this conclusion by comparing

earnings (losses) for the most recent three complete years reported in both sets of documents and

observing that Plaintiff's losses appeared considerably worse than those of Viisage. Specifically,

Plaintiff reported net losses of 129%, 134% and 34% of revenues for 2001, 2000, and 1999 respectively, whereas Viisage reported losing 6% of revenues in 2001, making a very small profit in 2000, and losing about 5% in 1999. And, while Viisage's SEC filings did contain the protest's alleged statements of risk, Plaintiff's filings contained similar statements, including: "We have a history of losses and *expect* future losses. We cannot assure you that we will achieve profitability…" and "… [after the next 12 months], we may find it necessary to obtain additional equity financing, debt financing, or credit facilities. We may not be able to obtain additional financings or credit facilities, or if these funds are available, they may not be available on satisfactory terms." (emphasis supplied by Protest Decisionmaker). Id. Consequently, it did not appear to the Protest Decisionmaker that Plaintiff had a discernibly better financial capability to perform than Viisage and, therefore, Plaintiff would not be due any relief even if its allegation was supportable. Id.

## II. PROCEDURAL HISTORY

A week after the contract was awarded, Plaintiff initiated its informal discovery by making its first Open Records Act request for procurement related documents to the GTA on November 18, 2002. Response to Plaintiff's Motion for Reconsideration, Exh. A, Tomlinson Aff. ¶ 4. Plaintiff filed its protest of the award of the contract to Viisage on November 26, 2002 pursuant to GTA Rule 665-2-11-.07. R., Tab 10, Protest. Thereafter, the GTA Executive Director and Chief Information Officer appointed the Protest Decisionmaker on December 3, 2002. R., Tab 8 December 3, 2002 Letter to Mr. Droze. Plaintiff submitted its second Open Records Act request for procurement related documents to the GTA on December 20, 2002. Response to Plaintiff's Motion for Reconsideration, Exh. A, Tomlinson Aff. ¶ 4. Plaintiff submitted its third Open Records Act request (a supplemental request related to the December 20

request) for procurement related documents to the GTA on January 15, 2003. Id. On February

12, 2003, Plaintiff submitted an Open Records Act request to the DMVS. Plaintiff's Motion for

Reconsideration, Exh. B, Clayton Aff. ¶ 4.

      While Plaintiff was pursuing its informal discovery under the Open Records Act, the

Protest Decisionmaker was investigating the matter pursuant to GTA Rule 665-2-11-.07(h). A

thorough and time consuming investigation was required because the Protest Decisionmaker had

absolutely no prior knowledge or understanding of the RFP requirements, the evaluation process,

or the evaluation results. Exh. 16, Freedman Aff. ¶ 5. In conducting his investigation, the

Protest Decisionmaker considered the following: Plaintiff's Protest, the Evaluation Team's

evaluations of Plaintiff and Viisage, the relevant portions the proposals of both Plaintiff and

Viisage, interviews and information provided by the Evaluation Team, interviews and

information provided by the GTA's acquisition management staff, portions of the response to the

protest submitted by Viisage (only Viisage's response regarding the allegations of impropriety

on its part were considered as the Protest Decisionmaker would have necessarily needed to make

inquiries of Viisage on these subjects if Viisage had not voluntarily submitted the response),

selected statements from Plaintiff's annual report, and selected statements from Viisage's annual

report. R., Tab 3, Protest Decision pp. 6 & 7. The Protest Decision was rendered as

expeditiously as possible after the receipt of all requested information on February 17, 2003

pursuant to GTA Rule 665-2-11-.07(g)2. Id. ¶ 6; R., Tab 3.

    The Protest Decision was based on the Protest Decisionmaker's investigation of the

evaluation process followed by the evaluation team, the merits of each protest allegation, and the

evaluation recommendation. His investigation complied with GTA Rule 665-2-11. R., Tab 3,

Protest Decision p. 6. He held (1) that the protest was not adequately supported and that

protestor's allegations were without merit, (2) that the protestor's request for relief be denied,

and (3) even if one or more of the allegations did have merit, relief would not be warranted

because, Viisage's technical proposal was superior to Plaintiff's proposal for a substantially

lower price. Id. The Protest Decisionmaker made the following Overall Findings:

1. The procurement including evaluation was conducted in compliance with GTA Rules 665-2-1 through 665-2-5 and with the provisions of the RFP, most notably Section 5. The evaluation team properly exercised its discretion in determining the amount of information and methods required to evaluate the proposals, exercised due diligence, followed a process which offered fair and equal opportunity to all offerors, and acted responsibly in its evaluation of offerors' submitted materials.
2. DMVS and GTA had unusual challenges in that none of the offerors' technical proposals fully complied with the RFP's requirements initially or after two subsequent attempts. Consistent with GTA Rules 665-2-4-.02(a)6. and 9.(ii)(II), DMVS and GTA took steps to advise and instruct the offerors to give them subsequent opportunities to respond with modified proposals which would comply with RFP requirements.
3. Viisage's technical proposal submitted as part of its Best and Final Offer (BAFO) passed every criterion of the technical evaluation for a substantially lower price than the corresponding Digimarc BAFO response.
4. The evaluation resulted in a recommendation which demonstrably provides the best value solution considering price, quality of technical proposal and demonstrated ability to perform.

Id. p. 7.

The Complaint was filed on March 5, 2003, over two weeks after the Protest Decision

was rendered despite the voluminous informal discovery in which the Plaintiff engaged during

the pendancy of the protest. Two days later Plaintiff filed a Motion and Brief for Expedited

Discovery to which the GTA and the DMVS objected. Oral argument was heard on April 1,

2003 and Plaintiff's Motion for Expedited discovery was granted in part. The parties reduced the

oral Order to writing, which was signed by this Court on April 2, 2003 and docketed on April 7,

2003. The GTA and the DMVS responded to all expedited discovery requests in a timely

manner, the first production of documents being due April 16, fifteen days after this Court

verbally granted Plaintiff's Motion for Expedited Discovery.

Plaintiff did not seek the extraordinary equitable relief of an interlocutory injunction until over three months after the Protest Decision was rendered, two and a half months after the Complaint was filed, and a month after the defendant entities responded to the expedited requests for production of documents. This delay occurred despite Plaintiff's knowledge that the DMVS and Viisage were proceeding with implementation of the DLS since at least December 29, 2002. Exh. 2, Clay Aff. ¶ 9.

## III. ARGUMENT AND CITATION OF AUTHORITY

Plaintiff's demand that this Court enjoin the final implementation of the new DLS must be denied as it will cause irreparable harm to the DMVS, the GTA, and the citizens of Georgia (collectively referred to hereinafter as the "State"). An injunction is an extraordinary equitable remedy which is not to be lightly granted. "In considering 'an application for an interlocutory injunction there should be a balancing of the conveniences and a consideration of whether the greater harm might be done by refusing than by granting the injunction.'" Armstrong v. Roberts, 254 Ga. 15, 16 (1985) (citations omitted). A balancing of the equities also demands that an injunction be denied when a party, with full knowledge of its rights, delays in asserting them, thereby allowing large expenditures to be made by others on whom injury would be inflicted by the granting of the injunction. Thomason v. Kern & Co., 259 Ga. 119, 120 at n. 1 (1989); Springtime, Inc. v. Douglas County, 228 Ga. 753, 757 (1972).

Because an interlocutory injunction is an extraordinary remedy designed to balance the conveniences of the parties pending the final outcome of the case, the facts must be viewed as a whole keeping in mind that *the real consideration* is the determination of the party to whom the danger is greatest. MARTA v. Wallace, 243 Ga. 491, 494-95 (1979). The Georgia Supreme Court recently opined that

29

> [u]nder the principle of balancing equities, an interlocutory injunction should be refused where its grant would operate oppressively on the defendant's rights, especially in such case that the denial of the temporary injunction would not work "irreparable injury" to the plaintiff or leave the plaintiff "practically remediless" in the event it "should thereafter establish the truth of (its) contentions."

Garden Hills Civic Assoc. v. MARTA, 273 Ga. 280, 281-82 (2000)(citations omitted) and cases cited therein; see also Armstrong v. Roberts, 254 Ga. 15 (1985). In establishing the balance of the relative equities, the courts may consider whether the status quo can be preserved, whether Plaintiff is likely to prevail on the merits, and whether Plaintiff has an adequate remedy at law. These factors, however, are not determinative, the determinative issue is whether the grant will operate oppressively on the defendant's rights. Garden Hills, 273 Ga. at 280-82; Ledbetter Bros., Inc. v. Floyd County, 237 Ga. 22 (1976). The granting of the interlocutory injunction would not only operate oppressively on the State's rights caused in part by Plaintiff's delay, Plaintiff is also not likely to prevail on any of the other factors. The overwhelming evidence compels the denial of the Motion.

## A. The grant of the interlocutory injunction will operate oppressively on the State.

Plaintiff will not suffer irreparable harm if its Motion is denied but irreparable harm *will* be forced upon the State. First, Georgia's citizens will loose the security benefits and protection of the new DLS. Second, Georgia's citizens, as taxpayers, will loose the hundreds of thousands of dollars invested in the development of the new DLS. Third, Viisage will loose the monies it invested in the development of the DLS. Finally, Plaintiff as the incumbent provider will receive a windfall both through the continuation of its existing contract and the fiscal impact the injunction will have on its competitor.

Georgia's existing drivers' license system is over ten years old. During the intervening years the world experienced the exponential development of the technology sector and a

dramatic increase in the threat of terrorism. The RFP was issued in part as a response to the reality of today's world after the tragic events of September 11, 2001. R., Tab 3, Protest Decision p. 1. The new DLS brings cutting edge security technology to Georgia's drivers' license system. Every day that the existing antiquated system is used increases the security risk to the State, Exh. 1, Burgess Aff. ¶ 6, and, therefore, further delay will cause irreparable harm to the State. Balanced against the mere financial harm the Plaintiff suggests it will suffer, the State's interest in having a secure drivers' license system, an essential governmental function, must be given superiority.

Not only will an interlocutory injunction cause irreparable damage to the security of Georgia's citizens, it will have grave fiscal impact on the State's limited resources. The GTA and the DMVS alone are spending almost $200,000.00 in out of pocket expenses and have expended over 9,500 personnel hours on the project. Significantly, the State's expenditures will include the *payment of Plaintiff's invoices totaling over $112,000.00*. See I. Background, § A, supra p. 4. Meanwhile, Plaintiff asserts that it will spend approximately $47,000.00 if it is forced to dismantle its existing drivers' license system. Plaintiff's Evid. App., Tab B, Paul Aff. ¶ 8. These transition expenses are a part of Plaintiff's obligations under its contract and, therefore, are *not* damages. They are the cost of doing business: Plaintiff's contract does not exist in perpetuity so the dismantling costs are the inevitable result of the contract's termination. Ironically, the payment Plaintiff receives from the DMVS is almost three times the cost of dismantling its system. In light of the difference in the parties' financial burdens, the profit Plaintiff will make off the extraction of the data, and the tenuous nature of the "damages" it asserts, the balance of the convenience to the parties supports a finding that the GTA and the DMVS will suffer the greater harm unless the interlocutory injunction is denied.

31

In addition to the irreparable harm the State will suffer, an interlocutory injunction will adversely impact Viisage. The fulfillment of its contractual obligations during the last seven months necessarily entailed the lease of space, the purchase of equipment, the hiring or relocating of staff, the writing of copious amounts of software code, and other expensive and time consuming activities. See I. Background, § A, supra p. 5. Coincidentally, Plaintiff contends that a denial of the interlocutory injunction will cause the loss of its assembled team of support personnel, Plaintiff's Evid. App., Tab B, Paul Aff. ¶ 9, ignoring that the reverse is also true; a grant of the interlocutory injunction will cause the loss of Viisage's assembled support personnel. Equity demands that this Court consider the financial impact an interlocutory injunction will have on a third party.

In reality, Plaintiff is seeking an interlocutory injunction in order to obtain the financial benefit of continuing to produce Georgia's drivers' licenses on an obsolete system. Plaintiff has no right to continue providing services. The law is clear, Plaintiff may not use equity to have the contract awarded to it as the GTA has the discretionary authority to determine the Offeror to whom the contract is awarded and may choose to award it to no Offeror. Credle v. East Bay Holding Co., 263 Ga. 907, 908 at n.2 (1994); RFP §§ 1.2, 6.2, 6.4, & 6.10; cf. Prison Health Services, Inc. v. DOAS, 265 Ga. 810 (1995)(noting DOAS decided to re-solicit the procurement after it upheld the protest of the award of a contract). Plaintiff's contract with the DMVS is a non-exclusive, no minimum contract. Exh. 4, Contract § 22. The DMVS may elect not to purchase services at any time or may terminate the contract on 90 days notice. Id. § 22 & Eleventh Amendment § 6. Nonetheless, as the incumbent provider, Plaintiff is in the unique position of being able to extend the life of its contract with the DMVS if it can only persuade this Court to grant its Motion. If this windfall to which Plaintiff is not entitled transpires, it will

irreparably harm the State. The harm to the taxpayers is immense but calculable; however, the harm to the security of the State's drivers' license system is not only incalculable, it is **truly** irreparable.

There can be no doubt that a balancing of the equities as required under <u>Garden Hills</u>, <u>supra,</u> mandates that the interlocutory injunction be denied. Like the case *sub judice*, the <u>Garden Hills</u> Court addressed a disgruntled bidder's objection to the award of a government contract. The plaintiff alleged in part that MARTA failed to comply with the request for proposal, that the request for proposal omitted certain critical factors, and that MARTA improperly negotiated with the successful bidder. <u>Garden Hills</u>, 273 Ga. at 280. Noting that the request for proposal permitted negotiations and that MARTA was vested with broad discretion to address factors of cost, convenience and safety, the <u>Garden Hills</u> Court affirmed the denial of the interlocutory injunction as the harm to MARTA far outweighed the potential for injury to the plaintiff. <u>Id.</u> at 280, 284 & 285. Here, as in <u>Garden Hills</u>, the potential harm to the State far outweighs the purported harm to the Plaintiff. Not only does Plaintiff utterly fail to show a preliminary injunction is vitally necessary, it will receive a windfall and hurt its competitor while the DLS, an innovative and virtually operational system, sits idle. Equity lies on the side of denying the injunction. Where, as here, there is a cry for interlocutory equitable relief without real danger, it should be denied. <u>Price v. Empire Land Co.</u>, 218 Ga. 80, 85 (1962).

**B.  Plaintiff, with full knowledge of its rights delayed in seeking interlocutory relief while the DMVS and the GTA proceeded with the implementation of the DLS.**

As set forth in Sections I. Background and II. Procedural History, <u>supra</u>, Plaintiff, with full knowledge of its rights delayed in seeking interlocutory relief while the DMVS and the GTA proceeded with the implementation of the DLS. "Equity favors the vigilant, and does not extend

33

its aid to the negligent or the sleepy." Holt v. Parsons, 118 Ga. 895, 897 (1903); Black v.

Barnes, 215 Ga. 827 (1960). A balancing of the equities demands that an injunction be denied

when a party, with full knowledge of its rights, delays in asserting them, thereby allowing large

expenditures to be made by others on whom injury would be inflicted by the granting of the

injunction. Thomason v. Kern & Co., 259 Ga. 119, 120 at n. 1 (1989); Springtime, Inc. v.

Douglas County, 228 Ga. 753, 757 (1972); e.g., Armstrong v. Roberts, 254 Ga. 15 (1985);

MARTA v. Wallace, 243 Ga. 491 (1979); McGregor v. Ft. Oglethorpe, 236 Ga. 711 (1976);

Bales v. Duncan, 231 Ga. 813 (1974); Black v. Barnes, 215 Ga. 827 (1960); Holt v. Parsons, 118

Ga. 895 (1903).

Despite Plaintiff's assertions that this Court must act immediately, Plaintiff did not seek

interlocutory relief until May 20, 2003. As a result, this matter will not be ripe for the Court's

consideration until after June 19, 2003, seven months after the contract was awarded, four

months after the Protest Decision was rendered, three months after the Complaint was filed, and

the very week the Plaintiff asserted was the critical date. Having consistently asserted that June

27 is the critical date, it is not the Plaintiff's planning, but the fortuitous extension of the project

plan schedule that places Plaintiff before this Court six weeks before the full implementation

date instead of the last week. To wait until the last week, or even the last month, to seek to block

the implementation of a project of this size is intolerable. This is not a situation where the

transfer of the services occurs with a simple flip of the switch.

This Court is asked to apply Bales v. Duncan, supra, Davies v. Curry, supra, and Black v.

Barnes, supra. The Bales plaintiff sought to enjoin the remodeling of a house as a day care

center in a residential subdivision. The suit was brought about two months after the plaintiff had

notice of the plans to build the day care center during which time the defendant expended

34

# Exhibit 2
# (Part 2 of 2)

approximately $15,000 on the project. <u>Bales v. Duncan</u>, 231 Ga. at 814. Balancing the equities, the <u>Bales</u> Court affirmed the trial court's denial of the injunction. <u>Id</u>. Similarly, in <u>Davies v. Curry</u>, <u>supra</u>, the Supreme Court, balancing the equities, affirmed the trial court's denial of the plaintiff's application to enjoin the remodeling of a home as a beauty parlor in a residential subdivision. Although the <u>Davis</u> complaint was filed only a month after the defendant obtained the remodeling permit, the evidence showed that the remodeling was substantially completed at a cost of approximately $15,000. <u>Davies v. Curry</u>, 230 Ga. at 191-94. The same analysis was applied in <u>Black v. Barnes</u>, <u>supra</u>, wherein the Supreme Court affirmed the trial court's denial of the plaintiff's application to enjoin the construction of an apartment project. There, the plaintiff filed suit about three months after construction began; however, some of the apartments were nearly completed and the defendant had expended approximately $100,000 on labor and materials. <u>Black v. Barnes</u>, 215 Ga. at 828-29.

Interlocutory injunctive relief by definition must be speedy. As a general rule, interlocutory injunction hearings occur within thirty days of filing, unless the parties agree otherwise, because an interlocutory injunction is an extraordinary relief that is time sensitive. <u>Focus Entertainment Int'l, Inc. v. Partridge Greene, Inc.</u>, 253 Ga. App. 121, 123-24 (2001). Plaintiff did not act swiftly after filing the Complaint. The insignificance of the discovery material used by the Plaintiff to support its Motion is noteworthy. Its brief contains two minor references to the responses to the Plaintiff's interrogatories, Plaintiffs' Brief pp. 40 & 41, and the Evidentiary Appendix appears to contain very few documents obtained through discovery. <u>Compare</u> Exh. 18, Tomlinson Aff. ¶ 4 <u>with</u> Plaintiff's Evid. App. Table of Contents. None of the discovery material decisively contributes to Plaintiff's position.

The GTA and the DMVS acknowledge that Plaintiff expressed its intention to seek interlocutory relief. In this regard, the Supreme Court's decision in Holt v. Parsons, supra, is persuasive. The Holt plaintiff taxpayer sought to enjoin the construction of a courthouse about three months after the public was put on notice of the plan to build it. Holt v. Parsons, 118 Ga. at 899. Although the evidence showed the plaintiff had given notice through his lawyer that injunctive relief would be sought only one month after the public was put on notice, the Holt Court found such notice to be insufficient in light of the monies expended on the project. Id. A mere objection or protest, or a mere threat to take legal proceedings is not sufficient to excuse a delay. Id.

**C. Plaintiff has an adequate remedy at law.**

An adequate remedy at law is available to Plaintiff and, therefore, equitable relief cannot lie. It is well established that a low bidder whose bid is unfairly rejected is entitled to an award of the reasonable costs of bid preparation, *not* lost profits. City of Atlanta v. J. A. Jones Construction Co., 260 Ga. 658 (1990); Credle v. City of Brunswick, 263 Ga. 907 (1994). Although equitable relief may be available to a frustrated bidder on a government contract, it is available *only* if the legal remedy is inadequate. Amdahl Corp. v. DOAS, 260 Ga. 690 (1990). Plaintiff asserts that its legal remedy is inadequate because the value of the contract is calculated to be in the millions of dollars. This disregards the state of the law. As noted in the Credle case cited by the Plaintiff, where, as here, the governmental agency has discretion regarding the award of the contract, the disgruntled vendor has no right to the contract and, therefore, no right to any lost profits. Credle, 263 Ga. 907, 908 at n. 2; see RFP § 6.2. Thus, an award of the reasonable costs of bid preparation is an adequate remedy.

36

The defendant entities acknowledge that GTA Rule 665-2-11-.07(k) provides that a protestor may not recover bid preparation costs. The GTA and the DMVS submit to this Court that said rule governs the relief available to a successful protestor at the administrative stage. Plaintiff was not a successful protestor.

### D. The status quo can be preserved only if the DMVS contract with Viisage, in existence for over seven months, is allowed to proceed.

It is true that a court may grant an interlocutory injunction to maintain the status quo until a hearing on the merits if the balancing of the relative equities of the parties favors the party seeking the injunction. Garden Hills, 273 Ga. at 281. Assuming *arguendo* that Plaintiff's contention that maintenance of the status quo supports the granting of the interlocutory injunction, the balance of the equities nonetheless undoubtedly favors the State. Plaintiff's argument that preservation of the status quo requires its Motion be granted, however, is not supported by the distinctive facts presented here.

In the present case, the preservation of the status quo argues *against* the grant of interlocutory relief. Plaintiff has no right to continue as the incumbent vendor. Yet all of its purported damages stem from the discontinuation of its current responsibilities. By way of illustration, consider Plaintiff's position if the third Offeror were the disgruntled vendor. There could be no harm to the fictitious plaintiff during the pendancy of the lawsuit as it would not have the discontinuation damages asserted by Plaintiff herein. Therefore, Plaintiff's contract would terminate and Viisage would continue to perform pending a ruling on the merits and the State would have the benefit of the new and secure DLS. In the unlikely event that the fictitious plaintiff prevailed on the merits, the GTA, on behalf of the DMVS, would enter into an emergency contract pursuant to O.C.G.A. § 50-25-7.6 and GTA Rules 665-2-10-.01, 665-2-12-

37

.02 & 665-2-13-.02(2)(f). Under these circumstances, Plaintiff, like the fictitious plaintiff, would be in a position to respond to the resolicitation, but without the hand-out it seeks here. Thus, Plaintiff's argument that the preservation of the status quo requires the grant of an interlocutory injunction is without merit; rather, it is a subterfuge designed to give Plaintiff the opportunity to unjustifiably keep the DMVS' business.

Plaintiff argues that its definition of the "status quo" is correct because the State will be left without a drivers' license system in the unlikely event that Plaintiff succeeds on the merits. Plaintiff's Brief p. 24. This is untrue. The GTA's emergency contracting authority is designed to avoid just such a situation. O.C.G.A. § 50-25-7.6 and GTA Rules 665-2-10-.01, 665-2-12-.02 & 665-2-13-.02(2)(f).

### E.  Plaintiff is unlikely to prevail on the merits.

Plaintiff acknowledges that the likelihood of success on the merits is not determinative but is merely one factor that may be considered. Plaintiff's Brief p. 24. As discussed in III. Argument, §§ A, B, & D, supra, the balancing of the equities clearly flows to the State and, consequently, even if Plaintiff is likely to prevail on the merits it is not entitled to interlocutory injunctive relief. However, Plaintiff is unlikely to succeed on the merits on the facts presented here.

Plaintiff bears the heavy burden of challenging an administrative decision of a state agency. IBM Corp. v. Evans, 265 Ga. 215, 217 (1995). The Court may substitute its judgment for that of the GTA only if the Court finds that it acted outside the scope of its authority, acted arbitrarily and capriciously in its decisionmaking authority, rendered a clearly erroneous decision, or acted in violation of the Plaintiff's constitutional rights. IBM Corp. v. Evans, 265 Ga. at 217. Plaintiff's brief contends that the GTA and the DMVS either acted outside the scope

38

of their authority or acted arbitrarily and capriciously. Plaintiff's Brief p. 39. Neither allegation

is supported by the facts or the law.

The GTA and the DMVS acted within the scope of their authority. The GTA is charged

with the duty of procuring technology resources on behalf of state agencies, including the

DMVS, whenever the estimated value of the contract exceeds $100,000.00, which the DLS

contract did. O.C.G.A. § 50-25-7.2(a). The DMVS' responsibilities include, among other

things, administering the State's laws and regulations relating to drivers' licenses, an essential

governmental function. O.C.G.A. § 40-16-2(a)(2). The GTA, on behalf of the DMVS, properly

exercised its discretionary authority when purchasing the DLS and, therefore, cannot be said to

have exceeded its authority.

Plaintiff acknowledges that the GTA's decision merits due deference citing <u>IBM Corp. v.</u>

<u>Evans</u>, 265 Ga. at 217. Plaintiff's Brief p. 39. As the Georgia Court of Appeals held in

<u>Exposition Enterprises, Inc. v. Georgia World Congress Center</u>, 177 Ga. App. 211, 214 (1985),

> Where an authority is authorized to do a particular act in its discretion, the courts
> will not control this discretion unless manifestly abused, nor inquire into the
> propriety, economy, and general wisdom of the undertaking, or into the details of the
> manner adopted to carry the matter into execution.

This case, like <u>Exposition Enterprises</u>, <u>supra</u>, and unlike <u>Hilton Constr. Co v. Rockdale</u>

<u>Co. Bd. of Educ.</u>, 245 Ga. 533 (1980) cited by Plaintiff on pages 20 and 22 of its brief, is not a

situation in which the administrative agency failed to exercise its discretion and merely accepted

the recommendation of a third a party. <u>Id</u>. On the contrary, Plaintiff's entire grievance rests on

the fact that the GTA *did* exercise of its discretion. Plaintiff is seeking to have this court

substitute Plaintiff's opinion for that of the GTA.

Notwithstanding its heavy burden, Plaintiff contends that "a few specific examples"

illustrate the likelihood of its success on the merits. Plaintiff's Brief p. 26. Simply put, Plaintiff

39

argues that the State gave Viisage advantages that it did not give other Offerors. A distillation of

Plaintiff's brief identified the following allegations:

> (1) The price proposals were opened inappropriately;
> (2) Viisage was given preferential treatment related to its permanent card solutions;
> (3) Viisage was given preferential treatment related to its temporary card solutions;
> (4) Viisage was improperly permitted to substitute the POS subcontractor;
> (5) Viisage is not a responsible Offeror; and
> (6) Viisage was given preferential treatment when it was asked to make a final demonstration.

An examination of the alleged examples demonstrates that the GTA, on behalf of the DMVS,

properly exercised its discretion and, therefore, the resulting decision is entitled to due deference.

Accordingly, Plaintiff is unlikely to prevail on the merits.

### (i) Price Proposals

Plaintiff incorrectly argues that the opening of the price proposals at the conclusion of the

initial evaluation was a material change to the provisions of the RFP. Section 5.1 of the RFP

merely provided that the evaluation would occur in two phases, the first phase being the

evaluation of the technical proposals and the second phase being the evaluation of the price

proposals. While it is true the RFP § 5.1 provides in part that "Offerors that do not receive at

least an overall satisfactory rating in Phase I will not be considered for Phase II," Section 5.1 did

not contemplate the situation which faced the Evaluation Team on August 1, 2002, to wit, no

proposal met the minimum requirements of the RFP. The Evaluation Team was familiar with the

RFP provisions permitting the rejection of all proposals, permitting clarifications, and permitting

waivers at the time it was faced with this dilemma. RFP §§ 5.5.1 & 5.6. Therefore, it reasonably

exercised its discretionary authority and waived the Phase I requirement for all Offerors and

proceeded to Phase II in order to ascertain whether it would be more cost effective to proceed

with the procurement or to cancel the RFP and start over. Plaintiff's Evid. App., Tab G. p. 22.

In this regard, page 28 of Plaintiff's brief omits significant material. The full response to the interrogatory quoted by Plaintiff includes the following:

> The Evaluation Committee was aware throughout the process that the revisions to the technical proposals would require revisions to the price proposals. The Evaluation Committee used the same procedures to review the revised August 26, 2002 technical and price proposals.

Id. Since all Offerors were treated equally and the Evaluation Team applied the same two phased approach to the second evaluation period, the Evaluation Team did not abuse its discretion. Furthermore, GTA Rule 665-2-5-.02 permits waivers and negotiations in extraordinary and unusual circumstances such as were faced here.

Assuming for the sake of argument, that the waiver of the condition precedent to opening the price proposals was an abuse of discretion, Plaintiff cannot complain at this late date. Plaintiff attended the August 14, 2002 clarification meeting and was asked to submit revised technical AND cost proposals on or before August 26, 2002. This was not a best and final offer as contemplated in Section 5.1 of the RFP and, consequently, Plaintiff knew or should have known that a strict adherence to the precondition for moving to Phase II had been waived. Plaintiff was not concerned about the clarification meeting or any other request for clarification until it learned that it was not to be awarded the contract. Pursuant to the GTA's Rules, Plaintiff was required to raise any complaints it had about the procurement process in a timely manner. GTA Rule 665-2-11-.07(c)1. Having failed to raise the matter in a timely manner, Plaintiff cannot now complain, when it is too late for the GTA to take remedial action.

*(ii) Permanent Card Solutions*

The fallacy of Plaintiff's position with regard to the permanent card solutions is easily revealed by a cursory reading of I. Background, § I, supra, pp. 18-23. First, both Plaintiff and Viisage submitted permanent card samples only with the July 19 Proposals and the August 26

41

Proposals. Plaintiff's statement on page 29 of its brief that Viisage submitted permanent card samples that were tested by the Evaluation Team in early August 2002 is simply erroneous. See I. Background, § D, supra p. 12 at n. 9. Second, both Offerors permanent card samples were tested and both Offerors had an acceptable permanent card solution at the end of the second evaluation period. Plaintiff's allegations on pages 12 and 31 of its brief that the Evaluation Team simply stopped testing Viisage's permanent card samples are again erroneous. See I. Background, § I, supra p. 21. Plaintiff's allegation on page 13 of its brief that Viisage completely revised its permanent card solution at BAFO is also erroneous. See I. Background, § E, supra p. 12. Third, the waiver of the requirement that each permanent card solution be submitted with a report from a certified laboratory was waived for all Offerors. Once again, Plaintiff's allegation on pages 14 and 15 of its brief that Viisage's "Unsatisfactory" ratings for the permanent card durability requirements were changed to satisfactory while Plaintiff's were not is erroneous. See I. Background, § I, supra pp. 19-20. It is abundantly clear that Viisage was not given preferential treatment and that Plaintiff's entire argument related to the permanent card solutions is based, at best, on a misunderstanding of the facts.

 *(iii) Temporary Card Solutions*

 Plaintiff's temporary card arguments are equally meritless. I. Background, § I, supra, pp. 18-23. First, both Plaintiff and Viisage submitted temporary card samples with the July 19 Proposals and the August 26 Proposals. While Plaintiff correctly states that Viisage submitted temporary card samples in early August 2002, its assertion that those temporary card samples were tested by the Evaluation Team is erroneous. See I. Background, § D, supra p. 12 at n. 9. Second, both Offerors temporary card samples failed the tests independently administered by the Evaluation Team prior to the September 2002 demonstrations. In actuality it is the Plaintiff that

42

received the benefit of an extra opportunity to produce an acceptable temporary card sample. At BAFO the Evaluation Team once again waived the requirement of Section 5.1 of the RFP that only Offerors whose proposals were minimally acceptable could proceed to BAFO when it permitted Plaintiff to respond to a BAFO offer despite its failure to produce an acceptable temporary card sample prior thereto. Only the Plaintiff benefited from this waiver. At that time, Plaintiff knew or should have known that it was being granted a waiver of the Section 5.1 requirement. Needless to say, it did not complain about receiving the waiver. Plaintiff's statement on page 13 of its brief that the Evaluation Team "declined" and "refused" to test the temporary card sample it submitted with its BAFO Proposal is misleading. Because Plaintiff's technical proposal was otherwise inferior to the Viisage proposal, the Evaluation simply expedited the evaluation process by deeming the temporary card sample to be compliant for the purpose of opening the price proposals. See I. Background, § I, supra p. 23. There was no harm to Plaintiff and, therefore, no foul.

  *(iv) POS Subcontractor*

    Contrary to Plaintiff's assertion, the Evaluation Team did not abuse its discretion when it permitted Viisage to substitute a new POS subcontractor prior to the final demonstration. Neither the RFP nor GTA's Rules prohibit the substitution of a subcontractor under these circumstances. See generally, RFP. The successful Offeror is solely accountable for the final product, regardless of whether it chooses to subcontract out all or part of the DLS, and must take whatever steps are necessary to assure the product is successful. Exh. 17, Viisage Contract §§ 8 & 16. Thus, unless the revised proposal was determined to provide a less satisfactory solution than the original solution, the substitution was permitted.

43

*(v) Responsibility Determination*

Pursuant to O.C.G.A. § 50-25-7.3(a)(6) and GTA Rule 665-2-4-.02(a)(8), the GTA is to award a contract after a competitive solicitation to a responsible Offeror. Neither the Georgia Code nor the GTA Rules defines the term "responsible." Nor does Plaintiff cite any case law for its position that "responsible" means an Offeror cannot have any risk factors enumerated in its quarterly 10-Qs filed with the SEC. Plaintiff's Brief pp. 17-18. This position is particularly suspect since the Plaintiff arguably cannot meet its own definition. See I. Background, § J, supra pp. 25-26.

Over twenty-five years ago, the Attorney General of Georgia had occasion to interpret language virtually identical to O.C.G.A. § 50-25-7.3(a)(6) in responding to a request for legal advice from the Department of Administrative Services. 1974 Op. Att'y Gen. 74-16. The Attorney General opined that the subject language "[c]learly vests considerable discretion in the department to consider factors other than price, and in fact, directs [the Department] to consider these factors." Id., p. 29. The opinion went on to note that "[t]he Supreme Court of this state has held that the courts should not interfere in the exercise of such discretionary power unless it is manifestly abused." Id. The relevant factors to be considered by the Department of Administrative Services included, but were not limited to, quality and fitness of the goods being offered and the financial solvency of the bidder. Id., p. 30. The Attorney General did not attempt to establish an exhaustive list of factors to consider, noting that *"the responsibility for making all ultimate determinations as to acceptability insofar as necessary to award a contract"* rests with the procuring agency. Id. (emphasis added).

In Georgia, deference is given to an agency's interpretation of its statutes and rules unless the interpretation is contrary to the plain language. Comm'r of Ins. v. Stryker, 218 Ga. App. 716,

44

718 (1995); <u>Belton v. Columbus Finance & Thrift Co.</u>, 127 Ga. App. 770, 772 (1972). Viisage is a "responsible" Offeror as that term is interpreted by the GTA as a matter of practice. <u>See</u> I. Background, § J, <u>supra</u> pp. 24-25. Here, Plaintiff is impermissibly asking this Court to substitute Plaintiff's opinion of what constitutes a "responsible offeror" for that of the GTA.

Perhaps in recognition of its heavy burden to overcome the due deference standard, Plaintiff attacks the timing of the investigation. First, Plaintiff asserts that the Evaluation Team did not initiate a responsibility investigation in a timely manner. Plaintiffs' Brief p. 17. This is erroneous. <u>See</u> I. Background, § J, <u>supra</u> pp. 23-26. Second, Plaintiff objects that the Notice of Award conditioned on the award on the "financial capability/profile being substantiated" and that the GTA should not have awarded the contract until after Viisage filed its third quarter 10-Q with the SEC. Plaintiff's Brief pp. 17-18. Thus, Plaintiff both argues that the responsibility evaluation was not initiated and completed in a timely manner and that it was concluded prematurely. Acceptance of this position puts the GTA in a "no win" situation. Furthermore, despite the wording of the Notice of Award, Viisage's financial capability/profile was substantiated prior to the final demonstration. Any conclusion Plaintiff may have reached to the contrary is unfortunate.

Plaintiff's concerns about the quality of the responsibility examination are also misplaced. As a part of his investigatory obligations, the Protest Decisionmaker took Plaintiff's allegations very seriously and examined additional information, which had not been considered by the Evaluation Team. <u>See</u> I. Background, § J, <u>supra</u>, pp. 25-26. Thus, the final decision of the GTA, as expressed in the Protest Decision, is especially deserving of due deference.

   *(vi) Final Demonstration*

45

The GTA's decision to recommend a final demonstration from the "apparent winner" was

an appropriate exercise of due diligence considering the innovative nature of the procurement

and the Offerors' history of misunderstanding the RFP requirements. The final demonstration

was not an opportunity for Viisage to improve its rating. In fact, the opposite is true, Viisage

could only reduce its rating. At worse it was harmless error. R., Tab 3, Protest Decision p. 17;

Exh. 8, Childers Aff. ¶ 11.

### III. CONCLUSION

The overwhelming evidence before the Court on Plaintiff's Motion for Interlocutory

Injunction demonstrates the irreparable harm that will befall the Georgia Technology Authority,

the Department of Motor Vehicle Safety, and the citizens of this State if Plaintiff's motion to

enjoin the final implementation of Georgia's new innovative drivers' license system. When

balancing the equities, Plaintiff's delay and the miniscule value of its purported damages is far

outweighed by the irreparable harm an interlocutory injunction will cause the State, both

measurable and immeasurable. Therefore, the Georgia Technology Authority and the

Department of Motor Vehicle Safety respectfully ask this Court to deny Plaintiff's Motion for

Interlocutory Injunction.

This 19th day of June, 2003.

Respectfully submitted,

THURBERT E. BAKER                        033887
Attorney General

DANIEL M. FORMBY                         269350
Deputy Attorney General

46

(Signatures Continued On Next Page)
(Signatures Continued From Previous Page)

_____    035550
JOHN B. BALLARD, JR.
Senior Assistant Attorney General


_____    357697
EMILY P. HITCHCOCK
Assistant Attorney General


PLEASE ADDRESS ALL
COMMUNICATIONS TO:

EMILY P. HITCHCOCK
Assistant Attorney General
40 Capitol Square, S.W.
Atlanta, Georgia 30303
(404) 651-6249

47

CERTIFICATE OF SERVICE

I do hereby certify that I have this day served the within and foregoing **RESPONSE TO MOTION FOR INTERLOCUTORY INJUNCTION BY THE GEORGIA TECHNOLOGY AUTHORITY AND THE DEPARTMENT OF MOTOR VEHICLE SAFETY** by depositing a copy thereof, postage prepaid, in the United States Mail, properly addressed upon:

> Valerie D. Barton, Esq.
> MCKENNA LONG & ALDRIDGE LLP
> 303 Peachtree Street, Suite 5300
> Atlanta, Georgia 30308

This 19th day of June, 2003.

 

EMILY P. HITCHCOCK
Assistant Attorney General



**State of Georgia**

## CONTRACT

This Contract made this *12* day of *November*, 2002 between the Georgia Department of Motor Vehicle Safety, (hereinafter referred to as the "DMVS") and *Viisage Technology, Inc.* ("Contractor").

     **WHEREAS**, the Georgia Technology Authority ("GTA") issued on behalf of the DMVS a Request for Proposal No. GTA000051, (See Attachment A) soliciting proposals for a central issuance Digitized License System (DLS) which would provide photograph, signature, and fingerprint capture, storage, and retrieval, and document production for driver's licenses, identification cards, and special identification cards as described in the RFP;

     **WHEREAS**, Contractor submitted a proposal to State of Georgia in response to the RFP ("Contractor's Proposal") (See Attachment B) and;

     **WHEREAS**, Contractor's Proposal was deemed by the State of Georgia to be that proposal most advantageous to the State;

     **NOW, THEREFORE**, in consideration of the mutual promises contained herein, the parties agree as follows:

1.    <u>Duration of Contract</u>

This Contract shall begin on *November 13 2002* and shall continue until *June 29 2004*. (hereinafter referred to as the "Term"). The DMVS may elect to renew this Contract on the same terms and conditions for five (5) additional one (1) year periods each at a time beginning July 1 and ending June 30.

2.    <u>Scope of Work</u>

Contractor agrees to furnish, deliver, install, and implement to the DMVS all of the services and deliverables required in the RFP and any amendments thereto, in addition to those services and deliverables described in Contractor's Proposal and any amendments thereto (collectively, the "Services").

Contractor further agrees to collaborate with the DMVS, the existing provider, Digimarc, as well as any vendor(s) selected in the future to provide similar Services under this Contract to support the operation and maintenance of the DLS. Specifically, Contractor must at the end of the Term or termination of the Agreement, fully cooperate with any vendor selected by the State of Georgia and the DMVS to transfer all Image files to an Image database of the State's choosing and provide custom software required for reading and exporting all Image and data files in a secure manner approved by the DMVS.

EXHIBIT 17

3.    Inclusion and Priority of Documents

The RFP and any amendments thereto (and any documents referenced therein), any and all of DMVS' clarification responses, and Contractor's Proposal (and any documents referenced therein) submitted in response thereto, including any and all amendments and any best and final offer (hereinafter referred to as the "BAFO"), specifically including the responses and clarifications of November 12, 2002, are incorporated into this Contract by reference and form an integral part of this Contract. In the event of a conflict between Contractor's Proposal and the RFP, the RFP shall govern. In the event of a conflict between Contractor's Proposal and this Contract, this Contract shall govern.

4.    Project Plan

The Contractor shall perform the Services in accordance with the Project Plan developed by the Contractor and the DMVS as set forth in Attachment C. The Project Plan shall be fully developed by XX, 2002.

5.    Delivery, Installation, and Approval

Contractor shall provide a complete system (as defined in the RFP or any other written communications prepared by the DMVS) for purposes of pilot testing as provided in the RFP. Upon satisfactory completion of any and all pilot tests (said determination to be within the sole discretion of the DMVS), the DMVS may provide the Contractor with a written notice (the "Approval Notice") and Contractor shall begin the installation and implementation of the deliverable to be used in performing the Services. Said installation and implementation shall be completed by the timeframe (the "Implementation Date") set forth in the Project Plan.

6.    Change Order Schedules

In the event that the DMVS determines that it does not require a deliverable and/or particular Service(s) and/or desires an additional deliverable and/or particular Service, it shall submit a Change Order Schedule to the Contractor at least XX days prior to the implementation date of said deliverable set forth in the Project Plan. Contractor shall not comply with a Change Order Schedule unless the Commissioner of the DMVS has approved it in writing.

7.    Modification of Deliverables and Services

The parties understand and agree that the installation and functionality of a deliverable may be dependent on an existing system provided by the GTA. In the event that GTA replaces an existing system, the Contractor shall make appropriate changes to its deliverables and Services within a reasonable time in accordance with the GTA protocols at no additional expense to the DMVS.

8.    Quality of Work

2

Contractor is responsible for the professional quality of all deliverables used in the performance of Services. Contractor represents that all work performed pursuant to this Contract shall be performed in accordance with all of the requirements of the RFP and in a manner consistent with that level of care and skill ordinarily exercised by other providers of similar services. All deliverables and Services provided by Contractor pursuant to this Contract shall be in conformance with and pursuant to all applicable local, state and federal rules, statutes, and regulations.

9.    Maintenance

Maintenance for the deliverables used in performing the Services will be executed in accordance with the RFP and/or Contractor's Proposal. In the event that Contractor does not fulfill its obligation set forth under this paragraph, the DMVS shall, at its option, have the right to deduct from any amounts due and owing the Contractor at any time during the Term of this Contract, any and all charges, costs, expenses, and/or other liabilities incurred by the DMVS as result from Contractor's failure to provide the maintenance set forth in the RFP and/or Contractor's Proposal.

10.    Works Made for Hire

Contractor acknowledges and agrees that any associated documentation produced or resulting from any work under this Contract (hereinafter referred to as the "Works") shall be owned solely and exclusively by the DMVS upon creation, and Contractor shall have no copyright or other property rights in such Works. If for any reason the Works would not be considered a "work made for hire" under applicable law, Contractor does hereby sell, assign, and transfer to the DMVS, its successors and assigns, the entire right, title and interest in and to the copyright in the Works and any registrations and copyright applications relating thereto and any renewals and extensions thereof, in and to all works based upon, derived from, or incorporating the Works, and in and to all income, royalties, damages, claims and payments now or hereafter due or payable with respect thereto. Contractor agrees to execute any and all documents or to take any actions, which may be necessary to fully effectuate the terms and conditions of this paragraph. The "Works" shall include but not be limited to data, notes, back-up documents, illustrations, hand-outs, and brochures, as well as any and all laminates, holograms, and/or scanned images unique to the State of Georgia developed by the Contractor in the performance of this Contract.

The DMVS shall grant the Contractor a non-exclusive license to use any and all laminates, holograms, and/or scanned images only for the purposes of performing its obligations under this Contract.

11.    Licensing Authority and License

Contractor warrants that it is the sole owner or has full power and authority to convey licenses for the deliverables used in the performance of the Services without the consent of a third party and shall indemnify and hold the DMVS harmless from any loss, costs, liability, or expense arising out of any breach or claim of breach of this warranty.

The Contractor shall obtain all necessary licenses at no additional expense to the DMVS to install all deliverables and perform the Services under this Contract.

3

The Source Code, along with any relevant commentary, explanations, and documentation, for any software Contractor utilizes in the performance under this Contract shall be escrowed within ten (10) days of the Approval Notice as defined in Paragraph 5 of this Contract, pursuant to the terms and conditions of the Escrow Agreement set forth in Attachment D, which is incorporated into this Contract by reference.

12.    Training

Contractor shall provide all training as more fully described in Contractor's Proposal one (1) week prior to the Implementation Date.

13.    Contractor Personnel

Contractor shall provide sufficient professional personnel and staffing as described in Contractor's Proposal to install, implement, and maintain deliverables in accordance with the implementation schedule and maintenance requirements set forth in the RFP and Contractor's Proposal. Contractor warrants and represents that all persons assigned to perform under this Contract shall be employees or authorized subcontractors of Contractor and shall be fully qualified to perform the Services. Contractor shall include a similar provision in any agreement with any subcontractor selected to perform any work and/or to provide any deliverables. Contractor's failure to continuously provide adequate staffing as indicated and identified in the RFP and Contractor's Proposal may result in the termination of this Contract.

The DMVS shall have the absolute right to require the Contractor to remove an employee from this project. In the event of such a removal, Contractor will replace the employee with appropriate personnel within sixty (60) days of the removal.

14.    Background Checks

Background checks will be performed by the DMVS on all Contractor employees assigned to perform under this Contract in accordance with the requirements of the RFP.

15.    DMVS Personnel

The DMVS shall assign a Project Manager who shall have the following responsibilities:

   a.    Serve as interface between the Contractor's Project Manager, Contractor's project team and all State of Georgia entities participating in project.

   b.    Obtain and provide information, data, decisions, and approvals requested by Contractor's Project Manager within a timeframe agreed upon by the DMVS at its sole discretion.

4

c.   Collaborate with Contractor's Project Manager to jointly monitor and measure progress of implementation activities and resolve deviations from the Project Plan.

d.   Collaborate with Contractor's Project Manager to jointly define DMVS' role and responsibilities as related to implementation activities.

e.   Provide staff knowledgeable about DMVS DDLS, DMVS LAN, mainframe, and networking conditions.

16.   Risk of Loss

Risk of loss for all deliverables shall vest in the Contractor during the Term of the Contract.

17.   Payment

For and in consideration of the Services performed pursuant to this Contract, the DMVS shall pay Contractor in accordance with the Best and Final Offer set forth in Attachment D.

The DMVS shall compensate the Contractor on a "cost per document" basis. For purposes of this Contract, "document" is defined as a permanent license and/or identification cards printed and issued upon the approval of the DMVS. The Contractor shall, on a monthly basis, invoice the DMVS for documents printed and issued, as well as for any costs associated with additional requirements requested by the DMVS (hereinafter referred to as the "Additional Pricing"). Specifically, the DMVS has elected to request, and Contractor has agreed to provide, the additional requirement of the variable UV printing feature on permanent cards at the Additional Pricing mutually agreed upon by both parties, which shall be $0.014 per card over and above the cost per document specified in the BAFO.

The DMVS shall remit payment to the Contractor within thirty (30) days after receipt of each invoice, unless the DMVS disputes the invoice as a result of Contractor's failure to perform the Services or other breach of the terms and conditions of this Contract.

**CONTRACTOR SHALL NOT INVOICE THE DMVS FOR ANY OTHER COSTS EXCEPT THOSE SET FORTH HEREINABOVE WITHOUT THE WRITTEN APPROVAL OF THE COMMISSIONER OF THE DMVS.**

18.   Subcontract

Other than as specified in the RFP, Contractor shall not subcontract, assign or otherwise permit anyone other than Contractor's personnel to perform any of the work and/or provide any of the Services under this Contract, or assign any of its rights or obligations hereunder. Contractor warrants that it shall make timely payments for work performed to any subcontractor hereunder and Contractor shall indemnify and hold harmless the DMVS and the State of Georgia for any breach of this warranty.

19.   Termination

The DMVS may, in its sole discretion, determine that Contractor is failing to substantially comply with the terms and conditions of this Contract. The DMVS shall provide written notice

5

thereof to Contractor. The notice must identify specific incidents or circumstances comprising the failure of performance. As soon as is practicable, but no more than five (5) business days after receipt of said notice. the appropriate representative of both parties shall meet to discuss the complaint. In the event the complaint is not resolved within the amount of time mutually agreed upon by both parties, the DMVS may terminate this Contract upon three (3) calendars days' written notice to Contractor.

This Contract may also be immediately terminated without further notice in the event that any of the following occurs:

a.  Contractor becomes insolvent or liquidation or dissolution of Contractor begins;

b.  A voluntary or involuntary bankruptcy petition is filed by or against Contractor under the U.S. Bankruptcy Code or any similar petition under any state insolvency law;

c.  An assignment is made by Contractor for the benefit of creditors; or

d.  A proceeding for the appointment of a receiver, custodian, trustee or similar agent are initiated with respect to Contractor.

Upon any termination or other expiration of this contract, Contractor shall return to the DMVS all papers, materials and other documents used or developed in connection with providing the Services under this Contract within thirty (30) days of termination or expiration of the Contract.

20.  **Termination For Convenience**

The DMVS may terminate this Contract upon thirty (30) days' written notice to Contractor. Such notice of cancellation shall be transmitted via U.S. Mail, Certified Return Receipt Requested or other verifiable express delivery system. Upon receipt of such notice, Contractor shall cease or wind up all affected work with all due haste. The Contractor shall be entitled to receive just and equitable compensation for Services rendered based on time spent prior to the termination date. The rates or amounts specified in the Contract, plus any listed discounts, shall serve as a ceiling for all calculations of payments due Contractor.

21.  **Funding**

If the source of payment for the Services no longer exists or is insufficient for the DMVS to meet its obligations hereunder, then the DMVS may immediately terminate this Contract without further obligation of the DMVS or the State of Georgia as of that moment. Notwithstanding the foregoing, the DMVS shall make a reasonable effort to provide at least thirty (30) days' notice (or such lesser notice as is practicable) to the Contractor when it determines that the loss of such source of payment is a reasonable possibility or probability. The DMVS shall provide immediate notice to Contractor upon the occurrence of any event that renders the source of payment for the total obligation of the DMVS for the Project no longer in existence or otherwise insufficient. The DMVS covenants that it shall remain obligated to pay for that portion of the Services performed and accepted by the DMVS prior to such termination. The good faith determination of the DMVS as to the occurrence of the events described herein shall be conclusive.

6

22.    <u>Reporting Requirements</u>

Contractor shall provide reports as set forth in the RFP.

23.    <u>Records Retention</u>

Contractor agrees to make available at all reasonable times during the period set forth below any of the records of the contracted work for inspection or audit by any authorized representative of the DMVS or the Georgia State Auditor. Contractor shall preserve and make available its records for a period of five (5) years from the date of final payment under this Contract, and for such period, if any, as is required by applicable statute. If the Contract is completely or partially terminated, the records relating to the work terminated shall be preserved and made available for a period of three (3) years from the date of any resulting final settlement. Records which relate to appeals, litigation, or the settlements of claims arising out of the performance of this Contract, or costs and expenses of any such agreement as to which exception has been taken by the State Auditor or any of his duly authorized representatives, shall be retained by Contractor until such appeals, litigation, claims or exceptions have been disposed of.

24.    <u>Relationship of the Parties</u>

Contractor warrants that all work performed by or on behalf of Contractor under this Contract shall be performed as an independent contractor. Furthermore, nothing in this Contract shall be construed as creating an employment relationship between the parties, between the DMVS and Contractor's employees, agents, or subcontractors, or between Contractor and DMVS' employees, agents, or subcontractor. Contractor shall be responsible for compliance with all laws, rules and regulations involving its respective employees, including, but not limited to, employment of labor, hours of labor, health and safety, working conditions, workers' compensation insurance, and payment of wages and Contractor agrees to indemnify and hold harmless the DMVS and the State of Georgia from any loss resulting from the breach of these warranties. This Contract shall not be construed so as to create a partnership or joint venture between Contractor and the State or any of its agencies.

25.    <u>State Technology Resource Agent</u>

O.C.G.A. §50-25-7.2 authorizes the Georgia Technology Authority to act as the agent of any agency for any technology resource purchase exceeding $100,000.00.

All parties acknowledge and agree that during the term of this Contract, the Georgia Technology Authority is authorized to act as agent for any state agency that is a party to this Contract exercising any and all rights, powers and responsibilities available to the principal agency and/or granted to the Georgia Technology Authority by law.

26.    <u>Indemnification</u>

Contractor hereby waives, releases, relinquishes, discharges and agrees to indemnify, protect and save harmless the State of Georgia (the "State"), the DMVS, GTA and their officers and employees (hereinafter collectively referred to as "Indemnitees"), of and from any and all claims,

7

demands, liabilities, losses, costs or expenses, including attorneys' fees, for bodily injury (including but not limited to death), personal injury or property damage caused by any act or omission on the part of Contractor, its agents, employees, subcontractors, or others working at the direction or on behalf of Contractor or caused by the breach of this Contract by Contractor.

This indemnification applies notwithstanding the fact that third parties or the Indemnitees may be partially responsible for the situation resulting in the claim or the claim results in a monetary obligation that exceeds any contractual commitment.

This indemnification extends to the successors and assigns of Contractor, and survives the termination of the Contract, and to the extent allowed by law, the bankruptcy of Contractor. This indemnification does not apply if the claim arises from the willful and wanton misconduct or sole negligence of the Indemnitees.

To the extent such damage or loss as covered by this indemnification is covered by the State of Georgia Tort Claims Fund, the Contractor agrees to reimburse the Fund. To the full extent permitted by the Constitution and the laws of the State and the terms of the Fund, the Contractor and its insurers waive any right of subrogation against the State, the Indemnitees, and the Fund and insurers participating thereunder, to the full extent of this indemnification.

Contractor shall, at its expense, be entitled to and shall have the duty to participate in the defense of any suit against the Indemnitees. No settlement or compromise of any claim, loss or damage entered into by Indemnitees shall be binding upon Contractor unless approved in writing by Contractor. No settlement or compromise of any claim, loss or damage entered into by Contractor shall be binding upon Indemnitees unless approved in writing by Indemnitees.

27.    Confidential Information

Contractor will be given access to, and become acquainted with, Confidential Information. "Confidential Information" is defined as information, data, and knowledge that are not generally known to the public or to other persons who can obtain economic value from its disclosure or use, and which has actual or potential economic value as long as it is kept secret. Confidential Information will include, among other things, personal information as defined in O.C.G.A. §40-5-1(13.5), any and all information disclosed to Contractor or known by Contractor as a consequence of performing under this Contract that is not generally known outside the DMVS about the DMVS' finances, operations, employees, policies, manuals, processes, technology, inventions, research, improvements, computer programs, designs, services, development projects, accounts, billing methods, pricing, data, business methods, marketing, systems or plans, internal affairs, legal affairs, creative ideas and concepts, projects in development, locations, advertising and promotional procedures, operating procedures, potential or existing reorganization plans, phone lists, mailing lists, any and all information entrusted to the DMVS by third parties, and any and all information defined as "Trade Secrets" under the Uniform Trade Secrets Act. Confidential Information may be contained in written materials, in verbal communications, in the unwritten knowledge of employees, and/or any other tangible medium of expression, including, but not limited to, tapes, hard disk and soft disk drive mechanisms, and any and all mechanisms for electronic storage of information.

Contractor shall not be considered a member of the general public for the purposes of receiving Confidential Information and shall not disclose the Confidential Information. Contractor shall not use Confidential Information for any purpose except for the business interests of the DMVS and

8

shall only disclose Confidential Information to its employees to the extent necessary to fulfill the intent and terms of this Contract. Furthermore, Contractor shall not disclose any Confidential Information for reasons not related to the business interests of the DMVS even in the course of casual discussions, to any person or entity, whether while performing the Services under this Contract or at any time thereafter.

The provisions set forth in hereinabove shall not apply if the Confidential Information:

    a. becomes publicly available through no fault of Contractor;

    b. is lawfully obtained from third parties without restriction; or

    c. can be shown to be previously known or developed by Contractor independent of the DMVS.

The above exceptions (a) through (c) shall not be interpreted by Contractor as justification to disregard the obligations of confidence set forth in this Contract merely because individual portions of the "Confidential Information" may be found to be within the exceptions, or because the "Confidential Information" is implied by, but not specifically disclosed in, information falling within the exceptions and shall not apply to personal information as defined in O.C.G.A. §40-5-1(13.5).

Contractor agrees not to remove, reproduce, summarize or copy, or cause to be removed, reproduced, summarized or copied, any Confidential Information except required by Contractor to perform.

Contractor agrees to return immediately to DMVS all Confidential Information, including duplicates, whenever the DMVS may require that such Confidential Information be returned.

No license under any patent, trade secret, or copyright, now or hereafter obtained is granted, is agreed to be granted, or implied by either this Contract or the disclosure of Confidential Information.
Any disclosure Contractor may make to the DMVS in connection with this Contract shall be with the understanding that no confidential relationship or liability with the DMVS is created or implied.

To the extent necessary to protect the DMVS' right, Contractor will have appropriate confidentiality agreements with its employees whose services it may require sufficient to enable it to comply with all the terms of this Contract.

Contractor agrees that, during the Term of this Contract and for a period of five (5) years thereafter, for as long as the Confidential Information remains proprietary to DMVS, Contractor and its employees will hold such Confidential Information in a fiduciary capacity for the benefit of the DMVS, and shall not directly or indirectly use, copy, reproduce, distribute, manufacture, duplicate, reveal, publish, disclose or cause to be disclosed, or otherwise transfer, such Confidential Information to any third party, or utilize such Confidential Information for any purpose, except as expressly specified in the exceptions hereinabove. With respect to personal information as now or hereafter may be defined in O.C.G.A. § 40-5-1(13.5), Contractor shall hold such information confidential in perpetuity.

Contractor acknowledges that the provisions set forth in this paragraph 27 are necessary and reasonable to protect the Confidential Information and, further, that a breach or threatened breach of any provision of this paragraph 27 by Contractor or at Contractor' direction will cause great

9

and irreparable harm to the DMVS for which it shall have no adequate remedy at law. Therefore, in addition to any other rights and remedies the DMVS may have, Contractor agrees that the DMVS shall be entitled to obtain a temporary restraining order or a preliminary or permanent injunction and other equitable relief to prevent a threatened or actual breach or continuing breach of this paragraph 27. Contractor acknowledges that this paragraph 27 shall be specifically enforceable in accordance with its terms. Contractor further acknowledges that any breach of any of the terms and conditions of this paragraph 27 may result in the immediate termination of this Contract.

Contractor understands that provisions set forth in this paragraph 27 are applicable to Contractor as of the date Contractor first acquired knowledge of any Confidential Information.

28.    <u>Insurance</u>

Contractor shall procure and maintain insurance, which shall protect the Contractor and the State from any claims for bodily injury, property damage, or personal injury, which may arise out of operations under the Contract. Contractor shall procure the insurance policies at the Contractor's own expense and shall furnish the State an insurance certificate listing the State and the DMVS as certificate holder. <u>The insurance certificate must document that the liability insurance coverage purchased by the Contractor includes contractual liability coverage to protect the State.</u> In addition, the insurance certificate must provide the following information:

    a.   Name and address of authorized agent,

    b.   Name and address of insured,

    c.   Name of insurance company (licensed to operate in Georgia),

    d.   Description of coverage in standard terminology,

    e.   Policy period,

    f.   Policy Number,

    g.   Limits of liability,

    h.   Name and address of certificate holder,

    i.   Acknowledgment of notice of cancellation to the State,

    j.   Signature of authorized agent,

    k.   Telephone number of authorized agent,

    l.   Details of policy exclusions in the comment section of Insurance Certificate.

Contractor is required to maintain the following insurance coverage for the duration of the Contract:

    m.   Workers' Compensation Insurance (Occurrence) in the amounts of the statutory limits established by the General Assembly of the State of Georgia (A self-

insurer must submit a certificate from the Georgia Board of Workers' Compensation stating that Contractor qualifies to pay its own workers' compensation claims.) In addition, Contractor shall require all subcontractors occupying the premises or performing work under this Contract to obtain an insurance certificate showing proof of Workers' Compensation Coverage.

n.     Commercial General Liability Policy (Occurrence), to include contractual liability. The Commercial General Liability Policy shall have dollar limits sufficient to insure that there is no gap in coverage between this policy and the Commercial Umbrella Policy described below.

o.     Business Auto Policy (Occurrence) to include but not be limited to liability coverage on any owned, non-owned and hired vehicle used by Contractor or Contractor's personnel in the performance of this Contract. The Business Automobile Policy shall have dollar limits sufficient to insure that there is no gap in coverage between this policy and the Commercial Umbrella Policy required in this Contract.

p.     Commercial Umbrella Policy (Occurrence), which must provide the same or broader coverage than those provided for in the above Commercial General Liability and Business Auto Policies. Policy limits for the Commercial Umbrella Policy shall have an annual aggregate limit of $3,000,000.

The foregoing policies shall contain a provision that coverage afforded under the policies will not be canceled, or not renewed or allowed to lapse for any reason until at least sixty (60) days prior written notice has been given to the DMVS. Certificates of Insurance showing such coverage to be in force shall be filed with the DMVS prior to commencement of any work under this Contract. The foregoing policies shall be obtained from insurance companies licensed to do business in Georgia and shall be with companies acceptable to the DMVS. All such coverage shall remain in full force and effect during the initial term of the Contract and any renewal or extension thereof.

29.     Performance Bond

Contractor shall, at its own expense, obtain and maintain for the life of this Contract and all renewals and extensions a performance bond issued by a surety company authorized to do business in the State of Georgia and acceptable to the DMVS in the amount of $3,000,000.00.

30.     Taxes

Contractor will pay all taxes lawfully imposed upon it with respect to this Contract. By this paragraph, the DMVS makes no representation whatsoever as to the liability or exemption from liability of Contractor to any tax imposed by any governmental entity.

31.     Compliance With All Laws

Contractor shall comply with all laws, ordinances, rules and regulations of any governmental entity pertaining to its performance pursuant to this Contract. Contractor shall also comply with all applicable DMVS and State policies and standards when performing work on DMVS premises, including but not limited to the DMVS and State health, safety and security standards.

32.   Survival of Representations

The terms, provisions, representations and warranties contained in this Contract shall survive the termination of this Contract.

33.   Drug-Free Workplace

Contractor hereby certifies as follows:

a.   Contractor will not engage in the unlawful manufacture, sale, distribution, dispensation, possession, or use of a controlled substance or marijuana during the performance of this Contract.

b.   If Contractor has more than one employee, including Contractor, Contractor shall provide for such employees a drug-free workplace, as defined under Official Code of Georgia Annotated ("OCGA") Sections 50-24-2(5) and 50-24-3(b), throughout the duration of this Contract.

c.   Contractor will secure from any subcontractor hired to work in a drug-free workplace the following written certification:

As part of the subcontracting agreement with (Contractor's Name), (Subcontractor's Name) certifies to Contractor that a drug-free workplace will be provided for the subcontractor's employees during the performance of this Contract pursuant to paragraph 7 of subsection B of OCGA ' 50-24-3.

Contractor may be suspended, terminated, or debarred if it is determined that:

a.   Contractor has made false certification hereinabove; or

b.   Contractor has violated such certification by failure to carry out the requirements of Official Code of Georgia Section 50-24-3.

34.   Trading With State Employees

Contractor hereby certifies that this Contract does not and will not violate the provisions of Official Code of Georgia Annotated § 45-10-20 et seq. in any respect.

35.   Notices

All notices under this Contract shall be deemed duly given: Upon delivery, if delivered by hand or overnight delivery (against receipt); or three days after posting, if sent by Registered or Certified Mail, Return Receipt Requested; to a party hereto at the address set forth below or to such other address as a party may designate by notice pursuant hereto.

Contractor:   _____

_____

12

_____

_____

DMVS:        Tim Burgess, Commissioner
             2206 East View Parkway
             Conyers, Georgia 30013

36.    Section Titles

The section titles used in this Contract are for reference purposes only and shall not be deemed a part of this Contract.

37.    Time Of The Essence

Time is of the essence in this Contract. Any reference to "days" shall be deemed calendar days unless otherwise specifically stated.

38.    Severability

Any section, subsection, paragraph, term, condition, provision or other part (hereinafter collectively of this Contract which is judged, held, found or declared to be voidable, void, invalid, illegal or otherwise not fully enforceable shall not affect any other part of this Contract, and the remainder of this Contract shall continue to be of full force and effect as set out herein. Any agreement of the parties to amend, modify, eliminate or otherwise change any part of this Contract shall not affect any other part of this Contract, and the remainder of this Contract shall continue to be of full force and effect as set out herein.

39.    Publicity

Any publicity pertaining to the Contract, including, but not limited to, notices, information pamphlets, press releases, research, reports, signs and similar public notices prepared by or for Contractor shall identify the DMVS as the sponsoring institution, and shall not be released prior to approval by the DMVS; however, Contractor may reference this Contract in proposals for other contracts without the DMVS' approval.

40.    Authority

Contractor has full power and authority to enter into and perform this Contract, and the person signing on behalf of Contractor has been properly authorized and empowered to enter into this Contract. Contractor further acknowledges that it has read this Contract, understands it, and agrees to be bound by it.

41.    Parties Bound

This Contract shall be binding on and inure to the benefit of the parties to this Contract and their respective heirs, executors, administrators, legal representatives successors and assigns.

13

42.    Choice of Law and Venue

This Contract shall be governed in all respects by the laws of the State of Georgia. Any lawsuit or other action brought against the DMVS and the State based upon or arising from this Contract shall be brought in a Court or other forum of competent jurisdiction in Fulton County in the State of Georgia.

43.    Amendments in Writing

No amendment to this Contract shall be effective unless it is in writing and signed by duly authorized representatives of the parties.

**NO REPRESENTATION, REQUEST, INSTRUCTION, DIRECTIVE OR ORDER, MADE OR GIVEN BY ANY OFFICIAL OF ANY AGENCY OF THE STATE OF GEORGIA, WHETHER VERBAL OR WRITTEN, SHALL BE EFFECTIVE TO AMEND THIS CONTRACT OR EXCUSE OR MODIFY PERFORMANCE HEREUNDER UNLESS REDUCED TO A FORMAL AMENDMENT AND EXECUTED AS SET FORTH ABOVE. CONTRACTOR SHALL NOT BE ENTITLED TO RELY ON ANY SUCH REPRESENTATION, REQUEST, INSTRUCTION, DIRECTIVE OR ORDER AND SHALL NOT, UNDER ANY CIRCUMSTANCES WHATSOEVER, BE ENTITLED TO ADDITIONAL COMPENSATION, DELAY IN PERFORMANCE, OR OTHER BENEFIT CLAIMED FOR RELYING UPON OR RESPONDING TO ANY SUCH REPRESENTATION, REQUEST, INSTRUCTION, DIRECTIVE OR ORDER.**

44.    Required Clauses

During the performance of this Contract, the parties agree to abide by the terms of Executive Order 11246 on nondiscrimination and will not discriminate against any person because of race, color, religion, sex or national origin. The participants will take affirmative action to ensure that applicants are employed without regard to their race, color, religion, or national origin.

No member of or delegate to Congress, or resident Commissioner, shall be admitted to any share or part of this Contract or any benefit that may arise therefrom; but this provision shall not be construed to extend to this Contract if made with a corporation for its general benefit.

The parties agree that any contracts developed and awarded pursuant to this Contract and all work and procedures related to said contracts, shall, at all times, conform to the applicable federal and state laws, rules, regulations, orders and approvals, including specifically, procedures and requirements relating to labor standards, equal employment opportunity, nondiscrimination, compliance with Americans with Disabilities Act, anti-solicitation, information, and auditing and reporting provisions.

45.    Entire Contract

This written Contract, including the RFP and amendments thereto, Contractor's Proposals and amendments thereto, and all other documents incorporated herein, constitutes the entire agreement between the parties with respect to the subject matter; and, all other prior and

14

contemporaneous agreements, representations, statements, negotiations, and undertakings are superseded hereby.

**THE PARTIES HERETO ACKNOWLEDGE THAT THEY HAVE READ AND UNDERSTAND THIS CONTRACT, AND AGREE TO BE BOUND BY ALL TERMS, CONDITIONS, AND PROVISIONS OF THIS CONTRACT, AS INDICATED BY THEIR SIGNING OF THIS CONTRACT.**

IN WITNESS WHEREOF, this Contract is executed as the date first written above.

**GEORGIA DEPARTMENT OF MOTOR VEHICLE SAFETY:**

By: _____    Date: _11/12/_____

Title: _Commissioner_____

**CONTRACTOR:**

By: _____    Date: _11/12/02_____

Title: _President/CEO_____    FEI/SS# _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_

**GEORGIA TECHNOLOGY AUTHORITY:**
**Approved as to Form and Award.**

By: _____    Date: _11/12/02_____

Larry Singer, CIO and Executive Director

15

# Exhibit 3

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-K

☒    ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the Fiscal Year Ended December 31, 2004

OR

☐    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the Transition Period from          to          .

Commission File Number 000-21559

# VIISAGE TECHNOLOGY, INC.
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | 04-3320515 |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 296 Concord Road, Billerica, MA | 01821 |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: (978)-932-2200

Securities registered pursuant to Section 12(b) of the Act: None

Securities registered pursuant to section 12(g) of the Act: Common Stock $.001 par value

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  ☐ Yes  ☒ No

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference into Part III of this Form 10-K or any amendment to this Form 10-K.  ☐

Indicate by a check mark whether the Registrant is an accelerated filer (as defined in Exchange Act Rule 12b-2).  ☒ Yes  ☐ No

The aggregate market value of the voting stock held by nonaffiliates of the registrant as of June 27, 2005, was approximately $155 million.

As of June 27, 2005, the registrant had 48,090,780 shares of Common Stock outstanding.

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| Facing Sheet |  | 1 |
| Table of Contents |  | 2 |
| **PART I** |  |  |
| Item 1 | Business | 3 |
| Item 2 | Properties | 14 |
| Item 3 | Legal Proceedings | 14 |
| Item 4 | Submission of Matters to a Vote of Security Holders | 15 |
| **PART II** |  |  |
| Item 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 16 |
| Item 6 | Selected Financial Data | 17 |
| Item 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 18 |
| Item 7A | Quantitative and Qualitative Disclosures about Market Risk | 46 |
| Item 8 | Financial Statements and Supplementary Data | 47 |
| Item 9 | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 80 |
| Item 9A | Controls and Procedures | 80 |
| **PART III** |  |  |
| Item 10 | Directors and Executive Officers of the Registrant | 81 |
| Item 11 | Executive Compensation | 84 |
| Item 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 87 |
| Item 13 | Certain Relationships and Related Transactions | 89 |
| Item 14 | Principal Accountant Fees and Services | 90 |
| **PART IV** |  |  |
| Item 15 | Exhibits and Financial Statement Schedules | 91 |
| **SIGNATURES** |  | 96 |

2

\

Table of Contents

PART I

Item 1. *Business*

Overview

Viisage Technology, Inc. was formed as a division of Lau Technologies in 1992. In 1996, we were incorporated as a Delaware company, just prior to the completion of our initial public offering of common stock. Our principal executive offices are located at 296 Concord Road, Billerica, MA 01821 Tel. 978.932.2200. When we refer to "we", "our" and "Viisage" in this Annual Report on Form 10-K, we mean Viisage Technology, Inc. as well as all of our consolidated subsidiaries, unless the context otherwise requires.

We are a leading provider of advanced technology identity solutions that enable governments, law enforcement agencies and businesses to enhance security, reduce identity theft and protect personal privacy. Our solutions are specifically designed for the identification of people and include secure credentialing, biometrics, automated document authentication and real-time identity databases, as well as systems design, development, integration and support services. These identity solutions enable our customers to manage the entire life cycle of an individual's identity for a variety of applications including civil identification, criminal identification and border management. Our customers use our solutions to help solve the following three critical problems in identity verification and management:

- assurance that the identification document is authentic and has been issued to the correct person;

- confidence that the person holding the identification is uniquely tied to and authorized to use the document; and

- verification of the privileges the individual is entitled to at a particular point in time.

Our solutions annually produce more than 30 million secure government-issued credentials at more than 2,000 locations. We are the second largest provider of U.S. drivers' licenses with a 30% market share, and are the sole source provider of passport production capability to the U.S. Department of State. We also are a recognized leader in biometrics in the field of face recognition. In addition, we are a leader in automated document authentication technology with approximately 2,500 installations in 15 countries. Our customers include governments, law enforcement agencies and businesses around the world.

Our business consists of one segment, the advanced technology identity solutions segment. See Note 12 to the Consolidated Financial Statements. As our market has become increasingly complex and more frequently requires the integration of various technologies and capabilities, we have established ourselves as a provider of end-to-end identity solutions. In January 2004, we acquired ZN Vision Technologies AG, or ZN, which solidified our leadership position in face recognition technology. In February 2004, we acquired Trans Digital Technologies Corporation, or TDT, which provided us with a significant presence in the U.S. federal government market and strengthened our capability and credibility in the border management market worldwide. And most recently, in October 2004, we acquired Imaging Automation, Inc., or iA, significantly adding breadth to our proprietary product portfolio with world-class document authentication products. The iA acquisition also supplemented our installed customer base, provided significant expansion in our distribution channels, particularly in Europe, the Middle East and Africa, and provided Viisage with a high value entrée into new markets.

We believe that our installed base of customers together with our leading face recognition and document authentication technologies provides us with a competitive advantage in delivering unified identity solutions for both the physical and digital domains.

Industry Overview

*Markets*

The ability to confirm an individual's identity is playing an increasingly important role in national and international security, personal privacy and commerce. Failure to provide adequate identification can lead to

3

Table of Contents

- the acquisition of Imaging Automation, Inc., or iA, the worldwide market leader in document authentication, which we completed in October 2004, and which has supplemented our installed customer base, significantly expanded our distribution channels, and provided us with a high value entrée into new markets; and

- the creation of a products group, consisting of product marketing, product management, sales and business development personnel and headed by an experienced sales executive, which focuses on driving sales of our products to our worldwide customer base and increasing product sales as a percentage of our overall net sales.

*Financial Results*

We generate revenue through the sale and license of products and services for verifying and managing identities. Our revenues increased from approximately $37.4 million for the year ended December 31, 2003 to approximately $67.5 million for the year ended December 31, 2004, due in large part to the acquisitions described in the preceding paragraph. Revenue is derived from multi-year contracts for systems implementation, credential production and related services as well as from solution sales to law enforcement agencies, the federal government, foreign governments and the gaming industry. Our net loss for 2004 was $7.0 million.

*Capital Raising Initiatives and Repayment of Indebtedness*

In August 2004, we sold approximately 7.3 million shares of our common stock in an underwritten public offering. We received net proceeds of approximately $37.4 million from the offering.

During 2004, we repaid in full a $15.3 million promissory note that we had issued to Buddy Beck, a director of Viisage and the former sole shareholder of TDT in connection with our acquisition of TDT. $14.5 million of the note was repaid in cash and the remaining $0.8 million was settled as an offset against a purchase price reduction negotiated as part of the acquisition of TDT. In addition, in 2004, we repaid in full our $4.3 million debt obligation to Lau Technologies, or Lau, one of our principal stockholders. Finally, in 2004, we repaid $7.7 million representing the outstanding principal balance under our loan agreement with Commerce Bank and Trust Company which was subsequently terminated.

In December 2004, we entered into a new loan agreement with a commercial lender which permits us to borrow up to $25,000,000, subject to certain financial covenants which may restrict the amounts borrowed. Certain of these covenants were amended in March 2005. No borrowings have been made under this agreement to date other than $2.3 million in letters of credit issued by Citizens to certain of our customers.

We expect our current capital resources to be adequate for our needs for at least the next 12 months. However, if we enter into a new drivers' license contract or engage in a significant acquisition or other strategic transaction, we could be required to raise additional capital, either in the form of debt or equity.

*Acquisitions*

In January 2004, we acquired all outstanding shares of ZN in exchange for an aggregate of 5,221,454 newly issued shares of our common stock and $493.00 in cash. In addition, we assumed ZN's employee share option plan, and accordingly have reserved 1,138,546 shares of our common stock for issuance to the plan participants. The options under this plan were fully vested prior to the close of the transaction.

In February 2004, we acquired all outstanding shares of TDT in exchange for 5,850,000 newly issued shares of our common stock, $5.0 million in cash and $15.3 million in notes, which have subsequently been repaid in full.

In October 2004, we completed the acquisition of iA. The purchase price for the acquisition included approximately 3.9 million shares of common stock, approximately $5.0 million in cash and the assumption of approximately $2.9 million of debt, which has subsequently been repaid in full. In addition, we issued fully vested stock options effective as of the close of the transaction to assume iA's employee stock option plans, and accordingly have reserved 565,270 shares of our common stock for issuance to the plans' participants.

19

# Exhibit 4

424B4 1 d424b4.htm PROSPECTUS

Table of Contents

Filed Pursuant to Rule 424(b)(4)
Registration No. 333-116698

Prospectus



## 7,500,000 Shares of Common Stock

We are offering 7,200,000 shares of our common stock, par value $0.001 per share. We will receive all of the net proceeds from the sale of such common stock. The selling shareholders identified in this prospectus are selling an additional 300,000 shares of our common stock. We will not receive any of the proceeds from the sale of the shares by the selling shareholders.

Our common stock is listed on the Nasdaq National Market under the symbol "VISG." The last reported sale price of our common stock on August 4, 2004 was $6.23 per share.

**Investing in our common stock involves a high degree of risk. Before buying any of these shares of our common stock, you should carefully consider the risk factors described in " Risk Factors" beginning on page 7 of this prospectus.**

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or passed upon the adequacy or accuracy of this prospectus. Any representation to the contrary is a criminal offense.**

|  | Per share | Total |
|---|---|---|
| Public offering price | $ 5.500 | $41,250,000 |
| Underwriting discounts and commissions | $ 0.316 | $ 2,370,000 |
| Proceeds, before expenses, to us | $ 5.184 | $37,324,800 |
| Proceeds to selling shareholders | $ 5.184 | $ 1,555,200 |

The underwriters may also purchase up to an additional 525,000 shares of our common stock from us and up to an additional 600,000 shares from the selling shareholders at the public offering price, less the underwriting discounts and commissions payable by us and the selling shareholders, to cover overallotments, if any, within 30 days from the date of this prospectus. If the underwriters exercise the option in full, the total underwriting discounts and commissions payable by us and the selling shareholders will be $2,725,500 and the total proceeds, before expenses, to us will be $40,046,400 and the total proceeds to the selling shareholders will be $4,665,600.

The underwriters are offering the shares of our common stock as described in "Underwriting." Delivery of the shares will be made on or about August 10, 2004.

## JPMorgan

## UBS Investment Bank

### Piper Jaffray

### JMP Securities

### Janney Montgomery Scott LLC

### Roth Capital Partners

August 4, 2004

## Table of Contents

You should rely only on the information contained or incorporated by reference in this prospectus. We have not authorized anyone to provide information different from that contained or incorporated by reference in this prospectus. Neither the delivery of this prospectus nor the sale of shares of common stock means that information contained or incorporated by reference in this prospectus is correct after the date of this prospectus. These documents do not constitute an offer to sell or solicitation of an offer to buy in any jurisdiction where offers or sales are not permitted. In this prospectus, "Viisage," "we," "our," "us," and "the Company" refer to Viisage Technology, Inc. and its consolidated subsidiaries, unless the context otherwise requires.

### Prospectus

| | |
|---|---|
| Forward-Looking Statements | ii |
| Prospectus Summary | 1 |
| Risk Factors | 7 |
| Use of Proceeds | 18 |
| Dilution | 19 |
| Capitalization | 20 |
| Price Range of Common Stock | 21 |
| Dividend Policy | 21 |
| Selected Consolidated Financial Data | 22 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 24 |
| Business | 42 |
| Management | 53 |
| Principal and Selling Shareholders | 55 |
| Description of Capital Stock | 57 |
| Underwriting | 60 |
| Where You Can Find More Information | 63 |
| Validity of Common Stock | 64 |
| Experts | 64 |
| Index to Consolidated Financial Statements | F-1 |

Our trademarks, service marks and trade names include Viisage, Viisage Technology, FaceEXPLORER, FaceTOOLS, FaceFINDER, FacePASS and SensorMast. This prospectus also contains trademarks, service marks, copyrights and trade names of other companies.

i

Table of Contents

## PRINCIPAL AND SELLING SHAREHOLDERS

The following table sets forth information known to us with respect to the beneficial ownership of our outstanding common stock as of July 15, 2004 by:

- each person known to us to be the beneficial owner of 5% or more of our common stock;
- each of our directors;
- each of our executive officers;
- each selling shareholder and
- all directors and executive officers as a group.

The percentage of our common stock beneficially owned prior to this offering in the following table is based on 35,870,327 shares of common stock outstanding on July 15, 2004. The table below assumes the underwriters do not exercise their over-allotment option. If the over-allotment option is exercised in full, we will sell an aggregate of 525,000 additional shares of common stock.

Beneficial ownership is determined in accordance with the rules of the Securities and Exchange Commission. In computing the number of shares beneficially owned by a person and the percentage ownership of that person, shares of common stock subject to options and warrants held by that person that are exercisable as of July 15, 2004 or will become exercisable within 60 days thereafter are deemed outstanding, while such shares are not deemed outstanding for purposes of computing percentage ownership of any other person.

Unless otherwise indicated in the footnotes to this table, the address of each beneficial owner is c/o Viisage Technology, Inc., 296 Concord Road, Third Floor, Billerica, MA 01821.

| Name | Shares Beneficially Owned Prior to Offering(1) | | Number of Shares Being Offered | Shares Beneficially Owned After Offering | |
|---|---|---|---|---|---|
| | Number | Percent | | Number | Percent |
| Joanna T. Lau (2) | 6,238,108 | 17.4% | 100,000(3) | 6,138,108 | 14.3% |
| Lau Technologies | 6,027,370 | 16.8% | 100,000 | 5,927,370 | 13.8% |
| Odeon Venture Capital AG(4) | 949,325 | 2.6% | 95,330 | 853,995 | 2.0% |
| Dr. Stefan Gehlen(5) | 168,392 | * | 4,670 | 163,722 | * |
| Denis K. Berube (6) | 6,238,108 | 17.4% | 100,000(3) | 6,138,108 | 14.3% |
| B.G. Beck (7) | 5,869,651 | 16.4% | 100,000 | 5,769,651 | 13.4% |
| Harriet Mouchly-Weiss(8) | 121,361 | * | —— | 121,361 | * |
| Charles E. Levine(9) | 138,181 | * | —— | 138,181 | * |
| Peter Nessen(10) | 87,827 | * | —— | 87,827 | * |
| Paul T. Principato (11) | 108,855 | * | —— | 108,855 | * |
| Thomas J. Reilly(12) | 118,073 | * | —— | 118,073 | * |
| Marcel Yon(13) | 949,325 | 2.6% | 95,330(14) | 853,995 | 2.0% |
| Bernard C. Bailey(15) | 250,000 | * | —— | 250,000 | * |
| Iftikhar A. Ahmad(16) | 177,406 | * | —— | 177,406 | * |
| William K. Aulet (17) | 66,666 | * | —— | 66,666 | * |
| Kenneth C. Scheflen | —— | * | —— | —— | * |
| James P. Ebzery(18) | 66,666 | * | —— | 66,666 | * |
| All directors and executive officers as a group (13 persons) (19) | 14,192,119 | 38.4% | 295,330(20) | 13,896,789 | 31.5% |

---

\*    Indicates holdings of less than one percent of the 35,870,327 shares issued and outstanding as of July 15, 2004.

(1)    Unless otherwise noted, and subject to applicable community property laws, to our knowledge each person identified possesses sole voting and investment power over the shares beneficially owned by such person.

55

Table of Contents

(2)   The address of Ms. Lau and Lau Technologies is c/o Lau Technologies, 30 Monument Square, Suite 220, Concord, Massachusetts 01742. Includes 6,027,370 shares held by Lau Technologies. Ms. Lau and Denis K. Berube, the spouse of Ms. Lau, own approximately 56% of the outstanding capital stock of Lau Technologies. Also includes 1,000 shares owned directly by Ms. Lau, 90,496 shares issuable to Mr. Berube pursuant to stock options, and 119,242 shares owned by Mr. Berube directly. Ms. Lau disclaims beneficial ownership of the 90,496 shares issuable to Mr. Berube and the 119,242 shares owned by Mr. Berube. Ms. Lau has sole voting and dispositive power over the shares beneficially owned by Lau.

(3)   Consists of 100,000 shares of our common stock being sold by Lau Technologies in this offering.

(4)   The address for Odeon Venture Capital AG, or Odeon, is Am Ruhrstein 33, 45133 Essen, Germany. Odeon held 16.6% of the fully-diluted share capital of ZN prior to its acquisition by us. Marcel Yon, the Chief Executive Officer of Odeon, serves as a member of our Board of Directors, and served as the Chief Executive Officer and as a member of the executive board of ZN immediately prior to the acquisition. As of the date of this prospectus, Yon AG, of which Mr. Yon is the Chief Executive Officer, serves as a consultant to us. Mr. Yon has sole voting and dispositive power over the shares beneficially owned by Odeon.

(5)   Includes 75,472 shares of common stock which may be required upon exercise of stock options. Dr. Stefan Gehlen held 1.6% of the fully-diluted share capital of ZN prior to its acquisition by us. In addition, Dr. Gehlen served as Chief Technology Officer and as a member of ZN's executive board prior to the acquisition. As of the date of this prospectus, Dr. Gehlen serves as an executive director of Viisage AG. Dr. Gehlen's address is Am Stens Hof 73, 44869 Bochum, Germany.

(6)   Includes 6,027,370 shares held by Lau Technologies. Also includes 1,000 shares owned directly by Joanna Lau, the spouse of Mr. Berube, 90,496 shares issuable to Mr. Berube pursuant to stock options, and 119,242 shares owned by Mr. Berube directly. Mr. Berube disclaims beneficial ownership of the 6,027,370 shares held by Lau Technologies and the 1,000 shares held by Ms. Lau.

(7)   Includes 10,000 shares of common stock which may be acquired upon exercise of stock options.

(8)   Includes 64,167 shares of common stock which may be acquired upon exercise of stock options.

(9)   Includes 79,136 shares of common stock which may be acquired upon exercise of stock options.

(10)  Includes 55,000 shares of common stock which may be acquired upon exercise of stock options.

(11)  Includes 72,167 shares of common stock which may be acquired upon exercise of stock options.

(12)  Includes 90,496 shares of common stock which may be acquired upon exercise of stock options.

(13)  The address of Mr. Yon is Am Ruhrstein 33, 45133 Essen, Germany. Includes 949,325 shares held by Odeon Venture Capital AG, of which Mr. Yon is the Chief Executive Officer. Mr. Yon serves as a member of our Board of Directors and served as the Chief Executive Officer and as a member of the executive board of ZN immediately prior to the acquisition. As of the date of this prospectus, Yon AG, of which Mr. Yon is the Chief Executive Officer, serves as a consultant to us. Mr. Yon has sole voting and dispositive power over the shares beneficially owned by Odeon.

(14)  Consists of 95,330 shares of our common stock being sold by Odeon Venture Capital AG in this offering.

(15)  Includes 250,000 shares of common stock which may be acquired upon exercise of stock options.

(16)  Includes 171,727 shares of common stock which may be acquired upon exercise of stock options.

(17)  Includes 66,666 shares of common stock which may be acquired upon exercise of stock options.

(18)  Includes 66,666 shares of common stock which may be acquired upon exercise of stock options.

(19)  Includes 1,045,267 of common stock which may be acquired upon exercise of stock options.

(20)  Consists of 100,000 shares of our common stock being sold by Lau Technologies in this offering, 100,000 shares of our common stock being sold by B.G. Beck in this offering and 95,330 shares of our common stock being sold by Odeon Venture Capital AG in this offering.

# Exhibit 5

IN THE SUPERIOR COURT OF FULTON COUNTY

STATE OF GEORGIA

FILED IN OFFICE

DEC 2 2 2004

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

DIGIMARC ID SYSTEM, LLC,          :

      Plaintiff,          :

               :          CIVIL ACTION

vs.          :

               :          FILE NO. 2003CV66498

GEORGIA TECHNOLOGY AUTHORITY          :
and the GEORGIA DEPARTMENT OF          :          JUDGE THELMA CUMMINGS MOORE
MOTOR VEHICLE SAFETY,          :

      Defendants.          :

               :

vs.          :

               :

VIISAGE TECHNOLOGY, INC. a Delaware          :
Corporation,          :

      Necessary Party-Defendant.          :

               :

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

The above-styled case came before the Court on October 27, 2004, for hearing on

Plaintiff Digimarc ID System, Inc.'s Motion for Partial Summary Judgment, filed October 11,

2004, Defendant Viisage's Motion for Summary Judgment, filed October 11, 2004, and

Defendants Georgia Technology Authority and the Georgia Department of Motor Vehicle

Safety's Motions for Summary Judgment, filed October 11, 2004. After having heard oral

argument and reviewed the respective motions and responsive pleadings, the Court finds as

follows:

1

## FINDINGS OF FACT

After reviewing the numerous pleadings in this case and having heard the rendition of

facts from all parties during the various motions hearings throughout the progress of this case,

significantly the facts as recited at the October 27, 2004, hearing on the cross-motions for

summary judgment, the Court deems the following rendition of the facts to be undisputed:

1.      Plaintiff Digimarc is the incumbent provider of Georgia's personal identification

solutions.  Plaintiff has been Georgia's vendor for personal identification solutions since 1996.

Defendant Department of Motor Vehicle Services ("DMVS") and Defendant Georgia

Technology Authority ("GTA") are responsible for providing personal identification services and

technology consulting for the state of Georgia.  Defendant DMVS and Defendant GTA

undertook actions to modernize the state's drivers' license identification card system ("DLS").

2.      The main updates to the current DLS were to include added security features and

a central identification issuance system as opposed to the current over-the-counter issuance

system. On May 24, 2002, Defendant GTA issued Request for Proposal number GTA000051

("RFP No. GTA000051, hereinafter "RFP") on Defendant DMVS's behalf to submit bids for the

replacement of Georgia's current digitized drivers' license system with an updated "turnkey"

solution. This process was a negotiated, solution-based solicitation. The RFP set forth certain

durability and security specifications for permanent drivers' licenses, non-driver identification

cards and special identification cards, and also set forth guidelines for temporary identification

cards to be used pending the issuance of permanent cards. These guidelines and other

requirements listed by the state also mandated that various technical upgrades and improvements

be implemented, and generally set forth various other needs that bidders were required to comply

with covering the gamut of possibilities needed to run and maintain a state identification system.

The RFP also set forth the standards to be used to determine what offeror would be awarded the final contract.

3.    According to GTA Rules 665-2-4-.02(a)(9)(i), there were at least two types of solicitations that may be used in the application of the best value procurement methodology: (i) One-step Invitation for Bids ("IFB") or Request for Proposals (RFP) Technical and price response is submitted at the same time; or (ii) Two-step IFB or RFP Technical responses (step one) and price responses (step two) to solicitation are submitted separately. With either type of solicitation, the RFP required each bidder to respond with a technical proposal and a price proposal. Specifically, Section 5.1 of the RFP mandated that the submitted proposals would receive a "comprehensive, fair, and impartial evaluation" in the following staged steps: (a) evaluation of technical proposals (Phase I); (b) identification of Offerors that meet the minimum technical requirements of Phase I (Offerors that do not receive at least an overall satisfactory rating in Phase I will not be considered for Phase II); (c) evaluation of price proposals (Phase II); (d) identification of Offerors' eligibility for demonstrations; (e) evaluation of demonstrations; and (f) evaluation of proposal on the basis of technical and cost factors.

4.    The Offerors' proposals were due and submitted on July 19, 2002. Three bidders submitted responses to RFP No. GTA000051, seeking to supply Georgia with its next generation of personal identification solutions. The Evaluation Team gathered at Unicoi State Park on Monday, July 29, 2002, to begin reviewing the proposals submitted on July 19, 2002, by the three bidders: Plaintiff Digimarc, Defendant Viisage and another bidder known as SoftLEAD, Inc. The GTA and DMVS thereafter conducted a review of the proposals submitted by the Offerors. Only two of those bidders, Plaintiff Digimarc and Viisage scored well enough on their initial proposals to warrant further consideration by Defendants, although neither bidder posted

scores that met the state's minimum requirements as set out in RFP No. GTA000051. The initial

technical evaluation was based on 219 separate evaluation factors, each rated as either

"excellent, good, satisfactory, or unsatisfactory." Plaintiff received fewer "unsatisfactory" votes

than did Viisage, but ultimately received fewer "excellent" and "good" ratings than did Viisage

also. Each one of the 219 criteria was assigned the same weight.

5.    By August 1, 2002, while still at the initial evaluation meeting being held at

Unicoi State Park, the Evaluation Team opened the price proposals for each bidder. After

prematurely opening the price proposals and having been pleased with Defendant Viisage's low

price, the Evaluation Team began inappropriate and unauthorized communications with

Defendant Viisage in efforts to get Defendant Viisage to submit a technically compliant proposal

to justify awarding the contract to Viisage. At this point, Defendants GTA and DMVS were in

violation of the GTA Rules and the RFP by opening the cost proposals prior to the completion of

the technical evaluations and despite the fact that no offeror had met the minimum technical

requirements of the RFP.

6.    It is apparent to the Court that favoritism towards Defendant Viisage began as

early as August 1, 2002, when the Evaluation Team began inappropriate and unauthorized

communications with Defendant Viisage. After the price proposals were prematurely opened,

the Evaluation Team contacted Defendant Viisage concerning the results of its testing of

Viisage's temporary and permanent card samples, informing Viisage that its temporary card

sample tore easily and that its permanent card samples easily delaminated and that the

information on the card could be easily altered. The Evaluation Team then asked Defendant

Viisage to submit additional samples of both its temporary and permanent cards by close of

business on August 5, 2002, in an effort to get the cards to meet the minimum requirements

4

under the RFP. Rather than comply with the Evaluation Team's request for additional permanent card samples, Defendant Viisage began working on an entirely new card design and construction.

7.    After having been in inappropriate contact with Defendant Viisage, it was not until August 9, 2002, that Defendant GTA notified the offerors, now including Plaintiff Digimarc, of a clarification meeting to be held on August 14, 2002, to discuss certain shortcomings in the offeror's proposals. At the August 14, 2002, meeting, the bidders were told that they could propose new temporary card solutions, including solutions that were constructed of a medium other than paper. However, nothing was said indicating the bidders could or should propose new permanent sample cards with a base construction different from what was presented in their original proposals submitted July 19, 2002. The initial permanent card proposed by Defendant Viisage was a card constructed of 10 millimeters of transparent Trans-Kote TXP, a 10 millimeter Teslin card, and a 10 millimeter writable clear back overlay. However, after having been in inappropriate contact with the Evaluation Team, Defendant Viisage undertook to make a new set of permanent samples cards using a product manufactured by 3M Corporation, known as Confirm Laminate. This card construction consisted of a 6 millimeter Confirm Laminate, a 14 millimeter Teslin core, and a 10 millimeter clear back overlay.

8.    After the August 14, 2002, meeting, the Evaluation Team sent out a communication to all bidders requesting additional sample cards to be submitted by close of business on August 26, 2002. The bidders were told to provide 18 "production quality samples" of each card solution proposed, but there was no indication that the requirements of the permanent card requested under the RFP had changed or that the bidders were to submit an entirely new permanent card proposal. Production quality samples were defined by the DMVS

5

as cards produced using the same methods, materials, equipment, parts and specifications as the card vendor is proposing to produce for the State of Georgia. Nevertheless, on August 26, 2002, Defendant Viisage submitted two entirely new proposed permanent card solutions- both made with 3M products. Defendant Viisage submitted a sample called the "Georgia Design Sample 3M Confirm Laminate" and a single card sample called the "Production Quality Card 3M Confirm Laminate," which was a driver's license card containing artwork and graphics from New York State. Defendant Viisage failed to label the Georgia Design Sample as "production quality" even though these cards met the specifications of production quality cards as defined by DMVS. These cards were discovered to be defective because the laminate was easily removed, leaving the underlying information on the card in tact and subject to alteration; thus, the Evaluation Team concluded they were not production quality.

9.     Defendant GTA subsequently asked Defendant Viisage to submit 17 samples of the New York cards, which Defendant Viisage had already falsely represented were production quality. Defendant Viisage then arranged for 3M to send 17 additional samples of the New York cards, indicating that these were its "production quality cards." The New York card samples were actually made by De La Rue and not Defendant Viisage and De La Rue never gave 3M or Defendant Viisage permission to use the New York card samples and they were only given to Defendant Viisage for marketing purposes. In short, Defendant Viisage submitted another vendors' sample cards, which it had no permission to use, in an attempt to submit acceptable permanent card samples.

10.     After the technical evaluations were scored, Viisage and Digimarc were invited to perform demonstrations for GTA and DMVS, and did so on September 26 and 27, 2002. Defendants conducted a series of various tests on samples submitted by Plaintiff and Viisage,

6

including durability tests and security tests. Following the demonstrations, GTA and DMVS

determined Viisage's temporary card solutions to be acceptable, and Digimarc's unacceptable.

Defendants also opened the price bids from the offerors. Viisage's price per card was quoted at a

substantially lower rate than was Plaintiff's price per card. Defendants were initially unhappy

with both companies' physical products, but liked Viisage's price per card better than Plaintiff's

price per card. Viisage's sample identification cards passed durability tests (after numerous

submissions and re-submissions) conducted by outside laboratories, and later Viisage samples

scored better than Plaintiff's samples in Defendants' own "in-house" durability and security

tests.

11.    In a further attempt to secure the contract with Defendants GTA and DMVS,

Defendant Viisage misrepresented the existence of a back-up card production facility. The RFP

required that each bidder describe what plans it had to produce permanent cards on a central

issuance basis in the event that a disaster disrupted the ability to issue cards from the primary

central issuance facility in Georgia. Prior to its July 19, 2002, initial proposal, Defendant

Viisage had no alternative central issuance production facility in service for another state.

Instead, it asked permission of Arthur Blank & Company to include them in the Georgia

proposal as a back-up card printing facility in case of disaster at the permanent facility in

Georgia. In fact, Arthur Blank & Company did not have the capacity to provide back-up card

production facilities, and Defendant Viisage had no binding contract with Arthur Blank &

Company that could serve as a basis for Defendant Viisage's assertion in its proposal that it had

secured this company as its back-up card production facility. In fact, Defendant Viisage had not

procured specific pricing information from Arthur Blank & Company regarding how much

money it would require from Defendant Viisage in order to prepare itself to serve as a back-up

7

card production facility.

12.    On October 8, 2002, GTA requested a Best and Final Offer ("BAFO") from Digimarc and Viisage, and each party submitted its BAFO to the State. The evaluation culminated with GTA awarding the DLS contract (the "Contract") to Viisage on November 12, 2002.

13.    Shortly thereafter, Digimarc filed an administrative protest challenging the award of the Contract to Viisage. The Protest Decisionmaker rejected Digimarc's protest, concluding that "[t]here are no merits to any of the protest's allegations." On March 5, 2003, Digimarc filed suit against GTA and DMVS to enjoin the awarding of the DLS contract to Viisage. Following a short period of discovery, the trial court held a hearing on July 31, 2003, enjoining Defendants from acting under the contract awarded to Defendant Viisage. On November 3, 2003, Viisage was added as a necessary party-defendant to Digimarc's suit.

14.    Upon the addition of Viisage as a necessary party, the parties pressed to complete discovery by January 9, 2004. GTA, DMVS, and Viisage requested an early trial date, agreeing to have the case transferred to another court. The request to transfer the case was opposed by Plaintiff Digimarc. This Court was able to adjust its calendar and expedited all hearings in the case, recognizing the urgency of the issues involved. However, discovery disputes, primarily dealing with the scheduling of depositions of key Viisage representatives and Plaintiff Digimarc's Motions to Compel discovery of Defendant Viisage, pushed discovery of the case well into mid to late 2004. Likewise, the parties stipulated to and entered into a scheduling agreement on or about June 9, 2004 (which has been amended at least twice, on August 13, 2004, and September 2, 2004, to accommodate discovery), wherein the parties agreed to submit

8

the current cross motions for summary judgment for the Court's review and a subsequent hearing on said motions was held on October 27, 2004.

15.    Meanwhile, the Commissioner of the DMVS learned that the existing contract with Digimarc would expire on June 30, 2004. In order to ensure that no gap would occur in the provision of drivers' licenses and identification cards, he instructed his staff to take steps necessary to execute an amendment to the Digimarc contract to continue it for a day-to-day term until such time as a transition could be effected to a new system. Digimarc then sought to negotiate a multi-year extension of its existing contract -- offering at least one card alternative that was "vastly superior" to the license Digimarc was providing under the current contract, but also an improvement to the proposal Digimarc submitted in response to the RFP at far less cost than originally proposed.

16.    The DMVS Commissioner determined that acceptance of any of the Option 2 alternatives in Digimarc's proposal would violate the State's competitive procurement laws. The DMVS Commissioner authorized a settlement proposal by which Digimarc and Viisage would re-submit BAFO submissions, which would be reviewed by a panel of independent experts to determine whether either proposal met the requirements of the RFP. Plaintiff Digimarc rejected this offer and demanded an award of the Contract. Plaintiff Digimarc has consistently maintained a demand of the Contract at issue in this case.

17.    The State recognized that the taxpayers of Georgia were at risk (intimating the concern for homeland security following the September 11, 2001 terrorist attacks) and therefore approached Viisage about a termination of the 2002 contract and a re-bid. Viisage made a demand for a termination payment of $8.2 million under GTA Rule 665-2-11-.09. The parties reached a settlement of this claim by which GTA and DMVS would pay Viisage $2 million, and

9

purchase $500,000 in equipment. Upon execution of this agreement, the State terminated for convenience the contract with Viisage.

18.    Following the settlement, Viisage issued a press release on July 20, 2004, announcing the settlement. Shortly thereafter, GTA, DMVS and Viisage, moved to dismiss this case. Digimarc fought against a re-bid which would include Viisage. Digimarc filed three motions for injunctive relief in response to the State's proposed re-bid (including Plaintiff Digimarc's Motion for Temporary Restraining Order filed July 23, 2004, Plaintiff's Motion For Temporary Restraining Order filed Aug. 17, 2004, and Plaintiff's Motion for Preliminary Injunction filed August 23, 2004). On September 2, 2004, this Court granted one of Digimarc's motions for temporary restraining order, and enjoined the settlement between Viisage and the State, but allowing the payment of $500,000 for equipment to Defendant Viisage and precluding the State from awarding a new contract until further order of the Court.

## CONCLUSIONS OF LAW

1.    When Plaintiff Digimarc filed an administrative protest challenging the award of the Contract to Viisage, the Protest Decisionmaker, Mr. Chuck Freedman, rejected Digimarc's protest, concluding that "[t]here are no merits to any of the protest's allegations." The Court acknowledges that the judiciary is only authorized to review administrative decisions when an agency allegedly acts beyond discretionary powers conferred upon it, abuses its discretion, or acts arbitrarily or capriciously with regard to an individual's constitutional rights. See Bentley v. Chastain, 242 Ga. 348 (1978). Thus, this Court cannot hear the case de novo but merely makes a determination of whether Defendants GTA and DMVS abused their discretion or acted arbitrarily or capriciously in the procurement process such as would constitute a violation of

10

Plaintiff Digimarc's rights under said procurement process in favor of Defendant Viisage.

2.       According to GTA Rules 665-2-4-.02(a)(9)(i), there were at least two types of solicitations in this case that may be used in the application of the best value procurement methodology: (i) One-step Invitation for Bids ("IFB") or Request for Proposals (RFP) Technical and price response is *submitted at the same time*; or (ii) Two-step IFB or RFP Technical responses (step one) and price responses (step two) to solicitation *are submitted separately*. See GTA Rules 665-2-4-.02(a)(9)(i). With either type of solicitation, the RFP required each bidder to respond with a technical proposal and a price proposal. Id. Specifically, Section 5.1 of the RFP mandated that the submitted proposals would receive a "comprehensive, fair, and impartial evaluation" in the various staged steps, particularly in the evaluation of the technical proposals as Phase I and an evaluation of price proposals as Phase II. See Request for Proposal ("RFP") No. GTA 000051.

3.       While the parties agree it is undisputed that the price proposals were submitted in separate envelopes from the technical proposals, they are in dispute as to whether the price proposals were to be considered at the same time as the technical proposals or whether they were to be considered at separate times; thus, the conflict as to whether this was a one-step or two-step procurement process allowing Defendant GTA and DMVS to open the price proposals at a specified time. The Court finds that the method of source selection in this case was, in fact, a two-step procurement under GTA Rules 665-2-4-.02(a)(9)(ii)(I) where technical responses were to be evaluated for acceptability first and then price offers were to be opened only for those offerors who submitted technically acceptable responses. In the present case, Defendants GTA and DMVS conducted a review of the proposals submitted by both Plaintiff Digimarc and Defendant Viisage, neither of which posted scores that met the state's minimum requirements as

11

set out in RFP No. GTA000051. Despite the fact that Defendants were initially unhappy with both companies' physical products, they proceeded to open the price bids and found Defendant Viisage's price per card was quoted at a substantially lower rate than was Plaintiff Digimarc's price per card. Although Defendant Viisage's sample identification cards passed durability tests (after numerous submissions and re-submissions) conducted by outside laboratories, and later Viisage samples scored better than Plaintiff's samples in Defendants' own "in-house" durability and security tests, the Court finds Defendants GTA and DMVS violated the GTA Rules and the RFP by considering the price proposals together with the initially unacceptable technical proposals and then proceeding to justify the procurement in favor of Defendant Viisage.

4.    It is apparent from a review of the deposition of George Theobald, Business Analyst for Defendant DMVS who was in charge of the Evaluation Team, that there is evidence the Evaluation Team, which was comprised of employees of Defendants GTA and DMVS, opened the price proposals prematurely and directed their efforts toward allowing Defendant Viisage to submit a "technically compliant" proposal in order to justify awarding the contract to the lowest priced vendor. George Theobald admitted that the Evaluation Team wanted to open the cost proposals prior to the completion of the technical evaluations and Defendant GTA did not oppose. (Theobald Deposition. 102:6-103:14). It is also evident by the memo written by George Theobald to the protest decision-maker, Mr. Chuck Freedman, dated December 31, 2002, that the Evaluation Team was biased towards Defendant Viisage's low-priced bid even with knowledge that Defendant Viisage had not submitted, at that time, a technically compliant proposal. In said memo, Mr. Theobald wrote:

> It became apparent from the initial and subsequent Viisage price proposals that DMVS would not only be able to cover operating costs with existing appropriations, but would also have enough cushion to cover unforeseen

12

implementation costs, **once a technically compliant solution was proposed.**
(See Exhibit 67 to Theobald Deposition).

5.      Likewise, it is further apparent in reviewing the testimonial evidence submitted in
this case that there are numerous discrepancies as to the permanent card samples submitted by
Defendant Viisage and whether or not Viisage was capable of producing the cards they
proposed.  When Plaintiff Digimarc and Defendant Viisage were asked to submitted permanent
card samples in August 2002, Defendant Viisage submitted samples labeled the "Georgia Design
Sample," which included a single card labeled in the written proposal as "Production Quality
Card 3M Confirm Laminate."  This card was actually a driver's license card designed by De La
Rue and containing artwork and graphics from New York State. (See Theobald Deposition.
250:20-251:9, and Exhibit 28 at 8).  It is clear to the Court that key representatives of Defendant
Viisage did not know how these card samples were made or whether Defendant Viisage was, in
fact, capable of making the cards it proposed were its permanent card samples. (See Ahmad
Deposition I. 276:24-278:14, 288:7-15; Exhibit 437; Ahmad Deposition II. 25:1-27:20);
(Vosseteig Deposition. 209:22-210:7).  Additionally, prior to submitting its July 19, 2002,
proposal, Defendant Viisage had not secured Arthur Blank & Company as its back-up card
production facility in the event that a disaster disrupted the ability to issue cards from the
primary central issuance facility in Georgia; as was a requirement under the RFP. (See
Digimarc's Exhibits 559-561, 691).  To this extent, it is further apparent that the State, being
Defendants GTA and DMVS, was more concerned with the price proposal rather than whether
Defendant Viisage could, in fact, produce the cards they proposed.

6.      Plaintiff Digimarc has suggested that, pursuant to O.C.G.A. 50-25-7.8, any such
contract procured in the manner described in the present case should be declared void *ab initio*

13

due to Defendant GTA and DMVS' failure to follow proper procurement procedures. However, the Court need not decide upon the issue of whether the contract was void *ab initio*, as this issue is moot because Defendants Viisage, GTA and DMVS have terminated the contract for convenience; to prevent a long and lengthy delay of these proceedings and imposing significant and unnecessary additional cost to all parties, not to mention critical additional delay in meeting the homeland security concerns of the citizens of the State of Georgia. An issue is moot when a determination is sought on a matter which, when rendered, cannot have any practical effect on the existing controversy. See <u>Schoen v. Cherokee County</u>, 242 Ga. App. 501, 503 (2000). Furthermore, in Georgia terminating a contract abrogates its meaning and the contract legally ceases to exist. See <u>Emanuel Tractor Sales, Inc. v. Department of Transportation</u>, 257 Ga. App. 360, 366 (2002). The Court finds in the present case that, irrespective of whether the contract was void *ab initio* or not, Defendant Viisage did provide a service to the State by way of providing equipment with which to produce the Georgia drivers' licenses at issue; thus, the settlement agreement in the amount of $500,000.00. The Court further finds that it would violate good conscience to impose upon Defendant Viisage **all** economic loss from having entered an alleged void contract. Where a benefit has been conferred by Defendant Viisage on the State in the form of goods, which the State accepted, Defendant Viisage may recover at least on a *quantum valebant* basis for the value of the conforming goods received by the State prior to the rescission of the contract. To this extent, Defendant Viisage has not been compensated *under* the contract, but rather under an implied-in-fact contract. See <u>United State v. Amdahl Corporation</u>, 786 F.2d 387, 393 (Fed. Civ. 1986).

7.    Plaintiff Digimarc has further suggested that it would have been the only bidder left standing, and thus would have been awarded the contract, but for the unethical conduct of

14

Defendant Viisage and Defendant GTA and DMVS. Plaintiff Digimarc admits that its posted

scores based on its initial technical proposal failed to meet the state's minimum requirements as

set out in RFP No. GTA000051. Accordingly, this Court is unconvinced that Plaintiff has

presented any concrete evidence that but for the alleged acts of Defendants Viisage, GTA and

DMVS Plaintiff Digimarc would have been awarded the contract at issue. This is especially

relevant where the ultimate grant of the contract lies in the discretion of Defendant GTA. See

Delta Data Sy. Corp. v. Webster, 744 F.2d 197, 204 (D.C. Cir. 1984) (holding that it is

undisputable that the ultimate grant of a contract must be left to the discretion of a government

agency; the courts will not make contracts for the parties. And further holding that it follows that

a court may not order the award of a contract unless it is **clear** that, but for the illegal behavior of

the agency, the contract would have been awarded to the party asking the court to order the

award).

        8.      The Court finds that there was inappropriate behavior on the part of Defendants

GTA and DMVS in this case by the untimely opening of price proposals, contact with Defendant

Viisage and the later attempt to justify the procurement in favor of Defendant Viisage. The

Court further finds that there were significant instances of misconduct and misrepresentations by

Defendant Viisage, as has been previously illustrated at length in the foregoing "Findings of

Fact," in an effort to secure the contract with Defendants GTA and DMVS. However, in

determining whether it should exercise such authority to grant the contract at issue to Plaintiff

Digimarc the court must consider several equitable factors, among them: whether the contract

has already been awarded to another party and, if so, is being performed; the extent an order

awarding the contract to the unsuccessful bidder is necessary to vindicate the interest of the

public, and competing bidders, in the agency's adherence to the law; and the cost to the

15

government, and hence to the taxpayers, of substituting an unsuccessful bidder for the successful

bidder whose price may have been considerably lower. See Choctaw Mfg. Co., Inc. v. United

States, 761 F.2d 609, 619 (11th Cir 1985).

9.    To be sure, the overriding concern in this case is for the safety and security of the

citizens in this state as it pertains to the concern for homeland security following the September

11, 2001, terrorist attacks.  Since the start of this litigation, it is apparent that the technology used

in producing drivers' licenses has been updated and improved, and it would not be in the best

interest of the citizens of the State of Georgia for GTA and DMVS to issue Georgia drivers'

licenses based upon old and outdated technology.  To this extent, the Court acknowledges that it

may appear that an order awarding the contract to the unsuccessful bidder, Plaintiff Digimarc,

would be necessary to vindicate Plaintiff and other competing bidders in forcing the agency's

adherence to the law.  However, the Court finds that the overriding equitable factor here dictates

that awarding such contract would not be in the best interest of the public and would not be cost-

effective to the government, and hence to the taxpayers, where the ultimate goal is to provide

drivers' licenses based on secure, updated and improved technology.

10.    Accordingly, under the circumstances of this case, it is the decision of this Court

to disallow an award of the contract at issue to Plaintiff Digimarc because Plaintiff has not

convinced this Court that but for the acts of Defendants Viisage, GTA and DMVS Plaintiff

would have been awarded the contract at issue.  Furthermore, it is the decision of this Court to

disallow the remainder of the 2.5 million settlement between Defendant Viisage and Defendant

GTA, same being $2 million, as this may constitute an unfair advantage in any re-bid process for

Defendant Viisage where it is clear to the Court that questionable conduct played a role in

Defendant Viisage's being awarded the contract at issue from the start of the process.  The Court

16

finds that Defendants GTA and DMVS shall be permitted to re-bid the contract, allowing both Plaintiff Digimarc and Defendant Viisage to participate in the re-bid process. This will allow the re-bid process to go forward based upon new technology, which will be in the best interests of the safety and security of the citizens of the State of Georgia to ensure homeland security. To this extent, Plaintiff Digimarc's Motion for Partial Summary Judgment and Defendant Viisage Motion for Summary Judgment are hereby **DENIED** and Defendants GTA and DMVS' Motion for Summary Judgment is hereby **GRANTED**. The re-bid process shall proceed.

17

SO ORDERED this _21st_ day of _December_, 2004.


THELMA WYATT CUMMINGS MOORE, JUDGE
FULTON COUNTY SUPERIOR COURT
ATLANTA JUDICIAL CIRCUIT

copies to:

Mr. John P. Hutchins, Esq.
Troutman Sanders, LLP
600 Peachtree Street, Suite 5200
Atlanta, GA 30308

Mr. John Gallagher, Esq.
Stites & Harbison
2800 SunTrust Plaza
303 Peachtree Street, NE
Atlanta, GA 30308

Ms. Emily P. Hitchcock, Esq.
Assistant Attorney General
Office of the Attorney General of Georgia
40 Capital Square, SW
Atlanta, GA 30334-1300

Mr. Peter M. Crofton, Esq.
Mr. Jameson B. Carroll, Esq.
King & Spalding
191 Peachtree Street
Atlanta, GA 30303-1763

# Exhibit 6

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

DIGIMARC ID SYSTEMS, LLC,

     Plaintiff,

vs.

GEORGIA TECHNOLOGY AUTHORITY and
the GEORGIA DEPARTMENT OF MOTOR
VEHICLE SAFETY,

     Defendants.

MAR 0 0 2003

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

Civil Action No. *2003CV66498*

## VERIFIED COMPLAINT FOR TEMPORARY RESTRAINING
## ORDER, INTERLOCUTORY AND PERMANENT INJUNCTIVE RELIEF

Plaintiff, Digimarc ID Systems, LLC, files this Verified Complaint for Temporary Restraining Order, Interlocutory and Permanent Injunctive Relief, showing the Court as follows:

### PARTIES AND PRELIMINARY FACTS

1.

Digimarc ID Systems, LLC, is a limited liability company organized and existing under the laws of Delaware, and is registered to do business and does business in Georgia. Digimarc has an office located at the headquarters of the Georgia Department of Motor Vehicle Safety, 2206 East View Parkway, Conyers, Georgia 30013.

2.

Digimarc is the leading global provider of secure and durable personal identification solutions and the leading producer of drivers' licenses in the United States, providing systems and services to thirty-five states. Internationally, Digimarc provides systems and services for sixty national governments around the world.

3.

Digimarc is the incumbent provider of Georgia's Digitized License System. This system has been producing drivers' licenses and other identification cards for Georgia since 1996.

4.

Under O.C.G.A. section 50-25-1, Defendant Georgia Technology Authority ("GTA") is a body corporate and politic, an instrumentality of the state, and a Georgia public corporation. It may be served with process at its office at 100 Peachtree Street, Suite 2300, Atlanta, Georgia 30303.

5.

The Georgia Department of Motor Vehicle Safety ("DMVS") was created under to O.C.G.A. section 40-16-2 and granted primary responsibility for, among other things, administering the laws and regulations relating to drivers' licenses. (O.C.G.A. § 40-16-2(a)(2).) DMVS may be served with process at its office at 2206 East View Parkway, Conyers, Georgia 30013.

6.

In or before spring 2002, GTA and DMVS embarked upon a plan to modernize Georgia's drivers' license and identification card system. Their stated purpose was to engage the services of a qualified and responsible vendor, experienced in providing a central issuance Digitized License System.

7.

This is an action for *de novo* judicial review of GTA's and DMVS's procurement process in relation to an RFP issued by GTA on May 24, 2002, seeking a contractor to provide the services necessary to modernize Georgia's drivers' license and identification card system. In

sum, GTA/DMVS acted arbitrarily and unfairly by its failure to follow Georgia law governing procurement, including applicable statutes, GTA's own rules and the specific requirements of the RFP, all of which are intended to protect the competitive bidding process and secure the services of a qualified, responsible and experienced vendor offering the "best value" to Georgia.

8.

The arbitrary and unfair conduct by GTA/DMVS inured to the benefit of only one bidder – Viisage Technology – and was detrimental to Digimarc, which would have received an award of the contract at issue but for the arbitrary and unfair conduct engaged in by GTA/DMVS.

9.

Despite the clear mandate in the RFP that all Offerors should be accorded fair and equal treatment with respect to any opportunity for discussion and revision of proposals, GTA and DMVS had improper communications with Viisage and granted repeated opportunities to Viisage, and only Viisage, to improve and revise its technical proposal until it was decreed by DMVS to be the most advantageous to Georgia. In so doing, GTA and DMVS failed to abide by the evaluation procedures set forth in the RFP, under GTA Rules and under Georgia law.

10.

Moreover, GTA and DMVS applied different evaluation criteria in favor of Viisage over any other vendor, failed to properly apply the evaluation criteria governing the procurement and failed to consider all criteria that the RFP required to be considered, all to the benefit of Viisage and to the detriment of Digimarc.

11.

In addition, despite the RFP's mandate setting forth the term of the contract to be covered

3

by the procurement, DMS and GTA subsequently entered into an illegal contract that exceeded the contractual term dictated by the RFP.

12.

Digimarc seeks to enjoin the implementation of the contract at issue and also seeks a mandatory injunction directing that the defendants award the contract arising out of the RFP to Digimarc and execute all contracts consistent with an award of the contract to Digimarc. In the alternative, Digimarc seeks an order requiring that GTA/DMVS re-bid the contract. Without such an injunction, Digimarc and Georgia's taxpayers will suffer immediate and irreparable harm and injury.

13.

Under O.C.G.A. section 50-25-9, this Court has exclusive, original jurisdiction over this action, and venue is proper.

### FACTS COMMON TO ALL COUNTS

The following facts are common to all counts of this complaint:

#### The RFP -- A Request For Proposals For A Digitized License System

14.

On or about May 24, 2002, GTA issued RFP No. GTA000051 on DMVS's behalf. A copy of the RFP is attached as Exhibit A.

15.

The RFP's stated purpose was to procure the services of a qualified, responsible and experienced vendor to provide a central issuance Digitized License System, including, among other things, photograph, signature and fingerprint capture, storage, retrieval and document production, all based upon a firm, fixed price for each driver's license, identification card, or

4

special identification card successfully produced. (RFP § 1.1.)

16.

GTA decided that using competitive sealed bidding would not be practical or advantageous to Georgia in procuring the desired services. (RFP § 1.2.) GTA elected to conduct the Digitized License System procurement as a negotiated, solution-based solicitation. Nevertheless, the RFP stated that competitive sealed proposals were to be submitted in response to the RFP in the same manner as competitive sealed bids and that the proposals would be opened in the same manner as competitive sealed bids. (RFP § 1.2.)

17.

The RFP established certain mandatory functional requirements, optional components, general work requirements and office space and support requirements for the Digitized License System. (RFP § 3.3.)

18.

In addition, the RFP set forth mandatory design specifications for permanent drivers' licenses, non-driver identification cards and special identification cards and also set forth general guidelines for temporary cards that would be issued pending the issuance of the permanent cards. (RFP §§ 3.4-3.7.)

19.

The RFP also set forth requirements for the following:

a.    Digitized License System workstations;

b.    specifications for the Central Imaging System, which would be the central repository maintained by the successful offeror for all images used for the license and card issuance process;

5

    c.    testing standards for the system;

    d.    operational supplies;

    e.    reporting;

    f.    training and documentation; and

    g.    other functionalities that DMVS could elect to procure or utilize at its option.

(RFP §§ 3.8-3.14.)

20.

The RFP required each Offeror to respond with a Technical Proposal and a separate Cost Proposal. (RFP § 4.2.) The RFP's stated criteria of evaluation was that any failure of a vendor's submitted proposal "to meet any minimum requirement **will cause** [a] reduction in the evaluation scoring of the Offeror's proposal." (RFP § 3.1.1 (emphasis in original).)

21.

The RFP mandated that a comprehensive, fair, and impartial evaluation of the proposals received would be conducted in the following steps:

    a.    evaluation of technical proposals;

    b.    identification of Offerors that meet the minimum technical requirements;

    c.    evaluation of price proposals;

    d.    identification of Offerors' eligibility for demonstrations;

    e.    evaluation of demonstrations; and

    f.    evaluation of proposal on the basis of technical and cost factors.

(RFP § 5.1.)

22.

The Offerors' Technical Proposals and separate Price Proposals were both due by July

6

19, 2002. (RFP App. A, Addendum No. 3.)

23.

The RFP mandated that evaluations of the Technical Proposals and the Product Demonstrations ("Phase 1") would be completed before GTA and DMVS proceeded to evaluate the Offerors' Price Proposals ("Phase 2"). (RFP §5.5.)

24.

The RFP did not permit Offerors to revise their Technical Proposals after submitting their initial proposals, which were due by July 19, 2002. Instead, the RFP mandated that "[i]ncompleteness or significant inconsistencies or inaccuracies in the Technical Proposal will result in a reduction of the evaluation rating." (RFP § 5.5.)

25.

According to the RFP, after the Price Proposals were evaluated, the Offerors would be accorded fair and equal treatment with respect to any opportunity for discussion and revision of their respective Price Proposals for the Technical Proposals that had been evaluated in Phase 1. (RFP § 5.6.)

26.

The procurement contract was to have a target implementation date of June 27, 2003 for the Digitized License System. (RFP App. A, Addendum No. 3.)

## Offerors' Initial Responses and Problems with Unequal Treatment

27.

On July 19, 2002, three Offerors presented their bid proposals to GTA in response to the RFP: Digimarc, Viisage and SoftLEAD, Inc.

7

28.

An evaluation team comprised of GTA and DMVS representatives reviewed each Offeror's bid proposal between July 29, 2002 and August 1, 2002. Copies of the Evaluation Results and Evaluation Sheets for Digimarc and Viisage are attached hereto as Exhibits B and C, respectively. (Ultimately, SoftLEAD's proposal was rejected by GTA and DMVS. Neither its proposal nor the evaluation of its proposal is at issue in this case.)

29.

GTA and DMVS appear to have utilized a "trade off" or "ranking" method of source selection, which permits "communications" to establish competitive ranges or negotiations, and final price adjustments or best and final offers. (RFP § 5.6 and GTA Rule 665-2-4-.02(a)(9)(ii).)

30.

"Communications" are defined under the Rules, however, "as exchanges between the state and Offerors after receipt of offers to address issues of past performance, to enhance the state's understanding of offers, to allow reasonable interpretation of the offer, or to facilitate the state's evaluation process." (GTA Rule 665-2-1-.01(f).) The Rules specifically state that "[c]ommunications shall not be used to cure material omissions in the offer." (GTA Rule 665-2-1-.01(f).)

31.

From the beginning of the evaluation process, significant problems developed in regard to GTA's and DMVS's compliance with the requirements of the RFP and applicable procurement laws, including GTA Rules, resulting in substantially unequal and otherwise illegal disparities in the treatment of the Offerors, as described in detail below.

8

32.

For example, in violation of the evaluation steps set forth in RFP § 5.1, mandating that Phase 1 technical evaluations be completed before proceeding to evaluate the Offerors' respective price proposals, by July 31, 2002, GTA and DMVS representatives had already opened the price proposals even though, as shown herein, they still had serious issues with the Viisage's technical proposal.

33.

Viisage's initial price proposal per card was 65% lower than anyone else's proposed price.

34.

After prematurely reviewing the Offerors' price proposals, GTA and DMVS further violated the required procedures governing the procurement, resulting in significant disparity in the treatment of Viisage and Digimarc with respect to a variety of issues. The first of these issues is the evaluation of temporary and permanent drivers' licenses, non-driver identification cards and special identification cards (hereinafter sometimes referred to collectively as "ID Cards"), as further set forth below.

## Temporary and Permanent Licenses

35.

The RFP required the Offerors to submit sample ID Cards for evaluation at the time that they filed their Technical Proposal, on July 19, 2002. (RFP §3.6.1.2.)

36.

As part of the technical submission for the permanent ID Cards, the RFP mandated that the Offeror's proposed permanent ID Cards "must be verified to meet AAMVA testing

9

standards by a certified testing lab and the results **must** accompany the Offeror's proposal."
(RFP § 3.5.4.3 (emphasis in original).)  Moreover, the RFP mandated that "DMVS shall conduct
independent testing of sample documents."  (RFP § 3.5.4.3.)

<div align="center">37.</div>

Included with the proposals of Viisage and Digimarc were their respective independent
lab tests for the permanent ID Cards that each was offering as mandated by sections 3.5-3.7 of
the RFP.  A copy of Viisage's independent lab test report is attached hereto as Exhibit D.

<div align="center">38.</div>

In its July 18, 2002 Proposal, Viisage proposed to offer a permanent card that was a
10/10/10 Polyester/Teslin/Polyester card design.    (Exhibit E, p. D-39.)    The mandatory
independent test report provided by Viisage for its July 18, 2002 permanent card proposal was
for this specific card structure.

<div align="center">39.</div>

Viisage's sample permanent ID Cards that it proposed as part of its July 18, 2002
Technical Proposal were defective from the start.  In sum, GTA and DMVS's testing found two
critical flaws in Viisage's permanent ID samples:  (1) the lamination on the ID Cards was easily
removed, such that the printed information on the ID Cards could be altered and re-assembled
without detection; and (2) the samples could not withstand minimum solvent strength tests.

<div align="center">40.</div>

In violation of GTA Rules 665-2-4-.06 and .07, and despite the fact that all samples were
to have been provided with the Technical Proposal, GTA wrote to Viisage in an e-mail dated
August 1, 2002 (in the guise of a "clarification") and gave Viisage a new deadline of August 5,
2002 by which it could provide new samples of its permanent ID Cards that might not fail the

<div align="center">10</div>

required tests so easily. (Exhibit F.)

41.

This extended deadline for filing a complete and conforming Technical Proposal was not given to either of the other Offerors.

42.

Viisage provided GTA/DMVS with new permanent card ID samples by August 5, 2002. But these samples also failed testing by DMVS because, again, the lamination could be removed intact with very little effort by simply crimping a corner of the ID and then peeling off the laminate by hand.

43.

Based upon the failure of the Viisage permanent ID Cards, on August 6, 2002 DMVS prepared and delivered to GTA a report detailing its concerns with both the permanent and temporary ID Cards proposed by Viisage. The report reaffirmed that was easy to tamper with the permanent ID Cards proposed by Viisage because the laminate could be removed, permitting the information or the card to be altered. DMVS also included a gratuitous statement that the Digimarc permanent card could be broken into two separate pieces after being repeatedly folded, a contingency against which no Offeror was required to design a permanent card.

44.

On August 9, 2002, GTA informed the Offerors of a purported "clarification" meeting to be conducted on August 14, 2002 to discuss certain stated shortcomings in the durability and security standards for the temporary and permanent ID Card samples presented by the Offerors.

45.

In violation of RFP section 5.4, GTA then held an oral "clarification" meeting with all

three Offerors on August 14, 2002.   At the meeting, GTA requested what it termed "supplemental information" and mandated that each Offeror submit 18 production grade permanent and temporary card samples by August 26, 2002, even though, at that point in time, only Viisage's permanent card samples had been found to be non-compliant with the RFP's minimum durability standards.

### 46.

At the August 14, 2002 meeting, GTA and DMVS also stated that all of the Offerors' proposed temporary ID Cards had failed to pass DMVS's undisclosed testing procedures for these samples. No communication was made at that meeting regarding any specific failure by any Offeror relating to permanent ID Cards. Rather, the entire focus of the meeting was upon the purported failure of the Offerors to provide temporary ID Cards that passed all of DMVS's undisclosed testing procedures. DMVS disclosed the type of testing agents that had been applied to the temporary ID Cards, but it did not disclose how the testing agents had been applied. Instead, DMVS simply requested that the Offerors "be creative" and submit new temporary ID Card approaches that might pass DMVS's undisclosed testing techniques.

### 47.

Upon information and belief, all of the Offerors then provided additional samples of proposed permanent and temporary ID Card samples by GTA's deadline of August 26, 2002.

### 48.

By August 28, 2002, DMVS tested what was, in fact, Viisage's third batch of sample permanent ID Cards, which should have been provided by July 19, 2002. Again, however, after testing Viisage's third batch of proposed permanent ID Cards, DMVS found that "the lamination is removed intact with very little effort." (Exhibit G.)

12

49.

In violation of GTA Rules 665-2-4-.06 and .07, on August 28, 2002, GTA again communicated to Viisage under the guise of a "clarification" that the permanent card samples Viisage provided on August 26, 2002 still were substandard because the lamination came off easily. (Exhibit G.)

50.

On August 29, 2002, GTA requested that Viisage provide GTA with yet another (now the fourth batch) of sample permanent ID Cards that would meet the minimum card durability standards set forth in the RFP.

51.

GTA did not provide Digimarc with any notice or indication that any part of its Technical Proposal that might have been deemed unsatisfactory by GTA and DMVS could be modified or provided late.

52.

Either at the same time as Viisage's submission of the fourth round of ID Cards or because this round of ID Cards also failed, on or about October 14, 2002, Viisage substantially changed its Technical Proposal for permanent ID Cards from its once proposed 10/10/10 Polyester/Teslin/Polyester card structure to a new 6/14/10 Confirm/Teslin/Polyester card structure. (Exhibit H.) As such, this was not simply "supplemental information" provided as a "clarification." Instead this was a brand new Technical Proposal submitted after all deadlines mandated by GTA and the RFP for all of the other Offerors had already expired.

53.

Moreover, in addition to the fact that the RFP had mandated to all Offerors that samples

had to be production quality, GTA had specifically instructed Viisage that it was to provide

sample ID Cards "produced using the same methods, materials, equipment, and specifications as

what is being proposed to Georgia." (Exhibit G.) Upon information and belief, Viisage failed to

comply with this requirement.

<div align="center">54.</div>

Further, despite the fact that the RFP mandated in sections 3.5.4.3 and 3.5.7(c) that

independent test data on card durability must be provided for the card structures proposed by an

Offeror, Viisage never provided any test report for its October 14, 2002 revised Technical

Proposal section that proposed a 6/14/10 Confirm/Teslin/Polyester card structure.

<div align="center">55.</div>

Upon information and belief, GTA and DMVS elected not to subject the fourth set of

revised Viisage permanent ID Cards (submitted on August 29, 2002) for testing and evaluation.

(Exhibit I – Response to Open Records Act Request.)

<div align="center">56.</div>

As such, because GTA and DMVS failed to conduct its own testing or to adhere to the

RFP requirement that Viisage submit independent lab testing, GTA and DMVS had no way of

knowing if the newly proposed card structures and samples would meet the RFP's durability

requirements.

<div align="center">57.</div>

Upon information and belief, proper testing of Viisage's revised ID Cards would have

revealed that the ID Cards still did not perform as required by the RFP in various material

respects, including, without limitation:

    a.    the revised Viisage ID Cards also would have failed the durability tests because

<div align="center">14</div>

of either excessive wear or delamination;

b.    the back of the revised ID Cards could be easily removed allowing counterfeit

activities directly on the back of the card and to the front of the card by going

through the back to expose the photo and variable data on the front; and

c.    the revised card structure likely fails to meet the requisite minimum stiffness

requirements in the Standards required in the RFP.

58.

Upon information and belief, simple examination of the ID Cards' printing under 10X

magnification would also have revealed that the ID Cards were not printed via the Indigo method

that had been proposed by Viisage in its Technical Proposal. Instead, Viisage's further set of

revised permanent ID Cards were most likely printed by either laser Xerographic or fixed offset

means and would not represent Viisage's "proposed means of production." The samples

provided by Viisage would not have been, therefore, production grade samples, as required by

the RFP.

59.

Upon information and belief, the final card samples provided by Viisage were not even

manufactured by Viisage. As such, Viisage never demonstrated the capability to produce the

most important aspect of Georgia's Digitized License System: a card that was durable and that

could not easily be tampered with.

60.

On September 16, 2002, GTA requested that each Offeror perform a demonstration of

only its proposed temporary ID Cards at DMVS Headquarters in Conyers, Georgia on September

26, 27 and 30, 2002.

15

61.

Digimarc performed the requested demonstration of its proposed temporary ID Card solution for GTA on September 27, 2002. Digimarc proposed two solutions, each of which utilized a different paper base.

62.

The Evaluation Committee performed ten tests on each of Digimarc's proposed solutions. GTA has claimed that Digimarc's first solution failed three out of the ten tests, and the second solution failed five out of the ten tests conducted by the Evaluation Committee.

63.

Digimarc thereafter revised its formulation for the temporary ID Cards to meet or exceed the standards tested by DMVS. Digimarc offered to provide GTA and DMVS with modified temporary ID Card samples for testing purposes. In contrast to the repeated opportunities given to Viisage, however, GTA and DMVS declined Digimarc's offer and refused to test Digimarc's new samples.

64.

Upon information and belief, Viisage's temporary ID Card solution also failed the September 26, 2002 demonstration. GTA allowed Viisage, however, to provide an improved temporary ID Card solution on or about October 7, 2002, which purportedly passed all of DMVS's tests.

**Best And Final Offer**

65.

On October 8, 2002, GTA forwarded Digimarc and Viisage a detailed request for a Best and Final Offer to be received by GTA no later than October 15, 2002.

16

66.

At this point, SoftLEAD was eliminated from consideration as a result of its perceived poor Technical Proposal and Price Proposal.

67.

Digimarc responded with its Best and Final Offer on October 15, 2002, including a sample of its modified temporary ID Card solution.

68.

Viisage also responded with its Best and Final Offer on or about October 15, 2002.

69.

On October 22, 2002, DMVS Business Analyst George Theobald notified Charles Nixon, GTA Contracting Officer for the RFP, as follows:

> DMVS has identified the proposal that initially appears to be most advantageous to the state, and we would like to begin the process of negotiating a contract. As part of this process, we would like to validate our technical findings with this Offeror during negotiations. Although a brief demonstration was held with each Offeror last last [sic] month, it was limited to the issuance of a Temporary Document and it did not cover some of the other critical capabilities needed in the new system. To adequately verify our decision, more extensive demonstrations and discussions of the proposed solution by the Offeror will be necessary.

(E-mail from Theobald to Nixon of Oct. 22, 2002.) Theobald's communication continued by listing minimum requirements for at least four presentations to be conducted by "this Offeror" only.

70.

On October 23, 2002, DMVS sent to GTA a draft evaluation result of Digimarc that was still a work in progress, but showing that DMVS had elected not to test [the revised samples of] Digimarc's temporary ID Cards.

17

71.

On October 28, 2002, prior to any proposed presentation by Viisage, DMVS

Commissioner Tim Burgess sent a letter to Michael McClearn, Procurement Director of GTA,

informing McClearn that Viisage was the "apparent winner" of this RFP. (Letter from Burgess

to McClearn of Oct. 28, 2002.)

72.

Burgess requested a prompt demonstration of Viisage's complete system and,

"[a]ssuming a successful demonstration," asked to begin contract negotiations immediately.

(Letter from Burgess to McClearn of Oct. 28, 2002.)

73.

On October 28, 2002, McClearn told Burgess that GTA:

> would prefer to treat the final demonstration and the negotiations
> as separate events. Once they have satisfied DMVS with an
> acceptable demo [Nixon] will be prepared to give them a letter,
> notifying them that they are the apparent winner and immediately
> invite them to enter into negotiations to finalize the contract. I
> think this will expedite the process. Of course, all of this will
> remain closed and confidential until the ink is dry on the contract.

(E-mail from McClearn to Burgess of Oct. 28, 2002.)

74.

Despite the selection of the apparent winner of the RFP, Theobald expressed the

following concerns to Nixon:

> As part of [the contract negotiations] process, we would like to
> validate our technical findings with this Offeror during
> negotiations. Although a brief demonstration was held with each
> Offeror last last (sic) month, it was limited to the issuance of a
> Temporary Document and it did not cover some of the other
> critical capabilities needed in the new system. To adequately verify
> our decision, more extensive demonstrations and discussions of the
> proposed solution by the Offeror will be necessary.

18

(E-mail from Theobald to Nixon of Oct. 29, 2002 (emphasis added).)

75.

GTA requested that Viisage perform additional demonstrations because "DMVS/GTA wants to be sure that the vendor selected can deliver all requirements on time and problem free. DMVS/GTA wants a demonstration that would show all requirements to assure that the vendor can meet the delivery schedule." (E-mail from Nixon to Mohammed Siddiqui, Viisage Marketing Director of Oct. 29, 2002.)

76.

GTA/DMVS did not request that Digimarc make any similar, additional demonstrations.

77.

Even before Viisage's additional demonstrations, however, GTA/DMVS and Viisage commenced contract negotiations. GTA and DMVS provided Viisage with a draft procurement contract on October 30, 2002. (E-mail from Siddiqui to Nixon of Oct. 30, 2002.)

78.

In fact, prior to entering into contract negotiations with Viisage, GTA had not even been made fully aware of DMVS's final scoring of the Offerors' proposals, as DMVS did not send GTA the final score sheets of the evaluations of the Offerors until November 6, 2002. (Theobald November 6, 2002 email to Nixon.)

79.

Nonetheless, on November 6, 2002, after contract negotiations with Viisage were already underway, DMVS indicated to GTA, "the award of the RFP should be contingent upon Viisage's financial capability/profile being substantially the same as well as the staffing for the project." (E-mail from DMVS Director of Legal Services Charemon Scott to DMVS General Counsel

19

Neal Childers and Theobald of Nov. 6, 2002.)

80.

Then, on November 7, 2002 Viisage indicated that it wanted to change its Technical Proposal again. On this date, Viisage informed GTA of a material change in its proposed Point of Sale software proposal. Viisage sought permission to replace its proposed vendor for the Point of Sale software with CenterStage.

81.

On November 7, 2002, Viisage forwarded GTA executed copies of both the contract and software escrow agreements. (E-mail from Siddiqui to Nixon of Nov. 7, 2002.)

82.

GTA and DMVS provided Viisage an opportunity to make an additional demonstration to the evaluation team on November 12, 2002. Upon information and belief on that date, Viisage performed the requested demonstrations.

83.

On the same day, November 12, 2002, GTA provided Viisage with a Notice of Intent to Award, and DMVS signed a contract with Viisage.

84.

Ultimately, the preferences granted to Viisage, as described above and as further described below, contributed to the conclusion by GTA and DMVS that "[a]ll 'Unsatisfactory' ratings identified during the evaluation of the initial proposal were rectified during the resubmission and clarification phases." (Exhibit C, p. 43.)

85.

But Digimarc was not made aware of or granted the same opportunity by GTA and

20

DMVS to demonstrate or to rectify any unsatisfactory ratings, either before or after Digimarc's Best and Final Offer.

### 86.

As noted above, a number of Viisage's unsatisfactory ratings dealt with the actual failure of performance tests relating to Viisage's proposal for Permanent ID Cards. Viisage was also granted substantial preferences in its opportunities to cure defects with respect to Temporary ID Cards. These elements of the RFP comprised critical portions of the central issue system.

### 87.

The preferential treatment granted by GTA and DMVS to Viisage by allowing Viisage multiple opportunities to cure defects in its proposals violated the express terms of the RFP, which mandated that all Offerors should be accorded fair and equal treatment with respect to any opportunity for discussion and revision of proposals. (RFP § 5.6.) This error resulted in Viisage having been wrongfully awarded the contract at issue. Had this error not been made, Digimarc would have been awarded the contract.

### Discrepancies in Evaluation Process

### 88.

In addition to the preferential treatment with regard to the Offerors' responses to the RFP in the area of permanent and temporary ID Cards and the Offerors' Best and Final Offers, GTA and DMVS failed to follow the RFP's requirements regarding the overall evaluation of the Offerors' responses to the RFP.

### 89.

The RFP directed that no other factors or criteria could be used in the evaluation of proposals except for the evaluation factors set forth in the RFP. (RFP § 5.7.)

21

90.

GTA and DMVS established certain minimum requirements with respect to proposals submitted by Offerors, and stated: "Whenever the terms **"shall"**, **"must"**, **"will"**, or **"is/are required"** are used in the RFP, the specification being referred to is a **minimum requirement** of this RFP. Failure to meet any minimum requirement will cause reduction in the evaluation scoring of the Offeror's proposal." (RFP § 3.1.1 (emphasis in original).)

91.

The RFP specified that the Scope of Work technical requirements referenced under Section 3 of the RFP would be considered as factors in the evaluation process of each Offeror's technical proposal and were ranked by relative importance on a scale of "Most Important – Very Important – Important, <u>in descending order</u>." (RFP § 5.3 (emphasis added).)

92.

Accordingly, an Offeror's ability to provide GTA and DMVS with a superior solution for the first critical and fundamental evaluation factors should have been accorded greater weight by the Evaluation Committee than the Offeror's solution for less important evaluation factors.

93.

For example, Section 3.3.1 of the RFP listed the Overall Solution Functional Requirements. These requirements should have been accorded greater weight in the evaluation process than the Offeror's ability to provide the Optional Components listed in Section 3.3.2 of the RFP.

94.

GTA and DMVS also judged the Offeror's response to each individual evaluation factor using the following "adjectival" ratings scale: Excellent – Good – Satisfactory – Unsatisfactory.

22

(RFP § 1.2.)

95.

The combined GTA and DMVS evaluations of each Offeror are included in Exhibits B and C hereto.

96.

According to the Digimarc Evaluation, Digimarc received a rating of "Excellent" with respect to six responses, a rating of "Good" with respect to eight responses, a rating of "Satisfactory" with respect to 202 responses, and a rating of "Unsatisfactory" with respect to only three responses. (Exhibit B.)

97.

More importantly, Digimarc received the top score of "Excellent" on its responses to four of the first ten critical and fundamental evaluation factors. (Exhibit B.)

98.

Digimarc also received the top score of "Excellent" for its recommended method of encryption and superior availability requirements for its travel back-up workstations. (Exhibit B; RFP §§ 3.6.6.2, 3.8.12.)

99.

In contrast, Viisage did not receive a single score of "Excellent" on its responses to the first ten critical evaluation factors. According to the Viisage Evaluation Sheet, Viisage received a rating of "Excellent" with respect to eleven responses, a rating of "Good" with respect to ten responses, a rating of "Satisfactory" with respect to 189 responses, and a rating of "Unsatisfactory" with respect to nine responses. Nine of out Viisage's first ten responses were rated merely as "Satisfactory" by the evaluation team. (Exhibit C.)

23

100.

If GTA and DMVS had truly ranked the technical requirements in Section 3 of the RFP

by relative importance on a scale of Most Important – Very Important – Important, in descending

order, Digimarc's ability to provide a superior solution for the initial critical technical

requirements would have been accorded far greater weight by GTA and DMVS in the evaluation

process than Viisage's favorable scores on factors of lesser relative importance.

101.

The failure by GTA/DMVS to properly weight Digimarc's scores, as compared to

Viisage's, coupled with Viisage's repeated and unique opportunities to correct unfavorable

scores, as noted above, unfairly and illegally resulted in the award of the contract to Viisage.

Had these failures by GTA/DMVS to adhere to the RFP not occurred, Digimarc would have been

awarded the contract.

**Financial Capabilities**

102.

GTA and DMVS also erred by failing to evaluate diligently Viisage's financial capability

to perform if awarded the contract, which resulted in the wrongful award of the contract at issue

to Viisage.

103.

Under O.C.G.A. section 50-25-7.3(6), GTA shall abide by the following standard when

awarding contracts by soliciting competitive sealed proposals:

> The award shall be made to the responsible vendor or vendors
> complying with the technology and architecture standards and
> policies of the [GTA] whose proposal or bid was timely and is
> determined in writing to be the most advantageous to the state,
> taking into consideration the evaluation factors set forth in the
> request for proposals or bids. No other factors or criteria shall be

24

used in the evaluation.

(O.C.G.A. § 50-25-7.3(6) (emphasis added).)

104.

Furthermore, under GTA Rules, an "[a]ward must be made to the <u>responsive and responsible offeror</u> whose offer is determined in writing to be the most advantageous to the state, using all evaluation factors set forth in the solicitation." (GTA Rule 665-2-4-.02(a)(8) (emphasis added).)

105.

In assessing whether an Offeror is responsible, GTA should have given consideration to the Offeror's financial solvency and overall ability to respond in quality and fitness to the particular requirements of the contract in question. (1974 Ga. Op. Att'y Gen. No. 74-16.)

106.

In the RFP, GTA expressed the importance it purportedly placed on the Offerors' financial capability to perform. Because "[f]inancial stability [was] very important in the overall assessment of a company's expected performance," each Offeror was required to provide sufficient financial data, including information regarding any bankruptcies within the past five years, to lead the RFP evaluators to the conclusion that the offeror had the financial capability to perform. (RFP § 4.2.1.3.4.)

107.

The RFP stated that an unsatisfactory evaluation with respect to the company's financial stability "may cause a serious impact to the overall evaluation." (RFP § 4.2.1.3.4.)

108.

Viisage failed to submit financial data sufficient "to lead evaluators to the conclusion that

25

[Viisage] ha[d] the financial capability to perform" in its response to the RFP. Thus, Viisage failed to comply with the requirements of section 4.2.1.3.4.

109.

It does not appear that GTA reduced Viisage's overall rating for Viisage's failure to provide financial data as required by section 4.2.1.3.4. and GTA Rule 665-2-4-.02(a)(8).

110.

It also does not appear that GTA/DMVS conducted any meaningful evaluation of Viisage's financial ability to perform.

111.

In fact, it appears that GTA and DMVS reviewed only scant financial data regarding Viisage, which data GTA/DMVS gathered on its own behalf. In addition, this review appears to have been conducted only _after_ GTA/DMVS had determined to award the contract to Viisage on or before October 22, 2002.

112.

The first act that GTA/DMVS undertook toward completing any due diligence on Vissage's financial viability appears to have occurred on November 1, 2002, when DMVS sent GTA a copy of Viisage's second quarter 10-Q filing with the Securities and Exchange Commission. (E-mail from Theobald to Nixon of Nov. 1, 2002.) As noted above, however, by October 22, 2002, DMVS had already determined Viisage to be the "apparent winner."

113.

The only other fact that evidences any due diligence undertaken by GTA/DMVS to determine whether Viisage was financially capable of performing was the fact that GTA ordered a Dun & Bradstreet report on Viisage on November 7, 2002. (E-mail from GTA Contract

26

Manager Charles Brooks to Nixon on Nov. 7, 2002.)

114.

Indeed, in the November 12, 2002 Notice of Award given to Viisage, GTA specifically stated that a condition of the contract's award to Viisage would be Viisage's "Financial capability/profile being substantiated." (Exhibit J.)

115.

Contrary to this mandate, however, Viisage apparently never provided any demonstration of its financial stability to perform. Instead, immediately after the demonstration, DMVS and Viisage signed the contract, the very same day as the Notice of Award.

116.

In fact, Viisage purposely waited until November 13, 2002 to file its third quarter 10-Q report with the Securities and Exchange Commission, a report that demonstrated Viisage to be even more financially weak then appeared in its second quarter 10-Q report that gave rise to Georgia's insistence that Viisage provide proof of its financial stability proof. It did not share this report with GTA/DMVS. (Exhibit K.)

117.

In the Risk Factor Analyses provided in Viisage's November 13, 2002 third quarter 10-Q filing with the Securities and Exchange Commission for the period ended September 29, 2002, Viisage acknowledged "[their] potential inability to obtain additional capital required for funding [their] operations and financing [their] growth" as a material risk factor. (Exhibit K, at 13.)

118.

This 10-Q report for third quarter of 2002 also revealed that Viisage was in default of certain financial covenants with its creditors. (Exhibit K, at 13.)

27

119.

As a result of a forced renegotiation of certain financial covenants, it was revealed that Viisage had further reduced its total available credit facility by $4 million. (Exhibit K, at 12.)

120.

Additionally, during the first nine months of 2002, Viisage's reported loss in earnings for the quarter totaled $6.5 million.

121.

Accordingly, Viisage did not and has not submitted financial data sufficient to support the conclusion that Viisage had the requisite financial capability to perform.

122.

GTA and DMVS failed to perform the financial assessment tests mandated by the RFP.

123.

These errors resulted in the wrongful award the contract at issue to Viisage. Had these errors not been made, Digimarc would have been awarded the contract.

### Cost Realism Analysis

124.

As defined in Appendix D of the RFP, the term "evaluation" means:

> The in-depth review and analysis of Offeror's proposals. It involves the application of judgment to the Offeror's proposed price and performance using the express evaluation factors and criteria in the solicitation and the procedures outlined herein. The purpose of evaluation is to identify deficiencies, omissions, and need for clarification in proposals, <u>determine the existence of price and technical realism</u>, and discriminate among proposals as to which best meets the acquisition objectives so that an appropriate selection and award is made.

(RFP App. D (emphasis added).)

28

125.

Accordingly, the RFP mandated that as part of its evaluation of any Technical Proposal and Cost Proposal, GTA and DMVS were required to conduct some form of price and technical realism analysis to determine if the proposed price had a sound economic basis in relation to the Technical Proposal and, thereby, to ensure that Georgia did not risk the ongoing viability of the Digitized License System by awarding the procurement contract to a vendor operating at a loss or selling a product/service at a less than sustainable margin. (RFP App. D.)

126.

Price proposals were also to be evaluated not only in terms of the overall price to Georgia but also the relative value offered by Offeror's price for the services that will actually be rendered. (RFP § 5.3.)

127.

Absent price and technical realism analysis, however, it would be impossible for the GTA or DMVS to determine if Viisage's proposed price covered the costs associated with card production and represented the overall "best value" for Georgia.

128.

Upon information and belief, neither GTA nor DMVS conducted any such mandated analysis of Viisage's proposals.

129.

Viisage's final, accepted price per ID Card was $1.009. Upon information and belief, this current Viisage price per card represents less than 67% of the estimated total cost of the components necessary to produce the ID Cards. Upon information and belief, Viisage will lose $0.516 for every ID Card it produces. Using Georgia's assumed production volumes, Viisage's

estimated total loss will be approximately $7.5 million.

<div align="center">130.</div>

As an example of the complete disconnect of the Viisage price from reality is Viisage's proposed price per card if the ID Cards are issued from Viisage's own building. For a facility with a minimum square footage requirement of 4,800 square feet, Viisage's proposed price differential per card had been only 1 cent. In order to provide an offsite factory, Viisage would need to build or lease a building, specially modify it into a totally secure building, and then to also operate and insure it each year all for a total amount of less than $0.43 per square foot per month. Thus, Viisage's proposed price of $1.009 is plainly is not realistic price that Viisage can sustain over time.

<div align="center">131.</div>

Further evidence of a capricious price evaluation is the fact that Georgia did not even know if the expensive software and equipment for Document Scanning for all the workstations was included in Viisage's base price at the time it was awarding Viisage the contract.

<div align="center">132.</div>

GTA and DMVS failed to perform the requisite price and technical realism analysis to determine if Viisage will reasonably be able to perform its obligations if it were awarded a contract for the services sought by the RFP.

<div align="center">133.</div>

These errors resulted in Viisage having been wrongfully awarded the contract at issue. Had these errors not been made, Digimarc would have been awarded the contract.

<div align="center">30</div>

## The Central Production Facility for Permanent ID Cards

134.

GTA and DMVS also erred with respect to Viisage's proposal for a Central Production Facility for permanent ID Cards.

135.

As defined in Appendix D of the RFP, the term "Central Production Facility" means the site for mass production for all permanent ID Cards, to be operated by the successful Offeror.

136.

The RFP mandated that the successful Offeror provide a Central Image System for storage and retrieval of digital photographs, signatures and fingerprints.  (RFP § 1.1.)  The Central Imaging System is the image database system that will be owned and operated by the successful Offeror at the Central Production Facility.  (RFP App. D.)

137.

At a minimum, the proposed solution resulting from the RFP was to replace the current Digitized License System, with all hardware and software required to support production of permanent ID Cards at the Central Production Facility.  (RFP § 2.7.1.1.)

138.

This solution would allow DMVS to achieve its strategic objective of improving customer service by reducing wait time for permanent ID Cards, using permanent document printers for "mass production" located only at the successful Offeror's Central Production Facility.  (RFP § 2.7.3.3.)

139.

The RFP required all Offerors to include pricing models based upon two different

31

Central Production Facility arrangements, including a model based on DMVS providing floor space for the facility in Conyers, Georgia and a second model based upon the Offeror acquiring facilities in Rockdale County, Georgia. (RFP §§ 3.3.4.1, 3.3.4.2.)

140.

Digimarc received the optimal score of "Excellent" on its proposed solutions to meet the needs of each of the 13 general work requirements set forth in section 3.3.3 of the RFP, including, but not limited to, provision for and operation of a Central Production Facility with proposed pricing models for the two different central production facilities, as required by Sections 3.3.4.1 and 3.3.4.2 of the RFP.

141.

With respect to the latter, the Digimarc Evaluation noted in its Comments section that Digimarc "[p]rovided a very comprehensive description on all anticipated needs, Included [sic] floor plans, equipment foot prints [sic], access requirements for loading of equipment and supplies, detailed electro-mechanical and environmental requirements, security and vault procedures."

142.

The Viisage Evaluation noted in its Comments section that Viisage "[p]rovided minimal information on space requirements for equipment" with respect to establishing a Central Production Facility at DMVS headquarters and further "[p]rovided minimal information on security and establishment plans" with respect to a Central Production Facility within Rockdale County, Georgia.

143.

The RFP mandated that the Offeror "must have installed at least one similar distributed

32

Digitized License System in North America." (RFP § 4.2.1.5.) As such, the RFP instructed that each Offeror had to identify and to describe the Offeror's experience with such similarly distributed projects, including the size of the organization, and its capabilities and its experience in applying the proposed technology. (RFP § 4.2.1.5.)

144.

Viisage has never installed a central issue production facility of the type mandated by the RFP.

145.

Viisage's only experience with implementing a full central issuance system was in Massachusetts in 1995 for drivers' licenses, which system Viisage operated through the fall of 2000.

146.

But as set forth in 1999 state of Massachusetts RFP No. RMV00-011, even after years of service by Viisage, Massachusetts continued to face significant problems with its drivers' license system, including, but not limited to, the following:

    a.     license backlogs;

    b.     lack of effective color correction software for workstation cameras;

    c.     driver license ink migration through the license hologram laminate;

    d.     inability to easily produce identification cards for other agencies;

    e.     lack of direct facial illumination resulting in fuzzy customer images;

    f.     visual inspection not functional;

    g.     slow response time of hardware support for equipment failures;

    h.     slow and incorrect image license reconciliation process; and

i.    issues with laminate wearing off, cracking and breaking on the DL/ID document.

(Exhibit L.)

147.

In 1993, the time at which Viisage was awarded the contract for Massachusetts, Massachusetts issued approximately 1.4 million ID Cards per year. In comparison, Georgia issued 2,442,073 ID Cards in 2001. (RFP § 2.4.) Approximately 5.6 million drivers are licensed in Georgia. (RFP § 2.4.) According to the RFP, the current image database is expected to have approximately fifteen million sets of stored images at the time the procurement contract is awarded. (RFP § 2.4.)

148.

Digimarc replaced the Massachusetts licensing system with a new installation in 2000, and remains in control of the Massachusetts licensing operations under a multi-year contract with Massachusetts.

149.

Accordingly, Viisage has not successfully installed a central issuance production system and facility similar to that required by the Georgia RFP. The only prior domestic experience upon which Viisage may rely includes one state central production facility that supported less than half the volume currently sustained by Georgia and one-quarter of the volume that Georgia could experience at full capacity. In spite of this, Viisage was not given an adverse rating for its lack of relevant demonstrated history.

150.

The technical requirements pertaining to the Central Production Facility were included in the first ten critical and fundamental evaluation factors. Given the high relative importance of

these evaluation factors, Viisage's inability to demonstrate historical familiarity with the systems and cards set forth in the RFP should have substantially reduced Viisage's overall evaluation results.

151.

GTA/DMVS did not, however, reduce Viisage's overall evaluation results based on Viisage's inability to comply with these critical requirements. This failure constitutes a significant error in the procurement process, which resulted in a wrongful award of the contract to Viisage. Had this error not been made, Digimarc would have been awarded the contract.

### The Central Image Server

152.

GTA and DMVS also erred with respect to Viisage's proposal regarding the Central Imaging System.

153.

Viisage proposed a Central Imaging System that was significantly undersized for the application mandated by the RFP.

154.

The Viisage Technical Proposal associated with the Central Imaging System also exhibited significant inconsistencies.

155.

Moreover, the Central Imaging System proposed by Viisage is not a "High Availability" configuration and, therefore, fails to meet the 99.99% uptime required by the RFP.

156.

Additionally, the Central Imaging System proposed by Viisage is not a truly redundant

35

configuration, as mandated by the RFP.

### 157.

Therefore, the Viisage proposal failed to provide adequately for the Central Imaging System, apparently due to Viisage's lack of understanding of the State's DMVS environment and the requirements of the solution.

### 158.

In spite of this, Viisage was not given a corresponding adverse evaluation by DMVS.

### 159.

This failure constitutes a significant error in the procurement process, which resulted in a wrongful award of the contract to Viisage.  Had this error not been made, Digimarc would have been awarded the contract.

### Back-Up Production Facilities

### 160.

GTA and DMVS also erred with respect to Viisage's proposal regarding back-up card production facility for use in the event the Central Production Facility is compromised.

### 161.

The Viisage proposal also failed to propose a satisfactory solution for a back-up card production facility for use in the event the Central Production Facility is compromised.

### 162.

In its RFP response, Viisage's proposed the following:  "In addition to providing a secure, fault-tolerate solution for central printing, Viisage has made arrangements with Arthur Blank and Company to use their card printing facility as a backup, in case of disaster at the permanent facility in Georgia.  In case of failure at the Central Production Facility that causes

significant downtime in card production, Viisage will produce the cards off-site. Viisage will develop security processes to ensure that all consumables and finished documents are under reasonable protection throughout the duration of the emergency."

<div align="center">163.</div>

Viisage does not have an agreement with Arthur Blank and Company to provide back-up card production services, as required by the RFP.

<div align="center">164.</div>

Viisage failed to provide reasonable proof in its RFP response that Arthur Blank and Company had the equipment, experience, servers and/or the security items needed to produce the ID Cards in the event the central facility were compromised. In fact, Arthur Blank does not have the equipment to produce drivers' licenses for the State. Nor, for that matter, does Viisage even have a formal, written agreement with Arthur Blank to provide any services for Viisage whatsoever in connection with Georgia.

<div align="center">165.</div>

In spite of this, Viisage was not given a corresponding adverse evaluation by DMVS.

<div align="center">166.</div>

This failure constitutes a significant error in the procurement process, which resulted in a wrongful award of the contract to Viisage. Had this error not been made, Digimarc would have been awarded the contract.

### The Optional Point of Sale System

<div align="center">167.</div>

GTA and DMVS also erred by failing to deem Viisage non-compliant in its RFP response with respect to the optional Point of Sale ("POS") System. (RFP § 3.14.4.)

<div align="center">37</div>

168.

According to the RFP, each Offeror was required to submit a proposal for a turnkey POS system that would interface with the Digitized License System and have the capacity to upgrade to meet future needs. (RFP § 3.14.4.)

169.

The RFP mandated a commercial "Off-the-Shelf" Fee Collection and Cash Management software package. (RFP § 3.14.4.1.1.)

170.

The RFP further specified that the successful offeror's POS system must accept transactions from and consolidate revenue across all delivery channels in use by DMVS, including, at the time of the RFP award, over-the-counter, Web-based Internet and IVR delivery channels. (RFP § 3.14.4.1.2.)

171.

The successful Offeror's POS system must also integrate easily with the Digitized License System, the Offline Application and the State's PeopleSoft financial system, and support both integrated online and standalone processing in the event of a system outage. (RFP §§ 3.14.4.1.3, 3.14.4.1.4.)

172.

During the initial phase of the bidding process, Viisage consistently designated Unisys as its vendor for the required proposal for a commercial "Off-the-Shelf" Fee Collection and Cash Management software package.

173.

On November 12, 2002, Mohammed Siddiqui, Viisage's Marketing Director, provided

38

written notification to Charles Nixon, Contracting Officer for GTA, of Viisage's intent to change

its POS provider from Unisys to CenterStage. (Letter from Siddiqui to Nixon of Nov. 12, 2002,

attached hereto as Exhibit M.)

174.

Upon information and belief, CenterStage does not have a commercial "Off-the-Shelf"

Fee Collection and Cash Management software package that meets the RFP requirements.

175.

Nonetheless, Viisage's last minute, wholesale change in its Technical Proposal in regard

to its proposed POS providers and systems apparently did not impact or alter GTA's evaluation

of Viisage's proposal whatsoever.

176.

Instead, GTA and DMVS had apparently negotiated the procurement contract with

Viisage, and Viisage executed that contract, prior to notifying GTA in writing of its intent to

substitute its proposed POS provider.

177.

In fact, DMVS delivered its "evaluation" findings with respect to Viisage's POS

resubmission to GTA on November 13, 2002, the day after DMVS signed the procurement

contract with Viisage.

178.

Even then, this evaluation was not properly done. Viisage never demonstrated that the

CenterStage application would meet the State's requirements. In connection with RFP

requirement 3.14.4.1, Viisage's revised Technical Proposal never demonstrated that the

CenterStage product would integrate easily with the DDLS, the Offline Application, and the

39

State's PeopleSoft financial system.

### 179.

Similarly Viisage made no attempt in its revised Technical Proposal to demonstrate that COMCASH will meet the requirement 3.14.4.6 to provide an open system design, include an interface that employs XML as the communication format, utilize the OPOS standard for hardware peripherals, or support high volume transaction and revenue processing.

### 180.

Viisage's revised Technical Proposal also did not specify the hardware that it would deliver as part of the POS solution. There is no specification for (1) POS Server, (2) Cash Drawers, (3) Financial Receipt Printers, or (4) Credit Card Readers, all of which must be a part of a complete system.

### 181.

Because Viisage never delivered a complete response with respect to the POS proposal, it could not have been possible for GTA/DMVS to judge if the Viisage proposal was fully compliant with the requirements of the RFP and "Satisfactory."

### 182.

Mere promises that Viisage will be compliant in the future with the RFP's requirements, without evidentiary substantiation, should have caused Viisage's response to have been judged non-compliant. Indeed, SoftLEAD was repeatedly scored with "Unsatisfactory" ratings for its proposed POS solution because of its failure to specify how each functional requirement would be met and how it would be fully integrated into the DLS.

### 183.

In contrast, Viisage's last-minute proposal of a completely new POS solution, which also

lacked such specificity, was given "Satisfactory" ratings by GTA/DMVS. (Exhibit N.)

184.

As such, GTA and DMVS erred by failing to adjust the relative overall ranking of Viisage's late-changed Technical Proposal with respect to this non-price factor in accordance with GTA Rule 665-2-4-.02(b).

185.

GTA and DMVS further erred by negotiating and awarding Viisage the contract prior to taking into account Viisage's responses to all of the evaluation factors mandated by the RFP.

186.

Accordingly, GTA and DMVS committed error in awarding Viisage the contract at issue. Had this error not been made, Digimarc would have been awarded the contract.

### Optional Mailer Feature

187.

The RFP also mandated that an optional mailer had to be proposed in order to mail completed permanent ID Cards to the applicants.

188.

The mailer proposed by Viisage, however, would not have been adequate for the system proposed in the RFP.

189.

If DMVS/GTA had conducted the mandated technical realism assessment of the Viisage proposed mailer option, it would have determined this as well.

190.

However, DMVS/GTA apparently never conducted such an assessment. In fact, instead

41

of penalizing Viisage for its inadequate mailing solution, DMVS/GTA gave Viisage all "Satisfactory" ratings and even one rating of "Excellent", upon which, in part, DMVS/GTA justified awarding the contract to Viisage.

191.

These significant errors in the procurement process resulted in a wrongful award of the contract to Viisage.  Had this error not been made, Digimarc would have been awarded the contract.

## Term of the Contract Signed

192.

Under the terms of the RFP, any contract that was supposed to be awarded was to be for a one-year contract with an option for five additional one-year periods.  (RFP §§ 1.7)

193.

The November 12, 2002 contract that the Viisage received should have provided, then, that its first expiration date would on November 12, 2003.

194.

The terms of the actual signed contract provided, however, that the first expiration would be on June 30, 2004.

195.

This is a material, illegal extension of the terms of the first contract, which, pursuant to the RFP, should have an annual expiration date ending on November 12, 2003.

## Digimarc's Protest of the GTA's Decision

196.

On November 26, 2002, in accordance with GTA Rule 665-2-11-.07 and by virtue of the

42

GTA's grant of a Protest filing deadline extension, Digimarc filed its protest to GTA's award of the contract to Viisage.

197.

On February 17, 2003, the Protest Decisionmaker for GTA denied Digimarc's Bid Protest.

## COUNT I
### (TEMPORARY AND PERMANENT INJUNCTIVE RELIEF – VIOLATION OF THE TERMS OF THE RFP)

198.

Digimarc incorporates Paragraphs 1 through 197, as if fully set forth herein.

199.

By acting in the manner described in this Complaint, GTA and DMVS have violated and are violating the terms of the RFP.

200.

Unless Defendants are restrained from proceeding with the implementation of the contractual agreement with Viisage pending the outcome of this lawsuit, Digimarc and the Georgia taxpayers will suffer immediate and irreparable harm and injury.

201.

Digimarc is likely to succeed on the merits of this lawsuit.

202.

Digimarc does not have an adequate remedy at law.

203.

Digimarc is entitled to a temporary restraining order, an interlocutory injunction and

43

permanent injunction restraining and enjoining Defendants and their officers, employees, agents, attorneys, affiliates, and all others acting in concert with them from proceeding with the implementation and performance of the contract awarded to Viisage in response to Georgia Technology Authority Request for Proposal No. GTA000051; a mandatory injunction directing Defendants to award the Contract to Digimarc, to execute all contracts consistent with an award of the Contract to Digimarc, and to proceed with the implementation and performance of such Contract with Digimarc; or, in the alternative, a mandatory injunction directing Defendants to re-bid the Contract.

### COUNT II
### (TEMPORARY AND PERMANENT INJUNCTIVE RELIEF – VIOLATION GTA RULES

204.

Digimarc incorporates Paragraphs 1 through 197, as if fully set forth herein.

205.

By acting in the manner described in this Complaint, GTA and DMVS have violated and are violating numerous rules governing GTA procurements, including but not limited to: 665-2-1-.01(f); 665-2-4-.02(a)(8); 665-2-4-.02(a)(9)(ii); 665-2-4-.02(b); 665-2-4-.06; 665-2-4-.07.

206.

Unless Defendants are restrained from proceeding with the implementation of the contractual agreement with Viisage pending the outcome of this lawsuit, Digimarc and Georgia taxpayers will suffer immediate and irreparable harm and injury.

207.

Digimarc is likely to succeed on the merits of this lawsuit.

44

208.

Digimarc does not have an adequate remedy at law.

209.

Digimarc is entitled to a temporary restraining order, an interlocutory injunction and permanent injunction restraining and enjoining Defendants and their officers, employees, agents, attorneys, affiliates, and all others acting in concert with them from proceeding with the implementation and performance of the contract awarded to Viisage in response to Georgia Technology Authority Request for Proposal No. GTA000051; a mandatory injunction directing Defendants to award the Contract to Digimarc, to execute all contracts consistent with an award of the Contract to Digimarc, and to proceed with the implementation and performance of such Contract with Digimarc; or, in the alternative, a mandatory injunction directing Defendants to re-bid the Contract.

## COUNT III
### (TEMPORARY AND PERMANENT INJUNCTIVE RELIEF – VIOLATION OF O.C.G.A. § 50-25-7.3(5))

210.

Digimarc incorporates Paragraphs 1 through 197, as if fully set forth herein.

211.

By acting in the manner described in this Complaint, GTA and DMVS have violated and are violating provisions of the Official Code of Georgia, including O.C.G.A. § 50-25-7.3(5), which states, "[t]he terms of the request for proposals or bids may allow for discussions or revisions but shall provide for fair and equal treatment of all vendors."

212.

Unless Defendants are restrained from proceeding with the implementation of the

45

contractual agreement with Viisage pending the outcome of this lawsuit, Digimarc and Georgia taxpayers will suffer immediate and irreparable harm and injury.

213.

Digimarc is likely to succeed on the merits of this lawsuit.

214.

Digimarc does not have an adequate remedy at law.

215.

Digimarc is entitled to a temporary restraining order, an interlocutory injunction and permanent injunction restraining and enjoining Defendants and their officers, employees, agents, attorneys, affiliates, and all others acting in concert with them from proceeding with the implementation and performance of the contract awarded to Viisage in response to Georgia Technology Authority Request for Proposal No. GTA000051; a mandatory injunction directing Defendants to award the Contract to Digimarc, to execute all contracts consistent with an award of the Contract to Digimarc, and to proceed with the implementation and performance of such Contract with Digimarc; or, in the alternative, a mandatory injunction directing Defendants to re-bid the Contract.

## COUNT IV
### (TEMPORARY AND PERMANENT INJUNCTIVE RELIEF – VIOLATION OF O.C.G.A. § 50-25-7.3(6))

216.

Digimarc incorporates Paragraphs 1 through 197, as if fully set forth herein.

217.

By acting in the manner described in this Complaint, GTA and DMVS have violated and are violating provisions of the Official Code of Georgia, including O.C.G.A. § 50-25-7.3(6),

which states:

> The award shall be made to the responsible vendor or vendors complying with the technology and architecture standards and policies of the [GTA] whose proposal or bid was timely and is determined in writing to be the most advantageous to the state, taking into consideration the evaluation factors set forth in the request for proposals or bids. No other factors or criteria shall be used in the evaluation.

218.

Unless Defendants are restrained from proceeding with the implementation of the contractual agreement with Viisage pending the outcome of this lawsuit, Digimarc and Georgia taxpayers will suffer immediate and irreparable harm and injury.

219.

Digimarc is likely to succeed on the merits of this lawsuit.

220.

Digimarc does not have an adequate remedy at law.

221.

Digimarc is entitled to a temporary restraining order, an interlocutory injunction and permanent injunction restraining and enjoining Defendants and their officers, employees, agents, attorneys, affiliates, and all others acting in concert with them from proceeding with the implementation and performance of the contract awarded to Viisage in response to Georgia Technology Authority Request for Proposal No. GTA000051; a mandatory injunction directing Defendants to award the Contract to Digimarc, to execute all contracts consistent with an award of the Contract to Digimarc, and to proceed with the implementation and performance of such Contract with Digimarc; or, in the alternative, a mandatory injunction directing Defendants to re-bid the Contract.

## COUNT V
### (TEMPORARY AND PERMANENT INJUNCTIVE RELIEF – VIOLATION OF O.C.G.A. §§ 50-25-1(C), (C)(4)-(5))

222.

Digimarc incorporates Paragraphs 1 through 197, as if fully set forth herein.

223.

By acting in the manner described in this Complaint, GTA and DMVS have violated and are violating provisions of the Official Code of Georgia, including O.C.G.A. § 50-25-1(c), (c)(4), and (c)(5) which state:

> (c) The purpose of the [GTA] shall be to provide for procurement of technology resources, technology enterprise management, and technology portfolio management . . . on such terms and conditions as may be determined to be in the best interest of the state in light of the following factors: . . . (4) Cost savings to the state through efficiency in the provision of public information; and (5) Such other factors as are in the public interest of the state and will promote the public health and welfare.

224.

Unless Defendants are restrained from proceeding with the implementation of the contractual agreement with Viisage pending the outcome of this lawsuit, Digimarc and Georgia taxpayers will suffer immediate and irreparable harm and injury.

225.

Digimarc is likely to succeed on the merits of this lawsuit.

226.

Digimarc does not have an adequate remedy at law.

227.

Digimarc is entitled to a temporary restraining order, an interlocutory injunction and permanent injunction restraining and enjoining Defendants and their officers, employees, agents,

48

attorneys, affiliates, and all others acting in concert with them from proceeding with the implementation and performance of the contract awarded to Viisage in response to Georgia Technology Authority Request for Proposal No. GTA000051; a mandatory injunction directing Defendants to award the Contract to Digimarc, to execute all contracts consistent with an award of the Contract to Digimarc, and to proceed with the implementation and performance of such Contract with Digimarc; or, in the alternative, a mandatory injunction directing Defendants to re-bid the Contract.

## COUNT VI
### (TEMPORARY AND PERMANENT INJUNCTIVE RELIEF – VIOLATION OF DUE PROCESS)

228.

Digimarc incorporates Paragraphs 1 through 197, as if fully set forth herein.

229.

By acting in the manner described in this Complaint, GTA and DMVS have deprived Digimarc of its property without due process of law in violation of the United States Constititution and the Georgia Constitution.

230.

Unless Defendants are restrained from proceeding with the implementation of the contractual agreement with Viisage pending the outcome of this lawsuit, Digimarc and Georgia taxpayers will suffer immediate and irreparable harm and injury.

231.

Digimarc is likely to succeed on the merits of this lawsuit.

232.

Digimarc does not have an adequate remedy at law.

233.

Digimarc is entitled to a temporary restraining order, an interlocutory injunction and permanent injunction restraining and enjoining Defendants and their officers, employees, agents, attorneys, affiliates, and all others acting in concert with them from proceeding with the implementation and performance of the contract awarded to Viisage in response to Georgia Technology Authority Request for Proposal No. GTA000051; a mandatory injunction directing Defendants to award the Contract to Digimarc, to execute all contracts consistent with an award of the Contract to Digimarc, and to proceed with the implementation and performance of such Contract with Digimarc; or, in the alternative, a mandatory injunction directing Defendants to re-bid the Contract.

**WHEREFORE,** Digimarc prays for the following relief:

a.  As to all Counts, a temporary restraining order, interlocutory injunction and permanent injunction restraining and enjoining Defendants and their officers, employees, agents, attorneys, affiliates, and all others acting in concert with them from proceeding with the implementation and performance of the contract awarded to Viisage in response to Georgia Technology Authority Request for Proposal No. GTA000051; a mandatory injunction directing Defendants to award the Contract to Digimarc, to execute all contracts consistent with an award of the Contract to Digimarc, and to proceed with the implementation and performance of such Contract with Digimarc; or, in the alternative, a mandatory injunction directing Defendants to re-bid the Contract;

b.  As to all Counts, the costs of this action, including reasonable attorneys' fees; and

c.  Such other and further relief as this Court deems just and proper.

This 5th day of March, 2003.

David Balser
Georgia Bar No. 035835
John Hutchins
Georgia Bar No. 380692
Valerie D. Barton
Georgia Bar No. 040832

MCKENNA LONG & ALDRIDGE LLP
303 Peachtree Street, Suite 5300
Atlanta, Georgia 30308
(404) 527-4000
(404) 527-4198 (facsimile)

*Attorneys for Plaintiff*
*Digimarc ID Systems, LLC*

51

# Exhibit 7

# DECISION

## PROTEST OF DIGIMARC ID SYSTEMS OF THE AWARD FOR REQUEST FOR PROPOSAL No. GTA 000051, DIGITIZED LICENSE SYSTEM FOR THE GEORGIA DMVS

### February 17, 2003

#### INTRODUCTION

Subsequent to the terrorist attacks on this country in September 2001, Georgia's new Department of Motor Vehicle Safety (DMVS) determined a need for a more secure drivers' license, and a more secure and efficient approach to generating such a license. The DMVS conducted extensive research of other states to identify any system that would meet Georgia's objectives.

DMVS concluded that no state's system met the post 9/11 enhanced security needs, that the Georgia requirements were unique compared to existing systems, and that DMVS would have to develop specifications from scratch to procure its desired system. DMVS did just that in conjunction with the Georgia Technology Authority (GTA).

During its review, DMVS determined that its remote locations could not issue licenses to onsite applicants that would be sufficiently secure. Therefore, any new system would have to provide for the remote locations to issue applicants temporary licenses which would remain in effect only until more secure permanent licenses could be produced at a central site and mailed to the respective applicants.

On May 24, 2002, pursuant to its procurement authority as established in O.C.G.A. Title 50, Chapter 25 and GTA Rules 665-1 et seq., the Georgia Technology Authority ("GTA"), on behalf of the Department of Motor Vehicle Safety ("DMVS"), conducted a competitive solicitation for the purchase of a digitized drivers' license system.

Paragraph 1.1 of the Request for Proposals provides as follows:

> The purpose of the ...RFP is to engage the services of a qualified Offeror to provide a central issuance Digitized License System (DLS) for the ...DMVS. The DLS will provide photograph, signature, and fingerprint capture, storage, and retrieval, as well as Document production based upon a firm, fixed price for each driver's license, identification card, or special identification card successfully produced. The State is seeking a qualified Offeror to assist the State in minimizing costs and improving the current level of performance, while furnishing new technology, with reliable hardware and software. This RFP requests several optional

1

*features to be proposed, which the State of Georgia may elect to exercise during the term of the Contract. The Successful Offeror will provide a Central Image System (CIS) for storage and retrieval of digital photographs, signatures, and fingerprints. The Successful Offeror will also provide installation and ongoing support for Workstations and printers statewide. All Workstations will contain an integrated end user interface with the existing DMVS Driver Licensing System (DDLS) and the Offline Application, as well as the Successful Offeror's DLS. This will allow DMVS staff to enter and retrieve Applicant information and capture, store, and retrieve a photograph, signature, and two fingerprints. In addition, the Successful Offeror will provide portable Travel Workstations that provide the same functionality as described above.*

A chronological review of the procurement follows.

| | |
|---|---|
| 5/24/02 | Request for Proposal ("RFP") issued. |
| 6/18/02 | Addendum No. 1 to the RFP issued. |
| 7/12/02 | Addendum No. 2 to the RFP issued. |
| 7/19/02 | Proposals received from Digimarc ID Systems (Digimarc), Viisage Technology (Viisage), and SoftLEAD Technology Partners, Inc. (SoftLEAD). |
| week of 7/22/02 | Technical proposals were evaluated by an evaluation team composed of six DMVS technical, programmatic and specialist officials and one GTA technical expert. In addition, three other DMVS specialists evaluated functional requirements related to their responsibilities within the department (investigations, training and financial). |

The evaluation included reviewing offerors' responses to RFP specifications and related questions, samples of temporary and permanent licenses, and offerors' corporate and individual experience. In addition, GTA reviewed offerors' financial viability. None of the offerors' sample licenses were found acceptable. The evaluation of the written technical proposals (responses to specifications and related questions) resulted in the following:

| Rating | Excellent | Good | Satisfactory | Unsatisfactory |
|---|---|---|---|---|
| Digimarc | 6 | 8 | 202 | 3 |
| Viisage | 11 | 10 | 189 | 9 |
| SoftLEAD | 0 | 1 | 121 | 97 |

With the RFP providing for an "adjectival" basis for evaluation, none of the specifications were weighted, nor was a single final score computed.

2

**Decision**
**Protest Of Digimarc ID Systems**

After the technical proposal evaluation was completed, the team evaluated the offerors' price proposals. The base price per card for each was as follows:

Price per License
At DMVS Site
At Own Site

Digimarc*
$1.964
$2.007

Viisage *
$0.690
$0.700

SoftLEAD**
$1.500
$1.650

\*   Price constant for all five years of contract.
\*\*  Price varies. This is the lowest price and is for the second year, after which the price increases by about $.05 per subsequent year. First year prices are $3.30 onsite and $3.45 offsite.

8/14/02    DMVS Commissioner met jointly with all three vendors to clarify DMVS requirements. The RFP was not amended; the requirements did not change.

8/16/02    All offerors were asked to submit new temporary license samples along with revised price proposals if appropriate.

8/26/02    All offerors submitted samples (in most cases, multiple samples) of both temporary and permanent licenses. The evaluation team tested all samples. All offerors submitted at least one permanent license sample which passed. None of the temporary license samples from any of the offerors passed.

All offerors submitted revised price proposals for several different cards. The total price proposals for both permanent and temporary cards which the evaluation team found to perform the best were:

Price per License
At DMVS Site
Difference from Original
At Own Site
Difference from Original

3

**Decision**
**Protest Of Digimarc ID Systems**

Digimarc*
$2.342
+$0.378
$2.385
+$0.378

Viisage *
$1.160
+$0.470
$1.170
+$0.470

SoftLEAD**
$1.591
+$0.091
$1.741
+$0.091

\*    Price constant for all five years of contract.
\*\*   Price varies. This is the lowest price and is for the second year, after
      which the price increases by about $.05 per subsequent year. First year
      prices are $3.391 onsite and $3.541 offsite.

| 9/16/02 | All offerors were asked to demonstrate the production of temporary licenses at the DMVS site. Each offeror was provided a description of the ten tests to be performed and given the results of the 8/26/02 tests. |

9/26/02    All offerors produced temporary licenses, which were tested by the
9/27/02    evaluation team onsite. The results of the tests were:
   ▪  Viisage produced two card stocks. One card stock had been treated to
      withstand nine of the tests, while the other had been treated to withstand
      the remaining test. Both passed the tests. Viisage was informed of the
      results and instructed to submit a single card to receive all tests.
   ▪  Digimarc produced two samples. Both failed multiple tests – neither
      passed. Digimarc was informed of the results.
   ▪  SoftLEAD produced three samples, all of which passed.

10/7/02    Viisage submitted a single card upon which the team performed all ten tests.
           The card passed all ten tests and was found acceptable.

10/8/02    The evaluation team determined which offerors' proposals merited further
           consideration. The Digimarc and Viisage technical proposals were close
           (Viisage had slightly more excellents and goods but also had more
           unsatisfactories while the SoftLEAD technical proposal was decidedly inferior

4

**Decision**
**Protest Of Digimarc ID Systems**

(97 unsatisfactories, or more than 10 times the number of Viisage unsatisfactories). Also, the SoftLEAD price proposal for the five year contract period was roughly equivalent to Digimarc's and much higher than Viisage's. Based on these factors, SoftLEAD was eliminated from further consideration.

DMVS selected options to implement. With GTA, the evaluation team composed instructions to Digimarc and Viisage to submit Best and Final Offers ("BAFOs"). These instructions requested prices for licenses and for the selected options and requested clarifications on a number of technical proposal responses. They also indicated the tests to be used on sample licenses and documented the results of the September tests.

10/15/02    Digimarc and Viisage submitted BAFOs.

The evaluation team evaluated the BAFOs. The results of the technical review were as follows:

1. For Digimarc, the revised responses for the original three unsatisfactory rated criteria (relating to the temporary license) were found to be cumbersome and potentially costly. The Digimarc proposal was for a laminate covering for which Digimarc indicated there would be an additional unspecified charge. Three of Digimarc's responses to 33 clarification requests were found unacceptable. None of the clarification responses impacted any evaluation score.

2. For Viisage, the revised responses for the original nine unsatisfactory rated criteria (relating to the temporary license) were found to be satisfactory. Also, the responses to the BAFO's 53 clarification requests were acceptable. None of the clarification responses impacted any evaluation score.

3. The BAFO price proposals were as follows:


Price per License
At DMVS Site
Difference from 8/26/02
At Own Site
Difference from 8/26/02

Digimarc**
$2.210
-$0.132
$2.289
-$0.096

Viisage

**Decision**
**Protest Of Digimarc ID Systems**

$0.985
-$0.175
$0.995
-$0.175

\*\* Digimarc's price did not include the cost of laminating its temporary card.

4. By the time of the BAFO, the Commissioner had determined that the DMVS would implement the offsite production option. Digimarc's offsite BAFO price was more than twice (roughly 130% greater than) the Viisage offsite BAFO price. Because Viisage's proposal was compliant for a substantially lower price, DMVS concluded that Viisage's proposal offered the state the best value and that Viisage should be awarded the contract.

10/16/02 — The evaluation team met with the Commissioner and Charles Nixon (GTA's Acquisition Management procurement officer) and recommended that the contract be awarded to Viisage. GTA recommended that DMVS exercise one final caution to validate it was making the right decision by having Viisage make a final demonstration of its entire process. At this point, Digimarc was eliminated from further consideration.

10/25/02 — The evaluation team reduced its final evaluation of the three offerors' technical proposals to written form. It also completed for each offeror a report of technical and price proposal evaluation findings, and demonstration observations.

10/28/02 — The Commissioner transmitted the final evaluation reports to GTA with the judgment that, "Viisage is the apparent winner," and requesting GTA "...to move expeditiously..." to award the contract to Viisage. The Commissioner also asked that GTA have Viisage demonstrate its complete system and, assuming a successful demonstration, begin contract negotiations.

10/29/02 — GTA sent an e-mail to Viisage directing it to perform a final demonstration and to be ready to discuss the implementation considerations of mainframe and CIS interaction and real-time synchronization.

11/7/02 — Viisage requested to substitute new subcontractor for the point of sale ("POS") component of proposal. DMVS agreed to consider substitution and requested an amended proposal describing the proposed substitute subcontractor's POS system

Period from 11/7/02 to 11/12/02 — Viisage submitted an amended proposal describing the capabilities of the new subcontractor's POS system.

6

**Decision**
**Protest Of Digimarc ID Systems**

> The evaluation team reviewed the revised POS provision, which was found to be at least as satisfactory as the original provision. No changes were made to the Viisage score.

11/12/02    Viisage made final demonstration and discussed final clarifications. Viisage then documented its oral responses in writing. No changes were made to the Viisage score.

11/12/02    Viisage was awarded the contract.

11/26/02    Digimarc filed protest.

12/3/02    The GTA Executive Director/State CIO appointed the Protest Decisionmaker.

**DECISION**

My decision is:
1. The protest is not adequately supported. There are no merits to any of the protest's allegations.
2. Protestor's request for relief is denied.
3. Even if one or more of the allegations were to have merit, relief would not be warranted because, according to the final evaluation reports which were completed prior to Viisage's final demonstration, Viisage's technical proposal was found satisfactory in all respects for a substantially lower price, whereas Digimarc's technical proposal had four significant deficiencies for a substantially higher price.

This decision is based on an investigation of the evaluation process followed by the evaluation team, of the merits of each protest allegation, and of the evaluation recommendation. The investigation complied with GTA Rule 665-2-11.

Information considered included the following:
1. The protest.
2. The core evaluation team evaluations of the winning offeror and the protesting offeror.
3. Relevant portions of the proposals of the winning offeror and the protesting offeror.
4. Interviews with and information provided by the core evaluation team.
5. Interviews with and information provided by GTA Acquisition Management staff.
6. Portions of the response to the protest submitted by the winning offeror. **NOTE: Only Viisage's response comments regarding those allegations of Viisage potential impropriety (I.B.(i) – no agreement with Arthur Blank and Co. to provide central card production back-up, and I.C. – inability to lawfully provide promised card features), were considered, since this was information that the protest decisionmaker would have solicited in order to**

7

**Decision**
<u>**Protest Of Digimarc ID Systems**</u>

> conduct his analysis. **Other protest response comments were disregarded because they potentially amplified or modified Viisage's technical proposal content.**

7. Selected statements from the annual report of the protesting offeror.
8. Selected statements from the annual report of the winning offeror.

## OVERALL FINDINGS

1. The procurement including evaluation was conducted in compliance with GTA Rules 665-2-1 through 665-2-5 and with the provisions of the RFP, most notably Section 5. The evaluation team properly exercised its discretion in determining the amount of information and methods required to evaluate the proposals, exercised due diligence, followed a process which offered fair and equal opportunity to all offerors, and acted responsibly in its evaluation of offerors' submitted materials.
2. DMVS and GTA had unusual challenges in that none of the offerors' technical proposals fully complied with the RFP's requirements initially or after two subsequent attempts. Consistent with GTA Rules 665-2-4-.02(a)6. and 9.(ii)(II), DMVS and GTA took steps to advise and instruct the offerors to give them subsequent opportunities to respond with modified proposals which would comply with RFP requirements.
3. Viisage's technical proposal submitted as part of its Best and Final Offer (BAFO) passed every criterion of the technical evaluation for a substantially lower price than the corresponding Digimarc BAFO response.
4. The evaluation resulted in a recommendation which demonstrably provides the best value solution considering price, quality of technical proposal and demonstrated ability to perform.

## FINDINGS FOR EACH ALLEGATION

Protestor asserted seven grounds for the protest: (a) the contract award was not made to a responsible Offeror, (b) GTA/DMVS applied an inconsistent procurement evaluation process, (c) the Viisage Proposal failed to comply with the mandatory requirements of the RFP without a reduction in its evaluation, (d) the Viisage Proposal promises services that it is unable to deliver lawfully, (e) the evaluation of the Viisage Proposal failed to determine the existence of proper price realism, (f) the evaluation was arbitrary, capricious and/or clearly erroneous, and (g) the procurement process violates Digimarc's constitutional rights by limiting other protest remedies to injunctive relief only. The following fact specific allegations were extracted from the Protestor's supporting content.

Notes:
1. The **bold typed** language in each allegation is taken directly from the protest.

8

**Decision**
**Protest Of Digimarc ID Systems**

2. The *italicized* language in each allegation is the decisionmaker's paraphrasing of supporting protest content.


**Allegation I: Viisage Is Not A Responsible Offeror**

I.A.    **Allegation: Viisage Lacks Necessary Financial Ability To Perform.**
   a. *Viisage's statements show declining earnings, cash and credit.*
   b. *Viisage has been awarded a contract by Delaware and will be awarded a contract by Oklahoma. Viisage is not financially capable of simultaneously making the capital investments required to perform all three contracts.*

   **Finding:    The allegation is not adequately supported. It is reasonable to conclude that Viisage does have the financial ability to perform.**
   a. GTA appropriately exercised its discretion in determining the amount of information required to responsibly evaluate offerors' financial ability to perform when it obtained a Dun & Bradstreet report on Viisage and reviewed the report to determine whether there were any factors that would require disqualification under GTA rules or the RFP's evaluation criteria. This review and the finding that there were no such factors appear to be a prudent approach and an appropriate interpretation of the information collected. While the Dun & Bradstreet report did ascribe some financial risk to the Viisage position, it did not consider the position alarming.
   b. Viisage also demonstrated its ability to perform through the ability to purchase a $3 million performance bond.
   c. The documentation submitted by the Protestor to support this allegation was insufficient because, while the SEC Form 10-K does demonstrate a substantial reduction in profitability for Viisage in 2002, that document does not demonstrate the alleged trend that would make Viisage an irresponsible offeror.
   d. I find that the documentation submitted by the Protestor to support this allegation does not change the reasonableness of the evaluation team's conclusion that Viisage has the necessary financial ability to perform.


I.B **Allegation: Viisage Lacks The Overall Ability To Perform Crucial Aspects Of The Contract.**
   a. *As a summary of allegations I.B.(i) through I.B.(vii) Viisage has never installed a similar distributed license system in N. America.*


9

**Decision**
**Protest Of Digimarc ID Systems**

**Finding:    The allegation is not adequately supported.  Viisage met the requirement that it have installed at least one similar distributed digital license system in N. America.**

    a.  In support of allegation I.B., the Protestor alleges that Viisage cannot perform because it has not installed systems in other states which match seven very detailed RFP requirements [I.B.(i) – back-up card production; I.B.(ii) – central license production; I.B.(iii) – fingerprint capture, storage and matching; I.B.(iv) – image database conversion; I.B.(v) – point of sales system; I.B.(vi) - mailer; I.B.(vii) – central image system].  That is, to meet the RFP's requirement for having installed a similar system, Viisage must have installed a system which meets each of the seven detailed requirements chosen by the protest.  By implication, the protest asserts that to pass the RFP requirement of having installed a *similar* system, an offeror must have previously installed a nearly *identical* system.  This hypothesis is not valid because:

       i.  The desired Georgia system is unique.  Therefore, it would be impossible for any offeror to have previously installed an identical system.

      ii.  DMVS has the discretion to determine what is a similar system and what is not.  It clearly established the baseline for defining a similar system when it outlined desired core components in RFP paragraphs 1.1 and 2.7.1 *et seq.*:

> *At a minimum, it is envisioned that the proposed solution resulting from the RFP will:*
> 1. *Replace current Digitized License System with all hardware and software required to support production of an over-the-counter Temporary DL/ID and a centrally produced Permanent DL/ID.*
> 2. *Replace the Central Image System, including hardware and software.*
> 3. *Provide Site hardware and software to meet the specifications detailed in each applicable area.*
> 4. *Provide printers that meet all requirements to produce the Temporary DL/ID and other paper documents defined in this proposal.*
> 5. *Use industry current operating systems for Workstations and servers.*

      iii.  The evaluation team confirmed through the American Association of Motor Vehicle Administrators (AAMVA) and reference checks that Viisage has installed at least one system that uses central issuance and at least four states with greater volumes than or equivalent volumes to Georgia.

      iv.  I find the team exercised proper discretion in defining what is a similar system, conducted an appropriate level of review of Viisage's response to the associated RFP requirement,

**Decision**
<u>**Protest Of Digimarc ID Systems**</u>

applied its standard fairly, and appropriately concluded that Viisage's related experience is satisfactory.

b. Notwithstanding that these several allegations relate to system features which would not necessarily be included in a "similar system," all allegations were considered. As noted in the following corresponding findings, I find none of these allegations to have merit.

**(i) Allegation: Viisage Cannot Provide the Required Back-Up Card Production**

a. *Viisage lied when it stated that it has a backup agreement with Arthur Blank & Co..*

b. *Viisage lied when it stated that it has the equipment, experience, servers or security items to produce the cards.*

**Finding: The allegation is not adequately supported. Viisage demonstrated that it has a backup agreement with Arthur Blank & Co., and it is reasonable to conclude that Viisage has the ability to provide the required back-up card production.**

a. The allegation did not present documentation to support its assertion that no agreement exist between Arthur Blank & Co. and Viisage, that Viisage lied when it stated that such agreement exists, or that Arthur Blank & Co. cannot provide the service.

b. The Viisage response to the protest included evidence of an agreement with Arthur Blank & Co.

c. I find that Arthur Blank & Co. can provide back-up card production. RFP back-up card production requirements were in RFP paragraphs 3.9.1.8, 15 and 17 and also in immediately subsequent requirements on disaster recovery, as well as a written response to an offeror inquiry at the offerors' conference. The evaluation team assessed offerors' responses only to **these** requirements. All proposals were reviewed based on the same standard. Based on that standard, the evaluation team found Viisage's response to the RFP's back-up requirements to be satisfactory.

d. I find the protest's allegations to be unsupported.

    i. The RFP portion cited by the allegation, p. 44, addresses two requirements that have nothing to do with back-up – par. 3.8.13, Terminal Emulation Mode, and par. 3.8.14, Workstation and Network Interaction. In fact, no requirement from page 42 through page 46 appears to apply to back-up for central printing of cards.

    ii. The RFP section to which the allegation quotes Viisage as responding, par. 3.3.4 *et. seq.* on p. 19, does not have any backup requirement either. The evaluation team did not consider the Viisage back-up statements in Viisage's response to par. 3.3.4 *et. seq.* for meeting either the RFP

**Decision**
**Protest Of Digimarc ID Systems**

requirements in section 3.3.4 or in meeting the RFP back-up requirements in paragraphs 3.9.1.8, 15 and 17 *et seq.*

### (ii) Allegation: Central Issue Production of Drivers' Licenses

a. *Viisage has never installed a system similar to Georgia's required system.*

b. *The only system installation (Mass) was not similar. That system generated 44% less documents than Ga. which constitutes a material difference in scope, complexity, and relevant experience.*

c. *Viisage has never produced a card meeting the RFP's specifications (one containing a teslin core and/or one laminated with 3M product).*

**Finding: The allegation is not adequately supported. It is reasonable to conclude from the Viisage proposal and due diligence of the evaluation team that Viisage has the ability to provide the required central issue production of drivers' licenses.**

a. The RFP seeks to obtain a unique system for Georgia, while the protest's definition of "similar" appears to be "identical." No state or North American country has a system which is "identical" to the one required in the RFP.

b. The production size differential between Massachusetts and Georgia alleged in the protest, if true, is not in of itself sufficient to conclude that the associated central issue production capability was dissimilar.

c. The evaluation team exercised proper discretion in defining what is a similar system, conducted an appropriate level of review of Viisage's response to the associated RFP requirement, applied its standard fairly, and appropriately concluded that Viisage's related experience is satisfactory.

d. Viisage demonstrated first-hand an ability to produce a teslin core, laminated card meeting the RFP's specifications during its presentations to the evaluation team.

### (iii) Biometrics Technology

#### A. Allegation: Fingerprint Capture/Storage

a. *Viisage has never implemented fingerprint capture and storage in N. America.*

**Finding: The allegation is not adequately supported. It is reasonable to conclude that Viisage has the ability to meet the RFP's requirements for capturing and storing fingerprints.**

a. Viisage proposed a subcontractor, SAGEN Morpho, to meet the RFP's fingerprint capturing and storing requirements. As required by the RFP, Viisage indicated it would comply with each

**Decision**
**Protest Of Digimarc ID Systems**

requirement and described how it would do so. The evaluation team reasonably concluded that Viisage, through its subcontractor, has implemented similar fingerprint capture/storage capabilities.

**B. Allegation: Fingerprint Matching, 1 to 1**
   a. *Viisage has never implemented the matching of applicant fingerprints against database fingerprints.*

   **Finding: The allegation is not adequately supported. It is reasonable to conclude that Viisage has the ability to meet the RFP's requirements for matching applicant fingerprints against database fingerprints.**
   a. Viisage proposed a subcontractor, SAGEN Morpho, to meet the RFP's fingerprint matching requirements. As required by the RFP, Viisage indicated it would comply with each requirement and described how it would do so. The evaluation team reasonably concluded that Viisage, through its subcontractor, has implemented similar fingerprint matching capabilities.

**(iv) Allegation: Image Database Migration**
   a. *Viisage has never completed an image database conversion of the size and complexity required by Georgia.*
   b. *Viisage has never implemented a solution requiring the use of fingerprints and has never accomplished such a conversion and re-extraction.*

   **Finding: The allegation is not adequately supported. It is reasonable to conclude that Viisage has the ability to meet the RFP's requirements for image database migration.**
   a. This allegation is erroneous because Viisage just migrated a Digimarc digital database in Mississippi (picture and signature, but not fingerprint). It was reasonable for the evaluation team to conclude that this was a sufficient indication that Viisage has performed similar database migrations/conversions.
   b. The database size differential alleged in the protest, if true, is not in of itself sufficient to conclude that the associated migration was dissimilar.

**(v) Allegation: Point of Sales (POS) System**
   a. *Viisage changed POS system subcontractors to one (CenterStage) which does not have a commercial off-the-shelf Fee Collection and Cash Management Product.*
   b. *CenterStage does not list any government agency as a client. Therefore, CenterStage (and, by extension, Viisage) does not have a similar implementation of a POS system.*

**Decision**
**Protest Of Digimarc ID Systems**

> c. *The evaluation team inappropriately rated as excellent Viisage's noncompliant proposal to meet the related criterion.*

**Finding: The allegation is not adequately supported. Viisage did not violate GTA rules or RFP procedures when it changed subcontractors; GTA did not violate GTA rules or RFP procedures when it failed to disqualify Viisage for changing subcontractors; the failure of CenterStage to list any government agency as a client is immaterial as to whether it can provide an acceptable POS service; it is reasonable to conclude that Viisage has the ability to meet the RFP's point of sales system requirements.**

a. GTA rules do not prohibit an offeror from substituting subcontractors either during a procurement or after an award. The RFP did not require that subcontractors be approved as a condition of award. The evaluation team took prudent steps to review the new subcontractor's capabilities.

b. The protest did not present evidence sufficient to demonstrate that the subcontractor does not have a compliant product. Documentation submitted to support this allegation (information from a website) was incomplete. Additional information on the website described the subcontractor's partner's product in enough detail to refute the allegation.

c. The allegation's assertion that CenterStage's failure to list a government agency as a client supports a conclusion that CenterStage (and, by extension, Viisage) does not have a similar implementation of a POS system is immaterial because:

  i. As discussed in the finding for allegation I.B, a POS system is not a core component described in RFP paragraphs 1.1 and 2.7.1 *et seq.* Therefore, it would not be considered in the definition of what is or is not a "similar system."

  ii. A POS system, by its definition, serves a business function, not a government one. There was no requirement for the evaluation team to consider whether an offeror had implemented a government application, only a need to determine how well the proposed system would meet the RFP's requirements.

d. It is reasonable to conclude that the evaluation team acted appropriately in evaluating the Viisage POS system proposal as excellent:

  i. The original POS process proposed by Viisage was deemed superior to that proposed by Digimarc in that the Viisage solution would add only a card swipe to each work station, while the Digimarc proposal would require the addition of an entire work station. Many DMVS sites do not have the room to add a sufficient number of work stations to be able to

14

**Decision**
**Protest Of Digimarc ID Systems**

    match their present productivity. Also, the Digimarc process would be far less efficient, requiring more time per applicant to process. The Digimarc proposal would require DMVS to use more staff to process the same number of transactions, which would increase DMVS's operating cost.

    ii. Digimarc indicated in its proposal that it would require an additional 8½ months to install its POS system. Viisage would not need this extra time.

    iii. The new Viisage subcontractor's system includes all features and advantages of the original subcontractor's system. Additionally, the new subcontractor's system includes significant features not present in the original subcontractor's system (capability for full integration with the state's accounting system, and web-based access to required reports) which were not considered in the final evaluation.

**(vi) Allegation: Mailer**

    a. *The mailer proposed by Viisage will not work because it cannot be driven by barcode nor does it have adequate capacity.*

**Finding: This allegation is moot because DMVS decided not to select a mailer option.**

**(vii) Allegation: An Inadequate Central Image System Has Been Proposed.**

    a. *The image system proposed by Viisage is inadequate because it does not have adequate capacity (by 1/3 to 1/2) and will not meet availability requirements.*

**Finding: The allegation is not adequately supported. It is reasonable to conclude that Viisage has the ability to meet the RFP's requirements for a central image system.**

    a. The protest cited "Exhibit H, pp.214, 267" for support. However, there were no pp. 214 or 267 in either of the Exhibit H tabs provided with the protest, nor was there a p. 214 in the "Exhibit M" tab which might have been part of one of the H tabs. Although an Exhibit M, p. 267 existed, the information on this page did not have anything to do with a central imaging system.

    b. Nonetheless, I sought to determine the merits of the allegation assuming Digimarc had provided the Viisage proposed central imaging system as an exhibit. The evaluation team reported that it reviewed the proposed system's and hardware's specifications in detail and concluded that Viisage was offering "…an enterprise class system, used a scalable hardware architecture, and appeared to be in support of the functional requirements." When the team

**Decision**
**Protest Of Digimarc ID Systems**

found inconsistencies, it required Viisage to respond to clarifications. Based on the technical proposal, technical product specifications from Compaq, and the subsequent clarifications from Viisage, the evaluation team found the proposed Central Image System to be compliant in supporting the underlying service requirements outlined in the RFP. The team's response to this allegation demonstrates a prudent approach to evaluating the Viisage response to the associated requirement and a reasonable conclusion that Viisage could perform as required.

I.C    Allegation: **Viisage Cannot Lawfully Provide Promised Card Features**

a. *Viisage does not have patent rights to print the licensee signature as part of the photo, nor to use digital watermarking to convey authentication information, so Viisage cannot provide the specified card.*

Finding:   **Viisage demonstrated in its response to the protest that it can comply with the RFP's requirements without infringing on Digimarc patents.**

a. Viisage proposed seven other features to meet the RFP's security requirement which would be met by printing the licensee signature as part of the photo. The evaluation team found that any of the other seven would meet the RFP requirement.
b. Viisage proposes lawfully meeting the RFP's required card features through a process for overlaying signature and photo using two separate images.
c. DMVS chose not to implement digital watermarking which was an optional RFP provision. The related allegation is therefore moot.

**Allegation II: The GTA/DMVS Applied Undisclosed, Inconsistent Evaluation Procedures**

II.A    Allegation: **Viisage Afforded Opportunity to Clarify "Unacceptable Scores and to Make an Extra Demonstration**

a. *Viisage was given an opportunity to correct unsatisfactory ratings not afforded to Protestor.*

II.B    Allegation: **Viisage Was Unfairly Given Additional Time.**

a. *Viisage was given four additional weeks (from Oct. 15 to Nov. 12) that were not given to Digimarc to provide conforming test documents.*
b. *The RFP did not define the requirements for the temporary ID document. Oral requirements for card and testing changed after each submittal.*

**Decision**
**Protest Of Digimarc ID Systems**

> c. *Viisage was able to conduct its own test of card compliance with*
>   *specifications.*

Finding:   **These allegations are not adequately supported.  Protestor**
**was treated fairly, and the processes followed complied with state**
**law, GTA rules and the RFP.  Specifically, Viisage was not given any**
**opportunities which were not given to Digimarc to remedy**
**noncompliant cards or to increase its score in any other way.**
**Viisage's temporary card was submitted, tested and found compliant**
**prior to BAFO instructions being distributed.**

> a. Viisage's permanent card was compliant after the August 26
>    submission.  All offerors were instructed to resubmit temporary
>    cards on that date, so there was no favoritism shown to any
>    one offeror.
> b. Viisage's temporary card was compliant before BAFO
>    instructions were issued to the offerors on Oct. 8.  Viisage was
>    therefore not required to have its card tested again at BAFO.
>    Protestor was given an opportunity to have its card tested at
>    BAFO.
> c. Viisage's entire proposal, including its temporary card, was
>    compliant no later than Oct. 25, at the time Viisage was
>    determined to be the apparent successful offeror, and before
>    the final presentation by Viisage on Nov. 12.
>    > i. The team's conclusion -- formulated after the BAFO
>    >    evaluation during the period of Oct. 16 to Oct. 25 -- that
>    >    Viisage had a proposal superior to that of Protestor was
>    >    supportable because Viisage had a compliant proposal for
>    >    less than half the price of the Protestor proposal, was
>    >    clearly in the best interest of DMVS and the citizens of
>    >    Georgia.  Therefore, it was consistent with the letter and
>    >    intent of State law and GTA rules.  This judgment, and the
>    >    determination that Viisage was the apparent successful
>    >    offeror, was documented in the DMVS Commissioner's
>    >    letter of Oct. 28 to the GTA Acquisition Management
>    >    Director.
>    > ii. The protest's Exhibit K document was a summary produced
>    >    after Nov. 12 (the date of the Viisage final demonstration) of
>    >    the Oct. 25 reports which were demonstrably written *prior to*
>    >    Viisage being instructed to make its final demonstration.
>    > iii. By reviewing the Oct. 25 reports, it is clear that Viisage had
>    >    a compliant proposal, *including temporary card*, at that time:
>    >    > (a) There is no mention of the Nov. 12 demonstration.  The
>    >    >    sentence in protest Exhibit K reading, "Viisage provided
>    >    >    complete temporary DL/ID documents during the final
>    >    >    demonstration conducted on Nov. 12, 2002," is not
>    >    >    present in the Oct. 25 report.

**Decision**
**Protest Of Digimarc ID Systems**

(b) The quote in the allegation, "All 'unsatisfactory' ratings identified during the evaluation of the initial proposal were rectified during the resubmission and clarification phases," does appear in the Oct. 25 report and clearly refers to the BAFO results on Oct. 15.

iii. The Commissioner's Oct. 28 request "...that a demonstration of the complete system be given by Vissage [*sic*] as soon as possible..." was made at the recommendation of GTA and was not to give Viisage an extra, unfair opportunity, but to exercise one final act of due diligence in confirming conclusions already drawn. This fact is evidenced by other statements in the Commissioner's letter such as:

> *These evaluations [attached to his letter] demonstrate that the Viisage proposal is judged to be superior to the Digimarc proposal. When this evaluation is combined with the huge difference in the price per card included in the best and final offer, it is clear to us that Viisage is the apparent winner.*

> *...Assuming a successful demonstration, DMVS would like to immediately begin contract negotiations [with Viisage].*

iv. This additional confirmation by DMVS and GTA constituted performing due diligence based on the rank ordering of proposals in the order of evaluation results at the conclusion of a phase (in this case the BAFO). This action was not prohibited in pars. 5.5.2. and 5.6. on pp. 87 and 89, respectively, of the RFP. At best, this action afforded an opportunity to observe all of the proposed system in operation at the same place at the same time. At worst, it was a harmless error.

d. I find that:

i. Between the evaluation team and the offerors, there clearly was some difficulty in having the offerors submit temporary license samples which met evaluation team approval. Whether that difficulty was primarily the department's inability to clearly communicate its needs or the offerors' inabilities to understand the needs, this process appears to have been trying for all involved. However, the original requirements for both the temporary and the permanent cards identified in the RFP were not changed during the procurement. It was a solution-based procurement.

ii. After the Aug. 26 tests in which none of the offerors submitted a compliant card, the state did issue more detailed guidelines including a description of tests applied by the evaluation team, but the state did not change the requirements. These communications on Sep. 16 requiring offerors to submit more

18

**Decision**
**Protest Of Digimarc ID Systems**

sample temporary cards on Sep. 26 (Viisage) and 27 (Digimarc)
were acknowledged in the affidavit to the protest.

   iii. Viisage was required to present a clarification to its September
27 samples on Oct. 7. Digimarc was required to present new
samples with its BAFO on Oct. 15.

  e. I find that:

    i. The evaluation team properly exercised its discretion in defining
requirements for a temporary license.

    ii. Requirements for the temporary card never changed, and they
were never issued orally, although the Commissioner did
provide all offerors with clarifying instructions on August 14. All
testing requirements were issued in writing.

    iii. There is no evidence that DMVS or GTA provided any guidance
or information to any offeror that gave an offeror unfair
advantage. Until September 16, offerors were provided
identical information. After September 16, offerors were
provided identical general guidance and information on
deficiencies specific to each offeror's submitted samples.

    iv. The September 16 communication to each offeror very clearly
communicated DMVS requirements for the temporary licenses
and the tests to be used to assess compliance.

  f. I find that the evaluation team documented in its evaluation and
later stated that it conducted all ten tests on the Viisage samples
both on Sep. 26 and on the single card submitted on Oct. 7. The
allegation submitted no evidence that this was not the case.

**Allegation III:**   **Viisage Failed to Comply with Mandatory RFP Requirements**

   *a. Viisage did not meet mandatory requirement to provide at least one
"category 3" security feature. The only feature proposed by Viisage
for that category is actually a "category 2" feature. The evaluation
team inappropriately gave Viisage a high mark for this
noncompliance.*

   *b. Viisage did not meet the mandatory requirement to provide a POS
system because Viisage's proposed POS system is not compliant.
Viisage did not meet the mandatory similar license system
experience requirements. The evaluation team did not mark down
Viisage for this noncompliance, thereby failing to adhere to
mandated reductions in evaluation scoring, indicating an arbitrary
and capricious decision.*

   **Finding: These allegations are not adequately supported. Viisage
has the ability to meet the RFP's requirements for a category 3
security feature. See the related findings for Viisage's proposed
POS system on pp. 12-13. Rather than acting arbitrarily and**

19

**Decision**
**Protest Of Digimarc ID Systems**

capriciously, there is every indication that the evaluation team
acted prudently and arrived at supportable conclusions.

a. A category 3 security feature is defined in RFP par. 3.5.5.3.3 (c) as
one which is "...covert and can only be verified by Examiners
having extensive knowledge and through the use of special
equipment.").

b. Viisage's proposed category 3 feature would use dynamic text that
can be related to the individual originally issued the document and
that can only be verified by an individual:
   o having access to the DMVS system,
   o having access to a decoding tool, knowing where to look on the
     document, and
   o knowing what to look for.
This certainly seems to meet the RFP requirement.

c. The evaluation team noted that the Viisage proposed solution was
closer to a category 3 feature than was the Digimarc proposal of
printing randomly placed images (the same image in every spot on
each and every license) in infrared ink on the card's laminate
covering. Although requiring a special tool, this feature would not
require an individual to have nearly the same level of knowledge for
verification as the Viisage feature would require.

**Allegation IV:**    **The GTA/DMVS Failed to Conduct a Proper Evaluation**
   *a. The RFP requires a determination of price realism which the*
   *evaluation team could not have done based on Protestor's*
   *calculation that Viisage's operating cost would be 67% higher than*
   *revenues.*
   *b. The evaluation team's award was capricious in that the team did*
   *not know if the costs for providing document scanning were*
   *included in Viisage's base price at the time of award.*

**Finding:    The allegation is not adequately supported. GTA and DMVS**
**conducted a proper evaluation and made an award supported by the**
**results thereof.**

a. The allegation is incorrect in its assertion that "by specific
definition...GTA/DMVS was required to conduct a cost realism
analysis to ensure that the amount being charged had a proper
economic basis to ensure that Georgia would not make a contract
award to a vendor who will have to operate at a loss..." The
"specific definition" to which the allegation refers in no way defines
price realism, let alone does it mandate the type of action asserted
by the allegation.

b. RFP procedures in sections 4 (Proposal Submission) and 5
(Evaluation) neither use the terms "price realism" or "cost realism,"
nor do they address in any other terms the type of analysis
discussed in the allegation. Furthermore, the only use in the RFP

**Decision**
**Protest Of Digimarc ID Systems**

of the term "price realism" occurs in RFP Appendix D. Neither Section 4 nor Section 5 references or incorporates Appendix D.

c. The National Institute of Governmental Purchasing, the recognized authority for procurement officials in all branches of government, does not define the term.

d. GTA has a history of sometimes using the term "price realism" to mean a determination that the agency can afford the product. DMVS can afford the product.

e. For all these reasons I find the evaluation team properly exercised its discretion in determining the amount of information required to make a responsible decision and that it conducted a proper evaluation.

f. The allegation's assertion that the evaluators did not know whether Viisage's price included the cost of document scanning is demonstrably false. The team demonstrated with a signed Viisage statement that the team did know that this cost was included prior to awarding the contract.

_____          _____

Charles R. Freedman                              Date
Protest Decisionmaker

21

# Exhibit 8

07/31/03  15:06 FAX 404 657 32⎽⎽    GA DEPT OF LAW                              🖾002/006
                                                                    PAGE  02/06
                                              JUDGE THELMA MOORE

07/31/2003  15:29    4047300162

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

FILED IN OFFICE
JUL 3 1 2003
DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

DIGIMARC ID SYSTEMS, LLC,

      Plaintiff,

vs.

GEORGIA TECHNOLOGY AUTHORITY and
the GEORGIA DEPARTMENT OF MOTOR
VEHICLE SAFETY,

      Defendants.

Civil Action No. 2003CV66498

## ORDER ON PLAINTIFF'S MOTION FOR INTERLOCUTORY INJUNCTION

    This matter came before the Court on the motion by Plaintiff Digimarc ID Systems, LLC

("Digimarc") filed on May 20, 2003, seeking to enjoin further implementation of and

performance under a contract dated November 12, 2002 between Viisage Technology, Inc.

("Viisage") and Georgia Department of Motor Vehicle Safety ("DMVS"), arising out of the

procurement process engaged in by the Georgia Technology Authority ("GTA") on behalf of

DMVS in connection with RFP No. GTA000051 (the "RFP"). The parties fully briefed the

issues and presented oral argument to the Court on July 28, 2003. Having considered the parties'

briefs and the oral arguments presented by counsel, as well as the pleadings and discovery on file

with the Court, the Court finds as follows:

### FINDINGS OF FACT

1.    The RFP was issued on May 24, 2002 seeking proposals from vendors for the provision

      of a new drivers' license and identification card system for Georgia. Proposals were

      received from three Offerors on July 19, 2002, including Plaintiff.

07/31/03  15:07 FAX 404 657 3_.9     GA DEPT OF LAW                              ☒003/006
                                                                          PAGE  03/06
07/31/2003  15:29   4047300162                 JUDGE THELMA MOORE

2.   The method of source selection in this two-step procurement was the "trade-off or
     ranking method."

3.   There is substantial evidence that the Evaluation Team opened the Offeror's Price
     Proposals prior to completing the evaluation of the Offeror's Technical Proposal, thus
     violating the Georgia Technology Authority Rules governing the use of the "trade-off or
     ranking method" of source selection.

4.   Defendants presented no evidence that the Evaluation Team properly sought or received a
     waiver of Georgia Technology Authority Rules under GTA Rule 665-1-2.04.

5.   There is substantial evidence, particularly the deposition of George Theobald, that the
     Evaluation Team, despite having questions about Viisage's submission, failed to take any
     action to verify or otherwise confirm:

     (a)   that the samples of permanent cards from the state of New York submitted by
           Viisage as representative of its permanent card solution (which was ultimately
           chosen by the Evaluation Team) were "production quality," or

     (b)   that Viisage's representations that it could produce similar cards if awarded the
           contract were true.

6.   There is substantial evidence that the Evaluation Team, after prematurely opening the
     Price Proposals, conducted the remainder of the procurement in a manner that unfairly
     favored Viisage.

7.   The contract was awarded to Viisage on or about November 12, 2002.

8.   Plaintiff filed a timely protest of the decision on November 26, 2002. The GTA Protest
     Decisionmaker rendered his decision denying Digimarc's Protest on February 17, 2003.

9.   Plaintiff timely filed the Complaint in this action on March 5, 2003.

10.    Plaintiff moved for Expedited Discovery on March 7, 2003.

11.    This Court held a hearing on Plaintiff's Motion for Expedited Discovery on April 1, 2003.

12.    This Court entered an Order for Expedited Discovery on April 7, 2003.

13.    Defendants produced documents and answered interrogatories on or about April 16, 2003.

14.    Plaintiff filed its Motion for Interlocutory Injunction on May 20, 2003.

15.    The facts and issues presented by Plaintiff's Complaint and Motion are particularly complicated.

16.    The implementation of the new drivers' license and identification card system is scheduled to begin on August 11, 2003.

17.    The successful Offeror, Viisage Technology, Inc., has not intervened in this case and, therefore, has not asserted an interest in avoiding delay in implementing the new drivers' license system.

18.    If Plaintiff's allegations regarding the opening of the Price Proposals and other irregularities are proved, the integrity of the entire procurement process could be damaged.

19.    Plaintiff's only remedy at law is the cost of preparing its proposal, leaving it practically remediless absent an injunction.

## CONCLUSIONS OF LAW

1.    The Court is concerned in this matter about the issue of whether the State received the "best value," as that term is defined in the Rules of the Georgia Technology Authority, for its Digitized License System.

2.  In light of the complexity of the issues presented, the Court finds that the Plaintiff's

    Motion for Interlocutory Injunction was timely filed.

3.  The Plaintiff has made a compelling case that irregularities occurred during the

    procurement process, and if the case proceeds to a full trial on the merits, there is a

    substantial likelihood that the Plaintiff will prevail.

4.  Absent injunctive relief, Plaintiff is without an adequate remedy.

5.  If the Court does not grant an injunction, the integrity of the procurement process in

    Georgia could be damaged.

    Therefore, IT IS HEREBY ORDERED that:

    Plaintiff's Motion for Interlocutory Injunction is GRANTED, and Defendants GTA and

DMVS are enjoined from all further activities related to implementation of or performance under

the contract dated November 12, 2002 between Viisage and DMVS, arising out of the

procurement process engaged in by GTA on behalf of DMVS in connection with the RFP until

further order of this Court.

    The Court will schedule a conference with counsel for the parties to discuss the

remaining discovery schedule and a possible trial date in order to schedule a full trial on the

merits as expeditiously as possible.

    SO ORDERED this 30th day of July 2003.

                                    Judge Thelma Wyatt Cummings Moore
                                    Fulton County Superior Court

4

07/31/03  15:08 FAX 404 657  ┴  ┘    GA DEPT OF LAW                    ✐006/006
07/31/2003  15:29    4047300162    JUDGE THELMA MOORE    PAGE  05/06

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

DIGIMARC ID SYSTEMS, LLC,

       Plaintiff,

vs.

GEORGIA TECHNOLOGY AUTHORITY and
the GEORGIA DEPARTMENT OF MOTOR
VEHICLE SAFETY,

       Defendants.

Civil Action No. 2003CV66498

### CERTIFICATE OF SERVICE

This is to certify that I have this day served the within and foregoing **Digimarc's**

**Response to Defendants' Motion for Findings of Fact and Conclusions of Law** upon all

parties to the above-captioned action by hand delivery addressed to:

      Emily P. Hitchcock
      John Ballard
      Office of the Attorney General
      40 Capitol Square SW
      Atlanta, GA. 30334-1300

This 30th day of July 2003.

                                   John P. Hutchins

MCKENNA LONG & ALDRIDGE LLP      *Attorney for Plaintiff*
303 Peachtree Street, Suite 5300      *Digimarc ID Systems, LLC*
Atlanta, GA  30308
(404) 527-4000
(404) 527-4198 (facsimile)

# Exhibit 9

IN THE SUPERIOR COURT OF FULTON COUNTY

STATE OF GEORGIA

| | | |
|---|---|---|
| **DIGIMARC ID SYSTEMS, LLC,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Civil Action No. 2003CV66498 |
| **GEORGIA TECHNOLOGY** | ) | |
| **AUTHORITY and the GEORGIA** | ) | |
| **DEPARTMENT OF MOTOR VEHICLE** | ) | |
| **SAFETY,** | ) | |
| | ) | |
| Defendants. | ) | |

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
OR IN THE ALTERNATIVE TO ADD AN INDISPENSABLE PARTY**

**I. STATEMENT OF THE CASE**

On May 24, 2002, the Georgia Technology Authority ("GTA"), on behalf of the

Department of Motor Vehicle Safety ("DMVS"), issued Request for Proposal GTA000051

("RFP"), the purpose of which was to engage the services of a qualified vendor to provide a new

digitized drivers' licensing system for the State of Georgia. Record of the Proceedings

(hereinafter cited as "R."), Tab 3, Protest Decision p. 1. In the RFP, the DMVS sought a

qualified vendor to provide the new Digitized License System, to assist in minimizing costs, to

improve the level of performance, and to furnish new technology. Id. After a thorough

evaluation of the proposals submitted by three vendors, GTA and DMVS issued the Notice of

Award to Viisage Technology, Inc. ("Viisage"). R., Tab 3, Protest Decision pp. 2-6. Thereafter,

Viisage and DMVS entered into a contract dated November 12, 2002 (the "Contract") pursuant

to which Viisage is to provide Georgia with a new Digitized License System. Response to Motion for Interlocutory Injunction (hereinafter cited as "Resp."), Exh. 17.

Plaintiff, a disgruntled bidder and the incumbent provider of Georgia's drivers' licensing system, filed a protest of the award of the Contract to Viisage, which protest was decided adversely to Plaintiff. R., Tab 3, Protest Decision p. 6. Plaintiff filed the Complaint on March 5, 2003. On May 20, 2003, Plaintiff filed a motion seeking to enjoin further implementation of and performance under the Contract. On July 31, 2003, the Court entered an Order on Plaintiff's Motion for Interlocutory Injunction (the "Order"), which enjoined GTA and DMVS "from all further activities related to implementation of or performance under the contract."

## II. FACTUAL BACKGROUND

The defendant entities and Viisage completed the vast majority of the work required to create Georgia's new Digitized License System prior to the entry of the Order. Resp. pp. 3-6. Implementation of the Digitized License System required both the GTA and the DMVS to invest substantial time and tax dollars to assure that it integrated with the DMVS' technology. Id. The vendor, Viisage, necessarily made the greatest expenditures. Subsequent to the entry of the Order, Elliot J. Mark, General Counsel for Viisage, informed the undersigned counsel of record for the GTA and DMVS that Viisage had incurred approximately $7.7 million in costs under the Contract prior to the entry of the Order. Exh. A, Attachment 1.

## III. ARGUMENT AND CITATION OF AUTHORITY

GTA and DMVS assert that "equity and good conscience" require this action not proceed without Viisage being named as a party. O.C.G.A. § 9-11-19(b). Specifically, O.C.G.A. § 9-11-19 mandates the joinder of persons needed for a just adjudication. GTA and DMVS, for the reasons outlined below, state that if joinder of Viisage is not feasible, proceeding with this action

2

would prejudice GTA, DMVS and the State of Georgia in a way that could not be avoided or

lessened by protective provisions in a judgment and that the judgment rendered by the Court

would be inadequate. A judgment rendered in Viisage's absence also will be prejudicial to

Viisage, which prejudice can easily be avoided by joining Viisage. Finally, GTA and DMVS

assert that Plaintiff would have adequate relief in the event of a dismissal for nonjoinder and that

it was Plaintiff's choice and decision not to name Viisage to the action in the first place. These

factors support a ruling by this Court that this action should be dismissed in the event Viisage

cannot feasibly be joined to this action pursuant to O.C.G.A. § 9-11-19(b).

Since GTA and DMVS are not currently aware of any reason why Viisage cannot be

joined to this action by the Plaintiff, as an alternative to dismissal, GTA and DMVS assert that

O.C.G.A. § 9-11-19 (a) applies. It provides in pertinent part that:

> A person who is subject to service of process shall be joined as a party in the
> action if:
> . . .
>> (2) He claims an interest relating to the subject of the action and is so
>> situated that the disposition of the action in his absence may:
>>> (A) As a practical matter impair or impede his ability to protect that
>>> interest; or
>>> (B) Leave any of the persons who are already a parties subject to a
>>> substantial risk of incurring double, multiple or otherwise
>>> inconsistent obligations by reason of his claimed interest.
> If he has not been so joined, the court shall order that he be made a party. . . .

In the instant case, Viisage is a necessary party within the parameters of O.C.G.A. § 9-11-

19(a)(2) and, therefore, this Court should order that Viisage be made a party to this action.


A. Equity and good conscience demand the dismissal of this action if Viisage is not named a
party.

A just adjudication of this action cannot be achieved without the presence of Viisage, the

successful vendor, thereby requiring its dismissal if Viisage is not joined. Equity and good

conscience demand no less. In a challenge to a competitively procured government contract

such as this, the successful vendor's unique relationship to the controversy compels a finding that it is not only a necessary but also an indispensable party to the action if a disgruntled bidder seeks to enjoin the award of the contract. E.g., Credle v. East Bay Holding Co., 263 Ga. 907 (1994)(successful bidder, East Bay Holding Co., named as defendant); Amdahl Corp. v. DOAS, 260 Ga. 690 (1990)(IBM, the successful bidder, intervened as a necessary party); Hilton Constr. Co. v. Rockdale Co. Bd. Of Educ., 245 Ga. 533 (1980)(trial court ordered successful bidder, Cube Construction, be added as defendant). The question is not whether the Plaintiff seeks relief against Viisage but rather, whether Viisage has an interest relating to the subject and is so situated that the disposition of the action in its absence may as a practical matter impair or impede its ability to protect that interest. Hall v. Oliver, 251 Ga. App. 122, 123 (2001); Coe v. Greenville Credit & Inv. Co., 164 Ga. App. 521, 522 (1982). Here, Viisage has a *direct* interest in whether the Contract is declared null and void and its interests cannot be adequately protected in its absence.

In order to give finality to the litigation, and in the interest of justice, Viisage's rights should not be jeopardized without giving it an opportunity to be heard. If this Court grants an injunction without Viisage's being a party to the action, Viisage may later attack the judgment by filing a motion to vacate it or by filing an independent action. 42 AM. JUR. 2d Injunctions § 242 (2003. Neither consequence furthers judicial economy. A just and efficient adjudication of the issues presented can only be achieved if Viisage is joined as a necessary party pursuant to O.C.G.A § 9-11-19(a)(2) and failure to do so is grounds for dismissal of the action.

B. Viisage has an interest relating to the subject of this action and is so situated that disposition of the action in its absence will impede its ability to protest that interest.

An entity that is subject to service of process is to be joined as a party to an action if it has an interest relating to the subject of the action and is so situated that disposition of the action in

4

its absence may, as a practical matter, impair or impede its ability to protect that interest. O.C.G.A § 9-11-19(a)(2)(A). In the context of this litigation and its particular facts, Viisage is so situated. Viisage is a party to the Contract that Plaintiff seeks to have declared null and void and permanently enjoined. A determination by the Court that the Contract is illegal will materially affect Viisage's rights under the Contract. It is difficult to contemplate a more direct interest in the matter. As a practical matter, Viisage cannot protect this interest unless it is a party to the action. Hall v. Oliver, supra; Coe v. Greenville Credit & Inv. Co., supra.

In addition to Viisage's direct interest in the outcome of the case, the Complaint contains allegations that relate solely to Viisage's ongoing business interests. Plaintiff's Complaint contains, without limitation, the following allegations based on information and belief:

1. "this current Viisage price per card represents 67% of the estimated total cost of the components necessary to produce the ID Cards;" and

2. "Viisage will lose $0.516 for every ID Card it produces."

Complaint ¶129. Although the allegations are irrelevant to the merits of the case, the defendant entities are in no position to refute or otherwise challenge them. Viisage, on the other hand, not only is in sole possession the underlying facts, it also has an interest in protecting its pricing structure and other confidential business information, which might be valuable to its competitors, such as Plaintiff, separate and apart from the this action.

As a Pennsylvania court recently noted: "While the government entity awarding a bid may ordinarily be expected to wish to avoid having its contract upset, it is far from certain that in the crucible of litigation it will always zealously defend the interests of the prevailing bidder. Indeed, in some situations, it should not do so, for its duty is to its citizens and taxpayers, not its contract partners." Polydyne, Inc. v. City of Philadelphia, 795 A.2d 495, 496 (Pa. Commw. Ct.

5

2002). It is possible that such a conflict of interests will occur in the case at hand as certain

allegations potentially create a divergence between the interests of the defendant entities and

Viisage. Plaintiff alleges that specific actions taken by Viisage were improper. While the

defendant entities have no reason to believe that the allegations are true. should subsequent

disclosures cast doubt on the truthfulness of Viisage's proposal. their duty will lie with the

citizens and taxpayers of Georgia, not Viisage.

 Plaintiff's allegations include, without limitation, the following specific improper actions

or inactions by Viisage:

   1. "Viisage's further set of revised permanent ID cards were most likely printed by

    either laser Xerographic or fixed offset means and would not represent Viisage's

    'proposed means of production;'" and

   2. "the final card samples provided by Viisage were not even manufactured by

    Viisage."

Complaint ¶¶ 58 & 59; see also Transcript of Proceedings Before the Honorable Thelma Wyatt

Cummings Moore on July 28, 2003 at pp. 33-34 & 47; Deposition of G. Theobald pp. 311-313;

Exh. B (Order to Compel at Exh. A). Without admitting that the allegations are relevant even if

true, GTA and DMVS simply assert that only Viisage can refute or explain the allegations. More

importantly, Viisage has an interest in protecting its business reputation against any implication

that it acted improperly, which is not the primary concern of the GTA and DMVS. Therefore,

Viisage's interests cannot be fully represented without its presence in the litigation.

 Where, as here, the granting of relief to the Plaintiff will prejudice the rights of third

parties, and their rights cannot be saved by the judgment, the controversy cannot be justly

adjudicated without their presence. <u>Blanton v. Duru</u>. 247 Ga. App. 175, 177-78 (2000); <u>Glover</u>

<u>v. Allstate Ins. Co.</u>, 229 Ga. App. 235, 235-37 (1997).

<u>C. Viisage has an interest relating to the subject of this action and is so situated that disposition
of the action in its absence will leave the Defendants subject to a substantial risk of incurring
multiple or otherwise inconsistent obligations by reason thereof.</u>

Not only does Viisage's absence from the case impair its ability to protect its interests and

rights under the Contract, its absence will leave DMVS, GTA and the State of Georgia subject to

the substantial risk of incurring multiple or otherwise inconsistent obligations by reason thereof.

The Georgia Supreme Court rejected the doctrine of binding precedent, as distinguished from the

doctrine of stare decisis, in <u>Norris v. Atlanta & West Point R.R. Co.</u>. 254 Ga. 684 (1985).

Therefore, to the extent that Viisage has expended sums in furtherance of the Contract, <u>see</u> II.

Factual Background. <u>supra</u>. the disposition of this action without Viisage's presence leaves the

State of Georgia subject to the risk of inconsistent obligations if Viisage files suit on the

Contract. <u>Stenger v. Grimes</u>. 260 Ga. 838 (1991); <u>McCalla, Raymer, Padrick, Cobb, Nichols &</u>

<u>Clark v. C.I.T. Finan. Serv., Inc.</u>, 235 Ga. App. 95, 96 (1998), <u>limited on other grds by</u> <u>McCarter</u>

<u>v. Bankers Trust Co.</u>, 247 Ga. App. 129 (2000).

The rule requiring that all persons whose rights might be affected by a judgment be made

parties to the action is not simply one of practice or convenience. It is designed to give finality

to litigation. Here, a decision permanently enjoining performance under the Contract necessarily

raises the specter of a suit against the defendant entities by Viisage to determine if GTA and

DMVS are liable to Viisage for the monies Viisage expended in furtherance of implementation

of the Contract. The possibility of subjecting Georgia's taxpayers to the consequences resulting

from inconsistent obligations is grounds for ordering that Viisage be joined as a necessary party.

<u>J.M. Huber Corp. v. Georgia Marble Co.</u>, 239 Ga. App. 271, 276-77 (1999).

In Burt v. Board of Educ., 477 N.E.2d 247 (Ill. App. 3d Dist. 1985), an Illinois Appellate

Court examined the doctrine of joinder of indispensable parties in the government procurement

context. Recognizing that the successful bidder was a necessary and indispensable party, the

Burt court employed the following analysis:

> The action brought by [loosing bidder] was to determine the validity of the
> board's actions. . . . [Successful bidder] was awarded the contract and had all the
> benefits and rights under it. Though action by the board under the contract was
> restrained, the contract was presumed valid until declared otherwise. The award
> of the contract to a bidder will not normally be interfered with unless there is a
> showing of manifest injustice or palpable abuse of discretion. [Successful
> bidder's] interest was in a $297,000 contract. If a court held that the board could
> not go forward with the contract with [successful bidder], its rights would
> certainly be materially affected.
>
> [The successful bidder's] presence would also protect the interests of the board
> before the trial court. After the relief was granted below, [the successful bidder]
> filed suit. Inclusion of [the successful bidder] in the present case would help the
> board protect its own interests. It would also prevent issues from being
> relitigated. Although not an issue here, the trial court below wisely consolidated
> the two actions below. [The successful bidder's] inclusion would also lead to a
> final determination of the validity of the . . . contract, an important point in both
> actions. The one thing the overburdened court system does not need is two
> actions consecutively arguing the same issues. For the reasons stated, the
> inclusion of [the successful bidder] would also enable the lower court to make a
> complete determination of the controversy at hand.

Id. at 396 (citations omitted). Here, the same analysis applies: Viisage's absence will leave GTA

and DMVS subject to the risk of incurring multiple or otherwise inconsistent obligations.

Conversely, its presence in the case will permit a complete determination of the controversy.

Therefore, Viisage is a necessary party to this action.

## IV. CONCLUSION

Plaintiff alleges that the Contract by and between Viisage Technology, Inc. and the

Department of Motor Vehicle Safety is null and void and should have named Viisage

Technology, Inc. as a party to this action when it filed its Complaint. GTA and DMVS raised

the failure to name an indispensable party in their Answers to Plaintiff's Complaint. See GTA's

8

Second Amended Answer Fifteenth Defense and DMVS' First Amended Answer Fifteenth

Defense. Plaintiff elected not to name Viisage Technology, Inc. as a party to this suit as a matter

of convenience. Therefore, for the reasons outlined above, the Court should order a dismissal of

the case at hand or, in the alternative, require Plaintiff name Viisage Technology, Inc. as a party.

This 1st day of October, 2003.

Respectfully submitted,

THURBERT E. BAKER                    033887
Attorney General

DANIEL M. FORMBY                     269350
Deputy Attorney General

JOHN B. BALLARD, JR.                 035550
Senior Assistant Attorney General

EMILY P. HITCHCOCK                   357697
Assistant Attorney General

PLEASE ADDRESS ALL
COMMUNICATIONS TO:

EMILY P. HITCHCOCK
Assistant Attorney General
40 Capitol Square, S.W.
Atlanta, Georgia 30303
(404) 651-6249

9

# Exhibit 10



**IN THE SUPERIOR COURT OF FULTON COUNTY**
**STATE OF GEORGIA**

FILED IN OFFICE

NOV. - 7 2003

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

DIGIMARC ID SYSTEMS, LLC,

      Plaintiff,

vs.

GEORGIA TECHNOLOGY AUTHORITY and
the GEORGIA DEPARTMENT OF MOTOR
VEHICLE SAFETY,

      Defendants.

Civil Action No. 2003CV66498

## CONSENT ORDER ON DEFENDANTS' MOTION TO DISMISS OR IN THE ALTERNATIVE TO ADD AN INDISPENSABLE PARTY

The parties to this action agree that Viisage Technology, Inc. ("Viisage") is a "necessary party" to this action, as that term is defined by Georgia law. The parties further agree that Viisage can be added as a party because this Court has personal jurisdiction over Viisage.

THEREFORE, IT IS HEREBY ORDERED that Viisage be added as a party to this action. Plaintiff Digimarc will, by Tuesday, November 4, 2003, make a request to Viisage that Viisage join this action as a plaintiff, as contemplated by O.C.G.A. § 9-11-19(a). If Viisage refuses to join as a plaintiff by Friday, November 7, 2003, Digimarc will take the necessary action to join Viisage as an interested party defendant by Monday, November 10, 2003.

This Consent Order resolves the issues raised by Defendants' Motion to Dismiss or in the Alternative to Add an Indispensable Party.

SO ORDERED, this 7th day of November 2003.

Judge Thelma Wyatt Cummings Moore
Fulton County Superior Court

CONSENTED TO:

David L. Balser
Georgia Bar No. 035835
John P. Hutchins
Georgia Bar No. 380692
Valerie D. Barton
Georgia Bar No. 040832
McKenna Long & Aldridge LLP
303 Peachtree Street, Suite 5300
Atlanta, Georgia  30308
(404) 527-4000
(404) 527-4198  (facsimile)
*Attorneys for Plaintiff*

Emily P. Hitchcock  w/express permission vb
Emily P. Hitchcock
Georgia Bar No. 357697
Office of the Attorney General
40 Capitol Square SW
Atlanta, GA  30334-1300
(404) 651-6249
(404) 657-3239  (facsimile)
*Attorney for Defendants*

2

# Exhibit 11

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

FILED IN OFFICE

NOV - 7 2003

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

DIGIMARC ID SYSTEMS, LLC,               )
                                        )
        Plaintiff,                      )
                                        )
v.                                      )
                                        )    CIVIL ACTION NO. 2003CV66498
GEORGIA TECHNOLOGY AUTHORITY )
and the GEORGIA DEPARTMENT OF           )
MOTOR VEHICLE SAFETY,                   )
                                        )
        Defendants.                     )
_____)

## RESPONSE OF VIISAGE TECHNOLOGY, INC. TO CONSENT ORDER ON DEFENDANTS' MOTION TO DISMISS OR IN THE ALTERNATIVE TO ADD AN INDISPENSABLE PARTY

COMES NOW Viisage Technology, Inc. ("Viisage"), not presently a party to this action, and responds to plaintiff and defendants' Consent Order of November 3, 2003, concerning the entry of Viisage into this lawsuit, respectfully showing the Court as follows:

1.

If Viisage's entry assists the Court in resolving promptly this lawsuit, Viisage willingly enters this matter. This corporation asks only that its entry not delay the presently scheduled close of discovery and the setting of a trial date. The presently named parties and Viisage have significant economic interests at stake, and none of these are furthered by extending the deadlines which the Court presently has in place.

2.

In seeking to add Viisage as a party, neither Digimarc, Georgia Technology Authority, nor Georgia Department of Motor Vehicle Safety raised claims against Viisage. If any of these

three had colorable claims, each has had months to make them, and Viisage's entry into this lawsuit does not ripen or furnish grounds for any new or additional claims.

3.

Viisage likewise raises no claims at this time. Based on the information presently known to Viisage, any claims it may raise are contingent and derivative: if Viisage is prevented from performing its contract with the State of Georgia, however, this entity will assert legal and equitable claims for damages.

4.

Viisage believes the contract entered into between this party and the State of Georgia is valid and enforceable in all respects. As such, this entity's interests are more closely aligned with defendants than with plaintiff. As such, Viisage respectfully requests it be added as a defendant in this lawsuit, pursuant to O.C.G.A. § 9-11-19(a). A draft order is attached for the Court's consideration.

RESPECTFULLY SUBMITTED this __7th__ day of November, 2003.

Jameson B. Carroll
Georgia Bar No. 112640
Peter Crofton
Georgia Bar No. 197122
Robert C. Khayat
Georgia Bar No. 416981
King & Spalding LLP
191 Peachtree Street
Atlanta, GA 30303
(404) 572-4600
Fax (404) 572-5144

**ATTORNEYS FOR VIISAGE TECHNOLOGY, INC.**

- 2 -

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

DIGIMARC ID SYSTEMS, LLC,                    )
                                             )
          Plaintiff,                         )
                                             )
v.                                           )
                                             )     CIVIL ACTION NO. 2003CV66498
GEORGIA TECHNOLOGY AUTHORITY )
and the GEORGIA DEPARTMENT OF      )
MOTOR VEHICLE SAFETY,                  )
                                             )
          Defendants.                        )
_____)

### CERTIFICATE OF SERVICE

This is to certify that I have this day served the foregoing **RESPONSE OF VIISAGE**

**TECHNOLOGY, INC. TO CONSENT ORDER ON DEFENDANTS' MOTION TO**

**DISMISS OR IN THE ALTERNATIVE TO ADD AN INDISPENSABLE PARTY** upon

counsel of record in the above-captioned civil action by causing a true and correct copy of same

to be sent via U.S. mail, addressed to:

John P. Hutchins                    Emily P. Hitchcock
McKenna Long & Aldridge, LLP        Attorney General's Office
303 Peachtree Street, Suite 5300    40 Capitol Square, SW
Atlanta, Georgia  30308             Atlanta, Georgia  30303

This _____ day of November, 2003.

Jameson B. Carroll

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

DIGIMARC ID SYSTEMS, LLC,                   )
                                            )
    Plaintiff,                              )
                                            )
v.                                          )
                                            )       CIVIL ACTION NO. 2003CV66498
GEORGIA TECHNOLOGY AUTHORITY )
and the GEORGIA DEPARTMENT OF   )
MOTOR VEHICLE SAFETY,                       )
                                            )
    Defendants.                             )
_____)

### ORDER

    HAVING CONSIDERED the parties' November 3, 2003 Consent Order and Viisage's

response to this Order,

    IT IS HEREBY ORDERED and ADJUDGED that Viisage be added to this action as an

indispensable party, pursuant to O.C.G.A. § 9-11-19(a), and that it be designated a defendant.

    SO ORDERED, this ___ day of _____, 2003.

 

                                         _____
                                         Thelma Wyatt Cummings Moore
                                         Judge, Fulton County Superior Court

# Exhibit 12
# (Part 1 of 2)

**COPY**

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA



DIGIMARC ID SYSTEMS, LLC,

        Plaintiff,

v.

GEORGIA TECHNOLOGY AUTHORITY and
the GEORGIA DEPARTMENT OF MOTOR
VEHICLE SAFETY,

        Defendants

v.

VIISAGE TECHNOLOGY, INC., a Delaware
corporation,

        Necessary Party-Defendant.

Civil Action No. 2003CV66498

FILED IN OFFICE

NOV 1 2 2003

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

## FIRST AMENDED COMPLAINT FOR
## INTERLOCUTORY AND PERMANENT INJUNCTIVE RELIEF

Plaintiff Digimarc ID Systems, LLC files this First Amended Complaint for Interlocutory

and Permanent Injunctive Relief, showing the Court as follows:

### PARTIES AND JURISDICTION

1.

Digimarc ID Systems, LLC is a limited liability company organized and existing under

the laws of Delaware, and is registered to do business and does business in Georgia. Digimarc

has an office located at the headquarters of the Georgia Department of Motor Vehicle Safety,

2206 East View Parkway, Conyers, Georgia  30013.

2.

Digimarc is the leading global provider of secure and durable personal identification

solutions and the leading producer of drivers' licenses in the United States, providing systems

and services to thirty-two states. Internationally, Digimarc provides systems and services for sixty national governments around the world.

<div align="center">3.</div>

Digimarc is the incumbent provider of Georgia's Digitized License System. This system has been producing drivers' licenses and other identification cards for Georgia since 1996.

<div align="center">4.</div>

Under O.C.G.A. section 50-25-1, Defendant Georgia Technology Authority ("GTA") is a body corporate and politic, an instrumentality of the state, and a Georgia public corporation. It may be served with process at its office at 100 Peachtree Street, Suite 2300, Atlanta, Georgia 30303.

<div align="center">5.</div>

The Georgia Department of Motor Vehicle Safety ("DMVS") was created under O.C.G.A. section 40-16-2 and granted primary responsibility for, among other things, administering the laws and regulations relating to drivers' licenses. O.C.G.A. § 40-16-2(a)(2). DMVS may be served with process at its office at 2206 East View Parkway, Conyers, Georgia 30013.

<div align="center">6.</div>

Viisage Technology, Inc. ("Viisage") is a provider of digital identification systems. It is a Delaware corporation with its principal place of business at 30 Porter Road, Littleton, Massachusetts 01460. Viisage was the winning bidder of the procurement that is the subject of this lawsuit.

<div align="center">7.</div>

Under O.C.G.A. section 50-25-9, this Court has exclusive, original jurisdiction over this action, and venue is proper.

<div align="center">2</div>

8.

Viisage is also subject to the personal jurisdiction of this Court.

## PRELIMINARY FACTS

9.

In or before spring 2002, GTA and DMVS embarked upon a plan to modernize Georgia's drivers' license and identification card system. Their stated purpose was to engage the services of a qualified and responsible vendor, experienced in providing a central issuance Digitized License System.

10.

This is an action for *de novo* judicial review of GTA and DMVS's procurement process in relation to an RFP issued by GTA on May 24, 2002, seeking a contractor to provide the services necessary to modernize Georgia's drivers' license and identification card system.

11.

Digimarc seeks to enjoin the implementation of the contract at issue and also seeks a mandatory injunction directing that GTA and DMVS award the contract arising out of the RFP to Digimarc and execute all contracts consistent with an award of the contract to Digimarc. In the alternative, Digimarc seeks an order requiring that GTA/DMVS re-bid the contract. Without such an injunction, Digimarc and Georgia's taxpayers will suffer immediate and irreparable harm and injury.

12.

In sum, GTA/DMVS acted arbitrarily and unfairly by their failure to follow Georgia law governing procurement, including applicable statutes, GTA's own rules and the specific requirements of the RFP, all of which are intended to protect the competitive bidding process and secure the services of a qualified, responsible and experienced vendor offering the "best value"

3

to Georgia.

13.

The arbitrary and unfair conduct by GTA/DMVS inured to the benefit of only one bidder – Viisage – and was detrimental to Digimarc.

14.

Despite the clear mandate in the RFP that all Offerors should be accorded fair and equal treatment with respect to any opportunity for clarification and revision of proposals, GTA and DMVS had improper communications with Viisage and granted repeated opportunities to Viisage, and only Viisage, to improve and revise its technical proposal until it was decreed by DMVS to be the most advantageous to Georgia. In so doing, GTA and DMVS failed to abide by the evaluation procedures set forth in the RFP, under GTA Rules, and under Georgia law.

15.

Moreover, GTA and DMVS applied different evaluation criteria in favor of Viisage over any other vendor, failed to properly apply the evaluation criteria governing the procurement and failed to consider all criteria that the RFP required to be considered, all to the benefit of Viisage and to the detriment of Digimarc.

16.

In addition, despite the RFP's mandate setting forth the term of the contract to be covered by the procurement, DMVS and GTA subsequently entered into an illegal contract that exceeded the contractual term dictated by the RFP.

## PROCEDURAL STATUS

17.

Digimarc filed its original Verified Complaint for Temporary Restraining Order, Interlocutory and Permanent Injunctive Relief in this action on March 5, 2003.

4

18.

Digimarc filed a Motion for Interlocutory Injunction on May 20, 2003.

19.

After Digimarc, GTA, and DMVS fully briefed the issues, this Court held an oral hearing on Digimarc's Motion for Interlocutory Injunction on July 28, 2003 and subsequently entered an Order dated July 31, 2003 temporarily enjoining GTA and DMVS from "all further activities related to implementation of or performance under the contract dated November 12, 2002 between Viisage and DMVS, arising out of the procurement process engaged in by GTA on behalf of DMVS in connection with the RFP until further order of this Court."

20.

On October 1, 2003, GTA and DMVS filed a Motion to Dismiss or in the Alternative to Add an Indispensable Party, seeking an order directing Digimarc to add Viisage as a party to the action.

21.

On November 3, 2003, the parties submitted a Consent Order agreeing that Viisage is a "necessary party" to this action, as that term is defined by Georgia law.

22.

Viisage has an interest in the outcome of this action such that Viisage could have intervened under O.C.G.A. Section 9-11-24 had it chosen to do so. In fact, Viisage had previously notified DMVS that it had expended monies in furtherance of the contract at issue in this case. Notwithstanding, Viisage did not voluntarily intervene.

23.

Nonetheless, consistent with the Consent Order agreed to by Digimarc, DMVS and GTA, on November 4, 2003, Digimarc corresponded with Viisage and offered Viisage the opportunity

to join the action as a party plaintiff.

24.

Viisage refused to join the action as a party plaintiff.

25.

On November 7, 2003, this Court entered a Consent Order directing that Viisage be added as a necessary party.

## FACTS COMMON TO ALL COUNTS

The following facts are common to all counts of this complaint:

### The RFP – A Request For Proposals For A Digitized License System

26.

On or about May 24, 2002, GTA issued RFP No. GTA000051 on DMVS's behalf. A certified copy of the RFP was filed with this Court by Stipulation of Digimarc, GTA, and DMVS on June 17, 2003.

27.

The RFP's stated purpose was to procure the services of a qualified, responsible, and experienced vendor to provide a central issuance Digitized License System, including, among other things, photograph, signature and fingerprint capture, storage, retrieval, and document production, all based upon a firm, fixed price for each driver's license, identification card, or special identification card successfully produced.  (RFP § 1.1.)

28.

GTA decided that using competitive sealed bidding would not be practical or advantageous to Georgia in procuring the desired services.  (RFP § 1.2.)  GTA elected to conduct the Digitized License System procurement as a negotiated, solution-based solicitation. Nevertheless, the RFP stated that competitive sealed proposals were to be submitted in response

6

to the RFP in the same manner as competitive sealed bids and that the proposals would be opened in the same manner as competitive sealed bids.  (RFP § 1.2.)

29.

The RFP established certain mandatory functional requirements, optional components, general work requirements and office space and support requirements for the Digitized License System.  (RFP § 3.3.)

30.

In addition, the RFP set forth mandatory design specifications for permanent drivers' licenses, non-driver identification cards, and special identification cards and also set forth general guidelines for temporary cards that would be issued pending the issuance of the permanent cards.  (RFP §§ 3.4-3.7.)

31.

The RFP also set forth requirements for the following:

a.    Digitized License System workstations;

b.    specifications for the Central Imaging System, which would be the central repository maintained by the successful offeror for all images used for the license and card issuance process;

c.    testing standards for the system;

d.    operational supplies;

e.    reporting;

f.    training and documentation; and

g.    other functionalities that DMVS could elect to procure or utilize at its option.

(RFP §§ 3.8-3.14.)

32.

The RFP required each Offeror to respond with a Technical Proposal and a separate Cost

Proposal. (RFP § 4.2.) The RFP's stated criteria of evaluation was that any failure of a vendor's

submitted proposal "to meet any minimum requirement **will** cause [a] reduction in the evaluation

scoring of the Offeror's proposal." (RFP § 3.1.1 (emphasis in original).)

33.

The RFP mandated that a comprehensive, fair, and impartial evaluation of the proposals

received would be conducted in the following steps:

   a.    evaluation of technical proposals;

   b.    identification of Offerors that meet the minimum technical requirements;

   c.    evaluation of price proposals;

   d.    identification of Offerors' eligibility for demonstrations;

   e.    evaluation of demonstrations; and

   f.    evaluation of proposal on the basis of technical and cost factors.

(RFP § 5.1.)

34.

The Offerors' Technical Proposals and separate Price Proposals were both due by

July 19, 2002. (RFP App. A, Addendum No. 3.)

35.

The RFP mandated that evaluations of the Technical Proposals ("Phase 1") would be

completed before GTA and DMVS proceeded to evaluate the Offerors' Price Proposals ("Phase

2"). (RFP §§ 5.1, 5.5.)

36.

The RFP mandated that "[i]ncompleteness or significant inconsistencies or inaccuracies

8

in the Technical Proposal will result in a reduction of the evaluation rating." (RFP § 5.5.)

37.

According to the RFP, after the Price Proposals were evaluated, the Offerors would be accorded fair and equal treatment with respect to any opportunity for discussion and revision of their respective Price Proposals for the Technical Proposals that had been evaluated in Phase 1. (RFP § 5.6.)

38.

The procurement contract was to have a target implementation date of June 27, 2003 for the Digitized License System. (RFP App. A, Addendum No. 3.)

### Offerors' Initial Responses and Problems with Unequal Treatment

39.

On July 19, 2002, three Offerors presented their bid proposals to GTA in response to the RFP: Digimarc, Viisage, and SoftLEAD, Inc.

40.

An evaluation team comprised of GTA and DMVS representatives reviewed each Offeror's bid proposal between July 29, 2002 and August 1, 2002. Copies of the Evaluation Results and Evaluation Sheets for Digimarc and Viisage are attached hereto as Exhibits A and B, respectively. (Ultimately, SoftLEAD's proposal was rejected by GTA and DMVS. Neither its proposal nor the evaluation of its proposal is at issue in this case.)

41.

GTA and DMVS utilized a "trade off" or "ranking" method of source selection, which permits "communications" to establish competitive ranges or negotiations, and final price adjustments or best and final offers. (RFP § 5.6; GTA Rule 665-2-4-.02(a)(9)(ii).)

9

42.

"Communications" are defined under the Rules, however, "as exchanges between the state and Offerors after receipt of offers to address issues of past performance, to enhance the state's understanding of offers, to allow reasonable interpretation of the offer, or to facilitate the state's evaluation process." (GTA Rule 665-2-1-.02(f).) The Rules specifically state that "[c]ommunications shall not be used to cure material omissions in the offer." (GTA Rule 665-2-1-.02(f).)

43.

From the beginning of the evaluation process, significant problems developed in regard to GTA and DMVS's compliance with the requirements of the RFP and applicable procurement laws, including GTA Rules, resulting in substantially unequal and otherwise illegal disparities in the treatment of the Offerors, as described in detail below.

44.

For example, in violation of the evaluation steps set forth in RFP § 5.1, mandating that Phase 1 technical evaluations be completed before proceeding to evaluate the Offerors' respective price proposals, by July 31, 2002, GTA and DMVS representatives had already opened the price proposals even though, as shown herein, they still had serious issues with the Viisage's technical proposal.

45.

Viisage's initial price proposal per card was 65% lower than anyone else's proposed price.

46.

After prematurely reviewing the Offerors' price proposals, GTA and DMVS further violated the required procedures governing the procurement, resulting in significant disparity in

10

the treatment of Viisage and Digimarc with respect to a variety of issues. The first of these issues is the evaluation of temporary and permanent drivers' licenses, non-driver identification cards and special identification cards (hereinafter sometimes referred to collectively as "ID Cards"), as further set forth below.

### Temporary and Permanent Licenses

47.

The RFP required the Offerors to submit sample ID Cards for evaluation at the time that they filed their Technical Proposal, on July 19, 2002. (RFP §3.6.1.2.)

48.

As part of the technical submission for the permanent ID Cards, the RFP mandated that the Offeror's proposed permanent ID Cards "**must** be verified to meet AAMVA testing standards by a certified testing lab and the results **must** accompany the Offeror's proposal." (RFP § 3.5.4.3 (emphasis in original).) Moreover, the RFP mandated that "DMVS shall conduct independent testing of sample documents." (RFP § 3.5.4.3.)

49.

Included with the proposals of Viisage and Digimarc were their respective independent lab tests for the permanent ID Cards that each was offering as mandated by sections 3.5-3.7 of the RFP. A copy of Viisage's independent lab test report is attached hereto as Exhibit C.

50.

In its Proposal dated July 19, 2002, Viisage proposed to offer a permanent card that was a 10/10/10 Polyester/Teslin/Polyester card design. (Ex. D at D-39.) The mandatory independent test report provided by Viisage for its July 19, 2002 permanent card proposal was for this specific card structure.

11

51.

Viisage's sample permanent ID Cards that it proposed as part of its July 19, 2002 Technical Proposal were defective from the start. In sum, GTA and DMVS's testing found two critical flaws in Viisage's permanent ID samples: (1) the lamination on the ID Cards was easily removed, such that the printed information on the ID Cards could be altered and re-assembled without detection; and (2) the samples could not withstand minimum solvent strength tests.

52.

In violation of GTA Rules 665-2-4-.06 and .07, and despite the fact that all samples were to have been provided with the Technical Proposal, GTA wrote to Viisage in an e-mail dated August 1, 2002 (in the guise of a "clarification") and notified Viisage of the specific deficiencies with its temporary and permanent card proposals. (Ex. E.)

53.

No similar communication was made with either of the other Offerors.

54.

DMVS then prepared and delivered to GTA a report detailing its concerns with both the permanent and temporary ID Cards proposed by Viisage. The report reaffirmed that was easy to tamper with the permanent ID Cards proposed by Viisage because the laminate could be removed, permitting the information or the card to be altered.

55.

DMVS also included a gratuitous statement that the Digimarc permanent card could be broken into two separate pieces after being repeatedly folded. However, the RFP's specifications for permanent ID Card durability did not require that an Offeror design a permanent card that could withstand breaking regardless of the method of folding applied. (RFP § 3.5.4.) The permanent ID Card samples tendered by Digimarc to GTA and DMVS complied

12

with industry standards for flexing without fracture.

56.

On August 9, 2002, GTA informed the Offerors of a purported "clarification" meeting to be conducted on August 14, 2002 to discuss certain stated shortcomings in the durability and security standards for both the temporary and permanent ID Card samples presented by the Offerors. However, although both durability and security issues had been raised with respect to Viisage's card solutions, the only issued that had been raised by GTA and DMVS with respect to Digimarc's permanent card solution was the issue of breaking in response to repeated bending – a durability issue.

57.

Importantly, at this point in time, Viisage was aware of exactly what deficiencies DMVS had identified with Viisage's proposed card solutions. Digimarc was not given similar information.

58.

In violation of RFP section 5.4, GTA then held an oral "clarification" meeting with all three Offerors on August 14, 2002. At the meeting, GTA requested what it termed "supplemental information" and mandated that each Offeror submit 18 production grade permanent and temporary card samples by August 26, 2002. At this point in time, there had been no problem identified with the security of Digimarc's permanent card solution, but Digimarc was nonetheless told that DMVS had identified problems with durability and security of all categories of cards for all vendors.

59.

At the August 14, 2002 meeting, GTA and DMVS also stated that all of the Offerors' proposed temporary ID Cards had failed to pass DMVS's undisclosed testing procedures for

13

these samples.  No communication was made at that meeting regarding any specific failure by any Offeror relating to permanent ID Cards.  Rather, the focus of the meeting was upon the purported failure of the Offerors to provide temporary ID Cards that passed all of DMVS's undisclosed testing procedures.  DMVS disclosed the type of testing agents that had been applied to the temporary ID Cards, but it did not disclose how the testing agents had been applied.  Instead, DMVS simply requested that the Offerors "be creative" and submit new temporary ID Card approaches that might pass DMVS's undisclosed testing techniques.  Moreover, the parties were told during this meeting that they could submit a temporary solution that was on a medium other than paper .

<div align="center">60.</div>

Digimarc then provided additional samples of proposed permanent and temporary ID Card samples by GTA's deadline of August 26, 2002.

<div align="center">61.</div>

DMVS evaluated Digimarc's proposed permanent and temporary ID Card solutions and rated both solutions as "acceptable."

<div align="center">62.</div>

Viisage's August 26 submission, on the other hand, was deficient in several respects. (Ex. F.)

<div align="center">63.</div>

In violation of GTA Rules, GTA again communicated to Viisage under the guise of a "clarification" and gave Viisage yet another opportunity to submit samples that complied with the requests previously made to all bidders.  (Ex. F.)

<div align="center">64.</div>

GTA did not provide Digimarc with any notice or indication that any part of its Technical

<div align="center">14</div>

Proposal that might have been deemed unsatisfactory by GTA and DMVS could be modified or provided late.

65.

Viisage submitted its sample documents after the expiration of the August 26 deadline.

66.

When Viisage finally did submit the cards that should have been submitted by August 26, it substantially changed its Technical Proposal for permanent ID Cards from its once proposed 10/10/10 Polyester/Teslin/Polyester card structure to a new 6/14/10 Confirm/Teslin/Polyester card structure. (Ex. G.)

67.

The RFP had mandated to all Offerors that samples had to be production quality.

68.

GTA had also specifically instructed Viisage that it was to provide sample ID Cards "produced using the same methods, materials, equipment, and specifications as what is being proposed to Georgia." (Ex. F.) Viisage failed to comply with this requirement and GTA/DMVS took no action to determine whether Viisage had complied with this requirement.

69.

GTA/DMVS failed to take any action to determine whether the permanent card samples submitted by Viisage were actually consistent with the card structure proposed by Viisage in writing.

70.

The permanent card samples produced by Viisage were not consistent with the card structure and methodology of production proposed by Viisage in writing for its newly proposed 6/14/10 Confirm/Teslin/Polyester card structure.

15

71.

As of August 29, Digimarc was the only vendor who had submitted permanent and temporary card solutions that had been deemed "acceptable" by DMVS.

72.

DMVS decided to wait until after Viisage submitted its late samples and then make an immediate recommendation as to which bidder would be the apparent winner.

73.

When the Evaluation Team reviewed Viisage's late-submitted samples and found them deficient, the Evaluation Team decided not to make a recommendation.

74.

Subsequently, GTA/DMVS decided to ask for a "demonstration," in violation of RFP section 5.5.2.

75.

GTA then issued a September 16, 2002 e-mail to all vendors which misled Digimarc into changing its temporary document solution from the solution that had previously been rated "acceptable" to another solution.

76.

Digimarc and Viisage then performed demonstrations on September 26, after which Viisage temporary card solutions were deemed "acceptable" and Digimarc temporary card solutions were deemed "unacceptable."

77.

Accordingly, after Viisage's temporary cards were rated as "unacceptable," the Evaluation Team changed the rating criteria and changed the rating of Digimarc's temporary card solutions from "acceptable" to "unacceptable."

16

78.

Digimarc thereafter revised its formulation for the temporary ID Cards to meet or exceed the standards tested by DMVS. Digimarc offered to provide GTA and DMVS with modified temporary ID Card samples for testing purposes. In contrast to the repeated opportunities given to Viisage, however, GTA and DMVS declined Digimarc's offer and refused to test Digimarc's new samples.

79.

The August 2002 Viisage permanent card samples selected by GTA/DMVS as the winning card design were not manufactured by Viisage.

80.

The August 2002 Viisage permanent card samples selected by GTA/DMVS as the winning card design were, in fact, cards from the New York State drivers' license program, which was state program under contract with another vendor - De La Rue.

81.

The August 2002 permanent card samples provided by Viisage to GTA/DMVS and selected as the winning card design were produced by Xerographic press production and not by the Indigo press method of production that had been proposed by Viisage in its Technical Proposal.

82.

Viisage did not procure an Indigo press for production of drivers' licenses until sometime in the year 2003.

83.

Viisage's permanent ID Card samples, made by Xerographic or fixed offset means, did not represent Viisage's "proposed means of production," as submitted by Viisage to GTA and

17

DMVS as its final permanent ID Card design. The samples provided by Viisage would not have been, therefore, production grade samples, as required by the RFP.

84.

As such, Viisage never demonstrated the capability to produce the most important aspect of Georgia's Digitized License System: a card that was durable and that could not easily be tampered with.

85.

Prior to awarding the contract to Viisage, DMVS was aware that Viisage had not manufactured the New York drivers' license samples provided by Viisage.

86.

Prior to awarding the contract to Viisage, DMVS failed to investigate the circumstances behind how Viisage had obtained the New York drivers' license samples that Viisage had submitted.

87.

Upon information and belief, GTA and DMVS elected not to subject the Viisage permanent ID Cards (submitted on August 29, 2002) for testing and evaluation.

88.

As such, because GTA and DMVS failed to conduct their own testing or to adhere to the RFP requirements that 1) Viisage submit independent lab testing; and 2) the samples submitted were production grade samples produced by the same method of production actually proposed by Viisage, GTA and DMVS had no way of knowing if the newly proposed card structures and samples would meet the RFP's durability requirements.

18

**Best And Final Offer**

89.

On October 8, 2002, GTA forwarded Digimarc and Viisage a detailed request for a Best and Final Offer to be received by GTA no later than October 15, 2002.

90.

By October 8, however, DMVS had already determined that Viisage was the apparent winner, and the only purpose of BAFO was to attempt to drive Viisage's price down.

91.

Digimarc responded with its Best and Final Offer on October 15, 2002, including a sample of its modified temporary ID Card solution.

92.

Viisage also responded with its Best and Final Offer on or about October 15, 2002.

93.

On October 22, 2002, DMVS Business Analyst George Theobald notified Charles Nixon, GTA Contracting Officer for the RFP, as follows:

> DMVS has identified the proposal that initially appears to be most advantageous to the state, and we would like to begin the process of negotiating a contract. As part of this process, we would like to validate our technical findings with this Offeror during negotiations. Although a brief demonstration was held with each Offeror last last [sic] month, it was limited to the issuance of a Temporary Document and it did not cover some of the other critical capabilities needed in the new system. To adequately verify our decision, more extensive demonstrations and discussions of the proposed solution by the Offeror will be necessary.

(Ex. H.) Theobald's communication continued by listing minimum requirements for at least four presentations to be conducted by "this Offeror" only.

94.

On October 23, 2002, DMVS sent to GTA a draft evaluation result of Digimarc that was

still a "work in progress," but showing that DMVS had elected not to test the revised samples of

Digimarc's temporary ID Cards. (Ex. I.)

<div align="center">95.</div>

On October 28, 2002, prior to any proposed presentation by Viisage, DMVS

Commissioner Tim Burgess sent a letter to Michael McClearn, Procurement Director of GTA,

informing McClearn that Viisage was the "apparent winner" of this RFP. (Ex. J.)

<div align="center">96.</div>

Burgess requested a prompt demonstration of Viisage's complete system and,

"[a]ssuming a successful demonstration," asked to begin contract negotiations immediately. (Ex.

J.)

<div align="center">97.</div>

On October 28, 2002, McClearn told Burgess that GTA:

> would prefer to treat the final demonstration and the negotiations
> as separate events. Once they have satisfied DMVS with an
> acceptable demo [Nixon] will be prepared to give them a letter,
> notifying them that they are the apparent winner and immediately
> invite them to enter into negotiations to finalize the contract. I
> think this will expedite the process. Of course, all of this will
> remain closed and confidential until the ink is dry on the contract.

(Ex. K.)

<div align="center">98.</div>

Despite the selection of the apparent winner of the RFP, Theobald expressed the

following concerns to Nixon:

> As part of [the contract negotiations] process, we would like to
> validate our technical findings with this Offeror during
> negotiations. Although a brief demonstration was held with each
> Offeror last last (sic) month, it was limited to the issuance of a
> Temporary Document and it did not cover some of the other
> critical capabilities needed in the new system. To adequately verify
> our decision, more extensive demonstrations and discussions of the

<div align="center">20</div>

<u>proposed solution by the Offeror will be necessary.</u>

(Ex. L (emphasis added).)

99.

GTA requested that Viisage perform additional demonstrations because "DMVS/GTA wants to be sure that the vendor selected can deliver all requirements on time and problem free. DMVS/GTA wants a demonstration that would show all requirements to assure that the vendor can meet the delivery schedule." (Ex. M.)

100.

GTA/DMVS did not request that Digimarc make any similar, additional demonstrations.

101.

Even before Viisage's additional demonstrations, however, GTA/DMVS and Viisage commenced contract negotiations. GTA and DMVS provided Viisage with a draft procurement contract on October 30, 2002. (Ex. N.)

102.

In fact, prior to entering into contract negotiations with Viisage, GTA had not even been made fully aware of DMVS's final scoring of the Offerors' proposals, as DMVS did not send GTA the final score sheets of the evaluations of the Offerors until November 6, 2002. (Ex. O.)

103.

Nonetheless, on November 6, 2002, after contract negotiations with Viisage were already underway, DMVS indicated to GTA that the award of the RFP should be contingent upon Viisage's financial capability / profile being substantially the same, as well as the staffing for the project.

104.

Then, on November 7, 2002, Viisage indicated that it wanted to change its Technical

21

Proposal again. On this date, Viisage informed GTA of a material change in its proposed Point of Sale software proposal. Viisage sought permission to replace its proposed vendor for the Point of Sale software with CenterStage. (Ex. P.)

### 105.

On November 7, 2002, Viisage forwarded GTA executed copies of both the contract and software escrow agreements. (Ex. Q.)

### 106.

GTA and DMVS provided Viisage an opportunity to make an additional demonstration to the evaluation team on November 12, 2002. Upon information and belief on that date, Viisage performed the requested demonstrations.

### 107.

On November 12, 2002, GTA provided Viisage with a Notice of Award, and DMVS signed a contract with Viisage. (Ex. R.)

### 108.

Ultimately, the preferences granted to Viisage, as described above and as further described below, contributed to the conclusion by GTA and DMVS that "[a]ll 'Unsatisfactory' ratings identified during the evaluation of the initial proposal were rectified during the resubmission and clarification phases." (Ex. C at 5.)

### 109.

But Digimarc was not made aware of or granted the same opportunity by GTA and DMVS to demonstrate or to rectify any unsatisfactory ratings, either before or after Digimarc's Best and Final Offer.

### 110.

As noted above, a number of Viisage's unsatisfactory ratings dealt with the actual failure

22

of performance tests relating to Viisage's proposal for Permanent ID Cards. Viisage was also granted substantial preferences in its opportunities to cure defects with respect to Temporary ID Cards. These elements of the RFP comprised critical portions of the central issuance system.

<div align="center">111.</div>

The preferential treatment granted by GTA and DMVS to Viisage by allowing Viisage multiple opportunities to cure defects in its proposals violated the express terms of the RFP, which mandated that all Offerors should be accorded fair and equal treatment with respect to any opportunity for discussion and revision of proposals. (RFP § 5.6.) This error resulted in Viisage having been wrongfully awarded the contract at issue. Had this error not been made, Digimarc would have been awarded the contract.

<div align="center">**Discrepancies in Evaluation Process**</div>

<div align="center">112.</div>

In addition to the preferential treatment with regard to the Offerors' responses to the RFP in the area of permanent and temporary ID Cards and the Offerors' Best and Final Offers, GTA and DMVS failed to follow the RFP's requirements regarding the overall evaluation of the Offerors' responses to the RFP.

<div align="center">113.</div>

The RFP directed that no other factors or criteria could be used in the evaluation of proposals except for the evaluation factors set forth in the RFP. (RFP § 5.7.)

<div align="center">114.</div>

GTA and DMVS established certain minimum requirements with respect to proposals submitted by Offerors, and stated: "Whenever the terms **"shall"**, **"must"**, **"will"**, or **"is/are required"** are used in the RFP, the specification being referred to is a **minimum requirement** of this RFP. Failure to meet any minimum requirement **will** cause reduction in the evaluation

<div align="center">23</div>

scoring of the Offeror's proposal." (RFP § 3.1.1 (emphasis in original).)

115.

The RFP specified that the Scope of Work technical requirements referenced under Section 3 of the RFP would be considered as factors in the evaluation process of each Offeror's technical proposal and were ranked by relative importance on a scale of "Most Important – Very Important – Important, in descending order." (RFP § 5.3 (emphasis added).)

116.

Accordingly, an Offeror's ability to provide GTA and DMVS with a superior solution for the first critical and fundamental evaluation factors should have been accorded greater weight by the Evaluation Committee than the Offeror's solution for less important evaluation factors.

117.

For example, section 3.3.1 of the RFP listed the Overall Solution Functional Requirements. These requirements should have been accorded greater weight in the evaluation process than the Offeror's ability to provide the Optional Components listed in section 3.3.2 of the RFP.

118.

GTA and DMVS also judged the Offeror's response to each individual evaluation factor using the following "adjectival" ratings scale: Excellent – Good – Satisfactory – Unsatisfactory. (RFP §§ 1.2, 5.5.1.1.)

119.

The combined GTA and DMVS evaluations of each Offeror are included in Exhibits B and C hereto.

120.

According to the Digimarc Evaluation, Digimarc received a rating of "Excellent" with

24

respect to six responses, a rating of "Good" with respect to eight responses, a rating of "Satisfactory" with respect to 202 responses, and a rating of "Unsatisfactory" with respect to only three responses. (Ex. A.)

121.

More importantly, Digimarc received the top score of "Excellent" on its responses to four of the first ten critical and fundamental evaluation factors. (Ex. A.)

122.

Digimarc also received the top score of "Excellent" for its recommended method of encryption and superior availability requirements for its travel back-up workstations. (Ex. A; RFP §§ 3.6.6.2, 3.8.12.)

123.

In contrast, Viisage did not receive a single score of "Excellent" on its responses to the first ten critical evaluation factors. According to the Viisage Evaluation Sheet, Viisage received a rating of "Excellent" with respect to eleven responses, a rating of "Good" with respect to ten responses, a rating of "Satisfactory" with respect to 189 responses, and a rating of "Unsatisfactory" with respect to nine responses. Nine of out Viisage's first ten responses were rated merely as "Satisfactory" by the evaluation team. (Ex. B.)

124.

If GTA and DMVS had truly ranked the technical requirements in Section 3 of the RFP by relative importance on a scale of Most Important – Very Important – Important, in descending order, Digimarc's ability to provide a superior solution for the initial critical technical requirements would have been accorded far greater weight by GTA and DMVS in the evaluation process than Viisage's favorable scores on factors of lesser relative importance.

125.

The failure by GTA/DMVS to properly weight Digimarc's scores, as compared to

Viisage's, coupled with Viisage's repeated and unique opportunities to correct unfavorable

scores, as noted above, unfairly and illegally resulted in the award of the contract to Viisage.

Had these failures by GTA/DMVS to adhere to the RFP not occurred, Digimarc would have been

awarded the contract.

**Financial Capabilities**

126.

GTA and DMVS also erred by failing to evaluate diligently Viisage's financial capability

to perform if awarded the contract, which resulted in the wrongful award of the contract at issue

to Viisage.

127.

Under O.C.G.A. section 50-25-7.3(6), GTA shall abide by the following standard when

awarding contracts by soliciting competitive sealed proposals:

> The award shall be made to the responsible vendor or vendors
> complying with the technology and architecture standards and
> policies of the [GTA] whose proposal or bid was timely and is
> determined in writing to be the most advantageous to the state,
> taking into consideration the evaluation factors set forth in the
> request for proposals or bids. No other factors or criteria shall be
> used in the evaluation.

O.C.G.A. § 50-25-7.3(6) (emphasis added).

128.

Furthermore, under GTA Rules, an "[a]ward must be made to the responsive and

responsible offeror whose offer is determined in writing to be the most advantageous to the state,

using all evaluation factors set forth in the solicitation." GTA Rule 665-2-4-.02(a)(8) (emphasis

added).

129.

In assessing whether an Offeror is responsible, GTA should have given consideration to the Offeror's financial solvency and overall ability to respond in quality and fitness to the particular requirements of the contract in question. 1974 Ga. Op. Att'y Gen. No. 74-16.

130.

In the RFP, GTA expressed the importance it purportedly placed on the Offerors' financial capability to perform. Because "[f]inancial stability [was] very important in the overall assessment of a company's expected performance," each Offeror was required to provide sufficient financial data, including information regarding any bankruptcies within the past five years, to lead the RFP evaluators to the conclusion that the offeror had the financial capability to perform. (RFP § 4.2.1.3.4.)

131.

The RFP stated that an unsatisfactory evaluation with respect to the company's financial stability "may cause a serious impact to the overall evaluation." (RFP § 4.2.1.3.4.)

132.

Viisage failed to submit financial data sufficient "to lead evaluators to the conclusion that [Viisage] ha[d] the financial capability to perform" in its response to the RFP. Thus, Viisage failed to comply with the requirements of section 4.2.1.3.4.

133.

It does not appear that GTA reduced Viisage's overall rating for Viisage's failure to provide financial data as required by RFP section 4.2.1.3.4 and GTA Rule 665-2-4-.02(a)(8).

134.

GTA/DMVS did not conduct any meaningful evaluation of Viisage's financial ability to perform, beyond reviewing two of Viisage's SEC filings and a Dunn & Bradstreet report.

# Exhibit 12
# (Part 2 of 2)

135.

This review of the scant financial data regarding Viisage was conducted only <u>after</u> GTA/DMVS had determined to award the contract to Viisage on or before October 22, 2002.

136.

The first act that GTA/DMVS undertook toward completing any due diligence on Viisage's financial viability appears to have occurred on November 1, 2002, when DMVS sent GTA a copy of Viisage's second quarter 10-Q filing with the Securities and Exchange Commission. (Ex. S.) As noted above, however, by October 22, 2002, DMVS had already determined Viisage to be the "apparent winner."

137.

The only other fact that evidences any due diligence undertaken by GTA/DMVS to determine whether Viisage was financially capable of performing was the fact that GTA ordered a Dun & Bradstreet report on Viisage on November 7, 2002. (Ex. T.)

138.

Indeed, in the November 12, 2002 Notice of Award given to Viisage, GTA specifically stated that a condition of the contract's award to Viisage would be Viisage's "Financial capability/profile being substantiated." (Ex. R.)

139.

Contrary to this mandate, however, Viisage never provided any demonstration of its financial stability to perform. Instead, immediately after the demonstration, DMVS and Viisage signed the contract, the very same day as the Notice of Award.

140.

In fact, Viisage purposely waited until November 13, 2002 to file its third quarter 10-Q report with the Securities and Exchange Commission, a report that demonstrated Viisage to be

even more financially weak then appeared in its second quarter 10-Q report that gave rise to Georgia's insistence that Viisage provide proof of its financial stability proof. It did not provide this report to GTA/DMVS. (Ex. U.)

<div align="center">141.</div>

In the Risk Factor Analyses provided in Viisage's November 13, 2002 third quarter 10-Q filing with the Securities and Exchange Commission for the period ended September 29, 2002, Viisage acknowledged "[their] potential inability to obtain additional capital required for funding [their] operations and financing [their] growth" as a material risk factor. (Ex. U at 13.)

<div align="center">142.</div>

This 10-Q report for third quarter of 2002 also revealed that Viisage was in default of certain financial covenants with its creditors. (Ex. U at 13.)

<div align="center">143.</div>

As a result of a forced renegotiation of certain financial covenants, it was revealed that Viisage had further reduced its total available operating line of credit to $4 million. (Ex. U at 12.)

<div align="center">144.</div>

Additionally, during the first nine months of 2002, Viisage's reported loss in earnings for the quarter totaled $6.5 million. (Ex. U at 4.)

<div align="center">145.</div>

Accordingly, Viisage did not submit financial data sufficient to support the conclusion that Viisage had the requisite financial capability to perform.

<div align="center">146.</div>

GTA and DMVS failed to perform the financial assessment tests mandated by the RFP.

<div align="center">29</div>

147.

These errors resulted in the wrongful award the contract at issue to Viisage. Had these

errors not been made, Digimarc would have been awarded the contract.

## Cost Realism Analysis

148.

As defined in Appendix D of the RFP, the term "evaluation" means:

> The in-depth review and analysis of Offeror's proposals. It involves the application of judgment to the Offeror's proposed price and performance using the express evaluation factors and criteria in the solicitation and the procedures outlined herein. The purpose of evaluation is to identify deficiencies, omissions, and need for clarification in proposals, determine the existence of price and technical realism, and discriminate among proposals as to which best meets the acquisition objectives so that an appropriate selection and award is made.

(RFP App. D (emphasis added).)

149.

Accordingly, the RFP mandated that, as part of its evaluation of any Technical Proposal

and Cost Proposal, GTA and DMVS were required to conduct some form of price and technical

realism analysis to determine if the proposed price had a sound economic basis in relation to the

Technical Proposal and, thereby, to ensure that Georgia did not risk the ongoing viability of the

Digitized License System by awarding the procurement contract to a vendor operating at a loss

or selling a product/service at a less than sustainable margin. (RFP App. D.)

150.

Price proposals were also to be evaluated not only in terms of the overall price to Georgia

but also the relative value offered by Offeror's price for the services that will actually be

rendered. (RFP § 5.3.)

151.

Absent price and technical realism analysis, however, it would be impossible for GTA or DMVS to determine if Viisage's proposed price covered the costs associated with card production and represented the overall "best value" for Georgia.

152.

Neither GTA nor DMVS conducted any such analysis of Viisage's proposals to determine if Viisage's proposed price covered the costs associated with Viisage's obligations under the contract.

153.

Viisage's final, accepted price per ID Card was $1.009. Upon information and belief, this Viisage price per card was below the estimated total cost to Viisage under the contract. Upon information and belief, Viisage's total loss will be approximately $7.5 million over the term of the contract with DMVS, assuming all extensions are taken by the State and without any future add-ons or change orders to the contract.

154.

As an example of the complete disconnect of the Viisage price from reality is Viisage's proposed price per card if the ID Cards are issued from Viisage's own building. For a facility with a minimum square footage requirement of 4,800 square feet, Viisage's proposed price differential per card had been only 1 cent.

155.

In order to provide an offsite factory, Viisage would need to build or lease a building, specially modify it into a totally secure building, and then to also operate and insure it each year all for a total amount of less than $0.43 per square foot per month..

31

156.

Further evidence of a capricious price evaluation is the fact that Georgia did not even know if the expensive software and equipment for Document Scanning for all the workstations was included in Viisage's base price at the time it was awarding Viisage the contract.

157.

GTA and DMVS failed to perform the requisite price and technical realism analysis to determine if Viisage will reasonably be able to perform its obligations if it were awarded a contract for the services sought by the RFP.

158.

These errors resulted in Viisage having been wrongfully awarded the contract at issue. Had these errors not been made, Digimarc would have been awarded the contract.

**The Central Production Facility for Permanent ID Cards**

159.

GTA and DMVS also erred with respect to Viisage's proposal for a Central Production Facility for permanent ID Cards.

160.

As defined in Appendix D of the RFP, the term "Central Production Facility" means the site for mass production for all permanent ID Cards, to be operated by the successful Offeror.

161.

The RFP mandated that the successful Offeror provide a Central Image System for storage and retrieval of digital photographs, signatures and fingerprints. (RFP § 1.1.) The Central Imaging System is the image database system that will be owned and operated by the successful Offeror at the Central Production Facility. (RFP App. D.)

32

162.

At a minimum, the proposed solution resulting from the RFP was to replace the current

Digitized License System with all hardware and software required to support production of

permanent ID Cards at the Central Production Facility.  (RFP § 2.7.1.1.)

163.

This solution would allow DMVS to achieve its strategic objective of improving

customer service by reducing wait time for permanent ID Cards, using permanent document

printers for "mass production" located only at the successful Offeror's Central Production

Facility.  (RFP § 2.7.3.3.)

164.

The RFP required all Offerors to include pricing models based upon two different Central

Production Facility arrangements, including a model based on DMVS providing floor space for

the facility in Conyers, Georgia and a second model based upon the Offeror acquiring facilities

in Rockdale County, Georgia.  (RFP §§ 3.3.4.1, 3.3.4.2.)

165.

Digimarc received the optimal score of "Excellent" on its proposed solutions to meet the

needs of each of the 13 general work requirements set forth in section 3.3.3 of the RFP,

including, but not limited to, provision for and operation of a Central Production Facility with

proposed pricing models for the two different central production facilities, as required by

Sections 3.3.4.1 and 3.3.4.2 of the RFP.  (Ex. A.)

166.

With respect to the latter, the Digimarc Evaluation noted in its Comments section that

Digimarc "[p]rovided a very comprehensive description on all anticipated needs, Included [sic]

floor plans, equipment foot prints [sic], access requirements for loading of equipment and

33

supplies, detailed electro-mechanical and environmental requirements, security and vault

procedures." (Ex. A.)

167.

The Viisage Evaluation noted in its Comments section that Viisage "[p]rovided minimal

information on space requirements for equipment" with respect to establishing a Central

Production Facility at DMVS headquarters and further "[p]rovided minimal information on

security and establishment plans" with respect to a Central Production Facility within Rockdale

County, Georgia. (Ex. B.)

168.

The RFP mandated that the Offeror "must have installed at least one similar distributed

Digitized License System in North America." (RFP § 4.2.1.5.) As such, the RFP instructed that

each Offeror had to identify and to describe the Offeror's experience with such similarly

distributed projects, including the size of the organization, and its capabilities and its experience

in applying the proposed technology. (RFP § 4.2.1.5.)

169.

Viisage has never installed a central issue production facility of the type mandated by the

RFP.

170.

Viisage's only experience with implementing a full central issuance system was in

Massachusetts in 1995 for drivers' licenses, which system Viisage operated through the fall

2000.

171.

Massachusetts, however, had significant problems with the drivers' license system

provided by Viisage, including, but not limited to, the following:

34

a.    license backlogs;

b.    lack of effective color correction software for workstation cameras;

c.    driver license ink migration through the license hologram laminate;

d.    inability to easily produce identification cards for other agencies;

e.    lack of direct facial illumination resulting in fuzzy customer images;

f.    visual inspection not functional;

g.    slow response time of hardware support for equipment failures;

h.    slow and incorrect image license reconciliation process; and

i.    issues with laminate wearing off, cracking and breaking on the DL/ID document.

(Ex. V at 2.)

172.

In 1993, the time at which Viisage was awarded the contract for Massachusetts, Massachusetts issued approximately 1.4 million ID Cards per year. In comparison, Georgia issued 2,442,073 ID Cards in 2001. (RFP § 2.4.) Approximately 5.6 million drivers are licensed in Georgia. (RFP § 2.4.) According to the RFP, the current image database is expected to have approximately fifteen million sets of stored images at the time the procurement contract is awarded. (RFP § 2.4.)

173.

Digimarc replaced the Massachusetts licensing system with a new installation in 2000, and remains in control of the Massachusetts licensing operations under a multi-year contract with Massachusetts.

174.

Viisage's then ongoing central issuance experience for drivers' licenses for Florida was only in its capacity as a subcontractor to Unisys for the central issuance system Unisys provided

for that State.

<p style="text-align:center">175.</p>

Accordingly, Viisage has not successfully installed a central issuance production system and facility similar to that required by the Georgia RFP. The only prior domestic drivers' license experience upon which Viisage may rely as a reference for a central issuance state facility it had installed was just one state central production facility that supported less than half the volume currently sustained by Georgia and one-quarter of the volume that Georgia could experience at full capacity. In spite of this, Viisage was not given an adverse rating for its lack of relevant demonstrated history.

<p style="text-align:center">176.</p>

The technical requirements pertaining to the Central Production Facility were included in the first ten critical and fundamental evaluation factors. Given the high relative importance of these evaluation factors, Viisage's inability to demonstrate historical familiarity with the systems and cards set forth in the RFP should have substantially reduced Viisage's overall evaluation results.

<p style="text-align:center">177.</p>

GTA/DMVS did not, however, reduce Viisage's overall evaluation results based on Viisage's inability to comply with these critical requirements. This failure constitutes a significant error in the procurement process, which resulted in a wrongful award of the contract to Viisage. Had this error not been made, Digimarc would have been awarded the contract.

<p style="text-align:center"><strong><u>The Central Image Server</u></strong></p>

<p style="text-align:center">178.</p>

GTA and DMVS also erred with respect to Viisage's proposal regarding the Central Imaging System.

<p style="text-align:center">36</p>

179.

Viisage proposed a Central Imaging System that was significantly undersized for the application mandated by the RFP.

180.

The Viisage Technical Proposal associated with the Central Imaging System also exhibited significant inconsistencies.

181.

The Central Imaging System proposed by Viisage was not a "High Availability" configuration and, therefore, fails to meet the 99.99% uptime required by the RFP.

182.

Additionally, the Central Imaging System proposed by Viisage is not a truly redundant configuration, as mandated by the RFP.

183.

Therefore, the Viisage proposal failed to provide adequately for the Central Imaging System, apparently due to Viisage's lack of understanding of the State's DMVS environment and the requirements of the solution.

184.

In spite of this, Viisage was not given a corresponding adverse evaluation by DMVS.

185.

This failure constitutes a significant error in the procurement process, which resulted in a wrongful award of the contract to Viisage. Had this error not been made, Digimarc would have been awarded the contract.

37

**Back-Up Production Facilities**

186.

GTA and DMVS also erred with respect to Viisage's proposal regarding a back-up card production facility for use in the event the Central Production Facility is compromised.

187.

The Viisage proposal failed to propose a satisfactory solution for a back-up card production facility for use in the event the Central Production Facility is compromised.

188.

In its RFP response, Viisage proposed the following: "In addition to providing a secure, fault-tolerate solution for central printing, Viisage has made arrangements with Arthur Blank and Company to use their card printing facility as a backup, in case of disaster at the permanent facility in Georgia. In case of failure at the Central Production Facility that causes significant downtime in card production, Viisage will produce the cards off-site. Viisage will develop security processes to ensure that all consumables and finished documents are under reasonable protection throughout the duration of the emergency."

189.

Viisage does not have an agreement with Arthur Blank and Company to provide back-up card production services, as required by the RFP.

190.

Viisage failed to provide reasonable proof in its RFP response that Arthur Blank and Company had the equipment, experience, servers and/or the security items needed to produce the ID Cards in the event the central facility were compromised. In fact, Arthur Blank does not have the equipment to produce drivers' licenses for the State. Nor, for that matter, does Viisage even have a formal, written agreement with Arthur Blank to provide any services for Viisage

38

whatsoever in connection with Georgia.

<div align="center">191.</div>

In spite of this, Viisage was not given a corresponding adverse evaluation by DMVS.

<div align="center">192.</div>

This failure constitutes a significant error in the procurement process, which resulted in a wrongful award of the contract to Viisage. Had this error not been made, Digimarc would have been awarded the contract.

<div align="center">**The Optional Point of Sale System**</div>

<div align="center">193.</div>

GTA and DMVS also erred by failing to deem Viisage non-compliant in its RFP response with respect to the optional Point of Sale ("POS") System. (RFP § 3.14.4.)

<div align="center">194.</div>

According to the RFP, each Offeror was required to submit a proposal for a turnkey POS system that would interface with the Digitized License System and have the capacity to upgrade to meet future needs. (RFP § 3.14.4.)

<div align="center">195.</div>

The RFP mandated a commercial "Off-the-Shelf" Fee Collection and Cash Management software package. (RFP § 3.14.4.1.1.)

<div align="center">196.</div>

The RFP further specified that the successful Offeror's POS system must accept transactions from and consolidate revenue across all delivery channels in use by DMVS, including, at the time of the RFP award, over-the-counter, Web-based Internet and IVR delivery channels. (RFP § 3.14.4.1.2.)

<div align="center">39</div>

197.

The successful Offeror's POS system must also integrate easily with the Digitized

License System, the Offline Application and the State's PeopleSoft financial system, and support

both integrated online and standalone processing in the event of a system outage. (RFP §§

3.14.4.1.3, 3.14.4.1.4.)

198.

During the initial phase of the bidding process, Viisage consistently designated Unisys as

its vendor for the required proposal for a commercial "Off-the-Shelf" Fee Collection and Cash

Management software package.

199.

On November 12, 2002, Mohammed Siddiqui, Viisage's Marketing Director, provided

written notification to Charles Nixon, Contracting Officer for GTA, of Viisage's intent to change

its POS provider from Unisys to CenterStage. (Ex. W.)

200.

CenterStage does not have a commercial "Off-the-Shelf" Fee Collection and Cash

Management software package that meets the RFP requirements.

201.

Nonetheless, Viisage's last minute, wholesale change in its Technical Proposal in regard

to its proposed POS providers and systems apparently did not impact or alter GTA's evaluation

of Viisage's proposal whatsoever.

202.

Instead, GTA and DMVS had apparently negotiated the procurement contract with

Viisage, and Viisage executed that contract, prior to notifying GTA in writing of its intent to

substitute its proposed POS provider.

40

203.

In fact, DMVS delivered its "evaluation" findings with respect to Viisage's POS resubmission to GTA on November 13, 2002, the day after DMVS signed the procurement contract with Viisage.

204.

Even then, this evaluation was not properly done. Viisage never demonstrated that the CenterStage application would meet the State's requirements. In connection with RFP requirement 3.14.4.1, Viisage's revised Technical Proposal never demonstrated that the CenterStage product would integrate easily with the DDLS, the Offline Application, and the State's PeopleSoft financial system.

205.

Similarly Viisage made no attempt in its revised Technical Proposal to demonstrate that COMCASH will meet the requirements of section 3.14.4.6 of the RFP to provide an open system design, include an interface that employs XML as the communication format, utilize the OPOS standard for hardware peripherals, or support high volume transaction and revenue processing.

206.

Viisage's revised Technical Proposal also did not specify the hardware that it would deliver as part of the POS solution. There is no specification for (1) POS Server, (2) Cash Drawers, (3) Financial Receipt Printers, or (4) Credit Card Readers, all of which must be a part of a complete system.

207.

Viisage wanted to change its POS solution vendor because Unisys cost more than that which would be charged by Comcash.

41

208.

At the time that Viisage proposed to GTA/DMVS to substitute Comcash for Unisys, there was not even a signed teaming agreement yet signed between Viisage and Comcash, much less any binding subcontract.

209.

Because Viisage never delivered a complete response with respect to the POS proposal, it could not have been possible for GTA/DMVS to judge if the Viisage proposal was fully compliant with the requirements of the RFP and "Satisfactory."

210.

Mere promises that Viisage will be compliant in the future with the RFP's requirements, without evidentiary substantiation, should have caused Viisage's response to have been judged non-compliant. Indeed, SoftLEAD was repeatedly scored with "Unsatisfactory" ratings for its proposed POS solution because of its failure to specify how each functional requirement would be met and how it would be fully integrated into the DLS.

211.

In contrast, Viisage's last-minute proposal of a completely new POS solution, which also lacked such specificity, was given "Satisfactory" ratings by GTA/DMVS. (Ex. X.)

212.

As such, GTA and DMVS erred by failing to adjust the relative overall ranking of Viisage's late-changed Technical Proposal with respect to this non-price factor in accordance with GTA Rule 665-2-4-.02(b).

213.

GTA and DMVS further erred by negotiating and awarding Viisage the contract prior to taking into account Viisage's responses to <u>all</u> of the evaluation factors mandated by the RFP.

42

214.

Accordingly, GTA and DMVS committed error in awarding Viisage the contract at issue. Had this error not been made, Digimarc would have been awarded the contract.

**Optional Mailer Feature**

215.

The RFP also mandated that an optional mailer had to be proposed in order to mail completed permanent ID Cards to the applicants.

216.

The mailer proposed by Viisage, however, would not have been adequate for the system proposed in the RFP.

217.

If DMVS/GTA had conducted the mandated technical realism assessment of the Viisage proposed mailer option, it would have determined this as well.

218.

However, DMVS/GTA apparently never conducted such an assessment. In fact, instead of penalizing Viisage for its inadequate mailing solution, DMVS/GTA gave Viisage all "Satisfactory" ratings and even one rating of "Excellent", upon which, in part, DMVS/GTA justified awarding the contract to Viisage.

219.

These significant errors in the procurement process resulted in a wrongful award of the contract to Viisage. Had this error not been made, Digimarc would have been awarded the contract.

43

## Term of the Contract and Provision of Performance Bond

220.

Under the terms of the RFP, any contract that was supposed to be awarded was to be for a one-year contract with an option for five additional one-year periods. (RFP § 1.7)

221.

Accordingly, the November 12, 2002 contract that Viisage received should have provided that its first expiration date would on November 12, 2003.

222.

The terms of the actual signed contract provided, however, that the first expiration would be on June 30, 2004.

223.

This is a material, illegal extension of the terms of the first contract, which, pursuant to the RFP, should have an annual expiration date ending on November 12, 2003.

224.

The November 12, 2002 contract that Viisage received required that a performance bond had to be provided by Viisage for the duration of the contract (*i.e.*, until June 30, 2004).

225.

The Notice of Award also required that Viisage had to provide the required performance bond. (Ex. R.)

226.

Viisage did not deliver a performance bond with an expiration date past November 12, 2003 to cover the full term of the contract, which has expiration date of June 30, 2004.

**<u>Digimarc's Protest of GTA's Decision</u>**

227.

On November 26, 2002, in accordance with GTA Rule 665-2-11-.07 and by virtue of GTA's grant of a Protest filing deadline extension, Digimarc filed its protest to GTA's award of the contract to Viisage (the "Protest").

228.

DMVS and/or GTA asked Viisage to provide a response to the Protest.

229.

Viisage's response to the Protest contained intentional misrepresentations of fact.

230.

In connection with the Protest Decisionmaker's investigation of the Protest, the Protest Decisionmaker solicited information from individuals at GTA and DMVS.

231.

Some of the information provided to the Protest Decisionmaker by GTA and DMVS in response to the Protest Decisionmaker's questions were factually inaccurate.

232.

On February 17, 2003, the Protest Decisionmaker for GTA denied Digimarc's Bid Protest, relying in part on the information provided to him by individuals from GTA, DMVS and Viisage.

**COUNT I**
**(<u>Temporary and Permanent Injunctive Relief – Violation</u>**
**<u>of the Terms of the RFP)</u>**

233.

Digimarc incorporates Paragraphs 1 through 232, as if fully set forth herein.

234.

By acting in the manner described in this Complaint, GTA and DMVS have violated and are violating the terms of the RFP.

235.

Unless GTA, DMVS and Viisage are restrained from proceeding with the implementation of the contractual agreement with Viisage pending the outcome of this lawsuit, Digimarc and the Georgia taxpayers will suffer immediate and irreparable harm and injury.

236.

Digimarc is likely to succeed on the merits of this lawsuit.

237.

Digimarc does not have an adequate remedy at law.

238.

Digimarc is entitled to a temporary restraining order, an interlocutory injunction and permanent injunction restraining and enjoining GTA, DMVS and Viisage and their officers, employees, agents, attorneys, affiliates, and all others acting in concert with them from proceeding with the implementation and performance of the contract awarded to Viisage in response to Georgia Technology Authority Request for Proposal No. GTA000051; a mandatory injunction directing GTA and DMVS to award the Contract to Digimarc, to execute all contracts consistent with an award of the Contract to Digimarc, and to proceed with the implementation and performance of such Contract with Digimarc; or, in the alternative, a mandatory injunction directing GTA and DMVS to re-bid the Contract.

## COUNT II
### (TEMPORARY AND PERMANENT INJUNCTIVE RELIEF – VIOLATION GTA RULES

239.

Digimarc incorporates Paragraphs 1 through 232, as if fully set forth herein.

240.

By acting in the manner described in this Complaint, GTA and DMVS have violated and are violating numerous rules governing GTA procurements, including but not limited to: 665-2-1-.01(f); 665-2-4-.02(a)(8); 665-2-4-.02(a)(9)(ii); 665-2-4-.02(b); 665-2-4-.06; 665-2-4-.07.

241.

Unless GTA, DMVS and Viisage are restrained from proceeding with the implementation of the contractual agreement with Viisage pending the outcome of this lawsuit, Digimarc and Georgia taxpayers will suffer immediate and irreparable harm and injury.

242.

Digimarc is likely to succeed on the merits of this lawsuit.

243.

Digimarc does not have an adequate remedy at law.

244.

Digimarc is entitled to a temporary restraining order, an interlocutory injunction and permanent injunction restraining and enjoining GTA, DMVS and Viisage and their officers, employees, agents, attorneys, affiliates, and all others acting in concert with them from proceeding with the implementation and performance of the contract awarded to Viisage in response to Georgia Technology Authority Request for Proposal No. GTA000051; a mandatory injunction directing GTA and DMVS to award the Contract to Digimarc, to execute all contracts consistent with an award of the Contract to Digimarc, and to proceed with the implementation

47

and performance of such Contract with Digimarc; or, in the alternative, a mandatory injunction directing GTA and DMVS to re-bid the Contract.

<div align="center">

**COUNT III**
**(TEMPORARY AND PERMANENT INJUNCTIVE RELIEF – VIOLATION**
**OF O.C.G.A. § 50-25-7.3(5))**

245.

</div>

Digimarc incorporates Paragraphs 1 through 232, as if fully set forth herein.

<div align="center">246.</div>

By acting in the manner described in this Complaint, GTA and DMVS have violated and are violating provisions of the Official Code of Georgia, including O.C.G.A. § 50-25-7.3(5), which states, "[t]he terms of the request for proposals or bids may allow for discussions or revisions but shall provide for fair and equal treatment of all vendors."

<div align="center">247.</div>

Unless GTA, DMVS and Viisage are restrained from proceeding with the implementation of the contractual agreement with Viisage pending the outcome of this lawsuit, Digimarc and Georgia taxpayers will suffer immediate and irreparable harm and injury.

<div align="center">248.</div>

Digimarc is likely to succeed on the merits of this lawsuit.

<div align="center">249.</div>

Digimarc does not have an adequate remedy at law.

<div align="center">250.</div>

Digimarc is entitled to a temporary restraining order, an interlocutory injunction and permanent injunction restraining and enjoining GTA, DMVS and Viisage and their officers, employees, agents, attorneys, affiliates, and all others acting in concert with them from proceeding with the implementation and performance of the contract awarded to Viisage in

<div align="center">48</div>

response to Georgia Technology Authority Request for Proposal No. GTA000051; a mandatory

injunction directing GTA and DMVS to award the Contract to Digimarc, to execute all contracts

consistent with an award of the Contract to Digimarc, and to proceed with the implementation

and performance of such Contract with Digimarc; or, in the alternative, a mandatory injunction

directing GTA and DMVS to re-bid the Contract.

## COUNT IV
### (TEMPORARY AND PERMANENT INJUNCTIVE RELIEF – VIOLATION OF O.C.G.A. § 50-25-7.3(6))

251.

Digimarc incorporates Paragraphs 1 through 232, as if fully set forth herein.

252.

By acting in the manner described in this Complaint, GTA and DMVS have violated and

are violating provisions of the Official Code of Georgia, including O.C.G.A. § 50-25-7.3(6),

which states:

> The award shall be made to the responsible vendor or vendors
> complying with the technology and architecture standards and
> policies of the [GTA] whose proposal or bid was timely and is
> determined in writing to be the most advantageous to the state,
> taking into consideration the evaluation factors set forth in the
> request for proposals or bids. No other factors or criteria shall be
> used in the evaluation.

253.

Unless GTA, DMVS and Viisage are restrained from proceeding with the implementation

of the contractual agreement with Viisage pending the outcome of this lawsuit, Digimarc and

Georgia taxpayers will suffer immediate and irreparable harm and injury.

254.

Digimarc is likely to succeed on the merits of this lawsuit.

255.

Digimarc does not have an adequate remedy at law.

256.

Digimarc is entitled to a temporary restraining order, an interlocutory injunction and

permanent injunction restraining and enjoining GTA, DMVS and Viisage and their officers,

employees, agents, attorneys, affiliates, and all others acting in concert with them from

proceeding with the implementation and performance of the contract awarded to Viisage in

response to Georgia Technology Authority Request for Proposal No. GTA000051; a mandatory

injunction directing GTA and DMVS to award the Contract to Digimarc, to execute all contracts

consistent with an award of the Contract to Digimarc, and to proceed with the implementation

and performance of such Contract with Digimarc; or, in the alternative, a mandatory injunction

directing GTA and DMVS to re-bid the Contract.

## COUNT V
### (TEMPORARY AND PERMANENT INJUNCTIVE RELIEF – VIOLATION OF O.C.G.A. §§ 50-25-1(C), (C)(4)-(5))

257.

Digimarc incorporates Paragraphs 1 through 232, as if fully set forth herein.

258.

By acting in the manner described in this Complaint, GTA and DMVS have violated and

are violating provisions of the Official Code of Georgia, including O.C.G.A. § 50-25-1(c), (c)(4),

and (c)(5) which state:

> (c) The purpose of the [GTA] shall be to provide for procurement
> of technology resources, technology enterprise management, and
> technology portfolio management . . . on such terms and conditions
> as may be determined to be in the best interest of the state in light
> of the following factors: . . . (4) Cost savings to the state through
> efficiency in the provision of public information; and (5) Such
> other factors as are in the public interest of the state and will

promote the public health and welfare.

259.

Unless GTA, DMVS and Viisage are restrained from proceeding with the implementation of the contractual agreement with Viisage pending the outcome of this lawsuit, Digimarc and Georgia taxpayers will suffer immediate and irreparable harm and injury.

260.

Digimarc is likely to succeed on the merits of this lawsuit.

261.

Digimarc does not have an adequate remedy at law.

262.

Digimarc is entitled to a temporary restraining order, an interlocutory injunction and permanent injunction restraining and enjoining GTA, DMVS and Viisage and their officers, employees, agents, attorneys, affiliates, and all others acting in concert with them from proceeding with the implementation and performance of the contract awarded to Viisage in response to Georgia Technology Authority Request for Proposal No. GTA000051; a mandatory injunction directing GTA and DMVS to award the Contract to Digimarc, to execute all contracts consistent with an award of the Contract to Digimarc, and to proceed with the implementation and performance of such Contract with Digimarc; or, in the alternative, a mandatory injunction directing GTA and DMVS to re-bid the Contract.

## COUNT VI
### (TEMPORARY AND PERMANENT INJUNCTIVE RELIEF – VIOLATION OF DUE PROCESS)

263.

Digimarc incorporates Paragraphs 1 through 232, as if fully set forth herein.

264.

By acting in the manner described in this Complaint, GTA and DMVS have deprived

51

Digimarc of its property without due process of law in violation of the United States Constitution and the Georgia Constitution.

265.

Unless GTA, DMVS and Viisage are restrained from proceeding with the implementation of the contractual agreement with Viisage pending the outcome of this lawsuit, Digimarc and Georgia taxpayers will suffer immediate and irreparable harm and injury.

266.

Digimarc is likely to succeed on the merits of this lawsuit.

267.

Digimarc does not have an adequate remedy at law.

268.

Digimarc is entitled to a temporary restraining order, an interlocutory injunction and permanent injunction restraining and enjoining GTA, DMVS and Viisage and their officers, employees, agents, attorneys, affiliates, and all others acting in concert with them from proceeding with the implementation and performance of the contract awarded to Viisage in response to Georgia Technology Authority Request for Proposal No. GTA000051; a mandatory injunction directing GTA and DMVS to award the Contract to Digimarc, to execute all contracts consistent with an award of the Contract to Digimarc, and to proceed with the implementation and performance of such Contract with Digimarc; or, in the alternative, a mandatory injunction directing GTA and DMVS to re-bid the Contract.

**COUNT VII**
**(AGAINST GTA AND DMVS ONLY)**
**(DAMAGES FOR BID PREPARATION COSTS)**

269.

Digimarc incorporates Paragraphs 1 through 232, as if fully set forth herein.

52

270.

As a result of the actions by GTA and DMVS described above, Digimarc is entitled to recover the reasonable costs of preparing its bid in response to Georgia Technology Authority Request for Proposal No. GTA000051, and all other related costs allowed under Georgia law.

**WHEREFORE**, Digimarc prays for the following relief:

a.  As to all Counts, that the currently entered interlocutory injunction be converted to a permanent injunction restraining and enjoining GTA, DMVS and Viisage and their officers, employees, agents, attorneys, affiliates, and all others acting in concert with them from proceeding with the implementation and performance of the contract awarded to Viisage in response to Georgia Technology Authority Request for Proposal No. GTA000051; a mandatory injunction directing GTA and DMVS to award the Contract to Digimarc, to execute all contracts consistent with an award of the Contract to Digimarc, and to proceed with the implementation and performance of such Contract with Digimarc; or, in the alternative, a mandatory injunction directing GTA and DMVS to re-bid the Contract;

b.  As to Count VII, Digimarc's reasonable costs of preparing its bid in response to Georgia Technology Authority Request for Proposal No. GTA000051;

c.  As to all Counts, the costs of this action, including reasonable attorneys' fees; and

d.  Such other and further relief as this Court deems just and proper.

This 12th day of November 2003.

_____
David Balser
Georgia Bar No. 035835
John Hutchins
Georgia Bar No. 380692
Valerie D. Barton
Georgia Bar No. 040832

MCKENNA LONG & ALDRIDGE LLP
303 Peachtree Street, Suite 5300
Atlanta, Georgia 30308
(404) 527-4000
(404) 527-4198 (facsimile)

*Attorneys for Plaintiff*
*Digimarc ID Systems, LLC*

# Exhibit 13

FILED IN OFFICE

FEB 1 3 2004

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

DIGIMARC ID SYSTEMS, LLC,

       Plaintiff,

v.

GEORGIA TECHNOLOGY AUTHORITY and
the GEORGIA DEPARTMENT OF MOTOR
VEHICLE SAFETY,

       Defendants,

v.

VIISAGE TECHNOLOGY, INC., a Delaware
corporation,

       Necessary Party-Defendant

Civil Action No. 2003CV66498

## GEORGIA TECHNOLOGY AUTHORITY, GEORGIA DEPARTMENT OF MOTOR VEHICLE SAFETY, AND VIISAGE TECHNOLOGY, INC.'S MOTION TO EXPEDITE TRIAL AND FOR A SPECIAL TRIAL SETTING OR TRANSFER OF THE CASE

Defendants Georgia Technology Authority ("GTA"), Georgia Department of Motor Vehicle Safety ("DMVS") and Necessary Party-Defendant Viisage Technology, Inc. ("Viisage") respectfully move this Court to expedite the trial of this matter and specially set this matter for trial commencing March 22, 2004. An expedited hearing of this matter is imperative due to:

- The recognized urgency of trying this matter in a timely manner and the fact this case should be ready for trial in March 2004;

- The facts the State's contract extension with Digimarc will expire on June 30, 2004 and the current injunction precludes the State from negotiating with any party other than Digimarc;

- Homeland Security concerns that have led Georgia, like the rest of the United States, to take additional security measures against terrorism and identity theft,

including the creation of both national and Georgia Departments of Homeland Security;

- The importance of increased security measures relating to driver's licenses, following the events of September 11, 2001; and

- The financial impact this case has on the State.

This case is appropriate for special setting both because trial of this matter is expected to last for approximately two to three weeks and because the parties and a majority of witnesses are from out of state. This case will be ready for trial in mid-March 2004, and a special setting is requested commencing March 22, 2004. If this Court is unable to set the case for that date, GTA, DMVS and Viisage move that this case be transferred to the Complex Civil Trial Division, pursuant to Rule 1002 of the Atlanta Judicial Circuit Superior Court Rules, Ga. P. Fulton Cty. Sup. Ct. Rule 1002.

GTA, DMVS, and Viisage further move that, in light of the recognized need for expedited resolution of this case, as set forth in detail in the accompanying Memorandum, the time for response to this Motion be shortened to seven (7) days, and the hearing of this Motion be expedited and held within ten (10) days of the filing of this Motion.

In support of this Motion, GTA, DMVS and Viisage submit to the Court the following:

1. Memorandum of Law in Support of Georgia Technology Authority, Georgia Department of Motor Vehicle Safety, and Viisage Technology, Inc.'s Motion to Expedite Trial and for Special Trial Setting or Transfer;

2. The Protest Decision affirming that Viisage be awarded the contract, attached as Exhibit 1 hereto;

3. Digimarc's Protest, attached as Exhibit 2 hereto;

4. Relevant Portions of the transcript of the hearing on Digimarc's Motion for Interlocutory Injunction, attached as Exhibit 3 hereto;

5. Order specially setting trial in the matter of Jernigan v. General Motors Corp., CV-200-104, in the 3rd Judicial Circuit in and for Bullock County Alabama for trial beginning April 19, 2004, attached as Exhibit 4 hereto;

-2-

6.    The Affidavit of Ronald K. Johnson, attached as Exhibit 5 hereto;

7.    The Affidavit of Bill Hitchens, attached as Exhibit 6 hereto;

8.    The Statement of Ronald D. Malfi, Counterfeit Identification Raises Homeland Security Concerns: Hearing before the House Select Comm. on Homeland Security, attached as Exhibit 7 hereto;

9.    The Affidavit of Christine Clay, attached as Exhibit 8 hereto;

10.   The transcript of the of the Hearing before the House Select Comm. on Homeland Security on Identification Documents Fraud, attached as Exhibit 9 hereto;

11.   The Affidavit of Cathy Malone, attached as Exhibit 10 hereto;

12.   Rule 1002 of the Atlanta Judicial Circuit Superior Court Rules, attached as Exhibit 11 hereto;

13.   Inneroffice memorandum dated August 23, 2002, attached as Exhibit 12;

14.   A Proposed Order granting this Motion, attached as Exhibit 13 hereto; and

15.   A proposed Scheduling Order setting deadlines for trial of this case on March 22, 2004, attached as Exhibit 14 hereto.

Respectfully submitted this 13th day of February, 2004.

OFFICE OF THE ATTORNEY GENERAL

*Emily Hitchcock*

Emily P. Hitchcock
Georgia Bar No. 357697
40 Capitol Square, S.W.
Atlanta, Georgia 30334-1300
(404) 651-6249
(404) 657-3239 (fax)

- and -

John P. Gallagher
Georgia Bar No. 212860
Stites & Harbison, PLLC
303 Peachtree Street, N.E.
2800 SunTrust Plaza
Atlanta, Georgia 30308
(404) 739-8800
(404) 739-8870 (fax)

**Attorneys for Defendants Georgia
Technology Authority and Georgia
Department of Motor Vehicle Safety**

KING & SPALDING LLP

Jameson B. Carroll
Georgia Bar No: 112640
Peter M. Crofton
Georgia Bar No: 197122
Robert C. Khayat, Jr.
Georgia Bar No: 416981
Gregory K. Smith
Georgia Bar No: 658363

191 Peachtree Street
Atlanta, Georgia 30303
(404) 572-4600
(404) 572-5144 (fax)

**Attorneys for Necessary Party-Defendant
Viisage Technology, Inc.**

*Signed by Jameson B. Carroll with express permission.

-4-

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

DIGIMARC ID SYSTEMS, LLC,

      Plaintiff,

v.

GEORGIA TECHNOLOGY AUTHORITY and
the GEORGIA DEPARTMENT OF MOTOR
VEHICLE SAFETY,

      Defendants,

v.

VIISAGE TECHNOLOGY, INC., a Delaware
corporation,

      Necessary Party-Defendant

Civil Action No. 2003CV66498

## CERTIFICATE OF SERVICE

This is to certify that I have this day served the foregoing **GEORGIA TECHNOLOGY AUTHORITY, GEORGIA DEPARTMENT OF MOTOR VEHICLE SAFETY, AND VIISAGE TECHNOLOGY, INC.'S MOTION TO EXPEDITE TRIAL AND FOR A SPECIAL TRIAL SETTING OR TRANSFER OF THE CASE** upon all parties to the above-captioned action by hand delivery to:

      David L. Balser
      John P. Hutchins
      Valerie D. Barton
      McKenna Long & Aldridge LLP
      303 Peachtree Street, Suite 5300
      Atlanta, GA 30308

This 13th day of February, 2004.

Jameson B. Carroll

# Exhibit 14

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

FILED IN OFFICE

JUN - 9 2004

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

DIGIMARC ID SYSTEMS, LLC,

       Plaintiff,

vs.

GEORGIA TECHNOLOGY AUTHORITY and
the GEORGIA DEPARTMENT OF MOTOR
VEHICLE SAFETY,

       Defendants,

vs.

VIISAGE TECHNOLOGY, INC., a Delaware
corporation,

       Necessary Party-Defendant.

Civil Action No. 2003CV66498

## SCHEDULING ORDER

IT IS HEREBY ORDERED that the following deadlines will govern this case, subject to

further order of the Court:

1.    A status conference will be held on Wednesday, July 21, 2004, at 9:30 a.m., at which the parties will advise the Court regarding the status of all outstanding motions, the status of discovery, and an estimate of the duration of the trial.

2.    The parties may file motions for summary judgment no later than July 21, 2004. Responses are due August 20, 2004. Replies, if any, are due no later than August 30, 2004. All papers and exhibits shall be served by hand delivery on opposing counsel, so as to afford each party the maximum time for briefing.

3.    The parties may file motions *in limine* regarding evidentiary motions reasonably known by them to require such a motion by no later than July 30, 2004. Responses may be filed no later than August 23, 2004. All papers and exhibits shall be served by hand delivery on opposing counsel, so as to afford each party the maximum time for briefing.

4.    No later than August 13, 2004, each party will file with the Court and serve on all other parties a listing of all persons whose testimony at trial will be presented in any parties' case-in-chief by deposition and a designation of the portions of each person's deposition which will be introduced. Counter-designations may be filed by August 27, 2004. All objections not filed by the date on which the case is first scheduled for trial shall be deemed waived or abandoned. Nothing in this order shall be deemed to alter the terms of O.C.G.A. section 9-11-32.

5.    A hearing on all pending motions, including motions for summary judgment and motions *in limine*, is scheduled for Wednesday, September 1, 2004. Prior to the hearing, the parties will provide the Court by letter accurate and reasonable estimates for the time needed for a hearing on each such motion. *Scheduling of the hearing will be dependent upon such estimates.*

6.    The parties will file a Consolidated Pre-Trial Order on or before Tuesday, September 7, 2004.

7.    A pre-trial conference will be held on Wednesday, September 8, 2004, at 9:30 a.m., at which the parties will provide the Court with refined estimate of the duration of the trial. *An estimate of time required for pre-trial conference is also necessary for scheduling*

8.    The parties will be prepared to begin trial during the September civil term. Given the schedules of the parties involved and their counsel, the Court expects to begin trial of this case either on Tuesday, September 14, 2004 or Tuesday, September 21, 2004. As noted in the Order, filed June 3, the Court will inform the parties if this trial setting is likely to be preempted by other matters on the Court's calendar, and the parties may then file motions accordingly as they see fit. The Court will also address issue of a trial date the July 21, 2004 status conference.

SO ORDERED this _9th_ day of June 2004.


Thelma Wyatt Cummings Moore, Judge
Fulton County Superior Court
Atlanta Judicial Circuit

2

# Exhibit 15

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

DIGIMARC ID SYSTEMS, LLC,

      Plaintiff,

vs.

GEORGIA TECHNOLOGY AUTHORITY and
the GEORGIA DEPARTMENT OF MOTOR
VEHICLE SAFETY,

      Defendants,

vs.

VIISAGE TECHNOLOGY, INC., a Delaware
corporation,

      Necessary Party-Defendant.

Civil Action No. 2003CV66498

## PLAINTIFF DIGIMARC ID SYSTEMS, LLC'S BRIEF IN SUPPORT OF ITS MOTION TO COMPEL COMPLIANCE WITH DISCOVERY ORDER, REVISE SCHEDULING ORDER AND FOR SANCTIONS AGAINST DEFENDANT VIISAGE TECHNOLOGY, INC.

In February, Viisage moved this Court for an immediate trial, even going so far as to request that the Court transfer this case to another judge because of "emergency" circumstances, that could not await a trial in the normal course of this Court's calendar. Digimarc pointed out at the time that this tactic by Viisage was nothing more than an obvious attempt to get this case before any court other than this one. Viisage's current conduct only serves to further expose the utter transparency of its previous ploy. This Court ordered Viisage more than a month ago to produce all relevant documents that are responsive to Digimarc's Request for Production of Documents, and even listed specific categories of documents that need to be produced. The Court also ordered Viisage to make witnesses available for deposition. Only timely compliance with this Discovery Order would make it possible to try this case on the schedule set forth by the

Court in the Scheduling Order entered on June 9, 2004. But Viisage is simply ignoring the Discovery Order. As a result, Digimarc is forced to come before this Court again and request that it set a time limit for Viisage's compliance with the Discovery Order and revise the Scheduling Order so that Digimarc can adequately prepare for trial. Digimarc also requests that this Court strike Viisage's Answer as a sanction for its blatant disregard of the Discovery Order, and further award Digimarc's attorneys' fees incurred in having to file the instant Motion.

## STATEMENT OF FACTS

At a hearing on May 25, 2004, this Court ordered Viisage to conduct a thorough and diligent search for and produce all relevant, non-privileged documents responsive to Digimarc's Motion to Compel Production of Documents, and it ordered both Viisage and Digimarc to certify that each has made a thorough and diligent search for documents. The Court also ordered Viisage to designate Craig Vosseteig and Barry Erhardt as 30(b)(6) witnesses and to cause their appearance at depositions at a time and place mutually agreeable to counsel. The Court documented all of these oral rulings in a written Order dated June 3, 2004 ("Discovery Order"), specifically setting forth seven particular categories of documents to be produced by Viisage.

Viisage has not complied with any of these orders. In fact, Viisage made only one half-hearted effort to offer Vosseteig and Erhardt, in advance of producing any documents, failed to follow up on Digimarc's effort to get documents produced in order to schedule depositions, and has made no movement whatsoever toward compliance with its document production obligations, including its obligation to certify its compliance. In contrast, Digimarc has fully complied with the Court's requirements under the Discovery Order, including filing an affidavit certifying that it has made a thorough and diligent search for relevant documents.

During a conference call with counsel for all parties on June 3, 2004, counsel for Viisage, Mr. Carroll, offered to make Mr. Vosseteig and Mr. Erhardt available for deposition, but only in

2

Atlanta, Georgia. Indeed, at that time, which was prior to the Court's issuance of the written

Discovery Order, Mr. Carroll even stated that he did not believe Viisage would be making an

additional document production in response to the Court's oral ruling on May 25, 2004. In reply

to Mr. Carroll's offer, Digimarc requested that the continuations of Viisage's 30(b)(6) deposition

occur at Viisage's offices in Massachusetts, after Viisage's supplemental production of

documents, and asked Mr. Carroll whether this presented a problem for Viisage. (TAB A – June

8, 2004 e-mail from John Hutchins to Jamie Carroll, 9:54 a.m.) Viisage's counsel did not

respond to Digimarc's request that the depositions occur in Massachusetts.

Also on June 8, 2004, after receiving a copy of the Discovery Order, Digimarc's counsel

sent a letter to Viisage's counsel, inquiring again about Viisage's supplemental production of

documents in light of the Court's written ruling. (TAB B) In that letter, Digimarc's counsel

stated:

> Obviously, Digimarc requires that these additional documents be produced
> sufficiently in advance of the completion of Viisage's 30(b)(6) deposition and the
> third-party depositions that the Court has issued Commissions for Digimarc to
> take so that Digimarc will have a meaningful opportunity for review the
> documents prior to the depositions. Given that the Court entered its Order on
> June 3, 2004 and that, as is evidenced by the e-mail you sent me this morning,
> you have obviously had a copy of the Order since at least yesterday, we request
> that Viisage make its supplemental production no later than Monday, June 14,
> 2004. Any further delay in producing the documents will only result in a delay in
> the taking of the depositions. The effect of further delay in the completion of
> discovery on the trial schedule set by the Court is obvious.

Viisage's counsel did not respond to this letter.

Finally, on June 21, Viisage's counsel sent an e-mail to all counsel stating:

> I have put the depos. off while Viisage looks for any addl. documents to produce,
> pursuant to the Court's order. When we are ready to reschedule the depos. of
> Vosseteig and Erhardt, we will ck. on their travel schedules to determine where
> they will be offered.

3

Within an hour, Digimarc's counsel responded:

> Any idea when additional documents will be produced? Summary judgment briefs are due one month from today, so we need to make some quick progress.

(TAB C) <u>Viisage's counsel did not respond.</u>

## ARGUMENT AND CITATION TO AUTHORITY

Viisage's utter failure to comply with the Discovery Order is inexcusable. Viisage had the entire month of June to produce the additional documents that it obviously possesses, and to make Vosseteig and Erhardt available. Moreover, Viisage has claimed as long ago as September 19, 2003 that it has already assembled responsive documents to Digimarc's document requests, when those requests were still in the form of a subpoena to Viisage as a non-party. Deposition of Elliot Mark, 33:23–34:21. Yet, Viisage has still not produced these documents. Because of Viisage's total lack of compliance, Digimarc has not yet been able to schedule the three third-party depositions for which this Court has issued commissions. Three of the seven categories of documents that the Court has ordered Viisage to produce are potentially relevant to the depositions of these three third parties, and the plain fact is that these documents should have been produced in January at the latest, if not earlier under the non-party subpoena to Viisage. It would be imprudent for Digimarc to take these depositions before Viisage's supplemental production occurs and before Viisage's 30(b)(6) deposition is completed.

This Court should order Viisage to produce documents under the Discovery Order by no later than July 8, 2004. Moreover, Viisage should be ordered to make Vosseteig and Erhardt available, at Viisage's headquarters in Massachusetts, no later than July 22, 2004. Digimarc will then attempt to schedule the depositions of the three third-party witnesses during the last two weeks of July, subject to their availability. A proposed Order is attached at **TAB D.**

4

Meanwhile, this Court has ordered the parties to file Motions for Summary judgment by July 21 and to designate deposition testimony by August 13. At this point, it is unrealistic to think that the document production and depositions that still remain can be concluded and the transcripts prepared in time to meet this deadline. Moreover, forcing Digimarc to meet this timetable would unfairly punish Digimarc for Viisage's intentional delay. Thus, if the Scheduling Order is not modified, Digimarc will be prejudiced by Viisage's dilatory conduct. The Scheduling Order dated June 9, 2004 was based on the Court's expectation that all parties would comply with the Order. Digimarc has complied with the Order. Viisage has not. By its delay, Viisage has undercut Digimarc's ability to complete its discovery, prepare its summary judgment motion and prepare for trial. This undercuts the broad purpose of the discovery rules, which is "to enable the parties to prepare for trial so that each party will know the issues and be fully prepared on the facts." Travis Meat & Seafood Co., Inc. v. Ashworth, 127 Ga. App. 284, 285, 193 S.E.2d 166, 168 (1972). The Scheduling Order must be modified to take Viisage's delay into account. A proposed modification to the Scheduling Order is attached as TAB E.

Finally, Viisage's conduct is impacting all of the parties and the Court, and Viisage should be sanctioned severely, including having its Answer stricken and paying Digimarc's attorneys' fees in connection with this Motion. Under O.C.G.A. § 9-11-37(b)(2)(C), upon failure to obey a court order to provide or permit discovery, the court may issue an order striking out part or all of an offending party's pleading. In addition, under O.C.G.A. § 9-11-37(b)(2) the court may require the offending party to pay attorneys' fees caused by the failure. These sanctions, in particular an order striking Viisage's Answer, are to be invoked "where the failure is willful, in bad faith, or in conscious disregard of an order." Didio v. Chess, 218 Ga. App. 550, 551, 462 S.E.2d 450, 452 (1995). Didio's facts are especially pertinent here. In Didio, the Court

of Appeals held that the State Court of Fulton County could strike a party's answer to a complaint where that party had failed to respond to repeated requests for discovery, a motion to compel discovery, and a court order to compel discovery. Id. at 550-51, 462 S.E.2d at 451-52.

Viisage's failure to obey the Discovery Order, even in the face of repeated communications from Digimarc's counsel, which Viisage ignored, is precisely the kind of "conscious disregard" that prompted the court in Didio to strike the offending party's answer. Viisage has not complied with one single aspect of the Court's Order. This Court cannot tolerate such blatant disregard of its orders. Under Georgia law, and under the broad principles underpinning the rules of discovery, Viisage's actions merit both award of legal fees to Digimarc and striking of Viisage's Answer. (Proposed Order attached as TAB D.)

## CONCLUSION

For the reasons set forth above, Digimarc respectfully requests that the Court set the suggested deadlines by which Viisage must comply with the Order, amend its Scheduling Order accordingly, and enter an order striking Viisage's Answer and directing Viisage to pay Digimarc's legal expenses as sanctions for its dilatory conduct. Should the Court grant Plaintiff's request for sanctions against Defendant, counsel for Plaintiff will submit an affidavit detailing the time and expenses incurred in having to file this Motion.

[signature on following page]

6

This 1st day of July 2004.

Respectfully submitted,

John P. Hutchins
Georgia Bar No. 380692
Valerie D. Barton
Georgia Bar No. 040832

MCKENNA LONG & ALDRIDGE LLP
303 Peachtree Street, Suite 5300
Atlanta, Georgia 30308
(404) 527-4000
(404) 527-4198 (facsimile)

*Attorneys for Plaintiff*
*Digimarc ID Systems, LLC*

7

# Exhibit 16

IN THE SUPERIOR COURT OF FULTON COUNTY

STATE OF GEORGIA

| | | |
|---|---|---|
| DIGIMARC ID SYSTEMS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| GEORGIA TECHNOLOGY | ) | |
| AUTHORITY and the GEORGIA | ) | |
| DEPARTMENT OF MOTOR VEHICLE | ) | Civil Action No. 2003CV66498 |
| SAFETY, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| VIISAGE TECHNOLOGY, INC., | ) | |
| | ) | |
| Necessary Party-Defendant. | ) | |

## STATE DEFENDANTS' MOTION TO DISMISS
## AND BRIEF IN SUPPORT THEREOF

COME NOW the Georgia Department of Motor Vehicle Safety and the Georgia

Technology Authority, State Defendants in the above-styled action, by and through counsel, the

Attorney General for the State of Georgia, and, pursuant to O.C.G.A. § 9-11-12(b)(1), file this

Motion to Dismiss on the grounds that the matter is moot. In support thereof, Defendants rely

upon the pleadings filed in the case and the affidavit of James R. Davis, attached hereto as

Exhibit A and incorporated herein by reference, and show as follows:

Plaintiff filed this action seeking to enjoin the implementation of the Department of

Motor Vehicle Safety's Digitized License System on March 5, 2003. The Court entered an Order

in the matter on July 31, 2003 temporarily enjoining the DMVS from all further activities related

to implementation of or performance under the contract by and between the DMVS and Viisage Technology, Inc. Because the provision of driver's licenses and identification cards to the State's citizens is an essential governmental function critical to the protection of this country's homeland security, the DMVS and the GTA wish to ensure as expeditiously as possible that the technology used to produce the driver's licenses and identification cards is not outdated and that the State is able to benefit from the current state of technology which has improved since the original Request for Proposal was posted. Davis Affidavit at ¶¶ 4-6 & Att. 1. Consequently, the DMVS terminated the contract with Viisage Technology, Inc. for convenience on July 20, 2004. Davis Affidavit at ¶ 7. Thus, there is no contract whose performance may be enjoined.

Additionally, the DMVS and GTA plan to promptly re-issue the Request for Proposal asking vendors to submit proposals for the provision of the Digitized License System. Davis Affidavit at ¶ 8. Currently, the DMVS and the GTA anticipate that the revised Request for Proposals will be posted by the end of October 2004. *Id.*. Thus, without further order of the Court, Plaintiff has received the alternative equitable remedy it sought in the Complaint, a re-bid of the procurement. See Complaint, Prayer for Relief. The matter, thus, is moot and should be dismissed. *Bowers v. Board of Regents*, 259 Ga. 221 (1989).

Therefore, in reliance on the mootness of the above-styled action, the Georgia Department of Motor Vehicle Safety and the Georgia Technology Authority respectfully ask this Court to grant the Motion to Dismiss.

This 21st day of July, 2004.

Respectfully submitted,

THURBERT E. BAKER          033887
Attorney General

Signatures Continued on Next Page

2

DANIEL M. FORMBY                    269350
Deputy Attorney General


JOHN B. BALLARD, JR.                035550
Senior Assistant Attorney General


Department of Law

EMILY P. HITCHCOCK                  357697
Senior Assistant Attorney General

State of Georgia
40 Capitol Square, S.W.
Atlanta, Georgia 30303
(404) 651-6249


Stites & Harbison, LLPC

JOHN P. GALLAGHER  up by eph  282860
Special Assistant Attorney General

303 Peachtree Street, NE
2800 SunTrust Plaza
Atlanta, Georgia 30308
(404) 739-8800


**Attorneys for the Georgia Technology Authority
and the Department of Motor Vehicle Safety**

3

# Exhibit 17

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA



DIGIMARC ID SYSTEMS, LLC,

      Plaintiff,

vs.

GEORGIA TECHNOLOGY AUTHORITY and
the GEORGIA DEPARTMENT OF MOTOR
VEHICLE SAFETY,

      Defendants,

vs.

VIISAGE TECHNOLOGY, INC., a Delaware
corporation,

      Necessary Party-Defendant.

Civil Action No. 2003CV66498

## VIISAGE TECHNOLOGY, INC.'S
## MOTION TO DISMISS AND SUPPORTING MEMORANDUM

Necessary Party-Defendant Viisage Technology, Inc. ("Viisage") respectfully moves that this Court dismiss this action in its entirety, or alternatively, that this Court dismiss Viisage from this action. This motion is based upon the recent termination of the DLS Contract ("Contract") between Viisage, the Department of Motor Vehicle Safety ("DMVS"), and the Georgia Technology Authority ("GTA"). Due to the termination of the Contract, the essential controversy that was the subject of this action -- whether Viisage was properly awarded the Contract -- is now moot, and this action should be dismissed.

Even if the Court were to determine that some residual controversy remains between Digimarc ID Systems, LLC ("Digimarc"), GTA, and DMVS, Viisage is a party to this action only by virtue of having been a party to the Contract with the GTA and DMVS. Now that the Contract has been terminated, Viisage no longer has an interest in the subject matter of this litigation and is

therefore no longer a necessary party. Because it is no longer a necessary party, and because no relief is sought from it other than it be restrained from implementing the now-terminated Contract with DMVS and GTA, Viisage respectfully requests be dismissed from this action.

## ARGUMENT

I.   **The Termination Of The Contract Renders The Controversy Among The Parties Moot, And This Action Should Be Dismissed.**

The DMVS has exercised its rights under the GTA Rules, Georgia law, and the Contract to terminate the Contract with Viisage for convenience. As the Contract with Viisage has been terminated, Digimarc's claim that the State improperly awarded the Contract to Viisage is moot.

Digimarc's central position in this case has been that Viisage was improperly awarded the Contract. As a result, Digimarc claims that it is entitled to an injunction "restraining and enjoining" the DMVS and GTA from implementing and performing the Contract with Viisage. Furthermore, Digimarc seeks an order that the Contract be awarded to it, or alternatively, is re-bid. Finally, Digimarc seeks (apparently as an alternative to injunctive relief) an award of its bid preparation costs from GTA and DMVS. GTA and DMVS have decided to terminate the existing contract for convenience and to re-bid the Contract. Given that the Contract is no longer in existence and that DMVS and GTA have decided to re-bid the Contract, there is no need for the Court to restrain implementation of the Contract, or to order a re-bid. To do so would be to decide a moot issue. It is well settled that "'The courts do not concern themselves with the solution of academic problems or the determination of dead issues.'" In the Interest of I.B., 219 Ga.App. 268, 270, 464 S.E.2d 865, 867 (1995).

In essence, Digimarc's claims are now "dead issues." As the State has terminated the Contract with Viisage - just as Digimarc requested in its prayer for relief - the issues regarding the award of the Contract are moot. "[T]he [Georgia] Supreme Court implied that moot matters

pending before trial courts should not be decided...." Id. In addressing the standard for trial courts

to review moot issues, the Court of Appeals found that, "It would be anomalous if the law allowed a

pleader to hurdle the mootness bar in the trial court and obtain an advisory opinion which is not

reviewable by the appellate court because the bar is placed in the way at that level." Id., 464 S.E.2d

at 867-868. As there is no longer any Contract for Digimarc to complain about, there is no

justiciable controversy before this Court to be decided. Consequently, this Court should dismiss

Digimarc's Amended Complaint as moot.

The only conceivable issues remaining after the termination of the Contract are Digimarc's

claim that the Contract should be awarded to it, and its claim for bid preparation costs. While GTA

and DMVS are more properly suited to address these issues, lest Digimarc argue that it is, in fact,

entitled to an order awarding it the Contract, Viisage must point out that such relief is both

unnecessary and unsupported by Georgia law. Indeed, the extraordinary relief of a mandatory

injunction compelling GTA and DMVS to enter a contract with a party whose offer the GTA and

DMVS rejected in favor of another is completely inappropriate in these circumstances.

O.C.G.A. § 9-5-8 (2002) provides, "The granting and continuing of injunctions shall always

rest in the sound discretion of the judge, according to the circumstances of each case. This power

shall be prudently and cautiously exercised and, except in clear and urgent cases, should not be

resorted to." A mandatory injunction awarding the Contract to Digimarc would deny the State its

due discretion as conferred by the Georgia law, including the GTA Rules. Viisage respectfully

submits that a court should not order GTA and DMVS to enter into a contract unwillingly. .

Furthermore, Viisage respectfully submits that because Digimarc has obtained, in effect, the

injunctive relief it sought, it is not entitled to bid preparation costs. That issue of course is an issue

between GTA, DMVS and Digimarc, and thus is tangential to the essential dispute in this litigation

-- whether the Contract was properly awarded.

Because all of Digimarc's claims for relief which properly can be awarded by this Court are moot or have been satisfied, and Digimarc's Amended Complaint should be dismissed.

## II.    Viisage Is No Longer A Necessary Party, And Should Be Dismissed In Any Event.

Even if the action were to continue against GTA and DMVS to determine whether Digimarc is entitled to an award of its bid preparation costs or an award of the Contract (and Viisage contends Digimarc is not entitled to such relief), by virtue of the termination for convenience, Viisage is no longer a necessary party, and therefore should be dismissed from this action.

The propriety of dismissing Viisage is self-evident. No claims have been asserted against Viisage. *See* Amended Complaint. Rather, because Digimarc sought that GTA, DMVS, and Viisage be restrained from implementing the Contract, Viisage was added as a necessary party to enable it to protect its interest in the Contract that it had been awarded. As the Contract that is the subject of Digimarc's Complaint has been terminated for convenience, and GTA and DMVS intend to issue a new Request for Proposals, Viisage no longer has any interest relating to the subject of this action. Thus, pursuant to O.C.G.A. § 9-11-19(a) Viisage is no longer a necessary party.

Georgia law is clear as to the test for when a party should be joined in the first instance. As stated in Hall v. Oliver, 251 Ga. App. 122, 122-23, 553 S.E.2d 656, 657 (2001):

> [T]here are two essential tests for determining whether a party is necessary to an action. First, can relief be afforded the plaintiff without the presence of the other party? And second, can the case be decided on its merits without prejudicing the rights of the other party?

*Id.* If the answer to either of those questions is no, then the party is necessary, and should be joined if feasible. The answer to both of these questions, however, now that the Contract has been terminated, is unquestionably yes, and therefore Viisage no longer is a necessary party.

Therefore, even if some dispute remains between the GTA, DMVS, and Digimarc, Viisage respectfully requests that because it is no longer a necessary party, and because no relief is sought

from it other than it be restrained from implementing the now-terminated Contract with DMVS and GTA, it be dismissed from this action.

WHEREFORE, Viisage prays that Digimarc's Amended Complaint be dismissed in its entirety, or in the alternative that Viisage be dismissed as a necessary party to this action and that Viisage be granted other relief as the Court deems proper.

Respectfully submitted, this _24th_ day of July, 2004.

KING & SPALDING LLP

Jameson B. Carroll
Georgia Bar No. 112640
Peter M. Crofton
Georgia Bar No. 197122
Robert C. Khayat, Jr.
Georgia Bar No. 416981
Gregory K. Smith
Georgia Bar No. 658363

191 Peachtree Street
Atlanta, Georgia 30303
(404) 572-4600
(404) 572-5144 (fax)

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

DIGIMARC ID SYSTEMS, LLC,

        Plaintiff,

v.

GEORGIA TECHNOLOGY AUTHORITY and
the GEORGIA DEPARTMENT OF MOTOR
VEHICLE SAFETY,

        Defendants,

v.

VIISAGE TECHNOLOGY, INC., a Delaware
corporation,

        Necessary Party-Defendant

Civil Action No. 2003CV66498

### CERTIFICATE OF SERVICE

This is to certify I am on this day serving the foregoing **VIISAGE TECHNOLOGY,**

**INC'S MOTION TO DISMISS AND SUPPORTING MEMORANDUM** upon all parties to

the above-captioned action by hand-delivery:

### Via Hand Delivery

David L. Balser
John P. Hutchins
Valerie D. Barton
McKenna Long & Aldridge LLP
303 Peachtree Street, Suite 5300
Atlanta, GA  30308
(404) 527-4198 (fax)

John B. Ballard, Jr.
Emily P. Hitchcock
Assistant Attorney General
Office of the Attorney General
40 Capitol Square SW
Atlanta, GA  30334-1300
(404) 657-3239 (fax)

John P. Gallagher
Catherine M. Banich
Stites & Harbison, PLLC
303 Peachtree Street, N.E.
2800 SunTrust Plaza
Atlanta, Georgia 30308
(404) 739-8870 (fax)

This _____ day of July, 2004.

_____
One of the Attorneys for Defendant Viisage
Technology, Inc.

# Exhibit 18

IN THE SUPERIOR COURT OF FULTON COUNTY

STATE OF GEORGIA

DIGIMARC ID SYSTEMS, LLC,   )
            )
  Plaintiff,      )
            )
vs.           )
            )
GEORGIA TECHNOLOGY   )
AUTHORITY and the GEORGIA  )
DEPARTMENT OF MOTOR VEHICLE )  Civil Action No. 2003CV66498
SAFETY,        )
            )
  Defendants,     )
            )
vs.           )
            )
VIISAGE TECHNOLOGY, INC.,  )
            )
  Necessary Party-Defendant. )

## SECOND AFFIDAVIT OF JAMES R. DAVIS

Personally appeared before the undersigned officer duly authorized to administer oaths, JAMES R. DAVIS, who upon being sworn, states as follows:

1.

I am over eighteen years of age and am competent to testify regarding the matters contained herein. My testimony is based on personal knowledge.

2.

I give this Affidavit for use in the above-styled case for any purposes allowed under the Georgia Civil Practice Act or any other provision of Georgia law or rules.

3.

I am the Commissioner of the Department of Motor Vehicle Safety ("Department") and was appointed to that position effective January 20, 2004.

4.

As Commissioner, it is within the exercise of my discretion to make policy decisions for the Department and to ensure that they are implemented.

5.

The provision of driver's licenses and identification cards to the State's citizens is a mission critical function of the Department.

6.

Upon being appointed Commissioner, I learned that Georgia's driver's licenses are easily altered and that the technology used to produce the cards is antiquated. Therefore, I determined, as a matter of policy, that the Department must explore all available alternatives to ensure as expeditiously as possible that the technology used to produce Georgia's driver's licenses and identification cards is not outdated.

7.

Upon being appointed Commissioner, I learned that Digimarc ID Systems, LLC, the Plaintiff in this lawsuit ("Digimarc"), is the current provider of driver's licenses and identification cards to the State of Georgia and that the contract was to expire on June 30, 2004. In order to assure that no gap occurs in the provision of driver's licenses and identification cards, I instructed my staff to take the steps necessary to execute an amendment to the contract to continue it for a day-to-day term until such time as a transition can be effected to a new system. On or about March 8, 2004, my staff and I met with John Duncan, Roger French and Sandra Villaneuve. To

my dismay, Mr. French asserted during that conversation that it might be 3, or even more, years before the above-styled case is resolved. Mr. French and his colleagues also acknowledged that the system currently being provided by Digimarc is woefully outdated.

8.

As a part of the contract negotiations, Digimarc submitted a proposal, a true and correct copy of which is attached hereto as Exhibit A, to upgrade the State's driver's license and identification card system. Option 2 of Digimarc's proposal contained at least one alternative that was not only vastly superior to the license being provided under the current contract with Digimarc, but also an improvement to the proposal it submitted in response to the RFP at far less cost than originally proposed. I determined that acceptance of any of the Option 2 alternatives in Digimarc's proposal would violate the State's competitive procurement laws.

9.

In order to expeditiously resolve the litigation and permit the Department to pursue the establishment of a secure driver's license and identification card system, I authorized the following settlement proposal:

    (a)  Termination of the November 12, 2002 contract with Viisage Technology, Inc. ("Viisage");

    (b)  Submission by Viisage and Digimarc of revised Best and Final Offers, both technical and cost proposals;

    (c)  Evaluation of the technical proposals by an independent panel of experts, to include a finding of whether each proposal "met" or "did not meet" the requirements of the RFP;

    (d)  My review of the report of the independent panel of experts;

(e)  My acceptance or rejection of the report of the independent panel of experts in its totality prior to opening the cost proposals;

(f)  If the panel's report was accepted, award of the contract to the vendor with the lowest bid whose proposal met the requirements of the original Request for Proposals; and

(g)  If the panel's report was rejected, re-bid of the contract.

10.

Digimarc rejected the settlement proposal without negotiation, except to state that it would accept an award of the contract. I determined that this alternative was unacceptable for a number of reasons, including without limitation, the technology Digimarc originally proposed, the cost of Digimarc's original proposal, and the existence of the contract with Viisage.

11.

In the interest of homeland security generally and because Georgia's citizens cannot wait several years to obtain a secure driver's license, I notified Viisage that the Department was terminating its contract for the new driver's license system for convenience. Viisage made a demand for a termination payment of $8.2 million dollars under GTA Rule 665-2-11-.09. After negotiations, the Department and the Georgia Technology Authority entered into a settlement agreement.

12.

I am familiar with the Executive Summary of The 9/11 Commission Report released on July 22, 2004, a true and correct copy of which is attached hereto as Exhibit B, and am aware that one of its recommendations, "Protect against and Prepare for Terrorist Attacks," recognizes the need for secure driver's licenses. My actions are consistent with The 9/11 Commission's

recommendations and its conclusion that the war on terrorism requires that immediate steps be taken to assure that the nation's driver's licenses and identification cards are secure.

13.

The Department, in conjunction with the Georgia Technology Authority, will promptly re-issue an updated Request for Proposals asking vendors to submit proposals for the provision of the new Digitized License System.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Further, affiant saith not.

Executed and sworn to before the undersigned officer, this 29th day of July, 2004.

Sworn to and subscribed before me this 29th day of July, 2004.

_____
Notary Public

_____
JAMES R. DAVIS

My Commission expires: 4/27/07

# Exhibit 19

-IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

DIGIMARC ID SYSTEMS, LLC,

        Plaintiff,

vs.

GEORGIA TECHNOLOGY AUTHORITY and
the GEORGIA DEPARTMENT OF MOTOR
VEHICLE SAFETY,

        Defendants,

vs.

VIISAGE TECHNOLOGY, INC., a Delaware
corporation,

        Necessary Party-Defendant.

Civil Action No. 2003CV66498

FILED IN OPEN COURT, THIS THE
_18_ DAY OF _Aug_ 2004

_____
JUDGE, DORIS L. DOWNS

### ORDER ON PLAINTIFF DIGIMARC ID SYSTEMS, LLC'S MOTION FOR TEMPORARY RESTRAINING ORDER SEEKING PRESERVATION OF STATUS QUO AND SUPPORTING MEMORANDUM OF LAW

On August 18, 2004, this matter came before this Court, as Presiding Judge, on Plaintiff

Digimarc ID Systems, LLC's Motion for Temporary Restraining Order Seeking Preservation of

Status Quo and Supporting Memorandum of Law. The Court held an oral hearing on Digimarc's

Motion, and all parties had the opportunity to be heard.

After considering Digimarc's Motion and the argument of the parties, this Court finds

that no prejudice will result to Defendants if Digimarc's Motion is granted, and Digimarc ~~will be~~ may be

irreparably harmed ~~because the performance under the underlying contract that Digimarc claims~~

~~is already enjoined by Judge Moore's July 31, 2003 Order will have already occurred.~~

Thus, IT IS HEREBY ORDERED that Defendants Georgia Technology Authority and

Department of Motor Vehicle Services and Necessary Party-Defendant Viisage Technology, Inc.

are hereby temporarily restrained and enjoined from consummating the transaction referenced in

the "Release and Settlement Agreement" between those parties dated July 20, 2004, specifically

the performance referenced in paragraphs 1 and 2 thereof, until September 2, 2004. This Court

understands that Judge Moore intends to hold a hearing on September 1, 2004, at which time it is

expected that she will further resolve this issue. This Court's temporary restraining order will

expire at 12:01 a.m. on September 2, 2004.

SO ORDERED this ___/8___ day of August 2004.


_____
Judge Doris L. Downs, Presiding Judge
Fulton County Superior Court

# Exhibit 20

# IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

DIGIMARC ID SYSTEMS, LLC,

        Plaintiff,

vs.

GEORGIA TECHNOLOGY AUTHORITY and
the GEORGIA DEPARTMENT OF MOTOR
VEHICLE SAFETY,

        Defendants,

vs.

VIISAGE TECHNOLOGY, INC., a Delaware
corporation,

        Necessary Party-Defendant.



FILED IN OFFICE

SEP - 2 2004

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

Civil Action No. 2003CV66498

## ORDER

On September 1, 2004, this matter came before the Court on the following motions:

- Plaintiff Digimarc ID Systems, LLC's Motion for Temporary Restraining Order, filed July 23, 2004;
- State Defendants' Motion to Dismiss, filed July 21, 2004;
- Viisage Technology, Inc.'s Motion to Dismiss, filed July 21, 2004; and
- Plaintiff Digimarc ID Systems, LLC's Motion To Compel Compliance With Discovery Order, Revise Scheduling Order And For Sanctions Against Defendant Viisage Technology, Inc., filed July 1, 2004.

The parties fully briefed the issues and presented oral argument to the Court. Having considered the parties' briefs, the oral arguments presented by counsel, the pleadings and discovery on file with the Court and all other matters of record, the Court finds as follows:

## FINDINGS OF FACT

1.  Under the Order on Plaintiff's Motion for Interlocutory Injunction ("Injunction Order") issued by this Court on July 31, 2003, the GTA and DMVS are currently enjoined on an interlocutory basis from all activities related to implementation of or performance under the contract dated November 12, 2002 between Viisage and DMVS, which contract is the subject of this lawsuit.

2.  In an effort to proceed with a new Request for Proposals for a Digitized Driver's License System for the State of Georgia, GTA, DMVS and Viisage attempted to enter into a settlement agreement, which contemplates a $2.5 million payment by GTA and DMVS to Viisage in exchange for mutual releases in connection with the termination of the November 12, 2002 contract, as well as the transfer of certain goods and equipment by Viisage to the State.

3.  Viisage has asserted that it has incurred costs in excess of $7 million prior to the 7/31/2003 injunction for development and implementation related to the November 12, 2002 contract.  Digimarc contends that payment of any amount by the State to Viisage pursuant to the settlement agreement would subsidize Viisage's development costs and, therefore, would give Viisage an unfair advantage vis-à-vis other bidders in a procurement under a new RFP.  DMVS, GTA and Viisage have not produced evidence to this Court regarding the exact nature and calculation of the $2.5 million payment to Viisage sufficient for it to determine whether Digimarc's contentions are correct.

4.  This Court has previously found that Plaintiff Digimarc has made a compelling case that irregularities occurred during the procurement process leading to the November 12, 2002

2

contract, and if the case proceeds to a full trial on the merits, there is a substantial likelihood that Plaintiff will prevail.

5. The contemplated payment by GTA and DMVS to Viisage and transfer of goods and equipment by Viisage to the State constitutes "activities related to implementation of or performance under the contract dated November 12, 2002," which is prohibited under the July 31, 2003 Injunction Order.

6. Counsel for DMVS and GTA has stated that she cannot project when a new RFP for the Digitized Driver's License System can be completed and posted, but it will very likely not be before the end of October 2004, as DMVS representatives plan to attend a conference held by the American Association of Motor Vehicle Administrators ("AAMVA") in late October 2004 prior to completing the preparation and development of the new RFP.

7. The Motions to Dismiss filed by GTA, DMVS and Viisage are predicated upon the completion of the settlement between those parties, and , due to this ruling enjoining implementation of that settlement and further scheduling an expedited date for hearing all dispositive motions, the Court will deny those motions at this time.

8. Defendant Viisage Technology, Inc. has not yet completed its discovery obligations under this Court's previously issued Order dated June 3, 2004.

## CONCLUSIONS OF LAW

1. Maintaining the status quo that exists as a result of this Court's July 31, 2003 Injunction Order will not prejudice DMVS and GTA in their efforts to move forward in the development of a new Digitized Driver's License System RFP.

3

2.   This Court has not had the opportunity to rule on the merits of this case and the propriety of all of Digimarc's claims as a matter of law.  Digimarc will be prejudiced, therefore, if the contemplated settlement by and among Defendants is allowed to proceed or the contemplated new RFP is awarded prior to the Court issuing such a ruling as a matter of law because such settlement or award would unfairly moot some of Digimarc's claims, leaving Digimarc with no adequate remedy at law.

3.   If Digimarc prevails on its claims in this case, the November 12, 2002 contract between DMVS and Viisage at issue may be deemed null and void *ab initio* on the basis of having been awarded in violation of the applicable procurement laws and rules.  O.C.G.A. § 50-25-7.8.

4.   The contemplated $2.5 million payment by GTA and DMVS to Viisage and transfer of goods and equipment to the State constitutes "performance," as that term is used in this Court's July 31, 2003 Injunction Order.

5.   Granting Plaintiff's Motion for Temporary Restraining Order will continue to preserve the status quo that has existed since the July 31, 2003 Injunction Order was entered by this Court.

6.   Viisage has not, to date, complied with Court's Order on Digimarc's Motion to Compel dated June 3, 2004.

Therefore, IT IS HEREBY ORDERED that:

Digimarc's Motion for Temporary Restraining Order is **GRANTED** and the July 31, 2003 Interlocutory Injunction continues to remain in full force and effect until further order of this Court;

4

GTA and DMVS may continue to move forward with the preparation and development of the new RFP for the Digitized Driver's License System for the State of Georgia, up to and including posting the new RFP on the GTA website;

GTA, DMVS and Viisage may not proceed with or consummate the transactions contemplated by the purported settlement agreement between those parties, including the making of payments or any further transfers of goods or equipment by and between Defendants, until further order of this Court; and,

With Viisage's consent, the State may retain and store any goods and equipment that have been previously delivered to it by Viisage in anticipation of performance under the settlement agreement between those parties; however, State may not compensate Viisage in any way for such goods or equipment or any costs attendant thereto until further order of this Court.

IT IS FURTHER ORDERED that:

The State Defendants' Motion to Dismiss is **DENIED** and Viisage Technology, Inc.'s Motion to Dismiss is **DENIED**.

IT IS FURTHER ORDERED that:

Plaintiff Digimarc ID Systems, LLC's Motion To Compel Compliance With Discovery Order, Revise Scheduling Order And For Sanctions Against Defendant Viisage Technology, Inc. is **GRANTED** in part and **DENIED** in part, as follows:

1.    Viisage shall immediately produce all documents set forth in this Court's discovery Order dated June 3, 2004.

2.    Viisage shall make available to counsel for Digimarc for review any and all documents listed in the relevance logs for e-mails and correspondence (but excluding any privilege log) previously prepared by Viisage in response to the Order of the court in

5

Massachusetts when Viisage was a non-party. Production of the documents in these categories, however, shall not be construed by Viisage to relieve it of its obligation to comply with this Court's previous Order requiring Viisage to respond to Digimarc's discovery requests with the broadest view possible as to what is relevant or is reasonably calculated to lead to the discovery of relevant information regardless of the completeness of any logs prepared by Viisage.

3.  Immediately following counsel for Digimarc's review of the above-referenced documents and Viisage's prompt production of any relevant, non-privileged documents discovered thereby, Viisage shall designate Craig Vosseteig and Barry Erhardt as 30(b)(6) witnesses in response to Digimarc's Notice of 30(b)(6) Deposition of Viisage Technology, Inc.

4.  Digimarc's request for attorneys' fees in connection with its Motion To Compel Compliance With Discovery Order, Revise Scheduling Order And For Sanctions Against Defendant Viisage Technology, Inc. is **GRANTED** and Viisage is ORDERED to pay Digimarc's attorneys' fees in the amount of $5,761.50 as set forth in the Affidavit of John P. Hutchins in Support of Motion for Sanctions.

IT IS FURTHER ORDERED that:

1.  GTA and DMVS shall provide an itemization supporting the determination of the propriety of payment of $500,000 for goods and equipment, including in such itemization the value of the equipment at Viisage's cost.

2.  Viisage shall provide an accounting of the direct costs Viisage alleges to have incurred in development and preparation for the implementation of the November 12, 2002 contract, including sufficient detail to determine why the $2 million payment to Viisage would not unfairly subsidize its development costs under a new RFP issued by GTA and DMVS.

6

IT IS FURTHER ORDERED that the Scheduling Order entered on June 9, 2004, as amended on August 13, 2004, is further amended and the following revised deadlines will govern this case, subject to further order of the Court:

1.    The documents to be produced by Viisage pursuant to this Court's June 3, 2003 Order and pursuant to the above-referenced review by counsel for Digimarc must be produced no later than September 7, 2004.

2.    The 30(b)(6) deposition witnesses that Viisage is ordered to make available under the Order entered by this Court on June 3, 2004 must be made available at Viisage's headquarters in Massachusetts after production of documents by Viisage but without further delay at a time reasonably convenient to the parties, counsel and the witnesses, taking into account the need for such testimony to be used as part of the dispositive motions this Court has ordered to be heard on an expedited basis.

3.    The parties must file all contemplated dispositive motions no later than October 11, 2004. Responses are due by October 20, 2004. Replies, if any, are due no later than October 25, 2004. All papers and exhibits shall be served by hand delivery on opposing counsel, so as to afford each party the maximum time for briefing.

4.    This Court shall hear all timely-filed dispositive motions, and any other motions that are pending and ripe for adjudication, at a hearing scheduled for October 27, 2004 at 9:30 a.m.

5.    Given the highly-expedited posture of this case and the demands of this Court's criminal calendar, the parties shall promptly provide the Court with an accurate estimate of the time required for the October 27, 2004 hearing.

7

SO ORDERED this 2nd day of September 2004.

Judge Thelma Wyatt Cummings Moore
Fulton County Superior Court

8

# Exhibit 21

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA



DIGIMARC ID SYSTEMS, LLC,

     Plaintiff,

vs.

GEORGIA TECHNOLOGY AUTHORITY and
the GEORGIA DEPARTMENT OF MOTOR
VEHICLE SAFETY,

     Defendants,

vs.

VIISAGE TECHNOLOGY, INC., a Delaware
corporation,

     Necessary Party-Defendant.

Civil Action No. 2003CV66498

## NOTICE OF APPEAL

COMES NOW VIISAGE TECHNOLOGY INC. ("Viisage") and, pursuant to O.C.G.A.

§ 5-6-37, gives notice that it hereby appeals to the Supreme Court of the State of Georgia from

this Court's Order enjoining performance of a settlement agreement between Viisage and the

State of Georgia, and also enjoining the award by the State of any contract arising from the

issuance of a Request for Proposals ("RFP") for the procurement of driver's licenses entered in

this action on September 2, 2004. Appeal as of right is appropriate from this Order because the

performance of the settlement agreement and issuance of an award pursuant to the State's

planned issuance of an RFP was enjoined for an indefinite period of time. A copy of the order

appealed from is attached hereto as Exhibit A.

RECORD ON APPEAL

The Clerk will please transmit the entire record on appeal and omit nothing, including, but not limited to, all pleadings, exhibits and other papers filed in connection with this matter.

In addition, the Clerk shall file all transcripts of evidence and proceedings in the Superior Court in this action, including but not limited to the following:

| Date | Hearing |
|------|---------|
| July 28, 2003 | Hearing on Interlocutory Injunction |
| May 25, 2004 | Hearing on Discovery and Other Issues |
| August 18, 2004 | Hearing on Temporary Restraining Order |
| September 1, 2004 | Hearing on Temporary Restraining Order |

JURISDICTION

The Supreme Court of Georgia, rather than the Court of Appeals, has jurisdiction of this appeal pursuant to O.C.G.A.§ 5-6-34(a)(4) and Article VI, Section VI, Paragraph III(2) of the Constitution of the State of Georgia.

Respectfully submitted this 1st day of October, 2004.

KING & SPALDING LLP

Jameson B. Carroll
Georgia Bar No. 112640
Peter M. Crofton
Georgia Bar No. 197122
Robert C. Khayat, Jr.
Georgia Bar No. 416981
Gregory K. Smith
Georgia Bar No. 658363

191 Peachtree Street
Atlanta, Georgia 30303
(404) 572-4600
(404) 572-5100 (fax)

ATTORNEYS FOR VIISAGE
TECHNOLOGY, INC.

3

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

DIGIMARC ID SYSTEMS, LLC,

        Plaintiff,

v.

GEORGIA TECHNOLOGY AUTHORITY and
the GEORGIA DEPARTMENT OF MOTOR
VEHICLE SAFETY,

        Defendants,

v.

VIISAGE TECHNOLOGY, INC., a Delaware
corporation,

        Necessary Party-Defendant

Civil Action No. 2003CV66498

## CERTIFICATE OF SERVICE

This is to certify I am on this day serving the foregoing **NOTICE OF APPEAL** upon the

parties referenced below by causing a copy of the same to be deposited in the United States mail,

first-class postage prepaid, addressed to:

        David L. Balser
        John P. Hutchins
        Valerie D. Barton
        McKenna Long & Aldridge LLP
        303 Peachtree Street, Suite 5300
        Atlanta, GA  30308
        (404) 527-4198 (fax)

        Oscar B. Fears
        Assistant Attorney General
        Office of the Attorney General
        40 Capitol Square SW
        Atlanta, GA  30334-1300

(404) 657-3239 (fax)

John P. Gallagher
Catherine M. Banich
Stites & Harbison, PLLC
303 Peachtree Street, N.E.
2800 SunTrust Plaza
Atlanta, Georgia 30308
(404) 739-8870 (fax)

This _____ day of October, 2004.

_____
One of the Attorneys for Defendant Viisage
Technology, Inc.

5

Exhibit A

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

DIGIMARC ID SYSTEMS, LLC,

      Plaintiff,

vs.

GEORGIA TECHNOLOGY AUTHORITY and
the GEORGIA DEPARTMENT OF MOTOR
VEHICLE SAFETY,

      Defendants,

vs.

VIISAGE TECHNOLOGY, INC., a Delaware
corporation,

      Necessary Party-Defendant.



Civil Action No. 2003CV66498

### ORDER

On September 1, 2004, this matter came before the Court on the following motions:

- Plaintiff Digimarc ID Systems, LLC's Motion for Temporary Restraining Order, filed July 23, 2004;
- State Defendants' Motion to Dismiss, filed July 21, 2004;
- Viisage Technology, Inc.'s Motion to Dismiss, filed July 21, 2004; and
- Plaintiff Digimarc ID Systems, LLC's Motion To Compel Compliance With Discovery Order, Revise Scheduling Order And For Sanctions Against Defendant Viisage Technology, Inc., filed July 1, 2004.

The parties fully briefed the issues and presented oral argument to the Court. Having

considered the parties' briefs, the oral arguments presented by counsel, the pleadings and

discovery on file with the Court and all other matters of record, the Court finds as follows:

### FINDINGS OF FACT

1.  Under the Order on Plaintiff's Motion for Interlocutory Injunction ("Injunction Order") issued by this Court on July 31, 2003, the GTA and DMVS are currently enjoined on an interlocutory basis from all activities related to implementation of or performance under the contract dated November 12, 2002 between Viisage and DMVS, which contract is the subject of this lawsuit.

2.  In an effort to proceed with a new Request for Proposals for a Digitized Driver's License System for the State of Georgia, GTA, DMVS and Viisage attempted to enter into a settlement agreement, which contemplates a $2.5 million payment by GTA and DMVS to Viisage in exchange for mutual releases in connection with the termination of the November 12, 2002 contract, as well as the transfer of certain goods and equipment by Viisage to the State.

3.  Viisage has asserted that it has incurred costs in excess of $7 million prior to the 7/31/2003 injunction for development and implementation related to the November 12, 2002 contract. Digimarc contends that payment of any amount by the State to Viisage pursuant to the settlement agreement would subsidize Viisage's development costs and, therefore, would give Viisage an unfair advantage vis-à-vis other bidders in a procurement under a new RFP. DMVS, GTA and Viisage have not produced evidence to this Court regarding the exact nature and calculation of the $2.5 million payment to Viisage sufficient for it to determine whether Digimarc's contentions are correct.

4.  This Court has previously found that Plaintiff Digimarc has made a compelling case that irregularities occurred during the procurement process leading to the November 12, 2002

contract, and if the case proceeds to a full trial on the merits, there is a substantial

likelihood that Plaintiff will prevail.

5.  The contemplated payment by GTA and DMVS to Viisage and transfer of goods and

equipment by Viisage to the State constitutes "activities related to implementation of or

performance under the contract dated November 12, 2002," which is prohibited under the

July 31, 2003 Injunction Order.

6.  Counsel for DMVS and GTA has stated that she cannot project when a new RFP for the

Digitized Driver's License System can be completed and posted, but it will very likely

not be before the end of October 2004, as DMVS representatives plan to attend a

conference held by the American Association of Motor Vehicle Administrators

("AAMVA") in late October 2004 prior to completing the preparation and development

of the new RFP.

7.  The Motions to Dismiss filed by GTA, DMVS and Viisage are predicated upon the

completion of the settlement between those parties, and , due to this ruling enjoining

implementation of that settlement and further scheduling an expedited date for hearing all

dispositive motions, the Court will deny those motions at this time.

8.  Defendant Viisage Technology, Inc. has not yet completed its discovery obligations

under this Court's previously issued Order dated June 3, 2004.

## CONCLUSIONS OF LAW

1.  Maintaining the status quo that exists as a result of this Court's July 31, 2003 Injunction

Order will not prejudice DMVS and GTA in their efforts to move forward in the

development of a new Digitized Driver's License System RFP.

3

2.     This Court has not had the opportunity to rule on the merits of this case and the propriety

of all of Digimarc's claims as a matter of law. Digimarc will be prejudiced, therefore, if

the contemplated settlement by and among Defendants is allowed to proceed or the

contemplated new RFP is awarded prior to the Court issuing such a ruling as a matter of

law because such settlement or award would moot some of Digimarc's claims, leaving

Digimarc with no adequate remedy at law.

3.     If Digimarc prevails on its claims in this case, the November 12, 2002 contract between

DMVS and Viisage at issue may be deemed null and void *ab initio* on the basis of having

been awarded in violation of the applicable procurement laws and rules. O.C.G.A. § 50-

25-7.8.

4.     The contemplated $2.5 million payment by GTA and DMVS to Viisage and transfer of

goods and equipment to the State constitutes "performance," as that term is used in this

Court's July 31, 2003 Injunction Order.

5.     Granting Plaintiff's Motion for Temporary Restraining Order will continue to preserve

the status quo that has existed since the July 31, 2003 Injunction Order was entered by

this Court.

6.     Viisage has not, to date, complied with Court's Order on Digimarc's Motion to Compel

dated June 3, 2004.

    Therefore, IT IS HEREBY ORDERED that:

    Digimarc's Motion for Temporary Restraining Order is **GRANTED** and the July 31,

2003 Interlocutory Injunction continues to remain in full force and effect until further order of

this Court;

4

GTA and DMVS may continue to move forward with the preparation and development of the new RFP for the Digitized Driver's License System for the State of Georgia, up to and including posting the new RFP on the GTA website;

GTA, DMVS and Viisage may not proceed with or consummate the transactions contemplated by the purported settlement agreement between those parties, including the making of payments or any further transfers of goods or equipment by and between Defendants, until further order of this Court; and,

With Viisage's consent, the State may retain and store any goods and equipment that have been previously delivered to it by Viisage in anticipation of performance under the settlement agreement between those parties; however, State may not compensate Viisage in any way for such goods or equipment or any costs attendant thereto until further order of this Court.

IT IS FURTHER ORDERED that:

The State Defendants' Motion to Dismiss is **DENIED** and Viisage Technology, Inc.'s Motion to Dismiss is **DENIED**.

IT IS FURTHER ORDERED that:

Plaintiff Digimarc ID Systems, LLC's Motion To Compel Compliance With Discovery Order, Revise Scheduling Order And For Sanctions Against Defendant Viisage Technology, Inc. is **GRANTED** in part and **DENIED** in part, as follows:

1.    Viisage shall immediately produce all documents set forth in this Court's discovery Order dated June 3, 2004.

2.    Viisage shall make available to counsel for Digimarc for review any and all documents listed in the relevance logs for e-mails and correspondence (but excluding any privilege log) previously prepared by Viisage in response to the Order of the court in

5

Massachusetts when Viisage was a non-party. Production of the documents in these categories, however, shall not be construed by Viisage to relieve it of its obligation to comply with this Court's previous Order requiring Viisage to respond to Digimarc's discovery requests with the broadest view possible as to what is relevant or is reasonably calculated to lead to the discovery of relevant information regardless of the completeness of any logs prepared by Viisage.

3.   Immediately following counsel for Digimarc's review of the above-referenced documents and Viisage's prompt production of any relevant, non-privileged documents discovered thereby, Viisage shall designate Craig Vosseteig and Barry Erhardt as 30(b)(6) witnesses in response to Digimarc's Notice of 30(b)(6) Deposition of Viisage Technology, Inc.

4.   Digimarc's request for attorneys' fees in connection with its Motion To Compel Compliance With Discovery Order, Revise Scheduling Order And For Sanctions Against Defendant Viisage Technology, Inc. is **GRANTED** and Viisage is ORDERED to pay Digimarc's attorneys' fees in the amount of $5,761.50 as set forth in the Affidavit of John P. Hutchins in Support of Motion for Sanctions.

   IT IS FURTHER ORDERED that:

1.   GTA and DMVS shall provide an itemization supporting the determination of the propriety of payment of $500,000 for goods and equipment, including in such itemization the value of the equipment at Viisage's cost.

2.   Viisage shall provide an accounting of the direct costs Viisage alleges to have incurred in development and preparation for the implementation of the November 12, 2002 contract, including sufficient detail to determine why the $2 million payment to Viisage would not unfairly subsidize its development costs under a new RFP issued by GTA and DMVS.

6

IT IS FURTHER ORDERED that the Scheduling Order entered on June 9, 2004, as amended on August 13, 2004, is further amended and the following revised deadlines will govern this case, subject to further order of the Court:

1.  The documents to be produced by Viisage pursuant to this Court's June 3, 2003 Order and pursuant to the above-referenced review by counsel for Digimarc must be produced no later than September 7, 2004.

2.  The 30(b)(6) deposition witnesses that Viisage is ordered to make available under the Order entered by this Court on June 3, 2004 must be made available at Viisage's headquarters in Massachusetts after production of documents by Viisage but without further delay at a time reasonably convenient to the parties, counsel and the witnesses, taking into account the need for such testimony to be used as part of the dispositive motions this Court has ordered to be heard on an expedited basis.

3.  The parties must file all contemplated dispositive motions no later than October 11, 2004. Responses are due by October 20, 2004. Replies, if any, are due no later than October 25, 2004. All papers and exhibits shall be served by hand delivery on opposing counsel, so as to afford each party the maximum time for briefing.

4.  This Court shall hear all timely-filed dispositive motions, and any other motions that are pending and ripe for adjudication, at a hearing scheduled for October 27, 2004 at 9:30 a.m.

5.  Given the highly-expedited posture of this case and the demands of this Court's criminal calendar, the parties shall promptly provide the Court with an accurate estimate of the time required for the October 27, 2004 hearing.

7

SO ORDERED this 2nd day of September 2004.

Judge Thelma Wyatt Cummings Moore
Fulton County Superior Court

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

DIGIMARC ID SYSTEMS, LLC,

       Plaintiff,

vs.

GEORGIA TECHNOLOGY AUTHORITY and
the GEORGIA DEPARTMENT OF MOTOR
VEHICLE SAFETY,

       Defendants,

vs.

VIISAGE TECHNOLOGY, INC., a Delaware
corporation,

       Necessary Party-Defendant.

Civil Action No. 2003CV66498

## NOTICE OF APPEAL

COMES NOW the Georgia Technology Authority and the Georgia Department of Motor

Vehicle Safety ("GTA" and "DMVS" respectively) and, pursuant to O.C.G.A. § 5-6-37, gives

notice that they hereby appeal to the Supreme Court of the State of Georgia from this Court's

Order enjoining performance of a settlement agreement between Viisage and the State of

Georgia, and also enjoining the award by the State of any contract arising from the issuance of a

Request for Proposals ("RFP") for the procurement of driver's licenses entered in this action on

September 2, 2004.  Appeal as of right is appropriate from this Order because the performance of

the settlement agreement and issuance of an award pursuant to the State's planned issuance of an

RFP was enjoined for an indefinite period of time.  A copy of the order appealed from is attached

hereto as Exhibit A.

GE043:000GE:93118:1:ATLANTA
10/1/04

RECORD ON APPEAL

The Clerk will please transmit the entire record on appeal and omit nothing, including, but not limited to, all pleadings, exhibits and other papers filed in connection with this matter.

In addition, the Clerk shall file all transcripts of evidence and proceedings in the Superior Court in this action, including but not limited to the following:

| Date | Hearing |
|------|---------|
| July 28, 2003 | Hearing on Interlocutory Injunction |
| May 25, 2004 | Hearing on Discovery and Other Issues |
| August 18, 2004 | Hearing on Temporary Restraining Order |
| September 1, 2004 | Hearing on Temporary Restraining Order |

JURISDICTION

The Supreme Court of Georgia, rather than the Court of Appeals, has jurisdiction of this appeal pursuant to O.C.G.A.§ 5-6-34(a)(4) and Article VI, Section VI, Paragraph III(2) of the Constitution of the State of Georgia.

Respectfully submitted this 1st day of October, 2004.

_Oscar B Fears (by JPG of express permission)_
THURBERT E. BAKER (Ga. Bar No. 033887)
Attorney General
DANIEL M. FORMBY (Ga. Bar. No. 269350)
Deputy Attorney General
JOHN B. BALLARD, JR. (Ga. Bar. No. 035550)
Senior Assistant Attorney General
OSCAR B. FEARS (Ga. Bar No. 257020)
Assistant Attorney General

PLEASE ADDRESS ALL
COMMUNICATIONS TO:

OSCAR B. FEARS
Assistant Attorney General
40 Capitol Square, S.W.
Atlanta, GA 30303
Telephone: (404) 651-6249

_John P Gallagher_
John P. Gallagher (Ga. Bar No. 282860)
Special Assistant Attorney General
**STITES & HARBISON, PLLC**
303 Peachtree Street, N.E.
2800 SunTrust Plaza
Atlanta, GA 30308
Telephone: (404) 739-8800
Facsimile: (404) 739-8870

ATTORNEYS FOR DEFENDANTS GEORGIA
TECHNOLOGY AUTHORITY AND THE
GEORGIA DEPARTMENT OF MOTOR
VEHICLES SAFETY

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

DIGIMARC ID SYSTEMS, LLC,

    Plaintiff,

vs.

GEORGIA TECHNOLOGY AUTHORITY and
the GEORGIA DEPARTMENT OF MOTOR
VEHICLE SAFETY,

    Defendants,

vs.

VIISAGE TECHNOLOGY, INC., a Delaware
corporation,

    Necessary Party-Defendant.



FILED IN OFFICE

SEP - 2 2004

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

Civil Action No. 2003CV66498

## ORDER

On September 1, 2004, this matter came before the Court on the following motions:

- Plaintiff Digimarc ID Systems, LLC's Motion for Temporary Restraining Order, filed July 23, 2004;
- State Defendants' Motion to Dismiss, filed July 21, 2004;
- Viisage Technology, Inc.'s Motion to Dismiss, filed July 21, 2004; and
- Plaintiff Digimarc ID Systems, LLC's Motion To Compel Compliance With Discovery Order, Revise Scheduling Order And For Sanctions Against Defendant Viisage Technology, Inc., filed July 1, 2004.

The parties fully briefed the issues and presented oral argument to the Court. Having considered the parties' briefs, the oral arguments presented by counsel, the pleadings and discovery on file with the Court and all other matters of record, the Court finds as follows:

## FINDINGS OF FACT

1. Under the Order on Plaintiff's Motion for Interlocutory Injunction ("Injunction Order") issued by this Court on July 31, 2003, the GTA and DMVS are currently enjoined on an interlocutory basis from all activities related to implementation of or performance under the contract dated November 12, 2002 between Viisage and DMVS, which contract is the subject of this lawsuit.

2. In an effort to proceed with a new Request for Proposals for a Digitized Driver's License System for the State of Georgia, GTA, DMVS and Viisage attempted to enter into a settlement agreement, which contemplates a $2.5 million payment by GTA and DMVS to Viisage in exchange for mutual releases in connection with the termination of the November 12, 2002 contract, as well as the transfer of certain goods and equipment by Viisage to the State.

3. Viisage has asserted that it has incurred costs in excess of $7 million prior to the 7/31/2003 injunction for development and implementation related to the November 12, 2002 contract. Digimarc contends that payment of any amount by the State to Viisage pursuant to the settlement agreement would subsidize Viisage's development costs and, therefore, would give Viisage an unfair advantage vis-à-vis other bidders in a procurement under a new RFP. DMVS, GTA and Viisage have not produced evidence to this Court regarding the exact nature and calculation of the $2.5 million payment to Viisage sufficient for it to determine whether Digimarc's contentions are correct.

4. This Court has previously found that Plaintiff Digimarc has made a compelling case that irregularities occurred during the procurement process leading to the November 12, 2002

2

contract, and if the case proceeds to a full trial on the merits, there is a substantial likelihood that Plaintiff will prevail.

5.  The contemplated payment by GTA and DMVS to Viisage and transfer of goods and equipment by Viisage to the State constitutes "activities related to implementation of or performance under the contract dated November 12, 2002," which is prohibited under the July 31, 2003 Injunction Order.

6.  Counsel for DMVS and GTA has stated that she cannot project when a new RFP for the Digitized Driver's License System can be completed and posted, but it will very likely not be before the end of October 2004, as DMVS representatives plan to attend a conference held by the American Association of Motor Vehicle Administrators ("AAMVA") in late October 2004 prior to completing the preparation and development of the new RFP.

7.  The Motions to Dismiss filed by GTA, DMVS and Viisage are predicated upon the completion of the settlement between those parties, and , due to this ruling enjoining implementation of that settlement and further scheduling an expedited date for hearing all dispositive motions, the Court will deny those motions at this time.

8.  Defendant Viisage Technology, Inc. has not yet completed its discovery obligations under this Court's previously issued Order dated June 3, 2004.

## CONCLUSIONS OF LAW

1.  Maintaining the status quo that exists as a result of this Court's July 31, 2003 Injunction Order will not prejudice DMVS and GTA in their efforts to move forward in the development of a new Digitized Driver's License System RFP.

2. This Court has not had the opportunity to rule on the merits of this case and the propriety of all of Digimarc's claims as a matter of law. Digimarc will be prejudiced, therefore, if the contemplated settlement by and among Defendants is allowed to proceed or the contemplated new RFP is awarded prior to the Court issuing such a ruling as a matter of law because such settlement or award would *unfairly* moot some of Digimarc's claims, leaving Digimarc with no adequate remedy at law.

3. If Digimarc prevails on its claims in this case, the November 12, 2002 contract between DMVS and Viisage at issue may be deemed null and void *ab initio* on the basis of having been awarded in violation of the applicable procurement laws and rules. O.C.G.A. § 50-25-7.8.

4. The contemplated $2.5 million payment by GTA and DMVS to Viisage and transfer of goods and equipment to the State constitutes "performance," as that term is used in this Court's July 31, 2003 Injunction Order.

5. Granting Plaintiff's Motion for Temporary Restraining Order will continue to preserve the status quo that has existed since the July 31, 2003 Injunction Order was entered by this Court.

6. Viisage has not, to date, complied with Court's Order on Digimarc's Motion to Compel dated June 3, 2004.

Therefore, IT IS HEREBY ORDERED that:

Digimarc's Motion for Temporary Restraining Order is **GRANTED** and the July 31, 2003 Interlocutory Injunction continues to remain in full force and effect until further order of this Court;

4

GTA and DMVS may continue to move forward with the preparation and development of the new RFP for the Digitized Driver's License System for the State of Georgia, up to and including posting the new RFP on the GTA website;

GTA, DMVS and Viisage may not proceed with or consummate the transactions contemplated by the purported settlement agreement between those parties, including the making of payments or any further transfers of goods or equipment by and between Defendants, until further order of this Court; and,

With Viisage's consent, the State may retain and store any goods and equipment that have been previously delivered to it by Viisage in anticipation of performance under the settlement agreement between those parties; however, State may not compensate Viisage in any way for such goods or equipment or any costs attendant thereto until further order of this Court.

IT IS FURTHER ORDERED that:

The State Defendants' Motion to Dismiss is **DENIED** and Viisage Technology, Inc.'s Motion to Dismiss is **DENIED**.

IT IS FURTHER ORDERED that:

Plaintiff Digimarc ID Systems, LLC's Motion To Compel Compliance With Discovery Order, Revise Scheduling Order And For Sanctions Against Defendant Viisage Technology, Inc. is **GRANTED** in part and **DENIED** in part, as follows:

1.  Viisage shall immediately produce all documents set forth in this Court's discovery Order dated June 3, 2004.

2.  Viisage shall make available to counsel for Digimarc for review any and all documents listed in the relevance logs for e-mails and correspondence (but excluding any privilege log) previously prepared by Viisage in response to the Order of the court in

5

Massachusetts when Viisage was a non-party. Production of the documents in these categories, however, shall not be construed by Viisage to relieve it of its obligation to comply with this Court's previous Order requiring Viisage to respond to Digimarc's discovery requests with the broadest view possible as to what is relevant or is reasonably calculated to lead to the discovery of relevant information regardless of the completeness of any logs prepared by Viisage.

3.  Immediately following counsel for Digimarc's review of the above-referenced documents and Viisage's prompt production of any relevant, non-privileged documents discovered thereby, Viisage shall designate Craig Vosseteig and Barry Erhardt as 30(b)(6) witnesses in response to Digimarc's Notice of 30(b)(6) Deposition of Viisage Technology, Inc.

4.  Digimarc's request for attorneys' fees in connection with its Motion To Compel Compliance With Discovery Order, Revise Scheduling Order And For Sanctions Against Defendant Viisage Technology, Inc. is **GRANTED** and Viisage is ORDERED to pay Digimarc's attorneys' fees in the amount of $5,761.50 as set forth in the Affidavit of John P. Hutchins in Support of Motion for Sanctions.

IT IS FURTHER ORDERED that:

1.  GTA and DMVS shall provide an itemization supporting the determination of the propriety of payment of $500,000 for goods and equipment, including in such itemization the value of the equipment at Viisage's cost.

2.  Viisage shall provide an accounting of the direct costs Viisage alleges to have incurred in development and preparation for the implementation of the November 12, 2002 contract, including sufficient detail to determine why the $2 million payment to Viisage would not unfairly subsidize its development costs under a new RFP issued by GTA and DMVS.

6

IT IS FURTHER ORDERED that the Scheduling Order entered on June 9, 2004, as amended on August 13, 2004, is further amended and the following revised deadlines will govern this case, subject to further order of the Court:

1. The documents to be produced by Viisage pursuant to this Court's June 3, 2003 Order and pursuant to the above-referenced review by counsel for Digimarc must be produced no later than September 7, 2004.

2. The 30(b)(6) deposition witnesses that Viisage is ordered to make available under the Order entered by this Court on June 3, 2004 must be made available at Viisage's headquarters in Massachusetts after production of documents by Viisage but without further delay at a time reasonably convenient to the parties, counsel and the witnesses, taking into account the need for such testimony to be used as part of the dispositive motions this Court has ordered to be heard on an expedited basis.

3. The parties must file all contemplated dispositive motions no later than October 11, 2004. Responses are due by October 20, 2004. Replies, if any, are due no later than October 25, 2004. All papers and exhibits shall be served by hand delivery on opposing counsel, so as to afford each party the maximum time for briefing.

4. This Court shall hear all timely-filed dispositive motions, and any other motions that are pending and ripe for adjudication, at a hearing scheduled for October 27, 2004 at 9:30 a.m.

5. Given the highly-expedited posture of this case and the demands of this Court's criminal calendar, the parties shall promptly provide the Court with an accurate estimate of the time required for the October 27, 2004 hearing.

7

SO ORDERED this 2nd day of September 2004.

Judge Thelma Wyatt Cummings Moore
Fulton County Superior Court

8

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

DIGIMARC ID SYSTEMS, LLC,

       Plaintiff,

v.

GEORGIA TECHNOLOGY AUTHORITY and
the GEORGIA DEPARTMENT OF MOTOR
VEHICLE SAFETY,

       Defendants,

v.

VIISAGE TECHNOLOGY, INC., a Delaware
corporation,

       Necessary Party-Defendant

Civil Action No. 2003CV66498

## CERTIFICATE OF SERVICE

This is to certify I am on this day serving the foregoing **NOTICE OF APPEAL** upon the

parties referenced below by causing a copy of the same to be deposited in the United States mail,

first-class postage prepaid, addressed to:

| | |
|---|---|
| John P. Hutchins | Jameson B. Carroll |
| McKenna Long & Aldridge LLP | King & Spalding LLP |
| 303 Peachtree Street, Suite 5300 | 191 Peachtree Street, NE |
| Atlanta, GA 30308 | Atlanta, GA 30303-1763 |
| Phone: (404) 572-4000 | Phone: (404) 572-4600 |
| Fax: (404)- 527-4198 | Fax: (404) 572-5100 |

This 1st day of October, 2004.

_____
One of the Attorneys for Defendants
Georgia Technology Authority and Georgia
Department of Motor Vehicle Safety

GE043:000GE:93118:1:ATLANTA
10/1/04

5

# Exhibit 22

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

DIGIMARC ID SYSTEMS, LLC,

           Plaintiff,

vs.

GEORGIA TECHNOLOGY AUTHORITY and
the GEORGIA DEPARTMENT OF MOTOR
VEHICLE SAFETY,

           Defendants,

vs.

VIISAGE TECHNOLOGY, INC., a Delaware
corporation,

           Necessary Party-Defendant.

Civil Action No. 2003CV66498

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

The instant motion presents three fundamental issues for this Court:

1.      The indisputable evidence shows that the State prematurely opened price proposals before completing technical evaluations, then as a result of its bias intentionally directed its efforts to assisting Viisage in submitting a "technically compliant" proposal, repeatedly violating applicable procurement law in the process. Given these facts, is there any genuine dispute that the contract awarded to Viisage should be declared void *ab initio*?

2.      But for the State's clear violations of applicable procurement law, its indisputable bias toward Viisage, and Viisage's deceptive conduct in the course of the bid process, Digimarc would have won the contract at issue. Does not equity demand that this Court employ its broad, discretionary, equitable powers to award Digimarc the complete relief it seeks, and restore the integrity of the bid process in Georgia, by awarding the contract at issue to Digimarc?

3.    Alternatively, if this Court does not find that equity demands that the contract should be awarded to Digimarc, given the State's clear bias in favor of Viisage and the indisputable evidence of Viisage's fraudulent conduct, does not equity demand that this Court enjoin the State defendants from awarding any re-bid of the contract at issue to Viisage, in order to protect the integrity of the bid process in Georgia?

Through discovery, Plaintiff Digimarc has irrefutably confirmed what it told this Court during the hearing on Digimarc's Motion for Interlocutory Injunction on July 28, 2003 – that the procurement that is the subject of this lawsuit was fatally flawed because Defendants GTA and DMVS repeatedly violated Georgia law, the GTA Rules and the express terms of Request for Proposal No. GTA000051 ("RFP"). Thus, the contract awarded to Viisage, dated November 12, 2002, is void *ab initio*.

In fact, the circumstances surrounding the conduct of the Defendants during the procurement are even worse than Digimarc suspected in July 2001. In addition to the serious violations of applicable law by GTA and DMVS, discovery has revealed that the award of the contract to Viisage was the result not only of bias by the Evaluation Team and GTA's incompetence, but also of an intentional plan on the part of the Evaluation Team to "rig" the bid in Viisage's favor. Moreover, Viisage knowingly and repeatedly misled GTA and DMVS and misrepresented its bid in several important respects, including its submission of permanent card samples that it represented as "production quality," its purported "arrangement" with Arthur Blank & Company in regard to back-up production facilities, and its reason for revising the portion of its bid related to its "point-of-sale" (POS) provider at the 11th hour. The facts conclusively show that, but for the State's gross violations of the applicable law and Viisage's deceptive conduct, Viisage would have been eliminated from consideration as of August 26, 2002, and the State would have awarded the contract at issue to Digimarc. When considered in

2

the aggregate, the circumstances of this case dictate that this Court employ its broad, discretionary, equitable powers to make the situation right, provide Digimarc with the complete relief that it seeks, and restore the integrity of the bid process in Georgia, which has been badly damaged by the conduct of the Defendants.

In support of this Motion, Digimarc relies on its Brief In Support of Motion for Partial Summary Judgment and  Statement of Material Facts as to Which No Genuine Dispute Exists, filed contemporaneously herewith, as well as the pleadings and discovery on file (or to be filed) with the Court.

The indisputable evidence shows that the State prematurely opened price proposals before completing technical evaluations, then as a result of its bias intentionally directed its efforts to assisting Viisage in submitting a "technically compliant" proposal, repeatedly violating applicable procurement law in the process.  There is no genuine issue of material fact regarding these issues.  Thus, summary judgment in Digimarc's favor is warranted, and the contract awarded to Viisage should be declared void *ab initio*.

Moreover, but for the State's clear violations of applicable procurement law, its indisputable bias toward Viisage, and Viisage's deceptive conduct in the course of the bid process, Digimarc would have won the contract at issue.  Under the circumstances of this case, Digimarc has no adequate remedy at law.  Equity demands that this Court employ its broad, discretionary, equitable powers to award Digimarc the complete relief it seeks, and restore the integrity of the bid process in Georgia, by awarding the contract at issue to Digimarc.

Alternatively, if this Court does not find that equity demands that the contract should be awarded to Digimarc, given the State's clear bias in favor of Viisage and the indisputable evidence of Viisage's fraudulent conduct, equity demands that this Court enjoin the State

3

defendants from awarding any re-bid of the contract at issue to Viisage, in order to protect the

integrity of the bid process in Georgia.

Respectfully submitted, this 11th day of October 2004.

John Hutchins
Georgia Bar No. 380692
TROUTMAN SANDERS LLP
600 Peachtree Street, Suite 5200
Atlanta, Georgia 30308
(404) 885-3460
(404) 962-6558 (facsimile)

*Attorney for Plaintiff*
*Digimarc ID Systems, LLC*

4

## CERTIFICATE OF SERVICE

This is to certify that I have this day served the within and foregoing **Plaintiff's Motion for Partial Summary Judgment** upon all parties to the above-captioned action by hand delivery addressed to:

Oscar B. Fears, III
Emily P. Hitchcock
John B. Ballard, Jr.
Office of the Attorney General
40 Capitol Square SW
Atlanta, GA 30334-1300

John P. Gallagher
Special Assistant Attorney General
Stites & Harbison, PLLC
303 Peachtree Street, NE
2800 SunTrust Plaza
Atlanta, GA 30308

Jameson B. Carroll
Peter M. Crofton
Robert C. Khayat
Gregory K. Smith
King & Spalding
191 Peachtree Street, NE
Atlanta, GA 30303

This 11th day of October 2004.

John P. Hutchins

*Attorney for Plaintiff*
*Digimarc ID Systems, LLC*

TROUTMAN SANDERS LLP
600 Peachtree Street, Suite 5200
Atlanta, Georgia 30308
(404) 885-3460
(404) 962-6558 (facsimile)

# Exhibit 23
# (Part 1 of 2)




## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

DIGIMARC ID SYSTEMS, LLC,

       Plaintiff,

vs.

GEORGIA TECHNOLOGY AUTHORITY and
the GEORGIA DEPARTMENT OF MOTOR
VEHICLE SAFETY,

       Defendants,

vs.

VIISAGE TECHNOLOGY, INC., a Delaware
corporation,

       Necessary Party-Defendant.

Civil Action No. 2003CV66498

---

### BRIEF IN SUPPORT OF A MOTION FOR SUMMARY JUDGMENT OF
### DEFENDANTS GEORGIA TECHNOLOGY AUTHORITY AND THE
### GEORGIA DEPARTMENT OF MOTOR VEHICLE SAFETY

John P. Gallagher (Ga. Bar No. 282860)
Special Assistant Attorney General
**STITES & HARBISON, PLLC**
303 Peachtree Street, N.E.
2800 SunTrust Plaza
Atlanta, GA 30308
Telephone:    (404) 739-8800
Facsimile:    (404) 739-8870

ATTORNEYS FOR DEFENDANTS
GEORGIA TECHNOLOGY AUTHORITY
AND THE GEORGIA DEPARTMENT OF
MOTOR VEHICLES SAFETY

**TABLE OF CONTENTS**

Page

INITIAL STATEMENT ................................................................................................1

BACKGROUND FACTS ..............................................................................................2

STANDARD OF REVIEW ...........................................................................................5

ARGUMENT AND CITATION OF AUTHORITY .....................................................6

I.   THE STATE HAS PROVIDED TO DIGIMARC THE ONLY AVAILABLE
     RELIEF REQUESTED MAKING THE ALLEGATIONS IN THE COMPLAINT
     MOOT. ...................................................................................................................6

     A.   DIGIMARC IS NOT ENTITLED TO AN AWARD OF THE CONTRACT..........11

          1.   The RFP is clear that no vendor has a right to an award of this
               contract ................................................................................................11

          2.   Digimarc cannot obtain an award of the contract by default .......................13

          3.   Georgia and federal case law do not support Digimarc's arguments
               that this Court should make an award the DLS Contract to Digimarc..........15

          4.   Practical and equitable considerations dictate that an award of the
               DLS Contract to Digimarc would be inappropriate .....................................21

     B.   VIISAGE SHOULD NOT BE DEBARRED FROM PARTICIPATING IN
          THE RE-BID..............................................................................................23

          1.   Plaintiff lacks standing to seek the debarment of Viisage and this
               Court lacks the constitutional authority to substitute its judgment for
               that of the GTA as to whether Viisage should be debarred from a re-
               bid........................................................................................................24

          2.   This Court should not order the debarment of Viisage from a re-bid
               because Digimarc cannot prove that it will suffer irreparable harm by
               Viisage's participation in the re-bid..........................................................26

          3.   To debar Viisage from participating in a future procurement would
               not be in the best interests of the citizens of Georgia....................................31

II.  DIGIMARC IS NOT ENTITLED TO BID PREPARATION COSTS ................................32

     A.   Digimarc is barred from seeking its bid preparation costs because it failed to
          raise the issue in its protest..............................................................................32

     B.   Digimarc is barred from an award of its bid preparation costs because it has
          already obtained equitable relief ......................................................................33

CONCLUSION ..............................................................................................................37

Defendants, Georgia Technology Authority ("GTA") and the Georgia Department of Motor Vehicle Safety ("DMVS"), respectfully submit this motion seeking summary judgment in their favor on the claims made by Plaintiff, Digimarc ID Systems, LLC ("Digimarc"), in this action.

### INITIAL STATEMENT

It is absolutely critical that Georgia immediately implement an updated, secure digital drivers license program. Defendants, GTA and DMVS, have endeavored to accomplish that goal, but are currently frustrated in their efforts because of this pending litigation. GTA and DMVS have tried to obtain resolution of this case through an expedited trial, but, for reasons beyond their control, this has not occurred. As an alternative, GTA and DMVS have attempted to break the deadlock created by this litigation by compromising with both Digimarc and Viisage. Earlier this year, those efforts included GTA and DMVS's request that both parties agree to a reconsideration of the proposals through a new round of BAFO, to be judged by an independent panel. Digimarc rebuffed those efforts, instead insisting upon an award of the contract.

On July 20, 2004, GTA and DMVS determined that, lacking cooperation from Digimarc and having been threatened by Digimarc that this litigation could continue for years, it was appropriate to terminate the contract awarded to Viisage for convenience and to enter into a settlement with Viisage of its potential claims arising from the costs it had incurred prior to the issuance of the preliminary injunction for system implementation. This action would enable GTA and DMVS to conduct a new procurement for the DLS Contract. Digimarc objected to the settlement through series of TRO and preliminary injunction motions and, through the Court's September 2, 2004 Order, has delayed the implementation of the settlement pending its opportunity to present its

-2-

claims for entitlement to an award of the contract or debarment of Viisage from the anticipated RFP re-issuance and re-bid[1].

The Court has scheduled a hearing on the parties' summary judgment motions for October 27, 2004. As set forth in herein, the time has come to release the State and the citizens of Georgia from the prison created by Digimarc's specious claim for entitlement to an award of the DLS Contract. Due to the State's termination of the contract with Viisage in anticipation of a re-issuance of a new RFP, Digimarc has already received the only relief to which it could be entitled and there is no reason to further impede the State's efforts to fulfill its obligations to the citizens of Georgia.

## BACKGROUND FACTS

On May 24, 2002, the GTA, on behalf of the DMVS, issued a request for proposal GTA 000051 (the "RFP"[2]), the purpose of which was to engage the services of a qualified vendor to provide the new digitized drivers license system for the DMVS. GTA[3] received technical and cost proposals from three vendors (hereinafter referred to as "Offerors") on July 19, 2002: one from the Plaintiff, the incumbent vendor; one from Viisage, the successful Offeror; and one from SoftLead, Inc. The SoftLead, Inc. proposal is not an issue in this case. After a lengthy period of detailed evaluation of the proposals and product demonstrations, a Notice of Award was issued to Viisage on November 12, 2002.

Plaintiff filed its administrative protest of the award of the contract to Viisage on November 26, 2002 pursuant to GTA Rule 665-2-11-.07. (*See* Protest of Digimarc ID Systems, LLC of the Award for Request for Proposal No. GTA 000051, attached hereto as Exhibit A). Charles

---

[1] Digimarc's claim seeking exclusion of Viisage from any re-bid of the DLS Contract is a new claim added by amendment to its complaint apparently in response to Defendants' contention that the Settlement and termination of the current contract with Viisage mooted Plaintiff's remaining claims for relief.

[2] Addenda to the RFP ratio in June 18 and July 12, 2002. As used herein, the term "RFP" means the May 24, 2002 RFP as amended by the two addenda. A certified copy of the RFP has been previously put on the record pursuant to the stipulation of the parties. Relevant paragraphs sited in this brief may be attached for the convenience of the Court.

[3] The GTA issued the RFP pursuant to O.C.G.A. § 50-15-7.3 and GA.COMP.R. and REGS. CH.665 ("GTA Rules"). The GTA Rules are available online at the either GTA.georgia.gov (click on procurement icon color then procurement policies icon, then official procurement rules icon) or hdtp://gta.georgia.gov/vgn/images/portal/cit underscore 1210-1267043 procurement underscore rules. PDF.

-3-

Freedman, the protest decision maker, after thorough investigation of the evaluation process and of

the award, denied Digimarc's protest on the merits. (*See* Decision of Protest, attached hereto as

Exhibit B). On March 5, 2003, Digimarc filed its Complaint in this action, seeking among other

relief, that the contract with Viisage be declared void presumably to trigger a re-bid of the

procurement. After a period of expedited discovery and a hearing before this Court on July 28,

2003, this Court on July 31, 2002 issued its Order for Plaintiff's Motion For Preliminary Injunction

("July 2003 Injunction") enjoining further performance of the contract by the State and Viisage. At

that time, the Court indicated that this case would likely be set for trial in January 2004. On or

about November 12, 2003, Digimarc filed its first Amended Complaint for Interlocutory and

Permanent Injunctive Relief, which included Viisage as a necessary party-defendant.

The parties agreed amongst themselves to expeditiously complete discovery by January 9,

2004. Given the pressing need for resolution of the case, GTA and DMVS also joined Viisage in a

motion filed in February seeking an expedited or "fast track" trial date. The importance of a Spring

trial date was enhanced by the fact that the then current contract extension with Digimarc would

expire in June. Due to the inability to obtain an early trial date, the State was compelled to

negotiate yet another contract extension with Digimarc.

During the course of these negotiations, Digimarc submitted a proposal to the State which

included an option offering the DMVS a central issue card system as required by the RFP issued in

2002, including a card providing far superior security at a vastly reduced cost from that proposed in

its RFP response. (*See* Second Affidavit Of James R. Davis, ("Second Davis Affid.")¶ 8 attached

hereto as Exhibit C). The Commissioner rejected that proposal due to his determination that

acceptance would violate the competitive bidding statutes. *Id*. Instead, the State negotiated a day to

day extension of Digimarc's existing contract in anticipation of a Summer trial date.

On June 9, 2003, the Court issued a Scheduling Order setting a hearing on all pending motions, including summary judgment motions and indicating that trial would begin during the second or third week in September.  Given the continual slippage in the trial schedule, the changes in the business, technical, and budgetary needs of the State, the continued improvements in technology and price of digitized license systems, the urgent need to remove the impediment to procurement of a secure digitized license system posed by this litigation, and the lack of agreement by Digimarc to previous proposals to end the litigation, DMVS and GTA considered termination of the contract with Viisage for convenience and settlement of Viisage's identified potential claim as a means to pave the way for a revision and re-issuance of the RFP.  *See* First Affidavit Of James R. Davis, ("First Davis Affid.") ¶¶ 4 – 8, attached hereto as Ex. D.  (*See also* Ex. C, Second Davis Affid. ¶¶ 7 – 13.).

Due to disputes not involving the State defendants and beyond their control, Digimarc by letter to the Court dated July 1, 2004 requested a further modification to the Scheduling Order, eliminating the possibility of a trial before the end of 2004.  GTA and DMVS thereafter negotiated a termination of the contract with Viisage for convenience and executed a Settlement Agreement on July 20, 2004.  (*See* Fourth Aff. of Emily P. Hitchcock, Ex. B, attached hereto as Exhibit E).  Shortly thereafter, GTA and DMVS filed their Motion to Dismiss the case as moot.

Digimarc responded by filing several requests for injunctive relief seeking to enjoin the complete implementation of the settlement for the primary stated purpose of obtaining a determination by the Court on the merits of its claim for entitlement to an award of the contract.  Digimarc also filed another amendment to its Complaint adding a request that Viisage be excluded from any re-bid of the RFP.  The Court on September 2, 2004 entered an Order temporarily enjoining completion of the settlement until further order of the Court pending an expedited hearing on the parties' motions for summary judgment set for October 27, 2004.

## STANDARD OF REVIEW

Georgia courts grant summary judgment when there is no dispute as to material facts and only issues of law remain. To prevail at summary judgment under O.C.G.A. § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. O.C.G.A. § 9-11-56(c). *See also Lau's Corp., Inc. v. Haskins*, 261 Ga. 491, 405 S.E.2d 474 (1991).

> A defendant may prevail on <u>summary judgment</u> 'by showing the court that the documents, affidavits, depositions and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of plaintiff's case.'

*Metts v. Wal-Mart Stores, Inc.* 2004 WL 1925654 (August 31, 2004) (quoting *Lau's Corp.*, 261 Ga. at 495, 405 S.E.2d at 475 (emphasis original). Once a moving defendant satisfies its burden of showing an absence of evidence to support plaintiff's case, the burden shifts to plaintiff to point to <u>specific</u> evidence why judgment should not be granted as a matter of law. *Id.*; *Strange v. Cox Enterprises*, 211 Ga. App. 731, 732, 440 S.E.2d 503 (1994).

## ARGUMENT AND CITATION OF AUTHORITY

I. <u>THE STATE HAS PROVIDED TO DIGIMARC THE ONLY AVAILABLE RELIEF REQUESTED MAKING THE ALLEGATIONS IN THE COMPLAINT MOOT.</u>

In its Second Amended Complaint, Digimarc asks this Court to find that the contract between Viisage and the State is void and to either award the contract to Digimarc or to order that the State conduct a re-bid. Recently Viisage and the State agreed to terminate the contract and to settle with Viisage for its potential claims ("the Settlement"). Upon a motion by Digimarc, this Court has temporarily stayed the settlement, but the issue is currently on appeal.[4] In the event the

---

[4] The appeal does not divest this Court of jurisdiction to modify or dissolve the injunction. *See* O.C.G.A. § 9-11-62(c)).

settlement is allowed to be consummated, Digimarc asks this Court to debar Viisage from the re-bid.

Digimarc is not entitled to further equitable relief from this Court as Digimarc has obtained all the relief it lawfully can obtain and the allegations raised in the Complaint are now moot. "An issue is moot when a determination is sought on a matter which, when rendered, cannot have any practical effect on the existing controversy." *Schoen v. Cherokee County*, 242 Ga. App. 501, 503, 530 S.E. 2d 226, 228 (2000). A trial court does not have the jurisdiction to decide a moot issue. *See In re I.B.*, 219 Ga. App. 268, 269-70, 464 S.E.2d 865, 867 (1995). Mootness is a mandatory grounds for dismissal. *See Collins v. Lombard Corp.*, 270 Ga. 120, 121, 508 S.E.2d 653, 655 (1998).

> The role of the judiciary is to address 'justiciable cases.' A controversy is justiciable when it is appropriate for judicial determination. It must be definite and concrete, touching the legal relations of parties having adverse legal interest, rather than being hypothetical, abstract, academic or moot. A controversy is 'justiciable' when there are interested parties asserting adverse claims upon an accrued state of facts... **The courts do not concern themselves with the solution of academic problems or the determination of dead issues.**

*In re I.B.*, 219 Ga. App. at 269-70, 464 S.E.2d at 867 (citations omitted)(emphasis added).

When a defendant grants the relief requested in a lawsuit, the court no longer has the jurisdiction to review the controversy upon which the request for relief was premised. *See Hudson v. Abercrombie*, 258 Ga. 729, 374 S.E.2d 83 (1988) (The lawsuit seeking to have the temporary administratix replaced was held to be moot after she removed herself as such); *International Indemnity Co. v. Terrell*, 178 Ga. App. 570, 344 S.E.2d 239 (1986) (The claim that plaintiff was entitled to the award of optional no-fault benefits under an insurance policy was rendered moot after the insurer paid the benefits); *Leonard v. Donald*, 134 Ga. App. 482, 214 S.E.2d 731 (1975) (The

fact that defendant in dispossessory proceeding had vacated premises mooted issue of right of possession originally raised to court).

The doctrine of mootness if well illustrated in *Schoen,* 242 Ga. App. 501, 530 S.E.2d 226 (2000). In *Schoen,* a resident of Cherokee County sued the County and others alleging that they violated the Georgia Open Meetings Act by holding a private meeting in which they discussed and acted upon a zoning matter, thereby, invalidating the decision. After the lawsuit was filed, the County discussed the zoning matter which formed the basis of the lawsuit in a public meeting and ratified the earlier actions taken. The trial court held that the County's actions mooted the issue of whether the County violated the Act because the County gave the plaintiff the relief he requested. Therefore, the court held, and the Georgia Supreme Court affirmed, that a decision by the court that the Act had been violated would have no practical effect.

Another decision relevant to the case at bar is *Hutchinson v. Composite State Board of Medical Examiners*, 263 Ga. 186, 429 S.E.2d 661 (1993). In *Hutchinson,* the plaintiff filed suit against the Composite State Board of Medical Examiners claiming that the Board had refused to grant a non-restricted license to the plaintiff to practice medicine in the State and did so without providing the plaintiff with notice and an opportunity to be heard in violation of plaintiff's civil rights. The trial court issued a temporary restraining order forbidding the Board to deny the plaintiff a license pending the resolution of the lawsuit. Subsequently, plaintiff appeared before the Board which then issued an unrestricted license. The trial court dismissed the lawsuit holding that the issuance of the license rendered moot all issues in the case other than the right to attorney's fees. The Georgia Supreme Court affirmed.

In this case, Digimarc requests that this Court terminate the contract between Viisage and the State because the contract allegedly was awarded in violation of State procurement laws. As further relief from the alleged wrong, Digimarc asks this Court to award the contract to Digimarc,

-8-

or, in the alternative, to order that the contract be re-bid without Viisage's participation. GTA and DMVS has now terminated the contract with Viisage in favor of a re-bid. GTA terminated the contract pursuant to its legislative authority to terminate a contract, in whole or in part, for any reason, at its "sole option and in the exercise of its sole discretion." GTA Rule 665-2-11-.09. *See* O.C.G.A § 50-25-1(a) ("the authority may contract and be contracted with and bring and defend actions"); O.C.G.A. § 50-25-4(a)(2) (power to "make and execute contracts and all other instruments necessary or convenient to exercise the powers of the authority or to further public purpose for which authority is created"); O.C.G.A. § 50-25-4(a)(31) (may "exercise any power granted by the laws of this state to public or private corporation which is not in conflict with the public purpose of the authority"); and O.C.G.A. § 50-25-4(a)(32) (power "to do all things necessary or convenient to carry out the powers conferred by this Chapter").[5] GTA also exercised its legislative discretion to settle with Viisage any potential claim Viisage may allege against the State arising out of the award of the contract. *See id.*

GTA's termination of the contract in favor of a re-bid is by no means an admission of liability. On the contrary, both GTA and DMVS dispute the allegation that the evaluation of proposals and award of the contract to Viisage violated the terms of the RFP, the GTA Rules, or the procurement statutes. The decision to terminate the contract with Viisage and re-bid the contract was made to promote the public interest and security of the State. Specifically, not to mention the cost of defending this lawsuit, this litigation is delaying the implementation of a licensing system critical to the security of Georgia's citizens, especially in light of the 9/11 attack and legislation arising out of the attack. Also of concern was the fact that DMVS had no option but to continue to extend its contract with Digimarc to provide licenses on an old and antiquated system during the

---

[5] The power to terminate the contract is legislative and, contrary to Digimarc's contentions in its serial motions for TRO and preliminary injunction filed after announcement of the contract termination, the termination did not constitute an action related to the performance of the contract and did not violate the July 28, 2003 preliminary injunction.

-9-

pendency of this litigation. Furthermore, DMVS has decided to make some substantial changes to the requirements of the procurement to better serve the needs of the State. *See generally*, First Davis Affid. at ¶¶ 5-8, Second Davis Affid. at ¶¶ 5-13, Fourth Clay Affid. at ¶¶ 11-13.

Digimarc asks this Court to prevent the State from giving it the very relief that it has requested in its Complaint because, for its own economic enrichment, it would rather be awarded the contract, or in the alternative, participate in a re-bid without any competition from Viisage. This Court does not have the authority to prevent the State from terminating the contract and settling with Viisage. Whether to settle, the reasons to settle and the amount paid for the settlement are issues within the sole discretion of the GTA and DMVS. The judiciary has no constitutional authority to direct a legislative authority how to exercise its discretionary power. *See International Business Machines Corp. v. Evans*, 265 Ga. 215, 453 S.E.2d 706 (1995) (*citing Bentley v. Chastain*, 242 Ga. 348, 352, 249 S.E.2d 38 (1978)). *See also, Ericsson GE Mobile Communications, Ind. v. Motorola Communications & Electronics, Inc.*, 120 F.3d 216, 221 (11th Cir. 1997). For the Court to dictate whether GTA can settle or the manner of settlement would be clear infringement of GTA's legislature powers.

The State has provided to Digimarc the only relief within this Court's power to order: GTA has terminated the contract and is preparing to place the procurement, as revised, based upon current, updated business and security imperatives, out for re-bid. Providing the available relief to Digimarc and settling potential claims with Viisage will allow all parties, and this Court, to forgo the time consuming and expensive nature of litigation. This was Commissioner Davis's intent in entering into the Settlement with Viisage which terminated the contract.

It is the public policy of Georgia to promote settlements of disputes. *See Mableton Parkway CVS, Inc. v. Salter*, 254 Ga. App. 162, 165, 561 S.E.2d 478, 481 (2002) (*citing Computer Communications Specialists v. Hall*, 188 Ga. App. 545, 546(1), 373 S.E.2d 630 (1988)). In that

regard, it has been held that courts should discourage litigation. *See Southern Bell Telephone & Telegraph Co. v. Cassin*, 111 Ga. 575, 36 S.E. 881, 890 (1900). Therefore, this Court should refrain from attempting to prevent the settlement in this case and force the parties into unnecessary litigation that will only ultimately produce the result provided by the State's action, but at a significant and unnecessary additional cost to all parties and critical additional delay in meeting the homeland security concerns of this State.

Any ruling by this Court regarding the merits of Digimarc's claims will have no practical effect on the relief available to Digimarc. As more fully set forth in the Sections A and B, *infra*, the only relief available is a re-bid of the contract. This Court does not have the authority to award the alternative relief requested, specifically, to 1) award the contract to Digimarc; or 2) to debar Viisage from participating in a future re-bid. Because Digimarc cannot lawfully obtain these forms of relief, its remaining claims are moot. Therefore, there is no justiciable controversy left for this Court to decide. As this Court lacks the jurisdiction to hear a moot controversy, judgment should be entered on behalf of Defendants.

## A.     DIGIMARC IS NOT ENTITLED TO AN AWARD OF THE CONTRACT.

Digimarc claims to be entitled to an award of the contract in this case. Digimarc has no "entitlement" to the contract under the express terms of the RFP, nor does Georgia or other case law support such an award in this case.

### 1.     The RFP is clear that no vendor has a right to an award of this contract.

The RFP for the Digital Drivers License program contains numerous provisions which clearly state that no vendor has a right to an award of the contract. These provisions include the following:

(a)     RFP § 5.5.1: "...The State reserves the right to: (a) waive variances or reject any or all proposals...";

-11-

(b)    RFP § 5.7: "The Offeror who, in the consensus of the GTA/DMVS represents the "best value" to the State, will be chosen to provide the Digitized License System for the Georgia Department of Motor Vehicle Safety. The award shall be made to the responsible Offeror, whose written proposal is determined to be the most advantageous to the State, taking into account all evaluation factors set forth in this RFP. No other factors or criteria shall be used in the evaluation. The GTA reserves the right to reject any and all proposals submitted in response to this request; and

(c)    RFP § 6.4: "There is no guarantee that a Contract shall result from this solicitation…"

In this case, Digimarc's proposal, at approximately two and one half times the price per card of Viisage's proposal, was never found to be compliant with all the requirements of the RFP or even an acceptable value to the State, much less the "best value." In fact, as admitted by Digimarc in the July 28, 2003 injunction hearing, and as alleged in ¶ 88 of Digimarc's Second Amended Complaint, the State never even tested Digimarc's new proposed temporary card for durability and tamper resistance at BAFO.[6] Therefore it is unknown whether Digimarc ever submitted a compliant solution. Furthermore, there were numerous additional material issues with Digimarc's BAFO response which would have required further clarification, evaluation, and negotiation by the evaluation team before the team could have made a determination that Digimarc's response to the RFP was technically compliant and even eligible for award. Christine Clay, a member of the evaluation team and the IT Section Manager for the DMVS has identified some of those issues in her Fourth Affidavit (*See* Fourth Clay Affid. at ¶¶ 6-8, Exhibit F). They include the following:

---

[6] The evaluation team elected not to test Digimarc's revised temporary card submission (prior to BAFO Digimarc's proposed temporary card had failed a number of the tests applied by the evaluation team). For purposes of the final evaluation the team merely assumed it was compliant in light of the evaluation team's determination that Viisage's proposal, with comparable or superior technical merit at less than half the cost represented the best value to the State. Theobald deposition pp. 366, line 4-367, line 6; **Fourth Clay Affid. at ¶¶ 5, 6, attached as Exhibit F.**

-12-

a.    Digimarc proposed a urethane backing for its new temporary card but did not provide a cost for the laminate rendering their price indeterminate. Additionally, it would require demonstration to show that such a card, requiring examiner intervention, could be fabricated within the strict time constraint of RFP § 3.4.2. *Id.* at ¶ 7;

b.    Digimarc took exception to the required ownership rights specified in RFP § 3.9.1, item 22. *Id.* at ¶ 8a;

c.    Digimarc indicated that biometric logon and document scanning were included in the base price but failed to acknowledge inclusion of POS and facial recognition in the BAFO requiring further clarification of cost. *Id.* at ¶ 8b;

d.    Digimarc's POS solution, although rated satisfactory, required an additional workstation which would significantly impact DMVS' space requirements and efficiencies, requiring further review of the space requirements of the equipment and available space at DMVS locations. *Id.* at ¶ 8d; and

e.    A full system demonstration was required of the apparently successful offeror's solution prior to recommendation for award. Digimarc did not perform that demonstration and therefore it is unknown whether their system as proposed complied with the requirements of the RFP. *Id* at ¶ 8e.

Digimarc clearly has no entitlement to an award under the express terms of the RFP given the above "open issues." While the Court's expertise is in the law, the evaluation committee is expert in the technology required by the DMVS and its appropriate cost. The evaluation team never made the findings with regard to Digimarc's proposal which would render it eligible for recommendation of award and it is inappropriate and impracticable to ask the Court to make such an evaluation on behalf of the State and the taxpayers.

2.    **Digimarc cannot obtain an award of the contract by default.**

Just as the evaluation team never made a finding, as required as a precondition for eligibility for award by the GTA Rules and the RFP, that Digimarc's proposal constituted the "best value" to the State, neither did it make the required findings which must be made under the GTA Rules to justify the award of a contract to a vendor when there is no competition. The relevant rules are the following:

(a)    GTA Rule 665-2-4.11 **Lack of Competition**. The agency and GTA shall make every effort to maximize competition. Where only a single offer or a single acceptable offer is received, the agency shall ascertain the reason and make it a matter of record. (Citing as authority O.C.G.A. §§ 50-25-7.3(e), 50-25-4(a)(30); and

(b)    GTA Rule 665-2-5-.01 **Basis for Rejection:** In soliciting offers, the agency or GTA may reject any offer in whole or in part. Basis for rejection shall include, but not be limited to, the agency or GTA deeming the offer unsatisfactory as to quantity, quality, delivery, **price** or service offered; the offer not complying with conditions of the solicitation document or with the intent of the proposed contract; **lack of competitiveness** by reason of collusion or otherwise **or knowledge that reasonably available competition was not received**; error(s) in specifications or indication that revision(s) would be to the state's advantage; **cancellation of or changes in the intended project** or other determination that the proposed requirement is no longer needed; **limitation or lack of available funds; circumstances that prevent determination of the lowest best value offer; or any determination that rejection would be to the best interest of the state.** (Emphasis added).

Clearly there has been no written finding by GTA or DMVS, as required by GTA Rule 665-2-4.11, justifying an award to Digimarc of the contract by default because of lack of any other

acceptable offer.  Likewise, as set forth in the affidavits of Christine Clay and Lisa Urich, and elsewhere in this brief, any number of the reasons for rejection set forth in GTA Rule 665-2-5-.01 would appear to apply to Digimarc's excessively priced proposal and render it doubtful that, had the State rejected Viisage's proposal or "disqualified" them as urged by Digimarc, the State would have awarded the contract to Digimarc, rather than rebid it.  First *see* Affidavit of Lisa Urich attached hereto as Exhibit G.  As testified by Christine Clay, it is quite possible that the evaluation committed would have recommended that the RFP be cancelled and reissued or revised and reissued in an attempt to attract more offerors and create a competitive bidding environment.  (*See* Exhibit F, Fourth Clay Affid. at ¶ 9).  Additionally, Ms. Clay indicates that it is further unknown whether, even if the evaluation team had recommended an award of the contract by default, that either the Commissioner of DMVS or GTA would have accepted the recommendation or instead exercised their discretion under the GTA Rules and the RFP to reject all offers.  *Id.*  According to Ms. Clay, then CIO Larry Singer was a strong proponent of competitive bidding and had cancelled another major technical procurement due to lack of competition in bidding.  *Id.*  Digimarc's request that the Court award it the contract would require the Court to improperly speculate as to the result of the agency's analysis of these issues, imposing its determinations in place of the discretionary determinations which must remain the province of the agency.

3.    **Georgia and federal case law do not support Digimarc's arguments that this Court should make an award the DLS Contract to Digimarc.**

Apparently, in recognition that the facts of this case and the law of Georgia do not support its request for a mandatory injunction requiring that the State award the digital driver's license contract to Digimarc, Plaintiff sets forth that prayer for relief *in the alternative* in all versions of its Complaint.  As early as 1896, the Georgia Supreme Court held that mandamus would not lie to compel the award of a contract to a particular bidder.  *Peeples v. Byrd*, 98 Ga. 688, 693, 25 S.E. 677 (1896).  The *Peeples* trial court refused to issue a mandamus compelling the award of the contract

-15-

to the frustrated bidder holding that, because there was no requirement that the lowest bidder be awarded the contract, the power conferred upon boards or an officer authorized to contract necessarily involves the exercise of discretion. *Id.* at 693 (*interpreted in Hilton Constr. Co. v. Rockdale County Bd of Educ.*, 245 Ga. 533, 266 S.E.2d 157 (1980)). More recently, in *Mark Smith Constr. Co. v. Fulton County,* 248 Ga. 694, 696, 285 S.E.2d 692 (1982), the Court again held that a writ of mandamus cannot be used to compel the award of a contract to a disappointed bidder where the contract has already been awarded to another.[7] As a general rule, the courts will not control the exercise of discretion unless it is manifestly abused, nor will they inquire into the propriety, economy, and general wisdom of the undertaking, or into the details of the manner adopted to carry the matter into execution. *Exposition Enterprises, Inc. v. Georgia World Congress Center Authority*, 177 Ga. App. 211, 338 S.E.2d 726 (1985); *J.C. Lewis Motor Co. v. Mayor of Savannah*, 210 Ga. 591, 82 S.E.2d 132 (1954).

At the same time, the exercise of discretion does not include the authority to circumvent the requirements of the applicable competitive procurement statute and the bid document. *IBM v. Evans*, 265 Ga. 215, 217, 453 S.E.2d 706 (1995). In the event a governmental entity acts without lawful authority or beyond the scope of its official power, the courts have found that the disappointed bidder has an adequate remedy at law - the recovery of bid preparation costs. *City of Atlanta v. J.A. Jones Constr. Co.*, 260 Ga. 658, 398 S.E.2d 369 (1990); *S&W Mechanical Co. v. City of Homerville*, 682 F. Supp. 546 (M.D. Ga. 1988).

If, on the particular facts before it, a court determines that the legal remedy is not adequate, equitable relief is available. *IBM,* 453 S.E.2d at 709, 265 Ga. at 217; *See Amdahl, Corp. v. Ga. Dept. of Administration Svcs.*, 260 Ga. 690, 398 S.E. 2d 540 (1990). The equitable relief typically available to the disappointed bidder is a judgment setting aside the contract as invalid. *Glynn*

---

[7] "Mandamus relief applies prospectively only. It will not lie to compel the undoing of acts already done and this is so even though the action taken was clearly illegal." *Atlanta Indep. Sch. Sys. v. Lane*, 266 Ga. 657, 660 (1996).

County v. Teal, 256 Ga. 174, 176, 345 S.E.2d 347 (1986). *See also Manley Bldg Co. v. Newton,*

114 Ga. 245, 254, 40 S.E. 2d 274 (1901). Invalidation of the contract is the relief which Digimarc

seeks if it cannot prevail upon the Court to dictate an award to it[8]. While counsel is unaware of any

Georgia case in which the court has voided the award of a contract to one party, and simultaneously

ordered that the contract be awarded to the frustrated bidder, at least one Georgia Supreme Court

case has indicated that such relief may be available in very limited circumstances. *See Hilton*

*Construction Company, Inc.*, 245 Ga. 533, 266 S.E.2d 157. The **limited** circumstance is where the

party seeking the relief submitted the **low** bid and the awarding agency's discretion in determining

the successful offeror was limited by statute to choosing the lowest acceptable bid.

*Hilton* concerned the issuance of a contract pursuant to sealed bids for the construction of a

vocational wing for a local high school. A total of five bids were submitted, the lowest being the

plaintiff's bid which was slightly less than the company to which the School Board awarded the

contract. In overturning the trial court's determination that the school board was authorized to

reject the low bid, the court observed:

> The board rejected plaintiff's bid because plaintiff was 'unknown'
> while Cube was 'known.' The State School Board regulations, sec.
> 40-3820(3)(L), which have the force and effect of law, Code Ann.
> § 32-653a, provide that projects using state funds will be awarded 'to
> the responsible bidder submitting the lowest acceptable bid.' (No
> argument is made that plaintiff's bid was not 'acceptable' within the
> meaning of this regulation.) Whatever may be meant by the word
> 'responsible,' we are certain that being "unknown" does not show that
> a bidder is not 'responsible.' The board was not authorized to reject
> plaintiff's bid on the basis that plaintiff was 'unknown.'

*Hilton*, 245 Ga. at 537, 266 S.E.2d at 161.

---

[8] Through previous offers to reevaluate new BAFO proposals (rejected by Digimarc) and the State's latest effort to
initiate a new procurement by terminating the contract with Viisage for convenience, the State has been attempting to
break the deadlock of litigation. See Second Davis Affid. at ¶¶ 9-13. The results of these efforts provide Digimarc with
an opportunity to participate in a re-bid of the contract, constituting all of the relief to which it could conceivably be
entitled.

Rejecting the defendants' claim that plaintiff had no standing to challenge the award of the contract to Cube, the court stated: "Hilton claims standing as the low bidder to assert a violation of these regulations [the bidding procedures]. We find it clear beyond peradventure that Hilton has a legally protected interest created by state law which gives it standing to assert this violation." *Id.* at 245 Ga. at 538, 266 S.E. 2d at 161. In distinguishing Peeples v. Byrd, the court stated that "[i]n that case there was no requirement that the lowest bid be accepted and the court held that a rejected bidder had no standing to challenge the contract entered into or to require that the contact be awarded to itself. Language suggesting that the same rule would obtain where the law required the letting of the bid to the lowest responsible bidder is dicta and will not be followed." *Id.* Although the court left the question of damages versus injunctive relief for determination by the trial court, the court did opine that "[i]f construction were not well underway, Hilton might well be entitled to be awarded the contract under the facts of this case once the administrative appeal reached the courts." *Id.* 538 6a at 540, 266 S.E. 2d at 162. It is clear from *Hilton* that injunctive relief in the form of an award of the contract can only be available to a low bidder in a case where the awarding entity is obligated by statute to award the contract to the low bidder.

Similar reasoning is to be found in the case of *Pataula Electric Membership Corporation v. Whitworth*, 951 F. 2d 1238 (11th Cir. 1992). *Pataula* concerned civil rights actions brought by two electrical companies against the Georgia Department of Corrections ("DOC") arising out of an award of contracts for provision of electric service to a prison. The DOC had awarded the contract to a third vendor, Georgia Power Company, which submitted a higher priced bid than plaintiffs. The district court dismissed plaintiffs' actions for failure to state a claim on the basis that they could not demonstrate that they were entitled to the service contracts and thus had no property interest protected under 42 U.S.C. § 1983. In reversing the dismissal of the case, the appeals court determined that the plaintiffs, as lower bidders, had a property interest in the award of the contracts

-18-

sufficient to support their standing to challenge the award to the higher bidder. *Id* at 1242-43. This was due to the fact that the procurement at issue was subject to the Georgia Vendor Manual requirement that "Contracts or open market purchases will in all cases be awarded to the lowest responsible bidder." *Id.* at 1241 (*citing* Ga. Dept. of Admin. Services, Ga. Vendor Manual, art. VIII, § 3, at 23). Finding that the express objective standard provided by the Vendor Manual which defines "lowest responsible bidder" strictly confined the discretion of the decision-maker, the court found that this limited discretion was "within the compass of discretion that the Georgia Supreme Court has found insufficient to preclude bidders from forming an expectation of an award. *Id.* at 1243 (citing *Amdahl and Hilton*).[9]

The Georgia Supreme Court has, subsequent to *Hilton*, reaffirmed that a frustrated bidder may not use equity to have a contract awarded to him if the decision-maker retained any discretion regarding the successful proposal. *See Credle v. East Bay Holding Company, Inc.*, 263 Ga. 907, 440 S.E. 2d 20 (Ga. 1994) ("The Credles and the Edwardses may not, however, use equity to have the contract awarded to one of them, as the City has discretion regarding the bidder that should be awarded the bid and was not required to award the bid to the bidder stating the highest rental agreement ...." 263 Ga. at 908, 440 S.E. 2d at 2). Because it is undisputed that the RFP in this case involved a procurement in which DMVS and GTA had an extremely high level of discretion in determining the successful offeror, Georgia law is entirely clear that Digimarc may not resort to equity to have this Court require an award of the contract be made to Digimarc.

Recognizing that Georgia case law does not support Digimarc's claims of entitlement to obtain an award of the contract in equity, Digimarc has previously argued to this Court that it may

---

[9] This stands in marked contrast to this procurement which is not subject to the Georgia Vendor Manual, but rather made subject to the GTA Rules and pursuant to an express finding that "use of competitive sealed bidding will not be practical or advantageous to the State in completing the acquisition of the services and commodities.... This procurement shall be a negotiated, solution-based solicitation. The Offeror's technical proposal will be evaluated using the adjectival method to determine the "best value" for the State." RFP § 1.2 (citing as authority O.C.G.A. § 50-25-7.3 and GTA Rules 665-1 *et seq.*).

find authority to make such an award in the reasoning of a number of non-Georgia federal cases. Those cases, however, far from supporting Digimarc's arguments in fact also demonstrate why under the undisputed facts of this case Defendants are entitled to summary judgment on Digimarc's claim for an award. Given both the highly discretionary nature of the procurement at issue and, as demonstrated by the Fourth Clay Affid. the speculation necessary to determine whether Digimarc would have actually been deemed to be the best value and awarded the contract under the initial procurement, this case does not fit within the narrow exception to the general rule that courts will not make contracts for the government recognized in some federal cases. *See, e.g. Choctaw Mfg. Co., Inc. v. United States*, 761 F.2d 609 (11th Cir 1985); *Superior Oil Co. v. Udall*, 409 F.2d 1115 (D.C. Cir. 1969).

Judge (now Justice) Scalia concisely enunciated the general logic employed by the federal courts in analyzing claims such as that made by Digimarc in this case in holding: "It is undisputable that the ultimate grant of a contract must be left to the discretion of a government agency; the courts will not make contracts for the parties." *Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 198 (D.C. Cir. 1984) (*citing Scanwell laboratories, Inc. v. Shaffer*, 424 F.2d 859, 869 (D.C. Cir. 1970)). Rather, "a court may not order the award of a contract unless it is clear that, but for the illegal behavior of the agency, the contract would have been awarded to the party asking the court to award." *Id.* Where there is nothing in the record to guarantee that the plaintiff would have been awarded the contract, there are no grounds to vacate the awards of the contract to another vendor and grant them to the plaintiff. *Id.* (citations omitted). *See also, Ralvin Pacific Properties, Inc. v. United States*, 871 F. Supp. 468, 475 (D.C. Cir. 1994) ("an award to a disappointed bidder is an extraordinary remedy to be applied only if it is clear that the disappointed bidder would have won the contract absent the flawed nature of the bidding process...[t]his Court does not desire to become a ... contracting officer.").

In the *Delta* case, award of the contract for computer equipment was to be made to the offeror meeting all mandatory requirements with the highest total evaluated score based upon four numerically weighted factors. The court recognized the discretionary nature of the procurement method and held that the district court had exceeded its authority in ordering award of the contract to the disappointed bidder. The level of discretion inherent in the procurement at issue in this case, a "best value" solution based procurement, with "adjectival" rather than numerical scoring, utilizing performance based specifications clearly exceeds that of the procurement in *Delta*. This is particularly so in light of the fact that the State in this case is seeking a complex system designed to serve numerous business needs of the state and interface with many current and planned systems as opposed to being merely a purchase of equipment. This presents a strong contrast to the *Choctaw* case relied upon by Digimarc

*Choctaw*, like a substantial percentage of the other reported cases in which a court has ordered an award to a disappointed bidder, involved a "small business set-aside contract" under the Small Business Act seeking bids to provide a commodity item.[10]  Significantly, the type of procurement at issue in *Choctaw* was "lowest responsible bidder", not "best value" and it was absolutely clear from the testimony in that case that the contract would have been awarded to *Choctaw* had it been the low bidder. *Choctaw*, 761 F.2d 609, 617 at no. 14. The Circuit Court specifically characterized the situation in Choctaw as resembling that in *Superior Oil Co. v. Udall*, 409 F.2d 1115 (D.C. Cir. 1970) In *Superior Oil*, a government land lease was required to be awarded to the highest bidder and therefore the contracting officer had no discretion in determination of the successful offeror. This presented a situation in which the *Choctaw* court observed that a district court is justified in ordering a contracting officer to award a contract to an unsuccessful bidder. *Id.* at 620. On the other hand, the *Choctaw* court specifically identified *Delta*

---

[10] The strong public policy goals inherent in SBA cases may justify restricting competition in and payment of a higher price. These policies are not implicated by the DLS procurement in this case.

*Data* as an example of a case wherein it was improper for a district court to order the award of a contract to an unsuccessful bidder due to the fact that the contracting officer had discretion in the evaluation of the offers *Id.* at 620-21. As noted above and in Defendants previous briefs, there can be no assurance that Digimarc would have been awarded the contract by default given its relatively high price. Furthermore, given the issues raised in the Fourth Clay Affid. demonstrating that further technical review and negotiation would be necessary to determine whether Digimarc even submitted a compliant proposal meeting the requirements of the RFP and was thus eligible for award, the Court cannot find that, but for the alleged defects in the procurement process, Digimarc would have been awarded the contract.

### 4. Practical and equitable considerations dictate that an award of the DLS Contract to Digimarc would be inappropriate.

Further removing this case from the situation in *Choctaw*, Digimarc in its First and Second Amended Complaints alleges a number of defects in the procurement process as a whole including, without limitation, a) that the evaluation team continued the procurement, including price review, despite the fact that **none** of the vendors initially submitted fully compliant proposals (Second Amended Complaint ¶ 44); b) that the evaluation team never completed evaluation of Digimarc's proposal at BAFO (Second Amended Compl. ¶ 88); and c) that GTA/DMVS did not perform required financial responsibility and cost analyses with regard to the vendors and their proposals (First Amended Compl. ¶¶ 127 and 149). Digimarc cannot (logically or legally) simultaneously maintain both that the procurement process was flawed in numerous allegedly material ways (which would also apply to evaluation of their own proposal) and that this Court should make an award of the contract to them under that very same process.

Digimarc's stated concerns, that no vendors get a second "bite at the apple" and that Viisage, its primary competitor be excluded from a re-bid, betray Digimarc's true motivations to have itself anointed the drivers license provider to Georgia by excluding competition, rather than

-22-

securing an award on the merits by proposing an economical contract that provides the best value to the taxpayers. Digimarc, itself, has provided the most glaring proof of how inappropriate and damaging to the State's interests it would be for the Court to take the *unprecedented* step of ordering the State to award the contract to Digimarc.

During the course of negotiating the latest contract extension, Digimarc issued a proposal to the State to provide a central issuance card of similar structure and features to that provided by Viisage. (A copy of that proposal is attached as **Exhibit** A to the Second Davis Affid.). As affirmed by Commissioner Davis, "[o]ption 2 of Digimarc's proposal contained at least one alternative that was not only vastly superior to the license being provided under the current contract with Digimarc, but also an improvement to the proposal it submitted in response to the RFP at far less cost than originally proposed." (Second Davis Affid. at ¶ 8). Digimarc is seeking a windfall at the expense of the taxpayers by demanding that this Court award the contract to Digimarc under a now (two years later) less than technologically superior proposal, for technology that was not chosen by the State, at a price which was not competitive with that of the successful vendor and which is considerably higher than that now being proposed even by Digimarc for yet superior technology. The procurement statutes are ultimately for the benefit of the taxpayers and citizens of this state. In that regard, these statutes should not be used as a sword against them to enrich Digimarc or any other vendor at their expense.[11]

It should be further noted that, since the issuance of the original RFP, all state operating budgets, including that of DMVS, have been substantially cut. (*See*, First Urich Affid. It is highly doubtful that the DMVS could now afford Digimarc's overpriced proposal which even further

---

[11] In fact, even assuming that there was a legal basis for the Court to require the state to award the contract to Digimarc, given the fact that Digimarc's proposal is no longer representative of even its best technology and yet vastly exceeds its cost, the Commissioner would likely be compelled in the prudent exercise of his discretion to terminate that contract for convenience immediately and rebid the contract to ensure that the State receives the best affordable secure system known to be available. Thus to allow Digimarc to continue to collect money on its antiquated contract while frustrating the State's efforts to rebid the contract at the earliest possible time will likely only produce the result of delaying the rebid of the contract in the face of the same serious homeland security concerns which motivate this procurement.

# Exhibit 23
# (Part 2 of 2)

supports the need for a new procurement process to issue. Along the same lines, as set forth in the Clay Affidavit, given the change in business methods and needs, and security imperatives since the original RFP issued well over 2 years ago, the State intends to substantially revise the RFP prior to re-issuance to better serve the needs of the citizens of Georgia and the user agencies.

Given these undisputed facts, it would be inappropriate, as a matter of fact and of law, for the Court to allow the use of its equitable powers to frustrate the needs of the State, the goals of the procurement statutes, and to deliver a windfall to a vendor, Digimarc, at the expense of the citizens of this State.

**B.    VIISAGE SHOULD NOT BE DEBARRED FROM PARTICIPATING IN THE RE-BID.**

Digimarc asks this Court to enjoin, or debar, Viisage from participating in the re-bid. Digimarc's request must be denied for several reasons: 1) Digimarc lacks standing to seek the debarment of Viisage and this Court lacks authority to substitute its discretion for that of GTA and order the debarment of Viisage; 2) Digimarc cannot prove that it would be irreparably harmed if Viisage were not debarred from a re-bid; and 3) to debar Viisage would be contrary to the interests of the citizens of Georgia.

**1.    Plaintiff lacks standing to seek the debarment of Viisage and this Court lacks the constitutional authority to substitute its judgment for that of the GTA as to whether Viisage should be debarred from a re-bid.**

The Legislature is empowered to enact laws of general application and then delegate to administrative officers or agencies the authority to make rules and regulations necessary to effect such laws. *See Dept. of Transportation v. Del-Cook Timber Co., Inc.*, 248 Ga. 734, 737, 285 S.E.2d 913, 916 (1982). Here, the Legislature has given the GTA the authority to solicit and enter into contracts. *See* O.C.G.A. §§ 50-25-4(2)(30); 50-25-7.3. The general bidding procedure for the GTA is established by statute. *See* O.C.G.A. § 50-25-7.3. However, the GTA has the discretion to establish any rules and regulations governing the bidding process. O.C.G.A. § 50-25-7.3(e).

-24-

The GTA has established rules and regulations governing the specifics of the bidding process and the process to challenge the award of contracts by the GTA. *See* Rules of GTA, Rule 665-1-2-.02 *et seq*. Within the bidding rules and regulations adopted by the GTA, it has established rules and procedures for challenges to awards providing a disgruntled bidder's ability to protest an award (GTA Rule 665-2-11-.07), and a means for the State to protect itself against deceitful bidders by providing a means for their debarment (GTA Rule 665-2-11-.10 and .13).

An agency has inherent authority to debar a bidding contractor from future bids because it is necessary to effectively administrate its delegated responsibilities. *Gonzales v. Freeman*, 334 F.2d 570, 576, 577 (D.C. App. 1964). In this regard, an agency must have the power to terminate business relations with contractors that interfere with the goals of the agency. *Id.* However, since debarment can cause such a serious impact to the contractor, the debarment must comply with the due process. *Id.* In that regard, GTA has published grounds for debarment, procedures to initiate debarment proceedings and hearing procedures. *See* GTA Rule 665-2-11-.13.

According to the GTA rules governing debarment proceedings, only the GTA may initiate suspension or debarment proceedings and only at its own discretion or upon another state agency's request. GTA Rules, 665-2-11-.10 and 665-2-11-.13. The GTA has not, to date, sought debarment proceedings against Viisage and DMVS has not requested such proceedings.[12] The GTA rules do not confer upon any private party or disgruntled bidder the right to initiate disbarment proceedings. Instead, a disgruntled bidder has been provided the right to follow formal protest procedures. Therefore, Digimarc lacks standing to seek a debarment in this case.

Regardless, the judiciary has no constitutional authority to direct a legislative authority how to exercise its discretionary power. *See International Business Machines Corp. v. Evans*, 265 Ga. 215, 453 S.E.2d 706 (1995) (*citing Bentley v. Chastain*, 242 Ga. 348, 352, 249 S.E.2d 38 (1978)).

---

[12] Debarment proceedings at this point would be premature since currently there is no pending procurement as the same has been enjoined by this Court.

*See also, Ericsson GE Mobile Communications, Ind. v. Motorola Communications & Electronics, Inc.*, 120 F.3d 216, 221 (11th Cir. 1997). The judiciary only has the constitutional authority to review an agency's decision to determine "whether the agency acted beyond the discretionary powers conferred upon it, abused its discretion, or acted arbitrarily or capriciously with regard to an individuals constitutional rights." *Bentley*, 242 Ga. at 350, 249 S.E.2d at 38 (1978). This is a question of law to be decided by the court. *See Reheis v. Baxley Creosoting and Osmose Wood Preserving Company*, 2004 WL 1472689 (Ga. App. July 1, 2004); *Strickland v. Douglas County*, 246 Ga. 640, 643, 272 S.E.2d 340, 343 (1980). The party challenging the decision has the heavy burden of proving the abuse or the arbitrary and capricious action. *International Business Machines Corp.*, 265 Ga. at 218, 453 S.E.2d at 709. The decision of the agency will be affirmed so long as there is "any evidence" to support the decision. *See Hall v. Ault*, 240 Ga. 585, 585-86 (1978); *Miles v. Andress*, 229 Ga. App. 86 (1997).

The limitation of the judiciary's powers arises from the Georgia Constitution's separation of powers doctrine that requires that the judiciary not interfere with the proper function of the legislative and executive branches. *See* Ga. Const. 1976, Art. I, Sec. II, Para. IV (Code Ann. Sections 2-204); *Bentley*, 242 Ga. at 349-50, 249 S.E.2d at 40. "It is axiomatic that, under the separation of powers, non-judicial functions may not be imposed on a constitutional court." *Bentley*, 242 Ga. at 351, 242 S.E.2d at 40. The judiciary also accords the decisions of a state agency a high level of deference. *Reheis*, 2004 WL 1472689 at p. 5. The judiciary has recognized that these agencies have "a high level of expertise and an opportunity for specialization unavailable in the judicial or legislative branches." *Bentley*, 242 Ga. at 350-51, 249 S.E.2d at 40. In that regard, an overbroad review of a discretionary agency decision would have the effect of substituting the judgment of a judge or jury for that of the agency. *Id.* Such a review would effectively nullify the benefits of legislative delegation to a specialized body. *Id.*

-26-

In this case, Digimarc is not asking the Court to review a decision of the GTA, but, instead, for the Court to make its own decision, using the Court's discretion in lieu of the agency's discretion. The Court would in fact be attempting to review an agency decision that has not yet occurred. This would essentially give Digimarc the opportunity to have a pre-bid protest. If an overbroad review of an agency's decision usurps legislative authority, making the decision for the agency abolishes the legislative authority. Clearly, ordering the debarment of Viisage for a re-bid would be outside of this Court's authority.

2. **This Court should not order the debarment of Viisage from a re-bid because Digimarc cannot prove that it will suffer irreparable harm by Viisage's participation in the re-bid.**

Even if this Court had the authority to use its equitable powers to debar Viisage, Digimarc cannot prove that it is entitled to an injunction barring Viisage from participating in a future procurement. Injunctive relief will only issue when there is evidence that a party will suffer irreparable harm without the injunction. *See City of Duluth v. Riverbrook*, 233 Ga. App. 46, 55, 502 S.E.2d 806, 814 (1998). An injunction will issue for the prevention of "future" injury, actually threatened, to prevent the perpetration of a legal wrong for which no adequate remedy can be had in damages. *See Catrett v. Landmark Dodge, Inc.*, 253 Ga. App. 639, 644, 560 S.E.2d 101, 106 (2002); *Hunter v. George*, 265 Ga. 573, 458 S.E.2d 830 (1995).

> It is not sufficient ground for an injunction that the injurious acts may possibly be committed, or that injury may possibly result from the acts sought to be prevented. There must be at least a reasonable probability that the injury will be done if no injunction is granted, and not a mere fear or apprehension.

*Thornton v. Skelton*, 149 Ga. 93, 99 S.E. 299, 300 (1919) (citation omitted). Therefore, courts will not intervene to allay apprehensions of speculative injuries, but only where the injury is imminent and irreparable. *See Strange v. Housing Authority of City of Summerville*, 2004 WL 1535219 (Ga. App. July 9, 2004); *Wiggin v. Horne*, 270 Ga. 571, 572, 512 S.E.2d 247, 248 (1999) (*quoting*

-27-

*Powell v. Garmany*, 208 Ga. 550, 551(1), 67 S.E.2d 781(1951)). The right to relief must be clear. *See Tarver v. Silver*, 180 Ga. 124, 127, 178 S.E. 377 (1935).

Digimarc cannot show that it will suffer future irreparable injury if Viisage participates in a re-bid. Digimarc claims that it will be injured if Viisage participates in the re-bid because Viisage will have an unfair advantage. This argument is based upon one or more speculative assumptions such as that efforts or intellectual capital developed by Viisage in the course of the aborted implementation of the now terminated contract is somehow transferable to the new procurement and that an unfair, illegal advantage would result.

The evidence reflects the contrary. As set forth in the Fourth Clay Affid. at ¶¶ 11-13 there will be numerous significant differences between the system required by the RFP issued in 2002 and that under development for issuance to accomplish the new procurement. However, the magnitude and specific details of these differences to date is undetermined. Therefore, any assumptions concerning what might or might not be useful to Viisage are wholly speculative.

Specifically, Ms. Clay explains that the construction, content and terms of the next Digitized License RFP ("New RFP") are unknown at this time. However, it is envisioned that the New RFP will maintain the fundamental premise of the 2002 RFP, "to procure an integrated, turnkey digitized driver's license system." *Id.* at ¶ 11. However, it will also diverge from the 2002 RFP in that the DMVS has developed new strategic and business requirements and the New RFP must incorporate these new requirements. Therefore, the requirements of the 2002 RFP have become inadequate to meet the DVS's current needs. Specifically, while Ms. Clay could not predict the magnitude of the strategic and business changes for a New RFP, she was able to identify some specific changes to system components that she anticipates will include as a minimum changes to the configuration and number of driver's license sites and issuance delivery methods that dictate the quantity and equipment type requirements, pricing structure, printer requirements, interface technology, point of

sale configuration and functionality, inventory control and audit procedures, and backup and business continuity requirements. *Id.* at ¶ 12-13.

Additionally, according to Ms. Clay, there has been significant changes in the national, state, local and agency environment since the 2002 RFP and these changes must be addressed in the New RFP to be issued. According to Ms. Clay, these material changes include the following:

(a)    The leadership of the State of Georgia has changed since the 2002 RFP was released. The leadership changes have redirected some of DMVS' priorities and may impact the requirements of the next Digitized License RFP.

(b)    DMVS' management team has changed since the 2002 RFP was released. The present management team will be drafting and reviewing the next Digitized License RFP requirements as they pertain to the agency's current strategic objectives.

(c)    Georgia Technology Authority's management and philosophy also has changed since the release of the 2002 RFP. It has implemented certain standards and procedures and has established technology imperatives that DMVS is required to adopt. These changes will have an impact on the requirements of the next Digitized License RFP.

(d)    Since the release of the 2002 RFP, DMVS has learned that the Plaintiff's storage of the current images is either incomplete or stored in a format requiring a significant conversion process. A description of porting issues will have to be provided for all potential vendors in the next Digitized License RFP. Images impacted include photo JPEGs, fingerprint images and the method of storing complete image records in individual tables.

(e)    The Department of Homeland Security's Patriot Act is not fully defined and may have an impact on requirements by the time the next Digitized License RFP is released.

(f)    Since the tragic events of September 11, 2001, the driver's license document as a secure identification document has become a national concern. *See* the Executive Summary of The 9/11 Commission Report attached as Exhibit B to the Second Affidavit of Commissioner James R. Davis. These homeland security concerns may have an impact on the requirements of the next Digitized License RFP.

(g)    The American Association of Automobile Administrators (AAMVA) has developed a security framework to enhance the security, uniformity and reliability of the driver licensing process among its member jurisdictions as delineated in the Driver's License Agreement (DLA) and associated Driver's License/Identification Card (DL/ID) standards document. An AAMVA-sponsored DLA conference is scheduled in late October to reveal the final DL/ID security features and to encourage jurisdiction participation in the DLA. DMVS has not yet made a determination as to its level of participation in the DLA. If adopted, the DL/ID card design will have a

significant impact on the requirements for card design and associated licensing functions in the next Digitized License RFP.

Therefore, in light of the differences presently identified between the 2002 RFP and the New RFP, it is unlikely that Viisage will have an advantage in the re-bid, much less an unfair advantage, and any finding of unfairness would be based on speculation and conjecture which cannot support an injunction.

Digimarc also claims that the settlement payment to Viisage will cover all of Viisage's "development costs" (which are undefined and unidentified by Digimarc), thereby giving Viisage a financial advantage in a re-bid as it allegedly would be able to underbid the prices of the other vendor. Digimarc claims that this allegation is evidenced by a Viisage press release. This allegation by Digimarc has no basis in fact, and appears to be wholly made up since the Viisage press release does not say anything of the sort. The settlement agreement will only allow Viisage to recoup approximately one third of the costs it expended on the contract, leaving Viisage in the red, which can hardly be considered a "financial advantage." *See* Fourth Hitchock Affid. ¶ 4,6. Even if Viisage were considered to have benefited in some way through its efforts to implement the contract, all contractors inherently have various advantages over others which is not to say that fair procurements cannot be had. Vendors are entitled to be treated fairly and equally, they are not required to start from a level playing field.

For instance, Digimarc, as the incumbent vendor in possession of the vast database in its own format of Georgia identification information (pictures and fingerprints) necessary to effectuate a drivers license program necessarily starts at an advantage over other vendors. Furthermore, as the vendor on the driver's license program for Georgia a substantial number of years, Digimarc undoubtedly has more familiarity with the business methods, technology, and personnel of the

Georgia DMVS than any other potential bidder. Surely Digimarc does not believe that any procurement in which it is allowed to bid is unfair for those reasons.

Furthermore, there is no assurance that Viisage will even be a bidder on any subsequent procurement, much less will be awarded the contract. Viisage has already endured substantial unreimbursed costs and is under the continuing threat that Digimarc's expressed litigiousness portends for a protracted future procurement. Digimarc is, in fact, attempting to litigate an advance protest to the re-bid and such is not ripe for review. In the event that Digimarc is **not** the successful vendor on the upcoming procurement, **and if** under the actual facts as they exist at that time, as opposed to the vague speculation invoked by Digimarc in this action, there appear grounds for protest, Digimarc will be free to file a protest in the normal fashion.

Without proof of a real and imminent threat against Digimarc, an injunction debarring Viisage from future procurement is actually a punishment for alleged past wrongs. The punishment is akin to a criminal sanction as it will likely cause serious repercussions. In *Gonzalez*, 334 F.2d at 574, Justice Burger, recognized the dire consequences caused by the termination of a contractor's right to bid or contract. Specifically the Court noted the impact as follows:

> The impact of debarment on a contract may be a sudden contraction of bank credit, adverse impact on market price of shares of listed stock, if any, and critical uneasiness of creditors generally, to say nothing of 'loss of fact' in the business community. These consequences are in addition to the loss of specific profits from the business denied as a result of debarment. We need not resort to a colorful term such as 'stigma' to characterize the consequences of such governmental action, for labels may blur the issues. But we strain no concept of judicial notice to acknowledge these basic facts of human life.

Therefore, as Digimarc has not shown that it will suffer irreparable harm if Viisage participates in a re-bid and because of the serious consequences to a deband bidder, this Court should find that a debanement of Viisage is not appropriate.

-31-

### 3.    To debar Viisage from participating in a future procurement would not be in the best interests of the citizens of Georgia.

The purpose of the competitive bidding process is to allow the government to obtain the most advantageous contracts while protecting the public coffers and assuring that taxpayers receive the best possible price. *See Garden Hills Civic Association, Inc. v. Metropolitan Atlanta Rapid Transit Authority*, 273 Ga. 280, 539 S.E.2d 811 (2000) (*citing City of Atlanta v. J.A. Jones Constr. Co.*, 260 Ga. 658(1), 398 S.E.2d 369 (1990)). *See also Delta Data Systems Corp. v. Webster*, 744 F.2d 197 (D.C. App. 1984). It would violate the very intent of the procurement statutes for this Court to allow Digimarc or any other vendor to use these laws against the taxpayers and citizens of this State. The very purpose of competition is to keep the costs and performance in check.

Digimarc and Viisage are the dominant driver's license and identification card providers in the United States. To disqualify Viisage, may in effect eliminate all competition for the bid, allowing Digimarc to set its price and its terms in an unencumbered manner. Such an order would force the State to incur, no doubt, exorbitant charges and potentially inferior performance and service. This would not serve the citizens of Georgia and runs completely counter to the purpose of the competitive bidding statutes. Therefore, the Court should refrain from ordering an injunction debarring Viisage from a future re-bid.

## II.    DIGIMARC IS NOT ENTITLED TO BID PREPARATION COSTS.

### A.    Digimarc is barred from seeking its bid preparation costs, and even a contract award, because it failed to raise the issue in its protest.

It is well established that, before resorting to equity, one must exhaust the available administrative remedies. *See Cerulean Companies, Inc. v. Tiller*, 271 Ga. 65, 516 S.E.2d 522 (1999); *Exum v. City of Valdosta*, 246 Ga. 169, 269 S.E.2d 441 (1980). Dissatisfied bidders on GTA's technology procurements may protest a contract award in a protest proceeding as set out in

-32-

GTA Rule 665-2-11-.07. Therefore, the State provides a frustrated bidder an administrative remedy.

Where an agency provides an administrative remedy, any and all objections to the challenged agency's decision must be raised before that agency as the scope of judicial review is limited to those objections upon which the agency has had an opportunity to rule. *Georgia Bd. Of Dentistry v. Pence*, 223 Ga. App. 603, 157 S.E. 2d 255 (1996); *Dept. of Public Safety v. Foreman*, 130 Ga. App. 71, 202 S.E. 2d 196 (1973). Consistent with the exhaustion of administrative remedies doctrine, GTA Rule 665-2-11-.07(b)4.(v) provides in pertinent part that "[a]ny grounds not included in the Protest that the Protestor could have raised when the Protest was filed will be deemed irrevocably waived and may not be part of, or grounds for, that or any subsequent Protest or other legal action filed by Protestor."

Digimarc filed a protest regarding the award of the contract to Viisage with the GTA. In its protest, Digimarc sought the suspension of the contract award and a re-evaluation of the proposals or, in the alternative cancellation of the solicitation. However, Digimarc did not seek an award of the contract or the payment of its bid preparation costs. Therefore, this Court should enter judgment on the State Defendants' behalf regarding the claim for such relief as a matter of law.

**B.**     **Digimarc is barred from an award of its bid preparation costs because it has already obtained equitable relief.**

A frustrated bidder may recover injunctive relief if there is not an adequate remedy at law. *Amdahl Corp. v. Ga. Dept. of Admin. Svcs.*, 260 Ga. 690, 697(3), 398 S.E. 2d 540 (1990). Injunctive relief in such cases may include, in the appropriate cases, an award of the contract, a re-review of the submitted bids or a re-bid for the contract. However, injunctive relief is not always an available remedy in bid protest cases as it may not meet the frustrated bidders' expectations, it may not serve the public interest or it may be impossible to perform. Therefore, the law allows a frustrated bidder to recover its reliance costs or bid preparation costs in lieu of injunctive relief.

In *Credle v. East Bay Holding Company, Inc.*, 263 Ga. 907, 440 S.E.2d 20(1994) the trial court held that the only remedy provided to a frustrated bidder in Georgia was bid preparation costs, as a matter of law. The frustrated bidder appealed and the Georgia Supreme Court reversed holding that, while a frustrated bidder can recover damages in the way of bid preparation costs, *see City of Atlanta v. J.A. Jones Construction Co.*, 260 Ga. 658(1), 398 S.E.2d 369 (1990), a frustrated bidder can also seek to recover equitable relief under the appropriate circumstances, *see Amdahl Corp*, 260 Ga. at 697(3), 398 S.E. 2d 540; *Hilton Constr. Co. v. Bd. of Education*, 45 Ga. 533, 538-40, 266 S.E.2d 157 (1980); *Glynn County v. Teal*, 256 Ga. 174, 175-76, 345 S.E.2d 347 (1986). The Court did not address whether the two remedies were mutually exclusive. *Credle*, 263 Ga. at 908, 440 S.E.2d at 21.

Many jurisdictions find that a frustrated bidder must chose between injunctive relief and reliance damages.[13] These remedies are mutually exclusive because the main objective in framing a private remedy for a frustrated bidder on a public project is to "assure that the government obtains the most advantageous contracts by complying with the procedures which the [appropriate Legislative body] and applicable regulations have provided." *See Delta Data Systems Corp. v. Webster*, 744 F.2d 197, 206 (D.C. App. 1984). The award procedures established by legislation and regulation for the procurement of goods and services "are not designed to establish private 'entitlements' to public business, but rather to produce the best possible contracts for the government in the majority of the cases." *Id.* Private parties have standing to sue for violation of public procurement laws only for the following reason:

---

[13] In order to consider injunctive relief, these courts, as has this Court, had already found that bid preparation costs did not provide adequate legal relief.

...to satisfy the public interest in having agencies follow the regulations which control government contracting. The public interest in preventing the granting of contracts through arbitrary or capricious action can properly be vindicated through a suit brought by one who suffers injury as a result of the illegal activity, but the suit itself is brought in the public interest by one acting essentially as a 'private attorney general.'

*Id.* (quoting *Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859, 864 (D.C. Cir. 1970)).

In that regard, the court in *Delta* held that putting the frustrated bidder in the economic position it would have occupied "but for the error" is normally the best approach to assure that the government obtains the most advantageous contracts. *Id.* at 206-07. However, the court recognized that it is not always possible to return the frustrated bidder to the status quo as the injunctive relief may be impracticable or "can only be achieved at a cost to the government that will greatly exceed the benefits derived from requiring observance of the proper procedures. *Id.* at 207. In such a case, the court has the power to seek reasonable alternatives. *Id.*

Pursuant to the specific facts in *Delta*, the court held that the needs of the government agency and the interests of justice would best be served by giving the frustrated bidder, Delta Data Systems Corp. ("Delta") the right to require the government agency to make a *nunc pro tunc* reselection of the contractor on the basis of the best final offers previously submitted. The court provided some parameters for the agency's consideration. However, the court held that such a reselection may not meet Delta's original expectations, given that considerable performance had already taken place under the contract, and the inherent difficulties the agency will have to approach a reevaluation of the proposals with the same impartiality it would originally have applied, knowing that making the award to Delta may involved shifting systems in mid-project and perhaps incurring some liability for termination to the bidder that was awarded the contract. *Id.* at 206. Therefore, the Court held that Delta was required choose between its injunctive expectations, *i.e.* obtaining a procedurally correct opportunity to obtain an award of the contract, or obtain its reliance costs, *i.e.*,

-35-

the bid preparation costs. *Id.* See *LeBoeuf, Lamb, Greene & McCrae, LLP v. Abraham*, 347 F.3d 315, (D.C. App. 2003) (holding that, on remand the district court should consider whether the frustrated bidder had preserved its bid preparation claim and could chose between its expectation or its reliance costs); *Elcon Enterprises, Inc. v. Washington Metropolitan Area Transit Authority*, 770 F. Supp. 667 (D.C. D.C. 1991)(district court ordered the agency to reconsider its decision in light of the court's holding, but recognized that the remedy may not provide the frustrated bidder its original expectations, in which case the bidder could have the option of recovering its bid preparation costs in lieu of reselection determination), overturned on other grounds in *Elcon Enterprises, Inc. v. Washington Metropolitan Area Transit Authority*, 977 F.2d 1472 (D.C. App. 1992) (the appellate court held that no relief was available because there was no violation of the procurement laws).

The reason for allowing reliance damages to frustrated bidders in lieu of injunctive relief is to protect both the bidders and the public's interest. See *Owen of Georgia, Inc.. v. Shelby County*, 648 F.2d 1084, 1094-95 (6th Cir. 1981). Allowing reliance damages when injunctive relief is unavailable or infeasible acts to assure bidders that their bids will receive fair and honest consideration. *Id.* Otherwise, "[t]he number of bidders, and thus the range of choice available to an awarding authority, may well be reduced if it were to be assumed by prospective bidders that such an authority would not abide by the applicable statutes in making its awards." *Id.* '[citations omitted]. In fact, the court held that "it is doubtful that many contractors would bid at all knowing the deck was stacked against them." *Id.* See also, *Planning and Design Solutions*, 118 N.M. at 716, 885 P.2d at 637.

Digimarc claims that it may recover its legal and equitable remedies pursuant to O.C.G.A. § 23-3-1. Recovery by a frustrated bidder of both its reliance and expectation costs would violate the very nature of allowing private causes of actions on public contracts. The Georgia Supreme Court has held that the procurement laws in the State of Georgia were designed "to protect the

public coffers from waste and to assure that taxpayers receive quality work and goods for the lowest possible price. " *J.A. Jones Constr. Co.*, 260 Ga. at 658, 398 S.E.2d at 370. *See Lethchas v. Sims Asphalt Co. Inc.*, 250 Ga. App. 179, 180, 550 S.E.2d 721, 722 (2001).

    To allow Digimarc to obtain injunctive relief, i.e., an award of the contract or a re-bid, as well as reliance costs, would give Digimarc a windfall far and above its expectations had it won the contract originally. The Settlement entered into by the State, necessary to pave the way for a re-bid, already provides Digimarc with the only available equitable relief to the same extent that it would be able to obtain at trial if it succeeded in convincing this Court to void the award to Viisage. If Digimarc had originally been awarded the contract, it would not have recouped its bid preparation costs. In the event of a re-bid, Digimarc will have an unfair advantage to those entities that bid in the first procurement proposals as the other bidders will have had to suffer multiple bid preparation costs.[14] Allowing both remedies will overburden the taxpayers and the citizens of this State: The State will have to pay twice for its alleged wrongdoing, in the award of reliance costs and in the cost to the State to issue a re-bid, including the liability the State faces to the bidder successful in the first procurement, Viisage. Therefore, this Court should find that Digimarc has already received its injunction relief and is not entitled to bid preparation costs as a matter of law.

---

[14] Viisage will not have this advantage. Any settlement by the state with Viisage is in settlement of claims Viisage has against the State for sums expended "executing" the contract, not for preparation of the bid.

## CONCLUSION

The only relief to which Digimarc would be entitled if this Court found that the State violated its procurement laws in awarding a contract to Viisage is the termination of the contract with Viisage and a re-bid for the procurement. Digimarc is entitled to neither an award of the contract, nor the debarment of Viisage in a re-bid. Furthermore, as Digimarc has obtained equitable relief, it is not entitled to recoup its bid preparation costs. Therefore, as Digimarc has obtained its equitable relief, the State Defendants, GTA and DMVS, are entitled to judgment in their favor as a matter of law against Digimarc's claims.

This 11th day of October, 2004.

John P. Gallagher
Georgia Bar No. 282860

**STITES & HARBISON** PLLC
303 Peachtree Street, N.E.
2800 SunTrust Plaza
Atlanta, Georgia 30308
Telephone: 404/739-8800
Facsimile: 404/739-8870

Attorney for Defendants Georgia
Technology Authority and the Georgia
Department of Motor Vehicle Safety

# RELEASE AND SETTLEMENT AGREEMENT

This Release and Settlement Agreement ("the Agreement") is made and entered into as of the 20th day of July 2004 ("the Effective Date"), by and between the Georgia Department of Motor Vehicle Safety, ("the DMVS"), the Georgia Technology Authority ("the GTA") and Viisage Technology, Inc., a Delaware corporation, ("Viisage"). As used herein, the words "Party" or "Parties" refer to the DMVS, the GTA and/or Viisage as the context requires.

## WITNESSETH:

WHEREAS, DMVS and Viisage entered into a contract on November 12, 2002 pursuant to which Viisage is to provide a Digitized License System for the State of Georgia ("the Contract");

WHEREAS, Digimarc ID Systems, LLC filed an action styled as *Digimarc ID Systems LLC v. Department of Motor Vehicle Safety*, Civil Action No. 2003CV66498 in the Fulton County Superior Court on March 5, 2003 seeking to enjoin the DMVS from all further activities related to implementation of or performance under the Contract;

WHEREAS, the Fulton County Superior Court entered an Order in *Digimarc ID Systems LLC v. Department of Motor Vehicle Safety*, Civil Action No. 2003CV66498 temporarily enjoining the DMVS from all further activities related to implementation of or performance under the Contract ("the Interlocutory Injunction");

WHEREAS, the Parties deny that there is any merit to the allegations made by Digimarc ID Systems in the action styled *Digimarc ID Systems LLC v. Department of Motor Vehicle Safety*, Civil Action No. 2003CV66498, and expressly deny any and all liability or misconduct

EXHIBIT B

alleged in that action and further deny that Digimarc ID Systems is entitled to any relief;

WHEREAS, the provision of driver's licenses and identification cards to the State's citizens is recognized by both Parties to be an essential governmental function that impacts homeland security;

WHEREAS, the Interlocutory Injunction is preventing the State from implementing the new Digitized License System with Viisage and the uncertainty of a trial date combined with the possibility of appeals by either Digimarc ID Systems, LLC or Viisage could further delay the State's ability to address the need for an updated secure driver's license and identification card system;

WHEREAS, the DMVS desires to exercise its right to terminate the Contract for convenience;

WHEREAS, Viisage has made a demand for a termination payment pursuant to GTA Rule 665-2-11-.09;

WHEREAS, the Parties disagree about the amount of the termination payment to which Viisage is entitled under GTA Rule 665-2-11-.09;

WHEREAS, the Parties desire to end the above-referenced dispute by compromise and, without a finding or admission of liability or wrongdoing as to either Party, each of which denies any wrongdoing or liability, to enter into this Agreement to settle and discharge all claims which are pending between the Parties, and which might have been raised by either Party related to the Contract, on the terms and conditions set forth herein; and

WHEREAS, the Parties believe that it is in their mutual interest to resolve this dispute, in part to avoid the risks, uncertainties and costs of litigation;

NOW THEREFORE, in consideration and reliance on the foregoing premises and the mutual agreements and covenants set forth herein, and for other good and valuable consideration, the adequacy and receipt of which are hereby acknowledged, the Parties agree as follows:

1. The DMVS and GTA shall pay an aggregate total of two million and five hundred thousand dollars ($2,500,000.00) to Viisage. Within thirty (30) calendar days of the execution of this Agreement, the DMVS will pay the amount of one million and three hundred thousand dollars ($1,300,000.00) to Viisage by its check in its normal manner, made out to Viisage, with reference to this Agreement and delivered by United States mail to Viisage, Attention: Elliot J. Mark, at 296 Concord Road, Third Floor, Billerica, Massachusetts 01821. Within thirty (30) calendar days of the execution of this Agreement, the GTA will pay the amount of one million and two hundred thousand dollars ($1,200,000.00) to Viisage by its check in its normal manner, made out to Viisage, with reference to this Agreement and delivered by United States mail to Viisage, Attention: Elliot J. Mark, at 296 Concord Road, Third Floor, Billerica, Massachusetts 01821.

2. Within thirty (30) calendar days of the execution of this Agreement, Viisage shall deliver to DMVS and GTA the equipment listed on Attachment 1 ("the Equipment"), which is incorporated herein by reference. Viisage hereby warrants and represents that said Equipment is in its original unopened box or otherwise in unused condition. Viisage shall ship the Equipment listed in Attachment 1 under Category A to the DMVS, Attention: Mark Pruitt, at 2206 East View Parkway, Conyers, Georgia 30013. Viisage shall ship the Equipment listed in Attachment 1 under Category B to the GTA, Attention: Bob Jarrell, 1520 West Tower, 200 Piedmont Avenue, Atlanta, Georgia 30334. Viisage shall pay the cost of shipping and insurance.

3. The DMVS, in conjunction with the GTA, hereby provides Viisage with written notice that it is terminating the Contract for convenience pursuant to GTA Rule 665-2-11-.09. Viisage hereby waives the seven (7) day notice of the termination for convenience required by said Rule.

4. Except for any claim which may hereafter arise under this Agreement, Viisage does hereby agree to forever and irrevocably release and discharge the DMVS and the GTA , the State of Georgia and its departments, agencies and instrumentalities and their respective officers, members, employees and directors as well as the self-insurance and insurance programs of the State of Georgia from any and all loss and liability, damages, claims, actions, causes of actions, sums of money due, attorneys' fees, court costs, expenses, debts, demands, or liabilities, in law or in equity, whether known or unknown, which Viisage had, now has or might have in the future relating to, arising out of, or in connection with any and all claims arising from or related to the Parties' performance under the Contract.

5. Except for any claim which may hereafter arise under this Agreement, the DMVS and the GTA, as representative of the interests of the State of Georgia, do hereby forever and irrevocably release and discharge Viisage, and its predecessors, successors, servants, employees, representatives, officers, directors, subsidiaries, stockholders, and affiliated companies, from any and all loss and liability, damages, claims, actions, causes of actions, sums of money due, attorneys' fees, court costs, expenses, debts, demands, or liabilities, in law or in equity, whether known or unknown, which the DMVS and the GTA had, now has or might have in the future relating to, arising out of, or in connection with any and all claims arising from or related to the Parties' performance under the Contract.

6. Each Party shall bear its own costs, including its own attorneys' fees and expenses.

7. This Agreement shall be interpreted and governed for all purposes, including but not limited to questions regarding its execution and validity, in accordance with the laws of the State of Georgia without regard to the application of conflict of laws principles.

8. This Agreement shall inure to the benefit of each party, its affiliates, successors and assigns, provided that, as the context requires, such affiliates, successors and assigns of the DMVS and the GTA are limited to those now or hereinafter in Georgia government.

9. This Agreement states all understandings and obligations of the Parties with respect to the subject matter hereof. All terms of this Agreement, including the recitals, are binding on the Parties. No amendment or modification of this Agreement shall be valid or binding unless made in writing and signed on behalf of each of the Parties by their respective, duly authorized officers. Additionally, any and all prior negotiations or agreements by any agent or representative of the parties are merged into this Agreement and no such prior negotiations or agreements shall be binding on the Parties or have any force or effect.

10. The terms, conditions, conveyance, and provisions of this agreement shall be deemed to be severable as qualified hereinafter. In the event that any provision of this Agreement is held to be unenforceable, unlawful, illegal, void or invalid by a court of competent jurisdiction and from which judgment no appeal can or has been taken, such provision shall be deemed changed to remove the invalid portion and, as so changed, shall be deemed a part of this Agreement as though originally included, if after such change the Agreement continues to reflect substantially the basic bargain and mutual benefit for each Party. The remaining provisions shall not be affected by any such change and shall remain valid and in full force and effect.

11. This Agreement may be executed in separate counterparts, each of which so executed and delivered shall constitute an original, but all such counterparts shall together constitute one and the same instrument. Any such counterpart may comprise one or more duplicates or duplicate signature pages any of which may be executed by less than all of the Parties, provided each Party executes at least one such duplicate or duplicate signature page. The Parties stipulate that a photostatic copy of an executed original will be admissible in evidence for all purposes in any proceeding as between the Parties.

12. This Agreement is undertaken solely for the purpose of resolving a disputed matter between the Parties, and this Agreement shall not constitute an admission of liability, wrongdoing, or of fact by either of the Parties, nor shall this Agreement or any of its details be admissible as evidence of such admission or such fact in any further proceeding.

13. Each of the Parties to this Agreement acknowledges that this Agreement has been negotiated at arm's length, that each of the undersigned Parties has been represented in the negotiations by counsel, and that none of the undersigned Parties has reposed trust or confidence in the other such as to create any confidential or fiduciary relationship. This Agreement shall be construed without regard to the Party responsible for its preparation and it shall be deemed to have been prepared jointly by all undersigned Parties. The language of all parts of this Agreement will in all cases be construed as a whole, according to its fair meaning. Any ambiguity or uncertainty existing herein shall not be interpreted or construed against any party hereto. Further, Viisage warrants and represents that the person executing this Agreement on its behalf is duly authorized and fully competent to execute this Agreement, understands its terms and provisions, and has voluntarily executed this Agreement.

14. Time is of the essence.

WITNESS the signatures of the Parties on the day and year set forth below.

**GEORGIA DEPARTMENT OF MOTOR VEHICLE SAFETY**

By: James R. Davis, Commissioner                    Date: 7/20/2004

**GEORGIA TECHNOLOGY AUTHORITY**

By: Tom Wade, Executive Director                    Date: _____

**VIISAGE TECHNOLOGY, INC.**                        Date: _____

By: _____
Title: _____

WITNESS the signatures of the Parties on the day and year set forth below.

**GEORGIA DEPARTMENT OF MOTOR VEHICLE SAFETY**

By: James R. Davis, Commissioner                    Date: _____

**GEORGIA TECHNOLOGY AUTHORITY**

By: Tom Wade, Executive Director                    Date: 7/20/04

**VIISAGE TECHNOLOGY, INC.**                    Date: _____

By: _____
Title: _____

WITNESS the signatures of the Parties on the day and year set forth below.

**GEORGIA DEPARTMENT OF MOTOR VEHICLE SAFETY**

By: James R. Davis, Commissioner        Date: _____

**GEORGIA TECHNOLOGY AUTHORITY**

By: Tom Wade, Executive Director        Date: _____

**VIISAGE TECHNOLOGY, INC.**        Date: 7/20/04

By: _____
Title: President and CEO

ATTACHMENT 1 TO THE
RELEASE AND SETTLEMENT AGREEMENT
BETWEEN THE GEORGIA DEPARTMENT OF MOTOR VEHICLE SAFETY,
THE GEORGIA TECHNOLOGY AUTHORITY AND VIISAGE TECHNOLOGY, INC.
EFFECTIVE JULY 20, 2004

## Category A

| | | | |
|---|---|---|---|
| DELL MARKETING, LP | 281-1155 | DELL OPTIPLEX GX260D | 289 |

## Category B

| | | | |
|---|---|---|---|
| PC CONNECTION | F3U133-06 | BELKIN USB CABLE 6' | 165 |
| PC CONNECTION | F3U133-10 | BELKIN USB CABLE 10' | 250 |
| PC CONNECTION | A3L791-100-S | RJ45/CAT5 CABLE 100' | 5 |
| PC CONNECTION | F5C070 | SURGE PROTECTORS | 447 |
| PC CONNECTION | 744872 | UPS 500 BACKUP SYSTE | 250 |
| PC CONNECTION | 1C134A | USB 4 PORT HUB | 190 |
| PC CONNECTION | 102796 | USB CABLE 10' A/B | 100 |
| DELL MARKETING, LP | 320-4106 | DELL 17" FLAT PANEL | 5 |
| DELL MARKETING, LP | 221-2071 | DELL LATITUDE C840 N | 2 |
| DELL MARKETING, LP | 320-4106 | DELL 17" FLAT PANEL | 368 |

ATTACHMENT 1 TO THE
RELEASE AND SETTLEMENT AGREEMENT
BETWEEN THE GEORGIA DEPARTMENT OF MOTOR VEHICLE SAFETY,
THE GEORGIA TECHNOLOGY AUTHORITY AND VIISAGE TECHNOLOGY, INC.
EFFECTIVE JULY 20, 2004

**Category A**

| DELL MARKETING, LP | 281-1155 | DELL OPTIPLEX GX260D | 289 |
|---|---|---|---|

**Category B**

| PC CONNECTION | F3U133-06 | BELKIN USB CABLE 6' | 165 |
|---|---|---|---|
| PC CONNECTION | F3U133-10 | BELKIN USB CABLE 10' | 250 |
| PC CONNECTION | A3L791-100-S | RJ45/CAT5 CABLE 100' | 5 |
| PC CONNECTION | F5C070 | SURGE PROTECTORS | 447 |
| PC CONNECTION | 744872 | UPS 500 BACKUP SYSTE | 250 |
| PC CONNECTION | 1C134A | USB 4 PORT HUB | 190 |
| PC CONNECTION | 102796 | USB CABLE 10' A/B | 100 |
| DELL MARKETING, LP | 320-4106 | DELL 17" FLAT PANEL | 5 |
| DELL MARKETING, LP | 221-2071 | DELL LATITUDE C840 N | 2 |
| DELL MARKETING, LP | 320-4106 | DELL 17" FLAT PANEL | 368 |

# Exhibit 24

# COPY

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

DIGIMARC ID SYSTEMS, LLC,

      Plaintiff,

v.

Civil Action No. 2003CV66498

GEORGIA TECHNOLOGY AUTHORITY and
the GEORGIA DEPARTMENT OF MOTOR
VEHICLE SAFETY,

      Defendants,

v.



FILED IN OFFICE

DEC 1 5 2003

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

VIISAGE TECHNOLOGY, INC., a Delaware
corporation,

      Necessary Party-Defendant

### VIISAGE TECHNOLOGY, INC.'S ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT FOR INTERLOCUTORY AND PERMANENT INJUNCTIVE RELIEF AND DEMAND FOR TRIAL BY STRUCK JURY

Defendant Viisage Technology, Inc. ("Viisage"), by and through its undersigned counsel,

demands a trial by a struck jury, and answers Plaintiff Digimarc ID System's LLC's First

Amended Complaint For Interlocutory And Permanent Injunctive Relief (the "Complaint" or

"Plaintiff's Complaint") as follows:

1.

Viisage is without information sufficient to form a belief as to the truth of the allegations

in paragraph 1 of Plaintiff's Complaint, and therefore such allegations are denied.

2.

Viisage is without information sufficient to form a belief as to the truth of the allegations

in paragraph 2 of Plaintiff's Complaint, and therefore such allegations are denied.

3.

Viisage admits the allegations in the first sentence of paragraph 3 of Plaintiff's Complaint. Viisage is without information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 3 of Plaintiff's Complaint, and therefore such allegations are denied.

4.

Upon information and belief, Viisage admits the allegations in paragraph 4 of Plaintiff's Complaint.

5.

Upon information and belief, Viisage admits the allegations in paragraph 5 of Plaintiff's Complaint.

6.

Viisage admits the allegations in paragraph 6 of Plaintiff's Complaint.

7.

Upon information and belief, Viisage admits the allegations in paragraph 7 of Plaintiff's Complaint.

8.

Viisage admits the allegations in paragraph 8 of Plaintiff's Complaint.

9.

Upon information and belief, Viisage admits the allegations in paragraph 9 of Plaintiff's Complaint.

10.

Viisage admits that the Plaintiff in this action seeks *de novo* judicial review of GTA and DMVS's procurement process in relation to a May 24, 2002 Request For Proposal ("RFP"), but denies that Plaintiff is entitled to *de novo* judicial review. Upon information and belief, Viisage admits the remaining allegations in paragraph 10 of Plaintiff's Complaint.

11.

Upon information and belief, Viisage admits the allegations in the first and second sentences of paragraph 11 of Plaintiff's Complaint, but denies that Plaintiff is entitled to any of the relief sought. The remaining allegations of this paragraph are denied.

12.

Viisage admits that the procurement process referenced in paragraph 12 of Plaintiff's Complaint is intended to permit the State of Georgia to exercise its discretion to secure the services of a vendor who will provide the "best value" to the State of Georgia. Viisage denies the remaining allegations in paragraph 12 of Plaintiff's Complaint.

13.

Viisage denies the allegations in paragraph 13 of Plaintiff's Complaint.

14.

Viisage denies the allegations in paragraph 14 of Plaintiff's Complaint.

15.

Viisage denies the allegations in paragraph 15 of Plaintiff's Complaint.

16.

Viisage denies the allegations in paragraph 16 of Plaintiff's Complaint.

-3-

17.

Upon information and belief, Viisage admits the allegations in paragraph 17 of Plaintiff's Complaint.

18.

Upon information and belief, Viisage admits the allegations in paragraph 18 of Plaintiff's Complaint.

19.

Viisage is without information sufficient to form a belief as to the truth of the allegation that the issues were fully briefed, and therefore such allegations are denied. Viisage states that the July 31, 2003 Order speaks for itself, and to the extent Plaintiff's allegations regarding the Order are inconsistent with it or not derived from it, such allegations are denied. Upon information and belief, Viisage admits the remaining allegations in paragraph 19 of Plaintiff's Complaint.

20.

Viisage admits the allegations in paragraph 20 of Plaintiff's Complaint.

21.

Viisage admits the allegations in paragraph 21 of Plaintiff's Complaint.

22.

Viisage admits that it has an interest in the outcome of this action, and upon information and belief admits that its interest would have entitled it to intervene under O.C.G.A. Section 9-11-24. Viisage admits the allegations in the second sentence of paragraph 22 of Plaintiff's Complaint. Viisage admits that it did not move to intervene, but denies that it did not voluntarily enter the litigation. The remaining allegations in this paragraph are denied.

-4-

23.

Viisage is without information or belief as to whether Digimarc's correspondence of November 4, 2003 was consistent with the Consent Order referenced in this paragraph, and therefore such allegations are denied. Viisage admits the remaining allegations in paragraph 23 of Plaintiff's Complaint.

24.

Viisage admits the allegations in paragraph 24 of Plaintiff's Complaint.

25.

Viisage admits the allegations in paragraph 25 of Plaintiff's Complaint.

Regarding the un-numbered heading "Facts Common to All Counts," Viisage denies that the referenced facts are common to all counts, or that any of the facts entitle Plaintiff to the relief sought.

26.

Viisage admits the allegations in the first sentence in paragraph 26 of Plaintiff's Complaint. Upon information and belief, Viisage admits the remaining allegations in paragraph 26 of Plaintiff's Complaint.

27.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 27 to the extent such allegations are inconsistent with the terms of the RFP. Viisage denies the remaining allegations in paragraph 27 of Plaintiff's Complaint.

28.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 28 to the extent such allegations are inconsistent with the terms of the RFP. Viisage denies the remaining allegations in paragraph 28 of Plaintiff's Complaint.

29.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 29 to the extent such allegations are inconsistent with the terms of the RFP. Viisage denies the remaining allegations in paragraph 29 of Plaintiff's Complaint.

30.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 30 to the extent such allegations are inconsistent with the terms of the RFP. Viisage denies the remaining allegations in paragraph 30 of Plaintiff's Complaint.

31.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 31 to the extent such allegations are inconsistent with the terms of the RFP. Viisage denies the remaining allegations in paragraph 31 of Plaintiff's Complaint.

32.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 32 to the extent such allegations are inconsistent with the terms of the RFP. Viisage denies the remaining allegations in paragraph 32 of Plaintiff's Complaint.

33.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 33 to the extent such allegations are inconsistent with the terms of the RFP. Viisage denies the remaining allegations in paragraph 33 of Plaintiff's Complaint.

34.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 34 to the extent such allegations are inconsistent with the terms of the RFP. Viisage denies the remaining allegations in paragraph 34 of Plaintiff's Complaint.

35.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 35 to the extent such allegations are inconsistent with the terms of the RFP. Viisage denies the remaining allegations in paragraph 35 of Plaintiff's Complaint.

36.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 36 to the extent such allegations are inconsistent with the terms of the RFP. Viisage denies the remaining allegations in paragraph 36 of Plaintiff's Complaint.

37.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 37 to the extent such allegations are inconsistent with the terms of the RFP. Viisage denies the remaining allegations in paragraph 37 of Plaintiff's Complaint.

38.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 38 to the extent such allegations are inconsistent with the terms of the RFP. Viisage denies the remaining allegations in paragraph 38 of Plaintiff's Complaint.

Regarding the un-numbered heading beginning "Offeror's Initial Responses," Viisage denies that there were "problems with unequal treatment."

39.

Viisage admits that on July 19, 2002, it presented its bid proposal to GTA in response to the RFP. Viisage is without information sufficient to form a belief as to the truth of the remaining allegations in this paragraph, and therefore such allegations are denied.

40.

Upon information and belief, Viisage admits the allegations in the first and second sentences of paragraph 40 of Plaintiff's Complaint. Viisage admits that SoftLEAD's proposal is not at issue in this case. Viisage is without information sufficient to form a belief as to the truth of the remaining allegations in this paragraph, and therefore such allegations are denied.

41.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 41 to the extent such allegations are inconsistent with the terms of the RFP. Viisage denies the remaining allegations in paragraph 41 of Plaintiff's Complaint.

42.

Viisage states that the GTA Rules speak for themselves, and denies all allegations of paragraph 42 to the extent such allegations are inconsistent with the referenced Rules. Viisage denies the remaining allegations in paragraph 42 of Plaintiff's Complaint.

43.

Viisage denies the allegations in paragraph 43 of Plaintiff's Complaint.

44.

Viisage is without information sufficient to form a belief as to the truth of the allegations regarding when the GTA and DMVS opened the price proposals, and therefore such allegations are denied. Viisage denies the remaining allegations in paragraph 44 of Plaintiff's Complaint.

45.

Viisage is without information sufficient to form a belief as to the truth of the allegations in paragraph 45 of Plaintiff's Complaint, and therefore such allegations are denied.

46.

Viisage denies the allegations in paragraph 46 of Plaintiff's Complaint.

47.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 47 to the extent such allegations are inconsistent with the terms of the RFP. Viisage denies the remaining allegations in paragraph 47 of Plaintiff's Complaint.

48.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 48 to the extent such allegations are inconsistent with the terms of the RFP. Viisage denies the remaining allegations in paragraph 48 of Plaintiff's Complaint.

49.

Viisage admits that included with its proposal were its independent lab tests for the permanent ID Cards that it was offering. Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 49 to the extent such allegations are inconsistent with the terms of the RFP. Viisage is without information sufficient to form a belief as to the truth of the remaining allegations in this paragraph, and therefore such allegations are denied.

50.

Viisage admits the allegations in paragraph 50 of Plaintiff's Complaint.

51.

Viisage denies the allegations in the first sentence of paragraph 51 of Plaintiff's Complaint. Viisage denies that any flaws identified by GTA or DMVS with regard to Viisage's card samples were "critical." Viisage admits that it received an "unsatisfactory rating" with regard to its laminate and solvent tests, but denies that the solvent tests constituted a complete battery of tests. The remaining allegations in paragraph 51 of Plaintiff's Complaint are denied.

52.

Viisage admits that it received an e-mail from GTA dated August 1, 2002, a copy of which is attached as Exhibit E to Plaintiff's Complaint. The remaining allegations of this paragraph are denied.

53.

Viisage is without information sufficient to form a belief as to the truth of the allegations in paragraph 53 of Plaintiff's Complaint, and therefore such allegations are denied.

54.

Viisage is without information sufficient to form a belief as to the truth of the allegations in paragraph 54 of Plaintiff's Complaint, and therefore such allegations are denied.

55.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 55 to the extent such allegations are inconsistent with the terms of the RFP. Viisage is without information sufficient to form a belief as to the truth of the remaining allegations in paragraph 55 of Plaintiff's Complaint, and therefore such allegations are denied.

56.

Viisage admits that on August 9, 2002, GTA informed Viisage of a meeting to be conducted on August 14, 2002 to discuss the temporary and permanent ID card samples provided by Viisage. Viisage is without information sufficient to form a belief as to the truth of the remaining allegations in the first sentence of paragraph 56 of Plaintiff's Complaint, and therefore such allegations are denied. The remaining allegations of this paragraph are denied.

57.

Viisage denies the allegations in paragraph 57 of Plaintiff's Complaint.

58.

Viisage admits that GTA held a meeting with all three Offerors on August 14, 2002. The remaining allegations in the first sentence of this paragraph are denied. Viisage admits the allegations in the second sentence of this paragraph. Viisage is without information sufficient to form a belief as to the truth of the remaining allegations of this paragraph, and therefore such allegations are denied.

-11-

59.

Viisage admits the allegations in paragraph 59 of Plaintiff's Complaint.

60.

Viisage is without information sufficient to form a belief as to the truth of the allegations in paragraph 60 of Plaintiff's Complaint, and therefore such allegations are denied.

61.

Viisage is without information sufficient to form a belief as to the truth of the allegations in paragraph 61 of Plaintiff's Complaint, and therefore such allegations are denied.

62.

Viisage denies the allegations in paragraph 62 of Plaintiff's Complaint.

63.

Viisage denies the allegations in paragraph 63 of Plaintiff's Complaint.

64.

Viisage is without information sufficient to form a belief as to the truth of the allegations in paragraph 64 of Plaintiff's Complaint, and therefore such allegations are denied.

65.

Viisage denies the allegations in paragraph 65 of Plaintiff's Complaint.

66.

Viisage admits that it changed its Technical Proposal for permanent ID cards from the originally proposed 10/10/10 Polyester/Teslin/Polyester card structure to a 6/14/10 Confirm/Teslin/Polyester card structure. All remaining allegations in this paragraph are denied.

67.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 67 to the extent such allegations are inconsistent with the terms of the RFP. The remaining allegations of paragraphs 67 of the Complaint are denied.

68.

Viisage admits that it received the email message attached as Exhibit F to the Complaint, and that the Complaint properly quotes a portion of the email message. All remaining allegations in this paragraph are denied.

69.

Viisage is without information sufficient to form a belief as to the truth of the allegations in paragraph 69 of Plaintiff's Complaint, and therefore such allegations are denied.

70.

Viisage denies the allegations in paragraph 70 of Plaintiff's Complaint.

71.

Viisage is without information sufficient to form a belief as to the truth of the allegations in paragraph 71 of Plaintiff's Complaint, and therefore such allegations are denied.

72.

Viisage denies that it samples were submitted late. Viisage is without information sufficient to form a belief as to the truth of the remaining allegations in paragraph 72 of Plaintiff's Complaint, and therefore such allegations are denied.

73.

Viisage is without information sufficient to form a belief as to the truth of the allegations in paragraph 73 of Plaintiff's Complaint, and therefore such allegations are denied.

74.

Viisage is without information sufficient to form a belief as to the truth of the allegations in paragraph 74 of Plaintiff's Complaint, and therefore such allegations are denied.

75.

Viisage admits that GTA sent an e-mail to Viisage and other vendors on September 16, 2002. All remaining allegations in this paragraph are denied.

76.

Viisage admits that its temporary card solutions were deemed "acceptable." Upon information and belief, Viisage admits the remaining allegations in this paragraph.

77.

Viisage denies the allegations in paragraph 77 of Plaintiff's Complaint.

78.

Viisage is without information sufficient to form a belief as to the truth of the allegations in paragraph 78 of Plaintiff's Complaint, and therefore such allegations are denied.

79.

Viisage denies the allegations in paragraph 79 of Plaintiff's Complaint.

80.

Viisage denies the allegations in paragraph 80 of Plaintiff's Complaint.

81.

Viisage denies the allegations in paragraph 81 of Plaintiff's Complaint.

82.

Viisage admits the allegations in paragraph 82 of Plaintiff's Complaint.

83.

Viisage denies the allegations in paragraph 83 of Plaintiff's Complaint.

84.

Viisage denies the allegations in paragraph 84 of Plaintiff's Complaint.

85.

Viisage is without information sufficient to form a belief as to the truth of the allegations in paragraph 85 of Plaintiff's Complaint, and therefore such allegations are denied.

86.

Viisage is without information sufficient to form a belief as to the truth of the allegations in paragraph 86 of Plaintiff's Complaint, and therefore such allegations are denied.

87.

Viisage is without information sufficient to form a belief as to the truth of the allegations in paragraph 87 of Plaintiff's Complaint, and therefore such allegations are denied.

88.

Viisage denies the allegations in paragraph 88 of Plaintiff's Complaint.

89.

Viisage admits that on October 8, 2002, GTA forwarded to it a request for a Best and Final Offer to be received by GTA by October 15, 2003. Viisage is without information sufficient to form a belief as to the truth of the remaining allegations in this paragraph, and therefore such allegations are denied.

90.

Viisage is without information sufficient to form a belief as to the truth of the allegations in paragraph 90 of Plaintiff's Complaint, and therefore such allegations are denied.

-15-

91.

Viisage is without information sufficient to form a belief as to the truth of the allegations in paragraph 91 of Plaintiff's Complaint, and therefore such allegations are denied.

92.

Viisage admits the allegations in paragraph 92 of Plaintiff's Complaint.

93.

Viisage states that the October 22, 2002 DMVS correspondence speaks for itself, and to the extent that the allegations in paragraph 93 of the Complaint incorrectly quote or represent the contents of this correspondence, such allegations are denied. Upon information and belief, Viisage admits the remaining allegations in paragraph 93 of Plaintiff's Complaint.

94.

Viisage is without information sufficient to form a belief as to the truth of the allegations in paragraph 94 of Plaintiff's Complaint, and therefore such allegations are denied.

95.

Viisage states that the October 28, 2002 DMVS correspondence speaks for itself, and to the extent that the allegations in paragraph 95 of the Complaint incorrectly quote or represent the contents of this correspondence, such allegations are denied. Upon information and belief, Viisage admits the remaining allegations in paragraph 95 of Plaintiff's Complaint.

96.

Viisage states that the October 28, 2002 DMVS correspondence speaks for itself, and to the extent that the allegations in paragraph 96 of the Complaint incorrectly quote or represent the contents of this correspondence, such allegations are denied. Upon information and belief, Viisage admits the allegations in paragraph 96 of Plaintiff's Complaint.

-16-

97.

Viisage states that the October 28, 2002 DMVS correspondence speaks for itself, and to the extent that the allegations in paragraph 97 of the Complaint incorrectly quote or represent the contents of this correspondence, such allegations are denied. Upon information and belief, Viisage admits the allegations in paragraph 97 of Plaintiff's Complaint.

98.

· Viisage states that the October 29, 2002 correspondence attached as Exhibit L to Plaintiff's Complaint speaks for itself, and to the extent that the allegations in paragraph 98 of the Complaint incorrectly quote or represent the contents of this correspondence, such allegations are denied. Upon information and belief, Viisage admits the allegations in paragraph 98 of Plaintiff's Complaint.

99.

Viisage states that the October 29, 2002 DMVS correspondence attached as Exhibit M speaks for itself, and to the extent that the allegations in paragraph 99 of the Complaint incorrectly quote or represent the contents of this correspondence, such allegations are denied. Viisage admits that it was asked to perform additional demonstrations. Viisage is without information sufficient to form a belief as to the truth of the remaining allegations of this paragraph, and therefore such allegations are denied.

100.

Viisage is without information sufficient to form a belief as to the truth of the allegations in paragraph 100 of Plaintiff's Complaint, and therefore such allegations are denied.

-17-

101.

Viisage denies the allegations in the first sentence of paragraph 101 of Plaintiff's Complaint. Viisage admits the allegations in the second sentence of paragraph 101 of Plaintiff's Complaint.

102.

Viisage is without information sufficient to form a belief as to the truth of the allegations in paragraph 102 of Plaintiff's Complaint, and therefore such allegations are denied.

103.

Viisage is without information sufficient to form a belief as to the truth of the allegations in paragraph 103 of Plaintiff's Complaint, and therefore such allegations are denied.

104.

Viisage admits that it notified GTA in writing of Viisage's decision to change its Point of Sale vendor. All remaining allegations in this paragraph are denied.

105.

Viisage denies the allegations in paragraph 105 of Plaintiff's Complaint.

106.

Viisage admits that it provided a demonstration of its Digitized License System on November 12, 2002. All remaining allegations in this paragraph are denied.

107.

Viisage admits the allegations in paragraph 107 of Plaintiff's Complaint.

108.

Viisage states that the document attached to Plaintiff's Complaint as Exhibit C speaks for itself, and to the extent that the allegations in paragraph 108 of the Complaint incorrectly quote or represent the contents of this correspondence, such allegations are denied. All remaining allegations in this paragraph are denied.

109.

Viisage is without information sufficient to form a belief as to the truth of the allegations in paragraph 109 of Plaintiff's Complaint, and therefore such allegations are denied.

110.

Viisage denies the allegations in paragraph 110 of Plaintiff's Complaint.

111.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 111 to the extent such allegations are inconsistent with the terms of the RFP. Viisage denies the remaining allegations in paragraph 111 of Plaintiff's Complaint.

112.

Viisage is without information sufficient to form a belief as to the truth of the allegations in paragraph 112 of Plaintiff's Complaint, and therefore such allegations are denied.

113.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 113 to the extent such allegations are inconsistent with the terms of the RFP. In particular, Viisage denies the allegations in paragraph 113 of Plaintiff's Complaint since the exact language in the RFP states that "No other factors or criteria shall be used in the evaluation." The remaining allegations in paragraph 113 of the Complaint are denied.

114.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 114 to the extent such allegations are inconsistent with the terms of the RFP. The remaining allegations in paragraph 114 of Plaintiff's Complaint are denied.

115.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 115 to the extent such allegations are inconsistent with the terms of the RFP. Viisage denies the remaining allegations in paragraph 115 of Plaintiff's Complaint

116.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 116 to the extent such allegations are inconsistent with the terms of the RFP. Viisage denies the remaining allegations in paragraph 116 of Plaintiff's Complaint.

117.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 117 to the extent such allegations are inconsistent with the terms of the RFP. Viisage denies the remaining allegations in paragraph 117 of Plaintiff's Complaint.

118.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 118 to the extent such allegations are inconsistent with the terms of the RFP. Viisage denies the remaining allegations in this paragraph.

119.

Viisage admits that evaluations are included in Exhibits B and C to the Complaint. Viisage is without information sufficient to form a belief as to the truth of the remaining allegations in paragraph 119 of Plaintiff's Complaint, and therefore such allegations are denied.

120.

Viisage states that the attached evaluations speak for themselves, and denies all allegations of paragraph 120 to the extent such allegations are inconsistent with the full evaluation completed by GTA and DMVS.

121.

Viisage states that the attached evaluations speak for themselves, and denies all allegations of paragraph 121 to the extent such allegations are inconsistent with the full evaluation completed by GTA and DMVS. Viisage is without information sufficient to form a belief as to the truth of the remaining allegations in paragraph 121 of Plaintiff's Complaint, and therefore such allegations are denied.

122.

Viisage states that the attached evaluations speak for themselves, and denies all allegations of paragraph 122 to the extent such allegations are inconsistent with the full evaluation completed by GTA and DMVS. Viisage further states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 122 to the extent such allegations are inconsistent with the terms of the RFP. Viisage is without information sufficient to form a belief as to the truth of the remaining allegations in paragraph 122 of Plaintiff's Complaint, and therefore such allegations are denied.

123.

Viisage states that the attached evaluations speak for themselves, and denies all allegations of paragraph 123 to the extent such allegations are inconsistent with the full evaluation completed by GTA and DMVS.   Viisage is without information sufficient to form a belief as to the truth of the remaining allegations in paragraph 123 of Plaintiff's Complaint, and therefore such allegations are denied. All remaining allegations in this paragraph are denied.

124.

Viisage states that the attached evaluations speak for themselves, and denies all allegations of paragraph 124 to the extent such allegations are inconsistent with the full evaluation completed by GTA and DMVS.   Viisage further states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 124 to the extent such allegations are inconsistent with the terms of the RFP. Viisage denies the remaining allegations in paragraph 124 of Plaintiff's Complaint.

125.

Viisage denies the allegations in paragraph 125 of Plaintiff's Complaint.

126.

Viisage denies the allegations in paragraph 126 of Plaintiff's Complaint.

127.

Viisage states that O.C.G.A. section 50-25-7.3(6) speaks for itself, and denies all allegations of paragraph 127 to the extent such allegations are inconsistent with the language of O.C.G.A. section 50-25-7.3(6).

128.

Viisage states that the GTA rules speak for themselves, and denies all allegations of paragraph 128 to the extent such allegations are inconsistent with the language of the GTA rules.

129.

Viisage states that the GTA rules and the Attorney General's Opinion referenced in paragraph 129 speak for themselves, and denies all allegations of paragraph 129 to the extent such allegations are inconsistent with the language of the GTA rules or the cited Attorney General's Opinion.

130.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 130 to the extent such allegations are inconsistent with the terms of the RFP.

131.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 131 of Plaintiff's Complaint to the extent such allegations are inconsistent with the terms of the RFP.

132.

Viisage denies the allegations in paragraph 132 of Plaintiff's Complaint

133.

Viisage is without information sufficient to form a belief as to the truth of the allegations in paragraph 133 of Plaintiff's Complaint, and therefore such allegations are denied.

134.

Viisage is without information sufficient to form a belief as to the truth of the allegations in paragraph 134 of Plaintiff's Complaint, and therefore such allegations are denied.

135.

Viisage is without information sufficient to form a belief as to the truth of the allegations in paragraph 135 of Plaintiff's Complaint, and therefore such allegations are denied.

136.

Viisage is without information sufficient to form a belief as to the truth of the allegations in paragraph 136 of Plaintiff's Complaint, and therefore such allegations are denied.

137.

Viisage is without information sufficient to form a belief as to the truth of the allegations in paragraph 137 of Plaintiff's Complaint, and therefore such allegations are denied.

138.

Viisage states that the Notice of Award given to Viisage speaks for itself, and to the extent any allegations of paragraph 138 of Plaintiff's Complaint are inconsistent with the Notice of Award, such allegations are denied. Viisage admits the remaining allegations in paragraph 138 of Plaintiff's Complaint.

139.

Viisage admits that the contract was signed on the same day as the Notice of Award and demonstration. The remaining allegations of this paragraph are denied.

140.

Viisage admits that it filed its quarterly report on Form 10-Q for the period ended September 29, 2002 on November 13, 2002, the date such report was due. All remaining allegations in this paragraph are denied.

141.

Viisage states that its November 13, 2002 third quarter Form 10-Q speaks for itself, and to the extent the allegations in paragraph 141 of Plaintiff's Complaint are inconsistent with the referenced Form 10-Q, such allegations are denied. All remaining allegations in this paragraph are denied.

142.

Viisage states that its November 13, 2002 third quarter Form 10-Q speaks for itself, and to the extent the allegations in paragraph 142 of Plaintiff's Complaint are inconsistent with the referenced Form 10-Q, such allegations are denied.

143.

Viisage states that its November 13, 2002 third quarter Form 10-Q speaks for itself, and to the extent the allegations in paragraph 143 of Plaintiff's Complaint are inconsistent with the referenced Form 10-Q, such allegations are denied. Viisage denies the remaining allegations in paragraph 143 of Plaintiff's Complaint.

144.

Viisage states that its November 13, 2002 third quarter Form 10-Q speaks for itself, and to the extent the allegations in paragraph 144 of Plaintiff's Complaint are inconsistent with the referenced Form 10-Q, such allegations are denied. Specifically, Viisage denies that the referenced Form 10-Q reports that "Viisage's reported loss in earnings for the quarter totaled $6.5 million."

145.

Viisage denies the allegations in paragraph 145 of Plaintiff's Complaint.

146.

Viisage denies the allegations in paragraph 146 of Plaintiff's Complaint.

147.

Viisage denies the allegations in paragraph 147 of Plaintiff's Complaint.

148.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 148 to the extent such allegations are inconsistent with the terms of the RFP. Viisage admits the remaining allegations in paragraph 148 of Plaintiff's Complaint.

149.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 149 to the extent such allegations are inconsistent with the terms of the RFP. Viisage denies the remaining allegations in paragraph 149 of Plaintiff's Complaint.

150.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 150 to the extent such allegations are inconsistent with the terms of the RFP. Viisage admits the remaining allegations in paragraph 150 of Plaintiff's Complaint.

151.

Viisage denies the allegations in paragraph 151 of Plaintiff's Complaint.

152.

Viisage is without information sufficient to form a belief as to the truth of the allegations in paragraph 152 of Plaintiff's Complaint, and therefore such allegations are denied.

153.

Viisage admits the allegations in the first sentence of paragraph 153 of Plaintiff's Complaint. All remaining allegations in this paragraph are denied.

154.

Viisage admits that the price differential between offsite production and onsite production in Viisage's proposal was one cent. All remaining allegations in paragraph 154 of Plaintiff's Complaint are denied.

155.

Viisage denies the allegations in paragraph 155 of Plaintiff's Complaint.

156.

Viisage denies that the price evaluation was capricious. Viisage is without information sufficient to form a belief as to the truth of the remaining allegations in paragraph 156 of Plaintiff's Complaint, and therefore such allegations are denied.

157.

Viisage is without information sufficient to form a belief as to the truth of the allegations in paragraph 157 of Plaintiff's Complaint, and therefore such allegations are denied.

158.

Viisage denies the allegations in paragraph 158 of Plaintiff's Complaint.

159.

Viisage denies the allegations in paragraph 159 of Plaintiff's Complaint.

160.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 160 to the extent such allegations are inconsistent with the terms of the RFP. Viisage admits the remaining allegations in paragraph 160 of Plaintiff's Complaint.

161.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 161 to the extent such allegations are inconsistent with the terms of the RFP. Viisage admits the remaining allegations in paragraph 161 of Plaintiff's Complaint.

162.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 162 to the extent such allegations are inconsistent with the terms of the RFP. Viisage admits the remaining allegations in paragraph 162 of Plaintiff's Complaint.

163.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 163 to the extent such allegations are inconsistent with the terms of the RFP. Viisage admits the remaining allegations in paragraph 163 of Plaintiff's Complaint.

164.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 164 to the extent such allegations are inconsistent with the terms of the RFP. Viisage admits the remaining allegations in paragraph 164 of Plaintiff's Complaint.

165.

Viisage states that the RFP and the State's evaluation records speak for themselves, and denies all allegations of paragraph 165 to the extent such allegations are inconsistent with the terms of the RFP or do not correctly reflect the information recorded in the State's complete evaluation records. Viisage is without information sufficient to form a belief as to the truth of the remaining allegations in paragraph 165 of Plaintiff's Complaint, and therefore such allegations are denied.

166.

Viisage states that the State's complete evaluation records speak for themselves, and denies all allegations in paragraph 166 of Plaintiff's Complaint to the extent such allegations do not correctly reflect or represent the information recorded in the complete evaluation records. Viisage is without information sufficient to form a belief as to the truth of the remaining allegations in paragraph 166 of Plaintiff's Complaint, and therefore such allegations are denied.

167.

Viisage states that the State's complete evaluation records speak for themselves, and denies all allegations in paragraph 167 of Plaintiff's Complaint to the extent such allegations do not correctly reflect or represent all of the information recorded in the complete evaluation records. All other allegations in this paragraph are denied.

168.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 168 to the extent such allegations are inconsistent with the terms of the RFP. Viisage denies the remaining allegations in paragraph 168 of Plaintiff's Complaint.

169.

Viisage denies the allegations in paragraph 169 of Plaintiff's Complaint.

170.

Viisage admits that it implemented a central issuance drivers' license system in the Commonwealth of Massachusetts. All other allegations in paragraph 170 of Plaintiff's Complaint are denied.

171.

Viisage states that the Request for Response for Image Licensing issued by the Commonwealth of Massachusetts Registry of Motor Vehicles speaks for itself, and to the extent that the allegations in paragraph 171 of Plaintiff's Complaint incorrectly quote or represent the contents of this Request for Response, such allegations are denied. All other allegations in this paragraph, including all subparts a-i, are denied.

172.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 172 to the extent such allegations are inconsistent with the terms of the RFP. Viisage admits the remaining allegations in paragraph 172 of Plaintiff's Complaint.

173.

Viisage admits the allegations in paragraph 173 of Plaintiff's Complaint.

174.

Viisage admits that it is a subcontractor to Unisys for the drivers' license system for the State of Florida. All remaining allegations in paragraph 174 of Plaintiff's Complaint are denied.

175.

Viisage denies the allegations in paragraph 175 of Plaintiff's Complaint.

-30-

176.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 176 to the extent such allegations are inconsistent with the terms of the RFP. Viisage denies the remaining allegations in paragraph 176 of Plaintiff's Complaint.

177.

Viisage denies that it was unable to comply with the requirements of the RFP, and denies that GTA/DMVS was obligated to reduce its overall evaluation results. Viisage denies the remaining allegations in paragraph 177 of Plaintiff's Complaint.

178.

Viisage denies the allegations in paragraph 178 of Plaintiff's Complaint.

179.

Viisage denies the allegations in paragraph 179 of Plaintiff's Complaint.

180.

Viisage denies the allegations in paragraph 180 of Plaintiff's Complaint.

181.

Viisage denies the allegations in paragraph 181 of Plaintiff's Complaint.

182.

Viisage denies the allegations in paragraph 182 of Plaintiff's Complaint.

183.

Viisage denies the allegations in paragraph 183 of Plaintiff's Complaint.

184.

Viisage denies that it failed to provide adequately for the Central Imaging System, and denies that there was any basis or obligation for DMVS to give it an "adverse evaluation" based on the portions of its submission relating to the Central Imaging System. Viisage is without information sufficient to form a belief as to the truth of the remaining allegations in paragraph 184 of Plaintiff's Complaint, and therefore such allegations are denied.

185.

Viisage denies the allegations in paragraph 185 of Plaintiff's Complaint.

186.

Viisage denies the allegations in paragraph 186 of Plaintiff's Complaint.

187.

Viisage denies the allegations in paragraph 187 of Plaintiff's Complaint.

188.

Viisage states that its complete response to the RFP speaks for itself, and denies all allegations in paragraph 188 of Plaintiff's Complaint to the extent that such allegations are inconsistent with or incorrectly reflect Viisage's complete response to the RFP. Viisage admits the allegations in paragraph 188 of Plaintiff's Complaint.

189.

Viisage states that the terms of the RFP and Viisage's complete response thereto speak for themselves, and denies all allegations of paragraph 189 to the extent such allegations are inconsistent with the terms of the RFP or are inconsistent with or incorrectly reflect Viisage's complete response to the RFP. Viisage has a written arrangement with Arthur Blank and Company to provide back-up card production services as described in Viisage's proposal, and therefore denies the remaining allegations in this paragraph.

190.

Viisage has a written arrangement with Arthur Blank and Company to provide back-up card production services and denies that the RFP requires Viisage to have a formal, written agreement with Arthur Blank and Company to provide such services. All other allegations in paragraph 190 of Plaintiff's Complaint are denied.

191.

Viisage denies that its evaluation was improperly evaluated. Viisage is without information sufficient to form a belief as to the truth of the remaining allegations in paragraph 191 of Plaintiff's Complaint, and therefore such allegations are denied.

192.

Viisage denies the allegations in paragraph 192 of Plaintiff's Complaint.

193.

Viisage denies the allegations in paragraph 193 of Plaintiff's Complaint.

194.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 194 to the extent such allegations are inconsistent with the terms of the RFP. Viisage admits the remaining allegations in paragraph 194 of Plaintiff's Complaint.

195.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 195 to the extent such allegations are inconsistent with the terms of the RFP. Viisage admits the remaining allegations in paragraph 195 of Plaintiff's Complaint.

196.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 196 to the extent such allegations are inconsistent with the terms of the RFP. Viisage admits the remaining allegations in paragraph 196 of Plaintiff's Complaint.

197.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 197 to the extent such allegations are inconsistent with the terms of the RFP. Viisage admits the remaining allegations in paragraph 197 of Plaintiff's Complaint.

198.

Viisage admits the allegations in paragraph 198 of Plaintiff's Complaint.

199.

Viisage admits that on November 12, 2002, Mohammed Siddiqui of Viisage sent to Charles Nixon a proposal submission with respect to a change in Viisage's POS provider. All other allegations in paragraph 199 of Plaintiff's Complaint are denied.

200.

Viisage denies the allegations in paragraph 200 of Plaintiff's Complaint.

201.

Viisage denies that any change with regard to its POS providers should have had any negative impact on its proposal. Viisage is without information sufficient to form a belief as to the truth of the remaining allegations in paragraph 201 of Plaintiff's Complaint, and therefore such allegations are denied.

202.

Viisage denies that it executed the procurement contract prior to notifying GTA of its intent to substitute its POS provider, and denies that it was obligated to notify GTA in writing or otherwise of its intent to substitute its POS provider. Viisage denies the remaining allegations in paragraph 202 of Plaintiff's Complaint.

203.

Viisage is without information sufficient to form a belief as to the truth of the allegations in paragraph 203 of Plaintiff's Complaint, and therefore such allegations are denied.

204.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 204 to the extent such allegations are inconsistent with the terms of the RFP or seek to impose obligations inconsistent with the RFP. Viisage denies the remaining allegations in paragraph 204 of Plaintiff's Complaint.

205.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 205 to the extent such allegations are inconsistent with the terms of the RFP or seek to impose obligations inconsistent with the RFP. Viisage denies the remaining allegations in paragraph 205 of Plaintiff's Complaint.

206.

Viisage admits that it did not specify all of the hardware that it would deliver as part of the POS solution in its written proposal, as opposed to the detailed description of the functionality of the POS solution that it did provide and demonstrate, and denies any allegation that it or its proposal failed to comply with the RFP requirements. All remaining allegations in paragraph 206 of Plaintiff's Complaint are denied.

207.

Viisage denies the allegations in paragraph 207 of Plaintiff's Complaint.

208.

Viisage admits the allegations in paragraph 208 of Plaintiff's Complaint.

209.

Viisage denies the allegations in paragraph 209 of Plaintiff's Complaint.

210.

Viisage denies that its submissions to GTA and DMVS were non-compliant. Viisage is without information sufficient to form a belief as to the truth of the remaining allegations in paragraph 210 of Plaintiff's Complaint, and therefore such allegations are denied.

211.

Viisage admits that its proposed POS solution was given "Excellent," "Good," and "Satisfactory" ratings by GTA/DMVS. All remaining allegations in paragraph 211 of Plaintiff's Complaint are denied.

212.

Viisage denies the allegations in paragraph 212 of Plaintiff's Complaint.

213.

Viisage denies the allegations in paragraph 213 of Plaintiff's Complaint.

214.

Viisage denies the allegations in paragraph 214 of Plaintiff's Complaint.

215.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 215 to the extent such allegations are inconsistent with the terms of the RFP. Viisage admits the remaining allegations in paragraph 215 of Plaintiff's Complaint.

216.

Viisage denies the allegations in paragraph 216 of Plaintiff's Complaint.

217.

Viisage denies that DMVS/GTA properly could have found that its proposed mailer was not adequate for the system proposed in the RFP. Viisage is without information sufficient to form a belief as to the truth of the remaining allegations in paragraph 217 of Plaintiff's Complaint, and therefore such allegations are denied.

218.

Viisage admits that its optional mailer solution received marks of "Excellent" and "Satisfactory" by GTA/DMVS. Viisage is without information sufficient to form a belief as to the truth of the remaining allegations in paragraph 218 of Plaintiff's Complaint, and therefore such allegations are denied.

219.

Viisage denies the allegations in paragraph 219 of Plaintiff's Complaint.

220.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 220 to the extent such allegations are inconsistent with the terms of the RFP. Viisage further states that the correct RFP section governing the term is section 1.1 and that such section indicates that the contract term will be based on the state's fiscal year end date of June 30. The remaining allegations of this paragraph are admitted.

221.

Viisage states that the terms of the RFP speak for themselves, and denies all allegations of paragraph 221 to the extent such allegations are inconsistent with the terms of the RFP. Viisage denies that the term of the contract is inconsistent with the RFP. Viisage is without information sufficient to form a belief as to the truth of the remaining allegations in paragraph 221 of Plaintiff's Complaint, and therefore such allegations are denied.

222.

Viisage admits the allegations in paragraph 222 of Plaintiff's Complaint.

223.

Viisage denies the allegations in paragraph 223 of Plaintiff's Complaint.

-38-

224.

Viisage states that the terms of the referenced contract speak for themselves, and denies all allegations in paragraph 224 of Plaintiff's Complaint to the extent that such allegations do not correctly represent or quote the referenced contract. Viisage admits that the signed contract with DMVS required a performance bond. All remaining allegations in paragraph 224 of Plaintiff's Complaint are denied.

225.

Viisage states that the Notice of Award speaks for itself, and denies all allegations in paragraph 225 of Plaintiff's Complaint to the extent they are inconsistent with the actual Notice of Award. Viisage admits the remaining allegations in paragraph 225 of Plaintiff's Complaint.

226.

Viisage admits that it delivered a performance bond with an expiration date of November 12, 2003. All remaining allegations in paragraph 226 of Plaintiff's Complaint are denied.

227.

Viisage is without information sufficient to form a belief as to the truth of the allegations in paragraph 227 of Plaintiff's Complaint, and therefore such allegations are denied.

228.

Viisage denies the allegations in paragraph 228 of Plaintiff's Complaint.

229.

Viisage denies the allegations in paragraph 229 of Plaintiff's Complaint.

230.

Viisage is without information sufficient to form a belief as to the truth of the allegations in paragraph 230 of Plaintiff's Complaint, and therefore such allegations are denied.

231.

Viisage is without information sufficient to form a belief as to the truth of the allegations in paragraph 231 of Plaintiff's Complaint, and therefore such allegations are denied.

232.

Viisage admits that the Protest Decisionmaker denied Digimarc's Bid Protest, and that such denial was made on February 17, 2003. Viisage is without information sufficient to form a belief as to the truth of the remaining allegations in paragraph 232 of the Complaint, and therefore such allegations are denied.

233.

Viisage incorporates paragraphs 1 through 233 as if fully set forth herein.

234.

Viisage denies the allegations in paragraph 234 of Plaintiff's Complaint.

235.

Viisage denies the allegations in paragraph 235 of Plaintiff's Complaint.

236.

Viisage denies the allegations in paragraph 236 of Plaintiff's Complaint.

237.

Viisage denies the allegations in paragraph 237 of Plaintiff's Complaint.

238.

Viisage denies the allegations in paragraph 238 of Plaintiff's Complaint.

239.

Viisage incorporates Paragraphs 1 through 239 as if fully set forth herein.

240.

Viisage denies the allegations in paragraph 240 of Plaintiff's Complaint.

241.

Viisage denies the allegations in paragraph 241 of Plaintiff's Complaint.

242.

Viisage denies the allegations in paragraph 242 of Plaintiff's Complaint.

243.

Viisage denies the allegations in paragraph 243 of Plaintiff's Complaint.

244.

Viisage denies the allegations in paragraph 244 of Plaintiff's Complaint.

245.

Viisage incorporates Paragraphs 1 through 245, as if fully set forth herein.

246.

Viisage denies the allegations in paragraph 246 of Plaintiff's Complaint.

247.

Viisage denies the allegations in paragraph 247 of Plaintiff's Complaint.

248.

Viisage denies the allegations in paragraph 248 of Plaintiff's Complaint.

249.

Viisage denies the allegations in paragraph 249 of Plaintiff's Complaint.

250.

Viisage denies the allegations in paragraph 250 of Plaintiff's Complaint.

251.

Viisage incorporates Paragraphs 1 through 251, as if fully set forth herein.

252.

Viisage states that O.C.G.A § 50-25-7.3(6) speaks for itself, and denies all allegations of

paragraph 252 to the extent such allegations are inconsistent with the statute. Viisage denies the

remaining allegations in paragraph 252 of Plaintiff's Complaint.

253.

Viisage denies the allegations in paragraph 253 of Plaintiff's Complaint.

254.

Viisage denies the allegations in paragraph 254 of Plaintiff's Complaint.

255.

Viisage denies the allegations in paragraph 255 of Plaintiff's Complaint.

256.

Viisage denies the allegations in paragraph 256 of Plaintiff's Complaint.

257.

Viisage incorporates Paragraphs 1 through 257, as if fully set forth herein.

258.

Viisage states that O.C.G.A § 50-25-1(c), (c)(4), and (c)(5) speak for themselves, and

denies all allegations of paragraph 258 to the extent such allegations are inconsistent with this

statute. Viisage denies the remaining allegations in paragraph 258 of Plaintiff's Complaint.

259.

Viisage denies the allegations in paragraph 259 of Plaintiff's Complaint.

260.

Viisage denies the allegations in paragraph 260 of Plaintiff's Complaint.

261.

Viisage denies the allegations in paragraph 261 of Plaintiff's Complaint.

262.

Viisage denies the allegations in paragraph 262 of Plaintiff's Complaint.

263.

Viisage incorporates Paragraphs 1 through 263, as if fully set forth herein.

264.

Viisage denies the allegations in paragraph 264 of Plaintiff's Complaint.

265.

Viisage denies the allegations in paragraph 265 of Plaintiff's Complaint.

266.

Viisage denies the allegations in paragraph 266 of Plaintiff's Complaint.

267.

Viisage denies the allegations in paragraph 267 of Plaintiff's Complaint.

268.

Viisage denies the allegations in paragraph 268 of Plaintiff's Complaint.

269.

Viisage incorporates Paragraphs 1 through 269, as if fully set forth herein. Viisage further states that Count VII is directed only against GTA and DMVS, and therefore does not require a response from Viisage.

270.

Viisage states that Count VII is directed only against GTA and DMVS, and therefore does not require a response from Viisage. To the extent any response is required; Viisage denies the allegations in paragraph 270 of Plaintiff's Complaint.

Regarding the un-numbered paragraph beginning "'WHEREFORE", Viisage denies that Digimarc is entitled to any of the relief requested therein.

**Viisage demands trial by a struck jury.**

## DEFENSES

Viisage denies all allegations not specifically admitted herein. Viisage submits the following defenses, and reserves the right to supplement such defenses as additional facts become available.

### FIRST DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

### SECOND DEFENSE

Digimarc's claim is barred because it failed to exhaust administrative remedies.

### THIRD DEFENSE

Digimarc is not entitled to *de novo* review.

### FOURTH DEFENSE

Digimarc is barred by the doctrine of unclean hands.

-44-

## FIFTH DEFENSE

Digimarc is barred by the doctrines of estoppel and/or waiver.

## SIXTH DEFENSE

Digimarc is barred by the doctrine of laches.

## SEVENTH DEFENSE

This Court lacks jurisdiction over the subject matter of this dispute.

Respectfully submitted this 15th day of December, 2003.


KING & SPALDING LLP


Jameson B. Carroll
Georgia Bar No: 112640
Peter M. Crofton
Georgia Bar No: 197122
Robert C. Khayat, Jr.
Georgia Bar No: 416981
Gregory K. Smith
Georgia Bar No: 658363

191 Peachtree Street
Atlanta, Georgia 30303
(404) 572-4600
(404) 572-5144 (fax)

-45-

## CERTIFICATE OF SERVICE

This is to certify that I have this day served the foregoing **VIISAGE TECHNOLOGY,**

**INC.'S ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT FOR**

**INTERLOCUTORY AND PERMANENT INJUNCTIVE RELIEF AND JURY DEMAND**

upon all parties to the above-captioned action by U.S. Mail, postage prepaid, addressed to:

> John B. Ballard, Jr.
> Emily P. Hitchcock
> Assistant Attorney General
> Office of the Attorney General
> 40 Capitol Square SW
> Atlanta, GA  30334-1300
>
> David L. Balser
> John P. Hutchins
> Valerie D. Barton
> McKenna Long & Aldridge LLP
> 303 Peachtree Street, Suite 5300
> Atlanta, GA  30308

This 15th day of December, 2003.

> Gregory K. Smith
> Georgia Bar No: 658363

-46-

# Exhibit 25

IN THE SUPERIOR COURT OF FULTON COUNTY

STATE OF GEORGIA

DIGIMARC ID SYSTEMS, LLC,        )
                                 )
          Plaintiff,             )
                                 )
vs.                              )
                                 )   Civil Action No. 2003CV66498
GEORGIA TECHNOLOGY              )
AUTHORITY and the GEORGIA        )
DEPARTMENT OF MOTOR VEHICLE      )
SAFETY,                          )
                                 )
          Defendants.            )

ANSWER AND DEFENSES OF
THE DEPARTMENT OF MOTOR VEHICLE SAFETY

COMES NOW the Department of Motor Vehicle Safety, a Defendant in the above-styled action, by and through its counsel, the Attorney General of Georgia, responds to the allegations of Plaintiff's Complaint as follows:

FIRST DEFENSE

The Complaint, in whole or in part, fails to state a claim upon which relief can be granted.

SECOND DEFENSE

Plaintiff's claim, in whole or in part, is barred for failure to raise the issues before the administrative agency as required by the Ga. Comp. R. & Reg. r. 665-2-11-.07(b)4.(v) (2002).

THIRD DEFENSE

Defendant denies that Plaintiff has been subject to the deprivation of any rights, privileges, or immunities secured by the Constitution or laws of the United States or the State of Georgia.

## FOURTH DEFENSE

Plaintiff's Complaint, in whole or in part, is barred by the doctrines of waiver and/or estoppel.

## FIFTH DEFENSE

The relief sought in the Complaint is barred because Plaintiff has an adequate remedy at law and, therefore, is not entitled to equitable and injunctive relief.

## SIXTH DEFENSE

Plaintiff is not entitled to relief because Defendant did not abuse its discretion and due deference is given to administrative decisions of a State agency.

## SEVENTH DEFENSE

Defendant shows that at all times it acted lawfully in issuing the Request for Proposal No. GTA000051, and Plaintiff is not entitled to relief.

## EIGHTH DEFENSE

Defendant shows that it had no obligation to award a contract to Plaintiff under the facts alleged in the Complaint and breached no duty or obligation of any kind to Plaintiff.

## NINTH DEFENSE

Defendant denies that it violated Ga. Comp. R. & Reg. rr. 665-2-1-.01(f), 665-2-4-.02(a)(8), 665-2-4-.02(9)(ii), 665-2-4-.02(b), -04-.06, and 665-2-4-.07.

## TENTH DEFENSE

Defendant denies that it violated O.C.G.A. § 50-25-7.3(5).

## ELEVENTH DEFENSE

Defendant denies that it violated O.C.G.A. § 50-25-7.3(6).

TWELFTH DEFENSE

Defendant denies that it violated O.C.G.A. §§ 50-25-1(c), (c)(4), and (c)(5).

THIRTEENTH DEFENSE

Plaintiff is not entitled to a de novo judicial review of the administrative decision.

FOURTEENTH DEFENSE

Without waiving the above defenses or any other defenses to which Defendant may be entitled, Defendant responds to the separately numbered paragraphs of Plaintiff's Complaint as follows:

Unnumbered Paragraph

The introductory unnumbered paragraph merely states Plaintiff's legal theories of recovery and, therefore, requires no response; to the extent a response is deemed required, said paragraph is denied.

1.

Defendant admits the allegations contained in Paragraph 1.

2.

Defendant admits Plaintiff is a provider of secure and durable personal identification solutions, including drivers' licenses, in the United States. Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 2 and, therefore, can neither admit nor deny same; to the extent that an answer is deemed required, said allegations are denied.

3.

Defendant admits the allegations contained in Paragraph 3.

-3-

4.

Defendant admits the allegations contained in Paragraph 4.

5.

Defendant admits the allegations contained in Paragraph 5.

6.

Defendant admits that, in conjunction with the Georgia Technology Authority ("GTA"), it planned to modernize Georgia's drivers' license and identification card system. Defendant admits that they sought to engage the services of a qualified and responsible vendor, experienced in providing a central issuance Digitized License System. The remaining allegations contained in Paragraph 6 are denied.

7.

Defendant admits that GTA, on its behalf, posted Request for Proposal Number GTA000051 (hereinafter the "RFP") on May 24, 2002 seeking a contractor to provide the services necessary to modernize Georgia's drivers' license and identification card system. Defendant admits Plaintiff seeks a de novo judicial review but denies Plaintiff is entitled to a de novo judicial review. The remaining allegations contained in Paragraph 7 are denied.

8.

Defendant denies the allegations contained in Paragraph 8.

9.

Defendant denies the allegations contained in Paragraph 9.

10.

Defendant denies the allegations contained in Paragraph 10.

11.

Defendant denies the allegations contained in Paragraph 11.

12.

Defendant admits that Plaintiff seeks an injunction directing the Defendants award the contract arising out of the RFP to Plaintiff, or, in the alternative seeks an order requiring Defendants re-bid the contract but denies that Plaintiff is entitled to such relief. Defendant denies the remaining allegations contained in Paragraph 12.

13.

Defendant admits that this Court has exclusive, original jurisdiction over this matter and that venue is proper pursuant to O.C.G.A. § 50-25-9.

Unnumbered Headings and Statement

The unnumbered headings and statement between Paragraphs 13 and 14 make no allegations warranting a response from Defendant. To the extent that such a response is required, Defendant denies all allegations contained in the unnumbered headings and statements between Paragraphs 13 and 14.

14.

Defendant admits the first sentence in Paragraph 14. Defendant denies that a true and complete copy of the RFP is attached as Exhibit A to the Complaint.

15.

Defendant admits that the RFP provides in part that the purpose was to procure the services of a qualified, responsible and experienced vendor to provide a central issuance Digitized License System, including, among other things, photograph, signature and fingerprint capture, storage, retrieval and document production, all based upon a firm fixed price for each

driver's license, identification card, or special identification card successfully produced. By way of further response, Defendant states that the RFP, including Section 1.1, speaks for itself; although Defendant denies that Plaintiff has accurately characterized or fully described Section 1.1 of the RFP. Any allegations contained in Paragraph 15 not expressly admitted are denied.

16.

Defendant admits the allegations contained in Paragraph 16. By way of further response, Defendant states that the RFP, including Section 1.2, speaks for itself, although Defendant denies that Plaintiff has fully described Section 1.2 of the RFP.

17.

Defendant admits the allegations contained in Paragraph 17. By way of further response, Defendant states that the RFP, including Section 3.3, speaks for itself, although Defendant denies that Plaintiff has fully described Section 3.3 of the RFP.

18.

Defendant denies the RFP set forth mandatory design specifications for permanent drivers' licenses, non-driver identification cards and special identification cards. Defendant admits the RFP set forth general guidelines for temporary cards that would be issued pending the issuance of the permanent cards. Any allegations contained in Paragraph 18 not expressly admitted are denied. By way of further response, Defendant states that the RFP, including Sections 3.4 through 3.7, speaks for itself, although Defendant denies that Plaintiff has accurately characterized or fully described Sections 3.4 through 3.7 of the RFP.

19.

Defendant admits the allegations contained in Paragraph 19. By way of further response, Defendant states that the RFP, including Sections 3.8 through 3.14, speaks for itself, although

Defendant denies that Plaintiff has fully described Sections 3.8 through 3.14 of the RFP.

20.

Defendant admits the allegations contained in the first sentence of Paragraph 20. Defendant admits that the RFP provided in part that failure "to meet any minimum requirement will cause [a] reduction in the evaluation score of the Offeror's proposal." Any allegations contained in the second sentence of Paragraph 20 not expressly admitted are denied. By way of further response, Defendant states that the RFP, including Sections 4.2 and 3.1.1, speaks for itself, although Defendant denies that Plaintiff has fully described the RFP, including Sections 4.2 and 3.1.1.

21.

Defendant admits the allegations contained in Paragraph 21. By way of further response, Defendant states that the RFP, including Section 5.1, speaks for itself, although Defendant denies that Plaintiff has accurately characterized or fully described the RFP, including Section 5.1.

22.

Defendant admits that the Offerors' Technical Proposals and separate Price Proposals were due July 19, 2002. Defendant denies the parenthetical statement in Paragraph 22. Any allegations contained in Paragraph 22 not expressly admitted are denied.

23.

Defendant admits that the RFP sets forth the steps of the evaluation. By way of further clarification, Defendant states that the RFP, including Section 5.5, speaks for itself, although Defendant denies that Plaintiff has accurately characterized or fully described the RFP, including Section 5.5. Any allegations contained in Paragraph 23 not expressly admitted are denied.

24.

Defendant denies the first sentence of Paragraph 24. Defendant admits that the RFP provides in part that "[I]ncompleteness or significant inconsistencies or inaccuracies in the Technical Proposal will result in a reduction of the evaluation rating." By way of further clarification, Defendant states that the RFP, including Section 5.5, speaks for itself; although Defendant denies that Plaintiff has accurately characterized or fully described the RFP, including Section 5.5. Any allegations contained in Paragraph 24 not expressly admitted are denied.

25.

Defendant admits that the RFP provides in part that Offerors would be accorded fair and equal treatment with respect to any opportunity for discussion and revision of their respective Price Proposals and Technical Proposals. By way of further response, Defendant states that the RFP, including Section 5.6, speaks for itself; although Defendant denies that Plaintiff has accurately characterized or fully described the RFP, including Section 5.6. Any allegations contained in Paragraph 25 not expressly admitted are denied.

26.

Defendant admits the first sentence of Paragraph 26. Defendant denies the parenthetical statement in Paragraph 26.

Unnumbered Heading Between Paragraphs 26 and 27

The unnumbered heading between Paragraphs 26 and 27of the Complaint makes no allegations warranting a response from Defendant. To the extent that such a response is required, it is denied.

27.

Defendant admits the allegations contained in Paragraph 27.

28.

Defendant denies the first sentence of Paragraph 28 as written and states that an evaluation team comprised of GTA and DMVS representatives reviewed each Offeror's bid proposal. Any allegations contained in the first sentence of Paragraph 28 not expressly admitted are denied. By way of response to the second sentence of Paragraph 28, Defendant states that portions of the copies of Exhibits B and C attached to its service copy of the Complaint are illegible and, therefore, it is without information or belief as to the accuracy of the attached Exhibits B and C; to the extent that a response is deemed required, it denies that true and accurate copies of the Evaluation Results and Evaluation Sheets for Plaintiff and Viisage are attached as Exhibits B and C to the Complaint. Defendant admits the allegations contained in the third sentence of Paragraph 28. The fourth sentence in Paragraph 28, to the extent it asserts legal theories or conclusions, requires no answer; to the extent a response is required, it is denied.

29.

Defendant denies the allegations contained in paragraph 29. By way of further response, Defendant states that the RFP, including Section 5.6, and its rules, including Ga. Comp. R. & Regs. r. 665-2-4-.02(a)(9)(ii), speak for themselves; although Defendant denies that Plaintiff has accurately characterized or fully described the RFP, including Section 5.6, or its rules, including Ga. Comp. R. & Regs. r. 665-2-4-.02(a)(9)(ii).

30.

Defendant admits the allegations contained in Paragraph 30. In response to Paragraph 30, Defendant states that Ga. Comp. R. & Regs. r. 665-2-1-01(f) speaks for itself; although Defendant denies that Plaintiff fully quotes Ga. Comp. R. & Regs. r. 665-2-1-01(f).

31.

Defendant denies the allegations contained in Paragraph 31.

32.

Defendant denies the allegations contained in Paragraph 32.

33.

Defendant admits the allegations contained in Paragraph 33.

34.

Paragraph 34, to the extent it asserts legal theories or conclusions, requires no answer; to the extent a response is required, Paragraph 34 is denied.

Unnumbered Heading Between Paragraphs 34 and 35

The unnumbered heading between Paragraphs 34 and 35 of the Complaint makes no allegations warranting a response from Defendant. To the extent that such a response is required, it is denied.

35.

Defendant admits the allegations contained in Paragraph 35. By way of further response, Defendant states that the RFP, including Section 3.6.1.2, speaks for itself; although Defendant denies that Plaintiff has fully described the RFP, including Section 3.6.1.2.

36.

Defendant admits that the RFP provides in part that permanent ID cards "**must** be verified to meet AAMVA testing standards by a certified lab and the results **must** accompany the Offeror's proposal" and that "DMVS shall conduct independent testing of sample documents." By way of further response, Defendant states that the RFP, including Section 3.5.4.3, speaks for

itself; although Defendant denies that Plaintiff has accurately characterized or fully described Section 3.5.4.3 of the RFP.

37.

Defendant admits the allegations contained in the first sentence of Paragraph 37. Defendant denies that a true and accurate copy of Viisage's independent lab test report is attached to the Complaint as Exhibit D. By way of further response, Defendant states that the RFP, including sections 3.5 through 3.7, speaks for itself; although Defendant denies that Plaintiff has fully described the RFP, including sections 3.5 through 3.7.

38.

Defendant admits that Viisage proposed a permanent card that was a 10/10/10 Polyester/Teslin/Polyester card design. Defendant admits that an independent test report provided by Viisage was for a 10/10/10 Polyester/Teslin/Polyester card design. Defendant admits that Exhibit E attached to the Complaint contains portions of the Viisage proposal; although Defendant denies that Exhibit E is an accurate and complete copy of the Viisage proposal.

39.

Defendant admits that the lamination on the permanent ID samples initially submitted by Viisage was easily removed, such that the printed information on the ID cards could be altered and re-assembled without detection. The remaining allegations contained in Paragraph 39 are denied.

40.

Defendant admits that GTA e-mailed Viisage on August 1, 2002 asking that it resubmit permanent cards by August 5, 2002. The remaining allegations contained in Paragraph 40 are

denied. By way of further response. Defendant states that Exhibit F speaks for itself; although Defendant denies that Plaintiff has accurately characterized or fully described Exhibit F.

41.

Defendant denies the allegations contained in Paragraph 41.

42.

Defendant denies the allegations contained in Paragraph 42.

43.

Defendant admits that it sent a report to GTA on August 6, 2002 regarding both permanent and temporary cards. Defendant admits the report provided in part that the laminate could be removed from the Viisage sample, permitting the information on the card to be altered. Defendant admits that the report provided in part that Plaintiff's sample card could be broken into two separate pieces after being repeatedly folded. Defendant denies the remaining allegations contained in Paragraph 43. By way of further response, Defendant states that the report speaks for itself; although Defendant denies that Plaintiff has accurately characterized or fully described the report.

44.

Defendant admits that on August 9, 2002 GTA informed all Offerors that a clarification meeting would be conducted on August 14, 2002 related to the durability and security standard for the temporary and permanent ID cards presented by Offerors. Defendant denies the remaining allegations contained in Paragraph 44. By way of further response, Defendant states that the August 9, 2002 notice of meeting speaks for itself; although Defendant denies that Plaintiff accurately characterizes or fully describes the August 9, 2002 notice.

-12-

45.

Defendant admits that it held an Offerors' conference on August 14. 2002 in conjunction with GTA, for the purpose of clarifying the RFP and that at the end of the meeting. it verbally requested all Offerors submit 18 production grade permanent and temporary card samples by August 26. 2002. Defendant denies the remaining allegations contained in Paragraph 45.

46.

Defendant admits that, during the August 14. 2002 meeting, Defendant and GTA stated that all Offerors' proposed temporary cards failed the tests to which Defendant submitted them. Defendant denies the second sentence of Paragraph 46. Defendant admits that it did not disclose the tests to which the temporary cards were submitted. Defendant denies the allegations contained in the fourth sentence of Paragraph 46. Defendant admits that it requested all Offerors be creative and submit new temporary cards for testing. Any allegations contained in Paragraph 46 not expressly admitted are denied.

47.

Defendant admits the allegations contained in Paragraph 47.

48.

Defendant denies the allegations contained in Paragraph 48. By way of further response. Defendant states that Exhibit G speaks for itself; although Defendant denies that Plaintiff has accurately characterized or fully described Exhibit G.

49.

Defendant admits that GTA submitted a request for clarification to Viisage by e-mail on August 28, 2002 and that the clarification stated in part that the lamination of a permanent card sample was removed with little effort. Defendant denies the remaining allegations in Paragraph

-13-

49. By way of further response, Defendant states that Exhibit G speaks for itself; although Defendant denies that Plaintiff has accurately characterized or fully described Exhibit G.

50.

Defendant denies the allegations contained in Paragraph 50.

51.

Defendant denies the allegations contained in Paragraph 51.

52.

Defendant admits that Viisage changed its Technical Proposal for permanent ID cards from a 10/10/10 Polyester/Teslin/Polyester card structure to a 6/14/10 Confirm/Teslin/Polyester card structure. Defendant denies the remaining allegations contained in the first sentence of Paragraph 52. To the extent that the allegations contained in the second and third sentences of Paragraph 52 are legal theories and conclusions, no answer is required; to the extent a response is required, the allegations contained in the second and third sentences of Paragraph 52 are denied. By way of further response, Defendant states that Exhibit H speaks for itself. Defendant admits that Exhibit H attached to the Complaint contains portions of the Viisage proposal; although Defendant denies Exhibit H is an accurate and complete document or that Plaintiff has accurately characterized or fully described Exhibit H.

53.

Defendant admits that the RFP required Offerors submit production quality samples. Defendant admits that it instructed Viisage to provide sample cards produced using the same methods, materials, equipment, and specifications as what is being proposed for Georgia. Defendant denies the remaining allegations contained in Paragraph 53. By way of further response, Defendant states that both the RFP and Exhibit G speak for themselves; although

-14-

Defendant denies that Plaintiff has accurately characterized or fully described the RFP or Exhibit

G.

<center>54.</center>

Defendant admits that the RFP required all Offerors provide independent test data on

card durability. Defendant admits Viisage did not provide a test report as a part of its October

14, 2002 revised Technical Proposal. Defendant denies the remaining allegations contained in

Paragraph 54. By way of further response, Defendant states that the RFP and the Viisage

proposal speak for themselves; although Defendant denies that Plaintiff has accurately

characterized or fully described the RFP or the Viisage proposal.

<center>55.</center>

Defendant denies the allegations contained in Paragraph 55 of the Complaint. Defendant

admits that an Exhibit I is attached to the Complaint; although Defendant denies that Exhibit I is

a complete document or that Plaintiff has accurately characterized or fully described Exhibit I.

<center>56.</center>

Defendant denies the allegations contained in Paragraph 56.

<center>57.</center>

Paragraph 57, to the extent it asserts legal theories or conclusions, requires no answer; to

the extent a response is required, Paragraph 57 is denied.

<center>58.</center>

Paragraph 58, to the extent it asserts legal theories or conclusions, requires no answer; to

the extent a response is required, Paragraph 58 is denied.

<center>59.</center>

Defendant is without knowledge or information sufficient to form a belief as to the truth

<center>-15-</center>

of the allegations contained in the first sentence of Paragraph 59 and, therefore, can neither admit nor deny same; to the extent that an answer is deemed required, the allegation is denied. Defendant denies the second sentence of Paragraph 59.

60.

Defendant admits the allegations contained in Paragraph 60.

61.

Defendant admits the allegations contained in Paragraph 61.

62.

Defendant admits the evaluation committee performed ten tests on each of Plaintiff's proposed solutions and that Plaintiff's first proposed solution failed three out of the ten tests and that the second solution failed five out of the ten tests conducted by the evaluation committee. Any allegations contained in Paragraph 62 not expressly admitted are denied.

63.

Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of Paragraph 63 and, therefore, can neither admit nor deny same; to the extent that an answer is deemed required, said allegations are denied. Defendant denies the remaining allegations contained in Paragraph 63 as written and states that Plaintiff provided a revised temporary card as a part of its best and final offer. Defendant admits that it did not test the revised temporary card Plaintiff submitted as a part of its best and final offer. Any allegations contained in Paragraph 63 not expressly admitted are denied.

64.

Defendant denies the first sentence of Paragraph 64. Defendant admits Viisage provided a temporary ID card solution that passed all tests on or about October 7, 2002.

-16-

Unnumbered Heading Between Paragraphs 64 and 65

The unnumbered heading between Paragraphs 64 and 65 of the Complaint makes no allegations warranting a response from Defendant. To the extent that such a response is required, it is denied.

65.

Defendant admits the allegations contained in Paragraph 65.

66.

Defendant admits that SoftLEAD was eliminated from consideration. By way of further response, Defendant states that the SoftLEAD Evaluation Report speaks for itself. Any allegations contained in Paragraph 66 not expressly admitted are denied.

67.

Defendant admits the allegations contained in Paragraph 67.

68.

Defendant admits the allegations contained in Paragraph 68.

69.

In response to Paragraph 69, Defendant admits that George Theobald e-mailed Charles Nixon on October 22, 2002. Defendant admits that George Theobald's title was Business Analyst on October 22, 2002. Defendant admits the quotation from the e-mail in Paragraph 69. By way of further response, Defendant states that the e-mail speaks for itself; although Defendant denies that Plaintiff has accurately characterized or fully described the e-mail.

70.

Defendant admits the allegations contained in Paragraph 70.

-17-

71.

Defendant admits the allegations contained in Paragraph 71 of the Complaint. By way of further response. Defendant states that the October 28. 2002 letter from Commissioner Tim Burgess to Michael McClearn speaks for itself: although Defendant denies that Plaintiff has accurately characterized or fully described the letter.

72.

Defendant admits the allegations contained in Paragraph 72 of the Complaint. By way of further response. Defendant states that the October 28. 2002 letter from Commissioner Tim Burgess to Michael McClearn speaks for itself: although Defendant denies that Plaintiff has accurately characterized or fully described the letter.

73.

Defendant admits the allegations contained in Paragraph 73 of the Complaint. By way of further response. Defendant states that the October 28, 2002 e-mail from Michael McClearn to Commissioner Tim Burgess speaks for itself; although Defendant denies that Plaintiff has accurately characterized or fully described the e-mail.

74.

Defendant admits an October 29, 2002 e-mail from George Theobald to Charles Nixon provides in part that

> As a part of this process, we would like to validate our technical findings with this Offeror during contract negotiations. Although a brief demonstration was held with each Offeror last last month, it was limited to the issuance of a Temporary Document and it did not cover some of the other critical capabilities needed in the new system. To adequately verify our decision. more extensive demonstrations and discussions of the proposed solution by the Offeror will be necessary.

Any allegations contained in Paragraph 74 not expressly admitted are denied. By way of further response. Defendant states that the October 29, 2002 e-mail from George Theobald to Charles

-18-

Nixon speaks for itself; although Defendant denies that Plaintiff has accurately characterized or fully described the e-mail.

<div align="center">75.</div>

Defendant admits the allegations contained in Paragraph 75. By way of further response, Defendant states that the October 29, 2002 e-mail from Charles Nixon to Mohammed Siddiqui speaks for itself; although Defendant denies that Plaintiff has accurately characterized or fully described the e-mail.

<div align="center">76.</div>

Defendant admits the allegations contained in Paragraph 76.

<div align="center">77.</div>

Defendant denies the first sentence of Paragraph 77. Defendant admits that a draft contract was provided to Viisage. Any allegations contained in Paragraph 77 not expressly admitted are denied. By way of further response, Defendant states that any e-mail from Mr. Siddiqui to Mr. Nixon dated October 30, 2002 will speak for itself.

<div align="center">78.</div>

Defendant admits that an evaluation report was e-mailed from Mr. Theobald to Mr. Nixon on November 6, 2002. Defendant denies the remaining allegations contained in Paragraph 78. By way of further response, Defendant states that the November 6, 2002 e-mail speaks for itself; although Defendant denies that Plaintiff accurately characterizes the e-mail.

<div align="center">79.</div>

Defendant admits that an e-mail from Charemon Scott to Neal Childers and George Theobald dated November 6, 2002 provided in part that "the award of the RFP should be contingent upon Viisage's financial capability/profile being substantially the same as well as the

<div align="center">-19-</div>

staffing for the project." By way of further response, Defendant states that the e-mail speaks for itself; although Defendant denies that Plaintiff accurately characterizes or fully describes the e-mail. Defendant denies any allegations contained in Paragraph 79 not expressly admitted.

80.

Defendant admits that Viisage indicated that it wanted to change the proposed vendor for the Point of Sale software to CenterStage on November 7, 2002. Any allegations contained in Paragraph 80 not expressly admitted are denied.

81.

Defendant denies the allegations contained in Paragraph 81.

82.

Defendant admits that Viisage made a demonstration on November 12, 2002. Any allegations contained in Paragraph 82 not expressly admitted are denied.

83.

Defendant admits the allegations contained in Paragraph 83.

84.

Defendant admits that page 43 of Exhibit C provides in part that "[a]ll 'Unsatisfactory' ratings identified during the evaluation of the initial proposal were rectified during the resubmission and clarification phases." The remaining allegations contained in Paragraph 84 are legal theories and require no answer; to the extent a response is required, the remaining allegations contained in Paragraph 84 are denied. By way of further response, Defendant states that portions of the copy of Exhibit C attached to its service copy of the Complaint are illegible and, therefore, it is without information or belief as to the accuracy of the attached Exhibit C; to

the extent that a response is deemed required, it denies that a true and accurate copy of the

Evaluation Results and Evaluation Sheets for Viisage is attached as Exhibit C to the Complaint.

85.

Defendant denies the allegations contained in Paragraph 85.

86.

Defendant admits the allegations contained in the first sentence of Paragraph 86. To the

extent that the remaining allegations contained in Paragraph 86 are legal theories and

conclusions, they require no answer; to the extent a response is required, the remaining

allegations contained in Paragraph 86 are denied.

87.

Defendant denies the allegations contained in Paragraph 87.

Unnumbered Heading Between Paragraphs 87 and 88

The unnumbered heading between Paragraphs 87 and 88 makes no allegations warranting

a response from Defendant. To the extent that such a response is required, it is denied.

88.

Defendant denies the allegations contained in Paragraph 88.

89.

Defendant admits the allegations contained in Paragraph 89. In further response to

Paragraph 89, Defendant states that the RFP, including Section 5.7, speaks for itself; although

Defendant denies that Plaintiff has accurately characterized or fully described the RFP, including

Section 5.7.

90.

Defendant admits the allegations contained in Paragraph 90. In further response to

Paragraph 90. Defendant states that the RFP, including Section 3.1.1, speaks for itself; although Defendant denies that Plaintiff has accurately characterized or fully described the RFP.

91.

Defendant denies the allegations contained in Paragraph 91. In further response to Paragraph 91, Defendant states that the RFP, including Section 5.3, speaks for itself.

92.

Defendant denies the allegations contained in Paragraph 92.

93.

Defendant admits that Section 3.3.1 of the RFP listed the Overall Solution Functional Requirements. In further response to Paragraph 93, Defendant states that the Section 3.3.1 of the RFP speaks for itself; although Defendant denies that Plaintiff has accurately characterized or fully described Section 3.3.1 of the RFP. Defendant denies the remaining allegations contained in Paragraph 93.

94.

Defendant admits the allegations contained in the sentence in Paragraph 94. Defendant admits that the RFP contains a Section 1.2; although it denies it relates to the content of the preceding sentence.

95.

By way of response to Paragraph 95, Defendant states that portions of the copies of Exhibits B and C attached to its service copy of the Complaint are illegible and, therefore, it is without information or belief as to the accuracy of the attached Exhibits B and C; to the extent that a response is deemed required, it denies that true and accurate copies of the Evaluation

Results and Evaluation Sheets for Plaintiff and Viisage are attached as Exhibits B and C to the Complaint.

96.

Defendant admits that Plaintiff's evaluation report provides in part that it received a rating of "Excellent" with respect to six responses, a rating of "Good" with respect to eight responses, a rating of "Satisfactory" with respect to 202 responses, and a rating or "Unsatisfactory" with respect to three responses. Any allegations contained in Paragraph 96 not expressly admitted are denied. In further response to Paragraph 96, Defendant states that the evaluation report speaks for itself; although Defendant denies that Plaintiff has accurately characterized or fully described the evaluation report. By way of further response to Paragraph 96, Defendant states that portions of the copy of Exhibit B attached to its service copy of the Complaint are illegible and, therefore, it is without information or belief as to the accuracy of the attached Exhibit B; to the extent that a response is deemed required, it denies that a true and accurate copy of the Evaluation Results and Evaluation Sheets for Plaintiff is attached as Exhibit B to the Complaint.

97.

Paragraph 97, to the extent it asserts legal theories or conclusions, requires no answer; to the extent a response is required, Paragraph 97 is denied.

98.

Defendant admits the allegations contained in Paragraph 98. In further response to Paragraph 98, Defendant states that the evaluation report and RFP speak for themselves; although Defendant denies that Plaintiff has accurately characterized or fully described the evaluation report or the RFP.

-23-

99.

The first sentence of Paragraph 99, to the extent it asserts legal theories or conclusions, requires no answer; to the extent a response is required, the first sentence of Paragraph 99 is denied. Defendant admits the Viisage evaluation report provides in part that Viisage received a rating of "Excellent" with respect to eleven responses, a rating of "Good" with respect to ten responses, a rating of "Satisfactory" with respect to 189 responses, and a rating of "Unsatisfactory" with respect to nine responses. The third sentence of Paragraph 99, to the extent it asserts legal theories or conclusions, requires no answer; to the extent a response is required, the third sentence of Paragraph 99 is denied. In further response to Paragraph 99, Defendant states that the evaluation report speaks for itself; although Defendant denies that Plaintiff has accurately characterized or fully described the evaluation report. By way of further response to Paragraph 99, Defendant states that portions of the copy of Exhibit C attached to its service copy of the Complaint are illegible and, therefore, it is without information or belief as to the accuracy of the attached Exhibit C; to the extent that a response is deemed required, it denies that a true and accurate copy of the Evaluation Results and Evaluation Sheets for Viisage is attached as Exhibit C to the Complaint. Any allegations contained in Paragraph 99 not expressly admitted are denied.

100.

Paragraph 100, to the extent it asserts legal theories or conclusions, requires no answer; to the extent a response is required, Paragraph 100 is denied.

101.

Paragraph 101, to the extent it asserts legal theories or conclusions, requires no answer; to the extent a response is required, Paragraph 101 is denied.

-24-

Unnumbered Heading Between Paragraphs 101 and 102

The unnumbered heading between Paragraphs 101 and 102 makes no allegations warranting a response from Defendant. To the extent that such a response is required, it is denied.

102.

Paragraph 102, to the extent it asserts legal theories or conclusions, requires no answer; to the extent a response is required, Paragraph 102 is denied.

103.

Defendant admits that O.C.G.A. § 50-25-7.3(a)(6) provides that

> The award shall be made to the responsible vendor or vendors complying with the technology and architecture standards and policies of the authority whose proposal or bid was timely and is determined in writing to be the most advantageous to the state, taking into consideration the evaluation factors set forth in the request for proposals or bids. No other factors or criteria shall be used in the evaluation.

By way of further clarification, Defendant states that the statute speaks for itself; although Defendant denies that Plaintiff accurately characterized or fully described the statute. Any allegations contained in Paragraph 103 not expressly admitted are denied.

104.

Defendant admits the allegations contained in Paragraph 104. In further response to Paragraph 104, Defendant states that Ga. Comp. R. & Regs. r. 665-2-4-.02(a)(8)(2002) speaks for itself; although Defendant denies that Plaintiff has fully described said Rule.

105.

Paragraph 105, to the extent it asserts legal theories or conclusions, requires no answer; to the extent a response is required, Paragraph 105 is denied. In further response to Paragraph 105, Defendant states that 1974 Op. Att'y Gen. 74-16 speaks for itself; although Defendant denies that

Plaintiff has accurately characterized or fully described 1974 Op. Att'y Gen. 74-16.

106.

The first sentence of Paragraph 106, to the extent it asserts legal theories or conclusions, requires no answer; to the extent a response is required, the first sentence of Paragraph 106 is denied. Defendant admits the allegations contained in the second sentence of Paragraph 106. In further response to the allegations contained in Paragraph 106, Defendant states that the RFP, including Section 4.2.1.3.4, speaks for itself; although Defendant denies that Plaintiff has fully described the RFP, including Section 4.2.1.3.4.

107.

Defendant admits the allegations contained in Paragraph 107 of the Complaint. In response to Paragraph 107, Defendant states that the RFP, including Section 4.2.1.3.4, speaks for itself; although Defendant denies that Plaintiff has fully described the RFP, including Section 4.2.1.3.4.

108.

Defendant denies the allegations contained in Paragraph 108.

109.

Paragraph 109, to the extent it asserts legal theories or conclusions, requires no answer; to the extent a response is required, Paragraph 109 is denied.

110.

Paragraph 110, to the extent it asserts legal theories or conclusions, requires no answer; to the extent a response is required, Paragraph 110 is denied.

111.

Paragraph 111, to the extent it asserts legal theories or conclusions, requires no answer; to

the extent a response is required. Paragraph 111 is denied.

<div align="center">112.</div>

Defendant admits that it sent GTA a copy of Viisage's second quarter 10-Q filing with the Securities and Exchange Commission on November 1, 2002. Defendant admits that it determined that Viisage was the apparent winner on October 22, 2002. The remaining allegations contained in Paragraph 112 are denied. By way of further response to Paragraph 112, Defendant states that the November 1, 2002 e-mail from Mr. Theobald to Mr. Nixon speaks for itself.

<div align="center">113.</div>

Defendant admits that it received a Dun & Bradstreet report on Viisage on November 7, 2002. The remaining allegations contained in Paragraph 113 are denied. By way of further response, Defendant states that the November 7, 2002 e-mail from Mr. Brooks to Mr. Nixon speaks for itself.

<div align="center">114.</div>

Defendant admits the allegations contained in Paragraph 114. Defendant admits that Exhibit J attached to the Complaint is a true and complete copy of the Notice of Award. In further response to Paragraph 114, Defendant states that the Notice of Award speaks for itself; although Defendant denies that Plaintiff has accurately characterized or fully described the Notice of Award.

<div align="center">115.</div>

Defendant admits that it executed the contract with Viisage the same day the Notice of Award was issued. Defendant denies the remaining allegations contained in Paragraph 115.

<div align="center">-27-</div>

116.

Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of Paragraph 116 and, therefore, can neither admit nor deny same; to the extent that an answer is deemed required, said allegations are denied. Defendant admits that it has not received a copy of the third quarter 10-Q report, if any, filed by Viisage with the Securities and Exchange Commission. Defendant is without knowledge or information sufficient to form a belief as to the truth of Exhibit K attached to the Complaint and, therefore, can neither admit nor deny same; to the extent that an answer is deemed required, Exhibit K is denied. Any allegations contained in Paragraph 116 not expressly admitted are denied.

117.

Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 117 and, therefore, can neither admit nor deny same; to the extent that an answer is deemed required, said allegations are denied. Defendant is without knowledge or information sufficient to form a belief as to the truth of Exhibit K attached to the Complaint and, therefore, can neither admit nor deny same; to the extent that an answer is deemed required, Exhibit K is denied.

118.

Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 118 and, therefore, can neither admit nor deny same; to the extent that an answer is deemed required, said allegations are denied. Defendant is without knowledge or information sufficient to form a belief as to the truth of Exhibit K attached to the

Complaint and. therefore. can neither admit nor deny same; to the extent that an answer is deemed required. Exhibit K is denied.

<div align="center">119.</div>

Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 119 and. therefore. can neither admit nor deny same; to the extent that an answer is deemed required. said allegations are denied.  Defendant is without knowledge or information sufficient to form a belief as to the truth of Exhibit K attached to the Complaint and. therefore. can neither admit nor deny same; to the extent that an answer is deemed required. Exhibit K is denied.

<div align="center">120.</div>

Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 120 and, therefore, can neither admit nor deny same; to the extent that an answer is deemed required. said allegations are denied.

<div align="center">121.</div>

Defendant denies the allegations contained in Paragraph 121.

<div align="center">122.</div>

Defendant denies the allegations contained in Paragraph 122.

<div align="center">123.</div>

Defendant denies the allegations contained in Paragraph 123.

<div align="center">Unnumbered Heading Between Paragraphs 123 and 124</div>

The unnumbered heading between Paragraphs 123 and 124 makes no allegations warranting a response from Defendant.  To the extent that such a response is required. it is denied.

<div align="center">-29-</div>

124.

Defendant admits that Paragraph 124 quotes the RFP's definition of "evaluation" with the exception of the emphasis added. In further response to Paragraph 124, Defendant states that Appendix D of the RFP speaks for itself, although Defendant denies that Plaintiff has accurately characterized Appendix D of the RFP.

125.

Paragraph 125, to the extent it asserts legal theories or conclusions, requires no answer; to the extent a response is required, Paragraph 125 is denied. By way of further response, Defendant states that the RFP, including Appendix D, speaks for itself and denies that Plaintiff accurately characterized or fully described the RFP, including Appendix D.

126.

Defendant admits the allegations contained in Paragraph 126. By way of further response, Defendant states that the RFP, including Section 5.3, speaks for itself; although Defendant denies that Plaintiff fully described the RFP, including Section 5.3.

127.

Paragraph 127, to the extent it asserts legal theories or conclusions, requires no answer; to the extent a response is required, Paragraph 127 is denied.

128.

Paragraph 128, to the extent it asserts legal theories or conclusions, requires no answer; to the extent a response is required, Paragraph 128 is denied.

129.

Defendant admits the first sentence of Paragraph 129. Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in

Paragraph 129 and, therefore, can neither admit nor deny same; to the extent that an answer is deemed required, said allegations are denied.

### 130.

Paragraph 130, to the extent it asserts legal theories or conclusions, requires no answer; to the extent a response is required, Paragraph 130 is denied.

### 131.

Paragraph 131, to the extent it asserts legal theories or conclusions, requires no answer; to the extent a response is required, Paragraph 131 is denied.

### 132.

Defendant denies the allegations contained in Paragraph 132.

### 133.

Defendant denies the allegations contained in Paragraph 133.

### Unnumbered Heading Between Paragraphs 133 and 134

The unnumbered heading between Paragraphs 133 and 134 makes no allegations warranting a response from Defendant. To the extent that such a response is required, it is denied.

### 134.

Paragraph 134, to the extent it asserts legal theories or conclusions, requires no answer; to the extent a response is deemed required, Paragraph 134 is denied.

### 135.

Defendant admits the allegations contained in Paragraph 135. In further response to Paragraph 135, Defendant states that the RFP, including Appendix D, speaks for itself; although Defendant denies that Plaintiff has fully described the RFP.

136.

Defendant admits the RFP asked the Offeror to provide a Central Image System for storage and retrieval of digital photographs, signatures, and fingerprints. Defendant admits the Central Imaging System is the image database system that will be owned and operated by the successful Offeror. Defendant denies the RFP mandates the Central Image System be housed at the Central Production Facility. All allegations in Paragraph 136 not expressly admitted are denied. In further response to Paragraph 136, Defendant states that the RFP, including Section 1.1 and Appendix D, speaks for itself; although Defendant denies that Plaintiff has accurately characterized or fully described the RFP, including Section 1.1 and Appendix D.

137.

Defendant admits that the RFP sought, in part, to replace the current Digitized License System with all hardware and software required to support production of permanent ID cards at a central production facility. All allegations in Paragraph 137 not expressly admitted are denied. In further response to Paragraph 137, Defendant states that the RFP, including Section 2.7.1.1, speaks for itself; although Defendant denies that Plaintiff has accurately characterized or fully described the RFP, including Section 2.7.1.1.

138.

Defendant admits that it is seeking a solution that would allow it to achieve a strategic objective of improving customer service by reducing waiting time for drivers' licenses and identification cards. Defendant admits that permanent document printers will be used for "mass production" at the successful Offeror's Central Production Facility. By way of further clarification, Defendant states that the RFP, including Section 2.7.3.3, speaks for itself; although

-32-

Defendant denies that Plaintiff accurately characterized or fully described the RFP, including Section 2.7.3.3. Any allegations contained in Paragraph 138 not expressly admitted are denied.

139.

Defendant admits the allegations contained in Paragraph 139. In further response to Paragraph 139, Defendant states that the RFP speaks for itself; although Defendant denies that Plaintiff has fully described the RFP.

140.

Defendant denies the allegations contained in Paragraph 140.

141.

Defendant admits that Plaintiff's evaluation report provides in part that Plaintiff "Provided a very comprehensive description on all anticipated needs, [i]ncluded floor plans, equipment foot prints, access requirements for loading of equipment and supplies, detailed electro-mechanical and environmental requirements, security and vault procedures." In further response to Paragraph 141, Defendant states that the evaluation report speaks for itself; although Defendant denies that Plaintiff has accurately characterized or fully described the evaluation report.

142.

Defendant admits that the Viisage evaluation report noted in its comments section that Viisage "[p]rovided minimal information on space requirements for equipment" with respect to establishing a Central Production Facility at its headquarters. Defendant denies the remaining allegations contained in Paragraph 142.

143.

Defendant admits the allegations contained in the first sentence of Paragraph 143.

-33-

Defendant admits that the RFP provided in part that Offeror's experience with similar projects should include a description of the size of the organization and capabilities and experience in applying the proposed technology. Any allegations contained in Paragraph 143 not expressly admitted are denied. In response to Paragraph 143, Defendant states that the RFP, including Section 4.2.1.5, speaks for itself; although Defendant denies that Plaintiff has accurately characterized or fully described the RFP, including Section 4.2.1.5.

144.

Defendant denies the allegations contained in Paragraph 144.

145.

Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 145 of the Complaint and, therefore, can neither admit nor deny same; to the extent that an answer is deemed required, said allegations are denied.

146.

Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 146 and Exhibit L and, therefore, can neither admit nor deny same; to the extent that an answer is deemed required, said allegations are denied.

147.

Defendant admits that Georgia issued 2,442,073 ID cards in 2001. Defendant admits that approximately 5.6 million drivers are licensed in Georgia and that the RFP state that the "current Image database is expected to have approximately 15 million sets of stored Images when this Contract is awarded." By way of further response, Defendant states that the RFP, including Section 2.4, speaks for itself; although Defendant denies that Plaintiff accurately characterizes or fully describes the RFP, including Section 2.4. Defendant is without knowledge or information

sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 147

and, therefore, can neither admit nor deny same; to the extent that an answer is deemed required,

said allegations are denied.

148.

Defendant admits that Plaintiff is the current vendor for Massachusetts. Defendant is

without knowledge or information sufficient to form a belief as to the truth of the remaining

allegations contained in Paragraph 148 and, therefore, can neither admit nor deny same; to the

extent that an answer is deemed required, said allegations are denied.

149.

Paragraph 149, to the extent it asserts legal theories or conclusions, requires no answer; to

the extent a response is required, Paragraph 149 is denied.

150.

Paragraph 150; to the extent it asserts legal theories or conclusions, requires no answer; to

the extent a response is required, Paragraph 150 is denied.

151.

Paragraph 151, to the extent it asserts legal theories or conclusions, requires no answer; to

the extent a response is required, Paragraph 151 is denied.

Unnumbered Heading Between Paragraphs 151 and 152

The unnumbered heading between Paragraphs 151 and 152 makes no allegations

warranting a response from Defendant. To the extent that such a response is required, they are

denied.

152.

Paragraph 152, to the extent it asserts legal theories or conclusions, requires no answer; to

the extent a response is required. Paragraph 152 is denied.

153.

Defendant denies the allegations contained in Paragraph 153.

154.

Defendant denies the allegations contained in Paragraph 154.

155.

Defendant denies the allegations contained in Paragraph 155.

156.

Defendant denies the allegations contained in Paragraph 156.

157.

Paragraph 157, to the extent it asserts legal theories or conclusions, requires no answer; to the extent a response is required, Paragraph 157 is denied.

158.

Paragraph 158, to the extent it asserts legal theories or conclusions, requires no answer; to the extent a response is required, Paragraph 158 is denied.

159.

Paragraph 159, to the extent it asserts legal theories or conclusions, requires no answer; to the extent a response is required, Paragraph 159 is denied.

Unnumbered Heading Between Paragraphs 159 and 160

The unnumbered heading between Paragraphs 159 and 160 makes no allegations warranting a response from Defendant. To the extent that such a response is required, it is denied.

160.

Paragraph 160, to the extent it asserts legal theories or conclusions, requires no answer; to the extent a response is required, Paragraph 160 is denied.

161.

Paragraph 161, to the extent it asserts legal theories or conclusions, requires no answer; to the extent a response is required, Paragraph 161 is denied.

162.

Defendant admits the allegations contained in Paragraph 162. In further response to Paragraph 162, Defendant states that the Viisage proposal speaks for itself; although Defendant denies that Plaintiff has accurately characterized or fully described the Viisage proposal.

163.

Defendant denies the allegations contained in Paragraph 163.

164.

Defendant denies the allegations contained in the first sentence of Paragraph 164 as written. Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in the second sentence of Paragraph 164 and, therefore, can neither admit nor deny same; to the extent that an answer is deemed required, said allegations are denied. Defendant denies the allegations contained in the third sentence of Paragraph 164.

165.

Paragraph 165, to the extent it asserts legal theories or conclusions, requires no answer; to the extent a response is required, Paragraph 165 is denied.

166.

Paragraph 166, to the extent it asserts legal theories or conclusions, requires no answer; to

-37-

the extent a response is required. Paragraph 166 is denied.

Unnumbered Heading Between Paragraphs 166 and 167

The unnumbered heading between Paragraphs 166 and 167 makes no allegations warranting a response from Defendant. To the extent that such a response is required, it is denied.

167.

Paragraph 167, to the extent it asserts legal theories or conclusions, requires no answer; to the extent a response is required, Paragraph 167 is denied.

168.

Defendant admits that the RFP provided that the Offeror submit a proposal for a turnkey POS system that would interface with the Digitized License System and have the capacity to upgrade to meet future needs. In further response to Paragraph 168, Defendant states that the RFP, including Section 3.14.4, speaks for itself; although Defendant denies that Plaintiff has fully described the RFP, including Section 3.14.4.

169.

Defendant admits the allegations contained in Paragraph 169. In further response to Paragraph 169, Defendant states that the RFP, including Section 3.14.4.1.1, speaks for itself; although Defendant denies that Plaintiff has fully described the RFP.

170.

Defendant admits the allegations contained in Paragraph 170. In further response to Paragraph 170, Defendant states that the RFP, including Section 3.14.4.1.2, speaks for itself; although Defendant denies that Plaintiff has fully described the RFP, including Section 3.14.4.1.2.

171.

Defendant admits the allegations contained in Paragraph 171. In further response to Paragraph 171, Defendant states that the RFP, including Sections 3.14.4.1.3 & 3.14.4.1.4, speaks for itself, although Defendant denies that Plaintiff has fully described the RFP.

172.

Defendant admits the allegations contained in Paragraph 172.

173.

Defendant admits the allegations contained in Paragraph 173. In further response to Paragraph 173, Defendant states that Exhibit M speaks for itself, although Defendant denies that Exhibit M is a true and correct copy of the Viisage revised POS proposal or that Plaintiff has accurately characterized or fully described Exhibit M.

174.

Defendant denies the allegations contained in Paragraph 174.

175.

Defendant denies the allegations of Paragraph 175 as written and states that Viisage's proposed change of the POS subcontractor did not change its final evaluation score. Any allegations contained in Paragraph 175 not expressly admitted are denied.

176.

Defendant denies the allegations contained in Paragraph 176.

177.

Defendant admits that it sent an evaluation report with respect to Viisage's POS submission to GTA on November 13, 2002. Defendant admits that it signed the procurement

contract with Viisage on November 12, 2002. Any allegations contained in Paragraph 177 not expressly admitted are denied.

### 178.

The first sentence of Paragraph 178, to the extent it asserts legal theories or conclusions, requires no answer; to the extent a response is required, the allegations contained in the first sentence of Paragraph 178 are denied. The remaining allegations contained in Paragraph 178 are denied.

### 179.

Defendant denies the allegations contained in Paragraph 179.

### 180.

Defendant admits the allegations contained in the first sentence of Paragraph 180. Defendant denies the second sentence of Paragraph 180 as written and states that the Viisage technical proposal did not include specifications for cash drawers, financial receipt printers, and credit card readers. Defendant denies the phrases "(1) POS Server" and "all of which must be a part of a complete system."

### 181.

Paragraph 181, to the extent it asserts legal theories or conclusions, requires no answer; to the extent a response is required, Paragraph 181 is denied.

### 182.

Paragraph 182, to the extent it asserts legal theories or conclusions, requires no answer; to the extent a response is deemed required, Paragraph 182 is denied.

### 183.

Defendant admits that Viisage's proposed POS solution was given a "Satisfactory" rating

-40-

by the evaluation committee. Defendant denies the remaining allegations contained in Paragraph 183. By way of further response to Paragraph 183, Defendant states that portions of the copy of Exhibit N attached to its service copy of the Complaint are illegible and, therefore, it is without information or belief as to the accuracy of the attached Exhibit N; to the extent that a response is deemed required, it denies that a true and accurate copy of the Revised POS Evaluation Findings is attached as Exhibit N to the Complaint.

<div align="center">184.</div>

Paragraph 184, to the extent it asserts legal theories or conclusions, requires no answer; to the extent a response is required, Paragraph 184 is denied.

<div align="center">185.</div>

Paragraph 185, to the extent it asserts legal theories or conclusions, requires no answer; to the extent a response is required, Paragraph 185 is denied.

<div align="center">186.</div>

Paragraph 186, to the extent it asserts legal theories or conclusions, requires no answer; to the extent a response is required, Paragraph 186 is denied.

<div align="center">Unnumbered Heading Between Paragraphs 186 and 187</div>

The unnumbered heading between Paragraphs 186 and 187 makes no allegations warranting a response from Defendant. To the extent that such a response is required, it is denied.

<div align="center">187.</div>

Defendant admits the allegations contained in Paragraph 187.

<div align="center">188.</div>

Defendant denies the allegations contained in Paragraph 188.

<div align="center">-41-</div>

189.

Paragraph 189, to the extent it asserts legal theories or conclusions, requires no answer; to the extent a response is required, Paragraph 189 is denied.

190.

Paragraph 190, to the extent it asserts legal theories or conclusions, requires no answer; to the extent a response is required, Paragraph 190 is denied.

191.

Paragraph 191, to the extent it asserts legal theories or conclusions, requires no answer; to the extent a response is required, Paragraph 191 is denied.

Unnumbered Heading Between Paragraphs 191 and 192

The unnumbered heading between Paragraphs 191 and 192 makes no allegations warranting a response from Defendant. To the extent that such a response is required, it is denied.

192.

Defendant denies the allegations contained in Paragraph 192. By way of further clarification, Defendant states that the RFP speaks for itself.

193.

Paragraph 193, to the extent it asserts legal theories or conclusions, requires no answer; to the extent a response is required, Paragraph 193 is denied.

194.

Defendant admits that the term of the contract it executed with Viisage on November 12, 2002 ends on June 30, 2004. By way of further response, Defendant states that the contract speaks for itself; although Defendant denies that Plaintiff accurately characterizes or fully

describes the contract. Any allegations contained in Paragraph 194 not expressly admitted are denied.

195.

Paragraph 195, to the extent it asserts legal theories or conclusions, requires no answer; to the extent a response is required, Paragraph 195 is denied.

Unnumbered Heading Between Paragraphs 195 and 196

The unnumbered heading between Paragraphs 195 and 196 makes no allegations warranting a response from Defendant. To the extent that such a response is required, it is denied.

196.

Defendant admits the allegations contained in Paragraph 196.

197.

Defendant admits the allegations contained in Paragraph 197.

Unnumbered Heading Between Paragraphs 197 and 198

The unnumbered heading between Paragraphs 197 and 198 makes no allegations warranting a response from Defendant. To the extent that such a response is required, it is denied.

198.

In response to Paragraph 198, Defendant incorporates herein by reference its responses to Paragraphs Nos. 1 through 197 above, as if fully stated herein.

199.

Defendant denies the allegations contained in Paragraph 199.

-43-

200.

Defendant denies the allegations contained in Paragraph 200.

201.

Defendant denies the allegations contained in Paragraph 201.

202.

Defendant denies the allegations contained in Paragraph 202.

203.

Defendant denies the allegations contained in Paragraph 203.

Unnumbered Heading Between Paragraphs 203 and 204

The unnumbered heading between Paragraphs 203 and 204 makes no allegations warranting a response from Defendant. To the extent that such a response is required, it is denied.

204.

In response to Paragraph 204, Defendant incorporates herein by reference its responses to Paragraphs Nos. 1 through 197 above, as if fully stated herein.

205.

Defendant denies the allegations contained in Paragraph 205.

206.

Defendant denies the allegations contained in Paragraph 206.

207.

Defendant denies the allegations contained in Paragraph 207.

208.

Defendant denies the allegations contained in Paragraph 208.

209.

Defendant denies the allegations contained in Paragraph 209.

Unnumbered Heading Between Paragraphs 209 and 210

The unnumbered heading between Paragraphs 209 and 210 makes no allegations warranting a response from Defendant. To the extent that such a response is required, it is denied.

210.

In response to Paragraph 210, Defendant incorporates herein by reference its responses to Paragraphs Nos. 1 through 197 above, as if fully stated herein.

211.

Defendant denies the allegations contained in Paragraph 211.

212.

Defendant denies the allegations contained in Paragraph 212.

213.

Defendant denies the allegations contained in Paragraph 213.

214.

Defendant denies the allegations contained in Paragraph 214.

215.

Defendant denies the allegations contained in Paragraph 215.

Unnumbered Heading Between Paragraphs 215 and 216

The unnumbered heading between Paragraphs 215 and 216 makes no allegations warranting a response from Defendant. To the extent that such a response is required, it is denied.

216.

In response to Paragraph 216. Defendant incorporates herein by reference its responses to Paragraphs Nos. 1 through 197 above. as if fully stated herein.

217.

Defendant denies the allegations contained in Paragraph 217.

218.

Defendant denies the allegations contained in Paragraph 218.

219.

Defendant denies the allegations contained in Paragraph 219.

220.

Defendant denies the allegations contained in Paragraph 220.

221.

Defendant denies the allegations contained in Paragraph 221.

Unnumbered Heading Between Paragraphs 221 and 222

The unnumbered heading between Paragraphs 221 and 222 makes no allegations warranting a response from Defendant. To the extent that such a response is required, it is denied.

222.

In response to Paragraph 222, Defendant incorporates herein by reference its responses to Paragraphs Nos. 1 through 197 above, as if fully stated herein.

223.

Defendant denies the allegations contained in Paragraph 223.

224.

Defendant denies the allegations contained in Paragraph 224.

225.

Defendant denies the allegations contained in Paragraph 225.

226.

Defendant denies the allegations contained in Paragraph 226.

227.

Defendant denies the allegations contained in Paragraph 227.

Unnumbered Heading Between Paragraphs 227 and 228

The unnumbered heading between Paragraphs 227 and 228 makes no allegations warranting a response from Defendant. To the extent that such a response is required, it is denied.

228.

In response to Paragraph 228, Defendant incorporates herein by reference its responses to Paragraphs Nos. 1 through 197 above, as if fully stated herein.

229.

Defendant denies the allegations contained in Paragraph 229.

230.

Defendant denies the allegations contained in Paragraph 230.

231.

Defendant denies the allegations contained in Paragraph 231.

232.

Defendant denies the allegations contained in Paragraph 232.

233.

Defendant denies the allegations contained in Paragraph 233.

234.

The final unnumbered paragraph contains Plaintiff's prayer for relief and, as such, does not require an answer; to the extent that a response is deemed required, said paragraph is denied.

235.

Any allegations contained in the Complaint not herein expressly admitted, denied, or otherwise responded to above are hereby denied.

**WHEREFORE,** Defendant the Department of Motor Vehicle Safety prays as follows:

(a)     That judgment be granted in favor of the Defendant;

(b)     That the Defendant be awarded attorney's fees; and

(c)     That this Court grant such other relief as is deemed proper.

This 7th day of April, 2003.

Respectfully submitted,

THURBERT E. BAKER                              033887
Attorney General

DANIEL M. FORMBY                               269350
Deputy Attorney General

JOHN B. BALLARD, JR.                           035550
Senior Assistant Attorney General

EMILY P. HITCHCOCK                             357697
Assistant Attorney General

PLEASE ADDRESS ALL
COMMUNICATIONS TO:
Emily P. Hitchcock
Assistant Attorney General
40 Capitol Square, S.W.
Atlanta, Georgia 30303
(404) 651-6249

CERTIFICATE OF SERVICE

I do hereby certify that I have this day served the within and foregoing ANSWER AND

DEFENSES OF THE DEPARTMENT OF MOTOR VEHICLE SAFETY by depositing a copy

thereof, postage prepaid, in the United States Mail, properly addressed upon:

> John P. Hutchins
> David Balser
> Valerie D. Barton
> MCKENNA LONG & ALDRIDGE LLP
> 303 Peachtree Street, Suite 5300
> Atlanta, Georgia 30308

This 7th day of April, 2003.

EMILY P. HITCHCOCK
Assistant Attorney General

# Exhibit 26



# IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

DIGIMARC ID SYSTEMS, LLC,

      Plaintiff,

vs.

GEORGIA TECHNOLOGY AUTHORITY and
the GEORGIA DEPARTMENT OF MOTOR
VEHICLE SAFETY,

      Defendants,

vs.

VIISAGE TECHNOLOGY, INC., a Delaware
corporation,

      Necessary Party-Defendant.

Civil Action No. 2003CV66498



FILED IN OFFICE

JAN 0 3 2005

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA.

## NOTICE OF APPEAL
### and
### REQUEST FOR CONSOLIDATION OF APPEALS

COMES NOW VIISAGE TECHNOLOGY INC. ("Viisage") and, pursuant to O.C.G.A.

§ 5-6-37, gives notice that it hereby appeals to the Supreme Court of the State of Georgia from

this Court's December 22, 2004 Order on Cross Motions for Summary Judgment.  Appeal as of

right is appropriate from this Order because it is a final judgment under O.C.G.A. § 9-11-54 and

this Court has entered a permanent injunction against the performance of the settlement

agreement between the State of Georgia and Viisage.  A copy of the order appealed from is

attached hereto as Exhibit A.

Given the nature and issues of the existing appeal of Viisage, the Department of Motor

Vehicle Safety, and Georgia Technology Authority, filed with this Court on October 1, 2004,

Viisage requests that the two appeals be consolidated for consideration by the Supreme Court.

Copies of the Notices of Appeal from the State and Viisage are attached hereto as Exhibit B.

RECORD ON APPEAL

To the extent that the entire record has not been collected and transmitted, up to and

including through this date, the Clerk will please transmit the entire record on appeal and omit

nothing, including, but not limited to, all pleadings, exhibits and other papers filed in connection

with this matter. Viisage understands that the Clerk of Court is currently preparing the Record of

this case for appeal pursuant to Viisage's and the State's Notices of Appeal of October 1, 2004.

To the extent that pleadings, exhibits, orders, and any and all other papers have been added to the

Record since October 1, 2004, Viisage requests such papers be added to the Record currently

being prepared by the Clerk of Court.

In addition, the Clerk shall file all transcripts of evidence and proceedings in the Superior

Court in this action, including but not limited to the following:

| Date | Hearing |
|---|---|
| July 28, 2003 | Hearing on Interlocutory Injunction |
| May 25, 2004 | Hearing on Discovery and Other Issues |
| August 18, 2004 | Hearing on Temporary Restraining Order |
| September 1, 2004 | Hearing on Temporary Restraining Order |
| October 27, 2004 | Hearing on Motions for Summary Judgment |

2

JURISDICTION

The Supreme Court of Georgia, rather than the Court of Appeals, has jurisdiction of this appeal pursuant to O.C.G.A.§ 5-6-34(a)(4) and Article VI, Section VI, Paragraph III(2) of the Constitution of the State of Georgia.

Respectfully submitted this 3rd day of January, 2005.

                                        KING & SPALDING LLP

                                        _____
                                        Jameson B. Carroll
                                        Georgia Bar No. 112640
                                        Peter M. Crofton
                                        Georgia Bar No. 197122
                                        Robert C. Khayat, Jr.
                                        Georgia Bar No. 416981
                                        Gregory K. Smith
                                        Georgia Bar No. 658363

191 Peachtree Street
Atlanta, Georgia 30303
(404) 572-4600
(404) 572-5100 (fax)

                                        ATTORNEYS FOR VIISAGE
                                        TECHNOLOGY, INC.

3

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

DIGIMARC ID SYSTEMS, LLC,

      Plaintiff,

v.

GEORGIA TECHNOLOGY AUTHORITY and
the GEORGIA DEPARTMENT OF MOTOR
VEHICLE SAFETY,

      Defendants,

v.

VIISAGE TECHNOLOGY, INC., a Delaware
corporation,

      Necessary Party-Defendant

Civil Action No. 2003CV66498

## CERTIFICATE OF SERVICE

This is to certify I am on this day serving the foregoing **NOTICE OF APPEAL** upon the parties referenced below by causing a copy of the same to be deposited in the United States mail, first-class postage prepaid, addressed to:

John P. Hutchins
Troutman Sanders LLP
Suite 5200
600 Peachtree Street
Atlanta, GA 30308
(404) 885-3900 (facsimile)

John P. Gallagher
Catherine M. Banich
Stites & Harbison, PLLC
303 Peachtree Street, N.E.
2800 SunTrust Plaza
Atlanta, Georgia 30308
(404) 739-8870 (facsimile)

John B. Ballard, Jr.
Oscar B. Fears
Assistant Attorney General
Office of the Attorney General
40 Capitol Square SW
Atlanta, GA  30334-1300
(404) 657-3239 (facsimile)

4

This 3rd day of January, 2005.

One of the Attorneys for Defendant Viisage
Technology, Inc.

# Exhibit 27

Viisage | News & Events | Media Releases                                                                Page 1 of 2

# ViiSAGE 

| Company▸ | Products▸ | Services▸ | Solutions▹ | Customers▸ | Thought Leadership▸ | Partners▸ | News/Events▸ | Downloads▸ | Investors▸ |



You are here:  → Homepage → News/Events → **News Releases**

Search 

```
_____ go▸
```

Quick Links

☞ News Releases Archive

## Viisage News And Media Releases

+  Click here for current News Releases

**Viisage Issues Statement on Digimarc v. State of Georgia Case**

LITTLETON, Mass.--(BUSINESS WIRE)--Aug. 1, 2003--Viisage Technology, Inc. (Nasdaq: VISG), a leading provider of advanced technology for identity verification solutions, provided the following statement today regarding the preliminary injunction issued by a superior court in Fulton County, Georgia stopping work on Viisage's new drivers' license system in the state of Georgia scheduled to begin production later this month:

"Georgia has confirmed that our contract remains in place and we have pledged full support to our customer in its efforts to expeditiously dispense with Digimarc's claims," said Bernard Bailey, president and CEO, Viisage. "The unfortunate victims in this program delay are the citizens and taxpayers of Georgia."

In November 2002, Viisage was awarded a six-year contract to produce digital drivers' licenses based on the company's identity verification solutions. The injunction, granted by Fulton County Superior Court Judge Thelma Wyatt Cummings Moore, was sought by Digimarc ID Systems, which has taken legal action against the state of Georgia, alleging that the state did not comply with its own bid processes when selecting a vendor for the digital drivers' license program. The merits of Digimarc's claims against the state of Georgia are to be addressed in further court proceedings.

About Viisage Technology

Viisage Technology, Inc. (NASDAQ: VISG) is a leading provider of advanced technology for identity verification solutions. Viisage's facial recognition and secure document technologies are delivering real-world results today, helping governments, law enforcement agencies, and businesses verify identities, enhance security, reduce identity theft, provide access control, and protect personal privacy - all ensuring the safety of people, assets and information. Viisage products power the greatest number of identity verification applications on the market today. With over 2,500 installations worldwide, Viisage's solutions stand out as a result of our superior technology and understanding of customer needs.

This news release contains forward-looking statements that involve risks and uncertainties. Forward-looking statements in this document and those made from time to time by Viisage through its senior management are made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. Forward-looking statements concerning future plans or results are necessarily only estimates and actual results could differ materially from expectations. Certain factors that could cause or contribute to such differences include, among other things, potential fluctuations in quarterly results, the size and timing of award and performance on contracts, dependence on large contracts and a limited number of customers, lengthy sales and implementation cycles, changes in management estimates incident to accounting for contracts, availability and cost of key components, market acceptance of new or enhanced products and services, proprietary technology and changing

competitive conditions, system performance, management of growth, dependence on key personnel, ability to complete proposed transactions, ability to obtain project financing, general economic and political conditions and other factors affecting spending by customers and other risks, uncertainties and factors including those described from time to time in Viisage's filings with the Securities and Exchange Commission, including without limitation, Viisage's Form 10K for the year ended December 31, 2002 and its quarterly reports on Form 10Q.

```
CONTACT: PAN Communications
         Jerry Griffin, 978-474-1900
         viisage@pancomm.com
         or
         Viisage Technology, Inc.
         Jim Ebzery, 978-952-2200
         jebzery@viisage.com

SOURCE: Viisage Technology, Inc.
```

"Safe Harbor" Statement under the Private Securities Litigation Reform Act of 1995: Statements in this press release regarding Viisage's business which are not historical facts are "forward-looking statements" that involve risks and uncertainties. For a discussion of such risks and uncertainties, which could cause actual results to differ from those contained in the forward-looking statements, see "Risk Factors" in the Company's Annual Report or Form 10-K for the most recently ended fiscal year.

→   Click here for current News Releases

# Exhibit 28







| DIGITAL WATERMARKING | DRIVER LICENSES & SECURE ID | PATENT LICENSING | PARTNERS |



Home > About Digimarc > Press Room > Press Releases

> Press Room
   **Press Releases**
   Recognition and Awards
   Events
   RSS Feed

Public Policy

Management Team

Corporate Governance

Corporate Investors

Jobs

LOGIN     CONTACT US

**PRESS RELEASES**

**Court Grants Digimarc Request to Halt Implementation of a Replacement Driver License System in Georgia**

*Court grants a stay of Viisage's planned implementation of Georgia driver license system until trial occurs*

**Tualatin, OR – Aug. 1, 2003 –** Digimarc Corporation (NASDAQ: DMRC) today announced that the state court for Fulton County, Georgia has granted Digimarc's request for a preliminary injunction to preclude the state's Department of Motor Vehicle Services from continuing to work with Viisage Technology, Inc. (NASDAQ: VISG) to install a new driver license system for the state of Georgia.

After the state awarded a contract to Viisage on November 12, 2002, Digimarc filed a protest with the state shortly thereafter and later filed suit in Superior Court in March 2003 claiming that the state had violated its own procurement procedures and that Viisage was not a responsible bidder to whom the contract should have been awarded. With a specific finding made by the court after a full hearing that Digimarc had "made a compelling case that irregularities occurred during the procurement process" and demonstrated a substantial likelihood of success on the merits with a full trial, the court enjoined any further activities by the state in continuing to work with Viisage until a trial takes place for Digimarc's protest.

Under the state's contract with Viisage, Georgia was scheduled to begin using Viisage to issue licenses in August 2003. With the stay issued by the court, Digimarc will continue to provide its services under its existing contract for the Georgia driver license system until the matter is resolved.

"We are pleased with the court's ruling that if the case proceeds to a full trial on the merits, there is a substantial likelihood we will prevail," said Indra Paul, president of Digimarc ID Systems. "We have supported the state of Georgia's digital drivers license system since 1997 and are confident that our bid proposed the highest quality and most secure driver license system that represents the best value for the people of Georgia. We hope that this matter will be resolved in a manner that allows us to continue to deliver on our commitment to providing the highest levels of quality service and support to Georgia's Department of Motor Vehicle Services and its customers."

**About Digimarc**
Digimarc Corporation (NASDAQ: DMRC), based in Tualatin, Ore., is a leading supplier of digital watermarking and secure personal identification technologies and solutions used in a wide range of security, identification and digital media content applications.

Digimarc provides more than 60 million government-issued photo identification documents, including driver licenses, per year for 33 U.S. states and more than 24 countries. Digimarc's digital watermarking technology provides a persistent digital identity to all media content and enhances the security of financial documents, identity documents and digital images.

Digimarc has an extensive intellectual property portfolio, with 113 issued U.S. patents with more than 2,000 claims, and more than 350 pending patent applications in digital watermarking, personal identification and related technologies. The company is headquartered in Tualatin, Oregon, with

Case 1:05-cv-10438-MLW    Document 42-33    Filed 04/03/2006    Page 3 of 3

other U.S. offices in Burlington, Massachusetts; Fort Wayne, Indiana; San Francisco, California; and the Washington DC area; and European offices in London and Vienna. Please go to www.digimarc.com for more company information.

**Press Contacts**

Leslie Constans
Digimarc Public Relations
503-495-4568
lconstans@digimarc.com

Miz Nakajima
Revolution PR for Digimarc
503-335-7100
mizuha@revolutionpr.com

**Securities Safe Harbor**
*With the exception of historical information contained in this release, the matters described herein contain certain "forward-looking statements" that are made pursuant to the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995. These statements are based on management's current reasonable expectations and are subject to certain assumptions, risks, uncertainties and changes in circumstances. Actual results may vary materially from those expressed or implied from the statements herein or from historical results, due to changes in economic, business, competitive, technological and/or regulatory factors. More detailed information about these factors is set forth in filings by Digimarc with the Securities and Exchange Commission, including the most recent annual report on Form 10-K and the most recent quarterly report on Form 10-Q. Digimarc is not obligated to (and expressly disclaims any obligation to) revise or update any forward-looking statements in order to reflect events or circumstances, whether they arise as a result of new information, future events, or otherwise.*

RSS

# Exhibit 29

Table of Contents

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM 10-Q

☒     **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the Quarter Ended June 29, 2003.

OR

☐     **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the Transition Period from          to          .

Commission File Number 000-21559

# VIISAGE TECHNOLOGY, INC.
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **04-3320515** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **30 Porter Road, Littleton, MA** | **01460** |
| (Address of principal executive offices) | (Zip Code) |

**(978) 952-2200**
Registrant's telephone number, including area code

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    ☒ Yes   ☐ No

Indicate by a check mark whether the Registrant is an accelerated filer (as defined in Rule 12b-2 of the Exchange Act)    ☐ Yes    ☒ No

Indicate the number of shares outstanding of each of the registrant's classes of common stock, as of the latest practicable date.

| Class | Outstanding at August 11, 2003 |
|---|---|
| Common stock, $.001 par value | 20,360,840 |

Table of Contents

VIISAGE TECHNOLOGY, INC.

FORM 10 – Q FOR THE QUARTER ENDED JUNE 29, 2003

INDEX

| | | Page |
|---|---|---|
| Facing Sheet | | 1 |
| Index | | 2 |
| **PART I—** | **FINANCIAL INFORMATION** | |
| Item 1— | Financial Statements | |
| | Consolidated Balance Sheets as of June 29, 2003 and December 31, 2002 | 3 |
| | Consolidated Statements of Operations for the three and six months ended June 29, 2003 and June 30, 2002 | 4 |
| | Consolidated Statements of Cash Flows for the six months ended June 29, 2003 and June 30, 2002 | 5 |
| | Notes to Financial Statements | 6 |
| Item 2— | Management's Discussion and Analysis of Financial Condition and Results of Operations | 12 |
| Item 3— | Quantitative and Qualitative Disclosures about Market Risk | 22 |
| Item 4— | Controls and Procedures | 22 |
| **PART II—** | **OTHER INFORMATION** | |
| Item 1— | Legal Proceedings | 23 |
| Item 2— | Changes in Securities and use of Proceeds | 23 |
| Item 3— | Defaults Upon Senior Securities | 23 |
| Item 4— | Submission of Matters to a Vote of Security Holders | 23 |
| Item 5— | Other Information | 23 |
| Item 6— | Exhibits and Reports on Form 8-K | 23 |
| **SIGNATURES** | | 24 |
| **CERTIFICATIONS** | | 25 |

Table of Contents

ZN. As consideration for the shares of ZN, we will pay approximately $13,000 in cash and issue an aggregate of 6,360,000 shares of our common stock, of which 5,221,454 shares will be issued directly to the ZN shareholders and 1,138,546 shares will be reserved for issuance under ZN's option plan, which we will assume upon the closing of the acquisition. The acquisition is expected to be completed in the third quarter of 2003 and is subject to approval by our stockholders.

## 7.  SUBSEQUENT EVENTS

On July 31, 2003 the superior court for Fulton County, Georgia issued a preliminary injunction stopping Georgia's Department of Motor Vehicle Safety from continuing to work with us to install a new drivers' license system for the state of Georgia. This injunction is the result of a law suit filed in March 2003 by one of our competitors, Digimarc Corporation. The suit claims that the Department of Motor Vehicle Safety did not comply with its own bid process when selecting a vendor for the digital drivers' license program. The merits of Digimarc Corporation's claims against the Department of Motor Vehicle Safety are to be addressed in further court proceedings. The Department of Motor Vehicle Safety has confirmed that our contract with them remains in place.

11

# Exhibit 30

10-K 1 d10k.htm FORM 10-K

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM 10-K

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

    **For the Fiscal Year Ended December 31, 2003**

<div align="center">OR</div>

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

    **For the Transition Period from          to          .**

<div align="center">Commission File Number 000-21559</div>

# VIISAGE TECHNOLOGY, INC.
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware**<br>(State or other jurisdiction of incorporation or organization) | **04-3320515**<br>(I.R.S. Employer Identification No.) |
| **30 Porter Road, Littleton, MA**<br>(Address of principal executive offices) | **01460**<br>(Zip Code) |

**Registrant's telephone number, including area code: (978)-952-2200**

**Securities registered pursuant to Section 12(b) of the Act: None**

**Securities registered pursuant to section 12(g) of the Act: Common Stock $.001 par value**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    ☒ Yes    ☐ No

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference into Part III of this Form 10-K or any amendment to this Form 10-K.    ☐

Indicate by a check mark whether the Registrant is an accelerated filer (as defined in Exchange Act Rule 12b-2).    ☐ Yes    ☒ No

The aggregate market value of the voting stock held by nonaffiliates of the registrant as of June 29, 2003, was approximately $70 million.

As of March 25, 2004, the registrant had 35,623,844 shares of Common Stock outstanding.

### DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's definitive Proxy Statement for the Annual Meeting of Shareholders to be held on May 20, 2004 are incorporated by reference in Part III of this Annual Report on Form 10-K.

Table of Contents

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| Facing Sheet |  | 1 |
| Table of Contents |  | 2 |

### PART I

| Item 1 | Business | 3 |
| Item 2 | Properties | 14 |
| Item 3 | Legal Proceedings | 15 |
| Item 4 | Submission of Matters to a Vote of Security Holders | 15 |

### PART II

| Item 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 16 |
| Item 6 | Selected Financial Data | 17 |
| Item 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 18 |
| Item 7A | Quantitative and Qualitative Disclosures about Market Risk | 42 |
| Item 8 | Financial Statements and Supplementary Data | 43 |
| Item 9 | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 69 |
| Item 9A | Controls and Procedures | 69 |

### PART III

| Item 10 | Directors and Executive Officers of the Registrant | 69 |
| Item 11 | Executive Compensation | 69 |
| Item 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 69 |
| Item 13 | Certain Relationships and Related Transactions | 70 |
| Item 14 | Principal Accountant Fees and Services | 70 |

### PART IV

| Item 15 | Exhibits, Financial Statement Schedules, and Reports on Form 8-K | 70 |
| SIGNATURES |  | 75 |

2

Table of Contents

rent at the new facility until December 5, 2004. We expect to use this property for corporate, administrative, research and development, customer support and other general business needs. While we believe that this new facility will be adequate to meet our immediate needs, it may become necessary to secure additional space in the future to accommodate any future growth. We believe that such additional space will be available as needed in the future on commercially reasonable terms. With the exception of our principal executive office lease, we have no material operating leases.

### Item 3. *Legal Proceedings*

On July 31, 2003 the superior court for Fulton County, Georgia issued a preliminary injunction prohibiting Georgia's Department of Motor Vehicle Safety from continuing to work with us to install a new drivers' license system for the State of Georgia. This injunction is the result of a lawsuit filed in March 2003 by one of our competitors, Digimarc ID Systems, LLC. The suit claims that the Department of Motor Vehicle Safety did not comply with its own bid process when selecting a vendor for the digital drivers' license program. The merits of Digimarc's claims against the Department of Motor Vehicle Safety are to be addressed in further court proceedings. The Department of Motor Vehicle Safety has confirmed that our contract with them remains in place. However, if the lawsuit is successful and we lose the contract, we could lose up to $19.7 million in revenue that we expected to recognize over the next five and one-half years. In addition, although we expect that the Department of Motor Vehicle Safety would be required to reimburse us for our costs incurred under the contract, if we are unable to obtain reimbursement of those costs, we could be required to recognize a loss of up to approximately $5 million for costs incurred to date on the Georgia contract.

We are not aware of any other legal matters that could have a material adverse effect on our business, financial condition or results of operations.

### Item 4. *Submission of Matters to a Vote of Security Holders*

There were no matters submitted to a vote of security holders in the fourth quarter of 2003.

Table of Contents

**Litigation involving our contract with Georgia could result in the cancellation of that contract which could cause us to lose $19.7 million in revenues over the next 5.5 years and could result in a loss of up to $5 million.**

In July 2003, a Georgia court issued a preliminary injunction prohibiting Georgia's Department of Motor Vehicle Safety from continuing to work with us to install the State's new driver's license system. The injunction is the result of a lawsuit filed in March 2003 by one of our competitors alleging that that the Department of Motor Vehicle Safety did not comply with its own bid process when it selected a vendor for its digital drivers' license program. The merits of the lawsuit are to be addressed in further court proceedings. The Department of Motor Vehicle Safety has confirmed that its contract with us remains in place. However, if the lawsuit is successful and Viisage loses the contract, we could lose up to $19.7 million in revenue that we expected to recognize over the next 5.5 years. In addition, although Viisage expects that the Department of Motor Vehicle Safety would be required to reimburse Viisage for its costs incurred under the contract, if Viisage is unable to obtain reimbursement of those costs, Viisage could recognize a loss of up to approximately $5 million for costs incurred to date on the Georgia contract.

**The adoption of EITF 00-21 resulted in a non-cash adjustment of $12.1 million and may have an adverse effect on our results of operations in the near term, which may depress the market price of our common stock.**

During the third quarter of 2003, we adopted the provisions of Emerging Issues Task Force 00-21, *Accounting for Revenue Arrangements with Multiple Deliverables*, or EITF 00-21, on a cumulative basis as of January 1, 2003. After discussions with the Securities and Exchange Commission staff regarding the effect of EITF 00-21 on revenue recognition on our secure credentials contracts, we decided to adopt EITF 00-21 via cumulative catch-up as of January 1, 2003 rather than prospectively as reflected in the previously filed Form 10-Q for the quarter ended September 28, 2003. The adoption of EITF 00-21 resulted in a non-cash adjustment reported as a cumulative effect of a change in accounting principle of $12.1 million. The adoption of EITF 00-21 affects the timing of revenue recognition under our secure credentials contracts and as a result we may report reduced revenue and an increased net loss for one or more of our fiscal quarters in 2004. This effect on our results of operations could cause our stock price to decline.

**Our strategy of expanding our face recognition business could adversely affect our business operations and financial condition.**

Part of our strategy is to enhance our leadership in face recognition technology and to expand our operations within our facial recognition business segment. Pursuing this strategy involves risks. For instance, to date, face recognition security solutions have not gained widespread commercial acceptance. Some of the obstacles to widespread acceptance of face recognition security solutions include a perceived loss of privacy and public perceptions as to the usefulness of face recognition technologies. Whether the market for face recognition security solutions will expand will be dependent upon factors such as:

- the success of our marketing efforts and publicity campaigns and those of our competitors; and
- customer satisfaction with our products and services, as well as those of our competitors.

We do not know when, if ever, face recognition security solutions will gain widespread commercial acceptance. In addition, our face recognition business segment has not achieved profitability, and it may never achieve profitability.

**We face intense competition, which could result in lower revenues and higher research and development expenditures and could adversely affect our results of operations.**

The events of September 11, 2001 have heightened interest in the use of biometric security solutions, and we expect competition in this field, which is already substantial, to intensify. Competitors are developing and bringing to market biometric security solutions that use face recognition as well as eye, fingerprint and other

36

# Exhibit 31



# ViiSAGE

Company ▸   Products ▸   Services ▸   Solutions ▸   Customers ▸   Thought Leadership ▸   Partners ▸   News/Events ▸   Downloads ▸   Investors ▸



You are here: → Homepage → News/Events → **News Releases**

Search 

go

Quick Links

✈ News Releases Archive

## Viisage News And Media Releases

→ Click here for current News Releases

### Viisage Takes Initiative to Help End Stalemate in Georgia Drivers' License Contract Dispute

Viisage to receive $2.5 million payment; New request for proposals to be issued by Georgia Department of Motor Vehicle Safety

BILLERICA, Mass., Jul 21, 2004 (BUSINESS WIRE) -- Viisage (Nasdaq: VISG), a leading provider of advanced technology identity solutions, today announced that the Company has taken decisive action to resolve the continuing stalemate over the implementation of the State of Georgia drivers' license contract. Under the terms of the agreement with the Georgia Department of Motor Vehicle Safety (DMVS), Viisage will receive a settlement of $2.5 million as reimbursement for work completed on the drivers' license contract awarded to Viisage in November 2002. This settlement terminates the current Georgia DMVS contract with Viisage. The agency has confirmed that it intends to file a motion to dismiss the lawsuit initiated by a Viisage competitor contesting the contract award. The Georgia DMVS also has confirmed that it plans to issue a new request for proposals for a new drivers' license system as soon as possible and no later than the end of October 2004.

"The State of Georgia Department of Motor Vehicle Safety has a responsibility to protect its citizens from identity-related crimes. Recognizing that the State has been unable to fulfill this responsibility for the past year due to the litigation, we chose to take a proactive step to help resolve this issue. Viisage and the State agreed that for the benefit of both our constituents, it was best to terminate our contract, settle final payments and enable the State to issue a request for proposals for a new contract," said Bernard Bailey, president and CEO of Viisage. "This is an amicable agreement with a valued customer on a contract that we believe was appropriately awarded to Viisage. We fully intend to compete for the new contract and are confident that, if re-awarded the contract, our advanced technology identity solutions would successfully fulfill the Georgia DMVS's needs for a state-of-the art solution."

The cash payment of $2.5 million will be received in the third quarter of 2004 and recognized on Viisage's balance sheet at that time. Of this payment, $2 million covers work performed by Viisage under the drivers' license contract, and the remaining $500,000 balance reflects the purchase by the State of certain assets that Viisage acquired specifically for the deployment of the Georgia solution. This settlement is expected to end the substantial and escalating legal costs that Viisage has been incurring over the past year. Also, had this settlement been negotiated during the second quarter, the Company's backlog at June 27, 2004 would have been $151 million rather than $171 million which included the Georgia contract.

About Viisage

Viisage (NASDAQ: VISG) delivers advanced technology identity solutions for governments, law enforcement agencies and businesses concerned with enhancing security, reducing identity theft, and protecting personal privacy. Viisage creates solutions using secure

credentials and face recognition technologies that quickly, reliably, and accurately identify individuals. With over 3,000 installations worldwide, Viisage's identity solutions stand out as a result of the Company's industry-leading technology and unique understanding of customer needs.

This news release contains forward-looking statements that involve risks and uncertainties. Forward-looking statements in this document and those made from time to time by Viisage through its senior management are made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995, as amended. Forward-looking statements concerning future plans or results are necessarily only estimates and actual results could differ materially from expectations. Certain factors that could cause or contribute to such differences include, among other things, the size and timing of contract awards, performance on contracts, availability and cost of key components, unanticipated results from audits of the financial results of acquired companies, changing interpretations of generally accepted accounting principles, outcomes of government reviews, potential fluctuations in quarterly results, dependence on large contracts and a limited number of customers, lengthy sales and implementation cycles, market acceptance of new or enhanced products and services, proprietary technology and changing competitive conditions, system performance, management of growth, dependence on key personnel, ability to obtain project financing, general economic and political conditions and other factors affecting spending by customers, the unpredictable nature of working with government agencies and other risks, uncertainties and factors including those described from time to time in Viisage's filings with the Securities and Exchange Commission, including without limitation, Viisage's Form 10-K for the year ended December 31, 2003 and its quarterly reports on Form 10-Q. Viisage undertakes no obligation to update any forward-looking statements.

SOURCE: Viisage

Viisage
Bill Aulet, 978-932-2424
aulet@viisage.com

"Safe Harbor" Statement under the Private Securities Litigation Reform Act of 1995: Statements in this press release regarding Viisage's business which are not historical facts are "forward-looking statements" that involve risks and uncertainties. For a discussion of such risks and uncertainties, which could cause actual results to differ from those contained in the forward-looking statements, see "Risk Factors" in the Company's Annual Report or Form 10-K for the most recently ended fiscal year.

→   Click here for current News Releases

# Exhibit 32

Table of Contents

As filed with the Securities and Exchange Commission on July 22, 2004

Registration No. 333-116698

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# Amendment No. 1
# to
# FORM S-3

### REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933

# Viisage Technology, Inc.
#### (Exact name of registrant as specified in its charter)

**Delaware**
**(State of incorporation)**

**04-3320515**
**(I.R.S. Employer Identification No.)**

296 Concord Road, Third Floor, Billerica, MA 01821, (978) 932-2200
**(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)**

Bernard C. Bailey
Chief Executive Officer
Viisage Technology, Inc., 296 Concord Road, Third Floor, Billerica, MA 01821, (978) 932-2200
**(Name, address, including zip code, and telephone number, including area code, and address of agent for service)**

*Copies to:*

| | | |
|---|---|---|
| Elliot J. Mark, Esq. | David M. McPherson, Esq. | Gerald S. Tanenbaum, Esq. |
| Viisage Technology, Inc. | Latham & Watkins LLP | Cahill Gordon & Reindel LLP |
| 296 Concord Road | 555 Eleventh Street, N.W. | 80 Pine Street |
| Third Floor | Suite 1000 | New York, NY 10005 |
| Billerica, MA 01821 | Washington, D.C. 20004 | Telephone: (212) 701-3000 |
| Telephone: (978) 932-2200 | Telephone: (202) 637-2200 | Telecopy: (212) 269-5420 |
| Telecopy: (978) 932-2218 | Telecopy: (202) 637-2201 | |

**Approximate date of commencement of proposed sale to public:**   From time to time, after this registration statement becomes effective.

If the only securities being registered on this Form are being offered pursuant to dividend or interest reinvestment plans, please check the following box. ☐

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, as amended, or the Securities Act, other than securities offered only in connection with dividend or interest reinvestment plans check the following box. ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If delivery of the prospectus is expected to be made pursuant to Rule 434, please check the following box. ☐

### Calculation of Registration Fee

| Title of each class of securities to be registered | Amount to be registered | Proposed maximum offering price per unit | Proposed maximum aggregate offering price | Amount of registration fee |
|---|---|---|---|---|
| Common Stock | 7,500,000 shares | $9.21 | $69,075,000 | $ 8,751.81(1) |
| Common Stock | 1,125,000 shares(2) | $6.49(3) | $ 7,301,250 | $ 925.07 |

(1) Previously paid.

(2) Represents shares to be purchased upon exercise by the underwriters of their over-allotment option.
(3) Estimated pursuant to Rule 457(c) under the Securities Act solely for the purpose of calculating the registration fee, based upon the average of the high and low sale prices of our common stock on July 19, 2004 on the Nasdaq National Market.

---

**The registrant hereby amends this registration statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this registration statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until the registration statement shall become effective on such date as the Commission acting pursuant to said Section 8(a), may determine.**

Table of Contents

The information is this prospectus is not complete and may be changed. We may not sell these securities until the registration statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offer to sell these securities and is not soliciting an offer to buy these securities in any state where the offer or sale is not permitted.

PRELIMINARY PROSPECTUS
Subject to completion, dated July 22, 2004



## 7,500,000 Shares of Common Stock

We are offering 7,200,000 shares of our common stock, par value $0.001 per share. We will receive all of the net proceeds from the sale of such common stock. The selling shareholders identified in this prospectus are selling an additional 300,000 shares of our common stock. We will not receive any of the proceeds from the sale of the shares by the selling shareholders.

Our common stock is listed on the Nasdaq National Market under the symbol "VISG." The last reported sale price of our common stock on July 20, 2004 was $7.16 per share.

**Investing in our common stock involves a high degree of risk. Before buying any of these shares of our common stock, you should carefully consider the risk factors described in " Risk Factors" beginning on page 7 of this prospectus.**

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or passed upon the adequacy or accuracy of this prospectus. Any representation to the contrary is a criminal offense.

|  | Per share | Total |
|---|---|---|
| Public offering price | $ | $ |
| Underwriting discounts and commissions | $ | $ |
| Proceeds, before expenses, to us | $ | $ |
| Proceeds to selling shareholders, before expenses | $ | $ |

The underwriters may also purchase up to an additional 525,000 shares of our common stock from us and up to an additional 600,000 shares from the selling shareholders at the public offering price, less the underwriting discounts and commissions payable by us and the selling shareholders, to cover overallotments, if any, within 30 days from the date of this prospectus. If the underwriters exercise the option in full, the total underwriting discounts and commissions payable by us will be $      and the total proceeds, before expenses, to us will be $      .

The underwriters are offering the shares of our common stock as described in "Underwriting." Delivery of the shares will be made on or about          , 2004.

**JPMorgan**                                              **UBS Investment Bank**

**Piper Jaffray**

**JMP Securities**          **Janney Montgomery Scott LLC**          **Roth Capital Partners**

## Table of Contents

You should rely only on the information contained or incorporated by reference in this prospectus. We have not authorized anyone to provide information different from that contained or incorporated by reference in this prospectus. Neither the delivery of this prospectus nor the sale of shares of common stock means that information contained or incorporated by reference in this prospectus is correct after the date of this prospectus. These documents do not constitute an offer to sell or solicitation of an offer to buy in any jurisdiction where offers or sales are not permitted. In this prospectus, "Viisage," "we," "our," "us," and "the Company" refer to Viisage Technology, Inc. and its consolidated subsidiaries, unless the context otherwise requires.

<p align="center"><strong>Prospectus</strong></p>

| | |
|---|---|
| Forward-Looking Statements | ii |
| Prospectus Summary | 1 |
| Risk Factors | 7 |
| Use of Proceeds | 18 |
| Dilution | 19 |
| Capitalization | 20 |
| Price Range of Common Stock | 21 |
| Dividend Policy | 21 |
| Selected Consolidated Financial Data | 22 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 24 |
| Business | 42 |
| Management | 53 |
| Principal and Selling Shareholders | 55 |
| Description of Capital Stock | 57 |
| Underwriting | 60 |
| Where You Can Find More Information | 63 |
| Legal Matters | 64 |
| Experts | 64 |
| Index to Consolidated Financial Statements | F-1 |

Our trademarks, service marks and trade names include Viisage, Viisage Technology, FaceEXPLORER, FaceTOOLS, FaceFINDER, FacePASS and SensorMast. This prospectus also contains trademarks, service marks, copyrights and trade names of other companies.

<p align="center">i</p>

Table of Contents

## RISK FACTORS

*You should carefully consider the following risk factors and all other information contained in this prospectus before investing in shares of our common stock. Investing in our common stock involves a high degree of risk. If any of the following risks actually occurs, our business, financial condition and results of operations could be materially and adversely affected. In that event, the trading price of our common stock could decline and you may lose part or all of your investment.*

### Risks Related to Viisage and the Industry

#### We have a history of operating losses.

We have a history of operating losses. Our business operations began in 1993 and, except for fiscal years 1996 and 2000, have resulted in net losses in each fiscal year. At March 28, 2004, we had an accumulated deficit of approximately $43.7 million. We will continue to invest in the development of our secure credential provisioning capabilities, biometric technologies and other components of advanced technology identity solutions. Accordingly, we cannot predict when or if we will ever achieve profitability.

#### We may be unable to obtain additional capital required to fund our operations and finance our growth.

The installation of our secure identification solutions requires significant capital expenditures. Furthermore, the continued development of our biometric and other advanced technologies will require additional capital. Although we have been successful in the past in obtaining financing for working capital and capital expenditures, including a $15 million private placement of our common stock in September 2003 and January 2004 and a new loan agreement with Commerce Bank and Trust Company in February 2004, we will have ongoing capital needs as we expand our business. We may be unable to obtain additional funds in a timely manner or on acceptable terms, which would render us unable to fund our operations or expand our business. If we are unable to obtain capital when needed, we may have to restructure our business or delay or abandon our development and expansion plans.

#### We derive over 90% of our revenue from government contracts, which are often non-standard, involve competitive bidding, may be subject to cancellation with or without penalty and may produce volatility in earnings and revenue.

More than 90% of our business involves providing products and services under contracts with U.S. federal, state and local government agencies and foreign government agencies. Obtaining contracts from government agencies is challenging, and government contracts often include provisions that are not standard in private commercial transactions. For example, government contracts may:

- include provisions that allow the government agency to terminate the contract without penalty under some circumstances;
- be subject to purchasing decisions of agencies that are subject to political influence;
- contain onerous procurement procedures and
- be subject to cancellation if government funding becomes unavailable.

Foreign government contracts generally include comparable provisions relating to termination for the convenience of the relevant foreign government. Securing government contracts can be a protracted process involving competitive bidding. In many cases, unsuccessful bidders may challenge contract awards, which can lead to increased costs, delays and possible loss of the contract for the winning bidder.

7

Table of Contents

**We derive a significant portion of our revenue from a few customers, the loss of which could have an adverse effect on our revenues.**

For the three-month period ended March 28, 2004, the U.S. Department of State, accounted for 13% of our revenue. For the year ended December 31, 2003, the Pennsylvania Department of Transportation and the Office of the Illinois Secretary of State, each accounted for 13% of our revenues. The U.S. Department of Justice has recently issued an indictment against former Governor of Illinois George Ryan and an updated indictment against former lobbyist Lawrence E. Warner on bribery and related federal racketeering charges. We had a formal consultative relationship with Mr. Warner's firm pursuant to which we paid that firm fees of approximately $800,000. Upon learning of the initial indictment of Mr. Warner in 2002, we immediately terminated our contract and relationship with Mr. Warner and his firm. There has been no assertion of any impropriety on our part.

For 2002, Connecticut Department of Information Technology and Mississippi Department of Information Technology Services, accounted for 10% and 12% of our revenues, respectively and an aggregate of 22% of our revenue. For 2001, Illinois Secretary of State, Unisys Corporation (Florida Department of Safety and Motor Vehicles), Kentucky Transportation Cabinet and Pennsylvania Department of Transportation, accounted for 10%, 12%, 14% and 13% of our revenue, respectively and an aggregate of 49% of our revenue. Since a small number of customers under our drivers' license contracts account for a substantial portion of our revenues, the loss of any of our significant customers would cause revenue to decline and could have a material adverse effect on our business.

**We derive revenue from only a limited number of products and services and we do not have a diversified product or service base.**

Substantially all of our revenues are derived from the sale of products and services comprising our identity solutions. We anticipate that substantially all of the growth in our revenue, if any, will also be derived from these sources. If for any reason our sale of these products or services is impeded, and we have not diversified our product and service offerings, our business and results from operations could be harmed.

**Loss of limited source suppliers may result in delays or additional expenses.**

We obtain certain hardware components and complete products from a limited group of suppliers. In particular, we obtain all of the printers and consumables for the U.S. Department of State passport contract and the Department of Defense, or DoD, Common Access Card, or CAC, contract from Toppan Printing Co. Ltd. Our reliance on these suppliers involves significant risks, including reduced control over quality and delivery schedules. Moreover, any financial instability of our manufacturers or contractors could result in our having to find new suppliers. We may experience significant delays in manufacturing and shipping our products to customers if we lose these sources or if supplies from these sources are delayed. As a result, we may be required to incur additional development, manufacturing and other costs to establish alternative sources of supply. It may take several months to locate alternative suppliers, if required, or to re-tool our products to accommodate components from different suppliers. We cannot predict if we will be able to obtain replacement components within the time frames we require at an affordable cost, or at all. Any delays resulting from suppliers failing to deliver components or products on a timely basis, in sufficient quantities and of sufficient quality or any significant increase in the price of components from existing or alternative suppliers could have a severe negative impact on our business, financial condition and results of operations.

**Termination of our contract with Georgia could cause us to lose $19.7 million in projected revenues over the next five and one-half years and could negatively affect our earnings.**

In July 2003, a Georgia court issued a preliminary injunction prohibiting Georgia's Department of Motor Vehicle Safety from continuing to work with us to install the State's new drivers' license system. The injunction is the result of a lawsuit filed in March 2003 by one of our competitors alleging that the Department of Motor Vehicle Safety did not comply with its own bid process when it selected a vendor for its new digital drivers' license program. In July 2004, we reached a settlement agreement with the State pursuant to which the Department of Motor Vehicle Safety terminated the contract for convenience and agreed to pay us $2.0 million in cash and the State agreed to

8

Table of Contents

purchase certain equipment from us for $500,000. The Department of Motor Vehicle Safety has filed a motion with the Georgia court to dismiss the case based upon the termination of the contract. The agency also has filed an affidavit stating that it intends to issue a new request for proposals for a digital drivers' license system before the end of October 2004. As a result of the termination of the contract, we will lose up to $19.7 million in revenue that we expected to recognize over the next five and one-half years, which was included in our $176 million of backlog at March 28, 2004, unless we are able to win the new contract for the digital drivers' license system and the revenues from such new contract are substantially similar to the terminated contract. While we believe we can utilize the remaining $2.8 million in assets being retained by us from the Georgia contract either in Georgia, if we win the contract based on the new request for proposals, or on alternative projects, to the extent that we are unable to utilize these assets or realize value through a sale of these assets, we would be required to take a charge to earnings.

### Our strategy of expanding our face recognition business could adversely affect our business operations and financial condition.

Part of our strategy is to enhance our leadership in face recognition technology and to expand our operations within our biometrics business segment. Pursuing this strategy involves risks. For instance, to date, face recognition security solutions have not gained widespread commercial acceptance. Some of the obstacles to widespread acceptance of face recognition security solutions include a perceived loss of privacy and public perceptions as to the usefulness of face recognition technologies. Whether the market for face recognition security solutions will expand will be dependent upon factors such as:

- the success of our marketing efforts and publicity campaigns and those of our competitors and
- customer satisfaction with our products and services, as well as those of our competitors.

We do not know when, if ever, face recognition security solutions will gain widespread commercial acceptance. In addition, our biometrics business segment has not achieved profitability, and it may never achieve profitability.

### We face intense competition, which could result in lower revenues and higher research and development expenditures and could adversely affect our results of operations.

The events of September 11, 2001 have heightened interest in the use of security solutions, and we expect competition in this field, which is already substantial, to intensify. We face competition in the secure credentials market from suppliers of drivers' licenses, passports, smart cards and other government-issued credentials. Competitors in biometrics are developing and bringing to market products that use face recognition as well as eye, fingerprint and other forms of biometric verification. Our products also will compete with non-biometric technologies such as certificate authorities and traditional keys, cards, surveillance systems and passwords. Widespread adoption of one or more of these technologies or approaches in the markets we intend to target could significantly reduce the potential market for our systems and products. Many of our competitors have significantly more cash and resources than we have. Our competitors may introduce products that are competitively priced, have increased performance or functionality or incorporate technological advances that we have not yet developed or implemented. To remain competitive, we must continue to develop, market and sell new and enhanced systems and products at competitive prices, which will require significant research and development expenditures. If we do not develop new and enhanced products or if we are not able to invest adequately in our research and development activities, our business, financial condition and results of operations could be negatively impacted.

### Unless we keep pace with changing technologies, we could lose customers and fail to win new customers.

Our future success will depend upon our ability to develop and introduce a variety of new products and services and enhancements to these new products and services in order to address the changing needs of the marketplace. We may not be able to accurately predict which technologies customers will support. If we do not introduce new products, services and enhancements in a timely manner, if we fail to choose correctly among technical alternatives or if we fail to offer innovative products and services at competitive prices, customers may forego purchases of our products and services and purchase those of our competitors.

9

# Exhibit 33

Digimarc Corporation : Digimarc Receives Favorable Ruling in Georgia Driver License Case    Page 1 of 2

   

Home > About Digimarc > Press Room > Press Releases

## PRESS RELEASES

> **Press Room**
> **Press Releases**
> Recognition and Awards
> Events
> RSS Feed

Public Policy

Management Team

Corporate Governance

Corporate Investors

Jobs

 LOGIN    CONTACT US

### Digimarc Receives Favorable Ruling in Georgia Driver License Case

**Tualatin, OR – Sept. 14, 2004 –** Digimarc Corporation (NASDAQ: DMRC) today announced that the Fulton County Superior Court in Georgia has continued until further order a previously issued restraining order in the Georgia driver license contract case. The order precludes the $2.5 million payment that Viisage Technology, Inc. (NASDAQ: VISG) recently announced it would receive in connection with a purported settlement of the litigation and termination of an alleged contract granted to it in 2002 by Georgia.

Among other things, the Court's ruling noted that:

- Any such payment to Viisage would violate the ongoing 2003 preliminary injunction it had previously issued, which precluded Georgia's Department of Motor Vehicle Safety and the Georgia Technology Authority from any activities related to the implementation or performance of the Viisage contract;
- Digimarc had "made a compelling case that irregularities occurred during the procurement process, and if the case proceeds to a full trial on the merits, there is a substantial likelihood that the Plaintiff will prevail."; and
- If Digimarc prevails in this case, the contract at issue between the Georgia DMVS and Viisage may be deemed null and void on the basis of having been awarded in violation of applicable procurement laws and rules.

The parties will continue to prepare the case for a trial, which is not expected to occur until sometime in 2005.

For the complete text of the Court's order, click here.

**About Digimarc**
Digimarc Corporation (NASDAQ: DMRC), based in Tualatin, Oregon, is a leading supplier of secure media solutions used in a wide range of security, identification and digital media content applications. Digimarc provides products and services that enable production of more than 60 million personal identification documents and driver licenses per year in 32 U.S. states and the District of Columbia and more than 20 countries. Digimarc's digital watermarking technology provides a persistent digital identity for various media content and is used to enhance the security of financial documents, identity documents and digital images, and support other media rights management applications.

Digimarc has an extensive intellectual property portfolio, with 174 issued U.S. patents with more than 3,000 claims, and more than 350 pending patent applications in digital watermarking, personal identification and related technologies.

The company is headquartered in Tualatin, Oregon, with other U.S. offices in Burlington, Massachusetts; Fort Wayne, Indiana; San Francisco, California; and the Washington DC area; and European offices in London.

**Securities Safe Harbor**
With the exception of historical information contained in this release, the matters described herein

contain certain "forward-looking statements" that are made pursuant to the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995. These statements are based on management's current reasonable expectations and are subject to certain assumptions, risks, uncertainties and changes in circumstances. Actual results may vary materially from those expressed or implied from the statements herein or from historical results, due to changes in economic, business, competitive, technological and/or regulatory factors. More detailed information about these factors is set forth in filings by Digimarc with the Securities and Exchange Commission, including the most recent annual report on Form 10-K and the most recent quarterly report on Form 10-Q. Digimarc is not obligated to (and expressly disclaim any obligation to) revise or update any forward-looking statements in order to reflect events or circumstances, whether they arise as a result of new information, future events, or otherwise.

Copyright © 1995 - 2006 Digimarc Corporation. All rights reserved.



# Exhibit 34



## ViiSAGE

| Company▸ | Products▸ | Services▸ | Solutions▸ | Customers▸ | Thought Leadership▸ | Partners▸ | News/Events▸ | Downloads▸ | Investors▸ |



You are here: → Homepage → News/Events → **News Releases**

Search 

# Viisage News And Media Releases

⟶ Click here for current News Releases

**Viisage Reports Record Results for Third Quarter 2004; Revenues increase 97% and Company increases guidance for 2004**

BILLERICA, Mass.--(BUSINESS WIRE)--Oct. 25, 2004--Viisage (NASDAQ: VISG), a leading provider of advanced technology identity solutions, today announced results for the third quarter ended September 26, 2004.

Revenues for the third quarter of 2004 totaled $19.91 million, marking the fifth consecutive quarter in which revenues set a Company record, up 97% from $10.11 million in the comparable period last year, as reported in accordance with the change in accounting principle described below. The net income for the third quarter of 2004 was $198,000, or $0.00 on a basic and diluted share basis, compared to a net loss of $389,000, or $0.02 per basic and diluted share, for the third quarter of 2003. The Company's third quarter results do not reflect any contribution from the recent acquisition of Imaging Automation (iA); financial results for iA and Viisage will be combined from October 5, 2004, the date the transaction was completed.

On December 30, 2003, Viisage adopted new accounting rule EITF 00-21, "Accounting for Revenue Arrangements with Multiple Deliverables," which pertains to revenue recognition for certain long-term contracts, such as Viisage's state drivers' licenses, retroactive to January 1, 2003.

"Viisage made important progress, financially and operationally, during the third quarter, as we expanded our product suite for identity solutions and produced a profitable quarter," said Bernard Bailey, president and CEO of Viisage. "We have greater traction with existing and prospective customers in a wide range of markets, and feel that we are well positioned to continue our growth. We were pleased with the reception given Viisage by the financial community despite the difficult market environment that existed during our recently completed follow-on offering, and plan to use the proceeds to further build our market leadership in identity solutions. With the addition of critical proofing and document authentication capabilities from iA, we are offering customers a comprehensive technology solution that truly addresses their needs."

Bailey concluded, "The Company's performance for the third quarter, combined with our accomplishments so far this quarter, give us the confidence to increase both our revenue and EBITDA guidance for 2004."

Bill Aulet, Viisage's chief financial officer, added, "Viisage continued to significantly improve its financial performance and strengthen its balance sheet in the past quarter while maintaining the necessary financial flexibility. Our strong revenue performance coupled with careful expense management enabled us to produce our first profitable quarter on a GAAP basis in several years. At the same time, our focus on growing EBITDA (earnings before interest, taxes, depreciation and amortization) proved successful as it increased to $3.4

million this past quarter, from $1.5 million in the same quarter last year. Lastly, we are pleased with the terms of our acquisition of Imaging Automation, since we believe this transaction will be accretive on a net income, EBITDA and EPS basis in 2005, and will help us continue to drive revenue and profit growth not only this year, but for many years to come."

```
Highlights for the third quarter of 2004:

--   Adding experienced Department of Defense executive Kenneth
     Scheflen as senior vice president of Federal Solutions group

--   Signing cooperation agreement with Siemens AG for 3-D face
     recognition technology development

--   Unveiling vision for new identity solutions product suite

--   Launching innovative Viisage PROOF(TM) product
```

Following the close of the quarter, Viisage announced the receipt of a contract valued at approximately $534,000 from the Ohio Department of Rehabilitation and Correction for a criminal identification system, as well as a new driver's license contract for Wisconsin, a contract extension for Maryland and expansion of face recognition solutions into existing driver's license contracts, all of the above totaling $10.91 million.

Separately, on October 5, 2004, Viisage announced the acquisition of privately-held Imaging Automation (iA), the industry and market leader in automated identity document authentication technologies. iA has more than 2,300 installations in 20 countries around the world.

```
Financial highlights for the third quarter of 2004:

--   Record revenues of $19.91 million

--   Company's first profitable quarter in three years, with net
     income of $198,000

--   Gross margin down slightly to 28% from 31% in the second
     quarter this year, reflecting product mix, and down from the
     record high 33% recorded in last year's third quarter

--   Generated EBITDA of $3.4 million, compared to $1.5 million in
     same quarter last year and $3.1 million in the second quarter
     of this year

--   Increased cash position at the end of the quarter from $12.62
     million to $37.36 million, reflecting successful completion of
     follow-on offering

--   Further improved the balance sheet by reducing outstanding
     debt from $29.8 million to $19.2 million, with an estimated
     annualized decrease in interest expense of approximately 20%

--   Backlog of $140 million, compared to $151 million last
     quarter
```

During the quarter, the Company completed the sale of 7.3 million shares of its common stock, along with approximately 425,000 shares of stock sold by certain shareholders, in an underwritten public offering. Net proceeds from the follow-on offering were approximately $37.9 million for the Company. Also during the quarter, Viisage proposed a settlement to the State of Georgia to resolve the ongoing litigation stalemate over the state's driver's license contract, awarded to Viisage in late 2002. The initiative entailed the termination of Viisage's contract, a payment to Viisage of $2.5 million and an agreement by the state to put the contract up for rebid later this year. This initiative is currently stalled following legal action taken by one of the Company's competitors in the state.

Total operating expenses for the third quarter of 2004 totaled $4.85 million, up slightly from

the prior quarter this year, and an increase from the $3.51 million reported in the comparable quarter last year, reflecting higher expenses following the acquisitions of ZN Vision Technologies and Trans Digital Technologies, legal costs from the litigation in Georgia and an increase in consulting costs related to a Sarbanes-Oxley compliance project. Sales and marketing expenses were $1.59 million, research and development totaled $896,000, and general and administrative expenses were $2.36 million. Total operating expenses in the same quarter last year included $1.24 million in sales and marketing costs, $946,000 in research and development and $1.33 million in general and administrative costs.

Financial Outlook for 2004

On the basis of its results for the nine months, Viisage is increasing its guidance for 2004, with annual revenue now anticipated to be between $66-68 million, increased from $60-63 million, and EBITDA anticipated to be between $11.5-12.5 million, increased from EBITDA of $11-12 million.

Nine Months Results

For the first nine months of 2004, revenues totaled a record $48.44 million, an increase of 79% from $27.05 million for the same period in 2003. The net loss for the first nine months of 2004 was $1.75 million, or $0.05 per basic and diluted share, compared to a net loss in the 2003 period of $4.13 million, or $0.20 per basic and diluted share, which excludes the impact of the one-time charge of $12.13 million or $0.59 per share that the Company recorded in connection with its change in accounting principle. Including that charge, the net loss for the first nine months of 2003 was $16.26 million, or $0.79 per basic and diluted share.

EBITDA

Viisage reports EBITDA as a financial performance measure and as a forecast of future performance. The Company calculates EBITDA by adding back to net earnings interest, taxes, depreciation and amortization. EBITDA is provided to investors as an additional performance gauge to results provided in accordance with generally accepted accounting principles (known as "GAAP"). Viisage's EBITDA should not be considered in isolation or as a substitute for comparable measures calculated and presented in accordance with GAAP. Viisage recently completed the acquisitions of ZN Vision Technologies, Trans Digital Technologies and Imaging Automation. While these acquisitions are expected to have a positive impact on Viisage's EBITDA for 2004, they also result in Viisage incurring significant non-cash charges for amortization of intangible assets that adversely affect Viisage's net income (loss) in 2004. Viisage believes that using EBITDA as a performance measure, together with operating income (loss) and net income (loss), will help investors better understand Viisage's underlying financial performance and ability to generate cash flow from operations. A reconciliation of GAAP to EBITDA earnings is included in the following tables:

|  | For the Quarter Ended | |
|  | Sept. 26, | Sept. 28, |
|  | 2004 | 2003 |
|  | (in thousands) | |
| Income (loss) before cumulative effect of change in accounting principle | $198 | $(389) |
| Add: | | |
| Depreciation and Amortization | 2,742 | 1,579 |
| Interest Expense, net | 411 | 276 |
| Taxes | 25 | -- |
| EBITDA | $3,376 | $1,466 |

Conference Call

Viisage will hold a conference call with the investment community to discuss these results on Tuesday, October 26, 2004, at 8:30 a.m. EDT. The call may be accessed via Webcast at the Company's Web site (www.viisage.com), 10 minutes prior to the start, or by calling 1-800-599-9816, confirmation code 54809725. Internationally, dial 1-617-847-8705 with the same confirmation code. A replay will be available as a Webcast, accessible on the Company's Web site, one hour after the completion of the call. In addition, the Company will also host a financial discussion with the investment community immediately after this call, with Chief Financial Officer Bill Aulet. This call may be accessed via Webcast at the Company's Web site (www.viisage.com), or by calling 1-800-299-9086, using confirmation code 23284444. Internationally, please dial 1-617-786-2903, using the same confirmation code. A replay of this call will also be available as a Webcast, accessible on the Company's Web site, beginning one hour after the completion of the call.

About Viisage

Viisage (NASDAQ: VISG) delivers advanced technology identity solutions for governments, law enforcement agencies and businesses concerned with enhancing security, reducing identity theft, and protecting personal privacy. Viisage creates solutions using secure credentials and face recognition technologies that quickly, reliably, and accurately identify individuals. With more than 3,000 installations worldwide, Viisage's identity solutions stand out as a result of the Company's industry-leading technology and unique understanding of customer needs.

This news release contains forward-looking statements that involve risks and uncertainties. Forward-looking statements in this document and those made from time to time by the Company through its senior management are made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. Forward-looking statements concerning future plans or results are necessarily only estimates and actual results could differ materially from expectations. Certain factors that could cause or contribute to such differences include, among other things, the size and timing of contract awards, performance on contracts, availability and cost of key components, unanticipated results from audits of the financial results of acquired companies, changing interpretations of generally accepted accounting principles, outcomes of government reviews, potential fluctuations in quarterly results, dependence on large contracts and a limited number of customers, lengthy sales and implementation cycles, market acceptance of new or enhanced products and services, proprietary technology and changing competitive conditions, system performance, management of growth, dependence on key personnel, ability to obtain project financing, general economic and political conditions and other factors affecting spending by customers, the unpredictable nature of working with government agencies and other risks, uncertainties and factors including those described from time to time in Viisage's filings with the Securities and Exchange Commission, including without limitation, Viisage's Form 10-K for the year ended December 31, 2003 and its quarterly reports on Form 10-Q. Viisage undertakes no obligation to update any forward-looking statements.

    -- Tables follow --

VIISAGE TECHNOLOGY, INC.
Consolidated Balance Sheets
(in thousands)
(Unaudited)

|  | Sept. 26, 2004 | Sept. 28, 2003 |
|---|---|---|
| Assets |  |  |
| Current assets: |  |  |
| Cash & cash equivalents | $    34,363 | $    11,423 |

|  |  |  |
|---|---:|---:|
| Accounts receivable | 18,002 | 8,026 |
| Inventories and other costs & estimated earnings in excess of billings | 3,293 | 4,496 |
| Other current assets | 1,176 | 1,136 |
| Total current assets | 56,834 | 25,081 |
| Property and equipment, net | 22,308 | 23,104 |
| Goodwill | 61,858 | - |
| Intangible assets, net | 21,708 | 2,892 |
| Restricted cash | 3,000 | 5,120 |
| Other assets | 1,427 | 2,082 |
|  | $ 167,135 | $ 58,279 |

**Liabilities & Shareholders Equity**

| Current liabilities: |  |  |
|---|---:|---:|
| Accounts payable & accrued expenses | $ 14,447 | $ 7,738 |
| Related party payable | 1,385 | - |
| Current portion of project financing | 3,968 | 4,259 |
| Current portion of related party notes | 10,300 | 1,829 |
| Total current liabilities | 30,100 | 13,826 |
| Project financing | 4,966 | 6,153 |
| Related party notes | - | 2,783 |
| Other liabilities | 414 | - |
| Total liabilities | 35,480 | 22,762 |
| Commitments and contingencies | 131,655 | 35,517 |
| Shareholders' equity | $ 167,135 | $ 58,279 |

VIISAGE TECHNOLOGY, INC.
Consolidated Statements of Operations
(in thousands, except per share amounts)
(Unaudited)

|  | Three Months Ended | | Nine Months Ended | |
|---|---:|---:|---:|---:|
|  | Sept. 26, 2004 | Sept. 28, 2003 | Sept. 26, 2004 | Sept. 28, 2003 |
| Revenue | $ 19,907 | $ 10,108 | $ 48,442 | $ 27,053 |
| Cost of revenue | 14,400 | 6,728 | 34,613 | 20,344 |
| Gross margin | 5,507 | 3,380 | 13,829 | 6,709 |
| Operating expenses: |  |  |  |  |
| Sales & marketing | 1,588 | 1,237 | 4,659 | 3,786 |
| Research & development | 896 | 946 | 2,797 | 2,828 |
| General & administrative | 2,362 | 1,328 | 6,717 | 3,454 |
| Total operating expenses | 4,846 | 3,511 | 14,173 | 10,068 |
| Operating Income (loss) | 661 | (131) | (344) | (3,359) |

| | | | | |
|---|---|---|---|---|
| Interest expense, net | 411 | 276 | 1,380 | 726 |
| Other (Income) expense | 27 | (18) | (48) | (18) |
| | --------- | --------- | --------- | --------- |
| Income (loss) before income taxes and cumulative effect of change in accounting principle | 223 | (389) | (1,676) | (4,067) |
| Provision for income taxes | 25 | - | 75 | 63 |
| | --------- | --------- | --------- | --------- |
| Income (loss) before cumulative effect of change in accounting principle | 198 | (389) | (1,751) | (4,130) |
| Cumulative effect of change in accounting principle | - | - | - | (12,131) |
| | --------- | --------- | --------- | --------- |
| Net income (loss) $ | 198 $ | (389) $ | (1,751) $ | (16,261) |
| | ========= | ========= | ========= | ========= |
| Basic net income (loss) per share before cumulative effect of change in accounting principle $ | 0.00 $ | (0.02) $ | (0.05) $ | (0.20) |
| | ========= | ========= | ========= | ========= |
| Diluted net income (loss) per share before cumulative effect of change in accounting principle $ | 0.00 $ | (0.02) $ | (0.05) $ | (0.20) |
| | ========= | ========= | ========= | ========= |
| Cumulative effect of change in accounting principle $ | 0.00 $ | 0.00 $ | 0.00 $ | (0.59) |
| | ========= | ========= | ========= | ========= |
| Basic net income (loss) per share $ | 0.00 $ | (0.02) $ | (0.05) $ | (0.79) |
| | ========= | ========= | ========= | ========= |
| Diluted net income (loss) per share $ | 0.00 $ | (0.02) $ | (0.05) $ | (0.79) |
| | ========= | ========= | ========= | ========= |
| Basic weighted average common shares | 40,072 | 21,512 | 35,783 | 20,711 |
| | ========= | ========= | ========= | ========= |
| Diluted weighted average common shares | 41,090 | 21,512 | 35,783 | 20,711 |
| | ========= | ========= | ========= | ========= |

CONTACT: Viisage Bill Aulet, 978-932-2424 SOURCE: Viisage

"Safe Harbor" Statement under the Private Securities Litigation Reform Act of 1995: Statements in this press release regarding Viisage's business which are not historical facts are "forward-looking statements" that involve risks and uncertainties. For a discussion of such risks and uncertainties, which could cause actual results to differ from those contained in the forward-looking statements, see

"Risk Factors" in the Company's Annual Report or Form 10-K for the most recently ended fiscal year.

→   Click here for current News Releases

# Exhibit 35
# (Part 1 of 2)



# Conference Call Transcript

## VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call

Event Date/Time: Oct. 26. 2004 / 8:30AM ET
Event Duration: N/A


© 2004 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call

## CORPORATE PARTICIPANTS

**Bernard Bailey**
*VISG - President and CEO*

**Bill Aulet**
*VISG - CFO*

## CONFERENCE CALL PARTICIPANTS

**David Gremmels**
*Thomas Weisel - Analyst*

**Paul Coster**
*JP Morgan - Analyst*

**Jim Ricchiuti**
*Needham and Company - Analyst*

**Scott Greiper**
*Unterberg - Analyst*

**Tim Quillin**
*Stephens Incorporated - Analyst*

## PRESENTATION

**Operator**

Good day, ladies and gentlemen, and welcome to the Third Quarter 2004 Viisage Technology Incorporated Earnings conference call. My name is Andrea, and I will be your coordinator for today. At this time, all participants are in a listen-only mode. We will be facilitating a question and answer session towards the end of today's conference. If at any time during the call you require assistance please press star, followed by zero and a coordinator will be happy to assist you.

I would now like to introduce today's host of today's call, Bernard Bailey, President and CEO. Please proceed.

**Bernard Bailey  - VISG - President and CEO**

Thank you, Andrea, and good morning. We're pleased you can join us for the Viisage Third Quarter 2004 conference call. I'm Bernard Bailey, President and CEO. On the call with me today is Bill Aulet, our Chief Financial Officer.

We'll start the call with the review of our operational highlights, and then I'll share with you what we see ahead of us now in terms of the market and opportunities. Bill will then review our financial performance for the quarter and discuss our guidance for 2004. Following Bill's remarks we will open the call up to q and a.

This quarter we have decided to do something a little bit different in order to more effectively utilize our time. As many of you are aware, we now have 11 different analysts from Wall Street firms providing financial coverage of Viisage. In order to provide an opportunity for investors to gain greater insights into the financial performance of the Company we will follow this call with a separate call focused specifically on financial questions. Bill will host that call, and it will immediately follow at the conclusion of this call. Of course, it is open to all of our investors, and you are encouraged to attend.

Now, let me turn the call over to Bill to read our Safe Harbor Statement.

**Bill Aulet  - VISG - CFO**

Thank you very much, Bernard, and good morning to everybody.

Statements that representatives of Viisage make on this call that are not historical facts are accurate as of today, October 26th, 2004, and may be considered forward-looking statements that involve risks and uncertainties, including reliance on public sector markets, the possibility of customer delays, the need for capital and


© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call**

compensation. You should refer to our Form 10-K for the year ended December 31st, 2003 filed with the Securities & Exchange Commission on March 30, 2004 under the heading 'certain factors that may affect future results', as well as our subsequent SEC filings for more information on the risk factors that could cause actual results to differ, perhaps materially, from our statements today. Viisage undertakes no obligation to publicly release any revisions to forward-looking statements, statements made today, or otherwise supplement statements made on this call.

Back to you Bernard.

---

**Bernard Bailey** - *VISG - President and CEO*

Thanks, Bill.

We are certainly exceedingly pleased with our results for this quarter. For the fifth straight quarter we are reporting record quarterly revenues. At $19.9 million, our revenues are up 97 percent on a year-over-year basis. I am also pleased to report that we produced a profitable quarter with earnings of almost $200,000. At the same time, we have generated a record level of EBITDA. At $3.4 million this quarter, our EBITDA was up more than 110 percent from the previous year's quarter.

These financial results are certainly a testament to our continued focus on delivering profitable revenue growth for our shareholders, while effectively managing our cost structure. I also think these results speak very well to the momentum we are building, both for the rest of this year, as well as leading us into 2005.

We have built Viisage into a leading identity solutions provider, offering customers a full life cycle of identity solutions. With the transformation of our Company through both organic development, as well as key acquisitions, we are well on our way to becoming the premiere provider in this marketplace, both domestically and internationally. The results we have already produced and the opportunities ahead of us provide us with the confidence today to increase our 2004 annual revenue and EBITDA guidance. Bill will detail these guidance numbers a little later on in the call.

Let me begin by addressing some of the important accomplishments we had this quarter, and then I will discuss some of the areas we are focusing upon to continue to improve our Company.

First of all, including our announcement this past week regarding the Wisconsin State Driver's License win, we have booked $15.4 million in sales backlog since our last call. Besides the $7 million contract with the State of Wisconsin, we expanded our business into the driver's license marketplace with extensions in Florida, Maryland, and Ohio, totaling more than $4 million in business. In addition, we also expanded our Federal backlog with extensions on our existing contract base totaling just over $2 million in additional

business. We are also very excited to report close to $2 million in new bookings for our face recognition solutions.

Longer term, we have continued to strengthen the total product portfolio of the Company going forward. In the face recognition arena, our signing of a cooperative partnering agreement with Siemens AG is a very important technological development, giving us advanced capabilities and a strong partner for continued advancement in 3D face recognition technology. In addition, the early results that have been reported from the U.S. Government's face recognition, grand challenge indicate that we are providing a face recognition solution that is technically equivalent or superior to any solution in the marketplace, both from an accuracy as well as a breadth of solution perspective.

In the identity solutions product arena, we unveiled in August our new identity solutions product suite and immediately launched the innovative Viisage proof product at the International AMVA Conference to great reviews from our customers. We continued to enhance our product capabilities with the acquisition of Imaging Automation, the leading provider of advanced technology verification and authentication solutions. We are already seeing wide acceptance of this solution in the marketplace with many many of our existing customers, as well as new customers and partners, demonstrating an interest in better understanding how Viisage can address their needs in this critical area of identity proofing.

This past quarter we also put a great deal of effort into improving the long-term financial health of our Company. Our follow-on offering allowed us to increase our cash position from $12.6 million to more than $37 million, while at the same time reducing our outstanding debt from $29.8 million to $19.2 million. This improved financial health has allowed us to secure a $25 million line of credit with the leading financial institution, Citizens Bank, which will give us even greater financial flexibility to build our Company going forward.

While there is much to be proud of this past quarter as a Company we would rather focus on what lies in front of us. Before we talk about the opportunities that we see, let me address a few areas that many of our investors have raised some questions about. Let me begin with our ongoing litigation.

Someone always asks for an update on **Georgia**, so let me share what we know. As I mentioned on our last call, last October we had — excuse me, last quarter we had proposed a settlement with our customer, the State of **Georgia**, entailing a payment to Viisage and a pledge by the State to rebid the RFP this year. The State agreed with our recommendation, signed an agreement with us, and was prepared to issue the final payment. Unfortunately, that settlement was the subject of a temporary restraining order by our competitor. Right now, we expect a hearing on a series of summary judgment motions to occur shortly, with a decision probably coming out in the next few weeks. We'll certainly let you know once we hear more information.


© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call**

As for our other pending lawsuit that arose last quarter concerning Fargo Electronics, Toppan and TDT, I have no update on that lawsuit other than to note that any court action is unlikely before the second half of 2005. We continue to believe there's absolutely no basis or standing for the complaint, and we filed motions to dismiss the case.

There was certainly much discussion this past quarter regarding the recent announcement of the Department of State's decision to select a competitor to the facial recognition contracts. We were disappointed in that decision, especially in light of recent announcements by DOS personnel, who have continued to applaud the outstanding performance of our solutions in the Diversity Visa Program. As I mentioned in our last call, it is important to understand the facts before jumping to any conclusions.

Since our last call, we have had the opportunity to receive an outbriefing from the Department of State Procurement personnel. So let me share with you what we now know. Viisage was involved in this RFP as a subcontractor through a systems integrator. Now, a lot of you ask, why did we bid it as a sub? Well, very simply because the procurement regulations required that in order to bid, a contractor had to be on the Government systems integrator GSA contract.

Just prior to the final bid submission, the Government then allowed the winning FR company under a dispute to bid directly as a prime contractor due to their standing on the GSA contract for technology products. As a company Viisage did not reside on either contract schedule, and therefore, we were excluded from bidding as a prime. Now, I think you can understand that this limited greatly our ability to affect the final pricing of the proposal.

From the outbriefing, we learned the Department State decision was made solely on price due to the fact that the difference in price between the winning bid and the second lowest bidder was almost 70 percent. We were clearly informed that our technology performed exceptionally well in all of the independent bench testing done during this procurement process. That said, we are gratified by the remarks made by the State Department representatives to the effect that the technology showed significant improvements from one that had been tested just 12 months ago.

We see this contract as an important validation for our industry and all participants. Fortunately, because of the fine work we have done for the Department of State on all of our existing contracts with them, we expect to compete vigorously for other opportunities there as they arise. Additionally, the acceptance of our technology by other integrators, as well as our positioning in key pilots being conducted presently in the European Union, as well as the Middle East, gives us comfort in the worldwide acceptance of our solution going forward.

So let's now focus on what lies ahead. Our goal this year has been to focus our strategy, ensure that we have the right products to support that strategy, and then execute against that strategy. We said we would expand our portfolio of identity solutions, and with the three acquisitions this year we have done so, and can now provide comprehensive solutions to our customers, especially in areas like proofing that are regarded as the weakest link in the entire identify verification chain. We are leveraging fully the opportunities that our acquisitions brought to the table, and together we have effectively attacked new markets while continuing to produce solid growth in our core business.

So where does that strategy lead us as we move into the last quarter of 2004 and prepare for 2005? I thought it would be helpful today if we went through our business market by market and provided you with some insights about the opportunities we see. These opportunities in some cases, I will emphasize, could not have been pursued by the stand-alone Viisage of 2003, since many entail collaborative efforts throughout the Company, fully utilizing the talent, market positions, and technology of the companies we have acquired.

We are continuing to pursue opportunities in a wide range of civil ID applications as varied as border management, passports, and benefits distribution, all in addition to driver's licenses. We continue to believe that identity solutions are moving from single documents to a far wider set of permissions, centered around verifying identity, and that more customers are recognizing this both as a problem they need to solve and looking to Viisage as the company that can help them do this.

The many important and large national and international opportunities like U.S. VISIT, TWIC, and other border management possibilities particularly are high on our list, even though timing of contracts rewards continues to remain difficult to project. I've said previously that we didn't expect to see any significant awards from these programs before the end of 2004 and probably more likely into 2005 at the earliest. That certainly remains the case.

But let's look at the wider horizons. Starting with our Federal business, the U.S. passport program continues to grow with more passports being issued to U.S. citizens over the next few years. The e-passport is a strategic and important growth initiative in which we will be participating once it moves beyond the initial chip deployment for which vendors have already been selected. We also see substantial opportunities for IA's authentication capabilities at consulates and embassies around the world.

On the worldwide passport and visa side, there are some 27 visa waiver countries that are evaluating and incorporating biometrics into their ID documents over the next 12 to 18 months, facing that October 2005 deadline, as well as considering the use of authenticating technologies like those we've recently acquired from IA.



© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Non-waiver countries are also moving toward e-passports, biometrics, and authentication, as well, sometimes even more quickly. There's tremendous opportunity within the Middle East in particular, as these countries move to better authenticate identities of their citizens as evidenced by the expansion of the Dubai Program with our solutions. This is a very large overall market.

On U.S. VISIT particularly, there continues to be a large opportunity for our combined capabilities and our solutions that solve many of the challenges that are raised in this initiative. The major programs like TWIC and Registered Traveler are also progressing along, utilizing our solutions for authentication and proofing in their pilots. I don't want to get more specific, but obviously we're very pleased to be involved in these initial efforts with a wide range of partners that we've been working with.

With smart cards for identification documents with both biometrics and other information embedded into them, following up on our very significant win earlier this year at the Department of Defense, we see ample opportunities domestically and internationally, including one that would provide similar cards for all Federal employees. I think many of you are aware of the recent Presidential directive calling for the deployment of CAC-similar cards throughout the Federal Government. We are active with the standards body that will develop common standards for these, and we are monitoring efforts to replicate the CAC Program going forward. So it is a great opportunity for us.

With the international connections coming out of our IA acquisition, we are in significantly better position in these markets than we had been previously. The addition of Ken Sheflein to head our Federal Team in Washington this past quarter also positions us extremely well for this marketplace. Many of you know Ken, and he is widely regarded as the father of the DOD's CAC Program, having driven that program within the defense manpower data center as its leader for the past 15 years.

We have already seen tremendous synergies with IA's focus and ours, especially with driver's license contracts, ones we have, as well as ones we are pursuing. These customers are very interested in authenticating the identity of the individuals before issuing a State credential. Our ability to leverage proofing solutions into this space creates a competitive advantage that we intend to pursue aggressively, as it exploits the weakest link in the identity chain.

But to think that we did IA for the single purpose of synergizing within the Department of Motor Vehicles Administration Offices would be missing this opportunity significantly. The border management opportunity for IA is also extremely strong. We see initiatives similar to the programs already in place in Canada and Australia where IA has delivered high quality results, and we are participating in a number of tests and pilots focused on integrating chip readers into border crossing solutions as part of the overall e-passport initiative.

The first vestiges of our identity solutions being used in the commercial marketplace are also emerging. Initially, overseas where there are strong mandates for access control. With IA's technology and our full product suite we are working with the range of partners primarily to address these opportunities, which are already producing some revenue for our Company. We expect this business will find greater traction in the longer term, particularly in areas like healthcare and financial services. We are already engaged in pilot programs with financial institutions, airlines, and casinos, specifically. And these initiatives are another example of the strong synergies between our authentication and identification capabilities.

Let me share with you why we are excited about the potential in these markets. First of all, in the airlines industry, one of our airlines customers has decided to adopt the IA technology to combat credit card fraud. In their case, they are looking for the definitive authentication of the identities of individuals taking a flight to verify that they, in fact, consummated the transaction that was recorded on their credit card. As hard as it may be for some of us to believe, there is a large number of people out there who charge their flights over the internet, and then when their bill comes, they claim that they never took the trip, claiming instead that the charge was done fraudulently. Now the airline will have a verified record of who actually made the trip.

In the financial services industry, the Patriot Act mandates formal documentation and verification of the identities of individuals opening new accounts. Certainly, the IA solutions provide an effective means of verifying the identity and documenting these transactions going forward, so we see tremendous opportunity in the financial services industry for these solutions.

We continue to see more interest in the law enforcement market, building upon our recent successes to expand the role of identity solutions in this critical arena. Demand for face recognition solutions is increasing in this market as successes like we've seen at Pinellas County, where they recently caught four fugitives with our technology, demonstrates the validity of our solutions. Across the U.S. and internationally, we are seeing large opportunities for information sharing solutions utilizing face recognition and criminal ID solutions that we have, and they are certainly under consideration. These include both interstate and intrastate solutions entailing interoperability as well. Viisage has achieved good success this year adding such customers as Jefferson County, a major metropolitan area, the Ohio Department of Corrections that we recently announced, and continued expansion down at Pinellas. Now, similar proposals are on the table with many other agencies.

As I've said before, historically, Viisage was a driver's license company, and this constituted the majority of our revenues and the foundation of our move into FR and other products that make the full spectrum of ID solutions. The driver's license business in the U.S. offers a number of opportunities over the next 12 to 18

Thomson StreetEvents

© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.



months with several very large key contracts expected for bid, including California, Texas, Virginia, and Indiana. We are still waiting to hear on West Virginia's plans. Altogether these constitute more than $100 million in potential revenues and all of these would be new to Viisage, so we are very excited. We are also buoyed by our recent win of Wisconsin, and we are aggressively pursuing other States to the extent that they make economic sense for our business.

As we showed you this quarter in our financial results, we are not going to forego profits just to record revenue expansion, so we will continue to bid with an eye on shareholder value in this marketplace. I will emphasize that the U.S. driver's license business remains an important avenue for the implementation and validation of our technology, but not the only one. European and Canadian drivers' licenses offer opportunities, like Ontario and the U.K., over the next 12 to 18 months. And we are very well positioned to pursue these opportunities, as well, either independently or working through our network of fine partners.

I want to reemphasize that there is a substantial up sell opportunity within our existing driver's license customer base, as demonstrated by our recent announcement of two customers now incorporating face recognition into their solutions. I wish I could tell you who those States are, but the fact of the matter is that they're so excited about the solution that they would much rather keep the solution under the covers and deploy it across the State. And there is also a large sized opportunity for Viisage with this customer base for our proofing product as well. In short, we are fully able to help them solve additional problems with our proofing, face recognition, and other credentialing capabilities.

In closing, let me say again how very pleased I am by our progress this past quarter, especially our record results and profitability. We firmly believe we have an extraordinary opportunity at our doorstep to build Viisage into the leading provider of ID solutions. And this quarter we have demonstrated that we can accomplish this goal in a fiscally responsible manner. The events of the past few weeks, from the acquisition of Imaging Automation to our key customer wins, provide me with continued confidence that we have many opportunities ahead of us, ones where we can continue to prove Viisage's value proposition to our customers.

With that, let me turn the call over to Bill to discuss our financial performance and outlook. Bill.

---

**Bill Aulet** - *VISG - CFO*

Thank you very much, Bernard.

As I begin, I want to remind you that on December 30th, 2003, Viisage adopted the new accounting principle, EITF 00-21, affecting how revenues are recognized under long-term contracts, like our driver's license agreements. This methodology is

retroactively applied to periods of January 31st, 2003, and to assist you in comparing our current results for earlier periods we have recalculated those prior periods results. We will refer to these figures throughout the call, but if you have any questions, please visit our web site at www.viisage.com in the Investor Section. I will also be using EBITDA and other non-GAAP measures during this discussion, and a reconciliation of those measures to the conforming GAAP measures is also on our web site in the same section.

As Bernard mentioned, for the third quarter of 2004, we experienced robust revenue growth. Revenues for the recently completed quarter were $19.91 million, a fifth consecutive record quarter. This represents a 97 percent increase year-over-year basis and a 22 percent increase on a quarter-over-quarter basis. This top line growth was driven by our Viisage Federal Solutions Group in Washington, D.C., and particularly the Department of Defense Common Access Program. We shipped over $5 million of Common Access Card production systems in the quarter, which represents significant revenue to the Company in this quarter. In addition, these systems will provide the foundation for ongoing higher margin revenue streams in the future, specifically in the area of consumables. The gross margin percentage on these production systems was within the mid-teens range and, therefore, while adding to the absolute gross margin, they did bring down the overall gross margin percentage for the Company in the quarter.

Of the 97 percent year-to-year growth rate, organic growth represented approximately one-third, demonstrating that not only are our acquisitions already contributing significantly to our top line growth but we are experiencing healthy organic growth in our core business, as well. Equally as important to our top line growth is our net income. We are proud to announce the first GAAP profit in three years with $198,000 of net income, or essentially breakeven on a basic and diluted share basis, demonstrating our commitment to attaining this important long-term goal.

We've been steadily improving our performance in the bottom line. In the first quarter, we had a loss of slightly over $1 million. Last quarter this has been reduced to a loss of $17,000. This quarter we crossed the breakeven line to be net income positive. For year-to-year comparison purposes, in the last year's third quarter the Company recorded a loss of $390,000 or 2 cents per share on a basic and diluted basis. We are pleased with our progress here.

It should be noted that included in the calculations of this net income is an existing charge related to the amortization of intangible assets, a non-cash expense resulting from our acquisitions, primarily related to TDT and ZN. This expense totaled over $900,000 for the quarter. Understanding the significant non-cash expense, which does not have to replenish and eventually goes away after the intangible asset on the balance sheet, is the major reason why our EBITDA performance was so strong again this quarter, but more about that later.

Thomson StreetEvents    streetevents@thomson.com    617.603.7900    www.streetevents.com 

© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call

On the gross profit margins, we indicated on the last conference call that they would decrease due to the Department of Defense production systems anticipated in this quarter. As projected, this became a reality this quarter as our gross margins decreased to 28 percent from 31 percent in this year's second quarter, and down from a record 33 percent in last year's third quarter. This is a reflection of product mix. We anticipate a substantial number of those productions to ship in the fourth quarter as well, albeit at a slightly lower total volume.

Even so, we see that investments we have made in improving our product offerings and efficiencies in delivery should make this just completed quarter a temporary depression in gross margin percentage. We are confident that these efforts to increase gross margin going forward will pay dividends in the near term. In fact, as we look forward to our pipeline for the next quarter and the productivity improvements we have made even with the significant component of Common Access Card production systems in the quarter's revenue, we believe we are poised for significant overall gross margin improvement that will not only return us to the margins we saw earlier this year but allow us to potentially exceed them.

We are also continuing our relentless effort to control costs and to improve efficiencies while simultaneously investing in key areas that will generate growth and improve profitability in the future. In the quarter overall operating expense increased quarter to quarter from $3.51 million in the same quarter last year and $4.74 million in the second quarter this year to $4.85 million in the just completed quarter.

The overall $110,00 increase in total operating expense on a quarter-to-quarter basis was driven by a $144,000 increase in G&A expense for the quarter. This was caused in large part by increases in three areas that offset other cost savings initiatives. First, consulting costs associated with our Sarbanes-Oxley compliance project grew from under $75,000 in the second quarter to over $350,000 in the just completed quarter. Secondly, legal costs associated primarily with Georgia and Fargo litigation continue to be significant, up $50,000 in total for over $300,000 for the quarter. Thirdly, there was a one-time expense of $120,000 for administrative and legal costs that were being amortized over the anticipated life of a note. When we paid off the note early in the just completed quarter, we had to take this expense in the quarter as well.

The fact that we've been able to hold operating expenses relatively flat in the prior quarter speaks well to our cost control, but we are not satisfied with our performance especially in the area of G&A. I will note that we have not yet seen any contribution from the rent reduction associated with our headquarters relocation from Littleton to Billerica, which will generate savings of about $15,000 per month, and that will be recognized starting in the fourth quarter of this year.

In the expenses for the third quarter, sales and marketing were $1.59 million, flat on both the sequential and annual comparison. R&D expenses were $893,000, down on both the sequential and the annual comparison, benefiting from the capitalization of software related to these products.

As mentioned earlier, we had a significant non-cash expense, and we have significant non-cash expenses, and so we tracked EBITDA, as well, as a valuable metric for the underlying strength of our business, specifically to generate cash flow. In the third quarter of 2004, we generated $3.4 million of EBITDA, another solid improvement both the $1.5 million we posted last year in the third quarter, as well as the $3.1 million we produced in the second quarter this year, and the $1.1 million we registered the first quarter of this year. We expect to continue to see improvement in this area, as well.

At the end of the third quarter of 2004, we had a cash position of approximately $37.36 million compared to $12.6 million at the end of the second quarter, reflecting the addition of net proceeds of approximately $37.9 million from our follow-on offering, offset by the initial repayment of related party debt of approximately $10 million. Of our cash position only approximately $3 million, or less than 10 percent, is encumbered. As Bernard mentioned, we're pleased to announce as well today that we have received a commitment letter from a major bank for a $25 million line of credit to replace our existing bank facilities. This new arrangement will not only give us valuable flexibility but will also reduce our rates of borrowing, significantly simplify our covenants, and increase yields on our money in the bank, all while making our G&A operations more productive by providing services locally and worldwide to meet our rapidly evolving needs.

In the fourth quarter we will be able, if we so choose, to reduce our outstanding debt quite significantly, and after paying off early prepayment fees, save approximately $600,000 a year in interest expense. We will be monitoring this closely, and our actions will be affected directly by our M&A program. But in any case, we have new financial flexibility that will be very valuable to support our growth, as well as being highly cost effective.

At the end of the third quarter, we had approximately 43 million shares outstanding, compared to 21.5 million at the end of the third quarter of last year, with the increase reflecting both the acquisitions we have made this year in which stock was issued, as well as the follow-on offering. We are pleased, as well, that we were able to secure financial terms in our acquisitions, and that we expect them to be accretive to our results in 2005.

Backlog at the end of the third quarter of 2004 was approximately $140 million, down from $151 million at the end of the second quarter this year. Historically, as we've said before, backlogs have not always moved in a linear fashion. Our businesses tend to be lumpy with large contracts playing a major factor. Importantly,



© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call

however, the backlog still constitutes a healthy multiple of our annual revenues. I'll remind you that in connection with the proposed settlement we announced in the State of **Georgia** we decreased the backlog by 19.7 million during the third quarter. Of course, the new contract wins that we've announced thus far this quarter will increase the backlog, especially the Wisconsin award. We are not providing mid-quarter figures on backlog since this is an end of quarter figure and interim numbers can be misleading. Suffice it to say that we are pleased with the direction with our wins and quite confident the backlog will continue to grow to reflect that.

The nine months' results are discussed in the release, so I won't take the time this morning to repeat that text.

Now, I'd like to discuss our annual guidance for 2004. In early May, based upon the strength of our pipeline business we raised annual guidance to $60 million to $63 million, and our EBITDA guidance for 2004 to $11 million to $12 million. At this time, we are comfortable raising this guidance yet again to revenue of $66 million to $68 million for 2004, up approximately 10 percent, and EBITDA of $11.5 million to $12.5 million for the year.

We were also active with our investor relations' outreach this quarter with the number of opportunities to meet with both retail and institutional investors. We spoke at the Roth Conference in New York in September, and later today we are presenting at the JP Morgan Small Cap Conference in Boston. We will also be presenting at the AeA Conference in early November in Monterey. We plan to continue our outreach and response efforts to ensure that we communicate effectively with investors about the Company's vision, strategy, and progress. As usual, we'll keep you updated through press releases on details associated with those presentations.

With that, let me turn the call back over to Bernard.

---

**Bernard Bailey - VISG - President and CEO**

Great. Thank you, Bill.

Andrea, we'd like to open the lines up now to some q and a.

---

## QUESTION AND ANSWER

**Operator**

[Caller instructions.]

Our first question comes from David Gremmels from Thomas Weisel. Please proceed.

---

**David Gremmels - Thomas Weisel - Analyst**

Thank you. Good morning. I wanted to ask you about the backlog. And I think early in the call you mentioned $15 million of new awards. Was that in Q3 alone, or in Q3 and Q4?

---

**Bernard Bailey - VISG - President and CEO**

No, what I said was that these were all announced since our last call, so it included some of the stuff that we announced in our call. Of the $10.9 million that we put out in a press release last week, some of that was closed in Q3 and some was closed in the early part of Q4.

---

**David Gremmels - Thomas Weisel - Analyst**

Okay. So I think, you know, adjusting for the State of **Georgia**, it looks like you booked around $9 million of new orders in Q3, so that would imply you have about $6 million of new orders thus far and already in Q4?

---

**Bernard Bailey - VISG - President and CEO**

Yeah, it's more like $7 million already.

---

**David Gremmels - Thomas Weisel - Analyst**

$7 million, okay. And I know you said you didn't want to discuss mid-quarter backlog, but you know, maybe you can talk about where you would hope to see backlog at the end of the year?

---

**Bernard Bailey - VISG - President and CEO**

Well, we don't give guidance on backlog, but what I'll tell you is that, you know, we see a lot of pretty exciting opportunities in front of us. You know, it's very difficult to predict backlog because we have no idea when particular decisions are going to be made, or when particular contracts are going to get formalized and signed, or what funding is going to be made available.

---

**Thomson StreetEvents**    streetevents@thomson.com    617.603.7900    www.streetevents.com    

© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call

You know, one of the issues that always occurs in the third quarter, of course, is that it's the end of the fiscal year. And while procurements occur, they don't necessarily manifest into signed contracts, so with all of that, it's very, very difficult to predict something like that, especially in the Government marketplace. So I'm sorry I can't give you a better number.

---

**David Gremmels** - *Thomas Weisel - Analyst*

Okay. And the $2.5 million payment from Georgia, was that – I just want to confirm that was not booked into revenue during the quarter, and you didn't receive the cash from that?

---

**Bernard Bailey** - *VISG - President and CEO*

Both of what you said is correct. A, it was never booked into revenue, and B, we did not receive the cash. Now, let me just highlight because some of our people may not be aware. In our driver's license, we only book revenue when we produce a card. We only produce revenue when we produce a card, so therefore, we're not going to book revenue until a card is produced, so there is no revenue that is booked regarding the Georgia procurement in any way.

---

**David Gremmels** - *Thomas Weisel - Analyst*

Okay. Great. And then, last question, you talked about the facial recognition visa award to the competitor. My understanding had been that there was going to be a separate contract to incorporate facial recognition technology into the passport program. Do you know is that contract a separate opportunity that you're pursuing, or is that wrapped up with that visa award?

---

**Bernard Bailey** - *VISG - President and CEO*

Well, there's two angles on that one. The first one is that the original procurement from the Department of State included both the visa and the passport. However, the only award that was made is relative to the two visa programs. So that's what's been awarded up to this point in time.

Does the Government have the flexibility to be able to award the passport to the competitor? The answer is yes. Will they? That remains to be seen. At this point in time, the award hasn't been made on the passport for the simple reason that the State Department is very, very busy in dealing with the whole chip on the passport and inlay issues which they're working with, and have just awarded to four vendors at this time. So a lot of that remains to be said.

As I said in my comments, you know, we have a great relationship with the Department of State, and that's a great relationship because quite frankly we're done some really good work for them

over the last several years on the passport business, as well as the diversity visa. They're also extremely satisfied with the quality of our solution and the accuracy of our face recognition technology as they've been deploying it on the diversity visa program for the past year. So with all of that we'll just continue to work with them, and do what's right for our customer, and put our customer first, and see how that plays itself out. But there's really nothing more specific relative to what may happen and when.

---

**David Gremmels** - *Thomas Weisel - Analyst*

Great. Thank you very much.

---

**Bernard Bailey** - *VISG - President and CEO*

You're welcome. Thanks for your questions.

---

**Operator**

Our next question comes from Paul Coster from JP Morgan. Please proceed.

---

**Paul Coster** - *JP Morgan - Analyst*

First of all, it looks like the guidance for the next quarter is pointing to flat, so it may be slightly down revenue. It's obviously got a lot of momentum. So what's accounting for the slowing sequential growth rate?

---

**Bernard Bailey** - *VISG - President and CEO*

Well, Paul, as you know, a couple of things on that. First of all, it's always our nature to want to make sure that we give guidance out there that is reflective of what we really believe is going to happen. So that's important to us.

Secondly, my gosh, you know, we've put together five straight record quarters in a row, and you know, we're getting at the point now where as a business we continue to grow and expand, and as we start to see some of the new acquisitions come on and the new opportunities, certainly we'll start to see more seasonality associated with the revenues that we'll have as the business going forward.

And I think that we're seeing some of that as we go forward in our Company. Certainly, you know, we will look and work aggressively to expand our revenues where it's appropriate, but we certainly also want to be realistic in what our assessment is and what that's going to be.

Having said that, you know, we've had some very aggressive deliveries associated with the DOD common access card systems

---


© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call

over the past two quarters and that has certainly helped us in our performance at the top line over that period. As Bill noted, all of those same systems have suppressed to some extent our gross profit margins. And so, we would expect to see gross profit margins expanding as that mix changes also.

**Paul Coster - JP Morgan - Analyst**

Fair enough. Is the Presidential election in any way sort of holding back activities at the moment, do you think?

**Bernard Bailey - VISG - President and CEO**

Not that I'm aware of, Paul, no, not at all.

**Paul Coster - JP Morgan - Analyst**

Okay. Long-term obviously, the growth rate this year has just been phenomenal. I would have thought it would be difficult to get anywhere close to this year's growth rate. But what are you looking for in the future if you can't say specifically, where do you think the growth is going to come in '05?

**Bernard Bailey - VISG - President and CEO**

Yeah, I can't say specifically, Paul. We'll certainly give that guidance out in January for what we see for next year. I mean I will tell you, for gosh sakes, don't expect it to stay up in the 70, 80, 90 percent that you saw this year, okay? That won't happen.

Now, having said that, let's back up and make sure we understand. You know, organically what we've been seeing is 20 to 30 percent growth rate year-over-year, organically. So, you know, a lot of what we've done has been how we've assembled our Company and put together some of the pieces together, and that's where we've gotten some of the growth rate through the acquisitions.

So what does that mean going forward? Well, to us going forward, certainly where we see the growth rate occurring is going to specifically be in three areas. First of all, in the Federal marketplace. We expect to see some very nice expansion in that marketplace, particularly with the Presidential initiatives directed around increasing identity solutions very much like the CAC program throughout the Federal marketplace there.

So we continue to see opportunities there, but it's not just the identity opportunities coming forward; it's really in the areas of the rollout of some of the Federal programs which we hope to be an important part of which is, of course, as I mentioned, U.S. VISIT, TWIC, and some of the other border management programs. So that's an area we expect to see continued expansion in and growth going forward.

Secondly, you know, I was really bullish when we did the Imaging Automation acquisition. Having worked with Ron Vanass and the team there now for the past month, I am even more excited about the potential there, and it goes well beyond just what you would normally expect in our traditional markets. And as I tried to allude to in my conversations, it expands into some of the commercial marketplaces, like the airlines and financial services, as well as healthcare, which we think has great potential going forward. So I am very, very bullish about this whole area of proofing and identity authentication going forward. So that's very exciting to us.

And then, of course, with the rollout towards this 2005 October deadline, you know, we are seeing a lot of momentum and a lot of discussion coming out relative to implementing the face recognition solution on a global basis. So we certainly expect to see continued expansion in that area.

So as I look at it, Paul, you know, we feel pretty good about our positioning. Now, from a driver's license standpoint, you know, things will be a little bit tougher there. Okay. We haven't won a lot of States in that area. A couple States will drop off, so we'll still have to fill in some of the gap there going forward, but we still remain very bullish. A lot of the States we talked about, the large opportunities, I don't want to mislead our analysts on Texas, California, Virginia, Indiana, these States will do their procurements most probably in the first half of this coming year, 2005, and we all know those things can move. But remember, we don't recognize revenue until we generate a card, so that probably won't kick in should we win any or some of those programs. It won't kick in until probably very late in the year at the earliest from a revenue standpoint. So hopefully, that gives you a little more color, Paul, as you try to look at the marketplace.

**Paul Coster - JP Morgan - Analyst**

Thank you, Bernard.

**Bernard Bailey - VISG - President and CEO**

You're welcome. Thank you.

**Operator**

Our next question comes from Jim Ricchiuti from Needham and Company. Please proceed..

**Jim Ricchiuti - Needham and Company - Analyst**

Thank you. Good morning.

**Bernard Bailey - VISG - President and CEO**


© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call

Hi, Jim.

**Jim Ricchiuti** - *Needham and Company - Analyst*

Bernard, I wonder if you could comment again on the gross margin issue or perhaps, Bill, you could? In the Q4, Bill, I think you alluded to the fact that you see gross margins possibly improving from Q3 levels. How much of the CAC business do you expect to ship in Q4? And is the benefit to sequential improvement that you see coming in Q4, is that also due to the addition of the 1A business?

**Bernard Bailey** - *VISG - President and CEO*

Bill, why don't you take that for Jim, okay?

**Bill Aulet** - *VISG - CFO*

Sure. As I mentioned, we shipped over $5 million of the CAC and that compressed it, but there were also underlying programs that we had been making investments in to become more of a product company in our solutions, providing products which will improve our gross margins. We will see those kicking in.

So, first of all, the CAC program will not be over $5 million, more in the neighborhood of $4 million in the fourth quarter, and then we see strength across the board in the driver's license business, in our kind of biometrics segment, if you want to call it that, and also Imaging Automation is very much a positive contributor to it. But it's basically following the strategy of, you know, increasing the product mix and the solutions that we offer, which allows us to increase our overall gross margins, as well as efficiencies that we've gotten in cost reduction in delivering in particularly the driver's license business.

**Jim Ricchiuti** - *Needham and Company - Analyst*

Okay. Great. And Bernard, just one final question for you if you could, just talking about the Presidential directives, as you look at that, and it's still early, you know, how this is all going to take shape. But as you look at the potential for that, do you see this as being ultimately more of a centrally issued ID card, or do you think it could be issued at the department and agency level using desktop systems? And I wonder if you could also comment on how you see that playing into the 1A business, as well?

**Bernard Bailey** - *VISG - President and CEO*

Yeah, a couple of things on that, Jim. First of all, it's not clear how it will happen, so I don't have any great wisdom on this. I do have a lot of experience in working down at the Government. And I would expect to see that it will continue to be an agency-by-

agency desktop type of issuance program and not a central issuance. Mainly because, you know, as we know, it's the Federal Government but they act as very, very separate entities.

For example, I could never see the DOD consolidating its card production into a central type of production because there's really a strong demand and need for over-the-counter fast response on these cards, and getting them issued out to people, just like many of us expect when we go and get an ID card. So I don't think that will happen. You know, I do think that you, you know, each agency will go through its own process in procurement and will do it appropriately. Different ones are at different stages today, and they'll roll out accordingly.

That being said, you well understand, Jim, and I know you do understand this, is that you know to really have the security through the identity of an individual, it has to be managed throughout the entire life cycle of the process. To miss a single arena or a single point in the life cycle weakens the entire chain of the life cycle and trust of the identity. As a result of that, it is absolutely clear to me that there will be a strong need to have to have solutions like the Imaging Automation solution to do both the upfront proofing and identity verification, coupled with the backend verification of the usage of that document. And already we're seeing that in discussions down in Washington with several of the agencies.

Now, certainly, the DMDC sees the applicability and the need for verifying individuals in the military, and most importantly, not so much the military people, but rather their dependents as they come forward. And then, in addition to that, we certainly see it in the passport arena and lots of discussion about verifying the identity of individuals and how do we verify those documents, both in the issuance as well as the usage in the backend. So clearly, this spills right over into any area where you have to issue an ID and a credential and verify that credential and tie that person to a credential. And Imaging Automation is an important part of that whole process.

**Jim Ricchiuti** - *Needham and Company - Analyst*

Okay. Thanks very much.

**Bernard Bailey** - *VISG - President and CEO*

You're welcome. Thank you, Jim.

**Operator**

Our next question comes from Scott Greiper from Unterberg. Please proceed.

**Scott Greiper** - *Unterberg - Analyst*


© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call

Good morning, guys. Congrats on the quarter.

**Bernard Bailey - VISG - President and CEO**

Thanks, Scott.

**Scott Greiper - Unterberg - Analyst**

A couple of questions. First of all, on the debt repayment, it looks like you paid off a little bit over $10 million, and you alluded in the call towards the possibility of no repayment this quarter but there were some prepayment issues. Can you give me some light as to, you know, when you would see using some of the cash from the secondary to repay debt?

And secondly, to follow-up, going back to Imaging Automation, you talked a lot about a commercial opportunities which I think is vital to diversifying the revenue stream, can you get a little more detailed, Bernard, on timing, not necessarily revenue timing but pilots that are ongoing in financial or healthcare, some of these other commercial applications?

**Bernard Bailey - VISG - President and CEO**

Yeah. Sure. Let me take the debt question first, okay. As you know, or all of you certainly were aware, when we filed the prospectus, when we did the follow-on offering that an important usage of our funds was to pay down our debt.

And why was that important? Well, that's important for very specifically, two reasons. Number one, it would allow us to have a lot more flexibility as a business going forward in terms of managing our business, but secondly, by getting rid of all our debt, it allows us to drop immediately about $2.4 million to our bottom line performance, helping us to get profitability even quicker.

So the obvious question then comes well, gee, if you got all of this cash, why didn't you just rush out and pay off the debt? And the fact of the matter is we wanted to do this in a smart way, Scott. And an important element in doing that was to make sure that we had secured behind us the flexibility to manage our business and our cash flow through its ups and downs, as any business has.

You know, I am very pleased as a business we're generating cash from operations on an annual basis, so all of us should feel pretty good about that. But we still want to have the ups and downs. For example, this quarter, our operating cash was actually slightly negative at about half a million dollars due to the fact that we had a significant run-up in our AR, which, as you well know, happens at the end of a fiscal year, and when you're in the Federal and State and local marketplace. So if that happens, we want the flexibility.

So what that all means is that what we wanted to do was make sure we had our line of credit in place. Now that we have it with Citizens Bank, we feel that we have the right debt structure and credit structure for the Company that will allow us now to use our cash to pay off that debt so we can drop to the bottom line a better financial performance for our shareholders.

So that's why we approached that, and, yes, there are some issues relative to prepayments and we wanted to make sure that we went through that the right way and developed the right flexibility as we negotiated our banking relationship going forward. We're now in a position to deal with those. And that was just signed here this past week. And so that's the question on the debt. Does that answer that for you?

**Scott Greiper - Unterberg - Analyst**

Yes, it does. Yes.

**Bernard Bailey - VISG - President and CEO**

Okay. Good. Thanks.

So now, you ask about the rollout and the timing relative to some of the commercial opportunities? And you know, Ron VanAws has just done a terrific job, and I'm really excited about getting some of our analysts and shareholders to spend some time with Ron to really get as excited about the Imaging Automation opportunity as I am about it. And when you speak to Ron, you certainly will be.

Having said that, you know, Ron has been working this market now for a couple of years, and has really planted some good seeds in the pilot stage on this, and it's a little bit premature to say exactly when that will happen, but I wouldn't be surprised to see some of that happen this quarter, Scott.

**Scott Greiper - Unterberg - Analyst**

The...

**Bernard Bailey - VISG - President and CEO**

Not in a big way, but in a way that will certainly demonstrate the validity of the solution and start to see the traction get started.

**Scott Greiper - Unterberg - Analyst**

Is the financial services industry because of the mandates of the Patriot Act sort of the lower hanging fruit on the commercial side?

**Bernard Bailey - VISG - President and CEO**


Thomson StreetEvents    streetevents@thomson.com    617.603.7900    www.streetevents.com

© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call

In our opinion, it certainly is. You know, there's certainly a compelling ROI reason for doing it there for them, as well as a mandated reason, and that always helps in the selling process. So I never call anything in this industry low hanging fruit. You know that, Scott. But certainly, on the tree, it certainly is lower than some of the other stuff.

**Scott Greiper** - *Unterberg* - *Analyst*

Okay. Thank you, Bernard. Congratulations.

**Bernard Bailey** - *VISG* - *President and CEO*

You're welcome. Thanks for everything, Scott.

**Operator**

And our next question comes from Tim Quillin from Stephens Incorporated. Please proceed.

**Tim Quillin** - *Stephens Incorporated* - *Analyst*

Good morning.

**Bernard Bailey** - *VISG* - *President and CEO*

Hi, good morning.

**Tim Quillin** - *Stephens Incorporated* - *Analyst*

I apologize, I had to hop off the call, and you may have answered this already. And you talked about the revenue from the CAC program, but what was the total revenue from what used to be called TDT?

**Bernard Bailey** - *VISG* - *President and CEO*

Well, we really don't break our revenue out that way through the previous acquisitions, so you know, we're not really in a position to talk about it that way.

Bill, do you have any other color you would want to give on that?

**Bill Aulet** - *VISG* - *CFO*

No, I would just say that's not the way we look at our business. We really combine our operations down there in Washington. We sell a total solution; there is no TDT standalone business anymore.

**Bernard Bailey** - *VISG* - *President and CEO*

Yeah, I mean it's just like ZN, you know, there's no way to put a number on ZN. We are an integrated company across the whole board and that's how we look at our business. Now we can look at Federal but the Federal includes a lot of what we did previously in the old Viisage, coupled with what we're doing now in the new Viisage. And certainly, our performance there has dramatically improved, and in many ways.

**Tim Quillin** - *Stephens Incorporated* - *Analyst*

Okay. Well, in the past couple of 10-Qs, you actually reported revenue from TDT and ZN, but I guess we'll take that with a grain of salt. As far as the CAC program and revenues that you're getting in '04, you know, how concerned are you about difficult comparisons in '05, and what's the sustainability of that revenue stream?

**Bernard Bailey** - *VISG* - *President and CEO*

Yeah, Bill, why don't you take that, okay?

**Bill Aulet** - *VISG* - *CFO*

Okay. Can you just repeat the question, Tim?

**Tim Quillin** - *Stephens Incorporated* - *Analyst*

Yeah, the question, Bill, is that on the CAC program, how sustainable is that revenue, and you know, how difficult are the comparisons going to be in '05?

**Bill Aulet** - *VISG* - *CFO*

Okay, so if we look at this year, we initially said that the CAC program is going to be doing $10 million for the initial order. That is primarily for the production system. Going forward, as you look into the other years, we see 20 percent of that being, coming in 20 percent plus or minus, probably plus, coming in consumables, service maintenance support, software upgrades, at much higher margins.

**Tim Quillin** - *Stephens Incorporated* - *Analyst*

Okay, so perhaps there was $1 million in 2Q, $5 million in 3Q, $4 million in 4Q, but in 2005 we'll drop down to, you know, closer to a $2 million to $3 million run rate?

**Bill Aulet** - *VISG* - *CFO*

Thomson StreetEvents    streetevents@thomson.com    617.603.7900    www.streetevents.com 

© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call

Yes.

**Tim Quillin** - *Stephens Incorporated - Analyst*

Okay, that's good. And then, Bernard, you had mentioned something that there's a couple of States that are going to drop off. Can you just talk about any possible, you know, revenue losses on the State side?

**Bernard Bailey** - *VISG - President and CEO*

Yeah. You know, as I mentioned, you know, there are a couple of these States that we continue to do business with them and support them so they transition over, one of which, of course, is Florida, which interestingly is now almost two years since its last award. And we continue to support that State as they try to get their new system up and running. So, we certainly anticipate Florida dropping off.

The second one, of course, then would be Ohio. You know, as Ohio gets its new system up and running, we anticipate that the Ohio revenues will also drop off next year as they switch over to the new vendor going forward. So those are the two major States that will impact us from a revenue standpoint.

**Tim Quillin** - *Stephens Incorporated - Analyst*

Would you be able to quantify at all what type of revenue that you're getting from Florida and Ohio in 2004?

**Bernard Bailey** - *VISG - President and CEO*

I don't mind doing that; the problem is I don't have it at my fingertips right now. You know, are you going to be on the next call?

**Tim Quillin** - *Stephens Incorporated - Analyst*

I'll try. I've got another conference call to get on, though.

**Bernard Bailey** - *VISG - President and CEO*

Yeah, I was going to say, Bill, maybe you can give some color around that on the next call.

**Bill Aulet** - *VISG - CFO*

If we run out of time I prefer to...

**Bernard Bailey** - *VISG - President and CEO*

I'd estimate probably combined between the two is around $5 million a year. I could be off a little bit, don't use that as the number.

**Tim Quillin** - *Stephens Incorporated - Analyst*

Right.

**Bernard Bailey** - *VISG - President and CEO*

But it's not trivial.

**Tim Quillin** - *Stephens Incorporated - Analyst*

Okay. Very good. Thanks, gentlemen.

**Bernard Bailey** - *VISG - President and CEO*

Yeah. You're welcome.

All right. Well, again, I want to thank all of you very much for participating with us today. I certainly appreciate the support of all of our shareholders and of all our investor base. If there's anything else that we can do to help answer questions for you or give you more insight, we certainly are willing to do that. Feel free to either e-mail Bill or myself, or give us a call.

In the meantime, I would strongly recommend if you want to gain more insight into the financials that you all participate in the follow-on call which will be a more detailed financial analysis call to help give some more perspective and insight on that.

So, once again, thanks for your time today. And we will continue to do the very best we can and work as hard as we can to create shareholder value for all of our investors. Thank you very much.

**Operator**

Ladies and gentlemen, thank you for participating in the conference. This concludes your presentation, you may now disconnect. Good day.


© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call

DISCLAIMER

Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

© 2004, Thomson StreetEvents All Rights Reserved

© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

# Exhibit 35
# (Part 2 of 2)



# Conference Call Transcript

## VISG - Viisage Technology, Inc. Earnings Conference Call

Event Date/Time: Oct. 26. 2004 / 9:30AM ET
Event Duration: N/A

© 2004 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

VISG - Viisage Technology, Inc. Earnings Conference Call

CORPORATE PARTICIPANTS

**Bill Aulet**
*VISG - CFO, SVP*

**Peter Faubert**
*VISG - VP Finance, Corporate Controller*

CONFERENCE CALL PARTICIPANTS

**Steve Gish**
*Roth Capital Partners - Analyst*

**Jim Richiutti**
*Needham & Company - Analyst*

**Keith Larose**
*Bradley, Foster & Sargent - Analyst*

**Amy Feng**
*JMP Securities - Analyst*

**Daniel Cummins**
*UBS - Analyst*

**David Gremmels**
*Thomas Weisel Partners - Analyst*

**Michael Chang**
*Stephens, Incorporated - Analyst*

**Amy Nam**
*JP Morgan - Analyst*

**Scott Greiper**
*Unterberg - Analyst*

**Dave Sterman**
*Halpern Capital - Analyst*

PRESENTATION

**Operator**

Welcome to the Viisage Technology Financial Discussion conference call. (CALLER INSTRUCTIONS). I would now like to turn the presentation over to your host for today's call, Mr. Bill Aulet, CFO. Please proceed sir.

**Bill Aulet - VISG - CFO, SVP**

Thank you very much. Good morning everybody. I think you all hopefully participated in the other call. And we're trying something today, to be able to get the information out quickly and consistently to everyone. So this call is going to be focused on the financial aspects. It's going to be heavily oriented towards the q-and-a. And we will try to provide as much information as is appropriate, so that you can understand our business.

Obviously we're very pleased with the quarter we've had. But it's not perfect. We have areas that we want to improve on. And we're willing to discuss both sides of it, what we think we did well, and what we think we're going to improve on going into the future.

So basically we're very happy with the top line growth. The margins were, as you saw, as we gave you guidance on, were going to be depressed, because of the product mix. We feel we're very well positioned on this going forward. Our operating expense was a bit higher than we really would like. That's primarily focused on G&A, which we talked about. We talked briefly about the interest on the call. And we can talk more about that.

But the big news here is that we crossed the line for being GAAP net income positive, even with all the significant amortization expenses, which, as I mentioned, were over $900,000 per quarter. And if you add those back in, we're making over $1.1 million per quarter on a cash earnings basis.

EBITDA is $3.4 million, significant progress again as well there. So all in all good. We're focused on continual cost reduction. We feel that with Imaging Automation, if you look at our history of acquisitions, the end one really solidified our base, and gave us technology that really was fundamental to our existence, and that being in facial recognition. So that solidified it with that side. We have the driver's license. Our technology now is as good as anybody else, if not better, in that area.

And then with TDT, we're able to get critical mass, significant cash flows and a presence in Washington. And now, with Imaging Automation, we have the ability to have a growth engine going forward that gives us great synergies on the top line, most importantly, as well as the operating leverage.

**Thomson StreetEvents**    streetevents@thomson.com    617.603.7900    www.streetevents.com

© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**VISG - Viisage Technology, Inc. Earnings Conference Call**

For those of you who don't know, we acquired Imaging Automation on October 5th. As of this past Friday, they were fully integrated. They're here in Billerica. And, going forward, we will save $50,000 a month, starting in February, on their real estate up there. We also gained synergies of eight people in the process, going from their CEO and CFO to people within the organization at the IT level, but primarily on the G&A side, but one or two in the engineering side.

So, with that opening comment, let me open it up for questions now for things about Viisage's financial perspective. Do we have questions?

## QUESTION AND ANSWER

**Operator**

(CALLER INSTRUCTIONS). Your first question comes from Steve Gish from Roth Capital Partners. Please proceed sir.

**Steve Gish  - Roth Capital Partners - Analyst**

Hi Bill.

**Bill Aulet - VISG - CFO, SVP**

Hey Steve, how are you?

**Steve Gish  - Roth Capital Partners - Analyst**

I am good. How are you?

**Bill Aulet - VISG - CFO, SVP**

Outstanding.

**Steve Gish  - Roth Capital Partners - Analyst**

Great. I think that I asked about this a little bit in terms of the revenue segmentation. But how are you, going forward, going to present that in the SEC filings? And, if you could, could you somehow segment out that revenue for this quarter?

**Unidentified Company Representative - VISG**

Sure. So let me just say, as a sidebar, I have Peter Faubert here with me, who some of you probably know well. But he's the Vice-President of Finance and the Corporate Controller here. And when Tim asked that question, we were kind of talking about it. We have had to disclose that up until now. But it really is getting almost meaningless, because you have Buddy Beck doing a call with Bernard, and their people working with our people, their people working on state driver's license contracts.

We had a presence in Washington, D.C. before. And basically, we hired Ken Scheflen to integrate the operations. And that's going very well. So I would say that they contributed heavily. And I don't want to duck the question here. I will let Peter say some things in a second too. But the CAC program was one. And certainly TDT played a key role in that. But Viisage has played a very key role in getting that business and going forward. So I am

**Thomson StreetEvents**    streetevents@thomson.com    617.603.7900    www.streetevents.com    

© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Viisage Technology, Inc. Earnings Conference Call

not sure how you would break that down and split that between the segments.

**Steve Gish - Roth Capital Partners - Analyst**

But I guess one of the questions would be then, did CAC account for a significant or a majority of the revenue for TDT?

**Bill Aulet - VISG**

Well, there is no TDT. Right? We have a Federal Solutions Group.

**Steve Gish - Roth Capital Partners - Analyst**

Okay.

**Bill Aulet - VISG**

And it accounted for over half of the revenue that we had down there. So it was over $5 million. And we did in the neighborhood of $10 million down there.

**Steve Gish - Roth Capital Partners - Analyst**

Okay. And then —

**Bill Aulet - VISG**

Before we go, let me just have this open discussion here. I am going to push the speakerphone to Peter and have him talk a little bit about segment reporting as well. Okay?

**Peter Faubert - VISG - VP Finance, Corporate Controller**

Yeah, Steve, I think we're going to continue to see different aspects of our business in some of the cross-selling that are some of the drivers behind some of these acquisitions starting to happen now. And we're seeing that in the Federal Solutions Group, certainly. I think we're also going to start to see some of the cross-selling opportunities between our historical FR solutions versus our driver's license solutions, and some of our federal opportunities as well.

So we are beginning to see a trend, where we're going to have some technologies that are sold into different opportunities and different markets, which makes it more and more difficult for us, going forward, to segment either by geography or by FR versus DL or federal. So we may see a change in 2005 in terms of how we segment this business. And we're trying to flush that out now.

**Bill Aulet - VISG**

Steve, let me give you a specific example related to that. Let's talk about the Department of State. So they produce the passports. Now their interest as well, at Department of State, is in identity solutions. And we give them a presentation. They're interested in facial recognition. Obviously, for the Diversity Visa program, as we've talked about, we have our FR gurus here, and kind of specialists in that area. And they go down, and they matrix into the Department of State.

In addition now, you have a situation where we have the Imaging Automation document authentication product. And while it's not here in the United States yet, in other countries they use the Imaging Automation platform to test new passports, test security features in the new passports. So if they're going to produce a new security feature, they will test it on the Imaging Automation product.

For instance in Canada, because they want to know, first of all, they check for the quality. And, second of all, they check for the security feature. And then if that security feature can be picked up, then it's valuable, because they have literally hundreds, in all the international airports, they have these document authenticators there. So that would be revenue that would be sold into the passport office.

And then you get into a question of how do you account for that revenue, where do the costs come from? That's why it's getting more and more complicated, which, by the way, we're not trying to make it difficult for you. That's just the way the business should be run.

**Steve Gish - Roth Capital Partners - Analyst**

Obviously our modeling is different than the way you've been reporting revenue. But the segments that you reported in the last Q, would that be what you report for the next two quarters, and then maybe you, along with your auditors, decide how to segment that out for next year?

**Bill Aulet - VISG**

Yeah. I would say that the reporting will be consistent for the fourth quarter, certainly the third quarter and the fourth quarter. And then we'll probably revisit how we're reporting at the beginning of 2005.

**Steve Gish - Roth Capital Partners - Analyst**

Okay. And Peter, Sarbanes-Oxley expenses were about $350K in the quarter?

Thomson StreetEvents    streetevents@thomson.com    617.603.7900    www.streetevents.com     4

© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Viisage Technology, Inc. Earnings Conference Call

**Peter Faubert** - *VISG - VP Finance, Corporate Controller*

Yeah.

**Steve Gish** - *Roth Capital Partners - Analyst*

What were those expenses for the first half of '04? And what would you expect in Q4?

**Peter Faubert** - *VISG - VP Finance, Corporate Controller*

Let's see. The total expenses today are probably in the $400,000 neighborhood. I expect that we're now through the big push in terms of our compliance project at this point. So I expect that we will continue to incur those costs in Q4, certainly as we go through the final testing stages. But I don't think it will maintain the same run rate that we had this quarter. I think we've reached the peak at this point.

**Steve Gish** - *Roth Capital Partners - Analyst*

Are a lot of those expenses initial expenses that therefore we could expect to see those expenses drop in '05?

**Peter Faubert** - *VISG - VP Finance, Corporate Controller*

Yes. We're certainly doing all of our process documentation work this year for the compliance by December 31, 2004 under 404. I expect that we will have some costs going forward into 2005, just to maintain our compliance, and to update as we integrate the companies and the like. But certainly I don't expect it to be at the same level as this initial preparation.

**Steve Gish** - *Roth Capital Partners - Analyst*

Okay great. And one last thing. The $120,000 one-time expense, that was a non-cash expense?

**Peter Faubert** - *VISG - VP Finance, Corporate Controller*

Yes it was. It was related to negotiation of some of the debt facilities that we paid off in the third quarter.

**Steve Gish** - *Roth Capital Partners - Analyst*

Okay. And from Bernard's statements, with this new credit facility, is your intent to pay down some of the existing debt?

**Bill Aulet** - *VISG*

Two things Steve I want to talk about. You raised the G&A line item. And then you raised the interest line item.

**Steve Gish** - *Roth Capital Partners - Analyst*

Yeah.

**Bill Aulet** - *VISG*

I just want to go back to the G&A line item for a second, because you're talking about those things. We were $2.4 million this quarter on the G&A line item. We believe that should go down. There are going to be challenges here. But we're going to try to move that down, because of those things.

Now, I will tell you right now, the big swingers in there are the legal and the Sarbanes-Oxley. And in addition, we are taking on some additional costs– not big, because of all the actions we have taken so far – in Imaging Automation.

**Steve Gish** - *Roth Capital Partners - Analyst*

Right.

**Bill Aulet** - *VISG*

So those costs will come in the fourth quarter.

**Steve Gish** - *Roth Capital Partners - Analyst*

And the legal expenses - are those expensed as incurred?

**Bill Aulet** - *VISG*

Yes.

**Steve Gish** - *Roth Capital Partners - Analyst*

Okay.

**Bill Aulet** - *VISG*

So we're hopeful that those will go down. We were hopeful last quarter. And they did not.

**Steve Gish** - *Roth Capital Partners - Analyst*

Right.

**Thomson StreetEvents**    streetevents@thomson.com    617.603.7900    www.streetevents.com    

© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Viisage Technology, Inc. Earnings Conference Call

**Bill Aulet - VISG**

Relative to the interest, let's talk about the interest. On the call there was a question about the interest. We have maintained that, until we got the right credit facility, at the right rate, and the right flexibility. So now we have that. And now we can essentially consolidate our debt. We have paid off the Beck debt. We have paid off the Lau debt. That was the highest expense debt, at 8.5%. We're now at the lower one.

**Steve Gish - Roth Capital Partners - Analyst**

Okay.

**Bill Aulet - VISG**

The issue with the lower ones is that, as we pay those off and consolidate them, there will be prepayment penalties that we will incur as we do that. So, while the interest payments will go away over time, in the fourth quarter there could be $600,000 of prepayment penalties that we incur, that are one-time charges. So that relates to Commerce Bank.

**Steve Gish - Roth Capital Partners - Analyst**

Sure. Okay.

**Bill Aulet - VISG**

So we need to navigate that through. One of the reasons we did not pay off the debt right away was in the M&A strategy, we want to make sure we maintain flexibility. However, now that we have this set up, and once everything is locked and loaded, we have the flexibility, because we have this line of credit. So we don't have to sit there with money out, and have cash on our balance sheet as much so.

**Steve Gish - Roth Capital Partners - Analyst**

Okay. And just one final thing. On the acquisition of iA, have you or have your auditors determined how much of the intangibles will be classified as good will?

**Bill Aulet - VISG**

Great question. We have engaged a valuation expert to do a preliminary assessment of the purchase accounting for iA. And, again, very preliminarily, we've identified about $8 million of identified intangible assets related to the acquisition. That's going to be spread pretty much throughout the operating expense line items, and a little bit going to cost of sales as well.

We've identified intangible assets related to contracts, patents, trademarks, licenses, acquired technology and customer lists, all of them. So we're probably going to take another, I'd say in the ballpark of half a million dollars a quarter, of amortization expense through the P&L, which will obviously increase our depreciation and amortization expense, and be backed out for EBITDA purposes as we go forward here.

**Steve Gish - Roth Capital Partners - Analyst**

Right. Okay. Thanks Bill. Thanks Peter.

**Bill Aulet - VISG**

Thank you Steve. And just one other note on that. We included that in our guidance going forward for this year.

**Steve Gish - Roth Capital Partners - Analyst**

Okay.

**Bill Aulet - VISG**

The half million dollars of expense related to amortization.

**Steve Gish - Roth Capital Partners - Analyst**

Okay.

**Operator**

Your next question comes from Jim Richiutti from Needham & Company.

**Jim Richiutti - Needham & Company - Analyst**

Hi. Yes, I am struggling a little bit with the G&A. And clearly you've got some moving parts here. And it sounds like it could go down as we look out in the early part of '05 from where you are in Q3. But Q4, it still sounds like the G&A is going to be up, especially when you factor in iA.

**Bill Aulet - VISG - CFO, SVP**

Okay. So let's talk about that. In iA, we basically eliminated five positions in the synergy. So a lot of that was eliminated right away. Unfortunately, we are picking up rent of $50,000 a month with them, so that will go up. But we also have the $120,000 related to the payoff of the Lau loan expense.



© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

The Sarbanes-Oxley, as Peter mentioned, it was particularly high in the third quarter. We hope, we believe that that's the case. We also had legal costs that were quite high. And these things, they're going to resolve themselves.

**Jim Richiutti - Needham & Company - Analyst**

But the legal bill will still be high in this quarter?

**Bill Aulet - VISG - CFO, SVP**

Yeah. We're not forecasting that to go down dramatically.

**Jim Richiutti - Needham & Company - Analyst**

Okay.

**Bill Aulet - VISG - CFO, SVP**

But you're right. On the G&A side, we're taking a little bit of a challenge here to try to reduce that.

**Jim Richiutti - Needham & Company - Analyst**

But you think you can bring it down versus Q3?

**Bill Aulet - VISG - CFO, SVP**

Yeah. And also, I mentioned on the call that we have the $15,000 a month that we're paying in Littleton right now, which has ended. So, essentially, we're going to pick up from the real estate there. We wrote off some bad debt in the casino business this past quarter. We're trying to make sure that everything is clean here going forward, bringing up everything we can.

**Jim Richiutti - Needham & Company - Analyst**

Okay. Your selling expense has been fairly steady, even with the big increases you've seen sequentially in revenues. Does that change at all as you go after some of these newer federal programs, as you layer in the iA business. Or as we look at it as a percent of revenue, should it stay pretty constant?

**Bill Aulet - VISG - CFO, SVP**

Well, it's actually going to go up materially here, because of Imaging Automation. When we bought Imaging Automation, we really liked their sales force. And we brought it over fully intact.

There wasn't anyone that we let go in that scenario. And so that will drive it up.

And going for these new programs, we've actually gotten a lot smarter about it. And with Ken Scheflen, we're working through partners. We hired Jeremy Kirsch earlier in the year to be a partners manager. And we're getting a lot more leverage. I think we're getting a lot smarter, Jim, about going after these things than we may have been in the past. So I see it going up materially, but it's going to stay below $2 million for sure. I shouldn't say for sure. It will go up, but not too much.

**Jim Richiutti - Needham & Company - Analyst**

Okay great. Thanks a lot.

**Operator**

Your next question comes from Keith LaRose with Bradley, Foster & Sargent.

**Keith Larose - Bradley, Foster & Sargent - Analyst**

A couple of questions. It was mentioned on the call that the R&D line item was lower by virtue of capitalizing some of the software development costs. Can you give me a little bit more color on that?

**Peter Faubert - VISG - VP Finance, Corporate Controller**

Yeah Keith, this is Peter. In the third quarter, as you know, we launched our proofing product. There was some fairly significant software customization work that went into that product. So we were required to capitalize some software development costs associated with proofing. Clearly, subsequent to – and I would say –

**Keith Larose - Bradley, Foster & Sargent - Analyst**

How much was that?

**Peter Faubert - VISG - VP Finance, Corporate Controller**

I would say it was in the probably $100,000 ballpark. Going forward, certainly we don't expect that we would have to capitalize that much software development cost in Q4. And in addition to that, we'll start taking amortization expense on what we did capitalize, just based on the fact that we've launched the product at this point. So you probably can expect research and development to increase a little bit related to the capitalization in Q3.

**Keith Larose - Bradley, Foster & Sargent - Analyst**

© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Viisage Technology, Inc. Earnings Conference Call

Thank you. Also, can you talk a little bit more on the, I guess Bernard had mentioned that the Department of State, the contract that was lost down there, that the competitor had a price that was 70% below other bids. Was that accurate?

**Bill Aulet - VISG**

Let me just explain that. We bid through a systems integrator. The way we understood it was that you needed to meet all the criteria. But they bid directly. And I guess on these things it says you supposedly get points for technical and partnership and delivery and all that. It seems that that didn't count as much as the price.

And they bid direct through no systems integrator. And so that helped their price as well. So they were significantly less than us. I don't know the exact numbers. And I do know what was public for them. That you can go find on the government web site. So we do know that it was dramatically less than us. But exactly 70%, I can't comment on that.

**Keith Larose - Bradley, Foster & Sargent - Analyst**

Okay. And one last item. Do you feel like adding any comments to issues relating to the merger pipeline going forward?

**Bill Aulet - VISG**

I think that's a very fair question. And I think that you've seen – we just talked about a kind of a progression. As we go forward, now we have critical mass. And if we can buy a company at an attractive price, that fits into the portfolio of solutions we have, and it's accretive, we will go do that. We will not do it in a serial manner. We can only do so many. So we're going to pick our spots carefully as to what we do.

But clearly I think you're seeing that as each acquisition goes on, they become more and more powerful to us. So we certainly have a strategy of being a total – providing advanced technology solutions, for identity, for identifying people. And along those lines, there are a number of opportunities out there. The question is, at the right price, the right philosophy. Do their markets match with us, does it contribute to our gross margin? It has to improve our growth rate, improve our gross margin, and be accretive in a relatively meaningful time frame.

**Keith Larose - Bradley, Foster & Sargent - Analyst**

Thanks guys. Good quarter, by the way.

**Bill Aulet - VISG**

Thank you very much Keith. Before we move on to the next one, I just want to say that the gross margin, I talked about that on the call as moving up. And I think Keith brought up the point about software capitalization. Because of these products that we're starting to see come out of the pipeline, and because of Imaging Automation, and because of efficiencies we're getting in the driver's license business, we are starting to see – and, by the way, the consumables starting to kick in for the Department of State, we see that the gross margins will move up here.

**Operator**

Amy Feng from JMP Securities.

**Amy Feng - JMP Securities - Analyst**

I wanted to talk some more about, could you just give us the states again that are upcoming for contracts on the Department of Motor Vehicle side? I know Bernard, I think, mentioned Texas and West Virginia. Which other states did he mention?

**Bill Aulet - VISG**

There's a state that you might be familiar with called California.

**Amy Feng - JMP Securities - Analyst**

Okay.

**Bill Aulet - VISG**

Texas, California, and Virginia are three big ones.

**Amy Feng - JMP Securities - Analyst**

Okay.

**Bill Aulet - VISG**

Indiana is also out there. West Virginia is out there right now. And that we expect in a short time frame. I also want to reemphasize the point that we're not going to win all of these things. We're going to go in, and we're going to bid responsibly on them. And if we bid responsibly and win them, I think you're going to see it's a very good business for us. And I also want to say in the Wisconsin bid, we are starting to see rationality return to the marketplace, relative to pricing. And that's a good sign. We're very happy with that.

So in answer to your question Amy, Texas, California, Virginia, are really big ones. Indiana, and then you have West Virginia that's out there right now. There's Ontario. And there's smaller


Thomson StreetEvents    streetevents@thomson.com    617.603.7900    www.streetevents.com    8

© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

VISG - Viisage Technology, Inc. Earnings Conference Call

ones. But as soon as they come up, it's a very finite market. It's a very finite group. So when they come up, everybody knows it.

**Amy Feng - JMP Securities - Analyst**

Okay. Let me ask you. In terms of the states that you just mentioned, are any of them your current customers?

**Bill Aulet - VISG**

No. None of them are our current customers.

**Amy Feng - JMP Securities - Analyst**

So any of these would be potentially big wins for you, and you could add these into your backlog.

**Bill Aulet - VISG**

That is correct. And we also say that when we win a state like Wisconsin, in the past we produced a driver's license. Now, today, when we go in, we win the state. We're looking to not only do the driver's license. But then we up-sell them high value, high margin business, like proofing stations, like facial recognition. And, as you saw in the quarter, there were two major states that added facial recognition, which totaled over $2 million. That's extremely profitable business, frankly more profitable than the Department of State contract that everyone talks so much about. But that's the kind of thing that we want to do.

And now we can go back into our existing customers and sell them Imaging Automation, the proofing station with Imaging Automation, at very high margins for us, and by the way, extremely valuable to them as well. And we're even looking at states that we don't own, that aren't our states for DMV, that we would sell a proofing solution into. And they're extremely receptive to that.

**Amy Feng - JMP Securities - Analyst**

Okay. And then in general, what's the time difference between when you officially have won the contract, and when you put out press release and make it publicly known?

**Bill Aulet - VISG**

Let me explain that, because that question has come up. We will not have a press release until there is a commitment from the customer. And then we will not release a customer's name unless they agree to do it. So in the case of Wisconsin, there was a letter, an award letter, that we have. And then usually there's a contract

signed. At this point, we announce the award letter. And then when the contract is signed, we'll have more specificity on the size of the contract and all the features of it. But basically the letter, the award letter that we got, after we've been notified, until we get something that's definitive, we prefer to go all the way to the contract. But then when we announce it, then we can tell you exactly how much revenue it is. And we can be much more definitive about it.

**Amy Feng - JMP Securities - Analyst**

Okay, great.

**Bill Aulet - VISG**

So usually, from award, it depends on the situation. But usually as soon as we know that contract is signed, we try to get it out immediately.

**Amy Feng - JMP Securities - Analyst**

Great. Thank you very much.

**Operator**

Daniel Cummins from UBS.

**Daniel Cummins - UBS - Analyst**

I have a couple questions. One, I was curious, you may have gone over this on the call, did you guys ever have a formal sit-down, either behind closed doors in a group forum with the other bidders, for the Visa FR award? I was curious whether you ever got to that point, kind of a clarification meeting.

**Bill Aulet - VISG**

It was our partner, Aptis, that had a formal debriefing. We had met with the customer as well, and were debriefed on it, because you know – so yes, we did.

**Daniel Cummins - UBS - Analyst**

Okay. So Bernard's comments, I'll take Bernard's comments in that context. Okay.

**Bill Aulet - VISG**

Did you hear his comments?


© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**VISG - Viisage Technology, Inc. Earnings Conference Call**

**Daniel Cummins** - *UBS - Analyst*

I did. Yes.

**Bill Aulet** - *VISG*

Okay. Perfect.

**Daniel Cummins** - *UBS - Analyst*

The other question is, the earn-out, the TDT earn-out, is that in any way adjusted or is it completely over, relative to the outcome at State for either Visa or E-Passport?

**Bill Aulet** - *VISG*

The earn-out there is done. That was related to the DOD CAC card. There is no further earn-out.

**Daniel Cummins** - *UBS - Analyst*

Okay.

**Bill Aulet** - *VISG*

We did not have an earn-out related to the Department of State FR bid.

**Daniel Cummins** - *UBS - Analyst*

Okay. And this is sort of related to the question about getting together with the senior management of Imaging Automation. Do you guys have a formal plan to get on the road with their senior management, and meet some of their customers, where you're looking for a better in, or with their integrator partners? And when do you expect to be on the road with those guys?

**Bill Aulet** - *VISG*

We have been on the road. As soon as we did the integration, we had a formal program where we called all the partners and notified them. And we've been joint marketing. They are, literally, here now. And all this week we have joint sales meetings early in the morning and usually late at night, and sometimes in between. But all that joint planning has already happened.

**Daniel Cummins** - *UBS - Analyst*

And, for the most part, those individuals, they're signed up to be with you for at least a year?

**Bill Aulet** - *VISG*

Imaging Automation?

**Daniel Cummins** - *UBS - Analyst*

Right.

**Bill Aulet** - *VISG*

I don't believe that there's a lock-up. No. They're not signed up.

**Daniel Cummins** - *UBS - Analyst*

Oh, I thought there were some employment contracts signed.

**Bill Aulet** - *VISG*

No. I don't believe that there are.

**Daniel Cummins** - *UBS - Analyst*

Okay. All right. Thanks. Good job on the quarter.

**Operator**

David Gremmels from Thomas Weisel Partners.

**David Gremmels** - *Thomas Weisel Partners - Analyst*

Thanks. Just a couple of quick housekeeping questions. In the past, you had given us net income projections. In this quarter, I know you gave revenue and EBITDA. Maybe I missed if you said anything about net income. Do you have guidance for the quarter or the full year?

**Bill Aulet** - *VISG*

Yeah. We're not changing the operating income guidance or the net income guidance. The net income was, essentially, the operating income was break-even. And the net loss guidance was $1.5 million. The reason why we're not doing that is we have a number of moving pieces that have come in, specifically the amortization of intangible assets here. And also, there was a slight change in the purchase accounting for the amortization of


© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**VISG - Viisage Technology, Inc. Earnings Conference Call**

intangible assets related to TDT, which Peter closed on. So those we are not changing.

**David Gremmels - Thomas Weisel Partners - Analyst**

Okay. And on the interest expense line, if you don't pay down any additional debt, what would that quarterly interest expense be?

**Bill Aulet - VISG**

I think if we did not take the one-time charge, our interest expense, net of interest income that we would have earned for the fourth quarter, would be anywhere between $20,000 and $50,000. So somewhat immaterial.

**David Gremmels - Thomas Weisel Partners - Analyst**

Okay. And then -

**Bill Aulet - VISG**

So the up shot of that is, David, for housekeeping, is that interest expense for this next quarter is going to kind of go up and be similar to what it was in the second quarter; yeah, it would be somewhat higher than what it was in the second quarter, because of that one time payment associated with prepayments.

**David Gremmels - Thomas Weisel Partners - Analyst**

Right. Okay. And then there was discussion of the segments. And, since you're not changing the segment reporting until next year most likely, could you give us the split between secure credentials and biometrics for the quarter?

**Bill Aulet - VISG - CFO, SVP**

Yeah. We can. The problem with this, David, as we go through this, and now we're working with our auditors, is that it's difficult, because the sales campaigns are so integrated. So the upshot of it is facial recognition is going to, if you look at it that way, be going down. Correct Peter? And the Federal Solutions business is going up. And the driver's license is becoming more profitable, and basically going up slightly to remaining flat.

**David Gremmels - Thomas Weisel Partners - Analyst**

Okay. So the facial recognition, as split out currently, is going to be coming down? And why is that?

**Bill Aulet - VISG - CFO, SVP**

Because the nature of the solutions that we're selling, we go out and sell an identity solution.

**David Gremmels - Thomas Weisel Partners - Analyst**

Okay. So it's just because it's not being broken out in terms of the contract as it was in the past?

**Peter Faubert - VISG - VP Finance, Corporate Controller**

That's correct. You know, again, what we're seeing is that where facial recognition revenue is being recorded as part of the driver's license solution, for example, in some instances, we're incorporating the underlying technology into the proofing solution that we have now launched. So we will now longer break out the face recognition component of those solutions as we sell those. So that's where we're starting to see the cross-selling opportunities, and really using the biometrics piece of our business as an enabling technology, to deliver some of the other solutions that we're selling into the marketplace. So pure face recognition and biometrics projects probably will decrease as we continue to integrate those solutions.

**Bill Aulet - VISG - CFO, SVP**

So David, let me just give you an example of that — we're not trying to make life difficult on you all. We have people who are kind of facial recognition experts here. But our sales people go out and they sell the total solution to the state of Connecticut, or the Department of Defense, or U.S. VISIT. They do not go in there and just sell face recognition. They go in, and we have the presentation that talks about a total identity solution made up of secure credentials, authentication, the biometrics, and then the database management. And that's what they're selling. And that's what we want them to sell. But on the flip side, I do want to say we have a group whose mission is measured and paid and compensated based on their ability to make our facial recognition the best in the world.

And Bernard talked about the facial recognition grand challenge. And so there are people here who take it very personally when, even if it's "just an FR bid", that we don't win that, because we're better than anybody else. We want to win those too. But we're looking to sell the total solution.

So the simple analogy is we're in the business of selling cars for transportation, not just the best carburetor in the world, or the best set of tires. And we believe that will improve our margins. And that's really what the customer wants. They want a total solution. They don't want to buy different pieces, and have to cobble it together all the time.

**Thomson StreetEvents**    streetevents@thomson.com    617.603.7900    www.streetevents.com     11

© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Viisage Technology, Inc. Earnings Conference Call

---

**David Gremmels** - *Thomas Weisel Partners - Analyst*

Okay. Understood. Is the revenue from the passport contract split pretty evenly throughout the year? So would that be in the $3-4 million range for the quarter?

---

**Bill Aulet** - *VISG*

Yeah. That's correct.

---

**David Gremmels** - *Thomas Weisel Partners - Analyst*

Okay. And then the last one. Are there any driver's license decisions coming up between now and the end of the year, or the ones that you talked about? Or are those all out in '05?

---

**Bill Aulet** - *VISG*

West Virginia is the only one that we can see.

---

**David Gremmels** - *Thomas Weisel Partners - Analyst*

Great. Okay thanks.

---

**Operator**

Michael Chang, Stephens, Incorporated.

---

**Michael Chang** - *Stephens, Incorporated - Analyst*

Just a few quick questions. The first one is a follow-up with Tim's question on the revenue from the states of Ohio and Florida. What is the revenue contribution for this year? At least the first three quarters, plus expected revenue for '04 from those two states?

---

**Bill Aulet** - *VISG*

Bernard was pretty much on target there.

---

**Michael Chang** - *Stephens, Incorporated - Analyst*

Okay. Okay.

---

**Bill Aulet** - *VISG*

That's a good number to work with.

---

**Michael Chang** - *Stephens, Incorporated - Analyst*

About five million, right?

---

**Bill Aulet** - *VISG*

Yeah.

---

**Michael Chang** - *Stephens, Incorporated - Analyst*

And I think in your presentation you mentioned that in 3Q about one-third of the total growth was from organic.

---

**Bill Aulet** - *VISG*

Yes.

---

**Michael Chang** - *Stephens, Incorporated - Analyst*

If that's the case, can I assume the acquired revenue will be around $6 million? Because the total growth is 97%.

---

**Bill Aulet** - *VISG*

Yeah. So it's either organic growth or it's from the acquisition. So, if a third of the 97 is from the organic --

---

**Michael Chang** - *Stephens, Incorporated - Analyst*

Yes. That's based on $10 million plus from 3Q last year.

---

**Bill Aulet** - *VISG*

Yeah.

---

**Michael Chang** - *Stephens, Incorporated - Analyst*

So the acquired, the revenue will be around $6 million.

---

**Bill Aulet** - *VISG*

Okay. So which quarter are you looking at?

---

**Michael Chang** - *Stephens, Incorporated - Analyst*

Just past, 3Q '04.

---

**Bill Aulet** - *VISG*

**Thomson StreetEvents**    streetevents@thomson.com    617.603.7900    www.streetevents.com

© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Viisage Technology, Inc. Earnings Conference Call

3Q '04 to compare to?

**Michael Chang** - *Stephens, Incorporated - Analyst*

3Q '03.

**Bill Aulet** - *VISG*

3Q '03. So, 3Q '03 we're looking at this, right. So you take out five from that?

**Michael Chang** - *Stephens, Incorporated - Analyst*

No. I mean 3Q '03 total revenue is $10.1 million.

**Bill Aulet** - *VISG*

Right.

**Michael Chang** - *Stephens, Incorporated - Analyst*

And the last quarter was $19 million. Total growth is 97%. And I think you mentioned that organic growth is about one-third.

**Bill Aulet** - *VISG*

That's correct.

**Michael Chang** - *Stephens, Incorporated - Analyst*

Which makes the acquired revenue will be probably $6 million?

**Bill Aulet** - *VISG*

That's correct.

**Michael Chang** - *Stephens, Incorporated - Analyst*

And that includes $5 million for the CAC program.

**Bill Aulet** - *VISG*

That's correct.

**Michael Chang** - *Stephens, Incorporated - Analyst*

Okay.

**Bill Aulet** - *VISG*

The CAC program is part of the organic growth.

**Michael Chang** - *Stephens, Incorporated - Analyst*

Okay, yeah. And that's very clear. And –

**Bill Aulet** - *VISG*

Please note along that, Michael, as I am looking at the numbers, organically, with that same business, we grew the margin substantially year-over-year.

**Michael Chang** - *Stephens, Incorporated - Analyst*

Yes. Yes. And the next question is how much revenue do you expect from Imaging Automation in 4Q and '05?

**Bill Aulet** - *VISG*

Imaging Automation grew year-to-year by 130%. I believe the that's the number, I don't have it off the top of my head. They did $6 million in the last fiscal year. So we expect that growth rate to continue going forward.

**Michael Chang** - *Stephens, Incorporated - Analyst*

Okay. $6 million last fiscal year, which ends in which month?

**Bill Aulet** - *VISG*

September 30, 2004.

**Michael Chang** - *Stephens, Incorporated - Analyst*

Okay. And the 130 percent year-over-year growth?

**Bill Aulet** - *VISG*

I am not saying it's going to be exactly 130. I am saying that we see that type of triple digit growth here.

**Michael Chang** - *Stephens, Incorporated - Analyst*

Yeah. That was based on actual data.

**Bill Aulet** - *VISG*


© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Viisage Technology, Inc. Earnings Conference Call

Yeah.

**Michael Chang** - *Stephens, Incorporated* - *Analyst*

Okay. Okay.

**Bill Aulet** - *VISG*

In September 2003, fiscal year 2003, they did $2.6 million. In 2004, they're going to do approximately $6 million. And that's an increase of 130 percent. Their gross margins were about 60%, because of the proprietary nature of their technology, as well as the software component. So we see that growth continuing in the future.

**Michael Chang** - *Stephens, Incorporated* - *Analyst*

Yeah. That's very clear. And also, you mentioned the cash used for operations was about a half million in the last quarter, because of the increased accounts receivable. Who is the largest customer holding this accounts receivable? I mean, who has not paid you yet?

**Bill Aulet** - *VISG*

Well that's easy, because it's the Department of State. But that doesn't mean that they're late in paying it. It means that was, in large part, current receivables, that we shipped a ton of them in the last two weeks, three weeks of the quarter.

**Michael Chang** - *Stephens, Incorporated* - *Analyst*

Okay. And last question, just want to clarify -

**Bill Aulet** - *VISG*

I'll just say one other thing about that. I want to make sure everyone understands. We don't have a problem with accounts receivable.

**Michael Chang** - *Stephens, Incorporated* - *Analyst*

No, no, no. I am not saying that.

**Bill Aulet** - *VISG*

From a standpoint of writing them off, I mentioned we wrote off $30,000. That's from the casino business. But we don't have a

receivables problem in general. This was just a matter of timing, as Bernard mentioned.

**Michael Chang** - *Stephens, Incorporated* - *Analyst*

Okay. And the last one was about interest expense. Did you say in 4Q, you will expect about a $600,000 one-time penalty from the early debt repayment?

**Bill Aulet** - *VISG*

That's the way it reads right now. Yes.

**Michael Chang** - *Stephens, Incorporated* - *Analyst*

Okay. And ongoing interest expense will be like $20,000 to $50,000 per quarter?

**Bill Aulet** - *VISG*

Yeah.

**Michael Chang** - *Stephens, Incorporated* - *Analyst*

Okay. That's very clear. So for 4Q, the increase expense will be about $600,000?

**Bill Aulet** - *VISG*

It will be a little bit more than that for the fourth quarter.

**Michael Chang** - *Stephens, Incorporated* - *Analyst*

Okay. Got you. Thank you very much.

**Bill Aulet** - *VISG*

We have time, until 10:30. Then I've got to run down to JP Morgan. So how many more do we have?

**Operator**

I see that there are five queued up. So your next question comes from Amy Nam from JP Morgan.

**Amy Nam** - *JP Morgan* - *Analyst*

A couple of quick questions for you. International customers this quarter as a percentage of revenue?


© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Viisage Technology, Inc. Earnings Conference Call

**Bill Aulet** - *VISG*

Well international, first of all, let me say that Imaging Automation does the lion's share of their business internationally, almost the inverse. If we do 90/10 domestic to international, they do 90/10 the other way. They have a very strong presence in Canada, U.K., Hungary, Australia, across the board, this border management. So for this past quarter, I would stick with our numbers of 90/10, although it might have been 85/15, because Alberta wasn't a big contributor. And I can't think of anybody else who was a big contributor. The lion's share of stuff for us is domestic. International is a huge growth opportunity, as is the commercial space as well.

**Amy Nam** - *JP Morgan* - *Analyst*

Okay. Customer concentration?

**Bill Aulet** - *VISG*

Department of State is going to be a big – no, I am sorry. The Department of Defense is going to be a big player in that. So that's going to be in the neighborhood of 25-30% I would guess.

**Amy Nam** - *JP Morgan* - *Analyst*

Okay. Why did the Company only pay down part of the debt this quarter, and not all of it?

**Bill Aulet** - *VISG*

Because we did not have a commitment from the bank. We were in the middle of doing the acquisition. We had finished the secondary offering. We came back, and believe it or not, took a vacation for a week. And then we came back and we immediately went into closing out the, making sure we had a successful quarter, and the Imaging Automation acquisition. And once we got into the Imaging Automation, we also were negotiating with banks. But we didn't want to pay off all the debt, and not be in a position to consummate the Imaging Automation, or do it at a price that wasn't good. So we maintained our flexibility. And then, once we have the bank locked up, now we're going to transfer that in there.

And, as of today, we've paid off the Beck note. We paid off the Lau note. The only thing that remains is Commerce. We now have the commitment letter, as of last night, with Citizens Bank. So we can move that over. But we didn't want to risk the growth of ours, to try to just wipe out there, and then not have our landing spot all set.

**Amy Nam** - *JP Morgan* - *Analyst*

Okay. And then so the interest cost on the residual debt is - ?

**Bill Aulet** - *VISG*

The interest costs for the past quarter were $411,000.

**Amy Nam** - *JP Morgan* - *Analyst*

And then going forward for the remaining portion?

**Bill Aulet** - *VISG*

What we have for interest for the next quarter will be, we just talked about that, about $625,000 as a ballpark.

**Amy Nam** - *JP Morgan* - *Analyst*

So $600,000 in the prepayment, and $25,000 in interest expense?

**Bill Aulet** - *VISG*

Right. And just offset by the fact that when we put it there, we're going to get some interest income as well.

**Amy Nam** - *JP Morgan* - *Analyst*

Okay, great. Thank you.

**Operator**

Scott Greiper from Unterberg.

**Scott Greiper** - *Unterberg* - *Analyst*

I just want to clarify, for myself and everybody else, the breakdown of the revenue growth in Q3, because I am not sure if it came through clearly. In any event, let's assume that you increase revenues just by $10m, just to round it off from $10m to $20m quarter over quarter, Q3 '03 - Q3 '04. A third of that is organic. So call that $3 million The rest is what?

**Bill Aulet** - *VISG*

I am sorry.

**Scott Greiper** - *Unterberg* - *Analyst*


**Thomson StreetEvents**   streetevents@thomson.com   617.603.7900   www.streetevents.com   16

© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Because I had earlier that the rest is iA, which would account for $6-7 million in the quarter.

**Bill Aulet** - *VISG*

There is no iA revenue in the third quarter.

**Scott Greiper** - *Unterberg - Analyst*

Right. So what is the rest from?

**Bill Aulet** - *VISG*

I am just pulling it up. So your question is we did – ?

**Peter Faubert** - *VISG*

It would be the legacy TDT and ZN revenue.

**Bill Aulet** - *VISG*

So yeah. In the third quarter of last year, we did $10.million. In this quarter we did $19.9 million. The driver's license business grew at 10%. And the facial recognition, as a segment, although there's facial recognition in the SIPS segment as well, which makes it challenging, is slightly down. And then the Federal Group came off the map, from 0 to over $9 million.

**Scott Greiper** - *Unterberg - Analyst*

All right. So that's the TDT?

**Bill Aulet** - *VISG*

Well, that's the problem. We call it TDT.

**Scott Greiper** - *Unterberg - Analyst*

I understand you don't break that out separately. But for all intents and purposes, that's what it is?

**Bill Aulet** - *VISG*

Not really, because you've got Ken Scheflen, you've got Kevin McKenna. You have got all of these people who are Viisage employees down there. I mean if you go down to our Washington office, you will see that there is no TDT, except as a legal entity.

They're all one now. So that includes the Diversity Visa. That includes a lot of other stuff. Does that help you?

**Scott Greiper** - *Unterberg - Analyst*

A little bit.

**Bill Aulet** - *VISG*

I am sorry. We're not trying to make it hard.

**Scott Greiper** - *Unterberg - Analyst*

I know you're not.

**Bill Aulet** - *VISG*

We're trying to –

**Scott Greiper** - *Unterberg - Analyst*

Okay. I will work through it, and I will get back with you. Thank you guys.

**Bill Aulet** - *VISG*

Scott, if you need any other help on baseball, just give us a call up here in Boston.

**Operator**

Dave Sterman from Halpern Capital.

**Dave Sterman** - *Halpern Capital - Analyst*

I don't know how much color you can give. But the up-front deployment there, the heavy business you booked there with the DOD with the Access Card in Q3, can you talk a little bit about the size, in terms of revenue, that that whole deployment is, what the margins are in the upfront installation, and then what the size of the consumables opportunity is, and the margins with that as well?

**Bill Aulet** - *VISG*

Yeah. I will do that real quickly. The upfront deployment, the original contract was for 1,750 systems. And that's $10.2 million. That does not include consumables. Those are deployed over this year probably.


© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**Dave Sterman - Halpern Capital - Analyst**

I am sorry. Could you repeat that number once again? I am sorry.

**Bill Aulet - VISG**

That's $10.2 million for the original systems. That's 1,750 systems. Those are essentially the razors. They go in. The gross margins are in the mid-teens. And so those are the razors. The ongoing business will be conservatively estimated at 20% of that. So that's $2-3 million a year. And the gross margins on that will be 50% plus. Is that fair , Peter?

**Peter Faubert - VISG - VP Finance, Corporate Controller**

Yes.

**Dave Sterman - Halpern Capital - Analyst**

I know that on the initial call, on the 8:30 call, there was a little bit of discussion of a hope to secure some additional access card business with some other Federal departments. Do you assume that they would be similar in size, smaller, larger? What are you looking at out there?

**Bill Aulet - VISG**

TWIC, the Transportation Workers ID Card, would be much bigger. Federal would be much bigger. There are a number of smaller initiatives that are out there. It can be much bigger. It can be smaller.

**Dave Sterman - Halpern Capital - Analyst**

And has government given you a sense of the time frames of when those will be put out to bid? For example, when will TWIC be out to bid?

**Bill Aulet - VISG**

TWIC III was out to bid, and won by Bearing Point.

**Dave Sterman - Halpern Capital - Analyst**

Oh, okay. And the – ?

**Bill Aulet - VISG**

But 1 think that's a good point. We will not do these things directly necessarily. We will work through partners.

**Dave Sterman - Halpern Capital - Analyst**

And has Bearing Point already established who their partners will be? Are you talking with them?

**Bill Aulet - VISG**

We are very familiar with Bearing Point.

**Dave Sterman - Halpern Capital - Analyst**

Okay. All right. That's it for me. Thank you.

**Bill Aulet - VISG**

Could we get one, or at most two more questions, if we can answer them quickly.

**Operator**

Okay sir. Your final question is a follow-up question from Steve Gish from Roth Capital Partners.

**Steve Gish - Roth Capital Partners - Analyst**

Hi, just real quick, the share count was 40.1m, approximately, basic shares. Including the acquisition, would we be looking at a basic share count of about 46.5?

**Bill Aulet - VISG**

Yeah, well the shares outstanding was 43.4 I want to say. And so if you include the acquisitions, that would bring it up to 48 range.

**Steve Gish - Roth Capital Partners - Analyst**

Okay.

**Bill Aulet - VISG**

We did 3.6 with Imaging Automation.

**Peter Faubert - VISG**

Yeah, 47.


© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

**VISG - Viisage Technology, Inc. Earnings Conference Call**

**Steve Gish** - *Roth Capital Partners - Analyst*

Okay. Thanks.

**Bill Aulet** - *VISG*

Thank you Steve. Well everybody, we thank you for participating. Hopefully this has been productive for everyone. I hope you appreciate the situation we're in with the new regulations that we have; we want to disclose this and make it easier for you. We want to. But we also have to do it in a consistent manner.

So this is a great forum from our standpoint. Hopefully it's been productive to you all. If you have ideas as to how we can improve it in the future, or you have further questions, please feel free to email me or call me at my office number.

Thank you very much. And let's hope the Red Sox can finish off our friends here from St. Louis. Thanks everyone. Good day.

**DISCLAIMER**

Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

© 2004, Thomson StreetEvents All Rights Reserved.


© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

# Exhibit 36

10-Q 1 d10q.htm FORM 10-Q

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the Quarterly Period Ended September 26, 2004.

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the Transition Period from _____ to _____.

Commission File Number 000-21559

# VIISAGE TECHNOLOGY, INC.
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware**<br>(State or other jurisdiction of<br>incorporation or organization) | **04-3320515**<br>(I.R.S. Employer<br>Identification No.) |
| **296 Concord Road, Third Floor, Billerica, MA**<br>(Address of principal executive offices) | **01821**<br>(Zip Code) |

Registrant's telephone number, including area code (978) 932-2200

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  ☒ Yes  ☐ No

Indicate by a check mark whether the Registrant is an accelerated filer (as defined in Rule 12b-2 of the Exchange Act)  ☐ Yes  ☒ No

Indicate the number of shares outstanding of each of the registrant's classes of common stock, as of the latest practicable date.

| Class | Outstanding at November 8, 2004 |
|---|---|
| Common stock, $.001 par value | 47,359,858 |

http://www.sec.gov/Archives/edgar/data/1018332/000119312504193019/d10q.htm

Table of Contents

**VIISAGE TECHNOLOGY, INC.**
FORM 10 – Q FOR THE QUARTER ENDED SEPTEMBER 26, 2004
INDEX

|  | Page |
|---|---|
| Facing Sheet | 1 |
| Index | 2 |
| PART I - FINANCIAL INFORMATION | |
| Item 1 – Financial Statements | |
| Consolidated Balance Sheets as of September 26, 2004 and December 31, 2003 | 3 |
| Consolidated Statements of Operations for the three and nine months ended September 26, 2004 and September 28, 2003 | 4 |
| Consolidated Statements of Cash Flows for the nine months ended September 26, 2004 and September 28, 2003 | 5 |
| Notes to Financial Statements | 6 |
| Item 2 – Management's Discussion and Analysis of Financial Condition and Results of Operations | 13 |
| Item 3 – Quantitative and Qualitative Disclosures about Market Risk | 30 |
| Item 4 – Controls and Procedures | 30 |
| PART II - OTHER INFORMATION | 31 |
| Item 1 – Legal Proceedings | 31 |
| Item 2 – Unregistered Sales of Equity Securities and Use of Proceeds | 31 |
| Item 3 – Defaults Upon Senior Securities | 31 |
| Item 4 – Submission of Matters to a Vote of Security Holders | 31 |
| Item 5 – Other Information | 31 |
| Item 6 – Exhibits | 31 |
| SIGNATURES | 32 |
| EXHIBIT INDEX | 33 |

2

Table of Contents

## VIISAGE TECHNOLOGY, INC.

### PART II - OTHER INFORMATION

#### ITEM 1 – LEGAL PROCEEDINGS

In July 2003, a Georgia court issued a preliminary injunction prohibiting Georgia's Department of Motor Vehicle Safety from continuing to work with us to install the State's new drivers' license system. The injunction is the result of a lawsuit filed in March 2003 by one of our competitors alleging that the Department of Motor Vehicle Safety did not comply with its own bid process when it selected a vendor for its new digital drivers' license program. In July 2004, we reached a settlement agreement with the State pursuant to which the Department of Motor Vehicle Safety terminated the contract for convenience and agreed to pay us $2.0 million in cash and the State agreed to purchase certain equipment from us for $500,000. The Department of Motor Vehicle Safety has filed a motion with the Georgia court to dismiss the case based upon the termination of the contract. The agency also has informed the court that it intends to issue a new request for proposals for a digital drivers' license system before the end of 2004. In response to a motion filed by the competitor, the Georgia court has issued a preliminary injunction prohibiting the Department of Motor Vehicle Safety and the State from making any payments to us under the settlement agreement. As a result of the termination of the contract, we will lose up to $19.7 million in revenue that we expected to recognize over the next five and one-half years, which was included in our $176 million of backlog at March 28, 2004, unless we are able to win the new contract for the digital drivers' license system and the revenues from such new contract are substantially similar to the terminated contract. While we believe we can utilize the remaining $2.8 million in assets being retained by us from the Georgia contract either in Georgia, if we win the contract based on the new request for proposals, or on alternative projects, to the extent that we are unable to utilize these assets or realize value through a sale of these assets, we would be required to take a charge to earnings.

Reference is made to Part II, Item 1 of our quarterly report on Form 10-Q for the quarterly period ended June 27, 2004, which was previously filed with the Securities and Exchange Commission.

#### ITEM 2 – UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS
None.

#### ITEM 3 – DEFAULTS UPON SENIOR SECURITIES
None.

#### ITEM 4 – SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS
None.

#### ITEM 5 – OTHER INFORMATION
None.

#### ITEM 6 – EXHIBITS
The exhibits listed in the Exhibits Index immediately preceding such exhibits are filed as part of this report.

31

Case 1:05-cv-04833-JMW  Document 82-42  Filed 04/03/2006

EX-31.1 4 dex311.htm CERTIFICATION OF CHIEF EXECUTIVE OFFICER PURSUANT TO SECTION 302

**Exhibit 31.1**

I, Bernard C. Bailey, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Viisage Technology, Inc.

2. Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report.

3. Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15 (e) and 15d-15(e)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 10, 2004

/s/ Bernard C. Bailey

Bernard C. Bailey
Chief Executive Officer
(Principal Executive Officer)

EX-31.2 5 dex312.htm CERTIFICATION OF CHIEF FINANCIAL OFFICER PURSUANT TO SECTION 302

**Exhibit 31.2**

I, William K. Aulet, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Viisage Technology, Inc.

2. Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report.

3. Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15 (e) and 15d-15(e)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 10, 2004                    /s/ William K. Aulet
                                           _____
                                           William K. Aulet
                                           Chief Financial Officer
                                           (Principal Financial Officer)

# Exhibit 37

5 of 14 DOCUMENTS

Copyright 2004 Associated Press
All Rights Reserved

The Associated Press State & Local Wire

These materials may not be republished without the express written consent of The Associated Press

December 27, 2004, Monday, BC cycle

**SECTION:** State and Regional

**LENGTH:** 302 words

**HEADLINE:** Judge orders new bids on tamper-resistant driver's licenses

**DATELINE:** ATLANTA

**BODY:**

Georgia would have to get new bids on a contract to produce new tamper-resistant driver's licenses under a Superior Court ruling.

The licenses, which could include hidden traps designed to make them more difficult to fake or alter, were to begin rolling out in September 2003 under a $20 million contract, but the state's current license maker, Oregon-based Digimarc ID Systems, protested the bidding.

Judge Thelma Wyatt Cummings Moore agreed with Digimarc's complaints in a ruling last week. She ruled that the contract must be rebid, and that a settlement between the state and winning bidder Viisage Technology should be reduced from $2.5 million to $500,000.

Georgia offered the settlement because it wanted to rescind the contract.

Viisage officials said Monday that they plan to appeal.

Moore's ruling said the state violated its own rules by looking at each company's prices after realizing that neither met the technical requirements of the job. She found that Viisage and certain state employees had inappropriate and unauthorized communications after the price proposals were discussed.

Joyce Goldberg, spokeswoman for the Georgia Technology Authority, said Monday that state officials believe the bids were handled appropriately under the procurement rules.

"None of us had any idea of whether it (the new license) was even affordable," Goldberg said. "To know if we were going to move forward on it, we had to know some about the pricing."

If the judge's ruling stands, a contract should be let by late spring or early summer, Goldberg said.

Digimarc's lawyer, John Hutchins of Atlanta, said company officials felt vindicated and said the lawsuit "served the taxpayers of Georgia."

---

Information from: The Atlanta Journal-Constitution, http://www.ajc.com

**LOAD-DATE:** December 28, 2004

Digimarc Prevails in Georgia Driver License Dispute; Court disallows pri

8 of 14 DOCUMENTS

Copyright 2004 Business Wire, Inc.
Business Wire

December 27, 2004 Monday  10:00 AM GMT

**DISTRIBUTION:** Business Editors; High-Tech Writers

**LENGTH:** 830 words

**HEADLINE:** Digimarc Prevails in Georgia Driver License Dispute; Court disallows prior contract award to Viisage

**DATELINE:** BEAVERTON, Ore. Dec. 27, 2004

**BODY:**

Digimarc Corporation (Nasdaq:DMRCE) today announced that the Fulton County Superior Court in Georgia has disallowed the State's 2002 driver license contract award to Viisage, finding that "there were significant instances of misconduct and misrepresentation by Defendant Viisage." The Court's ruling clears the way for the State to re-bid the contract and for Digimarc to compete to retain the State of Georgia's driver license business.

"Digimarc has served Georgia well for over 20 years. We look forward to participating in a fair procurement and offering our valued customer the latest innovations in driver license issuance systems, security and document quality," said Bruce Davis, chairman and CEO, Digimarc Corporation. "The procurement regulations are designed to provide an award of a contract such that the citizens of Georgia can achieve the best driver licenses in terms of quality, security and cost effectiveness, which Digimarc remains ready to deliver better than any other supplier. The Court has validated Digimarc's assertion that the competitor's questionable business practices created unnecessary expenses and legal difficulties for the State."

In its ruling, the Court also disallowed $2 million of a previously-announced $2.5 million settlement of Viisage's claim for an $8.2 million termination payment, allowing only a $500,000 payment for certain equipment that had been provided to the State.

The Court found, among other things, that:

-- price proposals in the original bid were prematurely opened, violating the State's own procurement rules;

-- "inappropriate and unauthorized communications" occurred between Viisage and certain State employees after the premature reading of the price proposals;

-- that Viisage's "temporary card sample tore easily" and its "permanent card samples easily delaminated and that the information on the card could be easily altered";

-- Viisage submitted another vendor's sample cards, which it did not have permission to use, in an attempt to submit acceptable permanent card samples;

-- "key representatives of Defendant Viisage did not know how these card samples were made or whether Defendant Viisage was, in fact, capable of making the cards it proposed ...;" and that

-- Viisage "misrepresented the existence of a back-up card production facility" in its bid submission.

For more details, see the complete text of the Court's order on our website at: http://www.digimarc.com/docs/GeorgiaRuling.pdf

About Digimarc

Digimarc Corporation (Nasdaq:DMRCE), based in Beaverton, Oregon, is a leading supplier of secure media solutions used in a wide range of security, identification and digital media content applications. Digimarc provides products

Digimarc Prevails in Georgia Driver License Dispute; Court disallows pri

and services that enable the production of more than 60 million personal identification documents and driver licenses per year in 32 U.S. states and the District of Columbia and more than 20 countries. Digimarc's digital watermarking technology provides a persistent digital identity for various media content and is used to enhance the security of financial documents, identity documents and digital images, and support other media rights management applications.

Digimarc has an extensive intellectual property portfolio, with 185 issued U.S. patents with more than 3,000 claims, and more than 350 pending patent applications in digital watermarking, personal identification and related technologies.

The company is headquartered in Beaverton, Oregon, with other U.S. offices in Burlington, Massachusetts; Fort Wayne, Indiana; San Francisco, California; and the Washington DC area; and European offices in London. Please go to www.digimarc.com for more company information.

Securities Safe Harbor

With the exception of historical information contained in this release, the matters described herein contain certain "forward-looking statements" that are made pursuant to the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995. These statements are based on management's current reasonable expectations and are subject to certain assumptions, risks, uncertainties and changes in circumstances. Actual results may vary materially from those expressed or implied from the statements herein or from historical results, due to changes in economic, business, competitive, technological and/or regulatory factors. More detailed information about these factors is set forth in filings by Digimarc with the Securities and Exchange Commission, including the most recent annual report on Form 10-K and the most recent quarterly report on Form 10-Q. Digimarc is not obligated to (and expressly disclaims any obligation to) revise or update any forward-looking statements in order to reflect events or circumstances, whether they arise as a result of new information, future events, or otherwise.

CONTACT: Digimarc Public Relations Leslie Constans, 503-469-4620 lconstans@digimarc.com or Revolution PR for Digimarc Mizuha Nakajima, 503-997-6045 mizuha@revolutionpr.com

URL: http://www.businesswire.com

LOAD-DATE: December 28, 2004



[December 27, 2004]



## Viisage Issues Statement on Digimarc v. State of Georgia Case

BILLERICA, Mass. --(Business Wire)-- Dec. 27, 2004 -- Viisage (Nasdaq: VISG), a leading provider of advanced technology identity solutions, provided the following statement today regarding the summary judgment ruling issued by a superior court in Fulton County, Georgia regarding the digital drivers' license contract between Viisage and the state of Georgia:

"Viisage learned today that the Georgia court has issued a summary judgment ruling permitting the state to move forward in its rebid of the state's drivers' license contract and permitting Viisage to compete to retain its contract with the state. We are pleased that the state will finally be permitted to begin the rebid process and that the judge has agreed with us and the state on virtually all aspects of the summary judgment motions," said Bernard Bailey, president and CEO, Viisage. "Contrary to statements made by our competitor in an earlier press release, the court did not disallow the 2002 award of the contract to Viisage. The court merely acknowledged that the state and Viisage had entered into a settlement agreement under which the state terminated the drivers' license contract with Viisage for convenience and was to pay Viisage a $2.5 million settlement payment, all as previously announced by Viisage. However, the court has ruled that the state cannot pay $2 million of that settlement payment. Without this payment, Viisage believes that either the settlement agreement with the state is not effective and that Viisage's contract with the state remains in place or that Viisage's initial claim for an $8.2 million settlement payment is revived. While we are very pleased with the overall result, we are disappointed and strongly disagree with this and certain other elements of the court's ruling, including statements of disputed fact which we believe are not appropriate in a summary judgment ruling, and intend to appeal."

About Viisage

Viisage (NASDAQ: VISG) delivers advanced technology identity solutions for governments, law enforcement agencies and businesses concerned with enhancing security, reducing identity theft, and protecting personal privacy. Viisage solutions include secure credentials such as passports and drivers' licenses, biometric technologies for uniquely linking individuals to those credentials, and credential authentication technologies to ensure the documents are valid before individuals are allowed to cross borders, gain access to finances, or granted other privileges. With over 3,000 installations worldwide, Viisage's identity solutions stand out as a result of the Company's industry-leading technology and unique understanding of customer needs. Viisage's product suite includes FaceTOOLS(R) SDK, Viisage PROOF(TM),

FaceEXPLORER(R), iA-thenticate(R), BorderGuard(R), FacePASS(TM) and FaceFINDER(R).

This news release contains forward-looking statements that involve risks and uncertainties. Forward-looking statements in this document and those made from time to time by Viisage through its senior management are made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995, as amended. Forward-looking statements concerning future plans or results are necessarily only estimates and actual results could differ materially from expectations. Certain factors that could cause or contribute to such differences include, among other things, the size and timing of contract awards, performance on contracts, availability and cost of key components, unanticipated results from audits of the financial results of acquired companies, changing interpretations of generally accepted accounting principles, outcomes of government reviews, potential fluctuations in quarterly results, dependence on large contracts and a limited number of customers, lengthy sales and implementation cycles, market acceptance of new or enhanced products and services, proprietary technology and changing competitive conditions, system performance, management of growth, dependence on key personnel, ability to obtain project financing, general economic and political conditions and other factors affecting spending by customers, the unpredictable nature of working with government agencies and other risks, uncertainties and factors including those described from time to time in Viisage's filings with the Securities and Exchange Commission, including without limitation, Viisage's Form 10-K for the year ended December 31, 2003 and its quarterly reports on Form 10-Q. Viisage undertakes no obligation to update any forward-looking statements.

[ Back To TMCnet.com's Homepage ]

Copyright 2006 Technology Marketing Corporation (TMC) - All rights reserved

Mass High Tech: The Journal of New England Technology: Viisage reacts to Georgia cou...  Page 1 of 1

**Mass High Tech: The Journal of New England Technology - December 27, 2004**
http://masshightech.bizjournals.com/masshightech/stories/2004/12/27/daily5.html



Security

# Viisage reacts to Georgia court's cancellation of state DMV contract

Mass High Tech: The Journal of New England Technology - December 27, 2004

The Fulton County Superior Court in Georgia has disallowed the state's 2002 driver license contract award to Billerica-based Viisage, finding that "there were significant instances of misconduct and misrepresentation by defendant Viisage."

Previous contract holder, Oregon-based Digimarc Corp., brought the suit against the Georgia Technology Authority, the state's Department of Motor Vehicle Safety and Viisage, which had been awarded the contract over Digimarc.

Court documents showed that the court found, among other things, that price proposals in the original bid from Viisage were prematurely opened, violating the state's own procurement rules, and "inappropriate and unauthorized communications" occurred between Viisage and certain state employees after the premature reading of the price proposals.

"Viisage learned today that the Georgia court has issued a summary judgment ruling permitting the state to move forward in its rebid of the state's drivers' license contract and permitting Viisage to compete to retain its contract with the state. We are pleased that the state will finally be permitted to begin the rebid process and that the judge has agreed with us and the state on virtually all aspects of the summary judgment motions," said Bernard Bailey, president and CEO of Viisage, in a statement. " While we are very pleased with the overall result, we are disappointed and strongly disagree with this and certain other elements of the court's ruling, including statements of disputed fact which we believe are not appropriate in a summary judgment ruling, and intend to appeal."

Viisage stock opened the day trading at $8.90, up eight cents from its close yesterday.

| Send us your comments | More Latest News → |

*All contents of this site © American City Business Journals Inc. All rights reserved.*

# Exhibit 38

Digimarc Corporation: Digimarc Prevails in Georgia Driver License Dispute    Page 1 of 2

  

Home > About Digimarc > Press Room > Press Releases

**PRESS RELEASES**

**Digimarc Prevails in Georgia Driver License Dispute**

*Court disallows prior contract award to Viisage*

> Press Room
> **Press Releases**
> Recognition and Awards
> Events
> RSS Feed

Public Policy

Management Team

Corporate Governance

Corporate Investors

Jobs



**Beaverton, OR – Dec. 27, 2004 –** Digimarc Corporation (NASDAQ: DMRCE) today announced that the Fulton County Superior Court in Georgia has disallowed the State's 2002 driver license contract award to Viisage, finding that "there were significant instances of misconduct and misrepresentation by Defendant Viisage." The Court's ruling clears the way for the State to re-bid the contract and for Digimarc to compete to retain the State of Georgia's driver license business.

"Digimarc has served Georgia well for over 20 years. We look forward to participating in a fair procurement and offering our valued customer the latest innovations in driver license issuance systems, security and document quality," said Bruce Davis, chairman and CEO, Digimarc Corporation. "The procurement regulations are designed to provide an award of a contract such that the citizens of Georgia can achieve the best driver licenses in terms of quality, security and cost effectiveness, which Digimarc remains ready to deliver better than any other supplier. The Court has validated Digimarc's assertion that the competitor's questionable business practices created unnecessary expenses and legal difficulties for the State."

In its ruling, the Court also disallowed $2 million of a previously-announced $2.5 million settlement of Viisage's claim for an $8.2 million termination payment, allowing only a $500,000 payment for certain equipment that had been provided to the State.

The Court found, among other things, that:

- price proposals in the original bid were prematurely opened, violating the State's own procurement rules;
- "inappropriate and unauthorized communications" occurred between Viisage and certain State employees after the premature reading of the price proposals;
- that Viisage's "temporary card sample tore easily" and its "permanent card samples easily delaminated and that the information on the card could be easily altered";
- Viisage submitted another vendor's sample cards, which it did not have permission to use, in an attempt to submit acceptable permanent card samples;
- "key representatives of Defendant Viisage did not know how these card samples were made or whether Defendant Viisage was, in fact, capable of making the cards it proposed …;" and that
- Viisage "misrepresented the existence of a back-up card production facility" in its bid submission.

For the complete text of the Court's order, click here.

**About Digimarc**
Digimarc Corporation (NASDAQ: DMRCE), based in Beaverton, Oregon, is a leading supplier of secure media solutions used in a wide range of security, identification and digital media content applications. Digimarc provides products and services that enable the production of more than 60 million personal identification documents and driver licenses per year in 32 U.S. states and the

District of Columbia and more than 20 countries. Digimarc's digital watermarking technology provides a persistent digital identity for various media content and is used to enhance the security of financial documents, identity documents and digital images, and support other media rights management applications.

Digimarc has an extensive intellectual property portfolio, with 185 issued U.S. patents with more than 3,000 claims, and more than 350 pending patent applications in digital watermarking, personal identification and related technologies.

The company is headquartered in Beaverton, Oregon, with other U.S. offices in Burlington, Massachusetts; Fort Wayne, Indiana; San Francisco, California; and the Washington DC area; and European offices in London.

### Securities Safe Harbor

With the exception of historical information contained in this release, the matters described herein contain certain "forward-looking statements" that are made pursuant to the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995. These statements are based on management's current reasonable expectations and are subject to certain assumptions, risks, uncertainties and changes in circumstances. Actual results may vary materially from those expressed or implied from the statements herein or from historical results, due to changes in economic, business, competitive, technological and/or regulatory factors. More detailed information about these factors is set forth in filings by Digimarc with the Securities and Exchange Commission, including the most recent annual report on Form 10-K and the most recent quarterly report on Form 10-Q. Digimarc is not obligated to (and expressly disclaims any obligation to) revise or update any forward-looking statements in order to reflect events or circumstances, whether they arise as a result of new information, future events, or otherwise.

Home   Login   Contact Us   Copyright   Privacy Policy
Copyright © 1995 - 2006 Digimarc Corporation. All rights reserved.

# Exhibit 39

# ViiSAGE



| Company▸ | Products▸ | Services▸ | Solutions▸ | Customers▸ | Thought Leadership▸ | Partners▸ | News/Events▸ | Downloads▸ | Investors▸ |

You are here:  → Homepage → News/Events → **News Releases**

Search



go

**Quick Links**

◦→ News Releases Archive

## Viisage News And Media Releases

→  Click here for current News Releases

**Viisage Issues Statement on Digimarc v. State of Georgia Case**

BILLERICA, Mass.--(BUSINESS WIRE)--Dec. 27, 2004--Viisage (Nasdaq: VISG), a leading provider of advanced technology identity solutions, provided the following statement today regarding the summary judgment ruling issued by a superior court in Fulton County, Georgia regarding the digital drivers' license contract between Viisage and the state of Georgia:

"Viisage learned today that the Georgia court has issued a summary judgment ruling permitting the state to move forward in its rebid of the state's drivers' license contract and permitting Viisage to compete to retain its contract with the state. We are pleased that the state will finally be permitted to begin the rebid process and that the judge has agreed with us and the state on virtually all aspects of the summary judgment motions," said Bernard Bailey, president and CEO, Viisage. "Contrary to statements made by our competitor in an earlier press release, the court did not disallow the 2002 award of the contract to Viisage. The court merely acknowledged that the state and Viisage had entered into a settlement agreement under which the state terminated the drivers' license contract with Viisage for convenience and was to pay Viisage a $2.5 million settlement payment, all as previously announced by Viisage. However, the court has ruled that the state cannot pay $2 million of that settlement payment. Without this payment, Viisage believes that either the settlement agreement with the state is not effective and that Viisage's contract with the state remains in place or that Viisage's initial claim for an $8.2 million settlement payment is revived. While we are very pleased with the overall result, we are disappointed and strongly disagree with this and certain other elements of the court's ruling, including statements of disputed fact which we believe are not appropriate in a summary judgment ruling, and intend to appeal."

About Viisage

Viisage (NASDAQ: VISG) delivers advanced technology identity solutions for governments, law enforcement agencies and businesses concerned with enhancing security, reducing identity theft, and protecting personal privacy. Viisage solutions include secure credentials such as passports and drivers' licenses, biometric technologies for uniquely linking individuals to those credentials, and credential authentication technologies to ensure the documents are valid before individuals are allowed to cross borders, gain access to finances, or granted other privileges. With over 3,000 installations worldwide, Viisage's identity solutions stand out as a result of the Company's industry-leading technology and unique understanding of customer needs. Viisage's product suite includes FaceTOOLS(R) SDK, Viisage PROOF(TM), FaceEXPLORER(R), iA-thenticate(R), BorderGuard(R), FacePASS(TM) and FaceFINDER(R).

This news release contains forward-looking statements that involve risks and uncertainties. Forward-looking statements in this document and those made from time to time by Viisage through its senior management are made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995, as amended. Forward-looking statements concerning future plans or results are necessarily only estimates and actual results could

differ materially from expectations. Certain factors that could cause or contribute to such differences include, among other things, the size and timing of contract awards, performance on contracts, availability and cost of key components, unanticipated results from audits of the financial results of acquired companies, changing interpretations of generally accepted accounting principles, outcomes of government reviews, potential fluctuations in quarterly results, dependence on large contracts and a limited number of customers, lengthy sales and implementation cycles, market acceptance of new or enhanced products and services, proprietary technology and changing competitive conditions, system performance, management of growth, dependence on key personnel, ability to obtain project financing, general economic and political conditions and other factors affecting spending by customers, the unpredictable nature of working with government agencies and other risks, uncertainties and factors including those described from time to time in Viisage's filings with the Securities and Exchange Commission, including without limitation, Viisage's Form 10-K for the year ended December 31, 2003 and its quarterly reports on Form 10-Q. Viisage undertakes no obligation to update any forward-looking statements.

```
CONTACT: Viisage
         Maureen Todaro, 978-932-2438
         mtodaro@viisage.com
         or
         PAN Communications
         Billy Balfour, 978-474-1900
         viisage@pancomm.com

SOURCE: Viisage
```

"Safe Harbor" Statement under the Private Securities Litigation Reform Act of 1995: Statements in this press release regarding Viisage's business which are not historical facts are "forward-looking statements" that involve risks and uncertainties. For a discussion of such risks and uncertainties, which could cause actual results to differ from those contained in the forward-looking statements, see "Risk Factors" in the Company's Annual Report or Form 10-K for the most recently ended fiscal year.

+  Click here for current News Releases

# Exhibit 40

Westlaw.                                                          **News**Room

12/28/04 ATLNTAJC C1                                                    Page 1


12/28/04 Atlanta J. - Const. C1
2004 WLNR 14927092

Atlanta Journal and Constitution (GA)
Copyright 2004 Atlanta Newspapers Inc.

December 28, 2004

Section: Metro News

JUDGE ORDERS STATE CONTRACT REBID $20 MILLION DEAL WAS FOR NEW DRIVER'S LICENSES

NANCY BADERTSCHER; Staff

A judge has ordered the state to rebid a $20 million contract to create a Georgia
driver's license meant to foil counterfeiters.

   The tamper-resistant licenses, which could include hidden traps designed to
make them more difficult to fake or alter, were to begin rolling out in September
2003. They were delayed because of bid protests from the state's current license
maker, Oregon-based Digimarc ID Systems.

   In a ruling last week, Fulton County Superior Court Judge Thelma Wyatt
Cummings Moore agreed with Digimarc's complaints about improprieties and
misrepresentations in the bidding process, which took place in 2002. But the judge
also ruled that Digimarc is not entitled to receive the contract by default and
said it should be rebid.

   In addition, she ruled that a settlement between the state and
Massachusetts-based Viisage Technology, the low bidder that won the contract,
should be reduced from $2.5 million to $500,000. Georgia offered the settlement
because it wanted to rescind the contract.

   Viisage officials said Monday that they plan to appeal.

   Moore's ruling said the state violated its own procurement rules by looking at
each company's prices after realizing that neither met the technical requirements
of the job. She found that Viisage and certain state employees had inappropriate
and unauthorized communications after the price proposals were discussed. The
judge also found "significant instances of misconduct and misrepresentations" by
Viisage, including its claim to have a backup card production facility.

   Joyce Goldberg, spokeswoman for the Georgia Technology Authority, said Monday
that state officials believe the bids were handled appropriately under the
procurement rules.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"None of us had any idea of whether it (the new license) was even affordable," Goldberg said. "To know if we were going to move forward on it, we had to know some about the pricing."

Digimarc's lawyer, John Hutchins of Atlanta, said company officials felt vindicated by the judge's findings of bidding irregularities and with the settlement reduction.

"And we believe that Digimarc's lawsuit, that brought all of this to light, served the taxpayers of Georgia by protecting the integrity of the bid process," Hutchins said.

In a statement on Viisage's Web site, Bernard Bailey, president and chief executive officer, said the company plans to appeal the judge's ruling, particularly regarding the $2 million reduction in the settlement.

"Viisage believes that either the settlement agreement with the state is not effective and that Viisage's contract with the state remains in place or that Viisage's initial claim for an $8.2 million settlement payment is revived," Bailey said.

If the judge's ruling stands, state officials should be able to award a contract by late spring or early summer, Goldberg said. Officials would not speculate Monday on when the licenses might be available to the public.

---- INDEX REFERENCES ----

COMPANY: DIGIMARC CORP

NEWS SUBJECT:  (Legal (1LE33))

REGION:  (USA (1US73); Americas (1AM92); North America (1NO39))

Language:  EN

OTHER INDEXING:  (DIGIMARC; DRIVER; FULTON COUNTY SUPERIOR COURT; GEORGIA; GEORGIA TECHNOLOGY AUTHORITY; LICENSES)  (Bailey; Bernard Bailey; Goldberg; Hutchins; John Hutchins; Joyce Goldberg; Moore; ORDERS STATE CONTRACT; Oregon; Thelma Wyatt Cummings; Viisage; Viisage Technology)

EDITION: Home

Word Count: 590
12/28/04 ATLNTAJC C1


END OF DOCUMENT


© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit 41



| Company› | Products› | Services› | Solutions› | Customers› | Thought Leadership› | Partners› | News/Events› | Downloads› | Investors› |



You are here:  → Homepage → News/Events → **News Releases**

Search 

go

Quick Links

⊙ News Releases Archive

# Viisage News And Media Releases

→  Click here for current News Releases

**Viisage Provides Preliminary Full Year 2004 Financials; Company meets revenue guidance; net income and EBITDA below expectations**

Company takes non-cash $2 million impairment charge related to Georgia contract

BILLERICA, Mass.--(BUSINESS WIRE)--Feb. 7, 2005--Viisage (NASDAQ: VISG), a leading provider of advanced technology identity solutions, announced today that, on a preliminary basis, it expects full year 2004 revenues to fall within the range of the Company's latest guidance. Earnings before interest, taxes, depreciation and amortization (EBITDA) and net income are expected to fall below guidance. The expected shortfall is primarily due to several non-recurring factors, including a non-cash impairment charge of $2 million in connection with a settlement involving the Company's previous drivers' license contract with the Georgia Department of Motor Vehicle Safety, which had been litigated. This charge was a result of a judge's ruling in the fourth quarter, which the Company is currently appealing.

In issuing its results for the third quarter of 2004 on October 25, 2004, the Company had increased its guidance for 2004, anticipating revenues for the full year in the range of $66-68 million, with EBITDA between $11.5-12.5 million, while maintaining net income guidance as a loss of $1.5 million for the year.

Based upon the preliminary review of its financial results for the year, Viisage now expects revenues of approximately $66-67 million, and EBITDA of approximately $8-9 million. Net income, which includes the $2 million impairment charge related to the terminated Georgia contract, is anticipated to be a loss of approximately $7-8 million. The primary drivers of the shortfall in operating performance are related to non-recurring charges, timing associated with contracts and a temporary increase in certain operating expenses. Viisage believes that these results do not reflect a change in the underlying fundamentals of the business. Specifically, fourth quarter results were impacted by the following:

-- Georgia - the non-cash write-down of certain assets related to the terminated Georgia contract reduced pre-tax income by $2 million in the fourth quarter but did not affect EBITDA.

-- Tax Liability - in the fourth quarter, the Company filed an election under Internal Revenue Tax Code Section 338(h)10 to treat its acquisition of TDT as an asset transaction for tax purposes. This election may generate approximately $8.5 million of future tax benefits. In connection with this election, an initial deferred tax asset of approximately $900,000 was created. Based on Viisage's history of tax losses, the Company had to provide approximately $900,000 for a valuation reserve against the deferred tax asset in the fourth quarter. This provision did not affect EBITDA.

-- Timing - deliveries on several substantial, high margin contracts, including a State of Florida Department of Highway Safety document authentication contract and a major European border management project, slipped from the fourth quarter of 2004 into the first half of 2005. This resulted in decreased revenue and an overall lower margin revenue mix for the quarter. Viisage estimates that these contracts would have contributed more than $1 million of gross profit directly affecting EBITDA and net income in the fourth quarter.

-- Sarbanes-Oxley Section 404 Compliance - despite work undertaken in prior quarters, Viisage experienced higher than anticipated costs related to its Sarbanes-Oxley compliance efforts. In the fourth quarter alone, compliance-related costs totaled $550,000. These expenses are expected to decrease dramatically going forward.

-- Currency - Viisage experienced a significant negative impact from the weak dollar, resulting in an approximately $500,000 decrease in EBITDA and net income in the fourth quarter. In light of the continued growth in its overseas revenue, the Company is considering various ways of mitigating future currency risks.

-- Legal and Other Charges - there were a number of charges in the fourth quarter related to specific legal matters that are now completed or winding down, as well as severance payments, that together totaled approximately $500,000.

"We continue to be very pleased with our top line growth, as we produced approximately $66-67 million in revenue this year, compared to $37 million in 2003," said Bernard Bailey, president and chief executive officer of Viisage. "We also are encouraged that our business continues to generate increased positive cash flow, with EBITDA growing substantially to an estimated $8-9 million this year from $2.3 million in 2003. We believe that investing aggressively in our company, amid the substantial market opportunity, while continuing to generate positive cash flow, is the best way to optimize the Company's long-term shareholder value in a high growth environment."

The Georgia drivers' license contract litigation has concluded with the state planning to conduct a new procurement for its drivers' license program. However, the status of Viisage's previously-awarded $2.5 million settlement from the state in connection with the termination of the contract has not been resolved. While the state has agreed to pay the amount to Viisage, the presiding judge reduced that payment to $2 million in her December summary judgment ruling. Viisage believes that it is appropriate to take a non-cash write-down of $2 million in the fourth quarter of 2004 for an impairment charge to assets currently on its balance sheet, although the Company continues to maintain the validity of its position in terms of the settlement and is appealing the judge's ruling.

Viisage will hold a conference call today, February 7, 2005, at 4:30 pm (EST) to discuss the issues addressed in this release and their impact on the Company's 2004 business and results. The call may be accessed via Webcast at the Company's Web site (www.viisage.com), ten minutes prior to the start, or by calling 1-888-396-2298, confirmation code 90309505. Internationally, dial 1-617-847-8708 with the same confirmation code. A replay will be available as a Webcast, accessible on the Company's Web site, beginning one hour after the completion of the call. Viisage expects to release its final results for the fourth quarter and full year 2004 after the market closes on Wednesday, March 2, 2005, and plans to hold a conference call at 8:00 am on Thursday, March 3, 2005 to discuss those results and to share its detailed outlook and guidance for 2005 at that time. Viisage expects that it will continue to show increased revenue on a year over year basis. However, to capitalize on its significant market opportunity, the Company also expects to continue to make substantial investments in its business in order to bolster its position as a leader in the identity solutions marketplace.

EBITDA

Viisage reports EBITDA as a financial performance measure and as an indicator of future performance. The Company calculates EBITDA by adding back to net earnings interest, taxes, depreciation and amortization. EBITDA is provided to investors as an additional performance gauge to supplement operating results provided in accordance with generally accepted accounting principles (known as "GAAP"). Viisage's EBITDA should not be considered in isolation or as a substitute for net income or other comparable measures calculated and presented in accordance with GAAP. The Company's calculation of EBITDA may differ from the methodologies used by other companies. During 2004, Viisage completed the acquisitions of ZN Vision Technologies, Trans Digital Technologies and Imaging Automation. As previously reported, while these acquisitions had a positive impact on Viisage's financial results for 2004, they also resulted in Viisage incurring significant non-cash charges for amortization of intangible assets that adversely affected Viisage's net income (loss) in 2004 and are expected to continue to have an adverse effect going forward. Management considers EBITDA a useful measure for reviewing the comparative operating performance of Viisage (although it should be reviewed in conjunction with net income in accordance with GAAP), because it helps investors better understand Viisage's underlying financial performance and ability to generate cash flow from operations, as well as compare operating performance between periods or to that of other companies.

```
                                      Preliminary Unaudited Results
                                           For the Year Ended
                                            December 31, 2004
Dollars In Thousands
                                      --------------------------------
                                         High              Low
                                      ---------------   ---------------

Net Loss                                 $(7,000)          $(8,000)

Add:
   Depreciation and Amortization     12,800 - 13,100   12,800 - 13,100
   Interest Expense, net                   1,900             1,900
   Taxes                                   1,000             1,000
                                      ---------------   ---------------

EBITDA                               $8,700 - 9,000    $7,700 - 8,000
                                      ===============   ===============
```

## About Viisage

Viisage (NASDAQ: VISG) delivers advanced technology identity solutions for governments, law enforcement agencies and businesses concerned with enhancing security, reducing identity theft, and protecting personal privacy. Viisage solutions include secure credentials such as passports and drivers' licenses, biometric technologies for uniquely linking individuals to those credentials, and credential authentication technologies to ensure the documents are valid before individuals are allowed to cross borders, gain access to finances, or granted other privileges. With over 3,000 installations worldwide, Viisage's identity solutions stand out as a result of the Company's industry-leading technology and unique understanding of customer needs. Viisage's product suite includes FaceTOOLS(R) SDK, Viisage PROOF(TM), FaceEXPLORER(R), iA-thenticate(R), BorderGuard(R), FacePASS(TM) and FaceFINDER(R).

This news release contains forward-looking statements that involve risks and uncertainties. Forward-looking statements in this document and those made from time to time by the Company through its senior management are made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. These forward-looking statements reflect the Company's current views with respect to the future events or financial performance discussed in this release, based on management's beliefs and assumptions and information currently available. When used, the words "believe", "anticipate", "estimate", "project", "should", "expect", "plan", "assume" and similar expressions that do not relate solely to historical matters identify forward-looking statements. Forward-looking statements concerning future plans or results are necessarily only estimates and actual results could differ materially from expectations. Certain factors that could cause or contribute to such differences include, among other things, the size and timing of contract awards, performance on contracts, availability and cost of key components, unanticipated results from audits of the

financial results of acquired companies, changing interpretations of generally accepted accounting principles, outcomes of government reviews, potential fluctuations in quarterly results, dependence on large contracts and a limited number of customers, lengthy sales and implementation cycles, market acceptance of new or enhanced products and services, proprietary technology and changing competitive conditions, system performance, management of growth, dependence on key personnel, ability to obtain project financing, general economic and political conditions and other factors affecting spending by customers, the unpredictable nature of working with government agencies and other risks, uncertainties and factors including those described from time to time in Viisage's filings with the Securities and Exchange Commission, including without limitation, Viisage's Form 10-K for the year ended December 31, 2003 and its quarterly reports on Form 10-Q. Viisage expressly disclaims any obligation to update any forward-looking statements.

CONTACT: Viisage
Bill Aulet, 978-932-2424
CFO
aulet@viisage.com
SOURCE: Viisage

"Safe Harbor" Statement under the Private Securities Litigation Reform Act of 1995: Statements in this press release regarding Viisage's business which are not historical facts are "forward-looking statements" that involve risks and uncertainties. For a discussion of such risks and uncertainties, which could cause actual results to differ from those contained in the forward-looking statements, see "Risk Factors" in the Company's Annual Report or Form 10-K for the most recently ended fiscal year.

→  Click here for current News Releases

# Exhibit 42

# Thomson StreetEv

## Conference Call Transcript

### VISG - Viisage Provides Preliminary Full Year 2004 Financials

Event Date/Time: Feb. 07. 2005 / 4:30PM ET
Event Duration: N/A

© 2005 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Thomson StreetEvents    streetevents@thomson.com    617.603.7900    www.streetevents.com    

© 2005 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without
the prior written consent of Thomson Financial.

VISG - Viisage Provides Preliminary Full Year 2004 Financials

CORPORATE PARTICIPANTS

**Bernard Bailey**
*Viisage - President and CEO*

**Bill Aulet**
*Viisage - CFO*

CONFERENCE CALL PARTICIPANTS

**Daniel Cummins**
*UBS - Analyst*

**David Sterman**
*Halpern Capital - Analyst*

**Paul Coster**
*JP Morgan - Analyst*

**David Gremmels**
*Thomas Weisel Partners - Analyst*

**Jim Ricchuiti**
*Needham and Company - Analyst*

**Steve Gish**
*Roth Capital Partners - Analyst*

**Ingrid Ebeling**
*JMP Securities - Analyst*

PRESENTATION

**Operator**

Welcome to the Viisage Preliminary 2004 conference call. [OPERATOR INSTRUCTIONS] I would now like to turn the conference over to your host for today's presentation, Mr. Bernard Bailey, president and chief executive officer. Please proceed, sir.

**Bernard Bailey** - *Viisage - President and CEO*

Thank you, Bill. Good afternoon, everyone, and thank you for joining us on such short notice this afternoon. I'm Bernard Bailey, president and chief executive officer of Viisage and with me this afternoon is Bill Aulet, our chief financial officer.

Our plan this afternoon is to briefly discuss in a little more detail the news we've just announced regarding our preliminary results for the fourth quarter and 2004, and then I'll provide a brief update on some business and market issues. At that point we'll open the floor to questions. However, I am sure you understand that we are limited in how much more information we can discuss regarding 2004 results and issues until our financial statements are finalized. So I'll now turn the call over to Bill Aulet for our Safe Harbor statement. Bill?

**Bill Aulet** - *Viisage - CFO*

Thank you, Bernard, and good afternoon, everybody. Statements that representatives of Viisage make on this call that are not historical facts or accurate as of today, February 7, 2005, and may be considered forward-looking statements that involve risks and uncertainties including reliance on public sector markets, the possibility of customer delays, the need for capital and competition. You should refer to our Form 10-K for the year ended December 31, 2003, filed with the Securities and Exchange Commission on March 30, 2004, under the heading, "Certain Factors That May Affect Future Results," as well as our subsequent SEC filings for more information on the risk factors that could cause actual results to differ, perhaps materially, from our statements today. Viisage undertakes no obligation to publicly release any revision to any forward-looking statement made today or otherwise update or supplement statements made on this call. In addition, on this call we plan to discuss EBITDA, or earnings before interest, tax, depreciation, and amortization, a non-GAAP measure within the meaning of applicable SEC regulations. We believe that presenting EBITDA nonetheless provides investors with meaningful information about operating performance. With that, back to you, Bernard.

**Bernard Bailey** - *Viisage - President and CEO*

**Thomson StreetEvents**     streetevents@thomson.com     617.603.7900     www.streetevents.com     

© 2005 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Thank you, Bill. As you saw in today's press release, our preliminary review of the fourth quarter and 2004 full-year financial results indicates that we will meet the guidance we provided for revenue, but we will fall short on both our EBITDA and net income guidance.

There are a number of factors contributing to these shortfalls. I intend to provide you the details in a few minutes, but I want to start by saying that while both our EBITDA and net income performance in the fourth quarter were disappointing, I am very encouraged, and I believe that, as investors, you should be, too, with the continued growth in our business. In October, when we last raised our revenue guidance from the $60m to $63m level, up to $66m to $68m, we had just completed the Imaging Automation acquisition, and we were just beginning to get our arms around this business. The good news is that we continue to see demand for all of our solutions as evidenced by the fact that our preliminary analysis indicates that our revenues will fall in the range of $66m to $67m for 2004. This boosts a year-over-year revenue increase of almost 80% from our revenue levels of 2003, much of that coming from significant organic growth.

At the same time, we had hoped to realize higher revenues in the fourth quarter from several Imaging Automation contracts. One of these contracts, the previously announced $1.1m win to reduce identity theft with the State of Florida Department of Highway Safety, experienced a significant delay in the rollout of the 175 iAuthenticate document authentication platforms, partially due to the impact of the three hurricanes that hit that state. Another significant revenue slip occurred when shipments on a major European Union border management contract, which we haven't announced yet, were delayed due to a part shortage by one of our subcontractors. We had received the contract award and the purchase order for the shipment in the fourth quarter, fully expecting to meet shipment and installation schedules in 2004. Had the shipments of the iAuthenticate platforms been successfully completed in 2004, we would have realized revenues of almost an additional $2m in the fourth quarter.

That brings us to the discussion of EBITDA. Those investors who have followed us in the past understand that due to the high levels of non-cash-related amortization expenses associated with cash-acquisitions, we look at EBITDA as a reflection of the cash-generation capabilities of the company. I continue to be very encouraged by the fact that our company has demonstrated an ability to be a strong generator of positive cash flow, even while absorbing three major acquisitions as well as demonstrating robust revenue growth. Preliminary financials for 2004 indicate that our EBITDA will be between $8m and $9m. This represents a significant increase over the 2003 EBITDA performance of $2.3m. Nevertheless, like you, we are disappointed that we fell short of our previous guidance of $11.5m to $12.5m for the year.

To better help you understand the shortfall, let me provide you some color that will allow you to take some comfort in knowing that this shortfall is, in most cases, due to a series of non-recurring events that do not undermine the long-term fundamentals of our business model. This shortfall can be primarily attributed to three primary buckets -- first, timing of revenues; second, currency translations; and, third, compliance, legal, and other acquisition-integration-related expenses.

I will discuss each of these in more detail now, beginning with the timing of revenues. Revenue timing impacted EBITDA in excess of $1m. As already outlined earlier on this call, we were impacted by close to $2m in revenues associated with the iAuthenticate contracts. During our overview of the Imaging Automation acquisition in October, we spoke of how the high content of both software and database products associated with the iAuthenticate platform results in a very solid contribution to our gross profit margins. In this case, the impact on EBITDA was in excess of $1m. This revenue and the associated gross profit margin did not go away, and is expected to be realized over the first two quarters of 2005.

The second primary factor affecting EBITDA in 2004 was currency translation. The negative impact to our business from this was about $500,000 and is directly related to the weaker dollar versus the yen. Our principal partner on the U.S. Department of Defense Common Access Card program is Toppan, a Japanese conglomerate. Last quarter we had a large shipment of printers creating an exposure for us. Since we buy the systems from Toppan in yen and get paid by the U.S. government in dollars. I understand that in a global economy, currency effects will not go away entirely, so we have carefully reviewed our procedures and are refining processes to minimize this risk going forward. Our new banking relationship with Citizen's, coupled with their broader set of services and resources, should provide additional leverage in this area.

Finally, the last major factor affecting EBITDA in 2004 was a series of higher-than-anticipated, non-recurring expenses related to compliance, legal, and acquisition integration charges. I spoke in October about the increased demands placed upon public companies, especially companies of our size, due to the necessity of implementing Sarbanes-Oxley Section 404 compliance. At the time, we estimated our requirements and the subsequent expenses to total $350,000 in the fourth quarter. In hindsight, it turns out we were wrong, and we underestimated the effort required from outside consultants. The real number is closer to $550,000. With the 31 December 2004 date behind us, I am now confident that our costs going forward on a continuing basis will decrease, though we do expect some residual costs during the first quarter of 2005 as we wrap up the consulting piece of the effort.

During the fourth quarter, legal expenses continue to impact us at a level higher than anticipated. First of all, the increased effort surrounded the judge's summary judgment decision associated with

 
© 2005 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

the George State driver's license contract led to an increase in expenses of about $200,000. In addition, a settlement of an outstanding lawsuit associated with the 2002 acquisition of Biometrica and the associated legal fees also approached an expense level of $200,000. We are happy, in both cases, to have this litigation that extends back to 2002 behind us in both the George as well as the Biometrica case. During this past quarter, we continued to finalize several issues related to the integrations of ZN, TDT, and Imaging Automation. These costs were primarily related to severance costs and final payments associated with former employees in both Germany and Washington, D.C. In addition, during this process, we were able to better understand several associated costs and, as a result, took steps to better reflect the impact to our business. This third category -- compliance, legal, and other acquisition integration nonrecurring charges, impacted our EBITDA in excess of $1m for the year and the quarter.

In summary, our EBITDA shortfall was impacted by three primary factors -- one, timing of firm-signed, high-margin contracts specifically associated with our iAuthenticate products; two, currency fluctuations due to the weak dollar versus the yen; and, finally, three, compliance, legal, and acquisition integration-related charges.

Now I would like to spend some time addressing the net income impact. Our latest guidance for net income was a loss of $1.5m for the year. We now expect that loss to be in the range of $7m to $8m. This loss directly reflects the impact due to the EBITDA shortfall. In addition, we have elected to take two non-cash-related charges that provide an additional impact of $2.9m in losses. These are the $2m asset write-down associated with the Georgia driver's license contract and the $900,000 non-cash charge related to our decision in the fourth quarter to treat the TDT acquisition as an asset transaction for tax purposes.

Let me first address the Georgia situation. I think many of you saw our press release on the conclusion of this legal matter last month. We have now had the opportunity to assess the situation more thoroughly in light of the most recent judge's decision to reduce our compensation related to terminating our contract with the State of Georgia, and we were able to discuss with our lawyers and our auditors what prudent measures we should take. As a result, we are taking a one-time, non-cash, $2m write-down during the fourth quarter of 2004 for an impairment charge to assets currently on our balance sheet. This, we believe, is taking an appropriately conservative approach to the situation.

As you'll recall, the December summary judgment ruling, in essence, sent the dispute in contract back to the Department of Motor Vehicle Safety in Georgia for a rebid -- exactly what we had asked for. At the same time, however, the court disallowed $2m of the $2.5m settlement agreement we had made with the state last summer. We have appealed that aspect of the ruling, and only that aspect, on several grounds including the most obvious in that

if the court agreed that the original contract should be terminated, as we proposed in the settlement, then disallowing the payment is contradictory. Nonetheless, in the fact of continuing legal uncertainty, we believe it is appropriate at this point to remove the financial uncertainty and take the write-down. We look forward to moving ahead now to the rebid and competing for this business in the marketplace, unencumbered by both legal and financial uncertainties.

The second factor that affected pretax income relates to our acquisition of TDT and an opportunity to pick up a very attractive tax asset. With the acquisition of TDT in February 2004, we had the option in the fourth quarter to file an election under IRS Tax Code Section 338h10 to treat the TDT acquisition as an asset transaction for tax purposes. Based on the company's expectations of future profitability, we decided that we would exercise this option, which is expected to result in approximately $8.5m of tax benefit over the next 14 years. Accounting rules require us to take a non-cash charge at this time, in effect, to "true up" or match both the tax and book financial statements. For this reason, we've booked an estimated $900,000 tax expense in the fourth quarter. This non-cash charge directly affects net income but has no effect on EBITDA nor does it negatively affect cash flow. While it may not look good on the P&L for this quarter, we think it is a prudent move for the long term.

While we are all disappointed by the bottom-line issues we faced this past quarter, we realize that our fundamental business is strong, as seen by our revenue growth and more so our ability to generate positive cash flow from operations as witnessed by an anticipated EBITDA of a positive $8m to $9m. All of this was accomplished in a year in which we radically transformed Viisage from a driver's license and facial recognition company to a leading provider of identity solutions. There is no question that enhanced identity solutions are being demanded around the globe, while the timing of these procurements is still not fully clear, resulting in some short-term ups and downs. What is clear is that both the long-term need and the acceptance of these solutions are being better understood by the marketplace.

The transformation of Viisage this past year has positioned our company to better address a much, much larger total market opportunity both here in the U.S. as well as abroad. We are seeing the benefits of that strategy with competitive wins in such diverse places as Florida, Pakistan, and several European Union countries.

Going forward in 2005, it is our intention to increase our investment levels so that we are better positioned to capitalize on these market opportunities. While we don't intend to provide guidance at this point -- we'll do that when we report final 2004 results on March 3rd-- I will emphasize, as we have all along, that we expect to continue to invest in technology and marketing, to maintain our product leadership position and capitalize on the tremendous opportunities available to us.


© 2005 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**VISG - Viisage Provides Preliminary Full Year 2004 Financials**

This we will do through both organic growth as well as strategic acquisitions. It is our goal to take Viisage to a $200m-plus revenue company, and we continue to believe that is a realistic goal over the next three to four years. In this type of high-growth environment, growing the top line amid an expanding market is our primary objective but not at any cost. We have every intention of being profitable in 2005 and making progress on our goal of expanding our gross margins. But you should anticipate that this top-line growth will not all flow directly to the bottom line in 2005 as we make significant investments to strengthen our company as we continue to position us better for the long-term market opportunity.

I look forward to speaking with you again in a month or so with more specifics, but right now we'll turn to the operator to open the floor to questions. I'll remind you again that we really can't provide a great deal of detail beyond what we have shared thus far until our results are final. But we certainly want to address any questions that we can at this time. Operator?

## QUESTION AND ANSWER

**Operator**

[OPERATOR INSTRUCTIONS] Our first question comes from Daniel Cummins of UBS. Please proceed, sir.

**Daniel Cummins  - UBS - Analyst**

Thanks, I just wanted to confirm that Bernard was talking in terms of full-year 2004 performance versus guidance, but that's implying that you will be nominally positive on EBITDA for the quarter? Is that correct?

**Bernard Bailey  - Viisage - President and CEO**

That's correct.

**Daniel Cummins  - UBS - Analyst**

Okay, I just want to run through the components of that again. I understand $1m from the timing of revenue, $500,000 for currency. Are we supposed to think in terms of an incremental $200,000 for Sarbanes-Oxley or for the whole 550?

**Bernard Bailey  - Viisage - President and CEO**

No, $200,000. So if you took that third category there, it's about $1m total in the legal as well as compliance as well as the integration-related expenses.

**Daniel Cummins  - UBS - Analyst**

I wasn't clear why the Georgia and the Biometrica -- $200,000 each -- why did those hit EBITDA?

**Bernard Bailey  - Viisage - President and CEO**

Because they were legal expenses that were incurred and came in this quarter above what we expected. The second one, though, just on the Biometrica, to be clear, that was a lawsuit that we had pending for two years and as a result of the settlement on that, we took that settlement and moved it in. So that was mostly settlement-related charges, not legal charges there.

**Daniel Cummins  - UBS - Analyst**

But they do represent cash outlays.


© 2005 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**VISG - Viisage Provides Preliminary Full Year 2004 Financials**

**Bernard Bailey** - *Viisage - President and CEO*

Pardon?

**Daniel Cummins** - *UBS - Analyst*

They do represent cash outlays for you?

**Bernard Bailey** - *Viisage - President and CEO*

Yes, they do.

**Operator**

Thank you very much, sir. Ladies and gentlemen, your next question comes from David Sterman of Halpern Capital. Please proceed.

**David Sterman** - *Halpern Capital - Analyst*

Hey, guys, I just wanted to spend a minute on the DOD contract with the Japanese vendor. Could you give us a sense of how far into the contract you are? And, at this point, I would assume with the higher cost of the equipment that there are no margins on this contract. I'm wondering if you can give insight on that, and what steps you can take to possibly put some margins in there?

**Bernard Bailey** - *Viisage - President and CEO*

There are a couple of elements to that that I want to answer -- a lot of questions there. First of all, for the most part, much of the rollout is accomplished in terms of the printer portion of the contract. So we're probably about 80-percent done with that piece of the contract. Secondly, we don't comment on specific program margins, but the program is profitable from a gross profit margin standpoint, even with these charges that were incurred here. Thirdly, what's not included and doesn't have the impact, which we mentioned before, which is much, much higher profit margins, are the consumables that follow the installation of the machine. So we continue to have a very robust and will continue to have for quite some time, a very robust consumables business that is very profitable, rolling off from that contract, going forward.

**David Sterman** - *Halpern Capital - Analyst*

Okay, and so if the equipment is 80-percent installed, at what point do the higher-margin consumables start to come into the mix here on this contract?

**Bernard Bailey** - *Viisage - President and CEO*

We're starting to see a little bit of that now, but it will have a much bigger impact as we go into the first and second quarter of this year. Again, it's hard to time exactly when because what's transformed in our business, with higher margin products, also comes the reality that timing becomes a more important aspect of our business. So will they flow in the first quarter or the second quarter? It depends upon shipments and deliveries from Japan and how we flow things through. But we should start to see a lot more of that beginning here in the first half of this year.

**Operator**

The next question comes from the line of Paul Coster of JP Morgan. Please proceed.

**Paul Coster** - *JP Morgan - Analyst*

A few quick questions. Can you just step us through how the hurricane affected -- I think I can guess it -- but how it affected the Florida contract? And then, secondly, on the component side, with the EU contract, what type of components are we talking about there?

**Bernard Bailey** - *Viisage - President and CEO*

A couple of things on that. First of all, on the Florida contract, basically, what happened in Florida was the whole state was really slowed down from several aspects from a procurement perspective. We had thought in early October that that deal would have been signed and shipments would have started a lot earlier on it. As it turned out, the state was bogged down in a lot of other issues, and they were much slower in getting the procurement finalized and rolled out and the funding taken care of. But, needless to say, it was completely done much later in the quarter than we anticipated, and, as a result of that, we weren't in a position to get the rollout moving as quickly as we would have hoped -- certainly unexpected in the October timeframe when that occurred.

As far as what we were dealing with on the contract in Eastern Europe, it was basically a small imaging piece for the document reader itself, which as a result of that we had to wait for it to come in for our subcontractor and by then we got caught up into the holiday season and weren't able to get the shipments out of subcontractor's door in time.

**Paul Coster** - *JP Morgan - Analyst*

On that point, is it a chip-level component or a module that we're talking about?

**Bernard Bailey** - *Viisage - President and CEO*


© 2005 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Viisage Provides Preliminary Full Year 2004 Financials

I believe it was a module, Paul.

---

**Paul Coster** - *JP Morgan - Analyst*

Okay, and it just felt like it was --

---

**Bernard Bailey** - *Viisage - President and CEO*

-- I can get more detail on that, but I believe it was module.

---

**Paul Coster** - *JP Morgan - Analyst*

It was just a timing issue, it wasn't an enduring problem inside the supply chain?

---

**Bernard Bailey** - *Viisage - President and CEO*

Oh, absolutely not.

---

**Paul Coster** - *JP Morgan - Analyst*

Okay, last question is you've alluded to investments in '05. Can you give us any color on the type of investment that you're talking about? Is this internal investment for organic growth or acquisition, basically?

---

**Bernard Bailey** - *Viisage - President and CEO*

Let me address that from two perspectives. The answer is that we are going to continue to invest for organic growth. We feel that our products and our positioning, right now, are being very, very well received in the marketplace amongst the integrators as well as our end-user customers in the marketplace. The iAuthenticate products, facial recognition, we're starting to find a lot more momentum and, of course, our credentialing solutions are much better favored, too. So we feel that we have to continue to invest in enhancing our organic products and increasing that suite of products that we have across the entire portfolio of the identity solution lifecycle. And, secondly, we also believe very strongly that we need to invest internally for organic growth for our sales and marketing organization, going forward, also.

That being said, it's not an either/or, Paul. As I mentioned in my conversation earlier, we will aggressively look at acquisitions where they make good strategic sense and fill in our portfolio, going forward, and that will be a part of how we look at our business, going forward. So it's really on both sides. We would not want to miss this opportunity to maintain our leadership position.

---

**Operator**

Your next question comes from David Gremmels of Thomas Weisel Partners. Please proceed.

---

**David Gremmels** - *Thomas Weisel Partners - Analyst*

Thank you. On the two contracts that slipped, the State of Florida and the European contract, I just wanted to confirm that those both are iA contracts and between the two, the revenue impact was $2m, and the gross margin impact was $1m?

---

**Bernard Bailey** - *Viisage - President and CEO*

That's about right, yes, you've got it both, yes. All of it's correct.

---

**David Gremmels** - *Thomas Weisel Partners - Analyst*

Okay, and were any of the associated deliveries accomplished, thus far, in Q1?

---

**Bernard Bailey** - *Viisage - President and CEO*

Yes, some of them have been. We continue to roll out in both cases on those contracts. The shipments required at the end of the fourth quarter came in, and we started shipping on that for the contract in Europe.

---

**David Gremmels** - *Thomas Weisel Partners - Analyst*

Given that iA closed in October, I believe, it sounds like both of these are purely external events, but I have to ask: did this cause you to reassess the iA business pipeline? Do you have any concern that there are any more surprises out there?

---

**Bernard Bailey** - *Viisage - President and CEO*

No, I don't on that, but you raise a very fair question, and let me give a little more color around that. Part of it is the reality of when you do some of these acquisitions. Let me address the first part. The strength of the iA pipeline is, as we've gotten into it, I've been more and more impressed with the quality of that pipeline and the demand that there is for these products in the marketplace. As an example, I was just over in the Middle East where we were demo-ing the products there at a very important conference and show, and there was just overwhelming interest throughout the entire Middle East for this product with its capabilities. So I feel very, very strongly about the strength of the pipeline, going forward, from a business standpoint.

Now, that being said, there is a simple reality here, and that is we work today in the public marketplace as Viisage. When we acquire

---


© 2005 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Viisage Provides Preliminary Full Year 2004 Financials

companies that are private companies, sometimes it takes a while for them to fully appreciate and understand what it means to end a quarter. And so, as a company, that's part of the focus that we've put on as we do these acquisitions, especially with companies that previously didn't have the same quarter pressure that you don't when you're not in the public market. So we have certainly heightened the awareness and made people aware throughout the company of what it means now to have to deliver on a quarterly basis in the public markets.

**David Gremmels** - *Thomas Weisel Partners - Analyst*

The last one, I understand you're not providing any guidance, but given the investments that you referenced, are we looking at an EBITDA increase, at least, in '05?

**Bernard Bailey** - *Viisage - President and CEO*

Yes. I don't know how much and, I'm sorry, we haven't gone to that level, and we're not giving that guidance, but you can feel confident that we feel good about the growth in the revenue side, and with that will be some commensurate improvement in the cash flow of the company.

**Operator**

Your next question comes from Jim Ricchiuti of Needham and Company. Please proceed.

**Jim Ricchiuti** - *Needham and Company - Analyst*

Thank you, good afternoon. Can you comment, Bernard, if you saw much in the way of litigation expense in the quarter associated with the Fargo litigation, and how you see that, perhaps, in Q1-Q2, if you can comment on that?

**Bernard Bailey** - *Viisage - President and CEO*

The reality is we're not seeing a lot of litigation expense associated with the Fargo situation, because the major force on that, obviously, or the major person who has to represent themselves there is really Toppan. And so we've kind of joined forces with them in working through some of this litigation expense and what will be there, but we certainly don't expect that to be anything in the line of what we had experienced throughout this whole **Georgia** driver's license fiasco.

That being said, we'll continue to monitor that and look at that, and we certainly don't expect anything close to what we've seen in the past. And, of course, the difference there is that's not hindering, in any way, our ability to roll out and execute on our contract with the Department of Defense.

**Jim Ricchiuti** - *Needham and Company - Analyst*

I realize you're not giving guidance for '05, but I wonder if you can comment on what the backlog looked like at the end of the quarter? Was it up versus Q3? Or just some general sense as to the visibility that you see out there in the pipeline?

**Bernard Bailey** - *Viisage - President and CEO*

Bill, do you have the numbers with you on the backlog? Would you want to comment on that, please?

**Bill Aulet** - *Viisage - CFO*

At this point, I'm not comfortable commenting on that.

**Bernard Bailey** - *Viisage - President and CEO*

Okay.

**Bill Aulet** - *Viisage - CFO*

Sorry, Jim.

**Jim Ricchiuti** - *Needham and Company - Analyst*

Can you give us any sense as to the business activity, both the pipeline that you see, just in general terms in the U.S. and perhaps in Europe and elsewhere overseas?

**Bernard Bailey** - *Viisage - President and CEO*

Well, just a little color on that. We are very encouraged by what we see in terms of the pipeline, going forward. We could start with just our core business, the driver's license business, and nothing has changed since our call on that. We continue to see states roll out and update their solutions and anticipate updating their solutions, going forward. The West Virginia bid is in; the Texas bid is in. It's going through the final reviews at this point in time. We expect Indiana, California, Virginia, a whole host of states to occur if not in the first half of the year, certainly in 2005. So that remains very strong. At the same time, there is a lot of built-up momentum down in Washington, D.C. around HSPD12 -- the Homeland Security Presidential Directive 12 - which is requiring much more advanced secure technology and the identity solutions and cards around the federal marketplace. That has been kind of pent-up demand, because a lot of those agencies are sitting back waiting now until the standard gets finalized around the FIPS 201 standard for these cards. So we see a lot of demand there.


© 2005 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

If we look overseas, what we're starting to see now is that, first of all, there's a lot of demand both domestically and overseas around this whole area of document authentication. People are finally awakening to the reality that proofing is probably the biggest Achilles' heel in this whole identity solution, and we're very well positioned with our authentication and proofing products to be able to address that.

At the same time, many countries --and you've seen some of the awards, some of them to us, some of them to our competition. We feel good about that because what that tells us is that there is market momentum beginning to come out now around the ePassport and the face recognition portion of that. So we're competing there and competing vigorously and, in some cases, winning and, in some cases, not winning. But we feel very good about our winning rate that we have in that marketplace right now.

So there's really increased demand everywhere. As far as how fast it will roll out and when that will convert, we certainly are seeing a lot more momentum than we did 12 months ago, and our positioning is much better. As I mentioned in my talk, we are now, as a company, really much better positioned to address a much, much larger addressable piece of the marketplace.

**Operator**

Your next question comes from Steve Gish of Roth Capital Partners. Please proceed.

**Steve Gish  - Roth Capital Partners - Analyst**

Hi, good afternoon. Could you just drill down a little bit more on the non-cash impairment charge? Was that specifically for hardware for Georgia? In other words, why could you not use some of that hardware for some of the other credentialing opportunities?

**Bernard Bailey  - Viisage - President and CEO**

Sure, I'll be glad to go down on that. The reality is that we went through that in great detail, Steve, because obviously we're not going to impair something that has the ability to convert to revenue, going forward. So as we look through that, most of the costs that we looked at in that $2m were either specific consumables or specific engineering development skills that we put in place that were uniquely attributable to the Georgia contract. You may remember, we do have on our balance sheet other costs that are associated with other assets that we were going to deploy into Georgia and, in fact, are using today on other contracts, going forward. So this was just that $2m portion that we had agreed with the state was unique to their specific situation, and we should have been reimbursed for those expenses.

**Steve Gish  - Roth Capital Partners - Analyst**

So looking down the road, when this is rebid and if Viisage is selected, could you actually see better margins because you could essentially take some of this product or consumables out of inventory?

**Bernard Bailey  - Viisage - President and CEO**

Well, the fact is that, going forward, we don't know what the RFP is going to look like. So it's almost impossible to comment on that, Steve, because it really depends upon what are the requirements of that RFP and how closely aligned it is. We didn't think it made sense to continue to keep those assets up on our balance sheet, given what we think is, going forward, relative to the procurement the quality of those assets. So I don't think that would be the case.

**Bill Aulet  - Viisage - CFO**

Bernard, this is Bill. Steve, I just want to comment briefly on that. The reason we're taking an impairment on it is because of the settlement; we had a $2.5m with the State of Georgia, and right now the judge in Georgia has ruled that that's $500,000. So it's appropriate at this time for us to take a $2m impairment charge on that. So that's, pure and simple, the reason.

**Operator**

Your next question comes from Ingrid Ebeling of JMP Securities. Please proceed.

**Ingrid Ebeling  - JMP Securities - Analyst**

Hello, thank you. Can you provide an estimate or a range for gross margins in the fourth quarter?

**Bernard Bailey  - Viisage - President and CEO**

We're not providing it at this time, Ingrid. Needless to say, I think we've highlighted it for you, is that those margins will be lower than we had anticipated because of the mix that came in for the revenue with less product and software.

**Ingrid Ebeling  - JMP Securities - Analyst**

How will today's announcement impact your foreign exchange hedging strategy, going forward, and your strategy in delivering the higher-end facial recognition systems?

**Bernard Bailey  - Viisage - President and CEO**


© 2005 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Well, first of all, in the facial recognition, going forward, it won't have any impact on that. We are continuing to be very aggressive in providing those solutions around the world, both throughout Europe and where we continue to see a lot of momentum in the Middle East and certainly here in the United States. So that won't have any impact, as we see it, going forward. Bill, do you want comment on the hedging?

### Bill Aulet - Viisage - CFO

Yes, the currency exchange, this is an issue, like a lot of these that we see, that we can fix. We know what the issue is. As Bernard said, we did three integrations -- three acquisitions and integrating them and, in the process, we learned what we can do better. So there are techniques that you can use from currency hedging. We are not a currency hedging shop, but we can reduce our risk there significantly, and we are investigating those right now with our partners, including Citizen's Bank.

### Operator

Your next question comes from Daniel Cummins of UBS as a follow-up. Please proceed, sir.

### Daniel Cummins - UBS - Analyst

Thanks. I know, Bernard, you said you expected the Sarbanes-Oxley expenses to decrease into first quarter '05. Could you give us some sense whether you think the number for this quarter would be closer to $150,000 or $350,000 just to give us a sense of magnitude on how you're coming with this, and do you think this is going to be a tough challenge on an ongoing basis if you continue to do acquisitions? Is any of what you're seeing more significantly challenging or difficult because you've done recent acquisitions?

### Bernard Bailey - Viisage - President and CEO

I'm going to let Bill take that in detail, but before he does, Dan, I want to comment on that from a couple of perspectives. First of all, we're looking at the acquisitions that we're doing, certainly, as Bill said, there's an awful lot that we've gained in this process, and we have certainly grown significantly as a company. What I didn't mention when I was mentioning some of the investments that we were going to make, and another thing that we are doing this year is we are significantly investing in our control infrastructure as a business, going forward. Last year, you'll remember that we made the investment of over $1m to put in an Oracle financial system. So we are going to be putting in place our internal support for that Oracle financial system. We are also adding some financial and accounting strength into the business to support both Bill and our controller, Peter Faubert, going forward, which will certainly help in all of this in terms of the acquisitions and our ability to better forecast as well as control and manage our business as we continue to grow, which we think is critical. Because we really do want that infrastructure in place to be able to support a much larger company, going forward.

So, with that, I thought I'd turn it over to Bill, and he can talk to you a little bit better about the impact here in the first quarter and going forward, but you can see that we will be making some investments in the infrastructure there. Bill?

### Bill Aulet - Viisage - CFO

Thank you, Bernard. Related to that, Dan, we'll be closer to $150,000, and I just want to reiterate Bernard's point in that Sarbanes, first of all, had a deadline of December 31st, which we came up to -- to strive to do everything we could for compliance. In that time period in the fourth quarter, because of a lot of things that were coming up, and we run with a very thin staff here, and Bernard just talked about a remediation there to increase our resources, particularly now that we've done the acquisitions and integrations. We had to divert our internal resources to handle some other issues, and therefore we had to hire outside consultants to do the Sarbanes-Oxley. But there was a clear deadline there that we had to drive toward, so that's why the costs were really driven up there. So I would say they were well above and beyond what they will usually be, and the Sarbanes-Oxley compliance was December 31st for the first go round. It does not go away. When you acquire a new company, you have 12 months to make them Sarbanes-Oxley compliant. But I think we will have more resources, as Bernard talked about, next year. We have gone through it. Everybody knows a lot more about it than they did last year, and I think we'll be much more efficient at it.

### Operator

We do have one more follow-up from Mr. Paul Coster of JP Morgan. Please proceed.

### Paul Coster - JP Morgan - Analyst

Yes, Bill, if I may -- gross margins, as we look into next quarter, it seems to us that there should be something of a rebound because obviously you've incurred the expenses associated with at least the Florida contract but not the revenues. Is that correct thinking?

### Bill Aulet - Viisage - CFO

Okay, just making sure I don't say anything wrong here. Your thought process is correct, and I'm going to just speak in the general. As Bernard mentioned, our high-margin business was what the timing was hit with, and we should see that bounce back in the next quarter. We're confident about that. So your assumptions, I would say, are fair.


© 2005 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**Operator**

That concludes our question-and-answer period for today. I'd like to turn the call back over to Mr. Bailey for closing remarks.

**Bernard Bailey** - *Viisage - President and CEO*

Thank you very much. Anyway, thanks, again, for joining us this evening. We certainly look forward to a fuller discussion of our results on March 3rd and, of course, we certainly hope you see us at some of the conferences we'll be attending over the next several months, where I think you'll be able to get a little bit more color relative to where our business is. Again, I very much appreciate all of you being on the call and, more importantly, I appreciate your support of our company. Have a good evening.

**Operator**

Thank you very much, ladies and gentlemen, for your participation in today's conference call. This concludes the presentation, and you may now disconnect. Have a good day.

**DISCLAIMER**

Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

© 2005, Thomson StreetEvents All Rights Reserved.



© 2005 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

# Exhibit 43

▶ ▶ ▶

# Conference Call Transcript

VISG - Q4 2004 Viisage Technology, Inc. Earnings Conference Call

Event Date/Time: Mar. 03. 2005 / 8:00AM ET
Event Duration: N/A

| Thomson StreetEvents | streetevents@thomson.com | 617.603.7900 | www.streetevents.com |

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Q4 2004 Viisage Technology, Inc. Earnings Conference Call

## CORPORATE PARTICIPANTS

**Bernard Bailey**
*VISG - President, CEO*

**Bill Aulet**
*VISG - CFO, SVP*

## CONFERENCE CALL PARTICIPANTS

**David Gremmels**
*Thomas Weisel Partners - Analyst*

**Keith LaRose**
*Bradley, Foster & Sargent - Analyst*

**Paul Coster**
*JP Morgan - Analyst*

## PRESENTATION

**Operator**

Thank you for standing by and welcome to the Q4 2004 Viisage Technology Incorporated Earning Conference Call. My name is Carlo, and I will be your coordinator for today's presentation. (OPERATOR INSTRUCTIONS)

I would now like to turn the presentation over to your host for today's call, Mr. Bernard Bailey, President and Chief Executive Officer. Please proceed, sir.

**Bernard Bailey  - VISG - President, CEO**

Good morning and welcome to the Viisage fourth quarter 2004 results conference call. I'm Bernard Bailey, President and CEO. With me today is Bill Aulet, our Chief Financial Officer.

It is once again a pleasure to have the opportunity to share with our investment community the Viisage financial results for 2004, as well as our perspective on this dynamic marketplace going forward. We have a lot to talk about today and I know that many of you have questions you want to ask, so with that I would like to jump right into things.

Bill, Would you please review our Safe Harbor statement?

**Bill Aulet  - VISG - CFO, SVP**

Thank you, Bernard, and good morning everybody. Statements that representatives of Viisage make on this call that are not historical facts are accurate as of today, March 3, 2005, and may be considered forward-looking statements that involve risk and uncertainties, including reliance on public sector markets, the possibility of customer delays and the need for capital and competition. You should refer to our form 10-K for the year end December 31, 2003, filed with the Securities and Exchange Commission on March 30, 2004 under the heading "Certain Factors That May Affect Future Results" as well as our subsequent SEC filings, for more information on the risk factors that could cause actual results to differ, perhaps materially, from our statements today.

Viisage undertakes no obligation to publicly release any revision to any forward-looking statements made today, or otherwise update or supplement statements made on this call. In addition, on this call we plan to discuss EBITDA, or Earnings Before Interest, Tax Depreciation and Amortization, a non-GAAP measure within the meaning of the applicable SEC regulations. We believe that presenting EBITDA nonetheless provides investors with meaningful information about operating performance.

© 2005 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Q4 2004 Viisage Technology, Inc. Earnings Conference Call

Now back to you, Bernard.

**Bernard Bailey - VISG - President, CEO**

Thanks, Bill. Let's start by talking about what we accomplished in 2004. By many measures, 2004 was an outstanding year for our Company. At the same time, I'm disappointed, and I'm sure many of you were disappointed, that we were not able to end the year on as strong of a note as we had hoped. But, it would be a mistake to allow the events of the last few weeks of the quarter to cloud the significant accomplishments that we have made over the past 12 months.

To best understand what we have accomplished, we need to go back to January of 2004. Some of you may remember that entering 2004, Viisage was a company that had a leadership position in the driver's license market and an interesting position in the nation's face recognition marketplace with technology that clearly needed to be upgraded if we expected to be competitive going forward. At the same time, we were coming off a modest growth year in which our revenues were a little over $37 million, with an EBITDA of just over $2 million. Additionally, we entered the year with a book backlog of business of about $92 million. Our customer base and the associated revenues came almost exclusively from the Department of Motor Vehicles agencies within the various state governments.

Today, the Viisage that you have an ownership position in is a very different company from the Viisage of just 12 months ago that I described. The transformation of our company has been part of the execution of a strategy designed to build Viisage into a leading provider of advanced technology identity solutions that is capable of addressing a much larger marketplace, both here in the United States as well as the rest of the world. And it is clear that we are on the right path. Just look at where we are today. The three acquisitions we undertook were designed to strengthen our technology and product portfolios, positioning us for growth in our existing markets, as well as placing us into new market opportunities.

With our acquisition of ZN Vision Technology and the subsequent additional R&D efforts we have made in face recognition, we are now recognized throughout the world as having the industry's preeminent face recognition technology. Focusing our market penetration on large database implementations, we have expanded our FR penetration by almost 100 percent in the driver's license marketplace, while also extending our penetration in law enforcement as well as gaining implementations in countries such as Canada, the Netherlands, the UAE, and Pakistan.

Our acquisition of Imaging Automation is given us the leading technology and market positioning in the burgeoning document authentication marketplace, allowing us to address a very critical customer need in the secure document life cycle, identity proofing. Already we have seen success in penetrating the US driver's license marketplace with the State of Florida contract we announced late in 2004.

The acquisition of TDT has allowed us to expand into the passport marketplace as well as the emerging opportunity for Smart Card credentials. We were able to leverage this acquisition into a critical win early in the year on the Department of Defense's Common Access Card. Along with the technology and products that these acquisitions have given us, we have also dramatically increased our customer base in the subsequent addressable market opportunities.

Entering 2005, we continue to enjoy a strong presence in the State and local government place, but we have also gained significant inroads with key agencies of the US Federal Government, including both the Departments of State and Defense. Additionally, we now have a strong presence in the critical worldwide identity solution marketplace, with product and solution placements in countries such as Germany, Pakistan, Canada, Australia, Belgium, Hungary, Sweden, Netherlands, and the UAE, to give you just a partial list. Fortunately, all of this has also translated into significantly improved financial performance for our investors.

As you saw in our announcement, revenues have grown year-over-year by 81 percent, to $67.5 million. We have also continued to improve our cash flow from operations as evidenced by an EBITDA of $8.6 million, an increase of almost 380 percent over 2003. Just as importantly, our multiyear backlog of business ended the year at $139 million, up 51 percent from where we entered the year, representing a continuing stream of revenues to support our business going forward.

Our transition to more products and solutions has also helped us to improve the value proposition to our customers, as witnessed by an improvement of more than 3 points in our gross profit margins to 28.5 percent. At the same time, we continued to shore up our balance sheet. Our follow on offering in August brought $38 million of cash to our company, allowing us to pay off virtually all of our debt, while still giving us a year end cash balance of $11.4 million. By every measure I am extremely proud of the accomplishments of our hard working and dedicated Viisage employees.

While we are pleased with the progress we have made in transforming Viisage in 2004, it is clear that we still have much work to do. When you have accomplished as much as we have this past year, it is inevitable that there will be bumps along the way. Frankly, we had a few as we wrapped up 2004.

Assimilating three acquisitions and getting our arms around the business models of each of these companies is a significant task by itself. When you combine that with the new financial system, a new revenue recognition accounting system, and the requirements


© 2005 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Q4 2004 Viisage Technology, Inc. Earnings Conference Call

of Sarbanes-Oxley compliance, you put a lot of stress on the system. We believe we have taken the steps necessary to minimize the impact going forward. In a few minutes, Bill will share with you some of the actions we are taking.

Now let's talk about what all of this means going forward and what you should be looking for as we execute against our business plan in 2005. I would like to frame the discussion around three questions that I think are critical in understanding our business going forward.

The first question is, what is the size of the addressable market opportunity in which Viisage is capable of competing? In other words, will this market emerge to become big enough to create a significant business opportunity for its suppliers? The second question, is Viisage positioned to capture a significant portion of this marketplace opportunity? And finally, when Viisage establishes a leadership position, as this market matures, can it achieve and sustain an acceptable profit level to support the investment? This is the way we look at our business strategy.

Let's look at the market opportunity we are addressing and our capabilities in this marketplace. The Viisage that has emerged out of 2004 is a company that is now positioned to provide products and solutions that it can address the full identity solution life cycle, from proofing, to enrollment, to credentialing, to verification of the user. Our reach is clearly global, with a footprint in virtually every region of the world. Let's look at some of the opportunities that are in front of us.

Here in the US at the State level, we are seeing continued demand to improve the credentialing process, not only in the driver's license market, but for virtually every credentialing activity. This includes citizen credentialing to protect identity theft victims, such as our recent win in Ohio, to State employees, first responders, and law enforcement initiatives. In addition, the recent passages of the Intelligence, as well as the Real ID bills, have all put additional security requirements around the state driver's license. As a consequence, we are starting to see additional procurements starting to heat up.

As you will remember in 2004, many of the procurements were deferred. We are very pleased to have been selected already for the first state procurement this year, West Virginia. This creates a new opportunity for our company and incorporates a multi-biometric solution with a Smart Card pilot for West Virginia citizens. Proposals are presently submitted for Texas and Indiana. Going forward this year, we expect opportunities in California, Virginia, Georgia, and North Carolina. Of these opportunities that I have listed, only North Carolina is a Viisage incumbent.

Just as exciting, we are now seeing more and more states begin to understand the value proposition around our document authentication solution. We are actively engaged in discussions with eight States, who are seriously looking at implementing this

technology in 2005. This is particularly exciting opportunity, especially when you are reminded that we only completed this acquisition in October of 2004.

When we look at the total procurement opportunity in this space for 2005 alone, it represents a total contract value of more than $200 million. Longer term, the total card opportunity, when we include first responders, State employees, and local governments, this opportunity expands dramatically.

In the law enforcement marketplace, we continue to be encouraged by the tremendous value that is being created at the Pinellas County Sheriff's office. This application expansion in 2004 led us to Jefferson and Essex Counties, and the DC Metropolitan Police, further substantiating the value of face recognition in law enforcement. If we just looked at the law enforcement market alone in the US for local marketplace, it represents an opportunity of greater than $200 million.

Jumping to the US Federal marketplace, Homeland Security Presidential Directive 12, or HSPD 12, is driving the need for improved credentialing for federal agencies. This directive is expected to drive demand for more than 1.5 million cards for the employee base alone. Expand that to contractors and support personnel, and it easily dwarfs this initial opportunity.

Continuing in the Federal government, the US-VISIT and TWIC programs continue to move forward, however slowly. The Department of Homeland Security through its recent organization of the Office of Screening, Coordination and Operations, has recognized the need to address and coordinate the entire credentialing procurement process. Newer opportunities are emerging with Homeland Security to address authentication requirements for both the land borders and airports. We are also seeing newer developing opportunities to address credentialing opportunities across various applications, such as mobile systems, airline pilots, and initiatives in criminal justice and corrections. All of these opportunities are candidates for face recognition, proofing, document authentication, and credentialing capabilities, the solutions that the Viisage of today is capable of delivering.

On the international stage, the opportunity is just as robust. With the October deadline approaching for the implementation of the electronic passport for the 27 Visa Waiver countries, we are beginning to see increased activity in this area. Today we are actively engaged in most of these countries, or with partners in these countries. At the same time, we continue to see activity in many countries regarding upgrades to their national ID cards, voter registration cards, and national identity databases.

Our recent partnership with NADRA, the National Agency for Database and Registration Administration, in Pakistan, is an excellent example of the type of activity we are seeing in developing countries around the world. These countries are being required to gain a better understanding of who is in their countries


© 2005 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

and their linkage to activities and transactions. Biometrics such as face recognition, identity proofing, and database management are key technologies in developing these solutions.

With NADRA, we have worked to integrate our face recognition technology into their national identity database, as well as their workflows for issuing passports and national identification cards. The effectiveness of the technology provides an important step in securing the identity of citizens throughout Pakistan. We see a tremendous opportunity to expand this solution in other developing countries around the world and are in discussions with agencies to do so.

I have spoken before about the convergence of physical and logical security, and how I see that as critical to the identity solutions marketplace as an enabling event in technology. I was thus pleased to see that Forrester Research issued a report in early January of this year, called "Security Convergence Gets Real." According to their estimates, companies in North America are expected to increase in spending threefold on projects combining physical security with IT security, with major focuses in the area of credentialing and authentication, areas where the Viisage has made early inroads as a market leader.

Our work on the CAC Card for the Department of Defense, and other similar projects we are undertaking for US and international customers, are signals that commercial adoption of the Smart Card is not far behind. Forrester's forecast for spending in this area in Europe and North America alone doubles each year from 2004 to 2008, reaching an addressable market opportunity of over $11 billion.

I think you can see that the market opportunity that Viisage is able to address today and our capabilities provide a very significant growth opportunity going forward. What we cannot predict is the timing of this marketplace. Those of us who have followed it over the past several years are clearly disappointed with the pace of implementation to this point. But all indications are that this pace is beginning to accelerate. The number of pilot projects as well as actual RFPs has certainly increased over the past few months, giving us encouragement that the accelerated growth we all expect to occur is getting closer.

In finalizing our discussion on this marketplace and Viisage's position within it, it inevitably leads to the question of profitability. The transformation of Viisage over the past year has driven a greater content of our business towards products and solutions. With that increased product mix comes the prospect for improved margins. And in fact, we saw the implications of that in our 2004 results, with our margins up over three points year-to-year.

Going forward, we expect to continue to increase our mix of products, allowing us to improve our value proposition and the subsequent profitability of those solutions. Our objective is to improve our overall gross profit margins to 40 percent by 2007. In

2005 we expect to see our profit margins improve by an additional 4 to 6 points above our 2004 levels.

Finally, that leads me to a brief comment on our guidance for 2005. While we are very excited about our opportunities in front of us for 2005, it is important to understand that many of these programs will not result in a huge revenue run up in 2005. There are a couple of reasons for this.

First of all, many of these programs will roll out slowly, with pilots extending into late 2005 and 2006, similar to what we have seen with programs such as US-VISIT. Additionally, as we know from our experience in the driver's license marketplace, it often takes six to twelve months from contract award to when we will begin to see revenues recognized before the program goes into production. Another point to be made is that our document authentication products to be a major contributor toward our revenues in 2005 is something that we absolutely anticipate. Since this capability has only been with us our acquisition in October, it will take some time before we can realize the full effect of implementing these products through our sales channels. Finally, I would add that as we continue to transition to a more robust product content, that carries with it a greater degree of lumpiness in quarter-to-quarter variability. Of course, the flip side to that is the potential for significant upside revenue deployment as contracts are signed.

Consequently, we are guiding revenues for 2005, conservatively to be between $73 and $80 million, an increase between 8 and 19 percent above our 2004 levels. As we get better visibility into our revenue screen throughout the year, we are positioned to modify this outlook appropriately. As we mentioned in our earnings release, revenue for the first quarter is expected to be between $15 and $17 million. As for EBITDA, we have decided to not give specific guidance on that number, but rather we can commit to the fact that directionally, we expect to improve our EBITDA performance above the levels we reported for 2004, and in line with what we see as our revenue improvement going forward. Similarly, from a GAAP-EPS standpoint, we are committed to running a profitable business in 2005, prior to the affect of expensing options beginning in July.

With that, I would like to now turn the call over to Bill, so that he can provide you some additional color around our earnings announcement that you have all had a chance to review. As you know, we will have a follow on call to allow those investors who are most interested in digging deeper into our financials, to ask more detailed questions, so Bill will limit his comments to some high level factors that are important in understanding our business.

**Bill Aulet** - *VISG - CFO, SVP*

Thank you very much, Bernard. Hello, everybody. Today, there are three things that I want to go over quickly here. First of all, some comments on the fourth quarter financials and secondly,


© 2005 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**VISG - Q4 2004 Viisage Technology, Inc. Earnings Conference Call**

some comments on Sarbanes-Oxley. And third, just to talk about very briefly, the key process we remediated since we spoke last, currency.

First, let's talk briefly about the financials. You've seen the results in our press release and Bernard noted the top line growth to $19 million, up 84 percent year-over-year basis, and up 81 percent on an annual basis. But looking at the bottom line, we felt an impact from a number of non-recurring items, which we described last month. As a result, the net loss for the fourth quarter of 2004 was $5.2 million, or 11 cents per fully diluted share, compared to a net loss of $1.4 million, or 6 cents per share in the prior year.

I think it's important to note that the 2004 fourth quarter loss includes some major non-cash items, specifically the $2 million impairment charge related to the termination of the **Georgia** contract. Secondly, the valuation reserve against the deferred tax asset resulted in an equivalent non-cash expense for the P&L statement of $900,000. Third, $4.9 million in the depreciation of asset line item, which includes now $1.4 million, which is specifically a result of amortization of intangible assets from the Company's acquisitions. Also weighing down the bottom line was shift in our product mix, most acutely caused by the timing of some major shipments with Imaging Automation in the fourth quarter, specifically from delays in Florida and a roll out in Europe, as we discussed in the last call. That resulted in lower overall gross margins for the quarter than we had anticipated.

In addition, our bottom line was adversely affected by Sarbanes-Oxley to the tune of $550,000, negative currency exchange of $500,000, and legal, severance and acquisition-related costs of over $500,000. We see similar impact in our operating expense for the quarter as well, which are notably higher at $9.1 million. Again, those include some of the non-cash items I pointed out already.

I will also point out, however, that Viisage in the fourth quarter was nearly double the size company it was a year earlier, following on the three acquisitions completed in 2004. If you exclude the charge related to **Georgia**, our operating expenses are down slightly as a percent of total revenue on a year-over-year basis. That being said, we would like to, and we expect to, see more leverage from our operating expense going forward. A major driver of operating expense is head count, so you should note that our full-time employee count at the end of December 2004 was 203, compared to 119 at the end of 2003.

Once again, we generated a positive EBITDA for the fourth quarter, some $974,000, which is a significant increase over $362,000 in the fourth quarter of 2003. On a quarter over quarter basis, our EBITDA was down from $3.376 million. Cash flow from operations for the quarter was a positive $2.4 million, which was very encouraging. Both of these numbers were driven by substantial depreciation and amortization, which I previously mentioned.

Gross margins were approximately 28 percent, up slightly from the year previous, but not as much as we had anticipated. Margin expansion remains a key goal, as Bernard has stated. At the end of the quarter, backlog was $139 million, roughly flat with $140 million at the end of third quarter 2003. As we said previously, changes of backlog are not linear, since movements are affected by the lumpiness of major contracts being awarded. In the fourth quarter, we did start to see an increase in the pace of contracts being released and we anticipate the pace to accelerate further throughout the upcoming year.

I am pleased to report that we are following through on our intention to improve our balance sheet for the fourth quarter, by paying off related party debt and project financing, steps that reduced our interest payments on an annualized basis by $1.4 million. In addition, we secured a line of credit for up to $25 million with Citizens Bank, which we believe is a much more flexible and cost effective solution than we have had in the past.

At the end of the fourth quarter we had $11.3 million in cash, up from $6.7 million. In the fourth quarter, there was no restricted cash for the first time in two years. Basic and diluted weighted average common shares rose from 40.2 million to 47.2 million. That was caused primarily by the 3.9 million shares that were issued with the Imaging Automation acquisition, and approximately a little under 500,000 from the exercise of options and warrants. The remaining change is because you have a weighted average. Our follow on offering of over 7 million shares was done in August.

Secondly, as you saw in the press release last night, we discovered in the process of our Sarbanes-Oxley compliance work and our year-end audit, that despite strong internal controls in most areas, there were enough adjustments in our close process to make clear that the Company was short on technical accounting resources to support Viisage's significantly more complex business. What this means is that we assessed ourselves as having an internal control deficiency that constitutes a material weakness, as defined by the Public Accounting Standard Board. More specifically, this means that we did not catch all the accounting adjustments with our internal staff that we should have. The ones that were there, had to be picked up as they had previously by our independent public auditors.

What it does NOT mean is that our financial statements are misstated or that it affects our historical financial statements. BDO Seidman, our public auditing firm, has informed us that they expect to issue an unqualified opinion on the consolidated financial statements that will be filed with Securities & Exchange Commission. As noted in the press release, they will issue a separate opinion regarding the Company's internal controls in conformance with the Sarbanes-Oxley Act Section 404, which will render an adverse opinion with respect to our internal controls over financial reporting.


© 2005 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Q4 2004 Viisage Technology, Inc. Earnings Conference Call

The good news is that we recognized this as an area for improvement months ago, and we've been working diligently to remedy these issues for some time. Early in 2004, we brought on Peter Faubert, an experienced CPA and finance manager, who's been a Controller in a public company previously, as our new controller. He has done an outstanding job, but we now need to fill in the organization around him as the Company and the associated complexity of our business has grown.

Towards this end, we have taken the following concrete steps. One, we have hired a new, new to Viisage that is, experienced accountant with a track record of success of 17 years and three public companies, who started in January of this year. Two, we hired an experienced technical accounting professional in the new position of Assistant Controller, who has eight years of experience, including four at Ernst &Young, and all the different groups, including audit, M&A and valuation of course, as a Controller with $50 million company, who starts at the end of this month. Third, we hired a experienced eight years, Oracle business systems administrator so we can accelerate the roll out of our accounting system to our newly acquired businesses and move to one integrated accounting platform for all our locations in Billerica, Washington, and Germany.

All of this -- but not all of this -- is what we mentioned in our last call about strengthening our internal infrastructure. In addition and related to the above investments that are dedicated to the financial group, is the IT group, which has a broader mission or organization. We've also hired a new, experienced head of Information Technology who will start next week and will significantly strengthen another key infrastructure area where we see room for improvement.

For the last six to eight months, we have been working hard on our internal controls with the goal of full compliance rating for the year 2004 in our Sarbanes-Oxley 404 review. While realizing that we will not get full compliance rating for 2004, which was disappointing, we also know that an imperfect rating is not the end of the world. In fact, it is not so unusual and we are far from alone, especially among small and medium-sized companies.

As the front page article from the Wall Street Journal mentioned just yesterday, over 500 companies, including even large companies like Kodak, Visteon, Sun Trust Banks, McAfee, Ceridian, Mentor Graphics, Cogent and Toys R Us have also reported deficiencies in their internal processes. We also feel that the process of working towards full compliance was a healthy and worthwhile one and made the Company stronger. In most areas such as payroll, accounts receivable, purchasing, revenue, inventory, asset management, treasury and Corporate governance, the Company's internal processes are now fully documented, analyzed, tested and deemed effective.

In any case, Sarbanes-Oxley Section 404 compliance is a reality, and is not going away. It is an ongoing process in our compliance effort. We will be required to continually improve our internal controls going forward and we will be tested every year. We expect our remediation to be fully implemented before the end of next year, and tested well before the year-end by our auditors. We think that we'll be in a position next year as to significantly improve our assessment rating. Returning back to the assessment for 2004, let me clearly state that we believe the concerns raised in this assessment are relatively easy to correct, and the assessment does not have an impact on the historical financial reporting of Viisage, including our financial statements for 4Q '04, and the full year of 2004.

The last area I want to briefly comment on is the progress we're making in the key area discussed on our last investor call, specifically the area of currency. After consulting with experts in the area, we have taken concrete steps to mitigate the exposure to foreign currency fluctuation that affected the Company's financial performance negatively in the fourth quarter. We have not only developed a foreign currency hedging plan, but we have begun to execute it almost immediately. We have executed forward buys for the first quarter, and effectively mitigated the currency risk for the Company's business done to date in foreign currency. We have a clear process going forward in the future, so that this is done for all our business involving foreign currency with our foreign-based suppliers in an efficient and effective way.

In summary, while 2004 was a time of great growth and accompanied with some turbulence, we came out of it strong and used the bumps to learn how to improve our operations and controls. We now feel that we have put in a foundation in place for the growth in the future, with strong and scalable internal controls.

With that, I'll turn it back to you, Bernard.

**Bernard Bailey** - *VISG - President, CEO*

Thanks for that insight, Bill. Before I turn the call over for Q&A, I want to reiterate a few points. First of all, 2004 was a year in which we dramatically transformed Viisage into a leading identity solutions player. We are now positioned to address a far greater market opportunity, an opportunity that we are truly beginning to see emerge both here in the US, as well as around the world.

Today, more than ever, I am extremely bullish on our long-term ability to both compete and win in this marketplace. At the same time, I am also realistic enough to understand that as this marketplace is emerging, it will be difficult to predict the specific timing around specific opportunities. A perfect example of that is just yesterday, we were surprised when we received the new order from one of our driver's license States to begin deploying our face recognition solution across their platform, a contract worth over $1 million, that we will execute on over the next two quarters.

Thomson StreetEvents    streetevents@thomson.com    617.603.7900    www.streetevents.com    

© 2005 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Q4 2004 Viisage Technology, Inc. Earnings Conference Call

It's further proof that our strategy of up selling our total solutions into our existing customer base continues to gain momentum. As a Company, we remain committed to continuing to aggressively enhance our market leadership position, while maintaining a cash flow-positive business.

With that, we'll open floor to questions.

## QUESTION AND ANSWER

---

**Operator**

(OPERATOR INSTRUCTIONS) David Gremmels, with Thomas Weisel Partners.

---

**David Gremmels - *Thomas Weisel Partners - Analyst***

Good morning, gentlemen. I just want to make sure I understand your comment on profitability for '05. Do you expect to be profitable for the full year '05, or just to achieve profitability at some point during '05?

---

**Bernard Bailey - *VISG – President, CEO***

We expect to be profitable for the full year, prior to the impact of expensing options, and what that will be.

---

**David Gremmels - *Thomas Weisel Partners - Analyst***

And which quarter -- will you be profitable in Q1 or if not, which quarter do you expect to achieve that?

---

**Bernard Bailey - *VISG – President, CEO***

We don't predict profitability on a quarterly basis, or forecast it that way, David. Given the natural lumpiness that can occur in our business, we're not really in a position to predict where that will be. But suffice it to say, our objective is, and directionally where we're headed, is for full-year profitability this year.

---

**David Gremmels - *Thomas Weisel Partners - Analyst***

Okay, great. And then on the Sarbanes-Oxley deficiencies, besides the investments you'll be making to improve the internal controls and the hiring and the things like that, is there any fallout from this? Will the 10-K be filed late? Is there any chance of a restatement as a result of this? Can you talk about that a little bit?

---

**Bernard Bailey - *VISG - President, CEO***

Sure. Let me talk about that, David, since I've been involved pretty deeply in this also. First of all, I think Bill was pretty clear on several points, but I think it's very, very important to reiterate them. Over 500 companies already have pre-announced that they have deficiencies from a Sarbanes-Oxley perspective. This is a new process that companies are going through. Secondly, we have an extremely skittish public accounting environment that exists out


© 2005 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

there for very obvious reasons. And there's no reason to get into that.

So consequently, everything that's out there is erring towards the conservative -- which is certainly probably needed in various parts of what we're doing. Having said that, it's important to understand what Bill talked about here. We have been going through an exhaustive, detailed analysis of our entire control system in this Company for the entire year. We've spent tons on consultants, tons on outside auditors. We've put a lot of effort on it internally, here within our Company. When we scrape through everything that we're doing, what we end up seeing is that we had a deficiency. Our deficiency as a Company was very simple. I asked Peter Faubert to do so much with so little for so long, that I started to believe he could do the impossible with nothing. And as a result of that, we needed to shore up our accounting structure in this Company.

And that is our deficiency. They simply said, "Gee, you need more accountants in this Company. You need more accounting support." So we've gone out and we've gotten that. Our deficiency is as simple as that. And as a result of that, it has no impact on prior reporting, and has no impact on our ability to get out our 10-K. And we are completely on track to do that. We just thought that it was very important that we outline for you, that this is a major weakness that we have, and it's one that we've taken steps on in addressing as a Company.

And we've already started to bring those people in, so I'm glad you asked the question again, David, because I know the flags tend to go up, but this is an easily correctable problem. And we have been audited and have been scrutinized in great, great detail, and this is what we need to focus on.

Now having said that, another area, and Bill has highlighted it, where we have got to put additional resource in place in the Company, has been in the IT area. You know, when you merge the way we have, three companies into the Company as we have, the natural area that is always a shortcoming is, how do you bring these disparate systems together? And that takes additional resources. So we have not perceived that as a major weakness, but we've only pointed it out in that our complete analysis of that area isn't done yet, and it may prove that that's another area that we need to shore up. Now certainly, we need to shore it up. Does it bring itself as a major weakness? We're not sure. So, in the spirit of having full disclosure and being candid with you, those are the two, all of which are easily correctable by additional resources, and some expense to our business.

**David Gremmels - Thomas Weisel Partners - Analyst**

Okay, that's very helpful. Thanks for that. My last question is -- I just want to focus in a little bit more on the facial recognition software business. Where are you seeing the most near-term

opportunities there? Is it with DMVs or Federal Government or international? And can you comment on the momentum there and prospects for growth in that facial recognition software area?

**Bernard Bailey - VISG - President, CEO**

Sure, I'd be glad to comment on that. First of all, as I mentioned, we announced -- or we received yesterday, another contract from another one of our States. We are really beginning to see our strategy centered around using face recognition as a large database mining tool being a very successful deployment of the technology for several reasons.

First of all, it works, and it works very, very well. Secondly, it provides tremendous value to our clients in their battle in this whole identity theft and identity fraud problem that exists out there, a problem that frankly, the States are just beginning to wrap their arms around and start to understand what they can do to help solve. So that's where we see the momentum. With this latest State, we're now up to about 11 States that we have. We have Canada in place. We're seeing virtually every new RFP that's coming out is requesting face recognition as an important component of the solution going forward. So clearly, in the driver's license, it's an important factor.

But what we're also seeing now is, if you look at law enforcement. We only have this opportunity on these calls, and it's a little bit unfortunate, because if I had the opportunity to show you and take you to Pinellas County, and show you the tremendous value that's being created down there, in their use of face recognition in law enforcement, it would really force you to question why this isn't being deployed across the entire spectrum of law enforcement agencies here in the United States and the world, because they are getting tremendous value from it.

And so, we are seeing momentum in that area, all right? As some of the Homeland Security funds and grants are being trickled down to the State level, we're seeing more and more of that money being focused over into the use of face recognition from a law enforcement standpoint.

Moving forward of course, on an international basis, we see all of the countries around world specifically focused on the requirement for the electronic passport, having needs for face recognition and deployment on that. We also see, as I mentioned with NADRA, where other countries around the world -- such as NADRA in Pakistan -- other countries around the world are seeing demand being generated and requirements being generated, relative to their needs to identify their citizens in their national ID databases, their passport application process, and in several other identity processes throughout their country.

So, we're seeing a lot of momentum in that area. That being said, I've had a lot of meetings and discussions with people in



© 2005 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Q4 2004 Viisage Technology, Inc. Earnings Conference Call

Homeland Security and law enforcement and other areas, and where there's tremendous opportunity, where the growth is going forward, and this is longer range, where it continues is still in the area of access control, as well as the area of secure surveillance in high security areas. So, that's where we see the momentum and the demand, that it's going forward from a business standpoint.

When we look at this business, we're conservatively estimating that if you look at face recognition as a component alone, that we expect it to grow at about 50 percent, year-over-year, going forward within our business.

---

**David Gremmels** - *Thomas Weisel Partners - Analyst*

Your filings give a split between secure credentials and biometrics. Do you have that split?

---

**Bernard Bailey** - *VISG - President, CEO*

For 2004?

---

**David Gremmels** - *Thomas Weisel Partners - Analyst*

Yes.

---

**Bernard Bailey** - *VISG - President, CEO*

Let me ask somebody here.

---

**David Gremmels** - *Thomas Weisel Partners - Analyst*

For the quarter, whatever you have.

---

**Bill Aulet** - *VISG - CFO, SVP*

Yes, David, can we address that on the financial call?

---

**David Gremmels** - *Thomas Weisel Partners - Analyst*

Okay, that's fine. Thanks.

---

**Operator**

Keith LaRose with Bradley, Foster, Sargent.

---

**Keith LaRose** - *Bradley, Foster & Sargent - Analyst*

Good morning, gentlemen. A couple of things, on the last call on the interim update, there was a final question that seemed to

address the backlog. And on that call, Bill I think seemed to back away, at least from my perspective, in providing some comfort level on let's say the integrity or confidence level in the backlog.

It appears to me that you went through the backlog with a fine-tooth comb, and a lot of these adjustments are related to you tightening up your expectations relative to the backlog. Am I accurate in that? And also, if you could address my first comment.

---

**Bernard Bailey** - *VISG - President, CEO*

Let me take that, Keith, if you don't mind. This is Bernard. First of all, to answer your question right out, you're wrong. And I'm sorry that we gave you that impression. Let me give you the right impression, okay? I remember the question, and it was a question that came forward that said, "Gee, Bill, can you tell us something about your backlog?" And Bill said, "No, not at this time," and it was simply because our focus wasn't on backlog then. So let me give you some color around that, but I want you to understand it had nothing to do with quality of the backlog, the integrity of the backlog, or anything else associated with the backlog. And the backlog has nothing to do with how we're looking out forward to the Business, okay?

So let me give you more color around the backlog, so you can have a higher degree of comfort on that, okay?

---

**Keith LaRose** - *Bradley, Foster & Sargent - Analyst*

Okay.

---

**Bernard Bailey** - *VISG - President, CEO*

We mentioned that we came out of the year with a backlog that was $139 million. That represents secure contracts that were signed through December of last year. Now that was down $1 million from 140 to 139, from the third quarter to the fourth quarter. So you can see that what that really translates to is that, from a business standpoint, we reported our quarterly revenues, and you can see that our backlog is $1 million below what those quarterly revenues would have been.

That's how much new business we booked during that quarter, so we're pretty flat from that standpoint. However, since the beginning of year, we've signed several new contracts. I just mentioned the contract we signed in face recognition with one of our States, $1 million. We signed Wisconsin, which was a $10 million opportunity that goes on top of our backlog. We signed West Virginia, which provides another good hit to our backlog. That is a one-year with four-year renewable contract, close to another $2 million in opportunity that we have there. Actually, close to $4 million that came out of that opportunity. So there's a whole host that has gone forward from that standpoint.

---

**Thomson StreetEvents**    streetevents@thomson.com    617.603.7900    www.streetevents.com        10

© 2005 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Q4 2004 Viisage Technology, Inc. Earnings Conference Call

So we look at our backlog, Keith, and it's an important indicator of our revenue going forward. I will tell you this, our backlog entering the year of $139 million, translated to approximately $50 million of that, which will be offset into revenue for 2005. Follow me there?

**Keith LaRose** - *Bradley, Foster & Sargent - Analyst*

Yes.

**Bernard Bailey** - *VISG - President, CEO*

Okay, good. That's very important. So you can see that without selling another piece of business this year, we've already got about $50 million of that, that translates immediately into revenue for 2005 for our business. And as I mentioned, if you go back and you look at our backlog in the beginning of the year, it was $92 million, so the $139 million that we ended up with, reflects not only our previous business in the driver's license, but it also incorporates a lot of the business that we've brought in from a backlog standpoint from our Federal business and other areas of our business going forward. So hopefully that gives you a little bit better understanding, but it certainly has nothing to do with how we look at going forward, Keith.

**Keith LaRose** - *Bradley, Foster & Sargent - Analyst*

Thanks for clarifying that. Also, it looks like if you hit $75 million in the revenue level for '05, and you hit the low end in quarter one, obviously you're going to be looking at $20 million a quarter after that to hit the low end of your revenue guidance for '05. Can you talk a little bit about how, tying that in with your comments about the first quarter, you had some transitions in contracts. Can you be specific about the transitions in contracts relative to the year becoming back end loaded?

**Bernard Bailey** - *VISG - President, CEO*

That's a real good question, and one I want to make sure you walk away with some comfort on that, okay? So it's going to take me a while to explain that, but I think it's very important. Let's start with a few things.

The first one is, our investors and we as Company, all of us need to realize that we're transitioning the Company to more of a product solution Company. With that comes greater lumpiness, relative to when revenues will be recognized and how they will occur. A perfect case in point, if you look at our business previously, when it was all a driver's license business, or certainly 90 percent driver's license, we could easily look at every single contract, know within a few licenses how many would be produced, multiply it times what that contract value is per license, and pretty

much tell you what the full year was going to be, because frankly, that business churns along very, very nicely.

As you get into products now, what ends up happening very clearly is that, as you receive the contract, you have to then pull it out of inventory and ship it. If it's not in inventory, you may miss a delivery. If the order comes in a day or two late, you may miss a delivery. When you start looking at delivering products from Japan, you have to look at when were they shipped, when were they received, and did we get them through customs and get them out to the customers?

So, lots more variability from a point to point standpoint starts to enter into our business going forward. So with that, that's why people say, "Well, gee, why can't you tell me? Here it is March, whatever it is 2nd or 3rd, why can't you tell me exactly what you're going to have for this quarter?"

**Keith LaRose** - *Bradley, Foster & Sargent - Analyst*

Do you have any consumables variability or constraints relative to your contracts, or what? I mean, the world uses UPS and FedEx pretty effectively on getting stuff where you need it to be, so I don't quite understand that.

**Bernard Bailey** - *VISG - President, CEO*

Yes, well let me answer it, Keith, if you'll let me finish, okay, please? Okay, so if we look at the consumables, yes, we use FedEx and UPS. Of course we do, but they have to come out of factories. They have to, in many cases, come from places like Japan. They get shipped, they have to get cleared through customs. So, there is the possibility that some lumpiness can occur there. There's lumpiness on when you ship the IAs, so it's not just consumables. It is also the readers that we ship relative to our rollout of our document authentication and so forth. So it gets into all of that.

And a perfect case of that is, right now, we're sitting and looking at this quarter we have in front of us, between $2 and $5 million of orders that we've had verbal commitments on, on an international basis, that we expect to be able to deliver and ship and get done. Contracts need to be signed, money needs to be moved, shipments need to occur. Will it all occur, in what window of time? It can move a week here and there going forward, so that's why there's variability when you look at it on a quarterly basis, as well as when you look at it on an ongoing basis going forward. And so with that, that's why the variability occurs, and the range is broader than what you would typically see.

**Keith LaRose** - *Bradley, Foster & Sargent - Analyst*



**Thomson StreetEvents**    streetevents@thomson.com     617.603.7900     www.streetevents.com     11

© 2005 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Q4 2004 Viisage Technology, Inc. Earnings Conference Call

Okay, and it seems to me like that range is not a weekly issue, this is a multi-quarter issue, relative to all of those moving parts, if I'm hearing you correctly?

**Bernard Bailey** - *VISG - President, CEO*

Well, it can occur at any point in time going forward. Now having said that, I want to make sure I completely answer your initial question that you had, so let me also talk about that, when you asked about the timing and the variability. So let's look at that.

We brought in the Imaging Automation piece of our business in October. We have been integrating that into our business, integrating it into our sales force, taking that solution out to our customers. Now, I think you can logically understand that the sales cycle on a procurement like these, with the Government, can be anything from 9 months to 18 months going forward.

So we are now really getting that into our channel, and our sales people are out there, showing it to our customers. There's tremendous excitement about it. That piece of our solution, that document authentication, that proofing piece, has really been highlighted, and in fact, if you look at HSPD 12 and the standards that came out, one of the really exciting parts of that standard is the need for all of these agencies to do some type of proofing up front. So we think we're at the right place in terms of that. Having said that though, that's why a big part of that business is back end-loaded for us, and we see that business coming in place.

Now if we look at our traditional business, then what we see is that we have a couple of contracts that are ending for us, that are dropping off, specifically Florida, which we lost that contract., as almost all of you are aware. Now it's been over 3 years ago when that loss occurred, and they have struggled in getting that deployment out. But now, 3 years later, it looks like it's deploying, so we'll finally get cut out of our contract there and we'll lose that revenue stream from that State. Similarly, in Ohio, sometime here in the second quarter, that will drop off the table also.

So these contracts, as they drop off, we see in the driver's license business, contracts that were lost, we're talking in some cases, over three years ago, the revenue is now dropping off, and that represents a shortfall for us of about $7 million here that will occur in the first half of the year. We have to backfill that. We feel very comfortable backfilling that, and that's why, when you look at some of the contract wins that we have, these won't come online until the second half of the year going forward. And that's why we can take some comfort in knowing that we will have a ramp up.

Now, what I don't want to do is support your logic of, if we do some number in the first quarter, that the next three quarters will all be $20 million. We are not telling you what the quarterly outlooks are for the other quarters, so I don't want my silence to confirm that to you. Okay, things will change.

**Keith LaRose** - *Bradley, Foster & Sargent - Analyst*

Understood. That's very helpful. Well, sooner or later, we're going to have to back into that low end, or somewhere in there.

**Bernard Bailey** - *VISG - President, CEO*

Oh yes, sooner or later, yes.

**Operator**

Paul Coster, with JP Morgan.

**Paul Coster** - *JP Morgan - Analyst*

Yes, three quick ones. First, Bill, can you give us a geographic breakdown and then who were some of your biggest customers?

**Bill Aulet** - *VISG - CFO, SVP*

About 90 percent of the business was in the United States, over 90 percent.

**Paul Coster** - *JP Morgan - Analyst*

And customer concentration?

**Bill Aulet** - *VISG - CFO, SVP*

Department of State was the biggest customer that we had, and then Department of Defense.

**Paul Coster** - *JP Morgan - Analyst*

Do you have a percentage breakout there?

**Bill Aulet** - *VISG - CFO, SVP*

Department of State was about 12 to 14 percent of our business. It's the largest one. Going forward, the Department of Defense represented roughly, probably about 8 percent of our business.

**Paul Coster** - *JP Morgan - Analyst*

Bernard, I think I'll probably ask in response to your own rhetorical question, which is why hasn't Pinellas County been adopted — why hasn't this solution has been adopted in other States?


© 2005 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Q4 2004 Viisage Technology, Inc. Earnings Conference Call

**Bernard Bailey** - *VISG - President, CEO*

The answer is it has been adopted in other locations. We recently sold the same solution in seven cities in Massachusetts, Essex County, in Massachusetts. We've also sold it into Jefferson County. We're using a similar solution with the Department of Defense in actually a classified application that they're using it for. And we're really excited about a recent deployment that we did with the DC Corrections Department down in Washington, DC, that deployed it as part of the work that we were doing down in Washington, DC. So we're seeing it.

That being said, and by the way, we also see a couple of deployments that are going on in Europe, very similarly within our business. But having said that, as we look at that, one such deployment overseas is Slovakia, where it's been deployed, what we also see is that the deployment dollars within the law enforcement have to come from some net additional funding. Where this funding is starting to come from now is in the Department of Homeland Security grants that are being issued down to the various State DHS offices. And that's where we see the funding coming from. That's where we see the support coming from. It's been slower than we would have liked going forward, but we certainly see that momentum increasing as we look at this year going forward.

**Paul Coster** - *JP Morgan - Analyst*

Okay. Last question, gross margins, you're looking to 4 to 6 percentage point increase in the year. It doesn't sound like you have a great deal of control over the product mix, the current quarter being an example. Can you just give us a little bit of color, as to how you believe that will come about?

**Bernard Bailey** - *VISG - President, CEO*

Sure, I'll be glad to give you that. First of all, there are a couple things. Number one, we have one program which we've made clear, the CAC program, where we got into that program and it's a razor blade business. The initial razor piece of the business is done. That was about $10 million of revenue last year. That was at relatively low margins. I say relative to what our averages are from a business standpoint, that we sold into that. That program drops off. So now as we backfill that with some of the consumables and the razor blades that we have from a business standpoint, you can anticipate that the margins on programs like that will go up.

Furthermore, as our other contracts age, they tend to improve the margins going forward historically. But the big margin increase that we're going to see is as we continue to transform our solutions to more of a product oriented business. So as you look more into the back end of the year, and we start to get more of the document authentication deployments occurring, coupled with more of the face recognition, like we talked about in law enforcement in these States, that's where the margins of our Business will increase going forward. And that will take on a much higher percentage of our overall mix of the Business.

We have to wrap up here, at 9 o'clock. What we've also said is that we will have a follow-on call as we've done in the past. This allows for much greater depth in terms of the financial analysis going forward. But having said that, I want to thank all of you for joining us this morning. We certainly appreciate your continuing interest in and support for Viisage. As a reminder, we'll be starting this other call momentarily to focus on any financial details that you would like to cover. You will need to disconnect and redial the number to participate in that call or listen to the webcast. Again, thank you very much for your interest and support in Viisage going forward.

**Operator**

Ladies and gentlemen, thank you for your participation in today's conference. This concludes the presentation. You may now disconnect.

DISCLAIMER

Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

© 2005, Thomson StreetEvents All Rights Reserved.


© 2005 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

# Exhibit 44

Copyright 2005 Factiva, a Dow Jones and Reuters Company
All Rights Reserved

(Copyright (c) 2005, Dow Jones & Company, Inc.)
The Wall Street Journal

March 2, 2005 Wednesday

**SECTION:** Pg. A1

**LENGTH:** 1709 words

**HEADLINE:** Accounting Rule Exposes Problems But Draws Complaints About Costs

**BYLINE:** By Deborah Solomon

**BODY:**

More than 500 public companies have reported deficiencies with their internal accounting controls under a controversial new federal rule -- a figure sure to feed the continuing debate about the cost and usefulness of recent efforts to strengthen corporate governance.

To backers, the volume of disclosures demonstrates that the new rule, part of the 2002 Sarbanes-Oxley corporate-accountability law, is pushing a lot of U.S. companies into line. But business groups complain that it's costing them a lot of money and effort to turn up deficiencies that in most cases are inconsequential.

The rule, section 404 of Sarbanes-Oxley, requires companies to assess the internal controls they have in place to ensure their financial reporting is accurate and reliable -- and requires accounting firms to vouch for those controls.

A Wall Street Journal review of about 50 of the public filings shows that the reported weaknesses range from minor issues that are easily correctable to larger problems that may require restating past financial results. Among problems turning up are a lack of specialized accounting expertise, unfettered employee access to some financial systems, problems identifying when certain assets need to be written off and difficulty in tracking and reporting costs.

Many of the problems have been reported by small- and medium-sized companies, but among the biggest to report some deficiency in internal controls are McAfee Inc., SunTrust Banks Inc., Eastman Kodak Co. and Toys "R" Us Inc. Securities and Exchange Commission officials say more disclosures are expected. Some companies have seen their stocks drop after disclosing deficiencies, but some have seen no reaction at all.

While the rule only requires companies to disclose material weaknesses in their annual reports, many companies have begun alerting investors about deficiencies and potential problems. The rule is intended as a disclosure mechanism to alert investors about problems, but companies could face SEC action if they report serious deficiencies or if they fail to disclose serious shortcomings.

"The internal-control disclosure requirement has the potential to provide the greatest long-term benefit in financial reporting," said Alan Beller, SEC's director of corporation finance.

Defenders say the disclosures stem from tougher auditing standards set by accounting firms embarrassed after recent financial frauds at Enron Corp., WorldCom Inc. and other companies.

"Auditors are no longer going to provide any type of flexibility to management," said Chris Mears, a partner with Rothstein Kass, an accounting and consulting firm.

But many executives call the rule onerous and say it is fattening the bottom lines of accounting firms while costing other companies billions of dollars.

Financial Executives International, a membership and advocacy group for financial executives, claims companies will spend an average of $3 million apiece to comply with the rule. Companies with more than $5 billion in revenue are expected to spend about $8 million on average, while companies with less than $100 million in revenue are expected to spend about $550,000 on average. Annual costs are expected to drop after the first year or two of the rule's implementation.

"I believe the external auditors are exceeding the intent of 404," said Alex Davern, finance chief for National Instruments Corp. and chairman of American Electronics Association's SOX 404 committee.

Mr. Davern says external auditors are requiring companies to pay for things that won't prevent fraud. "We had to pay an auditor to come to a meeting to prove the meeting took place," he said. He is lobbying regulators to tailor the rules for different-sized companies, thus softening the requirements for smaller firms.

Under the rule, management must conduct its own look at everything from who can access sensitive financial data to how many accountants a company has on staff, all to ensure that the data on its financial reports is accurate. After a company's managers review internal controls, its external auditor must perform an independent assessment and disclose whether it agrees with management's conclusions. Companies must include the auditor's attestations in their annual reports and disclose whether any material weaknesses have been identified.

Auditors say they are simply following the guidelines established by the Public Company Accounting Oversight Board for how an internal-controls review should be conducted. They say companies' costs stem not from aggressive auditing, but from the rule's requirement that companies pay for two reviews.

"There's somewhat of a dual track of work that's going on, which leads to some perception of a lot of cost being incurred, but we are as auditors bound" by the accounting board's standard, said Bob Dohrer, an accountant with McGladrey & Pullen LLP and a member of the American Institute of Certified Public Accountants' SOX 404 task force.

Because the rule is so new, he said, auditors have no choice but to strictly adhere to the accounting board's standard, he said. "We struggle internally with the fact that, not having gone through this before, how much room do you have to interpret certain provisions?" he said. "And at the end of the day it comes back to the words" established by the accounting board.

Still, SEC Chairman William Donaldson recently said that while he supports the regulation, it may need some fine-tuning and announced a public roundtable on the rule for April 13. SEC Commissioner Cynthia Glassman, a Republican who has at times clashed with Mr. Donaldson, said she's

concerned that the rule may have resulted in auditors -- rather than management -- dictating how companies think about internal controls.

Some firms have said they plan to go private to avoid compliance with section 404 and other Sarbanes-Oxley rules. Among them are Paul Mueller Co., a manufacturing firm; Ohio Art Co., which makes Etch-A-Sketch; and SholLodge Inc., which owns and operates Shoney's Inns. All have announced plans to deregister their securities, saying the costs of operating as a public company -- including complying with Sarbanes-Oxley -- have gotten too high.

For some companies, the problems uncovered have constituted a "material weakness," which means there are one or more significant deficiencies that result in "more than a remote likelihood that a material misstatement in the company's annual or interim financial statements will not be prevented or detected."

Last month, Eastman Kodak disclosed errors in its income-tax accounting and said it expected its auditor, PricewaterhouseCoopers, to issue an "adverse opinion" on its internal controls. The company was only able to report preliminary results for the fourth quarter and said "adjustments may result" after an analysis of its income tax accounting is completed. Despite the disclosure, Kodak's stock rose after the announcement, which analysts attributed to positive comments the company made simultaneously about its operations.

Some companies have said they plan to restate based on errors identified during reviews of their internal controls. Terex Corp., which manufactures construction-related and other equipment, said last month it would restate full-year earnings for 2001 to 2003 after discovering "imbalances" in certain company accounts. The company said the need to restate "arose primarily from the company's failure to properly record certain inter-company transactions." The change isn't expected to be material, and Terex's stock dropped 39 cents, or less than 1%, after the disclosure.

Tom Gelston, director of investor relations at Terex, said Terex had replaced an "antiquated" financial-reporting system in order to comply with Sarbanes-Oxley and that the new system revealed the problems. "Getting ready for the internal controls review helped discover this," Mr. Gelston said.

Navistar International Corp., a holding company that makes trucks and engines and has a finance arm that provides financing for trucks in the U.S. and Mexico, said an evaluation of its internal controls found "weaknesses in the disclosure controls and procedures within the company's finance subsidiary." In particular, Navistar said it had used improper accounting for the securitization of some loans. The company also identified a "lack of sufficient specialized" accounting personnel. Navistar has said it plans to restate financial results for fiscal 2002 and 2003 and the first three quarters of fiscal 2004 because of the accounting error. Some results will be adjusted upward, some downward.

To be sure, accounting firms are expected to see a big jump in revenue from the rule. Mr. Mears said audit costs are expected to increase 30% to 40% this year for companies with between $50 million to $500 million in revenue.

But Raymond Beier, a partner with PricewaterhouseCoopers, said auditors are doing what's required under Sarbanes-Oxley and that companies can benefit by systematically reviewing their internal controls.

"Auditors are trying to do the best job they can," he said. "Sarbanes-Oxley and 404 are first and foremost aimed at restoring investor confidence and improving the reliability of financial reporting. To that end, compelling companies to look more deeply at their financial reporting can certainly create the right environment for reducing the risk of fraud."

---

                    Control Issues

   Section 404 of the Sarbanes-Oxley law is aimed at helping companies prevent financial reporting mistakes and fraud. The rule requires companies to include in their annual reports:

   -- A statement of management s responsibility for establishing and maintaining "adequate" controls over financial reporting

   -- Management's assessment of the effectiveness of the company's internal controls

   -- A statement identifying the framework used by management to evaluate the effectiveness

   -- An auditor's report on management's evaluation of internal controls

   -- Any material weaknesses identified in the internal controls review

   Source: Securities and Exchange Commission

   (See related letter: "Letters to the Editor: Costs of Sarbanes-Oxley Are Out of Control" -- WSJ Mar. 21, 2005)

**NOTES:**
PUBLISHER: Dow Jones & Company Inc.

**LOAD-DATE:** March 21, 2005