# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| In re VIISAGE TECHNOLOGY, INC.<br>SECURITIES LITIGATION )<br>)<br>)<br>) | CIVIL ACTION NO. 05-cv-10438-MLW |
| This Pleading Applies to:  All Actions )<br>) | |

# DEFENDANTS' REPLY MEMORANDUM
# TO PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS THE
# CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Mitchell H. Kaplan (BBO #258940)
John R. Baraniak, Jr. (BBO #552259)
Aloknanda S. Bose (BBO #658108)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA  02110
Tel.:  (617) 248-5000

## Table of Contents

Page

I.  Argument.................................................................................................................2

    A.  Plaintiffs   Have   Not   Alleged   Any   Actionable
Misstatement/Omissions........................................................................2

        1.  Plaintiffs have not alleged any actionable misstatement
and/or omission concerning the Georgia litigation.......................2

        2.  Plaintiffs have not alleged any actionable misstatement
and/or omission concerning Viisage's EBITDA projection.......................9

        3.  Plaintiffs have not alleged any actionable misstatement
and/or omission concerning the Company's internal
controls. ..............................................................................11

    B.  Plaintiffs Have Not Adequately Alleged Any Defendants'
Scienter. ......................................................................................15

    C.  Plaintiffs' Section 11 Claim Is Subject to Rule 9(b) and Should Be
Dismissed.....................................................................................18

    D.  Defendants Berube, Beck and Yon Are Not Control Persons..............................20

II.  Conclusion.............................................................................................................21

## Table of Authorities

### Cases

*In re Adelphi Communications Corp. Sec. and Deriv. Litig.,*
  398 F. Supp. 2d 244 (S.D.N.Y. 2005) ...................................................................................20

*In re Cardinal Health Inc. Sec. Litig,*
  No. C2-04-575, 2006 U.S. Dist. LEXIS 18687 (S.D. Ohio, April 12, 2006)............................16

*In re Centennial Tech. Sec. Litig.,*
  52 F. Supp. 2d 178 (D. Mass. 1999)......................................................................................20

*In re Microstrategy, Inc. Sec. Litig.,* 115 F. Supp. 2d 620 (E.D. Va. 2000)....................................16

*In re Number Nine Visual Tech. Corp. Sec. Litig.,* 51 F. Supp. 2d 1 (D. Mass. 1999) .................20

*In re Royal Dutch/Shell Transp. Sec. Litig.,* 380 F. Supp. 2d 509 (D.N.J. 2005) ..........................14

*In re Seachange Int'l, Inc. Sec. Litig.,*
  No. 02-12116-DPW, 2004 U.S. Dist. LEXIS 1687 (D. Mass. Feb. 6, 2004).........................6, 7

*In re Sonus Networks, Inc. Sec. Litig.,*
  No. 04-10294-DPW, 2006 U.S. Dist. LEXIS 28272 (D. Mass. May 10, 2006) .......................20

*In re Veeco Instruments, Inc., Sec. Litig.,*
  No. 05 MD 1695 (CM), 2006 U.S. Dist. LEXIS 13226 (S.D.N.Y., March 21, 2006)..............16

*Kafenbaum v. GTECH Holdings Corp.,* 217 F. Supp. 2d 238 (D.R.I. 2002) ..................................7

*Keane v. Navarro,* 345 F. Supp. 2d 9 (D. Mass. 2004) ...............................................................8

*McNamara v. Bre-X Minerals, Ltd.,* 57 F. Supp. 2d 396 (E.D. Tex. 1999) ..................................17

*Meyer v. Biopure Corp.,* 221 F. Supp. 2d 195 (D. Mass. 2002).....................................................17

*Rand v. M/A-Com, Inc.,*
  824 F. Supp. 242 (D. Mass. 1992).........................................................................................20

*Schnall v. Annuity Life Re (Holdings), Ltd,*
  No. 3:02-CV-2133 (GLG), 2003 U.S. Dist. Lexis 24898 (D. Conn. Dec. 23, 2003)................20

*Washington Legal Found. v. Massachusetts Bar Found.,* 993 F.2d 962 (1st Cir. 1993) .................9

### Other Authorities

17 C.F.R. § 229.103....................................................................................................................2

Fed. R. Civ. P. 9(b)...........................................................................................................18, 19

Robert Pozen, *Why Sweat the Small Stuff?,*
   *Wall Street Journal,* April 5, 2006 (quoting Public Company Accounting Oversight
   Board (PCAOB) Auditing Standard No. 2)............................................................................13

*Sarbanes-Oxley Act:  Consideration of Key Principles Needed in Addressing
   Implementation for Smaller Public Companies*, a Report of the Committee
   on Small Business and Entrepreneurship, U. S. Senate, published by the United States
   Government Accountability Office,
   April, 2006....................................................................................................11, 12, 13

SEC Release No. 33-8124 ............................................................................................12

SEC Release No. 33-8238 ............................................................................................12

