# Exhibit A
# (Part 1 of 4)

United States Government Accountability Office

# GAO

Report to the Committee on Small Business and Entrepreneurship, U.S. Senate

April 2006

# SARBANES-OXLEY ACT

# Consideration of Key Principles Needed in Addressing Implementation for Smaller Public Companies



**G A O**
Accountability * Integrity * Reliability



# GAO
**Accountability·Integrity·Reliability**

# Highlights

Highlights of GAO-06-361, a report to the
Committee on Small Business and
Entrepreneurship, U.S. Senate

**April 2006**

# SARBANES-OXLEY ACT

# Consideration of Key Principles Needed in Addressing Implementation for Smaller Public Companies

## Why GAO Did This Study

Congress passed the Sarbanes-Oxley Act to help protect investors and restore investor confidence. While the act has generally been recognized as important and necessary, some concerns have been expressed about the cost for small businesses. In this report, GAO (1) analyzes the impact of the Sarbanes-Oxley Act on smaller public companies, particularly in terms of compliance costs; (2) describes responses of the Securities and Exchange Commission (SEC) and Public Company Accounting Oversight Board (PCAOB) to concerns raised by smaller public companies; and (3) analyzes smaller public companies' access to auditing services and the extent to which the share of public companies audited by mid-sized and small accounting firms has changed since the act was passed.

## What GAO Recommends

SEC should (1) assess sufficiency of internal control guidance for smaller public companies, (2) coordinate with PCAOB to ensure consistency of section 404 auditing standards with any additional internal control guidance for public companies, and (3) if further relief is deemed appropriate, analyze the unique characteristics of smaller public companies and their investors to ensure that the objectives of investor protection are met and any relief provided is targeted and limited.

www.gao.gov/cgi-bin/getrpt?GAO-06-361.

To view the full product, including the scope and methodology, click on the link above. For more information, contact William B. Shear, (202) 512-8678 or shearw@gao.gov, or Jeanette M. Franzel, (202) 512-9471 or franzelj@gao.gov.

## What GAO Found

Regulators, public companies, audit firms, and investors generally agree that the Sarbanes-Oxley Act of 2002 has had a positive and significant impact on investor protection and confidence. However, for smaller public companies (defined in this report as $700 million or less in market capitalization), the cost of compliance has been disproportionately higher (as a percentage of revenues) than for large public companies, particularly with respect to the internal control reporting provisions in section 404 and related audit fees. Smaller public companies noted that resource limitations and questions regarding the application of existing internal control over financial reporting guidance to smaller public companies contributed to challenges they face in implementing section 404. The costs associated with complying with the act, along with other market factors, may be encouraging some companies to become private. The companies going private were small by any measure and represented 2 percent of public companies in 2004. The full impact of the act on smaller public companies remains unclear because the majority of smaller public companies have not fully implemented section 404.

To address concerns from smaller public companies, SEC extended the section 404 deadline for smaller companies with less than $75 million in market capitalization, with the latest extension to 2007. Additionally, SEC and PCAOB issued guidance intended to make the section 404 compliance process more economical, efficient, and effective. SEC also encouraged the Committee of Sponsoring Organizations of the Treadway Commission (COSO), to develop guidance for smaller public companies in implementing internal control over financial reporting in a cost-effective manner. COSO's guidance had not been finalized as of March 2006. SEC also formed an advisory committee to examine, among other things, the impact of the act on smaller public companies. The committee plans to issue a report in April 2006 that will recommend, in effect, a tiered approach with certain smaller public companies partially or fully exempt from section 404, "unless and until" a framework for assessing internal control over financial reporting is developed that recognizes the characteristics and needs of smaller public companies. As SEC considers these recommendations, it is essential that the overriding purpose of the Sarbanes-Oxley Act—investor protection—is preserved and that SEC assess available guidance to determine if additional supplemental or clarifying guidance for smaller public companies is needed.

Smaller public companies have been able to obtain access to needed audit services and many moved from the largest accounting firms to mid-sized and small firms. The reasons for these changes range from audit cost and service concerns cited by companies to client profitability and risk concerns cited by accounting firms, including capacity constraints and assessments of client risk. Overall, mid-sized and small accounting firms conducted 30 percent of total public company audits in 2004—up from 22 percent in 2002. However, large accounting firms continue to dominate the overall market, auditing 98 percent of U.S. publicly traded company sales or revenues.

_____**United States Government Accountability Office**

# Contents

| **Letter** | | 1 |
|---|---|---|
| | Results in Brief | 4 |
| | Background | 9 |
| | Smaller Public Companies Have Incurred Disproportionately Higher Audit Costs in Implementing the Act, but Impact on Access to Capital Remains Unclear | 14 |
| | SEC and PCAOB Have Been Addressing Smaller Company Concerns Associated with the Implementation of Section 404 | 26 |
| | Sarbanes-Oxley Act Requirements Minimally Affected Smaller Private Companies, Except for Those Seeking to Enter the Public Market | 36 |
| | Smaller Companies Appear to Have Been Able to Obtain Needed Auditor Services, Although the Overall Audit Market Remained Highly Concentrated | 42 |
| | Conclusions | 52 |
| | Recommendations | 58 |
| | Agency Comments and Our Evaluation | 58 |

| **Appendix I** | **Objectives, Scope, and Methodology** | 61 |
|---|---|---|

| **Appendix II** | **Additional Details about GAO's Analysis of Companies Going Private** | 73 |
|---|---|---|

| **Appendix III** | **Comments from the Securities and Exchange Commission** | 84 |
|---|---|---|

| **Appendix IV** | **Comments from the Public Company Accounting Oversight Board** | 86 |
|---|---|---|

| **Appendix V** | **GAO Contacts and Staff Acknowledgments** | 87 |
|---|---|---|

## Tables

Table 1: Summary of Selected Sarbanes-Oxley Act Provisions Affecting Public Companies and Registered Accounting Firms — 11

Table 2: Primary Reasons Cited by Companies for Going Private, 1998-2005, by Percent — 23

Table 3: SEC Extensions of Section 404 Compliance Dates — 27

Table 4: IPO Direct Expenses as a Percentage of Company's Revenues, by Size — 38

Table 5: Companies Changing Accounting Firms, 2003-2004 — 44

Table 6: Cross-sectional Comparison of Request Letter Questions, Our Report Objectives, and Selected Findings — 61

Table 7: Reason for Going Private, by Category Descriptions — 80

## Figures

Figure 1: Median Audit Fees as a Percentage of 2003 and 2004 Revenues Reported by Public Companies as of August 11, 2005 — 16

Figure 2: Total Number of Companies Identified as Going Private, 1998-2005 — 22

Figure 3: Where Companies Traded Prior to Deregistration, July 2003-March 2005 — 25

Figure 4: IPO and Stock Market Performance, 1998-2005 — 39

Figure 5: Average Size of Companies Changing Auditors, 2003-2004, by Type of Accounting Firm Change — 46

Figure 6: Percentage of Clients Audited by Revenue Category, 4 Largest Accounting Firms versus Mid-sized and Small Accounting Firms, 2004 — 49

Figure 7: Total Number of IPOs, by Size of Accounting Firm, 1999–2004 — 51

Figure 8: Total Number of Companies Identified as Going Private from 1998 to 2005 — 77

## Abbreviations

| | |
|---|---|
| AMEX | American Stock Exchange |
| CEO | chief executive officer |
| CFO | chief financial officer |
| COSO | Committee of Sponsoring Organizations of the Treadway Commission |
| EDGAR | Electronic Data Gathering, Analysis, and Retrieval system |
| FCPA | Foreign Corrupt Practices Act of 1977 |
| HHI | Hirschman-Herfindahl Index |
| IPO | initial public offering |
| NASD | National Association of Securities Dealers, Inc. |
| NASDAQ | The Nasdaq Stock Market, Inc |
| NYSE | New York Stock Exchange |
| PCAOB | Public Company Accounting Oversight Board |
| QPL | Questionnaire Programming Language |
| OTCBB | Over the Counter Bulletin Board |
| SAS | statistical analysis software |
| SBA | Small Business Administration |
| SEC | Securities and Exchange Commission |
| SPO | secondary public offering |

This is a work of the U.S. government and is not subject to copyright protection in the United States. It may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



**United States Government Accountability Office**
**Washington, DC 20548**

April 13, 2006

The Honorable Olympia J. Snowe
Chair
Committee on Small Business and Entrepreneurship
United States Senate

The Honorable Michael B. Enzi
United States Senate

In response to numerous corporate failures arising from corporate mismanagement and fraud, Congress passed the Sarbanes-Oxley Act of 2002.[1] Generally recognized as one of the most significant market reforms since the passage of the securities legislation of the 1930s, the act is intended to help protect investors and restore investor confidence by improving the accuracy, reliability, and transparency of corporate financial reporting and disclosures, and reinforce the importance of corporate ethical standards. Public and investor confidence in the fairness of financial reporting and corporate ethics is critical to the effective functioning of our capital markets. The act's requirements apply to all public companies regardless of size and the public accounting firms that audit them.

The act established the Public Company Accounting Oversight Board (PCAOB) as a private-sector non-profit organization to oversee the audits of public companies that are subject to securities laws. PCAOB, which is subject to oversight by the Securities and Exchange Commission (SEC), is responsible for establishing related auditing, quality control, ethics, and auditor independence standards. The act also addresses auditor independence and the relationship between auditors and the public companies they audit. The act requires public companies to assess the effectiveness of their internal control over financial reporting and for their external auditors to report on management's assessment and the

---

[1]Pub. L. No. 107-204, 116 Stat. 745 (July 30, 2002).

effectiveness of internal controls.[2] The act also contains provisions intended to make chief executive officers (CEO) and chief financial officers (CFO) more accountable, improve the oversight role of boards of directors and audit committees, and provide whistleblower protection. Finally, the act expanded the SEC's oversight powers and mandated new and expanded criminal penalties for securities fraud and other corporate violations.

The specific objectives of this report are to (1) analyze the impact of the Sarbanes-Oxley Act on smaller public companies, including costs of compliance and access to capital; (2) describe SEC's and PCAOB's efforts related to the implementation of the act and their responses to concerns raised by smaller public companies and the accounting firms that audit them; (3) analyze the impact of the act on smaller privately held companies, including costs, ability to access public markets, and the extent to which states and capital markets have imposed similar requirements on privately held companies; and (4) analyze smaller companies' access to auditing services and the extent to which the share of public companies audited by small accounting firms has changed since the enactment of the act.[3]

To address these objectives, we reviewed information from a variety of sources, including the legislative history of the act, relevant regulatory pronouncements and public comments, research studies and papers, and other stakeholders (such as trade groups and market participants). To analyze the impact of the act on smaller public companies, we obtained data from SEC filings provided through a licensing agreement with Audit Analytics, and analyzed data elements including auditing fees and auditor

---

[2]Internal control is defined as a process effected by an entity's board of directors, management, and other personnel, designed to provide reasonable assurance regarding the achievement of the following objectives: (1) effectiveness and efficiency of operations; (2) reliability of financial reporting; and (3) compliance with laws and regulations. Internal control over financial reporting is a process that a company puts in place to provide reasonable assurance regarding the reliability of financial reporting and the integrity of the financial statement preparation process.

[3]For the purposes of this report, we use the term smaller public company to refer to a company with a market capitalization of $700 million or less unless otherwise noted. We use the term large accounting firms to refer to the top four U.S. accounting firms in terms of total revenue in fiscal year 2004—Deloitte & Touche LLP, Ernst & Young LLP, PricewaterhouseCoopers LLP, and KPMG LLP; mid-sized firms to refer to the four next largest U.S. firms—Grant Thornton LLP, BDO Seidman LLP, Crowe Chizek & Company LLC, and McGladrey & Pullen LLP; and small firms to refer to all other accounting firms in the United States., which consist of regional and local firms.

changes to determine costs of compliance.[4] Similarly, we constructed a database of public companies that went private using SEC filings and press releases retrieved from Lexis-Nexis, an online periodical database. To obtain information on smaller public companies' experiences with Sarbanes-Oxley Act compliance, we also conducted a survey of companies with market capitalization of $700 million or less and annual revenues of $100 million or less that, as of August 11, 2005, reported to SEC that they had complied with the act's internal control-related requirements. One hundred fifty-eight of 591 companies completed the survey, for an overall response rate of 27 percent.[5] Additionally, we held discussions with representatives of SEC, the Small Business Administration (SBA), PCAOB, smaller public companies, the Committee of Sponsoring Organizations of the Treadway Commission (COSO), financial service providers, rating agencies, institutional investors, trade groups, accounting firms, and other market participants.[6]

Because SEC has extended the date by which registered public companies with less than $75 million in public float (known as non-accelerated filers) had to comply with the act's internal control-related provisions (section 404) to their first fiscal year ending on or after July 15, 2007, we could not analyze the impact of the internal control provisions of the act for a significant number of smaller public companies (SEC estimates that non-accelerated filers represent about 60 percent of all registered public

---

[4]Audit Analytics is an online market intelligence service that provides information on U.S. public companies registered with SEC and accounting firms.

[5]We conducted an analysis to determine whether the respondents to our survey differed from the population of 591 companies in company assets, revenue, market capitalization, or type of company (based on the North American Industrial Classification System code) and found no evidence of substantial non-response bias on these characteristics. However, because of the low response rate, we do not consider these data to be a probability sample of all smaller public companies.

[6]COSO was originally formed in 1985 to sponsor the National Commission on Fraudulent Financial Reporting, an independent private-sector initiative that studied the causal factors that can lead to fraudulent financial reporting and developed recommendations for public companies and their independent auditors, SEC and other regulators, and educational institutions.

companies).[7] Thus, to gain some insight into the potential impact these provisions may have on smaller public companies, we analyzed public data and other information related to the experiences of public companies that have fully implemented the act's provisions. To determine the act's impact on smaller privately held companies, we interviewed officials about state requirements comparable to key Sarbanes-Oxley provisions and representatives of smaller private companies and financial institutions about capital access requirements. We also analyzed data on companies' initial public offering (IPO) and secondary public offering (SPO) from SEC filings. To assess changes in the domestic public company audit market, we used public data—for 2002 and 2004—on public companies and their external accounting firms to determine how the number and mix of domestic public company audit clients had changed for firms other than the large accounting firms. As requested by your staff, we addressed nine specific questions contained in your request letter.

Appendix I contains a more complete description of our scope and methodology, including a cross-sectional comparison between the nine specific questions contained in the request letter and the four objectives of this report. We conducted our work in California, Connecticut, Georgia, Maryland, New Jersey, New York, Virginia, and Washington, D.C., from November 2004 through March 2006 in accordance with generally accepted government auditing standards.

## Results in Brief

While regulators, public companies, auditors, and investors generally agree that the Sarbanes-Oxley Act has had a positive impact on investor protection, available data indicate that smaller public companies face

---

[7]Until recently, SEC distinguished between two types of public companies for financial reporting purposes—accelerated filers and non-accelerated filers. SEC defined a public company as an accelerated filer if it met certain conditions, namely that the company had a public float of $75 million or more as of the last business day of its most recently completed second fiscal quarter and the company filed at least one annual report with SEC. A non-accelerated filer is generally a public company that had a public float of less than $75 million as of the last business day of its most recently completed second fiscal quarter. In December 2005, SEC created a new category, the large accelerated filer. A large accelerated filer is generally a public company that had a public float of $700 million or more as of the last business day of its most recently completed second fiscal quarter. SEC also redefined an accelerated filer as a company that had at least $75 million but less than $700 million in public float. Accelerated filers and large accelerated filers are subject to shorter financial reporting deadlines than non-accelerated filers. SEC defines public float as the aggregate market value of voting and non-voting common equity held by non-affiliates of the issuer.

disproportionately higher costs (as a percentage of revenues) in complying with the act, consistent with the findings of the Small Business Administration on the impact of regulations generally on small businesses. While smaller companies historically have paid disproportionately higher audit fees than larger companies as a percent of revenues, the percentage difference between median audit fees paid by smaller versus larger public companies grew in 2004, particularly for companies that implemented the act's internal control provisions (section 404). Smaller public companies also cited other costs of compliance with section 404 and other provisions of the act, such as the use of resources for compliance rather than for other business activities. Moreover, the characteristics of smaller companies, including resource and expertise limitations and lack of familiarity with formal internal control frameworks, contributed to the difficulties and costs they experienced in implementing the act's requirements. This situation was also impacted by the fact that many companies documented their internal control for the first time and needed to make significant improvements to their internal control as part of their first year of implementing section 404, despite the fact that most have been required by law since 1977 to have implemented a system of internal accounting controls. Smaller public companies and accounting firms noted that the complexity of the internal control framework and the scope and complexity of the audit standard and related guidance for auditors on section 404 issued during rather than prior to the initial year of implementation contributed to the costs and challenges experienced in the first year of implementation.[8] It is generally expected that compliance costs for section 404 will decrease in subsequent years, given the first-year investment in documenting internal controls. The act, along with other market forces, appeared to have been a factor in the increase in public companies deregistering with SEC (going private)—from 143 in 2001 to 245 in 2004. However, these companies were small by any measure (market capitalization, revenue, or assets) and represented 2 percent of public companies in 2004. Based on our survey responses and discussions with smaller public companies that implemented section 404, it appears that the act has not adversely affected the ability of those smaller public companies to raise capital. However, it is too soon to assess fully the impact of the act on access to capital, particularly because of the large number of smaller public companies—the more than 5,900 small public

---

[8]This report focuses on smaller public companies, but some of the identified challenges and costs may also be present in larger public companies.

companies considered by SEC to be non-accelerated filers—that have been given an extension by SEC to implement section 404.

In response to concerns that smaller public companies raised about Sarbanes-Oxley Act requirements as implemented, particularly section 404, SEC and PCAOB have undertaken efforts to help the companies meet the requirements of the act. SEC initially provided those smaller public companies that are non-accelerated filers with additional time to comply with section 404 and subsequently extended the deadline several times, with the latest extension to July 15, 2007. SEC also formed an Advisory Committee on Smaller Public Companies to examine the impact of the act on smaller public companies. On March 3, 2006, the committee issued an exposure draft of its final report for public comment that contained recommendations that, if adopted by SEC, would exempt up to 70 percent of all public companies and 6 percent of U.S. equity market capitalization from all or some of the provisions of section 404, "unless and until" a framework for assessing internal control over financial reporting is developed that recognizes the characteristics and needs for smaller public companies. Specifically, the committee proposed that "microcap" companies (companies with market capitalization below $128 million) with revenues below $125 million and "smallcap" companies (companies with market capitalization between $128 million and $787 million) with revenues below $10 million would not have to comply with section 404(a) and section (b), management's and the external auditor's assessment and reporting on internal control over financial reporting, respectively. "Smallcap" companies with revenues between $10 million and $250 million would not have to comply with section 404(b), the external auditor's attestation on management's internal control assessment and the effectiveness of internal control over financial reporting. Following a public comment period, the committee is scheduled to issue its final recommendations in April 2006, at which time the recommendations would be considered by SEC. Additionally, SEC asked COSO to develop guidance designed to assist smaller public companies in using COSO's internal control framework in a small business environment. COSO issued a draft for public comment in October 2005, and plans to finalize the guidance in early 2006. While not specifically focused on small business issues, SEC held a public "roundtable" in April 2005, in which GAO participated, that gave public companies and accounting firms an opportunity to provide feedback to SEC and PCAOB on what went well and what did not during the first year of section 404 implementation. In response, SEC and PCAOB guidance issued additional section 404 guidance in May 2005. PCAOB also issued a report on November 30, 2005, that detailed inefficiencies companies experienced in the implementation of its auditing

standard on internal control. SEC and PCAOB plan to hold another roundtable on the second year of section 404 implementation in May 2006. However, because many efforts—particularly SEC's response to the exemption recommendations and COSO's efforts to provide guidance on using its internal control framework in a small business environment—are ongoing, smaller public companies may be deferring efforts to implement section 404 until such issues are resolved.

While the act does not impose new requirements on privately held companies, companies choosing to go public must realistically spend time and funds in order to demonstrate their ability to comply with the act, section 404 in particular, to attract investors who will seek the assurances and protections that compliance with section 404 provides. Such requirements, along with other factors, may have been a contributing factor in the reduced number of initial public offerings (IPO) issued by small companies. However, the overall performance of the stock market and changes in listing standards also likely affected the number of IPOs. From 1999 through 2004, IPOs by companies with revenues of $25 million or less decreased substantially from 70 percent of all IPOs in 1999 to about 46 percent in 2004. For those privately held companies not intending to go public, our research and discussions with representatives of financial institutions suggested that financing sources were generally not imposing requirements on private companies similar to those contained in the Sarbanes-Oxley Act as a condition for obtaining access to capital or other financial services. While a number of states proposed legislation with provisions similar to the Sarbanes-Oxley Act following its passage, three states passed legislation calling for private companies or nonprofit organizations to adopt requirements similar to some of the act's corporate governance provisions. In addition, our interviews and review of available research indicate that some privately held companies have voluntarily adopted some of the act's enhanced governance practices because they believe these practices make pragmatic business sense. Specifically, they have adopted practices such as CEO/CFO financial statement certification, appointment of independent directors, corporate codes of ethics, whistleblower procedures, and approval of nonaudit services by the board.

Smaller public companies have been able to obtain access to needed audit services since the passage of the act; however, data show that a substantial number of smaller public companies have moved from the large accounting firms to mid-sized and small firms. Many of these moves resulted from the resignation of a large accounting firm. The reasons for these changes range from audit cost and service concerns cited by companies to client profitability and risk concerns cited by accounting

firms, including capacity constraints and assessments of client risk. As a result, mid-sized and small accounting firms increased their share of smaller public company audits during 2002–2004. Our analysis of the risk characteristics of the companies leaving the large accounting firms shows that mid-sized and small accounting firms appear to be taking on a higher percentage of public companies with accounting issues such as going concern qualifications and other "risk" issues. Overall, mid-sized and small accounting firms conducted 30 percent of the total number of public company audits in 2004—up from 22 percent in 2002. However, the overall market for audit services remains highly concentrated, with companies audited by large firms representing 98 percent of total U.S. publicly traded company sales (revenues). In the long run, the act may reduce some of the competitive challenges faced by mid-sized and small accounting firms. For example, mid-sized and small accounting firms could increase opportunities to enhance their recognition and acceptance among capital market participants as a result of operating under PCAOB's registration and inspection process.

We have two concerns with certain draft recommendations from the Advisory Committee on Smaller Public Companies related to internal control. Our first concern relates to lack of specificity in the recommendations. While calling for an internal control framework that recognizes the needs of smaller public companies, the recommendations do not address what needs to be done to establish such a framework or what such a framework might include. In reviewing the implementation of section 404 for larger public companies, we noted that many, if not most, of the significant problems and challenges related to implementation issues rather than the internal control framework itself. We think it is essential that public companies, both large and small, have appropriate guidance on how to effectively implement the internal control framework and assess and report on the operating effectiveness of their internal control over financial reporting. Our second concern relates to the ambiguity surrounding the conditional nature of the "unless and until" provisions of the recommendations and the potential impact that may result for a large number of public companies that would qualify for either full or partial exemption from the requirements of section 404. Our concerns also include the additional time that may be needed to resolve the concerns of smaller public companies and the impact any further regulatory relief may have in delaying important investor protections associated with section 404.

When SEC begins its assessment of the final recommendations of its small business advisory committee, it is essential that SEC balance the key

principle behind the Sarbanes-Oxley Act—investor protection—against the goal of reducing unnecessary regulatory burden on smaller public companies. This report recommends that, in considering the concerns of the Advisory Committee on Smaller Public Companies regarding the ability of smaller public companies to effectively implement section 404, SEC should (1) assess whether the current guidance, particularly guidance on management's assessment of internal control over financial reporting, is sufficient or whether additional action is needed to help smaller public companies meet the requirements of section 404; (2) coordinate with PCAOB to help ensure that section 404-related audit standards and guidance are consistent with any additional guidance applicable to management's assessment of internal control and identify additional ways in which auditors of public companies can achieve more economical, effective, and efficient implementation of the standards and guidance related to internal control over financial reporting; and (3) if further relief is deemed appropriate, analyze and consider the unique characteristics of smaller public companies and their investors in determining categories of companies for which additional relief may be appropriate so that the objectives of investor protection are adequately met and any relief is targeted and limited.

We provided a draft of this report to the Chairman of SEC and the Acting Chairman of PCAOB for review and comment. We received written comments from SEC and PCAOB that are discussed in this report and reprinted in appendixes III and IV. SEC agreed that the Sarbanes-Oxley Act has had a positive impact on investor protection and confidence, and that smaller public companies face particular challenges in implementing certain provisions of the act, notably section 404. SEC stated that our recommendations should provide a useful framework for consideration of its advisory committee's final recommendations. PCAOB stated that it is committed to working with SEC on our recommendations and that it is essential to maintain the overriding purpose of the Sarbanes-Oxley Act of investor protection while seeking to make its implementation as efficient and effective as possible. Both SEC and PCAOB provided technical comments that were incorporated into the report as appropriate.

# Background

Responding to corporate failures and fraud that resulted in substantial financial losses to institutional and individual investors, Congress passed the Sarbanes-Oxley Act in 2002. As shown in table 1, the act contains

provisions affecting the corporate governance, auditing, and financial reporting of public companies, including provisions intended to deter and punish corporate accounting fraud and corruption.[9]

The Sarbanes-Oxley Act generally applies to those companies required to file reports with SEC under the Securities Exchange Act of 1934 and does not differentiate between small and large businesses.[10] The definition of small varies among agencies, but SEC generally calls companies that had less than $75 million in public float non-accelerated filers. Accelerated filers are required by SEC regulations to file their annual and quarterly reports to SEC on an accelerated basis compared to non-accelerated filers. As of 2005, SEC estimated that about 60 percent —5,971 companies—of all registered public companies were non-accelerated filers. SEC recently further differentiated smaller companies from what it calls "well-known seasoned issuers"—those largest companies ($700 million or more in public float) with the most active market following, institutional ownership, and analyst coverage.[11]

---

[9]While there is no standard definition of corporate governance, it can broadly be taken to refer to the system by which companies are directed and controlled, including the role of the board of directors, management, shareholders, and other stakeholders. According to the Organisation for Economic Co-operation and Development, corporate governance provides the structure through which the objectives of the company are set and the means of attaining those objectives and monitoring performance are determined.

[10]In addition to those companies required to file reports with SEC under the Securities Exchange Act of 1934, the Sarbanes-Oxley Act also applies to companies considered to be issuers that have filed a Securities Act of 1933 registration statement that is not yet effective.

[11]SEC also has a specific category of smaller companies called "small business issuers" that may use separate reporting requirements designed to be less onerous than those applicable to larger filers. Generally, "small business issuers" have less than $25 million in revenues and public float. See 17 C.F.R. § 228.10(a)(1).

**Table 1: Summary of Selected Sarbanes-Oxley Act Provisions Affecting Public Companies and Registered Accounting Firms**

| Provision | Main requirements |
| --- | --- |
| Section 101: Public Company Accounting Oversight Board | Establishes the PCAOB to oversee the audit of public companies that are subject to the securities laws. |
| Section 201: Services Outside the Scope of Practice of Auditors | Registered accounting firms cannot provide certain nonaudit services to a public company if the firm also serves as the auditor of the financial statements for the public company. Examples of prohibited nonaudit services include bookkeeping, appraisal or valuation services, internal audit outsourcing services, and management functions. |
| Section 301: Public Company Audit Committees | Listed company audit committees are responsible for the appointment, compensation, and oversight of the registered accounting firm, including the resolution of disagreements between the registered accounting firm and company management regarding financial reporting. Audit committee members must be independent. |
| Section 302: Corporate Responsibility for Financial Reports | For each annual and quarterly report filed with SEC, the CEO and CFO must certify that they have reviewed the report and, based on their knowledge, the report does not contain untrue statements or omissions of a material fact resulting in a misleading report and that, based on their knowledge, the financial information in the report is fairly presented. |
| Section 404: Management Assessment of Internal Controls | This section consists of two parts (a and b). First, in each annual report filed with SEC, company management must state its responsibility for establishing and maintaining an adequate internal control structure and procedures for financial reporting, and assess the effectiveness of its internal control structure and procedures for financial reporting. Second, the registered accounting firm must attest to, and report on, management's assessment of the effectiveness of its internal control over financial reporting. |
| Section 407: Disclosure of Audit Committee Financial Expert | Public companies must disclose in periodic reports to SEC whether the audit committee includes at least one member who is a financial expert and, if not, the reasons why. |

Source: GAO.

Title I of the act establishes PCAOB as a private-sector nonprofit organization to oversee the audits of public companies that are subject to the securities laws. PCAOB is subject to SEC oversight. The act gives PCAOB four primary areas of responsibility:

- registration of accounting firms that audit public companies in the U.S. securities markets;

- inspections of registered accounting firms;

- establishment of auditing, quality control, and ethics standards for registered accounting firms; and

- investigation and discipline of registered accounting firms for violations of law or professional standards.

Title II of the act addresses auditor independence. It prohibits the registered external auditor of a public company from providing certain

nonaudit services to that public company audit client. Title II also specifies communication that is required between auditors and the public company's audit committee (or board of directors) and requires periodic rotation of the audit partners managing a public company's audits.

Titles III and IV of the act focus on corporate responsibility and enhanced financial disclosures. Title III addresses listed company audit committees, including responsibilities and independence, and corporate responsibilities for financial reports, including certifications by corporate officers in annual and quarterly reports, among other provisions. Title IV addresses disclosures in financial reporting and transactions involving management and principal stockholders and other provisions such as internal control over financial reporting. More specifically, section 404 of the act establishes requirements for companies to publicly report on management's responsibility for establishing and maintaining an adequate internal control structure, including controls over financial reporting and the results of management's assessment of the effectiveness of internal control over financial reporting. Section 404 also requires the firms that serve as external auditors for public companies to attest to the assessment made by the companies' management, and report on the results of their attestation and whether they agree with management's assessment of the company's internal control over financial reporting.

SEC and PCAOB have issued regulations, standards, and guidance to implement the Sarbanes-Oxley Act. For instance, both SEC regulations and PCAOB's Auditing Standard Number 2, "An Audit of Internal Control Over Financial Reporting Performed in Conjunction with an Audit of Financial Statements" state that management is required to base its assessment of the effectiveness of the company's internal control over financial reporting on a suitable, recognized control framework established by a body of experts that followed due process procedures, including the broad distribution of the framework for public comment. Both the SEC guidance and PCAOB's auditing standard cite the COSO principles as providing a suitable framework for purposes of section 404 compliance. In 1992, COSO issued its "Internal Control—Integrated Framework" (the COSO Framework) to help businesses and other entities assess and enhance their internal control. Since that time, the COSO framework has been recognized by regulatory standards setters and others as a comprehensive framework for evaluating internal control, including internal control over financial reporting. The COSO framework includes a

common definition of internal control and criteria against which companies could evaluate the effectiveness of their internal control systems.[12] The framework consists of five interrelated components: control environment, risk assessment, control activities, information and communication, and monitoring. While SEC and PCAOB do not mandate the use of any particular framework, PCAOB states that the framework used by a company should have elements that encompass the five COSO components on internal control.

Internal control generally serves as a first line of defense in safeguarding assets and preventing and detecting errors and fraud. Internal control is defined as a process, effected by an entity's board of directors, management, and other personnel, designed to provide reasonable assurance regarding the achievement of the following objectives: (1) effectiveness and efficiency of operations; (2) reliability of financial reporting; and (3) compliance with laws and regulations. Internal control over financial reporting is further defined in the SEC regulations implementing section 404. These regulations define internal control over financial reporting as providing reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements, including those policies and procedures that

- pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company;

- provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and

- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

PCAOB's Auditing Standard No. 2 reiterates this definition of internal control over financial reporting. Internal control is not a new requirement for public companies. In December 1977, as a result of corporate

---

[12]COSO, *Internal Control – Integrated Framework*, 1992 and 1994.

falsification of records and improper accounting, Congress enacted the Foreign Corrupt Practices Act (FCPA).[13] The FCPA's internal accounting control requirements were intended to prevent fraudulent financial reporting, among other things. The FCPA required companies to: (1) make and keep books, records, and accounts that in reasonable detail accurately and fairly reflect the transactions and dispositions of assets and (2) develop and maintain a system of internal accounting controls sufficient to provide reasonable assurance over the recording and executing of transactions, the preparation of financial statements in accordance with standards, and maintaining accountability for assets.

## Smaller Public Companies Have Incurred Disproportionately Higher Audit Costs in Implementing the Act, but Impact on Access to Capital Remains Unclear

Based on our analysis, costs associated with implementing the Sarbanes-Oxley Act—particularly those costs associated with the internal control provisions in section 404—were disproportionately higher (as a percentage of revenues) for smaller public companies. In complying with the act, smaller companies noted that they incurred higher audit fees and other costs, such as hiring more staff or paying for outside consultants, to comply with the act's provisions. Further, resource and expertise limitations that characterize many smaller companies as well as their general lack of familiarity or experience with formal internal control frameworks contributed to the challenges and increased costs they faced during section 404 implementation. Along with other market factors, the act may have encouraged a relatively small number of smaller public companies to go private, foregoing sources of funding that were potentially more diversified and may be less expensive for many of these companies. However, the ultimate impact of the Sarbanes-Oxley Act on smaller public companies' access to capital remains unclear because of the limited time that the act has been in effect and the large number of smaller public companies that have not yet fully implemented the act's internal control provisions.

## Smaller Public Companies Incurred Disproportionately Higher Audit Costs

Our analysis indicates that audit fees have increased considerably since the passage of the act, particularly for those smaller public companies that have fully implemented the act. Both smaller and larger public companies have identified the internal control provisions in section 404 as the most costly to implement. However, audit fees may have also increased because of the current environment surrounding public company audits including,

---

[13]Pub. L. No. 95-213, 91 Stat. 1494 (Dec. 19, 1977).

among other things, the new regulatory oversight of audit firms, new requirements related to audit documentation, and legal risk. Figure 1 contains data reported by public companies on audit fees paid to external auditors before and after the section 404 provisions became effective for accelerated filers in 2004. Based on this data, we found that (1) audit fees already were disproportionately greater as a percentage of revenues for smaller public companies in 2003 and (2) the disparity in smaller and larger public companies' audit fees as a percentage of revenues increased for those companies that implemented section 404 in 2004.[14] For example, of the companies that reported implementing section 404, public companies with market capitalization of $75 million or less paid a median $1.14 in audit fees for every $100 of revenues compared to $0.13 in audit fees for public companies with market capitalization greater than $1 billion.[15] Among public companies with market capitalization of $75 million or less (2,263 in total), the 66 companies that implemented section 404 paid a median $0.35 more per $100 in revenues compared to those that had not implemented section 404. However, using publicly reported audit fees as an indicator of the act's compliance costs has some limitations. First, the audit fees reported by companies that complied with section 404 should include fees for both the internal control audit and the financial statement audit. As a result, we could not isolate the audit fees associated with section 404. Second, the fees paid to the external auditor do not include other costs companies incurred to comply with section 404 requirements, such as testing and documenting internal controls and fees paid to external consultants. While the spread between what smallest and largest public companies that implemented section 404 paid as a percentage of revenue increased between 2003 and 2004, we also noted that, as a percentage of revenue, the relative disproportionality between the audit fees paid by smaller public companies and the largest public companies remained roughly the same between 2003 and 2004. However, unlike audit fees, these costs are not separately reported and, therefore, are difficult to analyze and measure.

---

[14]We also looked at audit fees as a percentage of market capitalization. While there is less of a disparity when this measure is used, a significant difference is still observable between smaller and larger public companies.

[15]As noted in figure 1, public companies with market capitalization between $75 million and $250 million paid roughly 4.1 times what public companies with market capitalization greater than $1 billion paid in 2003. For those public companies that reported implementing section 404, this ratio increased only slightly to 4.3.

**Figure 1: Median Audit Fees as a Percentage of 2003 and 2004 Revenues Reported by Public Companies as of Aug. 11, 2005**



| Number and percentage of companies that filed internal control reports for first year of section 404 implementation | | | Company size (market capitalization in millions) | Median audit fee as a percentage of revenues | Difference between 404 filers and nonfilers (2004) |
|---|---|---|---|---|---|
| | 66 of 2,263 | 3% | >$0-$75 | .64% / .79 / 1.14 | .35% |
| | 520 of 1,188 | 44 | >75-250 | .29 / .35 / .56 | .21 |
| | 376 of 641 | 59 | >250-500 | .18 / .26 / .40 | .14 |
| | 184 of 309 | 60 | >500-700 | .15 / .20 / .30 | .10 |
| | 183 of 283 | 65 | >700-1,000 | .13 / .12 / .25 | .12 |
| | 927 of 1,342 | 69 | >1,000 | .07 / .07 / .13 | .06 |

2003 (all companies)

Companies that did not file internal control reports (2004)[a]

Companies that filed internal control reports (2004)[b]

Source: GAO analysis of Audit Analytics data.

Note: Our analysis is based on companies' end of the fiscal year market capitalization. SEC's criteria for categories of filers (accelerated versus non-accelerated filers) are based on companies' public float as of the end of their second quarter. Due to the timing difference, some of the companies identified in this analysis as having market capitalization of less than $75 million may have been accelerated filers under SEC's criteria.

[a]In addition to non-accelerated filers that were granted extensions, this includes accelerated filers that had not filed their internal control reports to SEC for reasons such as (1) the company's fiscal year ended before November 15, 2004, which pushed their reporting date to late 2005 or early 2006, or (2) the company was delinquent in implementing section 404.

[b]Some of these companies were non-accelerated filers that decided to file internal control reports voluntarily.

## Smaller Public Companies Incurred Other Costs in Complying with the Act

According to executives of smaller public companies that we contacted, smaller companies incurred substantial costs in addition to the fees they paid to their external auditors to comply with section 404 and other provisions of the act. For example, 128 of the 158 smaller public companies that responded to our survey (81 percent of respondents) had hired a separate accounting firm or consultant to assist them in meeting section 404 requirements. Services provided included assistance with developing methodologies to comply with section 404, documenting and testing internal controls, and helping management assess the effectiveness of internal controls and remediate identified internal control weaknesses. These smaller companies reported paying fees to external consultants for the period leading up to their first section 404 report that ranged from $3,000 to more than $1.4 million. Many also reported costs related to training and hiring of new or temporary staff to implement the act's requirements. Additionally, some of the smaller companies that responded to our survey reported that their CFOs and accounting staff spent as much as 90 percent of their time for the period leading up to their first section 404 report on Sarbanes-Oxley Act compliance-related issues. Finally, many of the smaller public companies incurred missed "opportunity costs" to comply with the act that were significant. For example, nearly half (47 percent) of the companies that responded to our survey reported deferring or canceling operational improvements and more than one-third (39 percent) indicated that they deferred or cancelled information technology investments.

While most companies, including the majority of the smaller public companies that responded to our survey and that we interviewed, cited section 404 as the most difficult provision to implement, smaller public companies reported challenges in complying with other Sarbanes-Oxley Act provisions as well. Nearly 69 percent of the smaller public companies that responded to our survey said that the act's auditor independence requirements had decreased the amount of advice that they received from their external auditor on accounting- and tax-related matters. About half the companies that responded to our survey indicated that they incurred additional expenses by hiring outside counsel for assistance in complying with various requirements of the act. Examples mentioned included legal assistance with drafting charters for board committees, drafting a code of ethics, establishing whistleblower protection, and reviewing CEO and CFO certification requirements. About 13 percent of the smaller public companies reported incurring costs to appoint a financial expert to serve on the audit committee, and about 6 percent reported incurring costs to appoint other independent members to serve on the audit committee. While these types of costs were consistent with those reported for larger

companies, the impact on smaller public companies was likely greater given their more limited revenues and resources.

## Smaller Companies Have Different Characteristics Than Larger Companies, Some of Which Contributed to Higher Implementation Costs

While public companies—both large and small—have been required to establish and maintain internal accounting controls since the Foreign Corrupt Practices Act of 1977, most public companies and their external auditors generally had limited practical experience in implementing and using a structured framework for internal control over financial reporting as envisioned by the implementing regulations for section 404.[16] Our survey of smaller public companies and our discussions with external auditors indicated that the internal control framework—that is the COSO framework—referred to in SEC's regulations and PCAOB's standards implementing section 404 was not widely used by public companies, especially smaller companies, prior to the Sarbanes-Oxley Act.

Many companies documented their internal controls for the first time as part of their first year implementation efforts to comply with section 404. As a result, many companies probably underestimated the time and resources necessary to comply with section 404, partly because of their lack of experience or familiarity with the framework. These challenges were undoubtedly compounded in companies that needed to make significant improvements in their internal control systems to make up for deferred maintenance of those systems. While this was largely true for both larger and smaller companies, regulators (SEC and PCAOB), public accounting firms, and others have indicated that smaller public companies often face particular challenges in implementing effective internal control over financial reporting.[17]

Resource limitations make it more difficult for smaller public companies to achieve economies of scale, segregate duties and responsibilities, and hire qualified accounting personnel to prepare and report financial information. Smaller companies are inherently less able to take advantage of economies of scale because they face higher fixed per unit costs than

---

[16]See "Management's Report on Internal Control over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports," 68 *Federal Register* 36636 (June 18, 2003) (final rule).

[17]See COSO's exposure draft, "Guidance for Smaller Public Companies Reporting on Internal Control over Financial Reporting" (Oct. 26, 2005), for a discussion of the challenges that smaller companies face in implementing effective internal control over financial reporting.

larger companies with more resources and employees. Implementing the functions required to segregate transaction duties in a smaller company absorbs a larger percentage of the company's revenues or assets than in a larger company. About 60 percent of the smaller public companies that responded to our survey said that it was difficult to implement effective segregation of duties. Several executives told us that it was difficult to segregate duties due to limited resources. According to COSO's draft guidance for smaller public companies, smaller companies can develop and implement compensating controls when resource constraints compromise the ability to segregate duties. The American Institute of Certified Public Accountants noted that smaller public companies often do not have the internal audit functions referred to in COSO's internal framework guidance. Other executives commented that it was difficult to achieve effective internal control over financial reporting because they lacked expertise within their internal accounting staff. For example, according to an executive from a company that reported a material weakness in its section 404 report, the financial accounting standards for stock options were too complex for his staff and it was easier to have its auditor fix the mistakes and cite the company for a material weakness in internal control over financial reporting. Two other executives told us that their auditors cited their companies with material weaknesses in internal controls over financial reporting for not having appropriate internal accounting staff; to remediate this weakness, the companies had to hire additional staff.

According to COSO, however, some of the unique characteristics of smaller companies create opportunities to more efficiently achieve effective internal control over financial reporting and more efficiently evaluate internal control which can facilitate compliance with section 404. These opportunities can result from more centralized management oversight of the business, and greater exposure and transparency with the senior levels of the company that often exist in a smaller company. For instance, management's hands-on approach in smaller companies can create opportunities for less formal and less expensive communications and control procedures without decreasing their quality. To the extent that smaller companies have less complex product lines and processes, and/or centralized geographic concentrations in operations, the process of achieving and evaluating effective internal control over financial reporting could be simplified.

According to SEC, another characteristic of smaller public companies is that they tend to be much more closely held than larger public companies; insiders such as founders, directors, and executive officers hold a high

percentage of shares in the companies. Further, CFOs of smaller public companies frequently play a more integrated operational role than their larger company counterparts. According to a recommendation by participants at the September 2005 Government-Business Forum on Small Business Capital Formation hosted by SEC, these types of shareholders are classic insiders who do not need significant SEC protection.[18] According to SEC's Office of Economic Analysis, among public companies with a market capitalization of $125 million or less, insiders own on average approximately 30 percent of the company's shares. Although the "insider" shareholders owners may not have the same need for significant investor SEC protection as investors in broadly held companies, minority shareholders who are not insiders may have a need for such protection.

## Complexity, Scope, and Timing of PCAOB Guidance also Appeared to Influence Cost of Section 404 Implementation

Accounting firms and public companies also have noted that the scope, complexity, and timing of PCAOB's Auditing Standard No. 2 contributed to the challenges and higher costs in the first year of implementation of section 404. PCAOB's Auditing Standard No. 2 establishes new audit requirements and governs both the auditor's assessment of controls and its attestation to management's report. PCAOB first issued an exposure draft of the standard for comment by interested parties on October 7, 2003. The Board received 194 comment letters from a variety of interested parties, including auditors, investors, internal auditors, public companies, regulators, and others. Due to the time needed to draft the standard, evaluate the comment letters, and finalize the standard, PCAOB did not issue the final standard until March 2004—more than 8 months after SEC issued its final regulations on section 404 and part way into the initial year of implementation for accelerated filers. SEC, which under the act is responsible for approving standards issued by PCAOB, did not approve Auditing Standard No. 2 until June 17, 2004. As a result of both timing and unfamiliarity with PCAOB's Auditing Standard No. 2, auditors were not prepared to integrate the internal control over financial reporting attestation and financial audits in the first year of implementation as envisioned by Auditing Standard No. 2.

Furthermore, according to PCAOB, auditors were not always consistent in their interpretation and application of Auditing Standard No. 2. In PCAOB's report on the initial implementation of Auditing Standard No. 2,

---

[18]SEC, *24th Annual SEC Government-Business Forum on Small Business Capital Formation, Final Report* (Washington, D.C.: November 2005).

the Board found that both auditors and public companies faced enormous challenges in the first year of implementation arising from the limited time frames for implementing the new requirements; a shortage of staff with prior training and experience in designing, evaluating, and testing controls; and related strains on available resources.[19] The Board found that some audits performed under these circumstances were not as effective or efficient as they should have been. Auditing firms and a number of public companies have stated that they expect subsequent years' compliance costs for section 404 to decrease.

## Costs Associated with the Sarbanes-Oxley Act May Have Impacted the Decision of Some Smaller Public Companies to Go Private, but Other Factors also Influenced Decision to Go Private

Since the passage of the act in July 2002, the number of companies going private (that is, ceasing to report to SEC by voluntarily deregistering their common stock) increased significantly.[20] As shown in figure 2, the number of public companies that went private has increased significantly from 143 in 2001 to 245 in 2004, with the greatest increase occurring during 2003.[21] However, the 245 companies represented 2 percent of public companies as of January 31, 2004. Based on the trends observed in 2003 and 2004 and the 80 companies that went private in the first quarter of 2005, we project that the number of companies going private will have risen more than 87 percent, from the 143 in 2001 to a projected 267 through the end of 2005. Our analysis also indicated that companies going private during this entire

[19] PCAOB Release No. 2005-023 *Report on the Initial Implementation of Auditing Standard No. 2, An Audit of Internal Control over Financial Reporting Performed in Conjunction with An Audit of Financial Statements* (Washington, D.C.: Nov. 30, 2005).

[20] According to the "Fast Answers" section of SEC's website, "a company goes private when it reduces the number of its shareholders to fewer than 300 and is no longer required to file reports with SEC." See www.sec.gov/answers/gopriv.htm. Stock of these companies no longer trades on the major markets; however, companies can and do continue trading on the less regulated Pink Sheets, which have no minimum listing standards. When a company suspends its duty to report to SEC but continues to trade on the Pink Sheets, it is commonly referred to as having "gone dark," since investors no longer have access to information in the form of 8-Ks or quarterly and annual financial statements filed with SEC. Or, after deregistering, some companies elect to become "fully private" and are no longer traded or listed on any market. For purposes of this report, we consider both types of companies—"gone dark" and "fully private"—as private. As such, the terms deregistering and "going private" are used interchangeably in this report. See appendix II for more details on the definition of "going private" used in this report.

[21] We eliminated companies that deregistered common stock as a result of acquisitions and mergers that were not "going private" transactions, liquidations, reorganizations, bankruptcy filings, or re-emergences. We also eliminated duplicate filings and filings by foreign registrants. These trends are consistent with a number of studies we identified, although data collection methodologies differ across samples. See appendix II for a full discussion of GAO's analysis.

period were disproportionately small by any measure (market capitalization, revenue, or assets).

**Figure 2: Total Number of Companies Identified as Going Private, 1998-2005**



Source: GAO analysis of SEC data.

Note: Includes companies that deregistered, but continued to trade over the less-regulated Pink Sheets ("went dark") and shell companies and blank check companies. Does not include companies that filed for, or are emerging from, bankruptcy, have liquidated or are in the process of liquidating, were headquartered in a foreign country, or were acquired by or merged into another company unless the transaction was initiated by an affiliate of the company and the company became a private entity. See appendix II for a fuller discussion of our analysis.

The costs associated with public company status were most often cited as a reason for going private (see table 2). While there are many reasons for a company deregistering—including the inability to benefit from its public company status—the percentage of deregistered companies citing the direct cost associated with maintaining public company status grew from 12 percent in 1998 to 62 percent during the first quarter of 2005. These costs include the accounting, legal, and administrative costs associated with compliance with SEC's reporting requirements as well as other expenses such as those related to managing shareholder accounts. The number of companies citing indirect costs, such as the time and resources

needed to comply with securities regulations, also has increased since the passage of the Sarbanes-Oxley Act.[22] In 2002, 64 companies that went private cited cost as one of the reasons for the decision; however, that number increased to 143 and 130 companies in 2003 and 2004, respectively. Many of the companies mentioned both the direct and indirect costs associated with maintaining their public company status. Over half of the companies that cited costs mentioned the Sarbanes-Oxley Act specifically (roughly 58 percent in 2004 and 2005 and 41 percent in 2003). For smaller public companies, the costs of complying with securities laws likely required a greater portion of their revenues, and cost considerations (indirect and direct) were the leading reasons for companies exiting the public market, even prior to the enactment of the Sarbanes-Oxley Act.[23]

**Table 2: Primary Reasons Cited by Companies for Going Private, 1998-2005, by Percent**

|  | Direct costs | Indirect costs | Market/liquidity issues | Private company benefits | Critical business issues | Other | No reason |
|---|---|---|---|---|---|---|---|
| 1998 | 12.3 | 5.3 | 14.0 | 26.3 | 15.8 | 3.5 | 54.4 |
| 1999 | 33.3 | 12.2 | 33.3 | 42.2 | 8.9 | 3.3 | 37.8 |
| 2000 | 20.0 | 11.1 | 32.2 | 37.8 | 20.0 | 5.6 | 38.9 |
| 2001 | 32.2 | 13.3 | 31.5 | 23.8 | 20.3 | 3.5 | 49.0 |
| 2002 | 44.4 | 13.9 | 35.4 | 22.9 | 16.0 | 1.4 | 45.1 |
| 2003 | 57.8 | 27.5 | 38.5 | 21.3 | 19.7 | 0.8 | 31.6 |
| 2004 | 52.7 | 25.7 | 28.6 | 15.9 | 15.5 | 1.2 | 38.4 |
| 2005 Q1 | 62.2 | 28.9 | 28.9 | 8.9 | 12.2 |  | 27.8 |

Source: GAO analysis of SEC filings and relevant press releases.

Note: See appendix II for a more detailed description of the categories and limitation for this analysis. Because companies were able to cite more than one reason for going private, the percentages may add up to more than 100 for each year.

Further, the benefits of public company status historically appeared to have been disproportionately smaller for smaller companies, companies

---

[22]See appendix II for full description of each reason.

[23]Consistent with our findings, a number of research reports also find that companies most often cited cost savings from not having to comply with SEC regulations as a benefit of going private. For example, see C. Luez, et al., "Why Do Firms Go Dark? Causes and Economic Consequences of Voluntary SEC Deregistrations," Wharton School Working Paper, University of Pennsylvania, September 2004, and S. Block, "The Latest Movement to Going Private: An Empirical Study," *Journal of Applied Finance*, 14 (1): 2004.

with limited need for external funding, and companies whose public shares were traded infrequently or in low volume at low prices.[24] As a result, issues unrelated to the Sarbanes-Oxley Act, such as market and liquidity issues and the benefits of being private, are also major reasons for companies going private. From 1999 to 2004, more companies cited market and liquidity issues than the indirect costs associated with maintaining their public company status. Companies in this category cited a wide variety of issues related to the company's publicly traded stock such as a lack of analyst coverage and investor interest, poor stock market performance, limited liquidity (trading volume), and inability to use the secondary market to raise additional capital.[25] Smaller companies also have cited advantages of private status such as greater flexibility, freedom from the short-term pressures of Wall Street, belief that the markets had consistently undervalued the company, and the ability to avoid disclosures of information that might benefit their competitors (see app. II).

Companies that elect to go private reduce the number of financing options available to them and must rely on other sources of funding. In aggregate, equity is cheaper when it is supplied by public sources, net of any costs of regulatory compliance. However, in some circumstances, private equity or bank lending may be preferable alternatives to the public market. Statistics suggest bank loans are the primary source of funding for U.S. companies that rely on external financing. Some companies with insufficient market liquidity had little opportunity for follow-on stock offerings and going private would not have fundamentally altered the way they raised capital. We found that almost 25 percent of the companies that deregistered from 2003 through the end of the first quarter of 2005 were not trading on any market at all (see fig. 3). Approximately 37 percent of the companies that went private during this period were traded on the Over-the-Counter Bulletin Board (OTCBB); the general liquidity of this market is significantly less than major markets traded on the NASDAQ

---

[24]In general, public companies will differ in the costs incurred and benefits obtained as a result of their public company status because of differences in size, industry, or other factors.

[25]Well before the passage of the Sarbanes-Oxley Act, analysts noted that a decline in analyst and research coverage of smaller companies and other challenges had resulted in a large number of smaller companies with extremely low valuations and limited trading volume and investor interest. For example, research in 2003 suggested that, while 95 percent of all companies with market capitalization greater than $1 billion were covered by an analyst, 21 percent of companies with market capitalization between $25-50 million were covered by an analyst, and just 3 percent of companies below $25 million market capitalization were covered.

Stock Market, Inc. (NASDAQ) or the New York Stock Exchange (NYSE).[26] Additionally, 14 percent were traded in the Pink Sheets and, therefore, were most likely closely held and traded sporadically, if at all. Pink Sheets LLC is not registered with SEC, has no minimum listing standards, does not require quoted companies to provide detailed information to its investors, and is regarded as high-risk by many investors. As a result, trading on the Pink Sheets may produce negative reputational effects that can further reduce liquidity and the market value of the company's stock, thereby increasing the cost of equity capital.[27]

**Figure 3: Where Companies Traded Prior to Deregistration, July 2003-March 2005**



Source: GAO analysis of SEC data.

[26]The OTCBB is an electronic quotation system for equity securities not traded or listed on any of the national exchanges or NASDAQ. Generally, issuers of securities quoted on the OTCBB are smaller companies.

[27]Although National Association of Securities Dealers, Inc. (NASD) oversees the OTCBB, the OTCBB is not part of the NASDAQ Stock Market. SEC has found that fraudsters often claim that an OTCBB company is a NASDAQ-listed company to mislead investors into thinking that the company is bigger than it actually is (see Microcap Stock: A Guide for Investors: http://www.sec.gov/investor/pubs/microcapstock.htm). Pink Sheets LLC has no affiliation with NASD and its activities are not regulated by SEC.

| It Is Too Soon to Determine How Sarbanes-Oxley Affected Access to Capital for Smaller Public Companies | As previously discussed, a large number of smaller public companies have not fully implemented all the requirements of the Sarbanes-Oxley Act, notably non-accelerated filers (public companies with less than $75 million in public float). As a result, it is unlikely that the act has affected access to the capital markets for these companies. Moreover, the limited time that the act's provisions have been in force would limit any impact on access to capital, even for the companies that have implemented section 404. For instance, more than 80 percent of the smaller public companies that responded to our survey indicated that the act has had no effect or that they had no basis to judge the effect of the act on their ability to raise equity or debt financing or on their cost of capital. |

There are indications that the Sarbanes–Oxley Act at a minimum has contributed to some smaller companies rethinking the costs and benefits of public company status. For example, more than 20 percent of the smaller companies that responded to our survey also stated that the act encouraged them to consider going private or deregistering. In contrast, a number of the smaller public companies that responded to our survey cited positive effects associated with the implementation of the act, notably positive impacts on audit committee involvement (60 percent), company awareness of internal controls (64 percent), and documentation of business processes (67 percent).

## SEC and PCAOB Have Been Addressing Smaller Company Concerns Associated with the Implementation of Section 404

SEC and PCAOB have taken actions to address smaller public company concerns about implementation of Sarbanes-Oxley Act provisions, particularly section 404, by giving smaller companies more time to comply, issuing or refining guidance, increasing communication and education opportunities, and establishing an advisory committee on smaller public companies. In particular, SEC has extended deadlines for complying with section 404 requirements several times since issuing its final rule in 2003 (see table 3). In its final rulemaking on section 404 requirements, SEC stated that it was sensitive to concerns that many smaller public companies would experience difficulty in evaluating their internal control over financial reporting because these companies might not have as formal or well-structured a system of internal control over financial reporting as larger companies. In November 2004, SEC granted "smaller" accelerated filers an additional 45 days to file their reports on internal control over financial reporting out of concern that these companies were not in a position to meet the original deadline. SEC granted non-accelerated filers two additional extensions in March 2005 and September 2005, with the latter extension giving non-accelerated filers until their first fiscal year after July 2007 before having to report under section 404. SEC also

considered the particular challenges facing smaller companies when granting these extensions. Further, SEC noted that there were other small business initiatives underway that could improve the effectiveness of non-accelerated company filers' implementation of the section 404 reporting requirements.

**Table 3: SEC Extensions of Section 404 Compliance Dates**

| Action | Date | Description |
|---|---|---|
| Final rule | June 5, 2003 | *SEC's rationale* |
| | | SEC adopted an extended transition period for compliance so that companies and their auditors would have time to prepare and satisfy the new requirements. |
| | | The transition period would provide additional time for PCAOB to develop the new auditing standard for internal control over financial reporting. |
| | | *Compliance dates* |
| | | An accelerated filer (generally, a U.S. company that has public equity float of more than $75 million and has filed at least one annual report with SEC) was required to comply for its first fiscal year ending on or after June 15, 2004. |
| | | A non-accelerated filer was required to comply for its first fiscal year ending on or after April 15, 2005. |
| Final rule; extension of compliance dates | February 24, 2004 | *SEC's rationale* |
| | | The extension would minimize the cost and disruption of implementing a new disclosure requirement. |
| | | The extension would provide companies and their auditors with a sufficient amount of time to perform additional testing or remediation of controls based on the final auditing standard. |
| | | *Compliance dates* |
| | | An accelerated filer was required to comply for its first fiscal year ending on or after November 15, 2004. |
| | | A non-accelerated filer was required to comply for its first fiscal year ending on or after July 15, 2005. |
| Exemptive order | November 30, 2004 | *SEC's rationale* |
| | | SEC was concerned that many smaller accelerated filers were not in a position to meet the compliance dates. |
| | | *Compliance dates* |
| | | Subject to certain conditions, a smaller accelerated filer (generally, a U.S. company with public float of less than $700 million) was granted an additional 45 days to comply. |
| | | The compliance dates for non-accelerated filers did not change. |

# Exhibit A
# (Part 2 of 4)

| Action | Date | Description |
|---|---|---|
| Final rule; extension of compliance dates | March 2, 2005 | *SEC's rationale* |
| | | In December 2004, SEC established an advisory committee to, among other things, assess the impact of the Sarbanes-Oxley Act on smaller public companies. The extension was intended to give the committee additional time to conduct its work. |
| | | In January 2005, COSO established a task force to provide guidance on how the COSO framework could be applied to smaller companies. The extension would give smaller public companies time to consider the new COSO guidance, which COSO intended to publish during the summer of 2005. |
| | | *Compliance dates* |
| | | The compliance dates for accelerated filers did not change. |
| | | A non-accelerated filer was required to comply for its first fiscal year ending on or after July 15, 2006. |
| Final rule; extension of compliance dates | September 22, 2005 | *SEC's rationale* |
| | | The extension was warranted due to ongoing efforts by the COSO task force and SEC's advisory committee. |
| | | In August 2005, the advisory committee recommended that SEC extend section 404 compliance dates for non-accelerated filers. The extension was consistent with the advisory committee's recommendation. |
| | | *Compliance dates* |
| | | The compliance dates for accelerated filers did not change. |
| | | A non-accelerated filer is required to comply for its first fiscal year ending on or after July 15, 2007. |

Source: GAO analysis of SEC regulatory actions.

While SEC's final rule serves as basic guidance for public company implementation of section 404 requirements, PCAOB's Auditing Standard Number 2 provides the auditing standards and requirements for an audit of the financial statements and internal control over financial reporting, as part of an integrated audit. It is a comprehensive document that addresses the work required by the external auditor to audit internal control over financial reporting, the relationship of that work to the audit of the financial statements, and the auditor's attestation on management's assessment of the effectiveness of internal control over financial reporting. The standard requires technical knowledge and professional expertise to effectively implement.

While both SEC regulations and the PCAOB standard refer to COSO's internal control framework, many companies were unfamiliar with or did not use this framework, despite the fact that public companies have been required by law to have implemented a system of internal accounting controls since 1977. According to SEC, smaller public companies and their auditors had expressed concern that the COSO internal control framework was designed primarily for larger public companies and smaller companies

lacked sufficient guidance on how they could use COSO's internal control framework, resulting in disproportionate section 404 implementation costs. As a result, SEC staff asked COSO to develop additional guidance to assist smaller public companies in implementing COSO's internal control framework in a small business environment. In October 2005, COSO issued a draft of the guidance for public comment, and anticipated issuing final guidance for smaller public companies in early 2006. The draft guidance outlined 26 principles for achieving effective internal control over financial reporting and provides examples on how companies can implement them. The draft guidance states that the fundamental concepts of good internal control over financial reporting are the same whether the company is large or small. At the same time, the draft guidance points out differences in approaches used by smaller companies versus their larger counterparts to achieve effective internal control over financial reporting and discusses the unique challenges faced by smaller companies. While intended to provide additional clarity to smaller companies for implementing an internal control framework, the guidance has received mixed reviews with some questioning whether it will significantly change the disproportionate cost and other burdens for smaller public companies associated with section 404 compliance.[28]

In December 2004, SEC announced its intention to establish its Advisory Committee on Smaller Public Companies to assess the current regulatory system for smaller companies under the securities laws, including the impact of the Sarbanes-Oxley Act. In addition to granting companies more time to meet the act's requirements, SEC has been considering how its section 404 guidance and overall approach to implementation might be revised. SEC chartered the advisory committee on March 23, 2005. The committee plans to issue its final report to SEC by April 2006.

On March 3, 2006, the committee published an exposure draft of its final report for public comment that contained 32 recommendations related to securities regulation for smaller public companies.[29] Due to the number of recommendations, the advisory committee refers to its 14 highest priority recommendations as "primary recommendations." One of its primary recommendations is an overarching recommendation calling for a "scaled"

---

[28]On January 20, 2006, we submitted a comment letter to COSO on its draft guidance that contained specific recommendations on areas where we felt the guidance could be improved.

[29]See 71 *Federal Register* 11090 (Mar. 3, 2006).

approach to securities regulation, whereby smaller public companies are stratified into two groups, "microcap" and "smallcap" companies. Under this recommendation, microcap companies would consist of companies whose common stock in the aggregate make up the lowest 1 percent of U.S. equity market capitalization. The advisory committee estimates, based on data from SEC's Office of Economic Analysis, that the microcap category would include public companies whose individual market capitalization is less than $128 million, approximately 53 percent of all U.S. public companies. For the smallcap category, the advisory committee estimates that the category would include public companies whose individual market capitalization is less than $787 million and greater than $128 million, and would encompass an additional 26 percent of U.S. public companies and an additional 5 percent of U.S. market capitalization. Taken together, the categories of microcap and smallcap companies, as defined by the advisory committee draft recommendations, would include approximately 79 percent of all U.S. public companies and 6 percent of market capitalization, according to the advisory committee's analysis of SEC data. The recommendation calling for a scaled approach for securities regulation based on company size was also incorporated into the committee's preliminary recommendations related to internal control over financial reporting.

While acknowledging that some have questioned whether smaller public companies' problems with section 404 have been overstated, the advisory committee concluded that section 404, as currently structured, "represents a clear problem for smaller public companies and their investors, one for which relief is urgently needed."[30] In part, the advisory committee based its conclusion on a belief that smaller public company compliance with section 404 has resulted in disproportionate costs and less certain benefits.

The advisory committee's primary recommendations related to internal control over financial reporting address regulatory relief from section 404 for a subset of the microcap and smallcap categories described above by the inclusion of revenue criteria.[31] Specifically, the committee's preliminary recommendations are that:

---

[30]71 *Federal Register* 11090, 11098.

[31]SEC staff told us that they had not conducted a legal analysis of the preliminary recommendations to determine if SEC has authority to issue exemptions from section 404.

- Unless and until a framework for assessing internal control over financial reporting for such companies is developed that recognizes their characteristics and needs, provide exemptive relief from all of the requirements of section 404 of the Sarbanes-Oxley Act to microcap companies with less than $125 million in annual revenue and to smallcap companies with less than $10 million in annual product revenue.[32]

- Unless and until a framework for assessing internal control over financial reporting for smallcap companies is developed that recognizes the characteristics and needs of those companies, provide exemptive relief from section 404(b) of the act—the external auditor involvement in the section 404 process—to smallcap companies with less than $250 million but greater than $10 million in annual product revenues and microcap companies with between $125 million and $250 million in annual revenues.

By including the revenue criteria, the committee's recommendations regarding section 404 cover a subset of the public companies included within its microcap and smallcap definitions. The committee estimated that, after applying the revenue criteria, 4,641 "microcap" public companies (approximately 49 percent of 9,428 public companies identified in data developed for the advisory committee by SEC's Office on Economic Analysis) may potentially qualify for full exemption from section 404 and another 1,957 "smallcap" public companies (approximately 21 percent of the SEC-identified public companies)—a total of 70 percent of SEC-identified public companies—may potentially qualify for exemption from the external audit requirement of section 404(b).[33] It is likely that a number of public companies that would qualify

---

[32]The exposure draft of the Advisory Committee on Smaller Public Companies uses the term "product revenue" as one of the criteria for categorizing smallcap companies for the purposes of its recommendations. However, the exposure draft did not contain an explanation of the term "product" revenue. As a result, it was not possible to analyze how a $10 million "product" revenue filter might affect the number of smallcap companies that would become eligible for the full exemption from section 404 otherwise limited to microcap companies under the Advisory Committee's preliminary recommendations. *See* 71 *Federal Register* 11093, 11104, and 11105.

[33]The 9,428 public companies identified by SEC included U.S. companies listed on the New York and American Stock Exchanges (NYSE and AMEX, respectively), the NASDAQ Stock Market, and the OTC Bulletin Board. However, data prepared for the Advisory Committee by SEC's Office of Economic Analysis noted that the 9,428 public companies do not include approximately 3,650 U.S. public companies whose stock trades on the Pink Sheets. The omission of Pink Sheet companies results in an understatement of the number and percentage of public companies that would be affected by the committee's recommendations calling for section 404 regulatory relief for smaller public companies.

for exemptive relief under the committee's recommendations have probably already complied with both sections of 404(a) and (b), based on their status as accelerated filers.

If adopted, these recommendations would effectively establish a "tiered approach" for compliance with section 404, "unless and until" a framework for assessing internal control over financial reporting is developed for microcap and smallcap companies. Under the tiered approach, larger public companies that do not meet the committee's size criteria for exemption would continue to be required to comply with both section 404(a)—management's assessment of and reporting on internal control over financial reporting—and section 404(b)—the external auditors' attestation on management's assessment and the effectiveness of the company's internal control. "Smallcap" public companies that meet the revenue criteria would be exempt from complying with section 404(b), but the companies would still be required to comply with section 404(a). "Microcap" and some "smallcap" companies that meet the revenue criteria would be entirely exempt from both section 404(a) and (b).[34] The committee's two primary recommendations related to regulatory relief from section 404 for smaller public companies also include additional requirements that affected public companies apply additional corporate governance provisions and report publicly on known material internal control weaknesses.[35]

In its next primary recommendation on internal control over financial reporting, which is premised on the adoption of the recommendation for microcap companies described above, the committee acknowledged that SEC might conclude, as a matter of public policy, that an audit requirement is necessary for smallcap companies. In that case, the committee recommended SEC provide for the external auditor to perform an audit of only the design and implementation of internal control over

---

[34]Under the committee's recommendations, "smallcap" companies with annual product revenues below $10 million would receive the same treatment as microcap companies and be exempted from having to comply with both sections 404(a) and (b).

[35]The specified corporate governance provisions included (1) adherence to standards relating to audit committees in conformity with Rule 10A-3 under the Securities Exchange Act and (2) adoption of a code of ethics with the meaning of Item 406 of Regulation S-K applicable to all directors, officers, and employees and compliance with further obligations under Item 406(c) relating to the disclosure of the code of ethics. Additionally, the committee recommended that management continue to be required to report on any known material weaknesses, including those uncovered by the external auditor and reported to the audit committee.

financial reporting, which by its nature would be more limited than the audit of the effectiveness of internal control over financial reporting required by section 404(b) and PCAOB's Auditing Standard No. 2, and that PCAOB develop a new auditing standard for such an engagement. While this recommendation is based on the view that having the external auditor perform a review of the design and implementation of internal control over financial reporting would be more cost-effective than the work otherwise required under Auditing Standard No. 2, the committee's report does not address the extent to which costs for such a review would be lower than that required under Auditing Standard No. 2 and whether the lower costs would be worth the reduced assurances provided by reduced scope of the external auditors' work on internal control over financial reporting.

While not specifically focused on small business issues, SEC also conducted a public "roundtable" in April 2005 that gave public companies, accounting firms, and others an opportunity to provide feedback to SEC and PCAOB on what went well and what did not during the first year of section 404 implementation. GAO also participated in this roundtable. Following the roundtable, the SEC and PCAOB Chairmen noted the importance of section 404 requirements but acknowledged that initial implementation costs had been higher than expected and noted the need to improve the cost-benefit equation for small and mid-sized companies. Both agencies issued additional guidance in May 2005 based on findings from the roundtable. PCAOB's guidance clarified that auditors (1) should integrate their audits of internal control over financial reporting with their audits of the client's financial statements, (2) exercise judgment and tailor their audit plans to best meet the risks faced by their clients rather than relying on standardized "checklists," (3) use a top-down approach beginning with company-level controls and use the risk assessment required by the standard, (4) take advantage of the work of others, and (5) engage in direct and timely communication with their audit clients, among other matters. Guidance by SEC and its staff emphasized the need for reasonable assurance, risk-based assessments, better communication between the auditor and client, and clarified what should be in material weakness disclosures. Representatives of the smaller public companies that we interviewed indicated that the additional guidance that SEC and PCAOB issued was helpful. SEC and PCAOB plan to hold a second roundtable in May 2006 to discuss companies' second year experiences with implementing section 404. Both chairs of SEC and PCAOB have said that they would consider additional guidance if necessary.

On November 30, 2005, PCAOB also issued a report on the initial implementation of its auditing standard on internal control over financial reporting.[38] The report included observations by PCAOB—based in significant part, but not exclusively, on its inspections of public accounting firms, which in the 2005 cycle included a review of a limited selection of audits of internal control over financial reporting—on why the internal control audits were not as efficient or effective as the standard intended. PCAOB also amplified the previously issued guidance of May 2005, discussing how auditors could achieve more effective and efficient implementation of the standard.

Further, PCAOB has held a series of forums nationwide to educate the small business community on the PCAOB inspections process and the new auditing standards. The goal of the forums was to provide small accounting firms and smaller public companies an opportunity to discuss PCAOB-related issues with Board members and staff. PCAOB also established a Standing Advisory Group to advise PCAOB on standard-setting priorities and policy implications of existing and proposed standards. The Standing Advisory Group has considered ways to improve the application of its internal control over financial reporting requirements—Auditing Standard No. 2—with respect to audits of smaller public companies.

Finally, both SEC and PCAOB have acknowledged the challenges that smaller public companies faced and continue to face in implementing section 404 and have begun to address those challenges. SEC also has emphasized that smaller companies need to focus on the quality of their internal control over financial reporting. Data provided by SEC's Office of Economic Analysis and other studies have pointed to the increased level of restatements as an indicator that the Sarbanes-Oxley Act—section 404 in particular—has gotten companies to identify and correct weaknesses that led to financial reporting misstatements in prior fiscal years. For example, according to recent research conducted by Glass, Lewis and Co., the restatement rate for smaller public companies was more than twice the rate for the largest public companies (9 percent for companies with revenues of less than $500 million and 4 percent for companies with more

---

[38]PCAOB Release No. 2005-023, *Report on the Initial Implementation of Auditing Standard No. 2, An Audit of Internal Control over Financial Reporting Performed in Conjunction with An Audit of Financial Statements* (Washington, D.C.: Nov. 30, 2005).

than $10 billion).[37] SEC staff also noted that smaller public companies had a disproportionately higher rate of material weaknesses in internal control over financial reporting during the first year of implementing section 404. Our discussions with accounting firms confirmed that smaller public companies have had a higher rate of reported material weaknesses in internal control over financial reporting than larger public companies.

A major challenge in considering any regulatory relief from section 404 is that the overriding purpose of the Sarbanes-Oxley Act is investor protection. Investor confidence in the integrity and reliability of financial reporting is a critical element for the efficient functioning of our capital markets. The purpose of internal control over financial reporting is to provide reasonable assurance over the integrity and reliability of the financial statements and related disclosures. Market reactions to financial misstatements illustrate the importance of accurate financial reporting, regardless of a company's size.

Given the anticipated regulatory changes, particularly those relating to section 404's internal control reporting requirements, smaller public companies may be limiting or not taking definitive actions to improve internal control over financial reporting based on a perception that they could become exempt from section 404. Further, PCAOB officials noted that such a perception may have limited smaller business involvement in PCAOB forums.

---

[37] See Glass Lewis & Co., "Restatements – Traversing Shaky Ground," *Trend Alert*, June 2, 2005. The restatement rate calculation only included companies with available financial data. The lack of financial data and, therefore, exclusion of these companies, may lead to a slight bias in the restatement rate for all companies (with a slightly larger impact on the rate for smaller companies).

# Sarbanes-Oxley Act Requirements Minimally Affected Smaller Private Companies, Except for Those Seeking to Enter the Public Market

While the act does not impose new requirements on privately held companies, companies choosing to go public realistically must spend additional time and funds in order to demonstrate their ability to comply with the act, section 404 in particular, to attract investors.[38] This may have been a contributing factor in the reduction of the number of initial public offerings (IPO) issued by small companies since 2002. However, other factors—stock market performance and changes in listing standards—likely also have affected the number of IPOs. While a number of states proposed legislation with provisions similar to the Sarbanes-Oxley Act, three states[39] actually enacted legislation requiring private companies or nonprofit organizations to adopt requirements similar to certain Sarbanes-Oxley Act provisions. Finally, some privately held companies have been adopting the act's enhanced governance practices because these companies believe these practices make good business sense.

## Sarbanes-Oxley May Have Affected IPO Activity; however, Other Important Factors also Influence Entry into the Public Market and Access to Capital

Small businesses that are not public companies typically rely on a variety of sources to finance their operations, including personal savings, credit cards, and collateralized bank loans. In addition, small businesses can use private equity capital sources such as venture capital funds—private partnerships that provide private equity financing to early- and later-stage high-growth small businesses—to fund their growth. Small businesses may also issue equity shares to other types of investors to finance further growth. These shares may be sold through private placements where shares are sold directly to investors (direct placement) or through a public offering where the shares are sold through an underwriter (going public).[40] In addition, some small companies issue equities that trade on smaller markets such as the Pink Sheets.[41] For those private companies desiring to enter the public market, the IPO process has always been recognized as a time-consuming and expensive endeavor.

---

[38]Section 404's requirements only apply to annual reports required by section 13(a) or section 15(d) of the Securities Exchange Act of 1934.

[39]Illinois, Texas, and California.

[40]For more information on small business equity capital formation, see GAO, *Small Business: Efforts to Facilitate Equity Capital Formation*, GAO/GGD-00-190 (Washington, D.C.: Sept. 29, 2000).

[41]Pink Sheets LLC, a privately held company, does not require companies to be registered with SEC; therefore, many of these companies do not make available the kind of detailed financial disclosures that SEC-registered companies must provide.

However, venture capitalists and private company officials told us that, as a result of the act and other market factors, many private companies have been spending additional time, effort, and money to convince investors that they can meet the requirements of the act. For example, investors have become more cautious and demanding of the private companies in which they invest. Consequently, private companies have hired auditors and additional staff to make substantial changes to their financial system and data-reporting capabilities, document internal controls and processes, and review or change accounting procedures.

According to venture capitalists and private company officials with whom we spoke, a private company's ability to meet the Sarbanes-Oxley Act's requirements can significantly decrease some of the investment risk associated with becoming a public company. For example, both groups told us that companies with well-documented internal control and governance policies were more attractive and able to secure investor funding at a much lower cost. Moreover, they noted that underwriters expected private companies to consider and comply with the act well in advance of going public. If a private company were unable to meet the act's requirements, venture capitalists would want the company to show evidence of a plan for becoming compliant as soon as the company became public. If not, venture capitalists noted that they would be less likely to invest in such a company and look elsewhere for investment opportunities.

These new expectations may have served to increase the expenses associated with the IPO process through changes in the professional fees charged by auditors and potentially other costs as well. Specifically, we found that there has been a disproportionate increase for the smallest companies when IPO expenses were viewed as a percentage of revenue. As shown in table 4, the direct expenses (excluding underwriting fees) associated with the IPO represented a significant portion of a small company's revenues, relative to larger companies, from 1998 through the second quarter of 2005. These expenses have increased disproportionably since 2002 for small companies going public—especially for the smallest of these companies ($25 million or less in revenues). While Sarbanes-Oxley Act requirements could explain some of this increase, legal, exchange listing, printing, and other fees unrelated to the act could also account for

this increase. Moreover, other market factors also could explain the increase in IPO expenses paid to auditors.[42]

**Table 4: IPO Direct Expenses as a Percentage of Company's Revenues, by Size**

| | $25 million or less | $25 -100 million | $100-250 million | $250-500 million | $500 million- 1 billion | Greater than $1 billion | All companies |
|---|---|---|---|---|---|---|---|
| 1998 | 12.5 | 3.0 | 1.2 | 0.6 | 0.3 | 0.2 | 0.9 |
| 1999 | 17.6 | 3.7 | 1.8 | 0.7 | 1.2 | 0.1 | 0.9 |
| 2000 | 21.3 | 3.3 | 1.9 | 0.8 | 0.3 | 0.1 | 0.6 |
| 2001 | 14.3 | 3.0 | 1.1 | 0.8 | 0.5 | 0.1 | 0.2 |
| 2002 | 10.6 | 3.1 | 1.1 | 0.6 | 0.3 | 0.1 | 0.1 |
| 2003 | 17.5 | 5.0 | 1.5 | 0.7 | 0.4 | 0.5 | 0.9 |
| 2004 | 25.9 | 4.9 | 2.2 | 1.5 | 0.4 | 0.3 | 1.3 |
| 2005 (Q1-Q2) | 28.1 | 5.3 | 1.5 | 1.2 | 0.6 | 0.3 | 1.0 |
| 1998 – 2005 Q2 | 18.2 | 3.8 | 1.7 | 0.9 | 0.5 | 0.1 | 0.4 |

Source: GAO analysis of data from SEC filings.

Note: Includes only companies with financial data available. In some cases, pro forma or un-audited revenue data were used. There can be significant lag between the dates when a company initially files for an IPO and when the stock of the company is finally priced (begins trading). The number of priced IPOs only includes those companies that initially filed for an IPO after November 1, 1997. See appendix I for more details.

In addition to the requirements of the Sarbanes-Oxley Act and the general increase in direct expenses, other important factors likely have influenced IPO activity. To illustrate, the downward trend in IPOs occurred before the passage of the Sarbanes-Oxley Act in mid-2002. It is widely acknowledged that IPO filings and pricings tend to be closely associated with stock market performance. As shown in figure 4, companies generally issued (priced) significantly more IPOs when stock market valuations were higher.

---

[42]Cost increases associated with concentration in the accounting industry are one of these potential factors. Some companies and their investment banks would consider only a large accounting firm when preparing for an IPO. In 2003 and 2004, over 80 percent of the companies completing the IPO process used a large accounting firm.



**Figure 4: IPO and Stock Market Performance, 1998-2005**

Source: GAO analysis of SEC data.

Note: The number of priced IPOs only includes those companies that initially filed for an initial public offering after November 1, 1997. For more information, see appendix II.

Companies with smaller reported revenues now make up a smaller share of the IPO market. The number of IPOs by companies with revenues of $25 million or less decreased substantially, from 70 percent of all IPOs in 1999 to about 48 percent in 2004 and 31 percent during the first two quarters of 2005. Venture capitalists told us that, on average, a private company had to demonstrate at least 6 quarters of profitability before it could go public and hire an auditor to carry it through the IPO process. According to the venture capitalists, an increasing number of small and mid-sized private companies have been pursuing mergers and acquisitions as a means of growing without going through the IPO process, which now typically costs more than a merger or acquisition.

## Potential Spillover Effects of the Sarbanes-Oxley Act on Private Companies Have Been Minimal

While the Sarbanes-Oxley Act has increased corporate governance and accountability awareness throughout business and investor communities, our research and discussions with representatives of financial institutions suggest that financiers are not requiring privately held companies to meet Sarbanes-Oxley Act requirements as a condition to obtaining access to capital or other financial services. For example, the representatives said they emphasize utilization of credit scoring to make decisions and may make lending decisions using "personal guarantees" in lieu of audited financial statements and reported cash flow on financial statements for the smallest private companies. For larger private companies, the representatives stated that they require audited financial statements and cash flow information, but that their lending requirements existed well before the Sarbanes-Oxley Act and have not changed as a result of its passage. Overall, they noted that they do not believe that the act has affected the way financial institutions and lenders conduct business with private companies. They also noted that financial institutions and lenders have always enjoyed the freedom to obtain virtually any information about a potential borrower and to inquire about the company's financial reporting process and corporate governance practices. For example, if it were considered necessary to help determine a company's ability repay a debt, a lender could ask the company to provide copies of any corporate governance guidelines, business ethics policies, and key committee charters that the company had adopted.

Immediately following the act's passage, several states proposed legislation to enact corporate governance and financial reporting reforms for private companies and nonprofit organizations. Specifically, several state legislatures proposed instituting requirements similar to those in the Sarbanes-Oxley Act for privately held state-registered companies. Subsequently, three states—Illinois, Texas, and California—passed legislation that mandates corporate governance and accountability requirements that resemble certain provisions of the Sarbanes-Oxley Act. For example, Illinois passed legislation in 2004 that requires enhanced disclosures for certain nonpublic companies and additional licensing requirements for certified public accountants and, in 2003, Texas passed legislation that imposes strict ethics and disclosure requirements for outside financial advisors and service providers, public or private, that provide financial services to the state government. On September 29, 2004, California adopted the Nonprofit Integrity Act of 2004, becoming the first state in the nation to require nonprofit organizations to meet requirements that resemble some provisions of the Sarbanes-Oxley Act. For instance, nonprofits with gross revenues of $2 million or more operating within the state of California currently are required to have independent auditors

and, in the case of charitable corporations, audit committees. Further, two other states—Nevada and Washington—have passed legislation that require accounting firms to retain work papers for 7 years for audits of both public and private companies. Furthermore, based on our research and discussions with representatives from the National Association of State Boards of Accountancy, we found that some state boards made changes to regulations that focus on key governance and accountability issues similar to those mandated by the Sarbanes-Oxley Act. For example, New Jersey adopted enhanced peer review requirements and Tennessee instituted additional work paper retention requirements for certified public accountants.

Based on our discussions with private equity providers and private company officials, it appears that some privately held companies increasingly have incorporated certain elements of the Sarbanes-Oxley Act into their governance and internal control policies. Specifically, they have adopted practices such as CEO/CFO financial statement certification, appointment of independent directors, corporate codes of ethics, whistleblower procedures, and approval of nonaudit services by the board. According to these officials, some private companies have reported receiving pressure from board members, auditors, attorneys, and investors to implement certain "best practice" policies and guidelines, modeled after the requirements of the act. They noted that the act has raised the bar for what constitutes best practices in corporate governance and for expectations regarding internal control. Additionally, the officials told us that some private companies may have chosen to voluntarily adopt certain practices that resemble Sarbanes-Oxley Act provisions to satisfy external auditors and legal counsel looking for comparable assurances to reduce risk, increase confidence, and improve credibility with many stakeholders. Based on our research, we found that many of the aspects of corporate governance reform currently being adopted by private companies were those relatively inexpensive to implement, but information on the specific costs associated with adopting these provisions was not available.

## Smaller Companies Appear to Have Been Able to Obtain Needed Auditor Services, Although the Overall Audit Market Remained Highly Concentrated

Since the enactment of the Sarbanes-Oxley Act, smaller public companies have been able to obtain needed auditor services; however, auditor changes suggest smaller companies have moved from using the services of a large accounting firm to using services of mid-sized and small firms. Some of this activity has resulted from the resignation of large accounting firms from providing audit services to small public companies. Reasons for these changes range from audit cost and service concerns cited by companies to client profitability and risk concerns cited by accounting firms, including capacity constraints and assessments of client risk. In recent years, public accounting firms have been categorized into three categories—the largest firms, "second tier" firms (mid-sized), and regional and local firms (small).[43] From 2002 to 2004, 1,006 companies reported auditor changes involving a departure from a large accounting firm. Over two-thirds of these companies reported switching to a mid-sized or small accounting firm. Most of the companies that switched to a mid-sized or small accounting firm were smaller public companies with market capitalization or revenues of $250 million or less. Overall, mid-sized and small accounting firms conducted 30 percent of the total number of public company audits in 2004—up from 22 percent in 2002. Despite client gains for mid-sized and small firms, the overall market for audit services remained highly concentrated, with mid-sized and smaller firms auditing just 2 percent of total U.S. publicly traded company revenue.[44] In the long run, mid-sized and small accounting firms could increase opportunities to enhance their recognition and acceptance among capital market participants as a result of the gains in public companies audited and operating under PCAOB's registration and inspection process.

---

[43]In addition to the four largest and four mid-sized firms, there were roughly 800 small and mid-sized accounting firms that issued audit opinions for U.S. companies in 2002 and approximately 600 that issued audit opinions in 2004.

[44]The term "revenue" is used interchangeably with the term "sales" used in the *Who Audits America* database. See appendix I for more detail.

| | |
|---|---|
| **Smaller Companies Found It Harder to Keep or Obtain the Services of a Large Accounting Firm, but Overall Access to Audit Services Appeared Unaffected** | Our limited review did not find evidence to suggest that the Sarbanes-Oxley Act has made it more difficult for smaller public companies to obtain needed audit services, but did suggest that smaller public companies may have found it harder to retain a large accounting firm as a result of increased demand for auditing services, largely due to the implementation of section 404 and other requirements of the act, and the capacity limitations of the large accounting firms. Of the 2,819 auditor changes from 2003 through 2004 that we identified using Audit Analytics data, 79 percent were made by companies that represented the smallest of publicly listed companies (companies with $75 million or less in market capitalization or revenue).[45] Although fewer mid-sized and small accounting firms conducted public company audits in 2004 because some firms did not register with PCAOB or merged with other firms, the market appears to have absorbed these changes effectively, with other firms taking on these clients. |
| **Recent Auditor Changes Resulted in Small Accounting Firms Gaining Clients** | Our analysis showed that 1,006 of the 2,819 changes, or 36 percent, involved departures from a large accounting firm. Of the 1,006 auditor changes, less than one-third (311 or 31 percent) resulted in the public company moving to another large accounting firm, and slightly under two-thirds (651 or 65 percent) retained a mid-sized or small accounting firm (see table 5).[46] |

[45]We analyzed auditor change data using the Audit Analytics database, excluding foreign filers, funds and trusts without market data, and benefit plans. We grouped public companies into five size categories based on their respective market capitalization: (1) up to $75 million, (2) greater than $75 million to $250 million, (3) greater than $250 million to $700 million, (4) greater than $700 million to $1 billion, and (5) greater than $1 billion. If market capitalization data were not available, revenue data were used as relevant proxies for company size. Companies without market capitalization or revenue data were not included in the analysis (643 companies).

[46]Forty-four companies (less than 1 percent) reported not finding a new auditor as of December 2004. Some of these companies may have deregistered, gone bankrupt, merged with or been acquired by another company, or otherwise ceased business activity.

**Table 5: Companies Changing Accounting Firms, 2003-2004**

| | Went to large accounting firm | Went to mid-sized accounting firm | Went to small accounting firm | No auditor reported as of December 2004 | Total departures |
|---|---|---|---|---|---|
| **Exiting large accounting firm** | 311 | 298 | 353 | 44 | 1,006 |
| Average market capitalization | $1,829,869,346 | $172,173,323 | $52,108,359 | - | |
| Average revenue | $1,291,589,676 | $138,816,527 | $50,765,823 | - | |
| **Exiting mid-sized accounting firm** | 18 | 30 | 147 | 21 | 216 |
| Average market capitalization | $1,285,735,282 | $59,822,406 | $38,111,445 | - | |
| Average revenue | $1,044,690,777 | $53,694,660 | $22,789,900 | - | |
| **Exiting small accounting firm** | 41 | 49 | 1,446 | 61 | 1,597 |
| Average market capitalization | $213,223,882 | $78,923,135 | $18,441,598 | - | |
| Average revenue | $92,138,114 | $28,518,987 | $5,039,327 | - | |
| Total gains[a] | 59 | 347 | 500 | 126 | |
| Total losses[b] | (695) | (186) | (151) | | |
| **Net gain (loss)** | (636) | 161 | 349 | 126 | |

Source: GAO analysis of Audit Analytics data.

Note: Average market capitalization and revenue figures are based only on those companies with available relevant financial data.

[a]Total gains represent the sum of companies that went to that particular category of accounting firm (large, mid-sized, or small) from another category (cells highlighted in grey for the particular column). For example, large accounting firms gained 59 companies from 2003 to 2004 (18 from mid-sized firms and 41 from small accounting firms).

[b]Total losses represent the sum of companies that left that particular category of accounting firm (large, mid-sized, or small) for another category of firm plus those for which there was no auditor reported as of December 2004 (cells highlighted in grey for that particular row). For example, large accounting firms lost 695 companies from 2003 to 2004 (298 went to mid-sized firms, 353 went to small-sized firms, and 44 that had no auditor reported as of December 2004).

Over the same period, mid-sized and small accounting firms lost fewer public company clients to the large accounting firms; as a result, mid-sized and small firms experienced a net increase of 510 public company clients—a net gain of 161 and 349 companies for mid-sized and smaller firms, respectively. Because we had no data on companies' selection processes, we could not determine whether mid-sized and small firms competed for these clients with other large accounting firms or if they received these clients by default with no competition from the other large accounting firms. According to *Who Audits America*, small and mid-sized

accounting firms increased their percentage public company audit from 22 percent in 2002 to 27 percent in 2003, and by 2004 they audited 30 percent of all U.S. publicly traded companies.[47] Small and mid-sized firms audited over 38 percent of all public clients in 2004 according to Audit Analytics data, which include, in addition to publicly traded companies, other SEC reporting companies including foreign registered entities, registered funds and trusts, and registered public companies that are not publicly traded.

The majority of the clients the mid-sized and small firms gained were smaller companies with market capitalization or revenues averaging $200 million or less. As shown in table 5 and figure 5, the companies leaving a large accounting firm and retaining another large firm tended to be very large—with average market capitalization (or revenue) of more than $1 billion. However, the average market capitalization (or revenue) of companies leaving a large accounting firm and retaining a mid-sized accounting firm was less than $175 million and the capitalization (or revenue) of companies retaining a small firm was significantly smaller— less than $53 million. Similarly, companies leaving smaller and mid-sized firms that retained a large accounting firm tended to be much larger than those that retained another mid-sized or small firm.

---

[47]These figures do not include foreign companies or companies that did not trade on NYSE, NASDAQ, AMEX, OTCBB, or the Pink Sheets. See appendix I for data reliability.

**Figure 5: Average Size of Companies Changing Auditors, 2003-2004, by Type of Accounting Firm Change**



Source: GAO analysis of Audit Analytics data.

Note: This figure includes only those companies with available relevant financial data.

## Reasons for Auditor Changes May Have Included Costs Related to the Act and Risk Assessments

While the reasons for the movement of smaller public companies to mid-sized and small accounting firms may be somewhat speculative at this point, the Sarbanes-Oxley Act may have contributed to this shift. Some smaller companies may have preferred a large firm because of the perception that large accounting firms—by virtue of their reputation or perceived skills—can help attract investors and improve access to capital.[48] Workload demands placed on the large firms by larger public companies, which represent the overwhelming majority of their clients, have increased with section 404 and other Sarbanes-Oxley Act implementing regulations. The resulting increases in workload and audit

---

[48]In a previous report, *Public Accounting Firms: Mandated Study on Consolidation and Competition*, GAO-03-864 (Washington, D.C.: July 2003), we noted that public companies wishing to demonstrate their worthiness for debt and equity investments might continue to employ a large accounting firm to increase their credibility among potential lenders and investors and that some companies and boards of directors have been reluctant to consider small firms.

fees appear to have constrained smaller companies' access to large accounting firms—either because smaller companies were unable to afford a large accounting firm or because large accounting firms resigned from smaller clients. According to Audit Analytics, the largest accounting firms resigned from three times as many clients in 2004 as in 2001, and three-quarters of those were companies with revenues of less than $100 million.

Beyond resignations by large accounting firms in response to increased demand for audit services, the act may have caused large accounting firms to reevaluate the risk in their aggregate client portfolios by increasing the responsibilities and liability of auditors, leading them to shed smaller public companies. According to the large accounting firms with whom we spoke, they did not have enough resources to retain all of their clients after the Sarbanes-Oxley Act and cited risk as a significant factor in choosing which clients to keep.[49] Moreover, the largest audit firms could be applying stricter profitability guidelines in selecting their clients, eliminating those engagements where profit margins are smaller.

While former clients of large accounting firms may represent opportunities for mid-sized and small accounting firms, they also represent some risks. For example, we found that a disproportionate percentage of the companies that left a large accounting firm for a small firm had accounting or risk issues. Overall, about 69 percent of the companies that left a large accounting firm switched to a mid-sized or small accounting firm. However, 92 percent of the companies that received a going concern qualification went to a mid-sized or small accounting firm.[50] In addition, about 81 percent of the companies with at least one accounting issue (such as restatement, reportable condition, scope limitation, management

---

[49]Many of the public accounting firms with whom we talked had a significant number of accelerated filers for 2004 and noted that the additional work challenged the firm's capacity. While the firms expanded and supplemented their capacity to handle the additional work, these firms also acknowledged that they took the workload and capacity issues into account in conducting their ongoing client acceptance and retention reviews. Many of the firms—particularly the large accounting firms—acknowledged that since 2002, their review and retention processes have resulted in a reduction of their public company audit client base to better match workload capacity.

[50]Ninety-four percent of the companies changing auditors that had going concern opinions had market capitalization of $75 million or less (or, if no market capitalization data were available, $75 million or less in revenues). A going concern opinion is issued by an auditor if the auditor has doubts about the company's ability to generate or raise enough resources to stay operational (to continue as a "going concern").

found to be unreliable, audit opinion concerns, illegal acts, or SEC investigation) went from a large to a mid-sized or small accounting firm. In contrast, 63 percent of the companies with no going concern qualification or any additional "risk" issues went to mid-sized and small firms. We also found that, if a large accounting firm resigned as the auditor of record, the company was more likely to switch to a mid-sized or small accounting firm. Roughly 85 percent of the smallest companies that were dropped by one of the largest accounting firms retained a smaller audit firm.

## Mid-sized and Small Accounting Firms Continued to Operate in a Highly Concentrated Market

Although mid-sized and small accounting firms gained clients in 2003 and 2004, they continued to operate in a market dominated by large accounting firms. The market for audit services in 2004 changed little from the market we described in our 2003 report.[51] For example, mid-sized and small accounting firms increased their share of all public company revenues by 1 percentage point in 2002–2004. The market for audit services remained highly concentrated—a tight oligopoly, where in 2004 the four largest firms audited 98 percent of the market and the remaining firms audited 2 percent—and the potential market power was significant.[52]

The market for smaller public company audits was much more competitive than the overall and large public company market. As shown in figure 6, while the market for audit services for large company clients remained dominated by large accounting firms, the market for the smallest public company clients appeared to indicate healthy competition. Mid-sized and small firms audited 59 percent of all public company clients with revenues of $25 million or less, 45 percent of all clients with revenues greater than $25 million up to $50 million, and 32 percent of all clients with revenues greater than $50 million up to $100 million. When these revenue categories were combined, the large accounting firms combined with the mid-sized firms audited 75 percent of companies with revenues of $100

[51]See GAO-03-864.

[52]These concentration statistics suggest a Hirschman-Herfindahl Index (HHI) of 2,505, which is equivalent to the index calculated for 2002 (2,566). The HHI is calculated by summing the squares of the individual market shares of all the participants. An HHI above 1,800 indicates a highly concentrated market in which firms have the potential for significant market power. While concentration ratios and the HHI are good indicators of market structure, these measures only indicate the potential for oligopolistic collusion or the exercise of market power and can overstate the significance of a tight oligopoly on competition. See GAO-03-864 for further discussion of the HHI.

million or less, while the small firms audited the remaining 25 percent.[63] As noted in our 2003 report, as companies expanded operations around the world, the large audit firms globally expanded through mergers in order to provide service to their international clients.[64]

**Figure 6: Percentage of Clients Audited by Revenue Category, 4 Largest Accounting Firms versus Mid-sized and Small Accounting Firms, 2004**



Source: *Who Audits America 2004.*

Note: Does not include companies that did not trade on the major exchanges or over-the-counter markets, foreign companies, or bankrupt companies. Figures omit certain small accounting firms that held a very small share of the market.

More recently, mid-sized and small accounting firms gained more large clients. In 2004, these accounting firms audited approximately 3 percent of

---

[63]As such, the four-firm and eight-firm (large accounting firms plus second-tier firms) concentration ratios are 0.55 and 0.75 respectively for this particular section of the market. These ratios are consistent with an HHI below 1,000. As a general rule, an HHI below 1,000 indicates a market predisposed to perform competitively, while an HHI above 1,800 indicates a highly concentrated market. See GAO-03-864.

[64]See GAO-03-864.

the companies with revenues greater than $500 million, up from 2 percent in 2002. However, as shown in table 5, the average revenue of the clients lost to the largest accounting firms was $1.1 billion while the average revenue of the client gained from the largest accounting firms was $138.8 million. Overall, mid-sized and small accounting firms conducted 30 percent of the total number of public company audits in 2004—up from 22 percent in 2002. While these companies make up just 2 percent of total public company revenue, they are a large segment of the market of publicly traded clients.[65]

## Sarbanes-Oxley Act May Impact the Continuing Competitive Challenges Faced by Mid-Sized and Small Accounting Firms

According to some experts, competitive challenges related to the ability of mid-sized and small firms to compete for public companies such as capacity, expertise, recognition, and litigation risks may have been strengthened since the passage of the Sarbanes-Oxley Act.[66] For example, in a recent American Assembly report, a number of industry professionals indicated that large accounting firms' facility with new requirements was seen as increasingly important as audits have become more complex and time-consuming and the financial consequences of noncompliance more severe.

Additionally, even though some experts believe that large accounting firms' regulatory competence has been overstated, a perception may exist among many large and some small U.S. companies as well as other market influencers and stakeholders that only the large accounting firms can

[65]Based on a large sample analyzed from Audit Analytics, when we broadened the market to include SEC reporting companies that do not publicly trade, funds and trusts, the 600 small and mid-sized firms we identified audited over 4,400 domestic public clients.

[66]As we noted in our 2003 report, mid-sized and small accounting firms face challenges in effectively competing for large national and multinational public company audits. The challenges include lack of staff resources, experience, technical expertise, and global reach necessary to audit large multinationals; establishing recognition and credibility with larger companies and market participants to counter the perception that only large firms can provide the required auditing services; increased litigation risk and insurance costs associated with auditing public companies; and difficulty in raising capital to expand infrastructure to compete with large accounting firms. Also, at a recent conference on auditor concentration organized by The American Assembly, experts generally agreed that significant challenges restrict the ability of mid-sized accounting firms to increase their market share and present a major alternative to the large accounting firms. "The Future of the Accounting Profession: Auditor Concentration," which was held on May 23, 2005, was a follow-on to the Assembly's November 2003 meeting where 57 business leaders, academics, journalists, and regulatory officials discussed the challenges the accounting profession faced. For more information, see http://www.americanassembly.org/index.php.

provide the required auditing services necessary to meet the requirements of the act. For example, the venture capital industry representatives that we spoke with stated that this perception has been especially prevalent for companies issuing IPOs. As shown in figure 7, companies large and small tended to use large accounting firms for IPOs.



**Figure 7: Total Number of IPOs, by Size of Accounting Firm, 1999–2004**



Source: GAO analysis of SEC data.

Over the long run, the Sarbanes-Oxley Act could ease some of these challenges. For example, mid-sized and small accounting firms have continued to confront the perceptions of capital market participants that only large firms have the skills and resources necessary to perform public company audits. These perceptions have constrained firms from obtaining or retaining many clients that the firms believed were within their capacity to audit. However, the increase in public company audits performed by mid-sized and small accounting firms has given these firms additional opportunities to enhance their recognition and acceptance among more public companies and capital market participants. Also, as smaller public companies begin complying with section 404 in 2007, small accounting firms will gain additional experience with the implementation of the act. Taking on additional clients will provide an important growth opportunity. Effectively matching company size and needs with accounting firm size

and capabilities could allow smaller public companies to find the best combination of quality, service value, and reach.

In addition, the PCAOB registration and inspection process and the establishment of attestation, quality control, and ethics standards to be used by registered public accounting firms in the preparation and issuance of audit reports could provide increased assurance of the quality of small accounting firm audits. Similarly, as more information will become available through PCAOB's ongoing inspection program, small accounting firms could establish a "track record," allowing for additional opportunities for recognition and acceptance among analysts, investment bankers, investors, and public companies.

## Conclusions

The Sarbanes-Oxley Act was a watershed event—strengthening disclosure and internal control requirements for financial reporting, establishing new auditor independence standards, and introducing new corporate governance requirements. Regulators, public companies, audit firms, and investors generally have acknowledged that many of the act's provisions have had a positive and significant impact on investor protection and confidence. Yet, for smaller public companies and companies of all sizes that have complied with the various provisions of the Sarbanes-Oxley Act, compliance costs have been higher than anticipated—with the higher cost being associated with the internal control over financial reporting requirements of section 404.

There is widespread agreement that several factors contributed to the costs of implementing section 404 for both larger and smaller public companies. Few public companies or their audit firms had prior direct experience with evaluating and reporting on the effectiveness of internal control over financial reporting or with implementing the COSO internal control framework, particularly in a small business environment. This was despite previous requirements, dating back to 1977, that public companies implement a system of internal accounting controls. The first year costs were exacerbated because many companies were documenting their internal control over financial reporting for the first time and remediating poor or nonexistent internal controls as part of their first-year implementation efforts to comply with section 404, both of which could be viewed as a positive impact of the act. In addition, the nature, timing, and extent of available guidance on establishing and assessing internal control over financial reporting made it more difficult for most public companies and audit firms to efficiently and effectively implement the requirements of section 404. As a result, management's implementation and assessment

# Exhibit A
# (Part 3 of 4)

efforts were largely driven by PCAOB's Auditing Standard No. 2, as guidance at a similar level of detail was not available for management's implementation and assessment process. These factors, in conjunction with the changed environment and expectations resulting from the act, contributed to a considerable amount of "learning curve" activities and inefficiencies during the initial year of implementation. Auditing firms and a number of public companies have stated that they expect subsequent years' compliance costs for section 404 to decrease. This is not unexpected given the significance and nature of the changes and a preexisting environment that did not place enough emphasis on effective internal control over financial reporting.

Consistent with the findings of the Small Business Administration on the impact of regulations generally on smaller public companies, it is reasonable to conclude that smaller public companies face disproportionately greater costs, as a percentage of revenues, than larger companies in meeting the requirements of the act. While facing the same basic requirements, smaller public companies generally have more limited resources, fewer shareholders, and generally less complex structures and operations. Again, this is to be expected given the economies of scale and differing levels of corporate infrastructure and resources. However, some of the unique characteristics of smaller companies can create opportunities to efficiently achieve effective internal control over financial reporting. Those characteristics include more centralized management oversight of the business, more involvement of top management in the business operations, simpler operations, and limited geographic locations.

The ultimate impact of the Sarbanes-Oxley Act on the majority of smaller public companies remains unclear because the time frame to comply with section 404 of the act was extended until fiscal years ending after July 2007 for the approximately 5,971 public companies with less than $75 million in public float. Recognizing the challenges that smaller public companies have faced in meeting the requirements of the act, particularly section 404, SEC formed an advisory committee on smaller public companies to analyze the impact of the act and other securities laws on smaller public companies. The advisory committee has issued an exposure draft of its final reporting stating that certain smaller public companies need relief from section 404, "unless and until" a framework for assessing internal control over financial reporting is developed that recognizes the characteristics and needs of smaller public companies. The exposure draft contains specific recommendations that would essentially result in a "tiered approach" for compliance with section 404 requirements, where larger public companies would continue to be required to fully comply

with all requirements of section 404, while smaller public companies consisting of "microcap" and "smallcap" companies would be granted differing levels of exemptions until an adequate framework was in place.

We have two specific concerns regarding the advisory committee's recommendations. First, the recommendations propose relief "unless and until a framework for assessing internal control over financial reporting" for smaller companies is developed that "recognizes the characteristics and needs of those companies." While the recommendations hinge on the need for a framework that recognizes smaller public company characteristics and needs of smaller public companies, they do not address what needs to be done to establish such a framework or how such a framework should take into consideration the characteristics and needs of smaller public companies. Many, if not most, of the significant problems and challenges encountered by large and small companies in implementing section 404 related to problems with implementation, rather than the internal control framework itself. In addition to having a useful internal control framework, appropriate implementation of a framework by public companies must be based on risk, facts and circumstances, and professional judgment. We believe that sufficient guidance covering both the internal control framework and the means by which it can be effectively implemented is essential to enable large and small public companies to implement a framework which would enable effective and efficient assessment and reporting on the effectiveness of internal control over financial reporting.

Our second concern relates to the ambiguity surrounding the conditional nature of the "unless and until" provisions of the recommendations and its potential impact on a large number of companies that would likely qualify for the proposed exemptions. If resolution of small public company concerns about a framework and its implementation results in an extended period of exemption, then large numbers of public companies would potentially be exempted for additional periods from complying with this important investor protection component of the act. The categories of microcap and smallcap companies, as defined by the advisory committee recommendations, cover 79 percent of U.S. public companies and 6 percent of the U.S. equity market capitalization when combined. Although the categories of microcap and smallcap have been further refined by the advisory committee through the addition of a revenue size filter for purposes of its primary recommendations on section 404, it appears that a large number of companies, up to 70 percent of all U.S. public companies, would be potentially exempted. Specifically, the committee estimates that, after applying the revenue criteria, 4,641 "micro

cap" public companies (approximately 49 percent of 9,428 public companies identified in data developed for the advisory committee by SEC's Office on Economic Analysis) may potentially qualify for the proposed full exemption from section 404 and another 1,957 "smallcap" public companies (approximately 21 percent of the identified public companies) may potentially qualify for the proposed exemption from the external audit requirement of section 404(b). These estimates do not include those public companies trading on the Pink Sheets that would be covered by the Advisory Committee's preliminary recommendations. In addition, it is likely that a number of public companies qualifying for exemptive relief under the committee's recommendations are likely to have already complied with both sections of 404(a) and (b) of the act under the current category of accelerated filers.

Also, regarding the committee's third primary internal control recommendation calling for a review of the design and implementation of internal control if SEC concludes, as a matter of public policy, that the external auditor's involvement is required, it is not clear from the committee's report the extent to which, particularly in the present environment, such a review would result in lower costs than those being associated with the implementation of PCAOB's Auditing Standard No. 2. Any lower costs that might result must be considered in light of the reduced independent assurances on the effectiveness of internal control over financial reporting that would result and the potential for confusion on the part of users of the public company's financial statements and audit reports.

Until sufficient guidance is available for smaller public companies, some interim regulatory relief on a limited scale may be appropriate. However, given the number of public companies that would potentially qualify for relief under the recommendations being considered, we believe that a significant reduction in scope of the proposed relief needs to occur to preserve the overriding investor protection purpose of the Sarbanes-Oxley Act. The purpose of internal control over financial reporting is to provide reasonable assurance over the integrity and reliability of the financial statements and related disclosures. Public and investor confidence in the fairness of financial reporting is critical to the effective functioning of our capital markets. Market reactions to financial statement misstatements illustrate the importance of accurate financial reporting, regardless of a company's size. SEC staff and others have pointed to the increased level of restatements as an indicator that the Sarbanes-Oxley Act—section 404 in particular—has prompted companies to identify and correct weaknesses that led to financial reporting misstatements in prior fiscal years.

Indicators also show that in some respects, smaller companies have a higher risk profile for investors. For instance, smaller public companies have higher rates of restatements generally and showed a disproportionately higher rate of reported material weakness in internal control over financial reporting during the initial year of section 404 implementation. Over time, having the effective internal control over financial reporting envisioned by the act can reduce some aspects of the higher risk profile of smaller public companies.

When SEC receives and considers the final recommendations of SEC's small business advisory committee, it is essential that SEC consider key principles, under the umbrella principle of investor protection, when deciding whether or to what extent to provide smaller public companies with alternatives to full implementation of the section 404 requirements. These principles include (1) assuring that smaller public companies have sufficient useful guidance to implement, assess, and report on internal controls over financial reporting to meet the requirements of section 404, (2) if additional relief is considered appropriate, conducting further analysis of small public company characteristics to significantly reduce the scope of companies that would qualify for any type of additional relief while working to ensure that the Sarbanes-Oxley Act's goal of investor protection is being met, and (3) acting expeditiously such that smaller public companies are encouraged to continue improving their internal control over financial reporting.

First, it is critical that SEC carefully assess the available guidance, including that being developed by COSO, to determine whether it is sufficient or whether additional action needs to be taken, such as issuing supplemental or clarifying guidance to smaller public companies to help them meet the requirements of section 404. Our analysis of available research and discussions with smaller public companies and audit firms indicate that public companies and external auditors have had limited practical experience with implementing internal control frameworks in a smaller company environment and that additional guidance is needed. Moreover, it is critical that SEC coordinate its actions with PCAOB, which is responsible for establishing standards for the external auditor's internal control attestations, to ensure that external auditors are using standards and guidance on section 404 compliance that are consistent with guidance for public companies and that they are doing so in an effective and efficient manner. As SEC considers the need for additional implementation guidance, it will be important that the guidance and related PCAOB audit standards be consistent and compatible. Also, it will be important for the PCAOB to continue to identify ways in which auditors

can achieve more economical, effective, and efficient implementation of audit-related standards and guidance.

Second, as SEC considers whether and to what extent it might be appropriate to provide additional interim relief to some categories of smaller public companies, it will be important to balance the needs of the investing public with the concerns expressed by small businesses. In doing so, it is important to determine whether there are unique characteristics, in addition to size, that could influence the extent that some regulatory accommodation might be appropriate in order to arrive at a targeted and limited category of companies being provided with potential exemptions. For example, if these companies were closely held or have a higher rate of insider investors, regulatory relief may raise less of an investor protection concern. These investors may be more knowledgeable about company operations and receive fewer benefits from section 404's enhanced disclosures. For companies that are widely traded, regulatory relief would raise more concerns about investor protection and relief would appear less appropriate. Furthermore, although the "insider" shareholder owners may not have the same need for investor protection as investors in broadly held companies, minority shareholders who are not insiders may need such protection. For other purposes, certain provisions of SEC's securities regulations and the Employee Retirement Income Security Act of 1974 regulations condition different types of relief, in part, on the nature and/or the financial sophistication of the investor, and SEC may wish to consider whether such approaches would help serve to balance the concerns of small businesses against the needs of investors. The criteria and characteristics used should be linked to the investor protection goals of the Sarbanes-Oxley Act and be geared toward limiting the numbers of companies that would be eligible based on those investor protection goals. In addition, the advisory committee's preliminary recommendations to exempt "smaller public companies" from the external audit requirements of section 404 would include a number of companies that have already complied with section 404, and SEC needs to carefully consider whether it is appropriate to provide regulatory relief on this basis.

Finally, we believe that SEC has an obligation to resolve section 404 implementation requirements for smaller public companies in a way that creates incentives for smaller public companies to take actions to improve their internal control over financial reporting. Rather than delaying implementation, which would likely result in smaller public companies anticipating future extensions or relief, SEC's resolution of these issues would provide needed clarity and certainty over the scope and timing of smaller companies' compliance with section 404 and provide incentives to

smaller public companies to begin the process of implementing section 404.

## Recommendations

In light of concerns raised by the SEC Advisory Committee on Smaller Public Companies and others regarding the ability of smaller public companies to effectively implement section 404, we recommend that the Chairman of SEC

- assess the guidance available, with an emphasis on implementation guidance for management's assessment of internal control over financial reporting, to determine whether the current guidance is sufficient and whether additional action is needed, such as issuing supplemental or clarifying guidance to help smaller public companies meet the requirements of section 404, and

- coordinate with PCAOB to (1) help ensure that section 404-related audit standards and guidance are consistent with any additional guidance applicable to management's assessment of internal control and (2) identify additional ways in which auditors' can achieve more economical, effective, and efficient implementation of the standards and guidance related to internal control over financial reporting.

If, in evaluating the recommendations of its advisory committee, SEC determines that additional relief is appropriate beyond the current July 2007 compliance date for non-accelerated filers, we recommend that the Chairman of SEC analyze and consider, in addition to size, the unique characteristics of smaller public companies and the knowledge base, educational background, and sophistication of their investors in determining categories of companies for which additional relief may be appropriate to ensure that the objectives of investor protection are adequately met and any relief is targeted and limited.

## Agency Comments and Our Evaluation

We provided a draft of this report to the Chairman, SEC, and the Acting Chairman, PCAOB, for their review and comment. We received written comments from SEC and PCAOB that are summarized below and reprinted in appendixes III and IV. SEC agreed that the Sarbanes-Oxley Act has had a positive impact on investor protection and confidence, and that smaller public companies face particular challenges in implementing certain provisions of the act, notably section 404. SEC stated that our recommendations should provide a useful framework for consideration of its advisory committee's final recommendations. PCAOB stated that it is

committed to working with SEC on our recommendations and that it is essential to maintain the overriding purpose of the Sarbanes-Oxley Act of investor protection while seeking to make its implementation as efficient and effective as possible. Both SEC and PCAOB provided technical comments that were incorporated into the report as appropriate.

As we agreed with your office, unless you publicly announce the contents of this report earlier, we plan no further distribution of it until 30 days from the date of this letter. At that time, we will send copies of this report to interested congressional committees and subcommittees; the Chairman, SEC; the Acting Chairman, PCAOB; and the Administrator, SBA. We will make copies available to others upon request. In addition, the report will be available at no charge on the GAO Web site at http://www.gao.gov.

If you have any questions concerning this report, please contact William B. Shear at (202) 512-8678 or shearw@gao.gov, or Jeanette M. Franzel at (202) 512-9471 or franzelj@gao.gov. Contact points for our Office of Congressional Relations and Public Affairs may be found on the last page of this report. See appendix V for a list of other staff who contributed to the report.

William B. Shear
Director, Financial Markets and
    Community Investment

Jeanette M. Franzel
Director, Financial Management
    and Assurance

# Appendix I: Objectives, Scope, and Methodology

Our reporting objectives were to (1) analyze the impact of the Sarbanes-Oxley Act on smaller public companies in terms of costs of compliance and access to capital; (2) describe the Securities and Exchange Commission's (SEC) and Public Company Accounting Oversight Board's (PCAOB) efforts related to the implementation of the act and their responses to concerns raised by smaller public companies and the accounting firms that audit them; (3) analyze the impact of the act on smaller privately held companies, including costs, ability to access public markets, and the extent to which states and capital markets have imposed similar requirements on smaller privately held companies; and (4) analyze smaller companies' access to auditing services and the extent to which the share of public companies audited by small accounting firms has changed since the enactment of the Sarbanes-Oxley Act.

In arriving at our report objectives, we incorporated nine specific questions contained in your request letter. See table 6 for a cross-sectional comparison of the nine specific questions contained in your letter, the four report objectives, and our findings.

**Table 6: Cross-sectional Comparison of Request Letter Questions, Our Report Objectives, and Selected Findings**

| Request letter question | Report objective | Findings |
|---|---|---|
| 1. In investigating the effects of the act on small public companies, please assess: | | |
| (a) How requirements in the act and the implementing regulations, as adopted for publicly traded companies, affect small business equity capital formation in both the stock and bond markets. | 1. Analyze the impact of the Sarbanes-Oxley Act on smaller public companies in terms of costs of compliance and **access to capital.**<br><br>2. Describe SEC's and PCAOB's efforts related to the implementation of the act and their responses to concerns raised by smaller public companies and the accounting firms that audit them. | Because a large number of smaller public companies have not yet implemented all the provisions of the act and the recent and ongoing actions by SEC and PCAOB to address small business implementation issues, it is too soon to determine the act's impact on smaller public companies' access to capital. Along with other market factors, the act may have encouraged some smaller companies to go private. Going private reduces financing options available to those companies, which must rely on potentially more expensive alternatives to public equity capital. |

Appendix I: Objectives, Scope, and
Methodology

| Request letter question | Report objective | Findings |
|---|---|---|
| (b) What the detailed costs are that small public companies bear in complying with the act on both a federal and state level. | 1. Analyze the impact of the Sarbanes-Oxley Act on smaller public companies in terms of **costs of compliance** and access to capital.<br><br>2. Describe SEC's and PCAOB's efforts related to the implementation of the act and their responses to concerns raised by smaller public companies and the accounting firms that audit them. | Our analysis of Audit Analytics data showed that the smallest companies that had fully implemented the act's provisions, particularly section 404, spent a median of 1.1 percent of their revenues on audit fees whereas companies that had not implemented section 404 spent 0.8 percent of their revenue on audit fees. Responses to our survey provided the following detailed costs for first year of implementation: fees to consultants for services related to section 404 ranged from $3,000 to over $1.4 million.<br><br>To help smaller companies and their auditors develop approaches to implement the act's requirements, SEC established an Advisory Committee on Smaller Public Companies. SEC recently extended the section 404 compliance deadline for non-accelerated filers based on the committee's recommendation, which SEC had previously done on two separate occasions. Currently, a non-accelerated filer must begin to comply with section 404 for its first fiscal year ending on or after July 15, 2007. The advisory committee has several other recommendations under consideration, including providing conditional total section 404 exemptive relief for the very smallest public companies or staggering the 404 requirements based on company size or other characteristics. Both SEC and PCAOB issued additional guidance to help both public companies and accounting firms in implementing section 404, expecting that the additional guidance would help lower public companies' costs of compliance. As the act was a federal law, there were no costs for public companies on a state level. |

Appendix I: Objectives, Scope, and
Methodology

| Request letter question | Report objective | Findings |
|---|---|---|
| (c) The challenges small companies face in obtaining access to auditing services in order to comply with the act. | 4. Analyze smaller companies' **access to auditing** services and the extent to which the share of public companies audited by smaller accounting firms has changed since the enactment of the Sarbanes-Oxley Act. | Smaller public companies appear to have been able to obtain needed auditing services, although not necessarily from their auditor of choice. However, many smaller companies moved from large accounting firms to smaller accounting firms and paid higher fees for audit services. In particular, smaller firms appear to be taking on a higher percentage of public companies with accounting issues. Furthermore, the act's auditor independence requirements caused smaller companies to seek advice from other sources, which increased costs. |
| 2. In investigating the effects of the act on small private companies, please assess the extent to which: | | |
| (a) Financial institutions require private small companies to comply with the act in order to receive capital financing and financial services. | 3. Analyze the impact of the act on smaller privately held companies, including costs, ability to access public markets, and the **extent to which** states and **capital markets have imposed similar requirements on smaller privately held companies.** | The act appears to have increased corporate governance and accountability awareness throughout the business and investor communities. However, it does not appear that the capital markets, notably banks and venture capitalists, are denying private companies access to capital or other financial services because of failure to meet Sarbanes-Oxley Act requirements. |
| (b) States have or are considering enacting provisions of the act for small privately held companies. | 3. Analyze the impact of the act on smaller privately held companies, including costs, ability to access public markets, and the **extent to which** states and capital markets have imposed similar requirements on smaller privately held companies. | Three states—Illinois, Texas, and California—have passed legislation with corporate governance and accountability requirements that resemble certain provisions of the Sarbanes-Oxley Act. Two other states enacted laws covering auditor work paper retention requirements and some state boards of accountancy have proposed rule changes affecting, among other things, enhanced peer review requirements for CPAs. We are unaware of any states that enacted a version of section 404 on internal control over financial reporting for privately held companies. |
| (c) Small privately held companies are being denied access to capital or other financial services, because they do not meet the act's requirements. | 3. Analyze the impact of the act on smaller privately held companies, including costs, ability to access public markets, and the **extent to which** states and **capital markets have imposed similar requirements on smaller privately held companies.** | Our research and discussions with representatives of financial institutions suggest that smaller private companies have not been denied access to capital or other financial services as a result of the act. |

Appendix I: Objectives, Scope, and
Methodology

| Request letter question | Report objective | Findings |
|---|---|---|
| (d) Small private companies are incurring additional costs to comply with any part of the act in order to receive financial services. Please include a detailed list of these compliance and accounting costs. | 3. Analyze the **impact of the act on smaller privately held companies, including costs,** ability to access public markets, and the extent to which states and capital markets have imposed similar requirements on smaller privately held companies. | We found no evidence that smaller private companies were incurring additional costs, except for smaller private companies intending to go public or "voluntarily" complying with provisions of the act. However, information on factors that may have encouraged smaller private companies to voluntarily comply with provisions of the act or the specific costs for those smaller private companies was not available. |
| (e) Compliance with the act has created significant barriers to entry for small privately held companies to reach the public markets. | 3. Analyze the **impact of the act on smaller privately held companies, including** costs, **ability to access public markets,** and the extent to which states and capital markets have imposed similar requirements on smaller privately held companies. | We found that smaller private companies wanting to go public were spending additional time, effort, and money to convince investors that they could meet the act's requirements. |
| 3. With respect to small accounting and auditing firms, we request that GAO review whether the market has improved for these firms since GAO's findings outlined in "Mandated Study on Consolidation and Competition," GAO-03-864, as required by Section 701 of the act. | 4. Analyze smaller companies' access to auditing services and the extent to which **the share of public companies audited by small accounting firms has changed** since the enactment of the Sarbanes-Oxley Act. | While the number of public companies audited by smaller accounting firms has increased since the passage of the act, large accounting firms continue to dominate the market in terms of the proportion of market capitalization audited. In 2004, large accounting firms audited 98 percent of total revenues. |

Source: GAO.

To address our four objectives, we reviewed and analyzed information from a variety of sources, including the legislative history of the act, relevant regulatory pronouncements and related public comment letters, and available research studies and papers. We also interviewed officials at SEC, PCAOB, and the Small Business Administration (SBA). In addition, we held discussions with the chief financial officers (CFO) of smaller public and private companies, representatives of relevant trade associations, accounting firms, market participants, and experts.

## Impact of Sarbanes-Oxley Act on Smaller Public Companies

We could not analyze the impact of the act on many smaller public companies because SEC has extended the date by which public registrants with less than $75 million public float (known as "non-accelerated" filers) must comply with Section 404 of the act to their first fiscal year ending on

or after July 15, 2007.[1] According to SEC, non-accelerated filers represent about 60 percent of all registered public companies and about 1 percent of total available market capitalization. As a result, we analyzed public data and other information related to the experiences of public companies that have fully implemented the act's provisions. We also compared the information from companies that had implemented the act with information from smaller companies that took the SEC extension to gain some insight into the potential impact of these provisions on the non-accelerated filers.

**Audit Fees and Auditor Changes**

Audit Analytics, an on-line market intelligence service maintained by Ives Group, Incorporated provides, among other things, a database of audit fees by company back to 2000 along with demographic and financial information. Using this database, we analyzed changes in the audit fees companies have paid by various size categories. Audit Analytics also provides a comprehensive listing of all reported auditor changes, which includes data on the date of change, departing auditor, engaged auditor, whether the change was a dismissal or resignation, whether there was a going concern flag or other accounting issues, and whether a fee dispute or fee reduction occurred. Using this database, we identified 2,819 auditor changes from 2003 through 2004.

We performed several checks to verify the reliability of the Audit Analytics data. For example, we crosschecked random samples from each of the Audit Analytics databases with SEC proxy and annual filings and other publicly available information. While we determined that these data were sufficiently reliable for the purpose of presenting trends in audit fees and auditor changes, the descriptive statistics on audit fees contained in the report should be viewed in light of a number of data challenges. First, the Audit Analytics audit fee database does not include fees for companies who did not disclose audit fees paid to their independent auditor in an SEC filing. Second, some companies included in the database—especially small companies—did not report complete financial data. We handled missing data by dropping companies with incomplete financial data from any analysis involving the use of such data. Therefore, it should be noted that we are not dealing with the entire population included in the Audit

---

[1]SEC's definition of a non-accelerated filer is based in part on the company's "public float," which is a subset of market capitalization. Market capitalization is defined as the number of shares outstanding multiplied by the price per share. Generally, a company's public float includes shares that are available to the public. Thus, shares held by company insiders such as the CEO or CFO would not be included in public float.

Appendix I: Objectives, Scope, and
Methodology

Analytics database but rather a large subset.[2] Because of these issues, the
results should be viewed as estimates of audit fees based on a large
sample rather than precise estimates of all fees charged over the entire
population. It should also be noted that SEC found issues with the data on
market capitalization (used largely in our discussion of auditor changes
and companies going private) which are being addressed by Audit
Analytics.

**Deregistrations**

To determine the number of companies that have deregistered before and
after the implementation of the Sarbanes-Oxley Act, we obtained and
analyzed data filed with SEC. From 1998 through April 24, 2005, over
15,000 companies filed SEC Form 15 (Certification and Notice of
Termination of Registration). First, we analyzed all the companies to
determine whether the company was deregistering its common stock to
continue to operate as a privately held company. During this step, we
eliminated companies that filed the Form 15 as a result of acquisitions,
mergers that were not "going private" transactions liquidations,
reorganizations, or bankruptcy filings or re-emergences.[3] We also
eliminated duplicate filings and filings by foreign registrants. For the
remaining companies, we reviewed their SEC filings and press releases
and other press articles to determine their reasons for deregistration. We
grouped the reasons into seven categories for our final analysis.

We took a number of steps to ensure the reliability of the database,
including testing of random samples of the coded data, 100 percent
verification of certain areas of the database, and various other quality
control measures. For the initial coding, we found the error rates to be 0.6
percent or lower for all years except 2001 and 1998. Because the initial
error rate exceeded 1.5 percent for these 2 years, we performed 100
percent verification and corrected any errors. However, because the error
rate for the remaining years was positive, it is unlikely that we captured

---

[2]In general, when working with any of the financial database, breaking out the number of
companies by size will result in the loss of observations because some companies will not
have financial data available.

[3]Companies that were merged into, or were acquired by, another company were only
included if the transaction was initiated by an affiliate of the company (either the company
filed a form Schedule 13E-3 with SEC or GAO analysis found evidence of a "going private"
transaction in the case of OTCBB- and Pink Sheet-listed companies).

Appendix I: Objectives, Scope, and
Methodology

every company going private in 1998–2005.[4] We also excluded all companies with one or zero holders of record unless that company also filed a Schedule 13E-3 (Going private transaction by certain issuers) with SEC.[5] In doing so, we may have missed some companies going private. However, an outside study found only 12 companies that filed a Form 15 but did not file a Schedule 13E-3 from 1998 through 2003.[6] Additionally, our analysis of the companies that listed more than one holder of record on the Form 15 should have picked up some of these types of firms. As a result, this limitation is minor in the context of this report and does not alter the trends also found by a number of research reports.

**Survey of Public Company Views on Implementing the Sarbanes-Oxley Act**

To obtain information about public companies' views on implementing Sarbanes-Oxley Act requirements, we conducted a Web-based survey of companies with market capitalization of $700 million or less and annual revenues of $100 million or less that reported to SEC that they had complied with the act's requirements related to internal control over financial reporting. To develop and test our questionnaire, we interviewed officials at 14 smaller public companies. We then pretested drafts of our questionnaire with 10 companies and then discussed their answers and experiences with our social science survey specialists. The pretests were conducted in person and by telephone with company executives in Virginia, Maryland, New York, Connecticut, California, Georgia, and Illinois.

To identify the smaller public companies eligible to participate in the survey, we analyzed company SEC filings from the Audit Analytics database. Our survey universe consisted of 591 companies that met the following five criteria: (1) $700 million or less in market capitalization as of the end of the company's 2004 fiscal year; (2) $100 million or less in revenues as of the end of the company's 2004 fiscal year end; (3)

---

[4]There may also be additional omissions due to errors on Form 15s or because some Form 15s that were initially listed by SEC were not found or were not available in electronic form. In a few instances, it appeared that the Form 15 was completed incorrectly by the firm. Mistakes included missing fields or an obvious misunderstanding of what information was required.

[5]A test of a random sample of 200 of these companies found that merging, bankrupt, and liquidating firms typically reported one or zero as the number of holders of record. In each case, the companies were found to have either merged with another company or had gone bankrupt or liquidated. See also Marosi and Massoud (2004), "Why Do Firms Go Dark," who used a similar method to exclude mergers and acquisitions.

[6]Leuz et al. (2004).

completed section 404 requirements by filing related reports of
management and the company's external auditor as of August 11, 2005; (4)
were not foreign companies; and (5) were not investment vehicles such as
mutual funds and shell companies. Of the 591, we could not reach 168
within the survey period because we were not able to obtain e-mail
addresses for the CFO or other executive. We began our Web-based survey
on September 21, 2005, and included all useable responses as of November
1, 2005. We sent follow-up e-mails on three occasions to remind
respondents to complete the survey. One hundred fifty-eight companies
completed the survey for an overall response rate of 27 percent. Only one
respondent indicated that his company was a non-accelerated filer.

The low response rate raised concerns that the views of 158 respondents
might not be representative of all smaller public company experiences
with the Sarbanes-Oxley Act. While we could not test this possibility for
our primary questions (whether the act places a disproportionate burden
on smaller companies or compromises their ability to raise capital), we did
conduct an analysis to determine whether our sample differed from the
population of 591 in company assets, revenue, and market capitalization
and type (based on the North American Industrial Classification System
code). We found no evidence of substantial non-response bias based on
these characteristics. However, because of the low response rate we still
could not assume that the views of the 158 respondents were
representative of the views of other smaller public companies on
implementing Sarbanes-Oxley Act requirements. Therefore, we do not
consider these data to be a probability sample of all smaller public
companies.

In addition to potential non-response bias, the practical difficulties of
conducting any survey may introduce other non-sampling errors. For
example, difference in how a particular question is interpreted or the
sources of information available to respondents may introduce errors. We
took steps to minimize such non-sampling errors in both the data
collection and data analysis stages. We examined the survey results and
performed computer analyses to identify inconsistencies and other
indications of error. A second independent analyst checked all the
computer analyses. Further, we used GAO's Questionnaire Programming
Language (QPL) system to create and process the Web-based survey. This
system facilitates the creation of the instrument, controls access, and
ensures data quality. It also automatically generates code for reading the
data into SAS (statistical analysis software). This tool is commonly used
for GAO studies.

Appendix I: Objectives, Scope, and
Methodology

We used QPL to automate some processes, but also used analysts to code the open-ended questions and then had a second, independent analyst review them. (The survey contained both open- and close-ended questions.) We entered a set of possible phrases, called tags, which we identified for each question into QPL. When the analysts reviewed the text responses, they assign the tags that best reflect the meaning of what the respondent has written. The system then compares the tags assigned by the independent reviewers. Multiple tags may be assigned to a single response; thus, it is possible for reviewers to agree on some tags and not on others. Although it is possible to have reviewers resolve their differences until agreement is found, for this survey we only considered tags that were selected by all reviewers on the first pass. Tags assigned by only one reviewer were dropped. This process allowed a quantitative analysis of open comments made by respondents. Finally, we verified all data processing on the survey in house and found it to be accurate.

## SEC and PCAOB Efforts to Address Smaller Company Concerns

To address our second objective describing SEC's and PCAOB's efforts related to the implementation of the act and their responses to concerns raised by smaller public companies and the accounting firms that audit them, we interviewed SEC and PCAOB staff on the rulemaking and standard setting processes. We also interviewed public company executives, representatives of relevant trade associations, and market participants for their reaction to the agencies' rules, guidance, and other public announcements.

During the course of our review, both SEC and PCAOB held forums and other open meetings to allow a public discourse on the act's impact on public companies, accounting firms, investors, and other market participants. We attended most of these forums and open meetings and reviewed submitted comments. Specifically, from November 2004 to February 2006, we attended either in person or through a Web cast the following: SEC's Advisory Committee on Smaller Public Companies open meetings; SEC's Roundtable on Implementation of Internal Control Reporting Provisions; SEC's Government-Business Forum on Small Business Capital Formation; PCAOB's Standing Advisory Group Meetings; and PCAOB's forums on auditing in the small business environment. We reviewed the guidance that SEC and PCAOB separately issued on May 16, 2005, as a result of comments received at SEC's section 404 roundtable.

## Impact of Act on Smaller Privately Held Companies

To determine the act's impact on smaller privately held companies, we analyzed available research and studies. We also interviewed officials of the National Association of State Boards of Accountancy in states that required or were considering requiring privately held companies to comply with corporate accountability, governance, and financial reporting measures comparable to key provisions in the Sarbanes-Oxley Act.

Further, we analyzed data and interviewed officials on whether lenders, financial institutions, private equity providers, or others were imposing the act's requirements on privately held companies as a condition of obtaining capital or financial services. Finally, we interviewed officials and analyzed available data on whether, as a result of the act, privately held companies were voluntarily adopting key provisions of the act as best practices or whether they had faced challenges in trying to reach the public markets.

To assess the impact of the act on privately held companies trying to reach the public markets, we obtained a sample from SEC's Electronic Data Gathering, Analysis, and Retrieval (EDGAR) system, a database that includes companies' initial public offering (IPO) and secondary public offering (SPO) filings. Our sample contained registration statements, pricings and applications for withdrawal filed with SEC from 1998 through July 2005. We performed various analyses of IPO and SPO activity prior to and after enactment of Sarbanes-Oxley, including analyses of the sizes of companies coming and returning to the market, types and amounts of IPO expenses, and the reasons cited by companies for withdrawing their IPO filing. We analyzed IPO expenses as a percentage of revenue and offering amount for companies in various size categories to determine whether the differences between the groups changed over time and whether the differences were statistically significant when controlling for other determining factors.

SEC's EDGAR database is considered the definitive source for information on IPOs since all companies issuing securities that list on the major exchanges and the OTCBB, as well as those that meet certain criteria listing on the Pink Sheets, must register the securities with SEC. Nevertheless, we crosschecked the descriptive statistics retrieved from EDGAR with NASDAQ's IPO data. However, there was no financial data available on several companies, while others failed to provide information to complete all of the fields. In cases where revenue was left blank, individual filings were reviewed and actual revenue, 9-month revenue or pro-forma data was used to determine the size of the company. In cases were this data was not available we dropped these companies from any analysis involving the use of such data. Additionally, there can be

significant lag between the dates a company initially files for an IPO with
SEC and when the stock of the company is finally priced (begins trading).
Because we had data on IPO filings during the last 2 months of 1997, we
were able to include those companies that priced IPOs over the 1998-2005
period that initially filed for an IPO during that time. However, any IPOs
that were priced during this time but had an initial filing that occurred
prior to November 1, 1997, are not included. For this reason the number of
priced IPOs for 1998 (and to an even lesser extent 1999) may understate
somewhat the actual numbers of companies coming to the public market
during that year. This limitation is insignificant in the context of this
report.

## Company Access to Auditing Services and Changes in Share of Public Companies That Small Firms Audit

To assess changes in the domestic public company audit market, we used
public data—for 2002 and 2004—on public companies and their external
accounting firm to determine how the number and mix of domestic public
company audit clients had changed for firms other than the large
accounting firms. To be consistent with our 2003 study of the structure of
the audit market, we used the *Who Audits America* database, a directory
of public companies with detailed information for each company,
including the auditor of record. Only domestic public companies traded on
the major exchanges or over-the-counter with available financial data were
included in our analysis of audit market concentration and the results do
not include a number of clients of the smallest audit firms. Users of our
2003 study will also note that we used the term "sales" when referring to
auditor concentration but use the term "revenue" in this report. Although
*Who Audits America* refers to sales, our conversations with the provider
of the data, confirmed that although the terms can be used
interchangeably, "revenue" is a better term than "sales" in accurately
describing the contents of the database.

To verify the reliability of these data sources, we performed several
checks to test the completeness and accuracy of the data. Previously GAO
crosschecked random samples of the *Who Audits America* database with
SEC proxy filings and other publicly available information. Descriptive
statistics calculated using the database were also compared with similar
statistics from published research. Moreover, academics who worked with
GAO in the past also compared random samples from *Compustat, Dow-
Jones Disclosure,* and *Who Audits America* and found no discrepancies.
We also crosschecked the results with estimates obtained using Audit
Analytics' audit opinion database. The results were not significantly
different and confirm the finding outlined in the body of the report.
However, because of the lag in updating some of the financial information

**Appendix I: Objectives, Scope, and
Methodology**

and the omission of a number of small public clients, the results should be
viewed as estimates useful for describing the market for audit services.

We conducted our work in California, Connecticut, Georgia, Maryland,
New Jersey, New York, Virginia, and Washington, D.C., from November
2004 through March 2006 in accordance with generally accepted
government auditing standards.

# Appendix II: Additional Details about GAO's Analysis of Companies Going Private

A number of research studies and anecdotal evidence suggest that a significant number of small companies have gone private as a result of costs associated with the increased disclosure and internal control requirements introduced by the Sarbanes-Oxley Act of 2002. To provide a better understanding of companies going private, we analyzed Form 15s filed by companies, related Securities and Exchange Commission (SEC) filings and press releases to determine the total number of companies exiting the public market and the reasons for the change in corporate structure. See appendix I for our scope and methodology. This appendix provides additional information on the construction of our database and descriptive statistics.

## Our Database Included Firms That "Went Dark" as Well as Firms That Completely Exited the Public Market

Although there is no consensus on the term "going private," we started with the description used in the "Fast Answers" section of SEC's Web site: a company "goes private" when it reduces the number of its shareholders to fewer than 300 (or 500 in some instances) and is no longer required to file reports with SEC.[1] To reduce the number of holders of record, a company can undertake a number of transactions including tender offers, reverse stock splits, and cash-out mergers. In many cases, the company already meets the requirement for deregistration and therefore the registrant need only file a Form 15 (which notifies SEC of a company's intent to deregister) with SEC to meet this description of "going private." As a result, we use the terms "going private" and "deregistering" interchangeably. However, not all companies that deregister completely exit the public markets; some elect to continue trading on the less regulated Pink Sheets.[2] Companies that deregister their shares with SEC but continue public trading on the Pink Sheets are often considered as having "gone dark" rather than private in the academic literature. However, our final "going private" numbers include companies that no longer trade on any exchange and those that continue to trade on the less

---

[1]Under certain SEC rules, public companies voluntarily can deregister by filing a Form 15 with SEC if they have fewer than 300 holders of record or fewer than 500 holders of record if the company's total assets have not exceeded $10 million at the end of the company's 3 most recent fiscal years and if the company meets some additional criteria. Many of these companies can have thousands of actual beneficial shareholders. For example, Ced & Co., the nominee of Depository Trust Company would be counted as one certificate holder of record for many thousands of investors served by the brokerage firms that are members of the Depository Trust Company.

[2]The Pink Sheets LLC does not require companies whose securities are quoted upon its systems to meet any listing requirements or require the companies to be registered with SEC.

regulated Pink Sheets ("went dark").[3] It should be noted that SEC does not have rules that define "going dark" and the term is used here as it is used in academic research.

The companies contained in our database include only those companies that deregistered common stock, were no longer subject to SEC filing requirements, and were headquartered in the United States. Moreover, the database excludes most cases where the company was acquired by, or merged into another company; filed for, or was emerging from, bankruptcy; or was undergoing or planning liquidation. We also excluded a significant number of companies that filed for an initial public offering and subsequently filed a Form 15 within a year; filed no annual or quarterly financials between the first filing with SEC and the Form 15; or filed as a result of reorganization where the company remained a public registrant. Based on the information contained on the Form 15, we were able to exclude four types of filers: (1) companies that deregistered securities other than their common stock; (2) companies that continued to be subject to public reporting requirements; (3) companies that were headquartered in a foreign country; and (4) companies for which a Form 15 could not be retrieved electronically.[4]

In addition to SEC filings, we used press releases located through Lexis-Nexis to investigate whether the companies experienced any of the disqualifying conditions (bankruptcy, merger, acquisition, liquidation, etc.). Companies that were merged into, or were acquired by, another company were only included if the transaction was initiated by an affiliate of the company (either the company filed a Schedule 13E-3 with SEC or our analysis found evidence of a "going private" transaction in the case of Over-the-Counter Bulletin Board (OTCBB) and Pink Sheet-quoted

---

[3]Because we are addressing the potential effects on the access to capital, our database focuses on "going private" from a public disclosure requirement perspective—not necessarily from a trading perspective. Some companies actively trade but are not required to disclose information to SEC via periodic filings—these are considered private; some companies do not trade actively but report to SEC—these are considered public and when they file a Form 15 and cease filing with SEC are considered to have gone private.

[4]In a few cases, we found companies that deregistered their common stock and had other public securities that were still subject to SEC reporting requirements, but later deregistered those securities shortly after the initial Form 15 filing. These types of companies are also included in our final numbers.

companies).[5] Moreover, if the transaction resulted in the company becoming a subsidiary of another publicly traded company or a foreign entity, or if the transaction met any of the other disqualifying conditions, that company was excluded from our final numbers.

Each Form 15 also contained the number of holders of record. We excluded all companies with one or zero holders of record unless that company also filed a Schedule 13E-3 with SEC. A test of a random sample of 200 of these companies found that merging, bankrupt, and liquidating firms typically reported one or zero as the number of holders of record.[6] Because there may have been some companies that went private by way of merger that did not file a Schedule 13E-3, our database may have excluded some companies going private as a result of using this qualifier. However, this limitation is minor in the context of this report (see app. I for additional information on data reliability). In total, these exclusions left us with 1,093 U.S. companies going private from 1998 through the first quarter of 2005 out of the 15,462 Form 15 filings initially provided to us by SEC.[7]

---

[5]Generally, if the transaction is initiated by an affiliate (an insider) of the company, Rule 13e-3 of the Securities Exchange Act of 1934 requires the affiliate to file a Schedule 13E-3 with SEC. The filing of a Schedule 13E-3 may also be required when affiliated transactions result in a company's publicly held securities no longer being traded on a national securities exchange or an inter-dealer quotation system, such as NASDAQ. The Schedule 13E-3 requires a discussion of the purposes of the transaction, any alternatives that the company considered, and whether the transaction is fair to all shareholders. The schedule also discloses whether and why any of its directors disagreed with the transaction or abstained from voting on the transaction and whether a majority of directors,who are not company employees, approved the transaction.

[6]The companies were found to have either merged with another company or, in some cases, had gone bankrupt or were liquidated. See also Marosi and Massoud (2004), "Why Do Firms Go Dark," University of Alberta, March 2004, who used a similar criterion to exclude companies.

[7]Ten additional companies went private between April 1, 2005, and April 24, 2005, bringing the total to 1,103.

## Consistent with Outside Studies, We Found That the Number of Companies That Went Private Increased Significantly from 2001 through 2004

The number of public companies going private increased significantly from 143 in 2001 to 245 in 2004 (see fig. 8). Based on the number of companies going private during the first quarter of 2005, we project that the number of companies going private will increase, to 267 companies by the end of 2005. While these numbers constitute a small percentage of the total number of public companies, the trends we identified suggest that more small companies are reconsidering the cost and benefits of remaining public and raising capital on domestic public equity markets. As figure 8 shows, the number of companies going private increased significantly, whether or not we excluded the types of companies explicitly considered as speculative investments by SEC—blank check and shell companies.[8] Overall, these companies, identified as such by Standard Industry Classification code, represent 17 percent of the companies going private in 2004 but just 2.5 percent of the companies going private during the first quarter 2005 and 8.4 percent of the overall sample.[9]

---

[8]SEC recently targeted regulatory problems that they identified where shell companies have been used as vehicles to commit fraud and abuse SEC's regulatory processes.

[9]Blank check companies are typically development stage companies that have no specific business plan or purpose or have indicated that their business plan was to engage in a merger or acquisition with an unidentified company or companies, entities, or persons. SEC defines a shell company as a company with no or nominal operations and either no or nominal assets, assets consisting solely of cash and cash equivalents, or assets consisting of any amount of cash and cash equivalents and nominal other assets. SEC noted that many investors have been victimized in shell company schemes over the years. However, their corporate structures and status as publicly listed entities and fully reporting issuers are features of interest for some small companies with a desire to go public by way of reverse merger. In a reverse merger, a private company merges with a public company and continues as the dominant successor.

# Exhibit A
# (Part 4 of 4)

Appendix II: Additional Details about GAO's
Analysis of Companies Going Private

**Figure 8: Total Number of Companies Identified as Going Private from 1998 to 2005**



Number of companies

Source: GAO analysis of SEC data.

Notes: Includes companies that deregistered but continued to trade over the less regulated Pink
Sheets ("went dark") and public shells and blank check companies. Does not include companies that
have filed for, or are emerging from, bankruptcy, have liquidated or are in the process of liquidating,
were headquartered in a foreign country or that have been acquired by or merged into another
company unless the transaction was initiated by an affiliate of the company and the company became
a private entity. The estimate for 2005 is projected based on the number of companies going private
in the first quarter and the pattern of deregistration activity found in 2003 and 2004.

[a]Partial year, only includes the first 2 quarters of 2005.

A number of research reports have also found that the number of
companies exiting the public market has increased since 2002. Although
there are differences in the search methodologies and types of companies
included, each study found similar trends and reached similar conclusions
(see fig. 9). For example, in Leuz et al. (2004) the number of companies
going dark or private increased from 144 to 313 between 2002 and 2003.
Moreover the authors found that the bulk of the increase was made up of
companies that continued trading on the Pink Sheets after deregistration.
Engel et al. (2004), which was based on a smaller subset of deregistering
companies, found a statistically significant increase in the rate at which
companies went private. Marosi and Massoud (2004) excluded all merger-

related transactions and found that the number of companies going dark increased from 71 in 2002 to 127 in 2003.[10]

**Figure 9: Companies Going Private or Dark, by Research Study**



Source: GAO analysis of SEC data and selected studies.

Note: Leuz et al. data includes going private and going dark companies in 1998–2003. The Marosi and Massoud data only includes companies going dark in 2001–2003. The Engel study includes data on going private transactions based on 13E-3 filings in 1998–2003. Additional differences in the types of companies excluded exist across these samples. GAO's number for 2005 is projected based on the number of companies going private in the first quarter and the pattern of deregistration activity found in 2003 and 2004.

[a]Partial year, only includes the first 2 quarters of 2005.

---

[10]E. Engel, R. Hayes, and X. Wang, "The Sarbanes-Oxley Act and Firms' Going Private Decisions," University of Chicago Working Paper, May 2004; C. Luez, A. Triantis, and T. Wang, "Why Do firms Go Dark? Causes and Economic Consequences of Voluntary SEC Deregistration," University of Pennsylvania Working Paper, September 2004; and Marosi and Massoud (2004), "Why Do Firms Go Dark," University of Alberta, March 2004.

## We Grouped Reasons for Company Decisions to Go Private into Seven Categories

In analyzing company decisions, we used various sources to determine why the companies included in our database deregistered their common stock. Because companies did not always disclose the reasons for their decision in an SEC filing, we also searched press releases and newswire announcements using the Lexis-Nexis search engine. We then used the reasons given in the various filings and other media to construct seven broad categories, summarized in table 7. Because companies often gave multiple reasons for the decision to deregister (go private) and it was difficult to tell which were the most important, we allowed up to six reasons for each company included in our database.[11] For example, Westerbeke Corporation went private in 2004 and cited the following reasons for the decision: "a small public float," inability to use its stock as currency for acquisitions, benefits the company would receive as private entity such as "greater flexibility," the ability to make "decisions that negatively affect quarterly earnings in the short run," and the costs and time devoted by employees and management "resulting from the adoption of the Sarbanes-Oxley Act of 2002." This company is included in our database with following coded reasons for going private: (1) market/liquidity issues; (2) private company benefits; (3) direct costs; and (4) indirect costs.

---

[11]It should be noted that these reasons are self reported by the company and are not based on any additional (and more complex) analysis of company behavior. Furthermore, because the Schedule 13E-3 requires a discussion of the purposes of the transaction, any alternatives that the company considered, and whether the transaction is fair to all shareholders, affiliates of the company that are advocating the transaction may list all the pros and cons of going private. As a result, in cases where a company is required to file a Schedule 13E-3 with SEC, cost savings are generally listed as a benefit of going private and therefore captured in our database as one of the reasons for the decision.

**Table 7: Reason for Going Private, by Category Descriptions**

| | |
|---|---|
| Direct costs | Company cites the costs associated with being a public company. Includes listing costs, regulatory compliance costs, expenses paid for outside advice, audit and attestation requirements, other expenses directly related to the implementation of the Sarbanes-Oxley Act, taxes at the corporate level, and costs related to shareholders and shareholder accounts. |
| Indirect costs | Company cites the amount of time and effort required to meet periodic reporting requirements, adhere to securities laws, and service shareholders. Includes time and company resources spent on Sarbanes-Oxley-specific requirements instead of regular business activities. |
| Market/liquidity issues | Company cites thinly traded stock or general illiquidity of company shares, poor market conditions, an undervalued or low stock price, lack of analyst coverage, or disinterest on the part of investors. Includes inability or difficulty in raising capital through follow-on offerings or using stock as currency for mergers, acquisitions, or employee compensation. |
| Private company benefits | Company cites benefits of becoming a private company including ability to act quickly without market pressure, keep information from competitors, or provide more flexibility in corporate operations. Also includes normal business decisions, changes in strategy, and belief that going private would provide better growth and investment opportunities. |
| Critical business issues | Company cites negative business prospects or critical issues that could undermine the ability of the company to remain profitable or continue as a going concern. Includes lawsuits, SEC actions, exchange delisting, general bad business, intense competition, or failure of plans that could have made the company more viable. |
| Other | Company cites reasons not covered by the listed categories. |
| No reason | Company provides no information on why it decided to deregister. Includes companies that indicated they deregistered simply because they met the requirements to do so. |

Source: GAO.

## More Companies Have Cited Costs as Reasons for Going Private Since 2002

Although companies go private for a variety of reasons, in recent years, more companies cited the direct costs of maintaining public company status as at least one of the reasons for going private. As shown in figure 10, the number of companies citing costs as at least one reason for going private increased from 64 in 2002 to 143 and 130 in 2003 and 2004. However, the percentage of companies citing cost as the only reason for exiting the market has increased significantly in recent years. While only 21 cited costs and no other reason in 2003 (15 percent of the total citing cost), 43 did so in 2004 (33 percent of the total citing cost). During the first quarter of 2005, nearly 50 percent of the companies mentioning cost, cited costs as the only reason for going private.

Appendix II: Additional Details about GAO's
Analysis of Companies Going Private

Figure 10: Companies Citing Costs as One of the Reasons for Going Private



Source: GAO analysis of SEC data.

[a]Partial year, only includes the first 2 quarters of 2005.

## Companies Going Private Typically Were among the Smallest of Publicly Traded Companies

By any measure (market capitalization, revenue or assets), the companies that went private over the 2004–2005 period represent some of the smallest companies in the public arena (see figs. 11 and 12). Because these companies were on average very small, they enjoyed limited analyst coverage and limited market liquidity—one of the primary benefits cited for going or remaining public. The median market capitalization and revenue for these companies was less than $15 million.

**Figure 11: Average and Median Sizes of Companies Going Private, 2004-2005**



Source: GAO analysis of SEC and Audit Analytics data.

Note: Only includes companies with financial data available.

Figure 12 also illustrates that companies going private were disproportionately small, which reflected that the net benefits from being public likely were smallest for small firms and the costs of complying with securities laws likely required a higher proportion of a smaller company's revenue. For example, 84 percent of the companies that went private in 2004 and 2005 had revenues of $100 million or less and nearly 69 percent had revenues of $25 million or less.[12] We also found that a significant portion of these companies—12.5 percent of those that went private in 2004–2005—had not filed quarterly or annual financial statements with SEC in more than 2 years; therefore, we did not have access to recent financial information.

---

[12]Given that the financial data are based on the company's last annual filing, these results should be viewed as estimates of company size.

**Appendix II: Additional Details about GAO's
Analysis of Companies Going Private**

Figure 12: Revenue Categories for Companies Going Private, 2004-2005



Source: GAO analysis based of SEC and Audit Analytics data.

Note: Only includes companies with financial data available.

# Appendix III: Comments from the Securities and Exchange Commission



UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

March 31, 2006

Mr. William B. Shear
Director, Financial Markets and Community Investment
United States Government Accountability Office
441 G Street, N.W.
Washington, DC 20548

Dear Mr. Shear:

Thank you for the opportunity to comment on your draft report entitled *Sarbanes-Oxley Act: Consideration of Key Principles Needed in Addressing Implementation for Smaller Public Companies*. We agree with you that the Sarbanes-Oxley Act has had a positive impact on investor protection and confidence, but share your concern that smaller public companies are facing particular challenges in implementing certain provisions of the Act, most notably Section 404.

As you note in your draft report, the Securities and Exchange Commission has undertaken a number of initiatives to assess the costs of compliance with the Sarbanes-Oxley Act, particularly Section 404, and to appropriately balance those costs with the benefits for smaller public companies. The Commission has extended filing deadlines, issued guidance, established the SEC Advisory Committee on Smaller Public Companies, and sponsored a Section 404 roundtable event in April 2005. In addition, the Commission will be conducting a second Section 404 roundtable event on May 10, 2006, which should provide further insight into the experiences of companies and their accountants in the second year of Section 404 implementation. The information gained at the roundtable may be useful to smaller companies.

Your draft report stresses the importance for the Commission, in assessing the final recommendations of the SEC Advisory Committee, of balancing the key principle behind the Sarbanes-Oxley Act—investor protection—against the goal of reducing the regulatory burden on smaller public companies.

The draft GAO report also makes three specific recommendations for the Commission's consideration in reviewing the final report of the Advisory Committee, as it relates to Section 404: (1) assess whether additional guidance is needed to help smaller public companies meet the requirements of Section 404, (2) work with the PCAOB to ensure consistency and efficient implementation of Section 404 guidance and standards, and (3) ensure that the objectives of investor protection are met and that any Section 404 relief granted is targeted and limited.

**Appendix III: Comments from the Securities
and Exchange Commission**

Mr. William B. Shear
March 31, 2006
Page 2

These recommendations should provide a useful framework for consideration of the
Advisory Committee's final recommendations, which are due to the Commission by
April 23, 2006. We do not believe, however, that it would be appropriate for us to
speculate or comment on the Committee's recommendations in this letter before they are
finalized and submitted to the Commission. We wish to emphasize that the Commission
continues to support the mission of the Advisory Committee, very much appreciates its
work, and looks forward to receiving its final recommendations.

Thank you again for the chance to comment upon your draft report. We appreciate the
GAO's attention to these important issues.

Sincerely,

John W. White
Director
Division of Corporation Finance

Scott A. Taub
Acting Chief Accountant

# Appendix IV: Comments from the Public Company Accounting Oversight Board



**PCAOB**
Public Company Accounting Oversight Board

1666 K Street, N.W.
Washington, DC 20006
Telephone: (202) 207-9100
Facsimile: (202) 862-8430
www.pcaobus.org

April 7, 2006

William B. Shear
Director, Financial Markets and
   Community Investments
U.S. Government Accountability Office
441 G Street, NW
Washington, DC 20548

Dear Mr. Shear:

We have received and reviewed your draft report entitled <u>Sarbanes-Oxley Act:</u> <u>Consideration of Key Principles Needed in Addressing Implementation for Smaller Public Companies.</u>  We appreciate your providing the Public Company Accounting Oversight Board with an opportunity to comment on this report.

Among the report's recommendations is for the Securities and Exchange Commission to work with the PCAOB to ensure that Section 404-related auditing guidance is consistent with any additional SEC guidance.

The PCAOB is committed to working with the SEC on GAO's recommendations. We agree that it is essential to preserve the overriding purpose of the Sarbanes-Oxley Act of investor protection while we seek ways to make its implementation as efficient and effective as possible.  Technical comments have been provided to your evaluators separately.  We do not have any additional comments at this time.

Sincerely,

Bill Gradison
Acting Chairman

# Appendix V: GAO Contacts and Staff Acknowledgments

## GAO Contacts

William B. Shear (202) 512-8678
Jeanette M. Franzel (202) 512-9471

## Acknowledgments

In addition to those named above, Harry Medina and John Reilly, Assistant Directors; E. Brandon Booth; Michelle E. Bowsky; Carolyn M. Boyce; Tania L. Calhoun; Martha Chow; Bonnie Derby; Barbara El Osta; Lawrance L. Evans Jr.; Gabrielle M. Fagan; Cynthia L. Grant; Maxine L. Hattery; Wilfred B. Holloway; Kevin L. Jackson; May M. Lee; Kimberly A. McGatlin; Marc W. Molino; Karen V. O'Conor; Eric E. Petersen; David M. Pittman; Robert F. Pollard; Carl M. Ramirez; Philip D. Reiff; Barbara M. Roesmann; Jeremy S. Schwartz; and Carrie Watkins also made key contributions to this report.

| **GAO's Mission** | The Government Accountability Office, the audit, evaluation and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
|---|---|
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday, GAO posts newly released reports, testimony, and correspondence on its Web site. To have GAO e-mail you a list of newly posted products every afternoon, go to www.gao.gov and select "Subscribe to Updates." |
| Order by Mail or Phone | The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to:<br><br>U.S. Government Accountability Office<br>441 G Street NW, Room LM<br>Washington, D.C. 20548<br><br>To order by Phone:  Voice:   (202) 512-6000<br>TDD:     (202) 512-2537<br>Fax:      (202) 512-6061 |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact:<br><br>Web site: www.gao.gov/fraudnet/fraudnet.htm<br>E-mail: fraudnet@gao.gov<br>Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Gloria Jarmon, Managing Director, JarmonG@gao.gov (202) 512-4400<br>U.S. Government Accountability Office, 441 G Street NW, Room 7125<br>Washington, D.C. 20548 |
| **Public Affairs** | Paul Anderson, Managing Director, AndersonP1@gao.gov (202) 512-4800<br>U.S. Government Accountability Office, 441 G Street NW, Room 7149<br>Washington, D.C. 20548 |

PRINTED ON ♻ RECYCLED PAPER

# Exhibit B
# (Part 1 of 2)



## U.S. Securities and Exchange Commission

**Securities and Exchange Commission**

**17 CFR PARTS 228, 229, 232, 240, 249, 270 and 274**

**[RELEASE NOS. 33-8124, 34-46427, IC-25722; File No. S7-21-02]**

**RIN 3235-AI54**

**Certification of Disclosure in Companies' Quarterly and Annual Reports**

**Agency:** Securities and Exchange Commission.

**Action:** Final rule; request for comments.

**Summary:** As directed by Section 302(a) of the Sarbanes-Oxley Act of 2002, we are adopting rules to require an issuer's principal executive and financial officers each to certify the financial and other information contained in the issuer's quarterly and annual reports. The rules also require these officers to certify that: they are responsible for establishing, maintaining and regularly evaluating the effectiveness of the issuer's internal controls; they have made certain disclosures to the issuer's auditors and the audit committee of the board of directors about the issuer's internal controls; and they have included information in the issuer's quarterly and annual reports about their evaluation and whether there have been significant changes in the issuer's internal controls or in other factors that could significantly affect internal controls subsequent to the evaluation. In addition, we are adopting previously proposed rules to require issuers to maintain, and regularly evaluate the effectiveness of, disclosure controls and procedures designed to ensure that the information required in reports filed under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported on a timely basis.

**Dates:** *Effective Date:* August 29, 2002.
*Comment Date:* Comments on the extension of the certification requirement to definitive proxy and information statements should be received on or before 30 days after publication in the *Federal Register*.

**Addresses:** Comments should be submitted in triplicate to Jonathan G. Katz, Secretary, Securities and Exchange Commission, 450 Fifth Street, NW, Washington, DC 20549-0609. Comments also may be submitted electronically at the following electronic mail address: rule-comments@sec.gov. To help us process and review your comments more efficiently, comments should be submitted by one method only. All comment letters should refer to File No. S7-21-02; this file number should be included in the subject line if electronic mail is used. Comment letters will be available for public inspection and copying in the Commission's

Public Reference Room, 450 Fifth Street, NW, Washington, DC 20549. Electronically submitted comment letters will be posted on the Commission's Internet website (http://www.sec.gov).[1]

**For Further Information Contact:** Mark A. Borges, Special Counsel, or Elizabeth M. Murphy, Chief, Office of Rulemaking, Division of Corporation Finance, at (202) 942-2910, or, with respect to issuers of asset-backed securities, Paula Dubberly, Chief Counsel, Division of Corporation Finance, at (202) 942-2900, or, with respect to investment companies, Tara L. Royal, Attorney, Office of Disclosure Regulation, Division of Investment Management, at (202) 942-0721, at the Securities and Exchange Commission, 450 Fifth Street, NW, Washington, DC 20549.

**Supplementary Information:** We are adopting new Item 307[2] of Regulation S-B,[3] new Item 307[4] of Regulation S-K,[5] new Rules 13a-14,[6] 13a-15,[7] 15d-14[8] and 15d-15[9] under the Securities Exchange Act of 1934 ("Exchange Act")[10] and new Rule 30a-2[11] under the Investment Company Act of 1940 ("Investment Company Act").[12] We also are adopting amendments to Rules 12b-15,[13] 13a-10[14] and 15d-10[15] and Forms 10-Q,[16] 10-QSB,[17] 10-K,[18] 10-KSB,[19] 20-F[20] and 40-F[21] under the Exchange Act, Rule 30b1-3 under the Investment Company Act,[22] Rule 302 of Regulation S-T[23] and Form N-SAR[24] under the Exchange Act and the Investment Company Act.

## I. Introduction

On July 30, 2002, the Sarbanes-Oxley Act of 2002 (the "Act") was enacted.[25] Section 302 of the Act, entitled "Corporate Responsibility for Financial Reports," requires the Commission to adopt final rules that must be effective by August 29, 2002, 30 days after the date of enactment, under which the principal executive officer or officers and the principal financial officer or officers, or persons providing similar functions, of an issuer each must certify the information contained in the issuer's quarterly and annual reports. Section 302 also requires these officers to certify that: they are responsible for establishing, maintaining and regularly evaluating the effectiveness of, the issuer's internal controls; they have made certain disclosures to the issuer's auditors and the audit committee of the board of directors about the issuer's internal controls; and they have included information in the issuer's quarterly and annual reports about their evaluation and whether there have been significant changes in the issuer's internal controls or in other factors that could significantly affect internal controls subsequent to the evaluation.

On June 14, 2002, we proposed rules that would have required a company's principal executive officer and principal financial officer to certify the contents of the company's quarterly and annual reports.[26] The June Proposals also would have required companies to maintain procedures to provide reasonable assurance that they are able to collect, process and disclose the information required in their Exchange Act reports. Finally, the June Proposals would have required companies to undertake an annual evaluation of these procedures under the supervision of management. Shortly after enactment of the Act, we provided supplemental information on the Act and the June Proposals.[27]

In light of Congress' directive in Section 302 of the Act, we are adopting rules that implement the certification mandated by the Act instead of the certification contained in the June Proposals. We received 102 comment letters in response to the June Proposals.[28] Although responding to the form of certification set forth in the June Proposals, a majority of the commenters supported a certification requirement for senior corporate officers.[29] In addition, the comment letters we have received since the enactment of the Act also express support for a certification requirement.[30] Because Section 302 of the Act prescribes the form of certification that we are to adopt, the new rules do not reflect many of the comments and suggestions that we received on the June Proposals.

While Section 302 of the Act requires an issuer's principal executive and financial officers to make specific certifications regarding their responsibilities to establish and maintain internal controls, it does not directly address the issuer's responsibility for controls and procedures related to the issuer's Exchange Act reporting obligations.[31] The June Proposals included requirements that companies maintain sufficient procedures to provide reasonable assurances that they are able to collect, process and disclose, within the time periods specified in the Commission's rules and forms, the information required to be disclosed in their Exchange Act reports.[32] We have adopted this requirement largely as proposed. Because of the broad scope of Section 302 of the Act, the new rules are applicable to all types of issuers that file reports under Section 13(a) or 15(d) of the Exchange Act, including foreign private issuers, banks and savings associations, issuers of asset-backed securities, small business issuers and registered investment companies.[33]

## II. Certification of Quarterly and Annual Reports

### A. Rule Requirements

As adopted, new Exchange Act Rules 13a-14 and 15d-14 require an issuer's principal executive officer or officers and the principal financial officer or officers, or persons performing similar functions, each to certify in each quarterly and annual report, including transition reports, filed or submitted by the issuer under Section 13(a) or 15(d) of the Exchange Act[34] that:

- he or she has reviewed the report;

- based on his or her knowledge, the report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the report;[35]

- based on his or her knowledge, the financial statements, and other financial information included in the report, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in the report;

- he or she and the other certifying officers:

- o are responsible for establishing and maintaining "disclosure controls and procedures" (a newly-defined term reflecting the concept of controls and procedures related to disclosure embodied in Section 302(a)(4) of the Act) for the issuer;

- o have designed such disclosure controls and procedures to ensure that material information is made known to them, particularly during the period in which the periodic report is being prepared;

- o have evaluated the effectiveness of the issuer's disclosure controls and procedures as of a date within 90 days prior to the filing date of the report; and

- o have presented in the report their conclusions about the effectiveness of the disclosure controls and procedures based on the required evaluation as of that date;

- he or she and the other certifying officers have disclosed to the issuer's auditors and to the audit committee of the board of directors (or persons fulfilling the equivalent function)

  - o all significant deficiencies in the design or operation of internal controls (a pre-existing term relating to internal controls regarding financial reporting)[36] which could adversely affect the issuer's ability to record, process, summarize and report financial data and have identified for the issuer's auditors any material weaknesses in internal controls; and

  - o any fraud, whether or not material, that involves management or other employees who have a significant role in the issuer's internal controls; and

- he or she and the other certifying officers have indicated in the report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of their evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

For purposes of the new rules, "disclosure controls and procedures" are defined as controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports filed or submitted by it under the Exchange Act[37] is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms.[38] "Disclosure controls and procedures" include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in its Exchange Act reports is accumulated and communicated to the issuer's management, including its principal executive and financial officers, as appropriate to allow timely decisions regarding required disclosure.

## B. Discussion of Certification Requirement

1. Issuers Subject to Certification Requirement

Section 302 of the Act states that the certification requirement is to apply to each company filing periodic reports under Section 13(a) or 15(d) of the Exchange Act.[39] Accordingly, new Exchange Act Rules 13a-14 and 15d-14 apply to the principal executive officers and principal financial officers, or persons performing similar functions, of any issuer that files quarterly and annual reports with the Commission under either Section 13(a) or 15(d) of the Exchange Act, including foreign private issuers, banks and savings associations, issuers of asset-backed securities and small business issuers.[40]

### a) Foreign Private Issuers

While the June Proposals would not have applied to foreign private issuers, [41] Section 302 of the Act makes no distinction between domestic and foreign issuers and, by its terms, clearly applies to foreign private issuers. New Exchange Act Rules 13a-14 and 15d-14, therefore, apply the certification requirement to the principal executive officers and principal financial officers of foreign private issuers that file reports under Section 13 (a) or 15(d) of the Exchange Act.[42]

### b) Banks and Saving Associations

The certification requirement of Section 302 of the Act also applies to principal executive officers and principal financial officers of banks and savings associations that file periodic reports under Section 13(a) or 15(d) of the Exchange Act. The Act amended Section 12(i) of the Exchange Act to make it clear that the federal banking agencies have the authority to administer and enforce various provisions of the Act, including the certification required by Section 302.[43]

### c) Asset-Backed Securities Issuers

Issuers of asset-backed securities in public offerings have a reporting obligation under either Section 13(a) or 15(d) of the Exchange Act, at least for a period of time.[44] Because of the nature of asset-backed issuers, the staff of the Division of Corporation Finance has granted requests allowing asset-backed issuers to file modified reports under the Exchange Act.[45]

The modified reporting structure for asset-backed issuers allows issuers or depositors to file modified annual reports on Form 10-K and to file reports tied to payments on the underlying assets in the trust. These reports include a copy of the servicing or distribution report required by the issuer's governing documents and information on the performance of the assets, payments on the asset-backed securities and any other material developments that affect the issuer. Because the reported information for asset-backed issuers differs significantly from that for other issuers, the certification requirement of Section 302 of the Act must be specifically tailored for asset-backed issuers. The new rules require asset-backed issuers to certify their reports. The staff of the Division of Corporation Finance today is providing guidance for asset-backed issuers regarding compliance with the certification requirement.

### d) Small Business Issuers

The June Proposals generally did not distinguish between large and small issuers. Similarly, Section 302 of the Act directs that the certification requirement apply to any company filing periodic reports under Section 13 (a) or 15(d) of the Exchange Act. Accordingly, new Rules 13a-14 and 15d-14 apply to all issuers that file Exchange Act periodic reports regardless of their size. We note, however, that because many small business issuers do not file Exchange Act reports, not all small business issuers will be subject to the certification requirement.

2. Reports Subject to Certification Requirement

Section 302 of the Act states that the required certification is to be included in each annual or quarterly report filed or submitted under either Section 13(a) or 15(d) of the Exchange Act.[46] Accordingly, the certification requirement applies to annual reports on Forms 10-K, 10-KSB, 20-F and 40-F.[47] The certification requirement also applies to quarterly reports on Forms 10-Q and 10-QSB. Finally, the certification requirement applies to amendments to, and transition reports on, any of the foregoing reports.[48]

Reports that are current reports, such as reports on Forms 6-K[49] and 8-K, rather than periodic (quarterly and annual) reports are not covered by the certification requirement.[50] Disclosure controls and procedures, however, are required to be designed, maintained and evaluated to ensure full and timely disclosure in current reports, as well as definitive proxy materials and definitive information statements, even though there is no specific certification requirement relating to reports on those forms.[51]

The new rules apply the certification requirement to foreign private issuers filing annual reports on Form 20-F and Canadian issuers filing annual reports on Form 40-F under our Multi-jurisdictional Disclosure System. Although Form 20-F is not required to be signed by any specific executive officer of a foreign registrant,[52] we believe that it is the clear intent of Congress to require that the appropriate officers execute and submit the required certification in an annual report filed under the Exchange Act on Form 20-F or 40-F.

As we first indicated in the June Proposals, we continue to consider whether we should extend a certification requirement to other documents filed under the Exchange Act, such as registration statements on Forms 10 and 10-SB[53] and definitive proxy and information statements. We solicit comment on whether any or all of these documents, or any other documents, should be certified by an issuer's senior officers.

3. Content of Certification

Section 302 of the Act states that the required certification is to made by an issuer's principal executive officer or officers and principal financial officer or officers, or persons performing similar functions. The required certification contains several statements. The certification statement concerning the material accuracy and completeness of the periodic reports that are covered by the statement mirrors the existing statutory disclosure standards for "material" accuracy and completeness of information contained in reports.[54]

The certification statement regarding fair presentation of financial statements and other financial information included in the report was not part of the June Proposals. This statement separately addresses the presentation of an issuer's financial disclosure. This financial disclosure includes financial statements (including footnote disclosure), selected financial data, management's discussion and analysis of financial condition and results of operations and other financial information in a report. The certification, as adopted, states that the overall financial disclosure fairly presents, in all material respects, the company's financial condition, results of operations and cash flows. We have added a specific reference to cash flows even though Section 302 of the Act does not include such an explicit reference. We believe that it is consistent with Congressional intent to include both income or loss and cash flows within the concept of "fair presentation" of an issuer's results of operations.

The certification statement regarding fair presentation of financial statements and other financial information is not limited to a representation that the financial statements and other financial information have been presented in accordance with "generally accepted accounting principles" and is not otherwise limited by reference to generally accepted accounting principles. We believe that Congress intended this statement to provide assurances that the financial information disclosed in a report, viewed in its entirety, meets a standard of overall material accuracy and completeness that is broader than financial reporting requirements under generally accepted accounting principles.[55] In our view, a "fair presentation" of an issuer's financial condition, results of operations and cash flows encompasses the selection of appropriate accounting policies, proper application of appropriate accounting policies, disclosure of financial information that is informative and reasonably reflects the underlying transactions and events and the inclusion of any additional disclosure necessary to provide investors with a materially accurate and complete picture of an issuer's financial condition, results of operations and cash flows.[56]

Both of the foregoing certification statements are to be made based on the knowledge of the certifying officer. This is not meant to change the current obligations of corporate officers in connection with the discharge of their duties. Both of the foregoing statements are also made in the context of the requirements of the reports in which they are included. In particular, quarterly reports on Forms 10-Q and 10-QSB have less extensive disclosure and financial statement and footnote requirements than annual reports. The certification requirement is not intended to require expansion of quarterly reports to satisfy the requirements of annual reports. Rather, completeness of disclosure will be determined through application of standards derived from our existing rules, forms and interpretations.[57]

While the certification described in the June Proposals contained a statement regarding the completion of a review of an issuer's internal procedures and controls aimed at assuring adequate disclosure, the certification required by Section 302 of the Act includes several, more detailed, statements concerning an issuer's "internal controls" and the ongoing oversight of these controls. For purposes of the certification required by Section 302(a)(4) of the Act, we have defined the term "disclosure controls and procedures" to incorporate a broader concept of controls and procedures designed to ensure compliance with disclosure

requirements generally. This definition is included in new Exchange Act Rules 13a-14 and 15d-14 and applies to the portion of the certification required by Section 302(a)(4) of the Act.[58]

We have defined the term "disclosure controls and procedures" to make it explicit that the controls contemplated by Section 302(a)(4) of the Act are intended to embody controls and procedures addressing the quality and timeliness of disclosure. We also have included this definition to differentiate this concept of disclosure controls and procedures from the pre-existing concept of "internal controls" that pertains to an issuer's financial reporting and control of its assets, as currently embodied in Section 13(b) of the Exchange Act[59] and as addressed in Sections 302(a)(5) and (a)(6) and Section 404 of the Act. We make this distinction based on our review of Section 302 of the Act as well as to effectuate what we believe to be Congress' intent - to have senior officers certify that required material non-financial information, as well as financial information, is included in an issuer's quarterly and annual reports. Under this interpretation, we maintain the pre-existing concept of internal controls without expanding it by relating it to non-financial information.

As discussed in the June Proposals, we are not requiring any particular procedures for conducting the required review and evaluation. Instead, we expect each issuer to develop a process that is consistent with its business and internal management and supervisory practices. We do recommend, however, that, if it has not already done so, an issuer create a committee with responsibility for considering the materiality of information and determining disclosure obligations on a timely basis.[60] As is implicit in Section 302(a)(4) of the Act, such a committee would report to senior management, including the principal executive and financial officers, who bear express responsibility for designing, establishing, maintaining, reviewing and evaluating the issuer's disclosure controls and procedures.

We believe that the concept of "internal controls" contemplated by Sections 302(a)(5) and (6) of the Act concern an issuer's controls and procedures for financial reporting purposes as required by Section 13(b) of the Exchange Act. They also relate to the "internal controls" addressed in Section 404 of the Act.[61] The certification required by new Exchange Act Rules 13a-14 and 15d-14 makes reference to certain disclosures regarding both disclosure controls and procedures and internal controls that must be made in the reports in which the certification is contained. These disclosure requirements appear in new Item 307 of Regulation S-K, Item 307 of Regulation S-B, Item 15 of Form 20-F and General Instruction B(6) of Form 40-F.

Because the statements involving disclosure controls and procedures and internal controls require the certifying officers to take certain specified actions, such as evaluating the effectiveness of the disclosure controls and procedures prior to the date of the report to which the certification relates, these statements will be required as part of the certification only with respect to any reports that cover periods ending on or after August 29, 2002, the effective date of the rules required by Section 302 of the Act. [62]

4. Form of Certification

The certification required by new Exchange Act Rules 13a-14 and 15d-14 must be in the exact form set forth in the amendments to the affected reports. The wording of the required certification may not be changed in any respect (even if the change would appear to be inconsequential in nature).[63]

5. Location of Certification

Section 302 of the Act states that the required certification is to be included "in" each quarterly or annual report filed or submitted under either Section 13(a) or 15(d) of the Exchange Act. To implement this directive, we have amended Forms 10-Q, 10-QSB, 10-K, 10-KSB, 20-F and 40-F under the Exchange Act to require that the certifications follow immediately after the signature sections of these reports.

The required certification is in addition to, and, thus, does not alter, the current signature requirements for quarterly and annual reports filed under the Exchange Act. The signatures required by the certifications will be part of these reports, and, therefore, also will be subject to the signature requirement of our rules.[64] We have amended Rule 302 of Regulation S-T[65] to make it clear that its requirements apply to the signatures appearing in these certifications.

6. Liability for False Certification

An issuer's principal executive and financial officers already are responsible as signatories for the issuer's disclosures under the Exchange Act liability provisions[66] and can be liable for material misstatements or omissions under general antifraud standards[67] and under our authority to seek redress against those who cause or aid or abet securities law violations.[68] An officer providing a false certification potentially could be subject to Commission action for violating Section 13(a) or 15(d) of the Exchange Act and to both Commission and private actions for violating Section 10(b) of the Exchange Act[69] and Exchange Act Rule 10b-5.[70]

**III. Disclosure Controls and Procedures**

**A. Rule Requirements**

As adopted, new Exchange Act Rules 13a-15 and 15d-15 require each issuer filing reports under Section 13(a) or Section 15(d) of the Exchange Act to maintain disclosure controls and procedures (as defined in new Exchange Act Rules 13a-14(c) and 15d-14(c)). We believe that, to assist principal executive and financial officers in the discharge of their responsibilities in making the required certifications, as well as to discharge their responsibilities in providing accurate and complete information to security holders, it is necessary for companies to ensure that their internal communications and other procedures operate so that important information flows to the appropriate collection and disclosure points in a timely manner.

**B. Discussion of Disclosure Controls and Procedures**

New Exchange Act Rules 13a-15 and 15d-15 complement existing requirements for reporting companies to establish and maintain systems of internal controls with respect to their financial information.[71] They are intended to ensure that an issuer maintains commensurate procedures for gathering, analyzing and disclosing all information that is required to be disclosed in its Exchange Act reports.

As discussed in the June Proposals, these procedures are intended to cover a broader range of information than is covered by an issuer's internal controls related to financial reporting. For example, the procedures should ensure timely collection and evaluation of information potentially subject to disclosure under the requirements of Regulation S-X,[72] Regulation S-K or S-B and Forms 20-F and 40-F. The procedures should capture information that is relevant to an assessment of the need to disclose developments and risks that pertain to the issuer's businesses.[73] They also should cover information that must be evaluated in the context of the disclosure requirement of Exchange Act Rule 12b-20. We believe that the new rules will help to ensure that an issuer's systems grow and evolve with its business and are capable of producing Exchange Act reports that are timely, accurate and reliable.[74]

New Exchange Act Rules 13a-15 and 15d-15 also are entirely complementary to the objectives of Section 302 of the Act. While Section 302 requires an issuer's principal executive and financial officers to make specific statements in their certifications and to take the actions satisfying the representations made in the statements as to the issuer's disclosure controls and procedures, it does not directly address the issuer's obligations with respect to these controls and procedures. The new rules will ensure that an issuer also has a responsibility to maintain adequate disclosure controls and procedures, so that its principal executive and financial officers can supervise and review these periodic evaluations and report the results to security holders through the issuer's Exchange Act reports.[75]

New Exchange Act Rules 13a-15 and 15d-15 also require the issuer, under the supervision of the principal executive and financial officers, to conduct an evaluation of the effectiveness of the design and operation of the issuer's disclosure controls and procedures within 90 days of the filing date of any quarterly or annual report filed under the Exchange Act. While the new rules do not provide detailed procedures for such an evaluation, the evaluation must, at a minimum, address the matters specified by the rules. We expect that this evaluation would be carried out in a manner that would form the basis for the certification statements required by Section 302 of the Act regarding disclosure controls and procedures required by new Exchange Act Rules 13a-14(b)(4)(ii)-(iii) and 15d-14(b)(4)(ii)-(iii) in an issuer's quarterly and annual reports.

We noted in the June Proposals that mandatory requirements regarding disclosure controls and procedures may raise several issues for foreign private issuers. Section 302 of the Act, however, does not provide any exception to the certification requirement for foreign private issuers. Because we believe that the maintenance of disclosure controls and procedures is an important part of satisfying the certification requirement, it is appropriate to require foreign private issuers to comply with new Exchange Act Rules 13a-15 and 15d-15 with respect to the implementation of the controls and procedures outlined in Section 302(a)(4) of the Act.

## IV. Certification of Registered Investment Company Annual and Semi-Annual Reports

We are implementing Section 302 of the Act with respect to registered investment companies by adopting new Investment Company Act Rule 30a-2. This rule requires a registered investment company that files periodic reports under Section 13(a) or 15(d) of the Exchange Act (that is, Form N-SAR) to include the certification specified by Section 302 in those periodic reports. We are also amending the instructions to Form N-SAR, the annual and semi-annual reporting form for registered investment companies, to require the specified certification to be filed as an exhibit to Form N-SAR.[76]

Section 302 requires the specified certification to be included in "each annual or quarterly report filed or submitted" under either Section 13(a) or 15(d) of the Exchange Act.[77] Form N-SAR is the form designated for registered investment companies to comply with their reporting requirements under Sections 13(a) and 15(d) of the Exchange Act, as well as periodic reporting requirements under Sections 30(a) and 30(b)(1)[78] of the Investment Company Act.[79] Registered management investment companies are required to file annual and semi-annual reports on Form N-SAR not more than 60 calendar days after the close of each fiscal year and fiscal second quarter.[80] Registered unit investment trusts are required to file annual reports on Form N-SAR with respect to each calendar year, not more than 60 calendar days after the close of each year.[81]

Unlike Forms 10-K and 10-Q, Form N-SAR does not require the filing of financial statements. However, Form N-SAR requires management investment companies to provide certain financial information based on the financial statements as of the same date contained in the investment company's annual and semi-annual reports to shareholders.[82] Therefore, we are requiring the signing officers of a registered management investment company to certify under new Investment Company Act Rule 30a-2(b)(3) that the financial information included in the report and the financial statements on which the financial information is based fairly present, in all material respects, the financial condition, results of operations, changes in net assets and cash flows (if the financial statements are required to include a statement of cash flows) of the investment company.[83] We have added a specific reference to changes in net assets and cash flows even though Section 302 of the Act does not include such an explicit reference. We believe that it is consistent with Congressional intent to include both income or loss, and changes in net assets and, in the case where the financial statements are required to include a statement of cash flows, within the concept of "fair presentation" of an investment company's results of operations.

The certification required by new Investment Company Act Rule 30a-2 must be in the exact form set forth in the amendments to Form N-SAR.[84] The wording of the required certification may not be changed in any respect (even if the change would appear to be inconsequential in nature).

Investment companies filing reports on Form N-SAR under Sections 13(a) and 15(d) of the Exchange Act will also be required to maintain disclosure controls and procedures under new Exchange Act Rules 13a-15 and 15d-15.[85] New Rules 13a-15 and 15d-15 also require an investment company,

under the supervision and with the participation of the principal executive and financial officers, to conduct an evaluation of the effectiveness of the design and operation of the investment company's disclosure controls and procedures within 90 days of the filing date of each report requiring certification under new Investment Company Act Rule 30a-2. We expect that this evaluation would be carried out in a manner that would form the basis for the certification statements required by Section 302 of the Act regarding disclosure controls and procedures required by new Investment Company Act Rule 30a-2(b)(4)(i)-(iii) in an investment company's Form N-SAR.[86]

The certification required by new Investment Company Act Rule 30a-2 makes reference to certain disclosures regarding both disclosure controls and procedures and internal controls that must be made in the reports in which the certification is contained. These disclosure requirements appear in the new instructions to Form N-SAR.[87]

Unit investment trusts will be required to provide the specified certification with respect to the items of Form N-SAR specific to them, which include very limited financial information.[88] We recognize that unit investment trusts, which are unmanaged, fixed portfolios of securities, have no corporate management structure and hence will not have a principal executive officer or principal financial officer. Therefore, in the case of a unit investment trust, the required certification should be signed by personnel of the sponsor, trustee, depositor or custodian who perform functions similar to those of a principal executive officer and principal financial officer on behalf of the trust.[89]

Unit investment trusts and small business investment companies are not required to transmit reports to their shareholders containing their financial statements, and Form N-SAR does not require unit investment trusts and small business investment companies to report financial information based on their financial statements.[90] Therefore, the certification requirement applicable to these investment companies does not include the requirement of new Investment Company Act Rule 30a-2(b)(3) that the signing officers certify that the financial information included in the periodic report and the financial statements on which it is based fairly present, in all material respects, the financial condition, results of operations, changes in net assets and cash flows (if the financial statements are required to include a statement of cash flows) of the investment company.[91]

Business development companies and face-amount certificate companies file periodic reports on Forms 10-K and 10-Q under the Exchange Act, and they are required to comply with the certification requirements applicable to these forms.[92]

We note that, in a companion release, we are proposing to require registered management investment companies to file certified shareholder reports with the Commission on new Form N-CSR and would designate these certified shareholder reports as reports that are required under Sections 13(a) and 15(d) of the Exchange Act. For registered management investment companies, the required reports to shareholders, rather than Form N-SAR, are the primary vehicle for providing financial statements to investors. We believe that the information in these reports to shareholders

should be certified. In addition, we are proposing an amendment to Form N-SAR that would uniformly apply to all registered investment companies, and not just those subject to Section 13(a) or 15(d) of the Exchange Act, the requirement to include in Form N-SAR the certification required by Section 302 of the Act. We are also proposing a new rule to apply disclosure controls and procedures requirements, similar to those contained in Exchange Act Rules 13a-15 and 15d-15, uniformly to all registered investment companies.

## V. Transition Provisions

Paragraphs (b)(1), (2) and (3) of new Exchange Act Rules 13a-14 and 15d-14 apply to quarterly and annual reports, including transition reports, filed after the Effective Date. Paragraphs (b)(4), (5) and (6) of Rules 13a-14 and 15d-14 apply to quarterly and annual reports, including transition reports, filed for periods ending after the Effective Date. Paragraph (a) of Item 307 of Regulations S-B and S-K and paragraph (b) of new Exchange Act Rules 13a-15 and 15d-15 apply to quarterly and annual reports, including transition reports, filed for periods ending after the Effective Date.

Paragraphs (b)(1), (2) and (3) of new Investment Company Act Rule 30a-2 apply to annual and semi-annual reports, including transition reports, on Form N-SAR filed after the Effective Date. Paragraphs (b)(4), (5) and (6) of Rule 30a-2 apply to annual and semi-annual reports, including transition reports, filed for periods ending after the Effective Date. Paragraph (a)(i) of the Instruction to sub-item 77Q3 of Form N-SAR and paragraph (b) of new Exchange Act Rules 13a-15 and 15d-15 apply to annual and semi-annual reports, including transition reports, on Form N-SAR filed for periods ending after the Effective Date.

## VI. Paperwork Reduction Act

The new rules and amendments to existing rules and forms contain "collection of information" requirements within the meaning of the Paperwork Reduction Act of 1995 ("PRA").[93] We published a notice requesting comment on the collection of information requirements in the June Proposals, and submitted these requirements to the Office of Management and Budget ("OMB") for review in accordance with the PRA.[94] The titles for those collections of information are "Form 10-K," "Form 10-KSB," "Form 10-Q" and "Form 10-QSB."[95]

While we received only one comment letter specifically remarking on our PRA estimates included in the June Proposals,[96] we revised the proposed amendments in response to the directives in Section 302 of the Act. The revisions made to the rules and amendments do not alter the burden estimates for Forms 10-K (OMB Control No. 3235-0063), 10-KSB (OMB Control No. 3235-0420), 10-Q (OMB Control No. 3235-0070) and 10-QSB (OMB Control No. 3235-0416) previously submitted to and approved by OMB.

The new rules and form amendments that we are adopting cover the more expansive reach of Section 302 of the Act and contain additional "collection of information requirements" within the meaning of the PRA. Accordingly, we submitted additional materials to OMB for emergency review in

accordance with the PRA.[97] The titles for these collections of information are "Form 20-F" (OMB Control No. 3235-0288), "Form 40-F" (OMB Control No. 3235-0381) and "Form N-SAR" (OMB Control No. 3235-0330). An agency may not conduct or sponsor, and a person is not required to respond to, an information collection unless it displays a currently valid OMB control number.

Form 10-K prescribes information that registrants must disclose annually to the market about its business. Form 10-KSB prescribes information that registrants that are "small business issuers" as defined under our rules must disclose annually to the market about its business.

Form 10-Q prescribes information that registrants must disclose quarterly to the market about its business. Form 10-QSB prescribes information that registrants that are "small business issuers" as defined under our rules must disclose quarterly to the market about its business.

Form 20-F is used by foreign private issuers to either register a class of securities under the Exchange Act or provide an annual report required under the Exchange Act. Form 40-F is used by foreign private issuers to file reports under the Exchange Act after having registered securities under the Securities Act and by certain Canadian registrants. Form N-SAR is used by registered investment companies to file annual and semi-annual reports under the Exchange Act and the Investment Company Act.

New Exchange Act Rules 13a-14 and 15d-14[98] require an issuer's principal executive and financial officers to certify the information contained in the issuer's quarterly and annual reports and that they have taken certain actions with respect to the issuer's internal controls for the collection and reporting of financial and other information that is subject to disclosure in the issuer's quarterly and annual Exchange Act reports. This certification requirement would become part of the "collection of information" required in each quarterly and annual report.

New Exchange Act Rules 13a-15 and 15d-15[99] require an issuer to maintain disclosure controls and procedures to provide reasonable assurance that the issuer is able to record, process, summarize and report the information required in the issuer's Exchange Act reports. These procedures would become part of the "collection of information" required in these reports.

New Investment Company Act Rule 30a-2 requires an investment company's principal executive and financial officers to certify the information contained in the investment company's annual and semi-annual reports on Form N-SAR and that they have taken certain actions with respect to the investment company's internal controls for the collection and reporting of financial and other information that is subject to disclosure in the investment company's reports on Form N-SAR. This certification requirement would become part of the "collection of information" required in each report on Form N-SAR.

The purpose of the certification and disclosure controls and procedures requirements is to ensure that the information that is collected and disclosed in Exchange Act reports is complete and accurate. Consequently, the senior officer certification, as well as the periodic evaluations of internal

reporting systems, required by the rules and amendments will become part of the process in which issuers engage to comply with the reporting requirements of the affected forms.

The compliance burden estimates for the collections of information are based on several assumptions.[100] The number of foreign private issuers that file annual reports on Form 20-F or 40-F is approximately 1,300 entities.[101] The number of registered investment companies that file Form N-SAR is approximately 4,450 entities.[102]

New Exchange Act Rule 13a-14 and new Investment Company Act Rule 30a-2 require an issuer's principal executive and financial officers to certify the information contained in the issuer's periodic reports. The compliance burden associated with new Exchange Act Rule 13a-14 and new Investment Company Act Rule 30a-2 is the burden associated with reading and thinking critically about each quarterly and annual report to be filed by the issuer so that the certifying officers can make the required certification. For purposes of the PRA, we estimate that the new certification requirement will result in an increase of five burden hours[103] per issuer in connection with preparing each annual report on Form 20-F or 40-F and an increase of five burden hours per issuer in connection with preparing each report on Form N-SAR.

New Exchange Act Rule 13a-15 requires an issuer to maintain sufficient procedures to collect, process and disclose the information required in its Exchange Act reports. We expect that issuers already maintain procedures, whether formal or informal, to comply with their Exchange Act disclosure obligations and for their own internal purposes. We do not believe that this requirement will result in any change in either the reporting or cost burden associated with preparing annual reports on Forms 20-F and 40-F or reports on Form N-SAR.

Based on a burden hour estimate of five hours per respondent per year, we estimate that the total burden hours of complying with Form 20-F and Form 40-F, revised to include the burden hours expected from the new rules, is estimated to be 586,248 hours for Form 20-F, an increase of 4,500 hours[104] from the current annual burden of 581,748 hours, and 525 hours for Form 40-F, an increase of 475 hours[105] from the current annual burden of 50 hours. The total burden hours of complying with Form N-SAR, revised to include the burden hours expected from the new rules, is estimated to be 154,450 hours,[106] an increase of 52,702 hours[107] from the current annual burden of 101,748 hours.

The total burden hours of complying with Forms 10-Q and 10-QSB, revised to include the burden hours expected from the new rules, is estimated to be 3,129,283 hours for Form 10-Q, an increase of 100,298 hours[108] from the current annual burden of 3,028,985 hours, and 1,288,488 hours for Form 10-QSB, an increase of 43,530 hours[109] from the current annual burden of 1,244,958 hours. The total burden hours of complying with Forms 10-K and 10-KSB, revised to include the burden hours expected from the new rules, is estimated to be 12,344,652 hours for Form 10-K, an increase of 35,190 hours[110] from the current annual burden of 12,309,462 hours, and 3,438,518 hours for Form 10-KSB, an increase of 14,209 hours[111] from the current annual burden of 3,424,309 hours.

In addition to the internal hours they will expend to comply with Forms 20-F and 40-F, we expect that respondents will retain outside professionals to assist in compliance with the information collection requirements. The total dollar cost of complying with Forms 20-F and 40-F, revised to include outside professional costs expected from the new rules, is estimated to be $523,596,000 for Form 20-F, an increase of $450,000[112] from the current annual burden of $523,146,000, and $52,500 for Form 40-F, an increase of $26,500[113] from the current annual burden of $26,000.

The total dollar cost of complying with Forms 10-Q and 10-QSB, revised to include outside professional costs expected from the new rules, is estimated to be $312,929,000 for Form 10-Q, an increase of $10,030,000[114] from the current annual burden of $302,899,000, and $128,849,000 for Form 10-QSB, an increase of $4,353,000[115] from the current annual burden of $124,496,000. The total dollar cost of complying with Forms 10-K and 10-KSB, revised to include outside professional costs expected from the new rules, is estimated to be $1,234,465,000 for Form 10-K, an increase of $3,519,000[116] from the current annual burden of $1,230,946,000, and $343,852,000 for Form 10-KSB, an increase of $1,421,000[117] from the current annual burden of $342,431,000.

Comments concerning the accuracy of these burden estimates, and any suggestions for reducing the burden, should be directed to the Commission. Compliance with the new rules is mandatory. Under our rules for the retention of manual signatures, issuers will be required to maintain the certifications for five years.[118] The information required by the new rules will not be kept confidential.

## VII. Cost-Benefit Analysis

The certification requirement that we are adopting today implements a Congressional mandate. We recognize that any implementation of the Sarbanes-Oxley Act will likely result in costs as well as benefits and have an effect on the economy. We are sensitive to the costs and benefits of our adoption of a rule that requires issuers to maintain disclosure controls and procedures. We discuss these costs and benefits below.

The new certification requirement may lead to some additional costs for issuers. The new rules require an issuer's principal executive and financial officers to review the issuer's periodic reports and to make the required certification. To the extent that corporate officers would need to spend additional time thinking critically about the overall context of their company's disclosure, issuers would incur costs (although investors would benefit from improved disclosure). The certification requirement creates a new legal obligation for an issuer's principal executive and financial officers, but does not change the standard of legal liability.

Issuers are already required to maintain reporting controls and procedures for identifying and processing the information needed to satisfy their disclosure obligations under the Exchange Act. The new rules do not dictate that issuers follow any particular procedure. By allowing issuers to determine what procedures are necessary to meet the obligation of the rules, we are mitigating the costs associated with compliance. Some issuers may need to institute appropriate controls and procedures. Other issuers

may need to enhance existing informal or ad hoc controls and procedures. These incremental costs are difficult to quantify. While we requested comment and supporting data in connection with the June Proposals on the cost of implementing, or upgrading and strengthening existing, reporting controls and procedures, we received no specific comment letters in response to that request.

The required periodic evaluation of reporting controls and procedures likely will result in costs for issuers. The new certification requirement likely will require issuers to create or strengthen internal controls to enable their senior executive officers to meet their certification obligations under the new rules. Many issuers already regularly monitor and evaluate their controls and procedures. Because the size and scope of these internal reporting systems is likely to vary among issuers, it is difficult to provide an accurate cost estimate.

Conversely, the new rules are likely to provide significant benefits by ensuring that information about an issuer's business and financial condition is adequately reviewed by the issuer's principal executive and financial officers and the issuer's internal systems keep pace with the growth of the business.

We believe that investor confidence in corporate disclosure has suffered, in part, because of a belief that corporate officers may not devote sufficient attention to the preparation of their companies' periodic reports and to the disclosure controls and procedures that generate the data from which they are prepared.

The new rules should help to ensure that issuers maintain sufficient internal reporting controls and procedures to provide reasonable assurance that they can record, process, summarize and report the information that is required in all Exchange Act reports. To the extent that issuers do not maintain adequate controls and procedures, the new rules should lead to the development, or enhancement and modernization, of these controls and procedures. The required periodic evaluation of these controls and procedures should ensure that issuers devote adequate resources and attention to the maintenance of their internal reporting systems. Additionally, the required evaluation should help to identify potential weaknesses and deficiencies in advance of a system breakdown, thereby ensuring the continuous, orderly and timely flow of information within the company and, ultimately, to investors and the marketplace.

## VIII. Final Regulatory Flexibility Analysis

This Final Regulatory Flexibility Analysis, or FRFA, has been prepared in accordance with the Regulatory Flexibility Act.[119] The FRFA pertains to new Exchange Act Rules 13a-15 and 15d-15 adopted for operating companies, for which we gave notice and sought comment. The Sarbanes-Oxley Act of 2002 directs us to adopt rules for registered investment companies. Because we find good cause to adopt those rules without notice and comment, we do not analyze them in the FRFA. New Exchange Act Rules 13a-15 and 15d-15 require an issuer to maintain disclosure controls and procedures to provide reasonable assurance that the issuer is able to record, process, summarize and report the information required in their Exchange Act reports.[120]

## A. Reasons for, and Objectives of, New Rules

New Exchange Act Rules 13a-15 and 15d-15 complement existing requirements for reporting companies to establish and maintain systems of internal controls with respect to their financial information. They are intended to ensure that an issuer maintains commensurate procedures for gathering, analyzing and disclosing all information that is required to be disclosed in its Exchange Act reports.

## B. Legal Basis

We are adopting the new rules under the authority set forth in Sections 10 (b), 13, 15(d) and 23(a) of the Exchange Act and Sections 3(a) and 302 of the Act.

## C. Small Entities Subject to the Final Rules

The new rules will affect small entities that are subject to the reporting requirements of Section 13(a) or 15(d) of the Exchange Act. For purposes of the Regulatory Flexibility Act, the Exchange Act[121] defines the term "small business," other than an investment company, to be an issuer that, on the last day of its most recent fiscal year, has total assets of $5 million or less.[122] We estimate that there are approximately 2,500 companies subject to the reporting requirements of Section 13(a) or 15(d) of the Exchange Act that are not investment companies and that have assets of $5 million or less.[123]

## D. Significant Issues Raised by Public Comment

The IRFA appeared in the June Proposals.[124] We requested comment on any aspect of the IRFA, including the number of small businesses that would be affected by the proposals, the nature of the impact, how to quantify the number of small entities that would be affected and how to quantify the impact of the proposals. We received one comment letter responding to that request.[125] This commenter recommended that we provide a transition period for small businesses and that we clarify the need for small businesses to audit their internal controls quarterly. This release contains a transition provision that delays compliance with the certification requirement as it relates to disclosure controls and procedures and internal controls.[126] The requirements for periodic audit of an issuer's internal controls will be considered at a future date.

## E. Reporting, Recordkeeping and Other Compliance Requirements

The new rules require issuers, including "small businesses," to maintain sufficient procedures to provide reasonable assurance that the issuer is able to record, process, summarize and report the information required in their Exchange Act reports filed with the Commission, and to periodically review and evaluate these procedures. We do not dictate the specifics of these procedures. The new rules may increase the costs associated with compliance with issuers' Exchange Act reporting obligations.

## F. Duplicative, Overlapping or Conflicting Federal Rules

Section 13(b)(2)(B) of the Exchange Act[127] requires issuers that are subject to the reporting requirements of Section 13(a) or 15(d) to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that the transactions and information are recorded as necessary to permit the preparation of the issuer's financial statements. New Exchange Act Rules 13a-15 and 15d-15 are intended to address the issuer's controls and procedures for recording, processing summarizing and reporting the information that is required to be disclosed in Exchange Act reports.

### G. Agency Action to Minimize Effect on Small Entities

The Regulatory Flexibility Act directs us to consider significant alternatives that would accomplish the stated objectives, while minimizing any significant adverse impact on small entities. In that regard, we considered the following alternatives: (a) establishing different compliance or reporting requirements that take into account the resources of small entities, (b) clarifying, consolidating or simplifying compliance and reporting requirements under the rules for small entities and (c) exempting small entities from all or part of the proposed rules. We solicited comment as to whether small business issuers should be excluded from the new rules. We received no comment letters responding to that request.

The periodic review and evaluation of information collection and reporting procedures required by the new rules involves a performance standard. The new rules do not mandate how issuers should conduct this review and evaluation. This flexibility will enable small and large entities to develop approaches for the review and evaluation that are appropriate to their individual circumstances. Because Congress has directed the senior officers of all issuers, regardless of size, to certify issuers' quarterly and annual reports, we do not believe it is consistent with that mandate to exempt small issuers from the new rules. We are not aware of any way to further clarify or simplify compliance for small entities.

### IX. Consideration of Burden on Competition and Promotion of Efficiency, Competition and Capital Formation

Section 23(a)(2) of the Exchange Act [128] requires us, when adopting rules under the Exchange Act, to consider the impact that any new rule would have on competition. In addition, Section 23(a)(2) prohibits us from adopting any rule that would impose a burden on competition not necessary or appropriate in furtherance of the purposes of the Exchange Act. Section 3(f) of the Exchange Act [129] and Section 2(c) of the Investment Company Act[130] requires us, when engaging in rulemaking where we are required to consider or determine whether an action is necessary or appropriate in the public interest, to consider, in addition to the protection of investors, whether the action will promote efficiency, competition and capital formation.

The new rules are intended to enhance investor confidence in the quality of the information available to them in quarterly and annual reports filed under the Exchange Act. We believe that by requiring an issuer's principal executive and financial officers to provide the required certification, investor confidence in the securities markets will be enhanced, thereby leading to a

more efficient market.

We do not believe that the new rules will impose any burden on competition. Issuers will incur some costs in complying with the new rules. These costs will include conducting periodic evaluations of the issuer's internal controls and procedures to record, process, summarize and report, on a timely basis, the information required in periodic and current reports filed by the issuer under the Exchange Act. We requested comment in connection on the June Proposals on whether the proposed rules, if adopted, would impose a burden on competition. We received no comment letters in response to that request.

## X. Administrative Procedure Act

The Administrative Procedure Act, or APA, generally requires an agency to publish notice of a proposed rulemaking in the Federal Register.[131] The APA's notice and comment requirement does not apply, however, if the agency "for good cause finds . . . that notice and public procedure are impracticable, unnecessary, or contrary to the public interest."[132] The Commission believes that it is appropriate to waive notice and comment for the portions of the new rules that were not included in the June Proposals and for the application of the new rules to investment companies. Congress has directed the Commission to implement Section 302 of the Act by rule within 30 days after the date of enactment.[133] It is impractical to provide notice and comment within the statutory deadline. It would be unnecessary and against the public interest to provide notice and opportunity for comment on a directive from Congress to implement specific rules. Accordingly, the Commission for good cause finds that delaying adoption of these rules until after a notice and comment period would be impractical, unnecessary and contrary to the public interest.

The APA also generally requires that an agency publish an adopted rule in the Federal Register 30 days before it becomes effective.[134] This requirement, however, does not apply if the agency finds good cause for making the rule effective sooner.[135] For the same reasons as it is waiving notice and comment, the Commission finds good cause to make the new Exchange Act Rules 13a-14 and 15d-14 and new Investment Company Act Rule 30a-2, and the amendments to related rules and forms, effective immediately. In addition, because new Exchange Act Rules 13a-15 and 15d-15 effectuate the purpose of the Section 302 certification requirement and might create a hardship if they did not become effective simultaneously with new Exchange Act Rules 13a-14 and 15d-14, the Commission finds good cause to make the rules effective immediately as to all issuers filing reports under Section 13(a) or 15(d) of the Exchange Act.[136]

## XI. Statutory Authority

The rules and amendments contained in this release are being adopted under the authority set forth in Sections 10(b), 13, 15(d) and 23(a) of the Exchange Act, Section 8, 30 and 38 of the Investment Company Act and Sections 3(a) and 302 of the Sarbanes-Oxley Act of 2002.

## List of Subjects in 17 CFR Parts 228, 229, 232, 240, 249, 270 and 274

Securities.

Investment Companies.

Reporting and recordkeeping requirements.

**TEXT OF FINAL RULES AND AMENDMENTS**

In accordance with the foregoing, Title 17, Chapter II, of the Code of Federal Regulations is amended as follows:

**Part 228 - INTEGRATED DISCLOSURE SYSTEM FOR SMALL BUSINESS ISSUERS**

1. The authority citation for Part 228 is amended by adding the following citation to read as follows:

Authority: 15 U.S.C. 77e, 77f, 77g, 77h, 77j, 77k, 77s, 77z-2, 77z-3, 77aa (25), 77aa(26), 77ddd, 77eee, 77ggg, 77hhh, 77jjj, 77nnn, 77sss, 78l, 78m, 78n, 78o, 78u-5, 78w, 78ll, 78mm, 80a-8, 80a-29, 80a-30, 80a-37 and 80b-11.

Section 228.307 is also issued under secs. 3(a) and 302, Pub.L.No. 107-204, 116 Stat. 745.

2. By adding §228.307 to read as follows:

**§228.307 Controls and Procedures.**

(a) Evaluation of disclosure controls and procedures. Disclose the conclusions of the small business issuer's principal executive officer or officers and principal financial officer or officers, or persons performing similar functions, about the effectiveness of the small business issuer's disclosure controls and procedures (as defined in §§240.13a-14(c) and 240.15d-14(c)) based on their evaluation of these controls and procedures as of a date within 90 days of the filing date of the quarterly or annual report that includes the disclosure required by this paragraph.

(b) Changes in internal controls. Disclose whether or not there were significant changes in the small business issuer's internal controls or in other factors that could significantly affect these controls subsequent to the date of their evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

(c) Asset-Backed Issuers. A small business issuer that is an Asset-Backed Issuer (as defined in Rule 13a-14(g) and Rule 15d-14(g) under the Securities Exchange Act of 1934 [17 CFR 240.13a-14(g) and 17 CFR 240.15d-14(g)] is not required to disclose the information required by this Item.

**Part 229 - STANDARD INSTRUCTIONS FOR FILING FORMS UNDER SECURITIES ACT OF 1933, SECURITIES EXCHANGE ACT OF 1934 AND ENERGY POLICY AND CONSERVATION ACT OF 1975 -**

**REGULATION S-K**

3. The authority citation for Part 229 is amended by adding the following citation to read as follows:

Authority: 15 U.S.C. 77e, 77f, 77g, 77h, 77j, 77k, 77s, 77z-2, 77z-3, 77aa (25), 77aa(26), 77ddd, 77eee, 77ggg, 77hhh, 77iii, 77jjj, 77nnn, 77sss, 78c, 78i, 78j, 78l, 78m, 78n, 78o, 78u-5, 78w, 78ll(d), 78mm, 79e, 79n, 79t, 80a-8, 80a-29, 80a-30, 80a-31(c), 80a-37, 80a-38(a) and 80b-11, unless otherwise noted.

Section 229.307 is also issued under secs. 3(a) and 302, Pub.L.No. 107-204, 116 Stat. 745.

4. By adding §229.307 to read as follows:

**§229.307 Controls and Procedures.**

(a) Evaluation of disclosure controls and procedures. Disclose the conclusions of the registrant's principal executive officer or officers and principal financial officer or officers, or persons performing similar functions, about the effectiveness of the registrant's disclosure controls and procedures (as defined in §§240.13a-14(c) and 240.15d-14(c)) based on their evaluation of these controls and procedures as of a date within 90 days of the filing date of the quarterly or annual report that includes the disclosure required by this paragraph.

(b) Changes in internal controls. Disclose whether or not there were significant changes in the registrant's internal controls or in other factors that could significantly affect these controls subsequent to the date of their evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

(c) Asset-Backed Issuers. A registrant that is an Asset-Backed Issuer (as defined in §240.13a-14(g) and §240.15d-14(g)) is not required to disclose the information required by this Item.

**PART 232 - REGULATION S-T - GENERAL RULES AND REGULATIONS FOR ELECTRONIC FILINGS**

5. The authority citation for Part 232 is amended by adding the following citation to read as follows:

Authority: 15 U.S.C. 77f, 77g, 77h, 77j, 77s(a), 77sss(a), 78c(b), 78l, 78m, 78n, 78o(d), 78w(a), 78ll(d), 79t(a), 80a-8, 80a-29, 80a-30 and 80a-37.

Section 232.302 is also issued under secs. 3(a) and 302, Pub.L.No. 107-204, 116 Stat. 745.

6. By amending §232.302 by revising paragraphs (a) and (b) to read as follows:

§232.302 Signatures.

(a) Required signatures to, or within, any electronic submission (including, without limitation, signatories within the certifications required by §§240.13a-14, 240.15d-14 and 270.30a-2 of this chapter) must be in typed form rather than manual format. Signatures in an HTML document that are not required may, but are not required to, be presented in an HTML graphic or image file within the electronic filing, in compliance with the formatting requirements of the EDGAR Filer Manual. When used in connection with an electronic filing, the term "signature" means an electronic entry in the form of a magnetic impulse or other form of computer data compilation of any letters or series of letters or characters comprising a name, executed, adopted or authorized as a signature. Signatures are not required in unofficial PDF copies submitted in accordance with §232.104.

(b) Each signatory to an electronic filing (including, without limitation, each signatory to the certifications required by §§240.13a-14, 240.15d-14 and 270.30a-2 of this chapter) shall manually sign a signature page or other document authenticating, acknowledging or otherwise adopting his or her signature that appears in typed form within the electronic filing. Such document shall be executed before or at the time the electronic filing is made and shall be retained by the filer for a period of five years. Upon request, an electronic filer shall furnish to the Commission or its staff a copy of any or all documents retained pursuant to this section.

\* \* \* \* \*

## PART 240 - GENERAL RULES AND REGULATIONS, SECURITIES EXCHANGE ACT OF 1934

7. The authority citation for Part 240 is amended by adding the following citations in numerical order to read as follows:

Authority: 15 U.S.C. 77c, 77d, 77g, 77j, 77s, 77z-2, 77z-3, 77eee, 77ggg, 77nnn, 77sss, 77ttt, 78c, 78d, 78e, 78f, 78g, 78i, 78j, 78j-1, 78k, 78k-1, 78l, 78m, 78n, 78o, 78p, 78q, 78s, 78u-5, 78w, 78x, 78ll, 78mm, 79q, 79t, 80a-20, 80a-23, 80a-29, 80a-37, 80b-3, 80b-4 and 80b-11, unless otherwise noted.

\* \* \* \* \*

Section 240.12b-15 is also issued under secs. 3(a) and 302, Pub.L.No. 107-204, 116 Stat. 745.

Section 240.13a-10 is also issued under secs. 3(a) and 302, Pub.L.No. 107-204, 116 Stat. 745.

Section 240.13a-14 is also issued under secs. 3(a) and 302, Pub.L.No. 107-204, 116 Stat. 745.

Section 240.13a-15 is also issued under secs. 3(a) and 302, Pub.L.No. 107-204, 116 Stat. 745.

Section 240.15d-10 is also issued under secs. 3(a) and 302, Pub.L.No. 107-204, 116 Stat. 745.

Section 240.15d-14 is also issued under secs. 3(a) and 302, Pub.L.No. 107-204, 116 Stat. 745.

Section 240.15d-15 is also issued under secs. 3(a) and 302, Pub.L.No. 107-204, 116 Stat. 745.

\* \* \* \* \*

8. By revising §240.12b-15 to read as follows:

**§240.12b-15 Amendments.**

All amendments must be filed under cover of the form amended, marked with the letter "A" to designate the document as an amendment, _e.g._, "10-K/A," and in compliance with pertinent requirements applicable to statements and reports. Amendments filed pursuant to this section must set forth the complete text of each item as amended. Amendments must be numbered sequentially and be filed separately for each statement or report amended. Amendments to a statement may be filed either before or after registration becomes effective. Amendments must be signed on behalf of the registrant by a duly authorized representative of the registrant. In addition, each principal executive officer and principal financial officer of the registrant must provide a new certification as specified in §240.13a-14 or §240.15d-14. The requirements of the form being amended will govern the number of copies to be filed in connection with a paper format amendment. Electronic filers satisfy the provisions dictating the number of copies by filing one copy of the amendment in electronic format. See Rule 309 of Regulation S-T (§232.309 of this chapter).

9. By amending §240.13a-10 to add an "Additional Note" after the "Note" at the end of the section to read as follows:

**§240.13a-10 Transition reports.**

\* \* \* \* \*

Additional Note: The report or reports to be filed pursuant to this section must include the certification required by §240.13a-14.

10. By adding §240.13a-14 to read as follows:

**§240.13a-14 Certification of disclosure in annual and quarterly reports.**

(a) Each report, including transition reports, filed on Form 10-Q, Form 10-QSB, Form 10-K, Form 10-KSB, Form 20-F or Form 40-F (§§249.308a, 249.308b, 249.310, 249.310b, 249.220f and 249.240f of this chapter) under section 13(a) of the Act (15 U.S.C. 78m(a)), other than a report filed by an Asset-Backed Issuer (as defined in paragraph (g) of this section), must include a certification containing the information set forth in paragraph (b) of this section in the form specified in the report. Each

principal executive officer or officers and principal financial officer or officers of the issuer, or persons performing similar functions, at the time of filing of the report must sign the certification.

(b) The certification included in each report specified in paragraph (a) of this section must be in the form specified in the report and consist of a statement of the certifying officer that:

(1) He or she has reviewed the report being filed;

(2) Based on his or her knowledge, the report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the report;

(3) Based on his or her knowledge, the financial statements, and other financial information included in the report, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in the report;

(4) He or she and the other certifying officers are responsible for establishing and maintaining disclosure controls and procedures (as such term is defined in paragraph (c) of this section) for the issuer and have:

(i) Designed such disclosure controls and procedures to ensure that material information relating to the issuer, including its consolidated subsidiaries, is made known to them by others within those entities, particularly during the period in which the periodic reports are being prepared;

(ii) Evaluated the effectiveness of the issuer's disclosure controls and procedures as of a date within 90 days prior to the filing date of the report ("Evaluation Date"); and

(iii) Presented in the report their conclusions about the effectiveness of the disclosure controls and procedures based on their evaluation as of the Evaluation Date;

(5) He or she and the other certifying officers have disclosed, based on their most recent evaluation, to the issuer's auditors and the audit committee of the board of directors (or persons fulfilling the equivalent function):

(i) All significant deficiencies in the design or operation of internal controls which could adversely affect the issuer's ability to record, process, summarize and report financial data and have identified for the issuer's auditors any material weaknesses in internal controls; and

(ii) Any fraud, whether or not material, that involves management or other employees who have a significant role in the issuer's internal controls; and

(6) He or she and the other certifying officers have indicated in the report whether or not there were significant changes in internal controls or in

other factors that could significantly affect internal controls subsequent to the date of their most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

(c) For purposes of this section and §240.13a-15 of this chapter, the term "disclosure controls and procedures" means controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports that it files or submits under the Act (15 U.S.C. 78a et seq.) is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Act is accumulated and communicated to the issuer's management, including its principal executive officer or officers and principal financial officer or officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

(d) A person required to provide the certification specified in paragraph (a) of this section may not have the certification signed on his or her behalf pursuant to a power of attorney or other form of confirming authority.

(e) Each annual report filed by an Asset-Backed Issuer (as defined in paragraph (g) of this section) under section 13(a) of the Act (15 U.S.C. 78m(a)) must include a certification addressing the following items:

(1) Review by the certifying officer of the annual report and other reports containing distribution information for the period covered by the annual report;

(2) The absence in these reports, to the best of the certifying officer's knowledge, of any untrue statement of material fact or omission of a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading;

(3) The inclusion in these reports, to the best of the certifying officer's knowledge, of the financial information required to be provided to the trustee under the governing documents of the issuer; and

(4) Compliance by the servicer with its servicing obligations and minimum servicing standards.

(f) With respect to Asset-Backed Issuers, the certification required by paragraph (e) of this section must be signed by the trustee of the trust (if the trustee signs the annual report) or the senior officer in charge of securitization of the depositor (if the depositor signs the annual report). Alternatively, the senior officer in charge of the servicing function of the master servicer (or entity performing the equivalent functions) may sign the certification.

(g) For purposes of this section, the term Asset-Backed Issuer means any issuer whose reporting obligation results from the registration of securities it issued that are primarily serviced by the cash flows of a discrete pool of receivables or other financial assets, either fixed or revolving, that by their

terms convert into cash within a finite time period plus any rights or other assets designed to assure the servicing or timely distribution of proceeds to security holders.

11. By adding §240.13a-15 to read as follows:

### §240.13a-15 Issuer's disclosure controls and procedures related to preparation of required reports.

(a) Every issuer that has a class of securities registered pursuant to section 12 of the Act (15 U.S.C. 78l), other than an Asset-Backed Issuer (as defined in §240.13a-14(g) of this chapter), must maintain disclosure controls and procedures (as defined in §240.13a-14(c) of this chapter).

(b) Within the 90-day period prior to the filing date of each report requiring certification under §240.13a-14 and §270.30a-2 of this chapter, an evaluation must be carried out under the supervision and with the participation of the issuer's management, including the issuer's principal executive officer or officers and principal financial officer or officers, or persons performing similar functions, of the effectiveness of the design and operation of the issuer's disclosure controls and procedures.

12. By amending §240.15d-10 to add an "Additional Note" after the "Note" at the end of the section to read as follows:

### §240.15d-10 Transition reports.

\* \* \* \* \*

Additional Note: The report or reports to be filed pursuant to this section must include the certification required by §240.15d-14.

13. By adding §240.15d-14 to read as follows:

### §240.15d-14 Certification of disclosure in annual and quarterly reports.

(a) Each report, including transition reports, filed on Form 10-Q, Form 10-QSB, Form 10-K, Form 10-KSB, Form 20-F or Form 40-F (§§249.308a, 249.308b, 249.310, 249.310b, 249.220f and 249.240f of this chapter) under section 15(d) of the Act (15 U.S.C. 78o(d)), other than a report filed by an Asset-Backed Issuer (as defined in paragraph (g) of this section), must include a certification containing the information set forth in paragraph (b) of this section in the form specified in the report. Each principal executive officer or officers and principal financial officer or officers of the issuer, or persons performing similar functions, at the time of filing of the report must sign the certification.

(b) The certification included in each report specified in paragraph (a) of this section must be in the form specified in the report and consist of a statement of the certifying officer that:

(1) He or she has reviewed the report being filed;

(2) Based on his or her knowledge, the report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the report;

(3) Based on his or her knowledge, the financial statements, and other financial information included in the report, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in the report;

(4) He or she and the other certifying officers are responsible for establishing and maintaining disclosure controls and procedures (as such term is defined in paragraph (c) of this section) for the issuer and have:

(i) Designed such disclosure controls and procedures to ensure that material information relating to the issuer, including its consolidated subsidiaries, is made known to them by others within those entities, particularly during the period in which the periodic reports are being prepared;

(ii) Evaluated the effectiveness of the issuer's disclosure controls and procedures as of a date within 90 days prior to the filing date of the report (the "Evaluation Date"); and

(iii) Presented in the report their conclusions about the effectiveness of the disclosure controls and procedures based on their evaluation as of the Evaluation Date;

(5) He or she and the other certifying officers have disclosed, based on their most recent evaluation, to the issuer's auditors and the audit committee of the board or directors (or persons fulfilling the equivalent function):

(i) All significant deficiencies in the design or operation of internal controls which could adversely affect the issuer's ability to record, process, summarize and report financial data and have identified for the issuer's auditors any material weaknesses in internal controls; and

(ii) Any fraud, whether or not material, that involves management or other employees who have a significant role in the issuer's internal controls; and

(6) He or she and the other certifying officers have indicated in the report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of their most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

(c) For purposes of this section and §240.15d-15 of this chapter, the term "disclosure controls and procedures" means controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports that it files or submits under the Act (15 U.S.C. 78a et seq.) is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms.

Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Act is accumulated and communicated to the issuer's management, including its principal executive officer or officers and principal financial officer or officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

(d) A person required to provide the certification specified in paragraph (a) of this section may not have the certification signed on his or her behalf pursuant to a power of attorney or other form of confirming authority.

(e) Each annual report filed by an Asset-Backed Issuer (as defined in paragraph (g) of this section) under section 13(a) of the Act (15 U.S.C. 78m(a)) must include a certification addressing the following items:

(1) Review by the certifying officer of the annual report and other reports containing distribution information for the period covered by the annual report;

(2) The absence in these reports, to the best of the certifying officer's knowledge, of any untrue statement of material fact or omission of a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading;

(3) The inclusion in these reports, to the best of the certifying officer's knowledge, of the financial information required to be provided to the trustee under the governing documents of the issuer; and

(4) Compliance by the servicer with its servicing obligations and minimum servicing standards.

(f) With respect to Asset-Backed Issuers, the certification required by paragraph (e) of this section must be signed by the trustee of the trust (if the trustee signs the annual report) or the senior officer in charge of securitization of the depositor (if the depositor signs the annual report). Alternatively, the senior officer in charge of the servicing function of the master servicer (or entity performing the equivalent functions) may sign the certification.

(g) For purposes of this section, the term Asset-Backed Issuer means any issuer whose reporting obligation results from the offering of securities it issued that are primarily serviced by the cash flows of a discrete pool of receivables or other financial assets, either fixed or revolving, that by their terms convert into cash within a finite time period plus any rights or other assets designed to assure the servicing or timely distribution of proceeds to security holders.

14. By adding §240.15d-15 to read as follows:

**§240.15d-15 Issuer's disclosure controls and procedures related to preparation of required reports.**

(a) Every issuer that files reports under section 15(d) of the Act (15 U.S.C.

78o(d)), other than an Asset-Backed Issuer (as defined in §240.15d-14(g) of this chapter), must maintain disclosure controls and procedures (as defined in §240.15d-14(c) of this chapter).

(b) Within the 90-day period prior to the filing date of each report requiring certification under §240.13a-14 and §270.30a-2 of this chapter, an evaluation must be carried out under the supervision and with the participation of the issuer's management, including the issuer's principal executive officer or officers and principal financial officer or officers, or persons performing similar functions, of the effectiveness of the design and operation of the issuer's disclosure controls and procedures.

## PART 249 - FORMS, SECURITIES EXCHANGE ACT OF 1934

15. The authority citation for Part 249 is amended by adding the following citations in numerical order to read as follows:

Authority: 15 U.S.C. 78a et seq., unless otherwise noted.

\* \* \* \* \*

Section 249.308a is also issued under secs. 3(a) and 302, Pub.L.No. 107-204, 116 Stat. 745.

Section 249.308b is also issued under secs. 3(a) and 302, Pub.L.No. 107-204, 116 Stat. 745.

Section 249.310 is also issued under secs. 3(a) and 302, Pub.L.No. 107-204, 116 Stat. 745.

Section 249.310b is also issued under secs. 3(a) and 302, Pub.L.No. 107-204, 116 Stat. 745.

Section 249.220f is also issued under secs. 3(a) and 302, Pub.L.No. 107-204, 116 Stat. 745.

Section 249.240f is also issued under secs. 3(a) and 302, Pub.L.No. 107-204, 116 Stat. 745.

\* \* \* \* \*

16. By amending Form 10-Q (referenced in §249.308a) by revising General Instruction G, by adding new Item 4 to "Part I - Financial Information" and by adding a "Certifications" section after the "Signatures" section to read as follows:

**Note: The text of Form 10-Q does not, and this amendment will not, appear in the Code of Federal Regulations.**

**FORM 10-Q**

\* \* \* \* \*

### GENERAL INSTRUCTIONS

\* \* \* \* \*

### G. Signature and Filing of Report.

If the report is filed in paper pursuant to a hardship exemption from electronic filing (see Item 201 et seq. of Regulation S-T (17 CFR 232.201 et seq.), three complete copies of the report, including any financial statements, exhibits or other papers or documents filed as a part thereof, and five additional copies which need not include exhibits must be filed with the Commission. At least one complete copy of the report, including any financial statements, exhibits or other papers or documents filed as a part thereof, must be filed with each exchange on which any class of securities of the registrant is registered. At least one complete copy of the report filed with the Commission and one such copy filed with each exchange must be manually signed on the registrant's behalf by a duly authorized officer of the registrant and by the principal financial or chief accounting officer of the registrant. (See Rule 12b-11(d) (17 CFR 240.12b-11(d).) Copies not manually signed must bear typed or printed signatures. In the case where the principal executive officer, principal financial officer or chief accounting officer is also duly authorized to sign on behalf of the registrant, one signature is acceptable provided that the registrant clearly indicates the dual responsibilities of the signatory. In addition, each principal executive officer and principal financial officer of the registrant must provide the certification required by Rule 13a-14 (17 CFR 240.13a-14) or Rule 15d-14 (17 CFR 240.15d-14) exactly as specified in this form.

\* \* \* \* \*

PART I - FINANCIAL INFORMATION

\* \* \* \* \*

### Item 4. Controls and Procedures.

Furnish the information required by Item 307 of Regulation S-K (§229.307 of this chapter).

\* \* \* \* \*

### SIGNATURES

\* \* \* \* \*

### CERTIFICATIONS\*

I, [identify the certifying individual], certify that:

1. I have reviewed this quarterly report on Form 10-Q of [identify registrant];

2. Based on my knowledge, this quarterly report does not contain any

# Exhibit B
# (Part 2 or 2)

untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3. Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:

a) designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

b) evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this quarterly report (the "Evaluation Date"); and

c) presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

a) all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6. The registrant's other certifying officers and I have indicated in this quarterly report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

Date: ...............

_____
[Signature]
[Title]

* Provide a separate certification for each principal executive officer and principal financial officer of the registrant. See Rules 13a-14 and 15d-14. The required certification must be in the exact form set forth above.

17. By amending Form 10-QSB (referenced in §249.308b) by revising General Instruction F, by adding new Item 3 to "Part I - Financial Information" and by adding a "Certifications" section after the "Signatures" section to read as follows:

**Note: The text of Form 10-QSB does not, and this amendment will not, appear in the Code of Federal Regulations.**

**FORM 10-QSB**

\* \* \* \* \*

**GENERAL INSTRUCTIONS**

\* \* \* \* \*

**F. Signature and Filing of Report**

1. If the report is filed in paper pursuant to a hardship exemption from electronic filing (see Item 201 et seq. of Regulation S-T (17 CFR 232.201 et seq.), file three "complete" copies and five "additional" copies of the report with the Commission and file at least one complete copy with each exchange on which any class of securities of the small business issuer is registered. A "complete" copy includes financial statements, exhibits and all other papers and documents. An "additional" copy excludes exhibits.

2. Manually sign at least one complete copy of the report filed with the Commission and with each exchange; other copies should have typed or printed signatures. (See Rule 12b-11(d) (17 CFR 240.12b-11(d).) In the case where the principal executive officer, principal financial officer or chief accounting officer is also duly authorized to sign on behalf of the small business issuer, one signature is acceptable provided that the issuer clearly indicates the dual responsibilities of the signatory. Each principal executive officer and principal financial officer of the small business issuer must provide the certification required by Rule 13a-14 (17 CFR 240.13a-14) or Rule 15d-14 (17 CFR 240.15d-14) exactly as specified in this form.

\* \* \* \* \*

PART I - FINANCIAL INFORMATION

\* \* \* \* \*

**Item 3. Controls and Procedures.**

Furnish the information required by Item 307 of Regulation S-B (§228.307 of this chapter).

\* \* \* \* \*

### SIGNATURES

* * * * *

### CERTIFICATIONS*

I, [identify the certifying individual], certify that:

1. I have reviewed this quarterly report on Form 10-QSB of [identify registrant];

2. Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3. Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and have:

a) designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

b) evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this quarterly report (the "Evaluation Date"); and

c) presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a) all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6. The registrant's other certifying officers and I have indicated in this quarterly report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

Date: ...............

_____
[Signature]
[Title]

* Provide a separate certification for each principal executive officer and principal financial officer of the registrant. See Rules 13a-14 and 15d-14. The required certification must be in the exact form set forth above.

* * * * *

18. By amending Form 10-K (referenced in § 249.310):

a. by revising General Instruction D(2)(a),

b. by redesignating Item 14 as Item 15 in Part IV,

c. adding new Item 14 to Part III, and

d. by adding a "Certifications" section after the "Signatures" section and before the reference to "Supplemental Information to be Furnished With Reports Filed Pursuant to Section 15(d) of the Act by Registrants Which Have Not Registered Securities Pursuant to Section 12 of the Act." The revisions read as follows:

**Note: The text of Form 10-K does not, and this amendment will not, appear in the Code of Federal Regulations.**

**FORM 10-K**

* * * * *

**GENERAL INSTRUCTIONS**

* * * * *

**D. Signature and Filing of Report.**

(1) * * *

(2)(a) The report must be signed by the registrant, and on behalf of the registrant by its principal executive officer or officers (who also must provide the certification required by Rule 13a-14 (17 CFR 240.13a-14) or Rule 15d-14 (17 CFR 240.15d-14) exactly as specified in this form), its principal financial officer or officers (who also must provide the certification

required by Rule 13a-14 (17 CFR 240.13a-14) or Rule 15d-14 (17 CFR 240.15d-14) exactly as specified in this form), its controller or principal accounting officer, and by at least the majority of the board of directors or persons performing similar functions. Where the registrant is a limited partnership, the report must be signed by the majority of the board of directors of any corporate general partner who signs the report.

\* \* \* \* \*

### Annual Report Pursuant to Section 13 or 15(d)

### of the Securities Exchange Act of 1934

\* \* \* \* \*

PART III

\* \* \* \* \*

### Item 14. Controls and Procedures.

Furnish the information required by Item 307 of Regulation S-K (§229.307 of this chapter).

\* \* \* \* \*

### SIGNATURES

\* \* \* \* \*

### CERTIFICATIONS\*

I, [identify the certifying individual], certify that:

1. I have reviewed this annual report on Form 10-K of [identify registrant];

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and have:

a) designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated

subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

b) evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

c) presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a) all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6. The registrant's other certifying officers and I have indicated in this annual report whether there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

Date: ...............

_____
[Signature]
[Title]

* Provide a separate certification for each principal executive officer and principal financial officer of the registrant. See Rules 13a-14 and 15d-14. The required certification must be in the exact form set forth above.

* * * * *

19. By amending Form 10-KSB (referenced in § 249.310b):

a. by revising General Instruction C.2.,

b. by adding new Item 14 to Part III, and

c. by adding a "Certifications" section after the "Signatures" section and before the reference to "Supplemental information to be Furnished With Reports Filed Pursuant to Section 15(d) of the Exchange Act By Non-reporting Issuers." The revisions read as follows:

**Note: The text of Form 10-KSB does not, and this amendment will not, appear in the Code of Federal Regulations.**

**FORM 10-KSB**

\* \* \* \* \*

**GENERAL INSTRUCTIONS**

\* \* \* \* \*

PART III

\* \* \* \* \*

**Item 14. Controls and Procedures.**

Furnish the information required by Item 307 of Regulation S-B (§228.307 of this chapter).

\* \* \* \* \*

**C. Signature and Filing of Report.**

1. \* \* \*

2. Who must sign. The small business issuer, its principal executive officer or officers (who also must provide the certification required by Rule 13a-14 (17 CFR 240.13a-14) or Rule 15d-14 (17 CFR 240.15d-14) exactly as specified in this form), its principal financial officer (who also must provide the certification required by Rule 13a-14 (17 CFR 240.13a-14) or Rule 15d-14 (17 CFR 240.15d-14) exactly as specified in this form), its controller or principal accounting officer and at least a majority of the board of directors or persons performing similar functions. If the small business issuer is a limited partnership, then the general partner and a majority of its board of directors if a corporation must sign the report. Any person who occupies more than one of the specified positions must indicate each capacity in which he or she signs the report. See Rule 12b-11 concerning manual signatures under powers of attorney.

\* \* \* \* \*

**SIGNATURES**

\* \* \* \* \*

**CERTIFICATIONS\***

I, [identify the certifying individual], certify that:

1. I have reviewed this annual report on Form 10-KSB of [identify registrant];

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and have:

a) designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

b) evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

c) presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a) all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6. The registrant's other certifying officers and I have indicated in this annual report whether there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

Date: ...............

_____
[Signature]
[Title]

* Provide a separate certification for each principal executive officer and principal financial officer of the registrant. See Rules 13a-14 and 15d-14. The required certification must be in the exact form set forth above.

\* \* \* \* \*

20. By amending Form 20-F (referenced in §249.220f):

a. by adding a new paragraph (e) to General Instruction B,

b. by adding new Item 15, and

c. by adding a "Certifications" section after the "Signatures" section and before the section referencing "Instructions as to Exhibits." The revisions read as follows:

**Note: The text of Form 20-F does not, and this amendment will not, appear in the Code of Federal Regulations.**

**FORM 20-F**

\* \* \* \* \*

**GENERAL INSTRUCTIONS**

\* \* \* \* \*

**B. General Rules and Regulations That Apply to this Form.**

\* \* \* \* \*

(e) Where the Form is being used as an annual report filed under Section 13(a) or 15(d) of the Exchange Act, provide the certification required by Rule 13a-14 (17 CFR 240.13a-14) or Rule 15d-14 (17 CFR 240.15d-14) exactly as specified in this form.

\* \* \* \* \*

PART II

\* \* \* \* \*

**Item 15. Controls and Procedures.**

(a) Where the Form is being used as an annual report filed under Section 13(a) or 15(d) of the Exchange Act, disclose the conclusions of the registrant's principal executive officer or officers and principal financial officer or officers, or persons performing similar functions, about the effectiveness of the registrant's disclosure controls and procedures (as defined in §§240.13a-15(c) and 240.15d-15(c)) based on their evaluation the controls and procedures as of a date within 90 days prior to the filing date of the report.

(b) Where the Form is being used as an annual report filed under Section 13(a) or 15(d) of the Exchange Act, disclose whether or not there were significant changes in the registrant's internal controls or in other factors that could significantly affect these controls subsequent to the date of their evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

\* \* \* \* \*

## SIGNATURES

\* \* \* \* \*

## CERTIFICATIONS\*

I, [identify the certifying individual], certify that:

1. I have reviewed this annual report on Form 20-F of [identify registrant];

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and have:

a) designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

b) evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

c) presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

a) all significant deficiencies in the design or operation of internal controls

which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6. The registrant's other certifying officers and I have indicated in this annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

Date: ...............

_____
[Signature]
[Title]

* Provide a separate certification for each principal executive officer and principal financial officer of the registrant. See Rules 13a-14 and 15d-14. The required certification must be in the exact form set forth above.

* * * * *

21. By amending Form 40-F (referenced in §249.240f) by adding a new paragraph (6) to General Instruction B and by adding a "Certifications" section after the "Signatures" section to read as follows:

**Note: The text of Form 40-F does not, and this amendment will not, appear in the Code of Federal Regulations.**

**FORM 40-F**

* * * * *

**GENERAL INSTRUCTIONS**

* * * * *

**B. Information To Be Filed on this Form.**

* * * * *

(6) Where the Form is being used as an annual report filed under Section 13 (a) or 15(d) of the Exchange Act:

(a) Provide the certification required by Rule 13a-14 (17 CFR 240.13a-14) or Rule 15d-14 (17 CFR 240.15d-14) exactly as specified in this form.

(b) Disclose the conclusions of the registrant's principal executive officer or

officers and principal financial officer or officers, or persons performing similar functions, about the effectiveness of the registrant's disclosure controls and procedures (as defined in §§240.13a-15(c) and 240.15d-15 (c)) based on their evaluation the controls and procedures as of a date within 90 days prior to the filing date of the report.

(c) Disclose in the report whether or not there were significant changes in the registrant's internal controls or in other factors that could significantly affect these controls subsequent to the date of their evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

\* \* \* \* \*

## SIGNATURES

\* \* \* \* \*

## CERTIFICATIONS\*

I, [identify the certifying individual], certify that:

1. I have reviewed this annual report on Form 40-F of [identify registrant];

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and have:

a) designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

b) evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

c) presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The registrant's other certifying officers and I have disclosed, based on

our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (and persons performing the equivalent function):

a) all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6. The registrant's other certifying officers and I have indicated in this annual report whether there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

Date: ...............

_____
[Signature]
[Title]

* Provide a separate certification for each principal executive officer and principal financial officer of the registrant. See Rules 13a-14 and 15d-14. The required certification must be in the exact form set forth above.

## PART 270 - RULES AND REGULATIONS, INVESTMENT COMPANY ACT OF 1940

22. The authority citation for part 270 is amended by adding the following citation in numerical order to read as follows:

**Authority:** 15 U.S.C. 80a-1, et seq., 80a-34(d), 80a-37, 80a-39, unless otherwise noted;

* * * * *

Section 270.30a-2 is also issued under 15 U.S.C. 78m, 78o(d), and 80a-29, and secs. 3(a) and 302, Pub. L. No. 107-204, 116 Stat. 745.

* * * * *

23. By adding § 270.30a-2 to read as follows:

### § 270.30a-2 Certification of disclosure in annual and semi-annual reports.

(a) Each report, including transition reports, filed on Form N-SAR (referenced in §§249.330 and 274.101) by a registered management investment company or unit investment trust must include a certification

containing the information set forth in paragraph (b) of this section in the form specified in the report, except that a report of a unit investment trust or small business investment company on Form N-SAR may omit paragraph (b)(3) of this section. Each principal executive officer or officers and principal financial officer or officers of the investment company, or persons performing similar functions, at the time of filing of the report must sign the certification.

(b) The certification included in each report specified in paragraph (a) of this section must be in the form specified in the report and consist of a statement of the certifying officer that:

(1) He or she has reviewed the report being filed;

(2) Based on his or her knowledge, the report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the report;

(3) Based on his or her knowledge, the financial information included in the report, and the financial statements on which the financial information is based, fairly present in all material respects the financial condition, results of operations, changes in net assets, and cash flows (if the financial statements are required to include a statement of cash flows) of the investment company as of, and for, the periods presented in the report;

(4) He or she and the other certifying officers are responsible for establishing and maintaining disclosure controls and procedures (as such term is defined in paragraph (c) of this section) for the investment company and have:

(i) Designed such disclosure controls and procedures to ensure that material information relating to the investment company, including its consolidated subsidiaries, is made known to them by others within those entities, particularly during the period in which the periodic reports are being prepared;

(ii) Evaluated the effectiveness of the investment company's disclosure controls and procedures as of a date within 90 days prior to the filing date of the report (the "Evaluation Date"); and

(iii) Presented in the report their conclusions about the effectiveness of the disclosure controls and procedures based on their evaluation as of the Evaluation Date;

(5) He or she and the other certifying officers have disclosed, based on their most recent evaluation, to the investment company's auditors and the audit committee of the board of directors (or persons fulfilling the equivalent function):

(i) All significant deficiencies in the design or operation of internal controls which could adversely affect the investment company's ability to record, process, summarize, and report financial data and have identified for the

investment company's auditors any material weaknesses in internal controls; and

(ii) Any fraud, whether or not material, that involves management or other employees who have a significant role in the investment company's internal controls; and

(6) He or she and the other certifying officers have indicated in the report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of their most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

(c) For purposes of this section, the term "disclosure controls and procedures" means controls and other procedures of an investment company that are designed to ensure that information required to be disclosed by the investment company in the reports that it files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized, and reported, within the time periods specified in the Commission's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an investment company in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to the investment company's management, including its principal executive officer or officers and principal financial officer or officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

(d) A person required to provide the certification specified in paragraph (a) of this section may not have the certification signed on his or her behalf pursuant to a power of attorney or other form of confirming authority.

24. Section 270.30b1-3 is amended by adding a sentence at the end of the section to read as follows:

**§270.30b1-3 Transition reports.**

* * * A report filed pursuant to this section must include the certification required by §270.30a-2.

**PART 249 - FORMS, SECURITIES EXCHANGE ACT OF 1934**

**PART 274 - FORMS PRESCRIBED UNDER THE INVESTMENT COMPANY ACT OF 1940**

25. The authority citation for Part 274 is revised to read as follows:

**Authority:** 15 U.S.C. 77f, 77g, 77h, 77j, 77s, 78c(b), 78l, 78m, 78n, 78o (d), 80a-8, 80a-24, 80a-26, and 80a-29, and secs. 3(a) and 302, Pub. L. No. 107-204, 116 Stat. 745, unless otherwise noted.

26. By amending Form N-SAR (referenced in §§ 249.330 and 274.101) by:

a. Revising the reference "132" in item 6 to read "133";

b. Adding item 133;

c. Revising the reference "132" in the fifth paragraph of General Instruction A to read "133";

d. Revising General Instructions D and G, and the Instructions to sub-items 77Q3 and 102P3;

e. Adding an Instruction to item 133; and

f. Revising the reference "132" in the Instructions to the Signature Page to read "133."

These additions and revisions read as follows:

**Note: The text of Form N-SAR does not, and these amendments will not, appear in the <u>Code of Federal Regulations</u>.**

**FORM N-SAR**

\* \* \* \* \*

133. Include the certifications required by rule 30a-2 under the Investment Company Act (17 CFR 270.30a-2).

\* \* \* \* \*

**GENERAL INSTRUCTIONS**

\* \* \* \* \*

**D. Preparation of Report**

(1) No item of the form except items 77 and 102 shall be answered by incorporating any information by reference. No exhibits or supplemental information are required or permitted, except in response to these items and item 133.

\* \* \* \* \*

**G. Submitting an Amendment to Form N-SAR on Paper or Electronically**

\* \* \* \* \*

(5) In an exhibit to the amendment, each principal executive officer and principal financial officer must provide the certification required by Item 133, instruction (a) for sub-item 77Q3, and instruction (a) for sub-item 102P3. A registrant that is a unit investment trust or a small business investment company may omit paragraph 3 of the certification required by

instruction 77Q3(a)(iii).

\* \* \* \* \*

## INSTRUCTIONS TO SPECIFIC ITEMS

\* \* \* \* \*

### SUB-ITEM 77Q3:

Subject to Rule 201.24 of the General Rules of Practice regarding incorporation by reference, the rules applicable to electronic submission of filings, and General Instruction F of this form, the following exhibits shall be filed as part of this form, if not previously filed:

(a) If the form is filed under Section 13(a) or 15(d) of the 1934 Act, include the following information:

(i) Disclose the conclusions of the registrant's principal executive officer or officers and principal financial officer or officers, or persons performing similar functions, about the effectiveness of the registrant's disclosure controls and procedures (as defined in rule 30a-2(c) under the Act (17 CFR 270.30a-2(c)) based on their evaluation of these controls and procedures as of a date within 90 days of the filing date of the report that includes the disclosure required by this paragraph.

(ii) Disclose whether or not there were significant changes in the registrant's internal controls or in other factors that could significantly affect these controls subsequent to the date of their evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

(iii) Include the certification of each principal executive officer and principal financial officer required by Rule 30a-2 under the Act (17 CFR 270.30a-2). Provide a separate certification for each principal executive officer and principal financial officer, or person performing similar functions, in the exact form set forth below:

## CERTIFICATIONS

I, [identify the certifying individual], certify that:

1. I have reviewed this report on Form N-SAR of [identify registrant];

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial information included in this report, and the financial statements on which the financial information is based, fairly present in all material respects the financial condition, results of

operations, changes in net assets, and cash flows (if the financial statements are required to include a statement of cash flows) of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in rule 30a-2(c) under the Investment Company Act) for the registrant and have:

a) designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this report (the "Evaluation Date"); and

c) presented in this report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize, and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6. The registrant's other certifying officers and I have indicated in this report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

Date: _____

_____
[Signature]
[Title]

(b) Furnish any other information required to be included as an exhibit pursuant to such rules and regulations as the Commission may prescribe.

\* \* \* \* \*

SUB-ITEM 102P3

See instructions for sub-item 77Q3. The registrant may omit paragraph 3 of the certification required by instruction (a)(iii).

* * * * *

ITEM 133

Include the exhibit required by instruction (a) for sub-item 77Q3. The registrant may omit paragraph 3 of the certification required by instruction (a)(iii).

By the Commission.

Margaret H. McFarland
Deputy Secretary

August 28, 2002

**Endnotes**

[1] We do not edit personal identifying information, such as names or electronic mail addresses, from electronic submissions. You should submit only information that you wish to make available publicly.

[2] 17 CFR 228.307.

[3] 17 CFR 228.10 *et seq.*

[4] 17 CFR 229.307.

[5] 17 CFR 229.10 *et seq.*

[6] 17 CFR 240.13a-14.

[7] 17 CFR 240.13a-15.

[8] 17 CFR 240.15d-14.

[9] 17 CFR 240.15d-15.

[10] 15 U.S.C. §78a *et seq.*

[11] 17 CFR 270.30a-2.

[12] 15 U.S.C. §80a-1 *et seq.*

[13] 17 CFR 240.12b-15.

[14] 17 CFR 240.13a-10.

[15] 17 CFR 240.15d-10.

[16] 17 CFR 249.308a.

[17] 17 CFR 249.308b.

[18] 17 CFR 249.310.

[19] 17 CFR 249.310b.

[20] 17 CFR 249.220f.

[21] 17 CFR 249.240f.

[22] 17 CFR 270.30b1-3.

[23] 17 CFR 232.302.

[24] 17 CFR 249.330; 17 CFR 274.101.

[25] Pub. L. 107-204, 116 Stat. 745 (2002).

[26] See Release No. 34-46079 (June 14, 2002) [67 FR 41877] (the "June Proposals").

[27] See Release No. 34-46300 (Aug. 2, 2002) [67 FR 51508] notifying interested parties of the rules that we are required to adopt pursuant to Section 302 of the Act and highlighting some of the major differences between those rules and the June Proposals.

[28] The commenters included 56 individual and institutional investors, 21 companies and company associations, one domestic governmental agency, one foreign governmental agency and 23 members of the accounting and legal communities. These comment letters and a summary of comments are available for public inspection and copying in our Public Reference Room, 450 Fifth Street, NW, Washington, DC 20549, in File No. S7-21-02. Public comments submitted electronically and the summary of comments are available on our website <http://www.sec.gov>.

[29] See, for example, the Letter dated June 13, 2002 of Robert E. Jones, the Letter dated June 24, 2002 of Dan Jamieson and the Letter dated July 5, 2002 of T. Jeffrey Mangin.

[30] See, for example, the Letter dated August 9, 2002 of the American Society of Corporate Securities and the Letter dated August 14, 2002 of the National Association of Real Estate Investment Trusts.

[31] Separately, Section 404 of the Act directs the Commission to prescribe rules for issuers to state in their annual reports required by Section 13(a) or 15(d) of the Exchange Act the responsibility of management for establishing and maintaining an adequate internal control structure and

procedures for financial reporting.

[32] See proposed Exchange Act Rules 13a-15 and 15d-15.

[33] See Section IV below for a discussion of registered investment companies. Registered investment companies generally are required to file periodic reports under Section 13(a) or 15(d) of the Exchange Act on Form N-SAR and, therefore, would provide the certification required by Section 302 of the Act. However, because Section 302 of the Act only applies to issuers that file periodic reports under Section 13(a) or 15(d) of the Exchange Act, the rules we are adopting today will not apply to registered investment companies that do not file periodic reports under either Section 13(a) or 15(d).

[34] 15 U.S.C.§§78m(a) or 78o(d). Section 13(a) of the Exchange Act requires every issuer of a security registered pursuant to Section 12 of the Exchange Act [15 U.S.C. §78l] to file with the Commission such annual reports and such quarterly reports as the Commission may prescribe. Section 15(d) of the Exchange Act requires each issuer that has filed a registration statement that has become effective pursuant to the Securities Act of 1933 [15 U.S.C.§77a *et seq.*] to file such supplementary and periodic information, documents and reports as may be required pursuant to Section 13 in respect of a security registered pursuant to Section 12. The duty of an issuer to file under Section 15(d) is automatically suspended for any fiscal year, other than a fiscal year in which its registration statement becomes effective or is required to be updated pursuant to Section 10(a)(3) of the Securities Act [15 U.S.C. §77j(a)(3)], if an issuer's securities are held of record by less than 300 persons. See Exchange Act Rule 12h-3(c) [17 CFR 240.12h-3(c)].

[35] As permitted under our rules, a registrant may satisfy its disclosure obligations under Part III of Forms 10-K and 10-KSB by incorporating the required information by reference from its definitive proxy or information statement, if that statement involves the election of directors and is filed not later than 120 days after the end of the fiscal year covered by the annual report. See General Instruction G(3) to Form 10-K and General Instruction E(3) to Form 10-KSB. For purposes of this provision, the certification in the annual report on Form 10-K or 10-KSB would be considered to cover the Part III information in a registrant's proxy or information statement as and when filed.

[36] See American Institute of Certified Public Accountants ("AICPA") Codification of Statements on Auditing Standards, AU §319.

[37] These reports include quarterly reports on Form 10-Q or 10-QSB, annual reports on Form 10-K, 10-KSB, 20-F or 40-F, current reports, definitive proxy materials filed under Section 14(a) of the Exchange Act [15 U.S.C. §78n(a)], definitive information statements filed under Section 14(c) of the Exchange Act [15 U.S.C. §78n(c)] and amendments to any of these reports or documents.

[38] See new Exchange Act Rules 13a-14(c) and 15d-14(c).

[39] See Section 302(a) of the Act.

[40] The new rules achieve the objective of Section 302(b) of the Act, which states that nothing in the provision is to be interpreted or applied in any way to allow any issuer to lessen the legal force of the certification requirement by an issuer that has reincorporated or engaged in any other transaction resulting in the transfer of the corporate domicile or offices of the issuer from inside of the United States to outside of the United States, because they are applicable to all issuers without regard to their jurisdiction of incorporation or domicile.

[41] For purposes of the Exchange Act, a "foreign private issuer" is any foreign issuer (other than a foreign government) except an issuer meeting the following conditions: (1) more than 50% of the issuer's outstanding voting securities are directly or indirectly held of record by residents of the U.S.; and (2) the majority of the executive officers or directors are U.S. citizens or residents; or more than 50% of the assets of the issuer are located in the U.S.; or the business of the issuer is administered principally in the U.S. See Exchange Act Rule 3b-4(c) [17 CFR 240.3b-4(c)]. We sought comment on whether to apply a certification requirement to foreign private issuers in the June Proposals.

[42] The new rules do not apply to foreign private issuers that furnish materials to the Commission pursuant to Exchange Act Rule 12g3-2(b) [17 CFR 240.12g3-2(b)].

[43] See Section 3(b)(4) of the Act.

[44] Asset-backed issuers also sometimes voluntarily file Exchange Act reports in order to comply with provisions in the indenture or pooling and servicing agreements.

[45] See, for example, Release No. 34-16520 (Jan. 23, 1980) (order granting application pursuant to Section 12(h) of the Exchange Act [15 U.S.C. §78/(h)] of Home Savings and Loan Association); Release No. 34-14446 (Feb. 6, 1978) (order granting application pursuant to Section 12(h) of the Exchange Act of Bank of America National Trust and Savings Association); Division of Corporation Finance no-action letters to *Key Bank USA, N.A.* (May 9, 1997) and *Bay View Securitization Corp.* (Jan. 15, 1998).

[46] See Section 302(a) of the Act.

[47] The certification requirement does not apply to annual reports on Form 11-K [17 CFR 239.311].

[48] See amended Exchange Act Rules 12b-15, 13a-10 and 15d-10. In the case of the amendment on or after the compliance date of the new rules of a quarterly or annual report filed prior to August 29, 2002, the certification requirement will apply.

[49] 17 CFR 249.306.

[50] A foreign private issuer must furnish under cover of Form 6-K material

information that it makes public or is required to make public under its home country laws or the rules of its home country stock exchange or that it distributes to security holders. While foreign private issuers may submit interim financial information under cover of Form 6-K, they do so pursuant to their home country requirements and not because of a Commission requirement to submit updated financial information for specified periods and according to specified standards. Therefore, we do not believe that a Form 6-K constitutes a "periodic" report analogous to a quarterly report on Form 10-Q or 10-QSB for which certification is required.

[51] See new Exchange Act Rules 13a-15 and 15d-15.

[52] See General Instruction D to Form 20-F.

[53] 17 CFR 249.210 and 249.210b.

[54] See Exchange Act Rules 10b-5(b) [17 CFR 230.10b-5(b)] and 12b-20 [17 CFR 240.12b-20.]. See also *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988); *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. (1976).

[55] Presenting financial information in conformity with generally accepted accounting principles may not necessarily satisfy obligations under the antifraud provisions of the federal securities laws. See *United States v. Simon*, 425 F.2d 796 (2d Cir. 1969). See also *In re Caterpillar, Inc.*, Release No. 34-30532 (Mar. 31, 1992); *Edison Schools, Inc.*, Release No. 34-45925 (May 14, 2002).

[56] See Exchange Act Rule 12b-20 and the case and proceedings referenced in n. 55 above. In addition, both International Accounting Standard IAS 1, ¶14 and 15 and AICPA, Codification of Statements on Auditing Standards, AU §411.04 speak to the essential elements that must be considered, within the framework of generally accepted accounting principles, in evaluating whether an issuer's financial statements fairly present its financial condition and results of operations. These statements, without being limited by reference to generally accepted accounting principles, provide guidance as to what elements should be considered in determining whether an issuer's financial information, taken as a whole, provides a fair presentation of its financial condition and results of operations. These elements include, without limitation, whether the accounting principles selected are appropriate in the circumstances and whether the disclosure is informative and reasonably reflects the underlying transactions and events.

[57] See, for example, *In re Caterpillar, Inc.*, Release No. 34-30532 (Mar. 31, 1992); Exchange Act Rule 12b-20.

[58] See new Exchange Act Rules 13a-14(c) and 15d-14(c).

[59] 15 U.S.C. §78m(b). See also AICPA Professional Standards AU Section 319.06 ("Internal controls is a process - effected by an entity's board of directors, management and other personnel - designed to provide reasonable assurance regarding the achievement of objectives in the following categories: (a) reliability of financial reporting, (b) effectiveness and efficiency of operations and (c) compliance with applicable laws and

regulations.").

[60] Officers and employees of an issuer who have an interest in, and the expertise to serve on, the committee could include the principal accounting officer (or the controller), the general counsel or other senior legal official with responsibility for disclosure matters who reports to the general counsel, the principal risk management officer, the chief investor relations officer (or an officer with equivalent responsibilities) and such other officers or employees, including individuals associated with the issuer's business units, as the issuer deems appropriate.

[61] The rules called for under Section 404 of the Act will be the subject of separate Commission rulemaking. See n. 75 below.

[62] See Section V below.

[63] To further emphasize the importance of the required certification, a principal executive officer or principal financial officer is not permitted to have the certification signed on his or her behalf pursuant to a power of attorney or other form of confirming authority. See new Exchange Act Rules 13a-14(d) and 15d-14(d).

[64] See Exchange Act Rule 12b-11(d) [17 CFR 240.12b-11(d)].

[65] 17 CFR 232.302.

[66] See Sections 13(a) and 18 of the Exchange Act [15 U.S.C. §§78m(a) and 78r].

[67] See, for example, *Howard v. Everex Systems, Inc.* 228 F.3d 1057 (9th Cir. 2000) (a corporate officer who signs a Commission filing containing representations "makes" the statement in the filing and can be liable as a primary violator of Section 10(b) of the Exchange Act).

[68] See Sections 20, 21, 21C and 21D of the Exchange Act [15 U.S.C. §78t, 78u, 78u-3 and 78u-4].

[69] 15 U.S.C. §78j(b).

[70] A false certification also may have liability consequences under Sections 11 and 12(a)(2) of the Securities Act [15 U.S.C. §§77k and 77*l*(a)(2)] where a quarterly or annual report is incorporated by reference into a registration statement on Form S-3 [17 CFR 239.13] or F-3 [17 CFR 239.33] or into a prospectus filed pursuant to Securities Act Rule 424(b) [17 CFR 230.424(b)].

[71] See Section 13(b)(2) of the Exchange Act [15 U.S.C. §78m(b)(2)] and Rules 13b2-1 and 13b2-2 [17 CFR 240.13b2-1 and 240.13b2-2].

[72] 17 CFR 210.1-01 *et seq.*

[73] For example, for some businesses, an assessment and evaluation of

operational and regulatory risks may be necessary.

[74] Accordingly, a company that failed to maintain adequate procedures, review them and otherwise comply with the rule could be subject to Commission action for violating Section 13(a) of the Exchange Act even where the failure did not lead to flawed disclosure.

[75] We note that Section 404 of the Act directs us to prescribe rules requiring each annual report filed under Section 13(a) or 15(d) of the Exchange Act to contain an internal control report, which shall: (1) state the responsibility of management for establishing and maintaining an adequate internal control structure and procedures for financial reporting: and (2) contain an assessment, as of the end of the most recent fiscal year of the issuer, of the effectiveness of the internal control structure and procedures of the issuer for financial reporting. These rules will be the subject of a separate rulemaking project.

[76] 17 CFR 249.330; 17 CFR 274.101; Item 133 and Instructions to Items 77Q3, 102P3 and 133 of Form N-SAR.

[77] See n. 34 above. Because Section 302 of the Sarbanes-Oxley Act only applies to companies that file periodic reports under Section 13(a) or 15(d) of the Exchange Act, the rules we are adopting today will not apply to registered investment companies that do not file periodic reports under Section 13(a) or 15(d).

[78] 15 U.S.C. §80a-30(a) and (b)(1).

[79] General Instruction A to Form N-SAR. See Release No. IC-14299 (Jan. 4, 1985) [50 FR 1442] (release adopting Form N-SAR).

[80] Investment Company Act Rule 30b1-1 [17 CFR 270.30b1-1]; General Instruction C to Form N-SAR.

[81] Investment Company Act Rule 30a-1 [17 CFR 270.30a-1]; General Instruction C to Form N-SAR. A unit investment trust is "an investment company which (A) is organized under a trust indenture, contract of custodianship or agency, or similar instrument, (B) does not have a board of directors, and (C) issues only redeemable securities, each of which represents an undivided interest in a unit of specified securities; but does not include a voting trust." Section 4(2) of the Investment Company Act [15 U.S.C. §80a-4(2)].

[82] See Items 72 and 74 of Form N-SAR and the Instructions to those items.

[83] In the case of a master-feeder fund, the report of the master fund on Form N-SAR would be expected to include a certification based upon the financial statements of the master fund included in the report to shareholders of the feeder fund.

[84] The certification must be filed as an exhibit to the report on Form N-SAR. The EDGAR document type must be EX-99.77Q3 CERT for an Exhibit filed in response to the instructions to sub-item 77Q3, EX-99.102P3 CERT for an

Exhibit filed in response to the instructions to sub-item 102P3 and EX-99.133 CERT for an Exhibit filed in response to the instructions to item 133 of this form.

85 New Exchange Act Rule 13a-15 applies to every issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act. New Exchange Act Rule 15d-15 applies to every issuer that is required to file reports pursuant to Section 15(d) of the Exchange Act.

86 New Investment Company Act Rule 30a-2(c) incorporates the definition of "disclosure controls and procedures" contained in new Exchange Act Rules 13a-14(c) and 15d-14(c). We recognize that, in the case of a series fund or family of investment companies, the disclosure controls and procedures for each fund in the series or family may be the same. Therefore, for purposes of new Investment Company Act Rule 30a-2(b)(4) (ii) and (iii), a single evaluation of the effectiveness of the disclosure controls and procedures for the series or family could be used in multiple certifications for the funds in the series or family, as long as the evaluation has been performed within 90 days of the date of the report on Form N-SAR.

87 Instructions (a)(i) and (ii) to sub-item 77Q3 of Form N-SAR.

88 See Items 111 to 132 of Form N-SAR.

89 Signing officers could include, for example, the officers of the depositor required to sign a registration statement on Form N-4 [17 CFR 239.17b; 17 CFR 274.11c] or N-6 [17 CFR 239.17c; 17 CFR 274.11d], or the officers of the depositor, trustee or custodian required to sign a registration statement on Form N-8B-2 [17 CFR 274.12].

90 *Cf.* Investment Company Act Rule 30e-2 [17 CFR 270.30e-2] (requiring registered unit investment trusts substantially all of the assets of which consist of securities issued by a management investment company to transmit to their shareholders semi-annually a report containing all of the applicable information and financial statements or their equivalent required to be included in reports of the management investment company for the same fiscal period).

91 Instruction to item 133 of Form N-SAR.

92 Business development companies are a category of closed-end investment company that are not required to register under the Investment Company Act. See 15 U.S.C. 80a-2(a)(48) (defining business development companies). A face-amount certificate company is an investment company that engages or proposes to engage in the business of issuing certain face amount certificates. See 15 U.S.C. 80a-4(1). See Release No. IC-14080 (Aug. 6, 1984) [49 FR 32370, 32372] (business development companies and face-amount certificate companies are required to file reports on other forms prescribed under the Exchange Act rather than Form N-SAR).

93 44 U.S.C. §3501 *et seq.*

[94] 44 U.S.C. §3507(d) and 5 CFR 1320.11.

[95] The burden hour and cost estimates for these collections of information are as follows: with respect to Form 10-K (OMB Control No. 3235-0063) an increase in annual reporting and recordkeeping burden hours and cost of 35,190 hours and $3,519,000, respectively; with respect to Form 10-KSB (OMB Control No. 3235-0420) an increase in annual reporting and recordkeeping burden hours and cost of 14,209 hours and $1,421,000, respectively; with respect to Form 10-Q (OMB Control No. 3235-0070) an increase in annual reporting and recordkeeping burden hours and cost of 100,298 hours and $10,030,000, respectively; and respectively; with respect to Form 10-QSB (OMB Control No. 3235-0416) an increase in annual reporting and recordkeeping burden hours and cost of 43,530 hours and $4,353,000, respectively.

[96] See the Letter dated August 2, 2000 of Bernard E. Klein.

[97] 44 U.S.C. §3507(j) and 5 CFR 1320.13.

[98] References to new Exchange Act Rule 13a-14 in this section also refer to new Exchange Act Rule 15d-14.

[99] References to new Exchange Act Rule 13a-15 in this section also refer to new Exchange Act Rule 15d-15.

[100] We have based our estimates of the effects that the new rules and amendments to existing rules and forms will have on these information collections primarily on our review of actual filings of these forms and the forms' requirements.

[101] This estimate is based on 1,200 foreign private issuers that file annual reports on Form 20-F and 100 Canadian issuers that file annual reports on Form 40-F.

[102] This estimate is based on 3,650 registered management investment companies and 800 registered unit investment trusts that file reports under Section 13(a) or 15(d) of the Exchange Act.

[103] This estimate is based on consultations with several law firms and other persons who regularly assist registrants in preparing and filing quarterly and annual reports with the Commission.

[104] This estimate is based on the current annual burden per filing for each foreign private issuer. The estimate of 4,500 hours is calculated by 1,200 foreign private issuers x one filing per year x five burden hours x .75).

[105] This estimate is based on the current annual burden per filing for each Canadian issuer. The estimate of 475 hours is calculated by 100 Canadian issuers x one filing per year x five burden hours x .75 + 100 hours to reflect an adjustment in the distribution of burden hours and associated costs). The estimate has then been increased by 100 hours due to an adjustment to reflect a revised burden hour/cost allocation (75%/25%) for the report.

<sup>106</sup> This estimate is based on the current annual burden per filing for each investment company. With regard to Form N-SAR, the current estimated average burden hours per response for registered management investment companies and registered small business investment companies is 14.75 hours and the current estimated average burden hours per response for registered unit investment trusts is six hours. The estimated average burden hours per response, if new Investment Company Act Rule 30a-2 is adopted, for Form N-SAR would increase the average burden hours per response by five hours per filing that is required to be certified. We estimate that 50 registered management investment companies are not subject to Section 13(a) or 15(d) of the Exchange Act and hence would not be required to include the certification. Therefore, the estimate of 154,450 hours is calculated by: (3,650 registered management investment companies x two filings per year x 19.75 burden hours) + (50 registered management investment companies not subject to Section 13(a) or 15(d) of the Exchange Act x two filings per year x 14.75 burden hours) + (800 registered unit investment trusts x one filing per year x 11 burden hours).

<sup>107</sup> The increase in burden hours is attributed to an increase of 400 registered management investment companies and 67 registered unit investment trusts that are required to file reports pursuant to the Exchange Act from the previous number of these issuers calculated for the current annual burden, and the certification requirement required by the new rule.

<sup>108</sup> The estimate of 100,298 hours is calculated by 26,746 quarterly reports x five burden hours x .75.

<sup>109</sup> The estimate of 43,350 hours is calculated by 11,608 quarterly reports x five burden hours x .75.

<sup>110</sup> The estimate of 35,190 hours is calculated by 9,384 annual reports x five burden hours x .75.

<sup>111</sup> The estimate of 14,209 hours is calculated by 3,789 annual reports x five burden hours x .75.

<sup>112</sup> This estimate is based on the current annual burden per filing for each foreign private issuer. The estimate of $450,000 is calculated by 1,200 foreign private issuers x one filing per year x five burden hours x .25 x $300.00).

<sup>113</sup> This estimate is based on the current annual burden per filing for each foreign private issuer. The estimate of $26,500 is calculated by 100 foreign private issuers x one filing per year x five burden hours x .25 x $300.00). The estimate has then been reduced by $11,000 due to an adjustment to reflect a revised burden hour/cost allocation (75%/25%) for the report.

<sup>114</sup> The estimate of $10,030,000 is calculated by 26,746 quarterly reports x five burden hours x .25 x $300.00.

<sup>115</sup> The estimate of $4,353,000 is calculated by 11,608 quarterly reports x five burden hours x .25 x $300.00.

[116] The estimate of $3,519,000 is calculated by 9,384 annual reports x five burden hours x .25 x $300.00.

[117] The estimate of $1,421,000 is calculated by 3,789 annual reports x five burden hours x .25 x $300.00.

[118] See the amendment to Rule 302(b) of Regulation S-T [17 CFR 232.302 (b)].

[119] 5 U.S.C. §603.

[120] The Initial Regulatory Flexibility Analysis ("IRFA") prepared in connection with the June Proposals also involved proposed rules under the Exchange Act that would have required an issuer's principal executive officer and principal financial officer to certify the information contained in their quarterly and annual reports That proposal has been superseded by the statutory mandate of Section 302 of the Act. The Act's directive to adopt rules for all issuers makes no distinction based on the size of the issuer. We, therefore, do not analyze the new rules adopted under the Exchange Act requiring certifications by an issuer's principal executive and financial officers.

[121] 17 CFR 240.0-10(a).

[122] A similar definition is provided under Securities Act Rule 157 [17 CFR 230.157].

[123] This estimate is based on filings with the Commission.

[124] See the June Proposals at Section V.

[125] See the Letter dated August 19, 2002 of the Office of the Chief Counsel for Advocacy of the U.S. Small Business Administration.

[126] See Section V above.

[127] 15 U.S.C. §78m(b)(2)(B).

[128] 15 U.S.C. §78w(a)(2).

[129] 15 U.S.C. §78c(f).

[130] 15 U.S.C. §80a-2(c).

[131] See 5 U.S.C. §553(b).

[132] *Id*. The Commission previously published notice and sought comment on a certification proposal that was somewhat similar to, but different in several material respects, from the new rules we are adopting today to implement Section 302 of the Sarbanes-Oxley Act. We did not propose rules that would apply to investment companies or foreign private issuers

(although we sought comment on the latter).

[133] See Section 302 (a) and (c) of the Act.

[134] See 5 U.S.C. §553(d).

[135] *Id.*

[136] This finding also satisfies the requirements of 5 U.S.C. §808(2), allowing the rules to become immediately, effective notwithstanding the requirements of 5 U.S.C. §801 (if agency finds that notice and public comment procedure are "impractical, unnecessary, or contrary to the public interest," a rule "shall take effect at such time as the Federal agency promulgating the rule determines").

*http://www.sec.gov/rules/final/33-8124.htm*

# Exhibit C
# (Part 1 of 4)



Home | Previous Page

## U.S. Securities and Exchange Commission

**Final Rule:**
**Management's Reports on Internal Control Over**
**Financial Reporting and Certification of Disclosure in**
**Exchange Act Periodic Reports**

SECURITIES AND EXCHANGE COMMISSION

17 CFR PARTS 210, 228, 229, 240, 249, 270 and 274

[RELEASE NOS. 33-8238; 34-47986; IC-26068; File Nos. S7-40-02; S7-06-03]

RIN 3235-AI66 and 3235-AI79

MANAGEMENT'S REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING AND CERTIFICATION OF DISCLOSURE IN EXCHANGE ACT PERIODIC REPORTS

**AGENCY:** Securities and Exchange Commission.

**ACTION:** Final rule.

**SUMMARY:** As directed by Section 404 of the Sarbanes-Oxley Act of 2002, we are adopting rules requiring companies subject to the reporting requirements of the Securities Exchange Act of 1934, other than registered investment companies, to include in their annual reports a report of management on the company's internal control over financial reporting. The internal control report must include: a statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting for the company; management's assessment of the effectiveness of the company's internal control over financial reporting as of the end of the company's most recent fiscal year; a statement identifying the framework used by management to evaluate the effectiveness of the company's internal control over financial reporting; and a statement that the registered public accounting firm that audited the company's financial statements included in the annual report has issued an attestation report on management's assessment of the company's internal control over financial reporting. Under the new rules, a company is required to file the registered public accounting firm's attestation report as part of the annual report. Furthermore, we are adding a requirement that management evaluate any change in the company's internal control over financial reporting that occurred during a fiscal quarter that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting. Finally, we are adopting amendments to our rules and forms under the Securities Exchange Act of 1934 and the Investment Company Act of 1940 to revise the Section 302 certification requirements and to require issuers to provide the certifications required by Sections 302

and 906 of the Sarbanes-Oxley Act of 2002 as exhibits to certain periodic reports.

**DATES:** Effective Date: August 14, 2003.

Compliance Dates: The following compliance dates apply to companies other than registered investment companies. A company that is an "accelerated filer," as defined in Exchange Act Rule 12b-2, as of the end of its first fiscal year ending on or after June 15, 2004, must begin to comply with the management report on internal control over financial reporting disclosure requirements in its annual report for that fiscal year. A company that is not an accelerated filer as of the end of its first fiscal year ending on or after June 15, 2004, including a foreign private issuer, must begin to comply with the annual internal control report for its first fiscal year ending on or after April 15, 2005. A company must begin to comply with the requirements regarding evaluation of any material change to its internal control over financial reporting in its first periodic report due after the first annual report required to include a management report on internal control over financial reporting. Companies may voluntarily comply with the new disclosure requirements before the compliance dates. A company must comply with the new exhibit requirements for the certifications required by Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 and changes to the Section 302 certification requirements in its quarterly, semi-annual or annual report due on or after August 14, 2003. To account for the differences between the compliance date of the rules relating to internal control over financial reporting and the effective date of changes to the language of the Section 302 certification, a company's certifying officers may temporarily modify the content of their Section 302 certifications to eliminate certain references to internal control over financial reporting until the compliance date, as further explained in Section III.E. below.

Registered investment companies must comply with the rule and form amendments applicable to them on and after August 14, 2003, except as follows. Registered investment companies must comply with the amendments to Exchange Act Rules 13a-15(a) and 15d-15(a) and Investment Company Act Rule 30a-3(a) that require them to maintain internal control over financial reporting with respect to fiscal years ending on or after June 15, 2004. In addition, a registered investment company's certifying officers may temporarily modify the content of their Section 302 certifications to eliminate certain references to internal control over financial reporting, as further explained in Section II.I. below. Registered investment companies may voluntarily comply with the rule and form amendments before the compliance dates.

**FOR FURTHER INFORMATION CONTACT:** N. Sean Harrison, Special Counsel, or Andrew D. Thorpe, Special Counsel, Division of Corporation Finance, at (202) 942-2910, or with respect to registered investment companies, Christian Broadbent, Senior Counsel, Division of Investment Management, at (202) 942-0721, or with respect to attestation and auditing issues, Edmund Bailey, Assistant Chief Accountant, Randolph P. Green, Professional Accounting Fellow, or Paul Munter, Academic Accounting Fellow, Office of the Chief Accountant, at (202) 942-4400, U.S. Securities and Exchange Commission, 450 Fifth Street, NW, Washington, DC 20549.

**SUPPLEMENTARY INFORMATION**: We are revising Items 307, 401 and

601 of Regulations S-B[1] and S-K;[2] adding new Item 308 to Regulations S-B and S-K; amending Form 10-K,[3] Form 10-KSB,[4] Form 10-Q,[5] Form 10-QSB,[6] Form 20-F,[7] Form 40-F,[8] Rule 12b-15,[9] Rule 13a-14,[10] Rule 13a-15,[11] Rule 15d-14[12] and Rule 15d-15[13] under the Securities Exchange Act of 1934 (the "Exchange Act");[14] amending Rules 1-02 and 2-02[15] of Regulation S-X;[16] amending Rules 8b-15,[17] 30a-2[18] and 30a-3[19] under the Investment Company Act of 1940 ("Investment Company Act");[20] and amending Forms N-CSR[21] and N-SAR[22] under the Exchange Act and the Investment Company Act.

## TABLE OF CONTENTS

I.  BACKGROUND

    A.  Management's Report on Internal Control over Financial Reporting

    B.  Certifications

II.  DISCUSSION OF AMENDMENTS IMPLEMENTING SECTION 404

    A.  Definition of Internal Control

        1.  Proposed Rule

        2.  Comments on the Proposal

        3.  Final Rules

    B.  Management's Annual Assessment of, and Report on, the Company's Internal Control over Financial Reporting

        1.  Proposed Rule

        2.  Comments on the Proposal

        3.  Final Rules

            a.  Evaluation of Internal Control over Financial Reporting

            b.  Auditor Independence Issues

            c.  Material Weaknesses in Internal Control over Financial Reporting

            d.  Method of Evaluating

            e.  Location of Management's Report

    C.  Quarterly Evaluations of Internal Control over Financial Reporting

1. Proposed Rule

2. Comments on the Proposal

3. Final Rules

D. Differences between Internal Control over Financial Reporting and Disclosure Controls and Procedures

E. Evaluation of Disclosure Controls and Procedures

F. Periodic Disclosure about the Certifying Officers' Evaluation of the Company's Disclosure Controls and Procedures and Disclosure about Changes to its Internal Control over Financial Reporting

1. Existing Disclosure Requirements

2. Proposed Amendments to the Disclosure Requirements

3. Final Disclosure Requirements

4. Conclusions Regarding Effectiveness of Disclosure Controls and Procedures

G. Attestation to Management's Internal Control Report by the Company's Registered Public Accounting Firm

H. Types of Companies Affected

1. Foreign Private Issuers

2. Asset-Backed Issuers

3. Small Business Issuers

4. Bank and Thrift Holding Companies

I. Registered Investment Companies

J. Transition Period

III. DISCUSSION OF AMENDMENTS RELATED TO CERTIFICATIONS

A. Proposed Rules

B. Final Rules

C. Effect on Interim Guidance Regarding Filing Procedures

D. Form of Section 302 Certifications

E. Transition Period

IV. PAPERWORK REDUCTION ACT

V. COST-BENEFIT ANALYSIS

VI. EFFECT ON EFFICIENCY, COMPETITION AND CAPITAL FORMATION

VII. FINAL REGULATORY FLEXIBILITY ANALYSIS

VIII. STATUTORY AUTHORITY AND TEXT OF RULE AMENDMENTS

## I. BACKGROUND

### A. Management's Report on Internal Control over Financial Reporting

In this release, we implement Section 404 of the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act"),[23] which requires us to prescribe rules requiring each annual report that a company, other than a registered investment company,[24] files pursuant to Section 13(a) or 15(d) of the Exchange Act to contain an internal control report: (1) stating management's responsibility for establishing and maintaining an adequate internal control structure and procedures for financial reporting; and (2) containing an assessment, as of the end of the company's most recent fiscal year, of the effectiveness of the company's internal control structure and procedures for financial reporting. Section 404 also requires every registered public accounting firm that prepares or issues an audit report on a company's annual financial statements to attest to, and report on, the assessment made by management. The attestation must be made in accordance with standards for attestation engagements issued or adopted by the Public Company Accounting Oversight Board ("PCAOB").[25] Section 404 further stipulates that the attestation cannot be the subject of a separate engagement of the registered public accounting firm.

We received over 200 comment letters in response to our release proposing requirements to implement Sections 404, 406 and 407 of the Sarbanes-Oxley Act.[26] Of these, 61 respondents commented on the Section 404 proposals.[27] These comment letters came from corporations, professional associations, accountants, law firms, consultants, academics, investors and others. In general, the commenters supported the objectives of the proposed new requirements. Investors supported the manner in which we proposed to achieve these objectives and, in some cases, urged us to require additional disclosure from companies. Other commenters, however, thought that we were requiring more disclosure than necessary to fulfill the mandates of the Sarbanes-Oxley Act and suggested modifications to the proposals. We have reviewed and considered all of the comments that we received on the proposals. The adopted rules reflect many of these comments -- we discuss our conclusions with respect to each topic and related comments in more detail throughout the release.

### B. Certifications

We also are adopting amendments to require companies to file the certifications mandated by Sections 302 and 906 of the Sarbanes-Oxley Act as exhibits to annual, semi-annual and quarterly reports. Section 302 required the Commission to adopt final rules that were to be effective by August 29, 2002, under which the principal executive and principal financial officers, or persons performing similar functions, of a company filing periodic reports under Section 13(a) or 15(d) of the Exchange Act[28] must provide a certification in each quarterly and annual report filed with the Commission. Section 906 of the Sarbanes-Oxley Act added new Section 1350 to Title 18 of the United States Code,[29] which contains a certification requirement subject to specific federal criminal provisions and that is separate and distinct from the certification requirement mandated by Section 302.[30] On August 28, 2002, we adopted Exchange Act Rules 13a-14 and 15d-14 and Investment Company Act Rule 30a-2 and amended our periodic report forms to implement the statutory directive in Section 302.[31] These rules and amendments became effective on August 29, 2002. On January 27, 2003, we adopted Form N-CSR to be used by registered management investment companies to file certified shareholder reports with the Commission.[32] The provisions added to Title 18 by Section 906 were by their terms effective on enactment of the Sarbanes-Oxley Act.

To enhance the ability of interested parties to effectively access the certifications through our Electronic Data Gathering, Analysis and Retrieval ("EDGAR") system and thereby enhance compliance with the certification requirements, we proposed to amend our rules and forms to require a company to file the certifications as an exhibit to the periodic reports to which they relate.[33] The proposals addressed both Section 302 and 906 certifications. After discussions with the Department of Justice, we concluded that, in light of the inconsistent methods that companies have been employing to fulfill their obligations under Section 906,[34] an exhibit requirement would consistently enable investors and the Commission staff, as well as the Department of Justice, to more effectively monitor compliance with this certification requirement.

## II. DISCUSSION OF AMENDMENTS IMPLEMENTING SECTION 404

### A. Definition of Internal Control

1. Proposed Rule

The proposed rules would have defined the term "internal controls and procedures for financial reporting"[35] to mean controls that pertain to the preparation of financial statements for external purposes that are fairly presented in conformity with generally accepted accounting principles as addressed by the Codification of Statements on Auditing Standards §319 or any superseding definition or other literature that is issued or adopted by the Public Company Accounting Oversight Board.

As noted in the Proposing Release, there has been some confusion over the exact meaning and scope of the term "internal control," because the definition of the term has evolved over time. Historically, the term "internal control" was applied almost exclusively within the accounting profession.[36] As the auditing of financial statements evolved from a process of detailed testing of transactions and account balances towards a process of sampling

and testing, greater consideration of a company's internal controls became necessary in planning an audit.[37] If an internal control component had been adequately designed, then the auditor could limit further consideration of that control to procedures to determine whether the control had been placed in operation. Accordingly, the auditor could rely on the control to serve as a basis to reduce the amount, timing or extent of substantive testing in the execution of an audit. Conversely, if an auditor determined that an internal control component was inadequate in its design or operation, then the auditor could not rely upon that control. In this instance, the auditor would conduct tests of transactions and perform additional analyses in order to accumulate sufficient, competent audit evidence to support its opinion on the financial statements.

From the outset, it was recognized that internal control is a broad concept that extends beyond the accounting functions of a company. Early attempts to define the term focused primarily on clarifying the portion of a company's internal control that an auditor should consider when planning and performing an audit of a company's financial statements.[38] However, this did not improve the level of understanding of the term, nor satisfactorily provide the guidance sought by auditors. Successive definitions and formal studies of the concept of internal control followed.

In 1977, based on recommendations of the Commission, Congress enacted the Foreign Corrupt Practices Act ("FCPA").[39] The FCPA codified the accounting control provisions contained in Statement of Auditing Standards No. 1 (codified as AU §320 in the Codification of Statements on Auditing Standards). Under the FCPA, companies that have a class of securities registered under Section 12 of the Exchange Act, or that are required to file reports under Section 15(d) of the Exchange Act, are required to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that:

- transactions are executed in accordance with management's general or specific authorization;

- transactions are recorded as necessary (1) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (2) to maintain accountability for assets;

- access to assets is permitted only in accordance with management's general or specific authorization; and

- the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.[40]

In 1985, a private-sector initiative known as the National Commission on Fraudulent Financial Reporting, also known as the Treadway Commission, was formed to study the financial reporting system in the United States. In 1987, the Treadway Commission issued a report recommending that its sponsoring organizations work together to integrate the various internal control concepts and definitions and to develop a common reference point.

In response, the Committee of Sponsoring Organizations of the Treadway Commission ("COSO")[41] undertook an extensive study of internal control to establish a common definition that would serve the needs of companies, independent public accountants, legislators and regulatory agencies, and to provide a broad framework of criteria against which companies could evaluate the effectiveness of their internal control systems. In 1992, COSO published its Internal Control -- Integrated Framework.[42] The COSO Framework defined internal control as "a process, effected by an entity's board of directors, management and other personnel, designed to provide reasonable assurance regarding the achievement of objectives" in three categories--effectiveness and efficiency of operations; reliability of financial reporting; and compliance with applicable laws and regulations. COSO further stated that internal control consists of: the control environment, risk assessment, control activities, information and communication, and monitoring. The scope of internal control therefore extends to policies, plans, procedures, processes, systems, activities, functions, projects, initiatives, and endeavors of all types at all levels of a company.

In 1995, the AICPA incorporated the definition of internal control set forth in the COSO Report in Statement on Auditing Standards No. 78 (codified as AU §319 in the Codification of Statements on Auditing Standards).[43] Although we recognized that the AU §319 definition was derived from the COSO definition, our proposal referred to AU §319 because we thought that the former constituted a more formal and widely-accessible version of the definition than the latter.

2. Comments on the Proposal

We received comments from 25 commenters on the proposed definition of "internal control and procedures for financial reporting." Eleven commenters stated that the proposed definition of internal control was appropriate or generally agreed with the proposal.[44] Two of these noted that the definition in AU §319 had been adopted by the bank regulatory agencies for use by banking institutions.[45] Fourteen of the 25 commenters opposed the proposed definition. Two of these asserted that the proposed definition was too complex and would not resolve the confusion that existed over the meaning or scope of the term.

Several of the commenters that were opposed to the proposed definition thought that we should refer to COSO for the definition of internal control, rather than AU §319.[46] Some of these commenters noted that the objective of AU §319 is to provide guidance to auditors regarding their consideration of internal control in planning and performing an audit of financial statements. The common concern of these commenters was that AU §319 does not provide any measure or standard by which a company's management can determine that internal control is effective, nor does it define what constitutes effective internal control. One commenter believed that absent such evaluative criteria or definition of effectiveness, the proposed rules could not be implemented effectively.[47] In addition, several of the commenters opposed to the proposed definition suggested that we use the term "internal control over financial reporting" rather than the term "internal controls and procedures for financial reporting,"[48] on the ground that the former is more consistent with the terminology currently used within the auditing literature.

A few of the commenters urged us to adopt a considerably broader definition of internal control that would focus not only on internal control over financial reporting, but also on internal control objectives associated with enterprise risk management and corporate governance. While we agree that these are important objectives, the definition that we are adopting retains a focus on financial reporting, consistent with our position articulated in the Proposing Release. We are not adopting a more expansive definition of internal control for a variety of reasons. Most important, we believe that Section 404 focuses on the element of internal control that relates to financial reporting. In addition, many commenters indicated that even the more limited definition related to financial reporting that we proposed will impose substantial reporting and cost burdens on companies. Finally, independent accountants traditionally have not been responsible for reviewing and testing, or attesting to an assessment by management of, internal controls that are outside the boundary of financial reporting.

3. Final Rules

After consideration of the comments, we have decided to make several modifications to the proposed amendments. We agree that we should use the term "internal control over financial reporting" in our amendments to implement Section 404, as well as our revisions to the Section 302 certification requirements and forms of certification.[49] Rapidly changing terminology has been one obstacle in the development of an accepted understanding of internal control. The term "internal control over financial reporting" is the predominant term used by companies and auditors and best encompasses the objectives of the Sarbanes-Oxley Act. In addition, by using this term, we avoid having to familiarize investors, companies and auditors with new terminology, which should lessen any confusion that may exist about the meaning and scope of internal control.

The final rules define "internal control over financial reporting" as:

A process designed by, or under the supervision of, the registrant's principal executive and principal financial officers, or persons performing similar functions, and effected by the registrant's board of directors,[50] management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

(1) Pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the registrant;

(2) Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the registrant are being made only in accordance with authorizations of management and directors of the

registrant; and

(3) Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the registrant's assets that could have a material effect on the financial statements.[51]

We recognize that our definition of the term "internal control over financial reporting" reflected in the final rules encompasses the subset of internal controls addressed in the COSO Report that pertains to financial reporting objectives. Our definition does not encompass the elements of the COSO Report definition that relate to effectiveness and efficiency of a company's operations and a company's compliance with applicable laws and regulations, with the exception of compliance with the applicable laws and regulations directly related to the preparation of financial statements, such as the Commission's financial reporting requirements.[52] Our definition is consistent with the description of internal accounting controls in Exchange Act Section 13(b)(2)(B).[53]

Following the general language defining internal control over financial reporting, clauses (1) and (2) include the internal control matters described in Section 103 of the Sarbanes-Oxley Act that the company's registered public accounting firm is required to evaluate in its audit or attestation report.[54] This language is included to make clear that the assessment of management in its internal control report as to which the company's registered public accounting firm will be required to attest and report specifically covers the matters referenced in Section 103. A few commenters believed that it would cause confusion if the definition of internal control did not acknowledge the objectives set forth in Section 103 of the Sarbanes-Oxley Act. As discussed in Section II.G below, the PCAOB is responsible for establishing the Section 103 standards.

Our definition also includes, in clause (3), explicit reference to assurances regarding use or disposition of the company's assets. This provision is specifically included to make clear that, for purposes of our definition, the safeguarding of assets is one of the elements of internal control over financial reporting and it addresses the supplementation of the COSO Framework after it was originally promulgated. In the absence of our change to the definition, the determination of whether control regarding the safeguarding of assets falls within a company's internal control over financial reporting currently could be subject to varying interpretation.

Safeguarding of assets had been a primary objective of internal accounting control in SAS No. 1. In 1988, the ASB issued Statement of Auditing Standards No. 55 (codified as AU §319 in the Codification of Statements on Auditing Standards), which replaced AU §320. SAS No. 55 revised the definition of "internal control" and expanded auditors' responsibilities for considering internal control in a financial statement audit. The prior classification of internal control into the two categories of "internal accounting control" and "administrative control" was replaced with the single term "internal control structure," which consisted of three interrelated components--control environment, the accounting system and control procedures. Under this new definition, the safeguarding of assets was no longer a primary objective, but a subset of the control procedures

component.[55] The COSO Report followed this shift in the iteration of safeguarding of assets. The COSO Report states that operations objectives "pertain to effectiveness and efficiency of the entity's operations, including performance and profitability goals and safeguarding resources against loss."[56] However, the report also clarifies that safeguarding of assets can fall within other categories of internal control.[57]

In 1994, COSO published an addendum to the <u>Reporting to External Parties</u> volume of the COSO Report. The addendum was issued in response to a concern expressed by some parties, including the U.S. General Accounting Office, that the management reports contemplated by the COSO Report did not adequately address controls relating to safeguarding of assets and therefore would not fully respond to the requirements of the FCPA.[58] In the addendum, COSO concluded that while it believed its definition of internal control in its 1992 report remained appropriate, it recognized that the FCPA encompasses certain controls related to safeguarding of assets and that there is a reasonable expectation on the part of some readers of management's internal control reports that the reports will cover such controls. The addendum therefore sets forth the following definition of the term "internal control over safeguarding of assets against unauthorized acquisition, use or disposition":

Internal control over safeguarding of assets against unauthorized acquisition, use or disposition is a process, effected by an entity's board of directors, management and other personnel, designed to provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the entity's assets that could have a material effect on the financial statements.

As indicated above, to achieve the desired result and to provide consistency with COSO's 1994 addendum, we have incorporated this definition into our definition of "internal control over financial reporting." We are persuaded that this is appropriate given the fact that our definition will be used for purposes of public management reporting, and that the companies that will be subject to the Section 404 requirements also are subject to the FCPA requirements. So, under the final rules, safeguarding of assets as provided is specifically included in our definition of "internal control over financial reporting."

## B. Management's Annual Assessment of, and Report on, the Company's Internal Control over Financial Reporting

1. Proposed Rule

We proposed to amend Item 307 of Regulations S-K and S-B, as well as Forms 20-F and 40-F, to require a company's annual report to include an internal control report of management containing:

- A statement of management's responsibility for establishing and maintaining adequate internal controls and procedures for financial reporting;

- The conclusions of management about the effectiveness of the company's internal controls and procedures for financial reporting

based on management's evaluation of those controls and procedures; and

- A statement that the registered public accounting firm that prepared or issued the company's audit report relating to the financial statements included in the company's annual report has attested to, and reported on, management's evaluation of the company's internal controls and procedures for financial reporting.

The proposed amendments did not list any additional disclosure requirements for the management report, but rather would have afforded management the flexibility to tailor the report to fit its company's particular circumstances.

2. Comments on the Proposal

We received comments from 17 commenters on our proposed annual internal control report requirements. All of these commenters believed, in varying degrees, that we should set forth additional disclosure criteria or standards for the management report. Nine commenters stated that we should provide guidance as to the topics to be addressed in the management report, or specify standards or a common set of internal control objectives to be considered by management when assessing the effectiveness of its company's internal control over financial reporting to ensure that control objectives are addressed in a consistent fashion.[59] These commenters believed that consistent standards for management's report on internal control would help investors to understand and compare the quality of various management internal control reports.

Several commenters also thought that we should require management's internal control report to include certain recitations that would parallel recitations that the registered public accounting firm would have to make in its report attesting to management's assessment.[60] Additional commenters believed that the management report on internal control should specifically reference the objectives contained in Section 103 of the Sarbanes-Oxley Act.[61] Furthermore, although Section 404(b) of the Sarbanes-Oxley Act does not explicitly direct us to require companies to file the registered public accounting firms' attestation reports as part of the companies' annual report filings, we proposed a filing requirement that most of those commenting on this aspect of the proposal supported.

3. Final Rules

After evaluating the comments received, we are adopting the proposals with several modifications. The final rules require a company's annual report to include an internal control report of management that contains:

- A statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting for the company;

- A statement identifying the framework used by management to conduct the required evaluation of the effectiveness of the company's internal control over financial reporting;

- Management's assessment of the effectiveness of the company's internal control over financial reporting as of the end of the company's most recent fiscal year, including a statement as to whether or not the company's internal control over financial reporting is effective.[62] The assessment must include disclosure of any "material weaknesses"[63] in the company's internal control over financial reporting identified by management. Management is not permitted to conclude that the company's internal control over financial reporting is effective if there are one or more material weaknesses in the company's internal control over financial reporting; and

- A statement that the registered public accounting firm that audited the financial statements included in the annual report has issued an attestation report on management's assessment of the registrant's internal control over financial reporting.[64]

As proposed, our final rules also require a company to file, as part of the company's annual report, the attestation report of the registered public accounting firm that audited the company's financial statements.

a. Evaluation of Internal Control over Financial Reporting

In the Proposing Release, we requested comment on whether we should establish specific evaluative criteria for management's report on internal control. All of the commenters responding to this request supported the establishment of such evaluative criteria in order to improve comparability among the standards used by companies to conduct their annual internal control evaluations.[65] Several commenters believed that we either should adopt the COSO Framework as the means by which management must evaluate its company's internal control over financial reporting or, alternatively, simply acknowledge the COSO Framework as being suitable for purposes of management's evaluation. Other commenters suggested that we require management to evaluate the effectiveness of a company's internal control over financial reporting using suitable control criteria established by a group that follows due process procedures.

After consideration of the comments, we have modified the final requirements to specify that management must base its evaluation of the effectiveness of the company's internal control over financial reporting on a suitable, recognized control framework that is established by a body or group that has followed due-process procedures, including the broad distribution of the framework for public comment.[66]

The COSO Framework satisfies our criteria and may be used as an evaluation framework for purposes of management's annual internal control evaluation and disclosure requirements. However, the final rules do not mandate use of a particular framework, such as the COSO Framework, in recognition of the fact that other evaluation standards exist outside of the United States,[67] and that frameworks other than COSO may be developed within the United States in the future, that satisfy the intent of the statute without diminishing the benefits to investors. The use of standard measures that are publicly available will enhance the quality of the internal control report and will promote comparability of the internal control reports of different companies. The final rules require management's report to identify

the evaluation framework used by management to assess the effectiveness of the company's internal control over financial reporting.[68]

Specifically, a suitable framework must: be free from bias; permit reasonably consistent qualitative and quantitative measurements of a company's internal control; be sufficiently complete so that those relevant factors that would alter a conclusion about the effectiveness of a company's internal controls are not omitted; and be relevant to an evaluation of internal control over financial reporting.[69]

b. Auditor Independence Issues

Because the auditor is required to attest to management's assessment of internal control over financial reporting, management and the company's independent auditors will need to coordinate their processes of documenting and testing the internal controls over financial reporting. However, we remind companies and their auditors that the Commission's rules on auditor independence prohibit an auditor from providing certain nonaudit services to an audit client.[70] As the Commission stated in its auditor independence release, auditors may assist management in documenting internal controls. When the auditor is engaged to assist management in documenting internal controls, management must be actively involved in the process. We understand the need for coordination between management and the auditor, however, we remind companies and auditors that management cannot delegate its responsibility to assess its internal controls over financial reporting to the auditor.[71] The rules adopted today do not amend the Commission's rules on auditor independence.

c. Material Weaknesses in Internal Control over Financial Reporting

In the Proposing Release, we did not propose any specific standard on which management would base its conclusion that the company's internal control over financial reporting is effective. We requested comment on whether we should prescribe specific standards upon which an effectiveness determination would be based, and also what standards we should consider. Several commenters agreed that the final rules should specify standards, and all believed that the existence of a material weakness in internal control over financial reporting should preclude a conclusion by management that a registrant's internal control over financial reporting is effective. We have considered these comments, and agree that the rules should set forth this threshold for concluding that a company's internal control over financial reporting is effective.

The final rules therefore preclude management from determining that a company's internal control over financial reporting is effective if it identifies one or more material weaknesses in the company's internal control over financial reporting.[72] For purposes of the final rules, the term "material weakness" has the same meaning as in the definition under GAAS and attestation standards.[73] The final rules also specify that management's report must include disclosure of any "material weakness" in the company's internal control over financial reporting identified by management in the course of its evaluation.[74]

d. Method of Evaluating

Many commenters addressed the method of evaluating internal control over financial reporting, and some sought additional precision or guidance regarding the extent of evaluation, including the documentation required.[75] The methods of conducting evaluations of internal control over financial reporting will, and should, vary from company to company. Therefore, the final rules do not specify the method or procedures to be performed in an evaluation. However, in conducting such an evaluation and developing its assessment of the effectiveness of internal control over financial reporting, a company must maintain evidential matter, including documentation, to provide reasonable support for management's assessment of the effectiveness of the company's internal control over financial reporting. Developing and maintaining such evidential matter is an inherent element of effective internal controls.[76] An instruction to new Item 308 of Regulations S-K and S-B and Forms 20-F and 40-F reminds registrants to maintain such evidential matter.[77]

The assessment of a company's internal control over financial reporting must be based on procedures sufficient both to evaluate its design and to test its operating effectiveness. Controls subject to such assessment include, but are not limited to: controls over initiating, recording, processing and reconciling account balances, classes of transactions and disclosure and related assertions included in the financial statements; controls related to the initiation and processing of non-routine and non-systematic transactions; controls related to the selection and application of appropriate accounting policies; and controls related to the prevention, identification, and detection of fraud. The nature of a company's testing activities will largely depend on the circumstances of the company and the significance of the control. However, inquiry alone generally will not provide an adequate basis for management's assessment.[78]

An assessment of the effectiveness of internal control over financial reporting must be supported by evidential matter, including documentation, regarding both the design of internal controls and the testing processes. This evidential matter should provide reasonable support: for the evaluation of whether the control is designed to prevent or detect material misstatements or omissions; for the conclusion that the tests were appropriately planned and performed; and that the results of the tests were appropriately considered. The public accounting firm that is required to attest to, and report on, management's assessment of the effectiveness of the company's internal control over financial reporting also will require that the company develop and maintain such evidential matter to support management's assessment.[79]

e. Location of Management's Report

Although the final rules do not specify where management's internal control report must appear in the company's annual report, we think it is important for management's report to be in close proximity to the corresponding attestation report issued by the company's registered public accounting firm. We expect that many companies will choose to place the internal control report and attestation report near the companies' MD&A disclosure or in a portion of the document immediately preceding the companies' financial statements.

### C. Quarterly Evaluations of Internal Control over Financial Reporting

1. Proposed Rule

We proposed to require a company's certifying officers to evaluate the effectiveness of the company's internal controls and procedures for financial reporting as of the end of the period covered by each annual and quarterly report that the company is required to file under the Exchange Act. The company's certifying officers already are required to evaluate the effectiveness of the company's disclosure controls and procedures on a quarterly basis.[80] We noted that a quarterly evaluation requirement with respect to internal controls would create symmetry between our requirements for periodic evaluations of both the company's disclosure controls and procedures and its internal controls and procedures for financial reporting, and give effect to the language in the Section 302 certification requirements regarding quarterly internal control evaluations.

2. Comments on the Proposal

We received responses from 25 commenters on the proposed amendments. Of the 25 commenters, four supported the proposal to require quarterly evaluations of internal controls and procedures for financial reporting.[81] One commenter specifically concurred with our objective of creating symmetry between the requirements to conduct periodic evaluations of both the company's disclosure controls and procedures and its internal controls and procedures for financial reporting.[82]

Twenty-one commenters opposed quarterly evaluations of internal controls.[83] Many of these believed that quarterly evaluations would impose substantial additional costs on companies without producing any incremental benefit to investors. One individual stated that the proper evaluation of a company's system of internal controls is a weighty and time-consuming process.[84] Twelve of the commenters opposed to quarterly evaluations indicated that quarterly evaluations of all aspects of internal controls and procedures would be extremely burdensome, expensive and difficult to perform under the time constraints of quarterly reporting, particularly as the accelerated filing deadlines for quarterly reports take effect.[85] Several other commenters argued that we should not go beyond the requirements of Section 404 of the Sarbanes-Oxley Act with respect to the frequency of internal control reporting without an adequate basis for doing so.[86] These commenters remarked that such a decision would be better made after we have had sufficient experience with the Section 302 certification requirements adopted in August of 2002.

Several commenters suggested alternatives to quarterly evaluations. Five commenters stated that it would be more appropriate and desirable if companies were required to make quarterly disclosure only of material changes to their internal control that occurred subsequent to management's most recent annual internal control evaluation.[87] Two other commenters similarly recommended that the quarterly evaluation be less rigorous than the annual evaluation.[88] One commenter stated that we should instead adopt an approach that requires less effort and assurance for purposes of quarterly reports, such as permitting companies to test compliance with controls relating to major applications on a rotating basis throughout the

year.[89] This commenter further stated that the objective of the quarterly evaluation should be to identify changes in controls during the quarter and evaluate whether they would change the certifying officers' conclusions about disclosure controls and internal controls as stated in the most recent annual report. The other commenter, although opposed to any quarterly evaluation requirement, believed that if we did require it, the quarterly evaluation should be viewed as an update of the annual evaluation, just as the quarterly report on Form 10-Q is an update of the annual report on Form 10-K.[90] One commenter stated that if we require some form of quarterly certification, it should be limited to negative assurance that nothing has come to the certifying officers' attention since the prior year's evaluation to suggest that the controls are no longer effective.[91]

3. Final Rules

After consideration of the comments received, we have decided not to require quarterly evaluations of internal control over financial reporting that are as extensive as the annual evaluation. We recognize that some controls operate continuously while others operate only at certain times, such as the end of the fiscal year. We believe that each company should be afforded the flexibility to design its system of internal control over financial reporting to fit its particular circumstances. The management of each company should perform evaluations of the design and operation of the company's entire system of internal control over financial reporting over a period of time that is adequate for it to determine whether, as of the end of the company's fiscal year, the design and operation of the company's internal control over financial reporting are effective.

Accordingly, we are adopting amendments that require a company's management, with the participation of the principal executive and financial officers, to evaluate any change in the company's internal control over financial reporting that occurred during a fiscal quarter that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting. We also have adopted a modification to the Section 302 certification requirement and our disclosure requirements to adopt this approach, as discussed below.

The management of a foreign private issuer that has Exchange Act reporting obligations must also, like its domestic counterparts, report any material changes to the issuer's internal control over financial reporting. However, because foreign private issuers are not required to file quarterly reports under Section 13(a) or 15(d) of the Exchange Act, the final rules clarify that a foreign private issuer's management need only disclose in the issuer's annual report the material changes to its internal control over financial reporting that have occurred in the period covered by the annual report.[92]

## D. Differences between Internal Control over Financial Reporting and Disclosure Controls and Procedures

Many of the commenters on the Proposing Release indicated that they were confused as to the differences between a company's disclosure controls and procedures and a company's internal control over financial reporting. Exchange Act Rule 13a-15(d) defines "disclosure controls and procedures"

to mean controls and procedures of a company that are designed to ensure that information required to be disclosed by the company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms. The definition further states that disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that the information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

While there is substantial overlap between a company's disclosure controls and procedures and its internal control over financial reporting, there are both some elements of disclosure controls and procedures that are not subsumed by internal control over financial reporting and some elements of internal control that are not subsumed by the definition of disclosure controls and procedures.

With respect to the latter point, clearly, the broad COSO description of internal control, which includes the efficiency and effectiveness of a company's operations and the company's compliance with laws and regulations (not restricted to the federal securities laws), would not be wholly subsumed within the definition of disclosure controls and procedures. A number of commenters suggested that the narrower concept of internal control, involving internal control over financial reporting, is a subset of a company's disclosure controls and procedures, given that the maintenance of reliable financial reporting is a prerequisite to a company's ability to submit or file complete disclosure in its Exchange Act reports on a timely basis. This suggestion focuses on the fact that the elements of internal control over financial reporting requiring a company to have a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles can be viewed as a subset of disclosure controls and procedures.

We agree that some components of internal control over financial reporting will be included in disclosure controls and procedures for all companies. In particular, disclosure controls and procedures will include those components of internal control over financial reporting that provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles. However, in designing their disclosure controls and procedures, companies can be expected to make judgments regarding the processes on which they will rely to meet applicable requirements. In doing so, some companies might design their disclosure controls and procedures so that certain components of internal control over financial reporting pertaining to the accurate recording of transactions and disposition of assets or to the safeguarding of assets are not included. For example, a company might have developed internal control over financial reporting that includes as a component of safeguarding of assets dual signature requirements or limitations on signature authority on checks. That company could nonetheless determine that this component is not part of disclosure controls and procedures. We therefore believe that while there is substantial

overlap between internal control over financial reporting and disclosure controls and procedures, many companies will design their disclosure controls and procedures so that they do not include all components of internal control over financial reporting.

## E. Evaluation of Disclosure Controls and Procedures

The rules in place starting in August 2002 requiring quarterly evaluations of disclosure controls and procedures and disclosure of the conclusions regarding effectiveness of disclosure controls and procedures have not been substantively changed since their adoption, including in the rules that we adopt today. These evaluation and disclosure requirements will continue to apply to disclosure controls and procedures, including the elements of internal control over financial reporting that are subsumed within disclosure controls and procedures.

With respect to evaluations of disclosure controls and procedures, companies must, under our rules and consistent with the Sarbanes-Oxley Act, evaluate the effectiveness of those controls and procedures on a quarterly basis. While the evaluation is of effectiveness overall, a company's management has the ability to make judgments (and it is responsible for its judgments) that evaluations, particularly quarterly evaluations, should focus on developments since the most recent evaluation, areas of weakness or continuing concern or other aspects of disclosure controls and procedures that merit attention. Finally, the nature of the quarterly evaluations of those components of internal control over financial reporting that are subsumed within disclosure controls and procedures should be informed by the purposes of disclosure controls and procedures.[93]

The rules adopted in August 2002 required the management of an Exchange Act reporting foreign private issuer to evaluate and disclose conclusions regarding the effectiveness of the issuer's disclosure controls and procedures only in its annual report and not on a quarterly basis. The primary reason for this treatment is because foreign private issuers are not subject to mandated quarterly reporting requirements under the Exchange Act. The rules adopted today continue this treatment.[94]

## F. Periodic Disclosure about the Certifying Officers' Evaluation of the Company's Disclosure Controls and Procedures and Disclosure about Changes to its Internal Control over Financial Reporting

1. Existing Disclosure Requirements

The rules that we adopted in August 2002 to implement the certification requirements of Section 302 of the Sarbanes-Oxley Act included new Item 307 of Regulations S-B and S-K. Paragraph (a) of Item 307 requires companies, in their quarterly and annual reports, to disclose the conclusions of the company's principal executive and financial officers (or persons performing similar functions) about the effectiveness of the company's disclosure controls and procedures as of a date within 90 days of the filing date of the quarterly or annual report. This disclosure enables the certifying officers to satisfy the representation made in their certifications that they have "presented in the quarterly or annual report their conclusions about the effectiveness of the disclosure controls and procedures based on their

evaluation."

Paragraph (b) of Item 307 requires the company to disclose in each quarterly and annual report whether or not there were significant changes in the company's internal controls or in other factors that could significantly affect these controls subsequent to the date of their evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses. This disclosure enables the certifying officers to satisfy the representation made in their certifications that they have "indicated in the quarterly or annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of their most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses."

2. Proposed Amendments to the Disclosure Requirements

In the Proposing Release, we proposed several revisions to the existing disclosure requirements regarding: (1) the certifying officers' evaluation of the company's disclosure controls and procedures; and (2) changes to the company's internal control over financial reporting. We also proposed to require quarterly disclosure regarding the conclusions of the certifying officers about the effectiveness of the company's internal control over financial reporting.

Moreover, we proposed to require evaluations of both types of controls as of the end of the period covered by the quarterly or annual report, rather than "as of a date within 90 days of the filing date" of the quarterly or annual report, as currently required with respect to disclosure controls. With respect to the disclosure about changes to the company's internal control over financial reporting, we proposed to require a company to disclose "any significant changes made during the period covered by the quarterly or annual report" rather than "whether or not there were significant changes in the company's internal control over financial reporting that could significantly affect these controls subsequent to the date of their evaluation."

The commenters were mixed in their reaction to these proposed changes. A couple of the commenters remarking on the point at which a company must undertake an evaluation of its controls "strongly agreed" with the proposed change to require evaluations as of the end of the period. Several other commenters preferred the existing "90 days within the filing date" evaluation point, noting that it provides more flexibility than the fixed point. Some of these commenters expressed concern that it would be hard to conduct evaluations on the last day of the period. One of the commenters suggested that the proposed requirement that a company disclose changes to its internal control over financial reporting that occurred at any time during a fiscal quarter was inconsistent with the proposed requirement that management evaluate such changes "as of the end of each fiscal quarter."[95] An additional commenter asserted that it was critical that we offer companies some guidance as to the types of changes that constitute "significant changes."[96] Finally, a few commenters noted that while we had proposed to delete the words "or other factors" from Exchange Act Rules 13a-14(b)(6) and 15d-14(b)(6) regarding disclosure of "significant changes in internal controls or in other factors that could significantly affect internal

# Exhibit C
# (Part 2 of 4)

controls...," we had not likewise proposed to delete those words from the actual certification language.

3. Final Disclosure Requirements

After consideration of the comments, we are adopting the proposals with several modifications. We are adopting as proposed the change of the evaluation date for disclosure controls to "as of the end of the period" covered by the quarterly or annual report. We are not specifying the point at which management must evaluate changes to the company's internal control over financial reporting. Given that the final rules do not require a company to state the conclusions of the certifying officers regarding the effectiveness of the company's internal control over financial reporting as of a particular date on a quarterly basis as proposed, as the company must with respect to disclosure controls and procedures, it is unnecessary to specify a date for the quarterly evaluation of changes in internal control over financial reporting. We believe that this change is consistent with the new accelerated reporting deadlines.[97]

We are amending the proposal that would have required companies to disclose any significant changes in its internal controls. Under the final rules, a company must disclose any change in its internal control over financial reporting that occurred during the fiscal quarter covered by the quarterly report, or the last fiscal quarter in the case of an annual report, that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting.[98] Furthermore, we have deleted the phrase "or in other factors" from Exchange Act Rules 13a-14 and 15d-15 and the form of certification. Although the final rules do not explicitly require the company to disclose the reasons for any change that occurred during a fiscal quarter, or to otherwise elaborate about the change, a company will have to determine, on a facts and circumstances basis, whether the reasons for the change, or other information about the circumstances surrounding the change, constitute material information necessary to make the disclosure about the change not misleading.[99]

While an evaluation of the effectiveness of disclosure controls and procedures must be undertaken on a quarterly basis, we expect that for purposes of disclosure by domestic companies, the traditional relationship between disclosure in annual reports on Form 10-K and intervening quarterly reports on Form 10-Q will continue. Disclosure in an annual report that continues to be accurate need not be repeated. Rather, disclosure in quarterly reports may make appropriate reference to disclosures in the most recent annual report (and, where appropriate, intervening quarterly reports) and disclose subsequent developments required to be disclosed in the quarterly report.

We note that, as required by the Sarbanes-Oxley Act, the quarterly certification regarding disclosure that the certifying officers must make to the company's auditors and audit committee provides:[100]

The company's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

We expect that if a certifying officer becomes aware of a significant deficiency, material weakness or fraud requiring disclosure outside of the formal evaluation process or after the management's most recent evaluation of internal control over financial reporting, he or she will disclose it to the company's auditors and audit committee.

4. Conclusions Regarding Effectiveness of Disclosure Controls and Procedures

In disclosures required under current Item 307 of Regulations S-K and S-B, Item 15 of Form 20-F and General Instruction B(6) to Form 40-F, some companies have indicated that disclosure controls and procedures are designed only to provide "reasonable assurance" that the controls and procedures will meet their objectives. In reviewing those disclosures, the Commission staff generally has not objected to that type of disclosure. The staff has, however, requested companies including that type of disclosure to set forth, if true, the conclusions of the principal executive and principal financial officer that the disclosure controls and procedures are, in fact, effective at the "reasonable assurance" level. Other companies have included disclosure that there is "no assurance" that the disclosure controls and procedures will operate effectively under all circumstances. In these instances, the staff has requested companies to clarify that the disclosure controls and procedures are designed to provide reasonable assurance of achieving their objectives and to set forth, if true, the conclusions of the principal executive and principal financial officers that the controls and procedures are, in fact, effective at the "reasonable assurance" level.

The concept of reasonable assurance is built into the definition of internal control over financial reporting that we are adopting. This conforms to the standard contained in the internal accounting control provisions of Section 13(b)(2) of the Exchange Act[101] and current auditing literature.[102] If management decides to include a discussion of reasonable assurance in the internal control report, the discussion must be presented in a manner that neither makes the disclosure in the report confusing nor renders management's assessment concerning the effectiveness of the company's internal control over financial reporting unclear.

## G. Attestation to Management's Internal Control Report by the Company's Registered Public Accounting Firm

In the Proposing Release, we proposed to amend Rules 210.1-02 and 210.2-02 of Regulation S-X to make conforming revisions to Regulation S-X to reflect the registered public accounting firm attestation requirements mandated by Section 404(b) of the Sarbanes-Oxley Act. Under the proposals, we set forth a definition for the new term "attestation report on

management's evaluation of internal control over financial reporting" and certain requirements for the accountant's attestation report. We are adopting the proposals substantially as proposed. However, the final rules define the expanded term "attestation report on management's evaluation of internal control over financial reporting." Several commenters suggested that we use this more specific term, noting that auditors currently perform attestation engagements on a broad variety of subjects. Amended Rule 2-02 requires every registered public accounting firm that issues an audit report on the company's financial statements that are included in its annual report required by Section 13(a) or 15(d) of the Exchange Act containing an assessment by management of the effectiveness of the registrant's internal control over financial reporting must attest to, and report on, such assessment.

At the time of the enactment of the Sarbanes-Oxley Act, the applicable standard for attestation by auditors of internal control over financial reporting was set forth in Statements on Standards for Attestation Engagements No. 10 ("SSAE No. 10"). That standard was used by auditors providing attestations on a voluntary basis to companies, as well as by auditors whose financial institution clients are required to obtain attestations under Federal Deposit Insurance Corporation Improvement Act of 1991,[103] as discussed below. Under the Sarbanes-Oxley Act, the PCAOB has become the body that sets auditing and attestation standards generally for registered public accounting firms to use in the preparation and issuance of audit reports on the financial statements of issuers, and under Section 404(b) of the Sarbanes-Oxley Act, the PCAOB is required to set standards for the registered public accounting firms' attestations to, and reports on, management's assessment regarding its internal control over financial reporting.

On April 16, 2003, the PCAOB designated Statements on Standards for Attestation Engagements as existed on April 16 as the standard for attestations of management's assessment of the effectiveness of internal control over financial reporting pending further PCAOB standard-setting in the area (and subject to our approval of the PCAOB's actions), and on April 25, we approved the PCAOB's action. SSAE No. 10 is thus the standard applicable on a transition basis for attestations required under Section 404 of the Act and the rules we are adopting today, again pending further PCAOB standard-setting (and our approval). We expect that the PCAOB will assess the appropriateness of those standards and modify them as needed, and any future standards adopted by the PCAOB will apply to registered public accounting firms in connection with the preparation and issuance of attestation reports on management's assessment of the effectiveness of internal control over financial reporting.

## H. Types of Companies Affected

Section 404 of the Sarbanes-Oxley Act states that the Commission must prescribe rules that require each annual report required by Section 13(a) or 15(d) of the Exchange Act to contain an internal control report. The Act exempts registered investment companies from this requirement.[104]

1. Foreign Private Issuers

Section 404 of the Sarbanes-Oxley Act makes no distinction between

domestic and foreign issuers and, by its terms, clearly applies to foreign private issuers. These amendments, therefore, apply the management report on internal control over financial reporting requirement to foreign private issuers that file reports under Section 13(a) or 15(d) of the Exchange Act. We have, however, adopted a later compliance date for foreign private issuers than for accelerated filers.

## 2. Asset-Backed Issuers

In the Proposing Release, we proposed to exclude issuers of asset-backed securities from the proposed rules implementing Section 404 of the Act. We noted that because of the unique nature of asset-backed issuers, such issuers are subject to substantially different reporting requirements. Most significantly, asset-backed issuers are generally not required to file the types of financial statements that other companies must file. Also, such entities typically are passive pools of assets, without a board of directors or persons acting in a similar capacity. We did not receive any comments on the proposed exclusion of asset-backed issuers from the internal control reporting requirements, and we are excluding asset-backed issuers from the new disclosure requirements as proposed.

## 3. Small Business Issuers

Our proposed rules implementing Section 404 of the Act did not distinguish between large and small issuers. Similarly, Section 404 of the Act directs that the management report on internal control over financial reporting apply to any company filing periodic reports under Section 13(a) or 15(d) of the Exchange Act. Accordingly, these amendments apply to all issuers that file Exchange Act periodic reports, except registered investment companies, regardless of their size. However, we are sensitive that many small business issuers may experience difficulty in evaluating their internal control over financial reporting because these issuers may not have as formal or well-structured a system of internal control over financial reporting as larger companies. Accordingly, we are providing an extended compliance period for small business issuers and other companies that are not accelerated filers.[105] In addition, our approach of not mandating specific criteria to be used by management to evaluate a company's internal control over financial reporting should provide small issuers some flexibility in meeting these disclosure requirements.

## 4. Bank and Thrift Holding Companies

In the Proposing Release, we stated that we were coordinating with the Federal Deposit Insurance Corporation (the "FDIC") and the other federal banking regulators to eliminate, to the extent possible, any unnecessary duplication between our proposed internal control report and the FDIC's internal control report requirements. Under regulations adopted by the FDIC implementing Section 36 of the Federal Deposit Insurance Act,[106] a federally insured depository institution with total assets of $500 million or more ("institution"), is required, among other things, to prepare an annual management report that contains:

- A statement of management's responsibility for preparing the institution's annual financial statements, for establishing and

Case 1:05-cv-10438-MLW   Document 52-9   Filed 05/26/2006   Page 6 of 27

maintaining an adequate internal control structure and procedures for financial reporting, and for complying with designated laws and regulations relating to safety and soundness;[107] and

- Management's assessment of the effectiveness of the institution's internal control structure and procedures for financial reporting as of the end of the fiscal year and the institution's compliance with the designated safety and soundness laws and regulations during the fiscal year.[108]

The FDIC's regulations additionally require the institution's independent accountant to examine, and attest to, management's assertions concerning the effectiveness of the institution's internal control structure and procedures for financial reporting.[109] The institution's management report and the accountant's attestation report must be filed with the FDIC, the institution's primary federal regulator (if other than the FDIC), and any appropriate state depository institution supervisor and must be available for public inspection.[110]

Although bank and thrift holding companies are not required under the FDIC's regulations to prepare these internal control reports, many of these holding companies do so under a provision of Part 363 of the FDIC's regulations[111] that permits an insured depository institution that is the subsidiary of a holding company to satisfy its internal control report requirements with an internal control report of the consolidated holding company's management if:

- Services and functions comparable to those required of the subsidiary by Part 363 are provided at the holding company level;[112] and

- The subsidiary has, as of the beginning of its fiscal year, (i) total assets of less than $5 billion or (ii) total assets of $5 billion or more and a composite rating of 1 or 2 under the Uniform Financial Institutions Rating System.[113]

Section 404 of the Sarbanes-Oxley Act does not contain an exemption for insured depository institutions that are both subject to the FDIC's internal control report requirements and required to file Exchange Act reports. In fact, it makes no distinction whatsoever between institutions subject to the FDIC's requirements and other types of Exchange Act filers. Accordingly, regardless of whether an insured depository institution is subject to the FDIC's requirements, insured depository institutions or holding companies that are required to file periodic reports under Section 13(a) or 15(d) of the Exchange Act are subject to the internal control reporting requirements that we are adopting today.

Although our final rules are similar to the FDIC's internal control report requirements, the rules differ in a few significant respects. Most notably, our final rules do not require a statement of compliance with designated laws and regulations relating to safety and soundness. Conversely, the following provisions in our rules are not included in the FDIC's regulations:

- The requirement that the report include a statement identifying the framework used by management to evaluate the effectiveness of the

company's internal control over financial reporting;[114]

- The requirement that management disclose any material weakness that it has identified in the company's internal control over financial reporting (and related stipulation that management is not permitted to conclude that the company's internal control over financial reporting is effective if there are one or more material weaknesses);

- The requirement that the company state that the registered public accounting firm that audited the financial statements included in the annual report has issued an attestation report on management's assessment of the company's internal control over financial reporting; and

- The requirement that the company must provide the registered public accounting firm's attestation report on management's assessment of internal control over financial reporting in the company's annual report filed under the Exchange Act.[115]

Several commenters generally supported our goal to eliminate or reduce duplicative reporting requirements. Some of these commenters asserted that we should recognize the substantial protections to depositors and investors provided by the federal laws that govern depository institutions and their holding companies. They suggested that our final rules should state that compliance with the FDIC's internal control report requirements satisfies the internal control report requirements that we are adopting under Section 404. A number of these commenters also thought that if we did not exempt insured depository institutions already filing internal control reports under the FDIC's requirements, we should provide an exemption in our rules mirroring the FDIC's exemption that excludes insured depository institutions or their holding companies with less than $500 million in assets from the internal control report requirements.

After consultation with the staffs of the FDIC, the Federal Reserve Board, the Office of Thrift Supervision and the Office of the Comptroller of Currency, we have determined that insured depository institutions that are subject to Part 363 of the FDIC's regulations (as well as holding companies permitted to file an internal control report on behalf of their insured depository institution subsidiaries in satisfaction of these regulations) and also subject to our new rules implementing Section 404 of the Sarbanes-Oxley Act[116] should be afforded considerable flexibility in determining how best to satisfy both sets of requirements. Therefore, they can choose either of the following two options:

- They can prepare two separate management reports to satisfy the FDIC's and our new requirements; or

- They can prepare a single management report that satisfies both the FDIC's requirements and our new requirements.

If an insured depository institution or its holding company chooses to prepare a single report to satisfy both sets of requirements, the report of management on the institution's or holding company's internal control over financial reporting (as defined in Exchange Act Rule 13a-15(f) or 15d-15(f))

will have to contain the following:[117]

- A statement of management's responsibility for preparing the registrant's annual financial statements, for establishing and maintaining adequate internal control over financial reporting for the registrant, and for the institution's compliance with laws and regulations relating to safety and soundness designated by the FDIC and the appropriate federal banking agencies;

- A statement identifying the framework used by management to evaluate the effectiveness of the registrant's internal control over financial reporting as required by Exchange Act Rule 13a-15 or 15d-15;

- Management's assessment of the effectiveness of the registrant's internal control over financial reporting as of the end of the registrant's most recent fiscal year, including a statement as to whether or not management has concluded that the registrant's internal control over financial reporting is effective, and of the institution's compliance with the designated safety and soundness laws and regulations during the fiscal year. This discussion must include disclosure of any material weakness in the registrant's internal control over financial reporting identified by management;[118] and

- A statement that the registered public accounting firm that audited the financial statements included in the registrant's annual report has issued an attestation report on management's assessment of the registrant's internal control over financial reporting.

Additionally, the institution or holding company will have to provide the registered public accounting firm's attestation report on management's assessment in its annual report filed under the Exchange Act.[119] For purposes of the report of management and the attestation report, financial reporting must encompass both financial statements prepared in accordance with GAAP and those prepared for regulatory reporting purposes.

## I. Registered Investment Companies

Section 404 of the Sarbanes-Oxley Act does not apply to registered investment companies, and we are not extending any of the requirements that would implement section 404 to registered investment companies.[120] Several commenters objected to the proposed requirement that the Section 302 certification include a statement of the officers' responsibility for internal controls.[121] These commenters argued that this requirement would contradict Section 405 of the Sarbanes-Oxley Act and represent a "back-door" application of Section 404, from which registered investment companies are exempt.[122] We disagree. The certification requirements implement Section 302 of the Sarbanes-Oxley Act, from which registered investment companies are not exempt.[123] We are not subjecting registered investment companies to the requirements implementing Section 404 of the Sarbanes-Oxley Act, including the annual and quarterly evaluation requirements with respect to internal control over financial reporting and the requirements for an annual report by management on internal control

over financial reporting and an attestation report on management's assessment.

We are adopting the following technical changes to our rules and forms implementing Section 302 of the Sarbanes-Oxley Act for registered investment companies in order to conform to the changes that we are adopting for operating companies.[124]

- Paragraph (d) of Investment Company Act Rule 30a-3. The amendments use the same term "internal control over financial reporting" that we are using in the rules for operating companies and include the same definition of "internal control over financial reporting" that we are adopting in Exchange Act Rules 13a-15(f) and 15d-15(f).

- Paragraph (a) of Investment Company Act Rule 30a-3. The amendments require every registered management investment company, other than a small business investment company, to maintain internal control over financial reporting. These amendments parallel those that we are adopting for operating companies in Exchange Act Rules 13a-15(a) and 15d-15(a).

- Introductory text and sub-paragraph (b) of paragraph 4 of the certification in Item 10(a)(2) of Form N-CSR. The amendments require the signing officers to state that they are responsible for establishing and maintaining internal control over financial reporting, and that they have designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under their supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

- Paragraph (4)(d) of the certification of Item 10(a)(2), and Item 9(b) of Form N-CSR. The amendments require disclosure of any change in the investment company's internal control over financial reporting that occurred during the most recent fiscal half-year that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting.

- Paragraph (5) of the certification of Item 10(a)(2) of Form N-CSR. The amendments require the signing officers to state that they have disclosed to the investment company's auditors and the audit committee all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the investment company's ability to record, process, summarize, and report financial information.

We are not, however, adopting proposed amendments that would have required the evaluation by an investment company's management of the effectiveness of its disclosure controls and procedures to be as of the end of the period covered by each report on Form N-CSR, rather than within 90 days prior to the filing date of the report, as our certification rules currently

require.[125] Commenters noted that this would require investment company complexes that have funds with staggered fiscal year ends to perform evaluations of their disclosure controls and procedures as many as twelve times per year. They argued that requiring such frequent evaluations would be extremely costly, inefficient, and operationally disruptive, and would not provide any benefits to shareholders.[126] We agree that the costs of requiring investment company complexes to perform evaluations of their disclosure controls and procedures twelve times per year would outweigh the benefits to investors. The certification rules we are adopting will require an investment company complex to perform at most four such evaluations per year.[127]

Transition Period for Registered Investment Companies

Registered investment companies must comply with the rule and form amendments applicable to them on and after August 14, 2003, except as follows. Registered investment companies must comply with the amendments to Exchange Act Rules 13a-15(a) and 15d-15(a) and Investment Company Act Rule 30a-3(a) that require them to maintain internal control over financial reporting with respect to fiscal years ending on or after June 15, 2004. In addition, registered investment companies must comply with the portion of the introductory language in paragraph 4 of the certification in Item 10(a)(2) of Form N-CSR that refers to the certifying officers' responsibility for establishing and maintaining internal control over financial reporting, as well as paragraph 4(b) of the certification, beginning with the first annual report filed on Form N-CSR for a fiscal year ending on or after June 15, 2004.

## J. Transition Period

We received a number of comments urging us to adopt an extended transition period for compliance with the new disclosure requirements.[128] We have decided to delay the compliance date of the requirement to provide a management report assessing the effectiveness of internal control over financial reporting and an auditor's attestation to, and report on, that assessment beyond that in the Proposing Release so that companies and their auditors will have time to prepare and satisfy the new requirements. These compliance dates do not apply to registered investment companies, which are not required to provide the management report assessing the effectiveness of internal control over financial reporting and the related auditor's attestation.[129] A company that is an "accelerated filer," as defined in Exchange Act Rule 12b-2, as of the end of its first fiscal year ending on or after June 15, 2004, must begin to comply with the management report on internal control over financial reporting disclosure requirements promulgated under Section 404 of the Sarbanes-Oxley Act in its annual report for that fiscal year. We recognize that non-accelerated filers, including smaller companies and foreign private issuers, may have greater difficulty in preparing the management report on internal control over financial reporting. Therefore, these types of companies must begin to comply with the disclosure requirements in annual reports for their first fiscal year ending on or after April 15, 2005. A company must begin to comply with the quarterly evaluation of changes to internal control over financial reporting requirements for its first periodic report due after the first annual report that must include management's report on internal control over financial reporting. We believe that the transition period is

appropriate in light of both the substantial time and resources needed to properly implement the rules[130] and the corresponding benefit to investors that will result. In addition, the transition period will provide additional time for the PCAOB to consider relevant factors in determining and implementing any new attestation standard as it finds appropriate, subject to our approval.

Consistent with this extended compliance period for management's internal control report and the related attestation, and for the subsequent evaluation of changes in internal control over financial reporting, the following provisions of the rules adopted today are subject to the extended compliance period:

- The provisions of Items 308(a) and (b) of Regulations S-K and S-B and the comparable provisions of Forms 20-F and 40-F requiring management's internal control report and the related attestation;

- The amendments to Rules 13a-15(a) and 15d-15(a) under the Exchange Act relating to maintenance of internal control over financial reporting; and

- The provisions of Rules 13a-15(c) and (d) and 15d-15(c) and (d) under the Exchange Act requiring evaluations of internal control over financial reporting and changes thereto.

The extended compliance period does not in any way affect the provisions of our other rules and regulations regarding internal controls that are in effect, including, without limitation, Rule 13b-2 under the Exchange Act.

Other rules relating to evaluation and disclosure adopted today are effective on August 14, 2003. These other rules include amendments to Items 308(c) of Regulations S-K and S-B and the comparable provisions of Forms 20-F and 40-F requiring disclosure regarding certain changes in internal control over financial reporting. These amendments modify existing requirements regarding disclosure of changes in internal control over financial reporting, are related to statements made in the Section 302 certifications of principal executive and financial officers, and provide clarifications that are beneficial and whose implementation need not be delayed. These other rules that are effective on August 14, 2003, also include amendments relating to disclosure controls and procedures.

## III. DISCUSSION OF AMENDMENTS RELATED TO CERTIFICATIONS

### A. Proposed Rules

We proposed to amend our rules and forms to require companies to file the certifications required by Section 302 of the Sarbanes-Oxley Act as an exhibit to the periodic reports to which they relate. Specifically, we proposed to amend the exhibit requirements of Forms 20-F and

40-F and Item 601 of Regulations S-B and S-K to add the Section 302 certifications to the list of required exhibits. In addition, we proposed to amend Exchange Act Rules 13a-14 and 15d-14 to require that Section 906 certifications accompany the periodic reports to which they relate, and to

amend Forms 20-F and 40-F and Item 601 of Regulations S-B and S-K to add Section 906 certifications to the list of required exhibits. We also proposed to amend Investment Company Act Rule 30a-2 to require that Section 906 certifications accompany the periodic reports on Form N-CSR to which they relate and Item 10 of Form N-CSR to add the Section 906 certifications as a required exhibit.

We received eight comment letters in response to the proposals.[131] The primary topic addressed by the commenters was whether Section 906 of the Sarbanes-Oxley Act applied to annual reports filed on Form 11-K. Most of the commenters believed that issuers required to file annual reports on Form 11-K should be exempt from the requirement to furnish a Section 906 certification as an exhibit.[132] Two commenters noted that the language of Section 906 that requires certification of the chief executive officer and chief financial officer (or equivalent thereof) is inconsistent with the actual administration of employee benefit plans because such plans do not have individuals acting as chief executive officer and chief executive officer.[133] Those commenters noted that employee benefit plans are typically administered through one or more committees that are appointed as the plan's named fiduciaries to administer the plan and oversee investments.[134] In addition, some commenters believed that we should provide an exemption for Form 11-K because employee benefit plans are already subject to extensive regulation under the Employee Retirement Income Security Act of 1974 ("ERISA"),[135] which includes a requirement for the plan administrator to certify, under penalties of perjury and other criminal and administrative penalties, the accuracy of the plan's disclosures under ERISA.[136]

Commenters also addressed other topics related to Section 906. One commenter requested that the Commission allow Section 906 certifications to remain confidential.[137] That commenter expressed concern that a plaintiff could use a Section 906 certification to create a basis for liability that did not otherwise exist.[138] One commenter objected to the proposal to deem Section 906 certifications as "furnished," rather than as "filed."[139] After considering all of the comments, we are adopting the proposals substantially as proposed.

On April 11, 2003, U.S. Senator Joseph Biden introduced a statement into the Congressional Record that discusses Section 906.[140] The statement asserts that Section 906 "is intended to apply to any financial statement filed by a publicly-traded company, upon which the investing public will rely to gauge the financial health of the company," which includes financial statements included in current reports on Forms 6-K and 8-K and annual reports on Form 11-K.[141] The language added to Title 18 by Section 906 refers to "periodic reports containing financial statements," and our proposals to require companies to furnish Section 906 certifications as exhibits applied to periodic (annual, semi-annual and quarterly) reports but did not address current reports on Forms 6-K and 8-K.[142] One commenter addressed the statement in the Congressional Record, indicating that the suggested requirements would create substantial practical burdens for companies to provide Section 906 certifications in current reports filed on Forms 6-K or 8-K.[143] We are also concerned that extending Section 906 certifications to Forms 6-K or 8-K could potentially chill the disclosure of information by companies. As noted above, four commenters argued that

Section 906 should not apply to Form 11-K.[144] In light of these developments, we are considering, in consultation with the Department of Justice, the application of Section 906 to current reports on Forms 6-K and 8-K and annual reports on Form 11-K and the possibility of taking additional action.

## B. Final Rules

We are amending the exhibit requirements of Forms 20-F and 40-F and Item 601 of Regulations S-B and S-K to add the Section 302 certifications to the list of required exhibits.[145] In the final rules, the specific form and content of the required certifications is set forth in the applicable exhibit filing requirement.[146] To coordinate the rules requiring an evaluation of "disclosure controls and procedures" and "internal control over financial reporting," we are moving the definition of the term "disclosure controls and procedures" from Exchange Act Rules 13a-14(c) and 15d-14(c) and Investment Company Act Rule 30a-2(c) to new Exchange Act Rules 13a-15 (c) and 15d-15(c) and Investment Company Act Rule 30a-3(c), respectively.

We are amending Exchange Act Rules 13a-14 and 15d-14 and Investment Company Act Rule 30a-2 to require the Section 906 certifications to accompany periodic reports containing financial statements as exhibits. We also are amending the exhibit requirements in Forms 20-F, 40-F and Item 601 of Regulations S-B and S-K to add the Section 906 certifications to the list of required exhibits to be included in reports filed with the Commission. In addition, we are amending Item 10 of Form N-CSR to add the Section 906 certifications as a required exhibit. Because the Section 906 certification requirement applies to periodic reports containing financial statements that are filed by an issuer pursuant to Section 13(a) or 15(d) of the Exchange Act, the exhibit requirement will only apply to reports on Form N-CSR filed under these sections and not to reports on Form N-CSR that are filed under the Investment Company Act only.[147] A failure to furnish the Section 906 certifications would cause the periodic report to which they relate to be incomplete, thereby violating Section 13(a) of the Exchange Act.[148] In addition, referencing the Section 906 certifications in Exchange Act Rules 13a-14 and 15d-14 and Investment Company Act Rule 30a-2 subjects these certifications to the signature requirements of Rule 302 of Regulation S-T.[149]

Section 906 requires that the certifications "accompany" the periodic report to which they relate. This is in contrast to Section 302, which requires the certifications to be included "in" the periodic report. In recognition of this difference, we are permitting companies to "furnish," rather than "file," the Section 906 certifications with the Commission.[150] Thus, the certifications would not be subject to liability under Section 18 of the Exchange Act.[151] Moreover, the certifications would not be subject to automatic incorporation by reference into a company's Securities Act registration statements, which are subject to liability under Section 11 of the Securities Act,[152] unless the issuer takes steps to include the certifications in a registration statement.

Although Section 906 does not explicitly require the certifications to be made public, we believe that it is appropriate to require certifications that "accompany" a publicly filed periodic report to be provided publicly in this

manner. We believe that Congress intended for Section 906 certifications to be publicly provided. Civil liability already exists under our signature requirements and the Section 302 certifications. In addition, any Section 906 certification submitted to the Commission as correspondence is subject to the Freedom of Information Act.[153] Finally, the requirement to furnish Section 906 certifications as exhibits serves a number of important functions. First, the exhibit requirement enhances compliance by allowing the Commission, the Department of Justice and the public to monitor the certifications effectively. Second, by subjecting the Section 906 certifications to the signature requirements of Regulation S-T, companies are required to retain a manually signed signature page or other authenticating document for a five-year period. This requirement helps to preserve evidential matter in the event of prosecution.

There are important distinctions to be made between Sections 302 and 906 of the Sarbanes-Oxley Act. Unlike the Section 302 certifications, the Section 906 certifications are required only in periodic reports that contain financial statements. Therefore, amendments to periodic reports that do not contain financial statements would not require a new Section 906 certification, but would require a new Section 302 certification to be filed with the amendment.[154] In addition, unlike the Section 302 certifications, the Section 906 certifications may take the form of a single statement signed by a company's chief executive and financial officers.[155]

### C. Effect on Interim Guidance Regarding Filing Procedures

We provided interim guidance regarding voluntary filing procedures for Section 906 certifications.[156] That guidance encouraged issuers to submit their Section 906 certifications as exhibits to the periodic reports to which they relate.[157] For issuers that are not investment companies, that interim voluntary guidance shall remain in effect until the rules become effective. In the event that the EDGAR system is not updated by the effective date, companies should submit the required certifications as Exhibit 99.[158] For registered investment companies, the interim guidance shall remain in effect until the rules become effective.[159]

### D. Form of Section 302 Certifications

We proposed several amendments to the form of certifications to be provided pursuant to Section 302 of the Sarbanes-Oxley Act. In particular, we proposed the following:

- The addition of a statement that principal executive and financial officers are responsible for designing internal controls and procedures for financial reporting or having such controls and procedures designed under their supervision;

- The clarification that disclosure controls and procedures may be designed under the supervision of principal executive and financial officers; and

- The revision of the statement as to the effectiveness of disclosure controls and procedures and internal controls and procedures for financial reporting would be as of the end of the period.

We have adopted the proposals referred to above substantially as proposed. In addition, we have made the following changes:

- We have incorporated the term "internal control over financial reporting" into the certification;

- We have amended the provision of the certification relating to changes in internal control over financial reporting, consistent with the final rules discussed above regarding evaluation and disclosure, so that it refers to changes that have materially affected or are reasonably likely to materially affect internal control over financial reporting;

- We have clarified that the statement as effectiveness of disclosure controls and procedures be as of the end of the period, but that the date of the evaluation is not specified; and

- We have made minor changes in the organization of the certification.

### E. Transition Period

The final rules regarding filing of certifications under Sections 302 and 906, for companies other than registered investment companies, will be effective on August 14, 2003. The compliance dates applicable to registered investment companies are described in Section II. I., above.

We believe that changes in the form of Section 302 certification described above are beneficial to both registrants and investors because they clarify the provisions of the certification. With one exception, discussed below, the changes are also not related to our new requirements regarding management's internal control report. With that one exception, appropriateness of the modified certification is thus not affected by the extended compliance period we are providing in connection with management's internal control report and the related attestation. Our rules adopted today also therefore provide that the form of Section 302 certification will be modified, with that one exception, in accordance with these rules effective on August 14, 2003.

We are applying the extended compliance period to the portion of the introductory language in paragraph 4 of the Section 302 certification that refers to the certifying officers' responsibility for establishing and maintaining internal control over financial reporting for the company, as well as paragraph 4(b), which must be provided in the first annual report required to contain management's internal control report and thereafter. As noted above, this extended compliance period does not in any way affect the provisions of our other rules and regulations regarding internal controls that are in effect.

### IV. PAPERWORK REDUCTION ACT

### A. Background

Certain provisions of our final amendments contain "collection of information" requirements within the meaning of the Paperwork Reduction

Act of 1995 ("PRA").[160] We published a notice requesting comment on the collection of information requirements in the proposing release for the rule amendments, and we submitted these requirements to the Office of Management and Budget ("OMB") for review in accordance with the PRA.[161] The titles for the collection of information are:

(1) "Form 10-Q" (OMB Control No. 3235-0070);

(2) "Form 10-QSB" (OMB Control No. 3235-0416);

(3) "Form 10-K" (OMB Control No. 3235-0063);

(4) "Form 10-KSB" (OMB Control No. 3235-0420);

(5) "Form 20-F" (OMB Control No. 3235-0288);

(6) "Form 40-F" (OMB Control No. 3235-0381);

(7) "Regulation S-X" (OMB Control No. 3235-0009);

(8) "Regulation S-K" (OMB Control No. 3235-0071);

(9) "Regulation S-B" (OMB Control No. 3235-0417); and

(10) "Form N-CSR" (OMB Control No. 3235-0570).

The forms are periodic reports adopted under the Exchange Act and the Investment Company Act. The regulations set forth the disclosure requirements for periodic reports, registration statements and proxy and information statements filed by companies to ensure that investors are informed. The hours and costs associated with preparing, filing and sending these forms constitute reporting and cost burdens imposed by each collection of information. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. Compliance with the requirements is mandatory. Under our rules for the retention of manual signatures,[162] companies must retain, for a period of five years, an original signature page or other document authenticating, acknowledging or otherwise adopting the certifying officers' signatures that appear in their electronically filed periodic reports. Responses to the information collections are not kept confidential.

## B. Summary of the Final Rules

The final rules require the annual report of every company that files periodic reports under Section 13(a) or 15(d) of the Exchange Act, other than reports by registered investment companies, to contain a report of management that includes:

- A statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting for the company;

- A statement identifying the framework used by management to evaluate the effectiveness of the company's internal control over financial reporting;

- Management's assessment of the effectiveness of the company's internal control over financial reporting, as of the end of the most recent fiscal year; and

- A statement that the registered public accounting firm that audited the financial statements included in the annual report has issued an attestation report on management's evaluation of the company's internal control over financial reporting.

We are adding these requirements pursuant to the legislative mandate in Section 404 of the Sarbanes-Oxley Act. Under our final rules, a company also will be required to evaluate and disclose any change in its internal control over financial reporting that occurred during the fiscal quarter that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting.

We are also adopting amendments to require companies to file the certifications mandated by Sections 302 and 906 of the Sarbanes-Oxley Act as exhibits to their annual, semi-annual and quarterly reports. These amendments will enhance the ability of investors, the Commission staff, the Department of Justice and other interested parties to easily and efficiently access the certifications through our Electronic Data Gathering, Analysis and Retrieval ("EDGAR") system and facilitate better monitoring of a company's compliance with the certification requirements.

### C. Summary of Comment Letters and Revisions to Proposals

We requested comment on the PRA analysis contained in the proposing releases addressing Section 404 and Sections 302 and 906 of the Sarbanes-Oxley Act.[163] We received no comments on our PRA estimates for the certification requirements. With respect to our PRA estimates for the rules implementing Section 404 of the Sarbanes-Oxley Act, eight commenters thought that our PRA estimates significantly understated the actual time and costs that companies would have to expend evaluating and reporting on their internal control over financial reporting.[164] However, few of these commenters provided actual alternative cost estimates, and none provided estimates that could be applied generally to all types and sizes of companies. One commenter believed that, based on its experience, we understated the burden estimate by at least a factor of 100.[165] In response to these commenters, and based on follow-up conversations with several of the commenters who expressed a view on our burden and cost estimates, we have revised our estimates as discussed more fully in Section IV.D below.

We have made a substantive modification to the proposed rules in response to the cost concerns expressed by commenters. Specifically, the final rules require companies to undertake a quarterly evaluation only of any change occurring during the fiscal quarter that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting. This change should substantially mitigate some of the

costs and burdens associated with the proposed requirements.

We have made additional substantive changes to the proposed rule as well. First, the final rules require management to evaluate the company's internal control over financial reporting using a suitable framework, such as the COSO Framework. Second, the final rules expand the list of information that must be included in the management report and specify that management cannot conclude that a company's internal control over financial reporting is effective if there are one or more material weaknesses in such control. Under the final rules, management must identify the framework used to evaluate the company's internal control over financial reporting and disclose any material weaknesses in the company's internal control over financial reporting discovered through the evaluation. We do not believe that these changes significantly alter the burdens imposed on companies resulting from the required assessment of internal control over financial reporting.

## D. Revisions to PRA Reporting and Cost Burden Estimates

As discussed above, in consideration of commenters' remarks, we are revising our PRA burden and cost estimates for the rules pertaining to Section 404 that we originally submitted to the OMB in connection with the proposed rules.

We derived our new burden hour estimates for the annual report forms by estimating the total amount of time that it will take a company's management to conduct the annual evaluation of its internal control over financial reporting and to prepare the required management report.[166] Our annual burden estimate is based on several assumptions. First, we assumed that the annual number of responses for each form would be consistent with the number of filings that we received in fiscal year 2002.[167] Second, we assumed that there is a direct correlation between the extent of the burden and the size of the reporting company, with the burden increasing commensurate with the size of the company. We believe that there will be a marked disparity of burdens and costs resulting from the new internal control requirements between the largest and smallest reporting companies. Our estimates reflect an average burden for all sizes of companies. Third, we assumed that the first-year burden would be greater than that for subsequent years, as a portion of the costs will reflect one-time expenditures associated with complying with the rule, such as compiling documentation, implementing new processes, and training staff. We also adjusted the second and third year estimates to account for the fact that management should become more efficient at conducting its internal control assessment and preparing the disclosure after the first year as the process becomes more routine.[168] Under these assumptions, we estimate that the average incremental burden for an annual filing will be 383 hours per company and the portion of that burden that is reflected as the cost associated with outside professionals is approximately $34,300 per company. For large corporations, we expect that this burden will be substantially higher. Indeed, we received estimates in the thousands of hours for some large and complex companies. Conversely, we expect small companies to find their burden to be less than this average. We also believe that many companies will experience costs well in excess of this average in the first year of compliance with the final rules. We believe that costs will decrease in subsequent years. This burden will also vary among companies based on the complexity of their organization and the nature of their

current internal control procedures. We therefore calculated our estimates by averaging the estimated burdens over a three-year period.

We derived our burden estimates for the quarterly report forms by estimating the total amount of time that it will take a company's management to conduct the quarterly evaluation of material changes to the company's internal control over financial reporting and for the company to prepare the required disclosure about such changes. We believe that these quarterly evaluations will impose little additional burden, as much of the structure to conduct these evaluations will be established in connection with the annual evaluations. We estimate that the quarterly reporting will impose an additional burden of five hours per company in connection with each quarterly report. Accordingly, we did not revise our original burden hour estimates for the quarterly report forms.

We estimate the total annual incremental burden (for annual and quarterly reports) associated with the new internal control evaluation and disclosure requirements for all companies to be approximately 3,792,888 hours of company personnel time and a cost of $481,013,550 for the services of outside professionals.[169]

Table 1 below presents these burdens and costs for each form affected by the final rules implementing Section 404 of Sarbanes-Oxley. We calculated the burden by multiplying the estimated number of affected responses by the estimated average number of hours that management will spend conducting its assessment of the company's internal control over financial reporting and preparing the related disclosure. For Exchange Act annual reports, we estimate that 75% of the burden of preparation is carried by the company internally and that 25% of the burden of preparation is carried by outside professionals retained by the company at an average cost of $300 per hour.[170] The portion of the burden carried by outside professionals is reflected as a cost, while the portion of the burden carried by the company internally is reflected in hours. There is no change to the estimated burden of the collections of information entitled "Regulation S-K," "Regulation S-B" and "Regulation S-X" because the burdens that these regulations impose are reflected in our revised estimates for the forms.

Table 1: Incremental Paperwork Burden for the rules implementing Section 404

We do not believe that the amendments with respect to the Section 302 certifications result in a need to alter the burden estimates that we previously submitted to OMB because they merely relocate the certifications from the text of quarterly and annual reports filed or submitted under Section 13(a) or 15(d) of the Exchange Act to the "Exhibits" section of the reports. We are, however, revising the burden estimates for quarterly and annual reports and for Form N-CSR based on the amendment with respect to the Section 906 certification.[171] The PRA estimates for these amendments do not reflect a cost because we believe that the entire burden will be borne by company personnel. With respect to semi-annual reports on Form N-CSR, because the financial statements of registered management investment companies are not as complex as those of operating companies, we estimate that the amendments relating to the Section 906 certifications would result in an increase of one burden hour per

portfolio.[172] We estimate that there are approximately 3,700 registered management investment companies that are required to file reports on Form N-CSR, containing 9,850 portfolios. The following table illustrates the incremental PRA estimates for the new Section 906 certification requirements:

Table 2: Incremental Paperwork Burden for Certification Requirements

| Form | Annual Responses | Hours/Form | Total Hours Added |
|------|-----------------|------------|-------------------|
| 20-F | 1,194 | 2 | 2,388 |
| 40-F | 134 | 2 | 268 |
| 10-K | 8,484 | 2 | 16,968 |
| 10-KSB | 3,820 | 2 | 7,640 |
| 10-Q | 23,743 | 2 | 47,486 |
| 10-QSB | 11,299 | 2 | 22,598 |
| N-CSR | 7,400 | 2.66[173] | 19,700 |
| Total | | | 117,048 |

## V. COST-BENEFIT ANALYSIS

The amendments implementing Section 404 of the Sarbanes-Oxley Act are congressionally mandated. We recognize that implementation of the Sarbanes-Oxley Act will likely result in costs and benefits to the economy. We are sensitive to the costs and benefits imposed by our rules, and we have considered costs and benefits of our amendments.

### A. Benefits

One of the main goals of the Sarbanes-Oxley Act is to enhance the quality of reporting and increase investor confidence in the financial markets. Recent market events have evidenced a need to provide investors with a clearer understanding of the processes that surround the preparation and presentation of financial information. These amendments are intended to accomplish the Act's goals by improving public company disclosure to investors about the extent of management's responsibility for the company's financial statements and internal control over financial reporting and the means by which management discharges its responsibility. The establishment and maintenance of internal control over financial reporting has always been an important responsibility of management. An effective system of internal control over financial reporting is necessary to produce reliable financial statements and other financial information used by investors. By requiring a report of management stating management's responsibility for the company's financial statements and internal control over financial reporting and management's assessment regarding the effectiveness of such control, investors will be able to better evaluate management's performance of its stewardship responsibilities and the reliability of a company's financial statements and other unaudited financial information.

The required annual evaluation of internal control over financial reporting will encourage companies to devote adequate resources and attention to the maintenance of such control. Additionally, the required evaluation should help to identify potential weaknesses and deficiencies in advance of a system breakdown, thereby facilitating the continuous, orderly and timely flow of information within the company and, ultimately, to investors and the marketplace. Improved disclosure may help companies detect fraudulent financial reporting earlier and perhaps thereby deter financial fraud or minimize its adverse effects. All of these benefits will increase market efficiency by improving investor confidence in the reliability of a company's financial disclosure and system of internal control over financial reporting. These benefits are not readily quantifiable. Commenters overwhelmingly supported the benefits of the amendments.

The amendments related to Section 302 of the Sarbanes-Oxley Act relocate the certifications required by Exchange Act Rules 13a-14 and 15d-14 from the text of quarterly and annual reports filed or submitted under Section 13 (a) or 15(d) of the Exchange Act to the "Exhibits" section of these reports. The amendments related to Section 906 of the Sarbanes-Oxley Act require that the certifications required by Section 1350 of Title 18 of the United States Code, added by Section 906 of the Act, accompany the periodic reports to which they relate as exhibits. These changes will enhance the ability of investors and the Commission staff to verify that the certifications have, in fact, been submitted with the Exchange Act reports to which they relate and to review the contents of the certifications to ensure compliance with the applicable requirements. In addition, the changes will enable the Department of Justice, which has responsibility for enforcing Section 906, to review effectively the form and content of the certifications required by that section.

## B. Costs

The final rules related to Section 404 of the Sarbanes-Oxley Act require companies, other than registered investment companies, to include in their annual reports a report of management on the company's internal control over financial reporting. The management report on internal control over financial reporting must include: a statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting; a statement identifying the framework used to evaluate the effectiveness of the company's internal control over financial reporting; management's assessment of the effectiveness of the company's internal control over financial reporting as of the end of the company's most recent fiscal year; and a statement that the registered public accounting firm that audited the company's financial statements included in the annual report has issued an attestation report on management's evaluation of the company's internal control over financial reporting. The final rules will increase costs for all reporting companies. These costs are mitigated somewhat because companies have an existing obligation to maintain an adequate system of internal accounting control under the FCPA. Moreover, one commenter noted that some companies already voluntarily include management reports on their internal controls in their annual reports. The preparation of the management report on internal control over financial reporting will likely involve multiple parties, including senior management, internal auditors, in-house counsel, outside counsel and audit committee members.

Many commenters believed that our proposal to require quarterly evaluations of a company's internal control over financial reporting would significantly increase the costs of preparing periodic reports. Several commenters also were concerned that the proposals would result in increased audit fees. We have limited data on which to base cost estimates of the final rules.

Using our PRA burden estimates, we estimate the aggregate annual costs of implementing Section 404(a) of the Sarbanes-Oxley Act to be around $1.24 billion (or $91,000 per company).[174] We recognize the magnitude of the cost burdens and we are making several accommodations to address commenters' concerns and to ease compliance, including:

- Requiring quarterly disclosure only of any change that has materially affected, or is reasonably likely to materially affect, a company's internal control over financial reporting; and

- An extended transition period for the new internal control reporting requirements.

We originally proposed to require a company to include an internal control report in its annual report for fiscal years ending on or after September 15, 2003. Under the final rules, a company that is an "accelerated filer" under the definition in Exchange Act Rule 12b-2 must begin to comply with the internal control report requirement in its annual report for its first fiscal year ending on or after June 15, 2004. All other companies must begin to comply with the requirement in their annual reports for their first fiscal year ending on or after April 15, 2005.

A longer transition period will help to alleviate the immediate impact of any costs and burdens imposed on companies. A longer transition period may even help to reduce costs as companies will have additional time to develop best practices, long-term processes and efficiencies in preparing management reports. Also, a longer transition period will expand the period of availability of outside professionals that some companies may wish to retain as they prepare to comply with the new requirements.

The PRA burden estimate, however, excludes several costs attributable to Section 404. The estimate does not include the costs associated with the auditor's attestation report, which many commenters have suggested might be substantial. It also excludes estimates of likely "indirect" costs of the final rules. For instance, the final rules increase the cost of being a public company; therefore the final rules may discourage some companies from seeking capital from the public markets. Moreover, the final rules may also discourage non-U.S. firms from seeking capital in the United States.

The incremental costs of the amendments related to Section 302 of the Sarbanes-Oxley Act are minimal. Since companies must already include the certifications required by Exchange Act Rules 13a-14 and 15d-14 in their quarterly and annual reports, there should be no incremental cost to relocating the certifications from the text of the reports to the "Exhibits" section of these reports. Requiring the Section 906 certifications to be included as an exhibit to the periodic reports to which they relate will lead to some additional costs for companies that currently are submitting the

certifications to the Commission in some other manner. While these costs are difficult to quantify, we estimate that the annual paperwork burden of the amendments will be approximately $23.4 million.[175]

One commenter has expressed concern that companies may assume greater legal risk by making their Section 906 certifications publicly available.[176] To the extent that companies may assume greater legal risk by including the Section 906 certifications as part of their periodic reports filed pursuant to the Exchange Act where these reports are incorporated by reference into Securities Act registration statements, we address this risk by requiring companies to "furnish," rather than "file," the certifications with the Commission for purposes of Section 18 of the Exchange Act or incorporation by reference into other filings. Thus, the amendments should mitigate this potential indirect cost of compliance. We believe that it is appropriate to require the certifications that accompany a periodic report to be publicly available. We believe that Congress intended for Section 906 certifications to be publicly available. Civil liability already exists by virtue of the pre-existing signature requirements and Section 302 certifications. In addition, any Section 906 certification submitted to the Commission as correspondence is subject to the Freedom of Information Act.[177]

## VI. EFFECT ON EFFICIENCY, COMPETITION AND CAPITAL FORMATION

Section 23(a)(2) of the Exchange Act[178] requires us to consider the anti-competitive effects of any rules that we adopt under the Exchange Act. In addition, Section 23(a)(2) prohibits us from adopting any rule that would impose a burden on competition not necessary or appropriate in furtherance of the purposes of the Exchange Act. The amendments related to Section 404 of the Sarbanes-Oxley Act represent the implementation of a congressional mandate. The final rules require management reports that improve investors' understanding of management's responsibility for the preparation of reliable financial information and maintaining adequate internal control over financial reporting. We anticipate that these requirements will enhance the proper functioning of the capital markets by increasing the quality and accountability of financial reporting and restoring investor confidence.

Section 2(b) of the Securities Act,[179] Section 3(f) of the Exchange Act[180] and Section 2(c) of the Investment Company Act[181] require us, when engaging in rulemaking to consider or determine whether an action is necessary or appropriate in the public interest, and consider whether the action will promote efficiency, competition, and capital formation. The amendments related to Section 404 are designed to enhance the quality and accountability of the financial reporting process and may help increase investor confidence, which implies increased efficiency and competitiveness of the U.S. capital markets. Increased market efficiency and investor confidence also may encourage more efficient capital formation. We requested comments on the effect of these amendments on efficiency, competition and capital formation analyses in the proposing release addressing Section 404. We received no comments in response to these requests.

The amendments related to Section 302 of the Sarbanes-Oxley Act would

relocate the certifications required by Exchange Act Rules 13a-14 and 15d-14 from the text of quarterly and annual reports filed or submitted under Section 13(a) or 15(d) of the Exchange Act to the "Exhibits" section of these reports. This relocation will enhance the ability of investors and the Commission staff to verify that the certifications have, in fact, been submitted with the Exchange Act reports to which they relate and to review the contents of the certifications to ensure compliance with the applicable requirements. The amendments related to Section 906 of the Sarbanes-Oxley Act also will streamline compliance with Section 1350 of Title 18 of the United States Code, added by Section 906 of the Act, and will enable investors, the Commission staff and the Department of Justice, which has responsibility for enforcing Section 1350, to verify submission and efficiently review the form and content of the certifications required by that provision.

We do not believe that the amendments related to certifications will impose any burden on competition, nor are we aware of any impact on capital formation that would result from the amendments. Depending on how an issuer's principal executive and principal financial officers presently satisfy the Section 906 certification requirements, issuers may incur some additional costs in submitting these certifications as an exhibit to their periodic reports. While these costs are difficult to quantify, we believe that they would be nominal. We requested comment on whether the amendments would affect competition, efficiency and capital formation. We received no comments in response to this request.

## VII. FINAL REGULATORY FLEXIBILITY ANALYSIS

This Final Regulatory Flexibility Analysis ("FRFA") has been prepared in accordance with the Regulatory Flexibility Act.[182] This FRFA relates to new rules and amendments that require Exchange Act companies, other than registered investment companies, to include in their annual reports a report of management on the company's internal control over financial reporting. The management report on internal control over financial reporting must include: a statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting; a statement identifying the framework used to evaluate the effectiveness of the company's internal control over financial reporting; management's assessment of the effectiveness of the company's internal control over financial reporting as of the end of the company's most recent fiscal year; and a statement that the registered public accounting firm that audited the company's financial statements included in the annual report has issued an attestation report on management's evaluation of the company's internal control over financial reporting. This FRFA also addresses new rules and amendments that require companies to file the certifications mandated by Sections 302 and 906 of the Sarbanes-Oxley Act as exhibits to their periodic reports. An Initial Regulatory Flexibility Analysis ("IRFA") was prepared in accordance with the Regulatory Flexibility Act in conjunction with each of the releases proposing these rules.[183] The proposing releases solicited comments on these analyses.

## A. Need for the Amendments

We are adopting these disclosure requirements to comply with the mandate of, and to fulfill the purposes underlying the provisions of, the Sarbanes-Oxley Act of 2002. The new evaluation and disclosure requirements

regarding a company's internal control over financial reporting are intended to enhance the quality of reporting and increase investor confidence in the fairness and integrity of the securities markets by making it clear that a company's management is responsible for maintaining and annually assessing such controls. The amendments related to Sections 302 and 906 of the Sarbanes-Oxley Act will enhance the ability of investors and the Commission staff to verify that the certifications have, in fact, been submitted with the Exchange Act reports to which they relate and to review the contents of the certifications to ensure compliance with the applicable requirements. The amendments also will streamline compliance with Section 1350 of Title 18 of the United States Code and will enable investors, the Commission staff and the Department of Justice, which has responsibility for enforcing Section 1350, to verify a company's submission of the Section 906 certification and efficiently review the form and content of the certifications.

## B. Significant Issues Raised by Public Comment

In the Proposing Releases, we requested comment on any aspect of the IRFA, including the number of small entities that would be affected by the proposals, and both quantitative and qualitative nature of the impact. Several commenters expressed concern that small business issuers, including small entities, would be particularly disadvantaged by our proposal to require quarterly evaluations of internal control over financial reporting. We received no commentary on the impact on small entities of the new certification requirements.

## C. Small Entities Subject to the Amendments

The new disclosure items affect issuers that are small entities. Exchange Act Rule 0-10(a)[184] defines an issuer, other than an investment company, to be a "small business" or "small organization" if it had total assets of $5 million or less on the last day of its most recent fiscal year. We estimate that there are approximately 2,500 issuers, other than investment companies, that may be considered small entities. For purposes of the Regulatory Flexibility Act, an investment company is a "small entity" if it, together with other investment companies in the same group of related investment companies, has net assets of $50 million or less as of the end of its most recent fiscal year.[185] We estimate that there are approximately 190 registered management investment companies that, together with other investment companies in the same group of related investment companies, have net assets of $50 million or less as of the end of the most recent fiscal year.[186]

The new disclosure items with respect to management's report on internal control over financial reporting and the registered public accounting firm's attestation report apply to any small entity, other than a registered investment company, that is subject to Exchange Act reporting requirements. The new certification requirements apply to any small entity that is subject to Exchange Act reporting requirements.

## D. Reporting, Recordkeeping and other Compliance Requirements

The amendments require a company's management to disclose information regarding the company's internal control over financial reporting, including

management's assessment of the effectiveness of the company's internal control over financial reporting. All small entities that are subject to the reporting requirements of Section 13(a) or 15(d) of the Exchange Act, other than registered investment companies, are subject to these evaluation and disclosure requirements. Because reporting companies already file the forms being amended, no additional professional skills beyond those currently possessed by these filers necessarily are required to prepare the new disclosure, although some companies may choose to engage outside professionals to assist them in complying with the new requirements. We expect that these new disclosure items will increase compliance costs incurred by small entities. We have calculated for purposes of the Paperwork Reduction Act that each company would be subject to an added annual reporting burden of approximately 398 hours and the portion of that burden that is reflected as the cost associated with outside professionals is approximately $35,286.[187] We believe, however, that the annual average burden and costs for small issuers are much lower.[188] For the new certification requirements, we estimate that a company, including a small entity, will be subject to an additional reporting burden of eight hours per year.[189] These burden estimates reflect only the burden and cost of the required collection of information.

### E. Agency Action to Minimize Effect on Small Entities

The Regulatory Flexibility Act directs us to consider alternatives that would accomplish our stated objectives, while minimizing any significant adverse impact on small entities. In connection with the amendments, we considered the following alternatives:

- Establishing different compliance or reporting requirements or timetables that take into account the resources available to small entities;

- Clarifying, consolidating or simplifying compliance and reporting requirements under the rules for small entities;

- Using performance rather than design standards; and

- Exempting small entities from all or part of the requirements.

Several of these alternatives were considered but rejected, while other alternatives were taken into account in the final rules. We believe the final rules fulfill the intent of the Sarbanes-Oxley Act of enhancing the quality of reporting and increasing investor confidence in the fairness and integrity of the securities markets.

Sections 302, 404 and 906 of the Sarbanes-Oxley Act make no distinction based on a company's size. We think that improvements in the financial reporting process for all companies are important for promoting investor confidence in our markets. For example, a 1999 report commissioned by the organizations that sponsored the Treadway Commission found that the incidence of financial fraud was greater in small companies.[190] However, we are sensitive to the costs and burdens that small entities will face. The final rules require only a quarterly evaluation of material changes to a company's internal control over financial reporting, unlike the proposed rules that

would have required management to evaluate the effectiveness of a company's internal control over financial reporting on a quarterly basis. In response to comments, including comments submitted by the Small Business Administration, we have decided not to adopt this proposal.

We believe that a blanket exemption for small entities from coverage of the requirements is not appropriate and would be inconsistent with the policies underlying the Sarbanes-Oxley Act. However, we have provided an extended transition period for companies that do not meet the definition in Exchange Act Rule 12b-2[191] of an "accelerated filer" for the rules implementing Section 404 of the Sarbanes-Oxley Act. Under the adopted rules, non-accelerated filers, including small business issuers, need not prepare the management report on internal control over financial reporting until they file their annual reports for fiscal years ending on or after April 15, 2005. This deferral provides non-accelerated filers more time to develop structured and formal systems of internal control over financial reporting.

We believe that the new disclosure and certification requirements are clear and straightforward. The amendments require only brief disclosure. An effective system of internal control over financial reporting has always been necessary to produce reliable financial statements and other financial information. Our amendments do not specify any particular controls that a company's internal control over financial reporting should include. Each company is afforded the flexibility to design its internal control over financial reporting according to its own set of circumstances. This flexibility should enable companies to keep costs of compliance as low as possible. Therefore, it does not seem necessary to develop separate requirements for small entities.

The final rules impose both design and performance standards regarding disclosure of management's responsibility for establishing and maintaining adequate internal control over financial reporting for the company and management's assessment of the effectiveness of such controls. The rules do, however, afford a company the flexibility to design its internal control over financial reporting to fit its particular circumstances. We believe that it would be inconsistent with the purposes of the Sarbanes-Oxley Act to specify different requirements for small entities.

## VIII. STATUTORY AUTHORITY AND TEXT OF RULE AMENDMENTS

The amendments described in this release are being adopted under the authority set forth in Sections 5, 6, 7, 10, 17 and 19 of the Securities Act, as amended, Sections 12, 13, 15, 23 and 36 of the Exchange Act, Sections 8, 30, 31 and 38 of the Investment Company Act, as amended and Sections 3(a), 302, 404, 405 and 906 of the Sarbanes-Oxley Act.

### List of Subjects

17 CFR Part 210

Accountants, Accounting, Reporting and recordkeeping requirements, Securities.

17 CFR Part 228

# Exhibit C
# (Part 3 of 4)

Reporting and recordkeeping requirements, Securities, Small businesses.

17 CFR Parts 229, 240 and 249

Reporting and recordkeeping requirements, Securities.

17 CFR Parts 270 and 274

Investment companies, Reporting and recordkeeping requirements, Securities.

**TEXT OF AMENDMENTS**

For the reasons set out in the preamble, the Commission amends title 17, chapter II, of the Code of Federal Regulations as follows:

**PART 210 – FORM AND CONTENT OF AND REQUIREMENTS FOR FINANCIAL STATEMENTS, SECURITIES ACT OF 1933, SECURITIES EXCHANGE ACT OF 1934, PUBLIC UTILITY HOLDING COMPANY ACT OF 1935, INVESTMENT COMPANY ACT OF 1940, INVESTMENT ADVISERS ACT OF 1940, AND ENERGY POLICY AND CONSERVATION ACT OF 1975**

1. The authority citation for Part 210 is revised to read as follows:

Authority: 15 U.S.C. 77f, 77g, 77h, 77j, 77s, 77z-2, 77z-3, 77aa(25), 77aa (26), 78c, 78j-1, 78l, 78m, 78n, 78o(d), 78q, 78u-5, 78w(a), 78ll, 78mm, 79e(b), 79j(a), 79n, 79t(a), 80a-8, 80a-20, 80a-29, 80a-30, 80a-31, 80a-37(a), 80b-3, 80b-11, 7202 and 7262, unless otherwise noted.

2. Section 210.1-02 is amended by:

a. Removing the authority citation following §210.1-02;

b. Redesignating paragraph (a) as paragraph (a)(1); and

c. Adding paragraph (a)(2).

The revisions read as follows:

**§210.1-02 Definition of terms used in Regulation S-X (17 CFR part 210).**

\* \* \* \* \*

(a)(1) \* \* \*

(2) Attestation report on management's assessment of internal control over financial reporting. The term attestation report on management's assessment of internal control over financial reporting means a report in which a registered public accounting firm expresses an opinion, or states that an opinion cannot be expressed, concerning management's assessment of the effectiveness of the registrant's internal control over financial

reporting (as defined in §240.13a-15(f) or 240.15d-15(f) of this chapter) in accordance with standards on attestation engagements. When an overall opinion cannot be expressed, the registered public accounting firm must state why it is unable to express such an opinion.

\* \* \* \* \*

3. Amend §210.2-02 by:

a. Revising the section heading;

b. Revising the headings of paragraphs (a), (b), (c) and (d); and

c. Adding paragraph (f).

The addition and revisions read as follows.

### §210.2-02 Accountants' reports and attestation reports on management's assessment of internal control over financial reporting.

(a) Technical requirements for accountants' reports. \* \* \*

(b) Representations as to the audit included in accountants' reports. \* \* \*

(c) Opinions to be expressed in accountants' reports. \* \* \*

(d) Exceptions identified in accountants' reports. \* \* \*

\* \* \* \* \*

(f) Attestation report on management's assessment of internal control over financial reporting. Every registered public accounting firm that issues or prepares an accountant's report for a registrant, other than an investment company registered under section 8 of the Investment Company Act of 1940 (15 U.S.C. 80a-8), that is included in an annual report required by section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.) containing an assessment by management of the effectiveness of the registrant's internal control over financial reporting must attest to, and report on, such assessment. The attestation report on management's assessment of internal control over financial reporting shall be dated, signed manually, identify the period covered by the report and clearly state the opinion of the accountant as to whether management's assessment of the effectiveness of the registrant's internal control over financial reporting is fairly stated in all material respects, or must include an opinion to the effect that an overall opinion cannot be expressed. If an overall opinion cannot be expressed, explain why. The attestation report on management's assessment of internal control over financial reporting may be separate from the accountant's report.

### PART 228 - INTEGRATED DISCLOSURE SYSTEM FOR SMALL BUSINESS ISSUERS

4. The general authority citation for Part 228 is revised to read as follows:

Authority: 15 U.S.C. 77e, 77f, 77g, 77h, 77j, 77k, 77s, 77z-2, 77z-3, 77aa (25), 77aa(26), 77ddd, 77eee, 77ggg, 77hhh, 77jjj, 77nnn, 77sss, 78l, 78m, 78n, 78o, 78u-5, 78w, 78ll, 78mm, 80a-8, 80a-29, 80a-30, 80a-37, 80b-11, 7202, 7241, and 7262; and 18 U.S.C. 1350, unless otherwise noted.

* * * * *

5. Revise §228.307 to read as follows:

### §228.307 (Item 307) Disclosure controls and procedures.

Disclose the conclusions of the small business issuer's principal executive and principal financial officers, or persons performing similar functions, regarding the effectiveness of the small business issuer's disclosure controls and procedures (as defined in §240.13a-15(e) or 240.15d-15(e) of this chapter) as of the end of the period covered by the report, based on the evaluation of these controls and procedures required by paragraph (b) of §240.13a-15 or 240.15d-15 of this chapter.

6. Add §228.308 to read as follows:

### §228.308 (Item 308) Internal control over financial reporting.

(a) Management's annual report on internal control over financial reporting. Provide a report of management on the small business issuer's internal control over financial reporting (as defined in §240.13a-15(f) or 240.15d-15 (f) of this chapter) that contains:

(1) A statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting for the small business issuer;

(2) A statement identifying the framework used by management to evaluate the effectiveness of the small business issuer's internal control over financial reporting as required by paragraph (c) of §240.13a-15 or 240.15d-15 of this chapter;

(3) Management's assessment of the effectiveness of the small business issuer's internal control over financial reporting as of the end of the small business issuer's most recent fiscal year, including a statement as to whether or not internal control over financial reporting is effective. This discussion must include disclosure of any material weakness in the small business issuer's internal control over financial reporting identified by management. Management is not permitted to conclude that the small business issuer's internal control over financial reporting is effective if there are one or more material weaknesses in the small business issuer's internal control over financial reporting; and

(4) A statement that the registered public accounting firm that audited the financial statements included in the annual report containing the disclosure required by this Item has issued an attestation report on management's

assessment of the small business issuer's internal control over financial reporting.

(b) *Attestation report of the registered public accounting firm.* Provide the registered public accounting firm's attestation report on management's assessment of the small business issuer's internal control over financial reporting in the small business issuer's annual report containing the disclosure required by this Item.

(c) *Changes in internal control over financial reporting.* Disclose any change in the small business issuer's internal control over financial reporting identified in connection with the evaluation required by paragraph (d) of §240.13a-15 or 240.15d-15 of this chapter that occurred during the small business issuer's last fiscal quarter (the small business issuer's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the small business issuer's internal control over financial reporting.

Instructions to Item 308

1. The small business issuer must maintain evidential matter, including documentation, to provide reasonable support for management's assessment of the effectiveness of the small business issuer's internal control over financial reporting.

2. A small business issuer that is an Asset-Backed Issuer (as defined in §240.13a-14(g) and §240.15d-14(g) of this chapter) is not required to disclose the information required by this Item.

7. Amend §228.401 by removing the phrase "internal controls and procedures for financial reporting" in paragraph (e)(2)(iv) of Item 401 and adding, in its place, the phrase "internal control over financial reporting".

8. Amend §228.601 by:

a. Removing the last sentence of paragraph (a)(1);

b. Revising the Exhibit Table;

c. Revising paragraph (b)(7) to read "No exhibit required.";

d. Revising the heading in paragraph (b)(11) to read "Statement re: computation of per share earnings"; and

e. Revising paragraphs (b)(27) through (b)(98).

The revisions read as follows.

**§228.601 (Item 601) Exhibits.**

* * * * *

**EXHIBIT TABLE**

(b) Description of exhibits. * * *

(27) through (30) [Reserved]

(31) Rule 13a-14(a)/15d-14(a) Certifications. The certifications required by Rule 13a-14(a) (17 CFR 240.13a-14(a)) or Rule 15d-14(a) (17 CFR 240.15d-14(a)) exactly as set forth below:

## CERTIFICATIONS*

I, [identify the certifying individual], certify that:

1. I have reviewed this [specify report] of [identify small business issuer];

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the small business issuer as of, and for, the periods presented in this report;

4. The small business issuer's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15 (e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the small business issuer and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the small business issuer, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the small business issuer's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the small business issuer's internal control over financial reporting that occurred during the small business issuer's most recent fiscal quarter (the small business issuer's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the small business issuer's internal control over financial reporting; and

5. The small business issuer's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the small business issuer's auditors and the audit committee of the small business issuer's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the small business issuer's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the small business issuer's internal control over financial reporting.

Date: ...............

_____

[Signature]
[Title]

* Provide a separate certification for each principal executive officer and principal financial officer of the small business issuer. See Rules 13a-14(a) and 15d-14(a)

(32) Section 1350.

(i) The certifications required by Rule 13a-14(b) (17 CFR 240.13a-14(b)) or Rule 15d-14(b) (17 CFR 240.15d-14(b)) and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. 1350).

(ii) A certification furnished pursuant to this Item will not be deemed "filed" for purposes of section 18 of the Exchange Act (15 U.S.C. 78r), or otherwise subject to the liability of that section. Such certification will not be deemed to be incorporated by reference into any filing under the Securities Act or the Exchange Act, except to the extent that the small business issuer specifically incorporates it by reference.

(33) through (98) [Reserved]

\* \* \* \* \*

**PART 229 - STANDARD INSTRUCTIONS FOR FILING FORMS UNDER**

### SECURITIES ACT OF 1933, SECURITIES EXCHANGE ACT OF 1934 AND ENERGY POLICY AND CONSERVATION ACT OF 1975 - REGULATION S-K

9. The general authority citation for Part 229 is revised to read as follows:

Authority: 15 U.S.C. 77e, 77f, 77g, 77h, 77j, 77k, 77s, 77z-2, 77z-3, 77aa (25), 77aa(26), 77ddd, 77eee, 77ggg, 77hhh, 77iii, 77jjj, 77nnn, 77sss, 78c, 78i, 78j, 78l, 78m, 78n, 78o, 78u-5, 78w, 78ll, 78mm, 79e, 79j, 79n, 79t, 80a-8, 80a-9, 80a-20, 80a-29, 80a-30, 80a-31(c), 80a-37, 80a-38(a), 80a-39, 80b-11, 7202, 7241, and 7262; and 18 U.S.C. 1350, unless otherwise noted.

\* \* \* \* \*

10. By revising §229.307 to read as follows:

### §229.307 (Item 307) Disclosure controls and procedures.

Disclose the conclusions of the registrant's principal executive and principal financial officers, or persons performing similar functions, regarding the effectiveness of the registrant's disclosure controls and procedures (as defined in §240.13a-15(e) or 240.15d-15(e) of this chapter) as of the end of the period covered by the report, based on the evaluation of these controls and procedures required by paragraph (b) of §240.13a-15 or 240.15d-15 of this chapter.

11. By adding §229.308 to read as follows:

### §229.308 (Item 308) Internal control over financial reporting.

(a) Management's annual report on internal control over financial reporting. Provide a report of management on the registrant's internal control over financial reporting (as defined in §240.13a-15(f) or 240.15d-15(f) of this chapter) that contains:

(1) A statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting for the registrant;

(2) A statement identifying the framework used by management to evaluate the effectiveness of the registrant's internal control over financial reporting as required by paragraph (c) of §240.13a-15 or 240.15d-15 of this chapter;

(3) Management's assessment of the effectiveness of the registrant's internal control over financial reporting as of the end of the registrant's most recent fiscal year, including a statement as to whether or not internal control over financial reporting is effective. This discussion must include disclosure of any material weakness in the registrant's internal control over financial reporting identified by management. Management is not permitted to conclude that the registrant's internal control over financial reporting is effective if there are one or more material weaknesses in the registrant's internal control over financial reporting; and

(4) A statement that the registered public accounting firm that audited the financial statements included in the annual report containing the disclosure required by this Item has issued an attestation report on management's assessment of the registrant's internal control over financial reporting.

(b) Attestation report of the registered public accounting firm. Provide the registered public accounting firm's attestation report on management's assessment of the registrant's internal control over financial reporting in the registrant's annual report containing the disclosure required by this Item.

(c) Changes in internal control over financial reporting. Disclose any change in the registrant's internal control over financial reporting identified in connection with the evaluation required by paragraph (d) of §240.13a-15 or 240.15d-15 of this chapter that occurred during the registrant's last fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

Instructions to Item 308

1. The registrant must maintain evidential matter, including documentation, to provide reasonable support for management's assessment of the effectiveness of the registrant's internal control over financial reporting.

2. A registrant that is an Asset-Backed Issuer (as defined in §240.13a-14(g) and §240.15d-14(g) of this chapter) is not required to disclose the information required by this Item.

12. By amending §229.401 by removing the phrase "internal controls and procedures for financial reporting" in paragraph (h)(2)(iv) of Item 401 and adding, in its place, the phrase "internal control over financial reporting".

13. By amending §229.601 by:

a. Removing the second and third sentences of paragraph (a)(1);

b. Revising the Exhibit Table which follows the Instructions to the Exhibit Table; and

c. Revising paragraphs (b)(27) through (b)(98).

The revisions read as follows:

### §229.601 (Item 601) Exhibits.

(a) Exhibits and index required. * * *

Instructions to the Exhibit Table

* * * * *

### EXHIBIT TABLE

(b) Description of exhibits. * * *

(27) through (30) [Reserved]

(31) Rule 13a-14(a)/15d-14(a) Certifications. The certifications required by Rule 13a-14(a) (17 CFR 240.13a-14(a)) or Rule 15d-14(a) (17 CFR 240.15d-14(a)) exactly as set forth below:

## CERTIFICATIONS*

I, [identify the certifying individual], certify that:

1. I have reviewed this [specify report] of [identify registrant];

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth

fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: ...............

_____

[Signature]
[Title]

* Provide a separate certification for each principal executive officer and principal financial officer of the registrant. See Rules 13a-14(a) and 15d-14 (a).

(32) Section 1350 Certifications.

(i) The certifications required by Rule 13a-14(b) (17 CFR 240.13a-14(b)) or Rule 15d-14(b) (17 CFR 240.15d-14(b)) and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. 1350).

(ii) A certification furnished pursuant to this item will not be deemed "filed" for purposes of Section 18 of the Exchange Act (15 U.S.C. 78r), or otherwise subject to the liability of that section. Such certification will not be deemed to be incorporated by reference into any filing under the Securities Act or the Exchange Act, except to the extent that the registrant specifically incorporates it by reference.

(33) through (98) [Reserved]

\* \* \* \* \*

**PART 240 - GENERAL RULES AND REGULATIONS, SECURITIES EXCHANGE ACT OF 1934**

14. The general authority citation for Part 240 is revised to read as follows:

Authority: 15 U.S.C. 77c, 77d, 77g, 77j, 77s, 77z-2, 77z-3, 77eee, 77ggg, 77nnn, 77sss, 77ttt, 78c, 78d, 78e, 78f, 78g, 78i, 78j, 78j-1, 78k, 78k-1, 78l, 78m, 78n, 78o, 78p, 78q, 78s,

78u-5, 78w, 78x, 78ll, 78mm, 79q, 79t, 80a-20, 80a-23, 80a-29, 80a-37, 80b-3, 80b-4, 80b-11, 7202, 7241, 7262, and 7263; and 18 U.S.C. 1350, unless otherwise noted.

\* \* \* \* \*

15. By revising §240.12b-15 to read as follows:

### §240.12b-15 Amendments.

All amendments must be filed under cover of the form amended, marked with the letter "A" to designate the document as an amendment, e.g., "10-K/A," and in compliance with pertinent requirements applicable to statements and reports. Amendments filed pursuant to this section must set forth the complete text of each item as amended. Amendments must be numbered sequentially and be filed separately for each statement or report amended. Amendments to a statement may be filed either before or after registration becomes effective. Amendments must be signed on behalf of the registrant by a duly authorized representative of the registrant. An amendment to any report required to include the certifications as specified in §240.13a-14(a) or §240.15d-14(a) must include new certifications by each principal executive and principal financial officer of the registrant, and an amendment to any report required to be accompanied by the certifications as specified in §240.13a-14(b) or §240.15d-14(b) must be accompanied by new certifications by each principal executive and principal financial officer of the registrant. The requirements of the form being amended will govern the number of copies to be filed in connection with a paper format amendment. Electronic filers satisfy the provisions dictating the number of copies by filing one copy of the amendment in electronic format. See §232.309 of this chapter (Rule 309 of Regulation S-T).

16. By amending §240.13a-14 by:

a. Revising paragraphs (a) and (b);

b. Removing paragraph (c);

c. Redesignating paragraphs (d), (e) and (f) as paragraphs (c), (d) and (e);

d. Revising newly redesignated paragraph (c), the introductory text of newly redesignated paragraph (d) and newly redesignated paragraph (e); and

e. Adding and reserving new paragraph (f).

The revisions read as follows:

### §240.13a-14 Certification of disclosure in annual and quarterly reports.

(a) Each report, including transition reports, filed on Form 10-Q, Form 10-QSB, Form 10-K, Form 10-KSB, Form 20-F or Form 40-F (§§249.308a, 249.308b, 249.310, 249.310b, 249.220f or 249.240f of this chapter) under section 13(a) of the Act (15 U.S.C. 78m(a)), other than a report filed by an Asset-Backed Issuer (as defined in paragraph (g) of this section), must include certifications in the form specified in the applicable exhibit filing requirements of such report and such certifications must be filed as an exhibit to such report. Each principal executive and principal financial officer of the issuer, or persons performing similar functions, at the time of filing of the report must sign a certification.

(b) Each periodic report containing financial statements filed by an issuer pursuant to section 13(a) of the Act (15 U.S.C. 78m(a)) must be accompanied by the certifications required by Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. 1350) and such certifications must be furnished as an exhibit to such report as specified in the applicable exhibit requirements for such report. Each principal executive and principal financial officer of the issuer (or equivalent thereof) must sign a certification. This requirement may be satisfied by a single certification signed by an issuer's principal executive and principal financial officers.

(c) A person required to provide a certification specified in paragraph (a) or (b) of this section may not have the certification signed on his or her behalf pursuant to a power of attorney or other form of confirming authority.

(d) Each annual report filed by an Asset-Backed Issuer (as defined in paragraph (g) of this section) under section 13(a) of the Act (15 U.S.C. 78m(a)) must include a certification addressing the following items: * * *

(e) With respect to Asset-Backed Issuers, the certification required by paragraph (d) of this section must be signed by the trustee of the trust (if the trustee signs the annual report) or the senior officer in charge of securitization of the depositor (if the depositor signs the annual report). Alternatively, the senior officer in charge of the servicing function of the master servicer (or entity performing the equivalent functions) may sign the certification.

(f) [Reserved]

* * * * *

17. Section 240.13a-15 is revised to read as follows:

### §240.13a-15 Controls and procedures.

(a) Every issuer that has a class of securities registered pursuant to section 12http://www.law.uc.edu/CCL/34Act/sec12.html of the Act (15 U.S.C. 78l), other than an Asset-Backed Issuer (as defined in §240.13a-14(g)), a small business investment company registered on Form N-5 (§§ 239.24 and 274.5 of this chapter), or a unit investment trust as defined by section 4(2) of the Investment Company Act of 1940 (15 U.S.C. 80a-4(2)), must maintain disclosure controls and procedures (as defined in paragraph (e) of this section) and internal control over financial reporting (as defined in paragraph (f) of this section).

(b) Each such issuer's management must evaluate, with the participation of the issuer's principal executive and principal financial officers, or persons performing similar functions, the effectiveness of the issuer's disclosure controls and procedures, as of the end of each fiscal quarter, except that management must perform this evaluation:

(1) In the case of a foreign private issuer (as defined in §240.3b-4) as of the end of each fiscal year; and

(2) In the case of an investment company registered under section 8 of the Investment Company Act of 1940 (15 U.S.C. 80a-8), within the 90-day period prior to the filing date of each report requiring certification under §270.30a-2 of this chapter.

(c) The management of each such issuer, other than an investment company registered under section 8 of the Investment Company Act of 1940, must evaluate, with the participation of the issuer's principal executive and principal financial officers, or persons performing similar functions, the effectiveness, as of the end of each fiscal year, of the issuer's internal control over financial reporting. The framework on which management's evaluation of the issuer's internal control over financial reporting is based must be a suitable, recognized control framework that is established by a body or group that has followed due-process procedures, including the broad distribution of the framework for public comment.

(d) The management of each such issuer, other than an investment company registered under section 8 of the Investment Company Act of 1940, must evaluate, with the participation of the issuer's principal executive and principal financial officers, or persons performing similar functions, any change in the issuer's internal control over financial reporting, that occurred during each of the issuer's fiscal quarters, or fiscal year in the case of a foreign private issuer, that has materially affected, or is reasonably likely to materially affect, the issuer's internal control over financial reporting.

(e) For purposes of this section, the term disclosure controls and procedures means controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports that it files or submits under the Act (15 U.S.C. 78a et seq.) is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

(f) The term internal control over financial reporting is defined as a process designed by, or under the supervision of, the issuer's principal executive and principal financial officers, or persons performing similar functions, and effected by the issuer's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and

includes those policies and procedures that:

(1) Pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

(2) Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the issuer are being made only in accordance with authorizations of management and directors of the issuer; and

(3) Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the issuer's assets that could have a material effect on the financial statements.

18. By amending §240.15d-14 by:

a. Revising paragraphs (a) and (b);

b. Removing paragraph (c);

c. Redesignating paragraphs (d), (e) and (f) as paragraphs (c), (d) and (e);

d. Revising newly redesignated paragraph (c), the introductory text of newly redesignated paragraph (d) and newly redesignated paragraph (e); and

e. Adding and reserving new paragraph (f).

The revisions read as follows.

### §240.15d-14 Certification of disclosure in annual and quarterly reports.

(a) Each report, including transition reports, filed on Form 10-Q, Form 10-QSB, Form 10-K, Form 10-KSB, Form 20-F or Form 40-F (§§249.308a, 249.308b, 249.310, 249.310b, 249.220f or 249.240f of this chapter) under section 15(d) of the Act (15 U.S.C. 78o(d)), other than a report filed by an Asset-Backed Issuer (as defined in paragraph (g) of this section), must include certifications in the form specified in the applicable exhibit filing requirements of such report and such certifications must be filed as an exhibit to such report. Each principal executive and principal financial officer of the issuer, or persons performing similar functions, at the time of filing of the report must sign a certification.

(b) Each periodic report containing financial statements filed by an issuer pursuant to section 15(d) of the Act (15 U.S.C. 78o(d)) must be accompanied by the certifications required by Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. 1350) and such certifications must be furnished as an exhibit to such report as specified in the applicable exhibit requirements for such report. Each principal executive and principal financial officer of the issuer (or equivalent thereof) must sign a certification. This requirement may be satisfied by a single certification

signed by an issuer's principal executive and principal financial officers.

(c) A person required to provide a certification specified in paragraph (a) or (b) of this section may not have the certification signed on his or her behalf pursuant to a power of attorney or other form of confirming authority.

(d) Each annual report filed by an Asset-Backed Issuer (as defined in paragraph (g) of this section) under section 15(d) of the Act (15 U.S.C. 78o (d)), must include a certification addressing the following items: * * *

(e) With respect to Asset-Backed Issuers, the certification required by paragraph (d) of this section must be signed by the trustee of the trust (if the trustee signs the annual report) or the senior officer in charge of securitization of the depositor (if the depositor signs the annual report). Alternatively, the senior officer in charge of the servicing function of the master servicer (or entity performing the equivalent functions) may sign the certification.

(f) [Reserved]

* * * * *

19. Section 240.15d-15 is revised to read as follows:

### §240.15d-15 Controls and procedures.

(a) Every issuer that files reports under section 15(d) of the Act (15 U.S.C. 78o(d)), other than an Asset-Backed Issuer (as defined in §240.15d-14(g) of this chapter), a small business investment company registered on Form N-5 (§§239.24 and 274.5 of this chapter), or a unit investment trust as defined in section 4(2) of the Investment Company Act of 1940 (15 U.S.C. 80a-4(2)), must maintain disclosure controls and procedures (as defined in paragraph (e) of this section) and internal control over financial reporting (as defined in paragraph (f) of this section).

(b) Each such issuer's management must evaluate, with the participation of the issuer's principal executive and principal financial officers, or persons performing similar functions, the effectiveness of the issuer's disclosure controls and procedures, as of the end of each fiscal quarter, except that management must perform this evaluation:

(1) In the case of a foreign private issuer (as defined in §240.3b-4) as of the end of each fiscal year; and

(2) In the case of an investment company registered under section 8 of the Investment Company Act of 1940 (15 U.S.C. 80a-8), within the 90-day period prior to the filing date of each report requiring certification under §270.30a-2 of this chapter.

(c) The management of each such issuer, other than an investment company registered under section 8 of the Investment Company Act of 1940, must evaluate, with the participation of the issuer's principal executive and principal financial officers, or persons performing similar functions, the effectiveness, as of the end of each fiscal year, of the issuer's

Final Rule: Management's Reports on Internal Control Over Financial Reporting and C...  Page 17 of 26
Case 1:03-cv-04349-NLW  Document 82-10  Filed 05/26/2006  Page 17 of 26

Page 62 of 93

internal control over financial reporting. The framework on which management's evaluation of the issuer's internal control over financial reporting is based must be a suitable, recognized control framework that is established by a body or group that has followed due-process procedures, including the broad distribution of the framework for public comment.

(d) The management of each such issuer, other than an investment company registered under section 8 of the Investment Company Act of 1940, must evaluate, with the participation of the issuer's principal executive and principal financial officers, or persons performing similar functions, any change in the issuer's internal control over financial reporting, that occurred during each of the issuer's fiscal quarters, or fiscal year in the case of a foreign private issuer, that has materially affected, or is reasonably likely to materially affect, the issuer's internal control over financial reporting.

(e) For purposes of this section, the term disclosure controls and procedures means controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports that it files or submits under the Act (15 U.S.C. 78a et seq.) is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

(f) The term internal control over financial reporting is defined as a process designed by, or under the supervision of, the issuer's principal executive and principal financial officers, or persons performing similar functions, and effected by the issuer's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

(1) Pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

(2) Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the issuer are being made only in accordance with authorizations of management and directors of the issuer; and

(3) Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the issuer's assets that could have a material effect on the financial statements.

**PART 249 - FORMS, SECURITIES EXCHANGE ACT OF 1934**

20. The general authority citation for Part 249 and the subauthority citation for "Section 249.331" are revised to read as follows:

Authority: 15 U.S.C. 78a et seq., 7202, 7233, 7241, 7262, 7264, and 7265; and 18 U.S.C. 1350, unless otherwise noted.

\* \* \* \* \*

Section 249.331 is also issued under 15 U.S.C. 78j-1, 7202, 7233, 7241, 7264, 7265; and 18 U.S.C. 1350.

\* \* \* \* \*

21. By amending Form 10-Q (referenced in §249.308a) by:

a. Removing the last sentence of General Instruction G;

b. Revising Item 4 to "Part I - Financial Information;" and

c. Removing the "Certifications" section after the "Signatures" section.

The revision reads as follows.

**Note: The text of Form 10-Q does not, and this amendment will not, appear in the Code of Federal Regulations.**

**FORM 10-Q**

\* \* \* \* \*

**Part I - Financial Information**

\* \* \* \* \*

**Item 4. Controls and Procedures.**

Furnish the information required by Items 307 of Regulation S-K (17 CFR 229.307) and 308(c) of Regulation S-K (17 CFR 229.308(c)).

\* \* \* \* \*

22. By amending Form 10-QSB (referenced in §249.308b) by:

a. Removing the last sentence of paragraph 2 of General Instruction F;

b. Revising Item 3 to "Part I - Financial Information;" and

c. Removing the "Certifications" section after the "Signatures" section.

The revision reads as follows.

**Note: The text of Form 10-QSB does not, and this amendment will**

not, appear in the Code of Federal Regulations.

## FORM 10-QSB

\* \* \* \* \*

**Part I - Financial Information**

\* \* \* \* \*

**Item 3. Controls and Procedures.**

Furnish the information required by Items 307 of Regulation S-B (17 CFR 228.307) and 308(c) of Regulation S-B (17 CFR 228.308(c)).

\* \* \* \* \*

23. By amending Form 10-K (referenced in § 249.310) by:

a. Removing the phrase "(who also must provide the certification required by Rule 13a-14 (17 CFR 240.13a-14) or Rule 15d-14 (17 CFR 240.15d-14) exactly as specified in this form)" each time it appears in the first sentence of paragraph (2)(a) of General Instruction D.;

b. Removing the phrase "(Items 1 through 9 or any portion thereof)" and adding, in its place, the phrase "(Items 1 through 9A or any portion thereof)" in the first sentence of paragraph (2) of General Instruction G.;

c. Removing the phrase "(Items 10, 11, 12 and 13)" and adding, in its place, the phrase "(Items 10, 11, 12, 13 and 14)" in the first sentence of paragraph (3) of General Instruction G.;

d. Removing the phrase "(Items 1 through 9)" in the third sentence of paragraph (4) of General Instruction G and adding, in its place, the phrase "(Items 1 through 9A)";

e. Removing the phrase "(Items 10 through 13)" in the third sentence of paragraph (4) of General Instruction G and adding, in its place, the phrase "(Items 10 through 14)";

f. Redesignating Item 14 of Part III as Item 9A of Part II and revising newly redesignated Item 9A;

g. Redesignating Item 15 in Part III as Item 14;

h. "Instruction to Item 15" is corrected to read "Instruction to Item 14";

i. Redesignating Item 16 in Part IV as Item 15;

j. Removing the "Certifications" section after the "Signatures" section and before the reference to "Supplemental Information to be Furnished With Reports Filed Pursuant to Section 15(d) of the Act by Issuers Which Have Not Registered Securities Pursuant to Section 12 of the Act."

The revision reads as follows.

**Note: The text of Form 10-K does not, and this amendment will not, appear in the Code of Federal Regulations.**

**Form 10-K**

\* \* \* \* \*

**PART II**

\* \* \* \* \*

### Item 9A. Controls and procedures.

Furnish the information required by Items 307 and 308 of Regulation S-K (17 CFR 229.307 and 229.308).

24. By amending Form 10-KSB (referenced in § 249.310b) by:

a. Removing the phrase "(who also must provide the certification required by Rule 13a-14 (17 CFR 240.13a-14) or Rule 15d-14 (17 CFR 240.15d-14) exactly as specified in this form)" each time it appears in the first sentence of paragraph 2 of General Instruction C.;

b. Redesignating Item 14 of Part III as Item 8A of Part II and revising newly redesignated Item 8A;

c. Redesignating Item 15 of Part III as Item 14;

d. "Instruction to Item 15" is corrected to read "Instruction to Item 14";

e. Revising Item 2 of Part III of "INFORMATION REQUIRED IN ANNUAL REPORT OF TRANSITIONAL SMALL BUSINESS ISSER"; and

f. Removing the "Certifications" section after the "Signatures" section and before the reference to "Supplemental Information to be Furnished With Reports Filed Pursuant to Section 15(d) of the Exchange Act By Non-reporting Issuers."

**Note: The text of Form 10-KSB does not, and this amendment will not, appear in the Code of Federal Regulations.**

**Form 10-KSB**

\* \* \* \* \*

**PART II**

\* \* \* \* \*

### Item 8A. Controls and Procedures

Furnish the information required by Items 307 of Regulation S-B (17 CFR 228.307) and 308 of Regulation S-B (17 CFR 228.308).

\* \* \* \* \*

INFORMATION REQUIRED IN ANNUAL REPORT OF TRANSITIONAL SMALL BUSINESS ISSER

\* \* \* \* \*

**PART III**

\* \* \* \* \*

Item 2. Description of Exhibits.

As appropriate, the issuer should file those documents required to be filed as Exhibit Number 2, 3, 5, 6, and 7 in Part III of Form 1-A. The registrant also shall file:

(12) Additional exhibits - Any additional exhibits which the issuer may wish to file, which shall be so marked as to indicate clearly the subject matters to which they refer.

(13) Form F-X - Canadian issuers shall file a written irrevocable consent and power of attorney on Form F-X.

(31) The exhibit described in paragraph (b)(31) of Item 601 of Regulation S-B.

(32) The exhibit described in paragraph (b)(32) of Item 601 of Regulation S-B.

25. By amending Form 20-F (referenced in §249.220f) by:

a. Revising paragraph (e) to General Instruction B;

b. Revising Item 15 of Part II;

c. Removing the phrase "internal controls and procedures for financial reporting" in paragraph (b)(4) of Item 16A of Part II and adding, in its place, the phrase "internal control over financial reporting";

d. Removing the "Certifications" section after the "Signatures" section and before the section referencing "Instructions as to Exhibits"; and

e. In the "Instruction as to Exhibits" section, redesignate paragraph 12 as paragraph 14 and add new paragraph 12 and paragraph 13.

The revisions and addition read as follows.

**Note: The text of Form 20-F does not, and this amendment will not,**

appear in the Code of Federal Regulations.

**FORM 20-F**

\* \* \* \* \*

**GENERAL INSTRUCTIONS**

\* \* \* \* \*

**B. General Rules and Regulations That Apply to this Form.**

\* \* \* \* \*

(e) Where the Form is being used as an annual report filed under Section 13 (a) or 15(d) of the Exchange Act, provide the certifications required by Rule 13a-14 (17 CFR 240.13a-14) or Rule 15d-14 (17 CFR 240.15d-14).

\* \* \* \* \*

**PART II**

\* \* \* \* \*

**Item 15. Controls and Procedures.**

(a) Disclosure Controls and Procedures. Where the Form is being used as an annual report filed under Section 13(a) or 15(d) of the Exchange Act, disclose the conclusions of the issuer's principal executive and principal financial officers, or persons performing similar functions, regarding the effectiveness of the issuer's disclosure controls and procedures (as defined in 17 CFR 240.13a-15(e) or 240.15d-15(e)) as of the end of the period covered by the report, based on the evaluation of these controls and procedures required by paragraph (b) of 17 CFR 240.13a-15 or 240.15d-15.

(b) Management's annual report on internal control over financial reporting. Where the Form is being used as an annual report filed under Section 13(a) or 15(d) of the Exchange Act, provide a report of management on the issuer's internal control over financial reporting (as defined in 17 CFR 240.13a-15(f) or 240.15d-15(f)) that contains:

(1) A statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting for the issuer;

(2) A statement identifying the framework used by management to evaluate the effectiveness of the issuer's internal control over financial reporting as required by paragraph (c) of 17 CFR 240.13a-15 or 240.15d-15;

(3) Management's assessment of the effectiveness of the issuer's internal control over financial reporting as of the end of the issuer's most recent fiscal year, including a statement as to whether or not internal control over financial reporting is effective. This discussion must include disclosure of any material weakness in the issuer's internal control over financial

reporting identified by management. Management is not permitted to conclude that the issuer's internal control over financial reporting is effective if there are one or more material weaknesses in the issuer's internal control over financial reporting; and

(4) A statement that the registered public accounting firm that audited the financial statements included in the annual report containing the disclosure required by this Item has issued an attestation report on management's assessment of the issuer's internal control over financial reporting.

(c) Attestation report of the registered public accounting firm. Where the Form is being used as an annual report filed under Section 13(a) or 15(d) of the Exchange Act, provide the registered public accounting firm's attestation report on management's assessment of the issuer's internal control over financial reporting in the issuer's annual report containing the disclosure required by this Item.

(d) Changes in internal control over financial reporting. Disclose any change in the issuer's internal control over financial reporting identified in connection with the evaluation required by paragraph (d) of 17 CFR 240.13a-15 or 240.15d-15 that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the issuer's internal control over financial reporting.

Instructions to Item 15.

1. The issuer must maintain evidential matter, including documentation, to provide reasonable support for management's assessment of the effectiveness of the issuer's internal control over financial reporting.

2. An issuer that is an Asset-Backed Issuer (as defined in 17 CFR 240.13a-14(g) and 17 CFR 240.15d-14(g)) is not required to disclose the information required by this Item.

\* \* \* \* \*

### Instructions as to Exhibits

\* \* \* \* \*

12. The certifications required by Rule 13a-14(a) (17 CFR 240.13a-14(a)) or Rule 15d-14(a) (17 CFR 240.15d-14(a)) exactly as set forth below:

### CERTIFICATIONS*

I, [identify the certifying individual], certify that:

1. I have reviewed this annual report on Form 20-F of [identify company];

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under

which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4. The company's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5. The company's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in

the company's internal control over financial reporting.

Date: ...............

_____

[Signature]
[Title]

\* Provide a separate certification for each principal executive officer and principal financial officer of the company. See Rules 13a-14(a) and 15d-14 (a).

13. (a) The certifications required by Rule 13a-14(b) (17 CFR 240.13a-14 (b)) or Rule 15d-14(b) (17 CFR 240.15d-14(b)) and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. 1350).

(b) A certification furnished pursuant to Rule 13a-14(b) (17 CFR 240.13a-14(b)) or Rule 15d-14(b) (17 CFR 240.15d-14(b)) and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. 1350) will not be deemed "filed" for purposes of Section 18 of the Exchange Act [15 U.S.C. 78r], or otherwise subject to the liability of that section. Such certification will not be deemed to be incorporated by reference into any filing under the Securities Act or the Exchange Act, except to the extent that the company specifically incorporates it by reference.

26. By amending Form 40-F (referenced in §249.240f) by:

a. Revising paragraph (6) to General Instruction B; and

b. Removing the phrase "internal controls and procedures for financial reporting" and adding, in its place, the phrase "internal control over financial reporting" in paragraph (8)(b)(4) of General Instruction B; and

c. Removing the "Certifications" section after the "Signatures" section.

The revision reads as follows.

**Note: The text of Form 40-F does not, and this amendment will not, appear in the Code of Federal Regulations.**

**FORM 40-F**

\* \* \* \* \*

**GENERAL INSTRUCTIONS**

\* \* \* \* \*

**B. Information To Be Filed on this Form**

\* \* \* \* \*

(6) Where the Form is being used as an annual report filed under Section 13(a) or 15(d) of the Exchange Act:

(a) (1) Provide the certifications required by Rule 13a-14(a) (17 CFR 240.13a-14(a)) or Rule 15d-14(a) (17 CFR 240.15d-14(a)) as an exhibit to this report exactly as set forth below.

## CERTIFICATIONS*

I, [identify the certifying individual], certify that:

1. I have reviewed this annual report on Form 40-F of [identify issuer];

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in this report;

4. The issuer's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the issuer and have:

> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the issuer, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

> (c) Evaluated the effectiveness of the issuer's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

> (d) Disclosed in this report any change in the issuer's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the issuer's internal

# Exhibit C
# (Part 4 of 4)

control over financial reporting; and

5. The issuer's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the issuer's auditors and the audit committee of the issuer's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the issuer's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the issuer's internal control over financial reporting.

Date: ...............

_____

[Signature]
[Title]

* Provide a separate certification for each principal executive officer and principal financial officer of the issuer. See Rules 13a-14(a) and 15d-14(a).

(2) (i) Provide the certifications required by Rule 13a-14(b) (17 CFR 240.13a-14(b)) or Rule 15d-14(b) (17 CFR 240.15d-14(b)) and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. 1350) as an exhibit to this report.

(ii) A certification furnished pursuant to Rule 13a-14(b) (17 CFR 240.13a-14(b)) or Rule 15d-14(b) (17 CFR 240.15d-14(b)) and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. 1350) will not be deemed "filed" for purposes of Section 18 of the Exchange Act [15 U.S.C. 78r], or otherwise subject to the liability of that section. Such certification will not be deemed to be incorporated by reference into any filing under the Securities Act or the Exchange Act, except to the extent that the issuer specifically incorporates it by reference.

(b) Disclosure Controls and Procedures. Where the Form is being used as an annual report filed under Section 13(a) or 15(d) of the Exchange Act, disclose the conclusions of the issuer's principal executive and principal financial officers, or persons performing similar functions, regarding the effectiveness of the issuer's disclosure controls and procedures (as defined in 17 CFR 240.13a-15(e) or 240.15d-15(e)) as of the end of the period covered by the report, based on the evaluation of these controls and procedures required by paragraph (b) of 17 CFR 240.13a-15 or 240.15d-15.

(c) Management's annual report on internal control over financial reporting. Where the Form is being used as an annual report filed under Section 13(a) or 15(d) of the Exchange Act, provide a report of management on the issuer's internal control over financial reporting (as defined in 17 CFR

240.13a-15(f) or 240.15d-15(f)) that contains:

(1) A statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting for the issuer;

(2) A statement identifying the framework used by management to evaluate the effectiveness of the issuer's internal control over financial reporting as required by paragraph (c) of 17 CFR 240.13a-15 or 240.15d-15;

(3) Management's assessment of the effectiveness of the issuer's internal control over financial reporting as of the end of the issuer's most recent fiscal year, including a statement as to whether or not internal control over financial reporting is effective. This discussion must include disclosure of any material weakness in the issuer's internal control over financial reporting identified by management. Management is not permitted to conclude that the issuer's internal control over financial reporting is effective if there are one or more material weaknesses in the issuer's internal control over financial reporting; and

(4) A statement that the registered public accounting firm that audited the financial statements included in the annual report containing the disclosure required by this Item has issued an attestation report on management's assessment of the issuer's internal control over financial reporting.

(d) Attestation report of the registered public accounting firm. Where the Form is being used as an annual report filed under Section 13(a) or 15(d) of the Exchange Act, provide the registered public accounting firm's attestation report on management's assessment of internal control over financial reporting in the annual report containing the disclosure required by this Item.

(e) Changes in internal control over financial reporting. Disclose any change in the issuer's internal control over financial reporting identified in connection with the evaluation required by paragraph (d) of 17 CFR 240.13a-15 or 240.15d-15 that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the issuer's internal control over financial reporting.

Instructions to paragraphs (b), (c), (d) and (e) of General Instruction B. 6.

1. The issuer must maintain evidential matter, including documentation, to provide reasonable support for management's assessment of the effectiveness of the issuer's internal control over financial reporting.

2. An issuer that is an Asset-Backed Issuer (as defined in 17 CFR 240.13a-14(g) and 240.15d-14(g)) is not required to disclose the information required by this Item.

\* \* \* \* \*

## PART 270 – RULES AND REGULATIONS, INVESTMENT COMPANY ACT OF 1940

27. The authority citation for Part 270 is amended by revising the

subauthority citation for "Section 270.30a-2" to read as follows:

Authority: 15 U.S.C. 80a-1 et seq., 80a-34(d), 80a-37, and 80a-39, unless otherwise noted.

* * * * *

Section 270.30a-2 is also issued under 15 U.S.C. 78m, 78o(d), 80a-8, 80a-29, 7202, and 7241; and 18 U.S.C. 1350, unless otherwise noted.

* * * * *

28. By revising the last sentence of §270.8b-15 to read as follows:

### §270.8b-15 Amendments.

* * * An amendment to any report required to include the certifications as specified in §270.30a-2(a) must include new certifications by each principal executive and principal financial officer of the registrant, and an amendment to any report required to be accompanied by the certifications as specified in §240.13a-14(b) or §240.15d-14(b) and §270.30a-2(b) must be accompanied by new certifications by each principal executive and principal financial officer of the registrant.

29. Section 270.30a-2 is revised to read as follows:

### §270.30a-2 Certification of Form N-CSR.

(a) Each report filed on Form N-CSR (§§249.331 and 274.128 of this chapter) by a registered management investment company must include certifications in the form specified in Item 10(a)(2) of Form N-CSR and such certifications must be filed as an exhibit to such report. Each principal executive and principal financial officer of the investment company, or persons performing similar functions, at the time of filing of the report must sign a certification.

(b) Each report on Form N-CSR filed by a registered management investment company under Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a) or 78o(d)) and that contains financial statements must be accompanied by the certifications required by Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. 1350) and such certifications must be furnished as an exhibit to such report as specified in Item 10(b) of Form N-CSR. Each principal executive and principal financial officer of the investment company (or equivalent thereof) must sign a certification. This requirement may be satisfied by a single certification signed by an investment company's principal executive and principal financial officers.

(c) A person required to provide a certification specified in paragraph (a) or (b) of this section may not have the certification signed on his or her behalf pursuant to a power of attorney or other form of confirming authority.

30. By revising §270.30a-3 to read as follows:

## § 270.30a-3 Controls and procedures.

(a) Every registered management investment company, other than a small business investment company registered on Form N-5 (§§239.24 and 274.5 of this chapter), must maintain disclosure controls and procedures (as defined in paragraph (c) of this section) and internal control over financial reporting (as defined in paragraph (d) of this section).

(b) Each such registered management investment company's management must evaluate, with the participation of the company's principal executive and principal financial officers, or persons performing similar functions, the effectiveness of the company's disclosure controls and procedures, within the 90-day period prior to the filing date of each report on Form N-CSR (§§ 249.331 and 274.128 of this chapter).

(c) For purposes of this section, the term disclosure controls and procedures means controls and other procedures of a registered management investment company that are designed to ensure that information required to be disclosed by the investment company on Form N-CSR (§§249.331 and 274.128 of this chapter) is recorded, processed, summarized, and reported within the time periods specified in the Commission's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an investment company in the reports that it files or submits on Form N-CSR is accumulated and communicated to the investment company's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

(d) The term internal control over financial reporting is defined as a process designed by, or under the supervision of, the registered management investment company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

(1) Pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the investment company;

(2) Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the investment company are being made only in accordance with authorizations of management and directors of the investment company; and

(3) Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the investment company's assets that could have a material effect on the financial statements.

## PART 249 - FORMS, SECURITIES EXCHANGE ACT OF 1934

## PART 274 - FORMS PRESCRIBED UNDER THE INVESTMENT COMPANY ACT OF

### 1940

31. The authority citation for Part 274 is amended by revising the authority citation for "Section 274.128" to read as follows:

Authority: 15 U.S.C. 77f, 77g, 77h, 77j, 77s, 78c(b), 78l, 78m, 78n, 78o (d), 80a-8, 80a-24, 80a-26, and 80a-29, unless otherwise noted.

\* \* \* \* \*

Section 274.128 is also issued under 15 U.S.C. 78j-1, 7202, 7233, 7241, 7264, and 7265; and 18 U.S.C. 1350.

32. Form N-SAR (referenced in §§ 249.330 and 274.101) is amended by revising the reference "internal controls and procedures for financial reporting" in paragraph (b)(6)(iv) of the Instruction to Sub-Item 102P3 to read "internal control over financial reporting".

33. Form N-CSR (referenced in §§ 249.331 and 274.128) is amended by:

a. In General Instruction D, revising the reference "Items 4, 5, and 10(a)" to read "Items 4, 5, and 10(a)(1)";

b. Revising paragraph 2.(a) of General Instruction F;

c. In paragraph (c) of Item 2, revising the reference "Item 10(a)" to read "Item 10(a)(1)";

d. In paragraph (f)(1) of Item 2, revising the reference "Item 10(a)" to read "Item 10(a)(1)";

e. In paragraph (b)(4) of Item 3, revising the reference "internal controls and procedures for financial reporting" to read "internal control over financial reporting";

f. Revising Item 9; and

g. In Item 10:

(i) The introductory text and paragraphs (a) and (b) are redesignated as paragraphs (a), (a)(1) and (a)(2), respectively;

(ii) Revising newly redesignated paragraph (a) and newly redesignated paragraph (a)(2); and

(iii) Adding new paragraph (b) and an Instruction to Item 10.

The revisions and additions read as follows.

**Note: The text of Form N-CSR does not, and these amendments will not, appear in the Code of Federal Regulations.**

### FORM N-CSR

\* \* \* \* \*

### GENERAL INSTRUCTIONS

\* \* \* \* \*

### F. Signature and Filing of Report.

\* \* \* \* \*

2. (a) The report must be signed by the registrant, and on behalf of the registrant by its principal executive and principal financial officers.

\* \* \* \* \*

### Item 9. Controls and Procedures.

(a) Disclose the conclusions of the registrant's principal executive and principal financial officers, or persons performing similar functions, regarding the effectiveness of the registrant's disclosure controls and procedures (as defined in Rule 30a-3(c) under the Act (17 CFR 270.30a-3 (c))) as of a date within 90 days of the filing date of the report that includes the disclosure required by this paragraph, based on the evaluation of these controls and procedures required by Rule 30a-3(b) under the Act (17 CFR 270.30a-3(b)) and Rules 13a-15(b) or 15d-15(b) under the Exchange Act (17 CFR 240.13a-15(b) or 240.15d-15(b)).

(b) Disclose any change in the registrant's internal control over financial reporting (as defined in Rule 30a-3(d) under the Act (17 CFR 270.30a-3(d)) that occurred during the registrant's last fiscal half-year (the registrant's second fiscal half-year in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

### Item 10. Exhibits.

(a) File the exhibits listed below as part of this Form.

\* \* \* \* \*

(a)(2) A separate certification for each principal executive and principal financial officer of the registrant as required by Rule 30a-2(a) under the Act (17 CFR 270.30a-2(a)), exactly as set forth below:

### CERTIFICATIONS

I, [identify the certifying individual], certify that:

1. I have reviewed this report on Form N-CSR of [identify registrant];

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, changes in net assets, and cash flows (if the financial statements are required to include a statement of cash flows) of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Rule 30a-3(c) under the Investment Company Act of 1940) and internal control over financial reporting (as defined in Rule 30a-3(d) under the Investment Company Act of 1940) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of a date within 90 days prior to the filing date of this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal half-year (the registrant's second fiscal half-year in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process,

summarize, and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: ...............

_____

[Signature]
[Title]

(b) If the report is filed under Section 13(a) or 15(d) of the Exchange Act, provide the certifications required by Rule 30a-2(b) under the Act (17 CFR 270.30a-2(b)), Rule 13a-14(b) or Rule 15d-14(b) under the Exchange Act (17 CFR 240.13a-14(b) or 240.15d-14(b)), and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. 1350) as an exhibit. A certification furnished pursuant to this paragraph will not be deemed "filed" for purposes of

Section 18 of the Exchange Act (15 U.S.C. 78r), or otherwise subject to the liability of that section. Such certification will not be deemed to be incorporated by reference into any filing under the Securities Act of 1933 or the Exchange Act, except to the extent that the registrant specifically incorporates it by reference.

Instruction to Item 10.

Letter or number the exhibits in the sequence that they appear in this item.

* * * * *

By the Commission.

J. Lynn Taylor
Assistant Secretary

June 5, 2003

_____

1    17 CFR 228.10 et seq.

2    17 CFR 229.10 et seq.

3    17 CFR 249.310.

4    17 CFR 249.310b.

5    17 CFR 249.308a.

6    17 CFR 249.308b.

7    17 CFR 249.220f.

8       17 CFR 249.240f.

9       17 CFR 240.12b-15.

10      17 CFR 240.13a-14.

11      17 CFR 240.13a-15.

12      17 CFR 140.15d-14.

13      17 CFR 240.15d-15.

14      15 U.S.C. 78a et seq.

15      17 CFR 210.1-02 and 2-02.

16      17 CFR 210.1-01 et seq.

17      17 CFR 270.8b-15.

18      17 CFR 270.30a-2.

19      17 CFR 270.30a-3.

20      15 U.S.C. 80a-1 et seq.

21      17 CFR 249.331; 17 CFR 274.128.

22      17 CFR 249.330; 17 CFR 274.101.

23      Pub. L. 107-204, 116 Stat. 745 (2002).

24      Section 404 of the Sarbanes-Oxley Act does not apply to any registered
        investment company due to an exemption in Section 405 of the Sarbanes-
        Oxley Act. See sec. 405 of Pub. L. 107-204, 116 Stat. 745 (2002).

25      On April 25, 2003, the Commission approved the PCAOB's adoption of the
        auditing and attestation standards in existence as of April 16, 2003 as interim
        auditing and attestation standards. See Release No. 33-8222 (Apr. 25, 2003)
        [68 FR 23335].

26      Release No. 33-8138 (Oct. 22, 2002) [67 FR 66208] ("Proposing Release").
        The public comments we received can be viewed in our Public Reference
        Room at 450 Fifth Street, NW, Washington, DC 20549, in File No. S7-40-02.
        Public comments submitted by electronic mail are available on our website,
        www.sec.gov.

27      The commenters on File No. S7-40-02 are as follows: Academics Paul Walker,
        Ph.D., CPA; Accounting Firms BDO Seidman, LLP; Deloitte & Touche LLP;
        Ernst & Young LLP; KPMG LLP; PricewaterhouseCoopers LLP; Associations
        America's Community Bankers; American Bankers Association; American Bar
        Association; American Corporate Counsel Association; American Institute of
        Certified Public Accountants; Association for Financial Professionals; the
        Association of the Bar of the City of New York; Association for Investment
        Management and Research; the Business Roundtable; Community Bankers
        Association of New York State; Edison Electric Institute; Financial Executives
        International; Independent Community Bankers of America; the Institute of
        Internal Auditors; Maine Bankers Association; Manufacturers Alliance/MAPI
        Inc.; Massachusetts Bankers Association; National Association of Real Estate
        Investment Trusts; New York Bankers Association; New York County Lawyers'
        Association; New York State Bar Association; Software & Information Industry
        Association; Software Finance and Tax Executives Council; Wisconsin Bankers
        Association; Corporations Cardinal Health, Inc.; Compass Bancshares, Inc.;
        Computer Sciences Corporation; Eastman Kodak Company; Eli Lilly and

Company; Emerson Electric Co.; Executive Responsibility Advisors, LLC; Greif Bros.; Intel Corporation; International Paper Company; Protiviti; Government Entities Federal Reserve Bank of Atlanta; Small Business Administration; Law Firms Dykema Gossett PLLC; Karr Tuttle Campbell; Fried, Frank, Harris, Shriver and Jacobson; Sutherland, Asbill & Brennan LLP; Individuals Thomas Damman; D. Scott Huggins; Tim J. Leech; Simon Lorne; Ralph Saul; Lee Squire; Robert J. Stuckey; Foreign Companies Siemens Aktiengesellcraft; International Entities British Bankers Association; British Embassy; Canadian Bankers Association; Confederation of British Industry; European Commission; Institute of Chartered Accountants of England and Wales.

28   15 U.S.C. 78m(a) or 78o(d). Section 13(a) of the Exchange Act requires every issuer of a security registered pursuant to Section 12 of the Exchange Act [15 U.S.C. 78l] to file with the Commission such annual reports and such quarterly reports as the Commission may prescribe. Section 15(d) of the Exchange Act requires each issuer that has filed a registration statement that has become effective pursuant to the Securities Act of 1933 [15 U.S.C. 77a et seq.] (the "Securities Act") to file such supplementary and periodic information, documents and reports as may be required pursuant to Section 13 in respect of a security registered pursuant to Section 12, unless the duty to file under Section 15(d) has been suspended for any fiscal year. See Exchange Act Rule 12h-3 [17 CFR 240.12h-3].

29   18 U.S.C. 1350.

30   See Release No. 34-46300 (Aug. 2, 2002) [67 FR 51508] at n. 11, containing supplemental information on the Commission's original certification proposal in light of the enactment of the Sarbanes-Oxley Act of 2002.

31   See Release No. 33-8124 (Aug. 28, 2002) [67 FR 57276] .

32   See Release No. IC-25914 (Jan. 27, 2003) [68 FR 5348].

33   See Release No. 33-8212 (Mar. 21, 2003) [68 FR 15600].

34   These methods have included: (1) submitting the statement as non-public paper correspondence; (2) submitting the statement as non-public electronic correspondence with the EDGAR filing of the periodic report; (3) submitting the statement under (1) or (2) above supplemented by an Item 9 Form 8-K report so that the statement is publicly available; (4) submitting the statement as an exhibit to the periodic report; and (5) submitting the statement in the text of the periodic report (typically, below the signature block for the report).

35   We proposed to use this term throughout the rules implementing the annual internal control report requirements of Section 404 of the Sarbanes-Oxley Act, as well as the revised Sarbanes-Oxley Section 302 certification requirements, to complement the defined term "disclosure controls and procedures" referred to in the Section 302 requirements. Congress used the term "internal controls" in Section 302 and "internal control structure and procedures for financial reporting" in Section 404.

36   For a history of the development of internal control standards, see Steven J. Root, Beyond COSO-Internal Control to Enhance Corporate Governance (1998).

37   In 1941, the Commission adopted amendments to Rules 2-02 and 3-07 of Regulation S-X that formally codified this practice. See Accounting Series Release No. 21 (Feb. 5, 1941) [11 FR 10921].

38   An early definition for the term appeared in Internal Control--Elements Of a Coordinated System and Its Importance to Management and the Independent Public Accountant, a report published in 1949 by the American Institute of Accountants, the predecessor to the American Institute of Certified Public

Accountants ("AICPA"). The report defined internal control to mean "the plan of organization and all of the coordinate methods and measures adopted within a business to safeguard its assets, check the accuracy and reliability of its accounting data, promote operational efficiency, and encourage adherence to prescribed managerial policies." Subsequent definitions of the term attempted to clarify the distinction by labeling the controls relevant to an audit as "internal accounting controls" and the non-accounting controls as "administrative controls." The AICPA officially dropped these distinctions in 1988. See Root, at p. 76.

39  Title I of Pub. Law No. 95-213 (1977). Beginning in 1973, as a result of the work of the Office of the Watergate Special Prosecutor, the Commission became aware of a pattern of conduct involving the use of corporate funds for illegal domestic political contributions. A subsequent Commission investigation revealed that instances of undisclosed questionable or illegal corporate payments--both domestic and foreign--were widespread. On May 12, 1976, the Commission submitted to the Senate Banking, Housing and Urban Affairs Committee a report entitled Report on Questionable and Illegal Corporate Payments and Practices. The report described and analyzed the Commission's investigation concerning improper corporate payments and outlined legislative and other responses that the Commission recommended to remedy these problems. One of the Commission's recommendations was that Congress enact legislation aimed expressly at enhancing the accuracy of the corporate books and records and the reliability of the audit process.

40  See Exchange Act Section 13(b)(2) [15 U.S.C. 78m(b)(2)].

41  The Treadway Commission was sponsored by the AICPA, the American Accounting Association, the Financial Executives International (formerly Financial Executives Institute), the Institute of Internal Auditors and the Institute of Management Accountants (formerly the National Association of Accountants). The Treadway Commission's report, the Report of the National Commission on Fraudulent Financial Reporting (Oct. 1987), is available at www.coso.org.

42  See COSO, Internal Control-Integrated Framework (1992) ("COSO Report"). In 1994, COSO published an addendum to the Reporting to External Parties volume of the COSO Report. The addendum discusses the issue of, and provides a vehicle for, expanding the scope of a public management report on internal control to address additional controls pertaining to safeguarding of assets. In 1996, COSO issued a supplement to its original framework to address the application of internal control over financial derivative activities.

43  Auditing Standards Board, AICPA, Statement on Auditing Standards No. 78, Consideration of Internal Control in a Financial Statement Audit: An Amendment to Statement on Auditing Standards No. 55 (1995).

44  See letters regarding File No. S7-40-02 of: America's Community Bankers ("ACB"); American Corporate Counsel Association ("ACCA"); American Institute of Certified Public Accountants ("AICPA"); Compass Bancshares, Inc. ("Compass"); Computer Sciences Corporation ("CSC"); the Edison Electric Institute ("EEI"); the Independent Community Bankers of America ("ICBA"); the Institute of Internal Auditors ("IIA"); the Association of the Bar of the City of New York, Committee on Corporate Law ("NYCB-CCL"); Protiviti; and Siemens AG.

45  See letters regarding File No. S7-40-02 of ACB and ICBA.

46  See letters regarding File No. S7-40-02 of: the American Bar Association, Committee on the Federal Regulation of Securities and the Committee on Law and Accounting ("ABA"); the Federal Reserve Bank of Atlanta ("FED"); IIA; Simon Lorne ("Lorne"); and Pricewaterhouse Coopers LLP ("PwC").

47  See ABA letter regarding File No. S7-40-02.

48  See letters regarding File No. S7-40-02 of: AICPA; Compass; Deloitte & Touche LLP ("D&T"); IIA; KPMG LLP ("KPMG"); and PwC.

49  See new Item 308 of Regulations S-K and S-B, amended Items 1-02 and 2-02 of Regulation S-X; amended Items 307and 401 of Regulations S-K and S-B; amended Exchange Act Rules 13a-14, 13a-15, 15d-14 and 15d-15; and amended Forms 20-F and 40-F.

50  The COSO Report states that the composition of a company's board and audit committee, and how the directors fulfill their responsibilities related to the financial reporting process, are key aspects of the company's control environment. An important element of the company's internal control over financial reporting "...is the involvement of the board or audit committee in overseeing the financial reporting process, including assessing the reasonableness of management's accounting judgments and estimates and reviewing key filings with regulatory agencies." See COSO Report at 130. The Commission similarly has stated in the past that both a company's management and board have important roles to play in establishing a supportive control environment. In its 1981 Statement of Policy regarding the FCPA, the Commission stated, "In the last analysis, the key to an adequate `control environment' is an approach on the part of the board and top management which makes clear what is expected and that conformity to these expectations will be rewarded while breaches will be punished." See Release No. 34-17500 (Jan. 29, 1981) [46 FR 11544].

51  See amended Exchange Act Rules 13a-14(d) and 15d-14(d). The scope of the term "preparation of financial statements in accordance with generally accepted accounting principles" in the definition encompasses financial statements prepared for regulatory reporting purposes.

52  Codification of Statements on Auditing Standards Section 317 requires auditors to consider a company's compliance with laws and regulations that have a direct and material effect on the financial statements.

53  15 U.S.C. 78m(b)(2)(B).

54  Section 103 of the Sarbanes-Oxley Act requires the PCAOB to establish by rule standards to be used by registered public accounting firms in the preparation and issuance of audit reports. In carrying out this responsibility, the PCAOB must include in the auditing standards that it adopts, among other things: a requirement that each registered public accounting firm describe in each audit report the scope of its testing of the company's internal control structure and procedures performed in fulfilling its internal control evaluation and reporting required by Section 404(b) of the Sarbanes-Oxley Act; present in the audit report (or attestation report) its findings from such testing; and an evaluation of whether the company's internal control structure and procedures: (1) include maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the company's assets; and (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with the authorization of management and directors of the company. In the audit report (or attestation report), the registered public accounting firm also must describe, at a minimum, material weaknesses in such internal controls and any material noncompliance found on the basis of such testing. See Sections 103(a)(2)(A) (iii)(I), (II) and (III) of the Sarbanes-Oxley Act. See also, Interim Professional Attestation Standards Rule 3300T, adopted in PCAOB Release No. 2003-006 (Apr. 18, 2003), and approved by the Commission on April 25, 2003.

55  Control procedures were described as policies and procedures in addition to the control environment and accounting system that management established to provide reasonable assurance that specific entity objectives will be

achieved. SAS 55 also states that control procedures may generally be categorized as procedures that include, among other things, "adequate safeguards over access to and use of assets and records, such as secured facilities and authorization for access to computer programs and data files." See Statement on Auditing Standards No. 55, paragraph no. 11.

56  See COSO "Addendum to Reporting to External Parties," Internal Control-Integrated Framework, (1994) ("1994 Addendum") at p. 154.

57  The COSO Report states: "Although these [objectives relating to safeguarding of resources] are primarily operations objectives, certain aspects of safeguarding can fall under other categories. . . [T]he goal of ensuring that any such asset losses are properly reflected in the entity's financial statements represents a financial reporting objective." The category in which an objective falls can sometimes depend on the circumstances. Continuing the discussion of safeguarding of assets, controls to prevent theft of assets - such as maintaining a fence around inventory and a gatekeeper verifying proper authorization of requests for movement of goods - fall under the operations category. These controls normally would not be relevant to the reliability of financial statement preparation, because any inventory losses would be detected pursuant to periodic physical inspection and recorded in the financial statements. However, if for financial reporting purposes management relies solely on perpetual inventory records, as may be the case for interim reporting, the physical security controls would then also fall within the financial reporting category. This is because these physical security controls, along with other controls over the perpetual inventory records, would be needed to ensure reliable financial reporting. Id. at 37.

58  As stated in n. 1 to the 1994 Addendum, the FCPA requires companies, among other things, to "devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary ... to maintain accountability for assets; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences."

59  See letters regarding File No. S7-40-02 of: ABA; CSC; EEI; FED; Eastman Kodak Co. ("Kodak"); KPMG; Protiviti; and PwC.

60  See letters regarding File No. S7-40-02 of: ACCA and Financial Executives Institute ("FEI").

61  See letters regarding File No. S7-40-02 of: AICPA; BDO Seidman, LLP ("BDO"); D&T; Ernst & Young LLP ("E&Y"); KPMG; and PwC.

62  Management must state whether or not the company's internal control over financial reporting is effective. A negative assurance statement indicating that nothing has come to management's attention to suggest that the company's internal control over financial reporting is not effective will not be acceptable.

63  A "material weakness" is defined in Statement on Auditing Standards No. 60 (codified in Codification of Statements on Auditing Standards AU §325) as a reportable condition in which the design or operation of one or more of the internal control components does not reduce to a relatively low level the risk that misstatements caused by errors or fraud in amounts that would be material in relation to the financial statements being audited may occur and not be detected within a timely period by employees in the normal course of performing their assigned functions. See discussion in Section II.B.3.b. below.

64  See new Item 308 of Regulations S-B and S-K, Item 15 of Form 20-F and General Instruction B(6) of Form 40-F.

65  Many commenters cited the absence of evaluative criteria in AU §319 in their arguments against the reference to AU §319 in our proposed definition of "internal controls and procedures for financial reporting."

66  See amended Exchange Act Rule 13a-15(c) or 15d-15(c), amended Item 15 of Form 20-F and amended General Instruction (B) to Form 40-F.

67  The Guidance on Assessing Control published by the Canadian Institute of Chartered Accountants and the Turnbull Report published by the Institute of Chartered Accountants in England & Wales are examples of other suitable frameworks.

68  We are aware that some of the evaluation frameworks used to assess a foreign company's internal controls in its home country do not require a statement regarding whether the company's system of internal control has been effective. Under our final rules, management of a foreign reporting company who relies on such an evaluation framework used in its home country is nevertheless under an obligation to state affirmatively whether its company's internal controls are, or are not, effective.

69  See AT §101, paragraph 24.

70  See Release No. 33-8183 (Jan. 28, 2003) [68 FR 6006].

71  Management's acceptance of responsibility for the documentation and testing performed by the auditor does not satisfy the auditor independence rules.

72  This is consistent with interim attestation standards. See AT §501.

73  The term "significant deficiency" has the same meaning as the term "reportable condition" as used in AU §325 and AT §501. The terms "material weakness" and "significant deficiency" both represent deficiencies in the design or operation of internal control that could adversely affect a company's ability to record, process, summarize and report financial data consistent with the assertions of management in the company's financial statements, with a "material weakness" constituting a greater deficiency than a "significant deficiency." Because of this relationship, it is our judgment that an aggregation of significant deficiencies could constitute a material weakness in a company's internal control over financial reporting.

74  See new Item 308(d) of Regulations S-B and S-K.

75  See, for example, letters re: File No. S7-40-02 of: ABA; AICPA; BDO; Intel; and Eli Lilly and Company.

76  Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. 78m(b)(2)(A)] requires companies to "make and keep books, records, and accounts, which in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer." See also Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. 78m(b)(2)(B)] and In re Microsoft Corp., Administrative Proceeding File No. 3-10789 (June 3, 2002). In the Microsoft order, the Commission stated that such books and records include not only general ledgers and accounting entries, but also memoranda and internal corporate reports. We have previously stated, as a matter of policy, that under Section 13(b)(2) "every public company needs to establish and maintain records of sufficient accuracy to meet adequately four interrelated objectives: appropriate reflection of corporate transactions and the disposition of assets; effective administration of other facets of the issuer's internal control system; preparation of its financial statements in accordance with generally accepted accounting principles; and proper auditing." Statement of Policy Regarding the Foreign Corrupt Practices Act of 1977, Release No. 34-17500 (Jan. 29, 1981) [46 FR 11544].

77  See Instruction 1 to new Item 308 of Regulations S-K and S-B, Instruction 1

to Item 15 of Form 20-F and Instruction 1 to paragraphs (b), (c), (d) and (e) of General Instruction B.6 to Form 40-F.

78  This statement should not be interpreted to mean that management personally must conduct the necessary activities to evaluate the design and test the operating effectiveness of the company's internal control over financial reporting. Activities, including those necessary to provide management with the information on which it bases its assessment, may be conducted by non-management personnel acting under the supervision of management.

79  See Statements on Standards for Attestation Engagements No. 10.

80  See Exchange Act Rules 13a-15(b) and 15d-15(b) [17 CFR 240.13a-15(b) and 240.15d-15(b)].

81  See letters regarding File No. S7-40-02 of: AICPA; Executive Responsibility; FED; and Protiviti.

82  See Protiviti letter regarding File No. S7-40-02.

83  See letters regarding File No. S7-40-02 of: ABA; ACB; ACCA; Association for Financial Professionals ("AFP"); Am. Bankers Assoc.; BDO; Business Roundtable ("BRT"); Computer Sciences Corporation ("CSC"); Compass; Thomas Damman ("Damman"); EEI; Emerson Electric Co. ("Emerson"); FEI; Fried, Frank, Harris, Shriver and Jacobson ("Fried Frank"); International Paper Company ("IPC"); ICBA; NYCB-CCL; New York State Bar Association ("NYSBA"); Siemens AG ("Siemens"); Software & Information Industry Association ("SIIA"); and Software Finance and Tax Executives Council ("SOFTEC").

84  See Damman letter regarding File No. S7-40-02.

85  See letters regarding File No. S7-40-02 of: ABA; ACB; ACCA; BRT; CSC; Emerson; Fried Frank; ICBA; IPC; NYCB-CCL; SIIA; and SOFTEC.

86  See letters regarding File No. S7-40-02 of: Am. Bankers Assoc.; CSC; Fried Frank.

87  See letters regarding File No. S7-40-02 of: Damman; Compass; EEI; Executive Responsibility Advisors, LLC ("Executive Responsibility"); and Siemens.

88  See letters regarding File No. S7-40-02 of: ABA and BDO.

89  See BDO letter regarding File No. S7-40-02.

90  See ABA letter regarding File No. S7-40-02.

91  See Emerson letter regarding File No. S7-40-02.

92  See Exchange Act Rules 13a-15(d) and 15d-15(d) [17 CFR 240.13a-15(d) and 240.15d-15(d)].

93  For example, where a component of internal control over financial reporting is subsumed within disclosure controls and procedures, even where systems testing of that component would clearly be required as part of the annual evaluation of internal control over financial reporting, management could make a different determination of the appropriate nature of the evaluation of that component for purposes of a quarterly evaluation of disclosure controls and procedures.

94  See Exchange Act Rules 13a-15(b) and 15d-15(b).

95  See ABA letter regarding File No. S7-40-02.

96  See Intel letter regarding File No. S7-40-02.

97  See Release No. 33-8128 (Sept. 16, 2002) [67 FR 58480]. The final rule amendments do not require that the evaluation take place on the last day of the period, but that the statement of effectiveness of the issuer's disclosure controls and internal control over financial reporting be as of the end of the period.

98  We have also made conforming changes to Forms 20-F and 40-F to clarify that the management of a foreign private issuer must disclose in the issuer's annual report filed on Form 20-F or 40-F any change in the issuer's internal control over financial reporting that occurred during the period covered by the annual report and that materially affected, or is reasonably likely to affect, this internal control. See Item 15(d) of Form 20-F and General Instruction B (6)(e) of Form 40-F.

99  See Exchange Act Rules 10b-5 and 12b-20 [17 CFR 240.10b-5 and 17 CFR 240.12b-20].

100  This is the disclosure required by paragraph 5 of the certification form.

101  15 U.S.C. 78m(b)(2).

102  See Codification of Statement on Auditing Standards AU §319.18.

103  Pub. L. 102-242, 105 Stat. 2242 (1991).

104  See Section 405 of the Sarbanes-Oxley Act.

105  See Section II. J. below.

106  12 U.S.C. 1831m.

107  The designated laws and regulations are federal laws and regulations concerning loans to insiders and federal and state laws and regulations concerning dividend restrictions. See 12 CFR Part 363, Appendix A, Guideline 12.

108  See 12 CFR 363.2, adopted in 58 FR 31332. These requirements only apply to an insured depository institution with total assets of $500 million or more. We recognize that the FDIC's regulations use the term "internal control structure and procedures for financial reporting" rather than the term "internal control over financial reporting" used in our rules. We think the differences in the meaning of the two terms are insignificant because both Section 36(b)(2) of the Federal Deposit Insurance Act and Section 404(a) of the Sarbanes-Oxley Act refer to "internal control structure and procedures for financial reporting." Nevertheless, the FDIC has defined the term "financial reporting" to include financial statements prepared in accordance with generally accepted accounting principles ("GAAP") and those prepared for regulatory reporting purposes (see FDIC Financial Institution Letter FIL-86-94, dated December 23, 1994).

109  12 CFR 363.3.

110  12 CFR 363.4(a) and (b).

111  12 CFR Part 363.

112  Services and functions are considered "comparable" if the holding company prepares and submits the management assessment of the effectiveness of the internal control structure and procedures for financial reporting and compliance with the designated safety and soundness laws and regulations based on information concerning the relevant activities and operations of those subsidiary institutions subject to Part 363. See 12 CFR Part 363,

Appendix A, Guideline 4.

113   This rating is more commonly known as the CAMELS rating, which addresses Capital adequacy, Asset quality, Management, Earnings, Liquidity and Sensitivity to market risk. See 12 CFR 363.1(b)(2). The appropriate federal banking agency may determine that an insured depository institution with total assets in excess of $9 billion that is a subsidiary of a holding company may not satisfy its FDIC internal control report requirement with an internal control report of the consolidated holding company's management if the agency determines that there could be a significant risk to the affected deposit insurance fund if the institution were allowed to satisfy its requirements in this manner. See 12 CFR 363.1(b)(3).

114   The FDIC's regulations do not specifically require that management identify the control framework used to evaluate the effectiveness of the institution's internal control over financial reporting. However, given the requirements of Sections 101 and 501 of the American Institute of Certified Public Accountants' attestation standards, the FDIC believes that the framework used must be disclosed or otherwise publicly available to all users of reports that institutions file with the FDIC pursuant to Part 363 of the FDIC's regulations.

115   The FDIC's regulations do require an independent public accountant to examine, attest to, and report separately on, the assertion of management concerning the institution's internal control structure and procedures for financial reporting, but these regulations do not require the accountant to be a registered public accounting firm. See 12 CFR 363.3(b).

116   Our rules do not provide an exemption that parallels the FDIC's exemption for insured depository institutions with less than $500 million in assets. It would be incongruous to provide an exemption in our rules for small depository institutions and not other small, non-depository Exchange Act reporting companies.

117   An insured depository institution subject to both the FDIC's requirements and our new requirements choosing to file a single report to satisfy both sets of requirements will file the report with its primary federal regulator under the Exchange Act and the FDIC, its primary federal regulator (if other than the FDIC), and any appropriate state depository institution supervisor under Part 363 of the FDIC's regulations. A holding company choosing to prepare a single report to satisfy both sets of requirements will file the report with the Commission under the Exchange Act and the FDIC, the primary federal regulator of the insured depository institution subsidiary subject to the FDIC's requirements, and any appropriate state depository institution supervisor under Part 363.

118   Management will not be permitted to conclude that the registrant's internal control over financial reporting is effective if there are one or more material weaknesses in the registrant's internal control over financial reporting.

119   An insured depository institution subject to both the FDIC's requirements and our new requirements choosing to file a single management report to satisfy both sets of requirements will file the attestation report with its primary federal regulator under the Exchange Act and the FDIC, its primary federal regulator (if other than the FDIC), and any appropriate state depository institution supervisor under Part 363 of the FDIC's regulations. A holding company choosing to prepare a single management report to satisfy both sets of requirements will file the attestation report with the Commission under the Exchange Act and the FDIC, the primary federal regulator of the insured depository institution subsidiary subject to the FDIC's requirements, and any appropriate state depository institution supervisor under Part 363.

120   See Section 405 of the Sarbanes-Oxley Act ("Nothing in section 401, 402, or 404, the amendments made by those sections, or the rules of the Commission

under those sections shall apply to any investment company registered under section 8 of the Investment Company Act of 1940 (15 U.S.C. 80a-8)."). The provisions that would not extend to registered investment companies include amendments to Exchange Act rules 13a-15(c) and 15d-15(c) (requiring annual evaluation of the effectiveness of internal control over financial reporting); Exchange Act rules 13a-15(d) and 15d-15(d) (requiring quarterly evaluation of any change in internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, internal control over financial reporting); and Items 308(a) and (b) of Regulations S-K and S-B (requiring annual report by management on internal control over financial reporting and attestation report on management's evaluation of internal control over financial reporting).

121 Proposed paragraph 4 of the certification section of proposed Form N-CSR. Proposing Release, note 26 above, 67 FR at 66250. We received 7 comment letters on the proposed changes to the certification rules with respect to investment companies in the Proposing Release. See letters regarding File No. S7-40-02 of: the Investment Company Institute ("ICI"); Protiviti; OppenheimerFunds, Inc. ("Oppenheimer"); The Association of the Bar of the City of New York; Leslie Ogg of Board Services Corporation ("Ogg"); Federated Funds; and D&T.

122 See letters regarding File No. S7-40-02 of: Association of the Bar of the City of New York; ICI; and Oppenheimer.

123 See Section 302(a)(4)(A) and (B) of the Sarbanes-Oxley Act (requiring signing officers to certify that they are responsible for establishing and maintaining internal controls and have designed the internal controls to ensure that material information relating to the issuer is made known to the signing officers).

124 For a discussion of changes to the form of the Section 302 certification for operating companies, see Section III. D. below.

125 Proposed Exchange Act Rules 13a-15(c) and 15d-15(c), proposed Investment Company Act Rule 30a-2(b)(4)(iii), and proposed Investment Company Act Rule 30a-3(b).

126 See letters regarding File No. S7-40-02 of: D&T; ICI; Ogg; and Oppenheimer.

127 See Release No. IC-25914 (Jan. 27, 2003) [68 FR 5348, 5352 n. 43] (noting that in the case of a series fund or family of investment companies in which the disclosure controls and procedures for each fund in the series or family are the same, a single evaluation of the effectiveness of the disclosure controls and procedures for the series or family could be used in multiple certifications for the funds in the series or family, as long as the evaluation has been performed within 90 days of the report on Form N-CSR).

128 See, for example, the letters regarding File No. S7-40-02 of: AICPA; D&T; CSC; E&Y; and Association of the Bar of the City of New York, Committee on Securities Regulation ("NYCB-CSR").

129 See Section II. I., above, for compliance dates applicable to registered investment companies.

130 See Section V. below.

131 See letters regarding File No. S7-06-03 of: ABA; Cleary, Gottlieb, Steen & Hamilton ("Cleary"); Prof. Paul A. Griffin ("Griffin"); Intel Corporation ("Intel"); ICI; PwC; John Stalnaker and Patrick Derksen ("Stalnaker"); and Rooks Pitts ("Rooks").

132 See letters regarding File No. S7-06-03 of: ABA; Cleary; Intel; and PwC.

133 See letters File No. S7-06-03 of ABA and Cleary.

134  Id.

135  Pub. L. No. 83-406, 88 Stat. 129 (1974).

136  See letters regarding File No. S7-06-03 of: ABA; Cleary; and PwC.

137  See ABA letter regarding File No. S7-06-03.

138  Id.

139  See Stalnaker letter regarding File No. S7-06-03.

140  See 149 Cong. Rec. S5325 (daily ed. Apr. 11, 2003).

141  Id. at S5331.

142  See Release No. 33-8212 (Mar. 21, 2003) [68 FR 15600] at fn. 37.

143  See ABA letter regarding File No. S7-06-03.

144  See letters regarding File No. S7-06-03 of: ABA; Cleary; Intel; and PwC.

145  We recently adopted Form N-CSR, to be used by registered management investment companies to file certified shareholder reports with the Commission. See Release No. IC-25914 (Jan. 27, 2003) [68 FR 5348]. As adopted, Form N-CSR requires the Section 302 certifications to be filed as an exhibit to a report on Form N-CSR. Item 10(b) of Form N-CSR.

146  Accordingly, we are revising Exchange Act Rules 13a-14 and 15d-14 to delete from those rules the detailed description of the contents of the required certifications and to revise the instructions to Forms 10-Q, 10-QSB, 10-K, and 10-KSB to delete the references to the Section 302 certification requirements. We are also adopting similar changes to Investment Company Act Rule 30a-2 and Form N-CSR.

147  See General Instruction A of Form N-CSR (Form N-CSR is a combined reporting form to be used for reports of registered management investment companies under Section 30(b)(2) of the Investment Company Act and Sections 13(a) or 15(d) of the Exchange Act); n. 28 above (discussing issuers covered by Sections 13(a) and 15(d) of the Exchange Act). Registered management investment companies that are required to file reports on Form N-CSR pursuant to Section 13(a) or 15(d) of the Exchange Act will be required to provide the Section 906 certifications under Exchange Act Rules 13a-14(b) and 15d-14(b) as well as Investment Company Act Rule 30a-2(b). By contrast, registered management investment companies that are required to file reports on Form N-CSR are required to provide the Section 302 certifications solely under Investment Company Act Rule 30a-2(a), which was adopted under Sections 13(a) and 15(d) of the Exchange Act as well as the Investment Company Act. Release No. 33-8124 (Aug. 28, 2002) [67 FR 57276, 57295]; Release No. IC-25914 (Jan. 27, 2003) [68 FR 5348, 5365].

148  See also Section 3(b)(1) of the Sarbanes-Oxley Act, which provides that "[a] violation by any person of this Act . . . shall be treated for all purposes in the same manner as a violation of the Securities Exchange Act of 1934 . . . and any such person shall be subject to the same penalties, and to the same extent, as for a violation of that Act. . . ."

149  See Rule 302(b) of Regulation S-T [17 CFR 232.302(b)]. Among other things, this rule requires that an issuer maintain manually signed certifications or other authenticating documents.

150  See, for example, Item 601(b)(32)(ii) of Regulation S-K.

151  15 U.S.C. 78r.

152  15 U.S.C. 77k.

153  5 U.S.C. 552 et seq.

154  See Exchange Act Rule 12b-15 [17 CFR 240.12b-15] and Investment Company Act Rule 8b-15 [17 CFR 270.8b-15]. Depending on the contents of the amendment, the form of certification required to be included may be subject to modification.

155  See Exchange Act Rules 13a-14(b) and 15d-14(b) [17 CFR 240.13a-14(b) and 240.15d-14(b)] and Investment Company Act Rule 30a-2(b) [17 CFR 270.30a-2(b)].

156  See Release No. 33-8212 (Mar. 21, 2003) [68 FR 15600] at Section III.

157  We are modifying that interim guidance, however, to more closely parallel the provisions of Section 302 of Regulation S-T that require retention of manual signatures for electronically filed signed statements. Issuers furnishing Section 906 certifications to the Commission as an exhibit to the periodic reports to which they relate during the period covered by the interim guidance should insert the following legend after the text of each certification: "A signed original of this written statement required by Section 906, or other document authenticating, acknowledging, or otherwise adopting the signature that appears in typed form within the electronic version of this written statement required by Section 906, has been provided to [name of issuer] and will be retained by [name of issuer] and furnished to the Securities and Exchange Commission or its staff upon request."

158  Use of Exhibit 99 for this purpose will remain in effect until we announce that our EDGAR system permits registrants to file or furnish exhibits 31 and 32 for Section 302 and 906 certifications. We will issue a statement and post it on the Commission's website to announce this date as soon as it becomes known.

159  For a registered management investment company filing reports on Form N-CSR, the EDGAR document type should be EX-99.906CERT for the Section 906 certifications.

160  44 U.S.C. 3501 et seq.

161  44 U.S.C. 3507(d) and 5 CFR 1320.11.

162  See Rule 302 of Regulation S-T [17 CFR 232.302].

163  See Release No. 33-8138 (Oct. 22, 2002) [67 FR 66208] and Release No. 33-8212 (Mar. 21, 2003) [68 FR 15600].

164  See letters regarding File No. S7-40-02 of: AICPA; BDO; D&T; Emerson; E&Y; IPC; Intel; and NYCB-CCL.

165  See Intel letter regarding File No. S7-40-02.

166  Our estimates are based on information from with several large and small firms, accounting firms and trade and professional associations.

167  The estimates used in the releases proposing these rules were based on the number of filings that we received in fiscal year 2001.

168  We assumed the estimated burdens in the second and third years would decline by 75% from the first year estimate.

169  Our PRA estimates do not include any additional burdens or costs that a company will incur as a result of having to obtain an auditor's attestation report on management's internal control report because the PCAOB, rather than the Commission, is responsible for establishing the attestation standards

and the Sarbanes-Oxley Act itself requires companies to obtain such an attestation. We have, however, included an estimated 0.5 hour burden in our revised annual burden estimates to account for the filing by the company of the attestation report.

170  The burden allocation for Forms 20-F and 40-F, however, use a 25% internal to 75% outside professional allocation to reflect the fact that foreign private issuers rely more heavily on outside professionals for the preparation of these forms.

171  While Section 906 of the Sarbanes-Oxley Act requires that certifications must accompany a periodic report, we are increasing our PRA burdens in view of the fact that the amendments explicitly require companies to furnish Section 906 certifications as exhibits to these reports. To date, companies have used various methods to fulfill their obligations under Section 906, and have not consistently submitted the certifications as part of the report.

172  Many registered management investment companies have multiple portfolios. However, they prepare separate financial statements for each portfolio. Thus, the burden of the Section 906 certifications is estimated on a portfolio basis rather than a registered management investment company basis.

173  This number represents the burden associated with the average number of portfolios per form. This number will vary for each registered management investment company depending on the number of portfolios. We estimate that the paperwork burden for each portfolio is one hour.

174  This estimate is based on the estimated total burden hours of 5,396,266, an assumed 75%/25% split of the burden hours between internal staff and external professionals, and an hourly rate of $200 for internal staff time and $300 for external professionals. The hourly cost estimate is based on consultations with several registrants and law firms and other persons who regularly assist registrants in preparing and filing periodic reports with the Commission. Our PRA estimate does not reflect any additional cost burdens that a company will incur as a result of having to obtain an auditor's attestation on management's internal control report.

175  This calculation is based on an estimate of burden hours multiplied by a cost of $200.00 per hour. (117,048 hours multiplied by $200.00 per hour). The hourly cost estimate is based on consultations with several registrants and law firms and other persons who regularly assist registrants in preparing and filing periodic reports with the Commission.

176  See ABA letter regarding File No. S7-06-03.

177  5 U.S.C. 552 et seq.

178  15 U.S.C. 78w(a)(2).

179  15 U.S.C §77b(b).

180  15 U.S.C. 78c(f).

181  15 U.S.C. 80a-2(c).

182  5 U.S.C. 601.

183  5 U.S.C. 603.

184  17 CFR 240.0-10(a).

185  17 CFR 270.0-10.

186  This estimate is based on figures compiled by the Commission staff regarding investment companies registered on Forms N-1A, N-2 and N-3, which are

required to file reports on Form N-CSR.

187 This estimate includes the burden for one annual report and three quarterly reports.

188 Under the method we used to estimate the PRA burdens associated with the Section 404 rules, we estimated that companies with less than $100 million in revenues would be subject to an added annual reporting burden of approximately 100 hours.

189 The estimated burden for one annual report and three quarterly reports.

190 See Beasley, Carcello and Hermanson, Fraudulent Financial Reporting: 1987-1997, An Analysis of U.S. Public Companies (Mar. 1999) (study commissioned by the Committee of Sponsoring Organizations of the Treadway Commission).

191 17 CFR 240.12b-2.

*http://www.sec.gov/rules/final/33-8238.htm*

# Exhibit D

 *ProQuest* ®

« Back to Document View

Databases selected:  ABI/INFORM Global

## THE WALL STREET JOURNAL.
## Why Sweat the Small Stuff?

*Robert C. Pozen*. **Wall Street Journal**. (Eastern edition). New York, N.Y.: Apr 5, 2006. pg. A.20

| | |
|---|---|
| Subjects: | Accounting policies,  SEC regulations,  Public Company Accounting Reform & Investor Protection Act 2002-US |
| Classification Codes | 9190,  4120,  4320,  4310 |
| Companies: | Securities & Exchange Commission (NAICS: 926150, Duns:00-347-5175 ) |
| Author(s): | Robert C. Pozen |
| Document types: | Commentary |
| Publication title: | Wall Street Journal. (Eastern edition). New York, N.Y.: Apr 5, 2006.  pg. A.20 |
| Source type: | Newspaper |
| ISSN/ISBN: | 00999660 |
| ProQuest document ID: | 1015867531 |
| Text Word Count | 1057 |
| Document URL: | http://proquest.umi.com/pqdweb?did=1015867531&sid=1&Fmt=3&cl ientId=11420&RQT=309&VName=PQD |

**Abstract** (Document Summary)

The SEC has adopted two different requirements for internal controls. First, it has defined "internal control structure and procedures . . . for financial reporting" under Section 404 to include more items of information with more details than those ordinarily included in the financial reports of public companies. In the commission's view, internal controls must provide reasonable assurance not only that material information in the company's financial statements is accurate, but also "that receipts and expenditures of the company are being made only in accordance with authorization of management and directors of the company." By unlinking "internal controls" from "financial reporting" in Section 404, the SEC encourages management and auditors to scrutinize detailed procedures for controlling ordinary expenditures -- e.g., reimbursing travel expenses and handling petty cash -- even in cases where they are clearly immaterial to the company's financial reports.

Second, the SEC requires management to assess a public company's "disclosure controls" -- defined as "controls and other procedures . . . designed to ensure that information required to be disclosed by the issuer in the reports it files" with the commission "is recorded, processed, summarized and reported" in a timely manner. This rule on "disclosure controls" is very confusing since it overlaps with the rule on "internal controls." The SEC should end this confusion by combining both into one rule on "internal controls" over "financial reporting," which would cover the accuracy and timeliness of "material" information submitted by public companies in their financial reports to the commission.

**Full Text** (1057  words)

*Copyright (c) 2006, Dow Jones & Company Inc. Reproduced with permission of copyright owner. Further reproduction or distribution is prohibited without permission.*

The Securities and Exchange Commission recently announced a roundtable to discuss Section 404 of the Sarbanes-Oxley law, which requires an annual assessment by public companies of their internal controls over financial reporting. Critics question whether its benefits outweigh its costs, which have been much higher than originally estimated; because of these concerns, an SEC advisory committee recently proposed total or partial exemptions from Section 404 for small companies (with market capitalizations less than $787 million). However, some commentators have strongly opposed such exemptions, since these small companies constitute 80% of all publicly listed firms and are the ones most susceptible to financial frauds.

I take a middle ground: The current rules on assessing internal controls for all public companies should be revised, greatly reducing the costs of these assessments while preserving most of their benefits. Specifically, the management of every public company would be required to publish an annual assessment of the company's internal controls, attested to by the company's auditors. But such assessments would be focused on the company's internal controls over material information contained in the company's financial reports to the SEC.

---

The SEC has adopted two different requirements for internal controls. First, it has defined "internal control structure and procedures . . . for financial reporting" under Section 404 to include more items of information with more details than those ordinarily included in the financial reports of public companies. In the commission's view, internal controls must provide reasonable assurance not only that material information in the company's financial statements is accurate, but also "that receipts and expenditures of the company are being made only in accordance with authorization of management and directors of the company." By unlinking "internal controls" from "financial reporting" in Section 404, the SEC encourages management and auditors to scrutinize detailed procedures for controlling ordinary expenditures -- e.g., reimbursing travel expenses and handling petty cash -- even in cases where they are clearly immaterial to the company's financial reports.

Second, the SEC requires management to assess a public company's "disclosure controls" -- defined as "controls and other procedures . . . designed to ensure that information required to be disclosed by the issuer in the reports it files" with the commission "is recorded, processed, summarized and reported" in a timely manner. This rule on "disclosure controls" is very confusing since it overlaps with the rule on "internal controls." The SEC should end this confusion by combining both into one rule on "internal controls" over "financial reporting," which would cover the accuracy and timeliness of "material" information submitted by public companies in their financial reports to the commission.

The concept of "materiality" is traditionally judged by whether information is significant to a company's overall financial situation. However, a much broader concept of "materiality" is applied to Section 404 by the Public Company Accounting Oversight Board (PCAOB), which oversees all auditors of public companies. According to its Auditing Standard No. 2, an auditor must apply materiality "in an audit of internal controls over financial reporting at both the financial- statement level and at the individual-balance level". This extension of materiality to individual balances tends to lead management and auditors to incur tremendous expense by examining controls over balances that are not financially significant for the company as a whole -- for example, reserve balances in a minor subsidiary, or inventory balances in a small factory.

The PCAOB's unduly expansive definition of materiality is exacerbated by its unduly expansive standard for assessing the likelihood of a problem occurring. According to Auditing Standard No. 2, "reasonable assurance" that internal controls are effective means that there is only a "remote likelihood that material misstatements will not be prevented or detected on a timely basis." This standard of "a remote likelihood" can easily lead to auditor concerns about internal controls based on hypothetical situations that have not occurred and are not very likely to occur. A more appropriate standard for determining that internal controls are effective would be that a problem is "unlikely to actually happen."

Suppose one employee signature is required for customer refunds under $100 and two signatures above that amount. The auditors may maintain that mishandling of small customer refunds is not "remote" because the one employee signing could, in theory, conspire with the customer to defraud the company. Yet the mishandling of small customer refunds is "unlikely to actually happen" because the one employee knows that his or her signature can easily be traced if any problem becomes evident on customer refunds.

Furthermore, Auditing Standard No. 2 states categorically: "There is no difference in the level of work performed" by the auditors when attesting to management's assessment of the company's internal controls, versus when the auditors express an opinion directly on the effectiveness of the company's internal controls. This approach leads to a high degree of redundant work: Management must test all of the company's internal controls; and the auditors can rely in part on management's testing, but only for less important areas of internal controls. A more efficient approach would be for the auditors to evaluate the design of the control systems, review the testing plan of management, and test a reasonable sample of internal controls.

In formulating their current rules, the PCAOB and the SEC were heavily influenced by an internal controls framework established in 1992 by COSO (a committee of sponsoring audit organizations). While its framework is excellent for many purposes, even the regulators recognize that, because it covers compliance with all laws and effectiveness of corporate operations, it is too broad for Section 404. COSO is now developing for small companies a control framework limited to financial reporting -- which should be extended to all public companies.

In short, instead of exempting small companies from Section 404, the SEC and the PCAOB should apply to all public companies narrower rules on internal controls. Management's assessment of internal controls should focus on the material information contained in the company's reports to the SEC, and the auditors should attest to management's assessment by reviewing its processes and sample testing. Both should apply the traditional concept of materiality -- financial significance relative to the whole company. In this manner, Section 404 will be very helpful in preventing material misstatements in a company's reports to the SEC, but at a much lower cost.

---

Mr. Pozen is chairman of MFS Investment Management.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re VIISAGE TECHNOLOGY, INC. SECURITIES LITIGATION ) ) ) ) This Pleading Applies to: All Actions ) ) | CIVIL ACTION NO. 05-cv-10438-MLW |

COMPENDIUM OF CERTAIN CITED AUTHORITIES TO
DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

A.   *Sarbanes-Oxley Act:   Consideration of Key Principles Needed in Addressing Implementation for Smaller Public* Companies, United States Senate Committee on Small Business and Entrepreneurship.

B.   SEC Release No. 33-8124.

C.   SEC Release No. 33-8238.

D.   *Why Sweat the Small Stuff?*, Robert Pozen, April 5, 2006, *Wall Street* Journal.

4085773_1.DOC