UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In re VIISAGE TECHNOLOGY, INC.
SECURITIES LITIGATION

Civil Action No. 05-cv-10438-MLW

This Pleading Applies to:  All Actions

LEAD PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED
AMENDED CLASS ACTION COMPLAINT

Jeffrey C. Block, Esq. (BBO # 6007470)
Leslie R. Stern, Esq. (BBO # 631201)
BERMAN DEVALERIO PEASE
 TABACCO BURT & PUCILLO
One Liberty Square, 8th Floor
Boston, Massachusetts 02109
(617) 542-8300

*Liaison Counsel for Lead Plaintiffs*

Jeffrey A. Klafter, Esq.
Klafter & Olsen LLP
1311 Mamoroneck Avenue, Suite 220
White Plains, New York 10605
(914) 997-5656

Kurt B. Olsen, Esq.
KLAFTER & OLSEN LLP
2121 K Street, N.W.
Suite 800
Washington, D.C.  20037
(202) 261-3553

Stephen D. Oestreich, Esq.
Robert N. Cappucci, Esq.
William W. Wickersham, Esq.
ENTWISTLE & CAPPUCCI LLP
280 Park Avenue, 26th Floor West
New York, New York 10017
(212) 894-7200

*Lead Counsel for Lead Plaintiffs*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. iii

PRELIMINARY STATEMENT ........................................................ 1

STATEMENT OF FACTS ................................................................ 3

    A.    Defendants Made Materially False and Misleading Statements In Connection With the Georgia Department Of Motor Vehicle Safety RFP...........4

    B.    Defendants Made Materially False and Misleading Statements Regarding the Adequacy of Viisage's Internal Controls............................10

ARGUMENT ................................................................................ 12

I.    THE APPLICABLE LEGAL STANDARDS ................................................. 12

II.    DEFENDANTS MADE ACTIONABLE MISTATEMENTS AND OMISSIONS ............ 13

    A.    Defendants' Made Actionable Misrepresentations and Omissions Regarding the Digimarc Action ...................................... 13

        1.    Defendants Affirmatively Misled Investors as to Viisage's Status as a Defendant in Digimarc Action and as to the Nature of the Allegations........ 13

        2.    Defendants' Had a Duty to Disclose the Truth about the Digimarc Action.. 17

            a.    Defendants Had a Duty to Disclose That Viisage Was a Defendant in the Digimarc Action and to Accurately Characterize Digimarc's Allegations ........................... 18

            b.    Defendants Had a Duty to Disclose the Material Risk to Their Entitlement to the $2.5 Million Settlement With the DMVS ...................................... 20

            c.    The Cases on Which Defendants Rely are Inapposite and Support the Merits of Plaintiffs' Claims ............. 21

        3.    Defendants "Truth On The Market" Defense is Without Merit .................. 24

    B.    Defendants Made Actionable Misrepresentations and Omissions Regarding Viisage's Internal Controls ........................... 26

    C.    Defendants Made Actionable Misrepresentations and Omissions Regarding Viisage's Projected EBITDA ............................... 29

III.   PLAINTIFFS' SECTION 10(B) CLAIM IS PREMISED
       ON A STRONG INFERENCE OF SCIENTER ................................................................. 31

       A.    Plaintiffs Adequately Allege that the
             Section 10(b) Defendants Acted with Scienter ..................................................... 31

             1.    Standards for Pleading Scienter .................................................................. 31

             2.    The Complaint Adequately Alleges Defendants'
                   Scienter With Regard to the Digimarc Action____ ...................................... 32

             3.    The Complaint Adequately Alleges Viisage's,
                   Bailey's and Aulet's Scienter With Respect to
                   Viisage's Internal Control Deficiencies ..................................................... 33

             4.    Defendants' Motives Further Support the
                   Requisite Inference of Scienter ................................................................. 34

IV.    PLAINTIFFS' SECTION 11 CLAIM NEED NOT BE
       ALLEGED IN ACCORDANCE WITH RULE 9(B) ........................................................ 37

V.     THE COMPLAINT SUFFICIENTLY PLEADS CONTROL PERSON
       LIABILITY AS TO BAILEY, AULET, BERUBE, BECK AND YON ............................ 40

CONCLUSION ............................................................................................................................. 43

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002) ................................................................................16, 32, 40, 43

*Amalgamated Clothing and Textile Workers Union v. J.P. Stevens & Co., Inc.*,
475 F. Supp. 328 (S.D.N.Y. 1979)..................................................................................22

*Basic Inc. v Levinson*,
485 U.S. 224 (1988)........................................................................................................28

*Beal v. Blache*,
No. 02-CV-12447-RGS, 2005 U.S. Dist. LEXIS 2151 (D. Mass. Feb. 14, 2005) .......20

*Chalverus v. Pegasystems, Inc.*,
59 F. Supp. 2d 226 (D. Mass. 1999) ..............................................................................43

*Conley v. Gibson*,
355 U.S. 41 (1957)..........................................................................................................12

*Cooperman v. Individual Inc.*,
171 F.3d 43 (1st Cir. 1999) .............................................................................................12

*Crowell v. Ionics, Inc.*,
343 F. Supp. 2d 1 (D. Mass. 2004) ...........................................................................32, 36

*DeMarco v. Lehman Brothers, Inc.*,
309 F. Supp. 2d 631 (S.D.N.Y. 2004)............................................................................14

*Ganino v. Citizens Utilities Co.*,
228 F.3d 154 (2d Cir. 2000)......................................................................................24, 25

*Greebel v. FTP Software, Inc.*,
194 F.3d 185 (1st Cir. 1999)...........................................................................................32

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983)........................................................................................................12

*Higginbotham v. Baxter International Inc.*,
No. 04-C-4909, 2005 U.S. Dist. LEXIS 12006 (N.D. Ill. May 25, 2005), *vacated by* 2005
U.S. Dist. LEXIS 21349 (N.D. Ill. Sept. 23, 2005) .......................................................34

*Howard v. Everex System, Inc*,
228 F.3d 1057 (9th Cir. 2000) ........................................................................................35

*In re Adelphia Communs. Corp. Sec. & Derivative Litigation,*
398 F. Supp. 2d 244 (S.D.N.Y. 2005)...............................................................43

*In re American Bank Note Holographics, Inc. Sec. Litigation,*
93 F. Supp. 2d 424 (S.D.N.Y. 2000).................................................................36

*In re Apple Computer Sec. Litigation,*
886 F.2d 1109 (9th Cir. 1989) ....................................................................24, 25

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litigation,*
324 F. Supp. 2d 474 (S.D.N.Y. 2004)...............................................................39

*In re Biogen Sec. Litigation,*
179 F.R.D. 25 (D. Mass. 1997).................................................................24, 26

*In re Cabletron System, Inc. Sec. Litigation,*
311 F.3d 11 (1st Cir. 2002)................................................................... passim

*In re Cardinal Health, Inc. Sec. Litigation,*
No. C2-04-575, 2006 U.S. Dist. LEXIS 18687 (S.D. Ohio Apr. 12, 2006) ...........33, 37

*In re Centennial Techs. Sec. Litigation,*
52 F. Supp. 2d 178 (D. Mass. 1999) .................................................................42

*In re Computervision Corp. Sec. Litigation,*
869 F. Supp. 56 (D. Mass. 1994), and *In re TyCom,* 2005 U.S. Dist. LEXIS 19154, a ..............40

*In re Credit Suisse First Boston Corp.,*
431 F.3d 36 (1st Cir. 2005)..............................................................................31

*In re Focus Enhancements, Inc. Sec. Litigation,*
309 F. Supp. 2d 134 (D. Mass. 2001) ...............................................................34

*In re Hypercom Corp. Sec. Litigation,*
No. CV-05-0455-PHX-NVW, 2006 U.S. Dist. LEXIS 2669 (D. Ariz. Jan. 4, 2006) ..................34

*In re Ibis Tech. Sec. Litig.,*
No. 04-10446 (RCL), 2006 U.S. Dist. LEXIS 18674 (D. Mass. Apr. 12, 2006)...........................35

*In re Immune Response Sec. Litigation,*
375 F. Supp. 2d 983 (S.D. Cal. 2005)................................................................25

*In re Interpublic Sec. Litig.,*
No. 02 Civ. 6527 (DLC), 2003 U.S. Dist. LEXIS 8844 (S.D.N.Y. May 30, 2003) ...............34, 36

iv

*In re Lernout & Hauspie Sec. Litigation,*
208 F. Supp. 2d 74 (D. Mass. 2002) ................................................................12

*In re Lernout & Hauspie Sec. Litigation,*
286 B.R. 33 (D. Mass. 2002) ................................................................43

*In re MicroStrategy, Inc. Sec. Litigation,*
115 F. Supp. 2d 620 (E.D. Va. 2000) ................................................................34

*In Re Number Nine Visual Tech. Corp. Sec. Litigation,*
51 F. Supp. 2d 1 (D. Mass. 1999) ................................................................38, 39, 40

*In re PLC Systems, Inc. Sec. Litigation,*
42 F. Supp. 2d 106 (D. Mass. 1999) ................................................................43

*In re PMA Capital Corp. Sec. Litigation,*
No. 03-6121, 2005 U.S. Dist. LEXIS 15696 (E.D. Pa. July 27, 2005)...................27, 29

*In re Par Pharmaceutical, Inc. Sec. Litigation,*
733 F. Supp. 668 (S.D.N.Y. 1990) ................................................................19

*In re PerkinElmer, Inc. Sec. Litigation,*
286 F. Supp. 2d 46 (D. Mass. 2003) ................................................................33

*In re Raytheon Sec. Litigation,*
157 F. Supp. 2d 131 (D. Mass. 2001) ................................................................19

*In re Resource America Sec. Litigation,*
No. 98-5446, 2000 U.S. Dist. LEXIS 10640 (E.D. Pa. July 26, 2000).........................35

*In re Royal Dutch/Shell Transport Sec. Litigation,*
380 F. Supp. 2d 509 (D.N.J. 2005) ................................................................29

*In re Seachange International, Inc. Sec. Litigation,*
No. 02-12116-DPW, 2004 U.S. Dist. LEXIS 1687 (D. Mass. Feb. 6, 2004) ...........21, 22

*In re Stac Electrics Sec. Litigation,*
89 F.3d 1399 (9th Cir. 1996), cited by Defendants in their Memorandum at page 42 .............38

*In re Stone & Webster, Inc. Sec. Litigation,*
414 F.3d 187 (1st Cir. 2005) ................................................................31

*In re Suprema Specialties, Inc. Sec. Litigation,*
438 F.3d 256 (3d Cir. 2006) ................................................................37

*In re Time Warner, Inc. Sec. Litigation,*
9 F.3d 259 (2d Cir. 1993) ..................................................................................................35

*In re Transkaryotic Therapies, Inc. Sec. Litigation,*
319 F. Supp. 2d 152 (D. Mass. 2004) ..........................................................................22, 33

*In re Tyco International,*
2004 U.S. Dist. LEXIS 24272 ......................................................................................40, 43

*In re Tyco International, Ltd. Multidistrict Litigation,*
No. 02-1335-B, 2004 U.S. Dist. LEXIS 20733 (D.N.H. Oct. 14, 2004) ...........................18

*In re Veeco Instruments, Inc. Sec. Litigation,*
No. 05-MD-1695 (CM), 2006 U.S. Dist. LEXIS 13226 (S.D.N.Y. Mar. 21, 2006) ....................34

*In re Vivendi Universal, S.A. Sec. Litig.,*
No. 02 Civ. 5571 (RJH), 2004 U.S. Dist. LEXIS 7015 (S.D.N.Y. April 21, 2004) ..................36

*In re Websecure, Inc. Sec. Litigation,*
182 F.R.D. 364 (D. Mass. 1998) ......................................................................................40

*KA Investments, LDC v. Number Nine Visual Tech. Corp.,*
2002 U.S. Dist. LEXIS 18690 (D. Mass. Aug. 26, 2002) .................................................29

*Kafenbaum v. GTECH Holdings Corp.,*
217 F. Supp. 2d 238 (D.R.I. 2002)................................................................................24, 35

*Kalnit v. Eichler,*
264 F.3d 131 (2d Cir. 2001)..............................................................................................36

*Lucia v. Prospect St. High Income Portfolio, Inc.,*
36 F.3d 170 (1st Cir. 1994)................................................................................................19

*Neer v. Pellino,*
389 F. Supp. 2d 648 (E.D. Pa. 2005) ...............................................................................27

*PR Diamonds, Inc. v. Chandler,*
364 F.3d 671 (6th Cir. 2004) .............................................................................................33

*Pacheco v. Cambridge Tech. Partners, Inc.,*
85 F. Supp. 2d 69 (D. Mass. 2000)....................................................................................25

*Rand v. Cullinet Software, Inc.,*
847 F. Supp. 200 (D. Mass 1994) ................................................................................24, 25

*Rand v. M/A-Com, Inc.*,
  824 F. Supp. 242 (D. Mass. 1992) ..................................................................................42

*Roeder v. Alpha Industrial, Inc.*,
  814 F.2d 22 (1st Cir. 1987) ..........................................................................17, 19, 22, 23

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) cited by Defendants at Def. Mem. at 40 n ...........................40

*Rothman v. Gregor*,
  220 F.3d 81 (2d Cir. 2000) ..........................................................................................36

*SEC v. Gorsek*,
  222 F. Supp. 2d 1112 (C.D. Ill. 2002) ...........................................................................15

*SEC v. Texas International Co.*,
  498 F. Supp. 1231 (N.D. Ill. 1980) ................................................................................22

*Schaffer v. The Timberland Co.*,
  924 F. Supp. 1298 (D.N.H. 1996) ..................................................................................24

*Scheuer v. Rhodes*,
  416 U.S. 232 (1974) ...............................................................................................12, 13

*Schnall v. Annuity & Life Re (Holdings) Ltd.*,
  No. 3:02-CV-2133 (GLG), 2003 U.S. Dist. LEXIS 24898 (D. Conn. Dec. 23, 2003)................42

*Scritchfield v. Paolo*,
  274 F. Supp. 2d 163 (D.R.I. 2003) .................................................................................29

*Sekuk Global Enterprises v. KVH Industrial, Inc.*,
  No. 04-306ML, 2005 U.S. Dist. LEXIS 16628 (D.R.I. Aug. 11, 2005).................................36

*Serabian v. Amoskeag Bank Shares, Inc.*,
  24 F.3d 357 (1st Cir. 1994) ..........................................................................................33

*Shaw v. Digital Equipment Corp.*,
  82 F.3d 1194 (1st Cir. 1996) .................................................................................. passim

*Swack v. Credit Suisse First Boston*,
  383 F. Supp. 2d 223 (D. Mass. 2004) .............................................................................24

*Swierkiewicz v. Sorema N.A.*,
  534 U.S. 506 (2002) .....................................................................................................37

*Wielgos v. Commonwealth Edison Co.*,
892 F.2d 509 (7th Cir. 1989)..............................................................................22

Lead Plaintiffs, Turnberry Asset Management and Electronic Trading Group LLC, Ronald Sauer and David and Lance Hancock (collectively "Plaintiffs"), respectfully submit this Memorandum of Law in Opposition to Defendants' Motion to Dismiss (the "Motion") the Consolidated Amended Class Action Complaint (the "Complaint") and Defendants' corresponding memorandum of law (the "Defendants' Memorandum" or "Def. Mem.").[1]

## PRELIMINARY STATEMENT

While Defendants' Memorandum contains a long recitation of facts and corresponding legal arguments concerning Defendants' extensive wrongdoing, this case boils down to two simple issues. First, Plaintiffs allege that Defendants affirmatively misled investors regarding the nature of, and Viisage's role in, the lawsuit brought by a competitor, Digimarc ID Systems ("Digimarc"), in connection with a $19.5 million contract awarded to Viisage by the Georgia Department of Motor Vehicle Safety (the "DMVS") to supply drivers' licenses to the State of Georgia. Digimarc's lawsuit (the "Digimarc Action") centered on serious misconduct on the part of Viisage in the bidding which led to Viisage being named as a defendant and to the Georgia court's disallowance of the contract based upon its findings "that there were significant instances of misconduct and misrepresentations by Defendant Viisage."

