# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| In re VIISAGE TECHNOLOGY, INC. SECURITIES LITIGATION | ) ) ) ) ) ) ) | CIVIL ACTION NO. 05-cv-10438-MLW |
| This Pleading Applies to: All Actions | | |

## DEFENDANTS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS CLAIMS RELATING TO DISCLOSURE OF THE GEORGIA LITIGATION

Defendants[1] submit this supplemental memorandum in response to the Court's request that the parties submit additional briefs addressing plaintiffs' claims predicated on Viisage's disclosures concerning the so-called Georgia Litigation,[2] with particular attention to the disclosures regarding that litigation contained in Viisage's August 4, 2004 Prospectus for its secondary public offering of common stock.

### A.    The Disclosures Required for Legal Proceedings

Item 103 of the Securities and Exchange Commission's ("SEC") Regulation S-K governs the information that a registrant is required to disclose concerning pending legal proceedings in

---

[1] Viisage Technology, Inc. ("Viisage"); Bernard C. Bailey and William Aulet (respectively the former Chief Executive Officer and Chief Financial Officer, and collectively the "Officer Defendants"); and Denis K. Berube, Marcel Yon, Buddy G. Beck, Charles A. Levine, Thomas J. Reilly, Harriet Mouchly-Weiss, Paul T. Principato, and Peter Nessen (collectively, the "Director Defendants").

[2] The Georgia Litigation refers to the action filed by Digimarc ID Systems, LLC ("Digimarc") against the Georgia Technology Authority and the Georgia Department of Motor Vehicle Safety (collectively, "GTA/DMVS") on March 5, 2003 in the Fulton County, Georgia, Superior Court in which Digimarc asserted that GTA/DMVS failed to follow Georgia law governing contract procurement in awarding Viisage the contract for a new "central issuance Digitized License System." See Bose Exs. 1 and 6, p. 2-3, ¶¶ 6 and 7. "Bose Ex." Refers to the exhibits to the Affidavit of Aloknanda Bose filed in support of Defendants' Motion to Dismiss. "Klafter Ex." Refers to the exhibits to the Declaration of Jeffrey A. Klafter filed with plaintiffs' opposition. "Baraniak Ex." refers to exhibits to the Affidavit of John Baraniak filed with this Supplemental Memorandum.

its Forms 10-Q and 10-K, as well as any prospectus or registration statement relating to the sale of its shares:

> Describe briefly any material pending legal proceedings, other than ordinary routine litigation incidental to the business, to which the registrant or any of its subsidiaries is a party or of which any of their property is the subject.  Include the name of the court or agency in which the proceedings are pending, the date instituted, the principal parties thereto, a description of the factual basis alleged to underlie the proceeding and the relief sought.

17 C.F.R. § 229.103; *see also* 17 C.F.R. § 229.10(a)(1) applying Item 103 to registration statements.

In *In Re Seachange International Sec. Litig.*, No. 02-12116, 2004 U.S. Dist. LEXIS 1687, at *31 (D. Mass. February 6, 2004), Judge Woodlock addressed the requirements of Item 103 in the context of a securities fraud claim.  Seachange was charged by a competitor with willfully infringing the competitor's patent.  The company disclosed in a prospectus and registration statement for a secondary offering the existence of the litigation.  *Id.* at *22-*23.  After the offering was completed, a jury returned a verdict of willful infringement by Seachange and the court awarded the plaintiff competitor its attorneys' fees.  In a securities class action the plaintiff argued, and the court agreed, that at the time of the registration statement Seachange knew that it was infringing on the competitor's patent and that Seachange was likely to lose the litigation.  *Id.* at 24.  The court, however, found disclosures describing the litigation in broad terms to be sufficient and concluded that neither Seachange nor its officers or directors had any duty to disclose more.  Judge Woodlock explained that "[w]hile a company that chooses to reveal material information, even though it had no duty to do so, 'must disclose the whole truth," it need not disclose everything it knows; rather, the company is required only to make additional disclosures to keep the information from being materially misleading."  *Id.* at 25.  "Given that at

the time of the offering the jury had not yet returned a verdict, Seachange was not obligated to predict the outcome or estimate the impact of the . . . litigation." *Id.* at 27 (citations omitted).

Tracing his reasoning to the First Circuit's decision in *Roeder v. Alpha Industries, Inc.*, 814 F.2d 22 (1st Cir. 1987), Judge Woodlock commented on the approach to litigation disclosure that the SEC adopted in Item 103.

> Item 103 marks the extent of a registrant's obligation to disclose information pertaining to pending litigation. In directing the required disclosure in Item 103 to the general contours of ongoing litigation, the SEC has deliberately chosen not to impose the type of duty of disclosure that plaintiffs contend defendants' breached. See *Roeder v. Alpha Industries, Inc., 814 F.2d 22 (1st Cir. 1987)* ("The SEC [] was 'given complete discretion . . . to require in corporate reports only such information as it deems necessary or appropriate in the public interest or to protect investors.'" (quoting S. Rep. No. 792, 73d Cong., 2d Sess. 10 (1934)). The disclosure required by Item 103 is meant to put potential investors on notice of pending litigation, not to force companies to predict a particular outcome in the litigation. . . . This disclosure was certainly enough to alert investors of the nCube litigation and prompt them to make further inquiry directly about the litigation should they choose to do so.

*Id.* at 33-34.[3]

---

[3] Other courts have addressed this issue in similar fashion. *See, e.g., Wieglos v. Commonwealth Edison Co.*, 892 F.2d 509, 518 (7th Cir. 1989)(company not required to disclose probability that tribunal will deliver a particular decision); *In re GlaxoSmithkline Securities Litigation,* No. 05 Civ 3751, 2006 WL 2871968 (S.D.N.Y.) (To hold that an expression of confidence in a legal position may be converted by hindsight into an actionable misrepresentation, if that company later loses, would have a chilling effect on companies seeking to defend their interests in litigation.); *White v. H&R Block, Inc.,* No. 02-CV-8965, 2004 WL 1698628, at *10 (S.D.N.Y. July 28, 2004) (company not required to present overly gloomy picture of litigation); *Kaplan v. Kahn*, No. C-93-020015 RPA, 1994 WL 618473, at *8 (N.D. Cal. Oct. 25, 1994)(company "need not admit fault or accuse itself of copyright violation in it is own disclosures when describing the nature of adverse litigation."); *Securities and Exchange Comm'n v. Texas Int'l Co.*, 498 F. Supp. 1231, 1249-50 (N.D. Ill. 1980)(company not required to speculate on potential outcomes); and *Amalgamated Clothing and Textile Workers Union v. J.P. Stevens & Co., Inc.,* 475 F. Supp. 328, 331-32 (S.D.N.Y. 1979), *vacated on other grounds*, 638 F.2d 7 (2d Cir) (proxy rules do not require management to accuse itself of antisocial or illegal policies).

B.    **The Georgia Litigation Disclosures**

1.    **Viisage Is Added As An "Interested" or "Necessary" Party**

The original complaint filed by Digimarc on March 5, 2003, did not name Viisage as a party to the Georgia Litigation.  Viisage was also not a party on July 31, 2003, when the Superior Court issued its Order on Digimarc's motion for a preliminary injunction.  In that Order the Court stated that "if . . . allegations regarding the opening of the Price Proposals and other irregularities are proved, the integrity of the entire procurement process could be damaged" and directed that GTA/DMVS "be enjoined from all further activities related to the implementation of or performance under" the DMVS/Viisage license contract.  Bose Ex. 8.

Thereafter, on October 1, 2003, GTA/DMVS filed a motion seeking to add Viisage as a party.  Ex. 9, Ex. 1.  In its brief in support of this motion GTA/DMVS explained its position as follows:

> The question is not whether the Plaintiff seeks relief against Viisage but rather, whether Viisage has an interest relating to the subject and is so situated that the disposition of the action in its absence may as a practical matter impair or impede its ability to protect that interest . . .   Here, Viisage has a direct interest in whether the Contract is declared null and void and its interests cannot be adequately protected in its absence.
>
> In order to give finality to the litigation, and in the interest of justice, Viisage's rights should not be jeopardized without giving it an opportunity to be heard.  If this Court grants an injunction without Viisage's being a part (sic) to the action, Viisage may later attack the judgment by filing a motion to vacate it or by filing an independent action. . . .   Neither consequence furthers judicial economy.  [internal citations omitted]

Bose Ex. 9, p. 4.

In response to this motion, a Consent Order issued on November 7, 2003, which directed that:

> Viisage be added as a party to this action.  Plaintiff Digimarc
> will . . . make a request that Viisage join this action as a
> plaintiff . . .  If Viisage refuses to join as a plaintiff . . ., Digimarc
> will take the necessary action to join Viisage as an *interested party
> defendant*. . . . [emphasis added, dates and citations to Georgia law
> omitted]

Bose Ex. 10.

