UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

In re VIISAGE TECHNOLOGY, INC.
SECURITIES LITIGATION

_____

This Pleading Applies to: All Actions

Civil Action No. 05-cv-10438-MLW

LEAD PLAINTIFFS' COMPENDIUM OF EXHIBITS SUBMITTED PURSUANT
TO THE COURT'S FEBRUARY 6, 2007 ORDER

Jeffrey C. Block, Esq.  (BBO# 6007470
Leslie R. Stern, Esq. (BBO# 631201)
**BERMAN DEVALERIO PEASE
TABACCO BURT & PUCILLO**
One Liberty Square, 8th Floor
Boston, MA 02109
(617) 542-8300

*Liaison Counsel for Lead Plaintiffs*

Jeffrey A. Klafter, Esq., *pro hac vice*
**KLAFTER & OLSEN LLP**
1311 Mamaroneck Ave., Suite 220
White Plains, NY 10605
(914) 997-5656

Kurt B. Olsen, Esq.
**KLAFTER & OLSEN LLP**
1250 Connecticut Ave., N.W.
Suite 200
Washington, D.C.  20036
(202) 261-3553

Stephen D. Oestreich, Esq.
Robert Cappucci, Esq.
William W. Wickersham, Esq.
**ENTWISTLE & CAPPUCCI LLP**
280 Park Avenue
26th Floor West
New York, NY 10017
(212) 894-7200

*Lead Counsel for Lead Plaintiffs*

## <u>TABLE OF CONTENTS</u>

October 1, 2003      Georgia Brief in Support of Defendants'
Motion to Dismiss or in the Alternative
to Add an Indispensable Party ........................................................Exhibit 1

November 7, 2003      Consent Order on Defendants' Motion
to Dismiss or in the Alternative to Add
an Indispensable Party ...............................................................Exhibit 2

November 12, 2003      Digimarc's First Amended Complaint for
Interlocutory and Permanent Injunctive Relief..............................Exhibit 3

April 20, 2004      Digimarc's Brief in Support of Plaintiff's Motion to
Compel Production of Documents from Viisage Technology........Exhibit 4

May 12, 2004      Viisage's Form 10-Q for the Quarterly
Period Ended March 28, 2004 ........................................................Exhibit 5

June 3, 2004      Georgia Court Order Granting Digimarc's
Motion to Compel.........................................................................Exhibit 6

June 21, 2004      Form S-3 Registration Statement and Preliminary
Prospectus for Viisage's 7.5 Million Share Offering.....................Exhibit 7

July 1, 2004      Digimarc's Brief in Support of its Motion to Compel
Compliance with Discovery Order, Revise Scheduling
Order and for Sanctions against Defendant Viisage ......................Exhibit 8

July 21, 2004      Viisage Press Release: Viisage Takes Initiative to
Help End Stalemate in Georgia Drivers' License
Contract Dispute .........................................................................Exhibit 9

July 21, 2004      Viisage Technology, Inc.'s Motion to Dismiss
and Supporting Memorandum ......................................................Exhibit 10

July 22, 2004      Q2 2004 Viisage Technology, Inc. Earnings
Conference Call .........................................................................Exhibit 11

July 22, 2004      Amendment No. 1 to Form S-3 and Preliminary
Prospectus for Viisage 7.5 Million Share Offering .....................Exhibit 12

August 4, 2004      Final Prospectus for Viisage 7.5 Million
Share Offering.............................................................................Exhibit 13

August 11, 2004      Viisage Form 10-Q for the Quarterly Period Ended
June 27, 2004 ...................................................................................Exhibit 14

August 18, 2004      Order on Plaintiff Digimarc Id Systems, LLC's Motion for
Temporary Restraining Order Seeking Preservation of Status
Quo and Supporting Memorandum Of Law ................................Exhibit 15

August 23, 2004      Digimarc's Second Amended Complaint ....................................Exhibit 16

September 2, 2004      Georgia Court's Order Granting Injunction
and Sanctioning Viisage ..............................................................Exhibit 17

October 5, 2004      Viisage Press Release:  Viisage Acquires
Imaging Automation and Expands Leadership
Position in Identity Solutions Market .........................................Exhibit 18

October 20, 2004      Digimarc's Brief in Opposition to Motion for
Summary Judgment by Viisage Technology, Inc. ......................Exhibit 19

October 21, 2004      Viisage Press Release:  Viisage Awarded Series
of Contracts Totaling $10.91 Million, Extending
Momentum with Identity Solutions and the
Drivers' License Market ..............................................................Exhibit 20

October 25, 2004      Viisage Press Release:  Viisage Reports
Record Results for Third Quarter ...............................................Exhibit 21

October 26, 2004      Q3 2004 Viisage Technology, Inc. Earnings
Conference Call ...........................................................................Exhibit 22

November 10, 2004   Viisage 10-Q for the Quarterly Period Ended
September 26, 2004 ......................................................................Exhibit 23

December 22, 2004   Georgia Court's Order and Judgment on Cross
Motions for Summary Judgment .................................................Exhibit 24

December 27, 2004   Viisage Press Release:  Viisage Issues
Statement on Digimarc v. State Of Georgia ...............................Exhibit 25

EXHIBIT 1

IN THE SUPERIOR COURT OF FULTON COUNTY

STATE OF GEORGIA

| | | |
|---|---|---|
| DIGIMARC ID SYSTEMS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Civil Action No. 2003CV66498 |
| GEORGIA TECHNOLOGY | ) | |
| AUTHORITY and the GEORGIA | ) | |
| DEPARTMENT OF MOTOR VEHICLE | ) | |
| SAFETY, | ) | |
| | ) | |
| Defendants. | ) | |

BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
OR IN THE ALTERNATIVE TO ADD AN INDISPENSABLE PARTY

I. STATEMENT OF THE CASE

On May 24, 2002, the Georgia Technology Authority ("GTA"), on behalf of the

Department of Motor Vehicle Safety ("DMVS"), issued Request for Proposal GTA000051

("RFP"), the purpose of which was to engage the services of a qualified vendor to provide a new

digitized drivers' licensing system for the State of Georgia. Record of the Proceedings

(hereinafter cited as "R."), Tab 3, Protest Decision p. 1. In the RFP, the DMVS sought a

qualified vendor to provide the new Digitized License System, to assist in minimizing costs, to

improve the level of performance, and to furnish new technology. Id. After a thorough

evaluation of the proposals submitted by three vendors, GTA and DMVS issued the Notice of

Award to Viisage Technology, Inc. ("Viisage"). R., Tab 3, Protest Decision pp. 2-6. Thereafter,

Viisage and DMVS entered into a contract dated November 12, 2002 (the "Contract") pursuant

to which Viisage is to provide Georgia with a new Digitized License System. Response to

Motion for Interlocutory Injunction (hereinafter cited as "Resp."), Exh. 17.

Plaintiff, a disgruntled bidder and the incumbent provider of Georgia's drivers' licensing

system, filed a protest of the award of the Contract to Viisage, which protest was decided

adversely to Plaintiff. R., Tab 3, Protest Decision p. 6. Plaintiff filed the Complaint on March 5,

2003. On May 20, 2003, Plaintiff filed a motion seeking to enjoin further implementation of and

performance under the Contract. On July 31, 2003, the Court entered an Order on Plaintiff's

Motion for Interlocutory Injunction (the "Order"), which enjoined GTA and DMVS "from all

further activities related to implementation of or performance under the contract."

## II. FACTUAL BACKGROUND

The defendant entities and Viisage completed the vast majority of the work required to

create Georgia's new Digitized License System prior to the entry of the Order. Resp. pp. 3-6.

Implementation of the Digitized License System required both the GTA and the DMVS to invest

substantial time and tax dollars to assure that it integrated with the DMVS' technology. Id. The

vendor, Viisage, necessarily made the greatest expenditures. Subsequent to the entry of the

Order, Elliot J. Mark, General Counsel for Viisage, informed the undersigned counsel of record

for the GTA and DMVS that Viisage had incurred approximately $7.7 million in costs under the

Contract prior to the entry of the Order. Exh. A, Attachment 1.

## III. ARGUMENT AND CITATION OF AUTHORITY

GTA and DMVS assert that "equity and good conscience" require this action not proceed

without Viisage being named as a party. O.C.G.A. § 9-11-19(b). Specifically, O.C.G.A. § 9-11-

19 mandates the joinder of persons needed for a just adjudication. GTA and DMVS, for the

reasons outlined below, state that if joinder of Viisage is not feasible, proceeding with this action

would prejudice GTA, DMVS and the State of Georgia in a way that could not be avoided or

lessened by protective provisions in a judgment and that the judgment rendered by the Court

would be inadequate. A judgment rendered in Viisage's absence also will be prejudicial to

Viisage, which prejudice can easily be avoided by joining Viisage. Finally, GTA and DMVS

assert that Plaintiff would have adequate relief in the event of a dismissal for nonjoinder and that

it was Plaintiff's choice and decision not to name Viisage to the action in the first place. These

factors support a ruling by this Court that this action should be dismissed in the event Viisage

cannot feasibly be joined to this action pursuant to O.C.G.A. § 9-11-19(b).

Since GTA and DMVS are not currently aware of any reason why Viisage cannot be

joined to this action by the Plaintiff, as an alternative to dismissal, GTA and DMVS assert that

O.C.G.A. § 9-11-19 (a) applies. It provides in pertinent part that:

> A person who is subject to service of process shall be joined as a party in the
> action if:
>     . . .
>     (2) He claims an interest relating to the subject of the action and is so
>     situated that the disposition of the action in his absence may:
>         (A) As a practical matter impair or impede his ability to protect that
>         interest; or
>         (B) Leave any of the persons who are already a parties subject to a
>         substantial risk of incurring double, multiple or otherwise
>         inconsistent obligations by reason of his claimed interest.
> If he has not been so joined, the court shall order that he be made a party. . . .

In the instant case, Viisage is a necessary party within the parameters of O.C.G.A. § 9-11-

19(a)(2) and, therefore, this Court should order that Viisage be made a party to this action.

A. Equity and good conscience demand the dismissal of this action if Viisage is not named a party.

A just adjudication of this action cannot be achieved without the presence of Viisage, the

successful vendor, thereby requiring its dismissal if Viisage is not joined. Equity and good

conscience demand no less. In a challenge to a competitively procured government contract

such as this, the successful vendor's unique relationship to the controversy compels a finding that it is not only a necessary but also an indispensable party to the action if a disgruntled bidder seeks to enjoin the award of the contract. E.g., Credle v. East Bay Holding Co., 263 Ga. 907 (1994)(successful bidder, East Bay Holding Co.. named as defendant); Amdahl Corp. v. DOAS, 260 Ga. 690 (1990)(IBM, the successful bidder, intervened as a necessary party); Hilton Constr. Co. v. Rockdale Co. Bd. Of Educ., 245 Ga. 533 (1980)(trial court ordered successful bidder, Cube Construction, be added as defendant). The question is not whether the Plaintiff seeks relief against Viisage but rather, whether Viisage has an interest relating to the subject and is so situated that the disposition of the action in its absence may as a practical matter impair or impede its ability to protect that interest. Hall v. Oliver, 251 Ga. App. 122, 123 (2001); Coe v. Greenville Credit & Inv. Co., 164 Ga. App. 521, 522 (1982). Here, Viisage has a *direct* interest in whether the Contract is declared null and void and its interests cannot be adequately protected in its absence.

In order to give finality to the litigation, and in the interest of justice. Viisage's rights should not be jeopardized without giving it an opportunity to be heard. If this Court grants an injunction without Viisage's being a party to the action, Viisage may later attack the judgment by filing a motion to vacate it or by filing an independent action. 42 AM. JUR. 2d Injunctions § 242 (2003. Neither consequence furthers judicial economy. A just and efficient adjudication of the issues presented can only be achieved if Viisage is joined as a necessary party pursuant to O.C.G.A § 9-11-19(a)(2) and failure to do so is grounds for dismissal of the action.

B. Viisage has an interest relating to the subject of this action and is so situated that disposition of the action in its absence will impede its ability to protest that interest.

An entity that is subject to service of process is to be joined as a party to an action if it has an interest relating to the subject of the action and is so situated that disposition of the action in

4

its absence may, as a practical matter, impair or impede its ability to protect that interest.

O.C.G.A § 9-11-19(a)(2)(A).  In the context of this litigation and its particular facts, Viisage is

so situated.  Viisage is a party to the Contract that Plaintiff seeks to have declared null and void

and permanently enjoined.  A determination by the Court that the Contract is illegal will

materially affect Viisage's rights under the Contract.  It is difficult to contemplate a more direct

interest in the matter.  As a practical matter, Viisage cannot protect this interest unless it is a

party to the action.  Hall v. Oliver, supra; Coe v. Greenville Credit & Inv. Co., supra.

In addition to Viisage's direct interest in the outcome of the case, the Complaint contains

allegations that relate solely to Viisage's ongoing business interests.  Plaintiff's Complaint

contains, without limitation, the following allegations based on information and belief:

1.   "this current Viisage price per card represents 67% of the estimated total cost of the
     components necessary to produce the ID Cards;" and

2.   "Viisage will lose $0.516 for every ID Card it produces."

Complaint ¶129.  Although the allegations are irrelevant to the merits of the case, the defendant

entities are in no position to refute or otherwise challenge them.  Viisage, on the other hand, not

only is in sole possession the underlying facts, it also has an interest in protecting its pricing

structure and other confidential business information, which might be valuable to its competitors,

such as Plaintiff, separate and apart from the this action.

As a Pennsylvania court recently noted: "While the government entity awarding a bid may

ordinarily be expected to wish to avoid having its contract upset, it is far from certain that in the

crucible of litigation it will always zealously defend the interests of the prevailing bidder.

Indeed, in some situations, it should not do so, for its duty is to its citizens and taxpayers, not its

contract partners."  Polydyne, Inc. v. City of Philadelphia, 795 A.2d 495, 496 (Pa. Commw. Ct.

2002). It is possible that such a conflict of interests will occur in the case at hand as certain allegations potentially create a divergence between the interests of the defendant entities and Viisage. Plaintiff alleges that specific actions taken by Viisage were improper. While the defendant entities have no reason to believe that the allegations are true, should subsequent disclosures cast doubt on the truthfulness of Viisage's proposal, their duty will lie with the citizens and taxpayers of Georgia, not Viisage.

Plaintiff's allegations include, without limitation, the following specific improper actions or inactions by Viisage:

1. "Viisage's further set of revised permanent ID cards were most likely printed by either laser Xerographic or fixed offset means and would not represent Viisage's 'proposed means of production;'" and

2. "the final card samples provided by Viisage were not even manufactured by Viisage."

Complaint ¶¶ 58 & 59; see also Transcript of Proceedings Before the Honorable Thelma Wyatt Cummings Moore on July 28, 2003 at pp. 33-34 & 47; Deposition of G. Theobald pp. 311-313; Exh. B (Order to Compel at Exh. A). Without admitting that the allegations are relevant even if true, GTA and DMVS simply assert that only Viisage can refute or explain the allegations. More importantly, Viisage has an interest in protecting its business reputation against any implication that it acted improperly, which is not the primary concern of the GTA and DMVS. Therefore, Viisage's interests cannot be fully represented without its presence in the litigation.

Where, as here, the granting of relief to the Plaintiff will prejudice the rights of third parties, and their rights cannot be saved by the judgment, the controversy cannot be justly

adjudicated without their presence. Blanton v. Duru. 247 Ga. App. 175, 177-78 (2000); Glover v. Allstate Ins. Co., 229 Ga. App. 235, 235-37 (1997).

C. Viisage has an interest relating to the subject of this action and is so situated that disposition of the action in its absence will leave the Defendants subject to a substantial risk of incurring multiple or otherwise inconsistent obligations by reason thereof.

Not only does Viisage's absence from the case impair its ability to protect its interests and rights under the Contract, its absence will leave DMVS, GTA and the State of Georgia subject to the substantial risk of incurring multiple or otherwise inconsistent obligations by reason thereof. The Georgia Supreme Court rejected the doctrine of binding precedent, as distinguished from the doctrine of stare decisis, in Norris v. Atlanta & West Point R.R. Co., 254 Ga. 684 (1985). Therefore, to the extent that Viisage has expended sums in furtherance of the Contract, see II. Factual Background, supra, the disposition of this action without Viisage's presence leaves the State of Georgia subject to the risk of inconsistent obligations if Viisage files suit on the Contract. Stenger v. Grimes. 260 Ga. 838 (1991); McCalla, Raymer, Padrick, Cobb, Nichols & Clark v. C.I.T. Finan. Serv., Inc., 235 Ga. App. 95, 96 (1998), limited on other grds by McCarter v. Bankers Trust Co., 247 Ga. App. 129 (2000).

The rule requiring that all persons whose rights might be affected by a judgment be made parties to the action is not simply one of practice or convenience. It is designed to give finality to litigation. Here, a decision permanently enjoining performance under the Contract necessarily raises the specter of a suit against the defendant entities by Viisage to determine if GTA and DMVS are liable to Viisage for the monies Viisage expended in furtherance of implementation of the Contract. The possibility of subjecting Georgia's taxpayers to the consequences resulting from inconsistent obligations is grounds for ordering that Viisage be joined as a necessary party. J.M. Huber Corp. v. Georgia Marble Co., 239 Ga. App. 271, 276-77 (1999).

In <u>Burt v. Board of Educ.</u>, 477 N.E.2d 247 (Ill. App. 3d Dist. 1985), an Illinois Appellate

Court examined the doctrine of joinder of indispensable parties in the government procurement

context. Recognizing that the successful bidder was a necessary and indispensable party, the

<u>Burt</u> court employed the following analysis:

> The action brought by [loosing bidder] was to determine the validity of the
> board's actions. . . . [Successful bidder] was awarded the contract and had all the
> benefits and rights under it. Though action by the board under the contract was
> restrained, the contract was presumed valid until declared otherwise. The award
> of the contract to a bidder will not normally be interfered with unless there is a
> showing of manifest injustice or palpable abuse of discretion. [Successful
> bidder's] interest was in a $297,000 contract. If a court held that the board could
> not go forward with the contract with [successful bidder], its rights would
> certainly be materially affected.
>
> [The successful bidder's] presence would also protect the interests of the board
> before the trial court. After the relief was granted below, [the successful bidder]
> filed suit. Inclusion of [the successful bidder] in the present case would help the
> board protect its own interests. It would also prevent issues from being
> relitigated. Although not an issue here, the trial court below wisely consolidated
> the two actions below. [The successful bidder's] inclusion would also lead to a
> final determination of the validity of the . . . contract, an important point in both
> actions. The one thing the overburdened court system does not need is two
> actions consecutively arguing the same issues. For the reasons stated, the
> inclusion of [the successful bidder] would also enable the lower court to make a
> complete determination of the controversy at hand.

<u>Id.</u> at 396 (citations omitted). Here, the same analysis applies: Viisage's absence will leave GTA

and DMVS subject to the risk of incurring multiple or otherwise inconsistent obligations.

Conversely, its presence in the case will permit a complete determination of the controversy.

Therefore, Viisage is a necessary party to this action.

## IV. CONCLUSION

Plaintiff alleges that the Contract by and between Viisage Technology, Inc. and the

Department of Motor Vehicle Safety is null and void and should have named Viisage

Technology, Inc. as a party to this action when it filed its Complaint. GTA and DMVS raised

the failure to name an indispensable party in their Answers to Plaintiff's Complaint. <u>See</u> GTA's

8

Second Amended Answer Fifteenth Defense and DMVS' First Amended Answer Fifteenth

Defense. Plaintiff elected not to name Viisage Technology, Inc. as a party to this suit as a matter

of convenience. Therefore, for the reasons outlined above, the Court should order a dismissal of

the case at hand or, in the alternative, require Plaintiff name Viisage Technology, Inc. as a party.

This 1st day of October, 2003.

Respectfully submitted,

THURBERT F. BAKER                     033887
Attorney General

DANIEL M. FORMBY                      269350
Deputy Attorney General

JOHN B. BALLARD, JR.                  035550
Senior Assistant Attorney General

EMILY P. HITCHCOCK                    357697
Assistant Attorney General

PLEASE ADDRESS ALL
COMMUNICATIONS TO:

EMILY P. HITCHCOCK
Assistant Attorney General
40 Capitol Square, S.W.
Atlanta, Georgia 30303
(404) 651-6249

9

EXHIBIT 2

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

```
FILED IN OFFICE
NOV - 7 2003
DEPUTY CLERK, SUPERIOR COURT
FULTON COUNTY, GA
```

DIGIMARC ID SYSTEMS, LLC,

    Plaintiff,

vs.                                                          Civil Action No. 2003CV66498

GEORGIA TECHNOLOGY AUTHORITY and
the GEORGIA DEPARTMENT OF MOTOR
VEHICLE SAFETY,

    Defendants.

---

## CONSENT ORDER ON DEFENDANTS' MOTION TO DISMISS OR IN THE ALTERNATIVE TO ADD AN INDISPENSABLE PARTY

    The parties to this action agree that Viisage Technology, Inc. ("Viisage") is a "necessary party" to this action, as that term is defined by Georgia law. The parties further agree that Viisage can be added as a party because this Court has personal jurisdiction over Viisage.

    THEREFORE, IT IS HEREBY ORDERED that Viisage be added as a party to this action. Plaintiff Digimarc will, by Tuesday, November 4, 2003, make a request to Viisage that Viisage join this action as a plaintiff, as contemplated by O.C.G.A. § 9-11-19(a). If Viisage refuses to join as a plaintiff by Friday, November 7, 2003, Digimarc will take the necessary action to join Viisage as an interested party defendant by Monday, November 10, 2003.

    This Consent Order resolves the issues raised by Defendants' Motion to Dismiss or in the Alternative to Add an Indispensable Party.

SO ORDERED, this 7th day of November 2003.

Judge Thelma Wyatt Cummings Moore
Fulton County Superior Court

CONSENTED TO:

David L. Balser
Georgia Bar No. 035835
John P. Hutchins
Georgia Bar No. 380692
Valerie D. Barton
Georgia Bar No. 040832
McKenna Long & Aldridge LLP
303 Peachtree Street, Suite 5300
Atlanta, Georgia 30308
(404) 527-4000
(404) 527-4198 (facsimile)
*Attorneys for Plaintiff*

Emily Hitchcock w/express permission VB

Emily P. Hitchcock
Georgia Bar No. 357697
Office of the Attorney General
40 Capitol Square SW
Atlanta, GA 30334-1300
(404) 651-6249
(404) 657-3239 (facsimile)
*Attorney for Defendants*

2

EXHIBIT 3



IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA



FILED IN OFFICE

NOV 1 2 2003

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

DIGIMARC ID SYSTEMS, LLC,

        Plaintiff,

v.

GEORGIA TECHNOLOGY AUTHORITY and
the GEORGIA DEPARTMENT OF MOTOR
VEHICLE SAFETY,

        Defendants

v.

VIISAGE TECHNOLOGY, INC., a Delaware
corporation,

        Necessary Party-Defendant.

Civil Action No. 2003CV66498

## FIRST AMENDED COMPLAINT FOR
## INTERLOCUTORY AND PERMANENT INJUNCTIVE RELIEF

    Plaintiff Digimarc ID Systems, LLC files this First Amended Complaint for Interlocutory

and Permanent Injunctive Relief, showing the Court as follows:

## PARTIES AND JURISDICTION

1.

    Digimarc ID Systems, LLC is a limited liability company organized and existing under

the laws of Delaware, and is registered to do business and does business in Georgia. Digimarc

has an office located at the headquarters of the Georgia Department of Motor Vehicle Safety,

2206 East View Parkway, Conyers, Georgia 30013.

2.

    Digimarc is the leading global provider of secure and durable personal identification

solutions and the leading producer of drivers' licenses in the United States, providing systems

and services to thirty-two states. Internationally, Digimarc provides systems and services for sixty national governments around the world.

3.

Digimarc is the incumbent provider of Georgia's Digitized License System. This system has been producing drivers' licenses and other identification cards for Georgia since 1996.

4.

Under O.C.G.A. section 50-25-1, Defendant Georgia Technology Authority ("GTA") is a body corporate and politic, an instrumentality of the state, and a Georgia public corporation. It may be served with process at its office at 100 Peachtree Street, Suite 2300, Atlanta, Georgia 30303.

5.

The Georgia Department of Motor Vehicle Safety ("DMVS") was created under O.C.G.A. section 40-16-2 and granted primary responsibility for, among other things, administering the laws and regulations relating to drivers' licenses. O.C.G.A. § 40-16-2(a)(2). DMVS may be served with process at its office at 2206 East View Parkway, Conyers, Georgia 30013.

6.

Viisage Technology, Inc. ("Viisage") is a provider of digital identification systems. It is a Delaware corporation with its principal place of business at 30 Porter Road, Littleton, Massachusetts 01460. Viisage was the winning bidder of the procurement that is the subject of this lawsuit.

7.

Under O.C.G.A. section 50-25-9, this Court has exclusive, original jurisdiction over this action, and venue is proper.

8.

Viisage is also subject to the personal jurisdiction of this Court.

## PRELIMINARY FACTS

9.

In or before spring 2002, GTA and DMVS embarked upon a plan to modernize Georgia's drivers' license and identification card system. Their stated purpose was to engage the services of a qualified and responsible vendor, experienced in providing a central issuance Digitized License System.

10.

This is an action for *de novo* judicial review of GTA and DMVS's procurement process in relation to an RFP issued by GTA on May 24, 2002, seeking a contractor to provide the services necessary to modernize Georgia's drivers' license and identification card system.

11.

Digimarc seeks to enjoin the implementation of the contract at issue and also seeks a mandatory injunction directing that GTA and DMVS award the contract arising out of the RFP to Digimarc and execute all contracts consistent with an award of the contract to Digimarc. In the alternative, Digimarc seeks an order requiring that GTA/DMVS re-bid the contract. Without such an injunction, Digimarc and Georgia's taxpayers will suffer immediate and irreparable harm and injury.

12.

In sum, GTA/DMVS acted arbitrarily and unfairly by their failure to follow Georgia law governing procurement, including applicable statutes, GTA's own rules and the specific requirements of the RFP, all of which are intended to protect the competitive bidding process and secure the services of a qualified, responsible and experienced vendor offering the "best value"

3

to Georgia.

13.

The arbitrary and unfair conduct by GTA/DMVS inured to the benefit of only one bidder – Viisage – and was detrimental to Digimarc.

14.

Despite the clear mandate in the RFP that all Offerors should be accorded fair and equal treatment with respect to any opportunity for clarification and revision of proposals, GTA and DMVS had improper communications with Viisage and granted repeated opportunities to Viisage, and only Viisage, to improve and revise its technical proposal until it was decreed by DMVS to be the most advantageous to Georgia. In so doing, GTA and DMVS failed to abide by the evaluation procedures set forth in the RFP, under GTA Rules, and under Georgia law.

15.

Moreover, GTA and DMVS applied different evaluation criteria in favor of Viisage over any other vendor, failed to properly apply the evaluation criteria governing the procurement and failed to consider all criteria that the RFP required to be considered, all to the benefit of Viisage and to the detriment of Digimarc.

16.

In addition, despite the RFP's mandate setting forth the term of the contract to be covered by the procurement, DMVS and GTA subsequently entered into an illegal contract that exceeded the contractual term dictated by the RFP.

**PROCEDURAL STATUS**

17.

Digimarc filed its original Verified Complaint for Temporary Restraining Order, Interlocutory and Permanent Injunctive Relief in this action on March 5, 2003.

4

18.

Digimarc filed a Motion for Interlocutory Injunction on May 20, 2003.

19.

After Digimarc, GTA, and DMVS fully briefed the issues, this Court held an oral hearing on Digimarc's Motion for Interlocutory Injunction on July 28, 2003 and subsequently entered an Order dated July 31, 2003 temporarily enjoining GTA and DMVS from "all further activities related to implementation of or performance under the contract dated November 12, 2002 between Viisage and DMVS, arising out of the procurement process engaged in by GTA on behalf of DMVS in connection with the RFP until further order of this Court."

20.

On October 1, 2003, GTA and DMVS filed a Motion to Dismiss or in the Alternative to Add an Indispensable Party, seeking an order directing Digimarc to add Viisage as a party to the action.

21.

On November 3, 2003, the parties submitted a Consent Order agreeing that Viisage is a "necessary party" to this action, as that term is defined by Georgia law.

22.

Viisage has an interest in the outcome of this action such that Viisage could have intervened under O.C.G.A. Section 9-11-24 had it chosen to do so. In fact, Viisage had previously notified DMVS that it had expended monies in furtherance of the contract at issue in this case. Notwithstanding, Viisage did not voluntarily intervene.

23.

Nonetheless, consistent with the Consent Order agreed to by Digimarc, DMVS and GTA, on November 4, 2003, Digimarc corresponded with Viisage and offered Viisage the opportunity

5

to join the action as a party plaintiff.

<div align="center">24.</div>

Viisage refused to join the action as a party plaintiff.

<div align="center">25.</div>

On November 7, 2003, this Court entered a Consent Order directing that Viisage be added as a necessary party.

<div align="center">**FACTS COMMON TO ALL COUNTS**</div>

The following facts are common to all counts of this complaint:

<div align="center">**The RFP – A Request For Proposals For A Digitized License System**</div>

<div align="center">26.</div>

On or about May 24, 2002, GTA issued RFP No. GTA000051 on DMVS's behalf.  A certified copy of the RFP was filed with this Court by Stipulation of Digimarc, GTA, and DMVS on June 17, 2003.

<div align="center">27.</div>

The RFP's stated purpose was to procure the services of a qualified, responsible, and experienced vendor to provide a central issuance Digitized License System, including, among other things, photograph, signature and fingerprint capture, storage, retrieval, and document production, all based upon a firm, fixed price for each driver's license, identification card, or special identification card successfully produced.  (RFP § 1.1.)

<div align="center">28.</div>

GTA decided that using competitive sealed bidding would not be practical or advantageous to Georgia in procuring the desired services.  (RFP § 1.2.)  GTA elected to conduct the Digitized License System procurement as a negotiated, solution-based solicitation. Nevertheless, the RFP stated that competitive sealed proposals were to be submitted in response

<div align="center">6</div>

to the RFP in the same manner as competitive sealed bids and that the proposals would be opened in the same manner as competitive sealed bids. (RFP § 1.2.)

29.

The RFP established certain mandatory functional requirements, optional components, general work requirements and office space and support requirements for the Digitized License System. (RFP § 3.3.)

30.

In addition, the RFP set forth mandatory design specifications for permanent drivers' licenses, non-driver identification cards, and special identification cards and also set forth general guidelines for temporary cards that would be issued pending the issuance of the permanent cards. (RFP §§ 3.4-3.7.)

31.

The RFP also set forth requirements for the following:

a.   Digitized License System workstations;

b.   specifications for the Central Imaging System, which would be the central repository maintained by the successful offeror for all images used for the license and card issuance process;

c.   testing standards for the system;

d.   operational supplies;

e.   reporting;

f.   training and documentation; and

g.   other functionalities that DMVS could elect to procure or utilize at its option.

(RFP §§ 3.8-3.14.)

32.

The RFP required each Offeror to respond with a Technical Proposal and a separate Cost Proposal. (RFP § 4.2.) The RFP's stated criteria of evaluation was that any failure of a vendor's submitted proposal "to meet any minimum requirement **will** cause [a] reduction in the evaluation scoring of the Offeror's proposal." (RFP § 3.1.1 (emphasis in original).)

33.

The RFP mandated that a comprehensive, fair, and impartial evaluation of the proposals received would be conducted in the following steps:

a.    evaluation of technical proposals;

b.    identification of Offerors that meet the minimum technical requirements;

c.    evaluation of price proposals;

d.    identification of Offerors' eligibility for demonstrations;

e.    evaluation of demonstrations; and

f.    evaluation of proposal on the basis of technical and cost factors.

(RFP § 5.1.)

34.

The Offerors' Technical Proposals and separate Price Proposals were both due by July 19, 2002. (RFP App. A, Addendum No. 3.)

35.

The RFP mandated that evaluations of the Technical Proposals ("Phase 1") would be completed before GTA and DMVS proceeded to evaluate the Offerors' Price Proposals ("Phase 2"). (RFP §§ 5.1, 5.5.)

36.

The RFP mandated that "[i]ncompleteness or significant inconsistencies or inaccuracies

8

in the Technical Proposal will result in a reduction of the evaluation rating." (RFP § 5.5.)

37.

According to the RFP, after the Price Proposals were evaluated, the Offerors would be accorded fair and equal treatment with respect to any opportunity for discussion and revision of their respective Price Proposals for the Technical Proposals that had been evaluated in Phase 1. (RFP § 5.6.)

38.

The procurement contract was to have a target implementation date of June 27, 2003 for the Digitized License System. (RFP App. A, Addendum No. 3.)

**Offerors' Initial Responses and Problems with Unequal Treatment**

39.

On July 19, 2002, three Offerors presented their bid proposals to GTA in response to the RFP: Digimarc, Viisage, and SoftLEAD, Inc.

40.

An evaluation team comprised of GTA and DMVS representatives reviewed each Offeror's bid proposal between July 29, 2002 and August 1, 2002. Copies of the Evaluation Results and Evaluation Sheets for Digimarc and Viisage are attached hereto as Exhibits A and B, respectively. (Ultimately, SoftLEAD's proposal was rejected by GTA and DMVS. Neither its proposal nor the evaluation of its proposal is at issue in this case.)

41.

GTA and DMVS utilized a "trade off" or "ranking" method of source selection, which permits "communications" to establish competitive ranges or negotiations, and final price adjustments or best and final offers. (RFP § 5.6; GTA Rule 665-2-4-.02(a)(9)(ii).)

42.

"Communications" are defined under the Rules, however, "as exchanges between the

state and Offerors after receipt of offers to address issues of past performance, to enhance the

state's understanding of offers, to allow reasonable interpretation of the offer, or to facilitate the

state's evaluation process." (GTA Rule 665-2-1-.02(f).) The Rules specifically state that

"[c]ommunications shall not be used to cure material omissions in the offer." (GTA Rule 665-2-

1-.02(f).)

43.

From the beginning of the evaluation process, significant problems developed in regard

to GTA and DMVS's compliance with the requirements of the RFP and applicable procurement

laws, including GTA Rules, resulting in substantially unequal and otherwise illegal disparities in

the treatment of the Offerors, as described in detail below.

44.

For example, in violation of the evaluation steps set forth in RFP § 5.1, mandating that

Phase 1 technical evaluations be completed before proceeding to evaluate the Offerors'

respective price proposals, by July 31, 2002, GTA and DMVS representatives had already

opened the price proposals even though, as shown herein, they still had serious issues with the

Viisage's technical proposal.

45.

Viisage's initial price proposal per card was 65% lower than anyone else's proposed

price.

46.

After prematurely reviewing the Offerors' price proposals, GTA and DMVS further

violated the required procedures governing the procurement, resulting in significant disparity in

10

the treatment of Viisage and Digimarc with respect to a variety of issues. The first of these

issues is the evaluation of temporary and permanent drivers' licenses, non-driver identification

cards and special identification cards (hereinafter sometimes referred to collectively as "ID

Cards"), as further set forth below.

### Temporary and Permanent Licenses

47.

The RFP required the Offerors to submit sample ID Cards for evaluation at the time that

they filed their Technical Proposal, on July 19, 2002. (RFP §3.6.1.2.)

48.

As part of the technical submission for the permanent ID Cards, the RFP mandated that

the Offeror's proposed permanent ID Cards "**must** be verified to meet AAMVA testing

standards by a certified testing lab and the results **must** accompany the Offeror's proposal."

(RFP § 3.5.4.3 (emphasis in original).) Moreover, the RFP mandated that "DMVS shall conduct

independent testing of sample documents." (RFP § 3.5.4.3.)

49.

Included with the proposals of Viisage and Digimarc were their respective independent

lab tests for the permanent ID Cards that each was offering as mandated by sections 3.5-3.7 of

the RFP. A copy of Viisage's independent lab test report is attached hereto as Exhibit C.

50.

In its Proposal dated July 19, 2002, Viisage proposed to offer a permanent card that was a

10/10/10 Polyester/Teslin/Polyester card design. (Ex. D at D-39.) The mandatory independent

test report provided by Viisage for its July 19, 2002 permanent card proposal was for this

specific card structure.

11

51.

Viisage's sample permanent ID Cards that it proposed as part of its July 19, 2002 Technical Proposal were defective from the start. In sum, GTA and DMVS's testing found two critical flaws in Viisage's permanent ID samples: (1) the lamination on the ID Cards was easily removed, such that the printed information on the ID Cards could be altered and re-assembled without detection; and (2) the samples could not withstand minimum solvent strength tests.

52.

In violation of GTA Rules 665-2-4-.06 and .07, and despite the fact that all samples were to have been provided with the Technical Proposal, GTA wrote to Viisage in an e-mail dated August 1, 2002 (in the guise of a "clarification") and notified Viisage of the specific deficiencies with its temporary and permanent card proposals. (Ex. E.)

53.

No similar communication was made with either of the other Offerors.

54.

DMVS then prepared and delivered to GTA a report detailing its concerns with both the permanent and temporary ID Cards proposed by Viisage. The report reaffirmed that was easy to tamper with the permanent ID Cards proposed by Viisage because the laminate could be removed, permitting the information or the card to be altered.

55.

DMVS also included a gratuitous statement that the Digimarc permanent card could be broken into two separate pieces after being repeatedly folded. However, the RFP's specifications for permanent ID Card durability did not require that an Offeror design a permanent card that could withstand breaking regardless of the method of folding applied. (RFP § 3.5.4.) The permanent ID Card samples tendered by Digimarc to GTA and DMVS complied

with industry standards for flexing without fracture.

56.

On August 9, 2002, GTA informed the Offerors of a purported "clarification" meeting to be conducted on August 14, 2002 to discuss certain stated shortcomings in the durability and security standards for both the temporary and permanent ID Card samples presented by the Offerors. However, although both durability and security issues had been raised with respect to Viisage's card solutions, the only issued that had been raised by GTA and DMVS with respect to Digimarc's permanent card solution was the issue of breaking in response to repeated bending – a durability issue.

57.

Importantly, at this point in time, Viisage was aware of exactly what deficiencies DMVS had identified with Viisage's proposed card solutions. Digimarc was not given similar information.

58.

In violation of RFP section 5.4, GTA then held an oral "clarification" meeting with all three Offerors on August 14, 2002. At the meeting, GTA requested what it termed "supplemental information" and mandated that each Offeror submit 18 production grade permanent and temporary card samples by August 26, 2002. At this point in time, there had been no problem identified with the security of Digimarc's permanent card solution, but Digimarc was nonetheless told that DMVS had identified problems with durability and security of all categories of cards for all vendors.

59.

At the August 14, 2002 meeting, GTA and DMVS also stated that all of the Offerors' proposed temporary ID Cards had failed to pass DMVS's undisclosed testing procedures for

13

these samples. No communication was made at that meeting regarding any specific failure by any Offeror relating to permanent ID Cards. Rather, the focus of the meeting was upon the purported failure of the Offerors to provide temporary ID Cards that passed all of DMVS's undisclosed testing procedures. DMVS disclosed the type of testing agents that had been applied to the temporary ID Cards, but it did not disclose how the testing agents had been applied. Instead, DMVS simply requested that the Offerors "be creative" and submit new temporary ID Card approaches that might pass DMVS's undisclosed testing techniques. Moreover, the parties were told during this meeting that they could submit a temporary solution that was on a medium other than paper .

60.

Digimarc then provided additional samples of proposed permanent and temporary ID Card samples by GTA's deadline of August 26, 2002.

61.

DMVS evaluated Digimarc's proposed permanent and temporary ID Card solutions and rated both solutions as "acceptable."

62.

Viisage's August 26 submission, on the other hand, was deficient in several respects. (Ex. F.)

63.

In violation of GTA Rules, GTA again communicated to Viisage under the guise of a "clarification" and gave Viisage yet another opportunity to submit samples that complied with the requests previously made to all bidders. (Ex. F.)

64.

GTA did not provide Digimarc with any notice or indication that any part of its Technical

Proposal that might have been deemed unsatisfactory by GTA and DMVS could be modified or provided late.

65.

Viisage submitted its sample documents after the expiration of the August 26 deadline.

66.

When Viisage finally did submit the cards that should have been submitted by August 26, it substantially changed its Technical Proposal for permanent ID Cards from its once proposed 10/10/10 Polyester/Teslin/Polyester card structure to a new 6/14/10 Confirm/Teslin/Polyester card structure. (Ex. G.)

67.

The RFP had mandated to all Offerors that samples had to be production quality.

68.

GTA had also specifically instructed Viisage that it was to provide sample ID Cards "produced using the same methods, materials, equipment, and specifications as what is being proposed to Georgia." (Ex. F.) Viisage failed to comply with this requirement and GTA/DMVS took no action to determine whether Viisage had complied with this requirement.

69.

GTA/DMVS failed to take any action to determine whether the permanent card samples submitted by Viisage were actually consistent with the card structure proposed by Viisage in writing.

70.

The permanent card samples produced by Viisage were not consistent with the card structure and methodology of production proposed by Viisage in writing for its newly proposed 6/14/10 Confirm/Teslin/Polyester card structure.

15

71.

As of August 29, Digimarc was the only vendor who had submitted permanent and temporary card solutions that had been deemed "acceptable" by DMVS.

72.

DMVS decided to wait until after Viisage submitted its late samples and then make an immediate recommendation as to which bidder would be the apparent winner.

73.

When the Evaluation Team reviewed Viisage's late-submitted samples and found them deficient, the Evaluation Team decided not to make a recommendation.

74.

Subsequently, GTA/DMVS decided to ask for a "demonstration," in violation of RFP section 5.5.2.

75.

GTA then issued a September 16, 2002 e-mail to all vendors which misled Digimarc into changing its temporary document solution from the solution that had previously been rated "acceptable" to another solution.

76.

Digimarc and Viisage then performed demonstrations on September 26, after which Viisage temporary card solutions were deemed "acceptable" and Digimarc temporary card solutions were deemed "unacceptable."

77.

Accordingly, after Viisage's temporary cards were rated as "unacceptable," the Evaluation Team changed the rating criteria and changed the rating of Digimarc's temporary card solutions from "acceptable" to "unacceptable."

16

78.

Digimarc thereafter revised its formulation for the temporary ID Cards to meet or exceed the standards tested by DMVS. Digimarc offered to provide GTA and DMVS with modified temporary ID Card samples for testing purposes. In contrast to the repeated opportunities given to Viisage, however, GTA and DMVS declined Digimarc's offer and refused to test Digimarc's new samples.

79.

The August 2002 Viisage permanent card samples selected by GTA/DMVS as the winning card design were not manufactured by Viisage.

80.

The August 2002 Viisage permanent card samples selected by GTA/DMVS as the winning card design were, in fact, cards from the New York State drivers' license program, which was state program under contract with another vendor - De La Rue.

81.

The August 2002 permanent card samples provided by Viisage to GTA/DMVS and selected as the winning card design were produced by Xerographic press production and not by the Indigo press method of production that had been proposed by Viisage in its Technical Proposal.

82.

Viisage did not procure an Indigo press for production of drivers' licenses until sometime in the year 2003.

83.

Viisage's permanent ID Card samples, made by Xerographic or fixed offset means, did not represent Viisage's "proposed means of production," as submitted by Viisage to GTA and

17

DMVS as its final permanent ID Card design.  The samples provided by Viisage would not have been, therefore, production grade samples, as required by the RFP.

84.

As such, Viisage never demonstrated the capability to produce the most important aspect of Georgia's Digitized License System: a card that was durable and that could not easily be tampered with.

85.

Prior to awarding the contract to Viisage, DMVS was aware that Viisage had not manufactured the New York drivers' license samples provided by Viisage.

86.

Prior to awarding the contract to Viisage, DMVS failed to investigate the circumstances behind how Viisage had obtained the New York drivers' license samples that Viisage had submitted.

87.

Upon information and belief, GTA and DMVS elected not to subject the Viisage permanent ID Cards (submitted on August 29, 2002) for testing and evaluation.

88.

As such, because GTA and DMVS failed to conduct their own testing or to adhere to the RFP requirements that 1) Viisage submit independent lab testing; and 2) the samples submitted were production grade samples produced by the same method of production actually proposed by Viisage, GTA and DMVS had no way of knowing if the newly proposed card structures and samples would meet the RFP's durability requirements.

## Best And Final Offer

89.

On October 8, 2002, GTA forwarded Digimarc and Viisage a detailed request for a Best and Final Offer to be received by GTA no later than October 15, 2002.

90.

By October 8, however, DMVS had already determined that Viisage was the apparent winner, and the only purpose of BAFO was to attempt to drive Viisage's price down.

91.

Digimarc responded with its Best and Final Offer on October 15, 2002, including a sample of its modified temporary ID Card solution.

92.

Viisage also responded with its Best and Final Offer on or about October 15, 2002.

93.

On October 22, 2002, DMVS Business Analyst George Theobald notified Charles Nixon, GTA Contracting Officer for the RFP, as follows:

> DMVS has identified the proposal that initially appears to be most advantageous to the state, and we would like to begin the process of negotiating a contract. As part of this process, we would like to validate our technical findings with this Offeror during negotiations. Although a brief demonstration was held with each Offeror last last [sic] month, it was limited to the issuance of a Temporary Document and it did not cover some of the other critical capabilities needed in the new system. To adequately verify our decision, more extensive demonstrations and discussions of the proposed solution by the Offeror will be necessary.

(Ex. H.) Theobald's communication continued by listing minimum requirements for at least four presentations to be conducted by "this Offeror" only.

94.

On October 23, 2002, DMVS sent to GTA a draft evaluation result of Digimarc that was

19

still a "work in progress," but showing that DMVS had elected not to test the revised samples of

Digimarc's temporary ID Cards. (Ex. I.)

95.

On October 28, 2002, prior to any proposed presentation by Viisage, DMVS

Commissioner Tim Burgess sent a letter to Michael McClearn, Procurement Director of GTA,

informing McClearn that Viisage was the "apparent winner" of this RFP. (Ex. J.)

96.

Burgess requested a prompt demonstration of Viisage's complete system and,

"[a]ssuming a successful demonstration," asked to begin contract negotiations immediately. (Ex.

J.)

97.

On October 28, 2002, McClearn told Burgess that GTA:

> would prefer to treat the final demonstration and the negotiations
> as separate events. Once they have satisfied DMVS with an
> acceptable demo [Nixon] will be prepared to give them a letter,
> notifying them that they are the apparent winner and immediately
> invite them to enter into negotiations to finalize the contract. I
> think this will expedite the process. Of course, all of this will
> remain closed and confidential until the ink is dry on the contract.

(Ex. K.)

98.

Despite the selection of the apparent winner of the RFP, Theobald expressed the

following concerns to Nixon:

> As part of [the contract negotiations] process, we would like to
> validate our technical findings with this Offeror during
> negotiations. Although a brief demonstration was held with each
> Offeror last last (sic) month, it was limited to the issuance of a
> Temporary Document and it did not cover some of the other
> critical capabilities needed in the new system. To adequately verify
> our decision, more extensive demonstrations and discussions of the

proposed solution by the Offeror will be necessary.

(Ex. L (emphasis added).)

99.

GTA requested that Viisage perform additional demonstrations because "DMVS/GTA wants to be sure that the vendor selected can deliver all requirements on time and problem free. DMVS/GTA wants a demonstration that would show all requirements to assure that the vendor can meet the delivery schedule." (Ex. M.)

100.

GTA/DMVS did not request that Digimarc make any similar, additional demonstrations.

101.

Even before Viisage's additional demonstrations, however, GTA/DMVS and Viisage commenced contract negotiations. GTA and DMVS provided Viisage with a draft procurement contract on October 30, 2002. (Ex. N.)

102.

In fact, prior to entering into contract negotiations with Viisage, GTA had not even been made fully aware of DMVS's final scoring of the Offerors' proposals, as DMVS did not send GTA the final score sheets of the evaluations of the Offerors until November 6, 2002. (Ex. O.)

103.

Nonetheless, on November 6, 2002, after contract negotiations with Viisage were already underway, DMVS indicated to GTA that the award of the RFP should be contingent upon Viisage's financial capability / profile being substantially the same, as well as the staffing for the project.

104.

Then, on November 7, 2002, Viisage indicated that it wanted to change its Technical

21

Proposal again. On this date, Viisage informed GTA of a material change in its proposed Point of Sale software proposal. Viisage sought permission to replace its proposed vendor for the Point of Sale software with CenterStage. (Ex. P.)

105.

On November 7, 2002, Viisage forwarded GTA executed copies of both the contract and software escrow agreements. (Ex. Q.)

106.

GTA and DMVS provided Viisage an opportunity to make an additional demonstration to the evaluation team on November 12, 2002. Upon information and belief on that date, Viisage performed the requested demonstrations.

107.

On November 12, 2002, GTA provided Viisage with a Notice of Award, and DMVS signed a contract with Viisage. (Ex. R.)

108.

Ultimately, the preferences granted to Viisage, as described above and as further described below, contributed to the conclusion by GTA and DMVS that "[a]ll 'Unsatisfactory' ratings identified during the evaluation of the initial proposal were rectified during the resubmission and clarification phases." (Ex. C at 5.)

109.

But Digimarc was not made aware of or granted the same opportunity by GTA and DMVS to demonstrate or to rectify any unsatisfactory ratings, either before or after Digimarc's Best and Final Offer.

110.

As noted above, a number of Viisage's unsatisfactory ratings dealt with the actual failure

22

of performance tests relating to Viisage's proposal for Permanent ID Cards. Viisage was also granted substantial preferences in its opportunities to cure defects with respect to Temporary ID Cards. These elements of the RFP comprised critical portions of the central issuance system.

111.

The preferential treatment granted by GTA and DMVS to Viisage by allowing Viisage multiple opportunities to cure defects in its proposals violated the express terms of the RFP, which mandated that all Offerors should be accorded fair and equal treatment with respect to any opportunity for discussion and revision of proposals. (RFP § 5.6.) This error resulted in Viisage having been wrongfully awarded the contract at issue. Had this error not been made, Digimarc would have been awarded the contract.

### Discrepancies in Evaluation Process

112.

In addition to the preferential treatment with regard to the Offerors' responses to the RFP in the area of permanent and temporary ID Cards and the Offerors' Best and Final Offers, GTA and DMVS failed to follow the RFP's requirements regarding the overall evaluation of the Offerors' responses to the RFP.

113.

The RFP directed that no other factors or criteria could be used in the evaluation of proposals except for the evaluation factors set forth in the RFP. (RFP § 5.7.)

114.

GTA and DMVS established certain minimum requirements with respect to proposals submitted by Offerors, and stated: "Whenever the terms **"shall"**, **"must"**, **"will"**, or **"is/are required"** are used in the RFP, the specification being referred to is a **minimum requirement** of this RFP. Failure to meet any minimum requirement **will** cause reduction in the evaluation

23

scoring of the Offeror's proposal." (RFP § 3.1.1 (emphasis in original).)

115.

The RFP specified that the Scope of Work technical requirements referenced under

Section 3 of the RFP would be considered as factors in the evaluation process of each Offeror's

technical proposal and were ranked by relative importance on a scale of "Most Important – Very

Important – Important, in descending order." (RFP § 5.3 (emphasis added).)

116.

Accordingly, an Offeror's ability to provide GTA and DMVS with a superior solution for

the first critical and fundamental evaluation factors should have been accorded greater weight by

the Evaluation Committee than the Offeror's solution for less important evaluation factors.

117.

For example, section 3.3.1 of the RFP listed the Overall Solution Functional

Requirements. These requirements should have been accorded greater weight in the evaluation

process than the Offeror's ability to provide the Optional Components listed in section 3.3.2 of

the RFP.

118.

GTA and DMVS also judged the Offeror's response to each individual evaluation factor

using the following "adjectival" ratings scale: Excellent – Good – Satisfactory – Unsatisfactory.

(RFP §§ 1.2, 5.5.1.1.)

119.

The combined GTA and DMVS evaluations of each Offeror are included in Exhibits B

and C hereto.

120.

According to the Digimarc Evaluation, Digimarc received a rating of "Excellent" with

respect to six responses, a rating of "Good" with respect to eight responses, a rating of "Satisfactory" with respect to 202 responses, and a rating of "Unsatisfactory" with respect to only three responses. (Ex. A.)

121.

More importantly, Digimarc received the top score of "Excellent" on its responses to four of the first ten critical and fundamental evaluation factors. (Ex. A.)

122.

Digimarc also received the top score of "Excellent" for its recommended method of encryption and superior availability requirements for its travel back-up workstations. (Ex. A; RFP §§ 3.6.6.2, 3.8.12.)

123.

In contrast, Viisage did not receive a single score of "Excellent" on its responses to the first ten critical evaluation factors. According to the Viisage Evaluation Sheet, Viisage received a rating of "Excellent" with respect to eleven responses, a rating of "Good" with respect to ten responses, a rating of "Satisfactory" with respect to 189 responses, and a rating of "Unsatisfactory" with respect to nine responses. Nine of out Viisage's first ten responses were rated merely as "Satisfactory" by the evaluation team. (Ex. B.)

124.

If GTA and DMVS had truly ranked the technical requirements in Section 3 of the RFP by relative importance on a scale of Most Important – Very Important – Important, in descending order, Digimarc's ability to provide a superior solution for the initial critical technical requirements would have been accorded far greater weight by GTA and DMVS in the evaluation process than Viisage's favorable scores on factors of lesser relative importance.

25

125.

The failure by GTA/DMVS to properly weight Digimarc's scores, as compared to

Viisage's, coupled with Viisage's repeated and unique opportunities to correct unfavorable

scores, as noted above, unfairly and illegally resulted in the award of the contract to Viisage.

Had these failures by GTA/DMVS to adhere to the RFP not occurred, Digimarc would have been

awarded the contract.

### Financial Capabilities

126.

GTA and DMVS also erred by failing to evaluate diligently Viisage's financial capability

to perform if awarded the contract, which resulted in the wrongful award of the contract at issue

to Viisage.

127.

Under O.C.G.A. section 50-25-7.3(6), GTA shall abide by the following standard when

awarding contracts by soliciting competitive sealed proposals:

> The award shall be made to the <u>responsible vendor</u> or vendors
> complying with the technology and architecture standards and
> policies of the [GTA] whose proposal or bid was timely and is
> determined in writing to be the most advantageous to the state,
> taking into consideration the evaluation factors set forth in the
> request for proposals or bids.  No other factors or criteria shall be
> used in the evaluation.

O.C.G.A. § 50-25-7.3(6) (emphasis added).

128.

Furthermore, under GTA Rules, an "[a]ward must be made to the <u>responsive and</u>

<u>responsible offeror</u> whose offer is determined in writing to be the most advantageous to the state,

using all evaluation factors set forth in the solicitation." GTA Rule 665-2-4-.02(a)(8) (emphasis

added).

26

129.

In assessing whether an Offeror is responsible, GTA should have given consideration to the Offeror's financial solvency and overall ability to respond in quality and fitness to the particular requirements of the contract in question.  1974 Ga. Op. Att'y Gen. No. 74-16.

130.

In the RFP, GTA expressed the importance it purportedly placed on the Offerors' financial capability to perform.  Because "[f]inancial stability [was] very important in the overall assessment of a company's expected performance," each Offeror was required to provide sufficient financial data, including information regarding any bankruptcies within the past five years, to lead the RFP evaluators to the conclusion that the offeror had the financial capability to perform.  (RFP § 4.2.1.3.4.)

131.

The RFP stated that an unsatisfactory evaluation with respect to the company's financial stability "may cause a serious impact to the overall evaluation."  (RFP § 4.2.1.3.4.)

132.

Viisage failed to submit financial data sufficient "to lead evaluators to the conclusion that [Viisage] ha[d] the financial capability to perform" in its response to the RFP.  Thus, Viisage failed to comply with the requirements of section 4.2.1.3.4.

133.

It does not appear that GTA reduced Viisage's overall rating for Viisage's failure to provide financial data as required by RFP section 4.2.1.3.4 and GTA Rule 665-2-4-.02(a)(8).

134.

GTA/DMVS did not conduct any meaningful evaluation of Viisage's financial ability to perform, beyond reviewing two of Viisage's SEC filings and a Dunn & Bradstreet report.

135.

This review of the scant financial data regarding Viisage was conducted only _after_ GTA/DMVS had determined to award the contract to Viisage on or before October 22, 2002.

136.

The first act that GTA/DMVS undertook toward completing any due diligence on Viisage's financial viability appears to have occurred on November 1, 2002, when DMVS sent GTA a copy of Viisage's second quarter 10-Q filing with the Securities and Exchange Commission. (Ex. S.) As noted above, however, by October 22, 2002, DMVS had already determined Viisage to be the "apparent winner."

137.

The only other fact that evidences any due diligence undertaken by GTA/DMVS to determine whether Viisage was financially capable of performing was the fact that GTA ordered a Dun & Bradstreet report on Viisage on November 7, 2002. (Ex. T.)

138.

Indeed, in the November 12, 2002 Notice of Award given to Viisage, GTA specifically stated that a condition of the contract's award to Viisage would be Viisage's "Financial capability/profile being substantiated." (Ex. R.)

139.

Contrary to this mandate, however, Viisage never provided any demonstration of its financial stability to perform. Instead, immediately after the demonstration, DMVS and Viisage signed the contract, the very same day as the Notice of Award.

140.

In fact, Viisage purposely waited until November 13, 2002 to file its third quarter 10-Q report with the Securities and Exchange Commission, a report that demonstrated Viisage to be

even more financially weak then appeared in its second quarter 10-Q report that gave rise to

Georgia's insistence that Viisage provide proof of its financial stability proof.  It did not provide

this report to GTA/DMVS.  (Ex. U.)

<div align="center">141.</div>

In the Risk Factor Analyses provided in Viisage's November 13, 2002 third quarter 10-Q

filing with the Securities and Exchange Commission for the period ended September 29, 2002,

Viisage acknowledged "[their] potential inability to obtain additional capital required for funding

[their] operations and financing [their] growth" as a material risk factor.  (Ex. U at 13.)

<div align="center">142.</div>

This 10-Q report for third quarter of 2002 also revealed that Viisage was in default of

certain financial covenants with its creditors.  (Ex. U at 13.)

<div align="center">143.</div>

As a result of a forced renegotiation of certain financial covenants, it was revealed that

Viisage had further reduced its total available operating line of credit to $4 million.  (Ex. U at

12.)

<div align="center">144.</div>

Additionally, during the first nine months of 2002, Viisage's reported loss in earnings for

the quarter totaled $6.5 million.  (Ex. U at 4.)

<div align="center">145.</div>

Accordingly, Viisage did not submit financial data sufficient to support the conclusion

that Viisage had the requisite financial capability to perform.

<div align="center">146.</div>

GTA and DMVS failed to perform the financial assessment tests mandated by the RFP.

<div align="center">29</div>

147.

These errors resulted in the wrongful award the contract at issue to Viisage. Had these errors not been made, Digimarc would have been awarded the contract.

**Cost Realism Analysis**

148.

As defined in Appendix D of the RFP, the term "evaluation" means:

> The in-depth review and analysis of Offeror's proposals. It involves the application of judgment to the Offeror's proposed price and performance using the express evaluation factors and criteria in the solicitation and the procedures outlined herein. The purpose of evaluation is to identify deficiencies, omissions, and need for clarification in proposals, <u>determine the existence of price and technical realism</u>, and discriminate among proposals as to which best meets the acquisition objectives so that an appropriate selection and award is made.

(RFP App. D (emphasis added).)

149.

Accordingly, the RFP mandated that, as part of its evaluation of any Technical Proposal and Cost Proposal, GTA and DMVS were required to conduct some form of price and technical realism analysis to determine if the proposed price had a sound economic basis in relation to the Technical Proposal and, thereby, to ensure that Georgia did not risk the ongoing viability of the Digitized License System by awarding the procurement contract to a vendor operating at a loss or selling a product/service at a less than sustainable margin. (RFP App. D.)

150.

Price proposals were also to be evaluated not only in terms of the overall price to Georgia but also the relative value offered by Offeror's price for the services that will actually be rendered. (RFP § 5.3.)

151.

Absent price and technical realism analysis, however, it would be impossible for GTA or DMVS to determine if Viisage's proposed price covered the costs associated with card production and represented the overall "best value" for Georgia.

152.

Neither GTA nor DMVS conducted any such analysis of Viisage's proposals to determine if Viisage's proposed price covered the costs associated with Viisage's obligations under the contract.

153.

Viisage's final, accepted price per ID Card was $1.009. Upon information and belief, this Viisage price per card was below the estimated total cost to Viisage under the contract. Upon information and belief, Viisage's total loss will be approximately $7.5 million over the term of the contract with DMVS, assuming all extensions are taken by the State and without any future add-ons or change orders to the contract.

154.

As an example of the complete disconnect of the Viisage price from reality is Viisage's proposed price per card if the ID Cards are issued from Viisage's own building. For a facility with a minimum square footage requirement of 4,800 square feet, Viisage's proposed price differential per card had been only 1 cent.

155.

In order to provide an offsite factory, Viisage would need to build or lease a building, specially modify it into a totally secure building, and then to also operate and insure it each year all for a total amount of less than $0.43 per square foot per month..

31

156.

Further evidence of a capricious price evaluation is the fact that Georgia did not even know if the expensive software and equipment for Document Scanning for all the workstations was included in Viisage's base price at the time it was awarding Viisage the contract.

157.

GTA and DMVS failed to perform the requisite price and technical realism analysis to determine if Viisage will reasonably be able to perform its obligations if it were awarded a contract for the services sought by the RFP.

158.

These errors resulted in Viisage having been wrongfully awarded the contract at issue. Had these errors not been made, Digimarc would have been awarded the contract.

## The Central Production Facility for Permanent ID Cards

159.

GTA and DMVS also erred with respect to Viisage's proposal for a Central Production Facility for permanent ID Cards.

160.

As defined in Appendix D of the RFP, the term "Central Production Facility" means the site for mass production for all permanent ID Cards, to be operated by the successful Offeror.

161.

The RFP mandated that the successful Offeror provide a Central Image System for storage and retrieval of digital photographs, signatures and fingerprints. (RFP § 1.1.) The Central Imaging System is the image database system that will be owned and operated by the successful Offeror at the Central Production Facility. (RFP App. D.)

162.

At a minimum, the proposed solution resulting from the RFP was to replace the current

Digitized License System with all hardware and software required to support production of

permanent ID Cards at the Central Production Facility.  (RFP § 2.7.1.1.)

163.

This solution would allow DMVS to achieve its strategic objective of improving

customer service by reducing wait time for permanent ID Cards, using permanent document

printers for "mass production" located only at the successful Offeror's Central Production

Facility.  (RFP § 2.7.3.3.)

164.

The RFP required all Offerors to include pricing models based upon two different Central

Production Facility arrangements, including a model based on DMVS providing floor space for

the facility in Conyers, Georgia and a second model based upon the Offeror acquiring facilities

in Rockdale County, Georgia.  (RFP §§ 3.3.4.1, 3.3.4.2.)

165.

Digimarc received the optimal score of "Excellent" on its proposed solutions to meet the

needs of each of the 13 general work requirements set forth in section 3.3.3 of the RFP,

including, but not limited to, provision for and operation of a Central Production Facility with

proposed pricing models for the two different central production facilities, as required by

Sections 3.3.4.1 and 3.3.4.2 of the RFP.  (Ex. A.)

166.

With respect to the latter, the Digimarc Evaluation noted in its Comments section that

Digimarc "[p]rovided a very comprehensive description on all anticipated needs, Included [sic]

floor plans, equipment foot prints [sic], access requirements for loading of equipment and

33

supplies, detailed electro-mechanical and environmental requirements, security and vault procedures." (Ex. A.)

167.

The Viisage Evaluation noted in its Comments section that Viisage "[p]rovided minimal information on space requirements for equipment" with respect to establishing a Central Production Facility at DMVS headquarters and further "[p]rovided minimal information on security and establishment plans" with respect to a Central Production Facility within Rockdale County, Georgia. (Ex. B.)

168.

The RFP mandated that the Offeror "must have installed at least one similar distributed Digitized License System in North America." (RFP § 4.2.1.5.) As such, the RFP instructed that each Offeror had to identify and to describe the Offeror's experience with such similarly distributed projects, including the size of the organization, and its capabilities and its experience in applying the proposed technology. (RFP § 4.2.1.5.)

169.

Viisage has never installed a central issue production facility of the type mandated by the RFP.

170.

Viisage's only experience with implementing a full central issuance system was in Massachusetts in 1995 for drivers' licenses, which system Viisage operated through the fall 2000.

171.

Massachusetts, however, had significant problems with the drivers' license system provided by Viisage, including, but not limited to, the following:

34

a.    license backlogs;

b.    lack of effective color correction software for workstation cameras;

c.    driver license ink migration through the license hologram laminate;

d.    inability to easily produce identification cards for other agencies;

e.    lack of direct facial illumination resulting in fuzzy customer images;

f.    visual inspection not functional;

g.    slow response time of hardware support for equipment failures;

h.    slow and incorrect image license reconciliation process; and

i.    issues with laminate wearing off, cracking and breaking on the DL/ID document.

(Ex. V at 2.)

172.

In 1993, the time at which Viisage was awarded the contract for Massachusetts,

Massachusetts issued approximately 1.4 million ID Cards per year.  In comparison, Georgia

issued 2,442,073 ID Cards in 2001.  (RFP § 2.4.)  Approximately 5.6 million drivers are licensed

in Georgia.  (RFP § 2.4.)  According to the RFP, the current image database is expected to have

approximately fifteen million sets of stored images at the time the procurement contract is

awarded.  (RFP § 2.4.)

173.

Digimarc replaced the Massachusetts licensing system with a new installation in 2000,

and remains in control of the Massachusetts licensing operations under a multi-year contract with

Massachusetts.

174.

Viisage's then ongoing central issuance experience for drivers' licenses for Florida was

only in its capacity as a subcontractor to Unisys for the central issuance system Unisys provided

for that State.

### 175.

Accordingly, Viisage has not successfully installed a central issuance production system and facility similar to that required by the Georgia RFP. The only prior domestic drivers' license experience upon which Viisage may rely as a reference for a central issuance state facility it had installed was just one state central production facility that supported less than half the volume currently sustained by Georgia and one-quarter of the volume that Georgia could experience at full capacity. In spite of this, Viisage was not given an adverse rating for its lack of relevant demonstrated history.

### 176.

The technical requirements pertaining to the Central Production Facility were included in the first ten critical and fundamental evaluation factors. Given the high relative importance of these evaluation factors, Viisage's inability to demonstrate historical familiarity with the systems and cards set forth in the RFP should have substantially reduced Viisage's overall evaluation results.

### 177.

GTA/DMVS did not, however, reduce Viisage's overall evaluation results based on Viisage's inability to comply with these critical requirements. This failure constitutes a significant error in the procurement process, which resulted in a wrongful award of the contract to Viisage. Had this error not been made, Digimarc would have been awarded the contract.

### **The Central Image Server**

### 178.

GTA and DMVS also erred with respect to Viisage's proposal regarding the Central Imaging System.

179.

Viisage proposed a Central Imaging System that was significantly undersized for the application mandated by the RFP.

180.

The Viisage Technical Proposal associated with the Central Imaging System also exhibited significant inconsistencies.

181.

The Central Imaging System proposed by Viisage was not a "High Availability" configuration and, therefore, fails to meet the 99.99% uptime required by the RFP.

182.

Additionally, the Central Imaging System proposed by Viisage is not a truly redundant configuration, as mandated by the RFP.

183.

Therefore, the Viisage proposal failed to provide adequately for the Central Imaging System, apparently due to Viisage's lack of understanding of the State's DMVS environment and the requirements of the solution.

184.

In spite of this, Viisage was not given a corresponding adverse evaluation by DMVS.

185.

This failure constitutes a significant error in the procurement process, which resulted in a wrongful award of the contract to Viisage.  Had this error not been made, Digimarc would have been awarded the contract.

### Back-Up Production Facilities

186.

GTA and DMVS also erred with respect to Viisage's proposal regarding a back-up card production facility for use in the event the Central Production Facility is compromised.

187.

The Viisage proposal failed to propose a satisfactory solution for a back-up card production facility for use in the event the Central Production Facility is compromised.

188.

In its RFP response, Viisage proposed the following: "In addition to providing a secure, fault-tolerate solution for central printing, Viisage has made arrangements with Arthur Blank and Company to use their card printing facility as a backup, in case of disaster at the permanent facility in Georgia. In case of failure at the Central Production Facility that causes significant downtime in card production, Viisage will produce the cards off-site. Viisage will develop security processes to ensure that all consumables and finished documents are under reasonable protection throughout the duration of the emergency."

189.

Viisage does not have an agreement with Arthur Blank and Company to provide back-up card production services, as required by the RFP.

190.

Viisage failed to provide reasonable proof in its RFP response that Arthur Blank and Company had the equipment, experience, servers and/or the security items needed to produce the ID Cards in the event the central facility were compromised. In fact, Arthur Blank does not have the equipment to produce drivers' licenses for the State. Nor, for that matter, does Viisage even have a formal, written agreement with Arthur Blank to provide any services for Viisage

38

whatsoever in connection with Georgia.

191.

In spite of this, Viisage was not given a corresponding adverse evaluation by DMVS.

192.

This failure constitutes a significant error in the procurement process, which resulted in a wrongful award of the contract to Viisage. Had this error not been made, Digimarc would have been awarded the contract.

### The Optional Point of Sale System

193.

GTA and DMVS also erred by failing to deem Viisage non-compliant in its RFP response with respect to the optional Point of Sale ("POS") System. (RFP § 3.14.4.)

194.

According to the RFP, each Offeror was required to submit a proposal for a turnkey POS system that would interface with the Digitized License System and have the capacity to upgrade to meet future needs. (RFP § 3.14.4.)

195.

The RFP mandated a commercial "Off-the-Shelf" Fee Collection and Cash Management software package. (RFP § 3.14.4.1.1.)

196.

The RFP further specified that the successful Offeror's POS system must accept transactions from and consolidate revenue across all delivery channels in use by DMVS, including, at the time of the RFP award, over-the-counter, Web-based Internet and IVR delivery channels. (RFP § 3.14.4.1.2.)

197.

The successful Offeror's POS system must also integrate easily with the Digitized

License System, the Offline Application and the State's PeopleSoft financial system, and support

both integrated online and standalone processing in the event of a system outage. (RFP §§

3.14.4.1.3, 3.14.4.1.4.)

198.

During the initial phase of the bidding process, Viisage consistently designated Unisys as

its vendor for the required proposal for a commercial "Off-the-Shelf" Fee Collection and Cash

Management software package.

199.

On November 12, 2002, Mohammed Siddiqui, Viisage's Marketing Director, provided

written notification to Charles Nixon, Contracting Officer for GTA, of Viisage's intent to change

its POS provider from Unisys to CenterStage. (Ex. W.)

200.

CenterStage does not have a commercial "Off-the-Shelf" Fee Collection and Cash

Management software package that meets the RFP requirements.

201.

Nonetheless, Viisage's last minute, wholesale change in its Technical Proposal in regard

to its proposed POS providers and systems apparently did not impact or alter GTA's evaluation

of Viisage's proposal whatsoever.

202.

Instead, GTA and DMVS had apparently negotiated the procurement contract with

Viisage, and Viisage executed that contract, prior to notifying GTA in writing of its intent to

substitute its proposed POS provider.

40

203.

In fact, DMVS delivered its "evaluation" findings with respect to Viisage's POS resubmission to GTA on November 13, 2002, the day after DMVS signed the procurement contract with Viisage.

204.

Even then, this evaluation was not properly done. Viisage never demonstrated that the CenterStage application would meet the State's requirements. In connection with RFP requirement 3.14.4.1, Viisage's revised Technical Proposal never demonstrated that the CenterStage product would integrate easily with the DDLS, the Offline Application, and the State's PeopleSoft financial system.

205.

Similarly Viisage made no attempt in its revised Technical Proposal to demonstrate that COMCASH will meet the requirements of section 3.14.4.6 of the RFP to provide an open system design, include an interface that employs XML as the communication format, utilize the OPOS standard for hardware peripherals, or support high volume transaction and revenue processing.

206.

Viisage's revised Technical Proposal also did not specify the hardware that it would deliver as part of the POS solution. There is no specification for (1) POS Server, (2) Cash Drawers, (3) Financial Receipt Printers, or (4) Credit Card Readers, all of which must be a part of a complete system.

207.

Viisage wanted to change its POS solution vendor because Unisys cost more than that which would be charged by Comcash.

41

208.

At the time that Viisage proposed to GTA/DMVS to substitute Comcash for Unisys, there was not even a signed teaming agreement yet signed between Viisage and Comcash, much less any binding subcontract.

209.

Because Viisage never delivered a complete response with respect to the POS proposal, it could not have been possible for GTA/DMVS to judge if the Viisage proposal was fully compliant with the requirements of the RFP and "Satisfactory."

210.

Mere promises that Viisage will be compliant in the future with the RFP's requirements, without evidentiary substantiation, should have caused Viisage's response to have been judged non-compliant. Indeed, SoftLEAD was repeatedly scored with "Unsatisfactory" ratings for its proposed POS solution because of its failure to specify how each functional requirement would be met and how it would be fully integrated into the DLS.

211.

In contrast, Viisage's last-minute proposal of a completely new POS solution, which also lacked such specificity, was given "Satisfactory" ratings by GTA/DMVS. (Ex. X.)

212.

As such, GTA and DMVS erred by failing to adjust the relative overall ranking of Viisage's late-changed Technical Proposal with respect to this non-price factor in accordance with GTA Rule 665-2-4-.02(b).

213.

GTA and DMVS further erred by negotiating and awarding Viisage the contract prior to taking into account Viisage's responses to <u>all</u> of the evaluation factors mandated by the RFP.

42

214.

Accordingly, GTA and DMVS committed error in awarding Viisage the contract at issue. Had this error not been made, Digimarc would have been awarded the contract.

**Optional Mailer Feature**

215.

The RFP also mandated that an optional mailer had to be proposed in order to mail completed permanent ID Cards to the applicants.

216.

The mailer proposed by Viisage, however, would not have been adequate for the system proposed in the RFP.

217.

If DMVS/GTA had conducted the mandated technical realism assessment of the Viisage proposed mailer option, it would have determined this as well.

218.

However, DMVS/GTA apparently never conducted such an assessment. In fact, instead of penalizing Viisage for its inadequate mailing solution, DMVS/GTA gave Viisage all "Satisfactory" ratings and even one rating of "Excellent", upon which, in part, DMVS/GTA justified awarding the contract to Viisage.

219.

These significant errors in the procurement process resulted in a wrongful award of the contract to Viisage. Had this error not been made, Digimarc would have been awarded the contract.

43

## Term of the Contract and Provision of Performance Bond

220.

Under the terms of the RFP, any contract that was supposed to be awarded was to be for a one-year contract with an option for five additional one-year periods. (RFP § 1.7)

221.

Accordingly, the November 12, 2002 contract that Viisage received should have provided that its first expiration date would on November 12, 2003.

222.

The terms of the actual signed contract provided, however, that the first expiration would be on June 30, 2004.

223.

This is a material, illegal extension of the terms of the first contract, which, pursuant to the RFP, should have an annual expiration date ending on November 12, 2003.

224.

The November 12, 2002 contract that Viisage received required that a performance bond had to be provided by Viisage for the duration of the contract (*i.e.*, until June 30, 2004).

225.

The Notice of Award also required that Viisage had to provide the required performance bond. (Ex. R.)

226.

Viisage did not deliver a performance bond with an expiration date past November 12, 2003 to cover the full term of the contract, which has expiration date of June 30, 2004.

44

**Digimarc's Protest of GTA's Decision**

227.

On November 26, 2002, in accordance with GTA Rule 665-2-11-.07 and by virtue of GTA's grant of a Protest filing deadline extension, Digimarc filed its protest to GTA's award of the contract to Viisage (the "Protest").

228.

DMVS and/or GTA asked Viisage to provide a response to the Protest.

229.

Viisage's response to the Protest contained intentional misrepresentations of fact.

230.

In connection with the Protest Decisionmaker's investigation of the Protest, the Protest Decisionmaker solicited information from individuals at GTA and DMVS.

231.

Some of the information provided to the Protest Decisionmaker by GTA and DMVS in response to the Protest Decisionmaker's questions were factually inaccurate.

232.

On February 17, 2003, the Protest Decisionmaker for GTA denied Digimarc's Bid Protest, relying in part on the information provided to him by individuals from GTA, DMVS and Viisage.

**COUNT I**
**(TEMPORARY AND PERMANENT INJUNCTIVE RELIEF – VIOLATION**
**OF THE TERMS OF THE RFP)**

233.

Digimarc incorporates Paragraphs 1 through 232, as if fully set forth herein.

45

234.

By acting in the manner described in this Complaint, GTA and DMVS have violated and are violating the terms of the RFP.

235.

Unless GTA, DMVS and Viisage are restrained from proceeding with the implementation of the contractual agreement with Viisage pending the outcome of this lawsuit, Digimarc and the Georgia taxpayers will suffer immediate and irreparable harm and injury.

236.

Digimarc is likely to succeed on the merits of this lawsuit.

237.

Digimarc does not have an adequate remedy at law.

238.

Digimarc is entitled to a temporary restraining order, an interlocutory injunction and permanent injunction restraining and enjoining GTA, DMVS and Viisage and their officers, employees, agents, attorneys, affiliates, and all others acting in concert with them from proceeding with the implementation and performance of the contract awarded to Viisage in response to Georgia Technology Authority Request for Proposal No. GTA000051; a mandatory injunction directing GTA and DMVS to award the Contract to Digimarc, to execute all contracts consistent with an award of the Contract to Digimarc, and to proceed with the implementation and performance of such Contract with Digimarc; or, in the alternative, a mandatory injunction directing GTA and DMVS to re-bid the Contract.

COUNT II
(TEMPORARY AND PERMANENT INJUNCTIVE RELIEF – VIOLATION
GTA RULES

239.

Digimarc incorporates Paragraphs 1 through 232, as if fully set forth herein.

240.

By acting in the manner described in this Complaint, GTA and DMVS have violated and are violating numerous rules governing GTA procurements, including but not limited to: 665-2-1-.01(f); 665-2-4-.02(a)(8); 665-2-4-.02(a)(9)(ii); 665-2-4-.02(b); 665-2-4-.06; 665-2-4-.07.

241.

Unless GTA, DMVS and Viisage are restrained from proceeding with the implementation of the contractual agreement with Viisage pending the outcome of this lawsuit, Digimarc and Georgia taxpayers will suffer immediate and irreparable harm and injury.

242.

Digimarc is likely to succeed on the merits of this lawsuit.

243.

Digimarc does not have an adequate remedy at law.

244.

Digimarc is entitled to a temporary restraining order, an interlocutory injunction and permanent injunction restraining and enjoining GTA, DMVS and Viisage and their officers, employees, agents, attorneys, affiliates, and all others acting in concert with them from proceeding with the implementation and performance of the contract awarded to Viisage in response to Georgia Technology Authority Request for Proposal No. GTA000051; a mandatory injunction directing GTA and DMVS to award the Contract to Digimarc, to execute all contracts consistent with an award of the Contract to Digimarc, and to proceed with the implementation

47

and performance of such Contract with Digimarc; or, in the alternative, a mandatory injunction directing GTA and DMVS to re-bid the Contract.

### COUNT III
### (TEMPORARY AND PERMANENT INJUNCTIVE RELIEF -- VIOLATION
### OF O.C.G.A. § 50-25-7.3(5))

245.

Digimarc incorporates Paragraphs 1 through 232, as if fully set forth herein.

246.

By acting in the manner described in this Complaint, GTA and DMVS have violated and are violating provisions of the Official Code of Georgia, including O.C.G.A. § 50-25-7.3(5), which states, "[t]he terms of the request for proposals or bids may allow for discussions or revisions but shall provide for fair and equal treatment of all vendors."

247.

Unless GTA, DMVS and Viisage are restrained from proceeding with the implementation of the contractual agreement with Viisage pending the outcome of this lawsuit, Digimarc and Georgia taxpayers will suffer immediate and irreparable harm and injury.

248.

Digimarc is likely to succeed on the merits of this lawsuit.

249.

Digimarc does not have an adequate remedy at law.

250.

Digimarc is entitled to a temporary restraining order, an interlocutory injunction and permanent injunction restraining and enjoining GTA, DMVS and Viisage and their officers, employees, agents, attorneys, affiliates, and all others acting in concert with them from proceeding with the implementation and performance of the contract awarded to Viisage in

response to Georgia Technology Authority Request for Proposal No. GTA000051; a mandatory

injunction directing GTA and DMVS to award the Contract to Digimarc, to execute all contracts

consistent with an award of the Contract to Digimarc, and to proceed with the implementation

and performance of such Contract with Digimarc; or, in the alternative, a mandatory injunction

directing GTA and DMVS to re-bid the Contract.

**COUNT IV**
**(TEMPORARY AND PERMANENT INJUNCTIVE RELIEF – VIOLATION**
**OF O.C.G.A. § 50-25-7.3(6))**

251.

Digimarc incorporates Paragraphs 1 through 232, as if fully set forth herein.

252.

By acting in the manner described in this Complaint, GTA and DMVS have violated and

are violating provisions of the Official Code of Georgia, including O.C.G.A. § 50-25-7.3(6),

which states:

> The award shall be made to the responsible vendor or vendors
> complying with the technology and architecture standards and
> policies of the [GTA] whose proposal or bid was timely and is
> determined in writing to be the most advantageous to the state,
> taking into consideration the evaluation factors set forth in the
> request for proposals or bids. No other factors or criteria shall be
> used in the evaluation.

253.

Unless GTA, DMVS and Viisage are restrained from proceeding with the implementation

of the contractual agreement with Viisage pending the outcome of this lawsuit, Digimarc and

Georgia taxpayers will suffer immediate and irreparable harm and injury.

254.

Digimarc is likely to succeed on the merits of this lawsuit.

49

255.

Digimarc does not have an adequate remedy at law.

256.

Digimarc is entitled to a temporary restraining order, an interlocutory injunction and permanent injunction restraining and enjoining GTA, DMVS and Viisage and their officers, employees, agents, attorneys, affiliates, and all others acting in concert with them from proceeding with the implementation and performance of the contract awarded to Viisage in response to Georgia Technology Authority Request for Proposal No. GTA000051; a mandatory injunction directing GTA and DMVS to award the Contract to Digimarc, to execute all contracts consistent with an award of the Contract to Digimarc, and to proceed with the implementation and performance of such Contract with Digimarc; or, in the alternative, a mandatory injunction directing GTA and DMVS to re-bid the Contract.

**COUNT V**
**(TEMPORARY AND PERMANENT INJUNCTIVE RELIEF – VIOLATION**
**OF O.C.G.A. §§ 50-25-1(C), (C)(4)-(5))**

257.

Digimarc incorporates Paragraphs 1 through 232, as if fully set forth herein.

258.

By acting in the manner described in this Complaint, GTA and DMVS have violated and are violating provisions of the Official Code of Georgia, including O.C.G.A. § 50-25-1(c), (c)(4), and (c)(5) which state:

> (c) The purpose of the [GTA] shall be to provide for procurement of technology resources, technology enterprise management, and technology portfolio management . . . on such terms and conditions as may be determined to be in the best interest of the state in light of the following factors: . . . (4) Cost savings to the state through efficiency in the provision of public information; and (5) Such other factors as are in the public interest of the state and will

50

promote the public health and welfare.

259.

Unless GTA, DMVS and Viisage are restrained from proceeding with the implementation

of the contractual agreement with Viisage pending the outcome of this lawsuit, Digimarc and

Georgia taxpayers will suffer immediate and irreparable harm and injury.

260.

Digimarc is likely to succeed on the merits of this lawsuit.

261.

Digimarc does not have an adequate remedy at law.

262.

Digimarc is entitled to a temporary restraining order, an interlocutory injunction and

permanent injunction restraining and enjoining GTA, DMVS and Viisage and their officers,

employees, agents, attorneys, affiliates, and all others acting in concert with them from

proceeding with the implementation and performance of the contract awarded to Viisage in

response to Georgia Technology Authority Request for Proposal No. GTA000051; a mandatory

injunction directing GTA and DMVS to award the Contract to Digimarc, to execute all contracts

consistent with an award of the Contract to Digimarc, and to proceed with the implementation

and performance of such Contract with Digimarc; or, in the alternative, a mandatory injunction

directing GTA and DMVS to re-bid the Contract.

## COUNT VI
### (TEMPORARY AND PERMANENT INJUNCTIVE RELIEF -- VIOLATION OF DUE PROCESS)

263.

Digimarc incorporates Paragraphs 1 through 232, as if fully set forth herein.

264.

By acting in the manner described in this Complaint, GTA and DMVS have deprived

Digimarc of its property without due process of law in violation of the United States Constitution and the Georgia Constitution.

<center>265.</center>

Unless GTA, DMVS and Viisage are restrained from proceeding with the implementation of the contractual agreement with Viisage pending the outcome of this lawsuit, Digimarc and Georgia taxpayers will suffer immediate and irreparable harm and injury.

<center>266.</center>

Digimarc is likely to succeed on the merits of this lawsuit.

<center>267.</center>

Digimarc does not have an adequate remedy at law.

<center>268.</center>

Digimarc is entitled to a temporary restraining order, an interlocutory injunction and permanent injunction restraining and enjoining GTA, DMVS and Viisage and their officers, employees, agents, attorneys, affiliates, and all others acting in concert with them from proceeding with the implementation and performance of the contract awarded to Viisage in response to Georgia Technology Authority Request for Proposal No. GTA000051; a mandatory injunction directing GTA and DMVS to award the Contract to Digimarc, to execute all contracts consistent with an award of the Contract to Digimarc, and to proceed with the implementation and performance of such Contract with Digimarc; or, in the alternative, a mandatory injunction directing GTA and DMVS to re-bid the Contract.

<center>**COUNT VII**
(AGAINST GTA AND DMVS ONLY)
(DAMAGES FOR BID PREPARATION COSTS)</center>

<center>269.</center>

Digimarc incorporates Paragraphs 1 through 232, as if fully set forth herein.

<center>52</center>

270.

As a result of the actions by GTA and DMVS described above, Digimarc is entitled to recover the reasonable costs of preparing its bid in response to Georgia Technology Authority Request for Proposal No. GTA000051, and all other related costs allowed under Georgia law.

**WHEREFORE,** Digimarc prays for the following relief:

a.  As to all Counts, that the currently entered interlocutory injunction be converted to a permanent injunction restraining and enjoining GTA, DMVS and Viisage and their officers, employees, agents, attorneys, affiliates, and all others acting in concert with them from proceeding with the implementation and performance of the contract awarded to Viisage in response to Georgia Technology Authority Request for Proposal No. GTA000051; a mandatory injunction directing GTA and DMVS to award the Contract to Digimarc, to execute all contracts consistent with an award of the Contract to Digimarc, and to proceed with the implementation and performance of such Contract with Digimarc; or, in the alternative, a mandatory injunction directing GTA and DMVS to re-bid the Contract;

b.  As to Count VII, Digimarc's reasonable costs of preparing its bid in response to Georgia Technology Authority Request for Proposal No. GTA000051;

c.  As to all Counts, the costs of this action, including reasonable attorneys' fees; and

d.  Such other and further relief as this Court deems just and proper.

This 12th day of November 2003.

David Balser
Georgia Bar No. 035835
John Hutchins
Georgia Bar No. 380692
Valerie D. Barton
Georgia Bar No. 040832

MCKENNA LONG & ALDRIDGE LLP     *Attorneys for Plaintiff*
303 Peachtree Street, Suite 5300     *Digimarc ID Systems, LLC*
Atlanta, Georgia  30308
(404) 527-4000
(404) 527-4198  (facsimile)

54

EXHIBIT 4

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

FILED IN OFFICE

APR 2 0 2004

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

DIGIMARC ID SYSTEMS, LLC,

        Plaintiff,

vs.

GEORGIA TECHNOLOGY AUTHORITY and
the GEORGIA DEPARTMENT OF MOTOR
VEHICLE SAFETY,

        Defendants,

vs.

VIISAGE TECHNOLOGY, INC., a Delaware
corporation,

        Necessary Party-Defendant.

Civil Action No. 2003CV66498

## BRIEF IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS FROM VIISAGE TECHNOLOGY, INC.

Plaintiff, Digimarc ID Systems, LLC ("Digimarc"), files this Brief in Support of its

Motion to Compel Documents from Defendant Viisage Technology, Inc., showing this Court as

follows:

## I. FACTUAL AND PROCEDURAL BACKGROUND

Digimarc filed its complaint in this action on March 5, 2003. Prior to the time that

Viisage was made a party to this action, Digimarc obtained a commission from this Court to

subpoena certain documents from Viisage and depose Viisage's Keeper of the Records in

Massachusetts. (Order for Issuance of Commission to Take Deposition Out of State of Viisage

Technology, Inc., Tab 1.) In accordance with that commission, the Massachusetts court issued a

subpoena, which Digimarc then served on Viisage, commanding Viisage to produce certain

documents and attend its Keeper of the Records Deposition on September 5, 2003. (Subpoena,

Tab 2; Affidavit of Roger L. French in Support of Plaintiff's Motion to Compel Production of Documents from Viisage Technology, Inc., ¶ 3.) At Viisage's request, the Keeper of the Records deposition was then postponed until September 19, 2003. (French Aff., ¶ 4.) Nearly two weeks later, Viisage requested another continuance of its Keeper of the Records deposition date. (French Aff., ¶ 5.) Digimarc's counsel responded that, as a matter of professional courtesy, Digimarc would agree to delay the Keeper of the Records deposition again if the request was not being made in an effort simply to be obstructionist. (French Aff., ¶ 5.) With this condition placed upon Digimarc's agreement to yet another postponement, Viisage rescinded its request. (French Aff., ¶ 5.) Instead, the day before its scheduled deposition date, Viisage filed an *ex parte* Emergency Motion for a Protective Order at 3:59 p.m. (Viisage Technology, Inc.'s Emergency Motion for Protective Order and Memorandum of Law in Support, Tab 3; French Aff., ¶ 6.) Then, Viisage simply showed up at its September 19 deposition on the next morning and refused to produce scores of documents even though no protective order had been issued by the Massachusetts court, which had issued the original subpoena along with an Order compelling Viisage to appear at the deposition and to produce documents. (French Aff., ¶ 6.) Based upon Viisage's Emergency Motion for Protective Order, the Massachusetts court then issued a limited protective order on November 4, 2003, ordering Viisage to produce a statement to Digimarc setting forth a description of all documents that Viisage had withheld on the basis of 1) attorney-client privilege; and 2) Viisage's objection that Digimarc's request for documents included documents not relevant to the issues in the instant case. (See Order on Viisage Technology, Inc.'s Emergency Motion for Protective Order, Tab 4.) On November 12, 2002, Viisage was forcibly added as a party to this case.

2

At or about the same time that Viisage was added as a party, Viisage produced three separate "logs" in accordance with the Massachusetts court's November 4 Order. The three logs together included descriptions of a total of 1385 separate documents that Viisage had withheld based on relevance or attorney-client privilege objections. (Relevance Log for E-mails, Tab 5; Attorney-Client Privilege and Work Product Log, Tab 6; Relevance Log for Correspondence, Tab 7.) Digimarc disputed Viisage's right to withhold these many documents, especially under the guise of a relevance objection. Viisage's relevance objection was based on the premise that, because the contract at issue in this case between Viisage and DMVS was awarded on November 12, 2002, no documents generated before the Georgia RFP was issued on May 24, 2002 and no documents issued after the November 12, 2002 contract date could ever be relevant to the issue of whether or not the procurement by GTA and DMVS was proper. (Affidavit of John P. Hutchins in Support of Plaintiff's Motion to Compel Production of Documents from Viisage Technology, Inc., ¶ 3.) Viisage made this assertion, however, without having reviewed most of the responsive documents that fall within these timelines. (See supra Section II.A.)

In an effort to avoid a contentious discovery dispute, Digimarc's counsel attempted to negotiate with Viisage to try to find a meaningful compromise, beginning with a conference call on December 9, 2003. Essentially, the parties worked to narrow the issues in dispute with respect to Digimarc's subpoena by identifying categories of documents that the parties agreed were relevant and which did not impede on Viisage's ability to protect its trade secrets. (Hutchins Aff., ¶ 6.) Given the strange procedural posture of the case against Viisage and the existence of the Massachusetts subpoena and court order, Digimarc served written document requests on Viisage under O.C.G.A. section 9-11-34 on December 10, 2003 (the last day to serve written discovery), with a cover letter stating as follows:

3

> Enclosed are your service copies of written discovery in the above-
> referenced case.  Please note that, with respect to the documents
> requested, we are serving these discovery requests in order to
> preserve our right to seek assistance from the court in the event
> that our discussion yesterday does not lead to a resolution of the
> current discovery issues in dispute.  <u>If we are able to reach a
> resolution of those issues, then we will withdraw these requests for
> documents</u>.

(Dec. 10, 2003 Letter from Hutchins to Carroll, Tab 8 (emphasis added).)  Copies of the

document requests that Digimarc served on Viisage are attached hereto at Tab 9.

After nearly a month of discussion, on January 6, 2004, Viisage finally indicated that the

parties had reached an agreement regarding Viisage's document production under which

Digimarc agreed to limit and Viisage agreed to produce a truncated group of documents (the

"Discovery Agreement").  Copies of the e-mails documenting the parties' agreement are attached

at Tab 10.  The documents that Viisage agreed to produce are as follows:

1.  All documents, <u>regardless of date</u>, that reflect changes between the
    technical proposal(s) that formed the basis of the award of the contract to
    Viisage and the solution that Viisage actually was implementing in
    Georgia.  (Emphasis added.)[1]

2.  Communications, internal or external, <u>regardless of date</u>, about facts that
    occurred during the procurement process, not including documents
    reflecting Viisage's trade secrets or proprietary business information.
    (Emphasis added.)

3.  Communications between Viisage and its third party vendors regarding
    the categories of documents listed in categories 1 and 2 above.  "Vendors"
    are defined as any party providing something of material value to Viisage
    that was used or was to be used by Viisage in performing the
    contract (other than ordinary and necessary business items such as, for
    example, office equipment and supplies and travel expenses).

4.  Documents that reflect Viisage's "damages" or losses in performing the
    contract to the extent that Viisage might argue that such damages or losses
    are a factor in balancing the equities of a permanent injunction.

---

[1] <u>See</u> exceptions set forth <u>supra</u> in footnote 8.

5.      Documents that reflect changes to Viisage's vendor costs in connection
        with the change from Unisys and CenterStage.[2]

6.      Communications after November 12, 2002 about Viisage's compliance
        with the conditions of the Notice of Award.[3]

7.      Communications by, between and among anyone about the investigation
        into the bid protest, the allegations of the complaint or the amended
        complaint, the allegations of the bid protest, the decision by the protest-
        decisionmaker or the court's decision on the motion for interlocutory
        injunction (i.e., all non-privileged documents that may reflect an
        admission in regard to the judicial or administrative proceedings in this
        case).

8.      Documents that reflect Viisage's means and methods to produce the cards
        used in Georgia, either as samples submitted during the procurement, or
        cards that were to be produced in performance of the actual contract.

9.      The documents numbered 3-9 on the relevance log (which were
        documents dated prior to 5/24/02 or earlier).

On January 9, 2004, Viisage provided copies of documents to Digimarc, along with

answers to Digimarc's written interrogatories. Along with these documents and responses,

Viisage's counsel enclosed a letter that stated as follows:

> Please find enclosed Viisage's responses to Digimarc's First
> Interrogatories and documents bates numbered V000001-V000277.
> The Certificate of Service will be with the Court. _Per the_
> _agreement of the parties, Digimarc has withdrawn its First Request_
> _for Production of Documents to Viisage; in lieu of responses,_
> _Viisage is producing herewith responsive documents._

(Jan. 9, 2004 Letter from Carroll to Hutchins (emphasis added), Tab 11.) Viisage did not

provide any further response to Digimarc's written document requests. Thus, it is plain that

Viisage's lack of response to Digimarc's written document requests was premised upon

Digimarc's agreement that, if Viisage cooperated and produced the documents outlined in the

nine categories above, Digimarc would not insist on written responses to Digimarc's written

---

[2] See exceptions set forth _supra_ in footnote 11.

[3] See exceptions set forth _supra_ in footnote 13.

document requests. Unfortunately, however, Viisage has failed to live up to its end of the

bargain by withholding responsive documents that fall under the nine categories listed above,

forcing Digimarc to file the instant motion to compel production of documents.

## II. ARGUMENT AND CITATION TO AUTHORITY

Digimarc's promise to withdraw its December 10, 2004 written requests for production

of documents to Viisage was entirely contingent upon a satisfactory resolution of the discovery

issues in dispute at the time. (Dec. 10, 2003 Letter from Hutchins to Carroll, Tab 8.) As will be

shown below, Viisage's production of documents was incomplete. Therefore, Viisage's

assumption that "Digimarc has withdrawn its First Request for Production of Documents to

Viisage" was erroneous. (See Jan. 9, 2004 Letter from Carroll to Hutchins, Tab 11.) Viisage

must either produce all of the responsive documents covered by the Massachusetts subpoena and

court order, as modified by the Discovery Agreement, or fully respond to Digimarc's First

Request for Production of Documents.

A.     **In Spite Of The November 4, 2003 Massachusetts Subpoena And Court Order And Digimarc's Subsequent Negotiations With Viisage Regarding Discovery Issues, Digimarc Ultimately Discovered During Viisage's 30(B)(6) Deposition In February 2004 That Viisage's Counsel Failed To Request, Search For, Or Produce Relevant, Responsive Documents Generated After The November 12, 2002 Contract Award Date.**

When Digimarc's counsel first conferred with Viisage on December 9, 2003 with respect

to the parties' discovery dispute, Viisage argued that, because the contract between Viisage and

DMVS at issue in this case was based upon the Georgia RFP, issued on May 24, 2002, and the

contract awarded on November 12, 2002, no documents generated prior to the May 24, 2002

RFP issuance date or after the November 12, 2002 contract date could be relevant to the issue of

whether or not the procurement by GTA and DMVS was proper. (Hutchins Aff., ¶ 3.) Digimarc

disagreed. In fact, Digimarc already knew that Viisage in all likelihood had substantial post-

November 12 documentation that is highly relevant.  For example, Digimarc had discovered during George Theobald's individual deposition in July 2003 that GTA and DMVS had completely failed to confirm that "the cards that Viisage promised to produce for Georgia were actually cards that Viisage could manufacture or subcontract the manufacture of, other than tak[ing] Viisage's word for it." (Theobald Dep., 378:8-14.)[4]  As Mr. Theobald testified:

> Q.    [MR. HUTCHINS]  The [Viisage] permanent card that the State ultimately chose, was it -- . . . was it the generic state design that we're looking at here on Exhibit 29 or was it the New York State design?
>
> A.    [MR. THEOBALD]  It ended up being the New York State design.

(Theobald Dep., 268:17-23.)

> Q.    [MR. HUTCHINS]  What you wanted from Viisage was the same card design and structure that earlier today we were referring as the New York cards; right?
>
> A.    [MR. THEOBALD]  Yes, sir.
>
> Q.    And so you got one five days after the demonstration that had a Georgia design on it.  How did you know that that was the card that you thought it was?
>
> . . .
>
> A.    We were planning on submitting those cards to an independent lab to make sure that they could perform adequately.  However, we found out that there was a substantial cost associated with the lab testing them, so we thought it best to wait until they were established in Georgia, they were producing it on equipment that was purchased for Georgia, and sending actual cards that are produced in Georgia with everything that is dedicated to us to the lab, and that way we could ensure our money was being spent on the final product and not something that was produced elsewhere.

---

[4] George Theobald has been deposed both as an individual and as a 30(b)(6) witness for DMVS.  His individual deposition is two volumes with concurrent page numbers.  Thus, in this brief, his individual deposition, which took place on June 17 and July 24, 2003, is referred to simply as "Theobald Dep."  Likewise, his 30(b)(6) testimony, which took place on January 16 and February 12, 2004, is two volumes with concurrent page numbers, and is referred to herein as "DMVS/Theobald Dep."

Q.    So when you got the 99 cards within five days of the demonstration, you didn't do anything to determine that those cards were actually the cards that Viisage said that they were going to produce for Georgia; is that right?  Other than take their word for it.

A.    That is correct.

(Theobald Dep., 377:2-378:14.)  GTA and DMVS (and Digimarc) further knew Viisage was not the vendor that produced the New York driver's licenses and identification cards submitted by Viisage in response to the Georgia RFP; De La Rue produces licenses for New York.[5] (Theobald Dep., 290:14-15.)  Nonetheless, GTA and DMVS failed to follow up to determine why Viisage submitted New York cards in its RFP response:

Q.    [MR. HUTCHINS]  Did you ever determine the reason why Viisage submitted sample cards from the state of New York?

A.    [MR. THEOBALD]  We wanted to call De La Rue to see if they would -- if they provided them, but we thought after consulting with GTA that that wouldn't be a prudent thing to do at the time.

Q.    Why?

A.    I don't remember exactly why.  I just remember that we did have a short conversation about it.  And since they were a potential offeror and they decided not to bid, we felt it would -- the timing of that was inappropriate.  So we wanted to do that and we didn't.  We thought about calling 3M because the materials that they were using, or at least the laminate, was a 3M laminate and thought that maybe 3M had produced it for them for marketing purposes or whatever.  But we just didn't.

Q.    I mean it's fair to say, isn't it, then, I take from your comment, that you -- the fact that these were New York cards or cards that appeared to be from New York State, sparked your curiosity?

---

[5] Information regarding the identity of state driver's license vendors is readily available on the Internet.  See, e.g., Fast, Efficient and Secure Driver Licences for New York State, at http://www.delarue.com/DLR_Content/CDA /Pages/NationalIDTD/projects/newyork/0,2046,,00.html (confirming that De La Rue is the license vendor for New York).

A.    We knew that De La Rue was producing New York cards, and we had questioned how he -- how they -- under what pretenses [Viisage] had submitted the cards.

(Theobald Dep., 289:15-290:17.)

Thus, because Viisage submitted sample permanent cards from New York in its response to the Georgia RFP, Digimarc believed in December 2003 (and now has evidence to prove) that Viisage made material misrepresentations of fact to the State during the evaluation process with regard to the permanent driver's license and identification card it was proposing.[6] One critical way that Digimarc could supplement its proof in this regard is to assess Viisage's actual performance with respect to implementation of its contract with DMVS from November 12, 2002 until the point at which this Court granted Digimarc's Motion for Interlocutory Injunction on July 31, 2003 to determine if Viisage was actually able to provide the products and services set forth in its final technical proposal.  Viisage, however, took the position that all documents in Viisage's possession, custody or control that were generated before the May 24, 2002 Georgia RFP issuance date and after the November 12, 2002 contract award date were irrelevant. (Hutchins Aff., ¶ 4.)  Moreover, Viisage apparently took this position without even reviewing the post-November 12, 2002 documents in question.  Instead, Viisage apparently simply made a blanket, wholesale, all-encompassing objection on relevance grounds without regard to the contents of the documents:

Q.    [MR. FRENCH]  I'm talking about Viisage documents, sir, not letters by attorneys.  Is it Viisage's position that anything – after November 12th 2002, no Viisage documents other than the

---

[6] As is discussed extensively in Digimarc's Response to Defendants' Motion to Expedite Trial and for a Special Trial Setting or Transfer of the Case, filed on March 15, 2004, Digimarc has uncovered (and will likely continue to uncover) indisputable evidence that Viisage made material misrepresentations of fact to the State during the evaluation process with regard to the permanent driver's license and identification card it was proposing, and DMVS and GTA awarded the contract to Viisage under the false impression that Viisage knew how to produce the permanent card sample type that DMVS selected.  (Resp. to Defs.' Motion at 3, 8-16.)

GTA response, telephone records are relevant, regardless of what the documents say internally?

MR. CAHILL: Objection.

A.    [VIISAGE KEEPER OF THE RECORDS ELLIOT J. MARK] It is our position that all of those documents are not relevant, yes.

Q.    Regardless of what they say internally?

MR. CAHILL: Objection. He just answered that question.

A.    It's our position that they're not relevant, yes.

Q.    Regardless of what they say internally?

A.    Yes.

(Viisage Records Dep., 228:19-229:10.)[7]

Q.    [MR. FRENCH] How did you prepare Exhibit 113 [Viisage's Log of E-Mail Documents with the State withheld on the basis of relevance]?

A.    [VIISAGE KEEPER OF THE RECORDS ELLIOT J. MARK] We took all of the e-mails that had been sent either to or from DMVS and put them on a spreadsheet.

Q.    And the subject matter, did you review each of the e-mails?

A.    I did not.

Q.    So, once again, you just made a blanket assertion of relevance based on date regardless of contents?

MR. CAHILL: Objection.

A.    That's correct. That's correct.

(Viisage Records Dep., 258:11-22.) Therefore, Viisage had withheld the post-November 12

documents listed in its November 4, 2003 Relevance Log for E-mails (Tab 4) without even

---

[7] Viisage's Keeper of the Records deposition occurred on September 19 and December 1, 2003. The deposition transcript is two volumes with concurrent page numbers. Thus, in this brief, the Viisage Keeper of the Records deposition is referred to simply as "Viisage Records Dep."

bothering to review those documents to ascertain if they contained information relating to matters raised or relevant to the claims asserted in the pleadings in this action or reasonably calculated to lead to the discovery of admissible evidence, as mandated by O.C.G.A. § 9-11-26(b).

Subsequent to this deposition, Digimarc's counsel asked Viisage's counsel, Jamie Carroll, how Digimarc could be assured that the documents withheld by Viisage on the basis of relevance were truly not within the scope of relevant discovery. (Hutchins Aff., ¶ 5.) Mr. Carroll responded to the effect that, as in all discovery, Digimarc must trust that Viisage's counsel would diligently review Viisage's documents for responsiveness and fulfill their obligations to make a good faith determination of non-relevance. (Hutchins Aff., ¶ 5.) Digimarc took Viisage's counsel at his word and agreed to restrict Digimarc's document discovery requests to the truncated nine categories set forth in the Discovery Agreement. (Hutchins Aff., ¶ 7.) Specifically, Digimarc agreed to negotiate the Discovery Agreement, limiting its inquiry into post-November 12 documents to narrow categories of information, based on the specific representation of Viisage that the pertinent documentation had been or would be reviewed and that Viisage had or would fulfill the responsibility to make a good faith determination on the issue of relevance prior to withholding documents based on an objection of non-relevance. (Hutchins Aff., ¶ 7.) Digimarc later learned, however, that Viisage **never** actually had a good-faith basis upon which to assert that all potentially responsive documents had been reviewed and a determination of non-relevance had been made in good faith:

> Q.    [MR. FRENCH] Did you provide any such writings to your counsel for review in response to request for production of documents from Digimarc?
>
> A.    [VIISAGE 30(b)(6) WITNESS IFTI AHMAD] I don't know if this was covered in those discussions.

11

Q.    I'm sorry?

A.    I do not know if it was covered in the discussion. We provided whatever documentation and information we had.

Q.    And what do you mean by "we"? Did you actually go through your files and provide all documents you had?

A.    I provided the documentation that the counsel advised me to give which is for the period that is specified.

Q.    So you did not give to your counsel any documents after November 12, 2002 except those he told you to specifically give to him; is that right?

A.    No. What I said is he specified that this is the duration which was before the bid was -- before the contract was awarded from the time the bid came in to provide documentation for that and I gave what I had and the others gave whatever they had.

Q.    Okay. I'm talking about after November 12, 2002, sir. Did you give your documents to counsel for counsel to review as to relevancy and privilege after November 12, 2002?

MR. KHAYAT:  Object to the form of the question.

Q.    Actually, it was a bad question. Before the documents which were produced or retained by Viisage after November 12, 2002, did you provide those documents to your counsel for review as to whether or not they should or should not be produced?

A.    What I recall was what was asked is a listing of e-mails, just a listing. Not the documents. I believe that was what was asked as best as I can remember.

(Viisage Dep. III, 218:7-219:17.)[8]

---

[8] Viisage's 30(b)(6) deposition has thus far covered portions of four different days in 2004 – January 20, February 10, February 18 and February 19. Unfortunately, the court reporter has started each day with new page numbers, so that there are four stand-alone volumes of Viisage's 30(b)(6) deposition. Thus, Viisage's deposition is referred to in this brief as follows:

> January 20  - "Viisage Dep. I"
> February 10 - "Viisage Dep. II"
> February 18 - "Viisage Dep. III"
> February 19 - "Viisage Dep. IV"

Digimarc would never have agreed to limit its document requests along the lines of the Discovery Agreement if it had known that Viisage's counsel had never even asked Viisage to show the post-November 12th documents to counsel for review. (Hutchins Aff., ¶ 8.) Thus, the entire basis for the Discovery Agreement is invalid. Given that Viisage never served timely objections to Digimarc's First Request for Production of Documents, Viisage should be compelled by this Court to produce all non-privileged documents that are responsive to Digimarc's First Request for Production of Documents, including those documents listed on the three separate "logs" produced by Viisage in accordance with the Massachusetts' court's November 4 Order. (See Relevance Log for E-mails, Tab 5; Attorney-Client Privilege and Work Product Log, Tab 6; Relevance Log for Correspondence, Tab 7.)

**B.     If This Court Is Not Convinced That Viisage's Misrepresentation To Digimarc With Respect To Its Discovery Efforts Merits Production Of All Non-Privileged Documents Responsive To Digimarc's Written Discovery Requests, Then Viisage Should At Least Be Compelled To Produce All Documents That Are Responsive To Each Of The Nine Categories Of Documents Mutually Agreed Upon By Viisage And Digimarc As Part Of The Discovery Agreement.**

In December 2003, Viisage failed to produce all documents that are responsive to the nine agreed-upon categories set forth in the Discovery Agreement.

**1.     Viisage Failed To Produce All Relevant, Non-Privileged, Responsive Documents Relating To Post-November 12, 2002 Changes In Viisage's Technical Proposal With Respect To Viisage's Proposed Back-Up Card Production Facility.**

Digimarc became aware in February 2004 that Viisage failed to produce all relevant, non-privileged, responsive documents relating to changes in Viisage's technical proposal to the State, as required under Category No. 1 of the Discovery Agreement. On January 6, 2004, Viisage confirmed Viisage's agreement to produce "[a]ll documents, regardless of date, that reflect changes between the technical proposal(s) that formed the basis of the award of the contract to Viisage and the solution that Viisage actually was implementing in Georgia." (See Dec. 26,

2003 E-mail from Hutchins to Carroll, Tab 10, Category No. 1 (emphasis added); see also Jan. 6,

2004 E-mail from Carroll to Hutchins, Tab 10 (confirming Viisage's agreement to produce the

documents reflected in the Dec. 26, 2003 e-mail).)[9]  Documents responsive to this category are

particularly important to a number of issues.

The best example is that the Georgia RFP mandated that each bidder have a back-up card

production facility to take over license production in the event the central permanent card

production facility is compromised.  (RFP ¶ 3.9.1.)  In response, Viisage's technical proposal

offered the following:

> In addition to providing a secure, fault-tolerant solution for central
> printing, Viisage has made arrangements with Arthur Blank and
> Company to use their card printing facility as a backup, in case of
> disaster at the permanent facility in Georgia.  In case of failure at
> the Central Production Facility that causes significant downtime in
> card production, Viisage will produce the cards off-site.  Viisage
> will develop security processes to ensure that all consumables and
> finished documents are under reasonable protection throughout the
> duration of the emergency.

(Digimarc's Brief in Support of Plaintiff's Motion to Compel the Completion of Viisage's

30(b)(6) Deposition, filed on March 15, 2004, Tab G, at D24.)  As Viisage is well aware,

---

[9] Viisage agreed to produce Category No. 1 documents with the exception of documents protected by the attorney-client privilege and the following:

> Viisage will produce these documents, except to the extent that they disclose
> Viisage's trade secrets and proprietary information (mostly pricing information).
> Viisage will not withhold any responsive documents, but will redact and
> produce.  If Digimarc believes that redaction makes it impossible to determine
> what changes are reflected, then (under the terms of an appropriate "outside
> counsel eyes only" agreement or protective order) Jamie Carroll will read to
> [Mr. Hutchins] the redacted information so that [Mr. Hutchins] can determine
> whether a further challenge is necessary.  If [Digimarc] deem[s] a further
> challenge necessary and the parties cannot resolve it, Digimarc still has the right
> to move to compel the redacted information based either on the ground that it
> did not constitute a trade secret or proprietary information or on the ground that
> there is no other way to prove the issue except with access to the information.
> Viisage reserves the right to argue the relevance of the information (and other
> arguments) in the event of such a motion to compel.

(Dec. 26, 2003 E-mail from Hutchins to Carroll, Tab 10, Category No. 1.)

Viisage's relationship with Arthur Blank & Co. ("Arthur Blank") has been a major issue since Digimarc filed its Protest to Request for Proposal No. GTA000051 on November 26, 2002.[10]  In Digimarc's Protest, Digimarc pointed out that Viisage does not, and never has had, an agreement with Arthur Blank to act as its back-up card printer.  (Digimarc Protest at 3.)

On February 12, 2004, Digimarc's counsel questioned DMVS 30(b)(6) witness Christine Clay regarding Viisage's use of Arthur Blank for back-up card production:

> Q.    [MR. HUTCHINS]  Do you remember as part of the evaluation of the various bidders' proposals that one of the things that the evaluation team considered was the various offerors' plans for disaster recovery in the event that a disaster occurred at the facility that was producing cards in Georgia?
>
> A.    [MS. CLAY]  Yes.
>
> Q.    And do you remember what -- and do you remember that as part of that disaster recovery plan each bidder proposed a plan for backup card production in the event of a disaster?
>
> A.    Yes.
>
> Q.    And do you remember Viisage's backup card production plan in terms of the proposal that it submitted including a plan to use Arthur Blank & Company as its backup card production provider?
>
> A.    Yes.
>
> Q.    Since the November 12th notice of award, what, if anything, has been done by DMVS to evaluate the backup card production plan that Viisage intends to implement?
>
> A.    We had had discussions in general regarding their plan for disaster recovery.
>
> Q.    All right.  You said we had discussions in general regarding their plan for disaster recovery.

---

[10] See Certified Copy of the Record of Proceedings in the Matter of: Protest of Digimarc ID Systems, of the Contract Award for Request for Proposal No. GTA 000051, Digitized License System for the Georgia Department of Motor Vehicle Safety, filed May 1, 2003, Ex. 10, hereinafter referred to as "Digimarc Protest."

A.    Right.

Q.    When did those discussions occur?

A.    Towards the end of -- getting closer to the end of the process, towards acceptance testing, we were told that Arthur Blank was not going to be their source for disaster recovery.

. . .

Q.    And who was involved in those discussions?

A.    Barry Erhardt [Viisage's program manager].

. . .

Q.    I just want to focus on the first discussion that you had about this topic. How did it come up?

A.    He started researching local companies to provide the backup services.

. . .

Q.    And what sort of local companies was he looking at?

A.    Printing companies and I believe storage companies. I know -- I recall two in particular that he had looked at, one on the north side and one on the south side of Atlanta.

. . .

Q.    Did Mr. Erhardt tell you why Viisage was changing its plan from a plan to use Arthur Blank to a plan to use a local company?

A.    I believe it was because of the cost that Arthur Blank was going to charge for the services.

Q.    Tell me what Mr. Erhardt told you about that.

A.    I -- what I recall is he just said that it was -- Arthur Blank was -- their charges were -- were outrageous. I don't know if that was the word that he used but they were too high for the -- for the services.

(DMVS 30(b)(6) Deposition of Christine Clay, 23:25-28:6.) As a result of Ms. Clay's deposition

testimony, Digimarc learned for the first time that, following the award of the contract on

16

November 12, 2002, Viisage had been negotiating with "local companies to provide the backup services" in lieu of the services it had represented to the State would be provided by Arthur Blank and that the reason for the change was the all-important issue of cost. (Clay Dep., 25:23-24.) Yet, Viisage failed to produce <u>any</u> documents in its January 9, 2004 production reflecting communications relating to this proposed change in Viisage's back-up production facility vendor.[11]

Viisage may argue that Viisage elected to exclude post-November 12, 2002 communications from its document production relating to this cost-driven change from Viisage's initial technical proposal because the negotiations with the local vendor never reached fruition in light of the injunction issued by this Court on July 31, 2003. Viisage's reliance upon this argument, however, would be disingenuous. Viisage has been on notice regarding Digimarc's allegations relating to Arthur Blank since Digimarc filed its Protest on November 26, 2002. (Digimarc Protest at 3.) Digimarc subsequently addressed the Arthur Blank issue in its: (1) Verified Complaint, filed on March 5, 2003 (Verified Compl., ¶¶ 160-66); (2) First Amended Complaint, filed on November 12, 2003 (First Amended Compl., ¶¶ 186-92); (3) Notice of Deposition to the Custodian of Records for Viisage Technology, Inc., filed on August 18, 2003 (Notice of Deposition, Ex. A at 7 ("Any and all documents, correspondence and communications evidencing or reflecting communications by and between Viisage and Arthur Blank concerning or regarding emergency back-up services to be provided in connection with the RFP and/or the Contract."); and, (4) Amended Notice of 30(b)(6) Deposition of Viisage Technology, inc., filed

---

[11] Notably, Viisage has also refused to produce Barry Erhardt, Viisage's Program Manager and point person with respect to negotiating with local back-up facility vendors, as a 30(b)(6) witness despite Digimarc's repeated requests that Viisage do so to fill in gaps left by Viisage's sole 30(b)(6) witness, Ifti Ahmad. (<u>See</u> Digimarc's Brief in Support of Plaintiff's Motion to Compel the Completion of Viisage's 30(b)(6) Deposition, filed on March 15, 2004, at 12-17.)

on December 31, 2003 (Amended Notice, Ex. A at 5 ("All facts, documents and materials related to Viisage's business relationship[] with . . . Arthur Blank.").  Consequently, it is patent that all documents regarding Viisage's relationship with Arthur Blank and Viisage's back-up facility proposal are relevant, regardless of their date.  Yet, in contradiction to the Discovery Agreement, Viisage failed to produce documents related to these post-award negotiations with Arthur Blank or with alternative, local back-up facility vendors because these documents would simply prove that there never was any agreement with Arthur Blank to act as back-up facility in the first place. Therefore, because Viisage has withheld responsive documents that fall under Category No. 1 of the Discovery Agreement, Digimarc requests that this Court compel Viisage either to produce <u>all</u> of the documents responsive to Category No. 1 covered by the Massachusetts subpoena and court order, as modified by the subsequent agreement of the parties, or fully respond to Digimarc's First Request for Production of Documents.

2.   <u>Viisage Failed To Produce All Relevant, Non-Privileged, Responsive Documents Relating To Viisage's Post-November 12, 2002 Change From Unisys As Its Point Of Sale Provider To Centerstage, A Local, Cheaper Vendor.</u>

Digimarc also became aware during February 2004 deposition testimony that Viisage has failed to produce all relevant, non-privileged, responsive documents relating to changes in Viisage's Point of Sale ("POS") system proposal to the State, as required under Category No. 5 of the Discovery Agreement.  (<u>See</u> Dec. 26, 2003 E-mail from Hutchins to Carroll, Tab 10, Category No. 5 ("Documents that reflect changes to Viisage's vendor costs in connection with the change from Unisys and Centerstage.").)[12]  The Georgia RFP required each Offeror to submit

---

[12] Viisage agreed to produce Category No. 5 documents with the exception of documents protected by the attorney-client privilege and the following:

> Viisage will produce these documents, except to the extent that they disclose
> Viisage's trade secrets and proprietary information <u>not</u> related to the reason for

Unisys to CenterStage. (Verified Compl., ¶ 173; First Amended Compl., ¶ 199.) Digimarc believes that Viisage substituted CenterStage for Unisys to reduce its cost with respect to the POS services Viisage proposed to the State because Viisage could not, in fact, produce its proposed cards, as described in its technical proposal, at the price submitted to the State in its Best and Final Offer. Subsequent testimony by Viisage's 30(b)(6) witness, Ifti Ahmad, indicates that Viisage substituted CenterStage for Unisys solely on the basis of a lower price to Viisage without any understanding as to whether the substitution represented any impairment in "best value" to the State:

> Q.    [MR. FRENCH]  This is Exhibit 541, a document produced to us by Viisage. Do you understand, sir, that Viisage generated a snapshot of the Point of Sale system for Georgia as of October 30, 2002?
>
> A.    [VIISAGE 30(b)(6) WITNESS IFTI AHMAD]  According to this document, yes, sir.
>
> Q.    Okay.  With the exception of Center Stage, where is the other vendor that you have referenced to the State in Exhibit 539 that you had two back-up POS providers?
>
> A.    Well, as I said, I don't remember who the -- in addition to NCR and Unisys, I believe there was another vendor that initially we were talking to. I could get that name. We had actually bid them or worked with them from another state. I don't remember their name. That's where we started from. Then we brought Unisys and NCR into our discussions.
>
> Q.    You never got a quote from the company who you can't recall?
>
> A.    We did not get a quote because as best as I recall, for that particular bid that we were working in, they submitted the quote to Digimarc and Digimarc basically asked them not to bid a POS solution with us. So they refused to bid it.
>
> Q.    Why was Exhibit 541 generated?
>
> A.    I can only assume that the three vendors were being compared to see what each vendor's pricing looks like.

Q.    And why was Viisage comparing the pricing of the three different vendors as of October 30, 2002?

A.    For our internal evaluation.

Q.    By October 30, 2002, Viisage was still putting forth Unisys as its POS provider to the State of Georgia. Isn't that fair?

A.    That is correct.

Q.    It wasn't until November 6, that Viisage came to the conclusion that it wanted to switch from Unisys to Center Stage. Is that fair?

A.    It would be around that time frame, yes, sir.

Q.    Did Exhibit 541 have anything to do with the decision of switching from Unisys to Center Stage?

A.    I believe it would be part of that decision process.

Q.    Tell me why.

A.    My assumption is that Center Stage was offering a better solution price-wise.

Q.    Is that the reason why Viisage switched from Unisys to Center Stage because Center Stage had a cheaper price?

A.    As I said, we were having a lot of trouble with Unisys being responsive to us, which is the primary reason we started to look elsewhere. We weren't getting the responsiveness that we needed.

Q.    All right, sir. Viisage has produced a series of communications with its third-party vendors. And I will represent to you there is nothing in there that talks about Unisys not being responsive to requests of Viisage. Can you explain that to me?

A.    That is what I recall. And I don't know if these are phone conversations. Maybe they were not Email, but that is what I recall. We were having an extremely difficult time getting to work with the people who were working on the Unisys POS solutions.

Q.    Who was Viisage's contact person with Unisys?

A.    I believe it was Mohammed Siddiqui.

21

Q.    Do you know who Mr. Siddiqui was talking with at Unisys?

A.    No, sir, I don't. I mean, I knew the name at that time. I don't remember it right now.

(Viisage Dep. II, 209:1-212:10.)[13] Yet, although Viisage agreed to produce "[d]ocuments that reflect changes to Viisage's vendor costs in connection with the change from Unisys and Centerstage," no such documents have been forthcoming from Viisage. Therefore, because Viisage has withheld responsive documents that fall under Category No. 5 of the Discovery Agreement, Digimarc requests that this Court compel Viisage either to produce <u>all</u> of the documents responsive to Category No. 5 covered by the Massachusetts subpoena and court order, as modified by the subsequent agreement of the parties, or fully respond to Digimarc's First Request for Production of Documents.

3.    <u>Viisage Failed To Produce All Relevant, Non-Privileged, Responsive Documents Relating To The Performance Bond To Be Provided By Viisage To The State Following The November 12, 20002 Contract Award.</u>

Viisage has also failed to produce all relevant, non-privileged, responsive documents relating to Viisage's compliance with the conditions of the Notice of Award, as required under Category No. 6 of the Discovery Agreement. (See Dec. 26, 2003 E-mail from Hutchins to Carroll, Tab 10, Category No. 6 ("Communications after Nov. 12 about Viisage's compliance with the conditions of the Notice of Award.").)[14] On November 12, 2002, GTA provided

---

[13] Notably, on March 1, 2004, Viisage filed its Response in Opposition to Plaintiff's Motions for Issuance of Commissions, opposing Digimarc's Motion for Issuance of Commission to depose Mr. Siddiqui.

[14] Viisage agreed to produce Category No. 6 documents with the exception of documents protected by the attorney-client privilege and the following:

> Viisage will produce these documents, except to the extent that they disclose Viisage's trade secrets and proprietary information (mostly pricing information). Viisage will not withhold any responsive documents, but will redact and produce. If Digimarc believes that redaction makes it impossible to determine what changes are reflected, then (under the terms of an appropriate "outside counsel eyes only" agreement or protective order) Jamie Carroll will read to

Viisage with a Notice of Award. (First Amended Compl., ¶ 107, Ex. R.) The Notice of Award required Viisage to provide a performance bond (among other things) that covered all of the performance obligations of Viisage during the entire term of the contract. (First Amended Compl., ¶ 225, Ex. R.) In violation of the express terms of GTA's Notice of Award, however, Viisage did not deliver a performance bond with an expiration date past November 12, 2003 to cover the full term of the contract, which has expiration date of June 30, 2004 (First Amended Compl., ¶ 226.):

> Q.    [MR. FRENCH] Take a look, sir, at the second page of Exhibit 65 which is the performance bond itself.
>
> A.    [VIISAGE 30(b)(6) WITNESS IFTI AHMAD]  Yes.
>
> Q.    You see the first paragraph which says: "This bond is for the term beginning November 12th, 2002 and ending November 11, 2003"?
>
> A.    Yes, sir.
>
> Q.    You see, sir, on Exhibit 547 the duration of the contract, very first page, Exhibit 547, sir, of the contract.  Do you see the very first paragraph says: "Duration, November 12th, 2002 shall continue until June 30 2004."
>
> A.    Yes, sir.
>
> Q.    Can you tell me why a performance bond for the State of Georgia was not provided up to June 30th of 2004?
>
> MR. GALLAGHER: Object to form.

---

[Mr. Hutchins] the redacted information so that [Mr. Hutchins] can determine whether a further challenge is necessary.  If [Digimarc] deem[s] a further challenge necessary and the parties cannot resolve it, Digimarc still has the right to move to compel the redacted information based either on the ground that it did not constitute a trade secret or proprietary information or on the ground that there is no other way to prove the issue except with access to the information. Viisage reserves the right to argue the relevance of the information (and other arguments) in the event of such a motion to compel.

(Dec. 26, 2003 E-mail from Hutchins to Carroll, Tab 10, Category No. 6.)

Q.    Withdrawn.  Do you know why the term of the bond is only November 12th, 2002 to November 11th of 2003 in spite of the fact that the contractor duration is from November 12th, 2003 to June 30 of 2004?

A.    I believe all the bonds that are issued are from renewal every year.  And for every other contract as well as this contract, we got a one-year bond.  We renew it every year which I believe is acceptable in the industry.  So for a five-year contract we may have with Connecticut, we get a one-year bond and we renew it.

Q.    Sir, isn't it a fact that the reason why Viisage did not provide a performance bond for the entire duration of the contract is because Mr. McDonald told Viisage that in order to secure a performance bond that it sees a one-year period you have to put up the collateral of $300?

A.    You may have information that I have.  I did not hear anything along those lines.

. . .

Q.    Sir, take a look at page 11 of Exhibit 547, specifically section 29 Performance Bond, ask you to read that paragraph to yourself.

A.    Yes, sir.

Q.    Sir, do you have an understanding of what was required of Viisage in terms of the time the performance bond had to be provided to cover the contract?

MR. GALLAGHER: Objection to the form.

A.    This 3 million dollars of the proposed bond that is required.

Q.    I understand, sir.  My question is a little different.  Do you have an understanding as to how long the term of that bond has to be as provided for in Exhibit 547?

A.    The way I understand it and the way it's written here is obtain and maintain for the life of the contract and all renewals and extensions of performance bond.  We obtained a one-year bond, and our intention was maintain it by renewing it every year which is what we do for every other contract.

Q.    All right, sir.  Take a look at the fourth paragraph of the performance bond in Exhibit 65.  Do you see that the performance

bond provided that the failure of the surety to renew the bond
would not be deemed to be a loss on the performance bond?

A.    It says that. I am not a contractor. I wouldn't understand
what it means.

Q.    So was it Viisage's position that it did not believe it needed
to provide a performance bond for the life of the contract?

MR. CARROLL:  Objection to the form.

A.    We for all of our contracts -- and Georgia was no exception
-- we provide the performance bond for the life of the contract, and
we renew it on a yearly basis.

Q.    And what recourse, if any, would the State have, sir, if you
did not renew the performance bond?

A.    We submit a couple of months before the contract is up for
renewal in all of our contracts. And we bought several of these
contracts on the same terms.

Q.    I understand, sir. But there is no obligation in the
performance bond that it has to be renewed in advance of
expiration; was there?

A.    But we are obligated to get it renewed every year.

Q.    That's my point, sir. If you don't renew it by November
11th of 2003, what performance bond recourse does the State have
for your breach of paragraph 29?

MR. GALLAGHER:  Objection to the form.

A.    As I said, that would be decided by the State's attorneys
and the State's people on what course of action they would take.

Q.    Did anybody at Georgia tell you that you did have to
provide a performance bond covering the life of the contract?

A.    Not to my recollection.

Q.    By your recollection, you are speaking on behalf of all of
Viisage?

A.    Yes, sir.

Q.    So Viisage as far as it's concerned was never given a waiver of the requirements of any sections pertaining to Exhibit 547; is that right?

MR. GALLAGHER:  Objection to form.

Q.    Withdrawn.  Was Viisage ever given any waiver of any of the contractual obligations on 547?

A.    I'm not aware of any.  <u>As I said we may be given some relief around when some of the things happened.  Like, you know, the escrow account that we had to have the software developed to put in escrow.  So maybe there was some documentation on this.</u>  But to the best of my knowledge, we followed the requirement of the contractor and the award.

MR. FRENCH:  Just so we are clear to follow up on the dialogue we had off the record:  If Viisage is taking a position that documents posted November 12th, 2002 are not relevant and that Viisage is not going to produce any further documentation other than that which is negotiated providing additional documentation, then Digimarc is deeming that to be an election on the part of Viisage that it will not produce such documents which is deemed during discovery to be relevant as something that you may want to introduce at the time of trial demonstrates anything after November 12th, 2002.  I do not expect a response, but that's my notice to you.

MR. CARROLL:  That's fine.

(Viisage Dep. II, 251:16 – 258:2 (emphasis added).)  Contrary to the Discovery Agreement, Viisage failed to produce the above-referenced documents regarding communications after November 12 relating to Viisage's compliance with the performance bond condition of the Notice of Award.  Therefore, because Viisage has failed to produce all responsive documents that fall under Category No. 6 of the Discovery Agreement, Digimarc requests that this Court compel Viisage either to produce <u>all</u> of the documents responsive to Category No. 6 covered by the Massachusetts subpoena and court order, as modified by the subsequent agreement of the parties, or fully respond to Digimarc's First Request for Production of Documents.

4. **Viisage Failed To Produce All Relevant, Non-Privileged, Responsive Documents Relating To Its VIP Card Security Vendor.**

As reflected in Category No. 8, Viisage agreed to produce all "[d]ocuments that reflect Viisage's means and methods to produce the cards used in Georgia, either as samples submitted during the procurement, or cards that were to be produced in performance of the actual contract." (See Dec. 26, 2003 E-mail from Hutchins to Carroll, Tab 10, Category No. 8.) Section 3.5.5.3 of the Georgia RFP mandated that each Offeror meet certain minimum security requirements with respect to its driver's licenses and identification cards, including the provision of a minimum of five security features, with at least one feature from each of the following categories:

> Category 1: Features that are overt and can be easily recognized in the field without the use of special inspection equipment and without requiring special knowledge/extensive training;
>
> Category 2: Features that can be verified in a law enforcement or secondary inspection facility with the use of special inspection equipment by Examiners with limited special knowledge;
>
> Category 3: Features that are covert and can only be verified by Examiners having extensive special knowledge and through the use of special equipment;

(RFP § 3.5.5.3(3).) When questioned regarding Viisage's compliance with this requirement, Viisage's 30(b)(6) witness, Ifti Ahmad, responded as follows:

> Q.    [MR. FRENCH]  And that Viisage as part of its proposal had to propose a response which had at least one security feature from each of the Categories 1, 2, and 3 for a total of a minimum of five security features?
>
> A.    [VIISAGE 30(b)(6) WITNESS IFTI AHMAD]  Yes, sir.
>
> Q.    What were the five security features being proposed by Viisage in response to this mandatory RFP requirement?
>
> A.    I believe the OVD, the ghost image, the known errors, the bar code, that's four, and the VIP [Variable Information Printing] are -- yes, the VIP, I think.

Q.    So let's break them down, sir. For your Category 1's, you are proposing OVD, ghost image and signature over photo; is that right?

A.    The five -- there are three listed here, that's correct.

Q.    For Category 2, what were the features being proposed by Viisage?

A.    What we listed here was microprinting, variable microprinting, known errors and machine readable to the bar code. So three in 2 and three in 1 that we listed here.

Q.    And for Category 3, what was the security feature being proposed by Viisage?

A.    Variable information, VIP encoded.

(Viisage Dep. III, 119:14-120:14.) Although Viisage included a description of the VIP security feature in its technical proposal to the State and included a card sample demonstrating the VIP feature during its November 12, 2002 presentation to GTA and DMVS, Viisage did not know how or by whom that sample card was produced:

Q.    [MR. FRENCH] What demonstration, if any, did Viisage do of its ability to produce VIP on a card with Confirm security laminate other than show examples produced by somebody else?

MR. KHAYAT: Object to the form.

A.    [VIISAGE 30(b)(6) WITNESS IFTI AHMAD] That is what we showed, I believe. We did not show a demonstration of VIP on one of the card samples that we produced. That's as best as I recollect.

Q.    Who produced the VIP card sample that you showed to the state on November 12, 2002?

A.    I don't know the answer to that.

Q.    Where did you get that card sample?

A.    I don't know. If I was to guess, it would be the vendor who provided that software or that capability.

Q.    Who was that?

A.      I think we were working through OpSec, O-P-S-E-C.

(Viisage Dep. III, 126:7-23.) Yet, Viisage failed to produce any documents relating to Viisage's communications with its VIP security vendor in response to Category No. 8, which required Viisage to produce documents that reflect Viisage's means and methods to produce the cards used as samples submitted during the procurement. (<u>See</u> Dec. 26, 2003 E-mail from Hutchins to Carroll, Tab 10, Category No. 8.) Because such documents are clearly relevant and responsive to Category No. 8 of the parties' Discovery Agreement, Viisage should produce them.

5.      <u>**Viisage Failed To Produce All Relevant, Non-Privileged, Responsive Documents Reflecting Viisage's "Damages" Or Losses In Performing The Contract Or Evidence Of Its Lease Agreement Of Its Georgia Facility.**</u>

Viisage agreed to produce "[d]ocuments that reflect Viisage's 'damages' or losses in performing the contract to the extent that Viisage might argue that such damages or losses are a factor in balancing the equities of a permanent injunction" with the following clarifications and limitations:

> Viisage will produce a categorization of damages. Viisage will produce any documents that it intends to use to prove this defense, or any documents that tend to disprove the defense and, further, that Viisage agrees that it is estopped against using any document for this purpose that has not previously produced to Digimarc.

> Digimarc reserves its right to challenge the categorization of damages and move to compel additional documents if it deems the categorization of damages insufficient to allow it to rebut the total amount expended as well as any argument that certain expenditures were necessarily incurred. Dig[i]marc further reserves its right to suspend the Viisage 30(b)(6) deposition on this issue and re-notice that deposition at a later date if the parties cannot ultimately reach agreement on this issue in light of the categorization of damages and Viisage's 30(b)(6) deposition.

> The parties agree that the failure to thus far reach agreement on this issue does not impact the agreement on the other issues listed in this e-mail.

(Dec. 26, 2003 E-mail from Hutchins to Carroll, Tab 10, Category No. 4.)  In response to Category No. 4, Viisage has produced only a single-page document reflecting eight line items which allegedly summarize Viisage's "damages."  (Viisage Dep. IV, Dep. Ex. 580, Summary of Viisage Costs January 8, 2004, Tab 12.)  If Viisage intends to contend at trial that its damages or losses are a factor in balancing the equities of a permanent injunction, Viisage must produce all relevant, responsive documents relating to Viisage's expenditures now, including sufficient detail to allow Digimarc to rebut the total amount expended and the necessity of specific expenditures.

In an effort to resolve this portion of the parties' discovery dispute, Digimarc's General Counsel, Roger French, attempted to gain a better understanding of Viisage's alleged expenditures during Viisage's 30(b)(6) deposition.  However, Viisage's counsel evaded his questions and ultimately refused to respond:

> Q.    [MR. FRENCH]  Can you tell me with greater specificity what is underlying the cost which appears in Exhibit 580?
>
> MR. KHAYAT:  Object to the form of the question.
>
> MR. GALLAGHER:  Object.
>
> A.    [VIISAGE 30(b)(6) WITNESS IFTI AHMAD]  I believe we were given protection by the Massachusetts court to not get into specifics on cost.
>
> Q.    Are you refusing to answer, sir?
>
> MR. KHAYAT:  I think he's --
>
> A.    I'm just referring to what advice I was given.
>
> Q.    At this time has Viisage made an election as to whether or not it will put forth evidence at trial as to its expenditures under this contract?
>
> MR. KHAYAT:  My understanding is that the conversation that you had in this prior deposition with Jamie Carroll is that is still the status.

MR. FRENCH: That you are going to, in fact, put in evidence of the costs or that you're not going to?

MR. KHAYAT: Whatever you and Jamie discussed is what I understand the case to be.

MR. FRENCH: I don't think there's been any conclusion yet reached, counsel. So I'm just trying to get conclusion while I have this document in front of me with this witness. It's been on the table for a long time now. Has Viisage made an election as to whether or not it will be presenting evidence at time of trial as to its expenditures to date under this contract?

MR. KHAYAT: And my understanding is that the parties have reached an agreement in that regard, and I'll have to find out. I tell you what, if you want to take a break and you want me to find out, I will go find out.

MR. FRENCH: Sure. Why don't we take a break.

. . .

MR. FRENCH: During the break, counsel have had the chance to confer, and the position that's being communicated by Viisage is that at this time it has not decided formally that it will not enter into evidence at trial evidence of the expenditures it's made to date on the contract, but it's reserving its rights to do so. And if it does so elect, it will provide Digimarc with a timely opportunity to take a deposition of a 30(b)6 designee of Viisage on this subject matter. Is that fair, counsel?

MR. KHAYAT: It is, it is fair to say that we are reserving this issue. Right now we don't plan to put on or to introduce this document. And if we do, we will provide you with an opportunity to depose someone on these points.

MR. FRENCH: Okay. And, and by this document I am not limiting my, my cross-examination of Viisage solely to Exhibit 580. If Viisage wants to introduce evidence of its expenditures to date, I am plainly going to ask for, and I think I'm entitled to receive, all the backup documentation associated with these expenditures to determine whether or not they are, in fact, prudent and reasonable and accurate.

MR. KHAYAT: Well, you can – your position is clearly stated.

(Viisage Dep. IV, 160:8-164:15.)

While Mr. French's "position [was] clearly stated," the requested documents have not been forthcoming. For example, with respect to Deposition Exhibit 580 (Viisage's Categorization of Damages, Tab 12), Mr. Ahmad testified that Viisage was, and still is, incurring costs for its Georgia facility following the July 31, 2003 injunction Order:

> Q.    [MR. FRENCH]  What expenditures was Viisage continuing to incur after the injunction on July 31?
>
> A.    [VIISAGE 30(b)(6) WITNESS IFTI AHMAD]  I can give you broad categories.  I don't know the specifics, sir.
>
> Q.    Okay.  What were the broad categories?
>
> A.    We still maintain a facility in Georgia.  Obviously -- and we maintain the experts that we hired to run the central printing. So there's labor and facility and obviously all the leads and the interest we have and so probably also a cost that we were incurring.

(Viisage Dep. IV, 158:1-13.)  Yet, Viisage refuses to produce documents related to the Georgia facility's lease agreement:

> Q.    [MR. FRENCH]  Your off site -- the state eventually chose an off-site production facility, right?
>
> A.    [VIISAGE 30(b)(6) WITNESS IFTI AHMAD]  That's correct.
>
> Q.    Did you buy or lease?
>
> A.    We lease, sir.
>
> Q.    Where is that lease contract?
>
> MR. KHAYAT:  Are you asking me or are you asking him?
>
> MR. FRENCH:  Yes.
>
> Q.    All right.  Where is that lease contract?
>
> MR. KHAYAT:  I can tell you again to the extent that they have a lease contract, I believe, and I don't know this, I would have to look at it, but I believe it would be post award again.

32

MR. FRENCH: That's within the category of documents which Viisage specifically said it would produce.

MR. KHAYAT: Clearly, you and I have a difference in opinion as to what the agreement is between the parties.

MR. FRENCH: No. This is -- your counsel said he would produce the lease.

MR. KHAYAT: He specifically said he would produce the lease?

MR. FRENCH: That's part of the stipulation which I think was obtained fraudulently, yes.

MR. KHAYAT: I disagree about it being obtained fraudulently. If that is something that we agreed to produce, then I would assume that we have produced it. If not, then I'll check into it.

Q.    How much are you paying for a lease in Georgia?

MR. KHAYAT: I object to that question because you are getting into issues of the cost of Viisage, and that's something that we have not agreed to produce.

MR. FRENCH: Yes, it is. I'm not making this up. You also said you were going provide me cost and information between Unysis versus Center Stage and I haven't seen that either.

(Viisage Dep. III, 207:22-209:11.)

Digimarc also seeks cost information with respect to the lease agreement for Viisage's proposed Georgia facility because Digimarc believes that GTA and DMVS failed to conduct a price realism analysis of Viisage's proposals to determine if Viisage's proposed price covered the costs associated with Viisage's obligations under the contract. (First Amended Compl., ¶¶ 148-58.) The Georgia RFP mandated that, as part of its evaluation, GTA and DMVS were required to conduct a price realism evaluation to determine if the vendor's proposed price had a sound economic basis and, thereby, to ensure that Georgia did not risk the ongoing viability of the Digitized License System by awarding the procurement contract to a vendor operating at a loss or selling a product/service at a less than sustainable margin. (See definition of

"Evaluation," RFP App. D; see also First Amended Compl., ¶¶ 148-49.) Digimarc believes that

Viisage's final price per driver's license or identification card was below the estimated total cost

Viisage would incur under the contract. One example of the disconnect between Viisage's

proposed price and a realistic cost estimate for card production is Viisage's proposed price per

card if the cards are issued from Viisage's own building rather than produced at a DMVS

facility.[15] For a facility with a minimum square footage requirement of 4,800 square feet,

Viisage's proposed price differential per card had been only 1 cent. In order to provide an offsite

factory, Viisage would need to build or lease a building, specially modify it into a totally secure

building, and then to also operate and insure it each year all for a total amount of less than $0.43

per square foot per month. Digimarc believes that this is not realistic, and further that GTA and

DMVS should have been aware that a 1 cent differential in the cost of production per card

between on-site and off-site facilities was not, in reality, achievable.

Digimarc is also seeking details relating to Viisage's actual expenditures in part because

Digimarc confirmed during the DMVS 30(b)(6) deposition of Christine Clay that the State had

---

[15] The Georgia RFP required each Offeror to submit two separate proposals regarding office space and support:

> 3.3.4.1  All Offerors will include in their price proposal, pricing models based
> on two different Central Production Facility arrangements. The first pricing
> model will be based on DMVS providing floor space for the Central Production
> Facility in Conyers, Ga. All Offerors will include in their price proposal specific
> floor space, temperature, networking, electrical power, lighting, and
> environmental requirements for the Central Production Facility to meet the
> requirements of the resulting Contract. All recurring utilities required by the
> Successful Offeror at the DMVS facility will be the responsibility of the
> Successful Offeror.

> 3.3.4.2  The second pricing model will be based upon the Successful Offeror
> acquiring or leasing a Central Production Facility in Rockdale County, Georgia.
> The Successful Offeror will be solely responsible for all costs associated with
> establishing the required production facility.

(RFP § 3.3.4.)

contemplated imposing liquidated damages on Viisage due to Viisage's delays in implementing

the Digitized License System. In DMVS's 30(b)(6) deposition, Ms. Clay testified:

> Q.    [MR. HUTCHINS] . . . At some point prior to the
> injunction being issued, was DMVS having discussions with
> Viisage about the possibility of imposing liquidated damages on
> Viisage?
>
> A.    [MS. CLAY]  Yes.
>
> Q.    What brought that about?
>
> A.    Acceptance testing and pilot testing were scheduled, and
> they had not met the -- the obligation for those -- for the pilot
> testing, which led to liquidated damages.
>
> Q.    What was the -- what was the status of those discussions at
> the time the injunction issued?
>
> A.    They had been served notice that DMVS was applying
> liquidated damages.

(Feb. 12, 2004 DMVS 30(b)(6) Deposition of Christine Clay, 34:25-35:13.)  Mr. Ahmad

confirmed potential for the assessment of damages during Viisage's 30(b)(6):

> Q.    [MR. FRENCH] . . . Georgia, in fact, threatened you with
> liquidated damages before the injunction; right?
>
> A.    [VIISAGE 30(b)(6) WITNESS IFTI AHMAD]  Georgia
> sent us a letter that they would assess some damages, they never
> did. They sent us a letter. We responded to that saying that all the
> reasons that for the longest time we couldn't get the data we were
> required to pull before we could start acceptance and rule out.

(Viisage Dep. II, 232:14-23.)  Even if the State ultimately elected not to assess liquidated

damages, in light of this Court's July 31, 2003 Order granting Digimarc's Motion for

Interlocutory Injunction, Digimarc is entitled to all documents relating to communications

between the State and Viisage concerning the potential assessment of liquidated damages,

regardless of the date of those documents for at least two reasons. First, Viisage's delays in

implementing the contract may relate to deficiencies in Viisage's technical proposal or Viisage's

35

misrepresentations regarding its ability to perform under its contract with DMVS. Second,

Viisage's costs, which it may argue weigh against a permanent injunction, may be artificially

inflated because Viisage was, in fact, developing capabilities during implementation that Viisage

purported to have prior to the contract award, but, in reality, did not. Digimarc is entitled to a

thorough review of these documents to ascertain if, and to what extent, these factors may have

impacted Viisage's cost. Digimarc is further entitled to all documents related to communications

with the State regarding the decision of whether to delay or proceed with the implementation of

the Digitized License System prior to finalization of Digimarc's protest and the subsequent

litigation.

Viisage, along with Defendants, has claimed that this case was ready for trial on March

22, 2004. (See Defendants' Motion to Expedite Trial and for a Special Trial Setting or Transfer

of the Case, filed February 13, 2004, at 1.) As Digimarc noted in its Response to Defendants'

Motion to Expedite Trial and for a Special Trial Setting or Transfer of the Case, filed on March

15, 2004, this case is not ready for trial largely due to Viisage's obstructionist tactics with respect

to Digimarc's discovery efforts. If Viisage intends to put forth evidence regarding its alleged

damages at trial, Viisage should be compelled by this Court to produce all documents responsive

to Category No. 4 now.

6. **Viisage Failed To Produce All Relevant, Non-Privileged, Responsive Documents Relating To Card Design Limitations And Its Problems With Providing The Full Color Background Viisage Promised To The State In Its Technical Proposal.**

Category No. 1 of the Discovery Agreement required Viisage to produce "[a]ll

documents, regardless of date, that reflect changes between the technical proposal(s) that formed

the basis of the award of the contract to Viisage and the solution that Viisage actually was

implementing in Georgia." (See Dec. 26, 2003 E-mail from Hutchins to Carroll, Tab 10,

36

Category No. 1 (emphasis added).) Digimarc believes, based in part upon Viisage's and DMVS's 30(b)(6) deposition testimony, that Viisage changed critical aspects of its card design following the November 12, 2002 contract award because Viisage was, in reality, unable to produce the card design it proposed to the State. Section 3.5.3 of the Georgia RFP asked each Offeror "to submit suggestions in the proposal indicating . . . variables, such as header and border color, enhancement of selected data fields, etc., that could facilitate changes and additions to the DL/ID over the life of the Contract." (RFP § 3.5.3.) The Georgia RFP also set forth 10 card design elements which each Offeror was required to include in its permanent card design template. (Id.) Viisage had to change its July 19, 2002 initial proposal, in part, because the permanent card sample easily delaminated, forcing the evaluation committee to issue a request for clarification:

> The samples provided with your technical proposal have been reviewed by our evaluation team and found that they failed the durability standards. The following are some of the deficiencies identified during the evaluation by our Technical Evaluation Team:
>
> Temporary Document: document tore easily;
>
> Permanent Document: Lamination easily removed, information left intact on card face; information easily altered; OVD remained intact on removed lament and showed no signs of fracture;
>
> failed test to solvents

(Theobald Dep., Dep. Ex. 10.) Viisage's subsequent card submissions also had issues with delamination. Mr. French raised and discussed this issue with Ifti Ahmad during Viisage's 30(b)(6) deposition:

> Q.    [MR. FRENCH] How did Viisage solve the delamination issue of its Confirm security laminate permanent cards?
>
> A.    [VIISAGE 30(b)(6) WITNESS IFTI AHMAD] The issue that we worked on was the card was one 26, August 26 was completely covered with ink which could potentially be interfering

with the addition. And after that, we did not submit cards with so much complete coverage of the background with ink.

. . .

Q.      When did you come to the conclusion that if you decrease the amount of ink which appears on your Teslin sheet, that the Confirm will adhere to it better?

A.      I don't exactly recall when we worked on it. But it has to be within that time between August 26th and November 1st.

. . .

Q.      Why did you even approach that solution problem?

A.      Because as you just showed me there was an Email from the State saying that they were able to delaminate the 3M Confirm card as well.

Q.      But the New York State driver's licenses, they did not send you an Email saying those delaminated; correct?

A.      They are not completely covered with the background the way the August 26th card is covered.

Q.      Are you sure about that, sir? Looking at 526, it looks like the background is covered completely to me. I don't see any white in the front of that.

A.      Right. But if you see, they have lines.

Q.      Okay.

A.      We had ink throughout the thing. We didn't have lines.

Q.      So your solution for the August 26, 2002 card had a design flaw which allowed the Confirm to delaminate. There was too much ink on the Teslin; right?

          MR. CARROLL:  Objection.

A.      I don't think that we thought at that time it had any design flaw. We had pretty close to the same background in the previous card except it was much, much lighter. So if you see the background on the July 19th card, it has those clouds. But it has a lot more white. And then it appears that our graphic designer

increased the background to have it more blue with the clouds. That was basically our assumption or my assumption.

Q.    I'm sorry, sir.  My question is a little bit different. Increasing the cloud effect of the August 26, 2002 card sample of Confirm resulted in the Confirm being able to be delaminated from the Teslin, correct?

A.    It is possible that that could be one of the reasons for delamination, that is correct.

Q.    In fact, not only possible.  That was the conclusion of Viisage; right?

A.    That was my conclusion, right.

Q.    So you changed your card design yet again by the time you got to the demos of November 12, 2002, correct?

A.    If by card design you mean the graphic, there was no specific graphic that the State had told us to follow.

MR. CARROLL:   Objection.

A.    The graphics was entirely up to us, whichever graphics we wanted to submit.

Q.    The July 19, 2002 sample was a representative sample of what you intended to produce for the State of Georgia, correct?

A.    As far as materials is concerned, that is correct.

Q.    In terms also of security features?  I see that we have security laminate on this.

A.    As far as security laminate and some of the security features that were proposed as in the proposal, that is correct.  But in that proposal, in every proposal, the State wants to work with us to come up with a final design of whatever the document is going to look like.  So it is a representative graphic that we submit for various card types and various complexions of people and so on and so forth.

Q.    All right, sir.  You obviously have come to some sort of design decision with the State of Georgia before the injunction, correct?

. . .

39

A.      We had come up with a design, that is correct.

Q.      Did it look like the demo card or more like the August 26th card or like the July 19th card in terms of graphics?

A.      I believe it looks more like the November 12th card.

. . .

Q.      And as part of the parameters of the design for the cards, did you communicate to the State that what we gave you on August 26, 2002 of a cloud background will not work?

A.      We didn't communicate because we didn't know at that point.

Q.      Not at that point, sir. I'm talking about ever. When you are deciding with the State as to the graphic design for the card, when you are having a discussion with the State; you have also figured out between August 26th, 2002 and November, whatever 2002, that too much ink on the Teslin results in a bad adherence between the Teslin and Confirm; correct?

A.      That's one of the parameters that it affects, that's correct.

Q.      Okay. And did you ever communicate that to the State, that too much ink on the Teslin impacts the ability of the Confirm card to adhere? I'm sorry, Confirm's security feature to adhere?

A.      I'm not sure if it was communicated. It must be discussed during the design discussions that we had during the card design process.

(Viisage Dep. II, 133:1-142:9.) Digimarc is entitled to documents relating to any post-November

12, 2002 changes to Viisage's card design (based upon its post-award negotiations with the State

or otherwise) because such documents tend to show, as Digimarc contends, that Viisage was

forced to change critical aspects of its card design because Viisage, in reality, lacked the

technological know-how to produce the card design it proposed to the State without that card

easily delaminating and falling apart. Such documents may further prove that Viisage failed to

provide the State with a true explanation for the changes to the general background color that

resulted from the parties' post-November 12, 2002 negotiations — a background that changed

nor the State has apparently submitted the final winning permanent card design to an

independent lab for testing:[16]

> Q.    [MR. FRENCH] And did you have an independent lab test done for he New York state driver's license which is Exhibit 526?
>
> A.    [VIISAGE 30(b)(6) WITNESS IFTI AHMAD] We had independent lab test done for the card samples that we had prepared for the state of New York, which is not Exhibit 526.
>
> Q.    So Exhibit 526 New York state driver licenses were not prepared by Viisage?
>
> A.    I believe we have never claimed that these cards were made by Viisage.
>
> Q.    So is the answer to my question yes, Viisage never made the New York state driver's license which appears in Exhibit 526?
>
> A.    That's correct.
>
> Q.    And the New York state driver's license which appears in Exhibit 526 is the one which Viisage provided as production quality samples for the state of Georgia; is that correct?
>
> A.    That has been my statement all along. That is correct.
>
> Q.    Okay. So my question is: For the New York State driver's license, sir, which appears in Exhibit 526 in which you provided to the state of Georgia as Viisage production quality samples, does Viisage have any independent lab test for the New York state driver's license that it tendered to Georgia?
>
> MR. KHAYAT: Object to the form.
>
> THE WITNESS: We have not tested New York state driver's licenses.

(Viisage Dep. III, 12:7-13:10.)

> [MR. HUTCHINS]  . . . Since the November 12th notice of award, has DMVS done anything to determine whether the cards that -- permanent cards that Viisage intends to produce as a part of

---

[16] Section 3.5.4 of the RFP required each Offeror to submit independent lab results from a certified testing lab that the Offeror's documents met AAMVA document durability testing standards. (RFP § 3.5.4(3).)

the fully implemented system are the same cards that the evaluation team chose as the winning permanent card design?

MR. GALLAGHER:  Object to the form.  You can answer if you can.

A.    [MS. CLAY]:  I'm not sure how we would have -- would have done that without sending -- I don't know how you could test to say this card is exactly what this card is without sending it off to an independent lab, sending it two cards for comparison, so no.

(Clay Dep., 23:8-21.)  Digimarc is entitled to documents, including sample cards, relating to any post-November 12, 2002 independent lab testing performed with respect to Viisage's driver's licenses and identification cards and any communications between Viisage and DMVS relating to independent lab testing because such documents and materials tend to show Digimarc contends that Viisage was forced to change critical aspects of its card design because Viisage was, in reality, unable to produce the card design it proposed to the State.  These documents and sample cards are highly relevant to that issue.  Therefore, because Viisage has withheld responsive documents that fall under Category No. 1 of the Discovery Agreement, Digimarc requests that this Court compel Viisage either to produce all of the documents responsive to Category No. 1 covered by the Massachusetts subpoena and court order, as modified by the subsequent agreement of the parties, or fully respond to Digimarc's First Request for Production of Documents.

### III.  CONCLUSION

As discussed in Plaintiff's Response to Viisage's Motion to Compel Full and Complete Production of Documents and Discovery Responses, and for Sanctions and Memorandum of Law in Support, from the point at which Viisage was forcibly added as a party to this action on November 12, 2003, Digimarc's counsel has worked diligently to resolve any discovery disputes that have arisen between the parties without necessitating the involvement of the Court.

43

Viisage's refusal to produce relevant, responsive documents, despite its agreement to do so, is part of an obstructionist strategy to block Digimarc's reasonable efforts to conclude its discovery in this case that should be thwarted by this Court. Therefore, Digimarc respectfully requests that its Motion to Compel Documents from Defendant Viisage Technology, Inc. be GRANTED.

This 20th day of April 2004.

John P. Hutchins
Georgia Bar No. 380692
Valerie D. Barton
Georgia Bar No. 040832

MCKENNA LONG & ALDRIDGE LLP
303 Peachtree Street, Suite 5300
Atlanta, Georgia 30308
(404) 527-4000
(404) 527-4198 (facsimile)

*Attorneys for Plaintiff*
*Digimarc ID Systems, LLC*

EXHIBIT 5

**Table of Contents**

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM 10-Q

☒ QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the Quarterly Period Ended March 28, 2004.

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the Transition Period from _____ to _____ .

Commission File Number 000-21559

# VIISAGE TECHNOLOGY, INC.

_____

(Exact name of registrant as specified in its charter)

Delaware _____       04-3320515 _____
(State or other jurisdiction of       (I.R.S. Employer
incorporation or organization)       Identification No.)

296 Concord Road, Third Floor, Billerica, MA _____       01821 _____
(Address of principal executive offices)       (Zip Code)

Registrant's telephone number, including area code       (978) 932-2200 _____

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

☑ Yes ☐ No

Indicate by a check mark whether the Registrant is an accelerated filer (as defined in Rule 12b-2 of the Exchange Act) ☐ Yes ☑ No

Indicate the number of shares outstanding of each of the registrant's classes of common stock, as of the latest practicable date.

| Class | Outstanding at May 10, 2004 |
|---|---|
| Common stock, $.001 par value | 35,777,841 |

Table of Contents

## VIISAGE TECHNOLOGY, INC.
FORM 10 – Q FOR THE QUARTER ENDED MARCH 28, 2004
INDEX

| | Page |
|---|---|
| Facing Sheet | 1 |
| Index | 2 |
| **PART I - FINANCIAL INFORMATION** | |
| Item 1 – Financial Statements | |
| Consolidated Balance Sheets as of March 28, 2004 and December 31, 2003 | 3 |
| Consolidated Statements of Operations for the three months ended March 28, 2004 and March 30, 2003 | 4 |
| Consolidated Statements of Cash Flows for the three months ended March 28, 2004 and March 30, 2003 | 5 |
| Notes to Financial Statements | 6 |
| Item 2 – Management's Discussion and Analysis of Financial Condition and Results of Operations | 12 |
| Item 3 – Quantitative and Qualitative Disclosures about Market Risk | 31 |
| Item 4 – Controls and Procedures | 31 |
| **PART II - OTHER INFORMATION** | |
| Item 1 – Legal Proceedings | 32 |
| Item 2 – Changes in Securities, Use of Proceeds and Issuer Purchases of Equity Securities | 32 |
| Item 3 – Defaults Upon Senior Securities | 33 |
| Item 4 – Submission of Matters to a Vote of Security Holders | 33 |
| Item 5 – Other Information | 33 |
| Item 6 – Exhibits and Reports on Form 8-K | 33 |
| **SIGNATURES** | 35 |
| **EXHIBIT INDEX** | 36 |

Table of Contents

## PART 1 – FINANCIAL INFORMATION

ITEM 1 – FINANCIAL STATEMENTS

<div align="center">

**VIISAGE TECHNOLOGY, INC.**
**Consolidated Balance Sheets**
**(in thousands)**

</div>

|  | March 28, 2004 | *December 31, 2003 |
|---|---|---|
|  | (Unaudited) |  |
| **Assets** |  |  |
| Current Assets: |  |  |
| Cash and cash equivalents | $ 9,282 | $ 6,666 |
| Accounts receivable | 9,343 | 7,057 |
| Inventories and other costs and estimated earnings in excess of billings | 4,647 | 4,050 |
| Other current assets | 1,162 | 439 |
| Total current assets | 24,434 | 18,212 |
| Property and equipment, net | 24,810 | 25,088 |
| Goodwill | 63,613 | — |
| Intangible assets, net | 18,519 | 2,693 |
| Restricted cash | 3,120 | 6,311 |
| Other assets | 796 | 2,176 |
|  | $ 135,292 | $ 54,480 |
| **Liabilities and Shareholders' Equity** |  |  |
| Current Liabilities: |  |  |
| Accounts payable and accrued expenses | $ 11,051 | $ 6,851 |
| Current portion of project financing | 4,175 | 3,734 |
| Current portion of related party notes | 6,765 | 1,740 |
| Total current liabilities | 21,991 | 12,325 |
| Project financing | 7,013 | 5,813 |
| Related party notes | 13,470 | 2,334 |
| Other liabilities | 622 | — |
| Total liabilities | 43,096 | 20,472 |
| Shareholders' equity | 92,196 | 34,008 |
|  | $ 135,292 | $ 54,480 |

\*   Derived from audited financial statements.

<div align="center">

The accompanying notes are an integral part of these financial statements.

3

</div>

Table of Contents

**Viisage Technology, Inc.**
**Consolidated Statements of Operations**
**(in thousands, except per share data)**
**(Unaudited)**

| | Three Months Ended | |
|---|---|---|
| | March 28, 2004 | March 30, 2003 |
| Revenue | $ 12,259 | $ 8,155 |
| Cost of revenue | 8,906 | 6,789 |
| Gross margin | 3,353 | 1,366 |
| Operating expenses: | | |
| Sales and marketing | 1,493 | 1,411 |
| Research and development | 959 | 945 |
| General and administrative | 2,137 | 1,093 |
| Total operating expenses | 4,589 | 3,449 |
| Operating loss | (1,236) | (2,083) |
| Interest expense | 392 | 219 |
| Other income | (21) | — |
| Loss before income taxes | (1,607) | (2,302) |
| Provision for income taxes | 25 | 63 |
| Loss before cumulative effect of change in accounting principle | (1,632) | (2,365) |
| Cumulative effect of change in accounting principle | — | (12,131) |
| Net loss | $ (1,632) | $ (14,496) |
| Basic and diluted net loss per share before cumulative effect of change in accounting principle | $ (0.05) | $ (0.12) |
| Cumulative effect of change in accounting principle | 0.00 | (0.60) |
| Basic and diluted net loss per share | $ (0.05) | $ (0.72) |
| Weighted average basic and diluted shares | 31,362 | 20,258 |

The accompanying notes are an integral part of these financial statements.

4

Table of Contents

**VIISAGE TECHNOLOGY, INC.**
**Consolidated Statements of Cash Flows**
**(in thousands)**
**(Unaudited)**

|  | Three Months Ended | |
|---|---|---|
|  | March 28, 2004 | March 30, 2003 |
| **Cash Flows from Operating Activities:** |  |  |
| Net loss | $ (1,632) | $ (14,496) |
| Adjustments to reconcile net loss to net cash provided by operating activities, net of effects of acquisitions: |  |  |
| Depreciation and amortization | 2,279 | 1,844 |
| Impact of cumulative effect of change in accounting Principle | — | 12,131 |
| Directors fees paid in common stock | 120 | 30 |
| Change in operating assets and liabilities: |  |  |
| Accounts receivable | 828 | 1,926 |
| Costs and estimated earnings in excess of billings | (273) | 6,830 |
| Other current assets | (433) | (371) |
| Accounts payable and accrued expenses | (303) | (1,457) |
| Net cash provided by operating activities | 586 | 6,437 |
| **Cash Flows from Investing Activities:** |  |  |
| Decrease in restricted cash | 3,191 | 291 |
| Additions to property and equipment | (369) | (5,711) |
| Cash paid for acquisitions, net of cash acquired | (5,227) | — |
| Increase in other assets | (415) | (183) |
| Net cash used for investing activities | (2,820) | (5,603) |
| **Cash Flows from Financing Activities:** |  |  |
| Net proceeds from project financing | 4,273 | — |
| Principal payments on project financing | (1,771) | (1,297) |
| Net proceeds from issuance of common stock | 2,348 | 34 |
| Net cash provided by (used for) financing activities | 4,850 | (1,263) |
| Net increase (decrease) in cash and cash equivalents | 2,616 | (429) |
| Cash and cash equivalents, beginning of period | 6,666 | 2,212 |
| Cash and cash equivalents, end of period | $ 9,282 | $ 1,783 |
| **Supplemental Cash Flow Information:** |  |  |
| Cash paid during the period for interest | $ 256 | $ 236 |
| **Non Cash Activities:** |  |  |
| Directors fees paid in common stock | $ 120 | $ 30 |
| Services paid in common stock | $ 14 | $ — |
| Acquisitions paid in common stock | $ 57,486 | $ — |
| Acquisitions paid in related party financing | $ 15,300 | $ — |
| Asset purchased with extended payment terms | $ 800 | $ — |

The accompanying notes are an integral part of these financial statements

Table of Contents

## VIISAGE TECHNOLOGY, INC.
### Notes to Financial Statements

## 1. DESCRIPTION OF BUSINESS

We deliver advanced technology identity solutions for governments, law enforcement agencies and businesses concerned with enhancing security, reducing identity theft, providing access control, and protecting personal privacy. We focus on identity solutions for civil identification, criminal identification and border management that improve personal convenience and security, deter fraud, reduce identification program costs, and protect personal privacy. By combining secure document and face recognition biometric technologies that quickly, reliably, and accurately identify individuals in both one-to-one and one-to-many situations, we have created innovative identity solutions. Our goal is to help our customers solve three critical aspects of verifying and managing identities:

- *assurance* that an identification document is authentic,
- *confidence* that the person holding the identification document is uniquely tied to and authorized to use the document, and
- *verification* of the privileges granted to the individual holding the document.

Our business involves two closely-related segments: secure credentials and biometrics. Our secure credentials solutions involve the design, development, marketing and implementation of integrated software and hardware solutions that produce identification credentials utilizing face recognition and other biometric technologies. The focus of our biometric technology solutions is primarily on applications designed to deter criminal and terrorist activities, including government research and development contracts.

We combine our proprietary biometric and secure credential software and hardware products with complementary industry standard products to create identity solutions that integrate into its customers' environments. These turnkey solutions integrate secure document technologies, image and data capture, relational databases, and multiple biometrics, improving the customer's ability to process and manage identity information. Applications include passports, driver's licenses, voter registration, national identification credentials, law enforcement, social services, access control, surveillance and PC network and Internet access security. Our primary customers are government agencies with particular penetration in U.S. government agencies such as the Department of State and state departments of motor vehicles, social services, and law enforcement. We are the sole source provider of high security technology and services to the U.S. Department of State for the production of U.S. passports and have captured a large percentage of the domestic driver's license market. We also have provided services under subcontracts for projects in the United Arab Emirates, Jamaica, the Philippines and the U.S. Immigration and Naturalization Service.

## 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

*Basis of Presentation*

The accompanying financial data as of March 28, 2004 and December 31, 2003, and for the three month periods ended March 28, 2004 and March 30, 2003, have been prepared pursuant to the rules and regulations of the Securities and Exchange Commission. Certain information and footnote disclosures normally included in financial statements prepared in accordance with accounting principles generally accepted in the United States of America have been condensed or omitted pursuant to such rules and regulations. The December 31, 2003 balance sheet was derived from audited financial statements, but does not include all disclosures required by generally accepted accounting principles. These financial statements should be read in conjunction with the financial statements and the notes thereto included in our Annual Report on Form 10-K for the year ended December 31, 2003.

Table of Contents

In the opinion of management, all adjustments (which include only normal recurring adjustments) necessary to present fairly the financial position, results of operations, and cash flows as of March 28, 2004 and for the three month periods ended March 28, 2004 and March 30, 2003, have been made. The results of operations for the period ended March 28, 2004 are not necessarily indicative of the operating results for the full year.

*Use of Estimates*

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions. These estimates and assumptions affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

*Stock-Based Compensation*

At March 28, 2004, we account for our stock-based compensation plans using the intrinsic value method, in accordance with the provisions of APB Opinion No. 25, *Accounting for Stock Issued to Employees*, and comply with the disclosure provisions of Statements of Financial Accounting Standards ("SFAS") No. 123, *Accounting for Stock-Based Compensation*, and SFAS No. 148, *Accounting for Stock-Based Compensation- Transition and Disclosure*. No stock-based employee compensation cost was reflected in net loss, as all options granted under those plans had an exercise price equal to the fair market value of the underlying common stock on the date of grant.

The following table illustrates, in accordance with the provisions of SFAS No. 148, *Accounting for Stock-Based Compensation—Transition and Disclosure*, the effect on net loss and loss per share if we had applied the fair value recognition provisions of SFAS No. 123, *Accounting for Stock-Based Compensation*, to stock-based employee compensation.

| | Three Months Ended | |
| --- | --- | --- |
| | March 28, 2004 | March 30, 2003 |
| Net loss as reported | $ (1,632) | $ (14,496) |
| Add: stock based employee compensation expense included in reported net loss, net of tax | — | — |
| Deduct: total stock based employee compensation expense determined under the fair value based method for all awards, net of tax | (993) | (602) |
| Pro forma net loss | $ (2,625) | $ (15,098) |
| Loss per share: | | |
| Basic and diluted—as reported | $ (0.05) | $ (0.72) |
| Basic and diluted—pro forma | (0.08) | (0.75) |

7

Table of Contents

The fair value of the Company's stock-based option awards to employees was estimated assuming no expected dividends and the following weighted-average assumptions:

|  | March 28, 2004 | March 30, 2003 |
|---|---|---|
| Risk free interest rate | 4.0 – 5.0 % | 4.0 – 5.0 % |
| Expected dividend yield | — | — |
| Expected lives | 3 – 10 years | 3 – 10 years |
| Expected volatility | 80% | 80% |

*Computation of Net Loss per Share*

The basic net loss per share calculation is computed based on the weighted average number of shares of common stock outstanding during the period. The impact of approximately 5,379,000 shares of common stock consisting of certain outstanding options and stock warrants were not reflected in the March 28, 2004 dilutive net loss per share calculation. The impact of approximately 3,735,000 shares of common stock consisting of certain outstanding options and stock warrants were not reflected in the March 30, 2003 dilutive net loss per share calculation. Potentially dilutive securities are excluded from the calculation of diluted earnings per share if their effect is anti-dilutive.

3. INCOME TAXES

No provision for federal income taxes has been made for the periods ended March 28, 2004 and March 30, 2003 due to the net loss in both periods. The provision for state income taxes for the periods ended March 28, 2004 and March 30, 2003 was approximately $25,000 and $63,000, respectively.

4. RELATED PARTY TRANSACTIONS AND SHAREHOLDERS' EQUITY

Lau Technologies, or Lau, and Mr. Buddy Beck beneficially own approximately 17.1% and 16.4%, respectively, of our outstanding common stock. Readers are referred to the "Notes to Financial Statements" section of the Company's 2003 Annual Report on Form 10-K for further discussion.

In May 2003 we entered into a loan agreement with Lau, whose principals are significant shareholders of Viisage, which provided for four term notes aggregating $7.3 million but not to exceed an outstanding principal balance of $7.0 million at any point in time. Two of these term notes, in the amounts of approximately $1.6 million and $287,000, replaced existing system finance lease obligations we had with a commercial leasing organization. These finance lease obligations were paid in full with the proceeds of the two new term notes. The remaining two new term notes with borrowing limits of $3.0 million and $2.5 million, are additional financing related to two new state contracts. All four new term notes bear interest at a rate of 8.5%. We believe that the terms of this loan agreement are the same as the terms that would have been provided to us by an unaffiliated lender. In particular, the financial covenants under this loan agreement are the same as the financial covenants under our loan agreement with our primary bank lender. We will draw funding on these notes as needed to meet our obligations for equipment purchases on the related state contracts. As of March 28, 2004 we had approximately $4.9 million outstanding under this loan agreement. Interest expense related to these term notes was approximately $95,000 for the three months ended March 28, 2004.

In connection with the acquisition of TDT on February 14, 2004, we issued a promissory note to Mr. Beck in the amount of $15.3 million, which is secured by some of TDT's assets. This note bears interest at a rate of 8.5% and is payable in equal installments of principal and interest on December 1, 2004, May 1, 2005 and December 1, 2005. We believe that the terms of this loan agreement are the same as the terms that would have been provided to us by an unaffiliated lender. In particular, the financial covenants under this loan agreement are the same as the financial covenants under our loan

8

Table of Contents

agreement with our primary bank lender. Interest expense related to this note was approximately $162,000 for the three months ended March 28, 2004.

At March 28, 2004 we had approximately $184,000 of accounts payable due to Lau.

5. BUSINESS SEGMENTS, GEOGRAPHICAL INFORMATION AND CONCENTRATIONS OF RISK

We follow SFAS No. 131 *Disclosures about Segments of a Business Enterprise and Related Information* , which establishes standards for reporting information about operating segments. Operating segments are defined as components of a company about which separate financial information is evaluated regularly by the chief operating decision maker in deciding how to allocate resources and in assessing performance.

The following table provides financial information by segment for the three months ended March 28, 2004 and March 30, 2003. We allocate direct costs and administrative expenses to each business segment based on management's analysis of each segment's resource needs. Revenue is reported within the segments by customer contracts. Within the secure credentials segment there is a component of the contract that utilizes our biometrics technology. Total assets as of March 28, 2004 include the preliminary allocation of goodwill to the operating segments.

| Three months ended March 28, 2004 | Secure Credentials | Biometrics | Total |
|---|---|---|---|
| Secure credentials | $ 10,184 | $ — | $ 10,184 |
| Biometrics | 336 | 1,739 | $ 2,075 |
| Total segment revenue | $ 10,520 | $ 1,739 | $ 12,259 |
| Segment profit (loss) before taxes | $ 679 | $ (2,286) | $ (1,607) |
| Depreciation and amortization | $ 2,040 | $ 239 | $ 2,279 |
| Interest expense | $ 392 | $ — | $ 392 |
| Total assets | $ 100,737 | $ 34,555 | $ 135,292 |
| Expenditures for long lived assets | $ 311 | $ 58 | $ 369 |

| Three months ended March 30, 2003 | Secure Credentials | Biometrics | Total |
|---|---|---|---|
| Secure credentials | $ 6,487 | $ — | $ 6,487 |
| Biometrics | 314 | 1,354 | $ 1,668 |
| Total segment revenue | $ 6,801 | $ 1,354 | $ 8,155 |
| Segment profit (loss) before taxes and cumulative effect | $ (600) | $ (1,702) | $ (2,302) |
| Depreciation and amortization | $ 1,690 | $ 154 | $ 1,844 |
| Interest expense | $ 219 | $ — | $ 219 |
| Total assets | $ 38,930 | $ 5,044 | $ 43,974 |
| Expenditures for long lived assets | $ — | $ 29 | $ 29 |

For the three month period ended March 28, 2004 we derived 96.2%, or $11.7 million, of our direct revenue within the Untied States. We derived an additional 1.3%, or $160,000, of our direct revenue in Canada. The remaining 2.5% was

9

Table of Contents

derived by our German subsidiary, primarily from customers in countries within the European Union. Virtually all of our direct revenue for the three month period ended March 30, 2003 was derived within the United States.

We believe for the near future that we will continue to derive a significant portion of our revenues from a limited number of large contracts. Secure identification segment customers who accounted for more than 10% of our total revenues are as follows:

- For the three months ended March 28, 2004, one customer accounted for an aggregate of 13.1%
- For the three months ended March 30, 2003, two customers accounted for an aggregate of 28%

No single biometrics customer accounted for over 10% of our total revenue in either three month period.

## 6. ACQUISITIONS

On January 23, 2004 we acquired all outstanding shares of ZN Vision Technologies AG ("ZN") in exchange for an aggregate of 5,221,454 newly issued shares of our common stock and $493.00 in cash. In addition, we agreed to assume ZN's employee share option plan, and accordingly have reserved 1,138,546 shares of our common stock for issuance to the plan participants. The purchase price for the acquisition was $31.5 million, based on the per share price of our common stock of $4.32 per share which is the average trading price of Viisage common stock over the five trading days immediately preceding and the two trading days immediately following March 28, 2003, the date on which the purchase agreement was signed. The acquisition was accounted for as a purchase, and accordingly, the operations of ZN are included in the financial statements since the effective date, the close of business on January 23, 2004. The purchase price has been allocated to net assets acquired based on their estimated fair values. We engaged an independent third party appraiser to perform a review of the acquired assets and have allocated the purchase price based on the preliminary results of their findings. The preliminary valuation is subject to further review which may result in adjustments to allocation of purchase price in the future. We have recorded approximately $74,000 in amortization related to the acquired intangible assets from the date of the acquisition through March 28, 2004. ZN is a leading German provider of face recognition and computer vision products and services. ZN, now known as Viisage Technology AG, is a wholly owned subsidiary of Viisage and serves as the base of our European operations.

On February 14, 2004 we acquired all outstanding shares of Trans Digital Technologies Corporation ("TDT") for $53.4 million. The purchase price consisted of 5,850,000 newly issued shares of our common stock, which were valued at $5.13 per share, which is the average price of Viisage common stock over the five trading days immediately preceding and the two trading days immediately following February 14, 2004, plus $15.3 million in notes and $5 million in cash. The acquisition was accounted for as a purchase, and accordingly, the operations of TDT are included in the financial statements since the effective date, the close of business on February 14, 2004. The purchase price has been allocated to net assets acquired based on their estimated fair values. We engaged an independent third party appraiser to perform a review of the acquired assets and have allocated the purchase price based on the preliminary results of their findings. The preliminary valuation is subject to further review which may result in adjustments to allocation of purchase price in the future. We have recorded approximately $384,000 in amortization related to the acquired intangible assets from the date of the acquisition through March 28, 2004. TDT is the sole source provider of high security technology and services to the U.S. Department of State for the production of U.S. passports. TDT is now a wholly owned subsidiary of Viisage.

In connection with the acquisition of TDT, we agreed to pay the former sole shareholder of TDT an additional cash payment of up to $2.6 million if the U.S. Department of Defense selected TDT for the production of smart cards as part of the agency's Common Access Card (CAC) program and placed orders with an aggregate value of at least $4 million prior to June 30, 2004. We received an initial purchase order of $10.2 million for this program and therefore we will record this contingent purchase price of $2.6 million related to the CAC program as additional goodwill in the second quarter of 2004.

The preliminary allocation of the purchase price for ZN and TDT, based on the purchase prices calculated for accounting purposes, is as follows (in thousands):

|  | ZN | TDT |
|---|---|---|
| Current assets | $ 1,639 | $ 3,020 |
| Property and equipment | 140 | 42 |
| Identified intangible assets | 1,974 | 14,460 |
| Goodwill | 27,733 | 35,880 |
|  | $ 31,486 | $ 53,402 |

## 7. LEGAL PROCEEDINGS

On July 31, 2003 the superior court for Fulton County, Georgia issued a preliminary injunction prohibiting Georgia's Department of Motor Vehicle Safety from continuing to work with us to install a new drivers' license system for the State of Georgia. This injunction is the result of

a lawsuit filed in March 2003 by one of our competitors, Digimarc ID Systems, LLC. The suit claims that the Department of Motor Vehicle Safety did not comply with its own bid process when selecting a vendor for the digital drivers' license program. The merits of Digimarc Corporation's claims against the Department of Motor Vehicle Safety are to be addressed in further court proceedings. The Department of Motor Vehicle Safety has confirmed that our contract with them remains in place. However, if the lawsuit is successful and we

10

Table of Contents

lose the contract, we could lose up to $19.7 million in revenue that we expected to recognize over the next five and one-half years. In addition, although we expect that the Department of Motor Vehicle Safety would be required to reimburse us for our costs incurred under the contract, if we are unable to obtain reimbursement of those costs, we could be required to recognize a loss of up to approximately $5 million for costs incurred to date on the Georgia contract.

11

Table of Contents

## VIISAGE TECHNOLOGY, INC.

ITEM 2 –   MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF
OPERATIONS

The following discussion and analysis should be read in conjunction with the financial statements and accompanying notes contained in our 2003 Annual Report on Form 10-K and in this Quarterly Report on Form 10-Q.

INTRODUCTION

We deliver advanced technology identity solutions for governments, law enforcement agencies and businesses concerned with enhancing security, reducing identity theft, providing access control, and protecting personal privacy. We focus on identity solutions for civil identification, criminal identification and border management that improve personal convenience and security, deter fraud, reduce identification program costs, and protect personal privacy. By combining secure document and face recognition biometric technologies that quickly, reliably, and accurately identify individuals in both one-to-one and one-to-many situations, we create innovative identity solutions. Our goal is to help our customers solve three critical aspects of verifying and managing identities:

- *assurance* that an identification document is authentic,

- *confidence* that the person holding the identification document is uniquely tied to and authorized to use the document, and

- *verification* of the privileges granted to the individual holding the document.

We generate revenue through the sale and license of products and services for verifying and managing identities. Our revenue increased from $8.16 million in the first quarter of 2003 to $12.26 million in the first quarter of 2004. Our net loss decreased by 31% during the same periods, excluding the one-time charge of $12.1 million in connection with our change in accounting principle as of January 1, 2003. Our efforts in 2004 have been and will continue to be primarily focused on expanding our portfolio of offerings to satisfy our customers' identity solution requirements. We have taken substantial steps in this direction through the acquisitions of ZN Vision Technologies AG in January 2004 and Trans Digital Technologies Corporation in February 2004. The acquisition of TDT enabled us to be selected to provide a solution to the U.S. Department of Defense to support the production of smart cards as part of the agency's Common Access Card (CAC) program. We continue to make investments in research and development and intend to continue to introduce new and enhanced product and service offerings. To further increase revenue, we are also expanding our distribution channels.

SEGMENTS AND GEOGRAPHIC INFORMATION

Our business involves two closely-related segments: secure credentials and biometrics. For the three-month period ended March 28, 2004, we derived 96.2%, or $11.7 million, of our direct revenue within the Untied States. We derived an additional 1.3%, or $160,000, of our direct revenue in Canada. The remaining 2.5%, or $307,000, was derived by our German subsidiary, primarily from customers in countries within the European Union.

*Secure Credentials Segment*

Our secure credentials segment accounted for approximately 85.8% and 84.2% of our revenues in the three-month periods ended March 28, 2004 and March 30, 2003, respectively. Our secure credentials solutions involve the design, development, marketing and implementation of integrated software and hardware solutions that produce identification credentials utilizing face recognition and other biometric technologies.

We provide customized systems utilizing proprietary products under service contracts that have five to seven year terms and several optional annual renewals after the initial contract term. These contracts generally provide for a fixed price

12

Table of Contents

for each identification credential produced. Contract prices vary depending on, among other things, design and integration complexities, the nature and number of workstations and sites, the projected number of secure credentials to be produced, the size of the database, the level of post-installation support and the competitive environment. Our secure credentials segment also includes the contracts we assumed as part of our acquisition of Trans Digital Technologies in February 2004. TDT contributed revenues of $1.8 million to this segment for the three months ended March 28, 2004. Under these contracts, we provide high security technology and services to the U.S. Department of State for the production of U.S. passports, as well as similar services to the U.S. Departments of Defense and Homeland Security.

In civil identification applications, such as drivers' licenses and passports, the sales cycle generally includes a formal request for proposal, or RFP, bidding process. In these public sector cases, our sales and marketing personnel regularly conduct visits and attend industry trade shows to identify bid opportunities and particular customer preferences, and to establish and cultivate relationships in advance of any bid. Once an RFP is issued, a comprehensive proposal is developed and usually followed by an on-site customer demonstration. The process from the issuance of an RFP to the ultimate award can take up to six months. Following the bid award a six-to-twelve month implementation and installation process usually ensues. We believe that long sales cycles in our public sector markets are endemic to the market and will continue. Further, customers may seek to modify the system either during or after the implementation of the system. While our long sales and implementation cycle requires the commitment of marketing resources and investments of working capital, we believe that it also serves as a barrier to entry for smaller companies and as an early indicator of potential competitors for particular projects. For existing customers, a considerably shorter sales and implementation cycle may be involved.

*Biometrics Segment*

Our biometrics segment accounted for approximately 14.2% and 15.8% of our revenue for the three month periods ended March 28, 2004 and March 30, 2003, respectively. The focus of our biometric technology solutions is primarily on applications designed to deter criminal and terrorist activities, including government research and development contracts. These initiatives generated 89.0% of this segment's revenue for the three months ended March 28, 2004, the remaining 11.0% was generated from sales in the gaming industry.

Within our biometrics segment, our contracts typically provide for the development, customization and installation of face recognition systems for government agencies, law enforcement agencies and businesses. These contracts are generally fixed price, and include milestones and acceptance criteria for the various deliverables under the contract. Contract prices vary depending on, among other things, design and integration complexities, the nature and number of workstations and sites, the size of the database, the level of post-installation support and the competitive environment. In certain cases, we provide licenses of off-the-shelf versions of our face recognition software on a per user basis.

For identity solutions that primarily require our advanced face recognition technology, such as criminal identification booking and investigation applications, the sales cycle tends to be shorter and the solution consists primarily of software products.

As we continue to implement our vision of being a total identity solutions provider, the biometrics and secure credentials segments become less distinct as discrete segments. We believe that the presence or future potential of integrated biometrics in secure credentials is a key factor in increasing revenue and profits from the secure credentials business. As a result, we are seeing the two segments converge into one market: identity solutions.

DEPENDENCE ON SIGNIFICANT CUSTOMERS

We believe for the near future that we will continue to derive a significant portion of our revenues from a limited number of large contracts. Secure identification segment customers who accounted for more than 10% of our total revenues are as follows:

- For the three months ended March 28, 2004, one customer accounted for an aggregate of 13.1%

13

Table of Contents

- For the three months ended March 30, 2003, two customers accounted for an aggregate of 28%

No single biometrics customer accounted for over 10% of our total revenue in either three month period.

CRITICAL ACCOUNTING POLICIES AND SIGNIFICANT ESTIMATES

We prepare our financial statements in accordance with generally accepted accounting principles in the United States, or US GAAP. Consistent with US GAAP, we have adopted accounting policies that we believe are most appropriate given the facts and circumstances of our business. The application of these policies has a significant impact on our reported results. In addition, some of these policies require management to make estimates. These estimates, which are based on historical experience and analysis of current conditions, have a significant impact on our reported results and the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements. If actual results differ significantly from these estimates, there could be a material effect on our financial statements.

*Valuation of Goodwill and Other Long-Lived and Intangible Assets*

Our long-lived assets include property, plant and equipment, other intangible assets and Goodwill. As of March 28, 2004, the balances of property, plant and equipment, other intangible assets and Goodwill, net of accumulated depreciation and amortization, were $24.8 million, $18.5 million and $63.6 million respectively.

Where we believe that property, plant and equipment and intangible assets have finite lives, we depreciate and amortize those assets over their estimated useful lives. For purposes of determining whether there are any impairment losses, as further discussed below, our management has examined the carrying value of our identifiable long-lived tangible and intangible assets, including their useful lives where we believe such assets have finite lives, when indicators of impairment are present. For all long-lived tangible and intangible assets, if an impairment loss were identified based on the fair value of the asset, as compared to the carrying value of the asset, such loss would be charged to expense in the period we identify the impairment. Furthermore, if our review of the carrying values of the long-lived tangible and intangible assets with finite lives indicates impairment of such assets, we may determine that shorter estimated useful lives are more appropriate. In that event, we will be required to record additional depreciation and amortization in future periods, which will reduce our earnings.

Factors we generally consider important which could trigger an impairment review on the carrying value of other long-lived tangible and intangible assets include the following:

- significant underperformance relative to expected historical or projected future operating results;
- significant changes in the manner of our use of acquired assets or the strategy for our overall business;
- underutilization of our tangible assets;
- discontinuance of product lines by ourselves or our customers;
- significant negative industry or economic trends;
- significant decline in our stock price for a sustained period;
- significant decline in our market capitalization relative to net book value.

Although we believe that the carrying value of our long-lived tangible and intangible assets were realizable as of March 28, 2004, future events could cause us to conclude otherwise.

Due to our two acquisitions in the first quarter of 2004, goodwill and other intangible assets were created as a result of the preliminary allocation of the purchase price to identified intangible assets of the acquired businesses. The values recorded for goodwill and other intangible assets represent preliminary estimates of fair values calculated by independent third-party appraisers and are subject to further review and finalization. Such valuations require us to provide significant estimates and assumptions, which are derived from information obtained from the management of

14

Table of Contents

the acquired businesses, and our business plans for the acquired businesses or intellectual property. Critical estimates and assumptions used in the initial valuation of goodwill and other intangible assets include, but are not limited to:

- future expected cash flows from product sales, customer contracts and acquired developed technologies and patents,

- expected costs to complete any in-process research and development projects and commercialize viable products and estimated cash flows from sales of such products,

- the acquired companies' brand awareness and market position,

- assumptions about the period of time over which we will continue to use the acquired brand, and

- discount rates.

These estimates and assumptions may be incomplete or inaccurate because unanticipated events and circumstances may occur. If estimates and assumptions used to initially value goodwill and intangible assets prove to be inaccurate, ongoing reviews of the carrying values of such goodwill and intangible assets may indicate impairment which will require us to record an impairment charge in the period in which we identify the impairment.

As of March 28, 2004, we have recorded goodwill of $63.6 million. We will perform impairment reviews on the carrying values of goodwill arising from the aforementioned acquisitions using the discounted cash flows approach at least annually. Because future cash flows and operating results used in the impairment review will be based on management's projections and assumptions, future events could cause such projections to differ from those used to originally value the acquisitions, which could lead to significant impairment charges of goodwill in the future.

*Secure Credentials Revenue and Cost Recognition*

During the third quarter of 2003, we adopted the provisions of Emerging Issues Task Force 00-21, *Accounting for Revenue Arrangements with Multiple Deliverables* , or EITF 00-21, on a cumulative basis as of January 1, 2003. EITF 00-21 governs how to identify whether goods or services, or both, to be delivered separately in a bundled sales arrangement, should be accounted for separately. The operating results for the three-month period ended March 28, 2003 reflects the cumulative effect of the change in accounting principle in 2003.

We deliver solutions under secure credential contracts primarily to federal and state government customers. We recognize revenue when pervasive evidence of a sales arrangement exists, delivery occurs or services are rendered, the sales price is fixed or determinable and collectibility is reasonably assured.

Product revenue on secure credential contracts where title to the products pass to the customer consist mainly of printing system components and consumables including printers, secure coating, ribbon, film and other parts. Revenue on products is recognized when the products are shipped and accepted by the customer. Services revenue under these contracts consists of preventative and remedial maintenance on printing systems. We also provide on site technical support and consulting services to our customers. Revenue on fixed price services is recognized ratably over the service period which approximates the timing of the services rendered. Revenue on time and material services is recognized as the services are rendered. Expenses on all services are recognized when the costs are incurred.

When elements such as products and services are contained in a single arrangement, or in related arrangements with the same customer, we allocate revenue to each element based on its relative fair value, provided that such element meets the criteria for treatment as a separate unit of accounting. The price charged when the element is sold separately generally determines fair value.

We have secure credential contracts, generally with state governments for the production of drivers' licenses and other identification credentials, where we have determined that we have multiple elements and where the title to equipment installed to produce these credentials does not pass to the customer. Under these contracts, the first element consists of hardware, system design, implementation, training, consumables management, maintenance and support which is

15

Table of Contents

accounted for as equipment and related executory services under lease in accordance with SFAS No. 13. The second element consists of customized software which is accounted for as a long term contract in accordance with AICPA Statement of Position 97-2, *Software Revenue Recognition* , or SOP 97-2, and Statement of Position 81-1, *Accounting for Performance of Construction-Type and Certain Production-Type Contracts* , or SOP 81-1, on a units of delivery method of measurement.

Costs related to the hardware element of these contracts are capitalized on the balance sheet and are depreciated over the contract term beginning when the system goes into service. The delivery of these credentials typically require us to customize, design, and install equipment and software at customer locations, as well as perform training, supply consumables, maintain the equipment and provide support services. Nonperformance of training, consumables management, maintenance and support services would prevent us from receiving payment for the costs incurred in the customization, design and installation of the system. EITF 00-21 limits the amount of revenue allocable to the customization, design and installation of the system to the amount that is not contingent upon the production of credentials. Revenue on these contracts under EITF 00-21 is earned based on, and is contingent upon, the production of credentials from the system. Due to the contingent performance of credential production in our secure credentials contracts, we defer revenue recognition for the system design and installation phase of our contracts, including customized software and equipment, and recognize revenue as credentials are produced.

Costs related to the customized software element of our secure credentials contracts where title to the hardware element does not pass to the customer are capitalized on the balance sheet during the period in which we are designing and installing the system and are amortized over the contract term beginning when the system goes into service. Costs related to this element of our secure credentials contracts incurred after the system is in service are expensed as incurred. Revenue related to this element of our secure credentials contracts is recorded as credentials are produced by the system.

Our secure credentials contracts related to the delivery of drivers' licenses and identification credentials typically provide that the state department of transportation, or similar agency, will pay a fixed price per credential produced utilizing a system we design, implement and support. Our fixed pricing includes charges for the use of the system, materials and the data that is stored on the credentials. Prices under these contracts vary depending on, among other things:

- Design and integration complexities;

- Nature and number of workstations and sites installed;

- Projected number of secure credentials to be produced;

- Size of the database;

- Level of post-installation involvement that will be required of us; and

- Competitive environment.

Prior to the adoption of EITF 00-21, we recognized revenue and costs associated with our secure credentials contracts as a single accounting element using the percentage-of-completion methodology.

*Biometrics Segment Revenue and Cost Recognition*

Within our biometrics segment, our contracts typically provide for the development, customization and installation of face recognition systems for government agencies, law enforcement agencies and businesses. These contracts are generally fixed price, and include milestones and acceptance criteria for the various deliverables under the contract. Contract prices vary depending on, among other things, design and integration complexities, the nature and number of workstations and sites, the size of the database, the level of post-installation support and the competitive environment. In certain cases, we provide licenses of off-the-shelf versions of our face recognition software on a per user basis.

16

Table of Contents

We recognize revenue under these contracts using the percentage-of-completion methodology in accordance with SOP 81-1. We use the percentage-of-completion methodology to account for revenue under these contracts because:

- A high level of certainty exists regarding expected cash flows from these contracts; and

- A reliable basis exists for determining the percentage of the contract that will be completed at the end of the accounting period.

We measure the percentage complete as costs are incurred or for contracts based on milestones, revenue is recognized when scheduled performance milestones and customer acceptance criteria have been achieved. These milestones are specific events or deliverables clearly identified in the contract. We recognize revenue based on the total milestone billable to the customer less revenue related to any future maintenance requirements. Billings occur under these contracts when the milestone is delivered and accepted by the customer. Milestones can include customized systems, installation and services as defined by the contract.

We record costs and estimated earnings in excess of billings under these contracts as current assets. We record billings in excess of costs and estimated earnings and accrued contract costs as current liabilities.

Revenue related to software licenses of off-the-shelf face recognition software is recognized in accordance with SOP 97-2 for these software licenses we recognize revenue when:

- Persuasive evidence of an arrangement exists;

- Delivery has occurred;

- The sales price is fixed and determinable;

- Collection is probable; and

- There are no post delivery obligations.

We adopted EITF 00-21 on a cumulative basis as of January 1, 2003. Based on our evaluation of biometrics contracts and the application of the new guidance, the adoption of EITF 00-21 did not have an impact on the accounting for revenue from biometrics systems under long-term contracts.

RESULTS OF OPERATIONS

*Revenue*

Revenue from our secure credentials segment are derived principally from multi-year contracts for systems implementation, credential production and related services. Revenue from our biometrics segment are derived principally from sales to law enforcement agencies, the federal government, and the gaming industry. Revenue for the first quarter of 2004 were approximately $12.3 million, compared to approximately $8.2 million for the first quarter of 2003. The 50.6% increase in revenue is derived from increases of approximately $3.7 million in the secure credentials segment and $300,000 in the biometrics segment. The increase in the secure credentials segment consists of $1.8 million from the operating results of TDT from February 15, 2004 through March 28, 2004, $610,000 from the sale of equipment and consumables directly to two states, $558,000 from a volume increase resulting from the rollout of one new state drivers' license contract, and approximately $730,000 from a net increase in volume and the fulfillment of certain milestones among our remaining contracts. The increase in our biometrics revenue is derived from the inclusion of approximately $307,000 in ZN revenue for the period from January 24, 2004 to March 28, 2004.

*Gross Margin*

Gross margins increased to 27.4% in the first quarter of 2004 from 16.8% in the first quarter of 2003. We expect gross margins on our secure credentials contracts to fluctuate based on changes in period cost of sales as a result of our

17

Table of Contents

adoption of EITF 00-21 due to the fact that in 2003 and in the future we will effectively recognize revenue on a fixed price per credential produced by our customers. If we successfully achieve cost saving measures in the delivery process, we will realize higher gross margins in those periods where the cost savings measures are achieved. Alternatively, in periods where our delivery costs are higher due to service and maintenance requirements, we expect gross margins to decrease for those periods. The overall increase in gross margin in the first quarter of 2004 compared to the first quarter of 2003 is due to margin increases in both the secure credentials and biometrics segments.

In the secure credentials segment, gross margins increased to 24.4% in the first quarter of 2004 from 11.1% in the first quarter of 2003. We achieved gross margin increases on 12 of the 15 secure credentials contracts that were active in both periods. Those contracts represented approximately 57.9% of the total revenue in that segment for the three-month period ended March 28, 2004. The margin increases were attributable to our minimization of period costs during the card production phase on all of our secure credentials contracts. We were able to achieve some of these costs savings by minimizing overtime labor charges through improved resource management of field service technicians. In addition, we installed inventory management software in multiple states throughout 2003, which allows us to better control consumables scrap, thus reducing our materials costs. In addition to these cost savings initiatives, we signed contract extensions in five states and began card production in two additional states during 2003, both of which resulted in margin increases for those states. Our margin increase in this segment was also attributable to the 30.3% gross margin on approximately $1.8 million of revenue contribution from TDT for the period from February 15 to March 28, 2004, which represented approximately 17.1% of the total segment revenue for the quarter. The gross margin related to TDT included approximately $384,000 of non-cash amortization of the identified intangible assets, as described in more detail below. These increases were offset by gross margin decreases in other states. In two states, gross margins decreased due to an increase in costs, while in a third state the gross margin decrease was primarily due to decreases in credential volume.

The secure credentials business is a highly competitive, bid-based business, which results in pricing pressure for those systems. In addition, the price of a system is dictated by the customer's specifications for the solution and its functionality. Some of these customer specifications include hardware, customized software, credential volume, number and type of security features on the credentials, and biometric identification on the credentials. All of these inputs are evaluated in our estimate of the cost of the system and ultimately influence the pricing for the system to be delivered. We are also aware of the customer's budget situation since this affects how much the customer can spend on the system. After all of these factors are considered, we price the contract and determine the gross margin for the system to be delivered. The price and margin fluctuate by customer due to the number of locations, volume of credentials, requirements and complexity of the system and competitive environment. Although prices remain fixed for products and services on a contract-by-contract basis, fluctuations in gross margin are attributable to changes in the customer mix, change orders and contract extensions received.

Gross margins in our biometrics segment decreased to 45.0% in the first quarter of 2004 from 46.0% in the first quarter of 2003.

For the three-month period ended March 28, 2004, we have allocated $384,000 of amortization expense for the TDT acquisition to cost of sales due to the fact that a majority of the identified intangible assets were attributed to contracts that are generating significant revenue. The $74,000 of amortization related to the ZN acquisition was included in operating expenses for the three months ended March 28, 2004.

18

Table of Contents

*Sales and Marketing Expenses*

Sales and marketing expenses increased approximately $82,000, from $1.4 million in the first quarter of 2003 to $1.5 million in the first quarter of 2004. The increase is primarily due to our investment in pursuing biometrics opportunities and the pursuit of significant opportunities in the secure identification marketplace. As a percentage of revenue, sales and marketing expenses decreased from 17.3% in the first quarter of 2003 to 12.2% in the first quarter of 2004.

*Research and Development Expenses*

Research and development expenses increased approximately $14,000, from $945,000 in the first quarter of 2003 to $959,000 in the first quarter of 2004. The increase is due principally to our continued investment in face recognition technologies and new product development. This investment included enhancing existing products with the intellectual property that was acquired through the acquisitions of ZN and TDT. As discussed above, research and development expenses include $74,000 of non-cash amortization expense related to the ZN identified intangible assets which contributed to the improvement in face recognition technologies and new product development. As a percentage of revenue, research and development expenses decreased from 11.6% in the first quarter of 2003 to 7.8% in the first quarter of 2004. We expect to continue to invest in product development in fiscal 2004.

*General and Administrative Expenses*

General and administrative expenses increased by approximately $1,000,000, from $1.1 million in the first quarter of 2003 to $2.1 million in the first quarter of 2004. The largest component of the increase derives from legal costs of approximately $527,000 stemming from the litigation surrounding our contract with the state of Georgia. General and administrative costs for ZN totaled $86,000 for the period from January 24, 2004 to March 28, 2004. General and administrative costs for TDT totaled $36,000 for the period from February 14, 2004 to March 28, 2004. The remainder of the increase is due to the logistical support required to grow our business through acquisitions while continuing to meet the financing requirements created by our expanding operations. As a percentage of revenue, general and administrative expenses increased from 13.4% in the first quarter of 2003 to 17.4% in the first quarter of 2004.

*Interest Expense*

Interest expense, net of approximately $21,000 and $28,000 of interest income for the first quarters of 2004 and 2003 respectively, increased approximately $176,000 from $247,000 in the first quarter of 2003 to $413,000 in the first quarter of 2004. The increase in interest expense is due to $162,000 of interest on the $15.3 million note used to purchase TDT, as well as approximately $14,000 of additional interest stemming from additional debt financing required to support contract delivery.

*Income Taxes*

There was no provision for federal income taxes for the periods ended March 28, 2004 and March 30, 2003 due to the net loss in both periods. The provision for state income taxes for the periods ended March 28, 2004 and March 30, 2003 were $25,000 and $63,000 respectively.

*Cumulative Effect of Change in Accounting Principle*

For the year ended December 31, 2003, we incurred a non-cash charge of $12.1 million representing the cumulative effect of a change in accounting principle related to our adoption of EITF 00-21 on a cumulative basis as of January 1, 2003.

19

Table of Contents

LIQUIDITY AND CAPITAL RESOURCES

Cash and cash equivalents were approximately $9.3 million at March 28, 2004, which consisted entirely of cash. This amount excludes approximately $3.1 million which is restricted under our term loan agreements and project financing. Cash and cash equivalents at December 31, 2003 were approximately $6.7 million, which consisted entirely of cash. This number excludes approximately $6.3 million which was restricted under our term loan agreements and project financing.

In the three-month period ended March 28, 2004, cash provided by operating activities was approximately $586,000, which stems from our net loss of approximately $1.6 million, offset by non-cash charges for depreciation and amortization of approximately $2.3 million, and cash used by the net increase in operating assets of approximately $62,000.

Accounts receivable increased approximately 32.9% from $7.0 million at December 31, 2003 to $9.3 million at March 28, 2004. This increase includes $874,000 and $2.2 million which were assets of ZN and TDT, respectively, acquired by us at the respective dates of acquisition of those companies. The remainder of the change, which resulted in an increase in cash of approximately $700,000, is due to the timing of billings and collections.

Inventories and other costs and estimated earnings in excess of billings increased approximately 14.7% from $4.1 million at December 31, 2003 to $4.6 million at March 28, 2004. This increase includes $189,000 and $135,000 which were assets of ZN and TDT, respectively, acquired by us at the date of acquisition. The remainder of the change, which resulted in a decrease in cash of approximately $176,000, reflects accumulation of consumables inventory that was unbilled as of March 28, 2004.

Accounts payable and accrued expenses increased approximately 61.3% from $6.9 million at December 31, 2003 to $11.1 million at March 28, 2004. This increase includes $1.5 million and $2.8 million which were liabilities of ZN and TDT, respectively, assumed by us at the dates of the respective acquisitions of those companies. The remainder of the change, which resulted in a decrease in cash of approximately $100,000, is due to the timing of payables.

In February 2004, we entered into a new loan agreement with Commerce Bank and Trust Company, or Commerce, that superseded the original loan agreement for our existing term loans. Under this new agreement, we borrowed an additional $3.0 million and reduced the required restricted cash balance under the new agreement with Commerce by $2.0 million. We also negotiated a reduction of $1.2 million of restricted cash with Lau Technologies, or Lau, concurrent with the execution of the new loan agreement with Commerce. The $3 million term loan provided by this agreement bears interest at a rate of 7.3%. The following table lists the approximate term note information for Commerce and Lau as of the dates indicated (in thousands):

| Lender | Original Loan Amount | Monthly Payment Provision | Date of Loan | Due Date | Interest Rate | Outstanding Principal March 28, 2004 |
|---|---|---|---|---|---|---|
| Commerce | $  4,000 | $     84 | 2/7/2001 | 6/20/2006 | 8.00% | $    2,053 |
| Commerce | 3,200 | 72 | 9/11/2001 | 3/11/2006 | 6.25% | 1,612 |
| Commerce | 1,800 | 34 | 12/12/2002 | 12/31/2007 | 5.25% | 1,394 |
| Commerce | 1,500 | 27 | 12/12/2002 | 4/24/2008 | 5.25% | 1,191 |
| Commerce | 1,200 | 24 | 12/12/2002 | 6/24/2007 | 5.25% | 901 |
| Lau | 2,040 | 53 | 5/30/2003 | 6/30/2009 | 8.50% | 1,673 |
| Lau | 2,500 | 51 | 5/30/2003 | 5/30/2008 | 8.50% | 2,249 |
| Lau | 1,562 | 64 | 5/30/2003 | 8/30/2005 | 8.50% | 1,014 |
| Lau | 287 | 42 | 5/30/2003 | 12/30/2003 | 8.50% | ---- |
| Commerce | 3,000 | 36 | 2/27/2004 | 2/27/2007 | 7.30% | 2,924 |
| | $  21,089 | $    487 | | | | $    15,011 |

20

Table of Contents

In accordance with the new loan agreement the term notes are collateralized by certain of our assets and the related contract assets. We restructured our bank covenants to account for the impact of the closing of our transactions with ZN and TDT. We are required to maintain various financial covenants, including;

- a net loss for 2004 of not more than $500,000 and positive net after-tax income in each fiscal year thereafter

- a minimum tangible net worth (as defined in the loan agreement) of approximately $16.7 million for the second quarter of 2004, increasing each quarter thereafter

- our debt to tangible net worth ratio (as defined in the loan agreement) not to exceed the following quarterly benchmarks: 3.00:1.00 for the second quarter of 2004, 2.75:1.00 for the third quarter of 2004, and 2.20:1.00 for the fourth quarter of 2004

- our debt service coverage ratio (as defined in the loan agreement) must be greater than 0.48 for the first quarter of 2004, 1.25 for the second and third quarters of 2004 and 1.00 for the fourth quarter of 2004

- annual capital expenditures may not exceed $1.5 million in 2004 and no single capital expenditure may exceed $250,000,

Additionally, in accordance with the new agreement, we must maintain $3.0 million of cash on deposit with the lender through September 29, 2004, $4.0 million through November 29, 2004 and $5.0 million by December 31, 2004 and thereafter. This amount is recorded as restricted cash in long term assets. As of March 28, 2004 we had an additional $120,000 of restricted cash at commerce bank related to our loan agreement with Lau.

We also had one capital lease arrangement in which we were required to maintain the same financial ratios and minimum levels of tangible capital funds, as stated above. Pursuant to this arrangement, the lessor purchases certain of our digital identification systems and leases them back to us for deployment with identified and contracted customers approved by the lessor. The lessor retains title to systems and has an assignment of our rights under the related customer contracts, including rights to use the software and technology underlying the related systems. Under this arrangement, the lessor bears the credit risk associated with payments by our customers, but we bear performance and appropriation risk and are generally required to repurchase a system in the event of a termination by a customer for any reason except credit default. This project lease arrangement was accounted for as a capital lease. At March 28, 2004, this lease-financing arrangement was paid in full.

In April 2003 we entered into an arrangement for approximately $1.5 million of equipment financing with three of our suppliers. These project lease arrangements are accounted for as capital leases. There are no financial covenants associated with these leasing arrangements. As of March 28, 2004 we had outstanding $611,000 under these arrangements. The interest rates on these capital leases are between 6% and 8% and are fixed. The terms of these leases range from 12 months to 60 months. In August 2003 we entered into an arrangement for financing of database licenses with another vendor. As of December 31, 2003 we had outstanding $500,000 under this arrangement.

In the first quarter of 2004 we purchased an asset totaling $800,000 which is payable in installments over four years. On the March 28, 2004 balance sheet, $200,000 is included in accounts payable and other accrued expenses and $600,000 is recorded under other liabilities.

We are in compliance with our bank covenants as of March 28, 2004 and we believe that we will be able to maintain compliance with our bank covenants in the future. However, this expectation is dependent on achieving our business plan. If we do not remain in compliance with the covenants in our financing arrangements, the lenders and the lessors could require immediate repayment of outstanding amounts. As of March 28, 2004, there was approximately $15.0 million outstanding under our credit facilities with Commerce and Lau.

In January 2004, we sold 456,007 shares of our common stock at $3.775 per share in a private sale to certain institutional investors to which we had previously sold shares in a private sale in September 2003. On February 14, 2004, we funded the acquisition of TDT with $5.0 million of available cash and executed a promissory note for an additional $15.3 million in addition to the issuance of new stock. The note bears interest at a rate of 8.5% per year and

21

Table of Contents

is payable in equal installments of principal and interest on December 1, 2004, May 1, 2005 and December 1, 2005. An additional cash payment of $2.6 million will be made to the former sole shareholder of TDT based upon TDT's selection by the U.S. Department of Defense for the production of smart cards as part of the agency's Common Access Card (CAC) program. This amount will be paid when we receive payment for our participation in this program. The acquisition of ZN was funded by the issuance of new stock.

We believe that our existing cash balances and anticipated cash flows from operations will be sufficient to meet our operating and debt service requirements for the next 12 months. However, if we cannot achieve our operating goals in 2004 or if we win additional secure credentials contracts in 2004, we may be required to seek additional financing. There can be no assurance that such financing will be available on commercially reasonable terms, or at all. Our ability to meet our business forecast is dependent on a number of factors, including those described in the section of this report entitled "Factors that May Affect Future Results."

CONTRACTUAL OBLIGATIONS

The following table sets forth our contractual obligations as of March 28, 2004.

|  | Total | Less than 1 Year | 1-3 Years | 3-5 Years | More than 5 Years |
|---|---|---|---|---|---|
| Long Term Debt Obligations | $ 30,310 | $ 10,208 | $ 18,539 | $ 1,563 | — |
| Capital Lease Obligations | 1,170 | 732 | 370 | 68 | — |
| Operating Lease Obligations | 2,394 | 637 | 775 | 883 | 144 |

CONTINGENT OBLIGATIONS

Our principal contractual commitments involve payments under capital leases, term notes and operating leases.

INFLATION

Although some of our expenses increase with general inflation in the economy, inflation has not had a material impact on our financial results to date.

RECENT ACCOUNTING PRONOUNCEMENTS

In March 2004, the Financial Accounting Standards Board ("FASB") issued a proposed Statement, "Share-Based Payment", that addresses the accounting for share-based payment transactions in which an enterprise receives employee services in exchange for (a) equity instruments of the enterprise or (b) liabilities that are based on the fair value of the enterprise's equity instruments or that may be settled by the issuance of such equity instruments. The proposed statement would eliminate the ability to account for share-based compensation transactions using APB Opinion No. 25, "Accounting for Stock Issued to Employees", and would generally require that such transactions be accounted for using a fair value-based method. As discussed in Note 2, we currently account for share-based compensation transactions using APB Opinion No. 25. If this statement is issued, the adoption of this interpretation will have a material negative impact on our consolidated financial position and results of operations, the level of which we are currently assessing.

OTHER EVENTS

On April 2, 2004, we announced that we had been selected by the U.S. Department of Defense, or DoD, to provide a solution to support the production of smart cards as part of the agency's Common Access Card (CAC) program. On May 7, 2004, we announced that we had received an initial purchase order in the amount of $10.2 million for this program. We will provide a solution to the DoD's Defense Manpower Data Center, or DMDC, through Telos Corporation, the DMDC's support contractor. The solution, which is expected to include 1,700 Toppan CP400 printers as the fixed-site desktop printers, as well as consumables and services, will be used for the production of secure

22

Table of Contents

identification cards throughout the Real-time Automated Personnel Identification System (RAPIDS). Implementation is scheduled to begin immediately and will continue over the next 12-18 months .

FORWARD-LOOKING STATEMENTS

This quarterly report on Form 10-Q contains or incorporates forward-looking statements within the meaning of section 27A of the Securities Act of 1933 and section 21E of the Securities Exchange Act of 1934. These forward-looking statements are based on current expectations, estimates, forecasts and projections about the industry and markets in which we operate and management's beliefs and assumptions. In addition, other written or oral statements that constitute forward-looking statements may be made by or on our behalf. Words such as "expect," "anticipate," "intend," "plan," "believe," "seek," "estimate," variations of such words and similar expressions are intended to identify such forward-looking statements. These statements are not guarantees of future performance and involve certain risks, uncertainties and assumptions that are difficult to predict. We have included important factors in the cautionary statements below under the heading "Factors That May Affect Future Results" that we believe could cause our actual results to differ materially from the forward-looking statements we make. We do not intend to update publicly any forward-looking statements, whether as a result of new information, future events or otherwise.

FACTORS THAT MAY AFFECT FUTURE RESULTS

The risks and uncertainties described below are not the only ones we face. Additional risks and uncertainties, including those not presently known to us or that we currently deem immaterial, may also impair our business.

**We may be unable to obtain additional capital required to fund our operations and finance our growth.**

The installation of our secure identification systems requires significant capital expenditures. In addition, the further development of our biometric and other advanced technologies will require additional capital. Although we completed a $15 million private placement of our common stock in September 2003 and January 2004 and a new loan agreement with a bank in February 2004 and have been successful in the past in obtaining financing for working capital and capital expenditures, we will have ongoing capital needs as we expand our business. We may be unable to obtain additional funds in a timely manner or on acceptable terms, which would render us unable to fund our operations or expand our business. If we are unable to obtain capital when needed, we may have to restructure our business or delay or abandon our development and expansion plans.

**Our leverage creates financial and operating risks that could limit the growth of our business.**

We have a significant amount of indebtedness. As of March 28, 2004, we had approximately $31.4 million in short and long-term debt and lease financing. This amount includes $15.3 million of related party debt incurred in the acquisition of TDT in February 2004. Our leverage could have important consequences to our business including:

- limiting our ability to obtain necessary financing for future working capital;

- limiting our ability to finance the acquisition of equipment needed to meet customer requirements;

- limiting our ability to finance the development of new technologies;

- requiring that we use a substantial portion of our cash flow from operations for debt service and not other operating purposes; and

- requiring that we comply with financial and operating covenants, which could cause an event of default under our debt instruments.

23

Table of Contents

Our ability to make principal and interest payments under long-term indebtedness and bank loans will be dependent upon our future performance, which is subject to financial, economic and other factors affecting us, some of which are beyond our control.

**We derive over 90% of our revenue from government contracts, which are often non-standard, involve competitive bidding, may be subject to cancellation with or without penalty and may produce volatility in earnings and revenue.**

More than 90% of our business involves providing products and services under contracts with U.S. federal, state, local and foreign government agencies. Obtaining contracts from government agencies is challenging, and government contracts often include provisions that are not standard in private commercial transactions. For example, government contracts may:

- include provisions that allow the government agency to terminate the contract without penalty under some circumstances;

- be subject to purchasing decisions of agencies that are subject to political influence;

- contain onerous procurement procedures; and

- be subject to cancellation if government funding become unavailable.

Foreign government contracts generally include comparable provisions relating to termination for the convenience of the relevant foreign government. Securing government contracts can be a protracted process involving competitive bidding. In many cases, unsuccessful bidders may challenge contract awards, which can lead to increased costs, delays and possible loss of the contract for the winning bidder.

**We derive a significant portion of our revenue from a few customers, the loss of which could have an adverse effect on our revenues.**

For the three month period ended March 28, 2004, one customer, the U.S. Department of State, accounted for an aggregate of 13.1% of our revenue. Since a small number of customers in our secure credentials segment account for a substantial portion of our revenues, the loss of any of our significant customers would cause revenue to decline and could have a material adverse effect on our business.

**Litigation involving our contract with Georgia could result in the cancellation of that contract which could cause us to lose $19.7 million in revenues over the next 5.5 years and could result in a loss of up to $5 million.**

In July 2003, a Georgia court issued a preliminary injunction prohibiting Georgia's Department of Motor Vehicle Safety from continuing to work with us to install the State's new driver's license system. The injunction is the result of a lawsuit filed in March 2003 by one of our competitors alleging that that the Department of Motor Vehicle Safety did not comply with its own bid process when it selected a vendor for its digital drivers' license program. The merits of the lawsuit are to be addressed in further court proceedings. The Department of Motor Vehicle Safety has confirmed that its contract with us remains in place. However, if the lawsuit is successful and Viisage loses the contract, we could lose up to $19.7 million in revenue that we expected to recognize over the next 5.5 years. In addition, although Viisage expects that the Department of Motor Vehicle Safety would be required to reimburse Viisage for its costs incurred under the contract, if Viisage is unable to obtain reimbursement of those costs, Viisage could recognize a loss of up to approximately $5 million for costs incurred to date on the Georgia contract.

24

Table of Contents

**The adoption of EITF 00-21 resulted in a non-cash adjustment of $12.1 million and may have an adverse effect on our results of operations in the near term, which may depress the market price of our common stock.**

During the third quarter of 2003, we adopted the provisions of Emerging Issues Task Force 00-21, Accounting for Revenue Arrangements with Multiple Deliverables, or EITF 00-21, on a cumulative basis as of January 1, 2003. After discussions with the Securities and Exchange Commission staff regarding the effect of EITF 00-21 on revenue recognition on our secure credentials contracts, we decided to adopt EITF 00-21 via cumulative catch-up as of January 1, 2003 rather than prospectively as reflected in the previously filed Form 10-Q for the quarter ended September 28, 2003. The adoption of EITF 00-21 resulted in a non-cash adjustment reported as a cumulative effect of a change in accounting principle of $12.1 million. The adoption of EITF 00-21 affects the timing of revenue recognition under our secure credentials contracts and as a result we may report reduced revenue and an increased net loss for one or more of our fiscal quarters in 2004. This effect on our results of operations could cause our stock price to decline.

**Our strategy of expanding our face recognition business could adversely affect our business operations and financial condition.**

Part of our strategy is to enhance our leadership in face recognition technology and to expand our operations within our face recognition business segment. Pursuing this strategy involves risks. For instance, to date, face recognition security solutions have not gained widespread commercial acceptance. Some of the obstacles to widespread acceptance of face recognition security solutions include a perceived loss of privacy and public perceptions as to the usefulness of face recognition technologies. Whether the market for face recognition security solutions will expand will be dependent upon factors such as:

- the success of our marketing efforts and publicity campaigns and those of our competitors; and

- customer satisfaction with our products and services, as well as those of our competitors.

We do not know when, if ever, face recognition security solutions will gain widespread commercial acceptance. In addition, our face recognition business segment has not achieved profitability, and it may never achieve profitability.

**We face intense competition, which could result in lower revenues and higher research and development expenditures and could adversely affect our results of operations.**

The events of September 11, 2001 have heightened interest in the use of biometric security solutions, and we expect competition in this field, which is already substantial, to intensify. Competitors are developing and bringing to market biometric security solutions that use face recognition as well as eye, fingerprint and other forms of biometric verification. Our products also will compete with non-biometric technologies such as certificate authorities and traditional keys, cards, surveillance systems and passwords. Widespread adoption of one or more of these technologies or approaches in the markets we intend to target could significantly reduce the potential market for our systems and products. Many of our competitors have significantly more cash and resources than we have. Our competitors may introduce products that are competitively priced, have increased performance or functionality or incorporate technological advances that we have not yet developed or implemented. To remain competitive, we must continue to develop, market and sell new and enhanced systems and products at competitive prices, which will require significant research and development expenditures. If we do not develop new and enhanced products or if we are not able to invest adequately in our research and development activities, our business, financial condition and results of operations could be negatively impacted.

**Unless we keep pace with changing technologies, we could lose customers and fail to win new customers.**

Our future success will depend upon our ability to develop and introduce a variety of new products and services and enhancements to these new products and services in order to address the changing needs of the marketplace. We may not be able to accurately predict which technologies customers will support. If we do not introduce new products,

Table of Contents

services and enhancements in a timely manner, if we fail to choose correctly among technical alternatives or if we fail to offer innovative products and services at competitive prices, customers may forego purchases of our products and services and purchase those of our competitors.

**Uncertainties in global economic markets could cause delays in customer purchases.**

Many customers and potential customers have delayed purchase intentions as a result of uncertainties in global economic markets. Government budgets, particularly at state and regional levels, have been or are expected to be reduced notably. Government contracts result from purchasing decisions made by public sector agencies that are particularly sensitive to budget changes and cutbacks during economic downturns, and variations in appropriations cycles. Many U.S. state customers are facing budget cuts, and some international customers are facing debt crises, introducing added uncertainty. Any shift in the government procurement process, which is outside of our control and may not be predictable, could impact the predictability of our quarterly results and may potentially have a material negative effect on our financial position, results of operation or cash flows.

**If we do not successfully expand our direct sales and services organizations and partnering arrangements, we may not be able to increase our sales or support our customers.**

In the fiscal years ended December 31, 2002 and 2003, and three-month periods ended March 28, 2004 and March 30, 2003, we sold substantially all of our services and licensed substantially all of our products through our direct sales organization. Our future success depends on substantially increasing the size and scope of our direct sales force and partnering arrangements, both domestically and internationally. We will face intense competition for personnel, and we cannot guarantee that we will be able to attract, assimilate or retain additional qualified sales personnel on a timely basis. Moreover, given the large-scale deployment required by some of our customers, we will need to hire and retain a number of highly trained customer service and support personnel. We cannot guarantee that we will be able to increase the size of our customer service and support organization on a timely basis to provide the high quality of support required by our customers. Failure to add additional sales and customer service representatives could result in our inability to increase our sales and support our customers.

**Integration of acquired businesses may be difficult and will consume significant financial and managerial resources, which could have an adverse effect on our results of operations.**

On January 23, 2004, we completed the acquisition of ZN Vision Technologies AG, or ZN, a leading German provider of face recognition and computer vision products and services. The integration of ZN's products and services with ours will be challenging and will consume significant financial and managerial resources. The challenges involved with this integration include, among others:

- challenges related to technology integration;

- possible difficulty implementing uniform standards, controls, procedures and policies; and

- possible loss of key employees.

In addition, the differences between U.S. and German business cultures and the geographic distance between the companies could present significant obstacles to the timely, cost-effective integration of the companies. We face similar integration issues with respect to Trans Digital Technologies Corporation, or TDT.

**The significant direct and indirect costs of our acquisition and integration of ZN and TDT could adversely affect our financial performance.**

We incurred approximately $2.7 million of costs in connection with the acquisitions of ZN and TDT, including:

26

Table of Contents

- costs associated with integrating our business with ZN and TDT;

- financial advisory fees; and

- costs and expenses for services provided by our lawyers and accountants.

The transaction costs and expenses attributable to financial advisory, legal and accounting services that we incurred will be capitalized as a component of the purchase price. Goodwill associated with the acquisition will be required to be tested at least annually for impairment, and we will be required to record a charge to earnings if there is an impairment in the value of such goodwill at a later date. Other intangible assets acquired in connection with the acquisition will be amortized over their estimated useful lives.

**The acquisitions of ZN and TDT could result in future impairment charges which could adversely affect our results of operations.**

As a result of our two acquisitions of ZN and TDT, goodwill and other intangible assets have been created. The values we may record for goodwill and other intangible assets will represent fair values calculated by independent third-party appraisers. Such valuations require us to provide significant estimates and assumptions, which are derived from information obtained from the management of the acquired businesses and our business plans for the acquired businesses or intellectual property. If estimates and assumptions used to initially value goodwill and intangible assets prove to be inaccurate, ongoing reviews of the carrying values of such goodwill and intangible assets may indicate impairments which will require us to record an impairment charge in the period in which we identify the impairments.

**If we do not achieve the expected benefits of our acquisitions of ZN and TDT, the price of our common stock could decline.**

We expect that the acquisition of ZN will enhance our leadership in face recognition technology through the combination of our technologies with those of ZN. Although the results of the initial tests of our combined technologies have been positive, the combination of such technologies might not meet the demands of the marketplace. If our technologies fail to meet such demand, customer acceptance of our face recognition solutions could decline, which would have an adverse effect on our results of operations and financial condition. In addition, we expect that the acquisition of ZN will enable us to market our systems and products on a global scale. Our face recognition customers are primarily located in the United States, and ZN's customers are primarily located in Europe. We might not be able to market successfully our products and services to ZN's customers or ZN's products and services to our customers. We expect that the acquisition of TDT will enhance our position in the market for secure credentials, particularly the U.S. government. If our product offerings and services fail to meet the demands of this marketplace, our results of operations and financial condition could be adversely affected. There is also a risk that we will not achieve the anticipated benefits of the acquisitions as rapidly as, or to the extent, anticipated by financial or industry analysts, or that such analysts will not perceive the same benefits to the acquisitions as we do. If these risks materialize, our stock price could be adversely affected.

**The success of our strategic plan to grow sales and develop relationships in Europe may be limited by risks related to conducting business in European markets.**

Although ZN has experience marketing and distributing its products and developing strategic relationships in Europe, part of our strategy will be to increase sales and build additional relationships in European markets. Risks inherent in marketing, selling and developing relationships in European markets include those associated with;

- economic conditions in European markets, including fluctuations in the relative values of the U.S. dollar and the Euro;

27

Table of Contents

- taxes and fees imposed by European governments that may increase the cost of products and services; and

- laws and regulations imposed by individual countries and by the European Union.

In addition, European intellectual property laws are different than U.S. intellectual property laws and we will have to ensure that our intellectual property is adequately protected in foreign jurisdictions and that ZN's intellectual property is adequately protected in the United States. If we do not adequately protect our intellectual property rights, competitors could use our proprietary technologies in non-protected jurisdictions and put us at a competitive disadvantage.

**Our business may be impacted by changes in the local marketplace of our foreign operations and fluctuations in currency exchange rates.**

As a result of our acquisitions of ZN and TDT, we expect that we will have increased exposure to foreign currency fluctuations. Net revenue and related expenses generated from our international location in Germany is denominated in euros. The results of operations and certain of our intercompany balances associated with this international location are exposed to foreign exchange rate fluctuations. In addition to our German operation, we will have increased transactions with Japanese vendors supplying hardware and consumables for the delivery of the TDT contracts. These transactions will increase our exposure to foreign currency fluctuations with the yen. To the extent the U.S. dollar weakens against these foreign currencies, the translation of these foreign currencies denominated transactions results in increased net revenue, operating expenses and net income. Similarly, our net revenue, operating expenses and net income will decrease when the U.S. dollar strengthens against these foreign currencies.

**If our systems and products do not perform as promised, we could experience increased costs, lower margins, liquidated damage payment obligations and harm to our reputation.**

We will be required to provide complex systems that will be required to operate on an "as needed" basis. Although we will deploy back-up systems, the failure of our products to perform as promised could result in increased costs, lower margins, liquidated damage payment obligations and harm to our reputation. This could result in contract terminations and have a material adverse effect on our business and financial results.

**Misappropriation of our intellectual property could harm our reputation, affect our competitive position and cost us money.**

We believe that our intellectual property, including our methodologies, will be critical to our success and competitive position. If we are unable to protect this intellectual property against unauthorized use by third parties, our reputation among existing and potential customers could be damaged and our competitive position adversely affected. Our strategies to deter misappropriation could be undermined if:

- the proprietary nature or protection of our methodologies is not recognized in the United States or foreign countries;

- third parties misappropriate our proprietary methodologies and such misappropriation is not detected; and

- competitors create applications similar to ours but which do not technically infringe on our legally protected rights.

If these risks materialize, we could be required to spend significant amounts to defend our rights and divert critical managerial resources. In addition, our proprietary methodologies may decline in value or our rights to them may become unenforceable.

28

Table of Contents

**Others could claim that we are infringing on their intellectual property rights, which could result in substantial costs, diversion of managerial resources and harm to our reputation.**

Although we believe that our products and services do not infringe the intellectual property rights of others, we might not be able to defend successfully against a third-party infringement claim. A successful infringement claim against us could subject us to:

- liability for damages and litigation costs, including attorneys' fees;

- lawsuits that prevent us from further use of the intellectual property;

- having to license the intellectual property from a third party, which could include significant licensing fees;

- having to develop a non-infringing alternative, which could be costly and delay projects; and

- having to indemnify clients with respect to losses they incurred as a result of the alleged infringement.

Even if we are not found liable in a claim for intellectual property infringement, such a claim could result in substantial costs, diversion of resources and management attention, termination of customer contracts and harm to our reputation.

**If we fail to adequately manage our resources, it could have a severe negative impact on our financial results or stock price.**

We could be subject to fluctuations in technology spending by existing and potential customers. Accordingly, we will have to actively manage expenses in a rapidly changing economic environment. This could require reducing costs during economic downturns and selectively growing in periods of economic expansion. If we do not properly manage our resources in response to these conditions, our results of operations could be negatively impacted.

**Future acquisitions of companies or technologies may result in disruptions to our business.**

Beyond the acquisitions of ZN and TDT, our growth strategy could include additional acquisitions of companies or technologies that complement ours. Future acquisitions could involve risks inherent in acquisitions, such as:

- challenges associated with integrating acquired technologies and the business and operations of acquired companies;

- exposure to unknown liabilities;

- diversion of managerial resources from day-to-day operations;

- possible loss of key employees, customers and suppliers;

- higher than expected transaction costs; and

- additional dilution to our existing stockholders if we use our common stock as consideration.

If we fail to manage these challenges adequately, our results of operations and stock price could be adversely affected.

29

Table of Contents

**The loss of key personnel could adversely affect our ability to remain competitive.**

We believe that the continued service of our executive officers will be important to our future growth and competitiveness. We have entered into employment agreements with Bernard C. Bailey, our Chief Executive Officer, William Aulet, our Chief Financial Officer, Jack Dillon, our Senior Vice President, Government Solutions, and James P. Ebzery, our Senior Vice President, Sales and Services. These agreements are intended to provide the executives with incentives to remain employed by us. However, we cannot assure you that they will remain employed by us. In addition, we believe that the continued employment of key members of our technical and sales staff is important to us. Most of our employees are entitled to voluntarily terminate their relationship with us, typically without any, or with only minimal, advance notice. The process of finding additional trained personnel to carry out our strategy could be lengthy, costly and disruptive. We might not be able to retain the services of all of our key employees or a sufficient number of them to execute our plans. In addition, we might not be able to continue to attract new employees as required.

**Our quarterly results could be volatile and may cause our stock price to fluctuate.**

We have experienced fluctuations in quarterly operating results and we expect those fluctuations to continue. We expect that our quarterly results will continue to be affected by, among other things, factors such as:

- the size and timing of contract awards;

- the timing of our contract performance;

- variations in the mix of our products and services; and

- contract losses and changes in management estimates inherent in accounting for contracts.

**We have a history of operating losses.**

We have a history of operating losses. Our business operations began in 1993 and, except for fiscal years 1996 and 2000, have resulted in net losses in each fiscal year. At March 28, 2004, we had an accumulated deficit of approximately $43.7 million. We will continue to invest in the development of our secure credential and biometric technologies. Accordingly, we cannot predict when or if we will ever achieve profitability.

**Certain of our stockholders have significant relationships with us, which could result in us taking actions that are not supported by unaffiliated stockholders.**

Lau Technologies, or Lau, and Mr. Buddy Beck, who is also a director and Vice Chairman, beneficially own approximately 17.1% and 16.4%, respectively, of our outstanding common stock. As a result, both Lau and Mr. Beck have a strong influence on matters requiring approval by our stockholders, including the election of directors and most corporate actions, including mergers and acquisitions. In addition, we have significant relationships with each of Lau and Mr. Beck, including:

- Lau has provided us with a credit facility in an aggregate principal amount of $7.3 million, which is secured by some of our assets;

- we acquired significant intellectual property, contracts and distribution channels through a transaction with Lau under which we agreed to pay Lau a 3.1% royalty on our face recognition revenues for a period of twelve and one half years, up to a maximum of $27.5 million;

- the spouse of the Chairman of our Board of Directors owns a majority of Lau's voting stock;

30

Table of Contents

- in connection with the acquisition of TDT, Mr. Beck was elected a member of our Board of Directors and appointed Vice Chairman;

- in connection with the acquisition of TDT, we issued a promissory note to Mr. Beck in the amount of $15.3 million, which is secured by some of TDT's assets;

- in connection with the acquisition of TDT, we entered into a consulting agreement with Mr. Beck under which we will pay Mr. Beck $300,000 per year for two years, provided that Mr. Beck devotes his full business time to developing business opportunities for us.

**Future sales of our common stock by Lau or Buddy Beck could depress the market price of our common stock.**

As of May 10, 2004, there were 35,777,841 shares of our common stock outstanding. Lau and Buddy Beck own approximately 17.1% and 16.4%, respectively, of our common stock. If either of these stockholders sell a significant number of shares of our common stock in the open market, our stock price could decline.

ITEM 3 – QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

Subsequent to our acquisition of ZN, our international operating resulting from transactions by our German operations and will be denominated in euros. Hardware and consumables purchases related to contracts associated with the TDT acquisition are denominated in Japanese yen. We mitigate exchange rate volatility by purchasing local currencies at favorable exchange rates. We do not hedge foreign currencies utilizing derivative instruments. Our international operations and transactions are subject to risks typical of international operations, including, but not limited to, differing economic conditions, changes in political climate, differing tax structures, other regulations and restrictions, and foreign currency exchange rate volatility. Accordingly, our future results could be materially adversely impacted by changes in these or other factors.

ITEM 4 – CONTROLS AND PROCEDURES

(a) *Evaluation of disclosure controls and procedures* . Our management, with the participation of our Chief Executive Officer, or CEO, and Chief Financial officer, or CFO, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act) as of March 28, 2004. In designing and evaluating our disclosure controls and procedures, our management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives, and our management necessarily applied its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Based on this evaluation, our CEO and CFO concluded that, as of March 28, 2004, our disclosure controls and procedures were (1) designed to ensure that material information relating to us, including our consolidated subsidiaries, is made known to our CEO and CFO by others within those entities, particularly during the period in which this report was being prepared and (2) effective, in that they provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the Securities Exchange Commission's rules and forms.

(b) *Changes in internal controls.* There were no changes in our internal controls over financial reporting that occurred during our most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

31

Table of Contents

## VIISAGE TECHNOLOGY, INC.

## PART II - OTHER INFORMATION

ITEM 1 – LEGAL PROCEEDINGS

On July 31, 2003 the superior court for Fulton County, Georgia issued a preliminary injunction prohibiting Georgia's Department of Motor Vehicle Safety from continuing to work with us to install a new drivers' license system for the State of Georgia. This injunction is the result of a lawsuit filed in March 2003 by one of our competitors, Digimarc ID Systems, LLC. The suit claims that the Department of Motor Vehicle Safety did not comply with its own bid process when selecting a vendor for the digital drivers' license program. The merits of Digimarc Corporation's claims against the Department of Motor Vehicle Safety are to be addressed in further court proceedings. The Department of Motor Vehicle Safety has confirmed that our contract with them remains in place. However, if the lawsuit is successful and we lose the contract, we could lose up to $19.7 million in revenue that we expected to recognize over the next five and one-half years. In addition, although we expect that the Department of Motor Vehicle Safety would be required to reimburse us for our costs incurred under the contract, if we are unable to obtain reimbursement of those costs, we could be required to recognize a loss of up to approximately $5 million for costs incurred to date on the Georgia contract.

We are not aware of any other legal matters that could have a material adverse effect on our business, financial condition or results of operations.

ITEM 2 – CHANGES IN SECURITIES, USE OF PROCEEDS AND ISSUER PURCHASES OF EQUITY SECURITIES

*Modification of Rights of Registered Securities.*

None.

*Limitation of Rights of Registered Securities.*

None.

*Use of Proceeds from Sale of Registered Securities.*

Not applicable.

*Issuer Repurchases of Securities.*

None.

*Restrictions Upon the Payment of Dividends*

We are prohibited under our borrowing arrangements from paying any cash dividends.

*Sales of Unregistered Securities*

On January 23, 2004 we acquired all of the outstanding shares of ZN Vision Technologies AG, or ZN, in exchange for an aggregate of 5,221,454 newly issued shares of our common stock and $493 in cash. In addition, we agreed to assume ZN's employee share option plan, and accordingly have reserved 1,138,546 shares of our common stock for issuance to the plan participants. 522,146 of the issued shares were placed into an escrow account for a period of one year (from acquisition date) to secure certain potential indemnification obligations of the share recipients. The shares were issued

32

Table of Contents

to the sellers in a transaction exempt from registration under the Securities Act of 1933, or the Securities Act, pursuant to Section 4(2) and Regulation S thereunder. We relied upon representations from the sellers in the securities purchase agreement as the basis for such exemption. We have filed with the Securities and Exchange Commission a registration statement on Form S-3 covering the shares issued in the acquisition.

On February 14, 2004 we acquired all of the outstanding shares of Trans Digital Technologies Corporation, or TDT, for 5,850,000 newly issued shares of our common stock, plus $15.3 million in notes and $5 million in cash. The shares were issued to the seller in a transaction exempt from registration under the Securities Act of 1933, or the Securities Act, pursuant to Section 4(2) thereunder. We relied upon representations from the seller in the stock purchase agreement as the basis for such exemption. We have agreed to file with the Securities and Exchange Commission a registration statement on Form S-3 covering the shares issued in the acquisition.

In January 2004, we sold 456,007 shares of our common stock at $3.775 per share in a private sale to certain institutional investors to which we had previously sold shares in a private sale in September 2003. Our net proceeds were approximately $1.6 million, and we intend to use those proceeds for general corporate purposes. The shares were sold to certain institutional investors in a transaction exempt from registration under the Securities Act pursuant to Rule 506 of Regulation D thereunder. We relied upon representations from the purchasers in the securities purchase agreements as the basis for such exemption. We have filed with the Securities and Exchange Commission a registration statement on Form S-3 covering the shares issued to the investors.

ITEM 3 – DEFAULTS UPON SENIOR SECURITIES

None.

ITEM 4 – SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

On January 23, 2004, we held a special meeting of stockholders to approve the issuance of shares of our common stock to the shareholders, and the participants under the share option plan, of ZN Vision Technologies AG in connection with the acquisition of ZN pursuant to a securities purchase agreement dated March 28, 2003 among Viisage, ZN and all of the shareholders of ZN. The issuance was approved with the following votes: 12,818,026 for, 121,535 against, and 13,530 abstained.

ITEM 5 – OTHER INFORMATION

None.

ITEM 6 – EXHIBITS AND REPORTS ON FORM 8-K

(a)    Exhibits

The exhibits listed in the Exhibits Index immediately preceding such exhibits are filed as part of this report.

(b)    Reports on Form 8-K

On January 30, 2004, we filed a Current Report on Form 8-K under Items 2 announcing the closing of the acquisition of ZN.

On February 19, 2004, we furnished a Current Report on Form 8-K under Item 12 containing a press release dated February 26, 2004 announcing our financial results for the period ended December 31, 2003.

On February 25, 2004, we furnished a Current Report on Form 8-K under Item 9 announcing the filing of a press release regarding our forecasted financial results for fiscal year 2004.

33

Table of Contents

On February 27, 2004, we filed a Current Report on Form 8-K under Item 2 announcing the closing of the acquisition of TDT.

34

Table of Contents

**VIISAGE TECHNOLOGY, INC.**

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**VIISAGE TECHNOLOGY, INC.**

Date: May 12, 2004                          By:          /s/   Bernard C. Bailey

                                                        _____
                                                        Bernard Bailey
                                                        President and Chief Executive Officer
                                                        (Principal Executive Officer)

Date: May 12, 2004                          By:          /s/   William K. Aulet

                                                        _____
                                                        William K. Aulet
                                                        Senior Vice President and Chief Financial Officer
                                                        (Principal Financial Officer)

35

Table of Contents

# EXHIBIT INDEX

| Exhibit No. | Note | Description |
|---|---|---|
| 2.1 | (a) | Stock Purchase Agreement dated as of February 14, 2004 by and among Viisage Technology, Inc., Trans Digital Technologies Corporation and B.G. Beck. |
| 2.2 | (b) | Securities Purchase Agreement dated as of March 28, 2003 (the "Securities Purchase Agreement") by and among Viisage Technology, Inc., ZN Vision Technologies AG and each of the Sellers named therein. |
| 2.3 | (b) | Amendment No. 1 to the Securities Purchase Agreement. |
| 2.4 | (b) | Amendment No. 2 to the Securities Purchase Agreement. |
| 2.5 | (c) | Amendment No. 3 to Securities Purchase Agreement. |
| 10.31 | (d) | Third Amended and Restated Loan Agreement, dated February 27, 2004, between the Company and Commerce Bank & Trust Co. |
| 10.54 | (d) | Sublease dated February 13, 2004 between the Company and eiStream Inc. |
| 10.55 | (d) | Consulting Agreement dated February 14, 2004 between the Company and B.G. Beck. |
| 10.56 | (d) | Amended and Restated Secured Promissory Note dated February 27, 2004 between the Company, Trans Digital Technologies Corporation and B.G. Beck. |
| 10.57 | (d) | Letter Agreement dated September 8, 2003 between the Company, Seligman Communications and Information Fund, Inc., Seligman New Technologies Fund, Inc., Seligman New Technologies Fund II, Lau Technologies, Odeon Venture Capital AG, Christoph v.d. Malsburg, Thomas Martinetz and Stefan Gehlen. |
| 31.1 | (e) | Certification of Principal Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2 | (e) | Certification of Principal Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1 | (e) | Certification of Principal Executive Officer pursuant to 18 U.S.C. Sec. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32.2 | (e) | Certification of Principal Financial Officer pursuant to 18 U.S.C. Sec. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |

| Note | Description |
|---|---|
| (a) | Previously filed as an exhibit to the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission on February 27, 2004 and incorporated herein by reference. |
| (b) | Included as an annex to the Company's definitive proxy statement on Schedule 14A filed with the Securities and Exchange Commission on December 30, 2003 and incorporated herein by reference. |
| (c) | Previously filed as an exhibit to the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission on January 30, 2004 and incorporated herein by reference. |
| (d) | Filed as an exhibit to the Company's Annual Report on Form 8-K filed with the Securities and Exchange Commission on March 30, 2004 and incorporated herein by reference. |
| (e) | Filed herewith. |

EXHIBIT 6

## IN THE SUPERIOR COURT OF FULTON COUNTY
### STATE OF GEORGIA

DIGIMARC ID SYSTEMS, LLC,

        Plaintiff,

vs.

GEORGIA TECHNOLOGY AUTHORITY and
the GEORGIA DEPARTMENT OF MOTOR
VEHICLE SAFETY,

        Defendants,

vs.

VIISAGE TECHNOLOGY, INC., a Delaware
corporation,

        Necessary Party-Defendant.

Civil Action No. 2003CV66498



FILED IN OFFICE

JUN 3 2004

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

### ORDER

    This matter came before the Court on the following motions:

    A motion jointly filed by Viisage Technology, Inc., Georgia Technology Authority and Georgia Department of Motor Vehicle Safety on February 13, 2004, entitled Motion To Expedite Trial And For A Special Trial Setting Or Transfer Of The Case;

    A motion filed by Viisage on February 27, 2004, entitled Motion To Compel Full And Complete Production Of Documents And Discovery Responses, And For Sanctions And Memorandum Of Law In Support;

    A motion filed by Digimarc ID Systems, LLC on March 15, 2004, entitled Motion To Compel The Completion Of Viisage's 30(b)(6) Deposition;

    A motion filed by Digimarc filed on April 20, 2004, entitled Motion To Compel

Production Of Documents From Viisage Technology, Inc.; and,

A motion filed by Viisage on April 19, 2004 seeking a protective order.

The parties fully briefed the issues and presented oral argument to the Court on May 25, 2004. Having considered the briefs and the oral arguments, as well as the pleadings and discovery on file with the Court:

IT IS HEREBY ORDERED that:

Plaintiff's Motion To Compel The Completion Of Viisage's 30(b)(6) Deposition is GRANTED, and Viisage is ordered to designate Craig Vosseteig and Barry Erhardt as 30(b)(6) witnesses in response to Digimarc's Notice of 30(b)(6) Deposition of Viisage Technology, Inc., as amended, and specifically in response to those areas of examination covered by Digimarc's Notice regarding which these Viisage employees have corporate knowledge reasonably available to them, and Viisage must cause the appearance of these two employees at depositions to take place at a time and place mutually agreeable to counsel;

IT IS FURTHER ORDERED that:

Plaintiff's Motion To Compel Production Of Documents From Viisage Technology, Inc. is GRANTED, and Viisage is ordered to conduct a thorough and diligent search for and, to the extent that they exist, produce all relevant, non-privileged documents that are responsive to Digimarc's Motion To Compel Production Of Documents From Viisage Technology, Inc. and that do not contain Viisage trade secrets (except as set forth below). Viisage's production should apply the broadest definition of relevance for discovery purposes and make available discoverable documents that either are relevant to the claims as presented by the Plaintiff in this case or that reasonably could be used by the Plaintiff to lead to the discovery of relevant information as to such claims. Documents to be produced by Viisage should include, but should

2

PAGE
010124

not necessarily be limited to, the following specific categories of documents identified in

Plaintiff's motion:

1. All non-privileged documents relating to post-November 12, 2002 changes in Viisage's technical proposal with respect to Viisage's proposed back-up card production facility and the process leading to the proposed final cards' design;

2. All non-privileged documents that reflect changes to Viisage's proposed vendor costs in connection with the change from Unisys and Centerstage for a Point of Sale vendor;

3. All non-privileged documents evidencing communications after November 12, 2002 about Viisage's compliance with the conditions of the Notice of Award, specifically including but not limited to documents related to the performance bond to be provided by Viisage to the State;

4. All non-privileged documents reflecting the leasing obligations of Viisage demonstrating the rational price basis for the differential in the Viisage proposed cost per card of one cent if Viisage had to provide its own off-site facility.

5. All non-privileged documents reflecting how Viisage came to submit New York State drivers licensees to the State of Georgia as being production samples of Viisage;

6. All non-privileged documents that reflect Viisage's means and methods to produce the cards used in Georgia, either as samples submitted during the procurement, or cards that were to be produced in performance of the actual contract, specifically including but not limited documents relating to Viisage's communications with its VIP security vendor; and,

7. All non-privileged documents that reflect changes between the technical proposal(s) that formed the basis of the award of the contract to Viisage and the final solution that Viisage actually was intending to implement in Georgia, specifically including, but not limited to, the following:

   a. documents relating to card design limitations and any problems experienced by Viisage in providing a card with a full color background; and,

   b. transmittal of permanent card production samples by Viisage to the GTA and/or DMVS after November 12, 2002; and

PAGE
010125

c.   documents, including sample cards, relating to any post-November 12, 2002 independent lab testing performed with respect to Viisage's permanent driver's licenses and identification cards intended to be used or proposed to be used in Georgia, and any communications between Viisage and DMVS relating to independent lab testing after November 12, 2002.

IT IS FURTHER ORDERED that, after completion of the search and production of any such documents, Viisage shall certify to the Court, by affidavit of counsel, that a thorough and diligent search has been completed and any responsive documents produced, in accordance with this Order. Given Viisage's statement to the Court that it does not intend to present evidence to this Court regarding its "damages" or losses in performing the Georgia contract, the Court will not order Viisage to produce documents reflecting that information.

IT IS FURTHER ORDERED that:

Defendant's Motion To Compel Full And Complete Production Of Documents And Discovery Responses, And For Sanctions And Memorandum Of Law In Support is DENIED in part, and GRANTED in part; specifically, Digimarc must assure that a thorough and diligent search has been made for all responsive documents that are not subject to Digimarc's objections, and certify, by affidavit of counsel, that Digimarc has made a thorough and diligent search for such documents. Defendant's request for sanctions is DENIED.

IT IS FURTHER ORDERED that:

Defendants' Motion to Expedite Trial and for a Special Trial Setting or Transfer of the Case is DENIED. However, the Court recognizes the significance of this case to Georgia citizens and will tentatively set it for trial during the term beginning September 14, 2004. The Court will separately enter a Scheduling Order. If the Court subsequently receives "speedy trial" demands or has other mandatory obligations that would cause the Court to be unable to keep this trial date as set, the Court will notify the parties of the potential conflict as soon as possible so

4

that the parties may file appropriate Motions relating to trial setting or transfer, which the Court will consider at the appropriate time.

IT IS FURTHER ORDERED that:

Viisage's Motion for Protective Order is DENIED.

The Court at this time makes no ruling regarding any of the parties' entitlement to attorneys' fees in connection with the filing or defense of the motions disposed of by this Order.

SO ORDERED this _3rd_ day of June 2004.

Judge Thelma Wyatt Cummings Moore
Fulton County Superior Court

5

EXHIBIT 7

Table of Contents

As filed with the Securities and Exchange Commission on June 21, 2004

Registration No. 333-

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM S-3

### REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933

# Viisage Technology, Inc.

### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **04-3320515** |
| (State of incorporation) | (I.R.S. Employer Identification No.) |

### 296 Concord Road, Third Floor, Billerica, MA 01821, (978) 932-2200
**(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)**

### Bernard C. Bailey
### Chief Executive Officer
### Viisage Technology, Inc., 296 Concord Road, Third Floor, Billerica, MA 01821, (978) 932-2200
**(Name, address, including zip code, and telephone number, including area code, and address of agent for service)**

*Copies to:*

| | | |
|---|---|---|
| **Elliot J. Mark, Esq.** | **David M. McPherson, Esq.** | **Gerald S. Tanenbaum, Esq.** |
| **Viisage Technology, Inc.** | **Latham & Watkins LLP** | **Cahill Gordon & Reindel LLP** |
| **296 Concord Road** | **555 Eleventh Street, N.W.** | **80 Pine Street** |
| **Third Floor** | **Suite 1000** | **New York, NY 10005** |
| **Billerica, MA 01821** | **Washington, D.C. 20004** | **Telephone: (212) 701-3000** |
| **Telephone: (978) 932-2200** | **Telephone: (202) 637-2200** | **Telecopy: (212) 269-5420** |
| **Telecopy: (978) 932-2218** | **Telecopy: (202) 637-2201** | |

**Approximate date of commencement of proposed sale to public:**     From time to time, after this registration statement becomes effective.

If the only securities being registered on this Form are being offered pursuant to dividend or interest reinvestment plans, please check the following box. ☐

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, as amended, or the Securities Act, other than securities offered only in connection with dividend or interest reinvestment plans check the following box. ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If delivery of the prospectus is expected to be made pursuant to Rule 434, please check the following box. ☐

### Calculation of Registration Fee

| Title of each class of securities to be registered | Amount to be registered | Proposed maximum offering price per unit(1) | Proposed maximum aggregate offering price | Amount of registration fee |
|---|---|---|---|---|
| Common Stock | 7,500,000 shares | $9.21 | $69,075,000 | $8,751.81 |

(1)   Estimated pursuant to Rule 457(c) under the Securities Act solely for the purpose of calculating the registration fee, based upon the average of the high and low sale prices of our common stock on June 15, 2004 on the Nasdaq National Market.

**The registrant hereby amends this registration statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this registration statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until the registration statement shall become effective on such date as the Commission acting pursuant to said Section 8(a), may determine.**

Table of Contents

The information is this prospectus is not complete and may be changed. We may not sell these securities until the registration statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offer to sell these securities and is not soliciting an offer to buy these securities in any state where the offer or sale is not permitted.

PRELIMINARY PROSPECTUS
Subject to completion, dated June 21, 2004



## 7,500,000 Shares of Common Stock

We are offering 7,200,000 shares of our common stock, par value $0.001 per share. We will receive all of the net proceeds from the sale of such common stock. The selling shareholders identified in this prospectus are selling an additional 300,000 shares of our common stock. We will not receive any of the proceeds from the sale of the shares by the selling shareholders.

Our common stock is listed on the Nasdaq National Market under the symbol "VISG." The last reported sale price of our common stock on June 18, 2004 was $9.47 per share.

**Investing in our common stock involves a high degree of risk. Before buying any of these shares of our common stock, you should carefully consider the risk factors described in " Risk Factors " beginning on page 7 of this prospectus.**

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or passed upon the adequacy or accuracy of this prospectus. Any representation to the contrary is a criminal offense.**

|  | Per share | Total |
|---|---|---|
| Public offering price | $ | $ |
| Underwriting discounts and commissions | $ | $ |
| Proceeds, before expenses, to us | $ | $ |
| Proceeds to selling shareholders, before expenses | $ | $ |

The underwriters may also purchase up to an additional 525,000 shares of our common stock from us and up to an additional 600,000 shares from the selling shareholders at the public offering price, less the underwriting discounts and commissions payable by us and the selling shareholders, to cover overallotments, if any, within 30 days from the date of this prospectus. If the underwriters exercise the option in full, the total underwriting discounts and commissions payable by us will be $          and the total proceeds, before expenses, to us will be $          .

The underwriters are offering the shares of our common stock as described in "Underwriting." Delivery of the shares will be made on or about          , 2004.

**JPMorgan**                                                **UBS Investment Bank**

**Piper Jaffray**

**JMP Securities**          **Janney Montgomery Scott LLC**          **Roth Capital**

Table of Contents

You should rely only on the information contained or incorporated by reference in this prospectus. We have not authorized anyone to provide information different from that contained or incorporated by reference in this prospectus. Neither the delivery of this prospectus nor the sale of shares of common stock means that information contained or incorporated by reference in this prospectus is correct after the date of this prospectus. These documents do not constitute an offer to sell or solicitation of an offer to buy in any jurisdiction where offers or sales are not permitted. In this prospectus, "Viisage," "we," "our," "us," and "the Company" refer to Viisage Technology, Inc. and its consolidated subsidiaries, unless the context otherwise requires.

## Prospectus

| | |
|---|---|
| Forward-Looking Statements | ii |
| Prospectus Summary | 1 |
| Risk Factors | 7 |
| Use of Proceeds | 18 |
| Dilution | 19 |
| Capitalization | 20 |
| Price Range of Common Stock | 21 |
| Dividend Policy | 21 |
| Selected Consolidated Financial Data | 22 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 24 |
| Business | 42 |
| Management | 53 |
| Principal and Selling Shareholders | 55 |
| Description of Capital Stock | 57 |
| Underwriting | 60 |
| Where You Can Find More Information | 63 |
| Legal Matters | 64 |
| Experts | 64 |
| Index to Consolidated Financial Statements | F-1 |

Our trademarks, service marks and trade names include Viisage, Viisage Technology, FaceEXPLORER, FaceTOOLS, FaceFINDER, FacePASS and SensorMast. This prospectus also contains trademarks, service marks, copyrights and trade names of other companies.

i

Table of Contents

## FORWARD-LOOKING STATEMENTS

This prospectus contains or incorporates forward-looking statements within the meaning of section 27A of the Securities Act of 1933 and section 21E of the Securities Exchange Act of 1934. These forward-looking statements are based on current expectations, estimates, forecasts and projections about the industry and markets in which we operate and management's beliefs and assumptions. In addition, other written or oral statements that constitute forward-looking statements may be made by or on our behalf. Words such as "expect," "anticipate," "intend," "plan," "believe," "seek," "estimate," variations of such words and similar expressions are intended to identify such forward-looking statements. These statements are not guarantees of future performance and involve risks, uncertainties and assumptions that are difficult to predict. We have included important factors in the cautionary statements below under the heading "Risk Factors" that we believe could cause our actual results to differ materially from the forward-looking statements we make. We do not intend to update publicly any forward-looking statements, whether as a result of new information, future events or otherwise.

ii

Table of Contents

## PROSPECTUS SUMMARY

*This summary highlights selected information from this prospectus and the documents that we have incorporated by reference and may not contain all the information that is important to you. As a result, it does not contain all of the information that you should consider before investing in our common stock. You should read the following summary together with the more detailed information and financial statements and notes to the financial statements contained elsewhere or incorporated by reference in this prospectus, as described under the heading "Where You Can Find More Information." To fully understand this offering, you should read all these documents. Unless otherwise indicated, the information in this prospectus assumes the underwriters have not exercised their over-allotment option. All currency amounts in this prospectus are stated in U.S. dollars.*

### Viisage Technology, Inc.

We are a leading provider of advanced technology identity solutions that enable governments, law enforcement agencies and businesses to enhance security, reduce identity theft and protect personal privacy. Our identity solutions include secure credential provisioning systems, biometric software and systems and real-time identity databases, as well as systems design, development, integration and support services. These solutions enable our customers to manage the entire life cycle of an individual's identity for a variety of applications including civil identification, criminal identification and border management. Our customers use our solutions to help solve the following four critical problems in identity verification and management:

- assurance that the identification document is authentic;

- assurance that the document has been issued to the correct person;

- confidence that the person holding the identification is uniquely tied to and authorized to use the document; and

- verification of the privileges the individual is entitled to at a particular point in time.

Our solutions annually produce more than 30 million secure government-issued credentials at more than 2,000 locations. We are the second largest provider of U.S. drivers' licenses with a 32% market share. We are the sole source provider of passport production capability to the U.S. Department of State. We also are a recognized leader in biometrics in the field of face recognition. Our customers include governments, law enforcement agencies and businesses in more than 15 countries.

As our market has become increasingly complex and more frequently requires the integration of various technologies and capabilities, we have established ourselves as a provider of end-to-end identity solutions. In January 2004, we acquired ZN Vision Technologies AG, or ZN, which solidified our leadership position in face recognition technology. In addition, in February 2004, we acquired Trans Digital Technologies Corporation, or TDT, which provides us with a significant presence in the U.S. federal government market and strengthens our capability and credibility in the border management market worldwide.

We believe that our installed base of secure credential customers together with our leading face recognition technology provide us with a competitive advantage in delivering unified identity solutions for both the physical and digital domains. For example, in April 2004, we were selected by the U.S. Department of Defense, or DoD, for the production of secure, smart credentials as part of the agency's Common Access Card, or CAC, program. The CAC is a single means of identification for access to both physical locations and computer networks. We expect the demand for these types of solutions to grow significantly in the future.

We generate revenue through the sale and license of products and services for verifying and managing identities. Our revenues increased from $8.2 million in the first quarter of 2003 to $12.3 million in the first

1

Table of Contents

quarter of 2004. Our net loss during the same periods decreased from $2.4 million to $1.6 million, excluding the one-time charge of $12.1 million in connection with our change in accounting principle as of January 1, 2003. At March 28, 2004, our backlog was $176.0 million. For a full description of how we calculate backlog, see "Business—Backlog."

## Market Opportunity

The ability to confirm an individual's identity is playing an increasingly important role in national and international security, personal privacy and commerce. Failure to provide adequate identification can lead to breaches of security and identity theft, the consequences of which can range from national security threats and loss of life to significant economic loss. Within this context, we believe that there is increasing pressure on governments and businesses to accelerate the adoption of advanced technology identity solutions. The concern over homeland security, in which identity solutions play a part, is exemplified by the size of the budget for the U.S. Department of Homeland Security, which was approximately $31 billion for the fiscal year ended September 30, 2003, and is projected to be approximately $37 billion for the fiscal year ended September 30, 2004. Furthermore, identity theft is the nation's fastest growing crime, and the Federal Trade Commission has estimated that the total cost of identity theft approaches $50 billion per year.

Government-issued credentials serve as the primary means for confirming the physical identity of an individual. The effectiveness, however, of these credentials is impaired by the following issues:

- the credential can be counterfeited or altered;

- the credential can be issued under false pretenses; and

- the credential rarely is linked to an identity database.

To address these complex problems, credential issuing agencies are seeking advanced technology identity solutions, which increasingly include secure credential provisioning systems, biometrics and real-time identity databases. We believe the global market for these solutions is driven by the following key trends:

- ***Growth in government-initiated security programs*** . Budgets for U.S. federal government agencies, such as the Department of Homeland Security, include spending for identity initiatives and we believe that government agencies will continue to be key drivers for the growth and development of the market for advanced technology identity solutions.

- ***Development of industry standards and requirements.*** Several organizations responsible for standards in a number of our markets have recently implemented requirements for the use of face recognition biometrics. We believe this will help stimulate the development of our target markets.

- ***Growing use of biometrics*** . Governments are increasingly mandating biometrics as an integral component of identity solutions. This increased demand, coupled with the maturation of the technology, is driving the market adoption of biometrics.

- ***Increasing cost of identity theft and financial fraud.*** The growing direct and indirect cost of identity theft and financial fraud is increasing the pressure on businesses and individuals to accelerate the adoption of advanced technology identity solutions.

- ***Convergence of physical and logical security systems.*** There is a growing need for governments and businesses to provide a highly secure, unified system for user authentication to both physical assets, such as buildings, and digital assets, such as computer networks.

2

Table of Contents

## Our Strategy

Our objective is to be the leading provider of advanced technology identity solutions for governments, law enforcement agencies and businesses. Key elements of our strategy to achieve this objective include:

*Focus on customer needs.* We are committed to solving our customers' problems and will continue to develop and market solutions to meet their evolving increasingly complex identity security needs.

*Continue to enhance and expand our product suite and solutions.* We intend to continue to broaden our product and solution offerings to meet our customer needs. We intend to continue to engage in product development activities to expand the scope and enhance the performance of our solutions.

*Leverage existing customer base to provide additional advanced technology identity solutions.* Many of our customers do not yet use the full range of our total solutions offerings. Accordingly, we will continue to provide thought and product leadership to these customers as they migrate toward more sophisticated identity solutions.

*Expand customer base both domestically and abroad.* We intend to focus our sales efforts on broadening our customer base in both domestic and international markets.

*Pursue strategic acquisitions and alliances .* We intend to augment our competitive position through acquisitions and alliances.

## Corporate Information

We were incorporated in Delaware in May 1996. Our principal executive offices are located at 296 Concord Road, Third Floor, Billerica, Massachusetts 01821, our telephone number at that location is (978) 932-2200 and our website address is www.viisage.com . The information contained on, or that can be accessed through, our website is not a part of this prospectus.

3

**Table of Contents**

## THE OFFERING

| | |
|---|---|
| Common stock we are offering | 7,200,000 shares |
| Common stock offered by the selling shareholders | 300,000 shares |
| Common stock to be outstanding after the offering | 43,055,165 shares |
| Nasdaq National Market symbol | VISG |
| Use of proceeds after expenses | We will use the proceeds of the common stock we are offering to repay approximately $30.3 million of indebtedness and for general corporate purposes. We will not receive any proceeds from the sale of common stock by the selling shareholders. See "Use of Proceeds." |
| Risk Factors | See "Risk Factors" beginning on page 7 of this prospectus for a discussion of factors you should carefully consider before deciding to invest in shares of our common stock. |

The number of shares of common stock to be outstanding after this offering is based on the number of shares of common stock outstanding as of June 16, 2004, assumes no exercise of the underwriters' over-allotment option to purchase an additional 1,125,000 shares of common stock and does not include shares issuable upon the exercise of 4,415,783 options outstanding as of June 16, 2004 with a weighted-average exercise price of $3.49 per share, or 812,469 shares issuable upon the exercise of warrants outstanding as of June 16, 2004 with a weighted-average exercise price of $11.94 per share.

4

Table of Contents

## SUMMARY CONSOLIDATED FINANCIAL DATA

The following table summarizes our consolidated financial data for the periods, and as of the dates, indicated. You should read the summary consolidated financial data set forth below in conjunction with "Selected Consolidated Financial Data," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the audited consolidated financial statements and the accompanying notes thereto included elsewhere in this prospectus. The historical and as adjusted results presented here are not necessarily indicative of future results.

The as adjusted balance sheet data gives effect to the sale of 7,200,000 shares of our common stock in this offering at an offering price of     per share and after deducting underwriting discounts and commissions and estimated offering expenses.

| | For the Years Ended December 31, | | | For the Three Months Ended(2) | |
| --- | --- | --- | --- | --- | --- |
| | 2001(1) | 2002(1) | 2003(2) | March 30, 2003 | March 28, 2004 |
| | | | | (unaudited) | |
| | (dollars in thousands, except per share data) | | | | |
| **Statement of Operations Data:** | | | | | |
| Revenue | $  26,280 | $  32,302 | $  37,371 | $  8,155 | $  12,259 |
| Cost of revenue | 19,602 | 25,239 | 27,844 | 6,789 | 8,906 |
| Gross margin | 6,678 | 7,063 | 9,527 | 1,366 | 3,353 |
| Operating expenses: | | | | | |
| Sales and marketing | 809 | 5,368 | 5,282 | 1,411 | 1,493 |
| Research and development | 2,054 | 4,457 | 3,650 | 945 | 959 |
| General and administrative | 2,500 | 5,069 | 5,110 | 1,093 | 2,137 |
| Acquisition expenses | 1,639 | — | — | — | — |
| Restructuring charges | — | 824 | — | — | — |
| Total operating expenses | 7,002 | 15,718 | 14,042 | 3,449 | 4,589 |
| Operating loss | (324) | (8,655) | (4,515) | (2,083) | (1,236) |
| Interest expense, net | (1,210) | (875) | (969) | (219) | (392) |
| Other income | — | — | 18 | — | 21 |
| Loss before income taxes and cumulative effect of change in accounting principle | (1,534) | (9,530) | (5,466) | (2,302) | (1,607) |
| Provision for income taxes | — | — | (63) | (63) | (25) |
| Loss before cumulative effect of change in accounting principle | (1,534) | (9,530) | (5,529) | (2,365) | (1,632) |
| Cumulative effect of change in accounting principle (3) | — | — | (12,131) | (12,131) | — |
| Net loss | (1,534) | (9,530) | (17,660) | (14,496) | (1,632) |
| Preferred stock dividends | (5) | — | — | — | — |
| Loss applicable to common shareholders | $  (1,539) | $  (9,530) | $  (17,660) | $  (14,496) | $  (1,632) |
| Basic and diluted loss per share before cumulative effect | $  (0.09) | $  (0.48) | $  (0.26) | $  (0.12) | $  (0.05) |
| Basic and diluted net loss per share applicable to common shareholders (4) | $  (0.09) | $  (0.48) | $  (0.82) | $  (0.72) | $  (0.05) |
| Weighted average basic and diluted common shares outstanding | 16,265 | 20,046 | 21,445 | 20,258 | 31,362 |
| Pro forma operating results (for application of EITF 00-21) | $  (494) | $  (11,176) | $  (5,529) | $  (2,365) | $  (1,632) |
| Pro forma net loss per share | $  (0.03) | $  (0.56) | $  (0.26) | $  (0.12) | $  (0.05) |

5

Table of Contents

|  | As of March 28, 2004 | |
|---|---|---|
|  | Actual | As Adjusted |
| **Balance Sheet Data:** | | |
| Working capital | $    2,443 | |
| Total assets | 135,292 | |
| Total debt | 31,423 | |
| Shareholders' equity | 92,196 | |

(1)   The results are presented under percentage of completion based on the cost to cost method of measurement.

(2)   The results are presented in accordance with EITF 00-21 applied on a cumulative basis as of January 1, 2003.

(3)   We adopted EITF 00-21 on a cumulative basis as of January 1, 2003. See note 2 in the Notes to Consolidated Financial Statements which discusses the change in accounting principle.

(4)   See note 2 in the Notes to Consolidated Financial Statements for information concerning the computation of basic and diluted net loss per share.

6

Table of Contents

# RISK FACTORS

*You should carefully consider the following risk factors and all other information contained in this prospectus before investing in shares of our common stock. Investing in our common stock involves a high degree of risk. If any of the following risks actually occurs, our business, financial condition and results of operations could be materially and adversely affected. In that event, the trading price of our common stock could decline and you may lose part or all of your investment.*

## Risks Related to Viisage and the Industry

### We have a history of operating losses.

We have a history of operating losses. Our business operations began in 1993 and, except for fiscal years 1996 and 2000, have resulted in net losses in each fiscal year. At March 28, 2004, we had an accumulated deficit of approximately $43.7 million. We will continue to invest in the development of our secure credential provisioning capabilities, biometric technologies and other components of advanced technology identity solutions. Accordingly, we cannot predict when or if we will ever achieve profitability.

### We may be unable to obtain additional capital required to fund our operations and finance our growth.

The installation of our secure identification solutions requires significant capital expenditures. Furthermore, the continued development of our biometric and other advanced technologies will require additional capital. Although we have been successful in the past in obtaining financing for working capital and capital expenditures, including a $15 million private placement of our common stock in September 2003 and January 2004 and a new loan agreement with Commerce Bank and Trust Company in February 2004, we will have ongoing capital needs as we expand our business. We may be unable to obtain additional funds in a timely manner or on acceptable terms, which would render us unable to fund our operations or expand our business. If we are unable to obtain capital when needed, we may have to restructure our business or delay or abandon our development and expansion plans.

### We derive over 90% of our revenue from government contracts, which are often non-standard, involve competitive bidding, may be subject to cancellation with or without penalty and may produce volatility in earnings and revenue.

More than 90% of our business involves providing products and services under contracts with U.S. federal, state and local government agencies and foreign government agencies. Obtaining contracts from government agencies is challenging, and government contracts often include provisions that are not standard in private commercial transactions. For example, government contracts may:

- include provisions that allow the government agency to terminate the contract without penalty under some circumstances;

- be subject to purchasing decisions of agencies that are subject to political influence;

- contain onerous procurement procedures and

- be subject to cancellation if government funding becomes unavailable.

Foreign government contracts generally include comparable provisions relating to termination for the convenience of the relevant foreign government. Securing government contracts can be a protracted process involving competitive bidding. In many cases, unsuccessful bidders may challenge contract awards, which can lead to increased costs, delays and possible loss of the contract for the winning bidder.

7

Table of Contents

**We derive a significant portion of our revenue from a few customers, the loss of which could have an adverse effect on our revenues.**

For the three-month period ended March 28, 2004, the U.S. Department of State, accounted for 13% of our revenue. For the year ended December 31, 2003, the Pennsylvania Department of Transportation and the Office of the Illinois Secretary of State, each accounted for 13% of our revenues. The U.S. Department of Justice has recently issued an indictment against former Governor of Illinois George Ryan and an updated indictment against former lobbyist Lawrence E. Warner on bribery and related federal racketeering charges. We had a formal consultative relationship with Mr. Warner's firm pursuant to which we paid that firm fees of approximately $800,000. Upon learning of the initial indictment of Mr. Warner in 2002, we immediately terminated our contract and relationship with Mr. Warner and his firm. There has been no assertion of any impropriety on our part.

For 2002, Connecticut Department of Information Technology and Mississippi Department of Information Technology Services, accounted for 10% and 12% of our revenues, respectively and an aggregate of 22% of our revenue. For 2001, Illinois Secretary of State, Unisys Corporation (Florida Department of Safety and Motor Vehicles), Kentucky Transportation Cabinet and Pennsylvania Department of Transportation, accounted for 10%, 12%, 14% and 13% of our revenue, respectively and an aggregate of 49% of our revenue. Since a small number of customers under our drivers' license contracts account for a substantial portion of our revenues, the loss of any of our significant customers would cause revenue to decline and could have a material adverse effect on our business.

**We derive revenue from only a limited number of products and services and we do not have a diversified product or service base.**

Substantially all of our revenues are derived from the sale of products and services comprising our identity solutions. We anticipate that substantially all of the growth in our revenue, if any, will also be derived from these sources. If for any reason our sale of these products or services is impeded, and we have not diversified our product and service offerings, our business and results from operations could be harmed.

**Loss of limited source suppliers may result in delays or additional expenses.**

We obtain certain hardware components and complete products from a limited group of suppliers. In particular, we obtain all of the printers and consumables for the U.S. Department of State passport contract and the Department of Defense, or DoD, Common Access Card, or CAC, contract from Toppan Printing Co. Ltd. Our reliance on these suppliers involves significant risks, including reduced control over quality and delivery schedules. Moreover, any financial instability of our manufacturers or contractors could result in our having to find new suppliers. We may experience significant delays in manufacturing and shipping our products to customers if we lose these sources or if supplies from these sources are delayed. As a result, we may be required to incur additional development, manufacturing and other costs to establish alternative sources of supply. It may take several months to locate alternative suppliers, if required, or to re-tool our products to accommodate components from different suppliers. We cannot predict if we will be able to obtain replacement components within the time frames we require at an affordable cost, or at all. Any delays resulting from suppliers failing to deliver components or products on a timely basis, in sufficient quantities and of sufficient quality or any significant increase in the price of components from existing or alternative suppliers could have a severe negative impact on our business, financial condition and results of operations.

**Litigation involving our contract with Georgia could result in the cancellation of that contract which could cause us to lose $19.7 million in revenues over the next five and one-half years and could result in a loss of up to $5 million.**

In July 2003, a Georgia court issued a preliminary injunction prohibiting Georgia's Department of Motor Vehicle Safety from continuing to work with us to install the State's new drivers' license system. The injunction is the result of a lawsuit filed in March 2003 by one of our competitors alleging that that the Department of

8

Table of Contents

Motor Vehicle Safety did not comply with its own bid process when it selected a vendor for its digital drivers' license program. Discovery is continuing in this lawsuit and a trial on the merits of the lawsuit has been scheduled for September 2004. The Department of Motor Vehicle Safety has confirmed that its contract with us remains in place. However, if the lawsuit is successful and we lose the contract, we could lose up to $19.7 million in revenue that we expected to recognize over the next five and one-half years. In addition, although we expect that the Department of Motor Vehicle Safety would be required to reimburse us for our costs incurred under the contract, if we are unable to obtain reimbursement of those costs, we could be required to recognize a loss of up to approximately $5 million for costs incurred to date on the Georgia contract.

**Our strategy of expanding our face recognition business could adversely affect our business operations and financial condition.**

Part of our strategy is to enhance our leadership in face recognition technology and to expand our operations within our biometrics business segment. Pursuing this strategy involves risks. For instance, to date, face recognition security solutions have not gained widespread commercial acceptance. Some of the obstacles to widespread acceptance of face recognition security solutions include a perceived loss of privacy and public perceptions as to the usefulness of face recognition technologies. Whether the market for face recognition security solutions will expand will be dependent upon factors such as:

- the success of our marketing efforts and publicity campaigns and those of our competitors and

- customer satisfaction with our products and services, as well as those of our competitors.

We do not know when, if ever, face recognition security solutions will gain widespread commercial acceptance. In addition, our biometrics business segment has not achieved profitability, and it may never achieve profitability.

**We face intense competition, which could result in lower revenues and higher research and development expenditures and could adversely affect our results of operations.**

The events of September 11, 2001 have heightened interest in the use of security solutions, and we expect competition in this field, which is already substantial, to intensify. We face competition in the secure credentials market from suppliers of drivers' licenses, passports, smart cards and other government-issued credentials. Competitors in biometrics are developing and bringing to market products that use face recognition as well as eye, fingerprint and other forms of biometric verification. Our products also will compete with non-biometric technologies such as certificate authorities and traditional keys, cards, surveillance systems and passwords. Widespread adoption of one or more of these technologies or approaches in the markets we intend to target could significantly reduce the potential market for our systems and products. Many of our competitors have significantly more cash and resources than we have. Our competitors may introduce products that are competitively priced, have increased performance or functionality or incorporate technological advances that we have not yet developed or implemented. To remain competitive, we must continue to develop, market and sell new and enhanced systems and products at competitive prices, which will require significant research and development expenditures. If we do not develop new and enhanced products or if we are not able to invest adequately in our research and development activities, our business, financial condition and results of operations could be negatively impacted.

**Unless we keep pace with changing technologies, we could lose customers and fail to win new customers.**

Our future success will depend upon our ability to develop and introduce a variety of new products and services and enhancements to these new products and services in order to address the changing needs of the marketplace. We may not be able to accurately predict which technologies customers will support. If we do not introduce new products, services and enhancements in a timely manner, if we fail to choose correctly among technical alternatives or if we fail to offer innovative products and services at competitive prices, customers may forego purchases of our products and services and purchase those of our competitors.

Table of Contents

**Security breaches in systems that we sell or maintain could result in the disclosure of sensitive government information or private personal information that could result in the loss of clients and negative publicity.**

Many of the systems we sell manage private personal information and protect information involved in sensitive government functions. A security breach in one of these systems could cause serious harm to our business as a result of negative publicity and could prevent us from having further access to such systems or other similarly sensitive areas for other governmental clients. Our systems may also be affected by outages, delays and other difficulties. Our insurance coverage in certain circumstances may be insufficient to cover losses and liabilities that may result from such events.

**The market for our solutions is still developing and if the industry adopts standards or a platform different from our platform, then our competitive position would be negatively affected.**

The market for identity solutions is still emerging. The evolution of this market is in a constant state of flux that may result in the development of different technologies and industry standards that are not compatible with our current products or technologies. In particular, the face recognition market lacks industry-wide standards. Several organizations, such as the International Civil Aviation Organization, which sets standards for travel documents that its member states then put into effect, and the National Institute for Standards and Testing, which is part of the U.S. Department of Commerce, have recently selected face recognition as the biometric to be used in identification documentation. It is possible, however, that these standards may change and that any standards eventually adopted could prove disadvantageous to or incompatible with our business model and product lines.

**The adoption of EITF 00-21 resulted in a non-cash adjustment of $12.1 million and may have an adverse effect on our results of operations in the near term which may depress the market price of our common stock.**

During the third quarter of 2003, we adopted the provisions of Emerging Issues Task Force 00-21, *Accounting for Revenue Arrangements with Multiple Deliverables* , or EITF 00-21, on a cumulative basis as of January 1, 2003. After discussions with the Securities and Exchange Commission staff regarding the effect of EITF 00-21 on revenue recognition on our secure identification contracts, we decided to adopt EITF 00-21 via cumulative catch-up as of January 1, 2003 rather than prospectively as reflected in the previously filed Form 10-Q for the quarter ended September 28, 2003. The adoption of EITF 00-21 resulted in a non-cash adjustment reported as a cumulative effect of a change in accounting principle of $12.1 million. The adoption of EITF 00-21 affects the timing of revenue recognition under our secure identification contracts and as a result we may report reduced revenue and an increased net loss for one or more of our fiscal quarters in 2004. This effect on our results of operations could cause our stock price to decline.

**Our leverage creates financial and operating risks that could limit the growth of our business.**

We have a significant amount of indebtedness. As of March 28, 2004, we had approximately $31.4 million in short and long-term debt and lease financing. This amount includes $15.3 million of related party debt incurred in our acquisition of Trans Digital Technologies, or TDT, in February 2004. While we plan to use part of the proceeds from this offering to repay all of this indebtedness, we may not raise sufficient funds in this offering to do so. Further, we may incur additional indebtedness in the future. To the extent that we do not repay a substantial portion of our debt following this offering, or if we incur additional debt in the future, such leverage could have important consequences to our business including:

- limiting our ability to obtain necessary financing for future working capital;

- limiting our ability to finance the acquisition of equipment needed to meet customer requirements;

- limiting our ability to finance the development of new technologies;

Table of Contents

- requiring that we use a substantial portion of our cash flow from operations for debt service and not other operating purposes and

- requiring that we comply with financial and operating covenants, the failure of which could cause an event of default under our debt instruments.

Our loan agreements with Commerce Bank and Trust Company and Lau Technologies, our single largest shareholder, impose significant operating and financial restrictions on us. These restrictions limit our ability to, among other things, make capital expenditures, incur additional indebtedness or make investments. In addition, these agreements require us to comply with certain financial covenants, including profitability, tangible net worth, debt to worth ratio and debt service coverage. Our ability to make principal and interest payments under long-term indebtedness and bank loans will be dependent upon our future performance, which is subject to financial, economic and other factors affecting us, some of which are beyond our control.

## Uncertainties in global economic markets could cause delays in customer purchases.

Many customers and potential customers have delayed purchase intentions as a result of uncertainties in global economic markets. Government budgets, particularly at state and regional levels, have been or are expected to be reduced notably. Government contracts result from purchasing decisions made by public sector agencies that are particularly sensitive to budget changes and cutbacks during economic downturns, and variations in appropriations cycles. Many U.S. state customers are facing budget cuts, and some international customers are facing debt crises, introducing added uncertainty. Any shift in the government procurement process, which is outside of our control and may not be predictable, could impact the predictability of our quarterly results and may potentially have a material negative effect on our financial position, results of operation or cash flows.

## If we do not successfully expand our direct sales and services organizations and partnering arrangements, we may not be able to increase our sales or support our customers.

In the fiscal years ended December 31, 2002 and 2003, and three-month periods ended March 28, 2004 and March 30, 2003, we sold substantially all of our services and licensed substantially all of our products through our direct sales organization. Our future success depends on substantially increasing the size and scope of our direct sales force and partnering arrangements, both domestically and internationally. We will face intense competition for personnel, and we cannot guarantee that we will be able to attract, assimilate or retain additional qualified sales personnel on a timely basis. Moreover, given the large-scale deployment required by some of our customers, we will need to hire and retain a number of highly trained customer service and support personnel. We cannot guarantee that we will be able to increase the size of our customer service and support organization on a timely basis to provide the high quality of support required by our customers. Failure to add additional sales and customer service representatives could result in our inability to increase our sales and support our customers.

## Integration of ZN's and TDT's businesses may be difficult and will consume significant financial and managerial resources which could have an adverse effect on our results of operations.

On January 23, 2004, we completed the acquisition of ZN Vision Technologies AG, or ZN, a leading German provider of face recognition and computer vision products and services. On February 14, 2004, we completed the acquisition of TDT. The integration of ZN's and TDT's products and services with ours will be challenging and will consume significant financial and managerial resources. The challenges involved with this integration include, among others:

- challenges related to technology integration;

- possible difficulty implementing uniform standards, controls, procedures and policies and

11

Table of Contents

- possible loss of key employees.

In addition, the differences between U.S. and German business cultures and the geographic distance between the companies could present significant obstacles to our timely, cost-effective integration of ZN.

**The significant direct and indirect costs of our acquisition and integration of ZN and TDT could adversely affect our financial performance.**

We incurred approximately $2.7 million of costs in connection with the acquisitions of ZN and TDT, including:

- costs associated with integrating our business with ZN and TDT;

- financial advisory fees and

- costs and expenses for services provided by our lawyers and accountants.

The transaction costs and expenses attributable to financial advisory, legal and accounting services that we incurred will be capitalized as a component of the purchase price. Goodwill associated with the acquisitions will be required to be tested at least annually for impairment, and we will be required to record a charge to earnings if there is an impairment in the value of such goodwill at a later date. Other intangible assets acquired in connection with the acquisitions will be amortized over their estimated useful lives.

**The acquisitions of ZN and TDT could result in future impairment charges which could adversely affect our results of operations.**

As a result of the acquisitions of ZN and TDT, goodwill and other intangible assets have been created. The values we may record for goodwill and other intangible assets will represent fair values calculated by independent third-party appraisers. Such valuations require us to provide significant estimates and assumptions, which are derived from information obtained from the management of the acquired businesses and our business plans for the acquired businesses or intellectual property. If estimates and assumptions used to initially value goodwill and intangible assets prove to be inaccurate, ongoing reviews of the carrying values of such goodwill and intangible assets may indicate impairments which will require us to record an impairment charge in the period in which we identify the impairments.

**If we do not achieve the expected benefits of our acquisitions of ZN and TDT, the price of our common stock could decline.**

We expect that the acquisition of ZN will enhance our leadership in face recognition technology through the combination of our technologies with those of ZN. Although the results of the initial tests of our combined technologies have been positive, the combination of such technologies might not meet the demands of the marketplace. If our technologies fail to meet such demand, customer acceptance of our face recognition solutions could decline, which would have an adverse effect on our results of operations and financial condition. In addition, we expect that the acquisition will enable us to market our systems and products on a global scale. Our face recognition customers are primarily located in the United States, and ZN's customers are primarily located in Europe. We might not be able to market successfully our products and services to ZN's customers or ZN's products and services to our customers. We expect that the acquisition of TDT will enhance our position in the market for secure credentials, particularly for the U.S. government. If our product offerings and services fail to meet the demands of this market, our results of operations and financial condition could be adversely affected. There is also a risk that we will not achieve the anticipated benefits of the acquisitions as rapidly as, or to the extent, anticipated by financial or industry analysts, or that such analysts will not perceive the same benefits to the acquisitions as we do. If these risks materialize, our stock price could be adversely affected.

12

Table of Contents

**The success of our strategic plan to grow sales and develop relationships in Europe may be limited by risks related to conducting business in European markets.**

Although ZN has experience marketing and distributing its products and developing strategic relationships in Europe, part of our strategy will be to increase sales and build additional relationships in European markets. Risks inherent in marketing, selling and developing relationships in European markets include those associated with:

- economic conditions in European markets, including fluctuations in the relative values of the U.S. dollar and the Euro;

- taxes and fees imposed by European governments that may increase the cost of products and services and

- laws and regulations imposed by individual countries and by the European Union.

In addition, European intellectual property laws are different than U.S. intellectual property laws and we will have to ensure that our intellectual property is adequately protected in foreign jurisdictions and that ZN's intellectual property is adequately protected in the United States. If we do not adequately protect our intellectual property rights, competitors could use our proprietary technologies in non-protected jurisdictions and put us at a competitive disadvantage.

**Our business may be impacted by changes in the local marketplace of our foreign operations and fluctuations in currency exchange rates.**

As a result of our acquisitions of ZN and TDT, we expect that we will have increased exposure to foreign currency fluctuations. Net revenue and related expenses generated from our international location in Germany are denominated in euros, exposing the results of operations and certain of our intercompany balances associated with this international location to foreign exchange rate fluctuations. In addition to our German operation, we will have increased transactions with Japanese vendors supplying hardware and consumables for the delivery of the TDT contracts. These transactions will increase our exposure to foreign currency fluctuations with the yen. To the extent the U.S. dollar weakens against these foreign currencies, the conversion of these foreign currency denominated transactions results in increased net revenue, operating expenses and net income. Similarly, our net revenue, operating expenses and net income will decrease when the U.S. dollar strengthens against these foreign currencies.

**If our systems and products do not perform as promised, we could experience increased costs, lower margins, liquidated damage payment obligations and harm to our reputation.**

We will be required to provide complex systems that will be required to operate on an "as needed" basis. Although we will deploy back-up systems, the failure of our products to perform as promised could result in increased costs, lower margins, liquidated damage payment obligations and harm to our reputation. The failure of our products also could result in contract terminations and have a material adverse effect on our business and financial results.

**Misappropriation of our intellectual property could harm our reputation, affect our competitive position and cost us money.**

We believe that our intellectual property, including our methodologies, will be critical to our success and competitive position. If we are unable to protect this intellectual property against unauthorized use by third parties, our reputation among existing and potential customers could be damaged and our competitive position adversely affected. Our strategies to deter misappropriation could be undermined if:

13

Table of Contents

- the proprietary nature or protection of our methodologies is not recognized in the United States or foreign countries;

- third parties misappropriate our proprietary methodologies and such misappropriation is not detected or

- competitors create applications similar to ours but which do not technically infringe on our legally protected rights.

If these risks materialize, we could be required to spend significant amounts to defend our rights and divert critical managerial resources. In addition, our proprietary methodologies may decline in value or our rights to them may become unenforceable.

**Others could claim that we are infringing on their intellectual property rights, which could result in substantial costs, diversion of managerial resources and harm to our reputation.**

Although we believe that our products and services do not infringe the intellectual property rights of others, we might not be able to defend successfully against a third-party infringement claim. A successful infringement claim against us could subject us to:

- liability for damages and litigation costs, including attorneys' fees;

- lawsuits that prevent us from further use of the intellectual property;

- having to license the intellectual property from a third party, which could include significant licensing fees;

- having to develop a non-infringing alternative, which could be costly and delay projects and

- having to indemnify clients with respect to losses they incurred as a result of the alleged infringement.

Even if we are not found liable in a claim for intellectual property infringement, such a claim could result in substantial costs, diversion of resources and management attention, termination of customer contracts and harm to our reputation.

**If we fail to adequately manage our resources, it could have a severe negative impact on our financial results or stock price.**

We are subject to fluctuations in technology spending by existing and potential customers. Accordingly, we will have to actively manage expenses in a rapidly changing economic environment. This could require reducing costs during economic downturns and selectively growing in periods of economic expansion. If we do not properly manage our resources in response to these conditions, our results of operations could be negatively impacted.

**Future acquisitions of companies or technologies may result in disruptions to our business.**

Beyond the acquisitions of ZN and TDT, our growth strategy could include additional acquisitions of companies or technologies that complement ours. Future acquisitions could involve risks inherent in acquisitions, such as:

- challenges associated with integrating acquired technologies and business of operations acquired companies;

- exposure to unknown liabilities;

- diversion of managerial resources from day-to-day operations;

14

Table of Contents

- possible loss of key employees, customers and suppliers;

- higher than expected transaction costs and

- additional dilution to our existing stockholders if we use our common stock as consideration.

If we fail to manage these challenges adequately, our results of operations and stock price could be adversely affected.

**The loss of key personnel could adversely affect our ability to remain competitive.**

We believe that the continued service of our executive officers will be important to our future growth and competitiveness. We have entered into employment agreements with our executive officers, including Bernard C. Bailey, our Chief Executive Officer, William K. Aulet, our Chief Financial Officer and James P. Ebzery, our Senior Vice President, Sales and Services. These agreements are intended to provide the executives with incentives to remain employed by us. However, we cannot assure you that they will remain employed by us. In addition, we believe that the continued employment of key members of our technical and sales staffs is important to us. Most of our employees are entitled to voluntarily terminate their relationship with us, typically without any, or with only minimal, advance notice. The process of finding additional trained personnel to carry out our strategy could be lengthy, costly and disruptive. We might not be able to retain the services of all of our key employees or a sufficient number of them to execute our plans. In addition, we might not be able to continue to attract new employees as required.

**Our quarterly results could be volatile and may cause our stock price to fluctuate.**

We have experienced fluctuations in quarterly operating results and we expect those fluctuations to continue. We expect that our quarterly results will continue to be affected by, among other things, factors such as:

- the size and timing of contract awards;

- the timing of our contract performance;

- variations in the mix of our products and services and

- contract losses and changes in management estimates inherent in accounting for contracts.

**Certain of our stockholders have significant relationships with us, which could result in us taking actions that are not supported by unaffiliated stockholders.**

Lau Technologies, or Lau, and B.G. Beck, who is also a director and Vice Chairman, beneficially own approximately 16.9% and 16.4%, respectively, of our outstanding common stock. After giving effect to the sale of 7,200,000 shares of our common stock in this offering, Lau and Mr. Beck will beneficially own approximately 13.8% and 13.4%, respectively, of our outstanding common stock. As a result of their ownership, both Lau and Mr. Beck have a strong influence on matters requiring approval by our stockholders, including the election of directors and most corporate actions, including mergers and acquisitions. In addition, we have significant relationships with each of Lau and Mr. Beck, including:

- Lau has provided us with a credit facility in an aggregate principal amount of $7.3 million, which is secured by some of our assets;

- we acquired significant intellectual property, contracts and distribution channels through a transaction with Lau under which we agreed to pay Lau a 3.1% royalty on our facial recognition revenues for a period of twelve and one half years, up to a maximum of $27.5 million;

- the Chairman of our Board of Directors and his spouse own a majority of Lau's voting stock;

15

Table of Contents

- in connection with the acquisition of TDT, Mr. Beck was appointed a member of our Board of Directors and appointed Vice Chairman;

- in connection with the acquisition of TDT, we issued a promissory note to Mr. Beck in the amount of $15.3 million, which is secured by some of TDT's assets and

- in connection with the acquisition of TDT, we entered into a consulting agreement with Mr. Beck under which we will pay Mr. Beck $300,000 per year for two years, provided that Mr. Beck devotes his full business time to developing business opportunities for us.

### Risks Related to Our Common Stock

**Future sales of our common stock may depress our stock price.**

The market price of our common stock could decline as a result of sales of substantial amounts of our common stock in the public market after this offering, or the perception that these sales could occur. In addition, these factors could make it more difficult for us to raise funds through future equity offerings. There will be 43,055,165 shares of our common stock outstanding immediately after this offering.

We and our executive officers and directors and the selling shareholders have entered into 90-day lock-up agreements with the underwriters. The lock-up agreements prohibit each of us from selling or otherwise disposing of shares of common stock except in limited circumstances. The lock-up agreements are only contractual agreements, and J.P. Morgan Securities Inc. and UBS Securities LLC, at their joint discretion, can waive the restrictions of any lock-up agreement at an earlier time without prior public notice or announcement and allow any of us to sell shares of common stock. If the restrictions in the lock-up agreement are waived, shares of our common stock will be available for sale into the public market, subject to applicable securities laws and our share retention policy, which could reduce the market price for shares of our common stock.

Lau and Mr. Beck own approximately 16.9% and 16.4%, respectively, of our common stock. After giving effect to the sale of 7,200,000 shares of our common stock in this offering, Lau and Mr. Beck will beneficially own approximately 13.8% and 13.4%, respectively, of our outstanding common stock. If either of these stockholders sells a significant number of shares of our common stock in the open market, our stock price could decline.

**Our stock price and trading volume may be volatile, which could result in substantial losses for our shareholders.**

The market price of our common stock may be highly volatile and be subject to wide fluctuations. In addition, the trading volume in our common stock may fluctuate and cause significant price variations to occur. Some of the factors that could negatively affect our share price or result in fluctuations in the price or trading volume of our common stock include:

- general economic conditions;

- actual or anticipated changes in our future financial performance;

- changes in financial estimates by securities analysts;

- changes in market interest rates;

- competitive developments, including announcements by us or our competitors of new products or services or significant contracts, acquisitions, strategic partnerships or capital commitments;

- the operations and stock performance of our competitors;

- fluctuations in our quarterly operating results;

16

Table of Contents

- additions or departures of senior management and key personnel and

- actions by institutional shareholders.

If the market price of our common stock declines significantly, you may be unable to resell your common stock at or above the offering price. We cannot assure you that the market price of our common stock will not fluctuate or decline significantly, including a decline below the offering price, in the future. In addition, the stock market in general can experience considerable price and volume fluctuations.

**Our board of directors may authorize the issuance of additional shares that may cause dilution.**

Our articles of incorporation authorizes our board of directors, without your approval, to:

- authorize the issuance of additional common or preferred stock in connection with future equity offerings, acquisitions of securities or other assets of companies and

- classify or reclassify any unissued common stock or preferred stock and to set the preferences, rights and other terms of the classified or reclassified shares, including the issuance of shares of preferred stock that have preference rights over the common stock with respect to dividends, liquidation, voting and other matters or shares of common stock that have preference rights over your common stock with respect to voting.

The issuance of additional shares could be substantially dilutive to your shares.

**Future offerings of debt securities, which would be senior to our common stock in liquidation, or equity securities, which would dilute our existing shareholders and may be senior to our common stock for the purposes of distributions, may harm the value of our common stock.**

In the future, we may attempt to increase our capital resources by making additional offerings of debt or equity securities, including commercial paper, medium-term notes, senior or subordinated notes, preferred stock or common stock. If we were to liquidate, holders of our debt securities and shares of preferred stock and lenders with respect to other borrowings will receive a distribution of our available assets before the holders of our common stock. Additional equity offerings by us may dilute your interest in us or reduce the value of your shares of common stock, or both. Our preferred stock, if issued, could have a preference on distribution payments that could limit our ability to make a distribution to you. Because our decision to issue securities in any future offering will depend on market conditions and other factors beyond our control, we cannot predict or estimate the amount, timing or nature of our future offerings. Further, market conditions could require us to accept less favorable terms for the issuance of our securities in the future. Thus, you will bear the risk of our future offerings reducing the value of your shares of common stock and diluting your interest in us.

**Our management will have broad discretion in the use of net proceeds from this offering and may not use them effectively.**

We will use approximately $30.3 million of the net proceeds of this offering to repay indebtedness as described in more detail under "Use of Proceeds." As of the date of this prospectus, we cannot specify with certainty the amounts we will spend on particular uses from the remaining net proceeds that we will receive from this offering. Our management will have broad discretion in the application of these net proceeds, but currently intends to use them as described in "Use of Proceeds." The failure by our management to apply these net proceeds effectively could adversely affect our ability to continue to develop our business.

17

Table of Contents

## USE OF PROCEEDS

We estimate that the net proceeds from the sale of the 7,200,000 shares of common stock that we are selling in this offering will be approximately $          , based on an assumed public offering price of $          per share and after deducting the estimated underwriting discounts and commissions and estimated offering expenses payable by us. If the underwriters exercise their over-allotment option in full, we estimate the net proceeds to us from such exercise will be approximately $          . We will not receive any of the proceeds of the shares that will be sold by the selling shareholders.

We expect to use the net proceeds from this offering to repay $15.3 million of notes payable to B.G. Beck in connection with our acquisition of Trans Digital Technologies on February 14, 2004, and to repay approximately $15.0 million of indebtedness outstanding under our loan agreements with Lau Technologies and Commerce Bank and Trust Company as of March 28, 2004. We borrowed $3.0 million from Commerce in February 2004 to finance our contract with the State of Illinois. The general repayment terms of such indebtedness are as follows:

| Lender | Due Date | Interest Rate | March 28, 2004 |
|---|---|---|---|
| | | | (unaudited)<br>(in thousands) |
| B.G. Beck | 12/1/2005 | 8.50% | $      15,300 |
| Commerce | 3/11/2006 | 6.25% | 1,612 |
| Commerce | 6/20/2006 | 8.00% | 2,053 |
| Commerce | 2/27/2007 | 7.30% | 2,924 |
| Commerce | 6/24/2007 | 5.25% | 901 |
| Commerce | 12/31/2007 | 5.25% | 1,394 |
| Commerce | 4/24/2008 | 5.25% | 1,191 |
| Lau | 8/30/2005 | 8.50% | 1,014 |
| Lau | 5/30/2008 | 8.50% | 2,249 |
| Lau | 6/30/2009 | 8.50% | 1,673 |
| | | | $      30,311 |

\*      We estimate that we will incur approximately $600,000 in prepayment penalties, which are not reflected in the table above.

We expect to use the remaining net proceeds for capital expenditures, working capital and general corporate purposes. We also may use a portion of the net proceeds to acquire complementary products, technologies or businesses, if and when such opportunities arise. Pending these uses, we intend to invest the net proceeds in short-term interest bearing, investment grade securities.

18

Table of Contents

## DILUTION

Our net tangible book value as of March 28, 2004 was approximately $10.1 million, or approximately $0.28 per share of common stock. Net tangible book value per share is determined by dividing our net tangible book value, which consists of tangible assets less total liabilities, by the number of shares of common stock outstanding on that date. Without taking into account any other changes in the net tangible book value after March 28, 2004, other than to give effect to our receipt of the estimated net proceeds from the sale by us of 7,200,000 shares of our common stock in this offering at an offering price of $      per share, less the underwriting discounts and commissions payable by us and our estimated offering expenses, our net tangible book value as of March 28, 2004, after giving effect to the items above would have been approximately $      million, or $      per share. This represents an immediate increase in the net tangible book value of $      per share to existing shareholders and an immediate dilution of $      per share to new investors. The following table illustrates this per share dilution:

| | | |
|---|---|---|
| Offering price per share | | $ |
| Net tangible book value per share as of March 28, 2004 | $      0.28 | |
| Increase in net tangible book value per share attributable to this offering | | |
| Pro forma net tangible book value per share as of March 28, 2004 after giving effect to this offering | | |
| Dilution per share to new investors | | $ |

This table is based on the number of shares as of March 28, 2004, and does not include the following:

- 4,585,000 shares of our common stock issuable upon the exercise of options outstanding as of that date at a weighted average exercise price of $3.41 per share and

- 812,000 shares of our common stock issuable upon exercise of warrants outstanding as of that date at a weighted average exercise price of $11.94 per share.

19

Table of Contents

## CAPITALIZATION

The following table sets forth our capitalization as of March 28, 2004 on an actual basis and on an adjusted basis. The as adjusted capitalization reflects the sale by us of 7,200,000 shares of common stock in this offering at an assumed public offering price of $        per share after deducting underwriting discounts and commissions and estimated offering expenses payable by us. This information should be read together with our consolidated financial statements and related notes included elsewhere in this prospectus.

|  | As of March 28, 2004 | |
|  | Actual | As Adjusted |
| --- | --- | --- |
|  | (dollars in thousands) | |
| Current portion of long-term debt | $    10,940 | $      703 |
| Long-term debt | 20,483 | 409 |
| Total debt | 31,423 | 1,112 |
| Shareholders' equity: | | |
| Common stock, $0.001 par value; 45,000,000 shares authorized; 35,625,176 shares and 42,825,176 shares (as adjusted) issued and outstanding, respectively(1) | 36 | 43 |
| Additional paid in capital | 135,869 | |
| Accumulated deficit | (43,709) | |
| Total shareholders' equity | 92,196 | |
| Total capitalization | $  123,619 | $ |

(1)    On June 15, 2004 we increased the number of authorized shares of our common stock to 75,000,000.

20

Table of Contents

## PRICE RANGE OF COMMON STOCK

Our common stock trades on the Nasdaq National Market under the symbol "VISG." The following table sets forth the quarterly range of high and low reported sale prices of the common stock on the Nasdaq National Market for the periods indicated.

| Fiscal year ended December 31, 2002 | High | Low |
|---|---|---|
| First Quarter | $ 10.14 | $ 5.02 |
| Second Quarter | 7.64 | 3.63 |
| Third Quarter | 5.10 | 2.50 |
| Fourth Quarter | 5.84 | 3.27 |

| Fiscal year ended December 31, 2003 | High | Low |
|---|---|---|
| First Quarter | $ 5.40 | $ 3.01 |
| Second Quarter | 5.78 | 3.76 |
| Third Quarter | 5.40 | 3.85 |
| Fourth Quarter | 4.61 | 3.34 |

| Fiscal year ending December 31, 2004 | High | Low |
|---|---|---|
| First Quarter | $ 8.20 | $ 3.53 |
| Second Quarter (through June 18, 2004) | 14.30 | 7.63 |

On June 18, 2004, the last reported sale price of the common stock as reported on the Nasdaq National Market was $9.47 per share. As of June 16, 2004, there were approximately 233 record holders of our common stock.

## DIVIDEND POLICY

We have never declared or paid cash dividends on our common stock. We are prohibited from paying dividends pursuant to our borrowing arrangements. Notwithstanding this limitation, we presently intend to retain our cash for use in the operation and expansion of our business and, therefore, do not anticipate paying any cash dividends in the foreseeable future.

21

Table of Contents

## SELECTED CONSOLIDATED FINANCIAL DATA

The following tables provide our selected consolidated financial data, which were derived from our audited consolidated financial statements for each of the three years in the period ended December 31, 2003. The historical results presented are not necessarily indicative of future results. The data should be read in conjunction with our financial statements, related notes and other financial information as of December 31, 2003 and for each of the three years in the periods ended December 31, 2003 appearing elsewhere in this prospectus, as well as the discussions appearing in "Management's Discussion and Analysis of Financial Condition and Results of Operations."

Our financial data for the three-month periods ended March 30, 2003 and March 28, 2004 were derived from our unaudited financial statements included elsewhere in this prospectus. The unaudited financial statements include all adjustments, consisting of normal recurring accruals, which we consider necessary for a fair presentation of our financial position and results of operations for those periods. Operating results for interim periods are not necessarily indicative of results that may be expected for the entire fiscal year.

| | For the Years Ended December 31, | | | For the Three Months Ended(2) | |
| --- | --- | --- | --- | --- | --- |
| | 2001(1) | 2002(1) | 2003(2) | March 30, 2003 | March 28, 2004 |
| | | | | (unaudited) | |
| | (dollars in thousands, except per share data) | | | | |
| **Statement of Operations Data:** | | | | | |
| Revenue | $ 26,280 | $ 32,302 | $ 37,371 | $ 8,155 | $ 12,259 |
| Cost of revenue | 19,602 | 25,239 | 27,844 | 6,789 | 8,906 |
| Gross margin | 6,678 | 7,063 | 9,527 | 1,366 | 3,353 |
| Operating expenses: | | | | | |
| Sales and marketing | 809 | 5,368 | 5,282 | 1,411 | 1,493 |
| Research and development | 2,054 | 4,457 | 3,650 | 945 | 959 |
| General and administrative | 2,500 | 5,069 | 5,110 | 1,093 | 2,137 |
| Acquisition expenses | 1,639 | — | — | — | — |
| Restructuring charges | — | 824 | — | — | — |
| Total operating expenses | 7,002 | 15,718 | 14,042 | 3,449 | 4,589 |
| Operating loss | (324) | (8,655) | (4,515) | (2,083) | (1,236) |
| Interest expense, net | (1,210) | (875) | (969) | (219) | (392) |
| Other income | — | — | 18 | — | 21 |
| Loss before income taxes and cumulative effect of change in accounting principle | (1,534) | (9,530) | (5,466) | (2,302) | (1,607) |
| Provision for income taxes | — | — | (63) | (63) | (25) |
| Loss before cumulative effect of change in accounting principle | (1,534) | (9,530) | (5,529) | (2,365) | (1,632) |
| Cumulative effect of change in accounting principle (3) | — | — | (12,131) | (12,131) | — |
| Net loss | (1,534) | (9,530) | (17,660) | (14,496) | (1,632) |
| Preferred stock dividends | (5) | — | — | — | — |
| Loss applicable to common shareholders | $ (1,539) | $ (9,530) | $ (17,660) | $ (14,496) | $ (1,632) |
| Basic and diluted net loss per share | $ (0.09) | $ (0.48) | $ (0.26) | $ (0.12) | $ (0.05) |
| Basic and diluted loss per share applicable to common shareholders (4) | $ (0.09) | $ (0.48) | $ (0.82) | $ (0.72) | $ (0.05) |
| Weighted average basic common shares outstanding | 16,265 | 20,046 | 21,445 | 20,258 | 31,362 |

Table of Contents

|  | For the Years Ended December 31, | | | For the Three Months Ended(2) | |
|---|---|---|---|---|---|
|  | 2001(1) | 2002(1) | 2003(2) | March 30, 2003 | March 28, 2004 |
|  |  |  | (dollars in thousands) | (unaudited) | |
| **Balance Sheet Data:** |  |  |  |  |  |
| Working capital | $ 38,115 | $ 22,244 | $ 5,887 | $ 2,642 | $ 2,443 |
| Total assets | 67,663 | 61,189 | 54,480 | 43,975 | 135,292 |
| Long-term obligations | 10,368 | 9,845 | 8,147 | 8,607 | 20,483 |
| Total debt | 14,645 | 15,108 | 13,621 | 13,811 | 31,423 |
| Shareholders' equity | 46,294 | 39,064 | 34,008 | 24,603 | 92,196 |

(1)   The results are presented under percentage of completion based on the cost to cost method of measurement.

(2)   The results are presented in accordance with EITF 00-21 applied on a cumulative basis as of January 1, 2003.

(3)   We adopted EITF 00-21 on a cumulative basis as of January 1, 2003. See note 2 in the Notes to Consolidated Financial Statements which discusses the change in accounting principle.

(4)   See note 2 in the Notes to Consolidated Financial Statements for information concerning the computation of basic and diluted net loss per share.

23

Table of Contents

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

You should read the following summary together with the more detailed business information and consolidated financial statements and related notes that appear elsewhere in this prospectus and in the documents that we incorporate by reference into this prospectus.

### Introduction

We are a leading provider of advanced technology identity solutions that enable governments, law enforcement agencies and businesses to enhance security, reduce identity theft and protect personal privacy. Our identity solutions include secure credential provisioning systems, biometric software and systems and real-time identity databases, as well as systems design, development, integration and support services. These solutions enable our customers to manage the entire life cycle of an individual's identity for a variety of applications including civil identification, criminal identification and border management. Our customers use our solutions to help solve the following four critical problems in identity verification and management:

- assurance that the identification document is authentic;

- assurance that the document has been issued to the correct person;

- confidence that the person holding the identification is uniquely tied to and authorized to use the document and

- verification of the privileges the individual is entitled to at a particular point in time.

Our solutions annually produce more than 30 million secure government-issued credentials at more than 2,000 locations. We are the second largest provider of U.S. drivers' licenses with a 32% market share, and we are the sole source provider of passport production capability to the U.S. Department of State. We also are a recognized leader in biometrics in the field of face recognition. Our customers include governments, law enforcement agencies and businesses in more than 15 countries.

We generate revenue through the sale and license of products and services for verifying and managing identities. Our revenues increased from $8.2 million in the first quarter of 2003 to $12.3 million in the first quarter of 2004. Our net loss during the same periods decreased from $2.4 million to $1.6 million, excluding the one-time charge of $12.1 million in connection with our change in accounting principle as of January 1, 2003. Our efforts in 2004 have been and will continue to be primarily focused on expanding our portfolio of offerings to satisfy our customers' identity solution requirements. We have taken substantial steps in this direction through the acquisitions of ZN Vision Technologies AG, or ZN, in January 2004 and Trans Digital Technologies Corporation, or TDT, in February 2004. The acquisition of TDT enabled us to be selected to provide a solution to the U.S. Department of Defense, or DoD, to support the production of smart cards as part of the agency's Common Access Card, or CAC, program. We continue to make investments in research and development and intend to continue to introduce new and enhanced product and service offerings. To further increase revenue, we are also expanding our distribution channels.

### Segments and Geographic Information

Our business involves two closely-related segments: secure credentials and biometrics. For the three-month period ended March 28, 2004, we derived 96.2%, or $11.7 million, of our direct revenue within the United States. We derived an additional 1.3%, or $160,000, of our direct revenue in Canada. The remaining 2.5%, or $307,000, was derived by our German subsidiary, primarily from customers in countries within the European Union. For the year ended December 31, 2003 approximately $36.6 million, or 97.8% of our direct revenue was derived within the United States. The remaining $818,000, or 2.2% of revenue was derived in Canada and the United Arab Emirates.

24

Table of Contents

### Secure Credentials Segment

Our secure credentials segment accounted for approximately 85.8% and 84.2% of our revenues in the three-month periods ended March 28, 2004 and March 30, 2003, respectively, and 82.2%, 84.7% and 86.6% of our revenue for the years ended December 31, 2003, 2002, and 2001, respectively. Our secure credentials solutions involve the design, development, marketing and implementation of integrated software and hardware solutions that produce identification credentials, many of which utilize face recognition and other biometric technologies.

We provide customized systems utilizing proprietary products under service contracts that typically have five to seven year terms and several optional annual renewals after the initial contract term. For drivers' licenses, these contracts generally provide for a fixed price for each identification credential produced. Contract prices vary depending on, among other things, design and integration complexities, the nature and number of workstations and sites, the projected number of secure credentials to be produced, the size of the database, the level of post-installation support and the competitive environment. Our secure credentials segment also includes the contracts we assumed as part of our acquisition of TDT in February 2004. TDT contributed revenues of $1.8 million to this segment for the three months ended March 28, 2004. Under these contracts, we provide high security technology and services to the U.S. Department of State for the production of U.S. passports, as well as similar services to the DoD and Homeland Security. Those contracts generally provide that we will be paid for the hardware, software and services we provide, as well as consumables delivered to the customer.

In civil identification applications, such as drivers' licenses and passports, the sales cycle generally includes a formal request for proposal, or RFP, bidding process. Once an RFP is issued, a comprehensive proposal is developed and usually followed by an on-site customer demonstration. The process from the issuance of an RFP to the ultimate award can take up to six months. Following the bid award a six-to-twelve month implementation and installation process usually ensues. We believe that long sales cycles in our public sector markets are endemic to the market and will continue. Further, customers may seek to modify the system either during or after the implementation of the system. While our long sales and implementation cycle requires the commitment of marketing resources and investments of working capital, we believe that it also serves as a barrier to entry for smaller companies and as an early indicator of potential competitors for particular projects. For existing customers, a considerably shorter sales and implementation cycle may be involved.

### Biometrics Segment

Our biometrics segment accounted for approximately 14.2% and 15.8% of our revenue for the three month periods ended March 28, 2004 and March 30, 2003, respectively, and 17.8%, 15.3% and 13.4% of our revenue for the years ended December 31, 2003, 2002, and 2001, respectively. The focus of our biometric technology solutions is primarily on applications designed to deter criminal and terrorist activities, including government research and development contracts. These initiatives generated 89.0% of this segment's revenue for the three months ended March 28, 2004, the remaining 11.0% was generated from sales in the gaming industry.

Within our biometrics segment, our contracts typically provide for the development, customization and installation of face recognition systems for government agencies, law enforcement agencies and businesses. These contracts are generally fixed price, and include milestones and acceptance criteria for the various deliverables under the contract. Contract prices are dependent on a variety of factors, including design and integration complexities, the nature and number of workstations and sites, the size of the database, the level of post-installation support and the competitive environment. In certain cases, we provide licenses for off-the-shelf versions of our face recognition software on a per user basis.

For identity solutions that primarily require our advanced face recognition technology, such as criminal identification booking and investigation applications, the sales cycle tends to be shorter and the solution consists primarily of software products.

25

Table of Contents

As we continue to implement our vision of being a total identity solutions provider, the biometrics and secure credentials segments become less distinct as discrete segments. We believe that the presence or future potential of integrated biometrics in secure credentials is a key factor in increasing revenue and profits from the secure credentials business. As a result, we are seeing the two segments converge into one market.

## Dependence on Significant Customers

We believe for the near future that we will continue to derive a significant portion of our revenues from a limited number of large contracts. Secure credentials segment customers who accounted for more than 10% of our total revenues are as follows:

- For the three months ended March 28, 2004, one customer accounted for an aggregate of 13.0%;

- For the three months ended March 30, 2003, two customers accounted for an aggregate of 28.0%;

- For the year ended December 31, 2003, two customers accounted for an aggregate of 26.0%;

- For the year ended December 31, 2002, two customers accounted for an aggregate of 22.0% and

- For the year ended December 31, 2001, four customers accounted for an aggregate of 49.0%

No single biometrics customer accounted for over 10% of our total revenue in any period.

## Critical Accounting Policies and Significant Estimates

We prepare our financial statements in accordance with generally accepted accounting principles in the United States, or US GAAP. Consistent with US GAAP, we have adopted accounting policies that we believe are most appropriate given the facts and circumstances of our business. The application of these policies has a significant impact on our reported results. In addition, some of these policies require management to make estimates. These estimates, which are based on historical experience and analysis of current conditions, have a significant impact on our reported results and the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements. If actual results differ significantly from these estimates, there could be a material effect on our financial statements.

### Valuation of Goodwill and Other Long-Lived and Intangible Assets

Our long-lived assets include property, plant and equipment, other intangible assets and goodwill. As of March 28, 2004, the balances of property, plant and equipment, other intangible assets and goodwill, net of accumulated depreciation and amortization, were $24.8 million, $18.5 million and $63.6 million, respectively. As of December 31, 2003, the balances of property, plant and equipment and other intangible assets, net of accumulated depreciation and amortization, were $25.1 million and $2.7 million, respectively.

Where we believe that property, plant and equipment and intangible assets have finite lives, we depreciate and amortize those assets over their estimated useful lives. For purposes of determining whether there are any impairment losses, as further discussed below, our management has examined the carrying value of our identifiable long-lived tangible and intangible assets, including their useful lives where we believe such assets have finite lives, when indicators of impairment are present. For all long-lived tangible and intangible assets, if an impairment loss were identified based on the fair value of the asset, as compared to the carrying value of the asset, such loss would be charged to expense in the period we identify the impairment. Furthermore, if our review of the carrying values of the long-lived tangible and intangible assets with finite lives indicates impairment of such assets, we may determine that shorter estimated useful lives are more appropriate. In that event, we will be required to record additional depreciation and amortization in future periods, which will reduce our earnings.

26

Table of Contents

Factors we generally consider important which could trigger an impairment review on the carrying value of other long-lived tangible and intangible assets include the following:

- significant underperformance relative to expected historical or projected future operating results;

- significant changes in the manner of our use of acquired assets or the strategy for our overall business;

- underutilization of our tangible assets;

- discontinuance of product lines by ourselves or our customers;

- significant negative industry or economic trends;

- significant decline in our stock price for a sustained period and

- significant decline in our market capitalization relative to net book value.

Although we believe that the carrying value of our long-lived tangible and intangible assets were realizable as of March 28, 2004 and December 31, 2003, future events could cause us to conclude otherwise.

Due to our two acquisitions in the first quarter of 2004, goodwill and other intangible assets were created as a result of the preliminary allocation of the purchase price to identified intangible assets of the acquired businesses. The values recorded for goodwill and other intangible assets represent preliminary estimates of fair values calculated by independent third-party appraisers and are subject to further review and finalization. Such valuations require us to provide significant estimates and assumptions, which are derived from information obtained from the management of the acquired businesses, and our business plans for the acquired businesses or intellectual property. Critical estimates and assumptions used in the initial valuation of goodwill and other intangible assets include, but are not limited to:

- future expected cash flows from product sales, customer contracts and acquired developed technologies and patents;

- expected costs to complete any in-process research and development projects and commercialize viable products and estimated cash flows from sales of such products;

- the acquired companies' brand awareness and market position;

- assumptions about the period of time over which we will continue to use the acquired brand and

- discount rates.

These estimates and assumptions may be incomplete or inaccurate because unanticipated events and circumstances may occur. If estimates and assumptions used to initially value goodwill and intangible assets prove to be inaccurate, ongoing reviews of the carrying values of such goodwill and intangible assets may indicate impairment which will require us to record an impairment charge in the period in which we identify the impairment.

As of March 28, 2004, we have recorded goodwill of $63.6 million. We will perform impairment reviews on the carrying values of goodwill arising from the aforementioned acquisitions at least annually. Because future cash flows and operating results used in the impairment review will be based on management's projections and assumptions, future events could cause such projections to differ from those used to originally value the acquisitions, which could lead to significant impairment charges of goodwill in the future.

27

Table of Contents

*Secure Credentials Revenue and Cost Recognition*

During the third quarter of 2003, we adopted the provisions of Emerging Issues Task Force 00-21, *Accounting for Revenue Arrangements with Multiple Deliverables* , or EITF 00-21, on a cumulative basis as of January 1, 2003. EITF 00-21 governs how to identify whether goods or services, or both, to be delivered separately in a bundled sales arrangement, should be accounted for separately. The operating results for the three-month period ended March 30, 2003 reflects the cumulative effect of the change in accounting principle in 2003.

We deliver solutions under secure credential contracts primarily to federal and state government customers. We recognize revenue when persuasive evidence of a sales arrangement exists, delivery occurs or services are rendered, the sales price is fixed or determinable and collectibility is reasonably assured.

In some cases, we generate revenue from the sale of products in which title passes to the customer. In these cases, we recognize revenue when the products are shipped and accepted by the customer. Services revenue under these contracts consists of preventative and remedial maintenance on printing systems. We also provide on site technical support and consulting services to our customers. Revenue on fixed price services is recognized ratably over the service period which approximates the timing of the services rendered. Revenue on time and material services is recognized as the services are rendered. Expenses on all services are recognized when the costs are incurred.

When elements such as products and services are contained in a single arrangement, or in related arrangements with the same customer, we allocate revenue to each element based on its relative fair value, provided that such element meets the criteria for treatment as a separate unit of accounting. The price charged when the element is sold separately generally determines fair value.

We have secure credential contracts, generally with state governments for the production of drivers' licenses and other identification credentials, where we have determined that we have multiple elements and where the title to equipment installed to produce these credentials does not pass to the customer. Under these contracts, the first element consists of hardware, system design, implementation, training, consumables management, maintenance and support which is accounted for as equipment and related executory services under lease in accordance with SFAS No. 13. The second element consists of customized software which is accounted for as a long term contract in accordance with AICPA Statement of Position 97-2, *Software Revenue Recognition* , or SOP 97-2, and Statement of Position 81-1, *Accounting for Performance of Construction-Type and Certain Production-Type Contracts* , or SOP 81-1, on a units of delivery method of measurement.

Costs related to the hardware element of these contracts are capitalized on the balance sheet and are depreciated over the remaining contract term beginning when the system goes into service. The delivery of these credentials typically requires us to customize, design and install equipment and software at customer locations, as well as perform training, supply consumables, maintain the equipment and provide support services. Nonperformance of training, consumables management, maintenance and support services would prevent us from receiving payment for the costs incurred in the customization, design and installation of the system. EITF 00-21 limits the amount of revenue allocable to the customization, design and installation of the system to the amount that is not contingent upon the production of credentials. Revenue on these contracts under EITF 00-21 is earned based on, and is contingent upon, the production of credentials from the system. Due to the contingent performance of credential production in our secure credentials contracts, we defer revenue recognition for the system design and installation phase of our contracts, including customized software and equipment, and recognize revenue as credentials are produced.

Costs related to the customized software element of our secure credentials contracts where title to the hardware element does not pass to the customer are capitalized on the balance sheet during the period in which we are designing and installing the system and are amortized over the remaining contract term beginning when the system goes into service. Costs related to this element of our secure credentials contracts incurred after the

28

Table of Contents

system is in service are expensed as incurred. Revenue related to this element of our secure credentials contracts is recorded as credentials are produced by the system.

Our secure credentials contracts related to the delivery of drivers' licenses and identification credentials typically provide that the state department of transportation, or similar agency, will pay a fixed price per credential produced utilizing a system we design, implement and support. Our fixed pricing includes charges for the use of the system, materials and the data that is stored on the credentials. Prices under these contracts vary depending on, among other things:

- Design and integration complexities;

- Nature and number of workstations and sites installed;

- Projected number of secure credentials to be produced;

- Size of the database;

- Level of post-installation involvement that will be required of us and

- Competitive environment.

Prior to the adoption of EITF 00-21, we recognized revenue and costs associated with our secure credentials contracts as a single accounting element using the percentage-of-completion methodology.

*Biometrics Segment Revenue and Cost Recognition*

Within our biometrics segment, our contracts typically provide for the development, customization and installation of face recognition systems for government agencies, law enforcement agencies and businesses. These contracts are generally fixed price, and include milestones and acceptance criteria for the various deliverables under the contract. Contract prices vary depending on, among other things, design and integration complexities, the nature and number of workstations and sites, the size of the database, the level of post-installation support and the competitive environment. In certain cases, we provide licenses of off-the-shelf versions of our face recognition software on a per user basis.

We recognize revenue under these contracts using the percentage-of-completion methodology in accordance with SOP 81-1. We use the percentage-of-completion methodology to account for revenue under these contracts because:

- A high level of certainty exists regarding expected cash flows from these contracts; and

- A reliable basis exists for determining the percentage of the contract that will be completed at the end of the accounting period.

We measure the percentage complete as costs are incurred or for contracts based on milestones, revenue is recognized when scheduled performance milestones and customer acceptance criteria have been achieved. These milestones are specific events or deliverables clearly identified in the contract. We recognize revenue based on the total milestone billable to the customer less revenue related to any future maintenance requirements. Billings occur under these contracts when the milestone is delivered and accepted by the customer. Milestones can include customized systems, installation and services as defined by the contract.

We record costs and estimated earnings in excess of billings under these contracts as current assets. We record billings in excess of costs and estimated earnings and accrued contract costs as current liabilities.

Under SOP 97-2 revenue related to software licenses of off-the-shelf face recognition software is recognized when:

- Persuasive evidence of an arrangement exists;

29

Table of Contents

- Delivery has occurred;

- The sales price is fixed and determinable;

- Collection is probable and

- There are no post delivery obligations.

We adopted EITF 00-21 on a cumulative basis as of January 1, 2003. Based on our evaluation of biometrics contracts and the application of the new guidance, the adoption of EITF 00-21 did not have an impact on the accounting for revenue from biometrics systems under long-term contracts.

## Results of Operations

### Comparison of fiscal quarters ended March 28, 2004 and March 30, 2003

#### Revenue

Revenue for the first quarter of 2004 were approximately $12.3 million, compared to approximately $8.2 million for the first quarter of 2003. The 50.6% increase in revenue is derived from increases of approximately $3.7 million in the secure credentials segment and $300,000 in the biometrics segment. The increase in the secure credentials segment consists of $1.8 million from the operating results of TDT from February 15, 2004 through March 28, 2004, $610,000 from the sale of equipment and consumables directly to two states, $558,000 from a volume increase resulting from the rollout of one new state drivers' license contract and approximately $730,000 from a net increase in volume and the fulfillment of certain milestones among our remaining contracts. The increase in our biometrics revenue is derived from the inclusion of approximately $307,000 in ZN revenue for the period from January 24, 2004 to March 28, 2004.

#### Gross Margin

Gross margins increased to 27.4% in the first quarter of 2004 from 16.8% in the first quarter of 2003. We expect gross margins on our secure credentials contracts to fluctuate based on changes in period cost of sales as a result of our adoption of EITF 00-21 due to the fact that in 2003 and in the future we will effectively recognize revenue on a fixed price per credential produced by our customers. If we successfully achieve cost saving measures in the delivery process, we will realize higher gross margins in those periods where the cost savings measures are achieved. Alternatively, in periods where our delivery costs are higher due to service and maintenance requirements, we expect gross margins to decrease for those periods. The overall increase in gross margin in the first quarter of 2004 compared to the first quarter of 2003 is due to margin increases in both the secure credentials and biometrics segments.

In the secure credentials segment, gross margins increased to 24.4% in the first quarter of 2004 from 11.1% in the first quarter of 2003. We achieved gross margin increases on 12 of the 15 secure credentials contracts that were active in both periods. Those contracts represented approximately 57.9% of the total revenue in that segment in period cost of sales as a result of our adoption of EITF 00-21 due to the fact that in 2003 and in the future we will effectively recognize revenue on a fixed price per credential produced by our customers. The margin increases were attributable to our minimization of period costs during the card production phase on all of our secure credentials contracts. We were able to achieve some of these costs savings by minimizing overtime labor charges through improved resource management of field service technicians. In addition, we installed inventory management software in multiple states throughout 2003, which allows us to better control consumables scrap, thus reducing our materials costs. In addition to these cost savings initiatives, we signed contract extensions in five states and began card production in two additional states during 2003, both of which resulted in margin increases for those states. Our margin increase in this segment was also attributable to the 30.3% gross margin on approximately $1.8 million of revenue contribution from TDT for the period from February 15 to March 28, 2004, which represented approximately 17.1% of the total segment revenue for the quarter. The gross margin related to TDT included approximately $384,000 of non-cash amortization of the identified intangible assets, as described in more detail

30

Table of Contents

below. These increases were offset by gross margin decreases in other states. In two states, gross margins decreased due to an increase in costs, while in a third state the gross margin decrease was primarily due to decreases in credential volume.

The secure credentials business is a highly competitive, bid-based business, which results in pricing pressure for those systems. In addition, the price of a system is dictated by the customer's specifications for the solution and its functionality. Some of these customer specifications include hardware, customized software, credential volume, number and type of security features on the credentials, and biometric identification on the credentials. All of these inputs are evaluated in our estimate of the cost of the system and ultimately influence the pricing for the system to be delivered. We are also aware of the customer's budget situation since this affects how much the customer can spend on the system. After all of these factors are considered, we price the contract and determine the gross margin for the system to be delivered. The price and margin fluctuate by customer due to the number of locations, volume of credentials, requirements and complexity of the system and competitive environment. Although prices remain fixed for products and services on a contract-by-contract basis, fluctuations in gross margin are attributable to changes in the customer mix, change orders and contract extensions received.

Gross margins in our biometrics segment decreased to 45.0% in the first quarter of 2004 from 46.0% in the first quarter of 2003.

For the three-month period ended March 28, 2004, we have allocated $384,000 of amortization expense for the TDT acquisition to cost of sales due to the fact that a majority of the identified intangible assets were attributed to contracts that are generating significant revenue. The $74,000 of amortization related to the ZN acquisition was included in operating expenses for the three months ended March 28, 2004.

### Sales and Marketing Expenses

Sales and marketing expenses increased approximately $82,000, from $1.4 million in the first quarter of 2003 to $1.5 million in the first quarter of 2004. The increase is primarily due to our investment in pursuing biometrics opportunities and the pursuit of significant opportunities in the secure identification marketplace. As a percentage of revenue, sales and marketing expenses decreased from 17.3% in the first quarter of 2003 to 12.2% in the first quarter of 2004.

### Research and Development Expenses

Research and development expenses increased approximately $14,000, from $945,000 in the first quarter of 2003 to $959,000 in the first quarter of 2004. The increase is due principally to our continued investment in face recognition technologies and new product development. This investment included enhancing existing products with the intellectual property that was acquired through the acquisitions of ZN and TDT. As discussed above, research and development expenses include $74,000 of non-cash amortization expense related to the ZN identified intangible assets which contributed to the improvement in face recognition technologies and new product development. As a percentage of revenue, research and development expenses decreased from 11.6% in the first quarter of 2003 to 7.8% in the first quarter of 2004. We expect to continue to invest in product development in fiscal 2004.

### General and Administrative Expenses

General and administrative expenses increased by approximately $1.0 million, from $1.1 million in the first quarter of 2003 to $2.1 million in the first quarter of 2004. The largest component of the increase derives from legal costs of approximately $527,000 stemming from the litigation surrounding our contract with the state of Georgia. General and administrative costs for ZN totaled $86,000 for the period from January 24, 2004 to March 28, 2004. General and administrative costs for TDT totaled $36,000 for the period from February 14, 2004

31

Table of Contents

to March 28, 2004. The remainder of the increase is due to the logistical support required to grow our business through acquisitions while continuing to meet the financing requirements created by our expanding operations. As a percentage of revenue, general and administrative expenses increased from 13.4% in the first quarter of 2003 to 17.4% in the first quarter of 2004.

### Interest Expense

Interest expense, net of approximately $21,000 and $28,000 of interest income for the first quarters of 2004 and 2003 respectively, increased approximately $173,000 from $219,000 in the first quarter of 2003 to $392,000 in the first quarter of 2004. The increase in interest expense is due to $162,000 of interest on the $15.3 million note used to purchase TDT, as well as approximately $14,000 of additional interest stemming from additional debt financing required to support contract delivery.

### Income Taxes

There was no provision for federal income taxes for the periods ended March 28, 2004 and March 30, 2003 due to the net loss in both periods. The provision for state income taxes for the periods ended March 28, 2004 and March 30, 2003 were $25,000 and $63,000 respectively.

### Cumulative Effect of Change in Accounting Principle

For the quarter ended March 30, 2003, we incurred a non-cash charge of $12.1 million representing the cumulative effect of a change in accounting principle related to our adoption of EITF 00-21 on a cumulative basis as of January 1, 2003.

### Comparison of fiscal years ended December 31, 2003 and 2002

### Revenue

Revenue for the year ended December 31, 2003 increased 19.6% to $37.4 million from $31.3 million in 2002 after adjusting the 2002 results on a pro forma basis for the impact of the accounting change. The increase in revenue of approximately $6.1 million resulted from increases of $4.4 million and $1.7 million in the secure credentials and biometrics segments, respectively, after adjusting the 2002 results on a pro forma basis for the impact of the accounting change. The increase in the secure credentials segment revenue was the result of credential volume increases in five states generating additional revenue in those states of approximately $3.3 million. Volume increases in two states resulted from the addition of new types of credentials or from normal fluctuations in credential issuances. Volume increases under our contracts with the Connecticut Department of Motor Vehicles and the State of Rhode Island, Division of Motor Vehicles were due to a full year of card production in 2003, in addition we began card production in Oklahoma in 2003. In addition to the volume increases, revenue under our contract serving the Maryland Department of Transportation and Motor Vehicle Administration increased $1.3 million in 2003 due to a full year of delivery on that contract. We also experienced an increase in revenue of approximately $300,000 due to net price per credential increases on contract extensions signed in 2003. The increase in revenue in the secure credentials segment was offset by volume decreases under drivers' license contracts in two states, which resulted in a decrease in revenue of approximately $386,000. The increase in secure credentials revenue for 2003 was also offset by decreases in revenue of approximately $260,000 under our contracts with Arizona Department of Transportation and New Mexico Department of Taxation and Revenue as a result of the expiration of those contracts in 2002. The increase in revenue in the biometrics segment related to the inclusion of a full year of revenue derived from our Pinellas County contract signed in October 2002. We also delivered face recognition solutions to the United Arab Emirates for the Dubai International Airport and to Alberta, Canada in mid-2003, which contributed approximately $800,000 of additional revenue combined.

32

Table of Contents

### *Gross Margin*

Gross margins increased to 25.5% for the year ended December 31, 2003 compared to 17.3% for 2002 after adjusting the 2002 results on a pro forma basis for the impact of accounting changes. We expect gross margins on our secure credentials contracts to fluctuate based on changes in period cost of sales as a result of our adoption of EITF 00-21 due to the fact that in 2003 and in the future we will effectively recognize revenue on a fixed price per credential produced by our customers. If we successfully achieve cost saving measures in the delivery process, we will realize higher gross margins in those periods where the cost savings measures are achieved. Alternatively, in periods where our delivery costs are higher due to service and maintenance requirements, we expect gross margins to decrease for those periods. The overall increase in gross margin in 2003 compared to 2002, after adjusting the 2002 results on a pro forma basis for the impact of the accounting change, is due to margin increases in both the secure credentials and biometrics segments.

In the secure credentials segment, gross margins increased to 21.1% in 2003 from 20.7% in 2002 after adjusting the 2002 results on a pro forma basis for the impact of the accounting change. We achieved margin increases on 10 of our 18 active secure credentials contracts in 2003. Those contracts represented approximately 66.7% of the total revenue in that segment for the year. The margin increases were attributable to our commitment to minimize period costs during the card production phase on all of our secure credentials contracts. We were able to achieve some of these costs savings by minimizing overtime labor charges through better resource management of field service technicians. In addition, we installed inventory management software in multiple states in 2003, which allows us to better control consumables scrap thus reducing our materials costs. In addition to these cost savings initiatives, we signed contract extensions in five states and began card production in two additional states during 2003, both of which resulted in margin increases for those states. These increases were offset by gross margin decreases in other states due primarily to decreases in credential volume during the year.

The secure credentials business is a highly competitive, bid-based business, which results in pricing pressure for those systems. In addition, the price of a system is dictated by the customer's specifications for the solution and its functionality. Some of these customer specifications include hardware, customized software, credential volume, number and type of security features on the credentials, and biometric identification on the credentials. All of these inputs are evaluated in our estimate of the cost of the system and ultimately influence the pricing for the system to be delivered. We are also aware of the customer's budget situation since this affects how much the customer can spend on the system. After all of these factors are considered, we price the contract and determine the gross margin for the system to be delivered. The price and margin fluctuate by customer due to the number of locations, volume of credentials, requirements and complexity of the system and competitive environment. Although prices remain fixed for products and services on a contract-by-contract basis, fluctuations in gross margin are attributable to changes in the customer mix, change orders and contract extensions received. Gross margins in our biometrics segment increased to 45.6% in 2003 from 15.0% in 2002 due to our improved efficiency in delivering biometrics solutions in the current year, as well as margin adjustments on selected projects in 2002. As we enhance our biometrics solutions, systems and delivery process, we expect that our internal processes around production and sourcing of hardware coupled with improved efficiency in the delivery of the solution should result in improving margins. We realized some of this efficiency in 2003.

We expect that gross margins in the future will include non-cash expenses related to the portion of the purchase price of TDT that is allocated to its contract with the U.S. Department of State and its other contracts. We are in the process of valuing the TDT transaction and will assign purchase price to these intangible assets based on the outcome of that valuation. The intangible assets recorded will be amortized through cost of sales over the remaining contract terms and may have a significant impact on our gross margins during that period.

33

Table of Contents

*Sales and Marketing Expenses*

Sales and marketing expenses decreased approximately $86,000, to $5.3 million for the year ended December 31, 2003 from $5.4 million in 2002. As a percentage of revenue, sales and marketing expenses decreased to 14.1% in 2003 from 17.2% in 2002 after adjusting the 2002 results on a pro forma basis for the impact of accounting changes. The decrease is primarily due to a decrease in the number of drivers' license contracts coming up for bid in 2003 within the secure credentials segment as a result of delays within certain states due to budgetary constraints. The bid and proposal process related to the secure credentials contracts for state drivers' license contracts generally requires the involvement of our technology personnel as we devise the system architecture during this phase that satisfies the states requirements in the proposal. As proposal volume was down in 2003, there was increased focus of these resources in other areas, specifically on the delivery of the systems that were contracted in 2002. We expect sales and marketing expenses to increase in absolute dollars and decrease as a percentage of revenue in 2004. This increase will result from our acquisitions of sales and marketing resources at ZN and TDT. In addition, we will continue our investment in increasing the awareness and demand for identity solutions, support our growth strategy in the federal marketplace and continue our focus on the civil and criminal identification opportunities.

*Research and Development Expenses*

Research and development expenses decreased approximately $807,000, to $3.7 million for the year ended December 31, 2003 from $4.5 million in 2002. As a percentage of revenue, research and development expenses decreased to 9.8% in 2003 from 14.3% in 2002 after adjusting the 2002 results on a pro forma basis for the impact of accounting changes. These decreases are the result of a restructuring and workforce reduction in the fourth quarter of 2002, as well as a decrease in our internal investment in research and development during 2003 anticipating the contribution that the ZN acquisition will bring to our research and development initiatives in the future. Development costs that benefited specific projects were recorded as cost of revenues and costs that did not benefit specific projects were recorded as research and development expenses. Software development costs we have capitalized subsequent to achieving technological feasibility have not been material. We expect research and development expenses to decrease in absolute dollars and as a percentage of revenue in 2004. These decreases will result from an increase in funded research projects to leverage our research and development initiatives in the United States and abroad.

*General and Administrative Expenses*

General and administrative expenses remained relatively flat, increasing by approximately $41,000, to $5.1 million for the year ended December 31, 2003 from $5.1 million in 2002. As a percentage of revenue, general and administrative expenses decreased to 13.7% in 2003 from 16.2% in 2002 after adjusting 2002 results on a pro forma basis for the impact of accounting changes. The slight increase in general and administrative expenses was due to the logistical support required to grow our business through acquisitions while continuing to meet the financing requirements created by our expanding operations. The benefits that we experienced related to the restructuring in 2002 and other cost savings initiatives were offset by additional expenses related to new strategic actions taken in 2003. Additional general and administrative expenses related to these actions included $725,000 of expense related to new strategic hires, $200,000 of expenses related to additional employee terminations in 2003, $150,000 of expenses related to pursuing new financing opportunities and $285,000 of additional professional fees related to our contract in Georgia. We expect general and administrative expenses to increase in absolute dollars and decrease as a percentage of revenue in 2004 primarily due to our acquisitions of ZN and TDT. In addition to the additional headcount in 2004 we expect additional overhead expenses related to facilities, human resources, administration and reporting.

Table of Contents

*Interest Expense*

Interest expense, net of approximately $99,000 and $196,000 of interest income in 2003 and 2002, respectively, increased approximately $94,000 for the year ended December 31, 2003 to $969,000 from $875,000 in 2002. The increase in interest expense reflects the additional debt financing required to support contract delivery in 2003.

*Other Income*

For the year ended December 31, 2003 we had other income of $18,000 related to a gain on the sale of certain card printer assets. There was no other income recognized for the year ended December 31, 2002.

*Income Taxes*

No provision for federal income taxes has been made for the years ended December 31, 2003 and 2002 due to the net loss in both periods. For the year ended December 31, 2003, the provision for state income taxes was approximately $63,000. There was no provision for state income taxes for the year ended December 31, 2002.

*Cumulative Effect of Change in Accounting Principle*

For the year ended December 31, 2003, we incurred a non-cash charge of $12.1 million representing the cumulative effect of a change in accounting principle related to our adoption of EITF 00-21 on a cumulative basis as of January 1, 2003.

*Comparison of Fiscal Years ended December 31, 2002 and 2001*

*Revenue*

Revenue increased to $32.3 million for the year ended December 31, 2002 from $26.3 million in 2001. Revenue in the secure credentials segment increased by $4.6 million, or 20.2%, as a result of winning new drivers' license contracts. Revenue in the biometrics segment increased by $1.4 million, or 40%, due to revenue generated from acquisitions and the continued organic growth of that business. The revenue generated from biometrics solutions in both segments increased by $2.4 million, or 58.7%, from $4.0 million in 2001 to $6.4 million in 2002, which was a result of an increase in the use of biometrics technology by some states in the production of drivers licenses and other credentials. After adjusting the 2002 and 2001 results on a pro forma basis for the impact of accounting changes, revenue increased to $31.3 million in 2002 from $28.2 million in 2001. Revenue in the secure credentials segment increased by $1.7 million, or 6.8% as a result of increased credential volumes from recently implemented drivers' license contracts beginning card production in 2002. Revenue in the biometrics segment does not change on a pro forma basis.

*Gross Margin*

Gross margins decreased to 21.9% for the year ended December 31, 2002 from 25.4% in 2001. The decline in gross margin reflects a change in product mix and contracts that included product development as well as delays in contract awards expected in the biometrics segment. This is evidenced by the improvement in gross margins from the first quarter of 2002 of 20.5% to 29.3% in the forth quarter of that year. In 2002, new contracts in the secure credentials segment accounted for 29.4% of our revenue and had a combined gross margin of 37.6%. In 2001, new contracts accounted for 16.6% of our revenue and had a combined gross margin of 13.7%. The gross margin excluding new contracts would have been 17.1% for 2002, as compared to 24.9% in 2001. After adjusting the 2002 and 2001 results on a pro forma basis for the impact of accounting changes, gross margins decreased to 17.3% for the year ended December 31, 2002 from 27.4% in 2001. The decline in gross margin reflects a change in product mix reducing the percentage of revenue recognized on secure credentials contracts and included a higher percentage of biometrics contracts that yielded lower margins in 2002. The biometrics segment in total averaged margins of 15.0% in 2002 compared to 40.0% in 2001.

35

Table of Contents

### Sales and Marketing Expenses

Sales and marketing expenses increased by approximately $4.6 million for the year ended December 31, 2002 from the prior year. This represents an increase to 16.6% from 3.1% of revenue. The increase was due to our investment in pursuing biometrics opportunities following the events of September 11, 2001 and the pursuit of significant opportunities in the secure credentials marketplace. Our expenses resulted from our increased presence and sponsorship at security related trade shows, additional resource allocation to pursue opportunities in the federal government sector and an increase in sales and marketing personnel. The expenses associated with these activities included $1.7 million of compensation expenses for new hires, $1.4 million for the reallocation of resources for sales support, $1.0 million associated with lobbyists and marketing consultants and an increase of $0.4 million in travel expenses to support lobbying and marketing activities. The result of this investment can be seen in the increase to our revenue, backlog, and customer base.

### Research and Development Expenses

Research and development expenses increased by approximately $2.4 million for the year ended December 31, 2002 from the prior year. This represents an increase to 13.8% from 7.8% of revenue. The increase is due to our continued investment in facial recognition technologies and new product development. This included enhancing existing products with the intellectual property that was acquired through the recent acquisitions. Our expenses included $1.9 million of compensation expenses for new hires, $400,000 for outside research consultants and $100,000 for additional leased office space for new hires.

### General and Administrative Expenses

General and administrative expenses increased by approximately $2.6 million for the year ended December 31, 2002 from the prior year. This represents an increase to 15.7% from 9.5% of revenue. This increase was due to additional rental costs of approximately $900,000 arising from additional leased office space and an increased rental rate on previously occupied space, $1.2 million in compensation expenses including placement fees for new hires, $100,000 for outside consultants and a write-down of a contract receivable of $400,000. As a result of the acquisitions in 2002, and to facilitate the growth of the business, we also increased investment in infrastructure and personnel.

### Restructuring Charge

We incurred a one-time restructuring charge of $824,000 in the fourth quarter of 2002. This consisted of approximately $248,000 associated with a workforce reduction of 21 individuals, or approximately 16% of the employee base. In addition, we took a charge for non-cancelable lease costs and capital equipment of approximately $420,000 and $156,000 respectively. Annualized savings associated with the workforce reduction are expected to total approximately $2.2 million.

### Interest Expense

Interest expense, net of approximately $196,000 and $31,000 of interest income in 2002 and 2001, respectively, decreased approximately $335,000 for the year ended December 31, 2002 from the prior year. This represents a decrease to 2.8% from 4.6% of revenue. This decrease reflects the impact of our continuing efforts to reduce our overall debt and related interest expense, as well as the retirement of a $4,000,000 operating line of credit with the proceeds of the $25 million private placement of common stock in December 2001.

### Income Taxes

We did not record any income tax for fiscal years 2002 and 2001 due to the net loss in each year.

Table of Contents

### Impact of Foreign Currency Translation

For the years ended December 31, 2003 and 2001, our foreign operations and export sales were approximately $800,000 and $1.2 million, respectively. We did not have any revenue related to foreign operations and export sales for the year ended December 31, 2002. We do not consider our foreign operations and export sales to be material for the years ended December 31, 2003, 2002 and 2001.

As a result of our acquisitions of ZN and TDT, we expect that we will have increased exposure to foreign currency fluctuations. Net revenue and related expenses generated from our international location in Germany is denominated in euros. The results of operations and certain of our intercompany balances associated with this international location are exposed to foreign exchange rate fluctuations. In addition to our German operation, we will have increased transactions with Japanese vendors supplying hardware and consumables for the delivery of the TDT contracts. These transactions will increase our exposure to foreign currency fluctuations with the yen. To the extent the U.S. dollar weakens against these foreign currencies, the translation of these foreign currencies denominated transactions results in increased net revenue, operating expenses and net income. Similarly, our net revenue, operating expenses and net income will decrease when the U.S. dollar strengthens against these foreign currencies.

## Liquidity and Capital Resources

Cash and cash equivalents were approximately $9.3 million at March 28, 2004, which consisted entirely of cash. This amount excludes approximately $3.1 million which is restricted under our term loan agreements and project financing. Cash and cash equivalents at December 31, 2003 were approximately $6.7 million, which consisted entirely of cash. This number excludes approximately $6.3 million which was restricted under our term loan agreements and project financing.

In the three-month period ended March 28, 2004, cash provided by operating activities was approximately $586,000, which stems from our net loss of approximately $1.6 million, offset by non-cash charges for depreciation and amortization of approximately $2.3 million and cash used by the net increase in operating assets of approximately $62,000.

Accounts receivable increased approximately 32.9% from $7.0 million at December 31, 2003 to $9.3 million at March 28, 2004. This increase includes $874,000 and $2.2 million which were assets of ZN and TDT, respectively, acquired by us at the respective dates of acquisition of those companies. The remainder of the change, which resulted in an increase in cash of approximately $700,000, is due to the timing of billings and collections.

Inventories and other costs and estimated earnings in excess of billings increased approximately 14.7% from $4.1 million at December 31, 2003 to $4.6 million at March 28, 2004. This increase includes $189,000 and $135,000 which were assets of ZN and TDT, respectively, acquired by us at the date of acquisition. The remainder of the change, which resulted in a decrease in cash of approximately $176,000, reflects accumulation of consumables inventory that was unbilled as of March 28, 2004.

Accounts payable and accrued expenses increased approximately 61.3% from $6.9 million at December 31, 2003 to $11.1 million at March 28, 2004. This increase includes $1.5 million and $2.8 million which were liabilities of ZN and TDT, respectively, assumed by us at the dates of the respective acquisitions of those companies. The remainder of the change, which resulted in a decrease in cash of approximately $100,000, is due to the timing of payables.

Table of Contents

In February 2004, we entered into a new loan agreement with Commerce Bank and Trust Company, or Commerce, that superseded the original loan agreement for our existing term loans. Under this new agreement, we borrowed an additional $3.0 million and reduced the required restricted cash balance under the new agreement with Commerce by $2.0 million. We also negotiated a reduction of $1.2 million of restricted cash with Lau Technologies, or Lau, concurrent with the execution of the new loan agreement with Commerce. The $3.0 million term loan provided by this agreement bears interest at a rate of 7.3%. The following table lists the approximate term note information for Commerce and Lau as of the dates indicated (in thousands):

| | | | | | | Outstanding Principal Balance | | |
| | | | | | | December 31, | | March 28, 2004 |
| Lender | Original Loan Amount | Monthly Payment Provision | Date of Loan | Due Date | Interest Rate | 2002 | 2003 | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | (unaudited) |
| Commerce | $ 4,000 | $ 84 | 2/7/2001 | 6/20/2006 | 8.00% | $ 3,044 | $ 2,259 | $ 2,053 |
| Commerce | 3,200 | 72 | 9/11/2001 | 3/11/2006 | 6.25% | 2,522 | 1,800 | 1,612 |
| Commerce | 1,800 | 34 | 12/12/2002 | 12/31/2007 | 5.25% | 1,800 | 1,477 | 1,394 |
| Commerce | 1,500 | 27 | 12/12/2002 | 4/24/2008 | 5.25% | 1,500 | 1,255 | 1,191 |
| Commerce | 1,200 | 24 | 12/12/2002 | 6/24/2007 | 5.25% | 1,200 | 962 | 901 |
| Lau | 2,040 | 53 | 5/30/2003 | 6/30/2009 | 8.50% | — | 1,795 | 1,673 |
| Lau | 2,500 | 51 | 5/30/2003 | 5/30/2008 | 8.50% | — | 1,098 | 2,249 |
| Lau | 1,562 | 64 | 5/30/2003 | 8/30/2005 | 8.50% | — | 1,181 | 1,014 |
| Lau | 287 | 42 | 5/30/2003 | 12/30/2003 | 8.50% | — | — | — |
| Commerce | 3,000 | 36 | 2/27/2004 | 2/27/2007 | 7.30% | — | — | 2,924 |
| | $ 21,089 | $ 487 | | | | $ 10,066 | $ 11,827 | $ 15,011 |

In accordance with the new loan agreement the term notes are collateralized by certain of our assets and the related contract assets. We restructured our bank covenants to account for the impact of the closing of our transactions with ZN and TDT. We are required to maintain various financial covenants, including:

- a net loss for the year ending December 31, 2004 of not more than $500,000 and positive net after-tax income in each fiscal year thereafter;

- a minimum tangible net worth (as defined in the loan agreement) of approximately $16.7 million for the second quarter of 2004, increasing each quarter thereafter;

- our debt to tangible net worth ratio (as defined in the loan agreement) not to exceed the following quarterly benchmarks: 3.00:1.00 for the second quarter of 2004, 2.75:1.00 for the third quarter of 2004, and 2.20:1.00 for the fourth quarter of 2004;

- our debt service coverage ratio (as defined in the loan agreement) must be greater than 0.48 for the first quarter of 2004, 1.25 for the second and third quarters of 2004 and 1.00 for the fourth quarter of 2004 and

- annual capital expenditures may not exceed $1.5 million for the year ending December 31, 2004 and no single capital expenditure may exceed $250,000

Additionally, in accordance with the new agreement, we must maintain $3.0 million of cash on deposit with the lender through September 29, 2004, $4.0 million through November 29, 2004 and $5.0 million by December 31, 2004 and thereafter. This amount is recorded as restricted cash in long term assets. As of March 28, 2004 we had an additional $120,000 of restricted cash at Commerce related to our loan agreement with Lau. We plan to use part of the proceeds from this offering to repay all outstanding indebtedness to Commerce and Lau. See "Use of Proceeds."

We also had one capital lease arrangement in which we were required to maintain the same financial ratios and minimum levels of tangible capital funds, as stated above. Pursuant to this arrangement, the lessor purchases

Table of Contents

certain of our digital identification systems and leases them back to us for deployment with identified and contracted customers approved by the lessor. The lessor retains title to systems and has an assignment of our rights under the related customer contracts, including rights to use the software and technology underlying the related systems. Under this arrangement, the lessor bears the credit risk associated with payments by our customers, but we bear performance and appropriation risk and are generally required to repurchase a system in the event of a termination by a customer for any reason except credit default. This project lease arrangement was accounted for as a capital lease. At March 28, 2004, this lease-financing arrangement was paid in full. At December 31, 2003 and 2002, we had approximately $318,000 and $5.0 million outstanding under these lease-financing arrangements, respectively.

In April 2003 we entered into an arrangement for approximately $1.5 million of equipment financing with three of our suppliers. These project lease arrangements are accounted for as capital leases. There are no financial covenants associated with these leasing arrangements. As of March 28, 2004 we had outstanding $611,000 under these arrangements. As of December 31, 2003 we have outstanding $876,000 under these arrangements. The interest rates on these capital leases are between 6% and 8% and are fixed. The terms of these leases range from 12 months to 60 months. In August 2003 we entered into an arrangement for financing of database licenses with another vendor. As of December 31, 2003 we had outstanding $600,000 under this arrangement.

In the first quarter of 2004 we purchased an asset totaling $800,000 which is payable in installments over four years. On the March 28, 2004 balance sheet, $200,000 is included in accounts payable and other accrued expenses and $600,000 is recorded under other liabilities.

We are in compliance with our credit facility covenants as of March 28, 2004 and December 31, 2003, and we believe that we will be able to maintain compliance with our bank covenants in the future. However, this expectation is dependent on achieving our business plan. If we do not remain in compliance with the covenants in our financing arrangements, the lenders and the lessors could require immediate repayment of outstanding amounts. As of March 28, 2004, there was approximately $15.0 million outstanding under our credit facilities with Commerce and Lau.

In January 2004, we sold 456,007 shares of our common stock at $3.775 per share in a private sale to certain institutional investors to which we had previously sold shares in a private sale in September 2003. On February 14, 2004, we funded the acquisition of TDT with $5.0 million of available cash and executed a promissory note for an additional $15.3 million in addition to the issuance of new stock. The note bears interest at a rate of 8.5% per year and is payable in equal installments of principal and interest on December 1, 2004, May 1, 2005 and December 1, 2005. We plan to use part of the proceeds from this offering to repay this note. See "Use of Proceeds." An additional cash payment of $2.6 million will be made to the former sole shareholder of TDT based upon TDT's selection by the U.S. Department of Defense for the production of smart cards as part of the agency's CAC program. This amount will be paid when we receive payment for our participation in this program. The acquisition of ZN was funded by the issuance of new stock.

We believe that our existing cash balances and anticipated cash flows from operations will be sufficient to meet our operating and debt service requirements for the next 12 months. However, if we cannot achieve our operating goals in 2004 or if we win additional secure credentials contracts in 2004, we may be required to seek additional financing. There can be no assurance that such financing will be available on commercially reasonable terms, or at all. Our ability to meet our business forecast is dependent on a number of factors, including those described in this prospectus under the heading "Risk Factors."

Table of Contents

## Contractual Obligations

The following table sets forth our contractual obligations as of March 28, 2004.

| | Total | Less than 1 Year | 1-3 Years | 3-5 Years | More than 5 Years |
|---|---|---|---|---|---|
| Long Term Debt Obligations | $ 30,311 | $ 10,208 | $ 18,539 | $ 1,564 | $ — |
| Capital Lease Obligations | 1,170 | 732 | 370 | 68 | |
| Operating Lease Obligations | 2,393 | 637 | 774 | 838 | 144 |

## Contingent Obligations

Our principal contractual commitments involve payments under capital leases, term notes and operating leases.

## Inflation

Although some of our expenses increase with general inflation in the economy, inflation has not had a material impact on our financial results to date.

## Recent Accounting Pronouncements

In April 2003, the FASB issued SFAS No. 149 which amends and clarifies financial accounting and reporting for derivative instruments, including certain derivative instruments embedded in other contracts, and for hedging activities under SFAS No. 133. In particular, SFAS No. 149 clarifies under what circumstances a contract with an initial net investment meets the characteristic of a derivative discussed in SFAS No. 133, clarifies when a derivative contains a financing component, amends the definition of an underlying (as initially defined in SFAS No. 133) to conform it to language used in FIN No. 45, Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others, and amends certain other existing pronouncements. SFAS No. 149 is effective for all contracts entered into or modified after June 30, 2003, subject to certain exceptions. The adoption of this statement did not have an impact on our financial position, results of operations, or cash flows.

In May 2003, the FASB issued SFAS No. 150, *Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity* , which establishes standards for how an issuer classifies and measures certain financial instruments with characteristics of both liabilities and equity. SFAS No. 150 requires that an issuer classify a financial instrument that is within its scope as a liability (or an asset in some circumstances), while many of such instruments were previously classified as equity or "mezzanine" equity. The statement also requires that income statement treatment be consistent with the balance sheet classification. That is, if the instrument is classified as a liability, payments to the holders are interest expense, not dividends, and changes in value are recorded in earnings. The statement relates to three specific categories of instruments: mandatorily redeemable shares, freestanding written put options and forward contracts that obligate an entity to purchase its own shares, and freestanding contracts that obligate an entity to pay with its own shares in amounts that are either unrelated, or inversely related, to the price of the shares. SFAS No. 150 is effective immediately for financial instruments entered into or modified after May 31, 2003 and otherwise is effective in the first interim period beginning after June 15, 2003. The adoption of this statement did not have an impact on our financial position, results of operations, or cash flows.

In January 2003, the FASB issued Financial Interpretation No. 46, *Consolidation of Variable Interest Entities* (FIN 46), which requires the consolidation of certain variable interest entities. In December 2003, the FASB issued a revision to FIN 46. The revised FIN 46, which replaces the original FIN 46 issued in January 2003, clarifies the application of Accounting Research Bulletin No. 51, *Consolidated Financial Statements* , to

40

Table of Contents

certain entities in which equity investors do not have the characteristics of a controlling financial interest or do not have sufficient equity at risk for the entity to finance its activities without additional subordinated financial support. While this interpretation exempts certain entities from its requirements, it also expands the definition of a variable interest entity ("VIE") to a broader group of entities than those previously considered special-purpose entities ("SPE's") and specifies the criteria under which it is appropriate for an investor to consolidate VIE's. Application of the revised FIN 46 is required in financial statements of public entities that have interest in structures that are commonly referred to as SPE's for periods ending after December 15, 2003. For all other types of VIE's, application of the revised FIN 46 by public entities is required for periods ending after March 15, 2004. The application of this interpretation with respect to structures commonly referred to as SPE's did not have a material impact on our financial position, results of operations, or cash flows. The application of this interpretation with respect to types of VIE's did not have a material impact on our financial position, results of operations or cash flows.

In December 2003, the Securities and Exchange Commission ("SEC") published SAB No. 104, *Revenue Recognition* . SAB No. 104 was effective upon issuance and supersedes SAB No. 101, *Revenue Recognition in Financial Statements* , and rescinds the accounting guidance contained in SAB No. 101 related to multiple-element revenue arrangements that was superseded by EITF Issue No. 00-21. Accordingly, SAB No. 104 rescinds portions of the interpretive guidance included in Topic 13 of the codification of staff accounting bulletins. While the wording of SAB No. 104 has changed to reflect the guidance of EITF 00-21, the revenue recognition principles of SAB No. 101 have remained largely unchanged. The adoption of SAB No. 104 did not have a material effect on our financial position, results of operations, or cash flows.

In March 2004, the Financial Accounting Standards Board ("FASB") issued a proposed Statement, "Share-Based Payment", that addresses the accounting for share-based payment transactions in which an enterprise receives employee services in exchange for (a) equity instruments of the enterprise or (b) liabilities that are based on the fair value of the enterprise's equity instruments or that may be settled by the issuance of such equity instruments. The proposed statement would eliminate the ability to account for share-based compensation transactions using APB Opinion No. 25, "Accounting for Stock Issued to Employees", and would generally require that such transactions be accounted for using a fair value-based method. As discussed in Note 2, we currently account for share-based compensation transactions using APB Opinion No. 25. If this statement is issued, the adoption of this interpretation will have a material negative impact on our consolidated financial position and results of operations, the level of which we are currently assessing.

## Quantitative and Qualitative Disclosures About Market Risk

Subsequent to our acquisition of ZN, our international operating resulting from transactions by our German operations will be denominated in euros. Hardware and consumables purchases related to contracts associated with the TDT acquisition are denominated in Japanese yen. We mitigate exchange rate volatility by purchasing local currencies at favorable exchange rates. We do not hedge foreign currencies utilizing derivative instruments. Our international operations and transactions are subject to risks typical of international operations, including, but not limited to, differing economic conditions, changes in political climate, differing tax structures, other regulations and restrictions and foreign currency exchange rate volatility. Accordingly, our future results could be materially adversely impacted by changes in these or other factors.

41

Table of Contents

## BUSINESS

### Summary

We are a leading provider of advanced technology identity solutions that enable governments, law enforcement agencies and businesses to enhance security, reduce identity theft and protect personal privacy. Our identity solutions include secure credential provisioning systems, biometric software and systems and real-time identity databases, as well as systems design, development, integration and support services. These solutions enable our customers to manage the entire life cycle of an individual's identity for a variety of applications including civil identification, criminal identification and border management. Our customers use our solutions to help solve the following four critical problems in identity verification and management:

- assurance that the identification document is authentic;

- assurance that the document has been issued to the correct person;

- confidence that the person holding the identification is uniquely tied to and authorized to use the document and

- verification of the privileges the individual is entitled to at a particular point in time.

Our solutions annually produce more than 30 million secure government-issued credentials at more than 2,000 locations. We are the second largest provider of U.S. drivers' licenses with a 32% market share, and we are the sole source provider of passport production capability to the U.S. Department of State. We also are a recognized leader in biometrics in the field of face recognition. Our customers include governments, law enforcement agencies and businesses in more than 15 countries.

As our market has become increasingly complex and more frequently requires the integration of various technologies and capabilities, we have established ourselves as a provider of end-to-end identity solutions. In January 2004, we acquired ZN Vision Technologies AG, or ZN, which solidified our leadership position in face recognition technology. In addition, in February 2004, we acquired Trans Digital Technologies Corporation, or TDT, which provides us with a significant presence in the U.S. federal government market and strengthens our capability and credibility in the border management market worldwide.

We believe that our installed base of secure credential customers together with our leading face recognition technology provide us with a competitive advantage in delivering unified identity solutions for both the physical and digital domains. For example, in April 2004, we were selected by the U.S. Department of Defense, or DoD, for the production of secure, smart credentials as part of the agency's Common Access Card, or CAC, program. The CAC is a single means of identification for access to both physical locations and computer networks. We expect the demand for these types of solutions to grow significantly.

### Industry Overview

#### *Market opportunity*

The ability to confirm an individual's identity is playing an increasingly important role in national and international security, personal privacy and commerce. Failure to provide adequate identification can lead to breaches of security and identity theft, the consequences of which can range from national security threats and loss of life to significant economic loss. Within this context, we believe that there is increasing pressure on governments and businesses to accelerate the adoption of advanced technology identity solutions. The concern over homeland security, in which identity solutions play a part, is exemplified by the size of the budget for the U.S. Department of Homeland Security, which was approximately $31 billion for the fiscal year ended September 30, 2003, and is projected to be approximately $37 billion for the fiscal year ended September 30, 2004. Furthermore, identity theft is the nation's fastest growing crime, and the Federal Trade Commission has estimated that its total cost approaches $50 billion per year.

42

Table of Contents

Government-issued credentials serve as the primary means for confirming the physical identity of an individual. The effectiveness, however, of these credentials is impaired by the following issues:

- the credential can be counterfeited or altered;

- the credential can be issued under false pretenses; and

- the credential rarely is linked to an identity database.

To address counterfeiting and alteration, identity credentials such as passports and drivers' licenses increasingly are incorporating more sophisticated security features. For example, pigment ink printing, security laminates, holograms, ultra violet printing, microprinting, security fonts, half tone portraits, physical or digital watermarks and 2D barcodes have become common security features for passports and drivers' licenses. We believe that issuing authorities will continue to upgrade their security features in order to overcome new means of counterfeiting and alteration.

Moreover, although identity credentials are becoming more secure, the ability to obtain them under false pretenses continues to be a major weakness of the credential issuing process. As a result, issuing authorities are now focusing on improving their ability to verify the identity of a person requesting an identification credential. As part of this effort, authorities have also recognized the need to have secure and accurate audit trails of the issuance process and supporting documents for each credential. In addition, issuing authorities are increasingly incorporating biometrics to verify personal identities and deter fraud. Biometrics is a means of identifying a person using biological features unique to that individual. Biometric identifiers include facial images, fingerprints, iris scans, retinal scans, voice data and hand geometry.

Finally, as secure identity credentials and biometrics become more prevalent, we believe the additional security generated by cross-checking the credential to a readily accessible identity database will grow in importance. This capability allows a higher level of identity assurance and real-time privilege management.

*Market drivers and trends*

To address the complexity of problems in the identity market, credential issuing authorities are seeking advanced technology identity solutions, which increasingly include secure credential provisioning systems, biometrics and real-time identity databases. We believe the global market for these solutions is driven by the following key trends:

- ***Growth in government-initiated security programs.*** We believe that government agencies will continue to be key drivers for the growth and development of the market for advanced technology identity solutions. For example, budgets for U.S. federal government agencies, such as the Department of Homeland Security, include spending for identity initiatives, such as:

  - the U.S. Visitor and Immigrant Status Indicator Technology program, or U.S. VISIT, which uses biometric data as part of new screening procedures for non-U.S. citizens entering the United States;

  - the Transportation Workers Identification Credential, or TWIC, which is a credentialing program that may eventually cover an estimated 12 million national transportation workers; and

  - the U.S. Department of State's planned introduction of "contactless chips" in passports, which are electronic chips that hold the bearer's biographic and photographic data.

- ***Development of industry standards and requirements.*** Several organizations responsible for standards in a number of our markets have recently implemented requirements for the use of face recognition biometrics. We believe this will help stimulate the development of our target markets. For example, in May 2003 the International Civil Aviation Organization, which sets recommended travel document standards for its member states, selected face recognition as the biometric to be used in passport

43

Table of Contents

documentation. Moreover, in February 2003, the National Institute for Standards and Testing, which is part of the U.S. Department of Commerce, recommended that a dual system of fingerprint and face recognition technology be used to verify the identities of visa holders at points of entry in the United States.

- *Growing use of biometrics* . Governments are increasingly mandating biometrics as an integral component of identity solutions. This increased demand, coupled with the maturation of the technology, is driving the market adoption of biometrics. According to the International Biometrics Group, spending on biometric security solutions is expected to grow at an approximately 46% compound annual rate from approximately $700 million in 2003 to approximately $4.6 billion by 2008.

- *Increasing cost of identity theft and financial fraud.* The growing direct and indirect cost of identity theft and financial fraud is increasing the pressure on businesses and individuals to accelerate the adoption of advanced technology identity solutions. Identity theft is the nation's fastest growing crime. The Federal Trade Commission has estimated that the total cost of identity theft approaches $50 billion per year.

- *Convergence of physical and logical security systems.* There is a growing need for governments and businesses to provide a highly secure, unified system for user authentication to access both physical assets, such as buildings, and digital assets, such as computer networks. For example, the CAC program provides identity verification for approximately four million DoD employees and military personnel to enable access to military property and DoD computer networks. We believe that this program represents the model for identity solutions that will be implemented by governments and businesses in the future.

## Our Identity Solutions

Our identity solutions include secure credential systems, biometrics, database technologies and services. These solutions enable governments and businesses to issue credentials and verify and manage identities throughout the entire identity life cycle.



- *Proofing.* Our solutions provide verification of a person's claimed identity by processing and cataloging breeder documents, such as birth certificates. Our solutions also provide customers the ability to perform identity verification on re-issuance of credentials and to submit queries to local and external proofing databases, as well as to perform duplicate analysis and verification using our face recognition technology.

- *Enrollment.* Our solutions enable the digital capture and storage of multiple pieces of data such as demographics, digital images, signatures and biometric data. Furthermore, our solutions enable the operator to rapidly import existing data without having to recreate it, thereby improving productivity and accuracy of the data by more effectively leveraging the existing database. Our enrollment solutions are designed to comply with a range of industry standards. In addition, our solutions create an audit trail of credentials, which includes information about the issuing operator as well as supporting breeder documents.

44

Table of Contents

- ***Issuance*** . Our solutions include state-of-the-art technologies for producing authentic and tamper-proof identification credentials. We offer turnkey solutions that include the hardware, software and consumables necessary to produce credentials, including static credentials and smart credentials using paper or plastic substrates. Credentials can be produced on-site (over-the-counter), off-site (central production) or through a hybrid of these two methods.

- ***Usage.*** Our solutions can be used to verify the identities of individuals in a variety of settings, including on a one-to-one basis, such as to verify a claimed identity at a border checkpoint, or on a one-to-many basis, such as to establish an individual's identity when he or she does not reveal his or her true identity. In addition, our secure identity solutions can be used to address physical security needs such as border access and digital security needs such as computer network access.

We offer the following key components as part of our identity solutions:

***Secure credential capabilities.*** We provide the necessary hardware, software and systems to enable our customers to produce secure and virtually tamper-proof credential documents that can be used for a variety of applications and settings. Our solutions are designed to integrate into our customers' credential provisioning processes and conform to regulatory standards and requirements. We offer a range of tamper-resistant features, including biometric data contained in bar codes or chips, holographic overlays, ghost imaging, ultraviolet printing and microprinting. As a result, our customers can create highly secure and durable credentials that not only have embedded security features, but also link the credential to the issuing agency location, operator and material used.

We offer two types of credential systems. The first is an instant issuance or "over the counter" system that enables our customers to produce identification credentials on location in minutes. The second is a central production system that receives the information electronically from the point of capture, and enables our customers to produce credentials from a secure off-site processing location. Our secure credentials systems' software is designed to integrate with a variety of third party software, and to support standard operating systems, network protocols and database products. In addition, we incorporate third party hardware, such as digital cameras and printers, into our systems, which enables us to offer configurations that meet our customers' requirements and take advantage of advances in technology.

***Biometric capabilities.*** In designing our identity solutions, we have developed a software platform upon which multiple biometrics can be integrated. The platform is designed to be independent of specific biometric technologies, thereby enabling customers to integrate one or several biometric identifiers as needed.

In addition to providing this independent platform, we have developed and invested in proprietary face recognition technology. We believe that face recognition will continue to grow as an important biometric for the following reasons:

- facial images do not reveal information that the person does not routinely disclose to the general public;
- facial images are already collected, stored and verified in large legacy databases as a part of most identity verification processes;
- facial image capture is non-intrusive and does not require the user to touch or interact with a physical device for a substantial timeframe to be enrolled;
- face recognition does not require new and costly enrollment procedures to be introduced;
- facial images can be captured from endorsed photographs which obviates the need for the person to be physically present;
- facial images are culturally accepted internationally as a means of identification and
- face recognition is the only biometric that can be easily verified by a person without special training.

Table of Contents

We believe that we are a market leader in face recognition technology. Our face recognition systems are highly scaleable, as evidenced by our deployment in the State of Illinois, which we believe to be the largest face recognition system worldwide. Our face recognition products have the following advantages:

- they provide the ability to search large-scale image databases containing millions of records on a real-time basis;
- they enable customers to rapidly enroll existing image databases;
- they combine two face recognition technologies which results in increased speed and accuracy and
- they are designed to easily enable the addition of other face recognition technologies and product updates.

***Systems Design, Development, Integration and Support.*** Our systems design, development, integration and support services are key components of our identity solutions. Our direct services organization supports our direct sales staff early in the sales cycle to help our customers identify their needs and design systems that will address these needs. Our software design and systems integration capabilities enable us to accommodate most computing environments and customers with special requirements. These capabilities also permit us to combine our products with best-of-breed offerings from other vendors to create a complete solution for our clients.

We also provide extensive customer training, telephone help desk support, and ongoing maintenance services through local and centralized field service technicians. In delivering these services, our direct service and support organizations can rely on the expertise of our software and hardware engineers or external technology consultants to provide post installation customer satisfaction. We also maintain a spare parts inventory and provide storage management, distribution and repair of the products we supply.

## Our Strategy

Our objective is to be the leading provider of advanced technology identity solutions for governments, law enforcement agencies and businesses. Key elements of our strategy to achieve this objective include:

***Focus on customer needs.*** We are committed to solving our customers' problems and will continue to develop and market solutions to meet their increasingly complex identity security needs. We believe th at our focus on providing solutions for the full identity life cycle, combined with our high level of responsiveness and service, differentiates us from our key competitors.

***Continue to enhance and expand our product suite and solutions.*** We intend to continue to broaden our product and solution offerings to meet our customer needs. In particular, we intend to continue to engage in product development activities to expand the scope and enhance the performance of our solutions and enable us to address attractive new markets.

***Leverage existing customer base to provide additional advanced technology identity solutions.*** We have established relationships with many government agencies demanding identity solutions including the DoD, U.S. Department of State, U.S. Department of Homeland Security and 16 state departments of motor vehicles. Many of our customers do not yet use the full range of our total solutions offerings. Accordingly, we will continue to provide thought and product leadership to these customers as they migrate toward more sophisticated identity solutions.

***Expand customer base both domestically and abroad.*** We believe that our experience, existing customer relationships and advanced technology identity solutions will enable us to expand our customer base. We intend to focus our sales efforts on broadening our relationship with U.S. federal, state and local governments. For example, 14 states are expected to be available for drivers' license bids over the next two years, 12 of which are

Table of Contents

currently supplied by our competitors. In addition, we believe that significant demand exists for our solutions outside of the United States. Our recent acquisition of ZN has provided us with an established base to more effectively pursue opportunities in the international market.

*Pursue strategic acquisitions and alliances* . We intend to augment our competitive position through acquisitions and alliances. We will pursue acquisitions that provide us with complementary technology, products, capabilities and market or customer access. We will pursue alliances that extend our reach into markets and technologies where we do not have a strong position today.

## Our Products

The following summarizes our current product offerings:

### Components

- The Image Capture Work Station is a multifunctional software solution that offers modules for capturing images, laying templates, checking image quality, previewing printing, managing devices such as cameras, connecting to mainframes and handling point of sale.

- The SensorMast is a fully integrated, secure tower unit that incorporates computer-controlled image capture equipment. This equipment includes commercially available digital cameras, adjustable lighting, frame grabbers, step motors, fingerprint and signature capture devices and barcode readers.

- The Visual Inspection System automatically evaluates credentials produced by our central production systems to determine whether the image and data on a person's identification credential correspond to the information about that person in the system database. If the information does not match, the Visual Inspection System automatically rejects the printed credential and identifies the defect for immediate corrective action. This system, which incorporates robotics, high-speed cameras and sophisticated software, automates an activity that is otherwise performed manually and is a potential source of cost savings and increased accuracy for customers.

- As a result of our February 2004 acquisition of TDT, Viisage now works in conjunction with Toppan Printing Co., Ltd. to bring advanced printing technology to our customers and markets.

### Platform Software

- The FaceTOOLS Software Developer's Kit is designed for application developers who want to incorporate state-of-the-art face recognition technology into their applications. Using FaceTOOLS, developers can create a variety of face recognition applications. FaceTOOLS is based on flexible template matching that incorporates a unique combination of multiple approaches to face recognition.

- FaceEXPLORER is a large image database research and mining tool that provides the ability to reduce fraud and crime by identifying duplicate images in large databases, such as licensed drivers, benefit recipients and visa holders. Additionally, law enforcement officials use FaceEXPLORER to match images and computer composites against existing image databases to identify suspects and known criminals. Customers use FaceEXPLORER to verify identities, improve customer service and reduce fraud by effectively retrieving, managing and analyzing their image databases. We have deployed FaceEXPLORER in one of the world's largest face recognition systems for the Illinois Secretary of State and State Police.

### Access Control

- FacePASS is a verification solution designed to meet complex access control system requirements. FacePASS utilizes face recognition technology to enable the customer to verify a person's identity to permit or deny access.

47

Table of Contents

*Surveillance*

- FaceFINDER is a modern surveillance identification solution that uses patented real-time video technology. FaceFINDER assists customers, such as casinos, domestic and international airports, military bases and government buildings, in identifying suspects either from long distance or from large crowds.

## Customers

Our customers use our identity solutions for a variety of applications, including civil identification, criminal identification and border management. For civil identification, we are the second largest provider of drivers' licenses to state departments of motor vehicles. In this market, we are increasingly incorporating our biometric systems into the credential issuing processes as we have done for the office of the Illinois Secretary of State. We also were recently selected by the DoD for the production of secure, smart credentials as part of the agency's CAC program. For criminal identification, our customers include the Ohio Department of Public Safety, Pinellas County, Florida, the U.S. Army and the U.S. Secret Service. For border management, we are the sole source provider of passport production capability to the U.S. Department of State.

Historically, we have experienced minimal customer turnover. We believe this is a result of our strong product portfolio and emphasis on customer service and support. The following is a representative list of our customer base:

Civil Identification -- Drivers' Licenses

Arkansas Office of Driver Services
Connecticut Department of Motor Vehicles
Illinois Secretary of State
Kentucky Transportation Cabinet
Maryland Department of Transportation and Motor
    Vehicle Administration*
Mississippi Department of Information Technology
    Services
North Carolina Department of Transportation
Oklahoma Department of Public Safety
Pennsylvania Department of Transportation
State of Rhode Island, Department of Administration,
    Division of Motor Vehicles
State of Delaware Department of Public Safety
Wisconsin Department of Transportation

Civil Identification -- Social Services

Connecticut Department of Social Services
Massachusetts Department of Transitional Assistance
New York Department of Social Services*

*By subcontract

Criminal Identification

City of New Bedford, Massachusetts Department of
    Police
Kentucky State Police of the Commonwealth of
    Kentucky
Ohio Department of Public Safety
Pinellas County Sheriff's Office
U.S. Army
U.S. Secret Service
Wisconsin Department of Transportation

Border Management

St. Petersburg – Clearwater International Airport
U.S. Department of Homeland Security
U.S. Department of State

Other

Berlin Airport
Hanover Zoo
U.S. Department of Defense*
U.S. Navy
100+ Casinos

48

Table of Contents

Following are examples of several successful customer deployments:

- **Pinellas County, Florida Sheriff's Office.** The Pinellas County, Florida Sheriff's office needed a more efficient and accurate method of verifying identities of prisoners. Working closely with the Pinellas County Sheriff's Office, we provided a solution that uses face recognition to enhance booking, release and criminal investigation processes in several facilities. By networking the face recognition enabled database, Pinellas County effectively utilizes face recognition in the identification of individuals – whether through the search of individuals at jail pre-booking, verification at jail release, screening at the airport, attendance at a court trial or even in the back of a police cruiser. Today the database has over one million entries and over 375,000 image queries have been made since the system's installation in 2001.

- **Illinois Secretary of State.** Since 2000, we have worked closely with the office of the Illinois Secretary of State to provide a solution to help identify individuals attempting to receive drivers' licenses through fraudulent means. The office of the Illinois Secretary of State uses our credential and face recognition system in 138 issuing locations to perform approximately 8,000 to 12,000 identity checks per day. To date, there have been numerous cases where our solution has detected serious fraud and apprehensions have been made.

- **U.S. Department of State** . We are the sole source provider of passports to the U.S. Department of State. In this program, we provide a combination of printers, services, project management, consumables and specialized research and development initiatives. We have supported this initiative since 1998 and have enabled the Department of State to deliver more than 40 million passports, with over seven million produced in 2003 alone. We began implementing additional advanced security technologies on a worldwide basis in 2002 and since that time, no known cases of counterfeit passport production have occurred.

For the three-month period ended March 28, 2004, the U.S. Department of State accounted for 13% of our revenue. For the year ended December 31, 2003, the Pennsylvania Department of Transportation and the Illinois Secretary of State each accounted for 13% of our revenue. We typically enter into multi-year contracts with our customers. A majority of our contracts are with U.S. federal or state governmental agencies. Government contracts are generally subject to termination for convenience or lack of appropriation at the determination of the subject agency. Contracts terminated by our customers for convenience would generally entitle us to recover all actual committed costs and profit, if any, on work performed through the date of cancellation. While termination is a significant financial risk, we have never experienced a government contract termination.

## Sales and Marketing

We market our products and identity solutions through both a direct sales force and strategic partnerships and alliances. Our direct sales force is responsible for marketing and selling our entire identity solutions portfolio. We have an international sales force responsible for the North American Market, Europe, the Middle East and Asia Pacific. We have established a dedicated U.S. federal sales team in Washington, D.C. responsible for marketing and selling to U.S. government agencies such as the Department of Homeland Security, the Department of State, the DoD, and others. As of May 31, 2004, we employed 32 people in our sales and marketing organization.

We continue to seek to develop strategic partnerships and distribution channels to broaden our coverage and increase the size of our market worldwide. We have established original equipment manufacture, or OEM, distribution agreements with partners to leverage our face recognition technology. We work with systems integrators, solution providers and service organizations to deliver identity solutions in combination with their core capabilities to expand our access to such organizations' existing relationships, marketing resources and credibility in new markets. We utilize local agents to expand our international access to opportunities.

Table of Contents

With the recent acquisition of ZN, we have increased our direct sales and marketing coverage in the European marketplace. Dedicated sales and services teams operate from our Bochum, Germany location. The acquisition of TDT has strengthened our coverage and access to the U.S. federal marketplace.

## Product Development

We focus our product development efforts on critical components for advanced technology identity solutions. These include proprietary software that addresses image capture, image processing, enhancement of face recognition accuracy and information retrieval from identity databases. In addition, we focus on expanding our capabilities in solutions for the civil identification, criminal identification and border management markets. As of May 31, 2004, we employed 35 people in our product development organization.

We benefit from research and development activities conducted by the manufacturers of the components integrated into our systems such as cameras, database software and computers. Moreover, many of our customers, including the U.S. government, provide direct funding to us to assist us in our research and development efforts on their behalf. For the three-month period ended March 28, 2004 and for the year ended December 31, 2003, our customers provided research and development funding of $695,000 and $3.4 million, respectively.

For the three-month periods ended March 28, 2004 and March 30, 2003, research and development expense was $959,000 and $945,000, respectively. For the years ended December 31, 2003, 2002 and 2001, research and development expense was $3.7 million, $4.5 million and $2.0 million, respectively. These amounts do not include spending for projects where our customers provide research and development funding. The costs associated with delivery of these projects are generally recorded as cost of revenues or as a contra research and development expense as appropriate.

## Intellectual Property

We believe that our intellectual property is important to both our secure credentials and our biometrics segments:

- Patents—Both our secure credentials segment and our biometrics segment use patented technology and trade secrets developed or acquired by us. We have significantly expanded our portfolio of face recognition patents and trade secrets through the acquisition of ZN. We have a portfolio of 13 U.S. and foreign patents. In addition, we have a number of U.S. and foreign patent applications in process for face recognition technologies, including 12 foreign patent applications previously filed by ZN. Our U.S. patents typically have a duration of 17 to 20 years.

- Trademarks—We have registered our "Viisage Technology" trademark, as well as trademarks for "FaceEXPLORER", "FaceFINDER", "FaceTOOLS" and "Sensormast" with the U.S. Patent and Trademark Office. Applications are pending in the United States and Europe for the "Viisage" and "FacePASS" trademarks and in Europe for "FaceEXPLORER" and "FaceFINDER".

- Copyrights—We have filed a copyright application for our SensorMast software and have made a copyright filing for our Visual Inspection System and related proprietary software.

## Backlog

Our backlog consists of signed contracts, subcontracts and customer commitments for which revenue has not yet been recognized and excludes phase-out or other extension opportunities included in such contracts. Backlog is only somewhat indicative of future revenue because contracts may be changed positively or negatively. Contracts included in our backlog could be cancelled at any time due to lack of performance without penalty. Contracts terminated by our customers for convenience would generally result in our recovery of all actual committed costs and profit, if any, on work performed through the date of cancellation.

50

Table of Contents

At March 28, 2004, our backlog was $176 million, compared to $83 million at March 30, 2003. At December 31, 2003, our backlog was $112 million, compared to $78 million at December 31, 2002. Approximately $32 million of this increase in backlog was related to our adoption of EITF 00-21 on a cumulative basis as of January 1, 2003. EITF 00-21 limits the amount of revenue that we may allocate to the customization, design and installation of systems to the amount that is not contingent upon the production of secure credentials. Revenue on our drivers' license contracts under EITF 00-21 is earned based on, and is contingent upon, the production of credentials from the system. Due to the contingent performance of credential production in these contracts, we defer revenue recognition for the system design and installation phase of our contracts, including customized software and equipment, until credentials are produced. As a result, revenue and margins that were recognized as earned and unbilled under our previous revenue recognition policy for secure documentation contracts were deferred under EITF 00-21 and therefore are included in our backlog at December 31, 2003.

## Competition

The market for our products and services in individual component areas of identity solutions, such as secure credentials and biometrics, is extremely competitive and we expect this competitive environment to intensify as the market for our products continues to grow. We compete on the basis of the following factors: service and support, technical excellence, price, credibility and flexibility in accommodating customer technical and business needs.

We believe that our comprehensive approach to identity solutions, our unique capabilities and our proprietary technology differentiate us from our competition. We are not aware of any company that competes with us directly on the basis of providing advanced technology identity solutions that cover the full identity life cycle.

*Secure Credentials Segment.* We face competition in the drivers' license market of our secure credentials systems market from companies, including Digimarc ID Systems, LLC, that, in some cases, have greater financial and marketing resources than we do. Substantially all of our sales to new customers have been the result of competitive bidding for contracts pursuant to public sector procurement rules. In some cases, we may be competing with an entity that has a pre-existing relationship with a potential customer, which could put us at a significant competitive disadvantage. In other cases, however, we have pre-existing relationships with customers, which give us an advantage relative to our competitors for that customer. As the secure identification market expands, additional competitors may seek to enter the market.

*Biometrics Segment.* In the field of biometric technology, we compete with several face recognition providers, including Identix Inc., as well as providers of other biometric solutions, such as fingerprint, iris and retinal scans, voice data and hand geometry. We believe that applications increasingly will require the use of multiple biometrics. Accordingly, while our face recognition technology competes with other biometrics, we have designed our identity solutions to serve as a platform for multiple biometric technologies so that we are able to provide the particular biometric required by our customers. We believe that our proprietary face recognition technology, together with our market leadership and experience integrating multiple biometrics, gives us a competitive advantage in the biometrics market.

## Seasonality

Our business is not subject to seasonal fluctuations.

## Working Capital Requirements

Our drivers' license contracts require significant capital to fund development and implementation. In 2003, we utilized bank borrowings and other lease financing vehicles to supplement our working capital to fund these capital requirements. In addition, in September 2003 and January 2004, we raised an aggregate of approximately

51

Table of Contents

$13.7 million in net proceeds through the private sale of shares of our common stock to certain institutional investors. These funds also were used for working capital. There are no special requirements or customer terms in our bank borrowings or other lease financing vehicles that are expected to have a material adverse effect on our working capital. As discussed more fully in "Management's Discussion and Analysis of Financial Condition and Results of Operations," we may raise additional capital, as needed, to fund working capital needs or growth activities.

## Employees

As of May 31, 2004, we had 187 full time employees. None of our employees is covered by collective bargaining agreements. We believe that our relations with our employees are good.

## Legal Matters

In July 2003, following the institution of a lawsuit by one of our competitors, a Georgia court issued a preliminary injunction which effectively prevents us from completing installation work on a drivers' license system for the Georgia Department of Motor Vehicle Safety. Discovery is continuing in this lawsuit and a trial on the merits of the lawsuit has been scheduled for September 2004. However, if the lawsuit is successful and we lose the contract, we could lose up to $19.7 million in revenue that we expected to recognize over the next five and one-half years. In addition, although we expect that the Department of Motor Vehicle Safety would be required to reimburse us for our costs incurred under the contract, if we are unable to obtain reimbursement of those costs, we could be required to recognize a loss of up to approximately $5 million for costs incurred to date on the Georgia contract.

We are not aware of any other legal matters that could have a material adverse effect on our business, financial condition or results of operations.

52

Table of Contents

# MANAGEMENT

### Executive Officers and Directors

The following persons are our executive officers and directors as of June 18, 2004.

| Name | Age | Position |
|------|-----|----------|
| Bernard C. Bailey | 50 | Chief Executive Officer, President and Director |
| Iftikhar A. Ahmad | 52 | Senior Vice President and General Manager, Secure Credentials |
| William K. Aulet | 46 | Senior Vice President and Chief Financial Officer |
| John J. Dillon | 67 | Senior Vice President, Government Solutions |
| James P. Ebzery | 44 | Senior Vice President, Worldwide Sales and Services |
| Denis K. Berube | 61 | Chairman of the Board |
| B.G. Beck | 67 | Vice Chairman of the Board |
| Charles E. Levine | 51 | Director |
| Marcel Yon | 37 | Director |
| Harriet Mouchly-Weiss | 61 | Director |
| Peter Nessen | 67 | Director |
| Paul T. Principato | 50 | Director |
| Thomas J. Reilly | 65 | Director |

Bernard C. Bailey, 50, joined Viisage in August 2002 as Chief Executive Officer. From January 2001 through August 2002, Mr. Bailey served as the Chief Operating Officer of Art Technology Group. Between April 1984 and January 2001, Mr. Bailey served in various capacities at IBM Corporation, including several executive positions. A graduate of the US Naval Academy, Mr. Bailey served for eight years as an officer in the US Navy.

Iftikhar A. Ahmad, 52, was appointed Senior Vice President and General Manager of our Secure Credentials business segment in October of 2002. Between March 1999 and October 2002 he served as Viisage's Vice President of Engineering and Program Management. From November 1996 until March 1999, Mr. Ahmad served as a Director in our Software Engineering Department. From January 1995 to November 1996, he was a senior consultant in Lau's Systems Engineering Department, and prior to that, he held various senior engineering positions at Digital Equipment Corporation.

William K. Aulet, 46, joined Viisage Technology in February 2003 as Chief Financial Officer. Between August 1996 and February 2003, he served as the President of SensAble Technologies. Mr. Aulet was one of the founders of Cambridge Decision Dynamics, where he served as President from April of 1995 to August of 1996. Prior to Cambridge Decision Dynamics, he spent twelve years at IBM Corporation, where he held various management positions. He is a Senior Lecturer at MIT's Sloan School of Management.

James P. Ebzery, 44, joined Viisage Technology in November 2002 as Senior Vice President of Sales and Marketing. Mr. Ebzery served as Vice President of Operations for Internet Capital Group from April 2000 to February 2002. Prior to joining ICG, he held senior sales and marketing positions at IBM Corporation from December 1983 to April 2000. He also served as the Worldwide Solutions Executive for the IBM Supply Chain Software Business.

John J. Dillon, 67, joined Viisage in February 2003 as Senior Vice President of Government Solutions. From January 1997 to February 2003, he served as Vice President of Central and Eastern Europe for Lockheed Martin, focusing on command and control and security systems. Prior to 1997, Mr. Dillon held a number of senior positions with Lockheed Martin, including Vice President of Business Development, Vice President of Software and Technical Services and Vice President of Command and Control and Security Systems. Mr. Dillon

Table of Contents

also previously served as a Vice President with Unisys Defense Systems, which became part of Loral Corporation, later purchased by Lockheed Martin.

Denis K. Berube, 61, has been the Chairman of the Board of Directors of Viisage since the Company's incorporation in 1996. Mr. Berube is Executive Vice President and Chief Operating Officer of Lau Technologies, or Lau. Lau is the largest holder of Viisage common stock, directly owning approximately 17% of its issued and outstanding common stock. Mr. Berube has been employed at Lau since 1990.

B.G. Beck, 67, was the President and Chief Executive Officer of Trans Digital Technologies Corporation from 1998 until its acquisition by Viisage in February 2004. Mr. Beck currently serves as a consultant to Viisage and also serves as a member of the Boards of Directors of Cardinal Bankshares Corporation, a provider of comprehensive individual and corporate banking services, and L-3 Communications MAS (US) Corporation, a leading supplier of a broad range of products used in a substantial number of aerospace and defense platforms.

Charles E. Levine, 51, has served as a director of Viisage since 1998. Mr. Levine retired in September 2002 from his position as President of Sprint PCS, a position he had held since January 1997. Before joining Sprint PCS, Mr. Levine served as Senior Vice President of Octel Services, a provider of voice systems services, from October 1994 through September 1996. Mr. Levine currently also serves as a member of the Boards of Directors of @Road, Inc., a wireless applications provider, Sierra Wireless Inc., a provider of a broad range of wireless products, including data modems, embedded modules and mobile phones, Somera Communications, a provider of telecommunications operators with equipment and deployment services, and Lexar Media, Inc., a provider of digital media such as compact flash and other flash memory products.

Marcel Yon, 37, was appointed a director of Viisage in June 2004. Mr. Yon was a founder of ZN Vision Technologies AG, or ZN, and served as its Chief Executive Officer from its inception in April 2000 until it was acquired by Viisage in January 2004. Mr. Yon currently serves as a consultant to Viisage and also serves as a member of the Board of Directors of Visiomed Diagnostics Ltd, a medical technology company listed on the Australian stock exchange. Mr. Yon was a founder of Visiomed AG which was acquired by Visiomed Diagnostics Ltd in January 2003. Prior to founding ZN and Visiomed, Mr. Yon advised on international mergers and acquisitions and strategy with Lazard & Co., an investment bank, in London.

Harriet Mouchly-Weiss, 61, has served as a director of Viisage since its incorporation in May 1996. Ms. Mouchly-Weiss founded Strategy XXI Group, an international communications and consulting firm, in January 1993 and has served as its managing partner since that time. Ms. Mouchly-Weiss currently also serves as a member of the Board of Directors of American Greetings Corporation, a company engaged in the design, manufacture and sale of everyday and seasonal greeting cards and other social expression products.

Paul T. Principato, 50, has served as a director of Viisage since May 2001 and as Chief Financial Officer of Lau since its incorporation in March 1990. Prior to 1990, Mr. Principato served as Controller at Barry Wright Corp.

Peter Nessen, 67, has served as a director of Viisage since its incorporation in May 1996. Since July 2003, Mr. Nessen has served as the President of Nessen Associates Ltd., a non-profit consulting company. From January 2003 to July 2003, Mr. Nessen served as an adviser to the Governor of the Commonwealth of Massachusetts on education matters. Mr. Nessen has been Chairman of the Board of NCN Financial, a private banking firm, since January 1995. From June 1993 through December 1994, Mr. Nessen was Dean for Resources and Special Projects at Harvard Medical School.

Thomas J. Reilly, 65, has served as a director of Viisage since its incorporation in May 1996. Mr. Reilly has been a self-employed financial consultant since December 1994. From June 1966 through November 1994, Mr. Reilly was with Arthur Andersen LLP, a public accounting firm, where he became a partner in 1975.

54

Table of Contents

## PRINCIPAL AND SELLING SHAREHOLDERS

The following table sets forth information known to us with respect to the beneficial ownership of our outstanding common stock as of June 16, 2004 by:

- each person known to us to be the beneficial owner of 5% or more of our common stock;

- each of our directors;

- each of our executive officers;

- each selling shareholder and

- all directors and executive officers as a group.

The percentage of our common stock beneficially owned prior to this offering in the following table is based on 35,855,165 shares of common stock outstanding on June 16, 2004. The table below assumes the underwriters do not exercise their over-allotment option. If the over-allotment option is exercised in full, we will sell an aggregate of 525,000 additional shares of common stock.

Beneficial ownership is determined in accordance with the rules of the Securities and Exchange Commission. In computing the number of shares beneficially owned by a person and the percentage ownership of that person, shares of common stock subject to options and warrants held by that person that are exercisable as of June 16, 2004 or will become exercisable within 60 days thereafter are deemed outstanding, while such shares are not deemed outstanding for purposes of computing percentage ownership of any other person.

Unless otherwise indicated in the footnotes to this table, the address of each beneficial owner is c/o Viisage Technology, Inc., 296 Concord Road, Third Floor, Billerica, MA 01821.

| Name | Shares Beneficially Owned Prior to Offering(1) | | Number of Shares Being Offered | Shares Beneficially Owned After Offering | |
|---|---|---|---|---|---|
| | Number | Percent | | Number | Percent |
| Joanna T. Lau (2) | 6,261,710 | 17.4% | 100,000(3) | 6,161,710 | 14.3% |
| Lau Technologies | 6,050,972 | 16.9% | 100,000 | 5,950,972 | 13.8% |
| Odeon Venture Capital AG(4) | 949,325 | 2.6% | 43,160 | 906,165 | 2.1% |
| Dr. Christoph von der Malsburg(5) | 949,325 | 2.6% | 43,160 | 906,165 | 2.1% |
| Dr. Stefan Gehlen(6) | 168,392 | * | 9,450 | 158,942 | * |
| Dr. Thomas Martinetz(7) | 207,781 | * | 4,230 | 203,551 | * |
| Denis K. Berube (8) | 6,261,710 | 17.4% | 100,000(3) | 6,161,710 | 14.3% |
| B.G. Beck (9) | 5,869,651 | 16.4% | 100,000 | 5,769,651 | 13.4% |
| Harriet Mouchly-Weiss(10) | 121,361 | * | — | 121,361 | * |
| Charles E. Levine(11) | 139,681 | * | — | 139,681 | * |
| Peter Nessen(12) | 87,827 | * | — | 87,827 | * |
| Paul T. Principato (13) | 108,855 | * | — | 108,855 | * |
| Thomas J. Reilly(14) | 118,073 | * | — | 118,073 | * |
| Marcel Yon(15) | 949,325 | 2.6% | 43,160(16) | 906,165 | 2.1% |
| Bernard C. Bailey(17) | 250,000 | * | — | 125,000 | * |
| Iftikhar A. Ahmad(18) | 177,406 | * | — | 177,406 | * |
| William K. Aulet (19) | 66,666 | * | — | 66,666 | * |
| John J. Dillon(20) | 25,000 | * | — | 25,000 | * |
| James P. Ebzery(21) | 66,666 | * | — | 66,666 | * |
| All directors and executive officers as a group (13 persons) (22) | 14,242,221 | 38.6% | — | | |

\*    Indicates holdings of less than one percent of the 35,855,165 shares issued and outstanding as of June 16, 2004.

(1)    Unless otherwise noted, and subject to applicable community property laws, to our knowledge each person identified possesses sole voting and investment power over the shares beneficially owned by such person.

Table of Contents

(2)     The address of Ms. Lau and Lau Technologies is c/o Lau Technologies, 30 Monument Square, Suite 220, Concord, Massachusetts 01742. Includes 6,050,972 shares held by Lau Technologies. Ms. Lau and Denis K. Berube, the spouse of Ms. Lau, own approximately 56% of the outstanding capital stock of Lau Technologies. Also includes 1,000 shares owned directly by Ms. Lau, 90,496 shares issuable to Mr. Berube pursuant to stock options, and 119,242 shares owned by Mr. Berube directly. Ms. Lau disclaims beneficial ownership of the 90,496 shares issuable to Mr. Berube and the 119,242 shares owned by Mr. Berube. Ms. Lau has sole voting and dispositive power over the shares beneficially owned by Lau.

(3)     Consists of 100,000 shares of our common stock being sold by Lau Technologies in this offering.

(4)     The address for Odeon Venture Capital AG, or Odeon, is Am Ruhrstein 33, 45133 Essen, Germany. Odeon held 16.6% of the fully-diluted share capital of ZN prior to its acquisition by us. Marcel Yon, the Chief Executive Officer of Odeon, serves as a member of our Board of Directors, and served as the Chief Executive Officer and as a member of the executive board of ZN immediately prior to the acquisition. As of the date of this prospectus, Yon AG, of which Mr. Yon is the Chief Executive Officer, serves as a consultant to us. Mr. Yon has sole voting and dispositive power over the shares beneficially owned by Odeon.

(5)     Dr. Christoph von der Malsburg held 16.6% of the fully-diluted share capital of ZN prior to its acquisition by us. Dr. von der Malsburg served as a member of ZN's supervisory board prior to the acquisition. Dr. von der Malsburg's address is Weimelhauser Str. 180, 44790 Bochum, Germany.

(6)     Includes 75,472 shares of common stock which may be required upon exercise of stock options. Dr. Stefan Gehlen held 1.6% of the fully-diluted share capital of ZN prior to its acquisition by us. In addition, Dr. Gehlen served as Chief Technology Officer and as a member of ZN's executive board prior to the acquisition. As of the date of this prospectus, Dr. Gehlen serves as an executive director of Viisage AG. Dr. Gehlen's address is Am Stens Hof 73, 44869 Bochum, Germany.

(7)     Dr. Thomas Martinetz held 3.6% of the fully-diluted share capital of ZN prior to its acquisition by us. Dr. Martinetz's address is Magadalenenweg 18, 85457 Wörth, Germany.

(8)     Includes 6,050,972 shares held by Lau Technologies. Also includes 1,000 shares owned directly by Joanna Lau, the spouse of Mr. Berube, 90,496 shares issuable to Mr. Berube pursuant to stock options, and 119,242 shares owned by Mr. Berube directly. Mr. Berube disclaims beneficial ownership of the 6,050,972 shares held by Lau Technologies and the 1,000 shares held by Ms. Lau.

(9)     Includes 10,000 shares of common stock which may be acquired upon exercise of stock options.

(10)    Includes 64,167 shares of common stock which may be acquired upon exercise of stock options.

(11)    Includes 79,136 shares of common stock which may be acquired upon exercise of stock options.

(12)    Includes 55,000 shares of common stock which may be acquired upon exercise of stock options.

(13)    Includes 72,167 shares of common stock which may be acquired upon exercise of stock options.

(14)    Includes 90,496 shares of common stock which may be acquired upon exercise of stock options.

(15)    The address of Mr. Yon is Am Ruhrstein 33, 45133 Essen, Germany. Includes 949,325 shares held by Odeon Venture Capital AG, of which Mr. Yon is the Chief Executive Officer. Mr. Yon serves as a member of our Board of Directors and served as the Chief Executive Officer and as a member of the executive board of ZN immediately prior to the acquisition. As of the date of this prospectus, Yon AG, of which Mr. Yon is the Chief Executive Officer, serves as a consultant to us. Mr. Yon has sole voting and dispositive power over the shares beneficially owned by Odeon.

(16)    Consists of 43,160 shares of our common stock being sold by Odeon Venture Capital AG in this offering.

(17)    Includes 250,000 shares of common stock which may be acquired upon exercise of stock options.

(18)    Includes 171,727 shares of common stock which may be acquired upon exercise of stock options.

(19)    Includes 66,666 shares of common stock which may be acquired upon exercise of stock options.

(20)    Includes 66,666 shares of common stock which may be acquired upon exercise of stock options.

(21)    Includes 25,000 shares of common stock which may be acquired upon exercise of stock options.

(22)    Includes 1,070,267 of common stock which may be acquired upon exercise of stock options.

56

Table of Contents

## DESCRIPTION OF CAPITAL STOCK

Our authorized capital stock consists of 75,000,000 shares of common stock, $0.001 par value, and 2,000,000 shares of preferred stock, $0.001 par value. The following is a summary of the material provisions of the common stock and the preferred stock contained in our certificate of incorporation and bylaws. For greater detail about our capital stock, please refer to our certificate of incorporation and bylaws.

### Common Stock

As of June 16, 2004, there were 35,855,165 shares of common stock issued and outstanding, held of record by approximately 233 stockholders. Options to purchase a total of 4,415,783 shares of common stock and warrants to purchase a total of 812,469 shares of common stock were outstanding on June 16, 2004.

The holders of our common stock are entitled to one vote per share on all matters to be voted on by stockholders. Stockholders are not entitled to cumulative voting rights with respect to the election of directors. Subject to the prior rights of holders of preferred stock, if any, the holders of our common stock are entitled to receive such dividends, if any, as may be declared from time to time by our board of directors in its discretion from funds legally available for such purpose. In the event of our voluntary or involuntary liquidation, dissolution or winding up, the holders of our common stock are entitled to receive and share ratably in all assets remaining available for distribution to stockholders after payment of any preferential amounts to which the holders of preferred stock may be entitled. Our common stock has no preemptive rights and is not redeemable, assessable or entitled to the benefits of any sinking fund. Shares of our common stock are not convertible into any other security. All outstanding shares of our common stock are, and the common stock to be issued in this offering will be, validly issued, fully paid and non-assessable.

### Preferred Stock

Pursuant to our certificate of incorporation, our board of directors has the authority without further action by our stockholders to issue up to 2,000,000 shares of preferred stock. Our board of directors has the authority to issue such preferred stock in one or more series and to fix the number of shares of any series of preferred stock and to determine the designation of any such series. The board of directors is also authorized to determine and alter the powers, rights, preferences and privileges and the qualifications, limitations and restrictions granted to or imposed upon any wholly unissued series of preferred stock. In addition, within the limitations or restrictions stated in any resolution or resolutions of the board of directors originally fixing the number of shares constituting any series, the board of directors has the authority to increase or decrease, but not below the number of shares of such series then outstanding, the number of shares of any series subsequent to the issue of shares of that series. The issuance of preferred stock, while providing desirable flexibility in connection with possible acquisitions and other corporate purposes, could have the effect of delaying, deferring or preventing a change in control without further action by our stockholders and may adversely affect the market price of, and the voting and other rights of, the holders of our common stock. As of June 16, 2004, there were no shares of our preferred stock outstanding. We have no current plans to issue any shares of preferred stock.

### Certain Provisions of Our Certificate of Incorporation and Bylaws

Certain provisions of Delaware law and our certificate of incorporation and bylaws could make more difficult the acquisition of Viisage by means of a tender offer, a proxy contest, or otherwise, and the removal of incumbent officers and directors. These provisions are expected to discourage certain types of coercive takeover practices and inadequate takeover bids and to encourage persons seeking to acquire control of Viisage to first negotiate with us. We believe that the benefits of increased protection of our potential ability to negotiate with

57

Table of Contents

the proponent of an unfriendly or unsolicited proposal to acquire or restructure Viisage outweighs the disadvantages of discouraging such proposals, including proposals that are priced above the then current market value of our common stock, because, among other things, negotiation of such proposals could result in an improvement of their terms.

Our board of directors is divided into three classes. The directors in each class will serve for a three-year term, with our stockholders electing one class each year. This system of electing and removing directors may tend to discourage a third party from making a tender offer or otherwise attempting to obtain control of Viisage, because it generally makes it more difficult for stockholders to replace a majority of the directors.

Our bylaws establish an advance notice procedure for stockholder proposals to be brought before an annual meeting of our stockholders, including proposed nominations of persons for election to our board of directors. At an annual meeting, stockholders may only consider proposals or nominations specified in the notice of meeting, brought before the meeting by or at the direction of our board of directors or properly brought before the meeting by a person who was a stockholder of record on the record date for the meeting, who is entitled to vote at the meeting and who has given to our corporate secretary timely written notice, in proper form, of the stockholder's intention to bring that business before the meeting. Although our bylaws do not give our board of directors the power to approve or disapprove stockholder nominations of candidates or proposals regarding other business to be conducted at a special or annual meeting of the stockholders, our bylaws may have the effect of precluding the conduct of certain business at a meeting if the proper procedures are not followed or may discourage or deter a potential acquiror from conducting a solicitation of proxies to elect its own slate of directors or otherwise attempting to obtain control of our company.

Under Delaware law, a special meeting of stockholders may be called by our board of directors or by any other person authorized to do so in our certificate of incorporation or bylaws. Our bylaws authorize a majority of our board of directors, the chairman of our board or the chief executive officer to call a special meeting of stockholders. However, our board of directors may amend the bylaws at any time to eliminate the right to call a special meeting of stockholders. The elimination of the right of stockholders to call a special meeting would mean that a stockholder could not force stockholder consideration of a proposal over the opposition of our board of directors by calling a special meeting of stockholders prior to such time as our board of directors believed such consideration to be appropriate or until the next annual meeting provided that the requestor met the notice requirements. The restriction on the ability of stockholders to call a special meeting means that a proposal to replace our board could be delayed until the next annual meeting.

## Certain Provisions of Delaware Law

We are subject to Section 203 of the Delaware General Corporation Law, an antitakeover law. In general, Section 203 prohibits a publicly held Delaware corporation from engaging in a business combination with an interested stockholder for a period of three years following the date the person became an interested stockholder, unless:

- Prior to the date of the person becoming an interested stockholder, the board of directors of the corporation approved either the business combination or the transaction which resulted in the stockholder becoming an interested stockholder;

- The stockholder owned at least 85% of the voting stock of the corporation outstanding at the time the transaction which resulted in the stockholder becoming an interested stockholder commenced, excluding for purposes of determining the number of shares outstanding;

  - Shares owned by persons who are directors and also officers and

58

Table of Contents

- Shares owned by employee stock plans in which employee participants do not have the right to determine confidentially whether shares held subject to the plan will be tendered in a tender or exchange offer or

- On or subsequent to the date of the person becoming an interested stockholder, the business combination is approved by the board and authorized at an annual or special meeting of stockholders, and not by written consent, by the affirmative vote of at least two-thirds of the outstanding voting stock which is not owned by the interested stockholder.

Generally, a business combination includes a merger, asset or stock sale or other transaction resulting in a financial benefit to the interested stockholder. An interested stockholder is a person who, together with affiliates and associates, owns or, within three years prior to the determination of interested stockholder status, did own 15% or more of a corporation's outstanding voting securities. We expect the existence of this provision to have an antitakeover effect with respect to transactions our board of directors does not approve in advance. We anticipate that Section 203 may also discourage attempts that might result in a premium over the market price for the shares of common stock held by stockholders.

### Transfer Agent

The transfer agent for our common stock is EquiServe Trust Company, N.A. Its address is 250 Royall Street, Canton, Massachusetts 02021, and its telephone number is (781) 575-2000.

### Listing

Our common stock is quoted on the Nasdaq National Market under the trading symbol "VISG."

<div align="center">59</div>

Table of Contents

# UNDERWRITING

We and the selling shareholders are offering the shares of our common stock described in this prospectus through the underwriters named below. J.P. Morgan Securities Inc. and UBS Securities LLC are the representatives of the underwriters. We and the selling shareholders will enter into an underwriting agreement with the representatives. Subject to the terms and conditions of the underwriting agreement, each of the underwriters has severally agreed to purchase the number of shares of common stock listed next to its name in the following table:

| Underwriters | Number of shares |
|---|---|
| J.P. Morgan Securities Inc. | |
| UBS Securities LLC. | |
| Piper Jaffray & Co. | |
| JMP Securities LLC | |
| Janney Montgomery Scott LLC | |
| Roth Capital Partners, LLC | |
| Total | 7,500,000 |

The underwriting agreement provides that if the underwriters take any of the shares presented in the table above, then they must take all of these shares. No underwriter is obligated to take any shares allocated to a defaulting underwriter except under limited circumstances. The underwriting agreement provides that the obligations of the underwriters are subject to certain conditions precedent, including the absence of any material adverse change in our business and the receipt of certain certificates, opinions and letters from us, our counsel and our independent auditors.

In connection with this offering, certain of the underwriters or securities dealers may distribute prospectuses electronically.

## Over-allotment Option

We have granted the underwriters an option to buy up to an aggregate of 525,000 additional shares of our common stock and the selling shareholders have granted the underwriters an option to buy up to an aggregate of 600,000 additional shares of our common stock. The underwriters may exercise this option solely for the purpose of covering over-allotments, if any, made in connection with this offering. The underwriters have 30 days from the date of this prospectus to exercise this option. If the underwriters exercise this option, they will each purchase additional shares approximately in proportion to the amounts specified in the table above.

## Commissions And Discounts

Shares sold by the underwriters to the public will initially be offered at the initial offering price set forth on the cover of this prospectus. Any shares sold by the underwriters to securities dealers may be sold at a discount of up to $      per share from the initial offering price. Any of these securities dealers may resell any shares purchased from the underwriters to other brokers or dealers at a discount of up to $      per share from the initial offering price. If all the shares are not sold at the initial offering price, the representatives may change the offering price and the other selling terms. Sales of shares made outside of the United States may be made by affiliates of the underwriters. Upon execution of the underwriting agreement, the underwriters will be obligated to purchase the shares at the prices and upon the terms stated therein, and, as a result, will thereafter bear any risk associated with changing the offering price to the public or other selling terms.

60

Table of Contents

The following table shows the per share and total underwriting discounts and commissions we and the selling shareholders will pay to the underwriters assuming both no exercise and full exercise of the underwriters' option to purchase up to an additional 1,125,000 shares.

|  | No exercise | Full exercise |
|---|---|---|
| Per share | $ | $ |
| Total | $ | $ |

We estimate that the total expenses of this offering payable by us, not including the underwriting discounts and commissions, will be approximately $253,751.81.

### No Sales of Similar Securities

We, the selling shareholders and our executive officers and directors will enter into lock-up agreements with the underwriters. Under these agreements, we and each of these persons may not, without the prior written approval of the representatives, subject to certain permitted exceptions, sell, offer to sell, contract or agree to sell, hypothecate, pledge, grant any option to purchase or otherwise dispose of or agree to dispose of, our common stock or securities convertible into or exercisable or exchangeable for our common stock or warrants or rights to purchase our common stock. These restrictions will be in effect for a period of 90 days after the date of the final prospectus. At any time and without public notice, the representatives may in their sole discretion, release all or some of the securities from these lock-up agreements.

We and the selling shareholders have agreed to indemnify the underwriters against certain liabilities, including liabilities under the Securities Act. If we and the selling shareholders are unable to provide this indemnification, we will contribute to payments the underwriters may be required to make in respect of those liabilities.

### Nasdaq National Market Listing

Our common stock is quoted on the Nasdaq National Market under the trading symbol "VISG."

### Price Stabilization, Short Positions

In connection with this offering, the underwriters may engage in activities that stabilize, maintain or otherwise affect the price of our common stock including:

- stabilizing transactions;

- short sales;

- purchases to cover positions created by short sales;

- imposition of penalty bids and

- syndicate covering transactions.

Stabilizing transactions consist of bids or purchases made for the purpose of preventing or retarding a decline in the market price of our common stock while this offering is in progress. These transactions may also include making short sales of our common stock, which involves the sale by the underwriters of a greater number of shares of common stock than they are required to purchase in this offering, and purchasing shares of common stock on the open market to cover positions created by short sales. Short sales may be "covered" shorts, which are short positions in an amount not greater than the underwriters' over-allotment option referred to above, or may be "naked" shorts, which are short positions in excess of that amount.

The underwriters may close out any covered short position by either exercising their over-allotment option, in whole or in part, or by purchasing shares in the open market. In making this determination, the underwriters

Table of Contents

will consider, among other things, the price of shares available for purchase in the open market as compared to the price at which they may purchase shares through the over-allotment option.

Naked short sales are in excess of the over-allotment option. The underwriters must close out any naked short position by purchasing shares in the open market. A naked short position is more likely to be created if the underwriters are concerned that there may be downward pressure on the price of the common stock in the open market that could adversely affect investors who purchased in this offering.

The underwriters also may impose a penalty bid. This occurs when a particular underwriter repays to the underwriters a portion of the underwriting discount received by it because the representatives have repurchased shares sold by or for the account of that underwriter in stabilizing or short covering transactions.

In addition, in connection with this offering, certain of the underwriters (and selling group members) may engage in passive market making transactions in the common stock on the Nasdaq National Market prior to the pricing and completion of the offering. Passive market making consists of displaying bids on the Nasdaq National Market no higher than the bid prices of independent market makers and making purchases at prices no higher than these independent bids and effected in response to order flow. Net purchases by a passive market maker on each day are limited to a specified percentage of the passive market maker's average daily trading volume in the common stock during a specified period and must be discontinued when such limit is reached. Passive market making may cause the price of the common stock to be higher than the price that otherwise would exist in the open market in the absence of such transactions. If passive market making is commenced, it may be discontinued at any time.

As a result of these activities, the price of our common stock may be higher than the price that otherwise might exist in the open market. If these activities are commenced, they may be discontinued by the underwriters at any time. The underwriters may carry out these transactions on the Nasdaq National Market, in the over-the-counter market or otherwise.

The underwriters and their affiliates have provided and may provide certain commercial banking, financial advisory and investment banking services for us for which they receive customary fees.

The underwriters and their affiliates may from time to time in the future engage in transactions with us and perform services for us in the ordinary course of their business.

<center>62</center>

Table of Contents

## WHERE YOU CAN FIND MORE INFORMATION

We are subject to the informational requirements of the Securities Exchange Act of 1934, as amended, or the Exchange Act, and, in accordance therewith, file annual, quarterly and current reports, proxy statements and other information with the Securities and Exchange Commission, or SEC. Such reports, proxy statements and other information can be inspected and copied at the SEC's Public Reference Room at 450 Fifth Street, N.W., Judiciary Plaza, Washington, D.C. 20549. Please call the SEC at 1-800-SEC-0330 for further information on the operation of the SEC's Public Reference Room. Copies of such material can be obtained from the Public Reference Section of the SEC at prescribed rates. Such material also can be accessed electronically by means of the SEC's home page on the internet (http://www.sec.gov) and on our website (http://www.viisage.com).

We have filed a registration statement and related exhibits with the SEC under the Securities Act of 1933, as amended, or the Securities Act. The registration statement contains additional information about us and our common stock. You can inspect or access electronically the registration statement and exhibits by the means described in the paragraph above.

The SEC allows us to "incorporate by reference" the information that we file with it, which means that we can disclose important information to you by referring you to another document filed separately with the SEC. The information incorporated by reference is an important part of this prospectus and the information that we file later with the SEC may updated and supersede this information. We incorporate by reference into this prospectus the documents listed below and any filings made by us with the SEC pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act after the date of filing of the registration statement of which this prospectus is part, but before the effective date of the registration statement (in each case, other than information in such documents that is not deemed to be filed).

- Our Annual Report on Form 10-K for the fiscal year ended December 31, 2003 (including information specifically incorporated by reference therein from our Proxy Statement for our 2004 Annual Meeting);

- Our Quarterly Report on Form 10-Q for the quarterly period ended March 28, 2004 (as amended on June 21, 2004);

- Our Current Reports on Form 8-K filed on January 30, 2004, February 27, 2004 (as amended on April 29, 2004) and May 21, 2004 (as amended on June 18, 2004) and

- Description of our common stock included in our Registration Statement on Form 8-A filed with the SEC pursuant to Section 12 of the Exchange Act on October 15, 1996 (No. 000-21559).

We will provide to each person, including any beneficial owner, to whom this prospectus is delivered a copy of any or all of the information that we have incorporated by reference into this prospectus but not delivered with this prospectus. To receive a free copy of any of the documents incorporated by reference in this prospectus, other than exhibits, unless they are specifically incorporated by reference in those documents, call or write Elliot J. Mark, our General Counsel, at our principal executive offices located at 296 Concord Road, Third Floor, Billerica, Massachusetts 01821. Our telephone number is (978) 932-2200.

You should rely only upon the information provided in this document or incorporated by reference in this prospectus and any supplement. We have not authorized anyone to provide you with different information.

Table of Contents

## LEGAL MATTERS

The validity of the shares of our common stock being offered by this prospectus will be passed upon for us by Latham & Watkins LLP and for the underwriters by Cahill Gordon & Reindel LLP.

## EXPERTS

Our financial statements as of December 31, 2002 and 2003 and for each of the three years in the period ended December 31, 2003, included herein and in our annual report on Form 10-K for the year ended December 31, 2003, which is incorporated by reference in this prospectus, have been audited by BDO Seidman, LLP, independent certified public accountants as indicated in their report with respect thereto, and are included herein and incorporated by reference in reliance upon the authority of said firm as experts in auditing and accounting.

The financial statements of ZN Vision Technologies AG as of December 31, 2003 and 2002 and for each of the years then ended, which are incorporated in this prospectus by reference to our current report on Form 8-K filed on May 21, 2004 and amended on June 18, 2004, have been audited by BDO Deutsche Warentreuhand AG, independent auditors as indicated in their report with respect thereto, and are included herein in reliance upon the authority of said firm as experts in auditing and accounting.

The financial statements of Trans Digital Technologies Corporation as of December 31, 2002 and 2003 and for the years then ended, which are incorporated in this prospectus by reference to our current report on Form 8-K filed on April 29, 2004, have been audited by BDO Seidman, LLP, independent certified public accountants as indicated in their report with respect thereto, and are included herein in reliance upon the authority of said firm as experts in auditing and accounting.

64

Table of Contents

## INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

|  | Page |
|---|---|
| Report of Independent Certified Public Accountants | F-2 |
| Consolidated Balance Sheets as of December 31, 2002, 2003 and March 28, 2004 | F-3 |
| Consolidated Statements of Operations for the years ended December 31, 2001, 2002 and 2003 and for the three month periods ended March 30, 2003 and March 28, 2004 | F-4 |
| Consolidated Statements of Changes in Shareholders' Equity for the years ended December 31, 2001, 2002 and 2003 and for the three month periods ended March 30, 2003 and March 28, 2004 | F-5 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2001, 2002 and 2003 and for the three month periods ended March 30, 2003 and March 28, 2004 | F-6 |
| Notes to Consolidated Financial Statements | F-7 |

F-1

Table of Contents

## REPORT OF INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS

To Viisage Technology, Inc.:

We have audited the accompanying consolidated balance sheets of Viisage Technology, Inc. and subsidiary as of December 31, 2003 and 2002, and the related consolidated statements of operations, changes in shareholders' equity and cash flows for each of the three years in the period ended December 31, 2003. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the Standards of the Public Company Accounting Oversight Board ("United States"). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Viisage Technology, Inc. and subsidiary as of December 31, 2003 and 2002, and the consolidated results of their operations and their cash flows for each of the three years in the period ended December 31, 2003, in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note 2 to the consolidated financial statements, the Company changed its method of accounting for certain revenue arrangements.

/s/ BDO SEIDMAN, LLP

Boston, Massachusetts
February 6, 2004
Except for Note 15, which is
    as of February 27, 2004

F-2

Table of Contents

## VIISAGE TECHNOLOGY, INC.

### Consolidated Balance Sheets
### (in thousands)

|  | December 31, 2002 | December 31, 2003 | March 28, 2004 (unaudited) |
|---|---|---|---|
| **Assets** | | | |
| Current Assets: | | | |
| Cash and cash equivalents | $ 2,212 | $ 6,666 | $ 9,282 |
| Restricted cash | 1,241 | — | — |
| Accounts receivable | 7,360 | 7,057 | 9,343 |
| Inventories and other costs and estimated earnings in excess of billings | 23,372 | 4,050 | 4,647 |
| Other current assets | 339 | 439 | 1,162 |
| Total current assets | 34,524 | 18,212 | 24,434 |
| Property and equipment, net | 16,629 | 25,088 | 24,810 |
| Goodwill | — | — | 63,613 |
| Intangible assets, net | 3,147 | 2,693 | 18,519 |
| Restricted cash | 6,163 | 6,311 | 3,120 |
| Other assets | 726 | 2,176 | 796 |
|  | $ 61,189 | $ 54,480 | $ 135,292 |
| **Liability and Shareholders' Equity** | | | |
| Current Liabilities: | | | |
| Accounts payable and accrued expenses | $ 7,017 | $ 6,851 | $ 11,051 |
| Current portion of project financing | 5,263 | 3,734 | 4,175 |
| Current portion of related party notes | — | 1,740 | 6,765 |
| Total current liabilities | 12,280 | 12,325 | 21,991 |
| Project financing | 9,845 | 5,813 | 7,013 |
| Related party notes | — | 2,334 | 13,470 |
| Other liabilities | — | — | 622 |
| Total liabilities | 22,125 | 20,472 | 43,096 |
| Commitments and contingencies | | | |
| Shareholders' Equity: | | | |
| Common stock, $0.001 par value; 45,000,000 shares authorized; 20,250,817, 23,892,772 and 35,625,176 shares issued and outstanding at December 31, 2002 and 2003 and March 28, 2004, respectively | 20 | 24 | 36 |
| Additional paid in capital | 63,461 | 76,061 | 135,869 |
| Accumulated deficit | (24,417) | (42,077) | (43,709) |
| Total shareholders' equity | 39,064 | 34,008 | 92,196 |
|  | $ 61,189 | $ 54,480 | $ 135,292 |

The accompanying notes are an integral part of these consolidated financial statements.

F-3

Table of Contents

## VIISAGE TECHNOLOGY, INC.

### Consolidated Statements of Operations
(in thousands, except per share data)

| | For the Years Ended December 31, | | | For the Three Months Ended | |
| --- | --- | --- | --- | --- | --- |
| | 2001 | 2002 | 2003 | March 30, 2003 | March 28, 2004 |
| | | | | (unaudited) | |
| Revenue | $ 26,280 | $ 32,302 | $ 37,371 | $ 8,155 | $ 12,259 |
| Cost of revenue | 19,602 | 25,239 | 27,844 | 6,789 | 8,906 |
| Gross margin | 6,678 | 7,063 | 9,527 | 1,366 | 3,353 |
| Operating expenses: | | | | | |
| Sales and marketing | 809 | 5,368 | 5,282 | 1,411 | 1,493 |
| Research and development | 2,054 | 4,457 | 3,650 | 945 | 959 |
| General and administrative | 2,500 | 5,069 | 5,110 | 1,093 | 2,137 |
| Acquisition expenses | 1,639 | — | — | — | — |
| Restructuring charges | — | 824 | — | — | — |
| Total operating expenses | 7,002 | 15,718 | 14,042 | 3,449 | 4,589 |
| Operating loss | (324) | (8,655) | (4,515) | (2,083) | (1,236) |
| Interest income | 31 | 196 | 99 | 28 | 21 |
| Interest expense | (1,241) | (1,071) | (1,068) | (247) | (413) |
| Other income | — | — | 18 | — | 21 |
| Loss before income taxes and cumulative effect of change in accounting principle | (1,534) | (9,530) | (5,466) | (2,302) | (1,607) |
| Provision for income taxes | — | — | (63) | (63) | (25) |
| Loss before cumulative effect of change in accounting principle | (1,534) | (9,530) | (5,529) | (2,365) | (1,632) |
| Cumulative effect of change in accounting principle | — | — | (12,131) | (12,131) | — |
| Net loss | (1,534) | (9,530) | (17,660) | (14,496) | (1,632) |
| Preferred stock dividends | (5) | — | — | — | — |
| Loss applicable to common shareholders | $ (1,539) | $ (9,530) | $ (17,660) | $ (14,496) | $ (1,632) |
| Basic and diluted loss per share before cumulative effect | $ (0.09) | $ (0.48) | $ (0.26) | $ (0.12) | $ (0.05) |
| Cumulative effect of change in accounting principle | $ — | $ — | $ (0.56) | $ (0.60) | $ — |
| Basic and diluted net loss per share applicable to common shareholders | $ (0.09) | $ (0.48) | $ (0.82) | $ (0.72) | $ (0.05) |
| Weighted average basic and diluted common shares outstanding | 16,265 | 20,046 | 21,445 | 20,258 | 31,362 |
| Pro forma operating results (for application of EITF 00-21) | $ (494) | $ (11,176) | $ (5,529) | $ (2,365) | $ (1,632) |
| Pro forma net loss per share | $ (0.03) | $ (0.56) | $ (0.26) | $ (0.12) | $ (0.05) |

The accompanying notes are an integral part of these consolidated financial statements.

Table of Contents

# VIISAGE TECHNOLOGY, INC.

## Consolidated Statements of Changes in Shareholders' Equity
### (in thousands)

| | Common Stock | Preferred Stock | Additional Paid-in Capital | Accumulated Deficit | Total |
|---|---|---|---|---|---|
| Balance, December 31, 2000 | $ 11 | $ 1,020 | $ 33,045 | $ (13,348) | $ 20,728 |
| Warrants issued for services | — | — | 994 | — | 994 |
| Exercise of employee stock options | 1 | — | 1,085 | — | 1,086 |
| Common stock issued for services | — | — | 297 | — | 297 |
| Common stock issued under employee stock purchase plan | — | — | 51 | — | 51 |
| Exercise of warrants | 3 | — | 764 | — | 767 |
| Conversion of debt and accrued interest | 1 | — | 1,067 | — | 1,068 |
| Private placement of common stock, net | 2 | — | 22,750 | — | 22,752 |
| Conversion of preferred stock and accrued dividends | 2 | (1,020) | 1,108 | — | 90 |
| Preferred stock dividends | — | — | — | (5) | (5) |
| Net loss | — | — | — | (1,534) | (1,534) |
| Balance, December 31, 2001 | 20 | — | 61,161 | (14,887) | 46,294 |
| Exercise of employee stock options | — | — | 974 | — | 974 |
| Common stock issued for services | — | — | 699 | — | 699 |
| Common stock issued under employee stock purchase plan | — | — | 51 | — | 51 |
| Contributed capital from Lau Acquisition | — | — | 576 | — | 576 |
| Net loss | — | — | — | (9,530) | (9,530) |
| Balance, December 31, 2002 | 20 | — | 63,461 | (24,417) | 39,064 |
| Exercise of employee stock options | — | — | 72 | — | 72 |
| Common stock issued for services | — | — | 319 | — | 319 |
| Common stock issued under employee stock purchase plan | — | — | 26 | — | 26 |
| Private placement of common stock, net | 4 | — | 12,183 | — | 12,187 |
| Net loss | — | — | — | (17,660) | (17,660) |
| Balance, December 31, 2003 | 24 | — | 76,061 | (42,077) | 34,008 |
| Exercise of employee stock options (unaudited) | — | — | 594 | — | 594 |
| Common stock issued under employee stock purchase plan (unaudited) | — | — | 33 | — | 33 |
| Common stock issued for acquisitions (unaudited) | 12 | — | 57,474 | — | 57,486 |
| Private placement of common stock, net (unaudited) | — | — | 1,707 | — | 1,707 |
| Net loss (unaudited) | — | — | — | (1,632) | (1,632) |
| Balance, March 28, 2004 (unaudited) | $ 36 | $ — | $ 135,869 | $ (43,709) | $ 92,196 |

The accompanying notes are an integral part of these consolidated financial statements.

Table of Contents

## VIISAGE TECHNOLOGY, INC.

### Consolidated Statements of Cash Flows
#### (in thousands)

| | For the Years Ended December 31, | | | For the Three Months Ended | |
|---|---|---|---|---|---|
| | 2001 | 2002 | 2003 | March 30, 2003 | March 28, 2004 |
| | | | | (unaudited) | |
| **Cash Flow from Operating Activities:** | | | | | |
| Net loss | $ (1,534) | $ (9,530) | $ (17,660) | $ (14,496) | $ (1,632) |
| Adjustments to reconcile net loss to net cash provided by (used for) operating activities: | | | | | |
| Depreciation and amortization | 4,511 | 7,197 | 6,806 | 1,844 | 2,279 |
| Gain on sale of equipment | — | — | (18) | — | — |
| Value of warrants issued for services | 994 | — | — | — | — |
| Directors fees paid in common stock | 297 | 380 | 319 | 30 | 120 |
| Impact of cumulative effect of change in accounting principle | — | — | 12,131 | 12,131 | — |
| Loss on disposal of fixed assets | — | 132 | 38 | — | — |
| Loss on disposal of intangible assets | — | 75 | 118 | — | — |
| Change in operating assets and liabilities: | | | | | |
| Accounts receivable | (1,516) | (2,022) | 303 | 1,926 | 828 |
| Inventories and other costs and estimated earnings in excess of billings | 3,007 | 289 | 1,402 | 6,830 | (273) |
| Other current assets | 299 | (38) | (100) | (371) | (433) |
| Accounts payable and accrued expenses | (3,773) | 406 | 1,101 | (1,457) | (303) |
| Net cash provided by (used for) operating activities | 2,285 | (3,111) | 4,440 | 6,437 | 586 |
| **Cash Flow from Investing Activities:** | | | | | |
| Purchase of equipment converted to project Financing | (7,946) | — | — | — | — |
| Restricted cash | — | (7,404) | 1,093 | 291 | 3,191 |
| Cash paid for acquisitions | — | (2,822) | (1,293) | — | (5,227) |
| Additions to property and equipment | (54) | (5,702) | (8,195) | (5,711) | (369) |
| Proceeds from sale of equipment | — | — | 35 | — | — |
| (Increase) decrease in other assets | (29) | (899) | (352) | (183) | (415) |
| Net cash used for investing activities | (8,029) | (16,827) | (8,712) | (5,603) | (2,820) |
| **Cash Flow from Financing Activities:** | | | | | |
| Net revolving credit repayments | (2,515) | — | — | — | — |
| Net proceeds from project financing | 7,946 | 4,500 | 3,318 | — | 4,273 |
| Principal payments on project financing | (4,000) | (4,037) | (6,877) | (1,297) | (1,771) |
| Net proceeds from issuance of common stock | 24,975 | 1,025 | 12,285 | 34 | 2,348 |
| Net cash provided by (used for) financing activities | 26,406 | 1,488 | 8,726 | (1,263) | 4,850 |
| Net increase (decrease) in cash and cash equivalents | 20,662 | (18,450) | 4,454 | (429) | 2,616 |
| Cash and cash equivalents, beginning of period | — | 20,662 | 2,212 | 2,212 | 6,666 |
| Cash and cash equivalents, end of period | $ 20,662 | $ 2,212 | $ 6,666 | $ 1,783 | $ 9,282 |
| **Supplemental Cash Flow Information:** | | | | | |
| Cash paid for interest | $ 1,161 | $ 944 | $ 1,078 | $ 236 | $ 256 |
| **Non-cash Transactions:** | | | | | |
| Conversion of convertible debt and accrued interest to common stock | $ 1,068 | $ — | $ — | $ — | $ — |
| Conversion of preferred stock and accrued dividends to common stock | $ 1,110 | $ — | $ — | $ — | $ — |
| Equipment purchased under capital leases | $ — | $ — | $ 2,071 | $ — | $ — |
| Directors fees paid in common stock | $ 297 | $ 380 | $ 300 | $ 30 | $ 120 |
| Assets contributed from Lau Acquisition Corp. | $ — | $ 576 | $ — | $ — | $ — |
| Value of warrants issued for service | $ 994 | $ — | $ — | $ — | $ — |
| Common stock issued for private placement costs | $ — | $ 319 | $ — | $ — | $ — |
| Services paid in common stock | $ — | $ — | $ 19 | $ — | $ 14 |
| Net assets acquired from Lau Technologies | $ — | $ — | $ — | $ — | $ — |
| Acquisitions paid in common stock | $ — | $ — | $ — | $ — | 57,486 |

The accompanying notes are an integral part of these consolidated financial statements.

Table of Contents

**VIISAGE TECHNOLOGY, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Information for the three-month periods ended March 30, 2003**
**and March 28, 2004 is unaudited)**

## 1.  DESCRIPTION OF BUSINESS

Viisage Technology, Inc. ("Viisage" or the "Company") is a leading provider of advanced technology identity solutions that enable governments, law enforcement agencies and businesses to enhance security, reduce identity theft and protect personal privacy. Our identity solutions include secure credential provisioning systems, biometric software and systems and real-time identity databases, as well as systems design, development, integration and support services. These solutions enable our customers to manage the entire life cycle of an individual's identity for a variety of applications including civil identification, criminal identification and border management. Our customers use our identity solutions to help solve the following four critical problems:

- assurance that the identification document is authentic;

- assurance that the document has been issued to the correct person;

- confidence that the person holding the identification is uniquely tied to and authorized to use the document and

- verification of the privileges the individual is entitled to at a particular point in time.

Our business involves two related segments: secure credentials and biometrics. Our secure credentials solutions involve the design, development, marketing and implementation of integrated software and hardware solutions that produce identification credentials utilizing face recognition and other biometric technologies. The focus of our biometric technology solutions is primarily on applications designed to deter criminal and terrorist activities, including government research and development contracts.

Viisage combines its proprietary biometric and secure credential software with complementary industry standard products to create identity solutions that integrate into its customers' environments. These turnkey solutions integrate secure document technologies, image and data capture, relational databases, and multiple biometrics, improving the customer's ability to process and manage identity information. Applications include passports, drivers' licenses, voter registration, national identification credentials, law enforcement, social services, access control, surveillance and PC network and Internet access security. Viisage's primary customers are government agencies with particular penetration in U.S. government agencies such as the Department of State and state departments of motor vehicles, social services, and law enforcement. Viisage is the sole source provider of high security technology and services to the U.S. Department of State for the production of U.S. passports by virtue of an acquisition in 2004 and has captured a large percentage of the domestic drivers' license market. Viisage also has provided services under subcontracts for projects in the United Arab Emirates, Jamaica, the Philippines and the U.S. Immigration and Naturalization Service.

## 2.  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

*Principles of Consolidation*

The consolidated financial statements include the accounts of the Company and its wholly owned subsidiary, Biometrica Systems, Inc. for the years ended December 31, 2002, 2003 and for the three month periods ended March 30, 2003 and March 28, 2004. The consolidated financial statements include the accounts of its wholly owned subsidiaries, Viisage AG and Trans Digital Technologies for the three month period ended March 28, 2004. Operating results for Viisage AG and Trans Digital Technologies are included from their dates of acquisition. All significant inter-company balances and transactions have been eliminated.

F-7

Table of Contents

<div align="center">

**VIISAGE TECHNOLOGY, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Information for the three-month periods ended March 30, 2003**
**and March 28, 2004 is unaudited)**

</div>

*Basis of Presentation*

The accompanying unaudited balance sheet as of March 28, 2004 and the related unaudited statements of operations and cash flows for the three-month periods ended March 30, 2003 and March 28, 2004 and the unaudited statement of changes in stockholders' equity for the three months ended March 28, 2004, have been prepared pursuant to the rules and regulations of the Securities and Exchange Commission. Certain information and footnote disclosures normally included in financial statements prepared in accordance with accounting principles generally accepted in the United States of America have been condensed or omitted pursuant to such rules and regulations.

In the opinion of management, all adjustments (which include only normal recurring adjustments) necessary to present fairly the financial position, results of operations, and cash flows as of March 28, 2004 and for the periods mentioned above have been made. The results of operations for the three-month period ended March 28, 2004 are not necessarily indicative of the operating results for the full year.

*Use of Estimates*

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

*Computation of Net Loss per Share*

We follow SFAS No. 128, *Earnings Per Share* , where basic loss per share is computed by dividing loss available to common shareholders by the weighted average number of common shares outstanding. The computation of diluted loss per share is similar to the basic loss per share computation except the denominator is increased to include the number of additional shares that would have been outstanding if the dilutive potential common shares had been issued. In addition, the numerator is adjusted for any changes in income or loss that would result from the assumed conversions of those potential shares.

Basic and diluted loss per share calculations are as follows (in thousands):

| | For the Year Ended December 31, | | | For the Three Months Ended | |
| --- | --- | --- | --- | --- | --- |
| | 2001 | 2002 | 2003 | March 30, 2003 | March 28, 2004 |
| | | | | (unaudited) | |
| Net loss available to common shareholders used in basic and diluted EPS | $ (1,539) | $ (9,530) | $ (17,660) | $ (14,496) | $ (1,632) |
| Weighted average common shares used in basic EPS | 16,265 | 20,046 | 21,445 | 20,258 | 31,362 |
| Effect of dilutive securities | — | — | — | — | — |
| Weighted average common shares and dilutive potential common shares used in dilutive EPS | 16,265 | 20,046 | 21,445 | 20,258 | 31,362 |

The diluted per share amounts do not reflect the impact of options outstanding, the conversion of convertible preferred stock, or stock warrants, for approximately 3,163,000, 3,382,000, 4,152,000, 3,735,000 and 5,379,000 shares at December 31, 2001, 2002 and 2003, March 30, 2003 and March 28, 2004, respectively because the effect of each is antidilutive.

<div align="center">

F-8

</div>

Table of Contents

**VIISAGE TECHNOLOGY, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Information for the three-month periods ended March 30, 2003**
**and March 28, 2004 is unaudited)**

*Contract Revenue and Cost Recognition*

For the year ended December 31, 2003 and the three months ended March 30, 2003, we incurred a non-cash charge of $12.1 million representing the cumulative effect of a change in accounting principle related to our adoption of Emerging Issues Task Force 00-21, *Accounting for Revenue Arrangements with Multiple Deliverables* , or EITF 00-21, on a cumulative basis as of January 1, 2003.

*Secure Credentials Revenue and Cost Recognition*

We deliver solutions under secure credential contracts primarily to federal and state government customers. We recognize revenue when pervasive evidence of a sales arrangement exists, delivery occurs or services are rendered, the sales price is fixed or determinable and collectibility is reasonably assured.

In some cases, we generate revenue from the sale of products in which title passes to the customer. In these cases, we recognize revenue when the products are shipped and accepted by the customer. Services revenue under these contracts consists of preventative and remedial maintenance on printing systems. We also provide on site technical support and consulting services to our customers. Revenue on fixed price services is recognized ratably over the service period which approximates the timing of the services rendered. Revenue on time and material services is recognized as the services are rendered. Expenses on all services are recognized when the costs are incurred.

When elements such as products and services are contained in a single arrangement, or in related arrangements with the same customer, we allocate revenue to each element based on its relative fair value, provided that such element meets the criteria for treatment as a separate unit of accounting. The price charged when the element is sold separately generally determines fair value.

We have secure credential contracts, generally with state governments for the production of drivers' licenses and other identification credentials, where we have determined that we have multiple elements and where the title to equipment installed to produce these credentials does not pass to the customer. Under these contracts, the first element consists of hardware, system design, implementation, training, consumables management, maintenance and support which is accounted for as equipment and related executory services under lease in accordance with SFAS No. 13. The second element consists of customized software which is accounted for as a long term contract in accordance with AICPA Statement of Position 97-2, *Software Revenue Recognition* , or SOP 97-2, and Statement of Position 81-1, *Accounting for Performance of Construction-Type and Certain Production-Type Contracts* , or SOP 81-1, on a units of delivery method of measurement.

Costs related to the hardware element of these contracts are capitalized on the balance sheet and are depreciated over the remaining contract term beginning when the system goes into service. The delivery of these credentials typically requires us to customize, design and install equipment and software at customer locations, as well as perform training, supply consumables, maintain the equipment and provide support services. Nonperformance of training, consumables management, maintenance and support services would prevent us from receiving payment for the costs incurred in the customization, design and installation of the system. EITF 00-21 limits the amount of revenue allocable to the customization, design and installation of the system to the amount that is not contingent upon the production of credentials. Revenue on these contracts under EITF 00-21 is earned based on, and is contingent upon, the production of credentials from the system. Due to the contingent performance of credential production in our secure credentials contracts, we defer revenue recognition for the system design and installation phase of our contracts, including customized software and equipment, and recognize revenue as credentials are produced.

F-9

Table of Contents

## VIISAGE TECHNOLOGY, INC.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (Information for the three-month periods ended March 30, 2003
### and March 28, 2004 is unaudited)

Costs related to the customized software element of our secure credentials contracts where title to the hardware element does not pass to the customer are capitalized on the balance sheet during the period in which we are designing and installing the system and are amortized over the remaining contract term beginning when the system goes into service. Costs related to this element of our secure credentials contracts incurred after the system is in service are expensed as incurred. Revenue related to this element of our secure credentials contracts is recorded as credentials are produced by the system.

Our secure credentials contracts related to the delivery of drivers' licenses and identification credentials typically provide that the state department of transportation, or similar agency, will pay a fixed price per credential produced utilizing a system we design, implement and support. Our fixed pricing includes charges for the use of the system, materials and the data that is stored on the credentials. Prices under these contracts vary depending on, among other things:

- Design and integration complexities;

- Nature and number of workstations and sites installed;

- Projected number of secure credentials to be produced;

- Size of the database;

- Level of post-installation involvement that will be required of us and

- Competitive environment.

Prior to the adoption of EITF 00-21, we recognized revenue and costs associated with our secure credentials contracts related to the delivery of drivers' licenses and identification credentials as a single accounting element using the percentage-of-completion methodology.

*Biometrics Segment Revenue and Cost Recognition*

Within our biometrics segment, our contracts typically provide for the development, customization and installation of face recognition systems for government agencies, law enforcement agencies and businesses. These contracts are generally fixed price, and include milestones and acceptance criteria for the various deliverables under the contract. Contract prices vary depending on, among other things, design and integration complexities, the nature and number of workstations and sites, the size of the database, the level of post-installation support and the competitive environment. In certain cases, we provide licenses of off-the-shelf versions of our face recognition software on a per user basis.

We recognize revenue under these contracts using the percentage-of-completion methodology in accordance with SOP 81-1. We use the percentage-of-completion methodology to account for revenue under these contracts because:

- A high level of certainty exists regarding expected cash flows from these contracts and

- A reliable basis exists for determining the percentage of the contract that will be completed at the end of the accounting period.

We measure the percentage complete as costs are incurred or for contracts based on milestones, revenue is recognized when scheduled performance milestones and customer acceptance criteria have been achieved. These milestones are specific events or deliverables clearly identified in the contract. We recognize revenue based on the total milestone billable to the customer less revenue related to any future maintenance requirements. Billings occur under these contracts when the milestone is delivered and accepted by the customer. Milestones can include customized systems, installation and services as defined by the contract.

F-10

Table of Contents

**VIISAGE TECHNOLOGY, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Information for the three-month periods ended March 30, 2003**
**and March 28, 2004 is unaudited)**

We record costs and estimated earnings in excess of billings under these contracts as current assets. We record billings in excess of costs and estimated earnings and accrued contract costs as current liabilities.

Under SOP 97-2 revenue related to software licenses of off-the-shelf face recognition software is recognized when:

- Persuasive evidence of an arrangement exists;

- Delivery has occurred;

- The sales price is fixed and determinable;

- Collection is probable and

- There are no post delivery obligations.

We adopted EITF 00-21 on a cumulative basis as of January 1, 2003. Based on our evaluation of biometrics contracts and the application of the new guidance, the adoption of EITF 00-21 did not have an impact on the accounting for revenue from biometrics systems under long-term contracts.

*Cash and Cash Equivalents*

We consider all highly liquid instruments, with maturity of three months or less when acquired, to be cash equivalents. As of December 31, 2002, 2003 and March 28, 2004, cash and cash equivalents consisted entirely of cash and exclude approximately $7.4 million, $6.3 million and $3.1 million, respectively, the use of which was restricted under our term loan agreement.

*Fair Value of Financial Instruments*

The carrying amounts of our financial instruments, including cash and cash equivalents, accounts receivable and payable and short and long-term borrowings, approximate fair values.

*Accounts Receivable and Concentrations of Credit Risk*

Accounts receivable are due principally from government agencies and contractors to government agencies, under long-term contracts that we entered into with our customers. Billings rendered in connection with work performed are in accordance with the terms of the contract and collateral is not required. Management periodically reviews accounts receivable for possible uncollectible amounts. In the event management determines a specific need for an allowance, a provision for doubtful accounts is provided. As of December 31, 2002, 2003 and March 28, 2004, management determined that no allowance for doubtful accounts was necessary.

For the year ended December 31, 2001, four customers, Illinois Secretary of State, Unisys Corporation (Florida Department of Safety and Motor Vehicles), Kentucky Transportation Cabinet and Pennsylvania Department of Transportation, each accounted for over 10% of our revenue and an aggregate of 49% of revenues for the year. For the year ended December 31, 2002, two customers, Connecticut Department of Information Technology and Mississippi Department of ITS each accounted for over 10% of our revenue and an aggregate of 22% of revenues for the year. As of December 31, 2002, the accounts receivable balances for these customers totaled approximately $349,000. For the year ended December 31, 2003, two customers, Pennsylvania Department of Transportation and Illinois Secretary of State, each accounted for more than 10% of our revenue and an aggregate of 26% of our revenue. As of December 31, 2003, the accounts receivable from these customers

F-11

Table of Contents

VIISAGE TECHNOLOGY, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Information for the three-month periods ended March 30, 2003
and March 28, 2004 is unaudited)

was $1.4 million. For the three months ended March 28, 2004, one customer, the U.S. Department of State, accounted for an aggregate of 13% of revenue for the period. As of March 28, 2004, the accounts receivable balance for this customer totaled approximately $863,000.

*Property and Equipment*

Property and equipment are recorded at cost or the lesser of fair value or the present value of minimum lease payments for items acquired under capital leases. Depreciation and amortization are calculated using the straight-line or usage-based methods over the estimated useful lives of the related assets (3 to 7 years) or the lease term, whichever is shorter.

System assets related to the hardware and customized software elements of our secure credentials contracts after January 1, 2003 are depreciated over the related contract terms using the straight-line method beginning when the system goes into service. The straight line method approximates the ratio that current gross revenues for the contract bear to the total of current and anticipated future gross revenues for that contract in accordance with Statement of Financial Accounting Standards (SFAS) No. 86, *Accounting for the Costs of Computer Software to be Sold, Leased, or Otherwise Marketed* .

*Intangible Assets*

Intangible assets consist primarily of completed technology, patents, customer lists and other assets primarily arising from the acquisition of a business or business assets. These intangible assets are amortized using the straight-line method over their estimated useful lives of 5 to 17 years (in thousands).

|  | December 31, | | March 28, 2004 | Weighted Average Useful Life |
|---|---|---|---|---|
|  | 2002 | 2003 | (unaudited) |  |
| Gross carrying amount: |  |  |  |  |
| Patents | $ 534 | $ 606 | $ 612 | 17 years |
| Completed technology | 2,384 | 2,384 | 4,445 | 5 years |
| Customer lists | 596 | 596 | 596 | 10 years |
| Acquired contracts | — | — | 14,430 | 5 years |
| Total intangible assets | 3,514 | 3,586 | 20,083 |  |
| Accumulated amortization: |  |  |  |  |
| Patents | (52) | (80) | (90) |  |
| Completed technology | (265) | (703) | (953) |  |
| Customer lists | (50) | (110) | (138) |  |
| Acquired contracts | — | — | (383) |  |
| Total accumulated amortization | (367) | (893) | (1,564) |  |
| Intangible assets, net | $ 3,147 | $ 2,693 | $ 18,519 |  |

F-12

Table of Contents

# VIISAGE TECHNOLOGY, INC.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (Information for the three-month periods ended March 30, 2003
### and March 28, 2004 is unaudited)

Amortization expense related to intangible assets was $3,500, $360,000, $526,000, $118,000 and $671,000 for the years ended December 31, 2001, 2002, 2003 and for the three months ended March 30, 2003 and March 28, 2004, respectively. Estimated amortization of our intangible assets for the next five fiscal years is as follows (in thousands):

| Estimated amortization expense for the year ended December 31, (intangible assets only) | |
|---|---|
| 2004 | $ 3,549 |
| 2005 | 3,851 |
| 2006 | 3,741 |
| 2007 | 3,732 |
| 2008 | 3,271 |

*Long Lived Assets*

We evaluate long-lived assets with finite lives, such as intangible assets, property and equipment and certain other assets, for impairment in accordance with Financial Accounting Standards Board Statement of Financial Accounting Standards No. 144 (SFAS 144), *Accounting for the Impairment or Disposal of Long-Lived Assets* . We record an impairment charge whenever events or changes in circumstances indicate that the carrying amount of the assets may not be recoverable through the estimated undiscounted future cash flows from the use of these assets. When any such impairment exists, the related assets are written down to fair value.

*Research and Development*

Research and development costs are charged to expense as incurred.

*Software Development*

We review software development costs incurred in accordance with the provisions of Statement of Financial Accounting Standards (SFAS) No. 86, *Accounting for the Costs of Computer Software to be Sold, Leased, or Otherwise Marketed* , which requires that certain costs incurred in the development of computer software to be sold or leased be capitalized once technological feasibility is reached. For the years ended December 31, 2001 and 2003, we did not capitalize any software development costs because development costs incurred subsequent to the establishment of technological feasibility were not material. For the year ended December 31, 2002 we capitalized $207,000 in software development costs, which is being amortized over three years. We recorded amortization expense of $69,000, $34,000 and $17,000 related to this asset in fiscal 2003 and 2002 and for the three months ended March 28, 2004, respectively.

Costs related to software developed for internal use are expensed as incurred until technological feasibility has been reached. Costs for externally purchased software is capitalized and depreciated over its estimated useful life not to exceed five years.

*Income Taxes*

We account for income taxes under SFAS No. 109, *Accounting for Income Taxes* . Deferred tax assets and liabilities are recognized for the estimated future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. Deferred income tax assets and liabilities are measured using currently enacted tax rates. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. Due

F-13

Table of Contents

VIISAGE TECHNOLOGY, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Information for the three-month periods ended March 30, 2003
and March 28, 2004 is unaudited)

to the uncertainty surrounding the realization of our net deferred tax asset, we have provided a full valuation allowance against this amount.

*Stock-Based Compensation*

We account for our stock-based compensation plans under Accounting Principles Board Opinion No. 25, *Accounting for Stock Issued to Employees* , and accordingly account for employee stock based compensation utilizing the intrinsic value method. SFAS No. 123, *Accounting for Stock-Based Compensation* , establishes a fair value based method of accounting for stock-based compensation plans. We have adopted the disclosure only alternative under SFAS No. 123, which requires disclosure of the pro forma effects on earnings and earnings per share as if SFAS No. 123 had been adopted as well as certain other information.

In December 2002, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards No. 148, *Accounting for Stock-Based Compensation—Transition and Disclosure* ("FAS 148"), which (i) amends FAS Statement No. 123, *Accounting for Stock-Based Compensation* , to provide alternative methods of transition for an entity that voluntarily changes to the fair value based method of accounting for stock-based employee compensation (ii) amends the disclosure provisions of FAS 123 to require prominent disclosure about the effects on reported net income of an entity's accounting policy decisions with respect to stock-based employee compensation and (iii) amends APB Opinion No. 28, *Interim Financial Reporting* , to require disclosure about those effects in interim financial information. Items (ii) and (iii) of the new requirements in FAS 148 are effective for financial statements for fiscal years ending after December 15, 2002. We initially adopted FAS 148 beginning for the fiscal year ended December 31, 2002 and continue to account for stock-based compensation utilizing the intrinsic value method. The additional disclosures required by FAS 148 are as follows (in thousands):

|  | For the Year Ended December 31, | | | For the Three Months Ended | |
| --- | --- | --- | --- | --- | --- |
|  | 2001 | 2002 | 2003 | March 30, 2003 | March 28, 2004 |
|  |  |  |  | (unaudited) | |
| Net loss as reported | $ (1,534) | $ (9,530) | $ (17,660) | $ (14,496) | $ (1,632) |
| Add: stock based employee compensation expense included in reported net loss | — | — | — | — | — |
| Deduct: total stock based employee compensation determined under fair value based method for all awards, net of tax | (3,036) | (2,279) | (3,358) | (602) | (993) |
| Pro forma net loss | $ (4,570) | $ (11,809) | $ (21,018) | $ (15,098) | $ (2,625) |
| Loss per share: |  |  |  |  |  |
| Basic and diluted, as reported | $ (0.09) | $ (0.48) | $ (0.82) | $ (0.72) | $ (0.05) |
| Basic and diluted, pro forma | $ (0.28) | $ (0.59) | $ (0.98) | $ (0.75) | $ (0.08) |

*Recent Accounting Pronouncements*

In April 2003, the FASB issued SFAS No. 149 which amends and clarifies financial accounting and reporting for derivative instruments, including certain derivative instruments embedded in other contracts, and for hedging activities under SFAS No. 133. In particular, SFAS No. 149 clarifies under what circumstances a

F-14

Table of Contents

## VIISAGE TECHNOLOGY, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Information for the three-month periods ended March 30, 2003
and March 28, 2004 is unaudited)

contract with an initial net investment meets the characteristic of a derivative discussed in SFAS No. 133, clarifies when a derivative contains a financing component, amends the definition of an underlying (as initially defined in SFAS No. 133) to conform it to language used in FIN No. 45, Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others, and amends certain other existing pronouncements. SFAS No. 149 is effective for all contracts entered into or modified after June 30, 2003, subject to certain exceptions. The adoption of this statement did not have an impact on our financial position, results of operations, or cash flows.

In May 2003, the FASB issued SFAS No. 150, *Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity* , which establishes standards for how an issuer classifies and measures certain financial instruments with characteristics of both liabilities and equity. SFAS No. 150 requires that an issuer classify a financial instrument that is within its scope as a liability (or an asset in some circumstances), while many of such instruments were previously classified as equity or "mezzanine" equity. The statement also requires that income statement treatment be consistent with the balance sheet classification. That is, if the instrument is classified as a liability, payments to the holders are interest expense, not dividends, and changes in value are recorded in earnings. The statement relates to three specific categories of instruments: mandatorily redeemable shares, freestanding written put options and forward contracts that obligate an entity to purchase its own shares, and freestanding contracts that obligate an entity to pay with its own shares in amounts that are either unrelated, or inversely related, to the price of the shares. SFAS No. 150 is effective immediately for financial instruments entered into or modified after May 31, 2003 and otherwise is effective in the first interim period beginning after June 15, 2003. The adoption of this statement did not have an impact on our financial position, results of operations, or cash flows.

In January 2003, the FASB issued Financial Interpretation No. 46, *Consolidation of Variable Interest Entities* (FIN 46), which requires the consolidation of certain variable interest entities. In December 2003, the FASB issued a revision to FIN 46. The revised FIN 46, which replaces the original FIN 46 issued in January 2003, clarifies the application of Accounting Research Bulletin No. 51, *Consolidated Financial Statements* , to certain entities in which equity investors do not have the characteristics of a controlling financial interest or do not have sufficient equity at risk for the entity to finance its activities without additional subordinated financial support. While this interpretation exempts certain entities from its requirements, it also expands the definition of a variable interest entity ("VIE") to a broader group of entities than those previously considered special-purpose entities ("SPE's") and specifies the criteria under which it is appropriate for an investor to consolidate VIE's. Application of the revised FIN 46 is required in financial statements of public entities that have interest in structures that are commonly referred to as SPE's for periods ending after December 15, 2003. For all other types of VIE's, application of the revised FIN 46 by public entities is required for periods ending after March 15, 2004. The application of this interpretation with respect to structures commonly referred to as SPE's did not have a material impact on our financial position, results of operations, or cash flows. The application of this interpretation with respect to other types of VIE's did not have a material impact on our financial position, results of operations or cash flows.

In December 2003, the Securities and Exchange Commission ("SEC") published SAB No. 104, *Revenue Recognition* . SAB No. 104 was effective upon issuance and supersedes SAB No. 101, *Revenue Recognition in Financial Statements* , and rescinds the accounting guidance contained in SAB No. 101 related to multiple-element revenue arrangements that was superseded by EITF Issue No. 00-21. Accordingly, SAB No. 104 rescinds portions of the interpretive guidance included in Topic 13 of the codification of staff accounting bulletins. While the wording of SAB No. 104 has changed to reflect the guidance of EITF 00-21, the revenue recognition principles of SAB No. 101 have remained largely unchanged. The adoption of SAB No. 104 did not have a material effect on our financial position, results of operations, or cash flows.

Table of Contents

# VIISAGE TECHNOLOGY, INC.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (Information for the three-month periods ended March 30, 2003
### and March 28, 2004 is unaudited)

In March 2004, the Financial Accounting Standards Board ("FASB") issued a proposed Statement, "Share-Based Payment", that addresses the accounting for share-based payment transactions in which an enterprise receives employee services in exchange for (a) equity instruments of the enterprise or (b) liabilities that are based on the fair value of the enterprise's equity instruments or that may be settled by the issuance of such equity instruments. The proposed statement would eliminate the ability to account for share-based compensation transactions using APB Opinion No. 25, "Accounting for Stock Issued to Employees", and would generally require that such transactions be accounted for using a fair value-based method. As discussed in Note 2, we currently account for share-based compensation transactions using APB Opinion No. 25. If this statement is issued, the adoption of this interpretation will have a material negative impact on our consolidated financial position and results of operations, the level of which we are currently assessing.

## 3.    RELATED PARTY TRANSACTIONS

*Debt*

In May 2003 we entered into a loan agreement with Lau Technologies, a significant shareholder of Viisage, which provided for four term notes aggregating $7.3 million but not to exceed an outstanding principal balance of $7.0 million at any point in time. Two of these term notes, in the amounts of approximately $1.6 million and $287,000, replaced existing system finance lease obligations we had with a commercial leasing organization. These finance lease obligations were paid in full with the proceeds of the two new term notes. The remaining two new term notes with borrowing limits of $3.0 million and $2.5 million, are additional financing related to two new state contracts. All four new term notes bear interest at an annual rate of 8.5%. We believe that the terms of this loan agreement are the same as the terms that would have been provided to us by an unaffiliated lender. In particular, the financial covenants under this loan agreement are the same as the financial covenants under our loan agreement with our primary bank lender. We may draw funding on these notes as needed to meet our obligations for equipment purchases on the related state contracts. As of December 31, 2003 we had approximately $4.1 million outstanding under this loan agreement, leaving approximately $2.9 million available for future needs. Interest expense related to these term notes was $229,000 for the year ended December 31, 2003. As of March 28, 2004 we had approximately $4.9 million outstanding under this loan agreement. Interest expense related to these term notes was approximately $95,000 for the three months ended March 28, 2004. (See Note 6 for further information).

*Licenses*

In fiscal 2001 and 2000, we obtained from Lau an exclusive, perpetual, worldwide license to use a U.S. patent purchased from Daozeng Lu and Simon Lu, and all improvements thereto, which relates to a system for automatically verifying the identity of an individual using identification parameters that are carried on an escort memory such as an identification or credit card. In 2002, we purchased this patent from Lau as part of the acquisition of Lau's face recognition assets.

*Other*

On January 10, 2002, we acquired the assets of Lau Security Systems, including technology, patents, contracts and distribution channels. In return, we agreed to pay Lau a royalty of 3.1% of face recognition revenues over the next 12 and one half years, up to an aggregate maximum of $27.5 million and assume certain liabilities related to the acquired business. Royalty expense included in operating expenses was approximately $108,000, $101,000, $34,000 and $38,000 for the years ended December 31, 2002 and 2003 and for the three months ended March 30, 2003 and March 28, 2004, respectively. There were no royalties paid to Lau for these technology patents in 2001.

F-16

Table of Contents

## VIISAGE TECHNOLOGY, INC.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (Information for the three-month periods ended March 30, 2003
### and March 28, 2004 is unaudited)

In connection with the purchase of the business of Lau Security Systems, we entered into consulting agreements with Denis K. Berube, Executive Vice President and Chief Operating Officer of Lau and Chairman of our Board, and Joanna Lau, President and Chief Executive Officer of Lau and the beneficial owner of more than 5% of our outstanding stock. Under the consulting agreements, each of Mr. Berube and Ms. Lau will receive annual compensation of $125,000. Each agreement terminates at the earlier of the tenth anniversary of the purchase or the commencement of the consultant's full-time employment elsewhere.

We provided administrative services for Lau for an annual fee of approximately $114,000 and $109,000 for the years ended December 31, 2002 and 2003, respectively. This arrangement was terminated on January 2004.

A Use and Occupancy Agreement with Lau requires us to pay our proportionate share of the cost of shared facilities and office services including rent, insurance, property taxes, utilities and other operating expenses, based on square footage or equipment utilized. The annual fee for facilities and services is revised for changes in space utilized and in operating expenses. For the years ended December 31, 2001, 2002, 2003 and for the three months ended March 30, 2003 and March 28, 2004 fees paid under this use and occupancy agreement were $360,000, $699,000, $725,000, $238,000 and $61,000, respectively. This agreement was terminated in January 2004.

Our employees previously participated in various Lau employee benefit plans. We paid our proportionate share of the costs of such plans based on the number of participating employees.

At December 31, 2002 we had $50,000 of accounts receivable due from Lau and approximately $126,000 of accounts payable due to Lau. At December 31, 2003 there was no accounts receivable balance due from Lau and there was $23,000 of accounts payable due to Lau. At March 28, 2004 there was no accounts receivable balance due from Lau and there was $23,000 payable due to Lau.

In connection with the acquisition of TDT on February 14, 2004, we issued a promissory note to B.G. Beck, the former President and Chief Executive Officer of TDT and Vice Chairman of our Board, in the amount of $15.3 million, which is secured by some of TDT's assets. This note bears interest at an annual rate of 8.5% and is payable in equal installments of principle and interest on December 1, 2004, May 1, 2005 and December 1, 2005. We believe that the terms of this loan agreement are the same as the terms that would have been provided to us by an unaffiliated lender. In particular, the financial covenants under this loan agreement are the same as the financial covenants under our loan agreement with our primary bank lender. Interest expense related to this note was approximately $162,000 for the three months ended March 28, 2004.

In connection with the acquisition of TDT, we also entered into a consulting agreement with Mr. Beck. Under the agreement, Mr. Beck will receive annual compensation of $300,000 for two years, provided that Mr. Beck devotes his full business time to developing business opportunities for us.

In connection with the acquisition of ZN, we entered into a consulting agreement with Yon AG, of which Marcel Yon, a member of our Board, is the Chief Executive Officer and sole shareholder. Under the consulting agreement, Yon AG will receive annual compensation of approximately $110,000 and is eligible for up to $55,000 in performance bonuses. This agreement can be terminated at any time with six months notice. We also lease certain office space in Bochum, Germany that is owned by Zentrum für Neuroinformatik GmbH, of which Mr. Yon is the Chief Executive Officer and beneficially owns, directly and indirectly, approximately 38% of its outstanding share capital. We believe the terms of the lease agreement are consistent with market rates. The lease agreement may be terminated at any time with six months notice.

F-17

Table of Contents

**VIISAGE TECHNOLOGY, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Information for the three-month periods ended March 30, 2003**
**and March 28, 2004 is unaudited)**

We have employment and noncompetition agreements with certain officers. Such agreements provide for employment and related compensation, and restrict the individuals from competing, as defined, with us during the terms of their respective agreements and for up to two years thereafter. The agreements also provide for stock options under our stock option plan and for severance payments upon termination under circumstances defined in such agreements.

## 4.  PROPERTY AND EQUIPMENT

Property and equipment are summarized as follows (in thousands):

|  | December 31, | | March 28, 2004 | Weighted Average Useful Life |
|---|---|---|---|---|
|  | 2002 | 2003 | | |
|  | | | (unaudited) | |
| System assets held under capital leases | $ 14,327 | $ 9,455 | $ 1,355 | Contract period |
| System assets | 16,216 | 42,702 | 51,017 | Contract period |
| Computer and office equipment | 1,185 | 1,654 | 2,845 | 5 years |
|  | 31,728 | 53,811 | 55,217 | |
| Less accumulated depreciation | 15,099 | 28,723 | 30,407 | |
|  | $ 16,629 | $ 25,088 | $ 24,810 | |

We had additions to system assets totaling $10.2 million for the year ended December 31, 2003 and $215,000 for the three months ended March 28, 2004. The net book value of system assets under capital leases was approximately $4.7 million, $3.9 million and $1.3 million at December 31, 2002, 2003 and March 28, 2004, respectively. Depreciation expense on fixed assets for the years ended December 31, 2001, 2002, 2003, March 30, 2003 and March 28, 2004 was approximately $4.5 million, $6.8 million, $6.3 million, $1.7 million and $1.6 million, respectively.

## 5.  ACCOUNTS PAYABLE AND ACCRUED EXPENSES

Accounts payable and accrued expenses consist of the following (in thousands):

|  | December 31, | | March 28, 2004 |
|---|---|---|---|
|  | 2002 | 2003 | |
|  | | | (unaudited) |
| Accounts payable | $ 3,441 | $ 3,673 | $ 7,799 |
| Other accrued expenses | 798 | 1,419 | 2,283 |
| Accrued bonus | — | 830 | 205 |
| Accrued payroll and related taxes | 393 | 462 | 276 |
| Accrued vacation | 478 | 436 | 488 |
| Accrued earned and unbilled costs | 1,487 | — | — |
| Accrued restructuring costs | 420 | 31 | — |
|  | $ 7,017 | $ 6,851 | $ 11,051 |

## 6.  LONG TERM DEBT AND PROJECT FINANCING ARRANGEMENTS

In February 2004, we entered into a new loan agreement with Commerce Bank and Trust Company, or Commerce, that superseded the original loan agreement for our existing term loans. Under this new agreement, we borrowed an additional $3.0 million and reduced the required restricted cash balance under the new agreement with Commerce by $2.0 million. We also negotiated a reduction of $1.2 million of restricted cash with

F-18

Table of Contents

# VIISAGE TECHNOLOGY, INC.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (Information for the three-month periods ended March 30, 2003
### and March 28, 2004 is unaudited)

Lau, concurrent with the execution of the new loan agreement with Commerce. The $3.0 million term loan provided by this agreement bears interest at an annual rate of 7.3%. The following table lists the approximate term note information for Commerce and Lau as of the dates indicated (in thousands):

| Lender | Original Loan Amount | Monthly Payment Provision | Date of Loan | Due Date | Annual Interest Rate | Outstanding Principal Balance | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | December 31, | | March 28, 2004 |
| | | | | | | 2002 | 2003 | |
| | | | | | | | | (unaudited) |
| Commerce | $ 4,000 | $ 84 | 2/7/2001 | 6/20/2006 | 8.00% | $ 3,044 | $ 2,259 | $ 2,053 |
| Commerce | 3,200 | 72 | 9/11/2001 | 3/11/2006 | 6.25% | 2,522 | 1,800 | 1,612 |
| Commerce | 1,800 | 34 | 12/12/2002 | 12/31/2007 | 5.25% | 1,800 | 1,477 | 1,394 |
| Commerce | 1,500 | 27 | 12/12/2002 | 4/24/2008 | 5.25% | 1,500 | 1,255 | 1,191 |
| Commerce | 1,200 | 24 | 12/12/2002 | 6/24/2007 | 5.25% | 1,200 | 962 | 901 |
| Lau | 2,040 | 53 | 5/30/2003 | 6/30/2009 | 8.50% | — | 1,795 | 1,673 |
| Lau | 2,500 | 51 | 5/30/2003 | 5/30/2008 | 8.50% | — | 1,098 | 2,249 |
| Lau | 1,562 | 64 | 5/30/2003 | 8/30/2005 | 8.50% | — | 1,181 | 1,014 |
| Lau | 287 | 42 | 5/30/2003 | 12/30/2003 | 8.50% | — | — | — |
| Commerce | 3,000 | 36 | 2/27/2004 | 2/27/2007 | 7.30% | — | — | 2,924 |
| | $ 21,089 | $ 487 | | | | $ 10,066 | $ 11,827 | $ 15,011 |

In accordance with the new loan agreement the term notes are collateralized by certain of our assets and the related contract assets. We restructured our bank covenants to account for the impact of the closing of our transactions with ZN and TDT. We are required to maintain various financial covenants, including;

- a net loss for the year ending December 31, 2004 of not more than $500,000 and positive net after-tax income in each fiscal year thereafter

- a minimum tangible net worth (as defined in the loan agreement) of approximately $16.7 million for the second quarter of 2004, increasing each quarter thereafter

- our debt to tangible net worth ratio (as defined in the loan agreement) not to exceed the following quarterly benchmarks: 3.00:1.00 for the second quarter of 2004, 2.75:1.00 for the third quarter of 2004, and 2.20:1.00 for the fourth quarter of 2004

- our debt service coverage ratio (as defined in the loan agreement) must be greater than 0.48 for the first quarter of 2004, 1.25 for the second and third quarters of 2004 and 1.00 for the fourth quarter of 2004

- annual capital expenditures may not exceed $1.5 million for the year ending December 31, 2004 and no single capital expenditure may exceed $250,000

Additionally, in accordance with the new agreement, we must maintain $3.0 million of cash on deposit with the lender through September 29, 2004, $4.0 million through November 29, 2004 and $5.0 million by December 31, 2004 and thereafter. This amount is recorded as restricted cash in long term assets. As of March 28, 2004 we had an additional $120,000 of restricted cash at Commerce related to our loan agreement with Lau.

We also had one capital lease arrangement in which we were required to maintain the same financial ratios and minimum levels of tangible capital funds, as stated above. Pursuant to this arrangement, the lessor purchases certain of our digital identification systems and leases them back to us for deployment with identified and contracted customers approved by the lessor. The lessor retains title to systems and has an assignment of our

Table of Contents

## VIISAGE TECHNOLOGY, INC.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (Information for the three-month periods ended March 30, 2003
### and March 28, 2004 is unaudited)

rights under the related customer contracts, including rights to use the software and technology underlying the related systems. Under these arrangements, the lessor bears the credit risk associated with payments by our customers, but we bear performance and appropriation risk and are generally required to repurchase a system in the event of a termination by a customer for any reason except credit default. These project lease arrangements are accounted for as capital leases. At December 31, 2003 and 2002, we had approximately $318,000 and $5.0 million outstanding under these lease-financing arrangements respectively. At March 28, 2004, this lease-financing arrangement was paid in full.

In April 2003 we entered into an arrangement for approximately $1.5 million of equipment financing with three of our suppliers. These project lease arrangements are accounted for as capital leases. There are no financial covenants associated with these leasing arrangements. As of March 28, 2004 we had outstanding $611,000 under these arrangements. As of December 31, 2003 we had outstanding $876,000 under these arrangements. The interest rates on these capital leases are between 6% and 8% and are fixed. The terms of these leases range from 12 months to 60 months. In August 2003 we entered into an arrangement for financing of database licenses with another vendor. As of December 31, 2003 we have outstanding $600,000 under this arrangement.

In the first quarter of 2004 we purchased an asset totaling $800,000 which is payable in installments over four years. On the March 28, 2004 balance sheet, $200,000 is included in accounts payable and other accrued expenses and $600,000 is recorded under other liabilities.

We are in compliance with our bank covenants as of March 28, 2004 and December 31, 2003 and we believe that we will be able to maintain compliance with our bank covenants in the future. However, this expectation is dependent on achieving our business plan. If we do not remain in compliance with the covenants in our financing arrangements, the lenders and the lessors could require immediate repayment of outstanding amounts. As of March 28, 2004, there was approximately $15.0 million outstanding under our credit facilities with Commerce and Lau.

At December 31, 2003, approximate future minimum annual payments under project financing capital leases and maturities of term notes are as follows (in thousands):

|  | Capital Leases | Term Notes |
|---|---|---|
| Year ending: |  |  |
| 2004 | $  1,314 | $  4,209 |
| 2005 | 398 | 4,235 |
| 2006 | 81 | 2,244 |
| 2007 | 61 | 1,008 |
| 2008 | 20 | 131 |
| Total minimum payments | 1,874 | 11,827 |
| Less interest portion | 80 |  |
| Present value of net minimum lease payments | 1,794 |  |
| Less current portion | 1,265 | 4,209 |
| Long term portion | $  529 | $  7,618 |

The above table excludes payments on the promissory note issued to B.G. Beck in connection with the acquisition of TDT. This note is payable in equal principal installments of $5.1 million on December 1, 2004, May 1, 2005 and December 1, 2005.

Table of Contents

## VIISAGE TECHNOLOGY, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
**(Information for the three-month periods ended March 30, 2003
and March 28, 2004 is unaudited)**

## 7.  COMMITMENTS AND CONTINGENCIES

*Leases*

We lease certain equipment and facilities used in its operations and the shared facilities discussed in Note 3. Rental expense for operating leases for the years 2001, 2002, and 2003 was approximately $360,000, $1.3 million, and $1.4 million, respectively.

At December 31, 2003, approximate future minimum annual payments under operating leases, including future lease payments for our new corporate headquarters (lease signed in January 2004), are as follows (in thousands):

| | Operating Leases |
|---|---|
| Year ending: | |
| 2004 | $      637 |
| 2005 | 379 |
| 2006 | 395 |
| 2007 | 411 |
| 2008 | 427 |
| 2009 | 144 |
| | $   2,393 |

*Employment Agreements*

We have employment agreements with certain individuals that provide for up to one year of severance payments as a result of early termination by us. The agreements also provide for non-competition either directly or indirectly for up to two years after the termination of employment.

## 8.  LITIGATION

On July 31, 2003 the superior court for Fulton County, Georgia issued a preliminary injunction prohibiting Georgia's Department of Motor Vehicle Safety from continuing to work with us to install a new drivers' license system for the State of Georgia. This injunction is the result of a lawsuit filed in March 2003 by one of our competitors, Digimarc ID Systems, LLC. The suit claims that the Department of Motor Vehicle Safety did not comply with its own bid process when selecting a vendor for the digital drivers' license program. Discovery is continuing in this lawsuit and a trial on the merits of the lawsuit has been scheduled for September 2004. The Department of Motor Vehicle Safety has confirmed that our contract with them remains in place. However, if the lawsuit is successful and we lose the contract, we could lose up to $19.7 million in revenue that we expected to recognize over the next five and one-half years. In addition, although we expect that the Department of Motor Vehicle Safety would be required to reimburse us for our costs incurred under the contract, if we are unable to obtain reimbursement of those costs, we could be required to recognize a loss of up to approximately $5 million for costs incurred to date on the Georgia contract.

## 9.  RETIREMENT BENEFITS

We previously participated in the Lau 401(k) plan and paid our proportionate share of plan expenses based on the number of participants. Our costs for this plan amounted to approximately $99,000, $191,000 and $182,000 for the years ended December 31, 2001, 2002 and 2003, respectively, and approximately $51,000 and

Table of Contents

**VIISAGE TECHNOLOGY, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Information for the three-month periods ended March 30, 2003**
**and March 28, 2004 is unaudited)**

$0 for the three months ended March 30, 2003 and March 28, 2004, respectively. Effective January 1, 2003, we established the Viisage 401(k) plan. The plan permits pretax contributions by participants of up to 15% of base compensation. We may make discretionary contributions to the plan, subject to certain limitations. Participants are fully vested in their contributions and 20% of employer contributions vest per year.

We do not offer any post-retirement benefits.

## 10.  INCOME TAXES

No provision for federal income taxes has been made for the years ended December 31, 2001, 2002 and 2003 or for the three months ended March 30, 2003 and March 28, 2004 due to net losses incurred in those periods. Income tax expense for the year ended December 31, 2003 represented state income taxes of $63,000. The provision for state income taxes for the period ended March 28, 2004 was approximately $25,000. A reconciliation of the federal statutory rate to our effective tax rate for the years ended December 31, 2001, 2002 and 2003 is as follows:

| | For the Year Ended December 31, | | | For the Three Months Ended | |
|---|---|---|---|---|---|
| | **2001** | **2002** | **2003** | **March 30, 2003** | **March 28, 2004** |
| | | | | (unaudited) | |
| Federal statutory rate | (34.0)% | (34.0)% | (34.0)% | (34.0)% | (34.0)% |
| State taxes, net of federal benefit | (6.0)% | (6.0)% | (6.0)% | (6.0)% | (6.0)% |
| Valuation allowance recorded | 40.0% | 40.0% | 40.0% | 40.0% | 40.0% |
| | —% | —% | —% | —% | —% |

The components and approximate tax effects of our deferred tax assets and liabilities as of December 31, 2002 and 2003 are as follows (in thousands):

| | December 31, | |
|---|---|---|
| | **2002** | **2003** |
| Deferred tax assets (liabilities): | | |
| Net operating loss carryforwards for tax purposes | $ 15,728 | $ 16,628 |
| Basis differences related to contract assets | (5,051) | (1,792) |
| Property, plant and equipment | (140) | (377) |
| Accruals and other reserves | 190 | 247 |
| Net deferred tax asset before valuation allowance | 10,727 | 14,706 |
| Valuation allowance | (10,727) | (14,706) |
| Net deferred tax asset | $ — | $ — |

Due to the uncertainty surrounding the realization of our net deferred tax asset, we have provided a full valuation allowance against this amount.

At December 31, 2003, we have available estimated net operating loss carryforwards for federal tax purposes of approximately $41.6 million to reduce, subject to certain limitations, future income taxes. These carryforwards expire from 2012 through 2023 and are subject to review and possible adjustment by the Internal Revenue Service.

Table of Contents

### VIISAGE TECHNOLOGY, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Information for the three-month periods ended March 30, 2003
and March 28, 2004 is unaudited)

## 11.  SHAREHOLDERS' EQUITY

*Stock Option Plans*

Under the 1996 Management Stock Option Plan and the 1996 Director Stock Option Plan (the Plans), the Board of Directors may grant incentive and nonqualified stock options to employees and officers and nonqualified stock options to directors. Generally, incentive stock options are granted at fair market value and are subject to the requirements of Section 422 of the Internal Revenue Code of 1986, as amended. Nonqualified options are granted at exercise prices determined by the Board of Directors. Options granted to date to directors vest immediately or between one to four years from the date of grant. Options granted to management and employees vest at various rates over periods ranging from three to seven years or, in some cases, earlier if certain performance criteria are met. The performance criteria are based on each $1 million increase in Company value up to approximately $1 billion, as adjusted. All options granted under the Plans expire ten years from the date of grant.

In fiscal year 2001, we adopted the "2001 Stock in Lieu of Cash Compensation for Directors Plan" to compensate the non-employee members of the Board of Directors. The number of shares that may be issued under the plan shall not exceed, in the aggregate, 800,000 shares of our common stock.

During 2002 and 2003, each member of our Board of Directors received $60,000 of compensation in cash and stock. For each year an aggregate of 61,686 and 78,738 shares of common stock, respectively was issued. The fair market value of the common stock on the grant date was approximately $380,000 and $300,000 for the years ended December 31, 2002 and 2003, respectively and was expensed during each year then ended. In addition, we issued an aggregate of 60,000 stock options to our Board of Directors in each year.

At December 31, 2003, we have reserved 4,807,100 shares of common stock for issuance under the management plan, of which 664,398 shares are available for future grants. We have reserved 576,616 shares of common stock for issuance under the directors' plan, of which 125,000 are available for future grants.

A summary of stock option activity under the Plans is as follows:

| | Shares | Exercise Price Per Share | | Weighted Average Exercise Price | |
|---|---|---|---|---|---|
| Options outstanding, December 31, 2000 | 1,936,991 | $ | 0.94 - $12.50 | $ | 3.65 |
| Granted | 961,500 | | 0.84 - 3.99 | | 2.98 |
| Exercised | (603,077) | | 0.84 - 12.25 | | 1.80 |
| Cancelled | (13,334) | | 1.38 - 12.25 | | 2.57 |
| Options outstanding, December 31, 2001 | 2,282,080 | $ | 0.84 - $12.50 | $ | 3.87 |
| Granted | 1,578,000 | | 3.08 - 8.41 | | 4.58 |
| Exercised | (414,763) | | 0.94 - 3.06 | | 2.07 |
| Cancelled | (875,322) | | 0.94 - 12.50 | | 3.60 |
| Options outstanding, December 31, 2002 | 2,569,995 | $ | 0.84 - $12.50 | $ | 4.72 |
| Granted | 1,063,500 | | 3.63 - 4.70 | | 4.15 |
| Exercised | (33,163) | | 0.94 - 3.99 | | 1.91 |
| Cancelled | (261,753) | | 2.25 - 12.25 | | 6.12 |
| Options outstanding, December 31, 2003 | 3,338,579 | $ | 0.84 - $12.50 | $ | 4.42 |
| Granted | 282,000 | | 4.07 - 5.45 | | 4.97 |
| Exercised | (199,332) | | 2.96 - 6.16 | | 2.98 |
| Cancelled | (25,047) | | 2.25 - 12.25 | | 6.25 |
| Options outstanding, March 28, 2004 (unaudited) | 3,396,200 | | $0.84 - $12.50 | $ | 4.54 |

Table of Contents

# VIISAGE TECHNOLOGY, INC.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (Information for the three-month periods ended March 30, 2003 and March 28, 2004 is unaudited)

The following table summarizes information about outstanding options as of December 31, 2003:

| Range of Exercise Prices | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| | Number Outstanding | Weighted Average Remaining Contractual Life | Weighted Average Exercise Price Per Share | Number Exercisable | Weighted Average Exercise Price Per Share |
| $0.84 - $ 1.88 | 72,499 | 5.69 years | $ 1.22 | 71,832 | $ 1.21 |
| 2.25 - 4.04 | 2,020,901 | 7.75 years | 3.41 | 833,159 | 3.23 |
| 4.44 - 7.25 | 1,030,803 | 8.63 years | 5.10 | 252,453 | 5.71 |
| 7.80 - 12.50 | 214,376 | 5.22 years | 12.29 | 164,416 | 12.33 |
| $0.84 - $12.50 | 3,338,579 | | $ 4.42 | 1,321,860 | $ 4.73 |

We have computed the pro forma disclosures required under SFAS No. 123 for options granted using the Black-Scholes option-pricing model prescribed by SFAS No. 123. The weighted average assumptions used are:

| | 2001 | 2002 | 2003 |
|---|---|---|---|
| Risk free interest rate | 4.0 - 5.0% | 4.0 - 5.0% | 4.0 - 5.0 % |
| Expected dividend yield | — | — | — |
| Expected lives | 3 -10 years | 3 -10 years | 3 -10 years |
| Expected volatility | 80% | 80% | 80% |
| Fair value of options granted | $3.52 | $3.83 | $2.51 |

The total value of options granted under our plans was computed as approximately $3.0 million for 2001, $6.0 million for 2002 and $3.7 million for 2003. Of these amounts, approximately $3.0 million, $2.2 million and $3.4 million would have been charged to operations for the years ended December 31, 2001, 2002 and 2003, respectively, for currently vested options. The remaining unvested amount of $5.3 million as of the December 31, 2003, will be amortized over the related future vesting periods.

The total value of options granted under our plans was computed as approximately $1.3 million for the three months ended March 30, 2003 and $1.2 million for the three months ended March 28, 2004. Of these amounts, approximately $600,000 and $1.0 million would have been charged to operations for the those periods for currently vested options. The remaining unvested amount of $5.9 million as of the March 28, 2004, will be amortized over the related future vesting periods.

*Employee Stock Purchase Plan*

In 1997, we adopted the 1997 Employee Stock Purchase Plan and between 1997 and May 2001 and reserved 340,000 shares of common stock for issuance under the plan. The purchase price is determined by taking the lower of 85% of the closing price on the first or last day of periods defined in the plan. As of December 31, 2003, 260,583 shares have been issued and options to purchase 5,611 shares of common stock at $3.06 per share were vested under the plan.

*Common Stock*

In February 2002, Lau exercised an option to purchase 60,000 shares of common stock at $1.90 per share, pursuant to an agreement entered into with us in 1999 under which Lau guaranteed a contract indemnification obligation of ours.

F-24

Table of Contents

## VIISAGE TECHNOLOGY, INC.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (Information for the three-month periods ended March 30, 2003
### and March 28, 2004 is unaudited)

At March 28, 2004 and December 31, 2003 we had outstanding warrants, which can be converted into 812,469 shares of common stock, with exercise prices ranging from $10.79 to $12.35 and expiration dates from November 30, 2005 to November 6, 2006.

On September 8, 2003, we sold an aggregate of 3,517,503 shares of our common stock, at a purchase price of $3.775 per share, in a private sale to institutional investors. The gross proceeds were approximately $13.3 million before investment fees and related expenses of approximately $1.1 million. In addition, on January 27, 2004 we sold an additional 456,007 shares of our common stock at $3.775 per share for proceeds of $1.7 million in a private sale to the same institutional investors following the closing of the ZN acquisition. We believe that the net proceeds of these sales and cash flow from operations will enable us to fund our ongoing operations for at least the next 12 months.

## 12. BUSINESS SEGMENTS, GEOGRAPHICAL INFORMATION, AND CONCENTRATIONS OF RISK

We follow SFAS No. 131 "Disclosures about Segments of a Business Enterprise and Related Information", which establishes standards for reporting information about operating segments. Operating segments are defined as components of a company about which the chief operating decision maker evaluates regularly in deciding how to allocate resources and in assessing performance.

The following table provides financial information by segment for the years ended December 31, 2001, 2002 and 2003, and for the three months ended March 30, 2003 and March 28, 2004. We allocate direct costs and administrative expenses to each business segment based on management's analysis of each segment's resource needs. Revenue is reported within the segments by customer contracts. Within the secure credentials segment there is a component of the contract that utilizes our biometrics technology. We did not report business segments prior to 2002 and therefore have not restated our results, other than revenue for the year ended December 31, 2001 to provide segment information because it would be impracticable to do so (in thousands).

| Three months ended March 30, 2003 | Secure Credentials | | Biometrics | | Total | |
|---|---|---|---|---|---|---|
| Secure credentials | $ | 6,487 | $ | — | $ | 6,487 |
| Biometrics | | 314 | | 1,354 | $ | 1,668 |
| Total segment revenue | $ | 6,801 | $ | 1,354 | $ | 8,155 |
| Segment profit (loss) before taxes | $ | (600) | $ | (1,702) | $ | (2,302) |
| Depreciation and amortization | $ | 1,690 | $ | 154 | $ | 1,844 |
| Interest expense | $ | 219 | $ | — | $ | 219 |
| Total assets | $ | 38,930 | $ | 5,044 | $ | 43,974 |
| Expenditures for long lived assets | $ | — | $ | 29 | $ | 29 |

F-25

Table of Contents

VIISAGE TECHNOLOGY, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Information for the three-month periods ended March 30, 2003
and March 28, 2004 is unaudited)

| Three months ended March 28, 2004 | Secure Credentials | Biometrics | Total |
|---|---|---|---|
| Secure credentials | $ 10,184 | $ — | $ 10,184 |
| Biometrics | 336 | 1,739 | $ 2,075 |
| Total segment revenue | $ 10,520 | $ 1,739 | $ 12,259 |
| Segment profit (loss) before taxes | $ 679 | $ (2,286) | $ (1,607) |
| Depreciation and amortization | $ 2,040 | $ 239 | $ 2,279 |
| Interest expense | $ 392 | $ — | $ 392 |
| Total assets | $ 100,737 | $ 34,555 | $ 135,292 |
| Expenditures for long lived assets | $ 311 | $ 58 | $ 369 |

| Year ended December 31, 2001 | Secure Credentials | Biometrics | Total |
|---|---|---|---|
| Secure credentials | $ 22,274 | $ — | $ 22,274 |
| Biometrics | 483 | 3,523 | $ 4,006 |
| Total segment revenue | $ 22,757 | $ 3,523 | $ 26,280 |

| Year ended December 31, 2002 | Secure Credentials | Biometrics | Total |
|---|---|---|---|
| Secure credentials | $ 25,943 | $ — | $ 25,943 |
| Biometrics | 1,427 | 4,932 | $ 6,359 |
| Total segment revenue | $ 27,370 | $ 4,932 | $ 32,302 |
| Segment profit (loss) before taxes | $ 1,088 | $ (10,618) | $ (9,530) |
| Depreciation and amortization | $ 6,729 | $ 468 | $ 7,197 |
| Interest expense | $ 875 | $ — | $ 875 |
| Total assets | $ 55,953 | $ 5,236 | $ 61,189 |
| Expenditures for long lived assets | $ 4,939 | $ 4,484 | $ 9,423 |

| Year ended December 31, 2003 | Secure Credentials | Biometrics | Total |
|---|---|---|---|
| Secure credentials | $ 29,396 | $ — | $ 29,396 |
| Biometrics | 1,313 | 6,662 | $ 7,975 |
| Total segment revenue | $ 30,709 | $ 6,662 | $ 37,371 |
| Segment profit (loss) before taxes and cumulative effect | $ 598 | $ (6,064) | $ (5,466) |
| Depreciation and amortization | $ 6,151 | $ 655 | $ 6,806 |
| Interest expense | $ 969 | $ — | $ 969 |
| Total assets | $ 50,410 | $ 4,070 | $ 54,480 |
| Expenditures for long lived assets | $ 8,248 | $ 1,497 | $ 9,745 |

For the year ended December 31, 2003 approximately $36.6 million, or 97.8% of our direct revenue was derived within the United States. The remaining $818,000, or 2.2% of revenue was derived in Canada and the United Arab Emirates.

Table of Contents

VIISAGE TECHNOLOGY, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Information for the three-month periods ended March 30, 2003
and March 28, 2004 is unaudited)

We believe that for the near future we will continue to derive a significant portion of our revenue from a limited number of large contracts. For the three months ended March 30, 2003 and March 28, 2004 and for the years ended December 31, 2001, 2002 and 2003, secure credentials segment customers who accounted for more than 10% of revenue in a given years are as follows:

- For the three months ended March 30, 2003, two customers accounted for an aggregate of 28%;

- For the three months ended March 28, 2004, one customer accounted for an aggregate of 13%;

- For the year ended December 31, 2001, four customers accounted for an aggregate of 49%;

- For the year ended December 31, 2002, two customers accounted for an aggregate of 22% and

- For the year ended December 31, 2003, two customers accounted for an aggregate of 26%.

No single biometrics customer accounted for over 10% of our total revenue in any period.

## 13. RESTRUCTURING CHARGES AND ACQUISITION EXPENSES

In connection with the acquisitions and the resulting consolidation of operations, management committed to a restructuring plan in the fourth quarter of 2002. Additionally, the plan was executed in December 2002.

In connection with these actions we recorded restructuring costs of $824,000 in accordance with Emerging Issues Task Force Issue No. 94-3, *Liability Recognition for Certain Employee Termination Benefits and Other Costs to Exit an Activity (including Certain Costs Incurred in a Restructuring)* and SEC Staff Accounting Bulletin No. 100, *Restructuring and Impairment Charges* . Included in the charge was $156,000 for the abandonment and write off of excess property, equipment and leasehold improvements. Additionally $248,000 was recorded for workforce reduction, consisting of severance and extended insurance benefits attributable to employees. The remaining $420,000 represented an accrual for non-cancelable lease payments for abandoned lease space, less management's estimates of sublease income.

All charges associated with the restructuring are included as restructuring costs under operating expenses in the statement of operations for fiscal 2002.

Below is a summary of restructuring costs as of December 31, 2003 (in thousands):

|  | Charged to Operations In 2002 | Total Cash Payments | Accrued Restructuring Liabilities December 31, | |
|---|---|---|---|---|
|  |  |  | 2002 | 2003 |
| Cash provisions: |  |  |  |  |
| Workforce reduction | $    248 | $    (248) | $ — | $ — |
| Non-cancelable leases | 420 | (389) | 420 | 31 |
|  | 668 | $    (637) | $ 420 | $ 31 |
| Non-cash: |  |  |  |  |
| Write-off of excess property and equipment | 156 |  |  |  |
| Total | $    824 |  |  |  |

F-27

Table of Contents

## VIISAGE TECHNOLOGY, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Information for the three-month periods ended March 30, 2003
and March 28, 2004 is unaudited)

In 2001, we incurred a fourth quarter one-time expense of $1.6 million relating to costs incurred in our attempt to purchase Polaroid Corporation's Identification Systems Business. These expenses related to legal and professional activities for due diligence as well as financing break-up fees associated with this unsuccessful acquisition.

## 14. QUARTERLY FINANCIAL DATA (UNAUDITED)

The following table sets forth selected quarterly financial data for 2002 and 2003. The operating results for 2003 are as reported after we adopted EITF 00-21 on a cumulative basis as of January 1, 2003. The first quarter results include a $12.1 million charge related to the accounting change. The operating results for 2002 are as reported prior to the change in accounting principle. (in thousands, except per share amounts):

| For the Year Ended December 31, 2002 | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| Revenue | $ 6,399 | $ 9,038 | $ 8,109 | $ 8,756 |
| Gross margin | $ 1,314 | $ 1,570 | $ 1,610 | $ 2,569 |
| Net loss(1) | $ (857) | $ (2,805) | $ (2,818) | $ (3,050) |
| Net loss applicable to common shareholders(1) | $ (857) | $ (2,805) | $ (2,818) | $ (3,050) |
| Basic and diluted net loss per share(1) | $ (0.04) | $ (0.14) | $ (0.14) | $ (0.16) |
| Basic and diluted loss per share applicable to common shareholders(1) | $ (0.04) | $ (0.14) | $ (0.14) | $ (0.16) |

| For the Year Ended December 31, 2003 | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| Revenue | $ 8,155 | $ 8,789 | $ 10,108 | $ 10,319 |
| Gross margin | $ 1,366 | $ 1,963 | $ 3,380 | $ 2,818 |
| Net loss | $ (14,496) | $ (1,376) | $ (389) | $ (1,399) |
| Net loss applicable to common shareholders | $ (14,496) | $ (1,376) | $ (389) | $ (1,399) |
| Basic and diluted net loss per share | $ (0.72) | $ (0.07) | $ (0.02) | $ (0.06) |
| Basic and diluted loss per share applicable to common shareholders | $ (0.72) | $ (0.07) | $ (0.02) | $ (0.06) |

(1)    During the fourth quarter of 2002, we incurred one-time expenses (see Note 13).

## 15. ACQUISITIONS (UNAUDITED)

On January 23, 2004 we acquired all outstanding shares of ZN Vision Technologies AG ("ZN") in exchange for an aggregate of 5,221,454 newly issued shares of our common stock and $493.00 in cash. In addition, we agreed to assume ZN's employee share option plan, and accordingly have reserved 1,138,546 shares of our common stock for issuance to the plan participants. The purchase price for the acquisition was $31.5 million, based on the per share price of our common stock of $4.32 per share which is the average trading price of Viisage common stock over the five trading days immediately preceding and the two trading days immediately following March 28, 2003, the date on which the purchase agreement was signed. The acquisition was accounted for as a purchase, and accordingly, the operations of ZN are included in the financial statements since the effective date, the close of business on January 23, 2004. The purchase price has been allocated to net assets acquired based on their estimated fair values. We engaged an independent third party appraiser to perform a review of the acquired assets and have allocated the purchase price based on the preliminary results of their findings. The preliminary valuation is subject to further review which may result in adjustments to allocation of purchase price in the future. We have recorded approximately $74,000 in amortization related to the acquired

F-28

Table of Contents

**VIISAGE TECHNOLOGY, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Information for the three-month periods ended March 30, 2003**
**and March 28, 2004 is unaudited)**

intangible assets from the date of the acquisition through March 28, 2004. ZN is a leading German provider of face recognition and computer vision products and services. ZN, now known as Viisage Technology AG, is a wholly owned subsidiary of Viisage and serves as the base of our European operations.

On February 14, 2004 we acquired all outstanding shares of Trans Digital Technologies Corporation ("TDT") for $53.4 million. The purchase price consisted of 5,850,000 newly issued shares of our common stock, which were valued at $5.13 per share, which is the average price of Viisage common stock over the five trading days immediately preceding and the two trading days immediately following February 14, 2004, plus $15.3 million in notes and $5 million in cash. The acquisition was accounted for as a purchase, and accordingly, the operations of TDT are included in the financial statements since the effective date, the close of business on February 14, 2004. The purchase price has been allocated to net assets acquired based on their estimated fair values. We engaged an independent third party appraiser to perform a review of the acquired assets and have allocated the purchase price based on the preliminary results of their findings. The preliminary valuation is subject to further review which may result in adjustments to allocation of purchase price in the future. We have recorded approximately $383,000 in amortization related to the acquired intangible assets from the date of the acquisition through March 28, 2004. TDT is the sole source provider of high security technology and services to the U.S. Department of State for the production of U.S. passports. TDT is now a wholly owned subsidiary of Viisage.

In connection with the acquisition of TDT, we agreed to pay the former sole shareholder of TDT a contingent purchase price cash payment of up to $2.6 million if the U.S. Department of Defense selected TDT for the production of smart cards as part of the agency's Common Access Card (CAC) program and placed orders with an aggregate value of at least $4 million prior to June 30, 2004. We received an initial purchase order of $10.2 million for this program and therefore we will record this contingent purchase price of $2.6 million related to the CAC program as additional goodwill in the second quarter of 2004.

The preliminary allocation of the purchase price for ZN and TDT, based on the purchase prices calculated for accounting purposes, is as follows (in thousands):

|                              | ZN        | TDT       |
|------------------------------|-----------|-----------|
| Current assets               | $  1,639  | $  3,020  |
| Property and equipment       | 140       | 42        |
| Identified intangible assets | 1,974     | 14,460    |
| Goodwill                     | 27,733    | 35,880    |
|                              | $ 31,486  | $ 53,402  |

F-29

Table of Contents

## VIISAGE TECHNOLOGY, INC.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (Information for the three-month periods ended March 30, 2003
### and March 28, 2004 is unaudited)

Identified intangible assets acquired in connection with the acquisitions of ZN and TDT consist primarily of completed technology and acquired contracts. These intangible assets are amortized using the straight-line method over their estimated useful lives of 1 to 5 years (in thousands).

|  | March 28, 2004 | Weighted Average Useful Life |
|---|---|---|
| Gross carrying amount: |  |  |
| Completed technology | $ 2,004 | 5 years |
| Acquired contracts | 14,430 | 5 years |
| Total intangible assets | 16,434 |  |
| Accumulated amortization: |  |  |
| Completed technology | (75) |  |
| Acquired contracts | (383) |  |
| Total accumulated amortization | (458) |  |
| Intangible assets, net | $ 15,976 |  |

We estimate annual amortization expense related to the identified intangible assets acquired in connection with the acquisitions of ZN and TDT to be approximately $3.2 million per year for the next five years.

The unaudited pro forma and combined selected operating data are presented as if the acquisitions of ZN and TDT had occurred on January 1, 2003 and 2004 for the three months ended March 30, 2003 and March 28, 2004, respectively. The unaudited pro forma data is for informational purposes only and may not necessarily reflect future results of operations or what the results of operations would have been had Viisage, ZN and TDT been operating as a combined entity for the periods presented. For the three months ended March 30, 2003, we incurred a non-cash charge of $12.1 million representing the cumulative effect of a change in accounting principle related to our adoption of Emerging Issues Task Force 00-21, *Accounting for Revenue Arrangements with Multiple Deliverables* , or EITF 00-21, on a cumulative basis as of January 1, 2003. The unaudited pro forma revenue, loss and loss per share information for the three months ended March 30, 2003 and March 28, 2004 are as follows (in thousands):

|  | For the Three Months Ended | |
|---|---|---|
|  | March 30, 2003 | March 28, 2004 |
|  | (unaudited) | |
| Revenue | $ 11,966 | $ 15,100 |
| Loss before cumulative effect of change in accounting principle | $ (3,176) | $ (1,053) |
| Net loss | $ (15,307) | $ (1,053) |
| Basic and diluted net loss per share before cumulative effect of change in accounting principle | $ (0.10) | $ (0.03) |
| Basic and diluted net loss per share | $ (0.76) | $ (0.03) |

## 16.  VALUATION AND QUALIFYING ACCOUNTS

We had no valuation reserves for accounts receivable for the periods presented.

F-30

Table of Contents

ViiSAGE

Table of Contents

<center>**PART II**</center>

<center>**INFORMATION NOT REQUIRED IN THE PROSPECTUS**</center>

**Item 14. Other Expenses of Issuance and Distribution.**

The following table sets forth the various expenses in connection with the securities being registered. All amounts shown are estimates, except the Securities and Exchange Commission registration fee.

| Item | Amount |
|---|---|
| Securities and Exchange Commission registration fee | $ 8,751.81 |
| Printing and EDGAR formatting fees and expenses | $ 100,000.00 |
| Accounting fees and expenses | $ 40,000.00 |
| Transfer agent's fees and expenses | $ 5,000.00 |
| Legal fees and expenses | $ 100,000.00 |
| Total | $ 253,751.81 |

Viisage will bear all expenses shown above, and the selling shareholders will not bear any portion of these expenses.

**Item 15. Indemnification of Directors and Officers.**

As permitted by the Delaware General Corporation law, as amended (the "DGCL"), the registrant's Restated Certificate of Incorporation, as amended, provides that the registrant's directors shall not be liable to the registrant or its stockholders for monetary damages for breach of fiduciary duty as a director to the fullest extent permitted by the DGCL as it now exists or as it may be amended. As of the date of this prospectus, the DGCL permits limitations on liability for a director's breach of fiduciary duty other than liability (i) for any breach of the director's duty of loyalty to the registrant or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the DGCL, or (iv) for any transaction from which the director derived an improper personal benefit. In addition, the registrant's bylaws provide that the registrant shall indemnify all directors, officers, employees and agents of the registrant for acts performed on behalf of the registrant in such capacity to the fullest extent permitted by law.

Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers or persons controlling the registrant pursuant to the foregoing provisions, the registrant has been informed that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Act and is therefore unenforceable.

In addition, the registrant has purchased directors and officers liability insurance.

**Item 16. Exhibits.**

The Exhibit Index immediately preceding the exhibits is incorporated herein by reference.

**Item 17. Undertakings.**

(a) The undersigned registrant hereby undertakes that, for purposes of determining any liability under the Securities Act of 1933, each filing of the registrant's annual report pursuant to Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934 that is incorporated by reference in the registration statement shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial *bona fide* offering thereof.

<center>II-1</center>

Table of Contents

(b) The undersigned registrant hereby undertakes to deliver or cause to be delivered with the prospectus, to each person to whom the prospectus is sent or given, the latest annual report to security holders that is incorporated by reference in the prospectus and furnished pursuant to and meeting the requirements of Rule 14a-3 or Rule 14c-3 under the Securities Exchange Act of 1934; and, where interim financial information required to be presented by Article 3 of Regulation S-X is not set forth in the prospectus, to deliver, or cause to be delivered to each person to whom the prospectus is sent or given, the latest quarterly report that is specifically incorporated by reference in the prospectus to provide such interim financial information.

(c) Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers and controlling persons of the registrant pursuant to the foregoing provisions, or otherwise, the company has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the registrant certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on Form S-3 and has duly caused this registration statement to be signed on its behalf by the undersigned, hereunto duly authorized in Billerica, Massachusetts on June 21, 2004.

**VIISAGE TECHNOLOGY, INC.**

By:          /s/   B ERNARD C. B AILEY
          ————————————————————
                    **Bernard C. Bailey**
                 **Chief Executive Officer**
                 *(Principal Executive Officer)*

### Power of Attorney and Signatures

Know all by these presents, that each individual whose signature appears below constitutes and appoints Bernard C. Bailey, William K. Aulet and Elliot J. Mark, jointly and severally, his or her true and lawful attorneys-in-fact and agents with full powers of substitution, for him or her and in his or her name, place and stead, in any and all capacities, to sign any and all amendments (including post-effective amendments) to this registration statement, and to file the same, with all exhibits thereto, and all documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be in and about the premises, as fully to all intents and purposes as he or she might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them, or their or his or her substitute or substitutes, may lawfully do or cause to be done by virtue thereof.

Pursuant to the requirements of the Securities Act of 1933, this registration statement has been signed by the following persons in the capacities and on the dates indicated.

| Name | Title | Date |
|---|---|---|
| /s/  B ERNARD C. B AILEY<br>———————————————<br>**Bernard C. Bailey** | Chief Executive Officer and Director<br>*(Principal Executive Officer)* | June 21, 2004 |
| /s/  W ILLIAM K. A ULET<br>———————————————<br>**William K. Aulet** | Chief Financial Officer and Treasurer<br>*(Principal Financial and Accounting Officer)* | June 21, 2004 |
| /s/  D ENIS K. B ERUBE<br>———————————————<br>**Denis K. Berube** | Director | June 21, 2004 |
| /s/  H ARRIET M OUCHLY -W EISS<br>———————————————<br>**Harriet Mouchly-Weiss** | Director | June 21, 2004 |
| /s/  P AUL T. P RINCIPATO<br>———————————————<br>**Paul T. Principato** | Director | June 21, 2004 |
| /s/  C HARLES E. L EVINE<br>———————————————<br>**Charles E. Levine** | Director | June 21, 2004 |

Table of Contents

| Name | Title | Date |
| --- | --- | --- |
| /s/  P ETER N ESSEN | Director | June 21, 2004 |
| Peter Nessen | | |
| /s/  T HOMAS J. R EILLY | Director | June 21, 2004 |
| Thomas J. Reilly | | |
| /s/  B.G. B ECK | Director | June 21, 2004 |
| B.G. Beck | | |
| /s/  M ARCEL Y ON | Director | June 21, 2004 |
| Marcel Yon | | |

II-4

Table of Contents

# EXHIBIT INDEX

| Exhibit No. | Description |
|---|---|
| 1.1* | Form of Underwriting Agreement |
| 4.1** | Restated Certificate of Incorporation |
| 4.2** | By-Laws. |
| 4.3+ | Specimen Common Stock Certificate |
| 5.1* | Opinion of Latham & Watkins LLP |
| 23.1 | Consent of BDO Seidman, LLP |
| 23.2 | Consent of BDO Deutsche Warentreuhand AG |
| 23.3* | Consent of Latham & Watkins LLP (Included in Exhibit 5.1) |
| 23.4 | Consent of BDO Seidman, LLP |
| 24.1 | Power of Attorney (Included on page II-3) |

\*    To be filed by amendment.

\*\*   Filed as a exhibit to the registrant's Form S-1 registration statement (Commission File No. 333-10649) filed August 22, 1996 and incorporated herein by reference.

\+    Filed as a exhibit to the registrant's Form S-1/A registration statement (Commission File No. 333-10649) filed November 4, 1996 and incorporated herein by reference.

EXHIBIT 8

ㄱ\ㅅ

## IN THE SUPERIOR COURT OF FULTON COUNTY
### STATE OF GEORGIA

DIGIMARC ID SYSTEMS, LLC,

      Plaintiff,

vs.

GEORGIA TECHNOLOGY AUTHORITY and
the GEORGIA DEPARTMENT OF MOTOR
VEHICLE SAFETY,

      Defendants,

vs.

VIISAGE TECHNOLOGY, INC., a Delaware
corporation,

      Necessary Party-Defendant.

Civil Action No. 2003CV66498

### PLAINTIFF DIGIMARC ID SYSTEMS, LLC'S BRIEF IN SUPPORT OF ITS MOTION TO COMPEL COMPLIANCE WITH DISCOVERY ORDER, REVISE SCHEDULING ORDER AND FOR SANCTIONS AGAINST DEFENDANT VIISAGE TECHNOLOGY, INC.

In February, Viisage moved this Court for an immediate trial, even going so far as to request that the Court transfer this case to another judge because of "emergency" circumstances, that could not await a trial in the normal course of this Court's calendar. Digimarc pointed out at the time that this tactic by Viisage was nothing more than an obvious attempt to get this case before any court other than this one. Viisage's current conduct only serves to further expose the utter transparency of its previous ploy. This Court ordered Viisage more than a month ago to produce all relevant documents that are responsive to Digimarc's Request for Production of Documents, and even listed specific categories of documents that need to be produced. The Court also ordered Viisage to make witnesses available for deposition. Only timely compliance with this Discovery Order would make it possible to try this case on the schedule set forth by the

Court in the Scheduling Order entered on June 9, 2004. But Viisage is simply ignoring the Discovery Order. As a result, Digimarc is forced to come before this Court again and request that it set a time limit for Viisage's compliance with the Discovery Order and revise the Scheduling Order so that Digimarc can adequately prepare for trial. Digimarc also requests that this Court strike Viisage's Answer as a sanction for its blatant disregard of the Discovery Order, and further award Digimarc's attorneys' fees incurred in having to file the instant Motion.

### STATEMENT OF FACTS

At a hearing on May 25, 2004, this Court ordered Viisage to conduct a thorough and diligent search for and produce all relevant, non-privileged documents responsive to Digimarc's Motion to Compel Production of Documents, and it ordered both Viisage and Digimarc to certify that each has made a thorough and diligent search for documents. The Court also ordered Viisage to designate Craig Vosseteig and Barry Erhardt as 30(b)(6) witnesses and to cause their appearance at depositions at a time and place mutually agreeable to counsel. The Court documented all of these oral rulings in a written Order dated June 3, 2004 ("Discovery Order"), specifically setting forth seven particular categories of documents to be produced by Viisage.

Viisage has not complied with any of these orders. In fact, Viisage made only one half-hearted effort to offer Vosseteig and Erhardt, in advance of producing any documents, failed to follow up on Digimarc's effort to get documents produced in order to schedule depositions, and has made no movement whatsoever toward compliance with its document production obligations, including its obligation to certify its compliance. In contrast, Digimarc has fully complied with the Court's requirements under the Discovery Order, including filing an affidavit certifying that it has made a thorough and diligent search for relevant documents.

During a conference call with counsel for all parties on June 3, 2004, counsel for Viisage, Mr. Carroll, offered to make Mr. Vosseteig and Mr. Erhardt available for deposition, but only in

2

Atlanta, Georgia. Indeed, at that time, which was prior to the Court's issuance of the written Discovery Order, Mr. Carroll even stated that he did not believe Viisage would be making an additional document production in response to the Court's oral ruling on May 25, 2004. In reply to Mr. Carroll's offer, Digimarc requested that the continuations of Viisage's 30(b)(6) deposition occur at Viisage's offices in Massachusetts, after Viisage's supplemental production of documents, and asked Mr. Carroll whether this presented a problem for Viisage. (TAB A – June 8, 2004 e-mail from John Hutchins to Jamie Carroll, 9:54 a.m.) Viisage's counsel did not respond to Digimarc's request that the depositions occur in Massachusetts.

Also on June 8, 2004, after receiving a copy of the Discovery Order, Digimarc's counsel sent a letter to Viisage's counsel, inquiring again about Viisage's supplemental production of documents in light of the Court's written ruling. (TAB B) In that letter, Digimarc's counsel stated:

> Obviously, Digimarc requires that these additional documents be produced sufficiently in advance of the completion of Viisage's 30(b)(6) deposition and the third-party depositions that the Court has issued Commissions for Digimarc to take so that Digimarc will have a meaningful opportunity for review the documents prior to the depositions. Given that the Court entered its Order on June 3, 2004 and that, as is evidenced by the e-mail you sent me this morning, you have obviously had a copy of the Order since at least yesterday, we request that Viisage make its supplemental production no later than Monday, June 14, 2004. Any further delay in producing the documents will only result in a delay in the taking of the depositions. The effect of further delay in the completion of discovery on the trial schedule set by the Court is obvious.

Viisage's counsel did not respond to this letter.

Finally, on June 21, Viisage's counsel sent an e-mail to all counsel stating:

> I have put the depos. off while Viisage looks for any addl. documents to produce, pursuant to the Court's order. When we are ready to reschedule the depos. of Vosseteig and Erhardt, we will ck. on their travel schedules to determine where they will be offered.

3

Within an hour, Digimarc's counsel responded:

> Any idea when additional documents will be produced? Summary judgment briefs are due one month from today, so we need to make some quick progress.

(TAB C)  Viisage's counsel did not respond.

## ARGUMENT AND CITATION TO AUTHORITY

Viisage's utter failure to comply with the Discovery Order is inexcusable. Viisage had the entire month of June to produce the additional documents that it obviously possesses, and to make Vosseteig and Erhardt available. Moreover, Viisage has claimed as long ago as September 19, 2003 that it has already assembled responsive documents to Digimarc's document requests, when those requests were still in the form of a subpoena to Viisage as a non-party. Deposition of Elliot Mark, 33:23–34:21. Yet, Viisage has still not produced these documents. Because of Viisage's total lack of compliance, Digimarc has not yet been able to schedule the three third-party depositions for which this Court has issued commissions. Three of the seven categories of documents that the Court has ordered Viisage to produce are potentially relevant to the depositions of these three third parties, and the plain fact is that these documents should have been produced in January at the latest, if not earlier under the non-party subpoena to Viisage. It would be imprudent for Digimarc to take these depositions before Viisage's supplemental production occurs and before Viisage's 30(b)(6) deposition is completed.

This Court should order Viisage to produce documents under the Discovery Order by no later than July 8, 2004. Moreover, Viisage should be ordered to make Vosseteig and Erhardt available, at Viisage's headquarters in Massachusetts, no later than July 22, 2004. Digimarc will then attempt to schedule the depositions of the three third-party witnesses during the last two weeks of July, subject to their availability. A proposed Order is attached at TAB D.

4

Meanwhile, this Court has ordered the parties to file Motions for Summary judgment by July 21 and to designate deposition testimony by August 13. At this point, it is unrealistic to think that the document production and depositions that still remain can be concluded and the transcripts prepared in time to meet this deadline. Moreover, forcing Digimarc to meet this timetable would unfairly punish Digimarc for Viisage's intentional delay. Thus, if the Scheduling Order is not modified, Digimarc will be prejudiced by Viisage's dilatory conduct. The Scheduling Order dated June 9, 2004 was based on the Court's expectation that all parties would comply with the Order. Digimarc has complied with the Order. Viisage has not. By its delay, Viisage has undercut Digimarc's ability to complete its discovery, prepare its summary judgment motion and prepare for trial. This undercuts the broad purpose of the discovery rules, which is "to enable the parties to prepare for trial so that each party will know the issues and be fully prepared on the facts." Travis Meat & Seafood Co., Inc. v. Ashworth, 127 Ga. App. 284, 285, 193 S.E.2d 166, 168 (1972). The Scheduling Order must be modified to take Viisage's delay into account. A proposed modification to the Scheduling Order is attached as TAB E.

Finally, Viisage's conduct is impacting all of the parties and the Court, and Viisage should be sanctioned severely, including having its Answer stricken and paying Digimarc's attorneys' fees in connection with this Motion. Under O.C.G.A. § 9-11-37(b)(2)(C), upon failure to obey a court order to provide or permit discovery, the court may issue an order striking out part or all of an offending party's pleading. In addition, under O.C.G.A. § 9-11-37(b)(2) the court may require the offending party to pay attorneys' fees caused by the failure. These sanctions, in particular an order striking Viisage's Answer, are to be invoked "where the failure is willful, in bad faith, or in conscious disregard of an order." Didio v. Chess, 218 Ga. App. 550, 551, 462 S.E.2d 450, 452 (1995). Didio's facts are especially pertinent here. In Didio, the Court

5

of Appeals held that the State Court of Fulton County could strike a party's answer to a complaint where that party had failed to respond to repeated requests for discovery, a motion to compel discovery, and a court order to compel discovery. Id. at 550-51, 462 S.E.2d at 451-52.

Viisage's failure to obey the Discovery Order, even in the face of repeated communications from Digimarc's counsel, which Viisage ignored, is precisely the kind of "conscious disregard" that prompted the court in Didio to strike the offending party's answer. Viisage has not complied with one single aspect of the Court's Order. This Court cannot tolerate such blatant disregard of its orders. Under Georgia law, and under the broad principles underpinning the rules of discovery, Viisage's actions merit both award of legal fees to Digimarc and striking of Viisage's Answer. (Proposed Order attached as **TAB D.**)

<u>CONCLUSION</u>

For the reasons set forth above, Digimarc respectfully requests that the Court set the suggested deadlines by which Viisage must comply with the Order, amend its Scheduling Order accordingly, and enter an order striking Viisage's Answer and directing Viisage to pay Digimarc's legal expenses as sanctions for its dilatory conduct. Should the Court grant Plaintiff's request for sanctions against Defendant, counsel for Plaintiff will submit an affidavit detailing the time and expenses incurred in having to file this Motion.

[signature on following page]

6

This 1st day of July 2004.

Respectfully submitted,

John P. Hutchins
Georgia Bar No. 380692
Valerie D. Barton
Georgia Bar No. 040832

MCKENNA LONG & ALDRIDGE LLP
303 Peachtree Street, Suite 5300
Atlanta, Georgia  30308
(404) 527-4000
(404) 527-4198 (facsimile)

*Attorneys for Plaintiff*
*Digimarc ID Systems, LLC*

7

EXHIBIT 9

Exhibit 99.1

Bill Aulet
Viisage
978.932.2424
aulet@viisage.com

Billy Balfour
PAN Communications
978.474.1900
viisage@pancomm.com

### Viisage Takes Initiative to Help End Stalemate in Georgia Drivers' License Contract Dispute

*Viisage to receive $2.5 million payment; New request for proposals to be issued by Georgia Department of Motor Vehicle Safety*

BILLERICA, Mass., Jul 21, 2004 — Viisage (Nasdaq: VISG), a leading provider of advanced technology identity solutions, today announced that the Company has taken decisive action to resolve the continuing stalemate over the implementation of the State of Georgia drivers' license contract. Under the terms of the agreement with the Georgia Department of Motor Vehicle Safety (DMVS), Viisage will receive a settlement of $2.5 million as reimbursement for work completed on the drivers' license contract awarded to Viisage in November 2002. This settlement terminates the current Georgia DMVS contract with Viisage. The agency has confirmed that it intends to file a motion to dismiss the lawsuit initiated by a Viisage competitor contesting the contract award. The Georgia DMVS also has confirmed that it plans to issue a new request for proposals for a new drivers' license system as soon as possible and no later than the end of October 2004.

"The State of Georgia Department of Motor Vehicle Safety has a responsibility to protect its citizens from identity-related crimes. Recognizing that the State has been unable to fulfill this responsibility for the past year due to the litigation, we chose to take a proactive step to help resolve this issue. Viisage and the State agreed that for the benefit of both our constituents, it was best to terminate our contract, settle final payments and enable the State to issue a request for proposals for a new contract," said Bernard Bailey, president and CEO of Viisage. "This is an amicable agreement with a valued customer on a contract that we believe was appropriately awarded to Viisage. We fully intend to compete for the new contract and are confident that, if re-awarded the contract, our advanced technology identity solutions would successfully fulfill the Georgia DMVS's needs for a state-of-the art solution."

The cash payment of $2.5 million will be received in the third quarter of 2004 and recognized on Viisage's balance sheet at that time. Of this payment, $2 million covers work performed by Viisage under the drivers' license contract, and the remaining $500,000 balance reflects the purchase by the State of certain assets that Viisage acquired specifically for the deployment of the Georgia solution. This settlement is expected to end the substantial and escalating legal costs that Viisage has been incurring over the past year. Also, had this settlement been negotiated during the second quarter, the Company's backlog at June 27, 2004 would have been $151 million rather than $171 million which included the Georgia contract.

**About Viisage**

Viisage (NASDAQ: VISG) delivers advanced technology identity solutions for governments, law enforcement agencies and businesses concerned with enhancing security, reducing identity theft, and protecting personal privacy. Viisage creates solutions using secure credentials and face recognition technologies that quickly, reliably, and accurately identify individuals. With over 3,000 installations worldwide, Viisage's identity solutions stand out as a result of the Company's industry-leading technology and unique understanding of customer needs.

This news release contains forward-looking statements that involve risks and uncertainties. Forward-looking statements in this document and those made from time to time by Viisage through its senior management are made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995, as amended. Forward-looking statements concerning future plans or results are necessarily only estimates and actual results could differ materially from expectations. Certain factors that could cause or contribute to such differences include, among other things, the size and timing of contract awards, performance on contracts, availability and cost of key components, unanticipated results from audits of the financial results of acquired companies, changing interpretations of generally accepted accounting principles, outcomes of government reviews, potential fluctuations in quarterly results, dependence on large contracts and a limited number of customers, lengthy sales and implementation cycles, market acceptance of new or enhanced products and services, proprietary technology and changing competitive conditions, system performance, management of growth, dependence on key personnel, ability to obtain project financing, general economic and political conditions and other factors affecting spending by customers, the unpredictable nature of working with government agencies and other risks, uncertainties and factors including those described from time to time in Viisage's filings with the Securities and Exchange Commission, including without limitation, Viisage's Form 10-K for the year ended December 31, 2003 and its quarterly reports on Form 10-Q. Viisage undertakes no obligation to update any forward-looking statements.

EXHIBIT 10

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA



DIGIMARC ID SYSTEMS, LLC,

    Plaintiff,

vs.

GEORGIA TECHNOLOGY AUTHORITY and
the GEORGIA DEPARTMENT OF MOTOR
VEHICLE SAFETY,

    Defendants,

vs.

VIISAGE TECHNOLOGY, INC., a Delaware
corporation,

    Necessary Party-Defendant.

Civil Action No. 2003CV66498

### VIISAGE TECHNOLOGY, INC.'S
### MOTION TO DISMISS AND SUPPORTING MEMORANDUM

Necessary Party-Defendant Viisage Technology, Inc. ("Viisage") respectfully moves that this Court dismiss this action in its entirety, or alternatively, that this Court dismiss Viisage from this action. This motion is based upon the recent termination of the DLS Contract ("Contract") between Viisage, the Department of Motor Vehicle Safety ("DMVS"), and the Georgia Technology Authority ("GTA"). Due to the termination of the Contract, the essential controversy that was the subject of this action -- whether Viisage was properly awarded the Contract -- is now moot, and this action should be dismissed.

Even if the Court were to determine that some residual controversy remains between Digimarc ID Systems, LLC ("Digimarc"), GTA, and DMVS, Viisage is a party to this action only by virtue of having been a party to the Contract with the GTA and DMVS. Now that the Contract has been terminated, Viisage no longer has an interest in the subject matter of this litigation and is

therefore no longer a necessary party. Because it is no longer a necessary party, and because no

relief is sought from it other than it be restrained from implementing the now-terminated Contract

with DMVS and GTA, Viisage respectfully requests be dismissed from this action.

<p style="text-align:center"><u>ARGUMENT</u></p>

**I.    The Termination Of The Contract Renders The Controversy Among The Parties Moot, And This Action Should Be Dismissed.**

The DMVS has exercised its rights under the GTA Rules, Georgia law, and the Contract to

terminate the Contract with Viisage for convenience. As the Contract with Viisage has been

terminated, Digimarc's claim that the State improperly awarded the Contract to Viisage is moot.

Digimarc's central position in this case has been that Viisage was improperly awarded the

Contract. As a result, Digimarc claims that it is entitled to an injunction "restraining and enjoining"

the DMVS and GTA from implementing and performing the Contract with Viisage. Furthermore,

Digimarc seeks an order that the Contract be awarded to it, or alternatively, is re-bid. Finally,

Digimarc seeks (apparently as an alternative to injunctive relief) an award of its bid preparation

costs from GTA and DMVS. GTA and DMVS have decided to terminate the existing contract for

convenience and to re-bid the Contract. Given that the Contract is no longer in existence and that

DMVS and GTA have decided to re-bid the Contract, there is no need for the Court to restrain

implementation of the Contract, or to order a re-bid. To do so would be to decide a moot issue. It is

well settled that "'The courts do not concern themselves with the solution of academic problems or

the determination of dead issues.'" In the Interest of J.B., 219 Ga.App. 268, 270, 464 S.E.2d 865,

867 (1995).

In essence, Digimarc's claims are now "dead issues." As the State has terminated the

Contract with Viisage - just as Digimarc requested in its prayer for relief - the issues regarding the

award of the Contract are moot. "[T]he [Georgia] Supreme Court implied that moot matters

<p style="text-align:center">-2-</p>

pending before trial courts should not be decided...." Id. In addressing the standard for trial courts to review moot issues, the Court of Appeals found that, "It would be anomalous if the law allowed a pleader to hurdle the mootness bar in the trial court and obtain an advisory opinion which is not reviewable by the appellate court because the bar is placed in the way at that level." Id., 464 S.E.2d at 867-868. As there is no longer any Contract for Digimarc to complain about, there is no justiciable controversy before this Court to be decided. Consequently, this Court should dismiss Digimarc's Amended Complaint as moot.

The only conceivable issues remaining after the termination of the Contract are Digimarc's claim that the Contract should be awarded to it, and its claim for bid preparation costs. While GTA and DMVS are more properly suited to address these issues, lest Digimarc argue that it is, in fact, entitled to an order awarding it the Contract, Viisage must point out that such relief is both unnecessary and unsupported by Georgia law. Indeed, the extraordinary relief of a mandatory injunction compelling GTA and DMVS to enter a contract with a party whose offer the GTA and DMVS rejected in favor of another is completely inappropriate in these circumstances.

O.C.G.A. § 9-5-8 (2002) provides, "The granting and continuing of injunctions shall always rest in the sound discretion of the judge, according to the circumstances of each case. This power shall be prudently and cautiously exercised and, except in clear and urgent cases, should not be resorted to." A mandatory injunction awarding the Contract to Digimarc would deny the State its due discretion as conferred by the Georgia law, including the GTA Rules. Viisage respectfully submits that a court should not order GTA and DMVS to enter into a contract unwillingly.  .

Furthermore, Viisage respectfully submits that because Digimarc has obtained, in effect, the injunctive relief it sought, it is not entitled to bid preparation costs. That issue of course is an issue between GTA, DMVS and Digimarc, and thus is tangential to the essential dispute in this litigation -- whether the Contract was properly awarded.

-3-

Because all of Digimarc's claims for relief which properly can be awarded by this Court are moot or have been satisfied, and Digimarc's Amended Complaint should be dismissed.

## II.     Viisage Is No Longer A Necessary Party, And Should Be Dismissed In Any Event.

Even if the action were to continue against GTA and DMVS to determine whether Digimarc is entitled to an award of its bid preparation costs or an award of the Contract (and Viisage contends Digimarc is not entitled to such relief), by virtue of the termination for convenience, Viisage is no longer a necessary party, and therefore should be dismissed from this action.

The propriety of dismissing Viisage is self-evident. No claims have been asserted against Viisage. *See* Amended Complaint. Rather, because Digimarc sought that GTA, DMVS, and Viisage be restrained from implementing the Contract, Viisage was added as a necessary party to enable it to protect its interest in the Contract that it had been awarded. As the Contract that is the subject of Digimarc's Complaint has been terminated for convenience, and GTA and DMVS intend to issue a new Request for Proposals, Viisage no longer has any interest relating to the subject of this action. Thus, pursuant to O.C.G.A. § 9-11-19(a) Viisage is no longer a necessary party.

Georgia law is clear as to the test for when a party should be joined in the first instance. As stated in Hall v. Oliver, 251 Ga. App. 122, 122-23, 553 S.E.2d 656, 657 (2001):

> [T]here are two essential tests for determining whether a party is necessary to an action. First, can relief be afforded the plaintiff without the presence of the other party? And second, can the case be decided on its merits without prejudicing the rights of the other party?

*Id.* If the answer to either of those questions is no, then the party is necessary, and should be joined if feasible. The answer to both of these questions, however, now that the Contract has been terminated, is unquestionably yes, and therefore Viisage no longer is a necessary party.

Therefore, even if some dispute remains between the GTA, DMVS, and Digimarc, Viisage respectfully requests that because it is no longer a necessary party, and because no relief is sought

-4-

from it other than it be restrained from implementing the now-terminated Contract with DMVS and

GTA, it be dismissed from this action.

WHEREFORE, Viisage prays that Digimarc's Amended Complaint be dismissed in its

entirety, or in the alternative that Viisage be dismissed as a necessary party to this action and that

Viisage be granted other relief as the Court deems proper.

Respectfully submitted, this 2nd day of July, 2004.

KING & SPALDING LLP

Jameson B. Carroll
Georgia Bar No. 112640
Peter M. Crofton
Georgia Bar No. 197122
Robert C. Khayat, Jr.
Georgia Bar No. 416981
Gregory K. Smith
Georgia Bar No. 658363

191 Peachtree Street
Atlanta, Georgia 30303
(404) 572-4600
(404) 572-5144 (fax)

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

DIGIMARC ID SYSTEMS, LLC,

        Plaintiff,

v.

GEORGIA TECHNOLOGY AUTHORITY and
the GEORGIA DEPARTMENT OF MOTOR
VEHICLE SAFETY,

        Defendants,

v.

VIISAGE TECHNOLOGY, INC., a Delaware
corporation,

        Necessary Party-Defendant

Civil Action No. 2003CV66498

## CERTIFICATE OF SERVICE

This is to certify I am on this day serving the foregoing VIISAGE TECHNOLOGY,

INC'S MOTION TO DISMISS AND SUPPORTING MEMORANDUM upon all parties to

the above-captioned action by hand-delivery:

### Via Hand Delivery

David L. Balser
John P. Hutchins
Valerie D. Barton
McKenna Long & Aldridge LLP
303 Peachtree Street, Suite 5300
Atlanta, GA  30308
(404) 527-4198 (fax)

John B. Ballard, Jr.
Emily P. Hitchcock
Assistant Attorney General
Office of the Attorney General
40 Capitol Square SW
Atlanta, GA  30334-1300
(404) 657-3239 (fax)

John P. Gallagher
Catherine M. Banich
Stites & Harbison, PLLC
303 Peachtree Street, N.E.
2800 SunTrust Plaza
Atlanta, Georgia 30308
(404) 739-8870 (fax)

This _21st_ day of July, 2004.

One of the Attorneys for Defendant Viisage
Technology, Inc.

EXHIBIT 11

11 of 243 DOCUMENTS

Copyright 2004 FDCHeMedia, Inc. All Rights Reserved
Copyright 2004 CCBN, Inc. All Rights Reserved
FD (Fair Disclosure) Wire

July 22, 2004 Thursday

Transcript 072204al.752

**LENGTH:** 8691 words

**HEADLINE:** Q2 2004 Viisage Technology, Inc. Earnings Conference Call - Final

**BODY:**

OPERATOR: Good morning, ladies and gentlemen, and welcome to the Viisage Technology Incorporated second quarter 2004 earnings conference call. My name is Alicia and I will be your operator. At this time all participants are in a listen-only mode. We will be facilitating a question and answer session towards the end of the conference. (Caller instructions.)

I would now like to introduce your host for today's call, Mr. Bernard Bailey, President and Chief Executive Officer. Please go ahead, sir.

BERNARD BAILEY, PRESIDENT, CEO, VISG: Thank you, Alicia, and good morning. We're pleased you can join us for the Viisage second quarter 2004 conference call. I'm Bernard Bailey, President and CEO. On the call with me today is Bill Aulet, our Chief Financial Officer.

We'll start the call with a review of our operational highlights last quarter and an update on what we see going forward. Then Bill will review our financial performance for the quarter and also discuss our guidance for 2004. Following Bill's remarks we'll open up the call to Q&A.

Now I'd like to ask Bill Aulet to read our Safe Harbor statement. Bill?

BILL AULET, CFO, VISG: Thank you, Bernard, and good morning, everybody. Statements that representatives of Viisage make on this call that are not historical facts are accurate as of today, July 22nd, 2004 and may be considered forward-looking statements that involve risk, uncertainties, including reliance on public sector markets, the possibility of customer delays and the need for capital, and competition.

You should refer to our form 10-K for the year ended December 31st, 2003 filed with the Securities and Exchange Commission on March 30th, 2004 under the heading "Certain Factors That May Affect Future Results" as well as our subsequent SEC filings, for more information on the risk factors that could cause actual results to differ, perhaps materially, from our statements today. Viisage undertakes no obligation to publicly release any revision to any forward-looking statements made today, or otherwise update or supplement statements made on this call.

Now I'll turn the call back to you, Bernard.

BERNARD BAILEY: Thanks, Bill. It is a real pleasure to be reporting to you today on a very strong second quarter. I hope you were as pleased as we are to see our business strategy, coupled with the outstanding efforts of our dedicated employees, translating into very strong business results. This quarter was truly a transformational quarter for our business.

As you know, this quarter was the first one to include fully, the results of our latest acquisition. And I think you can see that we are well on our way to executing our strategy of providing the full life cycle of identity solutions to our customers. We are transforming Viisage to address our customers' identity requirements and in return they are rewarding us in the marketplace.

Revenues this quarter achieved another record level, the fourth quarterly record in a row. At $16.3m in revenues, we were up 85% from a year earlier, representing both strong organic growth as well as the impact of our strategic ac-

quisitions. At the same time, our gross margins have also improved during this period, increasing from 17 points in the second quarter of 2003, to 31 points this past quarter.

This improvement is a reflection of the aggressive cost-cutting measures we put in place over the past two years, but more importantly, it reflects the results of our strategy to transform our business to a stronger mix of higher margin products and services that we committed to do for you over a year and a half ago.

For example, when we entered 2004, the lower margin drivers license business constituted 76% of our revenues. For this quarter the drivers license mix was down to about 54% of our revenues. This, despite the fact that we saw over 25% year over year organic growth in this segment.

Going forward, we anticipate this trend to continue with the drivers license segment of our secure ID business constituting less than 50% of our revenues for the full year. Assimilating two major acquisitions this quarter is certainly a testament to our team's ability to execute effectively. Just as important, we were able to do it efficiently, holding our corporate expenses in line with the prior quarter's spending levels. We saw the benefit of this drop to our bottom line as we reported a positive net income of some $200,000 for the quarter.

So where does all of this lead us as we move into the second half of 2004? We are continuing to pursue opportunities in a wide range of civil identity problems in applications as varied as border management, passports, benefits distribution, all in addition to our core drivers license business.

While we've been talking about the huge problem of identity fraud for a long time, it now seems that more and more people and more and more organizations have come to appreciate just how severe this problem is. More importantly, I'm very pleased now to see there is far greater understanding of how our technological advantages help our customers combat this huge challenge.

We continue to believe that identity solutions are moving from single documents to a far wider set of permissions, centered around verifying identity and that more customers are recognizing this both as a problem they need to solve and are looking to Viisage as the company that can help them do this.

Today, our product development group is collaborating with our customers and you saw some of the initial results of this work this past quarter. The terrific efforts of our engineering team now centered out of Bochum, Germany, allowed us to announce upgrades to our free leading spatial recognition solutions, all of which are already in implementation at various customers. Over the next few quarters you can expect to see new product announcements that will allow us to extend exciting new capabilities across the entire identity solution life cycle.

At the same time, we are also actively continuing to evaluate the marketplace in terms of filling out our portfolio of identity solutions through acquisitions and partnerships. Our track record in acquisitions thus far is strong, and therefore, as opportunities emerge, we remain interested in continuing to augment our organic growth by acquiring companies whose technologies and marketplaces enable us to fulfill our strategic vision.

I've often shared my view of this marketplace in the past. It is a marketplace in which many small companies are providing single point products to address one aspect of the identity solution problem. As a company we at Viisage are committed to providing a comprehensive integrated solution that addresses the entire spectrum of the solution offering.

From a customer standpoint we see customers looking to Viisage for a complete solution. Today, we are a customer-centered company focused on understanding and satisfying the needs of an increasingly diverse group of customers, with an increasingly wide series of solutions. Our core value is to make our customers successful, since when they are, we are as well.

That leads me to a discussion regarding our announcement yesterday about the State of Georgia driver's license contract. For those of you without the historical perspective, let me give you a quick sketch. In late 2002, Viisage was awarded, after a competitive bid, the driver's license contract for the State of Georgia, with a bid that included some of the most advanced features, including multi-biometrics as well as central production.

This was a key new win for Viisage and we immediately deployed resources in the State to begin implementation. And in fact, we were just days away from taking over the contract when the incumbent competitor that had held the contract filed a lawsuit against the State of Georgia Department of Motor Vehicle Safety alleging issues in the bidding process. Viisage was never a party to this lawsuit, which has dragged on and on for a year and a half, nor were any allegations of impropriety ever lodged against our company. Still and all, with more than $1m spent already in legal fees as

Q2 2004 Viisage Technology, Inc. Earnings Conference Call - Final FD (Fa

a related party and no prospect of a breakthrough in the logjam within the foreseeable future, we decided it was time to act.

Let me put this in context. Almost two years ago, when I joined Viisage, I said that we would build this company from the customer end. Central to that was a core value that states that we are committed to the success of our customers. That means making sure that they are successful in all they do, not just implementing on our contracts. As a result, we had to make sure that we lived by our core values. So rather than continue to let the State waste money and continue to deprive their customer of the advantages of Advanced identity Solutions documents, we took action.

We offered an approach that allowed the State to move this procurement from the courts to the marketplace where we believe it belongs. The terms of this settlement are spelled out in the press release we issued. What's most important are two facts. First, this step will enable the State to end the ongoing legal battle with its enormous costs for all parties.

Second, the State will be reissuing an RFP for this contract before the end of 2004, allowing its citizens to finally get the secure identity document that they require for their protection. We intend to compete aggressively for this contract and are confident that we will be successful and have the opportunity once again, to offer the citizens of Georgia an industry leading identification solution that will enhance document security and reduce the huge problem of identity theft.

On another note, I'm sure you noticed in our press release yesterday, the item about the lawsuit by Fargo Electronics, alleging that the Toppan printers we distribute infringe on patents Fargo holds. This relates to the Common Access Card contract with the Department of Defense, where we ousted Fargo, who was the incumbent at the time. We have just received a copy of this lawsuit and we are reviewing it. But I can tell you, we intend to defend against it vigorously.

The final item I would like to comment on deals with our recent S3 filing, allowing us the latitude to raise additional capital to fuel the growth and profitability of our company. Today we are announcing that we will be launching our follow-on offering, which will be led by JP Morgan and UBS, to raise funds in the marketplace. This activity will begin as soon as this call ends. This offering will generate proceeds, which will pay down our debt, reducing our interest expense by over $2.3m per year, allowing a clearer path to profitability for our shareholders. Just as importantly, this offering will also give us the opportunity to introduce the new Viisage and our Identity Solution strategy to a new group of investors.

In closing, let me say again that I am very pleased by our progress this quarter and that while we certainly have challenges in front of us like every business, I remain confident that we have many opportunities ahead of us, ones where we can continue to prove Viisage's value proposition to our customers. With that, I'll turn the call over to Bill to discuss our financial performance and outlook.

BILL AULET: Thank you very much, Bernard. And as I begin, I want to remind you that as of December 30th, 2003, Viisage adopted a new accounting principle, EITF-0021, affecting how revenues are recognized under long term contracts like our driver's license agreements. This methodology was retroactively applied to periods since January 1st, 2003. And to assist you in comparing our current results with earlier periods, we have recalculated those prior period results. We will refer to these figures throughout the call, but if you have any questions, please refer to our website at www.Viisage.com in the Investors section.

I will also be using EBITDA and other non-GAAP measures during this discussion. And a reconciliation of those measures to the conforming GAAP measures is also on our website in the same section.

We are very pleased with our top line growth for this quarter. Revenues for the second quarter of 2004 were yet another record at 16.28m, an 85% increase on a year over year basis and up 33% sequentially. I'll remind you that the second quarter of 2004 is the first to fully include the operating results of our ZN and TDT acquisitions, completed in the first quarter of this year.

The excellent improvement in our gross margins to 31%, up 3 full basis points on a sequential basis and even more robustly on a year to year basis, speaks to our continued commitment to drive efficiencies into operations, despite the challenges of integrating two acquisitions, completing a move and incurring other non-operating expenses, which is litigation.

We also continue to make solid progress with our cost controls, especially when the costs associated with the acquisitions of TDT and ZN are excluded, as well as the cost of some $200,000 for the Georgia litigation this quarter and other non-operational legal costs related to our secondary.

Considering that we now have nearly 75 additional full time employees and two more facilities following the acquisition, the fact that we've been able to hold expenses relatively flat with prior quarters speaks well to our work. In the back half of this year, the rent reduction associated with our headquarters relocation from Littleton to Billerica will be recognized. And we will also benefit from the reduction of litigation expenses for Georgia, although the contributions to those will be offset by at least some degree by increasing operating costs I mentioned. We expect that the rent reduction will lessen the operating expense by approximately $15,000 per quarter, starting in the fourth quarter of this year.

Lastly I'll note that the second quarter of 2004 included some 60,000 of expenses associated with headquarter's move, as well as $100,000 in severance expenses.

Total operating expenses for the second quarter of 2004 were 4.74m, up from 3.11m the same quarter last year and from 4.59m in the first quarter of this year. Looking at the expenses for the second quarter of 2004, 1.58m were for sales and marketing, fairly flat on both a sequential and annual comparison basis. R&D expenses were 952,000, also fairly flat on a sequential and annual comparison basis. And G&A rose to 2.2m, from 2.14m in the first quarter and 1.03m in the second quarter of 2003. I'll remind you that the G&A is where the burden of the Georgia litigation costs have been felt.

On a net basis, the loss for the second quarter this year was 317,000, or a 1 cent per share loss on a basic an diluted basis, a substantial improvement over the reported net loss of 1.38m, or 7 cents per share loss in the second quarter last year. Sequentially it also represents an improvement from the first quarter this year, where we reported net loss of 1.6m, or 5 cents per share loss.

Looking at our results on an EBITDA basis, in the second quarter of 2004 we generated EBITDA of 3.1m, a dramatic increase from both the 709,000 we posted last year in the second quarter, as well as the 1.1m we posted in the first quarter of this year. Once again, we generated positive cash flow in the second quarter of 2004. As a result, at the end of the second quarter of 2004 we had a cash position of approximately 12.6m, which was up from 12.4m at the end of the first quarter. Of this total, approximately 9.5m, or 75% is unencumbered that is not pledged against the State driver's license implementations or restricted bank covenants.

The cash total will be increased by the payment we are receiving from the State of Georgia of 2.5m, which will be recorded in the third quarter of this year. I think you can see by these numbers that we're doing a very good job of monitoring our cash and generating positive cash.

At the end of the second quarter of 2004, we had approximately 36m shares outstanding, compared to 20m at the end of the second quarter last year. Backlog at the end of the second quarter of 2004 was approximately 171m, down slightly from the 176m at the end of the first quarter.

I will note, historically, backlog does not always move in a linear direction, reflecting that some contracts are won and worked immediately, while others are implemented on a longer term basis, especially driver's license contracts. Importantly, however, the backlog still constitutes nearly three time our annual revenue. I'll remind you that in connection with the settlement we announced with the State of Georgia, this backlog will decrease by 19.7m in the third quarter, offset by any additions of contracts we win and recognize in the same period.

I'll add a quick note on the other financial aspects of Georgia, as Bernard mentioned. Strategically it's the right step to resolve this matter now, rather than allow it to linger, quite expensively as a matter of fact, for an indeterminate amount of time. The settlement reimburses us for costs we incurred in developing the state of the art system for Georgia, which is one we believe will set the new standard for central production of driver's license, which is very relevant, as a number of other large central production States are coming up for bid in the next two years.

We are also renouncing any claims for additional monies from the State related to this contract. We currently do not expect to take any charges related to the termination of this contract, although we will possess significant assets purchased for the implementation, some of which can be used and are being deployed in other contracts or other parts of our business.

The six-month results are stated in the release, so I won't take the time now to repeat the same text.

Now I'd like to discuss our annual guidance for 2004. In early May, based upon the strength of our business pipeline we raised our annual revenue guidance from 60m to 63m. Our EBITDA guidance for 2004 from 11m to 12m. At this time we are comfortable with this guidance and we're confirming it. As we've gone through the purchase accounting for our acquisitions of ZN and TDT and better clarified the non-cash expense associated with the amortization of intan-

Q2 2004 Viisage Technology, Inc. Earnings Conference Call - Final FD (Fa

gible assets, we recognize that the annual targets we provided last quarter for operating income and net loss will vary, even though the EBITDA outcome will not.

We now believe the operating income will essentially be breakeven, rather than the 500,000 and the net loss will be no greater than 1.5m rather than no greater than 0.5m. As we have said previously, given the legal situation in Georgia, we have removed expectations for the significant revenue contribution from that contract this year from our forecast. We are not changing our revenue guidance because of the settlement.

I'll also note we were active in the investor relations outreach this quarter as well, with a number of opportunities to meet both retail and institutional investors and shareholders. We spoke at the JP Morgan conference, the Piper Jaffray conference in May, as well as the AEA Micro-Cap conference in Monterrey in mid-May, in addition to our shareholders meeting in late May at our new company headquarters. We plan to continue our outreach and response efforts to ensure that we communicate effectively with investors about the Company's vision and strategy. As usual, we'll keep you updated through our press releases on the details associated with those presentations.

With that, let me turn the call back over to Bernard.

BERNARD BAILEY: Thanks, Bill. Let me just summarize. As we mentioned on the call, I'll tell you, I am very pleased and I hope you are too, with the results we've been able to post this quarter. At the same time, we know that there's still much work yet to do.

But I really believe that where we are now is we've put the cornerstone in place to really manage this business going forward and continue to grow and expand it. We've revamped the entire executive team over that past 18-months and in fact, we just added another key executive, Ken Scheflen, who joined us from the Department of Defense.

We've enhanced our technologies through acquisitions as well as our own internal development on the products. We've enhanced our presence in the marketplace through both acquisitions and the growth and we've worked to reduce our structure and our costs within our business. So I think we've got all the right things going on and in place in the business to really meet the challenges going forward.

Our action is now over the next couple of weeks, to go out and raise additional funds for the Company I think is another extremely important step to put the cornerstone in place to shore up our balance sheet and give us much more strength financially going forward to grow in this marketplace.

So, we're real excited. I hope you are too as investors. And I'd like to open the call up now to questions. Operator?

OPERATOR: (Caller instructions.) The first question is from Tim Quillin, with Stephens Incorporated. Please go ahead.

TIM QUILLIN, ANALYST, STEPHENS INCORPORATED: Good morning, gentlemen. Bernard, could you just give us an update on business development activities, the sales pipeline, in particular I'm interested in the synergies you're realizing as you take kind of a broader solution that combines TDT's, ZN's and your core business' capabilities?

BERNARD BAILEY: Sure, Tim. First of all, we continue to be very optimistic relative to the pipeline. We commented on that in the past and for the sake of brevity I wanted to keep that in the questions this time. But anyway, certainly we see tremendous opportunity going forward, first of all, in the federal marketplace and we see great synergies coming together. And that was really the reason we brought Ken Scheflen on board, who's really now serving as the leader to really pull our whole federal marketplace team together down there in Washington. Which is allowing us to integrate across the entire solution set going forward, into our customers. So Ken has that leadership capability. He's driving that for us. And we've integrated our entire Washington effort and federal effort together down in Washington, D.C.

The opportunities there are the usual suspects. We continue to be very involved with all of the key integrators and end users there. On the TWIC program as well as the US-VISIT program, and all of the major programs down there. But we also see a tremendous opportunity now with what we've done through our acquisitions to expand our set of offerings going forward.

I didn't talk about the CAC card in much detail, but let me just reiterate the importance of that to us as a company. Winning the CAC card at the end of the first quarter, and executing now in the second quarter was absolutely critical to us for a couple of reasons. First of all, it really establishes us as a key player in the areas of advanced technology secure identifications. Most of our callers realize the Common Access Card or CAC program for the DOD is the major identi-

Q2 2004 Viisage Technology, Inc. Earnings Conference Call - Final FD (Fa

fication program and most advanced one in this country. And to be a part of that is critical. And it's a program that is being expanded and replicated across multiple agencies in the federal government here in the US, so we think that's critical.

Secondly, in the passport area, being involved there and having the sole production of the passports has really positioned us very well to have discussions with the Department of State about advancing our technologies in face recognition, our printing capabilities as well as our ID management and business process capabilities into their organization. So, we're starting to see it in a lot of different areas here and just starting to see the beginning of it, Tim.

TIM QUILLIN: That's a good rundown. And could you give us a sense of use of proceeds from your offering and what type of acquisitions you might be considering to help broaden your solution?

BERNARD BAILEY: Sure, I'd be glad to do that, Tim. First of all, on use of proceeds, as I mentioned, one of the first things we'll do with the use of proceeds is use them to pay down our debt and improve the cost of capital in our company. Now that's important, because as an example, I think I told you our net income this quarter was a very positive, well over $200,000. Then we had over $500,000 in interest. That interest will go away. And so we really see this as $2.3m plus of interest on a full year basis going away, which will make it clearly much easier for us to get to profitability for our shareholders as a company. So that's the first use of proceeds, Tim.

That with the remaining monies, what we see is really giving us the ability to then execute on our strategic initiatives. And let me talk about some of them. First of all, we think it's absolutely critical for us to continue to expand our solution and product offerings going forward. So as I mentioned, we'll look at both acquisitions as well as organic growth in that area.

And that's important, Tim, because as you've seen from a margin standpoint we've improved from 17 points to 31 points and our goal is to get up to an ongoing, continuous rate of about 40 points of gross profit margin going forward. And to do that we have to bring in more advanced technologies and more products as well as do development. So we'll use the proceeds to help us do that.

Secondly, we'll use the proceeds then to take these additional products and services we have, to distribute them out through an enhanced channel. And the channel growth that we'll look for then will be expanding our partnerships and our distribution, certainly here in North America, but we also see tremendous opportunity in the European, Middle East and Asian marketplaces.

And those of you that have been following us, you know that an important part of our ZN acquisition was our ability to get a distribution platform there in Europe. And that's exciting to us, because as I mentioned last time, we won two significant opportunities, one in a European Union passport opportunity and another one a Visa opportunity. We're not allowed to describe the countries in that case, but needless to say to say they were a very significant opportunities in the border management. So, second thing then is to expand our distribution network and our partnerships going forward.

Now what does that mean from an acquisition standpoint? As I mentioned, Tim, we are going to be - continue to be very aggressive and acquisitive as a company. We're going to do it smartly. I think and I hope that our shareholders see that the couple of acquisitions that we've made recently have immediately become accretive our company. And we're going to continue to look smartly at acquisitions as we go forward.

What are the things we're looking at? Well, we're looking at things that will provide enhanced value to our customers and allow us to build the portfolio of solutions across the identity solution lifecycle. That means we're looking at enhancing our abilities and capabilities in the areas of proofing, in the areas of provisioning and distributing documents, in the areas of usage and in the areas of getting enrollment of people into databases. So across that entire lifecycle of identity solutions is where we'll be looking at opportunities.

And some of the things we'll look at will be things in the proofing area. Some of the things we're looking at are enhancing our biometric capability, as well as enhancing our ability to move into online verification and authentication, a very, very important part of our business. Because as most of you know and we've put in our strategy documents, strategically where we are headed is to place ourselves at the nexus of the convergence point between physical and logical identity solutions. And that's the company that we're creating going forward.

OPERATOR: The next question comes from Jim Ricchiuti, with Needham & Company. Please go ahead.

Q2 2004 Viisage Technology, Inc. Earnings Conference Call - Final FD (Fa

JIM RICCHIUTI, ANALYST, NEEDHAM & CO.: Thank you, good morning. Bill, I wonder if you can comment on the backlog and give us a sense as to how much of that backlog would be recognized into revenue in the second half of the year and how much in calendar '05?

BILL AULET: Okay. I don't have the numbers right off the top of my head, but let me just --.

JIM RICCHIUTI: If it's approximate that's fine.

BILL AULET: Let me just first say what drove the revenue this quarter. I think that's very important. I didn't - for the sake of brevity at first that we tried to leave more time for questions. What drove the revenue this quarter was first of all, the Department of Defense Common Access Card printers was a big step-up for us. We had a very strong, from the Department of State, shipment of consumables for the passports. And our driver's license business was up a good 20% year over year as was the FR business. So it was good across the board growth.

What was new there were things that came in. Most of that was out of the backlog, although some of the facial recognition and some of the business from the Federal Solutions was not directly out of the backlog.

Looking forward we see that - we see good coverage for our numbers for the rest of the year, but it's a multiyear backlog. So I would say what percent of that? If it was 171m, now you take that, we're 151m, if you take Georgia out of that now, you're looking at the coverage there, I would say for the rest of the year probably 80% of all of our numbers.

BERNARD BAILEY: Let me put a little more color around that for you, Jim. If you look at going forward in the guidance we gave you, the $60m to $63m, that says that we have somewhere around 32m plus or minus a little bit of revenue yet to go. Well of that $32m, $33m of revenue yet to go, you can probably look to see that about 26m of that will come from the existing backlog. So we're looking at some other significant programs and extensions that we see going forward that we'll be able to fill in that revenue stream going forward in our business.

Now, of that 26m or so that we see going forward, you can probably expect the backlog probably around 12m to 14m of that will come from our driver's license business and the remainder of the backlog will come out of both our facial recognition as well as our federal opportunities that we have down there and backlog that we have. So hopefully that gives you a little bit more color.

JIM RICCHIUTI: That's very helpful. On the issue of gross margins, nice improvement in the quarter. Are there any kind of mix issues that you anticipate over the next couple of quarters that could influence gross margins one way or the other? How should we think about gross margins going forward?

BERNARD BAILEY: Yes, I'm glad you asked that one, Jim. Mix is a factor. I pointed that out in what I discussed there. We had a very good mix this time in that we had some very strong solution services that we brought forward that helped enhance our margins going forward. Going out in the next quarter I would not expect to see us continuing, advancing from those margin levels. And there might in fact be a little bit of drop-off, a couple of points here or there going forward with the mix.

We're going to continue to work that. There will be a little bit of lumpiness on the mix in terms of how we go forward. We're committed to a very strong stream. But we feel the direction is clearly moving the way we want it to in terms of the product mix. But we'll see bumps from here and there.

We had a couple of outstanding items that happened this past quarter. One of them was the State of Maryland, where we were able to distribute some solutions for them. Also at the State government we provided some additional software. We had a very heavy mix of face recognition that as you know, provides us much better margins than in the past, and that happened - much better margins than our other solutions do.

So as a result of that, the mix was very favorable this time for us. Going forward you can expect it will probably drop a little bit, but the slight slope we're on is to move into that 40% range over the next two years or so.

BILL AULET: Jim, can I just add to that. When we go forward, the product mix, everything - a lot of things lined up this quarter for us, the software licenses, the consumables, with the [preferred] I was talking about. But as the product mix goes forward the Department of Defense Common Access printers are going to be a bigger part of that. So, that's going to be one of the reasons why we're going to have a little more pressure.

JIM RICCHIUTI: Great. And a final question, Bill. I wonder if you could just comment on what the legal expense associated with Georgia was in the quarter and do you anticipate how much of that is going to be offset or not offset by legal expense associated with the Fargo lawsuit?

BILL AULET: In this past quarter we spent about $200,000 on the Georgia legal expenses. At this point it would be - we're looking at the Fargo. We're taking it very seriously. We don't really know the magnitude of that one at this point.

OPERATOR: Your next question is from Scott Greiper. Please go ahead.

SCOTT GREIPER, ANALYST, C.E. UNTERBERG, TOWBIN: Good morning, gentlemen. Congrats on a good quarter. A couple of questions. If you can go a little bit more in depth on the growth margin side, and specifically on the, I take it the move to consumable sales, versus hardware production sales, which increases margins, doesn't that move forward over the balance of the years for the passport business where it stays consumables, or does hardware become a component of that at some point in time?

And second question is in regard to the deal and whether there is a price at which you would not move forward with the secondary?

BERNARD BAILEY: Let me take the first one for you, Scott. This is Bernard. Relative to the margins and the fact that consumables come in and I think what the point you're making is that the consumables are a little bit more consistent and go over time and probably carry a higher margin on it. And all of that is true.

That being said, when you're dealing with the federal government on consumables, what you see is that with year-end buying and budgets, sometimes that can be lumpy. So as a result of that it isn't always as smooth as it is in the driver's license, so sometimes they will use their budget that they'll have in a quarter to make a more significant purchase of advanced consumables and that creates a little bit of lumpiness in it. And that's why as that mix moves - the mix does move somewhat over time and change those margins somewhat there, Scott. So I hope that answers that question for you.

SCOTT GREIPER: So once they get in, or once the contracts move into the consumable stage, it's a matter of volume of buying or intensity of buying or does it at some point in time also include a hardware component again?

BERNARD BAILEY: It does at times include another hardware component again, but for the most part what it deals with is hen the buying occurs. And that can be in clumps or it can be distributed over a consistent period of time. That's all on that one. But obviously there's always the opportunity for more product and technology refresh and upgrades going forward that gets into that too.

Now as far as the second question is concerned, I'm going to turn that over to Bill and let him answer that, relative to what that means to us in terms of a price point and what we would do on that and so forth.

BILL AULET: Sure. Let me just add one thing to what Bernard said. It's an interesting point. We don't just sell consumables. We'll go in and work with the customer on the solution. In this quarter we had a significant software sale upgrade to the Department of State with regard to theirs. So it's not just always consumables. It can be service support and software.

Regarding the follow-on offering, I think if you look at our operations you can see we're doing, I think, a very good job of managing cash flow. And obviously at some price you don't do it. But we're moving forward with the full intent of doing this offering and we have to always act in the best interest of the shareholder.

SCOTT GREIPER: Sure. Lastly guys, if I could, I know the Fargo issue is one you're just sort of learning of, since they didn't send you anything ahead of announcing a lawsuit. But is there any early take on what this might mean and whether you consider it material or not? Not that you're not taking it seriously, but what could be the impact from what you can see right now?

BERNARD BAILEY: Scott, part of what we've always tried to do is work in an environment of complete openness and candor, as much as we possibly can, with all of our investors and shareholders and we will certainly do that in this case also. Unfortunately, because this came as kind of completely out of the blue to us, and we first saw it in a press release and then finally it was served later in the day to us, without any notice what so ever, we immediately tried, or did get on the phone to talk to our partner Toppan in Japan. And with the time difference, they hadn't even had any notification served at that time either. So it really is very, very early for us to comment on that. We will be more than forthright in bringing that forward to you.

What I can assure you is that we are going to address it and address it aggressively. And we as a company are so committed to the customer that to us it is absolutely critical that it be understood that we take our fight into the market-

Q2 2004 Viisage Technology, Inc. Earnings Conference Call - Final FD (Fa

place where it benefits the customers. And that's what we will continue to do as a company and we will address this. Because we know that in this case, in a very competitive procurement, the government made a selection for our solution and that's what's best for the Department of Defense and for the citizens of this country. And we will continue to make sure that we deliver that to our customers.

SCOTT GREIPER: So at some point in time I guess you guys will come out with some statement or perspective on it?

BERNARD BAILEY: Absolutely, as soon as we have a better understanding and grounding of that. All the technology resides with Toppan in this case, and what they're challenging. So we're really not in a position to make a statement on it until they give us their read on that. And our lawyers are working with them right now.

OPERATOR: The next question is from Paul Costa, with JP Morgan. Please go ahead.

PAUL COSTA, ANALYST, JP MORGAN: Good morning, gentlemen. I've got a few housekeeping questions. Bill, can you give us some sense of what the CapEx was for the quarter please and what your projection is for the remainder of the year? And how does EBITDA work through the system through the remainder of the year?

BILL AULET: CapEx was [diminimous], less than $1m I would say. And if it changes from that we'll let everyone know. Relative to EBITDA for the rest of the year, I mean, I think you can just cross - we're holding - I think the results were outstanding this quarter. We're very happy with over $3m of EBITDA and we're holding to the 11m to 12m for the full year. And I think you can just cross put it from there.

PAUL COSTA: Okay. Can you give us some sense of how you see the share count changing, and obviously with this pending deal in mind, but in addition, I'm sure you have some employee programs that are worth considering?

BILL AULET: I would just look historically. I think that it'd be basically the same as what it's been in the past.

BERNARD BAILEY: Yes, I mean, if you look at it, Paul, as we stated in the S3, we're looking at 7.5m total shares. So you can roll that into 7.2 with 300,000 following on after that at some point in time. And as far as the employee portion goes, that is really not a significant amount of it. It's certainly well less than 1m shares.

PAUL COSTA: The breakdown in the backlog that Bernard described earlier on, about 50% of it coming from driver's licenses, would it be correct for us to project that forward too to the total backlog as the appropriate mix?

BERNARD BAILEY: No, not it wouldn't be. No, the driver's - if we're looking at that backlog of $150m, in round figures, round figures, Paul, it is probably about 40% of that is caught in the federal and the face recognition, and then 60% of it roughly is in the driver's license business - plus or minus 5% on these.

PAUL COSTA: Okay. So that points to the long term gross margin improvement, doesn't it, if the proportion is coming from FRT is ticking up gradually?

BERNARD BAILEY: Absolutely. Plus what you'll see is that over time, the business that we're winning will continue to come from that. Just as you saw this quarter, we increased - we had about $12m, $13m in sales this quarter, of which the driver's license was a much smaller portion of that and that will continue over time.

So by the end of the year, our full year revenues for driver's license will be less than 50%. This quarter is was 54%, last year it was 76%.

BILL AULET: Yes, just to give you some numbers on that, Paul, at the beginning of 2003, when we first started, it was 80% of the revenue for the company came from credentials issued in the driver's license segment. At the end of this year we're projecting that 40% of our revenue will come from the driver's license business. Not that we don't like the driver's license business, we do. But it's just we're diversifying our portfolio, which gives us a lot of strength and will allow us to improve margins.

PAUL COSTA: So what would the organic growth rate have been this quarter if we'd stripped out the acquisitions? I guess that the CAC program is incremental, so that's just --.

BILL AULET: Well, let me give you a number on the organic growth. That was a very good question. The organic growth - pro forma organic growth, when we look at the business, would have been in the neighborhood, year to date, in the neighborhood of 33%, when you consider the acquisitions consolidated into it. As I said, the [phips] business was growing at 20%, the FR business was growing at 20%. So that's on a kind of year to date basis. Does that help you? It was solid across the board growth, organic and through acquisitions.

Q2 2004 Viisage Technology, Inc. Earnings Conference Call - Final FD (Fa

PAUL COSTA: Okay. And then Bernard, if I can ask you one question as of just looking a bit further out. Obviously identity theft is something that you believe that you can address. At the moment though I don't' think any revenues are really derived from that value proposition. When will they? Are there RFPs out there, are you getting involved in commercial applications, can you just give us some color around that?

BERNARD BAILEY: Yes, I can. I would have to be fair though, Paul, and challenge your first premise, which says that revenues today are not coming from the identity theft problem. If you look at the work that we're doing, it really all addresses this whole - for the most part, addresses this whole area of identity theft. I can go through example after example where the solutions that we've put in place and imbedded are face recognition at the driver's license have gone directly at helping to solve specific identity theft problems in States like Illinois and Oklahoma and Florida and Massachusetts and other States in that way. So, it's impossible to separate that out, because that's what we are at the core as a company, is focusing on that.

Now I think probably what you're saying is how much of it is really directed directly from things in the commercial marketplace that are focused around identity. And if that's the question, then I would tell you that right now our focus has been on the three major market areas where we see the early adopter movement. And that's in the border management, civil ID and law enforcement and that's where we focused our efforts. And we believe very strongly that the other commercial opportunities, at the enterprise level, will expand and expand significantly. But a lot of them are sitting back and letting the government be the early adopter. And that's why we've addressed that market initially.

OPERATOR: Your next question is from Amy [Sung], with J&P Securities. Please go ahead.

AMY SUNG, ANALYST, J&P SECURITIES: Yes, can you tell me, in terms of the pricing on your driver's licenses, can you give us a sense of where it stands right now and where do you see pricing going over the next 6-12 months as new contracts come up for bid?

BERNARD BAILEY: Yes, what we're seeing, Amy, that's a very aggressive marketplace from a pricing standpoint and so we continue to see it being aggressive, and prices being very aggressive. That's one of the reasons as we look at it, that it just makes a lot of sense for us to expand our portfolio into other opportunities from a business standpoint. I think that we'll continue to be aggressive from a pricing standpoint. The other major player there is basically - their whole business evolves around the driver's license business, so that is their major play.

AMY SUNG: Okay. And then my second question has to deal with cross selling opportunities. Of your existing customer base that use the Viisage Technology for their driver's licenses, are these the same people that would make purchase decisions as well for their State facial recognition purchases?

BERNARD BAILEY: Oh absolutely, Amy. In fact, we're seeing that happening again and again in various different States. So clearly, today we're in 16 different States, six of them have selected face recognition. We're in a couple of other different locations internationally where face recognition is and it's the same type of agencies. And we are in aggressive discussions with over half of our existing customer base right now, in terms of how they enhance their solution.

And fortunately with the economy getting a little healthier, they're starting to see a little bit of money free up at the State levels and they are doing everything they can to make investments in this area, because they see the value of it. But it's absolutely the same purchasing teams that are looking at this.

Just as we also see those same teams are looking at solutions in other areas that we have to provide. In the areas, for example, a big problem we see today is in the area of proofing. When people come in with the [breeder] document that leads to the driver's license or an existing driver's license to get a new one, it begs the question of how do you know that's an authentic document? And so that's another area that we see and we're working with partners and I think you're going to see some really exciting solutions and products coming from us in the near term that address that.

OPERATOR: Your next question is from Keith [Larose], of [Bradley Foster & Sergeant]. Please go ahead.

KEITH LAROSE, ANALYST, [BRADLEY FOSTER & SERGEANT]: Good morning, gentlemen. How are you? You seem to imply that the suit from Fargo is focused exclusively - and it may be just that's the way I'm taking it, on the CAC program with the DOD. But do you mean to imply that? And is it possible that that suit bleeds into passports as well and if not, can you kind of explain why there's a Chinese wall between those two?

BERNARD BAILEY: No, I really can't comment on that at all Keith, at this time, because we just don't know enough. As we know more then we will. I certainly don't want to imply anything relative to that. All I know is that it initially came out after that period of time. But when we know more we will make that available to everybody.

Q2 2004 Viisage Technology, Inc. Earnings Conference Call - Final FD (Fa

KEITH LAROSE: And are you aware if there have been any other previous contentious interactions between TDT and Fargo historically, prior to the launching of this suit, besides being normal competitors?

BERNARD BAILEY: I do know in every single discussion that we've had with our federal group and the people that have interfaced in this marketplace, that this came as a complete surprise and that there was no awareness of any issue like this in the past. We've asked all of them. There's certainly no documentation that we can find.

KEITH LAROSE: And I think someone else asked this, but I had a bit of a bad connection, so I apologize in advance. Obviously, given that your weighted average cost to capital is going up on this deal, what's your sensitivity relative to when it was announced the stock was up near 10 and now here we're 30% lower, what's your view on adjusting this deal relative to that?

BERNARD BAILEY: As Bill stated, we're going to do what makes the best sense for our shareholders, both in the immediate concern as well as the long term growth of the company.

BILL AULET: We're very confident, Keith, when we get out there in front of these institutions, as Bernard mentioned, that you might get a historic, which I haven't heard - that it's going to be a very positive response. I'd say we're extremely confident.

BERNARD BAILEY: Again, our time is up. I'm sure there are other people who are on the line for calls and I wish we had more time to take all of the calls. So Bill and I have a lot of work to do now, to go out and start the process of putting our offering out in the marketplace.

So with that I just want to say that we really do greatly appreciate your interest and support for Viisage. It's amazing how the interest and momentum amongst our investor base has grown over the last, certainly 6-9 months. And we really very much appreciate your interest and support. And you can have my assurance that we will continue, the entire company of Viisage, will continue to do our absolute utmost to earn your trust and to deliver as best we can in this marketplace and put our utmost effort in doing that.

If you have any additional questions I would ask and encourage you to email or call Bill Aulet or myself. And we certainly look forward to speaking with you again in the future and I wish all of you the very best. Thank you.

OPERATOR: Ladies and gentlemen, thank you for joining today's conference. This does conclude the presentation. You may now disconnect. Good day.

[CCBN reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES CCBN ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS. Copyright 2004, CCBN, Inc. All Rights Reserved.]

**LOAD-DATE:** August 6, 2004

EXHIBIT 12

S-3/A 1 ds3a.htm AMENDMENT NO. 1 TO FORM S-3

**Table of Contents**

As filed with the Securities and Exchange Commission on July 22, 2004

Registration No. 333-116698

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# Amendment No. 1
# to
# FORM S-3

#### REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933

# Viisage Technology, Inc.
#### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **04-3320515** |
| **(State of incorporation)** | **(I.R.S. Employer Identification No.)** |

296 Concord Road, Third Floor, Billerica, MA 01821, (978) 932-2200
**(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)**

Bernard C. Bailey
Chief Executive Officer
Viisage Technology, Inc., 296 Concord Road, Third Floor, Billerica, MA 01821, (978) 932-2200
**(Name, address, including zip code, and telephone number, including area code, and address of agent for service)**

*Copies to:*

| | | |
|---|---|---|
| Elliot J. Mark, Esq. | David M. McPherson, Esq. | Gerald S. Tanenbaum, Esq. |
| Viisage Technology, Inc. | Latham & Watkins LLP | Cahill Gordon & Reindel LLP |
| 296 Concord Road | 555 Eleventh Street, N.W. | 80 Pine Street |
| Third Floor | Suite 1000 | New York, NY 10005 |
| Billerica, MA 01821 | Washington, D.C. 20004 | Telephone: (212) 701-3000 |
| Telephone: (978) 932-2200 | Telephone: (202) 637-2200 | Telecopy: (212) 269-5420 |
| Telecopy: (978) 932-2218 | Telecopy: (202) 637-2201 | |

**Approximate date of commencement of proposed sale to public:** From time to time, after this registration statement becomes effective.

If the only securities being registered on this Form are being offered pursuant to dividend or interest reinvestment plans, please check the following box. ☐

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, as amended, or the Securities Act, other than securities offered only in connection with dividend or interest reinvestment plans check the following box. ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If delivery of the prospectus is expected to be made pursuant to Rule 434, please check the following box. ☐

#### Calculation of Registration Fee

| Title of each class of securities to be registered | Amount to be registered | Proposed maximum offering price per unit | Proposed maximum aggregate offering price | Amount of registration fee |
|---|---|---|---|---|
| Common Stock | 7,500,000 shares | $9.21 | $69,075,000 | $ 8,751.81(1) |

| Common Stock | 1,125,000 shares(2) | $6.49(3) | $ 7,301,250 | $ 925.07 |

(1) Previously paid.
(2) Represents shares to be purchased upon exercise by the underwriters of their over-allotment option.
(3) Estimated pursuant to Rule 457(c) under the Securities Act solely for the purpose of calculating the registration fee, based upon the average of the high and low sale prices of our common stock on July 19, 2004 on the Nasdaq National Market.

**The registrant hereby amends this registration statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this registration statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until the registration statement shall become effective on such date as the Commission acting pursuant to said Section 8(a), may determine.**

Table of Contents

**The information is this prospectus is not complete and may be changed. We may not sell these securities until the registration statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offer to sell these securities and is not soliciting an offer to buy these securities in any state where the offer or sale is not permitted.**

PRELIMINARY PROSPECTUS
Subject to completion, dated July 22, 2004



### 7,500,000 Shares of Common Stock

We are offering 7,200,000 shares of our common stock, par value $0.001 per share. We will receive all of the net proceeds from the sale of such common stock. The selling shareholders identified in this prospectus are selling an additional 300,000 shares of our common stock. We will not receive any of the proceeds from the sale of the shares by the selling shareholders.

Our common stock is listed on the Nasdaq National Market under the symbol "VISG." The last reported sale price of our common stock on July 20, 2004 was $7.16 per share.

**Investing in our common stock involves a high degree of risk. Before buying any of these shares of our common stock, you should carefully consider the risk factors described in " Risk Factors" beginning on page 7 of this prospectus.**

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or passed upon the adequacy or accuracy of this prospectus. Any representation to the contrary is a criminal offense.**

|  | Per share | Total |
|---|---|---|
| Public offering price | $ | $ |
| Underwriting discounts and commissions | $ | $ |
| Proceeds, before expenses, to us | $ | $ |
| Proceeds to selling shareholders, before expenses | $ | $ |

The underwriters may also purchase up to an additional 525,000 shares of our common stock from us and up to an additional 600,000 shares from the selling shareholders at the public offering price, less the underwriting discounts and commissions payable by us and the selling shareholders, to cover overallotments, if any, within 30 days from the date of this prospectus. If the underwriters exercise the option in full, the total underwriting discounts and commissions payable by us will be $        and the total proceeds, before expenses, to us will be $        .

The underwriters are offering the shares of our common stock as described in "Underwriting." Delivery of the shares will be made on or about        , 2004.

## JPMorgan                                    UBS Investment Bank

### Piper Jaffray

## JMP Securities          Janney Montgomery Scott LLC          Roth Capital Partners

## Table of Contents

You should rely only on the information contained or incorporated by reference in this prospectus. We have not authorized anyone to provide information different from that contained or incorporated by reference in this prospectus. Neither the delivery of this prospectus nor the sale of shares of common stock means that information contained or incorporated by reference in this prospectus is correct after the date of this prospectus. These documents do not constitute an offer to sell or solicitation of an offer to buy in any jurisdiction where offers or sales are not permitted. In this prospectus, "Viisage," "we," "our," "us," and "the Company" refer to Viisage Technology, Inc. and its consolidated subsidiaries, unless the context otherwise requires.

### Prospectus

| | |
|---|---|
| Forward-Looking Statements | ii |
| Prospectus Summary | 1 |
| Risk Factors | 7 |
| Use of Proceeds | 18 |
| Dilution | 19 |
| Capitalization | 20 |
| Price Range of Common Stock | 21 |
| Dividend Policy | 21 |
| Selected Consolidated Financial Data | 22 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 24 |
| Business | 42 |
| Management | 53 |
| Principal and Selling Shareholders | 55 |
| Description of Capital Stock | 57 |
| Underwriting | 60 |
| Where You Can Find More Information | 63 |
| Legal Matters | 64 |
| Experts | 64 |
| Index to Consolidated Financial Statements | F-1 |

Our trademarks, service marks and trade names include Viisage, Viisage Technology, FaceEXPLORER, FaceTOOLS, FaceFINDER, FacePASS and SensorMast. This prospectus also contains trademarks, service marks, copyrights and trade names of other companies.

i

Table of Contents

## FORWARD-LOOKING STATEMENTS

This prospectus contains or incorporates forward-looking statements within the meaning of section 27A of the Securities Act of 1933 and section 21E of the Securities Exchange Act of 1934. These forward-looking statements are based on current expectations, estimates, forecasts and projections about the industry and markets in which we operate and management's beliefs and assumptions. In addition, other written or oral statements that constitute forward-looking statements may be made by or on our behalf. Words such as "expect," "anticipate," "intend," "plan," "believe," "seek," "estimate," variations of such words and similar expressions are intended to identify such forward-looking statements. These statements are not guarantees of future performance and involve risks, uncertainties and assumptions that are difficult to predict. We have included important factors in the cautionary statements below under the heading "Risk Factors" that we believe could cause our actual results to differ materially from the forward-looking statements we make. We do not intend to update publicly any forward-looking statements, whether as a result of new information, future events or otherwise.

ii

Table of Contents

## PROSPECTUS SUMMARY

*This summary highlights selected information from this prospectus and the documents that we have incorporated by reference and may not contain all the information that is important to you. As a result, it does not contain all of the information that you should consider before investing in our common stock. You should read the following summary together with the more detailed information and financial statements and notes to the financial statements contained elsewhere or incorporated by reference in this prospectus, as described under the heading "Where You Can Find More Information." To fully understand this offering, you should read all these documents. Unless otherwise indicated, the information in this prospectus assumes the underwriters have not exercised their over-allotment option. All currency amounts in this prospectus are stated in U.S. dollars.*

### Viisage Technology, Inc.

We are a leading provider of advanced technology identity solutions that enable governments, law enforcement agencies and businesses to enhance security, reduce identity theft and protect personal privacy. Our identity solutions include secure credential provisioning systems, biometric software and systems and real-time identity databases, as well as systems design, development, integration and support services. These solutions enable our customers to manage the entire life cycle of an individual's identity for a variety of applications including civil identification, criminal identification and border management. Our customers use our solutions to help solve the following four critical problems in identity verification and management:

- assurance that the identification document is authentic;
- assurance that the document has been issued to the correct person;
- confidence that the person holding the identification is uniquely tied to and authorized to use the document; and
- verification of the privileges the individual is entitled to at a particular point in time.

Our solutions annually produce more than 30 million secure government-issued credentials at more than 2,000 locations. We are the second largest provider of U.S. drivers' licenses with a 30% market share. We are the sole source provider of passport production capability to the U.S. Department of State. We also are a recognized leader in biometrics in the field of face recognition. Our customers include governments, law enforcement agencies and businesses in more than 15 countries.

As our market has become increasingly complex and more frequently requires the integration of various technologies and capabilities, we have established ourselves as a provider of end-to-end identity solutions. In January 2004, we acquired ZN Vision Technologies AG, or ZN, which solidified our leadership position in face recognition technology. In addition, in February 2004, we acquired Trans Digital Technologies Corporation, or TDT, which provides us with a significant presence in the U.S. federal government market and strengthens our capability and credibility in the border management market worldwide.

We believe that our installed base of secure credential customers together with our leading face recognition technology provide us with a competitive advantage in delivering unified identity solutions for both the physical and digital domains. For example, in April 2004, we were selected by the U.S. Department of Defense, or DoD, for the production of secure, smart credentials as part of the agency's Common Access Card, or CAC, program. The CAC is a single means of identification for access to both physical locations and computer networks. We expect the demand for these types of solutions to grow significantly in the future.

We generate revenue through the sale and license of products and services for verifying and managing identities. Our revenues increased from $8.2 million in the first quarter of 2003 to $12.3 million in the first

1

Table of Contents

quarter of 2004. Our net loss during the same periods decreased from $2.4 million to $1.6 million, excluding the one-time charge of $12.1 million in connection with our change in accounting principle as of January 1, 2003.

## Market Opportunity

The ability to confirm an individual's identity is playing an increasingly important role in national and international security, personal privacy and commerce. Failure to provide adequate identification can lead to breaches of security and identity theft, the consequences of which can range from national security threats and loss of life to significant economic loss. Within this context, we believe that there is increasing pressure on governments and businesses to accelerate the adoption of advanced technology identity solutions. The concern over homeland security, in which identity solutions play a part, is exemplified by the size of the budget for the U.S. Department of Homeland Security, which was approximately $31 billion for the fiscal year ended September 30, 2003, and is projected to be approximately $37 billion for the fiscal year ended September 30, 2004. Furthermore, identity theft is the nation's fastest growing crime, and the Federal Trade Commission has estimated that the total cost of identity theft approaches $50 billion per year.

Government-issued credentials serve as the primary means for confirming the physical identity of an individual. The effectiveness, however, of these credentials is impaired by the following issues:

- the credential can be counterfeited or altered;
- the credential can be issued under false pretenses; and
- the credential rarely is linked to an identity database.

To address these complex problems, credential issuing agencies are seeking advanced technology identity solutions, which increasingly include secure credential provisioning systems, biometrics and real-time identity databases. We believe the global market for these solutions is driven by the following key trends:

- *Growth in government-initiated security programs*. Budgets for U.S. federal government agencies, such as the Department of Homeland Security, include spending for identity initiatives and we believe that government agencies will continue to be key drivers for the growth and development of the market for advanced technology identity solutions.

- *Development of industry standards and requirements.* Several organizations responsible for standards in a number of our markets have recently implemented requirements for the use of face recognition biometrics. We believe this will help stimulate the development of our target markets.

- *Growing use of biometrics.* Governments are increasingly mandating biometrics as an integral component of identity solutions. This increased demand, coupled with the maturation of the technology, is driving the market adoption of biometrics.

- *Increasing cost of identity theft and financial fraud.* The growing direct and indirect cost of identity theft and financial fraud is increasing the pressure on businesses and individuals to accelerate the adoption of advanced technology identity solutions.

- *Convergence of physical and logical security systems.* There is a growing need for governments and businesses to provide a highly secure, unified system for user authentication to both physical assets, such as buildings, and digital assets, such as computer networks.

2

Table of Contents

## Our Strategy

Our objective is to be the leading provider of advanced technology identity solutions for governments, law enforcement agencies and businesses. Key elements of our strategy to achieve this objective include:

*Focus on customer needs.* We are committed to solving our customers' problems and will continue to develop and market solutions to meet their evolving increasingly complex identity security needs.

*Continue to enhance and expand our product suite and solutions.* We intend to continue to broaden our product and solution offerings to meet our customer needs. We intend to continue to engage in product development activities to expand the scope and enhance the performance of our solutions.

*Leverage existing customer base to provide additional advanced technology identity solutions.* Many of our customers do not yet use the full range of our total solutions offerings. Accordingly, we will continue to provide thought and product leadership to these customers as they migrate toward more sophisticated identity solutions.

*Expand customer base both domestically and abroad.* We intend to focus our sales efforts on broadening our customer base in both domestic and international markets.

*Pursue strategic acquisitions and alliances.* We intend to augment our competitive position through acquisitions and alliances.

## Recent Operating Results

On July 21, 2003, we announced our unaudited consolidated financial results for the three and six months ended June 27, 2004. We reported revenue of approximately $16.3 million for the second quarter of 2004, representing an increase of 85.2% over our revenue of approximately $8.8 million for the second quarter of 2003. For the six months ended June 27, 2004, our revenue increased 68.4% from approximately $16.9 million in the first six months of 2003 to approximately $28.5 million in the first six months of 2004. Gross margins increased to 30.5% in the second quarter of 2004 from 22.3% in the second quarter of 2003. Gross margins increased to 29.2% for the first six months of 2004 from 19.6% for the first six months of 2003. Our net loss during the second quarter of 2004 was $317,000, or $0.01 per basic and diluted share, compared to a net loss during the comparable period of 2003 of $1.4 million, or $0.07 per basic and diluted share. For the first six months of 2004, our net loss was $1.9 million, or $0.06 per basic and diluted share, compared to a net loss during the comparable period of 2003 of $3.7 million, or $0.18 per basic and diluted share, excluding the one-time charge of $12.1 million in connection with our change in accounting principle as of January 1, 2003. As of June 27, 2004 we had approximately $12.6 million of cash and cash equivalents, and $29.8 million in total debt obligations. In addition, our backlog was approximately $171.0 million which will be reduced by $19.7 million in the third quarter as a result of the settlement with Georgia. Our operating results for the three and six months ended June 27, 2004 include the impact of our acquisitions of ZN and TDT in the first quarter of 2004.

## Corporate Information

We were incorporated in Delaware in May 1996. Our principal executive offices are located at 296 Concord Road, Third Floor, Billerica, Massachusetts 01821, our telephone number at that location is (978) 932-2200 and our website address is www.viisage.com. The information contained on, or that can be accessed through, our website is not a part of this prospectus.

3

Table of Contents

## THE OFFERING

| | |
|---|---|
| Common stock we are offering | 7,200,000 shares |
| Common stock offered by the selling shareholders | 300,000 shares |
| Common stock to be outstanding after the offering | 43,070,327 shares |
| Nasdaq National Market symbol | VISG |
| Use of proceeds after expenses | We will use the proceeds of the common stock we are offering to repay approximately $30.3 million of indebtedness and for general corporate purposes. We will not receive any proceeds from the sale of common stock by the selling shareholders. See "Use of Proceeds." |
| Risk Factors | See "Risk Factors" beginning on page 7 of this prospectus for a discussion of factors you should carefully consider before deciding to invest in shares of our common stock. |

The number of shares of common stock to be outstanding after this offering is based on the number of shares of common stock outstanding as of July 15, 2004, assumes no exercise of the underwriters' over-allotment option to purchase an additional 1,125,000 shares of common stock and does not include shares issuable upon the exercise of 4,550,621 options outstanding as of July 15, 2004 with a weighted-average exercise price of $3.70 per share, or 812,469 shares issuable upon the exercise of warrants outstanding as of July 15, 2004 with a weighted-average exercise price of $11.94 per share.

4

Table of Contents

## SUMMARY CONSOLIDATED FINANCIAL DATA

The following table summarizes our consolidated financial data for the periods, and as of the dates, indicated. You should read the summary consolidated financial data set forth below in conjunction with "Selected Consolidated Financial Data," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the audited consolidated financial statements and the accompanying notes thereto included elsewhere in this prospectus. The historical and as adjusted results presented here are not necessarily indicative of future results.

The as adjusted balance sheet data gives effect to the sale of 7,200,000 shares of our common stock in this offering at an assumed offering price of $7.16 per share and after deducting underwriting discounts and commissions and estimated offering expenses.

| | For the Years Ended December 31, | | | For the Three Months Ended(2) | |
| | 2001(1) | 2002(1) | 2003(2) | March 30, 2003 | March 28, 2004 |
| --- | --- | --- | --- | --- | --- |
| | | | | (unaudited) | |
| | | (dollars in thousands, except per share data) | | | |
| **Statement of Operations Data:** | | | | | |
| Revenue | $26,280 | $ 32,302 | $ 37,371 | $  8,155 | $ 12,259 |
| Cost of revenue | 1 9,602 | 25,239 | 27,844 | 6,789 | 8,906 |
| Gross margin | 6,678 | 7,063 | 9,527 | 1,366 | 3,353 |
| Operating expenses: | | | | | |
| Sales and marketing | 809 | 5,368 | 5,282 | 1,411 | 1,493 |
| Research and development | 2,054 | 4,457 | 3,650 | 945 | 959 |
| General and administrative | 2,500 | 5,069 | 5,110 | 1,093 | 2,137 |
| Acquisition expenses | 1,639 | — | — | — | — |
| Restructuring charges | — | 824 | — | — | — |
| Total operating expenses | 7,002 | 15,718 | 14,042 | 3,449 | 4,589 |
| Operating loss | (324) | (8,655) | (4,515) | (2,083) | (1,236) |
| Interest expense, net | (1,210) | (875) | (969) | (219) | (392) |
| Other income | — | — | 18 | — | 21 |
| Loss before income taxes and cumulative effect of change in accounting principle | (1,534) | (9,530) | (5,466) | (2,302) | (1,607) |
| Provision for income taxes | — | — | (63) | (63) | (25) |
| Loss before cumulative effect of change in accounting principle | (1,534) | (9,530) | (5,529) | (2,365) | (1,632) |
| Cumulative effect of change in accounting principle (3) | — | — | (12,131) | ( 12,131) | — |
| Net loss | (1,534) | (9,530) | (17,660) | ( 14,496) | (1,632) |
| Preferred stock dividends | (5) | — | — | — | — |
| Loss applicable to common shareholders | $(1,539) | $ (9,530) | $(17,660) | $(14,496) | $ (1,632) |
| Basic and diluted loss per share before cumulative effect | $  (0.09) | $   (0.48) | $   (0.26) | $   (0.12) | $   (0.05) |
| Basic and diluted net loss per share applicable to common shareholders (4) | $  (0.09) | $   (0.48) | $   (0.82) | $   (0.72) | $   (0.05) |
| Weighted average basic and diluted common shares outstanding | 1 6,265 | 20,046 | 21,445 | 20,258 | 31,362 |
| Pro forma operating loss (for application of EITF 00-21) | $   (494) | $(11,176) | $ (5,529) | $( 2,365) | $ (1,632) |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Pro forma net loss per share | $ | (0.03) | $ | (0.56) | $ | (0.26) | $ | (0.12) | $ | (0.05) |

5

Table of Contents

|  | As of March 28, 2004 | |
|---|---|---|
|  | Actual | As Adjusted |
| **Balance Sheet Data:** | | |
| Working capital | $ 2,443 | $ 30,702 |
| Total assets | 1 35,292 | 153,314 |
| Total debt | 31,423 | 1,112 |
| Shareholders' equity | 92,196 | 140,529 |

(1) The results are presented under percentage of completion based on the cost to cost method of measurement.

(2) The results are presented in accordance with EITF 00-21 applied on a cumulative basis as of January 1, 2003.

(3) We adopted EITF 00-21 on a cumulative basis as of January 1, 2003. See note 2 in the Notes to Consolidated Financial Statements which discusses the change in accounting principle.

(4) See note 2 in the Notes to Consolidated Financial Statements for information concerning the computation of basic and diluted net loss per share.

6

Table of Contents

# RISK FACTORS

*You should carefully consider the following risk factors and all other information contained in this prospectus before investing in shares of our common stock. Investing in our common stock involves a high degree of risk. If any of the following risks actually occurs, our business, financial condition and results of operations could be materially and adversely affected. In that event, the trading price of our common stock could decline and you may lose part or all of your investment.*

### Risks Related to Viisage and the Industry

**We have a history of operating losses.**

We have a history of operating losses. Our business operations began in 1993 and, except for fiscal years 1996 and 2000, have resulted in net losses in each fiscal year. At March 28, 2004, we had an accumulated deficit of approximately $43.7 million. We will continue to invest in the development of our secure credential provisioning capabilities, biometric technologies and other components of advanced technology identity solutions. Accordingly, we cannot predict when or if we will ever achieve profitability.

**We may be unable to obtain additional capital required to fund our operations and finance our growth.**

The installation of our secure identification solutions requires significant capital expenditures. Furthermore, the continued development of our biometric and other advanced technologies will require additional capital. Although we have been successful in the past in obtaining financing for working capital and capital expenditures, including a $15 million private placement of our common stock in September 2003 and January 2004 and a new loan agreement with Commerce Bank and Trust Company in February 2004, we will have ongoing capital needs as we expand our business. We may be unable to obtain additional funds in a timely manner or on acceptable terms, which would render us unable to fund our operations or expand our business. If we are unable to obtain capital when needed, we may have to restructure our business or delay or abandon our development and expansion plans.

**We derive over 90% of our revenue from government contracts, which are often non-standard, involve competitive bidding, may be subject to cancellation with or without penalty and may produce volatility in earnings and revenue.**

More than 90% of our business involves providing products and services under contracts with U.S. federal, state and local government agencies and foreign government agencies. Obtaining contracts from government agencies is challenging, and government contracts often include provisions that are not standard in private commercial transactions. For example, government contracts may:

- include provisions that allow the government agency to terminate the contract without penalty under some circumstances;
- be subject to purchasing decisions of agencies that are subject to political influence;
- contain onerous procurement procedures and
- be subject to cancellation if government funding becomes unavailable.

Foreign government contracts generally include comparable provisions relating to termination for the convenience of the relevant foreign government. Securing government contracts can be a protracted process involving competitive bidding. In many cases, unsuccessful bidders may challenge contract awards, which can lead to increased costs, delays and possible loss of the contract for the winning bidder.

7

Table of Contents

**We derive a significant portion of our revenue from a few customers, the loss of which could have an adverse effect on our revenues.**

For the three-month period ended March 28, 2004, the U.S. Department of State, accounted for 13% of our revenue. For the year ended December 31, 2003, the Pennsylvania Department of Transportation and the Office of the Illinois Secretary of State, each accounted for 13% of our revenues. The U.S. Department of Justice has recently issued an indictment against former Governor of Illinois George Ryan and an updated indictment against former lobbyist Lawrence E. Warner on bribery and related federal racketeering charges. We had a formal consultative relationship with Mr. Warner's firm pursuant to which we paid that firm fees of approximately $800,000. Upon learning of the initial indictment of Mr. Warner in 2002, we immediately terminated our contract and relationship with Mr. Warner and his firm. There has been no assertion of any impropriety on our part.

For 2002, Connecticut Department of Information Technology and Mississippi Department of Information Technology Services, accounted for 10% and 12% of our revenues, respectively and an aggregate of 22% of our revenue. For 2001, Illinois Secretary of State, Unisys Corporation (Florida Department of Safety and Motor Vehicles), Kentucky Transportation Cabinet and Pennsylvania Department of Transportation, accounted for 10%, 12%, 14% and 13% of our revenue, respectively and an aggregate of 49% of our revenue. Since a small number of customers under our drivers' license contracts account for a substantial portion of our revenues, the loss of any of our significant customers would cause revenue to decline and could have a material adverse effect on our business.

**We derive revenue from only a limited number of products and services and we do not have a diversified product or service base.**

Substantially all of our revenues are derived from the sale of products and services comprising our identity solutions. We anticipate that substantially all of the growth in our revenue, if any, will also be derived from these sources. If for any reason our sale of these products or services is impeded, and we have not diversified our product and service offerings, our business and results from operations could be harmed.

**Loss of limited source suppliers may result in delays or additional expenses.**

We obtain certain hardware components and complete products from a limited group of suppliers. In particular, we obtain all of the printers and consumables for the U.S. Department of State passport contract and the Department of Defense, or DoD, Common Access Card, or CAC, contract from Toppan Printing Co. Ltd. Our reliance on these suppliers involves significant risks, including reduced control over quality and delivery schedules. Moreover, any financial instability of our manufacturers or contractors could result in our having to find new suppliers. We may experience significant delays in manufacturing and shipping our products to customers if we lose these sources or if supplies from these sources are delayed. As a result, we may be required to incur additional development, manufacturing and other costs to establish alternative sources of supply. It may take several months to locate alternative suppliers, if required, or to re-tool our products to accommodate components from different suppliers. We cannot predict if we will be able to obtain replacement components within the time frames we require at an affordable cost, or at all. Any delays resulting from suppliers failing to deliver components or products on a timely basis, in sufficient quantities and of sufficient quality or any significant increase in the price of components from existing or alternative suppliers could have a severe negative impact on our business, financial condition and results of operations.

**Termination of our contract with Georgia could cause us to lose $19.7 million in projected revenues over the next five and one-half years and could negatively affect our earnings.**

In July 2003, a Georgia court issued a preliminary injunction prohibiting Georgia's Department of Motor Vehicle Safety from continuing to work with us to install the State's new drivers' license system. The injunction is the result of a lawsuit filed in March 2003 by one of our competitors alleging that the Department of Motor Vehicle Safety did not comply with its own bid process when it selected a vendor for its new digital drivers' license program. In July 2004, we reached a settlement agreement with the State pursuant to which the Department of Motor Vehicle Safety terminated the contract for convenience and agreed to pay us $2.0 million in cash and the State agreed to

8

Table of Contents

purchase certain equipment from us for $500,000. The Department of Motor Vehicle Safety has filed a motion with the Georgia court to dismiss the case based upon the termination of the contract. The agency also has filed an affidavit stating that it intends to issue a new request for proposals for a digital drivers' license system before the end of October 2004. As a result of the termination of the contract, we will lose up to $19.7 million in revenue that we expected to recognize over the next five and one-half years, which was included in our $176 million of backlog at March 28, 2004, unless we are able to win the new contract for the digital drivers' license system and the revenues from such new contract are substantially similar to the terminated contract. While we believe we can utilize the remaining $2.8 million in assets being retained by us from the Georgia contract either in Georgia, if we win the contract based on the new request for proposals, or on alternative projects, to the extent that we are unable to utilize these assets or realize value through a sale of these assets, we would be required to take a charge to earnings.

**Our strategy of expanding our face recognition business could adversely affect our business operations and financial condition.**

Part of our strategy is to enhance our leadership in face recognition technology and to expand our operations within our biometrics business segment. Pursuing this strategy involves risks. For instance, to date, face recognition security solutions have not gained widespread commercial acceptance. Some of the obstacles to widespread acceptance of face recognition security solutions include a perceived loss of privacy and public perceptions as to the usefulness of face recognition technologies. Whether the market for face recognition security solutions will expand will be dependent upon factors such as:

- the success of our marketing efforts and publicity campaigns and those of our competitors and

- customer satisfaction with our products and services, as well as those of our competitors.

We do not know when, if ever, face recognition security solutions will gain widespread commercial acceptance. In addition, our biometrics business segment has not achieved profitability, and it may never achieve profitability.

**We face intense competition, which could result in lower revenues and higher research and development expenditures and could adversely affect our results of operations.**

The events of September 11, 2001 have heightened interest in the use of security solutions, and we expect competition in this field, which is already substantial, to intensify. We face competition in the secure credentials market from suppliers of drivers' licenses, passports, smart cards and other government-issued credentials. Competitors in biometrics are developing and bringing to market products that use face recognition as well as eye, fingerprint and other forms of biometric verification. Our products also will compete with non-biometric technologies such as certificate authorities and traditional keys, cards, surveillance systems and passwords. Widespread adoption of one or more of these technologies or approaches in the markets we intend to target could significantly reduce the potential market for our systems and products. Many of our competitors have significantly more cash and resources than we have. Our competitors may introduce products that are competitively priced, have increased performance or functionality or incorporate technological advances that we have not yet developed or implemented. To remain competitive, we must continue to develop, market and sell new and enhanced systems and products at competitive prices, which will require significant research and development expenditures. If we do not develop new and enhanced products or if we are not able to invest adequately in our research and development activities, our business, financial condition and results of operations could be negatively impacted.

**Unless we keep pace with changing technologies, we could lose customers and fail to win new customers.**

Our future success will depend upon our ability to develop and introduce a variety of new products and services and enhancements to these new products and services in order to address the changing needs of the marketplace. We may not be able to accurately predict which technologies customers will support. If we do not introduce new products, services and enhancements in a timely manner, if we fail to choose correctly among technical alternatives or if we fail to offer innovative products and services at competitive prices, customers may forego purchases of our products and services and purchase those of our competitors.

9

Table of Contents

**Security breaches in systems that we sell or maintain could result in the disclosure of sensitive government information or private personal information that could result in the loss of clients and negative publicity.**

Many of the systems we sell manage private personal information and protect information involved in sensitive government functions. A security breach in one of these systems could cause serious harm to our business as a result of negative publicity and could prevent us from having further access to such systems or other similarly sensitive areas for other governmental clients. Our systems may also be affected by outages, delays and other difficulties. Our insurance coverage in certain circumstances may be insufficient to cover losses and liabilities that may result from such events.

**The market for our solutions is still developing and if the industry adopts standards or a platform different from our platform, then our competitive position would be negatively affected.**

The market for identity solutions is still emerging. The evolution of this market is in a constant state of flux that may result in the development of different technologies and industry standards that are not compatible with our current products or technologies. In particular, the face recognition market lacks industry-wide standards. Several organizations, such as the International Civil Aviation Organization, which sets standards for travel documents that its member states then put into effect, and the National Institute for Standards and Testing, which is part of the U.S. Department of Commerce, have recently selected face recognition as the biometric to be used in identification documentation. It is possible, however, that these standards may change and that any standards eventually adopted could prove disadvantageous to or incompatible with our business model and product lines.

**The adoption of EITF 00-21 resulted in a non-cash adjustment of $12.1 million and may have an adverse effect on our results of operations in the near term which may depress the market price of our common stock.**

During the third quarter of 2003, we adopted the provisions of Emerging Issues Task Force 00-21, *Accounting for Revenue Arrangements with Multiple Deliverables*, or EITF 00-21, on a cumulative basis as of January 1, 2003. After discussions with the Securities and Exchange Commission staff regarding the effect of EITF 00-21 on revenue recognition on our secure identification contracts, we decided to adopt EITF 00-21 via cumulative catch-up as of January 1, 2003 rather than prospectively as reflected in the previously filed Form 10-Q for the quarter ended September 28, 2003. The adoption of EITF 00-21 resulted in a non-cash adjustment reported as a cumulative effect of a change in accounting principle of $12.1 million. The adoption of EITF 00-21 affects the timing of revenue recognition under our secure identification contracts and as a result we may report reduced revenue and an increased net loss for one or more of our fiscal quarters in 2004. This effect on our results of operations could cause our stock price to decline.

**Our leverage creates financial and operating risks that could limit the growth of our business.**

We have a significant amount of indebtedness. As of March 28, 2004, we had approximately $31.4 million in short and long-term debt and lease financing. This amount includes $15.3 million of related party debt incurred in our acquisition of Trans Digital Technologies, or TDT, in February 2004. While we plan to use part of the proceeds from this offering to repay all of this indebtedness, we may not raise sufficient funds in this offering to do so. Further, we may incur additional indebtedness in the future. To the extent that we do not repay a substantial portion of our debt following this offering, or if we incur additional debt in the future, such leverage could have important consequences to our business including:

- limiting our ability to obtain necessary financing for future working capital;

- limiting our ability to finance the acquisition of equipment needed to meet customer requirements;

- limiting our ability to finance the development of new technologies;

10

Table of Contents

- requiring that we use a substantial portion of our cash flow from operations for debt service and not other operating purposes and
- requiring that we comply with financial and operating covenants, the failure of which could cause an event of default under our debt instruments.

Our loan agreements with Commerce Bank and Trust Company and Lau Technologies, our single largest shareholder, impose significant operating and financial restrictions on us. These restrictions limit our ability to, among other things, make capital expenditures, incur additional indebtedness or make investments. In addition, these agreements require us to comply with certain financial covenants, including profitability, tangible net worth, debt to worth ratio and debt service coverage. Our ability to make principal and interest payments under long-term indebtedness and bank loans will be dependent upon our future performance, which is subject to financial, economic and other factors affecting us, some of which are beyond our control.

**Others could claim that we are infringing on their intellectual property rights, which could result in substantial costs, diversion of managerial resources and harm to our reputation.**

Although we believe that our products and services do not infringe the intellectual property rights of others, we might not be able to defend successfully against a third-party infringement claim. A successful infringement claim against us could subject us to:

- liability for damages and litigation costs, including attorneys' fees;
- lawsuits that prevent us from further use of the intellectual property;
- having to license the intellectual property from a third party, which could include significant licensing fees;
- having to develop a non-infringing alternative, which could be costly and delay projects and
- having to indemnify clients with respect to losses they incurred as a result of the alleged infringement.

Even if we are not found liable in a claim for intellectual property infringement, such a claim could result in substantial costs, diversion of resources and management attention, termination of customer contracts and harm to our reputation.

On July 19, 2004, Fargo Electronics, Inc. initiated a patent infringement action in the U.S. District Court for the Eastern District of Virginia against Toppan Printing Co., Ltd. and TDT. The complaint alleges that Toppan and TDT's use, offer to sell and/or importation of certain personalized identification card printers, including Toppan's CP400 card printers, and associated laminators in the United States constitutes direct and indirect infringement of four patents allegedly owned by Fargo. The complaint seeks unspecified compensatory damages, permanent injunctive relief, trebling of damages for willful infringement and fees and costs. We are currently evaluating the claims in this lawsuit and intend to vigorously defend against them. We believe that the only products at issue are Toppan CP400 printers that were or are sold, used or imported as part of the CAC program. To date, we have received purchase orders of $10.2 million for Toppan CP400 printers for the CAC program, which are expected to be delivered by the end of the first quarter of 2005. There can be no assurance that we will prevail in this litigation. The litigation, with or without merit, could be time consuming and expensive to litigate or settle and could divert management's attention from our business.

**Uncertainties in global economic markets could cause delays in customer purchases.**

Many customers and potential customers have delayed purchase intentions as a result of uncertainties in global economic markets. Government budgets, particularly at state and regional levels, have been or are expected to be reduced notably. Government contracts result from purchasing decisions made by public sector agencies that are particularly sensitive to budget changes and cutbacks during economic downturns, and

11

<u>Table of Contents</u>

variations in appropriations cycles. Many U.S. state customers are facing budget cuts, and some international customers are facing debt crises, introducing added uncertainty. Any shift in the government procurement process, which is outside of our control and may not be predictable, could impact the predictability of our quarterly results and may potentially have a material negative effect on our financial position, results of operation or cash flows.

**If we do not successfully expand our direct sales and services organizations and partnering arrangements, we may not be able to increase our sales or support our customers.**

In the fiscal years ended December 31, 2002 and 2003, and three-month periods ended March 28, 2004 and March 30, 2003, we sold substantially all of our services and licensed substantially all of our products through our direct sales organization. Our future success depends on substantially increasing the size and scope of our direct sales force and partnering arrangements, both domestically and internationally. We will face intense competition for personnel, and we cannot guarantee that we will be able to attract, assimilate or retain additional qualified sales personnel on a timely basis. Moreover, given the large-scale deployment required by some of our customers, we will need to hire and retain a number of highly trained customer service and support personnel. We cannot guarantee that we will be able to increase the size of our customer service and support organization on a timely basis to provide the high quality of support required by our customers. Failure to add additional sales and customer service representatives could result in our inability to increase our sales and support our customers.

**Integration of ZN's and TDT's businesses may be difficult and will consume significant financial and managerial resources which could have an adverse effect on our results of operations.**

On January 23, 2004, we completed the acquisition of ZN Vision Technologies AG, or ZN, a leading German provider of face recognition and computer vision products and services. On February 14, 2004, we completed the acquisition of TDT. The integration of ZN's and TDT's products and services with ours will be challenging and will consume significant financial and managerial resources. The challenges involved with this integration include, among others:

- challenges related to technology integration;
- possible difficulty implementing uniform standards, controls, procedures and policies and
- possible loss of key employees.

In addition, the differences between U.S. and German business cultures and the geographic distance between the companies could present significant obstacles to our timely, cost-effective integration of ZN.

**The significant direct and indirect costs of our acquisition and integration of ZN and TDT could adversely affect our financial performance.**

We incurred approximately $2.7 million of costs in connection with the acquisitions of ZN and TDT, including:

- costs associated with integrating our business with ZN and TDT;
- financial advisory fees and
- costs and expenses for services provided by our lawyers and accountants.

The transaction costs and expenses attributable to financial advisory, legal and accounting services that we incurred will be capitalized as a component of the purchase price. Goodwill associated with the acquisitions will be required to be tested at least annually for impairment, and we will be required to record a charge to earnings if there is an impairment in the value of such goodwill at a later date. Other intangible assets acquired in connection with the acquisitions will be amortized over their estimated useful lives.

12

Table of Contents

**The acquisitions of ZN and TDT could result in future impairment charges which could adversely affect our results of operations.**

As a result of the acquisitions of ZN and TDT, goodwill and other intangible assets have been created. The values we may record for goodwill and other intangible assets will represent fair values calculated by independent third-party appraisers. Such valuations require us to provide significant estimates and assumptions, which are derived from information obtained from the management of the acquired businesses and our business plans for the acquired businesses or intellectual property. If estimates and assumptions used to initially value goodwill and intangible assets prove to be inaccurate, ongoing reviews of the carrying values of such goodwill and intangible assets may indicate impairments which will require us to record an impairment charge in the period in which we identify the impairments.

**If we do not achieve the expected benefits of our acquisitions of ZN and TDT, the price of our common stock could decline.**

We expect that the acquisition of ZN will enhance our leadership in face recognition technology through the combination of our technologies with those of ZN. Although the results of the initial tests of our combined technologies have been positive, the combination of such technologies might not meet the demands of the marketplace. If our technologies fail to meet such demand, customer acceptance of our face recognition solutions could decline, which would have an adverse effect on our results of operations and financial condition. In addition, we expect that the acquisition will enable us to market our systems and products on a global scale. Our face recognition customers are primarily located in the United States, and ZN's customers are primarily located in Europe. We might not be able to market successfully our products and services to ZN's customers or ZN's products and services to our customers. We expect that the acquisition of TDT will enhance our position in the market for secure credentials, particularly for the U.S. government. If our product offerings and services fail to meet the demands of this market, our results of operations and financial condition could be adversely affected. There is also a risk that we will not achieve the anticipated benefits of the acquisitions as rapidly as, or to the extent, anticipated by financial or industry analysts, or that such analysts will not perceive the same benefits to the acquisitions as we do. If these risks materialize, our stock price could be adversely affected.

**The success of our strategic plan to grow sales and develop relationships in Europe may be limited by risks related to conducting business in European markets.**

Although ZN has experience marketing and distributing its products and developing strategic relationships in Europe, part of our strategy will be to increase sales and build additional relationships in European markets. Risks inherent in marketing, selling and developing relationships in European markets include those associated with:

- economic conditions in European markets, including fluctuations in the relative values of the U.S. dollar and the Euro;
- taxes and fees imposed by European governments that may increase the cost of products and services and
- laws and regulations imposed by individual countries and by the European Union.

In addition, European intellectual property laws are different than U.S. intellectual property laws and we will have to ensure that our intellectual property is adequately protected in foreign jurisdictions and that ZN's intellectual property is adequately protected in the United States. If we do not adequately protect our intellectual property rights, competitors could use our proprietary technologies in non-protected jurisdictions and put us at a competitive disadvantage.

13

Table of Contents

**Our business may be impacted by changes in the local marketplace of our foreign operations and fluctuations in currency exchange rates.**

As a result of our acquisitions of ZN and TDT, we expect that we will have increased exposure to foreign currency fluctuations. Net revenue and related expenses generated from our international location in Germany are denominated in euros, exposing the results of operations and certain of our intercompany balances associated with this international location to foreign exchange rate fluctuations. In addition to our German operation, we will have increased transactions with Japanese vendors supplying hardware and consumables for the delivery of the TDT contracts. These transactions will increase our exposure to foreign currency fluctuations with the yen. To the extent the U.S. dollar weakens against these foreign currencies, the conversion of these foreign currency denominated transactions results in increased net revenue, operating expenses and net income. Similarly, our net revenue, operating expenses and net income will decrease when the U.S. dollar strengthens against these foreign currencies.

**If our systems and products do not perform as promised, we could experience increased costs, lower margins, liquidated damage payment obligations and harm to our reputation.**

We will be required to provide complex systems that will be required to operate on an "as needed" basis. Although we will deploy back-up systems, the failure of our products to perform as promised could result in increased costs, lower margins, liquidated damage payment obligations and harm to our reputation. The failure of our products also could result in contract terminations and have a material adverse effect on our business and financial results.

**Misappropriation of our intellectual property could harm our reputation, affect our competitive position and cost us money.**

We believe that our intellectual property, including our methodologies, will be critical to our success and competitive position. If we are unable to protect this intellectual property against unauthorized use by third parties, our reputation among existing and potential customers could be damaged and our competitive position adversely affected. Our strategies to deter misappropriation could be undermined if:

- the proprietary nature or protection of our methodologies is not recognized in the United States or foreign countries;
- third parties misappropriate our proprietary methodologies and such misappropriation is not detected or
- competitors create applications similar to ours but which do not technically infringe on our legally protected rights.

If these risks materialize, we could be required to spend significant amounts to defend our rights and divert critical managerial resources. In addition, our proprietary methodologies may decline in value or our rights to them may become unenforceable.

**If we fail to adequately manage our resources, it could have a severe negative impact on our financial results or stock price.**

We are subject to fluctuations in technology spending by existing and potential customers. Accordingly, we will have to actively manage expenses in a rapidly changing economic environment. This could require reducing costs during economic downturns and selectively growing in periods of economic expansion. If we do not properly manage our resources in response to these conditions, our results of operations could be negatively impacted.

14

Table of Contents

**Future acquisitions of companies or technologies may result in disruptions to our business.**

Beyond the acquisitions of ZN and TDT, our growth strategy could include additional acquisitions of companies or technologies that complement ours. Future acquisitions could involve risks inherent in acquisitions, such as:

- challenges associated with integrating acquired technologies and business of operations acquired companies;
- exposure to unknown liabilities;
- diversion of managerial resources from day-to-day operations;
- possible loss of key employees, customers and suppliers;
- higher than expected transaction costs and
- additional dilution to our existing stockholders if we use our common stock as consideration.

If we fail to manage these challenges adequately, our results of operations and stock price could be adversely affected.

**The loss of key personnel could adversely affect our ability to remain competitive.**

We believe that the continued service of our executive officers will be important to our future growth and competitiveness. We have entered into employment agreements with our executive officers, including Bernard C. Bailey, our Chief Executive Officer, William K. Aulet, our Chief Financial Officer and James P. Ebzery, our Senior Vice President, Worldwide Sales and Services. These agreements are intended to provide the executives with incentives to remain employed by us. However, we cannot assure you that they will remain employed by us. In addition, we believe that the continued employment of key members of our technical and sales staffs is important to us. Most of our employees are entitled to voluntarily terminate their relationship with us, typically without any, or with only minimal, advance notice. The process of finding additional trained personnel to carry out our strategy could be lengthy, costly and disruptive. We might not be able to retain the services of all of our key employees or a sufficient number of them to execute our plans. In addition, we might not be able to continue to attract new employees as required.

**Our quarterly results could be volatile and may cause our stock price to fluctuate.**

We have experienced fluctuations in quarterly operating results and we expect those fluctuations to continue. We expect that our quarterly results will continue to be affected by, among other things, factors such as:

- the size and timing of contract awards;
- the timing of our contract performance;
- variations in the mix of our products and services and
- contract losses and changes in management estimates inherent in accounting for contracts.

**Certain of our stockholders have significant relationships with us, which could result in us taking actions that are not supported by unaffiliated stockholders.**

Lau Technologies, or Lau, and B.G. Beck, who is also a director and Vice Chairman, beneficially own approximately 16.8% and 16.4%, respectively, of our outstanding common stock. After giving effect to the sale of 7,200,000 shares of our common stock in this offering, Lau and Mr. Beck will beneficially own approximately 13.8% and 13.4%, respectively, of our outstanding common stock. As a result of their ownership, both Lau and Mr. Beck have a strong influence on matters requiring approval by our stockholders, including the election of

15

Table of Contents

directors and most corporate actions, including mergers and acquisitions. In addition, we have significant relationships with each of Lau and Mr. Beck, including:

- Lau has provided us with a credit facility in an aggregate principal amount of $7.3 million, which is secured by some of our assets;
- we acquired significant intellectual property, contracts and distribution channels through a transaction with Lau under which we agreed to pay Lau a 3.1% royalty on our facial recognition revenues for a period of twelve and one half years, up to a maximum of $27.5 million;
- the Chairman of our Board of Directors and his spouse own a majority of Lau's voting stock;
- in connection with the acquisition of TDT, Mr. Beck was appointed a member of our Board of Directors and appointed Vice Chairman;
- in connection with the acquisition of TDT, we issued a promissory note to Mr. Beck in the amount of $15.3 million, which is secured by some of TDT's assets and
- in connection with the acquisition of TDT, we entered into a consulting agreement with Mr. Beck under which we will pay Mr. Beck $300,000 per year for two years, provided that Mr. Beck devotes his full business time to developing business opportunities for us.

### Risks Related to Our Common Stock

**Future sales of our common stock may depress our stock price.**

The market price of our common stock could decline as a result of sales of substantial amounts of our common stock in the public market after this offering, or the perception that these sales could occur. In addition, these factors could make it more difficult for us to raise funds through future equity offerings. There will be 43,070,327 shares of our common stock outstanding immediately after this offering.

We and our executive officers and directors and the selling shareholders have entered into 90-day lock-up agreements with the underwriters. The lock-up agreements prohibit each of us from selling or otherwise disposing of shares of common stock except in limited circumstances. The lock-up agreements are only contractual agreements, and J.P. Morgan Securities Inc. and UBS Securities LLC, at their joint discretion, can waive the restrictions of any lock-up agreement at an earlier time without prior public notice or announcement and allow any of us to sell shares of common stock. If the restrictions in the lock-up agreement are waived, shares of our common stock will be available for sale into the public market, subject to applicable securities laws and our share retention policy, which could reduce the market price for shares of our common stock.

Lau and Mr. Beck own approximately 16.8% and 16.4%, respectively, of our common stock. After giving effect to the sale of 7,200,000 shares of our common stock in this offering, Lau and Mr. Beck will beneficially own approximately 13.8% and 13.4%, respectively, of our outstanding common stock. If either of these stockholders sells a significant number of shares of our common stock in the open market, our stock price could decline.

**Our stock price and trading volume may be volatile, which could result in substantial losses for our shareholders.**

The market price of our common stock may be highly volatile and be subject to wide fluctuations. In addition, the trading volume in our common stock may fluctuate and cause significant price variations to occur. Some of the factors that could negatively affect our share price or result in fluctuations in the price or trading volume of our common stock include:

- general economic conditions;
- actual or anticipated changes in our future financial performance;
- changes in financial estimates by securities analysts;

16

Table of Contents

- changes in market interest rates;
- competitive developments, including announcements by us or our competitors of new products or services or significant contracts, acquisitions, strategic partnerships or capital commitments;
- the operations and stock performance of our competitors;
- fluctuations in our quarterly operating results;
- additions or departures of senior management and key personnel and
- actions by institutional shareholders.

If the market price of our common stock declines significantly, you may be unable to resell your common stock at or above the offering price. We cannot assure you that the market price of our common stock will not fluctuate or decline significantly, including a decline below the offering price, in the future. In addition, the stock market in general can experience considerable price and volume fluctuations.

**Our board of directors may authorize the issuance of additional shares that may cause dilution.**

Our articles of incorporation authorizes our board of directors, without your approval, to:

- authorize the issuance of additional common or preferred stock in connection with future equity offerings, acquisitions of securities or other assets of companies and
- classify or reclassify any unissued common stock or preferred stock and to set the preferences, rights and other terms of the classified or reclassified shares, including the issuance of shares of preferred stock that have preference rights over the common stock with respect to dividends, liquidation, voting and other matters or shares of common stock that have preference rights over your common stock with respect to voting.

The issuance of additional shares could be substantially dilutive to your shares.

**Future offerings of debt securities, which would be senior to our common stock in liquidation, or equity securities, which would dilute our existing shareholders and may be senior to our common stock for the purposes of distributions, may harm the value of our common stock.**

In the future, we may attempt to increase our capital resources by making additional offerings of debt or equity securities, including commercial paper, medium-term notes, senior or subordinated notes, preferred stock or common stock. If we were to liquidate, holders of our debt securities and shares of preferred stock and lenders with respect to other borrowings will receive a distribution of our available assets before the holders of our common stock. Additional equity offerings by us may dilute your interest in us or reduce the value of your shares of common stock, or both. Our preferred stock, if issued, could have a preference on distribution payments that could limit our ability to make a distribution to you. Because our decision to issue securities in any future offering will depend on market conditions and other factors beyond our control, we cannot predict or estimate the amount, timing or nature of our future offerings. Further, market conditions could require us to accept less favorable terms for the issuance of our securities in the future. Thus, you will bear the risk of our future offerings reducing the value of your shares of common stock and diluting your interest in us.

**Our management will have broad discretion in the use of net proceeds from this offering and may not use them effectively.**

We will use approximately $30.3 million of the net proceeds of this offering to repay indebtedness as described in more detail under "Use of Proceeds." As of the date of this prospectus, we cannot specify with certainty the amounts we will spend on particular uses from the remaining net proceeds that we will receive from this offering. Our management will have broad discretion in the application of these net proceeds, but currently intends to use them as described in "Use of Proceeds." The failure by our management to apply these net proceeds effectively could adversely affect our ability to continue to develop our business.

17

Table of Contents

## USE OF PROCEEDS

We estimate that the net proceeds from the sale of the 7,200,000 shares of common stock that we are selling in this offering will be approximately $48.3 million, based on an assumed public offering price of $7.16 per share and after deducting the estimated underwriting discounts and commissions and estimated offering expenses payable by us. If the underwriters exercise their over-allotment option in full, we estimate the net proceeds to us from such exercise will be approximately $51.9 million. We will not receive any of the proceeds of the shares that will be sold by the selling shareholders.

We expect to use the net proceeds from this offering to repay $15.3 million of notes payable to B.G. Beck in connection with our acquisition of Trans Digital Technologies on February 14, 2004, and to repay approximately $15.0 million of indebtedness outstanding under our loan agreements with Lau Technologies and Commerce Bank and Trust Company as of March 28, 2004. We borrowed $3.0 million from Commerce in February 2004 to finance our contract with the State of Illinois. The general repayment terms of such indebtedness are as follows:

| Lender | Due Date | Interest Rate | March 28, 2004 |
|--------|----------|---------------|----------------|
| | | | (unaudited)<br>(in thousands) |
| B.G. Beck | 12/1/2005 | 8.50% | $      15,300 |
| Commerce | 3/11/2006 | 6.25% | 1,612 |
| Commerce | 6/20/2006 | 8.00% | 2,053 |
| Commerce | 2/27/2007 | 7.30% | 2,924 |
| Commerce | 6/24/2007 | 5.25% | 901 |
| Commerce | 12/31/2007 | 5.25% | 1,394 |
| Commerce | 4/24/2008 | 5.25% | 1,191 |
| Lau | 8/30/2005 | 8.50% | 1,014 |
| Lau | 5/30/2008 | 8.50% | 2,249 |
| Lau | 6/30/2009 | 8.50% | 1,673 |
| | | | $      30,311 |

---

\*    We estimate that we will incur approximately $600,000 in prepayment penalties, which are not reflected in the table above.

We expect to use the remaining net proceeds for capital expenditures, working capital and general corporate purposes. We also may use a portion of the net proceeds to acquire complementary products, technologies or businesses, if and when such opportunities arise. Pending these uses, we intend to invest the net proceeds in short-term interest bearing, investment grade securities.

18

Table of Contents

# DILUTION

Our net tangible book value as of March 28, 2004 was approximately $10.1 million, or approximately $0.28 per share of common stock. Net tangible book value per share is determined by dividing our net tangible book value, which consists of tangible assets less total liabilities, by the number of shares of common stock outstanding on that date. Without taking into account any other changes in the net tangible book value after March 28, 2004, other than to give effect to our receipt of the estimated net proceeds from the sale by us of 7,200,000 shares of our common stock in this offering at an assumed offering price of $7.16 per share, less the underwriting discounts and commissions payable by us and our estimated offering expenses, our net tangible book value as of March 28, 2004, after giving effect to the items above would have been approximately $58.4 million, or $1.36 per share. This represents an immediate increase in the net tangible book value of $1.08 per share to existing shareholders and an immediate dilution of $5.80 per share to new investors. The following table illustrates this per share dilution:

| | | |
|---|---|---|
| Offering price per share | | $7.16 |
| Net tangible book value per share as of March 28, 2004 | $0.28 | |
| Increase in net tangible book value per share attributable to this offering | 1 .08 | |
| Pro forma net tangible book value per share as of March 28, 2004 after giving effect to this offering | | 1 .36 |
| Dilution per share to new investors | | $5.80 |

This table is based on the number of shares as of March 28, 2004, and does not include the following:

- 4,585,000 shares of our common stock issuable upon the exercise of options outstanding as of that date at a weighted average exercise price of $3.41 per share and
- 812,000 shares of our common stock issuable upon exercise of warrants outstanding as of that date at a weighted average exercise price of $11.94 per share.

19

Table of Contents

## CAPITALIZATION

The following table sets forth our capitalization as of March 28, 2004 on an actual basis and on an adjusted basis. The as adjusted capitalization reflects the sale by us of 7,200,000 shares of common stock in this offering at an assumed public offering price of $7.16 per share after deducting underwriting discounts and commissions and estimated offering expenses payable by us. This information should be read together with our consolidated financial statements and related notes included elsewhere in this prospectus.

| | As of March 28, 2004 | |
| --- | --- | --- |
| | Actual | As Adjusted |
| | (dollars in thousands) | |
| Current portion of long-term debt | $1 0,940 | $ 703 |
| Long-term debt | 20,483 | 409 |
| Total debt | 31,423 | 1,112 |
| Shareholders' equity: | | |
| Common stock, $0.001 par value; 45,000,000 shares authorized; 35,625,176 shares and 42,825,176 shares (as adjusted) issued and outstanding, respectively(1) | 36 | 43 |
| Additional paid in capital | 1 35,869 | 184,195 |
| Accumulated deficit | (43,709) | (43,709) |
| Total shareholders' equity | 92,196 | 140,529 |
| Total capitalization | $123,619 | $ 141,641 |

(1)   On June 15, 2004 we increased the number of authorized shares of our common stock to 75,000,000.

20

Table of Contents

## PRICE RANGE OF COMMON STOCK

Our common stock trades on the Nasdaq National Market under the symbol "VISG." The following table sets forth the quarterly range of high and low reported sale prices of the common stock on the Nasdaq National Market for the periods indicated.

| Fiscal year ended December 31, 2002 | High | Low |
|---|---|---|
| First Quarter | $10.14 | $5.02 |
| Second Quarter | 7.64 | 3 .63 |
| Third Quarter | 5.10 | 2 .50 |
| Fourth Quarter | 5.84 | 3 .27 |

| Fiscal year ended December 31, 2003 | High | Low |
|---|---|---|
| First Quarter | $5 .40 | $3.01 |
| Second Quarter | 5.78 | 3 .76 |
| Third Quarter | 5.40 | 3 .85 |
| Fourth Quarter | 4.61 | 3 .34 |

| Fiscal year ending December 31, 2004 | High | Low |
|---|---|---|
| First Quarter | $8 .20 | $3.53 |
| Second Quarter (through July 20, 2004) | 1 4.30 | 6 .24 |

On July 20, 2004, the last reported sale price of the common stock as reported on the Nasdaq National Market was $7.16 per share. As of July 15, 2004, there were approximately 239 record holders of our common stock.

## DIVIDEND POLICY

We have never declared or paid cash dividends on our common stock. We are prohibited from paying dividends pursuant to our borrowing arrangements. Notwithstanding this limitation, we presently intend to retain our cash for use in the operation and expansion of our business and, therefore, do not anticipate paying any cash dividends in the foreseeable future.

21

Table of Contents

## SELECTED CONSOLIDATED FINANCIAL DATA

The following tables provide our selected consolidated financial data, which were derived from our audited consolidated financial statements for each of the three years in the period ended December 31, 2003. The historical results presented are not necessarily indicative of future results. The data should be read in conjunction with our financial statements, related notes and other financial information as of December 31, 2003 and for each of the three years in the periods ended December 31, 2003 appearing elsewhere in this prospectus, as well as the discussions appearing in "Management's Discussion and Analysis of Financial Condition and Results of Operations."

Our financial data for the three-month periods ended March 30, 2003 and March 28, 2004 were derived from our unaudited financial statements included elsewhere in this prospectus. The unaudited financial statements include all adjustments, consisting of normal recurring accruals, which we consider necessary for a fair presentation of our financial position and results of operations for those periods. Operating results for interim periods are not necessarily indicative of results that may be expected for the entire fiscal year.

| | For the Years Ended December 31, | | | For the Three Months Ended(2) | |
| --- | --- | --- | --- | --- | --- |
| | 2001(1) | 2002(1) | 2003(2) | March 30, 2003 | March 28, 2004 |
| | | | | (unaudited) | |
| | (dollars in thousands, except per share data) | | | | |
| **Statement of Operations Data:** | | | | | |
| Revenue | $26,280 | $32,302 | $ 37,371 | $ 8,155 | $ 12,259 |
| Cost of revenue | 19,602 | 25,239 | 27,844 | 6,789 | 8,906 |
| Gross margin | 6,678 | 7,063 | 9,527 | 1,366 | 3,353 |
| Operating expenses: | | | | | |
| Sales and marketing | 809 | 5,368 | 5,282 | 1,411 | 1,493 |
| Research and development | 2,054 | 4,457 | 3,650 | 945 | 959 |
| General and administrative | 2,500 | 5,069 | 5,110 | 1,093 | 2,137 |
| Acquisition expenses | 1,639 | — | — | — | — |
| Restructuring charges | — | 824 | — | — | — |
| Total operating expenses | 7,002 | 15,718 | 14,042 | 3,449 | 4,589 |
| Operating loss | (324) | (8,655) | (4,515) | (2,083) | (1,236) |
| Interest expense, net | (1,210) | (875) | (969) | (219) | (392) |
| Other income | — | — | 18 | — | 21 |
| Loss before income taxes and cumulative effect of change in accounting principle | (1,534) | (9,530) | (5,466) | (2,302) | (1,607) |
| Provision for income taxes | — | — | (63) | (63) | (25) |
| Loss before cumulative effect of change in accounting principle | (1,534) | (9,530) | (5,529) | (2,365) | (1,632) |
| Cumulative effect of change in accounting principle (3) | — | — | (12,131) | ( 12,131) | — |
| Net loss | (1,534) | (9,530) | (17,660) | ( 14,496) | (1,632) |
| Preferred stock dividends | (5) | — | — | — | — |
| Loss applicable to common shareholders | $(1,539) | $(9,530) | $(17,660) | $(14,496) | $ (1,632) |
| Basic and diluted net loss per share | $ (0.09) | $ (0.48) | $ (0.26) | $ (0.12) | $ (0.05) |
| Basic and diluted loss per share applicable to common shareholders (4) | $ (0.09) | $ (0.48) | $ (0.82) | $ (0.72) | $ (0.05) |

| Weighted average basic common shares outstanding | 16,265 | 20,046 | 21,445 | 20,258 | 31,362 |

22

Table of Contents

|  | For the Years Ended December 31, | | | For the Three Months Ended(2) | |
|---|---|---|---|---|---|
|  | 2001(1) | 2002(1) | 2003(2) | March 30, 2003 | March 28, 2004 |
|  |  |  |  | (unaudited) | |
|  |  |  | (dollars in thousands) | | |
| **Balance Sheet Data:** | | | | | |
| Working capital | $38,115 | $22,244 | $ 5,887 | $ 2,642 | $ 2,443 |
| Total assets | 6 7,663 | 6 1,189 | 54,480 | 43,975 | 1 35,292 |
| Long-term obligations | 1 0,368 | 9,845 | 8,147 | 8,607 | 20,483 |
| Total debt | 1 4,645 | 1 5,108 | 13,621 | 13,811 | 31,423 |
| Shareholders' equity | 4 6,294 | 3 9,064 | 34,008 | 24,603 | 92,196 |

(1)    The results are presented under percentage of completion based on the cost to cost method of measurement.

(2)    The results are presented in accordance with EITF 00-21 applied on a cumulative basis as of January 1, 2003.

(3)    We adopted EITF 00-21 on a cumulative basis as of January 1, 2003. See note 2 in the Notes to Consolidated Financial Statements which discusses the change in accounting principle.

(4)    See note 2 in the Notes to Consolidated Financial Statements for information concerning the computation of basic and diluted net loss per share.

23

Table of Contents

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

You should read the following summary together with the more detailed business information and consolidated financial statements and related notes that appear elsewhere in this prospectus and in the documents that we incorporate by reference into this prospectus.

### Introduction

We are a leading provider of advanced technology identity solutions that enable governments, law enforcement agencies and businesses to enhance security, reduce identity theft and protect personal privacy. Our identity solutions include secure credential provisioning systems, biometric software and systems and real-time identity databases, as well as systems design, development, integration and support services. These solutions enable our customers to manage the entire life cycle of an individual's identity for a variety of applications including civil identification, criminal identification and border management. Our customers use our solutions to help solve the following four critical problems in identity verification and management:

- assurance that the identification document is authentic;
- assurance that the document has been issued to the correct person;
- confidence that the person holding the identification is uniquely tied to and authorized to use the document and
- verification of the privileges the individual is entitled to at a particular point in time.

Our solutions annually produce more than 30 million secure government-issued credentials at more than 2,000 locations. We are the second largest provider of U.S. drivers' licenses with a 30% market share, and we are the sole source provider of passport production capability to the U.S. Department of State. We also are a recognized leader in biometrics in the field of face recognition. Our customers include governments, law enforcement agencies and businesses in more than 15 countries.

We generate revenue through the sale and license of products and services for verifying and managing identities. Our revenues increased from $8.2 million in the first quarter of 2003 to $12.3 million in the first quarter of 2004. Our net loss during the same periods decreased from $2.4 million to $1.6 million, excluding the one-time charge of $12.1 million in connection with our change in accounting principle as of January 1, 2003. Our efforts in 2004 have been and will continue to be primarily focused on expanding our portfolio of offerings to satisfy our customers' identity solution requirements. We have taken substantial steps in this direction through the acquisitions of ZN Vision Technologies AG, or ZN, in January 2004 and Trans Digital Technologies Corporation, or TDT, in February 2004. The acquisition of TDT enabled us to be selected to provide a solution to the U.S. Department of Defense, or DoD, to support the production of smart cards as part of the agency's Common Access Card, or CAC, program. We continue to make investments in research and development and intend to continue to introduce new and enhanced product and service offerings. To further increase revenue, we are also expanding our distribution channels.

### Segments and Geographic Information

Our business involves two closely-related segments: secure credentials and biometrics. For the three-month period ended March 28, 2004, we derived 96.2%, or $11.7 million, of our direct revenue within the United States. We derived an additional 1.3%, or $160,000, of our direct revenue in Canada. The remaining 2.5%, or $307,000, was derived by our German subsidiary, primarily from customers in countries within the European Union. For the year ended December 31, 2003 approximately $36.6 million, or 97.8% of our direct revenue was derived within the United States. The remaining $818,000, or 2.2% of revenue was derived in Canada and the United Arab Emirates.

24

Table of Contents

### Secure Credentials Segment

Our secure credentials segment accounted for approximately 85.8% and 84.2% of our revenues in the three-month periods ended March 28, 2004 and March 30, 2003, respectively, and 82.2%, 84.7% and 86.6% of our revenue for the years ended December 31, 2003, 2002, and 2001, respectively. Our secure credentials solutions involve the design, development, marketing and implementation of integrated software and hardware solutions that produce identification credentials, many of which utilize face recognition and other biometric technologies.

We provide customized systems utilizing proprietary products under service contracts that typically have five to seven year terms and several optional annual renewals after the initial contract term. For drivers' licenses, these contracts generally provide for a fixed price for each identification credential produced. Contract prices vary depending on, among other things, design and integration complexities, the nature and number of workstations and sites, the projected number of secure credentials to be produced, the size of the database, the level of post-installation support and the competitive environment. Our secure credentials segment also includes the contracts we assumed as part of our acquisition of TDT in February 2004. TDT contributed revenues of $1.8 million to this segment for the three months ended March 28, 2004. Under these contracts, we provide high security technology and services to the U.S. Department of State for the production of U.S. passports, as well as similar services to the DoD and Homeland Security. Those contracts generally provide that we will be paid for the hardware, software and services we provide, as well as consumables delivered to the customer.

In civil identification applications, such as drivers' licenses and passports, the sales cycle generally includes a formal request for proposal, or RFP, bidding process. Once an RFP is issued, a comprehensive proposal is developed and usually followed by an on-site customer demonstration. The process from the issuance of an RFP to the ultimate award can take up to six months. Following the bid award a six-to-twelve month implementation and installation process usually ensues. We believe that long sales cycles in our public sector markets are endemic to the market and will continue. Further, customers may seek to modify the system either during or after the implementation of the system. While our long sales and implementation cycle requires the commitment of marketing resources and investments of working capital, we believe that it also serves as a barrier to entry for smaller companies and as an early indicator of potential competitors for particular projects. For existing customers, a considerably shorter sales and implementation cycle may be involved.

### Biometrics Segment

Our biometrics segment accounted for approximately 14.2% and 15.8% of our revenue for the three month periods ended March 28, 2004 and March 30, 2003, respectively, and, 17.8%, 15.3% and 13.4% of our revenue for the years ended December 31, 2003, 2002, and 2001, respectively. The focus of our biometric technology solutions is primarily on applications designed to deter criminal and terrorist activities, including government research and development contracts. These initiatives generated 89.0% of this segment's revenue for the three months ended March 28, 2004, the remaining 11.0% was generated from sales in the gaming industry.

Within our biometrics segment, our contracts typically provide for the development, customization and installation of face recognition systems for government agencies, law enforcement agencies and businesses. These contracts are generally fixed price, and include milestones and acceptance criteria for the various deliverables under the contract. Contract prices are dependent on a variety of factors, including design and integration complexities, the nature and number of workstations and sites, the size of the database, the level of post-installation support and the competitive environment. In certain cases, we provide licenses for off-the-shelf versions of our face recognition software on a per user basis.

For identity solutions that primarily require our advanced face recognition technology, such as criminal identification booking and investigation applications, the sales cycle tends to be shorter and the solution consists primarily of software products.

25

Table of Contents

As we continue to implement our vision of being a total identity solutions provider, the biometrics and secure credentials segments become less distinct as discrete segments. We believe that the presence or future potential of integrated biometrics in secure credentials is a key factor in increasing revenue and profits from the secure credentials business. As a result, we are seeing the two segments converge into one market.

**Dependence on Significant Customers**

We believe for the near future that we will continue to derive a significant portion of our revenues from a limited number of large contracts. Secure credentials segment customers who accounted for more than 10% of our total revenues are as follows:

- For the three months ended March 28, 2004, one customer accounted for an aggregate of 13.0%;
- For the three months ended March 30, 2003, two customers accounted for an aggregate of 28.0%;
- For the year ended December 31, 2003, two customers accounted for an aggregate of 26.0%;
- For the year ended December 31, 2002, two customers accounted for an aggregate of 22.0% and
- For the year ended December 31, 2001, four customers accounted for an aggregate of 49.0%

No single biometrics customer accounted for over 10% of our total revenue in any period.

**Critical Accounting Policies and Significant Estimates**

We prepare our financial statements in accordance with generally accepted accounting principles in the United States, or US GAAP. Consistent with US GAAP, we have adopted accounting policies that we believe are most appropriate given the facts and circumstances of our business. The application of these policies has a significant impact on our reported results. In addition, some of these policies require management to make estimates. These estimates, which are based on historical experience and analysis of current conditions, have a significant impact on our reported results and the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements. If actual results differ significantly from these estimates, there could be a material effect on our financial statements.

*Valuation of Goodwill and Other Long-Lived and Intangible Assets*

Our long-lived assets include property, plant and equipment, other intangible assets and goodwill. As of March 28, 2004, the balances of property, plant and equipment, other intangible assets and goodwill, net of accumulated depreciation and amortization, were $24.8 million, $18.5 million and $63.6 million, respectively. As of December 31, 2003, the balances of property, plant and equipment and other intangible assets, net of accumulated depreciation and amortization, were $25.1 million and $2.7 million, respectively.

Where we believe that property, plant and equipment and intangible assets have finite lives, we depreciate and amortize those assets over their estimated useful lives. For purposes of determining whether there are any impairment losses, as further discussed below, our management has examined the carrying value of our identifiable long-lived tangible and intangible assets, including their useful lives where we believe such assets have finite lives, when indicators of impairment are present. For all long-lived tangible and intangible assets, if an impairment loss were identified based on the fair value of the asset, as compared to the carrying value of the asset, such loss would be charged to expense in the period we identify the impairment. Furthermore, if our review of the carrying values of the long-lived tangible and intangible assets with finite lives indicates impairment of such assets, we may determine that shorter estimated useful lives are more appropriate. In that event, we will be required to record additional depreciation and amortization in future periods, which will reduce our earnings.

26

AMENDMENT NO. 1 TO FORM S-3                                                                Page 334 of 113

Table of Contents

Factors we generally consider important which could trigger an impairment review on the carrying value of other long-lived tangible and intangible assets include the following:

- significant underperformance relative to expected historical or projected future operating results;
- significant changes in the manner of our use of acquired assets or the strategy for our overall business;
- underutilization of our tangible assets;
- discontinuance of product lines by ourselves or our customers;
- significant negative industry or economic trends;
- significant decline in our stock price for a sustained period and
- significant decline in our market capitalization relative to net book value.

Although we believe that the carrying value of our long-lived tangible and intangible assets were realizable as of March 28, 2004 and December 31, 2003, future events could cause us to conclude otherwise.

Due to our two acquisitions in the first quarter of 2004, goodwill and other intangible assets were created as a result of the preliminary allocation of the purchase price to identified intangible assets of the acquired businesses. The values recorded for goodwill and other intangible assets represent preliminary estimates of fair values calculated by independent third-party appraisers and are subject to further review and finalization. Such valuations require us to provide significant estimates and assumptions, which are derived from information obtained from the management of the acquired businesses, and our business plans for the acquired businesses or intellectual property. Critical estimates and assumptions used in the initial valuation of goodwill and other intangible assets include, but are not limited to:

- future expected cash flows from product sales, customer contracts and acquired developed technologies and patents;
- expected costs to complete any in-process research and development projects and commercialize viable products and estimated cash flows from sales of such products;
- the acquired companies' brand awareness and market position;
- assumptions about the period of time over which we will continue to use the acquired brand and
- discount rates.

These estimates and assumptions may be incomplete or inaccurate because unanticipated events and circumstances may occur. If estimates and assumptions used to initially value goodwill and intangible assets prove to be inaccurate, ongoing reviews of the carrying values of such goodwill and intangible assets may indicate impairment which will require us to record an impairment charge in the period in which we identify the impairment.

As of March 28, 2004, we have recorded goodwill of $63.6 million. We will perform impairment reviews on the carrying values of goodwill arising from the aforementioned acquisitions at least annually. Because future cash flows and operating results used in the impairment review will be based on management's projections and assumptions, future events could cause such projections to differ from those used to originally value the acquisitions, which could lead to significant impairment charges of goodwill in the future.

27

### Secure Credentials Revenue and Cost Recognition

During the third quarter of 2003, we adopted the provisions of Emerging Issues Task Force 00-21, *Accounting for Revenue Arrangements with Multiple Deliverables*, or EITF 00-21, on a cumulative basis as of January 1, 2003. EITF 00-21 governs how to identify whether goods or services, or both, to be delivered separately in a bundled sales arrangement, should be accounted for separately. The operating results for the three-month period ended March 30, 2003 reflects the cumulative effect of the change in accounting principle in 2003.

We deliver solutions under secure credential contracts primarily to federal and state government customers. We recognize revenue when persuasive evidence of a sales arrangement exists, delivery occurs or services are rendered, the sales price is fixed or determinable and collectibility is reasonably assured.

In some cases, we generate revenue from the sale of products in which title passes to the customer. In these cases, we recognize revenue when the products are shipped and accepted by the customer. Services revenue under these contracts consists of preventative and remedial maintenance on printing systems. We also provide on site technical support and consulting services to our customers. Revenue on fixed price services is recognized ratably over the service period which approximates the timing of the services rendered. Revenue on time and material services is recognized as the services are rendered. Expenses on all services are recognized when the costs are incurred.

When elements such as products and services are contained in a single arrangement, or in related arrangements with the same customer, we allocate revenue to each element based on its relative fair value, provided that such element meets the criteria for treatment as a separate unit of accounting. The price charged when the element is sold separately generally determines fair value.

We have secure credential contracts, generally with state governments for the production of drivers' licenses and other identification credentials, where we have determined that we have multiple elements and where the title to equipment installed to produce these credentials does not pass to the customer. Under these contracts, the first element consists of hardware, system design, implementation, training, consumables management, maintenance and support which is accounted for as equipment and related executory services under lease in accordance with SFAS No. 13. The second element consists of customized software which is accounted for as a long term contract in accordance with AICPA Statement of Position 97-2, *Software Revenue Recognition*, or SOP 97-2, and Statement of Position 81-1, *Accounting for Performance of Construction-Type and Certain Production-Type Contracts*, or SOP 81-1, on a units of delivery method of measurement.

Costs related to the hardware element of these contracts are capitalized on the balance sheet and are depreciated over the remaining contract term beginning when the system goes into service. The delivery of these credentials typically requires us to customize, design and install equipment and software at customer locations, as well as perform training, supply consumables, maintain the equipment and provide support services. Nonperformance of training, consumables management, maintenance and support services would prevent us from receiving payment for the costs incurred in the customization, design and installation of the system. EITF 00-21 limits the amount of revenue allocable to the customization, design and installation of the system to the amount that is not contingent upon the production of credentials. Revenue on these contracts under EITF 00-21 is earned based on, and is contingent upon, the production of credentials from the system. Due to the contingent performance of credential production in our secure credentials contracts, we defer revenue recognition for the system design and installation phase of our contracts, including customized software and equipment, and recognize revenue as credentials are produced.

Costs related to the customized software element of our secure credentials contracts where title to the hardware element does not pass to the customer are capitalized on the balance sheet during the period in which we are designing and installing the system and are amortized over the remaining contract term beginning when the system goes into service. Costs related to this element of our secure credentials contracts incurred after the

28

Table of Contents

system is in service are expensed as incurred. Revenue related to this element of our secure credentials contracts is recorded as credentials are produced by the system.

Our secure credentials contracts related to the delivery of drivers' licenses and identification credentials typically provide that the state department of transportation, or similar agency, will pay a fixed price per credential produced utilizing a system we design, implement and support. Our fixed pricing includes charges for the use of the system, materials and the data that is stored on the credentials. Prices under these contracts vary depending on, among other things:

- Design and integration complexities;
- Nature and number of workstations and sites installed;
- Projected number of secure credentials to be produced;
- Size of the database;
- Level of post-installation involvement that will be required of us and
- Competitive environment.

Prior to the adoption of EITF 00-21, we recognized revenue and costs associated with our secure credentials contracts as a single accounting element using the percentage-of-completion methodology.

### Biometrics Segment Revenue and Cost Recognition

Within our biometrics segment, our contracts typically provide for the development, customization and installation of face recognition systems for government agencies, law enforcement agencies and businesses. These contracts are generally fixed price, and include milestones and acceptance criteria for the various deliverables under the contract. Contract prices vary depending on, among other things, design and integration complexities, the nature and number of workstations and sites, the size of the database, the level of post-installation support and the competitive environment. In certain cases, we provide licenses of off-the-shelf versions of our face recognition software on a per user basis.

We recognize revenue under these contracts using the percentage-of-completion methodology in accordance with SOP 81-1. We use the percentage-of-completion methodology to account for revenue under these contracts because:

- A high level of certainty exists regarding expected cash flows from these contracts; and
- A reliable basis exists for determining the percentage of the contract that will be completed at the end of the accounting period.

We measure the percentage complete as costs are incurred or for contracts based on milestones, revenue is recognized when scheduled performance milestones and customer acceptance criteria have been achieved. These milestones are specific events or deliverables clearly identified in the contract. We recognize revenue based on the total milestone billable to the customer less revenue related to any future maintenance requirements. Billings occur under these contracts when the milestone is delivered and accepted by the customer. Milestones can include customized systems, installation and services as defined by the contract.

We record costs and estimated earnings in excess of billings under these contracts as current assets. We record billings in excess of costs and estimated earnings and accrued contract costs as current liabilities.

Under SOP 97-2 revenue related to software licenses of off-the-shelf face recognition software is recognized when:

- Persuasive evidence of an arrangement exists;

29

Table of Contents

- Delivery has occurred;
- The sales price is fixed and determinable;
- Collection is probable and
- There are no post delivery obligations.

We adopted EITF 00-21 on a cumulative basis as of January 1, 2003. Based on our evaluation of biometrics contracts and the application of the new guidance, the adoption of EITF 00-21 did not have an impact on the accounting for revenue from biometrics systems under long-term contracts.

## Results of Operations

### Comparison of fiscal quarters ended March 28, 2004 and March 30, 2003

#### Revenue

Revenue for the first quarter of 2004 were approximately $12.3 million, compared to approximately $8.2 million for the first quarter of 2003. The 50.6% increase in revenue is derived from increases of approximately $3.7 million in the secure credentials segment and $300,000 in the biometrics segment. The increase in the secure credentials segment consists of $1.8 million from the operating results of TDT from February 15, 2004 through March 28, 2004, $610,000 from the sale of equipment and consumables directly to two states, $558,000 from a volume increase resulting from the rollout of one new state drivers' license contract and approximately $730,000 from a net increase in volume and the fulfillment of certain milestones among our remaining contracts. The increase in our biometrics revenue is derived from the inclusion of approximately $307,000 in ZN revenue for the period from January 24, 2004 to March 28, 2004.

#### Gross Margin

Gross margins increased to 27.4% in the first quarter of 2004 from 16.8% in the first quarter of 2003. We expect gross margins on our secure credentials contracts to fluctuate based on changes in period cost of sales as a result of our adoption of EITF 00-21 due to the fact that in 2003 and in the future we will effectively recognize revenue on a fixed price per credential produced by our customers. If we successfully achieve cost saving measures in the delivery process, we will realize higher gross margins in those periods where the cost savings measures are achieved. Alternatively, in periods where our delivery costs are higher due to service and maintenance requirements, we expect gross margins to decrease for those periods. The overall increase in gross margin in the first quarter of 2004 compared to the first quarter of 2003 is due to margin increases in both the secure credentials and biometrics segments.

In the secure credentials segment, gross margins increased to 24.4% in the first quarter of 2004 from 11.1% in the first quarter of 2003. We achieved gross margin increases on 12 of the 15 secure credentials contracts that were active in both periods. Those contracts represented approximately 57.9% of the total revenue in that segment for the three-month period ended March 28, 2004. The margin increases were attributable to our minimization of period costs during the card production phase on all of our secure credentials contracts. We were able to achieve some of these costs savings by minimizing overtime labor charges through improved resource management of field service technicians. In addition, we installed inventory management software in multiple states throughout 2003, which allows us to better control consumables scrap, thus reducing our materials costs. In addition to these cost savings initiatives, we signed contract extensions in five states and began card production in two additional states during 2003, both of which resulted in margin increases for those states. Our margin increase in this segment was also attributable to the 30.3% gross margin on approximately $1.8 million of revenue contribution from TDT for the period from February 15 to March 28, 2004, which represented approximately 17.1% of the total segment revenue for the quarter. The gross margin related to TDT included approximately $384,000 of non-cash amortization of the identified intangible assets, as described in more detail

30

below. These increases were offset by gross margin decreases in other states. In two states, gross margins decreased due to an increase in costs, while in a third state the gross margin decrease was primarily due to decreases in credential volume.

The secure credentials business is a highly competitive, bid-based business, which results in pricing pressure for those systems. In addition, the price of a system is dictated by the customer's specifications for the solution and its functionality. Some of these customer specifications include hardware, customized software, credential volume, number and type of security features on the credentials, and biometric identification on the credentials. All of these inputs are evaluated in our estimate of the cost of the system and ultimately influence the pricing for the system to be delivered. We are also aware of the customer's budget situation since this affects how much the customer can spend on the system. After all of these factors are considered, we price the contract and determine the gross margin for the system to be delivered. The price and margin fluctuate by customer due to the number of locations, volume of credentials, requirements and complexity of the system and competitive environment. Although prices remain fixed for products and services on a contract-by-contract basis, fluctuations in gross margin are attributable to changes in the customer mix, change orders and contract extensions received.

Gross margins in our biometrics segment decreased to 45.0% in the first quarter of 2004 from 46.0% in the first quarter of 2003.

For the three-month period ended March 28, 2004, we have allocated $384,000 of amortization expense for the TDT acquisition to cost of sales due to the fact that a majority of the identified intangible assets were attributed to contracts that are generating significant revenue. The $74,000 of amortization related to the ZN acquisition was included in operating expenses for the three months ended March 28, 2004.

### Sales and Marketing Expenses

Sales and marketing expenses increased approximately $82,000, from $1.4 million in the first quarter of 2003 to $1.5 million in the first quarter of 2004. The increase is primarily due to our investment in pursuing biometrics opportunities and the pursuit of significant opportunities in the secure identification marketplace. As a percentage of revenue, sales and marketing expenses decreased from 17.3% in the first quarter of 2003 to 12.2% in the first quarter of 2004.

### Research and Development Expenses

Research and development expenses increased approximately $14,000, from $945,000 in the first quarter of 2003 to $959,000 in the first quarter of 2004. The increase is due principally to our continued investment in face recognition technologies and new product development. This investment included enhancing existing products with the intellectual property that was acquired through the acquisitions of ZN and TDT. As discussed above, research and development expenses include $74,000 of non-cash amortization expense related to the ZN identified intangible assets which contributed to the improvement in face recognition technologies and new product development. As a percentage of revenue, research and development expenses decreased from 11.6% in the first quarter of 2003 to 7.8% in the first quarter of 2004. We expect to continue to invest in product development in fiscal 2004.

### General and Administrative Expenses

General and administrative expenses increased by approximately $1.0 million, from $1.1 million in the first quarter of 2003 to $2.1 million in the first quarter of 2004. The largest component of the increase derives from legal costs of approximately $527,000 stemming from the litigation surrounding our contract with the state of Georgia. General and administrative costs for ZN totaled $86,000 for the period from January 24, 2004 to March 28, 2004. General and administrative costs for TDT totaled $36,000 for the period from February 14, 2004

31

Table of Contents

to March 28, 2004. The remainder of the increase is due to the logistical support required to grow our business through acquisitions while continuing to meet the financing requirements created by our expanding operations. As a percentage of revenue, general and administrative expenses increased from 13.4% in the first quarter of 2003 to 17.4% in the first quarter of 2004.

***Interest Expense***

Interest expense, net of approximately $21,000 and $28,000 of interest income for the first quarters of 2004 and 2003 respectively, increased approximately $173,000 from $219,000 in the first quarter of 2003 to $392,000 in the first quarter of 2004. The increase in interest expense is due to $162,000 of interest on the $15.3 million note used to purchase TDT, as well as approximately $14,000 of additional interest stemming from additional debt financing required to support contract delivery.

***Income Taxes***

There was no provision for federal income taxes for the periods ended March 28, 2004 and March 30, 2003 due to the net loss in both periods. The provision for state income taxes for the periods ended March 28, 2004 and March 30, 2003 were $25,000 and $63,000 respectively.

***Cumulative Effect of Change in Accounting Principle***

For the quarter ended March 30, 2003, we incurred a non-cash charge of $12.1 million representing the cumulative effect of a change in accounting principle related to our adoption of EITF 00-21 on a cumulative basis as of January 1, 2003.

***Comparison of fiscal years ended December 31, 2003 and 2002***

***Revenue***

Revenue for the year ended December 31, 2003 increased 19.6% to $37.4 million from $31.3 million in 2002 after adjusting the 2002 results on a pro forma basis for the impact of the accounting change. The increase in revenue of approximately $6.1 million resulted from increases of $4.4 million and $1.7 million in the secure credentials and biometrics segments, respectively, after adjusting the 2002 results on a pro forma basis for the impact of the accounting change. The increase in the secure credentials segment revenue was the result of credential volume increases in five states generating additional revenue in those states of approximately $3.3 million. Volume increases in two states resulted from the addition of new types of credentials or from normal fluctuations in credential issuances. Volume increases under our contracts with the Connecticut Department of Motor Vehicles and the State of Rhode Island, Division of Motor Vehicles were due to a full year of card production in 2003, in addition we began card production in Oklahoma in 2003. In addition to the volume increases, revenue under our contract serving the Maryland Department of Transportation and Motor Vehicle Administration increased $1.3 million in 2003 due to a full year of delivery on that contract. We also experienced an increase in revenue of approximately $300,000 due to net price per credential increases on contract extensions signed in 2003. The increase in revenue in the secure credentials segment was offset by volume decreases under drivers' license contracts in two states, which resulted in a decrease in revenue of approximately $386,000. The increase in secure credentials revenue for 2003 was also offset by decreases in revenue of approximately $260,000 under our contracts with Arizona Department of Transportation and New Mexico Department of Taxation and Revenue as a result of the expiration of those contracts in 2002. The increase in revenue in the biometrics segment related to the inclusion of a full year of revenue derived from our Pinellas County contract signed in October 2002. We also delivered face recognition solutions to the United Arab Emirates for the Dubai International Airport and to Alberta, Canada in mid-2003, which contributed approximately $800,000 of additional revenue combined.

**Table of Contents**

*Gross Margin*

Gross margins increased to 25.5% for the year ended December 31, 2003 compared to 17.3% for 2002 after adjusting the 2002 results on a pro forma basis for the impact of accounting changes. We expect gross margins on our secure credentials contracts to fluctuate based on changes in period cost of sales as a result of our adoption of EITF 00-21 due to the fact that in 2003 and in the future we will effectively recognize revenue on a fixed price per credential produced by our customers. If we successfully achieve cost saving measures in the delivery process, we will realize higher gross margins in those periods where the cost savings measures are achieved. Alternatively, in periods where our delivery costs are higher due to service and maintenance requirements, we expect gross margins to decrease for those periods. The overall increase in gross margin in 2003 compared to 2002, after adjusting the 2002 results on a pro forma basis for the impact of the accounting change, is due to margin increases in both the secure credentials and biometrics segments.

In the secure credentials segment, gross margins increased to 21.1% in 2003 from 20.7% in 2002 after adjusting the 2002 results on a pro forma basis for the impact of the accounting change. We achieved margin increases on 10 of our 18 active secure credentials contracts in 2003. Those contracts represented approximately 66.7% of the total revenue in that segment for the year. The margin increases were attributable to our commitment to minimize period costs during the card production phase on all of our secure credentials contracts. We were able to achieve some of these costs savings by minimizing overtime labor charges through better resource management of field service technicians. In addition, we installed inventory management software in multiple states in 2003, which allows us to better control consumables scrap thus reducing our materials costs. In addition to these cost savings initiatives, we signed contract extensions in five states and began card production in two additional states during 2003, both of which resulted in margin increases for those states. These increases were offset by gross margin decreases in other states due primarily to decreases in credential volume during the year.

The secure credentials business is a highly competitive, bid-based business, which results in pricing pressure for those systems. In addition, the price of a system is dictated by the customer's specifications for the solution and its functionality. Some of these customer specifications include hardware, customized software, credential volume, number and type of security features on the credentials, and biometric identification on the credentials. All of these inputs are evaluated in our estimate of the cost of the system and ultimately influence the pricing for the system to be delivered. We are also aware of the customer's budget situation since this affects how much the customer can spend on the system. After all of these factors are considered, we price the contract and determine the gross margin for the system to be delivered. The price and margin fluctuate by customer due to the number of locations, volume of credentials, requirements and complexity of the system and competitive environment. Although prices remain fixed for products and services on a contract-by-contract basis, fluctuations in gross margin are attributable to changes in the customer mix, change orders and contract extensions received. Gross margins in our biometrics segment increased to 45.6% in 2003 from 15.0% in 2002 due to our improved efficiency in delivering biometrics solutions in the current year, as well as margin adjustments on selected projects in 2002. As we enhance our biometrics solutions, systems and delivery process, we expect that our internal processes around production and sourcing of hardware coupled with improved efficiency in the delivery of the solution should result in improving margins. We realized some of this efficiency in 2003.

We expect that gross margins in the future will include non-cash expenses related to the portion of the purchase price of TDT that is allocated to its contract with the U.S. Department of State and its other contracts. We are in the process of valuing the TDT transaction and will assign purchase price to these intangible assets based on the outcome of that valuation. The intangible assets recorded will be amortized through cost of sales over the remaining contract terms and may have a significant impact on our gross margins during that period.

33

Table of Contents

### Sales and Marketing Expenses

Sales and marketing expenses decreased approximately $86,000, to $5.3 million for the year ended December 31, 2003 from $5.4 million in 2002. As a percentage of revenue, sales and marketing expenses decreased to 14.1% in 2003 from 17.2% in 2002 after adjusting the 2002 results on a pro forma basis for the impact of accounting changes. These decrease is primarily due to a decrease in the number of drivers' license contracts coming up for bid in 2003 within the secure credentials segment as a result of delays within certain states due to budgetary constraints. The bid and proposal process related to the secure credentials contracts for state drivers' license contracts generally requires the involvement of our technology personnel as we devise the system architecture during this phase that satisfies the states requirements in the proposal. As proposal volume was down in 2003, there was increased focus of these resources in other areas, specifically on the delivery of the systems that were contracted in 2002. We expect sales and marketing expenses to increase in absolute dollars and decrease as a percentage of revenue in 2004. This increase will result from of our acquisitions of sales and marketing resources at ZN and TDT. In addition, we will continue our investment in increasing the awareness and demand for identity solutions, support our growth strategy in the federal marketplace and continue our focus on the civil and criminal identification opportunities.

### Research and Development Expenses

Research and development expenses decreased approximately $807,000, to $3.7 million for the year ended December 31, 2003 from $4.5 million in 2002. As a percentage of revenue, research and development expenses decreased to 9.8% from 14.3% in 2002 after adjusting the 2002 results on a pro forma basis for the impact of accounting changes. These decreases are the result of a restructuring and workforce reduction in the fourth quarter of 2002, as well as a decrease in our internal investment in research and development during 2003 anticipating the contribution that the ZN acquisition will bring to our research and development initiatives in the future. Development costs that benefited specific projects were recorded as cost of revenues and costs that did not benefit specific projects were recorded as research and development expenses. Software development costs we have capitalized subsequent to achieving technological feasibility have not been material. We expect research and development expenses to decrease in absolute dollars and as a percentage of revenue in 2004. These decreases will result from an increase in funded research projects to leverage our research and development initiatives in the United States and abroad.

### General and Administrative Expenses

General and administrative expenses remained relatively flat, increasing by approximately $41,000, to $5.1 million for the year ended December 31, 2003 from $5.1 million in 2002. As a percentage of revenue, general and administrative expenses decreased to 13.7% in 2003 from 16.2% in 2002 after adjusting 2002 results on a pro forma basis for the impact of accounting changes. The slight increase in general and administrative expenses was due to the logistical support required to grow our business through acquisitions while continuing to meet the financing requirements created by our expanding operations. The benefits that we experienced related to the restructuring in 2002 and other cost savings initiatives were offset by additional expenses related to new strategic actions taken in 2003. Additional general and administrative expenses related to these actions included $725,000 of expense related to new strategic hires, $200,000 of expenses related to additional employee terminations in 2003, $150,000 of expenses related to pursuing new financing opportunities and $285,000 of additional professional fees related to our contract in Georgia. We expect general and administrative expenses to increase in absolute dollars and decrease as a percentage of revenue in 2004 primarily due to our acquisitions of ZN and TDT. In addition to the additional headcount in 2004 we expect additional overhead expenses related to facilities, human resources, administration and reporting.

34

Table of Contents

### Interest Expense

Interest expense, net of approximately $99,000 and $196,000 of interest income in 2003 and 2002, respectively, increased approximately $94,000 for the year ended December 31, 2003 to $969,000 from $875,000 in 2002. The increase in interest expense reflects the additional debt financing required to support contract delivery in 2003.

### Other Income

For the year ended December 31, 2003 we had other income of $18,000 related to a gain on the sale of certain card printer assets. There was no other income recognized for the year ended December 31, 2002.

### Income Taxes

No provision for federal income taxes has been made for the years ended December 31, 2003 and 2002 due to the net loss in both periods. For the year ended December 31, 2003, the provision for state income taxes was approximately $63,000. There was no provision for state income taxes for the year ended December 31, 2002.

### Cumulative Effect of Change in Accounting Principle

For the year ended December 31, 2003, we incurred a non-cash charge of $12.1 million representing the cumulative effect of a change in accounting principle related to our adoption of EITF 00-21 on a cumulative basis as of January 1, 2003.

## Comparison of Fiscal Years ended December 31, 2002 and 2001

### Revenue

Revenue increased to $32.3 million for the year ended December 31, 2002 from $26.3 million in 2001. Revenue in the secure credentials segment increased by $4.6 million, or 20.2%, as a result of winning new drivers' license contracts. Revenue in the biometrics segment increased by $1.4 million, or 40%, due to revenue generated from acquisitions and the continued organic growth of that business. The revenue generated from biometrics solutions in both segments increased by $2.4 million, or 58.7%, from $4.0 million in 2001 to $6.4 million in 2002, which was a result of an increase in the use of biometrics technology by some states in the production of drivers licenses and other credentials. After adjusting the 2002 and 2001 results on a pro forma basis for the impact of accounting changes, revenue increased to $31.3 million in 2002 from $28.2 million in 2001. Revenue in the secure credentials segment increased by $1.7 million, or 6.8% as a result of increased credential volumes from recently implemented drivers' license contracts beginning card production in 2002. Revenue in the biometrics segment does not change on a pro forma basis.

### Gross Margin

Gross margins decreased to 21.9% for the year ended December 31, 2002 from 25.4% in 2001. The decline in gross margin reflects a change in product mix and contracts that included product development as well as delays in contract awards expected in the biometrics segment. This is evidenced by the improvement in gross margins from the first quarter of 2002 of 20.5% to 29.3% in the forth quarter of that year. In 2002, new contracts in the secure credentials segment accounted for 29.4% of our revenue and had a combined gross margin of 37.6%. In 2001, new contracts accounted for 16.6% of our revenue and had a combined gross margin of 13.7%. The gross margin excluding new contracts would have been 17.1% for 2002, as compared to 24.9% in 2001. After adjusting the 2002 and 2001 results on a pro forma basis for the impact of accounting changes, gross margins decreased to 17.3% for the year ended December 31, 2002 from 27.4% in 2001. The decline in gross margin reflects a change in product mix reducing the percentage of revenue recognized on secure credentials contracts and included a higher percentage of biometrics contracts that yielded lower margins in 2002. The biometrics segment in total averaged margins of 15.0% in 2002 compared to 40.0% in 2001.

35

Table of Contents

### Sales and Marketing Expenses

Sales and marketing expenses increased by approximately $4.6 million for the year ended December 31, 2002 from the prior year. This represents an increase to 16.6% from 3.1% of revenue. The increase was due to our investment in pursuing biometrics opportunities following the events of September 11, 2001 and the pursuit of significant opportunities in the secure credentials marketplace. Our expenses resulted from our increased presence and sponsorship at security related trade shows, additional resource allocation to pursue opportunities in the federal government sector and an increase in sales and marketing personnel. The expenses associated with these activities included $1.7 million of compensation expenses for new hires, $1.4 million for the reallocation of resources for sales support, $1.0 million associated with lobbyists and marketing consultants and an increase of $0.4 million in travel expenses to support lobbying and marketing activities. The result of this investment can be seen in the increase to our revenue, backlog, and customer base.

### Research and Development Expenses

Research and development expenses increased by approximately $2.4 million for the year ended December 31, 2002 from the prior year. This represents an increase to 13.8% from 7.8% of revenue. The increase is due to our continued investment in facial recognition technologies and new product development. This included enhancing existing products with the intellectual property that was acquired through the recent acquisitions. Our expenses included $1.9 million of compensation expenses for new hires, $400,000 for outside research consultants and $100,000 for additional leased office space for new hires.

### General and Administrative Expenses

General and administrative expenses increased by approximately $2.6 million for the year ended December 31, 2002 from the prior year. This represents an increase to 15.7% from 9.5% of revenue. This increase was due to additional rental costs of approximately $900,000 arising from additional leased office space and an increased rental rate on previously occupied space, $1.2 million in compensation expenses including placement fees for new hires, $100,000 for outside consultants and a write-down of a contract receivable of $400,000. As a result of the acquisitions in 2002, and to facilitate the growth of the business, we also increased investment in infrastructure and personnel.

### Restructuring Charge

We incurred a one-time restructuring charge of $824,000 in the fourth quarter of 2002. This consisted of approximately $248,000 associated with a workforce reduction of 21 individuals, or approximately 16% of the employee base. In addition, we took a charge for non-cancelable lease costs and capital equipment of approximately $420,000 and $156,000 respectively. Annualized savings associated with the workforce reduction are expected to total approximately $2.2 million.

### Interest Expense

Interest expense, net of approximately $196,000 and $31,000 of interest income in 2002 and 2001, respectively, decreased approximately $335,000 for the year ended December 31, 2002 from the prior year. This represents a decrease to 2.8% from 4.6% of revenue. This decrease reflects the impact of our continuing efforts to reduce our overall debt and related interest expense, as well as the retirement of a $4,000,000 operating line of credit with the proceeds of the $25 million private placement of common stock in December 2001.

### Income Taxes

We did not record any income tax for fiscal years 2002 and 2001 due to the net loss in each year.

36

Table of Contents

### *Impact of Foreign Currency Translation*

For the years ended December 31, 2003 and 2001, our foreign operations and export sales were approximately $800,000 and $1.2 million, respectively. We did not have any revenue related to foreign operations and export sales for the year ended December 31, 2002. We do not consider our foreign operations and export sales to be material for the years ended December 31, 2003, 2002 and 2001.

As a result of our acquisitions of ZN and TDT, we expect that we will have increased exposure to foreign currency fluctuations. Net revenue and related expenses generated from our international location in Germany is denominated in euros. The results of operations and certain of our intercompany balances associated with this international location are exposed to foreign exchange rate fluctuations. In addition to our German operation, we will have increased transactions with Japanese vendors supplying hardware and consumables for the delivery of the TDT contracts. These transactions will increase our exposure to foreign currency fluctuations with the yen. To the extent the U.S. dollar weakens against these foreign currencies, the translation of these foreign currencies denominated transactions results in increased net revenue, operating expenses and net income. Similarly, our net revenue, operating expenses and net income will decrease when the U.S. dollar strengthens against these foreign currencies.

### Liquidity and Capital Resources

Cash and cash equivalents were approximately $9.3 million at March 28, 2004, which consisted entirely of cash. This amount excludes approximately $3.1 million which is restricted under our term loan agreements and project financing. Cash and cash equivalents at December 31, 2003 were approximately $6.7 million, which consisted entirely of cash. This number excludes approximately $6.3 million which was restricted under our term loan agreements and project financing.

In the three-month period ended March 28, 2004, cash provided by operating activities was approximately $586,000, which stems from our net loss of approximately $1.6 million, offset by non-cash charges for depreciation and amortization of approximately $2.3 million and cash used by the net increase in operating assets of approximately $62,000.

Accounts receivable increased approximately 32.9% from $7.0 million at December 31, 2003 to $9.3 million at March 28, 2004. This increase includes $874,000 and $2.2 million which were assets of ZN and TDT, respectively, acquired by us at the respective dates of acquisition of those companies. The remainder of the change, which resulted in an increase in cash of approximately $700,000, is due to the timing of billings and collections.

Inventories and other costs and estimated earnings in excess of billings increased approximately 14.7% from $4.1 million at December 31, 2003 to $4.6 million at March 28, 2004. This increase includes $189,000 and $135,000 which were assets of ZN and TDT, respectively, acquired by us at the date of acquisition. The remainder of the change, which resulted in a decrease in cash of approximately $176,000, reflects accumulation of consumables inventory that was unbilled as of March 28, 2004.

Accounts payable and accrued expenses increased approximately 61.3% from $6.9 million at December 31, 2003 to $11.1 million at March 28, 2004. This increase includes $1.5 million and $2.8 million which were liabilities of ZN and TDT, respectively, assumed by us at the dates of the respective acquisitions of those companies. The remainder of the change, which resulted in a decrease in cash of approximately $100,000, is due to the timing of payables.

37

Table of Contents

In February 2004, we entered into a new loan agreement with Commerce Bank and Trust Company, or Commerce, that superseded the original loan agreement for our existing term loans. Under this new agreement, we borrowed an additional $3.0 million and reduced the required restricted cash balance under the new agreement with Commerce by $2.0 million. We also negotiated a reduction of $1.2 million of restricted cash with Lau Technologies, or Lau, concurrent with the execution of the new loan agreement with Commerce. The $3.0 million term loan provided by this agreement bears interest at a rate of 7.3%. The following table lists the approximate term note information for Commerce and Lau as of the dates indicated (in thousands):

| | | | | | | Outstanding Principal Balance | | |
| | | | | | | December 31, | | |
| Lender | Original Loan Amount | Monthly Payment Provision | Date of Loan | Due Date | Interest Rate | 2002 | 2003 | March 28, 2004 |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | (unaudited) |
| Commerce | $4,000 | $ 84 | 2/7/2001 | 6/20/2006 | 8.00% | $ 3,044 | $ 2,259 | $ 2,053 |
| Commerce | 3,200 | 72 | 9/11/2001 | 3/11/2006 | 6.25% | 2,522 | 1,800 | 1,612 |
| Commerce | 1,800 | 34 | 12/12/2002 | 12/31/2007 | 5.25% | 1,800 | 1,477 | 1,394 |
| Commerce | 1,500 | 27 | 12/12/2002 | 4/24/2008 | 5.25% | 1,500 | 1,255 | 1,191 |
| Commerce | 1,200 | 24 | 12/12/2002 | 6/24/2007 | 5.25% | 1,200 | 962 | 901 |
| Lau | 2,040 | 53 | 5/30/2003 | 6/30/2009 | 8.50% | — | 1,795 | 1,673 |
| Lau | 2,500 | 51 | 5/30/2003 | 5/30/2008 | 8.50% | — | 1,098 | 2,249 |
| Lau | 1,562 | 64 | 5/30/2003 | 8/30/2005 | 8.50% | — | 1,181 | 1,014 |
| Lau | 287 | 42 | 5/30/2003 | 12/30/2003 | 8.50% | — | — | — |
| Commerce | 3,000 | 36 | 2/27/2004 | 2/27/2007 | 7.30% | — | — | 2,924 |
| | $21,089 | $ 487 | | | | $10,066 | $11,827 | $ 15,011 |

In accordance with the new loan agreement the term notes are collateralized by certain of our assets and the related contract assets. We restructured our bank covenants to account for the impact of the closing of our transactions with ZN and TDT. We are required to maintain various financial covenants, including:

- a net loss for the year ending December 31, 2004 of not more than $500,000 and positive net after-tax income in each fiscal year thereafter;

- a minimum tangible net worth (as defined in the loan agreement) of approximately $16.7 million for the second quarter of 2004, increasing each quarter thereafter;

- our debt to tangible net worth ratio (as defined in the loan agreement) not to exceed the following quarterly benchmarks: 3.00:1.00 for the second quarter of 2004, 2.75:1.00 for the third quarter of 2004, and 2.20:1.00 for the fourth quarter of 2004;

- our debt service coverage ratio (as defined in the loan agreement) must be greater than 0.48 for the first quarter of 2004, 1.25 for the second and third quarters of 2004 and 1.00 for the fourth quarter of 2004 and

- annual capital expenditures may not exceed $1.5 million for the year ending December 31, 2004 and no single capital expenditure may exceed $250,000

Additionally, in accordance with the new agreement, we must maintain $3.0 million of cash on deposit with the lender through September 29, 2004, $4.0 million through November 29, 2004 and $5.0 million by December 31, 2004 and thereafter. This amount is recorded as restricted cash in long term assets. As of March 28, 2004 we had an additional $120,000 of restricted cash at Commerce related to our loan agreement with Lau. We plan to use part of the proceeds from this offering to repay all outstanding indebtedness to Commerce and Lau. See "Use of Proceeds."

We also had one capital lease arrangement in which we were required to maintain the same financial ratios and minimum levels of tangible capital funds, as stated above. Pursuant to this arrangement, the lessor purchases

38

## Table of Contents

certain of our digital identification systems and leases them back to us for deployment with identified and contracted customers approved by the lessor. The lessor retains title to systems and has an assignment of our rights under the related customer contracts, including rights to use the software and technology underlying the related systems. Under this arrangement, the lessor bears the credit risk associated with payments by our customers, but we bear performance and appropriation risk and are generally required to repurchase a system in the event of a termination by a customer for any reason except credit default. This project lease arrangement was accounted for as a capital lease. At March 28, 2004, this lease-financing arrangement was paid in full. At December 31, 2003 and 2002, we had approximately $318,000 and $5.0 million outstanding under these lease-financing arrangements, respectively.

In April 2003 we entered into an arrangement for approximately $1.5 million of equipment financing with three of our suppliers. These project lease arrangements are accounted for as capital leases. There are no financial covenants associated with these leasing arrangements. As of March 28, 2004 we had outstanding $611,000 under these arrangements. As of December 31, 2003 we have outstanding $876,000 under these arrangements. The interest rates on these capital leases are between 6% and 8% and are fixed. The terms of these leases range from 12 months to 60 months. In August 2003 we entered into an arrangement for financing of database licenses with another vendor. As of December 31, 2003 we had outstanding $600,000 under this arrangement.

In the first quarter of 2004 we purchased an asset totaling $800,000 which is payable in installments over four years. On the March 28, 2004 balance sheet, $200,000 is included in accounts payable and other accrued expenses and $600,000 is recorded under other liabilities.

We are in compliance with our credit facility covenants as of March 28, 2004 and December 31, 2003, and we believe that we will be able to maintain compliance with our bank covenants in the future. However, this expectation is dependent on achieving our business plan. If we do not remain in compliance with the covenants in our financing arrangements, the lenders and the lessors could require immediate repayment of outstanding amounts. As of March 28, 2004, there was approximately $15.0 million outstanding under our credit facilities with Commerce and Lau.

In January 2004, we sold 456,007 shares of our common stock at $3.775 per share in a private sale to certain institutional investors to which we had previously sold shares in a private sale in September 2003. On February 14, 2004, we funded the acquisition of TDT with $5.0 million of available cash and executed a promissory note for an additional $15.3 million in addition to the issuance of new stock. The note bears interest at a rate of 8.5% per year and is payable in equal installments of principal and interest on December 1, 2004, May 1, 2005 and December 1, 2005. We plan to use part of the proceeds from this offering to repay this note. See "Use of Proceeds." An additional cash payment of $2.6 million will be made to the former sole shareholder of TDT based upon TDT's selection by the U.S. Department of Defense for the production of smart cards as part of the agency's CAC program. This amount will be paid when we receive payment for our participation in this program. The acquisition of ZN was funded by the issuance of new stock.

We believe that our existing cash balances and anticipated cash flows from operations will be sufficient to meet our operating and debt service requirements for the next 12 months. However, if we cannot achieve our operating goals in 2004 or if we win additional secure credentials contracts in 2004, we may be required to seek additional financing. There can be no assurance that such financing will be available on commercially reasonable terms, or at all. Our ability to meet our business forecast is dependent on a number of factors, including those described in this prospectus under the heading "Risk Factors."

39

Table of Contents

## Contractual Obligations

The following table sets forth our contractual obligations as of March 28, 2004.

| | Total | Less than 1 Year | 1-3 Years | 3-5 Years | More than 5 Years |
|---|---|---|---|---|---|
| Long Term Debt Obligations | $30,311 | $10,208 | $18,539 | $1,564 | $ — |
| Capital Lease Obligations | 1,170 | 732 | 370 | 68 | — |
| Operating Lease Obligations | 2,393 | 637 | 774 | 838 | 144 |

## Contingent Obligations

Our principal contractual commitments involve payments under capital leases, term notes and operating leases.

## Inflation

Although some of our expenses increase with general inflation in the economy, inflation has not had a material impact on our financial results to date.

## Recent Accounting Pronouncements

In April 2003, the FASB issued SFAS No. 149 which amends and clarifies financial accounting and reporting for derivative instruments, including certain derivative instruments embedded in other contracts, and for hedging activities under SFAS No. 133. In particular, SFAS No. 149 clarifies under what circumstances a contract with an initial net investment meets the characteristic of a derivative discussed in SFAS No. 133, clarifies when a derivative contains a financing component, amends the definition of an underlying (as initially defined in SFAS No. 133) to conform it to language used in FIN No. 45, Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others, and amends certain other existing pronouncements. SFAS No. 149 is effective for all contracts entered into or modified after June 30, 2003, subject to certain exceptions. The adoption of this statement did not have an impact on our financial position, results of operations, or cash flows.

In May 2003, the FASB issued SFAS No. 150, *Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity*, which establishes standards for how an issuer classifies and measures certain financial instruments with characteristics of both liabilities and equity. SFAS No. 150 requires that an issuer classify a financial instrument that is within its scope as a liability (or an asset in some circumstances), while many of such instruments were previously classified as equity or "mezzanine" equity. The statement also requires that income statement treatment be consistent with the balance sheet classification. That is, if the instrument is classified as a liability, payments to the holders are interest expense, not dividends, and changes in value are recorded in earnings. The statement relates to three specific categories of instruments: mandatorily redeemable shares, freestanding written put options and forward contracts that obligate an entity to purchase its own shares, and freestanding contracts that obligate an entity to pay with its own shares in amounts that are either unrelated, or inversely related, to the price of the shares. SFAS No. 150 is effective immediately for financial instruments entered into or modified after May 31, 2003 and otherwise is effective in the first interim period beginning after June 15, 2003. The adoption of this statement did not have an impact on our financial position, results of operations, or cash flows.

In January 2003, the FASB issued Financial Interpretation No. 46, *Consolidation of Variable Interest Entities* (FIN 46), which requires the consolidation of certain variable interest entities. In December 2003, the FASB issued a revision to FIN 46. The revised FIN 46, which replaces the original FIN 46 issued in January 2003, clarifies the application of Accounting Research Bulletin No. 51, *Consolidated Financial Statements*, to

40

Table of Contents

certain entities in which equity investors do not have the characteristics of a controlling financial interest or do not have sufficient equity at risk for the entity to finance its activities without additional subordinated financial support. While this interpretation exempts certain entities from its requirements, it also expands the definition of a variable interest entity ("VIE") to a broader group of entities than those previously considered special-purpose entities ("SPE's") and specifies the criteria under which it is appropriate for an investor to consolidate VIE's. Application of the revised FIN 46 is required in financial statements of public entities that have interest in structures that are commonly referred to as SPE's for periods ending after December 15, 2003. For all other types of VIE's, application of the revised FIN 46 by public entities is required for periods ending after March 15, 2004. The application of this interpretation with respect to structures commonly referred to as SPE's did not have a material impact on our financial position, results of operations, or cash flows. The application of this interpretation with respect to types of VIE's did not have a material impact on our financial position, results of operations or cash flows.

In December 2003, the Securities and Exchange Commission ("SEC") published SAB No. 104, *Revenue Recognition*. SAB No. 104 was effective upon issuance and supersedes SAB No. 101, *Revenue Recognition in Financial Statements*, and rescinds the accounting guidance contained in SAB No. 101 related to multiple-element revenue arrangements that was superseded by EITF Issue No. 00-21. Accordingly, SAB No. 104 rescinds portions of the interpretive guidance included in Topic 13 of the codification of staff accounting bulletins. While the wording of SAB No. 104 has changed to reflect the guidance of EITF 00-21, the revenue recognition principles of SAB No. 101 have remained largely unchanged. The adoption of SAB No. 104 did not have a material effect on our financial position, results of operations, or cash flows.

In March 2004, the Financial Accounting Standards Board ("FASB") issued a proposed Statement, "Share-Based Payment", that addresses the accounting for share-based payment transactions in which an enterprise receives employee services in exchange for (a) equity instruments of the enterprise or (b) liabilities that are based on the fair value of the enterprise's equity instruments or that may be settled by the issuance of such equity instruments. The proposed statement would eliminate the ability to account for share-based compensation transactions using APB Opinion No. 25, "Accounting for Stock Issued to Employees", and would generally require that such transactions be accounted for using a fair value-based method. As discussed in Note 2, we currently account for share-based compensation transactions using APB Opinion No. 25. If this statement is issued, the adoption of this interpretation will have a material negative impact on our consolidated financial position and results of operations, the level of which we are currently assessing.

## Quantitative and Qualitative Disclosures About Market Risk

Subsequent to our acquisition of ZN, our international operating resulting from transactions by our German operations will be denominated in euros. Hardware and consumables purchases related to contracts associated with the TDT acquisition are denominated in Japanese yen. We mitigate exchange rate volatility by purchasing local currencies at favorable exchange rates. We do not hedge foreign currencies utilizing derivative instruments. Our international operations and transactions are subject to risks typical of international operations, including, but not limited to, differing economic conditions, changes in political climate, differing tax structures, other regulations and restrictions and foreign currency exchange rate volatility. Accordingly, our future results could be materially adversely impacted by changes in these or other factors.

41

Table of Contents

## BUSINESS

### Summary

We are a leading provider of advanced technology identity solutions that enable governments, law enforcement agencies and businesses to enhance security, reduce identity theft and protect personal privacy. Our identity solutions include secure credential provisioning systems, biometric software and systems and real-time identity databases, as well as systems design, development, integration and support services. These solutions enable our customers to manage the entire life cycle of an individual's identity for a variety of applications including civil identification, criminal identification and border management. Our customers use our solutions to help solve the following four critical problems in identity verification and management:

- assurance that the identification document is authentic;

- assurance that the document has been issued to the correct person;

- confidence that the person holding the identification is uniquely tied to and authorized to use the document and

- verification of the privileges the individual is entitled to at a particular point in time.

Our solutions annually produce more than 30 million secure government-issued credentials at more than 2,000 locations. We are the second largest provider of U.S. drivers' licenses with a 30% market share, and we are the sole source provider of passport production capability to the U.S. Department of State. We also are a recognized leader in biometrics in the field of face recognition. Our customers include governments, law enforcement agencies and businesses in more than 15 countries.

As our market has become increasingly complex and more frequently requires the integration of various technologies and capabilities, we have established ourselves as a provider of end-to-end identity solutions. In January 2004, we acquired ZN Vision Technologies AG, or ZN, which solidified our leadership position in face recognition technology. In addition, in February 2004, we acquired Trans Digital Technologies Corporation, or TDT, which provides us with a significant presence in the U.S. federal government market and strengthens our capability and credibility in the border management market worldwide.

We believe that our installed base of secure credential customers together with our leading face recognition technology provide us with a competitive advantage in delivering unified identity solutions for both the physical and digital domains. For example, in April 2004, we were selected by the U.S. Department of Defense, or DoD, for the production of secure, smart credentials as part of the agency's Common Access Card, or CAC, program. The CAC is a single means of identification for access to both physical locations and computer networks. We expect the demand for these types of solutions to grow significantly.

### Industry Overview

#### *Market opportunity*

The ability to confirm an individual's identity is playing an increasingly important role in national and international security, personal privacy and commerce. Failure to provide adequate identification can lead to breaches of security and identity theft, the consequences of which can range from national security threats and loss of life to significant economic loss. Within this context, we believe that there is increasing pressure on governments and businesses to accelerate the adoption of advanced technology identity solutions. The concern over homeland security, in which identity solutions play a part, is exemplified by the size of the budget for the U.S. Department of Homeland Security, which was approximately $31 billion for the fiscal year ended September 30, 2003, and is projected to be approximately $37 billion for the fiscal year ended September 30, 2004. Furthermore, identity theft is the nation's fastest growing crime, and the Federal Trade Commission has estimated that its total cost approaches $50 billion per year.

42

Table of Contents

Government-issued credentials serve as the primary means for confirming the physical identity of an individual. The effectiveness, however, of these credentials is impaired by the following issues:

- the credential can be counterfeited or altered;
- the credential can be issued under false pretenses; and
- the credential rarely is linked to an identity database.

To address counterfeiting and alteration, identity credentials such as passports and drivers' licenses increasingly are incorporating more sophisticated security features. For example, pigment ink printing, security laminates, holograms, ultra violet printing, microprinting, security fonts, half tone portraits, physical or digital watermarks and 2D barcodes have become common security features for passports and drivers' licenses. We believe that issuing authorities will continue to upgrade their security features in order to overcome new means of counterfeiting and alteration.

Moreover, although identity credentials are becoming more secure, the ability to obtain them under false pretenses continues to be a major weakness of the credential issuing process. As a result, issuing authorities are now focusing on improving their ability to verify the identity of a person requesting an identification credential. As part of this effort, authorities have also recognized the need to have secure and accurate audit trails of the issuance process and supporting documents for each credential. In addition, issuing authorities are increasingly incorporating biometrics to verify personal identities and deter fraud. Biometrics is a means of identifying a person using biological features unique to that individual. Biometric identifiers include facial images, fingerprints, iris scans, retinal scans, voice data and hand geometry.

Finally, as secure identity credentials and biometrics become more prevalent, we believe the additional security generated by cross-checking the credential to a readily accessible identity database will grow in importance. This capability allows a higher level of identity assurance and real-time privilege management.

### Market drivers and trends

To address the complexity of problems in the identity market, credential issuing authorities are seeking advanced technology identity solutions, which increasingly include secure credential provisioning systems, biometrics and real-time identity databases. We believe the global market for these solutions is driven by the following key trends:

- *Growth in government-initiated security programs.* We believe that government agencies will continue to be key drivers for the growth and development of the market for advanced technology identity solutions. For example, budgets for U.S. federal government agencies, such as the Department of Homeland Security, include spending for identity initiatives, such as:

  - the U.S. Visitor and Immigrant Status Indicator Technology program, or U.S. VISIT, which uses biometric data as part of new screening procedures for non-U.S. citizens entering the United States;
  - the Transportation Workers Identification Credential, or TWIC, which is a credentialing program that may eventually cover an estimated 12 million national transportation workers; and
  - the U.S. Department of State's planned introduction of "contactless chips" in passports, which are electronic chips that hold the bearer's biographic and photographic data.

- *Development of industry standards and requirements.* Several organizations responsible for standards in a number of our markets have recently implemented requirements for the use of face recognition biometrics. We believe this will help stimulate the development of our target markets. For example, in May 2003 the International Civil Aviation Organization, which sets recommended travel document standards for its member states, selected face recognition as the biometric to be used in passport

43

Table of Contents

documentation. Moreover, in February 2003, the National Institute for Standards and Testing, which is part of the U.S. Department of Commerce, recommended that a dual system of fingerprint and face recognition technology be used to verify the identities of visa holders at points of entry in the United States.

- *Growing use of biometrics.* Governments are increasingly mandating biometrics as an integral component of identity solutions. This increased demand, coupled with the maturation of the technology, is driving the market adoption of biometrics. According to the International Biometrics Group, spending on biometric security solutions is expected to grow at an approximately 46% compound annual rate from approximately $700 million in 2003 to approximately $4.6 billion by 2008.

- *Increasing cost of identity theft and financial fraud.* The growing direct and indirect cost of identity theft and financial fraud is increasing the pressure on businesses and individuals to accelerate the adoption of advanced technology identity solutions. Identity theft is the nation's fastest growing crime. The Federal Trade Commission has estimated that the total cost of identity theft approaches $50 billion per year.

- *Convergence of physical and logical security systems.* There is a growing need for governments and businesses to provide a highly secure, unified system for user authentication to access both physical assets, such as buildings, and digital assets, such as computer networks. For example, the CAC program provides identity verification for approximately four million DoD employees and military personnel to enable access to military property and DoD computer networks. We believe that this program represents the model for identity solutions that will be implemented by governments and businesses in the future.

## Our Identity Solutions

Our identity solutions include secure credential systems, biometrics, database technologies and services. These solutions enable governments and businesses to issue credentials and verify and manage identities throughout the entire identity life cycle.



- *Proofing.* Our solutions provide verification of a person's claimed identity by processing and cataloging breeder documents, such as birth certificates. Our solutions also provide customers the ability to perform identity verification on re-issuance of credentials and to submit queries to local and external proofing databases, as well as to perform duplicate analysis and verification using our face recognition technology.

- *Enrollment.* Our solutions enable the digital capture and storage of multiple pieces of data such as demographics, digital images, signatures and biometric data. Furthermore, our solutions enable the operator to rapidly import existing data without having to recreate it, thereby improving productivity and accuracy of the data by more effectively leveraging the existing database. Our enrollment solutions are designed to comply with a range of industry standards. In addition, our solutions create an audit trail of credentials, which includes information about the issuing operator as well as supporting breeder documents.

44

Table of Contents

- *Issuance*. Our solutions include state-of-the-art technologies for producing authentic and tamper-proof identification credentials. We offer turnkey solutions that include the hardware, software and consumables necessary to produce credentials, including static credentials and smart credentials using paper or plastic substrates. Credentials can be produced on-site (over-the-counter), off-site (central production) or through a hybrid of these two methods.

- *Usage.* Our solutions can be used to verify the identities of individuals in a variety of settings, including on a one-to-one basis, such as to verify a claimed identity at a border checkpoint, or on a one-to-many basis, such as to establish an individual's identity when he or she does not reveal his or her true identity. In addition, our secure identity solutions can be used to address physical security needs such as border access and digital security needs such as computer network access.

We offer the following key components as part of our identity solutions:

*Secure credential capabilities.* We provide the necessary hardware, software and systems to enable our customers to produce secure and virtually tamper-proof credential documents that can be used for a variety of applications and settings. Our solutions are designed to integrate into our customers' credential provisioning processes and conform to regulatory standards and requirements. We offer a range of tamper-resistant features, including biometric data contained in bar codes or chips, holographic overlays, ghost imaging, ultraviolet printing and microprinting. As a result, our customers can create highly secure and durable credentials that not only have embedded security features, but also link the credential to the issuing agency location, operator and material used.

We offer two types of credential systems. The first is an instant issuance or "over the counter" system that enables our customers to produce identification credentials on location in minutes. The second is a central production system that receives the information electronically from the point of capture, and enables our customers to produce credentials from a secure off-site processing location. Our secure credentials systems' software is designed to integrate with a variety of third party software, and to support standard operating systems, network protocols and database products. In addition, we incorporate third party hardware, such as digital cameras and printers, into our systems, which enables us to offer configurations that meet our customers' requirements and take advantage of advances in technology.

*Biometric capabilities.* In designing our identity solutions, we have developed a software platform upon which multiple biometrics can be integrated. The platform is designed to be independent of specific biometric technologies, thereby enabling customers to integrate one or several biometric identifiers as needed.

In addition to providing this independent platform, we have developed and invested in proprietary face recognition technology. We believe that face recognition will continue to grow as an important biometric for the following reasons:

- facial images do not reveal information that the person does not routinely disclose to the general public;

- facial images are already collected, stored and verified in large legacy databases as a part of most identity verification processes;

- facial image capture is non-intrusive and does not require the user to touch or interact with a physical device for a substantial timeframe to be enrolled;

- face recognition does not require new and costly enrollment procedures to be introduced;

- facial images can be captured from endorsed photographs which obviates the need for the person to be physically present;

- facial images are culturally accepted internationally as a means of identification and

- face recognition is the only biometric that can be easily verified by a person without special training.

45

Table of Contents

We believe that we are a market leader in face recognition technology. Our face recognition systems are highly scaleable, as evidenced by our deployment in the State of Illinois, which we believe to be the largest face recognition system worldwide. Our face recognition products have the following advantages:

- they provide the ability to search large-scale image databases containing millions of records on a real-time basis;
- they enable customers to rapidly enroll existing image databases;
- they combine two face recognition technologies which results in increased speed and accuracy and
- they are designed to easily enable the addition of other face recognition technologies and product updates.

*Systems Design, Development, Integration and Support.* Our systems design, development, integration and support services are key components of our identity solutions. Our direct services organization supports our direct sales staff early in the sales cycle to help our customers identify their needs and design systems that will address these needs. Our software design and systems integration capabilities enable us to accommodate most computing environments and customers with special requirements. These capabilities also permit us to combine our products with best-of-breed offerings from other vendors to create a complete solution for our clients.

We also provide extensive customer training, telephone help desk support, and ongoing maintenance services through local and centralized field service technicians. In delivering these services, our direct service and support organizations can rely on the expertise of our software and hardware engineers or external technology consultants to provide post installation customer satisfaction. We also maintain a spare parts inventory and provide storage management, distribution and repair of the products we supply.

## Our Strategy

Our objective is to be the leading provider of advanced technology identity solutions for governments, law enforcement agencies and businesses. Key elements of our strategy to achieve this objective include:

*Focus on customer needs.* We are committed to solving our customers' problems and will continue to develop and market solutions to meet their increasingly complex identity security needs. We believe that our focus on providing solutions for the full identity life cycle, combined with our high level of responsiveness and service, differentiates us from our key competitors.

*Continue to enhance and expand our product suite and solutions.* We intend to continue to broaden our product and solution offerings to meet our customer needs. In particular, we intend to continue to engage in product development activities to expand the scope and enhance the performance of our solutions and enable us to address attractive new markets.

*Leverage existing customer base to provide additional advanced technology identity solutions.* We have established relationships with many government agencies demanding identity solutions including the DoD, U.S. Department of State, U.S. Department of Homeland Security and 16 state departments of motor vehicles. Many of our customers do not yet use the full range of our total solutions offerings. Accordingly, we will continue to provide thought and product leadership to these customers as they migrate toward more sophisticated identity solutions.

*Expand customer base both domestically and abroad.* We believe that our experience, existing customer relationships and advanced technology identity solutions will enable us to expand our customer base. We intend to focus our sales efforts on broadening our relationship with U.S. federal, state and local governments. For example, 15 states are expected to be available for drivers' license bids over the next two years, 13 of which are

46

Table of Contents

currently supplied by our competitors. In addition, we believe that significant demand exists for our solutions outside of the United States. Our recent acquisition of ZN has provided us with an established base to more effectively pursue opportunities in the international market.

*Pursue strategic acquisitions and alliances*. We intend to augment our competitive position through acquisitions and alliances. We will pursue acquisitions that provide us with complementary technology, products, capabilities and market or customer access. We will pursue alliances that extend our reach into markets and technologies where we do not have a strong position today.

**Our Products**

The following summarizes our current product offerings:

*Components*

- The Image Capture Work Station is a multifunctional software solution that offers modules for capturing images, laying templates, checking image quality, previewing printing, managing devices such as cameras, connecting to mainframes and handling point of sale.

- The SensorMast is a fully integrated, secure tower unit that incorporates computer-controlled image capture equipment. This equipment includes commercially available digital cameras, adjustable lighting, frame grabbers, step motors, fingerprint and signature capture devices and barcode readers.

- The Visual Inspection System automatically evaluates credentials produced by our central production systems to determine whether the image and data on a person's identification credential correspond to the information about that person in the system database. If the information does not match, the Visual Inspection System automatically rejects the printed credential and identifies the defect for immediate corrective action. This system, which incorporates robotics, high-speed cameras and sophisticated software, automates an activity that is otherwise performed manually and is a potential source of cost savings and increased accuracy for customers.

- As a result of our February 2004 acquisition of TDT, Viisage now works in conjunction with Toppan Printing Co., Ltd. to bring advanced printing technology to our customers and markets.

*Platform Software*

- The FaceTOOLS Software Developer's Kit is designed for application developers who want to incorporate state-of-the-art face recognition technology into their applications. Using FaceTOOLS, developers can create a variety of face recognition applications. FaceTOOLS is based on flexible template matching that incorporates a unique combination of multiple approaches to face recognition.

- FaceEXPLORER is a large image database research and mining tool that provides the ability to reduce fraud and crime by identifying duplicate images in large databases, such as licensed drivers, benefit recipients and visa holders. Additionally, law enforcement officials use FaceEXPLORER to match images and computer composites against existing image databases to identify suspects and known criminals. Customers use FaceEXPLORER to verify identities, improve customer service and reduce fraud by effectively retrieving, managing and analyzing their image databases. We have deployed FaceEXPLORER in one of the world's largest face recognition systems for the Illinois Secretary of State and State Police.

*Access Control*

- FacePASS is a verification solution designed to meet complex access control system requirements. FacePASS utilizes face recognition technology to enable the customer to verify a person's identity to permit or deny access.

47

Table of Contents

*Surveillance*

- FaceFINDER is a modern surveillance identification solution that uses patented real-time video technology. FaceFINDER assists customers, such as casinos, domestic and international airports, military bases and government buildings, in identifying suspects either from long distance or from large crowds.

## Customers

Our customers use our identity solutions for a variety of applications, including civil identification, criminal identification and border management. For civil identification,we are the second largest provider of drivers' licenses to state departments of motor vehicles. In this market, we are increasingly incorporating our biometric systems into the credential issuing processes as we have done for the office of the Illinois Secretary of State. We also were recently selected by the DoD for the production of secure, smart credentials as part of the agency's CAC program. For criminal identification, our customers include the Ohio Department of Public Safety, Pinellas County, Florida, the U.S. Army and the U.S. Secret Service. For border management, we are the sole source provider of passport production capability to the U.S. Department of State.

Historically, we have experienced minimal customer turnover. We believe this is a result of our strong product portfolio and emphasis on customer service and support. The following is a representative list of our customer base:

Civil Identification – Drivers' Licenses

Arkansas Office of Driver Services
Connecticut Department of Motor Vehicles
Illinois Secretary of State
Kentucky Transportation Cabinet
Maryland Department of Transportation and Motor Vehicle Administration*
Mississippi Department of Information Technology Services
North Carolina Department of Transportation
Oklahoma Department of Public Safety
Pennsylvania Department of Transportation
State of Rhode Island, Department of Administration, Division of Motor Vehicles
State of Delaware Department of Public Safety
Wisconsin Department of Transportation

Civil Identification – Social Services

Connecticut Department of Social Services
Massachusetts Department of Transitional Assistance
New York Department of Social Services*


*By subcontract

Criminal Identification

City of New Bedford, Massachusetts Department of Police
Kentucky State Police of the Commonwealth of Kentucky
Ohio Department of Public Safety
Pinellas County Sheriff's Office
U.S. Army
U.S. Secret Service
Wisconsin Department of Transportation

Border Management

St. Petersburg – Clearwater International Airport
U.S. Department of Homeland Security
U.S. Department of State

Other

Berlin Airport
Hanover Zoo
U.S. Department of Defense*
U.S. Navy
100+ Casinos

48

Table of Contents

Following are examples of several successful customer deployments:

- **Pinellas County, Florida Sheriff's Office.** The Pinellas County, Florida Sheriff's office needed a more efficient and accurate method of verifying identities of prisoners. Working closely with the Pinellas County Sheriff's Office, we provided a solution that uses face recognition to enhance booking, release and criminal investigation processes in several facilities. By networking the face recognition enabled database, Pinellas County effectively utilizes face recognition in the identification of individuals – whether through the search of individuals at jail pre-booking, verification at jail release, screening at the airport, attendance at a court trial or even in the back of a police cruiser. Today the database has over one million entries and over 375,000 image queries have been made since the system's installation in 2001.

- **Illinois Secretary of State.** Since 2000, we have worked closely with the office of the Illinois Secretary of State to provide a solution to help identify individuals attempting to receive drivers' licenses through fraudulent means. The office of the Illinois Secretary of State uses our credential and face recognition system in 138 issuing locations to perform approximately 8,000 to 12,000 identity checks per day. To date, there have been numerous cases where our solution has detected serious fraud and apprehensions have been made.

- **U.S. Department of State**. We are the sole source provider of passports to the U.S. Department of State. In this program, we provide a combination of printers, services, project management, consumables and specialized research and development initiatives. We have supported this initiative since 1998 and have enabled the Department of State to deliver more than 40 million passports, with over seven million produced in 2003 alone. We began implementing additional advanced security technologies on a worldwide basis in 2002 and since that time, no known cases of counterfeit passport production have occurred.

For the three-month period ended March 28, 2004, the U.S. Department of State accounted for 13% of our revenue. For the year ended December 31, 2003, the Pennsylvania Department of Transportation and the Illinois Secretary of State each accounted for 13% of our revenue. We typically enter into multi-year contracts with our customers. A majority of our contracts are with U.S. federal or state governmental agencies. Government contracts are generally subject to termination for convenience or lack of appropriation at the determination of the subject agency. Contracts terminated by our customers for convenience would generally entitle us to recover all actual committed costs and profit, if any, on work performed through the date of cancellation. While termination is a significant financial risk, we have never experienced a government contract termination.

## Sales and Marketing

We market our products and identity solutions through both a direct sales force and strategic partnerships and alliances. Our direct sales force is responsible for marketing and selling our entire identity solutions portfolio. We have an international sales force responsible for the North American Market, Europe, the Middle East and Asia Pacific. We have established a dedicated U.S. federal sales team in Washington, D.C. responsible for marketing and selling to U.S. government agencies such as the Department of Homeland Security, the Department of State, the DoD, and others. As of May 31, 2004, we employed 32 people in our sales and marketing organization.

We continue to seek to develop strategic partnerships and distribution channels to broaden our coverage and increase the size of our market worldwide. We have established original equipment manufacture, or OEM, distribution agreements with partners to leverage our face recognition technology. We work with systems integrators, solution providers and service organizations to deliver identity solutions in combination with their core capabilities to expand our access to such organizations' existing relationships, marketing resources and credibility in new markets. We utilize local agents to expand our international access to opportunities.

49

Table of Contents

With the recent acquisition of ZN, we have increased our direct sales and marketing coverage in the European marketplace. Dedicated sales and services teams operate from our Bochum, Germany location. The acquisition of TDT has strengthened our coverage and access to the U.S. federal marketplace.

## Product Development

We focus our product development efforts on critical components for advanced technology identity solutions. These include proprietary software that addresses image capture, image processing, enhancement of face recognition accuracy and information retrieval from identity databases. In addition, we focus on expanding our capabilities in solutions for the civil identification, criminal identification and border management markets. As of May 31, 2004, we employed 35 people in our product development organization.

We benefit from research and development activities conducted by the manufacturers of the components integrated into our systems such as cameras, database software and computers. Moreover, many of our customers, including the U.S. government, provide direct funding to us to assist us in our research and development efforts on their behalf. For the three-month period ended March 28, 2004 and for the year ended December 31, 2003, our customers provided research and development funding of $695,000 and $3.4 million, respectively.

For the three-month periods ended March 28, 2004 and March 30, 2003, research and development expense was $959,000 and $945,000, respectively. For the years ended December 31, 2003, 2002 and 2001, research and development expense was $3.7 million, $4.5 million and $2.0 million, respectively. These amounts do not include spending for projects where our customers provide research and development funding. The costs associated with delivery of these projects are generally recorded as cost of revenues or as a contra research and development expense as appropriate.

## Intellectual Property

We believe that our intellectual property is important to both our secure credentials and our biometrics segments:

- Patents—Both our secure credentials segment and our biometrics segment use patented technology and trade secrets developed or acquired by us. We have significantly expanded our portfolio of face recognition patents and trade secrets through the acquisition of ZN. We have a portfolio of 13 U.S. and foreign patents. In addition, we have a number of U.S. and foreign patent applications in process for face recognition technologies, including 12 foreign patent applications previously filed by ZN. Our U.S. patents typically have a duration of 17 to 20 years.

- Trademarks—We have registered our "Viisage Technology" trademark, as well as trademarks for "FaceEXPLORER", "FaceFINDER", "FaceTOOLS" and "Sensormast" with the U.S. Patent and Trademark Office. Applications are pending in the United States and Europe for the "Viisage" and "FacePASS" trademarks and in Europe for "FaceEXPLORER" and "FaceFINDER".

- Copyrights—We have filed a copyright application for our SensorMast software and have made a copyright filing for our Visual Inspection System and related proprietary software.

## Backlog

Our backlog consists of signed contracts, subcontracts and customer commitments for which revenue has not yet been recognized and excludes phase-out or other extension opportunities included in such contracts. Backlog is only somewhat indicative of future revenue because contracts may be changed positively or negatively. Contracts included in our backlog could be cancelled at any time due to lack of performance without penalty. Contracts terminated by our customers for convenience would generally result in our recovery of all actual committed costs and profit, if any, on work performed through the date of cancellation.

AMENDMENT NO. 1 TO FORM S-3

Table of Contents

At March 28, 2004, our backlog was $176 million, compared to $83 million at March 30, 2003. At December 31, 2003, our backlog was $112 million, compared to $78 million at December 31, 2002. Included in these backlog amounts is $19.7 million from our contract with the Georgia Department of Motor Vehicle Safety which was terminated for convenience in July 2004 as a result of a settlement agreement with the agency and which is expected to be re-bid prior to the end of 2004. Approximately $32 million of the increase in backlog from December 31, 2002 to December 31, 2003 was related to our adoption of EITF 00-21 on a cumulative basis as of January 1, 2003. EITF 00-21 limits the amount of revenue that we may allocate to the customization, design and installation of systems to the amount that is not contingent upon the production of secure credentials. Revenue on our drivers' license contracts under EITF 00-21 is earned based on, and is contingent upon, the production of credentials from the system. Due to the contingent performance of credential production in these contracts, we defer revenue recognition for the system design and installation phase of our contracts, including customized software and equipment, until credentials are produced. As a result, revenue and margins that were recognized as earned and unbilled under our previous revenue recognition policy for secure documentation contracts were deferred under EITF 00-21 and therefore are included in our backlog at December 31, 2003.

Competition

The market for our products and services in individual component areas of identity solutions, such as secure credentials and biometrics, is extremely competitive and we expect this competitive environment to intensify as the market for our products continues to grow. We compete on the basis of the following factors: service and support, technical excellence, price, credibility and flexibility in accommodating customer technical and business needs.

We believe that our comprehensive approach to identity solutions, our unique capabilities and our proprietary technology differentiate us from our competition. We are not aware of any company that competes with us directly on the basis of providing advanced technology identity solutions that cover the full identity life cycle.

*Secure Credentials Segment.* We face competition in the drivers' license market of our secure credentials systems market from companies, including Digimarc ID Systems, LLC, that, in some cases, have greater financial and marketing resources than we do. Substantially all of our sales to new customers have been the result of competitive bidding for contracts pursuant to public sector procurement rules. In some cases, we may be competing with an entity that has a pre-existing relationship with a potential customer, which could put us at a significant competitive disadvantage. In other cases, however, we have pre-existing relationships with customers, which give us an advantage relative to our competitors for that customer. As the secure identification market expands, additional competitors may seek to enter the market.

*Biometrics Segment.* In the field of biometric technology, we compete with several face recognition providers, including Identix Inc., as well as providers of other biometric solutions, such as fingerprint, iris and retinal scans, voice data and hand geometry. We believe that applications increasingly will require the use of multiple biometrics. Accordingly, while our face recognition technology competes with other biometrics, we have designed our identity solutions to serve as a platform for multiple biometric technologies so that we are able to provide the particular biometric required by our customers. We believe that our proprietary face recognition technology, together with our market leadership and experience integrating multiple biometrics, gives us a competitive advantage in the biometrics market.

Seasonality

Our business is not subject to seasonal fluctuations.

Working Capital Requirements

Our drivers' license contracts require significant capital to fund development and implementation. In 2003, we utilized bank borrowings and other lease financing vehicles to supplement our working capital to fund these

51

Table of Contents

capital requirements. In addition, in September 2003 and January 2004, we raised an aggregate of approximately $13.7 million in net proceeds through the private sale of shares of our common stock to certain institutional investors. These funds also were used for working capital. There are no special requirements or customer terms in our bank borrowings or other lease financing vehicles that are expected to have a material adverse effect on our working capital. As discussed more fully in "Management's Discussion and Analysis of Financial Condition and Results of Operations," we may raise additional capital, as needed, to fund working capital needs or growth activities.

**Employees**

As of June 30, 2004, we had 188 full time employees and seven supplemental employees. Supplemental employees are employees on our payroll but who are not eligible for benefits. None of our employees is covered by collective bargaining agreements. We believe that our relations with our employees are good.

**Legal Matters**

In July 2003, a Georgia court issued a preliminary injunction prohibiting Georgia's Department of Motor Vehicle Safety from continuing to work with us to install the State's new drivers' license system. The injunction is the result of a lawsuit filed in March 2003 by one of our competitors alleging that the Department of Motor Vehicle Safety did not comply with its own bid process when it selected a vendor for its new digital drivers' license program. In July 2004, we reached a settlement agreement with the State pursuant to which the Department of Motor Vehicle Safety terminated the contract for convenience and agreed to pay us $2.0 million in cash and the State agreed to purchase certain equipment from us for $500,000. The Department of Motor Vehicle Safety has filed a motion with the Georgia court to dismiss the case based upon the termination of the contract. The agency also has filed an affidavit stating that it intends to issue a new request for proposals for a digital drivers' license system before the end of October 2004. As a result of the termination of the contract, we will lose up to $19.7 million in revenue that we expected to recognize over the next five and one-half years, which was included in our $176 million of backlog at March 28, 2004, unless we are able to win the new contract for the digital drivers' license system and the revenues from such new contract are substantially similar to the terminated contract. While we believe we can utilize the remaining $2.8 million in assets being retained by us from the Georgia contract either in Georgia, if we win the contract based on the new request for proposals, or on alternative projects, to the extent that we are unable to utilize these assets or realize value through a sale of these assets, we would be required to take a charge to earnings.

On July 19, 2004, Fargo Electronics, Inc. initiated a patent infringement action in the U.S. District Court for the Eastern District of Virginia against Toppan Printing Co., Ltd. and TDT. The complaint alleges that Toppan and TDT's use, offer to sell and/or importation of certain personalized identification card printers, including Toppan's CP400 card printers, and associated laminators in the United States constitutes direct and indirect infringement of four patents allegedly owned by Fargo. The complaint seeks unspecified compensatory damages, permanent injunctive relief, trebling of damages for willful infringement and fees and costs. We are currently evaluating the claims in this lawsuit and intend to vigorously defend against them. We believe that the only products at issue are Toppan CP400 printers that were or are sold, used or imported as part of the CAC program. To date, we have received purchase orders of $10.2 million for Toppan CP400 printers for the CAC program, which are expected to be delivered by the end of the first quarter of 2005. There can be no assurance that we will prevail in this litigation. The litigation, with or without merit, could be time consuming and expensive to litigate or settle and could divert management's attention from our business.

We are not aware of any other legal matters that could have a material adverse effect on our business, financial condition or results of operations.

52

Table of Contents

# MANAGEMENT

**Executive Officers and Directors**

The following persons are our executive officers and directors as of July 20, 2004.

| Name | Age | Position |
|---|---|---|
| Bernard C. Bailey | 51 | Chief Executive Officer, President and Director |
| Iftikhar A. Ahmad | 52 | Senior Vice President and General Manager, Secure Credentials |
| William K. Aulet | 46 | Senior Vice President and Chief Financial Officer |
| James P. Ebzery | 44 | Senior Vice President, Worldwide Sales and Services |
| Kenneth C. Scheflen | 58 | Senior Vice President, Federal Government Solutions |
| Denis K. Berube | 61 | Chairman of the Board |
| B.G. Beck | 67 | Vice Chairman of the Board |
| Charles E. Levine | 51 | Director |
| Marcel Yon | 37 | Director |
| Harriet Mouchly-Weiss | 61 | Director |
| Peter Nessen | 68 | Director |
| Paul T. Principato | 50 | Director |
| Thomas J. Reilly | 65 | Director |

Bernard C. Bailey, 51, joined Viisage in August 2002 as Chief Executive Officer. From January 2001 through August 2002, Mr. Bailey served as the Chief Operating Officer of Art Technology Group. Between April 1984 and January 2001, Mr. Bailey served in various capacities at IBM Corporation, including several executive positions. A graduate of the US Naval Academy, Mr. Bailey served for eight years as an officer in the US Navy.

Iftikhar A. Ahmad, 52, was appointed Senior Vice President and General Manager of our Secure Credentials business segment in October of 2002. Between March 1999 and October 2002 he served as Viisage's Vice President of Engineering and Program Management. From November 1996 until March 1999, Mr. Ahmad served as a Director in our Software Engineering Department. From January 1995 to November 1996, he was a senior consultant in Lau's Systems Engineering Department, and prior to that, he held various senior engineering positions at Digital Equipment Corporation.

William K. Aulet, 46, joined Viisage in February 2003 as Chief Financial Officer. Between August 1996 and February 2003, he served as the President of SensAble Technologies. Mr. Aulet was one of the founders of Cambridge Decision Dynamics, where he served as President from April of 1995 to August of 1996. Prior to Cambridge Decision Dynamics, he spent twelve years at IBM Corporation, where he held various management positions. He previously was a Senior Lecturer at MIT's Sloan School of Management.

James P. Ebzery, 44, joined Viisage in November 2002 as Senior Vice President of Sales and Marketing. Mr. Ebzery served as Vice President of Operations for Internet Capital Group from April 2000 to February 2002. Prior to joining ICG, he held senior sales and marketing positions at IBM Corporation from December 1983 to April 2000. He also served as the Worldwide Solutions Executive for the IBM Supply Chain Software Business.

Kenneth C. Scheflen, 58, joined Viisage in July 2004 as Senior Vice President of Federal Government Solutions. From 1977 until July 2004, Mr. Scheflen served as the Director of the Defense Manpower Data Center, or DMDC, of the U.S. Department of Defense. The DMDC collects and maintains automated data about DoD-affiliated personnel, manpower requirements and the financial transactions of the DoD. Mr. Scheflen joined DMDC when it was established in 1974. Prior to that, he held various senior positions at the Human Resources Research Organization, an entity which conducts research, develops products, and provides services to improve organizational performance.

53

Table of Contents

Denis K. Berube, 61, has been the Chairman of the Board of Directors of Viisage since the Company's incorporation in 1996. Mr. Berube is Executive Vice President and Chief Operating Officer of Lau Technologies, or Lau. Lau is the largest holder of Viisage common stock, directly owning approximately 17% of its issued and outstanding common stock. Mr. Berube has been employed at Lau since 1990.

B.G. Beck, 67, was the President and Chief Executive Officer of Trans Digital Technologies Corporation from 1998 until its acquisition by Viisage in February 2004. Mr. Beck currently serves as a consultant to Viisage and also serves as a member of the Boards of Directors of Cardinal Bankshares Corporation, a provider of comprehensive individual and corporate banking services, and L-3 Communications MAS (US) Corporation, a leading supplier of a broad range of products used in a substantial number of aerospace and defense platforms.

Charles E. Levine, 51, has served as a director of Viisage since 1998. Mr. Levine retired in September 2002 from his position as President of Sprint PCS, a position he had held since January 1997. Before joining Sprint PCS, Mr. Levine served as Senior Vice President of Octel Services, a provider of voice systems services, from October 1994 through September 1996. Mr. Levine currently also serves as a member of the Boards of Directors of @Road, Inc., a wireless applications provider, Sierra Wireless Inc., a provider of a broad range of wireless products, including data modems, embedded modules and mobile phones, Somera Communications, a provider of telecommunications operators with equipment and deployment services, and Lexar Media, Inc., a provider of digital media such as compact flash and other flash memory products.

Marcel Yon, 37, was appointed a director of Viisage in June 2004. Mr. Yon was a founder of ZN Vision Technologies AG, or ZN, and served as its Chief Executive Officer from its inception in April 2000 until it was acquired by Viisage in January 2004. Mr. Yon currently serves as a consultant to Viisage and also serves as a member of the Board of Directors of Visiomed Diagnostics Ltd, a medical technology company listed on the Australian stock exchange. Mr. Yon was a founder of Visiomed AG which was acquired by Visiomed Diagnostics Ltd in January 2003. Prior to founding ZN and Visiomed, Mr. Yon advised on international mergers and acquisitions and strategy with Lazard & Co., an investment bank, in London.

Harriet Mouchly-Weiss, 61, has served as a director of Viisage since its incorporation in May 1996. Ms. Mouchly-Weiss founded Strategy XXI Group, an international communications and consulting firm, in January 1993 and has served as its managing partner since that time. Ms. Mouchly-Weiss currently also serves as a member of the Board of Directors of American Greetings Corporation, a company engaged in the design, manufacture and sale of everyday and seasonal greeting cards and other social expression products.

Paul T. Principato, 50, has served as a director of Viisage since May 2001 and as Chief Financial Officer of Lau since its incorporation in March 1990. Prior to 1990, Mr. Principato served as Controller at Barry Wright Corp.

Peter Nessen, 68, has served as a director of Viisage since its incorporation in May 1996. Since July 2003, Mr. Nessen has served as the President of Nessen Associates Ltd., a non-profit consulting company. From January 2003 to July 2003, Mr. Nessen served as an adviser to the Governor of the Commonwealth of Massachusetts on education matters. Mr. Nessen has been Chairman of the Board of NCN Financial, a private banking firm, since January 1995. From June 1993 through December 1994, Mr. Nessen was Dean for Resources and Special Projects at Harvard Medical School.

Thomas J. Reilly, 65, has served as a director of Viisage since its incorporation in May 1996. Mr. Reilly has been a self-employed financial consultant since December 1994. From June 1966 through November 1994, Mr. Reilly was with Arthur Andersen LLP, a public accounting firm, where he became a partner in 1975.

54

Table of Contents

## PRINCIPAL AND SELLING SHAREHOLDERS

The following table sets forth information known to us with respect to the beneficial ownership of our outstanding common stock as of July 15, 2004 by:

- each person known to us to be the beneficial owner of 5% or more of our common stock;
- each of our directors;
- each of our executive officers;
- each selling shareholder and
- all directors and executive officers as a group.

The percentage of our common stock beneficially owned prior to this offering in the following table is based on 35,870,327 shares of common stock outstanding on July 15, 2004. The table below assumes the underwriters do not exercise their over-allotment option. If the over-allotment option is exercised in full, we will sell an aggregate of 525,000 additional shares of common stock.

Beneficial ownership is determined in accordance with the rules of the Securities and Exchange Commission. In computing the number of shares beneficially owned by a person and the percentage ownership of that person, shares of common stock subject to options and warrants held by that person that are exercisable as of July 15, 2004 or will become exercisable within 60 days thereafter are deemed outstanding, while such shares are not deemed outstanding for purposes of computing percentage ownership of any other person.

Unless otherwise indicated in the footnotes to this table, the address of each beneficial owner is c/o Viisage Technology, Inc., 296 Concord Road, Third Floor, Billerica, MA 01821.

| Name | Shares Beneficially Owned Prior to Offering(1) | | Number of Shares Being Offered | Shares Beneficially Owned After Offering | |
|---|---|---|---|---|---|
| | Number | Percent | | Number | Percent |
| Joanna T. Lau (2) | 6,238,108 | 17.4% | 100,000(3) | 6,138,108 | 14.3% |
| Lau Technologies | 6,027,370 | 16.8% | 100,000 | 5,927,370 | 13.8% |
| Odeon Venture Capital AG(4) | 949,325 | 2.6% | 95,330 | 853,995 | 2.0% |
| Dr. Stefan Gehlen(5) | 168,392 | * | 4,670 | 163,722 | * |
| Denis K. Berube (6) | 6,238,108 | 17.4% | 100,000(3) | 6,138,108 | 14.3% |
| B.G. Beck (7) | 5,869,651 | 16.4% | 100,000 | 5,769,651 | 13.4% |
| Harriet Mouchly-Weiss(8) | 121,361 | * | — | 121,361 | * |
| Charles E. Levine(9) | 138,181 | * | — | 138,181 | * |
| Peter Nessen(10) | 87,827 | * | — | 87,827 | * |
| Paul T. Principato (11) | 108,855 | * | — | 108,855 | * |
| Thomas J. Reilly(12) | 118,073 | * | — | 118,073 | * |
| Marcel Yon(13) | 949,325 | 2.6% | 95,330(14) | 853,995 | 2.0% |
| Bernard C. Bailey(15) | 250,000 | * | — | 125,000 | * |
| Iftikhar A. Ahmad(16) | 177,406 | * | — | 177,406 | * |
| William K. Aulet (17) | 66,666 | * | — | 66,666 | * |
| Kenneth C. Scheflen | — | * | — | — | * |
| James P. Ebzery(18) | 66,666 | * | — | 66,666 | * |
| All directors and executive officers as a group (13 persons) (19) | 14,192,119 | 38.4% | 295,330(20) | 13,896,789 | 31.5% |

\*    Indicates holdings of less than one percent of the 35,870,327 shares issued and outstanding as of July 15, 2004.

(1)    Unless otherwise noted, and subject to applicable community property laws, to our knowledge each person identified possesses sole voting and investment power over the shares beneficially owned by such person.

55

(2)  The address of Ms. Lau and Lau Technologies is c/o Lau Technologies, 30 Monument Square, Suite 220, Concord, Massachusetts 01742. Includes 6,027,370 shares held by Lau Technologies. Ms. Lau and Denis K. Berube, the spouse of Ms. Lau, own approximately 56% of the outstanding capital stock of Lau Technologies. Also includes 1,000 shares owned directly by Ms. Lau, 90,496 shares issuable to Mr. Berube pursuant to stock options, and 119,242 shares owned by Mr. Berube directly. Ms. Lau disclaims beneficial ownership of the 90,496 shares issuable to Mr. Berube and the 119,242 shares owned by Mr. Berube. Ms. Lau has sole voting and dispositive power over the shares beneficially owned by Lau.

(3)  Consists of 100,000 shares of our common stock being sold by Lau Technologies in this offering.

(4)  The address for Odeon Venture Capital AG, or Odeon, is Am Ruhrstein 33, 45133 Essen, Germany. Odeon held 16.6% of the fully-diluted share capital of ZN prior to its acquisition by us. Marcel Yon, the Chief Executive Officer of Odeon, serves as a member of our Board of Directors, and served as the Chief Executive Officer and as a member of the executive board of ZN immediately prior to the acquisition. As of the date of this prospectus, Yon AG, of which Mr. Yon is the Chief Executive Officer, serves as a consultant to us. Mr. Yon has sole voting and dispositive power over the shares beneficially owned by Odeon.

(5)  Includes 75,472 shares of common stock which may be required upon exercise of stock options. Dr. Stefan Gehlen held 1.6% of the fully-diluted share capital of ZN prior to its acquisition by us. In addition, Dr. Gehlen served as Chief Technology Officer and as a member of ZN's executive board prior to the acquisition. As of the date of this prospectus, Dr. Gehlen serves as an executive director of Viisage AG. Dr. Gehlen's address is Am Stens Hof 73, 44869 Bochum, Germany.

(6)  Includes 6,027,370 shares held by Lau Technologies. Also includes 1,000 shares owned directly by Joanna Lau, the spouse of Mr. Berube, 90,496 shares issuable to Mr. Berube pursuant to stock options, and 119,242 shares owned by Mr. Berube directly. Mr. Berube disclaims beneficial ownership of the 6,027,370 shares held by Lau Technologies and the 1,000 shares held by Ms. Lau.

(7)  Includes 10,000 shares of common stock which may be acquired upon exercise of stock options.

(8)  Includes 64,167 shares of common stock which may be acquired upon exercise of stock options.

(9)  Includes 79,136 shares of common stock which may be acquired upon exercise of stock options.

(10)  Includes 55,000 shares of common stock which may be acquired upon exercise of stock options.

(11)  Includes 72,167 shares of common stock which may be acquired upon exercise of stock options.

(12)  Includes 90,496 shares of common stock which may be acquired upon exercise of stock options.

(13)  The address of Mr. Yon is Am Ruhrstein 33, 45133 Essen, Germany. Includes 949,325 shares held by Odeon Venture Capital AG, of which Mr. Yon is the Chief Executive Officer. Mr. Yon serves as a member of our Board of Directors and served as the Chief Executive Officer and as a member of the executive board of ZN immediately prior to the acquisition. As of the date of this prospectus, Yon AG, of which Mr. Yon is the Chief Executive Officer, serves as a consultant to us. Mr. Yon has sole voting and dispositive power over the shares beneficially owned by Odeon.

(14)  Consists of 43,160 shares of our common stock being sold by Odeon Venture Capital AG in this offering.

(15)  Includes 250,000 shares of common stock which may be acquired upon exercise of stock options.

(16)  Includes 171,727 shares of common stock which may be acquired upon exercise of stock options.

(17)  Includes 66,666 shares of common stock which may be acquired upon exercise of stock options.

(18)  Includes 66,666 shares of common stock which may be acquired upon exercise of stock options.

(19)  Includes 1,045,267 of common stock which may be acquired upon exercise of stock options.

(20)  Consists of 100,000 shares of our common stock being sold by Lau Technologies in this offering, 100,000 shares of our common stock being sold by B.G. Beck in this offering and 95,330 shares of our common stock being sold by Odeon Venture Capital AG in this offering.

Table of Contents

# DESCRIPTION OF CAPITAL STOCK

Our authorized capital stock consists of 75,000,000 shares of common stock, $0.001 par value, and 2,000,000 shares of preferred stock, $0.001 par value. The following is a summary of the material provisions of the common stock and the preferred stock contained in our certificate of incorporation and bylaws. For greater detail about our capital stock, please refer to our certificate of incorporation and bylaws.

## Common Stock

As of July 15, 2004, there were 35,870,327 shares of common stock issued and outstanding, held of record by approximately 239 stockholders. Options to purchase a total of 4,550,621 shares of common stock and warrants to purchase a total of 812,469 shares of common stock were outstanding on July 15, 2004.

The holders of our common stock are entitled to one vote per share on all matters to be voted on by stockholders. Stockholders are not entitled to cumulative voting rights with respect to the election of directors. Subject to the prior rights of holders of preferred stock, if any, the holders of our common stock are entitled to receive such dividends, if any, as may be declared from time to time by our board of directors in its discretion from funds legally available for such purpose. In the event of our voluntary or involuntary liquidation, dissolution or winding up, the holders of our common stock are entitled to receive and share ratably in all assets remaining available for distribution to stockholders after payment of any preferential amounts to which the holders of preferred stock may be entitled. Our common stock has no preemptive rights and is not redeemable, assessable or entitled to the benefits of any sinking fund. Shares of our common stock are not convertible into any other security. All outstanding shares of our common stock are, and the common stock to be issued in this offering will be, validly issued, fully paid and non-assessable.

## Preferred Stock

Pursuant to our certificate of incorporation, our board of directors has the authority without further action by our stockholders to issue up to 2,000,000 shares of preferred stock. Our board of directors has the authority to issue such preferred stock in one or more series and to fix the number of shares of any series of preferred stock and to determine the designation of any such series. The board of directors is also authorized to determine and alter the powers, rights, preferences and privileges and the qualifications, limitations and restrictions granted to or imposed upon any wholly unissued series of preferred stock. In addition, within the limitations or restrictions stated in any resolution or resolutions of the board of directors originally fixing the number of shares constituting any series, the board of directors has the authority to increase or decrease, but not below the number of shares of such series then outstanding, the number of shares of any series subsequent to the issue of shares of that series. The issuance of preferred stock, while providing desirable flexibility in connection with possible acquisitions and other corporate purposes, could have the effect of delaying, deferring or preventing a change in control without further action by our stockholders and may adversely affect the market price of, and the voting and other rights of, the holders of our common stock. As of July 15, 2004, there were no shares of our preferred stock outstanding. We have no current plans to issue any shares of preferred stock.

## Certain Provisions of Our Certificate of Incorporation and Bylaws

Certain provisions of Delaware law and our certificate of incorporation and bylaws could make more difficult the acquisition of Viisage by means of a tender offer, a proxy contest, or otherwise, and the removal of incumbent officers and directors. These provisions are expected to discourage certain types of coercive takeover practices and inadequate takeover bids and to encourage persons seeking to acquire control of Viisage to first negotiate with us. We believe that the benefits of increased protection of our potential ability to negotiate with

57

Table of Contents

the proponent of an unfriendly or unsolicited proposal to acquire or restructure Viisage outweighs the disadvantages of discouraging such proposals, including proposals that are priced above the then current market value of our common stock, because, among other things, negotiation of such proposals could result in an improvement of their terms.

Our board of directors is divided into three classes. The directors in each class will serve for a three-year term, with our stockholders electing one class each year. This system of electing and removing directors may tend to discourage a third party from making a tender offer or otherwise attempting to obtain control of Viisage, because it generally makes it more difficult for stockholders to replace a majority of the directors.

Our bylaws establish an advance notice procedure for stockholder proposals to be brought before an annual meeting of our stockholders, including proposed nominations of persons for election to our board of directors. At an annual meeting, stockholders may only consider proposals or nominations specified in the notice of meeting, brought before the meeting by or at the direction of our board of directors or properly brought before the meeting by a person who was a stockholder of record on the record date for the meeting, who is entitled to vote at the meeting and who has given to our corporate secretary timely written notice, in proper form, of the stockholder's intention to bring that business before the meeting. Although our bylaws do not give our board of directors the power to approve or disapprove stockholder nominations of candidates or proposals regarding other business to be conducted at a special or annual meeting of the stockholders, our bylaws may have the effect of precluding the conduct of certain business at a meeting if the proper procedures are not followed or may discourage or deter a potential acquiror from conducting a solicitation of proxies to elect its own slate of directors or otherwise attempting to obtain control of our company.

Under Delaware law, a special meeting of stockholders may be called by our board of directors or by any other person authorized to do so in our certificate of incorporation or bylaws. Our bylaws authorize a majority of our board of directors, the chairman of our board or the chief executive officer to call a special meeting of stockholders. However, our board of directors may amend the bylaws at any time to eliminate the right to call a special meeting of stockholders. The elimination of the right of stockholders to call a special meeting would mean that a stockholder could not force stockholder consideration of a proposal over the opposition of our board of directors by calling a special meeting of stockholders prior to such time as our board of directors believed such consideration to be appropriate or until the next annual meeting provided that the requestor met the notice requirements. The restriction on the ability of stockholders to call a special meeting means that a proposal to replace our board could be delayed until the next annual meeting.

## Certain Provisions of Delaware Law

We are subject to Section 203 of the Delaware General Corporation Law, an antitakeover law. In general, Section 203 prohibits a publicly held Delaware corporation from engaging in a business combination with an interested stockholder for a period of three years following the date the person became an interested stockholder, unless:

- Prior to the date of the person becoming an interested stockholder, the board of directors of the corporation approved either the business combination or the transaction which resulted in the stockholder becoming an interested stockholder;

- The stockholder owned at least 85% of the voting stock of the corporation outstanding at the time the transaction which resulted in the stockholder becoming an interested stockholder commenced, excluding for purposes of determining the number of shares outstanding;

  - Shares owned by persons who are directors and also officers and

58

Table of Contents

- Shares owned by employee stock plans in which employee participants do not have the right to determine confidentially whether shares held subject to the plan will be tendered in a tender or exchange offer or

- On or subsequent to the date of the person becoming an interested stockholder, the business combination is approved by the board and authorized at an annual or special meeting of stockholders, and not by written consent, by the affirmative vote of at least two-thirds of the outstanding voting stock which is not owned by the interested stockholder.

Generally, a business combination includes a merger, asset or stock sale or other transaction resulting in a financial benefit to the interested stockholder. An interested stockholder is a person who, together with affiliates and associates, owns or, within three years prior to the determination of interested stockholder status, did own 15% or more of a corporation's outstanding voting securities. We expect the existence of this provision to have an antitakeover effect with respect to transactions our board of directors does not approve in advance. We anticipate that Section 203 may also discourage attempts that might result in a premium over the market price for the shares of common stock held by stockholders.

## Transfer Agent

The transfer agent for our common stock is EquiServe Trust Company, N.A. Its address is 250 Royall Street, Canton, Massachusetts 02021, and its telephone number is (781) 575-2000.

## Listing

Our common stock is quoted on the Nasdaq National Market under the trading symbol "VISG."

59

Table of Contents

## UNDERWRITING

We and the selling shareholders are offering the shares of our common stock described in this prospectus through the underwriters named below. J.P. Morgan Securities Inc. and UBS Securities LLC are the representatives of the underwriters. We and the selling shareholders will enter into an underwriting agreement with the representatives. Subject to the terms and conditions of the underwriting agreement, each of the underwriters has severally agreed to purchase the number of shares of common stock listed next to its name in the following table:

| Underwriters | Number of shares |
| --- | --- |
| J.P. Morgan Securities Inc. | |
| UBS Securities LLC. | |
| Piper Jaffray & Co. | |
| JMP Securities LLC | |
| Janney Montgomery Scott LLC | |
| Roth Capital Partners, LLC | |
| Total | 7,500,000 |

The underwriting agreement provides that if the underwriters take any of the shares presented in the table above, then they must take all of these shares. No underwriter is obligated to take any shares allocated to a defaulting underwriter except under limited circumstances. The underwriting agreement provides that the obligations of the underwriters are subject to certain conditions precedent, including the absence of any material adverse change in our business and the receipt of certain certificates, opinions and letters from us, our counsel and our independent auditors.

In connection with this offering, certain of the underwriters or securities dealers may distribute prospectuses electronically.

### Over-allotment Option

We have granted the underwriters an option to buy up to an aggregate of 525,000 additional shares of our common stock and the selling shareholders have granted the underwriters an option to buy up to an aggregate of 600,000 additional shares of our common stock. The underwriters may exercise this option solely for the purpose of covering over-allotments, if any, made in connection with this offering. The underwriters have 30 days from the date of this prospectus to exercise this option. If the underwriters exercise this option, they will each purchase additional shares approximately in proportion to the amounts specified in the table above.

### Commissions And Discounts

Shares sold by the underwriters to the public will initially be offered at the initial offering price set forth on the cover of this prospectus. Any shares sold by the underwriters to securities dealers may be sold at a discount of up to $     per share from the initial offering price. Any of these securities dealers may resell any shares purchased from the underwriters to other brokers or dealers at a discount of up to $     per share from the initial offering price. If all the shares are not sold at the initial offering price, the representatives may change the offering price and the other selling terms. Sales of shares made outside of the United States may be made by affiliates of the underwriters. Upon execution of the underwriting agreement, the underwriters will be obligated to purchase the shares at the prices and upon the terms stated therein, and, as a result, will thereafter bear any risk associated with changing the offering price to the public or other selling terms.

60

Table of Contents

The following table shows the per share and total underwriting discounts and commissions we and the selling shareholders will pay to the underwriters assuming both no exercise and full exercise of the underwriters' option to purchase up to an additional 1,125,000 shares.

|  | No exercise | Full exercise |
|---|---|---|
| Per share | $ | $ |
| Total | $ | $ |

We estimate that the total expenses of this offering payable by us, not including the underwriting discounts and commissions, will be approximately $254,676.88.

### No Sales of Similar Securities

We, the selling shareholders and our executive officers and directors will enter into lock-up agreements with the underwriters. Under these agreements, we and each of these persons may not, without the prior written approval of the representatives, subject to certain permitted exceptions, sell, offer to sell, contract or agree to sell, hypothecate, pledge, grant any option to purchase or otherwise dispose of or agree to dispose of, our common stock or securities convertible into or exercisable or exchangeable for our common stock or warrants or rights to purchase our common stock. These restrictions will be in effect for a period of 90 days after the date of the final prospectus. At any time and without public notice, the representatives may in their sole discretion, release all or some of the securities from these lock-up agreements.

We and the selling shareholders have agreed to indemnify the underwriters against certain liabilities, including liabilities under the Securities Act. If we and the selling shareholders are unable to provide this indemnification, we will contribute to payments the underwriters may be required to make in respect of those liabilities.

### Nasdaq National Market Listing

Our common stock is quoted on the Nasdaq National Market under the trading symbol "VISG."

### Price Stabilization, Short Positions

In connection with this offering, the underwriters may engage in activities that stabilize, maintain or otherwise affect the price of our common stock including:

- stabilizing transactions;
- short sales;
- purchases to cover positions created by short sales;
- imposition of penalty bids and
- syndicate covering transactions.

Stabilizing transactions consist of bids or purchases made for the purpose of preventing or retarding a decline in the market price of our common stock while this offering is in progress. These transactions may also include making short sales of our common stock, which involves the sale by the underwriters of a greater number of shares of common stock than they are required to purchase in this offering, and purchasing shares of common stock on the open market to cover positions created by short sales. Short sales may be "covered" shorts, which are short positions in an amount not greater than the underwriters' over-allotment option referred to above, or may be "naked" shorts, which are short positions in excess of that amount.

The underwriters may close out any covered short position by either exercising their over-allotment option, in whole or in part, or by purchasing shares in the open market. In making this determination, the underwriters

61

Table of Contents

will consider, among other things, the price of shares available for purchase in the open market as compared to the price at which they may purchase shares through the over-allotment option.

Naked short sales are in excess of the over-allotment option. The underwriters must close out any naked short position by purchasing shares in the open market. A naked short position is more likely to be created if the underwriters are concerned that there may be downward pressure on the price of the common stock in the open market that could adversely affect investors who purchased in this offering.

The underwriters also may impose a penalty bid. This occurs when a particular underwriter repays to the underwriters a portion of the underwriting discount received by it because the representatives have repurchased shares sold by or for the account of that underwriter in stabilizing or short covering transactions.

In addition, in connection with this offering, certain of the underwriters (and selling group members) may engage in passive market making transactions in the common stock on the Nasdaq National Market prior to the pricing and completion of the offering. Passive market making consists of displaying bids on the Nasdaq National Market no higher than the bid prices of independent market makers and making purchases at prices no higher than these independent bids and effected in response to order flow. Net purchases by a passive market maker on each day are limited to a specified percentage of the passive market maker's average daily trading volume in the common stock during a specified period and must be discontinued when such limit is reached. Passive market making may cause the price of the common stock to be higher than the price that otherwise would exist in the open market in the absence of such transactions. If passive market making is commenced, it may be discontinued at any time.

As a result of these activities, the price of our common stock may be higher than the price that otherwise might exist in the open market. If these activities are commenced, they may be discontinued by the underwriters at any time. The underwriters may carry out these transactions on the Nasdaq National Market, in the over-the-counter market or otherwise.

The underwriters and their affiliates have provided and may provide certain commercial banking, financial advisory and investment banking services for us for which they receive customary fees.

The underwriters and their affiliates may from time to time in the future engage in transactions with us and perform services for us in the ordinary course of their business.

62

Table of Contents

## WHERE YOU CAN FIND MORE INFORMATION

We are subject to the informational requirements of the Securities Exchange Act of 1934, as amended, or the Exchange Act, and, in accordance therewith, file annual, quarterly and current reports, proxy statements and other information with the Securities and Exchange Commission, or SEC. Such reports, proxy statements and other information can be inspected and copied at the SEC's Public Reference Room at 450 Fifth Street, N.W., Judiciary Plaza, Washington, D.C. 20549. Please call the SEC at 1-800-SEC-0330 for further information on the operation of the SEC's Public Reference Room. Copies of such material can be obtained from the Public Reference Section of the SEC at prescribed rates. Such material also can be accessed electronically by means of the SEC's home page on the internet (http://www.sec.gov) and on our website (http://www.viisage.com).

We have filed a registration statement and related exhibits with the SEC under the Securities Act of 1933, as amended, or the Securities Act. The registration statement contains additional information about us and our common stock. You can inspect or access electronically the registration statement and exhibits by the means described in the paragraph above.

The SEC allows us to "incorporate by reference" the information that we file with it, which means that we can disclose important information to you by referring you to another document filed separately with the SEC. The information incorporated by reference is an important part of this prospectus and the information that we file later with the SEC may updated and supersede this information. We incorporate by reference into this prospectus the documents listed below and any filings made by us with the SEC pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act after the date of filing of the registration statement of which this prospectus is part, but before the effective date of the registration statement (in each case, other than information in such documents that is not deemed to be filed).

- Our Annual Report on Form 10-K for the fiscal year ended December 31, 2003 (including information specifically incorporated by reference therein from our Proxy Statement for our 2004 Annual Meeting);

- Our Quarterly Report on Form 10-Q for the quarterly period ended March 28, 2004 (as amended on June 21, 2004);

- Our Current Reports on Form 8-K filed on January 30, 2004, February 27, 2004 (as amended on April 29, 2004), May 21, 2004 (as amended on June 18, 2004), June 23, 2004 and July 21, 2004 (disclosing the press release regarding the Georgia contract settlement); and

- Description of our common stock included in our Registration Statement on Form 8-A filed with the SEC pursuant to Section 12 of the Exchange Act on October 15, 1996 (No. 000-21559).

We will provide to each person, including any beneficial owner, to whom this prospectus is delivered a copy of any or all of the information that we have incorporated by reference into this prospectus but not delivered with this prospectus. To receive a free copy of any of the documents incorporated by reference in this prospectus, other than exhibits, unless they are specifically incorporated by reference in those documents, call or write Elliot J. Mark, our General Counsel, at our principal executive offices located at 296 Concord Road, Third Floor, Billerica, Massachusetts 01821. Our telephone number is (978) 932-2200.

You should rely only upon the information provided in this document or incorporated by reference in this prospectus and any supplement. We have not authorized anyone to provide you with different information.

63

Table of Contents

## VALIDITY OF COMMON STOCK

The validity of the shares of our common stock being offered by this prospectus will be passed upon for us by Latham & Watkins LLP and for the underwriters by Cahill Gordon & Reindel LLP.

## EXPERTS

Our financial statements as of December 31, 2002 and 2003 and for each of the three years in the period ended December 31, 2003, included herein and in our annual report on Form 10-K for the year ended December 31, 2003, which is incorporated by reference in this prospectus, have been audited by BDO Seidman, LLP, independent certified public accountants as indicated in their report with respect thereto, and are included herein and incorporated by reference in reliance upon the authority of said firm as experts in auditing and accounting.

The financial statements of ZN Vision Technologies AG as of December 31, 2003 and 2002 and for each of the years then ended, which are incorporated in this prospectus by reference to our current report on Form 8-K filed on May 21, 2004 and amended on June 18, 2004, have been audited by BDO Deutsche Warentreuhand AG, independent auditors as indicated in their report with respect thereto, and are included herein in reliance upon the authority of said firm as experts in auditing and accounting.

The financial statements of Trans Digital Technologies Corporation as of December 31, 2002 and 2003 and for the years then ended, which are incorporated in this prospectus by reference to our current report on Form 8-K filed on April 29, 2004, have been audited by BDO Seidman, LLP, independent certified public accountants as indicated in their report with respect thereto, and are included herein in reliance upon the authority of said firm as experts in auditing and accounting.

64

Table of Contents

## INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

|  | Page |
|---|---|
| Report of Independent Certified Public Accountants | F-2 |
| Consolidated Balance Sheets as of December 31, 2002, 2003 and March 28, 2004 | F-3 |
| Consolidated Statements of Operations for the years ended December 31, 2001, 2002 and 2003 and for the three month periods ended March 30, 2003 and March 28, 2004 | F-4 |
| Consolidated Statements of Changes in Shareholders' Equity for the years ended December 31, 2001, 2002 and 2003 and for the three month periods ended March 30, 2003 and March 28, 2004 | F-5 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2001, 2002 and 2003 and for the three month periods ended March 30, 2003 and March 28, 2004 | F-6 |
| Notes to Consolidated Financial Statements | F-7 |

F-1

Table of Contents

## REPORT OF INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS

To Viisage Technology, Inc.:

We have audited the accompanying consolidated balance sheets of Viisage Technology, Inc. and subsidiary as of December 31, 2003 and 2002, and the related consolidated statements of operations, changes in shareholders' equity and cash flows for each of the three years in the period ended December 31, 2003. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the Standards of the Public Company Accounting Oversight Board ("United States"). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Viisage Technology, Inc. and subsidiary as of December 31, 2003 and 2002, and the consolidated results of their operations and their cash flows for each of the three years in the period ended December 31, 2003, in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note 2 to the consolidated financial statements, the Company changed its method of accounting for certain revenue arrangements.

/s/ BDO SEIDMAN, LLP

Boston, Massachusetts
February 6, 2004
Except for Note 15, which is
    as of February 27, 2004

F-2

Table of Contents

# VIISAGE TECHNOLOGY, INC.

## Consolidated Balance Sheets
### (in thousands)

| | December 31, | | March 28, 2004 |
|---|---|---|---|
| | 2002 | 2003 | |
| | | | (unaudited) |
| **Assets** | | | |
| Current Assets: | | | |
| Cash and cash equivalents | $ 2,212 | $ 6,666 | $ 9,282 |
| Restricted cash | 1,241 | — | — |
| Accounts receivable | 7,360 | 7,057 | 9,343 |
| Inventories and other costs and estimated earnings in excess of billings | 23,372 | 4,050 | 4,647 |
| Other current assets | 339 | 439 | 1,162 |
| Total current assets | 34,524 | 18,212 | 24,434 |
| Property and equipment, net | 16,629 | 25,088 | 24,810 |
| Goodwill | — | — | 63,613 |
| Intangible assets, net | 3,147 | 2,693 | 18,519 |
| Restricted cash | 6,163 | 6,311 | 3,120 |
| Other assets | 726 | 2,176 | 796 |
| | $ 61,189 | $ 54,480 | $ 135,292 |
| **Liability and Shareholders' Equity** | | | |
| Current Liabilities: | | | |
| Accounts payable and accrued expenses | $ 7,017 | $ 6,851 | $ 11,051 |
| Current portion of project financing | 5,263 | 3,734 | 4,175 |
| Current portion of related party notes | — | 1,740 | 6,765 |
| Total current liabilities | 12,280 | 12,325 | 21,991 |
| Project financing | 9,845 | 5,813 | 7,013 |
| Related party notes | — | 2,334 | 13,470 |
| Other liabilities | — | — | 622 |
| Total liabilities | 22,125 | 20,472 | 43,096 |
| Commitments and contingencies | | | |
| Shareholders' Equity: | | | |
| Common stock, $0.001 par value; 45,000,000 shares authorized; 20,250,817, 23,892,772 and 35,625,176 shares issued and outstanding at December 31, 2002 and 2003 and March 28, 2004, respectively | 20 | 24 | 36 |
| Additional paid in capital | 63,461 | 76,061 | 135,869 |
| Accumulated deficit | ( 24,417) | ( 42,077) | (43,709) |
| Total shareholders' equity | 39,064 | 34,008 | 92,196 |
| | $ 61,189 | $ 54,480 | $ 135,292 |

The accompanying notes are an integral part of these consolidated financial statements.

F-3

Table of Contents

**VIISAGE TECHNOLOGY, INC.**

**Consolidated Statements of Operations**
**(in thousands, except per share data)**

| | For the Years Ended December 31, | | | For the Three Months Ended | |
| --- | --- | --- | --- | --- | --- |
| | 2001 | 2002 | 2003 | March 30, 2003 | March 28, 2004 |
| | | | | (unaudited) | |
| Revenue | $26,280 | $ 32,302 | $ 37,371 | $  8,155 | $ 12,259 |
| Cost of revenue | 1 9,602 | 25,239 | 27,844 | 6,789 | 8,906 |
| Gross margin | 6,678 | 7,063 | 9,527 | 1,366 | 3,353 |
| Operating expenses: | | | | | |
| Sales and marketing | 809 | 5,368 | 5,282 | 1,411 | 1,493 |
| Research and development | 2,054 | 4,457 | 3,650 | 945 | 959 |
| General and administrative | 2,500 | 5,069 | 5,110 | 1,093 | 2,137 |
| Acquisition expenses | 1,639 | — | — | — | — |
| Restructuring charges | — | 824 | — | — | — |
| Total operating expenses | 7,002 | 15,718 | 14,042 | 3,449 | 4,589 |
| Operating loss | (324) | (8,655) | (4,515) | (2,083) | (1,236) |
| Interest income | 31 | 196 | 99 | 28 | 21 |
| Interest expense | (1,241) | (1,071) | (1,068) | (247) | (413) |
| Other income | — | — | 18 | — | 21 |
| Loss before income taxes and cumulative effect of change in accounting principle | (1,534) | (9,530) | (5,466) | (2,302) | (1,607) |
| Provision for income taxes | — | — | (63) | (63) | (25) |
| Loss before cumulative effect of change in accounting principle | (1,534) | (9,530) | (5,529) | (2,365) | (1,632) |
| Cumulative effect of change in accounting principle | — | — | (12,131) | ( 12,131) | — |
| Net loss | (1,534) | (9,530) | (17,660) | ( 14,496) | (1,632) |
| Preferred stock dividends | (5) | — | — | — | — |
| Loss applicable to common shareholders | $(1,539) | $ (9,530) | $(17,660) | $(14,496) | $ (1,632) |
| Basic and diluted loss per share before cumulative effect | $  (0.09) | $  (0.48) | $  (0.26) | $  (0.12) | $  (0.05) |
| Cumulative effect of change in accounting principle | $  — | $  — | $  (0.56) | $  (0.60) | $  — |
| Basic and diluted net loss per share applicable to common shareholders | $  (0.09) | $  (0.48) | $  (0.82) | $  (0.72) | $  (0.05) |
| Weighted average basic and diluted common shares outstanding | 1 6,265 | 20,046 | 21,445 | 20,258 | 31,362 |
| Pro forma operating loss (for application of EITF 00-21) | $  (494) | $(11,176) | $ (5,529) | $( 2,365) | $ (1,632) |
| Pro forma net loss per share | $  (0.03) | $  (0.56) | $  (0.26) | $  (0.12) | $  (0.05) |

The accompanying notes are an integral part of these consolidated financial statements.

F-4

Table of Contents

# VIISAGE TECHNOLOGY, INC.
## Consolidated Statements of Changes in Shareholders' Equity
### (in thousands)

| | Common Stock | Preferred Stock | Additional Paid-in Capital | Accumulated Deficit | Total |
|---|---|---|---|---|---|
| Balance, December 31, 2000 | $ 11 | $ 1,020 | $ 33,045 | $ (13,348) | $ 20,728 |
| Warrants issued for services | — | — | 994 | — | 994 |
| Exercise of employee stock options | 1 | — | 1,085 | — | 1,086 |
| Common stock issued for services | — | — | 297 | — | 297 |
| Common stock issued under employee stock purchase plan | — | — | 51 | — | 51 |
| Exercise of warrants | 3 | — | 764 | — | 767 |
| Conversion of debt and accrued interest | 1 | — | 1,067 | — | 1,068 |
| Private placement of common stock, net | 2 | — | 22,750 | — | 22,752 |
| Conversion of preferred stock and accrued dividends | 2 | (1,020) | 1,108 | — | 90 |
| Preferred stock dividends | — | — | — | (5) | (5) |
| Net loss | — | — | — | (1,534) | (1,534) |
| Balance, December 31, 2001 | 20 | — | 61,161 | (14,887) | 46,294 |
| Exercise of employee stock options | — | — | 974 | — | 974 |
| Common stock issued for services | — | — | 699 | — | 699 |
| Common stock issued under employee stock purchase plan | — | — | 51 | — | 51 |
| Contributed capital from Lau Acquisition | — | — | 576 | — | 576 |
| Net loss | — | — | — | (9,530) | (9,530) |
| Balance, December 31, 2002 | 20 | — | 63,461 | (24,417) | 39,064 |
| Exercise of employee stock options | — | — | 72 | — | 72 |
| Common stock issued for services | — | — | 319 | — | 319 |
| Common stock issued under employee stock purchase plan | — | — | 26 | — | 26 |
| Private placement of common stock, net | 4 | — | 12,183 | — | 12,187 |
| Net loss | — | — | — | (17,660) | (17,660) |
| Balance, December 31, 2003 | 24 | — | 76,061 | (42,077) | 34,008 |
| Exercise of employee stock options (unaudited) | — | — | 594 | — | 594 |
| Common stock issued under employee stock purchase plan (unaudited) | — | — | 33 | — | 33 |
| Common stock issued for acquisitions (unaudited) | 12 | — | 57,474 | — | 57,486 |
| Private placement of common stock, net (unaudited) | — | — | 1,707 | — | 1,707 |
| Net loss (unaudited) | — | — | — | (1,632) | (1,632) |

| | | | | | |
|---|---|---|---|---|---|
| Balance, March 28, 2004 (unaudited) | $ 36 | $ — | $135,869 | $ (43,709) | $ 92,196 |

The accompanying notes are an integral part of these consolidated financial statements.

F-5

Table of Contents

### VIISAGE TECHNOLOGY, INC.
#### Consolidated Statements of Cash Flows
#### (in thousands)

| | For the Years Ended December 31, | | | For the Three Months Ended | |
|---|---|---|---|---|---|
| | 2001 | 2002 | 2003 | March 30, 2003 | March 28, 2004 |
| | | | | (unaudited) | |
| **Cash Flow from Operating Activities:** | | | | | |
| Net loss | $(1,534) | $ (9,530) | $(17,660) | $ (14,496) | $ (1,632) |
| Adjustments to reconcile net loss to net cash provided by (used for) operating activities: | | | | | |
| Depreciation and amortization | 4,511 | 7,197 | 6,806 | 1,844 | 2,279 |
| Gain on sale of equipment | — | — | (18) | — | — |
| Value of warrants issued for services | 994 | — | — | — | — |
| Directors fees paid in common stock | 297 | 380 | 319 | 30 | 120 |
| Impact of cumulative effect of change in accounting principle | — | — | 12,131 | 12,131 | — |
| Loss on disposal of fixed assets | — | 132 | 38 | — | — |
| Loss on disposal of intangible assets | — | 75 | 118 | — | — |
| Change in operating assets and liabilities: | | | | | |
| Accounts receivable | (1,516) | (2,022) | 303 | 1,926 | 828 |
| Inventories and other costs and estimated earnings in excess of billings | 3,007 | 289 | 1,402 | 6,830 | (273) |
| Other current assets | 299 | (38) | (100) | (371) | (433) |
| Accounts payable and accrued expenses | (3,773) | 406 | 1,101 | (1,457) | (303) |
| Net cash provided by (used for) operating activities | 2,285 | (3,111) | 4,440 | 6,437 | 586 |
| **Cash Flow from Investing Activities:** | | | | | |
| Purchase of equipment converted to project Financing | (7,946) | — | — | — | — |
| Restricted cash | — | (7,404) | 1,093 | 291 | 3,191 |
| Cash paid for acquisitions | — | (2,822) | (1,293) | — | (5,227) |
| Additions to property and equipment | (54) | (5,702) | (8,195) | (5,711) | (369) |
| Proceeds from sale of equipment | — | — | 35 | — | — |
| (Increase) decrease in other assets | (29) | (899) | (352) | (183) | (415) |
| Net cash used for investing activities | (8,029) | (16,827) | (8,712) | (5,603) | (2,820) |
| **Cash Flow from Financing Activities:** | | | | | |
| Net revolving credit repayments | (2,515) | — | — | — | — |
| Net proceeds from project financing | 7,946 | 4,500 | 3,318 | (1,297) | 4,273 |
| Principal payments on project financing | (4,000) | (4,037) | (6,877) | (1,297) | (1,771) |
| Net proceeds from issuance of common stock | 24,975 | 1,025 | 12,285 | 34 | 2,348 |
| Net cash provided by (used for) financing activities | 26,406 | 1,488 | 8,726 | (1,263) | 4,850 |
| Net increase (decrease) in cash and cash equivalents | 20,662 | (18,450) | 4,454 | (429) | 2,616 |
| Cash and cash equivalents, beginning of period | — | 20,662 | 2,212 | 2,212 | 6,666 |
| Cash and cash equivalents, end of period | $20,662 | $ 2,212 | $ 6,666 | $ 1,783 | $ 9,282 |
| **Supplemental Cash Flow Information:** | | | | | |
| Cash paid for interest | $ 1,161 | $ 944 | $ 1,078 | $ 236 | $ 256 |
| **Non-cash Transactions:** | | | | | |
| Conversion of convertible debt and accrued interest to common stock | $ 1,068 | $ — | $ — | $ — | $ — |
| Conversion of preferred stock and accrued dividends to common stock | $ 1,110 | $ — | $ — | $ — | $ — |
| Equipment purchased under capital leases | $ — | $ — | $ 2,071 | $ — | $ — |
| Directors fees paid in common stock | $ 297 | $ 380 | $ 300 | $ 30 | $ 120 |
| Assets contributed from Lau Acquisition Corp. | $ — | $ — | $ — | $ — | $ — |
| Value of warrants issued for service | $ 994 | $ — | $ — | $ — | $ — |
| Common stock issued for private placement costs | $ — | $ — | $ — | $ — | $ — |
| Services paid in common stock | $ — | $ 319 | $ — | $ — | $ 14 |
| Net assets acquired from Lau Technologies | $ — | $ — | $ 19 | $ — | $ — |
| Acquisitions paid in common stock | $ — | $ — | $ — | $ — | $ 57,486 |

The accompanying notes are an integral part of these consolidated financial statements.

F-6

**VIISAGE TECHNOLOGY, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Information for the three-month periods ended March 30, 2003**
**and March 28, 2004 is unaudited)**

## 1. DESCRIPTION OF BUSINESS

Viisage Technology, Inc. ("Viisage" or the "Company") is a leading provider of advanced technology identity solutions that enable governments, law enforcement agencies and businesses to enhance security, reduce identity theft and protect personal privacy. Our identity solutions include secure credential provisioning systems, biometric software and systems and real-time identity databases, as well as systems design, development, integration and support services. These solutions enable our customers to manage the entire life cycle of an individual's identity for a variety of applications including civil identification, criminal identification and border management. Our customers use our identity solutions to help solve the following four critical problems:

- assurance that the identification document is authentic;
- assurance that the document has been issued to the correct person;
- confidence that the person holding the identification is uniquely tied to and authorized to use the document and
- verification of the privileges the individual is entitled to at a particular point in time.

Our business involves two related segments: secure credentials and biometrics. Our secure credentials solutions involve the design, development, marketing and implementation of integrated software and hardware solutions that produce identification credentials utilizing face recognition and other biometric technologies. The focus of our biometric technology solutions is primarily on applications designed to deter criminal and terrorist activities, including government research and development contracts.

Viisage combines its proprietary biometric and secure credential software with complementary industry standard products to create identity solutions that integrate into its customers' environments. These turnkey solutions integrate secure document technologies, image and data capture, relational databases, and multiple biometrics, improving the customer's ability to process and manage identity information. Applications include passports, drivers' licenses, voter registration, national identification credentials, law enforcement, social services, access control, surveillance and PC network and Internet access security. Viisage's primary customers are government agencies with particular penetration in U.S. government agencies such as the Department of State and state departments of motor vehicles, social services, and law enforcement. Viisage is the sole source provider of high security technology and services to the U.S. Department of State for the production of U.S. passports by virtue of an acquisition in 2004 and has captured a large percentage of the domestic drivers' license market. Viisage also has provided services under subcontracts for projects in the United Arab Emirates, Jamaica, the Philippines and the U.S. Immigration and Naturalization Service.

## 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

*Principles of Consolidation*

The consolidated financial statements include the accounts of the Company and its wholly owned subsidiary, Biometrica Systems, Inc. for the years ended December 31, 2002, 2003 and for the three month periods ended March 30, 2003 and March 28, 2004. The consolidated financial statements include the accounts of its wholly owned subsidiaries, Viisage AG and Trans Digital Technologies for the three month period ended March 28, 2004. Operating results for Viisage AG and Trans Digital Technologies are included from their dates of acquisition. All significant inter-company balances and transactions have been eliminated.

F-7

Table of Contents

**VIISAGE TECHNOLOGY, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Information for the three-month periods ended March 30, 2003**
**and March 28, 2004 is unaudited)**

*Basis of Presentation*

The accompanying unaudited balance sheet as of March 28, 2004 and the related unaudited statements of operations and cash flows for the three-month periods ended March 30, 2003 and March 28, 2004 and the unaudited statement of changes in stockholders' equity for the three months ended March 28, 2004, have been prepared pursuant to the rules and regulations of the Securities and Exchange Commission. Certain information and footnote disclosures normally included in financial statements prepared in accordance with accounting principles generally accepted in the United States of America have been condensed or omitted pursuant to such rules and regulations.

In the opinion of management, all adjustments (which include only normal recurring adjustments) necessary to present fairly the financial position, results of operations, and cash flows as of March 28, 2004 and for the periods mentioned above have been made. The results of operations for the three-month period ended March 28, 2004 are not necessarily indicative of the operating results for the full year.

*Use of Estimates*

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

*Computation of Net Loss per Share*

We follow SFAS No. 128, *Earnings Per Share*, where basic loss per share is computed by dividing loss available to common shareholders by the weighted average number of common shares outstanding. The computation of diluted loss per share is similar to the basic loss per share computation except the denominator is increased to include the number of additional shares that would have been outstanding if the dilutive potential common shares had been issued. In addition, the numerator is adjusted for any changes in income or loss that would result from the assumed conversions of those potential shares.

Basic and diluted loss per share calculations are as follows (in thousands):

| | For the Year Ended December 31, | | | For the Three Months Ended | |
|---|---|---|---|---|---|
| | 2001 | 2002 | 2003 | March 30, 2003 | March 28, 2004 |
| | | | | (unaudited) | |
| Net loss available to common shareholders used in basic and diluted EPS | $(1,539) | $(9,530) | $(17,660) | $(14,496) | $(1,632) |
| Weighted average common shares used in basic EPS | 1 6,265 | 2 0,046 | 21,445 | 20,258 | 31,362 |
| Effect of dilutive securities | — | — | — | — | — |
| Weighted average common shares and dilutive potential common shares used in dilutive EPS | 1 6,265 | 2 0,046 | 21,445 | 20,258 | 31,362 |

The diluted per share amounts do not reflect the impact of options outstanding, the conversion of convertible preferred stock, or stock warrants, for approximately 3,163,000, 3,382,000, 4,152,000, 3,735,000 and 5,379,000 shares at December 31, 2001, 2002 and 2003, March 30, 2003 and March 28, 2004, respectively because the effect of each is antidilutive.

F-8

Table of Contents

**VIISAGE TECHNOLOGY, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Information for the three-month periods ended March 30, 2003**
**and March 28, 2004 is unaudited)**

*Contract Revenue and Cost Recognition*

For the year ended December 31, 2003 and the three months ended March 30, 2003, we incurred a non-cash charge of $12.1 million representing the cumulative effect of a change in accounting principle related to our adoption of Emerging Issues Task Force 00-21, *Accounting for Revenue Arrangements with Multiple Deliverables*, or EITF 00-21, on a cumulative basis as of January 1, 2003.

*Secure Credentials Revenue and Cost Recognition*

We deliver solutions under secure credential contracts primarily to federal and state government customers. We recognize revenue when pervasive evidence of a sales arrangement exists, delivery occurs or services are rendered, the sales price is fixed or determinable and collectibility is reasonably assured.

In some cases, we generate revenue from the sale of products in which title passes to the customer. In these cases, we recognize revenue when the products are shipped and accepted by the customer. Services revenue under these contracts consists of preventative and remedial maintenance on printing systems. We also provide on site technical support and consulting services to our customers. Revenue on fixed price services is recognized ratably over the service period which approximates the timing of the services rendered. Revenue on time and material services is recognized as the services are rendered. Expenses on all services are recognized when the costs are incurred.

When elements such as products and services are contained in a single arrangement, or in related arrangements with the same customer, we allocate revenue to each element based on its relative fair value, provided that such element meets the criteria for treatment as a separate unit of accounting. The price charged when the element is sold separately generally determines fair value.

We have secure credential contracts, generally with state governments for the production of drivers' licenses and other identification credentials, where we have determined that we have multiple elements and where the title to equipment installed to produce these credentials does not pass to the customer. Under these contracts, the first element consists of hardware, system design, implementation, training, consumables management, maintenance and support which is accounted for as equipment and related executory services under lease in accordance with SFAS No. 13. The second element consists of customized software which is accounted for as a long term contract in accordance with AICPA Statement of Position 97-2, *Software Revenue Recognition*, or SOP 97-2, and Statement of Position 81-1, *Accounting for Performance of Construction-Type and Certain Production-Type Contracts*, or SOP 81-1, on a units of delivery method of measurement.

Costs related to the hardware element of these contracts are capitalized on the balance sheet and are depreciated over the remaining contract term beginning when the system goes into service. The delivery of these credentials typically requires us to customize, design and install equipment and software at customer locations, as well as perform training, supply consumables, maintain the equipment and provide support services. Nonperformance of training, consumables management, maintenance and support services would prevent us from receiving payment for the costs incurred in the customization, design and installation of the system. EITF 00-21 limits the amount of revenue allocable to the customization, design and installation of the system to the amount that is not contingent upon the production of credentials. Revenue on these contracts under EITF 00-21 is earned based on, and is contingent upon, the production of credentials from the system. Due to the contingent performance of credential production in our secure credentials contracts, we defer revenue recognition for the system design and installation phase of our contracts, including customized software and equipment, and recognize revenue as credentials are produced.

F-9

Table of Contents

## VIISAGE TECHNOLOGY, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
#### (Information for the three-month periods ended March 30, 2003
#### and March 28, 2004 is unaudited)

Costs related to the customized software element of our secure credentials contracts where title to the hardware element does not pass to the customer are capitalized on the balance sheet during the period in which we are designing and installing the system and are amortized over the remaining contract term beginning when the system goes into service. Costs related to this element of our secure credentials contracts incurred after the system is in service are expensed as incurred. Revenue related to this element of our secure credentials contracts is recorded as credentials are produced by the system.

Our secure credentials contracts related to the delivery of drivers' licenses and identification credentials typically provide that the state department of transportation, or similar agency, will pay a fixed price per credential produced utilizing a system we design, implement and support. Our fixed pricing includes charges for the use of the system, materials and the data that is stored on the credentials. Prices under these contracts vary depending on, among other things:

- Design and integration complexities;
- Nature and number of workstations and sites installed;
- Projected number of secure credentials to be produced;
- Size of the database;
- Level of post-installation involvement that will be required of us and
- Competitive environment.

Prior to the adoption of EITF 00-21, we recognized revenue and costs associated with our secure credentials contracts related to the delivery of drivers' licenses and identification credentials as a single accounting element using the percentage-of-completion methodology.

*Biometrics Segment Revenue and Cost Recognition*

Within our biometrics segment, our contracts typically provide for the development, customization and installation of face recognition systems for government agencies, law enforcement agencies and businesses. These contracts are generally fixed price, and include milestones and acceptance criteria for the various deliverables under the contract. Contract prices vary depending on, among other things, design and integration complexities, the nature and number of workstations and sites, the size of the database, the level of post-installation support and the competitive environment. In certain cases, we provide licenses of off-the-shelf versions of our face recognition software on a per user basis.

We recognize revenue under these contracts using the percentage-of-completion methodology in accordance with SOP 81-1. We use the percentage-of-completion methodology to account for revenue under these contracts because:

- A high level of certainty exists regarding expected cash flows from these contracts and
- A reliable basis exists for determining the percentage of the contract that will be completed at the end of the accounting period.

We measure the percentage complete as costs are incurred or for contracts based on milestones, revenue is recognized when scheduled performance milestones and customer acceptance criteria have been achieved. These milestones are specific events or deliverables clearly identified in the contract. We recognize revenue based on the total milestone billable to the customer less revenue related to any future maintenance requirements. Billings occur under these contracts when the milestone is delivered and accepted by the customer. Milestones can include customized systems, installation and services as defined by the contract.

F-10

Table of Contents

## VIISAGE TECHNOLOGY, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Information for the three-month periods ended March 30, 2003
and March 28, 2004 is unaudited)

We record costs and estimated earnings in excess of billings under these contracts as current assets. We record billings in excess of costs and estimated earnings and accrued contract costs as current liabilities.

Under SOP 97-2 revenue related to software licenses of off-the-shelf face recognition software is recognized when:

- Persuasive evidence of an arrangement exists;
- Delivery has occurred;
- The sales price is fixed and determinable;
- Collection is probable and
- There are no post delivery obligations.

We adopted EITF 00-21 on a cumulative basis as of January 1, 2003. Based on our evaluation of biometrics contracts and the application of the new guidance, the adoption of EITF 00-21 did not have an impact on the accounting for revenue from biometrics systems under long-term contracts.

*Cash and Cash Equivalents*

We consider all highly liquid instruments, with maturity of three months or less when acquired, to be cash equivalents. As of December 31, 2002, 2003 and March 28, 2004, cash and cash equivalents consisted entirely of cash and exclude approximately $7.4 million, $6.3 million and $3.1 million, respectively, the use of which was restricted under our term loan agreement.

*Fair Value of Financial Instruments*

The carrying amounts of our financial instruments, including cash and cash equivalents, accounts receivable and payable and short and long-term borrowings, approximate fair values.

*Accounts Receivable and Concentrations of Credit Risk*

Accounts receivable are due principally from government agencies and contractors to government agencies, under long-term contracts that we entered into with our customers. Billings rendered in connection with work performed are in accordance with the terms of the contract and collateral is not required. Management periodically reviews accounts receivable for possible uncollectible amounts. In the event management determines a specific need for an allowance, a provision for doubtful accounts is provided. As of December 31, 2002, 2003 and March 28, 2004, management determined that no allowance for doubtful accounts was necessary.

For the year ended December 31, 2001, four customers, Illinois Secretary of State, Unisys Corporation (Florida Department of Safety and Motor Vehicles), Kentucky Transportation Cabinet and Pennsylvania Department of Transportation, each accounted for over 10% of our revenue and an aggregate of 49% of revenues for the year. For the year ended December 31, 2002, two customers, Connecticut Department of Information Technology and Mississippi Department of ITS each accounted for over 10% of our revenue and an aggregate of 22% of revenues for the year. As of December 31, 2002, the accounts receivable balances for these customers totaled approximately $349,000. For the year ended December 31, 2003, two customers, Pennsylvania Department of Transportation and Illinois Secretary of State, each accounted for more than 10% of our revenue and an aggregate of 26% of our revenue. As of December 31, 2003, the accounts receivable from these customers

F-11

Table of Contents

**VIISAGE TECHNOLOGY, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Information for the three-month periods ended March 30, 2003**
**and March 28, 2004 is unaudited)**

was $1.4 million. For the three months ended March 28, 2004, one customer, the U.S. Department of State, accounted for an aggregate of 13% of revenue for the period. As of March 28, 2004, the accounts receivable balance for this customer totaled approximately $863,000.

*Property and Equipment*

Property and equipment are recorded at cost or the lesser of fair value or the present value of minimum lease payments for items acquired under capital leases. Depreciation and amortization are calculated using the straight- line or usage-based methods over the estimated useful lives of the related assets (3 to 7 years) or the lease term, whichever is shorter.

System assets related to the hardware and customized software elements of our secure credentials contracts after January 1, 2003 are depreciated over the related contract terms using the straight-line method beginning when the system goes into service. The straight line method approximates the ratio that current gross revenues for the contract bear to the total of current and anticipated future gross revenues for that contract in accordance with Statement of Financial Accounting Standards (SFAS) No. 86, *Accounting for the Costs of Computer Software to be Sold, Leased, or Otherwise Marketed.*

*Intangible Assets*

Intangible assets consist primarily of completed technology, patents, customer lists and other assets primarily arising from the acquisition of a business or business assets. These intangible assets are amortized using the straight-line method over their estimated useful lives of 5 to 17 years (in thousands).

|  | December 31, | | March 28, 2004 | Weighted Average Useful Life |
|---|---|---|---|---|
|  | 2002 | 2003 | (unaudited) |  |
| Gross carrying amount: |  |  |  |  |
| Patents | $ 534 | $ 606 | $ 612 | 17 years |
| Completed technology | 2,384 | 2,384 | 4,445 | 5 years |
| Customer lists | 596 | 596 | 596 | 10 years |
| Acquired contracts | — | — | 14,430 | 5 years |
| Total intangible assets | 3,514 | 3,586 | 20,083 |  |
| Accumulated amortization: |  |  |  |  |
| Patents | (52) | (80) | (90) |  |
| Completed technology | (265) | (703) | (953) |  |
| Customer lists | (50) | (110) | (138) |  |
| Acquired contracts | — | — | (383) |  |
| Total accumulated amortization | (367) | (893) | (1,564) |  |
| Intangible assets, net | $3,147 | $2,693 | $ 18,519 |  |

F-12

Table of Contents

# VIISAGE TECHNOLOGY, INC.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (Information for the three-month periods ended March 30, 2003 and March 28, 2004 is unaudited)

Amortization expense related to intangible assets was $3,500, $360,000, $526,000, $118,000 and $671,000 for the years ended December 31, 2001, 2002, 2003 and for the three months ended March 30, 2003 and March 28, 2004, respectively. Estimated amortization of our intangible assets for the next five fiscal years is as follows (in thousands):

| Estimated amortization expense for the year ended December 31, (intangible assets only) | |
| --- | --- |
| 2004 | $3,549 |
| 2005 | 3,851 |
| 2006 | 3,741 |
| 2007 | 3,732 |
| 2008 | 3,271 |

*Long Lived Assets*

We evaluate long-lived assets with finite lives, such as intangible assets, property and equipment and certain other assets, for impairment in accordance with Financial Accounting Standards Board Statement of Financial Accounting Standards No. 144 (SFAS 144), *Accounting for the Impairment or Disposal of Long-Lived Assets*. We record an impairment charge whenever events or changes in circumstances indicate that the carrying amount of the assets may not be recoverable through the estimated undiscounted future cash flows from the use of these assets. When any such impairment exists, the related assets are written down to fair value.

*Research and Development*

Research and development costs are charged to expense as incurred.

*Software Development*

We review software development costs incurred in accordance with the provisions of Statement of Financial Accounting Standards (SFAS) No. 86, *Accounting for the Costs of Computer Software to be Sold, Leased, or Otherwise Marketed*, which requires that certain costs incurred in the development of computer software to be sold or leased be capitalized once technological feasibility is reached. For the years ended December 31, 2001 and 2003, we did not capitalize any software development costs because development costs incurred subsequent to the establishment of technological feasibility were not material. For the year ended December 31, 2002 we capitalized $207,000 in software development costs, which is being amortized over three years. We recorded amortization expense of $69,000, $34,000 and $17,000 related to this asset in fiscal 2003 and 2002 and for the three months ended March 28, 2004, respectively.

Costs related to software developed for internal use are expensed as incurred until technological feasibility has been reached. Costs for externally purchased software is capitalized and depreciated over its estimated useful life not to exceed five years.

*Income Taxes*

We account for income taxes under SFAS No. 109, *Accounting for Income Taxes*. Deferred tax assets and liabilities are recognized for the estimated future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. Deferred income tax assets and liabilities are measured using currently enacted tax rates. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. Due

F-13

Table of Contents

### VIISAGE TECHNOLOGY, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
**(Information for the three-month periods ended March 30, 2003**
**and March 28, 2004 is unaudited)**

to the uncertainty surrounding the realization of our net deferred tax asset, we have provided a full valuation allowance against this amount.

*Stock-Based Compensation*

We account for our stock-based compensation plans under Accounting Principles Board Opinion No. 25, *Accounting for Stock Issued to Employees*, and accordingly account for employee stock based compensation utilizing the intrinsic value method. SFAS No. 123, *Accounting for Stock-Based Compensation*, establishes a fair value based method of accounting for stock-based compensation plans. We have adopted the disclosure only alternative under SFAS No. 123, which requires disclosure of the pro forma effects on earnings and earnings per share as if SFAS No. 123 had been adopted as well as certain other information.

In December 2002, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards No. 148, *Accounting for Stock-Based Compensation—Transition and Disclosure* ("FAS 148"), which (i) amends FAS Statement No. 123, *Accounting for Stock-Based Compensation*, to provide alternative methods of transition for an entity that voluntarily changes to the fair value based method of accounting for stock-based employee compensation (ii) amends the disclosure provisions of FAS 123 to require prominent disclosure about the effects on reported net income of an entity's accounting policy decisions with respect to stock-based employee compensation and (iii) amends APB Opinion No. 28, *Interim Financial Reporting*, to require disclosure about those effects in interim financial information. Items (ii) and (iii) of the new requirements in FAS 148 are effective for financial statements for fiscal years ending after December 15, 2002. We initially adopted FAS 148 beginning for the fiscal year ended December 31, 2002 and continue to account for stock-based compensation utilizing the intrinsic value method. The additional disclosures required by FAS 148 are as follows (in thousands):

| | For the Year Ended December 31, | | | For the Three Months Ended | |
| --- | --- | --- | --- | --- | --- |
| | 2001 | 2002 | 2003 | March 30, 2003 | March 28, 2004 |
| | | | | (unaudited) | |
| Net loss as reported | $(1,534) | $ (9,530) | $(17,660) | $(14,496) | $ (1,632) |
| Add: stock based employee compensation expense included in reported net loss | — | — | — | — | — |
| Deduct: total stock based employee compensation determined under fair value based method for all awards, net of tax | ( 3,036) | (2,279) | (3,358) | (602) | (993) |
| Pro forma net loss | $(4,570) | $(11,809) | $(21,018) | $(15,098) | $ (2,625) |
| Loss per share: | | | | | |
| Basic and diluted, as reported | $( 0.09) | $ (0.48) | $ (0.82) | $ (0.72) | $ (0.05) |
| Basic and diluted, pro forma | $( 0.28) | $ (0.59) | $ (0.98) | $ (0.75) | $ (0.08) |

*Recent Accounting Pronouncements*

In April 2003, the FASB issued SFAS No. 149 which amends and clarifies financial accounting and reporting for derivative instruments, including certain derivative instruments embedded in other contracts, and for hedging activities under SFAS No. 133. In particular, SFAS No. 149 clarifies under what circumstances a

F-14

Table of Contents

## VIISAGE TECHNOLOGY, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Information for the three-month periods ended March 30, 2003
and March 28, 2004 is unaudited)

contract with an initial net investment meets the characteristic of a derivative discussed in SFAS No. 133, clarifies when a derivative contains a financing component, amends the definition of an underlying (as initially defined in SFAS No. 133) to conform it to language used in FIN No. 45, Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others, and amends certain other existing pronouncements. SFAS No. 149 is effective for all contracts entered into or modified after June 30, 2003, subject to certain exceptions. The adoption of this statement did not have an impact on our financial position, results of operations, or cash flows.

In May 2003, the FASB issued SFAS No. 150, *Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity*, which establishes standards for how an issuer classifies and measures certain financial instruments with characteristics of both liabilities and equity. SFAS No. 150 requires that an issuer classify a financial instrument that is within its scope as a liability (or an asset in some circumstances), while many of such instruments were previously classified as equity or "mezzanine" equity. The statement also requires that income statement treatment be consistent with the balance sheet classification. That is, if the instrument is classified as a liability, payments to the holders are interest expense, not dividends, and changes in value are recorded in earnings. The statement relates to three specific categories of instruments: mandatorily redeemable shares, freestanding written put options and forward contracts that obligate an entity to purchase its own shares, and freestanding contracts that obligate an entity to pay with its own shares in amounts that are either unrelated, or inversely related, to the price of the shares. SFAS No. 150 is effective immediately for financial instruments entered into or modified after May 31, 2003 and otherwise is effective in the first interim period beginning after June 15, 2003. The adoption of this statement did not have an impact on our financial position, results of operations, or cash flows.

In January 2003, the FASB issued Financial Interpretation No. 46, *Consolidation of Variable Interest Entities* (FIN 46), which requires the consolidation of certain variable interest entities. In December 2003, the FASB issued a revision to FIN 46. The revised FIN 46, which replaces the original FIN 46 issued in January 2003, clarifies the application of Accounting Research Bulletin No. 51, *Consolidated Financial Statements*, to certain entities in which equity investors do not have the characteristics of a controlling financial interest or do not have sufficient equity at risk for the entity to finance its activities without additional subordinated financial support. While this interpretation exempts certain entities from its requirements, it also expands the definition of a variable interest entity ("VIE") to a broader group of entities than those previously considered special-purpose entities ("SPE's") and specifies the criteria under which it is appropriate for an investor to consolidate VIE's. Application of the revised FIN 46 is required in financial statements of public entities that have interest in structures that are commonly referred to as SPE's for periods ending after December 15, 2003. For all other types of VIE's, application of the revised FIN 46 by public entities is required for periods ending after March 15, 2004. The application of this interpretation with respect to structures commonly referred to as SPE's did not have a material impact on our financial position, results of operations, or cash flows. The application of this interpretation with respect to other types of VIE's did not have a material impact on our financial position, results of operations or cash flows.

In December 2003, the Securities and Exchange Commission ("SEC") published SAB No. 104, *Revenue Recognition*. SAB No. 104 was effective upon issuance and supersedes SAB No. 101, *Revenue Recognition in Financial Statements*, and rescinds the accounting guidance contained in SAB No. 101 related to multiple-element revenue arrangements that was superseded by EITF Issue No. 00-21. Accordingly, SAB No. 104 rescinds portions of the interpretive guidance included in Topic 13 of the codification of staff accounting bulletins. While the wording of SAB No. 104 has changed to reflect the guidance of EITF 00-21, the revenue recognition principles of SAB No. 101 have remained largely unchanged. The adoption of SAB No. 104 did not have a material effect on our financial position, results of operations, or cash flows.

F-15

Table of Contents

## VIISAGE TECHNOLOGY, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Information for the three-month periods ended March 30, 2003
and March 28, 2004 is unaudited)

In March 2004, the Financial Accounting Standards Board ("FASB") issued a proposed Statement, "Share-Based Payment", that addresses the accounting for share-based payment transactions in which an enterprise receives employee services in exchange for (a) equity instruments of the enterprise or (b) liabilities that are based on the fair value of the enterprise's equity instruments or that may be settled by the issuance of such equity instruments. The proposed statement would eliminate the ability to account for share-based compensation transactions using APB Opinion No. 25, "Accounting for Stock Issued to Employees", and would generally require that such transactions be accounted for using a fair value-based method. As discussed in Note 2, we currently account for share-based compensation transactions using APB Opinion No. 25. If this statement is issued, the adoption of this interpretation will have a material negative impact on our consolidated financial position and results of operations, the level of which we are currently assessing.

## 3. RELATED PARTY TRANSACTIONS

*Debt*

In May 2003 we entered into a loan agreement with Lau Technologies, a significant shareholder of Viisage, which provided for four term notes aggregating $7.3 million but not to exceed an outstanding principal balance of $7.0 million at any point in time. Two of these term notes, in the amounts of approximately $1.6 million and $287,000, replaced existing system finance lease obligations we had with a commercial leasing organization. These finance lease obligations were paid in full with the proceeds of the two new term notes. The remaining two new term notes with borrowing limits of $3.0 million and $2.5 million, are additional financing related to two new state contracts. All four new term notes bear interest at an annual rate of 8.5%. We believe that the terms of this loan agreement are the same as the terms that would have been provided to us by an unaffiliated lender. In particular, the financial covenants under this loan agreement are the same as the financial covenants under our loan agreement with our primary bank lender. We may draw funding on these notes as needed to meet our obligations for equipment purchases on the related state contracts. As of December 31, 2003 we had approximately $4.1 million outstanding under this loan agreement, leaving approximately $2.9 million available for future needs. Interest expense related to these term notes was $229,000 for the year ended December 31, 2003. As of March 28, 2004 we had approximately $4.9 million outstanding under this loan agreement. Interest expense related to these term notes was approximately $95,000 for the three months ended March 28, 2004. (See Note 6 for further information).

*Licenses*

In fiscal 2001 and 2000, we obtained from Lau an exclusive, perpetual, worldwide license to use a U.S. patent purchased from Daozeng Lu and Simon Lu, and all improvements thereto, which relates to a system for automatically verifying the identity of an individual using identification parameters that are carried on an escort memory such as an identification or credit card. In 2002, we purchased this patent from Lau as part of the acquisition of Lau's face recognition assets.

*Other*

On January 10, 2002, we acquired the assets of Lau Security Systems, including technology, patents, contracts and distribution channels. In return, we agreed to pay Lau a royalty of 3.1% of face recognition revenues over the next 12 and one half years, up to an aggregate maximum of $27.5 million and assume certain liabilities related to the acquired business. Royalty expense included in operating expenses was approximately $108,000, $101,000, $34,000 and $38,000 for the years ended December 31, 2002 and 2003 and for the three months ended March 30, 2003 and March 28, 2004, respectively. There were no royalties paid to Lau for these technology patents in 2001.

F-16

Table of Contents

## VIISAGE TECHNOLOGY, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
#### (Information for the three-month periods ended March 30, 2003
#### and March 28, 2004 is unaudited)

In connection with the purchase of the business of Lau Security Systems, we entered into consulting agreements with Denis K. Berube, Executive Vice President and Chief Operating Officer of Lau and Chairman of our Board, and Joanna Lau, President and Chief Executive Officer of Lau and the beneficial owner of more than 5% of our outstanding stock. Under the consulting agreements, each of Mr. Berube and Ms. Lau will receive annual compensation of $125,000. Each agreement terminates at the earlier of the tenth anniversary of the purchase or the commencement of the consultant's full-time employment elsewhere.

We provided administrative services for Lau for an annual fee of approximately $114,000 and $109,000 for the years ended December 31, 2002 and 2003, respectively. This arrangement was terminated on January 2004.

A Use and Occupancy Agreement with Lau requires us to pay our proportionate share of the cost of shared facilities and office services including rent, insurance, property taxes, utilities and other operating expenses, based on square footage or equipment utilized. The annual fee for facilities and services is revised for changes in space utilized and in operating expenses. For the years ended December 31, 2001, 2002, 2003 and for the three months ended March 30, 2003 and March 28, 2004 fees paid under this use and occupancy agreement were $360,000, $699,000, $725,000, $238,000 and $61,000, respectively. This agreement was terminated in January 2004.

Our employees previously participated in various Lau employee benefit plans. We paid our proportionate share of the costs of such plans based on the number of participating employees.

At December 31, 2002 we had $50,000 of accounts receivable due from Lau and approximately $126,000 of accounts payable due to Lau. At December 31, 2003 there was no accounts receivable balance due from Lau and there was $23,000 of accounts payable due to Lau. At March 28, 2004 there was no accounts receivable balance due from Lau and there was $23,000 payable due to Lau.

In connection with the acquisition of TDT on February 14, 2004, we issued a promissory note to B.G. Beck, the former President and Chief Executive Officer of TDT and Vice Chairman of our Board, in the amount of $15.3 million, which is secured by some of TDT's assets. This note bears interest at an annual rate of 8.5% and is payable in equal installments of principle and interest on December 1, 2004, May 1, 2005 and December 1, 2005. We believe that the terms of this loan agreement are the same as the terms that would have been provided to us by an unaffiliated lender. In particular, the financial covenants under this loan agreement are the same as the financial covenants under our loan agreement with our primary bank lender. Interest expense related to this note was approximately $162,000 for the three months ended March 28, 2004.

In connection with the acquisition of TDT, we also entered into a consulting agreement with Mr. Beck. Under the agreement, Mr. Beck will receive annual compensation of $300,000 for two years, provided that Mr. Beck devotes his full business time to developing business opportunities for us.

In connection with the acquisition of ZN, we entered into a consulting agreement with Yon AG, of which Marcel Yon, a member of our Board, is the Chief Executive Officer and sole shareholder. Under the consulting agreement, Yon AG will receive annual compensation of approximately $110,000 and is eligible for up to $55,000 in performance bonuses. This agreement can be terminated at any time with six months notice. We also lease certain office space in Bochum, Germany that is owned by Zentrum für Neuroinformatik GmbH, of which Mr. Yon is the Chief Executive Officer and beneficially owns, directly and indirectly, approximately 38% of its outstanding share capital. We believe the terms of the lease agreement are consistent with market rates. The lease agreement may be terminated at any time with six months notice.

F-17

<div align="center">

**VIISAGE TECHNOLOGY, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Information for the three-month periods ended March 30, 2003**
**and March 28, 2004 is unaudited)**

</div>

We have employment and noncompetition agreements with certain officers. Such agreements provide for employment and related compensation, and restrict the individuals from competing, as defined, with us during the terms of their respective agreements and for up to two years thereafter. The agreements also provide for stock options under our stock option plan and for severance payments upon termination under circumstances defined in such agreements.

## 4. PROPERTY AND EQUIPMENT

Property and equipment are summarized as follows (in thousands):

| | December 31, | | March 28, 2004 | Weighted Average Useful Life |
|---|---|---|---|---|
| | 2002 | 2003 | | |
| | | | (unaudited) | |
| System assets held under capital leases | $14,327 | $ 9,455 | $ 1,355 | Contract period |
| System assets | 16,216 | 42,702 | 51,017 | Contract period |
| Computer and office equipment | 1,185 | 1,654 | 2,845 | 5 years |
| | 31,728 | 53,811 | 55,217 | |
| Less accumulated depreciation | 15,099 | 28,723 | 30,407 | |
| | $16,629 | $25,088 | $ 24,810 | |

We had additions to system assets totaling $10.2 million for the year ended December 31, 2003 and $215,000 for the three months ended March 28, 2004. The net book value of system assets under capital leases was approximately $4.7 million, $3.9 million and $1.3 million at December 31, 2002, 2003 and March 28, 2004, respectively. Depreciation expense on fixed assets for the years ended December 31, 2001, 2002, 2003, March 30, 2003 and March 28, 2004 was approximately $4.5 million, $6.8 million, $6.3 million, $1.7 million and $1.6 million, respectively.

## 5. ACCOUNTS PAYABLE AND ACCRUED EXPENSES

Accounts payable and accrued expenses consist of the following (in thousands):

| | December 31, | | March 28, 2004 |
|---|---|---|---|
| | 2002 | 2003 | |
| | | | (unaudited) |
| Accounts payable | $3,441 | $3,673 | $ 7,799 |
| Other accrued expenses | 798 | 1,419 | 2,283 |
| Accrued bonus | — | 830 | 205 |
| Accrued payroll and related taxes | 393 | 462 | 276 |
| Accrued vacation | 478 | 436 | 488 |
| Accrued earned and unbilled costs | 1,487 | — | — |
| Accrued restructuring costs | 420 | 31 | — |
| | $7,017 | $6,851 | $ 11,051 |

## 6. LONG TERM DEBT AND PROJECT FINANCING ARRANGEMENTS

In February 2004, we entered into a new loan agreement with Commerce Bank and Trust Company, or Commerce, that superseded the original loan agreement for our existing term loans. Under this new agreement, we borrowed an additional $3.0 million and reduced the required restricted cash balance under the new agreement with Commerce by $2.0 million. We also negotiated a reduction of $1.2 million of restricted cash with

<div align="center">F-18</div>

Table of Contents

**VIISAGE TECHNOLOGY, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Information for the three-month periods ended March 30, 2003**
**and March 28, 2004 is unaudited)**

Lau, concurrent with the execution of the new loan agreement with Commerce. The $3.0 million term loan provided by this agreement bears interest at an annual rate of 7.3%. The following table lists the approximate term note information for Commerce and Lau as of the dates indicated (in thousands):

| Lender | Original Loan Amount | Monthly Payment Provision | Date of Loan | Due Date | Annual Interest Rate | Outstanding Principal Balance | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | December 31, | | March 28, 2004 |
| | | | | | | 2002 | 2003 | |
| | | | | | | | | (unaudited) |
| Commerce | $4,000 | $ 84 | 2/7/2001 | 6/20/2006 | 8.00% | $ 3,044 | $ 2,259 | $ 2,053 |
| Commerce | 3,200 | 72 | 9/11/2001 | 3/11/2006 | 6.25% | 2,522 | 1,800 | 1,612 |
| Commerce | 1,800 | 34 | 12/12/2002 | 12/31/2007 | 5.25% | 1,800 | 1,477 | 1,394 |
| Commerce | 1,500 | 27 | 12/12/2002 | 4/24/2008 | 5.25% | 1,500 | 1,255 | 1,191 |
| Commerce | 1,200 | 24 | 12/12/2002 | 6/24/2007 | 5.25% | 1,200 | 962 | 901 |
| Lau | 2,040 | 53 | 5/30/2003 | 6/30/2009 | 8.50% | — | 1,795 | 1,673 |
| Lau | 2,500 | 51 | 5/30/2003 | 5/30/2008 | 8.50% | — | 1,098 | 2,249 |
| Lau | 1,562 | 64 | 5/30/2003 | 8/30/2005 | 8.50% | — | 1,181 | 1,014 |
| Lau | 287 | 42 | 5/30/2003 | 12/30/2003 | 8.50% | — | — | — |
| Commerce | 3,000 | 36 | 2/27/2004 | 2/27/2007 | 7.30% | — | — | 2,924 |
| | $21,089 | $ 487 | | | | $10,066 | $11,827 | $ 15,011 |

In accordance with the new loan agreement the term notes are collateralized by certain of our assets and the related contract assets. We restructured our bank covenants to account for the impact of the closing of our transactions with ZN and TDT. We are required to maintain various financial covenants, including;

- a net loss for the year ending December 31, 2004 of not more than $500,000 and positive net after-tax income in each fiscal year thereafter

- a minimum tangible net worth (as defined in the loan agreement) of approximately $16.7 million for the second quarter of 2004, increasing each quarter thereafter

- our debt to tangible net worth ratio (as defined in the loan agreement) not to exceed the following quarterly benchmarks: 3.00:1.00 for the second quarter of 2004, 2.75:1.00 for the third quarter of 2004, and 2.20:1.00 for the fourth quarter of 2004

- our debt service coverage ratio (as defined in the loan agreement) must be greater than 0.48 for the first quarter of 2004, 1.25 for the second and third quarters of 2004 and 1.00 for the fourth quarter of 2004

- annual capital expenditures may not exceed $1.5 million for the year ending December 31, 2004 and no single capital expenditure may exceed $250,000

Additionally, in accordance with the new agreement, we must maintain $3.0 million of cash on deposit with the lender through September 29, 2004, $4.0 million through November 29, 2004 and $5.0 million by December 31, 2004 and thereafter. This amount is recorded as restricted cash in long term assets. As of March 28, 2004 we had an additional $120,000 of restricted cash at Commerce related to our loan agreement with Lau.

We also had one capital lease arrangement in which we were required to maintain the same financial ratios and minimum levels of tangible capital funds, as stated above. Pursuant to this arrangement, the lessor purchases certain of our digital identification systems and leases them back to us for deployment with identified and contracted customers approved by the lessor. The lessor retains title to systems and has an assignment of our

F-19

Table of Contents

# VIISAGE TECHNOLOGY, INC.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (Information for the three-month periods ended March 30, 2003 and March 28, 2004 is unaudited)

rights under the related customer contracts, including rights to use the software and technology underlying the related systems. Under these arrangements, the lessor bears the credit risk associated with payments by our customers, but we bear performance and appropriation risk and are generally required to repurchase a system in the event of a termination by a customer for any reason except credit default. These project lease arrangements are accounted for as capital leases. At December 31, 2003 and 2002, we had approximately $318,000 and $5.0 million outstanding under these lease-financing arrangements respectively. At March 28, 2004, this lease-financing arrangement was paid in full.

In April 2003 we entered into an arrangement for approximately $1.5 million of equipment financing with three of our suppliers. These project lease arrangements are accounted for as capital leases. There are no financial covenants associated with these leasing arrangements. As of March 28, 2004 we had outstanding $611,000 under these arrangements. As of December 31, 2003 we had outstanding $876,000 under these arrangements. The interest rates on these capital leases are between 6% and 8% and are fixed. The terms of these leases range from 12 months to 60 months. In August 2003 we entered into an arrangement for financing of database licenses with another vendor. As of December 31, 2003 we have outstanding $600,000 under this arrangement.

In the first quarter of 2004 we purchased an asset totaling $800,000 which is payable in installments over four years. On the March 28, 2004 balance sheet, $200,000 is included in accounts payable and other accrued expenses and $600,000 is recorded under other liabilities.

We are in compliance with our bank covenants as of March 28, 2004 and December 31, 2003 and we believe that we will be able to maintain compliance with our bank covenants in the future. However, this expectation is dependent on achieving our business plan. If we do not remain in compliance with the covenants in our financing arrangements, the lenders and the lessors could require immediate repayment of outstanding amounts. As of March 28, 2004, there was approximately $15.0 million outstanding under our credit facilities with Commerce and Lau.

At December 31, 2003, approximate future minimum annual payments under project financing capital leases and maturities of term notes are as follows (in thousands):

|  | Capital Leases | | Term Notes | |
|---|---:|---|---:|---|
| Year ending: | | | | |
| 2004 | $ | 1,314 | $ | 4,209 |
| 2005 | | 398 | | 4,235 |
| 2006 | | 81 | | 2,244 |
| 2007 | | 61 | | 1,008 |
| 2008 | | 20 | | 131 |
| Total minimum payments | | 1,874 | | 11,827 |
| Less interest portion | | 80 | | |
| Present value of net minimum lease payments | | 1,794 | | |
| Less current portion | | 1,265 | | 4,209 |
| Long term portion | $ | 529 | $ | 7,618 |

The above table excludes payments on the promissory note issued to B.G. Beck in connection with the acquisition of TDT. This note is payable in equal principal installments of $5.1 million on December 1, 2004, May 1, 2005 and December 1, 2005.

F-20

Table of Contents

## VIISAGE TECHNOLOGY, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
#### (Information for the three-month periods ended March 30, 2003
#### and March 28, 2004 is unaudited)

### 7.   COMMITMENTS AND CONTINGENCIES

*Leases*

We lease certain equipment and facilities used in its operations and the shared facilities discussed in Note 3. Rental expense for operating leases for the years 2001, 2002, and 2003 was approximately $360,000, $1.3 million, and $1.4 million, respectively.

At December 31, 2003, approximate future minimum annual payments under operating leases, including future lease payments for our new corporate headquarters (lease signed in January 2004), are as follows (in thousands):

|                    | Operating Leases |
|--------------------|------------------:|
| Year ending:       |                   |
| 2004               | $          637    |
| 2005               | 379               |
| 2006               | 395               |
| 2007               | 411               |
| 2008               | 427               |
| 2009               | 144               |
|                    | $        2,393    |

*Employment Agreements*

We have employment agreements with certain individuals that provide for up to one year of severance payments as a result of early termination by us. The agreements also provide for non-competition either directly or indirectly for up to two years after the termination of employment.

### 8.   LITIGATION

In July 2003, a Georgia court issued a preliminary injunction prohibiting Georgia's Department of Motor Vehicle Safety from continuing to work with us to install the State's new drivers' license system. The injunction is the result of a lawsuit filed in March 2003 by one of our competitors alleging that the Department of Motor Vehicle Safety did not comply with its own bid process when it selected a vendor for its new digital drivers' license program. In July 2004, we reached a settlement agreement with the State pursuant to which the Department of Motor Vehicle Safety terminated the contract for convenience and agreed to pay us $2.0 million in cash and the State agreed to purchase certain equipment from us for $500,000. The Department of Motor Vehicle Safety has filed a motion with the Georgia court to dismiss the case based upon the termination of the contract. The agency also has filed an affidavit stating that it intends to issue a new request for proposals for a digital drivers' license system before the end of October 2004. As a result of the termination of the contract, we will lose up to $19.7 million in revenue that we expected to recognize over the next five and one-half years, which was included in our $176 million of backlog at March 28, 2004, unless we are able to win the new contract for the digital drivers' license system and the revenues from such new contract are substantially similar to the terminated contract. While we believe we can utilize the remaining $2.8 million in assets being retained by us from the Georgia contract either in Georgia, if we win the contract based on the new request for proposals, or on alternative projects, to the extent that we are unable to utilize these assets or realize value through a sale of these assets, we would be required to take a charge to earnings.

F-21

Table of Contents

**VIISAGE TECHNOLOGY, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Information for the three-month periods ended March 30, 2003**
**and March 28, 2004 is unaudited)**

## 9. RETIREMENT BENEFITS

We previously participated in the Lau 401(k) plan and paid our proportionate share of plan expenses based on the number of participants. Our costs for this plan amounted to approximately $99,000, $191,000 and $182,000 for the years ended December 31, 2001, 2002 and 2003, respectively, and approximately $51,000 and $0 for the three months ended March 30, 2003 and March 28, 2004, respectively. Effective January 1, 2003, we established the Viisage 401(k) plan. The plan permits pretax contributions by participants of up to 15% of base compensation. We may make discretionary contributions to the plan, subject to certain limitations. Participants are fully vested in their contributions and 20% of employer contributions vest per year.

We do not offer any post-retirement benefits.

## 10. INCOME TAXES

No provision for federal income taxes has been made for the years ended December 31, 2001, 2002 and 2003 or for the three months ended March 30, 2003 and March 28, 2004 due to net losses incurred in those periods. Income tax expense for the year ended December 31, 2003 represented state income taxes of $63,000. The provision for state income taxes for the period ended March 28, 2004 was approximately $25,000. A reconciliation of the federal statutory rate to our effective tax rate for the years ended December 31, 2001, 2002 and 2003 is as follows:

|  | For the Year Ended December 31, | | | For the Three Months Ended | |
|---|---|---|---|---|---|
|  | 2001 | 2002 | 2003 | March 30, 2003 | March 28, 2004 |
|  |  |  |  | (unaudited) | |
| Federal statutory rate | (34.0)% | (34.0)% | (34.0)% | (34.0)% | (34.0)% |
| State taxes, net of federal benefit | (6.0)% | (6.0)% | (6.0)% | (6.0)% | (6.0)% |
| Valuation allowance recorded | 40.0% | 40.0% | 40.0% | 40.0% | 40.0% |
|  | — % | — % | — % | — % | — % |

The components and approximate tax effects of our deferred tax assets and liabilities as of December 31, 2002 and 2003 are as follows (in thousands):

|  | December 31, | |
|---|---|---|
|  | 2002 | 2003 |
| Deferred tax assets (liabilities): |  |  |
| Net operating loss carryforwards for tax purposes | $ 15,728 | $ 16,628 |
| Basis differences related to contract assets | (5,051) | (1,792) |
| Property, plant and equipment | (140) | (377) |
| Accruals and other reserves | 190 | 247 |
| Net deferred tax asset before valuation allowance | 10,727 | 14,706 |
| Valuation allowance | ( 10,727) | (14,706) |
| Net deferred tax asset | $    — | $    — |

Due to the uncertainty surrounding the realization of our net deferred tax asset, we have provided a full valuation allowance against this amount.

At December 31, 2003, we have available estimated net operating loss carryforwards for federal tax purposes of

approximately $41.6 million to reduce, subject to certain limitations, future income taxes. These carryforwards expire from 2012 through 2023 and are subject to review and possible adjustment by the Internal Revenue Service.

F-22

Table of Contents

**VIISAGE TECHNOLOGY, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Information for the three-month periods ended March 30, 2003**
**and March 28, 2004 is unaudited)**

## 11. SHAREHOLDERS' EQUITY

*Stock Option Plans*

Under the 1996 Management Stock Option Plan and the 1996 Director Stock Option Plan (the Plans), the Board of Directors may grant incentive and nonqualified stock options to employees and officers and nonqualified stock options to directors. Generally, incentive stock options are granted at fair market value and are subject to the requirements of Section 422 of the Internal Revenue Code of 1986, as amended. Nonqualified options are granted at exercise prices determined by the Board of Directors. Options granted to date to directors vest immediately or between one to four years from the date of grant. Options granted to management and employees vest at various rates over periods ranging from three to seven years or, in some cases, earlier if certain performance criteria are met. The performance criteria are based on each $1 million increase in Company value up to approximately $1 billion, as adjusted. All options granted under the Plans expire ten years from the date of grant.

In fiscal year 2001, we adopted the "2001 Stock in Lieu of Cash Compensation for Directors Plan" to compensate the non-employee members of the Board of Directors. The number of shares that may be issued under the plan shall not exceed, in the aggregate, 800,000 shares of our common stock.

During 2002 and 2003, each member of our Board of Directors received $60,000 of compensation in cash and stock. For each year an aggregate of 61,686 and 78,738 shares of common stock, respectively was issued. The fair market value of the common stock on the grant date was approximately $380,000 and $300,000 for the years ended December 31, 2002 and 2003, respectively and was expensed during each year then ended. In addition, we issued an aggregate of 60,000 stock options to our Board of Directors in each year.

At December 31, 2003, we have reserved 4,807,100 shares of common stock for issuance under the management plan, of which 664,398 shares are available for future grants. We have reserved 576,616 shares of common stock for issuance under the directors' plan, of which 125,000 are available for future grants.

A summary of stock option activity under the Plans is as follows:

| | Shares | Exercise Price Per Share | Weighted Average Exercise Price |
|---|---|---|---|
| Options outstanding, December 31, 2000 | 1,936,991 | $ 0.94 - $12.50 | $ 3.65 |
| Granted | 961,500 | 0.84 - 3.99 | 2.98 |
| Exercised | (603,077) | 0.84 - 12.25 | 1.80 |
| Cancelled | (13,334) | 1.38 - 12.25 | 2.57 |
| Options outstanding, December 31, 2001 | 2,282,080 | $ 0.84 - $12.50 | $ 3.87 |
| Granted | 1,578,000 | 3.08 - 8.41 | 4.58 |
| Exercised | (414,763) | 0.94 - 3.06 | 2.07 |
| Cancelled | (875,322) | 0.94 - 12.50 | 3.60 |
| Options outstanding, December 31, 2002 | 2,569,995 | $ 0.84 - $12.50 | $ 4.72 |
| Granted | 1,063,500 | 3.63 - 4.70 | 4.15 |
| Exercised | (33,163) | 0.94 - 3.99 | 1.91 |
| Cancelled | (261,753) | 2.25 - 12.25 | 6.12 |
| Options outstanding, December 31, 2003 | 3,338,579 | $ 0.84 - $12.50 | $ 4.42 |
| Granted | 282,000 | 4.07 - 5.45 | 4.97 |
| Exercised | (199,332) | 2.96 - 6.16 | 2.98 |
| Cancelled | (25,047) | 2.25 - 12.25 | 6.25 |
| Options outstanding, March 28, 2004 (unaudited) | 3,396,200 | $ 0.84 - $12.50 | $ 4.54 |

F-23

Table of Contents

## VIISAGE TECHNOLOGY, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
**(Information for the three-month periods ended March 30, 2003 and March 28, 2004 is unaudited)**

The following table summarizes information about outstanding options as of December 31, 2003:

| Range of Exercise Prices | Options Outstanding | | | Options Exercisable | |
| --- | --- | --- | --- | --- | --- |
| | Number Outstanding | Weighted Average Remaining Contractual Life | Weighted Average Exercise Price Per Share | Number Exercisable | Weighted Average Exercise Price Per Share |
| $0.84 - $ 1.88 | 72,499 | 5.69 years | $    1.22 | 71,832 | $    1.21 |
| 2.25 -    4.04 | 2,020,901 | 7.75 years | 3.41 | 833,159 | 3.23 |
| 4.44 -    7.25 | 1,030,803 | 8.63 years | 5.10 | 252,453 | 5.71 |
| 7.80 -  12.50 | 214,376 | 5.22 years | 12.29 | 164,416 | 12.33 |
| $0.84 - $12.50 | 3,338,579 | | $    4.42 | 1,321,860 | $    4.73 |

We have computed the pro forma disclosures required under SFAS No. 123 for options granted using the Black-Scholes option-pricing model prescribed by SFAS No. 123. The weighted average assumptions used are:

| | 2001 | 2002 | 2003 |
| --- | --- | --- | --- |
| Risk free interest rate | 4.0 - 5.0% | 4.0 - 5.0% | 4.0 - 5.0 % |
| Expected dividend yield | — | — | — |
| Expected lives | 3 -10 years | 3 -10 years | 3 -10 years |
| Expected volatility | 80% | 80% | 80% |
| Fair value of options granted | $3.52 | $3.83 | $2.51 |

The total value of options granted under our plans was computed as approximately $3.0 million for 2001, $6.0 million for 2002 and $3.7 million for 2003. Of these amounts, approximately $3.0 million, $2.2 million and $3.4 million would have been charged to operations for the years ended December 31, 2001, 2002 and 2003, respectively, for currently vested options. The remaining unvested amount of $5.3 million as of the December 31, 2003, will be amortized over the related future vesting periods.

The total value of options granted under our plans was computed as approximately $1.3 million for the three months ended March 30, 2003 and $1.2 million for the three months ended March 28, 2004. Of these amounts, approximately $600,000 and $1.0 million would have been charged to operations for the those periods for currently vested options. The remaining unvested amount of $5.9 million as of the March 28, 2004, will be amortized over the related future vesting periods.

*Employee Stock Purchase Plan*

In 1997, we adopted the 1997 Employee Stock Purchase Plan and between 1997 and May 2001 and reserved 340,000 shares of common stock for issuance under the plan. The purchase price is determined by taking the lower of 85% of the closing price on the first or last day of periods defined in the plan. As of December 31, 2003, 260,583 shares have been issued and options to purchase 5,611 shares of common stock at $3.06 per share were vested under the plan.

*Common Stock*

In February 2002, Lau exercised an option to purchase 60,000 shares of common stock at $1.90 per share, pursuant to an agreement entered into with us in 1999 under which Lau guaranteed a contract indemnification obligation of ours.

F-24

Table of Contents

**VIISAGE TECHNOLOGY, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Information for the three-month periods ended March 30, 2003**
**and March 28, 2004 is unaudited)**

At March 28, 2004 and December 31, 2003 we had outstanding warrants, which can be converted into 812,469 shares of common stock, with exercise prices ranging from $10.79 to $12.35 and expiration dates from November 30, 2005 to November 6, 2006.

On September 8, 2003, we sold an aggregate of 3,517,503 shares of our common stock, at a purchase price of $3.775 per share, in a private sale to institutional investors. The gross proceeds were approximately $13.3 million before investment fees and related expenses of approximately $1.1 million. In addition, on January 27, 2004 we sold an additional 456,007 shares of our common stock at $3.775 per share for proceeds of $1.7 million in a private sale to the same institutional investors following the closing of the ZN acquisition. We believe that the net proceeds of these sales and cash flow from operations will enable us to fund our ongoing operations for at least the next 12 months.

**12. BUSINESS SEGMENTS, GEOGRAPHICAL INFORMATION, AND CONCENTRATIONS OF RISK**

We follow SFAS No. 131 "Disclosures about Segments of a Business Enterprise and Related Information", which establishes standards for reporting information about operating segments. Operating segments are defined as components of a company about which the chief operating decision maker evaluates regularly in deciding how to allocate resources and in assessing performance.

The following table provides financial information by segment for the years ended December 31, 2001, 2002 and 2003, and for the three months ended March 30, 2003 and March 28, 2004. We allocate direct costs and administrative expenses to each business segment based on management's analysis of each segment's resource needs. Revenue is reported within the segments by customer contracts. Within the secure credentials segment there is a component of the contract that utilizes our biometrics technology. We did not report business segments prior to 2002 and therefore have not restated our results, other than revenue for the year ended December 31, 2001 to provide segment information because it would be impracticable to do so (in thousands).

| Three months ended March 30, 2003 | Secure Credentials | Biometrics | Total |
|---|---|---|---|
| Secure credentials | $ 6,487 | $ — | $6 ,487 |
| Biometrics | 314 | 1,354 | $1 ,668 |
| Total segment revenue | $ 6,801 | $ 1,354 | $8 ,155 |
| Segment profit (loss) before taxes | $ (600) | $ (1,702) | $ (2,302) |
| Depreciation and amortization | $ 1,690 | $ 154 | $1 ,844 |
| Interest expense | $ 219 | $ — | $ 219 |
| Total assets | $ 38,930 | $ 5,044 | $43,974 |
| Expenditures for long lived assets | $ — | $ 29 | $ 29 |

F-25

Table of Contents

**VIISAGE TECHNOLOGY, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Information for the three-month periods ended March 30, 2003**
**and March 28, 2004 is unaudited)**

| Three months ended March 28, 2004 | Secure Credentials | Biometrics | Total |
|---|---|---|---|
| Secure credentials | $ 10,184 | $ — | $ 10,184 |
| Biometrics | 336 | 1,739 | $ 2,075 |
| Total segment revenue | $ 10,520 | $ 1,739 | $ 12,259 |
| Segment profit (loss) before taxes | $ 679 | $ (2,286) | $ (1,607) |
| Depreciation and amortization | $ 2,040 | $ 239 | $ 2,279 |
| Interest expense | $ 392 | $ — | $ 392 |
| Total assets | $100,737 | $ 34,555 | $135,292 |
| Expenditures for long lived assets | $ 311 | $ 58 | $ 369 |

| Year ended December 31, 2001 | Secure Credentials | Biometrics | Total |
|---|---|---|---|
| Secure credentials | $ 22,274 | $ — | $ 22,274 |
| Biometrics | 483 | 3,523 | $ 4,006 |
| Total segment revenue | $ 22,757 | $ 3,523 | $ 26,280 |

| Year ended December 31, 2002 | Secure Credentials | Biometrics | Total |
|---|---|---|---|
| Secure credentials | $ 25,943 | $ — | $ 25,943 |
| Biometrics | 1,427 | 4,932 | $ 6,359 |
| Total segment revenue | $ 27,370 | $ 4,932 | $ 32,302 |
| Segment profit (loss) before taxes | $ 1,088 | $(10,618) | $ (9,530) |
| Depreciation and amortization | $ 6,729 | $ 468 | $ 7,197 |
| Interest expense | $ 875 | $ — | $ 875 |
| Total assets | $ 55,953 | $ 5,236 | $ 61,189 |
| Expenditures for long lived assets | $ 4,939 | $ 4,484 | $ 9,423 |

| Year ended December 31, 2003 | Secure Credentials | Biometrics | Total |
|---|---|---|---|
| Secure credentials | $ 29,396 | $ — | $ 29,396 |
| Biometrics | 1,313 | 6,662 | $ 7,975 |
| Total segment revenue | $ 30,709 | $ 6,662 | $ 37,371 |
| Segment profit (loss) before taxes and cumulative effect | $ 598 | $ (6,064) | $ (5,466) |
| Depreciation and amortization | $ 6,151 | $ 655 | $ 6,806 |
| Interest expense | $ 969 | $ — | $ 969 |
| Total assets | $ 50,410 | $ 4,070 | $ 54,480 |
| Expenditures for long lived assets | $ 8,248 | $ 1,497 | $ 9,745 |

For the year ended December 31, 2003 approximately $36.6 million, or 97.8% of our direct revenue was derived within the United States. The remaining $818,000, or 2.2% of revenue was derived in Canada and the United Arab Emirates.

We believe that for the near future we will continue to derive a significant portion of our revenue from a limited number of large contracts. For the three months ended March 30, 2003 and March 28, 2004 and for the

F-26

Table of Contents

VIISAGE TECHNOLOGY, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Information for the three-month periods ended March 30, 2003
and March 28, 2004 is unaudited)

years ended December 31, 2001, 2002 and 2003, secure credentials segment customers who accounted for more than 10% of revenue in a given years are as follows:

- For the three months ended March 30, 2003, two customers accounted for an aggregate of 28%;
- For the three months ended March 28, 2004, one customer accounted for an aggregate of 13%;
- For the year ended December 31, 2001, four customers accounted for an aggregate of 49%;
- For the year ended December 31, 2002, two customers accounted for an aggregate of 22% and
- For the year ended December 31, 2003, two customers accounted for an aggregate of 26%.

No single biometrics customer accounted for over 10% of our total revenue in any period.

**13.  RESTRUCTURING CHARGES AND ACQUISITION EXPENSES**

In connection with the acquisitions and the resulting consolidation of operations, management committed to a restructuring plan in the fourth quarter of 2002. Additionally, the plan was executed in December 2002.

In connection with these actions we recorded restructuring costs of $824,000 in accordance with Emerging Issues Task Force Issue No. 94-3, *Liability Recognition for Certain Employee Termination Benefits and Other Costs to Exit an Activity (including Certain Costs Incurred in a Restructuring)* and SEC Staff Accounting Bulletin No. 100, *Restructuring and Impairment Charges*. Included in the charge was $156,000 for the abandonment and write off of excess property, equipment and leasehold improvements. Additionally $248,000 was recorded for workforce reduction, consisting of severance and extended insurance benefits attributable to employees. The remaining $420,000 represented an accrual for non-cancelable lease payments for abandoned lease space, less management's estimates of sublease income.

All charges associated with the restructuring are included as restructuring costs under operating expenses in the statement of operations for fiscal 2002.

Below is a summary of restructuring costs as of December 31, 2003 (in thousands):

|  | Charged to Operations In 2002 | Total Cash Payments | Accrued Restructuring Liabilities December 31, 2002 | Accrued Restructuring Liabilities December 31, 2003 |
|---|---|---|---|---|
| Cash provisions: |  |  |  |  |
| Workforce reduction | $    248 | $    (248) | $— | $— |
| Non-cancelable leases | 420 | (389) | 4 20 | 31 |
|  | 668 | $    (637) | $420 | $3 1 |
| Non-cash: |  |  |  |  |
| Write-off of excess property and equipment | 156 |  |  |  |
| Total | $    824 |  |  |  |

In 2001, we incurred a fourth quarter one-time expense of $1.6 million relating to costs incurred in our attempt to purchase Polaroid Corporation's Identification Systems Business. These expenses related to legal and professional activities for due diligence as well as financing break-up fees associated with this unsuccessful acquisition.

F-27

Table of Contents

## VIISAGE TECHNOLOGY, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Information for the three-month periods ended March 30, 2003
and March 28, 2004 is unaudited)

### 14.  QUARTERLY FINANCIAL DATA (UNAUDITED)

The following table sets forth selected quarterly financial data for 2002 and 2003. The operating results for 2003 are as reported after we adopted EITF 00-21 on a cumulative basis as of January 1, 2003. The first quarter results include a $12.1 million charge related to the accounting change. The operating results for 2002 are as reported prior to the change in accounting principle. (in thousands, except per share amounts):

| For the Year Ended December 31, 2002 | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| Revenue | $ 6,399 | $ 9,038 | $ 8,109 | $8 ,756 |
| Gross margin | $ 1,314 | $ 1,570 | $ 1,610 | $2 ,569 |
| Net loss(1) | $  (857) | $(2,805) | $(2,818) | $(3,050) |
| Net loss applicable to common shareholders(1) | $  (857) | $(2,805) | $(2,818) | $(3,050) |
| Basic and diluted net loss per share(1) | $  (0.04) | $ (0.14) | $  (0.14) | $  (0.16) |
| Basic and diluted loss per share applicable to common shareholders(1) | $  (0.04) | $ (0.14) | $  (0.14) | $  (0.16) |

| For the Year Ended December 31, 2003 | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| Revenue | $ 8,155 | $ 8,789 | $10,108 | $10,319 |
| Gross margin | $ 1,366 | $ 1,963 | $ 3,380 | $2 ,818 |
| Net loss | $(14,496) | $(1,376) | $   (389) | $(1,399) |
| Net loss applicable to common shareholders | $(14,496) | $(1,376) | $   (389) | $(1,399) |
| Basic and diluted net loss per share | $  (0.72) | $ (0.07) | $  (0.02) | $  (0.06) |
| Basic and diluted loss per share applicable to common shareholders | $  (0.72) | $ (0.07) | $  (0.02) | $  (0.06) |

(1)  During the fourth quarter of 2002, we incurred one-time expenses (see Note 13).

### 15.  ACQUISITIONS (UNAUDITED)

On January 23, 2004 we acquired all outstanding shares of ZN Vision Technologies AG ("ZN") in exchange for an aggregate of 5,221,454 newly issued shares of our common stock and $493.00 in cash. In addition, we agreed to assume ZN's employee share option plan, and accordingly have reserved 1,138,546 shares of our common stock for issuance to the plan participants. The purchase price for the acquisition was $31.5 million, based on the per share price of our common stock of $4.32 per share which is the average trading price of Viisage common stock over the five trading days immediately preceding and the two trading days immediately following March 28, 2003, the date on which the purchase agreement was signed. The acquisition was accounted for as a purchase, and accordingly, the operations of ZN are included in the financial statements since the effective date, the close of business on January 23, 2004. The purchase price has been allocated to net assets acquired based on their estimated fair values. We engaged an independent third party appraiser to perform a review of the acquired assets and have allocated the purchase price based on the preliminary results of their findings. The preliminary valuation is subject to further review which may result in adjustments to allocation of purchase price in the future. We have recorded approximately $74,000 in amortization related to the acquired intangible assets from the date of the acquisition through March 28, 2004. ZN is a leading German provider of face recognition and computer vision products and services. ZN, now known as Viisage Technology AG, is a wholly owned subsidiary of Viisage and serves as the base of our European operations.

On February 14, 2004 we acquired all outstanding shares of Trans Digital Technologies Corporation ("TDT") for $53.4 million. The purchase price consisted of 5,850,000 newly issued shares of our common stock, which were valued at $5.13 per share, which is the average price of Viisage common stock over the five trading days immediately preceding and the two trading days immediately following February 14, 2004, plus $15.3

F-28

Table of Contents

**VIISAGE TECHNOLOGY, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Information for the three-month periods ended March 30, 2003**
**and March 28, 2004 is unaudited)**

million in notes and $5 million in cash. The acquisition was accounted for as a purchase, and accordingly, the operations of TDT are included in the financial statements since the effective date, the close of business on February 14, 2004. The purchase price has been allocated to net assets acquired based on their estimated fair values. We engaged an independent third party appraiser to perform a review of the acquired assets and have allocated the purchase price based on the preliminary results of their findings. The preliminary valuation is subject to further review which may result in adjustments to allocation of purchase price in the future. We have recorded approximately $383,000 in amortization related to the acquired intangible assets from the date of the acquisition through March 28, 2004. TDT is the sole source provider of high security technology and services to the U.S. Department of State for the production of U.S. passports. TDT is now a wholly owned subsidiary of Viisage.

In connection with the acquisition of TDT, we agreed to pay the former sole shareholder of TDT a contingent purchase price cash payment of up to $2.6 million if the U.S. Department of Defense selected TDT for the production of smart cards as part of the agency's Common Access Card (CAC) program and placed orders with an aggregate value of at least $4 million prior to June 30, 2004. We received an initial purchase order of $10.2 million for this program and therefore we will record this contingent purchase price of $2.6 million related to the CAC program as additional goodwill in the second quarter of 2004.

The preliminary allocation of the purchase price for ZN and TDT, based on the purchase prices calculated for accounting purposes, is as follows (in thousands):

|  | ZN | TDT |
|---|---|---|
| Current assets | $1,639 | $ 3,020 |
| Property and equipment | 140 | 42 |
| Identified intangible assets | 1,974 | 14,460 |
| Goodwill | 27,733 | 35,880 |
|  | $31,486 | $53,402 |

Identified intangible assets acquired in connection with the acquisitions of ZN and TDT consist primarily of completed technology and acquired contracts. These intangible assets are amortized using the straight-line method over their estimated useful lives of 1 to 5 years (in thousands).

|  | March 28, 2004 | Weighted Average Useful Life |
|---|---|---|
| Gross carrying amount: |  |  |
| Completed technology | $ 2,004 | 5 years |
| Acquired contracts | 14,430 | 5 years |
| Total intangible assets | 16,434 |  |
| Accumulated amortization: |  |  |
| Completed technology | (75) |  |
| Acquired contracts | (383) |  |
| Total accumulated amortization | (458) |  |
| Intangible assets, net | $ 15,976 |  |

We estimate annual amortization expense related to the identified intangible assets acquired in connection with the acquisitions of ZN and TDT to be approximately $3.2 million per year for the next five years.

F-29

Table of Contents

### VIISAGE TECHNOLOGY, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
#### (Information for the three-month periods ended March 30, 2003
#### and March 28, 2004 is unaudited)

The unaudited pro forma and combined selected operating data are presented as if the acquisitions of ZN and TDT had occurred on January 1, 2003 and 2004 for the three months ended March 30, 2003 and March 28, 2004, respectively. The unaudited pro forma data is for informational purposes only and may not necessarily reflect future results of operations or what the results of operations would have been had Viisage, ZN and TDT been operating as a combined entity for the periods presented. For the three months ended March 30, 2003, we incurred a non-cash charge of $12.1 million representing the cumulative effect of a change in accounting principle related to our adoption of Emerging Issues Task Force 00-21, *Accounting for Revenue Arrangements with Multiple Deliverables*, or EITF 00-21, on a cumulative basis as of January 1, 2003. The unaudited pro forma revenue, loss and loss per share information for the three months ended March 30, 2003 and March 28, 2004 are as follows (in thousands):

|  | For the Three Months Ended | |
|---|---|---|
|  | March 30, 2003 | March 28, 2004 |
|  | (unaudited) | |
| Revenue | $ 11,966 | $ 15,100 |
| Loss before cumulative effect of change in accounting principle | $ (3,176) | $ (1,053) |
| Net loss | $(15,307) | $ (1,053) |
| Basic and diluted net loss per share before cumulative effect of change in accounting principle | $ (0.10) | $ (0.03) |
| Basic and diluted net loss per share | $ (0.76) | $ (0.03) |

### 16.  VALUATION AND QUALIFYING ACCOUNTS

We had no valuation reserves for accounts receivable for the periods presented.

### 17.  SUBSEQUENT EVENTS

On July 19, 2004, Fargo Electronics, Inc. initiated a patent infringement action in the U.S. District Court for the Eastern District of Virginia against Toppan Printing Co., Ltd. and TDT. The complaint alleges that Toppan and TDT's use, offer to sell and/or importation of certain personalized identification card printers, including Toppan's CP400 card printers, and associated laminators in the United States constitutes direct and indirect infringement of four patents allegedly owned by Fargo. The complaint seeks unspecified compensatory damages, permanent injunctive relief, trebling of damages for willful infringement and fees and costs. We are currently evaluating the claims in this lawsuit and intend to vigorously defend against them. We believe that the only products at issue are Toppan CP400 printers that were or are sold, used or imported as part of the CAC program. To date, we have received purchase orders of $10.2 million for Toppan CP400 printers for the CAC program, which are expected to be delivered by the end of the first quarter of 2005. There can be no assurance that we will prevail in this litigation. The litigation, with or without merit, could be time consuming and expensive to litigate or settle and could divert management's attention from our business.

F-30

Table of Contents



Table of Contents

# PART II

## INFORMATION NOT REQUIRED IN THE PROSPECTUS

### Item 14. Other Expenses of Issuance and Distribution.

The following table sets forth the various expenses in connection with the securities being registered. All amounts shown are estimates, except the Securities and Exchange Commission registration fee.

| Item | Amount |
| --- | --- |
| Securities and Exchange Commission registration fee | $ 9,676.88 |
| Printing and EDGAR formatting fees and expenses | $100,000.00 |
| Accounting fees and expenses | $4 0,000.00 |
| Transfer agent's fees and expenses | $ 5,000.00 |
| Legal fees and expenses | $100,000.00 |
| Total | $254,676.88 |

Viisage will bear all expenses shown above, and the selling shareholders will not bear any portion of these expenses.

### Item 15. Indemnification of Directors and Officers.

As permitted by the Delaware General Corporation law, as amended (the "DGCL"), the registrant's Restated Certificate of Incorporation, as amended, provides that the registrant's directors shall not be liable to the registrant or its stockholders for monetary damages for breach of fiduciary duty as a director to the fullest extent permitted by the DGCL as it now exists or as it may be amended. As of the date of this prospectus, the DGCL permits limitations on liability for a director's breach of fiduciary duty other than liability (i) for any breach of the director's duty of loyalty to the registrant or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the DGCL, or (iv) for any transaction from which the director derived an improper personal benefit. In addition, the registrant's bylaws provide that the registrant shall indemnify all directors, officers, employees and agents of the registrant for acts performed on behalf of the registrant in such capacity to the fullest extent permitted by law.

Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers or persons controlling the registrant pursuant to the foregoing provisions, the registrant has been informed that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Act and is therefore unenforceable.

In addition, the registrant has purchased directors and officers liability insurance.

### Item 16. Exhibits.

The Exhibit Index immediately preceding the exhibits is incorporated herein by reference.

### Item 17. Undertakings.

(a) The undersigned registrant hereby undertakes that, for purposes of determining any liability under the Securities Act of 1933, each filing of the registrant's annual report pursuant to Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934 that is incorporated by reference in the registration statement shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial *bona fide* offering thereof.

II-1

Table of Contents

(b) The undersigned registrant hereby undertakes to deliver or cause to be delivered with the prospectus, to each person to whom the prospectus is sent or given, the latest annual report to security holders that is incorporated by reference in the prospectus and furnished pursuant to and meeting the requirements of Rule 14a-3 or Rule 14c-3 under the Securities Exchange Act of 1934; and, where interim financial information required to be presented by Article 3 of Regulation S-X is not set forth in the prospectus, to deliver, or cause to be delivered to each person to whom the prospectus is sent or given, the latest quarterly report that is specifically incorporated by reference in the prospectus to provide such interim financial information.

(c) Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers and controlling persons of the registrant pursuant to the foregoing provisions, or otherwise, the company has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

(d) The undersigned registrant hereby undertakes that:

(1) For purposes of determining any liability under the Securities Act of 1933, the information omitted from the form of prospectus filed as part of this registration statement in reliance upon Rule 430A and contained in a form of prospectus filed by the registrant pursuant to Rule 424(b)(1) or (4) of 497(h) under the Securities Act shall be deemed to be part of this registration statement as of the time it was declared effective.

(2) For the purpose of determining any liability under the Securities Act of 1933, each post-effective amendment that contains a form of prospectus shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial *bona fide* offering thereof.

II-2

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the registrant certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on Form S-3 and has duly caused this registration statement to be signed on its behalf by the undersigned, hereunto duly authorized in Billerica, Massachusetts on July 22, 2004.

<div align="right">

**VIISAGE TECHNOLOGY, INC.**

By:    /s/  BERNARD C. BAILEY

**Bernard C. Bailey**
**Chief Executive Officer**
*(Principal Executive Officer)*

</div>

Pursuant to the requirements of the Securities Act of 1933, this registration statement has been signed by the following persons in the capacities and on the dates indicated.

| Name | Title | Date |
|---|---|---|
| *<br>Bernard C. Bailey | Chief Executive Officer and Director *(Principal Executive Officer)* | July 22, 2004 |
| *<br>William K. Aulet | Chief Financial Officer and Treasurer *(Principal Financial and Accounting Officer)* | July 22, 2004 |
| *<br>Denis K. Berube | Director | July 22, 2004 |
| *<br>Harriet Mouchly-Weiss | Director | July 22, 2004 |
| *<br>Paul T. Principato | Director | July 22, 2004 |
| *<br>Charles E. Levine | Director | July 22, 2004 |

II-3

**Table of Contents**

| Name | Title | Date |
|------|-------|------|
| * | Director | July 22, 2004 |
| Peter Nessen | | |
| * | Director | July 22, 2004 |
| Thomas J. Reilly | | |
| * | Director | July 22, 2004 |
| B.G. Beck | | |
| * | Director | July 22, 2004 |
| Marcel Yon | | |

\*By: _____ /S/ ELLIOT J. MARK _____
Attorney-in-Fact

II-4

Table of Contents

## EXHIBIT INDEX

| Exhibit No. | Description |
| --- | --- |
| 1.1 | Form of Underwriting Agreement |
| 4.1* | Restated Certificate of Incorporation |
| 4.2* | By-Laws. |
| 4.3+ | Specimen Common Stock Certificate |
| 5.1 | Opinion of Latham & Watkins LLP |
| 23.1 | Consent of BDO Seidman, LLP |
| 23.2 | Consent of BDO Deutsche Warentreuhand AG |
| 23.3 | Consent of Latham & Watkins LLP (Included in Exhibit 5.1) |
| 23.4 | Consent of BDO Seidman, LLP |
| 24.1** | Power of Attorney |

\*    Filed as a exhibit to the registrant's Form S-1 registration statement (Commission File No. 333-10649) filed August 22, 1996 and incorporated herein by reference.

\*\*   Previously filed.

+    Filed as a exhibit to the registrant's Form S-1/A registration statement (Commission File No. 333-10649) filed November 4, 1996 and incorporated herein by reference.

EXHIBIT 13

__Table of Contents__

<div style="text-align: right">

**Filed Pursuant to Rule 424(b)(4)**
**Registration No. 333-116698**
</div>

Prospectus



## 7,500,000 Shares of Common Stock

We are offering 7,200,000 shares of our common stock, par value $0.001 per share. We will receive all of the net proceeds from the sale of such common stock. The selling shareholders identified in this prospectus are selling an additional 300,000 shares of our common stock. We will not receive any of the proceeds from the sale of the shares by the selling shareholders.

Our common stock is listed on the Nasdaq National Market under the symbol "VISG." The last reported sale price of our common stock on August 4, 2004 was $6.23 per share.

**Investing in our common stock involves a high degree of risk. Before buying any of these shares of our common stock, you should carefully consider the risk factors described in " Risk Factors " beginning on page 7 of this prospectus.**

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or passed upon the adequacy or accuracy of this prospectus. Any representation to the contrary is a criminal offense.**

|  | Per share | Total |
|---|---|---|
| Public offering price | $ 5.500 | $ 41,250,000 |
| Underwriting discounts and commissions | $ 0.316 | $ 2,370,000 |
| Proceeds, before expenses, to us | $ 5.184 | $ 37,324,800 |
| Proceeds to selling shareholders | $ 5.184 | $ 1,555,200 |

The underwriters may also purchase up to an additional 525,000 shares of our common stock from us and up to an additional 600,000 shares from the selling shareholders at the public offering price, less the underwriting discounts and commissions payable by us and the selling shareholders, to cover overallotments, if any, within 30 days from the date of this prospectus. If the underwriters exercise the option in full, the total underwriting discounts and commissions payable by us and the selling shareholders will be $2,725,500 and the total proceeds, before expenses, to us will be $40,046,400 and the total proceeds to the selling shareholders will be $4,665,600.

The underwriters are offering the shares of our common stock as described in "Underwriting." Delivery of the shares will be made on or about August 10, 2004.

**JPMorgan**                                                    **UBS Investment Bank**

**Piper Jaffray**

**JMP Securities**        **Janney Montgomery Scott LLC**        **Roth Capital Partners**

August 4, 2004

Table of Contents

You should rely only on the information contained or incorporated by reference in this prospectus. We have not authorized anyone to provide information different from that contained or incorporated by reference in this prospectus. Neither the delivery of this prospectus nor the sale of shares of common stock means that information contained or incorporated by reference in this prospectus is correct after the date of this prospectus. These documents do not constitute an offer to sell or solicitation of an offer to buy in any jurisdiction where offers or sales are not permitted. In this prospectus, "Viisage," "we," "our," "us," and "the Company" refer to Viisage Technology, Inc. and its consolidated subsidiaries, unless the context otherwise requires.

<div align="center">

**Prospectus**

</div>

| | |
|---|---|
| Forward-Looking Statements | ii |
| Prospectus Summary | 1 |
| Risk Factors | 7 |
| Use of Proceeds | 18 |
| Dilution | 19 |
| Capitalization | 20 |
| Price Range of Common Stock | 21 |
| Dividend Policy | 21 |
| Selected Consolidated Financial Data | 22 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 24 |
| Business | 42 |
| Management | 53 |
| Principal and Selling Shareholders | 55 |
| Description of Capital Stock | 57 |
| Underwriting | 60 |
| Where You Can Find More Information | 63 |
| Validity of Common Stock | 64 |
| Experts | 64 |
| Index to Consolidated Financial Statements | F-1 |

Our trademarks, service marks and trade names include Viisage, Viisage Technology, FaceEXPLORER, FaceTOOLS, FaceFINDER, FacePASS and SensorMast. This prospectus also contains trademarks, service marks, copyrights and trade names of other companies.

<div align="center">

i

</div>

Table of Contents

## FORWARD-LOOKING STATEMENTS

        This prospectus contains or incorporates forward-looking statements within the meaning of section 27A of the Securities Act of 1933 and section 21E of the Securities Exchange Act of 1934. These forward-looking statements are based on current expectations, estimates, forecasts and projections about the industry and markets in which we operate and management's beliefs and assumptions. In addition, other written or oral statements that constitute forward-looking statements may be made by or on our behalf. Words such as "expect," "anticipate," "intend," "plan," "believe," "seek," "estimate," variations of such words and similar expressions are intended to identify such forward-looking statements. These statements are not guarantees of future performance and involve risks, uncertainties and assumptions that are difficult to predict. We have included important factors in the cautionary statements below under the heading "Risk Factors" that we believe could cause our actual results to differ materially from the forward-looking statements we make. We do not intend to update publicly any forward-looking statements, whether as a result of new information, future events or otherwise.

ii

Table of Contents

## PROSPECTUS SUMMARY

*This summary highlights selected information from this prospectus and the documents that we have incorporated by reference and may not contain all the information that is important to you. As a result, it does not contain all of the information that you should consider before investing in our common stock. You should read the following summary together with the more detailed information and financial statements and notes to the financial statements contained elsewhere or incorporated by reference in this prospectus, as described under the heading "Where You Can Find More Information." To fully understand this offering, you should read all these documents. Unless otherwise indicated, the information in this prospectus assumes the underwriters have not exercised their over-allotment option. All currency amounts in this prospectus are stated in U.S. dollars.*

### Viisage Technology, Inc.

We are a leading provider of advanced technology identity solutions that enable governments, law enforcement agencies and businesses to enhance security, reduce identity theft and protect personal privacy. Our identity solutions include secure credential provisioning systems, biometric software and systems and real-time identity databases, as well as systems design, development, integration and support services. These solutions enable our customers to manage the entire life cycle of an individual's identity for a variety of applications including civil identification, criminal identification and border management. Our customers use our solutions to help solve the following four critical problems in identity verification and management:

- assurance that the identification document is authentic;

- assurance that the document has been issued to the correct person;

- confidence that the person holding the identification is uniquely tied to and authorized to use the document; and

- verification of the privileges the individual is entitled to at a particular point in time.

Our solutions annually produce more than 30 million secure government-issued credentials at more than 2,000 locations. We are the second largest provider of U.S. drivers' licenses with a 30% market share. We are the sole source provider of passport production capability to the U.S. Department of State. We also are a recognized leader in biometrics in the field of face recognition. Our customers include governments, law enforcement agencies and businesses in more than 15 countries.

As our market has become increasingly complex and more frequently requires the integration of various technologies and capabilities, we have established ourselves as a provider of end-to-end identity solutions. In January 2004, we acquired ZN Vision Technologies AG, or ZN, which solidified our leadership position in face recognition technology. In addition, in February 2004, we acquired Trans Digital Technologies Corporation, or TDT, which provides us with a significant presence in the U.S. federal government market and strengthens our capability and credibility in the border management market worldwide.

We believe that our installed base of secure credential customers together with our leading face recognition technology provide us with a competitive advantage in delivering unified identity solutions for both the physical and digital domains. For example, in April 2004, we were selected by the U.S. Department of Defense, or DoD, for the production of secure, smart credentials as part of the agency's Common Access Card, or CAC, program. The CAC is a single means of identification for access to both physical locations and computer networks. We expect the demand for these types of solutions to grow significantly in the future.

We generate revenue through the sale and license of products and services for verifying and managing identities. Our revenues increased from $8.2 million in the first quarter of 2003 to $12.3 million in the first

1

Table of Contents

quarter of 2004. Our net loss during the same periods decreased from $2.4 million to $1.6 million, excluding the one-time charge of $12.1 million in connection with our change in accounting principle as of January 1, 2003.

## Market Opportunity

The ability to confirm an individual's identity is playing an increasingly important role in national and international security, personal privacy and commerce. Failure to provide adequate identification can lead to breaches of security and identity theft, the consequences of which can range from national security threats and loss of life to significant economic loss. Within this context, we believe that there is increasing pressure on governments and businesses to accelerate the adoption of advanced technology identity solutions. The concern over homeland security, in which identity solutions play a part, is exemplified by the size of the budget for the U.S. Department of Homeland Security, which was approximately $31 billion for the fiscal year ended September 30, 2003, and is projected to be approximately $37 billion for the fiscal year ended September 30, 2004. Furthermore, identity theft is the nation's fastest growing crime, and the Federal Trade Commission has estimated that the total cost of identity theft approaches $50 billion per year.

Government-issued credentials serve as the primary means for confirming the physical identity of an individual. The effectiveness, however, of these credentials is impaired by the following issues:

- the credential can be counterfeited or altered;

- the credential can be issued under false pretenses; and

- the credential rarely is linked to an identity database.

To address these complex problems, credential issuing agencies are seeking advanced technology identity solutions, which increasingly include secure credential provisioning systems, biometrics and real-time identity databases. We believe the global market for these solutions is driven by the following key trends:

- **Growth in government-initiated security programs** . Budgets for U.S. federal government agencies, such as the Department of Homeland Security, include spending for identity initiatives and we believe that government agencies will continue to be key drivers for the growth and development of the market for advanced technology identity solutions.

- **Development of industry standards and requirements.** Several organizations responsible for standards in a number of our markets have recently implemented requirements for the use of face recognition biometrics. We believe this will help stimulate the development of our target markets.

- **Growing use of biometrics** . Governments are increasingly mandating biometrics as an integral component of identity solutions. This increased demand, coupled with the maturation of the technology, is driving the market adoption of biometrics.

- **Increasing cost of identity theft and financial fraud.** The growing direct and indirect cost of identity theft and financial fraud is increasing the pressure on businesses and individuals to accelerate the adoption of advanced technology identity solutions.

- **Convergence of physical and logical security systems.** There is a growing need for governments and businesses to provide a highly secure, unified system for user authentication to both physical assets, such as buildings, and digital assets, such as computer networks.

2

Table of Contents

## Our Strategy

Our objective is to be the leading provider of advanced technology identity solutions for governments, law enforcement agencies and businesses. Key elements of our strategy to achieve this objective include:

*Focus on customer needs.* We are committed to solving our customers' problems and will continue to develop and market solutions to meet their evolving increasingly complex identity security needs.

*Continue to enhance and expand our product suite and solutions.* We intend to continue to broaden our product and solution offerings to meet our customer needs. We intend to continue to engage in product development activities to expand the scope and enhance the performance of our solutions.

*Leverage existing customer base to provide additional advanced technology identity solutions.* Many of our customers do not yet use the full range of our total solutions offerings. Accordingly, we will continue to provide thought and product leadership to these customers as they migrate toward more sophisticated identity solutions.

*Expand customer base both domestically and abroad.* We intend to focus our sales efforts on broadening our customer base in both domestic and international markets.

*Pursue strategic acquisitions and alliances .* We intend to augment our competitive position through acquisitions and alliances.

## Recent Operating Results

On July 21, 2004, we announced our unaudited consolidated financial results for the three and six months ended June 27, 2004. We reported revenue of approximately $16.3 million for the second quarter of 2004, representing an increase of 85.2% over our revenue of approximately $8.8 million for the second quarter of 2003. For the six months ended June 27, 2004, our revenue increased 68.4% from approximately $16.9 million in the first six months of 2003 to approximately $28.5 million in the first six months of 2004. Gross margins increased to 29.2% for the first six months of 2004 from 19.6% for the first six months of 2003. Our net loss during the second quarter of 2004 was $317,000, or $0.01 per basic and diluted share, compared to a net loss during the comparable period of 2003 of $1.4 million, or $0.07 per basic and diluted share. For the first six months of 2004, our net loss was $1.9 million, or $0.06 per basic and diluted share, compared to a net loss during the comparable period of 2003 of $3.7 million, or $0.18 per basic and diluted share, excluding the one-time charge of $12.1 million in connection with our change in accounting principle as of January 1, 2003. As of June 27, 2004 we had approximately $12.6 million of cash and cash equivalents, and $29.8 million in total debt obligations. In addition, our backlog was approximately $171.0 million which will be reduced by $19.7 million in the third quarter as a result of the settlement with Georgia. Our operating results for the three and six months ended June 27, 2004 include the impact of our acquisitions of ZN and TDT in the first quarter of 2004.

## Corporate Information

We were incorporated in Delaware in May 1996. Our principal executive offices are located at 296 Concord Road, Third Floor, Billerica, Massachusetts 01821, our telephone number at that location is (978) 932-2200 and our website address is www.viisage.com. The information contained on, or that can be accessed through, our website is not a part of this prospectus.

3

Table of Contents

**THE OFFERING**

| | |
|---|---|
| Common stock we are offering | 7,200,000 shares |
| Common stock offered by the selling shareholders | 300,000 shares |
| Common stock to be outstanding after the offering | 43,070,327 shares |
| Nasdaq National Market symbol | VISG |
| Use of proceeds after expenses | We will use the proceeds of the common stock we are offering to repay approximately $30.3 million of indebtedness and for general corporate purposes. We will not receive any proceeds from the sale of common stock by the selling shareholders. See "Use of Proceeds." |
| Risk Factors | See "Risk Factors" beginning on page 7 of this prospectus for a discussion of factors you should carefully consider before deciding to invest in shares of our common stock. |

The number of shares of common stock to be outstanding after this offering is based on the number of shares of common stock outstanding as of July 15, 2004, assumes no exercise of the underwriters' over-allotment option to purchase an additional 1,125,000 shares of common stock and does not include shares issuable upon the exercise of 4,550,621 options outstanding as of July 15, 2004 with a weighted-average exercise price of $3.70 per share, or 812,469 shares issuable upon the exercise of warrants outstanding as of July 15, 2004 with a weighted-average exercise price of $11.94 per share.

4

Table of Contents

## SUMMARY CONSOLIDATED FINANCIAL DATA

The following table summarizes our consolidated financial data for the periods, and as of the dates, indicated. You should read the summary consolidated financial data set forth below in conjunction with "Selected Consolidated Financial Data," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the audited consolidated financial statements and the accompanying notes thereto included elsewhere in this prospectus. The historical and as adjusted results presented here are not necessarily indicative of future results.

The as adjusted balance sheet data gives effect to the sale of 7,200,000 shares of our common stock in this offering at an offering price of $5.50 per share and after deducting underwriting discounts and commissions and estimated offering expenses.

|  | For the Years Ended December 31, | | | For the Three Months Ended(2) | |
|  | 2001(1) | 2002(1) | 2003(2) | March 30, 2003 | March 28, 2004 |
|---|---|---|---|---|---|
|  | | | | (unaudited) | |
|  | (dollars in thousands, except per share data) | | | | |
| **Statement of Operations Data:** | | | | | |
| Revenue | $ 26,280 | $ 32,302 | $ 37,371 | $ 8,155 | $ 12,259 |
| Cost of revenue | 19,602 | 25,239 | 27,844 | 6,789 | 8,906 |
| Gross margin | 6,678 | 7,063 | 9,527 | 1,366 | 3,353 |
| Operating expenses: | | | | | |
| Sales and marketing | 809 | 5,368 | 5,282 | 1,411 | 1,493 |
| Research and development | 2,054 | 4,457 | 3,650 | 945 | 959 |
| General and administrative | 2,500 | 5,069 | 5,110 | 1,093 | 2,137 |
| Acquisition expenses | 1,639 | — | — | — | — |
| Restructuring charges | — | 824 | — | — | — |
| Total operating expenses | 7,002 | 15,718 | 14,042 | 3,449 | 4,589 |
| Operating loss | (324) | (8,655) | (4,515) | (2,083) | (1,236) |
| Interest expense, net | (1,210) | (875) | (969) | (219) | (392) |
| Other income | — | — | 18 | — | 21 |
| Loss before income taxes and cumulative effect of change in accounting principle | (1,534) | (9,530) | (5,466) | (2,302) | (1,607) |
| Provision for income taxes | — | — | (63) | (63) | (25) |
| Loss before cumulative effect of change in accounting principle | (1,534) | (9,530) | (5,529) | (2,365) | (1,632) |
| Cumulative effect of change in accounting principle (3) | — | — | (12,131) | (12,131) | — |
| Net loss | (1,534) | (9,530) | (17,660) | (14,496) | (1,632) |
| Preferred stock dividends | (5) | — | — | — | — |
| Loss applicable to common shareholders | $ (1,539) | $ (9,530) | $ (17,660) | $ (14,496) | $ (1,632) |
| Basic and diluted loss per share before cumulative effect | $ (0.09) | $ (0.48) | $ (0.26) | $ (0.12) | $ (0.05) |
| Basic and diluted net loss per share applicable to common shareholders (4) | $ (0.09) | $ (0.48) | $ (0.82) | $ (0.72) | $ (0.05) |
| Weighted average basic and diluted common shares outstanding | 16,265 | 20,046 | 21,445 | 20,258 | 31,362 |
| Pro forma operating loss (for application of EITF 00-21) | $ (494) | $ (11,176) | $ (5,529) | $ (2,365) | $ (1,632) |
| Pro forma net loss per share | $ (0.03) | $ (0.56) | $ (0.26) | $ (0.12) | $ (0.05) |

5

Table of Contents

|                         | As of March 28, 2004 | |
|                         | Actual | As Adjusted |
|-------------------------|--------|-------------|
| **Balance Sheet Data:** |        |             |
| Working capital         | $    2,443 | $    19,439 |
| Total assets            | 135,292 | 142,051 |
| Total debt              | 31,423 | 1,112 |
| Shareholders' equity    | 92,196 | 129,266 |

(1)   The results are presented under percentage of completion based on the cost to cost method of measurement.

(2)   The results are presented in accordance with EITF 00-21 applied on a cumulative basis as of January 1, 2003.

(3)   We adopted EITF 00-21 on a cumulative basis as of January 1, 2003. See note 2 in the Notes to Consolidated Financial Statements which discusses the change in accounting principle.

(4)   See note 2 in the Notes to Consolidated Financial Statements for information concerning the computation of basic and diluted net loss per share.

6

Table of Contents

# RISK FACTORS

*You should carefully consider the following risk factors and all other information contained in this prospectus before investing in shares of our common stock. Investing in our common stock involves a high degree of risk. If any of the following risks actually occurs, our business, financial condition and results of operations could be materially and adversely affected. In that event, the trading price of our common stock could decline and you may lose part or all of your investment.*

## Risks Related to Viisage and the Industry

**We have a history of operating losses.**

We have a history of operating losses. Our business operations began in 1993 and, except for fiscal years 1996 and 2000, have resulted in net losses in each fiscal year. At March 28, 2004, we had an accumulated deficit of approximately $43.7 million. We will continue to invest in the development of our secure credential provisioning capabilities, biometric technologies and other components of advanced technology identity solutions. Accordingly, we cannot predict when or if we will ever achieve profitability.

**We may be unable to obtain additional capital required to fund our operations and finance our growth.**

The installation of our secure identification solutions requires significant capital expenditures. Furthermore, the continued development of our biometric and other advanced technologies will require additional capital. Although we have been successful in the past in obtaining financing for working capital and capital expenditures, including a $15 million private placement of our common stock in September 2003 and January 2004 and a new loan agreement with Commerce Bank and Trust Company in February 2004, we will have ongoing capital needs as we expand our business. We may be unable to obtain additional funds in a timely manner or on acceptable terms, which would render us unable to fund our operations or expand our business. If we are unable to obtain capital when needed, we may have to restructure our business or delay or abandon our development and expansion plans.

**We derive over 90% of our revenue from government contracts, which are often non-standard, involve competitive bidding, may be subject to cancellation with or without penalty and may produce volatility in earnings and revenue.**

More than 90% of our business involves providing products and services under contracts with U.S. federal, state and local government agencies and foreign government agencies. Obtaining contracts from government agencies is challenging, and government contracts often include provisions that are not standard in private commercial transactions. For example, government contracts may:

- include provisions that allow the government agency to terminate the contract without penalty under some circumstances;

- be subject to purchasing decisions of agencies that are subject to political influence;

- contain onerous procurement procedures and

- be subject to cancellation if government funding becomes unavailable.

Foreign government contracts generally include comparable provisions relating to termination for the convenience of the relevant foreign government. Securing government contracts can be a protracted process involving competitive bidding. In many cases, unsuccessful bidders may challenge contract awards, which can lead to increased costs, delays and possible loss of the contract for the winning bidder.

7

Table of Contents

**We derive a significant portion of our revenue from a few customers, the loss of which could have an adverse effect on our revenues.**

For the three-month period ended March 28, 2004, the U.S. Department of State, accounted for 13% of our revenue. For the year ended December 31, 2003, the Pennsylvania Department of Transportation and the Office of the Illinois Secretary of State, each accounted for 13% of our revenues. The U.S. Department of Justice has recently issued an indictment against former Governor of Illinois George Ryan and an updated indictment against former lobbyist Lawrence E. Warner on bribery and related federal racketeering charges. We had a formal consultative relationship with Mr. Warner's firm pursuant to which we paid that firm fees of approximately $800,000. Upon learning of the initial indictment of Mr. Warner in 2002, we immediately terminated our contract and relationship with Mr. Warner and his firm. There has been no assertion of any impropriety on our part.

For 2002, Connecticut Department of Information Technology and Mississippi Department of Information Technology Services, accounted for 10% and 12% of our revenues, respectively and an aggregate of 22% of our revenue. For 2001, Illinois Secretary of State, Unisys Corporation (Florida Department of Safety and Motor Vehicles), Kentucky Transportation Cabinet and Pennsylvania Department of Transportation, accounted for 10%, 12%, 14% and 13% of our revenue, respectively and an aggregate of 49% of our revenue. Since a small number of customers under our drivers' license contracts account for a substantial portion of our revenues, the loss of any of our significant customers would cause revenue to decline and could have a material adverse effect on our business.

**We derive revenue from only a limited number of products and services and we do not have a diversified product or service base.**

Substantially all of our revenues are derived from the sale of products and services comprising our identity solutions. We anticipate that substantially all of the growth in our revenue, if any, will also be derived from these sources. If for any reason our sale of these products or services is impeded, and we have not diversified our product and service offerings, our business and results from operations could be harmed.

**Loss of limited source suppliers may result in delays or additional expenses.**

We obtain certain hardware components and complete products from a limited group of suppliers. In particular, we obtain all of the printers and consumables for the U.S. Department of State passport contract and the Department of Defense, or DoD, Common Access Card, or CAC, contract from Toppan Printing Co. Ltd. Our reliance on these suppliers involves significant risks, including reduced control over quality and delivery schedules. Moreover, any financial instability of our manufacturers or contractors could result in our having to find new suppliers. We may experience significant delays in manufacturing and shipping our products to customers if we lose these sources or if supplies from these sources are delayed. As a result, we may be required to incur additional development, manufacturing and other costs to establish alternative sources of supply. It may take several months to locate alternative suppliers, if required, or to re-tool our products to accommodate components from different suppliers. We cannot predict if we will be able to obtain replacement components within the time frames we require at an affordable cost, or at all. Any delays resulting from suppliers failing to deliver components or products on a timely basis, in sufficient quantities and of sufficient quality or any significant increase in the price of components from existing or alternative suppliers could have a severe negative impact on our business, financial condition and results of operations.

**Termination of our contract with Georgia could cause us to lose $19.7 million in projected revenues over the next five and one-half years and could negatively affect our earnings.**

In July 2003, a Georgia court issued a preliminary injunction prohibiting Georgia's Department of Motor Vehicle Safety from continuing to work with us to install the State's new drivers' license system. The injunction is the result of a lawsuit filed in March 2003 by one of our competitors alleging that the Department of Motor Vehicle Safety did not comply with its own bid process when it selected a vendor for its new digital drivers' license program. In July 2004, we reached a settlement agreement with the State pursuant to which the Department of Motor Vehicle Safety terminated the contract for convenience and agreed to pay us $2.0 million in cash and the State agreed to

8

Table of Contents

purchase certain equipment from us for $500,000. The Department of Motor Vehicle Safety has filed a motion with the Georgia court to dismiss the case based upon the termination of the contract. The agency also has filed an affidavit stating that it intends to issue a new request for proposals for a digital drivers' license system before the end of October 2004. The competitor has filed a motion with the Georgia court to enjoin the Department of Motor Vehicle Safety and the State from making any payments to us under the settlement agreement. As a result of the termination of the contract, we will lose up to $19.7 million in revenue that we expected to recognize over the next five and one-half years, which was included in our $176 million of backlog at March 28, 2004, unless we are able to win the new contract for the digital drivers' license system and the revenues from such new contract are substantially similar to the terminated contract. While we believe we can utilize the remaining $2.8 million in assets being retained by us from the Georgia contract either in Georgia, if we win the contract based on the new request for proposals, or on alternative projects, to the extent that we are unable to utilize these assets or realize value through a sale of these assets, we would be required to take a charge to earnings.

## Our strategy of expanding our face recognition business could adversely affect our business operations and financial condition.

Part of our strategy is to enhance our leadership in face recognition technology and to expand our operations within our biometrics business segment. Pursuing this strategy involves risks. For instance, to date, face recognition security solutions have not gained widespread commercial acceptance. Some of the obstacles to widespread acceptance of face recognition security solutions include a perceived loss of privacy and public perceptions as to the usefulness of face recognition technologies. Whether the market for face recognition security solutions will expand will be dependent upon factors such as:

- the success of our marketing efforts and publicity campaigns and those of our competitors and

- customer satisfaction with our products and services, as well as those of our competitors.

We do not know when, if ever, face recognition security solutions will gain widespread commercial acceptance. In addition, our biometrics business segment has not achieved profitability, and it may never achieve profitability.

## We face intense competition, which could result in lower revenues and higher research and development expenditures and could adversely affect our results of operations.

The events of September 11, 2001 have heightened interest in the use of security solutions, and we expect competition in this field, which is already substantial, to intensify. We face competition in the secure credentials market from suppliers of drivers' licenses, passports, smart cards and other government-issued credentials. Competitors in biometrics are developing and bringing to market products that use face recognition as well as eye, fingerprint and other forms of biometric verification. Our products also will compete with non-biometric technologies such as certificate authorities and traditional keys, cards, surveillance systems and passwords. Widespread adoption of one or more of these technologies or approaches in the markets we intend to target could significantly reduce the potential market for our systems and products. Many of our competitors have significantly more cash and resources than we have. Our competitors may introduce products that are competitively priced, have increased performance or functionality or incorporate technological advances that we have not yet developed or implemented. To remain competitive, we must continue to develop, market and sell new and enhanced systems and products at competitive prices, which will require significant research and development expenditures. If we do not develop new and enhanced products or if we are not able to invest adequately in our research and development activities, our business, financial condition and results of operations could be negatively impacted.

## Unless we keep pace with changing technologies, we could lose customers and fail to win new customers.

Our future success will depend upon our ability to develop and introduce a variety of new products and services and enhancements to these new products and services in order to address the changing needs of the marketplace. We may not be able to accurately predict which technologies customers will support. If we do not introduce new products, services and enhancements in a timely manner, if we fail to choose correctly among technical alternatives or if we fail to offer innovative products and services at competitive prices, customers may forego purchases of our products and services and purchase those of our competitors.

Table of Contents

**Security breaches in systems that we sell or maintain could result in the disclosure of sensitive government information or private personal information that could result in the loss of clients and negative publicity.**

Many of the systems we sell manage private personal information and protect information involved in sensitive government functions. A security breach in one of these systems could cause serious harm to our business as a result of negative publicity and could prevent us from having further access to such systems or other similarly sensitive areas for other governmental clients. Our systems may also be affected by outages, delays and other difficulties. Our insurance coverage in certain circumstances may be insufficient to cover losses and liabilities that may result from such events.

**The market for our solutions is still developing and if the industry adopts standards or a platform different from our platform, then our competitive position would be negatively affected.**

The market for identity solutions is still emerging. The evolution of this market is in a constant state of flux that may result in the development of different technologies and industry standards that are not compatible with our current products or technologies. In particular, the face recognition market lacks industry-wide standards. Several organizations, such as the International Civil Aviation Organization, which sets standards for travel documents that its member states then put into effect, and the National Institute for Standards and Testing, which is part of the U.S. Department of Commerce, have recently selected face recognition as the biometric to be used in identification documentation. It is possible, however, that these standards may change and that any standards eventually adopted could prove disadvantageous to or incompatible with our business model and product lines.

**The adoption of EITF 00-21 resulted in a non-cash adjustment of $12.1 million and may have an adverse effect on our results of operations in the near term which may depress the market price of our common stock.**

During the third quarter of 2003, we adopted the provisions of Emerging Issues Task Force 00-21, *Accounting for Revenue Arrangements with Multiple Deliverables* , or EITF 00-21, on a cumulative basis as of January 1, 2003. After discussions with the Securities and Exchange Commission staff regarding the effect of EITF 00-21 on revenue recognition on our secure identification contracts, we decided to adopt EITF 00-21 via cumulative catch-up as of January 1, 2003 rather than prospectively as reflected in the previously filed Form 10-Q for the quarter ended September 28, 2003. The adoption of EITF 00-21 resulted in a non-cash adjustment reported as a cumulative effect of a change in accounting principle of $12.1 million. The adoption of EITF 00-21 affects the timing of revenue recognition under our secure identification contracts and as a result we may report reduced revenue and an increased net loss for one or more of our fiscal quarters in 2004. This effect on our results of operations could cause our stock price to decline.

**Our leverage creates financial and operating risks that could limit the growth of our business.**

We have a significant amount of indebtedness. As of March 28, 2004, we had approximately $31.4 million in short and long-term debt and lease financing. This amount includes $15.3 million of related party debt incurred in our acquisition of Trans Digital Technologies, or TDT, in February 2004. While we plan to use part of the proceeds from this offering to repay all of this indebtedness, we may not raise sufficient funds in this offering to do so. Further, we may incur additional indebtedness in the future. To the extent that we do not repay a substantial portion of our debt following this offering, or if we incur additional debt in the future, such leverage could have important consequences to our business including:

- limiting our ability to obtain necessary financing for future working capital;

- limiting our ability to finance the acquisition of equipment needed to meet customer requirements;

- limiting our ability to finance the development of new technologies;

10

Table of Contents

- requiring that we use a substantial portion of our cash flow from operations for debt service and not other operating purposes and

- requiring that we comply with financial and operating covenants, the failure of which could cause an event of default under our debt instruments.

Our loan agreements with Commerce Bank and Trust Company and Lau Technologies, our single largest shareholder, impose significant operating and financial restrictions on us. These restrictions limit our ability to, among other things, make capital expenditures, incur additional indebtedness or make investments. In addition, these agreements require us to comply with certain financial covenants, including profitability, tangible net worth, debt to worth ratio and debt service coverage. Our ability to make principal and interest payments under long-term indebtedness and bank loans will be dependent upon our future performance, which is subject to financial, economic and other factors affecting us, some of which are beyond our control.

**Others could claim that we are infringing on their intellectual property rights, which could result in substantial costs, diversion of managerial resources and harm to our reputation.**

Although we believe that our products and services do not infringe the intellectual property rights of others, we might not be able to defend successfully against a third-party infringement claim. A successful infringement claim against us could subject us to:

- liability for damages and litigation costs, including attorneys' fees;

- lawsuits that prevent us from further use of the intellectual property;

- having to license the intellectual property from a third party, which could include significant licensing fees;

- having to develop a non-infringing alternative, which could be costly and delay projects and

- having to indemnify clients with respect to losses they incurred as a result of the alleged infringement.

Even if we are not found liable in a claim for intellectual property infringement, such a claim could result in substantial costs, diversion of resources and management attention, termination of customer contracts and harm to our reputation.

On July 19, 2004, Fargo Electronics, Inc. initiated a patent infringement action in the U.S. District Court for the Eastern District of Virginia against Toppan Printing Co., Ltd. and TDT. The complaint alleges that Toppan and TDT's use, offer to sell and/or importation of certain personalized identification card printers, including Toppan's CP400 card printers, and associated laminators in the United States constitutes direct and indirect infringement of four patents allegedly owned by Fargo. The complaint seeks unspecified compensatory damages, permanent injunctive relief, trebling of damages for willful infringement and fees and costs. We are currently evaluating the claims in this lawsuit and intend to vigorously defend against them. We believe that the only products at issue are Toppan CP400 printers that were or are sold, used or imported as part of the CAC program. To date, we have received purchase orders of $10.2 million for Toppan CP400 printers for the CAC program, which are expected to be delivered by the end of the first quarter of 2005. There can be no assurance that we will prevail in this litigation. The litigation, with or without merit, could be time consuming and expensive to litigate or settle and could divert management's attention from our business.

**Uncertainties in global economic markets could cause delays in customer purchases.**

Many customers and potential customers have delayed purchase intentions as a result of uncertainties in global economic markets. Government budgets, particularly at state and regional levels, have been or are expected to be reduced notably. Government contracts result from purchasing decisions made by public sector agencies that are particularly sensitive to budget changes and cutbacks during economic downturns, and

11

Table of Contents

variations in appropriations cycles. Many U.S. state customers are facing budget cuts, and some international customers are facing debt crises, introducing added uncertainty. Any shift in the government procurement process, which is outside of our control and may not be predictable, could impact the predictability of our quarterly results and may potentially have a material negative effect on our financial position, results of operation or cash flows.

**If we do not successfully expand our direct sales and services organizations and partnering arrangements, we may not be able to increase our sales or support our customers.**

In the fiscal years ended December 31, 2002 and 2003, and three-month periods ended March 28, 2004 and March 30, 2003, we sold substantially all of our services and licensed substantially all of our products through our direct sales organization. Our future success depends on substantially increasing the size and scope of our direct sales force and partnering arrangements, both domestically and internationally. We will face intense competition for personnel, and we cannot guarantee that we will be able to attract, assimilate or retain additional qualified sales personnel on a timely basis. Moreover, given the large-scale deployment required by some of our customers, we will need to hire and retain a number of highly trained customer service and support personnel. We cannot guarantee that we will be able to increase the size of our customer service and support organization on a timely basis to provide the high quality of support required by our customers. Failure to add additional sales and customer service representatives could result in our inability to increase our sales and support our customers.

**Integration of ZN's and TDT's businesses may be difficult and will consume significant financial and managerial resources which could have an adverse effect on our results of operations.**

On January 23, 2004, we completed the acquisition of ZN Vision Technologies AG, or ZN, a leading German provider of face recognition and computer vision products and services. On February 14, 2004, we completed the acquisition of TDT. The integration of ZN's and TDT's products and services with ours will be challenging and will consume significant financial and managerial resources. The challenges involved with this integration include, among others:

- challenges related to technology integration;
- possible difficulty implementing uniform standards, controls, procedures and policies and
- possible loss of key employees.

In addition, the differences between U.S. and German business cultures and the geographic distance between the companies could present significant obstacles to our timely, cost-effective integration of ZN.

**The significant direct and indirect costs of our acquisition and integration of ZN and TDT could adversely affect our financial performance.**

We incurred approximately $2.7 million of costs in connection with the acquisitions of ZN and TDT, including:

- costs associated with integrating our business with ZN and TDT;
- financial advisory fees and
- costs and expenses for services provided by our lawyers and accountants.

The transaction costs and expenses attributable to financial advisory, legal and accounting services that we incurred will be capitalized as a component of the purchase price. Goodwill associated with the acquisitions will be required to be tested at least annually for impairment, and we will be required to record a charge to earnings if there is an impairment in the value of such goodwill at a later date. Other intangible assets acquired in connection with the acquisitions will be amortized over their estimated useful lives.

12

Table of Contents

**The acquisitions of ZN and TDT could result in future impairment charges which could adversely affect our results of operations.**

As a result of the acquisitions of ZN and TDT, goodwill and other intangible assets have been created. The values we may record for goodwill and other intangible assets will represent fair values calculated by independent third-party appraisers. Such valuations require us to provide significant estimates and assumptions, which are derived from information obtained from the management of the acquired businesses and our business plans for the acquired businesses or intellectual property. If estimates and assumptions used to initially value goodwill and intangible assets prove to be inaccurate, ongoing reviews of the carrying values of such goodwill and intangible assets may indicate impairments which will require us to record an impairment charge in the period in which we identify the impairments.

**If we do not achieve the expected benefits of our acquisitions of ZN and TDT, the price of our common stock could decline.**

We expect that the acquisition of ZN will enhance our leadership in face recognition technology through the combination of our technologies with those of ZN. Although the results of the initial tests of our combined technologies have been positive, the combination of such technologies might not meet the demands of the marketplace. If our technologies fail to meet such demand, customer acceptance of our face recognition solutions could decline, which would have an adverse effect on our results of operations and financial condition. In addition, we expect that the acquisition will enable us to market our systems and products on a global scale. Our face recognition customers are primarily located in the United States, and ZN's customers are primarily located in Europe. We might not be able to market successfully our products and services to ZN's customers or ZN's products and services to our customers. We expect that the acquisition of TDT will enhance our position in the market for secure credentials, particularly for the U.S. government. If our product offerings and services fail to meet the demands of this market, our results of operations and financial condition could be adversely affected. There is also a risk that we will not achieve the anticipated benefits of the acquisitions as rapidly as, or to the extent, anticipated by financial or industry analysts, or that such analysts will not perceive the same benefits to the acquisitions as we do. If these risks materialize, our stock price could be adversely affected.

**The success of our strategic plan to grow sales and develop relationships in Europe may be limited by risks related to conducting business in European markets.**

Although ZN has experience marketing and distributing its products and developing strategic relationships in Europe, part of our strategy will be to increase sales and build additional relationships in European markets. Risks inherent in marketing, selling and developing relationships in European markets include those associated with:

- economic conditions in European markets, including fluctuations in the relative values of the U.S. dollar and the Euro;

- taxes and fees imposed by European governments that may increase the cost of products and services and

- laws and regulations imposed by individual countries and by the European Union.

In addition, European intellectual property laws are different than U.S. intellectual property laws and we will have to ensure that our intellectual property is adequately protected in foreign jurisdictions and that ZN's intellectual property is adequately protected in the United States. If we do not adequately protect our intellectual property rights, competitors could use our proprietary technologies in non-protected jurisdictions and put us at a competitive disadvantage.

13

Table of Contents

**Our business may be impacted by changes in the local marketplace of our foreign operations and fluctuations in currency exchange rates.**

As a result of our acquisitions of ZN and TDT, we expect that we will have increased exposure to foreign currency fluctuations. Net revenue and related expenses generated from our international location in Germany are denominated in euros, exposing the results of operations and certain of our intercompany balances associated with this international location to foreign exchange rate fluctuations. In addition to our German operation, we will have increased transactions with Japanese vendors supplying hardware and consumables for the delivery of the TDT contracts. These transactions will increase our exposure to foreign currency fluctuations with the yen. To the extent the U.S. dollar weakens against these foreign currencies, the conversion of these foreign currency denominated transactions results in increased net revenue, operating expenses and net income. Similarly, our net revenue, operating expenses and net income will decrease when the U.S. dollar strengthens against these foreign currencies.

**If our systems and products do not perform as promised, we could experience increased costs, lower margins, liquidated damage payment obligations and harm to our reputation.**

We will be required to provide complex systems that will be required to operate on an "as needed" basis. Although we will deploy back-up systems, the failure of our products to perform as promised could result in increased costs, lower margins, liquidated damage payment obligations and harm to our reputation. The failure of our products also could result in contract terminations and have a material adverse effect on our business and financial results.

**Misappropriation of our intellectual property could harm our reputation, affect our competitive position and cost us money.**

We believe that our intellectual property, including our methodologies, will be critical to our success and competitive position. If we are unable to protect this intellectual property against unauthorized use by third parties, our reputation among existing and potential customers could be damaged and our competitive position adversely affected. Our strategies to deter misappropriation could be undermined if:

- the proprietary nature or protection of our methodologies is not recognized in the United States or foreign countries;

- third parties misappropriate our proprietary methodologies and such misappropriation is not detected or

- competitors create applications similar to ours but which do not technically infringe on our legally protected rights.

If these risks materialize, we could be required to spend significant amounts to defend our rights and divert critical managerial resources. In addition, our proprietary methodologies may decline in value or our rights to them may become unenforceable.

**If we fail to adequately manage our resources, it could have a severe negative impact on our financial results or stock price.**

We are subject to fluctuations in technology spending by existing and potential customers. Accordingly, we will have to actively manage expenses in a rapidly changing economic environment. This could require reducing costs during economic downturns and selectively growing in periods of economic expansion. If we do not properly manage our resources in response to these conditions, our results of operations could be negatively impacted.

14

Table of Contents

**Future acquisitions of companies or technologies may result in disruptions to our business.**

Beyond the acquisitions of ZN and TDT, our growth strategy could include additional acquisitions of companies or technologies that complement ours. Future acquisitions could involve risks inherent in acquisitions, such as:

- challenges associated with integrating acquired technologies and business of operations acquired companies;

- exposure to unknown liabilities;

- diversion of managerial resources from day-to-day operations;

- possible loss of key employees, customers and suppliers;

- higher than expected transaction costs and

- additional dilution to our existing stockholders if we use our common stock as consideration.

If we fail to manage these challenges adequately, our results of operations and stock price could be adversely affected.

**The loss of key personnel could adversely affect our ability to remain competitive.**

We believe that the continued service of our executive officers will be important to our future growth and competitiveness. We have entered into employment agreements with our executive officers, including Bernard C. Bailey, our Chief Executive Officer, William K. Aulet, our Chief Financial Officer and James P. Ebzery, our Senior Vice President, Worldwide Sales and Services. These agreements are intended to provide the executives with incentives to remain employed by us. However, we cannot assure you that they will remain employed by us. In addition, we believe that the continued employment of key members of our technical and sales staffs is important to us. Most of our employees are entitled to voluntarily terminate their relationship with us, typically without any, or with only minimal, advance notice. The process of finding additional trained personnel to carry out our strategy could be lengthy, costly and disruptive. We might not be able to retain the services of all of our key employees or a sufficient number of them to execute our plans. In addition, we might not be able to continue to attract new employees as required.

**Our quarterly results could be volatile and may cause our stock price to fluctuate.**

We have experienced fluctuations in quarterly operating results and we expect those fluctuations to continue. We expect that our quarterly results will continue to be affected by, among other things, factors such as:

- the size and timing of contract awards;

- the timing of our contract performance;

- variations in the mix of our products and services and

- contract losses and changes in management estimates inherent in accounting for contracts.

**Certain of our stockholders have significant relationships with us, which could result in us taking actions that are not supported by unaffiliated stockholders.**

Lau Technologies, or Lau, and B.G. Beck, who is also a director and Vice Chairman, beneficially own approximately 16.8% and 16.4%, respectively, of our outstanding common stock. After giving effect to the sale of 7,200,000 shares of our common stock in this offering, Lau and Mr. Beck will beneficially own approximately 13.8% and 13.4%, respectively, of our outstanding common stock. As a result of their ownership, both Lau and Mr. Beck have a strong influence on matters requiring approval by our stockholders, including the election of

15

Table of Contents

directors and most corporate actions, including mergers and acquisitions. In addition, we have significant relationships with each of Lau and Mr. Beck, including:

- Lau has provided us with a credit facility in an aggregate principal amount of $7.3 million, which is secured by some of our assets;

- we acquired significant intellectual property, contracts and distribution channels through a transaction with Lau under which we agreed to pay Lau a 3.1% royalty on our facial recognition revenues for a period of twelve and one half years, up to a maximum of $27.5 million;

- the Chairman of our Board of Directors and his spouse own a majority of Lau's voting stock;

- in connection with the acquisition of TDT, Mr. Beck was appointed a member of our Board of Directors and appointed Vice Chairman;

- in connection with the acquisition of TDT, we issued a promissory note to Mr. Beck in the amount of $15.3 million, which is secured by some of TDT's assets and

- in connection with the acquisition of TDT, we entered into a consulting agreement with Mr. Beck under which we will pay Mr. Beck $300,000 per year for two years, provided that Mr. Beck devotes his full business time to developing business opportunities for us.

### Risks Related to Our Common Stock

**Future sales of our common stock may depress our stock price.**

The market price of our common stock could decline as a result of sales of substantial amounts of our common stock in the public market after this offering, or the perception that these sales could occur. In addition, these factors could make it more difficult for us to raise funds through future equity offerings. There will be 43,070,327 shares of our common stock outstanding immediately after this offering.

We and our executive officers and directors and the selling shareholders have entered into 90-day lock-up agreements with the underwriters. The lock-up agreements prohibit each of us from selling or otherwise disposing of shares of common stock except in limited circumstances. The lock-up agreements are only contractual agreements, and J.P. Morgan Securities Inc. and UBS Securities LLC, at their joint discretion, can waive the restrictions of any lock-up agreement at an earlier time without prior public notice or announcement and allow any of us to sell shares of common stock. If the restrictions in the lock-up agreement are waived, shares of our common stock will be available for sale into the public market, subject to applicable securities laws and our share retention policy, which could reduce the market price for shares of our common stock.

Lau and Mr. Beck own approximately 16.8% and 16.4%, respectively, of our common stock. After giving effect to the sale of 7,200,000 shares of our common stock in this offering, Lau and Mr. Beck will beneficially own approximately 13.8% and 13.4%, respectively, of our outstanding common stock. If either of these stockholders sells a significant number of shares of our common stock in the open market, our stock price could decline.

**Our stock price and trading volume may be volatile, which could result in substantial losses for our shareholders.**

The market price of our common stock may be highly volatile and be subject to wide fluctuations. In addition, the trading volume in our common stock may fluctuate and cause significant price variations to occur. Some of the factors that could negatively affect our share price or result in fluctuations in the price or trading volume of our common stock include:

- general economic conditions;

- actual or anticipated changes in our future financial performance;

- changes in financial estimates by securities analysts;

16

Table of Contents

- changes in market interest rates;

- competitive developments, including announcements by us or our competitors of new products or services or significant contracts, acquisitions, strategic partnerships or capital commitments;

- the operations and stock performance of our competitors;

- fluctuations in our quarterly operating results;

- additions or departures of senior management and key personnel and

- actions by institutional shareholders.

If the market price of our common stock declines significantly, you may be unable to resell your common stock at or above the offering price. We cannot assure you that the market price of our common stock will not fluctuate or decline significantly, including a decline below the offering price, in the future. In addition, the stock market in general can experience considerable price and volume fluctuations.

**Our board of directors may authorize the issuance of additional shares that may cause dilution.**

Our articles of incorporation authorizes our board of directors, without your approval, to:

- authorize the issuance of additional common or preferred stock in connection with future equity offerings, acquisitions of securities or other assets of companies and

- classify or reclassify any unissued common stock or preferred stock and to set the preferences, rights and other terms of the classified or reclassified shares, including the issuance of shares of preferred stock that have preference rights over the common stock with respect to dividends, liquidation, voting and other matters or shares of common stock that have preference rights over your common stock with respect to voting.

The issuance of additional shares could be substantially dilutive to your shares.

**Future offerings of debt securities, which would be senior to our common stock in liquidation, or equity securities, which would dilute our existing shareholders and may be senior to our common stock for the purposes of distributions, may harm the value of our common stock.**

In the future, we may attempt to increase our capital resources by making additional offerings of debt or equity securities, including commercial paper, medium-term notes, senior or subordinated notes, preferred stock or common stock. If we were to liquidate, holders of our debt securities and shares of preferred stock and lenders with respect to other borrowings will receive a distribution of our available assets before the holders of our common stock. Additional equity offerings by us may dilute your interest in us or reduce the value of your shares of common stock, or both. Our preferred stock, if issued, could have a preference on distribution payments that could limit our ability to make a distribution to you. Because our decision to issue securities in any future offering will depend on market conditions and other factors beyond our control, we cannot predict or estimate the amount, timing or nature of our future offerings. Further, market conditions could require us to accept less favorable terms for the issuance of our securities in the future. Thus, you will bear the risk of our future offerings reducing the value of your shares of common stock and diluting your interest in us.

**Our management will have broad discretion in the use of net proceeds from this offering and may not use them effectively.**

We will use approximately $30.3 million of the net proceeds of this offering to repay indebtedness as described in more detail under "Use of Proceeds." As of the date of this prospectus, we cannot specify with certainty the amounts we will spend on particular uses from the remaining net proceeds that we will receive from this offering. Our management will have broad discretion in the application of these net proceeds, but currently intends to use them as described in "Use of Proceeds." The failure by our management to apply these net proceeds effectively could adversely affect our ability to continue to develop our business.

17

Table of Contents

## USE OF PROCEEDS

We estimate that the net proceeds from the sale of the 7,200,000 shares of common stock that we are selling in this offering will be approximately $37.1 million, after deducting underwriting discounts and commissions and estimated offering expenses payable by us. If the underwriters exercise their over-allotment option in full, we estimate the net proceeds to us from such exercise will be approximately $39.8 million. We will not receive any of the proceeds of the shares that will be sold by the selling shareholders.

We expect to use the net proceeds from this offering to repay $15.3 million of notes payable to B.G. Beck in connection with our acquisition of Trans Digital Technologies on February 14, 2004, and to repay approximately $15.0 million of indebtedness outstanding under our loan agreements with Lau Technologies and Commerce Bank and Trust Company as of March 28, 2004. We borrowed $3.0 million from Commerce in February 2004 to finance our contract with the State of Illinois. The general repayment terms of such indebtedness are as follows:

| Lender | Due Date | Interest Rate | March 28, 2004 |
|---|---|---|---|
| | | | (unaudited) (in thousands) |
| B.G. Beck | 12/1/2005 | 8.50% | $ 15,300 |
| Commerce | 3/11/2006 | 6.25% | 1,612 |
| Commerce | 6/20/2006 | 8.00% | 2,053 |
| Commerce | 2/27/2007 | 7.30% | 2,924 |
| Commerce | 6/24/2007 | 5.25% | 901 |
| Commerce | 12/31/2007 | 5.25% | 1,394 |
| Commerce | 4/24/2008 | 5.25% | 1,191 |
| Lau | 8/30/2005 | 8.50% | 1,014 |
| Lau | 5/30/2008 | 8.50% | 2,249 |
| Lau | 6/30/2009 | 8.50% | 1,673 |
| | | | $ 30,311 |

\*    We estimate that we will incur approximately $600,000 in prepayment penalties, which are not reflected in the table above.

We expect to use the remaining net proceeds for capital expenditures and general corporate purposes. We also may use a portion of the net proceeds to acquire complementary products, technologies or businesses, if and when such opportunities arise. Pending these uses, we intend to invest the net proceeds in short-term interest bearing, investment grade securities.

18

Table of Contents

## DILUTION

Our net tangible book value as of March 28, 2004 was approximately $10.1 million, or approximately $0.28 per share of common stock. Net tangible book value per share is determined by dividing our net tangible book value, which consists of tangible assets less total liabilities, by the number of shares of common stock outstanding on that date. Without taking into account any other changes in the net tangible book value after March 28, 2004, other than to give effect to our receipt of the estimated net proceeds from the sale by us of 7,200,000 shares of our common stock in this offering, less the underwriting discounts and commissions payable by us and our estimated offering expenses, our net tangible book value as of March 28, 2004, after giving effect to the items above would have been approximately $47.1 million, or $1.10 per share. This represents an immediate increase in the net tangible book value of $0.82 per share to existing shareholders and an immediate dilution of $4.40 per share to new investors. The following table illustrates this per share dilution:

| | | |
|---|---|---|
| Offering price per share | | $ 5.50 |
| Net tangible book value per share as of March 28, 2004 | $ 0.28 | |
| Increase in net tangible book value per share attributable to this offering | 0.82 | |
| Pro forma net tangible book value per share as of March 28, 2004 after giving effect to this offering | | 1.10 |
| Dilution per share to new investors | | $ 4.40 |

This table is based on the number of shares as of March 28, 2004, and does not include the following:

- 4,585,000 shares of our common stock issuable upon the exercise of options outstanding as of that date at a weighted average exercise price of $3.41 per share and

- 812,000 shares of our common stock issuable upon exercise of warrants outstanding as of that date at a weighted average exercise price of $11.94 per share.

19

Table of Contents

## CAPITALIZATION

The following table sets forth our capitalization as of March 28, 2004 on an actual basis and on an adjusted basis. The as adjusted capitalization reflects the sale by us of 7,200,000 shares of common stock in this offering after deducting underwriting discounts and commissions and estimated offering expenses payable by us. This information should be read together with our consolidated financial statements and related notes included elsewhere in this prospectus.

|  | As of March 28, 2004 | |
|  | Actual | As Adjusted |
| --- | --- | --- |
|  | (dollars in thousands) | |
| Current portion of long-term debt | $ 10,940 | $ 703 |
| Long-term debt | 20,483 | 409 |
| Total debt | 31,423 | 1,112 |
| Shareholders' equity: | | |
| Common stock, $0.001 par value; 45,000,000 shares authorized; 35,625,176 shares and 42,825,176 shares (as adjusted) issued and outstanding, respectively(1) | 36 | 43 |
| Additional paid in capital | 135,869 | 172,932 |
| Accumulated deficit | (43,709) | (43,709) |
| Total shareholders' equity | 92,196 | 129,266 |
| Total capitalization | $ 123,619 | $ 130,378 |

(1)   On June 15, 2004 we increased the number of authorized shares of our common stock to 75,000,000.

20

Table of Contents

## PRICE RANGE OF COMMON STOCK

Our common stock trades on the Nasdaq National Market under the symbol "VISG." The following table sets forth the quarterly range of high and low reported sale prices of the common stock on the Nasdaq National Market for the periods indicated.

| Fiscal year ended December 31, 2002 | High | Low |
|---|---|---|
| First Quarter | $ 10.14 | $ 5.02 |
| Second Quarter | 7.64 | 3.63 |
| Third Quarter | 5.10 | 2.50 |
| Fourth Quarter | 5.84 | 3.27 |

| Fiscal year ended December 31, 2003 | High | Low |
|---|---|---|
| First Quarter | $ 5.40 | $ 3.01 |
| Second Quarter | 5.78 | 3.76 |
| Third Quarter | 5.40 | 3.85 |
| Fourth Quarter | 4.61 | 3.34 |

| Fiscal year ending December 31, 2004 | High | Low |
|---|---|---|
| First Quarter | $ 8.20 | $ 3.53 |
| Second Quarter (through August 4, 2004) | 14.30 | 6.21 |

On August 4, 2004, the last reported sale price of the common stock as reported on the Nasdaq National Market was $6.23 per share. As of July 15, 2004, there were approximately 239 record holders of our common stock.

## DIVIDEND POLICY

We have never declared or paid cash dividends on our common stock. We are prohibited from paying dividends pursuant to our borrowing arrangements. Notwithstanding this limitation, we presently intend to retain our cash for use in the operation and expansion of our business and, therefore, do not anticipate paying any cash dividends in the foreseeable future.

21

Table of Contents

## SELECTED CONSOLIDATED FINANCIAL DATA

The following tables provide our selected consolidated financial data, which were derived from our audited consolidated financial statements for each of the three years in the period ended December 31, 2003. The historical results presented are not necessarily indicative of future results. The data should be read in conjunction with our financial statements, related notes and other financial information as of December 31, 2003 and for each of the three years in the periods ended December 31, 2003 appearing elsewhere in this prospectus, as well as the discussions appearing in "Management's Discussion and Analysis of Financial Condition and Results of Operations."

Our financial data for the three-month periods ended March 30, 2003 and March 28, 2004 were derived from our unaudited financial statements included elsewhere in this prospectus. The unaudited financial statements include all adjustments, consisting of normal recurring accruals, which we consider necessary for a fair presentation of our financial position and results of operations for those periods. Operating results for interim periods are not necessarily indicative of results that may be expected for the entire fiscal year.

| | For the Years Ended December 31, | | | For the Three Months Ended(2) | |
| --- | --- | --- | --- | --- | --- |
| | 2001(1) | 2002(1) | 2003(2) | March 30, 2003 | March 28, 2004 |
| | | | | (unaudited) | |
| | (dollars in thousands, except per share data) | | | | |
| **Statement of Operations Data:** | | | | | |
| Revenue | $ 26,280 | $ 32,302 | $ 37,371 | $ 8,155 | $ 12,259 |
| Cost of revenue | 19,602 | 25,239 | 27,844 | 6,789 | 8,906 |
| Gross margin | 6,678 | 7,063 | 9,527 | 1,366 | 3,353 |
| Operating expenses: | | | | | |
| Sales and marketing | 809 | 5,368 | 5,282 | 1,411 | 1,493 |
| Research and development | 2,054 | 4,457 | 3,650 | 945 | 959 |
| General and administrative | 2,500 | 5,069 | 5,110 | 1,093 | 2,137 |
| Acquisition expenses | 1,639 | — | — | — | — |
| Restructuring charges | — | 824 | — | — | — |
| Total operating expenses | 7,002 | 15,718 | 14,042 | 3,449 | 4,589 |
| Operating loss | (324) | (8,655) | (4,515) | (2,083) | (1,236) |
| Interest expense, net | (1,210) | (875) | (969) | (219) | (392) |
| Other income | — | — | 18 | — | 21 |
| Loss before income taxes and cumulative effect of change in accounting principle | (1,534) | (9,530) | (5,466) | (2,302) | (1,607) |
| Provision for income taxes | — | — | (63) | (63) | (25) |
| Loss before cumulative effect of change in accounting principle | (1,534) | (9,530) | (5,529) | (2,365) | (1,632) |
| Cumulative effect of change in accounting principle (3) | — | — | (12,131) | (12,131) | — |
| Net loss | (1,534) | (9,530) | (17,660) | (14,496) | (1,632) |
| Preferred stock dividends | (5) | — | — | — | — |
| Loss applicable to common shareholders | $ (1,539) | $ (9,530) | $ (17,660) | $ (14,496) | $ (1,632) |
| Basic and diluted net loss per share | $ (0.09) | $ (0.48) | $ (0.26) | $ (0.12) | $ (0.05) |
| Basic and diluted loss per share applicable to common shareholders (4) | $ (0.09) | $ (0.48) | $ (0.82) | $ (0.72) | $ (0.05) |
| Weighted average basic common shares outstanding | 16,265 | 20,046 | 21,445 | 20,258 | 31,362 |

22

Table of Contents

| | For the Years Ended December 31, | | | For the Three Months Ended(2) | |
|---|---|---|---|---|---|
| | 2001(1) | 2002(1) | 2003(2) | March 30, 2003 | March 28, 2004 |
| | | | (dollars in thousands) | (unaudited) | |
| **Balance Sheet Data:** | | | | | |
| Working capital | $ 38,115 | $ 22,244 | $ 5,887 | $ 2,642 | $ 2,443 |
| Total assets | 67,663 | 61,189 | 54,480 | 43,975 | 135,292 |
| Long-term obligations | 10,368 | 9,845 | 8,147 | 8,607 | 20,483 |
| Total debt | 14,645 | 15,108 | 13,621 | 13,811 | 31,423 |
| Shareholders' equity | 46,294 | 39,064 | 34,008 | 24,603 | 92,196 |

(1)    The results are presented under percentage of completion based on the cost to cost method of measurement.

(2)    The results are presented in accordance with EITF 00-21 applied on a cumulative basis as of January 1, 2003.

(3)    We adopted EITF 00-21 on a cumulative basis as of January 1, 2003. See note 2 in the Notes to Consolidated Financial Statements which discusses the change in accounting principle.

(4)    See note 2 in the Notes to Consolidated Financial Statements for information concerning the computation of basic and diluted net loss per share.

23

Table of Contents

## MANAG EMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

You should read the following summary together with the more detailed business information and consolidated financial statements and related notes that appear elsewhere in this prospectus and in the documents that we incorporate by reference into this prospectus.

### Introduction

We are a leading provider of advanced technology identity solutions that enable governments, law enforcement agencies and businesses to enhance security, reduce identity theft and protect personal privacy. Our identity solutions include secure credential provisioning systems, biometric software and systems and real-time identity databases, as well as systems design, development, integration and support services. These solutions enable our customers to manage the entire life cycle of an individual's identity for a variety of applications including civil identification, criminal identification and border management. Our customers use our solutions to help solve the following four critical problems in identity verification and management:

- assurance that the identification document is authentic;

- assurance that the document has been issued to the correct person;

- confidence that the person holding the identification is uniquely tied to and authorized to use the document and

- verification of the privileges the individual is entitled to at a particular point in time.

Our solutions annually produce more than 30 million secure government-issued credentials at more than 2,000 locations. We are the second largest provider of U.S. drivers' licenses with a 30% market share, and we are the sole source provider of passport production capability to the U.S. Department of State. We also are a recognized leader in biometrics in the field of face recognition. Our customers include governments, law enforcement agencies and businesses in more than 15 countries.

We generate revenue through the sale and license of products and services for verifying and managing identities. Our revenues increased from $8.2 million in the first quarter of 2003 to $12.3 million in the first quarter of 2004. Our net loss during the same periods decreased from $2.4 million to $1.6 million, excluding the one-time charge of $12.1 million in connection with our change in accounting principle as of January 1, 2003. Our efforts in 2004 have been and will continue to be primarily focused on expanding our portfolio of offerings to satisfy our customers' identity solution requirements. We have taken substantial steps in this direction through the acquisitions of ZN Vision Technologies AG, or ZN, in January 2004 and Trans Digital Technologies Corporation, or TDT, in February 2004. The acquisition of TDT enabled us to be selected to provide a solution to the U.S. Department of Defense, or DoD, to support the production of smart cards as part of the agency's Common Access Card, or CAC, program. We continue to make investments in research and development and intend to continue to introduce new and enhanced product and service offerings. To further increase revenue, we are also expanding our distribution channels.

### Segments and Geographic Information

Our business involves two closely-related segments: secure credentials and biometrics. For the three-month period ended March 28, 2004, we derived 96.2%, or $11.7 million, of our direct revenue within the United States. We derived an additional 1.3%, or $160,000, of our direct revenue in Canada. The remaining 2.5%, or $307,000, was derived by our German subsidiary, primarily from customers in countries within the European Union. For the year ended December 31, 2003 approximately $36.6 million, or 97.8% of our direct revenue was derived within the United States. The remaining $818,000, or 2.2% of revenue was derived in Canada and the United Arab Emirates.

24

Table of Contents

### Secure Credentials Segment

Our secure credentials segment accounted for approximately 85.8% and 84.2% of our revenues in the three-month periods ended March 28, 2004 and March 30, 2003, respectively, and 82.2%, 84.7% and 86.6% of our revenue for the years ended December 31, 2003, 2002, and 2001, respectively. Our secure credentials solutions involve the design, development, marketing and implementation of integrated software and hardware solutions that produce identification credentials, many of which utilize face recognition and other biometric technologies.

We provide customized systems utilizing proprietary products under service contracts that typically have five to seven year terms and several optional annual renewals after the initial contract term. For drivers' licenses, these contracts generally provide for a fixed price for each identification credential produced. Contract prices vary depending on, among other things, design and integration complexities, the nature and number of workstations and sites, the projected number of secure credentials to be produced, the size of the database, the level of post-installation support and the competitive environment. Our secure credentials segment also includes the contracts we assumed as part of our acquisition of TDT in February 2004. TDT contributed revenues of $1.8 million to this segment for the three months ended March 28, 2004. Under these contracts, we provide high security technology and services to the U.S. Department of State for the production of U.S. passports, as well as similar services to the DoD and Homeland Security. Those contracts generally provide that we will be paid for the hardware, software and services we provide, as well as consumables delivered to the customer.

In civil identification applications, such as drivers' licenses and passports, the sales cycle generally includes a formal request for proposal, or RFP, bidding process. Once an RFP is issued, a comprehensive proposal is developed and usually followed by an on-site customer demonstration. The process from the issuance of an RFP to the ultimate award can take up to six months. Following the bid award a six-to-twelve month implementation and installation process usually ensues. We believe that long sales cycles in our public sector markets are endemic to the market and will continue. Further, customers may seek to modify the system either during or after the implementation of the system. While our long sales and implementation cycle requires the commitment of marketing resources and investments of working capital, we believe that it also serves as a barrier to entry for smaller companies and as an early indicator of potential competitors for particular projects. For existing customers, a considerably shorter sales and implementation cycle may be involved.

### Biometrics Segment

Our biometrics segment accounted for approximately 14.2% and 15.8% of our revenue for the three month periods ended March 28, 2004 and March 30, 2003, respectively, and 17.8%, 15.3% and 13.4% of our revenue for the years ended December 31, 2003, 2002, and 2001, respectively. The focus of our biometric technology solutions is primarily on applications designed to deter criminal and terrorist activities, including government research and development contracts. These initiatives generated 89.0% of this segment's revenue for the three months ended March 28, 2004, the remaining 11.0% was generated from sales in the gaming industry.

Within our biometrics segment, our contracts typically provide for the development, customization and installation of face recognition systems for government agencies, law enforcement agencies and businesses. These contracts are generally fixed price, and include milestones and acceptance criteria for the various deliverables under the contract. Contract prices are dependent on a variety of factors, including design and integration complexities, the nature and number of workstations and sites, the size of the database, the level of post-installation support and the competitive environment. In certain cases, we provide licenses for off-the-shelf versions of our face recognition software on a per user basis.

For identity solutions that primarily require our advanced face recognition technology, such as criminal identification booking and investigation applications, the sales cycle tends to be shorter and the solution consists primarily of software products.

Table of Contents

As we continue to implement our vision of being a total identity solutions provider, the biometrics and secure credentials segments become less distinct as discrete segments. We believe that the presence or future potential of integrated biometrics in secure credentials is a key factor in increasing revenue and profits from the secure credentials business. As a result, we are seeing the two segments converge into one market.

## Dependence on Significant Customers

We believe for the near future that we will continue to derive a significant portion of our revenues from a limited number of large contracts. Secure credentials segment customers who accounted for more than 10% of our total revenues are as follows:

- For the three months ended March 28, 2004, one customer accounted for an aggregate of 13.0%;

- For the three months ended March 30, 2003, two customers accounted for an aggregate of 28.0%;

- For the year ended December 31, 2003, two customers accounted for an aggregate of 26.0%;

- For the year ended December 31, 2002, two customers accounted for an aggregate of 22.0% and

- For the year ended December 31, 2001, four customers accounted for an aggregate of 49.0%

No single biometrics customer accounted for over 10% of our total revenue in any period.

## Critical Accounting Policies and Significant Estimates

We prepare our financial statements in accordance with generally accepted accounting principles in the United States, or US GAAP. Consistent with US GAAP, we have adopted accounting policies that we believe are most appropriate given the facts and circumstances of our business. The application of these policies has a significant impact on our reported results. In addition, some of these policies require management to make estimates. These estimates, which are based on historical experience and analysis of current conditions, have a significant impact on our reported results and the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements. If actual results differ significantly from these estimates, there could be a material effect on our financial statements.

### *Valuation of Goodwill and Other Long-Lived and Intangible Assets*

Our long-lived assets include property, plant and equipment, other intangible assets and goodwill. As of March 28, 2004, the balances of property, plant and equipment, other intangible assets and goodwill, net of accumulated depreciation and amortization, were $24.8 million, $18.5 million and $63.6 million, respectively. As of December 31, 2003, the balances of property, plant and equipment and other intangible assets, net of accumulated depreciation and amortization, were $25.1 million and $2.7 million, respectively.

Where we believe that property, plant and equipment and intangible assets have finite lives, we depreciate and amortize those assets over their estimated useful lives. For purposes of determining whether there are any impairment losses, as further discussed below, our management has examined the carrying value of our identifiable long-lived tangible and intangible assets, including their useful lives where we believe such assets have finite lives, when indicators of impairment are present. For all long-lived tangible and intangible assets, if an impairment loss were identified based on the fair value of the asset, as compared to the carrying value of the asset, such loss would be charged to expense in the period we identify the impairment. Furthermore, if our review of the carrying values of the long-lived tangible and intangible assets with finite lives indicates impairment of such assets, we may determine that shorter estimated useful lives are more appropriate. In that event, we will be required to record additional depreciation and amortization in future periods, which will reduce our earnings.

26

Table of Contents

Factors we generally consider important which could trigger an impairment review on the carrying value of other long-lived tangible and intangible assets include the following:

- significant underperformance relative to expected historical or projected future operating results;

- significant changes in the manner of our use of acquired assets or the strategy for our overall business;

- underutilization of our tangible assets;

- discontinuance of product lines by ourselves or our customers;

- significant negative industry or economic trends;

- significant decline in our stock price for a sustained period and

- significant decline in our market capitalization relative to net book value.

Although we believe that the carrying value of our long-lived tangible and intangible assets were realizable as of March 28, 2004 and December 31, 2003, future events could cause us to conclude otherwise.

Due to our two acquisitions in the first quarter of 2004, goodwill and other intangible assets were created as a result of the preliminary allocation of the purchase price to identified intangible assets of the acquired businesses. The values recorded for goodwill and other intangible assets represent preliminary estimates of fair values calculated by independent third-party appraisers and are subject to further review and finalization. Such valuations require us to provide significant estimates and assumptions, which are derived from information obtained from the management of the acquired businesses, and our business plans for the acquired businesses or intellectual property. Critical estimates and assumptions used in the initial valuation of goodwill and other intangible assets include, but are not limited to:

- future expected cash flows from product sales, customer contracts and acquired developed technologies and patents;

- expected costs to complete any in-process research and development projects and commercialize viable products and estimated cash flows from sales of such products;

- the acquired companies' brand awareness and market position;

- assumptions about the period of time over which we will continue to use the acquired brand and

- discount rates.

These estimates and assumptions may be incomplete or inaccurate because unanticipated events and circumstances may occur. If estimates and assumptions used to initially value goodwill and intangible assets prove to be inaccurate, ongoing reviews of the carrying values of such goodwill and intangible assets may indicate impairment which will require us to record an impairment charge in the period in which we identify the impairment.

As of March 28, 2004, we have recorded goodwill of $63.6 million. We will perform impairment reviews on the carrying values of goodwill arising from the aforementioned acquisitions at least annually. Because future cash flows and operating results used in the impairment review will be based on management's projections and assumptions, future events could cause such projections to differ from those used to originally value the acquisitions, which could lead to significant impairment charges of goodwill in the future.

27

Table of Contents

*Secure Credentials Revenue and Cost Recognition*

During the third quarter of 2003, we adopted the provisions of Emerging Issues Task Force 00-21, *Accounting for Revenue Arrangements with Multiple Deliverables* , or EITF 00-21, on a cumulative basis as of January 1, 2003. EITF 00-21 governs how to identify whether goods or services, or both, to be delivered separately in a bundled sales arrangement, should be accounted for separately. The operating results for the three-month period ended March 30, 2003 reflects the cumulative effect of the change in accounting principle in 2003.

We deliver solutions under secure credential contracts primarily to federal and state government customers. We recognize revenue when persuasive evidence of a sales arrangement exists, delivery occurs or services are rendered, the sales price is fixed or determinable and collectibility is reasonably assured.

In some cases, we generate revenue from the sale of products in which title passes to the customer. In these cases, we recognize revenue when the products are shipped and accepted by the customer. Services revenue under these contracts consists of preventative and remedial maintenance on printing systems. We also provide on site technical support and consulting services to our customers. Revenue on fixed price services is recognized ratably over the service period which approximates the timing of the services rendered. Revenue on time and material services is recognized as the services are rendered. Expenses on all services are recognized when the costs are incurred.

When elements such as products and services are contained in a single arrangement, or in related arrangements with the same customer, we allocate revenue to each element based on its relative fair value, provided that such element meets the criteria for treatment as a separate unit of accounting. The price charged when the element is sold separately generally determines fair value.

We have secure credential contracts, generally with state governments for the production of drivers' licenses and other identification credentials, where we have determined that we have multiple elements and where the title to equipment installed to produce these credentials does not pass to the customer. Under these contracts, the first element consists of hardware, system design, implementation, training, consumables management, maintenance and support which is accounted for as equipment and related executory services under lease in accordance with SFAS No. 13. The second element consists of customized software which is accounted for as a long term contract in accordance with AICPA Statement of Position 97-2, *Software Revenue Recognition* , or SOP 97-2, and Statement of Position 81-1, *Accounting for Performance of Construction-Type and Certain Production-Type Contracts* , or SOP 81-1, on a units of delivery method of measurement.

Costs related to the hardware element of these contracts are capitalized on the balance sheet and are depreciated over the remaining contract term beginning when the system goes into service. The delivery of these credentials typically requires us to customize, design and install equipment and software at customer locations, as well as perform training, supply consumables, maintain the equipment and provide support services. Nonperformance of training, consumables management, maintenance and support services would prevent us from receiving payment for the costs incurred in the customization, design and installation of the system. EITF 00-21 limits the amount of revenue allocable to the customization, design and installation of the system to the amount that is not contingent upon the production of credentials. Revenue on these contracts under EITF 00-21 is earned based on, and is contingent upon, the production of credentials from the system. Due to the contingent performance of credential production in our secure credentials contracts, we defer revenue recognition for the system design and installation phase of our contracts, including customized software and equipment, and recognize revenue as credentials are produced.

Costs related to the customized software element of our secure credentials contracts where title to the hardware element does not pass to the customer are capitalized on the balance sheet during the period in which we are designing and installing the system and are amortized over the remaining contract term beginning when the system goes into service. Costs related to this element of our secure credentials contracts incurred after the

28

Table of Contents

system is in service are expensed as incurred. Revenue related to this element of our secure credentials contracts is recorded as credentials are produced by the system.

Our secure credentials contracts related to the delivery of drivers' licenses and identification credentials typically provide that the state department of transportation, or similar agency, will pay a fixed price per credential produced utilizing a system we design, implement and support. Our fixed pricing includes charges for the use of the system, materials and the data that is stored on the credentials. Prices under these contracts vary depending on, among other things:

- Design and integration complexities;

- Nature and number of workstations and sites installed;

- Projected number of secure credentials to be produced;

- Size of the database;

- Level of post-installation involvement that will be required of us and

- Competitive environment.

Prior to the adoption of EITF 00-21, we recognized revenue and costs associated with our secure credentials contracts as a single accounting element using the percentage-of-completion methodology.

### Biometrics Segment Revenue and Cost Recognition

Within our biometrics segment, our contracts typically provide for the development, customization and installation of face recognition systems for government agencies, law enforcement agencies and businesses. These contracts are generally fixed price, and include milestones and acceptance criteria for the various deliverables under the contract. Contract prices vary depending on, among other things, design and integration complexities, the nature and number of workstations and sites, the size of the database, the level of post-installation support and the competitive environment. In certain cases, we provide licenses of off-the-shelf versions of our face recognition software on a per user basis.

We recognize revenue under these contracts using the percentage-of-completion methodology in accordance with SOP 81-1. We use the percentage-of-completion methodology to account for revenue under these contracts because:

- A high level of certainty exists regarding expected cash flows from these contracts; and

- A reliable basis exists for determining the percentage of the contract that will be completed at the end of the accounting period.

We measure the percentage complete as costs are incurred or for contracts based on milestones, revenue is recognized when scheduled performance milestones and customer acceptance criteria have been achieved. These milestones are specific events or deliverables clearly identified in the contract. We recognize revenue based on the total milestone billable to the customer less revenue related to any future maintenance requirements. Billings occur under these contracts when the milestone is delivered and accepted by the customer. Milestones can include customized systems, installation and services as defined by the contract.

We record costs and estimated earnings in excess of billings under these contracts as current assets. We record billings in excess of costs and estimated earnings and accrued contract costs as current liabilities.

Under SOP 97-2 revenue related to software licenses of off-the-shelf face recognition software is recognized when:

- Persuasive evidence of an arrangement exists;

29

Table of Contents

- Delivery has occurred;

- The sales price is fixed and determinable;

- Collection is probable and

- There are no post delivery obligations.

We adopted EITF 00-21 on a cumulative basis as of January 1, 2003. Based on our evaluation of biometrics contracts and the application of the new guidance, the adoption of EITF 00-21 did not have an impact on the accounting for revenue from biometrics systems under long-term contracts.

## Results of Operations

### Comparison of fiscal quarters ended March 28, 2004 and March 30, 2003

#### Revenue

Revenue for the first quarter of 2004 were approximately $12.3 million, compared to approximately $8.2 million for the first quarter of 2003. The 50.6% increase in revenue is derived from increases of approximately $3.7 million in the secure credentials segment and $300,000 in the biometrics segment. The increase in the secure credentials segment consists of $1.8 million from the operating results of TDT from February 15, 2004 through March 28, 2004, $610,000 from the sale of equipment and consumables directly to two states, $558,000 from a volume increase resulting from the rollout of one new state drivers' license contract and approximately $730,000 from a net increase in volume and the fulfillment of certain milestones among our remaining contracts. The increase in our biometrics revenue is derived from the inclusion of approximately $307,000 in ZN revenue for the period from January 24, 2004 to March 28, 2004.

#### Gross Margin

Gross margins increased to 27.4% in the first quarter of 2004 from 16.8% in the first quarter of 2003. We expect gross margins on our secure credentials contracts to fluctuate based on changes in period cost of sales as a result of our adoption of EITF 00-21 due to the fact that in 2003 and in the future we will effectively recognize revenue on a fixed price per credential produced by our customers. If we successfully achieve cost saving measures in the delivery process, we will realize higher gross margins in those periods where the cost savings measures are achieved. Alternatively, in periods where our delivery costs are higher due to service and maintenance requirements, we expect gross margins to decrease for those periods. The overall increase in gross margin in the first quarter of 2004 compared to the first quarter of 2003 is due to margin increases in both the secure credentials and biometrics segments.

In the secure credentials segment, gross margins increased to 24.4% in the first quarter of 2004 from 11.1% in the first quarter of 2003. We achieved gross margin increases on 12 of the 15 secure credentials contracts that were active in both periods. Those contracts represented approximately 57.9% of the total revenue in that segment for the three-month period March 28, 2004. The margin increases were attributable to our minimization of period costs during the card production phase on all of our secure credentials contracts. We were able to achieve some of these costs savings by minimizing overtime labor charges through improved resource management of field service technicians. In addition, we installed inventory management software in multiple states throughout 2003, which allows us to better control consumables scrap, thus reducing our materials costs. In addition to these cost savings initiatives, we signed contract extensions in five states and began card production in two additional states during 2003, both of which resulted in margin increases for those states. Our margin increase in this segment was also attributable to the 30.3% gross margin on approximately $1.8 million of revenue contribution from TDT for the period from February 15 to March 28, 2004, which represented approximately 17.1% of the total segment revenue for the quarter. The gross margin related to TDT included approximately $384,000 of non-cash amortization of the identified intangible assets, as described in more detail

30

Table of Contents

below. These increases were offset by gross margin decreases in other states. In two states, gross margins decreased due to an increase in costs, while in a third state the gross margin decrease was primarily due to decreases in credential volume.

The secure credentials business is a highly competitive, bid-based business, which results in pricing pressure for those systems. In addition, the price of a system is dictated by the customer's specifications for the solution and its functionality. Some of these customer specifications include hardware, customized software, credential volume, number and type of security features on the credentials, and biometric identification on the credentials. All of these inputs are evaluated in our estimate of the cost of the system and ultimately influence the pricing for the system to be delivered. We are also aware of the customer's budget situation since this affects how much the customer can spend on the system. After all of these factors are considered, we price the contract and determine the gross margin for the system to be delivered. The price and margin fluctuate by customer due to the number of locations, volume of credentials, requirements and complexity of the system and competitive environment. Although prices remain fixed for products and services on a contract-by-contract basis, fluctuations in gross margin are attributable to changes in the customer mix, change orders and contract extensions received.

Gross margins in our biometrics segment decreased to 45.0% in the first quarter of 2004 from 46.0% in the first quarter of 2003.

For the three-month period ended March 28, 2004, we have allocated $384,000 of amortization expense for the TDT acquisition to cost of sales due to the fact that a majority of the identified intangible assets were attributed to contracts that are generating significant revenue. The $74,000 of amortization related to the ZN acquisition was included in operating expenses for the three months ended March 28, 2004.

### Sales and Marketing Expenses

Sales and marketing expenses increased approximately $82,000, from $1.4 million in the first quarter of 2003 to $1.5 million in the first quarter of 2004. The increase is primarily due to our investment in pursuing biometrics opportunities and the pursuit of significant opportunities in the secure identification marketplace. As a percentage of revenue, sales and marketing expenses decreased from 17.3% in the first quarter of 2003 to 12.2% in the first quarter of 2004.

### Research and Development Expenses

Research and development expenses increased approximately $14,000, from $945,000 in the first quarter of 2003 to $959,000 in the first quarter of 2004. The increase is due principally to our continued investment in face recognition technologies and new product development. This investment included enhancing existing products with the intellectual property that was acquired through the acquisitions of ZN and TDT. As discussed above, research and development expenses include $74,000 of non-cash amortization expense related to the ZN identified intangible assets which contributed to the improvement in face recognition technologies and new product development. As a percentage of revenue, research and development expenses decreased from 11.6% in the first quarter of 2003 to 7.8% in the first quarter of 2004. We expect to continue to invest in product development in fiscal 2004.

### General and Administrative Expenses

General and administrative expenses increased by approximately $1.0 million, from $1.1 million in the first quarter of 2003 to $2.1 million in the first quarter of 2004. The largest component of the increase derives from legal costs of approximately $527,000 stemming from the litigation surrounding our contract with the state of Georgia. General and administrative costs for ZN totaled $86,000 for the period from January 24, 2004 to March 28, 2004. General and administrative costs for TDT totaled $36,000 for the period from February 14, 2004

31

Table of Contents

to March 28, 2004. The remainder of the increase is due to the logistical support required to grow our business through acquisitions while continuing to meet the financing requirements created by our expanding operations. As a percentage of revenue, general and administrative expenses increased from 13.4% in the first quarter of 2003 to 17.4% in the first quarter of 2004.

### Interest Expense

Interest expense, net of approximately $21,000 and $28,000 of interest income for the first quarters of 2004 and 2003 respectively, increased approximately $173,000 from $219,000 in the first quarter of 2003 to $392,000 in the first quarter of 2004. The increase in interest expense is due to $162,000 of interest on the $15.3 million note used to purchase TDT, as well as approximately $14,000 of additional interest stemming from additional debt financing required to support contract delivery.

### Income Taxes

There was no provision for federal income taxes for the periods ended March 28, 2004 and March 30, 2003 due to the net loss in both periods. The provision for state income taxes for the periods ended March 28, 2004 and March 30, 2003 were $25,000 and $63,000 respectively.

### Cumulative Effect of Change in Accounting Principle

For the quarter ended March 30, 2003, we incurred a non-cash charge of $12.1 million representing the cumulative effect of a change in accounting principle related to our adoption of EITF 00-21 on a cumulative basis as of January 1, 2003.

### Comparison of fiscal years ended December 31, 2003 and 2002

### Revenue

Revenue for the year ended December 31, 2003 increased 19.6% to $37.4 million from $31.3 million in 2002 after adjusting the 2002 results on a pro forma basis for the impact of the accounting change. The increase in revenue of approximately $6.1 million resulted from increases of $4.4 million and $1.7 million in the secure credentials and biometrics segments, respectively, after adjusting the 2002 results on a pro forma basis for the impact of the accounting change. The increase in the secure credentials segment revenue was the result of credential volume increases in five states generating additional revenue in those states of approximately $3.3 million. Volume increases in two states resulted from the addition of new types of credentials or from normal fluctuations in credential issuances. Volume increases under our contracts with the Connecticut Department of Motor Vehicles and the State of Rhode Island, Division of Motor Vehicles were due to a full year of card production in 2003, in addition we began card production in Oklahoma in 2003. In addition to the volume increases, revenue under our contract serving the Maryland Department of Transportation and Motor Vehicle Administration increased $1.3 million in 2003 due to a full year of delivery on that contract. We also experienced an increase in revenue of approximately $300,000 due to net price per credential increases on contract extensions signed in 2003. The increase in revenue in the secure credentials segment was offset by volume decreases under drivers' license contracts in two states, which resulted in a decrease in revenue of approximately $386,000. The increase in secure credentials revenue for 2003 was also offset by decreases in revenue of approximately $260,000 under our contracts with Arizona Department of Transportation and New Mexico Department of Taxation and Revenue as a result of the expiration of those contracts in 2002. The increase in revenue in the biometrics segment related to the inclusion of a full year of revenue derived from our Pinellas County contract signed in October 2002. We also delivered face recognition solutions to the United Arab Emirates for the Dubai International Airport and to Alberta, Canada in mid-2003, which contributed approximately $800,000 of additional revenue combined.

32

Table of Contents

*Gross Margin*

Gross margins increased to 25.5% for the year ended December 31, 2003 compared to 17.3% for 2002 after adjusting the 2002 results on a pro forma basis for the impact of accounting changes. We expect gross margins on our secure credentials contracts to fluctuate based on changes in period cost of sales as a result of our adoption of EITF 00-21 due to the fact that in 2003 and in the future we will effectively recognize revenue on a fixed price per credential produced by our customers. If we successfully achieve cost saving measures in the delivery process, we will realize higher gross margins in those periods where the cost savings measures are achieved. Alternatively, in periods where our delivery costs are higher due to service and maintenance requirements, we expect gross margins to decrease for those periods. The overall increase in gross margin in 2003 compared to 2002, after adjusting the 2002 results on a pro forma basis for the impact of the accounting change, is due to margin increases in both the secure credentials and biometrics segments.

In the secure credentials segment, gross margins increased to 21.1% in 2003 from 20.7% in 2002 after adjusting the 2002 results on a pro forma basis for the impact of the accounting change. We achieved margin increases on 10 of our 18 active secure credentials contracts in 2003. Those contracts represented approximately 66.7% of the total revenue in that segment for the year. The margin increases were attributable to our commitment to minimize period costs during the card production phase on all of our secure credentials contracts. We were able to achieve some of these costs savings by minimizing overtime labor charges through better resource management of field service technicians. In addition, we installed inventory management software in multiple states in 2003, which allows us to better control consumables scrap thus reducing our materials costs. In addition to these cost savings initiatives, we signed contract extensions in five states and began card production in two additional states during 2003, both of which resulted in margin increases for those states. These increases were offset by gross margin decreases in other states due primarily to decreases in credential volume during the year.

The secure credentials business is a highly competitive, bid-based business, which results in pricing pressure for those systems. In addition, the price of a system is dictated by the customer's specifications for the solution and its functionality. Some of these customer specifications include hardware, customized software, credential volume, number and type of security features on the credentials, and biometric identification on the credentials. All of these inputs are evaluated in our estimate of the cost of the system and ultimately influence the pricing for the system to be delivered. We are also aware of the customer's budget situation since this affects how much the customer can spend on the system. After all of these factors are considered, we price the contract and determine the gross margin for the system to be delivered. The price and margin fluctuate by customer due to the number of locations, volume of credentials, requirements and complexity of the system and competitive environment. Although prices remain fixed for products and services on a contract-by-contract basis, fluctuations in gross margin are attributable to changes in the customer mix, change orders and contract extensions received. Gross margins in our biometrics segment increased to 45.6% in 2003 from 15.0% in 2002 due to our improved efficiency in delivering biometrics solutions in the current year, as well as margin adjustments on selected projects in 2002. As we enhance our biometrics solutions, systems and delivery process, we expect that our internal processes around production and sourcing of hardware coupled with improved efficiency in the delivery of the solution should result in improving margins. We realized some of this efficiency in 2003.

We expect that gross margins in the future will include non-cash expenses related to the portion of the purchase price of TDT that is allocated to its contract with the U.S. Department of State and its other contracts. We are in the process of valuing the TDT transaction and will assign purchase price to these intangible assets based on the outcome of that valuation. The intangible assets recorded will be amortized through cost of sales over the remaining contract terms and may have a significant impact on our gross margins during that period.

Table of Contents

*Sales and Marketing Expenses*

Sales and marketing expenses decreased approximately $86,000, to $5.3 million for the year ended December 31, 2003 from $5.4 million in 2002. As a percentage of revenue, sales and marketing expenses decreased to 14.1% in 2003 from 17.2% in 2002 after adjusting the 2002 results on a pro forma basis for the impact of accounting changes. The decrease is primarily due to a decrease in the number of drivers' license contracts coming up for bid in 2003 within the secure credentials segment as a result of delays within certain states due to budgetary constraints. The bid and proposal process related to the secure credentials contracts for state drivers' license contracts generally requires the involvement of our technology personnel as we devise the system architecture during this phase that satisfies the states requirements in the proposal. As proposal volume was down in 2003, there was increased focus of these resources in other areas, specifically on the delivery of the systems that were contracted in 2002. We expect sales and marketing expenses to increase in absolute dollars and decrease as a percentage of revenue in 2004. This increase will result from of our acquisitions of sales and marketing resources at ZN and TDT. In addition, we will continue our investment in increasing the awareness and demand for identity solutions, support our growth strategy in the federal marketplace and continue our focus on the civil and criminal identification opportunities.

*Research and Development Expenses*

Research and development expenses decreased approximately $807,000, to $3.7 million for the year ended December 31, 2003 from $4.5 million in 2002. As a percentage of revenue, research and development expenses decreased to 9.8% from 14.3% in 2002 after adjusting the 2002 results on a pro forma basis for the impact of accounting changes. These decreases are the result of a restructuring and workforce reduction in the fourth quarter of 2002, as well as a decrease in our internal investment in research and development during 2003 anticipating the contribution that the ZN acquisition will bring to our research and development initiatives in the future. Development costs that benefited specific projects were recorded as cost of revenues and costs that did not benefit specific projects were recorded as research and development expenses. Software development costs we have capitalized subsequent to achieving technological feasibility have not been material. We expect research and development expenses to decrease in absolute dollars and as a percentage of revenue in 2004. These decreases will result from an increase in funded research projects to leverage our research and development initiatives in the United States and abroad.

*General and Administrative Expenses*

General and administrative expenses remained relatively flat, increasing by approximately $41,000, to $5.1 million for the year ended December 31, 2003 from $5.1 million in 2002. As a percentage of revenue, general and administrative expenses decreased to 13.7% in 2003 from 16.2% in 2002 after adjusting 2002 results on a pro forma basis for the impact of accounting changes. The slight increase in general and administrative expenses was due to the logistical support required to grow our business through acquisitions while continuing to meet the financing requirements created by our expanding operations. The benefits that we experienced related to the restructuring in 2002 and other cost savings initiatives were offset by additional expenses related to new strategic actions taken in 2003. Additional general and administrative expenses related to these actions included $725,000 of expense related to new strategic hires, $200,000 of expenses related to additional employee terminations in 2003, $150,000 of expenses related to pursuing new financing opportunities and $285,000 of additional professional fees related to our contract in Georgia. We expect general and administrative expenses to increase in absolute dollars and decrease as a percentage of revenue in 2004 primarily due to our acquisitions of ZN and TDT. In addition to the additional headcount in 2004 we expect additional overhead expenses related to facilities, human resources, administration and reporting.

Table of Contents

### Interest Expense

Interest expense, net of approximately $99,000 and $196,000 of interest income in 2003 and 2002, respectively, increased approximately $94,000 for the year ended December 31, 2003 to $969,000 from $875,000 in 2002. The increase in interest expense reflects the additional debt financing required to support contract delivery in 2003.

### Other Income

For the year ended December 31, 2003 we had other income of $18,000 related to a gain on the sale of certain card printer assets. There was no other income recognized for the year ended December 31, 2002.

### Income Taxes

No provision for federal income taxes has been made for the years ended December 31, 2003 and 2002 due to the net loss in both periods. For the year ended December 31, 2003, the provision for state income taxes was approximately $63,000. There was no provision for state income taxes for the year ended December 31, 2002.

### Cumulative Effect of Change in Accounting Principle

For the year ended December 31, 2003, we incurred a non-cash charge of $12.1 million representing the cumulative effect of a change in accounting principle related to our adoption of EITF 00-21 on a cumulative basis as of January 1, 2003.

## Comparison of Fiscal Years ended December 31, 2002 and 2001

### Revenue

Revenue increased to $32.3 million for the year ended December 31, 2002 from $26.3 million in 2001. Revenue in the secure credentials segment increased by $4.6 million, or 20.2%, as a result of winning new drivers' license contracts. Revenue in the biometrics segment increased by $1.4 million, or 40%, due to revenue generated from acquisitions and the continued organic growth of that business. The revenue generated from biometrics solutions in both segments increased by $2.4 million, or 58.7%, from $4.0 million in 2001 to $6.4 million in 2002, which was a result of an increase in the use of biometrics technology by some states in the production of drivers licenses and other credentials. After adjusting the 2002 and 2001 results on a pro forma basis for the impact of accounting changes, revenue increased to $31.3 million in 2002 from $28.2 million in 2001. Revenue in the secure credentials segment increased by $1.7 million, or 6.8% as a result of increased credential volumes from recently implemented drivers' license contracts beginning card production in 2002. Revenue in the biometrics segment does not change on a pro forma basis.

### Gross Margin

Gross margins decreased to 21.9% for the year ended December 31, 2002 from 25.4% in 2001. The decline in gross margin reflects a change in product mix and contracts that included product development as well as delays in contract awards expected in the biometrics segment. This is evidenced by the improvement in gross margins from the first quarter of 2002 of 20.5% to 29.3% in the fourth quarter of that year. In 2002, new contracts in the secure credentials segment accounted for 29.4% of our revenue and had a combined gross margin of 37.6%. In 2001, new contracts accounted for 16.6% of our revenue and had a combined gross margin of 13.7%. The gross margin excluding new contracts would have been 17.1% for 2002, as compared to 24.9% in 2001. After adjusting the 2002 and 2001 results on a pro forma basis for the impact of accounting changes, gross margins decreased to 17.3% for the year ended December 31, 2002 from 27.4% in 2001. The decline in gross margin reflects a change in product mix reducing the percentage of revenue recognized on secure credentials contracts and included a higher percentage of biometrics contracts that yielded lower margins in 2002. The biometrics segment in total averaged margins of 15.0% in 2002 compared to 40.0% in 2001.

35

Table of Contents

### Sales and Marketing Expenses

Sales and marketing expenses increased by approximately $4.6 million for the year ended December 31, 2002 from the prior year. This represents an increase to 16.6% from 3.1% of revenue. The increase was due to our investment in pursuing biometrics opportunities following the events of September 11, 2001 and the pursuit of significant opportunities in the secure credentials marketplace. Our expenses resulted from our increased presence and sponsorship at security related trade shows, additional resource allocation to pursue opportunities in the federal government sector and an increase in sales and marketing personnel. The expenses associated with these activities included $1.7 million of compensation expenses for new hires, $1.4 million for the reallocation of resources for sales support, $1.0 million associated with lobbyists and marketing consultants and an increase of $0.4 million in travel expenses to support lobbying and marketing activities. The result of this investment can be seen in the increase to our revenue, backlog, and customer base.

### Research and Development Expenses

Research and development expenses increased by approximately $2.4 million for the year ended December 31, 2002 from the prior year. This represents an increase to 13.8% from 7.8% of revenue. The increase is due to our continued investment in facial recognition technologies and new product development. This included enhancing existing products with the intellectual property that was acquired through the recent acquisitions. Our expenses included $1.9 million of compensation expenses for new hires, $400,000 for outside research consultants and $100,000 for additional leased office space for new hires.

### General and Administrative Expenses

General and administrative expenses increased by approximately $2.6 million for the year ended December 31, 2002 from the prior year. This represents an increase to 15.7% from 9.5% of revenue. This increase was due to additional rental costs of approximately $900,000 arising from additional leased office space and an increased rental rate on previously occupied space, $1.2 million in compensation expenses including placement fees for new hires, $100,000 for outside consultants and a write-down of a contract receivable of $400,000. As a result of the acquisitions in 2002, and to facilitate the growth of the business, we also increased investment in infrastructure and personnel.

### Restructuring Charge

We incurred a one-time restructuring charge of $824,000 in the fourth quarter of 2002. This consisted of approximately $248,000 associated with a workforce reduction of 21 individuals, or approximately 16% of the employee base. In addition, we took a charge for non-cancelable lease costs and capital equipment of approximately $420,000 and $156,000 respectively. Annualized savings associated with the workforce reduction are expected to total approximately $2.2 million.

### Interest Expense

Interest expense, net of approximately $196,000 and $31,000 of interest income in 2002 and 2001, respectively, decreased approximately $335,000 for the year ended December 31, 2002 from the prior year. This represents a decrease to 2.8% from 4.6% of revenue. This decrease reflects the impact of our continuing efforts to reduce our overall debt and related interest expense, as well as the retirement of a $4,000,000 operating line of credit with the proceeds of the $25 million private placement of common stock in December 2001.

### Income Taxes

We did not record any income tax for fiscal years 2002 and 2001 due to the net loss in each year.

Table of Contents

*Impact of Foreign Currency Translation*

For the years ended December 31, 2003 and 2001, our foreign operations and export sales were approximately $800,000 and $1.2 million, respectively. We did not have any revenue related to foreign operations and export sales for the year ended December 31, 2002. We do not consider our foreign operations and export sales to be material for the years ended December 31, 2003, 2002 and 2001.

As a result of our acquisitions of ZN and TDT, we expect that we will have increased exposure to foreign currency fluctuations. Net revenue and related expenses generated from our international location in Germany is denominated in euros. The results of operations and certain of our intercompany balances associated with this international location are exposed to foreign exchange rate fluctuations. In addition to our German operation, we will have increased transactions with Japanese vendors supplying hardware and consumables for the delivery of the TDT contracts. These transactions will increase our exposure to foreign currency fluctuations with the yen. To the extent the U.S. dollar weakens against these foreign currencies, the translation of these foreign currencies denominated transactions results in increased net revenue, operating expenses and net income. Similarly, our net revenue, operating expenses and net income will decrease when the U.S. dollar strengthens against these foreign currencies.

## Liquidity and Capital Resources

Cash and cash equivalents were approximately $9.3 million at March 28, 2004, which consisted entirely of cash. This amount excludes approximately $3.1 million which is restricted under our term loan agreements and project financing. Cash and cash equivalents at December 31, 2003 were approximately $6.7 million, which consisted entirely of cash. This number excludes approximately $6.3 million which was restricted under our term loan agreements and project financing.

In the three-month period ended March 28, 2004, cash provided by operating activities was approximately $586,000, which stems from our net loss of approximately $1.6 million, offset by non-cash charges for depreciation and amortization of approximately $2.3 million and cash used by the net increase in operating assets of approximately $62,000.

Accounts receivable increased approximately 32.9% from $7.0 million at December 31, 2003 to $9.3 million at March 28, 2004. This increase includes $874,000 and $2.2 million which were assets of ZN and TDT, respectively, acquired by us at the respective dates of acquisition of those companies. The remainder of the change, which resulted in an increase in cash of approximately $700,000, is due to the timing of billings and collections.

Inventories and other costs and estimated earnings in excess of billings increased approximately 14.7% from $4.1 million at December 31, 2003 to $4.6 million at March 28, 2004. This increase includes $189,000 and $135,000 which were assets of ZN and TDT, respectively, acquired by us at the date of acquisition. The remainder of the change, which resulted in a decrease in cash of approximately $176,000, reflects accumulation of consumables inventory that was unbilled as of March 28, 2004.

Accounts payable and accrued expenses increased approximately 61.3% from $6.9 million at December 31, 2003 to $11.1 million at March 28, 2004. This increase includes $1.5 million and $2.8 million which were liabilities of ZN and TDT, respectively, assumed by us at the dates of the respective acquisitions of those companies. The remainder of the change, which resulted in a decrease in cash of approximately $100,000, is due to the timing of payables.

37

Table of Contents

In February 2004, we entered into a new loan agreement with Commerce Bank and Trust Company, or Commerce, that superseded the original loan agreement for our existing term loans. Under this new agreement, we borrowed an additional $3.0 million and reduced the required restricted cash balance under the new agreement with Commerce by $2.0 million. We also negotiated a reduction of $1.2 million of restricted cash with Lau Technologies, or Lau, concurrent with the execution of the new loan agreement with Commerce. The $3.0 million term loan provided by this agreement bears interest at a rate of 7.3%. The following table lists the approximate term note information for Commerce and Lau as of the dates indicated (in thousands):

| Lender | Original Loan Amount | Monthly Payment Provision | Date of Loan | Due Date | Interest Rate | Outstanding Principal Balance December 31, 2002 | 2003 | March 28, 2004 |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | (unaudited) |
| Commerce | $ 4,000 | $ 84 | 2/7/2001 | 6/20/2006 | 8.00% | $ 3,044 | $ 2,259 | $ 2,053 |
| Commerce | 3,200 | 72 | 9/11/2001 | 3/11/2006 | 6.25% | 2,522 | 1,800 | 1,612 |
| Commerce | 1,800 | 34 | 12/12/2002 | 12/31/2007 | 5.25% | 1,800 | 1,477 | 1,394 |
| Commerce | 1,500 | 27 | 12/12/2002 | 4/24/2008 | 5.25% | 1,500 | 1,255 | 1,191 |
| Commerce | 1,200 | 24 | 12/12/2002 | 6/24/2007 | 5.25% | 1,200 | 962 | 901 |
| Lau | 2,040 | 53 | 5/30/2003 | 6/30/2009 | 8.50% | — | 1,795 | 1,673 |
| Lau | 2,500 | 51 | 5/30/2003 | 5/30/2008 | 8.50% | — | 1,098 | 2,249 |
| Lau | 1,562 | 64 | 5/30/2003 | 8/30/2005 | 8.50% | — | 1,181 | 1,014 |
| Lau | 287 | 42 | 5/30/2003 | 12/30/2003 | 8.50% | — | — | — |
| Commerce | 3,000 | 36 | 2/27/2004 | 2/27/2007 | 7.30% | — | — | 2,924 |
| | $ 21,089 | $ 487 | | | | $ 10,066 | $ 11,827 | $ 15,011 |

In accordance with the new loan agreement the term notes are collateralized by certain of our assets and the related contract assets. We restructured our bank covenants to account for the impact of the closing of our transactions with ZN and TDT. We are required to maintain various financial covenants, including:

- a net loss for the year ending December 31, 2004 of not more than $500,000 and positive net after-tax income in each fiscal year thereafter;

- a minimum tangible net worth (as defined in the loan agreement) of approximately $16.7 million for the second quarter of 2004, increasing each quarter thereafter;

- our debt to tangible net worth ratio (as defined in the loan agreement) not to exceed the following quarterly benchmarks: 3.00:1.00 for the second quarter of 2004, 2.75:1.00 for the third quarter of 2004, and 2.20:1.00 for the fourth quarter of 2004;

- our debt service coverage ratio (as defined in the loan agreement) must be greater than 0.48 for the first quarter of 2004, 1.25 for the second and third quarters of 2004 and 1.00 for the fourth quarter of 2004 and

- annual capital expenditures may not exceed $1.5 million for the year ending December 31, 2004 and no single capital expenditure may exceed $250,000

Additionally, in accordance with the new agreement, we must maintain $3.0 million of cash on deposit with the lender through September 29, 2004, $4.0 million through November 29, 2004 and $5.0 million by December 31, 2004 and thereafter. This amount is recorded as restricted cash in long term assets. As of March 28, 2004 we had an additional $120,000 of restricted cash at Commerce related to our loan agreement with Lau. We plan to use part of the proceeds from this offering to repay all outstanding indebtedness to Commerce and Lau. See "Use of Proceeds."

We also had one capital lease arrangement in which we were required to maintain the same financial ratios and minimum levels of tangible capital funds, as stated above. Pursuant to this arrangement, the lessor purchases

Table of Contents

certain of our digital identification systems and leases them back to us for deployment with identified and contracted customers approved by the lessor. The lessor retains title to systems and has an assignment of our rights under the related customer contracts, including rights to use the software and technology underlying the related systems. Under this arrangement, the lessor bears the credit risk associated with payments by our customers, but we bear performance and appropriation risk and are generally required to repurchase a system in the event of a termination by a customer for any reason except credit default. This project lease arrangement was accounted for as a capital lease. At March 28, 2004, this lease-financing arrangement was paid in full. At December 31, 2003 and 2002, we had approximately $318,000 and $5.0 million outstanding under these lease-financing arrangements, respectively.

In April 2003 we entered into an arrangement for approximately $1.5 million of equipment financing with three of our suppliers. These project lease arrangements are accounted for as capital leases. There are no financial covenants associated with these leasing arrangements. As of March 28, 2004 we had outstanding $611,000 under these arrangements. As of December 31, 2003 we have outstanding $876,000 under these arrangements. The interest rates on these capital leases are between 6% and 8% and are fixed. The terms of these leases range from 12 months to 60 months. In August 2003 we entered into an arrangement for financing of database licenses with another vendor. As of December 31, 2003 we had outstanding $600,000 under this arrangement.

In the first quarter of 2004 we purchased an asset totaling $800,000 which is payable in installments over four years. On the March 28, 2004 balance sheet, $200,000 is included in accounts payable and other accrued expenses and $600,000 is recorded under other liabilities.

We are in compliance with our credit facility covenants as of March 28, 2004 and December 31, 2003, and we believe that we will be able to maintain compliance with our bank covenants in the future. However, this expectation is dependent on achieving our business plan. If we do not remain in compliance with the covenants in our financing arrangements, the lenders and the lessors could require immediate repayment of outstanding amounts. As of March 28, 2004, there was approximately $15.0 million outstanding under our credit facilities with Commerce and Lau.

In January 2004, we sold 456,007 shares of our common stock at $3.775 per share in a private sale to certain institutional investors to which we had previously sold shares in a private sale in September 2003. On February 14, 2004, we funded the acquisition of TDT with $5.0 million of available cash and executed a promissory note for an additional $15.3 million in addition to the issuance of new stock. The note bears interest at a rate of 8.5% per year and is payable in equal installments of principal and interest on December 1, 2004, May 1, 2005 and December 1, 2005. We plan to use part of the proceeds from this offering to repay this note. See "Use of Proceeds." An additional cash payment of $2.6 million will be made to the former sole shareholder of TDT based upon TDT's selection by the U.S. Department of Defense for the production of smart cards as part of the agency's CAC program. This amount will be paid when we receive payment for our participation in this program. The acquisition of ZN was funded by the issuance of new stock.

We believe that our existing cash balances and anticipated cash flows from operations will be sufficient to meet our operating and debt service requirements for the next 12 months. However, if we cannot achieve our operating goals in 2004 or if we win additional secure credentials contracts in 2004, we may be required to seek additional financing. There can be no assurance that such financing will be available on commercially reasonable terms, or at all. Our ability to meet our business forecast is dependent on a number of factors, including those described in this prospectus under the heading "Risk Factors."

39

Table of Contents

## Contractual Obligations

The following table sets forth our contractual obligations as of March 28, 2004.

| | Total | Less than 1 Year | 1-3 Years | 3-5 Years | More than 5 Years |
|---|---|---|---|---|---|
| Long Term Debt Obligations | $ 30,311 | $ 10,208 | $ 18,539 | $ 1,564 | $ — |
| Capital Lease Obligations | 1,170 | 732 | 370 | 68 | — |
| Operating Lease Obligations | 2,393 | 637 | 774 | 838 | 144 |

## Contingent Obligations

Our principal contractual commitments involve payments under capital leases, term notes and operating leases.

## Inflation

Although some of our expenses increase with general inflation in the economy, inflation has not had a material impact on our financial results to date.

## Recent Accounting Pronouncements

In April 2003, the FASB issued SFAS No. 149 which amends and clarifies financial accounting and reporting for derivative instruments, including certain derivative instruments embedded in other contracts, and for hedging activities under SFAS No. 133. In particular, SFAS No. 149 clarifies under what circumstances a contract with an initial net investment meets the characteristic of a derivative discussed in SFAS No. 133, clarifies when a derivative contains a financing component, amends the definition of an underlying (as initially defined in SFAS No. 133) to conform it to language used in FIN No. 45, Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others, and amends certain other existing pronouncements. SFAS No. 149 is effective for all contracts entered into or modified after June 30, 2003, subject to certain exceptions. The adoption of this statement did not have an impact on our financial position, results of operations, or cash flows.

In May 2003, the FASB issued SFAS No. 150, *Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity* , which establishes standards for how an issuer classifies and measures certain financial instruments with characteristics of both liabilities and equity. SFAS No. 150 requires that an issuer classify a financial instrument that is within its scope as a liability (or an asset in some circumstances), while many of such instruments were previously classified as equity or "mezzanine" equity. The statement also requires that income statement treatment be consistent with the balance sheet classification. That is, if the instrument is classified as a liability, payments to the holders are interest expense, not dividends, and changes in value are recorded in earnings. The statement relates to three specific categories of instruments: mandatorily redeemable shares, freestanding written put options and forward contracts that obligate an entity to purchase its own shares, and freestanding contracts that obligate an entity to pay with its own shares in amounts that are either unrelated, or inversely related, to the price of the shares. SFAS No. 150 is effective immediately for financial instruments entered into or modified after May 31, 2003 and otherwise is effective in the first interim period beginning after June 15, 2003. The adoption of this statement did not have an impact on our financial position, results of operations, or cash flows.

In January 2003, the FASB issued Financial Interpretation No. 46, *Consolidation of Variable Interest Entities* (FIN 46), which requires the consolidation of certain variable interest entities. In December 2003, the FASB issued a revision to FIN 46. The revised FIN 46, which replaces the original FIN 46 issued in January 2003, clarifies the application of Accounting Research Bulletin No. 51, *Consolidated Financial Statements* , to

40

Table of Contents

certain entities in which equity investors do not have the characteristics of a controlling financial interest or do not have sufficient equity at risk for the entity to finance its activities without additional subordinated financial support. While this interpretation exempts certain entities from its requirements, it also expands the definition of a variable interest entity ("VIE") to a broader group of entities than those previously considered special-purpose entities ("SPE's") and specifies the criteria under which it is appropriate for an investor to consolidate VIE's. Application of the revised FIN 46 is required in financial statements of public entities that have interest in structures that are commonly referred to as SPE's for periods ending after December 15, 2003. For all other types of VIE's, application of the revised FIN 46 by public entities is required for periods ending after March 15, 2004. The application of this interpretation with respect to structures commonly referred to as SPE's did not have a material impact on our financial position, results of operations, or cash flows. The application of this interpretation with respect to types of VIE's did not have a material impact on our financial position, results of operations or cash flows.

In December 2003, the Securities and Exchange Commission ("SEC") published SAB No. 104, *Revenue Recognition* . SAB No. 104 was effective upon issuance and supersedes SAB No. 101, *Revenue Recognition in Financial Statements* , and rescinds the accounting guidance contained in SAB No. 101 related to multiple-element revenue arrangements that was superseded by EITF Issue No. 00-21. Accordingly, SAB No. 104 rescinds portions of the interpretive guidance included in Topic 13 of the codification of staff accounting bulletins. While the wording of SAB No. 104 has changed to reflect the guidance of EITF 00-21, the revenue recognition principles of SAB No. 101 have remained largely unchanged. The adoption of SAB No. 104 did not have a material effect on our financial position, results of operations, or cash flows.

In March 2004, the Financial Accounting Standards Board ("FASB") issued a proposed Statement, "Share-Based Payment", that addresses the accounting for share-based payment transactions in which an enterprise receives employee services in exchange for (a) equity instruments of the enterprise or (b) liabilities that are based on the fair value of the enterprise's equity instruments or that may be settled by the issuance of such equity instruments. The proposed statement would eliminate the ability to account for share-based compensation transactions using APB Opinion No. 25, "Accounting for Stock Issued to Employees", and would generally require that such transactions be accounted for using a fair value-based method. As discussed in Note 2, we currently account for share-based compensation transactions using APB Opinion No. 25. If this statement is issued, the adoption of this interpretation will have a material negative impact on our consolidated financial position and results of operations, the level of which we are currently assessing.

## Quantitative and Qualitative Disclosures About Market Risk

Subsequent to our acquisition of ZN, our international operating resulting from transactions by our German operations will be denominated in euros. Hardware and consumables purchases related to contracts associated with the TDT acquisition are denominated in Japanese yen. We mitigate exchange rate volatility by purchasing local currencies at favorable exchange rates. We do not hedge foreign currencies utilizing derivative instruments. Our international operations and transactions are subject to risks typical of international operations, including, but not limited to, differing economic conditions, changes in political climate, differing tax structures, other regulations and restrictions and foreign currency exchange rate volatility. Accordingly, our future results could be materially adversely impacted by changes in these or other factors.

Table of Contents

## BUSINESS

### Summary

We are a leading provider of advanced technology identity solutions that enable governments, law enforcement agencies and businesses to enhance security, reduce identity theft and protect personal privacy. Our identity solutions include secure credential provisioning systems, biometric software and systems and real-time identity databases, as well as systems design, development, integration and support services. These solutions enable our customers to manage the entire life cycle of an individual's identity for a variety of applications including civil identification, criminal identification and border management. Our customers use our solutions to help solve the following four critical problems in identity verification and management:

- assurance that the identification document is authentic;

- assurance that the document has been issued to the correct person;

- confidence that the person holding the identification is uniquely tied to and authorized to use the document and

- verification of the privileges the individual is entitled to at a particular point in time.

Our solutions annually produce more than 30 million secure government-issued credentials at more than 2,000 locations. We are the second largest provider of U.S. drivers' licenses with a 30% market share, and we are the sole source provider of passport production capability to the U.S. Department of State. We also are a recognized leader in biometrics in the field of face recognition. Our customers include governments, law enforcement agencies and businesses in more than 15 countries.

As our market has become increasingly complex and more frequently requires the integration of various technologies and capabilities, we have established ourselves as a provider of end-to-end identity solutions. In January 2004, we acquired ZN Vision Technologies AG, or ZN, which solidified our leadership position in face recognition technology. In addition, in February 2004, we acquired Trans Digital Technologies Corporation, or TDT, which provides us with a significant presence in the U.S. federal government market and strengthens our capability and credibility in the border management market worldwide.

We believe that our installed base of secure credential customers together with our leading face recognition technology provide us with a competitive advantage in delivering unified identity solutions for both the physical and digital domains. For example, in April 2004, we were selected by the U.S. Department of Defense, or DoD, for the production of secure, smart credentials as part of the agency's Common Access Card, or CAC, program. The CAC is a single means of identification for access to both physical locations and computer networks. We expect the demand for these types of solutions to grow significantly.

### Industry Overview

#### *Market opportunity*

The ability to confirm an individual's identity is playing an increasingly important role in national and international security, personal privacy and commerce. Failure to provide adequate identification can lead to breaches of security and identity theft, the consequences of which can range from national security threats and loss of life to significant economic loss. Within this context, we believe that there is increasing pressure on governments and businesses to accelerate the adoption of advanced technology identity solutions. The concern over homeland security, in which identity solutions play a part, is exemplified by the size of the budget for the U.S. Department of Homeland Security, which was approximately $31 billion for the fiscal year ended September 30, 2003, and is projected to be approximately $37 billion for the fiscal year ended September 30, 2004. Furthermore, identity theft is the nation's fastest growing crime, and the Federal Trade Commission has estimated that its total cost approaches $50 billion per year.

42

Table of Contents

Government-issued credentials serve as the primary means for confirming the physical identity of an individual. The effectiveness, however, of these credentials is impaired by the following issues:

- the credential can be counterfeited or altered;

- the credential can be issued under false pretenses; and

- the credential rarely is linked to an identity database.

To address counterfeiting and alteration, identity credentials such as passports and drivers' licenses increasingly are incorporating more sophisticated security features. For example, pigment ink printing, security laminates, holograms, ultra violet printing, microprinting, security fonts, half tone portraits, physical or digital watermarks and 2D barcodes have become common security features for passports and drivers' licenses. We believe that issuing authorities will continue to upgrade their security features in order to overcome new means of counterfeiting and alteration.

Moreover, although identity credentials are becoming more secure, the ability to obtain them under false pretenses continues to be a major weakness of the credential issuing process. As a result, issuing authorities are now focusing on improving their ability to verify the identity of a person requesting an identification credential. As part of this effort, authorities have also recognized the need to have secure and accurate audit trails of the issuance process and supporting documents for each credential. In addition, issuing authorities are increasingly incorporating biometrics to verify personal identities and deter fraud. Biometrics is a means of identifying a person using biological features unique to that individual. Biometric identifiers include facial images, fingerprints, iris scans, retinal scans, voice data and hand geometry.

Finally, as secure identity credentials and biometrics become more prevalent, we believe the additional security generated by cross-checking the credential to a readily accessible identity database will grow in importance. This capability allows a higher level of identity assurance and real-time privilege management.

### Market drivers and trends

To address the complexity of problems in the identity market, credential issuing authorities are seeking advanced technology identity solutions, which increasingly include secure credential provisioning systems, biometrics and real-time identity databases. We believe the global market for these solutions is driven by the following key trends:

- **Growth in government-initiated security programs.** We believe that government agencies will continue to be key drivers for the growth and development of the market for advanced technology identity solutions. For example, budgets for U.S. federal government agencies, such as the Department of Homeland Security, include spending for identity initiatives, such as:

  - the U.S. Visitor and Immigrant Status Indicator Technology program, or U.S. VISIT, which uses biometric data as part of new screening procedures for non-U.S. citizens entering the United States;

  - the Transportation Workers Identification Credential, or TWIC, which is a credentialing program that may eventually cover an estimated 12 million national transportation workers; and

  - the U.S. Department of State's planned introduction of "contactless chips" in passports, which are electronic chips that hold the bearer's biographic and photographic data.

- **Development of industry standards and requirements.** Several organizations responsible for standards in a number of our markets have recently implemented requirements for the use of face recognition biometrics. We believe this will help stimulate the development of our target markets. For example, in May 2003 the International Civil Aviation Organization, which sets recommended travel document standards for its member states, selected face recognition as the biometric to be used in passport

43

Table of Contents

documentation. Moreover, in February 2003, the National Institute for Standards and Testing, which is part of the U.S. Department of Commerce, recommended that a dual system of fingerprint and face recognition technology be used to verify the identities of visa holders at points of entry in the United States.

- *Growing use of biometrics* . Governments are increasingly mandating biometrics as an integral component of identity solutions. This increased demand, coupled with the maturation of the technology, is driving the market adoption of biometrics. According to the International Biometrics Group, spending on biometric security solutions is expected to grow at an approximately 46% compound annual rate from approximately $700 million in 2003 to approximately $4.6 billion by 2008.

- *Increasing cost of identity theft and financial fraud.* The growing direct and indirect cost of identity theft and financial fraud is increasing the pressure on businesses and individuals to accelerate the adoption of advanced technology identity solutions. Identity theft is the nation's fastest growing crime. The Federal Trade Commission has estimated that the total cost of identity theft approaches $50 billion per year.

- *Convergence of physical and logical security systems.* There is a growing need for governments and businesses to provide a highly secure, unified system for user authentication to access both physical assets, such as buildings, and digital assets, such as computer networks. For example, the CAC program provides identity verification for approximately four million DoD employees and military personnel to enable access to military property and DoD computer networks. We believe that this program represents the model for identity solutions that will be implemented by governments and businesses in the future.

## Our Identity Solutions

Our identity solutions include secure credential systems, biometrics, database technologies and services. These solutions enable governments and businesses to issue credentials and verify and manage identities throughout the entire identity life cycle.



- *Proofing.* Our solutions provide verification of a person's claimed identity by processing and cataloging breeder documents, such as birth certificates. Our solutions also provide customers the ability to perform identity verification on re-issuance of credentials and to submit queries to local and external proofing databases, as well as to perform duplicate analysis and verification using our face recognition technology.

- *Enrollment.* Our solutions enable the digital capture and storage of multiple pieces of data such as demographics, digital images, signatures and biometric data. Furthermore, our solutions enable the operator to rapidly import existing data without having to recreate it, thereby improving productivity and accuracy of the data by more effectively leveraging the existing database. Our enrollment solutions are designed to comply with a range of industry standards. In addition, our solutions create an audit trail of credentials, which includes information about the issuing operator as well as supporting breeder documents.

44

Table of Contents

- ***Issuance*** . Our solutions include state-of-the-art technologies for producing authentic and tamper-proof identification credentials. We offer turnkey solutions that include the hardware, software and consumables necessary to produce credentials, including static credentials and smart credentials using paper or plastic substrates. Credentials can be produced on-site (over-the-counter), off-site (central production) or through a hybrid of these two methods.

- ***Usage.*** Our solutions can be used to verify the identities of individuals in a variety of settings, including on a one-to-one basis, such as to verify a claimed identity at a border checkpoint, or on a one-to-many basis, such as to establish an individual's identity when he or she does not reveal his or her true identity. In addition, our secure identity solutions can be used to address physical security needs such as border access and digital security needs such as computer network access.

We offer the following key components as part of our identity solutions:

***Secure credential capabilities.*** We provide the necessary hardware, software and systems to enable our customers to produce secure and virtually tamper-proof credential documents that can be used for a variety of applications and settings. Our solutions are designed to integrate into our customers' credential provisioning processes and conform to regulatory standards and requirements. We offer a range of tamper-resistant features, including biometric data contained in bar codes or chips, holographic overlays, ghost imaging, ultraviolet printing and microprinting. As a result, our customers can create highly secure and durable credentials that not only have embedded security features, but also link the credential to the issuing agency location, operator and material used.

We offer two types of credential systems. The first is an instant issuance or "over the counter" system that enables our customers to produce identification credentials on location in minutes. The second is a central production system that receives the information electronically from the point of capture, and enables our customers to produce credentials from a secure off-site processing location. Our secure credentials systems' software is designed to integrate with a variety of third party software, and to support standard operating systems, network protocols and database products. In addition, we incorporate third party hardware, such as digital cameras and printers, into our systems, which enables us to offer configurations that meet our customers' requirements and take advantage of advances in technology.

***Biometric capabilities.*** In designing our identity solutions, we have developed a software platform upon which multiple biometrics can be integrated. The platform is designed to be independent of specific biometric technologies, thereby enabling customers to integrate one or several biometric identifiers as needed.

In addition to providing this independent platform, we have developed and invested in proprietary face recognition technology. We believe that face recognition will continue to grow as an important biometric for the following reasons:

- facial images do not reveal information that the person does not routinely disclose to the general public;

- facial images are already collected, stored and verified in large legacy databases as a part of most identity verification processes;

- facial image capture is non-intrusive and does not require the user to touch or interact with a physical device for a substantial timeframe to be enrolled;

- face recognition does not require new and costly enrollment procedures to be introduced;

- facial images can be captured from endorsed photographs which obviates the need for the person to be physically present;

- facial images are culturally accepted internationally as a means of identification and

- face recognition is the only biometric that can be easily verified by a person without special training.

45

Não.

Table of Contents

currently supplied by our competitors. In addition, we believe that significant demand exists for our solutions outside of the United States. Our recent acquisition of ZN has provided us with an established base to more effectively pursue opportunities in the international market.

*Pursue strategic acquisitions and alliances* . We intend to augment our competitive position through acquisitions and alliances. We will pursue acquisitions that provide us with complementary technology, products, capabilities and market or customer access. We will pursue alliances that extend our reach into markets and technologies where we do not have a strong position today.

## Our Products

The following summarizes our current product offerings:

### Components

- The Image Capture Work Station is a multifunctional software solution that offers modules for capturing images, laying templates, checking image quality, previewing printing, managing devices such as cameras, connecting to mainframes and handling point of sale.

- The SensorMast is a fully integrated, secure tower unit that incorporates computer-controlled image capture equipment. This equipment includes commercially available digital cameras, adjustable lighting, frame grabbers, step motors, fingerprint and signature capture devices and barcode readers.

- The Visual Inspection System automatically evaluates credentials produced by our central production systems to determine whether the image and data on a person's identification credential correspond to the information about that person in the system database. If the information does not match, the Visual Inspection System automatically rejects the printed credential and identifies the defect for immediate corrective action. This system, which incorporates robotics, high-speed cameras and sophisticated software, automates an activity that is otherwise performed manually and is a potential source of cost savings and increased accuracy for customers.

- As a result of our February 2004 acquisition of TDT, Viisage now works in conjunction with Toppan Printing Co., Ltd. to bring advanced printing technology to our customers and markets.

### Platform Software

- The FaceTOOLS Software Developer's Kit is designed for application developers who want to incorporate state-of-the-art face recognition technology into their applications. Using FaceTOOLS, developers can create a variety of face recognition applications. FaceTOOLS is based on flexible template matching that incorporates a unique combination of multiple approaches to face recognition.

- FaceEXPLORER is a large image database research and mining tool that provides the ability to reduce fraud and crime by identifying duplicate images in large databases, such as licensed drivers, benefit recipients and visa holders. Additionally, law enforcement officials use FaceEXPLORER to match images and computer composites against existing image databases to identify suspects and known criminals. Customers use FaceEXPLORER to verify identities, improve customer service and reduce fraud by effectively retrieving, managing and analyzing their image databases. We have deployed FaceEXPLORER in one of the world's largest face recognition systems for the Illinois Secretary of State and State Police.

### Access Control

- FacePASS is a verification solution designed to meet complex access control system requirements. FacePASS utilizes face recognition technology to enable the customer to verify a person's identity to permit or deny access.

47

Table of Contents

*Surveillance*

- FaceFINDER is a modern surveillance identification solution that uses patented real-time video technology. FaceFINDER assists customers, such as casinos, domestic and international airports, military bases and government buildings, in identifying suspects either from long distance or from large crowds.

## Customers

Our customers use our identity solutions for a variety of applications, including civil identification, criminal identification and border management. For civil identification, we are the second largest provider of drivers' licenses to state departments of motor vehicles. In this market, we are increasingly incorporating our biometric systems into the credential issuing processes as we have done for the office of the Illinois Secretary of State. We also were recently selected by the DoD for the production of secure, smart credentials as part of the agency's CAC program. For criminal identification, our customers include the Ohio Department of Public Safety, Pinellas County, Florida, the U.S. Army and the U.S. Secret Service. For border management, we are the sole source provider of passport production capability to the U.S. Department of State.

Historically, we have experienced minimal customer turnover. We believe this is a result of our strong product portfolio and emphasis on customer service and support. The following is a representative list of our customer base:

Civil Identification – Drivers' Licenses

Arkansas Office of Driver Services
Connecticut Department of Motor Vehicles
Illinois Secretary of State
Kentucky Transportation Cabinet
Maryland Department of Transportation and Motor
    Vehicle Administration*
Mississippi Department of Information Technology
    Services
North Carolina Department of Transportation
Oklahoma Department of Public Safety
Pennsylvania Department of Transportation
State of Rhode Island, Department of Administration,
    Division of Motor Vehicles
State of Delaware Department of Public Safety
Wisconsin Department of Transportation

Civil Identification – Social Services

Connecticut Department of Social Services
Massachusetts Department of Transitional Assistance
New York Department of Social Services*

*By subcontract

Criminal Identification

City of New Bedford, Massachusetts Department of
    Police
Kentucky State Police of the Commonwealth of
    Kentucky
Ohio Department of Public Safety
Pinellas County Sheriff's Office
U.S. Army
U.S. Secret Service
Wisconsin Department of Transportation

Border Management

St. Petersburg – Clearwater International Airport
U.S. Department of Homeland Security
U.S. Department of State

Other

Berlin Airport
Hanover Zoo
U.S. Department of Defense*
U.S. Navy
100+ Casinos

48

Table of Contents

Following are examples of several successful customer deployments:

- **Pinellas County, Florida Sheriff's Office.** The Pinellas County, Florida Sheriff's office needed a more efficient and accurate method of verifying identities of prisoners. Working closely with the Pinellas County Sheriff's Office, we provided a solution that uses face recognition to enhance booking, release and criminal investigation processes in several facilities. By networking the face recognition enabled database, Pinellas County effectively utilizes face recognition in the identification of individuals -- whether through the search of individuals at jail pre-booking, verification at jail release, screening at the airport, attendance at a court trial or even in the back of a police cruiser. Today the database has over one million entries and over 375,000 image queries have been made since the system's installation in 2001.

- **Illinois Secretary of State.** Since 2000, we have worked closely with the office of the Illinois Secretary of State to provide a solution to help identify individuals attempting to receive drivers' licenses through fraudulent means. The office of the Illinois Secretary of State uses our credential and face recognition system in 138 issuing locations to perform approximately 8,000 to 12,000 identity checks per day. To date, there have been numerous cases where our solution has detected serious fraud and apprehensions have been made.

- **U.S. Department of State** . We are the sole source provider of passports to the U.S. Department of State. In this program, we provide a combination of printers, services, project management, consumables and specialized research and development initiatives. We have supported this initiative since 1998 and have enabled the Department of State to deliver more than 40 million passports, with over seven million produced in 2003 alone. We began implementing additional advanced security technologies on a worldwide basis in 2002 and since that time, no known cases of counterfeit passport production have occurred.

For the three-month period ended March 28, 2004, the U.S. Department of State accounted for 13% of our revenue. For the year ended December 31, 2003, the Pennsylvania Department of Transportation and the Illinois Secretary of State each accounted for 13% of our revenue. We typically enter into multi-year contracts with our customers. A majority of our contracts are with U.S. federal or state governmental agencies. Government contracts are generally subject to termination for convenience or lack of appropriation at the determination of the subject agency. Contracts terminated by our customers for convenience would generally entitle us to recover all actual committed costs and profit, if any, on work performed through the date of cancellation. While termination is a significant financial risk, we have never experienced a government contract termination.

## Sales and Marketing

We market our products and identity solutions through both a direct sales force and strategic partnerships and alliances. Our direct sales force is responsible for marketing and selling our entire identity solutions portfolio. We have an international sales force responsible for the North American Market, Europe, the Middle East and Asia Pacific. We have established a dedicated U.S. federal sales team in Washington, D.C. responsible for marketing and selling to U.S. government agencies such as the Department of Homeland Security, the Department of State, the DoD, and others. As of May 31, 2004, we employed 32 people in our sales and marketing organization.

We continue to seek to develop strategic partnerships and distribution channels to broaden our coverage and increase the size of our market worldwide. We have established original equipment manufacture, or OEM, distribution agreements with partners to leverage our face recognition technology. We work with systems integrators, solution providers and service organizations to deliver identity solutions in combination with their core capabilities to expand our access to such organizations' existing relationships, marketing resources and credibility in new markets. We utilize local agents to expand our international access to opportunities.

Table of Contents

With the recent acquisition of ZN, we have increased our direct sales and marketing coverage in the European marketplace. Dedicated sales and services teams operate from our Bochum, Germany location. The acquisition of TDT has strengthened our coverage and access to the U.S. federal marketplace.

## Product Development

We focus our product development efforts on critical components for advanced technology identity solutions. These include proprietary software that addresses image capture, image processing, enhancement of face recognition accuracy and information retrieval from identity databases. In addition, we focus on expanding our capabilities in solutions for the civil identification, criminal identification and border management markets. As of May 31, 2004, we employed 35 people in our product development organization.

We benefit from research and development activities conducted by the manufacturers of the components integrated into our systems such as cameras, database software and computers. Moreover, many of our customers, including the U.S. government, provide direct funding to us to assist us in our research and development efforts on their behalf. For the three-month period ended March 28, 2004 and for the year ended December 31, 2003, our customers provided research and development funding of $695,000 and $3.4 million, respectively.

For the three-month periods ended March 28, 2004 and March 30, 2003, research and development expense was $959,000 and $945,000, respectively. For the years ended December 31, 2003, 2002 and 2001, research and development expense was $3.7 million, $4.5 million and $2.0 million, respectively. These amounts do not include spending for projects where our customers provide research and development funding. The costs associated with delivery of these projects are generally recorded as cost of revenues or as a contra research and development expense as appropriate.

## Intellectual Property

We believe that our intellectual property is important to both our secure credentials and our biometrics segments:

- Patents—Both our secure credentials segment and our biometrics segment use patented technology and trade secrets developed or acquired by us. We have significantly expanded our portfolio of face recognition patents and trade secrets through the acquisition of ZN. We have a portfolio of 13 U.S. and foreign patents. In addition, we have a number of U.S. and foreign patent applications in process for face recognition technologies, including 12 foreign patent applications previously filed by ZN. Our U.S. patents typically have a duration of 17 to 20 years.

- Trademarks—We have registered our "Viisage Technology" trademark, as well as trademarks for "FaceEXPLORER", "FaceFINDER", "FaceTOOLS" and "Sensormast" with the U.S. Patent and Trademark Office. Applications are pending in the United States and Europe for the "Viisage" and "FacePASS" trademarks and in Europe for "FaceEXPLORER" and "FaceFINDER".

- Copyrights—We have filed a copyright application for our SensorMast software and have made a copyright filing for our Visual Inspection System and related proprietary software.

## Backlog

Our backlog consists of signed contracts, subcontracts and customer commitments for which revenue has not yet been recognized and excludes phase-out or other extension opportunities included in such contracts. Backlog is only somewhat indicative of future revenue because contracts may be changed positively or negatively. Contracts included in our backlog could be cancelled at any time due to lack of performance without penalty. Contracts terminated by our customers for convenience would generally result in our recovery of all actual committed costs and profit, if any, on work performed through the date of cancellation.

Table of Contents

At March 28, 2004, our backlog was $176 million, compared to $83 million at March 30, 2003. At December 31, 2003, our backlog was $112 million, compared to $78 million at December 31, 2002. Included in these backlog amounts is $19.7 million from our contract with the Georgia Department of Motor Vehicle Safety which was terminated for convenience in July 2004 as a result of a settlement agreement with the agency and which is expected to be re-bid prior to the end of 2004. Approximately $32 million of the increase in backlog from December 31, 2002 to December 31, 2003 was related to our adoption of EITF 00-21 on a cumulative basis as of January 1, 2003. EITF 00-21 limits the amount of revenue that we may allocate to the customization, design and installation of systems to the amount that is not contingent upon the production of secure credentials. Revenue on our drivers' license contracts under EITF 00-21 is earned based on, and is contingent upon, the production of credentials from the system. Due to the contingent performance of credential production in these contracts, we defer revenue recognition for the system design and installation phase of our contracts, including customized software and equipment, until credentials are produced. As a result, revenue and margins that were recognized as earned and unbilled under our previous revenue recognition policy for secure documentation contracts were deferred under EITF 00-21 and therefore are included in our backlog at December 31, 2003.

## Competition

The market for our products and services in individual component areas of identity solutions, such as secure credentials and biometrics, is extremely competitive and we expect this competitive environment to intensify as the market for our products continues to grow. We compete on the basis of the following factors: service and support, technical excellence, price, credibility and flexibility in accommodating customer technical and business needs.

We believe that our comprehensive approach to identity solutions, our unique capabilities and our proprietary technology differentiate us from our competition. We are not aware of any company that competes with us directly on the basis of providing advanced technology identity solutions that cover the full identity life cycle.

*Secure Credentials Segment.* We face competition in the drivers' license market of our secure credentials systems market from companies, including Digimarc ID Systems, LLC, that, in some cases, have greater financial and marketing resources than we do. Substantially all of our sales to new customers have been the result of competitive bidding for contracts pursuant to public sector procurement rules. In some cases, we may be competing with an entity that has a pre-existing relationship with a potential customer, which could put us at a significant competitive disadvantage. In other cases, however, we have pre-existing relationships with customers, which give us an advantage relative to our competitors for that customer. As the secure identification market expands, additional competitors may seek to enter the market.

*Biometrics Segment.* In the field of biometric technology, we compete with several face recognition providers, including Identix Inc., as well as providers of other biometric solutions, such as fingerprint, iris and retinal scans, voice data and hand geometry. We believe that applications increasingly will require the use of multiple biometrics. Accordingly, while our face recognition technology competes with other biometrics, we have designed our identity solutions to serve as a platform for multiple biometric technologies so that we are able to provide the particular biometric required by our customers. We believe that our proprietary face recognition technology, together with our market leadership and experience integrating multiple biometrics, gives us a competitive advantage in the biometrics market.

## Seasonality

Our business is not subject to seasonal fluctuations.

## Working Capital Requirements

Our drivers' license contracts require significant capital to fund development and implementation. In 2003, we utilized bank borrowings and other lease financing vehicles to supplement our working capital to fund these

Table of Contents

capital requirements. In addition, in September 2003 and January 2004, we raised an aggregate of approximately $13.7 million in net proceeds through the private sale of shares of our common stock to certain institutional investors. These funds also were used for working capital. There are no special requirements or customer terms in our bank borrowings or other lease financing vehicles that are expected to have a material adverse effect on our working capital. As discussed more fully in "Management's Discussion and Analysis of Financial Condition and Results of Operations," we may raise additional capital, as needed, to fund working capital needs or growth activities.

## Employees

As of June 30, 2004, we had 188 full time employees and seven supplemental employees. Supplemental employees are employees on our payroll but who are not eligible for benefits. None of our employees is covered by collective bargaining agreements. We believe that our relations with our employees are good.

## Legal Matters

In July 2003, a Georgia court issued a preliminary injunction prohibiting Georgia's Department of Motor Vehicle Safety from continuing to work with us to install the State's new drivers' license system. The injunction is the result of a lawsuit filed in March 2003 by one of our competitors alleging that the Department of Motor Vehicle Safety did not comply with its own bid process when it selected a vendor for its new digital drivers' license program. In July 2004, we reached a settlement agreement with the State pursuant to which the Department of Motor Vehicle Safety terminated the contract for convenience and agreed to pay us $2.0 million in cash and the State agreed to purchase certain equipment from us for $500,000. The Department of Motor Vehicle Safety has filed a motion with the Georgia court to dismiss the case based upon the termination of the contract. The agency also has filed an affidavit stating that it intends to issue a new request for proposals for a digital drivers' license system before the end of October 2004. The competitor has filed a motion with the Georgia court to enjoin the Department of Motor Vehicle Safety and the State from making any payments to us under the settlement agreement. As a result of the termination of the contract, we will lose up to $19.7 million in revenue that we expected to recognize over the next five and one-half years, which was included in our $176 million of backlog at March 28, 2004, unless we are able to win the new contract for the digital drivers' license system and the revenues from such new contract are substantially similar to the terminated contract. While we believe we can utilize the remaining $2.8 million in assets being retained by us from the Georgia contract either in Georgia, if we win the contract based on the new request for proposals, or on alternative projects, to the extent that we are unable to utilize these assets or realize value through a sale of these assets, we would be required to take a charge to earnings.

On July 19, 2004, Fargo Electronics, Inc. initiated a patent infringement action in the U.S. District Court for the Eastern District of Virginia against Toppan Printing Co., Ltd. and TDT. The complaint alleges that Toppan and TDT's use, offer to sell and/or importation of certain personalized identification card printers, including Toppan's CP400 card printers, and associated laminators in the United States constitutes direct and indirect infringement of four patents allegedly owned by Fargo. The complaint seeks unspecified compensatory damages, permanent injunctive relief, trebling of damages for willful infringement and fees and costs. We are currently evaluating the claims in this lawsuit and intend to vigorously defend against them. We believe that the only products at issue are Toppan CP400 printers that were or are sold, used or imported as part of the CAC program. To date, we have received purchase orders of $10.2 million for Toppan CP400 printers for the CAC program, which are expected to be delivered by the end of the first quarter of 2005. There can be no assurance that we will prevail in this litigation. The litigation, with or without merit, could be time consuming and expensive to litigate or settle and could divert management's attention from our business.

We are not aware of any other legal matters that could have a material adverse effect on our business, financial condition or results of operations.

52

Table of Contents

# MANAGEMENT

**Executive Officers and Directors**

The following persons are our executive officers and directors as of July 20, 2004.

| Name | Age | Position |
|------|-----|----------|
| Bernard C. Bailey | 51 | Chief Executive Officer, President and Director |
| Iftikhar A. Ahmad | 52 | Senior Vice President and General Manager, Secure Credentials |
| William K. Aulet | 46 | Senior Vice President and Chief Financial Officer |
| James P. Ebzery | 44 | Senior Vice President, Worldwide Sales and Services |
| Kenneth C. Scheflen | 58 | Senior Vice President, Federal Government Solutions |
| Denis K. Berube | 61 | Chairman of the Board |
| B.G. Beck | 67 | Vice Chairman of the Board |
| Charles E. Levine | 51 | Director |
| Marcel Yon | 37 | Director |
| Harriet Mouchly-Weiss | 61 | Director |
| Peter Nessen | 68 | Director |
| Paul T. Principato | 50 | Director |
| Thomas J. Reilly | 65 | Director |

Bernard C. Bailey, 51, joined Viisage in August 2002 as Chief Executive Officer. From January 2001 through August 2002, Mr. Bailey served as the Chief Operating Officer of Art Technology Group. Between April 1984 and January 2001, Mr. Bailey served in various capacities at IBM Corporation, including several executive positions. A graduate of the US Naval Academy, Mr. Bailey served for eight years as an officer in the US Navy.

Iftikhar A. Ahmad, 52, was appointed Senior Vice President and General Manager of our Secure Credentials business segment in October of 2002. Between March 1999 and October 2002 he served as Viisage's Vice President of Engineering and Program Management. From November 1996 until March 1999, Mr. Ahmad served as a Director in our Software Engineering Department. From January 1995 to November 1996, he was a senior consultant in Lau's Systems Engineering Department, and prior to that, he held various senior engineering positions at Digital Equipment Corporation.

William K. Aulet, 46, joined Viisage in February 2003 as Chief Financial Officer. Between August 1996 and February 2003, he served as the President of SensAble Technologies. Mr. Aulet was one of the founders of Cambridge Decision Dynamics, where he served as President from April of 1995 to August of 1996. Prior to Cambridge Decision Dynamics, he spent twelve years at IBM Corporation, where he held various management positions. He previously was a Senior Lecturer at MIT's Sloan School of Management.

James P. Ebzery, 44, joined Viisage in November 2002 as Senior Vice President of Sales and Marketing. Mr. Ebzery served as Vice President of Operations for Internet Capital Group from April 2000 to February 2002. Prior to joining ICG, he held senior sales and marketing positions at IBM Corporation from December 1983 to April 2000. He also served as the Worldwide Solutions Executive for the IBM Supply Chain Software Business.

Kenneth C. Scheflen, 58, joined Viisage in July 2004 as Senior Vice President of Federal Government Solutions. From 1977 until July 2004, Mr. Scheflen served as the Director of the Defense Manpower Data Center, or DMDC, of the U.S. Department of Defense. The DMDC collects and maintains automated data about DoD-affiliated personnel, manpower requirements and the financial transactions of the DoD. Mr. Scheflen joined DMDC when it was established in 1974. Prior to that, he held various senior positions at the Human Resources Research Organization, an entity which conducts research, develops products, and provides services to improve organizational performance.

Table of Contents

Denis K. Berube, 61, has been the Chairman of the Board of Directors of Viisage since the Company's incorporation in 1996. Mr. Berube is Executive Vice President and Chief Operating Officer of Lau Technologies, or Lau. Lau is the largest holder of Viisage common stock, directly owning approximately 17% of its issued and outstanding common stock. Mr. Berube has been employed at Lau since 1990.

B.G. Beck, 67, was the President and Chief Executive Officer of Trans Digital Technologies Corporation from 1998 until its acquisition by Viisage in February 2004. Mr. Beck currently serves as a consultant to Viisage and also serves as a member of the Boards of Directors of Cardinal Bankshares Corporation, a provider of comprehensive individual and corporate banking services, and L-3 Communications MAS (US) Corporation, a leading supplier of a broad range of products used in a substantial number of aerospace and defense platforms.

Charles E. Levine, 51, has served as a director of Viisage since 1998. Mr. Levine retired in September 2002 from his position as President of Sprint PCS, a position he had held since January 1997. Before joining Sprint PCS, Mr. Levine served as Senior Vice President of Octel Services, a provider of voice systems services, from October 1994 through September 1996. Mr. Levine currently also serves as a member of the Boards of Directors of @Road, Inc., a wireless applications provider, Sierra Wireless Inc., a provider of a broad range of wireless products, including data modems, embedded modules and mobile phones, Somera Communications, a provider of telecommunications operators with equipment and deployment services, and Lexar Media, Inc., a provider of digital media such as compact flash and other flash memory products.

Marcel Yon, 37, was appointed a director of Viisage in June 2004. Mr. Yon was a founder of ZN Vision Technologies AG, or ZN, and served as its Chief Executive Officer from its inception in April 2000 until it was acquired by Viisage in January 2004. Mr. Yon currently serves as a consultant to Viisage and also serves as a member of the Board of Directors of Visiomed Diagnostics Ltd, a medical technology company listed on the Australian stock exchange. Mr. Yon was a founder of Visiomed AG which was acquired by Visiomed Diagnostics Ltd in January 2003. Prior to founding ZN and Visiomed, Mr. Yon advised on international mergers and acquisitions and strategy with Lazard & Co., an investment bank, in London.

Harriet Mouchly-Weiss, 61, has served as a director of Viisage since its incorporation in May 1996. Ms. Mouchly-Weiss founded Strategy XXI Group, an international communications and consulting firm, in January 1993 and has served as its managing partner since that time. Ms. Mouchly-Weiss currently also serves as a member of the Board of Directors of American Greetings Corporation, a company engaged in the design, manufacture and sale of everyday and seasonal greeting cards and other social expression products.

Paul T. Principato, 50, has served as a director of Viisage since May 2001 and as Chief Financial Officer of Lau since its incorporation in March 1990. Prior to 1990, Mr. Principato served as Controller at Barry Wright Corp.

Peter Nessen, 68, has served as a director of Viisage since its incorporation in May 1996. Since July 2003, Mr. Nessen has served as the President of Nessen Associates Ltd., a non-profit consulting company. From January 2003 to July 2003, Mr. Nessen served as an adviser to the Governor of the Commonwealth of Massachusetts on education matters. Mr. Nessen has been Chairman of the Board of NCN Financial, a private banking firm, since January 1995. From June 1993 through December 1994, Mr. Nessen was Dean for Resources and Special Projects at Harvard Medical School.

Thomas J. Reilly, 65, has served as a director of Viisage since its incorporation in May 1996. Mr. Reilly has been a self-employed financial consultant since December 1994. From June 1966 through November 1994, Mr. Reilly was with Arthur Andersen LLP, a public accounting firm, where he became a partner in 1975.

54

Table of Contents

## PRINCIPAL AND SELLING SHAREHOLDERS

The following table sets forth information known to us with respect to the beneficial ownership of our outstanding common stock as of July 15, 2004 by:

- each person known to us to be the beneficial owner of 5% or more of our common stock;

- each of our directors;

- each of our executive officers;

- each selling shareholder and

- all directors and executive officers as a group.

The percentage of our common stock beneficially owned prior to this offering in the following table is based on 35,870,327 shares of common stock outstanding on July 15, 2004. The table below assumes the underwriters do not exercise their over-allotment option. If the over-allotment option is exercised in full, we will sell an aggregate of 525,000 additional shares of common stock.

Beneficial ownership is determined in accordance with the rules of the Securities and Exchange Commission. In computing the number of shares beneficially owned by a person and the percentage ownership of that person, shares of common stock subject to options and warrants held by that person that are exercisable as of July 15, 2004 or will become exercisable within 60 days thereafter are deemed outstanding, while such shares are not deemed outstanding for purposes of computing percentage ownership of any other person.

Unless otherwise indicated in the footnotes to this table, the address of each beneficial owner is c/o Viisage Technology, Inc., 296 Concord Road, Third Floor, Billerica, MA 01821.

| Name | Shares Beneficially Owned Prior to Offering(1) | | Number of Shares Being Offered | Shares Beneficially Owned After Offering | |
|---|---|---|---|---|---|
| | Number | Percent | | Number | Percent |
| Joanna T. Lau (2) | 6,238,108 | 17.4% | 100,000(3) | 6,138,108 | 14.3% |
| Lau Technologies | 6,027,370 | 16.8% | 100,000 | 5,927,370 | 13.8% |
| Odeon Venture Capital AG(4) | 949,325 | 2.6% | 95,330 | 853,995 | 2.0% |
| Dr. Stefan Gehlen(5) | 168,392 | * | 4,670 | 163,722 | * |
| Denis K. Berube (6) | 6,238,108 | 17.4% | 100,000(3) | 6,138,108 | 14.3% |
| B.G. Beck (7) | 5,869,651 | 16.4% | 100,000 | 5,769,651 | 13.4% |
| Harriet Mouchly-Weiss(8) | 121,361 | * | — | 121,361 | * |
| Charles E. Levine(9) | 138,181 | * | — | 138,181 | * |
| Peter Nessen(10) | 87,827 | * | — | 87,827 | * |
| Paul T. Principato (11) | 108,855 | * | — | 108,855 | * |
| Thomas J. Reilly(12) | 118,073 | * | — | 118,073 | * |
| Marcel Yon(13) | 949,325 | 2.6% | 95,330(14) | 853,995 | 2.0% |
| Bernard C. Bailey(15) | 250,000 | * | — | 250,000 | * |
| Iftikhar A. Ahmad(16) | 177,406 | * | — | 177,406 | * |
| William K. Aulet (17) | 66,666 | * | — | 66,666 | * |
| Kenneth C. Scheflen | — | * | — | — | * |
| James P. Ebzery(18) | 66,666 | * | — | 66,666 | * |
| All directors and executive officers as a group (13 persons) (19) | 14,192,119 | 38.4% | 295,330(20) | 13,896,789 | 31.5% |

\* Indicates holdings of less than one percent of the 35,870,327 shares issued and outstanding as of July 15, 2004.

(1) Unless otherwise noted, and subject to applicable community property laws, to our knowledge each person identified possesses sole voting and investment power over the shares beneficially owned by such person.

55

Table of Contents

(2)     The address of Ms. Lau and Lau Technologies is c/o Lau Technologies, 30 Monument Square, Suite 220, Concord, Massachusetts 01742. Includes 6,027,370 shares held by Lau Technologies. Ms. Lau and Denis K. Berube, the spouse of Ms. Lau, own approximately 56% of the outstanding capital stock of Lau Technologies. Also includes 1,000 shares owned directly by Ms. Lau, 90,496 shares issuable to Mr. Berube pursuant to stock options, and 119,242 shares owned by Mr. Berube directly. Ms. Lau disclaims beneficial ownership of the 90,496 shares issuable to Mr. Berube and the 119,242 shares owned by Mr. Berube. Ms. Lau has sole voting and dispositive power over the shares beneficially owned by Lau.

(3)     Consists of 100,000 shares of our common stock being sold by Lau Technologies in this offering.

(4)     The address for Odeon Venture Capital AG, or Odeon, is Am Ruhrstein 33, 45133 Essen, Germany. Odeon held 16.6% of the fully-diluted share capital of ZN prior to its acquisition by us. Marcel Yon, the Chief Executive Officer of Odeon, serves as a member of our Board of Directors, and served as the Chief Executive Officer and as a member of the executive board of ZN immediately prior to the acquisition. As of the date of this prospectus, Yon AG, of which Mr. Yon is the Chief Executive Officer, serves as a consultant to us. Mr. Yon has sole voting and dispositive power over the shares beneficially owned by Odeon.

(5)     Includes 75,472 shares of common stock which may be required upon exercise of stock options. Dr. Stefan Gehlen held 1.6% of the fully-diluted share capital of ZN prior to its acquisition by us. In addition, Dr. Gehlen served as Chief Technology Officer and as a member of ZN's executive board prior to the acquisition. As of the date of this prospectus, Dr. Gehlen serves as an executive director of Viisage AG. Dr. Gehlen's address is Am Stens Hof 73, 44869 Bochum, Germany.

(6)     Includes 6,027,370 shares held by Lau Technologies. Also includes 1,000 shares owned directly by Joanna Lau, the spouse of Mr. Berube, 90,496 shares issuable to Mr. Berube pursuant to stock options, and 119,242 shares owned by Mr. Berube directly. Mr. Berube disclaims beneficial ownership of the 6,027,370 shares held by Lau Technologies and the 1,000 shares held by Ms. Lau.

(7)     Includes 10,000 shares of common stock which may be acquired upon exercise of stock options.

(8)     Includes 64,167 shares of common stock which may be acquired upon exercise of stock options.

(9)     Includes 79,136 shares of common stock which may be acquired upon exercise of stock options.

(10)    Includes 55,000 shares of common stock which may be acquired upon exercise of stock options.

(11)    Includes 72,167 shares of common stock which may be acquired upon exercise of stock options.

(12)    Includes 90,496 shares of common stock which may be acquired upon exercise of stock options.

(13)    The address of Mr. Yon is Am Ruhrstein 33, 45133 Essen, Germany. Includes 949,325 shares held by Odeon Venture Capital AG, of which Mr. Yon is the Chief Executive Officer. Mr. Yon serves as a member of our Board of Directors and served as the Chief Executive Officer and as a member of the executive board of ZN immediately prior to the acquisition. As of the date of this prospectus, Yon AG, of which Mr. Yon is the Chief Executive Officer, serves as a consultant to us. Mr. Yon has sole voting and dispositive power over the shares beneficially owned by Odeon.

(14)    Consists of 95,330 shares of our common stock being sold by Odeon Venture Capital AG in this offering.

(15)    Includes 250,000 shares of common stock which may be acquired upon exercise of stock options.

(16)    Includes 171,727 shares of common stock which may be acquired upon exercise of stock options.

(17)    Includes 66,666 shares of common stock which may be acquired upon exercise of stock options.

(18)    Includes 66,666 shares of common stock which may be acquired upon exercise of stock options.

(19)    Includes 1,045,267 of common stock which may be acquired upon exercise of stock options.

(20)    Consists of 100,000 shares of our common stock being sold by Lau Technologies in this offering, 100,000 shares of our common stock being sold by B.G. Beck in this offering and 95,330 shares of our common stock being sold by Odeon Venture Capital AG in this offering.

Table of Contents

## DESCRIPTION OF CAPITAL STOCK

Our authorized capital stock consists of 75,000,000 shares of common stock, $0.001 par value, and 2,000,000 shares of preferred stock, $0.001 par value. The following is a summary of the material provisions of the common stock and the preferred stock contained in our certificate of incorporation and bylaws. For greater detail about our capital stock, please refer to our certificate of incorporation and bylaws.

### Common Stock

As of July 15, 2004, there were 35,870,327 shares of common stock issued and outstanding, held of record by approximately 239 stockholders. Options to purchase a total of 4,550,621 shares of common stock and warrants to purchase a total of 812,469 shares of common stock were outstanding on July 15, 2004.

The holders of our common stock are entitled to one vote per share on all matters to be voted on by stockholders. Stockholders are not entitled to cumulative voting rights with respect to the election of directors. Subject to the prior rights of holders of preferred stock, if any, the holders of our common stock are entitled to receive such dividends, if any, as may be declared from time to time by our board of directors in its discretion from funds legally available for such purpose. In the event of our voluntary or involuntary liquidation, dissolution or winding up, the holders of our common stock are entitled to receive and share ratably in all assets remaining available for distribution to stockholders after payment of any preferential amounts to which the holders of preferred stock may be entitled. Our common stock has no preemptive rights and is not redeemable, assessable or entitled to the benefits of any sinking fund. Shares of our common stock are not convertible into any other security. All outstanding shares of our common stock are, and the common stock to be issued in this offering will be, validly issued, fully paid and non-assessable.

### Preferred Stock

Pursuant to our certificate of incorporation, our board of directors has the authority without further action by our stockholders to issue up to 2,000,000 shares of preferred stock. Our board of directors has the authority to issue such preferred stock in one or more series and to fix the number of shares of any series of preferred stock and to determine the designation of any such series. The board of directors is also authorized to determine and alter the powers, rights, preferences and privileges and the qualifications, limitations and restrictions granted to or imposed upon any wholly unissued series of preferred stock. In addition, within the limitations or restrictions stated in any resolution or resolutions of the board of directors originally fixing the number of shares constituting any series, the board of directors has the authority to increase or decrease, but not below the number of shares of such series then outstanding, the number of shares of any series subsequent to the issue of shares of that series. The issuance of preferred stock, while providing desirable flexibility in connection with possible acquisitions and other corporate purposes, could have the effect of delaying, deferring or preventing a change in control without further action by our stockholders and may adversely affect the market price of, and the voting and other rights of, the holders of our common stock. As of July 15, 2004, there were no shares of our preferred stock outstanding. We have no current plans to issue any shares of preferred stock.

### Certain Provisions of Our Certificate of Incorporation and Bylaws

Certain provisions of Delaware law and our certificate of incorporation and bylaws could make more difficult the acquisition of Viisage by means of a tender offer, a proxy contest, or otherwise, and the removal of incumbent officers and directors. These provisions are expected to discourage certain types of coercive takeover practices and inadequate takeover bids and to encourage persons seeking to acquire control of Viisage to first negotiate with us. We believe that the benefits of increased protection of our potential ability to negotiate with

57

Table of Contents

the proponent of an unfriendly or unsolicited proposal to acquire or restructure Viisage outweighs the disadvantages of discouraging such proposals, including proposals that are priced above the then current market value of our common stock, because, among other things, negotiation of such proposals could result in an improvement of their terms.

Our board of directors is divided into three classes. The directors in each class will serve for a three-year term, with our stockholders electing one class each year. This system of electing and removing directors may tend to discourage a third party from making a tender offer or otherwise attempting to obtain control of Viisage, because it generally makes it more difficult for stockholders to replace a majority of the directors.

Our bylaws establish an advance notice procedure for stockholder proposals to be brought before an annual meeting of our stockholders, including proposed nominations of persons for election to our board of directors. At an annual meeting, stockholders may only consider proposals or nominations specified in the notice of meeting, brought before the meeting by or at the direction of our board of directors or properly brought before the meeting by a person who was a stockholder of record on the record date for the meeting, who is entitled to vote at the meeting and who has given to our corporate secretary timely written notice, in proper form, of the stockholder's intention to bring that business before the meeting. Although our bylaws do not give our board of directors the power to approve or disapprove stockholder nominations of candidates or proposals regarding other business to be conducted at a special or annual meeting of the stockholders, our bylaws may have the effect of precluding the conduct of certain business at a meeting if the proper procedures are not followed or may discourage or deter a potential acquiror from conducting a solicitation of proxies to elect its own slate of directors or otherwise attempting to obtain control of our company.

Under Delaware law, a special meeting of stockholders may be called by our board of directors or by any other person authorized to do so in our certificate of incorporation or bylaws. Our bylaws authorize a majority of our board of directors, the chairman of our board or the chief executive officer to call a special meeting of stockholders. However, our board of directors may amend the bylaws at any time to eliminate the right to call a special meeting of stockholders. The elimination of the right of stockholders to call a special meeting would mean that a stockholder could not force stockholder consideration of a proposal over the opposition of our board of directors by calling a special meeting of stockholders prior to such time as our board of directors believed such consideration to be appropriate or until the next annual meeting provided that the requestor met the notice requirements. The restriction on the ability of stockholders to call a special meeting means that a proposal to replace our board could be delayed until the next annual meeting.

## Certain Provisions of Delaware Law

We are subject to Section 203 of the Delaware General Corporation Law, an antitakeover law. In general, Section 203 prohibits a publicly held Delaware corporation from engaging in a business combination with an interested stockholder for a period of three years following the date the person became an interested stockholder, unless:

- Prior to the date of the person becoming an interested stockholder, the board of directors of the corporation approved either the business combination or the transaction which resulted in the stockholder becoming an interested stockholder;

- The stockholder owned at least 85% of the voting stock of the corporation outstanding at the time the transaction which resulted in the stockholder becoming an interested stockholder commenced, excluding for purposes of determining the number of shares outstanding;

  - Shares owned by persons who are directors and also officers and

58

Table of Contents

- • Shares owned by employee stock plans in which employee participants do not have the right to determine confidentially whether shares held subject to the plan will be tendered in a tender or exchange offer or

- • On or subsequent to the date of the person becoming an interested stockholder, the business combination is approved by the board and authorized at an annual or special meeting of stockholders, and not by written consent, by the affirmative vote of at least two-thirds of the outstanding voting stock which is not owned by the interested stockholder.

Generally, a business combination includes a merger, asset or stock sale or other transaction resulting in a financial benefit to the interested stockholder. An interested stockholder is a person who, together with affiliates and associates, owns or, within three years prior to the determination of interested stockholder status, did own 15% or more of a corporation's outstanding voting securities. We expect the existence of this provision to have an antitakeover effect with respect to transactions our board of directors does not approve in advance. We anticipate that Section 203 may also discourage attempts that might result in a premium over the market price for the shares of common stock held by stockholders.

**Transfer Agent**

The transfer agent for our common stock is EquiServe Trust Company, N.A. Its address is 250 Royall Street, Canton, Massachusetts 02021, and its telephone number is (781) 575-2000.

**Listing**

Our common stock is quoted on the Nasdaq National Market under the trading symbol "VISG."

Table of Contents

# UNDERWRITING

We and the selling shareholders are offering the shares of our common stock described in this prospectus through the underwriters named below. J.P. Morgan Securities Inc. and UBS Securities LLC are the representatives of the underwriters. We and the selling shareholders will enter into an underwriting agreement with the representatives. Subject to the terms and conditions of the underwriting agreement, each of the underwriters has severally agreed to purchase the number of shares of common stock listed next to its name in the following table:

| Underwriters | Number of shares |
| --- | --- |
| J.P. Morgan Securities Inc. | 3,375,000 |
| UBS Securities LLC. | 1,875,000 |
| Piper Jaffray & Co. | 1,200,000 |
| JMP Securities LLC | 375,000 |
| Janney Montgomery Scott LLC | 375,000 |
| Roth Capital Partners, LLC | 300,000 |
| Total | 7,500,000 |

The underwriting agreement provides that if the underwriters take any of the shares presented in the table above, then they must take all of these shares. No underwriter is obligated to take any shares allocated to a defaulting underwriter except under limited circumstances. The underwriting agreement provides that the obligations of the underwriters are subject to certain conditions precedent, including the absence of any material adverse change in our business and the receipt of certain certificates, opinions and letters from us, our counsel and our independent auditors.

In connection with this offering, certain of the underwriters or securities dealers may distribute prospectuses electronically.

## Over-allotment Option

We have granted the underwriters an option to buy up to an aggregate of 525,000 additional shares of our common stock and the selling shareholders have granted the underwriters an option to buy up to an aggregate of 600,000 additional shares of our common stock. The underwriters may exercise this option solely for the purpose of covering over-allotments, if any, made in connection with this offering. The underwriters have 30 days from the date of this prospectus to exercise this option. If the underwriters exercise this option, they will each purchase additional shares approximately in proportion to the amounts specified in the table above.

## Commissions And Discounts

Shares sold by the underwriters to the public will initially be offered at the initial offering price set forth on the cover of this prospectus. Any shares sold by the underwriters to securities dealers may be sold at a discount of up to $0.19 per share from the initial offering price. Any of these securities dealers may resell any shares purchased from the underwriters to other brokers or dealers at a discount of up to $0.10 per share from the initial offering price. If all the shares are not sold at the initial offering price, the representatives may change the offering price and the other selling terms. Sales of shares made outside of the United States may be made by affiliates of the underwriters. Upon execution of the underwriting agreement, the underwriters will be obligated to purchase the shares at the prices and upon the terms stated therein, and, as a result, will thereafter bear any risk associated with changing the offering price to the public or other selling terms.

Table of Contents

The following table shows the per share and total underwriting discounts and commissions we and the selling shareholders will pay to the underwriters assuming both no exercise and full exercise of the underwriters' option to purchase up to an additional 1,125,000 shares.

|  | No exercise | Full exercise |
|---|---|---|
| Per share | $ 0.316 | $ 0.316 |
| Total | $ 2,370,000 | $ 2,725,500 |

We estimate that the total expenses of this offering payable by us, not including the underwriting discounts and commissions, will be approximately $255,000.

### No Sales of Similar Securities

We, the selling shareholders and our executive officers and directors will enter into lock-up agreements with the underwriters. Under these agreements, we and each of these persons may not, without the prior written approval of the representatives, subject to certain permitted exceptions, sell, offer to sell, contract or agree to sell, hypothecate, pledge, grant any option to purchase or otherwise dispose of or agree to dispose of, our common stock or securities convertible into or exercisable or exchangeable for our common stock or warrants or rights to purchase our common stock. These restrictions will be in effect for a period of 90 days after the date of the final prospectus. At any time and without public notice, the representatives may in their sole discretion, release all or some of the securities from these lock-up agreements.

We and the selling shareholders have agreed to indemnify the underwriters against certain liabilities, including liabilities under the Securities Act. If we and the selling shareholders are unable to provide this indemnification, we will contribute to payments the underwriters may be required to make in respect of those liabilities.

### Nasdaq National Market Listing

Our common stock is quoted on the Nasdaq National Market under the trading symbol "VISG."

### Price Stabilization, Short Positions

In connection with this offering, the underwriters may engage in activities that stabilize, maintain or otherwise affect the price of our common stock including:

- stabilizing transactions;
- short sales;
- purchases to cover positions created by short sales;
- imposition of penalty bids and
- syndicate covering transactions.

Stabilizing transactions consist of bids or purchases made for the purpose of preventing or retarding a decline in the market price of our common stock while this offering is in progress. These transactions may also include making short sales of our common stock, which involves the sale by the underwriters of a greater number of shares of common stock than they are required to purchase in this offering, and purchasing shares of common stock on the open market to cover positions created by short sales. Short sales may be "covered" shorts, which are short positions in an amount not greater than the underwriters' over-allotment option referred to above, or may be "naked" shorts, which are short positions in excess of that amount.

The underwriters may close out any covered short position by either exercising their over-allotment option, in whole or in part, or by purchasing shares in the open market. In making this determination, the underwriters

61

Table of Contents

will consider, among other things, the price of shares available for purchase in the open market as compared to the price at which they may purchase shares through the over-allotment option.

Naked short sales are in excess of the over-allotment option. The underwriters must close out any naked short position by purchasing shares in the open market. A naked short position is more likely to be created if the underwriters are concerned that there may be downward pressure on the price of the common stock in the open market that could adversely affect investors who purchased in this offering.

The underwriters also may impose a penalty bid. This occurs when a particular underwriter repays to the underwriters a portion of the underwriting discount received by it because the representatives have repurchased shares sold by or for the account of that underwriter in stabilizing or short covering transactions.

In addition, in connection with this offering, certain of the underwriters (and selling group members) may engage in passive market making transactions in the common stock on the Nasdaq National Market prior to the pricing and completion of the offering. Passive market making consists of displaying bids on the Nasdaq National Market no higher than the bid prices of independent market makers and making purchases at prices no higher than these independent bids and effected in response to order flow. Net purchases by a passive market maker on each day are limited to a specified percentage of the passive market maker's average daily trading volume in the common stock during a specified period and must be discontinued when such limit is reached. Passive market making may cause the price of the common stock to be higher than the price that otherwise would exist in the open market in the absence of such transactions. If passive market making is commenced, it may be discontinued at any time.

As a result of these activities, the price of our common stock may be higher than the price that otherwise might exist in the open market. If these activities are commenced, they may be discontinued by the underwriters at any time. The underwriters may carry out these transactions on the Nasdaq National Market, in the over-the-counter market or otherwise.

The underwriters and their affiliates have provided and may provide certain commercial banking, financial advisory and investment banking services for us for which they receive customary fees.

The underwriters and their affiliates may from time to time in the future engage in transactions with us and perform services for us in the ordinary course of their business.

Table of Contents

## WHERE YOU CAN FIND MORE INFORMATION

We are subject to the informational requirements of the Securities Exchange Act of 1934, as amended, or the Exchange Act, and, in accordance therewith, file annual, quarterly and current reports, proxy statements and other information with the Securities and Exchange Commission, or SEC. Such reports, proxy statements and other information can be inspected and copied at the SEC's Public Reference Room at 450 Fifth Street, N.W., Judiciary Plaza, Washington, D.C. 20549. Please call the SEC at 1-800-SEC-0330 for further information on the operation of the SEC's Public Reference Room. Copies of such material can be obtained from the Public Reference Section of the SEC at prescribed rates. Such material also can be accessed electronically by means of the SEC's home page on the internet (http://www.sec.gov) and on our website (http://www.viisage.com).

We have filed a registration statement and related exhibits with the SEC under the Securities Act of 1933, as amended, or the Securities Act. The registration statement contains additional information about us and our common stock. You can inspect or access electronically the registration statement and exhibits by the means described in the paragraph above.

The SEC allows us to "incorporate by reference" the information that we file with it, which means that we can disclose important information to you by referring you to another document filed separately with the SEC. The information incorporated by reference is an important part of this prospectus and the information that we file later with the SEC may updated and supersede this information. We incorporate by reference into this prospectus the documents listed below and any filings made by us with the SEC pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act after the date of filing of the registration statement of which this prospectus is part, but before the effective date of the registration statement (in each case, other than information in such documents that is not deemed to be filed).

- Our Annual Report on Form 10-K for the fiscal year ended December 31, 2003 (including information specifically incorporated by reference therein from our Proxy Statement for our 2004 Annual Meeting);

- Our Quarterly Report on Form 10-Q for the quarterly period ended March 28, 2004 (as amended on June 21, 2004);

- Our Current Reports on Form 8-K filed on January 30, 2004, February 27, 2004 (as amended on April 29, 2004), May 21, 2004 (as amended on June 18, 2004), June 23, 2004, July 21, 2004 (disclosing the press release regarding the Georgia contract settlement) and July 22, 2004; and

- Description of our common stock included in our Registration Statement on Form 8-A filed with the SEC pursuant to Section 12 of the Exchange Act on October 15, 1996 (No. 000-21559).

We will provide to each person, including any beneficial owner, to whom this prospectus is delivered a copy of any or all of the information that we have incorporated by reference into this prospectus but not delivered with this prospectus. To receive a free copy of any of the documents incorporated by reference in this prospectus, other than exhibits, unless they are specifically incorporated by reference in those documents, call or write Elliot J. Mark, our General Counsel, at our principal executive offices located at 296 Concord Road, Third Floor, Billerica, Massachusetts 01821. Our telephone number is (978) 932-2200.

You should rely only upon the information provided in this document or incorporated by reference in this prospectus and any supplement. We have not authorized anyone to provide you with different information.

63

Table of Contents

## VALIDITY OF COMMON STOCK

The validity of the shares of our common stock being offered by this prospectus will be passed upon for us by Latham & Watkins LLP and for the underwriters by Cahill Gordon & Reindel LLP .

## EXPERTS

Our financial statements as of December 31, 2002 and 2003 and for each of the three years in the period ended December 31, 2003, included herein and in our annual report on Form 10-K for the year ended December 31, 2003, which is incorporated by reference in this prospectus, have been audited by BDO Seidman, LLP, independent certified public accountants as indicated in their report with respect thereto, and are included herein and incorporated by reference in reliance upon the authority of said firm as experts in auditing and accounting.

The financial statements of ZN Vision Technologies AG as of December 31, 2003 and 2002 and for each of the years then ended, which are incorporated in this prospectus by reference to our current report on Form 8-K filed on May 21, 2004 and amended on June 18, 2004, have been audited by BDO Deutsche Warentreuhand AG, independent auditors as indicated in their report with respect thereto, and are included herein in reliance upon the authority of said firm as experts in auditing and accounting.

The financial statements of Trans Digital Technologies Corporation as of December 31, 2002 and 2003 and for the years then ended, which are incorporated in this prospectus by reference to our current report on Form 8-K filed on April 29, 2004, have been audited by BDO Seidman, LLP, independent certified public accountants as indicated in their report with respect thereto, and are included herein in reliance upon the authority of said firm as experts in auditing and accounting.

64

Table of Contents

## INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

| | Page |
|---|---|
| Report of Independent Certified Public Accountants | F-2 |
| Consolidated Balance Sheets as of December 31, 2002, 2003 and March 28, 2004 | F-3 |
| Consolidated Statements of Operations for the years ended December 31, 2001, 2002 and 2003 and for the three month periods ended March 30, 2003 and March 28, 2004 | F-4 |
| Consolidated Statements of Changes in Shareholders' Equity for the years ended December 31, 2001, 2002 and 2003 and for the three month periods ended March 30, 2003 and March 28, 2004 | F-5 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2001, 2002 and 2003 and for the three month periods ended March 30, 2003 and March 28, 2004 | F-6 |
| Notes to Consolidated Financial Statements | F-7 |

F-1

Table of Contents

## REPORT OF INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS

To Viisage Technology, Inc.:

We have audited the accompanying consolidated balance sheets of Viisage Technology, Inc. and subsidiary as of December 31, 2003 and 2002, and the related consolidated statements of operations, changes in shareholders' equity and cash flows for each of the three years in the period ended December 31, 2003. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the Standards of the Public Company Accounting Oversight Board ("United States"). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Viisage Technology, Inc. and subsidiary as of December 31, 2003 and 2002, and the consolidated results of their operations and their cash flows for each of the three years in the period ended December 31, 2003, in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note 2 to the consolidated financial statements, the Company changed its method of accounting for certain revenue arrangements.

/s/ BDO SEIDMAN, LLP

Boston, Massachusetts
February 6, 2004
Except for Note 15, which is
   as of February 27, 2004

F-2

Table of Contents

# VIISAGE TECHNOLOGY, INC.

## Consolidated Balance Sheets
### (in thousands)

| | December 31, 2002 | December 31, 2003 | March 28, 2004 (unaudited) |
|---|---|---|---|
| **Assets** | | | |
| Current Assets: | | | |
| Cash and cash equivalents | $ 2,212 | $ 6,666 | $ 9,282 |
| Restricted cash | 1,241 | — | — |
| Accounts receivable | 7,360 | 7,057 | 9,343 |
| Inventories and other costs and estimated earnings in excess of billings | 23,372 | 4,050 | 4,647 |
| Other current assets | 339 | 439 | 1,162 |
| Total current assets | 34,524 | 18,212 | 24,434 |
| Property and equipment, net | 16,629 | 25,088 | 24,810 |
| Goodwill | — | — | 63,613 |
| Intangible assets, net | 3,147 | 2,693 | 18,519 |
| Restricted cash | 6,163 | 6,311 | 3,120 |
| Other assets | 726 | 2,176 | 796 |
| | $ 61,189 | $ 54,480 | $ 135,292 |
| **Liability and Shareholders' Equity** | | | |
| Current Liabilities: | | | |
| Accounts payable and accrued expenses | $ 7,017 | $ 6,851 | $ 11,051 |
| Current portion of project financing | 5,263 | 3,734 | 4,175 |
| Current portion of related party notes | — | 1,740 | 6,765 |
| Total current liabilities | 12,280 | 12,325 | 21,991 |
| Project financing | 9,845 | 5,813 | 7,013 |
| Related party notes | — | 2,334 | 13,470 |
| Other liabilities | — | — | 622 |
| Total liabilities | 22,125 | 20,472 | 43,096 |
| Commitments and contingencies | | | |
| Shareholders' Equity: | | | |
| Common stock, $0.001 par value; 45,000,000 shares authorized; 20,250,817, 23,892,772 and 35,625,176 shares issued and outstanding at December 31, 2002 and 2003 and March 28, 2004, respectively | 20 | 24 | 36 |
| Additional paid in capital | 63,461 | 76,061 | 135,869 |
| Accumulated deficit | (24,417) | (42,077) | (43,709) |
| Total shareholders' equity | 39,064 | 34,008 | 92,196 |
| | $ 61,189 | $ 54,480 | $ 135,292 |

The accompanying notes are an integral part of these consolidated financial statements.

F-3

Table of Contents

## VIISAGE TECHNOLOGY, INC.

### Consolidated Statements of Operations
### (in thousands, except per share data)

| | For the Years Ended December 31, | | | For the Three Months Ended | |
| --- | --- | --- | --- | --- | --- |
| | 2001 | 2002 | 2003 | March 30, 2003 | March 28, 2004 |
| | | | | (unaudited) | |
| Revenue | $ 26,280 | $ 32,302 | $ 37,371 | $ 8,155 | $ 12,259 |
| Cost of revenue | 19,602 | 25,239 | 27,844 | 6,789 | 8,906 |
| Gross margin | 6,678 | 7,063 | 9,527 | 1,366 | 3,353 |
| Operating expenses: | | | | | |
| Sales and marketing | 809 | 5,368 | 5,282 | 1,411 | 1,493 |
| Research and development | 2,054 | 4,457 | 3,650 | 945 | 959 |
| General and administrative | 2,500 | 5,069 | 5,110 | 1,093 | 2,137 |
| Acquisition expenses | 1,639 | — | — | — | — |
| Restructuring charges | — | 824 | — | — | — |
| Total operating expenses | 7,002 | 15,718 | 14,042 | 3,449 | 4,589 |
| Operating loss | (324) | (8,655) | (4,515) | (2,083) | (1,236) |
| Interest income | 31 | 196 | 99 | 28 | 21 |
| Interest expense | (1,241) | (1,071) | (1,068) | (247) | (413) |
| Other income | — | — | 18 | — | 21 |
| Loss before income taxes and cumulative effect of change in accounting principle | (1,534) | (9,530) | (5,466) | (2,302) | (1,607) |
| Provision for income taxes | — | — | (63) | (63) | (25) |
| Loss before cumulative effect of change in accounting principle | (1,534) | (9,530) | (5,529) | (2,365) | (1,632) |
| Cumulative effect of change in accounting principle | — | — | (12,131) | (12,131) | — |
| Net loss | (1,534) | (9,530) | (17,660) | (14,496) | (1,632) |
| Preferred stock dividends | (5) | — | — | — | — |
| Loss applicable to common shareholders | $ (1,539) | $ (9,530) | $ (17,660) | $ (14,496) | $ (1,632) |
| Basic and diluted loss per share before cumulative effect | $ (0.09) | $ (0.48) | $ (0.26) | $ (0.12) | $ (0.05) |
| Cumulative effect of change in accounting principle | $ — | $ — | $ (0.56) | $ (0.60) | $ — |
| Basic and diluted net loss per share applicable to common shareholders | $ (0.09) | $ (0.48) | $ (0.82) | $ (0.72) | $ (0.05) |
| Weighted average basic and diluted common shares outstanding | 16,265 | 20,046 | 21,445 | 20,258 | 31,362 |
| Pro forma operating loss (for application of EITF 00-21) | $ (494) | $ (11,176) | $ (5,529) | $ (2,365) | $ (1,632) |
| Pro forma net loss per share | $ (0.03) | $ (0.56) | $ (0.26) | $ (0.12) | $ (0.05) |

The accompanying notes are an integral part of these consolidated financial statements.

Table of Contents

## VIISAGE TECHNOLOGY, INC.

### Consolidated Statements of Changes in Shareholders' Equity
(in thousands)

| | Common Stock | Preferred Stock | Additional Paid-in Capital | Accumulated Deficit | Total |
|---|---|---|---|---|---|
| Balance, December 31, 2000 | $ 11 | $ 1,020 | $ 33,045 | $ (13,348) | $ 20,728 |
| Warrants issued for services | — | — | 994 | — | 994 |
| Exercise of employee stock options | 1 | — | 1,085 | — | 1,086 |
| Common stock issued for services | — | — | 297 | — | 297 |
| Common stock issued under employee stock purchase plan | — | — | 51 | — | 51 |
| Exercise of warrants | 3 | — | 764 | — | 767 |
| Conversion of debt and accrued interest | 1 | — | 1,067 | — | 1,068 |
| Private placement of common stock, net | 2 | — | 22,750 | — | 22,752 |
| Conversion of preferred stock and accrued dividends | 2 | (1,020) | 1,108 | (5) | 90 |
| Preferred stock dividends | — | — | — | (5) | (5) |
| Net loss | — | — | — | (1,534) | (1,534) |
| Balance, December 31, 2001 | 20 | — | 61,161 | (14,887) | 46,294 |
| Exercise of employee stock options | — | — | 974 | — | 974 |
| Common stock issued for services | — | — | 699 | — | 699 |
| Common stock issued under employee stock purchase plan | — | — | 51 | — | 51 |
| Contributed capital from Lau Acquisition | — | — | 576 | — | 576 |
| Net loss | — | — | — | (9,530) | (9,530) |
| Balance, December 31, 2002 | 20 | — | 63,461 | (24,417) | 39,064 |
| Exercise of employee stock options | — | — | 72 | — | 72 |
| Common stock issued for services | — | — | 319 | — | 319 |
| Common stock issued under employee stock purchase plan | — | — | 26 | — | 26 |
| Private placement of common stock, net | 4 | — | 12,183 | — | 12,187 |
| Net loss | — | — | — | (17,660) | (17,660) |
| Balance, December 31, 2003 | 24 | — | 76,061 | (42,077) | 34,008 |
| Exercise of employee stock options (unaudited) | — | — | 594 | — | 594 |
| Common stock issued under employee stock purchase plan (unaudited) | — | — | 33 | — | 33 |
| Common stock issued for acquisitions (unaudited) | 12 | — | 57,474 | — | 57,486 |
| Private placement of common stock, net (unaudited) | — | — | 1,707 | — | 1,707 |
| Net loss (unaudited) | — | — | — | (1,632) | (1,632) |
| Balance, March 28, 2004 (unaudited) | $ 36 | $ — | $ 135,869 | $ (43,709) | $ 92,196 |

The accompanying notes are an integral part of these consolidated financial statements.

F-5

Table of Contents

## VIISAGE TECHNOLOGY, INC.

### Consolidated Statements of Cash Flows
### (in thousands)

| | For the Years Ended December 31, | | | For the Three Months Ended | |
|---|---|---|---|---|---|
| | **2001** | **2002** | **2003** | **March 30, 2003** | **March 28, 2004** |
| | | | | (unaudited) | |
| **Cash Flow from Operating Activities:** | | | | | |
| Net loss | $ (1,534) | $ (9,530) | $ (17,660) | $ (14,496) | $ (1,632) |
| Adjustments to reconcile net loss to net cash provided by (used for) operating activities: | | | | | |
| Depreciation and amortization | 4,511 | 7,197 | 6,806 | 1,844 | 2,279 |
| Gain on sale of equipment | — | — | (18) | — | — |
| Value of warrants issued for services | 994 | — | — | — | — |
| Directors fees paid in common stock | 297 | 380 | 319 | 30 | 120 |
| Impact of cumulative effect of change in accounting principle | — | — | 12,131 | 12,131 | — |
| Loss on disposal of fixed assets | — | 132 | 38 | — | — |
| Loss on disposal of intangible assets | — | 75 | 118 | — | — |
| Change in operating assets and liabilities: | | | | | |
| Accounts receivable | (1,516) | (2,022) | 303 | 1,926 | 828 |
| Inventories and other costs and estimated earnings in excess of billings | 3,007 | 289 | 1,402 | 6,830 | (273) |
| Other current assets | 299 | (38) | (100) | (371) | (433) |
| Accounts payable and accrued expenses | (3,773) | 406 | 1,101 | (1,457) | (303) |
| Net cash provided by (used for) operating activities | 2,285 | (3,111) | 4,440 | 6,437 | 586 |
| **Cash Flow from Investing Activities:** | | | | | |
| Purchase of equipment converted to project Financing | (7,946) | — | — | — | — |
| Restricted cash | — | (7,404) | 1,093 | 291 | 3,191 |
| Cash paid for acquisitions | — | (2,822) | (1,293) | — | (5,227) |
| Additions to property and equipment | (54) | (5,702) | (8,195) | (5,711) | (369) |
| Proceeds from sale of equipment | — | — | 35 | — | — |
| (Increase) decrease in other assets | (29) | (899) | (352) | (183) | (415) |
| Net cash used for investing activities | (8,029) | (16,827) | (8,712) | (5,603) | (2,820) |
| **Cash Flow from Financing Activities:** | | | | | |
| Net revolving credit repayments | (2,515) | — | — | — | — |
| Net proceeds from project financing | 7,946 | 4,500 | 3,318 | — | 4,273 |
| Principal payments on project financing | (4,000) | (4,037) | (6,877) | (1,297) | (1,771) |
| Net proceeds from issuance of common stock | 24,975 | 1,025 | 12,285 | 34 | 2,348 |
| Net cash provided by (used by) financing activities | 26,406 | 1,488 | 8,726 | (1,263) | 4,850 |
| Net increase (decrease) in cash and cash equivalents | 20,662 | (18,450) | 4,454 | (429) | 2,616 |
| Cash and cash equivalents, beginning of period | — | 20,662 | 2,212 | 2,212 | 6,666 |
| Cash and cash equivalents, end of period | $ 20,662 | $ 2,212 | $ 6,666 | $ 1,783 | $ 9,282 |
| **Supplemental Cash Flow Information:** | | | | | |
| Cash paid for interest | $ 1,161 | $ 944 | $ 1,078 | $ 236 | $ 256 |
| **Non-cash Transactions:** | | | | | |
| Conversion of convertible debt and accrued interest to common stock | $ 1,068 | $ — | $ — | $ — | $ — |
| Conversion of preferred stock and accrued dividends to common stock | $ 1,110 | $ — | $ — | $ — | $ — |
| Equipment purchased under capital leases | $ — | $ — | $ 2,071 | $ — | $ — |
| Directors fees paid in common stock | $ 297 | $ 380 | $ 300 | $ 30 | $ 120 |
| Assets contributed from Lau Acquisition Corp. | $ — | $ 576 | $ — | $ — | $ — |
| Value of warrants issued for service | $ 994 | $ — | $ — | $ — | $ — |
| Common stock issued for private placement costs | $ — | $ 319 | $ — | $ — | $ — |
| Services paid in common stock | $ — | $ — | $ 19 | $ — | $ 14 |
| Net assets acquired from Lau Technologies | $ — | $ — | $ — | $ — | $ — |
| Acquisitions paid in common stock | $ — | $ — | $ — | $ — | $ 57,486 |

The accompanying notes are an integral part of these consolidated financial statements.

Table of Contents

**VIISAGE TECHNOLOGY, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Information for the three-month periods ended March 30, 2003**
**and March 28, 2004 is unaudited)**

## 1. DESCRIPTION OF BUSINESS

Viisage Technology, Inc. ("Viisage" or the "Company") is a leading provider of advanced technology identity solutions that enable governments, law enforcement agencies and businesses to enhance security, reduce identity theft and protect personal privacy. Our identity solutions include secure credential provisioning systems, biometric software and systems and real-time identity databases, as well as systems design, development, integration and support services. These solutions enable our customers to manage the entire life cycle of an individual's identity for a variety of applications including civil identification, criminal identification and border management. Our customers use our identity solutions to help solve the following four critical problems:

- assurance that the identification document is authentic;

- assurance that the document has been issued to the correct person;

- confidence that the person holding the identification is uniquely tied to and authorized to use the document and

- verification of the privileges the individual is entitled to at a particular point in time.

Our business involves two related segments: secure credentials and biometrics. Our secure credentials solutions involve the design, development, marketing and implementation of integrated software and hardware solutions that produce identification credentials utilizing face recognition and other biometric technologies. The focus of our biometric technology solutions is primarily on applications designed to deter criminal and terrorist activities, including government research and development contracts.

Viisage combines its proprietary biometric and secure credential software with complementary industry standard products to create identity solutions that integrate into its customers' environments. These turnkey solutions integrate secure document technologies, image and data capture, relational databases, and multiple biometrics, improving the customer's ability to process and manage identity information. Applications include passports, drivers' licenses, voter registration, national identification credentials, law enforcement, social services, access control, surveillance and PC network and Internet access security. Viisage's primary customers are government agencies with particular penetration in U.S. government agencies such as the Department of State and state departments of motor vehicles, social services, and law enforcement. Viisage is the sole source provider of high security technology and services to the U.S. Department of State for the production of U.S. passports by virtue of an acquisition in 2004 and has captured a large percentage of the domestic drivers' license market. Viisage also has provided services under subcontracts for projects in the United Arab Emirates, Jamaica, the Philippines and the U.S. Immigration and Naturalization Service.

## 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

*Principles of Consolidation*

The consolidated financial statements include the accounts of the Company and its wholly owned subsidiary, Biometrica Systems, Inc. for the years ended December 31, 2002, 2003 and for the three month periods ended March 30, 2003 and March 28, 2004. The consolidated financial statements include the accounts of its wholly owned subsidiaries, Viisage AG and Trans Digital Technologies for the three month period ended March 28, 2004. Operating results for Viisage AG and Trans Digital Technologies are included from their dates of acquisition. All significant inter-company balances and transactions have been eliminated.

F-7

Table of Contents

VIISAGE TECHNOLOGY, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Information for the three-month periods ended March 30, 2003
and March 28, 2004 is unaudited)

*Basis of Presentation*

The accompanying unaudited balance sheet as of March 28, 2004 and the related unaudited statements of operations and cash flows for the three-month periods ended March 30, 2003 and March 28, 2004 and the unaudited statement of changes in stockholders' equity for the three months ended March 28, 2004, have been prepared pursuant to the rules and regulations of the Securities and Exchange Commission. Certain information and footnote disclosures normally included in financial statements prepared in accordance with accounting principles generally accepted in the United States of America have been condensed or omitted pursuant to such rules and regulations.

In the opinion of management, all adjustments (which include only normal recurring adjustments) necessary to present fairly the financial position, results of operations, and cash flows as of March 28, 2004 and for the periods mentioned above have been made. The results of operations for the three-month period ended March 28, 2004 are not necessarily indicative of the operating results for the full year.

*Use of Estimates*

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

*Computation of Net Loss per Share*

We follow SFAS No. 128, *Earnings Per Share* , where basic loss per share is computed by dividing loss available to common shareholders by the weighted average number of common shares outstanding. The computation of diluted loss per share is similar to the basic loss per share computation except the denominator is increased to include the number of additional shares that would have been outstanding if the dilutive potential common shares had been issued. In addition, the numerator is adjusted for any changes in income or loss that would result from the assumed conversions of those potential shares.

Basic and diluted loss per share calculations are as follows (in thousands):

| | For the Year Ended December 31, | | | For the Three Months Ended | |
| --- | --- | --- | --- | --- | --- |
| | 2001 | 2002 | 2003 | March 30, 2003 | March 28, 2004 |
| | | | | (unaudited) | |
| Net loss available to common shareholders used in basic and diluted EPS | $ (1,539) | $ (9,530) | $ (17,660) | $ (14,496) | $ (1,632) |
| Weighted average common shares used in basic EPS | 16,265 | 20,046 | 21,445 | 20,258 | 31,362 |
| Effect of dilutive securities | — | — | — | — | — |
| Weighted average common shares and dilutive potential common shares used in dilutive EPS | 16,265 | 20,046 | 21,445 | 20,258 | 31,362 |

The diluted per share amounts do not reflect the impact of options outstanding, the conversion of convertible preferred stock, or stock warrants, for approximately 3,163,000, 3,382,000, 4,152,000, 3,735,000 and 5,379,000 shares at December 31, 2001, 2002 and 2003, March 30, 2003 and March 28, 2004, respectively because the effect of each is antidilutive.

F-8

Table of Contents

**VIISAGE TECHNOLOGY, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Information for the three-month periods ended March 30, 2003**
**and March 28, 2004 is unaudited)**

*Contract Revenue and Cost Recognition*

For the year ended December 31, 2003 and the three months ended March 30, 2003, we incurred a non-cash charge of $12.1 million representing the cumulative effect of a change in accounting principle related to our adoption of Emerging Issues Task Force 00-21, *Accounting for Revenue Arrangements with Multiple Deliverables* , or EITF 00-21, on a cumulative basis as of January 1, 2003.

*Secure Credentials Revenue and Cost Recognition*

We deliver solutions under secure credential contracts primarily to federal and state government customers. We recognize revenue when pervasive evidence of a sales arrangement exists, delivery occurs or services are rendered, the sales price is fixed or determinable and collectibility is reasonably assured.

In some cases, we generate revenue from the sale of products in which title passes to the customer. In these cases, we recognize revenue when the products are shipped and accepted by the customer. Services revenue under these contracts consists of preventative and remedial maintenance on printing systems. We also provide on site technical support and consulting services to our customers. Revenue on fixed price services is recognized ratably over the service period which approximates the timing of the services rendered. Revenue on time and material services is recognized as the services are rendered. Expenses on all services are recognized when the costs are incurred.

When elements such as products and services are contained in a single arrangement, or in related arrangements with the same customer, we allocate revenue to each element based on its relative fair value, provided that such element meets the criteria for treatment as a separate unit of accounting. The price charged when the element is sold separately generally determines fair value.

We have secure credential contracts, generally with state governments for the production of drivers' licenses and other identification credentials, where we have determined that we have multiple elements and where the title to equipment installed to produce these credentials does not pass to the customer. Under these contracts, the first element consists of hardware, system design, implementation, training, consumables management, maintenance and support which is accounted for as equipment and related executory services under lease in accordance with SFAS No. 13. The second element consists of customized software which is accounted for as a long term contract in accordance with AICPA Statement of Position 97-2, *Software Revenue Recognition* , or SOP 97-2, and Statement of Position 81-1, *Accounting for Performance of Construction-Type and Certain Production-Type Contracts* , or SOP 81-1, on a units of delivery method of measurement.

Costs related to the hardware element of these contracts are capitalized on the balance sheet and are depreciated over the remaining contract term beginning when the system goes into service. The delivery of these credentials typically requires us to customize, design and install equipment and software at customer locations, as well as perform training, supply consumables, maintain the equipment and provide support services. Nonperformance of training, consumables management, maintenance and support services would prevent us from receiving payment for the costs incurred in the customization, design and installation of the system. EITF 00-21 limits the amount of revenue allocable to the customization, design and installation of the system to the amount that is not contingent upon the production of credentials. Revenue on these contracts under EITF 00-21 is earned based on, and is contingent upon, the production of credentials from the system. Due to the contingent performance of credential production in our secure credentials contracts, we defer revenue recognition for the system design and installation phase of our contracts, including customized software and equipment, and recognize revenue as credentials are produced.

F-9

Table of Contents

**VIISAGE TECHNOLOGY, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Information for the three-month periods ended March 30, 2003**
**and March 28, 2004 is unaudited)**

Costs related to the customized software element of our secure credentials contracts where title to the hardware element does not pass to the customer are capitalized on the balance sheet during the period in which we are designing and installing the system and are amortized over the remaining contract term beginning when the system goes into service. Costs related to this element of our secure credentials contracts incurred after the system is in service are expensed as incurred. Revenue related to this element of our secure credentials contracts is recorded as credentials are produced by the system.

Our secure credentials contracts related to the delivery of drivers' licenses and identification credentials typically provide that the state department of transportation, or similar agency, will pay a fixed price per credential produced utilizing a system we design, implement and support. Our fixed pricing includes charges for the use of the system, materials and the data that is stored on the credentials. Prices under these contracts vary depending on, among other things:

- Design and integration complexities;

- Nature and number of workstations and sites installed;

- Projected number of secure credentials to be produced;

- Size of the database;

- Level of post-installation involvement that will be required of us and

- Competitive environment.

Prior to the adoption of EITF 00-21, we recognized revenue and costs associated with our secure credentials contracts related to the delivery of drivers' licenses and identification credentials as a single accounting element using the percentage-of-completion methodology.

*Biometrics Segment Revenue and Cost Recognition*

Within our biometrics segment, our contracts typically provide for the development, customization and installation of face recognition systems for government agencies, law enforcement agencies and businesses. These contracts are generally fixed price, and include milestones and acceptance criteria for the various deliverables under the contract. Contract prices vary depending on, among other things, design and integration complexities, the nature and number of workstations and sites, the size of the database, the level of post-installation support and the competitive environment. In certain cases, we provide licenses of off-the-shelf versions of our face recognition software on a per user basis.

We recognize revenue under these contracts using the percentage-of-completion methodology in accordance with SOP 81-1. We use the percentage-of-completion methodology to account for revenue under these contracts because:

- A high level of certainty exists regarding expected cash flows from these contracts and

- A reliable basis exists for determining the percentage of the contract that will be completed at the end of the accounting period.

We measure the percentage complete as costs are incurred or for contracts based on milestones, revenue is recognized when scheduled performance milestones and customer acceptance criteria have been achieved. These milestones are specific events or deliverables clearly identified in the contract. We recognize revenue based on the total milestone billable to the customer less revenue related to any future maintenance requirements. Billings occur under these contracts when the milestone is delivered and accepted by the customer. Milestones can include customized systems, installation and services as defined by the contract.

F-10

Table of Contents

**VIISAGE TECHNOLOGY, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Information for the three-month periods ended March 30, 2003**
**and March 28, 2004 is unaudited)**

We record costs and estimated earnings in excess of billings under these contracts as current assets. We record billings in excess of costs and estimated earnings and accrued contract costs as current liabilities.

Under SOP 97-2 revenue related to software licenses of off-the-shelf face recognition software is recognized when:

- Persuasive evidence of an arrangement exists;

- Delivery has occurred;

- The sales price is fixed and determinable;

- Collection is probable and

- There are no post delivery obligations.

We adopted EITF 00-21 on a cumulative basis as of January 1, 2003. Based on our evaluation of biometrics contracts and the application of the new guidance, the adoption of EITF 00-21 did not have an impact on the accounting for revenue from biometrics systems under long-term contracts.

*Cash and Cash Equivalents*

We consider all highly liquid instruments, with maturity of three months or less when acquired, to be cash equivalents. As of December 31, 2002, 2003 and March 28, 2004, cash and cash equivalents consisted entirely of cash and exclude approximately $7.4 million, $6.3 million and $3.1 million, respectively, the use of which was restricted under our term loan agreement.

*Fair Value of Financial Instruments*

The carrying amounts of our financial instruments, including cash and cash equivalents, accounts receivable and payable and short and long-term borrowings, approximate fair values.

EXHIBIT 14

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the Quarterly Period Ended June 27, 2004.

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the Transition Period from _____ to _____ .

### Commission File Number 000-21559

# VIISAGE TECHNOLOGY, INC.
#### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware**<br>(State or other jurisdiction of<br>incorporation or organization) | **04-3320515**<br>(I.R.S. Employer<br>Identification No.) |
| **296 Concord Road, Third Floor, Billerica, MA**<br>(Address of principal executive offices) | **01821**<br>(Zip Code) |
| **Registrant's telephone number, including area code** | **(978) 932-2200** |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   ☒ Yes   ☐ No

Indicate by a check mark whether the Registrant is an accelerated filer (as defined in Rule 12b-2 of the Exchange Act)   ☐ Yes   ☒ No

Indicate the number of shares outstanding of each of the registrant's classes of common stock, as of the latest practicable date.

| Class | Outstanding at August 10, 2004 |
|---|---|
| Common stock, $.001 par value | 43,101,018 |

Table of Contents

**VIISAGE TECHNOLOGY, INC.**
FORM 10 – Q FOR THE QUARTER ENDED JUNE 27, 2004
INDEX

| | Page |
|---|---|
| Facing Sheet | 1 |
| Index | 2 |
| **PART I - FINANCIAL INFORMATION** | |
| Item 1 – Financial Statements | |
| Consolidated Balance Sheets as of June 27, 2004 and December 31, 2003 | 3 |
| Consolidated Statements of Operations for the three and six months ended June 27, 2004 and June 29, 2003 | 4 |
| Consolidated Statements of Cash Flows for the six months ended June 27, 2004 and June 29, 2003 | 5 |
| Notes to Financial Statements | 6 |
| Item 2 – Management's Discussion and Analysis of Financial Condition and Results of Operations | 12 |
| Item 3 – Quantitative and Qualitative Disclosures about Market Risk | 28 |
| Item 4 – Controls and Procedures | 29 |
| **PART II - OTHER INFORMATION** | |
| Item 1 – Legal Proceedings | 30 |
| Item 2 – Changes in Securities, Use of Proceeds and Issuer Purchases of Equity Securities | 30 |
| Item 3 – Defaults Upon Senior Securities | 31 |
| Item 4 – Submission of Matters to a Vote of Security Holders | 31 |
| Item 5 – Other Information | 31 |
| Item 6 – Exhibits and Reports on Form 8-K | 31 |
| **SIGNATURES** | 32 |
| **EXHIBIT INDEX** | 33 |

Table of Contents

**PART 1 – FINANCIAL INFORMATION**
ITEM 1 – FINANCIAL STATEMENTS

<div align="center">

**VIISAGE TECHNOLOGY, INC.**
**Consolidated Balance Sheets**
**(in thousands)**

</div>

| | June 27, 2004 | *December 31, 2003 |
|---|---|---|
| | (Unaudited) | |
| **Assets** | | |
| Current Assets: | | |
|     Cash and cash equivalents | $ 9,503 | $ 6,666 |
|     Accounts receivable | 10,570 | 7,057 |
|     Inventories and other costs and estimated earnings in excess of billings | 3,775 | 4,050 |
|     Other current assets | 1,047 | 439 |
|         Total current assets | 24,895 | 18,212 |
| Property and equipment, net | 22,938 | 25,088 |
| Goodwill | 65,198 | — |
| Intangible assets, net | 17,518 | 2,693 |
| Restricted cash | 3,120 | 6,311 |
| Other assets | 1,984 | 2,176 |
| | $ 135,653 | $ 54,480 |
| | | |
| **Liabilities and Shareholders' Equity** | | |
| Current Liabilities: | | |
|     Accounts payable and accrued expenses | $ 10,921 | $ 6,851 |
|     Related party payable | 2,600 | — |
|     Current portion of project financing | 3,989 | 3,734 |
|     Current portion of related party notes | 10,885 | 1,740 |
|         Total current liabilities | 28,395 | 12,325 |
| Project financing | 6,024 | 5,813 |
| Related party notes | 7,932 | 2,334 |
| Other liabilities | 418 | — |
|         Total liabilities | 42,769 | 20,472 |
| Shareholders' equity | 92,884 | 34,008 |
| | $ 135,653 | $ 54,480 |

\*  Derived from audited financial statements.

<div align="center">

The accompanying notes are an integral part of these financial statements.

3

</div>

Table of Contents

**VIISAGE TECHNOLOGY, INC.**
**Consolidated Statements of Operations**
**(in thousands, except per share data)**
**(Unaudited)**

|  | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
|  | June 27, 2004 | June 29, 2003 | June 27, 2004 | June 29, 2003 |
| Revenues | $16,276 | $8 ,789 | $28,535 | $ 16,944 |
| Cost of revenues | 11,307 | 6,826 | 2 0,213 | 13,615 |
| Gross margin | 4,969 | 1,963 | 8,322 | 3,329 |
| Operating Expenses: | | | | |
| Sales and marketing | 1,578 | 1,138 | 3,071 | 2,549 |
| Research and development | 942 | 937 | 1,901 | 1,882 |
| General and administrative | 2,218 | 1,033 | 4,355 | 2,126 |
| Total operating expenses | 4,738 | 3,108 | 9,327 | 6,557 |
| Operating income (loss) | 231 | (1,145) | (1,005) | (3,228) |
| Interest income | 19 | 19 | 41 | 48 |
| Interest expense | (596) | (250) | (1,010) | (498) |
| Other income | 54 | — | 75 | — |
| Loss before income taxes and cumulative effect of change in accounting principle | (292) | (1,376) | (1,899) | (3,678) |
| Provision for income taxes | (25) | — | (50) | (63) |
| Loss before cumulative effect of change in accounting principal | (317) | (1,376) | (1,949) | (3,741) |
| Cumulative effect of change in accounting principle | — | — | — | (12,131) |
| Net loss | $    (317) | $(1,376) | $(1,949) | $(15,872) |
| Basic and diluted net loss per share before cumulative effect of change in accounting principal | $  (0.01) | $  (0.07) | $  (0.06) | $  (0.18) |
| Cumulative effect of change in accounting principal | $  (0.00) | $  (0.00) | $  (0.00) | $  (0.60) |
| Net loss per basic and diluted shares | $  (0.01) | $  (0.07) | $  (0.06) | $  (0.78) |
| Weighted average basic and diluted shares | 35,821 | 2 0,351 | 3 3,603 | 20,305 |

The accompanying notes are an integral part of these consolidated financial statements.

4

Table of Contents

**VIISAGE TECHNOLOGY, INC.**
**Consolidated Statements of Cash Flows**
**(in thousands)**
**(Unaudited)**

|  | Six Months Ended | |
|---|---|---|
|  | June 27, 2004 | June 29, 2003 |
| **Cash Flows from Operating Activities:** |  |  |
| Net loss | $(1,949) | $(15,872) |
| Adjustments to reconcile net loss to net cash provided by operating activities, net of effects of acquisitions: |  |  |
| Depreciation and amortization | 5,135 | 3,931 |
| Impact of cumulative effect of change in accounting principle | — | 12,131 |
| Directors fees paid in common stock | 260 | 120 |
| Change in operating assets and liabilities: |  |  |
| Accounts receivable | (399) | 555 |
| Inventories and costs and estimated earnings in excess of billings | 599 | 6,216 |
| Other current assets | (146) | (371) |
| Accounts payable and accrued expenses | (1,161) | (639) |
| Net cash provided by operating activities | 2,339 | 6,071 |
| **Cash Flows from Investing Activities:** |  |  |
| Decrease in restricted cash | 3,191 | 2,284 |
| Additions to property and equipment | (1,094) | (7,512) |
| Cash paid for acquisitions, net of cash acquired | (5,227) | (758) |
| Increase in other assets | (169) | (533) |
| Net cash used for investing activities | (3,299) | (6,519) |
| **Cash Flows from Financing Activities:** |  |  |
| Net proceeds from project financing and related party notes | 4,273 | 2,018 |
| Principal payments on project financing and related party notes | (3,498) | (2,697) |
| Net proceeds from issuance of common stock | 3,022 | 88 |
| Net cash provided by (used for) financing activities | 3,797 | (591) |
| Net increase (decrease) in cash and cash equivalents | 2,837 | (1,039) |
| Cash and cash equivalents, beginning of period | 6,666 | 2,212 |
| Cash and cash equivalents, end of period | $9,503 | $1,173 |
| **Supplemental Cash Flow Information:** |  |  |
| Cash paid during the period for interest | $534 | $471 |
| **Non Cash Activities:** |  |  |
| Directors fees paid in common stock | $260 | $120 |
| Services paid in common stock | $14 | $— |
| Acquisitions paid in common stock | $57,486 | $— |
| Acquisitions paid in related party financing | $15,300 | $— |
| Asset purchased under capital leases | $— | $584 |
| Asset purchased with extended payment terms | $800 | $— |

The accompanying notes are an integral part of these financial statements

Table of Contents

## VIISAGE TECHNOLOGY, INC.
### Notes to Financial Statements

### 1. DESCRIPTION OF BUSINESS

Viisage Technology, Inc. ("Viisage" or the "Company") is a leading provider of advanced technology identity solutions that enable governments, law enforcement agencies and businesses to enhance security, reduce identity theft, and protect personal privacy. Our identity solutions include secure credential provisioning systems, biometric software and systems and real time identity databases, as well as systems design, development, integration and support services. These solutions enable our customers to manage the entire life cycle of an individual's identity for a variety of applications including civil identification, criminal identification and border management. Our customers use our identity solutions to help solve the following four critical problems:

- *assurance* that an identification document is authentic;

- *assurance* that the document has been issued to the correct person;

- *confidence* that the person holding the identification document is uniquely tied to and authorized to use the document; and

- *verification* of the privileges the individual is entitled to at a particular point in time.

Our business involves two closely-related segments: secure credentials and biometrics. Our secure credentials solutions involve the design, development, marketing and implementation of integrated software and hardware solutions that produce identification credentials utilizing face recognition and other biometric technologies. The focus of our biometric technology solutions is primarily on applications designed to deter criminal and terrorist activities, including government research and development contracts.

Viisage combines its proprietary biometric and secure credential software with complementary industry standard products to create identity solutions that integrate into its customers' environments. These turnkey solutions integrate secure document technologies, image and data capture, relational databases, and multiple biometrics, improving the customer's ability to process and manage identity information. Applications include passports, driver's licenses, voter registration, national identification credentials, law enforcement, social services, access control, surveillance and PC network and Internet access security. Viisage's primary customers are government agencies with particular penetration in U.S. government agencies such as the Department of State and state departments of motor vehicles, social services, and law enforcement. Viisage is the sole source provider of high security technology and services to the U.S. Department of State for the production of U.S. passports by virtue of an acquisition in 2004 and has captured a large percentage of the domestic driver's license market. Viisage also has provided services under subcontracts for projects in the United Arab Emirates, Jamaica, the Philippines and the U.S. Immigration and Naturalization Service.

### 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

*Basis of Presentation*

The accompanying financial data as of June 27, 2004 and December 31, 2003, and for the three- and six-month periods ended June 27, 2004 and June 29, 2003, have been prepared pursuant to the rules and regulations of the Securities and Exchange Commission. Certain information and footnote disclosures normally included in financial statements prepared in accordance with accounting principles generally accepted in the United States of America have been condensed or omitted pursuant to such rules and regulations. The December 31, 2003 balance sheet was derived from audited financial statements, but does not include all disclosures required by generally accepted accounting principles. These financial statements should be read in conjunction with the financial statements and the notes thereto included in our Annual Report on Form 10-K for the year ended December 31, 2003.

In the opinion of management, all adjustments (which include only normal recurring adjustments) necessary to present fairly the financial position, results of operations, and cash flows as of June 27, 2004 and for the three- and six-month periods ended June 27, 2004 and June 29, 2003, have been made. The results of operations for the period ended June 27, 2004 are not necessarily indicative of the operating results for the full year.

*Use of Estimates*

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions. These estimates and assumptions affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

6

Table of Contents

*Stock-Based Compensation*

At June 27, 2004, we account for our stock-based compensation plans using the intrinsic value method, in accordance with the provisions of APB Opinion No. 25, *Accounting for Stock Issued to Employees*, and comply with the disclosure provisions of Statements of Financial Accounting Standards ("SFAS") No. 123, *Accounting for Stock-Based Compensation*, and SFAS No. 148, *Accounting for Stock-Based Compensation- Transition and Disclosure*. No stock-based employee compensation cost was reflected in net loss, as all options granted under those plans had an exercise price equal to the fair market value of the underlying common stock on the date of grant.

The following table illustrates, in accordance with the provisions of SFAS No. 148, *Accounting for Stock-Based Compensation— Transition and Disclosure*, the effect on net loss and loss per share if we had applied the fair value recognition provisions of SFAS No. 123, *Accounting for Stock-Based Compensation*, to stock-based employee compensation.

|  | Three Months Ended | | Six Months Ended | |
|  | June 27, 2004 | June 29, 2003 | June 27, 2004 | June 29, 2003 |
|---|---|---|---|---|
| Net loss as reported | $ (317) | $(1,376) | $(1,949) | $(15,872) |
| Add: stock based employee compensation expense included in reported net loss | — | — | — | — |
| Deduct: total stock based employee compensation expense determined under the fair value based method for all awards | (818) | (1,061) | (1,811) | (1,663) |
| Pro forma net loss | $(1,135) | $(2,437) | $(3,760) | $(17,535) |
| Loss per share: | | | | |
| Basic and diluted - as reported | $ (0.01) | $ (0.07) | $ (0.06) | $ (0.78) |
| Basic and diluted - pro forma | (0.03) | (0.12) | (0.11) | (0.86) |

The fair value of the Company's stock-based option awards to employees was estimated assuming no expected dividends and the following weighted-average assumptions:

|  | June 27, 2004 | June 29, 2003 |
|---|---|---|
| Risk free interest rate | 4.0 – 5.0% | 4.0 – 5.0% |
| Expected dividend yield | — | — |
| Expected lives | 3 – 10 years | 3 – 10 years |
| Expected volatility | 80% | 80% |

*Computation of Net Loss per Share*

The basic net loss per share calculation is computed based on the weighted average number of shares of common stock outstanding during the period. The impact of approximately 5,363,000 shares of common stock consisting of certain outstanding options and stock warrants were not reflected in the June 27, 2004 dilutive net loss per share calculation. The impact of approximately 3,534,000 shares of common stock consisting of certain outstanding options and stock warrants were not reflected in the June 29, 2003 dilutive net loss per share calculation. Potentially dilutive securities are excluded from the calculation of diluted earnings per share if their effect is anti-dilutive.

3. INCOME TAXES

No provision for federal income taxes has been made for the three- and six-month periods ended June 27, 2004 and June 29, 2003 due to the net loss in both periods. The provision for state income taxes for the six-month periods ended June 27, 2004 and June 29, 2003 was approximately $50,000 and $63,000, respectively. The provision for state income taxes for the three month period ended June 27, 2004 was approximately $25,000. There was no provision for state income taxes for the three month period ended June 29, 2003.

4. RELATED PARTY TRANSACTIONS AND SHAREHOLDERS' EQUITY

Lau Technologies, or Lau, and Mr. Buddy Beck beneficially own approximately 16.8% and 16.4%, respectively, of our outstanding common stock. Readers are referred to the "Notes to Financial Statements" section of the Company's 2003 Annual Report on Form 10-K for further discussion.

Table of Contents

In May 2003 we entered into a loan agreement with Lau, whose principals are significant shareholders of Viisage, which provided for four term notes aggregating $7.3 million but not to exceed an outstanding principal balance of $7.0 million at any point in time. Two of these term notes, in the amounts of approximately $1.6 million and $287,000, replaced existing system finance lease obligations we had with a commercial leasing organization. These finance lease obligations were paid in full with the proceeds of the two new term notes. The remaining two new term notes with borrowing limits of $3.0 million and $2.5 million, are additional financing related to two new state contracts. All four new term notes bear interest at a rate of 8.5%. We believe that the terms of this loan agreement are the same as the terms that would have been provided to us by an unaffiliated lender. In particular, the financial covenants under this loan agreement are the same as the financial covenants under our loan agreement with our primary bank lender. We will draw funding on these notes as needed to meet our obligations for equipment purchases on the related state contracts. As of June 27, 2004 we had approximately $4.5 million outstanding under this loan agreement. Interest expense related to these term notes for the three- and six-month periods ended June 27, 2004 was approximately $99,000 and $194,000, respectively.

In connection with the acquisition of TDT on February 14, 2004, we issued a promissory note to Mr. Beck in the amount of $15.3 million, which is secured by some of TDT's assets. This note bears interest at a rate of 8.5% and is payable in equal installments of principal and interest on December 1, 2004, May 1, 2005 and December 1, 2005. We believe that the terms of this loan agreement are the same as the terms that would have been provided to us by an unaffiliated lender. Interest expense related to this note for the three- and six-month periods ended June 27, 2004 was approximately $325,000 and $487,000, respectively.

In connection with the acquisition of TDT, we agreed to pay the former sole shareholder of TDT an additional cash payment of up to $2.6 million if the U.S. Department of Defense selected TDT for the production of smart cards as part of the agency's Common Access Card (CAC) program and placed orders with an aggregate value of at least $4 million prior to June 30, 2004. We received an initial purchase order of $10.2 million for this program and therefore we have recorded this contingent purchase price of $2.6 million related to the CAC program as additional goodwill and related party payables in the second quarter of 2004. This additional goodwill was offset by approximately $1.0 million of identified purchase price adjustments related to certain provisions in the stock purchase agreement. The purchase price adjustment of approximately $1.0 million is recorded on the balance sheet for the period ended June 27, 2004 as a reduction to the current portion of related party notes.

At June 27, 2004 we had approximately $169,000 of accounts payable due to Lau.

5. BUSINESS SEGMENTS, GEOGRAPHICAL INFORMATION AND CONCENTRATIONS OF RISK

We follow SFAS No. 131 *Disclosures about Segments of a Business Enterprise and Related Information*, which establishes standards for reporting information about operating segments. Operating segments are defined as components of a company about which separate financial information is evaluated regularly by the chief operating decision maker in deciding how to allocate resources and in assessing performance.

The following table provides financial information by segment for the three and six months ended June 27, 2004 and June 29, 2003. We allocate direct costs and administrative expenses to each business segment based on management's analysis of each segment's resource needs. Revenue is reported within the segments by customer contracts. Within the secure credentials segment there is a component of the contract that utilizes our biometrics technology. Total assets as of June 27, 2004 include the preliminary allocation of goodwill to the operating segments.

|  | Three Months Ended 06/27/04 | | | Three Months Ended 06/29/03 | | |
|---|---|---|---|---|---|---|
|  | SIPS | FRS | Total | SIPS | FRS | Total |
| Credential revenue | $ 14,138 | $  — | $ 14,138 | $7 ,116 | $  — | $7 ,116 |
| Facial recognition revenue | 336 | 1,802 | 2,138 | 325 | 1,348 | 1,673 |
| Total segment revenue | $ 14,474 | $1 ,802 | $ 16,276 | $7 ,441 | $ 1,348 | $8 ,789 |
| Segment profit (loss) before taxes and cumulative effect | $ 2,003 | $(2,295) | $ (292) | $ 36 | $(1,412) | $(1,376) |
| Depreciation and amortization | $ 2,582 | $ 274 | $ 2,856 | $1 ,948 | $ 179 | $2 ,127 |
| Interest expense | $ 586 | $ 10 | $ 596 | $ 250 | $ — | $ 250 |
| Total Assets | $101,460 | $34,193 | $135,653 | $38,283 | $ 6,389 | $44,672 |
| Expenditures for long lived assets | $ 714 | $ 11 | $ 725 | $1 ,967 | $ 1,334 | $3 ,301 |

|  | Six Months Ended 06/27/04 | | | Six Months Ended 06/29/03 | | |
|---|---|---|---|---|---|---|
|  | SIPS | FRS | Total | SIPS | FRS | Total |
| Credential revenue | $ 24,322 | $  — | $ 24,322 | $13,603 | $  — | $13,603 |
| Facial recognition revenue | 672 | 3,541 | 4,213 | 639 | 2,702 | 3,341 |
| Total segment revenue | $ 24,994 | $3 ,541 | $ 28,535 | $14,242 | $ 2,702 | $16,944 |
| Segment profit (loss) before taxes and cumulative effect | $ 2,682 | $(4,581) | $ (1,899) | $ (564) | $(3,114) | $(3,678) |
| Depreciation and amortization | $ 4,622 | $ 513 | $ 5,135 | $3 ,598 | $ 333 | $3 ,931 |
| Interest expense | $ 1,000 | $ 10 | $ 1,010 | $ 498 | $ — | $ 498 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Total Assets | $101,469 | $34,193 | $135,662 | $38,283 | $6,389 | $44,672 |
| Expenditures for long lived assets | $ 1,025 | $ 69 | $ 1,094 | $6 ,149 | $ 1,363 | $7 ,512 |

Table of Contents

For the six-month period ended June 27, 2004 we derived 95.7%, or $27.3 million, of our direct revenue within the Untied States. We derived an additional 1.6%, or $451,000, of our direct revenue in Canada. The remaining 2.7%, or $775,000, was derived by our German subsidiary, primarily from customers in countries within the European Union. For the six-month period ended June 29, 2003 approximately $16.8 million, or 98.8%, of our direct revenue was derived within the United States. The remaining 1.2% of revenue was primarily derived in Canada and the United Arab Emirates. For the three month period ended June 27, 2004 we derived 95.3%, or $15.5 million, of our direct revenue within the Untied States. We derived an additional 1.8%, or $291,000, of our direct revenue in Canada. The remaining 2.9%, or $468,000, was derived by our German subsidiary, primarily from customers in countries within the European Union. For the three months ended June 29, 2003 approximately $8.6 million or 97.9% of our direct revenue was derived in the United States. The remaining 2.1% of revenue was primarily derived in Canada and the United Arab Emirates.

We believe for the near future that we will continue to derive a significant portion of our revenues from a limited number of large contracts. Secure identification segment customers who accounted for more than 10% of our total revenues are as follows:

- For the three- and six-month periods ended June 27, 2004, one customer accounted for an aggregate of 22.9% and 18.9%, respectively.

- For the three- and six-month periods ended June 29, 2003, two customers accounted for an aggregate of 28.3% and 28.2%, respectively

No single biometrics customer accounted for over 10% of our total revenue in any period.

6. ACQUISITIONS

On January 23, 2004 we acquired all outstanding shares of ZN Vision Technologies AG ("ZN") in exchange for an aggregate of 5,221,454 newly issued shares of our common stock and $493.00 in cash. In addition, we agreed to assume ZN's employee share option plan, and accordingly have reserved 1,138,546 shares of our common stock for issuance to the plan participants. The purchase price for the acquisition was $31.5 million, based on the per share price of our common stock of $4.32 per share which is the average trading price of Viisage common stock over the five trading days immediately preceding and the two trading days immediately following March 28, 2003, the date on which the purchase agreement was signed. The acquisition was accounted for as a purchase, and accordingly, the operations of ZN are included in the financial statements since the effective date, the close of business on January 23, 2004. The purchase price has been allocated to net assets acquired based on their estimated fair values. We engaged an independent third party appraiser to perform a review of the acquired assets and have allocated the purchase price based on the preliminary results of their findings. The preliminary valuation is subject to further review which may result in adjustments to allocation of purchase price in the future. We have recorded approximately $172,000 in amortization related to the acquired intangible assets from the date of the acquisition through June 27, 2004. ZN is a leading German provider of face recognition and computer vision products and services. ZN, now known as Viisage Technology AG, is a wholly owned subsidiary of Viisage and serves as the base of our European operations.

On February 14, 2004 we acquired all outstanding shares of Trans Digital Technologies Corporation ("TDT") for $55.0 million. The purchase price consisted of 5,850,000 newly issued shares of our common stock, which were valued at $5.13 per share, which is the average price of Viisage common stock over the five trading days immediately preceding and the two trading days immediately following February 14, 2004, plus $15.3 million in notes and $5 million in cash. The acquisition was accounted for as a purchase, and accordingly, the operations of TDT are included in the financial statements since the effective date, the close of business on February 14, 2004. The purchase price has been allocated to net assets acquired based on their estimated fair values. We engaged an independent third party appraiser to perform a review of the acquired assets and have allocated the purchase price based on the preliminary results of their findings. The preliminary valuation is subject to further review which may result in adjustments to allocation of purchase price in the future. We have recorded approximately $1.1 million in amortization related to the acquired intangible assets from the date of the acquisition through June 27, 2004. TDT is the sole source provider of high security technology and services to the U.S. Department of State for the production of U.S. passports. TDT is now a wholly owned subsidiary of Viisage.

9

Table of Contents

In connection with the acquisition of TDT, we agreed to pay the former sole shareholder of TDT an additional cash payment of up to $2.6 million if the U.S. Department of Defense selected TDT for the production of smart cards as part of the agency's Common Access Card (CAC) program and placed orders with an aggregate value of at least $4 million prior to June 30, 2004. We received an initial purchase order of $10.2 million for this program and therefore we have recorded this contingent purchase price of $2.6 million related to the CAC program as additional goodwill in the second quarter of 2004. This additional goodwill was offset by approximately $1.0 million of identified purchase price adjustments related to certain provisions in the stock purchase agreement.

The preliminary allocation of the purchase price for ZN and TDT, based on the purchase prices calculated for accounting purposes, is as follows (in thousands):

|  | ZN | TDT |
| --- | --- | --- |
| Current assets | $ 1,219 | $ 3,020 |
| Property and equipment | 125 | 42 |
| Identified intangible assets | 1,974 | 1 4,460 |
| Goodwill | 2 7,418 | 3 7,465 |
|  | $30,736 | $54,987 |

Identified intangible assets acquired in connection with the acquisitions of ZN and TDT consist primarily of completed technology and acquired contracts. These intangible assets are amortized using the straight-line method over their estimated useful lives of 1 to 5 years (in thousands).

|  | June 27, 2004 | Weighted Average Useful Life |
| --- | --- | --- |
| Gross carrying amount: |  |  |
| Completed technology | $2 ,004 | 5 years |
| Acquired contracts | 1 4,430 | 5 years |
| Total intangible assets | 1 6,434 |  |
| Accumulated amortization: |  |  |
| Completed technology | (175) |  |
| Acquired contracts | (1,144) |  |
| Total accumulated amortization | (1,319) |  |
| Intangible assets, net | $15,115 |  |

We estimate annual amortization expense related to the identified intangible assets acquired in connection with the acquisitions of ZN and TDT to be approximately $3.2 million per year for the next five years.

The unaudited pro forma and combined selected operating data are presented as if the acquisitions of ZN and TDT had occurred on January 1, 2003 and 2004 for the six months ended June 29, 2003 and June 27, 2004, respectively. The unaudited pro forma data is for informational purposes only and may not necessarily reflect future results of operations or what the results of operations would have been had Viisage, ZN and TDT been operating as a combined entity for the periods presented. For the six months ended June 29, 2003, we incurred a non-cash charge of $12.1 million representing the cumulative effect of a change in accounting principle related to our adoption of Emerging Issues Task Force 00-21, *Accounting for Revenue Arrangements with Multiple Deliverables*, or EITF 00-21, on a cumulative basis as of January 1, 2003. The unaudited pro forma revenue, loss and loss per share information for the six months ended June 29, 2003 and June 27, 2004 are as follows (in thousands):

|  | Three Months Ended | | Six Months Ended | |
| --- | --- | --- | --- | --- |
|  | June 27, 2004 | June 29, 2003 | June 27, 2004 | June 29, 2003 |
| Revenue | $16,276 | $11,181 | $31,376 | $ 23,147 |
| Loss before cumulative effect of change in accounting principle | $ (317) | $(4,329) | $(1,370) | $ (7,505) |
| Net loss | $ (317) | $(4,329) | $(1,370) | $(19,636) |
| Basic and diluted net loss per share before cumulative effect of change in accounting principle | $ (0.01) | $ (0.21) | $ (0.04) | $ (0.37) |
| Basic and diluted net loss per share | $ (0.01) | $ (0.21) | $ (0.04) | $ (0.97) |

10

Table of Contents

### 7. LEGAL PROCEEDINGS

In July 2003, a Georgia court issued a preliminary injunction prohibiting Georgia's Department of Motor Vehicle Safety from continuing to work with us to install the State's new drivers' license system. The injunction is the result of a lawsuit filed in March 2003 by one of our competitors alleging that the Department of Motor Vehicle Safety did not comply with its own bid process when it selected a vendor for its new digital drivers' license program. In July 2004, we reached a settlement agreement with the State pursuant to which the Department of Motor Vehicle Safety terminated the contract for convenience and agreed to pay us $2.0 million in cash and the State agreed to purchase certain equipment from us for $500,000. The Department of Motor Vehicle Safety has filed a motion with the Georgia court to dismiss the case based upon the termination of the contract. The agency also has filed an affidavit stating that it intends to issue a new request for proposals for a digital drivers' license system before the end of October 2004. The competitor has filed a motion with the Georgia court to enjoin the Department of Motor Vehicle Safety and the State from making any payments to us under the settlement agreement. As a result of the termination of the contract, we will lose up to $19.7 million in revenue that we expected to recognize over the next five and one-half years, unless we are able to win the new contract for the digital drivers' license system and the revenues from such new contract are substantially similar to the terminated contract. While we believe we can utilize the remaining $2.8 million in assets being retained by us from the Georgia contract either in Georgia, if we win the contract based on the new request for proposals, or on alternative projects, to the extent that we are unable to utilize these assets or realize value through a sale of these assets, we would be required to take a charge to earnings.

On July 19, 2004, Fargo Electronics, Inc. initiated a patent infringement action in the U.S. District Court for the Eastern District of Virginia against Toppan Printing Co., Ltd. and TDT. The complaint alleges that Toppan and TDT's use, offer to sell and/or importation of certain personalized identification card printers, including Toppan's CP400 card printers, and associated laminators in the United States constitutes direct and indirect infringement of four patents allegedly owned by Fargo. The complaint seeks unspecified compensatory damages, permanent injunctive relief, trebling of damages for willful infringement and fees and costs. We are currently evaluating the claims in this lawsuit and intend to vigorously defend against them. We believe that the only products at issue are Toppan CP400 printers that were or are sold, used or imported as part of the CAC program. To date, we have received purchase orders of $10.2 million for Toppan CP400 printers for the CAC program, which are expected to be delivered by the end of the first quarter of 2005. There can be no assurance that we will prevail in this litigation. The litigation, with or without merit, could be time consuming and expensive to litigate or settle and could divert management's attention from our business.

### 8. SUBSEQUENT EVENTS

On August 10, 2004, we completed the sale of 7,200,000 shares of newly-issued common stock in an underwritten public offering. We estimate that our net proceeds from this offering will be approximately $37.1 million, after deducting underwriting discounts and commissions and estimated offering expenses.

11

Table of Contents

## VIISAGE TECHNOLOGY, INC.

ITEM 2 – MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

The following discussion and analysis should be read in conjunction with the financial statements and accompanying notes contained in our 2003 Annual Report on Form 10-K and in this Quarterly Report on Form 10-Q.

### INTRODUCTION

Viisage Technology, Inc. ("Viisage" or the "Company") is a leading provider of advanced technology identity solutions that enable governments, law enforcement agencies and businesses to enhance security, reduce identity theft, and protect personal privacy. Our identity solutions include secure credential provisioning systems, biometric software and systems and real time identity databases, as well as systems design, development, integration and support services. These solutions enable our customers to manage the entire life cycle of an individual's identity for a variety of applications including civil identification, criminal identification and border management. Our customers use our identity solutions to help solve the following four critical problems:

- *assurance* that an identification document is authentic;
- *assurance* that the document has been issued to the correct person;
- *confidence* that the person holding the identification document is uniquely tied to and authorized to use the document; and
- *verification* of the privileges the individual is entitled to at a particular point in time.

Our solutions annually produce more than 30 million secure government-issued credentials at more than 2,000 locations. We are the second largest provider of U.S. drivers' licenses with a 30% market share, and we are the sole source provider of passport production capability to the U.S. Department of State. We also are a recognized leader in biometrics in the field of face recognition. Our customers include governments, law enforcement agencies and businesses in more than 15 countries.

We generate revenue through the sale and license of products and services for verifying and managing identities. Our revenues increased from approximately $16.9 million in the first six months of 2003 to approximately $28.5 million in the first six months of 2004. Our net loss during the same periods decreased from approximately $3.7 million to approximately $1.9 million, excluding the one-time charge of $12.1 million in connection with our change in accounting principle as of January 1, 2003. Our efforts in 2004 have been and will continue to be primarily focused on expanding our portfolio of offerings to satisfy our customers' identity solution requirements. We have taken substantial steps in this direction through the acquisitions of ZN Vision Technologies AG, or ZN, in January 2004 and Trans Digital Technologies Corporation, or TDT, in February 2004. The acquisition of TDT enabled us to be selected to provide a solution to the U.S. Department of Defense, or DoD, to support the production of smart cards as part of the agency's Common Access Card, or CAC, program. We continue to make investments in research and development and intend to continue to introduce new and enhanced product and service offerings. To further increase revenue, we are also expanding our distribution channels.

### SEGMENTS AND GEOGRAPHIC INFORMATION

Our business involves two closely-related segments: secure credentials and biometrics. For the six-month period ended June 27, 2004, we derived 95.7%, or $27.3 million, of our direct revenue within the United States. We derived an additional 1.6%, or $451,000, of our direct revenue in Canada. The remaining 2.7%, or $775,000, was derived by our German subsidiary, primarily from customers in countries within the European Union.

*Secure Credentials Segment*

Our secure credentials segment accounted for approximately 88.9% and 87.6% of our revenues for the three- and six-month periods ended June 27, 2004, respectively. For the three- and six-month periods ended June 29, 2003 our secure credentials segment accounted for approximately 84.7% and 84.1% of our revenues, respectively. Our secure credentials solutions involve the design, development, marketing and implementation of integrated software and hardware solutions that produce identification credentials utilizing face recognition and other biometric technologies.

We provide customized systems utilizing proprietary products under service contracts that have five to seven year terms and several optional annual renewals after the initial contract term. These contracts generally provide for a fixed price for each identification credential produced. Contract prices vary depending on, among other things, design and integration complexities, the

12

Table of Contents

nature and number of workstations and sites, the projected number of secure credentials to be produced, the size of the database, the level of post-installation support and the competitive environment. Our secure credentials segment also includes the contracts we assumed as part of our acquisition of Trans Digital Technologies in February 2004. TDT contributed revenues of approximately $5.4 million and $7.2 million to this segment for the three- and six-month periods ended June 27, 2004, respectively. Under these contracts, we provide high security technology and services to the U.S. Department of State for the production of U.S. passports, as well as similar services to the U.S. Departments of Defense and Homeland Security. Those contracts generally provide that we will be paid for the hardware, software and services we provide, as well as consumables delivered to the customer.

In civil identification applications, such as drivers' licenses and passports, the sales cycle generally includes a formal request for proposal, or RFP, bidding process. In these public sector cases, our sales and marketing personnel regularly conduct visits and attend industry trade shows to identify bid opportunities and particular customer preferences, and to establish and cultivate relationships in advance of any bid. Once an RFP is issued, a comprehensive proposal is developed and usually followed by an on-site customer demonstration. The process from the issuance of an RFP to the ultimate award can take up to six months. Following the bid award a six-to-twelve month implementation and installation process usually ensues. We believe that long sales cycles in our public sector markets are endemic to the market and will continue. Further, customers may seek to modify the system either during or after the implementation of the system. While our long sales and implementation cycle requires the commitment of marketing resources and investments of working capital, we believe that it also serves as a barrier to entry for smaller companies and as an early indicator of potential competitors for particular projects. For existing customers, a considerably shorter sales and implementation cycle may be involved.

*Biometrics Segment*

Our biometrics segment accounted for approximately 11.1% and 12.4% of our revenue for the three- and six-month periods ended June 27, 2004, respectively. For the three- and six-month periods ended June 29, 2003 our biometrics segment accounted for approximately 15.3% and 15.9% of our revenues, respectively. The focus of our biometric technology solutions is primarily on applications designed to deter criminal and terrorist activities, including government research and development contracts. These initiatives generated 87.4% and 88.2% of this segment's revenue for the three- and six-month periods ended June 27, 2004, respectively. The remaining 12.6% and 11.8%, was generated from sales in the gaming industry.

Within our biometrics segment, our contracts typically provide for the development, customization and installation of face recognition systems for government agencies, law enforcement agencies and businesses. These contracts are generally fixed price, and include milestones and acceptance criteria for the various deliverables under the contract. Contract prices vary depending on, among other things, design and integration complexities, the nature and number of workstations and sites, the size of the database, the level of post-installation support and the competitive environment. In certain cases, we provide licenses of off-the-shelf versions of our face recognition software on a per user basis.

For identity solutions that primarily require our advanced face recognition technology, such as criminal identification booking and investigation applications, the sales cycle tends to be shorter and the solution consists primarily of software products.

As we continue to implement our vision of being a total identity solutions provider, the biometrics and secure credentials segments become less distinct as discrete segments. We believe that the presence or future potential of integrated biometrics in secure credentials is a key factor in increasing revenue and profits from the secure credentials business. As a result, we are seeing the two segments converge into one market: identity solutions.

DEPENDENCE ON SIGNIFICANT CUSTOMERS

We believe for the near future that we will continue to derive a significant portion of our revenues from a limited number of large contracts. Secure identification segment customers who accounted for more than 10% of our total revenues are as follows:

- For the three- and six-month periods ended June 27, 2004, one customer accounted for an aggregate of 22.9% and 18.9%, respectively.

- For the three- and six-month periods ended June 29, 2003, two customers accounted for an aggregate of 28.3% and 28.2%, respectively.

No single biometrics customer accounted for over 10% of our total revenue in any period.

CRITICAL ACCOUNTING POLICIES AND SIGNIFICANT ESTIMATES

We prepare our financial statements in accordance with generally accepted accounting principles in the United States, or US GAAP. Consistent with US GAAP, we have adopted accounting policies that we believe are most appropriate given the facts and circumstances of our business. The application of these policies has a significant impact on our reported results. In addition, some of

13

Table of Contents

these policies require management to make estimates. These estimates, which are based on historical experience and analysis of current conditions, have a significant impact on our reported results and the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements. If actual results differ significantly from these estimates, there could be a material effect on our financial statements.

*Valuation of Goodwill and Other Long-Lived and Intangible Assets*

Our long-lived assets include property, plant and equipment, other intangible assets and goodwill. As of June 27, 2004, the balances of property, plant and equipment, other intangible assets and goodwill, net of accumulated depreciation and amortization, were $22.9 million, $17.5 million and $65.2 million respectively.

Where we believe that property, plant and equipment and intangible assets have finite lives, we depreciate and amortize those assets over their estimated useful lives. For purposes of determining whether there are any impairment losses, as further discussed below, our management has examined the carrying value of our identifiable long-lived tangible and intangible assets, including their useful lives where we believe such assets have finite lives, when indicators of impairment are present. For all long-lived tangible and intangible assets, if an impairment loss were identified based on the fair value of the asset, as compared to the carrying value of the asset, such loss would be charged to expense in the period we identify the impairment. Furthermore, if our review of the carrying values of the long-lived tangible and intangible assets with finite lives indicates impairment of such assets, we may determine that shorter estimated useful lives are more appropriate. In that event, we will be required to record additional depreciation and amortization in future periods, which will reduce our earnings.

Factors we generally consider important which could trigger an impairment review on the carrying value of other long-lived tangible and intangible assets include the following:

- significant underperformance relative to expected historical or projected future operating results;
- significant changes in the manner of our use of acquired assets or the strategy for our overall business;
- underutilization of our tangible assets;
- discontinuance of product lines by ourselves or our customers;
- significant negative industry or economic trends;
- significant decline in our stock price for a sustained period;
- significant decline in our market capitalization relative to net book value.

Although we believe that the carrying value of our long-lived tangible and intangible assets were realizable as of June 27, 2004, future events could cause us to conclude otherwise.

Due to our two acquisitions in the first quarter of 2004, goodwill and other intangible assets were created as a result of the preliminary allocation of the purchase price to identified intangible assets of the acquired businesses. The values recorded for goodwill and other intangible assets represent preliminary estimates of fair values calculated by independent third-party appraisers and are subject to further review and finalization. Such valuations require us to provide significant estimates and assumptions, which are derived from information obtained from the management of the acquired businesses, and our business plans for the acquired businesses or intellectual property. Critical estimates and assumptions used in the initial valuation of goodwill and other intangible assets include, but are not limited to:

- future expected cash flows from product sales, customer contracts and acquired developed technologies and patents,
- expected costs to complete any in-process research and development projects and commercialize viable products and estimated cash flows from sales of such products,
- the acquired companies' brand awareness and market position,
- assumptions about the period of time over which we will continue to use the acquired brand, and
- discount rates.

14

Table of Contents

These estimates and assumptions may be incomplete or inaccurate because unanticipated events and circumstances may occur. If estimates and assumptions used to initially value goodwill and intangible assets prove to be inaccurate, ongoing reviews of the carrying values of such goodwill and intangible assets may indicate impairment which will require us to record an impairment charge in the period in which we identify the impairment.

As of June 27, 2004, we have recorded goodwill of $65.2 million. We will perform impairment reviews on the carrying values of goodwill arising from the aforementioned acquisitions at least annually. Because future cash flows and operating results used in the impairment review will be based on management's projections and assumptions, future events could cause such projections to differ from those used to originally value the acquisitions, which could lead to significant impairment charges of goodwill in the future.

*Secure Credentials Revenue and Cost Recognition*

During the third quarter of 2003, we adopted the provisions of Emerging Issues Task Force 00-21, *Accounting for Revenue Arrangements with Multiple Deliverables*, or EITF 00-21, on a cumulative basis as of January 1, 2003. EITF 00-21 governs how to identify whether goods or services, or both, to be delivered separately in a bundled sales arrangement, should be accounted for separately. The operating results for the six month period ended June 29, 2003 reflects the cumulative effect of the change in accounting principle in 2003.

We deliver solutions under secure credential contracts primarily to federal and state government customers. We recognize revenue when pervasive evidence of a sales arrangement exists, delivery occurs or services are rendered, the sales price is fixed or determinable and collectibility is reasonably assured.

Product revenue on secure credential contracts where title to the products pass to the customer consist mainly of printing system components and consumables including printers, secure coating, ribbon, film and other parts. Revenue on products is recognized when the products are shipped and accepted by the customer. Services revenue under these contracts consists of preventative and remedial maintenance on printing systems. We also provide on site technical support and consulting services to our customers. Revenue on fixed price services is recognized ratably over the service period which approximates the timing of the services rendered. Revenue on time and material services is recognized as the services are rendered. Expenses on all services are recognized when the costs are incurred.

When elements such as products and services are contained in a single arrangement, or in related arrangements with the same customer, we allocate revenue to each element based on its relative fair value, provided that such element meets the criteria for treatment as a separate unit of accounting. The price charged when the element is sold separately generally determines fair value.

We have secure credential contracts, generally with state governments for the production of drivers' licenses and other identification credentials, where we have determined that we have multiple elements and where the title to equipment installed to produce these credentials does not pass to the customer. Under these contracts, the first element consists of hardware, system design, implementation, training, consumables management, maintenance and support which is accounted for as equipment and related executory services under lease in accordance with SFAS No. 13. The second element consists of customized software which is accounted for as a long term contract in accordance with AICPA Statement of Position 97-2, *Software Revenue Recognition*, or SOP 97-2, and Statement of Position 81-1, *Accounting for Performance of Construction-Type and Certain Production-Type Contracts*, or SOP 81-1, on a units of delivery method of measurement.

Costs related to the hardware element of these contracts are capitalized on the balance sheet and are depreciated over the contract term beginning when the system goes into service. The delivery of these credentials typically require us to customize, design, and install equipment and software at customer locations, as well as perform training, supply consumables, maintain the equipment and provide support services. Nonperformance of training, consumables management, maintenance and support services would prevent us from receiving payment for the costs incurred in the customization, design and installation of the system. EITF 00-21 limits the amount of revenue allocable to the customization, design and installation of the system to the amount that is not contingent upon the production of credentials. Revenue on these contracts under EITF 00-21 is earned based on, and is contingent upon, the production of credentials from the system. Due to the contingent performance of credential production in our secure credentials contracts, we defer revenue recognition for the system design and installation phase of our contracts, including customized software and equipment, and recognize revenue as credentials are produced.

Costs related to the customized software element of our secure credentials contracts where title to the hardware element does not pass to the customer are capitalized on the balance sheet during the period in which we are designing and installing the system and are amortized over the contract term beginning when the system goes into service. Costs related to this element of our secure credentials contracts incurred after the system is in service are expensed as incurred. Revenue related to this element of our secure credentials contracts is recorded as credentials are produced by the system.

15

Table of Contents

Our secure credentials contracts related to the delivery of drivers' licenses and identification credentials typically provide that the state department of transportation, or similar agency, will pay a fixed price per credential produced utilizing a system we design, implement and support. Our fixed pricing includes charges for the use of the system, materials and the data that is stored on the credentials. Prices under these contracts vary depending on, among other things:

- Design and integration complexities;
- Nature and number of workstations and sites installed;
- Projected number of secure credentials to be produced;
- Size of the database;
- Level of post-installation involvement that will be required of us; and
- Competitive environment.

Prior to the adoption of EITF 00-21, we recognized revenue and costs associated with our secure credentials contracts as a single accounting element using the percentage-of-completion methodology.

*Biometrics Segment Revenue and Cost Recognition*

Within our biometrics segment, our contracts typically provide for the development, customization and installation of face recognition systems for government agencies, law enforcement agencies and businesses. These contracts are generally fixed price, and include milestones and acceptance criteria for the various deliverables under the contract. Contract prices vary depending on, among other things, design and integration complexities, the nature and number of workstations and sites, the size of the database, the level of post-installation support and the competitive environment. In certain cases, we provide licenses of off-the-shelf versions of our face recognition software on a per user basis.

We recognize revenue under these contracts using the percentage-of-completion methodology in accordance with SOP 81-1. We use the percentage-of-completion methodology to account for revenue under these contracts because:

- A high level of certainty exists regarding expected cash flows from these contracts; and
- A reliable basis exists for determining the percentage of the contract that will be completed at the end of the accounting period.

We measure the percentage complete as costs are incurred or for contracts based on milestones, revenue is recognized when scheduled performance milestones and customer acceptance criteria have been achieved. These milestones are specific events or deliverables clearly identified in the contract. We recognize revenue based on the total milestone billable to the customer less revenue related to any future maintenance requirements. Billings occur under these contracts when the milestone is delivered and accepted by the customer. Milestones can include customized systems, installation and services as defined by the contract.

We record costs and estimated earnings in excess of billings under these contracts as current assets. We record billings in excess of costs and estimated earnings and accrued contract costs as current liabilities.

Revenue related to software licenses of off-the-shelf face recognition software is recognized in accordance with SOP 97-2 for these software licenses we recognize revenue when:

- Persuasive evidence of an arrangement exists;
- Delivery has occurred;
- The sales price is fixed and determinable;
- Collection is probable; and
- There are no post delivery obligations.

16

Table of Contents

We adopted EITF 00-21 on a cumulative basis as of January 1, 2003. Based on our evaluation of biometrics contracts and the application of the new guidance, the adoption of EITF 00-21 did not have an impact on the accounting for revenue from biometrics systems under long-term contracts.

RESULTS OF OPERATIONS

*Revenue*

Revenues for the second quarter of 2004 were approximately $16.3 million, compared to approximately $8.8 million for the second quarter of 2003. Revenues for the first six months of 2004 increased 68.6% from approximately $16.9 million for the first six months of 2003 to approximately $28.5 million for the first six months of 2004. The 68.6% increase in revenue is derived from increases of approximately $10.8 million in the secure credentials segment and $840,000 in the biometrics segment. The increase in the secure credentials segment consists of $7.2 million from the operating results of TDT from February 15, 2004 through June 27, 2004, $1.5 million from the sale of equipment and consumables directly to two states, $1.2 million from a volume increase resulting from the rollout of two new state drivers' license contracts, and approximately $900,000 from a net increase in volume and the fulfillment of certain milestones among our remaining contracts. The increase in our biometrics revenue is derived from the inclusion of approximately $775,000 in ZN revenue for the period from January 24, 2004 to June 27, 2004.

*Gross Margin*

Gross margins increased to 30.5% in the second quarter of 2004 from 22.3% in the second quarter of 2003. Gross margins increased to 29.2% for the first six months of 2004 compared to 19.6% for the same period in 2003. We expect gross margins on our secure credentials contracts to fluctuate based on changes in period cost of sales as a result of our adoption of EITF 00-21 due to the fact that in 2003 and in the future we will effectively recognize revenue on a fixed price per credential produced by our customers. If we successfully achieve cost saving measures in the delivery process, we will realize higher gross margins in those periods where the cost savings measures are achieved. Alternatively, in periods where our delivery costs are higher due to service and maintenance requirements, we expect gross margins to decrease for those periods. The overall increase in gross margin for the first six months of 2004 compared to the first six months of 2003 is due to margin increases in the secure credentials segment from 14.1% to 29.2%, offset by a margin decrease in the biometrics segment from 48.8% to 46.9%.

In the secure credentials segment, gross margins increased to 28.3% in the second quarter of 2004 from 17.0% in the second quarter of 2003. Our margin increase for the fiscal year to date in this segment was attributable to the 32.4% gross margin on approximately $7.2 million of revenue contribution from TDT for the period from February 15 to June 27, 2004, which represented approximately 28.7% of the total segment revenue for the six month period. The gross margin related to TDT included approximately $1.1 million of non-cash amortization of the identified intangible assets, as described in more detail below. On other secure credentials contracts we achieved margin increases on 13 of the 15 drivers license contracts that were active in both periods. Those contracts represented approximately 46.8% of the total revenue in that segment for the six month period ended June 27, 2004. These margin increases were attributable to our minimization of period costs during the card production phase on all of our secure credentials contracts. We were able to achieve some of these costs savings by minimizing overtime labor charges through improved resource management of field service technicians. In addition, we installed inventory management software in multiple states throughout 2003, which allows us to better control consumables scrap, thus reducing our materials costs. In addition to these cost savings initiatives, we signed contract extensions in five states and began card production in two additional states during 2003. These increases were offset by gross margin decreases in two other states. In one of these states, gross margins decreased due to an increase in costs, while in the second state the gross margin decrease was primarily due to a decrease in credential volume.

The secure credentials business is a highly competitive, bid-based business, which results in pricing pressure for those systems. In addition, the price of a system is dictated by the customer's specifications for the solution and its functionality. Some of these customer specifications include hardware, customized software, credential volume, number and type of security features on the credentials, and biometric identification on the credentials. All of these inputs are evaluated in our estimate of the cost of the system and ultimately influence the pricing for the system to be delivered. We are also aware of the customer's budget situation since this affects how much the customer can spend on the system. After all of these factors are considered, we price the contract and determine the gross margin for the system to be delivered. The price and margin fluctuate by customer due to the number of locations, volume of credentials, requirements and complexity of the system and competitive environment. Although prices remain fixed for products and services on a contract-by-contract basis, fluctuations in gross margin are attributable to changes in the customer mix, change orders and contract extensions received.

Gross margins in our biometrics segment decreased to 48.7% in the second quarter of 2004 from 51.6% in the second quarter of 2003.

17

Table of Contents

For the three- and six-month periods ended June 27, 2004, we have allocated $762,000 and $1.1 million of amortization expense for the TDT acquisition to cost of sales due to the fact that a majority of the identified intangible assets were attributed to contracts that are generating significant revenue. Amortization related to the ZN acquisition totaling $98,000 and $172,000 was included in operating expenses for the three- and six-month periods ended June 27, 2004, respectively.

*Sales and Marketing Expenses*

Sales and marketing expenses increased approximately $500,000, from $1.1 million in the second quarter of 2003 to $1.6 million in the second quarter of 2004. For the fiscal year to date, sales and marketing expenses increased approximately $500,000, from $2.5 million in 2003 to $3.0 million in 2004. The increase is primarily due to our investment in pursuing biometrics opportunities and the pursuit of significant opportunities in the secure identification marketplace. As a percentage of revenue, sales and marketing expenses decreased from 12.9% in the second quarter of 2003 to 9.7% in the second quarter of 2004 and from 15.0% for the first six months of 2003 to 10.8% in the first six months of 2004.

*Research and Development Expenses*

Research and development remained relatively flat, increasing by approximately $5,000, from $937,000 in the second quarter of 2003 to $942,000 in the second quarter of 2004. For the fiscal year to date, research and development expenses were substantially unchanged at approximately $1.9 million for the first six months of 2003 and 2004. We were able to accomplish this despite adding additional research and development expenses resulting from our acquisition of TDT and ZN in 2004. Although we carefully control costs, we continue to invest in face recognition technologies and new product development. This investment included enhancing existing products with the intellectual property that was acquired through these acquisitions. As discussed above, research and development expenses for the three- and six-month periods ended June 27, 2004 include $98,000 and $172,000, respectively, of non-cash amortization expense related to the ZN identified intangible assets which contributed to the improvement in face recognition technologies and new product development. As a percentage of revenue, research and development expenses decreased from 10.7% in the second quarter of 2003 to 5.8% in the second quarter of 2004 and from 11.1% for the first six months of 2003 to 6.7% for the first six months of 2004. We expect to continue to invest in product development in fiscal 2004.

*General and Administrative Expenses*

General and administrative expenses increased approximately $1.2 million, from $1.0 million in the second quarter of 2003 to $2.2 million in the second quarter of 2004. For the fiscal year to date, general and administrative expenses increased approximately $2.2 million, from $2.1 million in 2003 to $4.3 million in 2004. Legal costs for the fiscal year to date increased approximately $610,000 stemming from the litigation surrounding our contract with the state of Georgia. The move of our corporate headquarters to its new location in Billerica, MA resulted in approximately $200,000 in direct expenses plus accelerated amortization of leasehold improvements in our old building of approximately $283,000. We also incurred additional leasehold improvements of approximately $205,000, which will be amortized over the life of our new lease. General and administrative costs for ZN totaled $133,000 for the period from January 24, 2004 to June 27, 2004. General and administrative costs for TDT totaled $148,000 for the period from February 14, 2004 to June 27, 2004. The remainder of the increase is due to the logistical support required to grow our business through acquisitions while continuing to meet the financing requirements created by our expanding operations. As a percentage of revenue, general and administrative expenses increased from 11.8% in the first quarter of 2003 to 13.6% in the first quarter of 2004.

*Interest Expense*

Interest expense, net of approximately $19,000 and $19,000 of interest income for the second quarters of 2003 and 2004 respectively, increased approximately $346,000 from $231,000 in the second quarter of 2003 to $577,000 in the second quarter of 2004. The increase in interest expense is due to $325,000 of interest on the $15.3 million note used to purchase TDT, as well as approximately $21,000 of additional interest stemming from additional debt financing required to support contract delivery. For the fiscal year to date interest expense, net of approximately $48,000 and $41,000 of interest income for the second quarters of 2003 and 2004 respectively, increased approximately $519,000 from $450,000 in the second quarter of 2003 to $969,000 in the second quarter of 2004. The increase in interest expense is due to $488,000 of interest on the $15.3 million note used to purchase TDT, as well as approximately $31,000 of additional interest stemming from additional debt financing required to support contract delivery.

*Income Taxes*

No provision for federal income taxes has been made for the three- and six-month periods ended June 27, 2004 and June 29, 2003 due to the net loss in both periods. The provision for state income taxes for the six-month periods ended June 27, 2004 and June 29, 2003 was approximately $50,000 and $63,000, respectively. The provision for state income taxes for the three-month period ended June 27, 2004 was approximately $25,000. There was no provision for state income taxes for the three-month period ended June 29, 2003.

18

Table of Contents

*Cumulative Effect of Change in Accounting Principle*

For the year ended December 31, 2003, we incurred a non-cash charge of $12.1 million representing the cumulative effect of a change in accounting principle related to our adoption of EITF 00-21 on a cumulative basis as of January 1, 2003.

LIQUIDITY AND CAPITAL RESOURCES

Cash and cash equivalents were approximately $9.5 million at June 27, 2004, which consisted entirely of cash. This amount excludes approximately $3.1 million which is restricted under our term loan agreements and project financing. Cash and cash equivalents at December 31, 2003 were approximately $6.7 million, which consisted entirely of cash. This number excludes approximately $6.3 million which was restricted under our term loan agreements and project financing.

In the six-month period ended June 27, 2004, cash provided by operating activities was approximately $2.3 million which stems from our net loss of approximately $1.9 million, offset by non-cash charges for depreciation and amortization of approximately $5.1 million, and cash used by the net increase in operating assets of approximately $847,000.

Accounts receivable increased approximately 51.4% from $7.0 million at December 31, 2003 to $10.6 million at June 27, 2004. This increase includes $874,000 and $2.2 million which were assets of ZN and TDT, respectively, acquired by us at the respective dates of acquisition of those companies. The remainder of the change, which resulted in an decrease in cash of approximately $1.3 million, is due to the timing of billings and collections.

Inventories and other costs and estimated earnings in excess of billings decreased approximately 7.3% from $4.1 million at December 31, 2003 to $3.8 million at June 27, 2004. This decrease includes $189,000 and $135,000 which were assets of ZN and TDT, respectively, acquired by us at the date of acquisition. The remainder of the change, which resulted in a increase in cash of approximately $24,000, reflects accumulation of consumables inventory that was unbilled as of June 27, 2004.

Accounts payable and accrued expenses increased approximately 59.4% from $6.9 million at December 31, 2003 to $10.9 million at June 27, 2004. This increase includes $1.5 million and $2.8 million which were liabilities of ZN and TDT, respectively, assumed by us at the dates of the respective acquisitions of those companies. The remainder of the change, which resulted in a decrease in cash of approximately $1.2 million, is due to the timing of payables.

In February 2004, we entered into a new loan agreement with Commerce Bank and Trust Company, or Commerce, that superseded the original loan agreement for our existing term loans. Under this new agreement, we borrowed an additional $3.0 million and reduced the required restricted cash balance under the new agreement with Commerce by $2.0 million. We also negotiated a reduction of $1.2 million of restricted cash with Lau Technologies, or Lau, concurrent with the execution of the new loan agreement with Commerce. The $3 million term loan provided by this agreement bears interest at a rate of 7.3%. The following table lists the approximate term note information for Commerce and Lau as of the dates indicated (in thousands):

| Lender | Original Loan Amount | Monthly Payment Provision | Date of Loan | Due Date | Interest Rate | Outstanding Principal June 27, 2004 |
|---|---|---|---|---|---|---|
| Commerce | $ 4,000 | $    84 | 2/7/2001 | 6/20/2006 | 8.00% | $   1,842 |
| Commerce | 3,200 | 72 | 9/11/2001 | 3/11/2006 | 6.25% | 1,422 |
| Commerce | 1,800 | 34 | 12/12/2002 | 12/31/2007 | 5.25% | 1,309 |
| Commerce | 1,500 | 27 | 12/12/2002 | 4/24/2008 | 5.25% | 1,127 |
| Commerce | 1,200 | 24 | 12/12/2002 | 6/24/2007 | 5.25% | 839 |
| Lau | 2,040 | 53 | 5/30/2003 | 6/30/2009 | 8.50% | 1,547 |
| Lau | 2,500 | 51 | 5/30/2003 | 5/30/2008 | 8.50% | 2,142 |
| Lau | 1,562 | 64 | 5/30/2003 | 8/30/2005 | 8.50% | 843 |
| Lau | 287 | 42 | 5/30/2003 | 12/30/2003 | 8.50% | — |
| Commerce | 3,000 | 36 | 2/27/2004 | 2/27/2007 | 7.30% | 2,698 |
| | $21,089 | $   487 | | | | $  13,769 |

In accordance with the new loan agreement the term notes are collateralized by certain of our assets and the related contract assets. We restructured our bank covenants to account for the impact of the closing of our transactions with ZN and TDT. We are required to maintain various financial covenants, including;

- a net loss for the year ending December 31, 2004 of not more than $500,000 and positive net after-tax income in each fiscal year thereafter,

Table of Contents

- a minimum tangible net worth (as defined in the loan agreement) of approximately $10.0 million, plus 80% of any new equity raised, plus 80% of net profit for the third quarter of 2004,

- our debt to tangible net worth ratio (as defined in the loan agreement) may not exceed the following quarterly benchmarks: 4.16:1.00 for the third quarter of 2004, and 4.10:1.00 for the fourth quarter of 2004,

- our debt service coverage ratio (as defined in the loan agreement) must be greater than 1.25 for the third quarter and 1.10 for the fourth quarter of 2004, and

- annual capital expenditures may not exceed $2.5 million for the year ending December 31, 2004 and no single capital expenditure may exceed $250,000 without lender approval.

Additionally, in accordance with the new agreement, we must maintain $3.0 million of cash on deposit with the lender through September 29, 2004, $4.0 million through November 29, 2004 and $5.0 million by December 31, 2004 and thereafter. This amount is recorded as restricted cash in long term assets. As of June 27, 2004 we had an additional $120,000 of restricted cash at Commerce Bank related to our loan agreement with Lau.

We also had one capital lease arrangement in which we were required to maintain the same financial ratios and minimum levels of tangible capital funds, as stated above. Pursuant to this arrangement, the lessor purchases certain of our digital identification systems and leases them back to us for deployment with identified and contracted customers approved by the lessor. The lessor retains title to systems and has an assignment of our rights under the related customer contracts, including rights to use the software and technology underlying the related systems. Under this arrangement, the lessor bears the credit risk associated with payments by our customers, but we bear performance and appropriation risk and are generally required to repurchase a system in the event of a termination by a customer for any reason except credit default. This project lease arrangement was accounted for as a capital lease. At June 27, 2004, this lease-financing arrangement was paid in full.

In April 2003 we entered into an arrangement for approximately $1.5 million of equipment financing with three of our suppliers. These project lease arrangements are accounted for as capital leases. There are no financial covenants associated with these leasing arrangements. As of June 27, 2004 we had outstanding $375,000 under these arrangements. The interest rates on these capital leases are between 6% and 8% and are fixed. The terms of these leases range from 12 months to 60 months. In August 2003 we entered into an arrangement for financing of database licenses with another vendor. As of December 31, 2003 we had outstanding $401,000 under this arrangement.

In the first quarter of 2004 we purchased an asset totaling $800,000 which is payable in installments over four years. On the June 27, 2004 balance sheet, $250,000 is included in accounts payable and other accrued expenses and $400,000 is recorded under other liabilities.

We are in compliance with our bank covenants as of June 27, 2004 and we believe that we will be able to maintain compliance with our bank covenants in the future. However, this expectation is dependent on achieving our business plan. If we do not remain in compliance with the covenants in our financing arrangements, the lenders and the lessors could require immediate repayment of outstanding amounts. As of June 27, 2004, there was approximately $13.8 million outstanding under our credit facilities with Commerce and Lau.

In January 2004, we sold 456,007 shares of our common stock at $3.775 per share in a private sale to certain institutional investors to which we had previously sold shares in a private sale in September 2003. On February 14, 2004, we funded the acquisition of TDT with $5.0 million of available cash and executed a promissory note for an additional $15.3 million in addition to the issuance of new stock. The note bears interest at a rate of 8.5% per year and is payable in equal installments of principal and interest on December 1, 2004, May 1, 2005 and December 1, 2005. This debt was offset by approximately $1.0 million of identified purchase price adjustments related to certain provisions in the stock purchase agreement.

An additional cash payment of $2.6 million will be made to the former sole shareholder of TDT based upon TDT's selection by the U.S. Department of Defense for the production of smart cards as part of the agency's Common Access Card (CAC) program. This amount was recorded as a related party payable on the June 27, 2004 balance sheet and will be paid when we receive payment for our participation in this program.

We believe that our existing cash balances and anticipated cash flows from operations will be sufficient to meet our operating and debt service requirements for the next 12 months. However, if we cannot achieve our operating goals in 2004 or if we win additional secure credentials contracts in 2004, we may be required to seek additional financing. There can be no assurance that such financing will be available on commercially reasonable terms, or at all. Our ability to meet our business forecast is dependent on a number of factors, including those described in the section of this report entitled "Factors that May Affect Future Results."

Table of Contents

### CONTRACTUAL OBLIGATIONS

The following table sets forth our contractual obligations as of June 27, 2004.

|  | Total | Less than 1 Year | 1-3 Years | 3-5 Years | More than 5 Years |
|---|---|---|---|---|---|
| Long Term Debt Obligations | $28,054 | $14,388 | $12,488 | $ 1,178 | — |
| Capital Lease Obligations | 794 | 483 | 260 | 51 | — |
| Operating Lease Obligations | 1,903 | 474 | 793 | 637 | — |

### CONTINGENT OBLIGATIONS

Our principal contractual commitments involve payments under capital leases, term notes and operating leases.

### INFLATION

Although some of our expenses increase with general inflation in the economy, inflation has not had a material impact on our financial results to date.

### OTHER EVENTS

On August 10, 2004, we completed the sale of 7,200,000 shares of newly-issued common stock in an underwritten public offering. We estimate that our net proceeds from this offering will be approximately $37.1 million, after deducting underwriting discounts and commissions and estimated offering expenses.

### FORWARD-LOOKING STATEMENTS

This quarterly report on Form 10-Q contains or incorporates forward-looking statements within the meaning of section 27A of the Securities Act of 1933 and section 21E of the Securities Exchange Act of 1934. These forward-looking statements are based on current expectations, estimates, forecasts and projections about the industry and markets in which we operate and management's beliefs and assumptions. In addition, other written or oral statements that constitute forward-looking statements may be made by or on our behalf. Words such as "expect," "anticipate," "intend," "plan," "believe," "seek," "estimate," variations of such words and similar expressions are intended to identify such forward-looking statements. These statements are not guarantees of future performance and involve certain risks, uncertainties and assumptions that are difficult to predict. We have included important factors in the cautionary statements below under the heading "Factors That May Affect Future Results" that we believe could cause our actual results to differ materially from the forward-looking statements we make. We do not intend to update publicly any forward-looking statements, whether as a result of new information, future events or otherwise.

### FACTORS THAT MAY AFFECT FUTURE RESULTS

The risks and uncertainties described below are not the only ones we face. Additional risks and uncertainties, including those not presently known to us or that we currently deem immaterial, may also impair our business.

**We have a history of operating losses.**

We have a history of operating losses. Our business operations began in 1993 and, except for fiscal years 1996 and 2000, have resulted in net losses in each fiscal year. At June 27, 2004, we had an accumulated deficit of approximately $44.0 million. We will continue to invest in the development of our secure credential provisioning capabilities, biometric technologies and other components of advanced technology identity solutions. Accordingly, we cannot predict when or if we will ever achieve profitability.

**We may be unable to obtain additional capital required to fund our operations and finance our growth.**

The installation of our secure identification systems requires significant capital expenditures. In addition, the further development of our biometric and other advanced technologies will require additional capital. Although we have been successful in the past in obtaining financing for working capital and capital expenditures, including a $15 million private placement of our common stock in September 2003 and January 2004 and a new loan agreement with a bank in February 2004, we will have ongoing capital needs as we expand our business. We may be unable to obtain additional funds in a timely manner or on acceptable terms, which would render us unable to fund our operations or expand our business. If we are unable to obtain capital when needed, we may have to restructure our business or delay or abandon our development and expansion plans.

21

Table of Contents

**We derive over 90% of our revenue from government contracts, which are often non-standard, involve competitive bidding, may be subject to cancellation with or without penalty and may produce volatility in earnings and revenue.**

More than 90% of our business involves providing products and services under contracts with U.S. federal, state, local and foreign government agencies. Obtaining contracts from government agencies is challenging, and government contracts often include provisions that are not standard in private commercial transactions. For example, government contracts may:

- include provisions that allow the government agency to terminate the contract without penalty under some circumstances;
- be subject to purchasing decisions of agencies that are subject to political influence;
- contain onerous procurement procedures; and
- be subject to cancellation if government funding become unavailable.

Foreign government contracts generally include comparable provisions relating to termination for the convenience of the relevant foreign government. Securing government contracts can be a protracted process involving competitive bidding. In many cases, unsuccessful bidders may challenge contract awards, which can lead to increased costs, delays and possible loss of the contract for the winning bidder.

**We derive a significant portion of our revenue from a few customers, the loss of which could have an adverse effect on our revenues.**

For the three-month period ended June 27, 2004, one customer, the U.S. Department of State, accounted for an aggregate of 22.9% of our revenue. Since a small number of customers in our secure credentials segment account for a substantial portion of our revenues, the loss of any of our significant customers would cause revenue to decline and could have a material adverse effect on our business.

**We derive revenue from only a limited number of products and services and we do not have a diversified product or service base.**

Substantially all of our revenues are derived from the sale of products and services comprising our identity solutions. We anticipate that substantially all of the growth in our revenue, if any, will also be derived from these sources. If for any reason our sale of these products or services is impeded, and we have not diversified our product and service offerings, our business and results from operations could be harmed.

**Loss of limited source suppliers may result in delays or additional expenses.**

We obtain certain hardware components and complete products from a limited group of suppliers. In particular, we obtain all of the printers and consumables for the U.S. Department of State passport contract and the Department of Defense, or DoD, Common Access Card, or CAC, contract from Toppan Printing Co. Ltd. Our reliance on these suppliers involves significant risks, including reduced control over quality and delivery schedules. Moreover, any financial instability of our manufacturers or contractors could result in our having to find new suppliers. We may experience significant delays in manufacturing and shipping our products to customers if we lose these sources or if supplies from these sources are delayed. As a result, we may be required to incur additional development, manufacturing and other costs to establish alternative sources of supply. It may take several months to locate alternative suppliers, if required, or to re-tool our products to accommodate components from different suppliers. We cannot predict if we will be able to obtain replacement components within the time frames we require at an affordable cost, or at all. Any delays resulting from suppliers failing to deliver components or products on a timely basis, in sufficient quantities and of sufficient quality or any significant increase in the price of components from existing or alternative suppliers could have a severe negative impact on our business, financial condition and results of operations.

**Termination of our contract with Georgia could cause us to lose $19.7 million in projected revenues over the next five and one-half years and could negatively affect our earnings.**

In July 2003, a Georgia court issued a preliminary injunction prohibiting Georgia's Department of Motor Vehicle Safety from continuing to work with us to install the State's new drivers' license system. The injunction is the result of a lawsuit filed in March 2003 by one of our competitors alleging that the Department of Motor Vehicle Safety did not comply with its own bid process when it selected a vendor for its new digital drivers' license program. In July 2004, we reached a settlement agreement with the State pursuant to which the Department of Motor Vehicle Safety terminated the contract for convenience and agreed to pay us $2.0 million in cash and the State agreed to purchase certain equipment from us for $500,000. The Department of Motor Vehicle Safety has filed a motion with the Georgia court to dismiss the case based upon the termination of the contract. The agency also has filed an affidavit

22

Table of Contents

stating that it intends to issue a new request for proposals for a digital drivers' license system before the end of October 2004. The competitor has filed a motion with the Georgia court to enjoin the Department of Motor Vehicle Safety and the State from making any payments to us under the settlement agreement. As a result of the termination of the contract, we will lose up to $19.7 million in revenue that we expected to recognize over the next five and one-half years, which was included in our $176 million of backlog at March 28, 2004, unless we are able to win the new contract for the digital drivers' license system and the revenues from such new contract are substantially similar to the terminated contract. While we believe we can utilize the remaining $2.8 million in assets being retained by us from the Georgia contract either in Georgia, if we win the contract based on the new request for proposals, or on alternative projects, to the extent that we are unable to utilize these assets or realize value through a sale of these assets, we would be required to take a charge to earnings.

**Our strategy of expanding our face recognition business could adversely affect our business operations and financial condition.**

Part of our strategy is to enhance our leadership in face recognition technology and to expand our operations within our face recognition business segment. Pursuing this strategy involves risks. For instance, to date, face recognition security solutions have not gained widespread commercial acceptance. Some of the obstacles to widespread acceptance of face recognition security solutions include a perceived loss of privacy and public perceptions as to the usefulness of face recognition technologies. Whether the market for face recognition security solutions will expand will be dependent upon factors such as:

- the success of our marketing efforts and publicity campaigns and those of our competitors; and
- customer satisfaction with our products and services, as well as those of our competitors.

We do not know when, if ever, face recognition security solutions will gain widespread commercial acceptance. In addition, our face recognition business segment has not achieved profitability, and it may never achieve profitability.

**We face intense competition, which could result in lower revenues and higher research and development expenditures and could adversely affect our results of operations.**

The events of September 11, 2001 have heightened interest in the use of biometric security solutions, and we expect competition in this field, which is already substantial, to intensify. Competitors are developing and bringing to market biometric security solutions that use face recognition as well as eye, fingerprint and other forms of biometric verification. Our products also will compete with non-biometric technologies such as certificate authorities and traditional keys, cards, surveillance systems and passwords. Widespread adoption of one or more of these technologies or approaches in the markets we intend to target could significantly reduce the potential market for our systems and products. Many of our competitors have significantly more cash and resources than we have. Our competitors may introduce products that are competitively priced, have increased performance or functionality or incorporate technological advances that we have not yet developed or implemented. To remain competitive, we must continue to develop, market and sell new and enhanced systems and products at competitive prices, which will require significant research and development expenditures. If we do not develop new and enhanced products or if we are not able to invest adequately in our research and development activities, our business, financial condition and results of operations could be negatively impacted.

**Unless we keep pace with changing technologies, we could lose customers and fail to win new customers.**

Our future success will depend upon our ability to develop and introduce a variety of new products and services and enhancements to these new products and services in order to address the changing needs of the marketplace. We may not be able to accurately predict which technologies customers will support. If we do not introduce new products, services and enhancements in a timely manner, if we fail to choose correctly among technical alternatives or if we fail to offer innovative products and services at competitive prices, customers may forego purchases of our products and services and purchase those of our competitors.

**Security breaches in systems that we sell or maintain could result in the disclosure of sensitive government information or private personal information that could result in the loss of clients and negative publicity.**

Many of the systems we sell manage private personal information and protect information involved in sensitive government functions. A security breach in one of these systems could cause serious harm to our business as a result of negative publicity and could prevent us from having further access to such systems or other similarly sensitive areas for other governmental clients. Our systems may also be affected by outages, delays and other difficulties. Our insurance coverage in certain circumstances may be insufficient to cover losses and liabilities that may result from such events.

Table of Contents

**The market for our solutions is still developing and if the industry adopts standards or a platform different from our platform, then our competitive position would be negatively affected.**

The market for identity solutions is still emerging. The evolution of this market is in a constant state of flux that may result in the development of different technologies and industry standards that are not compatible with our current products or technologies. In particular, the face recognition market lacks industry-wide standards. Several organizations, such as the International Civil Aviation Organization, which sets standards for travel documents that its member states then put into effect, and the National Institute for Standards and Testing, which is part of the U.S. Department of Commerce, have recently selected face recognition as the biometric to be used in identification documentation. It is possible, however, that these standards may change and that any standards eventually adopted could prove disadvantageous to or incompatible with our business model and product lines.

**The adoption of EITF 00-21 resulted in a non-cash adjustment of $12.1 million and may have an adverse effect on our results of operations in the near term, which may depress the market price of our common stock.**

During the third quarter of 2003, we adopted the provisions of Emerging Issues Task Force 00-21, Accounting for Revenue Arrangements with Multiple Deliverables, or EITF 00-21, on a cumulative basis as of January 1, 2003. After discussions with the Securities and Exchange Commission staff regarding the effect of EITF 00-21 on revenue recognition on our secure credentials contracts, we decided to adopt EITF 00-21 via cumulative catch-up as of January 1, 2003 rather than prospectively as reflected in the previously filed Form 10-Q for the quarter ended September 28, 2003. The adoption of EITF 00-21 resulted in a non-cash adjustment reported as a cumulative effect of a change in accounting principle of $12.1 million. The adoption of EITF 00-21 affects the timing of revenue recognition under our secure credentials contracts and as a result we may report reduced revenue and an increased net loss for one or more of our fiscal quarters in 2004. This effect on our results of operations could cause our stock price to decline.

**Our leverage creates financial and operating risks that could limit the growth of our business.**

We have a significant amount of indebtedness. As of June 27, 2004, we had approximately $28.8 million in short and long-term debt and lease financing. This amount includes $14.3 million of related party debt incurred in the acquisition of TDT in February 2004. While we plan to use part of the proceeds from our recent public offering to repay all of this indebtedness, we may incur additional indebtedness in the future. To the extent that we incur additional debt in the future, such leverage could have important consequences to our business including:

- limiting our ability to obtain necessary financing for future working capital;
- limiting our ability to finance the acquisition of equipment needed to meet customer requirements;
- limiting our ability to finance the development of new technologies;
- requiring that we use a substantial portion of our cash flow from operations for debt service and not other operating purposes; and
- requiring that we comply with financial and operating covenants, which could cause an event of default under our debt instruments.

Our ability to make principal and interest payments under long-term indebtedness and bank loans will be dependent upon our future performance, which is subject to financial, economic and other factors affecting us, some of which are beyond our control.

**Others could claim that we are infringing on their intellectual property rights, which could result in substantial costs, diversion of managerial resources and harm to our reputation.**

Although we believe that our products and services do not infringe the intellectual property rights of others, we might not be able to defend successfully against a third-party infringement claim. A successful infringement claim against us could subject us to:

- liability for damages and litigation costs, including attorneys' fees;
- lawsuits that prevent us from further use of the intellectual property;
- having to license the intellectual property from a third party, which could include significant licensing fees;
- having to develop a non-infringing alternative, which could be costly and delay projects; and
- having to indemnify clients with respect to losses they incurred as a result of the alleged infringement.

24

Table of Contents

Even if we are not found liable in a claim for intellectual property infringement, such a claim could result in substantial costs, diversion of resources and management attention, termination of customer contracts and harm to our reputation.

On July 19, 2004, Fargo Electronics, Inc. initiated a patent infringement action in the U.S. District Court for the Eastern District of Virginia against Toppan Printing Co., Ltd. and TDT. The complaint alleges that Toppan and TDT's use, offer to sell and/or importation of certain personalized identification card printers, including Toppan's CP400 card printers, and associated laminators in the United States constitutes direct and indirect infringement of four patents allegedly owned by Fargo. The complaint seeks unspecified compensatory damages, permanent injunctive relief, trebling of damages for willful infringement and fees and costs. We are currently evaluating the claims in this lawsuit and intend to vigorously defend against them. We believe that the only products at issue are Toppan CP400 printers that were or are sold, used or imported as part of the CAC program. To date, we have received purchase orders of $10.2 million for Toppan CP400 printers for the CAC program, which are expected to be delivered by the end of the first quarter of 2005. There can be no assurance that we will prevail in this litigation. The litigation, with or without merit, could be time consuming and expensive to litigate or settle and could divert management's attention from our business.

**Uncertainties in global economic markets could cause delays in customer purchases.**

Many customers and potential customers have delayed purchase intentions as a result of uncertainties in global economic markets. Government budgets, particularly at state and regional levels, have been or are expected to be reduced notably. Government contracts result from purchasing decisions made by public sector agencies that are particularly sensitive to budget changes and cutbacks during economic downturns, and variations in appropriations cycles. Many U.S. state customers are facing budget cuts, and some international customers are facing debt crises, introducing added uncertainty. Any shift in the government procurement process, which is outside of our control and may not be predictable, could impact the predictability of our quarterly results and may potentially have a material negative effect on our financial position, results of operation or cash flows.

**If we do not successfully expand our direct sales and services organizations and partnering arrangements, we may not be able to increase our sales or support our customers.**

In the fiscal years ended December 31, 2002 and 2003, and six-month periods ended June 27, 2004 and June 29, 2003, we sold substantially all of our services and licensed substantially all of our products through our direct sales organization. Our future success depends on substantially increasing the size and scope of our direct sales force and partnering arrangements, both domestically and internationally. We will face intense competition for personnel, and we cannot guarantee that we will be able to attract, assimilate or retain additional qualified sales personnel on a timely basis. Moreover, given the large-scale deployment required by some of our customers, we will need to hire and retain a number of highly trained customer service and support personnel. We cannot guarantee that we will be able to increase the size of our customer service and support organization on a timely basis to provide the high quality of support required by our customers. Failure to add additional sales and customer service representatives could result in our inability to increase our sales and support our customers.

**Integration of acquired businesses may be difficult and will consume significant financial and managerial resources, which could have an adverse effect on our results of operations.**

On January 23, 2004, we completed the acquisition of ZN Vision Technologies AG, or ZN, a leading German provider of face recognition and computer vision products and services. On February 14, 2004, we completed the acquisition of TDT. The integration of ZN's and TDT's products and services with ours will be challenging and will consume significant financial and managerial resources. The challenges involved with this integration include, among others:

- challenges related to technology innovation;
- possible difficulty implementing uniform standards, controls, procedures and policies and
- possible loss of key employees

In addition, the differences between U.S. and German business cultures and the geographic distance between the companies could present significant obstacles to our timely, cost-effective integration of ZN.

**The significant direct and indirect costs of our acquisition and integration of ZN and TDT could adversely affect our financial performance.**

We incurred approximately $2.7 million of costs in connection with the acquisitions of ZN and TDT, including:

- costs associated with integrating our business with ZN and TDT;

25

Table of Contents

- financial advisory fees; and
- costs and expenses for services provided by our lawyers and accountants.

The transaction costs and expenses attributable to financial advisory, legal and accounting services that we incurred will be capitalized as a component of the purchase price. Goodwill associated with the acquisition will be required to be tested at least annually for impairment, and we will be required to record a charge to earnings if there is an impairment in the value of such goodwill at a later date. Other intangible assets acquired in connection with the acquisition will be amortized over their estimated useful lives.

**The acquisitions of ZN and TDT could result in future impairment charges which could adversely affect our results of operations.**

As a result of our two acquisitions of ZN and TDT, goodwill and other intangible assets have been created. The values we may record for goodwill and other intangible assets will represent fair values calculated by independent third-party appraisers. Such valuations require us to provide significant estimates and assumptions, which are derived from information obtained from the management of the acquired businesses and our business plans for the acquired businesses or intellectual property. If estimates and assumptions used to initially value goodwill and intangible assets prove to be inaccurate, ongoing reviews of the carrying values of such goodwill and intangible assets may indicate impairments which will require us to record an impairment charge in the period in which we identify the impairments.

**If we do not achieve the expected benefits of our acquisitions of ZN and TDT, the price of our common stock could decline.**

We expect that the acquisition of ZN will enhance our leadership in face recognition technology through the combination of our technologies with those of ZN. Although the results of the initial tests of our combined technologies have been positive, the combination of such technologies might not meet the demands of the marketplace. If our technologies fail to meet such demand, customer acceptance of our face recognition solutions could decline, which would have an adverse effect on our results of operations and financial condition. In addition, we expect that the acquisition of ZN will enable us to market our systems and products on a global scale. Our face recognition customers are primarily located in the United States, and ZN's customers are primarily located in Europe. We might not be able to market successfully our products and services to ZN's customers or ZN's products and services to our customers. We expect that the acquisition of TDT will enhance our position in the market for secure credentials, particularly the U.S. government. If our product offerings and services fail to meet the demands of this marketplace, our results of operations and financial condition could be adversely affected. There is also a risk that we will not achieve the anticipated benefits of the acquisitions as rapidly as, or to the extent, anticipated by financial or industry analysts, or that such analysts will not perceive the same benefits to the acquisitions as we do. If these risks materialize, our stock price could be adversely affected.

**The success of our strategic plan to grow sales and develop relationships in Europe may be limited by risks related to conducting business in European markets.**

Although ZN has experience marketing and distributing its products and developing strategic relationships in Europe, part of our strategy will be to increase sales and build additional relationships in European markets. Risks inherent in marketing, selling and developing relationships in European markets include those associated with;

- economic conditions in European markets, including fluctuations in the relative values of the U.S. dollar and the Euro;
- taxes and fees imposed by European governments that may increase the cost of products and services; and
- laws and regulations imposed by individual countries and by the European Union.

In addition, European intellectual property laws are different than U.S. intellectual property laws and we will have to ensure that our intellectual property is adequately protected in foreign jurisdictions and that ZN's intellectual property is adequately protected in the United States. If we do not adequately protect our intellectual property rights, competitors could use our proprietary technologies in non-protected jurisdictions and put us at a competitive disadvantage.

**Our business may be impacted by changes in the local marketplace of our foreign operations and fluctuations in currency exchange rates.**

As a result of our acquisitions of ZN and TDT, we expect that we will have increased exposure to foreign currency fluctuations. Net revenue and related expenses generated from our international location in Germany is denominated in euros. The results of operations and certain of our inter-company balances associated with this international location are exposed to foreign exchange rate fluctuations. In addition to our German operation, we will have increased transactions with Japanese vendors supplying hardware and consumables for the delivery of the TDT contracts. These transactions will increase our exposure to foreign currency fluctuations with

26

Table of Contents

the yen. To the extent the U.S. dollar weakens against these foreign currencies, the translation of these foreign currencies denominated transactions results in increased net revenue, operating expenses and net income. Similarly, our net revenue, operating expenses and net income will decrease when the U.S. dollar strengthens against these foreign currencies.

**If our systems and products do not perform as promised, we could experience increased costs, lower margins, liquidated damage payment obligations and harm to our reputation.**

We will be required to provide complex systems that will be required to operate on an "as needed" basis. Although we will deploy back-up systems, the failure of our products to perform as promised could result in increased costs, lower margins, liquidated damage payment obligations and harm to our reputation. This could result in contract terminations and have a material adverse effect on our business and financial results.

**Misappropriation of our intellectual property could harm our reputation, affect our competitive position and cost us money.**

We believe that our intellectual property, including our methodologies, will be critical to our success and competitive position. If we are unable to protect this intellectual property against unauthorized use by third parties, our reputation among existing and potential customers could be damaged and our competitive position adversely affected. Our strategies to deter misappropriation could be undermined if:

- the proprietary nature or protection of our methodologies is not recognized in the United States or foreign countries;
- third parties misappropriate our proprietary methodologies and such misappropriation is not detected; and
- competitors create applications similar to ours but which do not technically infringe on our legally protected rights.

If these risks materialize, we could be required to spend significant amounts to defend our rights and divert critical managerial resources. In addition, our proprietary methodologies may decline in value or our rights to them may become unenforceable.

**If we fail to adequately manage our resources, it could have a severe negative impact on our financial results or stock price.**

We could be subject to fluctuations in technology spending by existing and potential customers. Accordingly, we will have to actively manage expenses in a rapidly changing economic environment. This could require reducing costs during economic downturns and selectively growing in periods of economic expansion. If we do not properly manage our resources in response to these conditions, our results of operations could be negatively impacted.

**Future acquisitions of companies or technologies may result in disruptions to our business.**

Beyond the acquisitions of ZN and TDT, our growth strategy could include additional acquisitions of companies or technologies that complement ours. Future acquisitions could involve risks inherent in acquisitions, such as:

- challenges associated with integrating acquired technologies and the business and operations of acquired companies;
- exposure to unknown liabilities;
- diversion of managerial resources from day-to-day operations;
- possible loss of key employees, customers and suppliers;
- higher than expected transaction costs; and
- additional dilution to our existing stockholders if we use our common stock as consideration.

If we fail to manage these challenges adequately, our results of operations and stock price could be adversely affected.

**The loss of key personnel could adversely affect our ability to remain competitive.**

We believe that the continued service of our executive officers will be important to our future growth and competitiveness. We have entered into employment agreements with our executive officers, including Bernard C. Bailey, our Chief Executive Officer, William K. Aulet, our Chief Financial Officer, and James P. Ebzery, our Senior Vice President, Worldwide Sales and Services. These agreements are intended to provide the executives with incentives to remain employed by us. However, we cannot assure you that they will remain employed by us. In addition, we believe that the continued employment of key members of our technical and sales staff is

27

Table of Contents

important to us. Most of our employees are entitled to voluntarily terminate their relationship with us, typically without any, or with only minimal, advance notice. The process of finding additional trained personnel to carry out our strategy could be lengthy, costly and disruptive. We might not be able to retain the services of all of our key employees or a sufficient number of them to execute our plans. In addition, we might not be able to continue to attract new employees as required.

**Our quarterly results could be volatile and may cause our stock price to fluctuate.**

We have experienced fluctuations in quarterly operating results and we expect those fluctuations to continue. We expect that our quarterly results will continue to be affected by, among other things, factors such as:

- the size and timing of contract awards;
- the timing of our contract performance;
- variations in the mix of our products and services; and
- contract losses and changes in management estimates inherent in accounting for contracts.

**Certain of our stockholders have significant relationships with us, which could result in us taking actions that are not supported by unaffiliated stockholders.**

Lau Technologies, or Lau, and Mr. Buddy Beck, who is also a director and Vice Chairman, beneficially own approximately 13.8% and 13.4%, respectively, of our outstanding common stock. As a result, both Lau and Mr. Beck have a strong influence on matters requiring approval by our stockholders, including the election of directors and most corporate actions, including mergers and acquisitions. In addition, we have significant relationships with each of Lau and Mr. Beck, including:

- Lau has provided us with a credit facility in an aggregate principal amount of $7.3 million, which is secured by some of our assets;
- we acquired significant intellectual property, contracts and distribution channels through a transaction with Lau under which we agreed to pay Lau a 3.1% royalty on our face recognition revenues for a period of twelve and one half years, up to a maximum of $27.5 million;
- the Chairman of our Board of Directors and his spouse own a majority of Lau's voting stock;
- in connection with the acquisition of TDT, Mr. Beck was elected a member of our Board of Directors and appointed Vice Chairman;
- in connection with the acquisition of TDT, we issued a promissory note to Mr. Beck in the amount of $15.3 million, which is secured by some of TDT's assets;
- in connection with the acquisition of TDT, we entered into a consulting agreement with Mr. Beck under which we will pay Mr. Beck $300,000 per year for two years, provided that Mr. Beck devotes his full business time to developing business opportunities for us.

**Future sales of our common stock by Lau or Buddy Beck could depress the market price of our common stock.**

As of August 10, 2004, there were 43,101,018 shares of our common stock outstanding. Lau and Buddy Beck own approximately 13.8% and 13.4%, respectively, of our common stock. If either of these stockholders sell a significant number of shares of our common stock in the open market, our stock price could decline.

ITEM 3 – QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

Subsequent to our acquisition of ZN, our international operating resulting from transactions by our German operations and will be denominated in euros. Hardware and consumables purchases related to contracts associated with the TDT acquisition are denominated in Japanese yen. We mitigate exchange rate volatility by purchasing local currencies at favorable exchange rates. We do not hedge foreign currencies utilizing derivative instruments. Our international operations and transactions are subject to risks typical of international operations, including, but not limited to, differing economic conditions, changes in political climate, differing tax structures, other regulations and restrictions, and foreign currency exchange rate volatility. Accordingly, our future results could be materially adversely impacted by changes in these or other factors.

28

Table of Contents

ITEM 4 – CONTROLS AND PROCEDURES

(a) *Evaluation of disclosure controls and procedures*. Our management, with the participation of our Chief Executive Officer, or CEO, and Chief Financial officer, or CFO, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act) as of June 27, 2004. In designing and evaluating our disclosure controls and procedures, our management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives, and our management necessarily applied its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Based on this evaluation, our CEO and CFO concluded that, as of June 27, 2004, our disclosure controls and procedures were (1) designed to ensure that material information relating to us, including our consolidated subsidiaries, is made known to our CEO and CFO by others within those entities, particularly during the period in which this report was being prepared and (2) effective, in that they provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the Securities Exchange Commission's rules and forms.

(b) *Changes in internal controls.* There were no changes in our internal controls over financial reporting that occurred during our most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

29

Table of Contents

## VIISAGE TECHNOLOGY, INC.

### PART II - OTHER INFORMATION

ITEM 1 – LEGAL PROCEEDINGS

In July 2003, a Georgia court issued a preliminary injunction prohibiting Georgia's Department of Motor Vehicle Safety from continuing to work with us to install the State's new drivers' license system. The injunction is the result of a lawsuit filed in March 2003 by one of our competitors alleging that the Department of Motor Vehicle Safety did not comply with its own bid process when it selected a vendor for its new digital drivers' license program. In July 2004, we reached a settlement agreement with the State pursuant to which the Department of Motor Vehicle Safety terminated the contract for convenience and agreed to pay us $2.0 million in cash and the State agreed to purchase certain equipment from us for $500,000. The Department of Motor Vehicle Safety has filed a motion with the Georgia court to dismiss the case based upon the termination of the contract. The agency also has filed an affidavit stating that it intends to issue a new request for proposals for a digital drivers' license system before the end of October 2004. The competitor has filed a motion with the Georgia court to enjoin the Department of Motor Vehicle Safety and the State from making any payments to us under the settlement agreement. As a result of the termination of the contract, we will lose up to $19.7 million in revenue that we expected to recognize over the next five and one-half years, which was included in our $176 million of backlog at March 28, 2004, unless we are able to win the new contract for the digital drivers' license system and the revenues from such new contract are substantially similar to the terminated contract. While we believe we can utilize the remaining $2.8 million in assets being retained by us from the Georgia contract either in Georgia, if we win the contract based on the new request for proposals, or on alternative projects, to the extent that we are unable to utilize these assets or realize value through a sale of these assets, we would be required to take a charge to earnings.

On July 19, 2004, Fargo Electronics, Inc. initiated a patent infringement action in the U.S. District Court for the Eastern District of Virginia against Toppan Printing Co., Ltd. and TDT. The complaint alleges that Toppan and TDT's use, offer to sell and/or importation of certain personalized identification card printers, including Toppan's CP400 card printers, and associated laminators in the United States constitutes direct and indirect infringement of four patents allegedly owned by Fargo. The complaint seeks unspecified compensatory damages, permanent injunctive relief, trebling of damages for willful infringement and fees and costs. We are currently evaluating the claims in this lawsuit and intend to vigorously defend against them. We believe that the only products at issue are Toppan CP400 printers that were or are sold, used or imported as part of the CAC program. To date, we have received purchase orders of $10.2 million for Toppan CP400 printers for the CAC program, which are expected to be delivered by the end of the first quarter of 2005. There can be no assurance that we will prevail in this litigation. The litigation, with or without merit, could be time consuming and expensive to litigate or settle and could divert management's attention from our business.

We are not aware of any other legal matters that could have a material adverse effect on our business, financial condition or results of operations.

ITEM 2 – CHANGES IN SECURITIES, USE OF PROCEEDS AND ISSUER PURCHASES OF EQUITY SECURITIES

*Modification of Rights of Registered Securities.*

None.

*Limitation of Rights of Registered Securities.*

None.

*Use of Proceeds from Sale of Registered Securities.*

Not applicable.

*Issuer Repurchases of Securities.*

None.

*Restrictions Upon the Payment of Dividends*

We are prohibited under our borrowing arrangements from paying any cash dividends.

*Sales of Unregistered Securities*

None.

30

Table of Contents

ITEM 3 – DEFAULTS UPON SENIOR SECURITIES

None.

ITEM 4 – SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

On May 20, 2004, we held our annual shareholders meeting. At that meeting, the following matters were voted on and approved:

(a) Bernard C. Bailey, Harriet Mouchly-Weiss and Paul T. Principato were elected as Class II directors to serve three-year terms. The vote was 29,848,614 for and 2,121,563 withheld with respect to Mr. Bailey; 21,562,131 for and 10,408,046 withheld with respect to Ms. Mouchly-Weiss, and 19,941,541 for and 12,028,636 withheld with respect to Mr. Principato.

(b) The decision to amend the Viisage 1996 Management Stock Option Plan, increasing the number of shares available for issuance from 4,807,100 to 6,000,000 and permitting directors of Viisage who also are employees of Viisage to receive option grants under the plan, was ratified. The vote was 19,820,818 for, 708,485 against, 55,243 abstained and 11,385,631 not voted.

(c)_ The decision to amend the Viisage 1996 Directors Stock Option Plan, increasing the number of shares available for issuance from 576,616 to 1,076,616, was ratified. The vote was 19,826,066 for, 703,094 against, 55,386 abstained and 11,385,631 not voted.

(d) The decision to amend our Restated Certificate of Incorporation, increasing the number of shares of common stock available for issuance from 45,000,000 to 75,000,000, was ratified. The vote was 31,114,410 for, 817,552 against and 38,215 abstained.

(e) The selection of BDO Seidman, LLP as our independent public accountants for the year ending December 31, 2003, was ratified. The vote was 28,202,072 for, 3,727,734 against and 40,371 abstained.

ITEM 5 – OTHER INFORMATION

None.

ITEM 6 – EXHIBITS AND REPORTS ON FORM 8-K

(a) Exhibits

The exhibits listed in the Exhibits Index immediately preceding such exhibits are filed as part of this report.

(b) Reports on Form 8-K

On April 29, 2004, we filed an amended Current Report on Form 8-K under Item 7 with respect to certain financial information related to the acquisition of TDT.

On May 4, 2004, we furnished a Current Report on Form 8-K under Item 12 containing a press release dated May 3, 2004 announcing our financial results for the period ended March 28, 2004.

On May 21, 2004 we filed a Current Report under Item 5 with respect to certain financial information related to the acquisition of ZN.

On June 18, 2004, we filed an amended Current Report on Form 8-K under Item 5 for the purpose of correcting one line item in the statement of operations included in the audited financial statements of ZN for the years ended December 31, 2002 and 2003.

On June 23, 2004, we filed a Current Report on Form 8-K under Item 5 containing a press release announcing the commencement of a public offering.

31

Table of Contents

**VIISAGE TECHNOLOGY, INC.**

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**VIISAGE TECHNOLOGY, INC.**

Date: August 11, 2004

By:  /s/ Bernard C. Bailey

Bernard Bailey
President and Chief Executive Officer
(Principal Executive Officer)

Date: August 11, 2004

By:  /s/ William K. Aulet

William K. Aulet
Senior Vice President and Chief Financial Officer
(Principal Financial Officer)

32

Table of Contents

<center>**EXHIBIT INDEX**</center>

| Exhibit No. | Note | Description |
|---|---|---|
| 1.1 | (a) | Underwriting Agreement dated August 4, 2004 between Viisage Technology, Inc., the underwriters named therein and the selling shareholders named therein. |
| 31.1 | (a) | Certification of Principal Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2 | (a) | Certification of Principal Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1 | (a) | Certification of Principal Executive Officer pursuant to 18 U.S.C. Sec. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32.2 | (a) | Certification of Principal Financial Officer pursuant to 18 U.S.C. Sec. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |

| Note | Description |
|---|---|
| (a) | Filed herewith. |

<center>33</center>

EXHIBIT 15

-IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

DIGIMARC ID SYSTEMS, LLC,

        Plaintiff,

vs.

GEORGIA TECHNOLOGY AUTHORITY and
the GEORGIA DEPARTMENT OF MOTOR
VEHICLE SAFETY,

        Defendants,

vs.

VIISAGE TECHNOLOGY, INC., a Delaware
corporation,

        Necessary Party-Defendant.

Civil Action No. 2003CV66498

FILED IN OPEN COURT, THIS THE
_18_ DAY OF _Aug_ 2004
_____
JUDGE, DORIS L. DOWNS

**ORDER ON PLAINTIFF DIGIMARC ID SYSTEMS, LLC'S MOTION FOR
TEMPORARY RESTRAINING ORDER SEEKING PRESERVATION OF STATUS
QUO AND SUPPORTING MEMORANDUM OF LAW**

On August _18_, 2004, this matter came before this Court, as Presiding Judge, on Plaintiff

Digimarc ID Systems, LLC's Motion for Temporary Restraining Order Seeking Preservation of

Status Quo and Supporting Memorandum of Law. The Court held an oral hearing on Digimarc's

Motion, and all parties had the opportunity to be heard.

After considering Digimarc's Motion and the argument of the parties, this Court finds

that no prejudice will result to Defendants if Digimarc's Motion is granted, and Digimarc ~~will be~~ may be

irreparably harmed ~~because the performance under the underlying contract that Digimarc claims~~

~~is already enjoined by Judge Moore's July 31, 2003 Order will have already occurred.~~

Thus, IT IS HEREBY ORDERED that Defendants Georgia Technology Authority and

Department of Motor Vehicle Services and Necessary Party-Defendant Viisage Technology, Inc.

are hereby temporarily restrained and enjoined from consummating the transaction referenced in

the "Release and Settlement Agreement" between those parties dated July 20, 2004, specifically

the performance referenced in paragraphs 1 and 2 thereof, until September 2, 2004. This Court

understands that Judge Moore intends to hold a hearing on September 1, 2004, at which time it is

expected that she will further resolve this issue. This Court's temporary restraining order will

expire at 12:01 a.m. on September 2, 2004.

SO ORDERED this _/8_ day of August 2004.


Judge Doris L. Downs, Presiding Judge
Fulton County Superior Court

2

EXHIBIT 16

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

FILED IN OFFICE

AUG 23 2004

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

DIGIMARC ID SYSTEMS, LLC,

        Plaintiff,

v.

GEORGIA TECHNOLOGY AUTHORITY and
the GEORGIA DEPARTMENT OF MOTOR
VEHICLE SAFETY,

        Defendants

v.

VIISAGE TECHNOLOGY, INC., a Delaware
corporation,

        Necessary Party-Defendant.

Civil Action No. 2003CV66498

## SECOND AMENDED COMPLAINT

Plaintiff Digimarc ID Systems, LLC files this Second Amended Complaint, showing the

Court as follows:

## PARTIES AND JURISDICTION

1.

Digimarc ID Systems, LLC is a limited liability company organized and existing under

the laws of Delaware, and is registered to do business and does business in Georgia. Digimarc

has an office located at the headquarters of the Georgia Department of Motor Vehicle Safety,

2206 East View Parkway, Conyers, Georgia 30013.

2.

Digimarc is the leading global provider of secure and durable personal identification

solutions and the leading producer of drivers' licenses in the United States, providing systems

and services to thirty-two states. Internationally, Digimarc provides systems and services for sixty national governments around the world.

3.

Digimarc is the incumbent provider of Georgia's Digitized License System. This system has been producing drivers' licenses and other identification cards for Georgia since 1996.

4.

Under O.C.G.A. section 50-25-1, Defendant Georgia Technology Authority ("GTA") is a body corporate and politic, an instrumentality of the state, and a Georgia public corporation.

5.

The Georgia Department of Motor Vehicle Safety ("DMVS") was created under O.C.G.A. section 40-16-2 and granted primary responsibility for, among other things, administering the laws and regulations relating to drivers' licenses. O.C.G.A. § 40-16-2(a)(2).

6.

Viisage Technology, Inc. ("Viisage") is a provider of digital identification systems. It is a Delaware corporation with its principal place of business at 296 Concord Road, Third Floor, Billerica, Massachusetts 01821. Viisage was given a Notice of Award of Contract as being determined to be the winning bidder of the procurement that is the subject of this lawsuit and subsequently signed a contract with the GTA and the DMVS.

7.

Under O.C.G.A. section 50-25-9, this Court has exclusive, original jurisdiction over this action, and venue is proper.

8.

Viisage is also subject to the personal jurisdiction of this Court.

## PRELIMINARY STATEMENT

9.

In or before spring 2002, GTA and DMVS embarked upon a plan to modernize Georgia's drivers' license and identification card system. Their stated purpose was to engage the services of a qualified and responsible vendor, experienced in providing a central issuance Digitized License System.

10.

This is an action for *de novo* judicial review of GTA and DMVS's procurement process in relation to an RFP issued by GTA on May 24, 2002, seeking a contractor to provide the services necessary to modernize Georgia's drivers' license and identification card system.

11.

Digimarc is entitled to a permanent injunction directing that GTA, DMVS and Viisage cease and forever abandon all activities related to implementation of or performance of the contract with Viisage arising out of the RFP. Digimarc is further entitled to a mandatory injunction requiring that GTA and DMVS award the contract to Digimarc. In the alternative, Digimarc is entitled to injunctive relief directing that GTA and DMVS re-bid the contract, but with the condition that GTA and DMVS are prohibited from awarding any new contract arising out of a re-bid to Viisage, in light of the clear bias exhibited by GTA and DMVS in favor of Viisage and Viisage's plainly fraudulent conduct in responding to the original RFP. Without injunctive relief in the form requested herein, Digimarc and Georgia's taxpayers will suffer immediate and irreparable harm and injury. Digimarc is also entitled to recover its bid costs as damages, and its attorneys' fees, in accordance with Georgia law.

12.

In sum, GTA and DMVS acted arbitrarily and unfairly by their failure to follow Georgia

3

law governing the procurement at issue, including applicable statutes, GTA's own rules and the specific requirements of the RFP, all of which are intended to protect the integrity of the competitive bidding process and secure the services of a qualified, responsible and experienced vendor offering the "best value" to Georgia.

13.

Despite the clear mandate in the RFP and under the GTA Rules that all Offerors should be accorded fair and equal treatment, particularly with respect to any opportunity for clarification and revision of proposals, GTA and DMVS had improper communications with Viisage and granted repeated opportunities to Viisage, and only Viisage, to improve and revise its technical proposal, including the submission of demonstrative sample cards that Viisage fraudulently claimed as its own even though it did not even know how they were manufactured, until Viisage's proposal was decreed by DMVS to be the most advantageous to Georgia. In so doing, GTA and DMVS failed to abide by the evaluation procedures set forth in the RFP, under GTA Rules, and under Georgia law.

14.

In addition, Viisage provided false and misleading information to GTA and DMVS as part of its bid which, in conjunction with the wrongful conduct of GTA and DMVS, unfairly skewed the procurement in Viisage's favor. GTA and DMVS knew or should have known that the information provided by Viisage was false, but failed to take any adverse action against Viisage because of their desire to skew the procurement in Viisage's favor.

15.

The circumstances of the arbitrary and unfair conduct by GTA/DMVS, coupled with Viisage's fraudulent conduct, inured only to Viisage's benefit and was detrimental to Digimarc. But for the wrongful conduct of GTA, DMVS and Viisage, as described herein, Viisage would

4

have been disqualified for its fraudulent conduct and failure to submit a compliant bid, and
Digimarc should have been awarded the contract at issue as the only qualified bidder left which
had submitted an acceptable proposal.

16.

In addition, despite the RFP's mandate setting forth the term of the contract to be covered
by the procurement, DMVS and GTA subsequently entered into an illegal contract that exceeded
the contractual term dictated by the RFP and which did not adhere to the conditions precedent set
forth in the Notice of Award that were required to be met before the contract became binding.

## PROCEDURAL STATUS

17.

Digimarc filed its original Verified Complaint for Temporary Restraining Order,
Interlocutory and Permanent Injunctive Relief in this action on March 5, 2003.

18.

Digimarc filed a Motion for Interlocutory Injunction on May 20, 2003.

19.

After Digimarc, GTA, and DMVS fully briefed the issues, this Court held an oral hearing
on Digimarc's Motion for Interlocutory Injunction on July 28, 2003 and subsequently entered an
Order dated July 31, 2003 temporarily enjoining GTA and DMVS from "all further activities
related to implementation of or performance under the contract dated November 12, 2002
between Viisage and DMVS, arising out of the procurement process engaged in by GTA on
behalf of DMVS in connection with the RFP until further order of this Court."

20.

On October 1, 2003, GTA and DMVS filed a Motion to Dismiss or in the Alternative to
Add an Indispensable Party, seeking an order directing Digimarc to add Viisage as a party to the

5

action.

<center>21.</center>

On November 3, 2003, the parties submitted a Consent Order agreeing that Viisage is a "necessary party" to this action, as that term is defined by Georgia law.

<center>22.</center>

Viisage has an interest in the outcome of this action such that Viisage could have intervened under O.C.G.A. Section 9-11-24 had it chosen to do so. In fact, Viisage had previously notified DMVS that it had expended monies in furtherance of the contract at issue in this case. Notwithstanding, Viisage did not voluntarily intervene.

<center>23.</center>

Nonetheless, consistent with the Consent Order agreed to by Digimarc, DMVS and GTA, on November 4, 2003, Digimarc corresponded with Viisage and offered Viisage the opportunity to join the action as a party plaintiff.

<center>24.</center>

Viisage refused to join the action as a party plaintiff.

<center>25.</center>

On November 7, 2003, this Court entered a Consent Order directing that Viisage be added as a necessary party.

<center>26.</center>

On November 12, 2003, Digimarc filed its First Amended Complaint, adding Viisage as a Necessary Party Defendant, and Viisage acknowledged service of the First Amended Complaint on November 20, 2003.

## FACTS COMMON TO ALL COUNTS

The following facts are common to all counts of this complaint:

<center>6</center>

## The RFP – A Request For Proposals For A Digitized License System

27.

On or about May 24, 2002, GTA issued RFP No. GTA000051 on DMVS's behalf.  A certified copy of the RFP was filed with this Court by Stipulation of Digimarc, GTA, and DMVS on June 17, 2003.

28.

The RFP's stated purpose was to procure the services of a qualified, responsible, and experienced vendor to provide a central issuance Digitized License System, including, among other things, photograph, signature and fingerprint capture, storage, retrieval, and document production, all based upon a firm, fixed price for each driver's license, identification card, or special identification card successfully produced.  (RFP § 1.1.)

29.

GTA decided that using competitive sealed bidding would not be practical or advantageous to Georgia in procuring the desired services.  (RFP § 1.2.)  GTA elected to conduct the Digitized License System procurement as a negotiated, solution-based solicitation. Nevertheless, the RFP stated that competitive sealed proposals were to be submitted in response to the RFP in the same manner as competitive sealed bids and that the proposals would be opened in the same manner as competitive sealed bids.  (RFP § 1.2.)

30.

The RFP established certain mandatory functional requirements, optional components, general work requirements and office space and support requirements for the Digitized License System.  (RFP § 3.3.)

31.

In addition, the RFP set forth mandatory design specifications for permanent drivers'

7

licenses, non-driver identification cards, and special identification cards and also set forth general guidelines for temporary cards that would be issued pending the issuance of the permanent cards. (RFP §§ 3.4-3.7.)

32.

The RFP required each Offeror to respond with a Technical Proposal and a separate Cost Proposal. (RFP § 4.2.) The RFP's stated criteria of evaluation was that any failure of a vendor's submitted proposal "to meet any minimum requirement will cause [a] reduction in the evaluation scoring of the Offeror's proposal." (RFP § 3.1.1 (emphasis in original).)

33.

The RFP mandated that a comprehensive, fair, and impartial evaluation of the proposals received would be conducted in the following steps:

    a.    evaluation of technical proposals;

    b.    identification of Offerors that meet the minimum technical requirements;

    c.    evaluation of price proposals;

    d.    identification of Offerors' eligibility for demonstrations;

    e.    evaluation of demonstrations; and

    f.    evaluation of proposal on the basis of technical and cost factors.

(RFP § 5.1.)

34.

The Offerors' Technical Proposals and separate Price Proposals were both due by July 19, 2002. (RFP App. A, Addendum No. 3.)

35.

The RFP mandated that evaluations of the Technical Proposals ("Phase 1") would be completed before GTA and DMVS proceeded to evaluate the Offerors' Price Proposals ("Phase

8

2"). (RFP §§ 5.1, 5.5.)

36.

The RFP mandated that "[i]ncompleteness or significant inconsistencies or inaccuracies in the Technical Proposal will result in a reduction of the evaluation rating." (RFP § 5.5.)

37.

According to the RFP, after the Price Proposals were evaluated, the Offerors would be accorded fair and equal treatment with respect to any opportunity for discussion and revision of their respective Price Proposals for the Technical Proposals that had been evaluated in Phase I. (RFP § 5.6.)

**Offerors' Initial Responses and Problems with Unequal Treatment**

38.

On July 19, 2002, three Offerors presented their bid proposals to GTA in response to the RFP: Digimarc, Viisage, and SoftLEAD, Inc.

39.

After receipt of the Offerors bid proposals, GTA distributed copies of only the Offerors' Technical Proposals to an evaluation team comprised of GTA and DMVS representatives ("the Evaluation Team") on or about July 22, 2002. GTA withheld the Price Proposals from distribution, consistent with the requirements of a two-step procurement under GTA Rules.

40.

The Evaluation Team then met at Unicoi State Park during the week of July 29, 2002 and reviewed the Offeror's Technical Proposals.

41.

GTA and DMVS utilized a "trade off" or "ranking" method of source selection, which permits "communications" to establish competitive ranges or negotiations, and final price

9

adjustments or best and final offers.  (RFP § 5.6; GTA Rule 665-2-4-.02(a)(9)(ii).)

42.

"Communications" are defined under the Rules, however, "as exchanges between the state and Offerors after receipt of offers to address issues of past performance, to enhance the state's understanding of offers, to allow reasonable interpretation of the offer, or to facilitate the state's evaluation process." (GTA Rule 665-2-1-.02(f).)  The Rules specifically state that "[c]ommunications shall not be used to cure material omissions in the offer."  (GTA Rule 665-2-1-.02(f).)

43.

From the beginning of the evaluation process, significant problems developed in regard to GTA and DMVS's compliance with the requirements of the RFP and applicable procurement laws, including GTA Rules, resulting in substantially unequal and otherwise illegal disparities in the treatment of the Offerors, as described in detail below.

44.

For example, in violation of the evaluation steps set forth in RFP § 5.1, mandating that Phase 1 technical evaluations be completed before proceeding to evaluate the Offerors' respective price proposals, by July 31, 2002, GTA and DMVS representatives had already opened the Offerors' Price Proposals even though they had not completed the technical evaluations.

45.

This review of prices revealed that Viisage's initial price proposal per card was 65% lower than anyone else's proposed price.

46.

In addition to prematurely reviewing the Offerors' Price Proposals, GTA and DMVS

10

further violated the required procedures governing the procurement, resulting in significant

disparity in the treatment of Viisage and Digimarc with respect to a variety of issues. The first of

these issues is the evaluation of temporary and permanent drivers' licenses, non-driver

identification cards and special identification cards (hereinafter sometimes referred to

collectively as "ID Cards"), as further set forth below.

### Temporary and Permanent Licenses

47.

The RFP required the Offerors to submit sample ID Cards for evaluation at the time that

they filed their Technical Proposal, on July 19, 2002. (RFP §3.6.1.2.)

48.

Moreover, the RFP and subsequent communications by GTA and DMVS mandated to all

Offerors that all such card samples had to be "production quality" – meaning that all samples had

to be produced using the same methods, materials, equipment, and specifications as what is

being proposed to Georgia.

49.

As part of the technical submission for the permanent ID Cards, the RFP mandated that

the Offeror's proposed permanent ID Cards "**must** be verified to meet AAMVA testing

standards by a certified testing lab and the results **must** accompany the Offeror's proposal."

(RFP § 3.5.4.3 (emphasis in original).) Moreover, the RFP mandated that "DMVS shall conduct

independent testing of sample documents." (RFP § 3.5.4.3.)

50.

Included with the proposals of Viisage and Digimarc were their respective independent

lab tests for the permanent ID Cards that each was offering, as mandated by sections 3.5-3.7 of

the RFP.

11

51.

In its Proposal dated July 19, 2002, Viisage proposed to offer a permanent card that was a 10/10/10 Polyester/Teslin/Polyester card design. In other words, that it was a card design in which two layers of Polyester laminate 10 millimeters in thickness sandwiched a 10 millimeter thick sheet of Teslin upon which the variable information of each ID would be printed. The mandatory independent test report provided by Viisage for its July 19, 2002 permanent card proposal was for this specific card structure.

52.

Viisage's sample permanent ID Cards that it proposed as part of its July 19, 2002 Technical Proposal were defective from the start. In sum, GTA's and DMVS's testing found two critical flaws in Viisage's permanent ID samples: (1) the lamination on the ID Cards was easily removed by simply peeling off the laminate, such that the printed information on the ID Cards could then be altered and re-assembled without detection; and (2) the samples could not withstand minimum solvent strength tests.

53.

In violation of GTA Rules 665-2-4-.06 and .07, and despite the fact that all samples were to have been provided with the Technical Proposal, GTA wrote to Viisage in an e-mail dated August 1, 2002 (in the guise of a "clarification") and notified Viisage of the specific deficiencies with its temporary and permanent card proposals.

54.

No similar communication was made with either of the other Offerors.

55.

Further, in the same e-mail, GTA requested that Viisage submit additional sample cards to GTA for evaluation by August 6, 2002.

56.

No similar opportunity was granted to any other Offeror during this time frame.

57.

However, after receiving notification from the GTA that its cards failed, Viisage's own review of its permanent card samples also revealed that the card design and method of production that it had used to make its permanent card samples did, indeed, result in the cards being able to be easily peeled apart such that tampering easily could take place. So, rather than adhere to the GTA's request for new permanent card samples which would still just fall apart, Viisage instead wrote to the GTA and made a hollow promise that "Viisage guarantees that the production overlay prepared for Georgia will meet the durability and security requirements of the State as identified in the RFP in general and Section 3.5.4 (below) in particular."

58.

Rather than just dismiss Viisage's proposal completely, DMVS then prepared and delivered to GTA a report detailing its concerns with both the permanent and temporary ID Cards proposed by Viisage. The report reaffirmed that it was easy to tamper with the permanent ID Cards proposed by Viisage because the laminate could be removed, permitting the information on the card to be altered.

59.

DMVS also included in this report a token statement that the Digimarc permanent card sample could be broken into two separate pieces after being repeatedly folded. However, this statement regarding the durability of Digimarc's permanent card was relevant to the evaluation of Digimarc's proposal. Any material that is repeatedly bent will break. The RFP had not mandated that the cards had to be indestructible. Rather, the permanent ID Card samples tendered by Digimarc to GTA and DMVS complied with industry standards for flexing without

13

fracture as well as all of the other applicable durability standards set forth in the RFP.

60.

On August 9, 2002, GTA informed the Offerors of a purported "clarification" meeting to be conducted on August 14, 2002 to discuss certain stated shortcomings in the durability and security standards for both the temporary and permanent ID Card samples presented by the Offerors. However, although Viisage had been made specifically aware of issues with both the durability and security of Viisage's card solutions, the only issue that had even been raised by GTA and DMVS with respect to Digimarc's permanent card solution was the issue of breaking in response to repeated bending – a durability issue.

61.

Importantly, at this point in time, Viisage was aware of exactly what deficiencies DMVS had identified with Viisage's proposed card solutions. Digimarc, however, was not given similar information.

62.

GTA then held an oral "clarification" meeting with all three Offerors on August 14, 2002. At the meeting, GTA requested what it termed "supplemental information" and mandated that each Offeror submit 18 additional production quality permanent and temporary card samples by August 26, 2002. At this point in time, there had been no problem identified with the security of Digimarc's permanent card solution, but Digimarc was nonetheless told that DMVS had identified problems with durability and security of all categories of cards for all vendors.

63.

At the August 14, 2002 meeting, GTA and DMVS also stated that all of the Offerors' proposed temporary ID Cards had failed to pass DMVS's undisclosed testing procedures for these samples. DMVS disclosed the type of testing agents that had been applied to the

14

temporary ID Cards, but it did not disclose how the testing agents had been applied. Instead, DMVS simply requested that the Offerors "be creative" and submit new, temporary ID Card samples by August 26, 2002 that might pass DMVS's undisclosed testing techniques. Moreover, the parties were told during this meeting that they could submit a temporary solution that was on a medium other than paper.

64.

Digimarc then timely provided additional samples of proposed permanent and temporary ID Card samples by GTA's deadline of August 26, 2002. In its submission of additional samples, Digimarc submitted additional, production quality, permanent card samples using the card design as originally proposed by it on July 19, 2002 and noted that it could not find any problem with its permanent cards in its subsequent testing. Based upon the request of the DMVS to submit a different temporary card design than the Offerors had first submitted on July 19, Digimarc provided a new proposal for a new temporary card design along with production quality samples of the temporary cards.

65.

DMVS evaluated Digimarc's proposed permanent and temporary ID Card solutions and rated both sample sets and solutions as "acceptable."

66.

Viisage's August 26 submission, on the other hand, was deficient in several respects, and those deficiencies were communicated to Viisage in violation of GTA Rules.

67.

In spite of the fact that July 19, 2002 was the mandatory deadline for when Technical Proposals were due, Viisage, without any authority to do so, substantially changed its Technical Proposal for its permanent card design with its August 26, 2002 proposal. Its permanent ID

15

Cards design changed from its once proposed 10/10/10 Polyester/Teslin/Polyester card structure to a new card structure of 6/14/10 Confirm/Teslin/Polyester. With this new Technical Proposal, Viisage did not submit any verification that the cards that it submitted as production quality samples along with this revised Technical Proposal had been verified to meet AAMVA testing standards by a certified testing lab even though this was a requirement of the RFP.

68.

These new permanent cards samples that Viisage provided with its wholly new Technical Proposal for permanent ID cards, however, also immediately failed testing by the DMVS. These cards were so poorly made that they too had their lamination removed intact with very little effort.

69.

In violation of the GTA Rules and the RFP's deadlines, Viisage was given, yet again, another opportunity to submit new permanent card samples.

70.

Also in violation of GTA Rules and the RFP's deadlines, GTA again gave Viisage yet another opportunity to submit samples of its temporary card samples because the temporary card samples provided on August 26 by Viisage were not production quality cards that could be tested by the GTA and the DMVS, a deadline extension that had not been offered to any of the other Offerors.

71.

GTA did not provide Digimarc with any notice or indication that any part of its Technical Proposal that might have been deemed unsatisfactory by GTA and DMVS could be modified or provided late.

16

72.

Viisage submitted its sample documents after the expiration of the August 26 deadline. In desperation, Viisage arranged for new permanent card samples to be submitted on August 29, 2002 that were, in fact, New York State drivers' licenses that were neither made by Viisage nor did Viisage even know how they were obtained. Production quality temporary cards were not provided by Viisage until September 3, 2002 -- over a week after the original deadline for providing these card samples.

73.

Viisage represented that its sample permanent ID cards, belatedly submitted in support of its August 26 Technical Proposal, were production quality even though they were New York drivers' licenses which are made by a competitor to Viisage.

74.

In truth, Viisage failed to comply with the requirement to submit production quality permanent cards.

75.

The permanent card samples it submitted did not match the card design set forth in Viisage's revised Technical Proposal.

76.

Moreover, Viisage did not know how to manufacture cards like the permanent sample cards it submitted as production quality cards nor did it know how these sample cards were manufactured. Viisage knew that its representation to the State that its permanent sample cards were production quality was materially false.

77.

DMVS, rather than seek to learn how Viisage came into the possession of New York

17

State drivers' licenses such that they could be submitted as Viisage's samples, chose instead to find these New York State card samples as acceptable and then simply relied upon Viisage's unsupported, undemonstrated position that the permanent samples provided were an accurate reflection of the cards that they would provide for Georgia.

<center>78.</center>

As of August 29, Digimarc was the only vendor who had submitted permanent and temporary card solutions that had been deemed "acceptable" by the Evaluation Team. As of this date, even though Viisage had submitted samples of permanent cards that it falsely represented as production quality, it had still not submitted samples of temporary cards that even appeared to meet the requirements set forth by the State.

<center>79.</center>

Nonetheless, even though Digimarc had submitted permanent and temporary card solutions that had been deemed "acceptable" by the Evaluation Team, the Team decided to wait until after Viisage submitted its late temporary card samples before making a recommendation to the DMVS Commissioner regarding a winning bidder. The Evaluation Team informed the Commissioner, however, that as soon as Viisage submitted its sample temporary cards, the Evaluation Team would make an immediate recommendation as to which bidder would be the apparent winner.

<center>80.</center>

However, when the Evaluation Team reviewed Viisage's late-submitted temporary card samples, it found them unacceptable and decided not to make a recommendation. Instead, after Viisage's temporary cards were deemed unacceptable by the Evaluation Team, the Evaluation Team changed the rating criteria and changed the rating of Digimarc's temporary card solutions from "acceptable" to "unacceptable."

<center>18</center>

81.

Subsequently, GTA/DMVS decided to ask for a demonstration under RFP section 5.5.2 and the applicable GTA Rules.

82.

GTA then issued a September 16, 2002 e-mail to all vendors which misled Digimarc into changing its temporary document solution from the solution that had previously been rated "acceptable" to another solution.

83.

Digimarc and Viisage then performed demonstrations on September 26 and 27, after which Viisage temporary card solutions were deemed "acceptable" and Digimarc temporary card solutions were deemed "unacceptable" by the Evaluation Team.

**Best And Final Offer**

84.

On October 8, 2002, GTA forwarded Digimarc and Viisage a detailed request for a Best and Final Offer to be received by GTA no later than October 15, 2002.

85.

By October 8, however, DMVS had already determined that Viisage was the apparent winner, and the only purpose of BAFO was to attempt to drive Viisage's price down.

86.

Digimarc responded with its Best and Final Offer on October 15, 2002.

87.

Viisage also responded with its Best and Final Offer on or about October 15, 2002.

88.

As part of its Best and Final Offer, Digimarc revised its formulation for the temporary ID

19

Cards to meet or exceed the standards tested by DMVS at the September demonstration.

Digimarc provided GTA and DMVS with modified temporary ID Card samples for testing

purposes. In contrast to the repeated opportunities given to Viisage, however, GTA and DMVS

declined to test Digimarc's new samples.

<div align="center">89.</div>

On October 22, 2002, DMVS Business Analyst George Theobald notified Charles Nixon,

GTA Contracting Officer for the RFP, as follows:

> DMVS has identified the proposal that initially appears to be most
> advantageous to the state, and we would like to begin the process
> of negotiating a contract. As part of this process, we would like to
> validate our technical findings with this Offeror during
> negotiations. Although a brief demonstration was held with each
> Offeror last [sic] month, it was limited to the issuance of a
> Temporary Document and it did not cover some of the other
> critical capabilities needed in the new system. To adequately verify
> our decision, more extensive demonstrations and discussions of the
> proposed solution by the Offeror will be necessary.

Theobald's communication continued by listing minimum requirements for at least four

presentations to be conducted by "this Offeror" only.

<div align="center">90.</div>

On October 23, 2002, DMVS sent to GTA a draft evaluation result of Digimarc that was

still a "work in progress," but showing that DMVS had elected not to test the revised samples of

Digimarc's temporary ID Cards.

<div align="center">91.</div>

On October 28, 2002, prior to any proposed presentation by Viisage, DMVS

Commissioner Tim Burgess sent a letter to Michael McClearn, Procurement Director of GTA,

informing McClearn that Viisage was the "apparent winner" of this RFP.

<div align="center">20</div>

92.

Burgess requested a prompt demonstration of Viisage's complete system and,

"[a]ssuming a successful demonstration," asked to begin contract negotiations immediately.

93.

On October 28, 2002, McClearn told Burgess that GTA:

> would prefer to treat the final demonstration and the negotiations
> as separate events. Once they have satisfied DMVS with an
> acceptable demo [Nixon] will be prepared to give them a letter,
> notifying them that they are the apparent winner and immediately
> invite them to enter into negotiations to finalize the contract. I
> think this will expedite the process. Of course, all of this will
> remain closed and confidential until the ink is dry on the contract.

94.

Despite the selection of the apparent winner of the RFP, Theobald expressed the

following concerns to Nixon:

> As part of [the contract negotiations] process, we would like to
> validate our technical findings with this Offeror during
> negotiations. Although a brief demonstration was held with each
> Offeror last last (sic) month, it was limited to the issuance of a
> Temporary Document and it did not cover some of the other
> critical capabilities needed in the new system. To adequately verify
> our decision, more extensive demonstrations and discussions of the
> proposed solution by the Offeror will be necessary.

95.

GTA requested that Viisage perform an additional demonstration because "DMVS/GTA

wants to be sure that the vendor selected can deliver all requirements on time and problem free.

DMVS/GTA wants a demonstration that would show all requirements to assure that the vendor

can meet the delivery schedule."

96.

GTA/DMVS did not request that Digimarc make any similar, additional demonstration.

21

97.

Even before Viisage's additional demonstration, however, GTA/DMVS and Viisage commenced contract negotiations. GTA and DMVS provided Viisage with a draft procurement contract on October 30, 2002.

98.

In fact, prior to entering into contract negotiations with Viisage, GTA had not even been made fully aware of DMVS's final scoring of the Offerors' proposals, as DMVS did not send GTA the final score sheets of the evaluations of the Offerors until November 6, 2002.

99.

Then, on November 7, 2002, Viisage indicated that it wanted to change its Technical Proposal again. On this date, Viisage informed GTA of a material change in its proposed Point of Sale software proposal. Viisage sought permission to replace its proposed vendor for the Point of Sale software with CenterStage, a vendor with whom Viisage had no contract or even any background information on CenterStage.

100.

DMVS agreed to this change, but required that Viisage re-submit the portion of its Technical Proposal that related to the change to CenterStage for evaluation.

101.

On November 7, 2002, Viisage forwarded GTA executed copies of both the drivers' license contract and the software escrow agreement.

102.

GTA and DMVS provided Viisage an opportunity to make an additional demonstration to the evaluation team on November 12, 2002. Upon information and belief, Viisage performed the requested demonstration that included capturing information for making permanent card samples

but did not, in fact, provide any permanent card samples during this demonstration.

103.

Because Viisage did not deliver its revised Technical Proposal, reflecting a change in its POS software provider, until November 12, it was not evaluated by the Evaluation Team until, at the earliest, the same day as the November 12 demonstration.

104.

On November 12, 2002, GTA provided Viisage with a Notice of Award, and DMVS and GTA then signed a contract with Viisage on the very same day.

105.

Thereafter, Viisage's permanent card samples that were delivered to DMVS after already having received the contract did not match Viisage's Technical Proposal and were not the same card design as the New York State drivers' license card samples that DMVS had found acceptable.

106.

Ultimately, the preferences granted to Viisage, as described above and as further described below, contributed to the conclusion by GTA and DMVS that "[a]ll 'Unsatisfactory' ratings identified during the evaluation of the initial proposal were rectified during the resubmission and clarification phases."

107.

But Digimarc was not made aware of or granted the same opportunity by GTA and DMVS to demonstrate or to rectify any unsatisfactory ratings, either before or after Digimarc's Best and Final Offer.

108.

As noted above, a number of Viisage's unsatisfactory ratings dealt with the actual failure

of performance tests relating to Viisage's proposal for permanent ID Cards. Viisage was also granted substantial preferences in its opportunities to cure defects with respect to temporary ID Cards. These elements of the RFP comprised critical portions of the central issuance system.

109.

In fact, the August 2002 Viisage permanent ID card samples submitted by Viisage and selected by GTA/DMVS as the winning card design were not even manufactured by Viisage.

110.

The August 2002 Viisage permanent ID card samples selected by GTA/DMVS as the winning card design were, in fact, cards from the New York State drivers' license program, which was a State program under contract with another vendor - De La Rue.

111.

Viisage's August 2002 permanent ID Card samples, therefore, did not represent Viisage's "proposed means of production," as submitted by Viisage to GTA and DMVS as its final permanent ID Card design.

112.

As such, Viisage never demonstrated the capability to produce the most important aspect of Georgia's Digitized License System: a card that was durable and that could not easily be tampered with.

113.

Prior to awarding the contract to Viisage, GTA and DMVS were aware that Viisage had not manufactured the New York drivers' license samples provided by Viisage.

114.

Prior to awarding the contract to Viisage, GTA and DMVS failed to investigate the circumstances behind how Viisage had obtained the New York drivers' license samples that

24

Viisage had submitted.

115.

In fact, GTA and DMVS elected not to subject the Viisage permanent ID Cards (submitted on August 29, 2002) for testing and evaluation.

116.

As such, because GTA and DMVS failed to conduct their own testing or to adhere to the RFP requirements that the samples submitted be production quality samples produced by the same method of production actually proposed by Viisage, GTA and DMVS had no way of knowing if the newly proposed card structures and samples would meet the RFP's durability requirements.

117.

The preferential treatment granted by GTA and DMVS to Viisage by allowing Viisage multiple opportunities to cure defects in its proposals violated the express terms of the RFP and the GTA Rules, which mandated that all Offerors should be accorded fair and equal treatment, particularly with respect to any opportunity for discussion and revision of proposals. (RFP § 5.6.) This error resulted in Viisage being wrongfully awarded the contract at issue.

### Price Realism Analysis

118.

As defined in Appendix D of the RFP, the term "evaluation" means:

> The in-depth review and analysis of Offeror's proposals. It involves the application of judgment to the Offeror's proposed price and performance using the express evaluation factors and criteria in the solicitation and the procedures outlined herein. The purpose of evaluation is to identify deficiencies, omissions, and need for clarification in proposals, determine the existence of price and technical realism, and discriminate among proposals as to which best meets the acquisition objectives so that an appropriate selection and award is made.

(RFP App. D (emphasis added).)

119.

Accordingly, the RFP mandated that, as part of its evaluation of any Technical Proposal and Cost Proposal, GTA and DMVS were required to conduct a price and technical realism analysis to determine if the proposed price had a sound economic basis in relation to the Technical Proposal and, thereby, to ensure that Georgia did not risk the ongoing viability of the Digitized License System by awarding the procurement contract to a vendor operating at a loss or selling a product/service at a less than sustainable margin.

120.

Price proposals were also to be evaluated not only in terms of the overall price to Georgia but also the relative value offered by Offeror's price for the services that will actually be rendered.  (RFP § 5.3.)

121.

Absent price and technical realism analysis, however, it would be impossible for GTA or DMVS to determine if Viisage's proposed price covered the costs associated with card production and represented the overall "best value" for Georgia.

122.

Neither GTA nor DMVS conducted any such analysis of Viisage's proposals to determine if Viisage's proposed price covered the costs associated with Viisage's obligations under the contract.

123.

Viisage's final, accepted price per ID Card was $1.009.  Upon information and belief, this Viisage price per card was below the estimated total cost to Viisage under the contract. Upon information and belief, Viisage's total loss will be approximately $7.5 million over the

term of the contract with DMVS, assuming all extensions are taken by the State and without any future add-ons or change orders to the contract.

124.

As an example of the complete disconnect of the Viisage price from reality is Viisage's proposed price per card if the ID Cards are issued from Viisage's own building. For a facility with a minimum square footage requirement of 4,800 square feet, Viisage's proposed price differential per card had been only 1 cent.

125.

In order to provide an offsite factory, Viisage would need to build or lease a building, specially modify it into a totally secure building, and then to also operate and insure it each year, all for a total amount of less than $0.43 per square foot per month.

126.

GTA and DMVS failed to perform the requisite price and technical realism analysis to determine if Viisage will reasonably be able to perform its obligations if it were awarded a contract for the services sought by the RFP.

127.

These errors resulted in Viisage having been wrongfully awarded the contract at issue.

### Back-Up Production Facilities

128.

GTA and DMVS also erred with respect to Viisage's proposal regarding a back-up card production facility for use in the event the Central Production Facility is compromised.

129.

The need to have a back-up production facility was an area that the State had particularly stressed was of importance to the State in the event that the central production facility proposed

by the Offerors should ever become inoperative.

<div align="center">130.</div>

Viisage, however, failed to propose a satisfactory solution for a back-up card production facility for use in the event the Central Production Facility is compromised.

<div align="center">131.</div>

In its RFP response, Viisage proposed the following: "In addition to providing a secure, fault-tolerate solution for central printing, Viisage has made arrangements with Arthur Blank and Company to use their card printing facility as a backup, in case of disaster at the permanent facility in Georgia. In case of failure at the Central Production Facility that causes significant downtime in card production, Viisage will produce the cards off-site. Viisage will develop security processes to ensure that all consumables and finished documents are under reasonable protection throughout the duration of the emergency."

<div align="center">132.</div>

Viisage, however, never had an agreement or even a basic understanding with Arthur Blank and Company under which Arthur Blank and Company would provide back-up card production services, as required by the RFP.

<div align="center">133.</div>

Viisage failed to provide reasonable proof in its RFP response that Arthur Blank and Company had the equipment, experience, servers and/or the security items needed to produce the ID Cards in the event the central facility were compromised. In fact, Arthur Blank and Company does not have the equipment to produce drivers' licenses for the State. As such, to this present day Viisage still has not obtained any agreement with Arthur Blank and Company to provide any back-up services for Viisage whatsoever in connection with Georgia.

<div align="center">28</div>

134.

In spite of this, Viisage was not given a corresponding adverse evaluation by DMVS.

135.

This failure constitutes a significant error in the procurement process, which resulted in a wrongful award of the contract to Viisage.

136.

In fact, Viisage's representation that it had "made arrangements with Arthur Blank and Company to use their card printing facility as a backup" was materially false and intentionally intended to mislead the State.

137.

After award of the contract, Viisage undertook to find a vendor in Georgia that could provide back-up card production facilities because, when Viisage finally began discussions with Arthur Blank and Company about what Arthur Blank and Company could do and would charge Viisage to act as a back-up card production facility, Arthur Blank and Company's pricing proposal was viewed by Viisage as outrageously high. Even then, Viisage still has never gotten any company to agree to provide back-up production services for Viisage for the State of Georgia's program akin to what Viisage had proposed in its proposal.

138.

As a result, Viisage's price proposal completely failed to take into account the actual cost of providing for back-up card production facilities and, as a result, was intentionally understated.

**Term of the Contract and Provision of Performance Bond**

139.

Under the terms of the RFP, any contract to be awarded was to be for the first year through June 30, 2003, with an option for five additional one-year periods.

140.

Accordingly, the November 12, 2002 contract that Viisage received should have provided that its first expiration date would be on June 30, 2003.

141.

The terms of the actual signed contract provided, however, that the first expiration would be on June 30, 2004.

142.

This is a material, illegal extension of the terms of the first contract, which, pursuant to the RFP, should have an annual expiration date ending on June 30, 2003.

143.

The November 12, 2002 contract that Viisage received required that a performance bond had to be provided by Viisage for the duration of the contract (*i.e.*, June 30, 2004).

144.

The Notice of Award also required that Viisage had to provide the required performance bond before the contract would take effect.

145.

Viisage, however, did not deliver a performance bond with an expiration date past November 12, 2003 to cover the full term of the contract, which has an expiration date of June 30, 2004. Such failure to provide the required term of the performance bond was, upon information and belief, grounded upon the fact that Viisage could not afford to provide a bond with a term of over a year.

### Digimarc's Protest of GTA's Decision

146.

On November 26, 2002, in accordance with GTA Rule 665-2-11-.07 and by virtue of GTA's grant of a Protest filing deadline extension, Digimarc filed its protest to GTA's award of the contract to Viisage (the "Protest").

147.

On February 17, 2003, the Protest Decisionmaker for GTA denied Digimarc's Bid Protest, relying in part on the inaccurate information provided to him by individuals from GTA, DMVS and Viisage.

### COUNT I
### (PERMANENT INJUNCTIVE RELIEF – VIOLATION OF THE TERMS OF THE RFP)

148.

Digimarc incorporates Paragraphs 1 through 147, as if fully set forth herein.

149.

By acting in the manner described in this Complaint, GTA and DMVS have violated and are violating the terms of the RFP.

150.

Unless GTA, DMVS and Viisage are restrained from proceeding with the implementation of the November 12, 2002 contract with Viisage, Digimarc and the Georgia taxpayers will suffer immediate and irreparable harm and injury. Among other things, the bias demonstrated by GTA and DMVS in favor of Viisage damaged the integrity of the bid process, which harmful conduct was exacerbated by the fact that Viisage provided false information in response to the RFP, with the intention of misleading GTA and DMVS, further undermining the integrity of the bid process. In order to rectify this harm to Digimarc and the Georgia taxpayers, this Court should

issue a preliminary and permanent injunction mandating that GTA and DMVS disqualify Viisage under the RFP and further preventing GTA and DMVS from conferring any benefit upon Viisage whatsoever in connection with the November 12, 2002 contract, the RFP or any re-bid of the contract for the Digitized License System, in the event that this Court orders a re-bid in response to Digimarc's claims.

### 151.

Moreover, because Viisage should have been disqualified under the RFP and, but for the State's unlawful conduct as described above, Digimarc would have been the only vendor to submit a proposal deemed acceptable by GTA and DMVS, Digimarc should have been awarded the contract in the first instance. Because sending the contract back out to bid opens Digimarc up to competition again, even though Digimarc was the only bidder to submit an acceptable bid, sending the contract back out to bid is not an adequate remedy at law.

### 152.

Digimarc is entitled to a permanent injunction restraining and enjoining GTA, DMVS and Viisage and their officers, employees, agents, attorneys, affiliates, and all others acting in concert with them from proceeding with the implementation or the performance of the contract awarded, or conferring any benefit whatsoever for Viisage's response to Georgia Technology Authority Request for Proposal No. GTA000051. Moreover, Digimarc is entitled to a mandatory injunction directing GTA and DMVS to award the contract to Digimarc or, in the alternative, to re-bid the Contract on the condition that any such re-bid contract cannot be awarded to Viisage.

### COUNT II
### (PERMANENT INJUNCTIVE RELIEF – VIOLATION GTA RULES

### 153.

Digimarc incorporates Paragraphs 1 through 147, as if fully set forth herein.

154.

By acting in the manner described in this Complaint, GTA and DMVS have violated and are violating numerous rules governing GTA procurements, including but not limited to: 665-2-1-.01(f); 665-2-4-.02(a)(8); 665-2-4-.02(a)(9)(ii); 665-2-4-.02(b); 665-2-4-.06; 665-2-4-.07.

155.

Unless GTA, DMVS and Viisage are restrained from proceeding with any implementation or recognition of the November 12, 2002 contract with Viisage, Digimarc and the Georgia taxpayers will suffer immediate and irreparable harm and injury. Among other things, the bias demonstrated by GTA and DMVS in favor of Viisage damaged the integrity of the bid process, which harmful conduct was exacerbated by the fact that Viisage intentionally provided false information in response to the RFP, with the intention of misleading GTA and DMVS, further undermining the integrity of the bid process. In order to rectify this harm to Digimarc and the Georgia taxpayers, this Court should issue a preliminary and permanent injunction mandating that GTA and DMVS disqualify Viisage under the RFP and further preventing GTA and DMVS from conferring any benefit upon Viisage whatsoever in connection with the November 12, 2002 contract, the RFP or any re-bid of the contract for the Digitized License System, in the event that this Court orders a re-bid in response to Digimarc's claims.

156.

Moreover, because Viisage should have been disqualified under the RFP and, but for the State's unlawful conduct as described above, Digimarc would have been the only vendor to submit a proposal deemed acceptable by GTA and DMVS, Digimarc should have been awarded the contract in the first instance. Because sending the contract back out to bid opens Digimarc up to competition again, even though Digimarc was the only bidder to submit an acceptable bid, sending the contract back out to bid is not an adequate remedy at law.

33

157.

Digimarc is entitled to a permanent injunction restraining and enjoining GTA, DMVS and Viisage and their officers, employees, agents, attorneys, affiliates, and all others acting in concert with them from proceeding with the implementation or the performance of the contract awarded, or conferring any benefit whatsoever for Viisage's response to Georgia Technology Authority Request for Proposal No. GTA000051. Moreover, Digimarc is entitled to a mandatory injunction directing GTA and DMVS to award the contract to Digimarc or, in the alternative, to re-bid the Contract on the condition that any such re-bid contract cannot be awarded to Viisage.

## COUNT III
### (PERMANENT INJUNCTIVE RELIEF – VIOLATION OF O.C.G.A. § 50-25-7.3(5))

158.

Digimarc incorporates Paragraphs 1 through 147, as if fully set forth herein.

159.

By acting in the manner described in this Complaint, GTA and DMVS have violated and are violating provisions of the Official Code of Georgia, including O.C.G.A. § 50-25-7.3(5), which states, "[t]he terms of the request for proposals or bids may allow for discussions or revisions but shall provide for fair and equal treatment of all vendors."

160.

Unless GTA, DMVS and Viisage are restrained from proceeding with the implementation of the November 12, 2002 contract with Viisage, Digimarc and the Georgia taxpayers will suffer immediate and irreparable harm and injury. Among other things, the bias demonstrated by GTA and DMVS in favor of Viisage damaged the integrity of the bid process, which harmful conduct was exacerbated by the fact that Viisage intentionally provided false information in response to the RFP, with the intention of misleading GTA and DMVS, further undermining the integrity of

34

the bid process. In order to rectify this harm to Digimarc and the Georgia taxpayers, this Court should issue a preliminary and permanent injunction mandating that GTA and DMVS disqualify Viisage under the RFP and further preventing GTA and DMVS from conferring any benefit upon Viisage whatsoever in connection with the November 12, 2002 contract, the RFP or any re-bid of the contract for the Digitized License System, in the event that this Court orders a re-bid in response to Digimarc's claims.

<div align="center">161.</div>

Moreover, because Viisage should have been disqualified under the RFP and, but for the State's unlawful conduct as described above, Digimarc would have been the only vendor to submit a proposal deemed acceptable by GTA and DMVS, Digimarc should have been awarded the contract in the first instance. Because sending the contract back out to bid opens Digimarc up to competition again, even though Digimarc was the only bidder to submit an acceptable bid, sending the contract back out to bid is not an adequate remedy at law.

<div align="center">162.</div>

Digimarc is entitled to a permanent injunction restraining and enjoining GTA, DMVS and Viisage and their officers, employees, agents, attorneys, affiliates, and all others acting in concert with them from proceeding with the implementation or the performance of the contract awarded, or conferring any benefit whatsoever for Viisage's response to Georgia Technology Authority Request for Proposal No. GTA000051. Moreover, Digimarc is entitled to a mandatory injunction directing GTA and DMVS to award the contract to Digimarc or, in the alternative, to re-bid the Contract on the condition that any such re-bid contract cannot be awarded to Viisage.

<div align="center">35</div>

## COUNT IV
### (PERMANENT INJUNCTIVE RELIEF – VIOLATION OF O.C.G.A. § 50-25-7.3(6))

163.

Digimarc incorporates Paragraphs 1 through 147, as if fully set forth herein.

164.

By acting in the manner described in this Complaint, GTA and DMVS have violated and are violating provisions of the Official Code of Georgia, including O.C.G.A. § 50-25-7.3(6), which states:

> The award shall be made to the responsible vendor or vendors complying with the technology and architecture standards and policies of the [GTA] whose proposal or bid was timely and is determined in writing to be the most advantageous to the state, taking into consideration the evaluation factors set forth in the request for proposals or bids. No other factors or criteria shall be used in the evaluation.

165.

Unless GTA, DMVS and Viisage are restrained from proceeding with the implementation of the November 12, 2002 contract with Viisage, Digimarc and the Georgia taxpayers will suffer immediate and irreparable harm and injury. Among other things, the bias demonstrated by GTA and DMVS in favor of Viisage damaged the integrity of the bid process, which harmful conduct was exacerbated by the fact that Viisage intentionally provided false information in response to the RFP, with the intention of misleading GTA and DMVS, further undermining the integrity of the bid process. In order to rectify this harm to Digimarc and the Georgia taxpayers, this Court should issue a preliminary and permanent injunction mandating that GTA and DMVS disqualify Viisage under the RFP and further preventing GTA and DMVS from conferring any benefit upon Viisage whatsoever in connection with the November 12, 2002 contract, the RFP or any re-bid of the contract for the Digitized License System, in the event that this Court orders a re-bid in

36

response to Digimarc's claims.

<div align="center">166.</div>

Moreover, because Viisage should have been disqualified under the RFP and, but for the State's unlawful conduct as described above, Digimarc would have been the only vendor to submit a proposal deemed acceptable by GTA and DMVS, Digimarc should have been awarded the contract in the first instance. Because sending the contract back out to bid opens Digimarc up to competition again, even though Digimarc was the only bidder to submit an acceptable bid, sending the contract back out to bid is not an adequate remedy at law.

<div align="center">167.</div>

Digimarc is entitled to a permanent injunction restraining and enjoining GTA, DMVS and Viisage and their officers, employees, agents, attorneys, affiliates, and all others acting in concert with them from proceeding with the implementation or the performance of the contract awarded, or conferring any benefit whatsoever for Viisage's response to Georgia Technology Authority Request for Proposal No. GTA000051. Moreover, Digimarc is entitled to a mandatory injunction directing GTA and DMVS to award the contract to Digimarc or, in the alternative, to re-bid the Contract on the condition that any such re-bid contract cannot be awarded to Viisage.

<div align="center">

**COUNT V**
**(PERMANENT INJUNCTIVE RELIEF – VIOLATION**
**OF O.C.G.A. §§ 50-25-1(C), (C)(4)-(5))**

</div>

<div align="center">168.</div>

Digimarc incorporates Paragraphs 1 through 147, as if fully set forth herein.

<div align="center">169.</div>

By acting in the manner described in this Complaint, GTA and DMVS have violated and are violating provisions of the Official Code of Georgia, including O.C.G.A. § 50-25-1(c), (c)(4), and (c)(5) which state:

<div align="center">37</div>

(c) The purpose of the [GTA] shall be to provide for procurement
of technology resources, technology enterprise management, and
technology portfolio management . . . on such terms and conditions
as may be determined to be in the best interest of the state in light
of the following factors: . . . (4) Cost savings to the state through
efficiency in the provision of public information; and (5) Such
other factors as are in the public interest of the state and will
promote the public health and welfare.

170.

Unless GTA, DMVS and Viisage are restrained from proceeding with the implementation
of the November 12, 2002 contract with Viisage, Digimarc and the Georgia taxpayers will suffer
immediate and irreparable harm and injury. Among other things, the bias demonstrated by GTA
and DMVS in favor of Viisage damaged the integrity of the bid process, which harmful conduct
was exacerbated by the fact that Viisage provided false information in response to the RFP, with
the intention of misleading GTA and DMVS, further undermining the integrity of the bid
process. In order to rectify this harm to Digimarc and the Georgia taxpayers, this Court should
issue a preliminary and permanent injunction mandating that GTA and DMVS disqualify Viisage
under the RFP and further preventing GTA and DMVS from conferring any benefit upon Viisage
whatsoever in connection with the November 12, 2002 contract, the RFP or any re-bid of the
contract for the Digitized License System, in the event that this Court orders a re-bid in response
to Digimarc's claims.

171.

Moreover, because Viisage should have been disqualified under the RFP and, but for the
State's unlawful conduct as described above, Digimarc would have been the only vendor to
submit a proposal deemed acceptable by GTA and DMVS, Digimarc should have been awarded
the contract in the first instance. Because sending the contract back out to bid opens Digimarc
up to competition again, even though Digimarc was the only bidder to submit an acceptable bid,

38

sending the contract back out to bid is not an adequate remedy at law.

<div align="center">172.</div>

Digimarc is entitled to a permanent injunction restraining and enjoining GTA, DMVS and Viisage and their officers, employees, agents, attorneys, affiliates, and all others acting in concert with them from proceeding with the implementation or the performance of the contract awarded, or conferring any benefit whatsoever for Viisage's response to Georgia Technology Authority Request for Proposal No. GTA000051. Moreover, Digimarc is entitled to a mandatory injunction directing GTA and DMVS to award the contract to Digimarc or, in the alternative, to re-bid the Contract on the condition that any such re-bid contract cannot be awarded to Viisage.

<div align="center">

## COUNT VI
### (PERMANENT INJUNCTIVE RELIEF – VIOLATION OF DUE PROCESS)

</div>

<div align="center">173.</div>

Digimarc incorporates Paragraphs 1 through 147, as if fully set forth herein.

<div align="center">174.</div>

Unless GTA, DMVS and Viisage are restrained from proceeding with the implementation of the November 12, 2002 contract with Viisage, Digimarc and the Georgia taxpayers will suffer immediate and irreparable harm and injury. Among other things, the bias demonstrated by GTA and DMVS in favor of Viisage damaged the integrity of the bid process, which harmful conduct was exacerbated by the fact that Viisage provided false information in response to the RFP, with the intention of misleading GTA and DMVS, further undermining the integrity of the bid process. In order to rectify this harm to Digimarc and the Georgia taxpayers, this Court should issue a preliminary and permanent injunction mandating that GTA and DMVS disqualify Viisage under the RFP and further preventing GTA and DMVS from conferring any benefit upon Viisage whatsoever in connection with the November 12, 2002 contract, the RFP or any re-bid of the

<div align="center">39</div>

contract for the Digitized License System, in the event that this Court orders a re-bid in response to Digimarc's claims.

### 175.

Moreover, because Viisage should have been disqualified under the RFP and, but for the State's unlawful conduct as described above, Digimarc would have been the only vendor to submit a proposal deemed acceptable by GTA and DMVS, Digimarc should have been awarded the contract in the first instance. Because sending the contract back out to bid opens Digimarc up to competition again, even though Digimarc was the only bidder to submit an acceptable bid, sending the contract back out to bid is not an adequate remedy at law.

### 176.

Digimarc is entitled to a permanent injunction restraining and enjoining GTA, DMVS and Viisage and their officers, employees, agents, attorneys, affiliates, and all others acting in concert with them from proceeding with the implementation or the performance of the contract awarded, or conferring any benefit whatsoever for Viisage's response to Georgia Technology Authority Request for Proposal No. GTA000051. Moreover, Digimarc is entitled to a mandatory injunction directing GTA and DMVS to award the contract to Digimarc or, in the alternative, to re-bid the Contract on the condition that any such re-bid contract cannot be awarded to Viisage.

### COUNT VII
#### (AGAINST GTA AND DMVS ONLY)
#### (DAMAGES FOR BID PREPARATION COSTS)

### 177.

Digimarc incorporates Paragraphs 1 through 147, as if fully set forth herein.

### 178.

As a result of the actions by GTA and DMVS described above, if this Court does not award the contract to Digimarc, then Digimarc is entitled to recover the reasonable costs of

preparing its bid in response to Georgia Technology Authority Request for Proposal No. GTA000051, and all other related costs allowed under Georgia law.

WHEREFORE, Digimarc prays for the following relief:

a.    As to all Counts, that the currently entered interlocutory injunction be converted to a permanent injunction restraining and enjoining GTA, DMVS and Viisage and their officers, employees, agents, attorneys, affiliates, and all others acting in concert with them from proceeding with the implementation or the performance of the contract awarded, or conferring any benefit whatsoever for Viisage in response to Georgia Technology Authority Request for Proposal No. GTA000051;

b.    As to all Counts, that this Court further enter a permanent injunction mandating that GTA and DMVS award the contract to Digimarc or, in the alternative, re-bid the contract on the condition that any such re-bid contract cannot be awarded to Viisage;

c.    As to Count VII, Digimarc's reasonable costs of preparing its bid in response to Georgia Technology Authority Request for Proposal No. GTA000051;

d.    As to all Counts, the costs of this action, including reasonable attorneys' fees; and

e.    Such other and further relief as this Court deems just and proper.

[signature on following page]

This 23rd day of August 2004.


John Hutchins
Georgia Bar No. 380692
Valerie D. Barton
Georgia Bar No. 040832

MCKENNA LONG & ALDRIDGE LLP        *Attorneys for Plaintiff*
303 Peachtree Street, Suite 5300        *Digimarc ID Systems, LLC*
Atlanta, Georgia 30308
(404) 527-4000
(404) 527-4198 (facsimile)

## CERTIFICATE OF SERVICE

This is to certify that I have this day served the within and foregoing **Second Amended Complaint** upon all parties to the above-captioned action by U.S. Mail, postage prepaid, addressed to:

Emily P. Hitchcock
John B. Ballard, Jr.
Assistant Attorney General
Office of the Attorney General
40 Capitol Square SW
Atlanta, GA 30334-1300

Jameson B. Carroll
Peter M. Crofton
Robert C. Khayat
Gregory K. Smith
King & Spalding
191 Peachtree Street, NE
Atlanta, GA 30303

This 23rd day of August 2004.

John P. Gallagher
Special Assistant Attorney General
Stites & Harbison, PLLC
303 Peachtree Street, NE
2800 SunTrust Plaza
Atlanta, GA 30308

Valerie D. Barton

*Attorney for Plaintiff*
*Digimarc ID Systems, LLC*

MCKENNA LONG & ALDRIDGE LLP
303 Peachtree Street, Suite 5300
Atlanta, GA 30308
(404) 527-4000
(404) 527-4198 (facsimile)

EXHIBIT 17

𝒫

## IN THE SUPERIOR COURT OF FULTON COUNTY
### STATE OF GEORGIA

DIGIMARC ID SYSTEMS, LLC,

        Plaintiff,

vs.

GEORGIA TECHNOLOGY AUTHORITY and
the GEORGIA DEPARTMENT OF MOTOR
VEHICLE SAFETY,

        Defendants,

vs.

VIISAGE TECHNOLOGY, INC., a Delaware
corporation,

        Necessary Party-Defendant.



FILED IN OFFICE

SEP - 2 2004

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

Civil Action No. 2003CV66498

### ORDER

On September 1, 2004, this matter came before the Court on the following motions:

- Plaintiff Digimarc ID Systems, LLC's Motion for Temporary Restraining Order, filed July 23, 2004;
- State Defendants' Motion to Dismiss, filed July 21, 2004;
- Viisage Technology, Inc.'s Motion to Dismiss, filed July 21, 2004; and
- Plaintiff Digimarc ID Systems, LLC's Motion To Compel Compliance With Discovery Order, Revise Scheduling Order And For Sanctions Against Defendant Viisage Technology, Inc., filed July 1, 2004.

The parties fully briefed the issues and presented oral argument to the Court. Having considered the parties' briefs, the oral arguments presented by counsel, the pleadings and discovery on file with the Court and all other matters of record, the Court finds as follows:

## FINDINGS OF FACT

1.   Under the Order on Plaintiff's Motion for Interlocutory Injunction ("Injunction Order")
     issued by this Court on July 31, 2003, the GTA and DMVS are currently enjoined on an
     interlocutory basis from all activities related to implementation of or performance under
     the contract dated November 12, 2002 between Viisage and DMVS, which contract is the
     subject of this lawsuit.

2.   In an effort to proceed with a new Request for Proposals for a Digitized Driver's License
     System for the State of Georgia, GTA, DMVS and Viisage attempted to enter into a
     settlement agreement, which contemplates a $2.5 million payment by GTA and DMVS to
     Viisage in exchange for mutual releases in connection with the termination of the
     November 12, 2002 contract, as well as the transfer of certain goods and equipment by
     Viisage to the State.

3.   Viisage has asserted that it has incurred costs in excess of $7 million prior to the
     7/31/2003 injunction for development and implementation related to the November 12,
     2002 contract.  Digimarc contends that payment of any amount by the State to Viisage
     pursuant to the settlement agreement would subsidize Viisage's development costs and,
     therefore, would give Viisage an unfair advantage vis-à-vis other bidders in a
     procurement under a new RFP.  DMVS, GTA and Viisage have not produced evidence to
     this Court regarding the exact nature and calculation of the $2.5 million payment to
     Viisage sufficient for it to determine whether Digimarc's contentions are correct.

4.   This Court has previously found that Plaintiff Digimarc has made a compelling case that
     irregularities occurred during the procurement process leading to the November 12, 2002

contract, and if the case proceeds to a full trial on the merits, there is a substantial likelihood that Plaintiff will prevail.

5. The contemplated payment by GTA and DMVS to Viisage and transfer of goods and equipment by Viisage to the State constitutes "activities related to implementation of or performance under the contract dated November 12, 2002," which is prohibited under the July 31, 2003 Injunction Order.

6. Counsel for DMVS and GTA has stated that she cannot project when a new RFP for the Digitized Driver's License System can be completed and posted, but it will very likely not be before the end of October 2004, as DMVS representatives plan to attend a conference held by the American Association of Motor Vehicle Administrators ("AAMVA") in late October 2004 prior to completing the preparation and development of the new RFP.

7. The Motions to Dismiss filed by GTA, DMVS and Viisage are predicated upon the completion of the settlement between those parties, and , due to this ruling enjoining implementation of that settlement and further scheduling an expedited date for hearing all dispositive motions, the Court will deny those motions at this time.

8. Defendant Viisage Technology, Inc. has not yet completed its discovery obligations under this Court's previously issued Order dated June 3, 2004.

## CONCLUSIONS OF LAW

1. Maintaining the status quo that exists as a result of this Court's July 31, 2003 Injunction Order will not prejudice DMVS and GTA in their efforts to move forward in the development of a new Digitized Driver's License System RFP.

3

2. This Court has not had the opportunity to rule on the merits of this case and the propriety of all of Digimarc's claims as a matter of law. Digimarc will be prejudiced, therefore, if the contemplated settlement by and among Defendants is allowed to proceed or the contemplated new RFP is awarded prior to the Court issuing such a ruling as a matter of law because such settlement or award would moot some of Digimarc's claims, leaving Digimarc with no adequate remedy at law.

3. If Digimarc prevails on its claims in this case, the November 12, 2002 contract between DMVS and Viisage at issue may be deemed null and void *ab initio* on the basis of having been awarded in violation of the applicable procurement laws and rules. O.C.G.A. § 50-25-7.8.

4. The contemplated $2.5 million payment by GTA and DMVS to Viisage and transfer of goods and equipment to the State constitutes "performance," as that term is used in this Court's July 31, 2003 Injunction Order.

5. Granting Plaintiff's Motion for Temporary Restraining Order will continue to preserve the status quo that has existed since the July 31, 2003 Injunction Order was entered by this Court.

6. Viisage has not, to date, complied with Court's Order on Digimarc's Motion to Compel dated June 3, 2004.

Therefore, IT IS HEREBY ORDERED that:

Digimarc's Motion for Temporary Restraining Order is **GRANTED** and the July 31, 2003 Interlocutory Injunction continues to remain in full force and effect until further order of this Court;

4

GTA and DMVS may continue to move forward with the preparation and development of the new RFP for the Digitized Driver's License System for the State of Georgia, up to and including posting the new RFP on the GTA website;

GTA, DMVS and Viisage may not proceed with or consummate the transactions contemplated by the purported settlement agreement between those parties, including the making of payments or any further transfers of goods or equipment by and between Defendants, until further order of this Court; and,

With Viisage's consent, the State may retain and store any goods and equipment that have been previously delivered to it by Viisage in anticipation of performance under the settlement agreement between those parties; however, State may not compensate Viisage in any way for such goods or equipment or any costs attendant thereto until further order of this Court.

IT IS FURTHER ORDERED that:

The State Defendants' Motion to Dismiss is **DENIED** and Viisage Technology, Inc.'s Motion to Dismiss is **DENIED**.

IT IS FURTHER ORDERED that:

Plaintiff Digimarc ID Systems, LLC's Motion To Compel Compliance With Discovery Order, Revise Scheduling Order And For Sanctions Against Defendant Viisage Technology, Inc. is **GRANTED** in part and **DENIED** in part, as follows:

1.  Viisage shall immediately produce all documents set forth in this Court's discovery Order dated June 3, 2004.

2.  Viisage shall make available to counsel for Digimarc for review any and all documents listed in the relevance logs for e-mails and correspondence (but excluding any privilege log) previously prepared by Viisage in response to the Order of the court in

5

Massachusetts when Viisage was a non-party. Production of the documents in these categories, however, shall not be construed by Viisage to relieve it of its obligation to comply with this Court's previous Order requiring Viisage to respond to Digimarc's discovery requests with the broadest view possible as to what is relevant or is reasonably calculated to lead to the discovery of relevant information regardless of the completeness of any logs prepared by Viisage.

3.  Immediately following counsel for Digimarc's review of the above-referenced documents and Viisage's prompt production of any relevant, non-privileged documents discovered thereby, Viisage shall designate Craig Vosseteig and Barry Erhardt as 30(b)(6) witnesses in response to Digimarc's Notice of 30(b)(6) Deposition of Viisage Technology, Inc.

4.  Digimarc's request for attorneys' fees in connection with its Motion To Compel Compliance With Discovery Order, Revise Scheduling Order And For Sanctions Against Defendant Viisage Technology, Inc. is **GRANTED** and Viisage is ORDERED to pay Digimarc's attorneys' fees in the amount of $5,761.50 as set forth in the Affidavit of John P. Hutchins in Support of Motion for Sanctions.

IT IS FURTHER ORDERED that:

1.  GTA and DMVS shall provide an itemization supporting the determination of the propriety of payment of $500,000 for goods and equipment, including in such itemization the value of the equipment at Viisage's cost.

2.  Viisage shall provide an accounting of the direct costs Viisage alleges to have incurred in development and preparation for the implementation of the November 12, 2002 contract, including sufficient detail to determine why the $2 million payment to Viisage would not unfairly subsidize its development costs under a new RFP issued by GTA and DMVS.

6

IT IS FURTHER ORDERED that the Scheduling Order entered on June 9, 2004, as amended on August 13, 2004, is further amended and the following revised deadlines will govern this case, subject to further order of the Court:

1. The documents to be produced by Viisage pursuant to this Court's June 3, 2003 Order and pursuant to the above-referenced review by counsel for Digimarc must be produced no later than September 7, 2004.

2. The 30(b)(6) deposition witnesses that Viisage is ordered to make available under the Order entered by this Court on June 3, 2004 must be made available at Viisage's headquarters in Massachusetts after production of documents by Viisage but without further delay at a time reasonably convenient to the parties, counsel and the witnesses, taking into account the need for such testimony to be used as part of the dispositive motions this Court has ordered to be heard on an expedited basis.

3. The parties must file all contemplated dispositive motions no later than October 11, 2004. Responses are due by October 20, 2004. Replies, if any, are due no later than October 25, 2004. All papers and exhibits shall be served by hand delivery on opposing counsel, so as to afford each party the maximum time for briefing.

4. This Court shall hear all timely-filed dispositive motions, and any other motions that are pending and ripe for adjudication, at a hearing scheduled for October 27, 2004 at 9:30 a.m.

5. Given the highly-expedited posture of this case and the demands of this Court's criminal calendar, the parties shall promptly provide the Court with an accurate estimate of the time required for the October 27, 2004 hearing.

SO ORDERED this 2nd day of September 2004.

Judge Thelma Wyatt Cummings Moore
Fulton County Superior Court

8

EXHIBIT 18

EXHIBIT 99.1

Maureen Todaro
Viisage
978.932.2438
mtodaro@viisage.com

Billy Balfour
PAN Communications
978.474.1900
viisage@pancomm.com

### Viisage Acquires Imaging Automation and Expands Leadership Position in Identity Solutions Market

*Acquisition of Leading Identity Document Authentication Company Solidifies Viisage's Comprehensive Identity Solutions Offerings; Opens Opportunities to New Markets*

**BILLERICA, Mass. – October 5, 2004** – Viisage (Nasdaq: VISG), a leading provider of advanced technology identity solutions, today announced the Company has acquired Imaging Automation (iA), a privately-held company headquartered in Bedford, New Hampshire. The acquisition provides Viisage with a market leadership position in identity document authentication to complement the Company's core competencies in secure identity credentials and biometrics. This addition to Viisage's product portfolio is expected to extend reach into existing Viisage markets and provide a critical component to Viisage's comprehensive offering for new markets in need of identity solutions. The iA products are embedded into the recently announced Viisage Identity Solutions Suite ™, beginning with the Viisage PROOF ™ offering.

Viisage has acquired all outstanding shares of iA stock for approximately $5 million in cash and 3.9 million newly issued shares of Viisage common stock as well as the assumption of $2.9 million in debt. The exchange is based upon the 20 day market closing price average of Viisage common stock as of two days prior to the completion of the transaction, which is $6.74. The transaction is expected to be accretive to Viisage on an EBITDA, operational cash flow and EPS basis in 2005.

Identity document issuing agencies, such as passport, visa, national ID, transportation security and driver's license authorities have a heightened awareness regarding the security vulnerabilities their documents pose to the public and homeland security. For example, the 9/11 Commission Report states that, "…for terrorists, travel documents are as important as weapons." iA's proprietary technologies, specifically in the areas of document scanning and authentication software, are fundamental to the solutions which effectively address this challenge. iA's hardware and software platforms are a foundation for world-class proofing solutions by providing real-time validation of documents and seamless integration with multiple biometrics. All of these offerings will be tightly integrated into Viisage's existing and future Identity Solutions Suite products, most notably in the proofing and usage processes.

"Imaging Automation provides a strong strategic fit for Viisage's identity solutions. The Company's market leading products provide both a complementary offering to our existing customers as well as high value entrée into new markets such as finance, healthcare, and hospitality where the need to authenticate identity documents is at an all time high and increasing dramatically," said Bernard Bailey, president and CEO of Viisage. "Further, iA provides an opportunity for us to leverage their existing relationships in Federal programs such as the U.S. VISIT and Registered Travelers Pilot programs. We expect the combination of our two businesses and products will create a company uniquely positioned for solving critical issues around the integrity of an individual's identity beginning with the up-front proofing and document authentication processes and continuing through credential usage."

The acquisition of iA enhances Viisage's existing global footprint, bringing installed customers in state, local and federal government agencies in countries including the United States, Canada, Hungary, Australia, Sweden, Finland, and the U.K. Many of iA's customers are focused specifically on significant

border management solutions, providing valuable traction with a key component of Viisage's overall strategic growth plan. In the fiscal year ending September 30, 2004, on an unaudited basis, iA's revenues were approximately $6 million, more than a 100 percent increase over its revenues in its prior fiscal year.

Bill Aulet, chief financial officer of Viisage, added, "We have found the financial fit of iA with Viisage to be extremely attractive. iA's software subscription model provides a strong, high margin, recurring revenue stream. Overall, we expect this transaction to be accretive in 2005 in terms of EBITDA, cash earnings, and earnings per share. We also expect this acquisition to increase our revenue growth rate and profitability this year and going forward. In addition, this acquisition is expected to give us more scale in terms of size and enable us to realize financial as well as competitive benefits. Further, we plan to integrate the operations immediately, enabling us to recognize cost savings."

"Through our current partnership with Viisage, we view the Company as a visionary and pioneer in the identity solutions space. The issue of identifying people is critically important for all governments, businesses and homeland security efforts," said Bill Thalheimer, chairman and CEO of Imaging Automation. "At iA, we are proud of our leadership in the identity document authentication space and recognize our clear fit into the larger picture of identity solutions. We expect our customers will profit from the obvious benefits that come from the combination of two significant market leaders in the identity solutions space –iA and Viisage."

Imaging Automation, www.imagingautomation.com , is the industry and market leader in automated identity document authentication technologies. With over 2,300 installations in 20 countries around the world from North America to Europe and Asia, iA has established itself as the leader of technology that facilitates the security and authenticity of today's critical identity documents including passports, visas, national ID cards and drivers' licenses. International customers include Canadian Customs and Revenue Agency, Singapore Port Authority, the Hungarian Border Police, Australia Immigration, and the Swedish National Police. Federal, state and local customers include the U.S. State Department, U.S. Immigration and Naturalization Service, Dallas Forth Worth International Airport, and six state agencies, including the Kansas Department of Motor Vehicles.

### Conference Call

Viisage plans to hold a conference call with investors to discuss this acquisition on Wednesday, October 6, 2004, at 8 am EDT. To participate in the call, please dial 1-800-659-2056, using passcode 80687503, or internationally, please call 1-617-614-2714, using the same passcode. The call will also be available as a Web cast, accessible on Viisage's investor relations homepage ( www.viisage.com/investors ) and will be archived there beginning approximately one hour after the call is completed.

### About Viisage

Viisage (NASDAQ: VISG) delivers advanced technology identity solutions for governments, law enforcement agencies and businesses concerned with enhancing security, reducing identity theft, and protecting personal privacy. Viisage creates solutions using secure credentials and face recognition technologies that quickly, reliably, and accurately identify individuals. With over 3,000 installations worldwide, Viisage's identity solutions stand out as a result of the Company's industry-leading technology and unique understanding of customer needs.

*This news release contains forward-looking statements that involve risks and uncertainties. Forward-looking statements in this document and those made from time to time by Viisage through its senior management are made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995, as amended. Forward-looking statements concerning future plans or results are necessarily only estimates and actual results could differ materially from expectations. Certain factors that could cause or contribute to such differences include, among other things, the size and timing of contract*

awards, performance on contracts, availability and cost of key components, unanticipated results from audits of the financial results of acquired companies, changing interpretations of generally accepted accounting principles, outcomes of government reviews, potential fluctuations in quarterly results, dependence on large contracts and a limited number of customers, lengthy sales and implementation cycles, market acceptance of new or enhanced products and services, proprietary technology and changing competitive conditions, system performance, management of growth, dependence on key personnel, ability to obtain project financing, general economic and political conditions and other factors affecting spending by customers, the unpredictable nature of working with government agencies and other risks, uncertainties and factors including those described from time to time in Viisage's filings with the Securities and Exchange Commission, including without limitation, Viisage's Form 10-K for the year ended December 31, 2003 and its quarterly reports on Form 10-Q. Viisage undertakes no obligation to update any forward-looking statements.

EXHIBIT 19

(6

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

FILED IN OFFICE

OCT 2 0 2004

*Billing*

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

DIGIMARC ID SYSTEMS, LLC,

Plaintiff,

vs.

GEORGIA TECHNOLOGY AUTHORITY and
the GEORGIA DEPARTMENT OF MOTOR
VEHICLE SAFETY,

Defendants,

vs.

VIISAGE TECHNOLOGY, INC., a Delaware
corporation,

Necessary Party-Defendant.

ORIGINAL

Civil Action No. 2003CV66498

## PLAINTIFF'S BRIEF IN OPPOSITION TO
## MOTION FOR SUMMARY JUDGMENT BY VIISAGE TECHNOLOGY, INC.

Faced with the overwhelming evidence of its own inequitable conduct in the course of the

procurement that is at issue in this dispute, Viisage has filed a motion for summary judgment that

overlooks the most important aspect of such a motion – that it be based on the merits of the case.

Viisage's motion is supported by a brief that relies on purported "facts" that have absolutely

nothing to do with the merits of Digimarc's claims.  In fact, in a case in which the parties have

taken more than 30 depositions and marked more than 700 exhibits, Viisage sums up what it

claims to be the "pertinent facts" in just over three pages, without citing a single deposition.

Viisage's motion and brief do not address the merits of Digimarc's claims at all.  Rather,

all Viisage has done is attempt to make enough "noise" that it might possibly divert this Court's

attention from the real issues related to the merits of Digimarc's claims, including Viisage's own

fraudulent conduct in the course of the bid process. Viisage's motion should be rejected. It has stated no grounds upon which Viisage is entitled to summary judgment.

## I. FACTS

The facts of this case are as follows:

**A.    GTA And DMVS Prematurely Opened Price Proposals Submitted By The Bidders, Then Embarked On A Plan To Justify Awarding The Contract To Viisage As The Lowest-Priced Bidder.**

At the opening of the July 28, 2003 hearing on Digimarc's Motion for Interlocutory Injunction, Digimarc's counsel explained Digimarc's theory of the case. First, this procurement was fatally flawed because the State's Evaluation Team ignored the express requirements of the RFP and the GTA Rules by prematurely considering the issue of price. (July 28, 2003 Hearing Transcript on Digimarc's Motion for Interlocutory Injunction ("Hr'g Tr."), 6:15-19.) Second, after prematurely discovering that Viisage's price was substantially lower than the other bidders, the Evaluation Team unfairly favored Viisage for the remainder of the evaluation process, even though the RFP expressly mandated that the procurement was a "best value" and not a "lowest price technically acceptable" procurement. (Hr'g Tr. 6:20-7:4.) As a result of its bias toward Viisage's low-priced proposal, the Evaluation Team directed its efforts toward allowing Viisage to submit a "technically compliant" proposal in order to justify awarding the contract to the lowest priced vendor. (Hr'g Tr. 7:5-9; see also DMVS/Theobald Dep. 269:18-270:8.)[1]  In sum, Digimarc's theory of the case has been totally confirmed.

---

[1] George Theobald was deposed in this case both as an individual and as a 30(b)(6) witness for DMVS. His individual deposition is two volumes with concurrent page numbers. In this brief, his individual deposition is referred to as "Theobald Dep." Likewise, his 30(b)(6) testimony is two volumes with concurrent page numbers and referred to herein as "DMVS/Theobald Dep." This Court should also note that the parties have attempted to consecutively number deposition exhibits in this case. Thus, Digimarc refers to exhibits in this brief simply by number, without reference to the deposition in which they were first marked. Counsel for the parties have agreed to jointly file a complete set of all deposition exhibits under an appropriate stipulation.

1. *The Evaluation Team prematurely opened and reviewed the three bidders'*
   *pricing proposals before completing the technical evaluation phase in violation*
   *of the GTA Rules and the express terms of the RFP.*

The RFP, issued on May 24, 2002, sought proposals from vendors to provide a new,

central issuance Digitized License System to produce driver's licenses and identification cards

for DMVS. (RFP § 1.1 (Certified Copy filed with Court on June 17, 2003); July 31, 2003 Order

on Plaintiff's Motion for Interlocutory Injunction ("Injunction Order"), at 1.) The RFP required

each bidder to respond with a technical proposal and a separate price proposal. (RFP §§ 4.2;

Complaint ¶ 20; GTA/DMVS Answers ¶ 20.)[2] The method of source selection for this two-step

procurement was the "trade-off or ranking method." (Injunction Order, at 2.)[3] Specifically, the

RFP mandated that the submitted proposals would receive a "comprehensive, fair, and impartial

evaluation" in the following staged steps:

    a.    evaluation of technical proposals (Phase I);

    b.    identification of Offerors that meet the minimum technical requirements;

    c.    evaluation of price proposals (Phase II);

    d.    identification of Offerors' eligibility for demonstrations;

    e.    evaluation of demonstrations; and

    f.    evaluation of proposal on the basis of technical and cost factors.

---

[2] Digimarc filed its Verified Complaint For Temporary Restraining Order, Interlocutory and Permanent Injunctive Relief on March 5, 2003 ("Complaint"), its First Amended Complaint For Interlocutory and Permanent Injunctive Relief on November 12, 2003 ("First Amended Complaint") and its Second Amended Complaint on August 23, 2004 ("Second Amended Complaint"). GTA filed its Answers and Defenses to the Complaint on April 4, 2003 ("GTA Answer"). DMVS filed its Answers and Defenses to the Complaint on April 7, 2003 ("DMVS Answer"). Viisage filed its Answer to the First Amended Complaint on December 15, 2003 ("Viisage Answer").

[3] GTA and DMVS admit that "[t]he method of source selection used by the State of Georgia for the RFP was the 'trade-off or ranking method of source selection,' as that phrase is used in GTA Rule 665-2-4-.02(a)(9)." (Defendants' Supplemental Response to Plaintiff's First Request for Admissions, Response No. 3.)

3

(RFP § 5.1; Complaint ¶ 21; GTA/DMVS Answers ¶ 21.) Most importantly, Section 5.1 of the RFP mandated (and GTA admits) that "Offerors that do not receive at least an overall satisfactory rating in Phase I will not be considered for Phase II." (RFP § 5.1; Deposition of Christopher Tomlinson, 38:25-39:4 (According to Mr. Tomlinson, GTA's counsel, GTA does not deny "that the RFP . . . requires that phase one technical evaluations be completed with an overall satisfactory rating before being considered for phase two.").)

The Evaluation Team gathered at Unicoi State Park on Monday, July 29, 2002 to begin reviewing the proposals submitted on July 19, 2003 by the three bidders: Plaintiff Digimarc, Defendant Viisage and another bidder known as SoftLEAD, Inc.[4] (Deposition of Charles Nixon, 39:17-40:1; Dep., Ex. 4; Complaint ¶ 27; GTA/DMVS Answers ¶ 27; Viisage Answer ¶ 39.) The voting members of the Evaluation Team included DMVS employees Ronny Johnson, Louise Strickland, Neal Childers, Chris Clay, Harriet Dye, George Theobald, Cathy Malone, Craig Southern and Wardell Brown and GTA technology expert David Craig. (Theobald Dep. 31:25-33:5; Ex. 4; Nixon Dep. 34:7-17; see also Response of GTA and DMVS to Plaintiff's Second Request for Admissions, Response No. 2.) George Theobald was in charge of the Evaluation Team and Charles "Chuck" Nixon served as the original GTA Contracting Officer who was responsible for "running the procurement." (Nixon Dep. 35:25-36:3, 44:16-19.)

As explained by Mr. Nixon, the responsibilities of the GTA Contracting Officer encompass a "broad spectrum:"

> A.    In the case of most RFPs if I start at the beginning, then I would help the agency formulate the procurement, and that's one of

---

[4] Ultimately, GTA and DMVS rejected SoftLEAD's proposal, at least in part due to a finding of "unsatisfactory" on 97 out of a possible 219 evaluation factors, including the fact that it never submitted satisfactory card samples. (Ex. 31.)

the reasons that I try to get the Evaluation Team set up early because the subject matter experts from the Evaluation Team, in my opinion, help or should help in actually writing the RFP because they're the best ones to judge; and then facilitate the writing of the RFP, putting it out on the street, making any changes or addendum; then once it's brought in, then all communication will go through me from the agency Evaluation Team to any of the vendors; and <u>my job is to see that there's a level playing field for everybody</u>.

(Nixon Dep. 44:18-45:9 (emphasis added).) The Contracting Officer also serves another vital function in the bid process:

Q.     As part of your responsibilities as a contracting officer, do you make an effort to assure that the agency and the Evaluation Team comply with the Georgia Technology Authority rules?

A.     Yes.  That's correct.

(Nixon Dep. 45:24-46:3.)  In this case, during the course of the evaluation process, a critical lapse in GTA's oversight of the Evaluation Team occurred, leading to the pricing bias that prejudiced Digimarc and unfairly favored Viisage for the remainder of the bid process.

DMVS has claimed that "[a]t the end of the initial evaluation of the technical proposals, no offeror met the minimum requirements of the RFP."  (DMVS's Expedited Partial Response to Plaintiff Digimarc ID System, LLC's First Interrogatories, Resp. to Interrog. No. 9.)  In fact, as late as August 6, 2002, after the meetings at Unicoi concluded, George Theobald wrote Mr. Nixon, expressing DMVS's dissatisfaction with the samples submitted by the Offerors and stating:

New temporary DL/ID samples, inclusive of all features proposed, need to be reviewed by the DMVS evaluation team <u>in order to complete the technical evaluation</u>.  With respect to the permanent DL/ID, the samples provided by Digimarc and Viisage failed to meet the durability requirements outlined in the RFP. . . . None of the sample cards provided by Viisage or Digimarc demonstrated the capability to meet the conditions that the AAMVA standards stipulate.

5

(Ex. 18.)(Emphasis added.)[5]  As noted above, the RFP mandated that "Offerors that do not

receive at least an overall satisfactory rating in Phase I will not be considered for Phase II,"

which was the price proposal evaluation stage of the RFP.  (RFP § 5.1.)  Clearly, none of the

offerors had received an overall satisfactory rating for its technical proposal before the

Evaluation Team left Unicoi.  Yet, by August 1, 2002, while still at the initial evaluation meeting

being held at Unicoi, the Evaluation Team had already "moved into the cost portion of the bid"

and opened the pricing proposals for each bidder.  (Ex. 9.)

> **2.    *This violation of the express terms of the RFP and the GTA Rules occurred due to lack of oversight by the GTA Contracting Officer and the Evaluation Team's failure to abide by the terms of the RFP.***

As discussed extensively during the July 28, 2003 hearing, Defendants GTA and DMVS

have offered a variety of reasons to justify prematurely opening the pricing proposals, many of

which were later changed or entirely withdrawn.  (Hr'g Tr. 9:1-14:11; Withdrawal of Statements

Made During Oral Argument, filed August 29, 2003.)  Ultimately, George Theobald offered this

honest explanation:

> Q.    During that meeting at Unicoi, around -- around this issue was there ever any discussion about whether or not this reasoning for opening the cost proposals, that being to determine or get some feel for this issue of affordability, was there ever any discussion about whether that reasoning was an allowable basis under the RFP or the GTA rules to open the cost proposals at that point?

> A.    GTA was present and we conducted it with them participating, and there were no objections.

> Q.    So nobody ever said one way or the other?

> A.    The question was asked and consensus was yes.  There were no -- there was no opposition.

---

[5] Digimarc does not agree that its initial sample cards failed to meet the RFP's durability requirements or AAMVA standards.  Nonetheless, that issue is not germane to the determination that GTA and DMVS opened the pricing proposals prior to completion of Phase I, the technical evaluation phase, of the RFP's evaluation process.

Q.    The question was asked, can we open the cost proposals? Is that the question you're referring to?

A.    I don't remember the exact question, but it's similar to that, do we open cost.

Q.    And are you saying that somebody said, "Yes, it's okay to open the cost," or nobody said anything and there was no objection so you just went ahead and opened them?

. . .

A.    Everybody wanted to open the cost proposal, and GTA didn't oppose.

Q.    All right. Who was there from GTA during that discussion, if you can remember?

A.    I believe David Craig and Barry Shepard.

(Theobald Dep. 102:6-103:14.) Plainly, the Evaluation Team relied upon the GTA Contracting

Officer to assure compliance with the GTA Rules and the terms of the RFP. (Theobald Dep.

47:15-49:10.) However, it is undisputed that at the time "[e]verybody wanted to open the cost

proposal," even before the technical evaluations were completed, the assigned GTA Contracting

Officer, Chuck Nixon, was not present to provide the required oversight.

During that week of July 29, when the meetings at Unicoi were taking place, Mr. Nixon

was called home upon learning that his house had burned. (Nixon Dep. 40:15-18.) Mr. Nixon

left Unicoi on the morning of Tuesday, July 30, to deal with this personal tragedy and was

replaced around lunchtime on Tuesday by GTA Contracting Officer Barry Shepard. (Nixon

Dep. 42:12-16; Deposition of Barry Shepard, 31:16-22, 33:21-34:5.) Mr. Shepard had not been

involved in the drivers' license system procurement since its inception. (Shepard Dep. 31:23-

32:7 ("The only involvement that I had had was way earlier in the year DMVS had had a

consultant that they brought in to work on the -- to develop the RFP. And I had sent them a copy

7

of the -- of then RFP shell that GTA used. And that was -- that was it. I just e-mailed it to the -- to the consultant.")) In fact, Mr. Shepard was entirely unfamiliar with the RFP:

> Q.    When you arrived at Unicoi, is it fair to say that you had never seen the RFP for the driver's license prior to that, for the driver's license procurement?
>
> A.    Yes, sir. As far as reviewing or anything, yeah, I wouldn't have -- wouldn't have looked at it.
>
> Q.    It's fair to say that you were sort of walking into this cold, just filling in for Mr. Nixon; right?
>
> A.    Yes, sir. I -- I tell you what, here's one thing; I helped him move the proposals from when they came in down to our area. That -- I mean that would be my only contact. But as far as going through the document, no, sir.
>
> Q.    Just physically picking up the proposals --
>
> A.    Yes, sir.
>
> Q.    -- and moving them from one place to another?
>
> A.    Yes, sir.

(Shepard Dep. 35:18-36:10.) Mr. Shepard was also only vaguely familiar with the GTA Rules:

> Q.    Exhibit 14 is a copy of the Rules of the Georgia Technology Authority.
>
> A.    Yes, sir.
>
> Q.    Are you familiar with those rules?
>
> A.    I'd -- I know that GTA has rules. I'd have to look at -- at it to see. But they're -- they're the ones that we had when I was there, but I do know GTA has procurement rules, yes, sir.
>
> Q.    And when -- when you were a contracting officer with GTA, did you have familiarity with GTA's rules?
>
> A.    At the time, yes, sir, I believe so.
>
> Q.    Was it part of your responsibility as a contracting officer to interpret and apply the rules of GTA to the procurements that you managed?

> A. Yes, sir. But if a situation arose where clarification or there was a question, we always referred it to our management to make sure, and then they in turn looked at the -- the rules or we looked at them together.

(Shepard Dep. 45:6-25.)

Despite acknowledging his responsibility for interpreting and applying the GTA rules, Mr. Shepard did not give <u>any</u> guidance to the Evaluation Team as to whether it was appropriate for the Evaluation Team to open the cost proposals before the technical evaluations were complete. In his deposition testimony, Mr. Shepard admitted that the Evaluation Team had determined "[a]t the end of the initial evaluation of the technical proposals [that] no offeror met the minimum requirements of the RFP." (Shepard Dep. 150:1-6.) Yet, Mr. Shepard failed to require the Evaluation Team to abide by Section 5.1 of the RFP, which mandated that the Evaluation Team not consider offerors that did not receive at least an overall satisfactory rating in Phase I, the technical evaluation phase, for Phase II, the pricing phase. In fact, Mr. Shepard was not even aware that the Evaluation Team was relying on him to give the oversight that was so clearly lacking in this circumstance:

> Q. I understand you have a general recollection of the topic of, "We've completed the technical --"
>
> A. Yeah.
>
> Q. "-- can we now open price."
>
> A. Yes.
>
> Q. What I'm asking you now is, did you have the impression that the evaluation team was looking to you for guidance on that topic?
>
> A. No, sir, not at that -- not my impression that they were.

(Shepard Dep. 62:24-63:8.)

As a result of this complete disconnect between Mr. Shepard, as the acting Contracting Officer, and the Evaluation Team, the critical guidance that was needed by the Evaluation Team in connection with the issue of whether it was appropriate to open price proposals was never given. Thus, the Evaluation Team opened the cost proposals prior to the completion of the technical evaluations and despite the fact that no offeror had met the minimum technical requirements of the RFP. ((Shepard Dep. 150:1-6; Third Affidavit of Neal Childers, filed as Exhibit 8 to Response to Motion for Interlocutory Injunction by the Georgia Technology Authority and the Department of Motor Vehicle Safety, on June 19, 2003 ("Childers Aff."), ¶ 6 (price proposals opened despite no offeror meeting minimum technical requirements); Ex. 18 (technical evaluations not complete); RFP § 5.9.)

3.    *Upon opening price proposals early, the Evaluation Team became biased toward Viisage's low-priced proposal and decided to intentionally skew the remainder of the bid process in favor of Viisage.*

This serious lapse in oversight with regard to the timing of opening the price proposals allowed the Evaluation Team to be blinded by the issue of price, a potential "evil" which is exactly the reason why bidders in a "best value" procurement are required to submit their proposals in a separate, sealed envelope. (RFP 4.2 ("The Offeror's proposal in response to this RFP should include two separate packages, each labeled accordingly: (Part 1) Technical Proposal . . .; (Part 2) Cost Proposal"); RFP 4.2.1.7.2 ("No cost information should be included in the Technical Proposal")(Emphasis in RFP.) The fact that the Evaluation Team became unswervingly biased toward Viisage's low price cannot be seriously disputed. After the premature opening of the price proposals, the Evaluation Team's favoritism toward Viisage was not simply the result of GTA's complete lack of oversight. Rather, it was the intentional plan of the Evaluation Team to do whatever was necessary to justify awarding the contract to Viisage. What the Evaluation Team learned when it prematurely opened the price proposals was that

Viisage's proposed price per card was 65% lower than any other bidder. (Complaint ¶ 33; GTA/DMVS Answers ¶ 33.) Upon learning this, the Evaluation Team was "pleased," even though no bidder had submitted a technical proposal that the Evaluation Team thought met the minimum criteria set forth in the RFP. (Ex. 7.) The reason the Evaluation Team was "pleased" has become clear. In fact, on December 31, 2002, in the midst of Digimarc's administrative protest and having had ample time to reflect on the events of the procurement, Mr. Theobald wrote a memo to the protest decision-maker, which indisputably proves the Evaluation Team's bias toward Viisage's low-priced bid.

> It became apparent from the initial and subsequent Viisage price proposals that DMVS would not only be able to cover operating costs with existing appropriations, but would also have enough cushion to cover unforeseen implementation costs, <u>once a technically compliant solution was proposed</u>.

(Ex. 67 (emphasis added).) This memo, written by Mr. Theobald, the leader of the Evaluation Team, makes clear that, after the price proposals were prematurely opened, the Evaluation Team intentionally employed a strategy to do whatever was necessary to secure "a technically compliant solution" from Viisage – a non-compliant, but low-priced vendor. (See, e.g., Exs. 7, 9, 10 and 11.) And if the failure by the GTA Contracting Officer (Mr. Shepard) to step in and prevent the premature opening of the price proposals was not bad enough, the GTA's oversight with respect to all that happened after the pricing bias entered the procurement was even worse.

4.  *During the remainder of the bid process, GTA and DMVS repeatedly violated Georgia law, including the GTA Rules and the express terms of the RFP, in order to help Viisage submit a technically compliant bid and skew the bid process in Viisage's favor.*

During the remainder of the week at Unicoi, Mr. Shepard utterly failed in his oversight of the Evaluation Team. Generally speaking, rather than serving as an independent barrier to biased or unauthorized communications between the Evaluation Team and the bidders, Mr. Shepherd

would simply take the Evaluation Team's communications to bidders, which he received from Mr. Theobald in the from of emails, "cut and paste" those emails into emails purportedly from him, and then send them to the bidders.

> A.    The Evaluation Team basically drafted, you know, we want to -- we want to question -- we want -- to all the vendors that come up, we need to ask them this, this and this.  I basically just take it and would put it in the correct format, put my signature block so there would be a contracting-officer-to -- to-vendor communication line.  I -- I can't -- can't remember drafting or, you know, anything specific on this.
>
> . . .
>
> . . . The only thing I would have done is put it in a -- in a -- did some wordsmithing, for lack of a better phrase, and put it in a format with my signature block.  The substantive, that was -- that was the DMVS folks.

(Shepard Dep. 52:13-22, 59:11-15.)  Mr. Shepard did not screen the Evaluation Team's communications at all to determine whether they complied with the GTA Rules.  (Shepard Dep. 52:13-22, 58:9-59:15.)  He merely acted as a "front man" for the Evaluation Team to have communications with the bidders directly.  This lack of oversight continued after Unicoi.  As a result, the Evaluation Team had a number of inappropriate communications with Viisage and granted Viisage repeated chances to submit a "technically compliant" bid – including:

- allowing Viisage to submit a completely new technical proposal for its permanent card solution after the original deadline for proposals had passed; and,

- repeatedly allowing Viisage to submit sample cards after deadlines set by the GTA had passed.

The favoritism started on August 1, 2002, the very next day after price proposals had been prematurely opened.  In an email from Mr. Shepard to Viisage, GTA informed Viisage of the results of the Evaluation Team's testing of Viisage's temporary and permanent card samples,

specifically stating that the sample temporary document "tore easily" and, with respect to the

sample permanent document:

> Lamination easily removed, information left intact on the card face; information easily altered; OVD [optical variable device] remained intact on removed lament and showed no signs of fracture.

(Ex. 10.)[6] Digimarc was not informed of any problems with its card samples at this point. (Exs.

451-458 (Requests for Clarification to Digimarc).) The August 1 email not only informed

Viisage of the deficiencies in its card samples, but it also asked Viisage to submit additional

samples of both its temporary and permanent card solution by the close of business on August 5,

2002 in an effort to try to get samples from Viisage that would meet the minimum performance

requirements of the RFP.

Upon receiving this communication from the State, Viisage did internal testing on its

original permanent card samples. (Viisage Dep.[7] III, (Ahmad), 195:14-15; 198:13-22; Viisage

Dep. VI (Vosseteig), 134:8-136:12; Deposition of Mohammed Siddiqui, 78:14-82:8 and Exs. 10,

---

[6] The Court should understand that it is an important security feature for cards to show evidence of tampering, which is the reason for the references to "information left intact on card face" and OVD remained intact . . . and showed no signs of fracturing." (DMVS/Theobald Dep., 170:9-25.)

[7] Viisage offered three witnesses to testify as its 30(b)(6) representatives: (1) Ifti Ahmad, whose deposition covered portions of four different days in 2004 – January 20, February 10, February 18 and February 19; (2) Craig Vosseteig, whose deposition covered portions of September 28 and October 8, 2004; and, (3) Barry Erhardt, whose deposition occurred on September 29, 2004. Unfortunately, the court reporter started each day of Mr. Ahmad's deposition testimony with new page numbers, and also treated the Vosseteig and Erhardt depositions separately from Mr. Ahmad's, meaning there are seven volumes of Viisage's 30(b)(6) deposition, although both volumes of the Vosseteig deposition are consecutively numbered. Thus, Viisage's deposition is referred to in this brief as follows:

| January 20 | (Ahmad) | - "Viisage Dep. I (Ahmad)" |
| February 10 | (Ahmad) | - "Viisage Dep. II (Ahmad)" |
| February 18 | (Ahmad) | - "Viisage Dep. III (Ahmad)" |
| February 19 | (Ahmad) | - "Viisage Dep. IV (Ahmad)" |
| September 28 | (Vosseteig) | - "Viisage Dep. V (Vosseteig)" |
| October 8 | (Vosseteig) | - "Viisage Dep. VI (Vosseteig)" |
| September 29 | (Erhardt) | - "Viisage Dep. VII (Erhardt)" |

13 & 431.) It also sent additional samples back to Eclipse Laboratories, the independent lab from which Viisage had obtained a test report, purportedly on its sample cards, that Viisage had submitted with its July 19 proposal. (Siddiqui Dep., 41:20-42:2, 104:15-21 & Ex. 692.) This internal Viisage testing and the Eclipse Laboratory testing confirmed to Viisage that its permanent card samples did, in fact, delaminate easily, just as the State had reported. (Viisage Dep. II (Ahmad), 12:8-13:5; Ex. 692.) Thus, in response to the State's request for additional samples, Viisage did not view merely providing additional samples of the same cards it had previously submitted as a viable option:

> Q.    Okay, so is it fair to say that if Viisage had submitted permanent card samples by August 6 as the State had requested, it believed its permanent card samples would have failed?
>
> A.    That is what we believed, yes, if we gave the same card samples back again.

(Viisage Dep. III (Ahmad), 221:21-222:2.) So, rather than comply with the State's request for additional permanent card samples, Viisage, instead, immediately began working on coming up with an entirely new card design and construction. (Viisage Dep. III (Ahmad), 228:16-229:13.) This is first evidenced by a letter from Viisage to GTA dated August 5, 2002, along with which Viisage submitted temporary card samples that were completely different in construction than the temporary card proposed by Viisage in its July 19 proposal. (Ex. 16; Siddiqui Dep., 91:2-5.)

At this point in time, there had been no communication to Digimarc that the Evaluation Team had found any deficiency at all with any of Digimarc's card samples. On August 9, 2002, Digimarc learned for the first time that there was potentially an issue with Digimarc's card samples, through a communication by GTA to all vendors. (Ex. 19.) However, contrary to the specific information that had been shared with Viisage, the information Digimarc learned

through this communication was very limited, general in nature, and purportedly applicable to all vendors. The August 9 communication by GTA simply stated:

> The Evaluation Committee . . . have completed their evaluation of samples submitted for both temporary and permanent Drivers License/Identification Cards. The findings of this evaluation have caused DMVS to have serious concerns regarding the durability and security of categories of cards samples submitted. Specifically, DMVS is concerned that the temporary card samples provided with the Technical Proposals are not the exact documents proposed for the project and the permanent card samples provided are not the actual production grade cards that are identical in construction, appearance or materials to those submitted to the independent laboratory for evaluation. DMVS is requiring new samples of both temporary and permanent Drivers License/Identification Cards.

This August 9 communication further notified the parties of a meeting to be held on August 14, 2002 at which it was stated that DMVS would "clarify their requirements for these cards with all vendors who submitted proposals" after which the vendors would be given an opportunity "to resubmit new samples." The crux of the communication was that DMVS had some question about whether the samples that had been submitted by the bidders were, in fact, true production quality samples of the same card construction that the bidders had proposed in their July 19 proposals. Purportedly, it was only this issue that DMVS was seeking to clarify. This communication did not indicate that DMVS was requesting the bidders to submit entirely new permanent card designs and wholly different permanent card samples. (Ex. 19; Siddiqui Dep., 132:7-24.)

At the August 14 meeting, the focus of the discussion by DMVS was on temporary cards submitted by the vendors. (Siddiqui Dep., 134:17-135-11.) The bidders were told that they could propose new temporary card solutions, including solutions that were constructed of a medium other than paper. (Theobald Dep., 358:14-23; Nixon Dep., 158:3-159:13; Ex. 40) But there was nothing said at the meeting that indicated that the bidders could or should propose new

permanent cards with a base construction that was entirely different from their original proposals submitted by the proposal deadline of July 19. Mr. Siddiqui, the person in charge of Viisage's proposal efforts, confirmed in his deposition that there was no new information learned by Viisage at that meeting that led Viisage to believe that the State was requesting the bidders to submit permanent card proposals of an entirely new card construction or that the permanent card requirements of the RFP had changed in any way. Mr. Siddiqui testified quite plainly that the focus of the discussion was on the temporary card:

> Q.    Was there anything said at that meeting that you can remember that was with respect to Viisage, new information for Viisage?
>
> A.    I remember the commissioner's response. He pretty much agreed with the statement. This was after a fairly long discussion when I proposed that the state didn't know what they wanted, and he agreed with me. And his main concern was that, you know, they wanted a secure card and you know, wanted to ensure that whatever card was – whatever temporary card was decided upon would have all the securities the state was looking for.
>
> Q.    In terms of the state's dissatisfaction with the samples that had been provided to the state, did Viisage learn anything new at that meeting that it didn't already know?
>
> . . .
>
> A.    I will state it very simply. I mean, one of the things that I used to explain myself better to the commissioner and the staff was that at the end of the day it was a paper document. If you subject it to a tear test, it would tear. I don't believe that there was anything that was said as a response to my comment that we can construe as new information at least that is my recollection.
>
> Q.    And with respect to this conversation that you had with the commissioner about the state not really knowing what it wanted, that only related to the temporary card; right?
>
> A.    True.
>
> Q.    There is nothing that led you to believe that the state didn't know what it wanted with respect to the permanent card; right?

16

A.    To the best of my recollection, no.

(Siddiqui Dep., 136:7-24.) Likewise, Digimarc did not perceive that the State said anything at

the August 14 meeting that indicated the State would allow a new submission of an entirely

different permanent card structure from what had been proposed by Digimarc on July 19.

(30(b)(6) Deposition of Stephen Malone, 96:18-97:24, 106:8-20, 108:19-109:13.)

However, by this time Viisage already knew information that Digimarc did not know. It

knew exactly what problems the Evaluation Team had identified with its July 19 permanent card

offering. And it further knew that the GTA had already allowed it to submit not only additional

temporary card samples on August 5, but card samples constructed from totally different material

than those proposed in Viisage's July 19 proposal. Armed with this knowledge, by August 9

Viisage had already embarked on a plan to submit new permanent card samples of a completely

different design and construction and a different temporary card design than what it had

originally proposed.

The initial permanent card proposed by Viisage was a card constructed of 10 millimeters

of transparent Trans-Kote™ TXP, a 10 millimeter Teslin core, and a 10 millimeter writable clear

back overlay. (Ex. 15) In order to submit a second, new submission using a revised card design,

Ifti Ahmad, Viisage's Senior Director of ID Services, instructed Viisage employee Craig

Vosseteig to make a new set of sample cards, using a product manufactured by 3M Corporation,

known as Confirm™ laminate. (Viisage Dep. V (Vosseteig ) 79:18-81:13; 84:15-20.) This card

was not consistent with the "10-10-10" construction of Viisage's originally proposed card, but

was of a completely different construction – a 6 millimeter Confirm™ laminate, a 14 millimeter

Teslin core, and a 10 millimeter clear back overlay. (Ex. 688, (August 26, 2002 Viisage

Proposal, "Viisage GA Permanent Card Option I", at 2.)) As noted above, Viisage's first

17

communications with 3M in connection with Georgia card samples occurred no later than August 9. (Ex. 683.)

After the August 14 meeting, the State sent out a communication to the bidders on August 16 summarizing what was discussed at the August 14 meeting and requesting additional sample cards, to be submitted by the deadline of 5:00 p.m. on August 26, 2002. (Ex. 21.) The August 16 memo specifically noted that the bidders were to provide 18 "production quality samples" of each card solution proposed, just as had been required by the original deadline of July 19. (Id.) There was no indication in this communication that the requirements of the permanent card requested under the RFP had changed, or that the bidders were free to submit an entirely new permanent card proposal. Instead, what had been communicated to the bidders about permanent cards was only that the Evaluation Team had concerns that the permanent card samples that had been provided along with the July 19 proposals had not been the same card samples submitted by the bidders to the independent lab for testing.

Nonetheless, on August 26, Viisage submitted a document entitled "Temporary and Permanent Card Re-Submission", which included two entirely new proposed permanent card solutions – both made with 3M products – including Permanent Card Option 1, the "6-14-10" Confirm™ laminate card. Digimarc submitted additional samples of its permanent cards on August 26, just as had been requested by the State, but it did not change its base card structure as set forth in its original technical proposal. (30(b)(6) Deposition of Brian LaBrec, 60:6-11; Ex.24.) In an August 30 e-mail to Commissioner Tim Burgess, George Theobald confirmed that Digimarc had done just what had been asked of it:

> Digimarc provided complete samples of each proposed solution, and the team was able to assess the various aspects such as erasure resistance, chemical sensitivity, and durability. Of the proposed solutions, the evaluation team determined the combination of a

proposed temporary Teslin document and a permanent Teslin
document using Tri-color Polasecure to be Digimarc's best
performing solution.[8]

After the evaluation team evaluated these card samples submitted by Digimarc, Mr. Theobald

updated the official record that he was charged with keeping of the evaluation process to note

that the evaluation team had given "acceptable" ratings to these two card sample types submitted

by Digimarc. (Ex. 23; Theobald Dep., 216:4-16.)

But there were still all kinds of problems with Viisage's sample cards, even after its

August 26 submission.  In connection with its request for new sample cards by August 26, the

GTA had made it clear that the bidders were to submit "production quality samples." (Ex. 21.)

"Production quality" samples were specifically defined by DMVS as cards produced "using the

same methods, materials, equipment, parts, and specifications as the card the vendor is proposing

to produce for Georgia." (Theobald Dep., 258:21-259:18; Ex. 25.)  The Evaluation Team not

only sought sample cards that were representative of the card structure set forth in the vendor's

technical proposal; but it also sought to procure production quality cards that the vendor "could

deliver on . . . and produce it for Georgia." (DMVS/Theobald Dep., 172:17-18.)  There is no

dispute that Viisage understood what the State meant when it used the phrase "production

quality." (Viisage Dep. VI (Vosseteig) Dep., 175:22-176:6, 187:22-189:10, 215:4-216:23;

Siddiqui Dep., 123:11-20,176:13-20.)

With regard to its permanent samples, Viisage's August 26 submission included samples

of its "Permanent Card Option 1" – the 6-14-10 Confirm™ laminate card.  These samples were

produced by Craig Vosseteig as Mr. Ahmad had requested him to do, and they were made using

---

[8] The permanent Teslin document using Tri-color Polasecure is exactly the same card permanent card construction
proposed in its original July 19 submission. (Exs. 172 & 24; (30(b)(6) Deposition of Brian LaBrec, 60:6-11.)

the same methods, materials, equipment and specifications as what Viisage was proposing in its revised, written technical proposal. (Viisage Dep. VI (Vosseteig) Dep., 187:22-189:10.) In its August 26 proposal, Viisage labeled this sample as the "Georgia Design Sample 3M Confirm Laminate" (hereinafter "the Georgia Design Sample"). Once again, the Evaluation Team found that the lamination on these cards "is removed intact with very little effort." (Ex. 26; Theobald Dep., 250:20-251:9.) However, along with the Georgia Design Sample, Viisage also included a single card in its submission that Viisage labeled in its written proposal as "Production Quality Card 3M Confirm Laminate," which was a driver's license card containing artwork and graphics from New York State (hereinafter "the New York Cards"). (Theobald Dep., 250:20-251:9; Ex. 28 at 8.) Viisage submitted 18 samples of the Georgia Design Sample, as required by the instructions from GTA, but only one sample of the New York Card. (Theobald Dep., 256:1-267:18; Exs. 26-29.) In reality, only the Georgia Design Sample were Viisage's "production quality cards" – meaning that they were made with the same methods, materials and equipment as what was being proposed for Georgia. ((Viisage Dep. VI (Vosseteig) Dep., 187:22-189:10; Siddiqui Dep., 168:11-169:7.) But because Viisage failed to label the Georgia Design Sample as "production quality" and because the laminate on the Georgia Design Sample was easily removed, leaving the underlying information on the card intact and subject to alteration, the Evaluation Team concluded that the Georgia Design Sample was not production quality. (DMVS/Theobald Dep., 178:18-183:18.)

GTA then requested that Viisage either confirm that it intended its Georgia Design Samples to be production quality samples or submit an additional 17 samples of the New York Cards, which Viisage had already falsely represented were production quality. (DMVS/Theobald Dep., 179:9-180:12; Ex. 26 (August 28, 2002 e-mail from GTA to Viisage.)

Importantly, in the August 28 e-mail, GTA and DMVS explicitly re-affirmed to Viisage its definition of "production quality" by stating that "production quality cards . . . should be produced using the same methods, materials, equipment, and specifications as what is being proposed for Georgia." It is clear from this August 28 e-mail that the reason the Evaluation Team sought additional samples from Viisage is because it appeared that Viisage had not provided the full set of 18 samples of the card it represented as "production quality" – the New York Card sample type that would not simply fall apart as did Viisage's Georgia Design Samples.

At this point, Viisage knew full well what the State meant by its requirement that Viisage submit "production quality cards." Viisage also knew that the Georgia Design Samples that it had submitted along with its August 26 re-submission were what it had intended as its "production quality cards." But, Viisage also knew the following:

- With respect to the permanent card samples it had submitted along with its July 19 proposal, the State had indicated on August 1 that those permanent card samples easily delaminated;

- Viisage's own testing on those permanent cards confirmed that they easily delaminated;

- Viisage sent some of those permanent card samples to Eclipse Laboratories, after learning from the State that the cards had delaminated, and Eclipse Labs confirmed that those card samples easily delaminated;

- Viisage then sent some new Georgia Design Samples along with its August 26 proposal, and GTA, once again, indicated that those card samples easily delaminated.

(Siddiqui Dep., 180:3-21.) But, Viisage did have available sample cards from the State of New York, which they had received from 3M, and regarding which Viisage was not aware of any problem with those card samples easily delaminating. (Siddiqui Dep., 158:16-159:7; 180:3-181:5.) So, in a desperate effort to keep its bid from being disqualified, Viisage simply lied to the State. In a letter to GTA dated August 28, Viisage claimed that its Georgia Design Samples

were not its true production quality card samples. (Ex. 27 (Aug. 28 letter from Viisage to GTA

stating that its Aug. 26 submission "only contained one production quality sample").) Viisage

then arranged for 3M to send 17 additional samples of the New York Cards by overnight

delivery directly to the State, under a cover letter dated August 28, 2002, in which Viisage

specifically stated to GTA and DMVS that these samples were "production quality." (Ex. 27;

Ex. 685; Siddiqui Dep., 160:3-14.) However, the New York Cards were not made with the same

methods, materials, equipment and specifications as what Viisage was proposing for Georgia.

The evidence is overwhelmingly to the contrary. De La Rue, not Viisage, manufactured the New

York Card samples. (Deposition of Ed Cole Dep., 30:2-7.) In Interrogatory responses served in

this case as far back as January 9, 2004, Viisage falsely stated that 3M made the New York

Cards (Defendant Viisage Technology, Inc.'s Objections and Responses to Plaintiff's First

Interrogatories, No. 2), even though it knew that De La Rue was the manufacturer of the cards.

(Viisage Dep. VI (Vosseteig), 191:5-209:15.) The evidence in this case is that De La Rue never

gave either 3M or Viisage permission to use the New York Card samples that it had made.

Rather, 3M only had possession of these samples as a courtesy from De La Rue for 3M's own

use and for laboratory testing purposes, and they were never intended to be used to help a

competitor win a bid. (Cole Dep. 53: 6-15) When 3M's account representative in charge of the

De La Rue New York account was asked about, he testified as follows:

> Q.     If there is evidence in this case that Viisage used the New York
> sample cards that it received from 3M to represent to the state
> of Georgia that those cards were a representative sample of what
> Viisage could do, is that consistent with your understanding of the
> reason why De La Rue gives New York sample cards to 3M?
>
> A.     No.

(Curry Dep. 34:19-25).

Viisage did not know in August 2002, and does not even know today, how the New York Cards it submitted to the State of Georgia as its own "production quality cards" were made or what materials make up the New York Cards. In reference to the New York Cards, Viisage has testified as follows:

Q.    That is a New York State Driver's License; is it not?

A.    The one on the right is.

Q.    Yes, and it has the word "sample" across it, correct?

A.    That is correct.

Q.    Who made that card, the one that says "sample" across the front?

A.    We did not make that card.

Q.    Who made that card?

A.    To my knowledge 3M may have made it. I don't know.

Q.    So you don't know who made that card?

A.    We don't know who made that card, and, as I said, our request and our interpretation was to show the State that this is how the 3M Confirm material that we are changing has its security features, and this is the card sample that we submitted, and here is a card that is made in production.

Q.    Okay, and this card sample that you submitted, what was the method of printing that variable information?

A.    I do not know, sir.

Q.    What was the method of die cutting?

A.    I do not know, sir.

Q.    What was the method of laminating?

A.    I do not know.

Q.    What was the card structure of this document on the right that has the word "sample"?

23

A.    It had a 3M Confirm laminate, which is what we were trying to show the State.

Q.    And was it a 6/14/10, or was it something else?

A.    I believe it was a 6/14/10.

Q.    Why do you believe it was a 6/14/10?

A.    Because 3M Confirm comes in six mils.

Q.    And could you also have a 6/12/12?

A.    You could have it.

Q.    So do you know if this was a 6/14/10 card; and by "this" I'm referring to the document on the right, which is a sample that you say is a New York State production card.

A.    I know that the Confirm is six. I don't know what the Teslin and the back laminate is.

. . .

Q.    And the production quality cards you have on Page 154, Exhibit No. 437, New York State Driver's License, was that made by the same method, materials, equipment and specifications as what was being proposed to the State of Georgia by Viisage?

A.    I do not know how a New York card is made. I know it uses a 3M Confirm material which is the issue that we were trying to address, but I do not know exactly how the New York card is made.

(Viisage Dep. I (Ahmad), 276:24-278:14, 288:7-15; Ex. 437; Viisage Dep. II (Ahmad), 25:1-

27:20.) Mr. Vosseteig made it absolutely clear that Viisage did not know enough about the New

York cards to honestly represent to the State that they were made with the same methods,

materials and equipment as what Viisage was proposing to the State:

Q.    As far as you know, Mr. Vosseteig, were the New York driver's license samples that were given to Viisage by 3M made using the same production method, means, equipment and construction as the Georgia design samples that you got made with 3M's assistance?

A.    I don't know that. I don't know what were those New York
samples came from. Or how they were produced.

(Viisage Dep. VI (Vosseteig), 209:22-210:7.) Thus, the facts are undisputed that Viisage simply

lied to the State of Georgia when it represented that the New York Card samples that it submitted

(three days late, on August 29) in support of its August 26 proposal were "production quality

cards." They were not, and Viisage knew it. Viisage only represented that they were because <u>all</u>

of the sample cards that it had produced using the same methods, materials and equipment as

what Viisage was proposing for the State had easily delaminated, and Viisage knew that if it

submitted additional samples of those cards, it was going to lose the bid. In short, Viisage

submitted another vendor's sample cards, which it had no absolutely no permission or right to

use, in a desperate attempt to submit acceptable permanent card samples, even though Viisage

had no idea how they were made.

The Affidavit of Joseph Sanders, the person in charge of overseeing the New York

driver's license document production during the late 1990's to 2001, makes it even more clear

that Viisage was not authorized in any way to submit sample New York Cards in support of its

bid. (Affidavit of Joseph Sanders, ¶ 2.) De La Rue and the State of New York had established a

program under which advance permission was required of the State of New York Department of

Motor Vehicles even for De La Rue to distribute samples of New York's driver's license cards.

(Sanders Aff., ¶ 5.) Mr. Sanders was the administrator from whom De La Rue would have been

required to get such permission to permit the use of production samples of New York driver's

licenses made during 1997 to 2001 for use in a manner other than for issuance to actual residents

of the state of New York. (Sanders Aff., ¶ 5.) Mr. Sanders never gave such permission for use

of cards made under his watch. (Sanders Aff., ¶ 6.) Yet, all of the sample New York Cards

submitted by Viisage to Georgia in 2002 were issued between the years 1997 and 2001. (Exs.

437, 526 & 534.) When taken together with Viisage's own admissions about its lack of

knowledge of the New York Cards, the testimony of Mr. Sanders and Mr. Curry plainly establish

that Viisage knowingly submitted stolen card samples to Georgia in support of its bid.

     To make matters worse, the Evaluation Team simply turned a blind eye to the obvious

incongruity created by the fact that Viisage was submitting card samples from New York State,

despite the fact that the Evaluation Team knew that another company, De La Rue, was the

vendor to that state.  DMVS has testified in its 30(b)(6) deposition as follows:

> Q.    So if you ask Viisage who produced the cards, and Viisage
> didn't know, then in order for the evaluation team to determine
> whether they were production quality cards, the evaluation team
> would need to know how the cards were produced, right?
>
> A.    Yes, sir.  You're correct.
>
> Q.    And if you asked Viisage how the cards were produced and
> Viisage said, "We don't know how they were produced," then the
> evaluation team would not have considered those cards production
> quality cards; correct?
>
> . . .
>
> A.    Yes.  You're – I believe you're correct, yes, sir.

(DMVS/Theobald Dep., 201:9-22.)  The Evaluation Team would not have considered the New

York Cards as production quality cards if it had known that Viisage did not know how the cards

were made, but the Evaluation Team did not want to know.  It was only interested in justifying

an award of the contract to Viisage by allowing Viisage to submit a "technically compliant bid."

GTA and DMVS knew that Viisage did not manufacture New York's driver's licenses, but

because of their bias in favor of Viisage, chose not to investigate the matter further:

> Q.    You testified in your individual deposition that when the
> evaluation team got these New York card samples that you had
> some questions about how Viisage had -- how Viisage was in a
> position to give New York card samples, given that you knew that
> De La Rue was the vendor in New York; right?

A.    Yes, sir.  We did talk about that.

Q.    And that you -- the evaluation team wanted to follow up on that issue but the GTA recommended that De La Rue not be contacted because De La Rue had attended the bidders' conference; right?

A.    Yes.  I believe that is correct.

Q.    And that you wanted to follow up with 3M because you knew 3M was the manufacturer of the Confirm laminate, but you didn't follow up with 3M, either; right?

A.    No.  We didn't feel that was appropriate at that point.

Q.    Why didn't the evaluation team just ask Viisage how they came into possession of cards from New York State?

A.    Hindsight being 20/20, we should have.

(DMVS/Theobald Dep. 197:11-198:7.)  "Hindsight being 20/20," it would have been advisable for GTA and DMVS to have investigated further because they would have learned that Viisage did not know how the New York Cards were made, what materials made up the cards, or even how 3M, the vendor who procured the cards for Viisage, obtained them.  Moreover, they would have learned that the New York cards, apart from having the same security laminate proposed by Viisage, did not have much else in the way of similarities with what Viisage was proposing in its revised Technical Evaluation.  But GTA and DMVS were, at this point, pursuing a strategy of helping Viisage submit a "technically compliant" proposal and had completely abandoned their responsibility to conduct a proper procurement aimed at obtaining the best overall value for the citizens of the State of Georgia.  And despite having repeatedly been given the opportunity to bring its technical proposal into compliance, Viisage never submitted a single, production-quality, permanent card sample in response to the RFP that the Evaluation Team found to be acceptable; yet, GTA and DMVS chose Viisage as the successful Offeror and awarded it the DMVS contract.

27

If that were not enough to show the utter bias exhibited by the Evaluation Team in favor of Viisage's low-priced bid, there is more. In addition to its failure in connection with its August 26 proposal to submit "production quality" permanent card samples, Viisage also failed to submit acceptable temporary card samples. Instead, Viisage only "provided sample of the raw materials for their proposed temporary document . . . . The lack of having complete samples of the temporary documents with sample demographic data/photographs prevented the evaluation team from determining durability and tamper resistance." (Ex. 31.) This Court should keep in mind that, unlike Digimarc, Viisage had known since August 1 that its temporary document samples had been deemed unacceptable by the Evaluation Team. Yet, even as of August 26, Viisage was still not able to submit the required temporary document samples. Viisage had not submitted passing production quality permanent samples on time, and it had not submitted the required temporary samples on time. Digimarc, on the other hand, had done exactly what had been asked of it, and had submitted a permanent and a temporary solution that had both been deemed "acceptable" by the state. So, as of August 29, the Evaluation Team was faced with one vendor – Digimarc – that had submitted an acceptable permanent card and an acceptable temporary card. It was also faced with another vendor – Viisage – that had submitted a permanent card (the New York Cards) that had been rated acceptable by the Evaluation Team, but it had been unable to test Viisage's temporary card samples because Viisage had only submitted "raw materials." Rather than rejecting Viisage's non-compliant bid at this point, the Evaluation Team gave Viisage yet another chance to submit a "technically compliant" bid. In his August 30 email report to Commissioner Burgess, Evaluation Team leader George Theobald explained:

> We have asked Viisage to provide 18 complete temporary sample
> documents using the same equipment as what would be used in

Georgia by Tuesday, September 3, 2002. After the complete temporary samples have been received, the evaluation team can finish rating the Viisage solution. . . . As soon as the temporary samples are received from Viisage, the evaluation team will test, and I hope to have a formal recommendation from the team <u>immediately</u> thereafter.

(Ex. 31.)(Emphasis added.) Viisage then submitted additional temporary samples on September 3, 2002. (Theobald Dep., 319:13-320:25 & Ex. 35.) Those temporary card samples failed. (Ex. 35.) But, even though there was one bidder – Digimarc – that had submitted an acceptable permanent and temporary card solution, the Evaluation Team did not make an "immediate recommendation" as Mr. Theobald had promised the DMVS Commissioner. Rather, in its most telling expression of its bias toward Viisage, the Evaluation Team <u>changed</u> Digimarc's temporary card rating from "acceptable" to "unacceptable." (Exs. 23, 35, 36, 38; Theobald Dep., 216:4-16.))

At this point, the Evaluation Team decided to ask for a demonstration. (Ex. 35; Theobald Dep., 349:11-13.) Viisage should not have been invited to this demonstration. Section 5.5.2 plainly states that only those Offerors whose proposed solution meets <u>all</u> the technical requirements of Section 3 (including temporary and permanent card samples) may be asked to present a demonstration of their proposed solution. As of September 3, <u>only</u> Digimarc had submitted acceptable temporary and permanent cards, even though its temporary card acceptable rating had been changed. Viisage's late submissions of its temporary cards had clearly failed.[9] Nonetheless, the State invited both Viisage and Digimarc to demonstrate their temporary solution on September 26 and 27. (Exs. 35 & 36.)

---

[9] Viisage's production quality permanent cards had also failed, but the Evaluation Team was operating at this time under its self-imposed illusion that Viisage could somehow produce the New York Cards.

29

In inviting bidders to a demonstration, however, the Evaluation Team's bias went even one step further, intentionally sabotaging Digimarc's efforts to present a successful demonstration of its previously-rated "acceptable" solution. The e-mail to vendors inviting them to demonstrate stated as follows:

> DMVS initially had concerns on each proposed temporary document's durability and its ability to survive the required 45-day life expectancy. DMVS expressed these concerns in the August 14 meeting to the vendor community. All Offerors proposed a temporary document using a medium with a substantially longer life than paper.

(Ex. 36) But DMVS had <u>not</u> expressed concerns at the August 14 meeting that each proposed temporary document's durability and its ability to survive the required 45-day life expectancy. (Ex. 21 ("summation of topics discussed" at August 14 meeting). To the contrary, it was during that August 14 meeting that DMVS had said that it was acceptable for the bidders to submit a temporary solution on a medium <u>other</u> than paper. (Theobald Dep., 358:14-23; Nixon Dep., 158:3-159:13; Ex. 40) It was Digimarc's non-paper medium – teslin – that the Evaluation Team had already rated "acceptable," although this was not known by Digimarc. Now, after changing Digimarc's rating from "acceptable" to "unacceptable," the State was communicating to Digimarc that it had concerns about a non-paper medium. As a result, Digimarc decided not to present its teslin-based temporary document at the demonstrations to be held in late September. (30(b)(6) Deposition of Dr. Robert L. Jones, 73:6-15.)

The evaluation then proceeded to the demonstrations, on September 26 and 27. During those demonstrations, each bidder presented proposed temporary solutions. This time, however, Viisage temporary card samples supposedly passed all but one of the Evaluation Team's testing (Theobald Dep., 362:21-363:4), and the Evaluation Team reported that Digimarc's temporary card samples failed to meet all of the Evaluation Team's tests. (Ex. 39.) Viisage was then given

extra time to submit new temporary documents for testing, which the State later found to be acceptable. Thus, as of the end of the re-evaluation of Viisage's now <u>fourth</u> set of temporary card samples, the Evaluation Team was faced with a nearly identical situation as that which existed on August 29:

- One vendor with an "acceptable" permanent card solution and an "acceptable" temporary card solution;
- Another vendor with acceptable permanent card solution, but purportedly no acceptable temporary solution.

The difference is that, <u>this time</u>, the bidder with both purportedly acceptable solutions was Viisage, not Digimarc. Thus, the Evaluation Team was finally in the position to justify awarding the contract to Viisage. Instead of also giving Digimarc a second chance to submit an acceptable temporary solution, as it had repeatedly done for Viisage, the Evaluation Team decided to go to the "Best and Final Offer" round. (Theobald Dep., 363:10-19.) But this additional round of submissions was not for the purpose of giving Digimarc another chance at submitting an acceptable offer. Rather, it was a sham, merely for the purpose of driving down the already low-price offered by Viisage. (Theobald Dep., 363:20-22.) In fact, although Digimarc submitted additional temporary card samples as part of its BAFO submission with the hope that the State would test them and find them acceptable, the Evaluation Team failed to even test these cards, because Viisage had a lower price. (Theobald Dep., 366:19-367:6.) Predictably, BAFO resulted in the contract being awarded to Viisage.

**B.    In Addition To Falsely Representing The New York Sample Cards As Production Quality Cards, Viisage Also Made Other False Statements To The State In An Effort To Win The Contract.**

In addition to the well-documented false statements that Viisage made to the State about the New York Cards, Viisage also made other false statements to the State during the course of the RFP, which helped it win the contract.

1.    *Viisage lied about the reason for its last-minute change in its POS proposal.*

The RFP required that each bidder identify how it would provide the State with a "Point of Sale" system to interface on a turn-key basis with the State's digitized license system and the State's PeopleSoft financial system such that DMVS would be provided with software and hardware to collect and track the fees paid to the DMVS either by payments to field operators or for payments made for renewal by mail and/or internet. (RFP, Section 3.14.4.) In its July 19 proposal, and subsequently all the way through the BAFO stage, Viisage identified Unisys as its POS provider. (Ex. 57.) However, on November 6, 2002, after the results of the sham BAFO proceeding had been used to justify naming Viisage as the apparent winner, Viisage verbally notified GTA that it wished to change its POS provider from Unisys to Centerstage. Viisage lied about the reason for the change. In a letter to GTA dated November 7, 2002, Viisage stated that the reason for the change had something to do with the responsiveness of Unisys and made a vague reference to some sort of technical issue that warranted a change from Unisys to Centerstage. (Ex. 57.) Because of its bias toward Viisage, the Evaluation Team acquiesced to the request for a change, even though no other bidder had gotten the opportunity to change this aspect of its technical proposal after the original deadline of July 19, 2002.

In fact, the real reason for the requested change by Viisage related to its unrealistic pricing that had allowed it to underbid its competition. Viisage failed to disclose to the State that the real reason it sought a change was to increase its margin on a contract that it had won by taking the position that it would not lose on price. Centerstage's price was approximately half that of Unisys, amounting to almost a million dollar difference, or approximately $.06 per card. (Exs. 700 & 701.) After underbidding everyone else by 65%, Viisage was allowed to not only change its vendor, but to submit an entirely new POS proposal on the very day that the Notice of Award was issued and the contract signed – November 12, 2002. (Ex. 60.) The only Viisage

witness who has testified to having any recollection of the activities on November 12, 2002, Mr. Siddiqui, testified that he has utterly no recollection of the Evaluation Team even breaking away from Viisage and the others in attendance on November 12 and taking time to formally evaluate the proposal before a signing ceremony of the contract took place. (Siddiqui Dep., 244:6-13.) Apparently, the Evaluation Team simply rubber-stamped the revised POS proposal submitted by Viisage nearly five months after the deadline. And there is no mystery about the reason – all the Evaluation Team cared about was Viisage's low price. In discussing whether it would allow Viisage to change its POS proposal at the 11th hour, the Evaluation Team made it clear that the only thing that really mattered was price. (Exs. 56 & 58.)

2.    *Viisage lied in its proposal when it stated that it had an "arrangement" with Arthur Blank & Company to provide back-up card production services.*

The RFP required that each bidder describe what plans it had to produce permanent cards on a central issuance basis in the event that a disaster disrupted the ability to issue cards from the primary central issuance facility in Georgia. (Exs. 559-561.) Digimarc described in its proposal that it would divert the data captured from DMVS sites in Georgia to its existing central production facility in the state of Massachusetts and produce cards there until the central production services in Georgia could be brought back online. Viisage, on the other hand, had no alternative central issuance production facility in service for another state. So, in order to satisfy the RFP's requirement with regard to a back-up card production plan, Viisage simply lied. Just two days before the proposal deadline of July 19, 2002, Viisage's Senior Vice President, Ifti Ahmad, sent an email to Betty Belinkiewicz, a Viisage employee, instructing her to "send an email or call ABCO and ask their permission to include them in the Georgia proposal as a back-up card printing facility in case of disaster at the permanent facility in Georgia," (Ex. 691), even though Viisage knew that Arthur Blank & Company did not have the capacity to provide back-

33

up card production facilities. Arthur Blank & Company is a provider of blank PVC-based cards for use by providers like Viisage in over-the-counter systems. (Siddiqui Dep., 65:19-24.) It does not have experience printing on teslin, nor does it have the equipment necessary to laminate or die-cut sheets of teslin into individual cards. (Viisage Dep. VI (Vosseteig), 234:19-241:17.) Vissage knew this, as evidenced by testimony given by Craig Vosseteig in Viisage's 30(b)(6) deposition. (Id.) Moreover, Viisage knew that it did not have any sort of binding agreement with Arthur Blank & Company that could even remotely serve as a basis for Viisage's statement in its proposal that it had secured the services of Arthur Blank as its back-up card production facility, but Viisage nonetheless made that representation to the State. In fact, Viisage had not even procured specific pricing information from Arthur Blank regarding how much money Arthur Blank would require from Viisage in order to prepare itself to serve as a back-up card production facility. There is not a single document produced in this case that indicates that Viisage ever even got a specific price quote from Arthur Blank, or entered into any kind of binding agreement with Viisage. Rather, the evidence is clear that, as late as March 27, 2003, Viisage first arranged meetings with Arthur Blank to discuss the terms under which Arthur Blank would be prepared to provide back-up card production facilities to Viisage. (Ex. 711.) No "arrangement" ever existed between Viisage and Arthur Blank. The evidence shows that even as late as the weeks leading up to the injunction in this case, Berry Erhardt of Viisage told Christine Clay of DMVS that Viisage was looking for alternative back-up card production providers because the cost that Arthur Blank wanted to charge Viisage was "outrageous," or words to that effect. (DMVS 30(b)(6) Deposition of Christine Clay, 23:25-28:6.) Trapped in its own lie, Viisage could not even explain the terms of its so-called "arrangement" with Arthur Blank. In its 30(b)(6) deposition, Viisage first offered the testimony of Mr. Ahmad, who said that Berry

34

Erhardt was the person to ask about what the arrangements were with Arthur Blank regarding back-up card production facilities. (Viisage Dep. III (Ahmad), 195:9-16.) But when questioned, Mr. Erhardt (another 30(b)(6) witnesses for Viisage), testified that it was Mr. Ahmad who was the person who was handling the arrangements with Arthur Blank. (Viisage Dep. VII (Erhardt), 101:9-102:17.) The only other witness offered by Viisage under rule 30(b)(6), Mr. Vosseteig, said he had no idea why Viisage had told the state in its RFP response that Arthur Blank would served as a back-up card production facility, because he knew full well that Arthur Blank did not have the equipment necessary to serve in such a role. (Viisage Dep. VI (Vosseteig), 234:19-241:17.)

In sum, the statement by Viisage in its RFP response that it had an "arrangement" with Arthur Blank to serve as a back-up card production facility was a lie from the beginning, cooked up by Ifti Ahmad at the 11th hour (only two days before the response was due) in order to nominally satisfy a requirement of the RFP that Viisage otherwise had no capacity to satisfy. The statement never had any basis in reality, and Viisage knew it. Because Viisage never had any basis upon which to assess the cost of providing back-up production facility, it did not factor this potentially "outrageous" cost into its pricing, contributing to its ability to significantly underbid its competition and entice the Evaluation Team into exactly the kind of price-biased behavior that has led to wrong award of the contract to Viisage.

C.    **The Evidence Clearly Shows That Digimarc Would Have Been Awarded The Contract But For The Wrongful Conduct Of Defendants.**

Tellingly, Ronnie Johnson, a member of the Georgia Evaluation Team, testified as follows:

> Q.    After the demonstrations, do you recall whether the evaluation team had come to any conclusion about which bidder's technical proposal was most advantageous to the State?

35

A.      If my memory serves me correct, outside the issue of the
cards, that – that – as far as Digimarc and Viisage, it's tit for tat. I
mean, there was some concerns and some minor issues, but, you
know, they're fairly tit for tat, and that, you know, the problems
with the temporary and permanent cards aside, that they – they
were, you know, fairly even at that point.

(Deposition of Ronny Johnson, 116:12-23; see also Theobald Dep., 366:19-367:6 ("remaining

aspects of the technical proposal appeared to be comparable").) There were only three vendors

who submitted bids for the RFP: Digimarc, Viisage and SoftLEAD. GTA and DMVS rejected

SoftLEAD's proposal based, in part, upon SoftLead's failure to submit acceptable permanent and

temporary card samples. (Ex. 31.) As discussed above, Viisage missed multiple deadlines, and

also failed to submit "production quality" permanent card samples. Given these missed

deadlines, and failure to follow the clear requirements of the RFP regarding production quality

samples, Viisage should have been eliminated. But certainly, if not for that reason, Viisage

should have been eliminated because, if the Evaluation Team had done even a cursory

investigation into Viisage's claim that the New York Cards were production quality, it would

have learned that Viisage had provided false information and that, in fact, Viisage's sample cards

were cards that Viisage knew virtually nothing about. (Viisage Dep. VI (Vossteig), 191:5-

210:7.)

      Once Viisage was eliminated, Digimarc would have been the only vendor left standing,

and there is abundant evidence that Digimarc's proposal had been deemed generally acceptable

by the Evaluation Team. There is the evidence that the Evaluation Team changed Digimarc's

temporary card rating from "acceptable" to "unacceptable" after Viisage failed to submit

temporary compliant temporary cards on or about September 3, 2002. (See Hr'g Tr. on

Digimarc's Motion for Interlocutory Injunction 35:2-37:16; Theobald Dep. 324:9-330:4.) Prior

to Viisage's failure, the Evaluation Team had reported that it was only awaiting Viisage's

temporary card submission before making an "immediate" recommendation to the Commissioner of DMVS. (Theobald Dep., Ex. 31 at 2.) Only after Viisage after failed to submit a compliant proposal did the Evaluation Team change Digimarc's rating, in order to justify not awarding the contract to Digimarc.

It had also been clear from the outset that Digimarc's price was within a range that the State could afford. In response to Digimarc's Interrogatories, DMVS has admitted that, when it opened the bidders' price proposals at Unicoi, "[n]one of the price proposals were completely unacceptable so DMVS concluded that it should continue with the procurement." (Georgia Department of Motor Vehicle Safety's Expedited Partial Response to Plaintiff Digimarc ID Systems, LLC's First Interrogatories, Response to Interrogatory No. 9, at 22.

Thus, the undisputed evidence is clear that, if Viisage had been eliminated, as it should have been, Digimarc would have been the only bidder left standing. The evidence is also clear that, but for the wrongful conduct of Evaluation Team in changing Digimarc's rating, Digimarc's proposal was acceptable in every material respect, including price. Under these circumstances, there is no reasonable basis to believe that Digimarc would not have been awarded the contract if Viisage had been eliminated along with SoftLEAD.

## II. ARGUMENT AND CITATION TO AUTHORITY

Digimarc has shown in its own Motion for Partial Summary Judgment why judgment as a matter of law should be entered in its favor, because there is no genuine dispute with respect to the facts set forth above. However, at the very least, the facts shown by Digimarc preclude summary judgment in favor of Viisage. On motion for summary judgment, the evidence, with all reasonable inferences therefrom, must be construed in the light most favorable to the non-moving party. Gowen v. Cady, 189 Ga. App. 473 (Ga. Ct. App., 1988)(citing O.C.G.A. § 9-11-56). Construing the facts of this case in the light most favorable to Digimarc, it is impossible for

37

this Court to decide, as a matter of law, that Digimarc is not entitled to the relief that it seeks.

Thus, summary judgment in the Viisage's favor must be denied.

## A.    DIGIMARC IS ENTITLED TO A FINDING THAT THE CONTRACT WITH VIISAGE IS VOID *AB INITIO.*

In support of its argument that Digimarc's claims are moot, Viisage, like the State relies

on the purported "termination for convenience" and planned re-bid of the DLS Contract. Viisage

ignores the fact that this purported "settlement" will result in a $2.5 million payment to Viisage.

Digimarc has claimed that this payment to Viisage would give Viisage an unfair advantage in

any future re-bid. But the payment is entirely predicated on the joint assertion that Viisage and

DMVS have a valid contract, which is an issue directly in dispute in this lawsuit. If Digimarc

prevails on the merits of its claims, the contract between the State and Viisage is void *ab initio.*

> Whenever any agency required by this chapter and the rules and regulations adopted pursuant to this chapter applying to the purchase of supplies, materials, or equipment through the authority shall contract for the purchase of such supplies, materials, or equipment contrary to this chapter or the rules and regulations made pursuant to this chapter, **such contract shall be void and of no effect**.

O.C.G.A. § 50-25.7.8.(emphasis provided).   Thus, if Digimarc prevails on the merits of its

claims, it is the State's contemplated payment to Viisage that becomes moot. Under those

circumstances, there could be no arguably valid reason for any payment by the State to Viisage

except as an effort to aid Viisage's re-bid efforts. Digimarc's claim that the contract at issue is

void *ab initio*, which neither the State nor Viisage has disputed in their motions for summary

judgment, is the lynchpin for its request in the alternative that the State be precluded from

awarding a contract to Viisage on any re-bid. Why would the State pay Viisage money on a void

contract except to further its original plan, hatched in August 2002, to help Viisage submit a compliant bid?[10]

Plainly, this Court should resolve Digimarc's claims on the merits, either finding that the contact was validly awarded or it was not. Failure by this Court to make a determination about the validity of the contract at issue will leave Digimarc at a severe disadvantage to later claim that the contemplated payment to Viisage violates the principles of fairness imbedded in the State's procurement process.

**B.    VIISAGE IS NOT ENTITLED TO SUMMARY JUDGMENT BASED ON ITS BOGUS DEFENSE OF UNCLEAN HANDS.**

Viisage's primary argument in support of its motion for summary judgment is that Digimarc's claims for equitable relief are barred by the doctrine of unclean hands. However, Viisage's badly misunderstands the doctrine of unclean hands and fails to correctly apply it to the facts of this case. Thus, summary judgment on this basis is unwarranted.

1.    *Viisage fundamentally misunderstands the nature of the unclean hands doctrine because the purported conduct of which it complains is unrelated to the underlying bid process.*

Viisage's brief states as follows:

> The doctrine prevents a party from obtaining relief if it has acted wrongly in the same transaction or incident that formed the subject matter of the action. *Whiten v. Murray*, 267 Ga. App. 417, 423 (2004). In essence, "[t]he unclean hands doctrine bars a litigant from seeking equitable relief if the 'misconduct relates directly to the transaction concerning which relief is sought.'"

---

[10] In fact, it bears noting that there is no evidence in the record that Viisage has ever asserted any claims against the State or made a demand for payment on the State. The only evidence of communications between Viisage and the State about Viisage's costs of performance is a letter from Viisage to Georgia Assistant Attorney General Emily Hitchcock dated August 13, 2003, almost a full year before the purported "settlement" between Viisage and the State. However, that letter says absolutely nothing about claims that Viisage has against the State, nor does it make a demand upon the State for payment.

(Viisage Brief, at 8 (citing <u>Gibson v. Huffman</u>, 246 Ga. App. 218, 220 (2000)(quoting <u>Sparks v.</u>

<u>Sparks</u>, 256 Ga. 788, 789 (1987.)  Although Viisage has correctly stated the unclean hands

doctrine, its attempt to apply it to the facts of this case is completely off base.  The purported

wrongful conduct of Digimarc about which Viisage complains is not even remotely related to the

transaction or incident that forms the subject matter of this case.

Digimarc's claims are all based on the conduct by GTA, DMVS and Viisage in

connection with the procurement process related to RFP No. GTA000051 requesting bids for the

replacement of Georgia's current digitized driver licensing system with an updated, turnkey

solution.  That RFP was issued on May 24, 2002 and the contract at issue was awarded to

Viisage by a Notice of Awarded dated November 12, 2002.  None of the purported "facts" cited

by Viisage as supporting its unclean hands defense relate to Digimarc's conduct in that

underlying procurement.  In fact, none of the purported "facts" even occurred during the time

frame in issue in this dispute.  At least four of the eight items of which Viisage complains relate

to Digimarc's purported conduct or legal positions taken <u>in</u> <u>the</u> <u>course</u> <u>of</u> <u>this</u> <u>litigation</u>.

It is plain even from the cases cited by Viisage that the unclean hands defense cannot rest

on conduct that does not relate to the underlying transaction at issue.  In <u>Sparks v. Sparks</u>, the

husband in a divorce case sought equitable division of the parties' marital residence.  The parties

had purchased the house together as a married couple in 1974.  In 1982, the husband had

transferred the title to the house to the wife in an effort to shield the home from a potential

judgment creditor.  As a defense to the husband's claim for equitable division in the divorce

case, the wife raised the husband's fraudulent transfer of the house to her, claiming that he was

barred from seeking an equitable division because of unclean hands.  The court, quite obviously,

held that unclean hands did not apply:

40

> [The husband's] misconduct in transferring the residence does not
> relate directly to his claim for an equitable division of the
> residence. That claim is based not on the circumstances
> surrounding the transfer [in 1982], but on the fact that the property
> was acquired during the parties' marriage [in 1974], through their
> labor and investment, thereby giving each party an equitable
> interest therein.

Sparks v. Sparks, 256 Ga. 788, 789 (citations omitted). See also, e.g., Gibson v. Huffman, 246

Ga. App. 218, 220 (defense of unclean hands did not bar plaintiff from bringing suit to enforce

covenants in defendant's deed, even where plaintiff was in violation of covenants in his own

deed, because plaintiff's conduct with regard to restrictive covenants in his deed was not related

to defendant's breach of covenants). Likewise, none of the purported "facts" upon which

Viisage relies relate to the underlying procurement process.[11]

> ### 2.   *Viisage's purported facts regarding Digimarc's wrongful conduct are bogus at worst and, at the very best, disputed, making summary judgment based on these "facts" inappropriate..*

In support of its unclean hands argument, Viisage sets forth eight items in its brief that it

claims evidence Digimarc's wrongful conduct. Each of these items is bogus. At the most, the

show that there are disputed issues of fact as to each, and they do not support summary judgment

in favor of Viisage.

> ### a.   *Digimarc did not violate any "competitive bid laws," and Viisage has not even cited to the purported laws that it believes Digimarc violated.*

The first item about which Viisage complains is that Digimarc allegedly sought to violate

competitive bid laws. Viisage asserts that "when this litigation was almost a year old —

[Digimarc allegedly sought] to improperly convince the State to violate competitive laws and

---

[11] Digimarc also wishes to address the substance of each of Viisage's purported "facts" regarding Digimarc's purported wrongful conduct. Rather than setting out all eight of Viisage's items twice – once for the purpose of showing that they do not relate to the underlying bid process and once to address the substance of the allegations, Digimarc will only set them out once below, in order to address their substance. However, in doing so, Digimarc will also point out specifically why each of them is unrelated to Digimarc's conduct in the underlying bid protest.

enter a purported 'contract extension' by which Digimarc could continue to provide drivers' licenses to the State for up to three more years." As Viisage points out, this circumstance, even if it could be portrayed as Viisage would like to portray it, occurred "when this litigation was almost a year old." It had nothing to do with misconduct by Digimarc during the underlying procurement process.

Moreover, there was nothing illegal or improper about this proposal by Digimarc. It came about as a direct result of the fact that the State had raised the issue in the course of this litigation that it felt its current driver's license system was not as secure as the State desired.[12] (Affidavit of John Duncan, ¶ 2, filed contemporaneously herewith.) A meeting took place on March 8, 2004 with the Commissioner of DMVS, his Staff and Emily Hitchcock of the Attorney General's office to discuss what changes Digimarc could make to the card design and/or system of distribution within the price currently paid by the State under its existing contract. (Duncan Aff., ¶ 2.) Notably, it was the State that initiated this meeting, seeking a contract extension with Digimarc. (Second Affidavit of James R. Davis, ¶ 7.)

At the meeting, Digimarc orally proposed that under a change order process a variety of changes could be made both to the current card's construction, additional security features could be provided, and even the method of distribution for the cards could be changed from an over-the-counter system to one where the cards are distributed from one of Digimarc's existing central issuance card factories. (Duncan Aff., ¶ 3.) It was at the request of DMVS's counsel, Ms. Hitchcock, that Digimarc provided the written proposal about Viisage now complains ("Contract

---

[12] The State first raised this concern in its Memorandum of Law in Support of Georgia Technology, Georgia Department of Motor Vehicle Safety, and Viisage Technology, Inc.'s Motion to Expedite Trial and for a Special Setting or Transfer of the Case (filed on February 13, 2004) at 6-7.

Extension Proposal"). The Contract Extension Proposal was not provided to the Commissioner until on or about March 15, 2004. (Duncan Aff., ¶ 4.)

Viisage argues that this proposal by Digimarc was for "a wholly new identification solution . . . one which complied with the 2002 procurement." (Viisage Brief, at 9.) But the facts show that the Contract Extension Proposal was merely an interim proposal, made in response to the State's request to Digimarc for a contract extension, and Digimarc simply attempted to address some of the security issues previously raised by the State in the context of this contract extension. Viisage's assertion that this was an effort by Digimarc to submit a proposal that "complied with the 2002 procurement" is preposterous. By merely comparing Digimarc's July 2002 proposal in response to the RFP to the Contract Extension Proposal provided in March 2004, it is easy to see that the latter proposal lacks many of the requirements of the 2002 RFP, including the establishment of an in-State central production facility, a Point-of-Sale system, a tie-in for the Secretary of State's voter registration system, an automated fingerprint imaging system, and more. (Ex. 172; Second Affidavit of James R. Davis, Ex. A; Duncan Aff., ¶ 5.) Viisage's statement that this proposal by Digimarc "violated competitive bid laws" is based on nothing other than Commissioner Davis's statement that he "determined that acceptance of any of the Option 2 alternatives in Digimarc's [March 15, 2004] proposal would violate the State's competitive bid laws." This statement by Commissioner Davis, as well as Viisage's reliance on it, is completely unsupported by reference to any statutes or regulations under which Digimarc's conduct in offering an interim proposal to the State even arguably would be illegal. In fact, even the GTA Rules provide for waivers of competition under at least two circumstances that would be applicable to Digimarc's March 15, 2004 proposal:

- where additional products or services are needed to complete an ongoing job or task;

- where a purchase is being made and a price is available from a previous contract.

GTA Rule 665-2-10-.01.

Viisage's argument that Digimarc's General Counsel somehow tried to "coerce" Commissioner Davis to agree to its proposal by purportedly asserting that it might be three or more years before this litigation were resolved should be similarly rejected. This statement attributed to Mr. French, even if it was relevant, is simply a statement of fact. It has already been more than six months since the March 15, 2004 meeting, and this litigation is still ongoing. Viisage has already filed one appeal arising from this case, and that appeal has not even been docketed yet. If more appeals follow, and they result in remands to this Court, it easily "might" be March 2007 before this litigation is fully resolved. Moreover, there is not even a hint of "coercion" in Commissioner Davis's Second Affidavit. He simply states that he was "dismayed" by the possibility of protracted litigation. That is certainly not sufficient evidence to warrant summary judgment in Viisage's favor, even if it was relevant.

Thus, Viisage's argument that Digimarc's proposal in response to the State's request for a contract extension was somehow inequitable should be rejected. At the very least, there are disputed issues of fact that preclude summary judgment based on this argument by Viisage.[13]

---

[13] In a blatantly obvious attempt simply to further smear Digimarc's General Counsel, Roger French, Viisage attempts to bolster its weak argument of "illegal, anticompetitive" conduct by pointing to the same assertions it has raised in its Motion to Revoke Mr. French's Pro Hac Vice admission to this Court. (Viisage Brief, at 10.) Viisage argues that this is somehow relevant to the merits of its unclean hands defense because, it asserts, Mr. French is "the lawyer who proposed this 'illegal 'extension.'" This tactic hardly merits a response, but it should be noted by this Court that the March 15, 2004 proposal of which Viisage now complains was made by John Duncan, Digimarc's Business Development Manager, Southeast Region, not by Mr. French. (Second Affidavit of James R. Davis, Ex. A.)

    **b.**    *Digimarc's argument that this was a Two-Step Procurement is supported by the evidence in this case and is far from a misrepresentation.*

Next, Viisage makes the ludicrous argument that Digimarc has unclean hands because "[i]n both its Second Amended Complaint and in the 2003 Preliminary Injunction Hearing," Digimarc alleged that the 2002 procurement was a "two-step" procurement. Certainly, Digimarc's arguments in this case do not constitute wrongful conduct by Digimarc in the underlying procurement and, hence, cannot be the basis for an unclean hands defense. But it also bears noting that the facts of the case support the finding, previously made by this Court, that this <u>was</u> a two-step procurement. (Injunction Order, at 2 "The method of source selection for this two-step procurement was the 'trade-off or ranking method.')[14] It is hard to believe that Viisage and the State continue to deny that this was a two-step procurement, in light of the abundant evidence that flies in the face of their denial, beginning with the terms of the RFP itself. Section 5.1 provides for evaluation in the following, staged steps:

- evaluation of technical proposals (Phase I);

- identification of Offerors that meet the minimum technical requirements;

- evaluation of price proposals (Phase II);

- identification of Offerors' eligibility for demonstrations;

- evaluation of demonstrations; and

- evaluation of proposal on the basis of technical and cost factors.

---

[14] GTA and DMVS admit that "[t]he method of source selection used by the State of Georgia for the RFP was the 'trade-off or ranking method of source selection,' as that phrase is used in GTA Rule 665-2-4-.02(a)(9)." (Defendants' Supplemental Response to Plaintiff's First Request for Admissions, Response No. 3.)

Viisage asserts that the terms of Rule 665-2-4-.02(a)(9)(ii), which addresses two-step procurements, supports its argument that this was a one-step procurement. But when you line that rule up with the RFP, Viisage's argument defies logic. Rule 665-2-4-.02(a)(9)(ii) states:

- technical responses (step one)
- price responses (step two)

Viisage also points out that Rule 665-2-4-.02(a)(9)(ii) ("two-step") states that technical responses and price responses are submitted separately, but that is exactly what was required by the RFP and what happened in this case. The RFP makes it absolutely clear that technical proposals and price proposals were to be submitted separately. Under section 4.0 of the RFP, which details what should be included in the Offerors proposals, section 4.2 states very clearly "The Offeror's proposal in response to this RFP should include the following two <u>separate packages</u>, each labled accordingly:

- (Part 1) Technical Proposal including Administrative Documents Section
- (Part 2) Cost Proposal

At the end of the description of what is to be included in the Technical Proposal, the RFP states, in bold, offset and underlined (under section 4.2.1.7.2):

<u>"No cost information should be included in the Technical Proposal."</u>

In the face of indisputable evidence that Technical Proposals and Price Proposals were required to be submitted <u>separately</u> in this procurement, Viisage relies on clearly erroneous opinions of Barry Shepherd and Chris Tomlinson that this was a one-step procurement. If that were true, however, the State would have no need to justify why it opened price proposals when it did, as it has repeatedly tried to do in this case. In a one-step procurement, technical proposals and price

46

are simply considered at the same time. That is clearly not what the RFP called for in this case, and it is not, in fact, what happened.

> **c.    *Digimarc has not used this litigation to conduct "industrial espionage" against Viisage, who clearly did not even know how to produce the permanent cards that were chosen by the State.***

Viisage makes the almost laughable argument that Digimarc has used this litigation for "to conduct industrial espionage" and again refers to the proposal by Digimarc to the Commissioner of DMVS to extend the existing contract. Notably, Viisage complains that, "after failing to win the contract in 2002, Digimarc proposed [in 2004] the exact card structure developed by Viisage." But it is Digimarc's failure to win the contract in 2002 that is the subject matter of this action, not its offer to extend its contract with the State in 2004. Thus, this circumstance, even if it were true, could not be the basis of an unclean hands defense.

But as support for its claim of industrial espionage, Viisage relies on the fact that Digimarc's March 15, 2004 proposal included the option of "the card design and structure approved by DMVS pursuant to the recent procurement." This is a reference to the 6-14-10 structure, including 3M Confirm™ laminate, Teslin core, and polycarbonate backing card structure that Viisage proposed in its August 26, 2002 proposal along with its Georgia Design Card samples that fell apart. But Digimarc did not need "industrial espionage" to discover this proposed structure. It was already available and provided to Digimarc under the Georgia Open Records Act before this litigation ever commenced.

It is important to note that Digimarc has never criticized this card construction. Rather, Digimarc has merely pointed out that Viisage was unable to produce a sample card using this construction that did not "easily delaminate." As a result, Viisage fraudulently represented to the State that the cards that it attempted to produce using this structure were <u>not</u> its "production quality" cards but that the New York Cards, which Viisage had no idea how to make, were its

"production quality" cards. In fact, if any party engaged in industrial espionage, it was Viisage. Contemporaneously with the filing of this Brief, Digimarc has presented the Affidavit of Joseph Sanders, the person in charge of overseeing the New York drivers license document production during the late 1990's to 2001. (Affidavit of Joseph Sanders, ¶ 2.) Mr. Sanders makes it clear that De La Rue and the State of New York had established a program under which advance permission was required of the State of New York Department of Motor Vehicles even for De La Rue to distribute samples of New York's driver's cards. (Sanders Aff., ¶ 5.) Mr. Sanders was the administrator from whom De La Rue would have been required to get such permission to permit the use of production samples of New York drivers licenses made during 1997 to 2001 for use in a manner other than for issuance to actual residents of the state of New York. (Sanders Aff., ¶ 5.) Mr. Sanders never gave such permission for use of cards made under his watch. (Sanders Aff., ¶ 6.) Yet, all of the sample New York Cards submitted by Viisage to Georgia in 2002 were issued between the years 1997 and 2001. (Exs. 437, 526 & 534.) As noted above, 3M's Mr. Kevin Curry also stated in no uncertain terms that Viisage's use of New York Card samples that that it received from 3M as a basis for representing Viisage's capabilities to Georgia was inconsistent with the why De La Rue gives New York Card samples to 3M. (Curry Dep. 34:19-25). When taken together, Mr. Sanders testimony and Mr. Curry's testimony make it clear that Viisage knowingly submitted stolen card samples to Georgia in support of its bid.

      **d.**     *Digimarc has not "conceded" that its 2002 proposal was overpriced and inferior.*

Again relying on Digimarc's March 15, 2004 Contract Extension Proposal, Viisage asserts that "Digimarc acknowledges that its 2002 Proposal was overpriced and inferior, yet tells this Court that proposal was the best value." Both the of these instances of purportedly wrongful conduct – the allegation that it should have been awarded the 2002 contract and the offer of a

contract extension to the State – occurred well after the underlying procurement resulted in the November 12, 2002 Notice of Award to Viisage, meaning they cannot be the basis for an unclean hands defense by Viisage. But Viisage's assertion that the Contract Extension Proposal by Digimarc is some sort of admission that Digimarc's 2002 proposal was "overpriced and inferior" is also totally unsupported. The only evidence that the 2004 proposal was better than the 2002 proposal is Commissioner Davis's conclusory statement that the 2004 proposal was an improvement over the 2002 proposal. However, the DMVS Commissioner could not possibly know, without the benefit of any critical evaluation of Digimarc's Contract Extension Proposal, that it is an improvement to the proposal Digimarc submitted in response to the RFP. Moreover, a simple comparison of the Contract Extension Proposal to the proposal submitted by Digimarc in July 2002 makes it clear that the Contract Extension Proposal lacks many of the requirements of the 2002 RFP, including the establishment of an in-State central production facility, a Point-of-Sale system, a tie-in for the Secretary of State's voter registration system, an automated fingerprint imaging system, and more. (Ex. 172; Second Affidavit of James R. Davis, Ex. A; Duncan Aff., ¶ 5.) The Contract Extension Proposal is merely an interim proposal, made at the State's request to try to address the State's need for a DLS contract while this litigation is ongoing. Digimarc did not even submit any sample cards with its Contract Extension Proposal. The suggestion that the Commissioner, who was not even Commissioner in 2002, could conclude based on the face of the Contract Extension Proposal that, as compared to the 2002 proposal, it offers a "substantially improved from both a technical and price perspective" (Viisage Brief, at 15) is ludicrous.

Moreover, this argument by Viisage ignores the facts presented in this case by Digimarc showing that the State found Digimarc's 2002 proposal acceptable in all material respects,

including price, during the course of the procurement. That Digimarc was able to propose different solutions at a different price in its Contract Extension Proposal than was contained in Digimarc's 2002 proposal does nothing to erase the fact that, in 2002, the State found Digimarc's RFP proposal acceptable. There is nothing inequitable about Digimarc arguing that it should be awarded the contract based on these facts, even if Digimarc were able to provide something different and cheaper now. It may be unfortunate that the State would be bound by a contract with Digimarc at one price for a particular product when, in fact, Digimarc might be able to offer a different product at a different price, but there is nothing inequitable about it because the State previously found the solution proposed by Digimarc to be acceptable in every material respect.

e.  *Digimarc has conclusively shown that Viisage did not know how to make the card that it represented to the State as its "production quality" card samples and does not know how to make that card today.*

Viisage asserts that Digimarc has somehow falsely claimed in this case that Viisage did not know how to make the card construction it proposed to the State. Viisage attempts to prove this by submitting a lab report connected with a Wisconsin procurement, in which Viisage purportedly had tests done on the same type of card sample it submitted to Georgia on August 26, 2002, which the State informed Viisage easily delaminated. It bears noting that Viisage does not claim that the Wisconsin cards it submitted for testing in that procurement in 2004 were made by the same method of production that Viisage could not make work in 2002. Nor, for that matter, does Viisage even claim that Viisage was the entity who manufactured the cards for the Wisconsin procurement. As far as this Court and Digimarc know, Viisage may have simply stolen more New York driver's licenses for use in the Wisconsin proposal too. Notwithstanding, Digimarc has never claimed that Viisage did not know how to make the sample cards that simply fell apart. Rather, in its Second Amended Complaint, Digimarc claims that "Viisage did not know how to manufacture cards like the permanent sample cards it submitted as production

50

quality cards nor did it know how these sample cards were manufactured." (Second Amended Complaint, ¶76.) The sample cards that Viisage submitted and represented as "production quality" cards were not the cards that fell apart. Rather, they were the New York Cards. There is ample evidence to support Digimarc's claim that Viisage did not have the slightest idea how to manufacture these cards, which are the cards that the State found acceptable, and that evidence has been repeatedly pointed out to this Court.

     f.    *Digimarc's argument in support of its prior Motion for Temporary Restraining Order does not support Viisage's unclean hands defense.*

Viisage makes the almost incomprehensible argument that, because Digimarc argued in support of its Motion for Temporary Restraining Order filed on July 23, 2004 that the proposed payment of $2 million by the State to Viisage "will cover all of Viisage's development costs it had to incur to provide the next generation of drivers license program the State sought in its 2002 procurement," it somehow has unclean hands. As noted repeatedly already, the positions taken by Digimarc in this lawsuit, which do not relate to its conduct in the underlying bid process, cannot support a defense of unclean hands. But even if it could, this argument by Digimarc in support of its July 23 TRO motion is in no way inequitable. It is simply argument. Digimarc relied on Viisage's press release in support of its argument, but Digimarc in no way suggested that it was <u>quoting</u> the press release, as Viisage seems to imply. Rather, the press release states at least twice that the payment by the State was for Viisage's development work. First, it states that the payment is "reimbursement for work completed under the drivers' license contract." Second, it states that the payment "covers work performed by Viisage under the drivers' license contract." The press release does not even hint that the payment covered <u>less</u> than all of Viisage's costs. Thus, Digimarc argued, quite reasonably, that the press release is evidence that

the payment by the State would cover "all of Viisage's development costs." This is merely advocacy on Digimarc's part, and it does not constitute inequitable conduct.

> **g.** *Viisage's efforts to smear Roger French will not support its unclean hands defense.*

Viisage once again employs the tactic of trying to smear Roger French, by arguing that he "manufactured evidence" and submitted an affidavit not based on the affiant's personal knowledge. Once again, as this alleged conduct relates to Digimarc's conduct in the course of this lawsuit, and not in the course of the underlying bid process, it cannot be the basis for an unclean hands defense. But it is equally important to note that Viisage is wildly overstating the impact of Indra Paul's testimony about his affidavit.

There are only <u>two</u> <u>statements</u> in Mr. Paul's affidavit regarding which he testified that he did not have "personal knowledge," as he defined it ("I personally reviewed or collected the information.") One of those statements was that "Viisage does not and never had made driver licenses for the State of New York -- a fact about which DMVS should have been aware. New York driver's licenses are, in fact, made by an English company wholly unrelated to Viisage named De La Rue." (First Affidavit of Indra Paul, ¶ 13.) Mr. Paul testified that he learned this information from Mr. French. Mr. Paul's affidavit also states:

> Digimarc was not informed prior to October 25, 2002, by way of any "clarification" or other "communication" from GTA, that the evaluation team reduced Digimarc's evaluation score because Digimarc allegedly failed to include all of Digimarc's lab results in its technical response to the RFP. Had Digimarc been alerted to this, Digimarc could have easily clarified the evaluation team's confusion on this issue and cured this alleged deficiency.

(First Affidavit of Indra Paul, ¶ 14.) Mr. Paul testified that he did not have personal knowledge of this fact, but that the information was provided to him by "Mr. French and another one of my direct reports. I cannot recall exactly who." (Paul Dep., at 62-63.)

52

Viisage argues that, because "Mr. Paul swore in his affidavit that he had personal knowledge" of these facts and later testified that he did not have personal knowledge, he committed perjury. However, if Mr. Paul made any statement in his affidavit that could be characterized as false, it was not one of the statements contained in paragraphs 13 or 14 of his affidavit. Rather, it was the statement in paragraph 1 that he was "competent to testify as to the matters herein based on my personal knowledge." Even though Viisage acknowledges that perjury includes the elements of a "knowing and willful false statement material to the issue or point in question," O.C.G.A. § 16-10-70, Viisage has offered <u>no evidence</u> that this statement in Mr. Paul's affidavit was willfully and knowingly false at the time he made that statement. It is unlikely the Mr. Paul appreciated at the time he signed his affidavit that any kernel of information provided in his affidavit that he had not collected or reviewed himself would later be characterized as perjury or that it would be argued by Viisage that he was incompetent to testify to facts he had learned from his direct reports. Likewise, Viisage has made no showing that this statement – that he was "competent to testify as to the matters herein based on my personal knowledge" – was material to any issue or point in question. As a matter of fact, the fact that Viisage does not and has never made New York driver's licenses is not, and has never been, in dispute in this litigation. That Mr. Paul did not have personal knowledge of this fact can hardly be characterized as material. Likewise, the statement in paragraph 14 of Mr. Paul's affidavit has never been disputed by the State or Viisage. Mr. Paul's lack of personal knowledge of that fact cannot, therefore, be characterized as "material to any issue or point in question."

Based on this sparse evidence, Viisage makes the conclusory statement that Mr. French "manufactured evidence." However, the evidence presented by Viisage shows only that Mr. French, as an attorney, assisted in the drafting of an affidavit for Mr. Paul's review, and that Mr.

53

Paul signed it, indicating his willingness to swear to the truth of the facts contained in the affidavit. If this is "manufacturing evidence," then Digimarc suspects that Viisage has manufactured plenty of evidence itself, as it is a common practice to secure affidavits by the process of a lawyer drafting the affidavit, the witness reviewing the affidavit and, ultimately, the witness signing the affidavit. If this set of circumstances amounts to anything, it amounts only to evidence that Viisage can use to impeach Mr. Paul. But it does not amount to evidence of subornation of perjury on Mr. French's part, which is essentially the claim that Viisage makes.[15]

> **h.**    *Mr. French's notarization of his own signature during the bid protest does not support Viisage's claim of unclean hands.*

Finally, Viisage states that Digimarc's claims for equitable relief based on the State's overwhelming bias in Viisage's favor and Viisage's repeated fraudulent representations to the State should be summarily disposed of because Mr. French notarized his own signature on Digimarc's bid protest document. Viisage makes the conclusory allegation, completely without support, that "this calls into question the validity of the protest in the first instance." This argument can be summarily rejected.

First of all, Mr. French was a Massachusetts notary, not a Georgia notary. Second, although it may have been contrary the Georgia statutory scheme governing notaries for Mr. French to notarize his own signature, this does not amount to inequitable conduct by Digimarc or by Digimarc's Georgia counsel, whom Digimarc was obviously relying on in the bid protest for guidance on Georgia law. Third, Mr. French's notarization in the bid protest certainly has

---

[15] In fact, it is Viisage that makes a false statement in its brief, when it makes the utterly irrelevant assertion that Mr. French resisted Viisage's efforts to take his deposition. Mr. French never resisted being deposed and, in fact, made himself voluntarily available for deposition, without requiring Viisage to get a subpoena issued. Mr. French only objected to his deposition being videotaped, and his deposition testimony makes that clear. ("[L]et me add for a final point that I am willing, able and prepared to go forward with this deposition, just no by video, which was never agreed to." Deposition of Roger French, 13:6-9.) Viisage misrepresents the Order entered regarding Mr. French's deposition, which only related to the issue of videotaping.

nothing to do with Digimarc's conduct in the underlying procurement. Finally, it is clear from

the GTA Rules that the self-notarization does not "call into question the validity of the protest."

GTA Rule 665-2-11-.07(b)4(ii) requires that each protest contain a notarized affidavit. But GTA

Rule 665-2-11-.07(b)5. states that the consequence for failing to do so is that the protest is

"subject . . . to summary dismissal in accordance with Rule GTA Rule 665-2-11-.07(e). The

latter Rule gives the Protest Decisionmaker sole discretion as to whether summary dismissal for

failure to comply with any aspect of GTA Rule 665-2-11-.07(b)4. is appropriate. Obviously, the

Protest Decisionmaker in this case did not summarily dismiss Digimarc's protest on this ground,

making Viisage's argument about Mr. French's notarization completely irrelevant.

**C.      DIGIMARC'S CLAIM IS NOT MOOTED BY THE PURPORTED
         SETTLEMENT BETWEEN VIISAGE AND THE STATE BECAUSE DIGIMARC
         HAS A VALID CLAIM TO THE CONTRACT AND THIS COURT HAS
         AUTHORITY TO GRANT THE RELIEF DIGIMARC SEEKS.**

Section II of Viisage's brief makes essentially the same arguments regarding "mootness"

and "debarment" that are made by the State in support of its motion for summary judgment.

Like the State, Viisage claims that Digimarc "has obtained all the relief it lawfully can obtain."

Viisage's argument on these points is essentially a short re-hash of the State's argument. Thus,

for the sake of brevity, Digimarc primarily relies on its brief filed in opposition to the State's

motion for summary judgment as its response to Sections II. of Viisage's Brief, and incorporates

that brief into this response by reference. In addition, however, Digimarc points out that, like the

State, Viisage acknowledges that the relief that Digimarc seeks, an award of the DLS Contract, is

an available remedy. Viisage quotes Delta Data Sys. Corp. v. Webster, 744 F.2d 197 (D.C. Cir.

1984) for the proposition that "a court may not order the award of a contract unless it is clear

that, but for the illegal behavior of the agency, the contract would have been awarded to the party

asking the court to order the award." Id. at 204 (emphasis added). Of course, that is exactly

Digimarc's claim, and Digimarc has pointed this Court to ample evidence that, but for the illegal conduct of GTA, DMVS and Viisage, Digimarc would have been awarded the contract. The only evidence that either the State or Viisage has pointed to in rebuttal to Digimarc's evidence is the fact that the procurement at issue was a "best value" procurement and the Fourth Affidavit of Christine Clay. But, at best, that evidence creates a question of disputed fact for resolution by way of a trial.

Also, Digimarc will address one of Viisage's "debarment" arguments in this brief, but otherwise rely on its Brief filed in opposition to the State's motion for summary judgment. The one argument that Viisage made on this issue that the State did not make is that the an injunction by this Court precluding the State from awarding any re-bid contract to Viisage would somehow violate Viisage's due process rights. This argument stretches due process jurisprudence beyond its limits. Given that Viisage is a party to this proceeding, it defies logic that a judgment by this Court that is within this Court's equitable power to make can somehow violate Viisage's right to due process. Viisage seems to be making the argument that it not only has a right to bid on a government contract, but also that the only circumstance under which that right can be taken away is under the GTA Rules. In other words, Viisage argues that it has a due process right to participate in the GTA's specified debarment procedure.

Even the case relied upon by Viisage, <u>Sameena, Inc. v. U.S. Air Force</u>, 147 F.3d 1148 (9th Cir. 1998) does not go that far. Rather, <u>Semeena</u> merely holds that, when an agency has promulgated rules under which it may debar a potential bidder, <u>the agency</u> must follow those rules. <u>Sameena</u> in no way limits the equitable power of this Court. "Procedural due process means notice and an opportunity . . . to be heard." <u>Jackson v. Spalding County</u>, 265 Ga. 792, 794 (1995). Viisage has been given ample due process in this proceeding, and there is no authority to

support its argument that it has a right to participate in the GTA debarment proceeding which somehow limits this Court's equitable authority.

**D.    THE ACTIONS OF GTA AND DMVS ARE SUBJECT TO *DE NOVO* REVIEW.**

After literally discovery spanning 18 months, and multiple evidentiary hearings, Viisage makes the late-found argument that "decisions of the state are not review <u>de novo</u>." (Viisage Brief, at 31.) Viisage relies on <u>International Business Machines v. Evans</u>, 265 Ga. 215, 217 (1995), but that reliance is misplaced. Unlike this case, <u>Evans</u> involved the award of a contract by the Georgia Department of Administrative Services, and thus was governed under the Chapter 13 of Title 50, the Georgia Administrative Procedure Act (the "APA"). This case is not governed under the APA.

Defendant GTA is a recent creation of the Georgia Legislature; the Georgia Legislature established the GTA effective July 1, 2000. The Legislature also granted this Court exclusive, original jurisdiction over actions involving the GTA. O.C.G.A. § 50-25-9. Section 50-25-1 *et seq.* of the Georgia Code, which governs the activities of the GTA, however, does not state the standard of judicial review of GTA's administrative decisions, as is often found in similar code provisions governing the activities of Georgia's state agencies and authorities. For example, parties are expressly directed to follow the APA when appealing the dismissal of a complaint by the administrator under the Fair Employment Practices Act; a decision of the Health Planning Review Board; or any order or action under the auspices of the Georgia Air Quality Act. O.C.G.A. §§ 45-19-39, 31-6-44, 12-9-15.[16] Subject to certain exceptions, the APA generally

---

[16] In some instances, the Georgia Legislature expressly specified the applicable standard of judicial review for the agency rather than referring to the APA. For example, aggrieved parties appealing under the Employment Security Act are advised to secure judicial review by filing a petition against the Commissioner in the superior court of the county where the employee was last employed within fifteen days of the board of review decision. O.C.G.A. § 34-8-223. The applicable standard of judicial review is unambiguously mandated: "In any judicial proceeding under this Code section, the findings of the board of review as to the facts, if supported by evidence and in the absence of

*(footnote continued on next page)*

stipulates that judicial review shall be conducted by the court without a jury and shall be confined to the record. O.C.G.A. § 50-13-19(g). The standard of judicial review varies, however, depending upon the agency or authority at question. For instance, the Legislature chose a different path with respect to persons aggrieved by any act of the Insurance Commissioner, mandating de novo review with some flexibility by agreement among the parties:

> Any person aggrieved by any act, determination, rule, regulation, or order or any other action of the Commissioner pursuant to this chapter may appeal the action to the Superior Court of Fulton County. The court shall conduct its review without a jury and by trial de novo, except that, if all parties including the Commissioner so stipulate, the review shall be confined to the record. Portions of the record may be introduced by stipulation into evidence in a trial de novo as to those parties so stipulating.

O.C.G.A. § 33-13-14(a). In contrast, Section 50-25-1 *et seq.* is silent with respect to the standard of judicial review of GTA administrative decisions.

### 1.    GTA's activities are not governed by the APA and are, therefore, subject to de novo review by the Superior Court.

The APA's restricted standard of judicial review does not apply to Defendant GTA because GTA, as a public authority, is specifically excluded from the definition of "agency" in O.C.G.A. section 50-13-2(1), which provides a comprehensive list of the administrative bodies that fall under the APA: "'Agency' means each state board, bureau, commission, department, activity, or officer authorized by law expressly to make rules and regulations or to determine contested cases, except . . . all public authorities." O.C.G.A. § 50-13-2(1). Nor does this matter qualify as a "contested case" under the APA. A contested case "means a proceeding, including, but not restricted to, rate making, price fixing, and licensing, in which the legal rights, duties, or

---

*(footnote continued from previous page)*

fraud, shall be conclusive, and the jurisdiction of the court shall be confined to questions of law." O.C.G.A. § 34-8-223.

privileges of a party <u>are required by law</u> to be determined by an agency after an opportunity for

hearing. O.C.G.A. § 50-13-2(2). Under GTA Rules, however,

> [t]he Protest Decisionmaker, in its sole discretion, either at the
> Protest Decisionmaker's own instance or upon the Protestor's prior
> written request, <u>may elect to conduct a hearing in connection with
> the Protest</u>. . . . In the event the Protest Decisionmaker schedules a
> hearing, the notice of the hearing <u>may set forth</u> the scope of the
> hearing, including, but not limited to, the issues to be addressed,
> the length of the hearing and whether documentary or testimonial
> evidence will be accepted.

GTA Rule 665-2-11-.07(i)(2) (emphasis added). Because the GTA Rules do not require notice

or an opportunity for a hearing prior to determining the legal rights, duties, or privileges of an

aggrieved party, a GTA bid protest does not qualify as a "contested case."

The APA, as a statute in derogation of the common law, must be strictly construed.

<u>Corner v. State</u>, 223 Ga. App. 353, 355 (1996) (citation omitted). Pre-APA cases relied upon the

de novo standard of review in the absence of a statute expressly mandating some form of

restricted judicial review. <u>See</u>, <u>e.g.</u>, <u>Ga. Pub. Serv. Comm'n v. Southern Bell</u>, 254 Ga. 244, 246

(1985) ("The pre-APA cases relied upon by [defendant] involve not only a complaint in equity,

but de novo review.") Accordingly, because the GTA is not an "agency" and this Protest is not a

contested case under the APA, this matter is not governed by the APA standards for restricted

judicial review and should be reviewed de novo by this Court. <u>See</u>, <u>e.g.</u>, <u>Hood v. Rice</u>, 120 Ga.

App. 691, 694 (1969) (holding that counsel may not rely upon any of the provisions of the APA

because the city board of education was not included within any of the definitions of 'agency'

contained in the APA and "[t]hus the Administrative Procedure Act does not apply.")

2.    *De Novo review of GTA decisions complies with the requirements of procedural*
      *due process in the absence of mandatory notice and an opportunity to be heard.*

Because "[e]ither party is entitled to be heard on the whole merits of the case," the

default standard of judicial review "in any case where not otherwise provided by law is a de

novo investigation." O.C.G.A. § 5-3-29; see also Bowman v. Parrott, 200 Ga. App. 405, 407-08

(1991) (discussing the application of the de novo judicial review standard to a decision by the

Department of Public Safety). "An appeal to the superior court . . . brings up the whole record

from the court below; and all competent evidence shall be admissible on the trial thereof,

whether adduced on a former trial or not." O.C.G.A. § 5-3-29.

In Bowman v. Parrott, the appellate court overruled a superior court decision involving

the Georgia Department of Public Safety ("DPS") because the superior court failed to conduct a

de novo hearing before issuing its final order in the matter. Parrott, 200 Ga. at 407. O.C.G.A.

section 40-5-66, providing for appeals from the DPS's decisions, grants aggrieved parties "the

right to enter an appeal in the superior court of the county of his residence or in the Superior

Court of Fulton County" and further mandates that "[t]he hearing on the appeal shall be de novo .

. . ." O.C.G.A. § 40-5-66. The appellate court held that, although the superior court is not

required to conduct a hearing on the merits of the DPS's decision to revoke the party's license "if

the parties waive their right to be heard, the superior court cannot avoid the dictates" of

O.C.G.A. section 5-3-29 by failing to hold the de novo hearing in the absence of such waiver by

the parties. Parrott, 200 Ga. at 408 (emphasis added).

The Georgia Supreme Court recently reaffirmed the application of this procedural due

process requirement to administrative agency decisions in Miles v. Shaw, 272 Ga. 475 (2000).

In Miles, the DPS suspended the defendant's driver's license. 272 Ga. at 476. O.C.G.A. section

40-5-66 granted the defendant two options to appeal the suspension: 1) pursue a de novo appeal

in the superior court; or 2) defer the de novo appeal and pursue a DPS administrative review. Id.

The defendant chose the second option and requested an administrative review by the DPS,

which was authorized under Rule 570 to review license suspensions without a hearing if "a

decision can be rendered on the face of the request without further proceedings." Id. The

defendant "was not afforded the opportunity to personally appear at the optional DPS

administrative review." Id. The DPS decided that a hearing was not needed and simply upheld

the suspension. Id.

The defendant then filed a petition for review in the superior court under O.C.G.A.

section 40-5-66, "thus triggering the previously deferred de novo appeal set forth in O.C.G.A. §

40-5-66." Id. The superior court held that the DPS's appellate procedures violated the

requirements of procedural due process and were unconstitutional. Id. at 477. The Georgia

Supreme Court agreed that the defendant was entitled to due process of law in her judicial appeal

of the DPS's administrative decision, stating:

> It is axiomatic that a driver's license is a property interest that may
> not be denied to an individual without due process of law. It
> follows that a driving license may not be suspended or terminated
> without first affording the licensee a meaningful hearing on the
> issue, as required by the procedural due process guarantees of the
> Fourteenth Amendment of the United States Constitution and
> Article One of our Georgia Constitution.

Id. at 477 (internal citations omitted). The court further agreed that the DPS's internal rules

failed to satisfy the dictates of procedures due process "when examined in isolation." Id. at 477

(emphasis omitted). The court disagreed, however, that the DPS's appellate procedures were on

the whole unconstitutional because the defendant was entitled to the previously deferred de novo

appeal to the superior court after the DPS rendered its adverse decision. Id. at 477-78.

Accordingly, an agency may conduct its internal review of an agency decision without holding a

hearing, thereby falling short of fulfilling the requirements of procedural due process, only so

long as that shortcoming is remedied by subsequent judicial review. Id.

Similarly here, absent the opportunity for de novo review by this Court, GTA's internal

protest procedures are unconstitutional. Digimarc repeatedly asked GTA and the appointed GTA

61

Protest Decisionmaker for a hearing as to Digimarc's Protest. GTA's Director, Michael McClearn, made a legal finding that Digimarc's Motion for Leave to File Reply Brief and Support of Protest and Renewed Motion for Stay of Execution of Contract and for Hearing on Protest were untimely filed and restricted the GTA Protest Decisionmaker's review to matters raised in Digimarc's original Protest. (Letter from M. McClearn to W. Droze of Feb. 17, 2003.) Mr. McClearn failed to state any basis, however, for his individual authority to issue legal rulings regarding GTA's protest procedures. The GTA Protest Decisionmaker did not hold a hearing and simply denied Digimarc's Protest.

The United States Constitution and the Georgia Constitution state "[n]o person shall be deprived of life, liberty, or property except by due process of law." U.S. Const. amend. XIV, § 1; Ga. Const. art. I, § 1, ¶ 1. In the circumstances presented here, Digimarc, which has operated Georgia's DLS since 1996 under a contract with DMVS which is not scheduled to terminate until June 30, 2004, has both an existing, vested property right in that contract and a prospective right in this cause of action that demands the protection afforded by procedural due process. Under the due process clauses of both the Georgia and United States Constitutions, therefore, GTA and DMVS must give Digimarc reasonable notice and grant Digimarc a meaningful opportunity to be heard before Digimarc may be deprived of these interests. Norris v. Henry County, 255 Ga. App. 718, 719 (citation omitted).

With respect to contracts, a property right is protected by due process against a taking or a retroactive impairment of contractual obligations, but only if that right is vested. Quetgles v. City of Columbus, 268 Ga. 619, 621 (1997). The wrongful and unlawful award of the DLS Contract to Viisage has effectively divested Digimarc of its existing, vested property right in its current amended contract with DMVS without notice or a meaningful opportunity to be heard

except for this lawsuit. But for this illegal award of the DLS Contract to Viisage, Digimarc would have been awarded the DLS Contract and continued in its current contractual role as Georgia's provider of drivers' licenses and other identification cards. Accordingly, as Digimarc has a protectable property interest in its contract with DMVS, the protest procedure observed by GTA must comply with the requirements of due process.

Digimarc also has a property interest in the judicial appeal of its protest against GTA and DMVS. A party's cause of action is a "species of property protected by the Fourteenth Amendment's Due Process Clause." Logan v. Zimmerman Brush Co., 455 U.S. 422, 428 (1982); see also Nix v. Long Mountain Res., Inc., 262 Ga. 506, 508-09 (1992) ("A party's cause of action is a property interest that cannot be denied without due process.") "[T]he Due Process Clauses protect civil litigants who seek recourse in the courts, either as defendants hoping to protect their property or as plaintiffs attempting to redress grievances." Logan, 455 U.S. at 429. In this matter, Digimarc is acting both to protect its property interest and to redress its grievance with GTA and DMVS. As the Supreme Court noted in Logan, it would require a remarkable reading of a "broad and majestic term," namely property, "to conclude that [for example] a horse trainer's license is a protected property interest under the Fourteenth Amendment, while a state-created right to redress discrimination is not." Id. at 431 (internal punctuation and citation omitted). Accordingly, the protest procedures promulgated by GTA must provide claimants with adequate notice and a meaningful opportunity to be heard. Nix, 262 Ga. at 509 (noting that the fundamental idea of due process is notice and an opportunity to be heard).

GTA's Protest Procedure fails to fulfill the constitutional requirements of procedural due process. The GTA Protest Decisionmaker has "sole discretion" in determining if a hearing will be held in connection with the protest. GTA Rule 665-2-11-.07(i)(2). The Protest

Decisionmaker denied Digimarc's repeated requests for a hearing. Moreover, under GTA Rules, if the Protest Decisionmaker chooses to hold a hearing, "the notice of the hearing may set forth the scope of the hearing, including, but not limited to, the issues to be addressed, the length of the hearing and whether documentary or testimonial evidence will be accepted." GTA Rule 665-2-11-.07(i)(2). "The issues and evidence considered by the Protest Decisionmaker are within the sole discretion of the Protest Decisionmaker." GTA Rule 665-2-11-.07(i)(2). The GTA's selected Protest Decisionmaker, therefore, decides every aspect of the protest investigation and adjudication procedures, including notice and the opportunity to be heard, on a case-by-case basis. Given the magnitude of the interests typically involved every time GTA awards a contract,[17] this unfettered grant of decisional power can only satisfy the requirements of procedural due process if a party has the right to de novo appeal to the courts.

## III. CONCLUSION

For all of the reasons stated above (and in Digimarc's brief in response to the State's motion for summary judgment), Viisage's motion for summary judgment must be denied.

---

[17] Georgia law requires all state agencies to contract through GTA for any technology resource purchase exceeding $100,000.00. O.C.G.A. § 50-25-7.2 (a) (emphasis added).

64

Respectfully submitted, this 20th day of October 2004.

John Hutchins
Georgia Bar No. 380692
TROUTMAN SANDERS LLP
600 Peachtree Street, Suite 5200
Atlanta, Georgia 30308
(404) 885-3460
(404) 962-6558 (facsimile)

*Attorney for Plaintiff*
*Digimarc ID Systems, LLC*

65

EXHIBIT 20

Viisage | News & Events | Media Releases

# Viisage News And Media Releases

+ Click here for current News Releases

**Viisage Awarded Series of Contracts Totaling $10.91 Million, Extending Momentum with Identity Solutions and the Drivers' License Market**

Wisconsin DMV Selects Viisage for New Five-Year Contract; Several Wins Marked by Expanded Use of Face Recognition for Identity Theft and Fraud Protection

BILLERICA, Mass.--(BUSINESS WIRE)--Oct. 21, 2004--Viisage (Nasdaq: VISG), a leading provider of advanced technology identity solutions, today announced a series of four state contract awards within the drivers' license market that serve to broaden the Company's leadership position in face recognition and identity documents solutions. Viisage provides secure identification documents in 15 U.S. states, eight of which have adopted Viisage's state-of-the-art face recognition capabilities to aid in identifying people and enhancing their identity theft and fraud protection programs.

Leading the latest round of wins is the state of Wisconsin Division of Motor Vehicles, which has selected Viisage for a five-year, competitively bid contract valued at $7 million to provide secure digital drivers' licenses. The extended relationship includes optional provisions for a range of Viisage's identity solutions offerings over the life of the contract. The Maryland Department of Motor Vehicles, through Hewlett-Packard, has also chosen to extend its relationship with Viisage by awarding the Company a two-year contract, valued at $2 million, to continue the production of the state's secure driver's licenses and IDs.

Two additional states that wish to remain unnamed for security purposes, have awarded Viisage separate contracts totaling $1.91 million to augment their identity theft and fraud protection initiatives by implementing Viisage's face recognition technology. The technology is being integrated as part of statewide programs to help protect residents against identity crimes and threats by ensuring each driver's license is granted only to the rightful owner.

"The use of face recognition technology is gaining broader and deeper traction around the world and our state government customers continue to be at the front of the adoption curve," said Bernard Bailey, president and CEO of Viisage. "As more states seek to further enhance their existing processes while battling identity crimes and threats, we expect these relationships to continue their history of innovation and security."

The recent release of the Viisage Identity Solutions Suite(TM), combined with Viisage's existing face recognition and secure credential capabilities, provides customers such as the Wisconsin DMV and Maryland DMV with a broad array of options for helping to identify people, ensuring secure credentials are granted to the right individuals and generally improving security.

"We are excited to have these states join the growing list of U.S. states and federal agencies leveraging our identity solutions as part of their secure identification programs," Mr. Bailey added.

About Viisage

Viisage | News & Events | Media Releases

Viisage (NASDAQ: VISG) delivers advanced technology identity solutions for governments, law enforcement agencies and businesses concerned with enhancing security, reducing identity theft, and protecting personal privacy. Viisage creates solutions using secure credentials and face recognition technologies that quickly, reliably, and accurately identify individuals. With over 3,000 installations worldwide, Viisage's identity solutions stand out as a result of the Company's industry-leading technology and unique understanding of customer needs.

This news release contains forward-looking statements that involve risks and uncertainties. Forward-looking statements in this document and those made from time to time by Viisage through its senior management are made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995, as amended. Forward-looking statements concerning future plans or results are necessarily only estimates and actual results could differ materially from expectations. Certain factors that could cause or contribute to such differences include, among other things, the size and timing of contract awards, performance on contracts, availability and cost of key components, unanticipated results from audits of the financial results of acquired companies, changing interpretations of generally accepted accounting principles, outcomes of government reviews, potential fluctuations in quarterly results, dependence on large contracts and a limited number of customers, lengthy sales and implementation cycles, market acceptance of new or enhanced products and services, proprietary technology and changing competitive conditions, system performance, management of growth, dependence on key personnel, ability to obtain project financing, general economic and political conditions and other factors affecting spending by customers, the unpredictable nature of working with government agencies and other risks, uncertainties and factors including those described from time to time in Viisage's filings with the Securities and Exchange Commission, including without limitation, Viisage's Form 10-K for the year ended December 31, 2003 and its quarterly reports on Form 10-Q. Viisage undertakes no obligation to update any forward-looking statements.

CONTACT: Viisage
Maureen Todaro, 978-932-2438
mtodaro@viisage.com
or
PAN Communications
Billy Balfour, 978-474-1900
viisage@pancomm.com
SOURCE: Viisage

"Safe Harbor" Statement under the Private Securities Litigation Reform Act of 1995: Statements in this press release regarding Viisage's business which are not historical facts are "forward-looking statements" that involve risks and uncertainties. For a discussion of such risks and uncertainties, which could cause actual results to differ from those contained in the forward-looking statements, see "Risk Factors" in the Company's Annual Report or Form 10-K for the most recently ended fiscal year.

# EXHIBIT 21

EX-99.1 2 dex991.htm PRESS RELEASE

**Exhibit 99.1**

FOR IMMEDIATE RELEASE

Contact: Bill Aulet, CFO
Viisage
978-932-2932

## Viisage Reports Record Results for Third Quarter 2004

### Revenues increase 97% and Company increases guidance for 2004

**BILLERICA, MASS. — October 25, 2004 —**Viisage (NASDAQ: VISG), a leading provider of advanced technology identity solutions, today announced results for the third quarter ended September 26, 2004.

Revenues for the third quarter of 2004 totaled $19.91 million, marking the fifth consecutive quarter in which revenues set a Company record, up 97% from $10.11 million in the comparable period last year, as reported in accordance with the change in accounting principle described below. The net income for the third quarter of 2004 was $198,000, or $0.00 on a basic and diluted share basis, compared to a net loss of $389,000, or $0.02 per basic and diluted share, for the third quarter of 2003. The Company's third quarter results do not reflect any contribution from the recent acquisition of Imaging Automation (iA); financial results for iA and Viisage will be combined from October 5, 2004, the date the transaction was completed.

On December 30, 2003, Viisage adopted new accounting rule EITF 00-21, "Accounting for Revenue Arrangements with Multiple Deliverables," which pertains to revenue recognition for certain long-term contracts, such as Viisage's state drivers' licenses, retroactive to January 1, 2003.

"Viisage made important progress, financially and operationally, during the third quarter, as we expanded our product suite for identity solutions and produced a profitable quarter," said Bernard Bailey, president and CEO of Viisage. "We have greater traction with existing and prospective customers in a wide range of markets, and feel that we are well positioned to continue our growth. We were pleased with the reception given Viisage by the financial community despite the difficult market environment that existed during our recently completed follow-on offering, and plan to use the proceeds to further build our market leadership in identity solutions. With the addition of critical proofing and document authentication capabilities from iA, we are offering customers a comprehensive technology solution that truly addresses their needs."

Bailey concluded, "The Company's performance for the third quarter, combined with our accomplishments so far this quarter, give us the confidence to increase both our revenue and EBITDA guidance for 2004."

Bill Aulet, Viisage's chief financial officer, added, "Viisage continued to significantly improve its financial performance and strengthen its balance sheet in the past quarter while maintaining the necessary financial flexibility. Our strong revenue performance coupled with careful expense management enabled us to produce our first profitable quarter on a GAAP basis in several years. At the same time, our focus on growing EBITDA (earnings before interest, taxes, depreciation and amortization) proved successful as it increased to $3.4 million this past quarter, from $1.5 million in the same quarter last year. Lastly, we are pleased with the terms of our acquisition of Imaging Automation, since we believe this transaction will be accretive on a net income, EBITDA and EPS basis in 2005, and will help us continue to drive revenue and profit growth not only this year, but for many years to come."

Highlights for the third quarter of 2004:

> - Adding experienced Department of Defense executive Kenneth Scheflen as Senior Vice President of Federal Solutions group
> - Signing cooperation agreement with Siemens AG for 3-D face recognition technology development
> - Unveiling vision for new identity solutions product suite
> - Launching innovative Viisage PROOF™ product

Following the close of the quarter, Viisage announced the receipt of a contract valued at approximately $534,000 from the Ohio Department of Rehabilitation and Correction for a criminal identification system, as well as a new driver's license contract for Wisconsin, a contract extension for Maryland and expansion of face recognition solutions into existing driver's license contracts, all of the above totaling $10.91 million.

Separately, on October 5, 2004, Viisage announced the acquisition of privately-held Imaging Automation (iA), the industry and market leader in automated identity document authentication technologies. iA has more than 2,300 installations in 20 countries around the world.

Financial highlights for the third quarter of 2004:

> - Record revenues of $19.91 million
> - Company's first profitable quarter in three years, with net income of $198,000
> - Gross margin down slightly to 28% from 31% in the second quarter this year, reflecting product mix, and down from the record high 33% recorded in last year's third quarter
> - Generated EBITDA of $3.4 million, compared to $1.5 million in same quarter last year and $3.1 million in the second quarter of this year
> - Increased cash position at the end of the quarter from $12.62 million to $37.36 million, reflecting successful completion of follow-on offering
> - Further improved the balance sheet by reducing outstanding debt from $29.8 million to $19.2 million, with an estimated annualized decrease in interest expense of approximately 20%
> - Backlog of $140 million, compared to $151 million last quarter.

During the quarter, the Company completed the sale of 7.3 million shares of its common stock, along with approximately 425,000 shares of stock sold by certain shareholders, in an underwritten public offering. Net proceeds from the follow-on offering were approximately $37.9 million for the Company. Also during the quarter, Viisage proposed a settlement to the State of Georgia to resolve the ongoing litigation stalemate over the state's driver's license contract, awarded to Viisage in late 2002. The initiative entailed the termination of Viisage's contract, a payment to Viisage of $2.5 million and an agreement by the state to put the contract up for rebid later this year. This initiative is currently stalled following legal action taken by one of the Company's competitors in the state.

Total operating expenses for the third quarter of 2004 totaled $4.85 million, up slightly from the prior quarter this year, and an increase from the $3.51 million reported in the comparable quarter last year, reflecting higher expenses following the acquisitions of ZN Vision Technologies and Trans Digital Technologies, legal costs from the litigation in Georgia and an increase in consulting costs related to our Sarbanes-Oxley compliance project. Sales and marketing expenses were $1.59 million, research and development totaled $896,000, and general and administrative expenses were $2.36 million. Total operating expenses in the same quarter last year included $1.24 million in sales and marketing costs, $946,000 in research and development and $1.33 million in general and administrative costs.

*Financial Outlook for 2004*

On the basis of its results for the nine months, Viisage is increasing its guidance for 2004, with annual revenue now anticipated to between $66-68 million, increased from $60-63 million, and EBITDA anticipated to be between $11.5-12.5 million, increased from EBITDA of $11-12 million.

*Nine Months Results*

For the first nine months of 2004, revenues totaled a record $48.44 million, an increase of 79% from $27.05 million for the same period in 2003. The net loss for the first nine months of 2004 was $1.75 million, or $0.05 per basic and diluted share, compared to a net loss in the 2003 period of $4.13 million, or $0.20 per basic and diluted share, which excludes the impact of the one-time charge of $12.13 million or $0.59 per share that the Company recorded in connection with its change in accounting principle. Including that charge, the net loss for the first nine months of 2003 was $16.26 million, or $0.79 per basic and diluted share.

*EBITDA*

Viisage reports EBITDA as a financial performance measure and as a forecast of future performance. The Company calculates EBITDA by adding back to net earnings interest, taxes, depreciation and amortization. EBITDA is provided to investors as an additional performance gauge to results provided in accordance with generally accepted accounting

principles (known as "GAAP"). Viisage's EBITDA should not be considered in isolation or as a substitute for comparable measures calculated and presented in accordance with GAAP. Viisage recently completed the acquisitions of ZN Vision Technologies, Trans Digital Technologies and Imaging Automation. While these acquisitions are expected to have a positive impact on Viisage's EBITDA for 2004, they also result in Viisage incurring significant non-cash charges for amortization of intangible assets that adversely affect Viisage's net income (loss) in 2004. Viisage believes that using EBITDA as a performance measure, together with operating income (loss) and net income (loss), will help investors better understand Viisage's underlying financial performance and ability to generate cash flow from operations. A reconciliation of GAAP to EBITDA earnings is included in the following tables:

|  | For the Quarter Ended | |
|  | September 26, | September 28, |
|  | 2004 | 2003 |
|  | (in thousands) | |
| Income (loss) before cumulative effect of change in accounting principle | $    198 | $    (389) |
| Add: | | |
| Depreciation and Amortization | 2,742 | 1,579 |
| Interest Expense, net | 411 | 276 |
| Taxes | 25 | — |
| EBITDA | $    3,376 | $    1,466 |

*Conference Call*

Viisage will hold a conference call with the investment community to discuss these results on Tuesday, October 26, 2004, at 8:30 am EDT. The call may be accessed via Webcast at the Company's Web site (*www.viisage.com*), ten minutes prior to the start, or by calling 1-800-599-9816, confirmation code 54809725. Internationally, dial 1-617-847-8705 with the same confirmation code. A replay will be available as a Webcast, accessible on the Company's Web site, one hour after the completion of the call. In addition, the Company will also host a financial discussion with the investment community immediately after this call, with Chief Financial Officer Bill Aulet. This call may be accessed via webcast at the Company's website (*www.viisage.com*), or by calling 1-800-299-9086, using confirmation code 23284444. Internationally, please dial 1-617-786-2903, using the same confirmation code. A replay of this call will also be available as a webcast, accessible on the Company's Web site, beginning one hour after the completion of the call.

## About Viisage

Viisage (NASDAQ: VISG) delivers advanced technology identity solutions for governments, law enforcement agencies and businesses concerned with enhancing security, reducing identity theft, and protecting personal privacy. Viisage creates solutions using secure credentials and face recognition technologies that quickly, reliably, and accurately identify individuals. With more than 3,000 installations worldwide, Viisage's identity solutions stand out as a result of the Company's industry-leading technology and unique understanding of customer needs.

*This news release contains forward-looking statements that involve risks and uncertainties. Forward-looking statements in this document and those made from time to time by the Company through its senior management are made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. Forward-looking statements concerning future plans or results are necessarily only estimates and actual results could differ materially from expectations. Certain factors that could cause or contribute to such differences include, among other things, the size and timing of contract awards, performance on contracts, availability and cost of key components, unanticipated results from audits of the financial results of acquired companies, changing interpretations of generally accepted accounting principles, outcomes of government reviews, potential fluctuations in quarterly results, dependence on large contracts and a limited number of customers, lengthy sales and implementation cycles, market acceptance of new or enhanced products and services, proprietary technology and changing competitive conditions, system performance, management of growth, dependence on key personnel, ability to obtain project financing, general economic and political conditions and other factors affecting spending by customers, the unpredictable nature of working with government agencies and other risks, uncertainties and factors including those described from time to time in Viisage's filings with the Securities and Exchange Commission, including without limitation, Viisage's Form 10-K for the year ended December 31, 2003 and its quarterly reports on Form 10-Q. Viisage undertakes no obligation to update any forward-looking statements.*

— Tables follow —

# # #

## VIISAGE TECHNOLOGY, INC.
### Consolidated Balance Sheets
### (in thousands)
### (Unaudited)

| | September 26, 2004 | September 28, 2003 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash & cash equivalents | $    34,363 | $    11,423 |
| Accounts receivable | 18,002 | 8,026 |
| Inventories and other costs & estimated earnings in excess of billings | 3,293 | 4,496 |
| Other current assets | 1,176 | 1,136 |
| Total current assets | 56,834 | 25,081 |
| Property and equipment, net | 22,308 | 23,104 |
| Goodwill | 61,858 | — |
| Intangible assets, net | 21,708 | 2,892 |
| Restricted cash | 3,000 | 5,120 |
| Other assets | 1,427 | 2,082 |
| | $   167,135 | $    58,279 |
| | | |
| **Liabilities & Shareholders Equity** | | |
| Current liabilities: | | |
| Accounts payable & accrued expenses | $    14,447 | $     7,738 |
| Related party payable | 1,385 | — |
| Current portion of project financing | 3,968 | 4,259 |
| Current portion of related party notes | 10,300 | 1,829 |
| Total current liabilities | 30,100 | 13,826 |
| Project financing | 4,966 | 6,153 |
| Related party notes | — | 2,783 |
| Other liabilities | 414 | — |
| Total liabilities | 35,480 | 22,762 |
| Commitments and contingencies | | |
| Shareholders' equity | 131,655 | 35,517 |
| | $   167,135 | $    58,279 |

## VIISAGE TECHNOLOGY, INC.
### Consolidated Statements of Operations
### (in thousands, except per share amounts)
### (Unaudited)

| | Three Months Ended | | Nine Months Ended | |
|---|---|---|---|---|
| | September 26, 2004 | September 28, 2003 | September 26, 2004 | September 28, 2003 |
| Revenue | $ 19,907 | $ 10,108 | $ 48,442 | $ 27,053 |
| Cost of revenue | 14,400 | 6,728 | 34,613 | 20,344 |
| Gross margin | 5,507 | 3,380 | 13,829 | 6,709 |
| Operating expenses: | | | | |
| Sales & marketing | 1,588 | 1,237 | 4,659 | 3,786 |
| Research & development | 896 | 946 | 2,797 | 2,828 |
| General & administrative | 2,362 | 1,328 | 6,717 | 3,454 |
| Total operating expenses | 4,846 | 3,511 | 14,173 | 10,068 |
| Operating Income (loss) | 661 | (131) | (344) | (3,359) |
| Interest expense, net | 411 | 276 | 1,380 | 726 |
| Other (Income) expense | 27 | (18) | (48) | (18) |
| Income (loss) before income taxes and cumulative effect of change in accounting principle | 223 | (389) | (1,676) | (4,067) |
| Provision for income taxes | 25 | — | 75 | 63 |
| Income (loss) before cumulative effect of change in accounting principle | 198 | (389) | (1,751) | (4,130) |
| Cumulative effect of change in accounting principle | — | — | — | (12,131) |
| Net income (loss) | $ 198 | $ (389) | $ (1,751) | $ (16,261) |
| Basic net income (loss) per share before cumulative effect of change in accounting principle | $ 0.00 | $ (0.02) | $ (0.05) | $ (0.20) |
| Diluted net income (loss) per share before cumulative effect of change in accounting principle | $ 0.00 | $ (0.02) | $ (0.05) | $ (0.20) |
| Cumulative effect of change in accounting principle | $ 0.00 | $ 0.00 | $ 0.00 | $ (0.59) |
| Basic net income (loss) per share | $ 0.00 | $ (0.02) | $ (0.05) | $ (0.79) |
| Diluted net income (loss) per share | $ 0.00 | $ (0.02) | $ (0.05) | $ (0.79) |
| Basic weighted average common shares | 40,072 | 21,512 | 35,783 | 20,711 |
| Diluted weighted average common shares | 41,090 | 21,512 | 35,783 | 20,711 |

EXHIBIT 22

# Conference Call Transcript

## VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call

Event Date/Time: Oct. 26. 2004 / 8:30AM ET

Event Duration: N/A

| Thomson StreetEvents | streetevents@thomson.com | 617.603.7900 | www.streetevents.com |  |

© 2004 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call

## CORPORATE PARTICIPANTS

**Bernard Bailey**
*VISG - President and CEO*

**Bill Aulet**
*VISG - CFO*

## CONFERENCE CALL PARTICIPANTS

**David Gremmels**
*Thomas Weisel - Analyst*

**Paul Coster**
*JP Morgan - Analyst*

**Jim Ricchiuti**
*Needham and Company - Analyst*

**Scott Greiper**
*Unterberg - Analyst*

**Tim Quillin**
*Stephens Incorporated - Analyst*

## PRESENTATION

**Operator**

Good day, ladies and gentlemen, and welcome to the Third Quarter 2004 Viisage Technology Incorporated Earnings conference call. My name is Andrea, and I will be your coordinator for today. At this time, all participants are in a listen-only mode. We will be facilitating a question and answer session towards the end of today's conference. If at any time during the call you require assistance please press star, followed by zero and a coordinator will be happy to assist you.

I would now like to introduce today's host of today's call, Bernard Bailey, President and CEO. Please proceed.

**Bernard Bailey - VISG - President and CEO**

Thank you, Andrea, and good morning. We're pleased you can join us for the Viisage Third Quarter 2004 conference call. I'm Bernard Bailey, President and CEO. On the call with me today is Bill Aulet, our Chief Financial Officer.

We'll start the call with the review of our operational highlights, and then I'll share with you what we see ahead of us now in terms of the market and opportunities. Bill will then review our financial performance for the quarter and discuss our guidance for 2004. Following Bill's remarks we will open the call up to q and a.

This quarter we have decided to do something a little bit different in order to more effectively utilize our time. As many of you are aware, we now have 11 different analysts from Wall Street firms providing financial coverage of Viisage. In order to provide an opportunity for investors to gain greater insights into the financial performance of the Company we will follow this call with a separate call focused specifically on financial questions. Bill will host that call, and it will immediately follow at the conclusion of this call. Of course, it is open to all of our investors, and you are encouraged to attend.

Now, let me turn the call over to Bill to read our Safe Harbor Statement.

**Bill Aulet - VISG - CFO**

Thank you very much, Bernard, and good morning to everybody.

Statements that representatives of Viisage make on this call that are not historical facts are accurate as of today, October 26th, 2004, and may be considered forward-looking statements that involve risks and uncertainties, including reliance on public sector markets, the possibility of customer delays, the need for capital and



**Thomson StreetEvents** | streetevents@thomson.com | 617.603.7900 | www.streetevents.com | 2

© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call

compensation. You should refer to our Form 10-K for the year ended December 31st, 2003 filed with the Securities & Exchange Commission on March 30, 2004 under the heading 'certain factors that may affect future results', as well as our subsequent SEC filings for more information on the risk factors that could cause actual results to differ, perhaps materially, from our statements today. Viisage undertakes no obligation to publicly release any revisions to forward-looking statements, statements made today, or otherwise supplement statements made on this call.

Back to you Bernard.

**Bernard Bailey** - *VISG - President and CEO*

Thanks, Bill.

We are certainly exceedingly pleased with our results for this quarter. For the fifth straight quarter we are reporting record quarterly revenues. At $19.9 million, our revenues are up 97 percent on a year-over-year basis. I am also pleased to report that we produced a profitable quarter with earnings of almost $200,000. At the same time, we have generated a record level of EBITDA. At $3.4 million this quarter, our EBITDA was up more than 110 percent from the previous year's quarter.

These financial results are certainly a testament to our continued focus on delivering profitable revenue growth for our shareholders, while effectively managing our cost structure. I also think these results speak very well to the momentum we are building, both for the rest of this year, as well as leading us into 2005.

We have built Viisage into a leading identity solutions provider, offering customers a full life cycle of identity solutions. With the transformation of our Company through both organic development, as well as key acquisitions, we are well on our way to becoming the premiere provider in this marketplace, both domestically and internationally. The results we have already produced and the opportunities ahead of us provide us with the confidence today to increase our 2004 annual revenue and EBITDA guidance. Bill will detail these guidance numbers a little later on in the call.

Let me begin by addressing some of the important accomplishments we had this quarter, and then I will discuss some of the areas we are focusing upon to continue to improve our Company.

First of all, including our announcement this past week regarding the Wisconsin State Driver's License win, we have booked $15.4 million in sales backlog since our last call. Besides the $7 million contract with the State of Wisconsin, we expanded our business into the driver's license marketplace with extensions in Florida, Maryland, and Ohio, totaling more than $4 million in business. In addition, we also expanded our Federal backlog with extensions on our existing contract base totaling just over $2 million in additional

business. We are also very excited to report close to $2 million in new bookings for our face recognition solutions.

Longer term, we have continued to strengthen the total product portfolio of the Company going forward. In the face recognition arena, our signing of a cooperative partnering agreement with Siemens AG is a very important technological development, giving us advanced capabilities and a strong partner for continued advancement in 3D face recognition technology. In addition, the early results that have been reported from the U.S. Government's face recognition, grand challenge indicate that we are providing a face recognition solution that is technically equivalent or superior to any solution in the marketplace, both from an accuracy as well as a breadth of solution perspective.

In the identity solutions product arena, we unveiled in August our new identity solutions product suite and immediately launched the innovative Viisage proof product at the International AMVA Conference to great reviews from our customers. We continued to enhance our product capabilities with the acquisition of Imaging Automation, the leading provider of advanced technology verification and authentication solutions. We are already seeing wide acceptance of this solution in the marketplace with many of our existing customers, as well as new customers and partners, demonstrating an interest in better understanding how Viisage can address their needs in this critical area of identity proofing.

This past quarter we also put a great deal of effort into improving the long-term financial health of our Company. Our follow-on offering allowed us to increase our cash position from $12.6 million to more than $37 million, while at the same time reducing our outstanding debt from $29.8 million to $19.2 million. This improved financial health has allowed us to secure a $25 million line of credit with the leading financial institution, Citizens Bank, which will give us even greater financial flexibility to build our Company going forward.

While there is much to be proud of this past quarter as a Company we would rather focus on what lies in front of us. Before we talk about the opportunities that we see, let me address a few areas that many of our investors have raised some questions about. Let me begin with our ongoing litigation.

Someone always asks for an update on **Georgia**, so let me share what we know. As I mentioned on our last call, last October we had – excuse me, last quarter we had proposed a settlement with our customer, the State of **Georgia**, entailing a payment to Viisage and a pledge by the State to rebid the RFP this year. The State agreed with our recommendation, signed an agreement with us, and was prepared to issue the final payment. Unfortunately, that settlement was the subject of a temporary restraining order by our competitor. Right now, we expect a hearing on a series of summary judgment motions to occur shortly, with a decision probably coming out in the next few weeks. We'll certainly let you know once we hear more information.



© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call

As for our other pending lawsuit that arose last quarter concerning Fargo Electronics, Toppan and TDT, I have no update on that lawsuit other than to note that any court action is unlikely before the second half of 2005. We continue to believe there's absolutely no basis or standing for the complaint, and we filed motions to dismiss the case.

There was certainly much discussion this past quarter regarding the recent announcement of the Department of State's decision to select a competitor to the facial recognition contracts. We were disappointed in that decision, especially in light of recent announcements by DOS personnel, who have continued to applaud the outstanding performance of our solutions in the Diversity Visa Program. As I mentioned in our last call, it is important to understand the facts before jumping to any conclusions.

Since our last call, we have had the opportunity to receive an outbriefing from the Department of State Procurement personnel. So let me share with you what we now know. Viisage was involved in this RFP as a subcontractor through a systems integrator. Now, a lot of you ask, why did we bid it as a sub? Well, very simply because the procurement regulations required that in order to bid, a contractor had to be on the Government systems integrator GSA contract.

Just prior to the final bid submission, the Government then allowed the winning FR company under a dispute to bid directly as a prime contractor due to their standing on the GSA contract for technology products. As a company Viisage did not reside on either contract schedule, and therefore, we were excluded from bidding as a prime. Now, I think you can understand that this limited greatly our ability to affect the final pricing of the proposal.

From the outbriefing, we learned the Department State decision was made solely on price due to the fact that the difference in price between the winning bid and the second lowest bidder was almost 70 percent. We were clearly informed that our technology performed exceptionally well in all of the independent bench testing done during this procurement process. That said, we are gratified by the remarks made by the State Department representatives to the effect that the technology showed significant improvements from one that had been tested just 12 months ago.

We see this contract as an important validation for our industry and all participants. Fortunately, because of the fine work we have done for the Department of State on all of our existing contracts with them, we expect to compete vigorously for other opportunities there as they arise. Additionally, the acceptance of our technology by other integrators, as well as our positioning in key pilots being conducted presently in the European Union, as well as the Middle East, gives us comfort in the worldwide acceptance of our solution going forward.

So let's now focus on what lies ahead. Our goal this year has been to focus our strategy, ensure that we have the right products to support that strategy, and then execute against that strategy. We said we would expand our portfolio of identity solutions, and with the three acquisitions this year we have done so, and can now provide comprehensive solutions to our customers, especially in areas like proofing that are regarded as the weakest link in the entire identify verification chain. We are leveraging fully the opportunities that our acquisitions brought to the table, and together we have effectively attacked new markets while continuing to produce solid growth in our core business.

So where does that strategy lead us as we move into the last quarter of 2004 and prepare for 2005? I thought it would be helpful today if we went through our business market by market and provided you with some insights about the opportunities we see. These opportunities in some cases, I will emphasize, could not have been pursued by the stand-alone Viisage of 2003, since many entail collaborative efforts throughout the Company, fully utilizing the talent, market positions, and technology of the companies we have acquired.

We are continuing to pursue opportunities in a wide range of civil ID applications as varied as border management, passports, and benefits distribution, all in addition to driver's licenses. We continue to believe that identity solutions are moving from single documents to a far wider set of permissions, centered around verifying identity, and that more customers are recognizing this both as a problem they need to solve and looking to Viisage as the company that can help them do this.

The many important and large national and international opportunities like U.S. VISIT, TWIC, and other border management possibilities particularly are high on our list, even though timing of contracts rewards continues to remain difficult to project. I've said previously that we didn't expect to see any significant awards from these programs before the end of 2004 and probably more likely into 2005 at the earliest. That certainly remains the case.

But let's look at the wider horizons. Starting with our Federal business, the U.S. passport program continues to grow with more passports being issued to U.S. citizens over the next few years. The e-passport is a strategic and important growth initiative in which we will be participating once it moves beyond the initial chip deployment for which vendors have already been selected. We also see substantial opportunities for IA's authentication capabilities at consulates and embassies around the world.

On the worldwide passport and visa side, there are some 27 visa waiver countries that are evaluating and incorporating biometrics into their ID documents over the next 12 to 18 months, facing that October 2005 deadline, as well as considering the use of authenticating technologies like those we've recently acquired from IA.

Thomson StreetEvents    streetevents@thomson.com    617.603.7900    www.streetevents.com    

© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call

Non-waiver countries are also moving toward e-passports, biometrics, and authentication, as well, sometimes even more quickly. There's tremendous opportunity within the Middle East in particular, as these countries move to better authenticate identities of their citizens as evidenced by the expansion of the Dubai Program with our solutions. This is a very large overall market.

On U.S. VISIT particularly, there continues to be a large opportunity for our combined capabilities and our solutions that solve many of the challenges that are raised in this initiative. The major programs like TWIC and Registered Traveler are also progressing along, utilizing our solutions for authentication and proofing in their pilots. I don't want to get more specific, but obviously we're very pleased to be involved in these initial efforts with a wide range of partners that we've been working with.

With smart cards for identification documents with both biometrics and other information embedded into them, following up on our very significant win earlier this year at the Department of Defense, we see ample opportunities domestically and internationally, including one that would provide similar cards for all Federal employees. I think many of you are aware of the recent Presidential directive calling for the deployment of CAC-similar cards throughout the Federal Government. We are active with the standards body that will develop common standards for these, and we are monitoring efforts to replicate the CAC Program going forward. So it is a great opportunity for us.

With the international connections coming out of our IA acquisition, we are in significantly better position in these markets than we had been previously. The addition of Ken Sheflein to head our Federal Team in Washington this past quarter also positions us extremely well for this marketplace. Many of you know Ken, and he is widely regarded as the father of the DOD's CAC Program, having driven that program within the defense manpower data center as its leader for the past 15 years.

We have already seen tremendous synergies with IA's focus and ours, especially with driver's license contracts, ones we have, as well as ones we are pursuing. These customers are very interested in authenticating the identity of the individuals before issuing a State credential. Our ability to leverage proofing solutions into this space creates a competitive advantage that we intend to pursue aggressively, as it exploits the weakest link in the identity chain.

But to think that we did IA for the single purpose of synergizing within the Department of Motor Vehicles Administration Offices would be missing this opportunity significantly. The border management opportunity for IA is also extremely strong. We see initiatives similar to the programs already in place in Canada and Australia where IA has delivered high quality results, and we are participating in a number of tests and pilots focused on integrating chip readers into border crossing solutions as part of the overall e-passport initiative.

The first vestiges of our identity solutions being used in the commercial marketplace are also emerging. Initially, overseas where there are strong mandates for access control. With IA's technology and our full product suite we are working with the range of partners primarily to address these opportunities, which are already producing some revenue for our Company. We expect this business will find greater traction in the longer term, particularly in areas like healthcare and financial services. We are already engaged in pilot programs with financial institutions, airlines, and casinos, specifically. And these initiatives are another example of the strong synergies between our authentication and identification capabilities.

Let me share with you why we are excited about the potential in these markets. First of all, in the airlines industry, one of our airlines customers has decided to adopt the IA technology to combat credit card fraud. In their case, they are looking for the definitive authentication of the identities of individuals taking a flight to verify that they, in fact, consummated the transaction that was recorded on their credit card. As hard as it may be for some of us to believe, there is a large number of people out there who charge their flights over the internet, and then when their bill comes, they claim that they never took the trip, claiming instead that the charge was done fraudulently. Now the airline will have a verified record of who actually made the trip.

In the financial services industry, the Patriot Act mandates formal documentation and verification of the identities of individuals opening new accounts. Certainly, the IA solutions provide an effective means of verifying the identity and documenting these transactions going forward, so we see tremendous opportunity in the financial services industry for these solutions.

We continue to see more interest in the law enforcement market, building upon our recent successes to expand the role of identity solutions in this critical arena. Demand for face recognition solutions is increasing in this market as successes like we've seen at Pinellas County, where they recently caught four fugitives with our technology, demonstrates the validity of our solutions. Across the U.S. and internationally, we are seeing large opportunities for information sharing solutions utilizing face recognition and criminal ID solutions that we have, and they are certainly under consideration. These include both interstate and intrastate solutions entailing interoperability as well. Viisage has achieved good success this year adding such customers as Jefferson County, a major metropolitan area, the Ohio Department of Corrections that we recently announced, and continued expansion down at Pinellas. Now, similar proposals are on the table with many other agencies.

As I've said before, historically, Viisage was a driver's license company, and this constituted the majority of our revenues and the foundation of our move into FR and other products that make the full spectrum of ID solutions. The driver's license business in the U.S. offers a number of opportunities over the next 12 to 18



Thomson StreetEvents    streetevents@thomson.com    617.603.7900    www.streetevents.com    5

© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call

months with several very large key contracts expected for bid, including California, Texas, Virginia, and Indiana. We are still waiting to hear on West Virginia's plans. Altogether these constitute more than $100 million in potential revenues and all of these would be new to Viisage, so we are very excited. We are also buoyed by our recent win of Wisconsin, and we are aggressively pursuing other States to the extent that they make economic sense for our business.

As we showed you this quarter in our financial results, we are not going to forego profits just to record revenue expansion, so we will continue to bid with an eye on shareholder value in this marketplace. I will emphasize that the U.S. driver's license business remains an important avenue for the implementation and validation of our technology, but not the only one. European and Canadian driver's licenses offer opportunities, like Ontario and the U.K., over the next 12 to 18 months. And we are very well positioned to pursue these opportunities, as well, either independently or working through our network of fine partners.

I want to reemphasize that there is a substantial up sell opportunity within our existing driver's license customer base, as demonstrated by our recent announcement of two customers now incorporating face recognition into their solutions. I wish I could tell you who those States are, but the fact of the matter is that they're so excited about the solution that they would much rather keep the solution under the covers and deploy it across the State. And there is also a large sized opportunity for Viisage with this customer base for our proofing product as well. In short, we are fully able to help them solve additional problems with our proofing, face recognition, and other credentialing capabilities.

In closing, let me say again how very pleased I am by our progress this past quarter, especially our record results and profitability. I firmly believe we have an extraordinary opportunity at our doorstep to build Viisage into the leading provider of ID solutions. And this quarter we have demonstrated that we can accomplish this goal in a fiscally responsible manner. The events of the past few weeks, from the acquisition of Imaging Automation to our key customer wins, provide me with continued confidence that we have many opportunities ahead of us, ones where we can continue to prove Viisage's value proposition to our customers.

With that, let me turn the call over to Bill to discuss our financial performance and outlook. Bill.

Bill Aulet - VISG - CFO

Thank you very much, Bernard.

As I begin, I want to remind you that on December 30th, 2003, Viisage adopted the new accounting principle, EITF 00-21, affecting how revenues are recognized under long-term contracts, like our driver's license agreements. This methodology is

retroactively applied to periods of January 31st, 2003, and to assist you in comparing our current results for earlier periods we have recalculated those prior periods results. We will refer to these figures throughout the call, but if you have any questions, please visit our web site at www.viisage.com in the Investor Section. I will also be using EBITDA and other non-GAAP measures during this discussion, and a reconciliation of those measures to the conforming GAAP measures is also on our web site in the same section.

As Bernard mentioned, for the third quarter of 2004, we experienced robust revenue growth. Revenues for the recently completed quarter were $19.91 million, a fifth consecutive record quarter. This represents a 97 percent increase year-over-year basis and a 22 percent increase on a quarter-over-quarter basis. This top line growth was driven by our Viisage Federal Solutions Group in Washington, D.C., and particularly the Department of Defense Common Access Program. We shipped over $5 million of Common Access Card production systems in the quarter, which represents significant revenue to the Company in this quarter. In addition, these systems will provide the foundation for ongoing higher margin revenue streams in the future, specifically in the area of consumables. The gross margin percentage on these production systems was within the mid-teens range and, therefore, while adding to the absolute gross margin, they did bring down the overall gross margin percentage for the Company in the quarter.

Of the 97 percent year-to-year growth rate, organic growth represented approximately one-third, demonstrating that not only are our acquisitions already contributing significantly to our top line growth but we are experiencing healthy organic growth in our core business, as well. Equally as important to our top line growth is our net income. We are proud to announce the first GAAP profit in three years with $198,000 of net income, or essentially breakeven on a basic and diluted share basis, demonstrating our commitment to attaining this important long-term goal.

We've been steadily improving our performance in the bottom line. In the first quarter, we had a loss of slightly over $1 million. Last quarter this has been reduced to a loss of $17,000. This quarter we crossed the breakeven line to be net income positive. For year-to-year comparison purposes, in the last year's third quarter the Company recorded a loss of $390,000 or 2 cents per share on a basic and diluted basis. We are pleased with our progress here.

It should be noted that included in the calculations of this net income is an existing charge related to the amortization of intangible assets, a non-cash expense resulting from our acquisitions, primarily related to TDT and ZN. This expense totaled over $900,000 for the quarter. Understanding the significant non-cash expense, which does not have to replenish and eventually goes away after the intangible asset on the balance sheet, is the major reason why our EBITDA performance was so strong again this quarter, but more about that later.



Thomson StreetEvents    streetevents@thomson.com    617.603.7900    www.streetevents.com (any part of any means without)

© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call

On the gross profit margins, we indicated on the last conference call that they would decrease due to the Department of Defense production systems anticipated in this quarter. As projected, this became a reality this quarter as our gross margins decreased to 28 percent from 31 percent in this year's second quarter, and down from a record 33 percent in last year's third quarter. This is a reflection of product mix. We anticipate a substantial number of those productions to ship in the fourth quarter as well, albeit at a slightly lower total volume.

Even so, we see that investments we have made in improving our product offerings and efficiencies in delivery should make this just completed quarter a temporary depression in gross margin percentage. We are confident that these efforts to increase gross margin going forward will pay dividends in the near term. In fact, as we look forward to our pipeline for the next quarter and the productivity improvements we have made even with the significant component of Common Access Card production systems in the quarter's revenue, we believe we are poised for significant overall gross margin improvement that will not only return us to the margins we saw earlier this year but allow us to potentially exceed them.

We are also continuing our relentless effort to control costs and to improve efficiencies while simultaneously investing in key areas that will generate growth and improve profitability in the future. In the quarter overall operating expense increased quarter to quarter from $3.51 million in the same quarter last year and $4.74 million in the second quarter this year to $4.85 million in the just completed quarter.

The overall $110,00 increase in total operating expense on a quarter-to-quarter basis was driven by a $144,000 increase in G&A expense for the quarter. This was caused in large part by increases in three areas that offset other cost savings initiatives. First, consulting costs associated with our Sarbanes-Oxley compliance project grew from under $75,000 in the second quarter to over $350,000 in the just completed quarter. Secondly, legal costs associated primarily with Georgia and Fargo litigation continue to be significant, up $50,000 in total for over $300,000 for the quarter. Thirdly, there was a one-time expense of $120,000 for administrative and legal costs that were being amortized over the anticipated life of a note. When we paid off the note early in the just completed quarter, we had to take this expense in the quarter as well.

The fact that we've been able to hold operating expenses relatively flat in the prior quarter speaks well to our cost control, but we are not satisfied with our performance especially in the area of G&A. I will note that we have not yet seen any contribution from the rent reduction associated with our headquarters relocation from Littleton to Billerica, which will generate savings of about $15,000 per month, and that will be recognized starting in the fourth quarter of this year.

In the expenses for the third quarter, sales and marketing were $1.59 million, flat on both the sequential and annual comparison. R&D expenses were $893,000, down on both the sequential and the annual comparison, benefiting from the capitalization of software related to these products.

As mentioned earlier, we had a significant non-cash expense, and we have significant non-cash expenses, and so we tracked EBITDA, as well, as a valuable metric for the underlying strength of our business, specifically to generate cash flow. In the third quarter of 2004, we generated $3.4 million of EBITDA, another solid improvement both the $1.5 million we posted last year in the third quarter, as well as the $3.1million we produced in the second quarter this year, and the $1.1million we registered the first quarter of this year. We expect to continue to see improvement in this area, as well.

At the end of the third quarter of 2004, we had a cash position of approximately $37.36 million compared to $12.6 million at the end of the second quarter, reflecting the addition of net proceeds of approximately $37.9 million from our follow-on offering, offset by the initial repayment of related party debt of approximately $10 million. Of our cash position only approximately $3 million, or less than 10 percent, is encumbered. As Bernard mentioned, we're pleased to announce as well today that we have received a commitment letter from a major bank for a $25 million line of credit to replace our existing bank facilities. This new arrangement will not only give us valuable flexibility but will also reduce our rates of borrowing, significantly simplify our covenants, and increase yields on our money in the bank, all while making our G&A operations more productive by providing services locally and worldwide to meet our rapidly evolving needs.

In the fourth quarter we will be able, if we so choose, to reduce our outstanding debt quite significantly, and after paying off early prepayment fees, save approximately $600,000 a year in interest expense. We will be monitoring this closely, and our actions will be affected directly by our M&A program. But in any case, we have new financial flexibility that will be very valuable to support our growth, as well as being highly cost effective.

At the end of the third quarter, we had approximately 43 million shares outstanding, compared to 21.5 million at the end of the third quarter of last year, with the increase reflecting both the acquisitions we have made this year in which stock was issued, as well as the follow-on offering. We are pleased, as well, that we were able to secure financial terms in our acquisitions, and that we expect them to be accretive to our results in 2005.

Backlog at the end of the third quarter of 2004 was approximately $140 million, down from $151 million at the end of the second quarter this year. Historically, as we've said before, backlogs have not always moved in a linear fashion. Our businesses tend to be lumpy with large contracts playing a major factor. Importantly,


© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call

however, the backlog still constitutes a healthy multiple of our annual revenues. I'll remind you that in connection with the proposed settlement we announced in the State of Georgia we decreased the backlog by 19.7 million during the third quarter. Of course, the new contract wins that we've announced thus far this quarter will increase the backlog, especially the Wisconsin award. We are not providing mid-quarter figures on backlog since this is an end of quarter figure and interim numbers can be misleading. Suffice it to say that we are pleased with the direction with our wins and quite confident the backlog will continue to grow to reflect that.

The nine months' results are discussed in the release, so I won't take the time this morning to repeat that text.

Now, I'd like to discuss our annual guidance for 2004. In early May, based upon the strength of our pipeline business we raised annual guidance to $60 million to $63 million, and our EBITDA guidance for 2004 to $11 million to $12 million. At this time, we are comfortable raising this guidance yet again to revenue of $66 million to $68 million for 2004, up approximately 10 percent, and EBITDA of $11.5 million to $12.5 million for the year.

We were also active with our investor relations' outreach this quarter with the number of opportunities to meet with both retail and institutional investors. We spoke at the Roth Conference in New York in September, and later today we are presenting at the JP Morgan Small Cap Conference in Boston. We will also be presenting at the AeA Conference in early November in Monterey. We plan to continue our outreach and response efforts to ensure that we communicate effectively with investors about the Company's vision, strategy, and progress. As usual, we'll keep you updated through press releases on details associated with those presentations.

With that, let me turn the call back over to Bernard.

**Bernard Bailey - VISG - President and CEO**

Great. Thank you, Bill.

Andrea, we'd like to open the lines up now to some q and a.

QUESTION AND ANSWER

**Operator**

[Caller instructions.]

Our first question comes from David Gremmels from Thomas Weisel. Please proceed.

**David Gremmels - Thomas Weisel - Analyst**

Thank you. Good morning. I wanted to ask you about the backlog. And I think early in the call you mentioned $15 million of new awards. Was that in Q3 alone, or in Q3 and Q4?

**Bernard Bailey - VISG - President and CEO**

No, what I said was that these were all announced since our last call, so it included some of the stuff that we announced in our call. Of the $10.9 million that we put out in a press release last week, some of that was closed in Q3 and some was closed in the early part of Q4.

**David Gremmels - Thomas Weisel - Analyst**

Okay. So I think, you know, adjusting for the State of Georgia, it looks like you booked around $9 million of new orders in Q3, so that would imply you have about $6 million of new orders thus far and already in Q4?

**Bernard Bailey - VISG - President and CEO**

Yeah, it's more like $7 million already.

**David Gremmels - Thomas Weisel - Analyst**

$7 million, okay. And I know you said you didn't want to discuss mid-quarter backlog, but you know, maybe you can talk about where you would hope to see backlog at the end of the year?

**Bernard Bailey - VISG - President and CEO**

Well, we don't give guidance on backlog, but what I'll tell you is that, you know, we see a lot of pretty exciting opportunities in front of us. You know, it's very difficult to predict backlog because we have no idea when particular decisions are going to be made, or when particular contracts are going to get formalized and signed, or what funding is going to be made available.

Thomson StreetEvents    streetevents@thomson.com    617.603.7900    www.streetevents.com    

© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**FINAL TRANSCRIPT**

VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call

You know, one of the issues that always occurs in the third quarter, of course, is that it's the end of the fiscal year. And while procurements occur, they don't necessarily manifest into signed contracts, so with all of that, it's very, very difficult to predict something like that, especially in the Government marketplace. So I'm sorry I can't give you a better number.

**David Gremmels - Thomas Weisel - Analyst**

Okay. And the $2.5 million payment from Georgia, was that – I just want to confirm that was not booked into revenue during the quarter, and you didn't receive the cash from that?

**Bernard Bailey - VISG - President and CEO**

Both of what you said is correct. A, it was never booked into revenue, and B, we did not receive the cash. Now, let me just highlight because some of our people may not be aware. In our driver's license, we only book revenue when we produce a card. We only produce revenue when we produce a card, so therefore, we're not going to book revenue until a card is produced, so there is no revenue that is booked regarding the Georgia procurement in any way.

**David Gremmels - Thomas Weisel - Analyst**

Okay. Great. And then, last question, you talked about the facial recognition visa award to the competitor. My understanding had been that there was going to be a separate contract to incorporate facial recognition technology into the passport program. Do you know is that contract a separate opportunity that you're pursuing, or is that wrapped up with that visa award?

**Bernard Bailey - VISG - President and CEO**

Well, there's two angles on that one. The first one is that the original procurement from the Department of State included both the visa and the passport. However, the only award that was made is relative to the two visa programs. So that's what's been awarded up to this point in time.

Does the Government have the flexibility to be able to award the passport to the competitor? The answer is yes. Will they? That remains to be seen. At this point in time, the award hasn't been made on the passport for the simple reason that the State Department is very, very busy in dealing with the whole chip on the passport and inlay issues which they're working with, and have just awarded to four vendors at this time. So a lot of that remains to be said.

As I said in my comments, you know, we have a great relationship with the Department of State, and that's a great relationship because quite frankly we're done some really good work for them

over the last several years on the passport business, as well as the diversity visa. They're also extremely satisfied with the quality of our solution and the accuracy of our face recognition technology as they've been deploying it on the diversity visa program for the past year. So with all of that we'll just continue to work with them, and do what's right for our customer, and put our customer first, and see how that plays itself out. But there's really nothing more specific relative to what may happen and when.

**David Gremmels - Thomas Weisel - Analyst**

Great. Thank you very much.

**Bernard Bailey - VISG - President and CEO**

You're welcome. Thanks for your questions.

**Operator**

Our next question comes from Paul Coster from JP Morgan. Please proceed.

**Paul Coster - JP Morgan - Analyst**

First of all, it looks like the guidance for the next quarter is pointing to flat, so it may be slightly down revenue. It's obviously got a lot of momentum. So what's accounting for the slowing sequential growth rate?

**Bernard Bailey - VISG - President and CEO**

Well, Paul, as you know, a couple of things on that. First of all, it's always our nature to want to make sure that we give guidance out there that is reflective of what we really believe is going to happen. So that's important to us.

Secondly, my gosh, you know, we've put together five straight record quarters in a row, and you know, we're getting at the point now where as a business we continue to grow and expand, and as we start to see some of the new acquisitions come on and the new opportunities, certainly we'll start to see more seasonality associated with the revenues that we'll have as the business going forward.

And I think that we're seeing some of that as we go forward in our Company. Certainly, you know, we will look and work aggressively to expand our revenues where it's appropriate, but we certainly also want to be realistic in what our assessment is and what that's going to be.

Having said that, you know, we've had some very aggressive deliveries associated with the DOD common access card systems

Thomson StreetEvents    streetevents@thomson.com    617.603.7900    www.streetevents.com

© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call

over the past two quarters and that has certainly helped us in our performance at the top line over that period. As Bill noted, all of those same systems have been suppressed to some extent our gross profit margins. And so, we would expect to see gross profit margins expanding as that mix changes also.

**Paul Coster** - *JP Morgan - Analyst*

Fair enough. Is the Presidential election in any way sort of holding back activities at the moment, do you think?

**Bernard Bailey** - *VISG - President and CEO*

Not that I'm aware of, Paul, no, not at all.

**Paul Coster** - *JP Morgan - Analyst*

Okay. Long-term obviously, the growth rate this year has just been phenomenal. I would have thought it would be difficult to get anywhere close to this year's growth rate. But what are you looking for in the future if you can't say specifically, where do you think the growth is going to come in '05?

**Bernard Bailey** - *VISG - President and CEO*

Yeah, I can't say specifically, Paul. We'll certainly give that guidance out in January for what we see for next year. I mean I will tell you, for gosh sakes, don't expect it to stay up in the 70, 80, 90 percent that you saw this year, okay? That won't happen.

Now, having said that, let's back up and make sure we understand. You know, organically what we've been seeing is 20 to 30 percent growth rate year-over-year, organically. So, you know, a lot of what we've done has been how we've assembled our Company and put together some of the pieces together, and that's where we've gotten some of the growth rate through the acquisitions.

So what does that mean going forward? Well, to us going forward, certainly where we see the growth rate occurring is going to specifically be in three areas. First of all, in the Federal marketplace. We expect to see some very nice expansion in that marketplace, particularly with the Presidential initiatives directed around increasing identity solutions very much like the CAC program throughout the Federal marketplace there.

So we continue to see opportunities there, but it's not just the identity opportunities coming forward; it's really in the areas of the rollout of some of the Federal programs which we hope to be an important part of which is, of course, as I mentioned, U.S. VISIT, TWIC, and some of the other border management programs. So that's an area we expect to see continued expansion in and growth going forward.

Secondly, you know, I was really bullish when we did the Imaging Automation acquisition. Having worked with Ron Vanass and the team there now for the past month, I am even more excited about the potential there, and it goes well beyond just what you would normally expect in our traditional markets. And as I tried to allude to in my conversations, it expands into some of the commercial marketplaces, like the airlines and financial services, as well as healthcare, which we think has great potential going forward. So I am very, very bullish about this whole area of proofing and identity authentication going forward. So that's very exciting to us.

And then, of course, with the rollout towards this 2005 October deadline, you know, we are seeing a lot of momentum and a lot of discussion coming out relative to implementing the face recognition solution on a global basis. So we certainly expect to see continued expansion in that area.

So as I look at it, Paul, you know, we feel pretty good about our positioning. Now, from a driver's license standpoint, you know, things will be a little bit tougher there. Okay. We haven't won a lot of States in that area. A couple States will drop off, so we'll have to fill in some of the gap there going forward, but we still remain very bullish. A lot of the States we talked about, the large opportunities, I don't want to mislead our analysts on Texas, California, Virginia, Indiana, these States will do their procurements most probably in the first half of this coming year, 2005, and we all know those things can move. But remember, we don't recognize revenue until we generate a card, so that probably won't kick in should we win any or some of those programs. It won't kick in until probably very late in the year at the earliest from a revenue standpoint. So hopefully, that gives you a little more color, Paul, as you try to look at the marketplace.

**Paul Coster** - *JP Morgan - Analyst*

Thank you, Bernard.

**Bernard Bailey** - *VISG - President and CEO*

You're welcome. Thank you.

**Operator**

Our next question comes from Jim Ricchiuti from Needham and Company. Please proceed..

**Jim Ricchiuti** - *Needham and Company - Analyst*

Thank you. Good morning.

**Bernard Bailey** - *VISG - President and CEO*


© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Case 1:05-cv-10438-MLW    Document 42    Filed 04/03/2006    Page 12 of 17    FINAL TRANSCRIPT

VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call

Hi, Jim.

**Jim Ricchiuti** - *Needham and Company - Analyst*

Bernard, I wonder if you could comment again on the gross margin issue or perhaps, Bill, you could? In the Q4, Bill, I think you alluded to the fact that you see gross margins possibly improving from Q3 levels. How much of the CAC business do you expect to ship in Q4? And is the benefit to sequential improvement that you see coming in Q4, is that also due to the addition of the 1A business?

**Bernard Bailey** - *VISG - President and CEO*

Bill, why don't you take that for Jim, okay?

**Bill Aulet** - *VISG - CFO*

Sure. As I mentioned, we shipped over $5 million of the CAC and that compressed it, but there were also underlying programs that we had been making investments in to become more of a product company in our solutions, providing products which will improve our gross margins. We will see those kicking in.

So, first of all, the CAC program will not be over $5 million, more in the neighborhood of $4 million in the fourth quarter, and then we see strength across the board in the driver's license business, in our kind of biometrics segment, if you want to call it that, and also Imaging Automation is very much a positive contributor to it. But it's basically following the strategy of, you know, increasing the product mix and the solutions that we offer, which allows us to increase our overall gross margins, as well as efficiencies that we've gotten in cost reduction in delivering in particularly the driver's license business.

**Jim Ricchiuti** - *Needham and Company - Analyst*

Okay. Great. And Bernard, just one final question for you if you could, just talking about the Presidential directives, as you look at that, and it's still early, you know, how this is all going to take shape. But as you look at the potential for that, do you see this as being ultimately more of a centrally issued ID card, or do you think it could be issued at the department and agency level using desktop systems? And I wonder if you could also comment on how you see that playing into the 1A business, as well?

**Bernard Bailey** - *VISG - President and CEO*

Yeah, a couple of things on that, Jim. First of all, it's not clear how it will happen, so I don't have any great wisdom on this. I do have a lot of experience in working down at the Government. And I would expect to see that it will continue to be an agency-by-

agency desktop type of issuance program and not a central issuance. Mainly because, you know, as we know, it's the Federal Government but they act as very, very separate entities.

For example, I could never see the DOD consolidating its card production into a central type of production because there's really a strong demand and need for over-the-counter fast response on these cards, and getting them issued out to people, just like many of us expect when we go and get an ID card. So I don't think that will happen. You know, I do think that, you know, each agency will go through its own process in procurement and will do it appropriately. Different ones are at different stages today, and they'll roll out accordingly.

That being said, as you well understand, Jim, and I know you do understand this, is that you know to really have the security through the identity of an individual, it has to be managed throughout the entire life cycle of the process. To miss a single arena or a single point in the life cycle weakens the entire chain of the life cycle and trust of the identity. As a result of that, it is absolutely clear to me that there will be a strong need to have to have solutions like the Imaging Automation solution to do both the upfront proofing and identity verification, coupled with the backend verification of the usage of that document. And already we're seeing that in discussions down in Washington with several of the agencies.

Now, certainly, the DMDC sees the applicability and the need for verifying individuals in the military, and most importantly, not so much the military people, but rather their dependents as they come forward. And then, in addition to that, we certainly see it in the passport arena and lots of discussion about verifying the identity of individuals and how do we verify those documents, both in the issuance as well as the usage in the backend. So clearly, this spills right over into any area where you have to issue an ID and a credential and verify that credential and tie that person to a credential. And Imaging Automation is an important part of that whole process.

**Jim Ricchiuti** - *Needham and Company - Analyst*

Okay. Thanks very much.

**Bernard Bailey** - *VISG - President and CEO*

You're welcome. Thank you, Jim.

**Operator**

Our next question comes from Scott Greiper from Unterberg. Please proceed.

**Scott Greiper** - *Unterberg - Analyst*


© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call

---

Good morning, guys. Congrats on the quarter.

---

**Bernard Bailey - VISG - President and CEO**

Thanks, Scott.

---

**Scott Greiper - Unterberg - Analyst**

A couple of questions. First of all, on the debt repayment, it looks like you paid off a little bit over $10 million, and you alluded in the call towards the possibility of no repayment this quarter but there were some prepayment issues. Can you give me some light as to, you know, when you would see using some of the cash from the secondary to repay debt?

And secondly, to follow-up, going back to Imaging Automation, you talked a lot about a commercial opportunities which I think is vital to diversifying the revenue stream, can you get a little more detailed, Bernard, on timing, not necessarily revenue timing but pilots that are ongoing in financial or healthcare, some of these other commercial applications?

---

**Bernard Bailey - VISG - President and CEO**

Yeah. Sure. Let me take the debt question first, okay. As you know, or all of you certainly were aware, when we filed the prospectus, when we did the follow-on offering that an important usage of our funds was to pay down our debt.

And why was that important? Well, that's important for very specifically, two reasons. Number one, it would allow us to have a lot more flexibility as a business going forward in terms of managing our business, but secondly, by getting rid all of our debt, it allows us to drop immediately about $2.4 million to our bottom line performance, helping us to get profitability even quicker.

So the obvious question then comes well, gee, if you got all of this cash, why didn't you just rush out and pay off the debt? And the fact of the matter is we wanted to do this in a smart way, Scott. And an important element in doing that was to make sure that we had secured behind us the flexibility to manage our business and our cash flow through its ups and downs, as any business has.

You know, I am very pleased as a business we're generating cash from operations on an annual basis, so all of us should feel pretty good about that. But we still want to have the ups and downs. For example, this quarter, our operating cash was actually slightly negative at about half a million dollars due to the fact that we had a significant run-up in our AR, which, as you well know, happens at the end of a fiscal year, and when you're in the Federal and State and local marketplace. So if that happens, we want the flexibility.

---

So what that all means is that what we wanted to do was make sure we had our line of credit in place. Now that we have it with Citizens Bank, we feel that we have the right debt structure and credit structure for the Company that will allow us now to use our cash to pay off that debt so we can drop to the bottom line a better financial performance for our shareholders.

So that's why we approached that, and yes, there are some issues relative to prepayments and we wanted to make sure that we went through that the right way and developed the right flexibility as we negotiated our banking relationship going forward. We're now in a position to deal with those. And that was just signed here this past week. And so that's the question on the debt. Does that answer that for you?

---

**Scott Greiper - Unterberg - Analyst**

Yes, it does. Yes.

---

**Bernard Bailey - VISG - President and CEO**

Okay. Good. Thanks.

So now, you ask about the rollout and the timing relative to some of the commercial opportunities? And you know, Ron VanAws has just done a terrific job, and I'm really excited about getting some of our analysts and shareholders to spend some time with Ron to really get as excited about the Imaging Automation opportunity as I am about it. And when you speak to Ron, you certainly will be.

Having said that, you know, Ron has been working this market now for a couple of years, and has really planted some good seeds in the pilot stage on this, and it's a little bit premature to say exactly when that will happen, but I wouldn't't be surprised to see some of that happen this quarter, Scott.

---

**Scott Greiper - Unterberg - Analyst**

The...

---

**Bernard Bailey - VISG - President and CEO**

Not in a big way, but in a way that will certainly demonstrate the validity of the solution and start to see the traction get started.

---

**Scott Greiper - Unterberg - Analyst**

Is the financial services industry because of the mandates of the Patriot Act sort of the lower hanging fruit on the commercial side?

---

**Bernard Bailey - VISG - President and CEO**

---

 
© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Case 1:05-cv-10438-MLW    Document 42    Filed 04/03/2006    Page 14 of 17

FINAL TRANSCRIPT

---

**VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call**

---

In our opinion, it certainly is. You know, there's certainly a compelling ROI reason for doing it there for them, as well as a mandated reason, and that always helps in the selling process. So I never call anything in this industry low hanging fruit. You know that, Scott. But certainly, on the tree, it certainly is lower than some of the other stuff.

---

**Scott Greiper - Unterberg - Analyst**

Okay. Thank you, Bernard. Congratulations.

---

**Bernard Bailey - VISG - President and CEO**

You're welcome. Thanks for everything, Scott.

---

**Operator**

And our next question comes from Tim Quillin from Stephens Incorporated. Please proceed.

---

**Tim Quillin - Stephens Incorporated - Analyst**

Good morning.

---

**Bernard Bailey - VISG - President and CEO**

Hi, good morning.

---

**Tim Quillin - Stephens Incorporated - Analyst**

I apologize, I had to hop off the call, and you may have answered this already. And you talked about the revenue from the CAC program, but what was the total revenue from what used to be called TDT?

---

**Bernard Bailey - VISG - President and CEO**

Well, we really don't break our revenue out that way through the previous acquisitions, so you know, we're not really in a position to talk about it that way.

Bill, do you have any other color you would want to give on that?

---

**Bill Aulet - VISG - CFO**

No, I would just say that's not the way we look at our business. We really combine our operations down there in Washington. We sell a total solution; there is no TDT standalone business anymore.

---

**Bernard Bailey - VISG - President and CEO**

Yeah, I mean it's just like ZN, you know, there's no way to put a number on ZN. We are an integrated company across the whole board and that's how we look at our business. Now we can look at Federal but the Federal includes a lot of what we did previously in the old Viisage, coupled with what we're doing now in the new Viisage. And certainly, our performance there has dramatically improved, and in many ways.

---

**Tim Quillin - Stephens Incorporated - Analyst**

Okay. Well, in the past couple of 10-Qs, you actually reported revenue from TDT and ZN, but I guess we'll take that with a grain of salt. As far as the CAC program and revenues that you're getting in '04, you know, how concerned are you about difficult comparisons in '05, and what's the sustainability of that revenue stream?

---

**Bernard Bailey - VISG - President and CEO**

Yeah, Bill, why don't you take that, okay?

---

**Bill Aulet - VISG - CFO**

Okay. Can you just repeat the question, Tim?

---

**Tim Quillin - Stephens Incorporated - Analyst**

Yeah, the question, Bill, is that on the CAC program, how sustainable is that revenue, and you know, how difficult are the comparisons going to be in '05?

---

**Bill Aulet - VISG - CFO**

Okay, so if we look at this year, we initially said that the CAC program is going to be doing $10 million for the initial order. That is primarily for the production system. Going forward, as you look into the other years, we see 20 percent of that being, coming in 20 percent plus or minus, probably plus, coming in consumables, service maintenance support, software upgrades, at much higher margins.

---

**Tim Quillin - Stephens Incorporated - Analyst**

Okay, so perhaps there was $1 million in 2Q, $5 million in 3Q, $4 million in 4Q, but in 2005 we'll drop down to, you know, closer to a $2 million to $3 million run rate?

---

**Bill Aulet - VISG - CFO**

© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call

Yes.

**Tim Quillin - Stephens Incorporated - Analyst**

Okay, that's good. And then, Bernard, you had mentioned something that there's a couple of States that are going to drop off. Can you just talk about any possible, you know, revenue losses on the State side?

**Bernard Bailey - VISG - President and CEO**

Yeah. You know, as I mentioned, you know, there are a couple of these States that we continue to do business with them and support them so they transition over, one of which, of course, is Florida, which interestingly is now almost two years since its last award. And we continue to support that State as they try to get their new system up and running. So, we certainly anticipate Florida dropping off.

The second one, of course, then would be Ohio. You know, as Ohio gets its new system up and running, we anticipate that the Ohio revenues will also drop off next year as they switch over to the new vendor going forward. So those are the two major States that will impact us from a revenue standpoint.

**Tim Quillin - Stephens Incorporated - Analyst**

Would you be able to quantify at all what type of revenue that you're getting from Florida and Ohio in 2004?

**Bernard Bailey - VISG - President and CEO**

I don't mind doing that; the problem is I don't have it at my fingertips right now. You know, are you going to be on the next call?

**Tim Quillin - Stephens Incorporated - Analyst**

I'll try. I've got another conference call to get on, though.

**Bernard Bailey - VISG - President and CEO**

Yeah, I was going to say, Bill, maybe you can give some color around that on the next call.

**Bill Aulet - VISG - CFO**

If we run out of time I prefer to...

**Bernard Bailey - VISG - President and CEO**

I'd estimate probably combined between the two is around $5 million a year. I could be off a little bit, don't use that as the number.

**Tim Quillin - Stephens Incorporated - Analyst**

Right.

**Bernard Bailey - VISG - President and CEO**

But it's not trivial.

**Tim Quillin - Stephens Incorporated - Analyst**

Okay. Very good. Thanks, gentlemen.

**Bernard Bailey - VISG - President and CEO**

Yeah. You're welcome.

All right. Well, again, I want to thank all of you very much for participating with us today. I certainly appreciate the support of all of our shareholders and of all our investor base. If there's anything else that we can do to help answer questions for you or give you more insight, we certainly are willing to do that. Feel free to either e-mail Bill or myself, or give us a call.

In the meantime, I would strongly recommend if you want to gain more insight into the financials that you all participate in the follow-on call which will be a more detailed financial analysis call to help give some more perspective and insight on that.

So, once again, thanks for your time today. I greatly appreciate your support. And we will continue to do the very best we can and work as hard as we can to create shareholder value for all of our investors. Thank you very much.

**Operator**

Ladies and gentlemen, thank you for participating in the conference. This concludes your presentation, you may now disconnect. Good day.

Thomson StreetEvents    streetevents@thomson.com    617.603.7900    www.streetevents.com 

© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call

DISCLAIMER

Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

© 2004, Thomson StreetEvents All Rights Reserved



EXHIBIT 21

Exhibit 99.1

FOR IMMEDIATE RELEASE

Contact: Bill Aulet, CFO
Viisage
978-932-2932

# Viisage Reports Record Results for Third Quarter 2004

## Revenues increase 97% and Company increases guidance for 2004

**BILLERICA, MASS. — October 25, 2004** —Viisage (NASDAQ: VISG), a leading provider of advanced technology identity solutions, today announced results for the third quarter ended September 26, 2004.

Revenues for the third quarter of 2004 totaled $19.91 million, marking the fifth consecutive quarter in which revenues set a Company record, up 97% from $10.11 million in the comparable period last year, as reported in accordance with the change in accounting principle described below. The net income for the third quarter of 2004 was $198,000, or $0.00 on a basic and diluted share basis, compared to a net loss of $389,000, or $0.02 per basic and diluted share, for the third quarter of 2003. The Company's third quarter results do not reflect any contribution from the recent acquisition of Imaging Automation (iA); financial results for iA and Viisage will be combined from October 5, 2004, the date the transaction was completed.

On December 30, 2003, Viisage adopted new accounting rule EITF 00-21, "Accounting for Revenue Arrangements with Multiple Deliverables," which pertains to revenue recognition for certain long-term contracts, such as Viisage's state drivers' licenses, retroactive to January 1, 2003.

"Viisage made important progress, financially and operationally, during the third quarter, as we expanded our product suite for identity solutions and produced a profitable quarter," said Bernard Bailey, president and CEO of Viisage. "We have greater traction with existing and prospective customers in a wide range of markets, and feel that we are well positioned to continue our growth. We were pleased with the reception given Viisage by the financial community despite the difficult market environment that existed during our recently completed follow-on offering, and plan to use the proceeds to further build our market leadership in identity solutions. With the addition of critical proofing and document authentication capabilities from iA, we are offering customers a comprehensive technology solution that truly addresses their needs."

Bailey concluded, "The Company's performance for the third quarter, combined with our accomplishments so far this quarter, give us the confidence to increase both our revenue and EBITDA guidance for 2004."

Bill Aulet, Viisage's chief financial officer, added, "Viisage continued to significantly improve its financial performance and strengthen its balance sheet in the past quarter while maintaining the necessary financial flexibility. Our strong revenue performance coupled with careful expense management enabled us to produce our first profitable quarter on a GAAP basis in several years. At the same time, our focus on growing EBITDA (earnings before interest, taxes, depreciation and amortization) proved successful as it increased to $3.4 million this past quarter, from $1.5 million in the same quarter last year. Lastly, we are pleased with the terms of our acquisition of Imaging Automation, since we believe this transaction will be accretive on a net income, EBITDA and EPS basis in 2005, and will help us continue to drive revenue and profit growth not only this year, but for many years to come."

Highlights for the third quarter of 2004:

> Adding experienced Department of Defense executive Kenneth Scheflen as Senior Vice President of Federal Solutions group

> Signing cooperation agreement with Siemens AG for 3-D face recognition technology development

> Unveiling vision for new identity solutions product suite

> Launching innovative Viisage PROOF ™ product

Following the close of the quarter, Viisage announced the receipt of a contract valued at approximately $534,000 from the Ohio Department of Rehabilitation and Correction for a criminal identification system, as well as a new driver's license contract for Wisconsin, a contract extension for Maryland and expansion of face recognition solutions into existing driver's license contracts, all of the above totaling $10.91 million.

Separately, on October 5, 2004, Viisage announced the acquisition of privately-held Imaging Automation (iA), the industry and market leader in automated identity document authentication technologies. iA has more than 2,300 installations in 20 countries around the world.

Financial highlights for the third quarter of 2004:

> Record revenues of $19.91 million

> Company's first profitable quarter in three years, with net income of $198,000

> Gross margin down slightly to 28% from 31% in the second quarter this year, reflecting product mix, and down from the record high 33% recorded in last year's third quarter

> Generated EBITDA of $3.4 million, compared to $1.5 million in same quarter last year and $3.1 million in the second quarter of this year

> Increased cash position at the end of the quarter from $12.62 million to $37.36 million, reflecting successful completion of follow-on offering

> Further improved the balance sheet by reducing outstanding debt from $29.8 million to $19.2 million, with an estimated annualized decrease in interest expense of approximately 20%

> Backlog of $140 million, compared to $151 million last quarter.

During the quarter, the Company completed the sale of 7.3 million shares of its common stock, along with approximately 425,000 shares of stock sold by certain shareholders, in an underwritten public offering. Net proceeds from the follow-on offering were approximately $37.9 million for the Company. Also during the quarter, Viisage proposed a settlement to the State of Georgia to resolve the ongoing litigation stalemate over the state's driver's license contract, awarded to Viisage in late 2002. The initiative entailed the termination of Viisage's contract, a payment to Viisage of $2.5 million and an agreement by the state to put the contract up for rebid later this year. This initiative is currently stalled following legal action taken by one of the Company's competitors in the state.

Total operating expenses for the third quarter of 2004 totaled $4.85 million, up slightly from the prior quarter this year, and an increase from the $3.51 million reported in the comparable quarter last year, reflecting higher expenses following the acquisitions of ZN Vision Technologies and Trans Digital Technologies, legal costs from the litigation in Georgia and an increase in consulting costs related to our Sarbanes-Oxley compliance project. Sales and marketing expenses were $1.59 million, research and development totaled $896,000, and general and administrative expenses were $2.36 million. Total operating expenses in the same quarter last year included $1.24 million in sales and marketing costs, $946,000 in research and development and $1.33 million in general and administrative costs.

*Financial Outlook for 2004*

On the basis of its results for the nine months, Viisage is increasing its guidance for 2004, with annual revenue now anticipated to between $66-68 million, increased from $60-63 million, and EBITDA anticipated to be between $11.5-12.5 million, increased from EBITDA of $11-12 million.

*Nine Months Results*

For the first nine months of 2004, revenues totaled a record $48.44 million, an increase of 79% from $27.05 million for the same period in 2003. The net loss for the first nine months of 2004 was $1.75 million, or $0.05 per basic and diluted share, compared to a net loss in the 2003 period of $4.13 million, or $0.20 per basic and diluted share, which excludes the impact of the one-time charge of $12.13 million or $0.59 per share that the Company recorded in connection with its change in accounting principle. Including that charge, the net loss for the first nine months of 2003 was $16.26 million, or $0.79 per basic and diluted share.

*EBITDA*

Viisage reports EBITDA as a financial performance measure and as a forecast of future performance. The Company calculates EBITDA by adding back to net earnings interest, taxes, depreciation and amortization. EBITDA is provided to investors as an additional performance gauge to results provided in accordance with generally accepted accounting

principles (known as "GAAP"). Viisage's EBITDA should not be considered in isolation or as a substitute for comparable measures calculated and presented in accordance with GAAP. Viisage recently completed the acquisitions of ZN Vision Technologies, Trans Digital Technologies and Imaging Automation. While these acquisitions are expected to have a positive impact on Viisage's EBITDA for 2004, they also result in Viisage incurring significant non-cash charges for amortization of intangible assets that adversely affect Viisage's net income (loss) in 2004. Viisage believes that using EBITDA as a performance measure, together with operating income (loss) and net income (loss), will help investors better understand Viisage's underlying financial performance and ability to generate cash flow from operations. A reconciliation of GAAP to EBITDA earnings is included in the following tables:

|  | For the Quarter Ended | |
|  | September 26, | September 28, |
|  | 2004 | 2003 |
|  | (in thousands) | |
| Income (loss) before cumulative effect of change in accounting principle | $ 198 | $ (389) |
| Add: | | |
| Depreciation and Amortization | 2,742 | 1,579 |
| Interest Expense, net | 411 | 276 |
| Taxes | 25 | — |
| EBITDA | $ 3,376 | $ 1,466 |

*Conference Call*

Viisage will hold a conference call with the investment community to discuss these results on Tuesday, October 26, 2004, at 8:30 am EDT. The call may be accessed via Webcast at the Company's Web site ( *www.viisage.com* ), ten minutes prior to the start, or by calling 1-800-599-9816, confirmation code 54809725. Internationally, dial 1-617-847-8705 with the same confirmation code. A replay will be available as a Webcast, accessible on the Company's Web site, one hour after the completion of the call. In addition, the Company will also host a financial discussion with the investment community immediately after this call, with Chief Financial Officer Bill Aulet. This call may be accessed via webcast at the Company's website ( *www.viisage.com* ), or by calling 1-800-299-9086, using confirmation code 23284444. Internationally, please dial 1-617-786-2903, using the same confirmation code. A replay of this call will also be available as a webcast, accessible on the Company's Web site, beginning one hour after the completion of the call.

**About Viisage**

Viisage (NASDAQ: VISG) delivers advanced technology identity solutions for governments, law enforcement agencies and businesses concerned with enhancing security, reducing identity theft, and protecting personal privacy. Viisage creates solutions using secure credentials and face recognition technologies that quickly, reliably, and accurately identify individuals. With more than 3,000 installations worldwide, Viisage's identity solutions stand out as a result of the Company's industry-leading technology and unique understanding of customer needs.

*This news release contains forward-looking statements that involve risks and uncertainties. Forward-looking statements in this document and those made from time to time by the Company through its senior management are made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. Forward-looking statements concerning future plans or results are necessarily only estimates and actual results could differ materially from expectations. Certain factors that could cause or contribute to such differences include, among other things, the size and timing of contract awards, performance on contracts, availability and cost of key components, unanticipated results from audits of the financial results of acquired companies, changing interpretations of generally accepted accounting principles, outcomes of government reviews, potential fluctuations in quarterly results, dependence on large contracts and a limited number of customers, lengthy sales and implementation cycles, market acceptance of new or enhanced products and services, proprietary technology and changing competitive conditions, system performance, management of growth, dependence on key personnel, ability to obtain project financing, general economic and political conditions and other factors affecting spending by customers, the unpredictable nature of working with government agencies and other risks, uncertainties and factors including those described from time to time in Viisage's filings with the Securities and Exchange Commission, including without limitation, Viisage's Form 10-K for the year ended December 31, 2003 and its quarterly reports on Form 10-Q. Viisage undertakes no obligation to update any forward-looking statements.*

— Tables follow —

# # #

### VIISAGE TECHNOLOGY, INC.
### Consolidated Balance Sheets
### (in thousands)
### (Unaudited)

|  | September 26, 2004 | September 28, 2003 |
|---|---:|---:|
| **Assets** | | |
| Current assets: | | |
|     Cash & cash equivalents | $ 34,363 | $ 11,423 |
|     Accounts receivable | 18,002 | 8,026 |
|     Inventories and other costs & estimated earnings in excess of billings | 3,293 | 4,496 |
|     Other current assets | 1,176 | 1,136 |
|         Total current assets | 56,834 | 25,081 |
| Property and equipment, net | 22,308 | 23,104 |
| Goodwill | 61,858 | — |
| Intangible assets, net | 21,708 | 2,892 |
| Restricted cash | 3,000 | 5,120 |
| Other assets | 1,427 | 2,082 |
|  | $ 167,135 | $ 58,279 |
| **Liabilities & Shareholders Equity** | | |
| Current liabilities: | | |
|     Accounts payable & accrued expenses | $ 14,447 | $ 7,738 |
|     Related party payable | 1,385 | — |
|     Current portion of project financing | 3,968 | 4,259 |
|     Current portion of related party notes | 10,300 | 1,829 |
|         Total current liabilities | 30,100 | 13,826 |
| Project financing | 4,966 | 6,153 |
| Related party notes | — | 2,783 |
| Other liabilities | 414 | — |
| Total liabilities | 35,480 | 22,762 |
| Commitments and contingencies | | |
| Shareholders' equity | 131,655 | 35,517 |
|  | $ 167,135 | $ 58,279 |

### VIISAGE TECHNOLOGY, INC.
### Consolidated Statements of Operations
### (in thousands, except per share amounts)
### (Unaudited)

|  | Three Months Ended | | Nine Months Ended | |
|---|---:|---:|---:|---:|
|  | September 26, 2004 | September 28, 2003 | September 26, 2004 | September 28, 2003 |
| Revenue | $ 19,907 | $ 10,108 | $ 48,442 | $ 27,053 |
| Cost of revenue | 14,400 | 6,728 | 34,613 | 20,344 |
|     Gross margin | 5,507 | 3,380 | 13,829 | 6,709 |
| Operating expenses: | | | | |
|     Sales & marketing | 1,588 | 1,237 | 4,659 | 3,786 |
|     Research & development | 896 | 946 | 2,797 | 2,828 |
|     General & administrative | 2,362 | 1,328 | 6,717 | 3,454 |
|     Total operating expenses | 4,846 | 3,511 | 14,173 | 10,068 |

| | | | | | | | |
|---|---:|---|---:|---|---:|---|---:|
| Operating income (loss) | | 661 | | (131) | | (344) | (3,359) |
| Interest expense, net | | 411 | | 276 | | 1,380 | 726 |
| Other (Income) expense | | 27 | | (18) | | (48) | (18) |
| Income (loss) before income taxes and cumulative effect of change in accounting principle | | 223 | | (389) | | (1,676) | (4,067) |
| Provision for income taxes | | 25 | | —— | | 75 | 63 |
| Income (loss) before cumulative effect of change in accounting principle | | 198 | | (389) | | (1,751) | (4,130) |
| Cumulative effect of change in accounting principle | | —— | | —— | | —— | (12,131) |
| Net income (loss) | $ | 198 | $ | (389) | $ | (1,751) | $ (16,261) |
| Basic net income (loss) per share before cumulative effect of change in accounting principle | $ | 0.00 | $ | (0.02) | $ | (0.05) | $ (0.20) |
| Diluted net income (loss) per share before cumulative effect of change in accounting principle | $ | 0.00 | $ | (0.02) | $ | (0.05) | $ (0.20) |
| Cumulative effect of change in accounting principle | $ | 0.00 | $ | 0.00 | $ | 0.00 | $ (0.59) |
| Basic net income (loss) per share | $ | 0.00 | $ | (0.02) | $ | (0.05) | $ (0.79) |
| Diluted net income (loss) per share | $ | 0.00 | $ | (0.02) | $ | (0.05) | $ (0.79) |
| Basic weighted average common shares | | 40,072 | | 21,512 | | 35,783 | 20,711 |
| Diluted weighted average common shares | | 41,090 | | 21,512 | | 35,783 | 20,711 |

EXHIBIT 22



# Conference Call Transcript

## VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call

Event Date/Time: Oct. 26. 2004 / 8:30AM ET
Event Duration: N/A

Thomson StreetEvents    streetevents@thomson.com    617.603.7900    www.streetevents.com 

© 2004 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call

## CORPORATE PARTICIPANTS

**Bernard Bailey**
*VISG - President and CEO*

**Bill Aulet**
*VISG - CFO*

## CONFERENCE CALL PARTICIPANTS

**David Gremmels**
*Thomas Weisel - Analyst*

**Paul Coster**
*JP Morgan - Analyst*

**Jim Ricchiuti**
*Needham and Company - Analyst*

**Scott Greiper**
*Unterberg - Analyst*

**Tim Quillin**
*Stephens Incorporated - Analyst*

## PRESENTATION

**Operator**

Good day, ladies and gentlemen, and welcome to the Third Quarter 2004 Viisage Technology Incorporated Earnings conference call. My name is Andrea, and I will be your coordinator for today. At this time, all participants are in a listen-only mode. We will be facilitating a question and answer session towards the end of today's conference. If at any time during the call you require assistance please press star, followed by zero and a coordinator will be happy to assist you.

I would now like to introduce today's host of today's call, Bernard Bailey, President and CEO. Please proceed.

**Bernard Bailey - VISG - President and CEO**

Thank you, Andrea, and good morning. We're pleased you can join us for the Viisage Third Quarter 2004 conference call. I'm Bernard Bailey, President and CEO. On the call with me today is Bill Aulet, our Chief Financial Officer.

We'll start the call with the review of our operational highlights, and then I'll share with you what we see ahead of us now in terms of the market and opportunities. Bill will then review our financial performance for the quarter and discuss our guidance for 2004. Following Bill's remarks we will open the call up to q and a.

This quarter we have decided to do something a little bit different in order to more effectively utilize our time. As many of you are aware, we now have 11 different analysts from Wall Street firms providing financial coverage of Viisage. In order to provide an opportunity for investors to gain greater insights into the financial performance of the Company we will follow this call with a separate call focused specifically on financial questions. Bill will host that call, and it will immediately follow at the conclusion of this call. Of course, it is open to all of our investors, and you are encouraged to attend.

Now, let me turn the call over to Bill to read our Safe Harbor Statement.

**Bill Aulet - VISG - CFO**

Thank you very much, Bernard, and good morning to everybody.

Statements that representatives of Viisage make on this call that are not historical facts are accurate as of today, October 26th, 2004, and may be considered forward-looking statements that involve risks and uncertainties, including reliance on public sector markets, the possibility of customer delays, the need for capital and

**Thomson StreetEvents**    streetevents@thomson.com    617.603.7900    www.streetevents.com    

© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call

compensation. You should refer to our Form 10-K for the year ended December 31st, 2003 filed with the Securities & Exchange Commission on March 30, 2004 under the heading 'certain factors that may affect future results', as well as our subsequent SEC filings for more information on the risk factors that could cause actual results to differ, perhaps materially, from our statements today. Viisage undertakes no obligation to publicly release any revisions to forward-looking statements, statements made today, or otherwise supplement statements made on this call.

Back to you Bernard.

---

**Bernard Bailey - VISG - President and CEO**

Thanks, Bill.

We are certainly exceedingly pleased with our results for this quarter. For the fifth straight quarter we are reporting record quarterly revenues. At $19.9 million, our revenues are up 97 percent on a year-over-year basis. I am also pleased to report that we produced a profitable quarter with earnings of almost $200,000. At the same time, we have generated a record level of EBITDA. At $3.4 million this quarter, our EBITDA was up more than 110 percent from the previous year's quarter.

These financial results are certainly a testament to our continued focus on delivering profitable revenue growth for our shareholders, while effectively managing our cost structure. I also think these results speak very well to the momentum we are building, both for the rest of this year, as well as leading us into 2005.

We have built Viisage into a leading identity solutions provider, offering customers a full life cycle of identity solutions. With the transformation of our Company through both organic development, as well as key acquisitions, we are well on our way to becoming the premiere provider in this marketplace, both domestically and internationally. The results we have already produced and the opportunities ahead of us provide us with the confidence today to increase our 2004 annual revenue and EBITDA guidance. Bill will detail these guidance numbers a little later on in the call.

Let me begin by addressing some of the important accomplishments we had this quarter, and then I will discuss some of the areas we are focusing upon to continue to improve our Company.

First of all, including our announcement this past week regarding the Wisconsin State Driver's License win, we have booked $15.4 million in sales backlog since our last call. Besides the $7 million contract with the State of Wisconsin, we expanded our business into the driver's license marketplace with extensions in Florida, Maryland, and Ohio, totaling more than $4 million in business. In addition, we also expanded our Federal backlog with extensions on our existing contract base totaling just over $2 million in additional

business. We are also very excited to report close to $2 million in new bookings for our face recognition solutions.

Longer term, we have continued to strengthen the total product portfolio of the Company going forward. In the face recognition arena, our signing of a cooperative partnering agreement with Siemens AG is a very important technological development, giving us advanced capabilities and a strong partner for continued advancement in 3D face recognition technology. In addition, the early results that have been reported from the U.S. Government's face recognition, grand challenge indicate that we are providing a face recognition solution that is technically equivalent or superior to any solution in the marketplace, both from an accuracy as well as a breadth of solution perspective.

In the identity solutions product arena, we unveiled in August our new identity solutions product suite and immediately launched the innovative Viisage proof product at the International AMVA Conference to great reviews from our customers. We continued to enhance our product capabilities with the acquisition of Imaging Automation, the leading provider of advanced technology verification and authentication solutions. We are already seeing wide acceptance of this solution in the marketplace with many of our existing customers, as well as new customers and partners, demonstrating an interest in better understanding how Viisage can address their needs in this critical area of identity proofing.

This past quarter we also put a great deal of effort into improving the long-term financial health of our Company. Our follow-on offering allowed us to increase our cash position from $12.6 million to more than $37 million, while at the same time reducing our outstanding debt from $29.8 million to $19.2 million. This improved financial health has allowed us to secure a $25 million line of credit with the leading financial institution, Citizens Bank, which will give us even greater financial flexibility to build our Company going forward.

While there is much to be proud of this past quarter as a Company we would rather focus on what lies in front of us. Before we talk about the opportunities that we see, let me address a few areas that many of our investors have raised some questions about. Let me begin with our ongoing litigation.

Someone always asks for an update on Georgia, so let me share what we know. As I mentioned on our last call, last October we had – excuse me, last quarter we had proposed a settlement with our customer, the State of Georgia, entailing a payment to Viisage and a pledge by the State to rebid the RFP this year. The State agreed with our recommendation, signed an agreement with us, and was prepared to issue the final payment. Unfortunately, that settlement was the subject of a temporary restraining order by our competitor. Right now, we expect a hearing on a series of summary judgment motions to occur shortly, with a decision probably coming out in the next few weeks. We'll certainly let you know once we hear more information.

**Thomson StreetEvents**    streetevents@thomson.com    617.603.7900    www.streetevents.com    

© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Case 1:05-cv-10438-MLW    Document 42    Filed 04/03/2006    FINAL TRANSCRIPT

VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call

As for our other pending lawsuit that arose last quarter concerning Fargo Electronics, Toppan and TDT, I have no update on that lawsuit other than to note that any court action is unlikely before the second half of 2005. We continue to believe there's absolutely no basis or standing for the complaint, and we filed motions to dismiss the case.

There was certainly much discussion this past quarter regarding the recent announcement of the Department of State's decision to select a competitor to the facial recognition contracts. We were disappointed in that decision, especially in light of recent announcements by DOS personnel, who have continued to applaud the outstanding performance of our solutions in the Diversity Visa Program. As I mentioned in our last call, it is important to understand the facts before jumping to any conclusions.

Since our last call, we have had the opportunity to receive an outbriefing from the Department of State Procurement personnel. So let me share with you what we now know. Viisage was involved in this RFP as a subcontractor through a systems integrator. Now, a lot of you ask, why did we bid it as a sub? Well, very simply because the procurement regulations required that in order to bid, a contractor had to be on the Government systems integrator GSA contract.

Just prior to the final bid submission, the Government then allowed the winning FR company under a dispute to bid directly as a prime contractor due to their standing on the GSA contract for technology products. As a company Viisage did not reside on either contract schedule, and therefore, we were excluded from bidding as a prime. Now, I think you can understand that this limited greatly our ability to affect the final pricing of the proposal.

From the outbriefing, we learned the Department State decision was made solely on price due to the fact that the difference in price between the winning bid and the second lowest bidder was almost 70 percent. We were clearly informed that our technology performed exceptionally well in all of the independent bench testing done during this procurement process. That said, we are gratified by the remarks made by the State Department representatives to the effect that the technology showed significant improvements from one that had been tested just 12 months ago.

We see this contract as an important validation for our industry and all participants. Fortunately, because of the fine work we have done for the Department of State on all of our existing contracts with them, we expect to compete vigorously for other opportunities there as they arise. Additionally, the acceptance of our technology by other integrators, as well as our positioning in key pilots being conducted presently in the European Union, as well as the Middle East, gives us comfort in the worldwide acceptance of our solution going forward.

So let's now focus on what lies ahead. Our goal this year has been to focus our strategy, ensure that we have the right products to support that strategy, and then execute against that strategy. We said we would expand our portfolio of identity solutions, and with the three acquisitions this year we have done so, and can now provide comprehensive solutions to our customers, especially in areas like proofing that are regarded as the weakest link in the entire identify verification chain. We are leveraging fully the opportunities that our acquisitions brought to the table, and together we have effectively attacked new markets while continuing to produce solid growth in our core business.

So where does that strategy lead us as we move into the last quarter of 2004 and prepare for 2005? I thought it would be helpful today if we went through our business market by market and provided you with some insights about the opportunities we see. These opportunities in some cases, I will emphasize, could not have been pursued by the stand-alone Viisage of 2003, since many entail collaborative efforts throughout the Company, fully utilizing the talent, market positions, and technology of the companies we have acquired.

We are continuing to pursue opportunities in a wide range of civil ID applications as varied as border management, passports, and benefits distribution, all in addition to driver's licenses. We continue to believe that identity solutions are moving from single documents to a far wider set of permissions, centered around verifying identity, and that more customers are recognizing this both as a problem they need to solve and looking to Viisage as the company that can help them do this.

The many important and large national and international opportunities like U.S. VISIT, TWIC, and other border management possibilities particularly are high on our list, even though timing of contracts rewards continues to remain difficult to project. I've said previously that we didn't expect to see any significant awards from these programs before the end of 2004 and probably more likely into 2005 at the earliest. That certainly remains the case.

But let's look at the wider horizons. Starting with our Federal business, the U.S. passport program continues to grow with more passports being issued to U.S. citizens over the next few years. The e-passport is a strategic and important growth initiative in which we will be participating once it moves beyond the initial chip deployment for which vendors have already been selected. We also see substantial opportunities for IA's authentication capabilities at consulates and embassies around the world.

On the worldwide passport and visa side, there are some 27 visa waiver countries that are evaluating and incorporating biometrics into their ID documents over the next 12 to 18 months, facing that October 2005 deadline, as well as considering the use of authenticating technologies like those we've recently acquired from IA.


© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call

Non-waiver countries are also moving toward e-passports, biometrics, and authentication, as well, sometimes even more quickly. There's tremendous opportunity within the Middle East in particular, as these countries move to better authenticate identities of their citizens as evidenced by the expansion of the Dubai Program with our solutions. This is a very large overall market.

On U.S. VISIT particularly, there continues to be a large opportunity for our combined capabilities and our solutions that solve many of the challenges that are raised in this initiative. The major programs like TWIC and Registered Traveler are also progressing along, utilizing our solutions for authentication and proofing in their pilots. I don't want to get more specific, but obviously we're very pleased to be involved in these initial efforts with a wide range of partners that we've been working with.

With smart cards for identification documents with both biometrics and other information embedded into them, following up on our very significant win earlier this year at the Department of Defense, we see ample opportunities domestically and internationally, including one that would provide similar cards for all Federal employees. I think many of you are aware of the recent Presidential directive calling for the deployment of CAC-similar cards throughout the Federal Government. We are active with the standards body that will develop common standards for these, and we are monitoring efforts to replicate the CAC Program going forward. So it is a great opportunity for us.

With the international connections coming out of our IA acquisition, we are in significantly better position in these markets than we had been previously. The addition of Ken Sheflein to head our Federal Team in Washington this past quarter also positions us extremely well for this marketplace. Many of you know Ken, and he is widely regarded as the father of the DOD's CAC Program, having driven that program within the defense manpower data center as its leader for the past 15 years.

We have already seen tremendous synergies with IA's focus and ours, especially with driver's license contracts, ones we have, as well as ones we are pursuing. These customers are very interested in authenticating the identity of the individuals before issuing a State credential. Our ability to leverage proofing solutions into this space creates a competitive advantage that we intend to pursue aggressively, as it exploits the weakest link in the identity chain.

But to think that we did IA for the single purpose of synergizing within the Department of Motor Vehicles Administration Offices would be missing this opportunity significantly. The border management opportunity for IA is also extremely strong. We see initiatives similar to the programs already in place in Canada and Australia where IA has delivered high quality results, and we are participating in a number of tests and pilots focused on integrating chip readers into border crossing solutions as part of the overall e-passport initiative.

The first vestiges of our identity solutions being used in the commercial marketplace are also emerging. Initially, overseas where there are strong mandates for access control. With IA's technology and our full product suite we are working with the range of partners primarily to address these opportunities, which are already producing some revenue for our Company. We expect this business will find greater traction in the longer term, particularly in areas like healthcare and financial services. We are already engaged in pilot programs with financial institutions, airlines, and casinos, specifically. And these initiatives are another example of the strong synergies between our authentication and identification capabilities.

Let me share with you why we are excited about the potential in these markets. First of all, in the airlines industry, one of our airlines customers has decided to adopt the IA technology to combat credit card fraud. In their case, they are looking for the definitive authentication of the identities of individuals taking a flight to verify that they, in fact, consummated the transaction that was recorded on their credit card. As hard as it may be for some of us to believe, there is a large number of people out there who charge their flights over the internet, and then when their bill comes, they claim that they never took the trip, claiming instead that the charge was done fraudulently. Now the airline will have a verified record of who actually made the trip.

In the financial services industry, the Patriot Act mandates formal documentation and verification of the identities of individuals opening new accounts. Certainly, the IA solutions provide an effective means of verifying the identity and documenting these transactions going forward, so we see tremendous opportunity in the financial services industry for these solutions.

We continue to see more interest in the law enforcement market, building upon our recent successes to expand the role of identity solutions in this critical arena. Demand for face recognition solutions is increasing in this market as successes like we've seen at Pinellas County, where they recently caught four fugitives with our technology, demonstrates the validity of our solutions. Across the U.S. and internationally, we are seeing large opportunities for information sharing solutions utilizing face recognition and criminal ID solutions that we have, and they are certainly under consideration. These include both interstate and intrastate solutions entailing interoperability as well. Viisage has achieved good success this year adding such customers as Jefferson County, a major metropolitan area, the Ohio Department of Corrections that we recently announced, and continued expansion down at Pinellas. Now, similar proposals are on the table with many other agencies.

As I've said before, historically, Viisage was a driver's license company, and this constituted the majority of our revenues and the foundation of our move into FR and other products that make the full spectrum of ID solutions. The driver's license business in the U.S. offers a number of opportunities over the next 12 to 18



Thomson StreetEvents     streetevents@thomson.com     617.603.7900     www.streetevents.com

© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call

months with several very large key contracts expected for bid, including California, Texas, Virginia, and Indiana. We are still waiting to hear on West Virginia's plans. Altogether these constitute more than $100 million in potential revenues and all of these would be new to Viisage, so we are very excited. We are also buoyed by our recent win of Wisconsin, and we are aggressively pursuing other States to the extent that they make economic sense for our business.

As we showed you this quarter in our financial results, we are not going to forego profits just to record revenue expansion, so we will continue to bid with an eye on shareholder value in this marketplace. I will emphasize that the U.S. driver's license business remains an important avenue for the implementation and validation of our technology, but not the only one. European and Canadian driver's licenses offer opportunities, like Ontario and the U.K., over the next 12 to 18 months. And we are very well positioned to pursue these opportunities, as well, either independently or working through our network of fine partners.

I want to reemphasize that there is a substantial up sell opportunity within our existing driver's license customer base, as demonstrated by our recent announcement of two customers now incorporating face recognition into their solutions. I wish I could tell you who those States are, but the fact of the matter is that they're so excited about the solution that they would much rather keep the solution under the covers and deploy it across the State. And there is also a large sized opportunity for Viisage with this customer base for our proofing product as well. In short, we are fully able to help them solve additional problems with our proofing, face recognition, and other credentialing capabilities.

In closing, let me say again how very pleased I am by our progress this past quarter, especially our record results and profitability. We firmly believe we have an extraordinary opportunity at our doorstep to build Viisage into the leading provider of ID solutions. And this quarter we have demonstrated that we can accomplish this goal in a fiscally responsible manner. The events of the past few weeks, from the acquisition of Imaging Automation to our key customer wins, provide me with continued confidence that we have many opportunities ahead of us, ones where we can continue to prove Viisage's value proposition to our customers.

With that, let me turn the call over to Bill to discuss our financial performance and outlook. Bill.

---

Bill Aulet - VISG - CFO

Thank you very much, Bernard.

As I begin, I want to remind you that on December 30th, 2003, Viisage adopted the new accounting principle, EITF 00-21, affecting how revenues are recognized under long-term contracts, like our driver's license agreements. This methodology is

retroactively applied to periods of January 31st, 2003, and to assist you in comparing our current results for earlier periods we have recalculated those prior periods results. We will refer to these figures throughout the call, but if you have any questions, please visit our web site at www.viisage.com in the Investor Section. I will also be using EBITDA and other non-GAAP measures during this discussion, and a reconciliation of those measures to the conforming GAAP measures is also on our web site in the same section.

As Bernard mentioned, for the third quarter of 2004, we experienced robust revenue growth. Revenues for the recently completed quarter were $19.91 million, a fifth consecutive record quarter. This represents a 97 percent increase year-over-year basis and a 22 percent increase on a quarter-over-quarter basis. This top line growth was driven by our Viisage Federal Solutions Group in Washington, D.C., and particularly the Department of Defense Common Access Program. We shipped over $5 million of Common Access Card production systems in the quarter, which represents significant revenue to the Company in this quarter. In addition, these systems will provide the foundation for ongoing higher margin revenue streams in the future, specifically in the area of consumables. The gross margin percentage on these production systems was within the mid-teens range and, therefore, while adding to the absolute gross margin, they did bring down the overall gross margin percentage for the Company in the quarter.

Of the 97 percent year-to-year growth rate, organic growth represented approximately one-third, demonstrating that not only are our acquisitions already contributing significantly to our top line growth but we are experiencing healthy organic growth in our core business, as well. Equally as important to our top line growth is our net income. We are proud to announce the first GAAP profit in three years with $198,000 of net income, or essentially breakeven on a basic and diluted share basis, demonstrating our commitment to attaining this important long-term goal.

We've been steadily improving our performance in the bottom line. In the first quarter, we had a loss of slightly over $1 million. Last quarter this has been reduced to a loss of $17,000. This quarter we crossed the breakeven line to be net income positive. For year-to-year comparison purposes, in the last year's third quarter the Company recorded a loss of $390,000 or 2 cents per share on a basic and diluted basis. We are pleased with our progress here.

It should be noted that included in the calculations of this net income is an existing charge related to the amortization of intangible assets, a non-cash expense resulting from our acquisitions, primarily related to TDT and ZN. This expense totaled over $900,000 for the quarter. Understanding the significant non-cash expense, which does not have to replenish and eventually goes away after the intangible asset on the balance sheet, is the major reason why our EBITDA performance was so strong again this quarter, but more about that later.



© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call

On the gross profit margins, we indicated on the last conference call that they would decrease due to the Department of Defense production systems anticipated in this quarter. As projected, this became a reality this quarter as our gross margins decreased to 28 percent from 31 percent in this year's second quarter, and down from a record 33 percent in last year's third quarter. This is a reflection of product mix. We anticipate a substantial number of those productions to ship in the fourth quarter as well, albeit at a slightly lower total volume.

Even so, we see that investments we have made in improving our product offerings and efficiencies in delivery should make this just completed quarter a temporary depression in gross margin percentage. We are confident that these efforts to increase gross margin going forward will pay dividends in the near term. In fact, as we look forward to our pipeline for the next quarter and the productivity improvements we have made even with the significant component of Common Access Card production systems in the quarter's revenue, we believe we are poised for significant overall gross margin improvement that will not only return us to the margins we saw earlier this year but allow us to potentially exceed them.

We are also continuing our relentless effort to control costs and to improve efficiencies while simultaneously investing in key areas that will generate growth and improve profitability in the future. In the quarter overall operating expense increased quarter to quarter from $3.51 million in the same quarter last year and $4.74 million in the second quarter this year to $4.85 million in the just completed quarter.

The overall $110,00 increase in total operating expense on a quarter-to-quarter basis was driven by a $144,000 increase in G&A expense for the quarter. This was caused in large part by increases in three areas that offset other cost savings initiatives. First, consulting costs associated with our Sarbanes-Oxley compliance project grew from under $75,000 in the second quarter to over $350,000 in the just completed quarter. Secondly, legal costs associated primarily with our Georgia and Fargo litigation continue to be significant, up $50,000 in total for over $300,000 for the quarter. Thirdly, there was a one-time expense of $120,000 for administrative and legal costs that were being amortized over the anticipated life of a note. When we paid off the note early in the just completed quarter, we had to take this expense in the quarter as well.

The fact that we've been able to hold operating expenses relatively flat in the prior quarter speaks well to our cost control, but we are not satisfied with our performance especially in the area of G&A. I will note that we have not yet seen any contribution from the rent reduction associated with our headquarters relocation from Littleton to Billerica, which will generate savings of about $15,000 per month, and that will be recognized starting in the fourth quarter of this year.

In the expenses for the third quarter, sales and marketing were $1.59 million, flat on both the sequential and annual comparison. R&D expenses were $893,000, down on both the sequential and the annual comparison, benefiting from the capitalization of software related to these products.

As mentioned earlier, we had a significant non-cash expense, and we have significant non-cash expenses, and so we tracked EBITDA, as well, as a valuable metric for the underlying strength of our business, specifically to generate cash flow. In the third quarter of 2004, we generated $3.4 million of EBITDA, another solid improvement both the $1.5 million we posted last year in the third quarter, as well as the $3.1million we produced in the second quarter this year, and the $1.1million we registered the first quarter of this year. We expect to continue to see improvement in this area, as well.

At the end of the third quarter of 2004, we had a cash position of approximately $37.36 million compared to $12.6 million at the end of the second quarter, reflecting the addition of net proceeds of approximately $37.9 million from our follow-on offering, offset by the initial repayment of related party debt of approximately $10 million. Of our cash position only approximately $3 million, or less than 10 percent, is encumbered. As Bernard mentioned, we're pleased to announce as well today that we have received a commitment letter from a major bank for a $25 million line of credit to replace our existing bank facilities. This new arrangement will not only give us valuable flexibility but will also reduce our rates of borrowing, significantly simplify our covenants, and increase yields on our money in the bank, all while making our G&A operations more productive by providing services locally and worldwide to meet our rapidly evolving needs.

In the fourth quarter we will be able, if we so choose, to reduce our outstanding debt quite significantly, and after paying off early prepayment fees, save approximately $600,000 a year in interest expense. We will be monitoring this closely, and our actions will be affected directly by our M&A program. But in any case, we have new financial flexibility that will be very valuable to support our growth, as well as being highly cost effective.

At the end of the third quarter, we had approximately 43 million shares outstanding, compared to 21.5 million at the end of the third quarter of last year, with the increase reflecting both the acquisitions we have made this year in which stock was issued, as well as the follow-on offering. We are pleased, as well, that we were able to secure financial terms in our acquisitions, and that we expect them to be accretive to our results in 2005.

Backlog at the end of the third quarter of 2004 was approximately $140 million, down from $151 million at the end of the second quarter this year. Historically, as we've said before, backlogs have not always moved in a linear fashion. Our businesses tend to be lumpy with large contracts playing a major factor. Importantly,



© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call

however, the backlog still constitutes a healthy multiple of our annual revenues. I'll remind you that in connection with the proposed settlement we announced in the State of Georgia we decreased the backlog by 19.7 million during the third quarter. Of course, the new contract wins that we've announced thus far this quarter will increase the backlog, especially the Wisconsin award. We are not providing mid-quarter figures on backlog since this is an end of quarter figure and interim numbers can be misleading. Suffice it to say that we are pleased with the direction with our wins and quite confident the backlog will continue to grow to reflect that.

The nine months' results are discussed in the release, so I won't take the time this morning to repeat that text.

Now, I'd like to discuss our annual guidance for 2004. In early May, based upon the strength of our pipeline business we raised annual guidance to $60 million to $63 million, and our EBITDA guidance for 2004 to $11 million to $12 million. At this time, we are comfortable raising this guidance yet again to revenue of $66 million to $68 million for 2004, up approximately 10 percent, and EBITDA of $11.5 million to $12.5 million for the year.

We were also active with our investor relations' outreach this quarter with the number of opportunities to meet with both retail and institutional investors. We spoke at the Roth Conference in New York in September, and later today we are presenting at the JP Morgan Small Cap Conference in Boston. We will also be presenting at the AeA Conference in early November in Monterey. We plan to continue our outreach and response efforts to ensure that we communicate effectively with investors about the Company's vision, strategy, and progress. As usual, we'll keep you updated through press releases on details associated with those presentations.

With that, let me turn the call back over to Bernard.

---

**Bernard Bailey - VISG - President and CEO**

Great. Thank you, Bill.

Andrea, we'd like to open the lines up now to some q and a.

## QUESTION AND ANSWER

---

**Operator**

[Caller instructions.]

Our first question comes from David Gremmels from Thomas Weisel. Please proceed.

---

**David Gremmels - Thomas Weisel - Analyst**

Thank you. Good morning. I wanted to ask you about the backlog. And I think early in the call you mentioned $15 million of new awards. Was that in Q3 alone, or in Q3 and Q4?

---

**Bernard Bailey - VISG - President and CEO**

No, what I said was that these were all announced since our last call, so it included some of the stuff that we announced in our call. Of the $10.9 million that we put out in a press release last week, some of that was closed in Q3 and some was closed in the early part of Q4.

---

**David Gremmels - Thomas Weisel - Analyst**

Okay. So I think, you know, adjusting for the State of Georgia, it looks like you booked around $9 million of new orders in Q3, so that would imply you have about $6 million of new orders thus far and already in Q4?

---

**Bernard Bailey - VISG - President and CEO**

Yeah, it's more like $7 million already.

---

**David Gremmels - Thomas Weisel - Analyst**

$7 million, okay. And I know you said you didn't want to discuss mid-quarter backlog, but you know, maybe you can talk about where you would hope to see backlog at the end of the year?

---

**Bernard Bailey - VISG - President and CEO**

Well, we don't give guidance on backlog, but what I'll tell you is that, you know, we see a lot of pretty exciting opportunities in front of us. You know, it's very difficult to predict backlog because we have no idea when particular decisions are going to be made, or when particular contracts are going to get formalized and signed, or what funding is going to be made available.

---



**Thomson StreetEvents**    streetevents@thomson.com    617.603.7900    www.streetevents.com

© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call

You know, one of the issues that always occurs in the third quarter, of course, is that it's the end of the fiscal year. And while procurements occur, they don't necessarily manifest into signed contracts, so with all of that, it's very, very difficult to predict something like that, especially in the Government marketplace. So I'm sorry I can't give you a better number.

**David Gremmels - Thomas Weisel - Analyst**

Okay. And the $2.5 million payment from Georgia, was that – I just want to confirm that was not booked into revenue during the quarter, and you didn't receive the cash from that?

**Bernard Bailey - VISG - President and CEO**

Both of what you said is correct. A, it was never booked into revenue, and B, we did not receive the cash. Now, let me just highlight because some of our people may not be aware. In our driver's license, we only book revenue when we produce a card. We only produce revenue when we produce a card, so therefore, we're not going to book revenue until a card is produced, so there is no revenue that is booked regarding the Georgia procurement in any way.

**David Gremmels - Thomas Weisel - Analyst**

Okay. Great. And then, last question, you talked about the facial recognition visa award to the competitor. My understanding had been that there was going to be a separate contract to incorporate facial recognition technology into the passport program. Do you know is that contract a separate opportunity that you're pursuing, or is that wrapped up with that visa award?

**Bernard Bailey - VISG - President and CEO**

Well, there's two angles on that one. The first one is that the original procurement from the Department of State included both the visa and the passport. However, the only award that was made is relative to the two visa programs. So that's what's been awarded up to this point in time.

Does the Government have the flexibility to be able to award the passport to the competitor? The answer is yes. Will they? That remains to be seen. At this point in time, the award hasn't been made on the passport for the simple reason that the State Department is very, very busy in dealing with the whole chip on the passport and inlay issues which they're working with, and have just awarded to four vendors at this time. So a lot of that remains to be said.

As I said in my comments, you know, we have a great relationship with the Department of State, and that's a great relationship because quite frankly we're done some really good work for them

over the last several years on the passport business, as well as the diversity visa. They're also extremely satisfied with the quality of our solution and the accuracy of our face recognition technology as they've been deploying it on the diversity visa program for the past year. So with all of that we'll just continue to work with them, and do what's right for our customer, and put our customer first, and see how that plays itself out. But there's really nothing more specific relative to what may happen and when.

**David Gremmels - Thomas Weisel - Analyst**

Great. Thank you very much.

**Bernard Bailey - VISG - President and CEO**

You're welcome. Thanks for your questions.

**Operator**

Our next question comes from Paul Coster from JP Morgan. Please proceed.

**Paul Coster - JP Morgan - Analyst**

First of all, it looks like the guidance for the next quarter is pointing to flat, so it may be slightly down revenue. It's obviously got a lot of momentum. So what's accounting for the slowing sequential growth rate?

**Bernard Bailey - VISG - President and CEO**

Well, Paul, as you know, a couple of things on that. First of all, it's always our nature to want to make sure that we give guidance out there that is reflective of what we really believe is going to happen. So that's important to us.

Secondly, my gosh, you know, we've put together five straight record quarters in a row, and you know, we're getting at the point now where as a business we continue to grow and expand, and as we start to see some of the new acquisitions come on and the new opportunities, certainly we'll start to see more seasonality associated with the revenues that we'll have as the business going forward.

And I think that we're seeing some of that as we go forward in our Company. Certainly, you know, we will look and work aggressively to expand our revenues where it's appropriate, but we certainly also want to be realistic in what our assessment is and what that's going to be.

Having said that, you know, we've had some very aggressive deliveries associated with the DOD common access card systems



© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call

over the past two quarters and that has certainly helped us in our performance at the top line over that period. As Bill noted, all of those same systems have suppressed to some extent our gross profit margins. And so, we would expect to see gross profit margins expanding as that mix changes also.

**Paul Coster - JP Morgan - Analyst**

Fair enough. Is the Presidential election in any way sort of holding back activities at the moment, do you think?

**Bernard Bailey - VISG - President and CEO**

Not that I'm aware of, Paul, no, not at all.

**Paul Coster - JP Morgan - Analyst**

Okay. Long-term obviously, the growth rate this year has just been phenomenal. I would have thought it would be difficult to get anywhere close to this year's growth rate. But what are you looking for in the future if you can't say specifically, where do you think the growth is going to come in '05?

**Bernard Bailey - VISG - President and CEO**

Yeah, I can't say specifically, Paul. We'll certainly give that guidance out in January for what we see for next year. I mean I will tell you, for gosh sakes, don't expect it to stay up in the 70, 80, 90 percent that you saw this year, okay? That won't happen.

Now, having said that, let's back up and make sure we understand. You know, organically what we've been seeing is 20 to 30 percent growth rate year-over-year, organically. So, you know, a lot of what we've done has been how we've assembled our Company and put together some of the pieces together, and that's where we've gotten some of the growth rate through the acquisitions.

So what does that mean going forward? Well, to us going forward, certainly where we see the growth rate occurring is going to specifically be in three areas. First of all, in the Federal marketplace. We expect to see some very nice expansion in that marketplace, particularly with the Presidential initiatives directed around increasing identity solutions very much like the CAC program throughout the Federal marketplace there.

So we continue to see opportunities there, but it's not just the identity opportunities coming forward; it's really in the areas of the rollout of some of the Federal programs which we hope to be an important part of which is, of course, as I mentioned, U.S. VISIT, TWIC, and some of the other border management programs. So that's an area we expect to see continued expansion in and growth going forward.

Secondly, you know, I was really bullish when we did the Imaging Automation acquisition. Having worked with Ron Vanass and the team there now for the past month, I am even more excited about the potential there, and it goes well beyond just what you would normally expect in our traditional markets. And as I tried to allude to in my conversations, it expands into some of the commercial marketplaces, like the airlines and financial services, as well as healthcare, which we think has great potential going forward. So I am very, very bullish about this whole area of proofing and identity authentication going forward. So that's very exciting to us.

And then, of course, with the rollout towards this 2005 October deadline, you know, we are seeing a lot of momentum and a lot of discussion coming out relative to implementing the face recognition solution on a global basis. So we certainly expect to see continued expansion in that area.

So as I look at it, Paul, you know, we feel pretty good about our positioning. Now, from a driver's license standpoint, you know, things will be a little bit tougher there. Okay. We haven't won a lot of States in that area. A couple States will drop off, so we'll have to fill in some of the gap there going forward, but we still remain very bullish. A lot of the States we talked about, the large opportunities, I don't want to mislead our analysts on Texas, California, Virginia, Indiana, these States will do their procurements most probably in the first half of this coming year, 2005, and we all know those things can move. But remember, we don't recognize revenue until we generate a card, so that probably won't kick in should we win any or some of those programs. It won't kick in until probably very late in the year at the earliest from a revenue standpoint. So hopefully, that gives you a little more color, Paul, as you try to look at the marketplace.

**Paul Coster - JP Morgan - Analyst**

Thank you, Bernard.

**Bernard Bailey - VISG - President and CEO**

You're welcome. Thank you.

**Operator**

Our next question comes from Jim Ricchiuti from Needham and Company. Please proceed..

**Jim Ricchiuti - Needham and Company - Analyst**

Thank you. Good morning.

**Bernard Bailey - VISG - President and CEO**


© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call

Hi, Jim.

**Jim Ricchiuti** - *Needham and Company - Analyst*

Bernard, I wonder if you could comment again on the gross margin issue or perhaps, Bill, you could? In the Q4, Bill, I think you alluded to the fact that you see gross margins possibly improving from Q3 levels. How much of the CAC business do you expect to ship in Q4? And is the benefit to sequential improvement that you see coming in Q4, is that also due to the addition of the 1A business?

**Bernard Bailey** - *VISG - President and CEO*

Bill, why don't you take that for Jim, okay?

**Bill Aulet** - *VISG - CFO*

Sure. As I mentioned, we shipped over $5 million of the CAC and that compressed it, but there were also underlying programs that we had been making investments in to become more of a product company in our solutions, providing products which will improve our gross margins. We will see those kicking in.

So, first of all, the CAC program will not be to over $5 million, more in the neighborhood of $4 million in the fourth quarter, and then we see strength across the board in the driver's license business, in our kind of biometrics segment, if you want to call it that, and also Imaging Automation is very much a positive contributor to it. But it's basically following the strategy of, you know, increasing the product mix and the solutions that we offer, which allows us to increase our overall gross margins, as well as efficiencies that we've gotten in cost reduction in delivering in particularly the driver's license business.

**Jim Ricchiuti** - *Needham and Company - Analyst*

Okay. Great. And Bernard, just one final question for you if you could, just talking about the Presidential directives, as you look at that, and it's still early, you know, how this is all going to take shape. But as you look at the potential for that, do you see this as being ultimately more of a centrally issued ID card, or do you think it could be issued at the department and agency level using desktop systems? And I wonder if you could also comment on how you see that playing into the 1A business, as well?

**Bernard Bailey** - *VISG - President and CEO*

Yeah, a couple of things on that, Jim. First of all, it's not clear how it will happen, so I don't have any great wisdom on this. I do have a lot of experience in working down at the Government. And I would expect to see that it will continue to be an agency-by-

agency desktop type of issuance program and not a central issuance. Mainly because, you know, as we know, it's the Federal Government but they act as very, very separate entities.

For example, I could never see the DOD consolidating its card production into a central type of production because there's really a strong demand and need for over-the-counter fast response on these cards, and getting them issued out to people, just like many of us expect when we go and get an ID card. So I don't think that will happen. You know, I do think that, you know, each agency will go through its own process in procurement and will do it appropriately. Different ones are at different stages today, and they'll roll out accordingly.

That being said, as you well understand, Jim, and I know you do understand this, is that you know to really have the security through the identity of an individual, it has to be managed throughout the entire life cycle of the process. To miss a single arena or a single point in the life cycle weakens the entire chain of the life cycle and trust of the identity. As a result of that, it is absolutely clear to me that there will be a strong need to have to have solutions like the Imaging Automation solution to do both the upfront proofing and identity verification, coupled with the backend verification of the usage of that document. And already we're seeing that in discussions down in Washington with several of the agencies.

Now, certainly, the DMDC sees the applicability and the need for verifying individuals in the military, and most importantly, not so much the military people, but rather their dependents as they come forward. And then, in addition to that, we certainly see it in the passport arena and lots of discussion about verifying the identity of individuals and how do we verify those documents, both in the issuance as well as the usage in the backend. So clearly, this spills right over into any area where you have to issue an ID and to a credential and verify that credential and tie that person to a credential. And Imaging Automation is an important part of that whole process.

**Jim Ricchiuti** - *Needham and Company - Analyst*

Okay. Thanks very much.

**Bernard Bailey** - *VISG - President and CEO*

You're welcome. Thank you, Jim.

**Operator**

Our next question comes from Scott Greiper from Unterberg. Please proceed.

**Scott Greiper** - *Unterberg - Analyst*

Thomson StreetEvents    streetevents@thomson.com    617.603.7900    www.streetevents.com    

© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call

Good morning, guys. Congrats on the quarter.

**Bernard Bailey - VISG - President and CEO**

Thanks, Scott.

**Scott Greiper - Unterberg - Analyst**

A couple of questions. First of all, on the debt repayment, it looks like you paid off a little bit over $10 million, and you alluded in the call towards the possibility of no repayment this quarter but there were some prepayment issues. Can you give me some light as to, you know, when you would see using some of the cash from the secondary to repay debt?

And secondly, to follow-up, going back to Imaging Automation, you talked a lot about a commercial opportunities which I think are vital to diversifying the revenue stream, can you get a little more detailed, Bernard, on timing, not necessarily revenue timing but pilots that are ongoing in financial or healthcare, some of these other commercial applications?

**Bernard Bailey - VISG - President and CEO**

Yeah. Sure. Let me take the debt question first, okay. As you know, or all of you certainly were aware, when we filed the prospectus, when we did the follow-on offering that an important usage of our funds was to pay down our debt.

And why was that important? Well, that's important for very specifically, two reasons. Number one, it would allow us to have a lot more flexibility as a business going forward in terms of managing our business, but secondly, by getting rid all of our debt, it allows us to drop immediately about $2.4 million to our bottom line performance, helping us to get profitability even quicker.

So the obvious question then comes well, gee, if you got all of this cash, why didn't you just rush out and pay off the debt? And the fact of the matter is we wanted to do this in a smart way, Scott. And an important element in doing that was to make sure that we had secured behind us the flexibility to manage our business and our cash flow through its ups and downs, as any business has.

You know, I am very pleased as a business we're generating cash from operations on an annual basis, so all of us should feel pretty good about that. But we still want to have the ups and downs. For example, this quarter, our operating cash was actually slightly negative at about half a million dollars due to the fact that we had a significant run-up in our AR, which, as you well know, happens at the end of end of a fiscal year, and when you're in the Federal and State and local marketplace. So if that happens, we want the flexibility.

So what that all means is that what we wanted to do was make sure we had our line of credit in place. Now that we have it with Citizens Bank, we feel that we have the right debt structure and credit structure for the Company that will allow us now to use our cash to pay off that debt so we can drop to the bottom line a better financial performance for our shareholders.

So that's why we approached that, and yes, there are some issues relative to prepayments and we wanted to make sure that we went through that the right way and developed the right flexibility as we negotiated our banking relationship going forward. We're now in a position to deal with those. And that was just signed here this past week. And so that's the question on the debt. Does that answer that for you?

**Scott Greiper - Unterberg - Analyst**

Yes, it does. Yes.

**Bernard Bailey - VISG - President and CEO**

Okay. Good. Thanks.

So now, you ask about the rollout and the timing relative to some of the commercial opportunities? And you know, Ron VanAws has just done a terrific job, and I'm really excited about getting some of our analysts and shareholders to spend some time with Ron to really get as excited about the Imaging Automation opportunity as I am about it. And when you speak to Ron, you certainly will be.

Having said that, you know, Ron has been working this market now for a couple of years, and has really planted some good seeds in the pilot stage on this, and it's a little bit premature to say exactly when that will happen, but I wouldn't be surprised to see some of that happen this quarter, Scott.

**Scott Greiper - Unterberg - Analyst**

The...

**Bernard Bailey - VISG - President and CEO**

Not in a big way, but in a way that will certainly demonstrate the validity of the solution and start to see the traction get started.

**Scott Greiper - Unterberg - Analyst**

Is the financial services industry because of the mandates of the Patriot Act sort of the lower hanging fruit on the commercial side?

**Bernard Bailey - VISG - President and CEO**


Thomson StreetEvents    streetevents@thomson.com    617.603.7900    www.streetevents.com

© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call

In our opinion, it certainly is. You know, there's certainly a compelling ROI reason for doing it there for them, as well as a mandated reason, and that always helps in the selling process. So I never call anything in this industry low hanging fruit. You know that, Scott. But certainly, on the tree, it certainly is lower than some of the other stuff.

**Scott Greiper - Unterberg - Analyst**

Okay. Thank you, Bernard. Congratulations.

**Bernard Bailey - VISG - President and CEO**

You're welcome. Thanks for everything, Scott.

**Operator**

And our next question comes from Tim Quillin from Stephens Incorporated. Please proceed.

**Tim Quillin - Stephens Incorporated - Analyst**

Good morning.

**Bernard Bailey - VISG - President and CEO**

Hi, good morning.

**Tim Quillin - Stephens Incorporated - Analyst**

I apologize, I had to hop off the call, and you may have answered this already. And you talked about the revenue from the CAC program, but what was the total revenue from what used to be called TDT?

**Bernard Bailey - VISG - President and CEO**

Well, we really don't break our revenue out that way through the previous acquisitions, so you know, we're not really in a position to talk about it that way.

Bill, do you have any other color you would want to give on that?

**Bill Aulet - VISG - CFO**

No, I would just say that's not the way we look at our business. We really combine our operations down there in Washington. We sell a total solution; there is no TDT standalone business anymore.

**Bernard Bailey - VISG - President and CEO**

Yeah, I mean it's just like ZN, you know, there's no way to put a number on ZN. We are an integrated company across the whole board and that's how we look at our business. Now we can look at Federal but the Federal includes a lot of what we did previously in the old Viisage, coupled with what we're doing now in the new Viisage. And certainly, our performance there has dramatically improved, and in many ways.

**Tim Quillin - Stephens Incorporated - Analyst**

Okay. Well, in the past couple of 10-Qs, you actually reported revenue from TDT and ZN, but I guess we'll take that with a grain of salt. As far as the CAC program and revenues that you're getting in '04, you know, how concerned are you about difficult comparisons in '05, and what's the sustainability of that revenue stream?

**Bernard Bailey - VISG - President and CEO**

Yeah, Bill, why don't you take that, okay?

**Bill Aulet - VISG - CFO**

Okay. Can you just repeat the question, Tim?

**Tim Quillin - Stephens Incorporated - Analyst**

Yeah, the question, Bill, is that on the CAC program, how sustainable is that revenue, and you know, how difficult are the comparisons going to be in '05?

**Bill Aulet - VISG - CFO**

Okay, so if we look at this year, we initially said that the CAC program is going to be doing $10 million for the initial order. That is primarily for the production system. Going forward, as you look into the other years, we see 20 percent of that being, coming in 20 percent plus or minus, probably plus, coming in consumables, service maintenance support, software upgrades, at much higher margins.

**Tim Quillin - Stephens Incorporated - Analyst**

Okay, so perhaps there was $1 million in 2Q, $5 million in 3Q, $4 million in 4Q, but in 2005 we'll drop down to, you know, closer to a $2 million to $3 million run rate?

**Bill Aulet - VISG - CFO**

Thomson StreetEvents    streetevents@thomson.com    617.603.7900    www.streetevents.com



© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call

Yes.

**Tim Quillin - Stephens Incorporated - Analyst**

Okay, that's good. And then, Bernard, you had mentioned something that there's a couple of States that are going to drop off. Can you just talk about any possible, you know, revenue losses on the State side?

**Bernard Bailey - VISG - President and CEO**

Yeah. You know, as I mentioned, you know, there are a couple of these States that we continue to do business with them and support them so they transition over, one of which, of course, is Florida, which interestingly is now almost two years since its last award. And we continue to support that State as they try to get their new system up and running. So, we certainly anticipate Florida dropping off.

The second one, of course, then would be Ohio. You know, as Ohio gets its new system up and running, we anticipate that the Ohio revenues will also drop off next year as they switch over to the new vendor going forward. So those are the two major States that will impact us from a revenue standpoint.

**Tim Quillin - Stephens Incorporated - Analyst**

Would you be able to quantify at all what type of revenue that you're getting from Florida and Ohio in 2004?

**Bernard Bailey - VISG - President and CEO**

I don't mind doing that; the problem is I don't have it at my fingertips right now. You know, are you going to be on the next call?

**Tim Quillin - Stephens Incorporated - Analyst**

I'll try. I've got another conference call to get on, though.

**Bernard Bailey - VISG - President and CEO**

Yeah, I was going to say, Bill, maybe you can give some color around that on the next call.

**Bill Aulet - VISG - CFO**

If we run out of time I prefer to...

**Bernard Bailey - VISG - President and CEO**

I'd estimate probably combined between the two is around $5 million a year. I could be off a little bit, but don't use that as the number.

**Tim Quillin - Stephens Incorporated - Analyst**

Right.

**Bernard Bailey - VISG - President and CEO**

But it's not trivial.

**Tim Quillin - Stephens Incorporated - Analyst**

Okay. Very good. Thanks, gentlemen.

**Bernard Bailey - VISG - President and CEO**

Yeah. You're welcome.

All right. Well, again, I want to thank all of you very much for participating with us today. I certainly appreciate the support of all of our shareholders and of all our investor base. If there's anything else that we can do to help answer questions for you or give you more insight, we certainly are willing to do that. Feel free to either e-mail Bill or myself, or give us a call.

In the meantime, I would strongly recommend if you want to gain more insight into the financials that you all participate in the follow-on call which will be a more detailed financial analysis call to help give some more perspective and insight on that.

So, once again, thanks for your time today. I greatly appreciate your support. And we will continue to do the very best we can and work as hard as we can to create shareholder value for all of our investors. Thank you very much.

**Operator**

Ladies and gentlemen, thank you for participating in the conference. This concludes your presentation, you may now disconnect. Good day.


**Thomson StreetEvents**     streetevents@thomson.com     617.603.7900     www.streetevents.com

© 2004 2002 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

VISG - Q3 2004 Viisage Technology, Inc. Earnings Conference Call

DISCLAIMER

Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

© 2004, Thomson StreetEvents All Rights Reserved



EXHIBIT 23

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the Quarterly Period Ended September 26, 2004.

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the Transition Period from _____ to _____ .

Commission File Number 000-21559

# VIISAGE TECHNOLOGY, INC.
#### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **04-3320515** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **296 Concord Road, Third Floor, Billerica, MA** | **01821** |
| (Address of principal executive offices) | (Zip Code) |

**Registrant's telephone number, including area code (978) 932-2200**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. ☒ Yes ☐ No

Indicate by a check mark whether the Registrant is an accelerated filer (as defined in Rule 12b-2 of the Exchange Act) ☐ Yes ☒ No

Indicate the number of shares outstanding of each of the registrant's classes of common stock, as of the latest practicable date.

| Class | Outstanding at November 8, 2004 |
|---|---|
| Common stock, $.001 par value | 47,359,858 |

Table of Contents

**VIISAGE TECHNOLOGY, INC.**
FORM 10 – Q FOR THE QUARTER ENDED SEPTEMBER 26, 2004
INDEX

|  | Page |
|---|---|
| Facing Sheet | 1 |
| Index | 2 |
| **PART I - FINANCIAL INFORMATION** | |
| Item 1 – Financial Statements | |
| Consolidated Balance Sheets as of September 26, 2004 and December 31, 2003 | 3 |
| Consolidated Statements of Operations for the three and nine months ended September 26, 2004 and September 28, 2003 | 4 |
| Consolidated Statements of Cash Flows for the nine months ended September 26, 2004 and September 28, 2003 | 5 |
| Notes to Financial Statements | 6 |
| Item 2 – Management's Discussion and Analysis of Financial Condition and Results of Operations | 13 |
| Item 3 – Quantitative and Qualitative Disclosures about Market Risk | 30 |
| Item 4 – Controls and Procedures | 30 |
| **PART II - OTHER INFORMATION** | 31 |
| Item 1 – Legal Proceedings | 31 |
| Item 2 – Unregistered Sales of Equity Securities and Use of Proceeds | 31 |
| Item 3 – Defaults Upon Senior Securities | 31 |
| Item 4 – Submission of Matters to a Vote of Security Holders | 31 |
| Item 5 – Other Information | 31 |
| Item 6 – Exhibits | 31 |
| **SIGNATURES** | 32 |
| **EXHIBIT INDEX** | 33 |

2

Table of Contents

**PART 1 – FINANCIAL INFORMATION**
ITEM 1 – FINANCIAL STATEMENTS

<div align="center">

**VIISAGE TECHNOLOGY, INC.**
**Consolidated Balance Sheets**
**(in thousands)**

</div>

|  | September 26, 2004 | *December 31, 2003 |
|---|---:|---:|
|  | (Unaudited) |  |
| Assets |  |  |
| Current Assets: |  |  |
|     Cash and cash equivalents | $ 34,363 | $ 6,666 |
|     Accounts receivable | 18,002 | 7,057 |
|     Inventories and other costs and estimated earnings in excess of billings | 3,293 | 4,050 |
|     Other current assets | 1,176 | 439 |
|         Total current assets | 56,834 | 18,212 |
| Property and equipment, net | 22,308 | 25,088 |
| Goodwill | 61,858 | — |
| Intangible assets, net | 21,708 | 2,693 |
| Restricted cash | 3,000 | 6,311 |
| Other assets | 1,427 | 2,176 |
|  | $ 167,135 | $ 54,480 |
| Liabilities and Shareholders' Equity |  |  |
| Current Liabilities: |  |  |
|     Accounts payable and accrued expenses | $ 14,447 | $ 6,851 |
|     Related party payable | 1,385 | — |
|     Current portion of project financing | 3,968 | 3,734 |
|     Current portion of related party notes | 10,300 | 1,740 |
|         Total current liabilities | 30,100 | 12,325 |
| Project financing | 4,966 | 5,813 |
| Related party notes | — | 2,334 |
| Other liabilities | 414 | — |
|     Total liabilities | 35,480 | 20,472 |
| Shareholders' equity | 131,655 | 34,008 |
|  | $ 167,135 | $ 54,480 |

\*   Derived from audited financial statements.

<div align="center">

The accompanying notes are an integral part of these financial statements.

3

</div>

Table of Contents

### VIISAGE TECHNOLOGY, INC.
#### Consolidated Statements of Operations
#### (in thousands, except per share data)
#### (Unaudited)

| | Three Months Ended | | Nine Months Ended | |
| --- | --- | --- | --- | --- |
| | September 26, 2004 | September 28, 2003 | September 26, 2004 | September 28, 2003 |
| Revenues | $ 19,907 | $ 10,108 | $ 48,442 | $ 27,053 |
| Cost of revenues | 14,400 | 6,728 | 34,613 | 20,344 |
| Gross margin | 5,507 | 3,380 | 13,829 | 6,709 |
| Operating Expenses: | | | | |
| Sales and marketing | 1,588 | 1,237 | 4,659 | 3,786 |
| Research and development | 896 | 946 | 2,797 | 2,828 |
| General and administrative | 2,362 | 1,328 | 6,717 | 3,454 |
| Total operating expenses | 4,846 | 3,351 | 14,173 | 10,068 |
| Operating income (loss) | 661 | (131) | (344) | (3,359) |
| Interest income | 67 | 19 | 108 | 67 |
| Interest expense | (478) | (295) | (1,488) | (793) |
| Other (income) expense | 27 | (18) | (48) | (18) |
| Income (loss) before income taxes and cumulative effect of change in accounting principle | 223 | (389) | (1,676) | (4,067) |
| Provision for income taxes | (25) | — | (75) | (63) |
| Income (loss) before cumulative effect of change in accounting principle | 198 | (389) | (1,751) | (4,130) |
| Cumulative effect of change in accounting principle | — | — | — | (12,131) |
| Net income (loss) | $ 198 | $ (389) | $ (1,751) | $ (16,261) |
| Basic net income (loss) per share before cumulative effect of change in accounting principle | $ 0.00 | $ (0.02) | $ (0.05) | $ (0.20) |
| Diluted net income (loss) per share before cumulative effect of change in accounting principle | $ 0.00 | $ (0.02) | $ (0.05) | $ (0.59) |
| Cumulative effect of change in accounting principle | $ 0.00 | $ (0.00) | $ (0.00) | $ (0.79) |
| Net income (loss) per basic share | $ 0.00 | $ (0.02) | $ (0.05) | $ (0.79) |
| Net income (loss) per diluted share | $ 0.00 | $ (0.02) | $ (0.05) | $ (0.79) |
| Weighted average basic shares | 40,072 | 21,512 | 35,783 | 20,711 |
| Weighted average diluted shares | 41,090 | 21,512 | 35,783 | 20,711 |

The accompanying notes are an integral part of these consolidated financial statements.

4

Table of Contents

**VIISAGE TECHNOLOGY, INC.**
**Consolidated Statements of Cash Flows**
**(in thousands)**
**(Unaudited)**

|  | Nine Months Ended | |
| --- | --- | --- |
|  | September 26, 2004 | September 28, 2003 |
| **Cash Flows from Operating Activities:** | | |
| Net loss | $ (1,751) | $ (16,261) |
| Adjustments to reconcile net loss to net cash provided by operating activities, net of effects of acquisitions: | | |
| Depreciation and amortization | 7,877 | 5,288 |
| Gain on sale of equipment | — | (18) |
| Impact of cumulative effect of change in accounting principle | — | 12,131 |
| Directors fees paid in common stock | 333 | 210 |
| Change in operating assets and liabilities: | | |
| Accounts receivable | (7,831) | (666) |
| Inventories and costs and estimated earnings in excess of billings | 1,081 | 956 |
| Other current assets | (299) | (707) |
| Accounts payable and accrued expenses | 2,299 | 1,988 |
| Net cash provided by operating activities | 1,709 | 2,921 |
| **Cash Flows from Investing Activities:** | | |
| Decrease in restricted cash | 3,311 | 2,284 |
| Additions to property and equipment | (1,680) | (5,792) |
| Cash paid for acquisitions, net of cash acquired | (6,227) | (1,054) |
| Proceeds from sale of equipment | — | 35 |
| Increase in other assets | (1,524) | (443) |
| Net cash used for investing activities | (6,120) | (4,970) |
| **Cash Flows from Financing Activities:** | | |
| Net proceeds from project financing and related party notes | 4,273 | 2,781 |
| Principal payments on project financing and related party notes | (13,150) | (3,935) |
| Net proceeds from issuance of common stock | 40,985 | 12,414 |
| Net cash provided by financing activities | 32,108 | 11,260 |
| Net increase in cash and cash equivalents | 27,697 | 9,211 |
| Cash and cash equivalents, beginning of period | 6,666 | 2,212 |
| Cash and cash equivalents, end of period | $ 34,363 | $ 11,423 |
| **Supplemental Cash Flow Information:** | | |
| Cash paid during the period for interest | $ 333 | $ 743 |
| **Non Cash Activities:** | | |
| Directors fees paid in common stock | $ 260 | $ 210 |
| Services paid in common stock | $ 14 | $ — |
| Acquisitions paid in common stock | $ 57,486 | $ — |
| Acquisitions paid in related party financing | $ 15,300 | $ — |
| Assets purchased under capital leases | $ — | $ 1070 |
| Assets purchased with extended payment terms | $ 800 | $ — |

The accompanying notes are an integral part of these financial statements

5

Table of Contents

**VIISAGE TECHNOLOGY, INC.**
**Notes to Financial Statements**

1. DESCRIPTION OF BUSINESS

Viisage Technology, Inc. ("Viisage" or the "Company") is a leading provider of advanced technology identity solutions that enable governments, law enforcement agencies and businesses to enhance security, reduce identity theft, and protect personal privacy. Our identity solutions include secure credential provisioning systems, biometric software and systems and real time identity databases, as well as systems design, development, integration and support services. These solutions enable our customers to manage the entire life cycle of an individual's identity for a variety of applications including civil identification, criminal identification and border management. Our customers use our identity solutions to help solve the following four critical problems:

- *assurance* that an identification document is authentic;

- *assurance* that the document has been issued to the correct person;

- *confidence* that the person holding the identification document is uniquely tied to and authorized to use the document and

- *verification* of the privileges the individual is entitled to at a particular point in time.

Our business involves two closely-related segments: secure credentials and biometrics. Our secure credentials solutions involve the design, development, marketing and implementation of integrated software and hardware solutions that produce identification credentials utilizing face recognition and other biometric technologies. The focus of our biometric technology solutions is primarily on applications designed to deter criminal and terrorist activities, including government research and development contracts.

Viisage combines its proprietary biometric and secure credential software with complementary industry standard products to create identity solutions that integrate into its customers' environments. These turnkey solutions integrate secure document technologies, image and data capture, relational databases, and multiple biometrics, improving the customer's ability to process and manage identity information. Applications include passports, driver's licenses, voter registration, national identification credentials, law enforcement, social services, access control, surveillance and PC network and Internet access security. Viisage's primary customers are government agencies with particular penetration in U.S. government agencies such as the Department of State and state departments of motor vehicles, social services, and law enforcement. Viisage is the sole source provider of high security technology and services to the U.S. Department of State for the production of U.S. passports by virtue of an acquisition in 2004 and has captured a large percentage of the domestic driver's license market. Viisage also has provided services under subcontracts for projects in the United Arab Emirates, Jamaica, the Philippines and the U.S. Immigration and Naturalization Service.

2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

*Basis of Presentation*

The accompanying financial data as of September 26, 2004 and December 31, 2003, and for the three and nine month periods ended September 26, 2004 and September 28, 2003, have been prepared pursuant to the rules and regulations of the Securities and Exchange Commission. Certain information and footnote disclosures normally included in financial statements prepared in accordance with accounting principles generally accepted in the United States of America have been condensed or omitted pursuant to such rules and regulations. The December 31, 2003 balance sheet was derived from audited financial statements, but does not include all disclosures required by generally accepted accounting principles. These financial statements should be read in conjunction with the financial statements and the notes thereto included in our Annual Report on Form 10-K for the year ended December 31, 2003.

In the opinion of management, all adjustments (which include only normal recurring adjustments) necessary to present fairly the financial position, results of operations, and cash flows as of September 26, 2004 and for the three and nine month periods ended September 26, 2004 and September 28, 2003, have been made. The results of operations for the period ended September 26, 2004 are not necessarily indicative of the operating results for the full year.

*Use of Estimates*

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions. These estimates and assumptions affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

Table of Contents

*Stock-Based Compensation*

At September 26, 2004, we account for our stock-based compensation plans using the intrinsic value method, in accordance with the provisions of APB Opinion No. 25, *Accounting for Stock Issued to Employees*, and comply with the disclosure provisions of Statements of Financial Accounting Standards ("SFAS") No. 123, *Accounting for Stock-Based Compensation*, and SFAS No. 148, *Accounting for Stock-Based Compensation- Transition and Disclosure*. No stock-based employee compensation cost was reflected in net income (loss), as all options granted under those plans had an exercise price equal to the fair market value of the underlying common stock on the date of grant.

The following table illustrates, in accordance with the provisions of SFAS No. 148, *Accounting for Stock-Based Compensation— Transition and Disclosure*, the effect on net income (loss) and loss per share if we had applied the fair value recognition provisions of SFAS No. 123, *Accounting for Stock-Based Compensation*, to stock-based employee compensation.

| | Three Months Ended | | Nine Months Ended | |
| --- | --- | --- | --- | --- |
| | September 26, 2004 | September 28, 2003 | September 26, 2004 | September 28, 2003 |
| Net income (loss) as reported | $ 198 | $ (389) | $ (1,751) | $ (16,261) |
| Add: stock based employee compensation expense included in reported net loss | — | — | — | — |
| Deduct: total stock based employee compensation expense determined under the fair value based method for all awards | (814) | (582) | (2,625) | (2,245) |
| Pro forma net loss | $ (616) | $ (971) | $ (4,376) | $ (18,506) |
| Income (loss) per share: | | | | |
| Basic - as reported | $ 0.00 | $ (0.02) | $ (0.05) | $ (0.79) |
| Diluted -- as reported | $ 0.00 | $ (0.02) | $ (0.05) | $ (0.79) |
| Basic - pro forma | $ (0.00) | $ (0.05) | $ (0.05) | $ (0.89) |
| Diluted – pro forma | $ (0.00) | $ (0.05) | $ (0.05) | $ (0.89) |

The fair value of the Company's stock-based option awards to employees was estimated assuming the following weighted-average assumptions:

| | September 26, 2004 | September 28, 2003 |
| --- | --- | --- |
| Risk free interest rate | 4.0 – 5.0% | 4.0 – 5.0% |
| Expected dividend yield | — | — |
| Expected lives | 3 – 10 years | 3 – 10 years |
| Expected volatility | 80% | 80% |

*Computation of Net Income (Loss) per Share*

The basic net income (loss) per share calculation is computed based on the weighted average number of shares of common stock outstanding during the period. The diluted net income (loss) per share calculation is computed based on the weighted average number of shares of common stock outstanding during the three-month period ended September 26, 2004, including dilutive share equivalents of 1,017,713 consisting of certain outstanding stock options and stock warrants, using the treasury stock method. The impact of approximately 948,000 common equivalent shares and 5,395,000 common equivalent shares, respectively consisting of certain outstanding options and stock warrants were not reflected in the three- and nine-month periods ended September 26, 2004 dilutive net loss per share calculation as their effect would be anti-dilutive. The impact of approximately 3,741,000 shares of common stock consisting of certain outstanding options and stock warrants were not reflected in the three-month and nine-month periods ended September 28, 2003 dilutive net loss per share calculation. Potentially dilutive securities are excluded from the calculation of diluted earnings per share if their effect is anti-dilutive.

### 3. INCOME TAXES

No provision for federal income taxes has been made for the three- and nine-month periods ended September 26, 2004 and September 28, 2003 due to our net loss for the nine-month period ended September 26, 2004. The provision for state income taxes for the nine-month periods ended September 26, 2004 and September 28, 2003 was approximately $75,000 and $63,000, respectively. The provision for state income taxes for the three-month period ended September 26, 2004 was approximately $25,000. There was no provision for state income taxes for the three-month period ended September 28, 2003.

Table of Contents

## 4. RELATED PARTY TRANSACTIONS AND SHAREHOLDERS' EQUITY

Lau Technologies, or Lau, and Mr. Buddy Beck beneficially own approximately 12.6% and 12.2%, respectively, of our outstanding common stock. Readers are referred to the "Notes to Financial Statements" section of the Company's 2003 Annual Report on Form 10-K for further discussion.

In connection with the acquisition of TDT on February 14, 2004, we issued a promissory note to Mr. Beck in the amount of $15.3 million, which is secured by some of TDT's assets. This note bears interest at a rate of 8.5% and is payable in equal installments of principal and interest on December 1, 2004, May 1, 2005 and December 1, 2005. We believe that the terms of this loan agreement are the same as the terms that would have been provided to us by an unaffiliated lender. Interest expense related to this note for the three- and nine-month periods ended September 26, 2004 was approximately $261,000 and $748,000, respectively. On September 22, 2004 the debt balance was reduced by a required principal payment of approximately $4.2 million. As of September 26, 2004 the remaining balance on this note was $10.3 million. As of October 19, 2004, all principal and interest on this note was voluntarily prepaid in full.

In connection with the acquisition of TDT, we agreed to pay Mr. Beck, the former sole shareholder of TDT, an additional cash payment of up to $2.6 million if the U.S. Department of Defense selected TDT for the production of smart cards as part of the agency's Common Access Card (CAC) program and placed orders with an aggregate value of at least $4.0 million prior to June 30, 2004. We received an initial purchase order of $10.2 million for this program and therefore we have recorded this contingent purchase price of $2.6 million related to the CAC program as additional goodwill. This additional goodwill was offset by approximately $836,000 of identified purchase price adjustments related to certain provisions in the stock purchase agreement. As of September 26, 2004, we have paid approximately $1.2 million of this obligation. The remaining $1.4 million is recorded as a related party payable.

In August 2004, we sold approximately 7.3 million shares of our common stock in an underwritten public offering. We received net proceeds of approximately $37.4 million from the offering.

In September 2004, we voluntarily prepaid indebtedness of $4.3 million to Lau which constituted payment in full of all outstanding indebtedness to Lau.

## 5. BUSINESS SEGMENTS, GEOGRAPHICAL INFORMATION AND CONCENTRATIONS OF RISK

We follow SFAS No. 131 *Disclosures about Segments of a Business Enterprise and Related Information*, which establishes standards for reporting information about operating segments. Operating segments are defined as components of a company about which separate financial information is evaluated regularly by the chief operating decision maker in deciding how to allocate resources and in assessing performance.

The following table provides financial information by segment for the three-and nine-month periods ended September 26, 2004 and September 28, 2003. We allocate direct costs and administrative expenses to each business segment based on management's analysis of each segment's resource needs. Revenue is reported within the segments by customer contracts. Within the secure credentials segment there is a component of the contract that utilizes our biometrics technology. Total assets as of September 26, 2004 include the preliminary allocation of goodwill to the operating segments.

| | Three Months Ended 09/26/04 | | | Three Months Ended 09/28/03 | | |
|---|---|---|---|---|---|---|
| | Secure Credentials | Biometrics | Total | Secure Credentials | Biometrics | Total |
| Secure credential revenue | $ 18,010 | $ — | $ 18,010 | $ 7,634 | $ — | $7,634 |
| Biometrics revenue | 364 | 1,533 | 1,897 | 616 | 1,858 | 2,474 |
| Total segment revenue | $ 18,374 | $ 1,533 | $ 19,907 | $ 8,250 | $ 1,858 | $10,108 |
| Segment profit (loss) before taxes and cumulative effect | $ 2,784 | $ (2,561) | $ 223 | $ 880 | $ (1,269) | $ (389) |
| Depreciation and amortization | $ 2,345 | $ 397 | $ 2,742 | $ 1,850 | $ 177 | $2,027 |
| Interest expense | $ 478 | $ — | $ 478 | $ 295 | $ — | $ 295 |
| Total Assets | $130,424 | $ 36,711 | $167,135 | $ 52,328 | $ 5,951 | $58,279 |
| Expenditures for long lived assets | $ 363 | $ 223 | $ 586 | $ 1,991 | $ 35 | $2,026 |

8

Table of Contents

|  | Nine Months Ended 09/26/04 | | | Nine Months Ended 09/28/03 | | |
|---|---|---|---|---|---|---|
|  | Secure Credentials | Biometrics | Total | Secure Credentials | Biometrics | Total |
| Secure credential revenue | $ 42,332 | $ — | $ 42,332 | $ 21,514 | $ — | $21,514 |
| Biometrics revenue | 1,036 | 5,074 | 6,110 | 978 | 4,561 | 5,539 |
| Total segment revenue | $ 43,368 | $ 5,074 | $ 48,442 | $ 22,492 | $ 4,561 | $27,053 |
| Segment profit (loss) before taxes and cumulative effect | $ 5,439 | $ (7,115) | $ (1,676) | $ 315 | $ (4,382) | $(4,067) |
| Depreciation and amortization | $ 6,967 | $ 910 | $ 7,877 | $ 4,778 | $ 510 | $5 ,288 |
| Interest expense | $ 1,478 | $ 10 | $ 1,488 | $ 793 | $ — | $ 793 |
| Total Assets | $130,424 | $36,711 | $167,135 | $ 52,328 | $ 5,951 | $58,279 |
| Expenditures for long lived assets | $ 1,388 | $ 292 | $ 1,680 | $ 4,394 | $ 1,398 | $5 ,792 |

For the nine-month period ended September 26, 2004 we derived 96.7%, or $46.9 million, of our direct revenue within the United States. We derived an additional 1.0%, or $462,000, of our direct revenue in Canada. The remaining 2.3%, or $1.1 million, was derived by our German subsidiary, primarily from customers in countries within the European Union. For the nine-month period ended September 28, 2003 approximately 97.4%, or $29.3 million, of our direct revenue was derived within the United States. The remaining 2.6% of revenue, or $800,000, was primarily derived in Canada and the United Arab Emirates. For the three-month period ended September 26, 2004 we derived 98.2%, or $19.6 million, of our direct revenue within the Untied States. The remaining 1.8%, or $357,000, was primarily derived by our German subsidiary from customers in countries within the European Union. For the three months ended September 28, 2003 approximately 95.5%, or $10.8 million, of our direct revenue was derived in the United States. The remaining 4.5% of revenue, or $500,000, was primarily derived in Canada and the United Arab Emirates.

We believe for the near future that we will continue to derive a significant portion of our revenues from a limited number of large contracts. Secure credentials customers who accounted for more than 10% of our total revenues are as follows:

- for the three- and nine-month periods ended September 26, 2004, two customers accounted for an aggregate of 38.6% and 29.6%, respectively; and

- for the three- and nine-month periods ended September 28, 2003, two customers accounted for an aggregate of 27.0% and 27.7%, respectively.

No single biometrics customer accounted for over 10% of our total revenue in any of the periods covered by this report.

6. ACQUISITIONS

On January 23, 2004 we acquired all outstanding shares of ZN Vision Technologies AG ("ZN") in exchange for an aggregate of 5,221,454 newly issued shares of our common stock and $493.00 in cash. In addition, we agreed to assume ZN's employee share option plan, and accordingly have reserved 1,138,546 shares of our common stock for issuance to the plan participants. The purchase price for the acquisition was $31.4 million, based on the per share price of our common stock of $4.32 per share which is the average trading price of Viisage common stock over the five trading days immediately preceding and the two trading days immediately following March 28, 2003, the date on which the purchase agreement was signed. The acquisition was accounted for as a purchase, and accordingly, the operations of ZN are included in the financial statements since the effective date, the close of business on January 23, 2004. The purchase price has been allocated to net assets acquired based on their estimated fair values. We engaged an independent third party appraiser to perform a review of the acquired assets and have allocated the purchase price based on the results of their findings. We have recorded approximately $287,000 in amortization related to the acquired intangible assets from the date of the acquisition through September 26, 2004. ZN is a leading German provider of face recognition and computer vision products and services. ZN, now known as Viisage Technology AG, is a wholly owned subsidiary of Viisage and serves as the base of our European operations.

On February 14, 2004 we acquired all outstanding shares of Trans Digital Technologies Corporation ("TDT") for $56.0 million. The purchase price consisted of 5,850,000 newly issued shares of our common stock, which were valued at $5.13 per share, which is the average price of Viisage common stock over the five trading days immediately preceding and the two trading days immediately following February 14, 2004, plus $15.3 million in notes and $5 million in cash. The acquisition was accounted for as a purchase, and accordingly, the operations of TDT are included in the financial statements since the effective date, the close of business on February 14, 2004. The purchase price has been allocated to net assets acquired based on their estimated fair values. We engaged an independent third party appraiser to perform a review of the acquired assets and have allocated the purchase price based on the results

9

Table of Contents

of their findings. The preliminary valuation is subject to further review which may result in adjustments to allocation of purchase price in the future. We have recorded approximately $1.9 million in amortization related to the acquired intangible assets from the date of the acquisition through September 26, 2004. TDT is the sole source provider of high security technology and services to the U.S. Department of State for the production of U.S. passports. TDT is now a wholly owned subsidiary of Viisage.

In connection with the acquisition of TDT, we agreed to pay the former sole shareholder of TDT an additional cash payment of up to $2.6 million if the U.S. Department of Defense selected TDT for the production of smart cards as part of the agency's Common Access Card (CAC) program and placed orders with an aggregate value of at least $4.0 million prior to June 30, 2004. We received an initial purchase order of $10.2 million for this program and therefore we have recorded this contingent purchase price of $2.6 million related to the CAC program as additional goodwill. This additional goodwill was offset by approximately $836,000 of identified purchase price adjustments related to certain provisions in the stock purchase agreement.

The preliminary allocation of the purchase price for ZN and TDT, based on the purchase prices calculated for accounting purposes, is as follows (in thousands):

|  | ZN | TDT |
|---|---|---|
| Current assets | $ 1,639 | $ 3,020 |
| Property and equipment | 140 | 42 |
| Identified intangible assets | 6,335 | 1 4,460 |
| Goodwill | 2 3,292 | 3 8,566 |
|  | $31,406 | $56,088 |

Identified intangible assets acquired in connection with the acquisitions of ZN and TDT consist primarily of completed technology and acquired contracts. These intangible assets are amortized using the straight-line method over their estimated useful lives, as follows:

|  | September 26, 2004 (in thousands) | Weighted Average Useful Life |
|---|---|---|
| Gross carrying amount: |  |  |
| Completed technology | $    6,365 | 10 years |
| Acquired contracts | 14,430 | 5 years |
| Total intangible assets | 20,795 |  |
| Accumulated amortization: |  |  |
| Completed technology | (293) |  |
| Acquired contracts | (1,902) |  |
| Total accumulated amortization | (2,195) |  |
| Intangible assets, net | $   18,600 |  |

We estimate annual amortization expense related to the identified intangible assets acquired in connection with the acquisitions of ZN and TDT to be approximately $3.2 million per year for the next five years.

10

Table of Contents

   The unaudited pro forma and combined selected operating data are presented as if the acquisitions of ZN and TDT had occurred on January 1, 2003 and 2004 for the three- and nine month periods ended September 28, 2003 and September 26, 2004, respectively. The unaudited pro forma data is for informational purposes only and may not necessarily reflect future results of operations or what the results of operations would have been had Viisage, ZN and TDT been operating as a combined entity for the periods presented. For the nine months ended September 28, 2003, we incurred a non-cash charge of $12.1 million representing the cumulative effect of a change in accounting principle related to our adoption of Emerging Issues Task Force 00-21, *Accounting for Revenue Arrangements with Multiple Deliverables*, or EITF 00-21, on a cumulative basis as of January 1, 2003. The unaudited pro forma revenue, income (loss) and income (loss) per share information for the nine months ended September 28, 2003 and September 26, 2004 are as follows (in thousands):

| | Three Months Ended | | | | Nine Months Ended | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | September 26, 2004 | | September 28, 2003 | | September 28, 2004 | | September 26, 2003 | |
| Revenue | $ | 19,907 | $ | 15,421 | $ | 51,283 | $ | 38,568 |
| Income (loss) before cumulative effect of change in accounting principle | $ | 198 | $ | 403 | $ | (1,172) | $ | (7,102) |
| Net income (loss) | $ | 198 | $ | 403 | $ | (1,172) | $ | (19,233) |
| Basic net income (loss) per share before cumulative effect of change in accounting principle | $ | 0.00 | $ | 0.01 | $ | (0.03) | $ | (0.22) |
| Diluted net income (loss) per share before cumulative effect of change in accounting principle | $ | 0.00 | $ | 0.01 | $ | (0.03) | $ | (0.22) |
| Basic net income (loss) per share | $ | 0.00 | $ | 0.01 | $ | (0.03) | $ | (0.61) |
| Diluted net income (loss) per share | $ | 0.00 | $ | 0.01 | $ | (0.03) | $ | (0.61) |

## 7. LEGAL PROCEEDINGS

   In July 2003, a Georgia court issued a preliminary injunction prohibiting Georgia's Department of Motor Vehicle Safety from continuing to work with us to install the State's new drivers' license system. The injunction is the result of a lawsuit filed in March 2003 by one of our competitors alleging that the Department of Motor Vehicle Safety did not comply with its own bid process when it selected a vendor for its new digital drivers' license program. In July 2004, we reached a settlement agreement with the State pursuant to which the Department of Motor Vehicle Safety terminated the contract for convenience and agreed to pay us $2.0 million in cash and the State agreed to purchase certain equipment from us for $500,000. The Department of Motor Vehicle Safety has filed a motion with the Georgia court to dismiss the case based upon the termination of the contract. The agency has informed the court that it intends to issue a new request for proposals for a digital drivers' license system before the end of 2004. In response to a motion filed by the competitor, the Georgia court has issued a preliminary injunction prohibiting the Department of Motor Vehicle Safety and the State from making any payments to us under the settlement agreement. As a result of the termination of the contract, we will lose up to $19.7 million in revenue that we expected to recognize over the next five and one-half years, unless we are able to win the new contract for the digital drivers' license system and the revenues from such new contract are substantially similar to the terminated contract. While we believe we can utilize the remaining $2.8 million in assets being retained by us from the Georgia contract either in Georgia, if we win the contract based on the new request for proposals, or on alternative projects, to the extent that we are unable to utilize these assets or realize value through a sale of these assets, we would be required to take a charge to earnings.

   On July 19, 2004, Fargo Electronics, Inc. initiated a patent infringement action in the U.S. District Court for the Eastern District of Virginia against Toppan Printing Co., Ltd. and TDT. The complaint alleges that Toppan and TDT's use, offer to sell and/or importation of certain personalized identification card printers, including Toppan's CP400 card printers, and associated laminators in the United States constitutes direct and indirect infringement of four patents allegedly owned by Fargo. The complaint seeks unspecified compensatory damages, permanent injunctive relief, trebling of damages for willful infringement and fees and costs. We are currently evaluating the claims in this lawsuit and intend to vigorously defend against them. We believe that the only products at issue are Toppan CP400 printers that were or are sold, used or imported as part of the CAC program. To date, we have received purchase orders of $10.2 million for Toppan CP400 printers for the CAC program, which are expected to be delivered by the end of the first quarter of 2005. There can be no assurance that we will prevail in this litigation. The litigation, with or without merit, could be time consuming and expensive to litigate or settle and could divert management's attention from our business.

## 8. SUBSEQUENT EVENTS

   On October 5, 2004 we acquired all of the outstanding capital stock of Imaging Automation, Inc. through a merger between Imaging Automation and a wholly-owned subsidiary of Viisage. The purchase price consisted of approximately 3.9 million newly

Table of Contents

issued shares of our common stock, approximately $5.0 million in cash and the assumption of $2.9 million in debt, which has subsequently been repaid in full. We also assumed the options outstanding under the Imaging Automation stock option plans which are exercisable for approximately 550,000 shares of our common stock. The acquisition will be accounted for as a purchase in the fourth quarter of 2004 and therefore the operations of Imaging Automation will be included in the financial statements from and after the effective date of the transaction. We have engaged an independent third party appraiser to perform a review of the acquired assets and will allocate the purchase price based on the results of its findings.

<div align="center">12</div>

Table of Contents

## VIISAGE TECHNOLOGY, INC.

ITEM 2 – MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

The following discussion and analysis should be read in conjunction with the financial statements and accompanying notes contained in our 2003 Annual Report on Form 10-K and in this Quarterly Report on Form 10-Q.

### OVERVIEW

We generate revenue through the sale and license of products and services for verifying and managing identities. Our revenues increased from approximately $27.1 million in the first nine months of 2003 to approximately $48.4 million in the first nine months of 2004. We generated approximately $198,000 of net income during the three months ended September 26, 2004 compared to a net loss of approximately $400,000 during the comparable period of 2003. Our net loss during the first nine months of 2004 decreased to approximately $1.8 million from approximately $4.1 million for the first nine months of 2003, excluding the one-time charge of $12.1 million in connection with our change in accounting principle as of January 1, 2003.

In August 2004, we sold approximately 7.3 million shares of our common stock in an underwritten public offering. We received net proceeds of approximately $37.4 million from the offering.

During September and October 2004, Viisage repaid in full a $15.3 million promissory note that it had issued to Buddy Beck, a director of Viisage and the former sole shareholder of Trans Digital Technologies, or TDT, in connection with our acquisition of TDT. $14.5 million of the note was repaid in cash and the remaining $0.8 million was repaid as an offset against a purchase price reduction negotiated as part of the acquisition of TDT. In addition, in September 2004, Viisage repaid in full its $4.3 million debt obligation to Lau Technologies, or Lau, one of its principal stockholders.

Following the close of the quarter, Viisage completed the acquisition of Imaging Automation, Inc., a privately-held company that provides identity document authentication solutions. The purchase price for the acquisition included approximately 3.9 million shares of common stock, approximately $5.0 million in cash and the assumption of approximately $2.9 million of debt, which has subsequently been repaid in full. In addition, since September 26, 2004, Viisage has announced the signing of a face recognition contract with the Ohio Department of Rehabilitation and Correction, the award of a new drivers' license contract with the State of Wisconsin, a drivers' license contract extension with the State of Maryland, and the expansion of various existing drivers' license contracts to include our face recognition technologies. Viisage expects those contracts and extensions to generate approximately $11.4 million of revenue over the next five years.

### COMPANY BACKGROUND

Viisage Technology, Inc. ("Viisage" or the "Company") is a leading provider of advanced technology identity solutions that enable governments, law enforcement agencies and businesses to enhance security, reduce identity theft, and protect personal privacy. Our identity solutions include secure credential provisioning systems, biometric software and systems and real time identity databases, as well as systems design, development, integration and support services. These solutions enable our customers to manage the entire life cycle of an individual's identity for a variety of applications including civil identification, criminal identification and border management. Our customers use our identity solutions to help solve the following four critical problems:

- *assurance* that an identification document is authentic;
- *assurance* that the document has been issued to the correct person;
- *confidence* that the person holding the identification document is uniquely tied to and authorized to use the document and
- *verification* of the privileges the individual is entitled to at a particular point in time.

Our solutions annually produce more than 30 million secure government-issued credentials at more than 2,000 locations. We are the second largest provider of U.S. drivers' licenses with a 30% market share, and we are the sole source provider of passport production capability to the U.S. Department of State. We also are a recognized leader in biometrics in the field of face recognition. Our customers include governments, law enforcement agencies and businesses in more than 15 countries.

### SEGMENTS AND GEOGRAPHIC INFORMATION

Our business involves two closely-related segments: secure credentials and biometrics. For the nine-month period ended September 26, 2004, we derived 96.7%, or $46.9 million, of our direct revenue within the United States. We derived an additional 1.0%, or $462,000, of our direct revenue in Canada. The remaining 2.3%, or $1.1 million, was derived by our German subsidiary, primarily from customers in countries within the European Union.

13

Table of Contents

*Secure Credentials Segment*

Our secure credentials segment accounted for approximately 92.3% and 89.5% of our revenues for the three- and nine-month periods ended September 26, 2004, respectively. For the three- and nine-month periods ended September 28, 2003 our secure credentials segment accounted for approximately 81.6% and 83.1% of our revenues, respectively. Our secure credentials solutions involve the design, development, marketing and implementation of integrated software and hardware solutions that produce identification credentials utilizing face recognition and other biometric technologies.

We provide customized systems utilizing proprietary products under service contracts that have five to seven year terms and several optional annual renewals after the initial contract term. These contracts generally provide for a fixed price for each identification credential produced. Contract prices vary depending on, among other things, design and integration complexities, the nature and number of workstations and sites, the projected number of secure credentials to be produced, the size of the database, the level of post-installation support and the competitive environment. We also provide high security technology and services to the U.S. Department of State for the production of U.S. passports, as well as similar services to the U.S. Departments of Defense and Homeland Security.

In civil identification applications, such as drivers' licenses and passports, the sales cycle generally includes a formal request for proposal, or RFP, bidding process. In these public sector cases, our sales and marketing personnel regularly conduct visits and attend industry trade shows to identify bid opportunities and particular customer preferences, and to establish and cultivate relationships in advance of any bid. Once an RFP is issued, a comprehensive proposal is developed and usually followed by an on-site customer demonstration. The process from the issuance of an RFP to the ultimate award can take up to six months. Following the bid award a six-to-twelve month implementation and installation process usually ensues. We believe that long sales cycles in our public sector markets are endemic to the market and will continue. Further, customers may seek to modify the system either during or after the implementation of the system. While our long sales and implementation cycle requires the commitment of marketing resources and investments of working capital, we believe that it also serves as a barrier to entry for smaller companies and as an early indicator of potential competitors for particular projects. For existing customers, a considerably shorter sales and implementation cycle may be involved.

*Biometrics Segment*

Our biometrics segment accounted for approximately 7.7% and 10.5% of our revenue for the three- and nine-month periods ended September 26, 2004, respectively. For the three- and nine-month periods ended September 28, 2003 our biometrics segment accounted for approximately 18.4% and 16.9% of our revenues, respectively. The focus of our biometric technology solutions is primarily on applications designed to deter criminal and terrorist activities, including government research and development contracts. These initiatives generated 87.9% and 88.1% of this segment's revenue for the three- and nine-month periods ended September 26, 2004, respectively. The remaining 12.1% and 11.9%, was generated from sales in the gaming industry.

Within our biometrics segment, our contracts typically provide for the development, customization and installation of face recognition systems for government agencies, law enforcement agencies and businesses. These contracts are generally fixed price, and include milestones and acceptance criteria for the various deliverables under the contract. Contract prices vary depending on, among other things, design and integration complexities, the nature and number of workstations and sites, the size of the database, the level of post-installation support and the competitive environment. In certain cases, we provide licenses of off-the-shelf versions of our face recognition software on a per user basis.

For identity solutions that primarily require our advanced face recognition technology, such as criminal identification booking and investigation applications, the sales cycle tends to be shorter and the solution consists primarily of software products.

As we continue to implement our vision of being a total identity solutions provider, the biometrics and secure credentials segments become less distinct as discrete segments. We believe that the presence or future potential of integrated biometrics in secure credentials is a key factor in increasing revenue and profits from the secure credentials business. As a result, we are seeing the two segments converge into one market: identity solutions.

DEPENDENCE ON SIGNIFICANT CUSTOMERS

We believe for the near future that we will continue to derive a significant portion of our revenues from a limited number of large contracts. Secure credentials customers who accounted for more than 10% of our total revenues are as follows:

- for the three- and nine-month periods ended September 26, 2004, two customer accounted for an aggregate of 38.6% and 29.6%, respectively; and

14

Table of Contents

- for the three- and nine-month periods ended September 28, 2003, two customers accounted for an aggregate of 27.0% and 27.7%, respectively.

No single biometrics customer accounted for over 10% of our total revenue in any of the periods covered by this report.

CRITICAL ACCOUNTING POLICIES AND SIGNIFICANT ESTIMATES

We prepare our financial statements in accordance with generally accepted accounting principles in the United States, or US GAAP. Consistent with US GAAP, we have adopted accounting policies that we believe are most appropriate given the facts and circumstances of our business. The application of these policies has a significant impact on our reported results. In addition, some of these policies require management to make estimates. These estimates, which are based on historical experience and analysis of current conditions, have a significant impact on our reported results and the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements. If actual results differ significantly from these estimates, there could be a material effect on our financial statements.

*Valuation of Goodwill and Other Long-Lived and Intangible Assets*

Our long-lived assets include property, plant and equipment, other intangible assets and goodwill. As of September 26, 2004, the balances of property, plant and equipment, other intangible assets and goodwill, net of accumulated depreciation and amortization, were $22.3 million, $21.7 million and $61.9 million, respectively.

Where we believe that property, plant and equipment and intangible assets have finite lives, we depreciate and amortize those assets over their estimated useful lives. For purposes of determining whether there are any impairment losses, as further discussed below, our management has examined the carrying value of our identifiable long-lived tangible and intangible assets, including their useful lives where we believe such assets have finite lives, when indicators of impairment are present. For all long-lived tangible and intangible assets, if an impairment loss were identified based on the fair value of the asset, as compared to the carrying value of the asset, such loss would be charged to expense in the period we identify the impairment. Furthermore, if our review of the carrying values of the long-lived tangible and intangible assets with finite lives indicates impairment of such assets, we may determine that shorter estimated useful lives are more appropriate. In that event, we will be required to record additional depreciation and amortization in future periods, which will reduce our earnings.

Factors we generally consider important which could trigger an impairment review on the carrying value of other long-lived tangible and intangible assets include the following:

- significant underperformance relative to expected historical or projected future operating results;
- significant changes in the manner of our use of acquired assets or the strategy for our overall business;
- underutilization of our tangible assets;
- discontinuance of product lines by ourselves or our customers;
- significant negative industry or economic trends;
- significant decline in our stock price for a sustained period; and
- significant decline in our market capitalization relative to net book value.

Although we believe that the carrying values of our long-lived tangible and intangible assets were realizable as of September 26, 2004, future events could cause us to conclude otherwise.

Due to our two acquisitions in the first quarter of 2004, goodwill and other intangible assets were created as a result of the allocation of the purchase price to identified intangible assets of the acquired businesses. The values recorded for goodwill and other intangible assets represent estimates of fair values calculated by independent third-party appraisers and are subject to further review and finalization. Such valuations require us to provide significant estimates and assumptions, which are derived from information obtained from the management of the acquired businesses, and our business plans for the acquired businesses or intellectual property. Critical estimates and assumptions used in the initial valuation of goodwill and other intangible assets include, but are not limited to:

- future expected cash flows from product sales, customer contracts and acquired developed technologies and patents;

15

Table of Contents

- expected costs to complete any in-process research and development projects and commercialize viable products and estimated cash flows from sales of such products;
- the acquired companies' brand awareness and market position;
- assumptions about the period of time over which we will continue to use the acquired brand; and
- discount rates.

These estimates and assumptions may be incomplete or inaccurate because unanticipated events and circumstances may occur. If estimates and assumptions used to initially value goodwill and intangible assets prove to be inaccurate, ongoing reviews of the carrying values of such goodwill and intangible assets may indicate impairment which will require us to record an impairment charge in the period in which we identify the impairment.

As of September 26, 2004, we have recorded goodwill of $61.9 million. We will perform impairment reviews on the carrying values of goodwill arising from the aforementioned acquisitions at least annually. Because future cash flows and operating results used in the impairment review will be based on management's projections and assumptions, future events could cause such projections to differ from those used to originally value the acquisitions, which could lead to significant impairment charges of goodwill in the future.

*Secure Credentials Revenue and Cost Recognition*

During the third quarter of 2003, we adopted the provisions of Emerging Issues Task Force 00-21, *Accounting for Revenue Arrangements with Multiple Deliverables*, or EITF 00-21, on a cumulative basis as of January 1, 2003. EITF 00-21 governs how to identify whether goods or services, or both, to be delivered separately in a bundled sales arrangement, should be accounted for separately. The operating results for the nine month period ended September 28, 2003 reflects the cumulative effect of the change in accounting principle in 2003.

We deliver solutions under secure credential contracts primarily to federal and state government customers. We recognize revenue when persuasive evidence of a sales arrangement exists, delivery occurs or services are rendered, the sales price is fixed or determinable and collectibility is reasonably assured.

Product revenue on secure credential contracts where title to the products pass to the customer consist mainly of printing system components and consumables including printers, secure coating, ribbon, film and other parts. Revenue on products is recognized when the products are shipped and accepted by the customer. Services revenue under these contracts consists of preventative and remedial maintenance on printing systems. We also provide on site technical support and consulting services to our customers. Revenue on fixed price services is recognized over the service period and approximates the timing of the services rendered. Revenue on time and material services is recognized as the services are rendered. Expenses on all services are recognized when the costs are incurred.

When elements such as products and services are contained in a single arrangement, or in related arrangements with the same customer, we allocate revenue to each element based on its relative fair value, provided that such element meets the criteria for treatment as a separate unit of accounting. The price charged when the element is sold separately generally determines fair value.

We have secure credential contracts, generally with state governments for the production of drivers' licenses and other identification credentials, where we have determined that we have multiple elements and where the title to equipment installed to produce these credentials does not pass to the customer. Under these contracts, the first element consists of hardware, system design, implementation, training, consumables management, maintenance and support which is accounted for as equipment and related executory services under lease in accordance with SFAS No. 13. The second element consists of customized software which is accounted for as a long term contract in accordance with AICPA Statement of Position 97-2, *Software Revenue Recognition*, or SOP 97-2, and Statement of Position 81-1, *Accounting for Performance of Construction-Type and Certain Production-Type Contracts*, or SOP 81-1, on a units of delivery method of measurement.

Costs related to the hardware element of these contracts are capitalized on the balance sheet and are depreciated over the contract term beginning when the system goes into service. The delivery of these credentials typically requires us to customize, design, and install equipment and software at customer locations, as well as perform training, supply consumables, maintain the equipment and provide support services. Nonperformance of training, consumables management, maintenance and support services would prevent us from receiving payment for the costs incurred in the customization, design and installation of the system. EITF 00-21 limits the amount of revenue allocable to the customization, design and installation of the system to the amount that is not contingent upon the production of credentials. Revenue on these contracts under EITF 00-21 is earned based on, and is contingent upon, the production of credentials from the system. Due to the contingent performance of credential production in our secure credentials contracts, we defer revenue recognition for the system design and installation phase of our contracts, including customized software and equipment, and recognize revenue as credentials are produced.

16

Table of Contents

Costs related to the customized software element of our secure credentials contracts where title to the hardware element does not pass to the customer are capitalized on the balance sheet during the period in which we are designing and installing the system and are amortized over the contract term beginning when the system goes into service. Costs related to this element of our secure credentials contracts incurred after the system is in service are expensed as incurred. Revenue related to this element of our secure credentials contracts is recorded as credentials are produced by the system.

The secure credentials business is a highly competitive, bid-based business, which results in pricing pressure for those systems. In addition, the price of a system is dictated by the customer's specifications for the solution and its functionality. Some of these customer specifications include hardware, customized software, credential volume, number and type of security features on the credentials, and biometric identification on the credentials. All of these inputs are evaluated in our estimate of the cost of the system and ultimately influence the pricing for the system to be delivered. We are also aware of the customer's budget situation since this affects how much the customer can spend on the system. After all of these factors are considered, we price the contract and determine the gross margin for the system to be delivered. The price and margin fluctuate by customer due to the number of locations, volume of credentials, requirements and complexity of the system and competitive environment. Although prices remain fixed for products and services on a contract-by-contract basis, fluctuations in gross margin are attributable to changes in the customer mix, change orders and contract extensions received.

Our secure credentials contracts related to the delivery of drivers' licenses and identification credentials typically provide that the state department of transportation, or similar agency, will pay a fixed price per credential produced utilizing a system we design, implement and support. Our fixed pricing includes charges for the use of the system, materials and the data that is stored on the credentials. Prices under these contracts vary depending on, among other things:

- design and integration complexities;
- nature and number of workstations and sites installed;
- projected number of secure credentials to be produced;
- size of the database;
- level of post-installation involvement that will be required of us; and
- competitive environment.

Prior to the adoption of EITF 00-21, we recognized revenue and costs associated with our secure credentials contracts as a single accounting element using the percentage-of-completion methodology.

*Biometrics Segment Revenue and Cost Recognition*

Within our biometrics segment, our contracts typically provide for the development, customization and installation of face recognition systems for government agencies, law enforcement agencies and businesses. These contracts are generally fixed price, and include milestones and acceptance criteria for the various deliverables under the contract. Contract prices vary depending on, among other things, design and integration complexities, the nature and number of workstations and sites, the size of the database, the level of post-installation support and the competitive environment. In certain cases, we provide licenses of off-the-shelf versions of our face recognition software on a per user basis.

We recognize revenue under these contracts using the percentage-of-completion methodology in accordance with SOP 81-1. We use the percentage-of-completion methodology to account for revenue under these contracts because:

- a high level of certainty exists regarding expected cash flows from these contracts; and
- a reliable basis exists for determining the percentage of the contract that will be completed at the end of the accounting period.

We measure the percentage complete as costs are incurred or for contracts based on milestones, revenue is recognized when scheduled performance milestones and customer acceptance criteria have been achieved. These milestones are specific events or deliverables clearly identified in the contract. We recognize revenue based on the total milestone billable to the customer less revenue related to any future maintenance requirements. Billings occur under these contracts when the milestone is delivered and accepted by the customer. Milestones can include customized systems, installation and services as defined by the contract.

17

**Table of Contents**

We record costs and estimated earnings in excess of billings under these contracts as current assets. We record billings in excess of costs and estimated earnings and accrued contract costs as current liabilities.

Revenue related to software licenses of off-the-shelf face recognition software is recognized in accordance with SOP 97-2. For these software licenses we recognize revenue when:

- persuasive evidence of an arrangement exists;

- delivery has occurred;

- the sales price is fixed and determinable;

- collection is probable; and

- there are no post delivery obligations.

We adopted EITF 00-21 on a cumulative basis as of January 1, 2003. Based on our evaluation of biometrics contracts and the application of the new guidance, the adoption of EITF 00-21 did not have an impact on the accounting for revenue from biometrics systems under long-term contracts.

RESULTS OF OPERATIONS

*Revenue*

Revenues from our secure credentials segment are derived principally from multi-year contracts for systems implementation, credential production and related services. Revenues from our biometrics segment are derived principally from sales to law enforcement agencies, the federal government, and the gaming industry. Revenues for the third quarter of 2004 were approximately $19.9 million, compared to approximately $10.1 million for the third quarter of 2003. Revenues for the first nine months of 2004 increased 78.6% from approximately $27.1 million for the first nine months of 2003 to approximately $48.4 million for the first nine months of 2004. The 78.6% increase in revenue is derived from increases of approximately $20.8 million in the secure credentials segment and $510,000 in the biometrics segment. The increase in the secure credentials segment consists of approximately $11.0 million of revenue generated from delivery of consumables and services related to the production of United States passports and related services for the Department of State as well as approximately $5.5 million from products shipped under the Department of Defense common access card procurement. Additional increases consisted of $2.0 million from the sale of equipment and consumables directly to two states and $1.8 million from a volume increase resulting from the rollout of two new state drivers' license contracts. The increase in our biometrics revenue is derived from the inclusion of approximately $1.1 million in international revenue for the period from January 24, 2004 to September 26, 2004 due to our acquisition of ZN Vision Technologies AG, or ZN, offset by a decrease in our U.S.-based biometric revenue of approximately $600,000.

*Gross Margin*

Gross margin decreased to 27.7% in the third quarter of 2004 from 33.4% in the third quarter of 2003. Gross margin increased to 28.5% for the first nine months of 2004 compared to 24.8% for the same period in 2003. We expect gross margin on our secure credentials contracts to fluctuate based on changes in period cost of sales as a result of our adoption of EITF 00-21 due to the fact that in 2004 and in the future we will effectively recognize revenue on a fixed price per credential produced by our customers. If we successfully achieve cost saving measures in the delivery process, we will realize higher gross margin in those periods where the cost savings measures are achieved. Alternatively, in periods where our delivery costs are higher due to service and maintenance requirements, we expect gross margin to decrease for those periods. The decrease in the gross margin percentage for the third quarter of 2004 is primarily due to the inclusion of approximately $5.4 million in hardware sales to the Department of Defense related to the common access card procurement at approximately 15% margin. The overall increase in gross margin for the first nine months of 2004 compared to the first nine months of 2003 is due to margin increases in the secure credentials segment from 19.7% to 26.1%, offset by a margin decrease in the biometrics segment from 49.9% to 45.3%.

In the secure credentials segment, gross margin decreased to 26.1% in the third quarter of 2004 from 29.9% in the third quarter of 2003. Our gross margin in this segment increased to 26.1% for the first nine months of 2004 compared to 19.7% for the comparable period of 2003. This increase was attributable to relatively higher gross margin on approximately $11.0 million of revenue from products and services provided under the United States passport contract and related services provided to the Department of State, which represented approximately 25.4% of the total secure credentials segment revenue for the nine-month period ended September

18

Table of Contents

26, 2004. Gross margin for the nine-month period ended September 26, 2004 included approximately $1.9 million of non-cash amortization of identified intangible assets, as described in more detail below. On other secure credentials contracts we achieved gross margin increases on 13 of the 14 drivers' license contracts that were active in both periods. Those contracts represented approximately 46.8% of the total revenue in the secure credentials segment for the nine-month period ended September 26, 2004. These increases were attributable to our minimization of period costs during the card production phase on all of our secure credentials contracts. We were able to achieve some of these costs savings by minimizing overtime labor charges through improved resource management of field service technicians. In addition, we installed inventory management software in multiple states throughout 2003, which allows us to better control consumables scrap, thus reducing our materials costs. In addition to these cost savings initiatives, we signed contract extensions in five states and began card production in two additional states during 2003. These increases were offset by gross margin decreases in two other states. In one of these states, gross margin decreased due to an increase in costs, while in the second state the gross margin decrease was primarily due to a decrease in credential volume.

Gross margin in our biometrics segment decreased to 41.8% in the third quarter of 2004 from 51.6% in the third quarter of 2003 due to the contract mix in the two quarters.

For the three- and nine-month periods ended September 26, 2004, we have allocated $762,000 and $1.9 million of amortization expense for the TDT acquisition to cost of sales due to the fact that a majority of the identified intangible assets were attributed to contracts that are generating significant revenue. Amortization related to the ZN acquisition totaling $115,000 and $287,000 was included in operating expenses for the three- and nine-month periods ended September 26, 2004 and September 28, 2003, respectively, and therefore did not impact gross margin.

*Sales and Marketing Expenses*

Sales and marketing expenses increased approximately $400,000, from $1.2 million in the third quarter of 2003 to $1.6 million in the third quarter of 2004. For the fiscal year to date, sales and marketing expenses increased approximately $900,000, from $3.8 million in 2003 to $4.7 million in 2004. The increase is primarily due to our investment in pursuing biometrics opportunities and the pursuit of significant opportunities in the secure identification marketplace. As a percentage of revenue, sales and marketing expenses decreased from 12.2% in the third quarter of 2003 to 8.0% in the third quarter of 2004 and from 14.0% for the first nine months of 2003 to 9.6% in the first nine months of 2004.

*Research and Development Expenses*

Research and development remained relatively flat, decreasing by approximately $50,000, from $946,000 in the third quarter of 2003 to $896,000 in the third quarter of 2004. Research and development expenses were substantially unchanged at approximately $2.8 million for the first nine months of 2003 and 2004. We were able to accomplish this despite adding additional research and development expenses resulting from our acquisitions in 2004. Although we carefully control costs, we continue to invest in biometric technologies and new product development. This investment included enhancing existing products with the intellectual property that was acquired through our first quarter 2004 acquisitions. Research and development expenses for the three- and nine-month periods ended September 26, 2004 include $115,000 and $287,000, respectively, of non-cash amortization expense related to the ZN identified intangible assets which contributed to the improvement in biometric technologies and new product development. As a percentage of revenue, research and development expenses decreased from 9.4% in the third quarter of 2003 to 4.5% in the third quarter of 2004 and from 10.5% for the first nine months of 2003 to 5.8% for the first nine months of 2004. We expect to continue to invest in product development in fiscal 2004.

*General and Administrative Expenses*

General and administrative expenses increased approximately $1.1 million, from $1.3 million in the third quarter of 2003 to $2.4 million in the third quarter of 2004. General and administrative expenses increased approximately $3.3 million, from $3.4 million in the first nine months of 2003 to $6.7 million in the comparable period of 2004. Legal costs for the fiscal year to date increased approximately $800,000 stemming primarily from the litigation surrounding our contract with the state of Georgia. The move of our corporate headquarters to its new location in Billerica, Massachusetts resulted in approximately $200,000 in direct expenses plus accelerated amortization of leasehold improvements in our old building of approximately $283,000. We also incurred additional expenditures for leasehold improvements of approximately $205,000, which will be amortized over the four and one-half year term of our new lease. General and administrative expenses increased by approximately $525,000 related to general and administrative expenses from acquired companies. We also incurred approximately $350,000 of additional expenses related to our Sarbanes-Oxley compliance project. The remainder of the increase is due to the logistical support required to grow our business through acquisitions while continuing to meet the financing requirements created by our expanding operations. As a percentage of revenue, general and administrative expenses decreased from 13.1% in the third quarter of 2003 to 11.9% in the third quarter of 2004.

19

Table of Contents

*Interest Expense*

Interest expense, net of approximately $19,000 and $67,000 of interest income for the third quarter of 2003 and 2004, respectively, increased approximately $135,000 from $276,000 in the third quarter of 2003 to $411,000 in the third quarter of 2004. This increase was primarily due to $260,000 of interest on the $15.3 million note used to purchase TDT, offset by a savings of approximately $125,000 stemming from the reduction of our debt. For the fiscal year to date, interest expense, net of approximately $67,000 and $108,000 of interest income for the third quarter of 2003 and 2004, respectively, increased approximately $654,000 from $726,000 in the third quarter of 2003 to $1.4 million in the third quarter of 2004. This increase was primarily due to $748,000 of interest on the $15.3 million note used to purchase TDT, offset by an approximately $94,000 reduction to interest expense stemming from the reduction of our debt.

*Income Taxes*

No provision for federal income taxes has been made for the three- and nine-month periods ended September 26, 2004 and September 28, 2003 due to our net loss for the nine-month period ended September 26, 2004. The provision for state income taxes for the nine-month periods ended September 26, 2004 and September 28, 2003 was approximately $75,000 and $63,000, respectively. The provision for state income taxes for the three-month period ended September 26, 2004 was approximately $25,000. There was no provision for state income taxes for the three-month period ended September 28, 2003.

*Cumulative Effect of Change in Accounting Principle*

For the year ended December 31, 2003, we incurred a non-cash charge of $12.1 million representing the cumulative effect of a change in accounting principle related to our adoption of EITF 00-21 on a cumulative basis as of January 1, 2003.

LIQUIDITY AND CAPITAL RESOURCES

Cash and cash equivalents were approximately $34.4 million at September 26, 2004, which consisted entirely of cash. This amount does not include approximately $3.0 million which is restricted under our term loan agreements and project financing. Cash and cash equivalents at December 31, 2003 were approximately $6.7 million, which consisted entirely of cash. This number does not include approximately $6.3 million which was restricted under our term loan agreements and project financing.

In the nine-month period ended September 26, 2004, cash provided by operating activities was approximately $1.9 million which stems from our net loss of approximately $1.8 million, offset by non-cash charges for depreciation and amortization of approximately $7.9 million, and cash used by the net change in operating assets and liabilities of approximately $4.8 million.

Accounts receivable increased approximately 157.1% from $7.0 million at December 31, 2003 to $18.0 million at September 26, 2004. This increase includes approximately $3.0 million of receivables attributable to TDT and ZN, each of which was acquired in the first quarter of 2004. The remainder of the change, which resulted in a decrease in cash of approximately $7.8 million, is due to the timing of billings and collections.

Inventories and other costs and estimated earnings in excess of billings decreased approximately 19.5% from $4.1 million at December 31, 2003 to $3.3 million at September 26, 2004. This change, which resulted in an increase in cash of approximately $1.1 million, reflects a reduction of consumables inventory as of September 26, 2004.

Accounts payable and accrued expenses increased approximately 108.7% from $6.9 million at December 31, 2003 to $14.4 million at September 26, 2004. This increase includes approximately $4.3 million of assumed liabilities attributable to TDT and ZN, each of which was acquired in the first quarter of 2004. The remainder of the change, which resulted in an increase in cash of approximately $2.4 million, is due to the timing of payables.

In February 2004, we entered into a new loan agreement with Commerce Bank and Trust Company, or Commerce, that superseded the original loan agreement for our existing term loans. Under this new agreement, we borrowed an additional $3.0 million and reduced the required restricted cash balance under the new agreement with Commerce by $2.0 million. The $3 million term loan provided by this agreement bears interest at a rate of 7.3%. The following table lists the approximate term note information for Commerce as of the dates indicated (in thousands):

| Lender | Original Loan Amount | Monthly Payment Provision | Date of Loan | Due Date | Interest Rate | Outstanding Principal September 26, 2004 |
|---|---|---|---|---|---|---|
| Commerce | $4,000 | $ 84 | 2/7/2001 | 6/20/2006 | 8.00% | $ 1,628 |
| Commerce | 3,200 | 72 | 9/11/2001 | 3/11/2006 | 6.25% | 1,228 |
| Commerce | 1,800 | 34 | 12/12/2002 | 12/31/2007 | 5.25% | 1,224 |
| Commerce | 1,500 | 27 | 12/12/2002 | 4/24/2008 | 5.25% | 1,062 |
| Commerce | 1,200 | 24 | 12/12/2002 | 6/24/2007 | 5.25% | 775 |
| Commerce | 3,000 | 36 | 2/27/2004 | 2/27/2007 | 7.30% | 2,467 |
| | $14,700 | $ 277 | | | | $ 8,384 |

Table of Contents

In accordance with the new loan agreement the term notes are collateralized by certain of our assets and the related contract assets. We restructured our bank covenants to account for the impact of the closing of our transactions with ZN and TDT. We are required to maintain various financial covenants, including;

- a net loss for 2004 of not more than $2.0 million,

- a minimum tangible net worth (as defined in the loan agreement) of approximately $39.0 million, plus 80% of any new equity raised, plus 80% of net profit for the third quarter of 2004,

- our liabilities to tangible net worth ratio (as defined in the loan agreement) may not exceed .60:1.00

- our debt service coverage ratio (as defined in the loan agreement) must be greater than 1.25 for the third quarter and 1.30 for the fourth quarter of 2004, and

- annual capital expenditures may not exceed $2.5 million in 2004 and no single capital expenditure may exceed $250,000 without lender approval.

In September 2004, we voluntarily prepaid indebtedness of $4.3 million to Lau. We currently have no indebtedness to Lau and have no plans to incur any indebtedness to Lau.

In April 2003 we entered into an arrangement for approximately $1.5 million of equipment financing with three of our suppliers. These project lease arrangements are accounted for as capital leases. There are no financial covenants associated with these leasing arrangements. As of September 26, 2004 we had outstanding approximately $246,000 under these arrangements. The interest rates on these capital leases are between 6% and 8% and are fixed. The terms of these leases range from 12 months to 60 months. In August 2003 we entered into an arrangement for financing of database licenses with another vendor. As of September 26, 2004, we had outstanding approximately $301,000 under this arrangement.

In the first quarter of 2004 we purchased an asset totaling $800,000 which is payable in installments over four years. On the September 26, 2004 balance sheet, $200,000 is included in accounts payable and other accrued expenses and $400,000 is recorded under other liabilities.

We are in compliance with our bank covenants as of September 26, 2004 and we believe that we will be able to maintain compliance with our bank covenants in the future. However, this expectation is dependent on achieving our business plan. If we do not remain in compliance with the covenants in our financing arrangements, the lender and the lessors could require immediate repayment of outstanding amounts. As of September 26, 2004, there was approximately $8.4 million outstanding under our credit facilities with Commerce Bank.

In January 2004, we sold 456,007 shares of our common stock at $3.775 per share in a private sale to certain institutional investors to which we had previously sold shares in a private sale in September 2003. On February 14, 2004, we funded the acquisition of TDT with $5.0 million of available cash and executed a promissory note for an additional $15.3 million in addition to the issuance of new stock. The note bears interest at a rate of 8.5% per year and is payable in equal installments of principal and interest on December 1, 2004, May 1, 2005 and December 1, 2005. This debt was offset by approximately $800,000 of identified purchase price adjustments related to certain provisions in the stock purchase agreement. On September 22, 2004 the debt balance was reduced by a required principal payment of approximately $4.2 million. As of September 26, 2004 the remaining balance on this note was $10.3 million. As of October 19, 2004, all principal and interest on this note was voluntarily prepaid in full.

An additional purchase price adjustment of $2.6 million, payable to the former sole shareholder of TDT, was incurred based upon TDT's selection by the U.S. Department of Defense for the production of smart cards as part of the agency's common access card (CAC) program. As of September 26, 2004, we have paid approximately $1.2 million of this obligation. The remaining $1.4 million is recorded as a related party payable.

21

Table of Contents

In August 2004, we sold 7,309,666 shares of our common stock at $5.50 per share in an underwritten public offering. Net proceeds from these sales were approximately $37.4 million.

We believe that our existing cash balances and anticipated cash flows from operations will be sufficient to meet our operating and debt service requirements for the next 12 months. However, if we cannot achieve our operating goals in 2004 or if we win additional secure credentials contracts in 2004, we may be required to seek additional financing. There can be no assurance that such financing will be available on commercially reasonable terms, or at all. Our ability to meet our business forecast is dependent on a number of factors, including those described in the section of this report entitled "Factors that May Affect Future Results."

CONTRACTUAL OBLIGATIONS

The following table sets forth our contractual obligations as of September 26, 2004.

| | Total | Less than 1 Year | 1-3 Years | 3-5 Years | More than 5 Years |
|---|---|---|---|---|---|
| Long Term Debt Obligations | $18,687 | $13,865 | $ 4,512 | $   310 | — |
| Capital Lease Obligations | 584 | 398 | 151 | 35 | — |
| Operating Lease Obligations | 1,803 | 373 | 793 | 637 | — |

CONTINGENT OBLIGATIONS

Our principal contractual commitments involve payments under capital leases, term notes and operating leases.

INFLATION

Although some of our expenses increase with general inflation in the economy, inflation has not had a material impact on our financial results to date.

FORWARD-LOOKING STATEMENTS

This quarterly report on Form 10-Q contains or incorporates forward-looking statements within the meaning of section 27A of the Securities Act of 1933 and section 21E of the Securities Exchange Act of 1934. These forward-looking statements are based on current expectations, estimates, forecasts and projections about the industry and markets in which we operate and management's beliefs and assumptions. In addition, other written or oral statements that constitute forward-looking statements may be made by or on our behalf. Words such as "expect," "anticipate," "intend," "plan," "believe," "seek," "estimate," variations of such words and similar expressions are intended to identify such forward-looking statements. These statements are not guarantees of future performance and involve certain risks, uncertainties and assumptions that are difficult to predict. We have included important factors in the cautionary statements below under the heading "Factors That May Affect Future Results" that we believe could cause our actual results to differ materially from the forward-looking statements we make. We do not intend to update publicly any forward-looking statements, whether as a result of new information, future events or otherwise.

FACTORS THAT MAY AFFECT FUTURE RESULTS

The risks and uncertainties described below are not the only ones we face. Additional risks and uncertainties, including those not presently known to us or that we currently deem immaterial, may also impair our business.

**We have a history of operating losses.**

We have a history of operating losses. Although we recorded net income of $198,000 for the three months ended September 26, 2004, our business operations began in 1993 and, except for fiscal years 1996 and 2000, have resulted in net losses in each fiscal year. At September 26, 2004, we had an accumulated deficit of approximately $44.0 million. We will continue to invest in the development of our secure credential and biometric technologies. Accordingly, we cannot predict when or if we will ever achieve profitability on an annual basis.

**We may be unable to obtain additional capital required to fund our operations and finance our growth.**

The installation of our secure identification systems requires significant capital expenditures. In addition, the further development of our biometric and other advanced technologies will require additional capital. Although we raised $37.9 million

22

Table of Contents

through a public offering of our common stock in August 2004, completed a $15 million private placement of our common stock in September 2003 and January 2004, entered into a new loan agreement with a bank in February 2004, and have been successful in the past in obtaining financing for working capital and capital expenditures, we will have ongoing capital needs as we expand our business. We may be unable to obtain additional funds in a timely manner or on acceptable terms, which would render us unable to fund our operations or expand our business. If we are unable to obtain capital when needed, we may have to restructure our business or delay or abandon our development and expansion plans.

**We derive over 90% of our revenue from government contracts, which are often non-standard, involve competitive bidding, may be subject to cancellation with or without penalty and may produce volatility in earnings and revenue.**

More than 90% of our business involves providing products and services under contracts with U.S. federal, state, local and foreign government agencies. Obtaining contracts from government agencies is challenging, and government contracts often include provisions that are not standard in private commercial transactions. For example, government contracts may:

- include provisions that allow the government agency to terminate the contract without penalty under some circumstances;
- be subject to purchasing decisions of agencies that are subject to political influence;
- contain onerous procurement procedures; and
- be subject to cancellation if government funding become unavailable.

Foreign government contracts generally include comparable provisions relating to termination for the convenience of the relevant foreign government. Securing government contracts can be a protracted process involving competitive bidding. In many cases, unsuccessful bidders may challenge contract awards, which can lead to increased costs, delays and possible loss of the contract for the winning bidder.

**We derive a significant portion of our revenue from a few customers, the loss of which could have an adverse effect on our revenues.**

For the three-month period ended September 26, 2004, two customers, the U.S. Department of State and Telos Corporation, accounted for an aggregate of 38.6% of our revenue. Since a small number of customers in our secure credentials segment account for a substantial portion of our revenues, the loss of any of our significant customers would cause revenue to decline and could have a material adverse effect on our business.

**We derive revenue from only a limited number of products and services and we do not have a diversified product or service base.**

Substantially all of our revenues are derived from the sale of products and services comprising our identity solutions. We anticipate that substantially all of the growth in our revenue, if any, will also be derived from these sources. If for any reason our sale of these products or services is impeded, and we have not diversified our product and service offerings, our business and results from operations could be harmed.

**Loss of limited source suppliers may result in delays or additional expenses.**

We obtain certain hardware components and complete products from a limited group of suppliers. In particular, we obtain all of the printers and consumables for the U.S. Department of State passport contract and the Department of Defense, or DoD, common access card, or CAC, contract from Toppan Printing Co. Ltd. Our reliance on these suppliers involves significant risks, including reduced control over quality and delivery schedules. Moreover, any financial instability of our manufacturers or contractors could result in our having to find new suppliers. We may experience significant delays in manufacturing and shipping our products to customers if we lose these sources or if supplies from these sources are delayed. As a result, we may be required to incur additional development, manufacturing and other costs to establish alternative sources of supply. It may take several months to locate alternative suppliers, if required, or to re-tool our products to accommodate components from different suppliers. We cannot predict if we will be able to obtain replacement components within the time frames we require at an affordable cost, or at all. Any delays resulting from suppliers failing to deliver components or products on a timely basis, in sufficient quantities and of sufficient quality or any significant increase in the price of components from existing or alternative suppliers could have a severe negative impact on our business, financial condition and results of operations.

23

Table of Contents

**Termination of our contract with Georgia could cause us to lose $19.7 million in projected revenues over the next five and one-half years and could negatively affect our earnings.**

In July 2003, a Georgia court issued a preliminary injunction prohibiting Georgia's Department of Motor Vehicle Safety from continuing to work with us to install the State's new drivers' license system. The injunction is the result of a lawsuit filed in March 2003 by one of our competitors alleging that the Department of Motor Vehicle Safety did not comply with its own bid process when it selected a vendor for its new digital drivers' license program. In July 2004, we reached a settlement agreement with the State pursuant to which the Department of Motor Vehicle Safety terminated the contract for convenience and agreed to pay us $2.0 million in cash and the State agreed to purchase certain equipment from us for $500,000. The Department of Motor Vehicle Safety has filed a motion with the Georgia court to dismiss the case based upon the termination of the contract. The agency also has informed the court stating that it intends to issue a new request for proposals for a digital drivers' license system before the end of 2004. In response to a motion filed by the competitor, the Georgia court has issued a preliminary injunction prohibiting the Department of Motor Vehicle Safety and the State from making any payments to us under the settlement agreement. As a result of the termination of the contract, we will lose up to $19.7 million in revenue that we expected to recognize over the next five and one-half years, which was included in our $176 million of backlog at March 28, 2004, unless we are able to win the new contract for the digital drivers' license system and the revenues from such new contract are substantially similar to the terminated contract. While we believe we can utilize the remaining $2.8 million in assets being retained by us from the Georgia contract either in Georgia, if we win the contract based on the new request for proposals, or on alternative projects, to the extent that we are unable to utilize these assets or realize value through a sale of these assets, we would be required to take a charge to earnings.

**Our strategy of expanding our face recognition business could adversely affect our business operations and financial condition.**

Part of our strategy is to enhance our leadership in face recognition technology and to expand our operations within our face recognition business segment. Pursuing this strategy involves risks. For instance, to date, face recognition security solutions have not gained widespread commercial acceptance. Some of the obstacles to widespread acceptance of face recognition security solutions include a perceived loss of privacy and public perceptions as to the usefulness of face recognition technologies. Whether the market for face recognition security solutions will expand will be dependent upon factors such as:

- the success of our marketing efforts and publicity campaigns and those of our competitors; and
- customer satisfaction with our products and services, as well as those of our competitors.

We do not know when, if ever, face recognition security solutions will gain widespread commercial acceptance. In addition, our face recognition business segment has not achieved profitability, and it may never achieve profitability.

**We face intense competition, which could result in lower revenues and higher research and development expenditures and could adversely affect our results of operations.**

The events of September 11, 2001 have heightened interest in the use of biometric security solutions, and we expect competition in this field, which is already substantial, to intensify. Competitors are developing and bringing to market biometric security solutions that use face recognition as well as eye, fingerprint and other forms of biometric verification. Our products also will compete with non-biometric technologies such as certificate authorities and traditional keys, cards, surveillance systems and passwords. Widespread adoption of one or more of these technologies or approaches in the markets we intend to target could significantly reduce the potential market for our systems and products. Many of our competitors have significantly more cash and resources than we have. Our competitors may introduce products that are competitively priced, have increased performance or functionality or incorporate technological advances that we have not yet developed or implemented. To remain competitive, we must continue to develop, market and sell new and enhanced systems and products at competitive prices, which will require significant research and development expenditures. If we do not develop new and enhanced products or if we are not able to invest adequately in our research and development activities, our business, financial condition and results of operations could be negatively impacted.

**Unless we keep pace with changing technologies, we could lose customers and fail to win new customers.**

Our future success will depend upon our ability to develop and introduce a variety of new products and services and enhancements to these new products and services in order to address the changing needs of the marketplace. We may not be able to accurately predict which technologies customers will support. If we do not introduce new products, services and enhancements in a timely manner, if we fail to choose correctly among technical alternatives or if we fail to offer innovative products and services at competitive prices, customers may forego purchases of our products and services and purchase those of our competitors.

24

Table of Contents

**Security breaches in systems that we sell or maintain could result in the disclosure of sensitive government information or private personal information that could result in the loss of clients and negative publicity.**

Many of the systems we sell manage private personal information and protect information involved in sensitive government functions. A security breach in one of these systems could cause serious harm to our business as a result of negative publicity and could prevent us from having further access to such systems or other similarly sensitive areas for other governmental clients. Our systems may also be affected by outages, delays and other difficulties. Our insurance coverage in certain circumstances may be insufficient to cover losses and liabilities that may result from such events.

**The market for our solutions is still developing and if the industry adopts standards or a platform different from our platform, then our competitive position would be negatively affected.**

The market for identity solutions is still emerging. The evolution of this market is in a constant state of flux that may result in the development of different technologies and industry standards that are not compatible with our current products or technologies. In particular, the face recognition market lacks industry-wide standards. Several organizations, such as the International Civil Aviation Organization, which sets standards for travel documents that its member states then put into effect, and the National Institute for Standards and Testing, which is part of the U.S. Department of Commerce, have recently selected face recognition as the biometric to be used in identification documentation. It is possible, however, that these standards may change and that any standards eventually adopted could prove disadvantageous to or incompatible with our business model and product lines.

**The adoption of EITF 00-21 resulted in a non-cash adjustment of $12.1 million and may have an adverse effect on our results of operations in the near term, which may depress the market price of our common stock.**

During the third quarter of 2003, we adopted the provisions of Emerging Issues Task Force 00-21, Accounting for Revenue Arrangements with Multiple Deliverables, or EITF 00-21, on a cumulative basis as of January 1, 2003. After discussions with the Securities and Exchange Commission staff regarding the effect of EITF 00-21 on revenue recognition on our secure credentials contracts, we decided to adopt EITF 00-21 using cumulative catch-up as of January 1, 2003 rather than prospectively as reflected in the previously filed Form 10-Q for the quarter ended September 28, 2003. The adoption of EITF 00-21 resulted in a non-cash adjustment reported as a cumulative effect of a change in accounting principle of $12.1 million. The adoption of EITF 00-21 affects the timing of revenue recognition under our secure credentials contracts and as a result we may report reduced revenue and an increased net loss for one or more of our fiscal quarters in 2004. This effect on our results of operations could cause our stock price to decline.

**Our leverage creates financial and operating risks that could limit the growth of our business.**

We have a significant amount of indebtedness. As of September 26, 2004, we had approximately $19.2 million in short- and long-term debt and lease financing. This amount includes $10.3 million of related party debt incurred in the acquisition of TDT in February 2004, which has subsequently been repaid in full. Our leverage could have important consequences to our business including:

- limiting our ability to obtain necessary financing for future working capital;
- limiting our ability to finance the acquisition of equipment needed to meet customer requirements;
- limiting our ability to finance the development of new technologies;
- requiring that we use a substantial portion of our cash flow from operations for debt service and not other operating purposes; and
- requiring that we comply with financial and operating covenants, which could cause an event of default under our debt instruments.

Our ability to make principal and interest payments under short- and long-term indebtedness and lease financing will be dependent upon our future performance, which is subject to financial, economic and other factors affecting us, some of which are beyond our control.

**Legal claims regarding infringement by us of third party intellectual property rights could result in substantial costs, diversion of managerial resources and harm to our reputation.**

Although we believe that our products and services do not infringe the intellectual property rights of others, we might not be able to defend successfully against a third-party infringement claim. A successful infringement claim against us could subject us to:

- liability for damages and litigation costs, including attorneys' fees;

25

Table of Contents

- lawsuits that prevent us from further use of the intellectual property;
- having to license the intellectual property from a third party, which could include significant licensing fees;
- having to develop a non-infringing alternative, which could be costly and delay projects; and
- having to indemnify clients with respect to losses they incurred as a result of the alleged infringement.

Even if we are not found liable in a claim for intellectual property infringement, such a claim could result in substantial costs, diversion of resources and management attention, termination of customer contracts and harm to our reputation.

On July 19, 2004, Fargo Electronics, Inc. initiated a patent infringement action in the U.S. District Court for the Eastern District of Virginia against Toppan Printing Co., Ltd. and TDT. The complaint alleges that Toppan and TDT's use, offer to sell and/or importation of certain personalized identification card printers, including Toppan's CP400 card printers, and associated laminators in the United States constitutes direct and indirect infringement of four patents allegedly owned by Fargo. The complaint seeks unspecified compensatory damages, permanent injunctive relief, trebling of damages for willful infringement and fees and costs. We are currently evaluating the claims in this lawsuit and intend to vigorously defend against them. We believe that the only products at issue are Toppan CP400 printers that were or are sold, used or imported as part of the CAC program. To date, we have received purchase orders of $10.2 million for Toppan CP400 printers for the CAC program, which are expected to be delivered by the end of the first quarter of 2005. There can be no assurance that we will prevail in this litigation. The litigation, with or without merit, could be time consuming and expensive to litigate or settle and could divert management's attention from our business.

## Uncertainties in global economic markets could cause delays in customer purchases.

Many customers and potential customers have delayed purchase intentions as a result of uncertainties in global economic markets. Government budgets, particularly at state and regional levels, have been or are expected to be reduced notably. Government contracts result from purchasing decisions made by public sector agencies that are particularly sensitive to budget changes and cutbacks during economic downturns, and variations in appropriations cycles. Many U.S. state customers are facing budget cuts, and some international customers are facing debt crises, introducing added uncertainty. Any shift in the government procurement process, which is outside of our control and may not be predictable, could impact the predictability of our quarterly results and may potentially have a material negative effect on our financial position, results of operation or cash flows.

## If we do not successfully expand our direct sales and services organizations and partnering arrangements, we may not be able to increase our sales or support our customers.

In the fiscal years ended December 31, 2002 and 2003, and nine month periods ended September 26, 2004 and September 28, 2003, we sold substantially all of our services and licensed substantially all of our products through our direct sales organization. Our future success depends on substantially increasing the size and scope of our direct sales force and partnering arrangements, both domestically and internationally. We will face intense competition for personnel, and we cannot guarantee that we will be able to attract, assimilate or retain additional qualified sales personnel on a timely basis. Moreover, given the large-scale deployment required by some of our customers, we will need to hire and retain a number of highly trained customer service and support personnel. We cannot guarantee that we will be able to increase the size of our customer service and support organization on a timely basis to provide the high quality of support required by our customers. Failure to add additional sales and customer service representatives could result in our inability to increase our sales and support our customers.

## Integration of acquired businesses may be difficult and will consume significant financial and managerial resources, which could have an adverse effect on our results of operations.

On January 23, 2004, we completed the acquisition of ZN Vision Technologies AG, or ZN, a leading German provider of face recognition and computer vision products and services. On February 14, 2004, we completed the acquisition of TDT. On October 5, 2004, we completed the acquisition of Imaging Automation, Inc., a market leader in identity document authentication. The integration of the products and services of these acquired companies with ours will be challenging and will consume significant financial and managerial resources. The challenges involved with this integration include, among others:

- challenges related to technology innovation;
- possible difficulty implementing uniform standards, controls, procedures and policies and

26

Table of Contents

- possible loss of key employees

In addition, the differences between U.S. and German business cultures and the geographic distance between the companies could present significant obstacles to our timely, cost-effective integration of ZN.

**The significant direct and indirect costs of our acquisition and integration of ZN, TDT and Imaging Automation could adversely affect our financial performance.**

To date, we have incurred approximately $3.7 million of costs in connection with the acquisitions of ZN, TDT and Imaging Automation, including:

- costs associated with integrating personnel, products and services;
- financial advisory fees; and
- costs and expenses for services provided by our lawyers and accountants.

The transaction costs and expenses attributable to financial advisory, legal and accounting services that we incurred will be capitalized as a component of the purchase price. Goodwill associated with the acquisition will be required to be tested at least annually for impairment, and we will be required to record a charge to earnings if there is an impairment in the value of such goodwill at a later date. Other intangible assets acquired in connection with these acquisitions will be amortized over their estimated useful lives.

**The acquisitions of ZN, TDT and Imaging Automation could result in future impairment charges which could adversely affect our results of operations.**

As a result of our acquisitions of ZN, TDT and Imaging Automation, goodwill and other intangible assets have been created. The values we may record for goodwill and other intangible assets will represent fair values calculated by independent third-party appraisers. Such valuations require us to provide significant estimates and assumptions, which are derived from information obtained from the management of the acquired businesses and our business plans for the acquired businesses or intellectual property. If estimates and assumptions used to initially value goodwill and intangible assets prove to be inaccurate, ongoing reviews of the carrying values of such goodwill and intangible assets may indicate impairments which will require us to record an impairment charge in the period in which we identify the impairments.

**If we do not achieve the expected benefits of our acquisitions of ZN, TDT and Imaging Automation, the price of our common stock could decline.**

We expect that the acquisition of ZN will enhance our leadership in face recognition technology through the combination of our technologies with those of ZN. Although the results of the initial tests of our combined technologies have been positive, the combination of such technologies might not meet the demands of the marketplace. If our technologies fail to meet such demand, customer acceptance of our face recognition solutions could decline, which would have an adverse effect on our results of operations and financial condition. In addition, we expect that the acquisition of ZN will enable us to market our systems and products on a global scale. Our face recognition customers are primarily located in the United States, and ZN's customers are primarily located in Europe. We might not be able to market successfully our products and services to ZN's customers or ZN's products and services to our customers. We expect that the acquisition of TDT will enhance our position in the market for secure credentials, particularly the U.S. government. We expect that the acquisition of Imaging Automation will provide us with a market leadership position in identity document authentication and will complement our core competencies in secure credentials and biometrics. We expect that this addition to our product portfolio will extend our reach into our current markets and provide a critical component to our comprehensive offering for new markets in need of identity solutions. However, there can be no assurance that our current customers or customers in new markets will be receptive to these additional offerings. If our product offerings and services fail to meet the demands of this marketplace, our results of operations and financial condition could be adversely affected. There is also a risk that we will not achieve the anticipated benefits of the acquisitions as rapidly as, or to the extent, anticipated by financial or industry analysts, or that such analysts will not perceive the same benefits to the acquisitions as we do. If these risks materialize, our stock price could be adversely affected.

**The success of our strategic plan to grow sales and develop relationships in Europe may be limited by risks related to conducting business in European markets.**

Although ZN has experience marketing and distributing its products and developing strategic relationships in Europe, part of our strategy will be to increase sales and build additional relationships in European markets. Risks inherent in marketing, selling and developing relationships in European markets include those associated with;

27

Table of Contents

- economic conditions in European markets, including fluctuations in the relative values of the U.S. dollar and the Euro;
- taxes and fees imposed by European governments that may increase the cost of products and services; and
- laws and regulations imposed by individual countries and by the European Union.

In addition, European intellectual property laws are different than U.S. intellectual property laws and we will have to ensure that our intellectual property is adequately protected in foreign jurisdictions and that ZN's intellectual property is adequately protected in the United States. If we do not adequately protect our intellectual property rights, competitors could use our proprietary technologies in non-protected jurisdictions and put us at a competitive disadvantage.

**Our business may be impacted by changes in the local marketplace of our foreign operations and fluctuations in currency exchange rates.**

As a result of our acquisitions of ZN, TDT and Imaging Automation, we expect that we will have increased exposure to foreign currency fluctuations. Net revenue and related expenses generated from our international location in Germany is denominated in euros. The results of operations and certain of our inter-company balances associated with this international location are exposed to foreign exchange rate fluctuations. In addition to our German operation, we will have increased transactions with Japanese vendors supplying hardware and consumables for the delivery of the TDT contracts. These transactions will increase our exposure to foreign currency fluctuations with the yen. To the extent the U.S. dollar weakens against these foreign currencies, the translation of these foreign currencies denominated transactions results in increased net revenue, operating expenses and net income. Similarly, our net revenue, operating expenses and net income will decrease when the U.S. dollar strengthens against these foreign currencies.

**If our systems and products do not perform as promised, we could experience increased costs, lower margins, liquidated damage payment obligations and harm to our reputation.**

We will be required to provide complex systems that will be required to operate on an "as needed" basis. Although we will deploy back-up systems, the failure of our products to perform as promised could result in increased costs, lower margins, liquidated damage payment obligations and harm to our reputation. This could result in contract terminations and have a material adverse effect on our business and financial results.

**Misappropriation of our intellectual property could harm our reputation, affect our competitive position and cost us money.**

We believe that our intellectual property, including our methodologies, will be critical to our success and competitive position. If we are unable to protect this intellectual property against unauthorized use by third parties, our reputation among existing and potential customers could be damaged and our competitive position adversely affected. Our strategies to deter misappropriation could be undermined if:

- the proprietary nature or protection of our methodologies is not recognized in the United States or foreign countries;
- third parties misappropriate our proprietary methodologies and such misappropriation is not detected; and
- competitors create applications similar to ours but which do not technically infringe on our legally protected rights.

If these risks materialize, we could be required to spend significant amounts to defend our rights and divert critical managerial resources. In addition, our proprietary methodologies may decline in value or our rights to them may become unenforceable.

**If we fail to adequately manage our resources, it could have a severe negative impact on our financial results or stock price.**

We could be subject to fluctuations in technology spending by existing and potential customers. Accordingly, we will have to actively manage expenses in a rapidly changing economic environment. This could require reducing costs during economic downturns and selectively growing in periods of economic expansion. If we do not properly manage our resources in response to these conditions, our results of operations could be negatively impacted.

**Future acquisitions of companies or technologies may result in disruptions to our business.**

Beyond the acquisitions of ZN, TDT and Imaging Automation, our growth strategy could include additional acquisitions of companies or technologies that complement ours. Future acquisitions could involve risks inherent in acquisitions, such as:

- challenges associated with integrating acquired technologies and the business and operations of acquired companies;

28

Table of Contents

- exposure to unknown liabilities;
- diversion of managerial resources from day-to-day operations;
- possible loss of key employees, customers and suppliers;
- higher than expected transaction costs; and
- additional dilution to our existing stockholders if we use our common stock as consideration.

If we fail to manage these challenges adequately, our results of operations and stock price could be adversely affected.

**The loss of key personnel could adversely affect our ability to remain competitive.**

We believe that the continued service of our executive officers will be important to our future growth and competitiveness. We have entered into employment agreements with Bernard C. Bailey, our Chief Executive Officer, William K. Aulet, our Chief Financial Officer, Iftikhar Ahmad, our Senior Vice President of Secure Identification Products and Services, Kenneth Scheflen, our Senior Vice President, Federal Solutions, and James P. Ebzery, our Senior Vice President, Sales and Services. These agreements are intended to provide the executives with incentives to remain employed by us. However, we cannot assure you that they will remain employed by us. In addition, we believe that the continued employment of key members of our technical and sales staff is important to us. Most of our employees are entitled to voluntarily terminate their relationship with us, typically without any, or with only minimal, advance notice. The process of finding additional trained personnel to carry out our strategy could be lengthy, costly and disruptive. We might not be able to retain the services of all of our key employees or a sufficient number of them to execute our plans. In addition, we might not be able to continue to attract new employees as required.

**Our quarterly results could be volatile and may cause our stock price to fluctuate.**

We have experienced fluctuations in quarterly operating results and we expect those fluctuations to continue. We expect that our quarterly results will continue to be affected by, among other things, factors such as:

- the size and timing of contract awards;
- the timing of our contract performance;
- variations in the mix of our products and services; and
- contract losses and changes in management estimates inherent in accounting for contracts.

**Certain of our stockholders have significant relationships with us, which could result in us taking actions that are not supported by unaffiliated stockholders.**

Lau Technologies, or Lau, and Mr. Buddy Beck, who is also a director and Vice Chairman, beneficially own approximately 12.6% and 12.2%, respectively, of our outstanding common stock. As a result, both Lau and Mr. Beck have a strong influence on matters requiring approval by our stockholders, including the election of directors and most corporate actions, including mergers and acquisitions. In addition, we have significant relationships with each of Lau and Mr. Beck, including:

- we acquired significant intellectual property, contracts and distribution channels through a transaction with Lau under which we agreed to pay Lau a 3.1% royalty on our face recognition revenues for a period of twelve and one half years, up to a maximum of $27.5 million;
- the spouse of the Chairman of our Board of Directors owns a majority of Lau's voting stock;
- in connection with the acquisition of TDT, Mr. Beck was elected a member of our Board of Directors and appointed Vice Chairman;
- in connection with the acquisition of TDT, we entered into a consulting agreement with Mr. Beck under which we will pay Mr. Beck $300,000 per year for two years, provided that Mr. Beck devotes his full business time to developing business opportunities for us; and

29

Table of Contents

- an additional purchase price adjustment of $2.6 million, payable to the former sole shareholder of TDT, was incurred based upon TDT's selection by the U.S. Department of Defense for the production of smart cards as part of the agency's CAC program. As of September 26, 2004 we have paid approximately $1.2 million of this obligation. The remaining $1.4 million is recorded as a related party payable.

**Future sales of our common stock by Lau or Buddy Beck could depress the market price of our common stock.**

As of November 8, 2004, there were 47,359,858 shares of our common stock outstanding. Lau and Buddy Beck own approximately 12.6% and 12.2%, respectively, of our common stock. If either of these stockholders sell a significant number of shares of our common stock in the open market, our stock price could decline.

ITEM 3 – QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

Subsequent to our acquisition of ZN, our international operating resulting from transactions by our German operations and will be denominated in euros. Hardware and consumables purchases related to contracts associated with the TDT acquisition are denominated in Japanese yen. We mitigate exchange rate volatility by purchasing local currencies at favorable exchange rates. We do not hedge foreign currencies utilizing derivative instruments. Our international operations and transactions are subject to risks typical of international operations, including, but not limited to, differing economic conditions, changes in political climate, differing tax structures, other regulations and restrictions, and foreign currency exchange rate volatility. Accordingly, our future results could be materially adversely impacted by changes in these or other factors.

ITEM 4 – CONTROLS AND PROCEDURES

(a) *Evaluation of disclosure controls and procedures*. Our management, with the participation of our Chief Executive Officer, or CEO, and Chief Financial officer, or CFO, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act) as of September 26, 2004. In designing and evaluating our disclosure controls and procedures, our management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives, and our management necessarily applied its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Based on this evaluation, our CEO and CFO concluded that, as of September 26, 2004, our disclosure controls and procedures were (1) designed to ensure that material information relating to us, including our consolidated subsidiaries, is made known to our CEO and CFO by others within those entities, particularly during the period in which this report was being prepared and (2) effective, in that they provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the Securities Exchange Commission's rules and forms.

(b) *Changes in internal controls.* There were no changes in our internal controls over financial reporting that occurred during our most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

Table of Contents

## VIISAGE TECHNOLOGY, INC.

**PART II - OTHER INFORMATION**

ITEM 1 – LEGAL PROCEEDINGS

In July 2003, a Georgia court issued a preliminary injunction prohibiting Georgia's Department of Motor Vehicle Safety from continuing to work with us to install the State's new drivers' license system. The injunction is the result of a lawsuit filed in March 2003 by one of our competitors alleging that the Department of Motor Vehicle Safety did not comply with its own bid process when it selected a vendor for its new digital drivers' license program. In July 2004, we reached a settlement agreement with the State pursuant to which the Department of Motor Vehicle Safety terminated the contract for convenience and agreed to pay us $2.0 million in cash and the State agreed to purchase certain equipment from us for $500,000. The Department of Motor Vehicle Safety has filed a motion with the Georgia court to dismiss the case based upon the termination of the contract. The agency also has informed the court that it intends to issue a new request for proposals for a digital drivers' license system before the end of 2004. In response to a motion filed by the competitor, the Georgia court has issued a preliminary injunction prohibiting the Department of Motor Vehicle Safety and the State from making any payments to us under the settlement agreement. As a result of the termination of the contract, we will lose up to $19.7 million in revenue that we expected to recognize over the next five and one-half years, which was included in our $176 million of backlog at March 28, 2004, unless we are able to win the new contract for the digital drivers' license system and the revenues from such new contract are substantially similar to the terminated contract. While we believe we can utilize the remaining $2.8 million in assets being retained by us from the Georgia contract either in Georgia, if we win the contract based on the new request for proposals, or on alternative projects, to the extent that we are unable to utilize these assets or realize value through a sale of these assets, we would be required to take a charge to earnings.

Reference is made to Part II, Item 1 of our quarterly report on Form 10-Q for the quarterly period ended June 27, 2004, which was previously filed with the Securities and Exchange Commission.

ITEM 2 – UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS
None.

ITEM 3 – DEFAULTS UPON SENIOR SECURITIES
None.

ITEM 4 – SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS
None.

ITEM 5 – OTHER INFORMATION
None.

ITEM 6 – EXHIBITS
The exhibits listed in the Exhibits Index immediately preceding such exhibits are filed as part of this report.

31

Table of Contents

**VIISAGE TECHNOLOGY, INC.**

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**VIISAGE TECHNOLOGY, INC.**

Date: November 10, 2004                    By:  /s/ Bernard C. Bailey
                                                _____
                                                Bernard C. Bailey
                                                President and Chief Executive Officer
                                                (Principal Executive Officer)

Date: November 10, 2004                    By:  /s/ William K. Aulet
                                                _____
                                                William K. Aulet
                                                Senior Vice President and Chief Financial Officer
                                                (Principal Financial Officer)

32

Table of Contents

## EXHIBIT INDEX

| Exhibit No. | Description |
| --- | --- |
| 10.59 | Form of Stock Option Agreement under 1996 Management Stock Option Plan |
| 10.60 | Form of Stock Option Agreement under 1996 Directors Stock Option Plan |
| 31.1 | Certification of Principal Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2 | Certification of Principal Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1 | Certification of Principal Executive Officer pursuant to 18 U.S.C. Sec. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32.2 | Certification of Principal Financial Officer pursuant to 18 U.S.C. Sec. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |

33

EXHIBIT 24

FILED IN OFFICE
DEC 2 2 2004
DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA.

IN THE SUPERIOR COURT OF FULTON COUNTY

STATE OF GEORGIA

DIGIMARC ID SYSTEM, LLC,                  :
                                          :
        Plaintiff,                        :
                                          :    CIVIL ACTION
                                          :
vs.                                       :    FILE NO. 2003CV66498
                                          :
GEORGIA TECHNOLOGY AUTHORITY              :    JUDGE THELMA CUMMINGS MOORE
and the GEORGIA DEPARTMENT OF             :
MOTOR VEHICLE SAFETY,                     :
                                          :
        Defendants.                       :
                                          :
vs.                                       :
                                          :
VIISAGE TECHNOLOGY, INC. a Delaware       :
Corporation,                              :
                                          :
        Necessary Party-Defendant.        :
                                          :

_____

### ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

The above-styled case came before the Court on October 27, 2004, for hearing on

Plaintiff Digimarc ID System, Inc.'s Motion for Partial Summary Judgment, filed October 11,

2004, Defendant Viisage's Motion for Summary Judgment, filed October 11, 2004, and

Defendants Georgia Technology Authority and the Georgia Department of Motor Vehicle

Safety's Motions for Summary Judgment, filed October 11, 2004.  After having heard oral

argument and reviewed the respective motions and responsive pleadings, the Court finds as

follows:

1

<u>FINDINGS OF FACT</u>

After reviewing the numerous pleadings in this case and having heard the rendition of

facts from all parties during the various motions hearings throughout the progress of this case,

significantly the facts as recited at the October 27, 2004, hearing on the cross-motions for

summary judgment, the Court deems the following rendition of the facts to be undisputed:

1.    Plaintiff Digimarc is the incumbent provider of Georgia's personal identification

solutions. Plaintiff has been Georgia's vendor for personal identification solutions since 1996.

Defendant Department of Motor Vehicle Services ("DMVS") and Defendant Georgia

Technology Authority ("GTA") are responsible for providing personal identification services and

technology consulting for the state of Georgia. Defendant DMVS and Defendant GTA

undertook actions to modernize the state's drivers' license identification card system ("DLS").

2.    The main updates to the current DLS were to include added security features and

a central identification issuance system as opposed to the current over-the-counter issuance

system. On May 24, 2002, Defendant GTA issued Request for Proposal number GTA000051

("RFP No. GTA000051, hereinafter "RFP") on Defendant DMVS's behalf to submit bids for the

replacement of Georgia's current digitized drivers' license system with an updated "turnkey"

solution. This process was a negotiated, solution-based solicitation. The RFP set forth certain

durability and security specifications for permanent drivers' licenses, non-driver identification

cards and special identification cards, and also set forth guidelines for temporary identification

cards to be used pending the issuance of permanent cards. These guidelines and other

requirements listed by the state also mandated that various technical upgrades and improvements

be implemented, and generally set forth various other needs that bidders were required to comply

with covering the gamut of possibilities needed to run and maintain a state identification system.

2

The RFP also set forth the standards to be used to determine what offeror would be awarded the final contract.

      3.     According to GTA Rules 665-2-4-.02(a)(9)(i), there were at least two types of solicitations that may be used in the application of the best value procurement methodology: (i) One-step Invitation for Bids ("IFB") or Request for Proposals (RFP) Technical and price response is submitted at the same time; or (ii) Two-step IFB or RFP Technical responses (step one) and price responses (step two) to solicitation are submitted separately. With either type of solicitation, the RFP required each bidder to respond with a technical proposal and a price proposal. Specifically, Section 5.1 of the RFP mandated that the submitted proposals would receive a "comprehensive, fair, and impartial evaluation" in the following staged steps: (a) evaluation of technical proposals (Phase I); (b) identification of Offerors that meet the minimum technical requirements of Phase I (Offerors that do not receive at least an overall satisfactory rating in Phase I will not be considered for Phase II); (c) evaluation of price proposals (Phase II); (d) identification of Offerors' eligibility for demonstrations; (e) evaluation of demonstrations; and (f) evaluation of proposal on the basis of technical and cost factors.

      4.     The Offerors' proposals were due and submitted on July 19, 2002. Three bidders submitted responses to RFP No. GTA000051, seeking to supply Georgia with its next generation of personal identification solutions. The Evaluation Team gathered at Unicoi State Park on Monday, July 29, 2002, to begin reviewing the proposals submitted on July 19, 2002, by the three bidders: Plaintiff Digimarc, Defendant Viisage and another bidder known as SoftLEAD, Inc. The GTA and DMVS thereafter conducted a review of the proposals submitted by the Offerors. Only two of those bidders, Plaintiff Digimarc and Viisage scored well enough on their initial proposals to warrant further consideration by Defendants, although neither bidder posted

3

scores that met the state's minimum requirements as set out in RFP No. GTA000051. The initial

technical evaluation was based on 219 separate evaluation factors, each rated as either

"excellent, good, satisfactory, or unsatisfactory." Plaintiff received fewer "unsatisfactory" votes

than did Viisage, but ultimately received fewer "excellent" and "good" ratings than did Viisage

also. Each one of the 219 criteria was assigned the same weight.

5.    By August 1, 2002, while still at the initial evaluation meeting being held at

Unicoi State Park, the Evaluation Team opened the price proposals for each bidder. After

prematurely opening the price proposals and having been pleased with Defendant Viisage's low

price, the Evaluation Team began inappropriate and unauthorized communications with

Defendant Viisage in efforts to get Defendant Viisage to submit a technically compliant proposal

to justify awarding the contract to Viisage. At this point, Defendants GTA and DMVS were in

violation of the GTA Rules and the RFP by opening the cost proposals prior to the completion of

the technical evaluations and despite the fact that no offeror had met the minimum technical

requirements of the RFP.

6.    It is apparent to the Court that favoritism towards Defendant Viisage began as

early as August 1, 2002, when the Evaluation Team began inappropriate and unauthorized

communications with Defendant Viisage. After the price proposals were prematurely opened,

the Evaluation Team contacted Defendant Viisage concerning the results of its testing of

Viisage's temporary and permanent card samples, informing Viisage that its temporary card

sample tore easily and that its permanent card samples easily delaminated and that the

information on the card could be easily altered. The Evaluation Team then asked Defendant

Viisage to submit additional samples of both its temporary and permanent cards by close of

business on August 5, 2002, in an effort to get the cards to meet the minimum requirements

4

under the RFP. Rather than comply with the Evaluation Team's request for additional

permanent card samples, Defendant Viisage began working on an entirely new card design and

construction.

7.    After having been in inappropriate contact with Defendant Viisage, it was not

until August 9, 2002, that Defendant GTA notified the offerors, now including Plaintiff

Digimarc, of a clarification meeting to be held on August 14, 2002, to discuss certain

shortcomings in the offeror's proposals. At the August 14, 2002, meeting, the bidders were told

that they could propose new temporary card solutions, including solutions that were constructed

of a medium other than paper. However, nothing was said indicating the bidders could or should

propose new permanent sample cards with a base construction different from what was presented

in their original proposals submitted July 19, 2002. The initial permanent card proposed by

Defendant Viisage was a card constructed of 10 millimeters of transparent Trans-Kote TXP, a 10

millimeter Teslin card, and a 10 millimeter writable clear back overlay. However, after having

been in inappropriate contact with the Evaluation Team, Defendant Viisage undertook to make a

new set of permanent samples cards using a product manufactured by 3M Corporation, known as

Confirm Laminate. This card construction consisted of a 6 millimeter Confirm Laminate, a 14

millimeter Teslin core, and a 10 millimeter clear back overlay.

8.    After the August 14, 2002, meeting, the Evaluation Team sent out a

communication to all bidders requesting additional sample cards to be submitted by close of

business on August 26, 2002. The bidders were told to provide 18 "production quality samples"

of each card solution proposed, but there was no indication that the requirements of the

permanent card requested under the RFP had changed or that the bidders were to submit an

entirely new permanent card proposal. Production quality samples were defined by the DMVS

5

as cards produced using the same methods, materials, equipment, parts and specifications as the card vendor is proposing to produce for the State of Georgia. Nevertheless, on August 26, 2002, Defendant Viisage submitted two entirely new proposed permanent card solutions- both made with 3M products. Defendant Viisage submitted a sample called the "Georgia Design Sample 3M Confirm Laminate" and a single card sample called the "Production Quality Card 3M Confirm Laminate," which was a driver's license card containing artwork and graphics from New York State. Defendant Viisage failed to label the Georgia Design Sample as "production quality" even though these cards met the specifications of production quality cards as defined by DMVS. These cards were discovered to be defective because the laminate was easily removed, leaving the underlying information on the card in tact and subject to alteration; thus, the Evaluation Team concluded they were not production quality.

9.      Defendant GTA subsequently asked Defendant Viisage to submit 17 samples of the New York cards, which Defendant Viisage had already falsely represented were production quality. Defendant Viisage then arranged for 3M to send 17 additional samples of the New York cards, indicating that these were its "production quality cards." The New York card samples were actually made by De La Rue and not Defendant Viisage and De La Rue never gave 3M or Defendant Viisage permission to use the New York card samples and they were only given to Defendant Viisage for marketing purposes. In short, Defendant Viisage submitted another vendors' sample cards, which it had no permission to use, in an attempt to submit acceptable permanent card samples.

10.      After the technical evaluations were scored, Viisage and Digimarc were invited to perform demonstrations for GTA and DMVS, and did so on September 26 and 27, 2002. Defendants conducted a series of various tests on samples submitted by Plaintiff and Viisage,

6

including durability tests and security tests. Following the demonstrations, GTA and DMVS

determined Viisage's temporary card solutions to be acceptable, and Digimarc's unacceptable.

Defendants also opened the price bids from the offerors. Viisage's price per card was quoted at a

substantially lower rate than was Plaintiff's price per card. Defendants were initially unhappy

with both companies' physical products, but liked Viisage's price per card better than Plaintiff's

price per card. Viisage's sample identification cards passed durability tests (after numerous

submissions and re-submissions) conducted by outside laboratories, and later Viisage samples

scored better than Plaintiff's samples in Defendants' own "in-house" durability and security

tests.

      11.    In a further attempt to secure the contract with Defendants GTA and DMVS,

Defendant Viisage misrepresented the existence of a back-up card production facility. The RFP

required that each bidder describe what plans it had to produce permanent cards on a central

issuance basis in the event that a disaster disrupted the ability to issue cards from the primary

central issuance facility in Georgia. Prior to its July 19, 2002, initial proposal, Defendant

Viisage had no alternative central issuance production facility in service for another state.

Instead, it asked permission of Arthur Blank & Company to include them in the Georgia

proposal as a back-up card printing facility in case of disaster at the permanent facility in

Georgia. In fact, Arthur Blank & Company did not have the capacity to provide back-up card

production facilities, and Defendant Viisage had no binding contract with Arthur Blank &

Company that could serve as a basis for Defendant Viisage's assertion in its proposal that it had

secured this company as its back-up card production facility. In fact, Defendant Viisage had not

procured specific pricing information from Arthur Blank & Company regarding how much

money it would require from Defendant Viisage in order to prepare itself to serve as a back-up

<div align="center">7</div>

card production facility.

12.    On October 8, 2002, GTA requested a Best and Final Offer ("BAFO") from Digimarc and Viisage, and each party submitted its BAFO to the State. The evaluation culminated with GTA awarding the DLS contract (the "Contract") to Viisage on November 12, 2002.

13.    Shortly thereafter, Digimarc filed an administrative protest challenging the award of the Contract to Viisage. The Protest Decisionmaker rejected Digimarc's protest, concluding that "[t]here are no merits to any of the protest's allegations." On March 5, 2003, Digimarc filed suit against GTA and DMVS to enjoin the awarding of the DLS contract to Viisage. Following a short period of discovery, the trial court held a hearing on July 31, 2003, enjoining Defendants from acting under the contract awarded to Defendant Viisage. On November 3, 2003, Viisage was added as a necessary party-defendant to Digimarc's suit.

14.    Upon the addition of Viisage as a necessary party, the parties pressed to complete discovery by January 9, 2004. GTA, DMVS, and Viisage requested an early trial date, agreeing to have the case transferred to another court. The request to transfer the case was opposed by Plaintiff Digimarc. This Court was able to adjust its calendar and expedited all hearings in the case, recognizing the urgency of the issues involved. However, discovery disputes, primarily dealing with the scheduling of depositions of key Viisage representatives and Plaintiff Digimarc's Motions to Compel discovery of Defendant Viisage, pushed discovery of the case well into mid to late 2004. Likewise, the parties stipulated to and entered into a scheduling agreement on or about June 9, 2004 (which has been amended at least twice, on August 13, 2004, and September 2, 2004, to accommodate discovery), wherein the parties agreed to submit

8

the current cross motions for summary judgment for the Court's review and a subsequent hearing on said motions was held on October 27, 2004.

15.    Meanwhile, the Commissioner of the DMVS learned that the existing contract with Digimarc would expire on June 30, 2004. In order to ensure that no gap would occur in the provision of drivers' licenses and identification cards, he instructed his staff to take steps necessary to execute an amendment to the Digimarc contract to continue it for a day-to-day term until such time as a transition could be effected to a new system. Digimarc then sought to negotiate a multi-year extension of its existing contract -- offering at least one card alternative that was "vastly superior" to the license Digimarc was providing under the current contract, but also an improvement to the proposal Digimarc submitted in response to the RFP at far less cost than originally proposed.

16.    The DMVS Commissioner determined that acceptance of any of the Option 2 alternatives in Digimarc's proposal would violate the State's competitive procurement laws. The DMVS Commissioner authorized a settlement proposal by which Digimarc and Viisage would re-submit BAFO submissions, which would be reviewed by a panel of independent experts to determine whether either proposal met the requirements of the RFP. Plaintiff Digimarc rejected this offer and demanded an award of the Contract. Plaintiff Digimarc has consistently maintained a demand of the Contract at issue in this case.

17.    The State recognized that the taxpayers of Georgia were at risk (intimating the concern for homeland security following the September 11, 2001 terrorist attacks) and therefore approached Viisage about a termination of the 2002 contract and a re-bid. Viisage made a demand for a termination payment of $8.2 million under GTA Rule 665-2-11-.09. The parties reached a settlement of this claim by which GTA and DMVS would pay Viisage $2 million, and

9

purchase $500,000 in equipment. Upon execution of this agreement, the State terminated for convenience the contract with Viisage.

18.    Following the settlement, Viisage issued a press release on July 20, 2004, announcing the settlement. Shortly thereafter, GTA, DMVS and Viisage, moved to dismiss this case. Digimarc fought against a re-bid which would include Viisage. Digimarc filed three motions for injunctive relief in response to the State's proposed re-bid (including Plaintiff Digimarc's Motion for Temporary Restraining Order filed July 23, 2004, Plaintiff's Motion For Temporary Restraining Order filed Aug. 17, 2004, and Plaintiff's Motion for Preliminary Injunction filed August 23, 2004). On September 2, 2004, this Court granted one of Digimarc's motions for temporary restraining order, and enjoined the settlement between Viisage and the State, but allowing the payment of $500,000 for equipment to Defendant Viisage and precluding the State from awarding a new contract until further order of the Court.

## CONCLUSIONS OF LAW

1.    When Plaintiff Digimarc filed an administrative protest challenging the award of the Contract to Viisage, the Protest Decisionmaker, Mr. Chuck Freedman, rejected Digimarc's protest, concluding that "[t]here are no merits to any of the protest's allegations." The Court acknowledges that the judiciary is only authorized to review administrative decisions when an agency allegedly acts beyond discretionary powers conferred upon it, abuses its discretion, or acts arbitrarily or capriciously with regard to an individual's constitutional rights. See Bentley v. Chastain, 242 Ga. 348 (1978). Thus, this Court cannot hear the case de novo but merely makes a determination of whether Defendants GTA and DMVS abused their discretion or acted arbitrarily or capriciously in the procurement process such as would constitute a violation of

10

Plaintiff Digimarc's rights under said procurement process in favor of Defendant Viisage.

2.    According to GTA Rules 665-2-4-.02(a)(9)(i), there were at least two types of solicitations in this case that may be used in the application of the best value procurement methodology: (i) One-step Invitation for Bids ("IFB") or Request for Proposals (RFP) Technical and price response is *submitted at the same time*; or (ii) Two-step IFB or RFP Technical responses (step one) and price responses (step two) to solicitation *are submitted separately*. See GTA Rules 665-2-4-.02(a)(9)(i).  With either type of solicitation, the RFP required each bidder to respond with a technical proposal and a price proposal. Id.  Specifically, Section 5.1 of the RFP mandated that the submitted proposals would receive a "comprehensive, fair, and impartial evaluation" in the various staged steps, particularly in the evaluation of the technical proposals as Phase I and an evaluation of price proposals as Phase II. See Request for Proposal ("RFP") No. GTA 000051.

3.    While the parties agree it is undisputed that the price proposals were submitted in separate envelopes from the technical proposals, they are in dispute as to whether the price proposals were to be considered at the same time as the technical proposals or whether they were to be considered at separate times; thus, the conflict as to whether this was a one-step or two-step procurement process allowing Defendant GTA and DMVS to open the price proposals at a specified time.  The Court finds that the method of source selection in this case was, in fact, a two-step procurement under GTA Rules 665-2-4-.02(a)(9)(ii)(I) where technical responses were to be evaluated for acceptability first and then price offers were to be opened only for those offerors who submitted technically acceptable responses.  In the present case, Defendants GTA and DMVS conducted a review of the proposals submitted by both Plaintiff Digimarc and Defendant Viisage, neither of which posted scores that met the state's minimum requirements as

11

set out in RFP No. GTA000051. Despite the fact that Defendants were initially unhappy with both companies' physical products, they proceeded to open the price bids and found Defendant Viisage's price per card was quoted at a substantially lower rate than was Plaintiff Digimarc's price per card. Although Defendant Viisage's sample identification cards passed durability tests (after numerous submissions and re-submissions) conducted by outside laboratories, and later Viisage samples scored better than Plaintiff's samples in Defendants' own "in-house" durability and security tests, the Court finds Defendants GTA and DMVS violated the GTA Rules and the RFP by considering the price proposals together with the initially unacceptable technical proposals and then proceeding to justify the procurement in favor of Defendant Viisage.

     4.     It is apparent from a review of the deposition of George Theobald, Business Analyst for Defendant DMVS who was in charge of the Evaluation Team, that there is evidence the Evaluation Team, which was comprised of employees of Defendants GTA and DMVS, opened the price proposals prematurely and directed their efforts toward allowing Defendant Viisage to submit a "technically compliant" proposal in order to justify awarding the contract to the lowest priced vendor. George Theobald admitted that the Evaluation Team wanted to open the cost proposals prior to the completion of the technical evaluations and Defendant GTA did not oppose. (Theobald Deposition. 102:6-103:14). It is also evident by the memo written by George Theobald to the protest decision-maker, Mr. Chuck Freedman, dated December 31, 2002, that the Evaluation Team was biased towards Defendant Viisage's low-priced bid even with knowledge that Defendant Viisage had not submitted, at that time, a technically compliant proposal. In said memo, Mr. Theobald wrote:

> It became apparent from the initial and subsequent Viisage price proposals that DMVS would not only be able to cover operating costs with existing appropriations, but would also have enough cushion to cover unforeseen

implementation costs, once a technically compliant solution was proposed. (See Exhibit 67 to Theobald Deposition).

5.    Likewise, it is further apparent in reviewing the testimonial evidence submitted in this case that there are numerous discrepancies as to the permanent card samples submitted by Defendant Viisage and whether or not Viisage was capable of producing the cards they proposed. When Plaintiff Digimarc and Defendant Viisage were asked to submitted permanent card samples in August 2002, Defendant Viisage submitted samples labeled the "Georgia Design Sample," which included a single card labeled in the written proposal as "Production Quality Card 3M Confirm Laminate." This card was actually a driver's license card designed by De La Rue and containing artwork and graphics from New York State. (See Theobald Deposition. 250:20-251:9, and Exhibit 28 at 8). It is clear to the Court that key representatives of Defendant Viisage did not know how these card samples were made or whether Defendant Viisage was, in fact, capable of making the cards it proposed were its permanent card samples. (See Ahmad Deposition I. 276:24-278:14, 288:7-15; Exhibit 437; Ahmad Deposition II. 25:1-27:20); (Vosseteig Deposition. 209:22-210:7). Additionally, prior to submitting its July 19, 2002, proposal, Defendant Viisage had not secured Arthur Blank & Company as its back-up card production facility in the event that a disaster disrupted the ability to issue cards from the primary central issuance facility in Georgia; as was a requirement under the RFP. (See Digimarc's Exhibits 559-561, 691). To this extent, it is further apparent that the State, being Defendants GTA and DMVS, was more concerned with the price proposal rather than whether Defendant Viisage could, in fact, produce the cards they proposed.

6.    Plaintiff Digimarc has suggested that, pursuant to O.C.G.A. 50-25-7.8, any such contract procured in the manner described in the present case should be declared void *ab initio*

13

due to Defendant GTA and DMVS' failure to follow proper procurement procedures. However, the Court need not decide upon the issue of whether the contract was void *ab initio*, as this issue is moot because Defendants Viisage, GTA and DMVS have terminated the contract for convenience; to prevent a long and lengthy delay of these proceedings and imposing significant and unnecessary additional cost to all parties, not to mention critical additional delay in meeting the homeland security concerns of the citizens of the State of Georgia. An issue is moot when a determination is sought on a matter which, when rendered, cannot have any practical effect on the existing controversy. See Schoen v. Cherokee County, 242 Ga. App. 501, 503 (2000). Furthermore, in Georgia terminating a contract abrogates its meaning and the contract legally ceases to exist. See Emanuel Tractor Sales, Inc. v. Department of Transportation, 257 Ga. App. 360, 366 (2002). The Court finds in the present case that, irrespective of whether the contract was void *ab initio* or not, Defendant Viisage did provide a service to the State by way of providing equipment with which to produce the Georgia drivers' licenses at issue; thus, the settlement agreement in the amount of $500,000.00. The Court further finds that it would violate good conscience to impose upon Defendant Viisage all economic loss from having entered an alleged void contract. Where a benefit has been conferred by Defendant Viisage on the State in the form of goods, which the State accepted, Defendant Viisage may recover at least on a *quantum valebant* basis for the value of the conforming goods received by the State prior to the rescission of the contract. To this extent, Defendant Viisage has not been compensated *under* the contract, but rather under an implied-in-fact contract. See United State v. Amdahl Corporation, 786 F.2d 387, 393 (Fed. Civ. 1986).

      7.    Plaintiff Digimarc has further suggested that it would have been the only bidder left standing, and thus would have been awarded the contract, but for the unethical conduct of

14

Defendant Viisage and Defendant GTA and DMVS. Plaintiff Digimarc admits that its posted scores based on its initial technical proposal failed to meet the state's minimum requirements as set out in RFP No. GTA000051. Accordingly, this Court is unconvinced that Plaintiff has presented any concrete evidence that but for the alleged acts of Defendants Viisage, GTA and DMVS Plaintiff Digimarc would have been awarded the contract at issue. This is especially relevant where the ultimate grant of the contract lies in the discretion of Defendant GTA. See Delta Data Sy. Corp. v. Webster, 744 F.2d 197, 204 (D.C. Cir. 1984) (holding that it is undisputable that the ultimate grant of a contract must be left to the discretion of a government agency; the courts will not make contracts for the parties. And further holding that it follows that a court may not order the award of a contract unless it is **clear** that, but for the illegal behavior of the agency, the contract would have been awarded to the party asking the court to order the award).

8.    The Court finds that there was inappropriate behavior on the part of Defendants GTA and DMVS in this case by the untimely opening of price proposals, contact with Defendant Viisage and the later attempt to justify the procurement in favor of Defendant Viisage. The Court further finds that there were significant instances of misconduct and misrepresentations by Defendant Viisage, as has been previously illustrated at length in the foregoing "Findings of Fact," in an effort to secure the contract with Defendants GTA and DMVS. However, in determining whether it should exercise such authority to grant the contract at issue to Plaintiff Digimarc the court must consider several equitable factors, among them: whether the contract has already been awarded to another party and, if so, is being performed; the extent an order awarding the contract to the unsuccessful bidder is necessary to vindicate the interest of the public, and competing bidders, in the agency's adherence to the law; and the cost to the

15

government, and hence to the taxpayers, of substituting an unsuccessful bidder for the successful

bidder whose price may have been considerably lower. See Choctaw Mfg. Co., Inc. v. United

States, 761 F.2d 609, 619 (11th Cir 1985).

9.    To be sure, the overriding concern in this case is for the safety and security of the

citizens in this state as it pertains to the concern for homeland security following the September

11, 2001, terrorist attacks. Since the start of this litigation, it is apparent that the technology used

in producing drivers' licenses has been updated and improved, and it would not be in the best

interest of the citizens of the State of Georgia for GTA and DMVS to issue Georgia drivers'

licenses based upon old and outdated technology. To this extent, the Court acknowledges that it

may appear that an order awarding the contract to the unsuccessful bidder, Plaintiff Digimarc,

would be necessary to vindicate Plaintiff and other competing bidders in forcing the agency's

adherence to the law. However, the Court finds that the overriding equitable factor here dictates

that awarding such contract would not be in the best interest of the public and would not be cost-

effective to the government, and hence to the taxpayers, where the ultimate goal is to provide

drivers' licenses based on secure, updated and improved technology.

10.    Accordingly, under the circumstances of this case, it is the decision of this Court

to disallow an award of the contract at issue to Plaintiff Digimarc because Plaintiff has not

convinced this Court that but for the acts of Defendants Viisage, GTA and DMVS Plaintiff

would have been awarded the contract at issue. Furthermore, it is the decision of this Court to

disallow the remainder of the 2.5 million settlement between Defendant Viisage and Defendant

GTA, same being $2 million, as this may constitute an unfair advantage in any re-bid process for

Defendant Viisage where it is clear to the Court that questionable conduct played a role in

Defendant Viisage's being awarded the contract at issue from the start of the process. The Court

16

finds that Defendants GTA and DMVS shall be permitted to re-bid the contract, allowing both

Plaintiff Digimarc and Defendant Viisage to participate in the re-bid process. This will allow the

re-bid process to go forward based upon new technology, which will be in the best interests of

the safety and security of the citizens of the State of Georgia to ensure homeland security. To

this extent, Plaintiff Digimarc's Motion for Partial Summary Judgment and Defendant Viisage

Motion for Summary Judgment are hereby **DENIED** and Defendants GTA and DMVS' Motion

for Summary Judgment is hereby **GRANTED**. The re-bid process shall proceed.

17

SO ORDERED this _21st_ day of _December_, 2004.

THELMA WYATT CUMMINGS MOORE, JUDGE
FULTON COUNTY SUPERIOR COURT
ATLANTA JUDICIAL CIRCUIT

18

copies to:

Mr. John P. Hutchins, Esq.
Troutman Sanders, LLP
600 Peachtree Street, Suite 5200
Atlanta, GA 30308

Mr. John Gallagher, Esq.
Stites & Harbison
2800 SunTrust Plaza
303 Peachtree Street, NE
Atlanta, GA 30308

Ms. Emily P. Hitchcock, Esq.
Assistant Attorney General
Office of the Attorney General of Georgia
40 Capital Square, SW
Atlanta, GA 30334-1300

Mr. Peter M. Crofton, Esq.
Mr. Jameson B. Carroll, Esq.
King & Spalding
191 Peachtree Street
Atlanta, GA 30303-1763

EXHIBIT 25



# ViiSAGE

| Company › | Products › | Services › | Solutions › | Customers › | Thought Leadership › | Partners › | News/Events › | Downloads › | Investors › |



You are here:  → Homepage  → News/Events  → **News Releases**

Search

[_____] go!

Quick Links

⊕ News Releases Archive

## Viisage News And Media Releases

→ Click here for current News Releases

**Viisage Issues Statement on Digimarc v. State of Georgia Case**

BILLERICA, Mass.--(BUSINESS WIRE)--Dec. 27, 2004--Viisage (Nasdaq: VISG), a leading provider of advanced technology identity solutions, provided the following statement today regarding the summary judgment ruling issued by a superior court in Fulton County, Georgia regarding the digital drivers' license contract between Viisage and the state of Georgia:

"Viisage learned today that the Georgia court has issued a summary judgment ruling permitting the state to move forward in its rebid of the state's drivers' license contract and permitting Viisage to compete to retain its contract with the state. We are pleased that the state will finally be permitted to begin the rebid process and that the judge has agreed with us and the state on virtually all aspects of the summary judgment motions," said Bernard Bailey, president and CEO, Viisage. "Contrary to statements made by our competitor in an earlier press release, the court did not disallow the 2002 award of the contract to Viisage. The court merely acknowledged that the state and Viisage had entered into a settlement agreement under which the state terminated the drivers' license contract with Viisage for convenience and was to pay Viisage a $2.5 million settlement payment, all as previously announced by Viisage. However, the court has ruled that the state cannot pay $2 million of that settlement payment. Without this payment, Viisage believes that either the settlement agreement with the state is not effective and that Viisage's contract with the state remains in place or that Viisage's initial claim for an $8.2 million settlement payment is revived. While we are very pleased with the overall result, we are disappointed and strongly disagree with this and certain other elements of the court's ruling, including statements of disputed fact which we believe are not appropriate in a summary judgment ruling, and intend to appeal."

About Viisage

Viisage (NASDAQ: VISG) delivers advanced technology identity solutions for governments, law enforcement agencies and businesses concerned with enhancing security, reducing identity theft, and protecting personal privacy. Viisage solutions include secure credentials such as passports and drivers' licenses, biometric technologies for uniquely linking individuals to those credentials, and credential authentication technologies to ensure the documents are valid before individuals are allowed to cross borders, gain access to finances, or granted other privileges. With over 3,000 installations worldwide, Viisage's identity solutions stand out as a result of the Company's industry-leading technology and unique understanding of customer needs. Viisage's product suite includes FaceTOOLS(R) SDK, Viisage PROOF(TM), FaceEXPLORER(R), iA-thenticate(R), BorderGuard(R), FacePASS(TM) and FaceFINDER(R).

This news release contains forward-looking statements that involve risks and uncertainties. Forward-looking statements in this document and those made from time to time by Viisage through its senior management are made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995, as amended. Forward-looking statements concerning future plans or results are necessarily only estimates and actual results could

differ materially from expectations. Certain factors that could cause or contribute to such differences include, among other things, the size and timing of contract awards, performance on contracts, availability and cost of key components, unanticipated results from audits of the financial results of acquired companies, changing interpretations of generally accepted accounting principles, outcomes of government reviews, potential fluctuations in quarterly results, dependence on large contracts and a limited number of customers, lengthy sales and implementation cycles, market acceptance of new or enhanced products and services, proprietary technology and changing competitive conditions, system performance, management of growth, dependence on key personnel, ability to obtain project financing, general economic and political conditions and other factors affecting spending by customers, the unpredictable nature of working with government agencies and other risks, uncertainties and factors including those described from time to time in Viisage's filings with the Securities and Exchange Commission, including without limitation, Viisage's Form 10-K for the year ended December 31, 2003 and its quarterly reports on Form 10-Q. Viisage undertakes no obligation to update any forward-looking statements.

```
CONTACT: Viisage
         Maureen Todaro, 978-932-2438
         mtodaro@viisage.com
         or
         PAN Communications
         Billy Balfour, 978-474-1900
         viisage@pancomm.com

SOURCE: Viisage
```

"Safe Harbor" Statement under the Private Securities Litigation Reform Act of 1995: Statements in this press release regarding Viisage's business which are not historical facts are "forward-looking statements" that involve risks and uncertainties. For a discussion of such risks and uncertainties, which could cause actual results to differ from those contained in the forward-looking statements, see "Risk Factors" in the Company's Annual Report or Form 10-K for the most recently ended fiscal year.

→  Click here for current News Releases