## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

**In re VIISAGE TECHNOLOGY, INC.**
**SECURITIES LITIGATION**

_____

**This Pleading Applies to:  All Actions**

_____

**Civil Action No. 05-cv-10438-MLW**

## MEMORANDUM OF LAW IN SUPPORT OF
## LEAD COUNSEL'S MOTION FOR AN AWARD OF
## ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES

Jeffrey C. Block, Esq.  (BBO# 600747)
Leslie R. Stern, Esq. (BBO# 631201)
Patrick T. Egan, Esq. (BBO# 637477)
**BERMAN DEVALERIO PEASE**
**TABACCO BURT & PUCILLO**
One Liberty Square, 8th Floor
Boston, MA 02109
(617) 542-8300

*Liaison Counsel for Lead Plaintiffs*

Jeffrey A. Klafter, Esq. (*pro hac vice*)
**KLAFTER & OLSEN LLP**
1311 Mamaroneck Ave., Suite 220
White Plains, NY 10605
(914) 997-5656

Kurt B. Olsen, Esq.
**KLAFTER & OLSEN LLP**
1250 Connecticut Ave., N.W.
Suite 200
Washington, D.C.  20036
(202) 261-3553

Stephen D. Oestreich, Esq.
Robert N. Cappucci, Esq. (*pro hac vice*)
**ENTWISTLE & CAPPUCCI LLP**
280 Park Avenue
26th Floor West
New York, NY 10017
(212) 894-7200

*Lead Counsel for Lead Plaintiffs*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................... iii

PRELIMINARY STATEMENT ................................................................. 1

STATEMENT OF FACTS ........................................................................... 2

ARGUMENT ............................................................................................... 3

A.    Plaintiffs' Counsel Are Entitled To A Fee
    or Creating A Common Fund ................................................................ 3

B.    In Accordance With the PSLRA and Under the
    First Circuit's Decision in *Thirteen Appeals*, Plaintiffs' Counsel
    Are Entitled to a Fee Based on a Percentage of the Fund ................. 4

C.    The Requested Fee is Reasonable as Measured
    By the Applicable Factors ..................................................................... 6

        1.    The Size of the Settlement and Number of
            Persons That May Benefit ...................................................... 7

        2.    The Risks of Nonpayment from the Litigation ...................... 8

        3.    The Amount of Time Devoted to the Case By
            Plaintiffs' Counsel ................................................................. 9

        4.    The Complexity and Duration of the Litigation ................... 11

        5.    The Skill, Experience, and Efficiency of the
            Attorneys Involved ................................................................. 12

        6.    Awards in Similar Cases ........................................................ 13

        7.    The Reaction of the Class Supports the Requested Fee ......... 15

        8.    Public Policy Considerations ................................................. 16

D.    The Attorneys' Fees Requested by Lead Counsel Are Fair and
    Reasonable Under the Lodestar/Multiplier Method .......................... 16

E.    The Requested Reimbursement of Expenses is Reasonable and
    Warrants the Approval of the Court ..................................................... 18

CONCLUSION ............................................................................................ 19

# TABLE OF AUTHORITIES

## CASES

*Abato v. Marcam Corp.*,
C.A. 94-11625-WGY (D. Mass. July 29, 1996) ................................. 14

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*,
421 U.S. 240 (1975) ......................................................................... 3

*Anixter v. Home-Stake Prod. Co.*,
77 F.3d 1215 (10th Cir. 1996) ......................................................... 8

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
472 U.S. 299 (1985) ......................................................................... 4

*Behrens v. Wometco Enter. Inc.*,
118 F.R.D. 534 (S.D. Fla. 1988) ...................................................... 6

*Berenson Co., Inc. v. Faneuil Hall Marketplace, Inc.*,
671 F. Supp. 819 (D. Mass. 1987) .................................................. *Passim*

*Blum v. Stenson*,
465 U.S. 886 (1984) ......................................................................... 5, 13

*Boeing Co. v. Van Gemert*,
444 U.S. 472 (1980) ......................................................................... 3

*Boston and Maine Corp. v. Sheehan, Phinney, Bass & Green, P.A.*,
778 F.2d 890 (1st Cir. 1985) ............................................................ 18

*Chalverus v. Pegasystems, Inc.*,
No. 97-12570-WGY (D. Mass. Dec. 19, 2000) ............................... 14

*Clark v. Lomas & Nettleton Fin. Corp.*,
79 F.R.D. 641 (N.D. Tex. 1978)
*vacated on other grounds*, 625 F.2d 49 (5th Cir. 1980),
*cert. denied*, 450 U.S. 1029 (1981)) ............................................... 11

*Conley v. Sears, Roebuck & Co.*,
222 B.R. 181 (D. Mass. 1998) ........................................................ 15, 18

*Cotton v. Hinton*,
559 F.2d 1326 (5th Cir. 1997) ......................................................... 11

*Deckler v. Ionics, Inc.*,
No. 03-cv-10393-WGY (D. Mass. Apr. 4, 2005) ............................ 14

*Deposit Guar. Nat'l Bank v. Roper*,
     445 U.S. 326 (1980)........................................................    16

*Eisenstadt v. Centel Corp.*,
     113 F.3d 738 (7th Cir. 1997) ............................................    8

*Friedberg v. Discreet Logic, Inc.*,
     C.A. No. 96-11232-EFH (D. Mass. Nov. 25, 1997) ........................    14

*Furtado v. Bishop*,
     35 F. 2d 915 (1st Cir. 1980)............................................    13

*In re Cambridge Biotech Corp. Sec. Litig.*,
     C.A. No. 93-12486-REK (D. Mass. Apr. 4, 1996) ..........................    14

*In re Cendant Corp. Litig.*,
     264 F.3d 201 (3d Cir. 2001).............................................    2

*In re Continental Ill. Sec. Litig.*,
     962 F.2d 566 (7th Cir. 1992) ...........................................    8, 13, 17

*In re Copley Pharm., Inc. Sec. Litig.*,
     No. 94-11897-WGY (D. Mass. Feb. 8, 1996) ................................    14-15

*In re Eaton Vance Corp. Sec. Litig.*,
     No. 01 CV 10911-EFH (D. Mass. April 26, 2006)...........................    14

*In re Fidelity/Micron Sec. Litig.*,
     167 F.3d 735 (1st Cir. 1999)............................................    18

*In re Global Crossing Sec. & ERISA Litig.*,
     225 F.R.D. 436 (S.D.N.Y. 2004) .........................................    12

*In re Gulf Oil/Cities Ser. Tender Offer Litig.*,
     142 F.R.D. 588 (S.D.N.Y. 1992) .........................................    9

*In re Interspeed, Inc. Securities Litigation*,
     C.A. No. 00-12090-EFH (D. Mass. July 10, 2001) .........................    14

*In re Lernout &Hauspie Sec. Litig.*,
     No. 00-CV-11589-PBS (D. Mass.)..........................................    15

*In re Lupron Marketing and Sales Practices Litig.*,
     228 F.R.D. 75 (D. Mass. 2005)...........................................    15

*In re Molten Metal Tech., Inc. Sec. Litig.*,
     C.A. No. 97-10325-MLW...................................................    13, 18, 19

*In re NASDAQ Market-Makers Antitrust Litig.*,
    187 F.R.D. 465 (S.D.N.Y. 1998) ...................................................... 15

*In Re Relafen Antitrust Litig.*,
    231 F.R.D. 52 (D. Mass. 2005)........................................................ 7, 14, 16-17

*In re Segue Software, Inc.*,
    No. 99-10891-RGS (D. Mass. July 31, 2001) ................................... 14

*In re Sequoia Sys. Sec. Litig.*,
    [1993-1994 Transfer Binder] Fed. Sec. L. Rep. (CCH)
    (D. Mass. Sept. 10, 1993) .................................................. 6

*In re Summit Technology Securities Litigation*,
    C.A. No. 96-11589-JLT (D. Mass. April 25, 2001).......................... 14

*In re Thirteen Appeals Arising out of San Juan DuPont*
    *Plaza Hotel Fire Litig.*,
    56 F.3d 295 (1st Cir. 1995)............................................... *Passim*

*In re Visa Check/Mastermoney Antitrust Litig.*,
    297 F.Supp.2d 503 (E.D.N.Y. 2003) ................................. 15

*In re V-Mark Software, Inc. Sec. Litig.*,
    C.A. No. 95-12249-EFH (D. Mass. Nov. 24, 1998)......................... 14

*In re Zoll Med. Corp. Sec. Litig.*,
    No. 94-11579-NG (D. Mass. Oct. 5, 1998) ...................................... 14

*Maley v. Del Global Techs. Corp.*,
    186 F. Supp. 2d 358 (S.D.N.Y. 2002)................................................ *Passim*

*Mills v. Electric Auto-Lite Co.*,
    396 U.S. 375 (1970).......................................................... 3, 18

*Missouri v. Jenkins*,
    491 U.S. 274 (1989)........................................................... 13, 17

*Morton v. Kurzweil Applied Intelligence, Inc.*,
    No. 10829-REK (D. Mass. Feb. 4, 1998) ......................................... 14

*Radford Trust v. First Unum Life Ins. Co. of Am.*,
    399 F. Supp. 2d 3 (D. Mass. 2005).................................... 17

*Ressler v. Jacobson*,
    149 F.R.D. 651 (M.D. Fla. 1992)..................................................... 4, 6, 16

*Robbins v. Koger Props.*,
116 F.3d 1441 (1lth Cir. 1997) ............................................................ 8

*U.S. Football League v. NFL*,
887 F.2d 408 (2d Cir. 1989)................................................................ 17

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
396 F.3d 96 (2d Cir. 2005)................................................................. 15

*Weinberger v. Great N. Nekoosa Corp.*,
925 F.2d 518 (1st Cir. 1991)................................................................ 4

*Zeid v. Open Env't Corp.*,
C.A. No. 96-12466-EFH (D. Mass. June 24, 1999).......................... 14

**STATUTES & RULES**

15 U.S.C. §78u-4(a)(6) ................................................................................. 5

**UNREPORTED DECISIONS**

*In re Interpublic Sec. Litig.*,
No. 02 Civ. 6527 (DLC), 2004 WL 2397190
(S.D.N.Y. Oct. 26, 2004) ................................................................. 9

*In re Linerboard Antitrust Litig.*,
2004 WL 1221350 (E.D. Pa. June 2, 2004) ...................................... 18

*In Re Lupron(R) Marketing and Sales Practices Litig.*,
2005 U.S. Dist. LEXIS 17456
(D. Mass. Aug. 17, 2005)................................................................. 6, 8, 14

**OTHER**

Thomas E. Willging, et al.,
"An Empirical Study of Class Actions in Four Federal District Courts:
Final Report to the Advisory Committee on Civil Rules," at 69
(Federal Judicial Center 1996)............................................................ 13

Stuart J. Logan, et al.,
"Attorney Fee Awards in Common Fund Class Actions,"
24 Class Action Reports 167 (2003)................................................... 19

Theodore Eisenberg and Geoffrey P. Miller,
"Attorneys Fees in Class Action Settlements, An Empirical Study,"
1 J. Empirical Leg. Stud. 27 (2004)................................................... 13

Denise N. Martin, et al.,
    "Recent Trends IV: What Explains Filings and Settlements in Shareholder
    and Class Actions?," at 12-13 (NERA 1996) ....................................    13

## PRELIMINARY STATEMENT

Lead Counsel respectfully submit this memorandum of law in support of their motion, on behalf of all plaintiffs' counsel,[1] for an award of attorneys' fees and reimbursement of out-of-pocket expenses in connection with the prosecution and resolution of this litigation against Viisage Technology, Inc. (now known as L-1 Identity Solutions, Inc.), Bernard C. Bailey, William K. Aulet, Denis K. Berube, Marcel Yon, Buddy G. Beck, Charles A. Levine, Thomas J. Reilly, Harriet Mouchly-Weiss, Paul T. Principato and Peter Nessen (collectively, "Defendants").

Plaintiffs' Counsel have vigorously prosecuted this action on behalf of the Class without receiving payment of any kind for their services. This action was prosecuted on an entirely contingent fee basis. Plaintiffs' Counsel also advanced or have committed to pay significant expenses out of their own pockets without any guarantee that they would be reimbursed.

Now, having agreed to resolve the claims remaining in this action for what Lead Counsel submit is a commendable result for the Class given the considerable risks to any recovery, Lead Counsel seek fair and reasonable compensation for their services. Lead Counsel respectfully request that the Court approve an award of attorneys' fees equal to 25% of the $2,300,000 settlement fund (the "Settlement Fund"),[2] and reimbursement of out-of-pocket expenses in the amount of $41,652.61. The requested fee is certainly within the range of fees that is customarily awarded to experienced counsel in similar contingency fee litigation in this Circuit and elsewhere. Moreover, each of the Lead Plaintiffs has provided an Affidavit or Declaration in support of the requested attorney fee. Lead Plaintiffs' support for the fee request is significant

---

[1]  The other plaintiffs' counsel on whose behalf Lead Counsel are moving are: Berman DeValerio Pease Tabacco, Court appointed Liaison Counsel, and the law offices of Roy Jacobs & Associates and Paskowitz & Associates, counsel of plaintiff Walter Cohutt, an additional plaintiff named in Lead Plaintiffs' Consolidated Amended Class Action Complaint filed in this Action on February 27, 2006. Together with Lead Counsel, these firms are collectively referred to herein as "Plaintiffs' Counsel".
[2]  As of October 31, 2007, the Settlement Fund has earned $13,365.35 in interest.

because: (a) the PSLRA empowers Lead Plaintiffs to guide securities fraud class actions; (b) Plaintiffs have every incentive to pay their counsel no more than a fair fee; and (c) the Lead Plaintiffs are all sophisticated businessman capable of negotiating a lower fee in appropriate circumstances. See Lead Plaintiff Affidavits or Declarations included in the Compendium of Affidavits and Declarations, submitted herewith. *See In re Cendant Corp. Litig.*, 264 F.3d 201, 220 (3d Cir. 2001) (under the PSLRA, "courts should afford a presumption of reasonableness to fee requests submitted pursuant to an agreement between a properly-selected lead plaintiff and properly-selected lead counsel"). Further, the reasonableness of the requested percentage of the Settlement Fund is amply supported by comparing the requested fee to Plaintiffs' Counsel's lodestar, which confirms that Lead Counsel are only seeking 57.6 percent of the collective lodestars of all Plaintiffs' Counsel.

For these and the reasons set forth below, Lead Counsel respectfully submit that the requested award of attorneys' fees is fair and reasonable under the applicable legal standards.

<u>**STATEMENT OF FACTS**</u>

Pursuant to this Court's Order Certifying the Class, Preliminarily Approving Settlement and Providing for Notice, filed August 17, 2007 (the "Preliminary Approval Order"), Lead Counsel caused the approved Notice of Pendency and Proposed Settlement of Class Action, Application for Attorneys' Fees and Expenses and Fairness Hearing (the "Notice") stating that Lead Counsel would apply for an award of attorneys' fees not to exceed 25 percent of the Settlement Fund and for reimbursement of expenses not to exceed $55,000 (the "Request for Attorneys' Fees and Expenses"), to be mailed to all Class members who could be identified from Viisage's stock transfer records and through the extensive efforts of the Claims Administrator. *See* Affidavit of Anya Verkhovskaya ("Verkhovskaya Aff."), sworn to on October 31, 2007, and also included in the Compendium of Affidavits and Declarations.

In a mailing effort that began on September 7, 2007, 25,154 Notices have been sent to members and potential members of the Class.  Verkhovskaya Aff., ¶¶ 7-10.  The deadline for Class members to file objections to the Request for Attorneys' Fees and Expenses was October 26, 2007.  As of the date of this filing, Lead Counsel are not aware of any objection from any class member to the Request for Attorneys' Fees and Expenses described in the Notice.[3]

The background and procedural history of the Action, the discovery conducted and the settlement negotiations are fully discussed in the Affidavit of Jeffrey A. Klafter in Support of Final Approval of Proposed Class Action Settlement, Plan of Allocation, and Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Expenses (the "Klafter Affidavit"), filed herewith, and to avoid repetition will not be repeated here.  As set forth in detail therein, Lead Plaintiffs faced serious obstacles to establishing liability and proving damages.  Nevertheless, after extensive arms-length negotiations with able defense counsel, Lead Counsel have obtained a recovery which they believe constitutes an excellent result for the Class.

## ARGUMENT

### A.  Plaintiffs' Counsel Are Entitled To A Fee For Creating A Common Fund

The Supreme Court of the United States has long recognized that when a representative plaintiff successfully establishes a common fund in which the other class members have a beneficial interest, the costs of litigation may be spread among the fund's beneficiaries.  *See, e.g*., *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("[A] litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."); *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 275 (1975); *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 392-93 (1970).

---

[3] Lead Counsel will immediately notify the Court if any objections or requests for exclusion are received after the date of this filing.

The First Circuit has explicitly recognized this Court's right to award attorneys' fees from a common fund in situations where, as here, the common fund is the result of the attorneys' successful prosecution of the action. *See*, *e.g.*, *In re Thirteen Appeals Arising out of San Juan DuPont Plaza Hotel Fire Litig.*, 56 F.3d 295, 305 (1st Cir. 1995) (hereinafter "*Thirteen Appeals*"); *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 523 (1st Cir. 1991).

Courts have widely recognized that granting adequate compensation for assuming the risks of class action securities cases is necessary to further the purposes of the federal securities laws. The Supreme Court has emphasized that private actions such as these provide "'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [SEC] action.'" *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) (citation omitted); *see also Ressler v. Jacobson*, 149 F.R.D. 651, 657 (M.D. Fla. 1992) ("Attorneys who bring class actions are acting as 'private attorneys general' and are vital to the enforcement of the securities laws. Accordingly, public policy favors the granting of counsel fees sufficient to reward counsel for bringing these actions and to encourage them to bring additional such actions.").

In complex securities class actions, able counsel for plaintiffs can often be retained only on a contingent fee basis. Therefore, a large segment of the public would be denied a remedy for violations of the securities laws if contingent fees awarded by the courts did not fairly and adequately compensate counsel for the services provided, the serious risks undertaken, and the delay before any compensation is received.

**B.    In Accordance With the PSLRA and Under the
First Circuit's Decision in *Thirteen Appeals*, Plaintiffs' Counsel
<u>are Entitled to a Fee Based on a Percentage of the Fund</u>**

In enacting the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), Congress determined that "[t]otal attorneys' fees and expenses awarded by the court to counsel

for the plaintiff class shall not exceed a <u>reasonable percentage</u> of the amount" recovered for the

Class.  15 U.S.C. §78u-4(a)(6) (emphasis added).  *See Blum v. Stenson*, 465 U.S. 886, 900 n.16

(1984) (stating that in common fund cases "a reasonable fee is based on a percentage of the fund

bestowed on the class").

        In *Thirteen Appeals*, the First Circuit joined the overwhelming majority of courts that

have adopted the percentage of a common fund as the basis for awarding fees.  56 F.3d 295.  In

*Thirteen Appeals*, a group of plaintiffs' lawyers objected to the district court's distribution of

attorneys' fees and argued that the district court erred "as a matter of law" in awarding fees under

the percentage of the fund method.  The First Circuit emphatically rejected this contention,

holding that in a common fund case a district court may calculate fees based on the percentage of

the fund ("POF") created:

> Our decision is driven both by <u>our recognition that use of the POF
> method in common fund cases is the prevailing praxis</u> and by the
> distinct advantages that the POF method can bring to bear in such
> cases.

56 F.3d at 307 (emphasis added).  As the First Circuit explained:

> In complex litigation -- and common fund cases, by and large, tend
> to be complex -- the POF approach is often less burdensome to
> administer than the lodestar method.  [citation omitted.]  Rather
> than forcing the judge to review the time records of a multitude of
> attorneys in order to determine the necessity and reasonableness of
> every hour expended, the POF method permits the judge to focus
> on "a showing that the fund conferring a benefit on the class
> resulted from" the lawyers' efforts....[citation omitted.]
>
> For another thing, <u>using the POF method in a common fund case
> enhances efficiency, or, put in the reverse, using the lodestar
> method in such a case encourages inefficiency.  Under the latter
> approach, attorneys not only have a monetary incentive to spend as
> many hours as possible (and bill for them) but also face a strong
> disincentive to early settlement</u>....[citation omitted.]  If the POF
> method is utilized, a lawyer is still free to be inefficient or to drag
> her feet in pursuing settlement options -- but, rather than being
> rewarded for this unproductive behavior, she will likely reduce her
> own return on hours expended.

> Another point is worth making: because the POF technique is
> result-oriented rather than process-oriented, it better approximates
> the workings of the marketplace.  We think that Judge Posner
> captured the essence of this point when he wrote that "the market
> in fact pays not for the individual hours but for the ensemble of
> services rendered in a case of this character."  [citation omitted.]
> In fine, the market pays for the result achieved.

*Id.* (emphasis added).

Given the amendments to the Federal Securities laws adopted with the enactment of the

PSLRA and the First Circuit's holding in *Thirteen Appeals*, Plaintiffs' Counsel are entitled to

receive a percentage of the fund recovered for the Class.[4]  Finally, percentage fee awards in such

cases "ensure that those who are engaged in the plaintiff's side of securities litigation are not

unduly discouraged from prompt resolution of these cases and full pursuit of the claims of

plaintiffs who, absent such counsel, would be unlikely to have any vindication of the rights that

they have in this setting."  *In re Sequoia Sys. Sec. Litig.*, [1993-1994 Transfer Binder] Fed. Sec.

L. Rep. (CCH) ¶98,089, at 98,730 (D. Mass. Sept. 10, 1993) (Woodlock, J.).[5]

## C.    <u>The Requested Fee is Reasonable as Measured by the Applicable Factors</u>

There is no hard and fast rule mandating a certain percentage of a common fund which

may reasonably be awarded as a fee.  The amount of any fee must be determined upon the facts

of each case.  The First Circuit in *Thirteen Appeals* did not provide a definitive list of factors for

the fee determination.  *See In Re Lupron(R) Marketing and Sales Practices Litig.*, 2005 U.S.

Dist. LEXIS 17456, at *12 (D. Mass. Aug. 17, 2005) (Stearns, J.) (hereinafter "*Lupron*") ("the

---

[4] Indeed, the percentage approach recognizes that, in determining counsel fees in representative shareholder
litigation where a common fund has been created, the quality of an attorney's services can best be measured by the
results achieved.  *E.g., Ressler*, 149 F.R.D. at 655 ("It is well-settled that one of the primary determinants of the
quality of the work performed is the result obtained."); *Behrens v. Wometco Enter. Inc.*, 118 F.R.D. 534, 547-48
(S.D. Fla. 1988) ("The quality of work performed in a case that settles before trial is best measured by the benefit
obtained."), *aff'd without op.*, 899 F.2d 21 (11th Cir. 1990).

[5] This Court's attorney fee decision in *Berenson Co., Inc. v. Faneuil Hall Marketplace, Inc.*, 671 F. Supp. 819 (D.
Mass. 1987) ("*Faneuil Hall*"), predated *Thirteen Appeals* and solely relied on the lodestar/multiplier approach.
Indeed, contrary to *Thirteen Appeals*, the Special Master on whom this Court relied concluded that "[the POF]

First Circuit does not mandate the weighing of any specific set of factors in assessing a common

fund fee request"). There, the First Circuit approved an attorneys' fee award of 30.9% of a $220

million recovery, or $68 million in attorneys' fees.

Relying on factors employed by other Circuit courts, courts within this District have

embraced the following factors:

> (1) the size of the fund and the number of persons benefitted; (2)
> the skill, experience, and efficiency of the attorneys involved; (3)
> the complexity and duration of the litigation; (4) the risks of the
> litigation; (5) the amount of time devoted to the case by counsel;
> (6) awards in similar cases; and (7) public policy considerations, if
> any..

*Id.; see also In Re Relafen Antitrust Litig.*, 231 F.R.D. 52, 79 (D. Mass. 2005) (Young, J.) (for a

substantially similar formulation adding "the presence or absence of substantial objections by

members of the class to the settlement terms and/or fees requested by counsel"). Application of

each of the relevant factors here supports the requested 25 percent fee.

### 1.    The Size of the Settlement and Number of Persons That May Benefit

This Settlement provides the Class with a $2.3 million, all-cash recovery that was

achieved despite the Court's ruling dismissing Lead Plaintiffs' Georgia DMVS Litigation claims

and despite the significant risks to any recovery discussed below and in more detail in the Klafter

Affidavit, ¶¶ 28-40. The recovery represents approximately 18 percent of the aggregate

recoverable damages of the Class, as determined by Lead Plaintiffs' damage expert, Financial

Markets Analysis, LLC ("FMA") and over 230 percent of the damages Defendants' expert can

be expected to present at trial. Klafter Affidavit, ¶ 39.

Based on the transfer records provided by Viisage's transfer agent, the Claims

Administrator has mailed the Court-approved Notice and Proof of Claim to more than 25,154

---

approach does not appear to be favored by the current and more persuasive authorities." *Id.*, at 836. In any event, as
discussed below, the requested fee is also reasonable under the lodestar/multiplier approach.

persons.  *See* Verkhovskaya Aff., ¶10.

### 2.    The Risks of Nonpayment from the Litigation

"Many cases recognize that the risk assumed by an attorney is perhaps the foremost

factor in determining an appropriate fee award."  *Lupron*, 2005 U.S. Dist. LEXIS 17456, at *15-

16 (internal quotations omitted).  Notably, the ability of Plaintiffs' Counsel to recoup their time

spent in this action was fully dependent on obtaining a sufficient recovery to do so.  This risk

encompasses not just the risk of no payment, but also the risk of underpayment.  *See In re*

*Continental Ill. Sec. Litig.*, 962 F.2d 566, 569-70 (7th Cir. 1992) (reversing district court's fee

award where court failed to account for, among other things, risk of underpayment to counsel).

Here, this risk has clearly come to pass as the Request for Attorneys Fees, if approved by the

Court, will only compensate Plaintiffs' Counsel for 57.6 percent of their time charges.

The contingency risk here was significant from the outset and supports the requested fee.

Plaintiffs' Counsel undertook this action on a strictly contingent-fee basis, and invested a

substantial amount of time and money to prosecute the action with no guarantee of compensation

or recovery of out-of-pocket costs.  There was a substantial risk of nonpayment in the event this

action was dismissed at the pleading or summary judgment stages.[6]  *See Maley v. Del Global*

*Techs. Corp.*, 186 F. Supp. 2d 358, 372 (S.D.N.Y. 2002) ("Class Counsel undertook a substantial

risk of absolute non-payment in prosecuting this action, for which they should be adequately

compensated.") (citations omitted); *In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393, 399 (class

---

[6]  The risk of non-recovery is often magnified as the case proceeds closer to and even beyond trial. There are many class actions in which able plaintiffs' counsel expended tens of thousands of hours but received no remuneration. *See, e.g.*, *Robbins v. Koger Props.*, 116 F.3d 1441 (11th Cir. 1997) (reversing $81 million jury verdict on loss causation grounds and entering judgment for defendant); *Eisenstadt v. Centel Corp.*, 113 F.3d 738 (7th Cir. 1997) (affirming granting of summary judgment for defendants); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning jury verdict based on 1994 Supreme Court opinion in action filed in 1973 and tried in 1988).

counsel not only undertook risks of litigation, but advanced own funds and financed litigation).[7]

Here, the risk that Plaintiffs' Counsel would expend enormous resources but still obtain an unfavorable result exceeded those typically presented by securities class actions. As discussed in detail in the Klafter Aff., ¶¶14, 17-22, the claims asserted in this Action were vigorously disputed from the outset. Those efforts led to the dismissal of Plaintiffs' Georgia DMVS Litigation claims and Defendants could be expected to continue their efforts to dismiss the balance of Plaintiffs' claims following discovery by means of a summary judgment motion. If Defendants failed in that effort, their counsel made it clear that they would try those claims before a jury.

Notwithstanding the risk of nonpayment, Plaintiffs' Counsel committed substantial financial resources and labor to the prosecution of this case, on a contingent-fee basis, over a period of more than two years and achieved a commendable result. These risks amply support the requested 25 percent fee.

**3.    The Amount of Time Devoted to the Case By Plaintiffs' Counsel**

The proposed Settlement is the product of considerable time and labor expended by Plaintiffs' Counsel. Prior to the filing of the Amended Complaint, Plaintiffs' Counsel conducted an extensive investigation into the Georgia DMVS Litigation and internal control issues present in the case. Klafter Aff., ¶ 13. In addition to preparing a comprehensive Amended Complaint, Plaintiffs' Counsel prepared extensive papers in opposition to Defendants' motion to dismiss and

---

[7] It is also worthwhile to note that this action was not spurred by a government investigation or enforcement action or stunning front-page disclosures of apparent wrongdoing. Plaintiffs' Counsel investigated this action and uncovered alleged wrongdoing on their own. *See In re Interpublic Sec. Litig.*, No. 02 Civ. 6527 (DLC), 2004 WL 2397190, at *12 (S.D.N.Y. Oct. 26, 2004) ("This was not a case in which there was a government investigation that had resulted in disclosure of misconduct and was also driving a settlement. To the extent that there was any wrongdoing, lead plaintiff would have to uncover it, and do so at some expense. Any award of attorneys' fees therefore should recognize this risk[.]"); *Maley*, 186 F. Supp. 2d at 371 ("Plaintiffs' Class Counsel did not 'piggy back' on any prior governmental action"); *In re Gulf Oil/Cities Ser. Tender Offer Litig.*, 142 F.R.D. 588, 597 (S.D.N.Y. 1992) (30% fee "eminently reasonable" because, among other things, "[t]his is not a case where plaintiffs' counsel can be cast as jackals to the government's lion, arriving on the scene after some enforcement or administrative agency has made the kill.").

argued at two hearings set by the Court to consider that motion. Lead Counsel also, at the direction of the Court, engaged in informal discovery concerning the internal control claims allowed by the Court to proceed to discovery, and thoroughly analyzed the documents provided by Defendants in response to Plaintiffs' informal requests. In sum, this discovery and investigation included: (a) review and analysis of 770 pages of documents produced by Defendants; (b) review and analysis of quarterly and annual reports and other documents filed by Viisage with the SEC during and following the Class Period; (c) consultation throughout the pendency of the litigation with damages experts retained by Lead Counsel, who advised on the recoverable damages in this action. *Id.*, ¶¶ 15, 17, 18.

After gaining a thorough understanding of the strength and weaknesses of the internal control claims and the issues concerning quantifying the damages attributable to these claims, Lead Counsel engaged in considerable efforts to resolve these claims. They engaged in numerous negotiations with counsel for the Defendants and Viisage's Directors and Officers Liability Insurer, and after reaching an agreement-in-principle to settle, had to prepare and negotiate the Stipulation of Settlement and all of its exhibits, before the proposed Settlement could be presented to this Court for preliminary approval. Klafter Aff., ¶¶ 17-24.

These highlights, described in further detail in the Klafter Affidavit, demonstrate the considerable efforts of Plaintiffs' Counsel in litigating the claims and obtaining the proposed Settlement presently before the Court. The number of hours spent by Plaintiffs' Counsel, which were spent efficiently, further attests to the substantial efforts entailed in bringing this case to a successful conclusion. Plaintiffs' Counsel spent an aggregate of 2,037.05 hours prosecuting this Action, resulting in a combined lodestar of $997,934.25. *See* Exhibit F to the Klafter Affidavit and the Firm Affidavits included in the Compendium of Affidavits filed herewith. If the Court approves the Settlement, it will be necessary for Lead Counsel to devote many additional hours

to the settlement administration process, for which they will receive no additional compensation. In sum, the time and effort put in by Plaintiffs' Counsel at significant risk amply support the requested attorneys' fee.

### 4.    The Complexity and Duration of the Litigation

Securities class actions are well recognized for their complexity and difficulty.  "[C]lass action suits" in general "have a well-deserved reputation as being most complex."  *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1997).  Moreover, federal courts have long recognized that securities class actions are notoriously complex and difficult to prove.  *See Sumitomo*, 189 F.R.D. at 281 ("[F]ederal courts, including this court, have long recognized that [securities class action] litigation is notably difficult and notoriously uncertain.") (citations omitted); *Maley*, 186 F. Supp. 2d at 372 ("A securities case such as this one, 'by its very nature, is a complex animal . . . .'") (citing *Clark v. Lomas & Nettleton Fin. Corp.*, 79 F.R.D. 641, 654 (N.D. Tex. 1978), *vacated on other grounds*, 625 F.2d 49 (5th Cir. 1980), *cert. denied*, 450 U.S. 1029 (1981)).

This case was unquestionably complicated in that it required Plaintiffs' to prove that defendants misrepresented the adequacy of Viisage's internal controls even though its lack of adequate internal controls did not lead to any restatement of financial results.  Further, from the documents produced during informal discovery, proving the falsity of Defendants' statements would have been dependent on an extensive analysis, assisted by experts, of Viisage's internal control systems and the modifications proposed and being implemented under the guidance of consultants retained by Defendants.  Klafter Aff., ¶¶ 28-34.

The damage issues faced by Plaintiffs were also complex, given the multiple announcements by Viisage on March 2, 2005.  Defendants would have proffered several complicated academic studies in support of their contention that less than five percent of the $0.97 price decline on March 3, 2005 was caused by the internal control revelations the prior

day.  To counter such evidence, it would be necessary to refute or distinguish these studies and present a convincing justification for a jury to conclude that half of that decline should be awarded to the Class.  The complexity and difficulty establishing liability and damages in this Action therefore supports the reasonableness of the requested fee.  Klafter Aff., ¶¶ 35-38.

     5.    **The Skill, Experience, and Efficiency of the Attorneys Involved**

Lead Counsel submit that they have demonstrated their skill and efficiency in representing the Lead Plaintiffs and the Class throughout this litigation and in achieving the proposed Settlement.  In addition, Lead Counsel's qualifications are beyond dispute.  The firm resumes of Lead Counsel, which previously have been filed with the Court and are herein incorporated by reference, demonstrate the firms' background and experience.

Moreover, Defendants were ably represented here by a nationally prominent law firm – Choate, Hall & Stewart -- with experience and expertise in this type of litigation.  "The quality of opposing counsel is also important in evaluating the quality of the services rendered by Plaintiffs' Class Counsel."  *Maley*, 186 F. Supp. 2d at 373.  Defendants attempted to end the litigation at the pleadings stage and would have continued their efforts to do so at the summary judgment and, if necessary, trial and appeal phase.  Lead Counsel's ability to recover a settlement valued at $2.3 million for the Class in the face of such formidable legal opposition provides further evidence of the quality and skill of their work and supports the fee requested.  *Id.*; *see also In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 467 (S.D.N.Y. 2004) ("Securities Lead Counsel obtained the Settlement in the face of vigorous opposition by defendants who were represented by some of the nation's leading law firms . . . .").  This factor therefore also supports the requested fee.

6.    **Awards in Similar Cases**

In selecting an appropriate percentage award, both the United States Supreme Court and the First Circuit have recognized that an appropriate fee is intended to approximate what counsel would receive if they were bargaining for their services in the marketplace. *Missouri v. Jenkins*, 491 U.S. 274, 285 (1989); *Thirteen Appeals*, 56 F.3d at 307; *see also Continental*, 962 F.2d at 568. The ordinary contingency fee arrangement is for one-third of the settlement fund. *See Furtado v. Bishop*, 635 F. 2d 915, 917 (1st Cir. 1980); *accord Blum*, 465 U.S. at 903 ("In tort suits, an attorney might receive one-third of whatever amount the plaintiff recovers.") (Brennan, J., concurring).

This Court, in *In re Molten Metal Tech., Inc. Sec. Litig.*, C.A. No. 97-10325-MLW, stated that:

> In the normal range of common fund recoveries, common fee awards fall in the 20 to 30 percent range. The median of this usual range is 25 percent. As an alternative to an initial focus on the recognized percentage range of common fund fee awards for cases that do not present extraordinary circumstances, this median 25 percent figure can be considered by the courts in their discretion as a reasonable and convenient starting point, norm, for common fund awards, from which deviation should be made as the court considers various relevant fee determinations.

*See In re Molten Metal Tech., Inc. Sec. Litig.*, C.A. No. 97-10325-MLW, August 6, 2001 Transcript of Final Approval Hearing, pp. 31-32.[8] Academic studies provide strong empirical support for that conclusion.[9] Nevertheless, in this District, attorney fee awards in security class

---

[8] A copy of the transcript is attached hereto as Exhibit A.

[9] *See, e.g.*, Theodore Eisenberg and Geoffrey P. Miller, "Attorneys Fees in Class Action Settlements, An Empirical Study," 1 J. Empirical Leg. Stud. 27 (2004) (between 1993 and 2002, the average fee award in securities cases covered by *Class Action Reports* was 30% and the mean fee was 27.9% and other data showed a median of 25% and a mean of 24.1% in securities cases); Denise N. Martin, et al., "Recent Trends IV: What Explains Filings and Settlements in Shareholder and Class Actions?," at 12-13 (NERA 1996) ("Regardless of case size, fees average 32% of the settlement."); and Thomas E. Willging, et al., "An Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules," at 69 (Federal Judicial Center 1996) (median attorneys' fee in class actions litigated in the subject districts ranged from 27% to 30%). All of these reports are included in Exhibit B, hereto.

actions have frequently exceeded 25 percent.[10]

The conclusion that a 25 percent fee is fair here finds further support in this Circuit's recent decision in *Thirteen Appeals*. There, for example, the First Circuit affirmed a District Court's award of a $68 million fee constituting 30.9% of a $220 million settlement arising from a hotel fire caused by numerous reckless acts. *See Thirteen Appeals*, 56 F.3d at 299-300, 313. It can hardly be said that what amounted to a series of promising personal injury actions presented the risk of non-payment apparent in this litigation.

Judge Young's relatively recent decision awarding counsel one-third of a $67 million settlement in *Relafen*, 231 F.R.D. at 77, 82, is also instructive. There, consumers sued SmithKline Beecham for improperly securing a patent for the compound marketed as Relafen through false statements in violation of the federal antitrust laws, state antitrust, unfair competition and consumer protection statutes, and many states' unjust enrichment laws. *Id.* at 60. <u>Before the consumers commenced that action</u>, generic drug manufacturers secured a jury verdict against SmithKline for engaging in precisely the misconduct the consumers sought to demonstrate. *Id.* at 59. Again, therefore, this case presents a far higher risk profile than did *Relafen*.

Similarly, in *Lupron*, 2005 U.S. Dist. LEXIS 17456, at *22, Judge Stearns awarded a

---

[10] *See, e.g.*, *In re Eaton Vance Corp. Sec. Litig.*, No. 01 CV 10911-EFH (D. Mass. April 26, 2006) (awarding 30 percent of settlement proceeds); *Deckler v. Ionics, Inc.*, No. 03-cv-10393-WGY (D. Mass. Apr. 4, 2005) (30% of settlement proceeds); *In re Segue Software, Inc.*, No. 99-10891-RGS (D. Mass. July 31, 2001) (Woodlock, J.) (33% of settlement fund); *In re Interspeed, Inc. Securities Litigation*, C.A. No. 00-12090-EFH (D. Mass. July 10, 2001) (awarding attorneys' fee equal to 30% of the settlement fund); *In re Summit Technology Securities Litigation*, C.A. No. 96-11589-JLT (D. Mass. April 25, 2001) (attorneys' fee award equal to 33 1/3% of the settlement fund); *Chalverus v. Pegasystems, Inc.*, No. 97-12570-WGY (D. Mass. Dec. 19, 2000) (33% of $5.25 million awarded); *Zeid v. Open Env't Corp.*, C.A. No. 96-12466-EFH (D. Mass. June 24, 1999) (attorney fee award of 33 1/3% of $6 million fund); *In re V-Mark Software, Inc. Sec. Litig.*, C.A. No. 95-12249-EFH (D. Mass. Nov. 24, 1998) (awarding attorneys' fees of 33 1/3 % of settlement fund); *In re Zoll Med. Corp. Sec. Litig.*, No. 94-11579-NG (D. Mass. Oct. 5, 1998) (33-1/3% of settlement); *Morton v. Kurzweil Applied Intelligence, Inc.*, No. 10829-REK (D. Mass. Feb. 4, 1998) (one-third of settlement fund); *Friedberg v. Discreet Logic, Inc.*, C.A. No. 96-11232-EFH (D. Mass. Nov. 25, 1997) (attorneys' fee award of 30% of recovery); *Abato v. Marcam Corp.*, C.A. 94-11625-WGY (D. Mass. July 29, 1996) (fee award of 33 1/3% of settlement fund); *In re Cambridge Biotech Corp. Sec. Litig.*, C.A. No. 93-12486-REK (D. Mass. Apr. 4, 1996) (fee award of 30% of the cash and common stock in the settlement funds); *In re*

25% fee in a case involving a $95 million settlement of claims that pharmaceutical companies conspired to inflate the price of the drug Lupron. That suit followed a guilty plea by one co-conspirator and the other defendants' agreements to cooperate with the government in exchange for non-prosecution agreements. *See In re Lupron Marketing and Sales Practices Litig.*, 228 F.R.D. 75, 78-79 (D. Mass. 2005). Accordingly, the risk of non-payment the plaintiffs' counsel faced in *Lupron* was not comparable to the risk Plaintiffs' Counsel assumed here.

Plaintiffs' Counsel recognize that some courts have noted that very large settlements may justify percentage fees lower than those typical in smaller class actions.[11] For the most part, however, courts have awarded lower percentage fees to avoid windfall "multiplier" payments to counsel in cases involving settlements far larger than this one. Furthermore, as established below, the fee request here represents a negative multiplier for Plaintiffs' Counsel.[12]

Lead Counsel therefore request a percentage fee that falls at the "benchmark" adopted by this and many other courts and well within the range typical in class actions within this Circuit.

### 7.    The Reaction of the Class Supports the Requested Fee

"The reaction of the Class," "is entitled to great weight by the Court." *Maley*, 186 F. Supp. 2d at 374; *see also Prudential*, 985 F. Supp. at 416 ("numerous courts have recognized that the lack of objections from members of the class is one of the most important reasons" in determining the reasonableness of the requested fee.). Here, over 25,154 copies of the Notice

---

*Copley Pharm., Inc. Sec. Litig.*, No. 94-11897-WGY (D. Mass. Feb. 8, 1996) (33-1/3% fee awarded on $6.3 million settlement fund). All of these Orders are included in Exhibit C, hereto.

[11] *E.g., In re Visa Check/Mastermoney Antitrust Litig.*,297 F.Supp.2d 503, 524-25 (E.D.N.Y. 2003) (awarding 6.5% fee and 3.5 multiplier in a settlement valued at over $3 billion), *aff'd, Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 492 (S.D.N.Y. 1998) (14% fee and 3.97 multiplier in action involving settlement in excess of $1 billion); *Conley v. Sears, Roebuck & Co.*, 222 B.R. 181, 187 (D. Mass. 1998).

[12] Lead Counsel are also mindful of three orders entered concerning three separate settlements in *In re Lernout &Hauspie Sec. Litig.*, No. 00-CV-11589-PBS (D. Mass.) ("*In re L&H*") (each of which are included in Exhibit C, hereto), awarding counsel fees equal to 20% of settlement funds of $115million, $60million and $5.27million. Each award, however, represented a multiplier ranging from 1.3 to 1.8, and there were criminal proceedings in Belgium (where L&H was based) against several of the defendants, including the senior executives of L&H and its accountants, KPMG, as well as an SEC investigation, which reduced the risks faced by plaintiffs' counsel there.

were mailed to Class members and potential Class members beginning September 7, 2007, and a

Summary Notice describing the proposed settlement was published on September 17, 2007 in the

national edition of <u>The Wall Street Journal</u>.  Verkhovskaya Aff., ¶¶ 7-10, 14.  The Notice

advised the Class, in plain English, that Lead Counsel would apply, on behalf of all Plaintiffs'

Counsel, for an award of attorneys' fees in an amount not to exceed 25% of the Settlement Fund,

as well as reimbursement of expenses incurred in the prosecution of this litigation not to exceed

$55,000.  Class members were notified that any and all objections to the proposed settlement and

Lead Counsel's application for attorneys' fees had to be filed with the Court and served on

counsel by October 26, 2007.  To date, no Class Members have filed an objection to Lead

Counsel's fee and expense request.  Given the extent of the mailing and publication notice here,

the absence of any objections to the requested attorneys' fees further supports the reasonableness

of the request. *See, e.g.*, *Ressler*, 149 F.R.D. at 656 (a lack of objections is "strong evidence of

the propriety and acceptability" of the fee request).

> ### 8.    Public Policy Considerations

As noted above, Courts have emphasized the indispensable role that private lawsuits play

in advancing the federal securities laws' policy of promoting fair disclosure.   Likewise, courts

have recognized that class actions serve an important function in our justice system by allowing

plaintiffs to "vindicat[e] the rights of individuals who otherwise might not consider it worth the

candle to embark on litigation in which the optimum result might be more than consumed by the

cost."  *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 338 (1980).  This policy-oriented factor

therefore also supports Lead Counsel's attorney fee request.

## D.    The Attorneys' Fees Requested by Lead Counsel Are Fair and Reasonable Under the Lodestar/Multiplier Method

The First Circuit does not require a court to cross check the percentage of fund against

the lodestar in its determination of the reasonableness of the requested fee.  *Relafen*, 231 F.R.D.

at 81.  Nevertheless, the requested fee is more than reasonable under the lodestar method of

analysis as it only represents 57.6 percent of the collective lodestar of Plaintiffs' Counsel.

As articulated by this Court, under the "lodestar/multiplier" method, a court is required to

engage in a two step analysis.  First, to determine the lodestar, the court multiplies the number of

hours spent on the case by each attorney's reasonable hourly rate.  Second, the court adjusts that

lodestar figure (by applying a multiplier) to reflect such factors as the risk, contingent nature of

the litigation, the result obtained and the quality of the attorneys' work.  *See generally Faneuil*

*Hall*, 671 F. Supp. at 830-33.

As reflected within Exhibit F to the Klafter Affidavit, Plaintiffs' Counsel collectively

expended 2,037.05 hours of professional time in the prosecution of this action.  As detailed in the

Klafter Affidavit, ¶¶ 52-58, Lead Counsel allocated the considerable work entailed in

prosecuting this litigation among themselves and additional Plaintiffs' Counsel to avoid

duplication of effort and to promote efficient litigation.  These hours have been multiplied by the

applicable current hourly rates[13] of the attorneys and paralegals[14] who worked on this action to

arrive at the base lodestar amount of $997,934.25.

In conducting a lodestar/multiplier analysis, the reasonableness of hourly rates is judged

by "the prevailing hourly rate in Boston for attorneys of comparable skill, experience, and

reputation."  *Radford Trust v. First Unum Life Ins. Co. of Am.*, 399 F. Supp. 2d 3, 14 (D. Mass.

2005).  As evidenced by the Affidavits of Patrick T. Egan and Thomas G. Shapiro, and the

---

[13]   The Supreme Court has held that the use of current rates is proper because those rates more adequately
compensate for inflation and loss of use of funds.  *See generally Jenkins*, 491 U.S. 274; *see also Faneuil Hall*, 671
F. Supp. at 831  (approving of use of current market rates to compensate the attorneys for the delay in payment of
their fees, appropriate when a case has lasted only a few years.)

[14]   Since it is customary to bill paralegals at hourly rates, their time should accordingly be compensated.
*Continental*, 962 F.2d at 569.  Many courts have noted the economic value of using paralegals to do work that would
otherwise be performed by attorneys.  *See id.; U.S. Football League v. NFL*, 887 F.2d 408, 416 (2d Cir. 1989);
*Faneuil Hall*, 671 F. Supp. at 836-37 ("the prevailing justification for a multiplier, the risk of not recovering fees,
pertains to paralegal expenses with particular force, since the cash risk to the firm is greater with respect to
paralegals, as with associates, than it is to partners.")

Affidavits of Plaintiffs' Counsel, all included in the Compendium of Affidavits and Declarations, the hourly rates of the professionals at each Plaintiffs' Counsel are commensurate with prevailing hourly rates of the leading firms in the District engaged in the prosecution of securities class actions. *See Faneuil Hall*, 671 F. Supp. at 831 (determination of reasonable hourly rates may be based upon "Affidavits from other attorneys in the community . . . to establish that the attorneys' rates are within the range generally charged for similar services.").

Applying these hourly rates yields a negative multiplier of approximately .576. *See Klafter Aff.*, ¶ 65. The requested fee, however, would clearly support a fee award representing a positive multiplier here. *See Faneuil Hall*, 671 F. Supp at 832 (noting that the First Circuit has recognized "that the risk of losing justifies a multiplier" and finding an agreed-upon fee representing a multiplier of 1.42 to be reasonable); *see also Molten Metal*, Transcript, p. 28 (30% fee award by this Court translated to a 1.63 multiplier).[15] Indeed, courts have repeatedly awarded significant positive multipliers when awarding a fee out of a common fund under the lodestar/multiplier approach.[16] The lodestar cross-check therefore firmly supports Lead Counsel's fee request.


E.    **The Requested Reimbursement of Expenses is Reasonable and Warrants the Approval of the Court**

In addition to an award of attorneys' fees, attorneys who create a common fund for the benefit of a class are also entitled to reimbursement of reasonable litigation expenses and costs from the fund. *See In re Fidelity/Micron Sec. Litig.*, 167 F.3d 735, 737 (1st Cir. 1999) (class counsel creating a common fund is entitled to recover "expenses, reasonable in amount, that

---

[15] The First Circuit has approved of multipliers as high as 6. *See Boston and Maine Corp. v. Sheehan, Phinney, Bass & Green, P.A.*, 778 F.2d 890, 894 (1st Cir. 1985); *see also Conley*, 222 B.R. 181 (awarding multiplier of 8.9).

[16] *See, e.g., In re Linerboard Antitrust Litig.*, 2004 WL 1221350, at *16 (E.D. Pa. June 2, 2004) ("during 2001-2003, the average multiplier approved in common fund class actions was 4.35 and during [the] 30 year period from 1973-

18

were necessary to bring the action to a climax"); *Faneuil Hall*, 671 F. Supp. at 833 ("In addition to attorneys' fees, plaintiffs' attorneys are also entitled to reimbursement of reasonable and necessary out-of-pocket expenses.").  Here, Lead Counsel seek reimbursement of expenses in an amount of $41,652.61.  These expenses were all reasonable, necessary and directly related to the prosecution of this litigation, as evidenced by the Klafter Affidavit, ¶¶ 66-72 and the Affidavits or Declarations of Plaintiffs' Counsel included in the Compendium of Affidavits and Declarations.  By efficiently allocating the work among Plaintiffs' Counsel, Lead Counsel also avoided multiplying expenses.  The total expense incurred of each Plaintiff's Counsel is summarized in Exhibit G to the Klafter Affidavit.

Lead Counsel submits that these expenses were reasonably and necessarily incurred in prosecuting this action and achieving the proposed Settlement, and should be reimbursed.  *See generally Mills*, 396 U.S. 375; *see also In re Molten Metal*, Transcript, p. 35 (approving expense reimbursement of $311,578); *Faneuil Hall*¸.671 F. Supp. at 826 (approving an award of expenses of $20,000).

## CONCLUSION

For all the reasons set forth herein and in the Klafter Affidavit, Lead Counsel respectfully request that the Court enter the proposed Order filed herewith awarding Plaintiffs' Counsel attorneys' fees in the amount of twenty-five (25%) of the Settlement Fund and reimbursement of out-of-pocket expenses incurred by Plaintiffs' Counsel in the amount of $41,652.61.

---

2003, [the] average multiplier approved in common fund class actions was 3.89") (citing Stuart J. Logan, et al., "Attorney Fee Awards in Common Fund Class Actions," 24 Class Action Reports 167 (2003)).

Dated: November 2, 2007                    Respectfully submitted,

**BERMAN DEVALERIO PEASE TABACCO**
**BURT & PUCILLO**

By:      /s/ Patrick T. Egan
          Jeffrey C. Block (BBO# 600747)
          Leslie R. Stern  (BBO# 631201)
          Patrick T. Egan (BBO# 637477)
          One Liberty Square, 8th Floor
          Boston, MA 02109
          (617) 542-8300

**Plaintiffs Liaison Counsel**

Jeffrey A. Klafter, Esq. (*pro hac vice*)
**KLAFTER & OLSEN LLP**
1311 Mamaroneck Ave., Suite 220
White Plains, NY 10605
(914) 997-5656

Kurt B. Olsen, Esq.
**KLAFTER & OLSEN LLP**
1250 Connecticut Avenue, N.W.
Suite 200
Washington, D.C.  20036
(202) 261-3553

Vincent R. Cappucci. Esq.
Stephen D Oestreich, Esq.
Robert N. Cappucci, Esq. (*pro hac vice*)
**ENTWISTLE & CAPPUCCI LLP**
280 Park Avenue
26th Floor West
New York, NY 10017
(212) 894-7200

**Co-Lead Counsel for Lead Plaintiffs and the Class**

20

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


MARILYN AXLER, ET AL                    )   CA 97-10325
v.                                      )   CA 98-10161
MOLTEN METALS, ET AL                    )   Boston, MA
                                        )   August 6, 2001
MARILYN AXLER, ET AL                    )
v.                                      )
SCIENTIFIC ECOLOGY, ET AL               )


BEFORE THE HONORABLE MARK L. WOLF
UNITED STATES DISTRICT JUDGE


APPEARANCES:


(As previously noted.)


JUDITH A. TWOMEY, RPR
Official Court Reporter
One Courthouse Way
Courtroom 10~Room 5200
Boston, MA 02210
(617)946-2577

1          THE CLERK:  This is Civil Action Number

2    97-10325, Marilyn Axler, et al versus Molten Metals

3    Technology, Incorporated, and also Civil Action Number

4    98-10161, Marilyn Axler, et al versus Scientific Ecology

5    Group, Incorporated.

6          Court is in session.  You may be seated.

7          THE COURT:  Good afternoon.  Would counsel

8    please identify themselves for the court and for the

9    record.

10          MR. SHAPIRO:  Good afternoon, your Honor.   Tom

11   Shapiro for the plaintiffs.

12          MR. BERMAN:  Good afternoon, your Honor.

13   Norman Berman for plaintiffs.

14          MS. BLAUNER:  Michelle Blauner for the

15   plaintiffs.

16          MR. KRAUS:  Good afternoon, your Honor.

17   Lawrence Kraus for defendants Nagle, Strong, and

18   Preston.

19          MR. TADD:  Michael Tadd for Steven Gray,

20   Chapter 11 Trustee for Molten Metals Technologies, Inc.

21          MR. CRAWFORD:  Your Honor, Ian Crawford on

22   behalf of defendant Ben Downs.

23          MR. HALSTON:  Daniel Halston on behalf of the

24   defendant William Haney.

25          MR. STEN:  John Sten on behalf of defendant,

3

1    Scientific Ecology Group.  And with me I have Susan

2    Romajas, New York counsel for Scientific Ecology Group.

3            THE COURT:  I have Ms. Romajas' motion to admit

4    pro hac vice.  I understand it came without, today,

5    without the required filing fee.  But I trust that will

6    be paid before you leave the courthouse.

7            MR. STEN:  Yes.  Thank you, your Honor.

8            THE COURT:  Then that motion is allowed.

9            Now, we're here today for final hearings with

10   regard to class certification and possible approval of

11   the settlements to which the parties have agreed in this

12   case.

13           With regard to the Molten Metals case, I'd like

14   to confirm or, if it's incorrect, be told that the

15   Molten Metals settlement will resolve all the claims in

16   the five punitive class actions that were filed

17   beginning in February, 1997 and then were consolidated

18   in the single complaint filed on about October 30, 1997,

19   is that correct?

20           MR. SHAPIRO:  Correct, your Honor.

21           THE COURT:  Those other cases remain open on my

22   docket, but if this settlement is approved, it will

23   result in their dismissal.

24           Then it's my understanding that these two

25   settlements are linked.  They essentially establish one

1    common fund for the same class, right?

2          MR. SHAPIRO:    They establish one common fund.

3    The way it's set up, your Honor, is the SEG case, if I

4    can call it that, has a smaller class period so that

5    people who -- the administrative in common with the

6    allocation will take into account that that settlement

7    fund was for the benefit of the smaller class period.

8          THE COURT:    Okay.  Do the SEG funds --

9    actually, eventually, I'm going to have to hear more

10   about the allocation formula and whether the SEG funds

11   go to more than the members of that smaller class.

12         MR. SHAPIRO:    They do not.

13         THE COURT:    They do not.  And am I correct that

14   there have been only seven opt outs representing 1,130

15   Molten Metals shares?

16         MR. SHAPIRO:    Correct, your Honor.  That's all

17   we're aware of.  We've checked the box right up till

18   today.  Right up till the last couple of days, I guess.

19   The deadline was some time ago.  One of the opt outs

20   actually had a profit on their shares, but we included

21   them in there.

22         THE COURT:    Now, I have a letter from Steven

23   Somkin (sic) that arrived today relating to his

24   communications with Norman Bloomenthal.

25         MR. SHAPIRO:    Mr. Somkin is one of the lead

1    plaintiffs, your Honor.  I have not seen a copy of the

2    letter.

3              THE COURT:  I'll show you the letter.  It says

4    -- well, actually, this is interesting -- Mr. Somkin is

5    seeking -- I'll show it to you -- compensation in the

6    amount of $1800.

7              (Document passed.)

8              THE COURT:  I'll make this letter exhibit 1.

9    But it's been my understanding that the named plaintiffs

10   were being treated exactly like every other party or

11   potential class member.  That's something I wanted to

12   clarify.

13             MR. SHAPIRO:   Under the PSLRA, the Securities

14   Litigation Reform Act of '95, there's a provision that

15   lead plaintiffs can be compensated for their time.

16   Since no lead plaintiff was deposed, although they did

17   have to produce documents, we made a determination that

18   we would not seek any compensation for serving as lead

19   plaintiff.

20             THE COURT:  Well, we'll make this part of the

21   record, but I don't understand that I have been asked,

22   and I have no present intention to approve any payment

23   to any of the named plaintiffs.

24             MR. SHAPIRO:   As I recall, your Honor, Mr.

25   Bloomenthal -- I know I had one counsel request or ask

1    about compensation for lead plaintiffs, and it was

2    probably Mr. Bloomenthal.  I've spoken to him many times

3    in the course of litigation, and I've implied that we

4    did not intend to ask for any compensation.  And you

5    notice it is going out to class members.  It does not

6    state that any compensation --

7              THE COURT:  Correct.

8              MR. SHAPIRO:  So we certainly have no

9    objection to it, but I think, given the notice that went

10   out, it would not be -- we couldn't recommend it.

11             THE COURT:  Okay.  Let me see if I understand

12   this correctly.  Is it correct that the two -- the

13   settlements in the two cases are to be pooled.  They

14   will total $11,835,000 for the punitive classes and

15   their attorneys because -- actually, I may have these

16   numbers wrong.

17             There's a certain total, but 1,325,000 is being

18   deducted to be retained by the trustee for the purposes

19   of the bankruptcy, leaving a total of $10,585,000?

20             MR. SHAPIRO:  No, there's actually -- in the

21   papers we submitted, there was a $10,000 oversight, your

22   Honor.

23             THE COURT:  What are the right numbers?

24             MR. SHAPIRO:  The right numbers is that a

25   total of $11,915,000 was paid in by three insurance

1    carriers in the Molten Metals action.  A total of

2    $1,255,000 was paid in the SEG action.

3          THE COURT:  By whom?

4          MR. SHAPIRO:   Half by the company and half by

5    the insurance carrier.

6          THE COURT:  The individual defendants have paid

7    nothing?

8          MR. SHAPIRO:  Right.  For a total of

9    $13,170,000.  Out of that amount, we had committed to

10   pay $1,325,000 to the trustee to resolve the trustee's

11   objection, leaving a net of $11,845,000.  And the papers

12   we submitted are in error.  They say 11 million 835.

13   But that was -- I don't know if your Honor needs to know

14   why we had that discrepancy.

15          Your Honor, if I may also point out, there is a

16   million in earnings on the settlement fund, $1,210,000

17   -- I'm sorry, $210,928.

18          THE COURT:  So how much is there to be

19   distributed to the attorneys in the class?

20          MR. SHAPIRO:   13,055,968 -- 928.  I'm sorry.

21   I didn't bring my bifocals, and I'm looking at you and

22   having trouble seeing the words in front of me.

23          THE COURT:  Your colleagues probably want to

24   make sure you see the numbers right rather than me.

25          MR. SHAPIRO:  And if I could say a word about

1    the interest, your Honor.  It is a significant

2    component.  When we remediated as the Molten Metals

3    defendants, we got to ten, 11 o'clock at night, some

4    very late hour of the night, making slow progress.  We

5    couldn't reach agreement on the number, and plaintiffs

6    proposed that if the defendants would agree to put up

7    the money promptly, in advance, that we would compromise

8    on the principal amount.  And it's turned out to be a

9    very good bargain for the plaintiffs because it's taken

10   longer than one would have expected to consummate the

11   settlement.  But getting the interest on that money,

12   which we figured would take some period of time because

13   we knew we had the trustee, Bankruptcy Court, was a

14   material element of the negotiations.

15           When we negotiated with the trustee in

16   bankruptcy, the agreement with them is they get the

17   million 325.  That's a flat amount, no interest.  So

18   there's no interest on top of that being paid to the

19   trustee.

20           THE COURT:  And the trustee will use that money

21   for what purpose?

22           MR. SHAPIRO:   It will go into the bankruptcy

23   estate and I think, in essence, it will go, if you

24   recall, there's a so-called close petition lender, a

25   group of financial people who owed many millions of

9

1    dollars to Molten Metals, the bankruptcy estate, and my

2    understanding is that they're not likely to be paid out

3    in full, that anything from the bankruptcy estate will

4    go to administration fees and then to the post-petition

5    limit.

6            THE COURT:   And is that the trustee's position

7    too?

8            MR. TADD:   Yes, it is, your Honor.

9            THE COURT:   Well, I've studied the submissions.

10   Let me ask this question.   Is there anybody in the

11   courtroom who hasn't filed an objection but wishes to

12   object?

13           No.

14           I've studied the submissions.   I'm certainly

15   satisfied that there's a proper basis for the

16   certification as a class.   I do have some questions with

17   regard to the fairness, reasonableness, and adequacy of

18   the settlements that I hope, Mr. Shapiro, you at least

19   will address in the course of whatever else you would

20   like to say.

21           But my first question was going to be are the

22   named plaintiffs treated the same as everybody else?   I

23   want to know whether the attorneys' fees were negotiated

24   after and independent of the agreement on the settlement

25   total fund for the class.   I want to know what

1    investigation was done with regard to the resources

2    available to the individuals in both cases and whether

3    any individual was contributing to the settlement, if

4    not, why not.  I want the allocation formula explained

5    to me and the reasons for it.  And I want to be reminded

6    of SEG's role in all of the alleged misconduct, which I

7    know it denies, and I know that it is not as directly

8    implicated as Molten Metals.  But I have those

9    questions.

10            MR. SHAPIRO:    Okay.  Happy to address them.

11            First, your Honor, as we indicated earlier, the

12    named plaintiffs are treated exactly like all other

13    class members.  There have been no negotiations over

14    attorneys' fees.  We are applying for fees to be paid

15    out of the common fund of the benefit we've created for

16    the class, so we've had no discussion about the amount

17    of attorneys' fees at all with defense counsel.  It's

18    entirely up to the court, and I would in due course, if

19    it's appropriate, address that issue.

20            We have done no independent investigation of

21    the resources of the individuals.  Let me speak first to

22    Molten Metals and then to SEG.  We did have

23    representations by defendants' counsel that none of the

24    defendants have the substantial means or the ability to

25    respond to multi-million dollar judgment.  We were

11

1    mindful that there was some insider trading, a number of

2    individual defendants sold several million dollars worth

3    of Molten Metals stock.

4              THE COURT:  How much?

5              MR. SHAPIRO:   I think the total was 15 million

6    over a large group.  I think three million is the

7    largest of any individual sale.  I have the complaint

8    here with the numbers in it if you want to find one's

9    precise numbers.

10             We know a little bit about the background of

11   the defendants.  There's an outside director, Mr. Strong

12   from Canada, who, from we know, from what we've garnered

13   from public sources, is probably the wealthiest of the

14   group, but as an outside director, the claim is probably

15   the most difficult to prove against him.

16             I think what it came down to, your Honor, is

17   that we felt we had very strong claims, that there were

18   false statements about the ability of Molten Metals'

19   technology.

20             It's an unusual case in that contrary to often

21   the criticism, you know, there's probably news and outs

22   and claims of file.  In this case, there was no

23   self-evident basis for bringing any claim.  And, in

24   fact, the announcement that triggered this litigation

25   occurred in October of '96, and my firm and Mr. Berman's

1   firm independently of each other and several other firms
2   all acted really independently, some in small groups,
3   but several independent groups of plaintiffs' counsel,
4   we independently investigated this company to see
5   whether there was a basis for recovering the dramatic
6   losses that occurred.

7          The October announcement precipitated something
8   like a 50 percent drop in the price of Molten Metals
9   stock.  The announcement was fairly innocuous in and of
10  itself.  The announcement was, we're not going to have
11  as much government funded development research revenue
12  as we counted on, and we're cutting back on a number of
13  our commercial development projects to focus on just a
14  few.  And I think because the stock was probably like
15  the dot coms, you know, very pricy to begin with, it
16  didn't take much to cause a tremendous run from the
17  stock.

18          So it wasn't self-evident that there was fraud
19  here.  An intensive investigation was undertaken.  Many
20  experts in the field were consulted.  And we were
21  convinced, and I know Mr. Berman's firm was convinced,
22  and Milberg Weiss firm in New York that filed the first
23  case days before we filed the case were convinced that
24  when you really look into the company's technology that
25  they were wildly overstating the ability of the

1    technology and the state of commercial development of

2    the technology, and lawsuits were filed after like a

3    four or four and-a-half month investigation.

4         Notwithstanding what we believe the strength of

5    the claims are, proving these claims to a jury could be

6    a very different matter.  You're talking about very

7    esoteric, sophisticated technology.  It was a real, I

8    think, blow to us when the company went into bankruptcy.

9    We were very concerned about did documents still exist,

10   could one get access to the documents, were they going

11   to still be in a form where you could figure out what

12   documents were there?  Employees would be scattering to

13   the four winds and, therefore, putting together the

14   evidence that the company knew -- the company knew that

15   its technology claims were false and that defendants

16   acted with an intent to defraud, particularly an outside

17   director like Mr. Strong who was not a technology person

18   himself, was a formidable task, particularly given the

19   bankruptcy.

20        We went into a mediation that was a long, very

21   difficult mediation.  We had four different insurance

22   carriers here, total of 20 million in insurance, minus

23   defense costs.  We feel we've reached a settlement with

24   a major portion of the available insurance and that

25   rather than continuing the litigation for years with all

1    the uncertainties with the possibility of recovering

2    judgments against the wealthier of the individual

3    defendants, if they were that wealthy, and that was

4    speculative, and recovering money from their individual

5    assets, meanwhile the insurance policy is wasting away

6    with defense cost, and we now have, I think, five very

7    prestigious, you know, well regarded Boston firms

8    representing the different defendants, all things

9    considered, it was better to reach the settlement that

10   we did, and I think that supports the fairness of that

11   settlement.

12            With respect to the Scientific Ecology Group

13   settlement, your Honor, I don't think there was any

14   problem with ability to pay.  And let me go to one of

15   your other Honor's questions and then come back to this

16   one.

17            Scientific Ecology Group was a joint venture

18   partner with Molten Metals in the construction of a

19   facility at Oakridge, Tennessee to process low level

20   radioactive waste that was the waste water coming out of

21   nuclear electric generated plants, and SEG had been in

22   that business.  SEG, somewhere along, it became a

23   subsidiary of Westinghouse, and then Westinghouse sold

24   the business and some other businesses.  It's our

25   understanding, our surmise, that Westinghouse has the

1    liability here, so there are certainly deep pockets to

2    pursue.

3           Mr. Arrowsmith, who is a defendant in the SEG

4    action, was the founder of SEG and president of it, and

5    he ran that business through his career.  There's no

6    reason to believe he has substantial assets.

7           If your Honor will recall, Scientific Ecology

8    moved to dismiss.  Your Honor denied that motion and

9    said that you felt the Statute of Limitations issue was

10   a very serious one, that it should be decided by summary

11   judgment.

12          And, frankly, after we did discovery and an

13   analysis, we thought the chances were more likely than

14   not that your Honor would find the Statute of

15   Limitations had been violated.

16          We were also mindful of the difficulty of

17   persuading a jury that Scientific Ecology Group acted

18   with an intent to defraud Molten Metals investors.  We

19   felt that we had put together through an intensive

20   investigation enough facts about that plan, and if your

21   Honor may recall from the complaint, with the aid of a

22   speaker, Mr. Grover from Illinois, we examined the

23   licensing files in Tennessee, also documents about

24   problems within the plant, and we felt that there was a

25   sufficient basis for alleging, and your Honor found --

1    we survived the motion to dismiss -- that Scientific

2    Ecology Group knew that the optimistic statements they

3    were making about the plant were false.

4             But proving they acted with a scienter, they

5    intended to defraud investors in an independent company,

6    Molten Metals, of course, was problematic, and we felt

7    in light of the settlement the Molten Metals defendants

8    had made, it made sense to wrap everything up rather

9    than testing the Statute of Limitations issue, and we

10   settled for a relatively modest amount.

11            THE COURT:  With SEG?

12            MR. SHAPIRO:   With SEG.

13            I think the remaining issue is the allocation

14   formula.  I'm happy to address that unless your Honor

15   wants to go anything I've already --

16            THE COURT:  No, that's fine.

17            MR. SHAPIRO:    The allocation formula is quite

18   complex.  It was done with the assistance of a damages

19   expert.  And, basically, what it attempts to do, your

20   Honor, is to divide the overall class period into

21   subsets, depending upon the nature of what

22   representations there were and what was disclosed.   And

23   then it also distinguishes between people who bought and

24   sold within a period of time and who held through the

25   end of that period of time.  The major demarcation is

1    the October 18 -- October, 1996 announcement which

2    precipitated the 50 percent price drop, and the price

3    sort of dribbled off from there, that we treat it

4    differently and preferably the people who bought before

5    that October 18 date and still held through October 18

6    and suffered that price decline.

7           As a condition of settlement, because

8    defendants wanted total peace, they insisted that the

9    settlement extend out until a restatement of certain

10   financial results in May of 1997, May 27, 1997, which

11   didn't -- by that time, it wasn't that significant and

12   there wasn't much if any price reaction.  So people who

13   bought after October 18 to the end of the class period

14   in May were treated differently.  And then there's a

15   differentiation between people who bought and held and

16   people who sold.

17          And I would like to say that we have lead

18   plaintiffs who are all over the place in terms of the

19   allocation plan.  I devised it together with the expert,

20   who primarily did it, and he advised me there was no

21   consideration given to what plaintiffs may have bought

22   or sold in what period.

23          THE COURT:  And was the allocation plan

24   described in the notice that was sent to the

25   shareholders?

1          MR. SHAPIRO:   Yes, in precise mathematical
2    detail, yes.

3          THE COURT:   What else do you think I ought to
4    know in considering whether this is fair, reasonable,
5    and adequate?  I've studied what's in your memo, which I
6    think is comprehensive and generally persuasive.

7          MR. SHAPIRO:   Well, we tried to put it all in
8    the memo.  I would say that the judgment of lead counsel
9    -- and, as you know, we've done a lot of these cases --
10   we felt it was in the best interest of the class, rather
11   than continuing on with years of complex and challenging
12   litigation with the possibility and not much probability
13   of ultimately collecting some money from individual
14   defendants, but I think the additional amount to be
15   gained, even if it was a few million dollars from these
16   individuals, would not have justified the risk of losing
17   millions of dollars worth of insurance.

18         THE COURT:   Well, when you negotiated -- that
19   makes it a very stark contrast.  Either you get the $13
20   million or you get nothing from the individuals.  Were
21   any genuine efforts made to get the individuals to
22   contribute?  Because when you say, I believe, you assert
23   misrepresentations were made, they weren't made -- if
24   there were misrepresentations or material omissions made
25   with scienter, they weren't made with some abstract

1    entity, there were human beings who were responsible for

2    that.

3                    MR. SHAPIRO:    Defense counsel took the

4    categorical position that we have insurance; that's what

5    insurance is for; and not a nickel will be contributed

6    by any of the individuals.    And we could have tested

7    that only by taking the risk of losing a great deal of

8    the insurance money.    And I'd say in hindsight, it's a

9    very good thing that we did, because I think as a result

10   of our allegations and our investigation -- in fact, Mr.

11   Hoffman -- he's not here this afternoon; his associate

12   is -- told me in this morning.    He said, I think you

13   guys have done a bang-up job.    Your investigation, your

14   allegations, are right on the mark, and they prompted

15   the trustee to begin its own investigation.    I think the

16   trustee was flabbergasted, if I may be candid, by the

17   amount of the settlement.    And if your Honor may recall,

18   the trustee who had consented to our going ahead with

19   the litigation, consented to use of the insurance

20   proceeds, and we had a Bankruptcy Court order

21   authorizing the proceeds to be used, when they saw the

22   amount of this settlement, they woke up, and they have

23   now brought their own claims against the individuals,

24   and I think it's only because we were ahead of them and

25   had a settlement that we were able to recover this, the

1    lion's share or at least over half of the available

2    insurance proceeds.  I think if we were not ahead of

3    them, we would be in a real horse race with the trustee

4    and may have wound up with no insurance proceeds.

5        So I think in hindsight that the decision to

6    settle has proved to be a very fortunate one for the

7    class.

8        THE COURT:  And is there anything that any of

9    the defendants would like to say with regard to whether

10   I ought to certify the class and approve the settlement

11   as fair, reasonable, and adequate?

12       MR. STEN:  Nothing to add, your Honor.

13       THE COURT:  Let me ask you this.  Is Mr.

14   Shapiro reliable in his representation that if the

15   plaintiffs insisted on individual contributions from the

16   individual defendants it would have been fatal to this

17   settlement?  Or is that the position that was taken

18   seriously by the defendants?

19       MR. CRAWFORD:  Your Honor, I believe it was.

20   Counsel at this table at that time were not representing

21   the individual defendants during that earlier

22   negotiation, but my understanding is that was in fact

23   the position taken by Bingham Dana, which was

24   representing the individual defendants at that point

25   and, in fact, we have each confirmed that with our

21

1  clients as we have gotten up to speed on this case.

2        MR. SHAPIRO:   If I could also add, your Honor,

3  it is exceedingly rare that any individual defendant

4  contributes to a securities filed settlement.

5        THE COURT:   It's exceedingly rare, but maybe it

6  shouldn't be.  Maybe it's rare because there's a

7  familiar dynamic.  You know, the insurance company pays.

8  You want to have a settlement.  It just makes more work

9  if judges are difficult.  And, you know, it may be

10  reasonable.  But I know it's exceedingly rare.  But I

11  also believe, and if you look at what I said, eventually

12  wrote, in sentencing C. R. Bard to pay $61 million in

13  fines relating to the (sic) -- it wasn't a securities

14  litigation -- it's after they admitted they were guilty

15  of civil and criminal offenses -- so I think there's

16  certainly distinctions between these cases -- their

17  liability was admitted; people had died.

18        But corporations act through individuals.  And

19  if there was misconduct, and none is admitted here, but

20  if there was misconduct, individual people engaged in

21  it.  And if insurance relieves them of their sense of

22  responsibility because the way these things always work

23  is, you know, if they commit a fraud on the market,

24  they'll get sued, some settlement will be reached within

25  the limits of the insurance policy, and --

1          MR. SHAPIRO:    It doesn't always work that way.

2     I know in this courthouse the Kendall Square Research

3     Corporation case, that was a very wealthy man who had

4     financed the company, and he didn't contribute to the

5     settlement directly, but he made a very large commitment

6     to put money in the company to help fund the settlement.

7     This is a case where we had no reason to believe that

8     any of the defendants could respond to a significant

9     judgment, more than a couple million, at best, not that

10    that isn't significant, that they did take a hard nose

11    approach, that we have every interest in maximizing the

12    recovery for the classes.  We'll get to, I hope, in a

13    minute, we're seeking a percentage of what we recover,

14    and that's been the practice, so it certainly wasn't

15    that we just grabbed a quick and easy settlement.  This

16    was not a quick settlement.

17          THE COURT:    I know that.

18          Well, having long familiarity with these two

19    punitive class actions and having the information that

20    has come in since the class was conditionally certified

21    for settlement purposes and the benefit of the hearing

22    today, I hereby certify each of the proposed settlement

23    classes in the two cases, Axler versus Scientific

24    Ecology Group, Inc and H. W. "Bud" Arrowsmith and In Re

25    Molten Metals Technologies, Inc securities litigation,

1    and I approve the linked settlements as each fair,

2    reasonable, and adequate.

3         I've analyzed the settlements individually and

4    together.  I find that proper notice of the proposed

5    settlements has been given to over 20,000 class members

6    or their representatives.  The requirements of Federal

7    Rule of Civil Procedure 23A are met.  The class is so

8    numerous that joinder is impractical.  Each case is

9    based on questions of law and fact that are common to

10   the class involved.  In fact, those questions

11   predominate.

12        Essentially, the claims of all class members

13   arise out of the same alleged misstatements and alleged

14   omissions.  The named plaintiffs are typical of the

15   members of the class.  They are fairly and adequately

16   representing the interests of each class.

17        In addition, the requirements of Federal Rule

18   of Civil Procedure 23B are satisfied.  Common questions

19   of law, in fact, predominate.  A class action is

20   superior to any other method of adjudication.

21        I also find that the settlement is fair,

22   reasonable, and adequate, as I've said.  Essentially,

23   I've used the framework I employed back in 1987 in

24   Ferenson (sic) versus Fanueil Hall Marketplace 671 F

25   Supp, 819.  The relevant factors really haven't changed,

1     although there is considerable case law since.

2             The settlements in both cases were reached

3     after meaningful investigation and/or discovery.  More

4     specifically, substantial investigation in the In Re

5     Molten Metals Technologies securities litigation case

6     and discovery in the Scientific Ecology Group, Inc case.

7     But, basically, the settlements were negotiated on

8     behalf of the punitive classes by experienced, capable

9     counsel who had significant information.  The

10    negotiations proceeded at arm's-length.  In the

11    circumstances, the settlements are presumptively

12    reasonable.

13            In addition, the settlements have procedural

14    integrity.  The named plaintiffs are being treated as

15    all others.  The negotiations, as I said, were conducted

16    by capable counsel.  And the issue of attorneys' fees

17    was not negotiated in connection with negotiating for

18    the establishment of a common fund.

19            In addition, the class has reacted favorably to

20    the proposed settlement.  There are no objections.  Only

21    seven individuals, representing 1,130 shares have opted

22    out.

23            The main question or the main issue, as my

24    questions suggest, are the adequacy of the amounts, but

25    I find that the amounts are certainly within the range

1    of reason and adequacy in view of the realities and
2    risks of this case.

3          As the Second Circuit recognized in 1974, a
4    leading case, City of Detroit versus Bernel (sic) Corp
5    495 F 2nd, 448 at 455, note 2, a small fraction of a
6    potential recovery could be reasonable in a case.

7          In this case, the plaintiffs claim that the
8    total losses amount to as much as $176 million.  The
9    amount of the settlement before attorneys' fees will be,
10    I'm told, $11,845,000.  That is, of course, only a
11    fraction of $176 million.  However, Molten Metals
12    Company is in bankruptcy.  The trustee in bankruptcy has
13    a claim to the insurance policy.  And if that claim were
14    valid and not compromised as part of the settlement,
15    there would be no insurance proceeds available to
16    contribute to the settlement of the case.  This is a
17    real issue.

18          In addition, there's a motion to dismiss
19    pending.  This case is relatively old, in part because
20    the bankruptcy stalled its progress, and it is far from
21    trial, even if plaintiffs survive or were to survive the
22    pending motion to dismiss.

23          In the SEG case, as I said in denying the
24    motion to dismiss, there is a significant Statute of
25    Limitations issue to be resolved at summary judgment or



1      trial.   Apparently, discovery has persuaded the

2      plaintiffs that they are vulnerable on that issue.

3              In addition, the claims against SEC Group and

4      Mr. Arrowsmith are somewhat attenuated, since this case

5      involves the integrity of the market for Molten Metals

6      shares, not SEG shares.  So it would be particularly

7      challenging to prove the claims against SEG and

8      Arrowsmith.

9              With regard to Molten Metals, there's a finite

10     amount of insurance which will dwindle if this

11     litigation continues, because defense costs have to be

12     paid and paid for many people.

13             Thus, in view of the uncertainty of prevailing

14     and recovering the roughly $11,845,000 that will be

15     available as part of the common fund is fair,

16     reasonable, and adequate.

17             I also find that the allocation formula is

18     fair, reasonable, and adequate.  I note that nobody

19     objected to that formula.

20             Thus, I believe the next and last issue is the

21     question of attorneys' fees.

22             Now, counsel, as I understand it, are seeking

23     30 percent of the fund, plus $311,578 in expenses.

24             Is that correct?

25             MR. SHAPIRO:   Correct, your Honor.

1    THE COURT:  And have you computed what 30

2  percent of the fund is on the new numbers you gave me

3  today?

4    MR. SHAPIRO:  Yes, your Honor.

5    THE COURT:  What is it?

6    MR. SHAPIRO:  $3,916,778.

7    THE COURT:  3 million 916 thousand --

8    MR. SHAPIRO:  -- 778 dollars.

9    THE COURT:  I think I'd like to do the

10  arithmetic too, because I did it while we were sitting

11  here, and I didn't get that number.  But what is the

12  common -- what is the -- wait a minute.  Are you talking

13  about 30 percent before or after the trustee gets the

14  1-3?

15    MR. SHAPIRO:  After.

16    THE COURT:  So it's 30 percent of 11,845,000?

17    MR. SHAPIRO:  Plus interest.

18    THE COURT:  The 11 million 845 doesn't include

19  the interest?

20    MR. SHAPIRO:  Right.

21    THE COURT:  What's total of the interest?

22    MR. SHAPIRO:  The interest is 1,210,928, for a

23  total of 13,055,928.

24    THE COURT:  To the extent I was talking before

25  about 11 million 845, I should have been talking about

1    13 million plus, which, of course, is more and thus even

2    more.

3         MR. SHAPIRO:    30 percent, your Honor, I also

4    calculated for your Honor's benefit a multiplier of lode

5    star of 1.63, which is slightly above the 1.42 that your

6    Honor approved in the Berenson case, and it sounds

7    reasonable.

8         THE COURT:  Hold on just a second.

9         (Short pause.)

10        THE COURT:  On my little calculator, I get the

11   same.  The number 30 percent would be 3,916,778.

12        MR. SHAPIRO:   Right.  If I could put that into

13   a little context, your Honor.

14        THE COURT:  Just one second.

15        (Short pause.)

16        THE COURT:  Go ahead.

17        MR. SHAPIRO:   I'm not sure where the $176

18   million figure came from.

19        THE COURT:  It's in your brief.  It's in the

20   memorandum I just read.  You can look at Mr. Berman all

21   you want.  I'll tell you where it came from.  You want

22   me to tell you what page?  Maybe I misunderstood it.

23        MR. SHAPIRO:   This is in the settlement brief

24   or the application?

25        THE COURT:  No, it's in the plaintiffs'

1    memorandum of law in support of proposed class

2    settlement.

3            MR. SHAPIRO:    176 million originally estimated

4    by class plaintiffs' damages expert and for the purpose

5    -- I see it now, your Honor.  That was an early estimate

6    that we had, and I believe with more careful reading, it

7    would not have gone in the brief.  For purposes of plan

8    of allocation --

9            THE COURT:  Why?

10           MR. SHAPIRO:    -- it's not far off.  For

11   purposes of plan of allocation, our expert estimated

12   damages at approximately $140 million.  That's not a

13   very big difference.  But I did want to tell your Honor

14   that to date -- and we're as surprised at this as anyone

15   -- to date, we have $42 million in claims, and the claim

16   deadline was the middle of July.  And I checked back

17   with the claims administrator to say that Merrill Lynch

18   customers and Fidelity customers, and we went through

19   the whole list, and they've sent out over 20,000

20   notices, and they've picked off all the big firms.  So

21   in terms of what the class members are likely to get out

22   of this case, it's going to be a much higher percentage

23   than what we estimated it would be.  We probably have

24   some more claims coming in and would approve them or

25   recommend that your Honor approve late claims.  But I

1    wouldn't expect at this date to have a lot more.  So

2    that class members would receive about 30 percent of

3    their losses and, in fact, when you apply --

4              THE COURT:  I don't think that's right, not if

5    you get -- how much is left after your fees?

6              MR. SHAPIRO:   After fees would be less than

7    that.

8              THE COURT:  Something less than ten million.

9    Something less than 25 percent.  But it's still not a

10   small fraction.  It's not like 13 million over 176.

11             MR. SHAPIRO:   Right.  But I would also say

12   that this was plaintiffs' aggressive view of what we

13   think damages are.  Defendants, if we litigated this

14   case, I'm sure would come in with a very different view.

15   So the truth is probably somewhere to be determined by a

16   jury if it were litigated.

17             After we submitted the fee brief, your Honor, I

18   went back through my files and found some notes of

19   earlier cases of your Honor and the Berenson case, and I

20   know I think the last hearing I had before your Honor

21   for a settlement approval was in the Duracraft case back

22   in 1997, and at that time your Honor said that you used

23   the Berenson case as really the standard that you use,

24   which your Honor cited a minute ago, and I would like to

25   just say a couple of things about that.  The Berenson

1   case was decided in 1997.

2           THE COURT:  Actually, I'm not sure I said or

3   intended to say I used the Berenson case on attorneys'

4   fees, because I didn't even read the Berenson case with

5   regard to attorneys' fees.  There were some Supreme

6   Court decisions that hadn't come down yet, so what I

7   think I would have told you, based on my standard

8   practice is that I usually -- Professor Neuberg in his

9   treatise said, and the treatise still says:  No general

10  rule can be articulated on what is a reasonable

11  percentage of a common fund.  And I do believe that a

12  common fund is appropriate, should look at a percentage,

13  and the main value of the lode star in this context is

14  to see to what extent if any there's a windfall or not.

15          MR. SHAPIRO:   Right.

16          THE COURT:  But Professor Neuberg said or

17  whoever is now writing for him says, since he's

18  deceased:  Usually 50 percent of the fund is the upper

19  limit on a reasonable fee award from a common fund in

20  order to assure that the fees are not a consumer

21  disproportionate part of the recovery obtained for the

22  class, though somewhat larger percentages are not

23  unprecedented.  In the normal range of common fund

24  recoveries, common fee awards fall in the 20 to 30

25  percent range.  The median of this usual range is 25

1    percent.  As an alternative to an initial focus on the

2    recognized percentage range of common fund fee awards

3    for cases that do not present extraordinary

4    circumstances, this median 25 percent figure can be

5    considered by the courts in their discretion as a

6    reasonable and convenient starting point, norm, for

7    common fund awards, from which deviation should be made

8    as the court considers various relevant fee

9    determinations.

10        That's in Mr. Neuberg's attorney fee awards,

11   section 2.08, 51 to 52.

12        That's generally the approach I take, and I'll

13   tell you that I have rarely awarded as much as 30

14   percent, but my present inclination is to think it's

15   justified here.  I think this has been unusually complex

16   and risky business.

17        MR. SHAPIRO:   It was one of the most complex

18   cases procedurally that we have ever been involved in.

19   We were in unchartered terrain with some of the

20   bankruptcy issues and trying to negotiate between the

21   trustee and the carriers and the individual defendants.

22   We had a lot of different parties to try to put

23   together.  It was inordinately difficult,

24   time-consuming, required a great deal of patience and

25   perseverance to do it.

1      The multiplier that that fee would result in is

2   a 1.6 multiplier of lode star.  It's within a range of

3   reasonableness.  30 percent and 33 percent has really

4   been the prevailing percentage awarded in a great number

5   of cases in this district by other judges.

6      THE COURT:  Well, you gave me a whole bunch

7   that said 30 percent.  I didn't see any of mine on

8   there.  So if you are really going to do your usual

9   terrific advocacy and wanted to persuade me, you

10   shouldn't just give me high end, you should give me

11   everything that's happened in the last few years or

12   something like that.

13      But at this point, my present perception, as I

14   said, is that, you know, if 20 to 30 percent is usually

15   reasonable, start at 25 percent, and then say -- I mean,

16   as a practical matter, I'm inclined to do it, but I

17   don't think I've ever given as much as 30 percent.

18      So if you want to come back and tell me at some

19   point that I gave you 30 percent in the Molten Metals

20   litigation, you should also remind me that this one had

21   the insurance problems and the bankruptcy problems and

22   the trustee and all that.

23      MR. SHAPIRO:  We would, your Honor.

24      THE COURT:  If you don't, I'll just pull it up

25   on my laptop.

1    Does anybody else wish to be heard on the fee

2    matter?

3    I am going to and do hereby award -- let me

4    clarify one thing, actually, Mr. Shapiro.  Is this it,

5    or are you going to be coming back for more fees in

6    connection with the administration?

7    MR. SHAPIRO:    There are some expenses in

8    connection with the administration for the settlement

9    administrator, but no fees; we ask you for no more fees.

10    THE COURT:    That was my understanding.

11    MR. SHAPIRO:    And then there's more work to be

12    done to administer the settlement, but there will be no

13    request for fees.

14    THE COURT:    Well, as I said, I generally am

15    guided by Professor Neuberg's Treatise and approach and

16    think that 20 to 30 percent is usually the right range

17    in a common fund case.  If I start with 25 percent and

18    consider whether an upward or downward adjustment is

19    appropriate, I think this is the rare case that an

20    upward adjustment to as much as 30 percent is

21    appropriate.

22    I have been involved for many years in the

23    litigation of the Molten Metals case and the Scientific

24    Ecology Group case.  They both have particular

25    complications.  Some of it, as Mr. Shapiro said earlier,

1    rooted in the complexity of the technology; more of it,

2    I would say, rooted in the Molten Metals bankruptcy and

3    the difficulties that generated, particularly the

4    adversarial position taken by the trustee.  I know that

5    the settlement had to be negotiated, renegotiated; and

6    then when there was a Scientific Ecology settlement,

7    altered, yet again.  Counsel have been industrious in

8    persevering in this matter.  It seems to me the case is

9    unusually complex and risky.

10        This is not a huge premium over the purported

11    lode star.  I think if there was a real lode star

12    analysis being done, I might, particularly in the early

13    stages, find there was a lot of duplication of

14    investigation and effort.  But, generally speaking, this

15    is not a huge increase over the lode star, and the

16    awards are intended to encourage attorneys to take

17    prudent risks.  This case probably turned out to be

18    riskier than counsel realized when they embarked on it.

19        So I am awarding attorneys' fees in the amount

20    of $3,916,778 and expenses of $311,578.  And the

21    attorneys' fees will have to be distributed by lead

22    counsel, as I understand it, under the order.

23        MR. SHAPIRO:  Your Honor, the way the judgment

24    is worded, it has a dollar figure for attorneys' fees,

25    and then it says, with interest, et cetera, but we

1  understand there will be no interest on that figure,

2  just so there's no ambiguity.  That will be the total

3  amount.

4            THE COURT:  Where is the with interest?

5            MR. SHAPIRO:  It says  --

6            THE COURT:  Because I can take that out.  It's

7  in paragraph 11.

8            MR. SHAPIRO:  12.  I'm looking at the Molten

9  Metals judgment.

10           THE COURT:  Paragraph 12 of Molten Metals.

11           MR. SHAPIRO:  Right.

12           THE COURT:  Now, I didn't, perhaps, examine

13  these closely enough.  I'm, of course, awarding a total

14  of 3 million 916 in the two cases.  I assume, while I'll

15  put the same number in both, I assume they're written in

16  a way that makes it clear that it's not three million

17  nine in each case, or is that not true?

18           MR. SHAPIRO:  It's not if you wanted to put

19  zero in the other one.  Maybe that would be easier than

20  trying to divide it up.  We have a record here as to

21  what your Honor intended.  I just thought in fairness I

22  should point out to your Honor, the language says, with

23  interest, but we understand the award includes interest.

24           THE COURT:  I'm going to take that out.

25           MR. SHAPIRO:  Fine.

1           THE COURT:  I've awarded all of that in the In

2    Re Molten Metals judgment, and I'm putting zeros in

3    paragraph 11 of the Axler judgment.

4           Is there anything further in this matter for

5    today?

6           MR. SHAPIRO:   Thank you, your Honor.

7           THE COURT:  Okay.  This has been arduous

8    litigation for counsel and, at times, challenging for

9    me, but you all have done a very good job.

10          Court will be in recess.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE


            I, JUDITH A. TWOMEY, RPR, Official Court

Reporter for the United States District Court, District

of Massachusetts, do hereby certify that the foregoing

transcript, pages 1 through 37 inclusive, was taken by

me stenographically and thereafter by me reduced to

transcription and is a true record of the proceedings in

the above-entitled matter to the best of my ability.


                        JUDITH A. TWOMEY, RPR
                        Official Court Reporter

# EXHIBIT B

**B-1**

*Journal of Empirical Legal Studies*
Volume 1, Issue 1, 27–78, March 2004

# Attorney Fees in Class Action Settlements: An Empirical Study

*Theodore Eisenberg and Geoffrey P. Miller\**

Study of two comprehensive class action case data sets covering 1993–2002 shows that the amount of client recovery is overwhelmingly the most important determinant of the attorney fee award. Even in cases in which the courts engage in the lodestar calculation (the product of reasonable hours and a reasonable hourly rate), the client's recovery generally explains the pattern of awards better than the lodestar. Thus, the time and expense of a lodestar calculation may be wasteful. We also find no robust evidence that either recoveries for plaintiffs or fees of their attorneys increased over time. The mean fee award in common fund cases is well below the widely quoted one-third figure, constituting 21.9 percent of the recovery across all cases for a comprehensive data set of published cases. A scaling effect exists: fees constitute a lower percent of the client's recovery as the client's recovery increases. Fees are also correlated with risk: the presence of high risk is associated with a higher fee, while low-risk cases generate lower fees. Fees as a percent of class recovery were found to be higher in federal than state court. The presence of "soft" relief (such as injunctive relief or coupons) has no material effect on the fee, regardless of whether the soft relief was included in the quantified benefit for the class used as the basis for computing the attorney fee. The study also addresses costs and expenses. Like fees, these display significant scale effects. The article proposes a simple methodology by which courts can evaluate the reasonableness of fee requests.

Of all the tasks facing trial court judges in class action litigation, one of the most difficult is determining an appropriate fee. Even in settled cases, the courts must determine that the fee is reasonable as part of their mandate to

———

*Eisenberg is Henry Allen Mark Professor of Law, Cornell Law School; Miller is Stuyvesant P. and William T. III Comfort Professor of Law, New York University Law School. Address correspondence to Theodore Eisenberg, Cornell Law School, Myron Taylor Hall, Ithaca, NY 14853; e-mail theodore-eisenberg@postoffice.law.cornell.edu.

We thank Kevin Clermont and Charles Silver for comments and Thomas P. Eisenberg, Nicolas Germain, Preetpal Grewal, and Erica Miller for research assistance.

protect the interests of absent class members. Courts employ different methodologies in performing this task. To date, however, they have rarely looked to empirical research for guidance as to the reasonableness of the fee. In part, the courts' failure to utilize empirical research is due to the relative paucity of available information. Existing empirical studies of attorney fees in class action cases are limited in scope and generally do not control for important variables.

This article provides a more comprehensive and analytically detailed study of attorney fees in class action cases. It uses two new databases. First, we compiled data on all state and federal class actions with reported fee decisions between 1993 and 2002, inclusive, in which the fee and class recovery could be determined with reasonable confidence. Second, we used information on class actions reported in the March–April 2003 edition of *Class Action Reports* (*CAR*), which contains more than 600 common fund cases from 1993 to 2002.[1] The data allow us to assess the determinants of court-awarded attorney fees and expenses in class action and shareholders derivative cases. The analysis should assist courts in evaluating requests by class counsel for awards of attorney fees and expenses.

We find that the level of client recovery is by far the most important determinant of the attorney fee amount. A scaling effect exists, with fees constituting a lower percent of the client's recovery as the client's recovery increases. The relation between fees and recovery is remarkably linear on a log scale, and is similar between cases in which no fee-shifting statute applies and cases in which the plaintiff had a right to seek reimbursement under a fee-shifting statute. The presence of high risk is associated with a higher fee, as is the presence of the case in federal rather than state court. Contrary to popular belief, we find no robust evidence that either recoveries for plaintiffs or fees of their attorneys as a percentage of the class recovery increased during the time period studied. Nor does the presence or absence of objectors to settlement have a discernable effect on fees. The presence of a settlement class—a class certified before the fee decision—is associated with lower fees but the effect is not statistically significant. The presence of "soft" relief (such as injunctive relief or coupons) has no material effect on the fee.

The dominance of the client's recovery as a determinant of the fee is nearly complete. Even in cases in which the courts engage in a lodestar

---

[1]Stuart J. Logan, Jack Moshman & Beverly C. Moore, Jr., Attorney Fee Awards in Common Fund Class Actions, 24 Class Action Rep. 169 (2003).

calculation (the product of reasonable hours and a reasonable hourly rate), the client's recovery explains the pattern of awards better than (in non-fee-shifting cases) or as about as well as (in fee-shifting cases) the lodestar calculation. Indeed, the lodestar multiplier (fee award divided by the product of reasonable hours and reasonable hourly rate) is significantly negatively correlated with the percentage fee when only these two variables are analyzed, and is not significant in the overall regression analysis. These results cast doubt on whether the fees actually awarded by courts follow the frequent case-law admonition that fees determined on the percentage method should be checked for reasonableness against the lodestar calculation.

The article is structured as follows: Part I describes the problem courts face in assessing requests for fees and expenses and outlines the leading methodologies used to rule on such requests. Part II surveys prior empirical studies on attorney fees in class action cases. Part III outlines hypotheses about fees and describes the data. Part IV presents the results of our study. We end with a brief conclusion.

## I. THE LEGAL BACKGROUND

All state and federal courts provide procedures for joinder of numerous plaintiffs (or defendants) into a class action in which parties not before the court are represented by a named plaintiff and by class counsel who, in the usual case, dominates and controls the litigation.[2] When a class action settles (or when, in rare cases, it results in a judgment for the class on the merits), class counsel is generally entitled to a fee award, either under a fee-shifting statute[3] or through application of the common fund

---

[2]The named plaintiff's minimal role is stressed in, e.g., John C. Coffee, Jr., The Regulation of Entrepreneurial Litigation: Balancing Fairness and Efficiency in the Large Class Action, 54 U. Chi. L. Rev. 877 (1987); Jonathan R. Macey & Geoffrey P. Miller, The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform, 58 U. Chi. L. Rev. 1 (1991). Securities fraud litigation under the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104–67, 109 Stat. 737 (codified in 15 U.S.C. §§ 77, 78) may present a different situation. See Parts III.A.11 and IV.C.

[3]Fee-shifting statutes provide that, in designated cases, defendants must pay the reasonable attorney fees of prevailing plaintiffs. E.g., 42 U.S.C. § 1988(b) (2000) (fees in civil rights cases).

doctrine.[4] All states and the federal courts also provide procedures under which a shareholder can, in appropriate circumstances, bring a derivative lawsuit in the name of the corporation. Here, too, the shareholder's attorney is generally entitled, if successful, to an award of fees under application of the "common benefit" rule.

The amount of fees and expenses paid to class counsel must ultimately be determined by the court. With respect to fee-shifting statutes and awards of fees under the common benefit rule in derivative cases, the fees will be paid by the defendant or by the corporation, neither of which have the ability to control the reasonableness of class counsel's fee demands. Without judicial supervision, counsel could make entirely unreasonable fee requests. In the case of fees from a common fund, counsel's request for compensation creates a direct conflict of interest with the class. Because class members are dispersed, disorganized, and typically have a relatively small stake in the outcome of the litigation, the class cannot protect itself against an unreasonable fee request. Again, court protection is required to prevent counsel from enriching themselves at the expense of the class.

Moreover, all class and derivative actions present the specter that counsel will "sell out" the class or the shareholders by agreeing to a low recovery in exchange for a generous fee. In common fund cases, the inappropriate bargain can take the form of a below-par settlement for the class coupled with a "clear sailing" agreement under which the defendant agrees not to object to (or even to pay directly) fees and expenses up to a certain amount. In fee-shifting and common benefit cases, similarly, the defendant can agree to pay class counsel's fees and expenses in an excessive amount coupled with inadequate relief for the class or the corporation. The risk of collusion with the defendant also necessitates judicial control over fees in all class action cases.

Determining proper fees and expenses, however, is problematic. As to expenses, courts review statements provided by counsel to assure that the items listed are properly compensable separately from the fee and to assess whether the amounts requested are reasonable. As to fees, ordinarily a much larger item than expenses, courts use different methodologies. At one time the most common method was to consider multiple factors, including the time and labor required, the customary fee, whether the fee is fixed or

———————

[4]See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 259 (1975) (describing history and function of the doctrine that plaintiffs' attorneys in class cases may be awarded fees from a common fund generated for the benefit of the class).

contingent, the amount involved and the results obtained, the experience, reputation, and ability of the attorneys, awards in similar cases, the nature and length of the professional relationship with the client, the time limitations imposed by the client or the circumstances, the preclusion of other employment by the attorney due to acceptance of the case, the novelty and difficulty of the questions, the skill needed to perform the legal services, and the "undesirability" of the case.[5]

The multifactor approach has the benefit of appearing to cover most of the important considerations. But, like most factor tests, it is difficult to apply in a consistent and coherent fashion. Some factors appear to be subjective, for example, the attorney's reputation or the undesirability of the case. Others seem duplicative—the list includes both "the customary fee" and "awards in similar cases." Further, the courts provide virtually no guidance as to how to weigh these factors or how to assess their impact if they cut in different directions. In practice, the multifactor approach approximates a discretionary grant of authority to the trial judge to set a reasonable fee based on his or her overall judgment about the case.

More recently, many courts, without necessarily repudiating the multifactor approach, have adopted two methodologies for determining fees that appear more objective and quantifiable: the lodestar and percentage methods. Under the lodestar method, as noted above, courts multiply the reasonable number of hours expended by counsel by a reasonable hourly rate and then adjust the product for various factors.[6] The lodestar method has numerous flaws, however: courts cannot easily determine either the reasonable hours or the reasonable hourly rate; there are few protections against counsel exaggerating either or both; the calculation involves the courts in time-consuming and mind-numbing bean counting and risks transforming the fee determination into a collateral lawsuit; standards for determining any multiplier for the lodestar are unclear and potentially arbitrary; and the method creates a perverse incentive to counsel to waste time in order to run up the bill once a victory of some sort appears reasonably certain.

————

[5] The leading precedent outlining this multifactor approach is Johnson v. Georgia Highway Express, 488 F.2d 714, 717–19 (5th Cir. 1974).

[6] E.g., Gisbrecht v. Barnhart, 535 U.S. 789 (2002). For discussion, and a critique of the lodestar approach, see Charles Silver, Unloading the Lodestar: Toward a New Fee Award Procedure, 70 Texas L. Rev. 856 (1992); Charles Silver, Due Process and the Lodestar Method: You Can't Get There from Here, 74 Tulane L. Rev. 1809 (2000).

The percentage fee fares better along these dimensions. Under this method, which resembles the contingency fee in individual tort cases, the court multiplies the amount recovered on behalf of the class by a percentage factor. The percentage method is easy to calculate, does not involve the court in fee audits, and does not create incentives to waste time. Although generally preferable to the lodestar method in cases where it can be used, the percentage method is also imperfect. In some cases (e.g., actions for injunctive relief or cases involving nonpecuniary relief such as hard-to-value coupons), the amount recovered may be difficult or impossible to quantify. Determining the proper percentage may be difficult, especially when the case is unusual in dimension (very large or very small) or especially difficult or risky. The percentage method provides an incentive for counsel to settle early in order to avoid expending low-return hours. And, unless adjusted for risk, the percentage method tends to overcompensate counsel in easy cases where the probability of recovery is high.

Perhaps in recognition that both the lodestar and percentage methods imperfectly estimate a reasonable fee, some courts adopt a blended approach that checks the percentage method for reasonableness against a lodestar calculation. This mixed approach may have value in correcting extreme cases in which the percentage approach alone would generate a windfall for class counsel, but it too is imperfect. Usually, when courts discuss a lodestar check, they do so with a view toward adjusting downward if the percentage approach alone results in an excessive fee. Thus, while it may correct for cases in which counsel would receive an exceptionally high hourly rate under the percentage method alone, the lodestar check does not usually adjust for cases in which counsel would receive an unusually low hourly rate. Thus, it may result in counsel being undercompensated on an aggregate basis. Further, because the lodestar check requires the lodestar calculation, it does not eliminate the burden on courts, the perverse incentive to run up hours, and the dangers of mini-trials.

Regardless of the methodology used, courts could benefit from reviewing empirical evidence on the amounts awarded in analogous cases. Courts in this setting engage in a process of appraisal, and any appraisal can properly take account of comparable transactions. In fact, courts frequently cite prior court precedents in which fees have been awarded. But courts almost never examine empirical research that could potentially provide more systematic and statistically controlled information about the determinants of awards. The following section surveys the existing literature and situates the current study against this backdrop.

## II. PRIOR STUDIES

Several prior empirical studies shed light on attorney fees. Herbert Kritzer's work undermines myths about contingency fees in individual cases, including beliefs that their use involves little risk and that "contingency fee lawyers and their clients are routinely in conflict."[7] Empirical analysis of adoption of the British Rule on fee shifting, under which the losing litigant pays the winner's fees, also promotes understanding of what might be achieved through fee reform.[8]

A few studies examine attorney fees in the class action setting. Studies by the National Economic Research Associates (NERA), an economic consulting firm, trace fees in securities class actions over the years. The most comprehensive NERA study, published in 1996, provides information on fee awards in settled securities class actions between 1991 and 1996, including mean and median awards of fees, and fees plus expenses as a percentage of settlement and as a function of increasing settlement amount.[9] The 1996 NERA study also breaks fee awards down by federal circuit, finding a remarkable uniformity in such awards between roughly 30 to 33 percent of the settlement amount. A 1999 update of the NERA study increases the sample size to 733 cases, with similar empirical findings.[10]

---

[7]Herbert M. Kritzer, Seven Dogged Myths Concerning Contingency Fees, 80 Wash. U. L.Q. 739, 741 (2002) [hereinafter Seven Dogged Myths]. See also Herbert M. Kritzer, Lawyer Fees and Lawyer Behavior in Litigation: What Does the Empirical Literature Really Say?, 80 Tex. L. Rev. 1943, 1949–57 (2002); Herbert M. Kritzer, Fee Arrangements and Fee Shifting: Lessons from the Experience in Ontario, 47, Law & Contemp. Probs 125 (1984). For a classic treatment of fees, see Kevin M. Clermont & John D. Currivan, Improving on the Contingent Fee, 63 Cornell L. Rev. 529 (1978).

[8]Susanne Di Pietro et al., Alaska Judicial Council, Alaska's English Rule Attorney's Fee Shifting in Civil Cases (1995); Gary M. Fournier & Thomas W. Zuehlke, Litigation and Settlement: An Empirical Approach, 71 Rev. Econ. & Stat. 189, 191 & n.5 (1989); James W. Hughes & Edward A. Snyder, Litigation and Settlement Under the English and American Rules: Theory and Evidence, 38 J.L. & Econ. 225 (1995); Edward A. Snyder & James W. Hughes, The English Rule for Allocating Legal Costs: Evidence Confronts Theory, 6 J.L. Econ. & Org. 345 (1990).

[9]Denise N. Martin, Vinita M. Juneja, Todd S. Foster & Frederick C. Dunbar, Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions? (NERA, Nov. 1996).

[10]Todd S. Foster, Denise N. Martin, Vinita M. Juneja & Frederick C. Dunbar, Trends in Securities Litigation and the Impact of PSLRA (NERA, June 1999). NERA's most recent iteration of the study does not provide information on fee or expense awards. Elaine Buckberg, Todd S. Foster, Ronald I. Miller & Adam Werner, Recent Trends in Securities Class Action Litigation: Will Enron and Sarbanes-Oxley Change the Tides? (NERA, June 2003).

*34    Attorney Fees in Class Action Settlements*

A 1996 Federal Judicial Center study examines all class actions terminated between July 1, 1992, and June 30, 1994, in four federal district courts.[11] This study reports mean and median fee awards of between 24 and 30 percent of the net monetary distribution to the class.

The March–April 2003 *CAR* provides information on 1,120 common fund cases extending back to 1974.[12] These data are discussed below.

Finally, William J. Lynk analyzed 332 securities cases reported in a 1990 edition of *CAR*.[13] Lynk found that mean fees and costs were 26.2 percent of the class recovery.

The present study differs from prior studies in several respects. Unlike the NERA and Lynk studies, which focus on securities class actions, or the Federal Judicial Center study, which examined class actions in four federal district courts, this study examines a full range of class action cases in all state and federal courts, using two independent data sets and comparing the results of these separate studies as a cross-check. The present sample covers 1993 to 2000; the Lynk study ends in 1990. Further, unlike prior studies other than Lynk's, the present study employs regression analysis to analyze the simultaneous effect of several variables on fees. The factors include some (such as risk) that have not previously been examined.

## III. HYPOTHESES AND DATA DESCRIPTION

This part first describes the hypotheses we test and then describes the data sets used to test them.

### A. Hypotheses

We started with several hypotheses about the determinants of fees and expenses in class action and shareholders' derivative cases and sought to design a study that tests those hypotheses against the two data sets. The factors that we believed shape fee awards are levels of client recovery, attorney time and effort, the category of case (e.g., securities, civil rights,

————

[11]Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules 4 (1996).

[12]Logan, et al., supra note 1.

[13]William J. Lynk, The Courts and the Plaintiffs' Bar: Awarding the Attorney's Fee in Class-Action Litigation, 23 J. Legal Stud. 185 (1994).

antitrust), the legal regime regulating fees applicable to the case (percentage of recovery, lodestar, and the presence of a fee-shifting statute), the riskiness of the case, the case's complexity, the presence of objectors to the fee, whether the recovery includes "soft" value to clients (such as coupons), whether a class was certified before the settlement, and whether the case was decided in federal or state court.

### 1. Case Size: The One-Third Fee

Substantial empirical evidence indicates that a one-third fee is a common benchmark in private contingency fee cases.[14] But evidence also suggests that the one-third fee is not as dominant as is widely believed.[15] Some regard one-third as a floor as well as a standard, with contingency fees often exceeding this percentage.[16] Kritzer, however, found that ex post downward adjustments from a one-third fee are also common.[17] Taken as a whole, the evidence suggests that one-third is the benchmark for privately negotiated contingent fees, but that significant variation up and occasional variation down exist as well.

Given this evidence, what fee levels should one expect to observe in court-approved class action settlements? One factor that might push fee percentages down as compared with individual contingent fee arrangements is

---

[14]See Herbert M. Kritzer, The Wages of Risk: The Returns of Contingency Fee Legal Practice, 47 DePaul L. Rev. 267, 285 (1998) ("[o]ne-third is the 'standard' contingency fee figure"). The one-third rule of thumb finds empirical support in James S. Kakalik, Patricia A. Ebener, William L.F. Felstiner, Gus W. Haggstrom & Michael G. Shanley, Variation in Asbestos Litigation and Compensation Expenses 84 tbl. 1 (RAND ICJ 1984).

[15]Kritzer's empirical study of contingency fees in Wisconsin found that only 53 percent of cases in which the parties were free to specify a fee employed a one-third contingency fee. Kritzer, supra note 14, at 285. Kritzer also notes that federal or state statutes dictate or limit fees in several classes of cases, including Social Security disability cases, workers' compensation cases, and medical malpractice cases. Id. See also Kritzer, Seven Dogged Myths, supra note 7, at 759.

[16]For example, Lester Brickman states: "Standard contingency fees are typically at least one-third, forty and even fifty percent in cases settled before trial and often more than fifty percent [of the net recovery] in cases which go to trial." Lester Brickman, ABA Regulation of Contingency Fees: Money Talks, Ethics Walks, 65 Fordham L. Rev. 247, 268 (1996). Kritzer's analysis of RAND's data from its study of the federal Civil Justice Reform Act also reveals substantial variation. In fixed percentage cases, the one-third fee again dominated, but there was more evidence of cases involving higher percentage fees, supporting Brickman's observation. Kritzer, Seven Dogged Myths, supra note 7, at 760.

[17]Kritzer, Seven Dogged Myths, supra note 7, at 761.

the larger size of class actions. The aggregate nature of class action cases should lead to larger awards to the class, which could well translate into lower percentage fee awards to attorneys as a result of economies of scale. But other factors might tend to increase fee awards. Because aggregating claims increases the litigation stakes, the parties can be expected to expend more resources to litigate a class action than an individual case. These increased expenditures may justify a higher fee. Class actions are also by their nature more complex than individual actions. Among other matters, the class certification question is added to the plaintiffs' attorneys' tasks. Internal class management, possible competition from other lawyers for class representation, and coordination of legal teams in large cases could require lawyer effort and expertise not required in the typical contingency fee cases. Theory does not predict whether class action fees will be higher or lower than the norm in individual litigation. As a working hypothesis, we predicted that average fees are approximately the same as in nonclass cases—approximately one-third of the recovery.

We also hypothesized, however, that the one-third guide would not hold constant across case types. For example, this percentage likely breaks down for cases with substantial nonmonetary relief. Injunctive relief in civil rights cases, for example, does not translate easily into a dollar amount on which to base a fee. As nonmonetary relief increases, the fee as a percent of dollars recovered should be expected to increase. Further, we predict that the fee as a percentage of the class recovery will decrease as recovery increases due to economy-of-scale effects.

## 2. Lodestar Effects

Two different lodestar questions are worth separating. First, given the predicted relation between client recovery and fee award, does the lodestar calculation better explain fee awards than the client recovery? If the lodestar does not do a better job than client recovery at predicting fees, its efficacy could be challenged on efficiency grounds in light of the work that goes into the lodestar calculation as well as the requirement that the lodestar method imposes on counsel of keeping detailed time records. Second, does use of the lodestar method raise or lower the fee award over the percentage method at a given level of client recovery? There is virtually no inherent limit on the fee based on the size of class recovery in lodestar cases: in theory the only considerations are the reasonable hours and the reasonable hourly rate. It is true that cases with larger recoveries will tend, other things equal, to require greater attorney effort, so some correlation between case size and

lodestar fee can be expected, and also true that the lodestar fee could be below as well as above the percentage fee in a given case. But in the absence of the built-in limitation of the percentage fee, counsel in lodestar cases have an incentive to run up hours and to refuse settlement offers in order to continue earning fees. Thus we hypothesize that, other things equal, fees in lodestar cases will be larger than fees in percentage cases of similar magnitude.

### 3. Effort; Complexity

Some cases are more complex than others, either because the proof required is technical or difficult to obtain, because the procedural context or applicable legal rules are convoluted or unique, or because the dynamics of litigation between the parties generates difficulties such as motions to compel discovery, motions for protective orders, motions for sanctions, and appellate proceedings such as petitions for writs of mandamus and appeals. We hypothesize that the fee will increase with case complexity, and that this effect will be observed even when we control for attorney hours and for ex ante risk: that is, for any given level of expenditure of hours and any given level of risk, courts are likely to award a higher fee if they observe that the litigation is highly convoluted and complex.

The length of time a case has been pending (its age) is a reasonable, though admittedly imperfect, proxy for complexity, especially needed when no lodestar fee is reported. As a further indication of the effort needed in a case, we include in our analysis whether the opinion is that of an appellate or trial court. Cases pressed through appeal introduce an additional stage to the proceedings and can signal enhanced complexity. When attorney hours are not reported, a case's age can also serve as a rough measure of effort.

### 4. Risk

Plaintiffs' attorneys in class and derivative cases nearly always litigate the case on a contingent basis: they will be responsible for all litigation costs, including both the opportunity costs of their time and the expenses of the litigation, if the case fails.[18] Because attorneys, like other economic actors, are

---

[18]The ethics rules of some states might be interpreted to make the representative plaintiff ultimately liable for litigation expenses, but in practice named plaintiffs do not assume this responsibility. See Geoffrey P. Miller, Payment of Expenses in Securities Class Actions: Ethical Dilemmas, Class Counsel, and Congressional Intent, 22 Rev. of Litig. 557 (2003).

expected to be risk averse, they demand compensation for the risk of nonsuccess in cases they take. That fees are adjusted for risk is widely accepted in the literature.[19] Courts often discuss risk when assessing fees in class action settlements.[20] Consistent with theory and practice, we expect that risk increases fees: other things equal, as the ex ante risk of a case increases, the percentage fee awarded will also increase.

5.  Payment by Defendant

In some cases, by statute or settlement, the defendant will pay the fee in addition to the agreed settlement amount. The influence of payment by the defendant on fees is ambiguous. If the court accepts that the defendant's fee payment is truly in addition to the client's recovery, the court may feel less need to scrutinize the fee. The additional fee is not coming out of the clients' pockets and less need exists for the court to protect the class. On this view, the defendant paying the fee could lead to increased fees because judicial scrutiny would be lower and because class counsel has a self-interest in obtaining the largest possible fee. On the other hand, paying the fee enhances the defendant's incentive to bargain vigorously over the fee in a settled case or to present strong arguments to reduce the fee in a litigated case. When the defendant truly separately negotiates the fee level, it has the obvious incentive to keep the fee as low as possible. Under this view, defendants' paying fees should be associated with lower fees to plaintiffs' counsel.

6.  Objectors

Objections to fee awards could signal different things. The objectors' economic calculus suggests that they should tend to find it worthwhile to object in larger cases. Expending resources to undermine a class action settlement signals that someone, objecting counsel or their clients, believes the stakes large enough to voice concerns. They are more likely to so believe in larger cases than in smaller cases, because the objector has a chance for receiving

_____

[19] E.g., Kritzer, Seven Dogged Myths, supra note 7, at 256, 265.

[20] E.g., High-risk cases: In re Unisys Corp. Retiree Med. Benefits ERISA Litig., 886 F. Supp. 445 (E.D. Pa. 1995); McLendon v. Continental Group, Inc., 872 F. Supp. 142 (D.N.J. 1994); In re Shell Oil Refinery, 155 F.R.D. 552 (E.D. La. 1993). Low-risk cases: Hanlon v. Chrysler Corp., 150 F.2d 1011, 1017, 1018 n.2 (9th Cir. 1998); In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d 283 (3d Cir. 1998); Conley v. Sears, Roebuck & Co., 222 Bankr. Rep. 181, 183–86 (D. Mass. 1998).

a larger commission from the class counsel to drop the objection. Objector presence could also signal that the award to counsel is too high. Objectors presumably value having some prospect of succeeding in their objection. They are more likely to succeed when a fee award they challenge is too high relative to an objectively proper fee than when the fee award is too low. Thus we hypothesize that the existence of an objector will correlate with lower fees, other things equal, and also that objectors will tend to appear in larger cases.

### 7. Interaction Between Lodestar Multiplier and Percentage

As noted above, many courts check the attorney fees determined by the percentage method against the lodestar award. The idea is that if the percentage fee grossly exceeds the lodestar amount, the attorney would be receiving a windfall, and the courts should adjust the fee downward to a more reasonable range. Courts may also use an informal lodestar check, even in cases where the check is not explicitly conducted, by granting a higher fee percentage in cases where they observe counsel expending unusually great efforts in the case. We predict, therefore, that there will be a strong negative correlation between the lodestar multiplier (fee award divided by the lodestar) and the percentage fee awarded, and that this interaction will hold even when other factors are held constant.

### 8. Soft Relief

Some believe that class action settlements systematically constitute better deals for the lawyers than for the clients. This fear is perhaps most often present in cases in which clients' recoveries consist in large part of non-monetary relief such as coupons for defendants' products.[21] Conflicts of interest between class clients and class counsel have led critics to question counsels' loyalty and ability to achieve fair awards for class members.[22] It is

---

[21]See Severin Borenstein, Settling for Coupons: Discount Contracts as Compensation and Punishment in Antitrust Lawsuits, 39 J.L. & Econ. 379 (1996); Christopher R. Leslie, A Market-Based Approach to Coupon Settlements in Antitrust and Consumer Class Action Litigation, 49 UCLA L. Rev. 991 (2002); Geoffrey P. Miller & Lori S. Singer, Nonpecuniary Class Action Settlements, 60 Law & Contemp. Probs. 97 (1997), Martha Neil, New Route for Class Actions, 89 A.B.A.J. 48 (2003); Note, In-Kind Class Action Settlements, 109 Harv. L. Rev. 810 (1996).

[22]Elliott J. Weiss & John S. Beckerman, Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions, 104 Yale L.J. 2053, 2065 (1995).

thus worth exploring the degree to which "soft" relief influences the amount of fees awarded to counsel in cases where soft relief is significant.

Soft relief may influence fees in two ways. In some cases, the court assigns a value to the soft relief and includes that value in the measure of the class recovery against which a percentage fee is assessed. These are the cases where class attorneys are often criticized for artificially inflating the assessed value of the case by including questionable coupons or other unwanted items in order to enhance their fees.[23] Our hypothesis is that such "included" soft relief will be negatively correlated with the fee percentage. The idea is that the court will perceive that the soft relief does not have the full economic value attributed to it, and accordingly will award a somewhat lower fee percentage to protect the class against a potentially excessive fee; or alternatively that counsel will pump up the assessed value of the class recovery with soft relief, then provide comfort to the court approving the fee by seeking a below-average percentage of the relief so obtained.

In other cases, the settlement includes items of soft relief that are not explicitly valued by the court and included in the class recovery against which fees are assessed under the percentage method. For example, the case may include defendant's commitment to refrain from engaging in the challenged conduct, thus benefiting class members and others in the future. If the court does not value this commitment, it will not be included in the quantified relief obtained by the class and will not be explicitly accounted for in the attorney fees. Our hypothesis is that "nonincluded" soft relief will be positively correlated with the percentage fee. Courts, in this hypothesis, will award a more generous fee because they want to account, at least roughly, for the added value that counsel has provided to the class and others by the nonincluded relief.

## 9. Federal Versus State Courts

We hypothesized that attorney fees as a percentage of the class recovery would tend to be higher in state court class actions than in federal class

---

[23]E.g., Lloyd Milliken, Jr., Fixing the Broken Class Action Lawsuit System, 47 Res Gestae 19 (2003) (proposed federal legislation "provides additional consumer protections to prevent egregious settlements that give lawyers millions of dollars while leaving the plaintiffs with worthless coupons"); Kendra S. Langlois, Note, Putting the Plaintiff Class' Needs in the Lead: Reforming Class Action Litigation by Extending the Lead Plaintiff Provision of the Private Securities Litigation Reform Act, 44 Wm. & Mary L. Rev. 855 (2002). Professor Leslie proposed that when coupon relief is awarded, counsel should also receive coupons as part of their fee. Leslie, supra note 21. The Texas legislature recently adopted a variant of his proposal. 2003 Tex. Sess. Law Serv. Ch. 204 (H.B. 4) (Vernon's).

actions, for two reasons.[24] One reason is the potential for "reverse auctions" in state courts.[25] The multidistrict litigation process often results in consolidating overlapping federal court class actions in a single jurisdiction, with the forum being chosen by a neutral panel of judges rather than the litigants. Overlapping state court class actions, however, are not consolidated in a single state.[26] With multiple actions to choose from as a settlement vehicle, defendants are potentially able to negotiate settlements that sell out the class in exchange for a generous fee for class counsel. If such reverse auctions occur, their effect might be observed in the form of a higher average percentage fee. Because reverse auctions are more likely in state court than in federal court class actions, we hypothesize a higher average percentage fee in state court actions.

In addition, fees may be higher in state courts because counsel may be able to file in remote jurisdictions with few judges and significant potential home-court advantage.[27] These attorneys likely select state court jurisdictions that they believe will be generous with fee awards.[28]

10. Settlement Classes

Some courts and commentators are suspicious of "settlement classes," in which a case may be certified for settlement purposes even if it does not

―――――

[24]We initially assumed that state court class action recoveries are smaller than federal recoveries. In nonclass action litigation, federal cases tend to be larger than state cases. E.g., Theodore Eisenberg, Jeffrey J. Rachlinski & Martin T. Wells, Reconciling Experimental Incoherence with Real World Coherence in Punitive Damages, 54 Stan. L. Rev. 1239, 1266 (2002). If the fee percent decreases as recoveries increase, then the average fee percent observed in federal court would tend to be lower than the percent observed in state courts. But our data reveal no statistically significant difference in the distributions of federal and state class action recoveries in non-fee-shifting cases.

[25]On reverse auctions, see John C. Coffee, Jr., Class Wars: The Dilemma of the Mass Tort Class Action, 95 Columbia L. Rev. 1343, 1350 (1995); Bruce Hay & David Rosenberg, "Sweetheart" and "Blackmail" Settlements in Class Actions: Reality and Remedy, 75 Notre Dame L. Rev. 1377, 1389–91 (2000).

[26]See Geoffrey P. Miller, Overlapping Class Actions, 71 N.Y.U.L. Rev. 514 (1996).

[27]See Interstate Class Action Jurisdiction Act of 1999: Hearings on H.R. 1875 Before the House Comm. on the Judiciary, 106th Cong. 81 (1999) (evidencing concerns about class counsel cherry-picking judges in state court class actions by filing in remote locations).

[28]Cf. Lynn M. LoPucki & Joseph W. Doherty, Why Are Delaware and New York Bankruptcy Reorganizations Failing?, 55 Vand. L. Rev. 1933 (2002) (suggesting relation between professional fees and forum in bankruptcy reorganizations).

meet all the criteria for certification of a litigation class.[29] In particular, settlement classes do not need to satisfy the manageability requirement of Rule 23(b)(3) because the proposal is that no trial will occur.[30] One concern about settlement classes is that they may be a vehicle for counsel to present an inadequate or collusive settlement to the court. If this concern is justified, we might expect to observe higher-than-average fees being awarded in such cases. On the other hand, the effect of settlement classes is ambiguous. Because such settlements often occur early in the litigation at a time when class counsel have not expended a large number of hours on the case, counsel could obtain a very large hourly rate even while accepting an average percentage of the recovery. Further, some courts have indicated that they will exercise enhanced scrutiny over settlements presented in the settlement class context.[31] If courts do exercise effective enhanced scrutiny, this might check the tendency of counsel to reward themselves with excessive fees in the settlement class context.

## 11. Securities Versus Other Types of Litigation

The structure of settlements and fees may differ in securities litigation compared to other class action litigation. The Private Securities Litigation Reform Act of 1995 (PSLRA)[32] applies only to securities class actions. In such actions, the PSLRA requires that the lead plaintiff choose the counsel for the class, subject to court review.[33] The choice for lead plaintiff is presumptively the member of the class who volunteers for the job and who has the largest financial stake.[34] This presumption is rebuttable only by evidence that such plaintiff "will not fairly and adequately protect the interests of the class"

———

[29]For particularly virulent condemnation of one settlement class, see Susan P. Koniak & George M. Cohen, Under Cloak of Settlement, 82 Virginia L. Rev. 1051 (1996).

[30]See Amchem Prods. Inc. v. Windsor, 521 U.S. 591 (1997).

[31]E.g., General Motors Corp. Pick-Up Truck Fuel Tanks Prod. Liab. Litig., 55 F.3d 768, 805 (3d Cir. 1995); Weinberger v. Kendrick, 698 F.2d 61, 73 (2d Cir. 1982).

[32]15 U.S.C. § 78u-4(a)(3) (2000).

[33]15 U.S.C. § 78u-4(a)(3)(B)(v) (2000).

[34]15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb) (2000).

or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class."[35]

The PSLRA's requirements generate conflicting predictions with respect to the expected level of fees in securities litigation. On the one hand, the Act's assurance that a large-stakes plaintiff will control the choice of counsel should promote selection of class counsel that is more accountable to the class than class counsel selected by other methods. This greater client control, if realized in practice, ought to reduce the fees in securities litigation because the client, not class counsel, would be in charge. On the other hand, greater client control of securities litigation may lead to selection of superior class counsel. When class counsel select themselves, counsel may be skilled at obtaining securities cases but less skilled at prosecuting them. When plaintiffs with a large financial stake select counsel, there may be an increased tendency to shop for the highest-quality counsel rather than to accept the counsel who happened to trigger the case filing. Greater counsel quality may warrant a higher percentage fee award than in other categories of cases.[36] The time period encompassed by our data allow exploring effects specific to securities litigation. The PSLRA does not apply to private actions commenced before and pending on December 22, 1995.[37] Since our data include cases commenced before and after the PSLRA's effective date, we can observe whether the PSLRA materially changed the pattern of fee awards in securities cases.

## 12. Expenses

We also started with certain hypotheses regarding costs and expenses of litigation—those amounts often paid to reimburse counsel for funds expended in the course of the litigation. Costs and expenses, as used here, do not include the value of attorneys' time. We predict that costs and expenses will be positively correlated with gross class recovery, age of case, presence of an appeal, the lodestar amount, and the amount of the counsel fee. We predict that costs and expenses will be negatively correlated with the presence of a settlement class (because if the case settles prior to certifica-

---

[35]15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(aa), (bb) (2000).

[36]There may be grounds to question this hypothesis, however, if the mix of class counsel is roughly the same post-PSLRA as pre-PSLRA.

[37]Private Securities Litigation Reform Act of 1995, Pub. L. 104–67, § 202 (1995).

tion, counsel will not have to expend resources on proving manageability and also will conserve on notice expenses).

### B. Data and Coding Conventions

To test these hypotheses we assembled a comprehensive database of published cases. We searched in the WESTLAW™ "AllCases" database using the search "settlement & 'class action' & attorney! w/2 fee! & date(= [1993–2002])." This search's results were checked against a search of the LEXIS™ "Mega" database using the same search terms. We also compiled lists of citations in the cases found by these search requests and included any additional cases meeting the basic search criteria. We further checked the list against the CCH™ Federal Securities and Trade Regulation Reporters. Once cases had been identified by this method, we sometimes gathered additional information about case characteristics from other sources, for example, information on the Internet or docket entries in the U.S. Courts PACER system. These searches yielded an initial list of 449 cases.

Two of the most important variables for our purposes are the fee and the client recovery. The fee was ascertainable in 417 class action cases.[38] Where expenses are identifiable, we separated them out and did not include them in the fee. The client recovery was usually available from the opinion and a usable amount was coded in 370 cases. If the court stated a range of value, we used the midpoint. If there was no better estimate available but a maximum recovery value could be ascertained, we used the maximum possible recovery. If the court estimated the relief at "over" a sum, the sum that was the minimum was used. Where the settlement amount included post- or prejudgment interest, we included that in the amount of the settlement.

To code the court's fee calculation method, we tracked whether the court engaged in a lodestar calculation and, if so, the purity of the lodestar approach. This generated three fee method categories: (1) percent method cases in which no lodestar calculation exists, (2) cases in which a lodestar calculation exists but as a check on the percent or in combination with the percent, and (3) pure lodestar cases in which the lodestar method was the exclusive method used. If the lodestar amount was not specified, but could be estimated with reasonable accuracy, we included it. We used plaintiffs' own estimates of their lodestar only when these estimates were not contested by the court. We also noted when the lodestar amount could not be

―――――

[38]If the litigation had the characteristics of a class action, even if not certified, we included it. This occurred only for certain employment discrimination cases.

calculated from the opinion. Where there was a range reported for multipliers, we used the midpoint.

For many other variables, coding was reasonably straightforward. The presence of an objector to the settlement, whether the case was in federal or state court, whether the defendant paid the fee, and whether soft relief constituted part of the recovery were all reasonably ascertainable from the opinions. We were often able to detect the presence of a settlement class by statements in the judicial opinion. It is possible, however, that in some cases the court may have approved a settlement involving a settlement class without announcing this fact and without providing other indicia in the opinion that the class had not previously been certified. Where nothing was said or could be inferred about the presence of a settlement class, we coded the case as a litigation class, keeping in mind the possibility that some of these cases may in fact have been undetectable settlement classes and that some degree of error is thus inevitable with respect to this variable.

In employment discrimination and civil rights cases, two prominent categories of fee-shifting statute cases, the amount of the relief to the class, as expected, often was difficult to quantify because a primary element of relief in such cases was often injunctive. For civil rights cases involving only injunctive relief, the cost to the defendant was used when this was available. In some fee-shifting cases, the court awarded attorney fees but it was impossible to estimate the amount of class damages. These fee and recovery coding conventions led to usable values for the fee amount and the client recovery, our two core variables, in 362 cases.

We coded the age of the case based on the opinion date and the date of filing, as reported in the opinion. We were able to calculate the age for 350 of the 362 cases.

Risk was not discussed in each opinion. Therefore, coding it depends on assuming that it was not prominent in cases in which courts did not mention it. We divided the cases into three risk categories. If nothing was said about risk or if the court's discussion suggested a normal degree of risk, the case was coded as being medium risk. If the court affirmatively indicated the existence of substantial risk, or if exceptional risk was evident from the facts or procedural history of the case, we coded the case as having high risk. If the court indicated or the facts otherwise indicated that the case was very likely to generate a substantial recovery for the class at the time it was brought, we coded the case as low risk.

One qualification about using published opinions is in order. This data set looks only to opinions that, for whatever reason, were published in some readily available form. The data set omits opinions that were not published.

Obviously, therefore, we have not included the full universe of cases in our data set. Although published opinions are not necessarily representative of the universe of all cases, they can lead to important insights. Our quantitative statements are, of course, estimates, but they represent substantially more informed estimates than those made without comprehensive knowledge of the opinions. In one important respect, opinions are representative: for judges seeking to inform their fee decisions with knowledge of other cases, published opinions are the prime source of data.[39] Further, as discussed immediately below, we checked the results of the published opinion data set against the results of the *CAR* data, which do include nonpublished opinions (but are less representative than the published opinion data set in other respects, e.g., by including only common fund cases).

*CAR* describes its data[40] and we leave the detailed description to that publication. The *CAR* data, updated in 2003 after an initial 1990 study, include 1,120 common fund cases, of which 630 are in the period 1993–2002. The *CAR* data emphasize securities cases, which are likely oversampled in relation to nonsecurities cases.[41] For the period 1993 to 2002, securities cases comprise 77 percent of the *CAR* cases compared to 39 percent of the published opinion data we assembled. The opinion data contain 276 nonsecurities cases (before reduction for missing data) compared to 147 nonsecurities cases in the *CAR* data. So the *CAR* editors gather more securities cases than are available through standard legal research databases. For nonsecurities cases, however, the *CAR* data do not contain all class action cases that are available in standard research databases. In addition, the *CAR* data exclude selected cases, including those in which class members received coupons.[42] Another difference is that the *CAR* data do not contain certain variables, such as risk, that often are ascertainable in the published opinion data.

————

[39]Cf. Theodore Eisenberg & Sheri Lynn Johnson, The Effects of Intent: Do We Know How Legal Standards Work?, 76 Cornell L. Rev. 1151, 1195 (1991).

[40]24 Class Action Rep. at 167–68, 194–97.

[41]To account for the possible imbalance in either or both data sets, we have run, but do not report here, our principal regression models with weighting schemes designed to reflect the overweighting of securities cases in the *CAR* data and the possible underweighting of securities cases in our data. No material change in our principal results emerged.

[42]24 Class Action Rep. at 194.

## IV.  EMPIRICAL RESULTS

Because fees so commonly represent a percent of the client's recovery, a natural starting point for studying fees is describing client recovery levels. For example, if client recoveries have increased over time, attorney fees should also be expected to increase in absolute amount even if not as a percent of the client recovery.

### A.  Client Recovery Levels

For the 370 cases for which we have client recovery data in the published opinion database, the mean gross recovery was $100 million in inflation-adjusted 2002 dollars, and the median gross recovery was $11.6 million. Figure 1 shows the mean and median client gross recovery for the years 1993 through 2002 in inflation-adjusted 2002 dollars. To complement our data, we report the mean and median recoveries from the *CAR* cases for this period, which show a mean gross recovery of $35.4 million in inflation-adjusted 2002 dollars and a median gross recovery of $7.6 million. The figure suggests that the mean client recovery has not noticeably increased over the last decade. A few large awards led to unusual peaks at over $200 million in the mean for the reported opinion data in 1994 and 2000. But the time trend in the mean is not noticeably upward over time.

The median recovery in our data shows more upward growth. But a relatively high period from 1999 to 2002 ends with the median award at $15 million, below where it was in 1994 and about where it was in 1996. Also, there is no statistically significant time trend in the median award. Even the ad-hoc approach of basing a time-trend inquiry on the observed peak in 1999, and post-1999 recovery levels, yields no significant result. If one divides recoveries into those received prior to 1999 and those received in 1999 and later, one cannot reject the hypothesis that the median recovery is the same for the two periods ($p = 0.161$). The *CAR* data show no upward movement in the median recovery over time. Thus, neither the mean nor the median recovery support popular and professional perception that recoveries in large class action cases are ever-increasing.[43]

―――――

[43]Cf. Ellen Kelleher, AIG Intensifies Efforts on Tort, Financial Times 16, 2003 WL 62023040 (Sept. 4, 2003) (referring to "a sudden rise in jury awards as well as increased risks of class action and corporate governance issues"). But there is a sense in which perceptions about class action recoveries are correct. The amounts plaintiffs recover in class action cases far exceed, on average, recoveries in other cases, even those that reach trial. For example, the median

*48    Attorney Fees in Class Action Settlements*

Figure 1:    Time trends in recoveries, 1993–2002.



SOURCES: Reported class action settlements with fee awards; 24 *Class Action Rep.* 169.

*B. Fee Awards*

We first discuss fee-award levels separately in relation to four major influ-
ences: legal regime (fee shifting or not), case category, client recovery level,
and time. We then assess the influence of these and other factors in regres-
sion models.

———

award in state-court tried tort cases in 1996 was $31,000. Bureau of Justice Statistics, U.S.
Dep't of Justice, Bulletin No. NCJ-179769, Tort Trials and Verdicts in Large Counties, 1996, at
6 (Aug. 2000). Comparing recoveries per plaintiff could be done using the number of class
members.

*Eisenberg and Miller     49*

Figure 2:   Distribution of attorney fee awards, 1993–2002, by fee-shifting status.



NOTE: Kernel density estimates.
SOURCE: Reported class action settlements with fee awards.

1.  Legal Regime, Case Category, and Fee Method

Preliminary examination of fee awards shows substantial heterogeneity in the fee award based on whether the case involved a fee-shifting statute. Figure 2, which shows the distributions of fee-award percents, shows that the two kinds of fee awards differ. Non-fee-shifting cases result in a relative paucity of awards above 35 percent of the client recovery. Fee-shifting cases have a much wider distribution of awards. Two factors explain this difference. First, because fees in common fund cases are often awarded under the percentage-of-recovery method, the highest permissible percentage award sets a ceiling. In fee-shifting cases, fees are usually calculated under the lodestar method, which is not dependent in any formal sense on the amount of class recovery.[44] Thus one would expect a wider range of fees in fee-

_____

[44]The lodestar method of computing fees has been the dominant method in federal statutory fee-shifting cases since 1984. See Gisbrecht v. Barnhart, 535 U.S. 789, 801 (2002).

shifting than in percentage cases.[45] Second, recoveries tend to be lower in fee-shifting cases than in percentage cases, thus justifying a higher fee as a percent of the recovery in light of scale dis-economies.

Table 1 summarizes fees as a percent of recoveries by fee-shifting status and case category for our published opinion data in Panel A and by case category for the *CAR* data in Panel B.[46] Panel A's "Total" row confirms the substantial differences between fee-shifting and non-fee-shifting cases and the greater dispersion of fees in fee-shifting cases shown in Figure 2. The table also breaks down the case categories in which counsel fees are awarded in class action and derivative cases. Securities law class actions tend to dominate, comprising over 40 percent of the non-fee-shifting cases and 39 percent of all cases, and an even greater proportion of the *CAR* data. But other categories, including antitrust and consumer cases, contribute a substantial number of cases. Securities cases also tend to have higher fee-award percents, though not the highest. The median securities case fee percent is 25.0 percent in our data compared to 20.0 percent for nonsecurities, non-fee-shifting cases, a highly statistically significant difference ($p = 0.0002$). We defer trying to interpret this difference until controlling for other factors in the regression models below. For now, it is worth noting that in non-fee-shifting cases, the axiomatic one-third fee is inaccurate; a fee of 20 to 25 percent of the recovery better describes reality.

Descriptive statistics about the fee percent awarded, now broken down by the court's method of computing fees, appear in Table 2. Consistent with Table 1, Table 2 shows higher percentage awards in fee-shifting cases. It also shows that the lodestar method differs in its effect depending on the degree to which it dominates. In non-fee-shifting cases, the pure percent method and the mixed method, in which both percent and lodestar play a role, yield quite similar fee percents. This pattern holds for both the published opinion data and for the *CAR* data, which do not differentiate between pure lodestar

———

[45]This is not a complete explanation: fees in some common fund cases are awarded on a pure lodestar basis, which would not be subject to any theoretical percentage ceiling, while fees in some fee-shifting cases are determined under the percentage method when counsel seeks an award from the common fund rather than under the fee-shifting rule. The distinction holds true, however, in the vast majority of cases.

[46]We included in the category of "Consumer" cases brought under the Fair Debt Collection Practices Act. Products liability cases are included in the Tort category. Shareholder derivative actions are included in the Corporate category.

*Eisenberg and Miller    51*

Table 1:    Fee-Award Percent Summary by Legal Regime and Case Category

| Category | Non-Fee-Shifting Cases | | | | Fee-Shifting Cases | | | |
|---|---|---|---|---|---|---|---|---|
| | Mean | Median | SD | N | Mean | Median | SD | N |
| A. Published Opinion Data, 1993–2002 | | | | | | | | |
| Antitrust | 21.4 | 23.3 | 9.9 | 36 | — | — | — | — |
| Civil rights | 37.0 | 37.0 | 1.4 | 2 | 26.1 | 31.3 | 17.3 | 7 |
| Consumer | 16.2 | 13.0 | 10.6 | 52 | 55.2 | 51.8 | 20.2 | 18 |
| Corporate | 20.4 | 20.0 | 11.5 | 15 | — | — | — | — |
| Employment | 25.3 | 23.4 | 9.6 | 7 | 37.5 | 31.8 | 21.7 | 16 |
| ERISA/pension | 22.0 | 24.0 | 7.8 | 7 | 24.4 | 16.2 | 26.4 | 15 |
| Mass tort | 18.3 | 18.7 | 7.0 | 7 | — | — | — | — |
| Securities | 24.1 | 25.0 | 8.9 | 142 | — | — | — | — |
| Tax refund | 13.1 | 11.5 | 9.7 | 6 | — | — | — | — |
| Tort | 17.9 | 19.6 | 9.2 | 10 | — | — | — | — |
| Other | 24.8 | 27.5 | 8.1 | 19 | 22.5 | 23.0 | 20.4 | 3 |
| Total | 21.9 | 23.2 | 9.9 | 303 | 37.5 | 33.0 | 25.9 | 59 |
| B. Class Action Reports Data (*CAR*), 1993–2002 | | | | | | | | |
| Antitrust | 26.8 | 28.4 | 7.1 | 31 | — | — | — | — |
| Consumer | 24.3 | 25.0 | 8.5 | 48 | — | — | — | — |
| Civil rights | 23.5 | 25.5 | 11.0 | 4 | — | — | — | — |
| Derivative | 33.3 | 33.3 | — | 1 | — | — | — | — |
| Employment | 25.5 | 25.7 | 7.6 | 17 | — | — | — | — |
| Environmental | 30.5 | 30.5 | 7.8 | 2 | — | — | — | — |
| Government regulation | 29.7 | 29.7 | — | 1 | — | — | — | — |
| Labor/wage/pension | 22.9 | 26.4 | 10.6 | 30 | — | — | — | — |
| Mass tort | 17.6 | 17.0 | 6.9 | 8 | — | — | — | — |
| Securities | 27.9 | 30.0 | 7.4 | 483 | — | — | — | — |
| Taxpayer | 3.5 | 3.5 | — | 1 | — | — | — | — |
| Utilities | 20.3 | 20.3 | 1.7 | 2 | — | — | — | — |
| Social welfare/entitlements | 16.9 | 16.9 | 4.4 | 2 | — | — | — | — |
| Total | 27.0 | 30.0 | 7.9 | 630 | — | — | — | — |

NOTE: Fee shifting and non-fee-shifting are the two legal regimes for the published opinion data. The *CAR* data include only common fund cases. The first column identifies the case categories, which differ between the two data sets.

SOURCES: Reported class action settlements with fee awards; 24 *Class Action Rep.* 169.

cases and mixed cases. But the more finely tuned coding in the published opinion data indicate that the pure lodestar method tends to reduce the fee percent. The pattern shifts in fee-shifting cases. Now the pure lodestar method tends to increase awards compared to the other methods (which may be employed in the settlement context). We again defer reaching conclusions until we control for other factors in the regression models.

52    *Attorney Fees in Class Action Settlements*

Table 2:   Fee-Award Percent Summary by Fee Method and Legal Regime

| | *Non-Fee-Shifting Cases* | | | | *Fee-Shifting Cases* | | | |
|---|---|---|---|---|---|---|---|---|
| *Fee Method* | *Mean* | *Median* | *SD* | *N* | *Mean* | *Median* | *SD* | *N* |
| A. Published Opinion Data, 1993–2002 | | | | | | | | |
| Percent | 22.3 | 24.0 | 9.9 | 197 | 26.7 | 30.0 | 14.1 | 17 |
| Mixed percent/lodestar | 22.9 | 25.0 | 9.0 | 68 | 24.3 | 23.0 | 10.8 | 9 |
| Pure lodestar | 17.2 | 16.5 | 10.5 | 38 | 46.6 | 50.1 | 28.4 | 33 |
| B. Class Action Reports Data (*CAR*), 1993–2002 | | | | | | | | |
| Percent | 27.5 | 30.0 | 7.5 | 370 | — | — | — | — |
| Lodestar | 26.3 | 29.6 | 8.4 | 260 | — | — | — | — |

NOTE: Fee shifting and non-fee-shifting are the two legal regimes for the published opinion data. The *CAR* data include only common fund cases and do not include a variable distinguishing fee-shifting from non-fee-shifting cases. The first column identifies the fee methods. The *CAR* data do not contain a separate "Mixed percent/lodestar" method category. Their percent method cases are likely dominated by what we code as percent cases in the opinion data. Panel A shows the numerical dominance of this category over the mixed category in the published opinion data.

SOURCES: Reported class action settlements with fee awards; 24 *Class Action Rep.* 169.

## 2.  Client Recovery Level and Fee Award

Figure 3 shows the strong correlation between the fee amount and the client recovery. Each small circle represents a case's fee amount and client recovery in the published opinion data.[47] As the client recovery increases, so does the fee. This is not in itself particularly noteworthy. The surprising feature of the pattern is how tight the relation is. To the extent cases depart from the pattern, they tend to do so by having low fee amounts. That is, the data points most distant from the central pattern tend to lie below, not above, the pattern.

In addition to the scatter plot of individual award-recovery points, Figure 3 contains three lines. Each line represents the best-fitting regression line for a set of data. The solid line represents the best-fitting regression line for non-fee-shifting cases in our reported cases data. The line represented by long dashes represents the best-fitting regression line for fee-shifting cases in our reported cases data. The line represented by the short dashes represents the best-fitting regression line for the *CAR* data. These one-variable regression models are impressive for all three data sets. The model explains 89 percent of the variance in non-fee-shifting reported cases and 90 percent

_____

[47]A scatter plot of the *CAR* data looks virtually identical in pattern to Figure 3.

Figure 3:    Fee amount versus recovery, 1993–2002.



SOURCES:  Reported class action settlements with fee awards; 24 *Class Action Rep.* 169.

of the variance in fee-shifting reported cases.[48] For the *CAR* data, the model explains 94 percent of the variance. Also reasonably impressive is the similarity of the fee-shifting and non-fee-shifting regression lines (slopes of 0.83 for non-fee-shifting cases and 0.74 for fee-shifting cases) and the *CAR* data line (slope of 0.90). No obvious theoretical reason exists to predict this close fit between the results in the fee-shifting and non-fee-shifting regimes. The fact that fees across the two regimes (and the *CAR* data) vary so similarly with recovery suggests that courts may be engaging in an intuitive approach that awards fees in log-linear relation to class recovery regardless of the formal methodology being used to calculate the fee.[49]

―――――

[48]Although the figure's lines are similar, they do differ at statistically significant levels. A Chow test of whether the coefficient on the client recovery variable is the same in the two samples yields $p = 0.0049$. The fee-shifting cases start with a higher intercept but then have a relatively flatter slope than the non-fee-shifting cases.

[49]The different distributions of the fee percents in fee-shifting and non-fee-shifting cases shown in Figure 2, and their similarity in relation to awards in Figure 3, raise the question of where the Figure 2 differences arise. The differences are largest for the smaller client recoveries that

Figure 4:    Fee percent versus recovery, 1993–2002.



SOURCES: Reported class action settlements with fee awards; 24 *Class Action Rep.* 169.

The relation between the fee percent (in contrast to the fee amount) and client recovery is also of interest. Figure 4 explores this relation. Like Figure 3, the figure combines a scatter plot of individual reported opinion cases with separate best-fitting regression lines for fee-shifting and non-fee-shifting reported cases, and the *CAR* data. In addition, the figure separately identifies fee-shifting reported cases, designated with an "f," and non-fee-shifting reported cases, designated with an "n."

Two major points emerge from the figure. First, all three data sets reveal a scale effect. As client recovery increases, the fee percent decreases. The regression lines, which differ in slope and intercept ($p < 0.0001$), nevertheless share a substantially negative correlation with the size of the client's recovery. The simple regression models explain substantially less of the fee percent than they did of the fee level. In non-fee-shifting cases, the model

---

are more common in fee-shifting cases, which generate the high percentage fees. If one limits the fee-shifting cases to those with recoveries in excess of $2 million, the slope on the fee-shifting regression line is 0.82, just about the same as the slope for the non-fee-shifting reported cases.

explains 25 percent of the variance, in fee-shifting cases, it explains 57 percent of the variance, and in the *CAR* data it explains 15 percent of the variance.[50] Second, fee-shifting cases dominate in the upper-left quadrant of the figure—corresponding to low-recovery, high-fee percent cases. They are scarce in the high-client-recovery range of cases.

### 3. Fee Percentage and Lodestar Multiplier

As noted above, judges frequently use the lodestar amount as a check for reasonableness even when they set the fee by the percentage method. Courts may be unwilling to award high percentage fees when doing so would result in attorney compensation far exceeding the lodestar amount, and conversely may be willing to award higher-than-normal percentage fees when the fee calculated by the percentage method would fall significantly below the lodestar. Thus, if the lodestar check is effective, we would expect to see a strong negative correlation between the lodestar multiplier (fee award divided by lodestar amount) and the fee as a percentage of the recovery.

Figure 5 shows a scatter plot of the relation between lodestar multipliers and percentage fees in the reported opinion data set, as well as the best-fitting regression lines. We limit these cases to those in which the multiplier is present and not equal to one. As can be seen, the prediction of a negative correlation is confirmed. Using only the multiplier (log) to explain the fee percent explains 10 percent of the variance in non-fee-shifting cases, 34 percent of the variance in fee-shifting cases, and 4 percent of the variance in the *CAR* data.

### 4. Time Trends for Fees

The hypothesis that attorney fees are increasing over time finds little support in our data. Figure 6 shows the essential facts. Neither the mean nor the median level of fee awards has increased over time, either for non-fee-shifting, fee-shifting, or *CAR* cases—a result largely confirmed by the regressions reported below. In one sense, this should come as no surprise. The fee level is fundamentally linked to the client's recovery. Since client recoveries have not increased over time, fee awards should not have been expected to increase. In another sense the result is intriguing. No real-dollar increase in the level of fee awards in major cases over the course of a decade is not

---

[50]The simple regression models used here for pictorial purposes are not entirely appropriate, given the skewed nature of the dependent variable. We report more appropriate models below.

Figure 5:   Fee percent versus multiplier, 1993–2002.



SOURCES: Reported class action settlements with fee awards; 24 *Class Action Rep.* 169.

the sort of fact we are accustomed to hearing. Impressions of fees as ever-increasing need greater empirical support than has been offered to date.

The figure does reveal an occasional peak, such as the one in the mean non-fee-shifting awards in 2000. As one might expect, most of the spike is the product of a few awards—in this case two very large fee awards, over $200 million, on recoveries of about $3.6 billion and $700 million. But the pattern of mean fee awards quickly returned to historical levels in 2001 and 2002. In fee-shifting cases, conclusions in any direction should be more tentative. As Table 2 shows, the data include only about six awards per year, on average, so both the mean and median are based on thin data. Indeed, we exclude 1993 from the fee-shifting lines in the graph because only one (high) award is in the database.

In the interest of complete reporting, we do find bits of evidence, reported in Figure 7, suggesting that fee awards as a percentage of recovery increased over time. Figure 7 shows a slight upward slope over time for the median fee percent in fee-shifting cases and a similar upward trend for the mean fee percent in non-fee-shifting cases. But the model of fee percent for fee-shifting cases in Table 4 shows no such time effect. A median regression

*Eisenberg and Miller    57*

Figure 6:    Class action attorney fee awards over time.



SOURCES:  Reported class action settlements with fee awards; 24 *Class Action Rep.* 169.

model for the fee-shifting cases also failed to detect an increasing time trend. And the *CAR* data on fee percents, also reported in Figure 7, show no such time trend.

5. Regression Models; Other Factors

We explore the relation to fee awards of the above and other factors in regression models. Table 3 contains descriptive statistics for each factor in the published opinion data. Dollar amounts are in inflation-adjusted 2002 dollars. We then combine the factors discussed so far and the other variables motivated by Part III's hypotheses to model the fee level and fee percent.

*58    Attorney Fees in Class Action Settlements*

Figure 7:   Fee percents over time.



SOURCES: Reported class action settlements with fee awards; 24 *Class Action Rep.* 169.

Table 4 reports the results of models of the fee as a percent of client recovery and of the fee amount itself. Given the differences in the award distributions of fee-shifting and non-fee-shifting cases, we report separate models for the two legal regimes, supplemented by models for the *CAR* data.

*Client Recovery; Lodestar.* Regression analysis generates several interesting results. The most salient observation, confirming Figure 3, is that the overwhelming determinant of fee is the amount of the recovery for the class. In all models with "Gross recovery" as an explanatory variable, this variable is highly statistically significant in explaining either the fee amount or the fee as a percent of the client's recovery.

Table 3:  Descriptive Statistics by Legal Regime and Relation to Fee Award

| Variable | Mean | Median | SD | Mean Fee Percent With/Without Characteristic | Correlation with Fee Percent/Fee Level | Significance of Relation to Fee Percent | Significance of Relation to Fee Level | N |
|---|---|---|---|---|---|---|---|---|
| A. Fee-Shifting Cases | | | | | | | | |
| Gross recovery (thousands) | 22,958.99 | 1305.89 | 72,051.55 | — | -0.374/0.577 | 0.004 | 0.000 | 59 |
| Gross recovery (log) | 6.13 | 6.12 | 1.13 | — | -0.770/0.947 | 0.000 | 0.000 | 59 |
| Lodestar (log) | 5.56 | 5.41 | 0.70 | — | -0.517/0.951 | 0.000 | 0.000 | 42 |
| Multiplier (log) | 0.00 | 0.00 | 0.51 | — | -0.462/0.667 | 0.002 | 0.000 | 43 |
| Age of case (log years) | 1.21 | 1.39 | 0.79 | — | -0.432/0.493 | 0.001 | 0.000 | 57 |
| Year | 1999.58 | 2000.00 | 2.50 | — | 0.187/-0.337 | 0.156 | 0.004 | 59 |
| Appellate case | 0.12 | 0.00 | 0.33 | 33.2/37.9 | — | 0.663 | 0.013 | 59 |
| Defendant paid | 0.70 | 1.00 | 0.46 | 43.4/27.5 | — | 0.036 | 0.089 | 59 |
| Federal case | 0.89 | 1.00 | 0.31 | 37.9/31.7 | — | 0.673 | 0.139 | 59 |
| High-risk case | 0.16 | 0.00 | 0.37 | 27.9/39.4 | — | 0.258 | 0.023 | 59 |
| Low-risk case | 0.07 | 0.00 | 0.25 | 53.1/36.0 | — | 0.165 | 0.069 | 59 |
| Objector | 0.20 | 0.00 | 0.40 | 16.3/42.3 | — | 0.001 | 0.001 | 59 |
| Mixed percent/lodestar | 0.12 | 0.00 | 0.33 | 24.3/39.9 | — | 0.119 | 0.158 | 59 |
| Pure lodestar approach | 0.59 | 1.00 | 0.49 | 46.6/25.9 | — | 0.008 | 0.046 | 59 |
| No multiplier | 0.29 | 0.00 | 0.46 | 29.8/40.3 | — | 0.268 | 0.644 | 59 |
| Nonincluded soft relief | 0.01 | 0.00 | 0.11 | 3.5/38.1 | — | 0.127 | 0.301 | 59 |
| Included soft relief | 0.17 | 0.00 | 0.38 | 33.6/38.5 | — | 0.778 | 0.460 | 59 |
| Settlement class | 0.24 | 0.00 | 0.43 | 34.0/39.2 | — | 0.539 | 0.231 | 58 |

Table 3:  Continued

| Variable | Mean | Median | SD | Mean Fee Percent With/Without Characteristic | Correlation with Fee Percent/Fee Level | Significance of Relation to Fee Percent | Significance of Relation to Fee Level | N |
|---|---|---|---|---|---|---|---|---|
| B. Non-Fee-Shifting Cases | | | | | | | | |
| Gross recovery (thousands) | 115,469.44 | 15,000.00 | 444,929.26 | — | −0.324/0.497 | 0.000 | 0.000 | 303 |
| Gross recovery (log) | 7.20 | 7.18 | 0.82 | — | −0.510/0.943 | 0.000 | 0.000 | 303 |
| Lodestar (log) | 6.27 | 6.32 | 0.61 | — | −0.030/0.921 | 0.690 | 0.000 | 179 |
| Multiplier (log) | 0.42 | 0.41 | 0.61 | — | −0.293/0.477 | 0.000 | 0.000 | 179 |
| Age of case (log years) | 1.05 | 1.10 | 0.63 | — | 0.146/0.135 | 0.012 | 0.016 | 293 |
| Year | 1997.79 | 1998.00 | 2.99 | — | −0.018/0.073 | 0.761 | 0.176 | 303 |
| Appellate case | 0.16 | 0.00 | 0.37 | 21.2/21.9 | — | 0.304 | 0.704 | 303 |
| Defendant paid | 0.18 | 0.00 | 0.39 | 11.8/23.5 | — | 0.000 | 0.502 | 303 |
| Federal case | 0.77 | 1.00 | 0.42 | 22.4/18.8 | — | 0.024 | 0.027 | 303 |
| High-risk case | 0.19 | 0.00 | 0.39 | 25.0/20.9 | — | 0.001 | 0.000 | 303 |
| Low-risk case | 0.13 | 0.00 | 0.34 | 15.2/23.0 | — | 0.000 | 0.536 | 303 |
| Objector | 0.36 | 0.00 | 0.48 | 19.4/23.4 | — | 0.000 | 0.000 | 303 |
| Mixed lodestar/percent | 0.18 | 0.00 | 0.39 | 22.9/21.5 | — | 0.201 | 0.043 | 303 |
| Pure lodestar approach | 0.13 | 0.00 | 0.33 | 17.5/22.4 | — | 0.004 | 0.055 | 303 |
| No multiplier | 0.48 | 0.00 | 0.50 | 22.3/21.5 | — | 0.541 | 0.163 | 303 |
| Beneficial soft relief | 0.12 | 0.00 | 0.33 | 17.2/22.6 | — | 0.001 | 0.065 | 303 |
| Questionable soft relief | 0.07 | 0.00 | 0.26 | 20.7/21.9 | — | 0.719 | 0.505 | 303 |
| Settlement class | 0.34 | 0.00 | 0.48 | 20.4/22.6 | — | 0.053 | 0.831 | 294 |

SOURCE: Reported class actions with fee awards, 1993–2002. Significance levels are *p*-values.

Table 4:  Regression Models of Fee Percent and Fee Amount

| | Published Opinions, No Fee Shifting Dependent Variable = | | | | Published Opinions, Fee Shifting Dependent Variable = | | | | Class Action Reports Dependent Variable = | | | |
| | Fee Amount | | | Fee Percent | Fee Amount | | | Fee Percent | Fee Amount | | | Fee Percent |
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gross recovery (log) | 0.839** (49.33) | | 0.859** (38.38) | -0.714** (10.70) | 0.763** (11.29) | | 0.751** (9.04) | -1.400** (3.87) | 0.895** (73.06) | | 0.898** (33.54) | -0.530** (9.39) |
| Lodestar amount (log) | | 1.050** (29.47) | | | | 0.997** (10.61) | | | | 1.194** (26.67) | | |
| Lodestar dummy | -0.038 (1.43) | | | -0.160 (1.48) | 0.023 (0.25) | | | 0.426 (0.77) | -0.050** (3.67) | | | -0.222** (3.40) |
| Defendant pays | -0.226** (4.13) | 0.067 (0.88) | -0.233** (2.99) | -0.895** (4.60) | 0.009 (0.12) | 0.087 (0.88) | 0.076 (0.81) | 0.266 (0.65) | | | | |
| Age (log years) | 0.051* (2.10) | -0.080* (1.99) | 0.022 (0.55) | 0.203* (2.16) | -0.064 (1.42) | -0.051 (0.79) | -0.084+ (1.83) | -0.562+ (1.83) | 0.046** (3.58) | -0.142** (2.97) | 0.050 (1.41) | 0.254** (4.09) |
| Appellate opinion | -0.023 (0.44) | 0.017 (0.26) | -0.090 (1.13) | 0.009 (0.05) | 0.333* (2.55) | 0.159 (1.23) | 0.380* (2.19) | 2.158* (2.42) | | | | |
| Federal case dummy | 0.120* (2.28) | 0.071 (1.01) | 0.078 (0.87) | 0.539* (2.53) | 0.063 (0.47) | -0.033 (0.31) | -0.001 (0.01) | 0.446 (0.52) | | | | |
| High-risk case dummy | 0.113** (3.58) | 0.081 (1.55) | 0.082* (2.13) | 0.529** (3.80) | 0.172+ (1.91) | 0.221 (1.67) | 0.192 (1.61) | 0.814+ (1.69) | | | | |
| Low-risk case dummy | -0.134** (3.46) | -0.066 (1.21) | -0.109* (2.18) | -0.616** (4.06) | -0.009 (0.10) | -0.077 (0.58) | -0.059 (0.50) | -0.364 (0.54) | | | | |

*62    Attorney Fees in Class Action Settlements*

Table 4:  Continued

| | Published Opinions, No Fee Shifting Dependent Variable = | | | | Published Opinions, Fee Shifting Dependent Variable = | | | | Class Action Reports Dependent Variable = | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fee Amount | | | Fee Percent | Fee Amount | | | Fee Percent | Fee Amount | | | Fee Percent |
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| Objector dummy | -0.031 (0.91) | 0.032 (0.73) | 0.010 (0.20) | -0.132 (0.94) | 0.053 (0.38) | 0.408* (2.47) | 0.053 (0.31) | 0.577 (0.72) | | | | |
| Nonincluded soft relief | 0.009 (0.21) | 0.021 (0.40) | -0.033 (0.51) | -0.079 (0.47) | -0.238 (1.17) | 0.173 (0.94) | -0.216 (0.80) | -0.639 (0.66) | | | | |
| Included soft relief | -0.022 (0.37) | 0.072 (0.94) | 0.063 (0.83) | 0.077 (0.34) | 0.060 (0.89) | -0.021 (0.19) | 0.073 (0.95) | 0.042 (0.10) | | | | |
| Settlement class | -0.005 (0.15) | 0.016 (0.35) | 0.024 (0.57) | -0.044 (0.33) | -0.148 (1.63) | -0.140 (0.94) | -0.171 (1.35) | -0.618 (1.14) | | | | |
| Year | 0.003 (0.70) | -0.008 (0.93) | 0.013* (2.36) | 0.019 (0.98) | -0.009 (0.67) | -0.010 (0.67) | -0.015 (0.71) | -0.032 (0.41) | 0.002 (1.21) | 0.006 (0.70) | 0.005 (0.74) | 0.014 (1.39) |
| Constant | -6.211 (0.67) | 15.035 (0.92) | -25.905* (2.34) | -28.514 (0.74) | 18.618 (0.71) | 20.933 (0.67) | 30.028 (0.73) | 77.321 (0.50) | -4.837 (1.18) | -13.089 (0.75) | -10.119 (0.74) | -19.159 (0.95) |
| Observations | 288 | 175 | 175 | 288 | 56 | 41 | 41 | 56 | 626 | 130 | 130 | 626 |
| Adj. $R^2$ | 0.92 | 0.87 | 0.91 | 0.49 | 0.95 | 0.95 | 0.94 | 0.65 | 0.94 | 0.86 | 0.93 | 0.25 |
| Root MSE | 0.20 | 0.24 | 0.21 | 0.85 | 0.21 | 0.21 | 0.22 | 1.24 | 0.15 | 0.26 | 0.19 | 0.73 |

Robust $t$ statistics in parentheses.

+ significant at 10%; *significant at 5%; **significant at 1%.

NOTE: Dependent variables are fee percent, transformed to square roots, and fee amount, transformed to logs. For the published opinion data, the sample is divided into fee-shifting and non-fee-shifting cases. Dummy variables for case categories are in the models but are not reported. A joint test of their significance in the published opinion data fails to reject the null hypothesis. They are highly significant in the *CAR* data. Variables not in the *CAR* models are not readily available in the *CAR* data. Root MSE is root mean squared error.

SOURCES: Reported class actions with fee awards, 1993–2002; 24 *Class Action Rep.* 169.

This is not a surprising result for common fund cases, given that fees in many such cases are determined as a percent of the class recovery. Gross recovery for the class is also highly significant, however, for fee-shifting cases, notwithstanding the fact that, in theory at least, court-awarded fees in such cases are not a function of the amount of class recovery. As Figure 3 shows, log scales reveal a positive linear relationship between fees and recovery in our data set of decided cases for both common fund and fee-shifting cases, as well as for the *CAR* data.

Focusing on a subset of the data—those cases with a computable lodestar amount reported—suggests that, in comparison to the client recovery, the lodestar fares poorly as a cost-effective way of calculating the fee, especially in non-fee-shifting cases. This conclusion emerges from comparing the second and third models for each of the three data sets—Models 2 and 3, 6 and 7, and 10 and 11. These models, by necessity, are limited to the subset of cases in which a lodestar award can be calculated[51] because we cannot test the lodestar calculation without information to compute the lodestar. We compare the ability of the client recovery variable to explain the fee with the ability of the lodestar calculation variable to explain the fee.

Consider first Models 2 and 3, those for non-fee-shifting cases. Table 3 shows that the lodestar-based Model 2 explains 87 percent of the variance in the fee award whereas the client-recovery-based Model 3 explains 91 percent of the variance. The client recovery model also has a lower root mean squared error. On both grounds it is preferable to the lodestar model. Yet it requires less effort to produce a client-recovery-based fee than a lodestar fee since the lodestar requires judicial scrutiny of hours and determination of hourly rates. The pattern is similar in the subset of the *CAR* data that allows computation of the lodestar. The client recovery Model 11 explains more variance with lower error than the lodestar Model 10. Only in the fee-shifting case data does the lodestar enjoy an advantage, but the advantage in both the percent of variance explained and the error seems trivial compared to the cost of computing the lodestar. And in the models that use fee percent as the dependent variable, client recovery models far outperform lodestar models. So whatever minor difference in fee the lodestar may yield in fee-shifting cases, it is hard to justify its time and expense in non-fee-shifting cases.

———

[51]For the *CAR* data, the lodestar amount is calculated by multiplying the hours awarded times the lodestar hourly rate.

*64    Attorney Fees in Class Action Settlements*

In the models of fee percent, Models 4, 8, and 12, the negative, significant coefficient on gross recovery[52] is worth highlighting. This scale effect—fee percent decreases as client recovery increases—provides empirical support for the normative justification underlying class actions. By aggregating smaller claims into a single larger action, economies of scale in legal services are achieved, which can be passed onto class members in the form of enhanced recoveries. Reform efforts that might undermine class actions should consider this efficiency.

The results for the lodestar dummy variable confirm the story suggested by Table 2. The lodestar method is associated with lower fees in non-fee-shifting cases and with higher fees in fee-shifting cases. The size of the coefficient is similar in the non-fee-shifting opinion models and the *CAR* data models. It is likely more significant in the *CAR* data because of that sample's larger number of cases. In addition, when we refine the samples down to a more common set of cases—securities cases in Table 5—the lodestar dummy variable behaves similarly in our data and in the *CAR* data.

At the same time, in models not reported here, we found no significance in the lodestar multiplier as an explanatory variable when added to the client-recovery-based model. We added this variable to Models 1, 4, 5, 8, 9, and 12, and one cannot reject the hypothesis that its coefficient is zero.[53] This is despite frequent judicial statements that the lodestar should be used to check the reasonableness of the fee awarded by the percentage method. The principal determinant of the fees awarded in class actions is the size of the class recovery, not the lodestar or lodestar multiplier.

*Complexity.* We expected a case's age to serve as a proxy for case complexity or attorney effort. In either case, it should be associated with increased fee awards. Table 3 presents mixed evidence about this hypothesis. Most of the nine models that use the client recovery as explanatory

───────

[52]We constructed the same models using net recovery rather than gross recovery as the key explanatory variable. No material change in results was observed.

[53]In models that limit the sample to cases reporting a lodestar and a multiplier, and that use the lodestar as an explanatory variable, the multiplier is significant. But these cases are in fact calculating the award by multiplying the lodestar. Since the multiplier is an after-the-fact adjustment to settle on a fee, the explanatory power of models using the lodestar and multiplier in lodestar cases is tautologous. These models have $R^2$ in excess of 0.99. Our question is whether one can explain the fee award without use of the after-the-fact multiplier.

In general, due to the smaller number of fee-shifting cases, results for these cases should be regarded as more tentative than results for non-fee-shifting cases.

variables show a significant association between case age and both fee amount and fee percent. But the association is positive in the non-fee-shifting and *CAR* common fund cases and negative in the fee-shifting cases.

The non-fee-shifting and *CAR* results square well with intuition. The fee-shifting result, even though only marginally significant, is somewhat mysterious, indicating that courts award lower fees in fee-shifting cases as the cases age. One possible explanation is that older fee-shifting cases may tend to be larger cases that cannot be settled quickly. If so, the client recovery effect may swamp the expected increase in the lodestar fee award due to the greater number of hours required of counsel as cases age. In fact, age and client recovery are substantially correlated in fee-shifting cases (rho = 0.481; $p$ = 0.0001) but not in non-fee-shifting cases (rho = 0.064; $p$ = 0.270). The coefficient for the age variable is positive if one omits client recovery from the model.

The non-fee-shifting and *CAR* models, Models 2 and 9, that use the lodestar as an explanatory variable also require explanation because the age variable changes sign and is significantly negatively related to the fee recovery. This may be because the lodestar fee is based on hours and already captures the time component of the case. If, as is likely, hours increase with case age, the lodestar amount should be more highly correlated with age than the client recovery. This turns out to be true, to a modest extent. The correlation between lodestar amount and age (rho = 0.272; $p$ = 0.0002) in non-fee-shifting cases is stronger than the correlation between client recovery and age (rho = 0.064; $p$ = 0.270). This stronger relation between lodestar amount and age persists in the *CAR* data (rho = 0.363; $p$ < 0.0001). The coefficient for the age variable is positive if one omits the lodestar amount from the model.

Another proxy for complexity is the presence of an appellate opinion. This was not significant in the published opinion data set for non-fee-shifting cases, but was significant for fee-shifting cases. It is difficult to interpret why the results vary between these two.

*Risk.* Risk influences fee awards in the expected manner. When courts mention risk in a way that we interpret as reflecting high risk, or when we could otherwise confidently code risk as high, there is a significant association with both the fee level and the fee percent. The sign on the high-risk variable coefficient is uniformly positive. Cases we interpret as being low risk, on the other hand, are associated with lower fees. The low-risk variable coefficient is always negative in both fee-shifting and non-fee-shifting cases. The

significance of the risk effects varies in non-fee-shifting and fee-shifting cases. In all non-fee-shifting models, a test of the hypothesis that the high- and low-risk variable coefficients are equal can be rejected at or beyond the 0.03 level. In the fee-shifting cases, the magnitude of the high-risk case effect is larger, as evidenced by the larger coefficients, but the test of the hypothesis that the two risk variables have equal coefficients can be rejected only at the 0.10 to 0.16 levels, depending on the particular model. The smaller fee-shifting sample may explain the less significant results.[54]

*Defendant Pays.* In non-fee-shifting cases, payment by defendant is associated with lower fee levels and percents, except in the seemingly inferior model using the lodestar as an explanatory variable. This result is consistent with the view that defendants exercise care to keep the fee low when they are paying it in addition to the client recovery. The absence of an effect in fee-shifting cases may be due to the fact that the defendant pays the fee in a substantial majority of fee-shifting cases.

*Objectors.* With the exception of one model, we cannot reject the hypothesis of no significant relation between the presence of an objector and the fee award. To alleviate the concern that the presence of an objector is not exogenous, we explored a simultaneous equation model in which the existence of an objection is modeled along with the fee award. The objection model included the fee award as an explanatory variable. Higher client recoveries and fee awards are significantly associated with the presence of an objector. For example, the median recovery in a case with an objector is $35 million; the median recovery in a case without an objector is $6.7 million. But the core objector-related result in Table 4 survived. We could not reject the hypothesis of no change in fee award in the presence of an objector.

―――――――

[54]This high-risk result should be reconciled with Table 3's descriptive statistics. The table indicates that, in fee-shifting cases, high risk is present in 16 percent of 59 cases. The presence of high risk is significantly associated with a lower fee percent, an initially strange result. The mean fee percent is 27.9 in high-risk cases compared to 39.4 in other cases. But this is an artifact of high-risk cases tending to have greater stakes. As the stakes increase, the scaling effect kicks in and drives the fee percent down. The median inflation-adjusted gross recovery in high-risk, fee-shifting cases is $4.6 million compared to a median of $492,000 in non-high-risk cases. As Table 4 shows, once one controls for size of recovery, high risk is associated with a higher percent fee, even in fee-shifting cases. A risk variable is not available in the *CAR* data.

*Settlement Classes.* We could not reject the null hypothesis as to the presence of a settlement class in non-fee-shifting cases. This result casts some doubt on the common perception that settlement classes are suspect because they can be vehicles for collusion between defendant and class counsel. It remains possible, however, that counsel do receive above-normal returns for their efforts in settlement classes because such classes tend to settle early and therefore may represent above-average hourly remuneration for counsel even if the fee as a percentage of the recovery is within ordinary limits. But the Table 4 models using the lodestar as explanatory variables also fail to reveal a settlement class effect.

*Soft Relief.* The presence of "soft" relief (such as coupons) when this was valued as part of the common fund is not statistically significant. Even though we distinguished between included and nonincluded soft relief, we find no robust soft relief effects.

*Federal Versus State Courts.* We predicted that fees as a percent of the recovery would be higher in state court class actions than in federal courts. This prediction is not confirmed by the evidence. If anything, the opposite is true. In two of the non-fee-shifting case models, being in federal court is significantly associated with higher fee levels and percents than is being in state court. In the other two models, the coefficient on the federal court dummy variable is also positive, although not significant. It might be supposed that this result is due to the impact of securities cases, almost all of which are in federal court and tend to generate fee percents above the norms for fee percentages across the universe of cases. In fact, however, the fee percents in nonsecurities cases are also higher in federal court than in state court (about 20 percent compared to 19 percent in nonsecurities, non-fee-shifting cases and 38 percent compared to 32 percent in fee-shifting cases).

*Time Trend.* The coefficient on the "Year" variable in Table 4 indicates that, in most models, we cannot reject the hypothesis of no linear time trend in either fee levels or fee percents. This result holds for both the published opinion data and the *CAR* data and is consistent with Figure 1. Model 3 is the only model with a significant and positive year effect. But this is for the subset of the data consisting of cases with a computable lodestar. A model using the subset of the data consisting of cases without a computable lodestar produces a negative coefficient for the year variable. We thus find no robust evidence of an increasing time trend in fees.

*C.  Securities Cases*

Table 4's regression models provide ambiguous guidance with respect to the relation between fees and case categories. As the note accompanying the table reports, a set of case category dummy variables is not significant in the published opinion data but is highly significant in the *CAR* data. To further explore fees in homogeneous categories, we separately analyze the published opinion non-fee-shifting cases by dividing the sample into securities cases and nonsecurities cases. The *CAR* data include only common fund cases and therefore have no fee-shifting cases. A further benefit of exploring securities cases separately is that it allows us to test the effect of the PSLRA on attorney fees.

A few adjustments to Table 4's models are necessary. First, for securities cases, we eliminated the federal case dummy variable. Over 98 percent of securities class actions we found were in federal court, so the federal case dummy would provide no information of value. Second, we introduced a post-PSLRA dummy variable to divide the sample into cases subject to the PSLRA and cases that preceded it. We treated a case as subject to the PSLRA if it was decided after the PSLRA and had an age in years that assured it commenced after the PSLRA's effective date. We treated a case as not subject to the PSLRA if (1) it was decided before 1996, or (2) it was decided after 1995 and had an age in years that indicated it commenced before the PSLRA's effective date. Cases that could not be unambiguously determined to be subject to or not subject to the PSLRA were dropped. Table 5 reports the results.

Table 5 suggests that the key results in Table 3 are not a consequence of combining the large group of securities cases with other class action cases. The key relations between fee size and client recovery, and fee percent and client recovery, remain intact. The effects of the defendant paying the fee and risk and the higher fees in federal court are also consistent with Table 4's results.

The new variable introduced in Table 5, the PSLRA dummy variable, provides ambiguous guidance. It is positive and significant in the published opinion securities case data, suggesting that fees in securities cases after the PSLRA increased both in level and percent—a result that was probably not intended by the drafters of the PSLRA, which is widely viewed as a statute intended to rein in the activities and profitability of securities class action attorneys. But the same variable is negative and insignificant in the *CAR* data models. The one unambiguous result is the absence of significant evidence that the PSLRA reduced fee awards in securities cases.

*Eisenberg and Miller*    *69*

Table 5:  Analysis of Securities Cases and Nonsecurities Non-Fee-Shifting Cases

|  | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
|  | *Securities Cases* | | *Nonsecurities Cases* | | *CAR Securities Cases* | |
|  | *Fee Amount* | *Fee Percent* | *Fee Amount* | *Fee Percent* | *Fee Amount* | *Fee Percent* |
| Gross recovery (log) | 0.854** (26.00) | −0.661** (4.76) | 0.832** (37.61) | −0.757** (8.85) | 0.916** (53.43) | −0.444** (5.31) |
| Lodestar dummy | −0.064+ (1.80) | −0.353* (2.21) | −0.005 (0.10) | −0.032 (0.20) | −0.048** (3.16) | −0.227** (3.04) |
| Post-PSLRA dummy | 0.089* (2.60) | 0.465** (2.81) | −0.000 (0.01) | | −0.011 (0.72) | −0.066 (0.93) |
| Defendant pays | −0.581** (4.69) | −2.308** (4.35) | −0.196** (2.87) | −0.718** (3.35) | | |
| Age (log years) | 0.029 (0.78) | 0.132 (0.87) | 0.077* (2.05) | 0.325* (2.35) | 0.039* (2.35) | 0.233** (2.91) |
| Appellate opinion | −0.063 (0.67) | −0.120 (0.27) | −0.012 (0.20) | −0.115 (0.52) | | |
| Multiplier (log) | 0.045 (1.26) | 0.112 (0.73) | −0.059 (1.51) | −0.172 (1.22) | −0.030 (0.79) | −0.107 (0.58) |
| High-risk case dummy | 0.100** (2.76) | 0.476** (2.91) | 0.103+ (1.90) | 0.521* (2.47) | | |
| Low-risk case dummy | −0.182** (3.26) | −0.768** (3.39) | −0.095 (1.53) | −0.411+ (1.79) | | |
| Objector dummy | −0.045 (1.07) | −0.106 (0.52) | −0.013 (0.27) | −0.053 (0.29) | | |
| Nonincluded soft relief | 0.021 (0.42) | 0.044 (0.19) | −0.000 (0.00) | −0.234 (1.16) | | |
| Included soft relief | −0.150 (0.71) | −0.213 (0.31) | 0.011 (0.17) | 0.054 (0.21) | | |
| Settlement class | −0.073* (2.07) | −0.337+ (1.89) | 0.014 (0.28) | 0.035 (0.19) | | |
| Federal case dummy | | | 0.153* (2.38) | 0.599** (2.90) | | |
| Constant | 0.387+ (1.71) | 9.530** (9.88) | 0.312* (2.04) | 9.283** (15.77) | −0.013 (0.11) | 8.168** (14.57) |
| Observations | 119 | 119 | 139 | 154 | 436 | 436 |
| Adj. $R^2$ | 0.94 | 0.46 | 0.91 | 0.49 | 0.94 | 0.16 |

Robust $t$ statistics in parentheses.

+ significant at 10%; *significant at 5%; **significant at 1%.

NOTE: Dependent variables are fee percent, transformed to square roots, and fee amount, transformed to logs. For the published opinion data, the sample includes only non-fee-shifting cases. Variables not in the *CAR* models are not readily available in the *CAR* data.

SOURCES: Reported class actions with fee awards, 1993–2002; 24 *Class Action Rep.* 169.

Another difference between the published opinion data and the *CAR* data is worth noting. The sign of the gross recovery coefficient is negative in fee percent Models 2 and 6. But the *CAR* data show significantly less of a scale effect. Although fee percent decreases with increasing size of class recovery in both, the rate of decrease is lower in the *CAR* data. The principal difference between the *CAR* data and the published opinion data is that the *CAR* data include substantial numbers of unpublished opinions. Courts may be discounting percentage fees to account for size of recoveries more in published opinions than in nonpublished ones. We offer two possible reasons for this result. First, when courts give an extremely generous fee (a high percentage for a large recovery), they may not want to advertise this fact for fear of being criticized, or out of concern that the decision might stand as an undesirable precedent for future cases where generous fees are not warranted. Second, the sources that yield the *CAR* data may tend to over-report high percentage awards relative to low percentage awards. Although *CAR* does not filter data,[55] it does solicit submissions of case information.[56] Attorneys might naturally tend to submit information about their highest percentage awards. In the context of jury verdict reports, such solicitation methodology has led to upwardly biased estimates of award amounts.[57]

### D. Costs and Expenses

We also examined costs and expenses of litigation. For non-fee-shifting cases, we had usable costs and expenses and recovery data for 232 cases. For fee-shifting cases, we had usable data for 43 cases. Costs and expenses for the sample as a whole were, on average, 4 percent of the relief for the class and 16 percent of the fee. Table 6, Panels A and B, break these figures down by legal regime and case category. Table 6, Panel C shows similar figures for the *CAR* data. The median values were, respectively, 2.3 percent and 10.5 percent in our opinion data and 3.1 percent and 11.3 percent, respectively, in the *CAR* data. Costs and expenses also varied across case type and legal regime, as shown in Table 6, Panel A. The highest median costs in a case category with at least 10 cases were 5.9 percent in consumer fee-shifting

---

[55]24 Class Action Rep. at 168.

[56]Id. at first page, unnumbered.

[57]Theodore Eisenberg, Neil LaFountain, Brian Ostrom, David Rottman & Martin T. Wells, Juries, Judges, and Punitive Damages: An Empirical Study, 87 Cornell L. Rev. 743, 747 (2002).

Table 6:   Costs and Expenses by Legal Regime and Case Category

| Category | *Non-Fee-Shifting Cases* | | | | *Fee-Shifting Cases* | | | |
|---|---|---|---|---|---|---|---|---|
| | Mean | Median | SD | N | Mean | Median | SD | N |
| A. Costs as Percent of Recovery | | | | | | | | |
| Antitrust | 2.7 | 2.1 | 2.6 | 30 | — | — | — | — |
| Civil rights | 8.4 | 8.4 | 7.2 | 2 | 4.9 | 4.3 | 4.0 | 4 |
| Consumer | 4.6 | 0.7 | 9.6 | 35 | 8.0 | 5.9 | 6.6 | 14 |
| Corporate | 2.2 | 1.4 | 2.2 | 8 | — | — | — | — |
| Employment | 2.9 | 2.8 | 3.0 | 4 | 5.3 | 2.8 | 7.4 | 12 |
| ERISA | 3.9 | 4.0 | 2.5 | 3 | 3.1 | 2.4 | 2.7 | 11 |
| Mass tort | 3.7 | 2.1 | 3.9 | 3 | — | — | — | — |
| Securities | 3.9 | 3.0 | 3.5 | 125 | — | — | — | — |
| Tax refund | 0.0 | 0.0 | — | 1 | — | — | — | — |
| Tort | 2.9 | 1.6 | 3.6 | 10 | — | — | — | — |
| Other | 2.1 | 2.2 | 1.3 | 11 | 1.6 | 1.6 | 0.3 | 2 |
| Total | 3.7 | 2.2 | 4.8 | 232 | 5.4 | 3.0 | 5.9 | 43 |
| B. Costs as Percent of Fee Award | | | | | | | | |
| Antitrust | 15.9 | 10.0 | 20.8 | 31 | — | — | — | — |
| Civil rights | 19.6 | 12.7 | 15.6 | 3 | 22.2 | 21.5 | 19.4 | 8 |
| Consumer | 26.8 | 4.7 | 53.8 | 38 | 16.8 | 9.1 | 19.3 | 15 |
| Corporate | 7.5 | 7.5 | 4.8 | 11 | — | — | — | — |
| Employment | 11.6 | 10.4 | 11.3 | 4 | 14.7 | 6.8 | 14.8 | 12 |
| ERISA | 14.4 | 16.6 | 6.1 | 4 | 12.1 | 6.8 | 10.6 | 11 |
| Mass tort | 23.3 | 20.0 | 18.7 | 3 | — | — | — | — |
| Securities | 15.9 | 13.0 | 12.5 | 136 | — | — | — | — |
| Tax refund | 1.1 | 1.1 | — | 1 | — | — | — | — |
| Tort | 14.2 | 15.0 | 11.4 | 11 | — | — | — | — |
| Other | 7.0 | 7.0 | 4.0 | 12 | 5.9 | 5.8 | 2.9 | 4 |
| Total | 16.7 | 10.7 | 24.5 | 254 | 15.3 | 8.0 | 15.8 | 50 |

C. Class Action Reports Data (*CAR*), 1993–2002

| | *Costs as Percent of Recovery* | | | | *Costs as Percent of Fee* | | | |
|---|---|---|---|---|---|---|---|---|
| Antitrust | 2.8 | 2.0 | 2.8 | 28 | 10.3 | 7.7 | 10.1 | 28 |
| Consumer | 2.9 | 1.0 | 5.0 | 36 | 14.3 | 4.1 | 26.3 | 36 |
| Civil rights | 4.2 | 2.4 | 4.4 | 4 | 18.2 | 17.6 | 12.6 | 4 |
| Derivative | — | — | — | — | — | — | — | — |
| Employment | 3.3 | 1.5 | 4.0 | 8 | 11.9 | 6.5 | 11.3 | 8 |
| Environmental | 6.8 | 6.8 | 8.0 | 2 | 19.4 | 19.4 | 21.2 | 2 |
| Government regulation | 5.7 | 5.7 | — | 1 | 19.3 | 19.3 | — | 1 |
| Labor/wage/pension | 1.7 | 0.9 | 1.7 | 28 | 7.8 | 5.3 | 6.8 | 28 |
| Mass tort | 3.9 | 3.4 | 3.4 | 8 | 21.2 | 15.0 | 17.6 | 8 |
| Securities | 4.8 | 3.6 | 4.3 | 461 | 17.9 | 12.4 | 28.0 | 461 |
| Taxpayer | 0.0 | 0.0 | — | 1 | 1.1 | 1.1 | — | 1 |
| Utilities | 1.1 | 1.1 | 0.4 | 2 | 5.4 | 5.4 | 2.5 | 2 |
| Social welfare/ entitlements | 0.4 | 0.4 | — | 1 | 2.9 | 2.9 | — | 1 |
| Total | 4.4 | 3.1 | 4.3 | 580 | 16.7 | 11.3 | 26.2 | 580 |

SOURCES:  Reported class action settlements with fee awards; 24 *Class Action Rep.* 169.

cases. For case categories with data available for more than 10 cases, Panel B shows that securities cases had the highest median costs as a percent of the fee, 13.0 percent.

A regression model, not reported here, of costs as a percent of recovery controls for case category and other factors used in Table 4. The model shows that costs, like fees, have a scale effect: their percent of recovery significantly declines as the size of the recovery increases, a result confirmed in the *CAR* data. The cost percent significantly increases with a case's age, also confirmed by the *CAR* data, and tends to be significantly higher in fee-shifting cases than in non-fee-shifting cases. We find no evidence in our data or the *CAR* data that the cost percent is increasing over time.

## V. A PRACTICAL APPLICATION—A LOOKUP TABLE TO CHECK ON FEE AWARDS

Our study provides information that may be useful to courts in evaluating requests for attorney fees, costs, and expenses in class action cases. Most simply, because our study finds an overwhelming correlation between class recovery and attorney fees, the court can conduct a simple initial inquiry that looks only at these two variables in any case where the size of class recovery can be estimated. The court need only compare the request in a given case with average awards in cases of similar magnitude. If the request is relatively close to average awards in cases with similar characteristics, the court may feel a degree of confidence in approving the award. If the request is significantly higher than amounts awarded in past cases, the court should inquire further. The methodology is more appropriate for non-fee-shifting cases in which, as Table 1 shows, the range of fee-award percents is less variable than in fee-shifting cases. Accordingly, we use only non-fee-shifting cases in the following analysis.

To provide numerical guidance, we divide the client recoveries in our published opinion data by decile, thus assigning approximately ten percent of the cases to one of ten ordered groups. For each client recovery decile, we compute the mean and median fee percents, and the standard deviation, for the published opinion data set. Since the deciles each contain an approximately equal number of cases, each fee percent computation is based on similarly sized samples. Table 7, Panel A, reports the results.

The table's first column identifies each decile. The second column shows the range of client recovery for the decile—for example, less than $1.4

Table 7:  Fee Percent at Deciles of Client Recoveries

| Client Recovery Decile | Recovery Range in Decile ($ Millions) | Mean Recovery in Decile ($ Millions) | Mean Fee Percent | Median Fee Percent | SD Fee Percent |
|---|---|---|---|---|---|
| A. Published Opinion Data | | | | | |
| Less than 10% | <1.4 | 0.8 | 29.5 | 30.0 | 5.9 |
| 10 to 20% | 1.4 to 3.1 | 2.3 | 26.5 | 25.0 | 10.9 |
| 20 to 30% | 3.1 to 5.2 | 4.3 | 25.0 | 29.4 | 7.9 |
| 30 to 40% | 5.2 to 9.7 | 7.2 | 25.6 | 26.0 | 7.0 |
| 40 to 50% | 9.7 to 15 | 12.0 | 22.7 | 22.4 | 8.4 |
| 50 to 60% | 15 to 22 | 18.8 | 22.0 | 24.5 | 8.6 |
| 60 to 70% | 22 to 38 | 30.4 | 19.0 | 19.0 | 9.9 |
| 70 to 80% | 38 to 79 | 53.7 | 16.9 | 15.5 | 10.2 |
| 80 to 90% | 79 to 190 | 122.2 | 17.6 | 15.0 | 9.2 |
| Greater than 90% | >190 | 929.1 | 12.0 | 10.1 | 8.1 |

B. Class Action Reports Data (*CAR*)

| Client Recovery Decile | Recovery Range in Decile ($ Millions) | Mean Recovery in Decile ($ Millions) | All Cases | | | Nonsecurities Cases | | |
|---|---|---|---|---|---|---|---|---|
| | | | Mean Fee Percent | Median Fee Percent | SD Fee Percent | Mean Fee Percent | Median Fee Percent | SD Fee Percent |
| Less than 10% | <1.4 | 0.8 | 30.0 | 30.0 | 9.9 | 30.9 | 33.2 | 8.2 |
| 10 to 20% | 1.4 to 3.1 | 2.3 | 29.2 | 30.0 | 5.4 | 25.6 | 25.0 | 6.9 |
| 20 to 30% | 3.1 to 5.2 | 4.3 | 28.9 | 30.0 | 6.1 | 26.5 | 26.4 | 7.9 |
| 30 to 40% | 5.2 to 9.7 | 7.2 | 28.7 | 30.0 | 5.3 | 28.9 | 29.6 | 5.1 |
| 40 to 50% | 9.7 to 15 | 12.0 | 28.0 | 30.0 | 6.1 | 27.3 | 25.0 | 5.2 |
| 50 to 60% | 15 to 22 | 18.8 | 26.7 | 28.0 | 7.8 | 26.6 | 30.0 | 7.9 |
| 60 to 70% | 22 to 38 | 30.4 | 24.8 | 25.0 | 9.7 | 22.1 | 23.4 | 10.1 |
| 70 to 80% | 38 to 79 | 53.7 | 24.3 | 25.4 | 8.5 | 23.9 | 25.5 | 9.0 |
| 80 to 90% | 79 to 190 | 122.2 | 20.3 | 20.8 | 7.5 | 19.5 | 20.2 | 8.3 |
| Greater than 90% | <190 | 929.1 | 16.4 | 17.6 | 9.6 | 17.6 | 16.4 | 10.6 |

NOTE: Client recovery amounts are in millions of inflation-adjusted $ 2002. Client recovery ranges and deciles in the second and third columns of both panels are computed using the published opinion data. The *CAR* data show the median fee percent award in the *CAR* data for the recovery range shown in the second column.

SOURCES: Reported class action settlements with fee awards, 24 *Class Action Rep.* 169.

million in the first decile. The next column shows the mean client recovery within the decile. For example, in the 30 to 40 percent decile, the mean client recovery was $7.2 million (with a range of $5.2 to $9.7 million). In Panel A, the next three columns show the summary statistics for the fee

percent within each decile. Panel B shows the summary statistics for the *CAR* data in the same range of client recovery. Because the *CAR* data are so dominated by securities cases, we report separately the fee percent for all *CAR* cases and for *CAR* nonsecurities cases alone.

With respect to fee percents, Table 7 shows, for example, that the mean fee percent in the lowest decile in the decided cases data was 29.5, the median was 30.0, and the standard deviation was 5.9. In that same range of client recovery, the median fee award in the *CAR* data was 30.0 percent for all cases and 33.2 percent for nonsecurities cases. In the highest decile of recovery, the mean client recovery was $929,100,000 in the decided cases data. The mean fee percent was 12.0 percent, with a median of 10.1 percent, and a standard deviation of 8.1 percent. In that range of client recovery, the median fee award in the *CAR* data was 17.6 percent for all cases and 16.4 percent for nonsecurities cases. Clearly, a substantial scaling effect is at work but, as discussed above, it is less strong in the *CAR* data than in the published opinion data.

Figure 8 illustrates the effect graphically. It differs from Table 7 in that we allow the *CAR* data to "speak for itself" by using the client recovery deciles as generated by its data. Both portions of Figure 8 show a scaling effect but it is less extreme in the *CAR* data.

Approximately 68 percent of the cases in each decile range are predicted to fall within one standard deviation of the predicted fee, and 95 percent of the cases are predicted to fall within two standard deviations of the predicted fee. The standard deviations are reported in Table 7, and illustrated in Figure 8.

Our suggestion is that fee requests falling within one standard deviation above or below the mean should be viewed as generally reasonable and approved by the court unless reasons are shown to question the fee. Fee requests falling within one and two standard deviations above or below the mean should be viewed as potentially reasonable but in need of affirmative justification. Fee requests falling more than two standard deviations above or below the mean should be viewed as presumptively unreasonable; attorneys seeking fees above this amount should be required to come forward with compelling reasons to support their request. This methodology assumes that judges render, on average across many cases, reasonably fair and efficient awards. If judges have not achieved these normative goals in existing awards, then their use as guidelines should be further tempered.

To illustrate how a court could use this information, suppose class counsel requests a fee of $7.5 million, equal to 25 percent of a recovery of

*Eisenberg and Miller    75*

Figure 8:    Fee percent range (one standard deviation) at levels of client recovery.



$30 million. At $30 million for the class, the mean fee in the published cases data set is 19.0 percent or $5.7 million. The question is whether the requested fee would be in the range of reason. At the $30 million recovery level, the one-standard-deviation range of fee percents is 9.9 percent, yielding a high end fee of 28.9 percent. The 28.9 percent figure corresponds to $8.67 million of a $30 million recovery. So a $7.5 million fee, equal to 25 percent of the recovery, is within one standard deviation of the mean fee at this client-recovery level. Thus the requested fee falls within the range of reasonableness and the court should approve it unless the court has information leading it to question such an award. On the other hand, suppose

counsel requests a fee of \$10 million or 33.3 percent of a \$30 million award. This request is more than one standard deviation above the mean of \$5.7 million and therefore should not be approved unless further evidence justifies the award. But neither should the court automatically disapprove such a fee, because it is well within two standard deviations of the mean at this recovery level (38.8 percent or \$11.64 million). Finally, suppose counsel requested a fee of 40 percent, or \$12 million. Because this is more than two standard deviations above the mean award at this recovery level, the court should presumptively disapprove the request unless powerful reasons justify approval.

In evaluating the fee according to this methodology, the court could appropriately take into account factors identified in this study as influencing the amount of the fee other than the gross recovery for the class. For example, case type might be considered. Table 1 shows that consumer class actions tend to generate lower fee percents than securities class actions. But case type should not receive too prominent a role. Table 4's reported opinion regression models do not permit rejection of the hypothesis that case categories, as a group, have no significant effect on fee recovery. If the case presents a higher-than-average risk profile, the court might well consider this a factor that could justify a higher-than-normal fee. Conversely, if the case is deemed low risk, this could be a factor yielding a reduced fee. Since, as Table 4 shows, the lodestar multiplier has no observable effect on fees in the published opinion data when one controls for client recovery and other variables, courts may appropriately give this factor less importance than the rhetoric of many cases suggests. In light of the substantial practical problems with calculating the lodestar, courts may even elect to dispense with this analysis altogether.

## VI. CONCLUSION

This study provides information about attorney fees and expenses awarded in both common fund and fee-shifting class action cases as well as in shareholders derivative cases in which the amount of the recovery for the corporation can be calculated. The single most important factor determining the fee is the size of the client's recovery. Non-fee-shifting and fee-shifting cases have such distinct fee characteristics that analyzing them together is inappropriate for many purposes. As theory would predict, given the incentives facing attorneys in fee-shifting cases, fees in these cases are significantly

higher as a percent of class recovery than fees in non-fee-shifting common fund cases.[58]

Fee size also increases as cases are found in federal rather than state court. The fee as a percent of client recovery is noticeably below the widely quoted one-third level, ranging from about 30 percent in the smallest cases down to about 10 percent in the largest cases in the published opinion data set. Fee as a percent of recovery in the *CAR* data was also below the one-third level, but was higher than in the published opinion data.

As theory also predicts, fees in fee-shifting cases display a markedly wider variance, as a percent of recovery, than fees in common fund cases (standard deviation of 25.0 percent for fee-shifting cases as compared with 9.9 percent for non-fee-shifting cases).

We find no robust evidence that attorney fees in common fund cases have been increasing or decreasing over the 10-year period studied. Upward time trend effects are not robust in models that include key variables. Nor do we find evidence that the presence of an objector has an impact on the fee, either up or down. Settlement classes were not robustly significantly associated with fee levels. We find some evidence that complexity is correlated with higher fees: age of the case was significant and positive for some non-fee-shifting case models and the presence of an appellate opinion was significant and positive for non-fee-shifting cases. However, the results on complexity were ambiguous both because we used inexact proxies for this variable (which is in itself poorly defined) and because we found no significance for appellate opinions in non-fee-shifting cases and a negative and significant result for age in fee-shifting cases.

We find evidence that fees tend to be higher in federal court than in state court in non-fee-shifting cases, and that, also in non-fee-shifting cases, fees tend to be lower when the defendant pays the fee rather than when the fee is taken out of the class recovery. The fact that the defendant pays the fees in a non-fee-shifting case was highly significant in most models (beyond the 0.01 level) and negative, suggesting that even when the money in some sense comes out of the same "pot" (the defendant's bank account), the defendant's commitment to pay the fees had a moderating effect on their amount.

Risk is also usually significant: fees as a percentage of the recovery tend to be higher in high-risk cases than in other cases, and lower in low-risk cases.

---

[58]Regression models not reported here strongly confirm this.

As to soft relief, we find no evidence that either soft relief included in the estimated benefit for the class, or soft relief that is not included in the estimated benefit, affects the fee award, either up or down.

We find robust evidence of a scaling effect. The percent of the recovery that goes to attorneys decreases as the size of the recovery increases, in both the reported opinions and in the *CAR* data. This effect can be interpreted as supporting the underlying theory for class actions. As similar cases are aggregated, the efficiency gains yield an increased net return to clients. This economy of scale carries over to costs and expenses. Costs absorb a lower percent of the recovery as the recovery increases. Costs also increase with case complexity and are higher in fee-shifting cases.

Finally, we present a table that can guide courts in assessing the size of the fees in class action cases. Given a level of client recovery, the table provides evidence of the presumptively valid range of fees.

**B-2**

LEXSEE 5 STAN JL BUS FIN 121


Copyright (c) 1999 The Board of Trustees of the Leland Junior University
Stanford Journal of Law, Business & Finance

Spring, 1999

*5 Stan. J.L. Bus. & Fin. 121*

**LENGTH:** 20508 words

FEATURES: Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions

**NAME:** Denise N. Martin, Vinita M. Juneja, Todd S. Foster and Frederick C. Dunbar*

**BIO:**

* Denise Martin is a Senior Consultant, Vinita Juneja is a Vice President, Todd Foster is an Analyst and Frederick Dunbar is a Senior Vice President at National Economic Research Associates, Inc. (NERA), an economic research and consulting firm.

**SUMMARY:**
 ... In this paper, after reviewing the relevant theoretical literature on whether shareholder class actions lead to optimal deterrence, we update our previous analysis of securities class action settlements using an expanded dataset. ...    The lodestar approach leads to collusive settlements, where a deal is struck to pay the attorneys' fees rather than to make the plaintiffs whole. ...    She finds no variation among the settlements as a percentage of shareholder losses, and asserts that it would be inconceivable that each of the cases had the same merit. ...    However, our studies also reveal that only 53 to 61 percent of the variance in settlements is explained by the presence or absence of codefendants, the age of the case, and the size of either investor loss or plaintiffs' damage estimates. ...    The database shows that the percentage of settlements to plaintiffs' claimed damages has a mean of 14 percent and a median of 12 percent. ...

**TEXT:**

   [*122]  **Introduction**

   Over the past seven years, National Economic Research Associates, Inc. ("NERA") has conducted a descriptive analysis of recent trends in securities class actions. We publicize this research primarily to provide a consolidated source of information for risk managers, plaintiff and defendant counsel, policymakers, and other interested parties. Risk managers may use this information to assess the likely exposure associated with potential future litigation and, consequently, to determine appropriate director and officer insurance premiums. Lawyers for defendants, plaintiffs, and insurance companies involved in pending shareholder class action lawsuits may use this research to estimate the likelihood of settlement and settlement amounts. These estimates may also serve a valuable function in determining appropriate attorneys' fees. Policymakers may use these results to draw conclusions regarding the appropriateness of litigation reform measures.

   In this paper, after reviewing the relevant theoretical literature on whether shareholder class actions lead to optimal deterrence, we update our previous analysis  [*123]  of securities class action settlements using an expanded dataset. We then use this dataset to perform statistical tests related to questions raised by optimal deterrence. In particular, we seek to explain the variance in settlement size and assess whether case merits play a role in settlement negotiations. While we are unable to find a general proxy for merits that has a consistent, statistically significant effect on settlement size, we find that the timing of settlements may indeed be reflective of a case's merits. In addition, we offer statistical evidence that only a portion of low-valued settlements are likely to be nuisance suit settlements.


**A. Stylized Facts on Shareholder Class Actions**

5 Stan. J.L. Bus. & Fin. 121, *

. From January 1991 through June 1998, 1,349 shareholder class actions were dismissed, settled, or reached a jury verdict.
. The annual number of dispositions increased from 131 cases in 1991 to 200 cases in 1997.
. Over the past seven-and-one-half year period, 83 percent of database cases settled. In general, most cases slated for appeal are settled before resolution of the pending appeal.
. The average proportion of settlement amount to plaintiffs' claimed damages is 14 percent. The average proportion of settlement amount to investor losses is about 9 percent.
. Of those settlements for which investor losses have been calculated, about 25 percent of the settlements are for total amounts less than $ 2 million.
. At least $ 5.5 billion was paid in settlement awards from January 1991 through June 1998. Plaintiffs' attorneys typically received up to one-third of settlement awards.

## B. Background

Over the past several years, a debate has regard over whether too much shareholder litigation exists. The stylized facts presented above reveal the magnitude of this litigation, as well as recent trends.   n1 What may be the first round of the public policy debate ended on December 22, 1995, when Congress overrode President Clinton's veto of the Private Securities Litigation Reform Act. Congress sided with advocates of reform and passed legislation to encourage a "reduction of abusive litigation" and a "reduction of coercive settlements." The recent passage of the  [*124]  Securities Litigation Uniform Standards Act of 1998, which removes many state securities class actions to federal court, may mark the end of round two.

In assessing the need for these reforms, scholars, politicians, attorneys, investors, and corporate officers advanced diverse opinions about whether the legal process functions efficiently or is out of control. Assuming an excess of shareholder class action lawsuits, these parties also disagreed (and continue to disagree) over the appropriate design of statutory reforms. In part, these conflicts arise because of differing incentives: while some contingents desire to rein in plaintiffs' attorneys at any cost, others fear that reform will fail to protect the small investor from securities fraud.

The debate over reforms follows a decade of scholarly criticism on various aspects of shareholder class actions, much of which is based on seemingly sound theoretical argument.   n2 These published analyses evaluate the procedures and rules for assessing liability and measuring damages. They determine, on a theoretical level, the effects of rules and procedures on the behavior of plaintiffs' attorneys and on management of defendant companies. These critiques demonstrate that, for a variety of reasons, shareholder litigation fails to provide optimal deterrence of securities fraud, i.e., fails to provide a system which maximizes the expected benefits of deterring securities fraud (e.g., capital market efficiency and investor protection), while minimizing the associated resource costs (e.g., enforcement, detection, litigation, and mistakes).

Ideally, rigorous empirical research would test the theories put forth by academics and help resolve key issues in the policy debate. Interestingly, parties involved in the debate agree on the proper analytical framework for conducting these empirical tests. In particular, they agree that the goal of securities laws is to achieve optimal deterrence. As such, a thorough empirical analysis would test: (1) whether the marginal social benefit of bringing shareholder class action suits is greater than or equal to the marginal social cost and (2) whether the overall social benefits of shareholder litigation are greater than the costs.

As a practical matter, however, empirical measurement of the costs and benefits is difficult, if not impossible, to conduct. Consequently, the empirical literature to date has tended to focus on the issue of whether a case's merits influence its filing and disposition -- i.e., whether the "merits matter".   n3 Unfortunately, much of the prior data analysis does not make full use of sophisticated, modern statistical techniques. Consequently, even in this somewhat narrow arena, the research is not yet rich enough  [*125]  to come to sweeping conclusions about the costs and benefits of these laws and the ensuing litigation.

## C. Summary of Empirical Findings

Ultimately, this paper examines the factors that (1) influence shareholder filings and (2) influence dispositions (including settlement amounts) of class action lawsuits. We do so here in an attempt to assess this key question in the debate on optimal deterrence: are meritorious (and only meritorious) cases being filed and settled?

5 Stan. J.L. Bus. & Fin. 121, *

First, we review the existing theoretical literature on deterrence. We find that contradictions in results obtained across different studies have led to confusion about whether, and to what extent, shareholder class action lawsuits deter fraudulent behavior. In particular, we verify that the current system, though plausibly resulting in some deterrence, cannot result in optimal deterrence. However, given counterbalancing forces, we cannot concur that the reforms put in place in 1995 have led us closer to optimal deterrence or even that there are any easy fixes, not yet implemented, that will do so.

Second, we update and expand upon the empirical research using more sophisticated valuation and statistical techniques. In particular, we investigate the proportion of shareholder class action claims that should be characterized as "nuisance suits", we assess whether the time to settlement is indicative of a case's merits and we conduct formal tests of whether the case merits influence settlement amount.

Our empirical results show:

1. The merits of most of these lawsuits -- measured by a number of factors that affect the apparent strength of the case on liability -- seem to be of relatively little, if any, importance in determining the amount of settlement.
2. The estimate of damages that plaintiffs would be able to present to the jury has much more explanatory power on settlement size than do the merits.
3. The amount of assets available -- primarily insurance limits but also measured by the defendant firm's capitalization -- is also a better indicator of settlement size than the merits.
4. High technology firms get sued more often than firms in other industries. This finding supports other research indicating that volatility, separate from the merits, increases the likelihood of an issuer being sued.
[*126] 5. Firms in the health services sector, particularly those subject to a governmental investigation prior to a complaint's filing, settle for significantly higher amounts than would otherwise be expected.
6. Filings are higher during time periods when the stock market is falling indicating that unconditional stock price declines, again separate from the merits, increase the likelihood of litigation.
7. Despite our finding that the merits don't much matter, it is not possible to say that a large number of lawsuits are nuisance suits -- rather, the majority of these suits tend to have low value because they have a low, though not insignificant, chance of winning at trial.

## I. Theoretical Critiques of Shareholder Litigation

Over the past decade, certain academics have argued that, for a variety of reasons, shareholder litigation fails to provide optimal deterrence of securities fraud. (As noted above, from the perspective of society, optimal deterrence is achieved when the marginal benefits of deterrence, e.g., capital market efficiency and investor protection, are equal to the marginal costs, e.g., enforcement, detection, litigation and mistakes). In particular, these commentators have asserted that:

1. Plaintiffs' attorneys have incentives to pursue strategies not necessarily in the best interests of their clients (potentially leading to over- or under-deterrence);   n4
2. The rules on damages in 10b-5 cases result in claims that are much higher than either the net harm to society or the profits to the defendants (potentially leading to over-deterrence);   n5
3. Damage claims are not paid by those individuals responsible for the fraud, but by current shareholders (potentially leading to under-deterrence);   n6 and
[*127] 4. The optimal private strategy for plaintiffs and defendants is not necessarily socially optimal because the merits of the case are of secondary importance in negotiating settlements (potentially leading to over- or under-deterrence).   n7

## A. Conflicts Between Plaintiffs' Attorneys and Their Clients

A series of articles by Professor John C. Coffee, Jr. has examined the incentives of plaintiffs' attorneys and shows that the interests of plaintiffs' counsel are not necessarily aligned with their clients.   n8 The analysis starts with the proposition that plaintiffs' attorneys make a decision to bring or proceed with a case that maximizes their own profits. Coffee then addresses two issues of particular concern: (1) the incentive of the plaintiffs' bar to bring "strike" or "nuisance" suits and (2) the perverse incentives caused by alternative methods of awarding attorneys' fees that result in lower than optimal settlements for meritorious claims.   n9 If securities fraud lawsuits are brought and settled with low

5 Stan. J.L. Bus. & Fin. 121, *

correlation to their merits, it would appear that fraudulent behavior is not punished consistently or enough and that non-fraudulent behavior may not be rewarded with freedom from litigation. Such a finding would indicate that the system deviates from the ideal of optimal social deterrence.

### 1. Nuisance Suits

According to Coffee, nuisance suits continue to be filed because plaintiffs and defendants bear asymmetric costs. Because defendants' costs tend to be higher than plaintiffs' costs, defendants' optimal strategy results in settling rather than undergoing costly litigation. n10 Consider a situation where defense costs are three times plaintiffs' costs, and the plaintiffs' attorneys' contingency fee totals one-third of the ultimate recovery amount. Even if a case has a small, but positive, chance of producing a court [*128] victory for plaintiffs, it pays for defendant to settle the case for an amount equal to the expected defense cost. Such an outcome is also satisfactory to plaintiffs' attorneys because they recover their opportunity cost. However, it may not be worthwhile for shareholder plaintiffs themselves to have these cases filed, since they receive little net benefit. Such strategic considerations underlie some, but not all, of the conjecture that the merits of cases do not impact settlement amount. n11

Coffee suggests that nuisance suits also exist because the suits allow a plaintiffs' law firm to diversify its portfolio of ongoing lawsuits for purposes of risk-spreading. n12 Put another way, each time a plaintiffs' law firm files a complaint, it makes a bet. The possible outcomes of each bet include receiving a large judgment at trial, getting a before-trial settlement for a fraction of the potential jury award, or receiving an adverse decision. A large number of these bets have a low probability of hitting the jackpot, but a fairly high probability of some type of settlement. These settlements, plus the very few jackpots, are enough to make the plaintiffs' law firm profitable. Again, however, this diversification of cases does not necessarily maximize the payoff to their clients, who might instead choose to pursue only those claims with a strong likelihood of success.

### 2. Fee Arrangements

Plaintiffs' attorneys are typically compensated under one of two fee arrangements: lodestar or contingency. Under lodestar, plaintiffs' attorneys are paid according to the time they spend on the case plus a bonus, which reflects risks taken (including the deferral of the payment). n13 This payment method contrasts with the contingent fee arrangement. Under contingency, plaintiffs' attorneys receive a percentage of the total recovery, usually up to about 33 percent (see Table 4).

Coffee shows that neither system aligns the incentives of plaintiffs' attorneys and their clients. n14 The lodestar approach leads to collusive settlements, where a deal is struck to pay the attorneys' fees rather than to make the plaintiffs whole. The contingency approach has the well-known infirmity that plaintiffs' attorneys will equate the marginal cost of their effort to their percentage of the marginal recovery rather than to the marginal recovery. This rule will lead to suboptimal effort and suboptimal recovery. n15

[*129] The latter problem can be understood with an example. Suppose that in the early phases of a lawsuit, a plaintiffs' law firm is deciding whether to spend an extra $ 10,000 dollars worth of time (measured in terms of opportunity cost) with the expected return to plaintiffs of $ 100,000 minus a 30 percent contingency fee. The incremental profit to the law firm for this extra effort is $ 20,000 (equal to the $ 30,000 expected fee minus the $ 10,000 opportunity cost). In this instance, the plaintiffs' attorneys will choose to make the extra effort. Moreover, this effort is clearly in the interests of their clients who expect to receive an extra $ 70,000 as a result.

In the typical lawsuit, however, extra effort by attorneys eventually leads to decreasing returns. At this point, under a contingent fee arrangement, the interests of plaintiffs' attorneys diverge from the interests of plaintiffs. To continue the example, suppose that $ 10,000 in effort leads to an expected recovery of only $ 25,000. Under a contingent fee arrangement, plaintiffs would recover $ 17,500 from this effort (equal to $ 25,000 minus 30 percent of $ 25,000). As a result, it would be in plaintiffs' interest to pursue this effort.

When plaintiffs' attorneys control the decision-making and are paid a contingency, however, the decision-making is based on the expected profits to the law firm. In this instance, the law firm profits would be negative $ 2,500 (equal to the contingency fee of $ 7,500 minus the $ 10,000 opportunity cost). At this point, therefore, plaintiffs' lawyers will choose to settle the case rather than pursue efforts that would otherwise be in their clients' interest.

A solution to this incentive problem would be to auction recovery rights to plaintiffs' law firms. n16 In such an auction, the law firm making the highest bid would pay this amount directly to plaintiffs. These attorneys would then pursue the litigation and keep any recoveries for themselves. In such a circumstance, attorneys would expend extra ef-

fort whenever expected marginal recovery promised to exceed marginal opportunity cost. However, as Coffee notes, one potential problem with the auction mechanism is that it does not provide adequate incentive for entrepreneurial attorneys to search for meritorious cases. n17 In particular, an entrepreneurial attorney is rewarded for finding fraud only through a share of the recovery. Under the auction approach, however, all recoveries go to the firm that wins the auction; therefore, there is no guarantee that the successful bidder is the firm that detected the fraud. Once the decision has been made to bring a suit, then, the auction approach ensures that the interests of the highest bidding firm would be aligned optimally with the interests of [*130] their clients; however, too few suits would be brought in the first place, resulting in under-deterrence. n18

### 3. Optimizing Fee Structures for Plaintiffs' Attorneys

Although critics often disparage the lodestar approach, most criticisms only reach the tip of the iceberg of problems with the lodestar method. For example, the existing literature has not adequately stressed the perverse incentives for a plaintiffs' attorney to run up costs. n19 In particular, the plaintiffs' law firm can maximize its profits by making as large a fee application as the court will allow. This incentive structure leads to the legal equivalent of lawyers digging holes and filling them up again, a process that entails, for example, needless depositions, discovery, and Bates stamping. There can be no doubt that the lodestar method leads to potentially enormous inefficiency.

The standard critique of the contingent fee method is insufficient. It does not logically follow that less than optimal effort on the part of plaintiffs' attorneys relative to the interests of their clients means that plaintiffs' effort is less than optimal relative to the interests of society. Suppose that the net social harm of 10b-5 class actions involving secondary market trading is much less than the damages allowed by courts to plaintiffs. n20, n21 In such a case, plaintiffs' attorneys may expend too little effort from the perspective of their clients while expending too much effort on deterrence from the perspective of society. The same criticism applies to the auction solution proposed above. As a policy matter, we should be confident that the recoveries that are being [*131] auctioned bear some relationship to desirable societal deterrence goals before implementing such a system. For this reason, the contingent fee approach seems better than the others offered.

## B. Are Rule 10b-5 (Out-of-Pocket) Damages Higher than Optimal?

The traditional and legal measure of damages in Rule 10b-5 class actions is based on the loss to stockholder plaintiffs who buy when the securities are over-priced and hold their securities until after corrective disclosures have wrung the inflation per share out of their market price. n22 Frank Easterbrook and Daniel Fischel have concluded that this out-of-pocket measure is higher than optimal. In particular, they claim these values are often much larger than either the net harm to society from the fraud or the profits to defendants from the fraud. n23

### 1. Net Harm, Profit-Based, and Loss-Based Measures

To analyze the problem of optimal damages, we start with the example of a fraud that inflates the value of an initial public offering (IPO). n24 In an IPO, the money is raised from investors who expect that they will earn a return reflecting the opportunity cost of capital. In particular, the investors typically expect a market return comparable to what they could earn from other investments of similar risk and liquidity. Instead, suppose the defendants have in their possession information that shows such an investment will earn less than the market return. The discounted present value of the future cash flows actually expected by defendants at the time of the offering, if any, is the true value of the IPO.

The difference between this true value and the sum invested by plaintiffs is the amount that society could have invested in other projects that were expected to pay the market return. Thus, this difference in IPO proceeds is the net harm to society from the [*132] fraud. In the case of an IPO, the difference also measures the out-of-pocket loss to investors. n25

The out-of-pocket measure is not necessarily equal to the profits earned by defendants from their fraud, however. Equality would only exist in atypical situations, such as if the defendants absconded with all of the proceeds from an IPO to some protected, off-shore account. More commonly, defendants have simply neglected a key piece of information in the offering materials or otherwise over-hyped the expected profits of their enterprise. Although defendants may benefit from increased executive compensation due to perceived good performance, investors usually suffer greater losses than corporate executives gain. Nonetheless, adoption of a loss-based measure of damages deters behavior otherwise causing significant net social harm.

### 2. Economic Losses Associated with Aftermarket Liability

5 Stan. J.L. Bus. & Fin. 121, *

Unfortunately, equivalence between net social harm and investor loss is not found in the majority of shareholder class actions, which are brought under Section 10 of the 1934 Act. Most shareholder plaintiffs purchased their securities in the aftermarket and claim that information from filings or press releases other than an offering prospectus caused the securities to be overpriced. In such a case, no resources are committed to unproductive uses as it would be in an IPO. In fact, all that has happened is that the sellers of the security have made a windfall gain by avoiding a loss that they would have incurred had the truth been known. The direct effect is simply a transfer of wealth from one set of investors to another -- from the buyer-plaintiff to the seller-nonparty.

For this reason, Easterbrook and Fischel find that loss-based measures (e.g., the out-of-pocket measure) exceed optimal damages.   n26 Further, Fischel testified before Congress that aftermarket securities litigation rules should be reformed to measure damages as profit- rather than loss-based.   n27 Professors Kraakman, Park, and Shavell address the issue of inefficient transfers between shareholders by proposing that  [*133]  plaintiffs assess settlement offers in terms of the net value to the firm.   n28 The problem with both proposals is that they inadequately consider the indirect effects of under-deterred securities fraud. Easterbrook and Fischel recognize some of these effects, but feel that their values are small relative to investor losses. And Kraakman, Park, and Shavell ignore the social impacts of 10b-5 fraud altogether.

To understand these indirect effects, consider an economy where aftermarket misinformation is allowed. Some risky investments are free from fraud and will be made at their true value. Other risky investments will be made at inflated prices, reflecting misleading or omitted information about the prospects of the firm. Without spending resources on private information gathering, an investor will not be able to distinguish between these two types of securities. Consequently, investors will typically not know which of their purchases of risky securities would be at true value and which would be at inflated values. Finally, assume there is a third type of investment that is safe, such as government bonds, where the investor is assured without any investment in private information that the purchase price is at true value. Safe securities have a lower expected return than risky securities. Under these circumstances, investors may over-invest in safe securities and underinvest in risky investments that are free of fraud in an attempt to avoid securities priced at inflated amounts.

If investors choose to gather information on the securities privately, the amount of resources they expend to detect and protect against fraud is one social cost of not having a remedy for aftermarket fraud. This cost is similar to the expenditures made by individuals to protect themselves from robbery. Most commentators recognize this cost, but view it as relatively small compared to the allowed damages in 10b-5 cases.

The second social cost, which has not been considered to any great extent, affects ongoing capital formation.   n29 Quite apart from the investments in aftermarket trading, there will be new issues of risky and risk-free securities. The expected return from holding any risky securities will have to be higher to compensate investors for risks of loss when the truth becomes known. As a result, investors will over-invest in the public offerings of safe securities. This social cost of fraud is then the reduction in the present value of projects that would be funded with the risky securities minus the present value of projects that will be funded with the safe securities. There is no reason  [*134]  to believe that this reduction is small relative to total shareholder litigation damages in aftermarket cases.

Some contingents have argued that concerns about efficient capital formation may be addressed solely through Section 11 claims, or claims alleging fraud in the public offering of securities.   n30 However, if fraud is not prevented in the aftermarket, capital formation will still be affected. For example, if those shareholders who bought in the IPO are still holding the security when fraud in the aftermarket is revealed, their investments will lose value. This risk will make them less likely to purchase in the IPO. Even if they are able to sell their stock in the aftermarket, its value will be reduced due to the risk of fraud. This possibility will again make the shareholder less likely to purchase the shares initially.

## C. Does It Matter Whether Those Responsible for the Fraud Pay for It?

It has long been recognized that damages from a fraud committed by a defendant company's employees are paid by the stockholders of the issuer.   n31 The issuer's stockholders bear these costs either directly (through employment agreements) or indirectly (through directors' and officers' liability insurance premiums).   n32 Any thorough review of shareholder class action litigation for policy considerations must examine the deterrent effect on those actually responsible for the fraud. An article by Arlen and Carney explores whether insulation from having to pay for damage claims affects management behavior.   n33 Arlen and Carney developed an empirical study and policy recommendations which we review in more detail below.

### 1. Increasing Sanctions on Management

5 Stan. J.L. Bus. & Fin. 121, *

The simple observation that managers and directors responsible for fraud are not punished legally might lead one to conclude that the current system under-deters fraudulent behavior and that some mechanism should be adopted to bring management's incentives into line with society's. Arlen and Carney suggest that the law should channel liability for mis-statements away from the corporation itself and toward the management and directors responsible for the misstatements. n34 Along these [*135] lines, they argue that criminal sanctions for securities fraud should be increased.  n35 As Arlen and Carney have noted, however, the possibility of judicial error makes this proposal somewhat problematic. n36 Furthermore, firms which did not indemnify officers and directors might face trouble attracting top management talent. Were criminal sanctions increased, this threat could well be realized since the potential liability for securities fraud is usually many times more than the net worth of any individual, and even weak cases appear to have jury appeal. n37 Therefore, even honest and competent managers would face ruinous exposure.

More globally, the initial observation that management has too little incentive to not commit fraud likely fails to consider the multiple forces at work. For example, higher-than-optimal 10b-5 damage rules over-deter fraudulent be-havior.  n38 Also, the risk of potentially ruinous jury awards may also over-deter unwanted behavior.  n39 Given these counterbalancing forces, the overall system might still be one in which roughly the right amount of deterrence is achieved.

### 2. Transferring Free Cash Flow Among Shareholders

Arlen and Carney also propose that, when settlements or verdicts are paid, current shareholders simply transfer wealth to past shareholders.  n40 A consequence of this proposition is that substantial conflicts may arise among class members. For example, some current shareholders may not be adequately compensated by any jury award because such an award will necessarily reduce the value of their current stock holdings. Thus, these current shareholders will want to settle early and minimize defense costs rather than pursue litigation. In such situations, these current shareholders may have interests that are more aligned with defendants. As such, it may make sense for the law to divide plaintiffs' classes into separate groups with separate counsel.

[*136]  **D. Do the Merits Matter in Settlements? The Theory**

### 1. Incentives and Behavior for Plaintiffs' Attorneys and Defendants

Janet Cooper Alexander has developed an analysis showing that the outcome of shareholder litigation is likely to be a settlement in which the settlement amount is independent of the case's merits.  n41 What she describes can be viewed, at a basic level, as a two-person, two-strategy game where the minimax strategy involves settlement rather than trial on the merits.  n42

Consider a case that has survived motions so that the only strategic decision left is whether to settle or to proceed with a trial. The defendants include named individuals who are covered by a limited amount of insurance. A settlement offer for below the policy limit reduces defendants' exposure to zero. A trial, on the other hand, is like entering a reverse lottery. One outcome promises no liability while the other outcome threatens a jury award many times greater than the net worth of the individual defendants.  n43 Defendants' best strategy to minimize the worst outcome is to settle.

For plaintiffs, the decision to go forward is controlled by plaintiffs' attorneys. The payoff vector for this player is the fee that will be awarded under different strategies and outcomes. Consider, first, the payoffs under a lodestar ap-proach. If a case goes all the way through trial, the amount of time actually expended at trial by the attorneys is a rela-tively small fraction of all the time spent on the case. For example, prior to trial, substantial amounts of effort will have been made on motions, discovery, and other case-related tasks. Consequently, plaintiffs' attorneys will get a dispropor-tionately small increase in fees by going past the discovery phase into trial. These decreasing returns will exist regard-less of the merits of the case.

Suppose, for example, that after discovery and on the eve of trial plaintiffs have a 50 percent chance of getting ei-ther a $ 20 million judgment or a defense verdict (meaning zero award and zero fees). Let the lodestar be two times the plaintiffs' attorneys' opportunity costs. Up to trial the attorneys have incurred costs of $ 1 million, and an additional $ 0.5 million would be required to take the case through trial. Therefore, applying the two-times factor, if plaintiffs settle before trial, their lodestar award will be $ 2 million, but if they win at trial their lodestar will be $ 3 million. The  [*137] expected payoff from trial is, therefore, $ 1 million (equal to an expected fee of 0.5 times $ 3 million plus 0.5 times zero minus an opportunity cost of $ 0.5 million) which is less than the $ 2 million they get with certainty from a settlement. Plaintiffs' attorneys clearly have an incentive to settle for any amount over $ 2 million--an amount that covers their fee application.

5 Stan. J.L. Bus. & Fin. 121, *

In contrast, their risk-neutral clients would prefer not to settle for any amount under $ 10.5 million. This can be seen by first noting that plaintiffs expect to net $ 8.5 from trial (equal to an expected recovery of 0.5 times zero plus 0.5 times the quantity $ 20 million in damages minus attorney fees of $ 3 million). Therefore, if they settle, they would like to net at least this same $ 8.5 million. Since the $ 2 million lodestar will go to the attorneys, they would require a settlement of $ 10.5 million to be at least as well off (in expected value terms) as by pursuing trial.

If the plaintiffs' attorneys' fees are based on contingency, rather than lodestar, then the implications of settlement rather than trial are somewhat different. Consider the above case on the eve of trial where, instead of a lodestar, the plaintiffs' attorneys will receive 30 percent of the jury award. The expected payoff from trial is then $ 2.5 million (equal to 0.5 times nothing plus 0.5 times 30 percent of $ 20 million minus the $ 0.5 million opportunity cost). In theory, plaintiffs' attorneys will then settle for no less than an amount that gives them $ 2.5 million in fees. At 30 percent, this would be a settlement of about $ 8.3 million.

This value is again less than the minimum amount that plaintiffs themselves would take to settle the case. The expected value of a trial is $ 7 million in net recovery to the plaintiff shareholders (equal to 0.5 times zero plus 0.5 times the quantity $ 20 million jury award minus $ 6 million contingency fee). Consequently, any settlement that nets less than $ 7 million after attorneys' fees is inferior to trial for a risk-neutral plaintiff; in gross terms this means any settlement less than $ 10 million nets the plaintiffs less than the expected trial result (after deducting the 30 percent, or $ 3 million, in attorneys' fees from the settlement).   n44

### 2. Does It Matter Whether Case Merits Influence Settlement Amounts?

Among the various academic critiques of the status quo, Alexander's has been the most controversial. Hostile reviews of her work have tended to frame the debate in terms of whether the merits matter at all which, unfortunately, deflects attention from the real issue -- namely, whether the merits matter enough.   n45 To deter fraud at the   [*138] lowest cost, we would like to have meritorious cases result in recoveries that approximate the net harm of the fraud to society and to have non-meritorious case disposed of at minimal cost. An implication of the Alexander study is that, instead, the system results in inadequate recoveries in meritorious cases and substantial payoffs in non-meritorious cases.

If this view is right, then what are the consequences of the status quo? The effect of large payoffs in non-meritorious cases is relatively easy to assess. Resources spent on pursuing and defending officers and directors that have done nothing wrong have been wasted. Furthermore, any awards granted to plaintiffs in these cases are a needless drain on corporate assets.

On the other hand, the critique that meritorious recoveries are too small is more difficult to assess. First, the standard that judges recovery size may be flawed. For example, settlements are often found small when compared against plaintiffs' total investment losses. As discussed more fully below, however, we find that low settlements may be the most efficient outcome -- even for meritorious cases. Moreover, while plaintiffs' losses are the legal measure of damages, plaintiffs' losses are not necessarily a measure of the social harm caused by defendants' actions. As noted above, the social harm is the misallocation of resources in capital formation outside of the firm.   n46 The value of actual social harm could be equal to, greater than, or less than the legal damage measure. Even when damages paid by defendants are significantly less than investor losses, if such damages were always paid by the defendants who were responsible for the fraud, then even low recoveries, yet large relative to individual wealth, would provide adequate deterrence.

The problem, rather, is that such recoveries may not be large relative to the insurance limits, in which case the protection afforded defendants may not provide adequate deterrence. Even if awards exceeded insurance limits, however, the overall economic harm could be greater than gains from deterrence. As Easterbrook and Fischel have noted, firms would not be able to find adequate supplies of officers and managers;   n47 competent, honest employees would face the risk of losing their wealth in non-meritorious litigation. Legal policy has not yet resolved this conundrum.

### [*139]  II. What Do the Data Show?

The empirical research on class actions has focused on (1) analyzing the dispositions of shareholder class actions and (2) assessing whether case merits influence settlement amount. Below, we present new evidence on these issues, using a dataset we compiled that includes filings and settlements from 1991 through mid-1998. We first describe this database and attempt to explain settlement size and variation. We then investigate statistically some of the issues related to shareholder litigation merits that are addressed in the academic literature. Where appropriate, we compare our findings to those in the existing literature.

5 Stan. J.L. Bus. & Fin. 121, *

### A. Descriptive Analysis

#### 1. Data

Using information from January 1991 to June 1998, we collected data, primarily from *Securities Class Action Alert* (SCAA), on case filings and dispositions, including case names, defendants, district courts, class periods, settlement amounts, and plaintiffs' attorneys' fee awards. For case filings, we supplemented SCAA with data obtained from *Securities Class Action Clearinghouse*   n48 and *Bloomberg, L.P.* For case dispositions, we supplemented SCAA with a computer search of the *Dow Jones News Wire* and reports from *The Wall Street Journal, The New York Times, Bloomberg, L.P.*, and the *Securities Regulation & Law Report*.

For 46 of these class actions, we had access to confidential information on plaintiffs' claimed damages, which we could relate directly to the settlement values obtained in those cases. This sample will be referred to as the "plaintiffs' claimed damages database." For a larger sample of 495 cases, we were generally not privy to plaintiffs' damage estimates. Here, we substituted investor losses as a proxy for plaintiffs' claimed damages.   n49 This larger sample will be referred to as the "investor losses database."

The specific criteria used to select cases included in this study are explained in the Tables, Notes and Sources.   n50 In general, we attempted to create and use the largest sample of comparable cases for which we could obtain the data necessary to perform the relevant statistical tests. Periodically, we update both databases and publish a  [*140]  working paper on recent trends in securities class actions.   n51 Where sufficient data exist, we test hypotheses using both datasets.

#### 2. Case Disposition Trends

Table 1 summarizes shareholder class action filings and dispositions from January 1991 through June 1998. Our complete database includes 1,349 cases that were dismissed, settled, or resolved by jury verdict during this time period. n52 Of these, 200 cases were resolved in 1997, up from 131 in 1991, suggesting a 7 percent average annual growth rate. While some of this increase may be due to more complete reporting of settlements, a significant amount is likely due to the increasing number of such claims being filed. Over the seven-and-one-half year period, 83 percent of the cases settled out of court.

#### 3. Settlements as a Proportion of Plaintiffs' Damages

Tables 3a and 3b narrow the focus to cases in which common stock is the only allegedly damaged security. We compare settlements to plaintiffs' damages in these cases, using investor losses as a proxy for plaintiffs' claimed damages where necessary.

In the plaintiffs' claimed damages database, we have actual estimates of damages made by plaintiffs' experts during the course of 46 shareholder class actions. As shown in Table 3a, the average settlement in these cases was $ 7.8 million. This average settlement was 13.7 percent of plaintiffs' claimed damages, while the median was 11.9 percent of damages.

Substituting investor losses as a proxy for alleged damages, we increased our sample size to 495 cases. We found that investor losses were highly correlated with claimed damages and produced results that were largely similar.   n53 In fact, investor losses were computed in a manner similar to the approach sometimes used by plaintiffs  [*141]  in computing damages.   n54 Briefly stated, losses are measured relative to what a class member would have earned with an investment in the S&P 500 index over the same time period.   n55 The number of shares purchased on any given day during the class period and either sold on any subsequent day during the class period or held to the end of the class period was estimated using the proportional decay model. John Torkelsen, an expert witness on whom plaintiffs' attorneys have often relied, developed this model.

#### 4. Plaintiffs' Attorneys' Fees

Table 4 presents the fees and expenses allocated to plaintiffs' attorneys. In the arena of attorney's fees, not much has changed in recent years. Fee amounts average approximately 32 percent of the settlement award. For the period January 1991 through June 1998, plaintiffs' attorneys received up to $ 1.5 billion in fees, as distinct from expenses.

Table 4 also shows cases for which an aggregated fees and expenses figure was reported. In contrast to the findings for fees alone, the total of fees and expenses declined as a percentage of settlement value when settlement value exceeded $ 50 million. This result may indicate that expenses remain independent of settlement size. Thus, a case with a

large settlement would incur about the same expenses as a small case. Given the small sample of cases in this category, however, we cannot draw any general conclusions about the pattern of expenses.

[*142]  **B. What Factors Explain Settlement Size?**

Next, we estimate the determinants of settlement size using statistical analysis. Where we need to control for the effects of a number of variables simultaneously, we employ multiple regression analysis.   n56

### 1. Plaintiffs' Damages Estimate Versus Investor Losses

Some commentators have argued that investor losses bear little relation to plaintiffs' damage estimates and, therefore, it is inappropriate to draw conclusions that use investor losses as a proxy for damage amounts. Beverly Moore, a proponent of this argument, asserts that plaintiffs' damage estimates are only about 27 percent of investor losses.   n57 However, he obtains this figure by dividing the sum of plaintiffs' damages from a sample of cases by the sum of investor losses for those cases. Such a ratio can be misleading if the ratio of damage estimate to losses is very atypical in even one large investor losses case. We find this to be the case in Moore's calculation. When we calculate the ratio of the plaintiffs' damage estimate to the investor losses in each case, and then take an average of these ratios, we arrive at a figure of 59 percent, more than double the ratio of the aggregates.

We find a reverse, though less pronounced, distortion using Moore's techniques on our own plaintiffs' claimed damages database. In particular, for a sample of 46 cases for which we have data on both plaintiffs' claimed damages and investor losses, the ratio of total plaintiffs' damage estimates to total investor losses is 87 percent. However, the average case-specific ratio is 78 percent. The properly-calculated figures show a strong correlation between the two measures (87 percent).

[*143]  This correlation is evidenced in the results of our statistical analyses. In particular, for several important analyses we were able to obtain results using both the plaintiffs' claimed damages and the investor losses databases. A comparison of these results, which appear in Tables 5 and 6, shows that the two measures perform in a very similar manner, with few exceptions.   n58 As a result, we have a great deal of confidence in the analyses that, due to a relatively small number of observations of plaintiffs' claimed damages, we were only able to perform using the investor losses variable as the measure of potential exposure.

In these regressions, which use either plaintiffs' claimed damages or investor losses to explain settlement size, the coefficient on plaintiffs' claimed damages is 0.57. This means that a doubling of estimated damages is accompanied by only a 48 percent increase in the expected settlement. The coefficient on investor losses is very similar (0.45) implying a 37 percent increase in the expected settlement with a doubling of investor losses. Both coefficients are highly statistically significant.

These results suggest that settlements tend to rise with both plaintiffs' claimed damages and investor losses, but at a decreasing rate. Figure 1 displays this effect for the investor losses sample. For example, investor losses of $ 100 million are associated with expected settlements of $ 5.7 million. However, if investor losses double to $ 200 million, the solid line increases to only $ 8.2 million, a 43 percent increase in the expected settlement. If the relationship were strictly proportional, we would have expected a settlement of $ 11.4 million.

[*144]  This finding is consistent with an argument, developed in more detail below, that the amount of assets available for settlements is an important factor explaining overall settlement size. We would expect, for example, that insurance limits may increase on average with investor losses but would be less than proportional. Some correlation between insurance limits and investor losses would be expected because larger firms with higher capitalization would be expected to have, on average, higher losses in capitalization from a stock price drop. Larger firms are also likely to have more insurance coverage. On the other hand, another factor causing investor losses is the extent of the stock price drop and this variable is likely to be uncorrelated with insurance coverage. Consequently, outside sources of funding for a settlement are less than proportional to investor losses.

### 2. Presence of Codefendants

Defendants other than a corporation and its officers and directors are named in many cases. For example, underwriters are defendants in about 18 percent of the reported settlements, and accountants are named in about 12 percent of cases (Table 7). In every year except 1991, average settlement value was higher when an accounting firm was named as a defendant than when there was no advisor codefendant. In every  [*145]  year but 1994 and 1997, the presence of an underwriter codefendant was associated with an increased settlement value.

5 Stan. J.L. Bus. & Fin. 121, *

This pattern is consistent with the hypothesis that settlement values are higher when more "deep pockets" are targeted (i.e., when another pool of insurance is available).

To measure this effect statistically, for the sample of cases for which we have plaintiffs' claimed damages, we included in our regression an indicator variable that takes a value of one if such an advisor codefendant was named and zero otherwise. n59 We find that if such a codefendant is present, the expected settlement value increases by 56 percent. The effect is statistically significant (Table 5). n60 That is, if there is, in fact, no systematic relationship between the presence of an advisor firm defendant and the resulting settlement value, there is only a remote probability that we would find a difference of the magnitude we observe in our sample by chance alone.

For the larger sample of cases, we find similar results. n61 In addition, in Regression 5 (Table 6), we had enough information to divide the advisor codefendant variable by type: accounting firm and underwriter. We find that for the entire sample period, expected settlements increased by a statistically significant 107 percent when an accounting firm was named.

The findings for accounting firm codefendants are consistent with the theory that settlement size is driven by the ability to pay. Among the assets available for settlement are the insurance covering defendant firms' officers' and directors' liability and the insurance covering malpractice or error and omissions by the advisor firms.

However, we did not find that settlements increase in a statistically significant manner with the presence of an underwriter or law firm codefendant. While the coefficients on both are positive, as we would expect, they are not statistically significant at the 10 percent level.

[*146] **3. Effect of Defendants' Primary Industry on Settlement**

Table 8 reveals that high-technology companies are a major focus of securities fraud class actions. Since 1991, 29 percent of all settlements came from this sector.

While a simple glance at descriptive statistics suggests that the ratio of settlement value to damages varies by industry, further statistical analysis is needed to discern whether this difference is significant. We performed this analysis and found that, except for health services, industry did not have a statistically significant effect on settlement size once we controlled for size of investor losses, the presence of an outside codefendant and the market capitalization of the defendant company. n62 In particular, for the database as a whole, there is no statistically significant difference between settlements reached by banks, high-technology or non-bank finance firms as compared with those in other industry segments.

We do find that cases against defendants in the health services industry settle for significantly more than cases in other industries. (See Table 6.) Below, we suggest hypotheses that might explain this observed pattern.

**4. The Influence of Circuits in Which Suits Are Filed**

Certain circuits are reputed to favor defendants or plaintiffs, either because of judicial philosophy or experience. Table 9 examines the settlement data by circuit. The largest number of cases continue to be settled in the Ninth Circuit (especially in California), which is to be expected since many high-technology companies are based in its jurisdiction. n63 The Second and Third Circuits have the next highest number of cases settled, but each has less than half the total of the Ninth. n64

There is some observable variation in the average size of the settlements across circuits, with settlements in the Tenth circuit being the highest. n65 However, when we tested this relationship statistically, we found that, after controlling for other key factors, there is no statistically significant difference between the settlement values experienced in different circuits.

[*147] **C. Settlements, Filings and Merit**

**1. Do Cases Involving Flagrant Fraud Settle for More?**

An article by Steven Marino and Renee Marino focuses on settlements involving accountants, attorneys, and underwriters. n66 After distinguishing cases involving flagrant fraud from others, the Marinos found that the average settlement amount for cases involving flagrant fraud was higher than for other cases. n67 This finding would appear to rebut anecdotal arguments that the merits do not influence settlement amounts at all. However, there are at least two equivocations with the Marinos' methodology.

First, the Marinos' definition of flagrant fraud is problematic. For example, the authors include insider trading as a type of flagrant fraud.   n68 However, the insider trading allegation is typically unsupported in most securities class action complaints because there is rarely any proof that the insider possessed material, nonpublic information at the time of the trade.   n69 Similarly, the Marinos include manipulation as a type of flagrant fraud.   n70 Once again, allegations of manipulation are often unsupported and, moreover, current legal scholarship hardly treats all types of manipulation as flagrant.   n71

Second, the statistical approach used by the authors is a simple comparison of the means of two samples. The results do not control for other variables that could be correlated with the size of the award -- such as defendant firm capitalization, the number of defendants, or the absolute size of plaintiffs' losses. To control for such influences on the size of awards requires more sophisticated statistical tests.

We performed these statistical tests using alternative measures of "flagrant fraud." In particular, one potential indicator of flagrant fraud is the existence of a related investigation or independent enforcement action by a federal or state agency.  [*148] Such activity, especially if it results in an order, indictment, plea or finding of guilt may reinforce the claims in the securities complaint.   n72 We created and included in our regression analysis a series of enforcement variables to test whether the presence of such an action was associated with higher settlement values. In particular, we divided the cases in the investor losses database into four levels -- (1) no action, (2) simple investigation, (3) a finding that regulations had been violated, and (4) a finding that restitution must be paid. Corresponding to the latter three levels, we specified three separate indicator variables (low, moderate, and high severity of enforcement action).

For the sample as a whole, we find *no* statistically significant impact of these variables. However, when we interact a merits variable with a variable indicating whether the defendant is in the health services industry, we find a statistically significant *positive* effect. (See Table 6.) In particular, we find that defendants in the healthcare industry reach settlements that are 46 percent higher than defendants in other industries and, when government enforcement actions have also been taken, these settlements increase by a total of 110 percent. The positive, significant coefficient on the health services/merits variable is intuitive - in those cases involving "flagrant fraud," higher settlements are demanded, and obtained, by plaintiffs. It is more difficult to explain the significance of the coefficient on defendants in the health services industry generally. One possible explanation is that higher settlements in health services cases involving allegations of flagrant fraud are indirectly driving the settlements in cases where there was no government involvement. A second possibility is that, for some of the healthcare cases, we have under-identified cases of alleged flagrant fraud. In particular, if these suits were accompanied by companion False Claims Acts suits or government intervention that occurred after the filing of the class action suit, these factors might not be reflected in our data. These results add some support to the Marino's conclusion that, at least in cases of flagrant fraud, the merits are playing a role.

## 2. Does a Section 11 or 12 Claim Increase Settlement Size?

An attribute that might be expected to increase the likelihood of a pro-plaintiff verdict is whether the case involved a security offering. If so, there is the potential for a claim under Section 11 or 12 of the 1933 Act, in addition to the more common Rule 10b-5  [*149] claim.   n73 Section 11 or 12 liability may be found if there has been negligence in the offering materials.   n74 By contrast, Rule 10b-5 requires scienter - an intent to deceive. As a result, plaintiffs have an easier burden of proof for liability under Section 11 than under Rule 10b-5, suggesting a verdict in their favor is more likely. Further, all offering shares are necessarily affected, again suggesting higher settlement values would accompany cases with offerings.   n75

The data do not provide support for the hypothesis that the occurrence of an offering increases settlement value. On average, cases with offerings have settled for 17 percent less than cases without offerings.

Controlling for the size of investor losses, the presence of an outside codefendant and the market capitalization of the defendant company, we find that the coefficient on the presence of an offering is negative and insignificant. Since cases involving offerings also typically have underwriters as named defendants, we hypothesize that this unexpected result might stem from a difficulty in separating the two effects.   n76 However, when we dropped the advisor coefficient variables from the regression, the effect of an offering, while positive, is still statistically insignificant. A possible explanation for the insignificance of the offering variable is that companies offering shares (particularly those with initial public offerings) tend to be smaller, less well-endowed defendants. As a result, plaintiffs may recognize that the prospects for a large settlement are limited and decide to accept a smaller amount.

## 3. Is Variance in Settlement Amount an Indication of Merit?

5 Stan. J.L. Bus. & Fin. 121, *

In her 1991 paper, Alexander supplements her analysis of shareholder litigation with a detailed study of 17 initial public offerings of high technology common stock. n77 She finds no variation among the settlements as a percentage of shareholder losses, and asserts that it would be inconceivable that each of the cases had the same merit. Consequently, she concludes that factors other than the merits must explain settlements.

[*150] Although highly provocative and intuitively plausible, Alexander's empirical results are based on a small and unrepresentative sample. In four recent reports, the results of which are updated in this paper, we applied more advanced statistical techniques to a larger sample of cases. We conclude that (1) the presence of accountant or underwriter codefendants increases settlement size substantially and, except for health services companies, (2) proxy variables indicating the quality of the case for plaintiffs (such as whether only negligence rather than scienter had to be proven or whether enforcement actions by federal agencies such as the Department of Justice were involved) did not result in increased settlements. n78

On the surface, these findings indicate that the defendant's available assets predict settlements better than do case merits. However, our studies also reveal that only 53 to 61 percent of the variance in settlements is explained by the presence or absence of codefendants, the age of the case, and the size of either investor loss or plaintiffs' damage estimates. (See Tables 5 and 6.) Thus, the remaining variance may be explained by a case's unobserved characteristics -- such as merits. Nonetheless, consistent with Alexander's theory, there is no evidence that the minimax strategy, where defendants and plaintiff choose to settle since it minimizes the likelihood of the worst outcome (a jury verdict for plaintiffs or defendants, respectively) is not the expected outcome of the current system.

### 4. Does the Timing of Settlements Indicate Merit?

Several conflicting hypotheses can be drawn from the existing theoretical literature regarding what the timing of settlements indicates about the merits of a case. In particular, with Coffee's framework of cost asymmetries between plaintiffs' and defendants' attorneys, n79 we might predict that plaintiffs would agree to settle sooner when they feel a case's value is low, so that only higher-valued cases would have staying power. However, Alexander's strategic framework for negotiations might lead us to expect that defendants settle particularly early when suits have more merit, in an attempt to prevent unwanted discovery that might reveal fraud and enhance the plaintiffs' bargaining power. n80 In addition, a possible implication of her work is that the closer the case gets to trial, the more pressure defendants feel to settle a case so as to avoid the potential jury verdict.

[*151] Our database allows us to shed light on some of these issues. As noted above, to do so, we created a variable that indicates the vintage of a case. Figure 2 depicts settlement values by case age for pre-Reform cases. n81

For these pre-Reform cases, we find that, all else equal, settlements made earlier are for lower amounts than those made later. This result is consistent with the hypothesis that plaintiffs settle earlier when they feel the case has a low value. It is inconsistent with the theory that defendants settle early and pay more when they are afraid of letting the case proceed through discovery. However, we also find that the expected settlement value changes little as the case proceeds beyond the first year. That is, defendants do seem to pay less if they settle within a year after a suit's filing. Nonetheless, it would appear that discovery tends to resolve uncertainty in favor of plaintiffs.

For cases that were both filed and settled since PSLRA was passed, however, we see a reversal of this trend. In particular, those post-Reform cases that settled within a year of filing settled for 63% *more* than cases that took longer to settle. This result is only weakly significant and is based on an as-yet small sample of observations. If this [*152] effect persists, however, we posit it may result from Reform Act provisions. In particular, given the higher pleading standards, defendants may have higher expectations that nuisance suits will be weeded out at the motion to dismiss phase. The fact that discovery is now stayed pending this ruling means that defendants incur few costs while "waiting it out." As a result, while it may have been worthwhile for pre-Reform defendants to settle nuisance suits quickly and for low values, it may now pay them to wait out the ruling on these weaker cases. If so, in the post-Reform era, those cases that settle very quickly after filing are disproportionately likely to be *highervalued* cases that defendants feel are unlikely to be weeded out at the motions stage. To make an informed decision about this hypothesis, we must wait until more post-Reform cases settle.

### 5. Are More Volatile Stocks the Subject of More Litigation?

In 1991, in an empirical paper on the issue of whether merits matter, Vincent O'Brien and Richard Hodges found considerable fault with the societal impact of shareholder class actions. n82 The authors presented a range of descriptive statistics on the disposition of cases over a three-year period from April 1988 through June 1991, and concluded that stock price volatility best explains the filing of shareholder class action lawsuits. In particular, O'Brien and Hodges

5 Stan. J.L. Bus. & Fin. 121, *

find that the stock of defendant firms possessed higher systematic risk (i.e., beta) than did the stock of the average firm. This finding suggests that factors other than case merits may explain why shareholder class actions are filed.

Jennifer Francis, Donna Philbrick, and Katherine Schipper reported statistical results that confirmed the O'Brien and Hodges finding on systematic risk. However, when the idiosyncratic risk of the firms being sued is taken into account, Francis et al. found that the overall variation in returns to have been lower than for comparable firms not sued. Thus, the Francis research overturns O'Brien and Hodges' initial findings on volatility.   n83 In particular, the Francis team found that the likelihood of being sued increased if the firm was larger or if the firm had a Big 6 accounting firm. n84 These results are consistent with our finding that the presence of an advisor codefendant, such as an accounting firm, influences settlement size. Also, as the Francis team pointed out, firm  [*153]  size is correlated with damages; if there are fixed costs to plaintiffs' attorneys of bringing a lawsuit, then the damages alleged against smaller firms may not yield enough in contingency fees to cover the costs of litigation.   n85

Our database shows that high-tech companies are sued disproportionately often compared to other types of companies and this effect has persisted over the seven-and-one-half years in our sample. If we believe that these firms have no special propensity to commit fraud, but may have more volatile stock prices, this finding calls into question the conclusion of Francis *et al.* that volatility is not at the root of some class actions.   n86 The prevalence of suits against high-technology firms suggest that a stock price drop in response to a timely disclosure is as likely to cause a complaint to be filed as is a stock price drop from the disclosure of a previous misstatement. At least for some cases, the merits would then be of secondary importance.

**6. Do Filings Follow Stock Market Trends?**

If suits are filed in response to the disclosure of previously misstated company-specific information, we would expect them to occur largely independent of overall market movements. However, we find a significant relationship between the number of monthly filings and the return on the Wilshire 5000, a broad market index, over the two months prior to filing (see Table 10). Thus, it appears that unconditional stock price movements, distinct from any measure of merit, affect the likelihood of filings.

**7. Are Low-Value Settlements Less Meritorious?**

An article by Joseph Grundfest provides an interesting interpretation of the available data on settlement size distribution.   n87 Grundfest reviews three studies on the dispersion of settlement amounts, finding that between 22% and 60% of settlements are for amounts likely to be less than defense costs.   n88 He notes that such settlements are sufficiently low for a defendant to credibly claim that the suit's merits did not matter--i.e., that defendants settled solely to mitigate the lawsuit's nuisance value.   n89

Our database provides additional statistics of this type.   n90 The database shows that the percentage of settlements to plaintiffs' claimed damages has a mean of 14 percent and a median of 12 percent. The highest percentage in our sample is 62  [*154]  percent. We also find that the proportion of settlements to investor losses has a mean of 9 percent and a median of 6 percent. Advocates of reform have argued that such data demonstrate that the merits do not matter and thus advocated for the inclusion of provisions in the Reform Act to make it more difficult to file claims that will result in low-valued settlements.   n91

Although Congress ultimately adopted some of the proposed provisions,   n92 we find that such a policy goal may be unjustified. In particular, such an interpretation of the data implies that all meritorious cases should go to trial or that all meritorious cases should receive a settlement or a verdict that is 100 percent (or a significantly larger fraction) of plaintiffs' damages estimates. There are a number of reasons why such an assumption is likely to be false.

> 1. The opportunity cost of going to trial for both plaintiffs' and defendants' attorneys may be quite high, so that even with a favorable verdict, the expected profitability of a trial is low.
> 2. The odds of a favorable liability finding for plaintiffs may be low.   n93
> 3. The damages proposed by plaintiffs may not be deemed credible so that even if there is a successful liability finding, plaintiffs' attorneys expect a lower damages judgment.

Plaintiffs' and defendants' attorneys consider these factors at the time of settlement. Such factors may explain why cases settle and why these settlement values appear low, even though some may be for meritorious claims. Therefore, the goal of eliminating low-value suits may be ill-conceived. Seeking to ensure that all cases brought have a high probability of success at trial employs a narrow definition of "merit," which does not consider that meritorious cases may

5 Stan. J.L. Bus. & Fin. 121, *

have a low probability of judgment for unrelated reasons. Instead, reform measures should isolate true nuisance suits from those with merits.

Using our database, we attempted to perform such an identification. Table 11a presents the ratio of settlement amounts to plaintiffs' claimed damages. Table 11b presents the ratio of settlement amounts to investor losses. Our goal here was to investigate the theory that many cases settling for less than $ 2 million were settling for [*155] nuisance value, as hypothesized by Joseph Grundfest   n94 and other parties advocating shareholder litigation reform. Consistent with the results in Grundfest's study, the sample of cases for which we have plaintiffs' claimed damages indicates that 20 percent settled for less than $ 2 million (Table 11a). Table 11b presents similar results for investor losses, with about 26 percent settling for less than $ 2 million.

However, in a related paper, we argue a low-value claim should not be equated with a low merit claim.   n95 For example, these settlements may represent the efficient outcome of negotiations between plaintiffs and defendants in cases where a jury trial would be particularly costly or risky. To distinguish between claims with low value and those with low merit (i.e., nuisance suits), we classified the cases settling for less than $ 2 million and less than $ 1 million into groups, according to the ratio of settlement to investor losses. About 9 percent of settlements are for less than $ 1 million. Of these, about two-thirds settle for an amount that is a much smaller fraction of total investor losses than the average for the whole sample. Most of the remaining suits with sub-$ 2 million settlements also settle for an amount less than the average percentage of investor losses, and about half of them are at a much smaller fraction of total investor losses than the average for the whole sample. Notably, we find that the average settlement as a percentage of investor losses for the settlements between $ 1 million and $ 2 million is also lower than the average for the full sample. On this basis, we estimate that at least 40 percent of the low-valued suits are truly likely to be nuisance suits. (See Figure 3.)

[*156] **III. Conclusions**

Our review of the existing research on the deterrent value and merits of shareholder class actions highlights several inconsistencies. Several theoretical arguments, such as those concerning the structure of plaintiffs' attorneys' fees and the lack of penalties on the actual perpetrators of fraud, lead to the conclusion that the current securities laws provide inadequate deterrence. However, other factors, such as the legal standard for 10b-5, under which damages are likely to exceed the net harm to society, suggest excessive deterrence. Thus far, the theoretical literature does not allow us to draw firm conclusions about whether the goal of optimal deterrence is being attained.

The empirical results are more definitive. In particular, we can say that three factors matter a lot in determining settlements are the following: 1) the overall amount of investor losses, which itself is a proxy for damages; 2) the availability of assets from the issuer, from insurance and from an auditor codefendant; and 3) a defendant in the health services industry.

Generally, we find that the merits do not have much, if any, explanatory power on settlement size. In particular, cases that should represent easier wins for plaintiff on [*157] liability are at best only weakly correlated with higher settlement values. With the exception of cases against health services industry defendants, suits in which government enforcement action was taken do not settle for more, either. On the other hand, we find that the proportion of lawsuits that can be unambiguously classified as nuisance suits is likely smaller than generally believed.

Turning to filings, we find support for the following propositions: 1) sectors with higher volatility are more likely to be sued; and, 2) more lawsuits occur in a down market. These findings provide support for the proposition that factors other than or in addition to fraud explain securities litigation activity.

The policy problems that follow from these findings are easy to state but not necessarily easy to solve. First, it is likely that there is inadequate discernment between meritorious and non-meritorious cases. This result is shown by our empirical findings that support broadly the game-theoretic analysis described by Professor Alexander.

In addition, reducing the benefits to bringing such lawsuits, as was done in portions of the PSLRA, is not necessarily the proper prescription because, first, the nuisance suit issue is not likely a major problem and, second, there is no proof that there is over-deterrence of fraud. Indeed, the likelihood of under-deterrence is to be expected given that wrong-doers are almost always insured and/or indemnified against losses arising from settlements of securities fraud claims.

[*158] **Tables**

**Table 1**

5 Stan. J.L. Bus. & Fin. 121, *

**Filings and Resolutions of Securities Clas Actions Suits**

| | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 |
|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) |
| | | | | | Filings by Year Suit Filed | |
| Number of Filings<1> | 206 | 230 | 208 | 301 | 237 | 238 |
| | | | | | Dispositions by Year Suit Disposed<2> | |
| Number of Settlements | 112 | 120 | 142 | 154 | 165 | 168 |
| Number of Dismissals<3> | 18 | 29 | 24 | 29 | 39 | 33 |
| Number of Judgments<4> | 1 | 4 | 3 | 4 | 3 | 3 |
| Total Dispositions | 131 | 153 | 169 | 187 | 207 | 204 |

| | 1997 | Jan-June 1998 | 1991 to June 1998 |
|---|---|---|---|
| | (7) | (8) | (9) |
| Number of Filings<1> | 238 | 149 | 1,807 |
| Number of Settlements | 170 | 83 | 1,114 |
| Number of Dismissals<3> | 30 | 14 | 216 |
| Number of Judgments<4> | 0 | 1 | 19 |
| Total Dispositions | 200 | 98 | 1,349 |

Federal Cases Only

| | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 |
|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) |
| | | | | | Filings by Year Suit Filed | |
| Number of Filings<1> | 157 | 195 | 160 | 227 | 178 | 125 |
| | | | | | Dispositions by Year Suit Disposed<2> | |
| Number of Settlements | 82 | 102 | 132 | 140 | 141 | 142 |
| Number of Dismissals<3> | 14 | 27 | 23 | 27 | 34 | 27 |
| Number of Judgments<4> | 1 | 3 | 2 | 3 | 3 | 3 |
| Total Dispositions | 97 | 132 | 157 | 170 | 178 | 172 |

| | 1997 | Jan-June 1998 | 1991 to June 1998 |
|---|---|---|---|
| | (7) | (8) | (9) |
| Number of Filings<1> | 183 | 118 | 1,343 |

5 Stan. J.L. Bus. & Fin. 121, *

| | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 |
|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) |
| Number of Settlements | | 141 | 63 | | 943 | |
| Number of Dismissals<3> | | 21 | 10 | | 183 | |
| Number of Judgments<4> | | 0 | 1 | | 16 | |
| Total Dispositions | | 162 | 74 | | 1,142 | |

[*159] **Table 2**

**Settlements in Securities Class Action Suits Included in this Study<5>**

| | 1991 | 1992 | 1993 |
|---|---|---|---|
| | (1) | (2) | (3) |
| Number of Settlements | 48 | 77 | 90 |
| Average Settlement | $ 6,349,801 | $ 9,892,532 | $ 8,323,556 |
| Total Value of Settlements | $ 304,790,437 | $ 761,724,971 | $ 749,120,028 |
| Median Settlement | $ 3,650,000 | $ 4,200,000 | $ 4,425,000 |
| Number of Settlements Indicating Plaintiffs Attorney Fees<6> | 42 | 67 | 80 |
| Average Plaintiffs' Attorney Fees<7> | $ 2,081,132 | $ 2,706,626 | $ 1,955,392 |

| | 1994 | 1995 | 1996 |
|---|---|---|---|
| | (4) | (5) | (6) |
| Number of Settlements | 101 | 104 | 108 |
| Average Settlement | $ 6,098,492 | $ 10,660,656 | $ 7,216,526 |
| Total Value of Settlements | $ 615,947,710 | $ 1,108,708,250 | $ 779,384,811 |
| Median Settlement | $ 3,575,000 | $ 4,775,000 | $ 4,055,000 |
| Number of Settlements Indicating Plaintiffs Attorney Fees<6> | 98 | 93 | 103 |
| Average Plaintiffs' Attorney Fees<7> | $ 2,004,833 | $ 3,502,878 | $ 2,294,364 |

| | 1997 | Jan-June 1998 | 1991 to June 1998 |
|---|---|---|---|
| | (7) | (8) | (9) |
| Number of Settlements | 98 | 41 | 667 |
| Average Settlement | $ 7,854,674 | $ 10,389,464 | $ 8,268,969 |

5 Stan. J.L. Bus. & Fin. 121, *

| | 1991 | 1992 | 1993 |
|---|---|---|---|
| | (1) | (2) | (3) |
| Total Value of Settlements | $ 769,758,077 | $ 425,968,012 | $ 5,515,402,296 |
| Median Settlement | $ 3,175,000 | $ 5,875,000 | $ 4,100,000 |
| Number of Settlements Indicating Plaintiffs Attorney Fees<6> | 86 | 40 | 609 |
| Average Plaintiffs' Attorney Fees<7> | $ 2,480,837 | $ 3,189,268 | $ 2,503,557 |

[*160]  **Table 3a**

**Settlements in Securities Class Action Suits Involving Common Stock Only<5,8> from Plaintiffsi Claimed Damages Database**

| | |
|---|---|
| Number of Settlements | 46 |
| Average Settlement | $ 7,827,102 |
| Median Settlement | $ 5,000,000 |
| Average Settlement as a Percentage of Plaintiffs' Claimed Damages | 13.67 % |
| Median Settlement as a Percentage of Plaintiffs' Claimed Damages | 11.88 % |
| Total Settlement as a Percentage of Total Plaintiffs' Claimed Damages | 4.90 % |

[*161]  **Table 3b**

**Settlements in Securities Class Action Suits Involving Common Stock Only<5,9> from Investor Losses Database**

| | 1991 | 1992 | 1993 |
|---|---|---|---|
| | (1) | (2) | (3) |
| Number of Settlements | 41 | 66 | 70 |
| Average Settlement | $ 4,905,864 | $ 7,442,878 | $ 5,122,697 |
| Median Settlement | $ 3,000,000 | $ 3,780,000 | $ 4,000,000 |
| Number of Cases for Which Investor Losses Were Calculated | 29 | 44 | 58 |
| Average Settlement for Cases for Which Investor Losses Were | $ 4,730,705 | $ 7,332,727 | $ 5,117,565 |
| Median Settlement for Cases for Which Investor Losses Were | | | |

5 Stan. J.L. Bus. & Fin. 121, *

|  | 1991 | 1992 | 1993 |
|---|---|---|---|
|  | (1) | (2) | (3) |
| Calculated | $ 2,450,000 | $ 4,000,000 | $ 4,012,500 |
| Average Settlement as a Percentage of Investor Losses | 15.30% | 7.32% | 7.71% |
| Median Settlement as a Percentage of Investor Losses | 5.54% | 5.06% | 5.21% |
| Average Settlement as a Percentage of Total Investor Losses | 3.66% | 3.03% | 2.71% |
|  | 1994 | 1995 | 1996 |
|  | (4) | (5) | (6) |
| Number of Settlements | 87 | 86 | 97 |
| Average Settlement | $ 5,530,146 | $ 7,280,968 | $ 7,006,989 |
| Median Settlement | $ 3,400,000 | $ 4,000,000 | $ 3,750,000 |
| Number of Cases for Which Investor Losses Were Calculated | 79 | 79 | 89 |
| Average Settlement for Cases for Which Investor Losses Were | $ 5,599,624 | $ 7,634,883 | $ 7,417,280 |
| Median Settlement for Cases for Which Investor Losses Were Calculated | $ 3,400,000 | $ 4,200,000 | $ 4,200,000 |
| Average Settlement as a Percentage of Investor Losses | 9.39% | 8.76% | 9.54% |
| Median Settlement as a Percentage of Investor Losses | 6.50% | 6.12% | 6.64% |
| Average Settlement as a Percentage of Total Investor Losses | 4.38% | 4.67% | 4.63% |
|  | 1997 | Jan-June 1998 | 1991 to June 1998 |
|  | (7) | (8) | (9) |
| Number of Settlements | 87 | 37 | 571 |
| Average Settlement | $ 6,718,334 | $ 10,052,311 | $ 6,645,103 |

5 Stan. J.L. Bus. & Fin. 121, *

|  | 1991 | 1992 | 1993 |
|---|---|---|---|
|  | (1) | (2) | (3) |
| Median Settlement | $ 3,100,000 | $ 5,630,000 | $ 3,703,902 |
| Number of Cases for Which Investor Losses Were Calculated | 82 | 35 | 495 |
| Average Settlement for Cases for Which Investor Losses Were | $ 7,005,550 | $ 9,010,300 | $ 6,771,977 |
| Median Settlement for Cases for Which Investor Losses Were Calculated | $ 3,175,000 | $ 5,630,000 | $ 3,900,000 |
| Average Settlement as a Percentage of Investor Losses | 7.35% | 10.33% | 9.01% |
| Median Settlement as a Percentage of Investor Losses | 5.10% | 5.33% | 5.87% |
| Average Settlement as a Percentage of Total Investor Losses | 3.70% | 2.73% | 3.74% |

[*162] **Table 4**

**Plaintiffs' Attorneys' Fees and Expenses<5,7,10>**

| Settlement Range | Number of Settlements | Total Value of Settlements | Total Attorney Fees |
|---|---|---|---|
|  | | (Dollars) | |
|  | (1) | (2) | (3) |
| $ 0 to $ 0.99 million | 53 | $     34,102,707 | $      10,718,956 |
| $ 1 to $ 1.99 million | 97 | 142,403,105 | 45,543,372 |
| $ 2 to $ 9.99 million | 325 | 1,563,382,901 | 503,941,745 |
| $ 10 to $ 49.99 million | 122 | 2,322,956,642 | 734,332,380 |
| $ 50+ million | 12 | 762,750,000 | 230,130,000 |
| Total | 609 | $ 4,825,595,355 | $ 1,524,666,453 |

| Settlement Range | Average Attorney Fees as a Percentage of Settlement | | Median Attorney Fees as a Percentage of Settlement |
|---|---|---|---|

5 Stan. J.L. Bus. & Fin. 121, *

| Settlement Range | Number of Settlements | Total Value of Settlements | Total Attorney Fees |
|---|---|---|---|
| | | (Dollars) | |
| | (1) | (2) | (3) |
| | | (Percent) | |
| | (4) | | (5) |
| $ 0 to $ 0.99 million | 31.13 % | | 33.33 % |
| $ 1 to $ 1.99 million | 32.08 | | 33.33 |
| $ 2 to $ 9.99 million | 32.19 | | 33.33 |
| $ 10 to $ 49.99 million | 31.86 | | 33.33 |
| $ 50+ million | 30.25 | | 30.00 |
| Total | 31.97 % | | 33.33 % |

**Plaintiffs' Attorneys' Fees and Expenses<5,7,10>**

| Settlement Range | Number of Settlements | Total Value of Settlements | Total Attorney Fees and Expenses |
|---|---|---|---|
| | | (Dollars) | |
| | (1) | (2) | (3) |
| $ 0 to $ 0.99 million | 21 | $    14,513,457 | $  5,236,972 |
| $ 1 to $ 1.99 million | 19 | 27,255,000 | 9,327,958 |
| $ 2 to $ 9.99 million | 76 | 362,472,708 | 131,173,713 |
| $ 10 to $ 49.99 million | 45 | 909,554,362 | 314,520,561 |
| $ 50+ million | 5 | 320,000,000 | 76,525,000 |
| Total | 166 | $ 1,633,795,527 | $ 536,784,204 |

| Settlement Range | Average Attorney Fees and Expenses as a Percentage of Settlement | | Median Attorney Fees and Expenses as a Percentage of Settlement |
|---|---|---|---|
| | | (Percent) | |
| | (4) | | (5) |
| $ 0 to $ 0.99 million | 36.61 % | | 35.00 % |
| $ 1 to $ 1.99 million | 34.23 | | 33.33 |
| $ 2 to $ 9.99 million | 36.08 | | 36.48 |
| $ 10 to $ 49.99 million | 34.94 | | 33.33 |
| $ 50+ million | 23.98 | | 25.00 |

5 Stan. J.L. Bus. & Fin. 121, *

| Settlement Range | Number of Settlements | Total Value of Settlements | Total Attorney Fees and Expenses |
|---|---|---|---|
| | | (Dollars) | |
| | (1) | (2) | (3) |
| Total | 35.26 % | | 34.77 % |

[*163] **Table 5**

**Settlements Increase with (1) Plaintiffs'Claimed Damages (But at a Declining Rate), (2) the Presence of an Advisor Codefendant and (3) Severe Enforcement Actions**

1

| Log of Settlement Value as a Function of the Following Independent Variables | Coefficient | t-Statistic<11> |
|---|---|---|
| | (1) | (2) |
| Constant Term | 5.32 | 4.35 |
| Log of Plaintiffs' Claimed Damages<8> | 0.57 | 8.17 |
| Advisor Was a Defendant<12> | 0.45 | 1.83 |
| Indicator Variable for Cases Settling within One Year of Filing<19> | 0.00 | 0.02 |
| Log of Years from End of Class Period to Publication in Securities Class Action Alert | -- | -- |
| Potential Section 11 Exposure<14,15> | -- | -- |
| Severity of Enforcement Action: | | |
| Low<16> | -- | -- |
| Moderate<17> | -- | -- |
| High<18> | -- | -- |
| Number of Observations | 46 | |
| Adjusted R-Squared | 0.61 | |

Results from Regression Number:

2

| Log of Settlement Value as a Function of the Following Independent Variables | Coefficient | t-Statistic<11> |
|---|---|---|
| | (3) | (4) |

1

| Log of Settlement Value as a Function of the Following Independent Variables | Coefficient | t-Statistic[11] |
|---|---|---|
| | (1) | (2) |
| Constant Term | 6.11 | 5.10 |
| Log of Plaintiffs' Claimed Damages[8] | 0.52 | 7.60 |
| Advisor Was a Defendant[12] | 0.51 | 2.18 |
| Indicator Variable for Cases Settling within One Year of Filing[19] | 0.03 | 0.12 |
| Log of Years from End of Class Period to Publication in Securities Class Action Alert | -- | -- |
| Potential Section 11 Exposure[14,15] | 0.01 | 0.05 |
| Severity of Enforcement Action: | | |
| Low[16] | -0.31 | -1.10 |
| Moderate[17] | -- | -- |
| High[18] | 1.62 | 2.65 |
| Number of Observations | 46 | |
| Adjusted R-Squared | 0.66 | |

3

| Log of Settlement Value as a Function of the Following Independent Variables | Coefficient | t-Statistic[11] |
|---|---|---|
| | (5) | (6) |
| Constant Term | 6.15 | 5.11 |
| Log of Plaintiffs' Claimed Damages[8] | 0.52 | 7.63 |
| Advisor Was a Defendant[12] | 0.53 | 2.19 |
| Indicator Variable for Cases Settling within One Year of Filing[19] | -- | -- |
| Log of Years from End of Class Period to Publication in Securities Class Action Alert | -0.05 | -0.35 |

5 Stan. J.L. Bus. & Fin. 121, *

1

| Log of Settlement Value as a Function of the Following Independent Variables | Coefficient | t-Statistic[11] |
|---|---|---|
| | (1) | (2) |
| Potential Section 11 Exposure[14,15] | 0.02 | 0.06 |
| Severity of Enforcement Action: | | |
|   Low[16] | -0.27 | -0.94 |
|   Moderate[17] | -- | -- |
|   High[18] | 1.61 | 2.66 |
| Number of Observations | 46 | |
| Adjusted R-Squared | 0.66 | |

[*164] **Table 6**

**Settlements Increase with (1) Investor Losses (But at a Declining Rate), (2) the Presence of an Advisor Code-fendant, (3) Market Capitalization and (4) for Companies in the Medical Services Industry**

Results from Regression Number:

| Log of Settlement Value as a Function of the Following Independent Variables | Coefficient | t-Statistic[11] |
|---|---|---|
| | 4 | |
| | (1) | (2) |
| Constant Term | 5.36 | 12.36 |
| Log of Investor Losses[9] | 0.45 | 15.14 |
| Log of Market Capitalization at the End of the Class Period[19] | 0.08 | 3.40 |
| Accountant Named as Defendant[20] | 0.73 | 6.76 |
| Underwriter Named as Defendant[21] | -- | -- |
| Settling within One Year of Filing[13] | -- | -- |
| Filed Post-SLRA and Settling within One Year[22] | -- | -- |
| Indicator Variable for Medical Services Industry[23] | 0.38 | 3.09 |
| Indicator Variable for Medical | | |

5 Stan. J.L. Bus. & Fin. 121, *

| Results from Regression Number: | | |
|---|---|---|
| Log of Settlement Value as a Function of the Following Independent Variables | 4 | |
| | Coeffecient | t-Statistic<11> |
| | (1) | (2) |
| Services Industry and Merit<24> | -- | -- |
| Number of Observations | 491 | |
| Adjusted R-Squared | 0.53 | |

| Results from Regression Number: | | |
|---|---|---|
| Log of Settlement Value as a Function of the Following Independent Variables | 5 | |
| | Coeffecient | t-Statistic<11> |
| | (3) | (4) |
| Constant Term | 5.29 | 12.11 |
| Log of Investor Losses<9> | 0.45 | 15.10 |
| Log of Market Capitalization at the End of the Class Period<19> | 0.09 | 3.54 |
| Accountant Named as Defendant<20> | 0.73 | 6.76 |
| Underwriter Named as Defendant<21> | 0.11 | 1.27 |
| Settling within One Year of Filing<13> | -- | -- |
| Filed Post-SLRA and Settling within One Year<22> | -- | -- |
| Indicator Variable for Medical Services Industry<23> | 0.38 | 3.10 |
| Indicator Variable for Medical Services Industry and Merit<24> | -- | -- |
| Number of Observations | 491 | |
| Adjusted R-Squared | 0.53 | |

| Results from Regression Number: | | |
|---|---|---|
| Log of Settlement Value as a Function of the Following Independent Variables | 6 | |
| | Coeffecient | t-Statistic<11> |
| | (5) | (6) |
| Constant Term | 5.43 | 12.51 |

5 Stan. J.L. Bus. & Fin. 121, *

Results from Regression Number:

| Log of Settlement Value as a Function of the Following Independent Variables | 4 | |
|---|---|---|
| | Coeffecient | t-Statistic<11> |
| | (1) | (2) |
| Log of Investor Losses<9> | 0.45 | 15.14 |
| Log of Market Capitalization at the End of the Class Period<19> | 0.08 | 3.28 |
| Accountant Named as Defendant<20> | 0.73 | 6.80 |
| Underwriter Named as Defendant<21> | -- | -- |
| Settling within One Year of Filing<13> | -- | -- |
| Filed Post-SLRA and Settling within One Year<22> | -- | -- |
| Indicator Variable for Medical Services Industry<23> | 0.26 | 1.84 |
| Indicator Variable for Medical Services Industry and Merit<24> | 0.49 | 1.79 |
| Number of Observations | 491 | |
| Adjusted R-Squared | 0.54 | |

Results from Regression Number:

| Log of Settlement Value as a Function of the Following Independent Variables | 7 | |
|---|---|---|
| | Coeffecient | t-Statistic<11> |
| | (7) | (8) |
| Constant Term | 5.40 | 12.47 |
| Log of Investor Losses<9> | 0.46 | 15.20 |
| Log of Market Capitalization at the End of the Class Period<19> | 0.08 | 3.20 |
| Accountant Named as Defendant<20> | 0.72 | 6.71 |
| Underwriter Named as Defendant<21> | -- | -- |

Settling within One Year of

5 Stan. J.L. Bus. & Fin. 121, *

Results from Regression Number:

| Log of Settlement Value as a Function of the Following Independent Variables | 4 | |
|---|---|---|
| | Coeffecient | t-Statistic<11> |
| | (1) | (2) |
| Filing<13> | -0.21 | -1.83 |
| Filed Post-SLRA and Settling within One Year<22> | 0.70 | 1.68 |
| Indicator Variable for Medical Services Industry<23> | 0.40 | 3.25 |
| Indicator Variable for Medical Services Industry and Merit<24> | -- | -- |
| Number of Observations | 491 | |
| Adjusted R-Squared | 0.54 | |

[*165] **Table 7**

**Settlements by Type of Codefendant Involved<5>**

| | Number of Settlements by Type of Advisor Codefendant | | | | | |
|---|---|---|---|---|---|---|
| | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 |
| | (1) | (2) | (3) | (4) | (5) | (6) |
| Accounting Firm | 4 | 10 | 11 | 10 | 12 | 17 |
| Law Firm | 0 | 4 | 2 | 0 | 1 | 0 |
| Underwriter | 9 | 14 | 17 | 15 | 16 | 21 |
| Accounting Firm and Underwriter | 2 | 7 | 5 | 2 | 5 | 4 |
| No Advisor Codefendant | 37 | 59 | 67 | 78 | 81 | 74 |

| | Number of Settlements by Type of Advisor Codefendant | | |
|---|---|---|---|
| | 1997 | Jun-98 | 1991 to Jun-98 |
| | (7) | (8) | (9) |
| Accounting Firm | 10 | 7 | 81 |
| Law Firm | 2 | 0 | 9 |
| Underwriter | 22 | 7 | 121 |
| Accounting Firm and Underwriter | 1 | 1 | 27 |
| No Advisor Codefendant | 66 | 28 | 490 |

| | Average Settlement by Type of Advisor Codefendant | | |
|---|---|---|---|
| | 1991 | 1992 | 1993 |

5 Stan. J.L. Bus. & Fin. 121, *

|  | Number of Settlements by Type of Advisor Codefendant | | | | | |
|---|---|---|---|---|---|---|
|  | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 |
|  | (1) | (2) | (3) | (4) | (5) | (6) |

|  | (1) | (2) | (3) |
|---|---|---|---|
| Accounting Firm | $ 5,500,000 | $ 14,432,000 | $ 16,359,207 |
| Law Firm | NA | 15,811,250 | 15,021,250 |
| Underwriter | 10,115,000 | 13,438,929 | 14,533,971 |
| Accounting Firm and Underwriter | 9,150,000 | 18,488,571 | 25,128,500 |
| No Advisor Codefendant | $ 5,677,174 | $ 9,321,694 | $ 6,682,593 |

|  | Average Settlement by Type of Advisor Codefendant | | |
|---|---|---|---|
|  | 1994 | 1995 | 1996 |
|  | (4) | (5) | (6) |
| Accounting Firm | $ 8,586,150 | $ 33,619,583 | $ 10,718,403 |
| Law Firm | NA | 2,285,000 | NA |
| Underwriter | 4,426,667 | 15,455,000 | 8,304,143 |
| Accounting Firm and Underwriter | 7,525,000 | 39,127,000 | 17,370,463 |
| No Advisor Codefendant | $ 6,137,644 | $ 8,069,485 | $ 6,652,254 |

|  | Average Settlement by Type of Advisor Codefendant | | |
|---|---|---|---|
|  | 1997 | Jun-98 | 1991 to Jun-98 |
|  | (7) | (8) | (9) |
| Accounting Firm | $ 18,518,552 | $ 16,997,143 | $ 16,320,323 |
| Law Firm | 1,375,000 | NA | 10,924,722 |
| Underwriter | 5,395,044 | 9,540,787 | 9,915,711 |
| Accounting Firm and Underwriter | 5,750,000 | 9,650,000 | 21,071,457 |
| No Advisor Codefendant | $ 7,136,842 | $ 8,923,304 | $ 7,251,601 |

|  | Median Settlement by Type of Advisor Codefendant | | |
|---|---|---|---|
|  | 1991 | 1992 | 1993 |
|  | (1) | (2) | (3) |
| Accounting Firm | $ 2,750,000 | $ 4,712,500 | $ 6,000,000 |
| Law Firm | NA | 4,997,500 | 15,021,250 |
| Underwriter | 5,500,000 | 5,237,500 | 4,500,000 |

5 Stan. J.L. Bus. & Fin. 121, *

| | Number of Settlements by Type of Advisor Codefendant | | | | | |
|---|---|---|---|---|---|---|
| | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 |
| | (1) | (2) | (3) | (4) | (5) | (6) |
| Accounting Firm and Underwriter | 9,150,000 | | 5,275,000 | | 4,500,000 | |
| No Advisor Codefendant | $ 3,250,000 | | $ 3,760,000 | | $ 4,000,000 | |

| | Median Settlement by Type of Advisor Codefendant | | |
|---|---|---|---|
| | 1994 | 1995 | 1996 |
| | (4) | (5) | (6) |
| Accounting Firm | $ 5,237,500 | $ 25,600,000 | $ 7,200,000 |
| Law Firm | NA | 2,285,000 | NA |
| Underwriter | 3,900,000 | 6,800,000 | 6,000,000 |
| Accounting Firm and Underwriter | 7,525,000 | 36,500,000 | 9,762,500 |
| No Advisor Codefendant | $ 3,537,500 | $ 4,200,000 | $ 3,050,000 |

| | Median Settlement by Type of Advisor Codefendant | | |
|---|---|---|---|
| | 1997 | Jun-98 | 1991 to Jun-98 |
| | (7) | (8) | (9) |
| Accounting Firm | $ 11,940,259 | $ 9,650,000 | $ 8,000,000 |
| Law Firm | 1,375,000 | NA | 2,150,000 |
| Underwriter | 3,500,000 | 9,650,000 | 5,100,000 |
| Accounting Firm and Underwriter | 5,750,000 | 9,650,000 | 10,000,000 |
| No Advisor Codefendant | $ 3,050,000 | $ 5,437,500 | $ 3,725,000 |

[*166] **Table 8**

**Settlements by Industry[5,9]**

| Industry | Number of Settlements | Total Value of Settlements | Total Investor Losses |
|---|---|---|---|
| | (1) | (2) | (3) |
| High-Technology | 155 | $ 983,187,824 | $ 26,955,652,885 |
| Commercial Banking | 40 | 190,391,818 | 7,348,702,338 |
| Finance & Insurance | 20 | 112,922,611 | 2,552,063,131 |
| Medical Services | 36 | 499,634,309 | 10,158,163,137 |
| Other | 244 | 1,565,992,181 | 42,081,863,454 |
| Total | 495 | $ 3,352,128,743 | $ 89,096,444,945 |
| | | Average | Median |

| Industry | Number of Settlements | Total Value of Settlements | Total Investor Losses |
|---|---|---|---|
| | (1) | (2) | (3) |
| Industry | Settlement Value as a Percentage of Investor Losses | | Settlement Value as a Percentage of Investor Losses |
| | (4) | | (5) |
| High-Technology | 7.60% | | 5.85% |
| Commercial Banking | 10.69% | | 5.46% |
| Finance & Insurance | 16.26% | | 7.55% |
| Medical Services | 9.20% | | 5.96% |
| Other | 9.01% | | 5.84% |
| Total | 9.01% | | 5.87% |

[*167]  **Table 9**

**Ratio of Settlement to Investor Losses by Circuit<5,9>**

| Circuit | Number of Settlements | Total Value of Settlements | Average Settlement Value |
|---|---|---|---|
| | | | (Dollars) |
| | (1) | (2) | (3) |
| D.C. | 2 | $ 6,750,000 | $ 3,375,000 |
| First | 39 | 156,288,609 | 4,007,400 |
| Second | 80 | 500,449,121 | 6,255,614 |
| Third | 60 | 272,937,199 | 4,548,953 |
| Fourth | 13 | 69,425,000 | 5,340,385 |
| Fifth | 22 | 147,918,500 | 6,723,568 |
| Sixth | 20 | 145,550,000 | 7,277,500 |
| Seventh | 20 | 183,183,784 | 9,159,189 |
| Eighth | 18 | 89,210,000 | 4,956,111 |
| Ninth | 172 | 1,343,791,530 | 7,812,741 |
| Tenth | 18 | 216,530,000 | 12,029,444 |
| Eleventh | 31 | 220,095,000 | 7,099,839 |
| Total | 495 | $ 3,352,128,743 | $ 6,771,977 |

Average Settlement

5 Stan. J.L. Bus. & Fin. 121, *

| Circuit | Number of Settlements | Total Value of Settlements | Average Settlement Value |
| --- | --- | --- | --- |
| | | | (Dollars) |
| | (1) | (2) | (3) |

| Circuit | Total Investor Losses | | Value as a Percentage of Investor Losses |
| --- | --- | --- | --- |
| | | | (Percent) |
| | (4) | | (5) |
| D.C. | $ 122,412,780 | | 5.90 % |
| First | 6,200,971,558 | | 7.77 |
| Second | 17,861,646,798 | | 8.56 |
| Third | 7,039,567,647 | | 10.97 |
| Fourth | 1,352,378,528 | | 6.90 |
| Fifth | 3,338,618,237 | | 7.11 |
| Sixth | 3,372,815,699 | | 17.22 |
| Seventh | 5,410,218,492 | | 8.78 |
| Eighth | 2,921,905,095 | | 7.14 |
| Ninth | 31,460,231,367 | | 8.02 |
| Tenth | 3,507,466,522 | | 13.74 |
| Eleventh | 6,508,212,222 | | 9.13 |
| Total | $ 89,096,444,945 | | 9.01 % |

[*168]  **Table 10**

**Filings Increase with Adverse Market Movements**

| Number of Monthly Filings as a Function of the Following Independent Variables | Coefficient | t-Statistic |
| --- | --- | --- |
| | (1) | (2) |
| Constant term | 15.93 | 24.57 |
| Return on Wilshire 5000 | -37.19 | -2.19 |
| Prior Month Return on Wilshire 5000 | -31.31 | 24.57 |
| Number of Observations | 90 | |
| Adjusted R-Squared | 0.05 | |

[*169]  **Table 11a**

5 Stan. J.L. Bus. & Fin. 121, *

**Ratio of Settlements to Plaintiffsi Claimed Damages by Settlement Ammount<5,8>**

| Settlement Range | Number of Settlements | Total Value of Settlements | Average Value of Settlements |
|---|---|---|---|
| | | (Dollars) | |
| | (1) | (2) | (3) |
| $ 0 to $ 1.99 million | 9 | $ 10,875,000 | $ 1,208,333 |
| $ 2.00 to $ 9.99 million | 26 | 135,987,680 | 5,230,295 |
| $ 10+ million | 11 | 213,184,000 | 19,380,364 |
| Total | 46 | $ 360,046,680 | $ 7,827,102 |

| Settlement Range | Average Settlement as a Percentage of Plaintiffs' Claimed Damages | Median Settlement as a Percentage of Plaintiffs' Claimed Damages |
|---|---|---|
| | (Percent) | |
| | (4) | (5) |
| $ 0 to $ 1.99 million | 11.86 % | 10.95 % |
| $ 2.00 to $ 9.99 million | 15.38 | 13.68 |
| $ 10+ million | 11.11 | 6.60 |
| Total | 13.67 % | 11.88 % |

[*170] **Table 11b**

**Ratio of Settlements to Investor Losses by Settlement Amount<5,9>**

| Settlement Range | Number of Settlements | Total Value of Settlements | Total Investor Losses |
|---|---|---|---|
| | | (Dollars) | |
| | (1) | (2) | (3) |
| $ 0 to $ 0.99 million | 44 | $ 30,802,707 | $ 1,394,952,228 |
| $ 1 to $ 1.99 million | 87 | 127,579,355 | 4,001,834,964 |
| $ 2 to $ 9.99 million | 273 | 1,312,291,901 | 33,847,764,282 |
| $ 10 to $ 49.99 million | 86 | 1,556,054,780 | 44,534,969,801 |
| $ 50+ million | 5 | 325,400,000 | 5,316,923,670 |
| Total | 495 | $ 3,352,128,743 | $ 89,096,444,945 |

| Settlement Range | Average Settlement as a Percentage of Investor Losses | Median Settlement as a Percentage of Investor Losses | Total Settlement as a Percentage of Total Investor Losses |
|---|---|---|---|
| | (Percent) | | |

5 Stan. J.L. Bus. & Fin. 121, *

| Settlement Range | Number of Settlements | Total Value of Settlements | Total Investor Losses |
|---|---|---|---|
| | | (Dollars) | |
| | (1) | (2) | (3) |
| | | | (2) / (3) |
| | (4) | (5) | (6) |
| $ 0 to $ 0.99 million | 8.10 % | 4.09 % | 2.21 % |
| $ 1 to $ 1.99 million | 7.91 | 6.00 | 3.19 |
| $ 2 to $ 9.99 million | 9.38 | 6.01 | 3.88 |
| $ 10 to $ 49.99 million | 9.30 | 6.31 | 3.49 |
| $ 50+ million | 11.17 | 5.20 | 6.12 |
| Total | 9.01 % | 5.87 % | 3.76 % |

[*171]  **Notes and Sources to Tables**

Disposition data were obtained from *Securities Class Action Alert* (SCAA). SCAA is a monthly newsletter published by Investors Research Bureau, Inc., Cresskill, New Jersey. A disposition was included if its resolution was published in the SCAA between January 1991 and June 1998. Settlements were included only if all the defendants settled or if some of the defendants settled and the charges were dismissed against the other defendants. All data used to compute investor losses were obtained from either FactSet Research Systems, Inc. or Interactive Data Corporation. All averages are calculated as arithmetic means unless otherwise stated. Filing data were obtained from the monthly issues of SCAA along with additional data compiled by SCAA. A filing was included if it was filed between January 1991 and June 1998. Numbers in columns may not always sum to totals presented due to rounding.

1) Filing data consist of all cases compiled by SCAA. This data is supplemented with filings reported in *Securities Class Action Clearinghouse* and in the news database of Bloomberg, L.P.

2) Includes resolution of cases which were identified in the *Dow Jones News Wire, New York Times, The Wall Street Journal* and *Securities Regulation & Law Report* between January 1, 1991 and June 30, 1996. Does not include partial or reversed dismissals or judgments.

3) Includes voluntary dismissals by plaintiffs.

4) Includes judgments by default.

5) Cases were selected for this study if they met the following criteria:

    1. The suit was filed in federal court.
    2. The named defendant(s) include a corporation or partnership.
    3. The plaintiff alleged fraud involving at least the price of common stock.
    4. The case included allegations of material misrepresentations and omissions regarding the true health and potential of the defendant company.
    5. The settlement was either in cash or a cash equivalent could be determined.

6) Includes cases for which attorney fees could be distinguished from attorney expenses.

5 Stan. J.L. Bus. & Fin. 121, *

[*172]  7) Attorney fees are frequently indicated as "up to" or "not to exceed" a particular percentage of the settlement value. For these cases, the maximum attorney fee awardable was used for calculations.

8) Data regarding plaintiffs' damage estimates from NERA case files were used for only those cases which met the criteria in note (5) above and had allegations involving only common stock.

9) Investor losses were calculated for those cases which met the criteria in note (5) above and the following:

> 1. The case had a defined class period over which purchases of common stock only were alleged to have been damaged.
> 2. The class period began on or after December 31, 1984.
> 3. Data were available on daily trading volume, daily closing price, and shares outstanding for the defendant company over the relevant time period from either FactSet Research Systems, Inc. or Interactive Data Corporation.

> Investor losses were computed in a manner similar to the approach sometimes used by plaintiffs in computing damages. Briefly stated, this approach attaches a damage (or investor loss) to the purchases made on each day during the class period. The investor losses calculation compares the actual stock price on each day during the class period with a hypothetical price which moves exactly like the S&P 500 index and arrives at a value on the last day of the class period equal to the defendant's average stock price for the five subsequent days. For shares purchased during the class period and held through to the end, the loss per share equals the difference between the actual and hypothetical purchase prices. For shares purchased and sold during the class period, the loss per share equals the difference between the actual and hypothetical purchase price less the difference between the actual and hypothetical sale price. This loss is limited to the actual loss (actual purchase price less actual sale price.) The number of shares bought on any given day during the class period and either sold on any given day during the class period or held to the end of the class period is estimated using the proportional decay model developed by John Torkelsen, an expert witness often used by plaintiffs' attorneys. This model was not adjusted for institutional holdings (SEC Form 13Fs), insider holdings or transactions (SEC forms 3 and 4), short interest, or shareholders with five percent ownership of the outstanding stock (SEC Forms 13D and 13G). An adjustment for dealer trading of 50 percent is applied to the volume of shares traded over the counter.

10) Includes cases for which information regarding attorney fees and expenses was available.

[*173]  11) For a two-tailed test of statistical significance with 42 degrees of freedom, an absolute value above 2.02 is significant at the 95 percent level of confidence and an absolute value above 2.70 is significant at the 99 percent level of confidence. For a one-tailed test, an absolute value above 1.68 is significant at the 95 percent level of confidence and an absolute value above 2.42 is significant at the 99 percent level of confidence.

> For a two-tailed test of statistical significance with 486 degrees of freedom, an absolute value above 1.96 is significant at the 95 percent level of confidence and an absolute value above 2.59 is significant at the 99 percent level of confidence. For a one-tailed test, an absolute value above 1.65 is significant at the 95 percent level of confidence and an absolute value above 2.33 is significant at the 99 percent level of confidence.

12) Advisor defendants are law firms, accounting firms, or underwriters.

13) This variable equals one if the number of years from the end of the class period to the date of settlement is less than one and otherwise equals zero.

14) Potential Section 11 exposure exists if there was a security offering during the class period.

15) This variable equals one if there was a security offering during the class period and otherwise equals zero.

5 Stan. J.L. Bus. & Fin. 121, *

16) This variable equals one if a regulatory or enforcement agency was investigating the defendant company and otherwise equals zero.

17) This variable equals one if a defendant company was ordered or consented to refrain from particular actions by a regulatory or enforcement agency and otherwise equals zero.

18) This variable equals one if a defendant admitted to or was found in violation of a regulatory or enforcement agency's regulations or was ordered to pay restitution, and otherwise equals zero.

19) Market capitalization is calculated as of the last day of the class period using data obtained from FactSet Research Systems, Inc. or Interactive Data Corporation.

20) This variable equals one if an accounting firm was named as a defendant and otherwise equals zero.

 [*174]  21) This variable equals one if an underwriter was named as a defendant and otherwise equals zero.

22) This variable equals one if the case was filed after passage of the PSLRA and settled within one year of filing and otherwise equals zero.

23) This variable equals one if the firms in the health services sector and otherwise equals zero.

24) This variable equals one for cases against firms in the health services sector involving an enforcement action as described in notes (16), (17) and (18) above and otherwise equals zero.

25) Monthly value of the Wilshire 5000 index obtained from FactSet Research Systems, Inc. For a two-tailed test of statistical significance with 87 degrees of freedom, an absolute value above 1.99 is significant at the 95 percent level of confidence and an absolute value above 2.63 is significant at the 99 percent level of confidence. For a one-tailed test, an absolute value above 1.66 is significant at the 95 percent level of confidence and an absolute value above 2.37 is significant at the 99 percent level of confidence.

**Legal Topics:**

For related research and practice materials, see the following legal topics:
Civil ProcedureClass ActionsCompromisesCivil ProcedureSettlementsGeneral OverviewTortsTransportation TortsGeneral Overview

**FOOTNOTES:**

n1 *See* VINITA M. JUNEJA, DENISE N. MARTIN, TODD S. FOSTER & FREDERICK C. DUNBAR, RECENT TRENDS V: WHAT EXPLAINS FILINGS AND SETTLEMENTS IN SHAREHOLDER CLASS ACTIONS? (NERA Working Paper, 1998) [hereinafter JUNEJA, ET AL. 1998].

n2 *See infra* Introduction for a survey of these articles.

n3 *See, e.g.*, Janet Cooper Alexander, *Do the Merits Matter? A Study of Settlements in Securities Class Actions*, *43 STAN. L. REV. 497 (1991)* [hereinafter ALEXANDER], Lucian Arye Bebchuk, *Suing Solely to Extract a Settlement Offer*, *17 J LEGAL STUD. 437 (1988),* and Robert Bone, *Modeling Frivolous Suits*, *145 U. PA. L. REV. 519 (1997).*

n4 *See* particularly John C. Coffee, Jr., *The Unfaithful Champion: The Plaintiff as Monitor in Shareholder Litigation*, 48 L. & CONTEMP. PROBS. 5 (1985), [hereinafter COFFEE 1985]; John C. Coffee, Jr., *Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions*, *86 COLUM. L. REV. 669 (1986)* [hereinafter COFFEE 1986]; and John C. Coffee,

Jr., *The Regulation of Entrepreneurial Litigation: Balancing Fairness and Efficiency in the Large Class Action*, *54 U. CHI. L. REV. 877 (1987)* [COFFEE 1987]. *See also*, Jonathan R. Macey & Geoffrey P. Miller, *The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform*, *58 U. CHI. L. REV. 40 (1991)* [hereinafter MACEY AND MILLER].

n5 *See* Frank H. Easterbrook and Daniel R. Fischel, *Optimal Damages in Securities Cases*, *52 U. CHI. L. REV. 611 (1985)* [hereinafter EASTERBROOK AND FISCHEL].

n6 *See* Jennifer H. Arlen & William J. Carney, *Vicarious Liability For Fraud On Securities Markets: Theory and Evidence*, *1992 U. ILL. L. REV. 691* ("Arlen and Carney"). *See also*, Thomas M. Jones, *An Empirical Examination of the Resolution of Shareholder Derivative and Class Action Lawsuits*, *60 B.U. L. Rev. 542 (1980)* [hereinafter JONES]; and *Breakdown of Contributions to Settlement Funds, Hearings Before the Subcommittee on Securities of the Committee on Banking, Housing, and Urban Affairs, United States Senate: A Growing Increase in Class-Action Securities Litigation Against Publicly-Traded Companies, Particularly High Technology, Accountants, Outside Directors and Lawyers*, 103d Cong. Exhibit 3 (1993) (statement of Melvyn I. Weis.).

n7 *See* Alexander, *supra* note 3.

n8 *See, e.g.* Coffee 1985, Coffee 1986, and Coffee 1987, *supra* note 4.

n9 *See* Coffee 1985 and Coffee 1987, *supra* note 4.

n10 *See* Coffee 1985, *supra* note 4, at 17. *See also* Coffee 1987, *supra* note 4, at 891.

n11 *See infra* parts II.D, III.C.

n12 *See* Coffee 1985, *supra* note 4, at 20.

n13 *See id.* at 33.

n14 *See* Coffee 1986, *supra* note 4, at 697.

n15 *See id.* at 687.

n16 *See* Coffee 1985, *supra* note 4, at 78 and Coffee 1986, *supra* note 4, at 692. *See also* Macey & Miller, *supra* note 4, at 6.

n17 *See* Coffee 1986, *supra* note 4, at 692.

n18 This problem is similar to one created by the 1995 Reform Act. The court is encouraged to assign lead plaintiff status to a plaintiff which has larger holdings than the plaintiff whose attorney did the initial research and drafting of papers to bring the lawsuit. If such transfers of litigation among attorneys were to become commonplace (which is not the case now) it may have a negative effect on bringing such lawsuits.

n19 *See infra* part I.D.

n20 Brought under the 1934 Securities Act, Rule 10b-5 class actions typically assert that the market price of shares purchased in the aftermarket (i.e., shares purchased not directly from the issuer but in the open market) was artificially inflated by an alleged misstatement or omission of a material piece of information.

n21 The proof that plaintiffs' attorneys effort is socially suboptimal would have to rely on two unstated assumptions: (1) the damages that are being recovered reflect the actual harm to society; and (2) the future behavior by potential defendants that would cause similar harms is deterred by the plaintiffs' lawsuit. In these circumstances, if plaintiffs' attorneys have incentives that are different from their clients' then their incentives are also socially suboptimal. If, in the alternative, plaintiffs' attorneys were to have a fee structure causing them to act in the best interests of their clients, then under these conditions it is more likely that their behavior will result in the appropriate amount of deterrence.

n22 In some shareholder class actions, the plaintiffs allege that the securities were under-priced. The loss-based damages occur when an investor buys a security before the class period when it is correctly priced and then sells the security at an artificially low price during the class period. The typical fact pattern in these cases is that the defendant failed to make a timely announcement of a merger or other tender offer for the defendant firm's shares. Had the announcement been timely and before the plaintiff sold, then the plaintiff would have realized a gain from a stock price run-up reflecting a merger or acquisition premium in the stock price. *See, e.g.*, *Basic Incorporated v. Max L. Levinson, 485 U.S. 224 (1988)*.

n23 *See* Easterbrook and Fischel, *supra* note 5, at 11.

n24 Class actions that arise pursuant to IPOs are brought under Section 11 of the 1933 Act.

n25 Dunbar and Juneja show that a reasonable interpretation of Section 11 statutory damages is the net harm rule. *See* FREDERICK C. DUNBAR & VINITA M. JUNEJA, *Making Securities Class Actions More Responsive to the Modern Shareholder*, SECURITIES CLASS ACTIONS: ABUSES AND REMEDIES 193, National Legal Center for the Public Interest (1994) [hereinafter DUNBAR AND JUNEJA 1994].

n26 *See* Easterbrook and Fischel, *supra* note 5, at 24.

n27 *See House Commerce Telecommunications and Finance Private Securities Litigation Revision: Hearings Before the Subcomm. on Telecommunications and Finance of the Senate Comm. On Commerce*, 104th Cong. (1995) (Statement of Daniel Fischel); *See also*, A. Mitchell Polinsky & Steven Shavell, *Should Liability be Based on the Harm to the Victim or the Gain to the Injurer*, 10 J.L. ECON. & ORG. 427 (1994).

n28 *See* Reinier Kraakman, Kyun Park, and Steven Shavell, *When Are Shareholder Suits in Shareholder Interest?*, *82 GEO. L.J. 1760 (1994)*.

n29 A third social cost is the absence of improved monitoring by shareholder/principals that occurs when their management/agents provide complete and truthful information. *See supra* note 27, at 188. *See also* Roberta Romano, *The Shareholder Suit: Litigation without Foundation?* 7 J.L. ECON. & ORG. 55 (1991).

n30 *See, e.g.*, Easterbrook and Fischel, *supra* note 5.

n31 *See* Jones, *supra* note 6.

N32 We find that only in a small percentage of cases do director and officer defendants contribute personally to the settlement and even then they often constitute only a small fraction of the total settlement. See the NERA database on settlement composition of payments.

n33 *See* Arlen & Carney, *supra* note 6.

n34 *See id.* at 713.

n35 *See id.* at 720.

n36 *See id.* at 733.

n37 *See, e.g., House Commerce Telecommunications and Finance Private Securities Litigation Revision: Hearings Before the Subcomm. on Telecommunications and Finance of the Senate Comm. On Commerce*, 104th Cong. (1995)(statement of James Kimsey, Chairman, America Online, Inc.).

n38 *See supra* part I.B.

n39 *See infra* part I.D.

n40 *See* Arlen & Carney, *supra* note 6, at 700.

n41 *See* Alexander, *supra* note 3, at 515.

n42 *See id.* at 506.

n43 Alexander also points to the standard fraud exclusion clause in D & O insurance contracts as forcing defendants to avoid trial. If the jury were to find fraud by defendants then the defendants' ability to make an insurance claim would be severely impaired. Settlement agreements, by contrast, can be worded so as to fall outside the fraud exclusion. *See id.* at 551.

n44 This difference in incentives between plaintiffs and plaintiffs' attorneys is just a different example of the point made by Professor Coffee. *See supra* note 4.

n45 *See What We Know and Don't Know: A Very Short Primer on Securities Class Actions: Before Subcomm. on Telecommunications and Finance of the Comm. On Energy and Commerce Before the Subcommittee on Telecommunications and Finance of the House Comm. on Energy and Commerce*, 103d. Cong. (1994) (statement of John C. Coffee, Jr.); *See also*, Joseph A. Grundfest, *Why Disimply? 108 HARV. L. REV. 728 (1994)* [hereinafter GRUNDFEST] responding to Joel Seligman, *The Merits Do Matter*, *108 HARV. L. REV. 438 (1994)* [hereinafter SELIGMAN].

n46 *See supra* part I.B.

n47 *See* Easterbrook & Fischel, *supra* note 5, at 25.

n48 <http://securities.stanford.edu>

5 Stan. J.L. Bus. & Fin. 121, *

n49 To estimate investor losses, we collected daily closing price and trading volume and monthly shares outstanding from two computerized data services -- FactSet Research Systems, Inc. and Interactive Data Corporation.

n50 *See infra* Tables, Notes and Sources.

n51 *See* Frederick C.. Dunbar, *Recent Trends in Securities Class Action Suits*, (Dunbar, 1992), Frederick C. Dunbar, Vinita M. Juneja, Denise N. Martin, *Recent Trends II: What Explains Settlements in Shareholder Class Actions?* (1993) (Dunbar, et al. 1993), Frederick C. Dunbar, Vinita M. Juneja, Denise N. Martin, Todd S. Foster, *Recent Trends III: What Explains Settlements in Shareholder Class Actions?* (1995) (Dunbar, et al. 1995), and Denise N. Martin, Vinita M. Juneja, Todd S. Foster and Frederick C. Dunbar, *Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions?*, 2 SEC. REFORM ACT LITIG. REP. 205 (1996) ("Martin, et al. 1996"). *See also* Juneja, et al. 1998, *supra* note 1.

n52 As described above, due to data constraints we could only obtain plaintiffs' claimed damages or calculate investor losses for a subsample of 46 and 495 of these cases, respectively.

n53 *See infra* part IIB.

n54 *See, e.g.*, *Control Data Corporation Securities Litigation, 116 F.R.D. 216 (8th Cir. 1986);* It should be noted that this approach to damage estimation in Rule 10b-5 and Section 11 securities class action suits can generate highly biased results. It is incapable of determining how much of investor losses is due to the alleged fraud and how much is due to other factors, such as the inherent volatility of the defendant's stock price or idiosyncratic events affecting the issuer that are unrelated to the alleged fraud. Note that in some of the literature, there is confusion between allowable market loss as used by claims administrators and investor losses as we calculate it. These measures are not necessarily equivalent. If allowable loss does not control for market movements, it will almost certainly be bigger than investor losses. If allowable loss is a single dollar amount per share, it will almost certainly be different from investor losses.

n55 In practice, this index is sometimes adjusted by the defendant firm's beta or replaced with an index specific to the industry (e.g., the Hambrecht & Quist Technology index). The proportional decay model is typically adjusted by plaintiffs for shares that are held through the class period by institutions (SEC Form 13F filers), insider transactions and holdings (SEC Forms 3 and 4 filers) and shareholders with 5 percent ownership of the outstanding stock (SEC Forms 13D and 13G filers). See Tables, Notes and Sources, Note 9 for a description of the investor losses calculation.

n56 The initial multiple regression estimates were made using a very flexible functional form that could assume different shapes -- linear, U-shaped, inverted U-shaped, L-shaped, etc. The data indicated that the size of settlements increase as investor losses increase (not surprisingly), but that the relationship is not linear. In particular, settlements increase with investor losses but at a declining rate. That is, the ratio of settlement size to investor loss is lower in those cases with high investor losses.

To quantify this effect, we estimated a simpler log form equation that performs as well statistically as the flexible form equation. The form of this equation is $\ln(S) = a + b*\ln(IL) + c*A + d*MC + e*H + I$ where $S$ = settlement value; $IL$ = investor losses over the class period; $A = 1$ if the case has accounting firm codefendants and 0 otherwise; $MC$ = the market capitalization of the defendant company at the end of the alleged class period and $H = 1$ if the defendant is in the health care industry and 0 otherwise; $\ln(.)$ = the natural logarithm operator; $a, b, c, d$ and $e$ = estimated coefficients; $I$ = stochastic term with expected value equal to zero, constant variance and uncorrelated among observations. The regression results from this specification, as well as others are discussed below.

n57 *See* Beverly C. Moore, Jr., *In Camera*, 16 CLASS ACTION REPORTS (1993), at 250.

n58 The primary exception is the significance of the merit-related proxy (i.e. the existence of government enforcement proceedings) in the plaintiffs' claimed damages sample.

n59 The formula for determining the effect of this variable in percentage terms equals (exp (x)-1)*100, where x is the coefficient on the indicator variable for whether an advisor was a named codefendant.

n60 This finding is based on a one-tailed test of statistical significance. *See* Tables, Notes and Sources, Note 11.

n61 While settlement values are higher for cases involving advisor codefendants, we do not observe that the incremental costs are borne entirely by those defendants. As noted above, using data on the allocation of settlements across classes of defendants, we find that in cases naming underwriters and/or accountants, these parties contributed 18.6 percent of the aggregate settlement. Similarly, for cases in which an accounting defendant and no underwriter defendants are named, the advisor defendants contribute 26.4 percent.

n62 Regression results for this specification and others that are referred to in the text but not included in the tables at the end of the paper are available upon request from the authors.

n63 In addition to California, the Ninth Circuit consists of Arizona, Idaho, Montana, Nevada, Oregon, Washington, Alaska, Hawaii, Guam, and the Northern Mariana Islands.

n64 The Second Circuit includes New York, Connecticut and Vermont, and the Third Circuit includes Delaware, New Jersey, and Pennsylvania and the U.S. Virgin Islands.

n65 The Tenth Circuit includes Colorado, Kansas, New Mexico, Oklahoma, Utah and Wyoming.

n66 *See* Steven P. Marino and Renee D. Marino, *An Empirical Study of Recent Securities Class Action Settlements Involving Accountants, Attorneys, or Underwriters*, 22 SEC. REG. L. J. 115 (1994) ("Marino and Marino").

n67 *See id.* at 124.

n68 *See id.* at 123.

n69 *See Chiarella v. United States, 445 U.S. 222, 63 L Ed 2d 348, 100 S Ct 1108 (1980).*

n70 *See* Marino and Marino, *supra* note 66, at 123.

n71 *See*, e.g., Daniel R. Fischel and David J. Ross, *Should the Law Prohibit 'Manipulation' in Financial Markets? 105 HARV. L. REV. 503 (1991),* Steve Thel, *Regulation of Manipulation Under Section 10(b): Security Prices and the Text of the Securities Exchange Act of 1934, 1988 COLUM. BUS. L. REV. 359,* and Steve Thel, *$ 850,000 in Six Minutes - The Mechanics of Securities Manipulation*, 79 CORN. L. REV. (1994).

n72 On the other hand, just because there is an enforcement action or an indictment does not mean there has been securities fraud. Management may have been very forthcoming to the investing public about the matters

being investigated an the process of the investigation. *See*, for example, *General Development Corporation Bond Litigation* (91 Civ. 0594) (LLM) MDL890, Memorandum and Order, July 8, 1992.

n73 The information from SCAA on settlements does not always indicate whether a Section 11 claim was made and settled. It is possible that some cases with security offerings were the subject of only Rule 10b-5 counts.

n74 This assumes the other conditions for liability are also met: namely, the alleged public misrepresentations or omissions were material and plaintiffs' losses were caused by them.

n75 Rule 10b-5 requires scienter or gross negligence whereas Section 11 and 12 do not. *17 C.F.R. § 240.10b-5 (1997).*

n76 This condition is known as multicollinearity. If severe multicollinearity is present, all that can be determined from the regression is the sum of the effects of the collinear variables and not their individual effects.

n77 *See* Alexander, *supra* note 3, at 497-598.

n78 *See, e.g.*, Dunbar, 1992, Dunbar, et al. 1993, and Dunbar, et al. 1994, and Martin, et al. 1996, *supra* note 51. *See also*, Juneja, et al. 1998, *supra* note 1.

n79 *See* Coffee 1986, *supra* note 4.

n80 *See* Alexander, *supra* note 3, at 567.

n81 We use the end of the class period as a proxy for the filing date and the SCAA report date as a proxy for the settlement date. The difference between these dates represents a measure of the age of the case at settlement.

n82 *See* Vincent E. O'Brien and Richard Hodges, *A Study of Class Action Securities Fraud Cases*, 1991 ("O'Brien and Hodges"). O'Brien's generally negative opinion toward shareholder class actions is presented in *The Class Action Shakedown Racket*, WALL ST. J., September 10, 1991, at A20.

n83 *See* Jennifer Francis, Donna Philbrick and Katherine Schipper, *Determinants and Outcomes in Class Action Securities Litigation*, March 1994 (revised working paper).

n84 *See id.* at 30.

n85 *See id.* at 27.

n86 *See id.* at 31.

n87 *See* Grundfest, *supra* note 45, at 742.

n88 *See* Grundfest, *supra* note 45, at 743.

n89 *See* Grundfest, *supra* note 45, at 743.

5 Stan. J.L. Bus. & Fin. 121, *

n90 Note that our database as of 1993 was one of the three samples considered by Grundfest in his calculations.

n91 Grundfest examines another sample in which 22 percent of the settlements exceeded $ 10 million, with an average of $ 21 million. He notes that "If the avoided defense costs in each of these cases were less than $ 10 million, then defendants' settlements clearly recognized a probability that the legal system might find some merit in plaintiffs' claims." *See* Grundfest, *supra* note 45, at 743.

n92 Pub. L. No. 104-67, 109 Stat. 737.

n93 Alexander and others are of the opinion that this reason is overriding.

n94 Professor Grundfest states that "this analysis suggests that a key statistic in the merits debate is the difference between the observed amount and the amount a defendant would be willing to pay simply to avoid the costs of mounting a defense. A defendant always has an incentive to settle a case for an amount less than avoidable defense costs because any such settlement is less costly than pursuing the case to verdict and prevailing at trial. In contrast, a defendant never has an incentive to settle for an amount in excess of avoidable defense costs unless the defendant recognizes some probability, however small, that a jury will rule in plaintiffs' favor." *See* Grundfest, *supra* note 45, at 741.

n95 *See* Dunbar, et al. 1995, *supra* note 51, for a more detailed description of the theoretical reasoning,

**B-3**

# Empirical Study of Class Actions in Four Federal District Courts:
# Final Report to the Advisory Committee on Civil Rules

*Thomas E. Willging, Laural L. Hooper & Robert J. Niemic*

Federal Judicial Center

1996

This Federal Judicial Center publication was undertaken in furtherance of the Center's statutory mission to conduct and stimulate research and development for the improvement of judicial administration. The views expressed are those of the authors and not necessarily those of the Federal Judicial Center.

# Contents

Acknowledgments  vii

Introduction  1

    The Rule 23 Debate in Historical Perspective  1

    The 1995 FJC Study  3

    Study Design and Methods  4

    Nature of the Data  5

Summary of Findings  7

Findings  13

    (1) Individual Actions and Aggregation  13

        (a) Average recovery per class member  13

        (b) Consolidation and related cases  14

    (2) Routine Class Actions  16

        (a) What was the relationship, if any, between the "easy applications" of Rule 23 and the substantive subjects of dispute?  16

        (b) How did class actions compare to other types of cases in terms of the type of outcome and the stage of the case at which the outcome occurred?  18

        (c) What was the frequency and rate of certification of (b)(1), (b)(2), and (b)(3) classes and how did these rates correspond with substantive areas?  19

        (d) How much judicial time did class actions take and how did that compare to other civil actions?  22

    (3) Race to File  23

    (4) Class Representatives  24

        (a) How many "repeat players"?  25

        (b) Did judges add or substitute representatives?  25

        (c) Did named representatives attend the approval hearing?  26

        (d) What was in it for the class representatives?  26

    (5) Time of Certification  26

        (a) Timing of motions and certification decisions  27

        (b) Local rules on the timing of certification motions  27

        (c) Decisions on merits in relation to certification  29

            (i) Outcomes of rulings on dismissal and summary judgment and impact on the litigation  32

            (ii) Timing of rulings on dismissal and summary judgment  33

        (d) Simultaneous motions to certify and approve settlement  34

    (e) Changes in certification rulings  35
  (6) Certification Disputes  36
    (a) How many certification contests were there and how much time did counsel spend opposing certification?  36
    (b) Was there a relationship between disputes over certification and the nature of suit?  37
    (c) How much effort was devoted to the choice between (b)(1), (b)(2), and (b)(3) classes and did the effort vary by nature of suit?  38
  (7) Plaintiff Classes  40
    (a) Did defendants ever seek and win certification of a plaintiff class?  40
    (b) How frequently did defendants acquiesce in certification of a plaintiff class by failing to oppose or by stipulating to class certification?  40
  (8) Defendant Classes  40
  (9) Issues Classes and Subclasses  41
  (10) Notice  45
    (a) What types of notice, in what time frame, have been required in (b)(1), (b)(2), and (b)(3) actions?  45
    (b) In what form was the notice issued, who paid the cost, and does the cost of notice discourage legitimate actions?  47
    (c) How much litigation of notice issues occurred?  49
    (d) Did the notices of proposed settlements contain sufficient detail to permit intelligent analysis of the benefits of settlement?  49
  (11) Opt Outs  52
    (a) Number of opt outs and relationships with subject areas and size of claims  52
    (b) Opt outs in (b)(1) or (b)(2) classes  54
  (12) Opt Ins  54
    (a) Opt-in classes  54
    (b) Claims procedures  55
  (13) Individual Member Participation  55
    (a) Participation before settlement  55
      (i) Attempts by class members to intervene  55
      (ii) Attempts by nonmembers to intervene  56
    (b) Class member participation in settlement by filing objections and attending settlement hearings  56
    (c) Nonrepresentative class member participation by filing appeals  59
  (14) Settlement  59
    (a) Did certification coerce settlement of frivolous or nearly frivolous claims?  59
      (i) Outcomes of certified classes compared with outcomes for noncertified cases  59
      (ii) Frequency of rulings on motions to dismiss, motions for summary judgment, trial dates scheduled, and trials held in certified class actions  60
      (iii) Timing of settlements in relation to class certification  61
    (b) Notice  62
    (c) Attendance of nonrepresentative parties at settlement approval hearings  64

(d) Provisions favoring named representatives  64
(e) How often did magistrate judges or special masters evaluate settlements?  64
(15) Trials  66
    (a) How often were trials held and with what results in what types of cases?  66
       (i) Certified cases with jury trials  67
       (ii) Noncertified cases with jury trials  67
    (b) How did class action trial rates compare with trial rates for all other civil cases within the district?  68
(16) Fee/Recovery Rates  68
    (a) What were the ratios of attorneys' fees to recoveries?  68
    (b) How were fees calculated?  69
    (c) How was benefit to the class taken into account?  74
    (d) What percentage of the fee amounts requested were awarded and how often were objections and appeals filed concerning fees?  76
(17) Trivial Remedies; Other Remedies  77
    (a) How frequently did certified (b)(3) classes lead to relief that is relatively trivial in comparison to attorneys' fees?  77
    (b) How frequently did certified (b)(2) classes lead to injunctive relief that is relatively trivial in comparison to attorneys' fees?  78
    (c) How often were recoveries distributed to charities or the like?  78
(18) Duplicative or Overlapping Classes  78
(19) Res Judicata  79
(20) Appeals  80
    (a) How often were appeals filed?  81
    (b) How often did appeals alter the prior decision of the trial judge?  82
    (c) To what extent did appellate review serve to correct errors in procedural decisions relating to the class action mechanism, such as class certification?  85
(21) Class Action Attorneys  87
    (a) How extensive was the class action bar across the four districts?  87
    (b) How often did the same attorneys appear as counsel for the class in different cases and in different courts?  88

Conclusion  89

Appendix A: Advisory Committee Draft of Proposed Rule 23—1993  93

Appendix B: Advisory Committee Draft of Proposed Rule 23—1995  101

Appendix C: Figures and Tables  111

Appendix D: Methods  197

# Acknowledgments

We are grateful to Professor Edward H. Cooper and Dean Thomas D. Rowe, Jr., for their comments on earlier drafts of this paper.

In gathering data at the courts, we became indebted to individuals too numerous to mention and in ways too numerous to document. In the U.S. District Court for the Eastern District of Pennsylvania we owe special thanks to Chief Judge Edward N. Cahn, Michael E. Kunz, Clerk of Court, and Marlene Anderson, liaison to the study; in the U.S. District Court for the Northern District of California, to Chief Judge Thelton E. Henderson, Richard W. Wieking, Clerk of Court, and Ian Keye and Cheri Borromeo, liaisons; in the U.S. District Court for the Southern District of Florida, to Chief Judge Norman C. Roettger, Carlos Juenke, Court Administrator/Clerk of Court, and Mario Toscano, Deborah Hirshberg, and Matthew Balch, liaisons; and in the U.S. District Court for the Northern District of Illinois, to then-Chief Judge James B. Moran, H. Stuart Cunningham, Clerk of Court, and Ted Newman, Chris Lavizzo, and Larry Appelson, liaisons. We also express our appreciation to the numerous members of their staffs who made our work possible and productive.

Within the Research Division of the Federal Judicial Center, the authors received substantial assistance from Marie Cordisco, George Cort, James Eaglin, William Eldridge, David Ferro, Scott Gilbert, Jane Ganz Heinrich, Julie Hong, Yvette Jeter, Molly Treadway Johnson, Patricia Lombard, Kim McLaurin, Naomi Medvin, Melissa Pecherski, Charles Sutelan, Elizabeth C. Wiggins, Carol Witcher, and other staff members.

We are also grateful to the editorial staff of the Center's Publications and Media Division for the editing and formatting of this document.

A shorter version of this report has been published in volume 71 of the New York University Law Review as part of a spring 1996 symposium on class actions.

# Introduction

Federal Rule of Civil Procedure 23, an outgrowth of an equity rule, was promulgated in 1938 as part of the first Federal Rules of Civil Procedure.[1] The current version of the rule creates a procedure designed to permit representative parties and their counsel to prosecute or defend civil actions on behalf of a class or putative class consisting of numerous parties. Rule 23 was last amended in 1966. The Judicial Conference Advisory Committee on Civil Rules is currently considering proposals to amend Rule 23.

## The Rule 23 Debate in Historical Perspective

Creating a workable procedural standard for class actions has challenged rule makers since the first draft was published in 1937.[2] The 1966 amendments to Rule 23 sparked a "holy war"[3] over the rule's creation of opt-out classes. Opinions became polarized, with class action proponents seeing the rule as "a panacea for a myriad of social ills" and opponents seeing the rule as "a form of 'legalized blackmail' or a 'Frankenstein Monster.'"[4]

Apparently anticipating debate about the 1966 amendments to Rule 23, Professor Benjamin Kaplan, then reporter to the advisory committee that drafted those amendments, was quoted as saying that "it will take a generation or so before we can fully appreciate the scope, the virtues, and the vices of the new Rule 23."[5] Respect for Professor Kaplan's caution may have dampened any advisory committee interest in revisiting Rule 23.[6] Now, a generation has passed and the current advisory committee has returned its attention to the hotly debated policy issues under-

---

1. Fed. R. Civ. P. 23, Advisory Committee Note to 1937 adoption (West ed. 1994). The U.S. Supreme Court adopted the Federal Rules of Civil Procedure on December 20, 1937, and ordered them to be reported to Congress at the beginning of the January 1938 session. Fed. R. Civ. P. at 8 (West ed. 1994).

2. *See* James W. Moore, *Federal Rules of Civil Procedure: Some Problems Raised by the Preliminary Draft,* 25 Geo. L.J. 551, 571 (1937) ("It is difficult, however, to appraise the various problems involved and state a technically sound and thoroughly workable rule" for class actions.).

3. Arthur R. Miller, *Of Frankenstein Monsters and Shining Knights: Myth, Reality, and the "Class Action Problem,"* 92 Harv. L. Rev. 664 (1979).

4. *Id.* at 665.

5. Marvin E. Frankel, *Some Preliminary Observations Concerning Civil Rule 23,* 43 F.R.D. 39, 52 (1967) (paraphrasing Professor Kaplan).

6. *See, e.g.,* Edward H. Cooper, Rule 23: Challenges to the Rulemaking Process 1 (Apr. 21, 1995) (unpublished draft paper presented at NYU Research Conference on Class Actions and Related Issues in Complex Litigation, on file at the Research Division, Federal Judicial Center) (an unspoken barrier shielded Rule 23 from Advisory Committee scrutiny for many years). A later version of Professor Cooper's paper has been circulated and is expected to be published in a spring 1996 symposium on class actions in the NYU Law Review.

lying the procedural framework of Rule 23. This report to the advisory committee addresses many of the empirical questions underlying those policy issues.

After the 1966 amendments, the emergence of mass torts as potential class actions has added fuel to the debate because of the high stakes inherent in that type of litigation. But the issues remain similar.[7] Broadly stated, three central issues permeate the debate. First, does the aggregation of numerous individual claims into a class coerce settlement by raising the stakes of the litigation beyond the resources of the defendant?[8] Second, does the class action device produce benefits for individual class members and the public—and not just to the lawyers who file them? And, finally, do those benefits outweigh the burdens imposed on the courts and on those litigants who oppose the class?[9]

In 1985 a Special Committee on Class Action Improvements of the American Bar Association's Section of Litigation articulated a list of recommended revisions of Rule 23 and called it to the attention of the advisory committee.[10] The ABA special committee found that "the class action is a valuable procedural tool" and recommended changes so that such actions would not "be thwarted by unwieldy or unnecessarily expensive procedural requirements."[11] Recommended changes included collapsing the three categories of class actions into one, expanding judicial discretion to modify the notice requirements, authorizing precertification rulings on motions to dismiss and motions for summary judgment, and permitting discretionary interlocutory appellate review of rulings on class certification.[12]

In March 1991, the Judicial Conference of the United States acted on a report of its Ad Hoc Committee on Asbestos Litigation. The Judicial Conference requested "the Standing Committee on Rules of Practice and Procedure to direct its Advisory Committee on Civil Rules to study whether Rule 23 of the Federal Rules of Civil Procedure should be amended to accommodate the demands of mass tort litigation."[13] Given these developments, the advisory committee drafted a proposed revision of Rule 23, based primarily on the ABA special committee's 1985 recommendations. Professor Edward H. Cooper, reporter to the advisory committee, circulated this draft to "civil procedure buffs," including academics, lawyers, interest groups, and bar organizations.[14] Many of the responses questioned the need for change and suggested that changes might upset settled practices and make matters worse.[15]

---

7. *See, e.g.,* Roger H. Transgrud, *Mass Trials in Mass Tort Cases: A Dissent,* 1989 U. Ill. L. Rev. 69, 74 (raising issues of fairness to litigants and coercion of settlements in mass torts).

8. *See, e.g.,* Staff of the Subcomm. on Securities, Senate Comm. on Banking, Housing and Urban Affairs, 103d Cong., 2d Sess., Private Securities Litigation 7–8 (May 17, 1994) [hereinafter Senate Staff Report].

9. *Id.; see also* Janet Cooper Alexander, *Do the Merits Matter? A Study of Settlements in Securities Class Actions,* 43 Stan. L. Rev. 497 (1991) (regardless of the merits of the claims on which they are based, settlements in securities class actions produce returns of only about 25% of the potential loss).

10. American Bar Association Section of Litigation, *Report and Recommendations of the Special Committee on Class Action Improvements,* 110 F.R.D. 195 (1986) [hereinafter *ABA Special Committee Report*]. The House of Delegates of the ABA authorized the Section of Litigation to transmit the report to the Advisory Committee but neither approved nor disapproved its recommendations. *Id.* at 196.

11. *Id.* at 198.

12. *Id.* at 199–200.

13. Judicial Conference of the United States, Ad Hoc Asbestos Committee Report 2 (March 1991).

14. Memorandum from Professor Edward H. Cooper to "Civil Procedure Buffs" (Jan. 21, 1993) (on file at the Research Division, Federal Judicial Center). A copy of the 1993 version of the Advisory Committee's proposed Rule

---

Legislative proposals to modify Rule 23 have paralleled the rule-making policy debates over the past twenty years.[16] As a recent example, in December 1995, Congress overrode a presidential veto and adopted legislation designed to alter substantive and procedural aspects of securities class actions.[17] This legislation had bipartisan support and was an outgrowth of hearings and an extensive staff report in 1994.[18] Among other provisions, the statute tightens pleading requirements for securities class actions and directs district judges to stay discovery and all other proceedings until there is a judicial ruling on any pending motion to dismiss for failure to satisfy those heightened pleading requirements.[19] The statute also modifies the notice requirements applicable to the filing and settlement of securities class actions[20] and limits attorneys' fees to "a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class."[21]

## The 1995 FJC Study

The Federal Judicial Center conducted the present study in 1994–1995 at the request of the advisory committee. In general, the committee asked the Center to provide systematic, empirical information about how Rule 23 operates. The study was designed to address a host of questions about the day-to-day administration of Rule 23 in the types of class actions that are ordinarily filed in the federal courts. The research design focused on terminated cases and did not encompass the study of mass tort class actions, which appear to occur relatively infrequently and remain pending for long periods of time.

This report describes the results of the study and addresses many of the issues in the continuing debate about class actions, including those raised by the ABA special committee's recommendations. The principal issues are:

- What portion of class action litigation addresses the type of class to be certified?
- Are judges reluctant to rule on the merits of claims before ruling on class certification?
- Does filing of a case as a class action or certifying a class coerce settlement without regard to the merits of the claims?
- How well does the notice process work and who bears its costs?
- In what ways do class representatives and individual class members participate in the litigation?

---

23 is attached as Appendix A. A copy of the November 1995 draft of proposed Rule 23 is included as Appendix B.

15. Cooper, *supra* note 6, at 1.

16. For example, the 95th and 96th Congresses considered proposals to amend Rule 23 at the behest of the U.S. Department of Justice, Office for Improvements in the Administration of Justice. *See* S. 3475, 95th Cong., 2d Sess. (1978), and H.R. 5103, 96th Cong., 1st Sess., Tit. I (1979). For further discussion of this proposal, see Stephen Berry, *Ending Substance's Indenture to Procedure: The Imperative for Comprehensive Revision of the Class Damage Action*, 80 Colum. L. Rev. 299 (1980) (evaluating H.R. 5103 to determine whether it satisfies the goals of improving the efficiency of small damage claim actions while protecting the interests of defendants and absent parties).

17. Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 (1995).

18. See Senate Staff Report, *supra* note 8, for a discussion of the issues raised at the hearings.

19. Private Securities Litigation Reform Act of 1995, 15 U.S.C.A. § 77z-1(b) (West Supp. 1996).

20. *Id.* § 77z-1(a)(3), (a)(7).

21. *Id.* § 77z-1(a)(6).

*Introduction*                                                                 3

- In cases that settle, how do the benefits to the class compare to the benefits to the class attorneys? How extensive is the class action plaintiffs' bar?
- How well does the appellate process work and how might discretionary interlocutory appeals of rulings on class certification affect the fairness of the process?

Such questions—and more—are incorporated in Professor Edward Cooper's April 1995 report to the advisory committee and conferees at New York University Law School's Research Conference on Class Actions.[22] Our report parallels Professor Cooper's report in that we have presented study data and analyses to correspond with his questions as closely as possible.[23] Where relevant, we present general background on the state of the law, often focusing on recent decisions in the circuits where study cases were filed.

## Study Design and Methods

We selected for analysis as class actions closed cases in which the plaintiff alleged a class action in the complaint or in which plaintiff, defendant, or the court initiated class action activity, such as a motion or order to certify a class. This report presents empirical data on all class actions terminated between July 1, 1992, and June 30, 1994, in four federal district courts: the Eastern District of Pennsylvania (E.D. Pa., headquartered in Philadelphia), the Southern District of Florida (S.D. Fla., headquartered in Miami), the Northern District of Illinois (N.D. Ill., headquartered in Chicago), and the Northern District of California (N.D. Cal., headquartered in San Francisco).[24]

We identified class actions meeting these selection criteria by a multistep screening process that included reviewing electronic court docket records, statistical records maintained by the Administrative Office of the U.S. Courts, and published opinions. We then reviewed all cases that were candidates for inclusion in the study.[25] For each case meeting study criteria, we examined court records and systematically entered appropriate case information into a computerized database. These data were then analyzed by the same attorney researchers who collected the data. In addition, we reviewed data about class actions from the Federal Judicial Center's 1987–1990 district court time study:[26] those data are summarized at relevant parts of this report.[27]

22. Cooper, *supra* note 6.

23. Our headings and subheadings generally follow the structure of Professor Cooper's paper, but occasionally we have adapted the titles or rearranged the parts to present the data more clearly.

24. Cases in the study represent a termination cohort, i.e., a group of cases that were selected because they were concluded within the same time period. Termination cohorts sometimes present problems of biased data if recent filing trends show fluctuations. Because of the limitations of class action filing data we have not been able to test filing trends as thoroughly as we would like. On the other hand, we have no reason to believe that the use of a termination cohort presents serious problems for these data. *See* Appendix D, Methods.

25. See Appendix D for details about the identification of class actions.

26. *See* Thomas E. Willging, et al., Preliminary Report on Time Study Class Action Cases (Feb. 9, 1995) (unpublished report on file with the Information Services Office of the Federal Judicial Center). The time study report includes national data derived from judges' records of the time they spent on the 51 class actions in the study. *See infra* § 2(d) and Table 19. See Appendix D for details about the time study.

27. The current report supplements Willging et al., *supra* note 26, and supersedes our preliminary presentation of data to the advisory committee concerning the first two districts studied. *See* Thomas E. Willging et al., Preliminary Empirical Data on Class Action Activity in the Eastern District of Pennsylvania and the Northern District of

We generally used the median (midpoint) to describe the central tendency of the data. We used this statistic because the mean (average) in many instances was inflated by a few extraordinarily large or small values ("outliers").

## Nature of the Data

Several perspectives regarding—and limitations of—the data deserve special mention at the outset. The four districts were not selected to be a scientific sampling of class actions nationwide. Rather, we selected the four districts because available statistical reports on the frequency of class action activity in those districts indicated that we would have the opportunity to examine a relatively large number of cases in those districts. This high volume would allow us to observe a variety of approaches to class actions. Similarly, the selection of districts from four separate geographic regions would enable us to observe any regional differences in approaches and the selection of districts from four circuits would enable us to observe variations in case law. Because this study did not employ random sampling or control or comparison groups, our results cannot and should not be viewed as representative of all federal district courts nor should causal inferences be drawn from the data. On the other hand, we have no reason or data that would lead us to believe that these districts are unusual or that they present a picture that is radically different from what one would expect to find in other large metropolitan districts.

Each district should be viewed as a separate entity and the data from the four districts should be viewed as descriptive—four separate snapshots of recent class action activity. Generally, data from the four districts should not be aggregated. Occasionally, when the number of cases on a given subject is quite small, we discuss combined data from the four districts for descriptive purposes only, but no inference should be drawn that these data are necessarily representative of all courts.[28]

California in Cases Closed Between July 1, 1992, and June 30, 1994 (rev. Apr. 13, 1995) (unpublished preliminary report on file with the Information Services Office of the Federal Judicial Center).

28. For example, when discussing subject matter (nature-of-suit) categories of cases in relation to infrequent events, we present the data in figures with a caution that no overall conclusions can be drawn from them.

# Summary of Findings

Overall, we identified 407 class actions in the four districts. Of those, 152 were certified as class actions, 59 of which were certified for settlement purposes only.

**1. Individual Actions and Aggregation.** Across the four districts, the median level of individual recoveries ranged from $315 to $528 and the maximum awards ranged from $1,505 to $5,331 per class member. Without an aggregative procedure like the class action, the average recovery per class member or even the maximum recovery per class member seems unlikely to be enough to support individual actions in most, if not all, of the cases studied.

Occasionally, other aggregative procedures were used in conjunction with a class action. District court consolidation of related cases occurred more frequently than multidistrict litigation (MDL) consolidation.

**2. Routine Class Actions.** Securities (b)(3) cases in the four districts exhibited a number of standard characteristics that suggest routineness in the way in which they are litigated and adjudicated. Such cases did not necessarily last longer than nonsecurities class actions, were about as likely to be subject to some form of objection to certification, and did not necessarily yield more dollars to individual class members. Securities cases were, however, more likely to be certified, to be subject to representativeness objections, to involve larger class sizes than nonsecurities cases, and to contain boilerplate allegations. Finally, numerosity objections were unlikely to occur in securities cases, but more likely to occur in other cases.

We did not find the above pattern of routine litigation practices in nonsecurities cases in which only a Rule 23(b)(2) class was sought. Nor did we find such a pattern in (b)(2) civil rights cases, a subset of the nonsecurities cases. Accordingly, we concluded that we cannot generalize about whether these types of (b)(2) cases represented routine applications of Rule 23.

Comparing class and nonclass settlement and trial rates as possible indicators of routineness, the settlement rate for other nonprisoner class actions was comparable to the settlement rate for nonprisoner civil actions, but no consistent pattern was detected across the four districts. The settlement rate for securities class actions was higher than for nonclass securities actions in three of the four districts. Trial rates (jury and bench), however, were generally about the same for all nonprisoner civil cases whether or not they were filed as class actions.

Despite similarities with nonclass cases in settlement and trial rates and despite some standardization of arguments and certification decisions in securities cases, class actions as a group do not appear to be routine cases according to two other measures. In three districts, class actions took two to three times the median time from filing to disposition (15–16 months compared to 5–6 months). In a national time study, certified and noncertified class actions on average consumed almost five times more judicial time than the typical civil case. Both these meas-

ures suggest that class actions are not routine in their longevity or in their demands on the courts.

The most frequently certified class was the Rule 23(b)(3) or "opt-out class," which occurred in roughly 50% to 85% of the certified classes in the four districts. The second most frequently certified class was the Rule 23(b)(2) or "injunctive class," which occurred in 17% to 44% of the certified classes. Rule 23(b)(1) "mandatory" classes were certified in a total of fourteen cases in three districts.

A securities case was the most likely case type to be certified as a (b)(3) class, while civil rights cases of various types were most likely to be certified as (b)(2) classes. Certification under more than one 23(b) subsection occurred in about 10% of the certified classes. The most frequent multiple certification combination was (b)(2) and (b)(3).

**3. Race to File.** Multiple filings of related class actions might indicate a race by counsel to the courthouse, perhaps to gain appointment as lead counsel. We found the following multiple filings: intradistrict consolidations, MDL consolidations, and related but unconsolidated cases. At least one form of multiple filing occurred in 20% to 39% of the class actions in the four districts.

On a related issue, it did not appear that many class action complaints were filed quickly for the ostensible purpose of preserving discoverable information.

**4. Class Representatives.** We did not find any evidence of professional class action plaintiffs. Very few persons functioned as a class representative in more than one case and none served in that capacity in more than two cases in the study. There were, however, changes in class representatives in 8% to 33% of certified class actions. Many of the changes appeared to signify a significant shift in the litigation or the removal of a person in response to arguments of opposing parties or objections of nonrepresentative parties. A substantial minority (26% to 46%) of all certified class actions in which the court approved a settlement included separately designated awards to the named class representatives. The median award per representative was under $3,000 in three courts and $7,560 in the fourth.

**5. Time of Certification.** Counsel filed motions to certify—or courts issued show cause orders for sua sponte certification—in the four districts within median times of 3.1 months to 4.3 months after the filing of the complaint. Judges ruled on motions to certify within median times of 2.8 months to 8.5 months after the date of the motion.

Parties often filed motions to dismiss or for summary judgment and judges generally ruled on those motions in a timely fashion, often dismissing a case in whole or in part. These rulings on the merits often preceded rulings on class certification, with the rate of precertification rulings on motions to dismiss being higher than the rate for summary judgment motions (although there were some precertification rulings on summary judgment motions in all four districts).

Overall, approximately two out of three cases in each of the four districts had a ruling on either a motion to dismiss, a motion for summary judgment, or a sua sponte dismissal order. Approximately three of ten cases in each district were terminated as the direct result of a ruling on a motion to dismiss or for summary judgment.

As to the timing of such rulings, defendants generally had an opportunity to test the merits of the litigation and obtained prompt judicial rulings on motions to dismiss. Not surprisingly, testing the factual sufficiency of claims via summary judgment took longer—sometimes more than a year—than obtaining rulings on motions to dismiss.

**6. Certification Disputes.** Across the four districts, 152 (37%) of the 407 cases filed as class actions were certified as such. Fifty-nine (39%) of the certified cases were certified for settlement purposes only. About 40% of the latter cases were settlement classes, that is, cases in which the parties submitted a proposed settlement to the court before or simultaneously with the first motion to certify a class.

In three of the four courts, opposition to certification was indicated in over half of the cases in which class certification was raised. Most arguments centered on traditional issues relating to the typicality, commonality, and named plaintiffs' representativeness. Opposition infrequently addressed the subtype of Rule 23(b) class to be certified; approximately 15% of judicial rulings granting class certification addressed the type of class certified. (See also sections 2 and 9 of this Summary.)

**7. Plaintiff Classes.** Defendants almost never sought certification of a plaintiff class and were successful in having a plaintiff class certified in only one instance. In half of the 152 certified cases, defendants acquiesced in a plaintiff class either by failing to oppose a motion to certify or by stipulating to certification.

**8. Defendant Classes.** Across the four districts, there were a total of four motions requesting certification of a defendant class, three filed by plaintiffs and one filed by defendants. One defendant class was certified, at plaintiffs' request, in a civil rights case.

**9. Issues Classes and Subclasses.** There were no issues classes in any of the four districts. Subclasses were infrequent, appearing in ten cases, five of which were securities cases.

The ability of the named plaintiff to represent the class was frequently disputed because of a potential conflict of interest with other class members. But disputes regarding the typicality of class representatives' claims were less frequent.

**10. Notice.** Notice of class certification or notice of settlement or voluntary dismissal was sent to class members in at least three-quarters or more of the certified class actions. Notice was delayed in a substantial number of cases. While the reason for the delays could not be determined, one consequence of the delays was to postpone notice expenses until the case had been resolved and such expenses could be shifted to the defendant. In a dozen cases, half of which were settlement classes, neither notice to the class nor hearing on settlement approval appeared to have taken place.

Parties and judges provided individual notice in almost all certified (b)(3) actions in which notice was issued. In at least two-thirds of the cases in each district, individual notices were supplemented by publication in a newspaper or other print medium.

The median number of recipients of notice of certification or settlement (or both) was substantial, ranging from approximately 3,000 individuals in one district to over 15,000 in another. In many cases plaintiffs and defendants shared the cost of notices. Across the four districts, the median cost of notice in the limited number of cases with data available exceeded $36,000 for notice of certification or settlement or both. Litigation related to notice issues occurred in less than one-quarter of the certified cases in which notice was communicated to the class.

Settlement notices generally did not provide either the net amount of the settlement or the estimated size of the class. A class member typically did not have the information with which to estimate his or her individual recovery. Also missing from most notices was information about the amount of attorneys' fees, costs of administration, and other expenses. Usually, however, notices included sufficient information about plans to distribute settlement funds, procedures

for filing claims, opt-out procedures, and the timetable for filing objections and participating in hearings.

**11. Opt Outs.** At the settlement stage, the percentage of cases with at least one member opting out was considerably higher than at the certification stage. The occurrence of at least one member opting out of a settlement ranged from 36% to 58% of the cases compared to 9% to 21% with at least one member opting out of a certification before settlement.

Across all four districts, the median percentage of members who opted out of a settlement was either 0.1% or 0.2% of the total membership of the class; 75% of the opt-out cases had 1.2% or fewer of class members opt out. Settlements with small average individual recoveries had a higher number of cases with one or more opt outs than cases with larger average individual recoveries.

**12. Opt Ins.** None of the certified class actions required that class members file a claim as a precondition to class membership. Many cases in the study used a claims procedure to distribute any settlement fund to class members. Claims procedures were used routinely in securities class actions. The effect of combining a claims procedure with an opt-out class appeared to be that a class member who did not opt out or file a claim was nonetheless precluded from litigating class issues in the future.

**13. Individual Member and Nonmember Participation.** Attempts to intervene in cases filed as class actions occurred relatively infrequently. Following rulings rejecting an attempt to intervene, three prospective intervenors filed appeals challenging that decision, but none was successful. Prospective intervenors also filed three appeals addressing other issues—again without success. In addition, objecting class members filed appeals of settlements in two major consumer class actions.

Overall, about half of the settlements that were the subject of a hearing generated at least one objection. Nonrepresentative parties participated by filing written objections to the settlement far more frequently than by attending the settlement hearing. Courts approved approximately 90% or more of the proposed settlements without changes in each district. In a small percentage of cases, the court conditioned settlement approval on the inclusion of specified changes.

**14. Settlement.** In each district, a substantial majority of certified class actions were terminated by class-wide settlements. Certified class actions were two to five times more likely to settle than cases that contained class allegations but were never certified. Certified class actions were less likely than noncertified cases to be terminated by traditional rulings on motions or trials. The vast majority of cases that were certified as class actions had also been the subject of rulings on motions to dismiss or for summary judgment, most of which did not result in dismissal or judgment. But noncertified cases were not simply abandoned; in each district, they were at least twice as likely as certified class actions to be disposed of by motion or trial (mostly by motion). Overall, about half of the noncertified cases were disposed of by motion or trial.

As to the relationship between class certification and settlement, many cases settled before the court ruled on certification. At the other end of the spectrum, a sizable number—a majority in three of the districts—settled more than a year after certification.

Special masters were never used to evaluate settlements and in only one case was a master used to facilitate settlement. Magistrate judges were used occasionally to evaluate a settlement and more frequently to facilitate settlement.

*Class Actions*

**15. Trials.** The number of trials in study cases was small; a trial began in only 18 (4%) of the 407 cases in the four districts combined. Plaintiff classes and individual plaintiffs did not fare well at trial. Except for one default judgment that led to a class settlement, no trial resulted in a final judgment for a plaintiff class. Of the three trials that found for individual plaintiffs, one judgment was vacated and remanded for dismissal, one judgment was vacated with a resulting $1 damage award for the plaintiff on remand, and one defendant's appeal was dismissed. Five of the 18 trials led to settlement during or after trial, including the default judgment case mentioned above, two certified cases that settled after partial judgments for the class, and two non-certified cases.

**16. Fee-Recovery Ratios.** Net monetary distributions to the class regularly exceeded attorneys' fees by substantial margins. In cases where benefits to the class can readily be quantified, the "fee-recovery rate" (fee awards as a percentage of the gross settlement amount) infrequently exceeded the traditional 33.3% contingency fee rate.

When a settlement created a fund for distribution to the class, three of the four districts calculated fees using the percentage of recovery method far more often than the lodestar method. Not surprisingly, courts generally used the lodestar method in cases where the class settlement produced nonquantifiable benefits. Judges appeared to attach special importance to actual benefits won for the class when calculating fees, either by using the percentage of the recovery method, considering fee objections, or adjusting the lodestar calculation.

Four or fewer appeals per district involved attorneys' fees issues. All fee-related appeals related to plaintiffs' counsel fees, including challenges to the amount of the award, denial of the fee request, or reduction of the fee request. For the four districts combined, only one of the fee-related appeals resulted in vacating a fee award. The other appeals ended in fee-award affirmance (two cases), appeal dismissal (two cases), reversal of denial of fees (one case), vacating the trial court's reduction of fees (one case), and remanding for reconsideration (one case).

**17. Trivial Remedies; Other Remedies.** We did not find any patterns of situations where (b)(3) actions produced nominal class benefits in relation to attorneys' fees. Nor did we find any (b)(2) cases that appeared to result in clearly trivial injunctive relief accompanied by high fees. The fee-recovery rate, as described above, exceeded 40% in 11% or fewer of settled cases, half of which included nonquantifiable benefits such as a permanent injunction. In the balance of cases with high fee-recovery rates, the settlement produced relatively small payments to the class as well as to attorneys for the class.

In five cases in two districts, a portion of the settlement funds was distributed to a charitable or other nonprofit organization.

**18. Duplicate or Overlapping Classes.** We found five duplicative or overlapping classes in related cases that were not consolidated with similar litigation pending in federal and state courts. Our review of the files indicated that those cases generated few difficulties for the court.

**19. Res Judicata.** No data were available.

**20. Appeals.** The rate of filing at least one appeal ranged from 15% to 34%. Noncertified cases were more likely to have one or more appeals than certified cases. Cases with trials showed even a higher rate of appeal. Few appeals led to altering the decision of the trial judge at the appellate level or on remand. Class certification before appeal, however, may have been one of the factors that led to settlement in cases that settled on remand.

Plaintiffs filed 75% to 85% of the appeals and were rarely successful in reversing or vacating trial court decisions. On the other hand, defendants rarely filed appeals; their appeals also did not lead to a high rate of reversal or vacation. Among appeals resulting in full or partial reversal on appeal, most reversals significantly changed the direction of the case. For appeals in cases that had been previously certified, reversal and remand generally resulted in a class settlement, although there were only seven such reversals in the study. On the other hand, reversal and remand in thirteen cases not previously certified generally did not lead to a successful outcome for the plaintiffs.

Parties rarely sought appellate review of district court decisions that dealt with the mechanics of the class action process, such as certification or class settlement. Litigants appealed certification decisions in seven study cases. Two cases involved certified classes. In one, the certification of a class was affirmed and, in the other, class certification was vacated. In the other five cases, putative class representatives appealed the denial of class certification. Three of these five appeals were unsuccessful. The fourth resulted in reversal and remand that led to class certification and the fifth resulted in dismissal with no class certified.

**21. Class Action Attorneys.** In 156 cases, 160 different law firms served as lead, co-lead, or liaison counsel, with more than 1 firm appointed in most cases. Twelve of these law firms served as lead or co-lead counsel in 4 or more cases. In total, these 12 firms appeared 95 cases, 63% of the certified cases in the study.

# Findings

## (1) Individual Actions and Aggregation[29]

### (a) Average recovery per class member

*Background.* In this opening section, we report data on one alternative to class actions, namely, the filing and consolidation of individual cases. The ultimate question in this subsection is: How many members of certified classes would have maintained individual actions absent the class action? We cannot answer that question in exactly those terms, but even the highest level of recovery per individual class member that we found appears unlikely to support separate individual actions.

   *Data.* Across the districts, the median level of the average recovery per class member[30] ranged from $315 to $528; 75% of the awards ranged from $645 to $3,341; and the maximum awards ranged from $1,505 to $5,331 (see Figure 1). Even assuming that an individual member might recover a higher award in a separate trial, the multiplier would have to be ten or more for an individual to meet the minimum jurisdictional amount for a diversity case. Cases seeking injunctive relief and cases brought under federal statutory authority could be brought as individual actions. However, without a substantial multiplier of individual damage awards, none of the awards would likely induce a private attorney to bring the case on a contingent fee basis or an individual to advance sufficient personal funds to retain an attorney to file the action. Nor is it clear how many, if any, individual actions would be supported by the hope for a statutory fee award (*see infra* § 16(b)).

   The median net settlement per class member in the relatively few securities cases ranged from $337 to $447 (see Figure 2). The comparable medians for nonsecurities classes ranged from $275 to $1,472 (see Figure 3). Given the small numbers of cases with monetary settlements in each district, no firm conclusions can be drawn about the differences between securities cases and all other cases. It does appear, however, that neither level of recovery would have been likely to support individual actions.

---

   29. *See generally* Judith Resnik, *From "Cases" to "Litigation,"* Law & Contemp. Probs., Summer 1991, at 5 (describing a trend toward aggregation).

   30. We calculated the average recovery per class member by starting with the gross settlement amount, deducting expenses, attorneys' fees, and any separate awards to the named class representatives, and dividing that net settlement amount by the number of notices sent to class members.

Discussion at the advisory committee's November 1995 meeting raised a question about the incidence of the "two-dollar" individual recovery.[31] To address that question, we examined all class actions in the four districts that were certified solely under (b)(3) and that produced an average distribution per class member of less than $100 (see Table 1). There were nine such cases in the four courts. These data did not include any two-dollar cases, but they do tend to bridge the gap between the anecdotal evidence and our quantitative evidence. The absence of such nominal recoveries in the four districts suggests that the anecdotal cases on which the discussion was based, which presumably arose in other districts, may represent outlier cases at the bottom of the range of class action recoveries.

For these nine cases with monetary awards below $100 per member, the average award to the class was $2.63 million and the median award was $2.55 million (see Table 1). For those same cases, fee awards were generally based on a percentage of the gross recovery. Those percentages clustered around 30% and five of the nine awards were exactly 30% of the total recovery. The average size of the class was 45,055 and the median size was 45,920 members. Eight of the nine cases were securities cases. (*See also infra* § 17(a) for a discussion of (b)(3) cases in which the relief was relatively trivial in relation to attorneys' fees and for a discussion of non-monetary relief in such cases.)

### (b) Consolidation and related cases

*Background.* In the previous section, we concluded that individuals would be unlikely to file individual cases to recover damages. In this subsection, we look at the extent to which separate cases were filed in relation to the same transactions. An important distinction, however, is that the separate cases discussed in this subsection generally were filed as class actions and not simply as individual claims. Here, we look for "relationships . . . between aggregation and numbers of individual actions arising out of the same transactional setting."[32] We also address how often "individual actions proceed in the same court, or in different courts, without any attempt at aggregation."[33] We found what appears to be a modest amount of interdistrict and intradistrict consolidation and also found a smaller number of cases that the court declined, or was without authority, to consolidate.

On occasion, a court may find that "[c]laims identical or similar to those made in a class action may be the subject of other litigation, either in the same court or in other federal or state courts."[34] Individuals who have no interest in being class members may file their own separate suits either before or after certification. Under Rule 23(b)(3)(B), the court must consider the pendency of other litigation concerning the controversy, in both state and federal courts, by or against members of the class.[35] Further, under Rule 23(c)(A)(4) common issues of fact or law may be carved out for class certification[36] on both an intradistrict[37] and on a nation-wide[38] ba-

---

31. Advisory Committee on Civil Rules, Minutes at 22–23, Nov. 9–10, 1995.

32. Cooper, *supra* note 6, at 25.

33. *Id.*

34. Manual for Complex Litigation, Third, § 30.3, at 234 (Federal Judicial Center 1995) [hereinafter MCL 3d].

35. *Id.* § 30.15, at 219 & n.691(citing Califano v. Yamasaki, 442 U.S. 682 (1979) (need to consider whether proposed nation-wide class would improperly interfere with similar pending litigation in other courts)).

36. *Id.* § 33.262, at 324 & n.1067 (citing Wadleigh v. Rhone-Poulenc Rorer, Inc., 157 F.R.D. 410 (N.D. Ill. 1994) (negligence liability for infected blood), *mandamus granted, class certification denied, In re* Rhone-Poulenc Rorer,

sis. Federal courts use Federal Rule of Civil Procedure 42(a)[39] for intradistrict transfers and the MDL statute for interdistrict transfers.[40] There is no clear authority for a federal court to consolidate cases filed in state court with actions filed in federal court.

*Data on consolidations.* In all four districts, interdistrict consolidation of cases in which there was class action activity was relatively infrequent. The Judicial Panel on Multidistrict Litigation consolidated between 3% and 6% of cases with cases from other districts. The median time from filing the complaint in a case to MDL consolidation ranged from approximately four months in three districts to approximately six months in the other district (see Figure 4). Due to the small number of cases for different nature-of-suit categories, we are unable to observe any distinct patterns or draw any reliable inferences about, say, antitrust, securities, or civil rights cases. In this small subset of cases, the most common nature-of-suit categories were antitrust cases followed by securities cases (see Table 2).

District courts consolidated similar cases within their own districts more often (14% to 20%) than the judicial panel consolidated cases across district lines. The median number of cases within each consolidation ranged from two to four (see Figure 5). Among intradistrict consolidations, the most frequent nature of suit was securities (see Table 3).

*Data on nonconsolidations.* We also looked at how often courts do not consolidate cases even though they are related to other litigation pending in federal and state courts. On the federal level, nonconsolidation of related cases occurred in 5% to 23% of the cases in the four districts (see Figure 6). Securities was the most common nature of suit among the nonconsolidated cases (see Table 4).

---

Inc., 51 F.3d 1293 (7th Cir. 1995) (district judge ordered to decertify the plaintiff class), *cert. denied*, 116 S. Ct. 184 (1995); *In re* Copley Pharmaceutical, Inc., "Albuterol" Prods. Liab. Litig., No. MDL 1013, 158 F.R.D. 485 (D. Wyo. 1994) (negligence, breach of warranty claims for contamination of bronchodilator), *defendant's motion to decertify plaintiff class denied*, *In re* Copley Pharmaceutical, 161 F.R.D. 456 (D. Wyo. 1995)).

37. *See, e.g.*, Sterling v. Velsicol Chem. Corp., 855 F. 2d 1188 (6th Cir. 1988) (opt-out class of water contamination victims in vicinity of a landfill); Jenkins v. Raymark Indus., 782 F.2d 468, 473 (5th Cir. 1986) (district-wide class of asbestos-injury claimants to resolve specific issues).

38. *See, e.g.*, *In re* School Asbestos Litig., 789 F.2d 996, 1009 (3d Cir.) (nation-wide 23(b)(3) class of schools seeking compensatory damages associated with the presence of asbestos-containing building materials), *cert. denied*, 479 U.S. 852 (1986).

39. Fed. R. Civ. P. 42(a) states:

   (a) Consolidation. When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all of the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

   Rule 42(a) permits partial or complete consolidation of related actions pending in the same district for both pretrial and trial purposes. *See* Lloyd v. Industrial Bio-Test Labs, Inc., 454 F. Supp.807 (S.D.N.Y. 1978) (securities case where the court granted the defendant's cross motion for consolidation); Wellman v. Dickinson, 79 F.R.D. 341, 348 (S.D.N.Y. 1978).

40. Pursuant to 28 U.S.C. § 1407(a) (1988), the Judicial Panel on Multidistrict Litigation is authorized to transfer civil actions pending in more than one district involving one or more common questions of fact to any district for coordinated or consolidated pretrial proceedings upon its determination that transfer "will be for the convenience of the parties and witnesses and will promote the just and efficient conduct of such actions."

*Findings*                                                                                          15

On the state level, we identified nonconsolidation with pending state litigation infrequently, ranging from 1% to 3% of the study cases (see Figure 6). Among this small group, securities and other civil rights cases were the most common nature of suit (see Table 5).

Nonconsolidation of related cases can present difficulties for courts, especially during discovery. Other problems arise when multiple actions result in conflicting or overlapping classes that may produce, among other things, inconsistent adjudications. For details about the types of difficulties we found in eight cases that were not consolidated with related litigation pending in federal and state courts, see Tables 6 and 7. While the nonconsolidations presented difficulties for the court, they did not appear to be insurmountable. Of the eight cases, half were eventually disposed of via a class settlement approved by the court. Three of the remaining cases were terminated via a judicial ruling on a motion to dismiss, a stipulated voluntary dismissal, and a judicial ruling on a motion for summary judgment.

## (2) Routine Class Actions

### (a) What was the relationship, if any, between the "easy applications" of Rule 23 and the substantive subjects of dispute?

*Background.* Some have maintained that class actions in certain nature-of-suit categories are often "easy applications" of Rule 23. These cases are considered easy or routine because they frequently involve complaints with boilerplate allegations, similar class certification arguments, and standard settlements. In particular, some have viewed securities class actions as fitting into such standard molds.[41] To test these premises, we compared study cases in different nature-of-suit categories. Since the number of filings in most categories was small, we limited our analysis, where appropriate, to securities cases, nonsecurities cases, and civil rights cases (a subset of nonsecurities cases).

*Data on Rule (b)(3) cases.* First, we compared indicators of routineness in cases filed as Rule 23(b)(3) class actions,[42] starting with duration of the case from complaint to closing. Despite the perceived complexity of securities cases, they did not take much longer to settle and close than nonsecurities class actions. Study data for the four districts showed the median time period from filing the complaint to closing ranged from twenty-four to twenty-eight months for settled securities class actions. In comparison, median time periods for settled nonsecurities class actions were shorter in two districts (with medians of eleven and thirteen months) and longer in two others (with medians of thirty-six and fifty months) (see Table 8).[43] In particular, the me-

---

41. *In re* Activision Sec. Litig., 723 F. Supp. 1373, 1374 (N.D. Cal. 1989) ("all too familiar path of large securities cases," including "lugubrious" pleading contests and "massive" discovery). A recent report found courts reacting to what some view as boilerplate shareholder allegations of officer/director fraud: "The increased [judicial] application of Rule 9(b) may stem from the courts' thinning patience with nearly identical 'boiler-plate' securities fraud complaints." Edward M. Posner & Karl L. Prior, *Motions to Dismiss Shareholders' Suits Against Officers and Directors* (ALI-ABA Course of Study: The Prosecution and Defense of Shareholder Litigation against Directors and Officers, Washington, D.C.), May 28–29, 1992, at 91, 109.

42. These include cases filed under Rule 23 (b)(3) alone or in combination with one or more other subdivisions of 23(b).

43. In addition, Figure 10, discussed *infra,* presents median duration periods for settled and nonsettled securities cases combined and compares class actions to nonclass civil actions.

dian case lengths for (b)(3) civil rights actions were about the same as, or longer than, for settled securities cases in the three districts where civil rights cases settled.

Do these results indicate that securities cases are "routine"? To respond to that question, we looked at the rate at which (b)(3) classes were certified, finding somewhat distinctive results for securities and civil rights cases. A (b)(3) class was certified in 94% to 100% of the securities cases where a motion or sua sponte order on certification was filed. In contrast, for nonsecurities actions, the certification rates were 64% to 93% in the three districts with sufficient numbers of cases for meaningful comparison (see Table 9). Interestingly, the certification rate for (b)(3) civil rights cases was 100% in each of the three districts with (b)(3) civil rights class actions, but these constituted only two or three cases per district. Although these data are not sufficient to support broad conclusions, high rates of certification within the securities and civil rights categories could indicate that these are easy applications of Rule 23, at least with respect to the certification decision.

We next examined the bases for opposition to class certification and again found some distinctive patterns among securities cases. In two districts, disputes over certification in securities cases were about as frequent as for the other major nature-of-suit categories in those districts. In the other two courts, objections to certification were filed about 1.5 times as often in nonsecurities cases[44] as in securities cases.[45] Of special note is that objections on the basis of numerosity were absent from all (b)(3) securities cases in three districts and were present in only 25% of the certification disputes in the fourth district. In nonsecurities cases, however, numerosity generally was raised more frequently. In two districts, it was at issue in 33% and 50% of the certification disputes; the other two districts had only two or three such cases. These limited results could be viewed as indicating relatively "easy" sailing toward satisfying the numerosity requirement in securities cases.

However, another observed difference was in arguments concerning the representativeness of the principal plaintiffs. In all or nearly all securities cases in the four districts, defendants disputed the ability of named plaintiffs to represent the class, often basing their arguments on alleged conflicts or purportedly unique facts applicable to the representatives (*see infra* § 6(b)). Generally, these objections occurred less frequently in nonsecurities (b)(3) cases (see Table 10). Representativeness disputes were often harder fought battles than numerosity disputes and frequently involved complex issues and facts. The relatively high rates of certifying securities classes, however, indicates that these challenges were quite often overcome; for example, the class representative in some cases was replaced by one who was more "representative" (*see infra* § 4(b)).

We also compared the amounts distributed from settlement funds in certified b(3) cases where the court approved a settlement. As might be expected, securities cases had median net monetary distributions to the class ($1.7 million to $3.0 million) far greater than in nonsecurities cases ($1.1 million or less). Comparing median attorneys' fee awards for securities and other class actions showed similar disparities in all but one district. These figures are misleading, though, unless viewed in light of class size because securities classes are generally large. We considered class size by computing the net settlement per class member—dividing the total net

---

44. Certification objections were filed in 58% and 59% of nonsecurities class actions in these two districts.

45. Certification objections were filed in 35% and 40% of securities class actions in these two districts.

monetary settlement amount by the number of notices sent to class members (*see supra* § 1(a)). The median net settlement per class member for securities cases exceeded that in nonsecurities cases in only one of the three districts with sufficient case counts to allow for comparison (see Table 11).

*Discussion.* In sum, the following general characteristics were found in many securities (b)(3) cases in the four districts: They did not necessarily last longer than most nonsecurities class actions; were about as likely, or somewhat less likely, to be subject to some form of objection to certification; and did not necessarily yield more dollars to individual class members. In addition, securities cases were more likely to be certified and subject to representativeness objections. Finally, numerosity objections were a rarity in securities cases, but a relatively frequent occurrence in other cases. Large class sizes in securities cases often made them distinctive when compared with most nonsecurities classes.

In addition, and somewhat understandably, the securities complaints contained more frequent use of boilerplate allegations when compared with the wide variety of other types of (b)(3) class actions. This appeared to be a factor of the governing law, the subject matter of the complaints, and the frequency with which securities cases were filed. Securities claims generally followed a recognizable pattern based on federal securities statutes and case precedent, whereas claims not dealing with securities often covered ground not as frequently traveled or charted new territory.

*Data on Rule (b)(2) cases.* We also compared similar indicators in nonsecurities cases in which only a Rule 23(b)(2) class was sought. In those cases that settled, the median time from complaint to closing ranged from fifteen to sixty months, not notably different from (b)(3) cases given the relatively small number of cases involved (see Table 12 compared to Table 8). The rate of (b)(2) certification ranged from 50% to 95% (see Table 13). In three of the districts, the (b)(2) certification rate was lower than for nonsecurities (b)(3) cases; in the fourth district it was higher (see Table 13 compared to Table 9). Looking just at the subset of (b)(2) civil rights cases showed a range of certification rates of 67% to 100%, with no notable patterns observed (see Table 13). We also found no recognizable patterns in the frequency of defendant opposition to motions to certify a (b)(2) class (see Table 14). We did, however, observe that the median fee award was considerably smaller for (b)(2) class counsel when compared to fees in nonsecurities (b)(3) cases (see Table 15 compared to Table 11). Given the disparate nature of these data, it is not possible to generalize about whether (b)(2) cases are easy or routine applications of Rule 23.

**(b) How did class actions compare to other types of cases in terms of the type of outcome and the stage of the case at which the outcome occurred?**

*Background.* In this subsection, we look at the routineness of class actions from a different angle, namely, how do class actions compare to other types of civil cases. Two related assertions are commonly made about class actions: that such cases generally settle and that they are rarely tried.[46] The underlying assumptions—sometimes explicitly stated[47]—are that the settlement

---

46. *See, e.g.,* Elliott J. Weiss & John S. Beckerman, *Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions,* 104 Yale L.J. 2053, 2098 (1995) ("Defendants' and plaintiffs' attorneys agree to settle virtually all class actions that survive motions to dismiss and motions for summary judgment."). *Cf.* Joel Seligman, *Commentary, The Merits Do Matter: A Comment On Professor Grundfest's "Disimplying Private Rights Of Action Under The Federal Securities Laws: The Commission's Authority,"* 108 Harv. L. Rev. 438,

rate for class actions is higher than that for other types of civil cases, and the trial rate is lower. In this section we will address that assumption by comparing the settlement and trial rates in the class actions we studied with such rates in nonclass action civil cases. The comparison group consists of all nonclass civil cases that were terminated in the four study districts during the same time period.

*Data.* Differences in data collection make it difficult to compare settlement rates in class actions and nonclass civil cases.[48] Allowing for such differences, it appears that the settlement rates for nonprisoner class actions were within approximately ±16% of the settlement rates for nonprisoner nonclass actions (see Figure 7). It also appears that settlement rates were higher for securities class actions than for all nonclass securities cases in all but one district (see Figure 8).

The rate of trial (jury and bench) was about the same for class actions and nonclass civil cases in one district and the class action rate was slightly higher in two districts. In the fourth district, the trial rate for class actions was 5.5% and the rate for nonclass civil cases was 3.2% (see Table 16). In securities cases, there were too few cases to treat as other than anecdotal information. Because of the Judicial Conference Advisory Committee on Civil Rules's interest in the subject, we include the information for descriptive purposes only (see Table 17).

In comparison with nonclass civil cases, class actions are not routine in terms of their longevity. Overall, the median time from filing to disposition for class actions was two to three times that of other civil cases in three of the four districts, and in the fourth (S.D. Fla.), class actions took about four and a half months longer at the median (see Figure 9). The patterns were similar for securities cases, but the gaps between class and nonclass securities cases were generally not as long as the corresponding gaps in nonsecurities cases (see Figure 10).

*Discussion.* Examining trial and settlement rates might lead one to conclude that class actions are routine, not very different from other cases terminated in the same courts during the same time span. But the length of time from filing to termination and, as we will see in *infra* § 2(d), the amount of judicial time required by class actions distinguish them from other cases.

## (c) What was the frequency and rate of certification of (b)(1), (b)(2), and (b)(3) classes and how did these rates correspond with substantive areas?

In this subsection, we examine the frequency and rate of certification of (b)(1), (b)(2), and (b)(3) classes (and combinations thereof) and address how the rates correspond with different nature-of-suit categories.

*Background.* Under Federal Rule of Civil Procedure 23 a case may be certified pursuant to

448 (1994) ("A substantial portion of securities class actions have been resolved by judicial dismissal on the basis of a defendant's motion.").

47. Alexander, *supra* note 9, at 524 ("Though empirical data are hard to come by, it seems clear that securities class actions are resolved by adjudication significantly less often than are other civil cases.").

48. As noted in Figures 7 and 8, the settlement rate for class actions was based on our observations, derived from the case files. Settlement rates for nonclass cases were derived from data provided by each court to the Administrative Office of the U.S. Courts upon termination of a case. We used the categories "dismissed: settled," "dismissed: voluntarily," and "judgment on consent." The differences between Administrative Office data and our data for the same set of class actions suggest that differences between class and nonclass cases may simply reflect the differences in data collection methods.

subdivisions (b)(1)(A), (b)(1)(B), (b)(2), or (b)(3).[49] Determining which subdivision under Rule 23 to use is not always clear.[50] There may also be instances where a class action may qualify under Rule 23(b)(3) as well as under (b)(1) or (b)(2).

If a (b)(3) class is sought and approved, class counsel is required to provide notice to all class members and an opportunity to opt out. The (b)(1) and (b)(2) subdivisions do not require notice of class certification and do not ordinarily allow opting out. "Because of the notice requirement and the frequent necessity of having to deal with individual damage claims, greater precision is required in (b)(3) actions than in those brought under (b)(1) or (b)(2)."[51]

If a proposed class action qualifies or fits the criteria of more than one of the (b) subdivisions, do parties or judges indicate a preference for class certification pursuant to Rule 23(b)(1) or (b)(2) over Rule 23(b)(3)?[52] Some believe that the increased burden of mandatory notice and

---

49. Fed. R. Civ. P. 23(b) states in relevant part:

    (b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision

      (a) are satisfied, and in addition:

        (1) the prosecution of separate actions by or against individual members of the class would create a risk of

          (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class; or

          (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

        (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

        (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include:

          (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions;

          (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

          (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;

          (D) the difficulties likely to be encountered in the management of the class action.

50. "The problem is that all class litigation, even litigation for damages, has the potential to affect a defendant's standard of conduct. For instance, a suit for nuisance damages may be won by some claimants and lost by others, thereby creating 'incompatible standards of conduct' for the defendant. Hence, damage actions, which are normally construed as (b)(3) actions, may also fall within the language of (b)(1)(A), and the court may deny notice, giving opportunity to appear or to opt out. The confusion from such amorphous language has resulted in inconsistent case law on what exactly constitutes a (b)(1)(A) class action and games in which the category is manipulated to avoid the time and expense of giving notice." Howard M. Downs, *Federal Class Actions: Diminished Protection for the Class and the Case for Reform*, 73 Neb. L. Rev. 646, 673 (1994) (footnotes omitted).

51. MCL 3d, *supra* note 34, § 30.14, at 217 & n.681 (citing Rice v. Philadelphia, 66 F.R.D. 17 (E.D. Pa. 1974)).

52. *See, e.g.,* Patrykus v. Gomilla, 121 F.R.D. 357 (N.D. Ill. 1988) (civil rights case certified under Rule 23 (b)(2) and (b)(3)); National Treasury Employees Union v. Reagan, 509 F. Supp. 1337 (D.D.C. 1981) (civil rights case certified conditionally under Rule 23(b)(1)(A) or (b)(2)); Bertozzi v. King Louie Int'l, Inc., 420 F. Supp.1166 (D.R.I. 1976) (securities case certified pursuant to Rule 23 (b)(1) and (b)(2)); Alaniz v. California Processors, Inc., 73 F.R.D. 269 (N.D. Cal.), *modified*, 73 F.R.D. 289 (N.D. Cal. 1976) (employment discrimination case certified under Rule 23(b)(2) and (b)(3)), *aff'd sub nom.* Alaniz v. Tillie Lewis Foods, 572 F.2d 657 (9th Cir.), *cert. denied*, 439 U.S. 837 (1978).

*Class Actions*

other requirements[53] deter parties from seeking (b)(3) certification. Similarly, some courts have expressed reluctance to certify a (b)(3) class when an action also met the requirements of either a (b)(1)[54] or (b)(2) class.[55] One commentator recommends that "[i]f the court determines that both provisions [(b)(2) and (b)(3)] apply, then it should treat the suit as having been brought under Rule 23(b)(2) so that all class members will be bound"[56] because "[t]o hold otherwise would allow the members to utilize the opting out provision in subdivision (c)(2), which in some cases would thwart the objectives of representative suits under Rule 23(b)(2)."[57]

*Data.* Of the 138 certified classes for which information was available, 84 (61%) were (b)(3) classes, 40 (29%) were (b)(2) classes, and the remaining 14 (10%) reflected an equal number of (b)(1)(A) and (b)(1)(B) classes (see Figure 11). Below, we look at the frequency and rate of certification of (b)(1), (b)(2), and (b)(3) classes among the different natures-of-suit categories. We present nature-of-suit information in response to the question raised, but with the caveat that the numbers are often so small that no general conclusion can be drawn from them.

*Rule 23(b)(1)(A) and (b)(1)(B).* Two of the four districts (E.D. Pa. and N.D. Ill.) certified a total of seven (b)(1)(A) classes.[58] Similarly, two districts (N.D. Ill. and N.D. Cal.) certified a total of seven (b)(1)(B) classes.[59]

*Rule 23(b)(2).* The four districts had a total of forty cases with certified (b)(2) classes. One district accounted for just over half of these cases. Civil rights cases of various types accounted for 50% of the (b)(2) classes. This is consistent with the advisory committee's note that describes various actions in the civil rights field as prototypes of a (b)(2) class,[60] without suggesting that subdivision (b)(2) is limited to civil rights cases. The second largest nature-of-suit category was ERISA, accounting for five of the forty cases (12.5%).

---

53. Additional requirements include: (1) notice must be individual to all members who can be identified through reasonable effort; (2) absent class members have the right to exclude themselves from the class and from the binding effect of the judgment; and (3) absent class members have the right to enter their appearance through counsel. Rule 23(c)(2).

54. *See, e.g.,* Robertson v. National Basketball Ass'n, 556 F.2d 682 (2d Cir. 1977) (antitrust case where the court found a Rule 23(b)(1) preferable to a (b)(3) class so that opt-out privileges would be unavailable).

55. *See, e.g.,* Hummel v. Brennan, 83 F.R.D. 141 (E.D. Pa. 1979) (a labor action where the court certified a Rule 23(b)(2) class rather than a Rule 23(b)(3) class to insure that one litigation would dispose of the issue; court also indicated that procedural safeguards are unnecessary when a class is homogeneous, and that any unfairness caused by members' inability to opt out was outweighed by the preventing of repetitious suits). *See also* 1 Herbert Newberg & Alba Conte, Newberg on Class Actions § 4.20, at 4-74 n.232 (3d ed. 1992).

56. 7A Charles Alan Wright et al., Federal Practice and Procedure § 1775, at 491 & n.64 (2d ed. 1986 & Supp. 1995) (citing Bing v. Roadway Express, Inc., 485 F.2d 441, 447 (5th Cir. 1973) ("Although [the] suit could have been brought as a (b)(3) action, (b)(2) actions generally are preferred for their wider res judicata effects."); McGlothlin v. Connors, 142 F.R.D. 626, 640 (W.D. Va. 1992); Tustin v. Heckler, 591 F. Supp. 1049, 1068 (D.N.J. 1984)).

57. Wright et al., *supra* note 56 at 491–92 (footnotes omitted).

58. The nature-of-suit categories were other personal property damage (1), civil rights (1), and Employment Retirement Income Security Act (ERISA) (1) in one district and securities (1), civil rights (1), ERISA (1), and other statutory actions (1) in the other.

59. N.D. Ill. certified five cases with the following nature-of-suit categories: ERISA (3), securities (1), and constitutionality of a state statute (1). N.D. Cal. certified the remaining two cases, which were securities actions.

60. Fed. R. Civ. P. 23 advisory committee's note (citing Potts v. Flax, 313 F.2d 284 (5th Cir. 1963); Bailey v. Patterson, 323 F.2d 201 (5th Cir. 1963), *cert. denied*, 376 U.S. 910 (1964); Brunson v. Board of Trustees, 311 F.2d 107 (4th Cir. 1962), *cert. denied*, 373 U.S. 933 (1963), as some examples).

*Rule 23 (b)(3).* The largest number of certified classes—eighty-four (61%)—were in the (b)(3) category. N.D. Ill. had the most, twenty-six (31%), followed by E.D. Pa. twenty-four (28%), N.D. Cal. twenty-three (27%), and S.D. Fla. eleven (13%). In the four districts combined, 64% of the certified (b)(3) classes were in securities cases (over 80% of certified (b)(3) classes in S.D. Fla., 74% in N.D. Cal., 62.5% in E.D. Pa., and 50% in N.D. Ill.).

*Multiple Certifications.* Multiple certifications were found in sixteen cases.[61] Three courts each had five cases and one court had one case (see Table 18). The most frequent combination was (b)(2) and (b)(3), occurring in five cases, including two ERISA actions, two civil rights actions, and one other statutory action. The second most frequent combination was (b)(1)(A) and (b)(2), occurring in three cases, one each of other statutory action, civil rights, and other personal property damage cases. The remaining eight cases contained a variety of certification combinations and involved securities, civil rights, ERISA, and constitutionality of state statute actions.

## (d) How much judicial time did class actions take and how did that compare to other civil actions?

*Background.* Yet another measure of the relative routineness of class actions is the amount of judicial time required. Using data from a sample of cases in the Federal Judicial Center's most recent District Court Time Study,[62] we compared the judicial time expended on class actions with that of civil cases (including class actions) filed within the time study sample period.

*Data.* Based on case weights derived from time study data, the average class action demands considerably more judge time than the average civil case. We found this when we looked at the data for all subject matter (nature-of-suit) categories combined and when we looked at the data by nature-of-suit category. Case weights are scaled in relation to the weight of an average case, which is rated as a "1." Note that the case weights are based on data from all cases (including class action cases) in the entire time study sample. Case weights are based on average judicial time expenditures and take into account a wide range of cases and judicial activity, from summary dismissals to extended trials.

If class actions were treated as a separate category for case weighting purposes (which they are not), the hours demanded for the class action cases in the district court time study would justify a case weight of 4.71,[63] higher than any civil case type except death penalty habeas corpus (6.15). Racketeer Influenced and Corrupt Organizations (RICO) (3.02) is the next closest

61. Includes three cases with combinations that included at least one (b) subdivision and an unspecified class type.

62. In the Federal Judicial Center district court time study (Willging et al., *supra* note 26), district and magistrate judges maintained records of the time they spent on a random sample of 8,320 civil cases filed in 86 U.S. district courts between November 1987 and January 1990. Fifty-one of those cases (0.61%, an incidence of 6.1 class actions for every 1,000 cases filed) contained class action allegations. For a more complete description of the time study methods and a listing of case weights for all nature-of-suit categories, see Memorandum from John Shapard to Subcommittee on Judicial Statistics of the Committee on Judicial Resources 1 (July 20, 1993) (on file with the Research Division, Federal Judicial Center) [hereinafter Shapard Memorandum].

63. Shapard Memorandum, *supra* note 62, at 6–7. The 4.71 case weight for class actions was derived by aggregating the time required for all class action cases in the sample and comparing that time to the time required for the average case. *See* Memorandum from John Shapard to Mark Shapiro, Rules Support Office, Administrative Office of the U.S. Courts (February 8, 1994) (on file with the Research Division, Federal Judicial Center).

*Class Actions*

civil case type. As compared to criminal cases, an average class action case would require about as much judge time as an average case dealing with extortion, racketeering, and threats (4.62) and would require less time than the average criminal prosecution for bankruptcy or securities fraud (5.30). Note that these are averages that take into account all judicial activity in the sample cases, including trials and sentencing when applicable.

The case weights for the three nature-of-suit categories that were most prevalent in the class action study are: securities, commodities, and exchange, 1.96; other civil rights (filed originally in federal court), 1.61; and prisoner civil rights (not U.S. defendant), 0.26.[64]

The average amount of time required for the average class action of each of the above three types is more than three times the average amount required for the average civil case of the same type. Securities class actions required 3.2 times the judicial time spent on all securities cases; other civil rights cases, 3.3 times as long; and prisoner civil rights cases, 5.03 times.

Certified class action cases consumed considerably more judge time than cases filed as class actions but never certified. Still, noncertified cases required more judicial time than the average civil case. In the eleven certified class actions in the time study, judges spent, on the average, eleven times more hours than they did in the average civil action. In the noncertified cases, judges spent twice the number of hours they spent on the average civil case (see Table 19).[65]

The above data indicate that class actions, on the average, are far from routine. However, some types of cases filed as class actions but not certified appear to be fairly routine. For example, other civil rights cases that were filed but not certified as class actions consumed less than one-third of the judge time consumed by all other civil rights cases. Likewise, securities cases that were filed but not certified as class actions consumed less than two-fifths of the judge time consumed by all securities cases. The low time demands of some of these noncertified cases may be accounted for by their consolidation into other cases that were not part of the time study.[66] In addition, the civil rights cases may have included some filings with frivolous class action allegations (e.g., by a pro se litigant who is not authorized to represent a class) combined with frivolous claims, leading to a prompt dismissal.

## (3) Race to File

*Background.* Critics of the use of the class action rule, especially in the securities field, claim that lawsuits frequently are filed without an adequate investigation, immediately after a triggering event, such as a precipitous decline in a stock's value.[67] Reportedly, the purpose of such practices is to gain an advantage in the competition to be appointed lead counsel for the class. Some commentators wonder whether the claims of speedy filings of class actions might be explained by less venal considerations, such as an effort to preserve evidence, especially in tort cases.[68]

---

64. Shapard Memorandum, *supra* note 62.

65. The calculation of the above hypothetical 4.71 case weight for class actions included both certified and uncertified cases. The average number of judge hours per case was approximately eleven for all class actions, but the amount of judge time for certified class actions was approximately three times that.

66. If a non–time study case became the lead case, judges were instructed not to count the time spent on the consolidated cases.

67. *See* Senate Staff Report, *supra* note 8, at 16–29; *see also, e.g.,* Greenfield v. U.S. Healthcare, 146 F.R.D. 118 (E.D. Pa. 1993), *aff'd sub nom.* Garr v. U.S. Healthcare, 22 F.3d 1274 (3d Cir. 1994).

68. Cooper, *supra* note 6, at 28.

We can supply only a modest amount of information relevant to the ultimate issue. We looked for multiple filings of class action claims and for information about efforts to preserve evidence, as indicated by a motion to expedite discovery or to preserve evidence.

*Data on multiple filings.* A race to the courthouse might be inferred from multiple filings of related claims. If so, the frequency and size of intradistrict consolidations (see Figure 12), the frequency and size of multidistrict litigation consolidations (*see supra* § 1(b) and Table 2), and the frequency with which we found related cases (*see infra* § 18 and Figure 13) represent potential races to the courthouse. The cumulative number of such cases is considerable: 32%, 22%, 20%, and 39% of the cases in the four districts had one or more of these three forms of multiple litigation (see Figure 14). Looking only at cases that led to either multidistrict or intradistrict consolidation indicates that from 13% to 22% of the cases involved multiple filings of cases that a district judge or the Judicial Panel on Multidistrict Litigation found to have common questions of law or fact.[69]

*Data on expedited discovery.* We also gathered information about whether class action complaints were filed for the ostensible purpose of expediting discovery or preserving discoverable information. Generally they were not, at least as measured by the frequency of requests for expedited discovery or preserving information in class litigation.

In seven cases in the four districts, plaintiffs moved for expedited discovery,[70] typically for the purpose of gathering evidence to support a motion for a preliminary injunction. Courts granted all but two of those seven requests. Otherwise, we found no evidence to support the claim that any early filings of class actions were for the purpose of expediting discovery or preserving information.

## (4) Class Representatives

*Call for research.* In this section we address issues related to the selection and supervision of class representatives. Examining the full range of questions raised concerning class representatives would call for interviewing lawyers and class representatives about their relationships and, perhaps, going back to case files or other records to examine depositions and other discovery information concerning named representatives. Most of that research is beyond the scope of this study. We urge other researchers to pursue the issues raised and we stand ready to provide information to support such an effort.

*Background.* To assure that a class is adequately represented, the court has wide discretion in selecting the named representative and class counsel.[71] While the selection of the representative may be less critical than the appointment of counsel, the class representatives should be free of conflicts of interest with the class[72] and should present claims and raise defenses that are typical of the class claims and defenses.[73]

---

69. Fed. R. Civ. P. 42(a); 28 U.S.C. § 1407 (1988).

70. Plaintiffs so moved in three (3%) of 117 cases in E.D. Pa., three (3%) of 102 cases in N.D. Cal., and one (1%) of seventy-two cases in S.D. Fla. In N.D. Ill., there were no such cases.

71. MCL 3d, *supra* note 34, § 30.16.

72. *Id. See generally* Downs, *supra* note 50, at 651–58.

73. Fed. R. Civ. P. 23(a)(3). *See also* General Telephone Co. v. Falcon, 457 U.S. 147 (1982); Howard M. Downs, *Federal Class Actions: Due Process by Adequacy of Representation (Identity of Claims) and the Impact of* General Telephone v. Falcon, 54 Ohio St. L.J. 607 (1993).

*Class Actions*

### (a) How many "repeat players"?

*Background.* One of the questions asked was if there are "professional" representatives who appear repeatedly, at least in particular subject areas.

*Data.* We found few multiple appearances of named plaintiffs in the four districts. Pooling all the names of class representatives into one file with 353 names of class representatives from 141 cases, we identified duplicate appearances by four individuals and one corporation. In each instance, the representative appeared in two separate class actions. None of the class representatives appeared in more than two cases in the study. In no instance did the same name arise in two districts.[74]

One of the five sets of duplicate appearances involved two securities actions, two sets involved one securities action and another statutory action (ERISA, RICO, and "other"), one set involved an antitrust action and a civil rights action, and the fifth set involved an ERISA action and an "other statutory action."

### (b) Did judges add or substitute representatives?

*Background.* The court has a continuing duty to insure that class representatives "remain free of conflicts and . . . 'vigorously pursue' the litigation in the interests of the class, including subjecting themselves to discovery."[75] The court may have to replace a class representative if "the representative's individual claim has been mooted or otherwise significantly affected by intervening events, such as decertification, or where the representative has engaged in conduct prejudicial to the interests of the class or is no longer interested in pursuing the litigation."[76] We examined the frequency with which representatives were changed in certified class actions.

*Data.* Changes in class representatives occurred in a considerable percentage of certified class actions in the four districts (21%, 8%, 21%, and 33%, representing ten, one, ten, and eleven cases, respectively) (see Figure 15). These differences in the rate of changes did not seem to have any direct relationship with the frequency of objections to certification based on the representativeness of the named plaintiffs in (b)(3) or (b)(2) cases (see Tables 10 and 14). Nor did the differences appear to have any direct relationship with the longevity of cases in those districts. The three districts with rates from 21% to 33% had approximately the same median times from filing to disposition (see Figure 9). Perhaps some unexamined feature of the local legal culture among the bar or bench in N.D. Cal. might help to explain the higher frequency of changes in that district.

For almost half of the changes, no reasons were evident in the case file. In three cases, the changes were to replace a deceased class representative. The remaining cases—also, almost half of the changes—were instances in which the change in representative appeared to reflect a significant change in the litigation. Seven changes involved explicit recognition that the representatives' claims were atypical of the class claims; five changes responded to situations affecting the ability of the class representative to continue to represent the class (e.g., conflict of interest; a redefined class did not include the representative); and three involved voluntary withdrawal

---

74. But note that our data only include class actions that were terminated in four districts during a two-year span.

75. MCL 3d, *supra* note 34, § 30.16, at 221 (footnote omitted).

76. *Id.* at 221–22.

from or opting out of the class. One change added representatives of a subclass of stock option holders.

### (c) Did named representatives attend the approval hearing?

*Background.* Class representatives' "views may be important in shaping the [settlement] agreement and will usually be presented at the fairness hearing."[77] While representatives' views may be entitled to "special weight," they do not have veto power over a proposed settlement.[78]

*Data.* Attendance of representative parties at the settlement approval hearing was uneven across the four districts. In E.D. Pa. (where records of the settlement hearing were most complete) one or more class representatives attended the settlement approval hearing in 46% of the certified, settled class actions (*see* discussion at *infra* § 13(b) and Figure 53). The rates in the other districts varied from 11% to 28%.

### (d) What was in it for the class representatives?

*Background.* "The propriety of 'incentive' awards to named plaintiffs has been rigorously debated. While a number of courts have approved such awards on the basis that class representatives take on risks and perform services, others have denied preferential allocation on the grounds that the named plaintiff may be tempted to settle an action to the detriment of the class or come to expect a 'bounty' for bringing suit."[79] A notice of proposed settlement should "disclose any special benefits provided to the class representatives."[80]

*Data.* A substantial minority of all certified, settled class actions in which the court approved a settlement included designated awards to the named class representatives.[81] In the four districts the percentages that included such awards were 26%, 46%, 40%, and 37% (see Figure 16). The median amounts of all awards to class representatives in the four districts were $7,500 in two districts, $12,000 in the third, and $17,000 in the fourth (see Figure 17). In many cases, there was more than one representative. The median award per representative in three courts was under $3,000 and in the fourth was $7,560 (see Figure 18). The median percentage of the total settlement that was awarded to class representatives was less than or equal to eleven thousandths of one percent (0.011%) in all four districts.

## (5) Time of Certification

*Introductory Data.* Across the four districts we found a total of 286 cases with either a motion for or against class certification or a sua sponte show cause order regarding certification in the four districts. Of these cases, 93 (33%) were unconditionally certified, 59 (21%) were certified for settlement purposes only, 76 (27%) were denied certification, 6 (2%) were deferred, and 52

---

77. *Id.* § 30.44, at 242.

78. *Id.*

79. 2 Newberg & Conte, *supra* note 55, § 11.38, at 11-80 to 11-82 and cases cited at nn. 209–11. *See also* Downs, *supra* note 50, at 692 ("Cases in the late 1970s and early 1980s abhorred such preferences, but recent cases permit such practices more freely." (footnote omitted)).

80. MCL 3d, *supra* note 34, § 30.212, at 228.

81. The data, of course, include only information that was available in the court file, the settlement, the notice to the class, or the motion for approval of the settlement and does not include any undisclosed preferences to class representatives. *See* Downs, *supra* note 50, at 692–93 (reporting that often the preferences are not disclosed to the class in the notice of settlement; also, finding that 37% of the cases studied in N.D. Cal. contained such preferences).

(18%) had no action indicated. In the following sections we discuss the process whereby decisions about certification were made.

## (a) Timing of motions and certification decisions

*Background.* In this subsection, we examine the point at which motions to certify are filed and the length of time that elapses before the court rules to see if there is "any pattern to the point at which the first certification decision is made." We also examine (*see infra* § 5(b)) "the effect of local rules requiring that a motion to certify be made within a stated period."[82] Federal Rule of Civil Procedure 23(c)(1) directs the court to determine "as soon as practicable" after the commencement of a case whether an action is to be maintained as a class action.

*Data.* How soon do counsel file motions to certify—or courts issue sua sponte orders regarding certification? Median times in the four districts ranged from 3.1 months to 4.3 months after the filing of the complaint.[83] Seventy-five percent (75th percentile) of the motions or orders were filed within a range of 6.5 months at one end to 16.3 months at the other (see Figure 19).

How soon do courts rule on motions to certify after they have been filed?[84] Three districts' median times ranged from 2.8 months to 4.1 months. The other district had a median time of 8.5 months. In 75% of the cases, courts ruled on class certification within 7.6, 15.8, 10.2, and 8.4 months after the filing of a motion to certify (see Figure 20).

## (b) Local rules on the timing of certification motions

*Background.* As noted above, Federal Rule of Civil Procedure 23(c)(1) directs the court to determine class status "as soon as practicable," but the rule provides little specific guidance. To fill that gap and encourage early resolution or settlement, three of the four districts specify, by local rule, a definite time within which the plaintiff must file its motion for certification unless good cause is shown to extend the time. E.D. Pa. and S.D. Fla. require the filing of a motion to certify within 90 days,[85] and N.D. Cal. requires the filing of such a motion within 180 days.[86] N.D. Ill. has no local rule addressing the timing of motions to certify.

82. Cooper, *supra* note 6, at 30.

83. In the time study, 64% of the motions or orders in fifty-one class action cases were filed within 100 days of the filing of the complaint. Preliminary Time Study, *supra* note 26, at 8–9.

84. For one standard of promptness, see 28 U.S.C. § 476 (motions pending for more than six months need to be included in a district court's semiannual report under the Civil Justice Reform Act). Note that the data reflect only those cases that contained both the certification motion filing date and the date of the court's ruling.

85. U.S. District Court for the Eastern District of Pennsylvania, Local Rule 27(c) (Aug. 1, 1980) states, in relevant part:

> Within ninety (90) days after the filing of the complaint in a class action, unless this period is extended on motion of good cause appearing, the plaintiff shall move for a determination under subdivision (c)(1) of Rule 23, Fed. R. Civ. P., as to whether the case is to be maintained as a class action.

U.S. District Court for the Southern District of Florida, Local Rule 23.1(A)(3) (Feb. 15, 1993) states:

> Within 90 days after the filing of a complaint in a class action, unless this period is extended on motion of good cause appearing, the plaintiff shall move for a determination under subdivision (c)(1) of Rule 23, Fed. R. Civ. P., as to whether the case is to be maintained as a class action.

86. U.S. District Court for the Northern District of California, Local Rule 200-6(c) (rev. Nov. 1, 1988) states:

*Data.* In the previous section, we saw that in 75% of the cases the time from the filing of the complaint to the filing of a motion to certify ranged from more than 6.5 to more than 16.3 months in the four districts. In E.D. Pa., the median time for filing a motion to certify was slightly longer than called for by the local rule, and in S.D. Fla., the median time was more than a month longer (see Figure 19). In N.D. Cal., the median time was in compliance with the 180-day limit, but the time for filing a motion to certify was longer than 180 days in at least 25% of the cases. N.D. Ill., which has no rule addressing how soon after the complaint a motion for certification must be filed, had the third shortest time span (8.2 months) between the two filings for 75% of the cases (see Figure 19). At the other extreme, N.D. Cal., with a 180-day filing requirement, had the longest time span between the filing date of the complaint and the filing date of the motion to certify (see Figure 19).

We found no relationship between the local rule and the time within which judges rule on motions to certify once filed. For example, judges took more time to issue 75% of their rulings (between seven and fifteen months) in the two districts with rules requiring early filing of motions to certify than in the district with a rule requiring filing within 180 days (see Figure 20).

Further, the time to settlement of the case did not appear to have any relationship to the local rules or the absence of a local rule. Our data revealed that neither the length of time from the court's ruling on certification to settlement of the case nor the length of time from filing of the case to settlement appeared to be influenced by the presence, absence, or provisions of a local rule. For example, in one district with a 90-day rule, 75% of the cases took approximately three-and-one-half years from the filing of the complaint to settlement, a figure higher than that of N.D. Ill., which has no rule. Cases in N.D. Cal. (180-day rule) were disposed of more quickly than cases in one jurisdiction with the 90-day rule (see Figure 21). On the other hand, E.D. Pa. (90-day rule) disposed of 75% of its cases approximately one year faster than the other three courts.

The time from ruling on certification to settlement followed similar paths. However, it must be noted that there was a substantial amount of missing data regarding settlements in two districts, and our conclusions are based solely on the limited available data. Overall, courts settled 75% of their cases in a range of fourteen to thirty-eight months after certification (see Figure 22; *see also infra* § 5(c)). Again, early filing practices did not correspond with quicker resolution of cases. It took over three years for one district with an early filing rule to dispose of its cases. But E.D. Pa. again settled its cases more quickly after certification than the other three courts.

Data on the time from filing to termination in two districts with the ninety-day certification rule showed termination of 75% of the courts' cases in just over two years. Termination rates were the same for the other district with the early certification rule and the district with no rule. Data showed that 75% of those cases were terminated in 34.1 months (see Figure 23).

*Discussion.* There has not been substantial compliance with the presumptive time limits of the local rules. However, it should be noted that each local rule has a clause "unless extended for good cause." Moreover, delays in judicial rulings on motions to certify can thwart the apparent intent of the local rules. Finally, prompt settlement of the case appears to be affected by

---

The party seeking to maintain an action as a class action shall file a motion for determination whether it may be so maintained pursuant to Rule 23(c)(1) within six months of the filing of that party's first pleading, or at such later time as the assigned judge may order or permit.

*Class Actions*

many factors other than a rule regarding the starting point of the class certification process. In all three of these areas one might reasonably expect other factors, such as the workload of the court or the number of judicial vacancies, to affect the court's output. Lack of compliance with the rules in the first instance suggests that in many cases judges and litigants do not see such rules as necessary to the management of the litigation before them.

### (c) Decisions on merits in relation to certification

*Summary.* In this rather lengthy subsection we present data on the frequency and type of rulings on motions to dismiss and motions for summary judgment. We also address the key issue of the timing of such rulings in relation to rulings on class certification. Many assume that class action litigation proceeds directly from certification of a class to settlement without judicial examination of the merits of the claims. The data presented in this section indicate otherwise. Parties often filed motions to dismiss or for summary judgment and judges generally ruled on those motions in a timely fashion, often dismissing a case in whole or in part. These rulings on the merits often preceded rulings on class certification.

*Background.* As noted above, Federal Rule of Civil Procedure 23(c)(1) directs the court to determine "[a]s soon as practicable" whether an action is to be maintained on behalf of or against a class. The rule is silent on the timing of rulings on class certification in relation to rulings on motions to dismiss or for summary judgment. The proposed amendment to Rule 23 that the advisory committee on civil rules circulated in January 1993 contained a new provision in 23(d)(1)(B) authorizing a court to "decide a motion under Rule 12 or 56 before the certification determination if the court concludes that the decision will promote the fair and efficient adjudication of the controversy and will not cause undue delay."[87]

Some argue that it would be more economical for a court to rule on the merits of a putative class action before committing resources to certifying and managing the case as a class action and before imposing an obligation to notify the class.[88] For the same or similar reasons, the advisory committee is currently considering a procedure that would require a preliminary assessment of the merits as part of a (b)(3) certification decision (see Appendix B, § 23(b)(3)(E)). As the data below show, many judges in the four districts have not seen themselves as lacking authority to rule on a motion to dismiss or to issue a sua sponte dismissal order before ruling on class certification. Nor, apparently, did judges in a prior empirical study of (b)(3) class actions show any reluctance to rule on the merits before ruling on certification.[89] Having explicit authority to so rule, however, might influence any judge who has felt constrained to avoid ruling on such motions prior to class certification.

Federal courts of appeals have taken divergent views on whether a ruling on a motion to dismiss or motion for summary judgment may precede a ruling on class certification. Some

---

87. Appendix A, § 23(d)(1)(B); *see also* Appendix B, § 23 (d)(1).

88. Note, *The Rule 23 (b)(3) Class Action: An Empirical Study*, 62 Geo. L.J. 1123, 1145 (1974) ("A judge concerned with the most efficient use of court time may be reluctant to consider certification and notice without some belief that the case is strong on the merits.") [hereinafter *Georgetown Empirical Study*].

89. *Id.* at 1144 ("In the preliminary stages of litigation, the court showed no reluctance to dismiss or grant summary judgment to defendants on the merits without consideration of the class issues."). The study examined all Rule 23(b)(3) class actions filed in the U.S. District Court for the District of Columbia between July 1, 1966, and Dec. 31, 1972.

*Findings*                                                                                              29

courts have interpreted the U.S. Supreme Court's ruling in *Eisen v. Carlisle & Jacqueline*[90] to mandate that the determination of class status is to be made before the decision on the merits.[91] The reasoning of such courts is that Rule 23(c)(1) requires that a class action seeking damages be certified before a determination on the merits in order to prevent one-way intervention or opting out by class members, who would know the outcome of the ruling on the merits.[92] Other courts have approved precertification rulings on the merits, reasoning that a party filing a pretrial motion to dismiss or for summary judgment may explicitly or implicitly waive the protection.[93] As noted above, of the courts of appeals for the four district courts involved in this study, the courts of appeals in the Third and Ninth Circuits have approved the practice of issuing precertification decisions on the merits, the Seventh Circuit has generally disapproved the practice,[94] and the Eleventh Circuit has no published ruling on this point. Based on the rulings in each circuit we would expect that there would be few, if any, precertification[95] rulings on the merits in N.D. Ill. and that E.D. Pa. and N.D. Cal. would have more such rulings.

*Data.* In three districts in the current study—putting aside N.D. Ill., which we will discuss separately below—the rate of precertification[95] rulings on motions to dismiss exceeded 70%. In cases in which there were rulings on both motions to dismiss and motions to certify, approximately 80% of the motions to dismiss were decided before the motions to certify (see Figure 24).[96] In all four districts, the rate of precertification ruling on motions for summary judgment was lower than the rate of precertification rulings on motions to dismiss (see Figure 25), but this may be a function of the differences between motions to dismiss and motions for summary judgment. One would expect, for example, that the need for discovery would delay the filing of summary judgment motions. In all courts, more than 20% of the rulings on summary judgment preceded the class certification ruling, and in N.D. Cal., 67% (ten of fifteen) of the summary judgment rulings preceded the class certification ruling (see Figure 25).

The data partially support the expectation that N.D. Ill. would have fewer precertification rulings because of case law in its court of appeals disapproving that practice. In fact, N.D. Ill. had the lowest rate of precertification rulings on motions to dismiss (twenty-eight of forty-six, or 61%; see Figure 24) of the four districts but the second highest rate of precertification rulings on motions for summary judgment (eleven of twenty-seven, or 41%; see Figure 25). Nevertheless,

---

90. 417 U.S. 156 (1974).

91. *Id.* at 177–78. *See, e.g.,* Nance v. Union Carbide Corp., 540 F.2d 718, 724 n.9 (4th Cir. 1976) (quoting Peritz v. Liberty Loan Corp., 523 F.2d 349 (7th Cir. 1975)), *vacated,* 431 U.S. 952 (1977).

92. Hudson v. Chicago Teachers Union, 922 F.2d 1306, 1317 (7th Cir.), *cert. denied,* 501 U.S. 1230 (1991). *See also* Peritz v. Liberty Loan Corp., 523 F.2d 349, 353–54 (7th Cir. 1975).

93. Katz v. Carte Blanche Corp., 496 F.2d 747 (3d Cir.) (en banc) (explicit waiver; use of "test case" procedure before certification ruling), *cert. denied,* 419 U.S. 885 (1974); Wright v. Schock, 742 F.2d 541 (9th Cir. 1984) (implicit waiver where defendant "assumes the risk" of a limited effect of its summary judgment motion).

94. *See* cases cited *supra* notes 92 & 93. *But see* Roberts v. American Airlines, Inc., 526 F.2d 757, 762 (7th Cir. 1975) (dictum that defendants by filing a motion for summary judgment before a ruling on class certification "assumed the risk that a judgment in their favor would not protect them from subsequent suits by other potential class members"), *cert. denied,* 425 U.S. 951 (1976).

95. We use the term "precertification" to mean before a *ruling* on certification, whether or not the ruling is to grant or deny certification.

96. These data do not include rulings on motions to dismiss that terminated the case without the need for a ruling on class certification.

*Class Actions*

N.D. Ill. judges issued a substantial number of precertification rulings on both types of motions, which suggests that the law of the circuit regarding precertification rulings has not been the only factor affecting the district judge's decision about when to rule on motions to dismiss or for summary judgment.[97]

As discussed in the last subsection, three of the districts have local rules regarding the timing of motions to certify a class; E.D. Pa. and S.D. Fla. require filing a motion to certify a class within 90 days and N.D. Cal. requires filing within 180 days.[98] Still, in E.D. Pa., the percentage of precertification rulings was substantial for motions to dismiss (thirty-one of forty, or 78%; see Figure 24), though not for motions for summary judgment (eight of twenty-six, or 31%; see Figure 25). In N.D. Cal., the percentage of precertification rulings was higher for both motions to dismiss (twenty-six of thirty-two, or 81%; see Figure 24) and for motions for summary judgment (ten of fifteen, or 67%; see Figure 25).

Again, as discussed in the last subsection, compliance with the rules did not appear to have been strict. Whether the local rules had an effect seemed doubtful. Assuming that there is any effect of the local rules, one might expect that requiring a prompt motion to certify would have more impact on the generally slower and more deliberate summary judgment process than on motions to dismiss. As one might expect, under the 180-day deadline for filing of motions to certify in N.D. Cal., rulings on summary judgment more often preceded rulings on certification than under the 90-day deadline in E.D. Pa. But the timing may say more about the nature of summary judgment than about the effects of the two local rules.

Whether a motion to dismiss was ruled on before or after a motion to certify did not appear to be related to the grounds cited in the ruling on dismissal. At both stages, such motions generally referred to Federal Rule of Civil Procedure 12(b)(6) or 12(b)(1) (see Table 20), which were the most frequently cited grounds in motions to dismiss generally (see Table 21). Note, however, that, in all districts but N.D. Ill., a motion to dismiss for failure to state a claim (Rule 12(b)(6)) was far more likely to be ruled on before certification. In N.D. Ill., such a motion was almost equally likely to be ruled on before or after certification. Perhaps the law of the circuit has some influence.

In our preliminary report to the advisory committee,[99] we discussed the greater likelihood of a motion being denied before rather than after a ruling on certification. We observed what appeared to be a pattern of denying precertification motions to dismiss more frequently in E.D. Pa. and in the time study sample of cases. This phenomenon also occurred to a minor extent in N.D. Ill., but not in N.D. Cal. or S.D. Fla. (see Table 22). If there is any relationship between the timing of certification and the denial of motions to dismiss, it might be subject to local variations. Note also that the disproportionate denial of precertification motions compared to

---

97. Note that Fed. R. Civ. P. 56(a) allows the filing of a motion for summary judgment "at any time after the expiration of 20 days from the commencement of the action . . . ," and Fed. R. Civ. P. 12(b) calls for the filing of a motion "before pleading." Neither rule sets a standard for when such motions should be decided.

Note also that case law in at least two other circuits has concluded that the parties may waive their right to a ruling on certification or may assume the risk that a precertification ruling on the merits may not have class-wide effect. *See* discussion at *supra* notes 93 & 94.

98. *See supra* notes 85 & 86.

99. *See* Willging et al, Preliminary Report, *supra* note 27, at 31–33.

*Findings*

postcertification motions also extended to summary judgment rulings in E.D. Pa., but not in the other courts (see Table 23).

### (i) Outcomes of rulings on dismissal and summary judgment and impact on the litigation

*Background.* In this subsection we present data about the outcomes of motions to dismiss and motions for summary judgment and in the following subsection we will present data as to the timing of the filings and rulings on such motions. Critics of the class action device, especially critics of shareholders' securities class actions, frequently referred to such cases as "strike suits."[100] While it is difficult to find a definition of a strike suit that crisply distinguishes it from most other types of litigation,[101] two essential ingredients seem to be the frivolity of the allegations and the difficulty of obtaining a ruling on the merits. The ultimate test of the strike element seems to be whether settlements are seen as being coerced because the defendants do not have a cost-effective opportunity to litigate the merits (*see infra* § 14(a)).[102]

The timing and outcome of rulings on motions to dismiss and motions for summary judgment are relevant to the question of whether the class action device is used as a strike suit. Examining such rulings should illuminate whether and when litigants in class actions have an opportunity to address the merits or frivolity of a claim. Motions to dismiss generally test the sufficiency of the underlying legal theory of the case as applied to the facts alleged in the complaint, regardless of whether or not those facts can be proved. Motions for summary judgment generally test the sufficiency of the factual basis for each element of the claim for relief, as shown through affidavits, depositions, and other documentary materials. In general, if a claim for relief survives a motion to dismiss, its legal claims are probably not frivolous. Likewise, if a claim survives a motion for summary judgment, its material factual allegations are probably not frivolous.

The timing of rulings on such motions is relevant to the cost of obtaining a ruling on the merits. If rulings can be obtained promptly, whether before or after class certification, parties opposing the class have an opportunity to resolve the claims on their merits without being forced to settle.

*Data on outcomes.* Overall, approximately two out of three cases in each of the four districts had rulings on either a motion to dismiss, a motion for summary judgment, or a sua sponte dismissal order (see Table 24). In three of the four districts, more than one out of six cases included both rulings on dismissal and summary judgment, and in the fourth approximately one case in nine had both types of rulings (see Table 24).[103]

---

100. *See, e.g.,* Senate Staff Report, *supra* note 8, at 18 ("Each of the corporate executives described what they characterized as 'strike suits' that were filed against their companies, generally following an adverse earnings announcement and resulting stock price drop.").

101. *See, e.g.,* Tim Oliver Brandi, *The Strike Suit: A Common Problem of the Derivative Suit and the Shareholder Class Action,* 98 Dick. L. Rev. 355, 357 n.1 (1994) ("The term 'strike suit,' coined in the 1930s, refers to a derivative action whose nuisance value gives it a settlement value independent of its merits."); Carol B. Swanson, *Juggling Shareholder Rights and Strike Suits, in Derivative Litigation: The ALI Drops the Ball,* 77 Minn. L. Rev. 1339, 1341 n.5 (1993) ("'Strike suits' are 'those based on reckless charges and brought for personal gain.'") (quoting Robert C. Clark, Corporate Law § 15.2 (1986)).

102. *Georgetown Empirical Study, supra* note 88, at 1136 (evidence that defendants gained dismissal or summary judgment indicates that they did not feel "forced to settle even if the plaintiff's claim is weak"). We discuss the issue of whether class actions lead to coerced settlements *infra* § 14(a).

103. An unknown number of those cases had multiple rulings on motions to dismiss and on motions for summary

Of the cases in which a motion to dismiss was filed, rulings were issued in from 73% to 81% of the cases depending on the district. That rate of ruling approximates the rates found in three studies of motions to dismiss in general litigation.[104] Rulings in which all or part of the complaint was dismissed amounted to 47%, 49%, 76%, and 77% of the rulings in E.D. Pa., S.D. Fla., N.D. Ill., and N.D. Cal., respectively (see Table 25). Overall, about half of the cases in each district included rulings dismissing all or part of the complaint.

The vast majority of motions for summary judgment were, as is typical,[105] filed by defendants (see Figure 26 and Table 26). In two districts, rulings on such motions were issued approximately 85% of the time and in the other two districts about 60% of the time (see Figure 27), data that are comparable to and, overall, somewhat higher than the rate of rulings in a study of general civil litigation.[106] Such motions were granted in whole or in part in more than half of the rulings (54%–68%) in three of the four districts studied. In the fourth, such motions were granted in whole or in part 39% of the time (see Table 26).

Combining all dismissals and summary judgment rulings for all cases in the four districts, we find that approximately two of five cases were dismissed in whole or in part or had summary judgment granted in whole or in part in two districts and that approximately three out of five cases were so treated in the other two districts (see Figure 28). But note that granting dismissal or summary judgment does not necessarily end the litigation because an amended complaint may be filed or the summary judgment may be partial or may not apply to all parties.

What effect do these rulings have on the litigation as a whole? In examining each class action file we identified the event or events that resulted in terminating the litigation. The effects of motions in each of the districts were strikingly similar: Approximately three out of ten cases in each district were terminated as the direct result of a ruling on a motion to dismiss or for summary judgment (see Table 27; see also Table 39).

### (ii) Timing of rulings on dismissal and summary judgment

*Data on timing.* One general standard of promptness is that motions should be decided within six months or a reason given for the delay.[107] Looking at the time from the filing of the first motion to dismiss to the first ruling on dismissal, the median time for rulings on motions to dismiss ranged from 2.6 months to 7.4 months. Three of the four courts had a median response time of less than four months (see Table 28). Because the median time is a measure of the central tendency (i.e., the middle of the data) and we wish to discuss a wider range of the data, we also calculated the time by which 75% of the motions had been decided and found that they were resolved in 4.7, 13.7, 8.6, and 5.4 months (see Table 28).

---

judgment filed on behalf of various defendants. To keep the demands of the study manageable we limited our motions study to identifying the filing of the first motion of a given type and examining the outcome of the first ruling on each type of motion.

104. Thomas E. Willging, Use of Rule 12(b)(6) in Two Federal District Courts 6–8 (Federal Judicial Center 1989) (finding a rate of 83% and reporting rates of 77% and 56% from two other studies).

105. *See* Joe S. Cecil & C. R. Douglas, Summary Judgment Practice in Three District Courts 5 (Federal Judicial Center 1987) (defendants filed 59%, 71%, and 80% of the motions for summary judgment in the three district courts studied).

106. *Id.* (finding that about two-thirds of the motions for summary judgment produced rulings).

107. 28 U.S.C § 476 (1990) (motions pending for more than six months need to be included in a semiannual report under the Civil Justice Reform Act).

The timing of rulings on summary judgment follow a similar pattern, but involve generally longer time spans than the rulings on motions to dismiss. The median time from the filing of the first motion for summary judgment to the first summary judgment ruling was less than four months in two courts and more than seven months in the other two courts (see Table 29). Seventy-five percent of all motions for summary judgment were resolved in 7.9, 15.4, 16.8, and 5.2 months in the four courts (see Table 29). The two slower courts were also slower in ruling on motions to dismiss.

*Discussion.* In analyzing the issue of whether large numbers of class actions are strike suits, our data yield mixed results. On the one hand, motions to dismiss are filed and granted more frequently in class action litigation than in ordinary civil litigation.[108] Such data indicate that a relatively large number of cases are found to be without legal or factual merit, or both. Comparison with data from a 1974 study of (b)(3) class actions indicates, however, that the rate of dismissal and summary judgment is lower in the current study than it was during 1966–1972 in one federal district court.[109]

On the other hand, defendants generally appear to have had an opportunity to test the merits of the litigation and obtain a judicial ruling in a reasonably timely manner, particularly for motions to dismiss. Testing the factual sufficiency of claims via summary judgment, however, may take more than a year for some rulings in some courts.

For at least one-third of the cases in our study, judicial rulings on motions terminated the litigation without a settlement, coerced or otherwise. The settlement value of other cases was undoubtedly influenced by rulings granting motions for partial dismissal or partial summary judgment and by rulings denying such motions. Such merits-related influences on settlement value, however, seem not to fall within the broadest definition of a strike suit.

### (d) Simultaneous motions to certify and approve settlement

*Background.* The question is how frequently do courts approve settlements which include the initial certification of a class? As a general principle, settlement negotiations in class actions are deferred until the court has ruled on class certification. However, on occasion, parties will enter into settlement agreements before a class is certified. Because of their advantages courts have

---

108. In an empirical study of the use of Fed. R. Civ. P. 12(b)(6) in two federal district courts, that rule was found to account for the disposition of 2% to 4% of all cases in the sample. Willging, *supra* note 104, at 7–9. Motions were filed in 13% of the cases in the sample and approximately 23% of the rulings resulted in a total disposition of the case. *Id.* An earlier study by the Center found higher rates of filing (40%) and disposition (65% compared to 52% in the later study), as well as a higher rate of granting of motions (40%) in a sample of cases in six federal district courts. *Id.* at 5–6 (citing Paul Connolly & Patricia Lombard, Judicial Controls and the Civil Litigative Process: Motions (Federal Judicial Center 1980)).

109. *Georgetown Empirical Study, supra* note 88, at 1136 (showing that 55% [44 of 81] of class actions were disposed of favorably to defendants by dismissal or summary judgment). Excluding four voluntary dismissals which we would not have counted as rulings on dismissal, the rate is 49% (40 of 81), compared to our rate of approximately 33%.

sometimes approved settlement classes.[110] But settlement classes generally warrant closer judicial scrutiny than settlements where the class certification has been litigated.[111]

*Data.* Across the four districts, a total of 152 cases were certified in some form or fashion. Of this total 93 cases (61%) were certified unconditionally and 59 cases (39%) were certified for settlement purposes only. Of those 59 cases, 28 (47%)—approximately 18% of all certified class actions—contained information or docket entries indicating that a proposed settlement was submitted to the court before or simultaneously with the first motion to certify.

The twenty-eight cases with simultaneous motions to certify and approve settlement were filed in three districts. One district had fourteen cases or 50% of all cases, eight of which were securities cases. The next district had seven cases (25%), four of which were other statutory actions. The third district also had seven cases (25%), four of which were civil rights actions (see Table 30). In twenty-four of the twenty-eight cases (86%), the court approved the settlement without changes. In the remaining cases, the court approved the settlement but with some changes. (*See also infra* § 14(b).)

Are there differences in the two types of classes certified for settlement purposes, that is, cases certified with or without a simultaneous settlement? Our data were especially limited in this area because information was missing for numerous cases, and as a result no reliable conclusions can be drawn from them. We found that the (b)(3) class was the most frequently certified class in both types of scenarios. The (b)(2) class was the second most frequently certified class (see Table 31). These results parallel our finding that the (b)(3) class is the most frequent type of class sought and certified. (*See supra* § 2(c).)

### (e) Changes in certification rulings

*Background.* In this subsection we look at the frequency with which courts change the definition of the class or the direction of their certification rulings. The *Manual for Complex Litigation, Third,* indicates that "[w]hether a class is certified and how its membership is defined can often have a decisive effect not only on the outcome of the litigation but also on its management. It determines the stakes, the structure of trial and methods of proof, the scope and timing of discovery and motion practice, and the length and cost of the litigation."[112] The *Manual* also warns that "[u]ndesirable consequences may follow when an expansive class, formed on insufficient information, is later decertified or redefined."[113]

*Data.* Of 152 *certified* cases, counsel in 23 (15%) cases filed either a motion to reconsider the court's decision or a motion to decertify the class. The courts' responses to these motions varied.[114] In 9 (39%) of the 23 cases the court affirmed its certification ruling. In 5 (21%) of the 23 cases the court denied reconsideration of the matter altogether (see Table 32).

---

110. *See, e.g.,* Weinberger v. Kendrick, 698 F.2d 61 (2d Cir. 1982); *In re* Beef Indus. Antitrust Litig., 607 F.2d 167 (5th Cir. 1979). *Cf.* Plummer v. Chemical Bank, 668 F.2d 654 (2d Cir. 1982); *In re* Franklin Bank Sec. Litig., 574 F.2d 662 (2d Cir. 1978).

111. MCL 3d, *supra* note 34, § 30.45.

112. *Id.* § 30.1, at 212.

113. *Id.* § 30.11, at 215.

114. Outcomes included: denying reconsideration, affirming certification, reversing certification, modifying certification deferring reconsideration, taking no action, and lastly, taking some other form of action.

*Findings*                                                                                          35

Of the districts' *noncertified* cases, in only 4% did counsel file a motion to reconsider the court's decision. The court denied the reconsideration motion in 72% of those cases. In the remaining 28% of the cases, the court either took some other action or did not rule on the request.

## (6) Certification Disputes

In this section we first address the questions: How much time is spent contesting certification? Are there correlations between the subjects of litigation and certification disputes? Is much effort devoted to contesting the choice between (b)(1), (b)(2), and (b)(3) classes, and does this correlate to the subject of the litigation?[115]

### (a) How many certification contests were there and how much time did counsel spend opposing certification?

*Background.* Pursuant to Federal Rule of Civil Procedure 23, class certification is left to the sound discretion of the district court.[116] Because judicial discretion is not immutable, disputes inevitably arise. At this stage, the court does not have the responsibility of adjudicating the merits of the class or individual claims (*see supra* § 5(c)).

*Data.* In three of the four study courts, defendants opposed certification in slightly over 50%[117] of the cases with a motion or sua sponte order regarding class certification. Defendants opposed 40% of the motions or orders in the other district (see Figure 29).

We have no reliable measure to estimate the time counsel spend contesting certification. Some have suggested that the length of the brief is an adequate indicator, but it is far from clear that more pages equates to more time, especially when the subject matter has become routinized (*see supra* § 2(a)). Notwithstanding this, because of the expressed interest in time spent on certification contests, we looked at brief lengths and at whether there appeared to be a relationship between the length of the opposition brief and the outcome of the certification dispute, that is, whether the case was certified.

We found that in at least 70% of cases where opposition to certification was indicated counsel in the four districts submitted opposition memoranda (see Figure 30). Further, in cases for which information was available, 75% of the opposition brief lengths ranged from twenty-seven pages or less in one district to sixty-one pages or less in another, with median lengths ranging from twelve pages to twenty-six pages. Briefs supporting certification in disputed cases were somewhat longer; 75% ranged from thirty-five pages or less in one district to seventy-six pages or less in another, with median lengths ranging from eighteen to forty pages (see Figure 31).

A relationship, although modest, appeared to exist between opposition brief lengths and whether a case was eventually certified. In 75% of the cases in three districts, opposition brief lengths were longer in certified cases (with differences of three pages in one district, 9.5 in the second, and thirty-one in the third).

How does the length of judicial opinions in contested cases that were ultimately certified (certified dispute cases) compare to contested cases that were not certified (noncertified dispute

---

115. Cooper, *supra* note 6, at 30.

116. Zeidman v. Ray McDermott & Co., 651 F.2d 1030, 1038–39 (5th Cir. 1981); 7B Wright et al., *supra* note 56, § 1785.

117. This percentage is lower than the time study figure, which was 60%. *See* Willging et al., *supra* note 26, at 10.

cases)? Should we expect to find lengthier opinions in certified cases? The length of opinions in certified dispute cases were somewhat lengthier than those in noncertified cases, but not dramatically so. We found that in 75% of the certified dispute cases, opinion lengths ranged from thirteen to twenty-four pages as compared to three to nineteen pages for noncertified cases (see Figure 32).[118]

Opposition to certification was indicated in twenty-seven different nature-of-suit categories in the four districts. In twelve of these different case types, opposition to certification appeared only once. Not surprisingly, because of the amount in controversy in many securities cases and because of their overall prevalence in the four districts, in two of the four districts opposition was most prevalent in these cases. In the third district, the number of securities and prisoner civil rights cases were the same and in the fourth district most opposition arose in other civil rights cases (see Table 33). When we combined civil rights cases—other civil rights, jobs, accommodations and welfare—they accounted for the most opposition in two districts (see Table 34). In another district, opposition was found equally in prisoner civil rights, securities, and other civil rights cases.

**(b) Was there a relationship between disputes over certification and the nature of suit?**

*Data.* Most of the contested cases included arguments about three of the four traditional Federal Rule of Civil Procedure 23(a) issues: typicality, representativeness, and commonality. Disputes addressing representativeness and typicality occurred with almost equal frequency. Arguments about the other traditional issue, the size of the class (numerosity), occurred less frequently (see Figure 33). Most disputes, except numerosity, arose in securities, civil rights, and labor cases. Numerosity disputes arose most frequently in civil rights and labor cases. Looking at each type of dispute separately, we found:

*Representativeness disputes.* Disputes regarding the ability of the representatives to adequately represent the class occurred most often, appearing in 89 of the 141 cases (63%) in which there was opposition to certification. Most of these disputes arose in securities (27 cases, or 30.3%), civil rights (23 cases, or 25.8%), and labor (15 cases, or 16.8%) cases.

*Typicality disputes.* Disputes addressing the typicality of the class representatives' claims arose in eighty-seven cases (61%) and similarly appeared most often in securities (twenty-six cases, or 29.8%), civil rights (twenty-four cases, or 27.5%), and labor (thirteen cases, or 14.9%) cases.

*Commonality disputes.* Disputes about the presence of common issues of law and fact appeared in seventy-four cases (52%) and again were generally found in securities (twenty-one cases, or 28.3%), civil rights (nineteen cases, or 25.6%), and labor (twelve cases, or 16.2%) cases.

*Numerosity disputes.* Numerosity disputes arose less frequently than the other types of disputes, occurring in forty-nine cases (34%). Such disputes generally appeared in civil rights (twenty-one cases, or 42.8%) and labor (six cases, or 12.2%) cases.

---

118. Time study data revealed that the average amount of judicial time spent on certification rulings was about five hours. The average ruling was approximately seven pages. The median length was one page but some were as long as twenty-five to thirty-five pages. Willging et al., *supra* note 26, at 13.

### (c) How much effort was devoted to the choice between (b)(1), (b)(2), and (b)(3) classes and did the effort vary by nature of suit?

*Background.* One of the assumptions set forth in the September 1985 report of the American Bar Association's Section of Litigation Special Committee on Class Action Improvements is that disputes over the type of class to be certified are frequent and problematic.[119] As a result of these disputes, the committee indicated that "[t]he trifurcation created by present subdivision (b) places a premium on pleading distinctions with important procedural consequences flowing to the victor."[120] Further, the committee recommended eliminating the three subsections of subdivision (b) "in favor of a unified rule permitting any action meeting the prerequisites of Rule 23(a) to be maintained as a class action if the court finds 'that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.'"[121]

A central feature of the preliminary draft proposal of Rule 23 circulated by the Advisory Committee on Civil Rules in January 1993 was the merger of current subdivisions (b)(1), (2), and (3) into a unitary standard.[122] This standard would have applied a single set of certification factors to all cases and allowed trial judges discretion in designing class actions suited to the needs of particular cases, including "the power to certify different class actions for different parts of the same case," less stringent forms of notice for (b)(3) classes, some form of notice in a (b)(1) or (b)(2) class action, and an opt-out right in (b)(1) or (b)(2) class actions.[123] "This new power over opt-out should make it easier for trial judges to experiment with novel opt-out structures. For example, a judge might certify a mandatory class for liability and an opt-out class for damages on the theory that the damage phase triggers a weightier litigant–autonomy interest than liability or on the theory that [permitting an] opt-out for damages is necessary to protect high stakes plaintiffs from exploitation."[124]

Not everyone agrees that there should be a collapsing of categories as set forth in the 1993 draft proposal. Some argue that the elimination of the Rule 23(b) categories would (1) have ramifications both for the opt-out provisions and the notice requirements of the existing rule and (2) impact the legitimacy lent by the traditions established by (b)(1) classes and the moral tones established by the civil rights cases' uses of (b)(2) classes. Additionally, others believe that

---

119. ABA Special Committee Report, *supra* note 10, at 203 ("With such procedural consequences at stake, it is no surprise that enormous amounts of energy and money are often devoted to the characterization battle, and difficult questions command the attention of the courts as the parties struggle at the outset of a case to decide whether the presence of an 'individual issue' defeats a claim to b)(1) status . . . ."). *See also* Tober v. Charnita, Inc., 58 F.R.D. 74 (M.D. Pa. 1973); Contract Buyers League v. F & F Inv., 48 F.R.D. 7 (N.D. Ill. 1969).

120. ABA Special Committee Report, *supra* note 10, at 204.

121. *Id.* The Committee Note of Proposed Rule 23 (see Appendix A) suggests that the rationale behind the collapsing of categories or proposing a unified rule was simplification:

This structure has frequently resulted in time-consuming procedural battles either because the operative facts did not fit neatly into any one of the three categories, or because more than one category could apply and the selection of the proper classification would have a major impact on whether and how the case should proceed as a class action.

122. Cooper, *supra* note 14.

123. Robert G. Bone, *Rule 23 Redux: Empowering the Federal Class Action*, 14 Rev. Litig. 79, 83 (1994).

124. *Id.* at 84 n.15 (citing John C. Coffee, Jr., *The Regulation of Entrepreneurial Litigation: Balancing Fairness and Efficiency in the Large Class Action*, 54 U. Chi. L. Rev. 877, 925–30 (1987) (analyzing various conditions on opt out)).

    

the current subdivisions have historical roots that enable the courts to draw upon the jurisprudence developed from those cases. A change in the rule could very well lead to unpredictable results.

If the language of the 1993 draft proposal were adopted, courts would be able to allow class members to opt out of (b)(1) and (b)(2) classes, and might deny members the opportunity to opt out of a (b)(3) class, thereby preventing individuals from pursuing individual litigation. Additionally, "[e]liminating the three categories is likely to create greater procedural complexity because the court must then determine in every case whether notice and opt out requirements should apply, and if so, under what conditions."[125] "This subjective standard . . . would invite protracted procedural battles about what the parties consider to be 'superior,' 'fair' and 'efficient.' The standard's inherent subjectivity would also practically assure that different judges applying their own views of superiority, fairness and efficiency would render decisions that litigants would inevitably find to be inconsistent and confusing."[126]

Some courts have experimented with their application of Rule 23 and have employed judicial discretion in applying the subsections of Rule 23(b) more flexibly.[127]

*Data.* We examined the extent to which the parties and the courts address the class-type issue and found that in all four districts the parties infrequently address the issue. In the 122 cases for which information was available, the parties' arguments in 95 cases (78%) did not address whether one type or another should be certified. In 20 cases (16%) the portion of the briefs devoted to such arguments was less than 25% of the size of the briefs. In the remaining 7 cases arguments regarding class type were less than 75% of the size of the briefs in 6 cases and between 75% to 99% in the remaining case.

Courts address the type of class to be certified less frequently than the parties.[128] In the 140 cases for which information was available, in approximately 85% of the cases the court did not address the class-type issue at all. However, in the 27 cases where counsel did raise the class-type issue, the courts in 21 of those cases (77%) addressed the issue. Of those 21 rulings, 20 devoted less than 25% of the opinion to the class-type issue and 1 devoted 50% to 74%.

*Discussion.* Data collected from the four districts do not support the American Bar Association's earlier stated assumption that disputes over the type of class to be certified are frequent. We cannot tell from these data whether the disputes over the type of class in this minority of cases might be problematic. Whether or not having disputes over the type of class in 22% of the opposition briefs and in about 15% of the judicial opinions supports a proposed rule change is clearly a question for the special committee.

125. Lawyers for Civil Justice et al., Comments on Federal Rule of Civil Procedure 23, at 1, 2 (Apr. 22, 1993) (unpublished report) (on file with the Research Division, Federal Judicial Center).

126. *Id.* at 7.

127. *See, e.g.,* Bell v. American Title Ins. Co., 277 Cal. Rptr. 583 (Cal. Ct. App. 1991); Boggs v. Divested Atomic Corp., 141 F.R.D. 58 (S.D. Ohio 1991).

128. *Cf. Georgetown Empirical Study, supra* note 88, at 1143 ("Orders granting certification seldom specif[y] which category of rule 23 (b) . . . [is] involved.").

### (7) Plaintiff Classes

#### (a) Did defendants ever seek and win certification of a plaintiff class?

*Data.* Defendants almost never sought certification of a plaintiff class. In less than 1% of the motions filed was the defendant seeking such certification. Our data uncovered one such motion in a tort (personal property-other fraud) case which was subsequently certified. In approximately 79% of the cases with certification motions, plaintiffs were seeking to certify a plaintiffs class. In over 12% of the remaining cases (see Figure 34, other category), the parties generally stipulated to a plaintiff class or settlement class.

#### (b) How frequently did defendants acquiesce in certification of a plaintiff class by failing to oppose or by stipulating to class certification?

*Data.* In half of the 152 certified cases, defendants acquiesced in certification of a plaintiff class by either failing to oppose the motion or sua sponte order for certification or by stipulating to class certification. Our data did not reveal defendants' basis or rationale for acquiescing.

### (8) Defendant classes[129]

*Background.* The core questions are: How common are defendant classes? Are there identifiable but narrow settings in which they are most likely?[130] Case law and commentary give us more information than the empirical data in the study, which simply confirms that use of defendant classes is rare. Defendant class actions have been long recognized as a valid procedural device "whereby an entire class of defendants can be bound to a judgment although some individual members did not participate in the litigation but were represented by named class representatives."[131] It appears on its face that Rule 23 allows for the certification of both defendant and plaintiff classes.[132] However, certification of defendant classes is presumed to be uncommon.[133]

Though perhaps uncommon, case law and commentary show that defendant classes have been used in various types of cases. The most common use is reported to be "in suits against local or state enforcement officials challenging the constitutionality of state law or practice."[134] Defendant classes have also been employed "in patent infringement cases in which a common

---

129. Note, *Defendant Class Actions*, 91 Harv L. Rev. 630, 637 (1978):

> The traditional defendant class action is limited to the resolution of issues that are perfectly common to all the class members. As such, it is essentially a device that permits the offensive assertion of collateral estoppel on the common issues against non-parties, rather than a method of conducting a unitary proceeding that determines the rights and liabilities of each class member represented in the suit.

130. Cooper, *supra* note 6, at 30–31. Professor Cooper also asks a number of questions about how defendant classes work. Given the paucity of data on the subject, we are unable to respond meaningfully to those questions.

131. Robert E. Holo, *Defendant Class Actions: The Failure of Rule 23 and a Proposed Solution*, 38 U.C.L.A. L. Rev. 223, 223 (1990).

132. Fed. R. Civ. P. 23(a) provides that "[o]ne or more members of a class may sue or be sued as representative parties. . . ."

133. *See* DeAllaume v. Perales, 110 F.R.D. 299, 303 (S.D.N.Y. 1986) ("Although Rule 23 provides for defendant as well as plaintiff classes, certification of a defendant class is rare.").

134. 1 Newberg & Conte, *supra* note 55, § 4.50, at 4-196.

*Class Actions*

question of patent validity is litigated against a defendant class of alleged infringers."[135] Case law also reveals that defendant classes have been upheld in civil rights,[136] criminal justice,[137] mental health,[138] and securities cases.[139]

*Data.* Our data support the earlier assertion that defendant classes are not common. In the four districts, there were a total of four motions requesting certification of a defendant class, three filed by plaintiffs and one filed by defendants. Of the 152 certified cases in the four districts, N.D. Ill. was the only one with a certified defendant class. Certification had been sought by the plaintiffs in a civil rights case. After reviewing that case file we were unable to determine whether the defendant was a willing representative for the class, nor could we ascertain the extent of compensation for such an undertaking.

## (9) Issues Classes and Subclasses

In this section we address the questions: How frequently, and in what settings, are issues classes [i.e., cases in which some but not all of the issues are certified for class treatment] used? Subclasses? How diligent and sophisticated is the inquiry into possible conflicts of interest within a class . . .?[140] We found no issues classes and few subclasses. We also found that the ability of the representative to represent the class was frequently disputed on the ground that the named plaintiffs had a potential conflict of interest with other class members.

*Background on issues classes and subclasses.* Rule 23(c)(4) authorizes the court (1) to allow a class action to be maintained with respect to particular issues, or (2) to divide the class into appropriate subclasses.[141] Subdivision (c)(4) is helpful in assisting the courts with the ability to restructure complex cases in order to meet the other requirements for maintaining a class action, such as the superiority and manageability requirements.[142]

All four of the districts, E.D. Pa.,[143] S.D. Fla.,[144] N.D. Ill.,[145] and N.D. Cal.,[146] have case law reflecting the courts' willingness to certify an issues class if the other Rule 23 requirements are fulfilled.

---

135. *Id.* at 4-197 (citing Dale Elecs., Inc. v. RCL, Inc., 53 F.R.D. 531 (D.N.H. 1971); Research Corp. v. Pfister Associated Growers, Inc., 301 F. Supp. 497 (N.D. Ill. 1969); Technograph Printed Circuits, Ltd. v. Methode Elecs., Inc., 285 F. Supp. 714 (N.D. Ill. 1968)).

136. *See, e.g.,* Callahan v. Wallace, 466 F.2d 59 (5th Cir. 1972); Doss v. Long, 93 F.R.D. 112 (N.D. Ga. 1981); Florida Businessmen for Free Enter. v. Florida, 499 F. Supp. 346 (N.D. Fla. 1980), *aff'd sub nom.* Florida Businessmen for Free Enter. v. Hollywood, 673 F.2d 1213 (11th Cir. 1982).

137. *See, e.g.,* Gerstein v. Pugh, 420 U.S. 103 (1975); Marcera v. Chinlund, 91 F.R.D. 579 (W.D. N.Y. 1981).

138. *See, e.g.,* Institutionalized Juveniles v. Secretary of Public Welfare, 78 F.R.D. 413 (E.D. Pa.), *rev'd on other grounds,* 442 U.S. 902 (1978); Kendall v. True, 391 F. Supp. 413 (W.D. Ky. 1975).

139. *See, e.g., In re* Alexander Grant & Co. Litig., 110 F.R.D. 528 (S.D. Fla. 1986). The plaintiff successfully sought certification of a defendant class in an action charging violation of federal securities and RICO laws; court indicated that the "certification of defendant classes has gained considerable acceptance in securities fraud litigation." *Id.* at 533. *See also In re* Itel Sec. Litig., 89 F.R.D. 104 (N.D. Cal. 1981) (court indicated that the existence of a plaintiff class often enhances the likelihood of certification of a defendant class).

140. Cooper, *supra* note 6, at 31. On this topic, Professor Cooper also raised a series of questions about how issues classes work. Given the absence of issues classes in our study, we cannot address those questions.

141. *See* 7B Wright et al., *supra* note 56, § 1790, at 268.

142. *Id.*

143. Halderman v. Pennhurst State School & Hosp., 612 F.2d 84, 109 (3d Cir. 1979) (finding certification of the

Additionally, case law also reveals that subclasses have been used in E.D. Pa.,[147] S.D. Fla.,[148] N.D. Ill.,[149] N.D. Cal.[150] and in a variety of substantive case types.

class for purposes of determining liability entirely proper in an action seeking injunctive relief against the continued maintenance of state school and hospital facility catering to persons suffering from mental retardation); Samuel v. University of Pittsburgh, 538 F.2d 991, 995 (3d Cir. 1976) (finding decertification of a class action in a case attacking a state-wide residency rule to be in error when the court could have used Rule 23(c)(4)(A) and (B) to better manage the class); McQuilken v. A&R Dev. Corp., 576 F. Supp. 1023, 1028, 1032 (E.D. Pa. 1983) (utilizing Rule 23(c)(4)(A) to limit the issues in a class action to recover damages to class members' property by construction activity); Griffen v. Harris, 83 F.R.D. 72, 74 (E.D. Pa. 1979) (holding that in light of Rule 23(c)(4)(A) the district court should reconsider its prior ruling on class certification, in an action challenging the Department of Housing and Urban Development administration of rent supplement program, as it pertains to damages); Swarb v. Lennox, 314 F. Supp. 1091, 1099 (E.D. Pa. 1970) (ordering class certification for a limited class with limited issues in a case involving the legality of the Pennsylvania judgment by confession practice), aff'd, 439 U.S. 1012 (1979).

144. Appleyard v. Wallace, 754 F.2d 955, 958 (11th Cir. 1985) (reversing the district court's decision to deny class certification in a suit brought for the denial of Medicaid benefits; court should have considered Rule 23(c)(4)); In re Nissan Antitrust Litig., 577 F.2d 910, 913 (5th Cir. 1978) (affirming district court's decision to separate out certain issues for class treatment in an antitrust action), cert. denied, 429 U.S. 1017 (1979).

145. Denberg v. United States, 696 F.2d 1193, 1207 (7th Cir. 1983) (finding that although the district court did not have jurisdiction over the action challenging decision of the Railroad Retirement Board to deny benefits to husbands of retired railroad workers, it was appropriate for the district court to utilize Rule 23(c)(4)(A) in order to separate out particular issues for class treatment), cert. denied, 466 U.S. 926 (1984); Barkman v. Wabash, Inc., No. 85-C-611, 1988 U.S. Dist. LEXIS 421, at *2, 8 (N.D. Ill. Jan. 19, 1988) (finding the use of Rule 23(c)(4)(A) appropriate in a securities action); Skelton v. GMC, 1985-2 Trade Cas. (CCH) ¶66, 683 (N.D. Ill. 1985) (holding that the common issue appropriate for class-wide treatment in a warranty case is the issue of whether a design or manufacturing defect breached the implied warranty of merchantability). But see In re Rhone-Poulenc Rorer, Inc., 51 F.3d 1293, 1297 (7th Cir. 1995) (reversing district court's decision to certify a class action as to the issue of negligence only in a product liability/negligence suit because district judge "exceed[ed] the permissible bounds of discretion in the management of federal litigation"), cert. denied, No. 95-147, 1995 U.S. LEXIS 6153 (Oct. 2, 1995).

146. Valentino v. Carter-Wallace, Inc., No. C94-2867, 1995 U.S. Dist. LEXIS 9938, at *1-2 (N.D. Cal. Mar. 15, 1995) (certifying pursuant to Rule 23(c)(4)(A) specific common issues for class treatment in a product liability/negligence suit); Arnold v. United Artists Theatre Circuit, Inc., 158 F.R.D. 439, 453 (N.D. Cal. 1994) (excluding plaintiff's deterrence claims for class certification in a case under the Americans with Disabilities Act); In re Activision Securities Litig., 621 F. Supp. 415, 439 (N.D. Cal.1985) (certifying defendant underwriter class with respect to particular issues); In re Gap Store Sec. Litig., 79 F.R.D. 283, 308 (N.D. Cal. 1978) (certifying defendant class of underwriters as to particular issues); I.M.A.G.E. v. Bailar, 78 F.R.D. 549, 559 (N.D. Cal.1978) (bifurcating issues in a civil rights action pursuant to Rule (c)(4)(A)). But see In re Dalkon Shield IUD Prod. Liab. Litig., 693 F.2d 847, 855 (9th Cir. 1982) (holding that "the few issues that might be tried on a class basis in this case balanced against issues that must be tried individually, indicate that the time saved by a class action may be relatively insignificant"), cert. denied, 459 U.S. 1171 (1983).

147. Samuel v. University of Pittsburgh, 538 F.2d 991, 996 (3d Cir. 1976) (holding that the district court abused its discretion by not investigating into the possible usefulness of subclasses before decertification was ordered); Williams v. Philadelphia Hous. Auth., No. 92-7072, 1993 U.S. Dist. LEXIS 8826, at *29 (E.D. Pa. June 30, 1993) (certifying a subclass in a case against the Housing Assistance Program); Troutman v. Cohen, 661 F. Supp. 802, 813 (E.D. Pa. 1987) (certifying subclasses for class action involving challenges to the Medical Assistance Skilled Care Regulations); Pennsylvania v. Int'l Union of Operating Eng'r, 469 F. Supp. 329, 391 (E.D. Pa. 1978) (certifying subclasses for a discrimination class action); Santiago v. City of Philadelphia, 72 F.R.D. 619, 629 (E.D. Pa. 1976) (certifying subclasses in a civil action class action); Dawes v. Philadelphia Gas Comm'n, 421 F. Supp. 806, 826 (E.D. Pa. 1976) (certifying subclasses in an action challenging certain policies and practices of the Philadelphia Gas Works); Sommers v. Abraham Lincoln Fed. Sav. & Loan Ass'n, 66 F.R.D. 581 (E.D. Pa. 1975) (certifying subclasses in a Sherman antitrust class action); Dorfman v. First Boston Corp., 62 F.R.D. 466, 476 (E.D. Pa. 1973) (certifying two

*Class Actions*

*Data on issues classes and subclasses.* Our results uncovered no issues classes in the four districts. The cases that were certified appeared to encompass all the issues in question. We had, for example, no mass tort cases where issues of fault and general causation might be suitable for class treatment, leaving other issues, for example, proximate cause or damages, to be determined on a case-by-case analysis. Finding no issues classes is not surprising from a judicial economy standpoint because issues classes can create additional litigation and courts are likely to use issues classes only when the advantages outweigh the disadvantages of promoting additional litigation.[151]

Our data revealed a total of ten subclasses in the four districts. Each district except for one certified three subclasses. Securities cases had the largest number of subclasses—five. Four of the remaining five subclasses were found in civil rights cases (see Figure 35). In these cases subclasses were often used to separate out different class members who either purchased stock under different circumstances than the rest of the class or were discriminated against by a defendant during a different time than the class period.

Our data showed that judges have used subclasses but not issues classes. It appears that courts, or at least the ones in the four districts, were more comfortable in certifying subclasses in cases where members held divergent or antagonistic interests. Allowing such subclasses in effect brings to closure all issues in a class, thereby terminating the entire litigation.

*Background on conflicts of interest.* As a general principle, class representatives' interests should not conflict with the interests of the class.[152] Pursuant to Federal Rule of Civil Procedure 23(a)(3) "[o]ne or more members of a class may sue or be sued as representative parties on behalf of all only if . . . (3) the claims or defenses of the representative parties are typical of the

---

subclasses in a securities class action).

148. Appleyard v. Wallace, 754 F.2d 955 (11th Cir. 1985) (vacating district court's decision to deny class certification and suggesting that the court should have considered using Rule 23(c)(4)). *But see* Mathews v. Diaz, 426 U.S. 67, 71 (1976) (finding that the district court in the Southern District of Florida lacked jurisdiction over the class action involving the Social Security Act and the class and subclass as certified were too broadly defined).

149. Williams v. State Bd. of Elections, 696 F. Supp. 1559, 1560 (N.D. Ill. 1988) (certifying subclasses in a civil rights class action); Technograph Printed Circuits, Ltd. v. Method Elec., Inc., 285 F. Supp. 714, 725 (N.D. Ill. 1968) (certifying subclasses in a patent class action).

150. American Timber & Trading Co. v. First Nat'l Bank, 690 F.2d 781, 786 n. 5 (9th Cir. 1982) (finding subclassification appropriate in a usury class action suit); Valentino v. Carter-Wallace, Inc., No. C 94-2867, 1995 U.S. Dist. LEXIS 9938, at *1 (N.D. Cal. March 15, 1995) (certifying subclass in product liability/negligence class action); Sullivan v. Chase Inv. Serv., Inc., 79 F.R.D. 246 (N.D. Cal. 1978) (certifying subclasses in class action against brokerage houses). *But see* Betts v. Reliable Collection Agency, Ltd., 659 F.2d 1000, 1005 (9th Cir. 1981) (finding that the district court had no authority to create a subclass in a Section 1983 class action violation); Mendoza v. United States, 623 F.2d 1338, 1349-50 (9th Cir. 1980) (affirming district court's decision to deny plaintiffs' subclass motion), *cert. denied*, 450 U.S. 912 (1981); Wilkinson v. FBI, 99 F.R.D. 148 (N.D. Cal. 1983) (denying subclass in constitutional class action challenge for failure to satisfy the numerosity requirement).

151. For a discussion of the advantages and disadvantages of issues classes, *see* 7B Wright et al., *supra* note 56, § 1790, at 271.

152. *But see* Zinberg v. Washington Bancorp, Inc., 138 F.R.D. 397, 407 (D.N.J. 1990) (the court found that the "[f]act that the named plaintiff in a securities fraud action purchased her stock through a broker who was her stepfather and who resided in the same household with her did not produce a conflict of interest between her and other members of the class nor show that she had access to inside information not available to the general public, and did not preclude finding that her claims were typical of those of members of the class.")

*Findings*                                                                                              43

claims or defenses of the class . . . ." In some instances a party's claim of representative status will only be defeated if the conflict goes to the very subject matter of the litigation.[153]

*Data on conflicts of interest.* In the majority of cases where typicality of the class was disputed, defendants generally contended that plaintiffs' claims were distinct from those of the class they sought to represent, or were subject to a defense unique to the representative. Arguments addressing actual conflicts of interest between the representative and class members occurred infrequently. Such arguments were raised in general terms and usually addressed the possibility of conflicts between class representatives and absent class members or alleged conflicts in plaintiffs' proposed class definition.

Under Rule 23(a)(4), a representative party is expected to fairly and adequately protect the interest of the class. In some instances, defendants might allege that a representative cannot satisfy the requirements of Rule 23(a)(4) if a potential conflict of interest exists with the other class members. The ability of the representative to represent the class was often disputed on the ground that the named plaintiffs had a potential conflict of interest with other class members. The general types of conflicts found in our study included but were not limited to:

1. Cases generally alleging inadequacy of representation due to antagonistic interests of the class representatives to class members whose rights and interests they purport to represent (e.g., named plaintiffs wanted to withdraw their pension contributions whereas other members wanted to wait for monthly retirement benefits).

2. Cases where the conflict centered around some class members not being entitled to the same relief.

3. A case where the dispute centered around the competition between lead counsel and another plaintiff's lawyer to represent the class. Lead counsel for the class submitted a proposal to continue to serve as lead counsel that included a $325,000 cap on costs and expenses to be reimbursed from the fund. Plaintiff's counsel argued that the cap committed counsel to seek an early settlement and represented a powerful incentive to settle the case and that lead counsel had bought an interest in the litigation and that interest conflicted with the class.

4. A case where counsel sought to act simultaneously as the class representative and as class counsel. A potential conflict of interest existed between her duty as representative to the class and her economic interest in attorneys' fees.

Courts addressed these conflicts in a variety of ways, sometimes substituting class representatives (*see supra* § 4(b)), sometimes denying class certification, and sometimes overruling the objection.

---

153. 7A Wright et al., *supra* note 56, § 1768, at 327 & Supp. 1995 (citing Michaels v. Ambassador Group, Inc., 110 F.R.D. 84 (E.D.N.Y. 1986) ("any conflict of interest arising between members of proposed class in an action for alleged violations of Securities Exchange Act section 10(b), from different times of purchase and sale, was minimal when compared to substantial questions common to all members of class, and any conflicts were too peripheral to mandate denial of class certification motion"); United States v. Rhode Island Dep't of Employment Sec., 619 F. Supp. 509, 513 (D.R.I.1985) ("[T]he fact that the class representative may be entitled to back pay in an amount different from that owed other class members does not automatically destroy the adequacy of her representation, nor create any conflict among class members going to the 'very subject matter of the litigation.'")).

*Class Actions*

## (10) Notice

### (a) What types of notice, in what time frame, have been required in (b)(1), (b)(2), and (b)(3) actions?

*Background.* Two different situations may call for notice: class certification and settlement. Regarding notice of certification, Federal Rule of Civil Procedure 23(c)(2) mandates that, "[i]n any class action maintained under subdivision (b)(3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." In (b)(1) and (b)(2) actions, district judges have discretion to provide notices whenever they deem it necessary "for the protection of the members of the class or otherwise for the fair conduct of the actions."[154] The *Manual for Complex Litigation, Third* indicates that notice of certification "may at times be advisable for (b)(1) and (b)(2) classes."[155]

Regarding notice of settlement, Rule 23(e) provides, without exception, that "notice of the proposed dismissal or compromise shall be given to all members of the class . . . ." Courts and commentators have concluded that "notice of [voluntary] dismissal or compromise is mandatory in all cases under Rule 23."[156]

Rule 23 does not specify a time within which notice must be sent, but the *Manual for Complex Litigation, Third* suggests that "notice should ordinarily be given promptly after the certification order is issued."[157] In some instances, class members or their representatives and, perhaps, defendants may have found it to be in their interests to delay notice, for example, when a settlement[158] or disposition of the liability issues is imminent. If the class prevails on liability, the ruling might have the effect of shifting the burden of paying the cost of notifying the class.[159] If the case settles, the parties can use the settlement agreement to specify their allocation of notice costs. If the class does not prevail on liability, however, the ruling will not bind class members who did not have notice of class certification.[160]

In its 1985 study, the ABA Section of Litigation's Special Committee on Class Action Improvements observed that Rule 23 imposes notice requirements exceeding those demanded by the Constitution and that Rule 23(c)(2) "frequently obliges a court to require the class representative to advance huge sums of money as a precondition to further prosecution of the action."[161] The proposed amendment to Rule 23 that the advisory committee circulated in 1993 would give the district judge discretion to require "appropriate notice" (see Appendix A, Pro-

---

154. Fed. R. Civ. P. 23(d)(2). *See* 7B Wright et al., *supra* note 56, § 1786, at 196.

155. MCL 3d, *supra* note 34, § 30.211, at 224. The purpose of the notice is to "help bring to light conflicting interests or antagonistic positions within the class . . . and dissatisfaction with the fairness and adequacy of representation." *Id.* Similarly, Newberg and Conte assert that notice in such cases is "frequently advisable." 2 Newberg & Conte, *supra* note 55, § 8.05, at 848.

156. 7B Wright et al., *supra* note 56, § 1797, at 365 & n.48.

157. MCL 3d, *supra* note 34, § 30.211, at 224.

158. *Id.* at 224–25.

159. 2 Newberg & Conte, *supra* note 55, § 8.09, at 8-33.

160. Failure to give adequate notice may mean that members of the class will not be bound by the judgment. 7B Wright et al., *supra* note 56, § 1789.

161. ABA Special Committee Report, *supra* note 10, at 208 (citing Eisen v. Carlisle & Jacqueline, 417 U.S. 156 (1974)).

posed Rule (1993) 23 (c)(2)). In making that decision, the judge would be directed to take into account a host of factors, including "the expense and difficulties of providing actual notice to all class members, and the nature and extent of any adverse consequences that class members may suffer from a failure to receive actual notice."[162] In this subsection we will present data on the current practices in the four districts, relate those practices to the current rules, and discuss the relevance of the data to proposed reforms.

*Data.* Notice of class certification or of the settlement or voluntary dismissal of a class action was sent to class members in at least 76% of the certified class actions in each of the four districts (see Figure 36). Although notice of certification before settlement is not required in (b)(1) and (b)(2) actions, the majority of such cases included some notice (see Table 35). Generally the notice in those cases was notice of settlement, but a sizable minority included personal notice of class certification.[163] As noted above, Rule 23(e) calls for notice of settlement in all certified class actions. In six settled (b)(2) class actions, however, no notice to the class or hearing regarding the settlement was indicated on the record.[164]

In the (b)(3) certified class actions, notice of certification or settlement was sent in all but six of the cases in the study.[165] As we discuss below in this subsection, notice appeared to have been delayed in sixteen certified (b)(3) actions in which the first notice was a notice of settlement. Our data do not reveal reasons for the lack of notice, but there are any number of possibilities, ranging from concerns about the cost of notice to the parties' inadvertence or neglect. In five of the six cases, the failure to notify the class of the certification appears to have deprived class members of an opportunity to participate in the action before a settlement or a ruling on the merits[166] and may as well have deprived the defendants of a final judgment of class-wide effect.[167] For further discussion of notice in settlement classes, *see infra* § 14(a).

*Discussion.* Failure to provide notice to the class in these cases seems to violate Rule 23(c)(2)'s mandate that notice be provided promptly in all cases. The omission may be the result of a conscious litigation strategy. In the words of one commentator, postponing notice may represent "litigation strategy and ingenuity," designed to obtain a ruling on the merits before providing notice.[168] In this way, class representatives might avoid the burden of paying the cost

---

162. Cooper, *supra* note 14.

163. In all four districts notice was issued in 37 cases certified in whole or in part under (b)(1) and (b)(2). Data was available regarding the event associated with notices in 31 cases. Of those, 23 were notices of settlement and eight were notices of certification. Only two of the eight cases with notices of certification had been certified in part under (b)(3). All eight cases included personal notice and four of those also included notice by publication. *See also* discussion of (b)(1) and (b)(2) classes *infra* § 11(b).

164. In four of the cases injunctive relief was included in the final order and in one of those cases a $10,000 payment to the named plaintiff was part of the settlement. In one of the other two cases, the court simply noted that the parties "settled out of court." The other case was dismissed "for statistical purposes" while the parties worked out the details of their settlement, with the parties to report to the court if there was any difficulty reaching settlement.

165. One of the six cases was terminated by remand to the state court. One was dismissed by stipulation without any damages or other remedy indicated and without any indication of court approval. The other four cases, one of which was certified as both a (b)(2) and a (b)(3) class, had been terminated by dismissal or summary judgment.

166. One of the purposes of the notice is to give the absent class member an opportunity to "enter an appearance through counsel." Fed. R. Civ. P. 23(c)(2).

167. *See supra* note 160.

168. 2 Newberg & Conte, *supra* note 55, § 8.09, at 8-33.

of notice[169] and both parties might avoid the expense and inconvenience of providing two sets of notices to the class. Delays in notice could also, of course, be the result of any number of other factors, such as the need to gather information about the class, inadvertence, neglect, the press of business, or any of the myriad reasons for delays in litigation.

*Data.* To examine the extent of delays in notice, we looked at the length of time between class certification and the first notice to the class (other than a notice of settlement). We found some variation. In the fastest of the four districts on this point, the median time span was 2.2 months between certification and notice, but 25% of the cases in that district took more than 16.3 months (see Figure 37). In the other districts, the median times were 3.3, 3.8, and 8.3 months (see Figure 37). In all four districts at least 25% of the certification notices were issued more than six months after the class was certified. We have no direct data on the reasons for those delays.

The time from ruling to notice of settlement may shed additional light on the extent to which settlement avoids the need for the class representatives or their attorneys to advance the costs of notice. In 27 (38%) class actions that were certified and later settled (i.e., excluding settlement classes), the first notice sent to the class was a notice of the settlement. Overall, 16 (59%) of those 27 cases had been certified as (b)(3) classes. The median elapsed time between certification and notice was almost three years in one district, more than a year in two other districts, and about three months in the fourth. The number of cases in which such time gaps occur is a relatively small proportion—less than 13%—of all certified and settled class actions. Nevertheless, the numbers are sufficient to show that the practice occurs and that the time gap between certification and notice of settlement can be quite wide.

*Discussion.* The combined effect of finding no notice at all in six certified (b)(3) actions and finding delayed notices in sixteen certified (b)(3) cases that eventually settled suggests that the lack of a precise timetable or guideline in Rule 23(c)(2) has in some cases allowed the parties to postpone or avoid notice. Such omissions thwart the intent of the advisory committee that class members be notified promptly of the class certification so that they can effectively exercise their rights to participate or opt out of the action.[170] Omitting notice also has the effect of avoiding the preclusive effect of a judgment for a defendant against a class.

These practices may be an effort to achieve informally, without a rule change, the result that the ABA Section of Litigation's special committee also sought, namely, recognition of notice costs as potential barriers to access to the courts and flexible allocation of the cost of providing notice. Addressing the merits of a case before certification might provide a mechanism for allocating the costs of notice.

### (b) In what form was the notice issued, who paid the cost, and does the cost of notice discourage legitimate actions?

*Background.* Rule 23(c)(2) requires individual notice in (b)(3) actions for class members "who can be identified with reasonable effort." Others are to be given "the best notice practicable un-

---

169. *Id.*

170. *See, e.g.,* Frankel, *supra* note 5, at 41 ("But it seems obvious that if notice is to be effective—if class members are to have a meaningful opportunity to request exclusion, appear in the action, object to the representation, etc.—the invitation must go out as promptly as the circumstances will permit."); 2 Newberg & Conte, *supra* note 55, § 8.09, at 8-32 to 8-33.

*Findings*                                                                                              47

der the circumstances." The *Manual for Complex Litigation, Third* states that "[p]ublication in newspapers or journals may be advisable as a supplement."[171] As discussed (*see supra* text accompanying note 161), *Eisen v. Carlisle & Jacqueline*[172] requires that class representatives be responsible for the cost. The *Manual for Complex Litigation, Third* points out that "[t]he manner of giving notice can encourage or discourage the assertion of certain claims, or can be so costly and burdensome as to frustrate plaintiffs' ability to maintain the action."[173] Commentators have asserted that the effect of *Eisen* "is to make the initiation of class actions more burdensome, particularly when they are brought under Rule 23(b)(3) and thus require individual notice to all identifiable class members."[174]

*Data.* The data indicate that the parties and judges follow the dictates of the *Eisen* line of cases by providing individual notice in almost all certified (b)(3) actions in which any notice was provided (see Table 36).[175] In at least two-thirds of the cases in each of the districts, the individual notices were supplemented by publication in a newspaper or other print medium. Other forms of notice, such as broadcasting or use of electronic media, were rarely or never used. A number of cases involved posting of notices at government offices, a form of notice that was particularly prevalent in (b)(2) actions.

The median number of recipients of notice of certification or settlement or both was substantial, ranging from a median of approximately 3,000 individuals in one district to a median of over 15,000 in another (see Figure 38). In all districts the number of notices sent to individuals equaled or exceeded the estimated number of class members. Generally, parties estimated the size of the class during the certification process, before notices were sent.

Data on the costs of implementing notices were difficult to obtain. Whether the data are representative of all cases in the four districts is doubtful. In three of the four districts we were unable to obtain cost data for half or more of the cases. Across the districts, in the cases for which data were available, the median costs of distributing notices exceeded $36,000 per case and in two of the districts the median costs were reported to be $75,000 and $100,000 per case.[176] In at least 25% of the cases in each district, the cost of notice exceeded $50,000 per case and in two of the districts, such costs exceeded $100,000 per case. These data are best viewed as a collection of anecdotes and estimates.

Who paid the costs? The short answer is that both plaintiffs and defendants paid. The practices varied in the four courts, but overall defendants paid more than plaintiffs in two courts, slightly less than plaintiffs in one, and considerably less in the fourth. Defendants paid all or part of the costs in 62%, 27%, 58%, and 46% of the cases in E.D. Pa., S.D. Fla., N.D. Ill., and N.D. Cal., respectively. The data are consistent with the data on the timing of notice (discussed

---

171. MCL 3d, *supra* note 34, § 30.211, at 225.

172. 417 U.S. 156 (1974).

173. MCL 3d, *supra* note 34, § 30.211, at 226.

174. 7B Wright et al., *supra* note 56, § 1788, at 234.

175. In only one case was it clear that notice other than individual notice was used. In that case, notice was communicated to an estimated 1 million Sears Auto Center repair customers by newspaper publication and by posting notices at all Sears repair centers. In another case, the file was incomplete, but there was no record of notice other than by publication.

176. These costs refer to notice of certification or settlement or both, depending on what type or types of notice were issued in each case.

*supra* in § 10(a)). Delays in issuing notice apparently led to shifting the cost of notice from plaintiff to defendant. Our data cannot tell us whether the delays reflected a desire to avoid notice costs or some other motivation.

Do these requirements discourage the pursuit of class actions as the editors of the *Manual for Complex Litigation, Third* and Professors Wright, Miller, and Kane assert? The available data on costs suggest that the costs in some cases are high enough to deter litigants or law firms from pursuing class actions, especially where a number of small claims are spread among a large number of class members. Costs of notice may also induce plaintiffs to define a class more narrowly than if costs were not a factor. The larger the class, the costlier the notice. The data on lack of notice in some cases and delays in others suggest that the impact of the cost is sufficient to give parties an incentive to avoid notice, but we do not have direct data showing that the cost of notice is the source of that problem.

### (c) How much litigation of notice issues occurred?

*Data.* In each of the four districts, litigation of notice issues occurred in less than one-quarter of the cases in which notice of certification or settlement was communicated to a certified class (see Figure 39). Overall, twenty-one objections were filed in 18 cases, fourteen by class members, two by class representatives, three by defendants, and two by others.

The most frequent type of objection, occurring eleven times, was to the content of the notices, that is, the failure to include information about an item the objector deemed important. Three of those eleven objectors complained specifically about the lack of information concerning attorneys' fees. Others had more general complaints that the information in the notice was inadequate to inform class members. Six objections complained that the notice had not been received in a timely manner, sometimes arriving after an opt-out period had expired or the hearing on settlement approval had been held. Two objectors complained about the exclusion or inferior treatment of a subgroup. (Objections to the substance of the settlement that were presented at the settlement approval hearing will be addressed in § 14(c), *infra*.)

Courts responded to all but six of the twenty-one objections. Seven were heard and rejected, six were heard and accepted in whole or in part, one was withdrawn, and one was handled through correspondence from the plaintiffs' attorney.

*Discussion.* Overall, the number of objections as well as their tenor and force was not great. Whether that is a sign that the process is working or not is hard to judge. Objections to notice do not appear to represent a significant mechanism for addressing or correcting the types of errors and omissions discussed *supra* in § 10(b) or *infra* in § 10(d).

### (d) Did the notices of proposed settlements contain sufficient detail to permit intelligent analysis of the benefits of settlement?

*Background.* The *Manual for Complex Litigation, Third* recommends that a notice of proposed settlement include a description of the essential terms of the settlement, information about attorneys' fees, disclosure of any special benefits for class representatives, specification of the time and place of the hearing, and an explanation of the procedure for allocating and distributing the settlement.[177] A combined notice of certification and settlement, as the first notice to the class, should include information about opt-out rights and deadlines as well as sufficient information

---

177. MCL 3d, *supra* note 34, § 30.212, at 228. *Cf.* 2 Newberg & Conte, *supra* note 55, § 8.32, at 8-105.

to allow the recipient to make an intelligent choice about opting out. A notice of settlement that is the second notice—that is where the class has already been given notice of certification and the opportunity to opt out—should communicate sufficient information to support an intelligent appraisal of whether to accept or oppose the settlement and whether to file a claim.

In either of the above instances, the putative or actual class member would need sufficient information to assess the impact of the settlement on the member's personal situation. The ultimate question in a rational, economic analysis would be: What can I expect to recover? The class member needs to know this to compare actual losses and determine whether to participate in the settlement or oppose it. To estimate a personal recovery, one needs to know at least the net dollar amount of the settlement and the estimated size of the class with which one can expect to share the net settlement.[178] Newberg and Conte state that it is "unnecessary for the settlement distribution formula to specify precisely the amount that each individual class member may expect to recover."[179] Courts have not demanded precision but have called for estimates of monetary benefits, fees and expenses, and individual recoveries.[180]

Language in a notice should be clear and direct.[181]

*Data.* We examined the settlement notices in all of the certified settled cases to determine whether they communicated the type of information described above. Settlement notices in the cases did not generally provide either the net amount of the settlement or the estimated size of the class. Rarely would a class member have the information from which to estimate his or her individual recovery. In only five cases, all of which were in two districts, did the notice include information about the size of the class. As to the net amount of the settlement, in one district a third of the notices included such information, in two districts, a fifth did, and in the fourth district, a tenth. Notices included information about the gross amount of the settlement in 64% to 90% of the cases (see Figure 40).

Missing from most disclosures was information about the dollar amount of attorneys' fees, costs of administration, and other expenses. In only one district did more than half of the notices include the dollar amount of attorneys' fees; at the other end of the range, in one district only 10% of the notices included such information (see Figure 41). In all four districts, however, more than two-thirds of the notices included information about either the percentage or the amount of attorneys' fees (see Figure 41). If the fees are calculated as a percentage of the gross settlement and not as a percentage of the net amount (practices differ), then information about the fee percentage and the gross amount of the settlement would suffice because a class member could calculate the fees by multiplying the gross settlement by the percentage to be allocated to

---

178. An estimate of the individual shares in the settlement or the percentage of damages to be compensated would, of course, serve the same purpose.

179. 2 Newberg & Conte, *supra* note 55, § 8.32, at 8-107.

180. Grunin v. International House of Pancakes, 513 F.2d 114, 122 (8th Cir.) ("the notice may consist of a very general description of the proposed settlement, including a summary of the monetary or other benefits that the class would receive and an estimation of attorneys' fees and other expenses"), *cert. denied*, 423 U.S. 864 (1975); Boggess v. Hogan, 410 F. Supp. 433, 442 (N.D. Ill. 1975) ("the notice should . . . include the best available information concerning fees and expenses together with an estimated range of unitary recovery").

181. *See, e.g.,* Avery v. Heckler, 762 F.2d 158, 165 (1st Cir. 1985) (affirming "a judicial decision that favors plain and direct English" in a proposed notice). *See generally* 2 Newberg & Conte, *supra* note 55, § 8.39 (discussing the language and content of notice, emphasizing the need for clear, objective language).

*Class Actions*

fees. Information about the costs of administration and other expenses, including the attorneys' legal expenses for discovery and other pretrial activity, are infrequently included in the notice of settlement (see Figure 42).[182]

Notices generally included sufficient information on the nonmonetary aspects of the settlement. In each district, more than 75% of the notices presented information on a plan of distribution for the proceeds and also included information and forms for submitting a claim. When equitable relief was included in the settlement, it was generally summarized in the notice. Opt-out rights, where applicable, were stated in the vast majority of notices and all notices in all four districts specified the date and time for a hearing on approval of the settlement.

*Discussion and call for research.* Notices did not appear to include sufficient information for an individual class member to appraise the net value of a settlement to the class or to calculate an expected personal share in the settlement. Is it reasonable to expect that additional information could be provided? It appears that much of the needed information was available at other stages of the litigation and might have been calculated or estimated in the notice of settlement. For example, the exact size of the class might not have been determined until after notices had been sent, yet the parties frequently offered estimates of class size in seeking certification. The Rule 23(a)(1) requirement that "the class be so numerous that joinder of all members is impracticable" demands that the parties and the court consider the size of the class. Moreover, in cases where notice of certification had been sent before a settlement, information about actual class size was available based on the number of notices sent and opt outs received.

What about attorneys' fees? The parties might argue that information about attorneys' fees was not available until after the settlement has been approved and the court entered an order awarding fees. This is technically true. An estimate, with caveats, may have been the most that could have been presented. But courts generally awarded attorneys' fees in the amount requested by the plaintiffs[183] and those requests were generally submitted to the court before the settlement approval hearing. Including the amount of the fee request in the notice might call for earlier calculation of the estimated fees. Where the fees are a percentage of the settlement, the actual calculation—or a clear statement of the formula—would avoid any problems a class member might have in applying the formula.

Notices generally included the technical information about distribution plans, claims procedures, opt-out rights, hearings, and objections. Counsel in these cases often followed routine formats for developing notices and presenting settlement approval information to the court.[184] Because the practice appears to be routinized, one would expect that counsel would follow any explicit guidelines established through the rule-making process.

Having read the notices in these cases presses us to make an additional observation. Many, perhaps most, of the notices present technical information in legal jargon. Our impression is that most notices are not comprehensible to the lay reader. A content analysis of the samples could test this impression. For any researchers who wish to take up this call for further research,

---

182. The median percentage of the gross settlement devoted to administrative costs was 2% across the four districts.

183. *See* discussion and data at *infra* § 16(d).

184. 2 Newberg & Conte, *supra* note 55, § 8.32, at 8-105 ("[R]ule 23(e) notices are becoming standardized in format . . ."). For sample forms, see *id.* at Appendix 8-2. *See also* MCL 3d, *supra* note 34, § 41.4.

we can make available a file of most or all of the notices we encountered in the four districts. Courts and commentators have agreed that notices should communicate the essential information in "plain English."[185]

# (11) Opt Outs

## (a) Number of opt outs and relationships with subject areas and size of claims

*Background.* The questions in this section are: How frequently do members opt out of (b)(3) classes? Is opting out related to specific subject areas or size of typical individual claims? The background question, which our data cannot answer directly, is: Why do class members opt out?

The choice of opting out may arise in two distinct contexts: after certification but before settlement or after a settlement has been proposed. As the discussion of notice indicates (*see supra* § 10), notice of certification was often deferred until after a settlement had been reached. We examined the rates of opting out at each stage separately and in combination and noted some characteristics of cases with large numbers of settlement opt outs.

*Data.* At the *certification stage*, the percentage of certified (b)(3) class actions with one or more class members opting out was 21%, 11%, 19%, and 9% in the four districts (see Figure 43). The number of cases in any single nature-of-suit category was too small for meaningful analysis. Because the advisory committee has asked for data on nature of suit, we present the information (see Figure 44), but with the caveat that differences among the categories cannot support any generalizations.

At the *settlement stage*, the percentage of cases with one or more opt-out members was considerably higher than at the certification stage. Those percentages ranged from 36% in two districts to 43% in the third and 58% in the fourth (see Figure 45). Again, the number of cases in each nature-of-suit category does not support detailed analysis of differences (see Figure 46).

Combining the opt outs at the certification and settlement stages yields percentages of certified (b)(3) class actions with one or more opt outs ranging from 42% to 50% in the four districts (see Figure 47). These percentages are somewhat lower than the percentage of opt outs observed in the Georgetown study.[186]

How many class members opted out in these cases? In all four districts, the median percentage of members who opted out was either 0.1% or 0.2% of the total membership of the class and 75% of the opt-out cases had 1.2% or fewer class members opt out. Again in all four districts, 75% or more of the cases with opt outs had fewer than 100 total opt outs. This left seven cases in the study with more than 100 opt outs.[187] Two cases had 2,500 and 5,203 members, respectively, who opted out. In both of these cases, objectors who were represented by attorneys ap-

---

185. *See supra* note 181.

186. *Georgetown Empirical Study, supra* note 88, at 1161 (58% of cases in national study had one or more opt outs).

187. In five of those seven cases, objectors or class members other than the official representatives appeared at the settlement approval hearing. Objections filed in the seven cases included objections to the attorneys' fees (five), insufficiency of the settlement amount to compensate for losses (three), insufficient deterrence (two), disfavoring particular groups in the class (two), and a host of miscellaneous objections, including a single allegation of collusion among the parties.

peared at the settlement hearings, a sign that they might be planning further litigation.[188] Over-all, three of the seven cases with more than 100 class members who opted out were securities class actions.[189]

Data regarding opt outs at the settlement stage suggest that there may be a relationship be-tween the average net amount of the settlement and the presence of one or more opt outs (see Figure 48). The number of cases is too small to yield definitive results and other factors cer-tainly may have affected the decision to opt out, but the direction and magnitude of the relation-ship in all four districts was similar. The data suggest the possibility that the smaller the average individual portion of the settlement the larger the number of cases in which one or more parties opt out.

*Discussion.* Intuitively, one might expect one of two relationships between the net monetary award and the decision to opt out. For very large awards, say in a products liability case in-volving serious personal injuries, one would expect the opt-out rate to increase as the size of the expected award increases because individuals with more serious than average injuries would be able to obtain representation and pursue a larger individual award. None of the cases in the study, however, had median awards of that magnitude (*see supra* § 1(a)). The largest average net individual award was $5,331 and the great majority of the awards were below $1,000 (*see supra* § 1(a)).

For the type of awards in this study—none of which seem high enough to support individual lawsuits on a contingent fee basis (*see supra* § 1(a))—one might expect that class members would have more incentive in the larger cases to remain in the class and recover an award in the thou-sands of dollars. As the size of the net average settlement decreases, members have less incentive to file a claim. If totally dissatisfied with the amount of the recovery, some members may choose to protest by opting out. Without additional research, we cannot know whether this happened in our study, but the data in Figure 48 are compatible with such a scenario.

Comparison of the opt-out rates in this study with those in the Georgetown study, published more than twenty years ago, showed no increase in the rate of opting out.[190] The levels of opt-

---

188. The case with 5,203 opt outs was the *General Motors Pick-Up Truck Litigation*. *In re* General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768 (3d Cir.), *cert. denied,* 116 S. Ct. 88 (1995). In that case many of the objectors were represented by a public interest organization, the Center for Auto Safety, or by govern-ment attorneys; the settlement approval was reversed on appeal. In the other large case, 2,500 (16%) of 15,818 class members opted out of a securities class action settlement of $4,119,000 after objecting, through an attorney, that the amount of the settlement was insufficient. Hooker v. Arvida/JMB, No. 92-7148 (N.D. Ill. filed Oct. 27, 1992). No appeal was filed in that case and there was no indication in the case file of further litigation, but the presence of the attorneys and the large number of opt outs indicate the possibility of further litigation by the opt-out members.

189. One of those cases was described in the previous note. In another, *In re* Oracle Sec. Litig., No. 90-931 (N.D. Cal. filed March 29, 1990), 115 members (0.0007%) of a class estimated at 164,000 opted out. The only objections filed in that case were to the amount of attorneys' fees. The other securities case, Mogul v. Nikken, Inc., No. 92-946 (N.D. Cal. filed March 4, 1992), involved a class of independent distributors of a networking marketing program, not a public securities offering: 360 (0.01%) members of a class of 28,533 opted out. In that case no objections were pre-sented at the hearing and there is no indication of an independent action by the opt-out members. The settlement included a mandatory (b)(1)(B) class for refunds for products and an opt-out (b)(3) class for claims based on eco-nomic loss arising from the marketing program.

190. *See* discussion of *Georgetown Empirical Study, supra* note 88. This portion of the Georgetown study was based on a national study of selected class actions, more than half of which were securities and antitrust cases. *Id.* at

*Findings*                                                                                                    53

ing out reported in the Georgetown study, in fact, indicate that opting out may have declined considerably.[191]

### (b) Opt outs in (b)(1) or (b)(2) classes

*Data.* As a practical matter, putative class members do not opt out in (b)(1) or (b)(2) classes, with one minor exception.[192] In addition, there were four settled class actions with opt outs that were certified under either (b)(1)(B) (one case) or (b)(2) (three cases) as well as (b)(3). At least in those cases, the certification of a class on mandatory grounds was not used as a way to evade the opt-out requirements of Rules 23 (b)(3) and 23 (c)(2).

We also looked for cases that had not been certified under (b)(3) yet appeared to be damage actions. In four cases, classes were certified under (b)(1) or (b)(2), but not (b)(3), and damages were awarded on a class-wide basis. None of the cases, however, appeared to represent distortions of the mandatory class categories to evade (b)(3) opt-out requirements.[193]

## (12) Opt Ins

### (a) Opt-in classes

*Background and Data.* The question raised is whether devices are employed to create what are essentially opt-in classes, by such means as defining the class to include only those members who file claims. The Georgetown study found that judges in three cases required an opt-in procedure and found that it reduced the class size by 39%, 61%, and 73%.[194] In that study the opt-out procedure generally reduced class size by 10% or less. Plaintiffs' attorneys raised concerns that the opt-in procedure excluded unsophisticated consumer class members.[195] Along similar lines, Newberg and Conte report a small number of opt-in cases that were approved under state court rules.[196]

---

1157–59.

191. In the national portion of their study, the Georgetown authors reported that in 31 of the 36 cases for which information was available, 10% or less of the class opted out. *Id.* at 1161. In the instant study more than 75% of the class actions in each district had fewer than 1.2% of the class opt out. Only two cases in the entire study had opt-out rates above 10%.

192. In one case certified as a (b)(1)(B) class for settlement purposes only, the case file included three letters from class members indicating their desire to opt out of the settlement. That settlement consisted of an agreement from a corporate entity to provide supplemental funding if needed to satisfy the terms of a loan to an employee stock ownership plan and did not include a monetary distribution. One objection to the settlement was to the scope of the language in the release given to defendants. There is no indication that the opt-out letters from these class members had any effect, because the class was defined as a mandatory class and because there was no monetary settlement. The effectiveness of the notice of opting out would be tested if the opt-out members filed suit against the defendant, but there was no evidence that this occurred.

193. In all four cases, notice of settlement was provided to the class, but opt-out rights were not provided in the notice. Three of these cases were ERISA cases involving relatively small retirement funds, each of which appeared to qualify as a limited fund. The fourth case involved a class of claimants who had filed complaints with a state fair employment commission and whose complaints had not been processed. The relief consisted of an order that the commission process the complaints for all who wished and that they pay $350 to those who chose that remedy. Thus, one might conclude that the injunctive relief was the primary remedy.

194. *Georgetown Empirical Study, supra* note 88, at 1148–51.

195. *Id.* at 1149–50.

196. 3 Newberg & Conte, *supra* note 55, § 13.22.

*Class Actions*

None of the certified class actions in this study defined the class as requiring the filing of a claim as a precondition to becoming a member of the class, but many used a claims procedure that, as a practical matter, limited the number who shared in the common fund (*see infra* § 12(b)).[197] Combining an opt-out class with a claims procedure appears to have the effect of precluding further litigation by class members who do not opt out or file claims.

## (b) Claims procedures

*Background and data.* A large number of cases in the study used a claims procedure to distribute the proceeds of a settlement fund to class members. Only those class members who filed claims shared in the benefits of the settlement, but all class members—as defined in the class certification order—who did not affirmatively opt out were bound by the judgment. Unfortunately, the parties generally did not report the number of claims received; thus, our data on claims received are too incomplete to present.

Claims procedures were used in 80% of certified, settled class actions in one district; 77% in another; 45% in the third; and 42% in the fourth (see Figure 49). Claims procedures were a standard modus operandi in securities class actions, being used in between 80% and 100% of these cases in the four districts (see Figure 50). Other types of cases that typically generate monetary awards also used claims procedures. For example, all three antitrust settlements in the study did so, as did three of the five employment discrimination cases. On the other hand, only four of twelve ERISA cases and one of eleven "other civil rights" cases established such procedures. An advantage of using a claims fund is that once the total number of claims is known, the entire fund can be distributed on a pro rata basis.[198]

# (13) Individual Member Participation

## (a) Participation before settlement

### (i) Attempts by class members to intervene

*Background.* The question is how frequently do nonrepresentative class members seek to intervene before the settlement stage? Intervention by putative class members can proceed under either Federal Rule of Civil Procedure 24(a) (intervention of right when granted by statute or when necessary to protect an interest of the prospective intervenor), Federal Rule of Civil Procedure 24(b) (permissive intervention when a statute provides for conditional intervention or there are common questions of law or fact), or Federal Rule of Civil Procedure 23(d)(2) (court may require that notice be given to class members to allow them "to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or oth-

---

197. We encountered a few cases filed as statutory opt-in class actions under 29 U.S.C. § 216(b) (1988) of the Fair Labor Standards Act (FLSA) and under 29 U.S.C. § 626(b) (1988) of the Age Discrimination in Employment Act (ADEA), both of which employ an opt-in procedure. Notice of filing a complaint is sent to all potential class members at the outset and they are given an opportunity to file a written consent to join the class. We did not include these cases in the study because they did not invoke Rule 23 and their structure did not match well with our study design. A separate study of FLSA and ADEA cases might provide data that would be useful for assessing the viability of a Rule 23 opt-in procedure.

198. For an illustration of a formula for allocating the fund according to the proportion of each claimant's damages, *see* 3 Newberg & Conte, *supra* note 55, § 12.35, at 12-85 to 12-86.

erwise to come into the action"). The main purposes of allowing intervention in class actions are to assure "that the class is adequately represented" and "to enable those class members on the outside of the litigation to function as effective watchdogs."[199]

*Data.* Attempts to intervene in cases filed as class actions occurred relatively infrequently in the study, in 11%, 0%, 9%, and 5% of the cases in the four districts (see Figure 51). Overall, judges granted about half of the requests (see Figure 51). The most frequently cited basis for intervention was Rule 24(b) (permissive intervention) (see Figure 52). Rule 23(d)(2) was cited in only three cases. The authority cited for intervention did not appear to make a difference in the outcome of the application (see Figure 52).

Data on intervention activity was spread among a wide assortment of nature-of-suit categories and no meaningful conclusions can be drawn about differences among the categories (see Table 37).

### (ii) Attempts by nonmembers to intervene

*Data.* In all four districts, a total of six nonmembers of an alleged class attempted to intervene in the class actions. Aside from representing special interests, there was no pattern to their applications.[200] Courts granted two of the six applications. All four of those that were denied intervenor status participated in the case at a later stage. In each case the would-be intervenors objected to the settlement and in three cases they filed an appeal, each of which was unsuccessful.[201] In addition to appeals from the denial of an application to intervene, three proposed intervenor–plaintiffs filed appeals on the plaintiffs' side from a denial of an injunction, a denial of class certification, and a summary judgment for the defendant. All three decisions were affirmed on appeal.

### (b) Class member participation in settlement by filing objections and attending settlement hearings

The question raised is: How frequently do nonrepresentative class members appear to contest settlement, and with what effect?[202] Objections may be presented by any class member who has not opted out of the litigation, any settling defendant, or any shareholder of a settling corpora-

199. 7B Wright et al., *supra* note 56, § 1799, at 438–39.

200. Two involved local labor unions, one of which successfully intervened on behalf of its members in a Title VII action (Stender v. Lucky Stores, No. 88-1467 (N.D. Cal. filed April 22, 1988)) and the other of which was denied intervention on the side of a class of abused and neglected children who were served by union members. The other successful intervenor was permitted to intervene in a securities class action for the limited purpose of maintaining an interpleader action. Sullivan & Long, Inc. v. Scattered Corp., No 93-4069 (N.D. Ill. filed July 7, 1993). Two other unsuccessful attempts are described in the next footnote.

201. In one case, a bankruptcy trustee for a corporate defendant sought to insure that the corporation did not waive its claims against accountants and other professionals. The trustee later filed objections to the attorneys' fee request and filed an appeal from the fee award, serving as the nominee of several class members. That appeal was pending at the time of our data collection. Weiner v. Southeast Banking Co., No. 90-760 (S.D. Fla. filed March 22, 1990). In another case, a pro-life coalition sought to intervene as a defendant in an abortion rights case against a defendants' class of state attorneys general. The court denied the application and the denial was affirmed on appeal, Keith v. Daley, 764 F.2d 1265 (7th Cir.), *cert. denied,* 474 U.S. 980 (1985). *See also* discussion of appeals *infra* at §§ 13(c) & 20(a).

202. Cooper, *supra* note 6, at 33.

tion.[203] Generally, a written objection must be filed before the hearing, and an objector need not appear at the hearing to have an objection considered by the court.[204]

*Data.* Our data permit us to document the objections raised by class members and other objectors and, within limits, to document their attendance at settlement approval hearings. Except in E.D. Pa., however, we were generally unable to obtain transcripts of the settlement approval hearings, so our report of attendance in the other three districts is based on clerical entries that seem likely to undercount the participation of class members and objectors.[205] With this caveat, court files indicate that nonrepresentative parties were recorded as attending the settlement hearing infrequently, with 14% in E.D. Pa. being the high mark and the other three districts showing 7% to 11% rates of participation (see Figure 53). Attendance of representative parties was also mixed. Again, E.D. Pa. had the highest rate, 46%, and the other districts varied from 11% to 28% (see Figure 53; *see also supra* § 4 (c)).

Participation by filing written objections to the settlement was far more frequent than participation by appearing at the settlement hearing. Generally, objectors filed their objections in writing before the hearing. Typically, the parties addressed the objections in the final motion for approval of the settlement. Overall, about half of the settlements that were the subject of a hearing generated at least one objection. The percentage of cases in which there was no objection ranged from 42% to 64% in the four districts (see Table 38).

The most frequent type of objection was to the amount of attorneys' fees as being disproportionate to the amount of the settlement; in 14% to 22% of the cases in the four districts, objectors raised this point (see Table 38). The next most frequent objection related to the insufficiency of the award to compensate class members for their losses. Next in line were objections that the settlement disfavored certain subgroups. A wide variety of objections were grouped in a miscellaneous category. Many of the miscellaneous objections raised serious concerns that were difficult to categorize.[206]

---

203. 2 Newberg & Conte, *supra* note 55, § 11.55, at 11-132 to 11-133.

204. *Id.* § 11.56, at 11-137.

205. But, in a recent article, the author asserted that an empirical study of terminated class actions in N.D. Cal. from 1985 to 1993 showed that "class representatives did not participate in 100% of the cases." Downs, *supra* note 50, at 691. Our study, however, found that one or more class representatives attended nine of 32 settlement approval hearings in N.D. Cal. and that the nine hearings were held between June 18, 1992, and December 17, 1993. The difference appears to be that we counted as an appearance any notation on the clerk's minute entry that one or more class representatives were present. Professor Downs did not count such entries as indicating presence because, in his experience, clerks place in the minute entry what the lawyers say in court. Thus, the minute entries may simply represent instances where a lawyer for the class announced an appearance "on behalf of [a class representative]" who was not present. Telephone conversation with Professor Downs (Jan. 2, 1996). Whatever view one takes of the N.D. Cal. data, the data derived from transcripts in E.D. Pa. appear to be the most reliable data available.

206. For example, in *In re* General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768 (3d Cir. 1995), *cert. denied*, No. 94-2137, 1995 U.S. LEXIS 5538 (Oct. 2, 1995), an extensive number of complaints were filed and heard at the settlement hearing, including complaints that the settlement did not properly address safety concerns. In two ERISA cases, pensioners raised questions about the effect of the settlement on their retirement benefits. In one case, shareholders raised a claim that the recovery was excessive and would diminish the value of their stock. Schlansky v. EAC Indus., No. 90-854 (N.D. Ill. filed Feb. 13, 1990). At least three miscellaneous objections raised questions about the scope of the release and at least four raised questions about the substantive terms of the proposed settlement.

*Findings*                                                                                      57

How did the courts respond to the objections? Approximately 90% or more of the proposed settlements were approved without changes in each of the four districts. In a small percentage of cases, the court approved the settlement conditioned on the inclusion of specified changes. Overall in the four districts, judges made changes in nine settlements before approving them. In seven of these cases, objections had been raised and the changes may have been responsive to those objections, but our data do not permit us to examine that relationship systematically.[207]

Similar results were obtained for specific objection to the amount of fees requested. Overall, in twenty-one cases, objections to the amount of attorneys' fees were filed. In nineteen of those twenty-one cases the court awarded 100% of the request and in the other two the court awarded less than the full fee request.[208] (For a comprehensive discussion of the courts' treatment of attorneys' fees in the study cases, *see infra* § 16.)

Our study was not designed to trace the responses to each objection, but our general impression is that the parties summarized and discussed most objections in a motion for settlement approval. The parties generally filed such a motion after the deadline for filing objections had passed, shortly before the settlement approval hearing. Many of the settlement approval orders, which were typically prepared by the parties for the judge's signature, specifically addressed objections.

*Discussion.* Objections represent an outside source of information about the substance of the settlement and its impact on class members. The settling parties at this stage have little or no incentive to present negative information about the settlement, so objections from class members and others may be a crucial source of information about defects in the settlement.

In approximately half of the settlements, there was some level of participation by nonrepresentative class members and others. The process channels participation into written filings that the parties review, filter, and present to the court. The objections, in the form received, are generally appended to the parties' filings for the court to read.

Appearances at hearings are infrequent and changes in the settlement as a result of objections are even less frequent. But, there are no data from other studies to suggest what one should expect.[209]

---

207. In one case the connection between the objection and the changes in the settlement was clear. Objectors complained that certification of a mandatory class was inappropriate and that parties should be given an opportunity to opt out. The court's approval of the settlement included an opportunity to opt out. McKenna v. Sears Roebuck, No. 92-2227 (N.D. Cal. filed June 12, 1992). In another instance, the change consisted of lowering the percentage of attorneys' fees awarded and changing the formula for calculation of fees and expenses, but it was unclear whether the change was responsive to a specific objection. Nathanson, IRA v. Tenera, No. 91-3454 (N.D. Cal. filed Oct. 2, 1991). In another case, the court's action in initially rejecting a settlement appeared to arise sua sponte. The court determined that a settlement of the derivative action had not been properly approved by disinterested members of the corporate board and, for that reason, the court disapproved that settlement. Because settlement of the class action was contingent on court approval of the derivative settlement, the class action settlement was disapproved until the parties reached a proper settlement of the derivative action. *In re* Oracle Sec., No. 90-931 (N.D. Cal. filed March 29, 1990).

208. In E.D. Pa., 58% of the fee request was awarded in one case and 100% in the other five cases in which objections to fees were filed. In N.D. Ill., 94% was awarded in one case and 100% in the other four cases with objections. In the other two districts 100% of the requested fees were awarded in all cases with objections to fees.

209. The Georgetown study did not examine participation or objections. *Georgetown Empirical Study, supra* note 88. *See also supra* note 205.

*Class Actions*

### (c) Nonrepresentative class member participation by filing appeals

*Data.* As noted in *supra* section 13(a)(2), three prospective intervenors filed appeals from the denial of their application to intervene. Prospective intervenors, together with one or more named plaintiffs, also filed appeals addressing other issues in three cases, one involving the denial of an injunction, another the denial of class certification, and the third, the granting of summary judgment for the defendant. In all three instances the trial court's judgment was affirmed.

In addition, objecting class members filed appeals in two major consumer class actions. One of those appeals, the *General Motors Pick-Up Truck Litigation,* resulted in a decision that vacated the order certifying a settlement class and remanded the case to the district court for further proceedings. In the other case, a class member filed an appeal from the district court's approval of a $3 million attorney fee award in a case in which the class remedy was to provide $50 coupons toward the purchase of specified automotive equipment to replace prior purchases of similar equipment.[210] That appeal is pending.

## (14) Settlement

### (a) Did certification coerce settlement of frivolous or nearly frivolous claims?

*Background.* Earlier (*see supra* § 5(c)(i)), we observed that one indicator of a "strike suit" is the power of the *filing* of a case to coerce a settlement without regard to the case's merit or lack thereof.[211] In this section we carry that discussion further by examining the relationship between class certification and the settlement of cases. The central question is: Does the act of *certifying* a class coerce settlement of frivolous or nearly frivolous claims? We cannot address this question directly with our data because we have no way of knowing, from the written court file, what factors influenced the parties to settle and whether class certification played so dominant a role as to be considered coercive. Such questions might be addressed by other methods, such as interviews.

One indirect, limited approach is to compare the outcomes of certified class actions (other than those certified for settlement purposes only) to cases in which certification was denied or not ruled on. If it is the class action device that coerces settlement, one would expect that certified cases would achieve settlements more frequently than cases that are not certified as class actions. Viewed from another angle, certified class actions would be less likely to be disposed of by noncoercive means, such as rulings on the merits via motions or trials. Such merits-related dispositions are the traditional ways for litigants to avoid being coerced to settle. These two tests overlap because cases that settle have by definition not been disposed of by rulings on the merits.

#### (i) Outcomes of certified classes compared with outcomes for noncertified cases

*Data.* Table 39 compares the various motion, trial, and settlement outcomes of all certified and noncertified class actions. Cases certified for settlement purposes only were not included in the above analysis because generally the settlement in those cases was reached before the court

---

210. McKenna v. Sears Roebuck Co., No. 92-2227 (N.D. Cal. filed June 12, 1992).
211. *See* discussion *supra* § 5(c).

ruled on certification. Thus, the settlement could not be said to be a product of a certification ruling.

Across the four districts, a substantial majority of certified class actions were terminated by class-wide settlements. In the four districts, the percentage of certified class actions terminated by a class settlement ranged from 62% to 100%, while settlement rates (including stipulated dismissals)[212] for cases not certified ranged from 20% to 30% (see Table 40). Certified class actions were more than two times more likely to settle than cases that contained class allegations but were never certified (see Table 40).

The converse proposition—that certified class actions are less likely to be terminated by traditional rulings on motions or trials—is also true. For the most part, this finding follows directly from having a high percentage of settlements that terminated the litigation. Combining the motion and trial categories in Table 39 yields a range of nonsettlement dispositions from 13% to 37% for certified class actions compared to a range of 45% to 62% for cases filed as class actions but never certified as such (see Table 41). In each of the four districts, noncertified cases were at least twice as likely as certified class actions to be disposed of by motion or trial. These data confirm empirical data from an earlier study of class action activity in N.D. Cal.[213]

What do those data tell us about whether settlement was coerced? Without examining the options available to the parties, whether those options were pursued successfully or unsuccessfully, one should not rush to conclude that the cases settled simply because they were certified. For example, if a case settled after a ruling on summary judgment or in the face of a trial date, that settlement might be seen as primarily the product of the ruling or the setting of a trial date. In the following section we will look at the data on these alternatives.

### (ii) Frequency of rulings on motions to dismiss, motions for summary judgment, trial dates scheduled, and trials held in certified class actions

*Data.* The vast majority of cases that were certified as class actions were also the subject of rulings on motions to dismiss, motions for summary judgment, or the setting of a trial date. Approximately a third of those cases in one district, 50% in two districts, and more than 80% in the fourth were the subject of rulings on at least one motion to dismiss (see Figure 54). The percentage of cases with rulings on motions for summary judgment ranged from 30% to 67%, with the middle two districts showing 43% and 44% (see Figure 55). Finally, trial dates were set in percentages ranging from 17% to 56% in the four districts (see Figure 56).

Overall, from 72% to 94% of the cases certified as class actions received either a ruling on a motion to dismiss, a ruling on a motion for summary judgment, or the setting of a trial date (see Figure 57). Looked at from the other side, at most 6% to 28% of the certified class actions in the four districts could possibly have settled without a ruling on the merits or the setting of a trial date.

---

212. Stipulated dismissals were not included as class settlements because a stipulation of dismissal does not satisfy the Rule 23(e) requirement of obtaining court approval for a class settlement. On the other hand, a stipulation of dismissal is an acceptable way of indicating a nonclass settlement.

213. Bryant G. Garth, *Studying Civil Litigation Through the Class Action*, 62 Ind. L.J. 497, 501 (1987). Garth and his colleagues found a 78% settlement rate for certified class actions compared to a 15% settlement rate for cases filed as class actions but not certified. Seventy percent of the uncertified cases were disposed of by motion to dismiss or by summary judgment.

Of the three factors discussed, the effect of setting of a trial date seems somewhat ambiguous and difficult to interpret because we have no way of measuring whether the date was firm or realistic enough to have an impact on settlement. Local practices may have clerks enter the settings in a semiautomatic fashion. But even eliminating the setting of a trial date as a factor does not change the data very much. More than two-thirds of the certified class actions in the four districts had rulings on either a motion to dismiss, a motion for summary judgment, or both (see Figure 58).

*Discussion.* The data indicate that certified class actions receive considerable attention from judges or their staff in the form of ruling on motions and setting trial dates. Data from the time study[214] reinforce this finding. Judges spent about eleven times more time on class actions than on the average civil case in the time study (*see supra* § 2(d)). Judicial rulings and active case management, including the setting of trial dates and holding pretrial conferences (see Table 19), cannot be said to eliminate the possibility of coerced settlements, but their prevalence in this study of class actions greatly diminishes the likelihood that the certification decision itself, as opposed to the merits of the underlying claims, coerced settlements with any frequency. The data show that a district judge examined the merits of the great majority of cases and that the parties pursued some, if not all, of the litigation alternatives available to them. One might reasonably conclude that rulings on motions and the case management practices limited the ability of a party to coerce a settlement without regard to the merits of the case.

Another perspective on the relationship between certification and settlement is to view certification as a "settlement event," that is, an event that would "affect substantially the potential value of a settlement," "clarify uncertainty about the value of the case," and "let lawyers gauge the approach of the judge."[215] From this angle, the certification decision can be expected to have a direct impact on settlement, just as a ruling on summary judgment or an arbitration award might have. The impact, though, seems to arise from implicit judicial recognition of the plausibility of the claims and the multiplication of those claims by the size of the class. In other words, the impetus to discuss settlement may flow from an assessment of the total liability the litigation might impose.

### *(iii) Timing of settlements in relation to class certification*

*Background.* Another indicator of the relationship between certification and settlement is the timing of the two events. If settlement occurs before or simultaneously with certification or long after certification, the possibility of any connection between the two seems remote. Unless settlement follows reasonably promptly after certification, the settlement would not seem to be directly related to the certification. While simultaneous settlement and certification might be seen as anticipating the probability of certification if no settlement was reached, there is no judicial ruling that can be said to coerce settlement. (For discussion of the effect of the filing of the complaint on settlement, *see supra* § 5(c).)

*Data.* The time from certification to settlement varied widely (see Table 42). The median times in the four districts ranged from 9.2 to 18.9 months. The majority of the cases in one district settled before certification and in the other three districts, 15%–37% of the cases settled be-

---

214. Willging et al., *supra* note 26.
215. Garth, *supra* note 213, at 504.

fore certification. In three districts, at least a quarter of the certified class actions settled within two months after certification. A large number of these cases were settlement classes which were certified simultaneously with the preliminary approval of a proposed settlement. At the other end of the scale, at least a quarter of the cases in all four districts took more than a year after certification to settle. In three districts, this quarter of the cases took approximately two to three and one-half years or more.

*Discussion.* The data on timing of settlements did not support any inference of a relationship between certification and settlement. Many cases settled before the court ruled on certification and a sizable number, a majority in three of the districts, settled more than a year after certification.

### (b) Notice

*Background.* When certification is first sought at the settlement stage, the question raised is: How effective is the attempt to ensure compliance with notice and certification requirements? As noted in section 10(a), *supra*, Rule 23(e) requires notice of settlement or compromise in all class actions, regardless of the type. Thus, all cases certified for settlement purposes would be expected to have a notice of the certification combined with a notice of the settlement and communicated to the class.[216] In section 10(a), however, we found that six settled (b)(2) classes received no notice of settlement. Our analysis in this section overlaps with that analysis. We also found in section 10(a) that five certified (b)(3) classes received no notice of certification before being disposed of on the merits (four) or by stipulation (one). We also found a tendency to delay notice after certification until a settlement was reached, perhaps to shift the costs of notifying the class to the defendant or a settlement fund or perhaps for other reasons, such as to gather information about the class.

Settlement classes are difficult for the court to evaluate because of the lack of an adversarial proceeding on class certification.[217] Complicated issues, such as conflicts between class counsel and counsel for individual plaintiffs or the need to protect future claimants, may challenge the court.[218] The approval process generally involves two steps: a preliminary evaluation of fairness and a later review, after notice, at a fairness hearing.[219]

*Data.* In two districts, notice of settlement was disseminated to the class in all class actions certified for settlement purposes. In the other two districts 13 of 16 (81%) and 12 of 15 (80%) settlement classes included notice to the class (see Figure 59). Overall six cases in the latter two districts did not include notice of the approval of a settlement class. In all of those cases, the court explicitly approved the proposed class settlement without requiring any changes. In none of the six cases did the file indicate that the classes were (b)(3) classes or that class damages were included in the settlement. All involved some form of injunctive relief. Nevertheless, Rule 23(e) requires notice to the class prior to the settlement of these cases so that class members have an opportunity to review the proposed settlement and participate in the review process.

---

216. When a settlement is presented to a court that has not ruled on certification, generally the court's order preliminarily approving the settlement includes a ruling on class certification.

217. MCL 3d, *supra* note 34, § 30.45, at 243–44.

218. *Id.* at 244.

219. *Id.* § 30.41, at 236–38.

*Class Actions*

In those same settlement class actions, the court issued a preliminary approval of the settlement in more than 80% of the cases in three districts and in 50% of the cases in the remaining district (see Figure 60). Overall there were twelve settlement classes, eight in one district, that did not appear to include a preliminary approval ruling (see Figure 60). Three of these cases involved class damages and all three of those cases had a subsequent fairness hearing. Seven settlement classes had neither evidence of preliminary approval nor of a later fairness hearing (see Figures 60 & 61). None of those seven cases was certified as a (b)(3) class and none involved money damages.

*Discussion.* A handful of cases in the study had no notice to the class of a class-wide settlement, generally for injunctive relief. Most of these same cases did not have either the preliminary approval of the judge or a hearing to examine the fairness of the settlement. All had the final approval of a judge. Rule 23(e) and the guidance of the *Manual for Complex Litigation, Third* make it clear that more is expected for a settlement class. Without notice to the class and the reaction of class members to the settlement, the judge might not have sufficient information to assess whether the settlement is fair and reasonably responsive to the interests of the class.

Nor does the fact that the cases involved injunctive relief and not money damages diminish the need for notice and a hearing. Injunctive relief sometimes weighs more heavily in the lives of class members than a modest share in a pecuniary settlement. For example, one of the settlements was on behalf of a class of persons who use wheelchairs, crutches, or similar aids and wish to attend sporting events at a specific facility. The injunctive relief provided that defendants would better accommodate such persons and stop denying floor level seating to the class. One assumes that some class members have a serious interest in the shaping and implementation of this relief and that notice to the class would assist the court in affirming or rejecting the rather vague proposed remedies. Notice and a hearing might generate information about whether the proposed remedy addressed all the barriers faced by class members.

Another example from this set of cases involved injunctive relief on behalf of a class of mentally retarded individuals who were misplaced in facilities for the mentally ill. The settlement provided for identifying all misplaced individuals and for funding 100 appropriate placements in community settings across the state. Class members, their family members, attorneys, or caseworkers would presumably be able to contribute information about whether the settlement would be likely to meet their needs.

In proposing a settlement class, the parties usually intend to bar future claims. Ironically, the lack of notice and a hearing leaves the settlement open to collateral attack by class members who were not notified of its provisions.[220]

Why might a court and the parties bypass notice and a hearing in this context? While there may be darker motives, a plausible reason may have been to save time and money, either for the parties or the court, or both. Individual notice to a huge class might forestall a worthwhile settlement because neither side can afford the notice costs. And, of course, the economy could be false if class members later successfully challenge the settlement.

That some courts and parties evaded the clear mandate of Rule 23(e) in this handful of cases raises the question of whether bypassing notice and a hearing might in some cases be meeting a need of class representatives or the court or both. If so, a rule allowing truncated notice (e.g., to

---

220. 2 Newberg & Conte, *supra* note 55, § 11.23, at 11-32.

a sample of class members or by posting at offices or locations where the problems arose) on explicit findings of financial hardship and high cost–benefit ratios might warrant the advisory committee's consideration.

### (c) Attendance of nonrepresentative parties at settlement approval hearings

This topic was discussed in *supra* section 13(b).

### (d) Provisions favoring named representatives

This topic was discussed in *supra* section 4(d).

### (e) How often did magistrate judges or special masters evaluate settlements?

*Background.* The proposed revision to Rule 23(e) "clarifies that the strictures of [Federal Rule of Civil Procedure] 53(b) do not preclude the court from appointing under that Rule a special master to assist the court in evaluating a proposed dismissal or settlement."[221] Rule 53(b) provides that a special master is to be appointed only in jury trials involving complicated issues, in nonjury trials upon a showing of some exceptional condition, or, if a magistrate judge is to be appointed, upon the consent of the parties.[222]

The proposed revision to Rule 23(e) also authorizes referring settlement or dismissal proposals to magistrate judges for evaluation. Currently, in civil litigation generally, district judges assign a variety of duties to magistrate judges.[223] These judicial officers perform duties that range from resolving discovery disputes to presiding, with the consent of the parties, over civil trials.

The principal reason for these proposed rule changes is to clarify that the court has the authority to appoint an independent master to investigate the fairness of dismissal or settlement proposals in any certified class action. The advisory committee cited some examples of when an independent evaluation might be necessary: when the named parties and their counsel have ceased to be adversaries with respect to the proposed dismissal or settlement, when the parties are required to disclose weaknesses in their own positions in the course of the evaluation of the proposal, when the parties are required to provide information to assure that the proposal does not directly or indirectly confer benefits upon class representatives or their counsel inconsistent with fiduciary obligations owed to members of the class, or when other conflict-of-interest issues must be resolved.[224]

*Data on Special Masters.* Of 126 proposed settlements in certified cases, a settlement was assigned to a special master (other than a magistrate judge) in only 2 cases.[225] One assignment was for the purpose of facilitating settlement and the other was to review a consent decree that incorporated a settlement. Neither assignment involved reporting to the judge on the merits of

---

221. Cooper, *supra* note 14, at 23.

222. Fed. R. Civ. P. 53(b). *See also* Wayne D. Brazil, *Special Masters in Complex Cases: Extending the Judiciary or Reshaping Adjudication?*, 53 U. Chi. L. Rev. 394, 395–98 (1986) (discussing historical use and purpose of special masters); Jonathan R. Macey & Geoffrey P. Miller, *The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform*, 58 U. Chi. L. Rev. 1, 57–58, 58 n.173 (1991) (discussing courts' justifications for appointing special masters).

223. 28 U.S.C. § 636(b)(3) (1976).

224. Cooper, *supra* note 14, at 22.

225. There were no referrals to review dismissal.

settlement. Moreover, courts appointed masters in only 3 cases in the study as a whole, counting all appointments for whatever purpose.[226]

*Data on Magistrate Judges.* The study found that referrals to magistrate judges for settlement purposes[227] were somewhat more frequent. By far, the greatest rate of magistrate referrals occurred in N.D. Cal. (47% of certified cases with proposed settlement; 14 of 30 cases).[228] In the other three courts, the comparable rates were 5%, 23%, and 20%.[229] Typically, the magistrate judge's role was to facilitate settlement, not to report and recommend to the district judge on the merits of a proposed settlement, although this occurred in some cases.

*Discussion.* The premise underlying the proposed rule change is that some judges are uncertain about their authority to appoint masters, especially for run-of-the-mill class action settlements or dismissals.[230] The rarity of appointment may indicate that district judges are reluctant to spark Rule 53(b) disputes within the litigation. The data may also indicate district judge confidence and pleasure with the effectiveness of referrals to magistrate judges. The differences in magistrate judge referral rates among the four districts may indicate variations in district referral practice generally, rather than propensity or reluctance to refer class action settlements.[231]

Another view is that the data reflect a general reluctance to assign matters to nonjudicial officers, who might be perceived as having the potential to create more problems than they solve. For example, the large numbers of parties in a class action make conflict of interest checks difficult for the master, possibly exacerbating the problems of potential and actual conflicts of interest that, it is argued, inherently exist in the class action setting. Others argue, however, that these "inherent" conflicts are themselves one reason to appoint a master, one who can, to some extent, serve as an additional guardian against collusive settlements or other alleged abuses.

The study's finding of generally low referral rates might suggest a need for the proposed rule change. Since class actions often involve time-consuming and complex issues, clear authorization for the use of masters and magistrate judges could potentially conserve district judge time and help expedite settlement and dismissal decisions.

---

226. In the third case, a master reviewed requests for attorneys' fees.

227. There were no referrals to review dismissal.

228. Although the proposed rule change would not affect cases until after certification, it is interesting to note that the rate of referral was lower for noncertified cases (37% or 7 of 19 cases). District judges eventually approved settlement in 20 of the 21 cases referred to magistrate judges.

229. The numbers of cases referred were small (2 of 43, 3 of 13, and 8 of 40, respectively). Rates of referral were similar for noncertified cases.

230. *See* La Buy v. Howes Leather Co., 352 U.S. 249, 256 (1957) (construing narrowly exceptional circumstances required to enlist services of special master).

231. For example, looking at other phases of class actions, the magistrate referral rate in N.D. Cal. was also significantly higher than the average rates in the other three districts with respect to the following phases of litigation: discovery management, resolution of class issues, claims resolution, fund administration, and counsel-fee application review; however, the district's rate of referral for pretrial case management was comparatively low and its rate of referring class certification issues was about average compared to the other three districts.

*Findings*    65

## (15) Trials

### (a) How often were trials held and with what results in what types of cases?

*Background.* The Judicial Conference Advisory Committee on Civil Rules asked us to determine how often class actions were actually tried on the merits and what results came from those trials. To this end, we identified the frequency and outcomes of trials by nature-of-suit code and by other case characteristics, such as certification status and Rule 23(b) subdivision.

*Data overview.* A trial began in only eighteen cases in the four districts combined. The trial rate in class actions in each of the four districts was not notably different from the 3% to 6% trial rate for nonprisoner nonclass civil actions (see Table 16). A little less than half of the eighteen trial cases were certified as class actions.[232] Given the small number of trials, we did not attempt to stratify trial outcome data by district.[233] Instead, we aggregated data for the four districts (see Tables 43 and 44); however, inferences about the universe of trials in class actions nation-wide cannot be made from these aggregated results.

Plaintiff classes and individual plaintiffs did not fare well at trial. Except for one default judgment that led to a class settlement,[234] no trial resulted in a final judgment for a plaintiff class. Of the three trials that found for individual plaintiffs, one judgment was vacated and remanded for dismissal, one judgment was vacated with a resulting $1 damage award for the plaintiff on remand, and one defendant's appeal was dismissed. Five of the eighteen trials led to settlement during or after trial, including the default judgment case mentioned above that was settled during an appeal, two certified cases after partial judgments for the class, and two non-certified cases.

Some have theorized that trials are more common in (b)(2) actions, because they often pursue still developing legal theories, and less common in (b)(3) actions where large sums are often at stake.[235] This did not appear to be the case in the small number of trials we studied. Four of the eighteen trials were in cases filed as (b)(2) class actions without any (b)(3) claims. Three were certified; one was not. An additional three noncertified civil rights actions did not specify a 23(b) type, but they also could have been of the pure (b)(2) variety. Thus, as many as seven of the eighteen trials involved (b)(2) issues with no (b)(3) issues. The same number of other trials involved classes seeking large dollar recoveries: five (b)(3) securities classes[236] and two (b)(2)/(b)(3) Title VII classes.[237]

---

232. The percentage of certified class actions in which a trial began ranged from 0% to 14% in the four districts (see Figure 56).

233. We did, however, gather data on the percentage of class action cases in which a trial date was entered on the docket (see Figure 62), the percentage of certified cases in which a trial date was entered on the docket (see Figure 56), the timing of the first entry of the trial date (see Figures 63 and 64), and the timing of the scheduled trial date (see Figures 65 and 66). The four study districts entered a trial date within two years of the filing of the complaint in over 40% of the cases for which trial dates were entered (see Figure 64). One district set a trial date in all of its cases within the first two years of the case. *See supra* § 14(a)(ii) for a discussion of the effect of setting a trial date on settlement.

234. In one certified case, the plaintiff class won a default judgment after the defendant failed to appear on the first day of the jury trial.

235. Cooper, *supra* note 6, at 33.

236. These five were jury trials, generally involving fraud issues, with all but one of the classes certified.

237. Both were combination jury/bench trial cases, one certified and the other not.

*Class Actions*

The remaining four trials concerned a certified class's (b)(3) contract claim, an uncertified b(3) ERISA claim, and (b)(2)/(b)(3) tort claims in cases in which the case file did not indicate that large dollars were at stake. No prisoner cases went to trial. More specific information on the eighteen trials is presented below.

*Data on Jury Trials.* Ten of the eighteen trials were before a jury (see Table 43). All but one resulted in decisions for the defendant or in settlement by the parties. The verdicts generally survived appeals, except for one reversal in part of a directed verdict.

Among the eighteen trials, cases involving (b)(3) claims had a higher rate of trial by jury than cases without (b)(3) claims. Seventy percent of the trial cases with (b)(3) claims went to jury trial, compared to 25% of the cases filed under (b)(2) alone.[238]

### (i) Certified cases with jury trials

Six of the ten jury trials involved class issues in certified cases. The class was not successful in four of these cases, including three securities cases and one contracts case. These four verdicts for defendants survived appeal. The fifth of the six jury trials in certified cases was a jury/bench combination in a protracted Title VII case that eventually settled, but only after nonfinal judgments for one large subclass on the issue of defendant's liability and for the defendant on its liability to a second subclass. In the sixth certified case, the plaintiff class won a default judgment; the court of appeals dismissed the appeal of that ruling after the parties settled.

### (ii) Noncertified cases with jury trials

Four of the ten jury trials were in cases not certified as class actions. In one securities case, the parties settled during the trial. In two civil rights cases, individual plaintiffs lost at trial; the resulting appeal in one case was dismissed and in the other case the court of appeals reversed in part and affirmed in part the trial court's directed verdict. In the fourth noncertified case, a jury/bench trial combination resulted in injunctive relief and damages for the individual plaintiff on Title VII claims and partial summary judgment for the defendant on an ADEA claim; resulting cross-appeals were dismissed.

*Data on Bench Trials.* Eight of the eighteen were bench trials (see Table 44). Defendants were found not liable in four of these cases. Three were not certified and involved individual claims concerning civil rights, personal injury, and ERISA issues, with no resulting appeals in two cases and an affirmance in the third. In the one certified case, the court found defendants not liable for civil rights violations, both with respect to the class and with respect to individual plaintiffs. No one appealed.

Courts found for individual plaintiffs in two bench trials[239] but the court of appeals vacated those judgments. Finally, two cases settled during, or immediately after, the bench trial: one a certified civil rights action and the other a noncertified contracts case.

---

238. Seven out of the ten trials in cases with (b)(3) claims (alone or in combination with (b)(1) or (b)(2) claims) were jury trials, compared to one jury trial out of four trials in cases with (b)(2) claims and no (b)(3) claims.

239. In one case involving personal property damage claims, the trial court awarded $75,000 to the individual plaintiffs with no award to the certified class. In the other, a civil rights case, no class was certified.

**(b) How did class action trial rates compare with trial rates for all other civil cases within the district?**

As discussed *supra*, in section 2(b), the rate of trial (jury and bench) for class actions and other civil cases was in the 3% to 6% range in the four districts (see Table 16).

## (16) Fee/Recovery Rates

*Overview.* An overarching question concerning attorneys' fees is whether, in addition to conferring benefits on attorneys, class action outcomes confer substantial benefits on class members. The major questions posed in this section are: What were the ratios of attorneys' fees to recoveries? What methods other than lodestar have courts used to regulate fees? To what extent have methods of fee regulation taken into account the benefit to the class?

**(a) What were the ratios of attorneys' fees to recoveries?**

*Background.* Professor Cooper has referred to the "cynical belief" that "many class actions serve only to confer benefits on class counsel."[240] To address this issue, we computed a "fee-recovery rate" (attorneys' fee awards[241] divided by gross monetary settlement[242]) for certified class actions where the court approved a settlement.[243] This rate is meaningful only in "distribution cases," cases where some form of monetary benefit was available for distribution to class members after payment of attorneys' fees and expenses, notice costs, and other administrative expenses. Interestingly, in two districts 82% of certified cases that settled were distribution cases, but the comparable figure in the other two courts was 53%.[244]

    *Data and Discussion.* There were no fee awards to, and few fee requests by, counsel other than plaintiffs' counsel.[245] In most cases, net monetary distributions to the class exceeded at-

---

240. Cooper, *supra* note 6, at 34. Some argue that class counsel at times receive large fees from settlements that provide nominal benefits or only speculative benefits to the class. *See* MCL 3d, *supra* note 34, § 30.42, at 239–40. *See also* Senate Staff Report, *supra* note 8, at 73–74.

241. Fee awards exclude sanctions and out-of-pocket expenses.

242. Gross monetary settlement includes any cash payments or quantifiable benefits to class members, separate payments to class representatives, donations to charities or public interest groups, attorneys' fees and expenses awarded by the court, and administrative costs of the settlement.

243. No case that went to trial and did not settle resulted in a final judgment or verdict in favor of a class. *See supra* § 15(a).

244. In the balance of certified and settled cases, the class received some form of equitable relief, coupons, price reductions, or other benefits that the court could not quantify, that the parties did not quantify, or that led to unresolved disputes concerning value in the litigation or on appeal. We refer to these as "no distribution cases." In the *General Motors Pick-Up Truck Litigation*, the principal settlement (vacated on appeal) consisted of distribution of $1,000 coupon certificates to an estimated 5–6 million class members. Objecting class members placed economic value on the coupon distribution that differed significantly from defendant's estimates. *In re* General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 807 (3d Cir.), *cert. denied*, 116 S. Ct. 88 (1995). The fee award, vacated on appeal, was $9.5 million. *Id.* at 822.

Sometimes litigants settled on liability issues but left each class member's claim to be determined individually, such that the total amount to be distributed to the class was not known at the time of the fee award. For example, under the claims resolution procedure in one settled case, class members who filed valid claims could receive 100% of the medical insurance benefits due to them for certain medical services. The settlement did not place a dollar limit on claim recoveries. Fee awards totaled $3.7 million.

245. Defendants' counsel unsuccessfully requested fees in one case each in three districts; case files did not con-

        *Class Actions*

torneys' fees by substantial margins. The fee-recovery rate infrequently exceeded the traditional 33.3% contingency fee rate. Median rates ranged from 27% to 30%. Most fee awards in the study were between 20% and 40% of the gross monetary settlement (see Figures 67 and 68).[246]

Some distribution cases also included other class relief that the court did not quantify.[247] This occurred about a third of the time in two districts and about 17% and 25% of the time in the other two courts. To the extent that monetary value can be associated with that relief, the data presented in this subsection understate the value of gross settlement and thus possibly overstate fee-recovery rates.

The fee-recovery rate calculations discussed in this subsection do not include cases with no net monetary distribution to class members (no distribution cases), because those settlements contained only equitable or other nonquantifiable relief. Fees and costs comprised all or a large percentage of the settlement funds in those cases.[248]

### (b) How were fees calculated?

*Background.* In most study cases—as in most class actions generally—the court awarded attorneys' fees under the century-old common fund doctrine.[249] Traditionally, in determining fees in common fund cases, courts included the size of the fund as a principal factor and frequently

tain the amounts sought. Parties other than plaintiffs or defendants requested fees in two cases in only one district. The first was a $300,000 fee application by nonlead counsel relating to legal services performed before the court appointed lead counsel pursuant to a competitive bidding process. Although the court declined to award the requested fees from the settlement fund, the order stated that nonlead counsel might be entitled to fees on the basis of *quantum meruit*. In the other case, counsel for an objecting class member unsuccessfully requested $131,000 in fees.

246. In one district, N.D. Cal., the median fee award to class counsel was $1.5 million, with an average fee award of approximately $2.5 million. In the other three districts, the median and average fee awards were smaller—with medians ranging between $0.6 million and approximately $1 million and averages from just under $0.75 million to approximately $1.4 million (see Figure 69). However, the N.D. Cal. average fee award was within the range of the other three districts if one excludes the district's largest fee award ($13.9 million).

N.D. Cal. also had the highest median ($5.1 million) and average ($10 million) gross monetary settlement. In comparison, the other three districts' median settlement amounts were between just under $2 million and approximately $3 million, with average amounts between $3.2 and $4.7 million (see Figure 70). For N.D. Cal., even if the largest settlement ($73.6 million) is excluded, the district still had a comparatively large mean settlement amount ($7.2 million). However, some perspective is offered by looking at the district's average gross monetary settlement per notice sent, which was only slightly above the comparable average for the other three districts combined.

247. For example, in one case, class counsel valued the settlement's "noncash" benefits at $8.3 million in addition to the $9.9 million monetary distribution. In another case, the defendant supplemented the $487,000 monetary distribution by agreeing to implement practices designed to increase the representation of women and African-Americans in its workforce.

248. *See supra* note 244. Typically, the only payments defendants made in these cases were to attorneys, class representatives, and noticing companies. We will refer to these payments collectively as "settlement costs." Fee awards as a percentage of these settlement costs were 96%, 91%, 88%, and 80% on the average for the four districts (see Table 45). The median percentage of gross settlement amounts attributable to costs of administering the settlement (primarily notice) was 2% across the four districts in the 29 cases for which data were available. In these cases, the median amount of such expenses was $100,000.

249. The principle governing the doctrine is that "persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense." Boeing Co. v. Van Gemert, 444 U.S. 472, 478–79 (1980). *See also* Mills v. Electric Auto-Lite Co., 396 U.S. 375, 392 (1970). *See generally* Alan Hirsch & Diane Sheehey, Awarding Attorneys' Fees and Managing Fee Litigation 5-48 & 75-88 (Federal Judicial Center 1994).

based awards on what the court considered to be a reasonable percentage of the fund.[250] In the early 1970s, courts began moving away from this approach toward the lodestar method, under which the fee award is calculated by multiplying the hours reasonably expended times the reasonable hourly rates.[251] In the 1980s, however, the pendulum swung again and courts began to reconsider the lodestar method.[252]

In federal courts today, a threshold question in determining fees in common fund cases is "whether the jurisdiction requires use of the lodestar method or whether it requires, permits, or has yet to rule upon the propriety of a percentage fee award."[253] In recent years, the trend has been toward the percentage of recovery method.[254] For example, the Court of Appeals for the Eleventh Circuit has required the percentage method in common fund class actions.[255] The Third,[256] Seventh,[257] and Ninth[258] Circuits authorize either the lodestar or the percentage method.

---

250. A basic premise of the percentage of recovery method is that a common fund is "itself the measure of success . . . [and] represents the benchmark from which a reasonable fee will be awarded." 3 Newberg & Conte, *supra* note 55, § 14.03, at 14-4. *See also* Camden I Condominium Ass'n v. Dunkle, 946 F.2d 768, 774 (11th Cir. 1991).

251. Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp., 487 F.2d 161, 167 (3d Cir. 1973). The Supreme Court never formally adopted the lodestar method in a common fund case. MCL 3d, *supra* note 34, § 24.121, at 189.

252. The latest swing away from lodestar received momentum from a footnote in a 1984 Supreme Court decision that distinguished between calculation of fees under fee-shifting statutes (where "a reasonable fee reflects the amount of attorney time reasonably expended") and under the common fund doctrine ("where a reasonable fee is based on a percentage of the fund bestowed on the class"). Blum v. Stenson, 465 U.S. 886, 900 n.16 (1984).

Additional momentum came in 1985 when a Third Circuit task force, formed to examine court-awarded attorneys' fees, recommended the percentage of recovery method for common fund cases. Court Awarded Attorneys' Fees, Report of the Third Circuit Task Force, *reprinted in* 108 F.R.D. 237, 255–56 (1985) [hereinafter Task Force Report]. The Task Force Report discussed criticism by courts, commentators, and members of the bar. Criticism included that lodestar has proven to be difficult to apply, time-consuming to administer, inconsistent in result, and capable of manipulation to reach a predetermined result. *Id.* at 246–53.

253. MCL 3d, *supra* note 34, § 24.121, at 188 (footnotes omitted).

254. *Id.* at 189.

255. *See* Camden I Condominium Ass'n v. Dunkle, 946 F.2d 768, 774 (11th Cir. 1991) ("Henceforth in this circuit, attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class.").

256. For example, in evaluating which method the district court could use, the Third Circuit stated recently that "the court may select the lodestar method in some non-statutory fee cases where it can calculate the relevant parameters (hours expended and hourly rate) more easily than it can determine a suitable percentage to award." *In re* General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 821 (3d Cir.), *cert. denied,* 116 S. Ct. 88 (1995).

257. *See, e.g., In re* Continental Ill. Sec. Litig., 962 F.2d 566, 572 (7th Cir. 1992) (fee award simulating "what the market in fact pays not for the individual hours but for the ensemble of services rendered in a case of this character" would be appropriate); Florin v. NationsBank of Georgia, 34 F.3d 560, 565 (7th Cir. 1994); Harmon v. Lymphomed, 945 F.2d 969, 975 (7th Cir. 1991). Although permitting either method, the Seventh Circuit has expressed a preference for the percentage method. *In re Continental Illinois,* 962 F.2d at 572–73.

258. Six Mexican Workers v. Arizona Citrus Growers, 904 F.2d 1301, 1311 (9th Cir.1990) (allowing use of either percentage or lodestar calculation method in common fund case). *See also In re* Washington Pub. Power Supply Sys. Sec. Litig., 19 F.3d 1291, 1295 (9th Cir. 1994). In Paul, Johnson, Alston & Hunt v. Graulty, 886 F.2d 268, 272 (9th Cir. 1989), the Ninth Circuit held that the percentage method is particularly suited for cases with multiple claims where it would be difficult to identify what fees directly relate to the claims that created the fund.

Proponents of the percentage method believe that it encourages early settlements and provides benefits to efficient counsel who under a lodestar approach might be penalized, rather than rewarded, for their efficiency.[259] The percentage method also saves the court from the cumbersome task of closely scrutinizing lodestar fee petitions to determine whether the hours claimed were reasonably spent for the benefit of the class.[260]

At the same time, the percentage method has been criticized because, when strictly applied, it can result in windfalls to class counsel in cases with very large settlements. Conversely, class attorneys can be penalized if they take on challenging cases that yield small monetary recoveries.[261] The method has also been criticized because it encourages early settlement and, thus, might deny the class a potentially more generous recovery that further litigation could bring.[262]

In a relatively small number of study cases, the court awarded fees pursuant to fee-shifting statutes, such as the one governing civil rights claims,[263] rather than under the common fund doctrine. Although over the past decade the percentage method has gained favor in common fund cases, lodestar remains the accepted method in fee-shifting cases.[264] Given that the common fund doctrine applies in most class actions, we will concentrate our discussion on that doctrine.

*Data and Discussion.* For all certified and settled cases in the study, lodestar was used more frequently than the percentage method in only one district, E.D. Pa. (see Figure 71). Even in that district, however, the percentage method was used nearly as much as lodestar. By contrast, N.D. Cal. determined fees by percentage of recovery 6:1 over lodestar and N.D. Ill. nearly 2:1

259. "Objections to the lodestar method were based on the . . . premise that attorneys pad their hours and otherwise engage in unethical activities to enhance their fees, and that key decisions pertaining to settlement are affected by counsel fees." Downs, *supra* note 50, at 667. *See also* 3 Newberg & Conte, *supra* note 55, § 14.03, at 14-3 to 14-7 and cases in nn. 17–20; Kirchoff v. Flynn, 786 F.2d 320, 324 (7th Cir. 1986) (lodestar creates an incentive to run up hours in relation to the stakes of the case); *In re* Oracle Sec. Litig., 131 F.R.D. 688, 693–97 (N.D. Cal. 1990) (same). For additional problems identified with the lodestar method, see Monique Lapointe, Note, *Attorneys' Fees in Common Fund Actions*, 59 Fordham L. Rev. 843, 847-61 (1991).

260. *See* Skelton v. General Motors Corp., 860 F.2d 250, 253 (7th Cir. 1988), *cert. denied*, 493 U.S. 810 (1989).

261. Cooper, *supra* note 6, at 34.

262. Some critics maintain that settlement sometimes occurs when class counsel determines that the case has reached its point of diminishing returns from the fees perspective, with class counsel viewing the additional attorney time necessary to obtain a larger class recovery as not cost beneficial. *See generally* John C. Coffee, Jr., *The Unfaithful Champion: The Plaintiff as Monitor in Shareholder Litigation*, Law & Contemp. Probs., Summer 1985, at 5, 41–44 [hereinafter Coffee, *Unfaithful Champion*]. *See also* John C. Coffee, Jr., *The "New Learning" on Securities Litigation*, N.Y.L.J., Mar. 25, 1993, at 5 [hereinafter Coffee, *New Learning*]. For a discussion of conflicts of interest that these situations create between class counsel and the class, see generally MCL 3d, *supra* note 34, § 30.16.

263. *See, e.g.*, Civil Rights Act of 1964, 42 U.S.C. § 1988 (1988) (public accommodation and employment discrimination cases). Such statutes specifically authorize recovery of attorneys' fees by the prevailing party. Whether the award is mandatory or permissive depends on the terms of the particular statute and applicable case law. MCL 3d, *supra* note 34, § 24.11. The availability of statutory fees is driven by public policy, encouraging private enforcement of substantive rights under the law. Statutory fee cases often produce only nominal damages or declaratory judgments—the kind of results that usually cannot be quantified. *See generally* Lapointe, *supra* note 259, at 865–67 (discussion of the differences between statutory fee and common fund cases).

264. Blanchard v. Bergeron, 489 U.S. 87, 94 (1989) (indicating that lodestar approach is the centerpiece of attorneys' fee awards in a statutory fee case (citing Hensley v. Eckerhart, 461 U.S. 424 (1983))); Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 565 (1986); Blum v. Stenson, 465 U.S. 886, 897 (1984). *See generally* Hirsch & Sheehey, *supra* note 249, at 19-44.

*Findings*

over lodestar. It appeared that the percentage method was the exclusive method in S.D. Fla. (see Figure 71).

Interestingly, S.D. Fla., which did not use lodestar, had the lowest average rate (24%) while E.D. Pa., which used lodestar the most, had the highest average fee-recovery rate (30%) (see Figure 68). The differences were not as pronounced for median fee-recovery rates, which ranged from 27% (S.D. Fla.) to 30% (N.D. Ill.) (see Figure 68).[265] Factors other than selection of fee-calculation method, of course, may have contributed to these results. Moreover, similar differences in mean and median fee-recovery rates were found when we looked only at cases using the percentage of recovery method (see Figure 72).

The four courts differed in their approaches to fee calculation depending on whether or not the settlement created a fund for distribution to the class. In certified cases with net monetary distributions to class members (distribution cases), the percentage method was far more prevalent than lodestar (see Figure 73). As one would expect, in settlements where the only benefits to the certified class were those that could not be easily quantified (no distribution cases), courts generally used lodestar or relied on consensual fee determinations (see Figure 74).

We will first discuss distribution cases. In the three districts where the appellate courts have authorized either fee-calculation method, lodestar was used in less than 10% of the distribution cases in two districts but in a third of the cases in E.D. Pa.[266] (see Figure 73). In all four districts, judges determined fees using the percentage method in 45% or more of the distribution cases. Percentage of recovery appeared to be the sole method used in S.D. Fla.[267] In N.D. Cal., judges used it in 78%[268] of the distribution cases, compared to about 60%[269] in N.D. Ill. and 45%[270] in E.D. Pa.[271] (see Figure 73).

In no distribution cases, lodestar was the dominant method in two districts (see Figure 74). In the other two districts, findings were less informative because, in all but a few cases, the parties consented on fees or the method used was not apparent from case files. In all four districts, nine cases were determined by lodestar and three by percentage of recovery (see Figure 74).[272] It appears that in many cases the court opted for lodestar when it could not quantify the value of class benefits, making a percentage of recovery calculation problematic.

---

265. Generally, the study could not measure the degree to which higher fee-recovery rates reflected high quality work done, efforts to pursue challenging but deserving claims, or other factors. See discussion of fee adjustments and multipliers *infra* § 16 (c).

266. The mean and median fee-recovery rates in E.D. Pa. distribution cases using lodestar were 30% and 28%, respectively, compared to 28% and 27% using the percentage method.

267. In S.D. Fla., all percentage method cases involved securities issues.

268. In N.D. Cal., over 80% of the percentage method cases involved securities issues. None involved civil rights claims.

269. In N.D. Ill., 60% were securities cases; 10% involved civil rights.

270. In E.D. Pa., nearly 90% were securities cases; no cases involved civil rights.

271. In one case each in two districts, the court applied both the lodestar and percentage of recovery methods (see Figure 73). These cases are included in the percentages cited above. In addition, we could not determine the method the court used in about 20% of the distribution cases where generally the parties stipulated to a fee award and the court approved all or most of the stipulated amount.

272. In 50% or more of the cases, parties stipulated to fees or the fee method was otherwise unknown.

Civil rights claims were generally more prevalent in no distribution cases.[273] In part, this explains the higher lodestar usage in no distribution cases; lodestar is the appropriate method when the court applies a fee-shifting statute.[274]

*The Percentage Method.* Median fee-recovery rates for distribution cases ranged from 27% to 30% when the percentage method was used, consistent with precedents in the four districts' respective courts of appeals (see Figure 72). For example, recently the Third Circuit cited an E.D. Pa. decision that noted that fee awards have ranged from 19% to 45% of the common fund.[275] In recent decisions, the Seventh[276] and Eleventh[277] Circuits have discussed benchmarks or ranges of 20% to 30%. In addition, the Eleventh Circuit has instructed district courts to apply the twelve *Johnson* factors[278] and other pertinent factors[279] in determining the fee percentage. The Ninth Circuit has indicated that 25% should be the "benchmark"[280] for such awards, subject to adjustment upward or downward to account for any unusual circumstances involved in a case.[281] When federal district courts across the country use the percentage of recovery method for common fund cases, most select a percentage in a range from 25% to 30% of the fund.[282]

*Other Methods.* To prevent a windfall to plaintiffs' counsel in cases where the settlement fund is unusually large, some courts have used the lodestar method[283] or a sliding scale percentage

---

273. Civil rights cases represented 44%, 0%, 19%, and 40% of cases with no net monetary distribution to the class, compared to 6%, 11%, 11%, and 9% of cases where the class received net monetary distributions.

274. *See supra* note 264.

275. *In re* General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 822 (3d Cir.), *cert. denied*, 116 S. Ct. 88 (1995) (citing *In re* SmithKline Beckman Corp. Sec. Litig., 751 F. Supp. 525, 533 (E.D. Pa. 1990)).

276. *See* Florin v. NationsBank of Georgia, 60 F.3d 1245, 1248 (7th Cir. 1995) (quoting *In re* Unisys Corp. Retiree Medical Benefits ERISA Litig., MDL No. 969, 1995 WL 130679, at *12 (E.D. Pa. Mar. 22, 1995) ("'the benchmark in common fund cases is 20%–30%'").

277. Camden I Condominium Ass'n, Inc. v. Dunkle, 946 F.2d 768, 774–75 (11th Cir. 1991) (noting that percentage method is "better reasoned" for common fund cases and that the "majority of common fund fee awards fall between 20% and 30% of the fund"). In addition, the Eleventh Circuit stated, as a general rule, that 50% may be established as an upper limit. *Id.*

278. Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717–19 (5th Cir. 1974).

279. The other factors include "the time required to reach a settlement, whether there are any substantial objections by class members or other parties to the settlement terms or the fees requested by counsel, any non-monetary benefits conferred upon the class by settlement, and the economics involved in prosecuting a class action." *Camden I*, 946 F.2d at 775. *See* discussion of fee enhancements *infra* § 16(c).

280. "A benchmark is a single percentage figure used over and over again, regardless of the type of litigation or the size of the recovery." Lapointe, *supra* note 259, at 867, n.165.

281. *See* Six Mexican Workers v. Arizona Citrus Growers, 904 F.2d 1301, 1311 (9th Cir. 1990) (25% of $850,000 in damages: a percentage award "should be adjusted or replaced . . . when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors"). *See also* Paul, Johnson, Alston & Hunt v. Graulty, 886 F.2d 268, 272 (9th Cir. 1989) (25% of a $4,736,000 recovery); *In re* Pacific Enterprises Sec. Litig., 47 F.3d 373, 379 (9th Cir. 1995) (an award of 33% was justified because of the complexity of the issues and the risks). See discussion of fee enhancements *infra* § 16 (c).

282. MCL 3d, *supra* note 34, § 24.121, at 189 (25%–30% range). *See also* Hirsch & Sheehey, *supra* note 249, at 68 (20%–30% range).

283. *In re* Washington Public Power Supply Sys. Litig., 19 F.3d 1291, 1297 (9th Cir. 1994) ("the 25% 'benchmark' is of little assistance" in a case where the settlement fund was large ($687 million)).

---

method with the percentage to be awarded decreasing as the size of the fund increases (sliding scale percentage method).[284] Only one case in the study had a gross monetary settlement amount greater than $50 million.[285] The fee-recovery rate in that N.D. Cal. case was 19%, below the Ninth Circuit benchmark of 25%.[286]

In another case, as part of a bidding process for lead class counsel, the court selected a fee structure that included the sliding scale percentage method. In addition, the fee percentage under this structure would be discounted by 20% if the case settled within the first year of litigation (an early settlement discount). That is, in addition to the sliding scale based on settlement amount, the class would also receive a discount on fees if the case settled early.[287] Such discounts generally are intended to keep class counsel from settling prematurely, under the theory that early settlement is likely to be advantageous to class counsel but detrimental to the class.[288] Some ascribe to this theory in particular with respect to cases with large potential recoveries where, as described above,[289] the sliding scale percentage method would decrease the fee percentage as the size of the fund increases. To offset any incentives for attorneys to settle early and obtain fees at a higher percentage of a smaller settlement, the early settlement discount has been introduced as a disincentive to premature settlement.

### (c) How was benefit to the class taken into account?

*Overview.* In determining fee awards, the courts often included consideration of the extent to which the class benefited from the settlement. We looked for the following as indicators: (1) use of the percentage of recovery method, (2) any adjustments to the lodestar amount based on results achieved, and (3) whether the court considered any fee objections.

Using this somewhat limited data-gathering technique, it was apparent that the court took class benefits into account in at least 80% of the distribution cases in two districts and at least 68% and 51% of the time in the other two districts (see Figure 73).[290] In the balance of the dis-

---

284. *See* Task Force Report, *supra* note 252, at 256. *See also* Florin v. NationsBank of Georgia, 60 F.3d 1245 (7th Cir. 1995) ("fee awards usually fall in the 13 percent–20 percent range for funds of $51–$75 million, and in the 6 percent–10 percent range for funds of $75–$200 million"). *See also* Coffee, *New Learning, supra* note 262, at 7 n. 13 and accompanying text. But, it has been noted:

> A percentage is a relative concept and one court's award of twenty-five percent of a $19.3 million recovery does not mean that the percentage continues to be reasonable when applied to a $4.7 million recovery. Thus, the notion that a percentage falling within a certain range is reasonable is inherently misleading.

Lapointe, *supra* note 259, at 868 & n.170.

285. Stender v. Lucky Stores, Case No. 88-1467 (N.D. Cal. filed April 22, 1988).

286. The parties stipulated to attorneys' fees and the court awarded the full amount of the fee request.

287. *In re* Oracle Sec. Litig., 132 F.R.D. 538, 541 (N.D. Cal. 1990). The selected fee structure was as follows:

| Recovery (in millions) | Time for Resolution | |
|---|---|---|
| | 0–12 months | 13 or more months |
| Up to $1 | 24% | 30% |
| $1–$5 | 20% | 25% |
| $5–$15 | 16% | 20% |
| $15 or more | 12% | 15% |

288. *See supra* note 262 and accompanying text.

289. *See supra* note 283.

290. This is in contrast to Professor Downs' findings that "class attorneys received substantial awards . . . with

---

*Class Actions*

tribution cases, case files did not provide sufficient information on fee-award rationale, often because awards were based on consent of the parties or unadjusted lodestar calculations. Given this, we generally could not determine whether or not the courts considered class benefits in their fee decisions for these cases. To the extent that they did, the percentages cited above are understated.

*Background on fee adjustments and multipliers.* One method courts have used to take class benefits and other considerations into account has been to apply enhancements or reductions to fee awards.[291] In common fund cases, the trend had been that fee enhancements, where not otherwise prohibited, should be reserved for the rare case in which the standard fee-calculation method will not adequately compensate the professional.

One method used to enhance fees has been to apply a multiplier to the lodestar amount.[292] In the past, the Seventh Circuit suggested limiting multipliers to a 200% increase in the lodestar.[293] The majority of courts, however, had not imposed such limits.[294]

*Data and discussion on fee adjustments and multipliers.* In two cases, the lodestar was enhanced by a multiplier. In each case, the multiplier was approximately 2.5 times the lodestar amount, resulting in a $765,000 (34%) fee award on a $2.2 million gross settlement in one case

---

little or no judicial scrutiny." Downs, *supra* note 50, app. at 710–11 (Chart D).

291. When counsel request fee enhancements, arguments generally are that the case was especially difficult, that the ultimate results produced exceptional benefits for the class, or that performance was otherwise superior. Counsel also sometimes asks for adjustments to reflect the novelty of the issues presented, risk of nonpayment, and delay in payment (loss of use of money). *See* Hirsch & Sheehey, *supra* note 249, at 69–70; 3 Newberg & Conte, *supra* note 55, § 14.03. *See also* Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717–19 (5th Cir. 1974) (twelve factors to be used in determining attorneys' fees); Kerr v. Screen Extras Guild, Inc., 526 F.2d 67, 70 (9th Cir. 1975), *cert. denied*, 425 U.S. 951 (1976); Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 562–66 (1986) (Delaware Valley I) (in the context of fee-shifting statutes, *Johnson* factors are subsumed within the lodestar amount absent extraordinary circumstances).

292. In a decision that might have affected the use of multipliers in study cases, on June 24, 1992, the Supreme Court barred risk multipliers (fee enhancers that account for counsel's risk of nonpayment) in statutory fee-shifting cases. City of Burlington v. Dague, 505 U.S. 557 (1992). The decision, however, did not address specifically whether risk multipliers remain available in common fund cases. The effect of *Dague* on study cases (i.e., cases terminated in the four districts between July 1, 1992, and June 30, 1994) is unclear; the relevant appellate courts did not begin to interpret the decision in the class action context until March 1994.

The Seventh and Ninth Circuits concluded that *Dague* does not extend to common fund cases. *See* Florin v. NationsBank of Georgia, 34 F.3d 560, 564–65 (7th Cir. 1994) (op. dated Sept. 8, 1994); *In re* Washington Public Power Supply System Sec. Litig., 19 F.3d 1291, 1300 (9th Cir. 1994) (holding that district court erred by refusing to award risk multiplier to lodestar calculation) (op. dated Mar. 23, 1994). On the other hand, a recent Third Circuit opinion, interrupting *Dague*, could be read to prohibit the use of multipliers for lodestar enhancement in common fund class actions. *In re* General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 822 (3d Cir.), *cert. denied*, 116 S. Ct. 88 (1995).

293. Skelton v. General Motors Corp., 860 F.2d 250, 258 (7th Cir. 1988), *cert. denied*, 493 U.S. 810 (1989). *But see In re* Superior Beverage/Glass Container Consol. Pretrial, 133 F.R.D. 119, 132 (N.D. Ill. 1990) (awarding multipliers ranging from 1.5 to 2.5, depending on each attorney's contribution). *See also In re* Continental Ill. Sec. Litig., 750 F. Supp. 868, 896 (N.D. Ill. 1990) (no multiplier allowed), *rev'd*, 962 F.2d 566, 569 (7th Cir. 1992). These three cases were not in the study.

294. *See* Richard B. Schmitt, *Shareholders Suits Pay Attorneys Less*, Wall St. J., Feb. 1, 1991, at B1, col. 4.

---

*Findings*                                                                                                    75

and a \$9.5 million fee award in the *General Motors Pick-Up Truck* settlement recently vacated on appeal.[295]

The dearth of enhancers or other adjustments in study cases might be related to the frequent use of the percentage method where the selected percentage itself can incorporate the factors that previously resulted in fee adjustments. Similarly, there is a trend, and in fee-shifting cases a mandate, to incorporate those factors into the lodestar components. Also, it is possible that, prior to 1994 appellate decisions affecting two of the study courts, *Dague* had a chilling effect on enhancements in common fund cases.[296]

### (d) What percentage of the fee amounts requested were awarded and how often were objections and appeals filed concerning fees?

*Data and Discussion.* We looked at how frequently the court awarded fee amounts less than counsel requested. Again, we found differences depending on the calculation method used. In the three districts that used the lodestar, courts granted lodestar amounts less than requested in 22%, 17%, and 33% of the cases. By contrast, when these same three courts used the percentage method, they reduced fee requests in 43%, 9%, and 16% of certified case settlements, respectively. The fourth district did not use lodestar and apparently did not reduce percentage method requests. Regardless of the method, the vast majority of awards were 90% to 100% of the request.

Class members, or other interested parties, did not object to fees very often; objections were filed with respect to five out of thirty-four (15%) fee awards in one court, three of eleven (27%) in another, five of thirty-four (15%) in the third, and seven of twenty-eight (25%) in the fourth district. An objection was filed in only one lodestar case (representing 11% of lodestar cases in that district and 6% of lodestar cases in the four districts combined). In contrast, rates of fee objection were higher in cases using the percentage method[297] (see Figure 75). Since objections were filed in percentage method cases 4.5 times as often as under lodestar, these results could be read to indicate that objections are more likely under the percentage method. However, one must also consider that notices of proposed settlement identified fee-related amounts[298] in 33% of the lodestar cases compared to 78% of percentage method cases. That is, for all four districts combined, class members in percentage cases were given information about fee amounts 2.4 times as often as in lodestar cases. Even considering this, however, there appeared to be less propensity to object under lodestar for some reason. Note, however, that one cannot extrapolate these data on a small number of cases to all class actions nationwide; factors other than those discussed here may have caused these results.

Appeals were filed in 15% to 34% of study cases (*see infra* § 20). For three of the four districts, 3% to 7% of these appeals (four or fewer per district) involved attorneys' fees issues,[299]

---

295. *In re* General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 822 (3d Cir.), *cert. denied*, 116 S. Ct. 88 (1995).

296. *See supra* note 292.

297. The rate reflects the number of percentage method cases with at least one fee objection divided by the number of percentage method cases.

298. These notices described the proposed settlements and either stated the amount or range of fees or the percentage of the settlement fund to be allocated to fees, subject to court approval.

299. Not including appeals on sanctions.

often accompanying appeals on other issues. In the fourth district, three fee-related appeals constituted 25% of the court's class action appeals. All fee-related appeals were challenges to the award, denial, or reduction of plaintiffs' counsel fees. In total, for the four districts, there were ten such appeals. One of these cases, the *General Motors Pick-Up Truck Litigation*, resulted in vacating a "settlement class" settlement that included $9.6 million in fee awards. The other appeals ended in fee-award affirmance (two cases), appeal dismissal (two cases), reversal of denial of fees (one case), vacating the trial court's reduction of fees (one case), and remanding for reconsideration (one case). The other two appeals were pending (see Tables 51 to 54).

## (17) Trivial Remedies; Other Remedies

### (a) How frequently did certified (b)(3) classes lead to relief that is relatively trivial in comparison to attorneys' fees?

Study results did not show recurring situations where (b)(3) actions produced nominal class benefits in relation to attorneys' fees. (*See also supra* § 1(a) for a discussion of the average recovery per individual class member and of cases in which the average individual recovery was less than $100.) We gauged this by determining, for each certified case with (b)(3) recovery, what percentage of the gross monetary settlement was paid to class counsel. This fee-recovery rate exceeded 40% in 11% of settled cases in two districts and in less than 5% of settled cases in the other two courts (see Figure 67).[300] In half of these cases, case files provided information that helped explain the "high" rates. For example, in some cases, monetary relief was accompanied by nonquantifiable (b)(2) benefits, such as a permanent injunction for the benefit of the class. In other cases, the settlement produced relatively small payments to the class as well as to attorneys for the class.[301] (For a more detailed discussion of fee-recovery rates, *see supra* § 16(a).)

In the four districts, in twelve cases that were certified *solely* under Rule 23(b)(3), attorneys' fees were awarded but no objectively quantifiable monetary relief was awarded to the class. Table 46 summarizes the relief and the attorneys' fee awards in those cases. Assessing whether the relief is trivial in relation to the fees calls for subjective judgments that we leave to the readers. The fee awards in these cases were generally the product of a stipulation (eight of nine cases for which information was available). In one case, the *General Motors Pick-up Truck Litigation*, the

300. The "fee-recovery rate" exceeded 40% in the following numbers of cases: two of eighteen certified settled cases with net monetary distribution in each of two districts, one of twenty-three cases in the third district, and zero of nine cases in the fourth.

301. In the case with the highest fee-recovery rate (71%), a $34,000 monetary class recovery and $83,000 fee award were accompanied by a prothonotary's agreement to place future interpleaded funds in separate interest-bearing accounts. The second highest rate (63%) involved a $3.6 million fee award, $300,000 in notice costs and a $1.8 million net cash distribution to a certified class of approximately 2,000 stockholders that incurred stock losses. The third highest rate (around 47%) was related to a $82,000 net monetary distribution to a class of terminated members of a health plan, with attorneys' fees of $76,000. The fourth largest rate (45%) was based on a $21,000 net monetary distribution and $17,500 in fees related to bank customers that received improper forms. Two other cases had high rates (just over 40% in each). One was a securities case, where the court used the percentage of recovery method but did not place a value on other nonclass benefits valued by class and settlement counsel at $8.3 million. The other was a lodestar case with a net monetary settlement of $200,000 where no noneconomic benefits were apparent in the case file. There also may have been other factors, not apparent in case files, that affected the rates at which fees were awarded.

court of appeals cast doubt on the justification for the stipulated fees when it vacated the settlement. Judges reduced substantially two of the four fee requests that were not stipulated by the parties.

**(b) How frequently did certified (b)(2) classes lead to injunctive relief that is relatively trivial in comparison to attorneys' fees?**

We looked at the percentage of certified (b)(2) cases that resulted in injunctive relief without any substantive monetary distribution. We found variation among the districts, with the percentage ranging from 0% (zero of three cases) in one district to 71% (five of seven cases) in another.[302] In just over half of these cases, attorneys' fee awards were around $50,000 or less, with injunctive relief ranging in scope from a nationwide nondiscrimination policy in a federal agency ($53,000 in fees) to a local housing authority's rewiring of dwelling units ($6,600 in fees). It appears that many would agree that the breadth of the results obtained was not trivial in comparison to the size of the fee award in these cases.

Cases with fee awards greater than $150,000 resulted in the following relief:

- improving treatment and placement opportunities for developmentally disabled Medicaid recipients ($682,681);
- entering into a consent decree concerning abortion and family planning services ($224,810 in fees); and
- readjudicating claims for survivor and disability benefits ($167,500).

The comparatively high level of fees makes it more difficult to assess their appropriateness after the fact. Given the breadth and complexity of these cases, however, many would consider the relief to be nontrivial (see Table 47).

**(c) How often were recoveries distributed to charities or the like?**

Nine percent or less of approved settlements included distribution of settlement funds to a charitable or other nonprofit organization.[303] This occurred in a total of five cases in two districts (see Table 48). One example is a settlement fund that donated $150,000 to the Chicago Bar Foundation for specific programs on domestic abuse, juvenile justice, and mentoring.

# (18) Duplicative or Overlapping Classes

*Background.* The core questions are: How common are duplicate or overlapping classes? What difficulties were posed by such classes? Case law and commentary provide us with more information than the empirical data in the study. It is clear that multiple actions that are similar or identical and brought in different forums can be problematic. Such problems include the de facto surrender of jurisdiction by a court's yielding priority to another action and intercourt and intersystem consolidation.[304] These multiple actions can result in conflicting or overlapping

---

302. The percentages of certified (b)(2) settlements that resulted in injunctive relief without any substantive monetary distribution were as follows: 71% (five of seven settled certified (b)(2) cases) in one court, 44% (seven of sixteen cases) in another district, 20% (one of five cases) in the third court, and 0% (zero of three cases) in the fourth.

303. The number of approved settlements with charitable distributions were as follows: three of thirty-four court-approved settlements in one district, two of twenty-seven settlements in another, zero of thirty-four in the third, and zero of eleven in the fourth.

304. *See, e.g.,* Garcia-Mir v. Civiletti, 32 Fed. R. Serv. 2d (Callaghan) 509 (D. Kan. 1981) (court denied certification because of the danger of overlapping classes and of wasted judicial effort; the court found that there were cases

classes that may produce inconsistent adjudications, duplication of effort, and confusion for class members, litigants, and judges.[305] "When such an overlap occurs, the individual's claims become subject to an 'irrational resolution by a race to judgment,'"[306] and "[e]ven if absent class members are permitted to opt out of any or all of the parallel lawsuits, no guarantee exists that the actions of many individual class members choosing to opt out will resolve the conflict or eliminate the overlap."[307] Problems arising from competing classes may benefit by consolidation of the actions in one court.[308]

*Data.* We found that overlapping classes generally arose in related cases that were not consolidated with similar litigation pending in federal and state courts (*see supra* § 1(b)). Our data uncovered five cases with what appeared to be duplicative or overlapping classes. The data showed that those cases generated few difficulties, if any, for the court. In several instances, the federal court avoided parallel proceedings by issuing a stay pending the completion of trial in related state litigation. Aside from our search for file references to related and consolidated cases, we did not inquire into the existence of competing class actions.

## (19) Res Judicata

*Call for Research.* There are no data from the field study on this topic. It would be interesting to pursue the extent to which opt-out plaintiffs or objecting class members filed an action on the same issues that were addressed in the class action. Our data would permit identification of counsel in those cases and a follow-up questionnaire or interview might well uncover interesting and useful data.

---

pending in another district involving the same class members and issues; the case was eventually transferred to the other district).

305. George T. Conway III, *The Consolidation of Multistate Litigation in State Courts*, 96 Yale L.J. 1099, 1101 & n.11 (1987) (quoting Kennedy, *Class Actions: The Right to Opt Out*, 25 Ariz. L. Rev. 3, 81 (1983): "Among the hypothetical parade of horribles which can be projected is the scenario in which fifty competing, national, multistate opt out class actions are brought on the same claims and all members remain silent in response to the fifty notices.").

306. *Id.* at 1121 & n.12 (citing Miller & Crump, *Jurisdiction and Choice of Law in Multistate Class Actions After Phillips Petroleum Co. v. Shutts*, 96 Yale L.J. 1, 70 (1986): "Professors Miller and Crump observe that a race to judgment among competing class actions would encourage litigants to engage in unseemly tactical behavior. 'For example, defendants could forum shop by delaying or accelerating particular actions. Plaintiffs could collude with similarly aligned parties in stalking horse litigation, diverting their opponents' attention or seeking collateral advantages such as the cumulative benefits of inconsistent discovery rulings.'" *Id.* at 1101 n.12 (quoting Miller & Crump, *supra*, at 24 (footnotes omitted))).

307. *Id.* at 1101.

308. Subclasses will often be necessary when independent actions are brought on behalf of classes that overlap or conflict with classes represented in other actions. For example, in the settling *Antibiotics* cases, well over 100 actions were filed, including several brought on behalf of nationwide classes. To avoid obvious conflicts, and to ease administrative chores, the consumer classes were redefined on a geographical basis, with states named as representatives of statewide consumer classes. 2 Newberg & Conte, *supra* note 55, § 7.31, at 7-93 to 7-94 (citing West Virginia v. Chas. Pfizer & Co., 314 F. Supp. 710 (S.D.N.Y. 1970), *aff'd*, 440 F.2d 1079 (2d Cir.), *cert. denied*, 404 U.S. 871 (1971)). "Similarly, nonsettling *Antibiotics* actions were upheld as statewide classes after being transferred for coordinated pretrial proceedings." *Id.* at 7-94 (citing *In re* Coordinated Pretrial Proceedings in Antibiotics Antitrust Actions, 333 F. Supp. 278 (S.D.N.Y. 1971), *nonsettling actions transferred*, 320 F. Supp 586 (J.P.M.L. 1970).

*Findings*                                                                 79

## (20) Appeals

*Background: Proposed Revision to Rule 23.* Under the final judgment rule,[309] orders granting or denying class certification are interlocutory and generally not appealable until the entry of a final judgment;[310] however, in certain cases courts have allowed interlocutory appeal under the limited exceptions of 28 U.S.C. §§ 1292(a) and (b).[311] Generally,

> [c]lass action certification rulings involve some factual analysis and thus do not qualify as "a controlling question of law as to which there is substantial ground for difference of opinion . . . . " [28 U.S.C. § 1292(b).] In short, there is little likelihood of immediate review of class action rulings even though such rulings may be crucial and controlling in the future conduct of the case.[312]

Pendent appellate jurisdiction over an otherwise unappealable order is available only to the extent necessary to ensure meaningful review of an appealable order.[313] Granting a petition for writ of mandamus for certification review is rare.[314]

The proposed revision to Rule 23 would add a provision that authorizes immediate appellate review of class certification rulings by leave of the court of appeals. As described in the draft committee note, this provision is intended to afford an opportunity for prompt correction of error before the parties incur significant litigation or settlement costs.[315] The underlying theory is that class certification rulings very often have make-or-break significance for the litigation,

---

309. Federal "courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts." 28 U.S.C. § 1291 (1988).

310. Coopers & Lybrand v. Livesay, 437 U.S. 463, 471 (1978) (order decertifying a class is not appealable under 28 U.S.C. § 1291); Gardner v. Westinghouse Broadcasting Co., 437 U.S. 478, 480 (1978) (not appealable under 28 U.S.C. § 1292(a)(1)). *But see* Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d 176 (2d Cir. 1990) (class representative's failure to prosecute its individual claims created a final judgment: denial of class certification merged into that judgment), *cert. denied,* 498 U.S. 1025 (1991).

311. Forbush v. J.C. Penney Co., 994 F.2d 1101 (5th Cir. 1993) (interlocutory appeal reversed denial of class certification); Gay v. Waiters & Dairy Lunchmen's Union, 549 F.2d 1330 (9th Cir. 1977) (ruling on class certification that is integral to a preliminary injunction ruling, also appealed, may be reviewed pursuant to 1292(a)). *See also* Castano v. American Tobacco Co., No. 95-30725, 1996 WL 273523, at *1 (5th Cir. May 23, 1996) (certifying class certification ruling for interlocutory appeal, pursuant to 28 U.S.C. § 1292(b)). *But see* Hoxworth v. Blinder, Robinson & Co., Inc., 903 F.2d 186, 208–09 (3d Cir. 1990) (class certification not reviewable under pendent appellate jurisdiction because preliminary injunction was vacated).

312. Downs, *supra* note 50, at 701.

313. Georgine v. Amchem Products, Inc., No. 94-1925, 1996 WL 242442, at *9 (3d Cir. May 10, l996) (holding that "[t]o give full effect to the appellants' right to review of the injunction, we must reach class certification"). *Hoxworth,* 903 F.2d at 209.

314. *In re* Catawba Indian Tribe of S.C., 973 F.2d 1133 (4th Cir. 1992) (writ of mandamus will not issue unless denying certification amounted to a usurpation of judicial power); Interpace Corp. v. Philadelphia, 438 F.2d 401 (3d Cir. 1971) (writ of mandamus power is rarely exercised in class action context). *But see In re* American Medical Systems, Inc., 75 F.3d 1069, 1090 (6th Cir. 1996) (ruling that writ of mandamus to decertify nationwide plaintiff class was justified because of trial court's "total disregard of the requirements of Rule 23" in medical device products liability case): *In re* Rhone-Poulenc Rorer, Inc., 51 F.3d 1293, 1297 (7th Cir.) (mandamus justified: district court certification of class was in error and delaying review would cause irreparable harm), *cert. denied,* 116 S. Ct. 184 (1995).

315. Appellate review would be "available only by leave of the court of appeals promptly sought, and proceedings in the district court . . . are not stayed . . . unless the district judge or court of appeals so orders." Cooper, *supra* note 14, Committee Note.

*Class Actions*

with denial of certification sometimes leading to quick dismissal of the case and with granting of certification at times seen as forcing defendants to settle. (*See supra* § 14(a).) The draft committee note anticipates that orders permitting immediate appellate review will be "rare." Others speculate about whether losing parties will seek interlocutory appellate review of nearly every decision on certification.

In 1986, the Special Committee on Class Action Improvements of the ABA Section of Litigation recommended a code change that would be similar in effect to the proposed rule amendment.[316] The ABA special committee proposed amending the jurisdictional provisions of 28 U.S.C. § 1292 to permit appellate review of a certification ruling by permission of the court of appeals "with accompanying safeguards designed to deter vexatious or delaying resort to interlocutory review."[317] The ABA special committee also anticipated that orders permitting such interlocutory review would be rare.[318]

Providing for discretionary interlocutory appeal of certification rulings might dovetail with another proposed change: making some level of probable success on the merits an additional element or factor for the court to consider in deciding whether to certify a class. (*See supra* § 5(c).) Some argue that both proposed changes would affect the impact of the certification ruling on parties' bargaining power during settlement negotiations. Some maintain that allowing interlocutory appeal on certification would be even more important if Rule 23 provided for consideration of probable success on the merits, because the certification ruling would make an even stronger statement on the potential outcome of a case than under the current rule.

### (a) How often were appeals filed?

*Data.* In the four districts, the rate of filing at least one appeal in class action cases ranged from 15% to 34% (see Figure 76).[319] For this purpose, rate of appeal is defined as the number of cases in which at least one appeal was filed divided by the number of cases in the study.[320] It is important to recognize, however, that the pool of cases from which parties generally might appeal is far less than all class actions in the study, because study cases exhibited a high rate of settlement and settlement judgments are infrequently appealed (see Table 39 and discussion at *supra* § 14(a)). The overall rate of appeal (see Figure 76) might have been even higher had it not been for the high rate of class settlement. Significant differences in appeal rates for settled cases

---

316. The ABA special committee made this recommendation prior to the enactment of 28 U.S.C. § 1292(e) (Supp. 1993) which provides the statutory authority for using the rule-making process to permit an appeal of interlocutory orders.

317. ABA Special Committee Report, *supra* note 10, at 200. The report cited 28 U.S.C. § 1927 (1988), Fed. R. Civ. P. 7, Fed. R. App. P. 38, and inherent judicial power as "ample deterrents against abusive resort to interlocutory review." *Id.* at 211.

318. *Id.* at 211.

319. In the time study, 14% of the class actions included one or more appeals. Willging et al., *supra* note 26, at 28. For discussion and statistics on appeal rates in federal civil cases, see generally Carol Krafka et al., Stalking the Increase in the Rate of Federal Civil Appeals 6–7, n.13 (Federal Judicial Center 1995); Judith A. McKenna, Structural and Other Alternatives for the Federal Courts of Appeals: Report to the United States Congress and the Judicial Conference of the United States 29–30 (Federal Judicial Center 1993); Richard A. Posner, The Federal Courts: Crisis and Reform 89–91 (1985).

320. There are other ways to estimate appeal rates for these and other purposes. *See, e.g.,* Krafka et al., *supra* note 319, at 4–6, 21–22; McKenna, *supra* note 319, at 29 & n.57.

---

(appeal rates ranging from 9% to 21%) and nonsettled cases (ranging from 33% to 43%) were observed in three districts. In the fourth court, the rate of appeal was the same (15%) for both settled and nonsettled cases.

In three districts, noncertified cases were more likely to have one or more appeals than certified cases (see Figure 76). These findings may reflect the higher rate of settlement found in certified cases (see Table 39 and discussion at *supra* § 14(a)(i)). In the fourth district, there was no difference in appeal rates for certified and noncertified cases.

Because of the elevated stakes in trial cases, one might expect that the percentage of cases that resulted in appeal would be higher for cases that go to trial compared to those that do not. This expectation was borne out for the four districts in the aggregate. Cases in the study resulted in eighteen trials and twelve of those trials led to appeals on trial-related issues (see Tables 43 and 44),[321] a 67% rate of appeal.[322] Looking only at fully completed trials, that is, excluding four cases that settled during trial (three of which resulted in no appeal), the rate of appeal was higher (79%). Given that these rates are for a small number of trials in cases terminated in a two-year period in four districts combined, they cannot be used to predict the rates for class actions nationally. It is interesting to note, however, that these appeal rates are much higher than past findings of the nation-wide appeal rate for all civil cases that terminated by trial. For example, a 1981 study found a 24% rate of appeal after full trials in 18,500 cases terminating between 1977 and the first half of 1978.[323]

There were twelve, thirty-four, thirty-six, and fifty-six appeals in the four districts. All but two of the appeals were from a final judgment or order. Most cases with appellate review included only one appeal. Two districts experienced multiple appeals in about a third of the cases with appeals; the comparable rate for the other two districts was around 10% (see Figure 77).

### (b) How often did appeals alter the prior decision of the trial judge?

*Data: Overview of Results on Appeal.* Few of the appeals resulted in altering the prior decision of the trial judge (see Figure 78).[324] The appellate courts reversed, vacated, or remanded in full in about 15% of the appeals from three districts and 6% from the fourth.[325] Appellate decisions affirmed in full with much greater frequency—in about 50% of decided appeals in three districts and in 33% in the fourth court. The other frequent disposition was dismissal of the appeal, ei-

321. Eight of 12 appeals of trial results led to an appellate ruling and the other four appeals were dismissed (see Tables 43 and 44).

322. In computing rate of appeal, for this purpose, the numerator was the number of post-trial appeals in cases where trial commenced; the denominator was the number of study cases where a trial commenced.

323. Gordon Bermant et al., Protracted Civil Trials: Views from the Bench and the Bar, Table 6, at 41 (Federal Judicial Center 1981). *See also* J. Woodford Howard, Jr., Court of Appeals in the Federal Judicial System: A Study of the Second, Fifth, and District of Columbia Circuits, Table 2.5, at 35 (1981).

324. The disposition data shown in Figure 78 is broken down further by appeals filed by plaintiffs (see Figure 79) and defendants (see Figure 80). Figures 78–80 show the number of decided appeals, rather than the number of cases with appeals; some cases had more than one appeal.

325. These percentages were obtained by dividing the number of appellate reversals, vacations, or remands for each district by the total number of appeals filed in study cases in that district, with the denominator excluding appeals where the court of appeals had not yet issued a decision. These five excluded appeals, shown in the legend for Figure 78, amount to about 3.6% of appeals filed in study cases in the four districts combined.

*Class Actions*

ther by the court of appeals or by stipulation of the parties. This occurred at rates in the four districts ranging from 28% to 36% of decided appeals (see Figure 78).[326]

Plaintiffs were appellants more often than defendants were. Plaintiffs filed about 75% of the appeals in three districts and 85% in the fourth.[327] The preliminary time study found that plaintiffs filed 71% of the appeals in that sample of fifty-one class actions nation-wide.[328]

In the instant study, between 13% and 26% of plaintiffs' appeals were successful, in whole or in part, in reversing or vacating trial court decisions in three courts.[329] The fourth court did not have a sufficient number of appeals for this stratification (see Figure 79). Few defendants' appeals resulted in reversal or vacation (see Figure 80).

*Data: Reversals.* Generally in study cases, after appellate reversal and remand of a dispositive order, case resolution in favor of the class appeared more likely if a class had been certified prior to the appeal than if no class had been certified. While other explanations may be possible for these observations, our study data establish a plausible hypothesis that may warrant further testing.

*Reversals in Cases with Certified Classes.* Viewing the four districts as an aggregate, appellate reversals in whole or in part occurred in seven cases where the district court had certified a class prior to the appeal (see Table 49). In four of the seven cases, after the appellate court reversed a final judgment, the district court on remand approved a class settlement. The judgments appealed from in three of these four cases had been dispositive in favor of the defendants.[330] The fourth case settled despite the court of appeals reversal of summary judgment for the plaintiff class on liability. In the other three of these seven cases, the court of appeals vacated a settlement (the *General Motors Pick-Up Truck Litigation* now pending in the district court), affirmed nearly all of a summary judgment for defendants in another case (also pending), and in the third case vacated a decision in favor of defendants with instructions to dismiss the case for lack of jurisdiction.

*Reversals in Cases with No Class Previously Certified.* Thirteen reversals occurred in cases where a class was not certified before appeal, again looking at the four districts as an aggregate.

---

326. These calculations exclude appeals where no appellate disposition information was available. *See supra* note 325.

327. This is not surprising given (1) the frequency and outcome of defendant motions to dismiss some or all of plaintiff claims, (2) the frequency and outcome of plaintiff motions for class certification, and (3) the outcome of trials in study cases. For example, motions to dismiss were granted in full or in part in about 75% of the rulings on motions to dismiss in two districts and in about 48% of such rulings in the other two districts (see Table 25). The district court denied certification of a plaintiff class in about one-third of the rulings on class certification in three districts and in half of the rulings in the fourth district (*see supra* § 5). For all four districts combined, plaintiffs were unsuccessful in about 70% of the trials that commenced, not counting trials that settled before completion (see Tables 43 and 44).

328. Willging et al., *supra* note 26, at 28.

329. *See supra* note 326.

330. In the first of these three cases, an appellate panel vacated summary judgment for the defendants. In the second case, the court of appeals reversed the district court's dismissal of the case for failure to state a claim; the district court had certified a plaintiff class on the same date that it dismissed the case. In the third settled case, the court of appeals twice reversed and remanded summary judgments for the defendants, once before and once after class certification.

The aftermath of reversals in these cases did not appear as favorable to the class as where a class had been certified before the filing of the appeal (see Table 50 compared to Table 49).

All but one of the thirteen were plaintiff appeals of claim dismissal or summary judgment for the defendants.[331] Despite appellate reversal of these judgments,[332] remand led to dismissal or no substantive success on plaintiffs' original claims in all but five of the twelve cases with plaintiff appeals; three of those five remanded cases are pending in district court. Another one of the five resulted in class certification and class settlement after remand. In the one additional case, a class was certified after reversal of the first summary judgment ruling for defendants; the case eventually settled after appellate reversal of a second summary judgment ruling for defendants.[333]

*Data: Issues on Appeal.* We categorized the principal issues and related outcomes on appeal in Tables 51 through 54.

*Implications for Proposed Amendments to Rule 23.* Study data on appeals can be interpreted in several ways but they should not be viewed as predictors of the universe of class action cases nation-wide. Because study data reflect a small number of appeals in a limited time period in only four districts, we cannot make broad-based conclusions.

Current supporters of the rule change have maintained that an appellate reversal of the class certification decision could change the life of a case in ways far beyond the class certification itself. Some might read the study's reversal and remand findings to suggest that certifying a class before a plaintiffs' appeal of dismissal or summary judgment had a significant impact on the eventual outcome of the case. Not surprisingly, cases certified before such appeal had a higher likelihood of class settlement after remand than those cases with no class certification before the appeal, suggesting the potential importance to a plaintiff class of a favorable and timely ruling on certification.[334] Some also might read the data to suggest that the absence of class certification before appeal of a dispositive order may decrease the likelihood of settlement upon remand, even if the appellate ruling on the dispositive motion is fully favorable to the plaintiff.

These readings of the data parallel the general observation that certified cases settled at a higher rate than noncertified cases (*see supra* § 14(a)). These outcomes may indicate a higher

---

331. In the defendants' appeal in one case, the appellate panel vacated the district court's injunction and award of nominal damages to individual plaintiffs, resulting in nominal damages on remand.

332. For example, in one case, the court of appeals vacated partial summary judgment for the defendants with instructions to dismiss plaintiffs' claims. In another case, plaintiffs and intervenors successfully challenged the district court's dismissal of the case but were unsuccessful in getting a reversal of the denial of class certification. In a third case, the court of appeals reversed in part the grant of defendant's motion for summary judgment.

333. Interestingly, there was no district court ruling on certification prior to the initial appeal in these two settled cases, whereas in over half of the other reversal cases the trial court ruled on, but denied, class certification before the filing of the appeal.

334. Some may argue that our results illustrate that rulings on dispositive motions, before giving plaintiffs the opportunity to have their class certified, could be viewed as a detriment to plaintiffs (see Table 50). If this phenomenon is widespread beyond the four districts, plaintiffs' lawyers might conclude after considering other factors that they prefer the issuance of a certification ruling before any ruling on dispositive motions, rather than run the risk of waiting and possibly precluding any future ruling on certification. *See supra* § 14(a)(i). Some plaintiffs' counsel might see this as a reason to oppose the proposed amendment to Rule 23 that would authorize, and thus possibly promote, district court rulings on dispositive motions prior to rulings on class certification, putting aside the cost of notice problem for purposes of this discussion. *See supra* § 5(c).

level of merit in certified cases than in noncertified cases. Although one cannot conclude from our data that class certification causes settlement, class certification before appeal could be viewed as one of the factors that led to eventual settlement. But, defendants and their counsel may view these cases as illustrations to support their arguments that certification exerts pro-plaintiff pressure on defendants.

### (c) To what extent did appellate review serve to correct errors in procedural decisions relating to the class action mechanism, such as class certification?

*Data: Appeals Involving Certification.* Study results suggest that litigants infrequently seek appellate review of district court decisions involving class action mechanics, such as certification or class settlement. For example, in the four districts combined, seven cases included appeals on class certification issues (see Table 55).

Putative class representatives appealed the denial of class certification in a total of five cases; two of the denials were reversed and remanded, two were affirmed, and one appeal was dismissed. After these appellate rulings, three of the cases were dismissed without class certification and two are pending in the district court. A class was certified in one of the pending cases; nonclass claims are pending in the other case.

Parties other than class representatives filed certification appeals in two cases. In the *General Motors Pick-Up Truck Litigation*, objecting class members successfully challenged a class settlement judgment and the standards used to certify the class. And, in another case, defendants twice appealed certification of a plaintiffs' class. The appellate court deemed the first district court certification decision as interlocutory and not reviewable.[335] When the certification decision later came up for appellate review with a final order, the court of appeals affirmed class certification.

*Discussion.* There could be several explanations for the small number of appeals involving class certification. For example, most class action appeals, given that they were nearly always filed after a final judgment, may have excluded certification issues because other issues, such as the merits of the claims, may have superseded the need or feasibility of revisiting the certification issue. Also, there was no apparent opposition to certification with respect to 50% to 60% of certification orders in the study. (*See supra* § 6(a); *see also supra* § 2(a).) In about 18% of the study's certified class actions, the parties submitted a proposed settlement before or simultaneously with the first motion to certify. (*See supra* § 5(d).)

When certification is granted, some defendants might settle rather than incur the costs of litigating to final judgment and appeal.[336] Likewise, when certification is denied, individual plaintiffs might be unwilling to incur expenses disproportionate to their individual recoveries to litigate further to secure appellate review on certification.[337] These projections of the impact on

---

[335]. Hoxworth v. Blinder, Robinson & Co., Inc., 903 F.2d 186, 209 (3d Cir. 1990).

[336]. *See Cooper, supra* note 14, Committee Note.

[337]. As described *supra* in § 20(c), the court of appeals reversed the denial of certification in two of the seven cases with appeals on certification issues. Such reversals have been cited as one of the reasons for authorizing interlocutory appeals concerning certification. Under the current rule, if the denial of class certification is reversed on appeal after the entry of a final judgment in the case, putative class members can delay their decision to opt in until remand with full knowledge of the nature of the final judgment. Some have argued that this scenario gives putative class members the advantage of "one way intervention." *See Cooper, supra* note 14, Committee Note. The infre-

plaintiffs and defendants can be viewed as consistent with the reasoning offered in the ABA special committee's commentary to its 1986 recommendation on interlocutory appeal.[338]

Regardless of the reasons, the dearth of certification appeals in the study does not necessarily mean that the revised rule would not have generated more appeals in these cases had it been in effect during the study period. Some believe that, since certification is a settlement-significant event, if parties can seek appeal they will, especially defendants challenging the grant of certification. (*See supra* § 14(a)(i).) The discretionary nature of the proposed rule, however, is designed to be a guard against abuse of the appellate process.

*Estimating Appeals of Certification Rulings Under the Proposed Amendment.* Our data may be useful as a description of the number of certification appeals currently taken. One might reasonably expect at least that many interlocutory appeals under the proposed amendment. Our data cannot predict, however, how many parties will seek such appellate review and how these interlocutory appeals will affect settlement prospects.

Even though few appeals in study cases involved the certification ruling itself, an analysis of all appeals in cases with certification rulings may provide some insight into how many additional appeals the amended rule might bring. In two districts nearly two-thirds of class actions included at least one ruling on certification, nearly half did in the third district, but only 36% did in the fourth (see Figure 81). Most (84% to 100%) of the appeals in these cases occurred after the ruling on certification (see Figure 82). Appeals, of any kind, in cases with rulings on certification occurred at about the same rate (19% to 34%) as in cases without any ruling on certification (see Figure 83 compared to Figure 76).

Many believe that the appellate courts will not grant appeals of routine certification decisions. The finding that only 19% to 34% of cases with rulings on certification resulted in any appeal on any issue (see Figure 83) could support the draft committee note's statement that the number of orders granting appeal under the proposed amendment would be rare. However, as discussed above, there are strongly held views that parties will seek review of certification rulings as freely as possible and that the proposed revision adding consideration of probable success would increase the significance of the certification ruling.

*Data: Appeals on Other Class Action Issues.* In addition to the certification appeals described above, only a small number of other appeals could be identified as characteristic of class actions. Most of these were fee-award appeals (four or fewer in each district). Arguably, these are not uniquely characteristic of class actions, particularly where a fee-shifting statute applied. (*See supra* § 16(d) for a discussion of the results on these appeals.)

---

quency of these types of cases in the study does not necessarily mean that they occur as infrequently in other cases or in other districts.

338. The ABA committee commentary stated:

> If [class certification] is denied, the individual plaintiff must abandon his efforts to represent the alleged class or incur expenses wholly disproportionate to his individual recovery in order to secure appellate review of the certification ruling. If, as often happens, the individual plaintiff is unwilling to incur such an expense, the case is dismissed and the certification ruling is never reviewed. . . . Conversely, if class certification is erroneously granted, a defendant faces potentially ruinous liability and may be forced to settle a case rather than run the economic risk of trial in order to secure review of the certification ruling.

ABA Special Committee Report, *supra* note 10, at 210–11.

*Class Actions*

In addition, prospective intervenors appealed the denial of intervention in one case in one district and in two cases in another. None of the intervenors was successful on appeal.

Objecting class members sought appellate review of the fairness and reasonableness of a class settlement in only one case, the *General Motors Pick-Up Truck Litigation.* That settlement was vacated. In two other appeals, a third-party defendant challenged the district court's approval of a settlement; however, those appeals were dismissed. Finally, in one case, the trial court's disqualification of plaintiffs' counsel was affirmed as part of an appeal of the district court's decision on class certification.

In section 10(c) *supra,* we saw that the certified class actions included twenty-one objections to some aspect of the notice process. But, no appeal involved any issue related to notice to the class.

## (21) Class Action Attorneys

### (a) How extensive was the class action bar across the four districts?

*Data and Discussion.* Some have expressed concerns about the prevalence of "class action firms" that appear with great frequency in class actions across the country.[339] Related to these concerns are questions concerning conflicts of interest that arise in class actions and even allegations of collusion between class counsel, defense counsel, and representative parties in certain cases.[340]

Using court files,[341] we identified lead, co-lead, and liaison counsel[342] in 150 of the 152 certified cases in the study[343] and in 4 noncertified cases.[344] These attorneys were from 160 different law firms from across the country. In most cases, more than one firm served as class counsel and at least one of the lead attorneys was from within the district where the case was being heard.

Two-thirds of the 160 firms had offices within the district where their respective cases were pending. As one might expect given the districts studied, most of these firms had offices in the Philadelphia, Miami, Chicago, or San Francisco metropolitan areas and they appeared more often within their respective districts than in the other study districts. However, certain Philadelphia firms had offices in California or Florida and appeared frequently outside E.D. Pa.

---

339. *See generally* Janet Cooper Alexander, *Do the Merits Matter? A Study of Settlements in Securities Class Actions,* 43 Stan. L. Rev. 497, 521–22, 545–48 (1991).

340. *See generally* Coffee, *Unfaithful Champion, supra* note 262, at 37–38; Senate Staff Report, *supra* note 8, at 61–62, 73–76.

341. Court files, of course, would not identify behind-the-scenes participation by lawyers who did not enter an appearance or identify themselves in a settlement or other document.

342. For definition and discussion of lead counsel and liaison counsel, see MCL 3d, *supra* note 34, § 20.22.

343. The court docket indicated that plaintiffs in the other two certified cases appeared *pro se.*

344. In 107 certified cases and 4 noncertified cases in the study, we identified counsel from court orders appointing class counsel or from notices to the class that included the name of class counsel. These 111 cases were as follows: 31 in E.D. Pa., 12 in S.D. Fla., 36 in N.D. Ill., and 32 in N.D. Cal. In 8 of the 111 cases, liaison counsel were appointed in addition to lead or co-lead counsel; in 1 case lead counsel was appointed for a certified defendants' class.

For 43 additional certified cases where court orders or class notices did not identify lead or co-lead counsel, we assumed that plaintiffs' attorneys listed on the docket sheets were lead or co-lead counsel. There were 24 such cases in E.D. Pa., none in S.D. Fla., 15 in N.D. Ill., and 4 in N.D. Cal.

A third of the 160 firms were from outside the study districts and generally appeared as co-lead counsel. Most of these firms were from New York City (18 firms), Los Angeles (5 firms), or Washington, D.C. (5 firms). Other firms hailed from various states, including Ohio (4 firms), Minnesota (3 firms), Massachusetts (2 firms), and Michigan (2 firms).

**(b) How often did the same attorneys appear as counsel for the class in different cases and in different courts?**

*Data.* As an indication of how often the same attorneys appeared as class counsel in different cases in different courts, we looked at the firms that were lead or co-lead counsel in four or more cases.[345] For the four districts combined, there were twelve such firms in ninety-five cases. All but two were certified cases. This means that these twelve firms were lead or co-lead counsel in 63% of the certified cases in the study.

One firm was lead or co-lead in seventeen cases and liaison counsel in two cases. These nineteen cases were spread more or less evenly among three districts, with no cases in N.D. Ill. Two other firms were each lead or co-lead counsel in about fifteen cases in three districts, again with no cases in N.D. Ill. One Washington, D.C., firm was in four cases in three districts. The other eight firms appeared almost exclusively in cases in their own districts. Interestingly, among these eight firms, the three Chicago firms did not appear outside N.D. Ill. (see Table 56).

---

[345]. Each consolidation of cases is counted as one case.

*Class Actions*

# Conclusion

In this section, we summarize some of the more intriguing findings, discuss implications for policy makers, and suggest areas for future research.

*Summary of significant findings.* Based on assumptions in the ABA committee report, we expected to find considerable litigation over the appropriate Rule 23 category,[346] judicial reluctance to examine the merits of cases before ruling on class certification,[347] and limited opportunities for appeal of certification rulings before final judgment.

We found little litigation about which Rule 23 category was appropriate. This finding across four districts suggests that the need for collapsing Rule 23's three categories is not as critical as some have suggested, but the question of whether the amount of litigation we found would justify a rule change is a policy question. Further, collapsing categories could create unintended consequences, such as clouding existing case precedent on noticing, opting out, and similar matters. Our finding raises questions about the need for a rule change but could not address whether there would be any harmful effect of changing the rule.

We also found, contrary to a premise underlying the ABA special committee's recommendation, that judges frequently ruled on motions to dismiss and motions for summary judgment prior to ruling on class certification. Among judges who did not so rule, however, we cannot rule out the possibility that some may have considered the absence of express permission for precertification merits rulings to be a factor that restrained them from so ruling. Again, our data do not suggest that the proposed change would have harmful effects. An unintended, but not necessarily harmful, consequence of the proposed change might be, for example, a dramatic shift in allocating the costs of notice. Our data suggest that the parties often appear to avoid imposing the full cost of notice on the proponent of the class despite the clear ruling in *Eisen v. Carlisle & Jacqueline*.[348] Explicitly permitting precertification rulings on the merits would remove one of *Eisen*'s major premises and make the rule consistent with the general practice that we found.

Concerning interlocutory appeals,[349] study data confirmed the assumption in the ABA committee report that there are limited opportunities for appellate review, interlocutory or not, of decisions on certification. We also found limited success by appellants in altering district

---

346. ABA Special Committee Report, *supra* note 10, at 3–4 ("this problem arises frequently").

347. *Id.* at 10 ("Clarification [is needed] to eliminate confusion concerning proper treatment of pre-certification motions . . . and to authorize consideration of such motions prior to certification of the class. . . .").

348. 417 U.S. 156 (1974).

349. ABA Special Committee Report, *supra* note 10, at 10 (recommending discretionary interlocutory appellate review of rulings on certification).

court decisions generally and few appeals of certification decisions. Whether the paucity of successful appeals of certification decisions is attributable to the lack of opportunity for earlier appeals of certification decisions or to the lack of appealable issues that survive final judgment cannot be answered with our data for various reasons. For example, because parties often settled certified class actions, only dissenting class members or intervenors would have retained a right to appeal. Thus, the number of appeals we found is not necessarily a measure of the number of issues that might have been candidates for interlocutory appeal immediately after the certification decision.

Based on anecdotal evidence, we expected to find a high level of abuse in the form of attorneys' fees that were disproportionate to the class recoveries.[350] Instead we found that attorneys' fees were generally in the traditional range of approximately one-third of the total settlement. While attorneys clearly derived substantial benefits from settlements, the recoveries to the class in most cases were not trivial in comparison to the fees. But, recoveries by individual class members were in amounts that could not be expected to support individual actions. This finding confirms that many cases satisfy an underlying purpose of Rule 23, which is to provide a mechanism for the collective litigation of relatively small claims that would not otherwise support cost-effective litigation. Our findings, however, do not address the monetary value or sufficiency of plaintiffs' recoveries in relation to any monetary losses they may have incurred.

Anecdotal evidence also led us to expect to find substantial evidence of "strike suits" where filing a class action or certifying a class coerced settlement without regard to the merits of claims.[351] Instead we found that although certified cases in the study settled at a higher rate than cases not certified as class actions, there were no objective indications that settlement was coerced by class certification. Rather, we found that settlements often appeared to be the combined product of a case surviving a motion to dismiss and/or a motion for summary judgment as well as being certified as a class action. Whether the size of the potential liability affected settlement was beyond the scope of the current study.

On the other hand, we found a sizable number of cases that might be characterized as unsuccessful strike suits, that is, cases that were filed as class actions and never certified as such. Such cases were often found to be without merit and were terminated by rulings on motions to dismiss or motions for summary judgment, not by settlements, coerced or otherwise. These data suggest that judges generally rule promptly on the merits of claims and that these rulings frequently dispose of unmeritorious claims.

One of the more surprising findings was that settlement and trial rates for cases filed as class actions were not much different from settlement and trial rates for civil cases generally.[352] The findings on settlement and trial rates are consistent with a general trend toward fewer trials and more settlements in civil litigation in federal district courts.[353]

---

350. *See, e.g.,* Senate Staff Report, *supra* note 8, at 7 ("settlements yield large fees for plaintiffs' lawyers but compensate investors for only a fraction of their actual losses"); *see also* Private Securities Litigation Reform Act of 1995, 15 U.S.C.A. § 77z-1(a)(6) (West Supp. 1996) (attorneys' fees in securities class actions shall be limited to "a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class").

351. *See* text accompanying *supra* notes 100 to 109 (§ 5(c)) and notes 211 to 215 (§ 14(a)).

352. *See* text accompanying *supra* notes 46 to 49 (§ 2(b)).

353. *See* Donna Stienstra & Thomas E. Willging, Alternatives to Litigation: Do They Have a Place in the Federal District Courts 33–36, 68 (Federal Judicial Center 1995) (federal civil trial rate diminished from more than 7% to less

Addressing one of the advisory committee's fundamental questions, we found that there are significant numbers of "routine" class actions that represent relatively standard or "easy" applications of Rule 23, especially in the securities and civil rights contexts. This finding suggests that there are well-established applications of Rule 23 that might be affected by a major restructuring of class action procedures.

*Calls for research.* In many respects, this study report represents a threshold empirical look at contemporary class actions. Because of time and budget constraints, we were unable to address certain issues that the advisory committee identified and, in the course of our research, we came across additional issues that warrant further study. We noted those issues in the various sections of the report and summarize them here primarily with the hope that we might stimulate other researchers to pursue them.

There is a basic need for research to determine the incidence or volume of class actions throughout the ninety-four districts of the federal system. Nation-wide statistics on class actions are reported to and by the Administrative Office of the U.S. Courts, but that reporting is not complete. For the four courts in this study we identified the majority of cases selected for the study by using electronic searches of dockets and databases of published opinions; the majority of the study cases could not be found in the statistics reported to the Administrative Office.[354] Similar searches for a scientifically selected sample of the other ninety districts would be required to get a clear picture of the national incidence of class action activity.

The advisory committee sought information about class representatives that we were unable to provide given the limits of our time and resources. Interviews of lawyers and class representatives would be necessary, for example, to develop a clearer picture of how representatives and attorneys come to be involved in class actions. Along similar lines, interviews of nonrepresentative class members, especially those who participate in the process by filing objections, claims, or opt-out notices would provide an opportunity to examine in-depth any "grass roots" dissatisfaction with particular class action settlements.

Some researchers have attempted to assess the percentage of individual loss that class action settlements redress.[355] Surveying class members might provide a better source of information about individual damages and the percentage of those damages recovered through the class actions process. Further, an expanded analysis of the content of notices sent to class members could provide more complete information about the clarity and effectiveness of notices in communicating relevant information about settlements.[356]

Also, study of the relationship among multiple filings of class actions seems in order. We encountered related cases in state and federal courts and noted their presence.[357] A more in-depth look at such overlapping cases might provide insights into ways to improve federal–state coordination and federal management of multidistrict and intradistrict consolidations.

---

than 4% between 1970 and 1993).

354. See the section "Identification and Definition of Class Actions" in Appendix D, *infra*, and Table 57.

355. *See* Senate Staff Report, *supra* note 8, at 151–61 (summarizing studies of whether the merits matter in securities class actions).

356. *See* text accompanying *supra* notes 177 to 185 (§ 10(d)).

357. *See* text accompanying *supra* notes 32 to 41 (§2(b)).

*Conclusion*                                                                                          91

Studying the res judicata effects of class settlements or adjudication would also be another worthy candidate for further research. In a similar vein, studying the frequency and nature of satellite or subsequent litigation by class members who opt out could generate data comparing class and individual recoveries and could thereby facilitate examining the sufficiency of class action settlements.

These calls for research suggest that there is much to be done before systematic data are available to put into perspective the anecdotes and generalizations that long have been driving the debate about class actions.

# Appendix A

**PROPOSED RULE 23—1993**

**Rule 23. Class Actions.**

**(a) Prerequisites.** One or more members of a class may sue or be sued as representatives on behalf of all if—with respect to the claims, defenses, or issues certified for class action treatment—

    (1) the members are so numerous that the joinder of all is impracticable;

    (2) legal or factual questions are common to the class;

    (3) the representative parties' positions typify those of the class;

    (4) the representative parties and their attorneys are willing and able to fairly and adequately protect the interests of all persons while members of the class until relieved by the court from that fiduciary duty; and

    (5) a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

**(b) Whether a Class Action Is Superior.** The matters pertinent in deciding under (a)(5) whether a class action is superior to other available methods include:

    (1) the extent to which separate actions by or against individual members might result in

        (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for the party opposing the class, or

        (B) adjudications that, as a practical matter, would dispose of the nonparty members' interests or reduce their ability to protect their interests;

    (2) the extent to which the relief may take the form of an injunction or declaratory judgment respecting the class as a whole;

    (3) the extent to which common questions of law or fact predominate over any questions affecting only individual members;

    (4) the class members' interests in individually controlling the prosecution or defense of separate actions;

    (5) the extent and nature of any related litigation already begun by or against members of the class;

    (6) the desirability or undesirability of concentrating the litigation in the particular forum; and

    (7) the likely difficulties in managing a class action which will be eliminated or significantly reduced if the controversy is adjudicated by other available means.

**(c) Determinations by Order Whether Class Action To Be Certified; Notice and Membership in Class; Judgment; Multiple Classes and Subclasses.**

    (1) As soon as practicable after persons sue or are sued as representatives of a class, the court must determine by order whether and with respect to what claims, defenses, or issues the action should be certified as a class action.

(A)  An order certifying a class action must describe the class and determine whether, when, how, and under what conditions putative members may elect to be excluded from, or included in, the class. The matters pertinent to this determination will ordinarily include:

(i) the nature of the controversy and the relief sought;

(ii) the extent and nature of the members' injuries or liability;

(iii) potential conflicts of interest among members;

(iv) the interest of the party opposing the class in securing a final and consistent resolution of the matters in controversy; and

(v) the inefficiency or impracticality of separate actions to resolve the controversy.

When appropriate, a putative member's election to be excluded may be conditioned upon a prohibition against maintaining a separate action on some or all of the matters in controversy in the class action or a prohibition against its relying in a separate action upon any judgment rendered or factual finding in favor of the class, and a putative member's election to be included in a class may be conditioned upon its bearing a fair share of litigation expenses incurred by the representative parties.

(B) An order under this subdivision may be conditional, and may be altered or amended before final judgment.

(2) When ordering that an action be certified as a class action under this rule, the court must direct that appropriate notice be given to the class under subdivision (d)(1)(C). The notice must concisely and clearly describe the nature of the action; the claims, defenses, or issues with respect to which the class has been certified; the persons who are members of the class; any conditions affecting exclusion or inclusion in the class; and the potential consequences of class membership. In determining how, and to whom, notice will be given, the court may consider the matters listed in (b) and (c)(1)(A), the expense and difficulties of providing actual notice to all class members, and the nature and extent of any adverse consequences that class members may suffer from a failure to receive actual notice.

(3) The judgment in an action certified as a class action, whether or not favorable to the class, must specify or describe those who are members of the class or have elected to be excluded on conditions affecting any separate actions.

(4) When appropriate, an action may be certified as a class action with respect to particular claims, defenses, or issues, by or against multiple classes or subclasses. Subclasses need not separately satisfy the requirements of subdivision (a)(1).

**(d) Orders in Conduct of Class Actions.**

(1) In the conduct of actions to which this rule applies, the court may make appropriate orders that:

(A) determine the course of proceedings or prescribe measures to prevent undue repetition or complication in the presentation of evidence or argument;

(B) decide a motion under Rule 12 or 56 before the certification determination if the court concludes that the decision will promote the fair and efficient adjudication of the controversy and will not cause undue delay;

(C) require notice to some or all of the class members or putative members of:

(i) any step in the action, including certification, modification, or decertification of a class, or refusal to certify a class;

(ii) the proposed extent of the judgment; or

(iii) the members' opportunity to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or otherwise to come into the action;

(D) impose conditions on the representative parties, class members, or intervenors;

94                                                                                                      *Class Actions*

    (E) require the pleadings be amended to eliminate allegations about representation of absent persons, and that the action proceed accordingly; or

    (F) deal with similar procedural matters.

  (2) An order under Rule 23 (d)(1) may be combined with an order under Rule 16, and may be altered or amended.

**(e) Dismissal or Compromise.** An action in which persons sue or are sued as representatives of a class must not, before the court's ruling under subdivision (c)(1), be dismissed, be amended to delete the request for certification as a class action, or be compromised without approval of the court. An action certified as a class action must not be dismissed or compromised without approval of the court, and notice of a proposed voluntary dismissal or compromise must be given to some or all members of the class in such manner as the court directs. A proposal to dismiss or compromise an action certified as a class action may be referred to a magistrate judge or other special master under Rule 53 without regard to the provisions of Rule 53(b).

**(f) Appeals.** A court of appeals may permit an appeal from an order granting or denying a request for class action certification under this rule upon application to it within ten days after entry of the order. An appeal does not stay proceedings in the district court unless the district judge or the court of appeals so orders.

# COMMITTEE NOTE

*Purpose of revision.* As initially adopted, Rule 23 defined class actions as "true," "hybrid," or "spurious" according to the abstract nature of the rights involved. The 1966 revision created a new tripartite classification in subdivision (b), and then established different provisions relating to notice and exclusionary rights based on that classification. For (b)(3) class actions, the rule mandated "individual notice to all members who can be identified through reasonable effort" and a right by class members to "opt-out" of the class. For (b)(1) and (b)(2) class actions, however, the rule did not by its terms mandate any notice to class members, and was generally viewed as not permitting any exclusion of class members. This structure has frequently resulted in time-consuming procedural battles either because the operative facts did not fit neatly into any one of the three categories, or because more than one category could apply and the selection of the proper classification would have a major impact on whether and how the case should proceed as a class action.

    In the revision, the separate provisions of former subdivisions (b)(1), (b)(2), and (b)(3) are combined to treat as pertinent factors in deciding "whether a class action is superior to other available methods for the fair and efficient adjudication of the controversy," which is added as subdivision (a) as a prerequisite for any class action. The issue of superiority of class action resolution is made a critical question, without regard to whether, under the former language, the case would have been viewed as being brought under (b)(1), (b)(2), or (b)(3). Use of a unitary standard, once the prerequisites of subdivision (a) are satisfied, is the approach taken by the National Conference of Commissioners on Uniform State Laws and adopted in several states.

    Questions regarding notice and exclusionary rights remain important in class actions—and, indeed, may be critical to due process. Under the revision, however, these questions are ones that should be addressed on their own merits, given the needs and circumstances of the case and without being tied artificially to the particular classification of the class action.

The revision emphasizes the need for the court, parties, and counsel to focus on the particular claims, defenses, or issues that are appropriate for adjudication in a class action. Too often, classes have been certified without recognition that separate controversies may exist between plaintiff class members and a defendant which should not be barred under the doctrine of claim preclusion. Also, the placement in subdivision (c)(4) of the provision permitting class actions for particular issues has tended to obscure the potential benefit of resolving certain claims and defenses on a class basis while leaving other controversies for resolution in separate actions.

As revised, the rule will afford some greater opportunity for use of class actions in appropriate cases notwithstanding the existence of claims for individual damages and injuries—at least for some issues, if not for the resolution of the individual damage claims themselves. The revision is not, however, an unqualified license for certification of a class whenever there are numerous injuries arising from a common or similar nucleus of facts. The rule does not attempt to authorize or establish a system for "fluid recovery" of damages, nor does it attempt to expand or limit the claims that are subject to federal jurisdiction by or against class members.

The major impact of this revision will be on cases at the margin: most cases that previously were certified as class actions will be certified under this rule, and most that were not certified will not be certified under the rule. There will be a limited number of cases, however, where the certification decision may differ from that under the prior rule, either because of the use of a unitary standard or the greater flexibility [given] notice and membership in the class.

Various non-substantive stylistic changes are made to conform to style and conventions adopted by the Committee to simplify the present rules.

*Subdivision (a).* Subdivision (a)(4) is revised to explicitly require that the proposed class representatives and their attorneys are both willing and able to undertake the fiduciary responsibilities inherent in representation of a class. The willingness to accept such responsibilities is a particular concern when the request for class treatment is not made by those who seek to be class representatives, as when a plaintiff requests certification of a defendant class. Once a class is certified, the class representatives and their attorneys will, until the class is decertified or they are otherwise relieved by the court, have an obligation to fairly and adequately represent the interests of the class, taking no action for their own benefit that would be inconsistent with the fiduciary responsibilities of the class.

Paragraph (5)—the superiority requirement—is taken from subdivision (b)(3) and becomes a critical element for all class actions.

The introductory language in subdivision (a) stresses that, in ascertaining whether the five prerequisites are met, the court and litigants should focus on the matters that are being considered for class action certification. The words "claims, defenses, or issues" are used in a broad and non-legalistic sense. While there might be some cases in which a class action would be authorized respecting a specifically defined cause of action, more frequently the court would set forth a generalized statement of the matters for class action treatment, such as all claims by class members against the defendant arising from the sale of specified securities during a particular period of time.

*Subdivision (c).* Former paragraph (2) of this subdivision contained the provisions for notice and exclusion in (b)(3) class actions.

Under the revision, the provisions relating to exclusion are made applicable to all class actions, but with flexibility for the court to determine whether, when, and how putative class

members should be allowed to exclude themselves from the class. The court may also impose appropriate conditions on such "opt-outs"—or, in some cases, even require that a putative member "opt-in" in order to be treated as a member of the class.

The potential for class members to exclude themselves from many class actions remains a primary consideration for the court in determining whether to allow a case to proceed as a class action, both to assure due process and in recognition of individual preferences. Even in the most compelling situation for not allowing exclusion—the fact pattern described in subdivision (b)(1)(A)—a person might nevertheless be allowed to be excluded from the class upon the condition that the person will not maintain any separate action and hence, as a practical matter, be bound by the outcome of the class action. The opportunity to elect exclusion from a class may also be useful, for example, in some employment discrimination action in which certain employees otherwise part of the class may, because of their own positions, wish to align themselves with the employer's side of the litigation either to assist in the defense of the case or to oppose the relief sought for the class.

Ordinarily, putative class members electing to be excluded from a plaintiff class will be free to bring their own individual actions, unhampered by factual findings adverse to the class, while potentially able, under the doctrine of issue preclusion, to benefit from factual findings favorable to the class. The revised rule permits the court, as a means to avoid this inequity, to impose a condition on "opting out" that will preclude an excluded member from relying in a separate action upon findings favorable to the class.

Rarely should a court impose an "opt-in" requirement for membership in a class. There are, however, situations in which such a requirement may be desirable to avoid the potential due process problems, such as with some defendant classes or in cases where an opt-out right would be appropriate but it is impossible or impractical to give meaningful notice of the class action to all putative members of the class. With defendant classes it may be appropriate to impose a condition that requires the "opting-in" defendant class members to share in the litigation expenses of the representative party. Such a condition would be rarely needed with plaintiff classes since typically the claims on behalf of the class, if successful, would result in common fund or benefit from which litigation expenses of the representative can be charged.

Under the revision, some notice of class certification is required for all types of class actions, but flexibility is provided respecting the type and extent of notice to be given to the class, consistent with constitutional requirements for due process. Actual notice to all putative class members should not, for example, be needed when the conditions of subdivision (b)(1) are met or when, under subdivision (c)(1)(A), membership in the class is limited to those who file an election to be members of the class. Problems have sometimes been encountered when the class members' individual interests, though meriting protection, were quite small when compared with the cost of providing notice to each member; the revision authorizes such factors to be taken into account by the court in determining, subject to due process requirements, what notice should be directed.

The revision to subdivision (c)(4) is intended to eliminate the problem when a class action with several subclasses should be certified, but one or more of the subclasses may not independently satisfy the "numerosity" requirement.

Under former paragraph (4), some issues could be certified for resolution as a class action, while other matters were not so certified. By adding similar language to other portions of the

rule, the Committee intends to emphasize the potential utility of this procedure. For example, in some mass tort situations, it might be appropriate to certify some issues relating to the defendants' culpability and—if the relevant scientific knowledge is sufficiently well developed—general causation for class action treatment, while leaving issues relating to specific causation, damages, and contributory negligence for potential resolution through individual lawsuits brought by members of the class.

*Subdivision (d).* The former rule generated uncertainty concerning the appropriate order of proceeding when a motion addressed to the merits of claims or defenses is submitted prior to a decision on whether a class should be certified. The revision provides the court with discretion to address a Rule 12 or Rule 56 motion in advance of a certification decision if this will promote the fair and efficient adjudication of the controversy. See *Manual for Complex Litigation, Second*, § 30.11.

Inclusion in the former subdivision (c)(2) of detailed requirements for notice in (b)(3) actions sometimes placed unnecessary barriers to formation of a class, as well as masked the desirability, if not need, for notice in (b)(1) and (b)(2) actions. Even if not required for due process, some form of notice to class members should be regarded as desirable in virtually all class actions. Subdivision (c)(2) requires that notice be given if a class is certified, though under subdivision (d)(1)(C) the particular form of notice is committed to the sound discretion of the court, keeping in mind the requirements of due process. Subdivision (d)(1)(C) contemplates that some form of notice may be desirable with respect to many other important rulings; subdivision (d)(1)(C)(i), for example, calls the attention of the court and litigants to the possible need for some notice if the court declines to certify a class in an action filed as a class action or reduces the scope of a previously certified class. In such circumstances, particularly if putative class members have become aware of the case, some notice may be needed informing the class members that they can no longer rely on the action as a means for pursuing their rights.

*Subdivision (e).* There are sound reasons for requiring judicial approval of proposals to voluntarily dismiss, eliminate class allegations, or compromise an action filed or ordered maintained as a class action. The reasons for requiring notice of such a proposal to members of a putative class are significantly less compelling. Despite the language of the former rule, courts have recognized the propriety of a judicially-supervised precertification dismissal or compromise without requiring notice to putative class members, e.g., *Shelton v. Pargo*, 582 F.2d 1298 (4th Cir. 1978). The revision adopts that approach. If circumstances warrant, the court has ample authority to direct notice to some or all putative class members pursuant to the provisions of subdivision (d). While the provisions of subdivision (e) do not apply if the court denies the request for class certification, there may be cases in which the court will direct under subdivision (d) that notice of the denial of class certification be given to those who were aware of the case.

Evaluations of proposals to dismiss or settle a class action sometimes involve highly sensitive issues, particularly should the proposal be ultimately disapproved. For example, the parties may be required to disclose weaknesses in their own positions, or to provide information needed to assure that the proposal does not directly or indirectly confer benefits upon class representatives or their counsel inconsistent with the fiduciary obligations owed to members of the class or otherwise involve conflicts of interest. Accordingly, in some circumstances, investigation of the fairness of these proposals conducted by an independent master can be of great benefit to the court, particularly since the named parties and their counsel have ceased to be

*Class Actions*

adversaries with respect to the proposed dismissal or settlement. The revision clarifies that the strictures of Rule 53(b) do not preclude the court from appointing under that Rule a special master to assist the court in evaluating a proposed dismissal or settlement. The master, if not a Magistrate Judge, would be compensated as provided in Rule 53(a).

*Subdivision (f).* The certification ruling is often the crucial ruling in a case filed as a class action. The plaintiff, in order to obtain appellate review of a ruling denying certification, will have to proceed with the case to final judgment and may have to incur litigation expenses wholly disproportionate to any individual recovery; and, if the plaintiff ultimately prevails on an appeal of the certification decision, postponement of the appellate decision raises the specter of "one way intervention." Conversely, if class certification is erroneously granted, a defendant may be forced to settle rather than run the risk of potentially ruinous liability of a class-wide judgment in order to secure review of the certification decision. The consequences, as well as the unique public interest in properly certified class actions, justify a special procedure allowing early review of this critical ruling.

Recognizing the disruption that can be caused by piecemeal reviews, the revision contains the provisions to minimize the risk of delay and abuse. Review will be available only by leave of the court of appeals promptly sought, and proceedings in the district court with respect to other aspects of the case are not stayed by the prosecution of such an appeal unless the district court or court of appeals so orders. The appellate procedure would be the same as for appeals under 28 U.S.C. § 1292(c). The statutory authority for using the rule-making process to permit an appeal of interlocutory orders is contained in 28 U.S.C. § 1292(e), as amended in 1992.

It is anticipated that orders permitting immediate appellate review should be rare. Nevertheless, the potential for this review should encourage compliance with the certification procedures and afford an opportunity for prompt correction of errors.

*Appendix A*

# Appendix B

**PROPOSED RULE 23—1995**

**Rule 23. Class Actions (November 1995 draft).**

**(a) Prerequisites.** One or more members of a class may sue or be sued as representative parties on behalf of all if with respect to the claims, defenses, or issues certified for class action treatment—

 (1) the members are so numerous that joinder of all members is impracticable;

 (2) there are questions of law or fact common to the class;

 (3) the representative parties' positions typify those of the class; and

 (4) the representative parties and their attorneys will fairly and adequately discharge the fiduciary duty to protect the interests of all persons while members of the class until relieved by the court from that fiduciary duty.

**(b) When Class Actions May Be Certified.** An action may be certified as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

 (1) the prosecution of separate actions by or against individual members of the class would create a risk of

  (A) inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for the party opposing the class, or

  (B) adjudications with respect to individual members of the class that would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

 (2) final injunctive or declaratory relief may be appropriate with respect to the class as a whole; or

 (3) the court finds (i) that the questions of law or fact common to the certified class predominate over individual questions included in the class action, (ii) that {the class claims, issues, or defenses are not insubstantial on the merits,} [alternative:] {the prospect of success on the merits of the class claims, issues, or defenses is sufficient to justify the costs and burdens imposed by certification}, and (iii) that a class action is superior to other available methods and necessary for the fair and efficient disposition of the controversy. The matters pertinent to these findings include:

  (A) the practical ability of individual class members to pursue their claims without class certification and their interests in maintaining or defending separate actions;

  (B) the extent and nature of any related litigation involving class members;

  (C) the desirability of concentrating the litigation in the particular forum;

  (D) the likely difficulties in managing a class action that will be avoided or significantly reduced if the controversy is adjudicated by other available means;

  (E) the probable success on the merits of the class claims, issues, or defenses;

  (F) whether the public interest in—and the private benefits of—the probable relief to individual class members justify the burdens of the litigation; and

(G) the opportunity to settle on a class basis claims that could not be litigated on a class basis or could not be litigated by [or against?] a class as comprehensive as the settlement class; or

(4) the court finds that permissive joinder should be accomplished by allowing putative members to elect to be included in a class. The matters pertinent to this finding will ordinarily include:

(A) the nature of the controversy and the relief sought;

(B) the extent and nature of the members' injuries or liability;

(C) potential conflicts of interest among members;

(D) the interest of the party opposing the class in securing a final and consistent resolution of the matters in controversy; and

(E) the inefficiency or impracticality of separate actions to resolve the controversy; or

(5) the court finds that a class certified under subdivision (b)(2) should be joined with claims for individual damages that are certified as a class action under subdivision (b)(3) or (b)(4).

**(c) Determination by Order Whether Class Action to Be Certified; Notice and Membership in Class; Judgment; Multiple Classes and Subclasses.**

(1) When persons sue or are sued as representatives of a class, the court shall determine by order whether and with respect to what claims, defenses, or issues the action should be certified as a class action.

(A) An order certifying a class action must describe the class. When a class is certified under subdivision (b)(3), the order must state when and how putative members (i) may elect to be excluded from the class, and (ii) if the class is certified only for settlement, may elect to be excluded from any settlement approved by the court under subdivision (e). When a class is certified under subdivision (b)(4), the order must state when, how, and under what conditions putative members may elect to be included in the class; the conditions of inclusion may include a requirement that class members bear a fair share of litigation expenses incurred by the representative parties.

(B) An order under this subdivision is conditional, and may be altered or amended before final judgment.

(2)(A) When ordering that an action be certified as a class action under this rule, the court shall direct that appropriate notice be given to the class. The notice must concisely and clearly describe the nature of the action, the claims, issues, or defenses with respect to which the class has been certified, the right to elect to be excluded from a class certified under subdivision (b)(3), the right to elect to be included in a class certified under subdivision (b)(4), and the potential consequences of class membership. [A defendant may be ordered to advance the expense of notifying a plaintiff class if, under subdivision (b)(3)(E), the court finds a strong probability that the plaintiff class will win on the merits.]

(i) In any class action certified under subdivision (b)(1) or (2), the court shall direct a means of notice calculated to reach a sufficient number of class members to provide effective opportunity for challenges to the class certification or representation and for supervision of class representatives and class counsel by other class members.

(ii) In any class action certified under subdivision (b)(3), the court shall direct to members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort [, but individual notice may be limited to a sampling of class members if the cost of individual notice is excessive in relation to the generally small value of individual members' claims]. The notice shall advise each member that any member who does not request exclusion may, if the member desires, enter an appearance through counsel.

*Class Actions*

(iii) In any class action certified under subdivision (b)(4), the court shall direct a means of notice calculated to accomplish the purposes of certification.

(3) Whether or not favorable to the class,

(A) The judgment in an action certified as a class action under subdivision (b)(1) or (2) shall include and describe those whom the court finds to be members of the class;

(B) The judgment in an action certified as a class action under subdivision (b)(3) shall include and specify or describe those to whom the notice provided in subdivision (c)(2)(A)(ii) was directed, and who have not requested exclusion, and whom the court finds to be members of the class; and

(C) The judgment in an action certified as a class action under subdivision (b)(4) shall include all those who elected to be included in the class and who were not earlier dismissed from the class.

(4) An action may be certified as a class action—

(A) with respect to particular claims, defenses, or issues; or

(B) by or against multiple classes or subclasses, which need not satisfy the requirement of subdivision (a)(1).

**(d) Orders in Conduct of Class Actions.**

(1) Before determining whether to certify a class the court may decide a motion made by any party under Rules 12 or 56 if the court concludes that decision will promote the fair and efficient adjudication of the controversy and will not cause undue delay.

(2) As a class action progresses, the court may make orders that:

(A) determine the course of proceedings or prescribe measures to prevent undue repetition or complication in presenting evidence or argument;

(B) require, to protect the members of the class or otherwise for the fair conduct of the action, notice to some or all members of:

(i) refusal to certify a class;

(ii) any step in the action;

(iii) the proposed extent of the judgment; or

(iv) the members' opportunity to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, to otherwise come into the action, or to be excluded from or included in the class;

(C) impose conditions on the representative parties, class members, or intervenors;

(D) require that the pleadings be amended to eliminate allegations about representation of absent persons, and that the action proceed accordingly;

(E) deal with similar procedural matters.

(3) An order under subdivision (d)(2) may be combined with an order under Rule 16, and may be altered or amended

**(e) Dismissal and Compromise.**

(1) Before a certification determination is made under subdivision (c)(1) in an action in which persons sue [or are sued] as representatives of a class, court approval is required for any dismissal, compromise, or amendment to delete class issues.

(2) An action certified as a class action shall not be dismissed or compromised without the approval of the court, and notice of a proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs.

(3) A proposal to dismiss or compromise an action certified as a class action may be referred to a magistrate judge or a person specially appointed for an independent investigation and report to

the court on the fairness of the proposed dismissal or compromise. The expenses of the investigation and report and the fees of a person specially appointed shall be paid by the parties as directed by the court.

**(f) Appeals.** A court of appeals may in its discretion permit an appeal from an order of a district court granting or denying a request for class action certification under this rule if application is made to it within ten days after entry of the order. An appeal does not stay proceedings in the district court unless the district judge or the court of appeals so orders.

## PARTIAL DRAFT ADVISORY COMMITTEE NOTE

December 12, 1995

*Subdivision (b).* Subdivision (b) has been amended in several respects. Some of the changes are designed to redefine the role of class adjudication in ways that sharpen the distinction between the aggregation of individual claims that would support individual adjudication and the aggregation of individual claims that would not support individual adjudication. Current attempts to adapt Rule 23 to address the problems that arise from torts that injure many people are reflected in part in some of these changes, but these attempts have not matured to a point that would support comprehensive rulemaking. When Rule 23 was substantially revised in 1966, the Advisory Committee Note stated: "A 'mass accident' resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses to liability, would be present, affecting the individuals in different ways. In these circumstances an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried." Although it is clear that developing experience has superseded that suggestion, the lessons of experience are not yet so clear as to support detailed mass tort provisions either in Rule 23 or a new but related rule.

The probability that a claim would support individual litigation depends both on the probability of any recovery and the probable size of such recovery as might be won. One of the most important roles of certification under subdivision (b)(3) has been to facilitate the enforcement of valid claims for small amounts. The median recovery figures reported by the Federal Judicial Center study all were far below the level that would be required to support individual litigation, unless perhaps in a small claims court. This vital core, however, may branch into more troubling settings. The mass tort cases frequently sweep into a class many members whose individual claims would easily support individual litigation, controlled by the class member. Individual class members may be seriously harmed by the loss of control. Class certification may be desired by defendants more than most plaintiff class members in such cases, and denial of certification or careful definition of the class may be essential to protect many plaintiffs. As one example, a defective product may have inflicted small property value losses on millions of consumers, reflecting a small risk of serious injury, and also have caused serious personal injuries to a relatively small number of consumers. Class certification may be appropriate as to the property damage claims, but not as to the personal injury claims.

In another direction, class certification may be sought as to individual claims that would not support individual litigation because of a dim prospect of prevailing on the merits. Certification in such a case may impose undue pressure on the defendant to settle. Settlement pressure arises in part from the expense of defending class litigation. More important, settlement pressure reflects the fact that often there is at least a small risk of losing against a very weak claim. A claim that might prevail in one of every ten or twenty individual actions gathers compelling force—a substantial settlement value—when the small probability of defeat is multiplied by the amount of liability to the entire class.

Individual litigation may play quite a different role with respect to class certification. Exploration of mass tort questions time and again led experienced lawyers to offer the advice that it is better to defer class litigation until there has been substantial experience with actual trials and decisions in individual

*Class Actions*

actions. The need to wait until a class of claims has become "mature" seems to apply peculiarly to claims that at least involve highly uncertain facts that may come to be better understood over time. New and developing law may make the fact uncertainty even more daunting. A claim that a widely used medical device has caused serious side effects, for example, may not be fully understood for many years after the first injuries are claimed. Pre-maturity [of] class certification runs the risk of mistaken decision, whether for or against the class. This risk may be translated into settlement terms that reflect the uncertainty by exacting far too much from the defendant or according far too little to the plaintiffs.

Item (ii) has been added to the findings required for class certification, and is supplemented by the addition of new factor (E) to the list of factors considered in making the findings required for certification. It addresses the concern that class certification may create an artificial and coercive settlement value by aggregating weak claims. It also recognizes the prospect that certification is likely to increase the stakes substantially, and thereby increase the costs of the litigation.

{*Version 1*} Taken to its full extent, this concern might lead to a requirement that the court balance the probable outcome on the merits against the cost and burdens of class litigation, including the prospect that settlement may be forced by the small risk of a large class recovery. A balancing test was rejected, however, because of its ancillary consequences. It would be difficult to resist demands for discovery to assist in demonstrating the probable outcome. The certification hearing and determination, already events of major significance, could easily become overpowering events in the course of the litigation. Findings as to probable outcome would affect settlement terms, and could easily affect the strategic posture of the case for purposes of summary judgment and even trial. Probable success findings could have collateral effects as well, affecting a party's standing in the financial community or inflicting other harms. And a probable success balancing approach must inevitably add considerable delay to the certification process.

The "first look" approach adopted by item (ii) is calculated to avoid the costs associated with balancing the probable outcome and costs of class litigation. The court is required only to find that the class claims, issues, or defenses "are not insubstantial on the merits." This phrase is chosen in the belief that there is a wide—although curious—gap between the higher possible requirement that the claims be substantial and the chosen requirement that they be not insubstantial. The finding is addressed to the strength of the claims "on the merits," not to the dollar amount that may be involved. The purpose is to weed out claims that can be shown to be weak by a curtailed procedure that does not require lengthy discovery or other prolonged proceedings. Often this determination will be supported by precertification motions to dismiss or for summary judgment. Even when it is not possible to resolve the class claims, issues, or defenses on motion, it may be possible to conclude that the claims, issues, or defenses are too weak to justify the costs of certification.

{*Version 2*} These risks can be justified only by a preliminary finding that the prospect of class success is sufficient to justify them. The prospect of success need not be a probability greater than 0.50. What is required is that the probability be sufficient in relation to the predictable costs and burdens, including settlement pressures, entailed by certification. The finding is not an actual determination of the merits, and pains must be taken to control the procedures used to support the finding. Some measure of controlled discovery may be permitted, but the procedure should be as expeditious and inexpensive as possible. At times it may be wise to integrate the certification procedure with proceedings on precertification motions to dismiss or for summary judgment. A realistic view must be taken of the burdens of certification—bloated abstract assertions about the crippling costs of class litigation or the coercive settlement effects of certification deserve little weight. At the end of the process, a balance must be struck between the apparent strength of the class position on the merits and the adverse consequences of class certification. This balance will always be case-specific, and must depend in large measure on the discretion of the district judge.

The prospect-of-success finding is readily made if certification is sought only for purposes of pursuing settlement, not litigation. If certification of a settlement class is appropriate under the standards discussed [with factor (G) and subdivision (e)] below, the prospect of success relates to the likelihood of reaching a settlement that will be approved by the court, and the burdens of certification are merely the burdens of negotiations that all parties are willing to pursue.

Care must be taken to ensure that subsequent proceedings are not distorted by the preliminary finding on the prospect of success. If a sufficient prospect is found to justify certification, subsequent pretrial and trial proceedings should be resolved without reference to the initial finding. The same caution must be observed in subsequent proceedings on individual claims if certification is denied.

One court's refusal to certify for want of a sufficient prospect of class success is not binding by way of res judicata if another would-be representative appears to seek class certification in the same court or some other court. The refusal to recognize a class defeats preclusion through the theories that bind class members. Even participation of the same lawyers ordinarily is not sufficient to extend preclusion to a new party. The first determination is nonetheless entitled to substantial respect, and a significantly stronger showing may properly be required to escape the precedential effect of the initial refusal to certify.

Item (iii) in the findings required for class certification has been amended by adding the requirement that a (b)(3) class be necessary for the fair and efficient [adjudication] of the controversy. The requirement that a class be superior to other available methods is retained, and the superiority finding—made under the familiar factors developed by current law, as well as the new factors (E), (F), and (G)—will be the first step in making the finding that a class action is necessary. It is no longer sufficient, however, to find that a class action is in some sense superior to other methods of [adjudicating] "the controversy." It also must be found that class certification is necessary. Necessity is meant to be a practical concept. In adding the necessity requirement, it also is intended to encourage careful reconsideration of the superiority finding without running the drafting risks entailed in finding some new word to substitute for "superior." Both necessity and superiority are together intended to force careful reappraisal of the fairness of class adjudication as well as efficiency concerns. Certification ordinarily should not be used to force into a single class action plaintiffs who would be better served by pursuing individual actions. A class action is not necessary for them, even if it would be superior in the sense that it consumes fewer litigating resources and more fair in the sense that it achieves more uniform treatment of all claimants. Nor should certification be granted when a weak claim on the merits has practical value, despite individually significant damages claims, only because certification generates great pressure to settle. In such circumstances, certification may be "necessary" if there is to be any [adjudication] of the claims, but it is neither superior nor necessary to the fair and efficient [adjudication] of the claims. Class certification, on the other hand, is both superior and necessary for the fair and efficient [adjudication] of numerous individual claims that are strong on the merits but small in amount.

Superiority and necessity take on still another dimension when there is a significant risk that the insurance and assets of the defendants may not be sufficient to fully satisfy all claims growing out of a common course of events. Even though many individual plaintiffs would be better served by racing to secure and enforce the earlier judgments that exhaust the available assets, fairness may require aggregation in a way that marshals the assets for equitable distribution. Bankruptcy proceedings may prove a superior alternative, but the certification decision must make a conscious choice about the best method of addressing the apparent problem.

Yet another problem, presented by some recent class-action settlements, arises from efforts to resolve future claims that have not yet matured to the point that would permit present individual enforcement. A toxic agent, for example, may have touched a broad universe of persons. Some have developed present injuries, most never will develop any injury, and many will develop injuries at some indefinite time in the future. Class action settlements, much more than adjudications, can be structured in ways that provide for processing individual claims as actual injuries develop in the future. Class disposition may be the only

*Class Actions*

possible means of resolving these "futures" claims. Although "necessary" in this sense, class certification—if it is ever appropriate—must be carefully guarded to protect the rights of class members who do not even have a realistic way to determine whether they may some day experience actual injury. The needs to effect meaningful notice and to protect the opportunity to opt out of the class require that any class be limited to terms that permit an individual claimant to opt out of the class and pursue individual litigation within a reasonable time after knowing both of the individual injury and the existence of the class litigation.

Factor (E) has been added to subdivision (b)(3) to complement the addition of new item (ii) and the addition of the necessity element to item (iii). The role of the probable success of the class claims, issues, or defenses is discussed with those items.

Factor (F) has been added to subdivision (b)(3) to effect a modest retrenchment in the use of class actions to aggregate trivial individual claims. It bears on the item (iii) requirement that a class action be superior to other available methods and necessary for the fair and efficient [adjudication] of the controversy. It permits the court to deny class certification if the public interest in—and the private benefits of—probable class relief do not justify the burdens of class litigation. This factor is distinct from the evaluation of the probable outcome on the merits called for by item (ii) and factor (E). At the extreme, it would permit denial of certification even on the assumption that the class position would certainly prevail on the merits.

Administration of factor (F) requires great sensitivity. Subdivision (b)(3) class actions have become an important private means for supplementing public enforcement of the law. Legislation often provides explicit incentives for enforcement by private attorneys-general, including qui tam provisions, attorney-fee recovery, minimum statutory penalties, and treble damages. Class actions that aggregate many small individual claims and award "common-fund" attorney fees serve the same function. Class recoveries serve the important functions of depriving wrongdoers of the fruits of their wrongs and deterring other potential wrongdoers. There is little reason to believe that the Committee that proposed the 1966 amendments anticipated anything like the enforcement role that Rule 23 has assumed, but there is equally little reason to be concerned about that belief. What counts is the value of the enforcement device that courts, aided by active class-action lawyers, have forged out of Rule 23(b)(3). In most settings, the value of this device is clear.

The value of class-action enforcement of public values, however, is not always clear. It cannot be forgotten that Rule 23 does not authorize actions to enforce the public interest on behalf of the public interest. Rule 23 depends on identification of a class of real persons or legal entities, some of whom must appear as actual representative parties. Rule 23 does not explicitly authorize substituted relief that flows to the public at large, or to court- or party-selected champions of the public interest. Adoption of a provision for "fluid" or "cy pres" class recovery would severely test the limits of the Rules Enabling Act, particularly if used to enforce statutory rights that do not provide for such relief. The persisting justification of a class action is the controversy between class members and their adversaries, and the final judgment is entered for or against the class. It is class members who reap the benefits of victory, and are bound by the res judicata effects of victory or defeat. If there is no prospect of meaningful class relief, an action nominally framed as a class action becomes in fact a naked action for public enforcement maintained by the class attorneys without statutory authorization and with no support in the original purpose of class litigation. Courts pay the price of administering these class actions. And the burden on the courts is displaced onto other litigants who present individually important claims that also enforce important public policies. Class adversaries also pay the price of class enforcement efforts. The cost of defending class litigation through to victory on the merits can be enormous. This cost, coupled with even a small risk of losing on the merits, can generate great pressure to settle on terms that do little or nothing to vindicate whatever public interest may underlie the substantive principles invoked by the class.

The prospect of significant benefit to class members combines with the public values of enforcing legal norms to justify the costs, burdens, and coercive effects of class actions that otherwise satisfy Rule 23 requirements. If probable individual relief is so slight as to be essentially trivial or meaningless, however, the core justification of class enforcement fails. Only public values can justify class certification. Public values do not always provide sufficient justification. An assessment of public values can properly include reconsideration of the probable outcome on the merits made for purposes of item (ii) and factor (E). If the prospect of success on the merits is slight and the value of any individual recovery is insignificant, certification can be denied with little difficulty. But even a strong prospect of success on the merits may not be sufficient to justify certification. It is no disrespect to the vital social policies embodied in much modern regulatory legislation to recognize that the effort to control highly complex private behavior can outlaw much behavior that involves merely trivial or technical violations. Some "wrongdoing" represents nothing worse than a wrong guess about the uncertain requirements of ambiguous law, yielding "gains" that could have been won by slightly different conduct of no greater social value. Disgorgement and deterrence in such circumstances may be unfair, and indeed may thwart important public interests by discouraging desirable behavior in areas of legal indeterminacy.

Factor (G) is added to resolve some, but by no means all, of the questions that have grown up around the use of "settlement classes." Factor (G) bears only on (b)(3) classes. Among the many questions that it does not touch is the question whether it is appropriate to rely on subdivision (b)(1) to certify a mandatory non-opt-out class when present and prospective tort claims are likely to exceed the "limited fund" of a defendant's assets and insurance coverage. This possible use of subdivision (b)(1) presents difficult issues that cannot yet be resolved by a new rule provision. Subdivisions (c)(1)(A)(2) and (e) also bear on settlement classes.

A settlement class may be described as any class that is certified only for purposes of settling the claims of class members on a class-wide basis, not for litigation of their claims. The certification may be made before settlement efforts have even begun, as settlement efforts proceed, or after a proposed settlement has been reached.

Factor (G) makes it clear that a class may be certified for purposes of settlement even though the court would not certify the same class, or might not certify any class, for litigation. At the same time, a (b)(3) settlement class continues to be controlled by the prerequisites of subdivision (a) and all of the requirements of subdivision (b)(3). The only difference from certification for litigation purposes is that application of these Rule 23 requirements is affected by the differences between settlement and litigation. Choice-of-law difficulties, for example, may force certification of many subclasses, or even defeat any class certification, if claims are to be litigated. Settlement can be reached, however, on terms that surmount such difficulties. Many other elements are affected as well. A single court may be able to manage settlement when litigation would require resort to many courts. And, perhaps most important, settlement may prove far superior to litigation in devising comprehensive solutions to large-scale problems that defy ready disposition by traditional adversary litigation. Important and even vitally important benefits may be provided for those who, knowing of the class settlement and the opportunity to opt out, prefer to participate in the class judgment and avoid the costs of individual litigation.

For all the potential benefits, settlement classes also pose special risks. The court's Rule 23(e) obligation to review and approve a class settlement commonly must surmount the informational difficulties that arise when the major adversaries join forces as proponents of their settlement agreement. Objectors frequently appear to reduce these difficulties, but it may be difficult for objectors to obtain the information required for a fully informed challenge. The reassurance provided by official adjudication is missing. These difficulties may seem especially troubling if the class would not have been certified for litigation, particularly if the action appears to have been shaped by a settlement agreement worked out even before the action was filed.

*Class Actions*

These competing forces are reconciled by recognizing the legitimacy of settlement classes but increasing the protections afforded to class members. Subdivision (c)(1)(A)(ii) requires that if the class was certified only for settlement, class members be allowed to opt out of any settlement after the terms of the settlement are approved by the court. Parties who fear the impact of such opt-outs on a settlement intended to achieve total peace may respond by refusing to settle, or by crafting the settlement so that one or more parties may withdraw from the settlement after the opt-out period. The opportunity to opt out of the settlement creates special problems when the class includes "futures" claimants who do not yet know of the injuries that will one day bring them into the class. As to such claimants, the right to opt out created by subdivision (c)(1)(A)(ii) must be held open until the injury has matured and for a reasonable period after actual notice of the class settlement.

The right to opt out of a settlement class is meaningless unless there is actual notice. Actual notice in turn means more than exposure to some official pronouncement, even if it is directly addressed to an individual class member by name. The notice must be actually received and also must be cast in a form that conveys meaningful information to a person of ordinary understanding. A class member is bound by the judgment in a settlement-class action only after receiving actual notice and a reasonable opportunity to opt out of the judgment.

Although notice and the right to opt out provide the central means of protecting settlement class members, the court must take particular care in applying some of Rule 23's requirements. Definition of the class must be approached with care, lest the attractions of settlement lead too easily to an over-broad definition. Particular care should be taken to ensure that there are no disabling conflicts of interests among people who are urged to form a single class. If the case presents facts or law that are unsettled and that are likely to be litigated in individual actions, it may be better to postpone any class certification until experience with individual actions yields sufficient information to support a wise settlement and effective review of the settlement.

When a settlement class seems premature, the same goals may be served in part by forming an opt-in class under subdivision (b)(4). An opt-in class will bind only those whose actual participation guarantees actual notice and voluntary choice. The major difference, indeed, is that the opt-in class provides clear assurance of the same goals sought by requiring actual notice and a right to opt out of a settlement-class judgment. Other virtues of opt-in classes are discussed separately with subdivision (b)(4).

*Subdivision (f).* This permissive interlocutory appeal provision is adopted under the power conferred by 28 U.S.C. § 1292(e). Appeal from an order granting or denying class certification is permitted in the sole discretion of the court of appeals. No other type of Rule 23 order is covered by this provision. It is designed on the model of § 1292(b), relying in many ways on the jurisprudence that has developed around § 1292(b) to reduce the potential costs of interlocutory appeals. The procedures that apply to the request for court of appeals permission to appeal under § 1292(b) should apply to a request for permission to appeal under Rule 23(f). At the same time, subdivision (f) departs from § 1292(b) in two significant ways. It does not require that the district court certify the certification ruling for appeal, although the district court often can assist the parties and court of appeals by offering advice on the desirability of appeal. And it does not include the potentially limiting requirements of § 1292(b) that the district court order "involve[] a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation."

Only a modest expansion of the opportunity for permissive interlocutory appeal is intended. Permission to appeal should be granted with great restraint. The Federal Judicial Center study supports the view that many suits with class action allegations present familiar and almost routine issues that are no more worthy of immediate appeal than many other interlocutory rulings. Yet several concerns justify some expansion of present opportunities to appeal. An order denying certification may confront the plaintiff with a situation in which the only sure path to appellate review is by proceeding to final judgment on the mer-

its of an individual claim that, standing alone, is far smaller than the costs of litigation. [The prior draft added that if a plaintiff class is certified after judgment for the representative plaintiffs, the result may be "one-way" intervention. That does not seem much of a concern to me—if indeed there is a valid claim on the merits, why should we be concerned that the late-certified class members have not had to take a sporting chance on losing their valid claims?] An order granting certification, on the other hand, may force a defendant to settle rather than incur the costs of defending a class action and run the risk of potentially ruinous liability. These concerns can be met at low cost by establishing in the court of appeals a discretionary power to grant interlocutory review in cases that show appeal-worthy certification issues.

The expansion of appeal opportunities effected by subdivision (f) is indeed modest. Court of appeals discretion is as broad as under §1292(b). Permission to appeal may be granted or denied on the basis of any consideration that the court of appeals finds persuasive. Permission is most likely to be granted when the certification decision turns on a novel or unsettled question of law. Such questions are most likely to arise during the early years of experience with new class-action provisions as they may be adopted into Rule 23 or enacted by legislation. Permission almost always will be denied when the certification decision turns on case-specific matters of fact and district court discretion.

The district court, having worked through the certification decision, often will be able to provide cogent advice on the factors that bear on the decision whether to permit appeal. This advice can be particularly valuable if the certification decision is tentative. Even as to a firm certification decision, a statement of reasons bearing on the probable benefits and costs of immediate appeal can help focus the court of appeals decision, and may persuade the disappointed party that an attempt to appeal would be fruitless.

The 10-day period for seeking permission to appeal is designed to reduce the risk that attempted appeals will disrupt continuing proceedings. It is expected that the courts of appeals will act quickly in making the preliminary determination whether to permit appeal. Permission to appeal does not stay trial court proceedings. A stay should be sought first from the trial court. If the trial court refuses a stay, its action and any explanation of its views should weigh heavily with the court of appeals.

*Class Actions*

# Appendix C

## Figures and Tables

The following figures and tables are generally derived from data collected in the field study described in Appendix D. One exception is Table 19, which is based on data derived from the Federal Judicial Center's district court time study and a review of relevant pleadings in class actions in the time study. *See* discussion *infra* Appendix D.

Another exception relates to the data supporting Figures 7–10 and Tables 16–17. The data for the class action cases in those figures and tables come from the class action field study that is the subject of this report. The comparison data for nonclass cases come from the Federal Judicial Center's Integrated Data Base (IDB), which is a compilation of records and case status reports routinely sent by clerks of court to the Administrative Office of the United States Courts. The Center makes the IDB available to the public through the Inter-University Consortium for Political and Social Research, which is located at the University of Michigan, Ann Arbor, Michigan 48109-1248. The IDB number is ICPSR # 8429.

As discussed in the Introduction and in Appendix D, we present these figures and data to describe the class action activity in four district courts in cases terminated within the study period. We present the data and figures as a systematic examination of class action activity in those four courts in cases terminated between July 1, 1992, and June 30, 1994. We caution the reader not to read too much into the data and especially not to draw inferences and conclusions about the universe of class activity. Data on subsets of the data elements, such as nature-of-suit categories or types of class actions, are particularly susceptible to misinterpretation because of their small numbers. For example, differences among districts in such cases may simply represent chance fluctuations or little more than that.

**Figure 1: Median Net Settlement Per Class Member in Settled, Certified Class Actions**



**Figure 2: Median Net Settlement Per Class Member in Settled, Certified Securities Class Actions**



*Class Actions*

**Figure 3: Median Net Settlement Per Class Member in Settled, Certified Nonsecurities Class Actions**



**Figure 4: Mean and Median Times from Filing of Complaint to Multidistrict Litigation Consolidation**



**Figure 5: Mean and Median Number of Cases Within Each Consolidation by the District Courts**



*Missing value = 1.

**Figure 6: Percentage of Related Cases Not Consolidated with Similar Litigation Pending in Federal and State Courts**



*Class Actions*

**Figure 7: Settlement Rates for Nonprisoner Class Actions Compared to Nonprisoner Civil Actions in Cases Terminated Between July 1, 1992, and June 30, 1994**



*Source:* Nonclass: Federal Judicial Center integrated database of Administrative Office data; Class: Federal Judicial Center class action project database (see first paragraph, Appendix D). The two data sets refer to civil cases terminated between July 1, 1992, and June 30, 1994. The Administrative Office data on settlement for the study cases differed from our data for the same set of cases. The differences were not consistently in the same direction. Overall, the Administrative Office data showed 190 settlements in the four districts compared to 214 in the Federal Judicial Center database. The settlement rates and numbers shown by the Administrative Office data for class cases were 64% (69), 41% (24), 47% (51), and 49% (46), respectively.

**Figure 8: Settlement Rates for Securities Class Actions Compared to Securities Civil Actions**



*Source:* Nonclass: Federal Judicial Center integrated database of Administrative Office data; Class: Federal Judicial Center class action project database (see first paragraph, Appendix D). The two data sets refer to civil cases terminated between July 1, 1992, and June 30, 1994. The Administrative Office data on settlement differed from our data for the same set of cases. The differences were not consistently in the same direction. Overall, the Administrative Office data showed fifty-seven settlements in the four districts compared to sixty-nine in the Federal Judicial Center database. The settlement rates shown by the Administrative Office data for securities class actions were 80% (twenty-four), 27% (four), 52% (twelve), and 49% (seventeen), respectively.

**Figure 9: Median Time from Filing to Disposition of Nonprisoner Class Actions Compared to Nonprisoner Civil Actions**



*Source:* Nonclass: Federal Judicial Center integrated database of Administrative Office data, Class: Federal Judicial Center class action project database (see first paragraph, Appendix D).

**Figure 10: Median Time from Filing to Disposition of Securities Class Actions Compared to Securities Civil Actions**



*Source:* Nonclass: Federal Judicial Center integrated database of Administrative Office data, Class: Federal Judicial Center class action project database (see first paragraph, Appendix D).

*Appendix C*                                                                 117

**Figure 11: Rule 23(b) Certifications**



*Note:* Data exclude combinations of types.

**Figure 12: Cases with Intradistrict Consolidation**



*Class Actions*

**Figure 13: Cases Referring to a Related Federal or State Case**



**Figure 14: Cases with Multidistrict Litigation Consolidation or Intradistrict Consolidation or Related Case**



**Figure 15: Certified Class Actions in Which Class Representatives Were Changed**



**Figure 16: Certified, Settled, Approved Class Actions with Separate Award to Class Representatives**



*Class Actions*

**Figure 17: Median Amount of Separate Awards to Class Representatives in Certified, Settled, Approved Class Actions**



**Figure 18: Median and 75th Percentile of Award per Individual Class Representatives in Certified, Settled, Approved Class Actions**



**Figure 19: Time from Filing of Complaint to Filing of Motion for Class Certification**



**Figure 20: Time from Filing Motion for Class Certification to Judicial Ruling on Certification Issue**



*Class Actions*

**Figure 21: Length of Time from Filing of Complaint to Settlement in Settled Cases**



**Figure 22: Length of Time from Ruling on Certification Motion to Settlement in Settled Cases**



**Figure 23: Length of Time from Filing of Complaint to Termination**



\*Missing value = 1.

**Figure 24: Timing of Rulings on Motions to Dismiss in Relation to Rulings on Class Certification**



*Class Actions*

**Figure 25: Timing of Rulings on Motions for Summary Judgment in Relation to Rulings on Class Certification**



**Figure 26: Type of Party Filing Motion for Summary Judgment**



**Figure 27: Rulings on Motions for Summary Judgment**



**Figure 28: Percentage of Rulings Granting Dismissal or Summary Judgment**



*Class Actions*

**Figure 29: Percentage of Oppositions to Motions to Certify and Sua Sponte Orders Regarding Certification**



*Note:* Data include only those cases where either a motion to certify was filed or a sua sponte order issued.

**Figure 30: Percentage of Submissions of Opposition Memoranda to Certification Motions and Sua Sponte Orders Regarding Certification**



**Figure 31: Supporting and Opposition Brief Lengths in Cases with Opposition to Motion for Certification or Sua Sponte Orders Regarding Certification**



**Figure 32: Length of Judicial Opinions in Certified and Noncertified Cases with Certification Disputes**



*Class Actions*

**Figure 33: Arguments Raised in Cases Opposing Motion for Class Certification or Sua Sponte Order Regarding Certification**



**Figure 34: Number of Party-Filed Motions For or Against Class Certification**



**Figure 35: Certified Subclasses and Nature of Suit**



Civil Rights
40%
(4 of 10 certified
subclasses)

ERISA
10%
(1 of 10 certified
subclasses)

Securities
50%
(5 of 10 certified
subclasses)

**Figure 36: Class Notice Issued as a Percentage of Certified Class Actions**



*Note:* Data are missing for some cases in two districts.

*Class Actions*

**Figure 37: Time from Ruling on Certification to Notice of Certification for Cases in Which Notice Was Issued**



**Figure 38: Median Number of Recipients of Individual Notice in Certified (b)(3) Class Actions**



**Figure 39: Percentage of Contests of the Notice Process in Cases with Notice**



**Figure 40: Percentage of Settled Class Actions with Notice Where Notice Includes the Gross Amount of the Settlement**



*Note:* The balance of the cases for each court had missing or inapplicable data.

*Class Actions*

**Figure 41: Percentage of Settled Class Actions with Notice Where Notice Included Amount or Percentage of Attorneys' Fees**



*Note:* The balance of the cases for each court had missing or inapplicable data. In some cases, notices included both the percentage and amount of attorneys' fees.

**Figure 42: Percentage of Settled Class Actions with Notice Where Notice Included Amounts for Administration or Other Expenses**



*Note:* The balance of the cases had missing or inapplicable data.

**Figure 43: Percentage of Certified 23(b)(3) Class Actions with One or More Opt Outs**



**Figure 44: Percentage of Certified 23(b)(3) Civil Rights, ERISA, Securities, and Other Class Actions with One or More Opt Outs**



*Class Actions*

**Figure 45: Percentage of Certified, Settled 23(b)(3) Class Actions with One or More Opt Outs of a Proposed Settlement**



**Figure 46: Percentage of Certified, Settled 23(b)(3) Class Actions with One or More Opt Outs from a Proposed Settlement by Nature of Suit**



**Figure 47: Percentage of Certified (b)(3) Class Actions with One or More Opt Outs from Certification or Settlement**



**Figure 48: Net Settlement Value Per Class Member of Certified, Settled Rule 23(b)(3) Classes With or Without One or More Opt Outs**



[*] The trimmed mean statistic is, like the mean (average) and the median (midpoint), a measure of the central tendency of a set of data. In this case, to reduce the distortion of extreme values, a 10% trimmed mean was used, that is, a mean of the data after eliminating 10% of the data from the top and the bottom.

*Class Actions*

**Figure 49: Percentage of Certified, Settled Class Actions Using Claims Procedures to Distribute Settlements**



**Figure 50: Percentage of Certified, Settled Securities Class Actions Using Claims Procedures to Distribute Settlements**



**Figure 51: Percentage of Cases with Attempts of Putative Class Members to Intervene and Percentage of Cases with Interventions Allowed**



**Figure 52: Success Rates for Various Bases for Attempted Intervention by Putative Class Members**



*Note:* Some motions cited more than one source.

*Class Actions*

**Figure 53: Percentage of Settlement Approval Hearings with Participation by Class Representatives or Nonrepresentative Class Members or Objectors**



**Figure 54: Percentage of Certified Class Actions with a Ruling on a Motion to Dismiss**



*Note:* Cases certified for settlement purposes are not included.

*Appendix C*

**Figure 55: Rulings on Motions for Summary Judgment in Certified Class Actions**



*Note:* Cases certified for settlement purposes only are not included.

**Figure 56: Percentage of Certified Class Actions with Trial Date Set**



*Note:* Cases certified for settlement purposes only are not included.

*Class Actions*

**Figure 57: Percentage of Certified Class Actions with a Ruling on a Motion to Dismiss or a Motion for Summary Judgment or a Trial Date Set**



*Note:* Cases certified for settlement purposes only are not included.

**Figure 58: Percentage of Certified Class Actions with a Ruling on a Motion to Dismiss or a Motion for Summary Judgment or Both**



*Note:* Cases certified for settlement purposes only are not included.

**Figure 59: Percentage of Settlement Class Actions in Which Notice of Settlement Was Communicated to the Class**



**Figure 60: Percentage of Settlement Class Actions in Which Preliminary Findings Were Entered**



*Class Actions*

**Figure 61: Percentage of Settlement Class Actions in Which Hearings Were Held Prior to Approval of Settlement**



**Figure 62: Percentage of Cases with a Trial Date Set**



**Figure 63: Mean and Median Time from First Complaint to First Entry of Trial Date for Cases with a Trial Date Entered**



**Figure 64: Time from First Complaint to First Entry of Trial Date for Cases with Trial Date Entered**



*Class Actions*

**Figure 65: Time from First Complaint to Scheduled Trial Date—Mean and Median for Cases with Trial Date Scheduled**



**Figure 66: Time from First Complaint to Scheduled Trial Date for Cases with Trial Date Scheduled**



**Figure 67: Fee-Recovery Rate Intervals in Certified Cases with Court-Approved Settlements Providing Net Monetary Distribution to Class**



*Note:* Figures 67–70 exclude fourteen cases where the only monetary distribution was to class representatives and twenty-four cases where the only monetary distribution was for attorneys' fees or administrative expenses. These thirty-eight cases (sixteen cases in two districts and two and four cases in the other two districts) are shown in Table 45. Figures 67–70 also exclude three cases (one in each of three districts) where there was no record of a fee request or a fee award but where the court approved a class settlement providing net monetary distribution to the class. "Net monetary distribution" is net of attorneys' fees and administrative expenses. "Fee-recovery rate" is fee awards as a percentage of gross monetary settlement. "Fee award" equals the total amount of fees awarded to plaintiffs' counsel, excluding sanctions and out-of-pocket expenses. "Gross monetary settlement" includes the following where applicable: payments or quantifiable benefits to class members, separate payments to class representatives, donations to charities or public interest groups, attorneys' fees and expenses, and administrative costs of the settlement.

[*] In the case with the 63% rate, a certified class of approximately 2,000 stockholders received net cash distributions of $1.8 million for damages related to stock sales. For the 71% rate, the settlement included a relatively small amount of interest a county prothonotary agreed to pay class members related to interpleaded funds in its trust account in the past six years. In addition, the prothonotary agreed to place interpleaded funds in separate interest-bearing accounts in the future.

**Figure 68: Mean and Median Fee-Recovery Rates in Certified Cases with Court-Approved Settlements Providing Net Monetary Distribution to Class**



*Note:* Figures 67–70 exclude fourteen cases where the only monetary distribution was to class representatives and twenty-four cases where the only monetary distribution was for attorneys' fees or administrative expenses. These thirty-eight cases (sixteen cases in two districts and two and four cases in the other two districts) are shown in Table 45. Figures 67–70 also exclude three cases (one in each of three districts) where there was no record of a fee request or a fee award but where the court approved a class settlement providing net monetary distribution to the class. "Net monetary distribution" is net of attorneys' fees and administrative expenses. "Fee-recovery rate" is fee awards as a percentage of gross monetary settlement. "Fee award" equals the total amount of fees awarded to plaintiffs' counsel, excluding sanctions and out-of-pocket expenses. "Gross monetary settlement" includes the following where applicable: payments or quantifiable benefits to class members, separate payments to class representatives, donations to charities or public interest groups, attorneys' fees and expenses, and administrative costs of the settlement.

**Figure 69: Mean and Median Fee Awards in Certified Cases with Court-Approved Settlements Providing Net Monetary Distribution to Class**



*Note:* Figures 67–70 exclude fourteen cases where the only monetary distribution was to class representatives and twenty-four cases where the only monetary distribution was for attorneys' fees or administrative expenses. These thirty-eight cases (sixteen cases in two districts and two and four cases in the other two districts) are shown in Table 45. Figures 67–70 also exclude three cases (one in each of three districts) where there was no record of a fee request or a fee award but where the court approved a class settlement providing net monetary distribution to the class. "Net monetary distribution" is net of attorneys' fees and administrative expenses. "Fee-recovery rate" is fee awards as a percentage of gross monetary settlement. "Fee award" equals the total amount of fees awarded to plaintiffs' counsel, excluding sanctions and out-of-pocket expenses. "Gross monetary settlement" includes the following where applicable: payments or quantifiable benefits to class members, separate payments to class representatives, donations to charities or public interest groups, attorneys' fees and expenses, and administrative costs of the settlement.

[*] Includes one case with fee award of $13,875,000.

*Class Actions*

**Figure 70: Mean and Median Gross Monetary Settlements in Certified Cases with Court-Approved Settlements Providing Net Monetary Distribution to Class**



*Note:* Figures 67–70 exclude fourteen cases where the only monetary distribution was to class representatives and twenty-four cases where the only monetary distribution was for attorneys' fees or administrative expenses. These thirty-eight cases (sixteen cases in two districts and two and four cases in the other two districts) are shown in Table 45. Figures 67–70 also exclude three cases (one in each of three districts) where there was no record of a fee request or a fee award but where the court approved a class settlement providing net monetary distribution to the class. "Net monetary distribution" is net of attorneys' fees and administrative expenses. "Fee-recovery rate" is fee awards as a percentage of gross monetary settlement. "Fee award" equals the total amount of fees awarded to plaintiffs' counsel, excluding sanctions and out-of-pocket expenses. "Gross monetary settlement" includes the following where applicable: payments or quantifiable benefits to class members, separate payments to class representatives, donations to charities or public interest groups, attorneys' fees and expenses, and administrative costs of the settlement.

[*] Includes one case with gross settlement of $73,570,000.

*Appendix C*                                                                                                    149

**Figure 71: Fee Calculation Method in Certified Cases with Court-Approved Settlements**



[*] Includes one of two cases where the court enhanced the lodestar calculation by a 2.5 multiplier.

[**] Includes at least two cases (6% of thirty-four cases) where the court reduced the lodestar calculation by more than 25%.

**Figure 72: Mean and Median Fee-Recovery Rates in Certified Cases Using Percentage of Recovery Method and Providing Net Monetary Distribution to Class**



*Note:* "Net monetary distribution" is net of attorneys' fees and administrative expenses.

*Appendix C*

151

**Figure 73: Fee Calculation Method in Certified Cases with Court-Approved Settlements Providing Net Monetary Distribution to Class**



*Note:* "Net monetary distribution" is net of attorneys' fees and administrative expenses.

[*] Includes *Masnik v. Bolar Pharmaceutical Co., Inc.,* No. 90-4086 (E.D. Pa. filed June 15, 1990), where a 2.5 enhancer was applied to the lodestar amount.

**Figure 74: Fee Calculation Method in Certified Cases with Court-Approved Settlements Providing *No* Net Monetary Distribution to Class**



*Note:* "Net monetary distribution" is net of attorneys' fees and administrative expenses. This figure includes cases where the only monetary distribution was to class representatives, to class counsel for fees, or for administrative expenses.

*Includes *General Motors Pick-Up Truck Liability Litigation* (55 F.3d 768 (3d Cir.), *cert. denied*, 116 S. Ct. 88 (1988)), where district court used both lodestar and percentage methods, including a 2.5 multiplier applied to the lodestar amount. The award was vacated and remanded on appeal.

**Figure 75: Objections to Attorneys' Fees by Fee Calculation Method in Certified Cases with Court Approved Settlements**



[*] Percentage of recovery cases include one case with both lodestar and percentage methods.

[**] Includes fee objections in the one case involving competitive bidding by prospective lead class counsel.

**Figure 76: Percentage of Cases with at Least One Appeal (All Class Actions: Certified Cases and Noncertified Cases)**



*Class Actions*

**Figure 77: Cases with Only One Appeal and Cases with Multiple Appeals**



*Note:* E.D. Pa. = 31 cases, 36 appeals; S.D. Fla. = 11 cases, 12 appeals; N.D. Ill. = 39 cases, 53 decided appeals, 3 pending; N.D. Cal. = 23 cases, 32 decided appeals, 2 pending.

**Figure 78: Disposition on Appeal**



*Note:* E.D. Pa. = 31 cases, 36 appeals; S.D. Fla. = 11 cases, 12 appeals; N.D. Ill. = 39 cases, 53 decided appeals, 3 pending; N.D. Cal. = 23 cases, 32 decided appeals, 2 pending.

[*] Includes the Third Circuit vacating the settlement in the *General Motors Pick-Up Truck* case (55 F.3d 768 (3d Cir.), *cert. denied*, 116 S. Ct. 88 (1995)).

[**] Includes one case where party opposing the class filed a writ of mandamus which the court of appeals denied.

**Figure 79: Disposition on Appeals Brought by Plaintiffs**



*Note:* Most appeals were filed on behalf of the class; others were filed by individual plaintiffs or proposed intervenor–plaintiffs. E.D. Pa. = 31 cases, 36 appeals; S.D. Fla. = 11 cases, 12 appeals; N.D. Ill. = 39 cases, 53 decided appeals, 3 pending; N.D. Cal. = 23 cases, 32 decided appeals, 2 pending.

[*] Includes the Third Circuit vacating the settlement in the *General Motors Pick-Up Truck* case (55 F.3d 768 (3d Cir.), *cert. denied*, 116 S. Ct. 88 (1995)).

**Figure 80: Disposition on Appeals Brought by Defendants**



*Note:* Includes defendants, third-party defendants, and proposed intervenor–defendants. E.D. Pa. = 31 cases, 36 appeals; S.D. Fla. = 11 cases, 12 appeals; N.D. Ill. = 39 cases, 53 decided appeals, 3 pending; N.D. Cal. = 23 cases, 32 decided appeals, 2 pending.

**Figure 81: Percentage of Cases with Rulings on Certification**



*Class Actions*

**Figure 82: Appeals in Cases with Ruling on Certification**



**Figure 83: Number of Cases with at Least One Appeal in Cases with Ruling on Certification**



## Table 1: Certified, Settled (b)(3) Classes with Average Net Distribution < $100 Per Class Member

| Caption, Docket No., and District | Class Definition | Gross Monetary Award | Net Monetary Award/ No. of Notices Sent | Total Award to Class Representatives | Nonmonetary Relief | Attorneys' Fee Award (method) (% of gross monetary award) |
|---|---|---|---|---|---|---|
| (1) Masnik v. Bolar Pharmaceutical, No. 90-4086 (E.D. Pa. filed June 15, 1990). | Holders of SmithKline Beckman Corp. common stock who sold it during class period or who exchanged it in the merger | $2.55 M | $1.48 M/ 75,000 members = $19.69 per member | $6,000 | None | $765,000 (lodestar) (30% of gross monetary award) |
| (2) Mandel v. Mortgage & Realty, No. 90-1848 (E.D. Pa. filed Mar. 16, 1990). | Purchasers of Mortgage & Realty common stock during class period | $1.33 M | $752,705/ 17,640 members = $42.67 per member | None indicated | None | $351,467 (% of gross monetary award) (26% of gross monetary award) |
| (3) Hoxworth v. Blinder, No. 88-285 (E.D. Pa. filed Jan. 14, 1988). | Buyers and sellers of 21 companies' securities through defendant during class period | $5.27 M | $3.19 M/ 72,519 members = $44.06 per member | $21,000 | None | $1.73 M (% of recovery) (33% of gross monetary award) |
| (4) Weiner v. Meridian Bancorp., Inc., No. 90-6211 (E.D. Pa. filed Sept. 26, 1990). | Purchasers of Meridian Bancorp securities during class period | $3.25 M | $2.21 M/ 45,290 members = $48.89 per member | $27,500 | None | $973,320 ($975,000 requested: method not specified) (30% of gross monetary award) |
| (5) Cannon v. Royce Laboratories, Inc., No. 92-923 (S.D. Fla. filed Apr. 23, 1992). | Purchasers of securities of Royce Laboratories during class period | $0.85 M | $416,047/ 5,980 members = $69.57 per member | None indicated | 750,000 shares of common stock and 1,975,000 warrants were included in the settlement, 70% of which were distributed to the class | $255,000 (% of recovery; plus 30% of common stock and warrants awarded) (30% of gross monetary award) |
| (6) Weiner v. Southeast Banking Co., No. 90-760 (S.D. Fla. filed Mar. 22, 1990). | Purchasers of Southeast Banking securities during class period | $5 M | $3.64 M/ 46,068 members = $78.95 per member | $14,000 | None | $1.25 M (% of recovery) (25% of gross monetary award) |
| (7) In re GE Energy Choice Light Bulb Consumer Litigation, No-92-4447 (N.D. Cal. filed Nov. 12, 1992). | Consumer purchasers of GE Energy Choice throughout the U.S. during a 3.5 year class period | $3.25 M | $2 M/ 123,000 members = <$16.26 per member[a] | None indicated | Modifications of advertising and packaging practices[b] | $975,000 (% of recovery) (30% of gross monetary award) |

(cont.)

*Class Actions*

## Table 1: Certified, Settled (b)(3) Classes with Average Net Distribution < $100 Per Class Member (continued)

| Caption, Docket No., and District | Class Definition | Gross Monetary Award | Net Monetary Award/ No. of Notices Sent | Total Award to Class Representatives | Nonmonetary Relief | Attorneys' Fee Award (method) (% of gross monetary award) |
|---|---|---|---|---|---|---|
| (8) Sahadi v. Stone, No. 93-20645 (N.D. Cal. filed Sept. 1, 1993). | Purchasers of Read-Rite stock during the class period | $2 M | $1.24 M/ 17,000 members = $73.17 per member | None indicated | None | $600,000 (% of recovery) (30% of gross monetary award) |
| (9) Nathanson IRA v. Tenera, No. 91-3454 (N.D. Cal. filed Oct. 2, 1991). | Purchasers of units of Tenera during class period | $0.125 M | $73,327/ 3,000 members = $24.44 per member | $3,000 | None | $20,077 ($37,500 requested: % of recovery) (16% of gross monetary award) |

*Note:* M = millions of dollars.

[a]The distribution per class member was probably less because purchasers of GE Energy Choice products who were not class members were also allowed to participate.

[b]Note that the monetary relief consisted of a funded rebate program with any surplus to be donated to charity or energy research purposes.

## Table 2: Number of Consolidated Cases Transferred by the Judicial Panel on Multidistrict Legislation and Nature of Suit

| Nature of Suit | E.D. Pa. ($n=7$) | S.D. Fla. ($n=2$) | N.D. Ill. ($n=6$) | N.D. Cal. ($n=4$) |
|---|---|---|---|---|
| Other contract actions | 1 | 0 | 0 | 0 |
| Contract product liability | 1 | 1 | 0 | 0 |
| Personal injury–product liability | 1 | 0 | 1 | 0 |
| Antitrust | 2 | 0 | 2 | 3 |
| Racketeer Influenced and Corrupt Organization Act (RICO) | 0 | 0 | 1 | 0 |
| Property rights–trademark | 1 | 0 | 0 | 0 |
| Securities | 1 | 1 | 2 | 1 |

**Table 3: Number of Consolidations by District Court and Nature of Suit**

| Nature of Suit | E.D. Pa. ($n=24$) | S.D. Fla. ($n=10$) | N.D. Ill. ($n=10$) | N.D. Cal. ($n=17$) |
|---|---|---|---|---|
| Contract | 5 | 0 | 1 | 0 |
| Torts–other fraud | 1 | 0 | 1 | 1 |
| Antitrust | 1 | 0 | 0 | 0 |
| Other civil rights | 0 | 0 | 1 | 1 |
| Racketeer Influenced and Corrupt Organization Act (RICO) | 0 | 0 | 1 | 0 |
| Prisoner petitions–habeas corpus | 0 | 0 | 0 | 1 |
| Other labor litigation | 0 | 1 | 0 | 0 |
| Employee Retirement Income Security Act (ERISA) | 1 | 0 | 1 | 0 |
| Trademark | 2 | 0 | 0 | 1 |
| Securities | 13 | 9 | 5 | 13 |
| Other statutory actions | 1 | 0 | 0 | 0 |

**Table 4: Number of Related Cases Not Consolidated with Similar Litigation Pending in Federal Courts and Nature of Suit**

| Nature of Suit | E.D. Pa. ($n=13$) | S.D. Fla. ($n=4$) | N.D. Ill. ($n=6$) | N.D. Cal. ($n=23$) |
|---|---|---|---|---|
| Contracts–stockholders suits | 0 | 0 | 0 | 1 |
| Other contract actions | 2 | 0 | 0 | 0 |
| Contract product liability | 1 | 0 | 0 | 0 |
| Personal injury–product liability | 0 | 0 | 0 | 1 |
| Other fraud | 0 | 0 | 1 | 0 |
| Antitrust | 0 | 0 | 0 | 1 |
| Other civil rights | 2 | 0 | 1 | 1 |
| Civil rights–jobs | 1 | 0 | 0 | 2 |
| Racketeer Influenced and Corrupt Organization Act (RICO) | 2 | 0 | 0 | 0 |
| Prisoner petitions–habeas corpus | 0 | 0 | 0 | 1 |

(cont.)

*Class Actions*

**Table 4: Number of Related Cases Not Consolidated with Similar Litigation Pending in Federal Courts and Nature of Suit (continued)**

| Nature of Suit | E.D. Pa. ($n$=13) | S.D. Fla. ($n$=4) | N.D. Ill. ($n$=6) | N.D. Cal. ($n$=23) |
|---|---|---|---|---|
| Prisoner–civil rights | 0 | 0 | 0 | 1 |
| Employee Retirement Income Security Act (ERISA) | 0 | 0 | 0 | 2 |
| Property rights–trademark | 1 | 0 | 0 | 0 |
| Securities | 4 | 4 | 3 | 11 |
| Other statutory actions | 0 | 0 | 1 | 2 |

**Table 5: Number of Related Cases Not Consolidated with Similar Litigation Pending in State Courts and Nature of Suit**

| Nature of Suit | E.D. Pa. ($n$=4) | S.D. Fla. ($n$=1) | N.D. Ill. ($n$=3) |
|---|---|---|---|
| Contract product liability | 1 | 0 | 0 |
| Personal injury–medical malpractice | 1 | 0 | 0 |
| Other personal property damage | 0 | 1 | 0 |
| Other civil rights | 0 | 0 | 2 |
| Securities | 2 | 0 | 1 |

**Table 6: Difficulties in Cases Not Consolidated in Federal Courts**

| Case | Type of Case | Difficulty |
|---|---|---|
| Case 1 | Statutory action | Documents were filed in both cases—one was a class action and the other was not. On different occasions, class-related documents were filed in the nonclass case, but not in the class case, which caused confusion not only for the parties but for the court. |
| Case 2 | Contract | Nonconsolidated case was stayed and later closed because the related case was farther along. It was not clear from the case file how much time and effort had been expended on the discovery process, but one can assume that there was duplication of effort. |
| Case 3 | Racketeer Influenced and Corrupt Organization Act (RICO) | In this case, five other class actions were pending against the defendants who moved before the Judicial Panel on Multidistrict Litigation for transfer of all of the cases to a single district. Prior to the court's ruling on the MDL issue the case was dismissed without prejudice. Defendant later learned that to have the case transferred by the Judicial Panel the case had to be open. Defendant then had to move for reconsideration of the court's dismissal of the case. The court denied vacating the dismissal order. |
| Case 4 | Securities | This case contained identical issues and the same defendants as in other related cases. The court found that the case was related but decided not to consolidate it. |

*Appendix C*

163

## Table 7: Difficulties in Cases Not Consolidated in State Courts

| Case | Type of Case | Difficulty |
|------|--------------|------------|
| Case 1 | Personal injury–medical malpractice | In this case the district court decided to abstain from ruling on its case while the state court case was still pending with parallel claims. There was considerable delay in the case before the district court ruled that the state court was a better forum for the plaintiffs. |
| Case 2 | Contract product liability | A number of class action complaints were filed in several state courts relying on state law products liability claims. Plaintiffs in those cases objected to the settlement. The court responded by coordinating the notice and settlement proposal to account for the state actions. |
| Case 3 | Statutory actions | Class action sought on state law claims. Defendant objected because of the duplicative nature of the litigation. |
| Case 4 | Securities | Co-lead counsel filed a motion to take action against another attorney, who attempted to dismiss voluntarily the federal action and file a duplicative class action in state court. The court held that the federal action could only be voluntarily dismissed after counsel represented to the court that he would dismiss the state class action and not file any other duplicative class actions. |

## Table 8: Median Case Duration (in Months) of (b)(3) Securities and Nonsecurities Cases with Court-Approved Settlements

|  | E.D. Pa. | | | S.D. Fla. | | |
|--|------------|------------------|-----------------|------------|------------------|-----------------|
|  | Securities | Non-securities | Civil Rights | Securities | Non-securities | Civil Rights |
| Settled Cases | 27 ($n$=13) | 13 ($n$=6) | 25 ($n$=2) | 24 ($n$=9) | 50 ($n$=2) | — ($n$=0) |
| Nonsettled Cases | 48 ($n$=3) | 18 ($n$=8) | — ($n$=0) | — ($n$=0) | — ($n$=0) | — ($n$=0) |

|  | N.D. Ill. | | | N.D. Cal. | | |
|--|------------|------------------|-----------------|------------|------------------|-----------------|
|  | Securities | Non-securities | Civil Rights | Securities | Non-securities | Civil Rights |
| Settled Cases | 28 ($n$=9) | 36 ($n$=13) | 78 ($n$=3) | 28 ($n$=16) | 11 ($n$=6) | 55 ($n$=2) |
| Nonsettled Cases | 12 ($n$=4) | 48 ($n$=1) | — ($n$=0) | 46 ($n$=2) | 58 ($n$=1) | — ($n$=0) |

*Note:* The "median case duration" is from filing the first complaint to termination of the case.

**Table 9: Rate of Certification in (b)(3) Securities and Nonsecurities Cases with Motions or Orders Filed on Certification**

| | E.D. Pa. | | | S.D. Fla. | | |
|---|---|---|---|---|---|---|
| | Securities ($n=16$) | Non-securities ($n=14$) | Civil Rights ($n=2$) | Securities ($n=9$) | Non-securities ($n=2$) | Civil Rights ($n=0$) |
| Percentage of Cases Certified | 94 | 64 | 100 | 100 | 100 | — |

| | N.D. Ill. | | | N.D. Cal. | | |
|---|---|---|---|---|---|---|
| | Securities ($n=13$) | Non-securities ($n=14$) | Civil Rights ($n=3$) | Securities ($n=18$) | Non-securities ($n=7$) | Civil Rights ($n=2$) |
| Percentage of Cases Certified | 100 | 93 | 100 | 94 | 86 | 100 |

**Table 10: Number of Numerosity and Representativeness Objections to Certification in (b)(3) Securities and Nonsecurities Cases with Disputes Over Certification**

| | E.D. Pa. | | S.D. Fla. | | N.D. Ill. | | N.D. Cal. | |
|---|---|---|---|---|---|---|---|---|
| | Securities ($n=10$) | Non-securities ($n=8$) | Securities ($n=3$) | Non-securities ($n=2$) | Securities ($n=6$) | Non-securities ($n=9$) | Securities ($n=8$) | Non-securities ($n=3$) |
| Numerosity objection | 0 (0%) | 4 (50%) | 0 (0%) | 0 (0%) | 0 (0%) | 3 (33%) | 2 (25%) | 2 (67%) |
| Represent-ativeness objection | 9 (90%) | 5 (63%) | 3 (100%) | 2 (100%) | 6 (100%) | 4 (44%) | 6 (75%) | 2 (67%) |

**Table 11: Median Settlement Fund Distribution Comparisons for Certified (b)(3) Securities and Nonsecurities Cases with Court-Approved Settlements**

| | E.D. Pa. | | S.D. Fla. | | N.D. Ill. | | N.D. Cal. | |
|---|---|---|---|---|---|---|---|---|
| | Securities ($n=12$) | Non-securities ($n=6$) | Securities ($n=9$) | Non-securities ($n=2$) | Securities ($n=9$) | Non-securities ($n=13$) | Securities ($n=14$) | Non-securities ($n=6$) |
| Net distribution[a] | $2,014,370 | $0[c] | $1,734,571 | $123,973 | $2,691,651 | $44,639 | $3,040,348 | $1,100,000 |
| Fee award[b] | $1,230,559 | $225,000 | $660,000 | $175,000 | $1,200,000 | $338,771 | $1,500,000 | $1,987,500 |
| Net settlement per class member | $299 ($n=11$) | $0 ($n=5$)[d] | $315 ($n=9$) | — ($n=0$) | $412 ($n=9$) | $562 ($n=8$) | $336 ($n=12$) | $956 ($n=5$) |

[a] "Net distribution" is net of attorneys' fees and administrative expenses.

[b] "Fee award" equals the total amount of fees awarded to plaintiffs' counsel, excluding sanctions and out-of-pocket expenses.

[c] Mean = $19,377.

[d] Mean = $166.

**Table 12: Median Case Duration (in Months) of (b)(2) Nonsecurities Cases with Court-Approved Settlements**

| | E.D. Pa. | | S.D. Fla. | | N.D. Ill. | | N.D. Cal. | |
|---|---|---|---|---|---|---|---|---|
| | Settled | Nonsettled | Settled | Nonsettled | Settled | Nonsettled | Settled | Nonsettled |
| All non-securities | 15 ($n=14$) | 17 ($n=11$) | 41 ($n=2$) | 41 ($n=2$) | 60 ($n=6$) | 106 ($n=3$) | 21 ($n=3$) | 46 ($n=1$) |
| Civil rights | 13 ($n=5$) | 13 ($n=1$) | 57 ($n=1$) | 57 ($n=1$) | 26 ($n=6$) | 26 ($n=3$) | 21 ($n=1$) | — ($n=0$) |

*Note:* The "median case duration" is from filing the first complaint to termination of the case.

**Table 13: Rate of Certification in (b)(2) Nonsecurities Cases with Motions or Orders Filed on Certification**

| | E.D. Pa. | | S.D. Fla. | | N.D. Ill. | | N.D. Cal. | |
|---|---|---|---|---|---|---|---|---|
| | Non-securities ($n=19$) | Civil Rights ($n=12$) | Non-securities ($n=3$) | Civil Rights ($n=3$) | Non-securities ($n=12$) | Civil Rights ($n=6$) | Non-securities ($n=4$) | Civil Rights ($n=1$) |
| Percentage of Cases Certified | 95 | 92 | 67 | 67 | 83 | 67 | 50 | 100 |

**Table 14: Number of Numerosity and Representativeness Objections to Certification in (b)(2) Nonsecurities Cases with Disputes over Certification**

| | E.D. Pa. | | S.D. Fla. | | N.D. Ill. | | N.D. Cal. | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Non-securities ($n=7$) | Civil Rights ($n=5$) | Non-securities ($n=2$) | Civil Rights ($n=2$) | Non-securities ($n=8$) | Civil Rights ($n=4$) | Non-securities ($n=2$) | Civil Rights ($n=1$) |
| Numerosity Objection | 5 (71%) | 3 (60%) | 0 (0%) | 0 (0%) | 3 (38%) | 2 (50%) | 1 (50%) | 1 (100%) |
| Represent-ativeness Objection | 3 (43%) | 2 (40%) | 0 (0%) | 0 (0%) | 7 (88%) | 4 (100%) | 1 (50%) | 1 (100%) |

**Table 15: Median Fee Awards for Certified (b)(2) Nonsecurities Cases with Court-Approved Settlements**

| | E.D. Pa. | | S.D. Fla. | | N.D. Ill. | | N.D. Cal. | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Non-securities ($n=9$) | Civil Rights ($n=6$) | Non-securities ($n=1$) | Civil Rights ($n=1$) | Non-securities ($n=6$) | Civil Rights ($n=3$) | Non-securities ($n=2$) | Civil Rights ($n=1$) |
| Median Fee Award[a] | $49,000 | $34,779 | $1,378 | $1,378 | $112,500 | $224,810 | $69,000 | $53,000 |

[a]"Fee award" equals the total amount of fees awarded to plaintiffs' counsel, excluding sanctions and out-of-pocket expenses.

**Table 16: Trial Rates for Nonprisoner Class Actions Compared to Nonprisoner Nonclass Civil Actions**

| | E.D. Pa. | | S.D. Fla. | | N.D. Ill. | | N.D. Cal. | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Trial | Class ($n=108$) | Nonclass ($n=7,603$) | Class ($n=58$) | Nonclass ($n=5,174$) | Class ($n=108$) | Nonclass ($n=8,264$) | Class ($n=94$) | Nonclass ($n=5,404$) |
| Rate | 5.5% | 4.4% | 3.4% | 3.6% | 5.5% | 3.2% | 4.3% | 2.7% |
| Number | 6 | 338 | 2 | 5,174 | 6 | 264 | 4 | 148 |

*Note:* Nonclass: Federal Judicial Center integrated database of Administrative Office of the U.S. Courts data; Class: Federal Judicial Center class action project database (see first paragraph, Appendix D). The two data sets refer to civil cases terminated between July 1, 1992, and June 30, 1994.

    The Administrative Office data on trial rates for the study cases differed from our data for the same set of cases. In three districts, the Administrative Office data showed fewer trials than the Federal Judicial Center data and in the other district the numbers were the same. Overall, the Administrative Office data showed thirteen trials compared to eighteen in the Federal Judicial Center database. The trial rates shown by the Administrative Office data were 4% (four), 2% (one), 6% (six), and 2% (two), respectively.

*Appendix C*                                                                          

### Table 17: Trial Rates for Securities Class Actions Compared to Securities Civil Actions

| | E.D. Pa. | | S.D. Fla. | | N.D. Ill. | | N.D. Cal. | |
|---|---|---|---|---|---|---|---|---|
| Trial | Class ($n=30$) | Nonclass ($n=191$) | Class ($n=15$) | Nonclass ($n=187$) | Class ($n=23$) | Nonclass ($n=148$) | Class ($n=35$) | Nonclass ($n=198$) |
| Rate | 10.0% | 16.7% | 0% | 5.8% | 8.7% | 5.4% | 0% | 0% |
| Number | 3 | 32 | 0 | 11 | 2 | 8 | 0 | 0 |

*Note:* Nonclass: Federal Judicial Center integrated database of Administrative Office of the U.S. Courts data, Class: Federal Judicial Center class action project database (see first paragraph, Appendix D). The two data sets refer to civil cases terminated between July 1, 1992, and June 30, 1994.

The Administrative Office data on trial rates for securities class actions differed from the Federal Judicial Center data on the same cases in only one instance. In E.D. Pa., the Administrative Office data showed two trials, a rate of 7%, whereas the Federal Judicial Center data showed three trials, a rate of 10%.

### Table 18: Number of Multiple Certifications and Rule 23(b) Certifications

| Rule 23(b) Combinations | E.D. Pa. ($n=5$) | S.D. Fla. ($n=1$) | N.D. Ill. ($n=5$) | N.D. Cal. ($n=5$) |
|---|---|---|---|---|
| 23(b)(1)(A) and (b)(2) | 0 | 0 | 1 | 0 |
| 23(b)(1)(A), (b)(1)(B), and type not specified | 0 | 0 | 1 | 0 |
| 23(b)(1)(A) and (b)(2) | 2 | 0 | 1 | 0 |
| 23(b)(1)(A), (b)(1)(B), and (b)(2) | 0 | 0 | 1 | 0 |
| 23(b)(1)(B) and (b)(2) | 0 | 0 | 1 | 0 |
| 23(b)(1)(B), (b)(2), and (b)(3) | 0 | 0 | 0 | 1 |
| 23(b)(1)(B) and (b)(3) | 0 | 0 | 0 | 1 |
| 23(b)(2) and (b)(3) | 3 | 1 | 0 | 1 |
| 23(b)(3) and type not specified | 0 | 0 | 0 | 2 |

### Table 19: District Judge and Magistrate Judge Time Expended

| Type of Activity | Judge Time (in Hours) | | Average Hours per Case | |
|---|---|---|---|---|
| | Certified ($n=11$) | Not certified ($n=40$) | Certified | Not certified |
| Class certification | 79 | 16 | 7.2 | 0.4 |
| Motions to dismiss | 61 | 13 | 5.5 | 0.3 |
| Discovery | 64 | 7 | 5.8 | 0.2 |
| Summary judgment | 30 | 48 | 2.7 | 1.2 |
| Notice to class | 4 | 0 | 0.4 | 0 |
| Pretrial conference | 1 | 1 | 0.1 | 0 |
| All other pretrial conferences | 1 | 0 | 0.1 | 0 |
| Trial | 0 | 10 | 0 | 0.3 |
| Facilitating settlement | 38 | 20 | 3.5 | 0.5 |
| Review and rule on proposed settlement | 31 | 6 | 2.8 | 0.2 |
| Presiding at settlement approval hearing | 16 | 1 | 1.5 | 0 |
| Ruling on attorneys' fees | 25 | 0 | 2.3 | 0 |
| Monitoring or enforcing final order | 11 | 0 | 1 | 0 |
| Other | 18 | 119 | 1.6 | 3 |
| Total | 379 | 241 | 34.5 | 6.1 |

*Source:* Willging et al., Preliminary Report on Time Study Class Action Cases (Feb. 9, 1995) (unpublished report on file with the Information Services Office of the Federal Judicial Center).

### Table 20: Grounds Cited in Rulings on Motions to Dismiss in Relation to Timing of Ruling on Certification

| Grounds Cited in Ruling[a] | E.D. Pa. | | S.D. Fla. | | N.D. Ill. | | N.D. Cal. | |
|---|---|---|---|---|---|---|---|---|
| | Before ($n=31$) | After ($n=9$) | Before ($n=14$) | After ($n=3$) | Before ($n=28$) | After ($n=18$) | Before ($n=26$) | After ($n=6$) |
| Rule 12(b)(1) | 6 | 1 | 0 | 0 | 3 | 7 | 1 | 0 |
| Rule 12(b)(2) | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| Rule 12(b)(3) | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| Rule 12(b)(6) | 18 | 4 | 6 | 0 | 11 | 12 | 15 | 3 |
| Rule 12(b)(7) | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other | 12 | 4 | 4 | 2 | 5 | 3 | 12 | 2 |
| Unknown | 3 | 2 | 5 | 0 | 9 | 2 | 5 | 1 |
| Total | 41 | 11 | 15 | 2 | 28 | 26 | 33 | 6 |

[a]More than one citation in some rulings.

**Table 21: Grounds Cited in Rulings on Motions to Dismiss in All Class Actions Terminated Between July 1, 1992, and June 30, 1994**

| Grounds Cited in Ruling[a] | E.D. Pa. ($n=61$) | S.D. Fla. ($n=31$) | N.D. Ill. ($n=63$) | N.D. Cal. ($n=48$) |
|---|---|---|---|---|
| Rule 12(b)(1) (lack of subject matter jurisdiction) | 11 | 2 | 15 | 2 |
| Lack of federal question | 5 | 0 | 4 | 0 |
| Incomplete diversity | 0 | 0 | 1 | 0 |
| Insufficient class amount in controversy | 2 | 0 | 1 | 0 |
| Insufficient individual amount in controversy | 0 | 0 | 0 | 0 |
| Other | 1 | 0 | 3 | 1 |
| Rule 12(b)(2) (lack of personal jurisdiction) | 0 | 0 | 2 | 1 |
| Rule 12(b)(3) (improper venue) | 1 | 0 | 1 | 0 |
| Rule 12(b)(4) (insufficiency of process) | 0 | 0 | 0 | 0 |
| Rule 12(b)(5) (insufficiency of service of process) | 0 | 1 | 0 | 0 |
| Rule 12(b)(6) (failure to state a claim) | 33 | 9 | 33 | 27 |
| Rule 12(b)(7) (failure to join a party) | 2 | 0 | 0 | 0 |
| Rule 9(b) (failure to plead fraud with specificity) | 7 | 3 | 3 | 10 |
| Rule 41(a) (voluntary dismissal) | 1 | 0 | 0 | 0 |
| Rule 41(b) (by court order) | 1 | 4 | 2 | 0 |
| 28 U.S.C. 1915(d) (frivolous) | 0 | 5 | 3 | 3 |
| Mootness | 3 | 1 | 0 | 1 |
| Abstention | 2 | 0 | 1 | 0 |
| Standing | 1 | 0 | 2 | 0 |
| Stipulated | 2 | 0 | 1 | 4 |
| Other | 8 | 8 | 2 | 4 |
| Unknown | 10 | 13 | 15 | 8 |
| Total | 82 | 46 | 80 | 60 |

[a]Some rulings cited more than one source.

**Table 22: Outcomes of Rulings on Motions to Dismiss in Relation to Timing of Rulings on Class Certification**

| Outcome | E.D. Pa. | | S.D. Fla. | | N.D. Ill. | | N.D. Cal. | |
|---|---|---|---|---|---|---|---|---|
| | Before | After | Before | After | Before | After | Before | After |
| Dismiss all | 4 | 2 | 4 | 1 | 8 | 9 | 8 | 3 |
| Dismiss part | 6 | 3 | 1 | 0 | 11 | 6 | 11 | 1 |
| Deny | 16 | 2 | 8 | 2 | 7 | 3 | 5 | 2 |
| Defer | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| No action | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other | 5 | 2 | 1 | 0 | 0 | 1 | 1 | 0 |
| Total | 31 | 9 | 14 | 3 | 26 | 19 | 26 | 6 |

**Table 23: Outcomes of Rulings on Motions for Summary Judgment in Relation to Timing of Rulings on Class Certification**

| Outcome | E.D. Pa. | | S.D. Fla. | | N.D. Ill. | | N.D. Cal. | |
|---|---|---|---|---|---|---|---|---|
| | Before | After | Before | After | Before | After | Before | After |
| Granted | 1 | 8 | 1 | 2 | 4 | 11 | 2 | 3 |
| Granted in part | 1 | 4 | 0 | 0 | 1 | 2 | 4 | 1 |
| Denied | 6 | 6 | 0 | 5 | 4 | 3 | 2 | 0 |
| Deferred | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| Other | 0 | 0 | 1 | 0 | 2 | 0 | 0 | 1 |
| Total | 8 | 18 | 2 | 7 | 11 | 16 | 10 | 5 |

**Table 24: Percentage of Cases with Rulings on Motions to Dismiss, Motions for Summary Judgment, and Sua Sponte Dismissals**

| Action | E.D. Pa. ($n$ = 121) | S.D. Fla. ($n$ = 72) | N.D. Ill. ($n$ = 117) | N.D. Cal. ($n$ = 107) |
|---|---|---|---|---|
| Motions to dismiss | 61 | 31 | 63 | 48 |
| Sua sponte dismissals | 7 | 12 | 12 | 12 |
| Motions for summary judgment | 35 | 13 | 31 | 22 |
| Cases with at least one ruling regarding dismissal or summary judgment | 81 (67%) | 48 (67%) | 85 (73%) | 64 (60%) |
| Cases with both a dismissal ruling and a summary judgment ruling | 22 (18%) | 8 (11%) | 21 (18%) | 17 (16%) |

*Appendix C*

171

## Table 25: Outcome of Rulings on Motions to Dismiss

| Outcome of Motion to Dismiss | E.D. Pa. (n = 61) | S.D. Fla. (n = 31) | N.D. Ill. (n = 62) | N.D. Cal. (n = 48) |
|---|---|---|---|---|
| Dismissed entire complaint | 26% (16 cases) | 39% (12 cases) | 42% (26 cases) | 48% (23 cases) |
| Dismissed one or more claims or parties | 21% (13 cases) | 10% (3 cases) | 34% (21 cases) | 29% (14 cases) |
| Denied the motion | 38% (23 cases) | 45% (14 cases) | 22% (14 cases) | 19% (9 cases) |
| Other | 15% (9 cases) | 6% (2 cases) | 2% (1 case) | 4% (2 cases) |

## Table 26: Outcome of Summary Judgment Rulings

| Outcome | E.D. Pa. (n = 35) | S.D. Fla. (n = 13) | N.D. Ill. (n = 31) | N.D. Cal. (n = 22) |
|---|---|---|---|---|
| Granted in whole | 12 (34%) | 4 (31%) | 17 (55%) | 8 (36%) |
| Granted in part | 7 (20%) | 1 (8%) | 4 (13%) | 6 (27%) |
| Denied | 13 (37%) | 7 (54%) | 8 (26%) | 5 (23%) |
| Deferred | 0 (0%) | 0 (0%) | 0 (0%) | 2 (9%) |
| Other | 3 (9%) | 1 (8%) | 2 (6%) | 1 (5%) |

## Table 27: Cases Closed as a Result of a Ruling on a Motion to Dismiss or Summary Judgment

| Ruling | E.D. Pa. (n = 117) | S.D. Fla. (n = 72) | N.D. Ill. (n = 116) | N.D. Cal. (n = 102) |
|---|---|---|---|---|
| Dismissal | 24 (20%) | 14 (19%) | 20 (17%) | 18 (18%) |
| Summary judgment | 16 (14%) | 6 (8%) | 19 (16%) | 11 (11%) |
| Subtotal | 40 (34%) | 20 (27%) | 39 (33%) | 29 (28%) |
| Minus duplicate cases | −3 (−3%) | −1 (−1%) | −3 (−3%) | 0 (0%) |
| Total | 37 (31%) | 19 (26%) | 36 (30%) | 29 (28%) |

**Table 28: Median Times (in Months) from Filing of Complaint to Filing of First Motion to Dismiss and from Filing of First Motion to Dismiss to the First Ruling on a Motion to Dismiss**

| Time | E.D. Pa. | S.D. Fla. | N.D. Ill. | N.D. Cal. |
|---|---|---|---|---|
| Median time from complaint to first motion to dismiss | 2.4 | 2.5 | 2.7 | 4.2 |
| Median time from first motion to dismiss to first ruling | 3.1 | 7.4 | 3.8 | 2.6 |
| 75th percentile of time from first motion to dismiss to first ruling | 4.7 | 13.7 | 8.6 | 5.4 |

**Table 29: Median Times (in Months) from Filing Complaint to Filing of First Motion for Summary Judgment and from Filing of First Motion for Summary Judgment to First Ruling on Summary Judgment**

| Time | E.D. Pa. | S.D. Fla. | N.D. Ill. | N.D. Cal. |
|---|---|---|---|---|
| Median time from complaint to first motion for summary judgment | 7.8 | 9.6 | 12.2 | 12.2 |
| Median time from first motion for summary judgment to first ruling | 3.7 | 7.4 | 9.0 | 3.5 |
| 75th percentile of time from first motion for summary judgment to first ruling | 7.9 | 15.4 | 16.8 | 5.2 |

*Appendix C*

173

**Table 30: Number of Cases with Simultaneous Motion to Certify and Approve Settlement and Nature of Suit**

| Nature of Suit | E.D. Pa. ($n=7$) | N.D. Ill. ($n=7$) | N.D. Cal. ($n=14$) |
|---|---|---|---|
| Torts–other fraud | 0 | 0 | 1 |
| Antitrust | 0 | 1 | 0 |
| Civil rights–prisoner | 1 | 0 | 0 |
| Civil rights–accommodations | 0 | 0 | 1 |
| Civil rights–other | 4 | 1 | 1 |
| Racketeer Influenced and Corrupt Organization Act (RICO) | 1 | 0 | 0 |
| Labor laws–other litigation | 0 | 0 | 1 |
| Employee Retirement Income Security Act (ERISA) | 0 | 0 | 2 |
| Securities | 0 | 1 | 8 |
| Other statutory actions | 0 | 4 | 0 |
| Contract: insurance | 1 | 0 | 0 |

**Table 31: Number of Certified Cases With and Without a Simultaneous Settlement and Type of Class**

| Case type | Federal Rule of Civil Procedure | | | |
|---|---|---|---|---|
| | 23(b)(1)(A) | 23(b)(1)(B) | 23(b)(2) | 23(b)(3) |
| With simultaneous settlement | 4 | 2 | 8 | 17 |
| Without simultaneous settlement | 11 | 8 | 18 | 36 |

**Table 32: Number of Certified Cases with Motions to Reconsider or Decertify and Outcome**

| Outcome | E.D. Pa. ($n=11$) | S.D. Fla. ($n=1$) | N.D. Ill. ($n=6$) | N.D. Cal. ($n=5$) | Total |
|---|---|---|---|---|---|
| Certification affirmed | 5 | 0 | 3 | 1 | 9 |
| Certification reversed | 1 | 0 | 0 | 0 | 1 |
| Certification modified | 0 | 0 | 1 | 1 | 2 |
| Reconsideration denied | 2 | 1 | 1 | 1 | 5 |
| Reconsideration deferred | 0 | 0 | 0 | 1 | 1 |
| No action taken | 1 | 0 | 0 | 1 | 2 |
| Other | 2 | 0 | 1 | 0 | 3 |

**Table 33: Number of Oppositions to Certification and Nature-of-Suit Categories**

| Nature of Suit | E.D. Pa. ($n=50$) | S.D. Fla. ($n=21$) | N.D. Ill. ($n=45$) | N.D. Cal. ($n=25$) |
|---|---|---|---|---|
| Stockholders suits | 0 (0%) | 0 (0%) | 0 (0%) | 1 (4%) |
| Other contract actions | 1 (2%) | 2 (10%) | 1 (2%) | 1 (4%) |
| Contract product liability | 1 (2%) | 0 (0%) | 0 (0%) | 0 (0%) |
| Torts–marine | 0 (0%) | 1 (5%) | 0 (0%) | 1 (4%) |
| Torts–motor vehicle– product liability | 1 (2%) | 0 (0%) | 0 (0%) | 0 (0%) |
| Personal injury–medical malpractice | 1 (2%) | 0 (0%) | 0 (0%) | 0 (0%) |
| Personal injury–product liability | 1 (2%) | 0 (0%) | 1 (2%) | 0 (0%) |
| Torts–other fraud | 1 (2%) | 0 (0%) | 3 (7%) | 0 (0%) |
| Torts–truth in lending | 0 (0%) | 0 (0%) | 1 (2%) | 0 (0%) |
| Torts–other personal property damage | 1 (2%) | 0 (0%) | 0 (0%) | 0 (0%) |
| Antitrust | 2 (4%) | 0 (0%) | 0 (0%) | 2 (8%) |
| Withdrawal | 0 (0%) | 1 (5%) | 0 (0%) | 0 (0%) |
| Other civil rights | 7 (14%) | 2 (10%) | 10 (22%) | 2 (8%) |

(cont.)

**Table 33: Number of Oppositions to Certification and Nature-of-Suit Categories (continued)**

| Nature of Suit | E.D. Pa. ($n=50$) | S.D. Fla. ($n=21$) | N.D. Ill. ($n=45$) | N.D. Cal. ($n=25$) |
|---|---|---|---|---|
| Civil rights–jobs | 5 (10%) | 1 (5%) | 4 (9%) | 2 (8%) |
| Civil rights–accommodations | 2 (4%) | 1 (5%) | 0 (0%) | 1 (4%) |
| Civil rights–welfare | 2 (4%) | 0 (0%) | 1 (2%) | 0 (0%) |
| Racketeer Influenced and Corrupt Organization Act (RICO) | 2 (4%) | 0 (0%) | 2 (4%) | 1 (4%) |
| Prisoner–civil rights | 2 (4%) | 4 (19%) | 2 (4%) | 0 (0%) |
| Labor/Management Relations Act | 0 (0%) | 0 (0%) | 1 (2%) | 0 (0%) |
| Other labor litigation | 0 (0%) | 1 (5%) | 1 (2%) | 0 (0%) |
| Employee Retirement Income Security Act (ERISA) | 5 (10%) | 3 (14%) | 6 (13%) | 1 (4%) |
| Securities | 13 (26%) | 4 (19%) | 7 (16%) | 11 (44%) |
| Social security–black lung | 1 (2%) | 0 (0%) | 0 (0%) | 0 (0%) |
| Social Security–Social Security Disability Income, Title XVI | 0 (0%) | 0 (0%) | 1 (2%) | 0 (0%) |
| Tax suits | 0 (0%) | 0 (0%) | 0 (0%) | 1 (4%) |
| Other statutory actions | 2 (4%) | 1 (5%) | 3 (7%) | 1 (4%) |
| Constitutionality of state statutes | 0 (0%) | 0 (0%) | 1 (2%) | 0 (0%) |

**Table 34: Number of Oppositions to Certification and Nature of Suit for All Categories of Civil Rights, Securities, and ERISA Cases**

| Nature of Suit | E.D. Pa. ($n=50$) | S.D. Fla. ($n=21$) | N.D. Ill. ($n=45$) | N.D. Cal. ($n=25$) |
|---|---|---|---|---|
| All civil rights | 16 (32%) | 4 (19%) | 15 (33%) | 5 (20%) |
| Securities | 13 (26%) | 4 (19%) | 7 (16%) | 11 (44%) |
| Employee Retirement Income Security Act (ERISA) | 5 (10%) | — | 6 (13%) | |
| Prisoner–civil rights | — | 4 (19%) | — | — |

**Table 35: Class Notice of Certification or Settlement Issued in Certified Class Actions by Type**

| Type of Class | E.D. Pa. ($n=53$) | S.D. Fla. ($n=13$) | N.D. Ill. ($n=51$) | N.D. Cal. ($n=35$) |
|---|---|---|---|---|
| 23(b)(1)(A) | 100%<br>(3) | 0%<br>(0) | 75%<br>(3) | 0%<br>(0) |
| 23(b)(1)(B) | 0%<br>(0) | 0%<br>(0) | 80%<br>(4) | 100%<br>(2) |
| 23(b)(2) | 60%<br>(12) | 100%<br>(3) | 45%<br>(5) | 100%<br>(5) |
| 23(b)(3) | 88%<br>(21) | 100%<br>(11) | 92%<br>(24) | 96%<br>(22) |
| No type specified | 60%<br>(3) | 0%<br>(0) | 67%<br>(4) | 73%<br>(8) |

*Note*. Some cases were certified under more than one subsection.

**Table 36: Type of Notice in Certified (b)(3) Class Actions**

| Type of Notice | E.D. Pa. ($n=24$) | S.D. Fla. ($n=11$) | N.D. Ill. ($n=26$) | N.D. Cal. ($n=23$) |
|---|---|---|---|---|
| Personal | 21 | 11 | 23 | 21 |
| Publication | 15 | 9 | 15 | 15 |
| Broadcast | 0 | 1 | 0 | 1 |
| Other (e.g., posting) | 2 | 1 | 2 | 3 |
| No notice | 3 | 0 | 2 | 1 |

*Note:* Most cases used more than one type of notice.

**Table 37: Intervention Success Rates for Various Nature of Suit Categories**

| Nature of Suit | Attempted | Granted | Percentage Granted |
|---|---|---|---|
| Contract | 2 | 0 | 0 |
| Product liability–medical malpractice | 1 | 1 | 100 |
| Fraud personal property | 2 | 1 | 50 |
| Antitrust | 3 | 2 | 67 |
| Other civil rights | 2 | 0 | 0 |
| Jobs–civil rights | 2 | 1 | 50 |
| Welfare–civil rights | 2 | 2 | 100 |
| Racketeer Influenced and Corrupt Organization Act (RICO) | 1 | 0 | 0 |
| Employee Retirement Income Security Act (ERISA) | 1 | 1 | 100 |
| Securities, commodities, exchange | 7 | 4 | 57 |
| Social security | 1 | 1 | 100 |
| Other statutory actions | 2 | 0 | 0 |
| Constitutionality of state statutes | 1 | 0 | 0 |

**Table 38: Types of Objections Raised During Settlement Approval Process as a Percentage of All Settlement Hearings**

| Type of Objection | E.D. Pa. ($n=35$) | S.D. Fla. ($n=14$) | N.D. Ill. ($n=36$) | N.D. Cal. ($n=32$) |
|---|---|---|---|---|
| Insufficient compensation | 20% (7) | 0% (0) | 17% (6) | 6% (2) |
| Insufficient deterrence | 3% (1) | 0% (0) | 3% (1) | 6% (2) |
| Representation parties favored | 3% (1) | 0% (0) | 8% (3) | 0% (0) |
| Groups unfairly disfavored | 11% (4) | 7% (1) | 3% (1) | 3% (1) |
| Collusion with opposing party | 3% (1) | 7% (1) | 6% (2) | 0% (0) |
| Attorneys' fees disproportionate | 17% (6) | 21% (3) | 14% (5) | 22% (7) |
| Other | 29% (10) | 14% (2) | 44% (16) | 25% (8) |
| No objection | 51% (18) | 64% (9) | 42% (15) | 60% (19) |

*Class Actions*

## Table 39: Outcomes of Certified and Noncertified Cases

| Outcome | E.D. Pa. Certified (n=36) | E.D. Pa. Not Certified (n=64) | S.D. Fla. Certified (n=6) | S.D. Fla. Not Certified (n=59) | N.D. Ill. Certified (n=35) | N.D. Ill. Not Certified (n=65) | N.D. Cal. Certified (n=16) | N.D. Cal. Not Certified (n=67) |
|---|---|---|---|---|---|---|---|---|
| Dismissed on motion | 5 (14%) | 23 (36%) | 0 | 22 (37%) | 4 (11%) | 28 (43%) | 0 | 23 (34%) |
| Summary judgment granted | 2 (5%) | 10 (16%) | 1 (17%) | 4 (7%) | 7 (20%) | 10 (15%) | 2 (13%) | 7 (10%) |
| Judgment after bench trial | 1 (3%) | 0 | 0 | 1 (2%) | 0 | 1 (2%) | 0 | 0 |
| Judgment after jury trial | 2 (5%) | 1 (2%) | 0 | 0 | 2 (6%) | 1 (2%) | 0 | 1 (1%) |
| Default judgment | 0 | 1 (2%) | 0 | 0 | 0 | 0 | 0 | 0 |
| Voluntary dismissal by plaintiff | 0 | 4 (6%) | 0 | 9 (15%) | 0 | 10 (15%) | 0 | 4 (6%) |
| Stipulated dismissal | 1 (3%) | 12 (19%) | 0 | 9 (15%) | 0 | 7 (11%) | 0 | 18 (27%) |
| Nonclass settlement approved | 0 | 4 (6%) | 0 | 4 (7%) | 1 (3%) | 8 (12%) | 0 | 2 (3%) |
| Class settlement approved | 23 (62%) | 1 (2%) | 6 (100%) | 0 | 25 (71%) | 0 | 14 (88%) | 4 (6%) |
| Other (e.g., case transferred) | 3 (8%) | 12 (19%) | 0 | 12 (20%) | 2 (6%) | 7 (11%) | 0 | 8 (12%) |

*Note:* Cases certified for settlement purposes only are not included.

## Table 40: Settlement of Certified Class Actions Compared with Settlement of Cases with Class Allegations that Were Not Certified

| Outcome | E.D. Pa. Certified (n=36) | E.D. Pa. Not Certified (n=64) | S.D. Fla. Certified (n=6) | S.D. Fla. Not Certified (n=59) | N.D. Ill. Certified (n=35) | N.D. Ill. Not Certified (n=65) | N.D. Cal. Certified (n=16) | N.D. Cal. Not Certified (n=67) |
|---|---|---|---|---|---|---|---|---|
| Stipulated dismissal | 1 (3%) | 12 (19%) | 0 | 9 (15%) | 0 | 7 (11%) | 0 | 18 (27%) |
| Nonclass settlement approved | 0 | 4 (6%) | 0 | 3 (5%) | 1 (3%) | 8 (12%) | 0 | 2 (3%) |
| Class settlement approved | 23 (62%) | 1[a] (2%) | 6 (100%) | 0 | 25 (66%) | 0 | 14 (88%) | 4 (6%) |
| Total | 65% | 27% | 100% | 20% | 69% | 23% | 88% | 36% |

*Note:* Cases certified for settlement purposes only are not included.

[a] Case involved some class relief but not a class certification, either explicitly or implicitly.

*Appendix C*

**Table 41: Disposition by Motion or Trial of Certified Cases Compared with Cases with Class Allegations Not Certified**

| Outcome | E.D. Pa. Certified ($n=36$) | E.D. Pa. Not Certified ($n=64$) | S.D. Fla. Certified ($n=6$) | S.D. Fla. Not Certified ($n=59$) | N.D. Ill. Certified ($n=35$) | N.D. Ill. Not Certified ($n=65$) | N.D. Cal. Certified ($n=16$) | N.D. Cal. Not Certified ($n=67$) |
|---|---|---|---|---|---|---|---|---|
| Dismissal on motion | 5 (14%) | 23 (36%) | 0 | 22 (37%) | 4 (11%) | 28 (43%) | 0 | 23 (34%) |
| Summary judgment granted | 2 (6%) | 10 (16%) | 1 (17%) | 4 (7%) | 7 (20%) | 10 (15%) | 2 (13%) | 7 (10%) |
| Judgment after bench trial | 1 (3%) | 0 | 0 | 1 (2%) | 0 | 1 (2%) | 0 | 0 |
| Judgment after jury trial | 2 (6%) | 1 (2%) | 0 | 0 | 2 (6%) | 1 (2%) | 0 | 1 (1%) |
| Total | 29% | 54% | 17% | 46% | 37% | 62% | 13% | 45% |

*Note:* Cases certified for settlement purposes only are not included.

**Table 42: Time from Ruling on Certification to Filing of Settlement in Certified, Settled Class Actions**

| Category | E.D. Pa. ($n=43$) | S.D. Fla. ($n=13$) | N.D. Ill. ($n=40$) | N.D. Cal. ($n=30$) |
|---|---|---|---|---|
| 25th percentile | 1.9 months | 11.2 months | 0 months | 0 months |
| Median | 9.2 months | 18.9 months | 15.6 months | 14.7 months |
| 75th percentile | 14.5 months | 41.5 months | 36 months | 22.6 months |
| Settlement filed before class certification | 10 cases (23%) | 7 cases (54%) | 6 cases (15%) | 11 cases (37%) |
| No data available | 4 cases | 0 cases | 3 cases | 0 cases |

## Table 43: Jury Trials

| Caption, Docket No., and District | Class Status | Nature of Suit | Days of Trial | Outcome of Trial | Results on Appeal |
|---|---|---|---|---|---|
| Hoxworth v. Blinder, No. 88-285, E.D. Pa. | Certified (b)(3) | Securities | 1 | Default judgment for plaintiff class | Affirmed; remanded for settlement |
| Melendez v. Illinois Bell Telephone Co., No. 90-5020, N.D. Ill. | Not certified (b)(2) & (b)(3) | Title VII | 8[a] | Injunction and damages for individual plaintiff; partial summary judgment for defendant[a] | Appeal dismissed |
| Jacobs v. Information Resources, No. 89-3772, N.D. Ill. | Certified[b] | Contracts | 20 | For defendant against plaintiff class | Affirmed |
| In re Atlantic Financial, No. 89-645, E.D. Pa. | Certified (b)(3) | Securities | 12 | For defendant against plaintiff class | Appeal dismissed |
| Ceisler v. First Pennsylvania Corp., No. 89-9234, E.D. Pa. | Certified (b)(3) | Securities | 11 | For defendant against plaintiff class | Affirmed |
| Schwartz v. System Software, No. 91-1154, N.D. Ill. | Certified (b)(3) | Securities | 10 | For defendant against plaintiff class | Affirmed |
| Bd. of Managers v. West Chester Areas, No. 92-3407, E.D. Pa. | Not certified (b)(2) | Civil rights | 4 | Directed verdict for defendant against individual plaintiff | Reversed in part; affirmed in part |
| Igo v. County of Sonoma, No. 90-352, N.D. Cal. | Not certified[b] | Civil rights | 3 | For defendant against individual plaintiff | Appeal dismissed |
| Stender v. Lucky Stores, No. 88-1467, N.D. Cal. | Certified (b)(2)&(b)(3) | Title VII | 44[a] | Parties settled after finding for one subclass[a] | No appeal |
| Pucci v. Litwin, No. 88-10923, N.D. Ill. | Not certified (b)(3) | Securities | 4 | Parties settled | No appeal |

[a]Combination bench and jury trial.

[b]Rule 23(b) type not specified.

## Table 44: Bench Trials

| Caption, Docket No., and District | Class Status | Nature of Suit | Days of Trial | Outcome of Trial | Results on Appeal |
|---|---|---|---|---|---|
| Packard v. Provident Nat'l. Bank, No. 91-5229, E.D. Pa. | Certified (b)(1)(A)&(B); (b)(2) | Personal property damage | 4 | For individual plaintiff after prior class settlement | Vacated; remanded for dismissal |
| Hedges v. Wauconda Community, No. 90-6604, N.D. Ill. | Not certified[a] | Civil rights | 2 | For individual plaintiff | Vacated in part; remanded |
| Dowling v. Commonwealth of Pennsylvania, No. 88-7568, E.D. Pa. | Certified (b)(2) | Civil rights | 20 | For defendant against plaintiff class and individual plaintiff | No appeal |
| Berndt v. Budget Rent-A-Car, No. 91-8294, N.D. Ill. | Not certified[a] | Civil rights | 5 | For defendant against individual plaintiff | No appeal |
| Williams v. Cordis Corp., No. 91-484, S.D. Fla. | Not certified (b)(3) | Employee Retirement Income Security Act (ERISA) | 3 | For defendant against individual plaintiff | No appeal |
| Mateo v. M/S KISO, No. 90-2357, N.D. Cal. | Not certified (b)(1),(2) & (3) | Personal injury | NA | For defendant against individual plaintiff | Affirmed |
| Merrill Drydock v. Longkeel, No. 90-2238, S.D. Fla. | Not certified[b] (b)(3) | Contracts | 8 | Parties settled (appeal on damages) | Appeal dismissed |
| Buttino v. FBI, No. 90-1639, N.D. Cal. | Certified (b)(2) | Civil rights | 3 | Parties settled after finding for plaintiff on liability | No appeal |

*Note:* NA = not available.

[a]Rule 23(b) type not specified.

[b]Motion for certification of defendant class denied.

**Table 45: Means and Medians for Fee Awards as Percentage of Gross Settlement Costs in Certified Cases with Court-Approved Settlements Providing No Net Monetary Distribution to Class**

| No Net Monetary Distribution to Class | E.D. Pa. (*n*=16) | S.D. Fla. (*n*=2) | N.D. Ill. (*n*=16) | N.D. Cal. (*n*=4) |
|---|---|---|---|---|
| Fee awards as percentage of gross settlement costs: | | | | |
| Mean | 96% | 88% | 91% | 80% |
| Median | 100% | 88% | 98% | 100% |
| Maximum | 100% | 100% | 100% | 100% |
| Minimum | 63% | 77% | 50% | 21% |
| Fee awards: | | | | |
| Mean award | $911,250 | $171,948 | $351,638 | $1,826,288 |
| Median award | $86,002 | $171,948 | $60,000 | $1,676,076 |
| Gross settlement costs: | | | | |
| Mean amount | $915,812 | $197,500 | $357,566 | $1,877,538 |
| Median amount | $101,000 | $197,500 | $80,197 | $1,676,076 |

*Note:* This table shows the thirty-eight cases where the only monetary distribution was for payments to class representatives, attorneys' fees, or administrative expenses. In addition to these thirty-eight cases, in fourteen certified cases (seven, one, four, two cases in the four districts, respectively), there was no record of a fee request or a fee award and court-approved settlements provided no net monetary distribution to the class. "Net monetary distribution" is net of attorneys' fees and administrative expenses. "Fee award" equals the total amount of fees awarded to plaintiffs' counsel, excluding sanctions and out-of-pocket expenses. "Gross settlement costs" include the following payments by defendants to fund the settlement where applicable: payments to class representatives, attorneys' fees and expenses, and administrative costs of the settlement such as notice costs.

**Table 46: Certified, Settled (b)(3) Classes with No Monetary Distribution to the Class**

| Caption, Docket No., and District | Class Definition | No. of Notices Sent | Total Award to Class Representatives | Nonmonetary Relief | Attorneys' Fee Award (Method) |
|---|---|---|---|---|---|
| Brownell v. State Farm Mutual Auto Ins., No. 90-2224 (E.D. Pa. filed Mar. 29, 1990). | All insureds who submitted a medical payment claim for personal injuries | 1.4 M | None indicated | Defendant agreed (1) not to use written criteria with respect to the duration, frequency, cost, and type of treatment without disclosing such criteria; and (2) not to compensate peer reviewers on a percentage or contingency fee basis | $225,000 (stipulated) |
| Assad v. Hibbard Brown & Co., No. 90-7420 (E.D. Pa. filed Nov. 20, 1990). | All who purchased or sold Children's Workshop Limited securities through defendant | Unknown | $6,000 | Class members who file claims are to receive certificates of monetary credits to be applied to future transactions with defendant | $50,000 (method not specified; $110,000 requested) |
| The Lindner Fund, Inc. v. Pollock, No. 91-6901 (E.D. Pa. filed Nov. 4, 1991). | All purchasers of defendant's common stock during class period | Unknown | None indicated | Settlement stated that plaintiffs' counsel reviewed the prospectuses and, based on discovery, stated that there is no good faith basis for asserting that the prospectuses contain any false or misleading statement or omission | $225,000 (stipulated) |
| Cherkas v. General Motors Corp., No 92-6450 (E.D. Pa. filed Nov. 9, 1992).[a] | Purchasers and owners of specific full-size GM pick-up trucks or chassis cab models | 5.7 M | None indicated | Certificates with a face value of $1,000 toward the purchase of a new GM pick-up truck (Notes: personal injury claims were not released; settlement vacated on appeal) | $9.6 M (stipulated) |
| Cohen v. Alan Bush Brokerage Co., No. 85-8018 (S.D. Fla. filed Jan. 10, 1985). | Purchasers of common stock of Comterm during class period | 305 | $8,000 | Coupons of a total estimated value of $1 million representing a credit for up to 60% of standard commission rates for common stock trading on an agency basis | $168,894 (stipulated up to $420,000; award contingent on number of claims) |
| Rodriguez v. Township of Dekalb, No. 82-20190 (N.D. Ill. filed Nov. 10, 1982). | All applicants for General Assistance (a local welfare program) | Unknown (notice by posting) | $750 | Injunction that all local government administrators adopt and consistently apply written General Assistance standards, maintained in a publicly available manual | $25,000 (method not specified) |

(cont.)

Case 1:05-cv-10438-MLW     Document 106-3     Filed 11/02/2007     Page 291 of 306

## Table 46: Certified, Settled (b)(3) Classes with No Monetary Distribution to the Class (continued)

| Caption, Docket No., and District | Class Definition | No. of Notices Sent | Total Award to Class Representatives | Nonmonetary Relief | Attorneys' Fee Award (Method) |
|---|---|---|---|---|---|
| Harris v. DeRobertis, No. 86-5094 (N.D. Ill. filed July 14, 1986). | All inmates of Cellhouse B-West, Stateville Correctional Center, from 1/8/92 to 1/11/92 | Unknown | None indicated | Claims procedure established—inmates could choose $50 payment without proof of injury or up to $3,000 for physical or psychological injuries sustained as a direct result of the lack of heat in the cellblock | $20,000 (method not specified) |
| Schlansky v. EAC Industries, No. 90-854 (N.D. Ill. filed Feb. 13, 1990). | Purchasers of EAC securities during class period | 222 | $2,000 | 40,000 shares of common stock and 370,000 warrants to buy an issue of stock at $4 a share during a five-year period | $200,000 plus 10,000 shares and 30,000 warrants (stipulated) |
| Aitken v. Fleet Mortgage, No. 90-3708 (N.D. Ill. filed June 28, 1990). | Residential real estate mortgagors with tax and insurance escrows computed by a particular method during the past year | 1.58 M | $12,000 | Rebates to be paid to current and past mortgage holders using a set formula | $1.35 M (stipulated, based on percentage of recovery) |
| Wesley v. GM Acceptance Corp., No. 91-3368 (N.D. Ill. filed May 31, 1991). | Illinois GMAC auto lessees who terminated a lease early and were assessed termination fees | 848 | $3,428 | Recalculation of lease termination charges on an actuarial basis for post-settlement terminations; for presettlement terminations, choice of $80 cash or $300 applied to a new consumer lease within a year of the settlement | $127,542 (lodestar; $150,000 requested) |
| Koerber v. S. C. Johnson & Sons, No. 93-20267 (N.D. Ill. filed Oct. 6, 1993). | All direct and indirect purchasers of Raid or Raid Max during class period | 2,418 | None indicated | (1) Requiring the defendant Bayer to affirmatively offer a license for Cyfluthrin to all of defendant's competitors on nondiscriminatory terms; (2) provide $1.4 million in promotional benefits to direct purchasers and $6.6 million to indirect (consumer) purchasers | $2.5 M (stipulated) |
| McKenna v. Sears Roebuck & Co., No. 92-2227 (N.D. Cal. filed June 12, 1992). | All purchasers of auto repairs from any Sears Center during class period of more than four years | 1 M | None indicated | (1) Enforcing its policy of satisfaction guaranteed or your money back and (2) establishing a method of distributing $50 coupons toward the purchase of brake calipers, coil springs, master cylinder, or idle arm upon showing proof of prior purchase of such an item | $3 M (stipulated) |

*Note:* M = Millions.

[a]The *General Motors Pick-Up Truck Litigation* (55 F.3d 768 (3d Cir.), *cert. denied*, 116 S. Ct. 88 (1995)).

## Table 47: Injunctive Relief in Certified (b)(2) Cases Providing No Net Monetary Distribution to Class

| Caption, Docket No., and District | Injunctive Relief | Fee Award |
|---|---|---|
| Bonsall Village v. Patterson, No. 90-457, E.D. Pa. | Modifying a township's zoning and development plans, encouraging development of an area occupied primarily by minorities | $140,000 |
| Bozzi v. Sullivan, No. 90-2580, E.D. Pa. | Readjudicating claims for widow, widower, survivor and disability benefits using appropriate regulations | $167,500 |
| Packard v. Provident Nat'l Bank, No. 91-5229, E.D. Pa. | Establishing a grievance-arbitration procedure allowing class members to challenge a bank's "sweep fees" applied to investment accounts | $90,000 |
| Avery v. City of Philadelphia, No. 92-7024, E.D. Pa. | Replacing the psychological examination process for police officer applicants, giving class members an opportunity for psychological reexamination | $49,000 |
| Williams v. Philadelphia Housing Authority, No. 92-7072, E.D. Pa. | Establishing a housing authority's policy that applicants will not be determined ineligible for Section 8 housing solely on the basis of a related debt to the housing authority unless that debt is the legal responsibility of the applicant; providing hearing/review procedures for applicants who disagree with authority's findings | $20,558 |
| Felix v. Sullivan, No. 92-7376, E.D. Pa. | Changing the services offered under pharmaceutical, dental, and other medical plans for all state residents who receive medical assistance benefits | $3,997 |
| Brooks v. Philadelphia Housing Authority, No. 93-232, E.D. Pa. | Requiring a housing authority to rewire certain housing units and install a separate meter for common area electric service | $6,624 |
| Keith v. Daley, No. 84-5602, N.D. Ill. | Entering a consent decree (1) that allows the state to regulate abortions and (2) that protects women's right to choose an abortion and receive family planning services | $224,810 |
| Bogard v. Duffy, No. 88-2414, N.D. Ill. | Improving treatment resources and placement opportunities for developmentally disabled Medicaid recipients | $682,681 |
| Castaneda v. Greyhound Retirement and Disability Plan, No. 88-4184, N.D. Ill. | Refraining from denying claims for return of individual contributions to a pension plan | $75,000 |
| Blum v. Icul Service Corp., No. 93-4399, N.D. Ill. | Agreeing that no letter shall be sent threatening consequences for failure to pay a debt before the 30-day validation period during which the alleged debtor may challenge the claim | $10,000 |
| Hiestand v. Schillerstrom, No. 93-6657, N.D. Ill. | Agreeing to modify defendant's collection letter so that no letter is sent demanding payment until after the applicable validation period has expired | $5,500 |
| Buttino v. FBI, No. 90-1639, N.D. Cal. | Adopting Federal Bureau of Investigation policy that "sexual orientation or preference may not be considered as a basis for a negative factor in determining one's suitability for employment" | $53,000 |

*Class Actions*

**Table 48: Donations to Charitable or Public Interest Organizations in Certified Cases with Court Approved Settlements**

| Caption, Docket No., and District | Distribution for Charitable Purposes |
| --- | --- |
| **N.D. Ill.** | |
| M&M v. Chicago Bd. Options, No. 88-02139 | *Cy pres* grants to:<br>Chicago-Kent College of Law—$14,000;<br>DePaul Univ. Law School—$35,000;<br>John Marshall Law School—$35,000;<br>Public Interest Law Initiative—$10,500;<br>Illinois Institute of Technology—$20,000;<br>Loyola Univ. of Chicago—$19,000. |
| *In re* Clozapine Anti-Trust Litigation, No. 91-2431 | (1) Discount credits with a value of $3 million to be used by mental health agencies of thirty-four states to treat patients who do not otherwise qualify for Medicaid benefits for therapy using the drug Clozapine;<br><br>(2) additional $3 million to the National Organization for Rare Diseases (NORD) for treating new Clozaril patients not otherwise qualified for Medicaid reimbursement; and<br><br>(3) a 15% rebate (to be distributed through NORD) for purchases, over a two-year period, of the drug Clozaril by patients on Social Security Disability Income. |
| *In re* Scouring Pads, No. 93-6594 | $150,000 to Chicago Bar Foundation for specified programs on domestic abuse, juvenile justice, and tutoring/mentoring. |
| **N.D. Cal.** | |
| Lucky Stores No. 88-01467 | A specified donation to a nonprofit organization in a Title VII employment discrimination case. |
| *In re* G.E. Energy Choice Light Bulb Consumer Litig., No. 92-4447 | Any money remaining in a rebate and coupon settlement fund to an unspecified charity. |

## Table 49: Reversals and Remands in Cases with Previously Certified Class

| | Cherkas v. General Motors Corp., Case No. 92-06450, E.D. Pa. | Packard v. Provident Nat'l. Bank, Case No. 91-05229, E.D. Pa. | Berman v. Int'l Controls Corp., Case No. 88-06206, S.D. Fla. | Bennett v. Bombela, Case No. 83-00480, N.D. Ill. | Harris v. DeRobertis, Case No. 86-05094, N.D. Ill. | Castaneda v. Greyhound Retirement and Disability Plan, Case No. 88-04184, N.D. Ill. | Untermeyer v. Margolis, No. 87-5491, Case No. 87-05491, N.D. Cal. |
|---|---|---|---|---|---|---|---|
| Issues on appeal | Certification of settlement class; settlement approval; class counsel fees | Bench trial award of punitive damages for individual plaintiff after class settlement | Summary judgment for defendants | Second of two summary judgments for defendants[a] | Case dismissal for failure to state a claim | Summary judgment on liability; declaratory judgment for plaintiff class | Summary judgment for defendants |
| Appeal filed by | Objecting class members | Defendants | Plaintiffs | Plaintiffs | Plaintiffs | Defendants | Plaintiffs |
| Outcome of appeal | Vacated; remanded | Vacated; remanded for case dismissal for lack of subject matter jurisdiction | Reversed in part; vacated in part | Reversed; remanded | Reversed; remanded | Reversed summary judgment; remanded | Affirmed in part; reversed in part; remanded with respect to claims against auditors |
| Eventual outcome of case | Pending[b] | Case dismissed | Court-approved class settlement | Court-approved class settlement | Court-approved class settlement | Court-approved class settlement | Pending[b] |

[a]Prior to class certification, the court of appeals reversed and remanded the first summary judgment for defendants.

[b]On remand after the study's cutoff date of June 30, 1994.

**Table 50: Reversals and Remands in Cases with No Class Previously Certified**

| | Bd. of Managers v. West Chester Areas, Case # 92-03407, E.D. Pa. | Baby Neal v. Casey, Case # 90-02343, E.D. Pa. | O'Neill v. City of Philadelphia, Case # 91-06759, E.D. Pa. | Flores v. Carnival Cruise, Case # 92-02766, S.D. Fla. | Grant v. U.S. Parole Comm., Case # 92-00484, S.D. Fla. | Joaquim v. Royal Caribbean, Case # 92-02767, S.D. Fla. |
|---|---|---|---|---|---|---|
| Cert. ruling preappeal | Yes (not certified) | Yes (not certified) | Yes (not certified) | No ruling | Yes (not certified) | Yes (not certified) |
| Issues on appeal | Directed verdict for defendants | Denial of class certification; partial summary judgment for defendants; stipulated judgment against named plaintiffs | Appeal #1: Denial in part of defendants' motion for summary judgment; Appeal #2: Partial summary judgment for defendant | Summary judgment for defendants | Dismissal of case | Dismissal of case |
| Appeal filed by | Plaintiffs | Plaintiffs | #1: Defendants #2: Plaintiffs | Plaintiffs | Plaintiffs | Plaintiffs |
| Outcome on appeal | Reversed in part; affirmed in part; remanded | Reversed; remanded (without review of partial summary judgment | #1: Vacated; remanded for dismissal of case #2: Appeal dismissed | Affirmed in part; reversed in part; remanded on compensatory claim | Affirmed in part; reversed in part | Reversed in part; vacated in part |
| Class certification after remand | No | No | No | No | No | No |
| Eventual outcome of case | Case dismissal | Case dismissal | Case dismissal | Pending[b] | Case dismissal | Pending[b] |

(cont.)

**Table 50: Reversals and Remands in Cases with No Class Previously Certified (continued)**

| | Bennett v. Bombela, Case # 83-00480, N.D. Ill. | Retired Chicago Police v. City of Chicago, Case # 90-00407, N.D. Ill. | Hedges v. Wauconda Community, Case # 90-06604, N.D. Ill. | Twenty-First Century v. Sherwood, Case # 87-05774, N.D. Cal. | Adesanya v. West America Bank, Case # 88-04342, N.D. Cal. | Miller v. Pacific Lumber Col, Case # 89-03500, N.D. Cal. | Vandenbosch v. Georgia Pacific Corp., Case # 90-00389, N.D. Cal. |
|---|---|---|---|---|---|---|---|
| Cert. ruling preappeal | No ruling | Yes (not certified) | No ruling | No ruling | No ruling | Yes (not certified) | No ruling |
| Issues on appeal | First of two summary judgments for defendants[a] | Denial of motion for class certification and intervention: dismissal of case | Permanent injunction against defendants and nominal damages for individual plaintiffs | Partial summary judgment for defendants; denial of plaintiffs' summary judgment motion | Dismissal of certain claims | Denial of class certification: dismissal of certain class representatives; partial summary judgment for defendant: disqualification of plaintiffs' counsel | Summary judgment for defendants |
| Appeal filed by | Plaintiffs | Plaintiffs: intervenors | Defendants | Plaintiffs | Plaintiffs | Plaintiffs | Plaintiffs |
| Outcome on appeal | Reversed: remanded | Affirmed in part (including affirmed of denial of class certification): reversed in part: remanded | Vacated injunction and damages: remanded on damages | Reversed: remanded | Affirmed in part: reversed in part: remanded | Reversed in part: remanded in part: affirmed disqualification of counsel | Affirmed in part: reversed in part: remanded |
| Class certification after remand | Yes | No | No | Yes | No | No | No |
| Eventual outcome of case | Court-approved class settlement[b] | Pending[b] | $1 to plaintiffs: case dismissal | Court-approved class settlement | Case dismissal | Case dismissal | Case dismissal stipulated by parties |

[a] The second remand after appeal is shown in Table 49.

[b] On remand after the study's cutoff date of June 30, 1994.

**Table 51: Issues and Dispositions on Appeal in E.D. Pa. Class Actions Terminated Between July 1, 1992, and June 30, 1994 (*n*=36 appeals in 31 cases)**

| No. of Appeals | Appellant | Issue on Appeal | Disposition of Appeal |
|---|---|---|---|
| 2 | Defendant | Certification of class | 1 affirmed; 1 not reviewable |
| 1 | Defendant | Default judgment for plaintiff | 1 affirmed |
| 1 | Defendant | Denial in part of summary judgment | 1 vacated, remanded for dismissal |
| 1 | Defendant | Denial of arbitration | 1 affirmed |
| 1 | Defendant | Bench trial judgment for plaintiff | 1 vacated, remanded for dismissal |
| 1 | Defendant | Motion for stay | 1 affirmed |
| 1 | Defendant | Preliminary injunction | 1 affirmed |
| 1 | Defendant | Summary judgment for plaintiff | 1 affirmed |
| 1 | Defendant | Denial of partial summary judgment | 1 appeal dismissed |
| 11 | Plaintiff | Dismissal of case | 9 affirmed; 2 appeals dismissed |
| 5 | Plaintiff | Summary judgment for defendant | 3 affirmed; 2 appeals dismissed |
| 3 | Plaintiff | Partial summary judgment for defendant | 1 affirmed; 1 reversed and remanded; 1 vacated, remanded for dismissal |
| 2 | Plaintiff | Order deeming dismissal motion to be summary judgment motion: issue not available | 1 appeal dismissed as interlocutory; 1 affirmed |
| 2 | Plaintiff | Taxation of defendant's costs | 2 affirmed |
| 1 | Plaintiff | Directed verdict for defendant | 1 reversed in part, affirmed in part |
| 1 | Plaintiff | Denial of class certification | 1 reversed and remanded |
| 1 | Plaintiff | Denial of sanctions | 1 appeal dismissed |
| 1 | Plaintiff | Dismissal of certain claims | 1 appeal dismissed |
| 1 | Plaintiff | Verdict for defendant | 1 appeal dismissed |
| 1 | Objecting class members | Certification of class[a] | 1 vacated and remanded |
| 1 | Objecting class members | Award of fees to plaintiff counsel[a] | 1 vacated and remanded |
| 1 | Objecting class members | Settlement approval[a] | 1 vacated and remanded |
| 1 | Party opposing class | Issue not available | 1 withdrawn |
| 1 | Proposed intervenors | Denial of intervention | 1 affirmed |

*Note:* Some appeals had more than one issue and some cases had more than one appeal.

[a] *General Motors Pick-Up Truck Litigation* (55 F.3d 768 (3d Cir.), *cert. denied*, 116 S. Ct. 88 (1995)).

**Table 52: Issues and Dispositions on Appeal in S.D. Fla. Class Actions Terminated Between July 1, 1992, and June 30, 1994 ($n$=12 appeals in 11 cases)**

| No. of Appeals | Appellant | Issue on Appeal | Disposition of Appeal |
|---|---|---|---|
| 1 | Defendant | Dismissal of case | 1 appeal dismissed |
| 1 | Defendant | Award of fees to plaintiff counsel | 1 affirmed |
| 1 | Defendant | Judgment for plaintiff after trial | 1 appeal dismissed |
| 5 | Plaintiff | Dismissal of case | 2 affirmed; 1 affirmed in part, reversed in part; 1 appeal dismissed; 1 reversed in part, vacated in part |
| 2 | Plaintiff | Summary judgment for defendant | 1 affirmed in part, reversed in part; 1 reversed in part, vacated in part |
| 1 | Plaintiff | Award of fees to plaintiff counsel | 1 affirmed |
| 1 | Non-named class member | Award of fees to plaintiff counsel | 1 appeal dismissed |

**Table 53: Issues and Dispositions on Appeal in N.D. Ill. Class Actions Terminated Between July 1, 1992, and June 30, 1994 ($n$=56 appeals in 39 cases)**

| No. of Appeals | Appellant | Issue on Appeal | Disposition of Appeal |
|---|---|---|---|
| 3 | Defendant | Summary judgment for plaintiff | 1 affirmed; 1 appeal dismissed; 1 reversed |
| 2 | Defendant | Award of fees to plaintiff counsel | 1 remanded for reconsideration; 1 pending |
| 2 | Defendant | Judgment for plaintiff | 1 affirmed in part, vacated in part, and remanded; 1 appeal dismissed |
| 1 | Defendant | Petition for writ of mandamus to recuse trial judge | 1 petition denied |
| 1 | Defendant | Denial of motion to dissolve preliminary injunction | 1 appeal dismissed |
| 1 | Defendant | Judgment for plaintiff | 1 affirmed |
| 1 | Defendant | Extension of time for filing plaintiff notice of appeal | 1 remanded for settlement |
| 18 | Plaintiff | Dismissal of case | 10 affirmed; 4 appeals dismissed; 1 reversed and remanded; 1 remanded for settlement; 2 pending |

(cont.)

*Class Actions*

**Table 53: Issues and Dispositions on Appeal in N.D. Ill. Class Actions Terminated Between July 1, 1992, and June 30, 1994 (*n*=56 appeals in 39 cases) (continued)**

| No. of Appeals | Appellant | Issue on Appeal | Disposition of Appeal |
|:---:|:---:|:---:|:---:|
| 9 | Plaintiff | Summary judgment for defendant | 6 affirmed; 1 appeal dismissed; 2 reversed and remanded |
| 7 | Plaintiff | Dismissal of certain claims | 1 affirmed; 5 appeals dismissed; 1 pending |
| 2 | Plaintiff | Verdict for defendant | 2 affirmed |
| 2 | Plaintiff | Partial summary judgment for defendant | 1 appeal dismissed; 1 pending |
| 1 | Plaintiff | Denial of class certification | 1 affirmed |
| 1 | Plaintiff | Denial of plaintiff attorneys' fees | 1 appeal dismissed |
| 1 | Plaintiff | Dismissal of third-party complaint | 1 affirmed |
| 1 | Plaintiff | Sanctions against plaintiff counsel | 1 affirmed |
| 1 | Plaintiff | Reduction of plaintiff fee request | 1 vacated and remanded |
| 1 | Plaintiff | Transfer of case | 1 appeal dismissed |
| 1 | Plaintiff and proposed intervenor | Denial of injunction | 1 affirmed |
| 1 | Plaintiff and proposed intervenor | Denial of class certification | 1 affirmed |
| 1 | Plaintiff and proposed intervenor | Denial of intervention | 1 affirmed |
| 1 | Plaintiff and proposed intervenor | Summary judgment for defendant | 1 affirmed |
| 2 | Third-party defendant | Settlement approval | 2 appeals dismissed |
| 1 | Third-party defendant | Denial of motion for reconsideration | 1 appeal dismissed |
| 1 | Third-party defendant | Dismissal of third-party defendant's counter-complaint | 1 appeal dismissed |
| 1 | Proposed intervenor–defendant | Denial of intervention | 1 affirmed |

*Note:* Some appeals had more than one issue and some cases had more than one appeal.

**Table 54: Issues and Dispositions on Appeal in N.D. Cal. Class Actions Terminated Between July 1, 1992, and June 30, 1994 ($n$=34 appeals in 23 cases)**

| No. of Appeals | Appellant | Issue on Appeal | Disposition of Appeal |
|:---:|:---:|:---:|:---:|
| 2 | Defendant | Partial summary judgment for plaintiff | 1 affirmed; 1 appeal dismissed |
| 1 | Defendant | Preliminary injunction | 1 appeal dismissed |
| 1 | Defendant | Denial of summary judgment | 1 affirmed |
| 10 | Plaintiff | Dismissal of case | 6 affirmed; 3 appeals dismissed; 1 pending |
| 3 | Plaintiff | Summary judgment for defendant | 1 affirmed; 1 affirmed in part, reversed in part, and remanded; 1 reversed in part, affirmed in part |
| 2 | Plaintiff | Partial summary judgment for defendant | 1 reversed; 1 reversed and remanded |
| 2 | Plaintiff | Judgment for defendant | 1 affirmed; 1 appeal dismissed |
| 2 | Plaintiff | Denial of motion for reconsideration | 1 affirmed in part, reversed in part, and remanded; 1 appeal dismissed |
| 2 | Plaintiff | Dismissal of certain claims | 1 affirmed; 1 affirmed in part, reversed in part, and remanded |
| 2 | Plaintiff | Denial of class certification | 1 appeal dismissed; 1 reversed |
| 1 | Plaintiff | Denial of injunction | 1 appeal dismissed |
| 1 | Plaintiff | Denial of in forma pauperis application | 1 appeal dismissed |
| 1 | Plaintiff | Denial of motion for modification of order | 1 appeal dismissed |
| 1 | Plaintiff | Denial of motion to disqualify judge | 1 appeal dismissed |
| 1 | Plaintiff | Denial of motion to vacate dismissal | 1 appeal dismissed |
| 1 | Plaintiff | Denial of plaintiff attorneys' fees | 1 reversed and remanded |
| 1 | Plaintiff | Bench trial judgment for defendant | 1 affirmed |
| 1 | Plaintiff | Summary judgment for opposing class members | 1 affirmed |
| 1 | Plaintiff | Dismissal of certain class representatives | 1 remanded |
| 1 | Plaintiff | Disqualification of plaintiff counsel | 1 affirmed |
| 1 | Objecting class member | Award of fees to plaintiff counsel | 1 pending |
| 1 | Third-party defendant | Summary judgment for plaintiff | 1 affirmed |

*Note:* Some appeals had more than one issue and some cases had more than one appeal.

## Table 55: Appeals Involving Certification Issues

| | E.D. Pa. Case No. 88-00285 | | E.D. Pa. Case No. 90-02343 | E.D. Pa. Case No. 92-06450 | N.D. Ill. Case No. 90-00407 | N.D. Ill. Case No. 92-07076 | N.D. Cal. Case No. 89-03500 | N.D. Cal. Case No. 93-03160 |
|---|---|---|---|---|---|---|---|---|
| Issues on appeal | Appeal #1: Certification of class; preliminary injunction | Appeal #2: Certification of class; default judgment for plaintiffs | Denial of motion to certify class; partial summary judgment for defendants; stipulated order of judgment against all named plaintiffs on individual claims | Certification of class; class settlement; attorneys' fee award | Denial of motion to certify class; summary judgment for defendants; denial of intervention; denial of preliminary injunction | Denial of motion to certify class; summary judgment for defendants | Denial of motion to certify class; partial summary judgment for defendants | Denial of motion to certify class; denial of injunction |
| §1292(b) certification for appeal | No | No | No; prior motion for 1292(b) certification was denied | | No | No; prior motion for 1292(b) certification was denied | No | No |
| Appeal filed by | Defendant | Defendant | Plaintiffs | Objecting class members | Plaintiffs and proposed intervenors | Plaintiff | Plaintiffs | Plaintiffs |
| Outcome of appeal | Injunction vacated; certification decision not reviewable | Affirmed | Reversed; remanded | Vacated; remanded | Affirmed in part (including affirmative of denial of class certification); reversed in part; remanded | Affirmed | Reversed; remanded[a] | Appeal dismissed |
| Eventual outcome of case | See Appeal #2 (next column) | Court-approved class settlement[b] | Class certified on remand; case pending[b] | Pending[b] | Pending[b] | No class certified; case dismissed | No class certified; case dismissed | No class certified; case dismissed |

[a]Court of appeals held certification is reviewable in combination with partial summary judgment for defendant, settlement of rest of individual claims, and entry of judgment against all named plaintiffs on their individual claims. Appellate court did not review the trial court's partial summary judgment decision, but reversed and remanded it because of the reversal of denial of class certification.

[b]On remand after the study's cutoff date of June 30, 1994.

**Table 56: Firms Most Frequently Serving as Lead or Co-Lead Counsel (Number of Class Action Cases)**

| Firm | Firm's Offices | E.D. Pa. Cases | S.D. Fla. Cases | N.D. Ill. Cases | N.D. Cal. Cases | Total No. of Cases |
|---|---|---|---|---|---|---|
| Chimicles Burt et al. (and Greenfield & Chimicles) | Los Angeles, Cal. West Palm Beach, Fla. Haverford, Pa. | 7 | 4[a] | 0 | 6 | 17[a] |
| Milberg Weiss | San Diego, Cal. New York, N.Y. | 1 | 1 | 0 | 14 | 16 |
| Berger & Montague | San Francisco, Cal. Philadelphia, Pa. | 7 | 2 | 0 | 5 | 14 |
| Lieff Cabraser | San Francisco, Cal. | 1 | 0 | 0 | 7 | 8 |
| Community Legal Services | Philadelphia, Pa. | 8 | 0 | 0 | 0 | 8 |
| Barrack Rodos | San Diego, Cal. Philadelphia, Pa. | 6 | 0 | 0 | 1 | 7 |
| Stephen F. Gold | Philadelphia, Pa. | 5 | 0 | 0 | 0 | 5 |
| Beeler Schad | Chicago, Ill. | 0 | 0 | 4 | 0 | 4 |
| Cohen, Milstein | Washington, D.C. | 0 | 1 | 2 | 1 | 4 |
| Edelman & Combs | Chicago, Ill. | 0 | 0 | 4 | 0 | 4 |
| Kohn (Nast) Savett | Philadelphia, Pa. | 4 | 0 | 0 | 0 | 4 |
| Lawrence Walner & Assoc. | Chicago, Ill. | 0 | 0 | 4 | 0 | 4 |

*Note:* Some firm names changed after they were entered on court records. Each consolidation of cases is counted as one class action case.

[a]Firm was liaison counsel in two additional cases.

*Class Actions*

# Appendix D

## Methods

*Nature of the Database.* The data in this field study report represent a full census of the population of class action cases that were terminated in E.D. Pa., S.D. Fla., N.D. Ill., and N.D. Cal. between July 1, 1992, and June 30, 1994. Unlike the time study data presented to the committee,[358] the field study is not a random sample. It documents all identifiable class action activity in the four districts in cases terminated during the study period and is a sample only in the sense of being limited to that time period.

    *Selection of Courts.* The four courts were selected for the field study on the basis of the level of class action activity shown in the Administrative Office of the U.S. Courts data and on the basis of geography. We undertook to study one court in the eastern, western, midwestern, and southern regions of the country and to study courts that were among the ten courts with the most class action cases filed.[359] We chose the regional approach so that we could examine class actions in different courts, in different circuits, and in different local legal cultures. Our purpose was to study a variety of approaches used by the bench and bar in litigating and adjudicating class actions.

    For each case in the study, an attorney–researcher examined pleadings, documents, briefs, orders, affidavits, declarations, and, when available, transcripts. In particular, we looked at rulings on motions to dismiss, motions for summary judgment, all briefs relating to class certification, filings relating to notice and approval of settlement, applications for attorneys' fees, and any orders relating to these matters. For certified class actions, we gathered a complete set of the notices the court approved. These documents are available to researchers who wish to study the notice process.

    *Identification and Definition of Class Actions.* With each court's assistance we conducted various searches for class actions. Our aim was to find all cases with class action allegations in the complaint or with indications of class action activity in the text of docket entries or published opinions. Because of limited resources available for the study we restricted the time period covered and selected all such cases that had been terminated[360] between July 1, 1992, and

---

    358. *See* Willging et al., *supra* note 26.

    359. We selected the courts before we discovered a substantial undercount of class action activity in the Administrative Office data, as explained below, in this section.

    360. We included in the "terminated" category cases that were closed but had issues pending appeal at the time of our field visit. Our subsequent follow-up on the outcome on appeal determined that, in a few cases, the district court case has been reopened after remand from the court of appeals. Nevertheless, these reopened cases are in-

June 30, 1994.[361] Cases that were consolidated or otherwise grouped were counted as a single case. This approach avoids counting cases more than once when the post-consolidation litigation and rulings took place only once. However, for one purpose in the report, to capture the total number of class action filings, we include the number of cases included in the consolidations (*see supra* § 1(b)).

Our initial search focused on databases provided on tape by the Administrative Office of the U.S. Courts for the five years prior to August 1994. An initial visit to two courts focused on cases identified in the Administrative Office data. In both jurisdictions, a subsequent LEXIS search of published opinions uncovered a large number of class action opinions in cases that were not identified as class actions in the Administrative Office database.

Discovering these cases led us to ask both courts to conduct three searches of their electronic records: one for the class action "flag" that is entered when a case is originally docketed; another for specific "event codes," such as the filing of a motion to certify a class, that identify class action activity; and a final search of the court's electronic docketing system, looking for the word "class."[362] These searches uncovered the majority of the cases in this study.[363] In Table 57 cases in the column "class action allegation" were the only cases identified in the Administrative Office data as class actions. The class action status of all other cases that were eventually included in our study had been recorded in the Administrative Office database as "missing." As Table 57 shows, Administrative Office statistics identified from one-fifth to one-half of the class actions in the four courts.

### Table 57: Class Action Status in Administrative Office Data for All Class Actions Terminated Between July 1, 1992, and June 30, 1994

| Class Action Status | E.D. Pa. ($n = 117$) | S.D. Fla. ($n = 72$) | N.D. Ill. ($n = 117$) | N.D. Cal. ($n = 102$) |
|---|---|---|---|---|
| Class Action Allegation | 22% (26 cases) | 51% (37 cases) | 35% (41 cases) | 45% (46 cases) |
| Missing Data | 78% (91 cases) | 49% (35 cases) | 65% (76 cases) | 55% (56 cases) |

cluded in the study because they were closed at the time of our field visit.

361. We chose this period because the advisory committee expressed an interest in recent class action activity, and July 1, 1992, to June 30, 1994, was the most recent period for which data were available. Two years of data represents the longest continuous period that could be studied with the resources available.

362. After identifying a case that appeared to be a class action, an attorney on the research team examined the docket sheet and file. If a case did not include a class action allegation, class certification activity, or class settlement activity, we excluded it from the study.

363. There may be class action cases that would escape identification by these searches, but they would be cases in which there was no detectable docket entry identifying class action activity and in which the initial complaint and cover sheet did not identify the case as a class action. Presumably, such cases, if they exist, would be rare, would have no or negligible class action activity, and would add little to the reader's understanding of class action litigation.

*Class Actions*

Those data lead to the conclusion that information on class actions reported in the Administrative Office database substantially undercounted class action activity during the study period. Data in our time study report[364] indicated that a substantial, but smaller, undercount occurred during the 1987–1989 time study period. Data from the Federal Judicial Center time study sample and from the Federal Judicial Center study of four courts support the conclusion that in the recent past there were no reliable national data on the number of class action filings and terminations in the federal courts.[365]

*The time study.* In the Federal Judicial Center's district court time study, district and magistrate judges maintained records of the time they spent on a random sample of 8,320 civil cases filed in 86 U.S. district courts between November 1987 and January 1990. Fifty-one of those cases (0.61%, an incidence of 61 class actions for every 10,000 cases filed) contained class action allegations. A case was defined as a class action either by reference to the case statistics maintained by the Administrative Office (36, or 71%) or, where there was no class action indicator in the Administrative Office statistics, to class action activity in a judge's time records (15, or 29%).[366] For all 51 time study cases, we reviewed docket sheets and case file documents of the type we reviewed in the four study districts, as described above.

Though informative, the time study class action data need to be used with caution. The time study data should be read as descriptive of a small national random sample of class actions. In total, the data are certainly more than anecdotal evidence; however, in many instances, information on important class action activity was available only for a small number of cases per district and these instances should be viewed as anecdotal examples. The time study data should not be thought of as representing the universe of class action activity nation-wide.[367]

*Termination cohort limits.* The cases studied comprise what is often called a termination cohort, consisting of all cases that terminated within a fixed time. Fluctuations in case filing rates affect the composition of a termination cohort. For example, if the rate of filing of securities class actions was to have increased abruptly in 1991, terminated securities class actions in our cohort might include more cases of shorter duration (e.g., perhaps more settlements than

---

364. *See* Willging et al., *supra* note 26, at 1, 4–5. Subsequent to the preliminary time study report, our further analysis of the time study data revealed more evidence of a serious undercount. In February 1995 we examined the published Administrative Office statistics for the period of the time study. Between January 1, 1988, and December 31, 1989, the core period of the time study, Administrative Office data indicate that there were 461,050 cases filed in all of the federal district courts and that 1,069 of these, or 0.23%, were recorded as being class actions. That incidence rate—23 class actions per 10,000 cases—is far lower than the rate of 61 per 10,000 cases found in the time study. *See* Willging et al., *supra* note 27, at 8 n.4.

365. In January 1995 the Administrative Office of the United States Courts began reminding U.S. district courts, on a monthly basis, of the correct procedures for reporting filing and termination data related to class action cases. To the extent that these efforts have resulted in a change in reporting from the courts, beginning in 1995 the reported statistics will more accurately reflect class actions in the courts. For further discussion and documentation of the lack of reliable national data on class action activity, *see* Willging et al., *supra* note 26, at 4–5.

366. One case identified in the Administrative Office data as a class action had no indication on the docket sheet or in the documents in the file that any class action allegations were involved. That case was eliminated from the sample discussed in Willging et al., *supra* note 26.

367. The time study data as a whole, of course, are fully suitable to their intended purpose of assigning case weights to various types of cases that were observed with much greater frequency than class actions. There is no separate case weight for class actions.

*Appendix D*                                                                                                 199

trials) than if the filing pattern had been steady. We are unable to examine the filing patterns of class actions because, as discussed above, there are no reliable national data on class action filings. But we do know that the filing pattern for all securities cases (class actions and nonclass actions) has been declining steadily at a rate of about 10% a year during the 1990s. And, securities class actions were the largest single nature of suit in our study, comprising 20% to 35% of the cases in the four districts. Other changes in filing patterns may have affected our cohort of cases. If such fluctuations have occurred, they would likely create an error of a few percentage points. Accordingly, our results—particularly on the time from filing to termination, settlement, or ruling on motions—should be viewed as approximations with a margin of error.

*Limits of the data.* The field study data should be read as descriptive of class action activity solely in the districts and the time period studied. We present these data as a systematic description of such activity, as four snapshots of courts selected because of their level of class action activity and their differences. Activity in one district cannot be generalized to other districts nor, of course, to a universe of class action activity nation-wide.

*Class Actions*

# EXHIBIT C

**C-1**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

———————————————————————————— x
:
IN RE EATON VANCE CORPORATION            :   No. 01 CV 10911 EFH
SECURITIES LITIGATION                    :
:
———————————————————————————— x

*E.F.H*

## [PROPOSED] ORDER GRANTING LEAD COUNSEL'S MOTION
## FOR ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES

WHEREAS:

A.     Lead Counsel, on behalf of all Plaintiffs' Counsel and Lead Plaintiffs Donald Chesner,
Elizabeth Chesner, the Sophie B. Bialeck Trust, and the Estate of Woodson W. Bassett, Jr., have filed
their Motion for an Award of Attorneys' Fees and Reimbursement of Expenses.

B.     This Court entered an Order Preliminarily Approving Settlement and Providing for
Notice to the Class dated January 9, 2006 (the "Preliminary Approval Order"), preliminarily approving
the proposed Settlement, directing individual and publication notice to potential Class Members,
scheduling a hearing for April 26, 2006 (the "Fairness Hearing"), and providing Class Members with an
opportunity to object to, *inter alia*, Lead Counsel's Request for Attorneys' Fees and Reimbursement of
Expenses and to be heard concerning such objections;

C.     Notice has been provided to the members of the Class in accordance with the
Preliminary Approval Order, as evidenced by the Affidavit of Thomas R. Glenn of Complete Claim
Solutions, Inc.;

D.     The Notice disseminated to Class Members in accordance with the Preliminary Approval
Order contained the maximum amounts Lead Counsel would seek for attorneys' fees and
reimbursement of expenses, respectively;

- 1 -

E.      Pursuant to the Preliminary Approval Order and as set forth in the Notice, any objections to Lead Counsel's Request for Attorneys' Fees and Reimbursement of Expenses were to be filed and served by April 12, 2006; and

F.      No objections to Lead Counsel's Request for Attorneys' Fees and Expenses have been received within the time frame set by the Court or to date.

G.      The Court held the Fairness Hearing on April 26, 2006 and has determined that the proposed Settlement of the Action on the terms and conditions provided in the Settlement Agreement is fair, reasonable, and adequate and should be approved by the Court, and entered the Final Judgment as provided for in the Settlement Agreement; and

WHEREAS, the Court, having considered all matters submitted to it at the hearing, along with all prior submissions by the Parties to the Settlement and others, and otherwise having determined the fairness and reasonableness of Lead Counsel's Motion for Attorneys' Fees and Reimbursement of Expenses;

NOW, THEREFORE, IT IS HEREBY ORDERED:

1.      This Order incorporates by reference the definitions in the Settlement Agreement, and all terms used herein shall have the same meanings as set forth in the Settlement Agreement.

2.      This Court has jurisdiction over the subject matter of Lead Counsel's Motion for Attorneys' Fees and Reimbursement of Expenses and all matters relating thereto, including all members of the Class.

3.      Due and adequate notice of the maximum amounts of Lead Counsel's Request for Attorneys' Fees and Reimbursement of Expenses, respectively, was directed to all persons who were reasonably identifiable Class members advising them of their right to object thereto.

4.      The award for attorneys' fees set forth below is reasonable as measured by applicable factors set forth in Coutin v. Young & Rubicam Puerto Rico, Inc., 124 F.3d 331, 337 n.3 (1st Cir. 1997) (citing Johnson v. Georgia Highway Express, Inc., 488 F.2d 714-717-19 (5th Cir. 1974)).

5. The award of attorneys' fees set forth below represents a reasonable percentage of the proceeds of the Settlement given the facts and proceedings in this case.

6. Accordingly, Lead Counsel, on behalf of all Plaintiffs' Counsel, are awarded attorneys' fees of $3,150,000.00, representing thirty percent (30%) of the Settlement Fund of $10.5 million, plus interest at the same rate as earned by the Settlement Fund, which shall be paid out of the Settlement Fund.

7. Lead Counsel, on behalf of all Plaintiffs' Counsel, are awarded reimbursement of expenses in the aggregate amount of $707,270.10, which shall be paid out each Settlement Fund. These expenses are fair, reasonable and were necessarily incurred in connection with the prosecution of this litigation. Lead Plaintiffs Donald Chesner and Elizabeth Chesner are awarded the sum of $26,485.00; Richard K. Bialeck, Trustee for Lead Plaintiff Sophie B. Bialeck Trust, is awarded the sum of $611.02; and the Estate of Lead Plaintiff Woodson W. Bassett, Jr. is awarded the sum of $6,000.00, as reasonable costs and expenses directly relating to their representation of the Class as provided in 15 U.S.C. § 77z-1(a)(4), such amounts to be paid out of the Settlement Fund.

8. The attorneys' fees and expenses approved by the Court in paragraphs 6 and 7 hereof (the "Fee and Expense Award") shall be payable from the Settlement Fund to Lead Counsel, on behalf of all Plaintiffs' Counsel and the Lead Plaintiffs, immediately upon entry of this Order (subject to the repayment provisions of ¶ 8.2 of the Settlement Agreement), notwithstanding the existence of any potential appeal or collateral attack on this Order.

9. Lead Counsel shall thereafter allocate the Fee and Expense Award payable as follows: (a) the attorneys' fees approved in paragraph 6 hereof among all Plaintiffs' Counsel in a manner that, in Lead Counsel's good-faith judgment, reflects such counsel's contribution to the institution, prosecution, or resolution of the Action; and (b) the expenses approved in paragraph 7 hereof, among each Plaintiffs' Counsel and Lead Plaintiff as approved by the Court.

- 3 -

10.     The Court hereby retains and reserves jurisdiction over all matters relating to the administration, consummation, enforcement, and interpretation of the Settlement Agreement, and for any other necessary purpose, including, but not limited to, any distribution to Authorized Claimants under the terms and conditions of the Settlement Agreement and pursuant to further orders of this Court.

IT IS SO ORDERED.

Dated: April 26, 2006

HON. EDWARD F. HARRINGTON, JR.
UNITED STATES DISTRICT JUDGE

# C-2

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JEROME DECKLER, Individually and On Behalf of All Others Similarly Situated, | ) ) | No. 03-CV-10393-WGY |
| | ) | [PROPOSED] ORDER AWARDING |
| Plaintiff, | ) ) | ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES |
| vs. | ) | |
| IONICS, INC., et al., | ) ) | |
| Defendants. | ) ) | |
| | ) | |

THIS MATTER having come before the Court on the application of Lead Plaintiff's counsel for an award of attorneys' fees and reimbursement of expenses incurred in the Litigation; the Court, having considered all papers filed and proceedings conducted herein, having found the settlement of this Litigation with the defendants to be fair, reasonable and adequate and otherwise being fully informed in the premises and good cause appearing therefor;

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:

1.  This Court has jurisdiction over the subject matter of this application and all matters relating thereto, including all Members of the Class who have not timely and validly requested exclusion.

2.  The Court hereby awards attorneys' fees of thirty percent (30%) of the settlement proceeds of $3,000,000 and reimbursement of expenses in an aggregate amount of $91,544.94. Said fees and expenses shall be allocated among plaintiff's counsel by Plaintiff's Settlement Counsel in a manner which, in their good-faith judgment, reflects each counsel's contribution to the institution, prosecution and resolution of the Litigation. The Court finds that the amount of fees

awarded is fair and reasonable under the "percentage-of-recovery" method. The awarded attorneys'

fees and expenses shall be paid to Plaintiff's Settlement Counsel from the settlement proceeds,

subject to the terms, conditions, and obligations of the Stipulation of Settlement dated as of

December 8, 2004.

    IT IS SO ORDERED.

DATED: _____4-4-05_____       _William A. Young_____

                         THE HONORABLE WILLIAM G. YOUNG
                         UNITED STATES DISTRICT JUDGE

S:\Settlement\Ionics.set\ORD00019534.doc

- 2 -

**C-3**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE SEGUE SOFTWARE, INC. SECURITIES LITIGATION | C.A. 99-10891-RGS |

## ORDER AND FINAL JUDGMENT

On July 26, 2000, this Court dismissed with prejudice Plaintiffs' Consolidated Amended Class Action Complaint. Plaintiffs appealed to the United States Court of Appeals for the First Circuit. On December 22, 2000, the parties jointly moved to remand the case to this Court for the limited purpose of approving settlement. The Court of Appeals granted that motion on February 16, 2001.

On the 30th day of July, 2001, a hearing was held before this Court to determine: (1) whether the terms and conditions of the Stipulation and Agreement of Settlement dated April 13, 2001 (the "Stipulation") are fair, reasonable, and adequate for the settlement of all claims asserted by the Class against the Defendants in the Complaint now pending in this Court under the above caption, including the release of the Defendants and the Released Parties, and should be approved; (2) whether final judgment should be entered dismissing the Complaint on the merits and with prejudice in favor of the Defendants and as against all persons or entities who are members of the Class herein who have not requested exclusion therefrom; (3) whether to approve the Plan of Allocation as a fair and reasonable method to allocate the Settlement proceeds among the members of the Class; and (4) whether and in what amount to award Plaintiffs' Counsel's fees and reimbursement of expenses.

The Court having considered all matters submitted to it at the hearing and otherwise; and it

Doc#: 119266 Ver#:1 2749:1386

appearing that a notice of the hearing substantially in the form approved by the Court was mailed to

all persons or entities reasonably identifiable, who purchased the common stock of Segue Software,

Inc. ("Segue") during the period July 14, 1998 through April 9, 1999, inclusive (the "Class Period"),

except those persons and entities excluded from the definition of the Class, as shown by the records

of Segue's transfer agent, at the respective addresses set forth in such records, and that a summary

notice of the hearing substantially in the form approved by the Court was published on May 23,

2001, in the national edition of <u>Investors Business Daily</u> pursuant to the specifications of the Court;

and that as of July 30, 2001, plaintiffs' counsel have received only one request for exclusion from

the Class, which is annexed hereto as Exhibit A; and the Court having considered and determined

the fairness and reasonableness of the award of attorneys' fees and expenses requested; and all

capitalized terms used herein having the meaning as set forth and defined in the Stipulation.

    NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

    1.    The Court has jurisdiction over the subject matter of the Action, the Plaintiffs and all

members of the Class, and the Defendants.

    2.    The Court finds that the prerequisites for a class action under Rule 23(a) and (b)(3)

of the Federal Rules of Civil Procedure have been satisfied in that (a) the number of Class members

is so numerous that joinder of all members thereof is impracticable; (b) there are questions of law

and fact common to the Class; (c) the claims of the Class Representatives are typical of the claims

of the Class they seek to represent; (d) the Class Representatives have and will fairly and adequately

represent the interest of the Class; (e) the questions of law and fact common to the members of the

Class predominate over any questions affecting only individual members of the Class; and (f) a class

action is superior to other available methods for the fair and efficient adjudication of the controversy.

3.      Pursuant to Rule 23 of the Federal Rules of Civil Procedure, this Court hereby finally

certifies this action as a class action on behalf of all persons who purchased the common stock of

Segue during the Class Period.  Excluded from the Class are Defendants, the officers and directors

of Segue during the Class Period, members of their immediate families (spouses, parents, siblings

and children), their legal representatives, heirs, successors, predecessors or assigns and any entity

in which Defendants have or had a controlling interest.  Also excluded from the Class are the persons

and/or entities who timely requested exclusion from the Class as listed on Exhibit A annexed hereto.

4.      Notice of the pendency of this Action as a class action and of the proposed Settlement

was given to all Class members who could be identified with reasonable effort.  The form and

method of notifying the Class of the pendency of the action as a class action and of the Settlement

and its terms and conditions met the requirements of Rule 23 of the Federal Rules of Civil Procedure

and due process, constituted the best notice practicable under the circumstances, and constituted due

and sufficient notice to all persons and entities entitled thereto.

5.      The Stipulation and the Settlement provided for therein are approved as fair,

reasonable and adequate, and the Class members and the parties are directed to consummate the

Stipulation in accordance with its terms and provisions.

6.      The Complaint, which the Court finds was filed on a good faith basis in accordance

with the Private Securities Litigation Reform Act and Rule 11 of the Federal Rules of Civil

Procedure based upon all publicly available information, is hereby dismissed with prejudice and

without costs.

7.      Plaintiffs and the other members of the Class and the heirs, executors, administrators,

representatives successors, assigns, agents, affiliates and partners of any of them and any person they

any other capacity, any Settled Defendants' Claims (as defined in the Stipulation) against any of the Plaintiffs, Class members or their attorneys.    The Settled Defendants' Claims are hereby compromised, settled, released, discharged and dismissed on the merits and with prejudice by virtue of the proceedings herein and this Order and Final Judgment.

9.     Neither this Judgment, the Stipulation, nor any of its terms and provisions, nor any of the negotiations or proceedings connected with it, nor any of the documents or statements referred to therein shall be:

(a)     offered or received against the Defendants or against the Plaintiffs or the Class as evidence of or construed as or deemed to be evidence of any presumption, concession, or admission by any of the Defendants or by any of the Plaintiffs or the Class with respect to the truth of any allegation by Plaintiffs or the validity of any claim that had been or could have been asserted in the Action or in any litigation, or the deficiency of any defense that has been or could have been asserted in the Action or in any litigation, or of any liability, negligence, fault, or wrongdoing of Defendants;

(b)     offered or received against the Defendants as evidence of a presumption, concession or admission of any fault, misrepresentation or omission with respect to any statement or written document approved or made by any Defendant, or against the Plaintiffs and the Class as evidence of any infirmity in the claims of Plaintiffs and the Class;

(c)     offered or received against the Defendants or against the Plaintiffs or the Class as evidence of a presumption, concession or admission with respect to any liability, negligence, fault or wrongdoing, or in any way referred to for any other reason as against any of the parties to the Stipulation, in any other civil, criminal or administrative action or proceeding, other than such

proceedings as may be necessary to effectuate the provisions of the Stipulation; provided, however, that Defendants may refer to and rely upon the Stipulation to effectuate the liability protection granted them thereunder;

(d)    construed against the Defendants or the Plaintiffs and the Class as an admission or concession that the consideration to be given hereunder represents the amount which could be or would have been recovered after trial; or

(e)    construed as or received in evidence as an admission, concession or presumption against Plaintiffs or the Class or any of them that any of their claims are without merit or that damages recoverable under the Complaint would not have exceeded the Settlement Fund.

10.    The Plan of Allocation is approved as fair and reasonable, and Plaintiffs' Counsel and the Claims Administrator are directed to administer the Stipulation in accordance with its terms and provisions.

11.    The Court finds that all parties and their counsel have complied with each requirement of Rule 11 of the Federal Rules of Civil Procedure as to all proceedings herein.

12.    Plaintiffs' Counsel are hereby awarded the sum of $ **415,470** fees, which sum the Court finds to be fair and reasonable, and $ **45,000** in reimbursement of expenses, which amounts shall be paid to Plaintiffs' Lead Counsel from the Settlement Fund with interest from the date such Settlement Fund was funded to the date of payment at the same net rate that the Settlement Fund earns. The award of attorneys' fees shall be allocated among Plaintiffs' Counsel in a fashion which, in the opinion of Plaintiffs' Lead Counsel, fairly compensates Plaintiffs' Counsel for their respective contributions in the prosecution of the Action.

13.     Exclusive jurisdiction is hereby retained over the parties and the Class members for all matters relating to this Action, including the administration, interpretation, effectuation or enforcement of the Stipulation and this Order and Final Judgment, and including any application for fees and expenses incurred in connection with administering and distributing the Settlement proceeds to the members of the Class.

14.     Without further order of the Court, the parties may agree to reasonable extensions of time to carry out any of the provisions of the Stipulation.

15.     There is no just reason for delay in the entry of this Order and Final Judgment and immediate entry by the Clerk of the Court is expressly directed pursuant to Rule 54 (b) of the Federal Rules of Civil Procedure.

Signed this **31st** day of *July*_____, 2001.

*Richard S. Stearns*_____

UNITED STATES DISTRICT JUDGE

C-4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---

Civil Action No. 00-CV-12090-EFH
All Actions

In re Interspeed, Inc. Securities Litigation

---

## ORDER AND FINAL JUDGMENT

On the 10th day of July, 2001, a hearing was held before this Court to determine: (1) whether this action should be finally certified as a class action for the purposes of settlement, pursuant to Rule 23(a) and (b)(3) of the Federal Rules Of Civil Procedure on behalf of the Class as defined in this Court's Preliminary Order in Connection with Settlement Proceedings dated April 5, 2001 (the "Preliminary Approval Order");[1] (2) whether the terms and conditions of the Stipulation and Agreement of Compromise, Settlement, and Release, dated March 14, 2001 (the "Stipulation") are fair, reasonable, and adequate for the settlement of all claims asserted by the Class against the defendants in the Complaint now pending in this Court under the above caption, including the release of the Defendants and the Released Parties, and should be approved; (3) whether judgment should be entered dismissing the Complaint on the merits and with prejudice in favor of the Defendants as against all persons or entities who are members of the Class certified in the Preliminary Order in Connection with Settlement Proceedings and who have not requested exclusion

---

[1]    Unless otherwise defined herein, all capitalized terms used herein shall have the meanings set forth in the Stipulation and Agreement of Compromise, Settlement and Release, dated March 14, 2001.

therefrom; and (4) whether and in what amount to award Plaintiffs' counsel attorneys' fees and reimbursement of expenses. The Court having heard all persons properly appearing and requesting to be heard; having considered all other matters properly submitted to it at the hearing and otherwise; and it appearing that a notice of the hearing substantially in the form approved by the Court was mailed to all Class Members reasonably identifiable from the records of Interspeed, at the respective addresses set forth in such records, and that a summary notice of the hearing substantially in the form approved by the Court was published in <u>Investor's Business Daily</u> pursuant to the directions of the Court; and the Court having considered and determined the fairness and reasonableness of the award of attorneys' fees and expenses requested; and finds that this Order and Final Judgment should be entered.

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1.      This action satisfies, for the purposes of the Settlement, the applicable prerequisites for class action treatment under Rules 23(a) and (b) of the Federal Rules of Civil Procedure. The Class as defined in the Stipulation is so numerous that joinder of all members is impracticable; there are questions of law and fact common to the Class; the claims of the Class representatives are typical of the claims of the Class; and the Class representatives will fairly and adequately protect the interests of the Class. Questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

2.      This action is hereby certified as a class action, for purposes of the Settlement only, on behalf of a class consisting of: all persons and entities who purchased or otherwise acquired Interspeed common stock during the time period beginning and including September

- 2 -

24, 1999 through and including October 6, 2000 (the "Class Period"). Excluded from the Class are the Defendants in this action, members of the immediate families of each of the Defendants, any Person in which any Defendant has a controlling interest or who is related to or affiliated with any Defendant, and the legal representatives, heirs, successors in interest, or assigns of any such excluded party. Also excluded from the Class are all the persons or entities listed on Exhibit A appended hereto, each of which has filed a valid request for exclusion from the Class.

3.    The terms of the Stipulation and the Settlement embodied therein are approved as fair, reasonable, and adequate, and in the best interests of the Class. The parties are directed to consummate the Stipulation in accordance with its terms and provisions.

4.    The Actions are hereby dismissed on the merits with prejudice, with each party to bear his/its own respective costs, except as provided in the Stipulation.

5.    Upon the Effective Date, the Lead Plaintiffs, Class, all Class Members, and the successors and assigns of any of them, are hereby permanently barred and enjoined from instituting, commencing, or prosecuting, either directly, derivatively, or in any other capacity, any Settled Claims against any of the Released Parties. The Settled Claims are hereby compromised, settled, released, discharged, and dismissed on the merits and with prejudice by virtue of the proceedings herein and this Order and Final Judgment.

6.    Upon the Effective Date, each of the Released Parties shall be deemed to have, and by operation of this Order and Final Judgment shall have, fully, finally, and forever released, relinquished, and discharged each and all of the Class Members, the Lead Plaintiffs and Plaintiffs' Counsel from all claims (whether or not known or suspected), arising out of, relating

- 3 -

to, or in connection with the institution, prosecution, assertion, settlement, or resolution of the Actions or the Settled Claims.

7.    Neither the Stipulation, nor any of its terms and provisions, nor any of the negotiations or proceedings connected with it, nor any of the documents or statements referred to therein shall be:

A.    Construed as, or deemed in any judicial, administrative, arbitration, mediation, or other type of proceeding to be evidence of, a presumption, concession, or an admission by any of the Released Parties of the truth of any fact alleged or the validity of any claim that has been, could have been or in the future might be asserted in the Actions, whether directly or derivatively, or otherwise against the Released Parties, or of any purported liability, fault, wrongdoing or otherwise of the Released Parties; or

B.    Offered or received in evidence in any judicial, administrative, arbitration, mediation, or other type of proceeding for any purpose whatsoever, including, but not limited to, as a presumption, concession or an admission of any purported liability, wrongdoing, fault, negligence, misrepresentation, or omission in any statement, document, report, or financial statement heretofore or hereafter issued, filed, approved, or made by any of the Released Parties or otherwise referred to for any other reason, other than for the purpose of, and in such proceeding as may be necessary for, construing, terminating or enforcing the Stipulation; or

C.    Construed as a concession or an admission that the Class Representatives or the Class have suffered any damage; or

- 4 -

D.    Construed as or received in evidence as an admission, concession, or presumption against the Class Representatives or the Class or any of them that any of their claims are without merit or that damages recoverable in the Actions would not have exceeded th Settlement Amount.

8.    Plaintiffs' counsel are hereby awarded *thirty* percent of the amounts deposited into the Settlement Fund as attorneys' fees, which sum the Court finds to be fair and reasonable, and $ *85,559.25* in reimbursement of expenses, plus the interest earned on such expenses as outlined in the Stipulation, which shall be paid to Plaintiffs' Co-Lead Counsel from the Settlement Fund.  The award of attorneys' fees shall be allocated among Plaintiffs' counsel in a fashion that, in the opinion of Plaintiffs' Co-Lead Counsel, fairly compensates each of Plaintiffs' Counsel for their respective contributions in the prosecution of the litigation.

9.    The Court finds that during the course of this action, the parties and their respective counsel at all times complied with the requirements of Rule 11 of the Federal Rules of Civil Procedure.

10.    The Court hereby retains exclusive jurisdiction over the parties and the Class Members for all matters relating to this litigation, including the administration, interpretation, effectuation, or enforcement of the Stipulation and this Order and Final Judgment.

11.    Without further order of the Court, the parties may agree to reasonable extensions of time to carry out any of the provisions of the Stipulation.

12.    There is no just reason for delay in the entry of this Order and Final Judgment, and immediate entry by the Clerk of the Court is expressly directed pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.

SO ORDERED this _10_ day of _July_, 2001

EDWARD F. HARRINGTON
UNITED STATES DISTRICT JUDGE

- 6 -

C-5

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

"FILED IN OPEN COURT"
4 - 2 5 - 0 1

|  |  |
|---|---|
| IN RE SUMMIT TECHNOLOGY<br>SECURITIES LITIGATION | )<br>)<br>) |
| | ) |
| THIS DOCUMENT RELATED TO: | )<br>) |
| ALL ACTIONS | )<br>)<br>) |

Civil Action No. 96-11589-JLT

**FINAL ORDER AND JUDGMENT AWARDING ATTORNEYS' FEES,
REIMBURSEMENT OF EXPENSES AND COMPENSATORY AWARDS**

The Court having held the Settlement Hearing on April 25, 2001 and having

considered all prior proceedings in the Litigation and all submissions made in connection

with the proposed Settlement;

NOW, THEREFORE, it is ORDERED, ADJUDGED and DECREED that:

1.      The Court has jurisdiction over the subject matter of the Litigation and

over all parties to the Litigation, including all Class members.

2.      Plaintiffs' Lead Counsel are awarded the sum of $ _Three Million Three hundred Thousand dollars_

in fees, equivalent to __33__ % of the Settlement Fund.  This fee shall be awarded as

provided in the Settlement Agreement together with interest earned on the Settlement

Fund from the date of the deposit to the date of payment.  Plaintiffs' Lead Counsel shall

in their sole discretion, allocate the award of attorneys' fees to all Plaintiffs' Classes

Counsel in the amounts Plaintiffs' Lead Counsel deems appropriate based upon the work

performed and contribution made to the Litigation of the action by the non-lead counsel.

3.    Plaintiffs' Lead Counsel are further awarded $_____ as

reimbursement for their reasonable out-of-pocket expenses incurred in the prosecution of

this Litigation, to be paid out of the Settlement Fund.

4.    Lead Plaintiffs Peter and Gloria Babigian, Scott Burke, Joseph Conzola

and the Teachers' Retirement System of Louisiana and Class Plaintiffs G.O. Morphew

and William E. Myers shall receive $_____, collectively for undertaking

representation of the Classes, and for assistance provided to Plaintiffs' Lead Counsel in

the course of the litigation.  The monies awarded to each of these Lead Plaintiffs and

Class Plaintiffs shall be in addition to each of their proportionate shares of the Settlement

Fund.

5.    The foregoing awards of fees and expenses shall be paid out of the

Settlement Fund and distributed at the times and in the manner provided in the Settlement

Agreement.

6.    Without affecting the finality of this Final Order and Judgment, the Court

hereby retains exclusive jurisdiction over the Litigation and the parties to the Settlement

for all matters related to this Litigation, including the administration, interpretation,

effectuation or enforcement of the Settlement Agreement and this Judgment, and

including any application for fees and expenses incurred in connection with the

administration and distribution of the Settlement Fund to the Classes.

Dated: _____, 2001

Joseph L. Tauro
United States District Judge

2

**C-6**

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

JOSEPH CHALVERUS, et al., individually and
on behalf of all others similarly situated,

Plaintiffs,

v.

PEGASYSTEMS, INC., ALAN TREFLER, and
IRA VISHNER,

Defendants.

C.A. No. 97-12570-WGY

## FINAL JUDGMENT

This matter having come before the Court for hearing on December 18, 2000, pursuant to
this Court's Order dated September 20, 2000 on the application of the parties for approval of the
settlement of this action (the "Settlement"), the terms and conditions of which are set forth in the
Stipulation of Settlement dated September 19, 2000 (the "Stipulation"), and exhibits attached
thereto; due and adequate Notice having been given to the Class as required in said Order; the Court
having considered the Stipulation and all papers filed and proceedings had herein; and good cause
appearing therefor;

IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.    This Judgment incorporates by reference the definitions in the Stipulation, and all
terms used herein shall have the same meanings as set forth in the Stipulation.

2.    This Court has jurisdiction over the subject matter of the Action and over all
parties to the Action, including all members of the Class.

DOCKETED 51

3.    The Court finds that this action may be maintained as a class action pursuant to Rule 23(b)(3), in that :

      a.    The class is so numerous that joinder of all members is impracticable;

      b.    There are questions of law or fact common to the class;

      c.    The claims of the representative plaintiffs are typical of the claims of the class;

      d.    The representative plaintiffs will fairly and adequately protect the interests of the class;

      e.    The questions of law or fact common to the members of the class predominate over any questions affecting only individual members; and

      f.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

4.    The Class is defined as all persons or entities (other than those who timely and validly requested exclusion from the Class) or entities who purchased the common stock of Pegasystems, Inc. ("Pegasystems") during the period from July 30, 1997 through October 29, 1997, inclusive, and who were damaged thereby, except Defendants herein (the "Class"). Excluded from the Class are all persons listed on Exhibit 1 hereto who have submitted timely requests for exclusion from the Class.

5.    Pursuant to Fed. R. Civ. P. 23 and §3(a)(10) of the Securities Act of 1933, this Court hereby approves the Settlement embodied in the Stipulation and finds that the Settlement is fair, reasonable and adequate and in the best interests of the Class.

6.    This action is hereby dismissed in its entirety as against all Defendants as to all Plaintiffs and Class members with prejudice and without costs to any party as against any other party, except as provided in the Stipulation.

7.    Each member of the Class shall be deemed conclusively to have released the Settled Claims against the Defendants and Released Parties, as provided in the Stipulation. Notwithstanding that any member of the Class may hereafter discover facts in addition to or different from those which the members of the Class now know or believe to be true with respect to the Action and Settled Claims, or to the subject matter of the release, each member of the Class shall be deemed, upon the Effective Date of the Settlement (as defined in the Stipulation), to fully, finally and forever settle and release any and all Settled Claims, as against the Defendants and Released Parties including all claims known or unknown, suspected or unsuspected, contingent or non-contingent, which now exist, may hereafter exist, or heretofore have existed, and without regard to the subsequent discovery or exercise of any such different or additional facts.

8.    Each Defendant shall be deemed conclusively to have released any and all claims relating to and including the Settled Claims against the members of the Class, Lead Plaintiffs and Plaintiffs' Counsel, as provided in the Stipulation.

9.    Each member of the Class shall be deemed conclusively to have released any and all claims relating to and including the Settled Claims against Lead Plaintiffs and Plaintiffs' Counsel, as provided in the Stipulation.

10.    Each member of the Class is permanently barred and enjoined from prosecuting the Settled Claims against the Defendants and Released Parties, as provided in the Stipulation.

11.    This Court hereby reserves jurisdiction, without affecting the finality of this Judgment, over:

3

a.  Implementation of the Settlement and any award or distribution of the

Settlement Fund, including interest earned/accrued thereon;

b.  Disposition of the Settlement Fund;

c.  Hearing and determining Plaintiffs' applications for attorneys' fees,

costs, and expenses (including fees and costs of experts and/or consultants) and

interest thereon;

d.  Enforcing and administering the Stipulation, including any releases

in connection therewith; and

e.  Other matters related or ancillary to the foregoing.

12.  The Court hereby awards to Plaintiffs' Counsel $ *1,732,500* in

attorneys' fees, with interest at the same rate as earned on the Settlement Fund, and

$ *139,904* in expenses to be paid out of the Settlement Fund, as provided in the

Stipulation and Notice approved by this Court. The award of attorneys' fees shall be allocated

among Plaintiffs' Counsel by Wolf Popper LLP, Chair of Plaintiffs' Executive Commitee, in a

fashion which, in the opinion of Wolf Popper LLP, fairly compensates each of Plaintiffs' Counsel

for their respective contributions in the prosecution of this Action.

13.  Lead Plaintiff Joseph Chalverus, one of the Class Representatives, is reimbursed

$ *2493* for his reasonable costs and expenses (including lost wages) directly related to his

representation of the Class.

14.  Lead Plaintiff Robert Harrer, one of the Class Representatives, is reimbursed

$ *1000* for his reasonable costs and expenses (including lost wages) directly related to his

representation of the Class.

4

15.    If the Effective Date does not occur, or if the Stipulation is terminated or canceled
pursuant to its terms, then this Final Judgment shall be rendered null and void and shall be vacated
and, in such event, all orders entered in connection therewith shall be vacated and rendered null and
void.

16.    Without further order of the Court, the Parties may agree to reasonable extensions
of time to carry out any provisions of the Stipulation.

17.    The Court hereby directs that this Final Judgment be entered by the clerk forthwith
pursuant to Federal Rule of Civil Procedure 54(b).  The direction of the entry of Final Judgment
pursuant to Rule 54(b) is appropriate and proper because this Final Judgment fully and finally
adjudicates the claims of the plaintiffs and the Class against the Defendants in this Action, it allows
consummation of the Settlement, and it will expedite the distribution of the Settlement proceeds to
the Class members.

Dated: _December 19_ , 2000

_William G. Young_
William G. Young
Chief Judge
United States District Court

5

**EXHIBIT 1**


No requests for exclusion.

C-7

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
------------------------------------x
RICHARD ZEID, KHOSROW and            :
HAIDEH ARDALAN, MICHAEL GATELY,      :
S & S ASSOCIATES, JAMES C.           :
CASTEEL, JAY MURRAY and AVI          :
TIROSH, individually and on behalf   :
of all persons similarly situated,   :
                                     :
          Plaintiffs,                :
                                     :        Civil Action No.
     v.                              :        96-12466-EFH
                                     :
OPEN ENVIRONMENT CORPORATION,        :
NATHAN P. MORTON, JAMES J.           :
DRISCOLL, ADAM HONIG, and            :
PHILLIP R. COPELAND,                 :
                                     :
          Defendants.                :
------------------------------------x
```

ORDER OF FINAL APPROVAL
AND
FINAL JUDGMENT OF DISMISSAL

This matter has come before the Court pursuant to the order of
the Court dated May 10, 1999 (the "Preliminary Approval Order"),
for approval of a settlement of the class actions consolidated
under the above caption (the "Class Action").  The parties to the
Class Action have requested approval of the Settlement set forth in
the Stipulation and Agreement of Compromise and Settlement dated
May 7, 1999 (the "Stipulation").  The Court has considered all
papers filed in connection therewith.  Good cause appearing
therefor, it is

ORDERED, ADJUDGED, AND DECREED THAT:

1.  The Stipulation, including the definitions contained therein, is incorporated in and made part of this Judgment,

2.  The Court has jurisdiction over the subject matter of the Class Actions and over all parties to them, including all members of the Class, which consists of all persons or entities who purchased Open Environment Corporation ("OEC") common stock from April 13, 1995 to October 10, 1996, inclusive (the "Class"). Excluded from the Class are the defendants herein, members of the immediate families of each of the Individual Defendants, parents, subsidiaries and affiliates of OEC (including Borland International, Inc., now known as Inprise Corporation), any entity i  which any defendant has a controlling interest, the past and present officers and directors of OEC and Inprise and the legal representatives, heirs, successors, predecessors in interest or assigns of any of those individuals. Also excluded from the class are those persons or entities who timely requested exclusion from the Class pursuant to the procedure set forth in the Preliminary Approval Order, whose names are listed on Exhibit A hereto.  The Court is a proper and convenient venue for the consideration, approval, and administration of the Settlement provided for in the Stipulation.

3.  Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, the Stipulation and the Settlement are approved in their entirety.

2

4.    The Court finds that the Settlement is, in all respects, fair, just, reasonable, equitable, and adequate to the Class.

5.    Based upon the submissions of counsel for the Class Plaintiffs, this Court finds that the dissemination of the Notice of Pendency and Proposed Settlement of Class Actions (the "Notice") as previously authorized by the Court fairly and adequately informed the Class of all material elements of this litigation and the proposed Settlement, and constituted the best notice practicable, and was valid, due and sufficient notice and complied with Rule 23 of the Federal Rules of Civil Procedure, the Private Securities Litigation Reform Act of 1995 and due process.

6.    The Class Action is dismissed against all of the 'endants on the merits, with prejudice, and without costs.

7.    The Settled Class Claims that each and every Named Plaintiff and each and every member of the Class directly or indirectly had, has or may have in the future against each and every Defendant are deemed fully, finally, and forever remised, released and discharged.  The term "Settled Class Claims" shall mean any and all claims, rights, or causes of action, whether known or unknown, whether accrued or unaccrued, and whether arising under any state or federal statutory or common law that have been or that could have been asserted by the plaintiffs or any members of the Class in any of the complaints, either directly or representatively against any and all Defendants that are related directly or indirectly to the subject matter of the litigation (except for mpliance with the Settlement).

3

8.    Each and every Named Plaintiff and each and every member
of the Class is hereby permanently enjoined and barred forever from
asserting or prosecuting, either directly or indirectly, any and
all of the Settled Class Claims that he or she had, have or may
have in the future against any and all Defendants.

9.    The Stipulation, this Order and Final Judgment, and the
fact of settlement are not an admission by Defendants of any
liability or wrongdoing whatsoever, nor is the Order and Final
Judgment a finding of the validity or invalidity of any claims in
the litigation or of any claims in the Class Actions or any
wrongdoing by anyone.    Neither the Stipulation, this Order and
Final Judgment, nor the fact of settlement shall be used or
c   trued as an admission of any fault, liability or wrongdoing by
any person.    Neither the Stipulation, the fact of settlement or the
settlement proceedings, the settlement negotiations, the mediation
proceedings, the Order and Final Judgment, nor any related document
shall be offered or received in evidence as an admission,
concession, presumption or inference against any party in any
proceeding other such proceedings as may be necessary to consummate
or enforce the Stipulation and the Settlement.

10.    This Court hereby awards counsel for the Named Plaintiffs
and the Class attorneys' fees in the aggregate amount of
$2,000,000 to be paid from the Settlement Fund established by
the Stipulation, for services performed by counsel in achieving the
Settlement and obtaining the Settlement Fund.

4

11.  This Court hereby orders reimbursement to counsel for Named Plaintiffs and the Class for expenses incurred, including expert fees, in the aggregate amount of $_80,263.26_ to be paid from the Settlement Fund.

12.  The above award of attorneys' fees and expenses shall bear interest at the rate actually earned on the Settlement Fund from the date of the establishment of the Settlement Fund to the date of the payment from the Settlement Fund.

13.  The amounts specified in paragraphs 10, 11, and 12 shall be delivered to Shapiro Haber & Urmy LLP, Lead Counsel, on behalf of all counsel for Named Plaintiffs and the Class and Shapiro Haber & Urmy LLP, Lead Counsel, shall allocate the fees awarded among all ınsel for Named Plaintiffs and the Class as it shall deem fair and equitable.

14.  Without affecting the finality of this Judgment, the Court hereby reserves and retains continuing jurisdiction to order the performance and administration of the Settlement, including, but not limited to, the processing of claims, and the distribution of settlement funds in accordance in accordance with the Settlement and all further approvals with respect thereto.

15.  The Court hereby determines that there is no just reason for delay and directs that this judgment be entered by the Clerk forthwith pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.  The direction of the entry of Final Judgment pursuant to Rule 54(b) is appropriate and proper because this Judgment fully

5

and finally adjudicates all remaining claims of Named Plaintiffs and the members of the Class in these Class Actions.

16.  The Named Plaintiffs and Defendants are hereby directed to execute and implement all the terms and provisions of the Stipulation and Settlement.

Dated:  *June 24* , 1999

*Edward F. Harrington*
Edward F. Harrington
United States District Judge



6



# CHIYODA LIFE ASSET MANAGEMENT
## OF AMERICA INC.

SWISS BANK TOWER
10 EAST 50TH STREET
25TH FLOOR
NEW YORK, NEW YORK 10022
TEL. (212) 838-2800

June 7, 1999

Open Environment Corporation
Settlement Administrator
c/o David Berdon & Co. LLP
P.O. Box 3218
Grand Central Station
New York, NY 10163

Re:     Zeid v Open Environment et
        al., Civil Action No. 96-12466- EFH

Dear Whomever It May Concern:

We would like to request exclusion to claims regarding the purposed settlement of litigation for common stock Open Enviornment Corporation (OEC) during the class period from April 13, 1995 through October, 10, 1996. Below please find information pertaining to our request.

Chiyoda Life Asset Management of America, Inc.
UBS Tower
10 East 50th Street, 25th Floor
New York, NY 10022
Tele: (212) 838-2800

## PURCHASED

| Account Name | Account # | Trade Date | Price Per Share | # Of Shares |
|---|---|---|---|---|
| Account C | 140141805 | 04/13/95 | 15.000 | 4,000 |

## SOLD

| Account Name | Account # | Trade Date | Price Per Share | # Of Shares |
|---|---|---|---|---|
| Account C | 140141805 | 04/13/95 | 21.95 | 4,000 |

Best regards,

Shinichi Sone
President

**C-8**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: VMARK SOFTWARE, INC. SECURITIES LITIGATION ) ) ) | Civil Action No. 95-12249-EFH |
| THIS DOCUMENT RELATES TO: ALL ACTIONS ) ) ) | |

<u>ORDER AND FINAL JUDGMENT</u>

A hearing having been held before this Court on the _2<u>4</u>_ day of

November, 1998, to determine, <u>inter alia</u>:  (1)  whether the terms and conditions of the

Stipulation and Agreement of Settlement, dated October 1, 1998 (the "Stipulation") are

fair, reasonable and adequate for the settlement of all claims asserted by the Class against

the Defendants in the complaint now pending in this Court in this Action, including the

release of the Defendants and the Released Persons and should be approved;  and (2)

whether judgment should be entered dismissing the Complaint on the merits and with

prejudice in favor of the Defendants and as against all persons or entities who are

members of the certified Class herein who have not requested exclusion therefrom.  The

Court having considered all matters submitted to it at the hearing and otherwise;  and it

appearing that a notice of the hearing substantially in the form approved by the Court was

mailed to all persons or entities reasonably identifiable, who purchased common stock of

VMark ("VMark") during the period from July 11, 1995 through October 10, 1995,

inclusive, as shown by the records of VMark's transfer agent, at the respective addresses

set forth in such records, and that a summary notice of the hearing substantially in the

form approved by the Court was published in the national edition of the Wall Street

<u>Journal</u> pursuant to the specifications of the Court; and all capitalized terms used herein having the meanings as set forth and defined in the Stipulation.

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1. The Stipulation is approved as fair, reasonable and adequate, and in the best interests of the Class, and the Class Members and the Parties are directed to consummate the Stipulation in accordance with its terms and provisions.

2. The forms and methods used for notifying the Class of the pendency and proposed settlement of this action provided the best notice practicable under the circumstances and fully met the requirements of Rule 23 of the Federal Rules of Civil Procedure and of due process. Such notification constituted due and sufficient notice to all persons and entities entitled to notice of the pendency of the action as a class action and of the terms of the Settlement.

3. The Complaint is hereby dismissed with prejudice and without costs, except as provided in the Stipulation, as against each and every one of the Defendants, their past or present subsidiaries, parents, affiliates, successors, predecessors, and insurers, and each of their present or former officers, directors, shareholders, employees, attorneys, advisors, underwriters, investment bankers, and accountants, and any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, heirs, estates, successors in interest, or assigns of the Defendants.

4. Members of the Class (except as to members of the Class identified in Exhibit 1 annexed hereto, each of whom have validly and timely filed

2

requests for exclusion from the Class and who may bring individual claims only) and the successors and assigns of any of them, are hereby permanently barred and enjoined from instituting, commencing or prosecuting, either directly or in any other capacity, any Settled Claims against any of the Released Persons. The Settled Claims are hereby compromised, settled, released, discharged and dismissed as against the Released Persons on the merits and with prejudice by virtue of the proceedings herein and this Order and Final Judgment. This release of Settled Claims includes the release of Unknown Claims. As of the Effective Date all Class members shall conclusively be deemed to have acknowledged that the Settled Claims include Unknown Claims.

5.    Neither the Stipulation, nor any of its terms and provisions, nor any of the negotiations or proceedings connected with it, nor any of the documents or statements referred to therein shall be:

(a)    offered or received against the Defendants as evidence of or construed as or deemed to be evidence of any presumption, concession, or admission by any of the Defendants of the truth of any fact alleged by Plaintiff or the validity of any claim that had been or could have been asserted in the Action or in any litigation, or the deficiency of any defense that has been or could have been asserted in the Action or in any litigation, or of any liability, negligence, fault, or wrongdoing of Defendants;

(b)    offered or received against the Defendants as evidence of a presumption, concession or admission of any fault, misrepresentation or omission with respect to any statement or written document approved or made by any Defendant, or against the Plaintiffs and the Class as evidence of any infirmity in the claims of Plaintiffs and the Class;

3

(c)    offered or received against the Defendants as evidence of a presumption, concession or admission of any liability, negligence, fault or wrongdoing, or in any way referred to for any other reason as against any of the parties to this Stipulation, in any other civil, criminal or administrative action or proceeding, other than such proceedings as may be necessary to effectuate the provisions of this Stipulation; provided, however, that if this Stipulation is approved by the Court, Defendants may refer to it to effectuate the liability protection granted them hereunder; or

(d)    construed against the Defendants or the Plaintiffs and the Class as an admission or concession that the consideration to be given hereunder represents the amount which could be or would have been recovered after trial.

6.    Without affecting the finality of this Order and Final Judgment in any way, exclusive jurisdiction is hereby retained over the Parties and the Class Members for all matters relating to this litigation, including the administration, interpretation, effectuation or enforcement of the Stipulation and this Order and Final Judgment, including without limitation, the injunction set forth in paragraph 4 above and to implement the distribution of the Net Settlement Fund to the Class. The procedures to distribute the Net Settlement Fund and the Plan of Allocation are hereby approved. Any appeal of the approval or lack of approval of any plan of allocation, fees, costs or incentive award, shall not prevent this Settlement from becoming effective.

7.    Without further order of the Court, the Parties may agree to reasonable extensions of time to carry out any of the provisions of the Stipulation.

8.    This Court hereby awards attorneys' fees of _33⅓_ percent of the Settlement Fund. Any and all allocations of attorneys' fees among the attorneys

representing the Class shall be made by Plaintiffs' Counsel, who shall apportion the fees based upon their assessment, in their sole discretion, of the respective contributions to the litigation made by other counsel representing the Class.

9.    This Court hereby awards counsel representing the Class reimbursement of expenses incurred, including expert fees, in the aggregate amount of $ _108,825.14_ to be paid from the Settlement Fund.

10.    The award of attorneys' fees shall bear interest at the rate actually earned on the Settlement Fund.

11.    This Court hereby awards an incentive payment of $ _1500.00_ to the Class Representative as an award for undertaking representation of the Plaintiff Class, and assistance provided to Plaintiffs' Counsel in the course of the litigation, to be paid from the Settlement Fund.

12.    The provisions of this Order constitute a full and complete adjudication of the matters considered and adjudged herein, and the Court determines that there is no just reason for delay and directs, pursuant to Fed. R. Civ. P. 54(b), this Final Judgment to be entered with respect to all matters ordered, judged and decreed.

Dated: _Nov. 24_____, 1998

_Edward F. Harrington_
EDWARD F. HARRINGTON
UNITED STATES DISTRICT JUDGE

VMark/Settle/FinOrd

**C-9**

*settlement*

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
****************************
                           *
IN RE:  ZOLL MEDICAL CORP  *
SECURITIES LITIGATION      *        CIVIL ACTION NO. 94-11579-NG
                           *
                           *
****************************
```

## ORDER OF FINAL APPROVAL AND
## FINAL JUDGMENT AND ORDER OF DISMISSAL

This matter having come before the Court for approval of a settlement of this action, and

the Court, having considered all papers filed in connection therewith, and good cause appearing

therefore, it is this  5  day of  Oct. , 1998,

### ORDERED, ADJUDGED, AND DECREED THAT:

1.      Unless otherwise defined herein, all terms that are capitalized herein shall have

the meanings ascribed to those terms in the Stipulation of Compromise and Settlement, dated

~~May~~ June 10, 1998 (the " Stipulation").  The term "Class" shall mean and consist of: All persons and

entities who purchased the common stock of Zoll Medical Corp. during the period beginning on

October 21, 1993 through and including July 19, 1994. Excluded from the class are the

Defendants, members of Zoll's Board of Directors, their immediate families, and any subsidiary,

affiliate, or controlling or controlled person of any such persons or entities.

2.      This Court has jurisdiction over the subject matter of this action and over all

parties to this action, including all members of the Class, and hereby determines that due and

proper notice of the proposed settlement of this action has been given to the members of the

Class pursuant to Rule 23 of the Federal Rules of Civil Procedure and due process.



3.     Based upon the evidence submitted by Class Counsel, this Court finds that the dissemination of the Notice of Class Action Determination, Proposed Settlement and Hearing Thereon, and Right to Share in Settlement Proceeds (the "Notice") as previously authorized by the Court constitutes the best notice practicable, and due and sufficient notice to those entitled to such notice.

4.     This Court hereby approves the settlement of the Class Action set forth in the Stipulation, and finds the settlement embodied therein (the "Settlement") is, in all respects, fair, reasonable, and adequate to and in the best interests of the Class Representative Plaintiffs and the other members of the Class, especially in light of the complexity, expense and probable duration of further litigation, the discovery conducted to date, the risks of establishing liability and damages, and the reasonableness of the consideration to be given in the proposed Settlement considering the range of possible recovery and the attendant risks of litigation, and the Court further directs the parties thereto to consummate the terms and provisions of the Stipulation.

5.     With the exception of all those persons who have filed proper and timely requests for exclusion from the Class pursuant to the Notice previously disseminated in this litigation (those persons being identified in Exhibit A annexed hereto), this Court hereby dismisses on the merits and without costs to any party the Consolidated Amended Class Action Complaint herein, as it pertains to any and all claims of whatever kind made or that could have been made in the Class Action, including, without limitation the Class Claims, as against the following defendants (the "Defendants"): Zoll Medical Corp., Rolf S. Stutz and Duane M. DeSisto. This Court specifically finds that all Class Members, except those identified in Exhibit A, are bound by the Settlement.

6.    As used herein, the term "Class Claims" shall mean any and all claims of or by the Plaintiff Class (a) that were asserted, or that could have been asserted, against Defendants in the civil action entitled In re: Zoll Medical Corp. Securities Litigation, U.S.D.C., D. Mass. C.A. No. 94-11579-NG (the "Action") or in any other action or proceeding or otherwise by the Class (as defined above), or any member or representative of the Class, (b) for alleged violations of federal or state statutory or common law, or any other law, and for damages, interest, attorneys' fees, expert or consulting fees, and any other costs or expenses, including, without limitation, any and all claim(s), and (c) arising from or relating to the purchase or sale of Zoll common stock during the Class Period.

7.    Upon the Effective Date of the Settlement, as defined in the Stipulation, the Class Representatives and all Class Members who have not properly excluded themselves from the Class, on behalf of themselves and their respective heirs, executors, administrators, successors and assigns, and any and all persons they represent, in their individual capacities, their capacities as purchasers, holders or sellers of Class Securities, and any and all corporate, representative or other capacities, for good and sufficient consideration, shall be barred and enjoined from bringing, and shall conclusively be deemed to have released and forever discharged as by an instrument under seal, with respect to the Class Claims, each and every one of the Defendants, their respective past, present and future partners, limited partners, principals, shareholders, officers, directors, joint venturers, investors, underwriters, auditors (including, without limitation, Ernst & Young, LLP), insurers, employees, agents, attorneys and representatives, and their respective heirs, executors, administrators, predecessors, successors, parents, subsidiaries, divisions, affiliates or assigns.

8.      Those persons identified in Exhibit A hereto shall be excluded from the Class and from any benefits under the Settlement and (a) said persons may not pursue any remedies on behalf of those who are bound by the final judgment herein against the Defendants in the Class Action or in connection with or relating in any way to the Class Claims compromised in the Settlement and (b) they shall not commence, maintain, or participate in any class or representative action relating in any way to the Class Claims compromised in the Settlement.

9.      The Stipulation, this Order and Final Judgment, and the fact of settlement shall not in any way be construed as an admission or be deemed to be evidence of any liability or wrongdoing of any Defendant, nor is the Order and Final Judgment a finding of the validity or invalidity of any claims in the litigation or of any claims in the Class Action or of any wrongdoing by any of the Defendants named therein. Neither the Stipulation, the fact of settlement or the settlement proceedings, the settlement negotiations, the Order and Final Judgment, nor any related document shall be offered or received in evidence as an admission, concession, presumption or inference against any party in any proceeding other than such proceedings as may be necessary to consummate or enforce the Stipulation and the Settlement.

10.     This Court hereby awards Class Counsel attorneys' fees of $500,000 ——. Any and all allocations of attorneys' fees among the attorneys representing Class Plaintiffs shall be made by Liaison Counsel for the Class, who shall apportion the fees based upon their assessment, in their sole discretion, of the respective contributions to the litigation made by counsel.

11.     This Court hereby awards Class Counsel reimbursement of expenses incurred, including expert fees, excluding costs of notice and administration, in the aggregate amount of $ 246,696.65 to be paid from the Settlement Funds. This Court hereby awards Plaintiffs

-4-

_Mallozzi and Vita_ compensation in the amount of _2100_ and _1900_, respectively, for their time devoted to this litigation, to be paid from the settlement funds.

12.    The award of attorneys' fees and expenses shall include interest at the rate actually earned on the Zoll Medical Class Action Settlement Fund.

13.    Without affecting the finality of this judgment, the Court hereby reserves and retains continuing jurisdiction to order the performance of the Settlement, including, but not limited to, the approval or rejection of claims, and the distribution of the Settlement Funds in accordance with the Settlement and the Court's further order.  The provisions of this Order constitute a full and complete adjudication of the matters considered and adjudged herein, and the Court determines that there is no just reason for delay and directs, pursuant to Fed. R. Civ. P. 54(b), this Final Judgment to be entered with respect to all matters ordered, judged and decreed.

Dated this _5_ day of _October_, 1998 at Boston, Massachusetts.

Nancy Gertner
United States District Judge

# C-10

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CAROL S. MORTON, et al.,          )
                                  )
                    Plaintiffs,)      C. A. No. 94-10829-REK
                                  )
          -against-               )
                                  )
KURZWEIL APPLIED INTELLIGENCE, )
INC., et al.,                     )
                    Defendants.)

## SEPARATE FINAL ORDER AND JUDGMENT

The above-entitled action (the "Class Action") was previously certified by this Court for settlement purposes as a class action on behalf of all persons who purchased common stock of Kurzweil during the period from August 17, 1993 through April 28, 1994, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are the Defendants, any affiliates, officers or directors of any entity defendants, and any members of the immediate families of the individual defendants. The defendants in this action are as follows: Kurzweil Applied Intelligence, Inc. Raymond C. Kurzweil, Bernard F. Bradstreet, Robertson, Stephens & Company, L.P. and Needham & Company, Inc. (on behalf of themselves and all other members of the underwriting syndicate for Kurzweil's initial public offering), and Coopers & Lybrand (collectively, excluding Coopers & Lybrand, the "Settling Defendants").

Pursuant to a Stipulation And Agreement of Partial Settlement (the "Stipulation") dated February 8, 1995, as amended, the Plaintiffs acting on behalf of themselves and the Class, entered into a settlement (the "Settlement") with the Settling Defendants.

On March 3, 1995, an Order Certifying Class Action For Settlement Purposes And Directing Notice, Settlement Hearing and Administration was entered by this Court certifying the Class for the purposes of the Settlement, directing that notice be given to the Class of the class certification and the proposed Settlement and of a hearing to determine whether the proposed Stipulation and Settlement should be approved as fair, adequate and reasonable, to determine fees, costs and expense reimbursements of Class Counsel, to consider the issuance of a settlement bar order, and to hear any objections to any of these matters.  Such a hearing was held, as noticed, on April 26, 1995.  Prior to the hearing, proof of the mailing and publication of the notice, as directed in said Order, was presented and filed.  Members of the Class were notified of their rights to appear at the hearing in opposition to the proposed certification, settlement, award of fees, reimbursement of expenses and the other matters before the Court.

The Court having heard from Class Counsel on behalf of the Class, and from counsel on behalf of the Settling Defendants, and having reviewed all of the submissions presented with respect to the proposed certification and Settlement, and the Court having determined that the class certification is proper and that the Settlement is fair, adequate and reasonable, and having considered the petition of Class Counsel for the award of fees, costs and expenses reimbursement and the affidavits and exhibits submitted in support thereof, it is hereby

ORDERED, ADJUDGED AND DECREED THAT:

2

1.    The Court has jurisdiction over the subject matter of these class actions and over all parties to them, including all members of the Class. This Court is a proper and convenient venue for the consideration, approval and administration of the Settlement provided for in the Stipulation.

2.    Based on the evidence submitted by counsel for the Class plaintiffs, this Court finds that the dissemination of the Notice Of Pendency Of Class Action, Proposed Partial Settlement Thereof, Settlement Hearing, Right To Share In Settlement Fund, And Attorneys' Fee Application (the "Notice") as previously authorized by this Court fairly and adequately informed the members of the Class of all material elements of this litigation and the proposed Settlement, and constituted the best notice practicable, and was valid, due and sufficient notice to those entitled to such notice and complied with Rule 23(e) of the Federal Rules of Civil Procedure and due process.

3.    The proposed Settlement (as provided for by the Stipulation and Exhibits thereto), including the respective contributions and releases, is in all respects fair, just, reasonable, equitable, adequate and proper, and in the best interests of the Class, and the Stipulation, Exhibits and the Settlement are approved in their entirety.

4.    The issuance of the Stock to persons identified in the Stipulation and Exhibits in accordance with Section 3(a)(10) of the Securities Act of 1933, is in all respects fair, just, reasonable, equitable, adequate and proper, and in the best interests of the Class, and approved by the Court.

3

5.    Plaintiffs and Settling Defendants shall consummate the Settlement in accordance with the Stipulation, which is approved in all respects and all terms of which are hereby incorporated by reference.

6.    The Stipulation, this Separate Final Order and Judgment and the fact of the settlement are not an admission by any Settling Defendant of any liability or wrongdoing whatsoever, nor is this Separate Final Order and Judgment a finding of the validity or invalidity of any claims in the litigation or of any claims in the class actions or of any wrongdoing by any Settling Defendant named therein.  Neither the Stipulation, this Separate Final Order And Judgment, nor the fact of settlement shall be used or construed as an admission of any fault, liability or wrongdoing by any person. Neither the Stipulation, the fact of settlement or the settlement proceedings, the settlement negotiations, the Separate Final Order and Judgment, nor any related document shall be offered or received in evidence as an admission, concession, presumption or inference against any party in any proceeding other than such proceedings as may be necessary to consummate or enforce the Stipulation and the Settlement.

7.    Those persons appearing on the list annexed hereto as Exhibit A have made a valid Request for Exclusion from the Class, are excluded from the Class, and shall not participate in the proceeds of the Settlement hereby approved nor receive any benefit thereunder.

8.    Each and every Class member, and their heirs, assigns, executors and successors in interest (other than those persons appearing on Exhibit A annexed hereto who have requested

4

exclusion from the Class), are permanently barred and enjoined from asserting claims against Settling Defendants herein, including their past, present or future officers, directors, partners, limited partners, representatives, principals, attorneys, agents and employees, and their heirs, executors, administrators, predecessor, successors, parents, subsidiaries, divisions, affiliates, and assigns, in connection with or arising out of or relating in any way to the transactions, matters or occurrences, representations or omissions, or other subject matters set forth, involved, alleged, embraced or otherwise referred to or which could have been embraced or otherwise referred to in the Action or the Complaint (the "Settled Claims"), and each Settling Defendant is permanently barred and enjoined from asserting against any other Settling Defendant any and all manner of claims, actions, suits or causes of action whatsoever which relate in any way to the Settled Claims. Nothing herein shall be deemed to release or settle any claims of the class or Kurzweil as against Kurzweil's independent accountants and auditors, Coopers & Lybrand.

9.    The above-captioned litigation and all claims asserted herein are dismissed as against the Settling Defendants with prejudice and on the merits and without costs (except as provided in the Stipulation), and all Settled Claims are hereby extinguished against all the Settling Defendants.

10.    Class Counsel are hereby awarded attorneys' fees in the amount of 30% of the number of shares of common stock of Kurzweil to be issued to the Class, $75,000 in cash, and reimbursement of expenses of $80,572 to be paid from the Cash

5

Settlement Fund as provided in the Stipulation, together with interest on the cash portion from the date hereof to the date of payment at the same rate as earned by the Cash Settlement Fund.

11. Without affecting the finality of this judgment, jurisdiction is hereby retained as to all matters related to administration and consummation of the Settlement hereby approved.

12. The Court hereby determines that there is no just reason for delay and directs that this judgment be entered by the Clerk of the Court forthwith pursuant to Rule 54(b) of the Federal Rules of Civil Procedure. The direction of the entry of final judgment pursuant to Rule 54(b) is appropriate and proper because this judgment fully and finally adjudicates the claims of the class plaintiffs and the members of the Class against the Settling Defendants in these actions; it allows consummation of the Settlement between the Class plaintiffs and the Settling Defendants, and it will expedite the distribution to the members of the Class of the proceeds of the Settlement.

SO ORDERED

Dated:    Boston, Massachusetts
          April 2<sub>6</sub> , 1995

_Robert E Keeton_<br>UNITED STATES DISTRICT JUDGE

6

## Exhibit A

William Jerry Caffey
4708 Abbott #205
Dallas, TX   75205
SSN: 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
Purchased 1500 shares
Sold 0 shares
Held 1500 shares on 4/28/94

Bernard E. Klein
761-6 Coco Plum Circle
Plantation, FL   33324
SSN: 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
Purchased 400 shares on 9/1/93
Sold 399 shares on 12/7/93
Held 1 share on 4/28/94
(Mr. Klein purchased 400 shares
and sold 399 of those shares
before the end of the class
period at a profit of $1,889.)

Barry Lam
1116 North Louis Street, Apt. 8
Glendale, CA   91207
SSN: 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
Purchased 200 shares
Sold 200 shares

# C-11

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BRUCE FRIEDBERG, ANTON PAPARELLA, SANDRA ESNER, GEOFFREY L. SHERWOOD and JERRY KRIM on behalf of themselves and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> DISCREET LOGIC INC., RICHARD J. SZALWINSKI, DAVID N. MACRAE, GARY G. TREGASKIS, DOUGLAS R. JOHNSON, THOMAS CANTWELL, DAVID FOSTER, TERRENCE HIGGINS, 9002-1585 QUEBEC INC., NEARCO TRUSTEE CO. (JERSEY) LTD. RE: GARY TREGASKIS SETTLEMENT, ROBERTSON, STEPHENS & CO., VOLPE, WELTY & CO., PIPER JAFFRAY INC., JOHN T. ROSSI, CHARLES H. FINNIE, and HANY M. NADA, <br><br> Defendants. | Civil Action No. 96-11232-EFH |

## ORDER OF FINAL APPROVAL, SETTLEMENT FAIRNESS, FINAL JUDGMENT AND ORDER OF DISMISSAL

This matter having come before the Court for approval of a settlement of the above-entitled action, as amended pursuant to this Court's October __2__, 1997 Order of Preliminary Approval of Settlement and the filing of the Second Amended Class Action Complaint (the "Action"), and the Court, having considered all papers filed in connection therewith, and good cause appearing therefor, it is

this __25__ day of _November_, 1997,

EXHIBIT B

**ORDERED, ADJUDGED, AND DECREED THAT:**

1.    Unless otherwise defined herein, all terms that are capitalized herein shall have the meanings ascribed to those terms in the Stipulation Of Compromise And Settlement, dated ___2___, 1997 (the "Settlement" or "Stipulation").  The term "Class" shall mean and consist of:  all persons and entities who purchased common stock of Discreet Logic Inc. ("Discreet") during the period September 13, 1995 through May 1, 1996, inclusive. This period shall be known hereinafter as the "Class Period." Excluded from the Class are Discreet, Richard J. Szalwinski, David N. MacRae, Gary G. Tregaskis, Douglas R. Johnson, Thomas Cantwell, David Foster, Terrence Higgins, 9002-1585 Quebec Inc., Nearco Trustee Co. (Jersey) Ltd. Re:  Gary Tregaskis Settlement, Robertson, Stephens & Co., Volpe, Welty & Co., Piper Jaffray Inc., John T. Rossi, Charles H. Finnie, Hany M. Nada (collectively the "Defendants"), Discreet's officers, directors and affiliates and each of their assignees, trustees and members of their immediate families.  Also excluded from the Plaintiff Class are any persons who submit valid and timely requests for exclusion from the Plaintiff Class.

2.    This Court has jurisdiction over the subject matter of this Action and over all parties to this Action, including all members of the Class, and hereby determines that due and proper notice of the proposed Settlement has been given to the members of the Class pursuant to Rule 23 of the Federal Rules of Civil

EXHIBIT B

- 2 -

Procedure, section 21D of the Exchange Act, 15 U.S.C. §78u-4(a)(7), due process, and any other applicable law.

3. Based upon the evidence submitted by Lead Counsel, this Court finds that the dissemination of the Notice of Class Action Determination, Proposed Settlement and Hearing Thereon, and Right to Share in Settlement Proceeds (the "Notice") as previously authorized by the Court, constituted the best notice practicable, and was due and sufficient notice to those entitled to such notice.

4. This Court hereby approves the Settlement and finds the Settlement is, in all respects fair, reasonable, and adequate, and in the best interest of the Class, especially in light of the complexity, expense and probable duration of further litigation, the discovery conducted to date, the risks of establishing liability and damages, and the reasonableness of the consideration to be given in the proposed Settlement considering the range of possible recovery and the attendant risks of litigation, and the Court further directs the parties thereto to consummate the terms and provisions of the Settlement.

5. With the exception of all those persons who have filed proper and timely requests for exclusion from the Class pursuant to the Notice previously disseminated in this Action (those persons being identified in Exhibit A annexed hereto), this Court hereby dismisses the Second Amended Complaint and all claims of any kind that were made, could have been made, or could in the

EXHIBIT B

- 3 -

future be made, in this Action, including the Class Claims, on the merits, with prejudice, and in full and final discharge of any and all Class Claims against the Defendants and the Released Parties, and without costs (except as provided in the Stipulation) to be binding on the Class Representatives and all Class Members. This Court specifically finds that all Class Members, except those identified in Exhibit A, are bound by the Settlement and this Order.

6.    As used herein, the term "Class Claims" shall mean any and all claims, debts, demands, actions, causes of action, specialties, covenants, contracts, variances, damages, rights, suits, sums, accounts, reckonings, presentments, extents and any other liabilities whatsoever, both at law and in equity, whether known or unknown, accrued or unaccrued, liquidated or contingent, or matured or unmatured (including any "Unknown Claims" as defined in the Stipulation), of or by the Class, or any member or representative of the Class, whether class, derivative or individual in nature, that were asserted, could have been asserted, could in the future be asserted, or are related to claims that were, could have been, or could in the future be asserted, in the Action or in any other action or proceeding or otherwise (including, without limitation any claims for alleged violations of federal or state statutory or common law, or any other law, and for damages, interest, attorneys' fees, expert or consulting fees, and any other costs, expenses or liability

EXHIBIT B

- 4 -

whatsoever) arising from or relating to (a) the purchase, sale, distribution or other transfer of Discreet Securities during the Class Period, and (b) the facts, transactions, events, occurrences, disclosures, statements, acts or omissions or failures to act by Discreet or any other Defendant which were, could have been or could in the future be asserted in the Action or in any other action or proceeding or otherwise.

7. Upon the Effective Date, as defined in the Stipulation, the Class Representatives and all Class Members who have not properly excluded themselves from the Class, on behalf of themselves and their respective heirs, executors, administrators, successors and assigns, and any and all persons they represent, in their individual capacities, their capacities as purchasers, holders or sellers of Discreet common stock, and any and all corporate, representative or other capacities, for and in consideration of the Settlement and other good and sufficient consideration, shall be barred and enjoined from bringing, and shall conclusively be deemed to have released and forever discharged as by an instrument under seal, with respect to the Class Claims, Discreet; Richard J. Szalwinski; David N. MacRae; Gary G. Tregaskis; Douglas R. Johnson; Thomas Cantwell; David Foster; Terrence Higgins; 9002-1585 Quebec Inc.; Nearco Trustee Co. (Jersey) Ltd. Re:  Gary Tregaskis Settlement; Robertson, Stephens & Co.; Volpe, Welty & Co.; Piper Jaffray Inc.; John T. Rossi; Charles H. Finnie; Hany M. Nada; Discreet's directors and

EXHIBIT B

officers insurance carriers; each of their respective past, present or future officers, directors, employees, predecessors, successors, acquirors, parents, subsidiaries, divisions, affiliates, partners, joint venturers, investors, underwriters, auditors, accounting firms, attorneys, agents, insurers, reinsurers or other representatives; and their respective heirs, executors, administrators, predecessors, successors and/or assigns; and any of them (the "Released Parties").  The Class Representatives and all Class Members who have not properly excluded themselves from the Class shall further, as of the Effective Date, conclusively be deemed to have waived the rights afforded by California Civil Code Section 1542 and any similar statute or law, or principle of common law, of California or any other jurisdiction.

8.    Those persons, if any, identified in Exhibit A hereto shall be excluded from the Class and from any benefits under the Settlement and (a) said persons may not pursue any claims or remedies on behalf of those who are bound by this Order of Final Approval, Settlement Fairness, Final Judgment and Order of Dismissal (the "Judgment"), against the Defendants or the other Released Parties, or in connection with or relating in any way to the Class Claims compromised in the Settlement and (b) they shall not commence, maintain, or participate in any class, derivative or representative action relating in any way to the Class Claims compromised in the Settlement, to the extent permitted by law.

EXHIBIT B

- 6 -

9.    Neither the Settlement, nor this Judgment, nor the fact of settlement shall in any way be construed as an admission or be deemed to be evidence of any liability or wrongdoing of any Defendant or any other person or entity, nor is the Judgment a finding of the validity or invalidity of any claims or defenses in the Action, or of any wrongdoing by any of the Defendants named therein.    Neither the Settlement, this Judgment, nor the fact of settlement shall be used or construed as an admission of any fault, liability or wrongdoing by any person or entity. Neither the Settlement, the fact of settlement or the settlement proceedings, the settlement negotiations, the Judgment, nor any related document shall be offered or received in evidence as an admission, concession, presumption or inference against any person or entity in any proceeding other than such proceedings as may be necessary to consummate or enforce the Settlement.

10.    The Court hereby approves the Plan of Allocation as fair, reasonable and equitable.

11.    This Court hereby awards attorneys' fees in the amount of __30__ % of the Settlement Fund, including interest at the same net rate (after payment of any taxes) earned by the Settlement Fund, to all counsel for the Class Representatives. The Court further awards expenses (including experts' fees and expenses) in the amount of $285,702.45 to all counsel for the Class Representatives.    The foregoing awards of fees and expenses shall be paid out of, and shall not be in addition to, the

- 7 -

EXHIBIT B

Settlement Fund at the time and in the manner provided in the Stipulation, and shall be turned over to Class Counsel as provided in the Stipulation. Any and all allocations of attorneys' fees and expenses among the counsel for all Class Representatives shall be made by Co-Lead Counsel for the Class, who shall apportion the fees and expenses based upon their assessment, in their sole discretion, of the respective contributions to the litigation made by each counsel.

12. Without affecting the finality of this Judgment, the Court hereby reserves and retains continuing jurisdiction to order the performance of the Settlement, including, but not limited to, the approval or rejection of claims, and the distribution of the Settlement Fund in accordance with the Settlement and any further order. The provisions of this Judgment constitute a full and complete adjudication of the matters considered and adjudged herein, and the Court determines that there is no just reason for delay and directs, pursuant to Fed. R. Civ. P. 54(b), this Judgment to be entered as a final judgment with respect to all matters ordered, judged and decreed.

Dated this _25_ day of _November_, 1997, at Boston, Massachusetts.

_Edward F. Harrington_
Edward F. Harrington
United States District Judge

427nwd2523/13.401905-1



- 8 -

EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SALVATORE N. FULCO, et al.,          )
                    Plaintiffs,      )
                                     )
v.                                   )     CIVIL ACTION
                                     )     NO. 89-1342-WGY
CONTINENTAL CABLEVISION INC.,        )
                    Defendants.      )
                                     )

ORDER RE ATTORNEYS' FEES

YOUNG, D.J.

March 30, 1994

The Court awards as attorneys' fees one-third of the $5,000,000.00 pre-trial settlement offer ($1,666,666.66) plus one-quarter of the difference between the $5,000,000.00 pre-trial settlement offer and the $6,200,000.00 post-trial settlement ultimately reached ($300,000.00) for a total fee award of $1,966,666.66.

The Court reserves the right to supplement this order with a memorandum of decision should the press of business permit and the interests of justice warrant.

_William G. Young_
WILLIAM G. YOUNG
UNITED STATES DISTRICT JUDGE

# C-12

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOHN P. ABATO on Behalf of Himself and All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) ) | C.A. 94-11625-WGY |
| v. | ) ) | |
| MARCAM CORPORATION, Paul A. Margolis, David Elsbree and Stephen L. Lifshatz, | ) ) ) | |
| Defendants. | ) ) ) | |

### ORDER OF FINAL APPROVAL AND
### FINAL JUDGMENT AND ORDER OF DISMISSAL
### CONCERNING MARCAM DEFENDANTS

This matter having come before the Court for approval of a settlement of this action, and the Court, having considered all papers filed in connection therewith, and good cause appearing therefore, it is this 29th day of July, 1996, HEREBY

**ORDERED, ADJUDGED, AND DECREED THAT**:

1.  Unless otherwise defined herein, all capitalized terms in this Order shall have the meanings ascribed to those terms in the Marcam Stipulation of Compromise and Settlement, dated May 20, 1996 (the "Marcam Stipulation"). The term "Plaintiff Class" shall mean and consist of:

> All persons and entities who purchased Marcam Corporation common stock during the period from October 23, 1991 through October 7, 1993 inclusive (the "Class Period"). Excluded from the Plaintiff Class are Peat Marwick, Howard Reisman, Amalia Reisman, Galite Reisman, Kenneth Reisman, Talia Reisman, and Amgata Holdings Ltd. (collectively, the "Reismans"), Marcam, and any affiliate of these persons or entities, any present or former officers, directors, partners, principals, or employees of Peat Marwick, the Reismans, Marcam and affiliated entities, and the members of the immediate family of any such persons, and the legal representatives, heirs, successors-in-interest or assigns of any such excluded persons or entities. Also excluded from the Plaintiff Class are any persons who submit valid and timely requests for exclusion from the Plaintiff Class.

-1-



2.  This Court has jurisdiction over the subject matter of this action and over all parties to this action, including all members of the Plaintiff Class, and hereby determines that due and proper notice of the proposed settlement of this action has been given to the members of the Plaintiff Class pursuant to Rule 23 of the Federal Rules of Civil Procedure and due process.

3.  Based upon the evidence submitted by Class Counsel, this Court finds that the dissemination of the Notice of Class Action Determination, Proposed Settlements and Hearing on Settlements, and Right to Share in Settlement Proceeds (the "Notice") as previously authorized by the Court constitutes the best notice practicable, and due and sufficient notice to those entitled to such notice.

4.  This Court hereby approves the settlement of the Class Action as set forth in the Marcam Stipulation, and finds the settlement embodied therein (the "Marcam Settlement") is, in all respects, fair, reasonable, and adequate to and in the best interests of the Plaintiff and the Plaintiff Class, especially in light of the complexity, expense and probable duration of further litigation, the discovery conducted to date, the risks of establishing liability and damages, the reasonableness of the consideration being given and the range of possible recoveries, and the Court further directs the parties to consummate the Marcam Settlement in accordance with the terms and provisions of the Marcam Stipulation.

5.  With the exception of all those persons who have filed proper and timely requests for exclusion from the Plaintiff Class pursuant to the Notice previously disseminated in this litigation (those persons being identified in Exhibit A annexed hereto), this Court hereby dismisses on the merits, with prejudice and without costs to any party, the Class Action against the Marcam Defendants, namely Marcam Corporation, Paul A. Margolis, David Cairns and Stephen J. Lifshatz. All Class Members, except those identified in Exhibit A, are bound by the Marcam Settlement.

6.  As used herein, the term "Settled Claims" shall mean any and all claims, allegations, liabilities, demands, rights, actions and causes of action (collectively "claims") of whatever nature, character or description, whether class, direct, representative, derivative or

individual in nature, known or unknown, foreseen or unforeseen, concealed or hidden, accrued or unaccrued that were asserted, or that could have been asserted, or that are related to claims that were or could have been asserted in any action or proceeding in this or any other court or forum or in the Class Action or otherwise by the Plaintiff Class or by any member or representative of the Plaintiff Class, for alleged violations of federal or state statutory or common law, or any other law, and for damages, interest, attorneys' fees, expert or consulting fees, and any other costs or expenses, (i) arising from or relating in any way to the purchase or sale of Marcam common stock during the Class Period; or (ii) arising from or relating in any way to Marcam's financial statements, and the restatement thereof, for its fiscal years 1991 through 1993, including all quarters therein, and the first and second quarters of fiscal 1994, and the auditing thereof; *except that* the term shall not include any claims that Plaintiff and the Plaintiff Class have against their brokers or against Marcam's independent auditors, Peat Marwick; and *except that* the term shall not include any claims for violation of the Marcam Stipulation (including all exhibits) and the Marcam Settlement.

7.  Upon the Effective Date of the Marcam Settlement, as defined in Paragraph 10 of the Marcam Stipulation, the Plaintiff and all members of the Plaintiff Class who have not properly excluded themselves, on behalf of themselves, their agents, heirs, executors, administrators, successors and assigns, and any and all persons they represent, in their individual capacity, their capacity as purchasers, holders or sellers of Marcam securities, and any and all corporate, representative, or other capacities, for and in consideration of the Settlement and other good and sufficient consideration, shall be barred and forever enjoined from filing suit with respect to or prosecuting any and all Settled Claims against the Marcam Defendants, namely Marcam Corporation, Paul A. Margolis, David Cairns and Stephen J. Lifshatz, their respective past, present or future officers, directors, partners, limited partners, joint venturers, investors, underwriters, attorneys, agents, insurers, representatives and employees, and their respective heirs, executors, administrators, predecessors, successors, parents, subsidiaries, divisions, affiliates and assigns; *except that* nothing herein shall bar or enjoin the filing or prosecution of

any claims that Plaintiff and the Plaintiff Class have against their brokers or against Marcam's

independent auditors, Peat Marwick; and *except that* nothing herein shall bar or enjoin the filing

or prosecution of claims for violation of the Marcam Stipulation (including all exhibits) and the

Marcam Settlement.

8. Those persons identified in Exhibit A hereto are excluded from the Plaintiff Class and

(a) shall not be entitled to any benefits under the Marcam Settlement; (b) may hereafter pursue

only their own remedies, if any, against the Marcam Defendants

9. Peat Marwick, as that term is defined in the Marcam Stipulation, and any other

person or entity not Peat Marwick that Plaintiff or any member of the Plaintiff Class has sued or

may sue (collectively, the "Barred Defendants") in connection with any and all claims that were

asserted, or that could have been asserted, or that are related to claims that were or could have

been asserted in any action or proceeding or in the Class Action or otherwise by the Plaintiff

Class, or by any member or representative of the Plaintiff Class, for alleged violations of federal

or state statutory or common law, or any other law, and for damages, interest, attorneys' fees,

expert or consulting fees, and any other costs or expenses: (i) arising from or relating to the

purchase or sale of Marcam common stock during the Class Period; or (ii) arising from or

relating to Marcam's financial statements, and the restatement thereof, for its fiscal years 1991

through 1993 (including all quarters therein) and the first and second quarters of fiscal 1994, and

the auditing thereof (collectively, "the Direct Claims"), are hereby barred, enjoined and

precluded from asserting any claim, howsoever denominated, against the Marcam Defendants, or

any of their predecessors, successors or assigns, or any of their past, present, or future partners,

investors, underwriters, principals, directors, insurers, employees, agents, attorneys, or

representatives of any of them, jointly or severally, seeking or in the nature of contribution,

indemnification, or reimbursement for <u>inter alia</u>, any judgment, settlement, payment,

disbursement, cost, fee or expense of any type entered or incurred in connection with the prosecution, defense or settlement of the Class Action, Civil Action No. 94-11625-WGY, or any other claims made, or lawsuit filed by or on behalf of the Plaintiff or any member of the Plaintiff Class alleging any of the Direct Claims, provided however that claims, if any, other than claims asserted for or in the nature of contribution, indemnification or reimbursement for the Direct Claims shall not be barred, enjoined, or precluded as a result of this paragraph.

10. In the event that the Plaintiff or any member of the Plaintiff Class herein recovers a judgment against any Barred Defendant in any action or proceeding alleging any of the Direct Claims, then: (a) that judgment shall be set off and reduced by the comparative fault method, i.e., the judgment shall be set off and reduced by the percentage of the losses of Plaintiff or the Plaintiff Class, if any, for which the factfinder in that action or proceeding determines that the Marcam Defendants, or any of their predecessors, successors or assigns, or any of the present or former partners, principals, shareholders, officers, directors, insurers, employees, agents, attorneys or representatives of any of them (but not including the Barred Defendant), would have been responsible had they not settled with Plaintiff and members of the Plaintiff Class; and (2) the Barred Defendant shall be released by the Plaintiff and the Plaintiff Class from that portion of the judgment that is reduced or set off pursuant to this Bar Order.

11. The Marcam Stipulation, this Order and Final Judgment, and the fact of settlement shall not in any way be construed as an admission or be deemed to be evidence of any liability or wrongdoing whatsoever by any Marcam Defendant, nor is the Order and Final Judgment a finding of the validity or invalidity of any claims in the litigation or of any claims in the Class Action or of any wrongdoing by any of the Marcam Defendants named therein. Neither the Marcam Stipulation, this Order and Final Judgment, nor the fact of settlement shall be used or construed as an admission of any fault, liability, wrongdoing or injury to the Plaintiff Class by the Marcam Defendants or any other person. Neither the Marcam Stipulation, the fact of settlement or the settlement proceedings, the settlement negotiations, the Order and Final

Judgment, nor any related document shall be offered in evidence as an admission, concession, presumption or inference against any party in any proceeding other than in such proceedings as may be necessary to consummate or enforce the Marcam Stipulation and the Marcam Settlement.

12. This Court hereby awards Class Counsel attorneys' fees in the aggregate amount of $1,725,000 to be paid from the Marcam Settlement Fund.

13. This Court hereby awards Class Counsel expenses incurred, including expert fees, in the aggregate amount of $161,697.74 to be paid from the Marcam Settlement Fund.

14. The award of attorneys' fees shall bear interest at the rate actually earned on the Marcam Settlement Fund.

15. The Court hereby awards an incentive payment of $5,000 to the Class Representative as an award for undertaking representation of the Plaintiff Class, and assistance provided to Class Counsel in the course of the litigation, to be paid from the Marcam Settlement Fund.

16. Without affecting the finality of this judgment, the Court hereby reserves and retains continuing jurisdiction to order the performance of the Marcam Settlement, including, but not limited to, the approval or rejection of claims, and the distribution of the Marcam Settlement Fund in accordance with the Marcam Settlement and the Court's further orders. Any appeal of the approval or lack of approval of any plan of allocation, fees, costs or incentive awards, shall not prevent this Settlement from becoming effective. The provisions of this Order constitute a full and complete adjudication of the matters considered and adjudged herein, and, the Court determines that there is no just reason for delay and directs, pursuant to Fed. R. Civ. P. 54(b), this Final Judgment to be entered with respect to all matters ordered, judged and decreed.

Dated:  July 29, 1996

WILLIAM G. YOUNG
UNITED STATES DISTRICT JUDGE

marcam\s\finorma

**EXHIBIT A**

**NO CLASS MEMBER HAS REQUESTED EXCLUSION**

# C-13

DISTRICT OF MASS.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

FILED IN OPEN COURT

DATE × _4/4/96_

_Carrie Thomas_

Deputy Clerk

_____
                                  )
                                  )
IN RE: CAMBRIDGE BIOTECH CORP.    )     CIVIL ACTION
SECURITIES LITIGATION             )     NO. 93-12486-REK
                                  )
                                  )
_____)

## FINAL ORDER AND JUDGMENT

This matter came before the Court upon a motion for
final approval of the terms of (i) the Agreement of Partial
Settlement ("Agreement 1") between the Plaintiffs in the
above-captioned action and Patrick J. Leonard, Peter P.
Hartman and Keith D. Jones (the "Individual Defendants") and
(ii) the Stipulation and Agreement of Settlement ("Agreement
2") between the Plaintiffs and Cambridge Biotech Corporation
("Cambridge Biotech") (together, the "Agreements"). Terms
defined in the Agreements are used herein with the same
meanings unless defined differently herein. The Court
having held a hearing on the proposed Settlement as embodied
in the Agreements (the "Settlement"), and having considered
the papers submitted in support of the Settlement and all
prior proceedings herein,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1.    This Court has jurisdiction over the subject
matter of this Action and over all parties to this Action,
including but not limited to, all members of the Settlement
Class, Cambridge Biotech, and the Individual Defendants.

36

2.    A Settlement Class is hereby certified, consisting
of all those persons who purchased the common stock of
Cambridge Biotech during the period from February 28, 1992
to and including May 9, 1994 (the "Settlement Class Period")
and were damaged thereby.  For purposes of the Settlement,
the following plaintiffs are certified as Class
Representatives: Steve and Candice Flig, Theodore J. Rogus,
Philip Cochran, Edward and Elizabeth McDaid, Jacob B.
Turner, Randy Ruffrano, Cynthia L. Zucaro, Brandon Harris,
Athanasios Cheliotis, Bert Vladimir, Eli Kramer, Joseph
Amrheim, Shelby Gordon, Roger A. Kimber, Alvin Levine, Felix
Obeski, Joseph B. Malanik, Florence Malanik, Robert J.
Vitkus, Bernard Leibowitz, Tzvi Shafer, and Sheila Schrank.
The Settlement Class and Class Representatives are certified
only with respect to the Settlement with Cambridge Biotech
and the Individual Defendants.  Excluded from the Class are
the Individual Defendants, the members of their immediate
families, Cambridge Biotech, Deloitte & Touche, parents,
subsidiaries, affiliates, successors, and assigns of
Cambridge Biotech or Deloitte & Touche, and their respective
officers and directors.  Also excluded from the Settlement
Class are those persons identified on Exhibit A hereto who
filed timely and valid requests for exclusion.

3.    In accordance with the Agreements and Order of the
Court, Plaintiffs caused to be mailed to the Settlement
Class members a Notice of Class Action Determination And

2

Hearing On Settlement (the "Notice") and caused to be published once in the national edition of <u>The Wall Street Journal</u> a summary notice (the "Summary Notice") of the pendency of the Settlement of this Consolidated Action and of the opportunity to object to the Settlement. An affidavit of mailing of the Notice and publication of the Summary Notice was duly filed with the Court.

4.    The Notice and the Summary Notice constitute the best notice practicable under the circumstances. The Affidavit of Mailing and Publication filed with this Court demonstrates that this Court's Orders with respect to the Notice and Summary Notice have been complied with and that the best notice practicable under the circumstances was in fact given and constituted valid, due and sufficient notice to all persons entitled thereto, fully and accurately informing all such persons of all material elements of the claims and the Settlement and complying fully with Rule 23 of the Federal Rules of Civil Procedure, due process and any other applicable law.

5.    The Agreements and Settlement are not admissions of wrongdoing by Cambridge Biotech or the Individual Defendants, nor is this Judgment a finding of the validity of any claims in this Consolidated Action or of any wrongdoing by any person. The Agreements, including the exhibits thereto, shall not be offered or received in evidence in any action or proceeding against Cambridge

3

Biotech or the Individual Defendants, in any court, administrative agency, or other tribunal for any purpose whatsoever other than to enforce the provisions of this Judgment, the Agreements, or the provisions of any related agreements or releases; except that the Agreements and the exhibits thereto may be filed in this Consolidated Action or related actions as evidence of the Settlement.

6.    The Agreements and Settlement are approved as entered into in good faith and as fair, reasonable and adequate to the Settlement Class within the meaning of Federal Rule of Civil Procedure 23 and are in the best interests of the Settlement Class.  The parties to the Agreements are hereby directed to consummate the Agreements in accordance with their terms and provisions.

7.    This Consolidated Action is dismissed with prejudice as to Cambridge Biotech, the Individual Defendants, and all other present and former directors and officers of Cambridge Biotech, without costs to any party as against any other.

8.    All Settlement Class Members who have not timely and validly requested exclusion are forever enjoined and barred from commencing or prosecuting, either directly, representatively, or in any other capacity, a class action or any other action, claim, or counterclaim against Cambridge Biotech, the Individual Defendants, or other present and former directors and officers of Cambridge

4

Biotech with respect to, based on, arising from, or for any
and all Class Claims or claims released in the Proof of
Claim and Release forms and the Agreements (the Released
Claims).

9.    On the later to occur of the Settlement Effective
Dates defined in Agreement 1 and defined in Agreement 2,
each Settlement Class Member who has not timely and validly
requested exclusion shall be deemed conclusively to have,
and by operation of this Judgment shall have, fully,
finally, and forever released, relinquished, and discharged
all the Released Claims against Cambridge Biotech, the
Individual Defendants, and all other present or former
officers and directors of Cambridge Biotech.

10.    Plaintiffs' Counsel shall maintain the Settlement
Fund (as defined in Agreement 1) in an interest-bearing
escrow account.   The Escrow Agents, Plaintiffs' Counsel, and
the Settlement Administrator shall have no liability to any
Class member with respect to any aspect of the
administration of this Settlement, including but not limited
to the processing of Proofs of Claim and the distribution of
the Settlement Fund to Class members.   Similarly, the Escrow
Agents shall not be liable for any action or inaction in
carrying out their role as Escrow Agents, except for their
own gross negligence or misconduct.

11.    The Court reserves jurisdiction, without affecting
the finality of this Judgment, over: (a) implementation of

the Settlement and any award, distribution or other
disposition of the Combined Settlement Fund; (b) enforcing
and administering this Judgment, (c) enforcing and
administering the Agreements, including any releases
executed or deemed to have been executed in connection
therewith; and (d) other matters related or ancillary to the
foregoing.

12. The Court hereby awards to Plaintiffs' counsel as
attorneys' fees 30% of the Cash Settlement Fund established
pursuant to Agreement 1, plus interest at the rate earned on
the Cash Settlement Fund, and 30% of the shares of common
stock to be paid to the Settlement Class pursuant to
Agreement 2. The Court awards to Plaintiffs' counsel for
reimbursement of costs and expenses the cash sum of
$61,080.16, to be paid out of the Cash Settlement Fund,
after the later to occur of the Effective Dates defined in
Agreement 1 and Agreement 2. The allocation among counsel
for the plaintiffs of the amounts awarded as attorneys' fees
shall be in the sole discretion of the Executive Committee
of Plaintiffs' Counsel, based on each counsel's relative
contribution to the case.

13. The Court hereby determines that there is no just
reason for delay and directs that this judgment be entered
by the clerk forthwith pursuant to Federal Rule of Civil
Procedure 54(b). The direction of the entry of final
judgment pursuant to Rule 54(b) is appropriate and proper

6

because this judgment fully and finally adjudicates the claims of the Plaintiffs and the Settlement Class against Cambridge Biotech and the Individual Defendants in this Consolidated Action, it allows consummation of the Settlement, and it will expedite the distribution of the Settlement proceeds to the Settlement Class Members.

Dated:    Boston, Massachusetts
          April 4th , 1996

                              _Robert E Keeton_
                              Robert E. Keeton,
                              United States District Judge

7

## EXHIBIT A

| Name | Number of Shares Purchased During Class Period |
|---|---|
| Wayne V. Anderson<br>P.O. Box 1796<br>Kingsland, TX 78639 | 2,000 |
| Banque Pour Industries Francaise USA<br>Account No. BSLH7576002<br>c/o Mellon Trust/The Boston Co.<br>Three Mellon Bank Center, Rm. 3631<br>Pittsburgh, Pennsylvania 15259 | 100 |
| Grant H. Burlingame<br>23 Parker Avenue<br>Holden, Massachusetts 01520 | 900 |
| Frank A. Dobson<br>53 Lepes Road<br>Somerset, Massachusetts 02726 | 1,000 |
| Florence A. Dunn and<br>Howard P. Dunn<br>50 Northeast Village Road<br>Concord, New Hampshire 03301 | 200 |
| June C. O'Brien<br>38 Palisade Avenue<br>Emerson, New Jersey 07630 | 800 |
| Louise R. Reynders<br>P.O. Box 30271<br>Sea Island, Georgia 31561 | 800 |
| Tim White<br>34 Goldgate Cres.<br>Orangeville, Ontario<br>Canada L9W 4B5 | 808 |
| TOTAL | 6,608 |

**C-14**

*Case Settlement plead*

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
                                    )
IN RE:  COPLEY PHARMACEUTICAL,      )
INC. SECURITIES LITIGATION          )     C.A. NO.  94-11897 (WGY)
                                    )
                                    )
                                    )
THIS DOCUMENT RELATES TO:           )
ALL ACTIONS                         )
                                    )
                                    )
```

## ORDER OF FINAL APPROVAL AND
## FINAL JUDGMENT AND ORDER OF DISMISSAL

This matter having come before the Court for approval of a
settlement of the above-entitled consolidated action (the
"Action"), and the Court, having considered all papers filed in
connection therewith, and good cause appearing therefor, it is
this 8th day of February, 1996,

### ORDERED, ADJUDGED, AND DECREED THAT:

1.    Unless otherwise defined herein, all terms that are
capitalized herein shall have the meanings ascribed to those
terms in the Stipulation of Compromise and Settlement, dated
November 17, 1995 (the "Settlement" or "Stipulation").  The term
"Class" shall mean and consist of: all persons and entities who
purchased common stock of Copley Pharmaceutical, Inc. ("Copley")
in the public market, pursuant to public offerings, or otherwise
during the period October 15, 1992 through December 6, 1994,
inclusive.  This period shall be known hereinafter as the "Class
Period."  Excluded from the Class are Copley, Jane C.I. Hirsh,
Anthony A. Bonelli, Steven N. Tannenbaum, Mark Hirsh, Theodore



Iorio, Bernard Grubstein (collectively, the "Defendants"), their assignees, trustees and members of their immediate families, Hoechst Celanese Corporation ("Hoechst"), and the officers, directors, affiliates, successors and assigns of Copley and Hoechst.

2.    This Court has jurisdiction over the subject matter of this Action and over all parties to this Action, including all members of the Class, and hereby determines that due and proper notice of the proposed Settlement has been given to the members of the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure and due process.

3.    Based upon the affidavits submitted by the Claims Administrator, this Court finds that the dissemination of the Notice of Class Action Determination, Proposed Settlement and Hearing Thereon, and Right to Share in Settlement Proceeds (the "Notice") as previously authorized by the Court, constitutes the best notice practicable, and due and sufficient notice to those entitled to such notice.

4.    This Court hereby approves the Settlement and finds the Settlement is, in all respects, fair, reasonable, and adequate, and in the best interest of the Class, especially in light of the complexity, expense and probable duration of further litigation, the discovery conducted to date, the risks of establishing liability and damages, and the reasonableness of the consideration to be given in the proposed Settlement considering the range of possible recovery and the attendant risks of

2

litigation, and the Court further directs the parties thereto to consummate the terms and provisions of the Settlement.

5.    With the exception of all those persons who have filed proper and timely requests for exclusion from the Class pursuant to the Notice previously disseminated in this Action (those persons being identified in Exhibit A annexed hereto), this Court hereby dismisses the Second Consolidated Amended Complaint and all claims of any kind that were made, could have been made, or could in the future be made, in the future be made, in the Class Action, or any other action or proceeding, against the Defendants, on the merits, with prejudice, and in full and final discharge of any and all Class Claims against the Defendants, and without costs (except as provided in the Stipulation) to be binding on the Class Representatives and all Class Members.  This Court specifically finds that all Class Members, except those identified in Exhibit A, are bound by the Settlement and this Order.

6.    As used herein, the term "Class Claims" shall mean any and all claims, debts, demands, actions, causes of action, damages, rights, suits, sums, and any other liabilities whatsoever, both at law and in equity, whether known or unknown, accrued or unaccrued, liquidated or contingent, or matured or unmatured, of or by the Class, or any member or representative of the Class, whether class, derivative or individual in nature, that were asserted, could have been asserted, could in the future be asserted, or are related to claims that were, could have been,

3

or could in the future be asserted, in the Action or in any other action or proceeding or otherwise, including, without limitation, any claims for alleged violations of federal or state statutory or common law, or any other law, and for damages, interest, attorneys' fees, expert or consulting fees, and any other costs, expenses or liability whatsoever, including, without limitation, any and all claims: (a) arising from or relating to the purchase or sale of Copley common stock during the Class Period in the public market, pursuant to public offerings, or otherwise, or (b) arising from or relating to Copley's or any other Defendant's statements or alleged omissions to make statements during the Class Period, including, without limitation, in filings with the Securities and Exchange Commission.

7.    Upon the Effective Date, as defined in the Stipulation, the Class Representatives and all Class Members who have not properly excluded themselves from the Class, on behalf of themselves and their respective heirs, executors, administrators, successors and assigns, and any and all persons they represent, in their individual capacities, their capacities as purchasers, holders or sellers of Copley common stock, and any and all corporate, representative or other capacities, for and in consideration of the Settlement and other good and sufficient consideration, shall be barred and enjoined from bringing, and shall conclusively be deemed to have released and forever discharged as by an instrument under seal, with respect to the Class Claims, the Defendants; Hoechst (including, without

4

limitation, the following Hoechst-affiliated entities: HCCP
Acquisition Corp., Hoechst Aktiengesellschaft, Hoechst
Corporation, Hoechst Celanese Insurance Company, Hoechst Marion
Roussel, Inc., Hoechst Roussel Pharmaceuticals Inc., Hoechst
Versicherungs-Aktiengesellschaft, and Roussel Uclaf, S.A.);
Copley's and Hoechst's directors and officers insurance carriers;
their respective past, present or future officers, directors,
employees, parents, subsidiaries, divisions, affiliates,
partners, joint venturers, investors, underwriters, auditors,
accounting firms, attorneys, agents, insurers, or
representatives; and their respective heirs, executors,
administrators, predecessors, successors and/or assigns, and any
of them (the "Released Parties").

8.    Those persons identified in Exhibit A hereto shall be
excluded from the Class and from any benefits under the
Settlement and (a) said persons may not pursue any claims or
remedies on behalf of those who are bound by this Order of Final
Approval and Final Judgment and Order of Dismissal (the
"Judgment"), against the Defendants or the other Released
Parties, or in connection with or relating in any way to the
Class Claims compromised in the Settlement and (b) they shall not
commence, maintain, or participate in any class, derivative, or
representative action relating in any way to the Class Claims
compromised in the Settlement.

9.    The Settlement, this Judgment, and the fact of
settlement shall not in any way be construed as an admission or

5

be deemed to be evidence of any liability or wrongdoing of any
Defendant or any other person or entity, nor is the Judgment a
finding of the validity or invalidity of any claims or defenses
in the Action, or of any wrongdoing by any of the Defendants
named therein.  Neither the Settlement, this Judgment, nor the
fact of settlement shall be used or construed as an admission of
any fault, liability or wrongdoing by any person or entity.
Neither the Settlement, the fact of settlement or the settlement
proceedings, the settlement negotiations, the Judgment, nor any
related document shall be offered or received in evidence as an
admission, concession, presumption or inference against any
person or entity in any proceeding other than such proceedings as
may be necessary to consummate or enforce the Settlement.

        10.   The Court hereby approves the Plan of Allocation as
fair, reasonable and equitable.

        11.   This Court hereby awards attorneys' fees in the amount
of 33⅓% of the Settlement Fund to all counsel for the Class
Representatives.  The Court further awards expenses (including
experts' fees and expenses) in the amount of $336,557 to all
counsel for the Class Representatives.  The foregoing awards of
fees and expenses shall be paid out of, and shall not be in
addition to, the Settlement Fund at the time and in the manner
provided in the Stipulation.  Any and all allocations of
attorneys' fees and expenses among the counsel for all Class
Representatives shall be made by Co-Lead Counsel for the Class,
who shall apportion the fees and expenses based upon their

                                    6

assessment, in their sole discretion, of the respective contributions to the litigation made by each counsel.

12. This Court hereby awards Compensatory Awards in the amount of $5,000 each to those Class Representatives whose depositions were taken in this Action and $2,000 to each of the remaining Class Representatives, which shall be paid out of, and shall not be in addition to, the Settlement Fund at the time and in the manner provided in the Settlement.

13. The awards of attorneys' fees and expenses shall bear interest, from the date of the entry of this Judgment until the fees and expenses are paid, at the rate earned by the Settlement Fund.

14. Without affecting the finality of this Judgment, the Court hereby reserves and retains continuing jurisdiction to order the performance of the Settlement, including, but not limited to, the approval or rejection of claims, and the distribution of the Settlement Fund in accordance with the Settlement and any further order. The provisions of this Judgment constitute a full and complete adjudication of the matters considered and adjudged herein, and the Court determines that there is no just reason for delay and directs, pursuant to

7

Fed. R. Civ. P. 54(b), this Judgment to be entered as a final judgment with respect to all matters ordered, judged and decreed. Dated this ___8th___ day of February, 1996, at Boston, Massachusetts.


_William G. Young_
William G. Young
United States District Judge

8