According to plaintiffs, Viisage (and certain of its officers and directors) can be liable for securities fraud for not expressly disclosing:  (1) that it was a nominal party in the Georgia litigation in which no claims were asserted against it and no relief was sought from it; (2) that it defrauded the State of Georgia when Georgia steadfastly denied that it had ever been defrauded; and (3) that it was unlikely to receive $2 million of a $2.5 million settlement with Georgia when no party to the litigation argued that the payment should be withheld and the court cited no authority in support of its decision to disallow the payment.  Defendants allegedly perpetrated this fraudulent scheme notwithstanding the fact that all information concerning the Georgia litigation was at all times publicly available for review in the pleadings on file in the Fulton County Superior Court.  Plaintiffs also contend that defendants committed securities fraud by including in its projected EBITDA the full $2.5 million settlement amount it was supposedly unlikely to receive, although all of Viisage's public disclosures on the subject made clear that the $2.5 million was not only not included in the EBITDA projections, but also that it would not even be included in earnings when it was collected.  Finally, Plaintiffs assert that Viisage did not timely disclose a material weakness in internal controls over financial reporting, which led to no restatement of the Company's financial results.  Moreover, in making this final assertion, plaintiffs reveal a profound misunderstanding of the differences between sections 302 and 404 of the Sarbanes-Oxley Act.  Plaintiffs' Opposition does nothing to transform these make weight claims into actionable allegations of securities fraud.  Nor does plaintiffs' Opposition demonstrate that the Complaint adequately alleges any defendant's scienter.  Plaintiffs' Complaint should be dismissed.[1]

---

[1] "Opposition" as used herein refers to [Proposed] Lead Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint filed May 8, 2006. "Opening Brief" will refer to Defendants' Memorandum in Support of their Motion to Dismiss the Consolidated Class Action Complaint.

## I.    ARGUMENT

### A.    Plaintiffs Have Not Alleged Any Actionable Misstatement/Omissions.

#### 1.    Plaintiffs have not alleged any actionable misstatement and/or omission concerning the Georgia litigation.

The bulk of plaintiffs' Opposition is devoted to arguing that defendants misled investors concerning the Georgia litigation. Plaintiffs seize upon defendant Bailey's technical misstatement in the course of a conference call to the effect that Viisage was never a "party" to the litigation and defendants' failure to point out that Digimarc had alleged that Viisage acted improperly in the bidding process. Plaintiffs also fault defendants for not disclosing the motions it filed in the litigation or the fact that the Georgia court sanctioned it $5,761.50 in attorneys' fees for not complying with a discovery order. Opposition at 8.

The short answer to plaintiffs' argument is that none of this constitutes actionable securities fraud. Plaintiffs cite no authority for the extraordinary proposition that a litigant must disclose each motion that is filed or any discovery order entered against it, and defendants are aware of none. Item 103 of Regulation S-K provides that a registrant which is a party to or effected by a litigation need only disclose "the date the action was instituted, the principal parties thereto, a description of the factual basis alleged to underlie the proceeding, and the relief sought." *See* 17 C.F.R. § 229.103. It plainly does not require a litigant to provide exhaustive detail of pre-trial discovery and motion practice.

Plaintiffs attempt to recast the Georgia litigation as focusing on Viisage's alleged fraudulent conduct in the bidding process. As Viisage points out in its Opening Brief, Digimarc's complaint was expressly premised upon the contention that the Georgia DMVS and Georgia Technology Authority failed to follow statutorily prescribed procedures and these agencies' own rules for opening and evaluating competitive bids. That is what Digimarc had to

2

prove to set aside the contract awarded to Viisage. A review of Digimarc's Georgia complaint makes clear that Digimarc was principally focused on alleging that Georgia purposely excused Viisage's inability to meet the requirements of the RFP. Georgia, for its part, expressly maintained that it was never misled and that Viisage was ready and able to perform under the contract. *See* Bose Ex 6[2] and Opening Brief at 11-12.

It is undisputed that Viisage originally was not a party to the litigation and was added later as a ""necessary party" on Georgia's motion. It also is undisputed that Viisage was given the choice of being added as a plaintiff or a defendant and that no claims were asserted against it by either Digimarc or Georgia, and that no relief was sought from it. Thus, Viisage was not a party to the litigation as that word is commonly used and understood, at least by non-lawyers. It neither brought claims nor defended against them.

Moreover, plaintiffs' argument that Bailey intentionally sought to mislead investors by stating that Viisage was not a "party" to the Georgia litigation is belied by the fact that, in the sentence which immediately follows that quoted by plaintiffs from the July 22, 2004 analysts conference call, Bailey explains that the Company had spent more than $1 million in legal fees "as a related party" to the litigation.[3] Later in that same call, defendant Aulet states that the Company spent $200,000 in legal fees in the second quarter on the Georgia litigation. *Id.* at 3. Moreover, in the July 21st press release that preceded the conference call, Viisage expresses its hope that Georgia's termination of the contract and related settlement will end the substantial and

---

[2] "Bose Ex." refers to the Transmittal Affidavit of Aloknanda S. Bose in Support of Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint filed April 3, 2006 with defendants' Opening Memorandum. Note that not only do plaintiffs not contest the propriety of considering the various Georgia litigation filings on a motion to dismiss, but also they themselves refer and rely on them in their Opposition. *See, e.g.*, Opposition at 14, n. 7, 8, 9, 10.

[3] *See* Ex. B to Declaration of Jeffrey A. Klafter in Support of Lead Plaintiffs' Opposition to Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint at page 2-3.

escalating legal costs that Viisage has been incurring over the past year. It is clear from the entirety of Bailey's and Aulet's remarks that there was no scheme to conceal Viisage's role in the litigation – if such concealment was even possible.