However, Defendants were determined to avoid having their misconduct come to light as long as possible. Thus, in numerous filings with the SEC, Defendants repeatedly characterized the Digimarc Action as alleging solely that the DMVS "did not comply with its own bid process." Defendants further denied that it was even a defendant in the action and only spoke of motions made by the DMVS while concealing parallel motions made by Viisage. For example, Viisage's CEO,

---

[1] Plaintiff herein responds to the arguments of the following defendants, on whose behalf the motion to dismiss was filed: Viisage Technologies, Inc. ("Viisage" or the "Company") and individuals Bernard C. Bailey ("Bailey"); William Aulet ("Aulet"); Dennis K. Berube ("Berube"); Marcel Yon ("Yon"); Buddy G. Beck ("Beck"); Charles A. Levine ("Levine"); Thomas J. Reilly ("Reilly"); Harriet Mouchly-Weiss ("Weiss"); Paul T. Principato ("Principato"); and Peter Nessen ("Nessen") (collectively, the "Individual Defendants"). Together, Viisage and the Individual Defendants are referred to herein as the "Defendants."

Defendant Bailey, told analysts that "*Viisage was never a party to this lawsuit, which has dragged on and on for a year and a half, nor were any allegations of impropriety ever lodged against our company.*" Further, when Viisage announced that the DMVS had filed a motion to dismiss, or motions for summary judgment with regard to, the Digimarc Action, Defendants omitted that Viisage had also done so.

Realizing that the misleading nature of defendants' statements is clear cut, defendants mischaracterize plaintiffs' allegations as alleging a mere "failure to predict the outcome" of the Georgia litigation. Defendants then concoct an argument that they had no duty to disclose the future and, that what they did disclose, was sufficient. Defendants' arguments fail because Plaintiffs' claims concerning the Digimarc Action are not based on predictions of the future, but rather, material statements of *present and past facts.* Not only were these facts required to be disclosed by SEC regulations, they were necessary to be disclosed, given the statements made, so that investors would be able to understand the truth about the Digimarc Action as well its impact on the $2.5 million settlement that Viisage claimed it initiated with the DMVS in an attempt to render the Digimarc Action moot. With no support to counter plaintiffs' true allegations, defendants assert the "truth on the market" defense. However, that argument is contradicted by both the facts and the law.

Second, this action concerns Defendants representations that Viisage's internal financial controls was effective when they were known to have been deficient throughout most of 2004. Instead, Defendants affirmed in all of its 2004 quarterly financial statements the exact opposite, neglecting to mention any outstanding deficiencies in the Company's internal controls.

Defendants were highly motivated to suppress any adverse disclosures concerning the Digimarc Action or Visage's lack of internal controls. Among other things, maintaining the Company's inflated stock price was a paramount concern as the Company approached the completion of a secondary offering of the Company's shares in mid-2004. The Secondary Offering not only assisted in wiping out

most of the Company's outstanding debt, but ensured that certain Defendants, who were also major creditors of the Company, would be paid and no longer suffer any risk to the more than $15 million they had loaned the Company.

On December 27, 2004, upon revelation of the Georgia court's ruling and Viisage's wrongdoing, Viisage's stock price declined from a Class Period high of $9.64 per share on December 23, 2004 (the previous trading day) to an intraday low of $8.38 on December 27, 2004, or a 15-percent drop, before closing at $8.82 on high volume.  On February 7, 2005, Viisage announced that its net income and EBITDA for fiscal year 2004 would fall well below its late-October 2004 guidance, due in large part to the Georgia court's December 22, 2004 ruling in the Digimarc Action that permanently disallowed the Company from recouping $2 million of the $2.5 million settlement with DMVS.  This news sent Viisage shares down as much as 24.3 percent to a low of $5.85 per share.  On March 2, 2005, Viisage revealed that its internal accounting controls were so flawed that they qualified as a "material weakness." That news caused Viisage's stock to plunge of as much as 27.2 percent to an intraday low of $4.30 per share.  In fact, Viisage's internal control deficiencies have yet to be rectified even today and Defendants' own statements show that they were aware of the deficiencies throughout most of 2004.

As demonstrated below, this case exemplifies exactly why the securities laws exist -- to rectify wrongs done to shareholders by holding the wrongdoers responsible for disregarding their duty to inform shareholders in a truthful and timely manner.

## STATEMENT OF FACTS

Viisage, claims to be a leading provider of advanced technology identity solutions that enable governments, law enforcement agencies and businesses to enhance security, reduce identity theft and protect personal privacy.  ¶ 2.[2]  During the Class Period, Viisage served a market

---

[2]    References to Plaintiffs' February 27, 2006 Consolidated Amended Complaint are cited as "¶ ___".

consisting primarily of state government agencies and, in particular, state departments of motor

vehicles, for which it designed and produced secure driver's licenses. ¶ 3. Viisage began

operations in 1993 and, with the exception of 1996 and 2000, has recorded a loss for each fiscal

year of its existence. *Id.*

A.    **Defendants Made Materially False and Misleading Statements In**
      **Connection With the Georgia Department Of Motor Vehicle Safety RFP**

During the Class Period, the Company represented itself to analysts and investors as a

growth-oriented company, emphasizing increasing revenues and its procurement of government

work. *Id.* During the first quarter of 2004, Viisage reported that 85.8 percent of its revenues were

from its "Secure Credentials Segment." *Id.* Maintaining the Company's reputation in the market

for secure credentials was a paramount concern for Viisage, and any hint of improper conduct on its

part would likely have had a significant impact on its growth strategy. *Id.* One of Viisage's most

important contracts during the Class Period was obtained through a May 24, 2002 RFP issued by

the Georgia Technology Authority ("GTA") on behalf of the DMVS, seeking proposals to provide a

digitized license system for the DMVS. ¶ 41. The DMVS contract was ultimately awarded to

Viisage on November 12, 2002, and was immediately contested by a competing bidder, Digimarc

ID Systems. ¶ 42. Shortly thereafter, on March 5, 2003, Digimarc sought to set aside the award in

an action filed in the Superior Court of Fulton County of Georgia against GTA and DMVS. ¶ 3.

In Viisage's Form 10-Q for the period ending March 28, 2004, filed with the Securities &

Exchange Commission (the "SEC") on the first day of the Class Period, May 12, 2004, the

Company mischaracterized the Digimarc Action as concerning whether the DMVS failed to comply

with its own bid process guidelines, while omitting that Viisage's misconduct was a central part of

the litigation. ¶ 52. Specifically, Viisage represented in its Form 10-Q that:

> On July 31, 2003 the superior court for Fulton County, Georgia issued
> a preliminary injunction prohibiting Georgia's [DMVS] from
> continuing to work with us to install a new drivers' license system for

4

> the State of Georgia. This injunction is the result of a lawsuit filed in
> March 2003 by one of our competitors, Digimarc ID Systems, LLC.
> **The suit claims that the [DMVS] did not comply with its own bid
> process when selecting a vendor for the digital drivers' license
> program.**

*Id.* (emphasis added). Although the Digimarc Action increasingly focused on Viisage's wrongdoing,

Viisage made virtually no change in this disclosure during the Class Period. For example, on June 3,

2004, the Georgia Court granted Digimarc's motion to compel Viisage to produce certain witnesses for

deposition and for Viisage to produce several categories of documents directly relating to its alleged

wrongdoing. ¶ 56.

Nevertheless, on June 21, 2004, the Company filed a Form S-3 Registration Statement for a

Secondary Offering of 7.2 million shares of newly issued common stock by Viisage and for the sale

of 300,000 shares held by Lau and Defendants Yon and Beck. ¶ 58. That Registration Statement

merely parroted the same misleading disclosure contained in Viisage's May 12, 2004 Form 10-Q. ¶

59.

The Secondary Offering was essential for Viisage. Viisage had not reported a profit in

2001, 2002, 2003 or the first quarter of 2004. *Id.* As of March 28, 2004, Viisage had total debt of

over $31.4 million, including $15.3 million that was owed to Defendant Beck and approximately $5

million that was owed to Lau. *Id.* The interest expense on the debt was substantially hampering the

Company's ability to report a profit. *Id.* The principal stated purpose of the Secondary Offering

was to repay approximately $30.3 million of indebtedness, which would virtually eliminate the

interest expense from Viisage's balance sheet. ¶ 59.

Despite the June 3, 2004 decision of the Georgia Court, Digimarc was forced on July 1,

2004 to file an additional motion seeking to enforce the decision on Viisage and for sanctions

against the Company due to its failure to comply with the Georgia Court's discovery order. ¶ 61.

Before that motion could be heard, however, on July 21, 2004, Viisage announced that it had

entered into a settlement with the DMVS by which the DMVS would, *inter alia*, pay Viisage $2.5 million for work it ostensibly completed for the DMVS since the bid award in exchange for the reopening of the RFP process. ¶ 62. Defendants touted the result as a "proactive step" to help resolve the dispute on a contract that was "appropriately awarded to Viisage." *Id.* In reality, the settlement was merely part of Viisage's illicit scheme to prevent Digimarc from obtaining full discovery of the Company's improper conduct in the DMVS bidding process, as ordered by the Georgia Court. ¶ 6.

In the July 21, 2004 press release, Defendants continued their subterfuge as to Viisage's involvement in the Digimarc Action by stating that because of the settlement, the DMVS would be filing a motion to dismiss the Digimarc Action. ¶ 62. Defendants did not disclose that the Company would also be filing a motion to dismiss because they did not want to reveal that Viisage was a party to the lawsuit. On the same day, Viisage also issued a press release announcing its financial results for its second quarter ended June 27, 2004, in which Defendant Aulet represented that Viisage expects "revenue between $60-63 million and EBITDA of $10-11 million" for 2004. ¶ 63.

In a conference call with analysts and investors held the next day, Defendant Bailey stated: "*Viisage was never a party to this lawsuit, which has dragged on and on for a year and a half, nor were any allegations of impropriety ever lodged against our company.*" ¶ 64 (emphasis added). Thereafter, Defendant Aulet stated that "the payment we are receiving from the State of Georgia of $2.5 million . . . will be recorded in the third quarter of this year." ¶ 65. However, risk to the receipt of this payment was not publicly disclosed by Viisage.

On July 22, 2004, Viisage filed an Amended Registration Statement with the SEC with respect to Viisage's Secondary Offering. ¶ 66. In the Amended Registration Statement, Viisage continued to represent that the lawsuit was a result of the DMVS's failure to "comply with its own

bid process when it selected a vendor for its new digital drivers' license program." *Id.* With respect to the $2.5 million settlement with the DMVS, Defendants misrepresented that the DMVS had "terminated the contract for convenience" and that the DMVS only had filed a motion to dismiss the Digimarc Action. The Amended Registration Statement also did not reveal any risk to the receipt of the $2.5 million payment. ¶ 66.

The next day Digimarc filed a motion for the entry of a temporary restraining order preventing the DMVS and Viisage from consummating the announced settlement on the grounds that the termination of the contract awarded to Viisage and payment of $2.5 million would violate the Georgia Court's injunction issued on July 31, 2003. ¶ 67. That motion was granted by the Georgia Court on August 19, 2004, but it was not disclosed by Defendants until October 26, 2004 – after Viisage had successfully secured new State contracts and a new line of credit. ¶¶ 71, 79-80.

On or about August 4, 2004, the Amended Registration Statement for the Secondary Offering became effective and on August 5, Viisage filed with the SEC a prospectus for the Secondary Offering (the "Prospectus") again stating that the DMVS had merely "terminated the contract for convenience," and falsely implying that it was not a party to the litigation. Viisage only added one sentence to the Prospectus concerning the Digimarc Action that was not contained in the Form S-3/A, indicating that Digimarc sought to enjoin the payment of $2.5 million. ¶ 68. No information, however, was provided as to the basis for the injunction, which would have enabled investors to assess Digimarc's likelihood of success.[3] The Secondary Offering successfully raised approximately $37.1 million for Viisage, of which $30.3 million was used to repay indebtedness owed principally to Beck and Lau, of which Defendant Berube was Executive Vice President and Chief Operating Office. ¶ ¶ 26, 68. In addition, Defendants Berube, Beck and Yon sold shares held

---

[3]   On August 11, 2004, Viisage filed its Form 10-Q for the quarter ended June 30, 2004. In that Form 10-Q, with regard to the Digimarc Action, Viisage merely repeated the false and misleading disclosure it had provided in the Prospectus. ¶ 69.

by them for proceeds totaling $2.3 million in the Secondary Offering. ¶ 68.