In response to this Consent Order, Viisage filed a pleading in which it noted that to date
no party had asserted a claim against it, and that, at present, it had no claim that it wished to
assert against any party.  Viisage concluded by stating that its "interests are more closely aligned
with defendants than with plaintiff.  As such, Viisage respectfully requests it be added as a
defendant in this lawsuit, pursuant to O.G.C.A. § 9-11-19(a)."[4]  Bose Ex. 11.

### 2.    The First Amended Complaint in the Georgia Litigation

On November 12, 2003, Digimarc filed a First Amended Complaint adding Viisage as
what it termed a "Necessary Party-Defendant."  Bose Ex. 12.  Other than adding Viisage, the
First Amended Complaint is, in substance, identical to the original Complaint.  It contains no
allegation that Viisage deceived, defrauded or misrepresented anything to GTA/DMVS or to
anyone else.  It is replete with allegations that Viisage's proposed solution did not meet the
requirements of the Georgia RFP, while Digimarc's passed with flying colors, as was the case in
the original Complaint.  Indeed, rather than alleging that Viisage sought to deceive the
GTA/DMVS, Digimarc repeatedly alleges that GTA/DMVS was aware that Viisage's
submission did not meet RFP requirements, but ignored those shortcomings and favored Viisage,
after it opened the envelope containing the price proposals.[5]

---

[4]  This Georgia Rule is essentially the same as Fed. R. Civ. P. 19(a).

[5]  For example, Digimarc in the Georgia Litigation, and now plaintiffs in this action, make much of the fact that
Viisage did not manufacture the sample New York licenses submitted to the GTA/DMVS in August 2002.  Rather
than alleging any kind of fraud or deception in connection with those cards, Digimarc actually alleges that "DMVS
was aware that Viisage had not manufactured the NY drivers' licenses samples," but accepted them anyway.  Bose
Ex. 12, ¶ 86.

It is also instructive to examine the seven counts pled in the First Amended Complaint: Count I asserts that "GTA and DMVS have violated and are violating" the terms of the RFP; Count II asserts that "GTA and DMVS have violated and are violating" numerous rules governing GTA procurements; Counts III-V assert that "GTA and DMVS have violated and are violating" certain specific provisions of the Official Code of Georgia; Count VI asserts that "GTA and DMVS have deprived Digimarc of its property without due process of law in violation of the United States Constitution and Georgia Constitution;" and Count VII asserts that as a result of the actions of GTA and DMVS described above, "Digimarc is entitled to recover the costs it incurred in preparing its bid." The First Amended Complaint contains no allegation that Viisage violated or breached any rule, regulation, statute or constitutional provision, nor any common law duty owed to anyone.

As to requested relief, all that the First Amended Complaint does with respect to Viisage is add it as another party to be "restrained and enjoined" from implementing the Georgia contract. Obviously, if GTA/DMVS are restrained and enjoined from implementing and performing the contract, that contract will effectively be terminated, regardless of whether Viisage is also enjoined from implementing and performing it. The other prayers for relief ask the Court to order GTA/DMVS (i) to award the contract to Digimarc or rebid it, and (ii) to pay Digimarc the costs incurred in preparing its bid. They do not mention Viisage.

### 3.    The Item 103 Disclosures in the Form 10-Q

Plaintiffs allege that the putative class period begins on May 12, 2004 with the filing of Viisage's Form 10-Q for the first quarter of 2004. This is the Item 103 disclosure regarding the Georgia Litigation contained in that 10-Q:

> On July 31, 2003 the superior court for Fulton County, Georgia issued a preliminary injunction prohibiting Georgia's Department of Motor Vehicle Safety from continuing to work with us to install

6

a new drivers' license system for the State of Georgia. This injunction is the result of a lawsuit filed in March 2003 by one of our competitors, Digimarc ID Systems, LLC. The suit claims that the Department of Motor Vehicle Safety did not comply with its own bid process when selecting a vendor for the digital drivers' license program. The merits of Digimarc Corporation's claims against the Department of Motor Vehicle Safety are to be addressed in further court proceedings. The Department of Motor Vehicle Safety has confirmed that our contract with them remains in place. However, if the lawsuit is successful and we lose the contract, we could lose up to $19.7 million in revenue that we expected to recognize over the next five and one-half years. In addition, although we expect that the Department of Motor Vehicle Safety would be required to reimburse us for our costs incurred under the contract, if we are unable to obtain reimbursement of those costs, we could be required to recognize a loss of up to approximately $5 million for costs incurred to date on the Georgia contract.

Baraniak Ex. A.[6]

This disclosure meets all of the requirements of Item 103. The principal parties to the Georgia Litigation were always Digimarc and GTA/DMVS. As demonstrated above, the First Amended Complaint contains no allegation that Viisage violated any federal or state statute or regulation or a common law duty owed to anyone. To be successful in its suit, Digimarc would have to prove that GTA/DMVS violated some statute, rule, regulation or constitutional mandate governing the contract procurement process. This disclosure fairly advises the investing public of that. The disclosure does not comment on the likelihood that Digimarc will succeed in its suit against the DMVS, and Item 103 does not require it to. The disclosure does, however, provide complete information concerning the adverse financial consequences that will be visited upon Viisage if the lawsuit is successful.

---

[6] This disclosure was repeated in a Form 10-Q/A amending the first quarter 10-Q to provide unrelated information concerning Viisage's acquisition of two companies and a Form S-3 Registration Statement for Viisage's anticipated secondary offering filed soon thereafter.

### 4.    DMVS' Termination of the Contract for Convenience and Settlement with Viisage

As explained in an affidavit of the Georgia Commissioner of the DMVS filed in the Georgia Litigation, Digimarc's existing contract with Georgia to provide drivers' licenses was due to expire on June 31, 2004. The Commissioner made offers to Digimarc regarding a temporary extension of that contract and proposals to settle the lawsuit, but they were rejected. In the course of these discussions, Digimarc asserted that it would be three or more years before the Georgia Litigation was resolved. The Commissioner concluded that Georgia could not "wait several years to obtain a secure drivers license. [He] notified Viisage that the Department was terminating its contract for the new drivers' license for convenience.[7] Viisage made a demand for a termination payment of $8.2 million under GTA Rule 665-2-11-09. After negotiations, the Department and [GTA] entered into a settlement agreement." Bose Ex. 18. The settlement agreement was executed on July 20, 2004. Bose Ex. 23, Attachment, p. 20.

On July 21, 2004, Viisage issued two press releases. One accurately reported the preliminary financial results for the second quarter of 2004. It made no mention of the Georgia Litigation. The second described the termination of Georgia license contract and settlement of Viisage's claim for termination compensation.

---

[7] The relevant provision of the contract states:

> **20.    Termination for Convenience**
>
> The DMVS may terminate this Contract upon thirty (30) days' written notice to Contractor. Such notice of cancellation shall be transmitted via U.S. Mail, Certified Return Receipt Requested or other verifiable express delivery system. Upon receipt of such notice, Contractor shall cease or wind up all affected work with all due haste. The Contractor shall be entitled to receive just and equitable compensation for Services rendered based on time spent prior to the termination date. The rates or amounts specified in the Contract, plus any listed discounts, shall serve as a ceiling for all calculations of payments due Contractor.

Bose Ex. 2, attachment, p. 6.

The cash payment of $2.5 million will be received in the third quarter of 2004 and recognized on Viisage's balance sheet at that time.  Of this payment, $2 million covers work performed by Viisage under the drivers' license contract, and the remaining $500,000 balance reflects the purchase by the State of certain assets that Viisage acquired specifically for the deployment of the Georgia solution.  This settlement is expected to end the substantial and escalating legal costs that Viisage has been incurring over the past year.  Also, had this settlement been negotiated during the second quarter, the Company's backlog at June 27, 2004 would have been $151 million rather than $171 million which included the Georgia contract.

Bose Ex. 31.

On July 22, 2004, Viisage convened its quarterly analysts conference call to discuss the second quarter results published in the prior day's press releases.  After reviewing the Company's finances, the discussion turned to the termination of the Georgia drivers' license contract.  Mr. Bailey made the following comment:

This was a key new win for Viisage and we immediately deployed resources in the State to begin implantation.  And in fact, we were just days away from taking over the contract when the incumbent competitor that had held the contract filed a lawsuit against the State of Georgia Department of Motor Vehicle Safety alleging issues in the bidding process.  Viisage was never a party to this lawsuit, which has dragged on and on for a year and a half, nor were any allegations of impropriety ever lodged against our company.  Still and all, with more than $1m spent already in legal fees as a related party and no prospect of a breakthrough in the logjam within the foreseeable future, we decided it was time to act.

Klafter Ex. C.