Plaintiffs take other liberties with the Georgia litigation record. They argue that "Digimarc had detailed misconduct by Viisage so serious that GTA/DMVS moved the Georgia Court for an order compelling Viisage to be added as a necessary party." Opposition at 13. *See also* Opposition at 15 ("Defendants' suggestion that their misconduct was not a central issue in the Digimarc Action case [sic] is belied by the GTA/DMVS' description of that case in which the GTA/DMVS highlighted the allegations against Viisage as the basis for adding Viisage as a necessary party."). Simply stated, this allegation is disingenuous. Georgia explained in its pleading that it was moving to add Digimarc as a necessary party primarily so that Viisage could protect its own interests in the contract it had been awarded against a "disgruntled bidder" (Digimarc) and even though it had "no reason to believe that [Digimarc's] allegations are true" or even relevant. Bose Ex. 10 at 2, 6.

Similarly, plaintiffs argue that defendants committed securities fraud by falsely stating that the proposed settlement "was for the 'convenience' of the parties when the settlement was in actuality an attempt to avoid having to comply with the discovery demands of Digimarc directed at Viisage's wrongful conduct." Opposition at 15. *See also* Opposition at 6 ("In reality, the settlement was merely part of Viisage's illicit scheme to prevent Digimarc from obtaining full discovery of the Company's improper conduct in the DMVS bidding process"). The Georgia GTA/DMVS, however, explained that the DMVS terminated the contract pursuant to Georgia statute "to ensure . . . that technology used to produce the driver's licenses and identification cards is not outdated and that the State is able to benefit from the current state of technology

which has improved." Bose Ex. 16 at 2. *See also* Bose Ex. 18 at ¶11, and Bose Ex. 23 at 9. Plaintiffs' supposition that the settlement was a vehicle to escape discovery is just that, a supposition unsupported by any particularized facts, not even an identification of the facts Viisage hoped to conceal. This supposition is not only not a reasonable inference from the facts alleged, but directly inconsistent with undisputed facts and with the facts found by the Georgia court. Bose Ex. 5 at 9 and Opening Brief at 11-12.

Plaintiffs assert that Bailey committed fraud during the October 26, 2004 conference call with market analysts when he described the Georgia settlement as being "unfortunately . . . the subject of a temporary restraining order," because the September 2, 2004 order of the Georgia Court was actually a preliminary injunction. Opposition at 19. While plaintiffs may be correct as a matter of civil procedure, the September 2, 2004 order actually reads as follows: "Digimarc's Motion for a Temporary Restraining Order is granted. . . ." Bose Ex. 20 at 4.

Perhaps most egregious is plaintiffs' argument that Viisage defrauded the State of Georgia in the bidding process. *See, e.g.*, Opposition at 14 (noting "Viisage's fraud in the bidding process."); 16, n. 11 ("fraudulent conduct on the part of Viisage"). This alleged "fact" is nothing more than plaintiffs' own invention. The Georgia GTA/DMVS – the allegedly defrauded party, maintained that Viisage had not done anything wrong. *See* Bose Ex. 10. More significantly, the Georgia court never found that Viisage committed fraud. In its December 22, 2004 Order on Cross Motions for Summary Judgment, the Georgia court found that Viisage had submitted another vendor's sample cards without permission and had misrepresented the existence of a back-up production facility. Bose Ex. 5 at ¶¶9, 11. The court made no finding that Georgia GTA/DMVS was ever misled by Viisage's conduct and Georgia, for its part,

expressly argued that it knew the source of the card sample and back-up facility. *See* Bose Ex. 23 and Opening Brief at 11-12. The word "fraud" is nowhere to be found in that Order.[4]

But all of this is window-dressing for plaintiffs' real claim – defendants should have disclosed to investors that the Georgia court would disallow $2 million of the $2.5 million settlement that Georgia had agreed to pay. Plaintiffs' protestations to the contrary, their claim is no different from the claim made by the plaintiffs in *In re Seachange Int'l, Inc. Sec. Litig.*, No. 02-12116-DPW, 2004 U.S. Dist. LEXIS 1687 (D. Mass. Feb. 6, 2004). In that case, as here, plaintiffs argued that the company's failure to predict an adverse litigation outcome was actionable securities fraud. Their reasoning was that because a jury had found the company had willfully infringed a patent, the company knew its conduct was unlawful and had a duty to disclose this earlier to investors. The court rejected that argument, sensibly holding that a company has no obligation to predict litigation outcomes or to accuse itself of wrongdoing. *See id.* at *27. Plaintiffs strain to distinguish *Seachange* on the ground that they had "recount[ed] in painstaking detail the undisclosed 'present-orientated aspects' of Viisage's fraud in the Georgia DMVS bid process, as alleged in the Digimarc Action, well before the Georgia Court granted Digimarc's motion for summary judgment." *See* Opposition at 22. Instead of explaining what these "present-orientated aspects" are, plaintiffs merely cite a slew of paragraphs in their Complaint which discuss the Georgia litigation, some of which allege misconduct by Viisage. This is no different than in *Seachange*. Viisage, as did Seachange, denied any wrongdoing. Viisage, like Seachange, was not obligated to accuse itself of wrongdoing or to predict that a court (or jury) would find against it. This Court, like the *Seachange* court, should reject

---

[4] Plaintiffs' argument that Viisage somehow is collaterally estopped from arguing that it did not mislead the DMVS (Opposition at 20), aside from being irrelevant, is absurd. Viisage did not litigate the issue in the Georgia action. Had it litigated the issue, it surely would have prevailed, as the DMVS expressly stated that it had not been misled.

plaintiffs' attempt to expand securities fraud liability to new areas never before recognized. This is especially so because here, unlike in *Seachange*, the allegedly aggrieved party – the State of Georgia –denied that Viisage had ever acted improperly in any way.