On August 23, 2004, Digimarc filed its Second Amended Complaint against the GTA, DMVS and Viisage, and its motion to preliminarily enjoin consummation of the settlement, agreement. ¶¶ 72-73. On September 2, 2004, the Georgia Court enjoined the proposed settlement, finding that the settlement violated its July 31, 2003 Injunction Order, granted Digimarc's second motion to compel and awarded Digimarc for its motion for sanctions $5,761.50 in attorney fees. ¶ 74. Viisage did not disclose the Georgia Court's order until November 10, 2004 although Viisage made several pubic pronouncements in the interim. ¶¶ 74-80.

On October 11, 2004, the parties in the Georgia litigation filed cross motions for summary judgment -- one by Viisage, one by the GTA and DMVS, and a partial summary judgment motion by Digimarc. In its response, filed on October 20, 2004, Digimarc provided an even fuller factual record of Viisage's wrongdoing in connection with its RFP proposals, as Viisage had finally provided the discovery Digimarc had been seeking all year. ¶ 76.

On October 25, 2004, Viisage increased its guidance for 2004 to $66-68 million in revenue and $11.5-12.5 million in EBITDA, even though the Georgia Court had preliminarily enjoined payment of the $2.5 million to Viisage. ¶ 78. On a conference call with analysts on October 26, the Company finally revealed the existence of the August 19, 2004 temporary restraining order concerning the July 21, 2004 settlement but failed to disclose: (1) the September 2, 2004 injunction; (2) that Viisage had been sanctioned by the Georgia Court; (3) that the Company's own wrongdoing was a material subject of the litigation as evidenced in detail in the then-pending summary judgment motion by Digimarc; and (4) that Viisage was even a defendant in the litigation, as evidenced by Viisage's motion for summary judgment. ¶ 80.

On November 10, 2004, Viisage continued to misrepresent the nature of the Digimarc Action when it Form 10-Q for the third quarter ended September 30, 2004, was filed. ¶ 81.

Although Viisage disclosed the September 2, 2004 injunction for the first time, Viisage continued to falsely state that the Digimarc Action concerned allegations "that the [DMVS] did not comply with its own bid process when it selected a vendor for its new digital drivers' license program" and that only the DMVS had filed a motion to dismiss. *Id.* Defendants also concealed the other portions of the September 2, 2004 Order in which the Georgia Court had sanctioned Viisage. *Id.* As a result, investors were deprived of any disclosure from which they could assess whether Viisage would receive the $2.5 million payment from the DMVS. *Id.*[4]

On December 22, 2004, the Georgia Court ruled on the pending cross-motions for summary judgment and concluded, based upon a substantial evidentiary record, "that there were significant instances of misconduct and misrepresentations by Defendant Viisage" and permanently disallowed the $2.5 million in payments Viisage claimed it was owed for services it purportedly performed under the then-terminated contract. ¶ 86. The Georgia Court pointed to certain undisputed facts which concerned the conduct of Viisage during the RFP process, including that Viisage "submitted another vendor's sample cards, which it had no permission to use, in an attempt to submit acceptable permanent card samples" and falsely represented that it had retained the firm of Arthur Blank & Company to provide back-up card printing facilities, when in fact, Arthur Blank & Company neither had the requisite technology to serve in such a capacity nor a binding contract with Viisage to provide such a service. ¶ 87.

Viisage did not disclose the Georgia Court's ruling until December 27, 2004, when news reports started circulating about the potential impact of the decision. ¶ 89.[5] Attempting to put a

---

[4]    With its continued concealment of the true nature of the Digimarc Action and risk to Viisage, in mid-December 2004, Viisage announced it had secured a new State contract and had secured up to $25 million in new financing. ¶¶ 84-85.

[5]    Defendants attempt to excuse their tardy disclosure of this highly material ruling by pointing to the fact that the ruling was issued the Wednesday before Christmas. Def. Mem. at 17. Christmas Day was on Saturday, leaving at least one business day in which to put out a press release. Defendants also point to the self-serving statement in Viisage's December 27, 2004 press release that it had learned of the decision on that day. Given that Viisage was a party to the lawsuit and the significance of the

9

false positive spin on that ruling, Viisage incredibly continued to conceal that its own misconduct was at issue in the litigation – misconduct which resulted the Georgia Court's decision. Instead, Viisage stated, "We are pleased that the state will finally be permitted to begin the rebid process and that the judge has agreed with us and the state on virtually all aspects of the summary judgment motions." ¶ 91. Yet, Viisage's stock price began to immediately decline following the announcements on December 27, 2004 -- from a Class Period high of $9.64 per share on December 23, 2004 (the previous trading day) to an intraday low of $8.38 on December 27, 2004, or a 15-percent drop, before closing at $8.82 on high volume. ¶ 93.

Shortly thereafter, on February 7, 2005, Viisage revealed that its EBITDA and earnings for 2004 were expected to fall below the guidance it had provided in late-October 2004, due to the Georgia Court's ruling concerning the $2 million sought by Viisage for its work for DMVS. ¶ 94. However, the $2 million should never have entered into any earnings calculation for the Company because the Georgia Court enjoined the payment as early as August 19, 2004. ¶ 71. The following day, Viisage's shares plunged as much as 24.3 percent -- from $7.27 to a low of $5.85 -- on extraordinarily high trading volume of over 4.6 million shares. ¶ 97.

**B.     Defendants Made Materially False and Misleading Statements
         Regarding the Adequacy of Viisage's Internal Controls**

In each of Viisage's Class Period Form 10-Q filings, certain of which were incorporated by reference into the offering documents for the Secondary Offering, Viisage represented, and its principal officers certified, "There were no changes in our internal controls over financial reporting that occurred during our most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting." ¶¶ 10, 53-54, 66, 69-70, 82-83. On March 2, 2005, Viisage again shocked the market, announcing that a "material

---

ruling, it is hardly credible that no one at Viisage learned of the ruling until after Digimarc issued a press release on it on December 27, 2004.

weakness" existed in Viisage's internal accounting controls as it had insufficient personnel

resources and technical accounting expertise within the accounting function to resolve non-routine

or complex accounting matters. ¶ 98.

On a March 3, 2005 conference call with analysts, Defendant Aulet admitted that the

Company recognized it had internal control deficiencies "months ago" and had been "working to

remedy the issues for some time," acknowledging that "for the last *six to eight months*, we have

been working hard on our internal controls *with the goal* of full compliance rating for the year 2004

in our Sarbanes-Oxley 404 review." ¶ 99. In response to this disclosure, shares of Viisage's

common stock plunged as much as 27.2 percent -- from the close of $5.47 the previous day to a low

of $4.30 on March 3, 2005, on extraordinarily high trading volume of over 6.2 million shares. ¶

100.

Viisage did not file its 2004 Forms 10-K or 10-Q for the first quarter until June 30, 2005.

Thereafter it amended both forms to provide further information about its internal controls.

Viisage's Form 10-K filings included the report of its auditors, BDO Seidman, LLP, in which the

auditor stated that: "A material weakness is a control deficiency, or combination of control

deficiencies, that results in *more than a remote likelihood that a material misstatement of the*

*annual or interim financial statements will not be prevented or detected*." ¶ 104 (emphasis

added). In its July 7, 2005 Form 10-K, Viisage admitted that "during the fourth quarter of 2004 and

the first quarter of 2005," the Company had made "significant changes" to its internal controls over

financial reporting designed to remedy the material weaknesses identified on March 2, 2005. *Id.*

Even as late as August 12, 2005, Viisage was unable to state that it had effective internal controls,

according to Viisage's Form 10-Q filed with the SEC on August 12, 2005. ¶ 105.

## ARGUMENT

### I.    THE APPLICABLE LEGAL STANDARDS

In considering a motion to dismiss, courts must accept a plaintiff's allegations as true, and draw all reasonable inferences in favor of the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *In re Cabletron Sys., Inc. Sec. Litig.*, 311 F.3d 11, 22 (1st Cir. 2002). It is well settled that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [plaintiff's] claim which would entitle [plaintiff] to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *see also In re Lernout & Hauspie Sec. Litig.*, 208 F. Supp. 2d 74, 82 (D. Mass. 2002). Consequently, any ambiguities or doubts concerning the sufficiency of plaintiffs' claims must be resolved in plaintiffs' favor. *See Scheuer*, 416 U.S. at 236.

Section 11 of the Securities Act provides a cause of action against persons who prepare or certify a registration statement that contains false and misleading information at the time the registration statement becomes effective. *See* 15 U.S.C. § 77k(a); *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381 (1983). To succeed on this claim, a plaintiff need only show that, at the time it became effective, the registration statement contained a material misrepresentation or omission. *See* 15 U.S.C. § 77k(a); *Cooperman v. Individual Inc.*, 171 F.3d 43, 46-47 (1st Cir. 1999). A plaintiff has no obligation to prove causation or to show that the Defendants acted with scienter. *Id.* Moreover, a company is strictly liable for Section 11 violations; it has no due diligence defense. *See, e.g., Herman & MacLean*, 459 U.S. at 381-82.[6]

---

[6]    The First Circuit highlighted Section 11's "unique" elements relative to Section 12(2) of the Securities Act and Section 10(b) of the Exchange Act, and stated that Section 11 "is intended to ensure that issuers, under pain of civil liability, not cut corners in preparing registration statements and that they disclose all material information required by the applicable statutes and regulations." *Id.* at 1204. "Accordingly, the disclosure requirements associated with a stock offering are more stringent than, for example, the regular periodic disclosures called for in the company's annual Form 10-K or quarterly Form 10-Q filings under the Exchange Act." *Id.* at 1208. In addition, Rule 9(b) of the Federal Rules of Civil Procedure does not apply to Plaintiffs' Section 11 claims. Even so, except for a conclusory statement regarding Plaintiffs' allegation that Defendants falsely represented that Viisage's July 2004 settlement with the DMVS was entered for "convenience," Defendants do not

II.    **DEFENDANTS MADE ACTIONABLE MISTATEMENTS AND OMISSIONS**

    A.    **Defendants' Made Actionable Misrepresentations**
           **and Omissions Regarding the Digimarc Action**

Defendants mischaracterize Plaintiffs' allegations when they argue that Plaintiffs have not

pled an actionable misrepresentation or omission with respect to the Digimarc Action. Def. Mem.

at 2, 21-22. Contrary to Defendants' assertions, Plaintiffs' claims are not that Defendants should

have predicted the outcome of the Digimarc Action. Rather, Plaintiffs' allegations are premised on

Defendants' affirmative misrepresentations and omissions concerning the nature and status of the

Digimarc Action. Defendants repeatedly and publicly stated that: (1) Digimarc's only alleged that

the GTA/DMVS failed to follow "its own bid process" in connection with the drivers' license

Georgia contract; (2) that Viisage was "*never a party*" in Digimarc's lawsuit; and (3) that no

"*allegations of impropriety*" were ever alleged against Viisage. ¶ 64. Defendants' statements were

patently false and misleading.

       1.    **Defendants Affirmatively Misled Investors as to Viisage's Status as a**
             **Defendant in Digimarc Action and as to the Nature of the Allegations**

The "gravamen" of Plaintiffs' claim is that Defendants made actionable false and misleading

statements in violation of the Securities Act and the Exchange Act when they stated in Viisage's

Amended Registration Statement and Prospectus, and Forms 10-Q filed during the Class Period that

the Digimarc Action related to claims "that the [Georgia DMVS] did not comply with its own bid

process when selecting a vendor for the digital drivers' license program." In fact, Digimarc had

detailed misconduct by Viisage so serious that the GTA/DMVS moved the Georgia Court for an

order compelling Viisage to be added as a necessary party under Georgia law on October 1, 2003.

¶¶ 52, 55, 57, 59, 66, 68, 69, 81, 109(a)-(c), 126(a), (c), (f); Def. Mem. at 8. In their brief seeking to

add Viisage as a necessary party, Digimarc alleges that:

---

make any substantive argument that Plaintiffs have not pled with particularity Defendants' false and misleading false
statements regarding the Digimarc Action. Def. Mem. at 29, 38-39; *see* Section IV, *infra*.

> *[S]pecific actions taken by Viisage were improper. . . . [and that]*
> *importantly, Viisage has an interest in protecting its business*
> *reputation against any implication that it acted improperly,* which is
> not the primary concern of the GTA and DMVS. Therefore, Viisage's
> interests cannot be fully represented without its presence in the
> litigation.[7]

On November 7, 2003, the Georgia Court ordered that Viisage be added as a "necessary party."[8] Viisage filed a motion consenting to be "added as a defendant,"[9] and on November 12, 2003, Digimarc filed an amended complaint naming Viisage as a Defendant. ¶ 43. Clearly, Viisage's fraud in the bidding process was central to Digimarc's claims. Def. Mem. at 22. Defendants' misleading description of the Digimarc Action concealed the allegations of wrongdoing against Viisage -- which the Georgia Court ultimately found true. The seriousness of those allegations -- and hence the misleading nature of Viisage's description of the Digimarc Action -- cannot be understated.[10]

During the Class Period, Viisage also engaged in a pattern of making materially false and misleading statements in Viisage's SEC filings, press releases and conference calls that further fostered Defendants' misleading assertion. For example, on July 22, 2004 -- just two weeks before Viisage's Secondary Offering -- Defendant Bailey specifically told analysts in a conference call that "*Viisage was never a party to this lawsuit, . . . nor were any allegations of impropriety ever lodged against our company.*" ¶ 64 (emphasis added). That statement was a patent violation of Section 10(b) of the Exchange Act. ¶ 126(d); s*ee, e.g., DeMarco v. Lehman Bros., Inc.*, 309 F. Supp. 2d 631, 635 (S.D.N.Y. 2004) ("*DeMarco*") (denying motion to dismiss and stating that "falsity and intent . . . overlap" given the "stark difference" between what analyst told the public and what he

---

[7] *See* Exhibit 9 to the Transmittal Affidavit of Aloknanda S. Bose In Support of Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint ("Bose Aff.") at 6 (emphasis added).

[8] *See* Bose Aff., Ex. 9 at 6.

[9] *See* Bose Aff., Ex. 11 at ¶ 4.