Plaintiffs contend that Mr. Bailey's oral remarks were intentionally and materially misleading.  They were not.  First, at the time the injunction referred to in the second sentence issued, Viisage was not any kind of party to the Georgia Litigation.  While Viisage was added as an "interested" or "necessary" party in November 2003, there were no significant changes to the factual allegations in the First Amended Complaint.  Moreover, as noted above, Digimarc did not

accuse Viisage of defrauding or deceiving anybody, nor assert that Viisage violated any state or

common law.  That which Digimarc had to prove to establish its claim also did not change at all

between the original and First Amended Complaint, *i.e.*, that GTA/DMVS had violated Georgia

contract procurement law.  Finally, when Bailey, a non-lawyer, admitted that Viisage had

already spent more than $1 million in legal fees "as a related party," he was certainly conveying

to all the analysts covering Viisage (and presumably Digimarc, its principal competitor, as well)

that Viisage was thoroughly bound up with and into this intractable litigation.

### 5.    The Georgia Litigation Disclosure in the Prospectus

On August 4, 2004, Viisage filed its final Prospectus for its secondary offering of

common stock.  The Prospectus described the Georgia Litigation as follows:

> In July 2003, a Georgia court issued a preliminary injunction
> prohibiting Georgia's Department of Motor Vehicle Safety from
> continuing to work with us to install the State's new drivers'
> license system.  The injunction is the result of a lawsuit filed in
> March 2003 by one of our competitors alleging that the
> Department of Motor Vehicle Safety did not comply with its own
> bid process when it selected a vendor for its new digital drivers'
> license program.  In July 2004, we reached a settlement agreement
> with the State pursuant to which the Department of Motor Vehicle
> Safety terminated the contract for convenience and agreed to pay
> us $2.0 million in cash and the State agreed to purchase certain
> equipment from us for $500,000.  The Department of Motor
> Vehicle Safety has filed a motion with the Georgia court to dismiss
> the case based upon the termination of the contract.  The agency
> also has filed an affidavit stating that it intends to issue a new
> request for proposals for a digital drivers' license system before the
> end of October 2004.  The competitor has filed a motion with the
> Georgia court to enjoin the Department of Motor Vehicle Safety
> and the State from making any payments to us under the settlement
> agreement.  As a result of the termination of the contract, we will
> lose up to $19.7 million in revenue that we expected to recognize
> over the next five and one-half years, which was included in our
> $176 million of backlog at March 28, 2004, unless we are able to
> win the new contract for the digital drivers' license system and the
> revenues from such new contract are substantially similar to the
> terminated contract.  While we believe we can utilize the
> remaining $2.8 million in assets being retained by us from the

> Georgia contract either in Georgia, if we win the contract based on the new request for proposals, or on alternative projects, to the extent that we are unable to utilize these assets or realize value through a sale of these assets, we would be required to take a charge to earnings.

Baraniak Ex. B.

The disclosure is completely accurate. It forthrightly advises investors that the potential adverse consequences to Viisage arising from the Georgia Litigation previously disclosed in its Form 10-Q had now come to pass. Viisage will not receive the nearly $20 million in anticipated income from the Georgia contract award. While the State had agreed to make $2.5 million in termination payments, Viisage discloses that Digimarc had already moved to enjoin those payments. Further, Viisage retains an additional $2.8 million in assets related to the Georgia contract that might have to be written off, if Viisage does not win the contract rebid and cannot make use of them on alternate projects.[8]

Plaintiffs' attempt to contort this frank disclosure into a materially fraudulent misstatement is disingenuous. The relevant allegations are found at paragraphs 109 a-b, on page 40, of their Amended Complaint.

Plaintiffs first allege fraud because Viisage failed to disclose that it had been added as a "defendant" to the Georgia Litigation on November 12, 2003. However, as noted above, whether called an "interested party defendant," as the Superior Court did in its Order, or "Necessary Party-Defendant," as Digimarc did in its First Amended Complaint, Viisage was clearly not a traditional "principal party" defendant, because it was not alleged to have violated any statute, regulation, rule or common law duty owed to anyone. To prove its case, Digimarc

---

[8] On August 11, 2004, Viisage filed its Form 10-Q for the second quarter of 2004. It contained the same Item 103 description of the Georgia Litigation. Am. Compl. ¶69.

had to prove that GTA/DMVS violated Georgia laws and rules, it did not have to prove any wrongful conduct by Viisage.

Plaintiffs next complain that Viisage did not disclose that it had filed a motion to dismiss Digimarc's Complaint.  Of course, Item 103 does not require disclosure of motions.  But even more significantly, Viisage was only a "necessary party," not alleged to have breached a duty or violated a law.   Viisage could not move independently to dismiss the operative claims of wrongdoing underlying the Georgia Litigation, because all of those claims were asserted against GTA/DMVS.  Indeed, if one looks at Viisage's four page combined motion to dismiss and brief, other than briefly summarizing GTA/DMVS' arguments in support of its motion to dismiss on account of mootness, Viisage simply states:

> Even if the actions were to continue against GTA and DMVS to determine whether Digimarc is entitled to an award of its bid preparation costs or an award of the Contract . . ., by virtue of the termination for convenience, Viisage is no longer a necessary party.
>
> The propriety of dismissing Viisage is self-evident.  No claims have been asserted against Viisage.  <u>See</u> Amended Complaint . . . Viisage was added as a necessary party to protect its interest in the Contract that had been awarded.  As the Contract has been terminated for convenience . . . Viisage no longer has an interest relating to the subject of the actions.

Bose Ex. 17, p. 4.  Item 103 clearly does not require disclosure of this motion.

Perhaps the most outrageous allegation in the entire Complaint, is Plaintiffs' contention that this Item 103 disclosure "falsely stated that the settlement with DMVS was reached for 'convenience' when in fact it was initiated by Viisage in an attempt to avoid having to comply with Digimarc's discovery demands."  This is just the kind of bald-face conclusary claim of fraud that the Private Securities Litigation Reform Act of 1995 was intended to prevent.  <u>See</u>, 15 U.S.C. § 78u-4(b)(1)-(2) and *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 194 (1st Cir. 1996).

It is flatly contradicted by the affidavit of the Georgia Commissioner of the DMVS, who testified that he terminated the Contract for "convenience" under the contract provision expressly entitling him to do so. With no supporting factual allegations of any kind, not even an allegation identifying the information Viisage was seeking to hide from disclosure, plaintiffs, in effect, accuse the Commissioner of submitting a fraudulent affidavit to the Georgia Superior Court, in addition to alleging fraud on the part of Viisage.

Finally, plaintiffs contend that the Georgia Litigation disclosure "failed to disclose that there was a substantial risk that . . . [Viisage] was not entitled to the $2.5 million." This is exactly what *Seachange* and the other cases cited above explicitly state need not be included in the Item 103 disclosure, *i.e.*, a prediction as to the outcome of the litigation. This is particularly true in this case where the existence of the motion to preliminarily enjoin the $2.5 million payment was disclosed, and no opinion was offered predicting how the court would rule upon it.

### 6.    The September 2, 2004 Order and Related Disclosure

On September 1, 2004, the Georgia Superior Court convened a hearing on a number of pending motions, including Digimarc's request for a Temporary Restraining Order restraining consummation of the settlement between Viisage and the DMVS.[9]  The court concluded that allowing the settlement "to proceed or the contemplated new RFP [to be] awarded" before the court could rule on the merits of the suit "would unfairly moot some of Digimarc's claims." On September 2, the court granted Digimarc's Motion for Temporary Restraining Order and stated that the July 31, 2003 Interlocutory Injunction remains in full force and effect. The court also issued a broad array of other procedural and discovery orders, including an order that "all

---

[9]  On August 18, 2004, a "Presiding Judge" of the Fulton County Superior Court issued an interim order preserving the status quo until Judge Moore, the assigned judge, could convene the September 1st hearing. Bose Ex. 19.

contemplated dispositive motions" be filed by October 11, 2004 and that all such motions would be heard on October 27, 2004.  Bose Ex. 20.[10]

On September 14, 2004, Digimarc issued a press release touting the Superior Court's September 2nd Order.  The web-based version of the press release included a link to the Order. Bose Ex. 33.  Viisage, for its part, was under no obligation to disclose anything concerning the Georgia Litigation, until it filed its 10-Q for the third quarter of 2004.  Nonetheless, it did so.

On October 25, 2004, it issued a press release preliminarily reporting its financial results for the third quarter.  There is no allegation that those results are misstated in any way.  On October 26, 2004, Viisage conducted its quarterly conference call with the analysts.  Once again, after reviewing the financial highlights for the quarter, CEO Bailey turned to the Georgia Litigation.