Plaintiffs' argument becomes even more incredulous in light of the fact that no party, not the state of Georgia, not even Digimarc, argued in its cross-motions for summary judgment that the payment Georgia had committed to pay Viisage was unlawful. Digimarc wanted to be awarded the contract or, in the alternative, for Viisage to be barred from participating in any re-bid. GTA Rule 665-2-11-09 and the express language of the drivers' license contract state that if Georgia terminates the contract for convenience, Viisage is "entitled to receive just and equitable compensation for services rendered based on time spent prior to the termination date." Bose Ex. 2, appendix at 6. Viisage initially claimed that it was due $8 million in reimbursement. Georgia and Viisage agreed to settle that claim for $2.5 million. The Georgia court, without citation to any authority, ruled that Georgia had properly terminated the contract for convenience, Digimarc's claim that the contract was void *ab initio* was therefore moot, but that it would "disallow" payment of $2 million of the $2.5 million settlement, "as this may constitute an unfair advantage [to Viisage] in any rebid process." Bose Ex. 5 at 16. How Viisage could have predicted, and then disclosed, this novel outcome is not clear.[5]

Finally, even if one assumes, *arguendo*, that Viisage's failure to provide all the detail about the Georgia litigation that plaintiffs contend had to be disclosed constituted either the misrepresentation or omission of a material fact, it, nonetheless, cannot be disputed that all of this information was publicly available at all times at the Georgia court (and was also frequently

---

[5] *Kafenbaum v. GTECH Holdings Corp.*, 217 F. Supp. 2d 238 (D.R.I. 2002), relied on by plaintiffs, is inapposite. That case did not involve the outcome of a pending lawsuit. Rather, the defendant admitted that its software had malfunctioned and been repaired. The question was whether certain statements were misleading with respect to that malfunction and, if so, whether they were material. *Id.* at 248-49.

touted in Digimarc's press releases and on its website). Plaintiffs' only answer to this argument is that it is a question of fact whether the Georgia court's records or certain orders posted on Digimarc's website entered the public domain in a fashion "proportional to" defendants' alleged false and misleading statements. *See* Opposition at 25. Plaintiffs go even further and argue that the fact that analysts never corrected Bailey on the July 22 conference call when he said Viisage was not a party and had not been charged with any improprieties lead to "the most reasonable inference . . . that Defendants' false and misleading statements *worked* – the market was completely unaware of the fact that Digimarc had named Viisage as a defendant and had made serious allegations against Viisage." *Id.*

This argument is specious. There are no facts alleged in the Complaint concerning whether and to what degree the Georgia court file and Digimarc press releases were in public domain. A plaintiff cannot supplement its complaint by adding new facts to an opposition to stave off dismissal. *See, e.g., Keane v. Navarro*, 345 F. Supp. 2d 9, 12 (D. Mass. 2004). Apparently, plaintiffs recognize this, by asking the Court to draw "the most reasonable inference" that the market was "completely unaware" of these facts. Plaintiffs do not explain why this is the most reasonable inference to be drawn, nor why it is even a reasonable inference. If this litigation was as important to Viisage investors as plaintiffs contend, then the marketplace (in the person of at least some of the analysts who followed Viisage and participated in the conference calls in question) would surely have accessed the Georgia pleadings. This is not the typical securities fraud claim in which the defendant is alleged to have concealed internal negative information about the company. Here, the allegedly undisclosed negative facts were pleadings and orders filed in a court. Although on a motion to dismiss a court should draw all reasonable inferences in plaintiffs' favor, it need not indulge in conjecture or resort to drawing

unreasonable inference just to save plaintiffs' defective claims. *See Washington Legal Found. v. Massachusetts Bar Found.*, 993 F.2d 962, 971 (1st Cir. 1993). Item 103 of Regulation S-K is written to require disclosure of the existence of litigation that is material to a company so that investors may follow the course of the proceedings if they choose to. Plaintiffs do not argue that Viisage did not adequately disclose the existence of the litigation and the economic impact that an adverse judgment would have upon it. No court has previously held that a registrant must disclose more, let alone predict an adverse outcome.

        **2.**      **Plaintiffs have not alleged any actionable misstatement and/or omission concerning Viisage's EBITDA projection.**

Plaintiffs argue that the Company's projections of EBITDA (earnings before interest, taxes, depreciation and amortization) made in quarter-ending press releases and follow-up analyst conference calls July 21-22 and October 25-26 were "highly misleading" because those projections included the $2.5 million settlement from the GTA/DMVS, when "[d]efendants knew that there was a significant risk that Viisage would be able to realize the benefit of the $2.5 million due to the Company's improper conduct." Opposition at 30-31. To support their argument, plaintiffs cite the Company's definition of EBITDA as "adding back to net earnings interest, taxes, depreciation and amortization" (*see* Opposition at 29), and the Company's February 7, 2005 Press Release which disclosed that EBITDA *and net income* were expected to fall below guidance due to several non-recurring factors, including a non-cash impairment charge of $2 million in connection with the Georgia settlement. *See* Opposition at 29, 30 and Klafter Ex. B, Bose Ex. 41 at 1.