[10] ¶ 45-50, 86-87; *See also* Bose Aff., Ex. 9 at 6; Bose Aff., Ex. 12 at ¶¶ 67-70, 79-80, 188-90, 229.

told preferred customers); *SEC v. Gorsek*, 222 F. Supp. 2d 1112, 1123 (C.D. Ill. 2002) (finding

defendant liable under Exchange Act because defendant's "statements were lies").

Defendants' response to that allegation is relegated to a footnote in their brief, Def. Mem. at

27 n.46, in which Defendants argue Viisage was "only . . . an interested party defendant" and that

the risks to the Company and the central issue in the case did not change. A "necessary party

defendant" is not any less a "defendant" for purposes of Regulation S-K, Item 103 or the other

federal securities laws. Moreover, Defendants' suggestion that their misconduct was not a central

issue in the Digimarc Action case is belied by the GTA/DMVS' description of that case in which

the GTA/DMVS highlighted the allegations against Viisage as the basis for adding Viisage as a

necessary party. *Id.*

Defendants made other material misrepresentations and misleading statements which are

actionable. For example, after the Georgia Court denied Viisage's and the GTA/DMVS' request for

an early trial and compelled Viisage to comply with Digimarc's discovery requests -- none of which

Viisage disclosed -- Viisage attempted to render the Digimarc Action moot by settling the dispute

with the GTA/DMVS. *See* Def. Mem. at 9; ¶¶ 6, 51, 56, 61-62, 66, 74.

Specifically, in a July 21, 2004 press, Viisage announced a $2.5 million proposed settlement

with the GTA/DMVS and stated that the GTA/DMVS had filed a motion to dismiss Digimarc's

complaint in light of this proposed settlement. ¶¶ 62, 66  However, Viisage pointedly failed to

disclose that it also had concurrently filed a motion to dismiss Digimarc's complaint -- which if

disclosed would have contradicted their earlier assertion that they were "not a party" to the

Digimarc Action. ¶¶ 109(a), 126(b)-(c). Plaintiffs also allege that Defendants violated the

Securities Act and the Exchange Act when Viisage falsely stated that the proposed settlement was

for the "convenience" of the parties when the settlement was in actuality an attempt to avoid having

to comply with the discovery demands of Digimarc directed at Viisage's wrongful conduct. ¶¶

15

109(b), 126(b), 132.[11]

Defendants further argue on this point that the sworn affidavit of the Commissioner of the Georgia DMVS confirms that it was the DMVS that initiated the settlement and not Viisage. Def. Mem. at 29. However, Viisage represented in its press release, described above, that *it* had taken the initiative. Moreover, Defendant Bailey stated in Viisage's July 22, 2004 conference call that "[w]*e offered an approach* that allowed the State to move this procurement from the courts to the marketplace where we believe it belongs." ¶ 64 (emphasis added). Further, during the October 26, 2004 conference call with analysts, Bailey stated that "[a]s I mentioned on our last call . . . last quarter *we had proposed settlement* with our customer, the State of Georgia. . . . [and the] State agreed with *our recommendation*, [and] signed an agreement with us."[12] Defendants cannot ignore their own public characterization of the genesis of the settlement.[13]

In addition, Plaintiffs allege that Defendants' statements in October 2004 concerning the Digimarc Action gave rise to a duty to timely disclose the material fact that on September 2, 2004, the Georgia Court issued an order which: (i) preliminarily enjoined the proposed settlement between GTA/DMVS and Viisage; (ii) imposed sanctions against Viisage for its repeated failure to comply with the Georgia Court's discovery orders; and (iii) denied the motions to dismiss filed by Viisage as well as the GTA and DMVS. ¶ 126(e)-(f). No disclosure of this significant ruling was made by Viisage until November 10, 2004, when Defendants still omitted material facts concerning

---

[11]  Defendants attempt to deflect the import of its false characterization of the settlement by contending that Plaintiffs have alleged no "nefarious facts" that Viisage was attempting to shield from discovery. Def. Mem. at 29. The Complaint, however, pleads with detailed specificity, fraudulent conduct on the part of Viisage, the discovery of which it had stonewalled until sanctioned by the Georgia Court. ¶¶ 41-51.

[12]  *See* Bose Aff., Ex. 35 at 3 (emphasis added).

[13]  Further, given Viisage's public statements, the Commissioner's affidavit only highlights a factual dispute that cannot be resolved on the present motion to dismiss because the Court "must make all reasonable inferences in favor of the plaintiff." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 78 (1st Cir. 2002).

the court's ruling.[14]

### 2.  Defendants' Had a Duty to Disclose the Truth about the Digimarc Action

Although Defendants clearly made actionable false statements and statements which omitted material facts necessary to make the statements accurate, Defendants devote extensive portions of their Memorandum of Law to the notion that they had no duty to disclose any of the concealed facts alleged in the Complaint.  Def. Mem. at 21-28.  The First Circuit's opinion in *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194 (1st Cir. 1996) ("*Shaw*"), is the seminal case setting forth the bases giving rise to a defendants' disclosure obligations under Section 11 of the Securities Act and Section 10(b) of the Exchange Act.  Relying in part on the Court's earlier opinion in *Roeder v. Alpha Indus., Inc.* 814 F.2d 22, 27 (1st Cir. 1987), the First Circuit stated that "three situations [can] . . . give rise to a duty to disclose material facts:  (i) when an insider trades in the company's securities on the basis of material nonpublic information; (ii) when a statute or regulation requires disclosure; and (iii) when the company has previously made a statement of material fact that is false, inaccurate, incomplete, or misleading in light of the undisclosed information."[15]  *Id.* at 1202 n.3.[16]

Here, in accordance with all three bases for disclosure identified in *Shaw*, Defendants were required to make full disclosure concerning the nature and status of the Digimarc Action.  However, Defendants made misleading or incomplete statements that misled investors as to those issues.[17]

---

[14]   Defendants suggest that they did disclose the September 2, 2004 Order, Def. Mem. at 25, but all Bailey revealed was the TRO issued August 19, 2004.  ¶¶ 71, 80; *see* Def. Mem. at 16 (quoting Bailey as only stating that "the settlement was the subject of a temporary restraining order.").

[15]   However, the First Circuit stated further that "[w]e do not decide here whether these three situations are the only ones that could trigger a duty of disclosure, or whether they necessarily would do so in every case."  *Shaw*, 82 F.3d at 1202 n.3.

[16]   Defendants acknowledge that any of these three bases gives rise to a duty to disclose, *see* Def. Mem. at 23, but ignore their import to their own conduct.  *See* Def. Mem. at 23.

[17]   Notably, Defendants do not question the materiality of their failure to disclose Viisage's status as a defendant in the Digimarc Action, the fact that Digimarc had alleged improper conduct by Viisage, and the misleading nature of Viisage's description of the Digimarc Action.  Defendants even admit in their brief that Defendant Bailey stated in a conference call with analysts that "somebody always asks for an update on Georgia." Def. Mem. at 16.

a.    **Defendants Had a Duty to Disclose That Viisage
Was a Defendant in the Digimarc Action and to
Accurately Characterize Digimarc's Allegations**

Plaintiffs allege that Defendants had a duty to disclose in Viisage's Amended Registration

Statement and Prospectus filed in connection with Viisage's $37 million Secondary Offering, and

other disclosures during the Class Period, the material fact that: (i) Digimarc named Viisage as a

Defendant in the Digimarc Action in November 2003; (ii) Digimarc had alleged serious misconduct

on Viisage's part; and (iii) Viisage had also filed a motion to dismiss Digimarc's complaint in

connection with the proposed settlement announced on July 21, 2004, revealing that Viisage was a

defendant in the Digimarc Action. ¶ 109(a).

First, Defendants' duty to disclose all of the aforementioned information arises because

Viisage sold $37 million in stock in the Secondary Offering while in possession of this nonpublic

material information. "[A] corporation trading in its own securities [is] an 'insider' for purposes of

the 'disclose or abstain' rule." *Shaw*, 82 F.3d at 1203 (citation omitted). Second, contrary to

Defendants' argument, Item 103 of Regulation S-K governing disclosures of "legal proceedings"

expressly requires that a registrant identify itself as a "party" when named in a lawsuit and also

describe "the factual basis" upon which the complaint is based.[18]  Def. Mem. at 29, 38-39.  A

simple reading of Item 103 demonstrates that Defendants flatly violated its disclosure requirements

when they failed to identify Viisage itself as a defendant or make any "description of the factual

basis" of Digimarc's allegations against Viisage. *See, e.g., In re Tyco Int'l, Ltd. Multidistrict

Litigation*, No. 02-1335-B, 2004 U.S. Dist. LEXIS 20733, at *14 (D.N.H. Oct. 14, 2004) (holding

that defendants had a duty to disclose "material information . . . and related party transactions that

must be accurately disclosed to investors pursuant to SEC regulations.")

---

[18]   Specifically, Item 103 states in relevant part:  "Describe briefly any material pending legal proceedings . . . to which the registrant or any of its subsidiaries is a party or of which any of their property is the subject [and to include] . . . *the date instituted, the principal parties thereto, a description of the factual basis alleged to underlie the proceeding* and the relief sought."  17 C.F.R. § 229.103 (emphasis added).

Also, because Viisage affirmatively stated that Digimarc only alleged that the GTA/DMVS failed "to follow its own bid process," Viisage had a duty to fully disclose the facts to make their selective disclosures not misleading, as Digimarc's complaint included Viisage as a defendant and alleged that Viisage had acted improperly in its bid. *See, e.g., Lucia v. Prospect St. High Income Portfolio, Inc.*, 36 F.3d 170, 175 (1st Cir. 1994) (reversing in part summary judgment and stating that "the fact that a statement is literally accurate does not preclude liability under federal securities laws [because] '[s]ome statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors.'") (citations omitted). "'If . . . a company chooses to reveal relevant, material information even though it had no duty to do so, it must disclose the whole truth.'" *Roeder*, 814 F.2d at 26 (citation omitted).[19]

Therefore, Viisage had a duty to disclose that it also had filed a motion to dismiss Digimarc's complaint -- not just the DMVS -- and the Georgia Court's September 2, 2004 Order. ¶ 126(e). For example, with respect to the latter issue, Defendant Bailey stated on the October 26, 2004 conference call that "somebody always asks for an update on Georgia" and disclosed the August 19, 2004 temporary restraining order (the "TRO") -- but made no mention of the later September 2, 2004 order which preliminarily enjoined the proposed settlement between DMVS and Viisage, imposed sanctions against Viisage for its repeated failure to comply with the Georgia Court's discovery orders, and denied the motions to dismiss filed by Viisage and the DMVS. ¶ 134. This was clearly a material event in the Digimarc Action and its omission made Defendant Bailey's statements about the Georgia litigation on the October 26, 2004 conference call materially

---

[19]   *See also In re Raytheon Sec. Litig.*, 157 F. Supp. 2d 131, 151 (D. Mass. 2001) (denying in part defendants' motion to dismiss, finding a duty to disclose contract problems and stating that "[h]aving opened the door to discussing the schedule and progress on the contract, Raytheon was obligated to disclose the material information regarding delays and overruns that would affect RSC's ability to complete the contract in a timely fashion."); *In re Par Pharmaceutical, Inc. Sec. Litig.*, 733 F. Supp. 668, 675 (S.D.N.Y. 1990) (denying motion to dismiss and stating that "once corporate officers undertake to make statements, they are obligated to speak truthfully and to make such additional disclosures as are necessary to avoid rendering the statements made misleading.").

misleading.[20]

Thus, Plaintiffs' claims concerning truthful and complete disclosure of the nature and status of the Digimarc Action are grounded on well-established legal principles requiring disclosure of then-existant facts as to pending material litigation.

       **b.**       **Defendants Had a Duty to Disclose the Material Risk to Their Entitlement to the $2.5 Million Settlement With the DMVS**

Defendants had a duty to disclose the substantial risks to Viisage's July 2004 settlement with the GTA/DMVS (the "Settlement") -- including the Company's entitlement to the $2.5 million payment -- caused by Viisage's own wrongdoing. ¶ 109(c). Defendants mischaracterize this claim as a "failure to predict the outcome of the Georgia litigation" and repeatedly argue that "[t]hroughout the litigation, both Viisage and the Georgia GTA/DMVS consistently denied Digimarc's allegations of wrongdoing by Viisage." Def. Mem. at 21, 24.

In the first instance, Defendants' attempt to re-argue Digimarc's fraud allegations against Viisage have no place in this action. The Georgia Court's December 2004 ruling on summary judgment, concluding that Viisage misled Georgia DMVS in its bid as alleged by Digimarc, is a final judgment. Thus, Viisage is collaterally estopped from arguing that it did not mislead the DMVS. *See, e.g., Beal v. Blache*, No. 02-CV-12447-RGS, 2005 U.S. Dist. LEXIS 2151, *6 (D. Mass. Feb. 14, 2005) ("The offensive use of collateral estoppel by a plaintiff seeking to prevent a defendant from relitigating an issue that the defendant has unsuccessfully litigated previously against another party is an accepted practice"). Second, Defendants' denials of wrongdoing are irrelevant to Plaintiffs' claims that Defendants misrepresented the *allegations at issue* in and status of the Digimarc Action, the status of the Action and falsely denied that Viisage was even a defendant in the Digimarc Action.

---

[20]    Viisage's November 10, 2004 Form 10-Q also failed to disclose any of the Georgia Court's rulings other than the entry of the preliminary injunction. Thus, Viisage still falsely represented that the motion to dismiss filed solely by the DMVS was still pending, when it, as well as its own motion to dismiss, had been denied on September 2, 2004. ¶ 126(f). While Defendants cite *Roeder*, 814 F.2d at 34 in their brief to defend against Plaintiffs' allegations, Def. Mem. at 25, that page does not exist in the opinion and, in any event, *Roeder* does not support Defendants' argument.