> Someone always asks for an update on Georgia, so let me share what we know.  As I mentioned on our last call, last October we had -- excuse me, last quarter we had proposed a settlement with our customer, the State of Georgia, entailing a payment to Viisage and a pledge by the State to rebid the RFP this year.  The State agreed with our recommendation, signed an agreement with us, and was prepared to issue the final payment.  Unfortunately, that settlement was the subject of a temporary restraining order by our competitor.  Right now, we expect a hearing on a series of summary judgment motions to occur shortly, with a decision probably coming out in the next few weeks.  We'll certainly let you know once we hear more information.

Bose Ex. 36, p. 3.

This comment is accurate in all respects.  Plaintiffs complain that Mr. Bailey should have used the word "injunction" instead of "Temporary Restraining Order."  *See* Compl. ¶80.  In fact, as noted above, Judge Moore used the term "Temporary Restraining Order," not the word

---

[10]  On August 23, 2004, Digimarc filed a Second Amended Complaint.  The Court makes no reference to it in the September 2, 2004 Order or in its December 22, 2004 Order on the dispositive motions.

"injunction," in her September 2nd Order.  There exists no SEC rule, nor any case law, that required Mr. Bailey to comment on the court's discovery rulings or that Viisage had been ordered to pay $5,761.50 in attorneys' fees.

### 7.    The Cross-Motions for Summary Judgment and Related Disclosure

On October 11, 2004, the parties filed cross-motions for summary judgment. GTA/DMVS's principal argument was precisely the same as that set out in its motion to dismiss: by terminating the Viisage contract for convenience, "[t]he state has provided to Digimarc the only available relief requested making the allegations of the Complaint moot."  Bose Ex. 23, p. 6.  Moreover, GTA/DMVS continued to dispute the premise of Digimarc's underlying case:

> GTA terminated the contract pursuant to its legislative authority to terminate a contract, in whole or in part, for any reason, as its "sole option and in the exercise of its sole discretion . . . ."
>
> GTA's termination of the contract in favor of a re-bid is by no means an admission of liability.  On the contrary, both GTA and DMVS dispute the allegation that the evaluation of proposals and award of the contract to Viisage violated the terms of the RFP, the GTA Rules, or the procurement statutes.  The decision to terminate the contract with Viisage and re-bid the contract was made to promote the public interest and security of the State.

Bose Ex. 23, p. 9.  Neither GTA/DMVS, nor Viisage ever conceded that either of them did anything improper, and Georgia certainly never asserted that Viisage had misled it in any way.  The motions were argued on October 27, 2004.

On November 11, 2004, Viisage filed its third quarter Form 10-Q.  This is the Georgia Litigation disclosure:

> In July 2003, a Georgia court issued a preliminary injunction prohibiting Georgia's Department of Motor Vehicle Safety from continuing to work with us to install the State's new drivers' license system.  The injunction is the result of a lawsuit filed in March 2003 by one of our competitors alleging that the Department of Motor Vehicle Safety did not comply with its own bid process when it selected a vendor for its new digital drivers'

license program.  In July 2004, we reached a settlement agreement with the State pursuant to which the Department of Motor Vehicle Safety terminated the contract for convenience and agreed to pay us $2.0 million in cash and the State agreed to purchase certain equipment from us for $500,000.  The Department of Motor Vehicle Safety has filed a motion with the Georgia court to dismiss the case based upon the termination of the contract.  The agency also has informed the court that it intends to issue a new request for proposals for a digital drivers' license system before the end of 2004.  In response to a motion filed by the competitor, the Georgia court has issued a preliminary injunction prohibiting the Department of Motor Vehicle Safety and the State from making any payments to us under the settlement agreement.  As a result of the termination of the contract, we will lose up to $19.7 million in revenue that we expected to recognize over the next five and one-half years, which was included in our $176 million of backlog at March 28, 2004, unless we are able to win the new contract for the digital drivers' license system and the revenues from such new contract are substantially similar to the terminated contract.  While we believe we can utilize the remaining $2.8 million in assets being retained by us from the Georgia contract either in Georgia, if we win the contract based on the new request for proposals, or on alternative projects, to the extent that we are unable to utilize these assets or realize value through a sale of these assets, we would be required to take a charge to earnings.

Bose Ex. 36.

Again, this disclosure meets all of the requirements of Item 103 and is accurate. Plaintiffs' new claim of material misstatement is that in this disclosure "Viisage continued to . . . falsely represent to the public that Viisage was entitled to the $2.5 million from Georgia DMVS." Compl. ¶81.  In fact, the disclosure contains no such representation.  Viisage simply states undisputed facts:  the DMVS agreed to pay Viisage $2.5 million and the Court has enjoined the payment.  There is no further characterization of the matter, nor prediction of the outcome of the dispute.[11]

---

[11]   It may be noted that GTA/DMVS' position before the Georgia Court was that it had entered into a binding settlement agreement with Viisage and the Court did not have any authority to set it aside:

> This Court does not have the authority to prevent the State from terminating the contract and settling with Viisage.  Whether to settle, the reasons to settle and the amount paid for the settlement are issues within the sole discretion of the GTA and DMVS.

Bose, Ex. 23, p. 10.

Moreover, the statement that the DMVS "has filed a motion with the Georgia court to dismiss the case based upon the termination of the contract" is also certainly a fair description of the GTA/DMVS' consistent position in all its Court filings since it terminated the contract and settled the contract compensation issue with Viisage. It is precisely the position argued to the Court by GTA/DMVS in its summary judgment brief: because GTA/DMVS itself terminated the contract, Digimarc has already received the only relief to which it could possibly be entitled, *i.e.*, "the termination of the contract with Viisage and a rebid for the procurement," and the case was therefore moot and should be dismissed as a matter of law. Bose Ex. 28, p. 38.

### 8.    Plaintiffs' Contention That the $2.5 Million Had Any Bearing on Viisage's Actual or Forecast EBITDA Is Simply Wrong

Plaintiffs allege that Viisage's forward looking guidance to the market for EBITDA (earnings before interest, taxes, depreciation and amortization) constituted a material misrepresentation because it included the $2.5 million settlement payment. For example, in paragraph 78 of the Complaint, plaintiffs quote from Viisage's October 25, 2004 press release in which Viisage reports strong results for the third quarter of 2004 and states that it is therefore increasing its "guidance" for annual EBITDA for 2004 to "$11.5 to $12.5 million, increased from EBITDA of $11 to $12 million." Plaintiffs then assert that this is fraud, alleging in bold-faced type: "Viisage **included the $2.5 million payment** in its increased EBITDA guidance for 2004." [emphasis in original]

That allegation is simply wrong. It reflects a fundamental misunderstanding of what EBITDA measures. It also demonstrates that plaintiffs did not bother to read Viisage's actual disclosures, at least those that did not further plaintiffs' purposes.

EBITDA is a proxy for operating cash flows generated by an enterprise. To calculate EBITDA, begin with a company's earnings, then add back interest and taxes, and then the non-

cash expenses:  depreciation and amortization.  This calculation is certainly well known and, in any event, expressly explained in the October 25, 2004 press release.  Bose Ex. 34, p. 3.  The $2.5 million payment would have been a partial reimbursement of expenses incurred in preparing to perform the Georgia contract that Viisage had capitalized and would therefore be reflected on Viisage's balance sheets as an asset.  It is part of the $5 million of costs that Viisage repeatedly identified in its Item 103 disclosure as an asset that might have to be written off, if Viisage lost the Georgia contract.  This $2.5 million payment would therefore never be a part of earnings, if collected, because it would not be revenue.  It would therefore never play any part in an EBITDA calculation.

CFO Aulet was careful to make this clear in the July 21, 2004 press release announcing the settlement.  "The cash payment of $2.5 million will be . . . recognized on Viisage's *balance sheet*." [emphasis added]  In other words, a capital asset will be eliminated on payment (debited) and the cash account increased (credited).  It would never be "recognized" in a profit and loss statement.

This point was also specifically discussed in the October 26, 2004 analysts' conference call.

> **Questions by Analyst**
>
> Okay.  And the $2.5 million payment from Georgia, was that -- I just want to confirm that was not booked into revenue during the quarter, and you didn't receive the cash from that?
>
> **Answer by CEO Bailey**
>
> Both of what you said is correct.  A, it was never booked into revenue, and B, we did not receive the cash.  Now, let me just highlight because some of our people may not be aware.  In our driver's license, we only book revenue when we produce a card.  We only produce revenue when we produce a card, so therefore, we're not going to book revenue until a card is produced, so there is no revenue that is booked regarding the Georgia procurement in any way.