Plaintiffs' argument is actually inconsistent with the press releases and conference calls on which it is based. Plaintiffs read the Company's February 7th press release as saying that EBITDA will fall below guidance because of the Georgia court's disallowance of $2 million of

the Georgia settlement when, in fact, it says no such thing. Rather, the February 7th press release expressly states that the $2 million impairment charge was a non-cash item that affected net income, but not EBITDA. *See* Bose Ex. 42. When a company writes down (*i.e.*, depreciates) the value of an asset because it has been impaired, that is a non-cash event.

In the July 22nd analyst conference call cited by plaintiffs for the Company's EBITDA guidance, William Aulet, Viisage's CFO, states:

> As we have said previously, given the legal situation in Georgia, we have removed expectations for the significant revenue contribution from that contract this year from our forecast. *We are not changing our revenue guidance because of the settlement.*

Klafter Ex. C at 5 (emphasis added). The Company also made its treatment of the anticipated settlement payment quite clear during the October 26th third quarter conference call with analysts when Aulet, in response to an analyst's question, answered that the Company would never book the $2.5 million settlement payment as revenue because the Company only books revenue when it produces a driver's license card. "There is no revenue that is booked regarding the Georgia procurement in any way." Bose Ex. 35 at 9. The anticipated $2.5 million was partial repayment of costs incurred in preparing to produce driver's licenses for Georgia. This point is made very clearly in the description of the settlement that appears in the prospectus for the August 2004 Secondary Offering and third quarter Form 10-Q. *See* Bose Ex. 32 and 36.

More fundamentally, this EBITDA allegation is nothing more than an attempt to manufacture a claim of fraud out of clever wordsmithing. In 2003, Viisage first disclosed that if it lost the Georgia contract as a result of the Digimarc complaint, it might have to recognize loss of approximately $5 million, representing costs incurred in preparation to produce licenses for Georgia. *See* Bose Ex. 30. After the contract was terminated for convenience, Viisage disclosed not only the $2.5 million settlement, but also the risk that Viisage still might have to write off

$2.8 million of costs incurred, if it did not win the Georgia rebid or other contracts in which it could use the same assets. *See* Bose Ex. 32. It is hardly surprising that when the Georgia court "disallowed" $2 million of that settlement, that amount was written off.

**3.    Plaintiffs have not alleged any actionable misstatement and/or omission concerning the Company's internal controls.**

In defense of their claims based on defendants' statements concerning the Company's internal controls, plaintiffs conflate the certification requirements arising out of two different sections of the Sarbanes-Oxley Act: Sections 302 and 404. These sections serve different purposes, a point that the SEC has made abundantly clear in its regulations and releases implementing them.

Section 302 of the Sarbanes-Oxley Act, entitled "Corporate Responsibility for Financial Reports," provides, in principal part, that

> For each annual and quarterly report filed with the SEC, the CEO and CFO must certify that they have reviewed the report and, based on their knowledge, the report does not contain untrue statements or omissions of a material fact resulting in a misleading report and that, based on their knowledge, the financial information in the report is fairly presented.

*See Sarbanes-Oxley Act: Consideration of Key Principles Needed in Addressing Implementation for Smaller Public Companies*, a Report of the Committee on Small Business and Entrepreneurship, U. S. Senate, published by the United States Government Accountability Office, April, 2006, at 11.[6] The purpose of this section was to insure that the CEO and CFO of a public company took responsibility for information disclosed in SEC filings. In August 2002,

---

[6] A copy of this report (the "GAO Report") is attached to the Compendium of Certain Authorities filed herewith for the Court's convenience at Tab A.

the SEC promulgated rules implementing Section 302. *See* SEC Release No. 33-8124.[7] In its regulations, the SEC defined a new term "disclosure controls and procedures" which "are intended to embody controls and procedures addressing the quality and timeliness of disclosure." The SEC noted that it wished to differentiate this new term "disclosure controls and procedures" from the "pre-existing concept of 'internal controls'." *Id.* at 8. The SEC also formulated the certification that the CEO and CFO of a registrant would have to execute regarding the company's financial disclosure in quarterly and annual SEC filings beginning in the third quarter of 2002. *Id.* at 9 and 13, and No. 93. The SEC expressly noted that it had not yet adopted rules implementing Section 404, which "will be the subject of a separate rulemaking project." *Id.* at n.75.

By contrast, Section 404 of the Sarbanes-Oxley Act, entitled "Management Assessment of Internal Controls," provides:

> In each annual report filed with the SEC, company management must state its responsibility for establishing and maintaining an adequate internal control structure and procedures for financial reporting, and assess the effectiveness of its internal control structure and procedures for financial reporting.

GAO Report at 11. The SEC first promulgated the rules implementing Section 404 in August 2003. *See* SEC Release No. 33-8238.[8] These rules defined the term "internal controls and procedures for financial reporting," and identified how management must evaluate internal controls on an annual basis and attest to its assessment regarding their effectiveness. The rules also addressed how the Company's auditors were to review and report on management's assessment. *See, id.* at 9 and 11. The SEC also expressly addressed the relationship between

---

[7] Compendium, Tab B: SEC Release No. 33-8124

[8] Compendium, Tab C: SEC Release No. 33-8238

Sections 302 and 404 and whether quarterly evaluations of internal control over financial reporting should be required. The SEC concluded that they should not. "The management of each company should perform evaluations of the design and operation of the company's entire system of internal control over financial reporting . . . as of the end of the Company's fiscal year." *Id.* Indeed, the SEC noted that some controls actually operate only at the end of a fiscal year.