For similar reasons, the argument is misplaced with regard to Plaintiffs' claims concerning the $2.5 million settlement payment. None of Defendants' positive disclosures concerning the $2.5 million settlement payment disclosed any facts from which investors could assess the risk of the potential for the invalidation of the Settlement, such as the claims of serious wrongdoing on the part of Viisage, that Viisage was a defendant and that Viisage had been sanctioned by the Georgia Court for violating its discovery orders. ¶¶ 62, 64-66, 68-69, 109(c). Further, even though the Georgia Court preliminarily enjoined the payment on September 2, 2004, no disclosure was made by Viisage of this ruling until November 10, 2004. ¶ 81. Even then, no disclosure was provided concerning the wrongdoing with which Viisage was charged. *Id.*

### c.    The Cases on Which Defendants Rely are Inapposite and Support the Merits of Plaintiffs' Claims

Defendants rely primarily on this Court's opinion in *In re Seachange Int'l, Inc. Sec. Litig.*, No. 02-12116-DPW, 2004 U.S. Dist. LEXIS 1687, at *23 (D. Mass. Feb. 6, 2004) ("*Seachange*"), in support of their contention that they had no duty to disclose Viisage's wrongdoing or the risks to the Settlement posed by that wrongdoing. Def. Mem. at 22-24.

First, S*eachange* is inapposite because, unlike the case at bar, the defendant in *Seachange* disclosed it was a defendant and described the claim against it. *Seachange*, 2004 U.S. Dist. LEXIS 1687, at *23. Second, *Seachange* does not stand for the proposition that a defendant does not have a duty to disclose alleged improper conduct that later becomes public, as Defendants argue. Specifically, in *Seachange*, plaintiffs alleged, *inter alia*, that the defendant's disclosures in an amended registration statement regarding a patent infringement action brought against it by a competitor were misleading because the defendant did not "disclose the fact that it was likely to lose the litigation because Seachange knew at the time of the Offering that it was infringing on the [competitor's] patent." *Id.* at *31. The Court rejected plaintiffs' claim because "plaintiffs fail[ed] to point to any present-oriented aspect of the statements they allege were materially misleading"

21

and "[t]he only factual allegation plaintiffs offer to support their contention . . . is the jury verdict, subsequent to the Offering . . . ." *Id.* at *19, 23. Here, Plaintiffs recount in painstaking detail the undisclosed "present-orientated aspects" of Viisage's fraud in the Georgia DMVS bid process, as alleged in the Digimarc Action, well before the Georgia Court granted Digimarc's motion for summary judgment. *See, e.g.,* ¶¶ 5, 8, 41-51, 61, 72, 74, 76.[21]

Contrary to Defendants' argument, it is clear in this Circuit that defendants have a duty to disclose their misconduct as long as Plaintiffs comply with at least one of the three *Shaw* factors. In *Roeder*, the plaintiff sued Alpha Industries, Inc. and certain of its officers and directors under the Securities Act based on Defendants' failure to disclose that certain company's executives had engaged in a bribery scheme to win business. At the outset, the Circuit Court rejected the district court's finding that this information was not material, stating that "[i]nvestors may prefer to steer away from an enterprise that circumvents fair competitive bidding and opens itself to accusations of misconduct" -- just as alleged in this case. *Roeder*, 814 F.2d at 25; ¶¶ 3, 5. The Court further stated that:

> [i]nvestors may want to know about illegal activity for the same reason management will be reluctant to reveal it: it threatens to damage the corporation severely. Excepting from the disclosure rules information management has reason to hide would eviscerate the protection for investors embodied in the securities laws.

---

[21] None of the other cases cited by Defendants are analogous to the case at bar. For example, in *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509 (7th Cir. 1989), the Seventh Circuit found no violation of Item 103 because the defendant *did disclose* the proceeding before Nuclear Regulatory Commission ("NRC") -- just not that it was before an arm of the NRC, the Atomic Safety and Licensing Board. *Id.* at 517. In addition, the defendant also "told investors that it did not have licenses and that environmental groups were opposing its applications," so investors knew it was a party to the proceeding. *Id.* Judge Easterbrook stated further that plaintiff's claim was "rather like revealing pending litigation without saying that the case is pending before a magistrate." *Id.* Defendants' other citations are equally inapplicable to the facts of this case. *SEC v. Texas Int'l Co.*, 498 F. Supp. 1231 (N.D. Ill. 1980), has nothing to do with disclosing alleged improper conduct. Rather, the issue was whether the defendant should have computed alternative values of stock based on the possibility that "the appellate court disagreed with the reorganization court's valuation." *Id.* at 1249. Notably, in their brief, Defendants omitted the sentence immediately preceding the one recited in their parenthetical. That sentence reads "We think that [the defendant] was accurate in limiting its comments to a description of the issues on appeal and a statement that the appeal may affect the plan." *Id.* at 1250; *see also Amalgamated Clothing and Textile Workers Union v. J.P. Stevens & Co., Inc.*, 475 F. Supp. 328, 330 (S.D.N.Y. 1979) ("Plaintiffs do not dispute that Stevens has disclosed the various labor litigation in which it has been involved and the specific findings of labor law violations.").

*Roeder,* 814 F.2d at 25.

> Defendants argue that they had no duty disclose the illegality before
> they were indicted because, "there were no 'facts' that could have
> been released before the impending indictment became probable; only
> 'contingencies'" -- the same "prediction" argument that Defendants
> make here. *Id.* at 25 n.1. The First Circuit rejected that argument in
> *Roeder,* stating that "[t]he legal consequences of the bribery may have
> been only contingencies, but the act itself would be a fact [and the
> plaintiff] has provided . . . factual information without speculation."
> *Id.*[22]

Here, as discussed above and unlike the plaintiff in *Roeder,* Plaintiffs have met all three of

the requirements giving rise to a duty to disclose all of the aforementioned material information

regarding the Digimarc Action. Further, in accordance with *Roeder,* Plaintiffs have provided

"facts" revealing Viisage's misconduct in bidding on the Georgia contract. *See, e.g.,* ¶¶ 5, 8, 41-51,

61, 72, 74, 76. Thus, Defendants' argument that they had no duty to disclose their misconduct --

and the risk to their entitlement to the $2.5 million settlement in light of the *alleged* misconduct --

should therefore be rejected. *See, e.g., Shaw,* 82 F.3d at 120 (stating that "[p]resent, known

information that strongly implies an important future outcome is not immune from mandatory

disclosure merely because it does not foreordain any particular outcome."); *In re Transkaryotic*

*Therapies, Inc. Sec. Litig.,* 319 F. Supp. 2d 152, 159 (D. Mass. 2004) (rejecting defendant's

argument that its disclosures about a preliminary letter from the FDA which questioned the efficacy

of its drug were adequate even though the company disclosed "that [the] FDA denied marketing

approval for [the drug] and requested additional data," because the defendant concealed the FDA's

opinion that "[defendant's] studies did not show efficacy and were methodologically flawed and

that in order to generate acceptable data, TKT would have to start over from scratch").

Defendants' selective disclosure here gave rise to a duty to disclose the full truth about

---

[22]    Although the First Circuit ultimately held that there was no duty to disclose this information, it was because plaintiffs had
not alleged "insider trading, [a] statute or regulation requiring disclosure, [or any] inaccurate, incomplete, or misleading prior
disclosures." *Roeder,* 814 F.2d at 27.

Digimarc's allegations against Viisage and, hence, Defendants' duty to disclose the material risk that misconduct posed to the Settlement. *See also Kafenbaum v. GTECH Holdings Corp.*, 217 F. Supp. 2d 238, 243 (D.R.I. 2002) (denying motion to dismiss and stating defendants "omitted the substantial risks to the Company from the Camelot computer malfunction and defendants' subsequent cover-up").

### 3.   Defendants "Truth On The Market" Defense is Without Merit

In a last-ditch attempt to prevent this case from proceeding, Defendants assert the "truth on the market" defense and argue that "there was simply no way [shareholders] . . . could have been misled" by their false and misleading statements regarding the Digimarc Action. Def. Mem. 26.  In making this argument, Defendants simply ignore their repeated false statements that Viisage was not a defendant and that the litigation did not concern any wrongdoing by Viisage.  This gave neither investors nor security analysts any reason to ferret out the record in the Digimarc Action or Digimarc press releases.  Defendants' argument is without merit in law or in fact, and Defendants do not point to a single statement that the market was aware of Defendants' falsehoods described above.

As an initial matter, "the truth on the market defense . . . necessarily involves a fact-intensive inquiry which is ill-suited to a motion to dismiss." *Schaffer v. The Timberland Co.*, 924 F. Supp. 1298, 1308-09 (D.N.H. 1996) ("*Timberland*") (denying defendants' motion to dismiss, citing *Rand v. Cullinet Software, Inc.*, 847 F. Supp. 200 (D. Mass. 1994) (Wolf, D.J.) ("*Rand*")); *Swack v. Credit Suisse First Boston*, 383 F. Supp. 2d 223, 238 (D. Mass. 2004) (same); *see also Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000) (same).  Furthermore, all of the cases cited by Defendants for the "truth on the market defense" were decided after discovery and on motions for summary judgment -- not at the pleading stage as Defendants attempt to here.  Def. Mem. 26-27 (citing *Rand*, 847 F. Supp. at 204); *see In re Biogen Sec. Litig.*, 179 F.R.D. 25, 34 (D. Mass. 1997) ("*Biogen*"); *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1111 (9th Cir. 1989) ("*Apple*").

24

In addition, "in order to have a sufficiently curative effect, the dissemination of the subsequent information must be proportional to the original misstatement or incomplete statement." *Rand*, 847 F. Supp. at 206 (citing *Apple*, 886 F.2d at 1116). In other words, "the corrective information must be conveyed to the public 'with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by' the alleged misstatements." *Ganino*, 228 F.3d. at 167 (quoting *Apple*, 886 F.2d at 1116).

Here, Defendants do not, and cannot, point to any facts demonstrating that the Georgia Court's docket or certain orders posted on Digimarc's website entered the public domain in a fashion "proportional to" defendants' false and misleading statements discussed above. Indeed, the reasonable inferences drawn from the allegations and evidence presented directly contradicts that notion. For example, analysts never questioned Defendants, even when Defendant Bailey lied on the July 22, 2004 conference call by falsely stating that Viisage was not even a party to Digimarc's complaint and that Digimarc had not alleged any "impropriety" by Viisage. Indeed, the most reasonable inference is that Defendants' false and misleading statements *worked* -- the market was completely unaware of the fact that Digimarc had named Viisage as a defendant and had made serious allegations against Viisage regarding its improper conduct in its bid on Georgia contract, rather than merely alleging that the GTA/DMVS failed to "follow its own bid process."[23] Defendants' assertion of the truth on the market defense is, therefore, without merit, is ill-timed and

---

[23] The primary case relied upon by Defendants, *Biogen*, demonstrates that there must be evidence *that the market actually knew of the alleged falsehood* for the "truth on the market" defense to cure the alleged false and misleading statement. Def. Mem. 26-27. As the Court stated in *Biogen*, "[i]t is undisputed that [the curative] information entered the public domain, was discussed by securities analysts in their reports, and was reflected in the drop in the price of Biogen common stock." *Biogen*, 179 F.R.D. at 37. Here, Defendants point to no facts or events evidencing a similar "curative disclosure." *See, e.g., In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1037 (S.D. Cal. 2005) (denying defendants' motion to dismiss and rejecting assertion of "truth on the market" defense stating, *inter alia*, that plaintiffs' allegations "suggest that Defendants attempted to suppress public knowledge of the [the fact defendants alleged was curative]." Defendants also cite *Pacheco v. Cambridge Tech. Partners, Inc.*, 85 F. Supp. 2d 69, 78-79 (D. Mass. 2000) arguing that the undisclosed information was immaterial. Def. Mem. 28. That case is inapposite to the case at bar. In *Pacheco*, unlike here, the Court found that numerous market analysts, however, had already reached the same conclusion that plaintiffs alleged was fraudulently concealed. *Id.* at 78.

should be rejected.

**B.    Defendants Made Actionable Misrepresentations
and Omissions Regarding Viisage's Internal Controls**

Plaintiffs allege that Defendants Bailey and Aulet issued false certifications ("Section 302 Certifications") in each of the Company's 2004 Forms 10-Q (certain of which were incorporated into the Secondary Offering disclosures) which misled investors as to the effectiveness of Viisage's internal controls. *See, e.g.*, ¶¶ 53, 69, 82, 107, 109(d), 126(g).  Items 307 and 308 of SEC Regulation S-K, 17 C.F.R. § 229.307 and 308, require that a registrant's Chief Executive Officer and Chief Financial Officer "disclose conclusions regarding the effectiveness of the registrant's disclosure and controls and procedures" and certify that they:  (1) are responsible for establishing and maintaining disclosure controls and internal controls over financial reporting; (2) have designated such controls; and (3) have evaluated the effectiveness of the company's controls. *Id.* The officers must also present their conclusions regarding the effectiveness of the company's controls. *Id.*; 17 C.F.R. § 229.601.

In each of these filings, Defendants Bailey and Aulet falsely stated that Viisage's internal controls and procedures were effective. *See, e.g.*, ¶¶ 53, 69, 82, 107, 109(d), 126(g).  Defendants also falsely certified that:  (1) based upon their knowledge, each fiscal year 2004 quarterly report did not contain any untrue statement of material fact or omit a necessary material fact; and (2) Viisage's internal controls were sufficient during 2004 and complied with Sarbanes-Oxley requirements.  ¶ 109(d).[24]  By signing a Section 302 Certification, Defendants may be held liable for any false or misleading statements within the Company's quarterly reports, including their statements regarding the adequacy of Viisage's internal controls. *See In re PMA Capital Corp. Sec.*

---

[24] Defendants' Section 302 Certification states that each Form 10-Q disclosed "any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter . . . [and] that has materially affected, or is reasonably likely to materially affect, the registrant's internal control[s] over financial reporting." *See, e.g.*, ¶¶ 54, 70, 83, 109(d), 126(g).

*Litig.*, No. 03-6121, 2005 U.S. Dist. LEXIS 15696, at *32-*33 (E.D. Pa. July 27, 2005) ("The internal control statements are actionable. . . . The Sarbanes-Oxley certifications are relevant because the [d]efendants claimed therein that all internal control deficiencies had been disclosed."); *see also* 17 C.F.R. §§ 240.13a-15(e) and 15d-15(e).[25]

Defendants first argue that the Section 302 Certification and the statements therein were not false and misleading because the internal controls were not deficient during the respective periods covered by the Forms 10-Q. The facts demonstrate otherwise. Referring to the deficiencies in the Company's internal controls announced on March 2, 2005, Aulet specifically stated on Viisage's March 3, 2005 conference call:

> The good news is that we recognized this as an area for improvement ***months ago, and we've been working diligently to remedy these issues for some time.** Early in 2004*, we brought on Peter Faubert, an experienced CPA and finance manager, who's been a Controller in a public company previously, as our new controller. He has done an outstanding job, but we now need to fill in the organization around him as the Company and the associated complexity of our business has grown.