Bose Ex. 35, p. 9

Ultimately, after the Georgia Court issued its summary judgment opinion and prohibited Georgia from paying Viisage $2 million of the $2.5 million, Viisage concluded that it should write down, *i.e.*, depreciate, the value of certain of the assets recorded on its books in connection with its preparation to perform the Georgia contract. This asset writedown also has no effect on EBITDA, as the $2 million non-cash depreciation expense reduced earnings, but then was added back in calculating EBITDA. This point is also expressly disclosed by Viisage in a press release: "the non-cash write-down of certain assets related to the terminated Georgia contract reduced pre-tax income by $2 million in the fourth quarter but did not affect EBITDA." Bose Ex. 41.

Finally, Defendants also note that an EBITDA forecast is quintessentially a forward looking statement expressly protected from being the predicate for a claim of securities fraud under the Private Securities Litigation Reform Act of 1995. *See* § 102(b) of the PSLRA, 15 U.S.C. § 78u-5(c)(1)(A)(i), and *Seachange* at 15-16.

### C.    Conclusion

Viisage was forthright in its disclosures concerning the Georgia Litigation and fully complied with the requirements of SEC Item 103. It was never a principal party to this litigation, as it was not alleged to have violated any statute, rule or regulation, or common law duty to anyone. Viisage nonetheless was always completely forthcoming in explaining the substantial adverse economic impact that a finding that GTA/DMVS had violated Georgia procurement law would have on it. It was also careful never to predict how the Court would ultimately rule on any issue raised by the case. Finally, any matter of interest to anyone following Viisage or

Digimarc set out in an order or pleading would always be a matter of public record. All claims arising out of disclosures regarding the Georgia Litigation should be dismissed.

VIISAGE TECHNOLOGY, INC.

By its attorneys,


/s/ John R. Baraniak, Jr.
Mitchell H. Kaplan (BBO #258940)
John R. Baraniak, Jr. (BBO #552259)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA 02110
(617) 248-5000

Dated:  February 14, 2007

## CERTIFICATE OF SERVICE

This is to certify that on February 14, 2007, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

William B. Federman
Stuart W. Emmons
FEDERMAN & SHERWOOD
10205 N. Pennsylvania Avenue
Oklahoma City, OK 73120
Tel.: (405) 235-1560
Fax: (405) 239-2112

and

Alan L. Kovacs (BBO #278240)
LAW OFFICE OF ALAN L. KOVACS
2001 Beacon Street, Suite 106
Boston, MA 02135
Tel.: (617) 964-1177
Fax: (617) 332-1223

**Attorneys for Plaintiff**

/s/ John R. Baraniak, Jr.
John R. Baraniak, Jr.

4173197v1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  | ) |  |
|---|---|---|
| **In re VIISAGE TECHNOLOGY, INC.**<br>**SECURITIES LITIGATION** | )<br>)<br>) | **CIVIL ACTION NO. 05-cv-10438-MLW** |
|  | ) |  |
|  | ) |  |
| **This Pleading Applies to:  All Actions** | ) |  |
|  | ) |  |

## TRANSMITTAL AFFIDAVIT OF JOHN R. BARANIAK, JR.

I, John R. Baraniak, Jr., depose and state the following:

1.    I am a partner at the law firm Choate, Hall & Stewart LLP, counsel for defendants in the above-entitled action.  I am a member in good standing of the Bar of the Commonwealth of Massachusetts.

2.    I submit this affidavit on behalf of all the defendants and in support of Defendants' Supplemental Memorandum in Support of Their Motion to Dismiss Claims Relating to Disclosure of the Georgia Litigation.  The statements made herein are based on my personal knowledge unless otherwise noted.

3.    Attached hereto as *Exhibit A* is a true and accurate copy of excerpted pages from L-1 Identity Solutions, Inc.'s (formerly Viisage) Form 10-Q filed May 12, 2004.

4.    Attached hereto as *Exhibit B* is a true and accurate copy of excerpted pages from Viisage's August 4, 2004 Prospectus.

Subscribed and sworn to under the penalties of perjury this 14th day of February, 2007.


/s/ John R. Baraniak, Jr.
John R. Baraniak, Jr.

*Exhibit A*



# FORM 10-Q

## L-1 IDENTITY SOLUTIONS, INC. - ID

**Filed: May 12, 2004 (period: March 28, 2004)**

Quarterly report which provides a continuing view of a company's financial position

Table of Contents
derived by our German subsidiary, primarily from customers in countries within the European Union. Virtually all of our direct revenue for the three month period ended March 30, 2003 was derived within the United States.

We believe for the near future that we will continue to derive a significant portion of our revenues from a limited number of large contracts. Secure identification segment customers who accounted for more than 10% of our total revenues are as follows:

- For the three months ended March 28, 2004, one customer accounted for an aggregate of 13.1%

- For the three months ended March 30, 2003, two customers accounted for an aggregate of 28%

No single biometrics customer accounted for over 10% of our total revenue in either three month period.

## 6. ACQUISITIONS

On January 23, 2004 we acquired all outstanding shares of ZN Vision Technologies AG ("ZN") in exchange for an aggregate of 5,221,454 newly issued shares of our common stock and $493.00 in cash. In addition, we agreed to assume ZN's employee share option plan, and accordingly have reserved 1,138,546 shares of our common stock for issuance to the plan participants. The purchase price for the acquisition was $31.5 million, based on the per share price of our common stock of $4.32 per share which is the average trading price of Viisage common stock over the five trading days immediately preceding and the two trading days immediately following March 28, 2003, the date on which the purchase agreement was signed. The acquisition was accounted for as a purchase, and accordingly, the operations of ZN are included in the financial statements since the effective date, the close of business on January 23, 2004. The purchase price has been allocated to net assets acquired based on their estimated fair values. We engaged an independent third party appraiser to perform a review of the acquired assets and have allocated the purchase price based on the preliminary results of their findings. The preliminary valuation is subject to further review which may result in adjustments to allocation of purchase price in the future. We have recorded approximately $74,000 in amortization related to the acquired intangible assets from the date of the acquisition through March 28, 2004. ZN is a leading German provider of face recognition and computer vision products and services. ZN, now known as Viisage Technology AG, is a wholly owned subsidiary of Viisage and serves as the base of our European operations.

On February 14, 2004 we acquired all outstanding shares of Trans Digital Technologies Corporation ("TDT") for $53.4 million. The purchase price consisted of 5,850,000 newly issued shares of our common stock, which were valued at $5.13 per share, which is the average price of Viisage common stock over the five trading days immediately preceding and the two trading days immediately following February 14, 2004, plus $15.3 million in notes and $5 million in cash. The acquisition was accounted for as a purchase, and accordingly, the operations of TDT are included in the financial statements since the effective date, the close of business on February 14, 2004. The purchase price has been allocated to net assets acquired based on their estimated fair values. We engaged an independent third party appraiser to perform a review of the acquired assets and have allocated the purchase price based on the preliminary results of their findings. The preliminary valuation is subject to further review which may result in adjustments to allocation of purchase price in the future. We have recorded approximately $384,000 in amortization related to the acquired intangible assets from the date of the acquisition through March 28, 2004. TDT is the sole source provider of high security technology and services to the U.S. Department of State for the production of U.S. passports. TDT is now a wholly owned subsidiary of Viisage.

In connection with the acquisition of TDT, we agreed to pay the former sole shareholder of TDT an additional cash payment of up to $2.6 million if the U.S. Department of Defense selected TDT for the production of smart cards as part of the agency's Common Access Card (CAC) program and placed orders with an aggregate value of at least $4 million prior to June 30, 2004. We received an initial purchase order of $10.2 million for this program and therefore we will record this contingent purchase price of $2.6 million related to the CAC program as additional goodwill in the second quarter of 2004.

The preliminary allocation of the purchase price for ZN and TDT, based on the purchase prices calculated for accounting purposes, is as follows (in thousands):

|  | ZN | TDT |
|---|---|---|
| Current assets | $ 1,639 | $ 3,020 |
| Property and equipment | 140 | 42 |
| Identified intangible assets | 1,974 | 14,460 |
| Goodwill | 27,733 | 35,880 |
|  | $31,486 | $53,402 |

## 7. LEGAL PROCEEDINGS

Source: L-1 IDENTITY SOLUTIO, 10-Q, May 12, 2004

On July 31, 2003 the superior court for Fulton County, Georgia issued a preliminary injunction prohibiting Georgia's Department of Motor Vehicle Safety from continuing to work with us to install a new drivers' license system for the State of Georgia. This injunction is the result of a lawsuit filed in March 2003 by one of our competitors, Digimarc ID Systems, LLC. The suit claims that the Department of Motor Vehicle Safety did not comply with its own bid process when selecting a vendor for the digital drivers' license program. The merits of Digimarc Corporation's claims against the Department of Motor Vehicle Safety are to be addressed in further court proceedings. The Department of Motor Vehicle Safety has confirmed that our contract with them remains in place. However, if the lawsuit is successful and we

10

**Table of Contents**

lose the contract, we could lose up to $19.7 million in revenue that we expected to recognize over the next five and one-half years. In addition, although we expect that the Department of Motor Vehicle Safety would be required to reimburse us for our costs incurred under the contract, if we are unable to obtain reimbursement of those costs, we could be required to recognize a loss of up to approximately $5 million for costs incurred to date on the Georgia contract.