It is Section 404 (not Section 302) of the Sarbanes-Oxley Act and the SEC's implementing regulations that has caused so much controversy concerning the costs and challenges that smaller companies have experienced in complying with the Sarbanes-Oxley Act. Of particular concern has been the application of PCAOB Auditor's Standard No. 2 in making this annual assessment of the effectiveness of internal controls. It states that internal controls over financial reporting are effective only if there is no "remote likelihood that material misstatements will not be prevented or detected on a timely basis." *See, e.g.,* Robert Pozen, *Why Sweat the Small Stuff?, Wall Street Journal,* April 5, 2006 (quoting Public Company Accounting Oversight Board (PCAOB) Auditing Standard No. 2)[9] and GAO Report at 5 ("Smaller public companies and accounting firms noted that the complexity of the internal control framework and the scope and complexity of the audit standard and related guidance for auditors on Section 404 issued during rather than prior to the initial year of implementation contributed to the costs and challenges experienced in the first year of implementation").

It is with this distinction between the purposes and requirements of sections 302 and 404 in mind that plaintiffs' allegations of fraud must be examined. Plaintiffs, to save their internal control claims, are reduced to comparing apples to oranges. Plaintiffs cite William Aulet's

---

[9] Compendium, Tab D.: Robert Pozen April 5, 2006 *Wall Street Journal* article.

March 3, 2005 statement with respect to Viisage's internal controls on a conference call with analysts that Viisage "recognized this as an area for improvement months ago, and we've been working diligently to remedy these issues for some time," as demonstrating that Bailey and Aulet's earlier Section 302 Certifications were false and misleading. But the Section 302 Certifications filed with the second and third quarter 10-Qs referenced managements' acceptance of responsibility for the financial information contained in the quarterly reports and the evaluation of company's "disclosure controls." This certification said absolutely nothing with respect to whether Viisage would be able to satisfy Section 404's new standards with respect to the effectiveness of its "internal controls and procedures for financial reporting," when it completed its first annual assessment and reported on it in its Form 10-K for fiscal year 2004. In fact, in October 2004, Viisage expressly told analysts that the Section 404 compliance project was both expensive and not yet complete. *See* Opening Brief at 19.

The cases on which plaintiffs rely are wholly inapposite. In both *In re PMA Capital Corp. Sec. Litig.*, No. 03-6121, 2005 U.S. Dist. Lexis 15696 (E.D. Pa. July 27, 2005) and *In re Royal Dutch/Shell Transp. Sec. Litig.*, 380 F. Supp. 2d 509 (D.N.J. 2005), not only were there allegedly false Sarbanes-Oxley certifications, but there were also allegedly materially false financial statements (*PMA*) and oil reserve reports (*Royal Dutch/Shell*). In *Royal Shell*, it is not at all clear specifically to what the false certifications related. *Id.* at 558. In PMA they apparently related to internal controls; however, PMA involved allegations of materially false financial reports expressly linked to the particular internal control deficiency identified in an auditor's report. *PMA* at *33, n. 8. There are no such allegations here. Plaintiffs have not cited any case in which a court has sustained a securities law claim involving Section 302

certifications, nor any case based on a certification regarding internal controls, when the material weakness in question was not linked to allegedly false financial reports.

**B.    Plaintiffs Have Not Adequately Alleged Any Defendants' Scienter.**

Plaintiffs' Opposition highlights the Complaint's lack of adequate allegations of scienter. With respect to the Georgia litigation, plaintiffs apparently argue that because the alleged disclosures were false and/or misleading, defendants must have known they were false. Plaintiffs point to allegations that Bailey stated that Viisage was not a party to the litigation and that no allegations of impropriety had been lodged against Viisage. *See* Opposition at 32-33. Any adverse inference that could theoretically be drawn from this conlcusory allegation is eliminated by Bailey's statement in the very next sentence that the Company had spent more than $1 million in legal fees "as a related party" to the litigation, *see* Klafter, Ex. B at page 2-3, and Aulet's disclosure that the Company spent $200,000 in legal fees in the second quarter alone. *Id.*

Plaintiffs' scienter allegations with respect to defendants' statements concerning the Company's alleged internal control deficiencies are similarly devoid of any underlying factual bases. Most importantly, as described above, the Section 302 certification refers only to financial disclosures and simply do not constitute an opinion that the company would be able to meet the new Section 404 standards regarding the effectiveness of its internal controls on financial reporting at year end. To support their argument that the Complaint has sufficiently alleged defendants' knowledge of the internal control problems months earlier than the Company disclosed them (assuming that there existed a duty to disclose them), plaintiffs point to statements concerning Viisage's progress toward complying with the new Sarbanes-Oxley standards – not whether control deficiencies cast doubt on the accuracy of the Company's reported financial results. (*See* page 14, *supra*.).