Bose Aff., Ex. 43, at 7; ¶ 99 (emphasis added).

While Defendants maintain that Aulet only admitted that internal controls were "an area for improvement," his full statement that Viisage had been "remedy[ing] these issues for some time" indicates that there existed extensive internal control deficiencies that had to be "remed[ied.]" Indeed, Defendant Aulet stated on Viisage's October 26, 2004 conference call that the costs associated with the Company's "Sarbanes-Oxley compliance project" had been escalating throughout 2004, increasing "*to over $350,000 in the just completed* [third] *quarter*." Bose Aff., Ex. 35, at 7 (emphasis added). On February 7, 2005, Viisage stated that, "in the fourth quarter alone, compliance-related costs totaled

---

[25] Defendants wrongly claim the Plaintiffs are "attempting to state a private cause of action" for violations of section 404 of the Sarbanes-Oxley Act ("Section 404"). Def. Mem. at 34. Plaintiffs' private cause of action is for violations of Section 11 of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and not for violations of Section 404. Furthermore, the sole case which Defendants cite in support of their position (*Neer v. Pellino*, 389 F. Supp. 2d 648, 652-657 (E.D. Pa. 2005)) is inapplicable to the case at bar because it addresses Section 304 and not Section 404.

$550,000." ¶ 126(g). In addition, although Viisage represented in its March 2, 2005 press release that it expected "to reach profitability during 2005," in its July 5, 2005, press release, it stated that "ongoing higher compliance expenses" were a principal reason why the Company no longer anticipated "reaching GAAP profitability in 2005 and may not increase its cash generation compared to 2004 as previously expected." *Id.* It is a fair inference that these significant expenses were necessary to remedy material deficiencies; not just to improve a functioning internal control system.[26]

Aulet's self-serving statement that material internal control deficiencies did not come to light while they were spending hundreds of thousands of dollars on "Sarbanes-Oxley compliance" is also belied by the fact that in its July 7, 2005 Form 10-K, Viisage admitted that "during the fourth quarter of 2004 and the first quarter of 2005," the Company had made "significant changes" to its internal controls over financial reporting designed to remediate the material weaknesses identified on March 2, 2005, ¶ 10 (emphasis added), and that, over a year later, Viisage has still not rectified its material internal control weaknesses. *See* Form 10-K, filed on March 16, 2006, at 59-61, attached as Exhibit A to the Affidavit of Jeffrey A. Klafter, filed herewith ("Klafter Dec."). Any suggestion that Defendants did not recognize any deficiencies in internal controls prior to the time of its year-end audit is implausible.[27]

---

[26] If the internal controls were sufficient until at least November 2004, no "improvement" would have been required to maintain their sufficiency. Defendants would like this Court to believe that they dismantled a sufficient internal control system in the name of "improvement[s]," leaving the Company with a deficient system in the meantime, and placing the Company in violation of securities laws and exchange rules. This is obviously preposterous, and this Court must accept their admission which evidences that each of the Company's Forms 10-Q from fiscal year 2004 contain false and misleading statements regarding internal control effectiveness.

[27] In addition, in an effort to minimize the deficiencies in the Company's internal controls, Defendants compare Viisage's failures with those of other companies. Specifically, Defendants claim that complying with the Sarbanes-Oxley Act's internal control requirements is a "huge undertaking . . . [and] like over 500 . . . other public companies, [Viisage] was unable to report timely compliance." Def. Mem. at 33. Defendants' argument fails for two reasons: First, Defendants misstate the March 2, 2005 *Wall Street Journal* article when they state that Viisage was "like other public companies" because they were "unable to report timely compliance." According to *The Wall Street Journal* article, these other public companies "reported deficiencies in their internal processes," but neither the conference call transcript nor the article provide evidence that these companies misled investors prior to their internal controls disclosures. Second, even if many other companies failed to report timely compliance (which was not the case), widespread compliance failures would not excuse any individual failure. Companies who fail to comply with SEC rules and regulations regarding internal controls are subject to liability. *See, e.g., Basic Inc. v Levinson*, 485 U.S. 224 (1988).

Defendants' next suggest, without any support, that because Viisage did not restate any of its financial statements, there can be no liability. The filing, in and of itself, of a false Sarbanes Certification, however, is actionable. *See PMA Capital,* 2005 U.S. Dist. LEXIS 15696, at *31 (upholding Section 10(b) claim for failure to disclose inadequate financial controls and finding that the Sarbanes-Oxley certifications were relevant because the defendants claimed therein that all internal control deficiencies had been disclosed.); *In re Royal Dutch/Shell Transp. Sec. Litig.,* 380 F. Supp. 2d 509, 519 (D.N.J. 2005) (allegations of materially false Sarbanes Certifications sufficient to support Section 10(b) claim). Further, there is no reason why liability cannot attach to affirmative misstatements, such as Defendants' statements as to the efficacy of Viisage's internal controls, that, when revealed, have a material impact on the price of the company's stock. Here, the materiality of Defendants' affirmative misrepresentations is demonstrated by: (1) the immediate and extreme stock price drop following Viisage's March 2, 2005 disclosure; (2) the risk to delisting of Viisage's securities; and (3) Viisage's inability to timely file its 2004 Form 10-K. ¶¶ 12, 102-103.[28]

### C.    Defendants Made Actionable Misrepresentations and Omissions Regarding Viisage's Projected EBITDA

On July 21, 2004 Viisage announced both its $2.5 million settlement with the DMVS and maintained its EBITDA guidance for 2004. ¶¶ 62-63. In doing so, Viisage stated that it calculated EBITDA as follows: "The Company calculates EBITDA by adding back to net earnings interest, taxes, depreciation and amortization." *See* July 21, 2004 Earnings Press Release, Klafter Dec., Ex. B. Aulet further stated on the following day's conference call that "The settlement reimburses us

---

[28] *See, e.g., Scritchfield v. Paolo,* 274 F. Supp. 2d 163, 188 (D.R.I. 2003) (holding that issues of materiality, as they relate to stock price drops, are factual disputes and not matters to be settled by a motion to dismiss, because these issues will likely require expert testimony about general market trends and the timing of the market's reaction to misrepresentations and/or omissions); *KA Invs., LDC v. Number Nine Visual Tech. Corp.,* 2002 U.S. Dist. LEXIS 18690, *34 (D. Mass. Aug. 26, 2002) (defendants did not dispute that misrepresentations which concerned a failure to comply with NASDAQ listing requirements and could have potentially resulted in the company's delistment from the NASDAQ Exchange were of material interest).

for costs we incurred in developing the state of the art system for Georgia. . . ," Klafter Dec., Ex. C, at 4, costs which were capitalized. An inability to recover these capitalized costs would reduce earnings *and* EBITDA, as defined by Viisage, since the resulting write-off would neither be interest, taxes, depreciation nor amortization. For the reasons discussed in Section II(A)(2)(b), above, Defendants knew that there was a significant risk that Viisage would be able to realize the benefit of the $2.5 million due to the Company's improper conduct.

Instead of taking into account this significant risk, Viisage maintained its EBITDA guidance on July 21 and increased its guidance on October 26 even though by that time the Georgia Court had preliminarily enjoined the payment. Viisage made no announcement at that time or until February 7, 2005 that the $2.5 million receivable was impaired -- nearly five months after the Georgia Court's injunction and about a month and a half after the Georgia Court's summary judgment decision. ¶ 86. As Defendants were aware of this material risk, the allegations in the Complaint also support scienter as to the EBITDA guidance provided on July 21-22 and October 25-26, 2004.[29]

Defendants argue that the $2 million non-cash impairment relating to the DMVS settlement did not impact the Company's EBITDA. However, the plain language of the Company's February 7, 2005 Press Release belies this notion. That release explicitly states, in pertinent part:

> ***Earnings before interest, taxes, depreciation and amortization (EBITDA) and net income are expected to fall below guidance.*** The expected shortfall is primarily due to several non-recurring factors, ***including a non-cash impairment charge of $2 million in connection with a settlement involving the Company's previous drivers' license contract with the Georgia Department of Motor Vehicle Safety***, which had been litigated.

---

[29]    Defendants cite to FASB Statement of Financial Accounting Standards No. 144 "Accounting for Impairment or Disposal of Long-Lived Assets" for the unremarkable proposition that the asset should have been deemed impaired when the Company could no longer expect cash flow equal to the carrying amount of the asset. Def. Mem. at 30 n.47. However, there was substantial risk of impairment as of July 21 given Viisage's improper conduct and the risk of impairment was even clearer by September 2, 2004 when the Georgia Court issued its injunction. ¶ 74.

Bose Aff., Ex. 41, at 1 (emphasis added); ¶ 94. Further, Defendants' denial that the $2 million write-off

impacted EBITDA is nothing more than an attempt to deflect this Court from their misrepresentations.

Based on Aulet's statements on the July 22 call, investors would clearly believe that the recovery of

these expenses would avoid a write-off which, given Viisage's public definition of EBITDA, would

avoid a negative impact to EBITDA.[30] Thus, given Defendants' other public statements, the EBITDA

projections on July 21-22 and October 25-26 were highly misleading and created a false expectation that

was deflated on February 7, 2005, after the Company announced that it was taking a charge to earnings

for $2 million of the $2.5 million in the fourth quarter. ¶ 97.

III.     **PLAINTIFFS' SECTION 10(B) CLAIM IS PREMISED ON A STRONG INFERENCE OF SCIENTER**

     A.     **Plaintiffs Adequately Allege that the Section 10(b) Defendants Acted with Scienter**

          1.     **Standards for Pleading Scienter**

     In their Motion, Defendants fail to address the well-pled allegations that Defendants acted

with scienter when issuing numerous public statements. Scienter may be established by allegations

which support a sufficient inference that "the Defendants acted with either knowing, intentional

falsity, or reckless disregard for the truthfulness of the statements" at issue. *In re Stone & Webster,*

*Inc. Sec. Litig.*, 414 F.3d 187, 199 (1st Cir. 2005). There is no "rigid formula for pleading scienter,"

and courts employ a 'fact-specific approach' that proceeds case by case. *In re Cabletron,* 311 F.3d

at 38. A class action plaintiff, while required to plead with particularity, is nonetheless, not required

to plead evidence. *Id.* at 33; *In re Credit Suisse First Boston Corp.,* 431 F.3d 36, 46 (1st Cir. 2005)

("[A] pleading setting forth a section 10(b) claim need not . . . elaborate upon every jot and title of

evidentiary detail.").

---

[30]   Defendants' assertion that the write-off did not impact EBITDA is inconsistent with Viisage's public definition of
EBITDA and the appropriateness of its failure to include the write-off in EBITDA is an issue that cannot be resolved on the
present motion.

In making the scienter determination, a court must evaluate "the totality of the circumstances." *Crowell v. Ionics, Inc.,* 343 F. Supp. 2d 1, 13 (D. Mass. 2004) (citing *Cabletron,* 311 F.3d at 40). The First Circuit has "considered many different types of evidence as relevant to show scienter," *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 196 (1st Cir. 1999) (citations omitted), and has permitted Plaintiffs to "combine various facts and circumstances indicating fraudulent intent." *Aldridge,* 284 F.3d at 82; *see also Cabletron,* 311 F.3d at 40 (noting that while "[e]ach individual fact about scienter may provide only a brushstroke," the "resulting portrait" can meet the "strong inference" requirement). Ultimately, such "[i]nferences must be reasonable and strong -- but not irrefutable. . . . Plaintiffs need not foreclose all other characterizations of fact, as the task of weighing contrary accounts is reserved for the fact finder." *Aldridge,* 284 F.3d at 82.

### 2. The Complaint Adequately Alleges Defendants' Scienter With Regard to the Digimarc Action

Plaintiffs detail numerous bases for inferring that Defendants acted with scienter with regard to their misrepresentations and omissions concerning the Digimarc Action. ¶¶ 132-34. These allegations establish that there can be no question that Bailey and Aulet, the most senior executives of the Company, knew that the Company was named as a defendant in the Digimarc Action; indeed Viisage had ultimately consented to being so named. ¶ 43. There can also be no question that these Defendants knew that Viisage's own wrongdoing was a central part of Digimarc's claims, as that wrongdoing was detailed in the amended complaints filed by Digimarc naming Viisage (¶ 72), of Viisage's own motions to dismiss the Digimarc Action (¶¶ 66, 76) and of the Georgia Court's adverse rulings against Viisage (¶¶ 71, 74), one of which imposed sanctions on the Company (¶ 74). Indeed, Bailey and Aulet professed up-to-date knowledge as to the Digimarc Action on several occasions. *See, e.g.,* ¶¶ 64; Def. Mem. at 16 ("Somebody always asks for an update on Georgia."). A strong inference of scienter is also provided by another of Defendant Bailey's consistent misrepresentations regarding the Digimarc Action when on July 22, 2004, he stated, "***Viisage was***

32

*never a party to this lawsuit, which has dragged on and on for a year and a half, nor were any*

*allegations of impropriety ever lodged against our company.*" ¶ 133 (emphasis added); *see also* ¶

134.  Notably, Defendants make no effort to dispute Defendants' knowledge as to these materially

misrepresented and omitted facts or the strong inference of scienter provided by Defendants' pattern

of conduct.[31]

### 3. The Complaint Adequately Alleges Viisage's, Bailey's and Aulet's Scienter With Respect to Viisage's Internal Control Deficiencies

Defendants' scienter argument with regard to Viisage's lack of adequate internal controls is

essentially the same as their argument as to the falsity of their statements, *see* Def. Mem. at 33-34,

and fails for the same reasons discussed in section 2 above.  Plaintiffs' allegations regarding

deficiencies in internal controls give rise to a strong inference of scienter in that they demonstrate:

(i) Defendants' knowledge or reckless disregard of internal control deficiencies that were necessary

to redress throughout 2004 at a cost of over $500,000 (¶¶ 138, 126(g)); (ii) deficiencies that were so

great that they caused Viisage not to reach profitability in 2005; and (iii) after more than two years

of efforts to correct them, Viisage's auditors are still unwilling to certify that the internal controls

are adequate.