11

Source: L-1 IDENTITY SOLUTIO, 10-Q, May 12, 2004

Table of Contents

## VIISAGE TECHNOLOGY, INC.

ITEM 2 –   MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF
OPERATIONS

The following discussion and analysis should be read in conjunction with the financial statements and accompanying notes contained in our 2003 Annual Report on Form 10–K and in this Quarterly Report on Form 10–Q.

INTRODUCTION

We deliver advanced technology identity solutions for governments, law enforcement agencies and businesses concerned with enhancing security, reducing identity theft, providing access control, and protecting personal privacy. We focus on identity solutions for civil identification, criminal identification and border management that improve personal convenience and security, deter fraud, reduce identification program costs, and protect personal privacy. By combining secure document and face recognition biometric technologies that quickly, reliably, and accurately identify individuals in both one–to–one and one–to–many situations, we create innovative identity solutions. Our goal is to help our customers solve three critical aspects of verifying and managing identities:

- *assurance* that an identification document is authentic,

- *confidence* that the person holding the identification document is uniquely tied to and authorized to use the document, and

- *verification* of the privileges granted to the individual holding the document.

We generate revenue through the sale and license of products and services for verifying and managing identities. Our revenue increased from $8.16 million in the first quarter of 2003 to $12.26 million in the first quarter of 2004. Our net loss decreased by 31% during the same periods, excluding the one–time charge of $12.1 million in connection with our change in accounting principle as of January 1, 2003. Our efforts in 2004 have been and will continue to be primarily focused on expanding our portfolio of offerings to satisfy our customers' identity solution requirements. We have taken substantial steps in this direction through the acquisitions of ZN Vision Technologies AG in January 2004 and Trans Digital Technologies Corporation in February 2004. The acquisition of TDT enabled us to be selected to provide a solution to the U.S. Department of Defense to support the production of smart cards as part of the agency's Common Access Card (CAC) program. We continue to make investments in research and development and intend to continue to introduce new and enhanced product and service offerings. To further increase revenue, we are also expanding our distribution channels.

SEGMENTS AND GEOGRAPHIC INFORMATION

Our business involves two closely–related segments: secure credentials and biometrics. For the three–month period ended March 28, 2004, we derived 96.2%, or $11.7 million, of our direct revenue within the Untied States. We derived an additional 1.3%, or $160,000, of our direct revenue in Canada. The remaining 2.5%, or $307,000, was derived by our German subsidiary, primarily from customers in countries within the European Union.

*Secure Credentials Segment*

Our secure credentials segment accounted for approximately 85.8% and 84.2% of our revenues in the three–month periods ended March 28, 2004 and March 30, 2003, respectively. Our secure credentials solutions involve the design, development, marketing and implementation of integrated software and hardware solutions that produce identification credentials utilizing face recognition and other biometric technologies.

We provide customized systems utilizing proprietary products under service contracts that have five to seven year terms and several optional annual renewals after the initial contract term. These contracts generally provide for a fixed price

12

<u>Table of Contents</u>

for each identification credential produced. Contract prices vary depending on, among other things, design and integration complexities, the nature and number of workstations and sites, the projected number of secure credentials to be produced, the size of the database, the level of post–installation support and the competitive environment. Our secure credentials segment also includes the contracts we assumed as part of our acquisition of Trans Digital Technologies in February 2004. TDT contributed revenues of $1.8 million to this segment for the three months ended March 28, 2004. Under these contracts, we provide high security technology and services to the U.S. Department of State for the production of U.S. passports, as well as similar services to the U.S. Departments of Defense and Homeland Security.

In civil identification applications, such as drivers' licenses and passports, the sales cycle generally includes a formal request for proposal, or RFP, bidding process. In these public sector cases, our sales and marketing personnel regularly conduct visits and attend industry trade shows to identify bid opportunities and particular customer preferences, and to establish and cultivate relationships in advance of any bid. Once an RFP is issued, a comprehensive proposal is developed and usually followed by an on–site customer demonstration. The process from the issuance of an RFP to the ultimate award can take up to six months. Following the bid award a six–to–twelve month implementation and installation process usually ensues. We believe that long sales cycles in our public sector markets are endemic to the market and will continue. Further, customers may seek to modify the system either during or after the implementation of the system. While our long sales and implementation cycle requires the commitment of marketing resources and investments of working capital, we believe that it also serves as a barrier to entry for smaller companies and as an early indicator of potential competitors for particular projects. For existing customers, a considerably shorter sales and implementation cycle may be involved.

*Biometrics Segment*

Our biometrics segment accounted for approximately 14.2% and 15.8% of our revenue for the three month periods ended March 28, 2004 and March 30, 2003, respectively. The focus of our biometric technology solutions is primarily on applications designed to deter criminal and terrorist activities, including government research and development contracts. These initiatives generated 89.0% of this segment's revenue for the three months ended March 28, 2004, the remaining 11.0% was generated from sales in the gaming industry.

Within our biometrics segment, our contracts typically provide for the development, customization and installation of face recognition systems for government agencies, law enforcement agencies and businesses. These contracts are generally fixed price, and include milestones and acceptance criteria for the various deliverables under the contract. Contract prices vary depending on, among other things, design and integration complexities, the nature and number of workstations and sites, the size of the database, the level of post–installation support and the competitive environment. In certain cases, we provide licenses of off–the–shelf versions of our face recognition software on a per user basis.

For identity solutions that primarily require our advanced face recognition technology, such as criminal identification booking and investigation applications, the sales cycle tends to be shorter and the solution consists primarily of software products.

As we continue to implement our vision of being a total identity solutions provider, the biometrics and secure credentials segments become less distinct as discrete segments. We believe that the presence or future potential of integrated biometrics in secure credentials is a key factor in increasing revenue and profits from the secure credentials business. As a result, we are seeing the two segments converge into one market: identity solutions.

DEPENDENCE ON SIGNIFICANT CUSTOMERS

We believe for the near future that we will continue to derive a significant portion of our revenues from a limited number of large contracts. Secure identification segment customers who accounted for more than 10% of our total revenues are as follows:

- For the three months ended March 28, 2004, one customer accounted for an aggregate of 13.1%

13

Table of Contents

Our ability to make principal and interest payments under long–term indebtedness and bank loans will be dependent upon our future performance, which is subject to financial, economic and other factors affecting us, some of which are beyond our control.

**We derive over 90% of our revenue from government contracts, which are often non–standard, involve competitive bidding, may be subject to cancellation with or without penalty and may produce volatility in earnings and revenue.**

More than 90% of our business involves providing products and services under contracts with U.S. federal, state, local and foreign government agencies. Obtaining contracts from government agencies is challenging, and government contracts often include provisions that are not standard in private commercial transactions. For example, government contracts may:

- include provisions that allow the government agency to terminate the contract without penalty under some circumstances;

- be subject to purchasing decisions of agencies that are subject to political influence;

- contain onerous procurement procedures; and

- be subject to cancellation if government funding become unavailable.

Foreign government contracts generally include comparable provisions relating to termination for the convenience of the relevant foreign government. Securing government contracts can be a protracted process involving competitive bidding. In many cases, unsuccessful bidders may challenge contract awards, which can lead to increased costs, delays and possible loss of the contract for the winning bidder.

**We derive a significant portion of our revenue from a few customers, the loss of which could have an adverse effect on our revenues.**

For the three month period ended March 28, 2004, one customer, the U.S. Department of State, accounted for an aggregate of 13.1% of our revenue. Since a small number of customers in our secure credentials segment account for a substantial portion of our revenues, the loss of any of our significant customers would cause revenue to decline and could have a material adverse effect on our business.

**Litigation involving our contract with Georgia could result in the cancellation of that contract which could cause us to lose $19.7 million in revenues over the next 5.5 years and could result in a loss of up to $5 million.**

In July 2003, a Georgia court issued a preliminary injunction prohibiting Georgia's Department of Motor Vehicle Safety from continuing to work with us to install the State's new driver's license system. The injunction is the result of a lawsuit filed in March 2003 by one of our competitors alleging that that the Department of Motor Vehicle Safety did not comply with its own bid process when it selected a vendor for its digital drivers' license program. The merits of the lawsuit are to be addressed in further court proceedings. The Department of Motor Vehicle Safety has confirmed that its contract with us remains in place. However, if the lawsuit is successful and Viisage loses the contract, we could lose up to $19.7 million in revenue that we expected to recognize over the next 5.5 years. In addition, although Viisage expects that the Department of Motor Vehicle Safety would be required to reimburse Viisage for its costs incurred under the contract, if Viisage is unable to obtain reimbursement of those costs, Viisage could recognize a loss of up to approximately $5 million for costs incurred to date on the Georgia contract.