The cases plaintiffs cite in its Opposition for the proposition that the "magnitude" of the alleged internal control deficiencies provides an inference of knowledge or recklessness are inapposite. In *In re Cardinal Health Inc. Sec. Litig*, No. C2-04-575, 2006 U.S. Dist. LEXIS 18687 (S.D. Ohio, April 12, 2006), the alleged control deficiencies led to massive financial reporting restatement as the company overstated operating revenue for four years by $26 billion, among other problems. *Id.* at *72, *77-78. Likewise, in *In re Microstrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 636 (E.D. Va. 2000), the alleged internal control deficiencies caused the company to report a $19 million profit when it actually suffered a $36 million loss during the period and to overstate its revenues by $66 million. *Id.*

Here the stated deficiencies that resulted in material weakness related to lack of technical accounting expertise sufficient to resolve certain complex accounting matters and an aspect of the information technology systems.[10] The absence of any allegations of financial misstatement negates any inference of intent to deceive or recklessness that plaintiffs would have this Court draw. *Compare In re Veeco Instruments, Inc., Sec. Litig.*, No. 05 MD 1695 (CM), 2006 U.S. Dist. LEXIS 13226, at *31-32 (S.D.N.Y., March 21, 2006), (fact that the company dramatically reduced its internal accounting staff by 75% "constitutes strong circumstantial evidence of recklessness (if not conscious misbehavior)").[11]

Plaintiffs make no scienter argument whatsoever with respect to its claim that the Company's EBITDA guidance was fraudulent.

---

[10] Plaintiffs' contention that the market price of Viisage stock reacted to Viisage's disclosure that it would report material weaknesses in internal controls (Opposition at 11) must be taken with a large grain of salt. That disclosure was only a paragraph in a March 2, 2005 press release that included several pages of both historic and forecast financial information. The most that can be said concerning the modest movement in the price of Viisage's stock is that it reacted to the March 2nd press lease. *See* Transmittal Affidavit of John R. Baraniak, Jr. filed herewith, Exhibit 1.

[11] To the contrary, in the March 3, 2005 conference call Aulet described the additional experienced accounting staff that had been hired by Viisage. Bose Ex. 43 at 7.

Plaintiffs' argument that it has alleged defendants' scienter by alleging their motive and opportunity fares no better. Plaintiffs argue in its Opposition that defendants had four principal motivations in perpetrating the alleged fraud: (1) to complete a secondary offering of the Company's stock; (2) to use the Company's stock to expand by acquiring other companies; (3) to replace its existing financing with a more favorable loan; and (4) to personally profit from the sale of Viisage stock. None of these alleged "motivations," itself raises or contributes to raising a strong inference of scienter.

Plaintiffs' wild speculation that the Company was on the verge of collapse and desperately needed the August, 2004 Secondary Offering is pure fiction and unsupported by any factual allegations, other than the facts that working capital would rise and debt would decrease after the offering. The same can be said for virtually any stock offering by any company. These generic allegations do not support an inference of defendants' scienter. *See, e.g., McNamara v. Bre-X Minerals, Ltd.*, 57 F. Supp. 2d 396, 405 (E.D. Tex. 1999) (allegations that a defendant acted to improve a company's financial health or reputation, or to increase capital are insufficient to allege motive). *See, also, Meyer v. Biopure Corp.*, 221 F. Supp. 2d 195, 209 (D. Mass. 2002) (defendant's attempt to secure $75 million in private financing in order to continue operations not sufficient to create a "blanket presumption that any omissions were made with intent to defraud"). It is also important to consider the timing of this offering. By August 5, 2004, Georgia had terminated the drivers' license contract causing Viisage to remove from its product backlog $20 million of anticipated income. This was disclosed in bold face type in Viisage's Amended Registration Statement, where Viisage also disclosed Digimarc's recently filed motion to restrain the $2.5 settlement payment. Bose, Ex. 32. The Offering was completed well in advance of any of the Georgia court's orders enjoining payment of the settlement. Thus, most of

the alleged fraud happened *after* the Secondary Offering, and therefore, the Offering could not have been the motivation.

That same temporal disconnect is the reason that Viisage's replacement financing *during* the third quarter of 2004 cannot serve as motivation for the Company's allegedly inflated third quarter results announced weeks later.

Plaintiffs' contention that defendants were motivated to inflate Viisage's shares in order to acquire other companies using Viisage shares suffers from two problems. First, nowhere is this alleged motive alleged in the Complaint. Second, in this case, the alleged fraud concerns a failure to disclose pleadings that were filed and orders entered in a well disclosed litigation. It is, quite frankly, absurd to conjecture that a company willing to be acquired in exchange for Viisage shares would not review the docket and public filings in that case.

Finally, plaintiffs all but abandon any argument that it has alleged defendants' scienter by virtue of certain stock sales made by individual defendants during the putative Class Period. Plaintiffs devote only two sentences to this argument, stating in conclusory fashion only that the sales "were at a suspicious time." They point to no factual allegations that explain why the timing was suspicious or the amount of Viisage stock defendants retained. *See* Opposition at 37.

### C.     Plaintiffs' Section 11 Claim Is Subject to Rule 9(b) and Should Be Dismissed.

Plaintiffs' Section 11 claim fails for the reasons discussed in Sections A and B above – plaintiffs have not alleged an actionable misrepresentation or omission and have not adequately alleged any defendants' scienter. With respect to the latter point, plaintiffs attempt to evade well-established law that their Section 11 claim satisfy Fed. R. Civ. P. 9(b)'s particularity requirement by arguing that this claim does not sound in fraud. In doing so, plaintiffs go so far as to say that "[d]efendants do not point to a single paragraph in the Section 11 count of the