The magnitude of the internal control deficiencies here provides an additional inference of

knowledge or recklessness.  *In re Cardinal Health, Inc. Sec. Litig.*, No. C2-04-575, 2006 U.S. Dist.

LEXIS 18687, at *72 (S.D. Ohio Apr. 12, 2006) (quoting *PR Diamonds, Inc. v. Chandler*, 364 F.3d

671, 685 (6th Cir. 2004) and holding that an inference of knowledge or recklessness may be drawn

from allegations of accounting violations that are so "simple, basic and pervasive in nature, and so

---

[31]  *See Cabletron*, 311 F.3d at 40-41(citing *Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357 (1st Cir. 1994), finding scienter against the insider defendants adequately pled based on, among other things, their access to non-public information which materially contradicted their public pronouncements; scienter against the corporate defendant was upheld based on the allegations of scienter against the corporate defendant's agents); *In re Transkaryotic*, 319 F. Supp. 2d at 162 (defendants' publication of statements when they knew facts suggesting the statements were inaccurate or incomplete is classic evidence of scienter); *In re PerkinElmer, Inc. Sec. Litig*, 286 F. Supp. 2d 46, 54-55 (D. Mass. 2003) (allegations of scienter as to CEO and CFO were held sufficient where, *inter alia,* complaint alleged that both individuals had access to details about company's deals, made misleading statements, or signed financial filings and reports in which misleading statements were contained).

great in magnitude, that they should have been obvious to a defendant"); *see also In re*

*MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 636 (E.D. Va. 2000) (the "magnitude,"

"pervasiveness," and "repetitiveness" of the company's violations of "simple" accounting principles

"serve to amplify the inference of scienter").  In addition, the Company admitted on March 2, 2005

that "it had insufficient personnel resources and technical accounting expertise within the

accounting function to resolve non-routine or complex accounting matters." ¶ 98.  Although

Defendants Aulet and Bailey acknowledged that the Company's internal control structure had been

under scrutiny the entire year and they were working to remedy the issues, ¶ 99, the fact that the

issues remained after a year is further evidence of scienter.  *See In re Veeco Instruments, Inc. Sec.*

*Litig.*, No. 05-MD-1695 (CM), 2006 U.S. Dist. LEXIS 13226, at *31 (S.D.N.Y. Mar. 21, 2006)

("[A] failure to maintain sufficient internal controls to avoid fraud is sufficiently indicative of

scienter").[32]

### 4.  Defendants' Motives Further Support the Requisite Inference of Scienter

Defendants had numerous motives to defraud Viisage investors.[33]  First, there is no doubt

that Viisage's financial outlook prior to the Secondary Offering was bleak.  ¶ 59.  The Company

---

[32]  Defendants argue, relying on several decisions, that a mere announcement of internal control deficiencies is insufficient to plead scienter. Def. Mem. at 33, 33 n.59. This case does not involve a mere announcement of internal control deficiencies and none of the cases on which Defendants' rely involved the massive failure of internal controls present here or admissions by the Defendants that the problem was well-known long prior to the disclosure. *See In re Focus Enhancements, Inc. Sec. Litig.*, 309 F. Supp. 2d. 134, 160 (D. Mass. 2001) (mere GAAP violation); *In re Hypercom Corp. Sec. Litig*, No. CV-05-0455-PHX-NVW, 2006 U.S. Dist. LEXIS 2669, at *13 (D. Ariz. Jan. 4, 2006) (supports Plaintiffs' position here in that the court noted that "the greater the magnitude of the restatement or GAAP violation, the more likely that such a restatement or violation was made consciously or recklessly."); *Higginbotham v. Baxter Int'l Inc.*, No. 04-C-4909, 2005 U.S. Dist. LEXIS 12006, at *16 (N.D. Ill. May 25, 2005) (no allegations as to the nature of the internal control deficiencies or showing defendants' awareness of them), *vacated by* 2005 U.S. Dist. LEXIS 21349 (N.D. Ill. Sept. 23, 2005); *In re Interpublic Sec. Litig.*, No. 02 Civ. 6527 (DLC), 2003 U.S. Dist. LEXIS 8844, at*41 (S.D.N.Y. May 30, 2003) (accounting errors occurred in subsidiaries of the company due to diverse failures).

[33]  Defendants Berube and Beck are named in the Section 10(b) Count solely with respect to the registration statements they signed, which included the registration statements for the Secondary Offering by which each sold over $700,000 of Viisage stock and had their indebtedness to Viisage fully repaid. *See* ¶¶ 123, 135. In addition to motive, Plaintiffs contend that Berube and Beck, given their roles as Chairman and Vice-Chairman of Viisage's board and significant participation in the activities of the Company, may fairly be charged with knowledge or reckless disregard of the false and misleading statements concerning the Digimarc Action and Viisage's internal controls included in the registration statements they signed.

was straining under a heavy debt load (mostly owed to Defendants Berube and Beck) and lacked

working capital. Indeed, the Prospectus makes clear that, without the proceeds of the offering,

Viisage stood at the precipice of financial disaster, and was in danger of violating its loan

covenants. *See* ¶¶ 59, 60, 68, 141, 143. A chart on page five of that Prospectus shows that, as of

March 28, 2004, Viisage had a scant $*2.4 million in working capital, and $31.4 million in total*

*debt.* If the offering were successful, working capital would climb to $19.4 million, total debt

would be effectively extinguished and Beck and Lau Technologies (controlled by Berube and his

wife) would collectively have $19.6 million in indebtedness by the Company repaid. ¶ 135; Bose

Ex. 32 at.5, 18. The importance of the success of the Secondary Offering therefore provided a

strong motive to each of the 10(b) Defendants to defraud Viisage investors. *See, e.g., Cabletron,*

311 F.3d at 39 (finding sufficient motive where "the executives' careers and the very survival of the

company were on the line"); *In re Ibis Tech. Sec. Litig.,* No. 04-10446 (RCL), 2006 U.S. Dist.

LEXIS 18674, at *6 (D. Mass. Apr. 12, 2006) (scienter adequately pled against company and CEO

where success of public offering was essential to maintain the viability of the company).[34]

Defendants' motive to commit fraud is also supported by their plan to grow Viisage by the

use of acquisitions substantially funded by the issuance of new Viisage shares. In 2004 alone,

Viisage completed two acquisitions for an aggregate purchase price of $84.9 million, principally

funded by newly issued Viisage shares as consideration. ¶¶ 3, 58, 142. Where a Company has a

plan to grow through acquisition, that creates a strong inference of scienter based on a concrete

---

[34]   A scheme to benefit a struggling corporation is assumed also to benefit its key insiders, and therefore creates an inference of scienter that personally applies to them. *See, e.g., Howard v. Everex Sys., Inc,* 228 F.3d 1057, 1064 (9th Cir. 2000) (CEO of company sufficiently claimed to have motive to inflate sales in order to raise financing for company, and avoid loan covenant defaults); *In re Time Warner, Inc. Sec. Litig.,* 9 F.3d 259, 269-270 (2d Cir. 1993) (officers and directors were alleged to have sought to artificially inflate the company's stock price in order to enable the company to lessen the dilutive effect of a planned offering of securities by Time Warner); *Kafenbaum,* 217 F. Supp. 2d at 247 (scienter inferred as to corporate officers based on their desire to commit fraud so as to ensure that corporation did not lose important contract, or have to refund money received from previous private sale of stock); *In re Resource America Sec. Litig.,* No. 98-5446, 2000 U.S. Dist. LEXIS 10640, at *22 (E.D. Pa. July 26, 2000) (finding strong inference of scienter where complaint alleged that all of the defendants, including the individual defendants who did not themselves engage in insider trading, were motivated to commit fraud in order to complete a $112 million public stock offering).

motive to inflate the share price. *See Crowell*, 343 F. Supp. 2d at 19; *Sekuk Global Enterprises v. KVH Indus., Inc.,* No. 04-306ML, 2005 U.S. Dist LEXIS 16628, at *47 (D.R.I. Aug. 11, 2005); *In re Vivendi Universal, S.A. Sec. Litig.,* No. 02 Civ. 5571 (RJH), 2004 U.S. Dist. LEXIS 7015, at *27-28 (S.D.N.Y. April 21, 2004); *In re Interpublic*, 2003 U.S. Dist. LEXIS 8844, at *33-34.[35]

Defendants also had a motive to conceal Viisage's wrongdoing in order to secure a new $25 million line of credit in October 2004, which replaced the lower limit, higher interest rate facilities. ¶ 79. Notably, Defendants did not disclose the TRO issued by the Georgia Court in August until after that line of credit had been secured. ¶ 80. The crucial need for this new credit facility creates a strong inference of the Defendants' scienter. *See In re American Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 445 (S.D.N.Y. 2000) (motive sufficiently alleged by showing benefits of enhancement of company's ability to raise cash under the $30 million credit facility agreement).[36]

Ignoring all of these motives providing a strong inference of scienter, Defendants challenge Plaintiffs' additional allegations that Lau, controlled by Defendant Berube and his wife, realized proceeds of $779,779.00 from the sale of 141,778 shares of Viisage common stock on the Secondary Offering and stood to be repaid the $15.3 million owed by Viisage to him, while Defendant Beck realized proceeds of $779,779 from the sale of 141,778 shares of Viisage common stock on the Secondary Offering and stood to be repaid $4.3 million owed to him. ¶ 141; *see also* Def. Mem. at 34-35 (discussing ¶ 141).

---

[35] *See also Rothman v. Gregor*, 220 F.3d 81, 93 (2d Cir. 2000) (upholding a finding of scienter against the individual defendants and the company based on, *inter alia,* one acquisition where company shares were used as partial consideration for the acquisition.). Defendants contend that the motive to inflate one's stock for acquisition purposes is insufficient as a matter of law, citing *Kalnit v. Eichler*, 264 F.3d 131, 140 (2d Cir. 2001). *See* Def. Mem. at 35 n.50. The *Kalnit* court, however, reached no such conclusion. Rather, it merely held that the plaintiffs' motive theory – that defendant concealed an agreement that could lead to a higher price for the company to benefit themselves at the expense of the shareholders – made no economic sense as any higher price would benefit shareholders as well as them. In contrast, Defendants motive to conceal the true nature of the Digimarc Action harmed Viisage shareholders amd benefited Defendants.

[36] Defendants also had a strong motive to conceal its own wrongdoing as the Company's principal business was derived from bidding on public contracts. ¶ 5.

Specifically, Defendants argue that Plaintiffs have failed to demonstrate that the stock sales are unusual in amount or timing, but Defendants construe the Complaint too narrowly, as the primary scienter allegations as to Berube and Beck are grounded in not only the economic benefits discussed, but also in Viisage's admissions that "both Lau and Mr. Beck have a strong influence on matters requiring approval by our stockholders, including . . . *most corporate actions*." ¶ 135 (emphasis added). Further, the sales were at a suspicious time given the precarious financial condition of the Company and the Company's significant indebtedness to them at the time of the Secondary Offering.[37]

## IV. PLAINTIFFS' SECTION 11 CLAIM NEED NOT BE ALLEGED IN ACCORDANCE WITH RULE 9(B)

Defendants argue that Rule 9(b)'s particularity requirements apply to Plaintiffs' Section 11 claims rather than Rule 8(a)'s more liberal pleading standards.[38]  However, Defendants do *not argue* that Plaintiffs' Section 11 claim relating to Defendants' false and misleading statements regarding the Digimarc Action in Viisage's Prospectus and Amended Registration Statement at ¶ 109(a)-(c) "sound in fraud." Def. Mem. 38-39.  Instead, Defendants merely argue that the Section 11 claim has "the exact same bases as for plaintiffs' Section 10(b) claim." *Id.* at 38.  Defendants then simply refer to the alleged misrepresentations and omissions concerning the Prospectus and repeat their flawed argument that they had no duty to accurately disclose information concerning the Digimarc Action. *Id.* at 39.

The only allegation that Defendants argue "sounds in fraud" are those asserting that

---

[37] Even if their stock sales on the Secondary Offering are not themselves determinative, because they maintained significant holdings in the Company, they clearly bolster the other allegations of scienter made as to Berube and Beck. *See, e.g., In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 278 (3d Cir. 2006) (scienter adequately plead based on insider stock sales, and other factors, even though sellers argued that there was no scienter because they retained substantial holdings in the company); *In re Cardinal Health*, 2006 U.S. Dist. LEXIS 18687, at *106 (rejecting argument that CEO could not be found to have acted with scienter because he did not sell all of his holdings, and even purchased shares during the class period").

[38] Under Rule 8(a), a complaint adequately states a claim when it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) (citing Fed. R. Civ. P. 8(a)(2)). Thus, under Rule 8(a)'s liberal pleading standard, a complaint is sufficient if it gives "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id.* (citation omitted).

Defendants falsely stated that Viisage had adequate internal controls, alleged at ¶ 109(d). Def. Mem. at 41. In doing so, Defendants rely solely on two paragraphs in the Complaint, ¶¶ 10, 99. Defendants' arguments are contradicted by established case law in this Circuit and this District and a plain reading of the allegations in the Complaint. *See In Re Number Nine Visual Tech. Corp. Sec. Litig.*, 51 F. Supp. 2d 1 (D. Mass. 1999) ("*Number Nine*").

First, it is well settled in this Circuit that a Section 11 claim can have the "same bases" as a claim pled under Section 10(b) and remain a distinct claim as long as there is no claim of scienter or reliance in the Section 11 allegations. Specifically, "in *Shaw*, the First Circuit addressed the issue as follows: "Although the complaint [at issue] does assert that defendants actually possessed the information that they failed to disclose, those allegations cannot be thought to constitute 'averments of fraud,' absent any claim of scienter and reliance. Otherwise, any allegation of nondisclosure of material information would be transformed into a claim of fraud for purposes of Rule 9(b).'" *Number Nine*, 51 F. Supp. 2d at 12 quoting *Shaw*, 82 F.3d at 1223. As the court in *Number Nine* stated, a complaint alleging claims under Section 11 and Section 10(b) can be "crafted with these considerations in mind." 51 F. Supp. 2d at 12.