24

Source: L–1 IDENTITY SOLUTIO, 10–Q, May 12, 2004

Table of Contents

- in connection with the acquisition of TDT, Mr. Beck was elected a member of our Board of Directors and appointed Vice Chairman;

- in connection with the acquisition of TDT, we issued a promissory note to Mr. Beck in the amount of $15.3 million, which is secured by some of TDT's assets;

- in connection with the acquisition of TDT, we entered into a consulting agreement with Mr. Beck under which we will pay Mr. Beck $300,000 per year for two years, provided that Mr. Beck devotes his full business time to developing business opportunities for us.

**Future sales of our common stock by Lau or Buddy Beck could depress the market price of our common stock.**

As of May 10, 2004, there were 35,777,841 shares of our common stock outstanding. Lau and Buddy Beck own approximately 17.1% and 16.4%, respectively, of our common stock. If either of these stockholders sell a significant number of shares of our common stock in the open market, our stock price could decline.

ITEM 3 – QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

Subsequent to our acquisition of ZN, our international operating resulting from transactions by our German operations and will be denominated in euros. Hardware and consumables purchases related to contracts associated with the TDT acquisition are denominated in Japanese yen. We mitigate exchange rate volatility by purchasing local currencies at favorable exchange rates. We do not hedge foreign currencies utilizing derivative instruments. Our international operations and transactions are subject to risks typical of international operations, including, but not limited to, differing economic conditions, changes in political climate, differing tax structures, other regulations and restrictions, and foreign currency exchange rate volatility. Accordingly, our future results could be materially adversely impacted by changes in these or other factors.

ITEM 4 – CONTROLS AND PROCEDURES

(a) *Evaluation of disclosure controls and procedures*. Our management, with the participation of our Chief Executive Officer, or CEO, and Chief Financial officer, or CFO, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a−15(e) and 15d−15(e) under the Securities Exchange Act) as of March 28, 2004. In designing and evaluating our disclosure controls and procedures, our management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives, and our management necessarily applied its judgment in evaluating the cost−benefit relationship of possible controls and procedures. Based on this evaluation, our CEO and CFO concluded that, as of March 28, 2004, our disclosure controls and procedures were (1) designed to ensure that material information relating to us, including our consolidated subsidiaries, is made known to our CEO and CFO by others within those entities, particularly during the period in which this report was being prepared and (2) effective, in that they provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the Securities Exchange Commission's rules and forms.

(b) *Changes in internal controls*. There were no changes in our internal controls over financial reporting that occurred during our most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

31

Source: L−1 IDENTITY SOLUTIO, 10-Q, May 12, 2004

Table of Contents

**VIISAGE TECHNOLOGY, INC.**

**PART II – OTHER INFORMATION**

ITEM 1 – LEGAL PROCEEDINGS

On July 31, 2003 the superior court for Fulton County, Georgia issued a preliminary injunction prohibiting Georgia's Department of Motor Vehicle Safety from continuing to work with us to install a new drivers' license system for the State of Georgia. This injunction is the result of a lawsuit filed in March 2003 by one of our competitors, Digimarc ID Systems, LLC. The suit claims that the Department of Motor Vehicle Safety did not comply with its own bid process when selecting a vendor for the digital drivers' license program. The merits of Digimarc Corporation's claims against the Department of Motor Vehicle Safety are to be addressed in further court proceedings. The Department of Motor Vehicle Safety has confirmed that our contract with them remains in place. However, if the lawsuit is successful and we lose the contract, we could lose up to $19.7 million in revenue that we expected to recognize over the next five and one−half years. In addition, although we expect that the Department of Motor Vehicle Safety would be required to reimburse us for our costs incurred under the contract, if we are unable to obtain reimbursement of those costs, we could be required to recognize a loss of up to approximately $5 million for costs incurred to date on the Georgia contract.

We are not aware of any other legal matters that could have a material adverse effect on our business, financial condition or results of operations.

ITEM 2 – CHANGES IN SECURITIES, USE OF PROCEEDS AND ISSUER PURCHASES OF EQUITY SECURITIES

*Modification of Rights of Registered Securities.*

None.

*Limitation of Rights of Registered Securities.*

None.

*Use of Proceeds from Sale of Registered Securities.*

Not applicable.

*Issuer Repurchases of Securities.*

None.

*Restrictions Upon the Payment of Dividends*

We are prohibited under our borrowing arrangements from paying any cash dividends.

*Sales of Unregistered Securities*

Source: L−1 IDENTITY SOLUTIO, 10−Q, May 12, 2004

Table of Contents

**VIISAGE TECHNOLOGY, INC.**

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**VIISAGE TECHNOLOGY, INC.**

Date: May 12, 2004     By:     /s/   Bernard C. Bailey

Bernard Bailey

President and Chief Executive Officer

(Principal Executive Officer)

Date: May 12, 2004     By:     /s/   William K. Aulet

William K. Aulet

Senior Vice President and Chief Financial Officer

(Principal Financial Officer)

35

# *Exhibit B*

424B4 1 d424b4.htm PROSPECTUS

Table of Contents

Filed Pursuant to Rule 424(b)(4)
Registration No. 333-116698

Prospectus



## 7,500,000 Shares of Common Stock

We are offering 7,200,000 shares of our common stock, par value $0.001 per share. We will receive all of the net proceeds from the sale of such common stock. The selling shareholders identified in this prospectus are selling an additional 300,000 shares of our common stock. We will not receive any of the proceeds from the sale of the shares by the selling shareholders.

Our common stock is listed on the Nasdaq National Market under the symbol "VISG." The last reported sale price of our common stock on August 4, 2004 was $6.23 per share.

**Investing in our common stock involves a high degree of risk. Before buying any of these shares of our common stock, you should carefully consider the risk factors described in " Risk Factors" beginning on page 7 of this prospectus.**

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or passed upon the adequacy or accuracy of this prospectus. Any representation to the contrary is a criminal offense.**

|  | Per share | Total |
|---|---|---|
| Public offering price | $ 5.500 | $41,250,000 |
| Underwriting discounts and commissions | $ 0.316 | $ 2,370,000 |
| Proceeds, before expenses, to us | $ 5.184 | $37,324,800 |
| Proceeds to selling shareholders | $ 5.184 | $ 1,555,200 |

The underwriters may also purchase up to an additional 525,000 shares of our common stock from us and up to an additional 600,000 shares from the selling shareholders at the public offering price, less the underwriting discounts and commissions payable by us and the selling shareholders, to cover overallotments, if any, within 30 days from the date of this prospectus. If the underwriters exercise the option in full, the total underwriting discounts and commissions payable by us and the selling shareholders will be $2,725,500 and the total proceeds, before expenses, to us will be $40,046,400 and the total proceeds to the selling shareholders will be $4,665,600.

The underwriters are offering the shares of our common stock as described in "Underwriting." Delivery of the shares will be made on or about August 10, 2004.

# JPMorgan                                    UBS Investment Bank

### Piper Jaffray

# JMP Securities        Janney Montgomery Scott LLC        Roth Capital Partners

August 4, 2004

Table of Contents

**We derive a significant portion of our revenue from a few customers, the loss of which could have an adverse effect on our revenues.**

For the three-month period ended March 28, 2004, the U.S. Department of State, accounted for 13% of our revenue. For the year ended December 31, 2003, the Pennsylvania Department of Transportation and the Office of the Illinois Secretary of State, each accounted for 13% of our revenues. The U.S. Department of Justice has recently issued an indictment against former Governor of Illinois George Ryan and an updated indictment against former lobbyist Lawrence E. Warner on bribery and related federal racketeering charges. We had a formal consultative relationship with Mr. Warner's firm pursuant to which we paid that firm fees of approximately $800,000. Upon learning of the initial indictment of Mr. Warner in 2002, we immediately terminated our contract and relationship with Mr. Warner and his firm. There has been no assertion of any impropriety on our part.

For 2002, Connecticut Department of Information Technology and Mississippi Department of Information Technology Services, accounted for 10% and 12% of our revenues, respectively and an aggregate of 22% of our revenue. For 2001, Illinois Secretary of State, Unisys Corporation (Florida Department of Safety and Motor Vehicles), Kentucky Transportation Cabinet and Pennsylvania Department of Transportation, accounted for 10%, 12%, 14% and 13% of our revenue, respectively and an aggregate of 49% of our revenue. Since a small number of customers under our drivers' license contracts account for a substantial portion of our revenues, the loss of any of our significant customers would cause revenue to decline and could have a material adverse effect on our business.