Complaint regarding Defendants' false and misleading statements about the Digimarc Action that references any scienter or reliance." Opposition at 39. Defendants can point to at least ten paragraphs, incorporated by reference into plaintiffs' Section 11 claim (*see* Complaint ¶ 106 "Lead Plaintiff Turnberry repeats and realleges the allegations set forth in paragraph [sic] 1-105 as though fully set forth herein."). For example, with respect to the Georgia litigation, plaintiffs allege that defendants participated in "a subterfuge on the part of Viisage aimed at preventing these facts from coming to light," Complaint ¶6, and "concealed" the Georgia court's rulings," *id.* ¶¶7, 80, 81. Plaintiffs also ascribe various motives to defendants for their actions, including "taking advantage of [the] artificial inflation" in its stock price, *id.* ¶ 11, "engag[ing] in a determined effort to stymie Digimarc's discovery efforts while at the same time concealing from the investing public its own wrongdoing," *id.* ¶ 51, not disclosing "the true state of affairs" concerning the Georgia contract so as to not "jeopardize the offering or the ability to raise sufficient funds to extinguish [its] debt," *id.* ¶ 59, and engaging in "a further effort to avoid any disclosure of its own wrongdoing, and to maintain the fiction that it was not even a defendant in the action." *Id.* ¶ 66. With respect to its claims based on defendants' internal control statements, plaintiffs allege that "the Company's internal control deficiencies were well known throughout 2004." *Id.* ¶ 99.

Plaintiffs' disclaimer of reliance on any fraud allegations does not insulate their claim from Rule 9(b) scrutiny. A court in this District very recently rejected a plaintiff's "effort to plead some kind of lesser included claim simply by inserting a talismanic disclaimer in the Complaint." *See In re Sonus Networks, Inc. Sec. Litig.*, No. 04-10294-DPW, 2006 U.S. Dist.

LEXIS 28272, *26. (D. Mass. May 10, 2006). The instant case is no different, and the result should be the same.[12]

### D.    Defendants Berube, Beck and Yon Are Not Control Persons.

In defense of their control person claims against non-officer defendants Berube, Beck and Yon, plaintiffs simply restate the allegations that defendants' Opening Brief showed were inadequate. In particular, plaintiffs rely heavily on the allegation that Lau and Beck "have a strong influence on matters requiring approval by stockholders, including the election of directors and most corporate actions." Opposition at 42, quoting Complaint §§ 120(d), 152. Having a "strong influence" on "matters requiring approval by stockholders" is not equivalent to the type of day to day "control" necessary to make out a Section 20(a) claim. In fact, plaintiffs do not allege that shareholder approval was required for any of the allegedly false and misleading disclosures at issue in this case. Clearly it was not. Rather, plaintiffs have alleged only that these three individuals were outside directors who had a financial interest in Viisage. This is not enough. *See* Opening Brief at 36-38.[13]

---

[12] Significantly, the court in *Sonus* declined to follow *In re Number Nine Visual Tech. Corp. Sec. Litig.*, 51 F. Supp. 2d 1 (D. Mass. 1999), a case relied on heavily by plaintiffs in their Opposition, explaining: "To the extent Number Nine is read to stand for the proposition that a simple disclaimer, without a parsing of factual allegations, is sufficient to save Section 11 and 12(a)(2) claims from heightened pleading requirements, I decline to adopt this blinkered reading of the more nuanced distinctions drawn in the case law relied upon for the Securities Act claims." *Sonus*, at *24. That court also distinguished *Number Nine* on the grounds that the plaintiffs there had specifically and expressly excluded over 30 paragraphs of its complaint from its Section 11 claim, unlike the *Sonus* plaintiff and unlike the plaintiffs in the instant case.

[13] The cases cited by plaintiffs in support of the Section 20(a) claim are inapposite. In *In re Adelphi Communications Corp. Sec. and Deriv. Litig.*, 398 F. Supp. 2d 244, 262 (S.D.N.Y. 2005), the alleged control persons were indirect majority owners of the alleged primary violator company *and were alleged to have "had direct involvement in the day-to-day operations of the Company." Id.* (emphasis added). *Schnall v. Annuity Life Re (Holdings), Ltd,* No. 3:02-CV-2133 (GLG), 2003 U.S. Dist. Lexis 24898, at *26-27 (D. Conn. Dec. 23, 2003) involved directors alleged to have been control persons by virtue of having signed the multiple SEC disclosures alleged to have been false and misleading. The court in *In re Centennial Tech. Sec. Litig.*, 52 F. Supp. 2d 178, 186 (D. Mass. 1999), held merely that an employer "controls" its employee. In *Rand v. M/A-Com, Inc.*, 824 F. Supp. 242, 262-64 (D. Mass. 1992), the court found that the defendants were *not* control persons.

## II.    CONCLUSION

For the foregoing reasons, and the reasons given in Defendants' Opening Memorandum, the Court should dismiss Plaintiffs' Consolidated Amended Class Action Complaint in its entirety as against all defendants and with prejudice.

> VIISAGE TECHNOLOGY, INC., BERNARD C. BAILEY, WILLIAM AULET, DENIS K. BERUBE, MARCEL YON, BUDDY G. BECK, CHARLES A. LEVINE, THOMAS J. REILLY, HARRIET MOUCHLY-WEISS, PAUL T. PRINCIPATO AND PETER NESSEN,
>
> By its attorneys,
>
>
> /s/ John R. Baraniak, Jr.
> Mitchell H. Kaplan (BBO #258940)
> John R. Baraniak, Jr. (BBO #552259)
> Aloknanda S. Bose (BBO #658108)
> CHOATE, HALL & STEWART LLP
> Two International Place
> Boston, MA  02110
> Tel.:  (617) 248-5000

Dated:  May 26, 2006

4081992_2.DOC