Here, the Complaint specifically states that the Section 11 claim "is not based on and does not sound in fraud and expressly excludes any element of any paragraph that alleges that defendants' misconduct was done intentionally, knowingly or with reckless disregard for the truth and any element of a paragraph that otherwise sounds in fraud." ¶ 107. The court in *Number Nine* held that this "disclaimer of fraud-type allegations is effective to prevent the Securities Act claims from 'sounding in fraud.'"[39] 1 F. Supp. 2d at 12.[40] Furthermore, Plaintiffs' Section 10(b) count has a

---

[39] In so doing, the Court stated that its holding "will minimize litigation costs by ensuring that plaintiffs need file only one complaint and one civil action to pursue their securities claims." *Id.* Furthermore, the Court specifically rejected the holding in *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 n.2 (9th Cir. 1996), cited by Defendants in their Memorandum at page 42. *Number Nine*, 51 F. Supp. 2d at 12.

separate section entitled "False and Misleading Statements" at ¶¶ 126-30 followed by a section entitled

"Defendants Acted with Scienter" at ¶¶ 131-47.  This is more than adequate to prevent Plaintiffs'

Section 11 count from sounding in fraud.

Defendants do not point to a single paragraph in the Section 11 count of the Complaint

regarding Defendants' false and misleading statements about the Digimarc Action that references

any scienter or reliance.  With respect to the internal control allegations in the Section 11 count at ¶

109(d), Defendants point to ¶¶ 10, 99 as causing Plaintiffs' internal control claim to sound in fraud.

Def. Mem. 41.  However, those paragraphs only reflect what Defendants stated about their lack of

internal controls and makes no allegation at all about scienter or fraudulent intent.[41]

Lastly, Defendants concede that ¶ 113 further casts Plaintiffs' Section 11 and 15 claims in

negligence by averring, *inter alia*, that the Defendants "in the exercise of reasonable care should

have known of the material misstatements and omissions contained in the Amended Registration

Statement and Prospectus as set forth herein."  Def. Mem. at 41.  *See, e.g., In re Tyco Int'l, Ltd.

Multidistrict Litig.* No. 02-1335-P3, 2004 U.S. Dist. LEXIS 24272, at *32 (D. N.H. Dec 2, 2004).[42]

---

[40]    Thus, Plaintiffs here have gone beyond the standard articulated in *Number Nine* for properly separating a Section 11 count from a Section 10(b) count by separating Defendants' false and misleading statements falling under Section 11 at ¶¶ 52-105 from the Section 10(b) count.  The allegations at ¶¶ 52-105 contain no references to reliance or fraudulent intent and even exclude any reference to Defendant Bailey's lie to analysts on the July 22, 2004 that Viisage was not a party to the Digimarc Action and that Digimarc had not alleged any "impropriety" against Viisage.  ¶ 126(d).

[41]    *See, e.g., In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 502-03 (S.D.N.Y. 2004) (distinguishing *Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) cited by Defendants at Def. Mem. at 40 n.52 and holding that plaintiffs sufficiently pled Section 11 claim as a negligence claim because "plaintiffs have alleged facts independent of their scienter allegations," and thus, the court did not need to "sift through allegations of fraud in search of some 'lesser included' claim of strict liability'" as in *Rombach* ).

[42]    Defendants' reliance on other cases within this Circuit fail to support their argument because they are readily distinguishable from the case at bar.  Def. Mem. at 40-42 citing *In re Websecure, Inc. Sec. Litig.*, 182 F.R.D. 364 (D. Mass. 1998) ("*Websecure*"), *In re Computervision Corp. Sec. Litig.*, 869 F. Supp. 56 (D. Mass. 1994) ("*Computervision*"), and *In re TyCom,* 2005 U.S. Dist. LEXIS 19154, at *60.  In *Websecure,* issued the year before *Number Nine,* the Court held that only where plaintiffs specifically pled that the false statements "were knowingly false, deceptive, and incomplete" did their Section 11 claims sound in fraud.  *Websecure,* 182 F.R.D. at 367.  In *Computervision,* the plaintiffs made allegations in connection with their Section 11 claim that specifically evidenced knowledge and/or intent (*e.g.*, defendants "manipulated the market" and thus, "sounded in fraud."  *Id.* at 63-64.  In *Tycom,* the court noted that the "specific factual allegations on which [the Section 11 claim was] based aver that Defendants 'deliberately misrepresented TyCom's projections of market demand in the Prospectus in order to defraud investors.'" *Id.* at *7, *60.  Here, Defendants can point to no such averments of knowledge or intent by plaintiffs in their Section 11 count.

39

In sum, Plaintiffs have pled their Securities Act claims as distinct from their Section 10(b)

fraud claims as required in *Number Nine* and other decisions within this Circuit. As Plaintiffs'

Section 11 claims are adequately pled in accordance with Rule 8(a) of the Federal Rules of Civil

Procedure, they should not be dismissed.

## V.    THE COMPLAINT SUFFICIENTLY PLEADS CONTROL PERSON LIABILITY AS TO BAILEY, AULET, BERUBE, BECK AND YON

Having sufficiently alleged primary violations of Section 11 of the Securities Act and 10(b)

of the Exchange Act against Viisage, Defendants Bailey, Aulet, Berube, Beck and Yon may also be

held liable as control persons of Viisage under Section 15 of the Securities Act and Section 20 of

the Exchange Act. While Defendants do not challenge the control person claims against Bailey and

Aulet, they contend that Plaintiffs have not adequately alleged that Beck, Berube or Yon were

"control persons."

As the First Circuit observed in *Cabletron*:

> Control is a question of fact that "will not ordinarily be resolved
> summarily at the pleading stage." 2 T.L. Hazen, Treatise on the Law of
> Securities Regulation § 12.24(1) (4th ed. 2002). *The issue raises a*
> *number of complexities that should not be resolved on such an*
> *underdeveloped record.*

311 F.3d at 41 (emphasis added). Where the allegations set forth an adequate basis for Defendants'

active "participation in the decision making process of the corporation," as they do here, the control

person claims may not be dismissed. *See Aldridge*, 284 F.3d at 85.

Defendant Berube was, at all relevant times, Chairman of the Viisage Board and had held

that position since the Company's incorporation in 1996. Berube was the Executive Vice-President

of Lau Technologies, controlled by Berube and his wife, which owned approximately 6.3 million

Viisage shares, or 17.6 percent of the Company's outstanding shares, and was Viisage's largest

shareholder. In May 2003, Viisage entered into a loan agreement with Lau, pursuant to which Lau

provided debt financing to Viisage in a principal amount that could not exceed $7.0 million at any

time. These loans were due in part in December 2003, August 2005, May 2008 and June 2009. Bose Aff., Ex. 32, at 38. As of the Secondary Offering, Viisage owed Lau approximately $4.3 million. ¶ 26. In addition, on January 10, 2002, in connection with a transaction with Lau, Viisage became obligated to pay Lau a royalty of 3.1 percent of facial recognition revenues over the next twelve and a half years, up to a maximum of $27.5 million. Bose Aff., Ex. 32, at F-16.

Beck was the Vice-Chairman of the Viisage Board of directors. ¶ 28. On February 14, 2004, Viisage acquired all of the outstanding capital stock of Trans Digital Technologies Corporation ("TDT"). Upon the closing of this transaction, Beck, the former President and Chief Executive Officer of TDT, became the beneficial owner of 5.869 million Viisage shares, or 16.4 percent of the total outstanding shares. In connection with the acquisition, Viisage issued a promissory note payable to Beck in the principal amount of $15.3 million. The note bore interest at a rate of 8.5 percent per year and was payable in equal installments of principal and interest on December 1, 2004, May 1, 2005 and December 1, 2005. ¶ 28; Bose Aff., Ex. 32, at F-17.

Since June 2004, Yon has served as a Director of Viisage. Yon was CEO of ZN Vision Technologies, a company acquired by Viisage in 2003. Yon is the Chief Executive Officer of Odeon Venture Capital AG, which, prior to the Class Period (and until the Secondary Offering), owned 949,325 shares of Viisage common stock. Yon has sole voting and dispositive power over the shares beneficially owned by Odeon. Odeon realized proceeds of $743,363.50 from the sale of 135,157 shares of Viisage common stock that were included in Viisage's Secondary Offering of 7.5 million shares of common stock. Yon signed Viisage's Registration Statement on Form S-3 filed with the SEC on June 21, 2004, and the Amended Registration Statement on Form S-3/A filed with the SEC on July 22, 2004 for the Secondary Offering of 7.5 million shares of common stock. ¶¶ 27, 120(e); Bose Aff., Ex. 32, at 55.

Given the multiple financial stakes of Berube and Beck in the Company, Viisage took the

41

unusual step of disclosing in its Forms 10-Q and S-3 filings (which Berube and Beck signed) that

"as a result of their ownership, both Lau and Mr. Beck have a ***strong influence on*** matters requiring

approval by our stockholders, including the election of directors and ***most corporate actions***." ¶¶

120(d), 152 (emphasis added).  In support of this conclusion, Defendants themselves pointed to

Lau's $7.3 million loan to Viisage, the Company's $27.5 million royalty obligation to Lau, his

service as Chairman of Viisage's board and his control, with his wife, over Lau.  Bose Ex. 32, at 15-

16.

    Defendants acknowledge these allegations but argue that they do not provide any evidence

that the allegations prove the ability to actually exercise control over the company.  Def. Mem. at

37.  Their own words, however, speak otherwise.  If Beck and Lau have "a strong influence" on

"most corporate actions," due to their respective enormous financial stakes in Viisage, it is

reasonable to infer that Beck and Berube, as Lau's designee, actively participated in the decision

making processes of the Company to protect those financial interests.  Indeed, the fact that

$20,326,000 of the $37,324,800 in Secondary Offering proceeds to the Company were to be used to

repay Lau and Beck, and that virtually all of the other shares being sold on the Secondary offering

were owned by Lau, Beck and Yon (or companies they controlled) suggests that they each had a

significant role in the decision to go forward with the Secondary Offering.  In sum, these were the

Chairman, Vice-Chairman and a director of the Board all with significant financial ties to the

Company.  To suggest that they did not have the power to control or influence the operations of

Viisage, and did not exercise that power, is meritless.  *See In re Centennial Techs. Sec. Litig.*, 52 F.

Supp. 2d 178, 186 (D. Mass. 1999); *Rand v. M/A-Com, Inc.*, 824 F. Supp. 242, 262 (D. Mass.

1992); *Schnall v.  Annuity & Life Re (Holdings) Ltd.*, No. 3:02-CV-2133 (GLG), 2003 U.S. Dist.

LEXIS 24898, at *26-27 (D. Conn. Dec. 23, 2003) (allegations as to a non-executive chairman who

signed corporate disclosures coupled with share ownership, were sufficient to find defendant a

42

control person at pleading stage.); *In re Adelphia Communs. Corp. Sec. & Derivative Litig.*, 398 F.

Supp. 2d 244, 262 (S.D.N.Y. 2005) (rejecting argument that plaintiffs "have not properly alleged

that defendant is a control person because he is only a minority shareholder of ABIZ (17%) and

Chairman of its Board of Directors but not an officer").[43]  Defendants' authorities are inapposite.[44]

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety.

Dated: August 11, 2006

/s/      Jeffrey C. Block, Esq.
Jeffrey C. Block, Esq. (BBO # 6007470)
Leslie R. Stern, Esq. (BBO # 631201)
**BERMAN DEVALERIO PEASE
  TABACCO BURT & PUCILLO**
One Liberty Square, 8th Floor
Boston, Massachusetts 02109
(617) 542-8300

*Plaintiffs' Liaison Counsel*

Jeffrey A. Klafter, Esq.
**KLAFTER & OLSEN LLP**
1311 Mamaroneck Ave., Suite 220
White Plains, New York 10605
(914) 997-5656

Kurt B. Olsen, Esq.

---

[43]  Courts in this District also hold that where a defendant is primarily liable, secondary liability is *per se* established. *Chalverus v. Pegasystems, Inc.*, 59 F. Supp. 2d 226, 236-37 (D. Mass. 1999) ("[A] court should deny a motion to dismiss a [S]ection 20(a) claim when the defendants themselves made the allegedly false and misleading statements."); *In re PLC Systems, Inc. Sec. Litig.*, 42 F. Supp. 2d 106, 121-22 (D. Mass. 1999) (false statements attributable to a defendant is a sufficient basis for Section 20(a) liability.)

[44]  In *Aldridge,* 284 F.3d at 75 n.1, 85, the court was faced with a highly peculiar set of facts--the defendants alleged to be control persons (referred to in the opinion as the "trust defendants") were not natural persons at all but rather passive business trusts which held shares in corporate defendant A.T. Cross.  Accordingly, the control person claims against them were dismissed as the complaint, unlike here, was devoid of any allegation that these trusts were in any manner "actively participating in the decision-making processes of the corporation." *Id.* at 85.  Nor does *Tyco* support Defendant, as that court dismissed a control person claim against one outside director since plaintiffs could allege nothing more than that he was a major shareholder and once served as the CEO of a corporation that Tyco later acquired, but denied the motion to dismiss sought by another outside director who was designated the lead outside director and had some business dealings with the company. *Id.* at *52-*53.  Such business dealings were sufficient to create an inference of control at the pleading stage. *Id.*.  Here, the allegations of control are even stronger.  Defendants' reliance on *In re Lernout & Hauspie Sec. Litig.*, 286 B.R. 33, 39 (D. Mass. 2002) is also misplaced.  There, the alleged control person was not even a director at the relevant time. *Id.* at 42.

**KLAFTER & OLSEN LLP**
2121 K Street, N.W., Suite 800
Washington, D.C.  20037
(202) 261-3553

Stephen D. Oestreich, Esq.
Robert Cappucci, Esq.
William W. Wickersham, Esq.
**ENTWISTLE & CAPPUCCI LLP**
280 Park Avenue, 26th Floor West
New York, New York 10017
(212) 894-7200

*Lead Counsel for Lead Plaintiffs*
Roy L. Jacobs, Esq.
**ROY JACOBS & ASSOCIATES**
60 East 42nd Street, 46th Floor
New York, New York 10165
(212) 867-1156

Laurence D. Paskowitz, Esq.
**PASKOWITZ & ASSOCIATES**
60 East  42nd Street, 46th Floor
New York, New York 10165
(212) 685-0969

*Counsel for Additional Plaintiff Walter Cohut*

44