**We derive revenue from only a limited number of products and services and we do not have a diversified product or service base.**

Substantially all of our revenues are derived from the sale of products and services comprising our identity solutions. We anticipate that substantially all of the growth in our revenue, if any, will also be derived from these sources. If for any reason our sale of these products or services is impeded, and we have not diversified our product and service offerings, our business and results from operations could be harmed.

**Loss of limited source suppliers may result in delays or additional expenses.**

We obtain certain hardware components and complete products from a limited group of suppliers. In particular, we obtain all of the printers and consumables for the U.S. Department of State passport contract and the Department of Defense, or DoD, Common Access Card, or CAC, contract from Toppan Printing Co. Ltd. Our reliance on these suppliers involves significant risks, including reduced control over quality and delivery schedules. Moreover, any financial instability of our manufacturers or contractors could result in our having to find new suppliers. We may experience significant delays in manufacturing and shipping our products to customers if we lose these sources or if supplies from these sources are delayed. As a result, we may be required to incur additional development, manufacturing and other costs to establish alternative sources of supply. It may take several months to locate alternative suppliers, if required, or to re-tool our products to accommodate components from different suppliers. We cannot predict if we will be able to obtain replacement components within the time frames we require at an affordable cost, or at all. Any delays resulting from suppliers failing to deliver components or products on a timely basis, in sufficient quantities and of sufficient quality or any significant increase in the price of components from existing or alternative suppliers could have a severe negative impact on our business, financial condition and results of operations.

**Termination of our contract with Georgia could cause us to lose $19.7 million in projected revenues over the next five and one-half years and could negatively affect our earnings.**

In July 2003, a Georgia court issued a preliminary injunction prohibiting Georgia's Department of Motor Vehicle Safety from continuing to work with us to install the State's new drivers' license system. The injunction is the result of a lawsuit filed in March 2003 by one of our competitors alleging that the Department of Motor Vehicle Safety did not comply with its own bid process when it selected a vendor for its new digital drivers' license program. In July 2004, we reached a settlement agreement with the State pursuant to which the Department of Motor Vehicle Safety terminated the contract for convenience and agreed to pay us $2.0 million in cash and the State agreed to

8

Table of Contents

purchase certain equipment from us for $500,000. The Department of Motor Vehicle Safety has filed a motion with the Georgia court to dismiss the case based upon the termination of the contract. The agency also has filed an affidavit stating that it intends to issue a new request for proposals for a digital drivers' license system before the end of October 2004. The competitor has filed a motion with the Georgia court to enjoin the Department of Motor Vehicle Safety and the State from making any payments to us under the settlement agreement. As a result of the termination of the contract, we will lose up to $19.7 million in revenue that we expected to recognize over the next five and one-half years, which was included in our $176 million of backlog at March 28, 2004, unless we are able to win the new contract for the digital drivers' license system and the revenues from such new contract are substantially similar to the terminated contract. While we believe we can utilize the remaining $2.8 million in assets being retained by us from the Georgia contract either in Georgia, if we win the contract based on the new request for proposals, or on alternative projects, to the extent that we are unable to utilize these assets or realize value through a sale of these assets, we would be required to take a charge to earnings.

### Our strategy of expanding our face recognition business could adversely affect our business operations and financial condition.

Part of our strategy is to enhance our leadership in face recognition technology and to expand our operations within our biometrics business segment. Pursuing this strategy involves risks. For instance, to date, face recognition security solutions have not gained widespread commercial acceptance. Some of the obstacles to widespread acceptance of face recognition security solutions include a perceived loss of privacy and public perceptions as to the usefulness of face recognition technologies. Whether the market for face recognition security solutions will expand will be dependent upon factors such as:

- the success of our marketing efforts and publicity campaigns and those of our competitors and
- customer satisfaction with our products and services, as well as those of our competitors.

We do not know when, if ever, face recognition security solutions will gain widespread commercial acceptance. In addition, our biometrics business segment has not achieved profitability, and it may never achieve profitability.

### We face intense competition, which could result in lower revenues and higher research and development expenditures and could adversely affect our results of operations.

The events of September 11, 2001 have heightened interest in the use of security solutions, and we expect competition in this field, which is already substantial, to intensify. We face competition in the secure credentials market from suppliers of drivers' licenses, passports, smart cards and other government-issued credentials. Competitors in biometrics are developing and bringing to market products that use face recognition as well as eye, fingerprint and other forms of biometric verification. Our products also will compete with non-biometric technologies such as certificate authorities and traditional keys, cards, surveillance systems and passwords. Widespread adoption of one or more of these technologies or approaches in the markets we intend to target could significantly reduce the potential market for our systems and products. Many of our competitors have significantly more cash and resources than we have. Our competitors may introduce products that are competitively priced, have increased performance or functionality or incorporate technological advances that we have not yet developed or implemented. To remain competitive, we must continue to develop, market and sell new and enhanced systems and products at competitive prices, which will require significant research and development expenditures. If we do not develop new and enhanced products or if we are not able to invest adequately in our research and development activities, our business, financial condition and results of operations could be negatively impacted.

### Unless we keep pace with changing technologies, we could lose customers and fail to win new customers.

Our future success will depend upon our ability to develop and introduce a variety of new products and services and enhancements to these new products and services in order to address the changing needs of the marketplace. We may not be able to accurately predict which technologies customers will support. If we do not introduce new products, services and enhancements in a timely manner, if we fail to choose correctly among technical alternatives or if we fail to offer innovative products and services at competitive prices, customers may forego purchases of our products and services and purchase those of our competitors.

9

## Table of Contents

capital requirements. In addition, in September 2003 and January 2004, we raised an aggregate of approximately $13.7 million in net proceeds through the private sale of shares of our common stock to certain institutional investors. These funds also were used for working capital. There are no special requirements or customer terms in our bank borrowings or other lease financing vehicles that are expected to have a material adverse effect on our working capital. As discussed more fully in "Management's Discussion and Analysis of Financial Condition and Results of Operations," we may raise additional capital, as needed, to fund working capital needs or growth activities.

### Employees

As of June 30, 2004, we had 188 full time employees and seven supplemental employees. Supplemental employees are employees on our payroll but who are not eligible for benefits. None of our employees is covered by collective bargaining agreements. We believe that our relations with our employees are good.

### Legal Matters

In July 2003, a Georgia court issued a preliminary injunction prohibiting Georgia's Department of Motor Vehicle Safety from continuing to work with us to install the State's new drivers' license system. The injunction is the result of a lawsuit filed in March 2003 by one of our competitors alleging that the Department of Motor Vehicle Safety did not comply with its own bid process when it selected a vendor for its new digital drivers' license program. In July 2004, we reached a settlement agreement with the State pursuant to which the Department of Motor Vehicle Safety terminated the contract for convenience and agreed to pay us $2.0 million in cash and the State agreed to purchase certain equipment from us for $500,000. The Department of Motor Vehicle Safety has filed a motion with the Georgia court to dismiss the case based upon the termination of the contract. The agency also has filed an affidavit stating that it intends to issue a new request for proposals for a digital drivers' license system before the end of October 2004. The competitor has filed a motion with the Georgia court to enjoin the Department of Motor Vehicle Safety and the State from making any payments to us under the settlement agreement. As a result of the termination of the contract, we will lose up to $19.7 million in revenue that we expected to recognize over the next five and one-half years, which was included in our $176 million of backlog at March 28, 2004, unless we are able to win the new contract for the digital drivers' license system and the revenues from such new contract are substantially similar to the terminated contract. While we believe we can utilize the remaining $2.8 million in assets being retained by us from the Georgia contract either in Georgia, if we win the contract based on the new request for proposals, or on alternative projects, to the extent that we are unable to utilize these assets or realize value through a sale of these assets, we would be required to take a charge to earnings.

On July 19, 2004, Fargo Electronics, Inc. initiated a patent infringement action in the U.S. District Court for the Eastern District of Virginia against Toppan Printing Co., Ltd. and TDT. The complaint alleges that Toppan and TDT's use, offer to sell and/or importation of certain personalized identification card printers, including Toppan's CP400 card printers, and associated laminators in the United States constitutes direct and indirect infringement of four patents allegedly owned by Fargo. The complaint seeks unspecified compensatory damages, permanent injunctive relief, trebling of damages for willful infringement and fees and costs. We are currently evaluating the claims in this lawsuit and intend to vigorously defend against them. We believe that the only products at issue are Toppan CP400 printers that were or are sold, used or imported as part of the CAC program. To date, we have received purchase orders of $10.2 million for Toppan CP400 printers for the CAC program, which are expected to be delivered by the end of the first quarter of 2005. There can be no assurance that we will prevail in this litigation. The litigation, with or without merit, could be time consuming and expensive to litigate or settle and could divert management's attention from our business.

We are not aware of any other legal matters that could have a material adverse effect on our business, financial condition or results of operations.

52